# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA

_____

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | No. C10 – 3074 – LRR |
|  | : |  |
| Respondent, | : | **CAPITAL 2255 PROCEEDINGS** |
|  | : |  |
| -v- | : | HON. LINDA R. READE |
|  | : | Chief U.S.D.J. |
| DUSTIN LEE HONKEN, | : |  |
|  | : |  |
| Petitioner. | : |  |

_____ :

### PETITIONER'S MEMORANDUM OF LAW AND SUPPLEMENTED MOTION PURSUANT TO 28 U.S.C. § 2255 AND APPENDIX

Leigh Skipper
Chief Federal Defender
By: Michael Wiseman
Chief, Capital Habeas Corpus Unit
Shawn Nolan
Supervising Assistant Federal Defender
Timothy Kane
Assistant Federal Defender
Federal Community Defender Office
Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520
Counsel for Petitioner, Dustin Lee Honken

Dated: Philadelphia, PA
June 6, 2011

# TABLE OF CONTENTS

PRELIMINARY STATEMENT AND SCOPE OF THESE SUBMISSIONS.. . . . . . . . . . . . . . x

ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

RESPONSE TO THE GOVERNMENT'S ANSWER REGARDING PROCEDURAL
MATTERS AND CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL. . . . . . . . . . . . 1

CLAIMS FOR RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**Claim One**
　　　Petitioner's Rights to Due Process, Trial by Jury, Confrontation,
Compulsory Process, and Against Cruel and Unusual Punishment Were
Violated When Trial Counsel Provided Ineffective Assistance by Failing
to Object to the Admission of the Court's Sentencing Findings in a Prior
Case; Appellate Counsel Likewise Provided Ineffective Assistance by
Failing to Raise and Litigate the Issue. . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**Claim Two**
　　　Petitioner's Rights to Effective Trial and Appellate Counsel, Due
Process, and Against Double Jeopardy and Cruel and Unusual
Punishment Were Violated When Trial Counsel Failed to Object to the
Admission of Evidence Related to Issues Previously Litigated and
Resolved in Petitioner's Favor in His 1998 Drug Conspiracy Sentencing
Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**Claim Three**
　　　The Government Violated Due Process When it Failed to Disclose
Exculpatory Evidence Relevant to Cooperating Witnesses. Trial
Counsel Ineffectively Failed to Discover this Evidence. Accordingly,
Petitioner's Convictions and Sentences Violated the Fifth, Sixth and
Eighth Amendments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

i

**Claim Four**

Petitioner's Convictions and Sentences Resulting from His Convictions for Violation of 21 U.S.C. § 848(c) (Continuing Criminal Enterprise) were Obtained in Violation of the Fifth, Sixth and Eighth Amendments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

**Claim Five**

Petitioner's Rights to Effective Assistance of Counsel, Due Process, and Against Double Jeopardy and Cruel and Unusual Punishment Were Violated When Trial Counsel Failed to Object to Multiplicitous Charges for Drug Conspiracy Murder and Continuing Criminal Conspiracy Murder, in Violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

**Claim Six**

Petitioner's Rights Under the Fifth, Sixth and Eighth Amendments Were Violated When Trial Counsel Ineffectively Failed to Object to the Admission of Hearsay Evidence Regarding the Quantity of Drugs Alleged in the Superceding Indictment; Appellate Counsel Ineffectively Failed to Raise and Litigate this Issue. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

**Claim Seven**

Petitioner's Rights to Due Process, to an Impartial Jury, to Effective Assistance of Counsel, and Against Cruel and Unusual Punishment Were Violated Where Trial Counsel Failed to Object to the Exclusion of Qualified Jurors from the Venire, Contrary to Witherspoon v. Illinois and its Progeny; Appellate Counsel Were Ineffective for Failing to Raise and Litigate this Issue; All in Violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution. . . . . . . . . . . . . . . . . . . . . . . 58

**Claim Eight**

The Systemic Exclusion And/or Under-Representation from the Jury Pool of African Americans, Latinos and Other Minority Groups Violated Petitioner's Rights under the Fifth, Sixth and Eighth Amendments. Counsel Ineffectively Failed to Litigate Challenges to this Unconstitutional System for Summoning Venire Persons. . . . . . . . . . . . . . 75

Case 3:10-cv-03074-LTS-KEM    Document 19    Filed 06/06/11    Page 3 of 192

**Claim Nine**

Petitioner Was Denied His Sixth Amendment Right to Effective Assistance of Counsel at His Capital Sentencing. . . . . . . . . . . . . . . . . . . . . . 81

**Claim Ten**

The Court's Penalty Phase Instructions Failed to Properly Narrow the Scope of the Jury's Consideration of Future Dangerousness and Failed to Guide the Jury's Weighing of Aggravating and Mitigating Circumstances; Counsel Were Ineffective for Failing to Object in Violation of Petitioner's Fifth, Sixth, and Eighth Amendment Rights. . . 105

**Claim Eleven**

Victim Impact Evidence Presented to the Jury Was Received in Violation of the Fifth, Sixth and Eighth Amendments. . . . . . . . . . . . . . . 112

**Claim Twelve**

The Government Violated Petitioner's Rights under the Eighth Amendment and the Due Process Clause by Presenting Inconsistent Arguments at His Trial and His Co-Defendant's Trial; Counsel Were Ineffective under the Sixth Amendment for Failing to Discover and Present Readily Available Evidence that Was Presented by the Government at his Co-Defendant's Trial. . . . . . . . . . . . . . . . . . . . . . . . . 119

**Claim Thirteen**

Trial Counsel's Stipulation to the Circumstances Regarding the Alleged Acquisition of Maps Allegedly Generated by Angela Johnson in Lieu of Testimony from Robert McNeese, Violated the Fifth and Sixth Amendments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

**Claim Fourteen**

The Government Violated the Fifth Amendment When it Repeatedly Elicited Inadmissible Testimony Regarding Petitioner's Alleged Involvement with Drugs and Violence That Was Too Remote to be Relevant. Trial and Appellate Counsel Ineffectively Failed to Object to or Litigate All of the Instances of Misconduct. . . . . . . . . . . . . . . . . . . . . . 133

iii

**Claim Fifteen**

    Petitioner Was Denied His Rights to Due Process, a Fair Trial and the Effective Assistance of Counsel Where the Jury Heard Inadmissible Evidence of Petitioner's Prior Bad Acts and the Trial Court Failed to Give the Jury a Cautionary Instruction Concerning That Evidence...... 139

**Claim Sixteen**

    Trial Counsel Ineffectively Failed to Present Abundant, Readily Available Evidence that Would Have Supported their Theory of Defense .................................................................. 148

**Claim Seventeen**

    Petitioner Was Deprived of His Fifth, Sixth and Eighth Amendment Rights to Trial by an Impartial Jury and Due Process When the Trial Court Dismissed a Juror During Penalty Phase Deliberations but Upheld the Guilt Phase Verdict. Trial and Appellate Counsel Ineffectively Litigated these Issues. ...................................... 156

**Claim Eighteen**

    The Security Measures Used by this Court During Trial Denied Petitioner His Rights to a Jury Trial, to the Presumption of Innocence, Due Process, the Effective Assistance of Counsel and to Be Free of Cruel and Unusual Punishment as Guaranteed by the Fifth, Sixth and Eighth Amendments. ...................................... 164

**Claim Nineteen**

    Counsel Were Ineffective under the Sixth Amendment for Failing to Properly Litigate the Government's Use of Pseudo-Scientific Forensic Expert Testimony; in the Alternative, New Evidence Establishes That Petitioner Was Convicted and Sentenced to Death on the Basis of Inaccurate and Unreliable Expert Testimony in Violation of the Eighth Amendment and the Due Process Clause.......................... 172

**Claim Twenty**

    Petitioner is Entitled to Relief Based Upon the Cumulative Impact of the Constitutional Violations Described in this Motion................... 175

Case 3:10-cv-03074-LTS-KEM    Document 19    Filed 06/06/11    Page 5 of 192

**Claim Twenty-One**
    The Manner in Which the Government Would Carry Out Petitioner's
    Execution Would Violate the Eighth Amendment. . . . . . . . . . . . . . . . . . . 177

**Conclusion**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 178

**APPENDIX**

## Table of Contents

1.  *United States v. Dustin Honken*, 3:96-cr-03004-MWB, Judgment (Feb. 25,
    1998) (Trial Exhibit 303)

2.  *United States v. Dustin Honken*, 3:96-cr-03004-MWB, Amended Judgment
    (Feb. 1, 2000) (Trial Exhibit 304)

3.  *United States v. Dustin Honken*, 3:96-cr-03004-MWB, Superseding Indictment
    (July 10, 1996)

4.  *United States v. Dustin Honken*, 3:96-cr-03004-MWB, Amended and Final
    Presentence Investigation Report (Dec. 4, 1997)

    **Transcripts**, *United States v. Dustin Honken*, 3:96-cr-03004-MWB:

5.  Transcript (June 2, 1997)

6.  Transcript (Dec. 15, 1997)

7.  Transcript (Dec. 16, 1997)

8.  Transcript (Feb. 17, 1998)

9.  Transcript (Feb. 18, 1998)

10. Transcript (Feb. 24, 1998)

11. Transcript (Jan. 25, 2000)

12.    Declaration of Terry Bregar (Dec. 1, 2010)

13.    Declaration of Anthony Johnson (Mar. 8, 2011)

14.    Terry Bregar - Bureau of Prisonss Medical Records

15.    United States Government Memorandum, Subject: Tokars, Fredric (June 8, 1999)

16.    Affidavit of John Hunter (Aug. 24, 2000)

17.    Affidavit of Joseph Dougherty (Aug. 23, 2003)

18.    Affidavit of Artie DuFur (Aug. 7, 2001)

19.    Affidavit of Jesse J. Mack (Aug. 29, 2000)

20.    Affidavit of Wayne A. Byerly (Mar. 28, 2001)

21.    Affidavit of Luis Lua (Aug. 30, 2000)

22.    Declaration of Melissa Friesenborg (Nov. 16, 2010)

23.    Declaration of Timothy Cutkomp (Dec. 1, 2010)

24.    Declaration of David Honken (Apr. 19, 2011)

25.    Declaration of Kathy Schuess (May 5, 2011)

26.    Declaration of Alyssa Nelson (May 26, 2011)

27.    Declaration of Jeffrey Honken (May 18, 2011)

28.    DCI Criminal Laboratory Report (Apr. 28, 1993)

29.    Juror Questionnaire for Venire Person 12

30.   Juror Questionnaire for Venire Person 24

31.   Juror Questionnaire for Venire Person 338

32.   Juror Questionnaire for Venire Person 538

33.   Juror Questionnaire for Venire Person 556

34.   Juror Questionnaire for Venire Person 574

35.   Juror Questionnaire for Venire Person 635

36.   Juror Questionnaire for Venire Person 668

37.   Juror Questionnaire for Venire Person 701

38.   Juror Questionnaire for Venire Person 809

39.   Juror Questionnaire for Venire Person 813

40.   Juror Questionnaire for Venire Person 916

41.   Juror Questionnaire for Venire Person 935

42.   Juror Questionnaire for Venire Person 945

43.   E-mail from Alfredo Parrish to Leon Spies (July 27, 2004)

44.   Declaration of Lisa Rickert (May 16, 2011)

45.   Declaration of John Warren, Ph.D. (June 3, 2011)

46.   Declaration of Michael M. Gelbort, M.D. (June 6, 2011)

47.   Declaration of Richard Dudley, Jr., M.D. (June 2, 2011)

48.   Report of Melissa Piasecki, M.D. (May 26, 2011)

49. *United States v. Johnson*, 3:01-cr-03046-MWB, Transcript Excerpts

50. Division of Criminal Investigation Report - Excavation Activity

51. Interview of Joann DeGeus - Report Exhibit 12-1 (July 11, 1997)

52. Division of Criminal Investigation Report - Report Exhibit 12-A

53. Mason City Police Report - Report Exhibit 12-B (Sept. 15, 1999)

54. Interview of Mike Billick (Dec. 15, 1993)

55. Interview of Brandy Wilson (Oct. 23, 2000)

56. Interview of Christi Gaubatz (Feb. 13, 1997)

57. Interview of Kristin Thompson (Jan. 31, 1994)

58. Interview of Cherryl Bachman (Feb. 22, 2000)

59. Interview of Sherri Kunkel (Feb. 15, 1994)

60. Interview of Sherri Kunkel (Apr. 10, 1997)

61. Interview of Holly Johnson (Feb. 17, 1997)

62. Interview of Arlyn Johnson (Feb. 14, 1997)

63. Interview of Mikell Olson (Feb. 24, 1997)

64. Interview of Richard Summers (May 12, 2000)

65. Interview of Christi Gaubatz (Feb. 16, 1997)

66. DEA Report of Investigation (Mar. 26, 1993)

67. Interview of Wendy Jensen (Feb. 19, 1994)

68.   Interview of Terry Kunkel (Apr. 9, 1997)

69.   Dustin Honken - Bureau of Prisonss Records - USP Marion and Florence

70.   Dustin Honken - Bureau of Prisonss Records - USP Terre Haute

71.   Dustin Honken - Britt Medical Center Records

72.   Declaration of Charles Rogers, Esq. (June 6, 2011)

73.   Declaration of Alfredo Parrish, Esq. (June 6, 2011)

74.   Declaration of Leon Spies, Esq. (June 6, 2011)

75.   Declaration of Marvea Smidt (May 26, 2011)

76.   Declaration of Laurel Christianson (Apr. 18, 2011)

77.   Declaration of Sandra Fiems (May 9, 2011)

78.   Declaration of Teri Fry (Oct. 20, 2010)

79.   Declaration of Carol Hilgenberg (Dec. 1, 2010)

80.   Declaration of Carol Honken (May 12, 2011)

81.   Declaration of Steve Honken (Apr. 19, 2011)

82.   Declaration of Alan Johnson (Nov. 4, 2010)

83.   Declaration of Mark Johnson (Sept. 9, 2009)

84.   Declaration of Ronald Nelson (Feb. 16, 2011)

85.   Declaration of Courtney Snater (Apr. 20, 2011)

On November 29, 2010, Petitioner filed a motion to extend deadlines with respect to his to-be-filed § 2255 Motion. *United States v. Honken*, 01 – CR – 3047, Dkt. # 796. In that motion, counsel explained that they planned to meet the one-year limitations period governing the filing of the § 2255 Motion. Counsel also explained that because of their entry into the litigation with over half the limitations period already having run (undersigned counsel relieved prior counsel about half way through the limitations period when prior counsel discovered a conflict of interest), counsel required additional time to investigate and, if needed, to amend or supplement the § 2255 Motion. Finally, counsel wished to have this additional time to provide the Court and the Government with a memorandum of law and documents in support of the claims that would be contained in the § 2255 Motion.

On November 30, 2010, Judge Bennett partially granted Petitioner's motion. *United States v. Honken*, CR – 01– 3047, Dkt. # 797. In that order, Petitioner was afforded until June 1, 2011, to make these various submissions. This Court extended the June 1 deadline to June 6, 2011.

Counsel filed a timely § 2255 Motion on December 14, 2010. *United States v. Honken*, No. 3:10– cv– 3074 (LRR), Dkt. # 1. Since that filing, counsel have been

x

diligently investigating and drafting supplements to the § 2255 Motion, and gathering supporting documents.

This submission contains Petitioner's legal arguments entitling him to relief on each of the grounds asserted in the December 14, 2010, § 2255 Motion. He does not seek to amend the § 2255 Motion by adding any new claims that were not included in the original Motion. However, Petitioner supplements the facts contained in the § 2255 Motion, and many of these facts are specifically discussed in the body of this *Memorandum*, while others are included as exhibits.

All exhibits are contained in the Appendix, and citations to the exhibits identify their location in the Appendix. References to sequentially numbered pages of the transcript of the trial proceedings in this case are cited as "Tr." followed by a page citation. Transcripts of other proceedings are cited either as "Tr." and are followed by the date of the proceeding and a page number, or as "Johnson Tr." followed by a page citation for co-defendant Johnson's trial transcripts.

The ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES (2003) are published at 31 Hofstra L.Rev. 913 (2003) and are available on-line: www.aba.org/advocacy/other_aba_initatives/ death_penalty_representation/resources/Guidelines.html (last visited June 5, 2011). They are herein referred to simply as the "ABA Guidelines."

All other citations are either self-explanatory or are explained.  All emphasis is provided unless otherwise noted.

Dustin Lee Honken will be referred to by name, or as Petitioner.  The United States will be referred to as the Government.

Case 3:10-cv-03074-LTS-KEM    Document 19    Filed 06/06/11    Page 13 of 192

# ARGUMENT

## RESPONSE TO THE GOVERNMENT'S ANSWER REGARDING PROCEDURAL MATTERS AND CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL

On January 5, 2011, the Government filed its *Answer to Petitioner's Motion Under 28 U.S.C. § 2255* (hereafter cited as *GR*, followed by a page number). Petitioner takes this opportunity to respond to some of the Government's general arguments with which he disagrees.

The Government asserts that "in a section 2255 collateral challenge, a petitioner, in order to gain relief under any claim, is obliged to show 'a good deal more' than would be sufficient on a direct appeal. . ." *GR*, 5. It goes on to argue only "fundamental defects" resulting in a "miscarriage of justice" are remediable. *Id.* This is incorrect. The bulk of Petitioner's claims are based on assertions that trial counsel were ineffective under the Sixth Amendment. Claims of ineffective assistance of counsel are governed by the familiar *Strickland v. Washington*, 466 U.S. 668 (1984) standard. Nowhere in *Strickland* or its progeny is there a requirement that a petitioner in a collateral proceeding must demonstrate a "fundamental miscarriage of justice."

Similarly, the Government contends that claims of ineffective assistance of counsel are governed by *Lockhart v. Fretwell*, 506 U.S. 364 (1993), and by *Strickland*. *GR*, 6. This is error. *Strickland* alone is the controlling law, and as the

1

Supreme Court has made clear, *Fretwell* is reserved for unusual circumstances, not implicated in Petitioner's case. *See Williams v. Taylor*, 539 U.S. 362 (2000) (finding state court that applied *Fretwell* instead of *Strickland* to have been unreasonable in its application of governing standard).

The Government also articulates the correct *Strickland* standard. *GR*, 7-8. However, it ignores how that standard is applied in claims affecting the penalty. In a capital case, prejudice is shown if counsel's deficient performance would have caused even one juror to vote for life. *Wiggins v. Smith*, 539 U.S. 510, 536 (2003) (*Strickland* prejudice established if even one juror is persuaded to vote for life imprisonment instead of death).

2

**CLAIMS FOR RELIEF**

**CLAIM ONE**

**PETITIONER'S RIGHTS TO DUE PROCESS, TRIAL BY JURY, CONFRONTATION, COMPULSORY PROCESS, AND AGAINST CRUEL AND UNUSUAL PUNISHMENT WERE VIOLATED WHEN TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE BY FAILING TO OBJECT TO THE ADMISSION OF THE COURT'S SENTENCING FINDINGS FROM A PRIOR CASE; APPELLATE COUNSEL LIKEWISE PROVIDED INEFFECTIVE ASSISTANCE BY FAILING TO RAISE AND LITIGATE THE ISSUE.**

**A.      Facts**

At trial, the Government published to the jury, presented testimony about, and made arguments based on exhibits containing the sentencing findings that the District Court made in case CR96-3004-001-MWB, a prior drug conspiracy prosecution of Mr. Honken. *See, e.g.*, Tr., 2189-90, 3285-86, 3288. These findings included that:

- Petitioner had an "Aggravated Role" in the drug conspiracy;

- Petitioner was initially sentenced to 24 years in prison and subsequently was re-sentenced to an increased term of 27 years in prison;

- Petitioner was sentenced additionally to a term of 5 years supervised release, during which he was prohibited from possessing a firearm;

- the severity of Petitioner's sentence was based on "the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, and to afford adequate deterrence to criminal conduct;" and

3

- Petitioner was "accountable for 2.87 kilograms of methamphetamine actual."

Gov. Trial Ex. 303 at 2-3, 7, Appendix 1, Gov. Trial Ex. 304, 2-3, 7, Appendix 2.

The District Court's sentencing findings were relevant to numerous factual issues at the guilt phase of trial, including whether Petitioner was an organizer, supervisor, or manager of five other persons in a continuing criminal enterprise, whether Petitioner had possessed and/or used a firearm, and whether the alleged drug conspiracy and continuing criminal enterprise involved more than 100 grams of actual methamphetamine. Further, all of the sentencing findings were directly relevant to the jury's decision whether to sentence Mr. Honken to life imprisonment or to death. For example, the court's finding of an "Aggravated Role," and its sentencing of Mr. Honken to more than a quarter-century in prison in light of the "seriousness of the offense," directly impacted the jury's appraisal of what sentence was appropriate for the instant crimes and indicated the court's tacit approval of a harsh sentence.

## B. Constitutional Violations

Under Supreme Court law at the time of trial, the Due Process Clause of the Fifth Amendment and the jury trial guarantee of the Sixth Amendment required the jury to assess all facts that constitute an element of a charged crime and/or may increase the punishment for a crime, and the jury's assessment of those facts required

4

the Government to prove them beyond a reasonable doubt.  *E.g., In re Winship*, 397 U.S. 358 (1970); *Apprendi v. New Jersey*, 530 U.S. 466 (2000); *United States v. Andrews*, 339 F.3d 754 (8th Cir. 2003)*; see also Old Chief v. United States*, 519 U.S. 172 (1997) (finding that the danger of unfair prejudice substantially outweighs the probative value of admitting the record of a prior judgment "where the name or nature of the prior offense raises the risk of a verdict tainted by improper considerations"). The District Court's "factual findings" presented to the jury as incontrovertible facts did not meet these constitutional imperatives.  As such, they were made without Petitioner's capital jury considering the facts and judgments that went into the court's prior findings.  Moreover, because these findings were made during the prior sentencing proceeding – at which the burden of proof was only by a preponderance of the evidence – the presentation of this evidence reduced the Government's burden of proving the above described facts beyond a reasonable doubt.  Thus, Petitioner's convictions and death sentences were premised on an unconstitutionally low burden of proof.

Further, when the Government presented and relied upon the District Court's factual findings, the court itself, in effect, became a witness against Petitioner, in violation of Petitioner's right to compel and confront witnesses against him.  *See Crawford v. Washington*, 541 U.S. 36 (2004); *Kirby v. United States*, 174 U.S. 47

5

(1899); *United States v. Riley*, 236 F.3d 982 (8th Cir. 2001).  Indeed, even in civil cases, courts rule that "judicial findings of fact in a court's order in a previous case are not admissible in another case." *E.g.*, *United States v. Jones*, 29 F.3d 1549, 1554 (11th Cir. 1994); *Nipper v. Snipes*, 7 F.3d 415, 418 (4th Cir 1993).  When such findings are introduced against a criminal defendant, this rule becomes one of constitutional necessity "in view of the almost certain collision with confrontation rights."  Fed. R. Evid. 803(8) adv. comm. notes; *accord United States v. DeSantis*, 134 F.3d 760, 770 (6th Cir. 1998) (finding prejudicial error where prosecutor introduced state court findings against criminal defendant).

Additionally, each of the above-enumerated errors undermined the heightened reliability that due process and the Eighth Amendment require in capital cases.  *E.g., Kyles v. Whitley*, 514 U.S. 419, 422 (1995); *Sumner v. Shuman*, 483 U.S. 66, 72 (1987).

### C.  Ineffective Assistance of Counsel

"[T]rial counsel in a death penalty case must be especially aware . . . of the heightened need to fully preserve all potential issues for later review."  ABA Guideline 10.8 (cmt) (internal quotation omitted).  In light of this duty, counsel's failure to raise a timely objection to a constitutional violation at trial constitutes ineffective assistance. *E.g., Kimmelman v. Morrison*, 477 U.S. 365 (1986) (counsel's

6

failure to file timely motion to suppress evidence was deficient); *Manning v. Bowersox*, 310 F.3d 571, 576-77 (8th Cir. 2002) (counsel's failure to object to admission of evidence was constitutionally deficient); *Burns v. Gammon*, 260 F.3d 892, 896-97 (8th Cir. 2001) ("No sound trial strategy could include failing to make a constitutional objection . . .").

Despite these well-established legal principles protecting Petitioner from the Government's use of the District Court's prior factual findings against Petitioner, trial counsel ineffectively failed to object on these grounds. *See* Tr., 2189. Counsel had no strategic or tactical reason for this failure. Decl. of Charles Rogers, Esq., Appendix 72, at ¶ 4; Decl. of Leon Spies, Esq., Appendix 74, at ¶ 4; Decl. of Alfredo Parrish, Esq., Appendix 73, at ¶ 4. Indeed, there was absolutely nothing for the defense to gain and much to lose from the admission of this evidence. *See Manning v. Bowersox*, 310 F.3d 571, 576-77 (8th Cir. 2002) ("Here, there can be no doubt that the performance of Manning's counsel was deficient . . . The lack of a contemporaneous objection at trial allowed the government to proffer Herrera's testimony unfettered, despite being constitutionally inadmissible.").

Trial counsel's deficient performance prejudiced Petitioner. At the guilt phase, trial counsel's failure caused prejudice by permitting the Government to present improper evidence as to numerous disputed issues, including Petitioner's role in the

7

offense, his possession and/or use of firearms, and the amount of methamphetamine involved in the drug operation, and to argue based on that improper evidence. *E.g.*, Tr. 3285-86 (Government guilt phase closing argument) ("Ladies and gentlemen, as to conspiracy to commit a drug crime, you have in evidence Exhibit 303 which is the judgment and sentence of conviction of two drug crimes, conspiracy to distribute methamphetamine and attempted manufacture of methamphetamine, February 1998, conspiracy involving at least 100 grams of pure methamphetamine."). Indeed, the **only** evidence the Government presented to establish the statutory amount of methamphetamine required for Counts 8 to 17 was (1) the improperly admitted sentencing findings from the prior drug case, *see id.*; and (2) the improperly admitted hearsay testimony concerning a Government laboratory report, *see* Claim 6, *infra*. Without one or both of these pieces of improper evidence, there is a reasonable probability that the jury would not have, and could not have, convicted Petitioner. *See Manning*, 310 F.3d at 577 ("counsel here allowed the jury to hear damaging, inadmissible testimony. . . . Because there is a substantial likelihood that absent this testimony the trial result would have been different, Manning has shown prejudice").

At penalty, trial counsel's failure prejudiced Petitioner in these same ways and encouraged the jury to reach a death sentence. Indeed, the improperly admitted evidence held the imprimatur – and literally the signature – of the same court that was

8

presiding over the trial, thus exacerbating the prejudice and undermining confidence in the jury's verdicts. *See Nipper*, 7 F.3d at 418 ("The same concerns about a jury's ability to refrain from placing great weight on a judge's findings apply equally in determining whether the error was harmless"); *id*. ("judicial findings of fact present a rare case where, by virtue of their having been made by a judge, they would likely be given undue weight by the jury, thus creating a serious danger of unfair prejudice.") (internal quotation omitted); *Greycas, Inc. v. Proud*, 826 F.2d 1560, 1567 (7th Cir. 1987) ("A practical reason for denying [a judgment's] evidentiary effect is . . . the difficulty of weighing a judgment, considered as evidence, against whatever contrary evidence a party to the current suit might want to present. The difficulty must be especially great for a jury, which is apt to give exaggerated weight to a judgment."); *see also Quercia v. United States*, 289 U.S. 466, 469 (1933) ("The influence of a trial judge on a jury is necessarily and properly of great weight and his lightest word or intimation is received with deference, and may prove controlling").

Appellate counsel's performance also was deficient. The admission of the District Court's sentencing findings was plain error and should have been raised as such. At the time of the direct appeal, it was standard practice that appellate counsel in capital cases should seek to litigate all issues, whether or not previously presented, that were arguably meritorious. ABA Guideline 10.15.1. Prevailing precedent

9

recognized that appellate counsel could be ineffective for failing to raise a meritorious claim, even where the claim would have been reviewed under the plain error standard. *Carter v. Bowersox*, 265 F.3d 705, 716-17 (8th Cir. 2001). There was not, and could not be, any tactical or strategic reason for counsel not to raise this meritorious claim. The error was plain, and would have resulted in the vacating of Petitioner's convictions and/or vacating of his death sentences.

### CLAIM TWO

**PETITIONER'S RIGHTS TO EFFECTIVE TRIAL AND APPELLATE COUNSEL, DUE PROCESS, AND AGAINST DOUBLE JEOPARDY AND CRUEL AND UNUSUAL PUNISHMENT WERE VIOLATED WHEN TRIAL COUNSEL FAILED TO OBJECT TO CHARGES AND EVIDENCE RELATED TO ISSUES PREVIOUSLY LITIGATED AND RESOLVED IN PETITIONER'S FAVOR IN HIS 1998 DRUG CONSPIRACY SENTENCING PROCEEDINGS.**

The question of whether Petitioner was continuing to engage in a drug conspiracy during the time period in which these murders occurred, has twice been litigated in the District Court. The first time, in sentencing proceedings in 1997 and 1998, the District Court found and entered a Judgment that Petitioner was not continuing to so engage; the second time, in the ten capital counts for which Petitioner was convicted, the jury reached the opposite conclusion. The first time, the answer to the question meant the difference between a 27-year prison sentence and a mandatory life sentence; the second time, the stakes were life and death. The first

10

time, the Government purposefully sought final resolution of the question, despite knowing of the potential for "collateral consequences."

Those collateral consequences are governed by the Fifth Amendment to the United States Constitution and by longstanding Supreme Court law. Indeed, it has been "an established rule of federal criminal law" for nearly a century that, "when an issue of ultimate fact has been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Ashe v. Swenson*, 397 U.S. 436, 443 (1970), *citing United States v. Oppenheimer*, 242 U.S. 85 (1916). This rule "is embodied in the Fifth Amendment guarantee against double jeopardy," *Ashe*, 397 U.S. at 445, and the rule holds regardless of whether the issue of fact was determined by a jury or by a judge. *Oppenheimer*, 242 U.S. at 87-88 ("however the issue was raised in the former case, after judgment upon it, it could not be reopened in a later prosecution.").

At Mr. Honken's 1997 and 1998 drug conspiracy sentencing proceedings, the United States presented extensive evidence in its effort to prove, among other things, that Mr. Honken had continued to engage in a drug conspiracy after his pretrial release in March 1993. After briefing, five days of testimony, and oral argument, the District Court made a factual finding on this question and resolved it in Petitioner's favor. The District Court made other findings in Petitioner's favor as well.

11

Six years later, in this capital case, the United States again alleged and litigated the same issues that had been determined **in Petitioner's favor** in 1998, and succeeded in obtaining capital convictions based largely on those allegations. Trial counsel, one of whom was also Petitioner's counsel at the drug sentencing proceedings, inexplicably failed to object to the relitigation of these issues and inexplicably failed to assert Petitioner's rights under the Fifth Amendment and federal law – when Petitioner's life depended on it.

