**4**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | **PRESENTENCE INVESTIGATION REPORT** |
| | ) | |
| DUSTIN LEE HONKEN | ) | **DOCKET NO.: CR 96-3004-001-MWB** |

**Prepared For:** Honorable Mark W. Bennett
U.S. District Court Judge

**Prepared By:** Jay V. Jackson
U.S. Probation Officer
(712) 233-3930

AMENDED AND FINAL COPY

**Assistant U.S. Attorney**
Patrick J. Reinert
401 First Street S.E., Suite 400
Cedar Rapids, Iowa 52401-1825
(319) 363-1990

**Defense Counsel**
Alfredo Parrish
2910 Grand Ave.
Des Moines, Iowa 50312
(515) 284-5737

**Sentence Date:** December 15, 1997

**Offense:** <u>Count One:</u> Conspiracy to Distribute Methamphetamine - 21 U.S.C. § 846 -
Life with a 10 year mandatory minimum/$4,000,000

<u>Count Four:</u> Attempted Manufacturing of Methamphetamine - 21 U.S.C. § 841(a)(1) -
Life with a 10 year mandatory minimum/$4,000,000

**Release Status:** Detained

**Detainers:** None

**Codefendants:** Timothy Cutkomp

**Related Cases:** None

*STATUTORY MINIMUM*

**YES**

*168 - 210*

*June 10, 1996*
*14 ~ 10*
*22 mo*

**Date Report Prepared:** August 13, 1997      **Date Report Revised:** December 4, 1997

## Identifying Data:

**Birth Name:**     Dustin Lee Honken

**Date of Birth:**    03/22/68
**Age:**    29
**Race:**    White (Non Hispanic)
**Sex:**    Male

**Height:**    6'3"
**Weight:**    170 lbs.
**Color Eyes:**    Blue
**Color Hair:**    Brown
**Tattoos:**    None
**Scars:**    None
**Marks:**    None

**SSN No:**
**FBI No:**
**USM No:**
**Other ID No:**

**Education:**    Some College
**Dependents:**    Two (children)
**Citizenship:**    United States

**Legal Address:**    626 3rd Avenue S.W.
    Britt, Iowa 50423
    (515) 843-3124

**Aliases:**    None known



## PART A. THE OFFENSE

### Charge(s) and Conviction(s)

1. On April 11, 1996, a three count Indictment was returned by a Northern District of Iowa Grand Jury, Central Division, naming the defendant, Dustin Lee Honken, and Timothy Cutkomp as defendants. Count 1 charged each defendant with conspiracy to distribute and manufacture 1,000 grams or more of methamphetamine and 100 grams or more of pure methamphetamine. Count 2 charged each defendant with possession and aiding and abetting the possession of chemicals with intent to manufacture methamphetamine. Count 3 charged each defendant with possession of glassware with intent to manufacture methamphetamine.

2. On April 30, 1996, the defendant appeared for an arraignment, via a warrant, before Chief U. S. Magistrate Judge John Jarvey. On this same date a detention hearing was held and the defendant was released on an unsecured bond with pretrial supervision.

3. On July 10, 1996, a Superseding Indictment was returned by a Northern District of Iowa Grand Jury, Central Division, naming the defendant, Dustin Lee Honken, and Timothy Cutkomp as defendants.

4. Count 1 alleges that between 1992 and February 7, 1996, in the Northern District of Iowa and elsewhere, the defendant and Timothy Cutkomp did knowingly and unlawfully combine, conspire, confederate, and agree with persons known and unknown to the Grand Jury to commit the following offenses against the United States: distribution of 1,000 grams or more of a mixture or substance containing a detectable amount of methamphetamine and 100 grams or more of pure methamphetamine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A); knowingly manufacture 1,000 grams or more of a mixture or substance containing a detectable amount of methamphetamine and 100 grams or more of pure methamphetamine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A); knowingly (sic) attempt to manufacture 1,000 grams or more of a mixture or substance containing a detectable amount of methamphetamine and 100 grams or more of pure methamphetamine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A). This in violation of 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(A).

5. Count 2 alleges that on or about February 7, 1996, in the Northern District of Iowa, the defendant and Timothy Cutkomp did knowingly and intentionally unlawfully possess and aid and abet the possession of listed chemicals, that is, benzyl chloride, benzyl cyanide and phenylacetic acid, with the intent to manufacture methamphetamine, a Schedule II controlled substance. This in violation of 21 U.S.C. § 841(d) and 18 U.S.C. § 2.

3

6.      Count 3 alleges that on or about February 7, 1996, in the Northern District of Iowa, the defendant and Timothy Cutkomp did knowingly and intentionally possess and aid and abet the possession of two triple neck round-bottom flasks knowing, intending, and having reasonable cause to believe they would be used to unlawfully manufacture and attempt to manufacture a controlled substance, namely methamphetamine, and listed chemicals, including benzyl chloride, benzyl cyanide, phenylacetic acid and methylamine. This in violation of 21 U.S.C. § 843(a)(6) and 18 U.S.C. § 2.

7.      Count 4 alleges that on or about February 7, 1996, in the Northern District of Iowa, the defendant did knowingly and unlawfully attempt to manufacture and aid and abet the attempted manufacture of more than 100 grams of pure methamphetamine and one kilogram of a mixture or substance containing a detectable amount of methamphetamine. This in violation of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(A) and 18 U.S.C. § 2.

8.      On June 2, 1997, the defendant appeared before U. S. District Judge Mark W. Bennett and pled guilty to Counts 1 and 4 of the Superseding Indictment. Although there is no plea agreement, the government will move to dismiss Counts 2 and 3.

### Pretrial Adjustment

9.      On April 30, 1996, the defendant was released on an unsecured bond and placed on pretrial supervision with the following special conditions: electronic monitoring with work release privileges; maintain employment; avoid contact with Daniel Cobeen, Sandy Fiems, Jay Lien, and James Honken; report to U. S. Probation as directed; refrain from possessing a firearm, destructive device or other dangerous weapon; refrain from excessive use of alcohol, and any use or possession of a narcotic drug unless prescribed by a physician; surrender passport to Clerk of Court; obtain no passport; and submit to random urinalysis as directed.

10.     On June 10, 1996, the government filed a motion to revoke the defendant's pretrial release. The motion was based largely on communications between the defendant and codefendant Cutkomp in May 1996. These communications were monitored and are set out in detail in the Obstruction of Justice section of this report. The defendant was arrested on June 10, 1996, and did consent to detention.

### Codefendants

11.     Timothy Cutkomp pled guilty to Count 1 of the Superseding Indictment, Conspiracy to Distribute Methamphetamine, and on July 16, 1997, was sentenced to 54 months imprisonment and five years supervised release. The guideline imprisonment range was 168 to 210 months; however, the Court departed downward following a Substantial Assistance motion filed by the government.

4

### Related Cases

12. None

### The Offense Conduct

13. After reviewing the discovery file and the offense reports, the probation officer concurs with the factual elements as set out in the "Factual Basis For Plea" section of the Rule 11 letter filed with the Court. This information has been paraphrased in part in the following paragraphs.

14. In early 1993 an investigation was initiated by the Mason City Police Department into the drug activity of defendant Dustin Honken after intelligence data identified Honken as a source of supply for methamphetamine in the Mason City area. An alleged co-conspirator of Honken's was Greg Nicholson. On March 17, 1993, 148.34 grams of methamphetamine was found in a brown laboratory jar during a search of Nicholson's residence and Nicholson identified the methamphetamine as Honken's. Laboratory analysis disclosed the methamphetamine was 97% pure. Nicholson cooperated with law enforcement and indicated that Honken, who was residing in Arizona, would be traveling to Mason City to retrieve money owed to him for past methamphetamine sales.

**148.34 grams (mixture) or 143.89 grams (actual) of methamphetamine**

15. On March 21, 1993, Nicholson contacted the Mason City Police Department and advised that Honken was in Mason City and planned to meet with Nicholson to retrieve a drug debt. Officers provided Nicholson with $3,000 and he was equipped with a transmitter and recorder. At approximately 12:50 p.m. on March 21, 1993, Honken arrived at Nicholson's residence and during this meeting Nicholson paid Honken the $3,000. Shortly thereafter Honken was taken into custody. Seized from Honken was a ledger showing money owed by "T-Man" and "G-Man". Further investigation identified "T-Man" as Terry Degeus and "G-Man" as Greg Nicholson.

16. On April 20, 1993, Honken was indicted by a Northern District of Iowa Grand Jury and charged with Conspiracy to Distribute Methamphetamine. Honken was released on bond with pretrial supervision.

17. Prior to Honken's indictment Nicholson was interviewed by federal agents and also testified before the Grand Jury. During the interview and in his grand jury testimony Nicholson discussed Honken's and Timothy Cutkomp's drug trafficking activities. Nicholson stated that Honken admitted he was involved in the manufacturing of methamphetamine and that he had a lab in Arizona. Nicholson stated he was aware that Honken had studied chemistry while attending Northern Iowa Community College in Mason City. Nicholson admitted obtaining marijuana from Honken initially, and said that ultimately he began obtaining methamphetamine from Honken during the summer of 1992. Nicholson reported the methamphetamine he received from Honken was packaged in

5

brown laboratory jars. Nicholson further stated he obtained instructions from Honken on how to cut the methamphetamine with Inositial. Nicholson also indicated Honken had told him the methamphetamine was very pure.

18. Nicholson reported he obtained methamphetamine from Honken on at least eight occasions between four and eight ounces on each occasion. He indicated the first two or three times was four to five ounces and the last number of times it may be as high as eight to ten ounces. Even assuming a minimum of four ounces of methamphetamine for each of the eight occasions would result in 32 ounces or 907.2 grams. In addition, it is the government's position that based on the 97% pure lab reports from the methamphetamine seized from Nicholson, it is proper to assume the aforementioned methamphetamine was also 97% pure.