### A. The 1996 Drug Conspiracy Case

In 1996, the United States charged that "[b]etween about 1992 and February 7, 1996, in the Northern District of Iowa and elsewhere, Dustin Lee Honken and Timothy Cutkomp, did knowingly combine, conspire, confederate and agree with persons known and unknown to the Grand Jury" to attempt to manufacture, to manufacture, and to distribute 100 or more grams of pure methamphetamine and 1000 or more grams of a mixture containing methamphetamine, "in violation of Title 21, United States Code, Sections 846, 841 (a)(1) and 841(b)(1)(A)." CR96-3004-001-MWB, Dkt. # 42, Superseding Indictment at 1-2 (Count 1) (N.D. Iowa 7/10/96). On June 2, 1997, Mr. Honken pled guilty to this Count (and to Count 4), and the United States dismissed Counts 2 and 3 of the Superseding Indictment.

The District Court accepted Mr. Honken's guilty plea with the understanding

12

that:

> when it comes time for sentencing, we're going to start with a clean slate, and you'll be able to contest I think primarily the quantities, your role in the offense but basically anything else that you and Mr. Parrish want to contest at the time of sentencing.

CR96-3004-001-MWB, 6/2/1997 Tr. at 14, Appendix 5.

One of the issues disputed by the parties was whether the drug conspiracy continued after Mr. Honken's pre-trial release on March 26, 1993 and thus whether any conspiratorial acts were committed between that date and March 21, 1995. If so, then the sentencing guidelines required a three-point enhancement. *See* 1997 Sentencing Guidelines § 2J1.7. As explained in the Amended and Final Presentence Investigation Report ("PSIR"):

> U.S.S.G. § 2J1.7 directs that if an enhancement under 18 U.S.C. § 3147 applies (penalty for an Offense Committed While on Release), add three levels to the offense level for the offense committed while on release as if this section were a Specific Offense Characteristic contained in the offense guideline for the offense committed while on release. Based on codefendant Cutkomp's debriefing statements it appears the defendant continued the conspiracy to manufacture methamphetamine while under bond supervision for the 1993 Conspiracy to Manufacture Methamphetamine charge. In view of the aforementioned, 18 U.S.C. § 3147 appears applicable and therefore this enhancement is recommended.

PSIR ¶ 134, Appendix 4.

Under the guidelines calculations as set forth in the PSIR, and as ultimately

13

imposed by the court in the Amended Judgment, the § 2J1.7 enhancement meant the difference between a mandatory life sentence and a lesser sentence.[1]  The parties thus had significant incentive to litigate – and vigorously contested – the issue.

Similarly, the United States sought a 2-level enhancement for possession of a firearm, and in support alleged various facts, including that Mr. Honken had possessed a Tec-9 handgun (which Angela Johnson had purchased) in the course of the drug conspiracy, and had melted down and destroyed the gun in 1993 in order to hide evidence of crimes; that Mr. Honken purchased a (different) handgun from Rick Held while on pretrial release in 1996; and that Mr. Honken had sought a high-powered automatic firearm in order to threaten Timothy Cutkomp if he cooperated with the Government.  *See* Tr., 2/24/98, 1220-22, Appendix 10.  Again, had the District Court found in favor of the Government on any of these allegations, the 2-

---

[1]After the United States successfully appealed to the Eighth Circuit, Mr. Honken's offense level under the guidelines was 41, and he was sentenced to 324 months imprisonment.  If the District Court had found that the Government had established the § 2J1.7 enhancement, the offense level would have been 44, and a mandatory life sentence would have been imposed.  Similarly, under the PSIR's calculations, with the § 2J1.7 enhancement, the offense level would have been 45 (a mandatory life sentence); without the § 2J1.7 enhancement, the offense level would have been 42, with a guidelines range of 360 months to life.  Prior to the Government's appeal, the District Court had found an offense level of 38, with a range of 235 to 293 months; with the 3-point enhancement that offense level would have been 41, with a guidelines range of 324 to 405 months, i.e., an increase of 31 to 170 months.  The District Court's rejection of the § 2J1.7 enhancement was not at issue in the Government's appeal.

14

level enhancement would have resulted in a mandatory life sentence instead of the 324-month sentence ultimately imposed.

The Government – which at the time of the sentencing hearing suspected Mr. Honken in the disappearance of the five witnesses – vigorously litigated these issues in seeking a life sentence for Mr. Honken. In addition to oral arguments and briefing, the Government presented **twenty-five witnesses** and numerous exhibits (including extensive, secretly recorded audiotapes of conversations Mr. Honken had while on pre-trial release) in support of its allegations, over the course of **five days of court hearings** between December 15, 1997, and February 24, 1998. The Government even had the opportunity to cross-examine Petitioner over the course of two days. As the District Court found, the Government litigated the disputed sentencing issues with "thoroughness and zealousness." Tr. 2/24/98, 1228, Appendix 10.

Further, the Government, defense counsel Mr. Parrish, and the District Court were all well aware of the potential "collateral consequences" of litigating these issues in the sentencing proceedings. *Id.* at 1239. Over the course of the sentencing proceedings, repeated mention was made of the ongoing grand jury investigation into the disappearance of the five witnesses, and of the potential that sentencing findings, in Mr. Parrish's words, may later "be binding on any additional court." Tr. 1/25/00

15

at 6 (resentencing hearing), Appendix 11.[2]  One representative exchange went as follows:

> PROSECUTOR: I do understand the Court's thinking on the obstruction and not wanting necessarily to make findings on everything. I'm a bit chagrin[ed] to say that I have to raise at least one of those in the context of the gun.
>
> THE COURT: No. And I understand that.
>
> PROSECUTOR: And that may require the Court may or may not require the Court to make a finding at this stage.
>
> THE COURT: I understand . . .

Tr., 2/24/98, 1240, Appendix 10.  Despite its concerns, the Government fully litigated these issues in its pursuit of a life sentence.  *See id.* (reflecting that the court's guidelines calculations to that point would fall short of a mandatory life sentence without additional enhancement).

---

[2] *See, e.g.*, Tr. 6/2/97 at 39, Appendix 5 (prosecutor explaining: "There have been some matters that we've investigated in a grand jury investigation that's still ongoing which could result in potential additional charges. Some of that evidence may be presented to the Court here as part of the obstruction or on some other issues including the Court mentioned potential upward departures."); Tr. 2/24/98 at 1232, Appendix 10 (Mr. Parrish arguing: "standing here today in this courtroom we would all be perhaps fooling ourselves if we didn't think that the driving force for the government in this matter was not the act of the disappearance of the other witnesses. . . . We've had the grand jury since 1993 review this case. Agents perhaps scoured the countryside and all other aspects of Iowa interviewing witnesses, intercepting every letter written by Mr. Honken, monitoring his phone calls, taping his phone calls, having his best friend at some point tape him . . ."); *see also, e.g.,* Tr. 12/15/97 at 66, 110-16, Appendix 6; Tr. 2/17/98 at 628, 825, Appendix 8.

16

After full litigation of these issues, however, the District Court made findings **against the Government and in Mr. Honken's favor**. The court found that Mr. Honken had not committed any acts in furtherance of the conspiracy while on pretrial release between March 1993 and March 1995, and thus rejected the Government's request for a § 2J1.7 enhancement. Tr. 2/24/98 at 1192, Appendix 10.[3] The court's final judgment specifically reflected this finding. Ex. 303, Judgment 2/25/98 at 7, Appendix 1 ("the defendant did not commit a portion of the offense while on bond"); Ex. 304, Amended Judgment 2/1/00 at 7, Appendix 2 (same).

The court likewise rejected all of the Government's allegations that Mr. Honken had possessed or sought to possess firearms in the course of the conspiracy, and thus the court denied the Government's request for a 2-level firearm enhancement. Tr. 2/24/98 at 1246, Appendix 10 ("I'm going to go with probation and

---

[3] The District Court articulated the ruling as follows:

THE COURT: I just don't think the government's carried its burden of proof on this issue. You know, Mr. Cutkomp [(the Government's star witness)] has his own set of problems including his own credibility problems, and I'm not convinced that the government carried its burden of proof that there's any corroborating evidence, and I'm not willing to credit Mr. Cutkomp's testimony on this adjustment. So the three-level increase under 2J1.7 is denied.

*Id*. at 1190-92, Appendix 10.

17

hold that the government failed to carry its burden of proof on this issue with regard

to all three of the guns."). Again, the court's final judgment reflected this finding.

Ex. 303, Judgment 2/25/98 at 7, Appendix 1 (adopting the factual findings in the

presentence report, except as otherwise noted); Ex. 304, Amended Judgment 2/1/00

at 7, Appendix 2 (same).

### B.    The Capital Case

Despite these prior judicial findings against the Government, the Government

alleged and sought to prove these same factual issues as elements of the crimes and

as conspiratorial acts in the capital trial. The relitigation of these issues at trial

included, but was not limited to:

> (1)    the charges as set forth in Counts 8 through 11 of the Superseding Indictment, disputed at trial, and detailed in the District Court's instructions to the jury that, "[o]n or about July 25, 1993, . . . **while** knowingly engaging [in a drug conspiracy under 21 U.S.C. §§ 846 and 841(b)(1)(A)] between 1992 and 1998," Petitioner committed four murders;[4]

> (2)    the charges set forth in Count 12 of the Superseding Indictment, disputed at trial, and detailed in the District Court's instructions to the jury that, "[o]n or about November 5, 1993, . . . **while** knowingly engaging [in a drug conspiracy under 21 U.S.C. §§ 846 and 841(b)(1)(A)] between 1992 and 1998," Petitioner committed a fifth murder;

---

[4] *See also* Dkt. # 512, Preliminary and Final Instructions to the Jury at 2, 23-24, 28 (10/14/2004).

18

(3)     the charges set forth in Counts 13 through 16 of the Superseding Indictment, disputed at trial, and detailed in the District Court's instructions to the jury that, "[o]n or about July 25, 1993, . . . **while** engaging in and working in furtherance of a continuing criminal enterprise . . .[involving] a continuing series of narcotics violations under [21 U.S.C. § 801, et seq.] occurring between 1992 and 2000," Petitioner committed four murders;

(4)     the charges set forth in Count 17 of the Superseding Indictment, disputed at trial, and detailed in the District Court's instructions to the jury that, "[o]n or about November 5, 1993, . . . **while** engaging in and working in furtherance of a continuing criminal enterprise . . .[involving] a continuing series of narcotics violations under [21 U.S.C. § 801, et seq.] occurring between 1992 and 2000," Petitioner committed a fifth murder;

(5)     The specific factual allegations underlying the continuing criminal enterprise charges set forth in Counts 13 to 17 of the Superseding Indictment, disputed at trial, and detailed in the District Court's instructions to the jury, including that Petitioner "manufactured," "possessed with intent to distribute," and "distributed," methamphetamine "[b]etween 1992 and 2000," and conspired and intended to do the same;

(6)     allegations, evidence, and argument presented by the Government that Petitioner possessed a Tec-9 handgun in the course of the drug conspiracy, used the handgun to kill Terry DeGeus, and had melted down and destroyed the handgun with Timothy Cutkomp in order to conceal and destroy evidence of his crimes. *E.g.*, Tr., 24 (Government opening statement); Tr., 739-46 (testimony of Timothy Cutkomp); Tr., 991-94 (testimony of Special Agent Lori Lewis); Tr., 1490-91 (testimony of Fredric Tokars); Tr., 1814 (testimony of Steve Vest); Tr., 2723-24 (testimony of Special Agent William Basler); Tr., 3216, 3239-42 (Government closing argument);

(7)     allegations, evidence, and argument presented by the Government that Petitioner purchased a handgun from Rick Held while Petitioner

19

was on pretrial release in 1996. *E.g.*, Tr., 1063-69 (testimony of Rick Held); Tr., 3246-47 (Government closing argument);

(8)    allegations, evidence, and argument presented by the Government that Petitioner had sought a high powered automatic firearm in order to eliminate Government witnesses in 1996. *E.g.*, Tr., 20 (Government opening statement).

Petitioner's rights under the Fifth Amendment and federal law barred relitigation of these issues. Indeed, the District Court's prior finding that the drug conspiracy did not continue after March 1993 and through March 1995, and that Petitioner committed no acts in furtherance of the conspiracy during that time period, precluded as a matter of law the Government's attempt to establish the statutory nexus in Counts 8 to 17 that the murders occurred "while" Petitioner was engaged in the charged drug conspiracy and continuing criminal enterprise. The District Court's ruling that Petitioner had not possessed or sought to possess the Tec-9 handgun, which the Government alleged was used to kill Terry DeGeus, likewise precluded the Government from litigating that issue at the capital trial. In short, if Petitioner's double jeopardy rights had been protected at trial, the Government could not have obtained convictions on Counts 8 to 17 of the Superseding Indictment.

Indeed, while completely overlooking the District Court's prior sentencing findings, *see* Rogers Decl., Appendix 72, at ¶ 4, defense counsel at trial moved for acquittal on Counts 8 to 17. The gist of the defense motion was that the Government

20

had failed to present evidence that the drug conspiracy continued after March 1993, and thus that the Government could not establish that the murders were committed "while" the drug conspiracy and continuing criminal enterprise were ongoing, as required by the relevant statutes. *See* Dkt. # 490, *Motion for Acquittal*, at 2-3 (10/5/04); Tr., 2832-36.

The Government responded by arguing that Petitioner "took steps throughout the time period from 1992 up until 1996 to manufacture and distribute methamphetamine without stop," based on evidence of statements Petitioner made during recorded conversations with Cutkomp; testimony from Cutkomp and Dan Cobeen that Petitioner had sought to manufacture methamphetamine between March 1993 and 1995; and testimony from Cutkomp that Petitioner had melted down the alleged murder weapon. Tr. 2841-43.[5] Significantly, these were the same allegations, as presented through the same witnesses and the same exhibits, that the Government

_____

[5] Initially, the Government also contended that Petitioner had pled guilty in 1997 to the charge that "from about 1992 and **continuing** until 1996 the defendant engaged in a conspiracy," thus foreclosing the defense's argument. Tr. 2841, 2862-63. The Government, however, backed off this assertion after conceding that the indictment had not alleged a **continuing** conspiracy and that the guilty plea was therefore not "dispositive." *Id*. at 2862-63. The prosecutor, who had not represented the Government in the prior case, also expressed uncertainty about the factual basis for the guilty plea. *See id*. And neither the prosecutor, defense counsel, nor the court accurately described the prior case as involving a dispute about the duration of the conspiracy – a dispute that was expressly resolved in Petitioner's favor and thus was indeed "dispositive" of the Motion for Acquittal.

21

made and the District Court rejected at the prior sentencing proceeding. Despite –

and without being reminded of – its prior findings, the District Court accepted the

Government's argument and denied the Motion for Acquittal.

### C. The Double Jeopardy Violation

Under the Double Jeopardy Clause, "when an issue of ultimate fact has been

determined by a valid and final judgment, that issue cannot again be litigated between

the same parties." *Ashe*, 397 U.S. at 443; *see also Nesbitt v. Hopkins*, 86 F.3d 118,

120 (8th Cir. 1996) (a factual issue may not be relitigated where the issue "was

necessarily determined by the factfinder against the government and, in the second

prosecution, that same fact is required to be proved beyond a reasonable doubt in

order to convict.") (internal quotation omitted); *State v. Butler*, 505 N.W.2d 806

(Iowa 1993). This rule governs regardless of whether the issue of fact was

determined by a jury or by a judge; rather, the question is whether the issue's

determination was implicit in "a valid and final judgment." *Ashe*, 397 U.S. at 443;

*see also Oppenheimer*, 242 U.S. at 87-88 ("however the issue was raised in the

former case, after judgment upon it, it could not be reopened in a later prosecution.").

As set forth in detail above, factual issues alleged, presented, and disputed at

trial – and upon which Petitioner's convictions on Counts 8 to 17 were necessarily

based – were indistinguishable from the factual issues previously litigated and

22

decided in Petitioner's favor in the same court. The court's prior determination of these issues was express and was obviously necessary to the outcome of the 1998 sentencing proceedings. Indeed, the issues were specifically contested by the parties, were integral to the court's final sentence of Petitioner, and were set forth in specific findings in the transcript and in the final Judgment. Further, the court made these findings only after the Government had a full and fair opportunity to litigate the issues. In addition to extensive briefing and argument, the Government presented more than two dozen witnesses and scores of exhibits in support of its allegations over the course of five days of court hearings. In its pursuit of a life sentence of Mr. Honken, and despite its awareness of the potential "collateral consequences" of litigating these issues, the Government, with "thoroughness and zealousness," sought and obtained final factual findings from the sentencing court. Tr., 2/24/98, 1239, 1228. The Government was thereafter bound by those findings, and its successful relitigation of those issues in Counts 8 to 17 violated Petitioner's double jeopardy rights. *See Garrett v. United States*, 471 U.S. 773, 798 (1985) ("Any acquittal on a predicate offense would of course bar the Government from later attempting to relitigate issues in a prosecution under § 848.") (citing *Ashe*) (O'Connor, J., concurring).

23

**D.      Prior Counsel Were Ineffective**

Because "[f]ailure to preserve an issue may result in the client being executed even though reversible error occurred at trial, . . . trial counsel in a death penalty case must be especially aware . . . of the heightened need to fully preserve all potential issues for later review."  ABA Guideline 10.8 (cmt) (2003) (internal quotation omitted).  Trial counsel therefore have an obligation to "consider all legal claims potentially available" and to present claims "as forcefully as possible."   ABA Guideline 10.8.A.1 & 10.8.B.1.  In light of these obligations, it is well established that trial counsel's failure to raise a timely objection to a constitutional violation constitutes deficient performance. *E.g., Reagan v. Norris*, 365 F.3d 616, 622 (8th Cir. 2004) (finding trial counsel's failure to object to jury instructions constitutionally deficient); *Manning v. Bowersox*, 310 F.3d 571, 576-77 (8th Cir. 2002) (finding trial counsel's failure to object to admission of evidence constitutionally deficient); *Burns v. Gammon*, 260 F.3d 892, 896-97 (8th Cir. 2001) ("No sound trial strategy could include failing to make a constitutional objection . . ."); *Starr v. Lockhart*, 23 F.3d 1280 (8th Cir. 1993) (finding trial and appellate counsel ineffective for failing to object to and raise an erroneous jury instruction); *see also Murphy v. Puckett*, 893 F.2d 94 (5th Cir. 1990) (trial counsel ineffective for failing to litigate valid double jeopardy claim).

24

Despite their obligations to pursue meritorious legal issues, and despite well-established law precluding relitigation of the factual findings set forth above, trial counsel unreasonably failed to raise an objection. Trial counsel did not have a strategic or tactical reason for this failure. Rogers Decl., Appendix 72, at ¶ 4; Spies Decl., Appendix 74, at ¶ 4; Parrish Decl., Appendix 73, at ¶ 4.

Indeed, Mr. Parrish was present when the District Court warned of "collateral consequences in terms of grand jury proceedings and the like," during the sentencing proceeding, and Mr. Parrish expressed his own awareness that the court's findings could "be binding on any additional court." Tr. 1/25/00 at 6 (resentencing hearing), Appendix 11; Tr., 2/24/98, 1239, Appendix 10. Further, trial counsel pursued a double jeopardy objection to the Government's subsequent charges in this case, under a theory of barred successive prosecutions. *See United States v. Honken*, 271 F.Supp.2d 1097 (July 21, 2003). But counsel inexplicably failed to raise the meritorious collateral estoppel objection based on the court's prior factual findings in Petitioner's favor, despite the court's explicit pretrial reference to trial counsel's omission. *See id.* at 1106 n.2 ("Honken is not asserting the protection of the Double Jeopardy Clause in the sense of 'collateral estoppel,' because he is not relying on any 'ultimate fact' determined *against* the Government in his prior prosecution on the drug conspiracy charge.") (emphasis in original). Thus, despite being on notice of the

25

issue, and despite the absence of any strategic concern or potentially adverse impact of pursuing this set of objections, trial counsel simply failed to do so. This oversight apparently occurred because Mr. Rogers drafted the double jeopardy challenge, whereas Mr. Parrish was familiar with the record from the prior sentencing proceedings. *See* Rogers Decl., Appendix 72, at ¶ 4.

Petitioner was prejudiced by trial counsel's failure. There is a reasonable likelihood that the jury would not have reached guilt verdicts on the charged counts, and by definition could not have reached guilt verdicts on Counts 8 to 17, if trial counsel had objected to and excluded the relitigation of these factual issues and/or invoked the court's prior findings in its case and in its Motion for Acquittal or Motion for New Trial. Further, even if the jury had reached guilt verdicts on one or more of those counts, there is a reasonable likelihood that the penalty phase verdicts would not have resulted in a death verdict if counsel had objected to this evidence.

Appellate counsel's performance also was deficient. The relitigation of these factual findings was plain error and should have been raised as such. At the time of the direct appeal, it was standard practice that appellate counsel in capital cases should seek to litigate all issues, whether or not previously presented, that were arguably meritorious. ABA Guideline 10.15.1. Prevailing decisional law recognized that appellate counsel could be ineffective for failing to raise a meritorious claim,

26

even where the claim would have been reviewed under the plain error standard. *Carter v. Bowersox*, 265 F.3d 705, 716-17 (8th Cir. 2001). There was not, and could not be, any tactical or strategic reason for counsel not to raise this meritorious claim. The error was plain, and would have resulted in the vacating of Petitioner's convictions and/or vacating of his death sentences.

## CLAIM THREE

**THE GOVERNMENT VIOLATED DUE PROCESS WHEN IT FAILED TO DISCLOSE EXCULPATORY EVIDENCE RELEVANT TO COOPERATING WITNESSES. TRIAL COUNSEL INEFFECTIVELY FAILED TO DISCOVER THIS EVIDENCE. ACCORDINGLY, PETITIONER'S CONVICTIONS AND SENTENCES VIOLATED THE FIFTH, SIXTH AND EIGHTH AMENDMENTS.**

The case against Petitioner was built on the testimony of more than a dozen jailhouse informants and other cooperating witnesses. The testimony of these witnesses constituted the only "direct" evidence that Petitioner committed the murders. The Government, however, failed to comport with its obligation to turn over evidence critical to the credibility of these witnesses. The testimony of several of these witnesses was procured only after the Government threatened, cajoled, induced and coaxed them into providing false, exaggerated, and misleading testimony implicating Petitioner in the charged crimes and in other misconduct. To the extent that trial counsel knew, or reasonably should have known, that the Government

27

procured this testimony in these improper ways, counsel were ineffective for not discovering these facts. Moreover, counsel were ineffective for failing to investigate fully the backgrounds of these witnesses and for failing to impeach these witnesses with information that was either actually available, or which they could have discovered. Petitioner's rights to due process and effective counsel were violated. These errors implicated both his convictions and sentences.

The Government presented fifteen jailhouse informants and/or cooperating witnesses to the jury: Dan Cobeen, Timothy Cutkomp, Dean Donaldson, William Dean, Dennis Putzier, Terry Bregar, Daniel Frye, Frederick Tokars, Ronald McIntosh, Steve Vest, Steven Ferguson, Anthony Altimus, Anthony Johnson, Joseph McGee, and Michael Kluver. The Government used coercive tactics with many of these witnesses and failed to disclose that to the defense. In addition, many of these witnesses testified with the expectation of receiving benefits in return. These expectations were based on either express promises made by law enforcement or implied inducements. Information relevant to some of these inducements was not provided to the defense. The Government also failed to disclose impeachment evidence relevant to the veracity of these witnesses and evidence of bias and motive to lie, including information that some of these witnesses had been cooperating with law enforcement agencies for years. Additionally, many of these witnesses were

28

transported to the trial together or were otherwise in the presence of one another and discussed their testimony and their expectations of favorable treatment among themselves. This, too, was not revealed to the defense.

### A. The Law of *Brady*

The Due Process Clause requires a prosecutor to disclose evidence to the accused that is favorable to the defense and that is material. *Banks v. Dretke*, 540 U.S. 668 (2004); *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Giglio v. United States*, 405 U.S. 150, 153-56 (1972); *United States v. Bagley*, 473 U.S. 667, 676 (1985); *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). The duty to enforce *Brady* "with painstaking care is never more exacting than it is in a capital case." *Kyles*, 514 U.S. at 422.

"Evidence impeaching the credibility of a government witness, as well as exculpatory evidence, falls under the *Brady* doctrine." *United States v. O'Conner*, 64 F.3d 355, 358 (8th Cir. 1995), *citing Giglio*, 405 U.S. at 154. Here, as in *O'Conner*, "threats, and attempts to influence [witnesses'] trial testimony, were all evidence defense counsel could have used to impeach the credibility of the [witnesses]." *Id; see also Reutter v. Solem*, 888 F.2d 578 (8th Cir. 1989) (granting new trial based on prosecutor's suppression of favorable treatment of witness).

Due process is also violated "when the State, although not soliciting false

evidence, allows it to go uncorrected when it appears." *Napue v. Illinois*, 360 U.S. 264, 269 (1959). The prosecution may not knowingly rely on false evidence even where such evidence goes only to the credibility of a witness, because "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors . . . that a defendant's life or liberty may depend." *Id*.; *see also Banks*, 540 U.S. at 694 ("It has long been established that the prosecution's 'deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice' . . . . [I]t was also appropriate for Banks to assume that his prosecutors would not stoop to improper litigation conduct to advance prospects for gaining a conviction").

A prosecutor's failure to disclose *Brady* material requires a new trial when the exculpatory evidence would have been material to the trial. *Kyles*, 514 U.S. at 432, *citing Brady*, 373 U.S. at 87; *see also Banks*, 540 U.S. at 675-76. The "touchstone of materiality is . . . not whether the defendant would more likely or not have received a different verdict with the [suppressed] evidence, but whether in its absence he received a fair trial. . . ." *Kyles*, 514 U.S. at 434. Thus, to show materiality, Petitioner need not demonstrate that the non-suppressed evidence would have been inadequate to convict, because "sufficiency of [the remaining] evidence [is not] the

30

touchstone" of materiality. *Id*. at 435 n.8. If there is "any reasonable likelihood" that the non-disclosure could have "affected the judgment of the jury," relief must be granted. *Napue*, 360 U.S. at 271; *Giglio*, 405 U.S. at 154. The materiality of suppressed evidence must be "considered collectively, not item-by-item." *Kyles*, 519 U.S. at 436. *See also O'Conner*, 64 F.3d at 358 (describing the materiality standard as a "probability sufficient to undermine confidence in the outcome.") (quoting *Bagley*, 473 U.S. at 682).

An even less stringent materiality standard applies when the prosecutor knowingly conveys, or fails to correct, false information to the jury; then, the proper materiality standard is that of *Bagley*, 473 U.S. at 678-79 & n.9, and *United States v. Agurs*, 427 U.S. 97, 103 (1976), which require the Government to show that the error is **harmless beyond a reasonable doubt**. *See United States v. Alzate*, 47 F.3d 1103, 1110 (11th Cir. 1995) (quoting *Agurs*) (when the prosecutor knowingly conveys false information to the jury, the falsehood is material "if there is any reasonable likelihood" it "could have affected the judgment of the jury," requiring the prosecution to show "harmless[ness] beyond a reasonable doubt"); *Jackson v. Brown*, 513 F.3d 1057, 1076 (9th Cir. 2008) (although *Napue* does not create a *per se* rule of reversal, "if it is established that the government knowingly permitted the introduction of false testimony reversal is virtually automatic"). Here, Mr. Honken

31

is entitled to relief under *Brady* and *Napue*.

The requirement of disclosure is self-executing and does not depend on a specific request for such information from the defense. *Agurs*, 427 U.S. at 107 ("[I]f the evidence is so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce, that duty should equally arise even if no request is made"). Government attorneys with actual or constructive knowledge of exculpatory information are required to disclose it. Even when such information is known only to law enforcement agents involved in the investigation or prosecution of the matter at hand, prosecutors are charged with constructive knowledge of the information and disclosure is required. *Kyles*, 514 U.S. at 437 ("the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police"). Here, however, defense counsel requested all such materials. The Government told defense counsel that all exculpatory materials had been turned over and also represented that to the court. Tr., 8/24/04, 24. Recent investigation reveals this not to be the case.

### B. Evidence That Was Not Disclosed

The Government used questionable tactics to entice jailhouse informants to cooperate, but failed to disclose this information to the defense. The trial court had an inkling that such inappropriate tactics were being undertaken by the Government

32

at the time of Petitioner's previous sentencing. Indeed, during that sentencing proceeding, the court commented that "something happened between the proffer and the testimony" of Timothy Cutkomp which resulted in Cutkomp testifying to larger quantities of methamphetamine being produced than he had indicated at his initial proffer. Tr., 2/24/98, Appendix 10 at 1179. The court was certainly on to something. Undersigned counsel have developed evidence that the Government in fact engaged in questionable tactics and failed to turn over exculpatory material to trial counsel.

Informants have indicated that they were pressured by the Government to provide false testimony against Petitioner. Terry Bregar has indicated that Government officials, who interviewed him in prison, pressured him to say that Petitioner had confessed to committing the murders. *See* Decl. of Terry Bregar at ¶ 4, Appendix 14 ("The prosecutor kept trying to get me to say that Dustin had told me that he had killed some people. He kept pushing me to say that. It wasn't true and I kept telling him that."). Mr. Bregar repeatedly told the agents of the Government that Petitioner had never said such things in his presence, yet they persisted in their efforts to get him to say so. Ultimately, in spite of this pressure, Bregar refused to testify that Petitioner had confessed to him, but did testify about an escape plan allegedly involving Petitioner.

Dennis Putzier, who also was called by the Government at Petitioner's trial,

33

was threatened with a life sentence if he did not testify in the manner that the Government wished. Prior to testifying at Petitioner's capital trial, he was visited in prison by Government agents. He was told that if he did not testify that Petitioner confessed to committing the murders to him and that Petitioner was involved in an escape plan with him, he would be charged with conspiracy to commit murder. He was shown the sentencing guidelines chart and was told he would be facing three hundred and sixty months to life in prison. He has stated that the only reason he testified as he did was because of these threats. He has also indicated that he was never in the same cell block with Petitioner and that he lied to the grand jury.[6]

Anthony Johnson, who testified for the Government at Petitioner's trial, was also threatened with criminal charges if he did not cooperate. He has indicated that while he was serving a federal sentence, he was taken to the Woodbury County Jail. At that time he was questioned by a federal agent about Petitioner. Decl. of Anthony Johnson at 2, Appendix 13. When Mr. Johnson told the agent that he had nothing to say, the agent told him that he knew that Mr. Johnson had bought his camper using

---

[6]Much of this information is from an interview with Mr. Putzier conducted by current counsel. In discovery, counsel has also received tapes of a police interview with Putzier last year, in which he says he was threatened with a sentence of three hundred and sixty months if he did not testify as he was told and in which he admitted that he lied. The tapes and a transcription will be available for the Court at the evidentiary hearing. Counsel proffers that Putzier will testify at the hearing consistent with these facts.