**32 ounces or 907.2 grams (mixture) or 879.98 (actual) grams of methamphetamine**

19. Nicholson also described that the defendant would front the methamphetamine to him to resell and then Nicholson would repay the defendant when defendant came back to town. In a conversation Nicholson was heard discussing with Honken that Nicholson had fronted out most of the methamphetamine and paid Honken $3,000. Honken and Nicholson also discussed another customer of Honken's by the name of Terry Degeus. Honken and Nicholson further discussed the price for quarter pounds and kilo quantities of methamphetamine.

20. In July 1993, Nicholson failed to appear in Iowa State Court for a Delivery of Marijuana charge. Attempts to locate Nicholson were unsuccessful. Information disclosed that Nicholson had separated from his wife and moved in with a new girlfriend. Nicholson's new girlfriend, Lori Duncan, and Duncan's two children were reported missing and could not be located. On August 6, 1993, a federal material witness warrant was issued for Nicholson's arrest; however, to date neither Nicholson nor his girlfriend or her children have been found. After attempts to locate Nicholson were unsuccessful the charges against Honken and Cutkomp in the U. S. District Court were dismissed in March 1995. In addition, in the fall of 1993 another drug customer of Honken's, Terry Degeus, disappeared.

20(a) On October 27, 1993, Scott Tracy Hahn, Honken's coworker, testified before the grand jury that Honken approached him and requested he assist in getting rid of some cocaine. Hahn indicated he knew Gregory Nicholson and knew Nicholson had been obtaining cocaine from Honken. He further indicated he assisted Nicholson in returning currency to Honken for the sale of marijuana and other drugs. Hahn specifically indicated that he was obtaining methamphetamine from Nicholson and on one occasion was not able to get methamphetamine because Honken was "late with the delivery."

6

20(b)   In December 1993 agents interviewed Melissa Friesenborg, Honken's girlfriend, in Tucson, Arizona. Friesenborg acknowledged that a few days after Honken's arrest in March 1993, Honken contacted her and instructed her to dispose of items left by him in her apartment. Friesenborg located some clothing and what Friesenborg described as chemical glassware in her apartment. Friesenborg threw away the glassware and mailed Honken his clothing.

20(c)   Other witnesses interviewed after Honken's arrest revealed that Honken's brother, Jeff Honken, and defendant Honken were operating a business known as Printed Circuit Technology, which was also known as PCT, in Tucson, Arizona. Seized from Honken by Mason City Police Officers was a receipt, dated February 23, 1993, from Hill Brothers Chemical Corporation in Tucson. DEA agents conducted an audit of Hill Brothers Chemical Corporation's records and discovered that on at least three occasions representatives of Printed Circuit Technology purchased chlorine gas cylinders. A receipt was also found for the purchase of ammonia by the company PCT.

20(d)   An analysis of telephone records associated with Honken and PCT revealed that Honken had been in contact with another chemical company in Tucson known as Adchemco Scientific. Records received from Adchemco showed that beginning in April 1992 and continuing through August 20, 1992, Honken, using the business PCT, received numerous chemicals including Naphthalene, Benzene Acid, Toluene, Formaldehyde, Sulfuryl Chloride, Denatured Alcohol, Acetone, Alconox and Ethyl Ether. Honken also ordered numerous pieces of equipment and glassware including but not limited to Beakers, Gas Dispersion Tube, Thermometers, Clamps, Flasks, Stoppers and a Glass Funnel.

21.     In late September 1995, Daniel Cobeen approached the Cerro Gordo County Attorney's Office and informed that Honken was attempting to manufacture methamphetamine. Cobeen reported that Honken had befriended him and had talked to him about the possibility of manufacturing methamphetamine. Cobeen reported that on one occasion he did purchase one-eighth ounce of methamphetamine for Honken. Cobeen advised he believed that Honken was "testing" him to see if he was reliable. Cobeen indicated that as time went on he assisted Honken more and more with the construction of a lab. He stated he accompanied Honken and Cutkomp to Des Moines, Iowa, where at Honken's request he opened a mailbox drop under a fictitious name. The mailbox was used for the purpose of receiving lab materials such as glassware. Cobeen further reported that Honken advised him that charges against him were dropped after Nicholson disappeared and Honken suggested that he had killed him. According to Cobeen, Honken admitted to having manufactured methamphetamine in Arizona and stated Jeff Honken was involved and had destroyed chemicals and equipment after Honken's 1993 arrest. During this meeting with agents, Cobeen agreed to cooperate with the government.

7

21(a) In October 1995, Honken asked Cobeen to order a hydrogen tank from a welding shop in Mason City and in November 1995, Honken had equipment delivered using the mailbox to manufacture methamphetamine.

22. In December 1995, Honken advised Cobeen that Cobeen would be his main methamphetamine distributor. Honken advised Cobeen would receive 22% of the proceeds from the sale of methamphetamine produced through the lab. Honken also stated he and Cutkomp had enough "stuff" to manufacture $200,000 worth of methamphetamine. Cobeen also reported that Honken stated the methamphetamine would be 97% pure.

23. Cobeen stated that on January 6, 1996, while at Honken's residence, Honken led Cobeen to the garage and showed him items that Honken indicated were associated with the manufacture of methamphetamine. Cobeen observed two triple neck flasks, two five gallon plastic containers, each with plastic tubing coming out of them, along with five or six boxes containing chemicals and glassware. Honken explained to Cobeen that to manufacture methamphetamine he would need to manufacture an initial chemical and then a second chemical before the manufacturing of the methamphetamine itself. Honken stated they were planning on producing $30,000 worth of methamphetamine on the first run.

24. On January 10, 1996, Cobeen met with Honken at Honken's residence and during this meeting Honken showed Cobeen the assembled lab in the garage and also advised Cobeen that Cutkomp no longer wanted to work with the lab. Honken offered to split Cutkomp's share with Cobeen estimating Cutkomp's share would be $40,000, representing 40% of the total. During this meeting Honken stated Angela Johnson supplied Honken with between $2,500 and $3,000 to be used for the purchase of lab equipment.

24(a) On January 11, 1996, Cobeen accompanied Honken to get two gallons of mercuric acid and PVC tubing and on January 22, 1996, Cobeen accompanied Cutkomp to a lab store in Minneapolis to retrieve two bottles of manganese chloride.

25. On February 7, 1996, a search warrant was executed on Honken's residence at 1104 16th Street, N.E., Mason City, Iowa.

26. Recovered from the search were quantities of benzyl cyanide, benzyl chloride, toluene, sodium hydroxide, phenylacetic acid, glassware, distillation apparatus, heating mantels, and the apparatus necessary to produce methamphetamine from a synthesis of toluene. Additionally, officers found articles on synthesis located around various chemical journals and a handwritten note showing the synthesis route which started with toluene as the initial ingredient. The five step synthesis process is from toluene to benzyl chloride, benzyl chloride to benzyl cyanide, benzyl cyanide to phenylacetic acid, phenylacetic acid to phenylacetone (P-2-P) and the phenylacetone (P-2-P) to methamphetamine.

8

27. Drug Enforcement Administration (DEA) chemist John Meyers and Iowa Drug Narcotics Enforcement (DNE) chemists went to the site of the laboratory and recovered samples of all substances seized. DEA chemist Meyers analyzed the substances seized and the method of production utilized by Honken and Cutkomp in the laboratory. The search team found 16.4 kilograms of toluene on site. The government's chemists estimate that based upon the defendant's method of production and articles seized describing the synthesis route, 16.4 kilograms of toluene could result in a yield of **5.6 to 7.4 kilograms of methamphetamine.**

**5.6 to 7.4 kilograms of (actual) methamphetamine**

28. Timothy Cutkomp signed a proffer and agreed to be debriefed by agents. Cutkomp described his drug involvement with Honken beginning back in 1991 - 1993. Cutkomp stated that while enrolled in NIACC Honken approached Cutkomp about manufacturing methamphetamine. In late 1991 or early 1992 Honken moved to Tucson and purchased glassware and chemicals to make methamphetamine. In May 1992, Cutkomp and Honken went to Tucson, Arizona, and subsequently purchased condensers, flasks, triple neck flasks in various sizes and chemicals including toluene, benzene, sulphur acid and hydrochloric acid. Cutkomp indicated Honken at that time used a recipe converting toluene to benzyl chloride, benzyl chloride to benzyl cyanide, and a sodium metal was then to convert benzyl cyanide to P-2-P. Hydrogen was used to convert P-2-P to methamphetamine. Cutkomp indicated the first time he produced methamphetamine with Honken he produced approximately four ounces of methamphetamine. This first methamphetamine was brought to Mason City and Honken sold the methamphetamine to Gregory Nicholson.

**4 ounces (113.4 grams) of methamphetamine (mixture)**

29. After making the sale Honken returned to Tucson and set up a laboratory in a shed near Cutkomp's residence. Cutkomp estimated it took approximately one month to produce a pound of methamphetamine. According to Cutkomp he was responsible for the daily production and Honken came over approximately once a week to check on the laboratory. Honken promised him a thirty percent share of the proceeds from the sale of the methamphetamine. Cutkomp indicated that one pound of methamphetamine was finished in late September or early October 1992, and that Honken took this methamphetamine and gave it to Gregory Nicholson.

**16 ounces (453.6 grams) methamphetamine (mixture)**

30. Cutkomp reported the currency was to be returned to Honken by Nicholson and Terry Degues. In November 1992, Cutkomp and Honken returned to Tucson and again continued to manufacture methamphetamine and during that month produced another one pound of methamphetamine. This methamphetamine was sold to Nicholson and Terry Degeus.

**16 ounces (453.6 grams) methamphetamine (mixture)**

9

Case 3:10-cv-03074-LTS-KEM    Document 19-4    Filed 06/06/11    Page 10 of 36

31. Cutkomp stated that during December 1992, he and Honken manufactured an additional six ounces to one pound of methamphetamine.



**6 ounces (170.1 grams) methamphetamine (mixture)**

32. In December 1992, Cutkomp moved to Des Moines for a brief period only to return in January 1993, at Honken's request. Once Honken convinced him to return to Tucson they again continued to manufacture methamphetamine. Cutkomp estimated that between January 1993 and March 1993 he and Honken produced two to three pounds of methamphetamine. Cutkomp stated that Honken traveled to Iowa on at least six occasions.