34

money from illegal drug sales. *Id.* Thereafter, Mr. Johnson "got a lawyer" who "negotiated a deal with the government where [Mr. Johnson] would not get new charges if [he] told them what [he] knew about" Petitioner. *Id.* at 4. He has also indicated that he signed a written agreement to that effect. *Id.* This information was not turned over to the defense. In fact, Mr. Johnson testified that he received no benefit whatsoever from the Government for giving information about Petitioner. Tr., 2090. This was false.

Thus, at a hearing, Petitioner will present evidence that the Government engaged in coercive tactics to get jailhouse informant witnesses to cooperate and to testify. The fact that the defense was not made aware of these tactics and of any pressure exerted toward witnesses violated Petitioner's right to due process. *O'Conner*, 64 F.3d at 358.

The Government suppressed additional exculpatory material. Terry Bregar testified that Petitioner was involved in an escape plan and that Petitioner had told him that he had bailed Dean Donaldson out of prison to take care of some things for him. He also testified that Petitioner had made a motion as if shooting a gun when he told Bregar that witnesses had not shown up in his earlier case. The Government elicited testimony from Bregar that his sentence was reduced by four and a half years in return for his cooperation. Tr., 1385. However, what was not revealed was that

35

Mr. Bregar had a possible stroke prior to his testimony at Petitioner's trial. *See* Terry Bregar - Bureau of Prisonss Medical Records at 1, Appendix 14 (noting that Mr. Bregar had possible temporal arteritis – a stroke – in 1997). The stroke left him blind and affected his memory. Decl. of Terry Bregar at ¶ 3, Appendix 12. Bureau of Prisonss medical records reveal the following notation on July 1, 2004, just two months prior to Mr. Bregar's testimony at Petitioner's trial: "Patient states that he has noticed increasing trouble with short term memory over the last several months." Bregar Bureau of Prisonss Medical Records at 3, Appendix 14.

Mr. Bregar has also indicated that the Government knew both that he had a stroke and that it had a significant impact on his memory. Bregar Decl. at ¶ 5, Appendix 12. This information was not disclosed to the defense. Indeed, the Government asked him in leading fashion if his blindness was caused by diabetes. Tr., 1383-84. However, it is now clear that some combination of seizures and the stroke contributed to his blindness and also affected his memory. Additionally, at the time he testified against Petitioner, Bregar was being medicated for major depression. His federal prison records indicate that on September 17, 2004, just seven days prior to his testimony, he was prescribed regular doses of Trazodone and Amitriptyline.[7]

_____

[7]Trazodone is primarily used for the treatment of depression. www.medicinenet.con/trazodone/article.htm. Amitriptyline is more commonly known as Elavil and is an "antidepressant with sedative effects." Physicians' Desk

36

Bregar Records at 4, Appendix 14. This also was not revealed to the defense.

Dennis Putzier testified that Petitioner had confessed to him and that Petitioner tried to escape from the Woodbury Jail at a time when they were both inmates there. As stated above, Mr. Putzier has recently disclosed that he was pressured by the Government to provide this testimony. Indeed, he was threatened with a life sentence if he did not. Additionally, he has stated that he never spoke to Petitioner face-to-face in the prison. There was always a window or door between them. He has also stated that there is no way that Petitioner could have made it to Putzier's block for the alleged escape attempt, and that Putzier told that to the agents. Putzier testified that Petitioner tried to escape with him only because Putzier he was afraid of a life sentence. This evidence was not revealed to Petitioner.

Both Mr. Putzier and Mr. Bregar have confirmed that many of the jailhouse informant witnesses were transported to Sioux City together and were otherwise held together at various times prior to testifying either at Petitioner's earlier sentencing proceeding, at a grand jury inquiry, or at Petitioner's capital trial. *See, e.g.,* Decl. of Terry Bregar at ¶ 6, Appendix 12 ("I remember when I was brought to Sioux City for Dustin's trial. They picked me up in a prison van from Cedar Rapids where I was serving my time. They went to different prisons and jails and picked up a bunch of

Reference, 55th Edition (2001) at 626.

37

guys who were going to the trial to testify against Dustin."). At those times, groups of informant witnesses would discuss the case and their testimony with each other, compare notes and make up stories based on these group conversations. *See id.* ("We were all in the van together and talked a lot about what we were going to say."). Additionally, they all talked about hoping to get reductions in their sentences and about other benefits that they expected in return for their testimony. *Id.* ("Everybody was hoping to get some time knocked off their sentences."). However, this information was never turned over to the defense or was denied by the witnesses during their testimony.

Additionally, many of these cooperating witnesses had been cooperating with the authorities in other matters and had been doing so prior to the time they claimed that Petitioner made incriminating statements to them. The introduction of such statements, made at a time when Petitioner was in custody and when he was being questioned by an agent of the Government, violated Petitioner's rights to remain silent (Fifth Amendment) and right to counsel (Sixth Amendment). *See Massiah v. United States*, 377 U.S. 201 (1964); *United States v. Red Bird*, 287 F.3d 709 (8th Cir. 2002). Additionally, the fact that informant witnesses had cooperated in the past is evidence of bias and motive that should have been turned over to the defense. Failure

38

to do so violated due process.[8]

### C.  Counsel's Deficient Performance

To the extent that trial counsel could have uncovered additional evidence that was not provided by the Government regarding these jailhouse informants and cooperating witnesses, counsel's performance was deficient.  The Sixth Amendment right to effective assistance of counsel is violated when counsel's representation is deficient, falling below "an objective standard of reasonableness," and the defendant is prejudiced.  *Strickland v. Washington*, 466 U.S. 668, 694 (1984).  Had counsel conducted a thorough investigation into these witnesses, counsel might have learned that the Government procured the testimony of these witnesses in the improper ways described above, and that some of these witnesses had long histories of cooperating with the Government.  Counsel also could have learned about the group meetings held among many of these cooperating witnesses and their expectations of favorable treatment.  To the extent that counsel could have uncovered this evidence in the face

---

[8]It appears that trial counsel knew that some of these witnesses had been cooperating with various agencies of the Government prior to their cooperation regarding Petitioner.  For example, Fredric Tokars had provided information to the Government in 1999.  This is reflected in a Government Memorandum dated June 8, 1999, that was in trial counsel's files.  *See* United States Government Memorandum, Subject: Tokars, Fredric (June 8, 1999), Appendix 8.  Yet counsel failed to confront Tokars with this fact.  To the extent counsel had such information and failed to use it, counsel were ineffective.

39

of the Government's suppression of it, counsel's performance was deficient. The Sixth Amendment requires counsel to investigate and consider viable theories to attack the Government's case. *Foster v. Lockhart*, 9 F.3d 722, 726 (8th Cir. 1993) (affirming grant of writ when trial counsel failed to investigate guilt issue); *Parkus v. Delo*, 33 F.3d 933, 938-39 & n.6 (8th Cir. 1994) (remanding for evidentiary hearing to address counsel's failure to thoroughly investigate guilt phase defense). *See also Rompilla v. Beard*, 545 U.S. 374 (2005) (finding counsel ineffective for failing to examine a court file that would have led to additional mitigating evidence).

Additionally, counsel failed to present evidence that would have further challenged the veracity of the jailhouse informants. Counsel were in possession of some of this evidence but failed to present it to the jury. This was ineffective. *Schneider v. Delo*, 85 F.3d 335, 339 (8th Cir. 1996) (where counsel fails to present evidence of innocence, court must determine whether counsel's performance fell below professional standards and whether the defense was prejudiced); *United States v. Easter*, 539 F.2d 663 (8th Cir. 1976) (counsel ineffective for failing to present available evidence that government informant harbored animosity against defendant and had misused the police to harass the defendant). Counsel presented only two witnesses to challenge the credibility of the fifteen informants – David Loparo and Neal Huffman – although many more were available. These two witnesses each

40

testified that they knew Petitioner in prison and that he never admitted to them that he killed anyone. Tr., 2960 (Loparo); Tr., 3073 (Huffman). Loparo refuted McGee's assertion that Petitioner confessed to him in the presence of Loparo (Tr., 2967), and testified that Fred Tokars repeatedly asked him for information about Petitioner (Tr., 2964-65). Huffman testified that some of Petitioner's legal materials disappeared in the prison (Tr., 3047; 3059), and that jailhouse informant Steve Vest had access to Petitioner's legal materials (Tr., 3049), and went out of his way to become Petitioner's cellmate (Tr., 3052). Thus, counsel only presented evidence to challenge three of the fifteen jailhouse informants and other cooperating witnesses, although evidence was available to rebut many more.

For example, there were numerous witnesses who would have testified that cooperating witnesses had admitted to them that they fabricated evidence against Petitioner to assist themselves in their own cases. Specifically, witnesses could have testified that jailhouse informants admitted to them that they had read Petitioner's legal documents and news articles about his case and were fabricating evidence based on that knowledge. *See, e.g.*, Aff. of John Hunter, Appendix 16 (indicating that Ronald MacIntosh told him he planned to "concoct a story" against Petitioner); Aff. of Joseph Dougherty, Appendix 17 ("MacIntosh informed me that he had already read all of Mr. Honken's legal papers and could put together a good factual story for the

41

F.B.I."); Aff. of Artie DuFur, Appendix 18 ("MacIntosh said that he had fabricated a story that we could take to the federal authorities, that would guarantee our release from federal custody"); Aff. of Jesse J. Mack, Appendix 19 (indicating that Fred Tokars told him he had "access to [Petitioner's] legal work and he could made up a believable story that he and I could take to the feds to get a deal"); Aff. of Wayne A. Byerly, Appendix 20 (indicating that he provided news articles about Petitioner's case to Steve Vest, who then told him they could get a deal based on what they knew from the articles); Aff. of Luis Lua, Appendix 21 (indicating that Dennis Putzier had admitted to him that he lied in his testimony at the grand jury). Other witnesses could have testified that the Government attempted to coerce them into lying about Petitioner, but they refused. *See, e.g.,* Decl. of Terry Bregar, Appendix 12; Aff. of Luis Lua, Appendix 21. Some of these witnesses were known to Petitioner's lawyers, yet they failed to present this evidence to the jury. Counsel's performance was deficient.

### D. *Brady* Materiality and *Strickland* Prejudice

Materiality analysis under Brady is co-extensive with prejudice analysis under Strickland. *See Strickler v. Greene*, 527 U.S. 263, 282-88 (1999). As outlined above, these thresholds are met "'if there is a reasonable probability that, had [it] been disclosed to the defense, the result of the proceeding would have been different.' A

42

reasonable probability of a different result is shown when the government's failure to disclose 'undermines confidence in the outcome of the trial.'" *United States v. Garcia*, 562 F.3d 947, 953 (8th Cir. 2009) (quoting *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995)) (internal brackets omitted). Here, the suppression of the exculpatory information going to the credibility of these cooperating witnesses is highly material. Without this testimony, the case against Petitioner was completely circumstantial. There was no eyewitness testimony. There was no confession to law enforcement. Indeed, there is no forensic evidence whatsoever to connect Petitioner to the crimes. The only direct evidence that Petitioner committed these crimes came from the jailhouse informants, who testified that Petitioner had confessed to them. Had the Government turned over the suppressed evidence, or if counsel discovered it on their own, the testimony of these cooperating witnesses would have been decimated. The wholesale challenge to the credibility of these witnesses that could have been mounted would certainly have resulted in the probability of a different verdict and/or sentence.

In assessing *Brady* materiality, the Court must consider the ways in which effective counsel could have used the suppressed evidence, both at trial and through pre-trial investigation and development of other evidence. *Bagley*, 473 U.S. at 676, 683 (court must consider how suppressed evidence could have been "used

43

effectively" by counsel, including "any adverse effect that the [suppression] might have had on the preparation or presentation of the defendant's case"); *accord Kyles*, 514 U.S. at 441.

Moreover, materiality of evidence is "considered collectively, not item by item." *Kyles*, 514 U.S. at 436. This is critical to the analysis here. For example, had the jury known that the informants were transported together, were otherwise held together and that they discussed their testimony as a group, the veracity of all of these witnesses would surely have been put in a different light. Additionally, evidence that Government agents threatened and induced the testimony of some of these witnesses (*see, e.g.,* Decl. of Terry Bregar, Appendix 12; Decl. of Anthony Johnson, Appendix 13) would have cast doubt on the testimony of all of the informants. *See Kyles*, 514 U.S. at 445 ("Damage to the prosecution's case would not have been confined to evidence of the eyewitnesses, for [the suppressed evidence] would have raised opportunities to attack not only the probative value of crucial physical evidence and the circumstances in which it was found, but the thoroughness and even the good faith of the investigation"); *id*. at 446, *quoting Bowen v. Maryland*, 799 F.2d 593, 613 (10th Cir. 1986) ("A common trial tactic of defense lawyers is to discredit the caliber of the investigation or the decision to charge the defendant, and we may consider such use in assessing a possible *Brady* violation"); *Lindsey v. King*, 769 F.2d 1034,

44

1042 (5th Cir. 1985) (noting that *Brady* evidence "carried within it the potential . . . for the . . . discrediting . . . of the police methods employed in assembling the case.").

If even some of the undisclosed inducements had been disclosed, or uncovered by effective counsel, the jury would have had a better view of the improper tactics being employed by the Government. Such a view would have caused the jury to view the entire investigation and Government presentation with a more discerning eye. For the same reasons that the evidence is material, counsel's failure to uncover it, to the extent that they could have in the face of suppression, resulted in prejudice. *See Strickler*, 527 U.S. at 297 (Souter, J., concurring) ("the Court treats the prejudice enquiry as synonymous with the materiality determination under *Brady*"). In either event, confidence in the outcome of the trial and sentencing is undermined, and Petitioner should be granted a new trial.[9]

---

[9]Undersigned counsel have located and interviewed a number of the above-described witnesses. As to others, Court intervention will be required to permit interviews because a number of the witnesses are in undisclosed locations as part of a witness protection program. Counsel have requested that the Government provide access to these witnesses, but that has not occurred as of the filing of this pleading. Petitioner believes that he has presented a *prima facie* case that the Government engaged in improper tactics in these regards. This *prima facie* presentation requires discovery related to this issue prior to the scheduled hearing.

45

**PETITIONER'S CONVICTIONS AND SENTENCES RESULTING FROM HIS CONVICTIONS FOR VIOLATION OF 21 U.S.C. § 848(C) (CONTINUING CRIMINAL ENTERPRISE) WERE OBTAINED IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS.**

Counts 13 to 17 of the Superseding Indictment alleged that Petitioner was an organizer, supervisor, or otherwise a manager of five other persons in a continuing criminal enterprise, in violation of 21 U.S.C. § 848(c). In order to establish the management element, the Government must demonstrate "that the defendant exerted some type of influence over another individual as exemplified by that individual's compliance with the defendant's directions, instructions, or terms." *United States v. Possick*, 849 F.2d 332, 336 (8th Cir. 1988). The five other persons over whom Petitioner was alleged to have acted as a manager were Timothy Cutkomp, Gregory Nicholson, Terry DeGeus, Angela Johnson, and Jeffrey Honken. *See* Superseding Indictment at 17-35; Dkt. # 512 at 26-27, 77-78 (jury instructions).

In reality, Petitioner did not act as an organizer or supervisor of, or otherwise manage, Jeffrey Honken. Evidence was available to trial counsel that would have refuted the Government's contrary allegations, but trial counsel unreasonably failed to collect and/or present this evidence. The evidence available to trial counsel included numerous witnesses and documentary evidence demonstrating that:

46

- Jeffrey Honken held considerable sway and influence over his younger brother, Dustin Honken – not vice versa – including during the drug operation and in earlier schemes; *see* Decl. of Melissa Friesenborg ¶¶ 8-10, Appendix 22; Decl. of Timothy Cutkomp ¶ 3, 15, Appendix 23; Decl. of David Honken ¶ 19, Appendix 24.; Decl. of Kathy Schuess ¶ 11, Appendix 25; Decl. of Jeffrey Honken ¶ 26, Appendix 27; Decl. of Alyssa Nelson ¶ 20, Appendix 26.

- Jeffrey Honken minimized and misstated his role in the drug operation, including regarding his financial profits, his use own use and distribution of methamphetamine, his knowledge of the operation, and his decision-making role; *see* Decl. of Alyssa Nelson ¶ 20, Appendix 26; Decl. of Timothy Cutkomp ¶ 15, Appendix 23.

- Jeffrey Honken was the older and dominant brother and did not take orders, directions, or instructions from Petitioner about anything, including during the drug operation; *see* Decl. of Kathy Schuess ¶ 11, Appendix 25; Decl. of Melissa Friesenborg ¶¶ 8-10, Appendix 22; Decl. of Timothy Cutkomp ¶ 15, Appendix 23; Decl. of Jeffrey Honken ¶¶ 27-31, Appendix 27.

- Jeffrey Honken was never organized, supervised, or managed by Petitioner in the drug operation; *see* Decl. of Timothy Cutkomp ¶ 15, Appendix 23; Decl. of Jeffrey Honken ¶¶ 27-31, Appendix 27.

Further, in instructing the jury regarding the elements of a continuing criminal enterprise, the District Court instructed that, "You are **not** required to agree unanimously as to the identities of the five persons." Dkt. No. 512 at 26 (emphasis in original). This was clearly erroneous, as the Government alleged the statutory minimum number of persons (one organizer plus five others acting in concert) to

47

constitute a continuing criminal enterprise under 21 U.S.C. § 848(c). As such, the jurors were required to unanimously agree that the Government had proven its allegation that Petitioner organized, supervised, or otherwise managed Jeffrey Honken, Timothy Cutkomp, Greg Nicholson, Terry DeGeus, and Angela Johnson. The court failed to so instruct the jury. The court's instructions misstated the law and misled the jury on an indispensable element of Counts 13 through 17. Trial counsel, however, failed to object to the instruction.

Trial counsel's failures constituted deficient performance. Trial counsel did not have a strategic or tactical reason for failing to develop and present evidence that Jeffrey Honken was not organized, supervised, or otherwise managed by Petitioner. Rogers Decl., Appendix 72, at ¶ 6; Spies Decl., Appendix 74, at ¶¶ 6-7. Indeed, trial counsel presented two witnesses at guilt phase – Marvea Honken and Alyssa Honken – for this purpose and argued the issue in closing. Tr., 3376-77. However, in presenting only Petitioner's mother and sister to discuss Petitioner's overall relationship with his older brother, counsel failed to present less biased witnesses and witnesses who could attest to the brothers' relationship in the course of the drug operation. Counsel likewise failed to collect and present the other evidence described above.

Thus, counsel were alerted to the importance of the issue and had no sound

48

tactical or strategic reason either for failing to collect and present evidence from additional sources, including from one of the alleged controlees (Jeffrey Honken) – which would have obviously carried great weight with the jury – or to object to the District Court's erroneous instruction. These failures constituted deficient performance. *See White v. Roper*, 416 F.3d 728, 732 (8th Cir. 2005) (counsel ineffective for failing to call two witnesses who would have supported their theory of defense); *Foster v. Lockart*, 9 F.3d 722, 726 (8th Cir. 1993) (habeas relief where counsel failed to properly investigate guilt issue); *Parkus v. Delo*, 33 F.3d 933, 938-39 & n.6 (8th Cir. 1994) (remanding for evidentiary hearing on counsel's failure to thoroughly investigate guilt phase defense); *Schneider v. Delo*, 85 F.3d 335, 339 (8th Cir. 1996) (court must inquire into *Strickland* performance and prejudice inquiries where counsel fails to present evidence of innocence); *Starr v. Lockhart*, 23 F.3d 1280 (8th Cir. 1993) (trial counsel ineffective for failing to object to and raise an erroneous jury instruction); *Reagan v. Norris*, 365 F.3d 616, 622 (8th Cir. 2004) (trial counsel's failure to object to jury instructions constitutionally deficient).

Petitioner was prejudiced by trial counsel's failures. Had counsel performed effectively in these regards, there is a reasonable likelihood that the jury would not have found that Petitioner managed Jeffrey Honken and thus could not have reached guilty verdicts on Counts 13 to 17. *See White*, 416 F.3d at 732-33.

49

**PETITIONER'S RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL, DUE PROCESS, AND AGAINST DOUBLE JEOPARDY AND CRUEL AND UNUSUAL PUNISHMENT WERE VIOLATED WHEN TRIAL COUNSEL FAILED TO OBJECT TO MULTIPLICITOUS CHARGES FOR DRUG CONSPIRACY MURDER AND CONTINUING CRIMINAL CONSPIRACY MURDER, IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

The drug conspiracy charges set forth in Counts 8 through 12 of the Superseding Indictment were lesser included offenses, and multiplicitous, of the continuing criminal enterprise charges set forth in Counts 13 through 17, respectively. Nonetheless, despite the existence of controlling case law on this issue at the time of trial, counsel failed to object or move to dismiss the duplicitous counts, and this failure prejudiced Petitioner.

In 1996, a unanimous Supreme Court held that:

A guilty verdict on a § 848 charge necessarily includes a finding that the defendant also participated in a conspiracy violative of § 846; conspiracy is therefore a lesser included offense of CCE. . . . Accordingly, one of petitioner's convictions, as well as its concurrent sentence, is unauthorized punishment for a separate offense and must be vacated.

*Rutledge v. United States*, 517 U.S. 292, 307 (1996); *see also Jeffers v. United States*, 432 U.S. 137, 149-50 (1977) (plurality opinion) ("§ 846 is a lesser included offense of § 848, because § 848 requires proof of every fact necessary to show a violation

50

under § 846 as well as proof of several additional elements"). That had been the law of the Eighth Circuit since a least 1988, and was repeatedly reiterated thereafter. *See United States v. Possick*, 849 F.2d 332, 341 (8th Cir. 1988); *United States v. Holt*, 969 F. 2d 685, 687 (8th Cir. 1992); *United States v. Jelinek*, 57 F. 3d 655, 660 (8th Cir. 1995); *United States v. Fairchild*, 189 F. 3d 769, 781 (8th Cir. 1999); *United States v. Jefferson*, 215 F. 3d 820, 823 (8th Cir. 2000). In *Rutledge*, the Supreme Court noted that the problem of multiplicious drug conspiracy and continuing criminal enterprise convictions was "unlikely to arise in the future" because "[a] jury is generally instructed not to return a verdict on a lesser included offense once it has found the defendant guilty of the greater offense." *Rutledge*, 517 U.S. at 307 n.16.

Nonetheless, the problem did arise here because trial counsel failed to request such an instruction and failed otherwise to object to the multiplicitous convictions. This failure was deficient performance. Trial counsel had no strategic or tactical reason for failing to object. *See* Rogers Decl., Appendix 72, at ¶ 5; Spies Decl., Appendix 74, at ¶ 5; Parrish Decl., Appendix 73, at ¶ 5. Trial counsel raised a double jeopardy objection against successive prosecutions, *see United States v. Honken*, 271 F. Supp. 2d 1097 (N.D. Iowa, 2003), but simply overlooked the meritorious double jeopardy objection based on multiplicity. Indeed, trial counsel's double jeopardy motion cited *Jeffers*, *Jelinek*, *Fairchild*, and *Jefferson*, but strangely asserted that the

51

rule requiring that a conviction on the lesser drug conspiracy charge must be vacated, "[o]bviously . . . has no application in the instant case." Dkt. # 119 at 7 n.4. Counsel for Petitioner's co-defendant, by contrast, **successfully** litigated the same issue in the same case in the same court. *See United States v. Johnson*, 495 F.3d 951, 981 (8th Cir. 2007) (vacating convictions for drug conspiracy murder).

Trial counsel's failure prejudiced Petitioner. Had trial counsel objected, Petitioner would have been granted relief, at a minimum, from his convictions on the drug conspiracy murder charges in Counts 8 to 12. *See United States v. Honken*, 541 F.3d 1146, 1153-54 (8th Cir. 2008). Indeed, on direct appeal, the "government agree[d that] Honken's drug conspiracy murder and CCE murder convictions were multiplicitous, but argue[d], unlike Johnson, [that] Honken waived his right to challenge the multiplicitous counts because he did not raise the multiplicity issue below." *Id*. at 1154. The Eighth Circuit, like the Government, thus implicitly recognized that Petitioner's drug convictions would have been vacated but for counsel's failure to preserve the issue. *See id.*[10]

---

[10] Because the Government prevailed on its argument on direct appeal – that, despite the multiplicity of the charges, trial counsel did not preserve the issue below – the Government is now estopped from adopting a contradictory position here. *See Pegram v. Herdrich*, 530 U.S. 211, 228 n.8 (2000) ("Judicial estoppel generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.").

52

In addition, if trial counsel had protected Petitioner's double jeopardy rights against being convicted on multiplicitous counts, there is a reasonable likelihood that Petitioner would not have been sentenced to death on any counts. At the penalty phase, the jury was directed to consider **twice** the prospect of a death sentence for each murder, and, in effect, to double-count as aggravating factors the multiplicitous counts. This scenario twice put Petitioner in jeopardy of life, in violation of the Double Jeopardy Clause. It also violated Petitioner's rights to due process and against cruel and unusual punishment by unduly emphasizing the option of a death sentence to the jury. And, by permitting the jury to improperly double count, the death sentence was arbitrary and capricious in violation of the Eighth Amendment. If trial counsel had objected to the multiplicitous counts, there is a reasonable probability that the jury would not have sentenced Petitioner to death on any counts, or that the Court of Appeals would have vacated any death sentence.

53

## CLAIM SIX

**PETITIONER'S RIGHTS UNDER THE FIFTH, SIXTH AND EIGHTH AMENDMENTS WERE VIOLATED WHEN TRIAL COUNSEL INEFFECTIVELY FAILED TO OBJECT TO THE ADMISSION OF HEARSAY EVIDENCE REGARDING THE QUANTITY OF DRUGS ALLEGED IN THE SUPERSEDING INDICTMENT; APPELLATE COUNSEL INEFFECTIVELY FAILED TO RAISE AND LITIGATE THIS ISSUE.**

One of the essential elements of the drug conspiracy murder charges, Counts 8 through 12, was "that the conspiracy involved at least 100 grams of pure meth." Tr., 3285 (Government's closing argument); *see* Superseding Indictment at 14-17 (alleging, under 21 U.S.C. §§ 846 and 841(b)(1)(A), a conspiracy to manufacture and distribute "100 grams or more of pure methamphetamine and 1000 grams or more of a mixture or substance containing a detectable amount of methamphetamine"); Tr., 3416 (jury instructions). The 100-gram threshold was likewise an integral part of the continuing criminal enterprise charges, Counts 13 to 17. *See* Dkt. # 512 at 29-30, 75-76 (jury instructions); Superseding Indictment at 17-35.

The primary evidence the Government presented to meet its burden of proving that the conspiracy involved more than 100 grams of pure methamphetamine was the laboratory report of Criminalist Debra Davis, as offered through the hearsay testimony of police officer Frank Stearns. *See* Tr., 48-50. At closing argument, the only evidence the Government relied on to argue that it had met its burden of proving

54

this element was, again, Davis's laboratory report.  Tr., 3285-86.[11]  Despite the

Government's reliance on Ms. Davis's report to establish this element of the crimes,

however, Ms. Davis did not testify and Petitioner thus had no opportunity to confront

her conclusions – or the evidence collection, testing, and analysis upon which her

conclusions were based.

Federal law at the time of trial precluded the use of such testimonial hearsay

without an opportunity for cross-examination, under both the Confrontation Clause

and the Federal Rules of Evidence.  *See Crawford v. Washington*, 541 U.S. 36 (2004)

(the Confrontation Clause bars testimonial hearsay absent witness unavailability and

a prior opportunity to cross examine);[12] *United States v. Riley*, 236 F.3d 982 (8th Cir.

2001) (the Federal Rules of Evidence bar hearsay presentation of crime lab reports);

---

[11] The Government also referenced in its closing argument the District Court's Judgment, and by extension its drug quantity findings, in Petitioner's prior drug case. Tr. 3285-86 ("Ladies and gentlemen, as to conspiracy to commit a drug crime, you have in evidence Exhibit 303 which is the judgment and sentence of conviction of two drug crimes, conspiracy to distribute methamphetamine and attempted manufacture of methamphetamine, February 1998, conspiracy involving at least 100 grams of pure methamphetamine.").  To the extent the jury relied on those findings in determining the drug amounts involved in the conspiracy, that reliance was improper as set forth in Claim One, *supra*.

[12] *See also Melendez-Diaz v. Massachusetts,* 129 S.Ct. 2527, 2533 (2009) (holding that the Confrontation Clause bars hearsay presentation of crime-lab reports and explaining that this conclusion derives from a "rather straightforward application of our holding in *Crawford*.").

55

*accord United States v. Le*, 272 F.3d 530 (8th Cir. 2001).

Trial counsel were ineffective for failing to raise objections under the Confrontation Clause and *Riley*. *E.g., Kimmelman v. Morrison*, 477 U.S. 365 (1986) (counsel's failure to file timely motion to suppress evidence was deficient performance); *Manning v. Bowersox*, 310 F.3d 571, 576-77 (8th Cir. 2002) (counsel's failure to object to admission of evidence constitutionally deficient); *Burns v. Gammon*, 260 F.3d 892, 896-97 (8th Cir. 2001) ("No sound trial strategy could include failing to make a constitutional objection . . ."). Counsel had no strategic or tactical reason for this failure. Indeed, Ms. Davis's conclusions were an essential part of the Government's case against Petitioner, and every opportunity should have been made to challenge those conclusions. In Petitioner's 1998 sentencing, Mr. Parrish had succeeded in obtaining a finding that a similar drug quantity report was "false, fraudulent, whatever word you want to use, and misleading." Tr., 2/24/98, 1174, Appendix 10. Significantly, the law enforcement agencies who collected the evidence for Ms. Davis's report also participated in the collection of the evidence in the false, fraudulent, and misleading report. Cross-examination of Ms. Davis would have been a fertile ground for challenging her assumptions, credentials, methods, and conclusions. Trial counsel's failure to protect Petitioner's confrontation and evidentiary rights was unreasonable and deficient.

56

Petitioner was prejudiced by trial counsel's failure. The jury would not have, and could not have, reached guilt verdicts on Counts 8 to 17 if trial counsel had objected to and excluded the hearsay presentation of Ms. Davis's report. *Cf. Le*, 272 F.3d at 532 ("We explicitly reject the government's suggestion that the error was harmless. It is difficult to imagine, and should be even more difficult to argue, that a defect in proving the chemical was methamphetamine is harmless, when the defendants are on trial for distribution of that drug."); *accord Manning v. Bowersox*, 310 F.3d 571, 576-77 (8th Cir. 2002). In the absence of guilt verdicts on those counts, Petitioner could not have been sentenced to death.