**40 ounces (1,134 grams) methamphetamine (mixture)**

33. Cutkomp stated that while Honken was on pretrial release in 1993, Honken approached him about making more methamphetamine. Honken wanted Cutkomp to go back to Arizona to pick up some chemicals. Cutkomp made a trip to the western United States, but he did not pick up chemicals. Sometime thereafter in 1993, Honken proposed that Cutkomp make another trip to Arizona to pick up chemicals. Cutkomp was accompanied by Christi Cole. Cutkomp set up an answering service in Arizona that he used to order chemicals from Adchemco in Tucson.

34. Cutkomp reported that again in early 1994, Honken talked with him about trying to get back into the methamphetamine business. Cutkomp stated that Honken and Angie Johnson went to Arizona in early 1994 and obtained glassware and chemicals.

35. Cutkomp said that he and Honken attempted to manufacture methcathanone, a drug similar to methamphetamine, in Angie Johnson's basement during the spring of 1994. After this work in Johnson's basement, they moved the equipment to the attic of James Honken's house for a month or two. In the attic, Honken and Cutkomp experimented on making a hallucinogenic called MDA. From there, Honken and Cutkomp moved the equipment to an apartment that Cutkomp rented in Mason City. They stored the materials there for about nine months. In the spring of 1995, they moved the laboratory equipment to Cutkomp's new residence on Eighth Street in Mason City, Iowa.

36. In the fall of 1995, Honken moved into a residence at 1104 - 16th Street NE, Mason City, Iowa, and decided to establish a laboratory at that residence. Cutkomp was to receive $30,000 to $60,000 for his share in manufacturing the methamphetamine. The laboratory was eventually assembled in Honken's garage. Cutkomp said that the lab was going to run continuously to produce various quantities of methamphetamine with each batch producing between 8 ounces to one pound of methamphetamine.

10

37.     According to Cutkomp, Honken was using the same production method during the entire period. The aforementioned drug quantity estimates by Cutkomp total approximately 2.32 kilograms of methamphetamine (mixture).

**2.32 kilograms of methamphetamine (mixture)**

38.     For guideline purposes the government contends the defendant should be held accountable for the drug quantity estimates made by codefendant Cutkomp (2.32 kilograms of methamphetamine [mixture] or 2.25 kilograms of methamphetamine [actual])[1] and the estimated production capacity of the seized laboratory (5.6 kilogram of methamphetamine [actual]). This results in a total quantity of 7.85 kilograms of methamphetamine (actual). The quantities seized from the Nicholson's residence and described in Nicholson's testimony are not included to avoid double counting the quantities described by Cutkomp.

**Conspiracy Total: 7.85 kilograms of methamphetamine (actual)**

**Victim Impact**

39.     There are no identifiable victims of the instant offense.

**Adjustment for Obstruction of Justice**

40.     The government has reported they will provide evidence at the sentencing hearing to establish that the defendant has attempted to obstruct justice in a number of different ways. A synopsis of a portion of the government's arguments is as follows.

**Pretrial release (1996)**

41.     Honken was released on conditions of release on May 1, 1996. Later that month, codefendant Cutkomp agreed to meet with law enforcement agents. In an interview in May 1996, and in subsequent statements and testimony before the Grand Jury, Cutkomp described efforts by Honken to obstruct the pending prosecution. Cutkomp said that he learned the following before he began to cooperate with law enforcement in May 1996:

> (a) Cutkomp said that Honken believed that by killing Cobeen and destroying evidence, he could succeed in forcing the government to drop the charges against him and Cutkomp.

> (b) Cutkomp said that Honken attempted to ascertain the location of the chemicals and equipments seized pursuant to the search warrant. Honken believed that the chemicals were located in a

---

[1] The government asserts that 97% purity should be used to determine the methamphetamine (actual) produced by the defendant based on the lab reports on methamphetamine seized from Gregory Nicholson and prior statements by Honken to Daniel Cobeen that the methamphetamine would be 97% pure.

storage area in Bondurant, Iowa. Honken and Cutkomp made three to five trips to Bondurant in Angela Johnson's car to view the storage facility. Honken asked Cutkomp to join him in breaking into the location and destroying the evidence.

(c) Honken devised a plan in which Angela Johnson would drive Honken and Cutkomp to Bondurant; they would cut phone lines at a main junction near Altoona, so that telephones and alarms in the area would be disabled; Honken and Cutkomp would break into the storage building and destroy the evidence; when finished, they would contact Johnson by cell phone and arrange for her to pick them up. When Honken and Cutkomp visited Bondurant, they wore dark clothes and masks so that they could not be identified on cameras posted near the storage building.

(d) Cutkomp said that Honken proposed killing Cobeen and Special Agent Graham. Honken told Cutkomp that if Cobeen were to disappear, then the government's case against Cutkomp would be insufficient. Honken said that Graham must be killed as well because he witnessed the meetings between Cobeen and Honken. Cutkomp said that Honken had determined SA Graham's address.

(e) Cutkomp said that Honken had discussed building a bomb and targeting the DEA laboratory in Chicago because evidence is stored at the laboratory.

42. Between May 16 and June 6, 1996, Cutkomp participated in monitored conversations with Honken under the supervision of law enforcement agents. It is noted that the government intends to offer the recorded conversations as evidence at the sentencing hearing. Excerpts from the tapes will be summarized.

43. On May 16, 1996, Honken discussed with Cutkomp the evidence against them in the pending case. Honken discussed the chain of custody for the evidence and said that the government needed all witnesses in the chain to admit the evidence. Honken said that he didn't need to get Cobeen, because if one person in the chain cannot go to the trial, then the government cannot get in the evidence. Honken said that all he has to do is make sure that one of them cannot go to trial.

44. Honken told Cutkomp that he was constrained by the electronic monitoring. He said that he had obtained some electronics books and was attempting to figure out the megahertz range of the transmitter on his leg. Honken said that he found a company that will "build you anything they want. You just send'em what you want..." He further discussed how the electronic equipment might work to defeat the electronic monitoring. Honken told Cutkomp that if he did not get off the electronic monitoring, he would be on a "very short time line."

12

45.    Honken discussed with Cutkomp the need to identify the "focal points" of the government's evidence. Honken said that there are three total, and he has already found one. He told Cutkomp that SA Graham is the focal point for Dan Cobeen. Honken said that without Cobeen and Graham, Cutkomp would be out of the case. Honken said, "If I wanted to bad enough, I'd go get my guardian and slit certain things, but I'm in no hurry right now. There's no hurry. 'Cause if they haven't moved him now, they ain't gonna."

46.    Honken said that SA Mizell is one of the biggest focal points. He discussed trying to find Mizell in Cedar Rapids by using the library and the courthouse. Honken said that "If I can find him, if I can find them, I ain't worried about it." Honken then made a "click, click, click" noise that simulated the firing of a gun. He said "Hello" and laughed. Cutkomp asked Honken, "That's all it'd take, huh?" Honken responded, "Yeah, it would. Five minutes of my time."

47.    On May 24, 1996, Honken and Cutkomp had another monitored conversation. Honken explained that if Cobeen does not testify, then he believes that the case against Cutkomp will not be successful. Honken said it is "very likely" that Cobeen will not testify: "like a hundred percent in my mind right now." Honken stated that "I've climbed far bigger hills than that little hill."

48.    Honken also discussed the physical evidence. He said that if one of the laboratory witnesses did not testify, then the evidence could be excluded. Honken stated that if the case is on hold for a long time, then he has more time and opportunity to puncture more holes in the case. He predicted that if he made two or three holes, then the prosecutor would put the case on hold for a year or two "just like he did last time."

49.    Honken discussed the tape recordings made by Cobeen. Honken noted that Cobeen made the tapes and handed them to SA Graham. Honken said, "Well, poof, poof, no wires" -- meaning if Cobeen and Graham are killed, the tapes will not be admissible. Honken explained that there were more witnesses that implicated him than implicated Cutkomp. Honken wondered "how far am I gonna to get before they start going, hey." He said he was having a hard time deciding where to go first. Honken discussed whether law enforcement would connect attacks on different witnesses and tie them back to Honken. He was concerned that agents might increase surveillance of Honken after the disappearance of one witness, so that he might not have an opportunity to do anything else. Thus, Honken said, "If I can find a person that is so central that I'll only need one, then I'll go ping, ping."

50.    Honken stated that he had inquired about electronic equipment that would allow him to avoid monitoring. He said that he found a place that was totally confidential that would build a device for him. Honken said that it was his "best alibi," meaning that if he has equipment that will cause the monitoring device to signal that he is home even when he is not, then he will have an alibi against charges that he committed crimes outside his home. Honken said that he was to send the company $30, and then probably $2,000.

13

51. Cutkomp said that he did not want somebody to come back on him if something happens. Cutkomp said he was still worried about "the other stuff," meaning the disappearance of the witnesses in 1993. Honken told Cutkomp not to worry about that because "[t]here is no even possible remote way of anything connecting to you . . . because you haven't done anything." Honken said, "they'll have a difficult enough time coming back on me if any, any possibility." He told Cutkomp that "there is no possible way on earth it could come back to you."

52. Honken told Cutkomp to find the house of Brian Beach, who is a friend of Cobeen's, and to provide Honken with information about the house and its surroundings. He asked, for instance, whether there were woods around Beach's house. Honken said that he believed that if Cobeen were to move, then they could locate him by watching Beach's house, because Beach and Cobeen see each other three times per week.

53. Honken told Cutkomp he would not allow the government to obtain a conviction and take him away from his son. He said that he did not care what he had to do. Honken said, "It would hurt me more if my dog died than all of them." Honken said that for every action, there is a reaction. He said that "we're not talking a mountain to get out of this. . . . I truthfully believe if you're determined enough, no matter what situation you're in, you could get out of it. I mean if you're determined enough or ruthless enough."