Appellate counsel's performance was also deficient. The admission of Ms. Davis's report through hearsay was plain error and should have been raised as such. At the time of the direct appeal, it was standard practice, and case law required, that appellate counsel in capital cases were expected to litigate all arguably meritorious issues, even when the claim would be reviewed under the plain error standard. *See* ABA Guideline 10.15.1; *Carter v. Bowersox*, 265 F.3d 705, 716-17 (8th Cir. 2001). There was not, and could not be, any tactical or strategic reason for counsel not to raise this meritorious claim. The error was plain, and would have resulted in the appeals court vacating Petitioner's convictions on Counts 8 to 17 and thus vacating his death sentences as well.

57

## CLAIM SEVEN

**PETITIONER'S RIGHTS TO DUE PROCESS, TO AN IMPARTIAL JURY, TO EFFECTIVE ASSISTANCE OF COUNSEL, AND AGAINST CRUEL AND UNUSUAL PUNISHMENT WERE VIOLATED WHERE TRIAL COUNSEL FAILED TO OBJECT TO THE EXCLUSION OF QUALIFIED JURORS FROM THE VENIRE, CONTRARY TO *WITHERSPOON V. ILLINOIS* AND ITS PROGENY; APPELLATE COUNSEL WERE INEFFECTIVE FOR FAILING TO RAISE AND LITIGATE THIS ISSUE; ALL IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

### A.    Introduction

The Constitution requires that a capital defendant be tried by an impartial jury. *Morgan v. Illinois*, 504 U.S. 719, 729-30 (1992). It is well-settled that the Government "may not entrust the determination of whether a man should live or die to a tribunal organized to return a verdict of death." *Witherspoon v. Illinois*, 391 U.S. 510, 521 (1968). "A sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Id.* at 522. The test for determining whether a juror can be impartial in a capital case "is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (*quoting Adams v. Texas*, 448 U.S. 38, 45 (1980). If even one venire member is improperly

58

excluded for cause, a death sentence cannot stand.  *Kinder v. Bowersox*, 272 F.3d 532, 543 (8th Cir. 2001) (*citing Gray v. Mississippi*, 481 U.S. 648, 667-68 (1987)).

During jury selection, trial counsel unreasonably consented to the removal of at least 29 venire members for cause without any voir dire inquiry regarding their ability to be impartial and to follow the law, and without any indication that they **would not** be able to serve.  Counsel did so in an attempt to broker an informal trade with the Government whereby jurors with views on both ends of the death penalty spectrum (*i.e.* those who are both strongly opposed to, and in favor of, capital punishment, but who are still within the range of constitutionally-permissible viewpoints) would be dismissed by agreement.

As described below, even had counsel successfully executed this trade, as intended, it would have been ineffective under *Strickland*, for it served to stack the deck against their client in violation of *Witherspoon*.  Counsel here was doubly-ineffective, insofar as they mishandled via simple oversight even the bad deal they had brokered.  Finally, apellate counsel were ineffective for failing to raise on appeal the only two *Witherspoon* objections trial counsel did make.  As a result, Petitioner is entitled to a new penalty phase.

59

## B.      The Voir Dire Process in this Case

One thousand potential jurors were each mailed a thirty-page questionnaire in advance of Petitioner's trial.  After eliminating persons who could not be located or who did not return their questionnaires, counsel for both parties entered an agreement to exclude nearly 250 potential jurors for cause, based solely on answers given in the questionnaires.  *See* Dkt. # 342, Order (July 29, 2004).  Approximately 163 of the 250 were excused based on their answers to Question 72 of the questionnaire, regarding *Witherspoon* eligibility.  Question 72 reads:

72.    Regarding the death penalty, which of the following ten statements most accurately represents your beliefs? Please read all ten statements, take some time to reflect, and then circle the appropriate statement(s):

a.    I am personally, morally, religiously or otherwise opposed to the death penalty, and will never vote to impose it under any circumstances.

b.    I am strongly opposed to the death penalty, and I will have a difficult time voting to impose it.

c.    I am philosophically, morally, or religiously opposed to the death penalty. Nonetheless, I believe that I can vote to impose the death penalty if it is called for by the facts and the law in the case.

d.    I am generally opposed to the death penalty. Nonetheless, I believe that I can vote to impose the death penalty if it is called for by the facts and the law in the case.

60

e. In a case in which the defendant is convicted and in which the death penalty is requested, I can vote to impose the death penalty, or a sentence other than death, which ever is appropriate based on the facts and the law in the case.

f. I am generally in favor of the death penalty. Nonetheless, I believe that I can vote to impose a sentence other than death if it is called for by the facts and the law in the case.

g. I am philosophically, morally, or religiously in favor of the death penalty. Nonetheless I believe that I can vote to impose a sentence other than death if it is called for by the facts and the law in the case.

h. I am strongly in favor of the death penalty, and I will have a difficult time voting against it.

i. In a case in which the defendant is convicted and in which the death penalty is requested, I will always vote to impose the death penalty.

j. None of the above.

The Questionnaire obviously was designed to ferret out those jurors who would be excludable under *Witherspoon* (those who answered "yes" to "a"), and those who would be excludable under *Morgan* (those who answered "yes" to "i").

In actual live voir dire, those who provided answers on the next grade in from either end of the spectrum, *i.e.*, those who answered "yes" to either question "b" or "h" would be subject to further probing as to whether those answers would

61

substantially impair their ability to perform their duty as jurors.  *See Witt*, 469 U.S. at 428; *Uttecht v. Brown*, 551 U.S. 1 (2007).  Depending on follow up questioning, some of those jurors may have been deemed qualified, while others may not have been.

Upon the completion of the questionnaires in this case, 29 potential jurors were struck for answering "b."  Rather than subjecting these jurors to further probing, counsel engaged in a trade with the Government that should have ostensibly resulted in the elimination of all potential jurors from either end of the spectrum (initially eliminating those who answered yes to "a" and "i" and then additionally eliminating those who answered "yes" to "b" and "h").  However, a review of the questionnaires tells a different story.

In reality, multiple venire persons who answered "yes" to "h" (those who would have a difficult time **not** imposing death) were left in the qualified pool.  Trial counsel failed to secure the removal of venire persons 24, 556 and 574, each of whom had answered "h" or "i" to Question 72.  *See* Questionnaires for venire persons 24, 556, 574, Appendices 30, 33, 34, respectively.  Moreover, some of the struck "b" venire persons were struck even though they answered follow-up questions indicating that they could be impartial and follow the court's instructions.  At least 8 venire persons who answered "b" nonetheless indicated in response to subsequent questions

62

that they could be impartial and impose the death penalty in accordance with the law. (*See* Questionnaires for venire persons 338, 635, 668, 701, 809, 916, 935 and 945, Appendices 31, 35, 36, 37, 38, 40, 41, 42, respectively). For example, venire person 945 stated that "I am unsure how I feel about the death penalty [] I believe that it is religiously wrong, but I am not 100% against it," suggesting her ability to follow the law as instructed. *Id.* Nothing in the questionnaires indicates that these venire persons were properly excludable under *Witherspoon*.

What is more, multiple jurors' responses were misidentified as a matter of simple oversight, further increasing the detriment of the deal to Petitioner. For example, Juror 12 was struck for cause for answering "b," despite the fact that on her questionnaire she answered "d." Juror 809 circled answers "b," "c" and "e," yet also was struck for answering "b," despite the agreement between parties that jurors who circled multiple answers would remain in the larger pool and be subject to in-person voir dire. Voir Dire Tr., 3170. Nearly a dozen errors of this nature were uncovered when the questionnaires were reviewed by current counsel.

### C. Trial Counsel were Ineffective

#### 1. Counsel's Performance was Deficient

Counsel were ineffective under *Strickland* for unwittingly stacking the deck against their client in terms of the death penalty viewpoints of the qualified pool.

63

First, even had counsel carefully read the questionnaires and correctly tallied all of the potential jurors who actually chose answer "b" and all of the potential jurors who actually chose answer "h," this would not have been a sensible trade. The reason it was not sensible is because, while the Government must obtain a unanimous decision in order to secure a death sentence, the defense requires but a single holdout in order to obtain a life sentence. *See, e.g.*, *Wiggins v. Smith*, 539 U.S. 510, 537 (2003) (reversing death sentence due to counsel's ineffectiveness where Court held that there was "a reasonable probability that at least one juror would have struck a different balance."). By consenting to the removal of jurors from the ends of the spectrum without even bothering to question them about their views, counsel improperly consented to the removal of the precise individuals who would be most likely to vote for life. Because the Government needs unanimity, while the defense needs a single vote, the removal of (otherwise qualified) jurors from the ends of the spectrum favors the Government, not the defense.

Of greater concern, however, is that the defense was not even able to reap the full benefit of the bad deal they secured. As demonstrated above, they were substantially over-inclusive in agreeing to excuse death scrupled venire members, and under-inclusive in agreeing to excuse death prone venire members. These mistakes were made as a matter of simple oversight, as they could not possibly have flowed

64

from any reasonable strategy. Indeed, even **at the time of the agreement,** one member of the defense team had substantial concerns. *See* 7/27/04 e-mail from Parrish to Spies, Appendix 43 ("The juror agreement was ok **but there were issues**").

### 2. Petitioner Suffered Prejudice

Petitioner was prejudiced by counsel's ineffectiveness. None of the jurors who answered "b" on the questionnaire were excludable for cause simply based upon that answer. *See United States v. Chanthadara*, 230 F.3d 1237, 1269 (10th Cir. 2000) (Federal Death Penalty Act case where juror found to have been improperly excused based solely on questionnaire answer, which was equivocal); *Nicklasson v. Roper*, 491 F.3d 830, 836 (8th Cir. 2007) (finding that "[b]y failing to recognize the need for additional death qualification voir dire questioning in the face of contradictory responses by sixteen potential jurors, the Missouri Supreme Court may have overlooked essential demands of fairness"). The "b" answer reflects precisely the kind of "general objection[]" to or expression of "conscientious or religious scruples" against the death penalty that *Witherspoon* dictates is not a proper criterion for exclusion. *Witherspoon*, 391 U.S. at 522.

Any violation of *Witherspoon* is prejudicial; the wrongful exclusion of even a single venire person for cause is grounds for vacating the death penalty. *Kinder*, 272 F.3d at 543 (citing *Gray*, 481 U.S. at 667-68). Because of counsel's ill-conceived and

65

ill-executed deal, there is clearly a substantial probability that the jury empaneled to decide Petitioner's fate was drawn from an unrepresentative pool that was unconstitutionally skewed towards death. The combination of the nearly dozen jurors who did not answer "b" in the first place, with the 8 jurors who, despite having answered "b," made clear elsewhere in their questionnaires that their views were more moderate, with the 3 death prone jurors who were **not** excused but should have been under the terms of the deal, resulted in a sea change in the composition of the qualified pool.[13] Petitioner was prejudiced, and is entitled to a new sentencing hearing with a jury drawn from a pool that is not unconstitutionally predisposed to return a death verdict.

**D.** **Appellate Counsel Were Ineffective for Failing to Raise the Two Preserved *Witherspoon* Challenges Made at Trial**

Trial counsel did make two *Witherspoon* challenges, to jurors 538 and 813. Appellate counsel failed to raise these claims on appeal, however. Appellate counsel were ineffective in not raising these clearly meritorious issues, which would have resulted in the granting of a new penalty phase.

---

[13]It is worth noting that, as mentioned above, current counsel has not been able to view all of the returned questionnaires. While most were included in trial counsel's files, there are a not insubstantial number that are missing. It is thus possible that the disparity is even greater than has been specified in this claim.

66

### 1. Juror 538

While Juror 538 was not a forceful death penalty advocate, she never once said that she would refuse to consider the penalty. Her most direct statement as to her views and capabilities was the following: "To me it would be a big responsibility to have to choose the death penalty. But again, with the crime, it still goes to whether I feel strong enough that this crime was done for sure by this man. I'd have to hear the facts. I just don't – I mean, if it was – if I felt it was terrible enough, there's a chance that I could." Voir Dire Tr., 460. She was a qualified juror, based on her views.

Counsel for the Government and the court were focused on the fact that the juror recited that the Government would have to prove that Petitioner was guilty beyond all doubt, as opposed to beyond a reasonable doubt. But the juror was referring to sentencing someone to death, not to finding someone guilty. Defense counsel correctly pointed out that residual doubt is a perfectly legitimate mitigating circumstance, as the trial court in this case ultimately concluded, in line with several other district courts. *United States v. Honken*, 378 F. Supp. 2d 1040 (N.D. Iowa 2004); *see also United States v. Bodkins*, 2005 WL 1118158 (W.D. Va. 2005); *United States v. Foster*, 2004 WL 868649 (D. Md. 2004); *United States v. Davis*, 132 F. Supp. 2d 455 (E.D. La. 2001). It would certainly have been appropriate in this case,

67

where the Government's evidence was largely circumstantial and based upon less-than-credible jailhouse informants, for a juror to have voted for life imprisonment where she had some lingering doubt as to whether Petitioner was actually guilty. Nevertheless, the court erroneously ruled that her death penalty views would substantially impair her performance as a juror. Voir Dire Tr., 3581.

### 2.	Juror 813

Juror 813 initially checked letters "c," "d," and "e" on her questionnaire. Again, she never said that she would be unable to sentence the defendant to death. To the contrary, she was very clear that she could sentence someone to death: "I would have to know in my heart that this penalty was the correct one, the proper one to do, not just if I – if I felt that it should be. I would just have to know in my heart that it was deserved I guess. And if it was a heinous-enough crime, which obviously it would have to be if they were going for the death penalty, I could do it." *Id.* at 2415.

Upon the Government's questioning, the prosecutor repeatedly attempted to convince this juror that she would in fact hold the Government to a higher standard of proof than the beyond a reasonable doubt standard. The juror repeatedly responded that she would have to be "very sure," *id.* 2414, or "very, very sure," *id.*, 2415, but said nothing to suggest that she would not hold the Government to its

68

Case 3:10-cv-03074-LTS-KEM    Document 19    Filed 06/06/11    Page 81 of 192

proper burden of proof.  This juror, who was the last to be questioned for the day and who had been sitting around for several hours before she was called in to be individually questioned, finally weakly acquiesced to the prosecutor's fourth or fifth leading attempt to get her to say that she would have to be convinced beyond "all" doubt before sentencing someone to death:

> Q.  . . . But let me put it to you this way.  The government's burden beyond a reasonable doubt as the judge instructed you this morning is not proof beyond all possible doubt.  Would you need it to be proven to you beyond all possible doubt before you could impose the death penalty?
>
> A.  I think so
>
> Q.  And if the judge said, Well, no the government only has to prove it beyond a reasonable doubt, like I said, some people can follow that; some people can't.  Some people require, no, it's gotta be more.  It's gotta be beyond all possible doubt.  Is that where you're at?
>
> A.  Probably, yes.
>
> Q.  And so you'd have a hard time following an instruction if you still – if the instruction was the government only has to prove it beyond a reasonable doubt, you'd have a hard time following that instruction?
>
> A.  I guess if you put it that way, yes.

*Id.*, 2415-16.

When defense counsel had the opportunity to examine this potential juror, she reiterated clearly what she expressed before the prosecutor pushed her to accede that she would hold the Government to a higher burden: merely that she would have to be

69

very sure before sentencing someone to death.

Q. Okay. Now, if and only if the jury finds Mr. Honken guilty beyond a reasonable doubt of some capital offense would the issue of punishment ever arise; okay? Now, what I think I heard you telling Mr. Williams was if I'm in that situation, if I have any doubt whatsoever in my mind, even though it wasn't enough to keep me from finding him guilty, that might keep me from imposing the death penalty. Is that what you were saying?

A. Yes.

Q. And would that be the same as saying if there's still some – I'll call it leftover doubt, not – because we've already had proof beyond a reasonable doubt, there's some leftover doubt as to guilt, would you consider that as some reason not to impose the death penalty?

A. All I can say is what I've said before. I would find it very hard to do that, and I guess I would just have to know in my heart that that was warranted.

Q. Okay. And that would include being very sure, as you put in the questionnaire, that he was guilty of the capital offense; right?

A. (Witness nodded head.)

Q. Is that true?

A. Yes, yes.

Q. But it wouldn't mean you would not be able to consider and weigh everything that you've heard in making that decision.

A. No, sir.

Q. And it wouldn't mean that the decision's already made in your mind, would it?

70

A.    Oh, no.

*Id.*, 2421-22.

The prosecutor then stood up to re-examine this potential juror to attempt to talk her out of her viewpoint a second time.  The juror expressed some exasperation at the prosecutor's attempt to retread the same ground, however she unambiguously reiterated that she could impose the death penalty and unambiguously responded to a straightforward question that her views on the death penalty would not impair her in the performance of her duties as a juror:

> Q.    Ma'am, I sense from your questionnaire and the answers you've given here today that the idea of the death penalty is a very difficult concept for you to contemplate, the idea that you'd have to sign a piece of paper that would cause the execution of another person.
>
> A.    It would be.
>
> Q.    And that's a difficult thing for you.  Do you think that your concerns about the death penalty, your thoughts about the death penalty would be such that would – while it wouldn't eliminate at least the possibility that you could impose the death penalty, do you think it would substantially impair your ability to really realistically consider the penalty in the case?
>
> A.    You know, I've never had to do this before.  I don't know how to keep repeating myself.  It would be very hard for me, but I would also – I could if it came to that, but it would be hard.  And for me to say it wouldn't be, I would not be telling the truth.  It would be very hard.  But I haven't heard the case.  I haven't listen – I don't know anything about it.  And it's really at this point – I would have to hear everything, and I'd have to know what I was doing.  I'd have to weigh all the evidence and feel that it was the right thing to do.

71

Q. And here's the bottom line. Some people come in here, and they've got some strong views either for the death penalty or against the death penalty, that they know in their own heart that when they go back in that jury room they can't seriously consider one of those two options, that they know their views are so strong that it really substantially impairs their ability to realistically consider both those options, and they know it before they go back there. And nobody's being judgmental whether you're pro-death penalty or against the death penalty. But we only can have jurors who have views that are neutral enough on the death penalty that they can't be substantially impaired in their ability to realistically consider either option. **Do you think that your views on the death penalty are so strong that it's going to impair your ability to really consider the death penalty as an option when you go back in that room?**

A. **No, I do not.**

*Id.*, 2423-24.

Despite this juror's consistent, unambiguous statements that she could impose the death penalty, her clear statements that she would consider and weigh all the evidence, and her clear statement that her views on the death penalty would not substantially impair her in the commission of her duties, the court nevertheless struck her for cause.

In fact, the judge made an express finding of fact that the juror would hold the Government to something higher than the beyond a reasonable doubt standard when she was evaluating whether the Government had established an aggravating factor. *Id.*, 2430. The defense correctly pointed out that "[n]obody asked her about

72

aggravating factors," and the judge simply responded: "I understand that – well, look, you know what? I'm not debating you. You made your record. I find a fair reading of her testimony is that she would require the government to prove an aggravating factor beyond a reasonable doubt." *Id.*

This juror's views clearly render her qualified. She, like almost every person, simply felt that sentencing someone to death would be a hard decision and that she would want to be sure someone was guilty before making that decision. She is well within the mainstream on her position on the death penalty, having initially circled questionnaire choices "c," "d," and "e," as reflective of her views. Her exclusion was a clear constitutional error under *Witherspoon* and *Witt*.

### 3. Deficient Performance and Prejudice

Appellate counsel's performance was deficient. These two erroneous exclusions were objected to at trial, and in the case of Juror 538, there was substantial argument occurring over multiple days and in briefing. Trial counsel made lengthy, persuasive, and coherent arguments as to why it would be unconstitutional to exclude Juror 538, and at one point the trial court indicated its inclination to keep the juror in the qualified pool–an indication of how close the issue was. *See* Voir Dire Tr., 3323 (After multiple arguments spanning several days, and written briefing submissions, the District Court states: "Let me just tell you what I'm thinking. I'm probably going

73

to leave that juror on, but I want to review it one more time, but I'm leaning towards leaving that juror on."). At the time of the direct appeal, it was standard practice that appellate counsel in capital cases should seek to litigate all issues that were arguably meritorious. ABA Guideline 10.15.1. Prevailing decisional law recognized that appellate counsel could be ineffective for failing to raise a meritorious claim, even where the claim would have been reviewed under the plain error standard. *Carter v. Bowersox*, 265 F.3d 705, 716-17 (8th Cir. 2001). There was not, and could not be, any tactical or strategic reason for counsel not to raise these well-preserved, meritorious claims of constitutional error, which are per se prejudicial. *See Kinder*, 272 F.3d at 543. There is a reasonable probability that raising this claim would have resulted in the reversal of Petitioner's sentences.

74

**THE SYSTEMIC EXCLUSION AND/OR UNDER-REPRESENTATION FROM THE JURY POOL OF AFRICAN AMERICANS, LATINOS AND OTHER MINORITY GROUPS VIOLATED PETITIONER'S RIGHTS UNDER THE FIFTH, SIXTH AND EIGHTH AMENDMENTS. COUNSEL INEFFECTIVELY FAILED TO LITIGATE CHALLENGES TO THIS UNCONSTITUTIONAL SYSTEM FOR SUMMONING VENIRE PERSONS.**

Petitioner was denied a jury pool representing a fair cross-section of the community in violation of the Fifth, Sixth and Eighth Amendments. The initial jury pool for Petitioner's capital trial included over 600 people. Only one panelist was African American, while just two were Latino – numbers dramatically unrepresentative of the Northern District of Iowa. Other groups were also under-represented. Not one African American or Latino prospective juror was represented in the smaller "qualified pool" of 75 venire persons from which the panel of 18 jurors ultimately derived.

**A. African Americans and Latinos were Systematically Under-Represented in Violation of the Constitution**

The right of a defendant to a jury chosen from a representative cross-section of the community is an essential component of the Sixth Amendment right to a jury trial. *Taylor v. Louisiana*, 419 U.S. 522, 530 (1975). Petitioner herein alleges a *prima facie* fair cross-section violation under the Sixth Amendment: (1) the excluded group is a distinctive group in the community; (2) the representation of the distinctive

75

group in the venire or jury pool is not fair and reasonable in relation to the population of the group in the community; and (3) this under-representation resulted from systematic exclusion of the group from the jury selection process. *Duren v. Missouri*, 439 U.S. 357, 364 (1979); *accord United States v. Rogers*, 73 F.3d 774, 776 (8th Cir. 1996); *United States v. Garcia*, 991 F.2d 489, 491 (8th Cir. 1993).

As to the first prong, it is beyond dispute that African Americans and Latinos are both distinctive groups within the Northern District of Iowa. *Garcia*, 991 F.2d at 491. As to the second prong, the representation of both groups was neither fair nor reasonable in relation to the populations of these groups in the community. As of 2000, the census closest to Petitioner's trial, African Americans made up 1.65% of the population in the Northern District, yet were only 0.17% of the larger venire, and 0.00% of the qualified pool. Likewise, Latinos were 2.39% of the Northern District's population, yet were represented as only 0.33% of the venire, and 0.00% of the qualified pool.

Two methods of analysis are typically used to determine the reasonableness of racial disparities in fair cross-section claims: comparative disparity and absolute disparity. *Rogers*, 73 F.3d at 776-77. Comparative disparity is calculated by dividing the absolute disparity by the population percentage of the group in the community and then multiplying by 100. Thus, this method looks at the percentage decrease in the

76

probability that members of the distinctive group at issue will be selected for the jury wheel because of systematic under-representation. *Id.* Comparative disparity is often used when the base populations involved in the claim are small relative to the total population concerned. For African Americans the comparative disparity in Petitioner's case was 90% for the larger venire and 100% for the qualified pool. For Latinos, the comparative disparity was 86% for the larger venire and 100% for the qualified pool. 100% is obviously the highest possible comparative disparity. The numbers at issue here are staggering. African Americans and Latinos have, in effect, been nearly completely excluded from jury service in the Northern District of Iowa.

Absolute disparity is calculated by subtracting the percentage of a distinctive group on the jury wheel from the percentage of that group in the community. *Id.* In Petitioner's case, there was an absolute disparity of 1.48% for African Americans and 2.06% for Latinos.[14] These are dramatic and unreasonable differences and denied Petitioner his right to a jury comprising a fair cross-section of the community. In *Rogers*, both the absolute and comparative disparities at issue were significantly less

---

[14] The maximum absolute disparity for any distinctive group cannot exceed the percentage it holds within the total population. In Petitioner's case the maximum absolute disparity for African Americans was 1.65%, while for Latinos it was 2.39%. The utility of absolute disparity analysis is thus quite limited here, because minorities may not be systematically excluded from jury service simply because of their low representation in the community.

77

profound than the disparities at issue in this case, and the court determined them not to be fair and reasonable in relation to the community makeup as a whole. *Rogers*, 73 F.3d at 776-77 (absolute disparity 1.87% - 1.29%, or 0.579% , and comparative disparity of 30.96%).

As to the third prong, requiring that the exclusion be "systematic," Petitioner begins with a discussion of the law in the Eighth Circuit. In *Garcia*, an Eighth Circuit panel denied the defendant's claim of systematic exclusion, despite a five-year history of minority under-representation in the Southern District of Iowa, stating that "[a] numerical disparity alone does not violate any of Garcia's rights and thus will not support a challenge to the Iowa Plan." *Garcia*, 991 F.2d at 492. Under the court's reasoning in that case, a defendant can never establish that a violation is systematic, even with unassailable statistical data of long-term, substantial under-representation, absent some sort of nefarious cause, such as "suspect voter registration qualifications or that the [jury selection] [p]lan is administered in a discriminatory manner." *Id.*

In *Rogers*, another Eighth Circuit panel, while recognizing its powerlessness to overturn *Garcia*, was nevertheless harshly critical of that decision. Indeed, in *Rogers*, the panel stated that "[d]efendant's statistics establish, at a minimum, a prima facie case that blacks are being systematically excluded from jury service in the Southern District of Iowa, and that, unless some justification is forthcoming, the

78

system in place there does not comport with our constitution." *Rogers*, 73 F.3d at 777. Because the *Rogers* court was bound by *Garcia* (which it suggested was in conflict with *Duren* itself), it did not grant relief, however it did "encourage this court en banc to re-visit the issue of Iowa's jury-selection plan and the Iowa federal district courts to reform their jury plan to increase minority representation." *Id.* at 778. The en banc court did not grant rehearing, and the debate remains alive. *See, e.g.*, *United States v. Rodriguez*, 581 F.3d 775, 790 & n.5 (8th Cir. 2009).

Petitioner specifically alleges that the Northern District of Iowa's jury selection method resulted in a systematic exclusion of African Americans and Latinos from the rolls under *Duren* and under the more stringent Eighth Circuit standard in *Garcia*. It is clear that since the concerns expressed by the *Rogers* court in 1996, the problem has not gotten better, but worse. Petitioner will show at a hearing that the exclusion has been substantial, long-term, and follows from a flawed process.[15] This method resulted in an unreasonable and unfair representation of African Americans and Latinos in Petitioner's jury pool, denying Petitioner a fair trial.

---

[15]Petitioner will be seeking further discovery on this issue and will present the full picture of the systematic under-representation at a hearing on this matter.

**B.    Trial and Appellate Counsel were Ineffective for Failing to Raise and Litigate this Issue**

Trial counsel were ineffective for failing to raise this issue at the time of jury selection.  *Strickland*, 466 U.S. 668.  All the information relied upon by post-conviction counsel was available at the time of trial.  Furthermore, the court granted counsel's motion for funding (Dkt. # 538) and use of jury selection experts who ultimately provided counsel with lists of potential jurors sorted by a variety of demographic information.  However, the sorted summaries provided to counsel included absolutely no race information, either because counsel failed to request it, or unreasonably relied upon an analyst's lack of knowledge that systemic under-representation of this magnitude violates the Constitution.  There was no strategic reason for counsel's failure to object to the lack of a fair cross-section in the jury pool; counsel were simply unaware of the facts.

Petitioner suffered prejudice, as a jury drawn from a non-representative cross-section of the community violates the Constitution and mandates a new trial.  *Duren*, 439 U.S. at 370.  Petitioner's convictions and sentences should be reversed.

Similarly, appellate counsel were ineffective for failing to raise this issue.  At the time of the direct appeal, it was standard practice that appellate counsel in capital cases should seek to litigate all potentially meritorious claims.  The fair cross-section

80

violation is plain error, and appellate counsel were ineffective for failing to raise it as such. *Carter v. Bowersox*, 265 F.3d 705, 716-17 (8th Cir. 2001). There was not, and could not be, any tactical or strategic reason for counsel not to raise this meritorious claim. Appellate counsel's failure to raise the issue prejudiced Petitioner. The error was of a constitutional magnitude, and would have resulted in the appeals court vacating Petitioner's convictions and death sentences.

## CLAIM NINE

### PETITIONER WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AT HIS CAPITAL SENTENCING.

In five decisions over the last decade, the Supreme Court has outlined counsel's duties in preparing for and presenting a capital penalty phase. *Williams v. Taylor*, 529 U.S. 362 (2000); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Rompilla v. Beard*, 545 U.S. 374 (2005); *Porter v. McCullom*, 130 S.Ct. 447 (2009); *Sears v. Upton*, 130 S.Ct. 3259 (2010). At the core of these decisions is the recognition that capital counsel have a Sixth Amendment "obligation to conduct a thorough investigation of the defendant's background" to identify "all reasonably available mitigating evidence." *Wiggins*, 539 U.S. at 522, 524; *Williams*, 529 U.S. at 393 (prisoner had "a right – indeed, a constitutionally protected right – to provide the jury with the mitigating evidence that his trial counsel either failed to discover or failed

81

to offer.").

The Court of Appeals for the Eighth Circuit anticipated this line of cases, *Antwine v. Delo,* 54 F.3d 1357 (8th Cir. 1995); *Hill v. Lockhart*, 28 F.3d 832, 842 (8th Cir. 1994); *Henderson v. Sargent*, 926 F.2d 706, 711 (8th Cir. 1991); *Kenley v. Armontrout*, 937 F.2d 1298, 1304 n. 5 (8th Cir. 1991), and has been steadfast in applying them. *Sinesterra v. United States*, 600 F.3d 300 (8th Cir. 2010) (in § 2255 case: "Sinisterra's counsel had an obligation to conduct a thorough background investigation and to exercise reasonable, professional judgment in determining the mitigation evidence to present during the penalty phase of Sinisterra's trial." citing *Williams v. Taylor,* 529 U.S. at 396 and *Simmons v. Luebbers,* 299 F.3d 929, 938-39 (8th Cir.2002)).

Because of the importance of conducting a thorough investigation into the existence of mitigating evidence, counsel's alleged "decisions" not to present particular mitigating evidence cannot "be justified as a tactical decision [to present other mitigating evidence] because counsel had not 'fulfilled their obligation to conduct a thorough investigation.'" *Wiggins*, 539 U.S. at 521-22, *quoting Williams*, 529 U.S. at 396; *id.*, at 527 ("*Strickland* [*v. Washington*, 466 U.S. 688 (1984)] does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy. Rather, a reviewing court must consider the

82

reasonableness of the investigation said to support that strategy.")