54. Honken said that this case was not as hard as last time. He said that "both those guys [Nicholson and Degeus] were skeptical." He said that one (Nicholson) moved, and it took time for Honken to find him. He eventually found Nicholson when a friend told Honken where to find Nicholson. By contrast, he said, this time the witnesses are not worried. Honken told Cutkomp that he was working alone: "This has been a lone venture for me, now, this time. I'm not telling nobody nothing. I'm not even telling you when and where, how or what."

55. On May 29, 1996, Honken and Cutkomp met again. Honken asked Cutkomp if he looked at any places, and Cutkomp provided him with the information that he had requested about Brian Beach's house. Honken asked if there was "any cover." Cutkomp said there was a trailer park, and Honken said, "I'm not gonna to sit by somebody's fucking trailer." Honken asked if there were any trees or groves. After Cutkomp described the area, Honken concluded that it would be difficult to hide there and wait.

56. Honken asked Cutkomp to go to Honken's father and get $500. Honken said that he needed the money immediately, and that it was not to pay back his mother or for the electronic equipment relating to the transmitter on his leg. Cutkomp asked why he needed the money, and Honken responded, "the less you know, the better you are for me."

57. Honken told Cutkomp that sometimes he thinks he is insane to think that he can kill witnesses. He asked Cutkomp, "How many people do you know that plan to go poo, poo, poo (3 shooting sounds) like three different times?" Honken said that he does not think it is insane to do it. He thought it was insane to think he could do it and actually get away

14

with it. Cutkomp said he did not see how Honken could do it and get away with all of them. Honken said that was the problem, but for him it was an "all or none deal," whereas for Cutkomp, one witness would probably make a major difference. Honken said he would pick the most important witness first. Cutkomp told Honken to make sure that no kids get hurt, and Honken agreed. Honken advised Cutkomp that he could not tell his attorney that he was going to commit a crime before he did so, because the attorney would be obligated to report him.

58. Honken asked Cutkomp to try to get the no-contact order removed so the two of them could meet openly. He said that there were some other things that he would need Cutkomp to do, such as looking up information for Honken. Honken wanted the order rescinded because he did not want to risk pretrial detention.

59. Cutkomp told Honken that he was worried about the stuff that happened in 1993. Honken told him "nothing even possible that could affect you in any way." Cutkomp said he was concerned that his helping Honken to destroy the gun draws him into it. Honken told Cutkomp not to worry about it, and said "There is not a snowball's chance in hell you'll be charged with anything." Honken said, "If something bad did happen to those things, very little, the only thing they got looking at me is that there are witnesses against me. That's it." When Cutkomp continued to express concern, Honken said, "The only thing that -- the only thing that would affect would be me. It's not gonna affect you. Theres nothing for you. Don't worry about that."

60. Honken discussed his plans for killing witnesses. He said, "if I go boom, I have a mess," and he viewed that as a problem. He said wherever you go, wherever you have them, you'll get a mess there, "unless you use a baseball bat." But he said that a baseball bat is "risky," because you only have one chance. So Honken said that "poof" (a gun) is much better. Honken discussed the possibility of using a taser gun. He agreed that it would not leave a mess, but said that you would have to get close enough to use it.

61. Honken remarked that it was very hard for him to do anything at that time. He assumed it would have to be dark, and said he had to think of a plan that would be foolproof. Honken stated that the best thing is just to wait outside their vehicle, sneak up on them, attack them with a "crack," and then put them in their own vehicle and drive it. He said, "that's where, where I'm at right now."

62. Honken told Cutkomp that "when it comes down to that I'm a whole different fucking person that I am normally. I'm there to take care of business. Nothing is going to get in the way." Honken went on to say that the problem is that Cobeen did not go out much, so the best place to get him was probably the house of the friend (Beach). Honken explained that he could shoot the outside light, but then he would have to know the schedule for when people would be home. He stated that "if I know where somebody is somewhere and I know a time frame, then I kill em."

15

63. Cutkomp asked Honken what kind of weapon he had. Honken said "there is no escaping it." He said that the weapon fired around 1400 rounds per minute, that the rounds were armor piercing, and that the firearm was a quiet, fold-out model. Honken said that he could just go to the friend's house and "go around and clean house if I had to." Cutkomp said no, that would be against the rules. Honken replied, "There are no rules in war."

64. Honken asked Cutkomp to obtain a frequency meter for him from Radio Shack. Honken said the meter cost was $100, and he needed it for a day, after which Cutkomp could return the meter and get his money back. Honken wanted the meter to determine the frequency of the transmitter on his leg. Honken told Cutkomp to get money from Honken's father.

65. Honken talked about killing Cobeen. He said it would take only one or two minutes of his time. Honken said that he would pull up beside him, say "guess who fucker," and kill him. Honken said, "That is a look that you'll never forget, when they're like, I'm fucked." Honken further stated that even if he were in prison for fifteen years, he would get Cobeen when he was released: "No matter what, I swear on my life, that fucker's gonna go." Honken said Cobeen could have warned him about the investigation. He told Cutkomp that he was "beyond furious." Honken explained that he was "mad" at Nicholson, but "this is totally different, totally fucking different."

66. Honken told Cutkomp that if the government started losing ground on the case, he believed that they would start to talk to people where Honken and Cutkomp worked. Honken said that is why he often has thought maybe he should have an example. He said you would think that three "poof" (shootings) would be enough example for anyone.

67. Cutkomp asked Honken for some warning as to when he would kill the witnesses, so Cutkomp could be out drinking or at home. Honken replied, "Anytime between now and the trial." Honken said there are probably going to be three or four. "Two of them here. Two of them way long ways away." Honken said he knew for "a hundred percent sure" that everything would be taken care of if there were five people killed, but he said he could not do that many. Honken said he would have to narrow it down to two or three.

68. Cutkomp said that SA Graham would be expecting an attack. Honken said that he would not because he is a cop. In Iowa, Honken said, the mentality of law enforcement is that they are omnipotent. Honken asked Cutkomp to drive by a residence that he believed was Graham's to verify if Graham's car was there.

69. Honken asked Cutkomp, "So are you fairly confident that I'm going to take care of this for ya?" When Cutkomp expressed some reservation, Honken said, "For my fucking track record, would you think differently?" Cutkomp said, "I have a conscience." Honken replied, "I probably do too, but I buried it with the fact that they did this to themselves. They put themselves in that position. They made me choose between my family and them. I'm sorry, but there ain't no choice." Honken told Cutkomp that as long as Cobeen did not "pull a Houdini," he was confident that Cutkomp would walk away from the charges.

16

70. Cutkomp advised agents that on June 2, 1996, Honken had another individual work part of his shift at work, and on June 3, 1996, Honken called in sick for a portion of the day. [witness testified that he worked part of a shift for Honken]. Cutkomp stated that Honken told him he wanted to see if his immediate supervisor would turn him in if he did not report for work as scheduled. The United States Probation Office later learned from Honken's employer that he was absent from work for part of the day on both June 2 and June 3. Cutkomp said that Honken told him that he had developed a plan for killing Dan Cobeen.

71. On June 4, 1996, Cutkomp and Honken had another monitored conversation. Honken told Cutkomp that the vehicle they use could not be Honken's or Cutkomp's. Honken said he thought of getting one of "Jerry's" to test drive because it would have a dealer license plate. Honken asked Cutkomp what else he had learned about Cobeen's activities, and he told Cutkomp that Cutkomp was not the only person working on it. Honken said that he did not plan to involve anyone else, and said that "I didn't the other time either." Honken said that he was "more careful than anything because I know the consequences." He explained that the death penalty now applied to federal murders: "Besides, it's not, not talking the rest of your days here. You're talking the end of your days. New law."

72. Cutkomp said he would have no part of doing that. Honken replied, "Don't even remotely worry about that. I have enough anger in me that there is no problem. There is no problem with that. How can you fucking remotely worry? Have I ever backed out on something illegal that I wanted to do. No. If I do something, I do it. I'm not afraid to do stuff. So don't you worry about that. If it has to go to those measures, then it will not bother me one bit. One iota."

73. Honken explained that "Once you go a certain distance, there ain't no turning back. I don't know. I'm not going to worry about it. I've seen worse things. That I never care to speak of." When Cutkomp asked if it bothered him, Honken replied, "Nope. Never think about it. Never. Never bothers me. Honestly. Thought it would for a long time. Never has. Maybe someday it will. I don't know. Never dream about it. Never nothing. Always, always worried about that. Thought I'd have nightmares all kinds of nasty shit. Never thought about it. I just went (whif sound) -- over. Part of my life is over. Go on. Don't even worry about it."

74. Honken said that the killing of Cobeen had to be planned perfectly. Honken said that he might have to kill Cobeen's buddy if he is with Cobeen: "that's his tough s---." Honken asked Cutkomp to obtain money from Honken's father for Honken. He also directed Cutkomp to do surveillance of Cobeen. He told Cutkomp to use someone else's car and to wear a hat and be disguised. Honken also instructed Cutkomp to be careful in conversation with Honken. He told him "Don't ever say his name, or nothing. Ever. When you say "him," I know who you're talking about."

17

75. Honken told Cutkomp that he did not deserve fourteen years for his criminal conduct. He said there is no way he would spend that much time away from his kids. Honken explained his view on the value of human life: "When something crosses a boundary and tries to take mine away from me, then that is no longer worth anything to me. But the neighbor across the street that makes me mad is still valuable to me. I mean it's a total different thing. Doesn't mean I go (poof) -- oh he's, I'm mad (poof) (poof) -- it's not like that. It's when they think that they're more valuable than me."

76. Cutkomp said that during the June 4 conversation, he provided Honken with a piece of paper containing handwritten information about the frequency meter that Honken wanted Cutkomp to get for him from Radio Shack. Honken stated that Cutkomp had identified the frequency meter that Honken wanted.

77. On June 6, 1996, Cutkomp had another monitored conversation with Honken. Honken said that he had driven to Cobeen's house and looked around. Honken said that his probation officer told him that he received reports that Honken was driving around.