Application of these principles to Petitioner's penalty trial demonstrates that counsel were ineffective. Counsel engaged a mitigation specialist who conducted a investigation of the facts regarding Petitioner's upbringing and background. However, in a critical error, counsel failed to abide the recommendation of the mitigation specialist to engage a mental health expert to explore the significance of those facts that were uncovered. A mental health expert would have been able to place the facts that were uncovered by the mitigation specialist into their proper mitigating perspective, and would have led reasonable counsel to present them. The proper use of a mental health professional would have also led to the discovery of additional facts, which neither the mitigation specialist nor counsel were able to discover.

Undersigned counsel have done what the trial mitigation specialist recommended. They have engaged three mental health experts, two of whom have evaluated Petitioner and one of whom has opined on the impact of Petitioner's extensive use of and manufacture of methamphetamine. Collectively, these experts present a dramatically different and far more mitigating profile of Dustin Honken. Moreover, the perspective of a mental health professional would have also provided an explanation for the aggravating evidence presented by the Government. As such,

83

the mental health profile of Dustin Honken could have tipped the balance in favor of life. *See Porter*, 130 S.Ct. at 454 ("Had the judge and jury been able to place the unpresented mitigating evidence 'on the mitigating side of the scale,' and appropriately reduced the ballast on the aggravating side of the scale, there is clearly a reasonable probability that the [sentencer] 'would have struck a different balance,' *Wiggins,* 539 U.S., at 537 []and it is unreasonable to conclude otherwise."). In other words, the mitigating evidence and opinions that were not presented to the jury due to counsel's deficient failure to follow the advice of the mitigation specialist, caused Petitioner *Strickland* prejudice.

### A. Facts

Trial counsel retained a highly qualified mitigation specialist, Lisa Rickert. She has provided a declaration outlining her qualifications and role in Petitioner's pre-trial investigation. Decl. of Lisa Rickert, Appendix 44. Ms. Rickert possesses a Masters of Social Work from the University of Wisconsin at Madison and, in addition to her extensive experience in forensic social work, she has worked on a significant number of capital cases. *Id.* at ¶¶ 1-2. She was recommended to the defense team by Charles Rogers, Esq., who was appointed by the trial court as "learned counsel," and who had worked with her previously. *Id.* at ¶ 6; Decl. of Charles Rogers, Appendix 72 at ¶ 7.

84

As Ms. Rickert points out in her declaration (¶¶ 4-5), by virtue of her training and experience, she is able to screen for the presence or absence of mental health mitigation, and thus fulfills the requirements set forth in the ABA Guidelines. *See* ABA Guideline 4.1 ("The defense team should contain at least one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments."); ABA Guideline 10.4 (C) (same).

Ms. Rickert joined the defense team in late 2002. Rickert Decl., Appendix 44 at ¶ 6. As she began her investigation, "several prominent themes and red flags for significant mitigation themes began to emerge." *Id.*, ¶ 7. She discovered notable family dysfunction, violence and threats of violence. *Id.* She encountered substantial evidence that Petitioner's father, Jim Honken*,* was a degenerate drunkard, and an open and notorious criminal, who bragged about and recruited his young sons to assist in his criminal lifestyle. *Id.* at ¶ 8. According to her investigation, Jim Honken visited significant traumas on his young children, such as by violently killing family pets and threatening to kill Petitioner, among others. Young Dustin Honken actually believed that his father made people "disappear." *Id.* at ¶¶ 9-10. Ms. Rickert herself witnessed Jim Honken's violent proclivities, when he pulled a revolver on her during one attempt at interviewing him. *Id.* at ¶ 12.

Petitioner's mother, Marvea, was not able to counterbalance the horrendous

85

dysfunction caused by Jim Honken within the family. Marvea suffered at the hands of Jim Honken and she became deeply and chronically depressed. *Id.* at ¶¶ 7, 13. She began to carry on extra-marital affairs, and left much of the child-rearing duties to Petitioner's older brother, Jeff Honken. Decl. of Jeffrey Honken, Appendix 27 at ¶ 4. Marvea eventually divorced Jim Honken, but even then she withdrew into the world of her new husband, and her children were left without any emotional support or the type of love and nurturing that children require. Rickert Decl., Appendix 44, at ¶ 13.

Ms. Rickert has explained the importance of the facts that she learned:

The facts that I have summarized above are highly significant to a mitigation specialist in a number of ways. First, it is indisputably accepted in the mental health field that parental modeling can shape the mental health of children, and how generally they grow into adults. In the case of the Honken family, Jim modeled an asocial lifestyle. As a thief, liar and bully, he, in effect, normalized this behavior for his children. They learned that it is not only acceptable, but admirable to "get by" by stealing and breaking the law, instead of working; that breaking the law was a badge of honor, and most regrettably that violence is a legitimate tool to obtain one's way in life. Second, Jim's conduct toward his children, his wife, other people and even animals was highly traumatic for those around him. There was much about Dustin Honken that struck me as similar to the profile one often sees in physically abused and traumatized children, even as they grow to adulthood. To be sure, I encountered significant reports of childhood physical abuse. However, the physical abuse in this case was overshadowed by the trauma visited by Jim upon his family. Third, the family dynamic combined with Dustin's presentation evidenced that early childhood abandonment and attachment issues were present. Such

86

issues can lead to a host of mental health pathology, which can be highly mitigating in the context of a capital case. In sum, the mitigation themes that emerged related to Dustin's parental abandonment and attachment issues; trauma-related pathology and the toll taken by the horrendously poor parental modeling.

*Id.* at ¶ 14.

Ms. Rickert performed her role. She generated a social history and screened

Mr. Honken for mental health impairments relevant to that history. Not surprisingly,

based on her investigation, she advised counsel to have Mr. Honken evaluated by a

mental health professional:

> In both my written and oral communications with counsel through the course of my preparations and investigation, I advised them of the need to have Mr. Honken evaluated by a mental health expert with a specialty in the areas of trauma, abandonment and related subjects. I also expressed my belief that it was critically important to set forth the full picture of Dustin's life, even though some aspects of it were negative and even involved Dustin's own criminal conduct. For instance, I learned that in some instances well before the capital offense Dustin engaged in conduct eerily similar to that displayed by his father.
>
> *                                *                                *
>
> Counsel never followed my recommendation to engage a mental health expert to explore and possibly opine on the subjects that I have noted above, i.e., trauma, attachment, abandonment and negative parental modeling.

*Id.* at ¶¶ 15, 16.[14]

---

[14]As pointed out in Ms. Rickert's declaration, counsel engaged two experts, Dr. Michael Gelbort and Dr. Mark Cunningham. The former only conducted testing for

87

Ms. Rickert states that she "never understood why counsel did not have Mr. Honken evaluated on these topics by an expert." *Id.* Learned counsel Rogers provides some answers:

> Ms. Rickert recommended that we have Mr. Honken evaluated by a psychologist or psychiatrist to assess the psychological impact of his difficult upbringing. Mr. Parrish, Mr. Spies and I consulted with Ms. Rickert about this, and discussed this among ourselves and decided not to have the evaluation conducted. I was concerned that if we were to have Mr. Honken evaluated, then the government would also have him evaluated. I was quite sure that the government would likely use Daniel Martell or Park Deitz. That turned out to be the case, when the government placed Dr. Dietz on their witness list. These doctors routinely worked with the government at that time and they always found capital defendants to have an anti-social personality disorder. I was convinced they would do the same here. This is the reason I suggested that we not have Mr. Honken evaluated by a psychiatrist or psychologist as Lisa Rickert had suggested. We did not have any discussions about the fact that we could have done a confidential evaluation that the government did not have to know about. There was no discussion of any rule requiring a fire wall be set up in the prosecutor's office with respect to any penalty phase mental health mitigation that we wished to use.[15]

---

brain damage, and finding little of significance, he did not testify. Dr. Cunningham opined that Mr. Honken would not constitute a future danger while in BOP custody, however, this opinion was based solely on "demographic information, none of which related to Mr. Honken as an individual." Most significant for the instant claim, neither expert performed a "comprehensive mitigation" workup (Rickert Decl. ¶ 16), nor did they examine or opine on "trauma, attachment, abandonment and negative partental modeling." *Id.;* Decl. of Michael Gelbort, Ph.D., Appendix 46, at ¶ 1.

[15]Mr. Rogers' use of "firewall" is a reference to Fed.R.Crim.P. Rule 12.2 which provides for sealing of the results of any mental health evaluation conducted by the Government until such time, if any, that the defendant is convicted of a capital-

Rogers Decl., Appendix 72, at ¶ 8; *see also* Decl. of Leon Spies, Appendix 74, at ¶ 11; Decl. of Alfredo Parrish, Appendix 73, at ¶ 7.

Having not had Petitioner evaluated by a mental health professional, counsel correspondingly failed to understand that some of the so-called "bad facts" about Mr. Honken – that they did not want the jury to hear – were actually, in context, mitigating facts.  As Ms. Rickert explains:

> I also expressed my belief that it was critically important to set forth the full picture of Dustin's life, even though some aspects of it were negative and even involved Dustin's own criminal conduct.  For instance, I learned that in some instances well before the capital offense Dustin engaged in conduct eerily similar to that displayed by his father.  As with much capital mitigation, some of what I learned had a "two edged sword" quality to it, that is, it had the potential to mitigate or aggravate.  Counsel made the determination not to present some of the potentially mitigating evidence out of fear of its potential aggravation without having obtained the opinion of a mental health professional.

Rickert Decl., Appendix 44, at ¶ 15.

Counsel also did not have Mr. Honken evaluated to determine whether his offense behavior was influenced by his exposure to methamphetamine and its component parts, either through use of the drug, or through the process of its manufacture.  Mr. Rogers states that this was an oversight and was not the product of any tactical or strategic reasoning.  Rogers Decl., Appendix 72, ¶ 9.  Had counsel

---

eligible count.

89

not failed to obtain a comprehensive mental health evaluation of Petitioner, this oversight would have been avoided. *See* Decl. of Richard Dudley, Jr., M.D., Appendix 47, at ¶¶ 16-17; Decl. of John F. Warren, Ph.D., Appendix 45, at ¶¶ 10-11; Report of Melissa Piasecki, Appendix 48.

## B. Deficient Performance

It has been a prominent feature of capital jurisprudence in the modern era, *i.e.* since *Furman v. Georgia*, 408 U.S. 238 (1972), that evidence of a dysfunctional childhood and resulting emotional disturbance should be presented to the capital sentencer. *See, e.g.*, *Eddings v. Oklahoma*, 455 U.S. 104 (1982) ("Evidence of a difficult family history and of emotional disturbance is typically introduced by defendants in mitigation. *See McGautha v. California*, 402 U.S. 183, 187-188 (1971)").

Here, counsel presented portions of the first category of evidence noted in *Eddings*, *i.e.,* some evidence of dysfunction or "difficult family history," but failed to present any evidence of the second category, *i.e.*, evidence of the resulting "emotional disturbance." That failure is not attributable to a tactical decision, arrived at after a full investigation – such a decision being "virtually unchallengeable." *Strickland*, 466 U.S. at 390-91 ("strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable"). Rather,

counsel's failures here resulted from decisions made after **no** investigation of the mental health impacts of Petitioner's "difficult family history." Thus, as a "strategic choice[] made after less than complete investigation," it was only "reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.*

In assessing whether counsel here made a reasonable tactical decision not to have Mr. Honken evaluated by a mental health professional, as recommended by their mitigation specialist and by the ABA Guidelines, *see* ABA Guideline 10.11.F.2, counsel's failure to understand the firewall concept behind Rule 12.2 is prominent. As learned counsel, Mr. Rogers was responsible for bringing the existence and operation of this Rule to the attention of co-counsel. He did not. *See* Rogers Decl., Appendix 72, at ¶ 8; Spies Decl., Appendix 74, at ¶ 12; Parrish Decl., Appendix 73, at ¶ 8; *cf.* Rickert Decl., Appendix 44, at ¶ 17 ("I never understood why counsel did not have Mr. Honken evaluated . . . I could only see an upside to having a confidential evaluation conducted.").

Defense counsel did not follow Ms. Rickert's recommendation for a number of reasons: 1) they were concerned that the defense evaluator(s) would have concluded that Mr. Honken had an anti-social personality disorder; 2) they were concerned that if the defense did an evaluation, then the Government would have also

91

done such an evaluation, and would have used either Park Dietz or Daniel Martell to evaluate; and 3) they were concerned that an evaluation by these Government experts would have also found Mr. Honken to have an anti-social personality disorder. *See* Rickert Decl., Appendix 44, at ¶ 17; Rogers Decl., Appendix 72, at ¶ 8; Spies Decl., Appendix 74, at ¶ 11; Parrish Decl., Appendix 73, at ¶ 7. These were not reasonable concerns upon which to decide not to have Mr. Honken evaluated.

Trial counsel's collective fear that an evaluation would have resulted in some information being developed that was harmful to Mr. Honken was not reasonable. Because such an evaluation would have by nature been confidential until such time, if any, that counsel provided notice of intent to present mental health evidence in the penalty phase, counsel quite literally had nothing to lose by pursuing the multiple reds flags and following Ms. Rickert's recommendation. Moreover, the firewall provisions of Rule 12.2 would have insured that the reports of the evaluations (both from defense and Government experts) would have remained sealed and not available to the trial prosecutors, unless and until Petitioner's counsel decided to present evidence of mental health deficits in the penalty phase.

Counsel failed to appreciate that the results of either their own or the

92

Government's evaluations could not have caused them harm – if ever[16] – until such time as counsel reviewed all reports from both sides and were then in a position to make a fully informed decision based on a complete investigation of the issue. The failure to understand this factor is quite similar to the error made by trial counsel in *Williams v. Taylor*, 529 U.S. at 395. There, counsel were found deficient when they "failed to conduct an investigation that would have uncovered extensive records . . . not because of any strategic calculation but because they **incorrectly thought that state law barred access to such records**." Here, counsel failed to cause the evaluations to take place, not because of a "strategic calculation" but because they "incorrectly" failed to understand that the law ensured no harm could come of the evaluation until such time, if ever, that **the defense decided** to place Petitioner's mental health in issue. *See* Fed. R. Crim. Pro. 12.2. Accordingly, counsel did not make a tactical or strategic decision that is "virtually unchallengeable." Rather, "[t]heir decision to end their investigation when they did was neither consistent with the professional standards . . . nor reasonable in light of the evidence counsel uncovered in the social services records – evidence that would have led a reasonably

---

[16]Lisa Rickert expected that even a Government evaluation would have resulted in helpful information. *See* Rickert Decl., Appendix 44, at ¶ 17 ("I could see no harm in having the evaluation conducted, and seeing what benefits could be derived . . . I was not sure that Dr. Dietz would even disagree with the opinions that I hoped and expected would emerge from a defense evaluation.")

93

competent attorney to investigate further." *Wiggins*, 539 U.S. at 534.

Counsel's failure to have Mr. Honken evaluated also limited their ability to see and understand that some of the so-called bad facts that they chose to keep from the jury, were, in reality, and from a mental health perspective, mitigating facts. *See Thomas v. Horn*, 570 F.3d 105, 129 (3d Cir. 2009):

> Additionally, the quantity of aggravating evidence that the jury already did consider was significant. But Thomas' mental health history acts as a common thread that ties all this evidence together. A single juror may well have believed that this unifying factor explained Thomas' horrific actions in a way that lowered his culpability and thereby diminished the justification for imposing the death penalty. *Penry v. Lynaugh,* 492 U.S. 302, 319 (1989).

Thus, by making the uninformed choice not to have Petitioner seen by a mental health professional, counsel also insured that they would not be able to appreciate the complete picture of Petitioner that mitigated the offenses.

### C.    Prejudice

Prejudice under *Strickland* and its progeny is established if there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. This "undermines confidence"/"reasonable probability" standard is less demanding than proof by a preponderance of the evidence. *Id.*; *Williams*, 529 U.S. at 405-06;

94

*Kenley v. Armontrout*, 937 F.2d 1298, 1304 n.5 (8th Cir. 1991).

As noted above, undersigned counsel have had evaluations conducted by three mental health professionals. The results of these evaluations provide true insight into the mental health deficits that significantly influenced Petitioner's conduct. As such, they would have provided the sentencer the opportunity to make a "reasoned moral response" to Mr. Honken's background and deficits, as required by the Supreme Court:

> Underlying *Lockett*[17] and *Eddings,* is the principle that punishment should be directly related to the personal culpability of the criminal defendant. If the sentencer is to make an individualized assessment of the appropriateness of the death penalty, evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are **attributable to a disadvantaged background, or to emotional and mental problems**, may be less culpable than defendants who have no such excuse. . . Thus, the sentence imposed at the penalty stage should reflect a reasoned moral response to the defendant's background, character, and crime.

*Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (internal quotation marks and citations omitted).

Petitioner has been evaluated by Dr. Richard Dudley, a psychiatrist.[18] Dr.

---

[17]*Lockett v. Ohio*, 438 U.S. 586 (1978).

[18]Dr. Dudley is a highly credential forensic mental health evaluator, whose credentials have been recognized by the Supreme Court. *Sears*, 130 S.Ct. at 3264 (referring to Dr. Dudley as a "well-credentialed expert").

95

Dudley has concluded that Mr. Honken has the type of troubled upbringing and resulting psychological and psychiatric deficits that mitigate in a capital case:

> My evaluation reveals that Mr. Honken (whom I sometimes refer to below as Dustin, for the sake of clarity) had an extremely difficult childhood and adolescence. I also discovered that there was an absence of any significant influences that might have alleviated the serious impact of those difficulties on his psychological development. **As a result, he developed emotional difficulties. Absolutely no effort was made to identify and obtain treatment for these difficulties during his important developmental years; and therefore he continued to suffer from these psychiatric difficulties. Left unrecognized and untreated, these difficulties have had a profound impact on his adult functioning**.

Decl. of Richard Dudley, Jr., M.D., Appendix 47, at ¶ 5. After reviewing the relevant social history, Dr. Dudley concluded that this history left Petitioner with a "profound sense of abandonment" (*id.* at ¶¶ 7, 9). Such emotional and actual abandonment has serious implications for the development of a child: "In regard to potential psychological assaults that a parent can visit on a child, abandonment, or fear of abandonment, are among the most damaging." *Id.* at ¶ 9. Dr. Dudley explains the origins and impacts of the constellation of facts and impairments extant in Mr. Honken's life:

> It is my opinion to within a reasonable degree of medical certainty that the above noted dysfunctional, painful, and extremely difficult childhood and adolescence caused Mr. Honken to develop a combination of emotional difficulties. These difficulties were first evident during Mr. Honken's childhood years, and then became

96

increasingly complex and pronounced as he became a late adolescent and young adult. Children require a stable, nurturing and loving family to develop into mentally healthy adults. **In the absence of such an environment, and particularly in the face of parental abandonment and dysfunction, children grow into adults with an impaired ability to control their impulses, to make sound judgments and to predict the consequences of their behavior. Such an environment also causes children and adult survivors of such an upbringing to develop paranoia and impaired adult relationships. It is my opinion, that Mr. Honken suffers from these emotional difficulties.**

*Id.* at ¶ 12.

In addition to the dysfunction and abandonment suffered by Mr. Honken, he also displays the hallmarks of an adult survivor of childhood trauma:

Mr. Honken's father's constant threats of violence and actual violence, and Mr. Honken's experiences of being bullied by family and peers alike, were particularly traumatic for him. As a result, **he developed the type of trauma-related symptoms of anxiety seen in children so traumatized, such as an overwhelming and chronic fear that something horrible was going to happen, hypervigilance, and over-reactivity to perceived threats.** Given the absence of nurture, support and/or protection from the traumatic threats of violence and actual violence, Mr. Honken also developed a physiologic component to his trauma response. When children are frightened, they have the same physiologic response that adults have (commonly known as the 'fight or flight response'). When children who consistently have a nurturing or protective adult around them to calm them down when they have such experiences, they will eventually learn how to manage or calm that physiologic response on their own. But when there is repeated exposure to such fear and trauma in the absence of a nurturing or protective adult, children never learn how to calm that physiologic response and end up in a constant state of hyper-arousal that is extremely difficult to manage and control. In diagnostic terms, Mr. Honken developed an Anxiety Disorder, NOS, with many of the symptoms of anxiety and avoidant

97

behavior seen in traumatized children.

Id., ¶ 13.

Dr. Dudley also explains that Mr. Honken's experience with drugs and alcohol – going from abstinence to prolific and debilitating methamphetamine abuse – was his way of gaining relief from the psychic pain he felt:

> Although Mr. Honken had purposely avoided the use and abuse of alcohol and other substances well into his adult life, it is not at all surprising that once he tried methamphetamine and discovered how well it medicated away his anxiety, fears and sense of powerlessness, he wanted more. However, the heavy use of methamphetamine eventually exacerbated all of Mr. Honken's above noted difficulties in that such heavy use ultimately made him more fearful, paranoid, grandiose, impulsive, and frantic in his efforts to maintain some sense of security and stability in his life. The use of this powerful drug also made it more difficult for him to maintain any type of stability of his mood, and ultimately impaired his decision-making capabilities and judgment.

*Id.*, ¶ 17.

This highly credentialed and experienced forensic evaluator has also considered the mitigating value of what was presented at trial in light of what he learned and reviewed in the course of his evaluation. The two presentations do not compare:

> I have been asked by counsel to compare – from a forensic psychiatric perspective – the mitigating value of what was presented at Mr. Honken's penalty trial, with what I have learned about Mr. Honken, and my professional opinions about his psychopathology. Trial counsel presented a narrow and superficial factual snapshot of Mr. Honken's

98

upbringing. In addition to not presenting a full factual picture of Mr. Honken's upbringing and the events that shaped his life, trial counsel failed to provide the jury with a mental health-based explanation for how these facts shaped Mr. Honken's mental health deficits. The jury never heard about why the facts mitigate from a mental health perspective. In my experience in capital cases, the opinions that I have set forth in this statement are typically presented, when available, in the penalty phase of a capital trial.

*Id*. at ¶ 19.

The facts and opinions contained in Dr. Dudley's declaration demonstrate that Petitioner was severely prejudiced by counsel's deficient performance. *See* Parrish Decl., Appendix 73, at ¶ 9 ("I have had an opportunity to consider the opinions of [current counsel's] experts. Had these opinions been available at the time of trial, I believe that we would have strongly considered using them."); Spies Decl., Appendix 74, at ¶ 13.

Dr. Dudley's overall view was shared by psychologist John F. Warren, III, Ph.D. Like Dr. Dudley, Dr. Warren, reviewed voluminous materials about Mr. Honken's life and upbringing, conducted two detailed clinical interviews, and administered psychological tests. Warren Decl., Appendix 45, at ¶¶ 4-5. He largely agrees with the views expressed by Dr. Dudley about the existence and impact of Mr. Honken's upbringing. Moreover, he shows that trial counsel's concerns that Mr. Honken could be found to have an anti-social personality disorder, were not well

99

founded.  Dr. Warren indicates that the psychological tests he administered do not bear out that diagnosis, and that background information reveals that Mr. Honken lacked the required conduct disorder as a child to qualify for that diagnosis.  *Id*. at ¶ 13.  Dr. Warren also concludes that:

> there was a great deal of mitigating evidence that could have been presented to the jury.  At the time of the offenses, Mr. Honken was a severely debilitated individual.  Despite these significant mental health impairments, the trial record of the penalty phase reveals that no mental health mitigation was presented at all.  The psychological difficulties and resultant dysfunction described herein and in Dr. Dudley's declaration were not part of the penalty phase presentation.  In my experience, the combined mental health effects of the family history of mental illness, Mr. Honken's upbringing, which was marked by abuse, neglected and abandonment, and his severe drug use, would have been substantially mitigating.

*Id*. at ¶ 14.

Dr. Warren, like Dr. Dudley, also opined that Petitioner's methamphetamine abuse coincided with and profoundly exacerbated the psychological and emotional crisis that Petitioner was experiencing at the time of the crimes.  *See* Dudley Decl., Appendix 47, at ¶¶ 16-17; Warren Decl., Appendix 45, at ¶¶ 10-11.  Counsel's deficient failure to explore the impact of Mr. Honken's use and manufacture of methamphetamine thus also caused Petitioner prejudice.

Undersigned counsel posed a series of hypothetical questions to a medical doctor with expertise in the effects of the use and manufacture of methamphetamine.

100

Melissa Piaskecki, M.D., has provided counsel with a report. *See* Report of Melissa

Piasecki, Appendix 48. In that report, she explains a number of important mitigating

factors based on Mr. Honken's exposure to this powerful drug. She explains that use

of methamphetamine is associated with "behavior changes including irrational and

violent behavior." *Id*., at 2. She notes that "amphetamine's association with violence

in chronic users has been noted since the 1970's and the association has been

confirmed for methamphetamine." *Id.* She continues:

> A survey of 1,000 users entering treatment found that interpersonal
> violence was frequently reported . . . A review of fatalities involving
> methamphetamine found a significant elevation of death by homicide
> and suicide in users relative to users of other substances. . . A 2009 case
> control study of inmates convicted of homicide found that a history of
> recent methamphetamine use increased the odds of being involved with
> a homicide nearly nine-fold . . .

*Id.* Dr. Piasecki also explains the psychiatric impacts of such exposure, including

psychotic symptoms and paranoia. *Id.*, 3. Dr. Piasecki notes that exposure to the

manufacturing process (both to the drug and its component parts) also can cause

many of the same side-effects as actually ingesting the finished product. *Id.*

In seeking to mitigate the offenses, and to offer the jury the full picture of

factors that could have led it to a reasoned moral judgment that life imprisonment was

appropriate, certainly the views of Dr. Piasecki, or a like forensic practitioner, could

have resulted in a sentence of life imprisonment. Accordingly, Petitioner has suffered

101

prejudice from counsel's failure to consult such an expert.

Petitioner suffered additional prejudice from his lawyers' decision not to engage a mental health professional. In addition to the expert opinions that could have been presented to the jury, a mental health professional could have assisted in eliciting additional facts from the various lay witnesses contacted by the defense team. Such an expert can provide counsel and their mitigation specialist with advice identifying red flags for further investigation and guidance about how to approach witnesses in order to elicit painful or embarrassing information. Additionally, an expert can interview selected lay witnesses in order to bring a professional approach to eliciting this information.

Undersigned counsel have done just this. After consultation with their experts and through direct expert-to-witness interviews, counsel have elicited a variety of important mitigating facts of which the trial defense team never learned. *See, e.g.*, Dudley Decl., Appendix 47, at ¶ 6 ("[Marvea's] relationship with Jim Honken was characterized by fear and abuse, including in their sexual relationship, which can most charitably be described as deeply dysfunctional but more descriptively included marital rape, threats of violence, and complete emotional estrangement. There is little doubt that Marvea's repulsion and estrangement from Jim negatively affected her ability to emotionally connect with and accept Dustin and her other children.");

102

Marvea Smidt Decl., Appendix 75, at ¶ 19 (Jim Honken "would want sex frequently, and especially when he had been drinking, which was pretty much all the time. I wouldn't want sex, but I wasn't in a position to resist him. He forced me to have sex with him even though I didn't want to. Jim would be desensitized from drinking so it lasted way too long. The pain was terrible. I would just lay there like a zombie, and waited for him to get it over with. That was all I felt I could do. During my entire marriage to Jim, I did not know that a woman could get enjoyment from sex. I didn't know what that meant. His mistreatment of me got worse after my miscarriage and Matthew's death. Later, when I became stronger and stood up to him, he became more forceful. Jim would say I had to do what he wanted because I was his wife. Looking back on it after having been in a happy marriage, Jim abused me in a way that I would call marital rape."); Alyssa Nelson Decl., Appendix 26, at ¶¶ 11, 13 ("I testified that when our mother remarried Ron Smidt, the kids were jealous of Ron. I did not testify about how Mom put her man before her children. She would take care of his wants before she took care of our needs. Ron wanted dinner at six o'clock sharp everyday. So, Ron got his dinner every night at six o'clock. It didn't matter what else was going on in our lives – Ron wanted his dinner at six o'clock. My mom wasn't present for us because she had to take care of Ron. . . I did not testify about how Mom and Ron would spend the evenings behind closed

103

doors."); Marvea Smidt Decl., Appendix 75, at ¶ 22 ("When Jim and I divorced, I thought Jim might want custody of one of the children. So, I told him he could take Dustin. Jim certainly wasn't able to take care of Dustin. I wish I hadn't offered because Dustin must have felt so unwanted."); *Id.* at ¶¶ 12-15 ("There is a lot of mental illness in my family, particularly depression and anxiety. . . My sister Laurel has also had multiple mental issues over the years . . . My brother Tim has struggled with depression and alcoholism for many years . . . have been depressed on and off as long as I can remember."); Alyssa Nelson Decl., Appendix 26, at ¶¶ 24-25 ("Like many people in my family, I have a lifelong history of mental health problems . . . My maternal grandfather was an alcoholic. My maternal grandmother was extremely nervous and anxious. She would have been much better off if she had been prescribed Valium. My maternal uncle Tim is an alcoholic. He suffers from anxiety and depression. Tim's oldest children, Courtney and Jason have had substance abuse problems. Jason has had legal problems for driving under the influence of alcohol. Tim's twins have been treated for depression. My maternal aunt, Laurel, has been hospitalized for anxiety and depression. Her son has substance abuse problems and a serious eating disorder.").

104

**THE COURT'S PENALTY PHASE INSTRUCTIONS FAILED TO PROPERLY NARROW THE SCOPE OF THE JURY'S CONSIDERATION OF FUTURE DANGEROUSNESS AND FAILED TO GUIDE THE JURY'S WEIGHING OF AGGRAVATING AND MITIGATING CIRCUMSTANCES; COUNSEL WERE INEFFECTIVE FOR FAILING TO OBJECT IN VIOLATION OF PETITIONER'S FIFTH, SIXTH, AND EIGHTH AMENDMENT RIGHTS.**

In instructing the jury during the penalty phase, the court erred in several areas. First, the court's instruction regarding future dangerousness was overly broad, allowing the jury to find that circumstance based merely on Petitioner's custody classification. This instruction failed to properly guide the weighing process of aggravating and mitigating evidence, as required by the Eighth Amendment. The instruction also effectively directed the jury to reject the defense contention during the penalty hearing that Petitioner's high custody classification would make him less dangerous, rather than more dangerous in the future in prison. Additionally, the court failed to instruct the jury that in the weighing process, they must find that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt. Counsel were ineffective for failing to object to these errors.

**A.      The Court's Instruction Regarding Future Dangerousness was Overly Broad**

The court's instructions on future dangerousness stated:

Final 'Penalty Phase' Instruction No. 4 - Step Three: 'Non-Statutory'

105

> Aggravating Factors. . . Evidence that the defendant would be a danger in the future to the lives and safety of other persons may include **one or more** of the following: (a) specific threats of violence; (b) a continuing pattern of violence: (c) low rehabilitative potential; (d) lack of remorse; and (e) high custody classification.