78. As they discussed killing Cobeen, Cutkomp began to question Honken about the disappearances of the witnesses in 1993. Honken became concerned when Cutkomp started to ask these questions. He told Cutkomp, "You're talking about the sole person taker care of right here. That's me. You know, some things are better left forgotten about. No use opening a can of worms. You know, why would you want to get into something that you're not even into? That would be crazy." When Cutkomp said he thought he already was in, Honken replied, "You're not. You're not. You're you're not. There's nothing, absolutely nothing, were you involved in. Nothing. No possible way to put A plus B together to equal C. No possible way. Impossible. You are -- you are my best friend and I have never said outright things to you, right? Never. I've never said it, have I?" Cutkomp expressed concern that Honken may have spoken to someone else about the disappearances. Honken said, "I have not. I have not and never will. Don't you fucking worry about that. Drunk. Whatever. No. Never. Never. Never. Never."

79. Honken again stressed how carefully the killing of Cobeen must be planned: "I told you that if things are followed, tracked very carefully, timed routines, very carefully is the key. You know, because it's getting haphazard and getting in a hurry and, and we both know what that does. And this is a whole, we're talking whole different level here of carefulness compared to any pissin' little drug thing or anything. There's no comparison. That's why I treat this totally different, because it is totally different. It means that's why you're in no hurry, I'm in no hurry. For a long time and the longer time goes the better that is for us. So right now we know very little, and very little information means a possibility for very big mistakes, so that is the key . . . ."

18

80. Cutkomp mentioned a possible loophole in the government's evidence, but Honken said "We never want to take the risk of going against them in trial anyway." Honken said that he wanted to make sure that the case does not go to trial. He said that was the only real chance that they had to defeat the charges. Honken stressed that he was not going to prison over the drug charges.

81. Honken said that if things happen in Cutkomp's favor (meaning that Cobeen is killed), then Cutkomp will elude prosecution and there will be big holes in Honken's case. Honken stated, "I'll tell you, it's gonna be a happy day when I get a hold of your key and relieve some of my tension."

82. Honken and Cutkomp discussed a possible role for Cutkomp in killing Cobeen. Cutkomp said that he "could never pull it." Honken said, "I know . . . that's fine. I'm glad you know your limitations and you don't say, yeah, yeah, I can go do that and then you get there, muff things up, so then I don't have the chance. I don't want that even a possibility, so that's fine. I will take care of it. Very gladly without any problem whatsoever, as long as I get the opportunity. If I get the opportunity, there will be no problems whatsoever. Because I do not have that same mental blockage, especially in certain scenarios."

83. Honken assured Cutkomp that Honken would get him out of this, as long as the government did not put Cobeen into hiding. Even then, however, Honken said he would "go another route anyway." Honken stated that "one way or another, I'm either going to get caught or we're going to be out of this. There ain't no in between."

84. On June 10, 1996, the government filed a motion to revoke Honken's pretrial release, based largely on the communications between Cutkomp and Honken while on pretrial release. The motion was granted, and Honken has been detained since that date.

85. Several witnesses provided information about Honken's activities on pretrial release. Kurt Zirbel, who worked at Kraft Foods with Honken, testified that while Honken was on pretrial release in 1996, he asked whether Zirbel would sell him a handgun. Zirbel said that Honken claimed the gun was for his girlfriend, and he asked Zirbel about it for about two to three weeks. Zirbel declined to sell Honken a gun. Zirbel also said that Honken stated that if he could figure out a way to jam the electronic monitoring device that he was wearing, he could make a fortune.

86. Robert Riepma of Kraft testified that he sold Honken an SKS paratrooper rifle in 1994 or 1995. Riepma said that the firearm was 40 to 44 inches long with a 30-round clip and a 9 to 10 inch bayonet. Riepma also testified that he sold a .380 caliber Davis firearm to Rick Held of Kraft in 1996. This firearm was nickle-plated with black grips and a 5-round clip. Riepma said he sold the gun to Held for $180, and Held did not say why he wanted the gun.

19

87. Rick Held testified that while Honken was on pretrial release, he told Held that he was looking for a .380 handgun. Held said that Honken claimed the gun was for his girlfriend. Honken suggested that Held contact Bob Riepma at Kraft. Held said that Riepma had a .380 handgun for sale, and after checking with Honken, Held purchased the handgun from Riepma for $85.00. Held said that Honken gave him $5.00 for his trouble. Held did not tell Riepma why he wanted the gun. He testified that Honken told Held to keep it to himself, because Honken did not want anybody to know about the gun.

88. Held said that he placed the gun in his pickup truck, and told Honken that he could get it from the truck. Held testified that Honken was arrested and detained before he was able to pick up the gun from the pickup truck. Held said that after Honken was arrested, a woman identifying herself as Honken's girlfriend called him and said that Honken had been arrested, and that he "doesn't want that pup anymore." Held understood this to mean that Honken no longer wanted the gun.

89. Marcy Hyde of Kraft testified that she worked closely with Honken at Kraft. She said that while Honken was on pretrial release, he started to take long breaks at 8:00 p.m. She said that the breaks lasted as long as two hours. Honken told Hyde that he had to go to the hospital to provide blood and urine samples as a result of the criminal charges that were brought against him. In fact, Honken was not required to provide such samples. Hyde also testified that Honken inquired whether Hyde knew where SA John Graham lived. Hyde knows Graham because her husband is a friend of Graham's. Hyde said that she told Honken the general location where she believed that Graham lived. Hyde testified that Honken claimed he wanted to know Graham's address because Graham was following him.

90. Arthur Ketchum of Kraft testified that shortly before Honken was arrested and detained, he called Ketchum and asked him to substitute for Honken on the first half of his shift. Ketchum said Honken told him he had "some business to attend to." Ketchum said that on another occasion, about two or three weeks before Honken's detention, Honken asked Ketchum to work a night for him, so that Honken could spend the time with his daughter.

91. On June 13 and 14, 1996, agents obtained documents from Honken's locker at Kraft Foods. Among the documents was a page from the Mason City Directory that includes the name Graham. SA Graham resides in Mason City. Agents also found numerous papers and magazines relating to firearms and electronics. One document was an order form for books or videos entitled "Full Auto Conversion of the SKS Rifle," "How to Make a Silencer for a .22," "How to Make Disposable Silencers, Vol. II," and The Ruger 1022 Exotic Weapons System." The order form was in the name of Belen Butterfield. Butterfield told agents that in February or March 1996, she agreed to receive a package at her residence for Honken. Honken told her that he needed to order something and wanted it sent to her residence.

20

92.     The government will further attempt to establish that after Honken was detained in June 1996, he attempted to kill cooperating defendant Timothy Cutkomp. This matter came to the attention of the government when an attorney for Dean Lester Donaldson, an inmate at the Woodbury County Jail, contacted the United States Attorney's Office. Donaldson provided information about the attempt to kill Cutkomp, and agents conducted an independent investigation of Donaldson's statements.

93.     In his first interview with agents on December 9, 1996, Donaldson stated that while he was detained at the Woodbury County Jail with Honken between June and August 1996, Honken had arranged to provide bail money for Donaldson and solicited Donaldson to kill Cutkomp after Donaldson's release. Donaldson said that he had several documents relating to the plan to kill Cutkomp, and he stored the documents at a building belonging to Phil Parmalee. Agents executed a search warrant at a building at 1922 Virginia Street in Sioux City, Iowa, and obtained the documents.

94.     Donaldson testified that he was in the D-Block at the Woodbury County Jail between about January 23, 1996, and August 14, 1996. He said that he was in the same block with Honken between sometime in June 1996 and his release on August 14, 1996.

95.     Honken told Donaldson that he was in jail for methamphetamine charges, and he was caught when his best friend, Tim, and another person named Cobeen provided information to the government. Honken told Donaldson that he planned to go back into the drug business when he was released, and he expected to make $10 million. He asked Donaldson if he wanted to join the business, and offered Donaldson a 50/50 division of profits.

96.     Honken told Donaldson that he needed a hydrogen tank and some chemicals to restart his methamphetamine operation. Honken told Donaldson that he already had a hydrogen tank, which he had stored with a friend named Jay, who worked with Honken in Mason City. Honken provided Donaldson with a handwritten note to Jay. Honken instructed Donaldson to deliver the note to Jay and obtain the hydrogen tank. The letter from Honken to Jay was recovered at 1922 Virginia Street. It states, "I'm having this letter hand delivered so my friend here can get something from you."

97.     Agents later contacted Jay Lien of Mason City, who worked with Honken at Kraft. Lien admitted that Honken had asked him to store a hydrogen tank. Lien said he had moved the tank to the residence of Jerry Flaherty and stored it there. Lien took agents to Flaherty's residence and retrieved the tank. Agents took custody of the hydrogen tank.

98.     Honken also asked Donaldson to obtain various chemicals and books needed to manufacture methamphetamine. Honken gave Donaldson a list of the chemicals and books, but he required Donaldson to write them down himself, so that the list would not be in Honken's handwriting. Agents recovered the lists from 1922 Virginia Street.

99. Honken explained to Donaldson that if Tim was not a witness in his case, then Honken probably could reduce his sentence to about three years. Honken also explained that if Cobeen was not a witness, then he thought that he would receive no jail time. Honken told Donaldson that if he had been out of jail one week longer, he intended to kill Cobeen, the prosecuting attorney in Cedar Rapids, and a DEA chemist in Chicago. Honken also said he was going to kill Angie Johnson because he was concerned that she might tell authorities about the bodies of the witnesses and other persons who were killed in 1993. Honken told Donaldson that he would be able to establish an alibi for the killings that he planned to do in 1996. Honken had figured out how to make his electronic monitoring device show that he was at home even when he was out of the house. Honken said that Angie Johnson was willing to kill the witnesses, but Honken did not want her to do so, because if something went wrong, then Johnson might cooperate with authorities and implicate Honken in the 1993 murders.

100. During these discussions, Donaldson said that maybe he could kill Tim. Honken was very interested in that possibility, and he constructed a plan to kill Cutkomp. At first, Honken wanted Donaldson to kill both Cutkomp and Cobeen. Donaldson told Honken that it would be impossible to kill Cobeen, however, because Cobeen lived in town in an upstairs apartment.