Dkt. # 524, at 23. Thus, the jury was free to find future dangerousness from the mere fact that Petitioner had a high custody classification. In fact, the jury did find the existence of this aggravating circumstance.

Such a broadly worded aggravating circumstance violates the Eighth Amendment. *Furman v. Georgia*, 408 U.S. 238 (1972) (failure of capital sentencing scheme to guide the discretion of the jury violates Eighth Amendment). Since *Furman*, the Supreme Court has "insisted that the channeling and limiting of the sentencer's discretion in imposing the death penalty is a fundamental constitutional requirement for sufficiently minimizing the risk of wholly arbitrary and capricious action." *Maynard v. Cartwright*, 486 U.S. 356, 362 (1988), *citing Gregg v. Georgia*, 428 U.S. 153, 189 (1976), *Spaziano v. Florida*, 468 U.S. 447, 462 (1984), and *Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988). Surely, the sentencer's discretion was not guided here, where the court's instruction basically amounted to a directed verdict on this circumstance, because of the use of the words "one or more of the following."

This instruction was particularly problematic in view of the fact that Petitioner

106

presented Dr. Mark Cunningham, "to help [the jury] understand some issues dealing with the Government's allegation about future dangerousness in this case." Tr., 3725. Dr. Cunningham testified generally as to the classification systems in federal prisons and regarding rates of homicides in prison. Additionally, he testified that the Security Designation and Custody Classification Manual of the U.S. Bureau of Prisonss requires that inmates serving a life sentence, like Petitioner would be if not sentenced to death, "shall be housed in a high-security-level institution." Tr., 3740. Thus, the court's instruction endorsed the Government's view that a high custody status equated to future dangerousness, and thereby implicitly rejected Dr. Cunningham's opinion. Stated differently, the court's instruction took sides with regard to whether a higher custody status was mitigating, as testified to by Dr. Cunningham. Since the jury found this aggravating circumstance, the instruction violated due process, Petitioner's right to a jury trial and the Eighth Amendment's requirements for weighing aggravating and mitigating evidence.

**B.      The Court Failure to Instruct the Jury Regarding Weighing of Aggravating and Mitigating Circumstances Violated Due Process, the Right to a Jury Trial and the Eighth Amendment**

The court also erred in failing to instruct the jury as to what standard of proof it should use in the process of weighing aggravating circumstances against mitigating circumstances. Due process and the Eighth Amendment require that before a capital

107

jury may return a verdict of death, it must be convinced beyond a reasonable doubt of the relative weight of the aggravating and mitigating circumstances. The court did not provide this guidance.

In *Apprendi v New Jersey*, 530 U.S. 466 (2000), the United States Supreme Court held that pursuant to the "Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Id*. at 476.

In *Ring v. Arizona*, 536 U.S. 584 (2002), the Supreme Court extended *Apprendi* to the capital sentencing context, concluding that "[c]apital defendants, no less than non-capital defendants . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." *Id*. at 589. In so holding, the Court explicitly overruled its prior holding in *Walton v. Arizona*, 497 U.S. 639 (1990).[19]

_____

[19]In upholding Arizona's capital sentencing scheme against a challenge that it violated the Sixth Amendment, *Walton* held that aggravating factors were not "elements of the offense," but rather merely "sentencing considerations" guiding the choice between equally permissible sentences of life and death. *Ring* rejected this reasoning and found that because under Arizona law a defendant could not be sentenced to death unless further findings were first made, Arizona's aggravating factors were "the functional equivalent of [] element[s] of a greater offense." *Apprendi*, 530 U.S. at 494 n. 19. *Ring* held that, "[i]f a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact – no

108

Because *Apprendi* held that the Sixth Amendment prohibits a defendant from exposure "to a penalty **exceeding** the maximum he would receive if punished according to the facts reflected in the jury verdict alone," *Apprendi*, 530 U.S. at 483, "even if the State characterizes the additional findings . . . as 'sentencing factors,'" *Ring*, at 589, the Court found "*Apprendi*'s reasoning irreconcilable with *Walton*." *Id*. *Ring* thus holds that the same Sixth Amendment rights that apply to a capital defendant during the guilt phase of trial also apply in the sentencing phase.

Under *Ring*, the sentencing procedures followed in this case violate the Constitution, since the jury was not instructed that the aggravating circumstances must outweigh the mitigating circumstances **beyond a reasonable doubt**. The requirement that the jury find that the aggravating circumstances outweigh the mitigating circumstances for the imposition of death, must be treated as elements of the offense and therefore "'must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt.'" *Ring*, 536 U.S. at 600, (*quoting Jones v. United States*, 526 U.S. 227, 243 n.6 (1999). Thus, *Ring* requires the finding that aggravating circumstances outweigh mitigating circumstances to be made beyond a reasonable doubt.

matter how the State labels it – **must be found by a jury beyond a reasonable doubt**." *Ring*, 536 U.S. at 602.

109

Here, the court instructed the jury that it was to "consider whether the 'aggravating factors' . . ., taken together, sufficiently outweigh any 'mitigating factors' . . . so that the count in question calls for a sentence of death. Such language, which did not instruct the jury that the aggravating factors must outweigh the mitigating factors **beyond a reasonable doubt**, does not comport with the requirements of *Ring*. Because this finding, necessary to imposition of the death sentence, was not made beyond a reasonable doubt, Petitioner's death sentence must be vacated.

### C. Prior Counsel Were Ineffective For Failing to Object to These Errors and for Failure to Litigate These Issues on Appeal

Trial counsel ineffectively failed to object to these errors. Counsel performed deficiently as there could be no possible strategic reason for failing to object. Indeed, with respect to future dangerousness, counsel argued against this aggravating circumstance stating in closing that Petitioner would not be a danger in prison. Tr., 3927. Yet counsel failed to object to the court's instruction effectively directing a verdict on this aggravating factor. Petitioner was prejudiced by counsel's deficient performance. There is a reasonable probability that had counsel objected the outcome of the penalty phase would have been different. *See Starr v. Lockhart*, 23 F.3d 1280 (8th Cir. 1993) (finding trial and appellate counsel ineffective for failing to object to

110

and failing to raise an erroneous jury instruction); *Reagan v. Norris*, 365 F.3d 616 (8th Cir. 2004) (finding trial counsel's failure to object to erroneous jury instruction to be constitutionally deficient).

Appellate counsel's performance also was deficient. These instructional errors constitute plain error and should have been raised as such. At the time of the direct appeal, it was standard practice that appellate counsel in capital cases should seek to litigate all issues, whether or not previously presented, that were arguably meritorious. ABA Guideline 10.15.1. This Circuit likewise recognizes that appellate counsel is ineffective for failing to raise a meritorious claim, where the claim would have been reviewed under the plain error standard. *Carter v. Bowersox*, 265 F.3d 705, 716-17 (8th Cir. 2001). There was not, and could not be, any tactical or strategic reason for counsel not to raise this meritorious claim.

Trial and appellate counsel's failure to raise these instructional claims prejudiced Petitioner. The instructional error was plain. There was a reasonable likelihood of a different penalty verdict and/or a different outcome on direct appeal. Petitioner is entitled to a new sentencing.

111

# CLAIM ELEVEN

## VICTIM IMPACT EVIDENCE PRESENTED TO THE JURY WAS RECEIVED IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS.

Although so-called victim impact evidence is generally not precluded under the Eighth Amendment, the victim impact presentation in this case was unconstitutional in several respects. It was far too emotional, highly charged, and speculative, and therefore was unduly prejudicial and failed to comport with the Eighth Amendment. The highly charged nature of the testimony in this case even caused Judge Bennett to have an emotional reaction, which must have been seen by some number of the jurors, thereby tainting the reliability of the death verdict. In some instances, the Government presented an untrue picture of the impact of the death of two of the victims (DeGeus and Nicholson), and trial counsel ineffectively failed to challenge this false evidence. Finally, the court's instruction failed to guide the jury to properly weigh the victim impact aggravating factor.

Victim impact evidence is admissible as a "legitimate way 'of informing the sentencing authority about the specific harm caused by the crime in question.'" *Williams v. Norris*, 612 F.3d 941, 951 (8th Cir. 2010), *quoting Payne v. Tennessee*, 501 U.S. 808, 825 (1991). "The state does not have unfettered discretion to offer such evidence, however. If a witness or remark in a particular case so infects the

112

sentencing proceeding so as to render it fundamentally unfair, the defendant may seek relief under the Due Process Clause." *Storey v. Roper*, 603 F.3d 507, 517 (8th Cir. 2010). Indeed, in *Payne*, the Court did not intend to allow the extensive and unfair testimony such as that presented here. Victim impact testimony is only allowed to the extent that it provides "a quick glimpse of the life which a defendant chose to extinguish." *Payne* 501 U.S. at 822 (internal quotation marks omitted).

The testimony here far exceeded the bounds of *Payne*, as it was extraordinarily moving and emotional. Accordingly, it was so unduly prejudicial that it rendered the penalty hearing fundamentally unfair, in violation of due process and the Eighth Amendment. The trial court all but acknowledged this to be the case:

> I have already presided over the "penalty phase" in the companion case against Dustin Honken. This case will likely involve "victim impact" evidence that is substantially similar to the "victim impact" evidence in Honken's case, because this case involves the same alleged murders of the same victims. I can say, without hesitation, that the "victim impact" testimony presented in Honken's trial was the most forceful, emotionally powerful, and emotionally draining evidence that I have heard in any kind of proceeding in any case, civil or criminal, in my entire career as a practicing trial attorney and federal judge spanning nearly 30 years. Indeed, I cannot help but wonder if *Payne v. Tennessee*, 501 U.S. 808 . . . (1991), which held that victim impact evidence is legitimate information for a jury to hear to determine the proper punishment for capital murder, would have been decided the same way if the Supreme Court Justices in the majority had ever sat as trial court judges in a federal death penalty case and had observed first hand, rather than through review of a cold record, the unsurpassed emotional power of victim impact testimony on a jury. It has now been over four months

113

since I heard this testimony in the Honken trial and **the juror's sobbing during the victim impact testimony still rings in my ears**. This is true even though the federal prosecutors in Honken used admirable restraint in terms of the scope, amount, and length of victim impact testimony. To pretend that such evidence is not potentially unfairly prejudicial on issues to which it has little or no probative value is simply not realistic, even if the court were to give a careful limiting instruction. Rather, such potent, emotional evidence is a quintessential example of information likely to cause a jury to make a determination on an unrelated issue on the improper basis of inflamed emotion and bias-sympathetic or antipathetic, depending on whether one is considering the defendant or the victims' families. *Cf. Gabe*, 237 F.3d at 959-60 (defining "unfair prejudice" for purposes of Rule 403 as " 'an undue tendency to suggest decision on an improper basis'").

*United States v. Johnson*, 362 F. Supp. 2d 1043, 1106-07 (N.D. Iowa 2005).

It also was speculative in a manner that violated the Eighth Amendment. For instance, Rhonda Francis testified that she was the sister of victim Terry DeGeus. In addition to her testimony about the emotional impact of the death of her brother, she compared the character and emotional makeup of her late brother with her father. Tr., 3477. This type of testimony was irrelevant to any issue before the jury. Counsel failed to object to it. Then, she testified that the emotional upheaval caused by the death of her brother caused her father to develop diabetes. Tr., 3480. She also testified that "as blood pressure goes, I think most of us have high blood pressure now, so it's been a long, long journey." *Id.* This testimony was irrelevant, highly prejudicial and well beyond this lay witness's expertise to offer such an opinion.

114

Again, counsel failed to object.

Ms. Francis also testified that Mr. DeGeus was "always kind and always loving." Tr., 3482. This testimony was belied by the fact that Mr. DeGeus was a known habitual violent criminal who dealt drugs and acted as an enforcer in the various enterprises. *See* Claim Sixteen, *infra*. The prosecution should not have participated in the presentation of such obviously inaccurate testimony and defense counsel – who knew this testimony to be false – should have presented the truth to the jury either through cross examination, extrinsic evidence, or by moving in limine to preclude the evidence.

Similarly improper, speculative and highly prejudicial testimony was received from Kathy Nicholson, the ex-wife of victim Greg Nicholson. She described the alleged impact of Mr. Nicholson's death on his father: "his health started going bad. He ended up having to retire early. The stress of the situation worsened him being sick . . . He passed away two weeks after we buried Greg." Tr., 3503-04. Again, this testimony was speculative and constituted improper lay opinions about the impact of stress on the father's health, retirement and ultimate death. Defense counsel ineffectively failed to object to this testimony, or to seek to correct it through cross examination or by use of extrinsic evidence.

Robert Milbrath testified that he was the brother of Lori Duncan. Among other

115

things, he testified that she was "very much against [drugs]. She did not want to be around drugs at all. She did not want to know anybody or have her girls around drugs at all." Tr., 3510. This testimony was obviously in significant conflict with the fact that she dated men who were deeply involved in drugs, including Mr. Nicholson. Counsel ineffectively failed to correct this testimony, either through cross examination, extrinsic evidence or argument.

Testimony about the loss of Lori Duncan and her two minor children was obviously emotionally wrenching. Counsel failed to properly move to sanitize this testimony so as to bring it within the parameters of the Fifth and Eighth Amendments. Displays of the children in their Halloween costumes (Tr., 3514) and testimony about the obvious "devastation" (Tr., 3516) their death had on the family could have only caused undue prejudice.

If the testimony was not heart-wrenching enough, the court engaged in an emotional display of its own. This display occurred during the testimony of several of the impact witnesses. Tr., 3669 (counsel making record of their observations). While the court disputed counsel's statement that they saw the Judge crying during portions of the testimony, the court did not dispute that "there was some emotion in my voice" as "it was very emotional testimony" Tr., 3674.

Significantly, the court also observed that while it did not want to take

116

evidence at that time, that taking of evidence on this issue "may come and probably will come at a later day." *Id.* That day has come. In his to-be-filed discovery motion, Petitioner will request permission to interview the jurors in regard to the trial judge's emotional response and in connection with the impact this testimony had on the jury. *See Storey*, 603 F.3d at 517 ("The 'fundamentally unfair' due process standard typically means that the petitioner must show that there is a reasonable probability that the alleged error affected the outcome of the trial and that absent the impropriety, the verdict likely would have been different.") (citing *Skillicorn v. Luebbers*, 475 F.3d 965, 972 (8th Cir.2007)). The only way that Petitioner can meet this standard is to be allowed to interview the jurors.

Additionally, the court's instruction on victim impact evidence failed to provide the constitutionally required narrowing concepts to the jury. It stated:

> For Counts 8 through 17, the effect of the crime upon the victim's family was injurious. The prosecution must prove that the murder of the victim **deprived the surviving members of the victim's family of the benefit of having the victim in their lives** and as a result, their lives have changed and they have experienced significant emotional trauma, and that such injurious effect tends to support imposition of the death penalty.

Dkt. # 524, p. 24). This instruction failed to abide the constitutional mandate that aggravating circumstances must meaningfully distinguish those who are to sentenced to death from those who are not. *See Furman v. Georgia*, 408 U.S. 238 (1972)

117

(failure of capital sentencing scheme to guide the discretion of the jury violates narrowing requirements of the Eighth Amendment). Any death "deprives the surviving family members" from the benefits of having the victim in their lives, and thus the instructions violated the Eighth Amendment.

Trial counsel ineffectively failed to object to or otherwise litigate the issues arising from the victim impact evidence. Counsel have a duty to raise timely objections to such constitutional violations. *See Reagan v. Norris*, 365 F.3d 616, 622 (8th Cir. 2004) (finding trial counsel's failure to object to jury instructions constitutionally deficient); *Manning v. Bowersox*, 310 F.3d 571, 576-77 (8th Cir. 2002) (finding trial counsel's failure to object to admission of evidence constitutionally deficient); *Burns v. Gammon*, 260 F.3d 892, 896-97 (8th Cir. 2001); 2003 ABA Guideline 10.8-The Duty to Assert Legal Claims.

Appellate counsel's performance also was deficient. The admission of this extensive and unfair victim impact evidence was plain error and should have been raised as such. At the time of the direct appeal, it was standard practice that appellate counsel in capital cases should seek to litigate all issues, whether or not previously presented, that were arguably meritorious. ABA Guideline 10.15.1. Prevailing decisional law recognized that appellate counsel could be ineffective for failing to raise a meritorious claim, even where the claim would have been reviewed under the

118

plain error standard.  *Carter v. Bowersox*, 265 F.3d 705, 716-17 (8th Cir. 2001).

There was not, and could not be, any tactical or strategic reason for counsel not to

raise this meritorious claim.  These failures caused Petitioner prejudice at trial and on

appeal.  Proper litigation of these issues at trial would have precluded this evidence

which surely had a significant impact on the jury.  The error was plain, and would

have resulted in the vacating of Petitioner's death sentences had it been raised on

appeal.

### CLAIM TWELVE

**THE GOVERNMENT VIOLATED PETITIONER'S RIGHTS UNDER THE EIGHTH AMENDMENT AND THE DUE PROCESS CLAUSE BY PRESENTING INCONSISTENT ARGUMENTS AT HIS TRIAL AND HIS CO-DEFENDANT'S TRIAL; COUNSEL WERE INEFFECTIVE UNDER THE SIXTH AMENDMENT FOR FAILING TO DISCOVER AND PRESENT READILY AVAILABLE EVIDENCE THAT WAS PRESENTED BY THE GOVERNMENT AT HIS CO-DEFENDANT'S TRIAL.**

The Government repeatedly argued during Angela Johnson's trial that Johnson

was the more culpable of the two defendants for purposes of punishment.  The

Government elicited substantial testimony that Petitioner had no history of violence

prior to his meeting Johnson.  Indeed, the Government went so far as to suggest that

Petitioner was not even capable of murder absent the manipulation and negative

influences of Johnson.  Despite the Government's own assertions at Johnson's

subsequent trial that Johnson was a manipulator without whose influence these

119

murders may never have happened, the Government followed a much different course during Petitioner's trial. There, the Government described Petitioner as the manipulator and strenuously argued that death was therefore the only appropriate punishment in his case. The Government's improper change of tactics violated Petitioner's Eighth Amendment and due process rights.

In *Bradshaw v. Stumpf*, 545 U.S. 175 (2005), a capital habeas case, the United States Supreme Court took up the issue of whether prosecutorial inconsistencies at co-defendants' trials violate due process. The Court held that the inconsistency at issue in that case (the identity of the triggerman) did not affect the underlying conviction because the inconsistency was immaterial to any of the elements of murder. *Id.* at 186-87. The Court remanded on the issue of punishment, however, ruling that "[t]he prosecutor's use of allegedly inconsistent theories may have a more direct effect on Stumpf's sentence . . . for it is at least arguable that the sentencing panel's conclusion about Stumpf's principal role in the offense was material to its sentencing determination." *Id.* at 187.

Similarly, the Eighth Circuit has held that due process is violated where an inconsistency exists "at the core of the prosecutor's cases against defendants for the same crime." *Smith v. Groose*, 205 F.3d 1045, 1052 (8th Cir. 2000) (habeas relief based upon inconsistent theories at separate trials); *see also United States v. Paul*,

120

217 F.3d 989, 998 (8th Cir. 2000) (Federal Death Penalty Act case stating that due process violated where Government relies on "factually inconsistent and irreconcilable evidence at the two trials"); *United States v. Higgs*, 353 F.3d 281, 326 (4th Cir. 2003) (Federal Death Penalty Act case citing with approval both *Smith* and *Paul*); *Thompson v. Calderon*, 120 F.3d 1045, 1058-59 (9th Cir. 1997) (en banc), *vacated on other grounds*, 523 U.S. 538 (1998).

Because the Government relied on inconsistent evidence and theories respecting the appropriate punishment for Petitioner and Johnson, due process and the Eighth Amendment have been violated and Petitioner's death sentences should be overturned.

In the alternative, to the extent that the favorable evidence subsequently used by the Government at Johnson's trial was available to Petitioner's counsel, they were ineffective for failing to investigate and present this evidence, which tended to show that Petitioner was less culpable and less deserving of a death sentence.

## A.    The Government's Improper Change of Tactics

The Government's improper switch in this case pertains primarily to the sentencing determination.  As the Supreme Court noted in *Stumpf*, the question of whether a co-defendant occupies the principal role in a capital crime may well determine whether the jury feels that person deserves the death penalty.  *Stumpf*, 545

121

U.S. at 187. During Petitioner's trial, the Government consistently portrayed him as a callous, calculating, and violent manipulator. The Government spent significant time during its penalty phase closing arguing that Petitioner substantially planned and premeditated the killings (Tr., 3904-09) and that he is a future danger (Tr., 3911-14).

The Government's evidence and argument regarding Petitioner's relative culpability was much different during Johnson's trial. There, the Government asserted on more than one occasion that the murders at issue would not have even happened but for Johnson's influence over Petitioner. During its argument at the eligibility phase of Johnson's trial, for example, the Government argued the following to the jury:

> Ask yourself absent both of them coming together, Dustin Honken being the planner in this case and obviously with the motivation to kill and Angela Johnson who was somebody who acts, whether without her intentional conduct and prodding along Dustin Honken whether this murder would have happened. But for her, Dustin Honken couldn't have made entry into that house. Greg Nicholson would have seen him at that point and resisted.
>
> But for her, there was no way to get Terry DeGeus out to a point where he could be killed. But for her, Dustin Honken, he could have come up with a gun maybe someplace, but would he have? Could he have? It's that conduct by the defendant in this case that led to these murders.

Johnson Tr., Appendix 49, at 2465.

During the Government's case in aggravation against Johnson, it asked Alyssa

122

Nelson, Petitioner's sister, the following question: "[k]nowing what you know about his personality absent some outside influence, can you see Dustin Honken murdering five people?" *Id*. at 2679. The court sustained an objection to this question; however, the fact that the prosecutor asked it suggests that the he had a good faith basis to believe that Petitioner was **not** capable of murder, absent Johnson's influence. Certainly, the notion that Petitioner was not capable of murder absent outside influence is an "aspect of [his] character" that may serve "as a basis for a sentence less than death" *Lockett v. Ohio*, 438 U.S. 586, 604 (1978), and it may well have been "material to [the jury's] sentencing determination." *Stumpf*, 545 U.S. at 187.

The Government also clearly believed that as between Petitioner and Johnson, it was Johnson who was the manipulator, not Petitioner. In arguing for the potential admission in rebuttal of a series of threatening, profanity-laden telephone messages that Johnson had left for Petitioner, the Government made the following argument:

> Your Honor, while at least arguably this advances the Government's aggravating factor of future dangerousness, we are offering it much more in response to the defense assertions in their mitigating factors that this defendant had a mitigating role because she was under the influence and under duress and under the direction of Dustin Honken.
>
> And what this tape does more than anything else is tells you exactly what the relationship was between those two people. I mean, she's – this is a guy who murdered five people, and she's threatening to kick his

123

ass, he better get him (sic) home, that she told him not to fuck with her.

> I mean, this is somebody who's not led, who's not been under duress or under the influence of Dustin Honken. This is somebody who very much can stand up for herself, if anything else, is the one telling Dustin Honken what to do, where to go, where to be. And so I think this opens up a huge window into what the relationship really was like between them.

Johnson Tr., Appendix 49 at 2512-13.

Indeed, while Johnson's defense submitted as a proposed mitigating factor at the penalty phase the alleged fact that Johnson acted under the substantial influence of Petitioner, the Government argued that it did not "think there was a shred of evidence to suggest that at any point she was under substantial influence of Dustin Honken." *Id*. at 3979. The court agreed, and did not even let Johnson submit this as a potential mitigating factor to the jury. *Id*. at 3980.

Further, the Government on at least two occasions during its penalty phase closing argument in Johnson's trial set forth its position that Johnson was more morally culpable, thus more deserving of the death penalty, than Petitioner:

> What I was trying to describe to you is the Angela Johnson who manipulated her way to the top of the Honken organization, who constantly pushed and pressured Honken to get with it and make that methamphetamine so she could get her money back, who has kept pushing Dustin Honken after he was caught again in 1996 to kill again, and that's the image that I asked you to accept.

*Id*., 4079-80; *see also id*. at 4026 ("When you're back thinking about role in the

124

offense, do not, do not, just jump to the conclusion that the person who pulls the trigger is the person who's the most morally culpable for the crime. Think about what you know about this defendant and her violence, her impulsivity, **her ability to manipulate Honken**, Terry DeGeus. And ask yourself this question: Is it more morally culpable to pull the trigger, or is it more culpable for someone to egg on, to push?"). The Government certainly did not ask the jury to accept that same image during Petitioner's trial the previous year.

The Government reaffirmed its position on Petitioner's character during its argument on Johnson's motion for a new trial, in which it argued that "[p]rior to Dustin Honken meeting Angela Johnson, he wasn't a violent person," however Johnson "was a violent person. She was angry, she was volatile. **When you come down to it, it was Angela who pushed it.**" *United States v. Johnson*, Hearing on Motion for New Trial (11/16/05).

Indeed, the Government presented evidence that, prior to meeting Johnson, Petitioner never had been violent. Johnson Tr., Appendix 49 at 323-24, 856-57, 858, 914-15 (Cutkomp testifying that, without Johnson's influence, Petitioner may never have been capable of murder); *see also id.* at 977-78, 1056-57, 1521, 2668-69, 2672, 3203-04, 3271. This evidence came from an abundance of sources, including several who would, if anything, have had a bias against Honken and in favor of Johnson, such

125

as Johnson's siblings and ex-husband (with whom she shared a child and was on friendly terms).

The Government also elicited testimony that, unlike Petitioner, Johnson had a lifelong history of violence and threatening behavior. The Government's case included evidence that Johnson had, for example, expressed her jealousy of Kathy Rick by repeatedly threatening to kill her, attempting to break into her house, and vandalizing her car. *Id*. at 779; 781; 2637-39. It also included evidence that Johnson had threatened to kill Dan Cobeen, *id*. at 709, had threatened to kill a corrections officer at the Benton County Jail, *id*. at 2777, and had made an oblique threat to Jeff Honken and his children. *Id*. at 369-70. The Government elicited testimony that Johnson's threats were not merely idle; the evidence revealed that she photographed people present at court proceedings, *id*. at 2679-81, and made efforts to ascertain the name, make of car, and home address of the Benton County corrections officer. *Id*. at 2777. The Government elicited further testimony that Tim Cutkomp was more afraid of Johnson than of Petitioner, *id*. at 2621; 4026-27, and that on one occasion Petitioner awoke to find Johnson holding a gun to his head. *Id*. at 2678-79.

According to the Government's evidence, Johnson's involvement in the methamphetamine business also both predated and postdated her acquaintance with Petitioner. For example, while Johnson was attempting to further her

126

methamphetamine business (after Petitioner had already been incarcerated on his 1996 federal drug charges), Johnson's eyes "lit up" when discussing the prospect of becoming a mafia hit woman with an undercover law enforcement officer. *Id*. at 2740.

Despite all of this, the Government repeatedly pressed the theme during Petitioner's trial that he was a violent manipulator who was capable of anything and supremely deserving of the ultimate punishment. *E.g.* Tr., 3913 ("You all know what this defendant is capable of"); Tr., 3918 ("If this case, if these facts don't call for the death penalty, then what case does?"). The Government's contrary views and evidence from Johnson's trial were directly relevant to Petitioner's culpability and numerous disputed issues at Petitioner's penalty phase, including the question of his future dangerousness in prison. This discrepancy violated Petitioner's Eighth Amendment and due process rights under Eighth Circuit and Supreme Court law, and Petitioner is entitled to a new sentencing proceeding.

### B. In the Alternative, Defense Counsel were Ineffective for Failing to Present the Evidence Relied upon by the Government at Johnson's Trial, to the Extent it was Available to Them

Some of the evidence presented by the Government at Johnson's trial was available to Petitioner's counsel and could have been presented at his trial. Petitioner's counsel did not present this available evidence. Counsel had no strategic

127

basis for failing to introduce this evidence, as it was consistent with and supportive of counsel's chosen theory of defense at both the guilt and penalty phases. *Strickland v. Washington*, 466 U.S. 668 (1984). Counsel's omissions prejudiced Petitioner, as there is a reasonable probability that absent this failure, at least one juror would have voted for a life sentence for Petitioner on all counts. *See id.* at 694.

### CLAIM THIRTEEN

**TRIAL COUNSEL'S STIPULATION TO THE CIRCUMSTANCES REGARDING THE ALLEGED ACQUISITION OF MAPS ALLEGEDLY GENERATED BY ANGELA JOHNSON IN LIEU OF TESTIMONY FROM ROBERT MCNEESE, VIOLATED THE FIFTH AND SIXTH AMENDMENTS. APPELLATE COUNSEL'S FAILURE TO RAISE CLAIMS RELATED TO THE STIPULATION WAS INEFFECTIVE.**

As the United States Supreme Court has observed, "[t]here are few subjects . . . upon which this Court and other courts have been more nearly unanimous than in the expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." *Lee v. Illinois*, 476 U.S. 530, 540 (1986) (citation omitted). Counsel in a criminal case may waive confrontation rights by stipulating to the admission of evidence only if "it can be said that the attorney's decision was a legitimate trial tactic or part of a prudent trial strategy." *United States v. Stephens*, 609 F.2d 230, 232-33 (5th Cir. 1980); *see also United States v. Orr*, 707 F. Supp. 2d

128

894, 900 (S.D. Iowa 2009) (waiver reasonable if made "after thorough investigation") (citation omitted).

In this case, rather than insist on the presentation of the testimony of Robert McNeese, a Government agent with well-documented credibility problems, and of so-called "handwriting and fingerprint experts," trial counsel agreed to a stipulation that furnished the only evidence establishing the foundation and authenticity of maps, purportedly generated by Angela Johnson, describing the location of the bodies of the five victims. This violated Petitioner's confrontation rights and his right to the effective assistance of counsel.