101. Honken told Donaldson that Tim had been his best friend for 13 years, that they worked together at the Jello plant in Mason City, that he drove a two-tone brown Chevy, and that he lived with his parents out in the country. Honken described Tim as 28 years old, 6' 2" tall, with long blond hair. This description matches Cutkomp.

102. Honken told Donaldson that he wanted Donaldson to bond out of jail and kill Cutkomp in August because Honken's trial date was approaching. Honken told Donaldson that he would arrange for bond money through one of his girlfriends, Kathy Rick. (Honken has fathered one child each by Kathy Rick and Angela Johnson). Honken said that he would have Kathy Rick put up her house as security. Donaldson testified that he eventually signed an agreement with Lederman Bail Bonds in Sioux City.

103. Witnesses from Lederman Bail Bonds confirmed that Kathy Rick posted bond for Donaldson. Rick told Lederman employees that she did not know Donaldson, but that her boyfriend was a close friend of Donaldson. Rick posted her house as security. Rick confirmed that she posted bond for Donaldson at Honken's request.

104. Donaldson testified that Honken created a rough map to show how to find the residence of Tim's parents. (Honken also provided a regular Iowa map). Honken wrote the rough map, and Donaldson copied it in his own handwriting. The rough map showed the farm house where Tim's parents live, and locations designated as places for Donaldson to abduct and kill Tim. Agents discovered the rough map and an Iowa map among the documents at 1922 Virginia Street.

22

105. Donaldson said that Honken originally proposed that Donaldson kill Tim and his parents, but Donaldson refused. Donaldson and Honken then discussed other scenarios. They discussed placing a barrier in the road near a stop sign, where Cutkomp would be required to exit his vehicle to move the barrier. One plan was for Donaldson to lie-in-wait for Tim at that location, and to shoot him when he got out of his car. Another option, proposed by Honken, was to place a barrier behind some corn bins near the Cutkomp property. Donaldson would then kill Tim behind the corn bins. Donaldson testified that he and Honken rejected the corn bin plan, and settled on the location near the stop sign.

106. Honken and Donaldson discussed how to dispose of Tim's body after he was killed. The plan was for Donaldson to shoot Tim, throw him in Tim's car, and drive him back behind some bins on other property owned by Cutkomp's father. Donaldson would then drive away in his own car.

107. Honken told Donaldson that he could use a gun that Rick Held was holding for Honken. Honken described his gun as a rifle. Donaldson did not want to use that gun because he inferred from conversations with Honken that the gun that Held possessed was the gun that Honken used to kill witnesses in 1993.

108. Honken told Donaldson that Cutkomp went to work by about 5:30 a.m. on certain Tuesdays, and that it would still be relatively dark outside. Honken provided Donaldson with a calendar that showed Tim's work schedule for August, September, and October 1996. Honken also gave Donaldson the name and telephone number of a place where he could call to obtain a night scope for a rifle. Agents discovered the calendar and a number for Night Scope International among the documents at 1922 Virginia Street.

109. Honken directed that after Donaldson killed Tim, he should take the gun to a pond near Clear Lake and throw the gun in the pond. Honken told Donaldson that the pond had moss on top and a foot of mud under the water, so the gun would never be found.

110. Honken directed that after Donaldson disposed of the gun, he should drive to Des Moines. In Des Moines, Donaldson was to mail a threatening letter to Cobeen's parents, saying that Cobeen should not testify at the upcoming drug trial. Honken told Donaldson to obtain an old typewriter, which could not be traced, to type the letter. He told Donaldson to mail the letter from Des Moines, so that it would be harder for law enforcement to trace the letter. Honken gave Donaldson specific instructions about what to say in the letter to Cobeen's parents. Donaldson copied the letter from Honken's handwriting into his own handwriting. Agents recovered this document at 1922 Virginia Street. Honken told Donaldson that he would give him $10 million from the new methamphetamine business if he completed the plan.

23

Case 3:10-cv-03074-LTS-KEM    Document 19-4    Filed 06/06/11    Page 24 of 36

111. As Donaldson's release neared, he and Honken began to discuss other possible means of killing Tim. Donaldson testified that Honken may have realized that Donaldson was reluctant to kill anyone, so Donaldson suggested hiring someone from the El Foresteros biker club to kill Cutkomp. Donaldson also suggested that a man named LaDean Hummel might do it.

112. Honken proposed a means by which Donaldson could get $5000 to pay the El Foresteros or Hummel to kill Cutkomp. Honken told Donaldson that Rick Held, who worked at Kraft Foods, would supply a truck and trailer that Donaldson could use to steal some hogs. Honken told Donaldson that Held was behind on his feed bill and would probably loan the truck and trailer if he got one-third of the money. Donaldson was supposed to tell Held that he was using the equipment to raise money for Honken to pay his attorney. Honken provided Donaldson with a handwritten letter of introduction to Held. Agents found this document among the papers at 1922 Virginia Street.

113. Honken provided Donaldson with a document that showed a code that Donaldson was to use to communicate with Honken from outside the jail. Honken explained to Donaldson that he used a similar code with his girlfriends, Angie Johnson and Kathy Rick. Honken told Donaldson that the code required reference to a book, and each of them needed to have the same book. Agents located a page demonstrating this code among the papers at 1922 Virginia Street.

114. Donaldson testified that after he was released on August 14, 1996, he took no steps to complete the plan to kill Cutkomp or to threaten Cobeen. He did have contact with Kathy Rick, who called him in an attempt to recover the bond money that she posted.

115. Donaldson failed to appear for his State Court sentencing on November 7, 1996, and he was arrested on November 21, 1996. He was placed in the C-block at the Woodbury County Jail. Donaldson saw Honken through a window at the jail, and Honken gave him a cold look. According to Donaldson slipped Honken a note essentially saying things were coming together. Donaldson later stated during an interview that he sent Honken a note saying he was sorry things had not worked out as they had discussed. Donaldson further testified that he feared for his life and hoped to placate Honken.

116. Donaldson met with agents in early December and provided information about the attempt to kill Cutkomp. On December 18, 1996, Donaldson was called from his cell by other inmates who said that someone was shooting at Donaldson. Donaldson saw Honken through a window. Honken had his hand in the form of a gun, and he was "shooting" at Donaldson. Donaldson testified that he could read Honken's mouth calling Donaldson "a fucking snitch." Donaldson said that a few minutes later, another inmate named William Walter "Boo" Dean came to Donaldson's cell and said that Honken had asked Dean to "fuck up" Donaldson. Donaldson said Dean told him that Honken said Donaldson was "a fucking dead man," and that Honken was going to have someone get Donaldson.

24

117. William Walter Dean testified that he saw Honken motioning at Donaldson through the glass with his hand in the form of a gun. He said that Honken was calling Donaldson a snitch, and telling Donaldson that he was a dead man for snitching on Honken. Dean said that Honken asked him to go up and try to get Donaldson to come out of his room.

118. Inmate Terry Bregar testified that Honken told him he had bonded an individual out of jail to take care of some matters for Honken. Bregar said that when Honken learned that the man had not done anything, and the man failed to appear for court, Honken turned into "a raving maniac." Bregar said that Honken formed a gun with his hand and said, "I'll kill the son of a bitch." Honken said he was going to put some people on him right now, and Honken went to use the phone.

118(a) Former inmate Anthony Altimus stated that in about January 1997, he was assigned to the G-Block of the Woodbury County Jail with Honken. Altimus learned from another inmate that Honken wanted a gun in order to kill his best friend, who was a witness against Honken. (The description of the "best friend" given by Altimus corresponds to cooperating prosecution witness Timothy Cutkomp.)

118(b) When the other inmate was moved out of the G-Block, Honken spoke to Altimus about his desire to kill the witness. Honken eventually told Altimus that he wanted Altimus to kill Honken's best friend, who worked at Kraft Foods. According to Altimus, Honken said that his best friend "wore a wire on him" and got him busted with some methamphetamine. Honken agreed to pay Altimus $1,000 and to arrange for him to leave the country after killing the best friend.

118(c) Honken told Altimus that he would arrange for Altimus to post bond so that he could be released from the Woodbury County Jail. Honken said that Angela Johnson (Honken's girlfriend) would pick up Altimus outside the jail and take him to a motel in Des Moines. There, Angela Johnson was to explain the plan to kill the best friend and then to take Altimus to the town where the friend lived.

118(d) During these conversations, Honken told Altimus that he had killed three witnesses in 1993, and that the government was forced to dismiss a previous case against Honken. Honken said that Angela Johnson was going to tell Altimus how to kill the best friend "like they did in 1993," so that they would not be detected.

118(e) Altimus said that efforts to raise the bond money involved another inmate named Johnson (no relation to Angela Johnson), who owed Honken $1,000 for a methamphetamine recipe. Altimus said that Honken arranged for inmate Johnson to transfer the $1,000 to Angela Johnson. Angela Johnson was then supposed to use the $1,000 to post bond for Altimus. Altimus said the plan to post bond failed when the bondsman required $1,200 and efforts to raise the additional money from Altimus's grandmother failed.

25

118(f) Altimus stated Honken explained that he previously had bonded out another inmate whom Honken described as a "crackhead", to kill his best friend. The description of the previous inmate whom Honken bonded out is consistent with Dean Donaldson.

118(g) When the plan to post bond for Altimus's release failed, Altimus and Honken discussed other schemes to gain Altimus's release. These included raising bond money through the sale of drugs or guns, and attempting to escape from the Woodbury County Jail.

118(h) Altimus stated that he was aware of an effort by Honken to arrange for the presentation of false exculpatory testimony at his sentencing hearing. Altimus heard Honken discuss with another inmate, Carl Medina, testimony that Honken wanted Medina to give at the hearing. This testimony apparently was designed to contradict testimony of Dean Donaldson. From the conversation that he heard, Altimus knew that the proposed testimony by Medina would be false.

### Attempted Escape

119. The government will further attempt to establish that in about November 1996, Honken attempted to escape from the Woodbury County Jail. Several witnesses have provided information about the escape plan.