By agreeing to the stipulation, counsel unreasonably forfeited the opportunity to confront, cross examine and bring to the jury's attention a number of meritorious challenges to the core of the stipulation, *i.e.* that the maps were actually generated by Johnson, including:

- that McNeese has a well-known history of cooperation with the Government in exchange for benefits;

- some of McNeese's past cooperation led to the presentation of false evidence;

- permitting the false impression to go to the jury that McNeese received no benefit from his cooperation in this case;

- relinquishing the opportunity to challenge the handwriting and fingerprint opinions – the former being "junk" science and the

129

latter being subject to challenge.[20]

Trial counsel's stipulation also unreasonably relinquished the legal challenge to what constituted hearsay evidence, specifically the potential testimony from McNeese that Johnson told him what the maps represented. Thus, the Government was able to suggest that Petitioner knew the location of the bodies (because Johnson knew) even though it presented no evidence connecting Petitioner to the maps. During closing arguments, the Government repeatedly emphasized Petitioner's "guilt by association":

> In July of the year 2000, Dustin Honken's girlfriend, the mother of his daughter and the associate in his continuing drug enterprise, Angela Johnson, was indicted and arrested for the murders of Greg Nicholson, Terry DeGeus, Lori Duncan, Kandi Duncan, and Amber Duncan and within weeks after that arrest, while sitting in the Benton County Jail,

---

[20]The National Academy of Sciences published a report *Strengthening Forensic Science in the United States: A Path Forward* ("NAS Report") (2009), which points out that so-called handwriting analysis is not based on sound science) (NAS Report at 167: "The scientific basis for handwriting comparisons needs to be strengthened."), and which points out the many ways in which fingerprint testimony is subject to challenge (*id.* at 142 "Given the lack of validity testing for fingerprinting; the relative dearth of difficult proficiency tests; the lack of a statistically valid model of fingerprinting; and the lack of validity standards for declaring a match, [] claims of absolute confidence in identification are unjustified.") The foundation for the NAS Report's conclusions were available to trial counsel at the time of the stipulation and they were ineffective for failing to consider and act upon these bases. Alternatively, if counsel's unawareness of these bases for challenging the two "expert" opinions was excusable, the NAS Report constitutes newly discovery evidence, which could not have been ascertained through the exercise of due diligence. *See* Claim Nineteen, *infra*.

130

was duped by a fellow inmate into drawing two maps, maps that located two graves in the country near Mason City, Iowa, two hidden, shallow graves, one of which held the body of Terry DeGeus, the other, a shallow, hidden grave holding the bodies of Greg Nicholson, Lori Duncan, Kandi Duncan, and Amber Duncan.

Ladies and gentleman, that is an outline of the government's case, the circumstantial evidence, the series of occurrences, the chain of circumstances from which there is one logical, one reasonable conclusion: That Dustin Honken and Angela Johnson together murdered these five people.

Tr., 3216-17. The prosecutor repeated this argument four more times in his summation, calling on the jury to convict Petitioner of the murders based on the maps and arguing that since Johnson was guilty, Petitioner must be guilty as well. *See id*. at 3256-57, 3273, 3287, 3391.

Recognizing the damaging impact of the maps and their significance to the Government's case, counsel vigorously challenged the admissibility of the maps and the accompanying handwritten notes allegedly provided to McNeese by Johnson. Tr., 2342-61. And counsel were successful in securing the exclusion of the notes, which further incriminated Johnson. Moreover, cases that had been decided at the time of this stipulation provided a basis for objecting to the testimonial hearsay of the handwriting and fingerprint witnesses. *E.g., Crawford v. Washington*, 541 U.S. 36, 51-52 (2004) (precluding the use of such testimonial hearsay without the opportunity for cross-examination). Trial counsel had no sound strategic or tactical reason for

131

entering into this stipulation – they wanted to keep out the maps and related evidence in any way they could.

Petitioner was prejudiced by trial counsel's failure. By stipulating to the hearsay statements, trial counsel gave up challenging the admissibility and/or credibility of the testimony that provided the context, background and meaning of the maps. Counsel foreclosed any opportunity to explore McNeese's relationship with the Government, his relationship with Johnson, including Johnson's responses to his advances, and to challenge the authenticity of the maps. The admission of these statements without subjecting McNeese or the handwriting and fingerprint analysts to rigorous cross-examination was prejudicial.

This was not the situation where McNeese's testimony would have opened the door to or "highlighted damning evidence." *United States v. Toms*, 396 F.3d 427, 433 (D.C. Cir. 2005). Had trial counsel required McNeese to testify, cross-examination would have shown that McNeese's testimony regarding the maps was not credible for a variety of reasons, including that McNeese had a long history of cooperating with the Government, including the United States Attorney's Office for the Northern District of Iowa, and that he received benefits from the Government for his cooperation in this case. *See United States v. Johnson*, 196 F. Supp. 2d 795, 802-06 (N.D. Iowa 2002).

132

**THE GOVERNMENT VIOLATED THE FIFTH AND EIGHTH AMENDMENTS WHEN IT REPEATEDLY ELICITED INADMISSIBLE TESTIMONY REGARDING PETITIONER'S ALLEGED INVOLVEMENT WITH DRUGS AND VIOLENCE THAT WAS TOO REMOTE TO BE RELEVANT. TRIAL AND APPELLATE COUNSEL INEFFECTIVELY FAILED TO OBJECT TO OR LITIGATE ALL OF THE INSTANCES OF MISCONDUCT.**

The Government deliberately elicited testimony from Scott Gahn on redirect examination that was in direct conflict with the trial court's prior rulings that such evidence was inadmissible. This conduct violated Petitioner's due process and Eighth Amendment rights. Trial counsel were ineffective for failing to object to the prosecutor's actions and for failing to seek a curative instruction.

**A.     The Government Improperly Elicited Prejudicial Testimony that the Court Previously Ruled Inadmissible**

A prosecution's duty in a criminal case "is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935); *accord United States v. Agurs*, 427 U.S. 97, 111 (1976) (it is the "prosecutor's obligation to serve the cause of justice"). Thus, when a prosecutor believes a witness may give an inadmissible answer during his examination, he must warn the witness to refrain from making such a statement, or avoid asking that potential question. *See United States v. Whimpy*, 531 F.2d 768, 771-72 & n.6 (5th Cir. 1976) ("It is clearly improper for the prosecuting attorney to ask questions eliciting facts and evidence which are

133

inadmissible and prejudicial."); *see also United States v. Johnston*, 127 F.3d 380, 394-96 (5th Cir. 1997) (prosecutors' questions constituted misconduct because questions were designed to elicit otherwise inadmissible hearsay testimony of informants and law enforcement officials); *United States v. Wadlington*, 233 F.3d 1067, 1077-78 (8th Cir. 2000) (same).

Here, the prosecutor asked a question on redirect examination that he knew, or should have known, would elicit the same answers that the court had previously ruled inadmissible. On direct examination, the prosecutor twice asked Gahn questions relating to Petitioner's alleged drug distribution prior to the time of the charged conspiracy in this case (1993-2000) and the original case that was dismissed (1991-1993). Gahn first testified that when he worked with Mr. Honken at Wellborn Industries in the summer of 1988, Mr. Honken asked if he knew anyone who would sell cocaine. Tr., 188-90. Trial counsel objected on the grounds that the time period was too remote to be relevant. The court sustained the objection and ordered the jury to disregard any testimony from Gahn about drug activity during that period. *Id*. at 190. Gahn then testified that he owed Petitioner a drug debt – some time in 1989, 1990 or 1991 – and implied that Petitioner was a dangerous person to shortchange. *Id*. at 192-93. Again counsel objected, and again, the court ruled that the time period was too remote and instructed the jury to disregard testimony of drug activity that was

from "a time frame earlier than 1991." *Id.* at 193-94; 204-05.

Despite the court's rulings, the prosecutor elicited the same testimony on redirect examination that the court had already precluded on direct:

Q. How do you know that to be true?

A. There was two times that Dustin ever made me real nervous, and you get that gut feeling where you know something's a little bit off. One was when he told me to pay up for the money – pay him the money for the coke that I did. I had a little feeling that if I didn't pay this guy his money, it could be bad news . . .

*Id*. at 225-26. This time, however, trial counsel failed to object to the prosecutor's misconduct and Gahn's testimony, and the jury heard this improper evidence. The Government's decision to elicit this testimony not once, but three times, suggests that the prosecution deliberately flouted the court's rulings. The Government's conduct was improper and violated Petitioner's due process rights. *See United States v. Haley*, 452 F.2d 391, 396 (8th Cir. 1971) ("[W]hen the government deliberately engages in prejudicial proof it may be estopped to deny the prejudicial effect on the jury regardless of the strength of its case."); *Whimpy*, 531 F.2d at 771 ("We refuse to countenance the conduct of the prosecutor in . . . conducting the rebuttal examination in a way which was in direct conflict with the ruling of the court."). *Cf. United States v. Robinson*, 774 F.2d 261, 277 (8th Cir. 1985) (no abuse of discretion to deny mistrial where prosecutor stated that his improper questions were inadvertent).

135

The Government's actions deprived Petitioner of a fair trial. The evidence was irrelevant to the crimes charged and constituted improper propensity evidence that suggested that because Mr. Honken dealt drugs prior to 1991, it was likely that he dealt drugs during the pendency of the conspiracy. *See Old Chief v. United States*, 519 U.S. 172 (1997). Further, because of trial counsel's failure to act, Gahn's testimony was admitted without objection, and the jury did not receive a curative instruction to mitigate its prejudicial effects. *Cf. Wadlington*, 233 F.3d at 1078 (no prejudice where defense counsel objected and the court sustained the objection and issued instructions); *Robinson*, 774 F.2d at 277 (no prejudice for "mere asking" of improper question).

Moreover, the inadmissible evidence bolstered Gahn's characterization of Mr. Honken's behavior on the day of Greg Nicholson's disappearance by comparing Gahn's "feelings" on that day to his earlier "feelings." *See* Tr., 226 ("I had the same feeling the day he was in my club looking for Greg"). The Government also emphasized this link during the closing argument, stating: "Dustin Honken came to [Gahn] wanting to know where's Greg Nicholson, desperate to find Greg Nicholson." Tr., 3231. Without this impermissible bolstering, Gahn's testimony would have been significantly less credible, and it is reasonably likely that the jury would have discredited his testimony.

136

**B.      Prior Counsel Were Ineffective For Failing to Object to These Errors and for Failure to Litigate These Issues on Appeal**

The above-described prosecutorial misconduct violated due process for the reasons stated. The trial court did not issue a curative instructions to the jury, and defense counsel were constitutionally ineffective for failing to object and seek one. Given counsel's prior objections, counsel clearly wanted to prevent the jury from hearing evidence of Petitioner's alleged drug activity prior to the time of the charged conspiracy.   Even if the Government's action did not amount to a due process violation, there was no reasonable strategic reason for counsel to fail to object to the prosecutor's actions on redirect examination, especially in light of the court's clear rejection of such evidence as irrelevant. *See* Tr., 194 ("And so I'm having a hard time understanding how a lot of the stuff that happened four or five years earlier is relevant.").   Petitioner was prejudiced, as the prosecutor's actions improperly introduced evidence of alleged drug activity that was irrelevant to the charged crimes and in direct conflict with the ruling of the court. *See Manning v. Bowersox*, 310 F.3d 571, 576-77 (8th Cir. 2002) (finding trial counsel's failure to object to admission of evidence constitutionally deficient).

Trial counsel also was ineffective for not properly raising this claim in its Motion for a New Trial.  The court rejected Petitioner's claim that Scott Gahn evaded

137

the court's evidentiary rulings when he testified that Petitioner used drugs on redirect examination, in part because counsel failed to cite to any pages of the record to support its claim. *United States v. Honken*, 381 F. Supp. 2d 936, 1004 (N.D. Iowa 2005). As described in the Petition and above, the record makes clear that the actual misconduct was the prosecutor's evasion of the court's prohibition of testimony concerning Petitioner's alleged drug distribution prior to 1991.

Appellate counsel were likewise ineffective for failing to raise the due process violation. The prosecutor's disregard for the court's ruling was clear from the record. At the time of direct appeal, it was standard practice that appellate counsel should seek to litigate all arguably meritorious issues, whether or not previously presented. *See* 2003 ABA Guideline 10.15.1. Decisional law extant at the time of direct appeal required the same. *See Carter v. Bowersox*, 265 F.3d 705, 716-17 (8th Cir. 2001). Counsel could have no tactic or strategy for failing to raise these claims at each stage of the proceedings. Where, as here, counsel fails to raise or litigate such plain error, both deficient performance and prejudice – and therefore constitutional ineffectiveness of counsel – are established. *Starr v. Lockhart*, 23 F.3d 1280 (8th Cir. 1993).

138

### C. The Government's Improper Questioning Also Violated the Eighth Amendment

Because of the prosecutor's misconduct, the jury was permitted to weigh these additional bad acts in the penalty phase, undermining Petitioner's substantial right to heightened reliability in the capital sentencing determination. *See Caldwell v. Mississippi*, 472 U.S. 320, 323 (1985) (there is a heightened "need for reliability in the determination that death is the appropriate punishment in a specific case"); *accord Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). To the extent that trial and appellate counsel failed to object and to raise this issue on appeal, counsel were ineffective. Counsel could have no tactic or strategy for failing to raise and litigate such meritorious claims on appeal. Petitioner was prejudiced.

### CLAIM FIFTEEN

**PETITIONER WAS DENIED HIS RIGHTS TO DUE PROCESS, A FAIR TRIAL AND THE EFFECTIVE ASSISTANCE OF COUNSEL WHERE THE JURY HEARD INADMISSIBLE EVIDENCE OF PETITIONER'S PRIOR BAD ACTS AND THE TRIAL COURT FAILED TO GIVE THE JURY A CAUTIONARY INSTRUCTION CONCERNING THAT EVIDENCE.**

The Government introduced detailed and extensive evidence of Petitioner's alleged escape attempt from Woodbury County Jail that was unrelated to the offenses charged. Introduced as "intrinsic evidence" and under Federal Rule of Evidence 404(b), purportedly relevant to Counts 6 (soliciting Dean Donaldson and Anthony

139

Altimus to murder Timothy Cutkomp)[21] and Count 7 (conspiracy to tamper with witnesses and to solicit the murder of witnesses) of the Superseding Indictment, this evidence was not necessary to prove these counts and its relevance was marginal at best. On the other hand, it served the improper purpose of showing propensity and should have been excluded under Rule 404(b) and under Rule 403 on the ground that any probative value was substantially outweighed by the prejudicial effect. The trial court permitted the introduction of this evidence because counsel, while objecting, failed to argue the proper basis for excluding it.

### A. Evidence Related to Petitioner's Alleged Escape Attempt from Woodbury County Jail

Counsel moved *in limine* to preclude the Government from introducing this evidence. The Government claimed that the escape attempt was "inextricably intertwined" with Counts 6 and 7. The Government argued that Mr. Honken's "motive for killing the witnesses was to avoid serving time in prison" and thus his attempt to escape custody was evidence supporting that motive. Dkt. # 297 at 4. The court accepted this argument. *United States v. Honken*, 378 F. Supp. 2d 970, 1002 (N.D. Iowa 2004). Alternatively, it said the testimony was admissible under Rule

---

[21]During trial, the prosecution withdrew the portion of this charge alleging that Petitioner solicited the murder of Daniel Cobeen, and this charge only involved the alleged solicitation of the murder of Cutkomp. Dkt. # 512 at 51.

140

404(b) to establish Mr. Honken's intent and plan to murder or tamper with witnesses. *Id*. And the court ruled that, under Rule 403, the probative impact of the evidence would not be outweighed by undue prejudice, relying in part on the Government's assurances that it would not conduct a "mini-trial" on the nature of the escape attempt. *Id*. at 1003.

Despite these assurances, the Government presented extensive evidence in support of the alleged escape attempt. The prosecution called three jailhouse informants, each of whom received some benefit from the Government in return for their cooperation, to testify regarding the alleged escape attempt. Dennis Putzier testified that Petitioner asked to participate in Putzier's planned escape after he learned that Putzier had broken through the bricks in his cell. Tr., 1292; 1303-06; 1315-1320. Terry Bregar testified that Petitioner planned to escape with Putzier and that he saw Petitioner chiseling bricks in his cell. Tr., 1399-1405. Dennis Frye, who had known Putzier since 1994, also testified that he noticed Petitioner using a broken door handle to chip away at the bricks in his cell. Tr., 1431-33. In addition, the Government introduced several exhibits from the Woodbury County Jail, including 25 photographs.

141

**B.    The Evidence Should Have Been Excluded as Improper Propensity Evidence**

### 1.    It was not intrinsic to the crimes charged

When a defendant is charged with participating in a conspiracy, the Government may introduce proof that he committed another crime that was in furtherance of or inextricably intertwined with conspiracy. Such evidence is considered "intrinsic," rather than covered by Rule 404(b). *See United States v. O'Dell*, 204 F.3d 829, 833 (8th Cir. 2000); *United States v. Molina*, 172 F.3d 1048, 1055 (8th Cir. 1999).

Even accepting the jailhouse witnesses' uncorroborated testimony, the evidence did not show that the alleged escape attempt was in furtherance of the solicitation and conspiracy charges, let alone inextricably intertwined with them as the court found. *See United States v. Heidebur*, 122 F.3d 577, 580 (8th Cir. 1997) (testimony about defendant's alleged molestation of his stepdaughter not intrinsic to charge of knowingly possessing explicit photos of her). In *Heidebur*, the court held that the mother's motivation for searching for the photos – the inappropriate contact – had "nothing whatsoever to do with the factual setting of the **crime** charged." *Id*. Here, the Government posited that Petitioner attempted to escape to kill Donaldson. However, even if Petitioner wanted to escape to kill Donaldson for not killing

142

Cutkomp, the escape was not an integral part of the immediate context of the crimes charged but was a separate and distinct crime. *Cf. United States v. Williams*, 95 F.3d 723, 731 (8th Cir. 1996) (murder held to be integral where defendants charged with conspiracy and kidnaping after abducting the victim).

For this reason, the alleged escape attempt was not intrinsic to Counts 6 and 7, nor was it necessary to prove Petitioner's intent and plan to murder or tamper with witnesses.

### 2. The evidence was unduly prejudicial under Federal Rules of Evidence 403 and 404(b)

Federal Rule of Evidence 404 provides, in relevant part:

> (b) Other crimes, wrongs or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident . . .

The purpose of Rule 404(b) is to protect an accused's constitutional right to a fair trial from the tendency that character evidence has to "weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge." *Michelson v. United States*, 335 U.S. 469, 475-76 (1948); *see also Old Chief*, 519 U.S. at 184-85 (unfair prejudice "certainly include[s] . . . generalizing a defendant's earlier bad act into bad character

143

and taking that as raising the odds that he did the later bad act now charged"); *United States v. Shoffner*, 71 F.3d 1429, 1432 (8th Cir. 1995) ("Evidence of prior bad acts is not admissible under Rule 404(b) solely to prove the defendant's criminal disposition.") (citation omitted).

In determining whether the danger of unfair prejudice substantially outweighs the probative value of an item of evidence, a court "must assess the genuine need for the challenged evidence and balance that necessity against the risk that the information will influence the jury to convict on improper grounds." *United States v. Sriyuth*, 98 F.3d 739, 747-48 (3d Cir. 1996). The evidence of the alleged escape attempt in this case should have been excluded under Rule 403 and Rule 404(b) because the undue prejudice it caused Mr. Honken vastly outweighed any conceivable probative value it might have had.

In assessing the prejudicial impact of the "other crimes" evidence, the court failed to consider the probative value of the alleged escape attempt in light of other admissible evidence. *See Old Chief*, 519 U.S. at 184-85 (Rule 403 requires court to determine marginal probative value of extrinsic evidence relative to other available evidence). The Government had other witnesses, including Putzier and Bregar, who testified to Mr. Honken's solicitation of Donaldson and Altimus. Thus, there was no need for the Government to introduce evidence of the unrelated escape attempt except

144

as evidence of Mr. Honken's bad character and propensity to commit this crime. *See United States v. Weir*, 575 F.2d 668, 672 (8th Cir. 1978) (evidence that defendant in bank robbery trial threatened to kill informants and an FBI agent "extremely inflammatory" and "tended to bolster the credibility of the government's primary witness"). Even if portions of testimony were relevant, it could have been offered without mention of the objectionable "other crimes" evidence. *Id*. at 671. Thus, while the probative value of Mr. Honken's alleged escape attempt was minimal, the unfair prejudicial effect of the evidence was substantial.

In order to minimize the highly prejudicial effect of evidence of prior bad acts or criminal activity, due process requires the trial court to provide the jury with an appropriate limiting instruction. *Spencer v. Texas*, 385 U.S. 554, 561-62 (1967) (where evidence of prior crimes is admitted, defendant's interests are protected by a limiting instruction to mitigate the possibility of prejudice). The court did not give, nor did trial counsel request, a limiting instruction that the evidence was to be considered only as to Counts 6 and 7 of the indictment, which could have lessened the danger of any unfair prejudice arising from the erroneous admission of Petitioner's prior bad acts. *Cf. United States v. Rolett*, 151 F.3d 787, 789 (8th Cir. 1998) (instructing the jury that it could receive the evidence for a limited purpose and not to "pinpoint" the defendant's character).

145

The erroneous admission of this evidence likely exerted a substantial influence on the jury's guilty verdicts on the capital charges. The remaining, untainted evidence was not overwhelming, but rather, was plagued by significant gaps and conveyed by witnesses of questionable credibility. Petitioner was also prejudiced at sentencing. Because the jury could consider the alleged escape attempt as evidence that Mr. Honken posed a continuing threat even while incarcerated, it likely weighed it in reaching its death penalty verdicts.

### C. Counsel Were Ineffective

Trial counsel were ineffective for failing to object to the admission of the evidence under Rule 404(b) and the case law defining "intrinsic" evidence and for failing to request that the court instruct the jury as to the narrow purpose for which the evidence was admitted. Trial counsel could not have had a strategic or tactical reason for failing to make the proper objections or requesting the limiting instruction.

Nor could counsel have had a reason for failing to renew its objection to preclude evidence of the alleged escape attempt. Counsel put on three witnesses – Lt. Lynette Redden, David Amick, and Thomas Steven Mullin – to show that there was no evidence that Mr. Honken attempted to escape from Woodbury County Jail and that he was not charged with a crime or violation of jail rules for the alleged attempt. Counsel were aware of the danger that the jury would view the escape as

146

evidence of Mr. Honken's propensity to commit crimes and thus had no reason not to forcefully prevent its presentation at trial. Trial counsel likewise had no strategic or tactical reason for not requesting that the court provide the jury with an appropriate limiting instruction. *See Dawson v. Cowan*, 531 F.2d 1374, 1377 (6th Cir. 1976).

Petitioner was prejudiced by trial counsel's failure. For the reasons described above, there is a reasonable likelihood that the jury, without proper guidance from the court, considered evidence of the alleged escape attempt as propensity and bad character evidence and that it would not have would not have reached guilty verdicts on the relevant charges and would not have sentenced Petitioner to death on any counts, if trial counsel had not performed deficiently. *E.g.*, *Manning v. Bowersox*, 310 F.3d 571, 576-77 (8th Cir. 2002) (finding trial counsel ineffective for failing to object to admission of admission of evidence).

Appellate counsel also were ineffective for failing to raise this claim on appeal. The court's erroneous admission of this evidence was plain error and should have been raised as such. At the time of the direct appeal, it was standard practice that appellate counsel in capital cases should seek to litigate all issues, whether or not previously presented, that are arguably meritorious. 2003 ABA Guideline 10.15.1. Similarly, prevailing case law required counsel to raise colorable issues on direct appeal. *Carter v. Bowersox*, 265 F.3d 705, 716-17 (8th Cir. 2001). There was not

147

any tactical or strategic reason for counsel not to raise this meritorious claim. Appellate counsel's failure to raise these issues prejudiced Petitioner. The error was plain, and would have resulted in the vacation of either Petitioner's convictions and/or death sentences.

**CLAIM SIXTEEN**

**TRIAL COUNSEL INEFFECTIVELY FAILED TO PRESENT ABUNDANT, READILY AVAILABLE EVIDENCE THAT WOULD HAVE SUPPORTED THEIR THEORY OF DEFENSE.**

Counsel's theory of defense at trial was that Terry DeGeus was responsible for the deaths of Greg Nicholson and the Duncans, and then later was killed due to his involvement in their deaths. Abundant evidence was at counsel's fingertips, some of it requiring only minimal investigation and some of it actually present in discovery provided by the Government, which counsel could have used to support this theory and to establish a reasonable doubt, or a residual doubt, in the minds of the jury. Despite the ready availability of evidence casting suspicion on DeGeus, counsel presented only the thinnest of threads to support their chosen theory. Had counsel presented this additional available evidence, there is a reasonable probability that the jury would have found Petitioner not guilty and or would not have sentenced Petitioner to death. Counsel were ineffective and Petitioner's Sixth Amendment rights were violated.

148

The Sixth Amendment guarantees the right to effective assistance of counsel to criminal defendants. *Strickland v. Washington*, 466 U.S. 668 (1984). This guarantee requires counsel to investigate and consider viable defenses to the charged crimes. *See, e.g.*, *Foster v. Lockart*, 9 F.3d 722, 726 (8th Cir. 1993) (affirming grant of habeas relief where counsel failed to properly investigate guilt issue); *Parkus v. Delo*, 33 F.3d 933, 938-39 & n.6 (8th Cir. 1994) (remanding for evidentiary hearing on counsel's failure to thoroughly investigate guilt phase defense); *Schneider v. Delo*, 85 F.3d 335, 339 (8th Cir. 1996) (court must inquire into *Strickland* performance and prejudice inquiries where counsel fails to present evidence of innocence); *United States v. Easter*, 539 F.2d 663 (8th Cir. 1976) (counsel ineffective for failing to present available evidence of government informant's animosity towards defendant and misuse of police to harass defendant).

Because counsel failed to adequately investigate and present evidence in support of their chosen theory of defense, the jury was not given a basis to find reasonable doubt in the Government's version of events. Petitioner was therefore prejudiced. But for counsel's failures in this regard, there is a reasonable probability that the jury would have acquitted. At a minimum, there is a reasonable probability that the jury would have had a lingering doubt at the penalty phase and would have sentenced Petitioner to life.

149

## A. Evidence that Terry DeGeus Committed the Murders

Available evidence indicated that Terry DeGeus had a history of aggression, paranoia, and violence, and that he was a methamphetamine dealer and user. DeGeus had both the motive and the opportunity to kill Greg Nicholson, and he was the primary suspect of law enforcement agents for years. While it was certainly a reasonable strategy for counsel to attempt to shift the jury's focus onto DeGeus, it was not reasonable for counsel to fail to follow through on their chosen theory by supporting it with available evidence.

Counsel could have introduced the very evidence that made DeGeus a primary suspect of multiple law enforcement agencies for years. This evidence included DeGeus's activities at and around the time of the Nicholson/Duncan disappearances, along with DeGeus's suspicious statements, actions, and demeanor around this time, which were described by numerous witnesses.

Law enforcement officers determined that DeGeus was employed at the time of the Nicholson/Duncan murders by his father's excavation business. Officers determined that DeGeus had in fact been involved in an excavation on the specific date of disappearance of Nicholson and the Duncans, and their suspicion of DeGeus was so strong that they thought it prudent to examine this excavation site as a possible location of the bodies. Division of Criminal Investigation Report, Appendix 50;

150

Interview of Joann DeGeus, Appendix 51. Over the course of two days in 1997, law enforcement officials did in fact complete this excavation with the aid of cadaver dogs. Division of Criminal Investigation Report, Appendix 52. Law enforcement's suspicion of DeGeus did not end there. In 1999, investigators decided to re-excavate the same site, again with the aid of cadaver dogs, in an attempt to find the bodies. Mason City Police Report, Appendix 53.

Law enforcement had good reason to suspect DeGeus. Counsel could have presented evidence that DeGeus had at least two independent reasons for wanting to harm Nicholson: first, because Nicholson was a competitor in the Mason City area meth dealing world (*see, e.g.*, Interview of Mike Billick, Appendix 54), and second because Nicholson's decision to cooperate with authorities had the potential to send DeGeus to prison for a lengthy term. DeGeus was acutely aware of this fact, as he was constantly asking whether or not a grand jury subpoena had arrived at his home. *See, e.g.*, Interview of Brandy Wilson, Appendix 55; 2/13/97 Interview of Christi Gaubatz, Appendix 56.

According to nearly every witness interviewed by law enforcement, DeGeus was particularly violent and aggressive. *See, e.g.*, Interview of Kristin Thompson, Appendix 57. Counsel could have presented, for example, evidence of multiple instances of serious physical and verbal abuse directed towards Angela Johnson,

151

including multiple occasions on which he threatened to kill her. *See, e.g.*, Interview of Cherryl Bachman, Appendix 58; 2/15/94 Interview of Sherri Kunkel, Appendix 59; 4/10/97 Interview of Sherri Kunkel, Appendix 60; Interview of Holly Johnson, Appendix 61; Interview of Arlyn Johnson, Appendix 62; 2/13/97 Interview of Christi Gaubatz, Appendix 56; Interview of Mikell Olson, Appendix 63; Interview of Richard Summers, Appendix 64. Counsel could also have presented evidence of DeGeus stalking Johnson and breaking into her home. 2/15/94 Interview of Sherri Kunkel, Appendix 59; 4/10/97 Interview of Sherri Kunkel, Appendix 60.

Johnson was not the only target of DeGeus's harassment, however. Numerous other witnesses could have described DeGeus's violent, paranoid, and harassing behavior. *See, e.g.*, 2/16/97 Interview of Christi Gaubatz, Appendix 56. When DeGeus was first arrested during the 1993 drug investigation he "refused to allow officers in his residence and told officers that he would 'shot' [sic] a cop and 'go down in a blaze of fire' if they ever caught him with a load of 'dope' before he gave up." DEA Report of Investigation, Appendix 66. DeGeus engaged police in a two hour standoff before ultimately surrendering, and upon police's ultimate entry into the home, they discovered a burning odor and a pile of freshly-burned documents on the floor. *Id.* DeGeus's ex-wife, Wendy Jensen could have testified that DeGeus once threatened to kill her with a shotgun on Christmas, and then threatened to kill

152

himself.  Interview of Wendy Jensen, Appendix 67.  DeGeus also at one point "had taken on five cops at one time and had won," according to Jensen.  *Id.*  Jensen was so afraid of DeGeus that after Johnson broke up her marriage, she sent Johnson a card to thank her, saying that her divorce from DeGeus was the best thing ever to happen to her.  *Id.*  After they divorced, Jensen got as far away from DeGeus as she could.  Jensen also felt as though Johnson was holding something over DeGeus's head.  *Id.*

DeGeus may have been suspected in other murders and also threatened to kill Rich Gerdes, whom he suspected of stealing his daughter's piggy bank.  *See, e.g.,* Interview of Terry Kunkel, Appendix 68.  DeGeus's reaction to this supposed theft was to take Gerdes out on a country road and threaten him with a gun.  *Id.*  Another person on the list of people DeGeus threatened to kill was Cristi Gaubatz's ex-husband.  2/13/97 Interview of Christi Gaubatz, Appendix 56.

DeGeus was also a heavy abuser of methamphetamine, along with alcohol and other substances of abuse, which only increased his violence, aggression, and paranoia.  *See id.*  DeGeus frequently presented, especially around the time of the Nicholson/Duncan disappearances, as manic, paranoid, and disheveled.  *Id.*

153

## B. Counsel's Ineffective Presentation

While counsel did present some evidence to cast suspicion on DeGeus, it paled in comparison to the mountain of evidence they could have presented, detailed above. Numerous law enforcement agencies targeted DeGeus as their primary suspect for years, and they had good reason for doing so. As such, counsel's performance was deficient. *White v. Roper*, 416 F.3d 728, 732 (8th Cir. 2005) (counsel ineffective for failing to call two witnesses who would have supported their theory of defense).