120. Former inmate Terry Bregar testified that Honken described the plan to him while they were together in D-block in the Woodbury County Jail. Honken said that inmates in the adjacent C-block already had busted out a couple blocks from the wall of a cell near the ceiling. They planned to punch through the outside brick and drop a rope blanket about 40-feet down to the ground outside. They planned to pull up a heavy duty rope with the rope blanket and use it to escape out the hole. Bregar said that inmate David Leavitt made the rope from blankets.

121. Honken told Bregar that he and a partner (Dayton Sabasta) planned to break through the wall of Honken's cell to the adjacent C-block, so they could escape through the hole. Honken and Sabasta broke a metal handle of a cell door and a coat hook off a wall. They used the handle and hook as a hammer and chisel, respectively, and attempted to break through the wall to C-block. Honken and Sabasta were unable to break through the wall because the block was poured with cement.

122. Bregar said that Honken then attempted to pick the lock on the fire door between blocks C and D. He used a bow off a pair of old glasses, and he used the coat hook as a tension bar. Bregar saw Honken successfully pick the lock, but he did not open the door. The guard could not see the space where Honken picked the lock because it is a blind spot from the guard stand.

26

123. Bregar said that Honken reported that inmates in C-block needed to saw through a piece of reinforcement bar that was found in the blocks in cell C-8. Honken took a strike plate from Bregar's cell door and used it to break a piece of nosing off the stairs. The nosing was a five-inch piece of abrasive material with aluminum underneath. Honken and the others planned to use the nosing as a hacksaw to cut through the reinforcement bar.

124. Bregar saw Dayton Sabasta tie the nosing to a piece of string and swing the piece under the front door of the D-block over to the front door of the C-block. Honken said that they were sending the piece to an inmate named Dennis in C-block. Investigation determined that the inmate in C-block was named Dennis Putzier.

125. Bregar testified that one night, Honken came to look out Bregar's window. There was a late model Chrysler sitting across the street from the jail with the parking lights on. When Honken saw the car, he said, "it's a go." Honken told Bregar that if he heard some noise later that night, he should think nothing of it. Bregar said that nothing happened that night because the guy with the rope never showed up outside the jail.

126. Former inmate William Garrison testified that he observed activity relating to an attempt to escape from the jail in November 1996. Garrison heard Honken and Sabasta talking about an escape from the jail. Garrison saw Sabasta break a handle off a cell door. Garrison saw Honken and Sabasta in Honken's cell while Sabasta attempted to pound a hole through the wall from D-block to C-block. Garrison said that they used the door handle as a hammer and a coat hook as a chisel. Garrison saw Honken attempt to pick the lock on the fire door with various pieces of equipment.

127. Former inmate David Leavitt testified that he observed the hole in the wall in cell C-8 while he was detained at the Woodbury County Jail after his sentencing on November 1, 1996. Leavitt saw Putzier working on the hole in the wall. Putzier said that he was trying to escape by breaking through the concrete and climbing down a rope on the other side. Leavitt testified that he made a 40-foot thin rope from blankets for Putzier at Putzier's request. Putzier hoped to get someone outside the jail to assist with the escape. He hoped to pull up a thicker rope, a crowbar, and a sledgehammer with the rope that Leavitt made. Leavitt observed Putzier talking regularly to an identified person or persons through the fire door to D-block.

128. Former inmate Derek Boggs testified that he was assigned to cell C-8 in November 1996. Boggs saw that there was a hole in the top of wall of the cell. Boggs said that when he arrived at the jail, Putzier told him that there was more than likely going to be an escape, and Boggs could choose whether he wanted to be involved. Boggs chose not to be involved, but he observed Putzier regularly working on the hole in the wall in cell C-8. Boggs heard Putzier say that inmates named Dustin and Dayton would be involved in the escape. Boggs saw Putzier communicate with those two inmates through the fire door between blocks C and D.

27

128(a) Former inmate James Derrick reported he saw Honken sharpening an object for 15 or 20 minutes and after that saw Honken stick an object inside the locking mechanism of a door to see if it would fit.

128(b) Former inmate Daniel Frye stated that on one occasion he noticed a loud banging noise coming from Honken's cell. At about the same time, Frye noticed that the brass metal handle from his cell door was missing. He later learned from another inmate that Honken and Dayton Sabasta had taken the door handle for the purpose of trying to break through the wall from cell block D to cell block C.

128(c) Former inmate Anthony Altimus reported that Honken told him of an attempt to escape from the Woodbury County Jail. According to Altimus, Honken said that an inmate named Dennis Putzier had tried to knock a hole through the outside wall of the jail in C-Block. Honken was then going to break from D-Block to C-Block and escape with Putzier. Honken said that when Putzier encountered the reinforcement bar in the hole leading outside, Angela Johnson brought a hacksaw blade to the jail to cut through the bar. Putzier had broken a finer hole through the wall in order to bring in the hacksaw and other materials. Honken told Altimus that the plan failed because Putzier "chickened out."

129. On or about November 21, 1996, jail personnel discovered a hole in the wall of cell C-8 near the ceiling. Jailers also found damage to the wall in Honken's cell that is consistent with testimony about the attempt by Honken and Sabasta to break through the wall from D-block to C-block. Jailers discovered that a piece of the nosing was missing from the stairs in the location where witnesses said that Honken broke off a piece to use as a hacksaw. Investigation verified that the fire door is located in a blind spot from the guard stand at the jail.

## Adjustment for Acceptance of Responsibility

130. Given the Obstruction of Justice and the Commission of an Offence While on Release enhancements, the defendant would not appear eligible for the Acceptance of Responsibility reduction.

## Offense Level Computations

131. The 1997 edition of the Guidelines Manual has been used in this case.

### Count 1 - Conspiracy to Distribute Methamphetamine
### Count 4 - Attempted Manufacturing of Methamphetamine

132. Pursuant to U.S.S.G. § 3D1.2(d), the counts will be grouped into one closely related group because the total amount of drug quantity from both counts will be considered in determining the Base Offense Level.

28

Case 3:10-cv-03074-LTS-KEM    Document 19-4    Filed 06/06/11    Page 29 of 36

133. **Base Offense Level:** The most appropriate United States Sentencing Commission Guideline (U.S.S.G.) for a violation of 21 U.S.C. §§ 846 & 841(a)(1) is U.S.S.G. § 2D1.1. As set out in the Offense Conduct section, the government has stated they will be able to establish that the defendant is accountable for 7.85 kilograms of methamphetamine (actual). U.S.S.G. § 2D1.1(a)(3)(c)(1) directs if the offense involved more than three kilograms of methamphetamine (actual) the Base Offense Level is 38.

134. **Specific Offense Characteristic:** U.S.S.G. § 2J1.7 directs that if an enhancement under 18 U.S.C. § 3147 applies (penalty for an Offense Committed While on Release), add three levels to the offense level for the offense committed while on release as if this section were a Specific Offense Characteristic contained in the offense guideline for the offense committed while on release. Based on codefendant Cutkomp's debriefing statements it appears the defendant continued the conspiracy to manufacture methamphetamine while under bond supervision for the 1993 Conspiracy to Distribute Methamphetamine charge. In view of the aforementioned, 18 U.S.C. § 3147 appears applicable and therefore this enhancement is recommended. +3

135. **Victim-Related Adjustments:** None 0

136. **Adjustments for Role in the Offense:** U.S.S.G. 3B1.1(c) directs if the defendant was an organizer, leader, manager, or supervisor in any criminal activity, increase by two levels. Offense reports reflect the defendant planned and organized the manufacturing and the distribution of methamphetamine. Furthermore, the defendant recruited participants (Cutkomp, Cobeen and Johnson), claimed a greater share of the proceeds and had supervisory control over the participants activities. In view of the aforementioned, this enhancement is recommended. +2

137. **Adjustment for Obstruction of Justice:** U.S.S.G. § 3C1.1 directs that if the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by two levels. Based on the information contained in the Obstruction of Justice section this two level enhancement appears applicable. +2

138. **Adjusted Offense Level (Subtotal)** 45

139. **Adjustment for Acceptance of Responsibility:** Given the Obstruction of Justice and the Commission of the Offense While on Release enhancements, the defendant would not appear eligible for the Acceptance of Responsibility reduction. 0

140. **Adjusted Offense Level:** 45

29

Case 3:10-cv-03074-LTS-KEM    Document 19-4    Filed 06/06/11    Page 30 of 36

141. **Chapter Four Enhancements:** None      <u>0</u>

142. **Total Offense Level:**      **<u>45</u>**

## PART B. CRIMINAL HISTORY

### Juvenile Adjudications

143. None known

### Adult Criminal Convictions

| Date of Arrest | Conviction/Court | Date Sentence Imposed/Disposition | Guideline | Pnt |
|---|---|---|---|---|
| 144. 06/09/86 (age 19) | Theft - 2nd Degree Hancock County District Court Garner, IA | 01/26/87: Deferred Judgment, 3 - 5 years probation 02/11/91: Discharged from probation | 4A1.1(c) | 1 |

Hancock County District Court records, case # 3316, reflect the defendant was arrested by the Hancock County Sheriff's office for stealing a 1980 Pontiac automobile. The defendant was originally charged with 1st Degree Theft and 2nd Degree Burglary. The defendant was represented by counsel and pursuant to a plea agreement pled guilty to the reduced theft charge. He received a deferred judgment with probation. An order of discharge from deferred judgment probation was granted on 02/11/91. It is noted that codefendant Timothy Cutkomp was also involved with this theft.

### Criminal History Computation

145. The total of the criminal history points is 1. According to the Sentencing Table at U.S.S.G. Chapter 5, Part A, 1 criminal history point establishes a Criminal History Category of I.

### Other Arrests

| Date of Arrest | Charge | Agency | Disposition |
|---|---|---|---|
| 146. 03/21/93 | Conspiracy to Deliver Methamphetamine | U. S. District Court Northern District of Iowa | Dismissed |

Case 3:10-cv-03074-LTS-KEM     Document 19-4     Filed 06/06/11     Page 31 of 36

The government moved to dismiss this case after a witness, Gregory Nicholson, could not be located. It is noted that a warrant for the witness was issued and, to date, the whereabouts of the witness is unknown.