Counsel's failure to introduce this evidence prejudiced Petitioner. Had counsel presented the facts that led law enforcement agencies to suspect DeGeus, there is a reasonable probability that the jury would have had a reasonable doubt as to Petitioner's guilt. There was absolutely no physical evidence linking Petitioner with the Duncan home or the crime scenes. The Government's case was entirely circumstantial and relied heavily on the testimony of jailhouse informants and other individuals (such as Cristi Gaubatz and Timothy Cutkomp) who were similarly seeking to curry favor with the Government to escape their own criminal liability. Many of the Government's key witnesses admitted to having previously committed perjury and/or lied to investigators. Had the defense followed through on their attempt to cast suspicion on DeGeus, there is a reasonable probability that the jury would have reached a different verdict. *Strickland*.

154

Counsel's failures also detrimentally affected Petitioner's sentence, in violation of the Sixth and Eighth Amendments. While the prospect of residual doubt was submitted to the jury as a proposed mitigating circumstance, no juror found the existence of this mitigator. **Yet even the Government** did not feel it had enough evidence to prosecute Petitioner until seven years after the victims' disappearances, and most of the evidence ultimately presented at Petitioner's trial was already known to law enforcement prior to the bodies being discovered.[22] Had counsel put up the evidence outlined above, there is at least a reasonable probability that one juror would have found residual doubt at the penalty phase and thus spared Petitioner's life.

---

[22]The primary exception, of course, being the numerous Government informant witnesses who sought benefits to testify against Petitioner after he was incarcerated facing capital charges.

155

## CLAIM SEVENTEEN

**PETITIONER WAS DEPRIVED OF HIS FIFTH AND SIXTH AMENDMENT RIGHTS TO TRIAL BY AN IMPARTIAL JURY AND DUE PROCESS WHEN THE TRIAL COURT DISMISSED A JUROR DURING PENALTY PHASE DELIBERATIONS BUT UPHELD THE GUILT PHASE VERDICT. TRIAL AND APPELLATE COUNSEL INEFFECTIVELY LITIGATED THESE ISSUES.**

The Sixth Amendment right to jury trial "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961); *see also McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984) ("One touchstone of a fair trial is an impartial trier – a jury capable and willing to decide the case solely on the evidence before it.") (citation omitted). Due process requires that the defendant be tried by a "jury capable and willing to decide the case solely on the evidence before it." *Smith v. Phillips*, 455 U.S. 209, 217 (1982).

Post-trial, the court conducted an inquiry on whether Juror 523 was prejudiced by extraneous comments made by her employer. In denying Petitioner's motion for a mistrial, the court found that Juror 523 was not credible. Yet the court failed to act on this finding when it allowed the guilty verdict delivered by this Juror to remain standing. The court's findings and handling of the incident violated Petitioner's rights to trial by an impartial jury and due process.

The jury retired for penalty phase deliberations on Thursday, October 21, 2004.

156

The court then "dismissed" the alternate jurors and instructed them to remain "on call" in case they were needed. The alternates also were told not to discuss the case with anyone or to expose themselves to publicity about the case. Tr., 3933-34. On Thursday afternoon, after the jurors decided not to deliberate on Friday, Juror 523 approached the court staff "teary eyed" and "reported that she didn't feel comfortable going back to work [on Friday] because her boss was making inappropriate comments. . . ." *Id*. at 3944-45. Specifically, he "would walk by her desk and say 'killer, killer, killer,' kind of whisper, and then he would also walk by and say 'fry him, fry him, fry him,' and he wouldn't say it directly to her, but he would walk by and whisper that in passing." *Id*. at 3945.

After questioning by the court on October 21, 22 and 25, Juror 523 was dismissed and replaced with Alternate Juror 425, and the reconstituted jury was instructed to begin their penalty phase deliberations anew. The court then conducted a post-trial evidentiary hearing on the defense's motion for a mistrial. At the hearing, the Government called six persons identified as officers or managers of the company at which Juror 523 worked, each of whom was represented by counsel, and Petitioner called Juror 523 to testify.

The court concluded that Juror 523 was upset by the stress of her duties as a juror. *United States v. Honken*, 381 F. Supp. 2d 936, 1034 (N.D. Iowa 2005).

157

Further, the court found that Juror 523's boss did not make comments to the effect of "guilty, guilty, guilty," "fry him," or "when are you gonna fry him?" Instead, the court determined Juror 523's testimony was inconsistent, and the only comment supported by credible evidence was "Juror 523 should have said something 'outrageous' to get out of jury duty." *Id*. at 1032. Ultimately, the court found that:

> Juror 523 was troubled and upset by October 21, 2004 . . . by the stress of the duties of a juror in a capital case, coupled with the stress of changing "gears" to return to work when she was not in trial, and the fact that she had to go to work while other jurors did not, **all of which manifested in a desire to finish deliberations as quickly as possible and to "get her life back***."*

*Id*. at 1034. Petitioner's motion for a mistrial was denied.

### A. Petitioner is Entitled to a New Evidentiary Hearing

Federal Rules of Evidence 606(b) provides that "a juror may testify about (1) whether extraneous prejudicial information was improperly brought to the jury's attention, [and] (2) whether any outside influence was improperly brought to bear upon any juror," but "may not testify as . . . to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict . . . or concerning the juror's mental processes in connection therewith." Despite Rule 606(b)'s clear mandates, the trial court allowed the Government to extensively question Juror 523 on what impact, if any, the comments had on her, over

158

defense counsel's objection. Tr. 12/16/04, 62-63, 65-67; s*ee United States v. Honken*, 541 F.3d 1146, 1169 (8th Cir. 2009) (finding that the court's ruling violated Rule 606(b)).  After hearing this inadmissible evidence, the trial court concluded that any comments made to Juror 523 were "innocuous" and had no effect on her ability to render an impartial verdict.  *Honken*, 381 F. Supp. 2d at 1034.  The court also concluded that the stress of being a capital juror and the stress of having to work when other jurors did not caused Juror 523 to magnify a "humourous" comment in order to get out of deliberations and "get her life back."  *Id*.

There is little evidentiary support for the court's conclusions.  Juror 523 never testified that she was stressed by her jury service.  Rather, she testified that she was upset by the repeated improper comments from her boss when she returned to her place of employment.  Further, her responses during voir dire did not suggest that she would be stressed by juror service.  When asked whether she was capable of deciding guilt or innocence during voir dire, she responded "you bet."  Tr., 2935.  She also assured the court that if she decided the death penalty was appropriate she had no reservations about "putting [her] name on a verdict form that would have the effect of causing somebody to be executed."  Tr., 2937.  Moreover,  Juror 523's testimony was not inconsistent.  Throughout the inquiry,  Juror 523 maintained that her boss told her that Petitioner was "guilty, guilty, guilty."  If her testimony changed it all, it

159

was to minimize the effect of her boss's comments on her ability to be impartial.

On appeal, the Eighth Circuit found that Federal Rule of Evidence 606(b) precluded the trial court's inquiry into whether Juror 523 was affected her boss's comments. *See Honken*, 541 F.3d at 1169. The Eighth Circuit conducted an objective assessment on the likelihood that the comment would affect a typical juror and concluded that it would not. *Id.* Its decision, however, was based on the trial court's findings of fact concerning Juror 523's credibility and what comments her boss made. *Id.* ("The record does suggest the comment amounted to nothing more than an unsolicited, passing remark which was made, and taken, in jest."). Because it is unclear the extent to which the inadmissible evidence regarding the effect of the comments on Juror 523 influenced the trial court's findings of fact, Petitioner is entitled to a full and fair evidentiary hearing that comports with the dictates of Rule 606(b). *See United States v. Brown*, 108 F.3d 863, 867 (8th Cir. 1997) (if evidence presented contains inadmissible evidence under Rule 606(b), court should confine its inquiry to properly admissible matters).

## B.    Alternatively, Petitioner's Right to An Impartial Jury Was Violated

Alternatively, assuming the trial court's findings are correct, Petitioner's rights to an impartial trial by jury and due process were violated because the court found that Juror 523 had not been truthful in her dealings with the court.

160

Juror dishonesty during voir dire may be the basis for granting a new trial where a party demonstrates that a "juror failed to answer honestly a material question on voir dire and then further show that a correct response would have provided a valid basis for a challenge for cause." *McDonough*, 464 U.S. at 556. Under that standard, a defendant must show that 1) a juror answered dishonestly; 2) that she was motivated by partiality; and 3) that the true facts, if known, would have supported striking her for cause. *United States v. Tucker*, 137 F.3d 1016, 1026 (8th Cir. 1998); *see Williams v. Taylor*, 529 U.S. 420 (2000) (requiring evidentiary hearing on claim of juror bias).

All of those factors are present in this case, and Juror 523's dishonesty is perhaps even more damaging because it occurred during trial and deliberations. Here, the court found that Juror 523 falsely claimed that her boss made comments about Petitioner's guilt to "finish deliberations as quickly as possible . . . to 'get her life back.'" *Honken*, 381 F. Supp. 2d at 1034. Thus, she lied during deliberations and her lie – that Petitioner was "guilty, guilty, guilty" – revealed a strong bias against Petitioner. Further, the motive for her lie, to finish deliberations as quickly as possible, indicates that Juror 523 rushed to judgment and found Petitioner guilty for

161

reasons other than the evidence presented.[23]

In *United States v. Colombo*, 869 F.2d 149 (2d Cir. 1989), a juror failed to reveal that her brother-in-law worked as an attorney for the Government, because she wanted to sit on the jury. The Second Circuit held that the juror's deliberate failure to disclose the information exhibited "an interest [that] not only suggests a view on the merits and/or knowledge of evidentiary facts but is also quite inconsistent with an expectation that a prospective juror will give truthful answers concerning his or her ability to weigh the evidence fairly and obey the instructions of the court" and remanded for an evidentiary hearing. *Colombo*, 869 F.2d at 151-52. Juror 523's willingness to mislead the court in this case also suggests an impermissible impartiality. Under these circumstances, Petitioner's rights under the Fifth and Sixth Amendments were violated.

## C. Prior Counsel Were Ineffective

Trial counsel were ineffective for failing to properly litigate this claim. Trial counsel argued that Petitioner's right to an impartial jury was violated because Juror 523 was tainted by an outside influence, and they generally objected to the court's

---

[23] Courts have held that it is improper for judges to pressure jurors to finish deliberations more quickly. *See e.g.*, *United States v. Flannery*, 451 F.2d 880, 883 (1st Cir. 1970) (improper to suggest that "it was more important to be quick than to be thoughtful")*; United States v. Diamond*, 430 F. 2d 688, 695-97 (5th Cir. 1970).

162

factual findings.  However, counsel failed to fully challenge the scope of the court's

evidentiary hearing and the impact on the court's factual findings of testimony from

Juror 523, minimizing the effect of her boss's comments on her ability to be impartial.

Moreover, counsel failed to challenge the validity of the guilt verdict, if the court's

finding that Juror 523 lied to finish deliberations more quickly is presumed correct.

There can be no reasonable strategic or tactical reason for this failure.  Despite being

on notice of the issue, and despite the absence of any potential adverse impact of

pursuing this set of objections, trial counsel failed to do so.  But for counsel's failure,

there is a reasonable probability that the outcomes of the guilt and penalty phases of

Petitioner's trial would have been different. *See Manning v. Bowersox*, 310 F.3d 571,

576-77 (8th Cir. 2002).  Petitioner's Fifth, Sixth and Eighth Amendment rights were

violated.

Appellate counsel's performance also was deficient.  The improper scope of

the post-trial evidentiary hearing and, alternatively, Juror 523's dishonesty were plain

error.[24]  At the time of the direct appeal, it was standard practice that appellate

counsel in capital cases should litigate all potentially meritorious issues.  ABA

---

[24]Appellate counsel did argue that the trial court should not have relied on this inadmissible evidence in concluding that Juror 523 had not been prejudiced by her boss' comments.  However, counsel did not argue that the court should not have relied on this evidence in making its factual findings, or that it was improper for the Eighth Circuit to rely of the findings of the lower court.

163

Guideline 10.15.1.  This standard was enunciated in case law extant at the time of the appeal.  *Carter v. Bowersox*, 265 F.3d 705, 716-17 (8th Cir. 2001).  There was not, and could not be, any tactical or strategic reason for counsel not to raise these meritorious issues.  Appellate counsel's failure to raise the issue prejudiced Petitioner.  The error was plain, and would have resulted in the appeals court vacating Petitioner's convictions, or, at a minimum, vacating his death sentences.

**CLAIM EIGHTEEN**

**THE SECURITY MEASURES USED BY THIS COURT DURING TRIAL DENIED PETITIONER HIS RIGHTS TO A JURY TRIAL, TO THE PRESUMPTION OF INNOCENCE, DUE PROCESS, THE EFFECTIVE ASSISTANCE OF COUNSEL AND TO BE FREE OF CRUEL AND UNUSUAL PUNISHMENT AS GUARANTEED BY THE FIFTH, SIXTH AND EIGHTH AMENDMENTS.**

The court put in place excessive security measures at trial.  The evidence presented by the Government in support of its request for the security measures came almost exclusively from compromised jailhouse informants.  Since the Government suppressed exculpatory information regarding these witnesses (*see* Claim Three), the court's decisions in this regard were not based upon a complete picture of the competency of this evidence.  In any event, these security measures interfered with Petitioner's right to counsel and to a full and fair trial.  They also impacted the jury, who were led to believe that Petitioner was an extraordinarily dangerous person –

164

without competent evidence of such and where Petitioner's alleged dangerousness was at the core of the issues the jury would resolve. This, in turn, tainted both the guilt and penalty verdicts. To the extent that counsel knew about some of these measures and failed to fully object and challenge the evidence, and to the extent that counsel could have uncovered some of the information suppressed by the Government, counsel were ineffective. Ultimately, Petitioner's right to fully confront this evidence was compromised.

The court set in place various security measures based upon allegations by the Government. For the most part, these allegations were based upon information received from the jailhouse informant witnesses. None of these witnesses testified at the sealed hearing held prior to trial. Moreover, as established in Claim Three, the Government failed to disclose information that would have undermined the veracity of these witnesses. Additionally, these measures were put in place without giving the defense an opportunity to challenge the allegations through cross examination of the jailhouse informants. The court accepted the allegations and set in place onerous security measures that were unwarranted and unnecessary, and which prejudiced Petitioner in multiple respects.

For example, Petitioner was bolted to the floor at counsel table and was made to wear a stun belt. The defense objected and a hearing was held on the record,

165

although sealed.  The court's subsequent decision was based almost exclusively on the testimony of Marshal Arechiga.  He testified based on information he had been given by the Government that originated with the jailhouse informants.  However, Petitioner was not given the opportunity to cross examine those witnesses, because they were not presented at the hearing.[25]  Counsel's failure to fully object and challenge this evidence was ineffective.

At the time of Petitioner's trial, it was well established that a trial court could not restrain a criminal defendant absent a particularized justification. In *Illinois v. Allen*, 397 U.S. 337 (1970), the Supreme Court held that a defendant could forfeit his Sixth Amendment right to be present and unrestrained at his own trial. The *Allen* court sanctioned the use of physical restraints "as a last resort" and articulated a framework for handling unruly defendants that linked the trial court's response to the seriousness of the defendant's misbehavior.  *Id*. at 343-44.

In *Holbrook v. Flynn*, 475 U.S. 560 (1986), the Court addressed the presence of armed guards at trial. The Court concluded that the presence of armed guards was

---

[25]The District Court found that some of this information was subject to adversarial testing at Petitioner's 1998 sentencing hearing and at the hearing pertaining to the anonymous jury.  *United States v. Honken*, 378 F. Supp. 2d 1010, 1025-26 (N.D. Iowa 2000).  However, because the Government suppressed exculpatory information of which the court was unaware, Petitioner did not have a full opportunity to confront this evidence.

166

not the "sort of inherently prejudicial practice that, **like shackling**, should be permitted only where justified by an essential state interest specific to each trial." *Id*. at 568-69.

Prior to Petitioner's trial, the court held a hearing on the question of security measures. However, as noted above, Petitioner was not entitled to challenge the evidence upon which the court ultimately based its decision to shackle Mr. Honken. Thus, the court did not establish a particularized reason for the enhanced security measures as required by due process. The Supreme Court held in *Deck v. Missouri*, 544 U.S. 622, 632 (2005), that "given their prejudicial effect, due process does not permit the use of visible restraints if the trial court has not taken account of the circumstances of the particular case." The Court noted that "any such determination must be case specific; that is to say, it should reflect particular concerns, say special security needs or escape risks, related to the defendant on trial." *Id.* at 633. Any "particularized concerns" at issue here were not established, as the court merely relied on the hearsay statements of jailhouse informants.

Stun belts are particularly onerous and should require even closer judicial scrutiny. In fact, at least one jurisdiction, the State of Indiana, has banned the use of stun belts. *Wrinkles v. State*, 749 N.E.2d 1179, 1194 (Ind. 2001). The Ninth and Eleventh Circuits have reversed convictions when the use of stun belts was not amply

167

justified on the record, as it was not justified here. *See, e.g., Gonzales v. Pliler*, 341

F.3d 897 (9th Cir. 2003); *United States v. Durham*, 287 F.3d 1297 (11th Cir. 2002).

Those courts focused on the interference with the right to communicate with counsel

inherent in the use of this security method.

> The nature of the device and its effect upon the wearer when activated, requiring and unwilling defendant to wear a stun belt during trial may have significant psychological consequences. These "psychological consequences" cannot be understated. Stun belts, for example, may pose a far more substantial risk of interfering with a defendant's Sixth Amendment right to confer with counsel than do leg shackles. We have long noted that "one of the defendant's primary advantages of being present at the trial is his ability to communicate with his counsel." . . . Stun belts may directly derogate this "primary advantage," impacting a defendant's right to be present at trial and to participate in his or her defense. . . . "wearing a stun belt is a considerable impediment to a defendant's ability to follow the proceedings and take an active interest in the presentation of his case." "The fear of receiving a painful and humiliating shock for any gesture that could be perceived as threatening likely" hinders a defendant's participation in defense of the case – including those movements necessary for effective communication with counsel.

*Gonzales*, 341 F.3d at 900 (citations omitted).

In *United States v. Mahasin*, 442 F.3d 687 (8th Cir. 2006), the Eighth Circuit

recently approved the use of a stun belt and shackling at a federal trial. The court

noted that "visible shackling undermines the presumption of innocence and the

related fairness of the factfinding process." *Id.* at 691, *quoting Deck*, 125 S.Ct. at

2013. There, the court determined that the trial court did not abuse its discretion in

168

ordering the restraints. However, the defendant in that case had recently been convicted for the attempted murder of a government witness, had recently assaulted a deputy sheriff and another inmate, had threatened his own attorney and was on trial at the time for the courtroom assault of a federal prosecutor during his previous trial. None of those factors are present here. Petitioner had been in courtroom proceedings on many occasions and had never acted out in any way. Moreover, there was no competent evidence presented to the court that Petitioner had ever attempted to escape or that he had ever threatened anyone. The court's determination here violated due process.

Additionally, Petitioner suffers from a heart ailment. *See* Dustin Honken - Bureau of Prisons Medical Records, Appendix 69, 70. Counsel were unaware of this because they never secured all of his medical records. Records show that he was treated for this condition as early as age fourteen. Dustin Honken - Britt Medical Center Records, Appendix 71. With his condition, the activation of the stun belt could very well have been fatal to Petitioner. This circumstance severely interfered with Petitioner's ability to consult fully with counsel and to participate in the litigation of his case.[26]

---

[26]Petitioner notes that an issue regarding shackling was raised and rejected in his direct appeal. *United States v. Honken*, 541 F.3d 1146, 1163 (8th Cir. 2008). However, Petitioner alleges additional facts in this claim. Namely, that the decision

169

Additional onerous and unnecessary security measures were also put in place with respect to the jury that could have only had an objective and profound impact on the individual jurors.[27] For example, although the jury was not sequestered, the jurors met in a secret location each day. They were then transported to the courthouse together under very tight security. Upon arrival at the courthouse, they were ushered inside also under very tight security and were able to see snipers and other uniformed and armed law enforcement personnel in many areas in and around the courthouse. Such drastic security measures were surely to have effects on the jurors' view of Petitioner and their analysis of the evidence – particularly during the penalty phase. The question is whether there is "'an unacceptable risk . . . of impermissible factors coming into play'" that could have a negative impact on the jury. *Holbrook*, 475 U.S. at 570 (1986), *quoting Estelle v. Williams*, 425 U.S. 501, 505 (1976). The court's

---

to utilize the stun belt and to shackle him was based upon information from jailhouse informants that was not subject to adversarial testing and which was compromised by due process violations. Additionally, counsel ineffectively failed to present evidence of Petitioner's severe heart problems as they relate to this issue.

[27]These facts are alleged by information and belief. Petitioner requests a hearing on this claim and will be requesting permission to interview the jurors about these issues. This Circuit has held that "the burden of affirmatively demonstrating prejudice from security measures is on the defendant." *United States v. Williams*, 987 F.2d 1430 (8th Cir. 1990), *citing United States v. Robinson*, 645 F.2d 616, 617 (8th Cir.1981). The only way that Petitioner can establish this is through access to the jurors. Petitioner will include this request in the discovery motion to be filed with this Court.

170

implementation of these enhanced security measures lent credence to the evidence presented through the jailhouse informants at trial, though Petitioner maintained then and now that the testimony was false. *See* Claim Three. This situation resulted in a violation of Petitioner's Fifth, Sixth and Eighth Amendment rights.

To the extent that counsel failed to object and fully litigate these issues, counsel were ineffective. Petitioner was prejudiced by counsel's deficient performance as there is a reasonable probability that the enhanced security measures had a profound impact on the jurors and affected their ability to fairly consider the evidence.

Appellate counsel were ineffective for failing to raise fully these issues on appeal. While counsel did raise this issue of the implementation of shackles and the stun belt, counsel did not raise it in terms of the constitutional violations alleged here. Additionally, since the Government suppressed exculpatory information regarding the jailhouse informants, the trial court and the appellate court was not privy to all of these arguments.

171

## CLAIM NINETEEN

**COUNSEL WERE INEFFECTIVE UNDER THE SIXTH AMENDMENT FOR FAILING TO PROPERLY LITIGATE THE GOVERNMENT'S USE OF PSEUDO-SCIENTIFIC FORENSIC EXPERT TESTIMONY; IN THE ALTERNATIVE, NEW EVIDENCE ESTABLISHES THAT PETITIONER WAS CONVICTED AND SENTENCED TO DEATH ON THE BASIS OF INACCURATE AND UNRELIABLE EXPERT TESTIMONY IN VIOLATION OF THE EIGHTH AMENDMENT AND THE DUE PROCESS CLAUSE.**

The Government offered significant forensic expert testimony at Petitioner's trial in order to secure his conviction and death sentence. Defense counsel were ineffective for failing to adequately challenge this evidence. Alternatively, the landmark 2009 National Academy of Sciences Report (described herein) is new evidence that undermines Petitioner's convictions and sentences. The Fifth and Eighth Amendment require that flaws in the scientific presentation be remedied.

Counsel were ineffective under the Sixth amendment for failing to exclude, properly-cross examine, and/or rebut with defense experts the unreliable pseudo-scientific testimony introduced by the Government. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); *Strickland v. Washington*, 466 U.S. 668 (1984). The Government's forensic evidence at Petitioner's trial included: handwriting and questioned document evidence, firearms and ballistics evidence, forensic pathology evidence, forensic dental evidence, and forensic anthropology evidence. All of this forensic evidence produced by the Government suffered from

172

serious flaws in methodology and accuracy, and generally lacked a sound scientific basis. Counsel were ineffective for failing either to attempt to exclude this evidence pre-trial via a *Daubert* hearing, present contrary scientific evidence of their own, or, at a minimum, effectively challenge the Government's evidence through cross-examination. But for counsel's failings in this regard, there is a reasonable probability that the outcomes of the guilt and penalty phases of Petitioner's trial would have been different. Petitioner's Sixth Amendment rights were violated.

In the alternative, new evidence establishes that Petitioner was convicted and sentenced to death on the basis of inaccurate and unreliable expert scientific testimony, in violation of his due process and Eighth Amendment rights. On February 18, 2009, the National Academy of Sciences ("NAS") issued a landmark report regarding the state of forensic science in this country. *See* NAT'L ACAD. OF SCI., STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES: A PATH FORWARD (Feb. 2009) (hereinafter "NAS" and "NAS Report"). The NAS is the preeminent scientific organization in the United States, and it was commissioned by Congress to study the forensic sciences and to issue this landmark report. The report represents new evidence that undermines the reliability of the critically important scientific testimony presented by the Government at Petitioner's trial to obtain a conviction and death sentence. In light of this new evidence, Petitioner's conviction and sentence

173

are unconstitutional under the Eighth Amendment and the Due Process Clause.

The NAS Report reveals that Petitioner's convictions and death sentence were based on unreliable evidence, in violation of due process and the Eighth Amendment. "Reliability is . . . a due process concern." *White v. Illinois*, 502 U.S. 346, 363-64 (1992). Hence, the Due Process Clause requires that criminal convictions be reliable and trustworthy. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 646 (1974); *Thompson v. City of Louisville*, 362 US 199, 204 (1960). The use of exaggerated, inaccurate, or misleading testimony, such as that presented by the Government here, deprives a defendant of a fair trial if "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury." *Napue v. Illinois*, 360 U.S. 264, 271 (1959); *see also Mooney v. Holohan*, 294 U.S. 103 (1935); *Pyle v. Kansas*, 317 U.S. 213 (1942); *Alcorta v. Texas*, 355 U.S. 28 (1957); *Giglio v. United States*, 405 U.S. 150 (1972).

Similarly, the Eighth Amendment imposes a heightened standard "for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (plurality opinion); *see also Godfrey v. Georgia*, 446 U.S. 420, 427-28 (1980); *Mills v. Maryland*, 486 U.S. 367, 383-84 (1988). This need for heightened reliability requires "**accurate** sentencing information [as] an indispensable prerequisite to a reasoned determination

174

of whether a defendant shall live or die," *Gregg v. Georgia*, 428 U.S. 153, 190 (1976) (plurality opinion), and invalidates death sentences imposed as a result of the jury's consideration of materially inaccurate evidence. *Johnson v. Mississippi*, 486 U.S. 578, 590 (1988) (Eighth Amendment does not permit a death sentence to be imposed by a jury that was allowed to consider materially inaccurate evidence); *Tuggle v. Netherland*, 516 U.S. 10, 14 (1995) (same). The jury's death verdict here was based in significant part on materially inaccurate and unreliable pseudo-scientific evidence. As such, Petitioner's death sentence cannot stand.

### CLAIM TWENTY

#### PETITIONER IS ENTITLED TO RELIEF BASED UPON THE CUMULATIVE IMPACT OF THE CONSTITUTIONAL VIOLATIONS DESCRIBED IN THIS *MOTION.*

Each of the above-described claims of constitutional error stands on its own and independently requires relief. Petitioner has set forth the prejudice attendant to each claim in the discussion of each claim, above. Nevertheless, Petitioner submits that, in assessing prejudice, this Court must consider the cumulative impact of all of the instances of constitutional error that the Court finds to be established.

This Court "may reverse where the case as a whole presents an image of unfairness that has resulted in the deprivation of a defendant's constitutional rights, even though none of the claimed errors is itself sufficient to require reversal." *United*

175

*States v. Samples*, 456 F.3d 875, 887 (8th Cir. 2006) (quoting *United States v. Riddle*, 193 F.3d 995, 998 (8th Cir. 1999)); *see also Kyles v. Whitley*, 514 U.S. 419, 436-37 (1995) (prejudice from *Brady* violations must be assessed cumulatively); *Chambers v. Mississippi*, 410 U.S. 284, 298 (1973) ("We need not decide, however, whether this error alone would occasion reversal since Chambers' claimed denial of due process rests on the ultimate impact of that error when viewed in conjunction with the trial court's refusal to permit him to call other witnesses."); *United States v. New*, 491 F.3d 369 (8th Cir. 2007) ("If [a prosecutor's] remarks were improper, then we determine whether they deprived the defendant of a fair trial by examining the cumulative effect of the misconduct, the strength of the properly admitted evidence of the defendant's guilt, and any curative actions taken by the trial judge"); *White v. Roper*, 416 F.3d 728, 732 (8th Cir. 2005) (counsel found constitutionally ineffective for failing to call two separate witnesses); *Cargle v. Mullin*, 317 F.3d 1196 (10th Cir. 2003) (prejudice found both because of ineffective assistance of trial counsel and because of *Brady* violations).

Petitioner's trial involved numerous constitutional errors, comprising ineffective assistance of counsel, prosecutorial misconduct, and trial court error. As set forth in the various claims, above, each of these errors was itself sufficiently prejudicial to warrant relief. In combination, it is clear that Petitioner's convictions

176

and/or sentences should be reversed.

## CLAIM TWENTY-ONE

### THE MANNER IN WHICH THE GOVERNMENT WOULD CARRY OUT PETITIONER'S EXECUTION WOULD VIOLATE THE EIGHTH AMENDMENT.

Petitioner alleges that the manner of carrying out his execution would violate the Eighth Amendment to the United States Constitution. This constitutional violation would arise because of the combination of drugs to be used, the protocol governing the execution, the use of untrained non-medical and unqualified personnel and the physical space in which the execution would be carried out. The combination of these factors would result in the infliction of unnecessary pain and suffering in violation of the Eighth Amendment.

While Petitioner's belief that the execution under the current Bureau of Prisons protocols would violate the Eighth Amendment, he acknowledges that this issue is not ripe at this time. Nonetheless, he raises it here, lest he be deemed to have waived any such challenge.

177

## CONCLUSION

For all of the above reasons, those contained in the previously filed § 2255 Motion and based upon the entire record herein, Petitioner requests that the Court grant the relief sought in the § 2255 Motion.

Respectfully Submitted,

/s/ Michael Wiseman

Michael Wiseman
Shawn Nolan
Timothy Kane
Federal Community Defender
Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520

Counsel for Petitioner
Dustin Lee Honken

Dated:  June 6, 2011
    Philadelphia, Pennsylvania

178

## CERTIFICATE OF SERVICE

I, Michael Wiseman, hereby certify that on this 6th day of June 2011 I served the foregoing on the following person by ECF filing and by placing two copies in the United States Mail, postage prepaid, to the following:

C.J. Williams, Esq.
Assistant United States Attorney
United States Attorney's Office
Northern District of Iowa
401 First Street, S.E.
Hach Building, Suite 400
Cedar Rapids, IA 52401-1825

/s/ Michael Wiseman
_____
Michael Wiseman