## PART C. OFFENDER CHARACTERISTICS

### Personal and Family Data

147. The defendant was born March 22, 1968, in Burlington, Iowa. He is one of four children born to the union of James Honken, age 64, and Marvea Nee Hamilton Smidt. The defendant's parents divorced when he was age 8 and following the divorce the defendant remained with his mother in Britt, Iowa. His mother married Ron Smidt approximately 18 months later. The defendant, his mother and step-father remained in Britt where his mother has been employed at a local bank for 17 years and his step-father owns a used car lot.

148. The defendant's father resides in Steamboat Rock, Iowa, and is unemployed. According to the defendant and his mother, Mr. Honken is a chronic alcoholic and rarely works. Despite his father's alcohol abuse, the defendant maintains he has a good relationship with him when his father is sober. The defendant did not object to Mr. Honken being contacted as part of the presentence investigation; however, the defendant advised his father is intoxicated nearly every day. It is noted that the defendant's father has a prior bank robbery conviction.

149. Although the defendant's parents separated when he was at a young age, he described his childhood upbringing as good. He reported he was never abused or neglected and advised he had a good relationship with his mother and stepfather. The defendant described his mother as "perfect."

150. The defendant moved out of the family home during the summer following his high school graduation in 1986. He moved to Tucson, Arizona, where he lived with his brother, Jeff Honken, age 34, until approximately 1989. He then returned to Britt where he worked and attended college. In January 1992, he returned to Tucson and continued to reside there until his March 1993 arrest. Since his 1993 arrest he has lived in the Mason City area.

151. The defendant has two siblings, Jeff Honken, age 33, who resides in Mesa, Arizona, and is employed as a manager for Motorola and Alyssa Honken, age 24, who resides in South Sioux City, Nebraska, and is employed as a counselor at the Boys and Girls Home. The defendant had another brother, Matthew Honken, who died shortly after birth.

152. The defendant's mother verified the family history as provided by the defendant. Mrs. Honken advised the family loves Dustin and remains very supportive. Mrs. Honken described her son as friendly, outgoing, caring, and an overall good person. According to Mrs. Honken neither drugs nor alcohol have been a problem for her son and he has never shown any signs of violence.

Case 3:10-cv-03074-LTS-KEM    Document 19-4    Filed 06/06/11    Page 32 of 36

153. The defendant is single and has never married. However, he has two children. Ryan Honken, age 3, resides with his mother, Kathy Rick, in Mason City, Iowa. The defendant had an on and off romantic relationship with Ms. Rick from 1989 through 1993. The defendant does pay child support through the Cerro Gordon County District Court. Ms. Rick verified the aforementioned and described the defendant as a good father and caring person. According to Ms. Rick prior to the defendant's incarceration, he saw his son approximately three to four times per week.

154. Marvea Honken, age 3, resides with her mother, Angela Johnson, in Urbandale, Iowa. The defendant cohabited with Ms. Johnson from late 1993 until his arrest in April 1996. Ms. Johnson advised she has a good relationship with the defendant and has maintained contact with him while he has been in jail. Ms. Johnson described the defendant as a reasonable, sensible and down to earth person. She stated he has always supported his daughter and considers him a good father.

## Physical Condition

155. The defendant described his overall physical health as good. He reported no prior health problems although he maintains he may have an irregular heart beat.

## Mental and Emotional Health

156. The defendant described his mental and emotional health as stable. Prior to his arrest for the instant offense he has never had or sought any professional help in this area. The defendant did file a motion requesting a psychological evaluation and the Court granted the motion. In September 1997, a forensic evaluation was conducted at the Metropolitan Correctional Center, Chicago, Illinois. Forensic Psychologist, Dr. Daniel Greenstein completed the evaluation and diagnosed the defendant as suffering from Axis I: Adjustment Disorder with Anxiety, Methamphetamine Abuse and Adult Antisocial Behavior; and Axis II: Personality Disorder NOS, With Antisocial and Borderline Features. The evaluation assessed the defendant is having a difficult time dealing with the anxiety related to his current legal problems; however, concluded the defendant does not suffer from a severe mental disease or defect.

## Substance Abuse

157. The defendant reported he drinks alcohol two or three times per month and does not feel he has any alcohol related problems. The defendant stated he was introduced to marijuana in approximately 1993 and after that began using the drug roughly once a week. The defendant also admitted to experimenting with cocaine and LSD or acid but reported no extended use.

158. The defendant reported that in early 1993 he was introduced to methamphetamine. He advised that shortly thereafter he was using the drug on nearly a daily basis for approximately four months before his arrest in March 1993. The defendant advised that while he was on pretrial release for the 1993 arrest, he did not use any drugs and after his

32

release (May 1995) he used methamphetamine on an occasional basis. He advised he smoked and snorted the drug. The defendant related that in retrospect he believes he had a drug problem during the early part of 1993.

### Education and Vocational Skills

159. The defendant graduated from the Britt Public High School in May 1986. The defendant reported that in 1989, he enrolled in the community college in Mason City, Iowa, (NIACC), and advised he is approximately one semester short of obtaining a two year general associate degree. The defendant also reported attending the Pima Community College in Tucson, Arizona, for one month before dropping out.

### Employment Record

160. From January 1994, until the defendant's arrest in April 1996, he was employed at the Kraft Plant in Mason City. He worked in the packing department and earned $10 an hour. He earned approximately $22,000 gross per year. Employment verification reflected the defendant worked approximately 40 hours per week and his work performance was rated as average.

161. The defendant stated that during portions of 1993 and while in high school he worked for his stepfather at Smidt Motor in Britt, Iowa. He earned an hourly wage while working various jobs such as mechanic and salesman while attending school.

162. From January 1992 through June 1992, the defendant worked for Printed Circuit Technology, in Tucson, Arizona. He advised he earned approximately $8,000 during this employment and explained that he assembled circuit boards. According to the defendant this company has since disbanded.

### Financial Condition: Ability to Pay

163. The defendant reported he has no assets and since he has been incarcerated for the past 12 months, he has no income. Prior to the defendant's incarceration he was earning approximately $22,000 per year. The defendant reported he has two outstanding debts, one to the Kraft Credit Union for $800 for the balance owed on a credit card and $2,000 owed for a student loan.

## PART D. SENTENCING OPTIONS

### Custody

164. **Statutory Provisions:** The maximum term of imprisonment for Counts 1 and 4 is Life. There is also a 10 year mandatory minimum on each count. 21 U.S.C. § 841(a)(1)(A).

165. **Guideline Provisions:** Pursuant to U.S.S.G. Chapter 5, based on a Total Offense Level of 45 and a Criminal History Category of I, the guideline imprisonment range is Life.

Case 3:10-cv-03074-LTS-KEM    Document 19-4    Filed 06/06/11    Page 34 of 36

166. If the Court applies the U.S.S.G. § 2J1.7 enhancement (commission of offense while on bond) and determines a guideline imprisonment range of less than Life, the sentencing judgement should divide the sentence between the sentence attributable to the underlying offense and the sentence attributable to the enhancement. U.S.S.G. § 2J1.7, comment. (N.2) & 18 U.S.C. § 3147.

### Impact of Plea Agreement

167. Although the government agreed to move to dismiss Counts 2 and 3, there is no plea agreement and the guideline computations have taken into account all relevant conduct related to the instant offense.

### Supervised Release

168. **Statutory Provisions:** A term of at least five years supervised release is required on each count. 21 U.S.C. § 841(a)(1)(A). If a Life sentence is imposed, supervised release becomes a moot issue.

169. **Guideline Provisions:** The guideline range for a term of supervised release is five years. U.S.S.G. § 5D1.2(b). Such terms of supervised release run concurrently. 18 U.S.C. § 3624(e). If a Life sentence is imposed, supervised release becomes a moot issue.

### Probation

170. **Statutory Provisions:** The defendant is not eligible for probation because the instant offense is a Class A felony. 18 U.S.C. § 3561(a)(1).

171. **Guideline Provisions** The defendant is not eligible for probation because the instant offense is a Class A felony. U.S.S.G. § 5B1.1(b)(1).

### Fines

172. **Statutory Provisions:** The maximum fine for both counts is $4,000,000 for a total of $8,000,000. 21 U.S.C. § 841(a)(1)(A). A special assessment of $50 is mandatory for both counts for a total of $100. 18 U.S.C. § 3013.

173. **Guideline Provisions:** The fine range for the instant offense is from $25,000 to $8,000,000. U.S.S.G. § 5E1.2(c)(4).

174. Subject to the defendant's ability to pay, the Court shall impose an additional fine amount that is at least sufficient to pay the cost to the Government of any imprisonment, probation, or supervised release, pursuant to U.S.S.G. § 5E1.2(I). The most recent advisory from the Administrative Office of the United States Courts, dated March 28, 1997, suggests the following monthly costs be used: $1,910.17 for imprisonment; $1,186.25 for community confinement; and $217.18 for supervision.

34

### Restitution

175. **Statutory Provisions:** Restitution is not an issue in this case.

### Denial of Federal Benefits

176. **Statutory Provisions:** Pursuant to 21 U.S.C. § 862(a)(1)(A) upon a first conviction for distribution of a controlled substance, a defendant may be declared ineligible for any or all Federal benefits for up to five years as determined by the Court.

177. **Guideline Provisions:** Pursuant to U.S.S.G. § 5F1.6, the Court may deny eligibility for certain Federal benefits of any individual convicted of distribution or possession of a controlled substance.

178. Subsection (e) of 21 U.S.C. § 862 provides that a period of benefit ineligibility "shall not apply to any individual who cooperates or testifies with the Government in the prosecution of a Federal or State offense or who is in a Government witness protection program".

## PART E. FACTORS THAT MAY WARRANT DEPARTURE

179. The probation officer has no information concerning the offense or the offender which would warrant a departure from the prescribed sentencing guidelines.

Respectfully submitted,

By: _Jay V. Jackson_

Jay V. Jackson
U. S. Probation Officer

JVJ/kjg