7

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

  vs.

DUSTIN LEE HONKEN,

     Defendant.

_____/

# ORIGINAL

No. CR 96-3004

TRANSCRIPT OF SENTENCING

VOLUME 2

 

    The Sentencing held before the Honorable Mark W. Bennett, Judge of the United States District Court for the Northern District of Iowa, at the Federal Courthouse, 320 Sixth Street, Sioux City, Iowa, December 16, 1997, commencing at 8:04 a.m.

APPEARANCES

| | |
|---|---|
| For the Plaintiff: | PATRICK J. REINERT, ESQ.<br>STEVEN M. COLLOTON, ESQ.<br>Assistant United States Attorneys<br>Suite 400<br>401 First Street Southeast<br>Cedar Rapids, IA  52407-4950 |
| For the Defendant: | ALFREDO PARRISH, ESQ.<br>Parrish, Kruidenier, Moss,<br>  Dunn & Montgomery<br>2910 Grand Avenue<br>Des Moines, IA 50312 |
| Also present: | Jay Jackson, Probation Officer |
| Reported by: | Shelly Semmler, CSR, RMR<br>320 Sixth Street<br>Sioux City, IA  51101<br>(712) 233-3846 |

THE COURT: Please be seated. Mr. Cutkomp, you're still under oath, and I think you're still on direct examination as I recall.

MR. COLLOTON: Your Honor, Mr. Reinert had to attend to another matter if that's all right.

THE COURT: So you're going to continue?

MR. COLLOTON: Yes.

THE COURT: I forgot. Thank you, Mr. Colloton.

TIMOTHY CUTKOMP, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

CONTINUED DIRECT EXAMINATION

BY MR. COLLOTON:

Q. Mr. Cutkomp, you have in front of you Government Exhibits 1B through 5B which we talked a little bit about yesterday.

A. Yes.

Q. Let me ask you some questions about those exhibits. In Exhibit 1B, would you please turn to page 2 and look at the second Dustin block from the bottom? Do you see where it says, But it doesn't sound like they got a whole lot. I think that shit's in Oklahoma?

A. Yes.

Q. What did you understand Mr. Honken to mean by that shit's in Oklahoma?

A. The chemicals or glassware.

Q. Which chemicals or glassware?

A.   From the lab that we had in Mason City.

Q.   Let me ask you to turn to page 3 at the top of the page, the first Dustin block, second line.   Do you see where it says Mr. Honken --

MR. PARRISH:   What date are you reading from?

MR. COLLOTON:   This is Exhibit 1B.

MR. PARRISH:   Thanks.

BY MR. COLLOTON:

Q.   Do you see where it says, He's gonna ask Reinert exactly where it's at?

A.   Yes.

Q.   What did you understand Mr. Honken to mean by that?

A.   The chemicals and glassware again.

Q.   What about them?

A.   He's going to have his lawyer find out where the chemicals and glassware are at.

Q.   Let me ask you to go down to the second Dustin block from the bottom of that page.   Do you see in the middle of the paragraph it says, He cooperated me since October 5, man, everything, I get my hands on him October 5.   Every time he talked to me or you he'd go right to Graham?

A.   I don't see that.

Q.   Do you see that in the middle of the --

A.   Yes, yes.

Q.   What did you understand Mr. Honken to mean by every time

he talked to me?

A.    It was Dan Cobeen.

Q.    Let me ask you to turn to page 6.  Do you see the third Dustin block from the bottom where it says, I don't even need to get him.  Why do I need to get him?

A.    Dan Cobeen again.

Q.    And what did you understand Mr. Honken to mean by get him?

A.    To make him disappear, to kill him.

Q.    Do you see the next Dustin block where it says, Remember I said every link in the chain has to be there?

A.    Where was that at?

Q.    The next Dustin block after the one you were just looking at.

A.    Okay.

Q.    What did you understand Mr. Honken to mean by every link in the chain has to be there?

A.    That everyone that was at the house during the raid that had handled the chemicals or glassware would have to be -- have to be accounted for.

Q.    Let me ask you to turn to page 10.  Look at the last block on the page.  Do you see where in the fourth line from the bottom it says, So now I found this company that'll build you anything they want, you want?

A.    Yes.

Q.    Do you see that?

A.    Yes.

Q.    What did you understand Mr. Honken to be talking about there?

A.    Getting some kind of an electronic device that would -- so he would be able to fool the ankle bracelet so he'd be able to leave if he wanted to.

Q.    Let me ask you to turn to page 11 and look at the fifth Dustin block from the bottom beginning with, I know.  Do you see that?

A.    Yes.

Q.    Do you see the last sentence there says, Um, if I don't get it off, I'm going to be very short timeline?

A.    Yes.

Q.    What did you understand Mr. Honken to mean by that?

A.    He would only have a short time to be out of the house.

Q.    If what?

A.    If he wasn't able to get the ankle bracelet taken off or figure out how to fool it somehow.

Q.    Now, do you see two Dustin blocks down from there you've just said, Who's the people that and Dustin says, I already found one of 'em?

A.    Yes.

Q.    And do you see then two more blocks down from there Dustin says, I found one.  Basically there's two others to

find?

A. Yes, yes.

Q. What was your understanding of Mr. Honken's statements there?

A. Those would have been the people at the house during the raid.

Q. What about them?

A. He found where one person lived, but he still needed to find where the other two people lived.

Q. Then do you see at the bottom --

THE COURT: Mr. Colloton?

MR. COLLOTON: Yes.

THE COURT: I don't want to interfere with your relentless pursuit of the obvious, but so far, you know, I've understood everything you've gone through. There hasn't been any question in my mind what any of these matters meant. It was very clear to me. But like I said, it's an important matter, and if you want to pursue the obvious, far be it from me to stop you.

BY MR. COLLOTON:

Q. Let me ask you to look at Exhibit 2B. I'll ask you to turn to page 8. Do you see the fourth Dustin block down from there?

A. Yes.

Q. Do you see where Mr. Honken says, I've climbed far

bigger hills than that little hill?

A.   Yes.

Q.   What did you understand him to be referring to there?

A.   The case that we had in '93.

Q.   What about it?

A.   The people that had disappeared.

Q.   Let me ask you to turn to page 18 of that exhibit.  Do you see the fifth Dustin block down --

A.   Yes.

Q.   -- where Mr. Honken says, At least not for no ten fucking years and then at the end he says, That lowers you down to two to four at the most?  Do you see that?

A.   Yes.

Q.   Do you see the next block, Mr. Honken says, That one over there is a hundred percent?

A.   Yes.

Q.   And you say, That one would be easy?

A.   Yes.

Q.   What are you referring to when you say that one?

A.   Dan Cobeen.

Q.   Let me ask you to turn to page 21.  Do you see the second Dustin block down where he says, As long as this person don't vanish before then?

A.   Yes.

Q.   What did you understand this person to mean?

A. Dan Cobeen.

Q. And do you see two more blocks down Mr. Honken says, One and one only. You don't want two, three, or four?

A. Yes.

Q. What did you understand him to be talking about there?

A. I didn't want anyone -- I was telling him I didn't want anyone else other than the one person he was talking about to get killed.

Q. Let me ask you to turn to page 26. Do you see halfway down the page there's a block where you say, I'm worried about the other stuff still?

A. Yes.

Q. What did you mean by the other stuff?

A. The people that disappeared in '93.

Q. Do you see the last block on the page? You say, I'm worried that you took a little thing threw in there or something.

A. Yes.

Q. What did you mean by that?

A. Piece of clothing or a shoe or something that I had had.

Q. What about it?

A. That if he had buried the people he would have left something of mine there.

Q. On the next page, the second Dustin block, the third line, do you see where he says, So there's no possibility of

you having anything to worry about me. I have stuff to worry about from you?

A. Yes.

Q. What did you understand him to mean by that?

A. I was telling him that I was worried about him having done something to get me in trouble, and he said that he hadn't done anything and had nothing to worry -- I didn't have to worry about him but he was worried about me cooperating.

Q. Please turn to page 29. Do you see the second Dustin block from the bottom where he says, Probably, but it's so hard to get that person to do anything?

A. Yes.

Q. Then you said, So she'd just go up and -- do you see that?

A. Yes.

Q. Who were you referring to there?

A. Angie Johnson.

Q. Please turn to page 33. Do you see the second Tim block from the bottom where you say, Brian Beach?

A. Yes.

Q. Who's Brian Beach?

A. Dan Cobeen's friend.

Q. And what was the relevance of Brian Beach to your discussion here?

A.   That Dan was staying with Brian.

Q.   Please turn to page 37 -- actually, I'm sorry, page 38. Do you see the second Dustin block from the bottom where he says, This is a step back from last time?

A.   Yes.

Q.   What did you understand that to refer to?

A.   '93 case again.

Q.   Then on the next page, the second Dustin block from the top, do you see where it says, You gotta remember both those guys were skeptical?

A.   Yes.

Q.   What did you understand that to refer to?

A.   Terry DeGeus and Greg Nicholson.

Q.   Then do you see three more Dustin blocks down where he says, I mean the one fucking moved, vanished?

A.   Yes.

Q.   Then do you see further down from there, two more Dustin blocks down, it says, Mister one of his friends that has a very big mouth?

A.   Yes.

Q.   Then the next block says, The big guy, and you say, Oh, yeah.

A.   Yes.

Q.   What do you understand that -- what was that discussion about?

A. It was about Scott Gahn had told Dustin where Greg Nicholson was living because he had moved out of his house.

Q. Please turn to Exhibit 3B. On page 12 -- well, that's probably too obvious. Let me go to page 13, the first Dustin block at the top. Do you see that, where it says, You need -- you pick the most important thing first because, ah, there are other things that might be important after the first one?

A. Yes.

Q. And then you said, Have you decided what the most important thing is first?

A. Yes.

Q. What was that discussion about?

MR. PARRISH: Well, I'm going to object -- you can allow a whole lot in sentencing hearings, but I'm going to object to what it's all about. The conversation speaks for itself. And if he's changing the conversation, he shouldn't use that as a foundation to change the nature and meaning of the conversation. The conversation was taped by agents. They knew what they meant. It would be irrelevant as to anything dealing with this conversation because it changes the nature of this conversation.

THE COURT: Well, I think the question what's it all about is a shorthand for what this witness's understanding of the conversation was, and I think that's permissible, so the objection's overruled.

A.   Talking about the people that were in the house and who would be the most important person in those people that would -- if one of them would disappear, that it would make the whole case fall apart.

Q.   All right.  Please turn to page -- bottom of page 18. Do you see your last block there?  You say, That gun.

A.   Yes.

Q.   Then on the top of the next page, the third block down, you say, Well, that's something I helped with.  Draws me into it.

A.   Yes.

Q.   What were you referring to there?

A.   The gun that we had melted down.

Q.   Do you see about four Tim blocks down from there you said, What is the possibility of one of them showing up?

A.   Yes.

Q.   What did you mean by that?

A.   One of the people that disappeared in '93.

Q.   And then do you see your next block?  You say, I know that, laugh, I mean, and then you said, Coming up?

A.   Yes.

Q.   What did you mean by that?

A.   Being unburied.

Q.   Please turn to page 25.  Do you see the sixth Dustin block down where Mr. Honken says, I could always just wait

until they're at a friend's house and go around and clean house if I had to?

A. Yes.

Q. You have a discussion about rules, rules of war?

A. Yes.

Q. What did you understand Mr. Honken to mean by go around and clean house if I had to?

A. If Dan was in a house with a bunch of other people, he could just go over to the house and shoot them all.

Q. Please turn to page 28. Do you see the fifth Dustin block from the bottom where he says in the second line, That's why if I can fool this right here probably be -- I'll probably be better?

A. Yes.

Q. Then do you see on the top of the next page there's discussion of a frequency meter?

A. Yes.

Q. What was your understanding of that discussion?

A. There was a frequency meter at Radio Shack that he wanted me to go look at.

Q. Now, did you actually do anything in response to this discussion after the conversation was over?

A. Yes.

Q. What did you do?

A. I went to Radio Shack and looked at one and got

information on it.

Q. What'd you do with the information?

A. I brought it back to Dustin.

Q. Please turn to page 34. Do you see the second block from the top you say, You're not using my torch again?

A. Yes.

Q. What did you mean there?

A. There was another gun that he wanted to get rid of. He couldn't use a torch at my parents' house again.

Q. Like you had done in '93?

A. Yes.

Q. Do you see on the next page, the very bottom, Dustin says, Even if I'm in prison for fucking 15 years, whatever. When I get out, he's still dead?

A. Yes.

Q. Who did you understand him to mean by he?

A. Dan Cobeen.

Q. Pardon me?

A. Dan Cobeen.

Q. Please turn to page 44 and look at the fifth Dustin block from the bottom. Do you see where he says, That's another thing I want you to do. You remem -- can you describe me the -- the -- the station wagon?

A. Yes.

Q. And then you say, It was dark?

A.   Yes.

Q.   What was your understanding of that conversation?

A.   A station wagon had come into my -- the driveway one night, and I thought it was Mr. Graham, and he wanted me to check and see if the station wagon that I had seen was a -- was the one that Graham was driving.  On 17th Street he wanted me to drive by the house and see if it was the same car.

Q.   On page 46 do you see the Dustin block in the middle of the page right after you've said, 'Cause I have a conscience?

A.   Yes.

Q.   Then he says in the middle there, They put themselves in that position.  They made me choose between my family and them?

A.   Yes.

Q.   Who did you understand him to mean by they?

A.   Any of the witnesses.

Q.   Then do you see on the next page on the top of the page, the first Dustin block says, As long as he doesn't pull a Houdini, you know.  I'm confident that you'll walk?

A.   Yes.

Q.   And then you said, He hasn't yet?

A.   Yes.

Q.   Who are you referring to when you said he?

A.   Dan Cobeen.

Q. Then on the next exhibit, 4B, do you see at the bottom of the page, you talked about I went by Radio Shack?

A. First page?

Q. No, page 3. I'm sorry. Bottom of the page.

A. Yes.

Q. Is that what you were referring to before when you went by to get the information?

MR. PARRISH: Objection. Asked and answered. He stated that. It's in the record. It's cumulative.

THE COURT: Overruled.

A. Would you ask the question again?

Q. I'll skip that one.

A. Okay.

Q. Please turn to bottom of 16. Do you see the last Dustin block where he says, I'm not that worried about it. I've seen worse things that I care never to speak of?

A. Yes.

Q. And at the top of the page following you said, Does it bother you?

A. Yes.

Q. What were you referring to when you said it?

A. The people that disappeared in '93.

Q. What about the people?

A. Having killed them.

Q. Please turn to the last one, Exhibit 5B. Do you see --

please turn to page 11 and look at the third Dustin block from the bottom. Do you see where he says, You don't ask shit like that. What happened to your left -- pardon me, your right-hand, left-hand shit?

A. Yeah.

Q. Then you said, I wasn't planning on being involved in anything.

A. Yes.

Q. What was your understanding of that discussion about right hand, left hand?

A. When he was talking to me about the disappearances and the possibility of getting rid of more witnesses before, I told him if he was going to do something just to do it and not tell me anything about it. The right hand shouldn't know what the left hand is doing.

Q. Then on the top of the next page do you see your first block? You said, Well, I need to know. I need to know before I go any farther.

A. Yes.

Q. Then Mr. Honken says, I'm not going to discuss -- I'm not going to discuss that here and now. No way. So maybe sometime.

A. Yes.

Q. What did you mean when you said, I need to know before I go any farther?

A. I wanted to know what happened with the people that had disappeared, where they were at.

Q. Please turn to page 22. Do you see the first Tim block on the page? You say, It's partly why I want to know about the others?

A. Yes.

Q. What were you referring to there?

A. I'm just trying to find out what happened to those disappearance -- the people that disappeared.

Q. Then do you see further down on that page Mr. Honken in the third block of Dustin down from there at the end of that block, he says, Well, I can guarantee you with one thing. There is no possible way ever. There's only one thing in my mind? Do you see that?

A. Yes.

Q. Then the next block Dustin says, There's only one?

A. Yes.

Q. And then three blocks down from there you say, I know exactly which one you're talking about too?

A. Yes.

Q. What were you referring to there when you said, I know exactly which one you're talking about too?

A. Terry DeGeus.

Q. What did you mean by that?

A. That there was a possibility that he would show up

somehow.

Q. What do you mean by show up somehow?

A. Come out of the ground.

Q. And back up in the first Dustin block that I read there where he says, Well, I can guarantee you with one thing, there is no possible way ever --

A. Yes.

Q. -- what did you understand that sentence to mean?

A. Greg and his girlfriend and the two kids.

Q. What about them?

A. That they would never be found.

Q. And then please turn to page 26 and 27, the last two pages, and I will mercifully end this part of the questioning. Do you see where at the end Dustin says, I mean as long as he don't disappear. It's the only way. Well, it doesn't matter?

A. Yes.

Q. And at the top of the next page you say, I thought that's what we wanted, and then he says, Well, I mean they hide him?

A. Yes.

Q. What did you understand him to mean by hide him?

A. That Dan might be put in protective custody.

Q. Do you see the next Dustin block where he says, But even if that happens, I'm still going to go another route anyway

so --

A.    Yes.

Q.    What did you understand him to mean by that?

A.    The people that were in the house during the raid.

Q.    What about them?

A.    That they would be the ones that he'd go after anyway.

Q.    Now, let me ask you just a couple other questions. There was some discussion in here about avoiding electronic monitoring --

A.    Yes.

Q.    -- that you mentioned.  Were you having any conversations with Mr. Honken during this period other than the ones that are recorded?

A.    Yes.

Q.    Where were you talking to him?

A.    At work.

Q.    Did you ever have any conversations with him at work about what steps he could take to avoid being monitored or being constrained in his movement?

A.    Yes, the --

Q.    What conversation did you have about that?

A.    Getting the monitor taken off.

Q.    What conversations, if any, did you have about his work schedule at Kraft?

A.    The -- one time he had not come to work and had someone

else work for him, just seeing if that would be possible, if he could do that without the probation officer finding out about it.

MR. COLLOTON: That's all I have, Judge. I appreciate the Court bearing with me on that.

THE COURT: Thank you, Mr. Colloton.

Mr. Parrish, you may cross-examine.

MR. PARRISH: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. PARRISH:

Q. Mr. Cutkomp, why don't we get started by your telling me the approximate number of times you've met with law enforcement officials on this case.

A. I don't know how many times it would be.

Q. Over 20 you would think?

A. Yes.

Q. Over 30?

A. Possibly, yes.

Q. Okay. Did you meet with any law enforcement officials to get ready for your examination here in court?

A. Yes.

Q. And did they brief you on preparing for cross-examination at all?

A. How do you mean brief?

Q. Did they tell you about questions you might be asked on

cross-examination?

A.    No.

Q.    They did not.

A.    No.

Q.    They haven't told you anything about that.

A.    About questions --

Q.    Mr. Colloton, Mr. Reinert, any of the other people who might be involved did not tell you anything about the fact that you may be questioned in court by someone who is not representing the government?

A.    Yes.

Q.    What did they tell you about that?

A.    That you would cross-examine me.

Q.    What did they tell you?

A.    Just that you would cross-examine me on the evidence.

Q.    That's all?

A.    Yes.

Q.    They didn't go in any further detail than that?

A.    Not that I recall.

Q.    When did they tell you that?

A.    A couple days ago I know they told me.

Q.    And where did you meet when they sat to talk about that?

A.    In LeMars.

Q.    In LeMars?

A.    Yes.

Q. And tell me who was present.

A. Myself, Lori, and the lawyer here.

Q. Mr. Colloton?

A. Mr. Colloton.

Q. And how long did that meeting last?

A. Several hours.

Q. What do you call several hours?

A. Two.

Q. And what did you go over in that meeting?

A. The information in the tapes.

Q. That's it?

A. And the grand jury. I looked over that.

Q. Okay. Explain to me how you went over that when you met with them. When they were sitting there, had you had the grand jury notes before you met with them --

A. Yes.

Q. -- to review?

A. Yes, I did.

Q. So then they sat down with you for two hours, and what did you talk about during those two hours?

A. Just what I meant by what I had said on certain parts.

Q. Much like Mr. Colloton did here in court with you today?

A. Yes.

Q. So he took about two hours, and you already had the transcript. And what he did when you were meeting with him

for those two hours is cover with you what you meant by some of the things that were in the tapes.

A. Yes.

Q. Is that right?

A. Yes.

Q. Did he tell you why he was doing that?

A. To make the time go faster here because I didn't want to have to read the whole thing here because I --

Q. Well, did he tell you it was already in evidence and we had agreed that it was going into evidence already?

A. Yes.

Q. Well, did he give you any further explanation as to why he was going over specific items and what it meant other than that?

A. No.

Q. Other than going over those items in the transcript, what else did he do during those two hours with you?

A. Went over the grand jury.

Q. Did he ask you what things in the grand jury meant too?

A. Just went over the -- went over it like what we did here like --

Q. Well, I thought he covered the grand jury. He was the person conducting the grand jury.

A. Yes.

Q. Well, if he was the person conducting the grand jury,

why did he have you go over and explain what you meant when you testified in front of the grand jury?

A.    I don't know.

Q.    Did he ask you if you wanted to change anything or anything?

A.    No.

Q.    What else did he do during that meeting other than go over and point out to you what he wanted to have you testify to in court and what it meant in the transcript?

A.    That was all.

Q.    Did they relate to you as to how you were to testify on cross-examination?

A.    No.

Q.    What about direct examination?

A.    What's direct examination?

Q.    When he asks you questions, did he give you an idea of what you were supposed to do during that process?

A.    No.

Q.    They didn't even tell you and say answer the questions yes rather than nodding your head; they didn't say look at the court, look at the lawyers who are asking you the questions?  They didn't do anything like that?

A.    They may have said something about looking at the judge or lawyers.

Q.    I want to know what they said to you.

A.   I don't remember that, no.

Q.   You don't remember anything else that they said to you?

A.   I don't remember being told how to answer any questions, no.

Q.   And was that the only meeting you had with them?

A.   No, it wasn't.

Q.   Had you met with Mr. Colloton before?

A.   Yes.

Q.   Where was that?

A.   In Cedar Rapids.

Q.   And how long before this last meeting of a couple of days ago had you met with him on that?

A.   Approximately a month.

Q.   And what did you do at that meeting?

A.   About the same thing we did.

Q.   So you had your transcripts at that point?

A.   I didn't have them before that.  I just looked them over.

Q.   While he was there?

A.   Most of the time I spent listening to the tapes and making sure that the -- that these were correct and then went over it just for a few minutes.

Q.   With Mr. Colloton.

A.   Yes.

Q.   And when you say a few minutes, what do you call a few

minutes?

A.    Talked to him for probably half an hour.

Q.    And you went over the transcripts at that point also?

A.    Just questions that he had about certain things.

Q.    What kind of questions did he have?

A.    I don't remember.

Q.    Had you met with him at any time prior to that?

A.    Yes.

Q.    With the transcripts or without them?

A.    With -- I looked over the transcripts another time, and I believe it was at that time that I went into the grand jury.

Q.    So before you went to the grand jury, you reviewed another set of transcripts; is that correct?

A.    I reviewed my -- what I had told the officers, yes.

Q.    I mean you reviewed the tape transcripts in April before you went before the grand jury.

A.    I don't remember if it was before or -- I don't remember the time frame there.

Q.    So how many times would you say you reviewed the transcripts in this case?

A.    The transcripts being the tapes?

Q.    Yes.

A.    Six times.

Q.    Okay.  And how many times have you reviewed them with

Mr. Colloton before you came into court today?

A. The two times.

Q. Well, actually it would have been three because you also reviewed them in April; right? You said you couldn't remember whether it was before or afterwards.

A. I listened to tapes to make sure they were correct, yes.

Q. So it would have been three times.

A. Yes.

Q. Did you change any of your interpretation of the taped conversation or transcripts at any point in time since April of 1997 when you went in front of the grand jury?

A. No. I may have changed a few words the last time I listened to it because the quality of the sound was a lot better.

Q. I just noticed what you did is that you added things in them like buried. And I listened to the tapes. I also read the transcripts, and I didn't find anything in there like that. Did I miss something?

A. If it's written down, then yes.

Q. Well, it's not written down, and you said buried and unburied when you were referring to certain witnesses.

A. Oh.

Q. Now, did you just make that up, or is that in the tapes somewhere where you and Mr. Colloton discussed that?

A. It's -- it was implied by Dustin and myself.

Q. Oh, so he never said it. Is that what you're telling me?

A. He never directly said it.

Q. Okay. And where did you get the word buried? From the -- did you get that from some of the law enforcement officials or something?

A. No, just from Dustin and I talking.

Q. Well, you said Dustin never said it because it's not on the tapes. You said it was implied.

A. Yes.

Q. I guess my question is where did you specifically get the term buried and unburied from. Unburied is kind of an unusual term.

A. From discussing the disappearances of the people that had disappeared in '93. Over time in the things that Dustin had said, I understood him to mean that he had -- after he had killed the people that he had buried them.

Q. I didn't see anywhere on any of these tapes he said he had killed anyone. Did I miss something on that?

A. It was implied also.

Q. Okay. So it was implied that he had killed them. It was implied that he had buried them. And you also mentioned at some point yesterday in your testimony that he had incinerated them at some point. Was that implied also?

A. He was implying that he would try to do that. He hadn't

implied that he had done that.

Q. And also I guess it was implied that he was getting money to buy a backhoe. That was implied also.

A. No, that was direct. He wanted to --

Q. No, I mean a backhoe so he could dig up the bodies and bury them deeper. That was implied; right?

A. Yes.

Q. Let me ask you this: Why is all of the stuff that's so damaging implied?

A. Because that's the way that Dustin and I talked. We -- in high school and after that we'd gotten in some trouble together, and we just over time learned to talk in the way that if anyone else was listening that it wouldn't be understood exactly what we were talking about.

Q. Oh, so you mean you all have developed such a system of communication that you don't even speak directly to each other. You only speak by implication. Is that what your testimony is before this Court?

A. At times, yes.

Q. Well, you say at times. I thought you had indicated to the grand jury -- and correct me if I'm wrong -- that this is a young man you had known since, what, kindergarten or something and you're a year older than him; right?

A. That's correct, yes.

Q. And that he had talked you into coming out to Arizona at

least two or three separate occasions?

A. Yes.

Q. Was all this by implication too?

A. No, that was direct.

Q. Oh. So some conversations I take that he has direct and some he has by implication.

A. Yes.

Q. So not all of your conversations are by implication.

A. That's true.

Q. Well, let me give you some idea. When you were meeting with the agents, how many times did you tell them you had been arrested for exposure?

A. Twice.

Q. Are you sure you didn't tell them once?

A. I believe it was twice.

Q. Have you seen your presentence report?

A. Yes, I have.

Q. And what does your presentence report say?

A. That I was prosecuted for one indecent exposure.

Q. Well, does it say you were arrested twice?

A. Yes.

Q. It does?

A. I believe it does. I don't have it in front of me. I don't know.

Q. You reviewed it, did you not?

A. Yes, I did.

Q. So you believe you told -- and your testimony is that you told the presentence investigators and your report actually reflects that you were arrested twice for exposure.

A. Yes. I believe that I told them that.

Q. Could you be mistaken by that?

A. I could be mistaken, yes.

Q. You possibly could have told them just once?

A. Yes.

Q. And that would have been a mistake.

A. Yes.

Q. Would that have been a deliberate mistake?

A. No.

Q. What kind of mistake would that have been?

A. I was prosecuted for it once, and I may have misunderstood at the time.

Q. Oh. So you're saying that rather than telling them about it once, you thought they were only asking you questions about how many times you had been prosecuted for it?

A. I don't recall what was going on at that time exactly. If I had the investigation here, the report, I might clear my mind a little more.

Q. You think the report may help you clarify it?

A. Yes.

MR. PARRISH: Your Honor, at this time I would request a copy of the presentence report. I think I should be entitled to it to at least cross-examine him on some of the issues. What they've disclosed to me in the Jencks material was one indecent exposure count which was charged 10-10 of '95 and 11-17-95 dismissed without prejudice.

THE COURT: Mr. Colloton?

MR. COLLOTON: We've disclosed to him a computer printout of prior convictions in case there's any felonies that would be impeaching. I don't have his presentence report here. I don't know -- he's admitted that there was a second arrest for which he was not prosecuted. I guess I'm not sure what the issue is, why there's a need for the presentence report. I think he's elicited another arrest that's not even a conviction and not shown on the computer printout. It's not a conviction. It's not impeaching. I understand the rules of evidence don't apply. But if the Court wants to order that we get the presentence report or if it would be helpful, I can try to have it faxed here. I don't know that Mr. Parrish is entitled to read his whole presentence report. Those are normally sealed. I guess I just don't see where he's going.

THE COURT: Do you want it for any other purpose other than the impeachment of one conviction, one arrest for indecent exposure?

MR. PARRISH: I may want it, Your Honor, to test his credibility on other matters as we develop. He is a pretty critical witness. I think the government is relying on him. They've met with him over 20 or 30 times. They've disclosed everything else. It's kind of strange they would leave out -- as thorough as I know Mr. Colloton is and Mr. Reinert is, it's strange for them to leave out an arrest on a case. And I don't know what else is left out.

MR. COLLOTON: Normally an arrest -- I'm sorry.

THE COURT: No. Go ahead, Mr. Colloton.

MR. COLLOTON: An arrest is not typically impeachment material unless it's a conviction, and we typically don't provide a complete presentence report for someone to the opposing counsel.

MR. PARRISH: Well, Your Honor, I have a copy of a citation from -- showing two arrests of Mr. Cutkomp. It does not show any dismissal, and I didn't know -- show dismissal of both counts on indecent exposure. So I don't know -- I didn't get this from the government, but it's kind of unusual I think for the government to miss something like that, particularly on one of their informants who they've worked so diligently with, both -- and law enforcement officials. I want to know if they've missed something else or something else they're not telling me about.

THE COURT: Well, I mean, the problem is that a

presentence report is not really a statement by the individual. And so, I mean, usually the lawyer prepares the offense conduct statement if a defense lawyer even does it. Most of the time they don't do anything. So it's not really this witness's statement. If -- I think they'd be required to turn over any statement, but I don't think a presentence report is a statement. I think you'd agree with that.

MR. PARRISH: They do, Your Honor, as I understand it, debrief him during the presentence or take a statement from the defendant. Whether they did that in this case or not, I don't know. I would at least at a minimum like to see that statement if it was taken because it is reviewed. I know with my clients it's reviewed with the -- if they decide to give a statement, it's reviewed with the presentence investigator for the accuracy of it. As a matter of fact, those are some of the most accurate statements I've seen, those that are taken from the defendant.

THE COURT: Mr. Jackson, who did the presentence report on Mr. Honken if you know?

MR. JACKSON: I did, Your Honor.

THE COURT: Okay. Does the government have any objection to me turning over the presentence report to Mr. Parrish just for purposes of review and for cross-examination of Mr. Honken -- Mr. Cutkomp? Do you have any objection to him seeing the presentence report? I guess if he wanted it,

he could have asked for it earlier.

MR. COLLOTON: I guess that's a little bit of my view, that it wasn't in the discovery file. We could have discussed this ahead of time. But given where we are, if he wants a statement that he made, it seems to me Mr. Jackson could look at the report, see if there's some paragraphs in there that say Mr. Cutkomp was interviewed and said the following and then copy that part of it rather than -- because as I understand the reason they're sealed is there's a lot of personal biographical stuff in there that really isn't relevant to cross-examination and is private.

THE COURT: Let me ask Mr. Jackson a couple more questions. Mr. Jackson, do you actually have a separate document in your file that you consider to be the statement of the individual for whom you're preparing the presentence report?

MR. JACKSON: At times we do. Not in every case, but at times we do and the problem --

THE COURT: Do you recall -- I'm sorry.

MR. JACKSON: The other problem with Mr. Cutkomp, at the time of his presentence interview, he was in Linn County Jail, and Bob Askelson actually did the interview in the jail. So I didn't actually interview him, but I prepared the report, the guideline computations and that. So I don't have an accurate reflection of the interview. But I can look in

the file and see if there is notes to that effect.

THE COURT: Did Mr. Askelson prepare a written memorandum or summary of his interview of Mr. Cutkomp?

MR. JACKSON: I believe he did, Your Honor.

THE COURT: Well, I think Mr. Parrish is entitled to the summary of the statement by Mr. Cutkomp, and out of an abundance of caution I'm going to give him the entire presentence report. It's a little bit unusual, but there's a lot at stake here, and I'm giving both sides some leeway. And, Mr. Jackson, I'd ask you to make a copy of Mr. Cutkomp's presentence report and make a copy of the statement that Mr. Askelson obtained if there is one from Mr. Cutkomp, and we'll give that to Mr. Parrish at our next recess -- first recess. Would you be able to do that now?

MR. JACKSON: Yes.

THE COURT: Okay. Thank you, Mr. Jackson.

MR. COLLOTON: Is that a practice, Judge, you want to follow with all witnesses here who may have been prosecuted in federal court? Should we be gathering up all presentence reports, or can we limit it to any statements that might have been made that are somehow relevant?

THE COURT: Well, who are the other witnesses that have been prosecuted -- nobody's been prosecuted in relationship to this conspiracy.

MR. COLLOTON: That's right.

THE COURT: I'm going to limit -- Mr. Cutkomp kind of stands alone in that regard.

MR. PARRISH: That would be my position. I don't think I have the request in any other cases. Just the fact that the relationship is so intricate and it goes to the issue of who was controlling whom and what the responsibility of the drug issue is, and I think that's what we're going to be getting into. The rest of the witnesses don't even come close to this issue.

THE COURT: Okay. You may continue your cross-examination.

BY MR. PARRISH:

Q. I think the next point I was getting to, Mr. Cutkomp, as a matter of fact, these incidents take place in September. One takes place in September of 1995; is that correct?

A. Yes.

Q. And where were you living when the first incident took place?

A. I was -- I don't recall for sure where I was living, either with my parents on Eighth Street or in -- with my ex-wife.

Q. And where was your ex-wife living at that time?

A. In Mason City.

Q. And your parents lived where? At Rural Route 2?

A. Yes.

Q.    In Britt, Iowa?

A.    Yes.

Q.    And were you on probation September 1 of 1995?

A.    No.

Q.    Had your charges been dismissed at that point?

A.    In September?

Q.    Yes, sir.

A.    No.

Q.    They were still pending.  I thought they were dismissed in March.

A.    Which charges are you talking --

Q.    Your original charges.

A.    The drug charges?

Q.    Yes.  The 1993 charges.

A.    My charges had been dropped right -- just a few weeks after I was arrested.

Q.    For exposure?

A.    No, drug charges.

Q.    Oh, you mean the drug charges.  So on September 1 -- I guess that's the point I'm getting at.  September 1, 1995, you had no charges pending on anything; is that correct?

A.    That's correct.

Q.    And you and Mr. Honken September 1, 1995, weren't engaged in any type of conspiracy to do anything, were you?

A.    At that time, yes.

Q. You're saying you were.

A. Yes.

Q. And you were charged with exposing yourself.

A. Yes, I was.

Q. And you told him about it.

A. Told --

Q. Dustin about it.

A. I don't recall if I told him or not.

Q. Was he --

A. At that time.

Q. So you may not have mentioned that to him.

A. The second arrest I did.

Q. But the first arrest you may not have.

A. Yes.

Q. And were you prosecuted on the first arrest?

A. The first one's the one that was dropped.

Q. Let me ask you -- so that's the one you may not have told him about?

A. I don't recall if I told him or --

Q. Now, what stage were you in in 1995, September 1, when you were arrested on this first exposure charge? What stage were you in in any drug -- illegal drug activity?

A. We were -- either had just moved everything out of my house or was getting ready to move it into Dustin's house on 16th Street. I don't recall exactly what was going on at

that time.

Q. You don't recall -- are you telling me you were moving the stuff? You don't recall what was going on? Which one?

A. I don't know what the time period is that we had had it set up in the house and when --

Q. Were -- go ahead. I'm sorry.

A. -- and when I had left my house.

Q. Let me ask you this question about the incident: Were you hospitalized at any point around September of 1995?

A. For the second arrest I was, yes.

Q. And how long were you hospitalized?

A. Three days I believe.

Q. Okay. Did Dustin know about that?

A. Yes.

Q. So from September 1 to October 11 when you were arrested again on the exact same charge, my question is are you telling me that you and Dustin continued to work on establishing an illegal drug operation, or was there a break in it?

A. How do you mean? Were we physically making the drugs at that time?

Q. Right.

A. I don't know if we were -- at that very time we were physically making them. I mean, there was -- we were talking about it and stuff at that time.

Q. Well, you were having other emotional problems at that time, weren't you?

A. Yes.

Q. So would you agree with me that it's possible that there was a period of time when you and Dustin did not talk and you did not tell him about the incident of your arrest, this life-long friend of yours, and you did not tell him the kind of emotional problems you were going through?

A. Yes.

Q. And you were not engaged in any drug activity of any sort.

A. How do you mean?

Q. Well, you weren't engaged because you weren't talking. You weren't even seeing him.

A. Oh, I was -- I talked to him even between those times. I worked with him. I would have seen him and talked to him, hung out with him, but I didn't tell him about the first arrest.

Q. Oh. So then here's your life-long friend who you generally share everything with, and you're saying from September 1 up until October 11 you had no conversation with him about the fact you had been arrested.

A. I don't know if I did or not. I may have. I may not have.

Q. But yet you were still working together on a drug

venture; is that right?

A. That's correct.

Q. And it was after these people had disappeared; is that correct?

A. Yes.

Q. And you were in custody for how long, or were you just given a ticket?

A. For the indecent --

Q. On the first arrest.

A. I was released right away.

Q. You were taken to jail and then released?

A. Yes.

Q. And I take it Dustin was your best friend back then.

A. Yes.

Q. You were not working for law enforcement officials.

A. No, I wasn't.

Q. And it's possible, as you indicate, that you may not have mentioned this to him all the way until October 11 when you went and was hospitalized.

A. That's correct.

Q. That would have been unusual; isn't that correct?

A. It was an embarrassing thing. I didn't even --

Q. That's not my question about whether or not it was embarrassing. It would have been unusual; would you agree?

A. I would share most of the things that happened in my

life with him, yes.

Q. So it would be unusual that you didn't tell him about this for almost a month and a half?

A. In most circumstances, yes.

Q. Well, did you have any other arrest in your life that you didn't tell Dustin about?

A. No.

Q. So it was unusual.

A. Yes.

Q. Why is it so difficult for you to admit that?

A. It's -- because of the circumstances at that time, I -- I didn't want him to know about it. It was really embarrassing for me.

Q. No, that's not the question I'm asking. Why is it so unusual for you to admit to me that -- why is it so difficult for you to admit to me that it was unusual not to tell him something like that?

A. I don't know what -- I don't know what you're getting at.

Q. You understood the question, did you not?

A. (Witness nodded head.) Can you repeat what you're wanting me to answer?

Q. Well, you have answered it at this point, but I'm wondering why it's so difficult for you to acknowledge that it was unusual.

A.   I don't know.

Q.   No one told you not to answer my questions directly, did they?

A.   No.  I'm trying to answer you directly.

Q.   Did you readily tell him about your second arrest when you were hospitalized?

A.   I don't remember exactly what I told him.

Q.   Is it --

A.   I told him about it, yes.

Q.   Is it a fact that possibly Dustin asked you as to where you had been and why you hadn't been hanging out with him in the last month or so that the whole issue came up?

A.   No.  I would have been -- I would have been around him at that time.

Q.   Okay.  You had indicated you'd have been around him, and you said you were staying with your wife in Mason City; is that correct?

A.   Yes.

Q.   On the first arrest you were staying with your wife in Mason City?

A.   At that -- I don't know where I was at.  I was either on Eighth Street with my ex-wife or in Britt.

Q.   One of those two addresses; is that right?

A.   Three addresses.

Q.   Okay.  Give us those three addresses that you would have

been living.

A. Either in Britt, Mason City on Eighth --

Q. Okay. What address would you have been living at in Britt?

A. 2785 Iowa Avenue.

Q. Okay. And whose address is that?

A. That's my parents' house.

Q. Okay.

A. On Eighth Street in Mason City or -- I don't remember where my ex-wife was at. It might have been Pennsylvania or something like that.

Q. Let me go now to -- we're at this time of September of 1995, and you indicate you don't remember what you and Mr. Honken were doing, but you think it might have been something having to do with drugs; is that correct?

A. I know that we were at least setting up or getting ready to set up in his house in Mason City.

Q. But you don't know whether you were setting up, getting ready to set up, having a conversation about setting up?

A. I don't recall what we were doing at that time.

Q. Those were difficult times for you; right?

A. That was a hard time for me, yes.

Q. And were you hospitalized more than once?

A. No.

Q. Were you on drugs or anything?

A.   I was drinking alcohol, yes.

Q.   And did you go on binges at all?

A.   No.  One night I would drink.

Q.   Just a one-night binge?

A.   Where I would go out and party at night?  Yeah.

Q.   And how long would you say that period of time in September and October did you have those problems, the emotional problems, the drinking problems -- how long did they go on other than the -- and the arrest, the two arrests in 1995?

A.   Could I explain something about what was going on in my mind at that time?

Q.   Sure.

A.   With the disappearances and being involved in the drugs and with my ex-wife, I had -- I had -- there was a lot of things that were going on that really were stressful for me at that time.  And I really didn't want to be involved in the drug activity at that time, but in a way I was afraid not to be.  And the indecent exposure things came from I needed a -- it was a way for me to escape kind of from all the pressures that were going on.

Q.   Who told you that?

A.   I had a -- I went to a counselor for a while, and these are issues that we discussed.

Q.   So you're saying that's what your counselor told you was

going on; is that right?

A.   That's the conclusions that I came to through talking to him, yes.

Q.   Okay.  And you admit that at that point you were pretty emotionally unstable?

A.   I needed a way to escape.  I think most of my activities during that time were stable, but that one activity that I embellished in was not a stable thing to do, no.

Q.   Okay.  Now, you're not claiming you were so unstable that you got involved in the drug business during that time.

A.   How do you mean?  That I got involved with it because I was unstable?

Q.   Right.

A.   No, I didn't.

Q.   And you would agree that someone who was your best friend would have recognized probably that you were kind of going through some weird things?

A.   Yes.

Q.   Now, if we had to put a time limit on when you were going through that phase and we just have these two target dates here of September and October of 1995, what kind of time would you put on it?

A.   I would say that I had problems with it before that.

Q.   Okay.  What kind of time period would you put on it?

A.   Probably years.

Q.   Years?

A.   Yes.

Q.   How many years?

A.   Since our arrest in '93.

Q.   So you think you had emotional problems from 1993 straight up until including --

A.   That one problem, the indecent exposure.  It was a way of me escaping from --

Q.   So this would have been the end of it.

A.   Yes.

Q.   So for two years then you think you would have been pretty well emotionally unstable?

A.   I wasn't emotionally unstable.  I had a situation where I would feel very -- a whole lot of pressure and I would do that, yes.

Q.   Okay.  Now, let me ask you this:  Are you saying from 1993 up until 1995 when you went through this and were finally hospitalized in 1995 that you didn't know what you were doing?

A.   I knew what I was doing, yes.

Q.   And your memory may have been a little off during that time?

A.   I don't have a perfect memory anyway, so it could be off any time.

Q.   Your memory's just not that good.

A.   I have an okay memory, but I don't -- I can't memorize everything.

Q.   It fails you sometimes; is that right?

A.   I don't remember what I'm supposed to remember sometimes.

Q.   That's what I mean.  Your memory fails you on occasion.

A.   Yes.

Q.   More so than what you think other people's memories fail them?

A.   I would say average.  I'm average.

Q.   You've had plenty of time, have you not, though, to go back and re-read your activity which involved getting involved in drug transactions?

A.   Yes.

Q.   You weren't exposing yourself back in 1992, were you, when you went out to Arizona?

A.   I may have been, yes.

Q.   You were doing it then too?

A.   Yes.

Q.   You were never arrested for it, though.

A.   No.

Q.   Did you have any other kind of problem other than public exposure problems back in 1992?

A.   Not that I recall.

Q.   Okay.  Now, you just indicated you thought these public

exposure problems came from your arrest in '93 and the fact of the disappearance of these people. Are you telling us now that these public exposure problems preceded that date?

A. Yes, they would have, some of them.

Q. Some of them?

A. I did have some problem with it after my divorce from my ex-wife too.

Q. And when was that?

A. In -- that would have been in '92.

Q. So then before your arrest then you were exposing yourself; is that right?

A. Yes.

Q. Did you tell Dustin about that?

A. No.

Q. This is the first time Dustin would have known anything about it is today?

A. Yes.

Q. Did you ever get arrested for it before?

A. No.

Q. And how often were you doing it?

A. Could be once a month, once every six months.

Q. And when you make the statement that a lot of your problems with public exposure came from your involvement with Dustin and drug trafficking, that's not quite accurate, is it?

A. It began before that, but it had accelerated. And before that I had pretty much stopped doing it, but after the arrest it triggered the pressure of thinking that I was going to go to prison. It was an escape for me.

Q. Let me ask you, did you tell the law enforcement officials about this before today?

A. I don't recall telling them the whole thing, no. I may have but -- I told -- I told someone about it. It might have been the psychiatrist. I talked to him about it.

Q. Are you telling me that you told law enforcement officials prior to today about the incidents that occurred prior to September 1 of 1995?

A. I don't remember if I did or not.

Q. You might have just overlooked that.

A. I -- yes.

Q. Did they ask you when they were debriefing you if you had other problems, emotional problems or psychiatric problems prior to the hospitalization in 1995?

A. Yes.

Q. You didn't admit them to them, though.

A. I don't remember if I did or not.

Q. Would that have been something deliberate on your part that you did not admit that?

A. No.

Q. It was just an oversight on your part maybe.

A.    Yes.

Q.    And is it because your memory fails you on things like that too?

A.    No.

Q.    You were too embarrassed to admit it?

A.    Some of it, yes, I was embarrassed to admit it.

Q.    So you would agree then that you're the type individual where if something is going to embarrass you or make you look bad you have a difficult time admitting it.

A.    I would say with that, yes, I had a difficult time admitting it.  I have done my best to relate everything that's happened in my life to the officers to make sure that I hadn't left anything out.

Q.    But you would agree that that was more embarrassing to you than drug dealing.

A.    It's all embarrassing to me.  It was --

Q.    Well, it was equally embarrassing to you.  You made admissions about your drug dealing and your misconduct and drugs, but you did not make any admissions about your misconduct with public exposure or violating other laws.  You would agree with that.

A.    I may have told them.  I don't remember for sure what I said.

Q.    Well, I've read all the reports they have given to me, and I have not seen it.  And so I'm asking you if you did

tell them who did you tell?

A.   I know I told the psychiatrist.

Q.   Well, I asked about law enforcement officials.

A.   I may have told one of them at one time during our interviews.  I don't recall.

Q.   Which one?

A.   I don't recall.  I don't know.

Q.   Did they tell you that if you told them things that you would eventually have to tell me or you'd have to be cross-examined on it?

A.   Yes.

Q.   Is that one reason you didn't tell them?

A.   No.

Q.   Can you come up with any other explanation other than what you've given as to why you didn't tell them about this other type of misconduct you had been involved in for several years?

A.   I may have told them.  I don't remember for sure.

Q.   And if you did tell them, you've forgotten that you've told them?

A.   Yes.

Q.   Can you think of any other misconduct that you have been involved in that you may have forgotten to tell them?

A.   No.

Q.   Now, if we could just go back then to 1992 out in

Arizona, did you, in fact, get involved with any public exposure in Arizona?

A. Yes, I did.

Q. On how many occasions?

A. One time.

Q. And what happened?

A. I was questioned about it and released.

Q. Where were you questioned?

A. Near a college.

Q. And was it by law enforcement officials?

A. It was -- the campus police were there.

Q. And was there a report made on it?

A. I don't know.

Q. Where were you taken to be questioned?

A. Just right on the street.

Q. Did you tell Dustin about it?

A. I don't recall that I did.

Q. And that happened while you were making drugs.

A. Yes.

Q. And that was the only time that it happened in Arizona?

A. Yes.

Q. And you admit that you did not tell the law enforcement officials about that incident in Arizona.

A. I don't know if I did or not.

Q. Did they ever ask you at any point in their debriefing

of you is there anything else that you need to tell us yourself about your background, about any law violations that you may have been involved in and we want you to be completely honest with us?

A. Yes.

Q. Did you know at that time when you didn't tell them about these incidents that you were being dishonest with them?

A. I may have told them. I really don't remember.

Q. I understand. But do you think if you had not told them about it you would have been dishonest with them? Let me ask it that way.

A. If I was thinking about it at that time that I should tell them, yes, that would have been dishonest.

Q. So it's possible then you may have been dishonest with them about that.

A. The possibility's there.

Q. Okay. And the reason that you were dishonest with them about that you believe is because it was too embarrassing to you to talk about?

MR. COLLOTON: Objection to the form of the question because he didn't say he had been dishonest about it.

THE COURT: Sustained.

BY MR. PARRISH:

Q. If, in fact, you had not told them about it, would you

have been dishonest with them about it?

A. Yes, if I left it out on purpose, yes.

Q. And you're saying you did not leave it out on purpose?

A. If I left it out, I did not leave it out on purpose.

Q. It was accidentally?

A. Yes.

Q. And if you had to count the number of times you had exposed yourself, how many times would that be?

A. Thirty probably.

Q. And so you think leaving out 29 of those times was not dishonest.

A. If I left them out, I did it understanding that by talking to the psychiatrist that I had -- that those were things for the psychiatrist. I didn't know that everything that had ever happened in my life I should tell people about.

Q. What about -- did you think it was illegal?

A. Yes.

Q. You knew it was against the law.

A. Yes.

Q. You knew you had been questioned about it.

A. Yes.

Q. And you're telling us as you sit here today that disclosure of misconduct that you knew was illegal was not something that you thought was required in this case.

A. I know I did tell them about it. I didn't tell them

about every single incident.

Q. And so you think by not telling them about 30 times where you had been involved in a situation like that would not show that you were being dishonest?

A. I believe I told them that I was having problems with it, so that would have covered the 30 times. I didn't realize I needed to tell them about every single incident.

Q. Now, in Arizona you would agree that you were the person manufacturing the drugs.

A. Yes.

Q. You would agree that you were the person who spent probably 95 percent of the time with the drugs.

A. Yes.

Q. You would agree that you were the person who bought the equipment for the drugs.

A. After I moved down there I bought the rest of the equipment, yes. Most of the equipment was purchased before I arrived.

Q. Well, you indicated, did you not, when you arrived there that the equipment was, in fact, old, rusted out things and there had been no production before you arrived. That's what you said in your statements, did you not?

A. Not that the equipment was old. I said that it had rusted -- the chemicals had rusted a bicycle, yes.

Q. And there had been no production before you arrived.

A. There had been no methamphetamine made.

Q. Right.

A. Yes.

Q. So actually no methamphetamine was produced until you arrived in Arizona.

A. That's correct.

Q. As a matter of fact, you would agree that Dustin had never produced any methamphetamine to your knowledge until you worked with him.

A. Yes.

Q. You would also agree that you were the one who had financial problems.

A. Yes.

Q. You would also agree that you were the individual who had a marital problem.

A. That's correct.

Q. You would also agree that in Arizona you never saw Dustin deliver any drugs to anyone.

A. That is correct.

Q. You never saw him collect money from anyone.

A. That's correct.

Q. You would also agree that in Arizona the house that the drugs were being manufactured was a house listed in your name.

A. Yes.

Q. You would also agree that the apartment was in your name.

A. That's right.

Q. I take it you had no telephone there.

A. At the house we didn't. I don't know about the -- I used a pay phone at the apartment, yes.

Q. As a matter of fact, Dustin moved out and moved in with the other young lady who testified, Miss Friesenborg or -- I can't recall her name. Yeah, Miss Friesenborg; is that correct?

A. In November, yes.

Q. And you had been there since May.

A. Yes.

Q. And from May till almost August, the most that was produced was approximately four ounces that you basically supervised; isn't that correct?

A. Could you repeat that?

Q. It was only four ounces that were produced that you basically supervised the production of.

A. No, that's not right.

Q. How many ounces were produced?

A. Where I -- I never supervised production.

Q. I thought you said just a minute ago that you were there 95 percent of the time. You said Dustin never came over except maybe stop by once a week. You also said that it was

in your name, the apartment and the house.

A. Uh-huh.

Q. And you were the one who went out to buy the equipment; is that correct?

A. Yes.

Q. And I assume you were the one who was taking care of the equipment and doing the production.

A. What do you mean by supervise? I was watching --

Q. Oh, does that trigger something because of the guidelines in your mind?

A. No, I don't know what you mean by supervised.

Q. Well, I mean, if you're handling equipment, you're supervising the production.

A. Like I'm doing it myself?

Q. Yes.

A. Okay. Yes. I would have done most of it, yes.

Q. All right. You did most of it.

A. Yes.

Q. And you actually packaged it up?

A. With help, yes.

Q. What do you mean with help?

A. Dustin helped me when we packaged it. Dustin would help me.

Q. So he would just come over to package it?

A. He was there to -- if I had any problems and I didn't

understand how to get through a process, he would show me how to get through it.

Q.   So it was like a team effort.

A.   Yes.

Q.   What?  Were you better mechanically or something like that?

A.   I wouldn't think I was better at it.

Q.   Well, is Dustin pretty good with mechanical things?

A.   Yeah.

Q.   What do you mean pretty good?  Are you better than he is?

A.   Better than average.

Q.   But he's not as good as you, is he?

A.   I would say he's probably better than I am at mechanical things.

Q.   Well, who put the mechanics on the equipment to produce the meth?

A.   How do you mean?

Q.   Who put it together?

A.   We did.

Q.   When you say we, didn't you indicate in your prior statements that you did?

A.   During the majority of the time I did most of the work on it, yes.

Q.   That's what I mean.  So you're saying that you did most

of the work mechanically, but you're saying he was as good as you.

A. Yes.

Q. If he was as good as you at it, why didn't he do it?

A. That was my part of the third that I was supposed to collect. My part was to manufacture.

Q. Let's talk about that third for a second. You said it was who -- Jeff was supposed to get a third?

A. Yes.

Q. Dustin was supposed to get a third?

A. Yes.

Q. And you were supposed to get a third?

A. That's correct.

Q. But actually you were getting more than a third.

A. I only got a couple thousand dollars out of it.

Q. I thought you said that your rent at $600 a month was being paid.

A. Well, that was the rent for the -- that's where I was living, but it was the rent for the manufacture of the drugs.

Q. Oh, so that didn't count as a benefit to you.

A. I didn't look at it that way, no.

Q. Oh, okay. But even though you were living in a house, you had entertainment money, you had food, that was -- and there was no production for 4 months, so that's $2,400 right there, and then you had food bill on top of that, and you had

entertainment money you've consistently talked about on top of that. So roughly that could have been $5,000 in benefits.

A.   Yes.

Q.   Isn't that true?

A.   Yes.

Q.   Plus you also told the agents you got another 5,000 in cash, didn't you?

A.   Two to three thousand.

Q.   Well, didn't you say a total of 5,000 to the grand jury?

A.   I don't remember.

Q.   Well, I read your grand jury statement again last night. I thought you told them another $5,000. Could I have been inaccurate on that?

A.   I don't remember what it says.

Q.   Well, I thought you indicated that the total was 5,000 in cash that you had received.

A.   I don't know.

Q.   Does that sound about right?

A.   I don't know the exact number.

Q.   Okay. So if you had the benefit that you received by living, by the expenses, you also got travel money, didn't you?

A.   I went back to Iowa on a Greyhound bus once -- twice.

Q.   Well, once, but you came back some other time, didn't you?

A.   Yes.

Q.   And you also got an apartment in 1992 in December in Des Moines that you signed a lease for six months?

A.   Yes.

Q.   How did you get out of that lease?

A.   I just quit paying for it.

Q.   And how much did that lease cost you for that apartment down in Merle Hay?

A.   I only paid for probably two months' rent.

Q.   How much was that?

A.   I don't remember.  It was a pretty cheap apartment. $200.

Q.   Near Merle Hay?

A.   It was an old -- like a hotel.

Q.   You said a refurbished hotel.

A.   Yeah.

Q.   And they charge by the day rate.

A.   No, it was a month.

Q.   How much was it?

A.   Like 220 or 250.  I don't remember.

Q.   Okay.  So that's two months.  That's another, say, $500. So that's almost eleven or twelve thousand dollars; is that right?

A.   I don't know.  I don't know exactly what all of it would add up to be.

Q.   Let's just look at that just a second then in terms of what you've testified to.  If we take the advance money with no production and we take the 5,000 in cash that you think you might have received over the period of time and we also take the rent that you paid in Des Moines, I assume the living expenses because you didn't have a job when you were living in Des Moines; right?  Is that correct?

A.   Yes.

Q.   All right.  That's roughly about eleven or twelve thousand dollars.

        MR. COLLOTON:  I object again to the form of the question because he never said he got $5,000 or even that he might have.  He said two to three thousand.

        THE COURT:  Sustained.

BY MR. PARRISH:

Q.   Well, are you telling us all you got then was 2,000 in cash?  Is that your testimony today?

A.   I remember on the one incident after the 20,000 was brought back that I got two to three thousand dollars, yes.

Q.   All right.  But you also got money at other times; isn't that correct?

A.   Yes, I would have.

Q.   All right.  So if you add it all up, wouldn't you agree that you came roughly close to 5,000 cash that you're willing to admit to?

A. I would say yeah. That would be reasonable that I received that much.

MR. PARRISH: Do you still have an objection?

MR. COLLOTON: If I have one, I'll pose it.

THE COURT: Why don't we take a recess now till ten o'clock. Mr. Jackson, were you able to obtain copies of the statement by Mr. Cutkomp and the presentence report?

MR. JACKSON: I was, Your Honor.

THE COURT: Why don't you give those to Mr. Parrish for purposes -- Mr. Colloton?

MR. COLLOTON: I wonder, Judge, on some of the family information, where people live and his family, whether that's really necessary to turn that over, if we could omit that section.

MR. PARRISH: Your Honor, I'm satisfied with just the statement, his statement that he gave.

MR. COLLOTON: All right. Well, then that resolves that.

MR. PARRISH: Your Honor, I would make another request from the government. If they have information about this gentleman that we be allowed to -- Mr. Cutkomp that we be allowed to get it at this point. If he's made those statements to law enforcement officials, I'd like for them to at least check their records because we have no acknowledgment in that in the information they've given us

under --

THE COURT: I don't understand what you're asking for.

MR. PARRISH: I'd like any statements they've made that may relate to his law violations other than what they've given us in this material here. They've given us the grand jury. They've given us his statements, and none of them refer to that.

MR. COLLOTON: The Jencks file should contain everything that's written down. Now, if he said something to an agent and they didn't write it down, I wouldn't have any report on that. So if Mr. Parrish wants, I can look through that and make sure everything we have is in there but other than that --

THE COURT: Well, I'm not going to delay this any longer. You could have asked for this stuff earlier.

MR. PARRISH: You can't, Your Honor, under the rules. There's no way I can get it.

THE COURT: They don't have to give it to you. You've gotta ask for it.

MR. PARRISH: Well, after he testifies I'm entitled to it.

THE COURT: But generally the government gives you Jencks Act material earlier than what the statutory requirement is.

MR. PARRISH:  They didn't here so --

THE COURT:  You didn't get the Jencks --

MR. COLLOTON:  I think he had it overnight.

MR. PARRISH:  Yeah, I took it the night after he got on the stand.  Yesterday I had it.

THE COURT:  Okay.  Well, whatever.  Well, what is it that you're asking for?

MR. PARRISH:  Well, if they have other statements about Mr. Cutkomp's conduct, I'd like for them to at least ask the agents if he made a disclosure of this to other agents about his misconduct.  I think we're entitled to get it.

THE COURT:  I think we've gone through that enough. Tell me, you know, what is it that you want.

MR. PARRISH:  Just what I said.

THE COURT:  Well, I don't understand what you said.

MR. PARRISH:  I said if he -- if they have law enforcement statements that he's made with regard to any misconduct on his part, I'd like to get those statements.

THE COURT:  Statements that Mr. Cutkomp made to law enforcement about -- what do you mean misconduct?

MR. PARRISH:  Any misconduct.  He's saying he thinks he might have told some agent.

THE COURT:  But wait a minute.  You're entitled to Mr. Cutkomp's statements.

MR. PARRISH: Right.

THE COURT: Okay. Do you have any of Mr. Cutkomp's statements --

MR. PARRISH: That's all I'm asking.

THE COURT: -- as that word is defined in the Jencks Act that you haven't already given Mr. Parrish?

MR. COLLOTON: Not that I know of. That's why I said I'll look through this and compare it to my file. But we had copied all of the statements; plus we put in there things that we don't think are even Jencks material which are reports of agents who interviewed Mr. Cutkomp, but we've turned those over so that Mr. Parrish would have those.

THE COURT: Okay.

MR. COLLOTON: I thought what he's asking for is things he may have said that weren't written down, and I just have no record of that.

THE COURT: That's not a statement for Jencks Act purposes.

MR. COLLOTON: That's my understanding.

THE COURT: And you're not asking for that. You're asking for any written statements.

MR. PARRISH: Any statements he's given with regard to any misconduct. The problem I'm having, there's nothing in there to indicate what he's talking about now, but he says, I may have told them. If he told them, it may be

important for us to know that because we have no knowledge of this.

THE COURT: And you're saying you've given every Jencks Act statement that Mr. Cutkomp made to Mr. Parrish?

MR. COLLOTON: Plus all --

THE COURT: Plus other things that don't even fall within the Jencks Act, but you're taking a liberal view.

MR. COLLOTON: I guess it's debatable whether they fall. Our view is they don't. But yes, we've given him reports by agents and said yes, we interviewed him on such and such a date, and here's what he said. What I don't know is whether Mr. Cutkomp said to one of the agents one time, By the way, I had this public exposure problem and they didn't write it down in the report because they were doing a report about --

THE COURT: Something else.

MR. COLLOTON: -- his drug activity.

THE COURT: But you've given him all Jencks Act reports.

MR. COLLOTON: Right.

THE COURT: And you're going to double-check just to make sure you've given him all Jencks Act reports.

MR. COLLOTON: Since that's an issue, I will do that.

THE COURT: And, Mr. Jackson, you've given me the

presentence report.

MR. JACKSON: That's correct, Your Honor.

THE COURT: And is there also a separate statement that the defendant -- I'm sorry, that Mr. Cutkomp gave?

MR. JACKSON: I have the notes of the presentence interview, Your Honor.

MR. PARRISH: And I'm satisfied with just his statement to the presentence interviewer without --

THE COURT: Well, it's not really a statement I guess. It depends.

MR. COLLOTON: It's Mr. Askelson's statements.

THE COURT: It's Mr. Askelson's notes which would not be a statement under the Jencks Act.

MR. COLLOTON: Right.

THE COURT: But I'm going to give it to him anyway.

MR. COLLOTON: That's fine.

THE COURT: It's better to err on the side of full disclosure here because there's no reason not to.

MR. COLLOTON: That's fine. That's of the nature of these reports of what he said.

THE COURT: Okay. I'm going to give you, Mr. Parrish -- here's a copy of the presentence report.

MR. COLLOTON: On the family stuff, Judge, do you feel that we can -- if he's comfortable with just the statements, could we just copy those pages? Usually that's

three or four pages at the most.

THE COURT: Is there something about the personal and family data section that's a problem? I'm sure Mr. Honken knows a heck of a lot more about Mr. Cutkomp's personal family situation than what's contained in the presentence report. They were best friends all of their lives from first grade. What could possibly be in here that Mr. Honken wouldn't know a thousand times fold? Have you looked at it?

MR. COLLOTON: I haven't looked at it. I'm sorry.

THE COURT: Why don't you look at it and tell me what the problem is. I mean, we're just wasting my time again. Is there something in there that's a problem?

MR. COLLOTON: No, Judge. I wasn't sure how detailed it was on whereabouts, addresses, phone numbers, and that sort of thing. It does seem to be just names and ages and general employment and things like that. I appreciate the chance to look at it.

THE COURT: Now, if you think there is something in here that raises some kind of security concern --

MR. COLLOTON: That's what I was getting at. I should have been more implicit maybe.

THE COURT: I was just assuming because of their friendship he would know where the siblings live and those kinds of things that are generally contained in the

presentence report.  If there is a security concern, let me know.  I don't want to be responsible for --

MR. COLLOTON:  Well, and that's how I felt about it.  That's why I wanted to look at it.  It doesn't seem that it has anything about people having moved or new addresses or anything like that.

THE COURT:  Okay.

MR. PARRISH:  Thank you.

THE COURT:  Why don't we -- we'll be in recess until 10:15.

(Recess at 9:48 a.m.)

THE COURT:  Please be seated.  Mr. Parrish?

MR. PARRISH:  Thank you, Your Honor.

BY MR. PARRISH:

Q.  I believe I left off -- I know that's probably not right up there at the moment, but we were asking you questions about your prior arrest, and then we went back to I believe 1992 and the manufacturing process out in Arizona and the amount of funds that you were, in fact, receiving.  Now, if you concede at least that you had approximately $12,000, could you tell me at most the amount of money Mr. Honken had at any one point in time that you observed?

A.  On his person or --

Q.  From any production the two of you all made.

A.  At one time I know he had 20,000.

Q. Yes. I saw that in your notes. I heard your testimony about that yesterday. And my question is did you see $20,000, and did you along with him count out $20,000?

A. I don't recall if we counted it all out, no.

Q. As a matter of fact, would it be accurate to say that you never saw $20,000 on him?

A. I never counted it out, so I don't know for sure.

Q. You just know that he made a statement once that he had $20,000, is that right, after he had come back from Iowa?

A. He came back from Iowa with a bunch of money, pulled it out and said, This is $20,000.

Q. But you never saw it.

A. I saw the money, yes.

Q. The full 20,000.

A. I didn't count it all, no.

Q. And other than his statement, you had no other independent verification of the fact that it was $20,000; is that correct?

A. That's correct.

Q. You never spoke with Mr. DeGeus, and you never spoke with Mr. Nicholson to confirm that they had given him $20,000; is that correct?

A. That's correct.

Q. And you knew for a fact at least to your knowledge they were the only two people he had dealt with in Iowa.

A.    That's correct, yes.

Q.    And you did not observe him give $20,000 to Jeff at any point; would that be accurate?

A.    That would be correct, yes.

Q.    But he did give you money out of that; is that correct? That's when you took what you thought was approximately two to three thousand dollars at that point.

A.    I don't recall if he gave that to me or if Jeff did.

Q.    Okay.  But one of the two gave it to you.

A.    Yes.

Q.    So would it be accurate to say that if you had to look at the whole production operation when you were in Arizona and what you had done in Iowa you may have received, if you count the benefit and count the $5,000 you received -- the total amount he had was roughly $30,000 -- you would have received one-third of that.

A.    If that's the amount we came up with.

Q.    Is there any reason why you would dispute that?

A.    No.

Q.    Let's talk a little bit about the amounts that came up in Arizona.  Now, as I understand it, you worked in Arizona from May until you came back for the Britt Hobo Days or something like that, and you produced a relatively small amount, is that right, initially which was approximately four ounces?

A.   Yes.

Q.   And it's true that that was mixed prior to the time you came back to Iowa; is that right?

A.   I don't remember if we did it before or after.

Q.   Well, it was mixed at some point.

A.   Yes, it was.

Q.   And if my understanding is correct, you didn't come back to Iowa the first time.

A.   That's correct.

Q.   And you don't recall any pure meth being delivered to anyone, do you?

A.   I wasn't there, no.

Q.   But you don't recall that being done to your best recollection.

        MR. COLLOTON:   Objection.  He just said he wasn't there.

        THE COURT:   Overruled.

A.   Could you repeat what you --

Q.   Yeah.  Do you remember any pure meth being delivered to anyone?

A.   I don't remember seeing any meth delivered to anybody, no.

Q.   Pure meth.

A.   I don't know if it would have been pure or not when it was delivered.  I guess I don't understand what you're --

Q. Well, did you mix the meth on occasion?

A. Yes.

Q. On how many occasions would you say you mixed the meth?

A. Two or three times.

Q. And would that have been the batch that would have been a pound, a pound and a half that would have been toward the end of November?

A. No. That one --

Q. Of 1992.

A. I don't remember. It was a pound and a half, and then we -- if we mixed it ourselves with the cut, then it would have been whatever, twice that when we brought it back.

Q. Okay. On the drive back?

A. Yeah. I don't remember if we did it or if we took the cut and had -- so Greg could do it because I remember that we took cut up there to him so he could mix it himself sometimes.

Q. Well, are you saying now that you took cut to Greg? I thought you said you never delivered anything --

A. I never took it.

Q. So as far as you know, Greg could have been getting it from some other source too.

A. Yes.

Q. All right. So any pure meth found at Greg Nicholson's place may not have even belonged to you guys.

A. That's possible, yes.

Q. All right. And I guess my other point is you would agree that from what you're saying right now you don't recall whether you mixed it before you left Arizona or not.

A. That's true.

Q. All right. And you do know for a fact that it was mixed two or three times.

A. Yes.

Q. Possibly more.

A. I wouldn't think any more than that because I --

Q. What were you using for mix?

A. Vitamin B.

Q. And who bought the vitamin B?

A. Dustin and I went to a smoke shop type place and bought it.

Q. You both went at the same time?

A. Yes.

Q. And did you use the same mix for all of it?

A. Yes.

Q. And in your sentencing you did not contest at all the amount, did you?

A. No, I did not.

Q. Did you have a chance to take a look at it, the report, the presentence report?

A. Which report would --

Q. Your final presentence report.

A. Yes, I did.

Q. All right. And in it you noted that they talked about the amount of actual meth and the amount of mixture?

A. I don't --

Q. You don't recall that?

A. I don't remember -- I don't remember what was all in the report, no.

Q. Okay. Well, let me just refresh your recollection just a second. If they talked about actual meth being somewhere in the neighborhood of 5.6 to 7.4 kilograms, from what you actually saw, that would be high?

A. That would be the pure meth?

Q. Right.

A. I would have to -- how many pounds would that be?

Q. By 2.2 pounds --

A. So it would be about ten pounds all together? It would --

Q. I'm talking about pure meth now. I'm not talking about a mixture.

A. Okay. Probably -- from what I remember, it would be about six or seven pounds.

Q. Total of pure.

A. Yes.

Q. That you made?

A.    Yes.

Q.    Are you sure about that?

A.    Yes.

Q.    So if we go back then and talk about what you said in your presentence report, you would agree that that might be inconsistent with that?

A.    If I said that many kilos, yeah.  I don't know what I said.

        MR. COLLOTON:  May I ask what paragraph you're looking at?

        MR. PARRISH:  Well, I'm not really looking at a paragraph, but if you want to look at page 8, paragraph 26.

BY MR. PARRISH:

Q.    Well, at one -- now, you also talked about a mixture, and then the mixtures, you talked about 4 ounces, 16 ounces, another 16 ounces, another 6 ounces, another 40 ounces, and that was it.

A.    That's all -- whatever's down there is what we --

Q.    Well, how did that get up in terms of what you produced to 5.6 or 6 kilograms?

A.    I don't know.

Q.    Could you have been mistaken?

A.    If I wrote down the 5.6 I could have been.

Q.    Do you think that would be high?

A.    I don't know the exact amounts.

Q.   Were you confused about the amounts at one point or something or the weight?

A.   I don't remember the exact weights, no.

Q.   Did you weigh them out?

A.   I was there when they were weighed, yes.

Q.   Who actually weighed them?

A.   Both of us would have weighed it as we were going along, when we were packaging it.

Q.   I mean the final product.  Who would weigh out the final product?

A.   Both of us.

Q.   And did you weigh it in the mixed form after vitamin B had been added?

A.   Both.

Q.   Did you make notes on it when you would weigh it out in the final pure form and then in the mixed form?

A.   No.

Q.   Well, which time would you weigh it?

A.   Both.  We weighed it both before and after.

Q.   All right.  But you didn't keep notes on it.

A.   No.

Q.   So then you would produce the pure meth and then do the mix and then weigh it out again.

A.   Yes.

Q.   All right.  So then you did mostly mix it before then it

was delivered.

A. Two or three times. I don't remember the exact amount. I know that we delivered it pure and we delivered it mixed both.

Q. Okay. What's the most you've seen in terms of the pure form actually produced at one time?

A. Pound and a half.

Q. All right. And that's the one you said you produced about November; isn't that correct?

A. No. That was the end of --

Q. End of August?

A. February.

Q. And that was the only time?

A. Of that much, yes.

Q. Okay. And that was the largest amount you ever produced?

A. Yes.

Q. Now, was that a mixture, or was that pure?

A. That was pure at the pound and a half.

Q. And you're positive about that.

A. Yes. It was --

Q. And what did you do with that pound and a half of pure?

A. We packaged it up, and I took it to Greg.

Q. Is that the time your parents picked you up at the bus station?

A.    Yes.

Q.    And this was in -- I think it was March, right, of 1993 according to what you said?

A.    Yes.

Q.    And who took him the mixture at that point?

A.    He would have had it already.

Q.    You actually delivered it.

A.    Yes.

Q.    So you delivered the pure meth that you manufactured in Arizona that no one helped you mix that you had, in fact, manufactured on your own, and then you had the conversation directly with Nicholson once you delivered it; is that what you're telling us?

A.    If we had not mixed it ahead of time.  I don't remember if that was one we -- I don't remember which ones we mixed and did not mix.

Q.    And you're saying Mr. Honken did not deliver it; is that correct?

A.    The last batch Dustin did not deliver.  That's true.

Q.    Well, the March of '93 batch, he did not deliver it; is that correct?

A.    That's correct.

Q.    He did not manufacture it because you indicated you had done that already.

A.    I did most of it, yes.

Q. He did not package it.

A. No, he helped me package.

Q. All he did was to help you package it before you left.

A. That was the majority of what he did was helping me package it, yes.

Q. All right. And he was gone during that time living with Miss Friesenborg, and he would only drop by about one day a week according to what you said.

A. Yes.

Q. So the largest batch that you made, if I understand you correctly, which was pure, you did basically 95 percent of the work including the delivery.

A. Yes.

Q. And did you negotiate with Mr. Nicholson once you arrived back in Iowa the fact that he didn't have to pay you?

A. The fact --

Q. That Mr. Nicholson didn't have to pay you.

A. At that time?

Q. Yes.

A. I didn't do any negotiating, no.

Q. Well, you dropped it off, and there had to be some discussion whether or not he had to pay you.

A. I don't remember talking about payment.

Q. Well, what was your conversation with Mr. Nicholson when you dropped it off?

A.   Talked about his band, and I don't remember the whole conversation.

Q.   You've forgotten that.

A.   Yeah.

Q.   And this is the largest delivery you ever made to him.

A.   Yes.

Q.   Did you ever make any other deliveries that you had manufactured to anyone else other than Mr. Nicholson?

A.   Not that I recall.

Q.   And did you make any other deliveries to Mr. Nicholson?

A.   Not that I recall.

Q.   And then you would agree then that everything else was a mixture because there were only three other times.

A.   I'm not sure.  It would have been two or three times that we mixed it.

Q.   Okay.  What about the four-ounce delivery then?  The four-ounce delivery, was that a mixture?

A.   Four ounces?

Q.   Yes.  That was the amount that was made when you first went out to Arizona in 1992.

A.   That would have been what we made, and then it would have got cut after that.

Q.   Okay.  So you actually had eight ounces maybe?

A.   Yeah, if we mixed it.  I don't know when we mixed it.

Q.   Okay.  Did you ever make a delivery to Mr. DeGeus of any

money -- pick up any money from him or deliver any methamphetamine to him?

A. I picked up some money from him a couple times.

Q. Two times?

A. That I remember, yes.

Q. And how much did you pick up?

A. I don't remember how much money it was.

Q. So if I understand it correctly then, in addition to manufacturing -- spending 95 percent manufacturing, you also picked up money in addition to delivery of the pure --

A. Yes.

Q. Totally how many deliveries were there to Mr. DeGeus?

A. I don't know how many times he got it.

Q. But you only manufactured about four times; is that right?

A. About six times.

Q. A total of six times.

A. Yes.

Q. Is that right? And the rest of the weights you would agree were between the four ounces which was the smallest amount you all produced right after you got there until the pound and a half that you produced right before you came back to Iowa and delivered it yourself.

A. Yes.

Q. Okay. And would the other amounts have been somewhere

around 6 to 16 ounces the other 3 times?

A. Yes.

Q. Never over 16 ounces; you agree?

A. Except for the last batch.

Q. Right. We've talked about the last batch, but the other two to three times would have been in --

A. Yes.

Q. Okay. In that range. And when you indicate in your presentence report that the four ounces were a mixture -- and would you like to take a look at this so we won't --

MR. COLLOTON: What paragraph are you looking at?

MR. PARRISH: We're going to look at page 28.

BY MR. PARRISH:

Q. Look at page 28 (sic) on page 9 where you say those 4 ounces of mixture -- I just want to make sure I'm not confusing you because you indicate there was 8 ounces with a mixture in your testimony, but in your presentence it says 4 ounces of mixture, and you also indicated to the officers in your initial statements it was 4 ounces that was made when you first went out there.

MR. COLLOTON: My presentence report only has 18 pages here. Are you sure it's the presentence report you're --

MR. PARRISH: I thought it was. Let me see. Maybe I'm looking at the wrong one.

MR. COLLOTON: Is that Mr. Honken?

MR. PARRISH: Yeah, that's Mr. Honken's. I thought I had a copy of his. Did I give you my copy?

MR. COLLOTON: No, no, you had one.

MR. PARRISH: Thanks. Let me get this. Sorry about that. I'm trying to find one -- oh, here it is.

BY MR. PARRISH:

Q. Do you recall giving an initial statement to a Mr. Graham back May 14 of 1996?

A. Yes.

Q. And do you recall you told him in that report that once you got to Arizona that you produced four ounces. It was the first time you and Mr. Honken made it after you had numerous setbacks out in Arizona?

A. Yes.

Q. So you're telling us now that that was eight ounces.

A. If we would have -- if we would have mixed it up. I don't know if we cut it or not.

Q. So you're not sure then if I'm correct that that was, in fact, eight ounces. That could have been four ounces mixed.

A. I believe it was four ounces of pure from what I remember.

Q. But you could be mistaken.

A. That is possible, yes.

Q. Okay. Because you never told them at any point during

any interview that it was eight ounces.

A.    No.

Q.    Okay.  And you never told them that the pound and a half was ever three pounds.

A.    I don't remember that.

Q.    Okay.

A.    I may have.

Q.    So if we would go then to the next production date -- which would have been your trip back, what, about November sometime?

A.    No, that was late September, early October.

Q.    Okay.  Did you bring any back at that point?

A.    Not that I remember.

Q.    Did Dustin bring any back?

A.    Yes.

Q.    And how much did he bring back to your recollection?

A.    Between 8 to 10 ounces.

Q.    All right.  And that could have been a mixture?

A.    That one I'm sure was 8 to 10 ounces.

Q.    Of mixture.

A.    Of pure.

Q.    Of pure.

A.    Yes.

Q.    Okay.  And going then into -- was there another trip in 1993, or was that the last trip?

A.   '92 you mean?

Q.   '92.

A.   No.   There was one in December sometime.

Q.   And that's when you moved back to Iowa and got an apartment.

A.   Yes.

Q.   Did you bring any back at that point?

A.   I don't believe I brought that back, no.

Q.   Okay.  Did Dustin bring anything back at that point?

A.   Yes.

Q.   And how much did he bring back?

A.   Around 8 to 10 ounces again.

Q.   And was that a mixture or pure?

A.   That would have been pure.

Q.   Then where were the two to three times that you brought back the mixture?

A.   The other times that we would have had it would have been mixture.

Q.   In March is when you closed the lab down; right?

A.   Yes.

Q.   So that was a pound and a half of pure you brought back.

A.   That's true.

Q.   So if all of them were pure each time you manufactured, there was no time left for mixture.

A.   I don't recall which ones were mixed or not.  I know

when we got done manufacturing them before they were mixed on those others that those were the weights that they were. I don't know what they were when we brought them back.

Q. And you're not saying you're absolutely correct on them.

A. I'm sure on the ones after -- the four ounces I'm not positive about, but the others I am sure.

Q. So according to your testimony, there is only one mixture that you're definitely sure about.

A. That we mixed?

Q. Right.

A. I know that we did it at least two times that we mixed it, but I don't know what it -- I don't know which ones they were.

Q. Okay. That's what you're confused about?

A. Yes.

Q. Okay. And you don't recall ever clarifying for law enforcement officials which ones were pure and which ones were mixtures, I take it.

A. Yes.

Q. Is that accurate?

A. I went by pure on all of them is what I was meaning to do.

Q. Okay. But now that you've been questioned on it, you would have to agree that all of them were not pure.

A. Not all of them were pure when we -- when they were

delivered. That's true.

Q. But you do know for a fact that the largest batch that was delivered that you did most of the work on, that was pure.

A. No, I don't know that. That was -- we could have cut that one also.

Q. So you're saying even the one that you brought back when you closed the lab down in 1993 where you brought back the pound and a half, that may not have even been pure.

A. The pound and a half that we manufactured may have been cut before we delivered it. I don't remember.

Q. So when you testified just a few minutes ago that you delivered DeGeus a pound and a half of pure, that could have been inaccurate?

A. Did I say DeGeus?

Q. Nicholson.

A. Nicholson.

Q. That could have been inaccurate.

A. I'm meaning that it was a pound and a half of pure that we made. I don't remember if it was a pound and a half when I delivered it.

Q. Okay. You could have delivered three pounds.

A. That's correct.

Q. Okay. Can you think of any other deliveries in there other than the ones we've discussed here this morning?

A.   No, I don't remember any more.

Q.   So if we had to look back then at your operation in Arizona, you would agree that we have discussed every instance that you've manufactured methamphetamine while you were in Arizona for delivery back to Iowa.

A.   Yes.

Q.   And you can't think of any other instance in which you or Mr. Honken would have brought drugs back to Iowa that were manufactured in Arizona when the two of you all were working together out there.

A.   I don't recall any other instance, no.

Q.   And I think we have covered the mixture, and I realize you indicate that some you're unclear on, but we would have discussed the mixture on each time that you manufactured a batch.

A.   I believe so, yes.

Q.   Okay.  And you would agree that up until this point the only thing about our discussion that was not discussed with law enforcement officials were the exact mixtures.

A.   If I didn't discuss that with them, then yes.  I may have discussed that with them.  I don't recall.

Q.   But you just can't recall; is that correct?

A.   Yes.

Q.   Now, if we could and without going through 1995, that period between September and October when you were having

those difficulties, would you agree that you and Mr. Honken had some type of falling out in 1995 other than what you related to law enforcement officials up to this point?

A.    I don't remember any falling out that we had.

Q.    Are you sure about that?

A.    Yes.

Q.    Do you recall whether or not there was some disagreement between you and he over his relationship with your spouse?

A.    Yes, that did happen.

Q.    Did you just forget about that or something when I asked the question initially?

A.    We didn't have a falling out about it.  I knew that something happened, and he denied it, and she said something happened.  I didn't -- I didn't get upset with it or anything like that.

Q.    Are you telling me you never related to law enforcement officials that you and Mr. Honken had another ax to grind against each other?

A.    I don't know if I mentioned that or not.

Q.    You mean it was just an oversight on your part?

A.    I didn't think that was important to discuss, no.

Q.    You didn't think it was important to discuss the fact that you got upset with him because he and your wife got involved in a relationship?

        MR. COLLOTON:  Objection.  He just said he didn't

get upset with them, they didn't have a falling out, so I think that question misstates the record.

THE COURT: Overruled.

A. Could you ask me the question again?

Q. Let me ask you, are you telling me that you didn't think it was any concern to law enforcement officials that you and Mr. Honken had had some type of disagreement over the fact that he had had a relationship with your wife in 1995 right before you began to work for the government?

A. I started working for them in '96.

Q. Well, isn't it true that you became upset, also had a problem with the exposure, the mental health hospital, and other problems right after you found out he had had a relationship with your wife?

A. If that was the same time period, yes.

Q. Okay. You didn't disclose that to the government, did you?

A. No, I didn't tell them about their relationship, no.

Q. Is there some reason as to why you didn't tell them about it?

A. I didn't think that it was important.

Q. Well, don't you think, Mr. Cutkomp, that it would be important to tell the government if you were going in with taped conversations that there may have been an ulterior motive on your part to entrap this man in conversation that

was incriminating because you would have an ax to grind because he had a relationship with your wife?

A.   I -- it didn't even cross my mind.  It was a -- Dustin said it didn't happen, so I took it at that, that it didn't happen.

Q.   Oh.  So you believed Dustin and you disbelieved your wife?

A.   I would have believed Dustin before I would have believed her, yes.

Q.   So you were having all of these other problems with this idea of your wife having a relationship which led to basically a mental breakdown, and you're telling us that then you agreed to work for the government to get Mr. Honken on tape, and you did not think it was important to let them know that maybe you and Dustin had other problems with each other.

A.   I didn't even -- I hadn't even looked at it as a problem.

Q.   If you hadn't looked at it as a problem, then why did you have to go get mental health assistance because of it?

A.   That had nothing to do with me going for help.

Q.   Are you telling us that you didn't disclose to the psychiatrist that your wife had had a relationship with a guy you considered to be your best friend?

A.   I'm sure I mentioned it, yes.

Q.   Well, if it was important enough to mention to the

psychiatrist and now you were going to go try to get this man on tape to show that he was a bad, bad man, are you telling me that you didn't think it was important enough to mention to the law enforcement officials?

A. No, I did not.

Q. Okay. And I assume that's the same thing you considered when you had exposure charges of over 30 times. You took that same factor of analysis into consideration that that wasn't important to let them know?

MR. COLLOTON: I object because he never said he was charged 30 times with exposure.

MR. PARRISH: I withdraw the question. Not charged. I withdraw the question.

BY MR. PARRISH:

Q. So you would agree that at about the same time that Mr. Honken and you had some discussion about him having a relationship with your wife, your wife making an admission that she and Mr. Honken had a relationship, it was the same time that you decided to pull out of this drug operation with Mr. Honken?

A. It would have been about that time, yes.

Q. Okay. And you're telling us that the only reason you decided to pull out is that you suddenly had a relationship with God.

A. No, that's not why. I had been considering it before

that all along.

Q. Isn't it true that you felt since early on that Mr. Honken was the type person who used you as an individual to attract a woman and then he would end up getting the woman because he knew how to talk to them?

A. Oh, yes, that happened.

Q. And when that ultimately happened to your wife, that was in your opinion the straw that broke the camel's back, and you were going to do whatever was necessary to destroy this man.

A. At that time in my relationship with my ex-wife, she had had -- been with -- had affairs with many other people, and at that point we were just friends. We had decided that we would just be friends, and I was okay with that.

Q. Well, Mr. Cutkomp, that's not exactly the fact, is it, because you and your wife had had a relationship that would be off and on and had been off and on for a number of years?

A. We talked about getting back together.

Q. Right.

A. We never actually did.

Q. I understand that. But it was a relationship that would be off sometimes, a relationship that would be on sometimes.

A. Yes, to a point.

Q. Okay. And you would agree that all these factors came in together at one point. You were arrested twice for

exposure. You went into a mental hospital for three days. Dustin had related to you that he and your wife had had a relationship, and she had acknowledged it, and it was at the same time that you decided to break away from the drug operation. All of those things happened at one juncture in 1995.

A. Around the same time period, yes.

Q. All right. Now, would you agree that it was the next point in time that -- in this whole relationship that you began to have conversations with Mr. Honken about -- and we're not talking about taped conversations -- about his relationship with your wife?

A. It was during that time period that it happened. I only remember one or two conversations with Dustin about it.

Q. And you would agree that then starting in January of '96 up to and including May of '96, did you work with Dustin at all in setting up a lab?

A. Of '96?

Q. Yes.

A. Or '95?

Q. '96 we're talking right now. Your last arrest and mental assistance was in October and early November of 1995.

A. Yes.

Q. Now we're going to January through May of 1996. Did you work at all with setting up a lab?

A. There was a lab set up at Dustin's house in the garage, yes.

Q. My question is, did you work at all in setting it up?

A. I assisted, yes.

Q. All right. But you told him in 1995 you wanted out.

A. Yes, I did.

Q. And you acknowledged -- well, let me strike that question.

When did you first then agree to work with law enforcement officials?

A. After my arrest.

Q. In what month?

A. Can you tell me what month I was arrested? It was a couple weeks after, the week after, right around there.

Q. That you began to do it? Would it be like April?

A. Whatever the time frame is. I don't remember the exact time. Spring after the arrest.

Q. Is your memory better if it's like in spring, fall, and things like that as opposed to dates?

A. Yes.

Q. Again, like you say, you have a tough time with memory.

A. Specifics, yes.

Q. Okay. And that's when you decided to some extent you would implicate your friend; is that right?

A. Yes.

Q. And you would agree that one of the things you wanted to try to implicate him in is in a murder.

A. Yes.

Q. And you perhaps knew him better than anyone; is that correct?

A. That is correct.

Q. And you had what? Six separate conversations with him where they were taped?

A. Yeah, around there.

Q. Okay. And you have already agreed in my cross-examination that at no point in time did he indicate to you he had killed anyone, he had buried someone, he had unburied someone. You would agree to that.

A. He indicated to me he did, yes.

Q. He told you he had killed someone.

A. He didn't say, I killed someone, but I knew what he was talking about.

Q. Well, we're not going by what you knew he was talking about, but we're just trying to go by what he said.

A. I don't know if the word kill was used or not.

Q. Well, has he ever told you even off tape that he's killed someone?

A. It was the same way as it was on tape.

Q. My question is, sir, did he ever tell you off tape that he had killed someone?

A. In the way that he did on the tape, yes, in the --

Q. Do you have a tough time understanding my question or something?

A. I don't know what you're wanting me to --

Q. Did he ever tell you, I have killed someone?

A. No, he did not say those words.

MR. COLLOTON: Objection. Asked and answered.

THE COURT: It has been now.

BY MR. PARRISH:

Q. Did he ever tell you he had buried someone, he says, I have buried someone?

A. No.

Q. Did he ever tell you, I have burned someone up?

A. No.

Q. Either on or off tape.

A. No.

Q. Did he ever tell you that I've had someone kill Mr. DeGeus or his family or Mr. Nicholson and his family or anyone like that?

A. No.

Q. As a matter of fact, what you did is that while you were working with Dustin, you would start conversations in private that were not on tape knowing later on you would be on tape; isn't that true?

A. No, that's not correct.

Q. Are you telling me while you were working for them between May and June -- and when I say working for them, the law enforcement officials -- you never had any conversations about what about happened to Mr. DeGeus or Mr. Nicholson?

A. Yes, we did.

Q. Off tape?

A. Yes.

Q. So then you would have those conversations off tape knowing that the conversations would be picked up later on on tape.

A. I guess I didn't -- I don't understand what you're --

Q. Let me try to clarify a little bit. You and Mr. Honken would be at work sometimes.

A. Yes.

Q. Is that true?

A. Yes.

Q. You would not be on tape at work.

A. That's correct.

Q. But later on you were on tape.

A. Yes.

Q. You would have conversations about these people or what he was doing or what his plans were off tape.

A. Yes, that's correct.

Q. But then once you were wired, you would go back and pick up that conversation on occasion.

A.   I went back and discussed what -- when I would go in, I was told not to bring up anything, to let him bring it up, and that's what I attempted to do when I was on the tape.

Q.   Well, what about when you were off the tape, you know, when you're priming the pump?  Do you know how to prime a pump?

A.   Yeah.

Q.   Are we speaking the same language?

A.   Yeah, I understand what you're saying.

Q.   All right.  So when you're trying to get a deal and you're with this man who's your best friend who you found out has had a relationship with your wife and you want to prime the pump, do you know how to do that?

A.   I don't believe that I could have done that to him, no.

Q.   Why is that?

A.   I don't think that he would have fallen for something like that.

Q.   Because you think he's -- he knew what was going on?

A.   I think he's smart enough to know if somebody was trying to prime the pump on him.

Q.   Well, let me ask you this:  Why is it that there's no reference at all to maybe someone is taping us or maybe our phones are bugged?  I mean, I've been listening to this stuff for 27 years.  There's absolutely nothing on the tape to indicate when he's talking to you that maybe you're wired.

A. That I --

Q. That you're wired.

A. I didn't tell him that I was wired.

Q. Yeah. But if he's so smart, wouldn't he have figured it out?

A. He did start to question it at several points, yes.

Q. And where do you say he decided to question it? What does he say to you?

A. He asks me if I'm wired.

Q. And what do you say?

A. I told him no at least on one occasion and yes on another.

Q. And you told him you were wired on another?

A. And I lifted my shirt up so he could look on another occasion.

Q. And during those times did his conversation ever change?

A. I don't recall. I'd have to look back at the transcripts.

Q. And when you lifted your shirt up, did the conversation ever change?

A. For a few minutes.

Q. Did he ever talk any differently other than as you indicated he's always talked?

A. Pretty much the same all the time.

Q. There's no doubt in your mind about that?

A.    No.

Q.    Did he ever deny at all any involvement in any drug manufacturing?

A.    To me?

Q.    Yes.

A.    No.

Q.    Did he ever deny that he had harmed anyone?

A.    Just saying are you meaning I deny that I -- I don't recall if he just said those words or not.  He may have.

Q.    Well, did he ever say, I don't know what happened to those folks?

A.    That's possible, yes.

Q.    He said that several times that you were making inquiries, didn't he?

A.    I don't remember.  At least one point he said that.

Q.    And I know Mr. Colloton had you go through and read various portions of the transcripts, and we're not going to do that.  But would you agree that as he highlighted certain portions of the transcripts he left out clearly explanations that followed or conversations that may have led up to those highlights that he wants to put into the transcript?

A.    I didn't see that, no.

Q.    Well, at one point when you were talking about, well, what are you going to do and he says it could be easy -- I think it's transcript 5B or something like that, the Exhibit

5B -- he said, Well, what does your lawyer say about it? What does your lawyer say you should do? That's the other part of that conversation.

A. I remember that part.

Q. Yeah. And you would agree as he highlights various points there are other things that follow up that explains what Dustin means also other than your going back now and explaining what he means.

A. It had to do with the same thing.

Q. Right.

A. Just another way of asking me.

Q. And you would agree also that there were conversations that took place off the record about some of these same things.

A. Yes.

Q. All right. And even during those conversations Dustin never made any admissions that he did something himself.

A. Not in the way that you told me.

Q. Other than what's here on tape.

A. In that way he told me, yes.

Q. As a matter of fact, you probably told the officers that beforehand, didn't you?

A. Yes, I did.

Q. And that would -- let me just ask you something. It's true, is it not, that with regard to Mr. Nicholson's

disappearance, that was more beneficial to your case than it was to Dustin's case, wasn't it?

A. Not that I know of. I didn't have a case at the time.

Q. You eventually had one.

A. In '93 or -- which one are you talking about?

Q. The '93 delivery.

A. Yeah, I got arrested with him, but my charges were dropped.

Q. And Mr. Nicholson was the pound and a half that you delivered to and that you manufactured out in Arizona.

A. Yes.

Q. So as you analyzed your culpability on that pound and a half, your weight was a lot heavier than Dustin's was, wasn't it?

A. The testimony of him on me?

Q. Right.

A. No, I would say he would have more testimony against Dustin than myself.

Q. Well, you just said Dustin never delivered him a pound and a half. You're the one that did that.

A. Yes.

Q. So I'm saying weight-wise Nicholson's testimony was more damaging to you than it was to Dustin.

A. You mean for the amount.

Q. Yeah, yeah.

A.   Yes, that would be --

Q.   Absolutely.  It's not even a close question, is it?

A.   Greg would have known that it came from Dustin also, though.

Q.   How do you know?  You said you never dealt -- you never saw the two of them together.

A.   I knew what they were doing.  He wouldn't have accepted the drugs from me if he didn't know what we were doing.

Q.   Well, that's just your word.

A.   Yes.

Q.   So if we disbelieve your word, who else's word do we go to?

        MR. COLLOTON:  Objection.  That's argumentative.

        MR. PARRISH:  If he knows.

        THE COURT:  Overruled.

A.   Would you repeat it?

Q.   Yeah.  If we reject your word, who else's word do we go to?

A.   Dustin's or Greg's.

Q.   Do you know where Greg is?

A.   No.

Q.   Now, how far did DeGeus live from you?

A.   About a quarter mile.

Q.   Did he live closer to you, or did he live closer to Dustin?

A. He lived closer to me.

Q. Did you know him?

A. I -- yeah, I knew him.

Q. Did you ever go to his house?

A. To pick up the drugs, yes.

Q. Oh, DeGeus's house to pick up the drugs?

A. Or the money from the drugs. I'm sorry.

Q. And you never saw Dustin do that?

A. No, I never saw him go to his house.

Q. So DeGeus was someone who could've implicated you more so than he could have implicated Dustin too, couldn't he?

A. I only picked up money from him.

Q. How much?

A. A couple thousand at the most I would say from him.

Q. And was anyone there at the time you picked it up?

A. No.

Q. So DeGeus could have implicated you also?

A. He could have said I picked up money, yes.

Q. For drugs.

A. I don't remember if I discussed the drugs or not with him. I just -- he knew I was picking up the money for Dustin.

Q. As you assess this in your particular situation and as you have testified here today, who did most of the work in this manufacture in terms of amounts as opposed to you,

Dustin?

A.    The actual work?

Q.    Yes.

A.    Or the -- the actual labor on it would have been me. The brain work on it --

Q.    And who delivered the greatest weight of drugs of anyone involved in this?  You or Dustin?

A.    At one time it would have been me, the one and a half pounds.

Q.    But totally who delivered the most drugs in this transaction in terms of weight?  You or Dustin?

A.    Dustin.

Q.    Well, we added it up.  It looks like you did most.

A.    I only remember --

        MR. COLLOTON:  Objection at this point.  I'm sorry. I'll withdraw it.

A.    I only remember delivering the one time, the pound and a half.

Q.    Well, at any other point was there -- well, you said it could have been 3.2 pounds also.

A.    If we had mixed it up, yes, it would have been.

Q.    Well, who else ever delivered a weight that heavy other than you?

A.    At one time no one did.

Q.    Okay.  So you delivered the largest single amount of

drugs --

A. Yes.

Q. -- in this whole thing; right?

A. Yes.

Q. You did the most work. You did the most drugs. Who lived in the place where the drugs were manufactured?

A. I did.

Q. And whose name was the drugs in -- in the house, the apartment, the house?

A. The house was in my name.

Q. And Dustin never supplied you any money for any of this, did he, when you went out?

A. What do you mean when I went out?

Q. To Arizona. You said Jeff supplied the money.

A. That's where the money came from. I don't know if Jeff handed me the money or Dustin did.

Q. So Jeff actually supplied the money; is that correct?

A. That's correct.

Q. Now, you mentioned yesterday about a gun that was there. Did you ever tell the agents at all about a gun being there?

A. I don't remember if I did or not. I think I did, but I don't remember.

Q. You think you might have told them about a gun?

A. That we would have had at the house. I don't remember.

Q. But it's possible that you forgot that also?

A.   I don't -- I don't know.  If it's not in there, yes, I forgot to put that down, yes.

Q.   You didn't realize that would have added possibly another charge had you admitted that.

A.   No, I didn't know that.

Q.   You had no idea.

A.   No.

Q.   Were you ever shown any statements of Mr. Nicholson or did anyone show you the amounts that Mr. Nicholson claimed that he was getting?

A.   I saw the list of what people owed.  That's all.

Q.   Where did you get that list from?

A.   Dustin showed it to me.

Q.   Did you show any other -- were you shown any other list?

A.   That's the only one I remember.

Q.   Nothing else?

A.   No.

          MR. PARRISH:  I don't have any further questions.

          THE COURT:  Mr. Colloton?

                    REDIRECT EXAMINATION

BY MR. COLLOTON:

Q.   Mr. Cutkomp, Mr. Parrish was asking you whether -- what your role was and saying all -- I think you said you did the leg work?

A.   I did most of the actual manufacture.

Q. All right. And I thought you got cut off there when you started talking about what Mr. Honken's role was.

A. He was the one that explained to me how to do it and made sure I was doing it correctly.

Q. And who's the one -- how did you know to deliver drugs to Nicholson and DeGeus?

A. Dustin told me.

Q. How did you know how much money or when to collect money from those guys?

A. Dustin told me.

Q. When you're talking to Mr. Parrish about quantity, there was a lot of talk about pure and mix everything. Let me make sure I got that understood. Were the quantities that you gave yesterday on direct examination for each batch the amounts before or after you mixed them?

A. That was before we mixed it.

Q. And you're saying then four ounces the first time is your best recollection.

A. Yes.

Q. And then you listed the others which were 8 to 10 and 8 to 10 and then a pound and a pound and a pound and a half; right?

A. Yes.

Q. And you believe those are accurate amounts of the actual methamphetamine before it was mixed.

A. Yes.

Q. And then you're saying two or three of those may have been mixed before they were brought to Iowa.

A. That's right.

Q. But you can't tell us which one was mixed before it came and which ones came pure.

A. Yes.

Q. And that's your best estimate of the total amount that you made in Arizona and brought to Iowa.

A. Yes, that's my best estimate.

Q. Now, with regard to the money, Mr. Parrish said as I recall -- I'll try to state it accurately -- that if we came up with a total of $30,000 made out of this venture, then you would have received about a third of it.

A. Yes, I remember that.

Q. Do you remember him asking that?

A. Yes.

Q. And you said yes to that because he thought after he went through it with you that you may have received 10,000 or so in --

A. Benefits.

Q. -- aggregate benefits; right?

A. Yes.

Q. Now, what was the price of the methamphetamine as it was sold in Iowa?

A.   Well, to begin with it was around 1,800.

Q.   Did it change over time?

A.   Yes.

Q.   What did it change to?

A.   I was told that it was lowered to -- I think it got down to about 1,400.

Q.   1,400.  And when did it change?  Do you know?

A.   Just over time.

Q.   You don't know as to which batch it changed?

A.   Each time he'd -- I don't know exactly when it was, no.

Q.   All right.  So if we took the total number of ounces that you've mentioned using the conservative amount, say 8, and if it's an 8 to 10 and we took that times 1,400 just to be safe and not fight about 1,800 versus 1,400, that would be the total amount of money that would have been made from selling all that meth; is that right?

A.   Yes, if we would have sold it all, yes.

Q.   Did you sell most of it?

A.   The last batch, I know that it hadn't been all sold yet.

Q.   Because Nicholson got caught?

A.   Yes.

Q.   Do you know how much he paid on that?

A.   That would have been around 1,400.

Q.   Around 1,400?

A.   Yes.

Q. So if you want to figure out the actual amount as opposed to just taking 30,000, you would have to do the math as to all of the meth before the last batch, take 1,400 for the last batch, and then that would be the total amount of money owed?

A. Yes.

Q. I mean paid. I'm sorry.

A. I don't know how exactly we did it. If it was like one ounce, he'd get charged for two because of the cut if it was the pure stuff.

Q. Oh, so you might have even made more money than if you just take the pure ounces times 1,400.

A. Yes.

Q. Because you might have made 2,800 on one pure ounce.

A. Yes.

Q. So that would even be very conservative if we only counted the pure meth times 1,400.

A. Yes.

Q. So then we would have to take about 10,000 as a percentage of that total number to see what your real percentage was, wouldn't we?

A. Yes.

Q. All right. I won't -- we can do the math. We've made the record, but I don't think we need to dwell on --

MR. PARRISH: Who made the record?

MR. COLLOTON: We can argue about it too.

MR. PARRISH: Yeah, we can.

THE COURT: And no doubt will.

MR. COLLOTON: No doubt.

BY MR. COLLOTON:

Q. Now, do you remember Mr. Parrish said something to you about how there was no -- he's done all these cases and there was never any point in here like other cases apparently where the defendant worried about having a wire on you?

MR. PARRISH: That's a misstatement of the record, but that's fine.

MR. COLLOTON: Is that a misstatement of the record? Okay then.

BY MR. COLLOTON:

Q. Do you remember questions about whether Mr. Honken was concerned about your wearing a wire?

A. Yes.

Q. And you said you thought that it had come up; is that right?

A. Yes.

Q. Do you still got those exhibits in front of you, those transcripts?

A. Yes.

Q. Look at 5B, please, and page 14, the first block. Do you see there where Dustin says, How do I know that you

didn't fucking cooperate with those mother fuckers, pin something else on me to get off this? That's what I'm worried about, Tim, to be honest with you. That's why I'm scared to talk about anything until I can get somewhere where I can sit there and check to make sure there ain't nothin'? Do you see that?

A. Yes.

Q. What did you understand him to be talking about there?

A. He wanted to get somewhere where he could strip search me and make sure there was no wires and feel safe.

Q. Back in 1993 when Mr. Nicholson disappeared, you're saying your charge was dismissed in state court; right?

A. Yes.

MR. COLLOTON: That's all I have, Judge. That's all I have.

THE COURT: Thank you, Mr. Colloton.

Any recross, Mr. Parrish?

MR. PARRISH: Just a second, Your Honor.

RECROSS-EXAMINATION

BY MR. PARRISH:

Q. After you had had this serious problem in 1995 with your mental health, were there any points in time where you and Dustin talked in detail about that?

A. I don't recall discussing it in detail, no.

Q. Did you ever tell the agents prior to the time that you

signed up that you had been in a mental institution for a while?

A.    I don't know if I did or not.

Q.    You might have forgotten to mention that too?

A.    If I didn't mention it and I meant to, then I forgot, yeah.

Q.    Okay.  Now, Dustin knew about it; is that right?

A.    Yeah.

Q.    And you would have to admit -- you even indicate in a couple of your statements that I just read over the break -- that you were having a tough time mentally.

A.    Yes.

Q.    And Dustin recognized that you were on the edge, you had indicated earlier because of his relationship with you, and he knew you were on the edge.

A.    Yes.

Q.    And you acknowledged that; is that right?

A.    Yes.

Q.    Now, how did you know that he was not trying to keep you from cracking up and doing something crazy such as what you had done before?

A.    That's possible that he could have been doing that at one point, yes.

Q.    Because didn't you at one point tell him with regard to Cobeen, I'm watching you closely?

A. I --

Q. With regard to what was happening with Cobeen.

A. I don't know. I don't remember that statement.

Q. Have you ever owned a gun before?

A. Have I owned a gun? No.

Q. You never had a gun?

A. I had a shotgun, yes. It was my brother's.

Q. When was the last time you've had a gun?

A. I had the gun in high school. It was my brother's gun.

Q. And you're telling us you have not had a gun in your hand since then?

A. I have not had one that was -- that I was keeping for myself, no.

Q. Well, have you had a gun in your hand since then?

A. The ones of Jeff's I had.

Q. Oh, you did.

A. Yes.

Q. When did you have them?

A. In Arizona.

Q. And how many did you have?

A. Two.

Q. Where did you have them?

A. In the house.

Q. Did you ever take them over to Miss Friesenborg's house?

A. I don't remember if I did or not.

Q. You might have done that?

A. I might have when I moved out of the house.

Q. Okay. That's something you would have done; is that right?

A. If I would have, I would have left them there for Jeff to come to pick up, yes.

Q. Right. And it was you who called Miss Friesenborg and told her to move that stuff out, didn't you?

A. Yes.

Q. It was not Dustin who called, was it?

A. I don't know if he called later, but that time it was me, yes.

Q. And it was also you who showed up when she went down to be debriefed by agents; is that right?

A. That's correct.

Q. It was not Dustin; is that right?

A. That's correct.

Q. Now, Dustin knew, according to what you're saying, that you were operating on the edge, so to speak, at some point. Did he try to do anything to put your mind at ease about your case?

A. I don't remember if he did or not.

Q. Well, didn't he accept responsibility for making the mistakes that got you into this trouble?

A. At one point he said that he was sorry he got me into

the trouble, yes.

Q. Because he had made the mistakes and not you, is that right, because you were -- you didn't make those kind of mistakes?

A. I had told him that we shouldn't -- that we should get out of making the drugs and not to talk to Cobeen, and that was the mistake he was referring to, those mistakes.

Q. And he was trying to put your mind at ease about Cobeen, wasn't he?

A. He was trying to put my mind at ease about that he would take care of things.

Q. Well, did he ever say, I will take care of Cobeen?

A. If the -- in a way he did, yes. I'd have to look back over to see if it was exactly worded that way or not.

Q. Okay. But don't you think he was basically trying to put your mind at ease about the mistakes he had made and to acknowledge that you had not made the mistakes, that he had made the mistakes?

A. That's not why I think he was saying that, no.

Q. But you would agree that during that point in time you were not at your mental best.

A. When I was taping him?

Q. Not only when you were taping him but back through when you had the mental breakdown.

A. I would say at that point I was not at my best.

Q. Is that the only breakdown you had was that in October of '95? Was that the last breakdown you had?

A. That's the -- yes.

Q. You never went back?

A. No.

Q. And you didn't keep seeing the psychiatrist?

A. Yes, I did.

Q. Did you tell the agents at the time you started working with them that you were under psychiatric care?

A. Yes, I believe I did.

Q. You did?

A. I know that when I was arrested I was ordered to get psychiatric care. So if I didn't mention it, I assumed that they knew.

Q. You were told to get psychiatric care?

A. Yes.

Q. By whom?

A. The judge.

Q. For what reason?

A. For the indecent exposure and also when I was charged with the drugs to get psychiatric care also for -- to see if I needed any other help.

Q. But my question is, did you tell them beforehand that you were on psychiatric care?

A. I don't recall if I did or not.

Q. But you were already prior to your arrest; is that right?

A. Yes.

Q. And Dustin knew that.

A. Yes.

Q. And so for the first time you were receiving psychiatric care at the same time that you were going through these problems with your personal life.

A. Yes.

Q. And these conversations took place under that whole umbrella of your relationship with him.

A. With the psychiatrist?

Q. Right.

A. (Witness nodded head.)

Q. And Dustin being aware of it, being aware that you were on the verge of a possible another nervous breakdown.

A. I don't know if he thought that or not.

Q. But you'd just had one.

A. I didn't think that I was on the verge of another one.

Q. Okay. You thought you had recovered okay.

A. Yes.

Q. Okay. But you're not familiar as to what Dustin thought.

A. I don't know what he thought, no.

Q. Okay. And did you have any discussions with him about

that?

A. I don't recall having discussions with him about it, no.

Q. Not even off the record.

A. No, not even off the record.

MR. PARRISH: Okay. I have nothing further.

THE COURT: Mr. Colloton?

FURTHER REDIRECT EXAMINATION

BY MR. COLLOTON:

Q. Do you think it's accurate to say you had a mental breakdown?

A. I don't know if that's what word I would use.

Q. You had a three-day period where you were in the hospital?

A. I wanted to get help for it.

Q. And then you had some ongoing consultation?

A. Yes.

Q. What did Mr. DeGeus look like?

A. Probably about 5-10, slender, muscular.

Q. DeGeus or Nicholson?

A. DeGeus. But he was muscular, but he was -- he wasn't fat or anything.

MR. COLLOTON: Nothing else.

MR. PARRISH: I don't have anything further, Your Honor. Thank you.

THE COURT: Thank you, Mr. Cutkomp. You're excused.

MR. PARRISH: He gave me some other notes. I gave those to -- Steve, do you have those notes? I think they go back to Jay.

THE COURT: Mr. Jackson, I'm going to return the Cutkomp presentence report to you. And I think we also have the notes from Bob Askelson.

MR. PARRISH: Wasn't there another -- was there another note on the back of that, or was that it? Okay.

THE COURT: Are you ready to call another witness?

MR. COLLOTON: Sure. Yeah. I'm sorry.

THE COURT: That's okay.

MR. COLLOTON: United States calls Dean Donaldson.

DEPUTY WALHOF: We have to get him from upstairs, Your Honor.

THE COURT: How long do you think his testimony will take?

MR. COLLOTON: It will take past noon. I know that. It's fairly lengthy I'm afraid.

THE COURT: We'll go till noon and then take an hour break.

MR. COLLOTON: Okay.

(A discussion was held off the record.)

THE COURT: You'll have to stand up so I can swear you in.

DEAN DONALDSON, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated. Would you state your full name, please, and spell your last name.

THE WITNESS: Dean Lester Donaldson, D-o-n-a-l-d-s-o-n.

DIRECT EXAMINATION

BY MR. COLLOTON:

Q. Mr. Donaldson, are you currently in state custody?

A. Yes, I am.

Q. You're serving a state sentence?

A. Yes.

Q. And for what are you serving a state sentence?

A. Second degree theft.

Q. Were you prosecuted in Woodbury County?

A. Yes.

Q. Were you incarcerated for a time at Woodbury County Jail?

A. Yes.

Q. When did you go into the Woodbury County Jail in connection with that theft charge?

A. January 23, 1996.

Q. And about how long were you incarcerated there in that stretch?

A. Till August 14.

Q. Were you awaiting trial?

A. Yes.

Q. And why were you in jail as opposed to out?

A. Because I couldn't post bond.

Q. Where were you housed in the Woodbury County Jail?

A. D block.

Q. Do you know the defendant in this case, Dustin Honken?

A. Yes.

Q. Do you see him here in court today?

A. Yes.

Q. How did you first meet him or where, I should say?

A. In D block in Woodbury County Jail.

Q. Did you meet him when he was detained in there on this federal case?

A. Yes.

Q. What conversations did you have with Mr. Honken about his case when he first came in?

A. Not too much at all at first.

Q. All right. What eventually did you talk about?

A. That progressed, and he told me why he was in there.

Q. What did he say about why he was in there?

A. Because he had a meth lab.

Q. What did he say, if anything, about the government's evidence against him?

A. He had some witnesses testifying that he had a lab.

Q. Who did he say were the government witnesses?

A. Cobeen.

Q. Who else did he say was a government witness?

A. Tim.

Q. How did he describe Tim?

A. He was 6-2, blond hair. That's all. And he used to be his best friend for 13 years.

Q. What did Mr. Honken tell you about -- well, strike that. Excuse me.

What, if anything, did Mr. Honken say to you about his future plans?

A. As to --

Q. As relating to drugs.

A. Well, we had talked about a deal where if he had the chemicals that he needed he could make one more deal worth ten million dollars.

Q. What did he say about how he wanted to do that?

A. Well, he needed some things that weren't confiscated the first time, and he also -- there was some other chemicals that he needed that possibly he wanted me to get if I would.

Q. What did he say about how he was going to sell the drugs in this future plan?

A. Through the Internet so no one could pick up any big quantity. It would be placed through the Internet where people would pick tubes of meth up at -- just small quantities of meth.

Q. What did he say about how that was going to work?

A.   In response to -- I don't understand.

Q.   You were going to use the Internet to have tubes of meth --

A.   That only he would know where they were at.  No one could break into the Internet to ever get where they're all placed at.

Q.   Now, you said that he told you he needed some chemicals and things like that that had not been seized?

A.   Right.  Well -- yes.

Q.   What did he tell you that he needed to do this future meth project?

A.   Well, he had a tank that was hard to get ahold of that he wanted me to go get for him, and there was some other things, some other chemicals that he wanted me to get.

Q.   Let me ask you about this tank first.  What did he say about this tank?

A.   That it wasn't seized -- it wasn't found in the -- when the feds come in and got his stuff.

Q.   What did he say about where it was?

A.   It was at a friend of his.

Q.   Did he describe who that was?

A.   Yes.

Q.   Who did he say had the tank?

A.   A guy named Jay, a friend of his that he worked with, young, 21, likable guy.

Q. From where?

A. Mason City.

Q. And what did he talk to you about with respect to that tank?

A. He wanted me to get it and hang on to it.

Q. And what kind of arrangement did he propose to you financially?

A. Well, that he was going to make one big time, one more big deal worth ten million and we'd split it.

Q. How were you supposed to get this tank if you're in the Woodbury County Jail?

A. He was going to bond me out.

Q. And then how were you supposed to get a tank from somebody named Jay in Mason City?

A. He left me a note.

Q. What do you mean by that?

A. A note to give to Jay.

Q. Let me show you what's been marked Government Exhibit 11G. Do you recognize Government Exhibit 11G?

A. Yes.

Q. What's 11G?

A. That's the note to Jay from Dustin.

Q. Is this a note that he gave to you in the jail?

A. Yes.

Q. What did you eventually do with this note?

A.   I put it with the rest of my paperwork that I had while I was in jail.

Q.   Where did you put that paperwork?

A.   At Phil Parmelee's when I got out.

Q.   Now, you mentioned Mr. Honken also wanted you to get some chemicals; is that right?

A.   Yes.

Q.   How were you supposed to know what chemicals to get?

A.   He gave me a list of things to do.

Q.   Let me show you what's marked Government Exhibit 11F. Do you recognize that?

A.   Yes, I do.

Q.   What's Government Exhibit 11F?

A.   It's a list of things he wanted me to get for him.  He wrote them down.  I copied them.

Q.   Why did you copy them?

A.   Because he didn't want his handwriting on them.

Q.   Did you discuss with him any of these specific chemicals on Exhibit 11F?

A.   Yes.

Q.   What did you talk about?

A.   The rocket fuel and the paint thinner.

Q.   Which one's the rocket fuel?

A.   The methane.  I think that's how you pronounce it.

Q.   What conversation did you have about that?

A. Well, I told him that I thought I knew where I could get it.

Q. What conversation did you have about paint -- what do you mean by paint thinner?

A. It's a chemical that's in paint thinner.

Q. Which one is that?

A. Toluene, toluene.

Q. And what conversation did you have about that with Mr. Honken?

A. He just told me how much to get, how much of it to get. It would make a certain amount which I don't remember what that was.

Q. Is sassafras oil listed on that exhibit?

A. Yes.

Q. What conversation, if any, did you have with Mr. Honken about that?

A. That was another drug that he was going to make.

Q. What was another drug?

A. Sassafras was -- is a chemical he needed to put in some drug he was going to make I think from the sixties that college people like, and he was going to make a lot of money so in order to finance maybe the ten million dollar meth if he didn't have the money.

Q. What is listed on the bottom of Exhibit 11F, on the bottom of the first page?

A.   Professor Buzz.

Q.   But I mean what is the nature of those things?

A.   Oh, they're all drug-related chemicals.

Q.   Professor Buzz is a chemical?

A.   That's -- them are books that he wanted me to get.

Q.   What did he say about the books?

A.   They were books that he wanted me to get because they might be outdated by the time, you know, that -- anytime they'd be outdated.

Q.   Do you see about six lines up or seven lines up from the bottom of 11F it says D, period, m-o-m-s?

A.   Yes.

Q.   Did you talk about that notation with Mr. Honken?

A.   Yes, I did.

Q.   What did he tell you about that?

A.   That book could be gotten at his mother's place.

Q.   And what does D, period, m-o-m-s mean?

A.   That's Dustin's mom.

Q.   What's on the second page or maybe the back of what you have there, of 11F?

A.   Them are just some more books.

Q.   What did he say about those books or --

A.   He gave me a place that says Dalton's book store, where to purchase a book.

Q.   What did Mr. Honken say to you about how he was going to

be able to participate in this if he was in the Woodbury County Jail?

A. Well, he was going to bond me out. As we talked earlier on, he was going to bond me out just to get this done.

Q. And when did he think he would be able to participate in that with you?

A. When we first talked, in just a few years, maybe possibly five.

Q. How did he tell you that he had figured that?

A. Because he had a book of federal guidelines that he checked out every day.

Q. You say that was at first. What discussions did you have about timing after that?

A. This was the period of a month and a half or a month. Kept talking every day about it, and I believed after a while we weren't even getting -- I was never -- it was just talk.

Q. But I mean how did the time when he would be available change if at all over your --

A. Well, in his guidelines he pointed out if Tim was gone or Cobeen, especially Tim because he took him back to the '93 meth lab, would knock off so many points on the guideline and possibly knock a couple years off.

Q. Now, you say Tim would take him back to '93. What do you mean by that?

A. Tim and him were involved in '93.

Q. Involved in what?

A. In a meth bust by the federal government.

Q. How do you know that?

A. He told me so.

Q. And what did Mr. Honken tell you about how that case got resolved?

A. It was resolved because all the witnesses came up missing.

Q. What description, if any, did Mr. Honken give you about the witnesses who came up missing?

A. That one was a big tough guy.

Q. What did he say about the big tough guy? How else did he describe him?

A. He used to date Angie, his girlfriend.

Q. What else did he say to describe him?

A. He owed $30,000.

Q. To whom?

A. To Dustin.

Q. And who else did he say?

A. He just mentioned a couple.

Q. Pardon me?

A. A couple is all he mentioned. He didn't say the names, just a couple.

Q. And did he mention anybody else being missing?

A. No.

Q.   He mentioned nobody else being missing?

A.   Well, he said a kid had been missing, but he never got into detail of any kind.

Q.   And what did he say, if anything, to you about how the first person you mentioned who owed the $30,000 ended up missing?

A.   Well, he just said he was supposed to go to sentencing or a plea bargain and again the witnesses never -- they came up missing so --

Q.   And what did he say to you, if anything, about how the first guy you mentioned, the $30,000 debt guy, disappeared?

A.   They met out in the country at an abandoned place.

Q.   Who did?

A.   Dustin and this man.

Q.   And what did Dustin tell you happened out there?

A.   He was shot out there, and he said he didn't die like they do on TV.  He shot him and he kept coming.  He shot him and he kept coming.

Q.   Who shot who?

A.   Dustin shot the big guy.

Q.   What did he say happened after that?

A.   He shot him again, and he said they don't die like they do on TV.  He kept coming, and the guy said, Don't kill me. I'll pay you 30,000.

Q.   And what happened then?

A. He died.

Q. What else did he tell you about that?

A. Just that dead people are heavier when they're -- dead people are real heavy. He told me that.

Q. What did he tell you about how this couple disappeared, if anything?

A. He mentioned that they pulled up in front of a house. He said it was more Angie's idea to do it than his. Pulled up, and they went in the house, and they strangled them.

Q. What did he say about how these people had been strangled?

A. With a drop cord.

Q. What did he say happened to the bodies of these people after they were killed?

A. They were buried.

Q. What did he say, if anything, about how they were buried?

A. They were buried with a backhoe.

Q. Did he ever express any concern about that situation?

A. Yes.

Q. What did he say to you about that?

A. He was worried about them surfacing. Either they were buried shallow or he was worried about Angie telling.

Q. Did you talk to Mr. Honken or did he talk to you about any plans he had to try to avoid liability for his current

case?

A.   Yes.

Q.   What did he say to you about that?

A.   That if he -- he had just beaten this monitoring band on his leg, if he would have had another week, he was going to take care of all the witnesses again.

Q.   Did he say specifically anything about who he was going to take care of again?

A.   Cobeen -- at that time Cobeen, Pat Reinert, the chemist from Chicago I believe he was and then come back and kill Angie because she was a witness to all -- she was the key to a lot of things.

Q.   What do you mean when he said he'd beaten the -- did you say something about beating an electronic monitor?

A.   Yes.

Q.   What did he say to you about that?

A.   He'd figured out how the monitor was going to say he was at home and he really wasn't.

Q.   And what did he say was the benefit of that?

A.   Well, he had -- he had proof he was home.

Q.   Did he say anything about any role for Angie Johnson in that plan or that prospect?

A.   No, he didn't, just that that was the last person he was going to kill because she could link him to the '93.  And they figured they would put pressure on her so he would

eliminate that.

Q. Did you discuss with Mr. Honken how since he wasn't out of jail, that he was in jail, he could try to do any of these things?

A. Well, as we progressed in talking -- again, it seemed like just talk -- he discussed in his guidelines book if -- well, if Tim was gone, I'd be down to this much. And that's when he discussed maybe having someone take him out.

Q. And what further conversation did you have with him about that?

A. He had asked me if I would do it, and I guess at that time I agreed to do it.

Q. So what discussions did you have about it?

A. We just -- he -- we discussed it for several days, and then he ended up giving me directions to his folks' place.

Q. All right. Let me first ask you how did he describe -- well, who did you talk about that you were supposed to kill?

A. Tim.

Q. And you said he described him as 6-2, blond hair, best friend for 13 years?

A. Yes.

Q. What did he say about where he worked?

A. He worked with him at the Jell-O plants.

Q. What did he say about what kind of car he drove, if anything?

A.    I believe it was a 1984 to '86 two-tone brown Chevy.

Q.    What did he say about where --

A.    Impala, I believe.

Q.    Pardon me?

A.    I think it was an Impala, I believe.

Q.    What did he say about where this fella lived?

A.    He lived with his folks out in the country.

Q.    Now, you said you were unable to get bond.  How were you supposed to get out of jail to do this?

A.    He was going to do that for me.

Q.    What did he say about how he would do that?

A.    Since I had been living in Texas, I had a Texas address, so I needed collateral, and he was going to take care of that for me.  He was going to have Kathy Ricks take care of it, the collateral.

Q.    Did he tell you who Kathy Rick or Ricks is?

A.    One of his girlfriends.

Q.    Did you eventually get bonded out?

A.    Yes.

Q.    Do you know how -- did you have contact with the bonding company about it?

A.    Through Lederman Bonding.

Q.    Do you know who put up bond for you to get out?

A.    Kathy Rick.

Q.    When was it that you got bonded out?

A.   August 14.

Q.   Did you discuss with Mr. Honken the timing of when you were going to get out?

A.   Yes.

Q.   What conversation did you have about that?

A.   It was important that I got out because he -- his deadline for trial was coming up soon.

Q.   Now, you said he gave you some kind of directions as to how you were supposed to find Tim?

A.   Yeah.

Q.   How did you get those directions?

A.   He gave me directions, and I copied it.

Q.   Let me show you what's marked Government Exhibit 11K. Do you recognize Exhibit 11K?

A.   Yes.

Q.   What's that?

A.   That's directions to Tim's folks.

Q.   And you're saying you copied this down?

A.   Yes.

Q.   From what?

A.   From his copy.

Q.   Now let me ask you, did you talk to Mr. Honken about this diagram?

A.   Yes.

Q.   Well, first of all, what did you do with this paper

after you got out of jail?

A.   Again, all my belongings was at Phil Parmelee's.

Q.   And then at some point you got taken back -- we'll get to this, but you got taken back into jail in November; is that right?

A.   Right.

Q.   Pardon me?

A.   Yes.

Q.   And your papers and stuff were still at Phil Parmelee's house?

A.   Yes.

Q.   And so you haven't seen this since you left -- you didn't have physical custody of it since you left Parmelee's house?

A.   No.

Q.   All right.  Do you see on the bottom right-hand part of Exhibit 11G there's a box with an X in it that says, This one?

A.   Right.  That was where Tim's folks' lived.

Q.   And what conversation did you have with Mr. Honken about how you were supposed to carry out this plan to kill Tim?

A.   Further down the road there's a bridge, and on the left-hand side there's some bends, and he said to park there, put up a barricade, and he'll stop to move the barricade, and he said to shoot him there.

Q.    Was that the first idea he mentioned?

A.    Yes.

Q.    Did you ever talk about whether you should kill him at the house itself?

A.    Yes, he did.  He did say prior to that just to go to the house and kill them all.

Q.    What did he say about that, or what did you say about that?

A.    I asked him why would he kill his mom and dad, and he just said they had him.

Q.    How did you react to that idea?

A.    I didn't think that was real smart.

Q.    So then you discussed this other idea that you mentioned?

A.    I just --

Q.    Where is -- I'm sorry.

A.    Go ahead.

Q.    Where is that depicted on the diagram?

A.    It's back to this corner by the blacktop.  There's a bend in the house there -- or bend in buildings or something he said.

Q.    Is there anything on Exhibit 11K that marks the spot where you were talking about?

A.    Yes.

Q.    What marks the spot?

A. An X.

Q. Which X?

A. It's an X with a circle around it by the -- it says two miles. Right below it there's an X.

Q. And that's where you discussed putting a barricade in the road?

A. Right.

Q. What discussion did you have with Mr. Honken about the other X that's on the right side of the diagram to the left of the word b-r-i-g-e?

A. Well, I had told him that I didn't think that was very good, so that's why we went down to this place, and further down the road he said that Tim's dad had an abandoned place down the road farther, to just park the car in there and walk down to the corner and wait for him by the barricade.

Q. And when you're talking about walking down to the corner away from by the barricade, you mean the X near the two-mile mark?

A. Right.

Q. What conversation did you have with Mr. Honken about the X up by the word bridge?

A. Again, nothing -- that was -- that was his first plan which -- one of the first plans that we chose not to do.

Q. Did you talk to Mr. Honken about how you were supposed to actually kill somebody, what weapon or method you would

use?

A.   A gun.

Q.   What did he say to you about how you could get a gun?

A.   He said he had a gun.

Q.   Where did he say -- did he say you could get the gun?

A.   Yes, he said I could -- well, he -- he did say I could get the gun.

Q.   What did he say about where it was?

A.   He said it was at Rick Held's.

Q.   Did you know Rick Held?

A.   No.

Q.   Did you agree to use that gun?

A.   No.

Q.   Why not?

A.   Because of what -- it probably went back to '93. I'm assuming it went back to '93.

Q.   Therefore what?

A.   I didn't -- I figured there was killings behind it. I'm assuming. And I said no, I didn't want it.

Q.   Did he tell you about what kind of gun he had?

A.   Yes, he did, but I really don't remember. It was a rifle I believe.

        THE COURT:  Mr. Colloton, do you have any problem with taking our noon break now?

        MR. COLLOTON:  None, Judge.

THE COURT: Okay. We'll be in recess until one o'clock. Thank you.

(Lunch recess at 12:01 p.m.)

THE COURT: Please be seated. Mr. Colloton, I interrupted you. You were in the middle of your direct examination of Mr. Donaldson.

MR. COLLOTON: Yeah. Let me try to remember.

THE COURT: Do you want me to read back what your last question was?

MR. COLLOTON: That would be helpful, Judge.

THE COURT: Question, Did he tell you about the kind of gun he had? Answer, Yes, he did, but I really don't remember. It was a rifle I believe. The Court, Mr. Colloton, do you have any problem with taking our noon break now?

MR. COLLOTON: Mr. Colloton, none.

THE COURT: None.

MR. COLLOTON: All right.

BY MR. COLLOTON:

Q. Mr. Donaldson, did you discuss with Mr. Honken when you should go out to the places indicated on the diagram to try to kill Tim?

A. Yes.

Q. What did he say to you about that?

A. He gave me the days that he would go in an hour early to

the Jell-O place. I believe it was on a Tuesday I believe.

Q. What do you mean he gave it to you?

A. He gave me the days and nights that he worked.

Q. In what form did he give it to you?

A. He had a calendar with -- put minuses and zero. Zero meant one or the other, and minuses meant the other.

Q. Let me show you Government Exhibit 11J. Do you recognize that?

A. Yes.

Q. Is that the document you're referring to?

A. Yes.

Q. And you're saying that -- where did you get that document?

A. From Dustin.

Q. Whose writing is on that document?

A. Dustin's I believe. That's the way I received it.

Q. And what discussion did you have about Exhibit 11J with Mr. Honken?

A. Well, again, on Tuesday -- the first Tuesday of the working -- the day shift they'd go in an hour early, so it would therefore be darker -- it'd be best to get -- that'd be the best time of the day to do it early in the morning when he was at that stop sign.

Q. Did you discuss how you were supposed to kill Tim if it was early in the morning and still dark or dark outside?

A. Well, he'd given me a deal on a high-powered rifle night scopes.

Q. What do you mean he'd given you a deal on that?

A. He'd given me an address.

Q. Do you still have Exhibit 11K in front of you?

A. I got 11J.

Q. You don't still have 11K which was the diagram? Do you still have that in front of you?

A. Yeah.

Q. All right. Would you look at the back of that which I think is the second page on the photocopies?

A. Okay. Go ahead.

Q. What is the information written at the bottom of the back side of 11K?

A. These are just addresses.

Q. What's at the bottom?

A. Oh, there's a deal here, but it's an address for night scopes.

Q. Are you saying you can't see it because of the sticker?

A. I can see night and amounts, scope.

Q. All right. Well, let me --

MR. COLLOTON: Any objection to showing a copy of that to the witness?

MR. PARRISH: None.

BY MR. COLLOTON:

Q. Let me show you a copy of 11K which doesn't have the evidence tag blocking it. Do you see the writing at the bottom of the back side of the second page of 11K?

A. Right.

Q. Where did you get that information?

A. From Dustin.

Q. What discussion did you have with him about that?

A. That if it was dark that I could put a night scope on it. That way I wouldn't have no trouble seeing.

Q. You could put a night scope on what?

A. On the rifle.

Q. Now, what discussion did you have with him about the specific writing on there, Night Scope International and the number underneath it?

A. He got that out of a magazine I believe. Is that what you're saying?

Q. What did he tell you about it?

A. That that's where I could -- if I needed a scope that I could get one here, a night scope.

Q. What's the writing on the right side where it appears to say 279?

A. That's the price of it. It says gun mount.

Q. All right. And did you write that?

A. Yes.

Q. Why did you write that?

A. Because, again, he said possibly this would be a place to get a high -- or a night scope and gun mounting, a gun mount.

Q. Did you talk to Mr. Honken about the plan for what you were to do after you killed Tim?

A. Yes.

Q. What conversation did you have with Mr. Honken about that?

A. Again, goes back to this diagram. He wanted me to take it back to where his -- to where my car was to be parked and leave -- throw him in his car and throw -- take it back to this abandoned place that Tim's dad owned behind them buildings and leave it.

Q. What did he want you to do after that?

A. Take the gun and throw it in a pond that was not far from there. It was real muddy water.

Q. What did he want you to do after that?

A. He wanted me to -- we discussed on Minneapolis or Des Moines. He wanted me to write a letter to Cobeen's mom and dad advising him it wouldn't be wise that their son shows up for court, for Dustin Honken's court.

Q. What do you mean when you say we discussed Minneapolis and Des Moines? What was said about those places?

A. Well, he said take to Des Moines -- or excuse me, to Minneapolis, and I -- in the final end the point was the

letter was supposed to be sent from Des Moines.

Q. Why did he say he wanted you to go to Minneapolis?

A. To take -- so there wouldn't be no fingers pointed at Angie.

Q. Why didn't you eventually plan to go to Minneapolis?

A. I told him I didn't want to drive up to Minneapolis. That's what I told him.

Q. Now, you were supposed to send a letter then from Des Moines. Is that what you're saying?

A. Right.

Q. And how were you supposed to prepare the letter?

A. Supposed to be typed. I was supposed to have purchased an old typewriter.

Q. Whose idea was that?

A. Dustin suggested all those things, and he's very intelligent. I went along with a lot of the things he said.

Q. What was the purpose of an old typewriter?

A. Not being able to go back and find out possibly where it was purchased or what typewriter it came off of.

Q. How did you know what you were supposed to say in this letter that you're talking about?

A. He'd given me -- he showed me what to put on that letter.

Q. Let me show you what are Government Exhibits 11L and M. What's Government Exhibit 11L?

A.   This is what he wanted put in the letter.

Q.   Who wrote that document in front of you, 11L?

A.   I did.

Q.   Why did you write it?

A.   He didn't want his handwriting on anything.

Q.   And where were you supposed to send that letter once you typed it?

A.   To Darrell Cobeen.

Q.   How did you know the name and address to send it?

A.   He gave it to me.

Q.   Do you see Exhibit 11M in front of you?

A.   Yes.

Q.   What's that?

A.   That's the address, Darrell Cobeen.

Q.   What did Mr. Honken say about the likely effect of these actions on his case?

A.   That his family would probably advise him to withdraw to testify against him, and he would be let go.

Q.   When you say the family would probably advise him to withdraw --

A.   Advise the son to withdraw testifying against Dustin.

Q.   Meaning who to withdraw?

A.   Their son.  I don't know their son's name.  Cobeen's son.

Q.   And that would result in Dustin's case having to be

dropped?

A. Right.

Q. What was to be the benefit to you of doing all of this?

A. Again, it goes back to that ten million he talked about. He'd talked about going halves when we got into this. He'd give it all to me if I did it.

Q. Was there ever a point at which you discussed some alternate plan to kill Tim other than your doing it yourself?

A. Yes.

Q. How did that come up?

A. Because again for -- this went on for weeks, and it was more like talk than being realistic, and at the very end it looked like I was going to get out. I said I didn't know if I could do it. So I told him I knew some El Forestros and I knew this other man that would possibly do it and I'd ask.

Q. What other person are you talking about?

A. LaDean Hummel was a man that I suggested was kind of a violent man, that he'd possibly do it, and I knew a guy at the El Forestros that would do it I said. I didn't say I knew he'd do it. I said he might do it.

Q. Did you think it would cost anything?

A. Yes.

Q. What did you decide about that?

A. We didn't know. Five or ten thousand. Weren't sure.

Q. When you started to discuss that option, how did you and

Mr. Honken think you were going to get the money to do that?

A. We talked about what I had been in trouble for in the past, and that's livestock theft, hog rustling, and he said his friend, Rick Held, was behind on a feed bill and his wife didn't have knowledge of it. Possibly he'd be interested in helping him out and helping himself out at the same time.

Q. So specifically what were you to tell Rick Held?

A. He had a note for me to give to Rick Held. It was basically to help Dustin with his lawyer fees.

Q. What was to help Dustin with his lawyer fees?

A. The hogs, the hogs that I was going to bring -- he was going to ask to use his truck and trailer and ask him if he would sell these and get a third or -- possibly a third I believe it was and the rest Dustin would get to take care of his lawyer fees. He needed money for his attorney.

Q. So you were supposed to tell Rick Held the money was going to be for lawyer fees?

A. (Witness nodded head.)

Q. Is that right?

A. Right, plus help him with his feed bill.

Q. Let me show you Government Exhibits 11H and I. Do you recognize those?

A. Yes.

Q. What are those? What's 11H?

A. That's a note that he wrote to Rick.

Q. And what's 11I at the bottom there, bottom of the same envelope?

A. Oh, I'm sorry. That's Rick Held, Mason City. That's where he was employed. He's a farmer, and he's employed at the Jell-O place where Dustin worked.

Q. How do you know that?

A. Only that Dustin told me. I don't know that.

Q. Who wrote 11I with the name and the town?

A. I did.

Q. Why did Dustin write 11H which was the letter to Rick Held?

A. Because that was -- he would more be -- he would more believe it if Dustin wrote it than I.

Q. Did you talk to Mr. Honken about your thoughts about whether you would actually do this or not when you got out?

A. In regards to --

Q. Whether you would actually carry out what he wanted you to do.

A. I assured him I would try.

Q. And did you talk about the possibility that you wouldn't do it?

A. Yes.

Q. What did you say about that or what conversation --

A. That's where again we brought in El Forestros, and that's when El Forestros and other men were brought into the

picture.

Q. Did Mr. Honken ever say anything to you about what would happen if you didn't carry out the plan?

A. Only time he mentioned just don't make him mad. I asked him what would happen. He just said not to make him mad.

Q. Let me show you some other exhibits here, Mr. Donaldson. On 11K which is the diagram with the names and the numbers on the back --

A. Yes.

Q. -- what did Mr. Honken say to you about why he wanted you to copy down those names and numbers?

A. Kathy Rick was his -- he said if I needed anything to call Kathy. And Marvea Smidt was his mother, and I was supposed to pick something up from her, a book. And Angie Johnson was basically for drugs. She was supposed to get drugs from Jimmy Rodriguez, and I was supposed to help set that up.

Q. What do you mean by that?

A. Well, not help set it up, but he had his number here that if I wanted I could call him and see if he did it or call her and see if she had gotten them. And also Jimmy Rodriguez had $200 that he had given him for work release, and he was supposed to pay it back, and he said if I needed it I could call him.

Q. Is Jimmy Rodriguez's number on here?

A.    Yes, it is.

Q.    Is that where it says Jimmy?

A.    Yes.

Q.    Did you talk to Mr. Honken about how you should communicate with him once you got out of jail?

A.    Yes.

Q.    What did he tell you about that?

A.    I had a special book with a code.  It was a book that he give me with a code that I could go by.

Q.    Let me show you Government Exhibit 11B.  Do you recognize that?

A.    Yes.

Q.    What's 11B?

A.    That's the code that he set up to communicate with him.

Q.    What did he tell you about -- in general about how that was supposed to work?

A.    Well, I honestly don't remember, to be honest, about how it works.  I don't.

Q.    Well, do you see on the piece of paper where there's a block that says page and then there's a number sign?  What was that supposed to refer to?

A.    Well, it'd be so many zeroes would be the page and the paragraph and the word and then the letters.  So I had a system so he could read -- the first word in a paragraph of the page would be an R, and it would set up words is what it

did.

Q.   And you're saying you got a book from him that you were supposed to use for that purpose?

A.   (Witness nodded head.)

Q.   You have to answer out loud.

A.   Yes.  I'm sorry.

Q.   Let me show you Government Exhibits 11C and D.  Do you recognize Government Exhibit 11C there?  Do you recognize Government Exhibit 11C?

A.   Yes.

Q.   What's that?

A.   It's Kathy Rick -- that's her number.

Q.   And what's on the back of 11C?

A.   Phil Parmelee's name and number.

Q.   Who wrote that information down?

A.   I did.

Q.   Who was Phil Parmelee again?

A.   It's a person when I bonded out of here I bonded to his address.

Q.   And then what's Exhibit 11D?  It's on the same envelope there, that small piece of paper.

A.   Oh.  Again, Kathy Rick, Mason City.  It's her telephone number.

Q.   Let me show you Exhibit 11E.  Do you recognize that?

A.   Yes.

Q. What's Exhibit 11E?

A. It's some more chemicals that are needed to make metham -- meth.

Q. Is this more of the chemicals that Mr. Honken wanted you to get when you got out?

A. Yes.

Q. Did you write this stuff down?

A. Yes.

Q. Where did you get the information to write it down?

A. From Dustin.

Q. Let me show you Government Exhibit 11N. What's that?

A. It's a map of Iowa.

Q. Where did you get that?

A. Dustin gave it to me.

Q. What did he say about why he was giving you that?

A. To better guide me in that area that I'm not knowledgeable about around the Mason City area.

Q. Where are you from?

A. I'm from Sioux City area.

Q. Let me show you Exhibit 11O.

A. That's just an envelope that he had given me, put some personal things in it.

Q. And let me show you Exhibit 11A. What's that?

A. That's just an envelope with my attorney's name on it, Peter Van Etten.

Q.    And let me show you Government Exhibit 11P.  What's that?

A.    That was just a magazine that I had inquired at the D unit, D block, and I told Dustin that it reminded me of him.

Q.    Who's pictured on the front of that cover?

A.    Just says, The odyssey of a mad genius.  I can't even think of his name.

Q.    Now, you said you were released from jail on August 14 after Mr. Honken arranged for you to be bonded out; right?

A.    (Witness nodded head.)

Q.    You have to answer out loud.

A.    Yes.

Q.    Then you went to Phil Parmelee's place?

A.    Yes.

Q.    And you stored your belongings there?

A.    Yes.

Q.    Did you store all the exhibits that I've shown you in the 11 series at Parmelee's house?

A.    Yes.

Q.    Did you ever take any action on the plan to kill a witness or witnesses -- a witness that you had discussed with Mr. Honken?

A.    No, I didn't.

Q.    Did you ever make any contact with Rick Held?

A.    No.

Q. Did you ever make any contact with Jay, the guy who had the tank?

A. No, I didn't.

Q. Did you ever make any contact with Angie Johnson?

A. No, I didn't.

Q. Did you ever make any contact with anyone from the El Forestros?

A. No.

Q. Did you ever make any contact with LaDean Hummel?

A. No, I didn't.

Q. Did you ever have any contact from outside the jail with Mr. Honken when you were out --

A. No, I didn't.

Q. Did you ever contact Mr. Honken's mother?

A. No.

Q. Did you ever purchase any of the books that Mr. Honken had listed?

A. No, I didn't.

Q. Did you ever visit the area of the location of Tim's parents?

A. No, I didn't.

Q. Did you ever take any steps in furtherance of the plan that you had to kill Tim?

A. No, I didn't.

Q. Did you make contact with Kathy Rick?

A.   Yes.

Q.   What was the nature of your contact with her?

A.   Because she wanted some money back from that bond which Phil kept saying he would pay her some money.  He was trying to help me out.  She kept calling, and I didn't have it.  So I talked to her several times on the phone.

Q.   What was your understanding with Mr. Honken as to your responsibility for that bond?

A.   He wasn't concerned about the money.  He was concerned about getting done what he wanted done.

Q.   Did you stay at Phil Parmelee's house the whole time you were out on bond?

A.   No, I didn't.  I stayed there like two weeks, and then I moved to Steve White's place.

Q.   What did you do with the paperwork that I've showed you when you left Parmelee's house?

A.   I never seen that.  Once I left jail, I never seen it again till I was in jail again, till I was --

Q.   Where did you leave it?

A.   I left it at Phil Parmelee's.

Q.   Did you have a state case going then?

A.   Yes.

Q.   Criminal case?  And what happened to that case while you were out on bond?

A.   I pleaded guilty to five-year sentence and was supposed

to be in court on November 7, and I failed to be there.

Q. What happened when you failed to be there? Eventually what happened?

A. I was caught 13 days later by the bondsman.

Q. What happened to you after you got caught?

A. I was brought into Woodbury County Jail.

Q. Where were you put in the Woodbury County Jail?

A. C block.

Q. Did you have any contact, visual or verbal, with Mr. Honken?

A. Yes. I saw him -- I saw him walk by once, and I wrote him a letter one time, a short letter.

Q. What happened when you first saw him again when you were back in the jail?

A. He had that look in his eyes like he had when we talked about Tim.

Q. Describe that look.

A. A evil look.

Q. What did you do when you first saw him?

A. I didn't want to see him. I just went back to my room, and then I -- I don't know if it was that day or what day it was I wrote him a short note. I didn't have no paper. And I said I'd get back to him, and he never got back to me, so I knew something was wrong right there. I wrote a note through the door. He was in D block.

Q. How did you end up having contact with the federal government in connection with this whole matter?

A. Prior to that there was a guy that was in his unit that made a noose. He said I was dead, and he somehow got Dustin's name involved, and I knew what he was talking about anyway. And so I talked to my attorney about it, and he contacted you.

Q. At some point then did a federal agent come to visit you at the Wood --

A. Yes, he did.

Q. At the Woodbury jail?

A. Yes.

Q. What, if anything, happened in regard to this whole matter on December 18 of last year?

A. On December 18?

Q. Yeah.

A. I'm not positive of the date, but after talking to these people, I was sitting up on the rail talking to a little Vietnamese guy, and the guy that was two doors down from me yelled over to me several times, said, Somebody's shooting at you. And I immediately knew who it was. And I took my time going over there, and he's pointing a gun at me.

Q. Who is?

A. Dustin.

Q. Where were you?

A. I was in C unit on the top rail.

Q. Where was Mr. Honken?

A. He was in the rec. room across the hall with glass windows.

Q. What do you mean he was pointing a gun at you?

A. Well, pointing at me like a gun.

Q. You mean with his hand in --

A. Right.

Q. You have to let me finish the question. You mean with his hand in the shape of a gun?

A. Right.

Q. What else did you see through the window at that time?

A. Then he said I was a -- a snitch, and I just said no. I went back to my room. I stayed there. Everybody kept looking up there. And then Boo Dean came in, and he was taking it as a joke kind of, said that he said I was a dead man and he was supposed to come up and kick the shit out of me.

Q. Who's Boo Dean?

A. He's a guy that was in C unit with me.

Q. What do you mean he was taking it as a joke?

A. Well, I don't -- I don't think he took it as serious as it was.

Q. How did you take it?

A. Serious.

Q. Why did you take it seriously?

A. Because what I know of Dustin.

Q. How do you know he was calling you a snitch if you were --

A. Because I --

Q. Let me finish the question.

A. Excuse me.

Q. -- if you were separated by a window?

A. Because you could read -- it was clear. You can read lips.

Q. Have you had any further contact with Mr. Honken after that occasion before today?

A. No.

Q. Were you moved out of the Woodbury County Jail?

A. Yes.

Q. Shortly thereafter?

A. Yes.

Q. Now let me go through what happened in your case in state court. You eventually ended up having a plea and a sentencing in that; right?

A. Yes.

Q. Now, is it right that initially you were charged with two counts of theft?

A. Yes.

Q. And you were charged as an habitual offender; is that

right?

A.   Yes.

Q.   Because you had -- is it two or three --

A.   Yeah.

Q.   Pardon me?

A.   Right.

Q.   You had three prior theft convictions?

A.   Yes.

Q.   And then after you failed to appear for sentencing, you were charged with another failure to appear?

A.   Yes.

Q.   Not another but I mean you were charged with failure to appear; right?

A.   Yes.

Q.   Then did you eventually work out a plea agreement with the county attorney?

A.   Yes, I did.

Q.   Did you plead to two counts of theft and one count of failure to appear?

A.   Yes.

Q.   As part of the plea agreement, did the county attorney drop the habitual offender enhancement?

A.   Yes.

Q.   What was your understanding of the benefit of that to you?

A. The only benefit, if any, was that he came to my sentencing.

Q. No, no. I'm talking about the benefit of the dropping of the habitual offender enhancement.

A. Five years. It saved me five years.

Q. And -- now, you mentioned somebody coming to your sentencing. Did you and your attorney subpoena a DEA agent to come to your sentencing?

A. Yes, we did.

Q. Did he testify about your assistance in this investigation?

A. Yes.

Q. Did he testify that you had given substantial assistance in the view of the government?

A. Yes.

Q. Did he make any recommendation to the judge specifically as to what you should get as a sentence?

A. No, he didn't.

Q. What was the potential sentence for you in that case?

A. Fifteen years versus ten.

Q. You mean --

A. I got 10; I could have got 15.

Q. You could have had three 5-year consecutive terms?

A. Right.

Q. And the judge decided to give you what?

A.    Two.

THE COURT:  Were they consecutive or concurrent?

THE WITNESS:  Consecutive.

BY MR. COLLOTON:

Q.    You mean the two 5 years were consecutive to each other?

A.    Right, right.

Q.    What happened to the third 5-year?  Was that run concurrent?

A.    Concurrent.

Q.    And you say that the habitual enhancement would have added another five.  Do you understand how that works?

A.    Well, the habitual wasn't -- it wasn't involved in that plea bargain.  There was no habitual.

Q.    But originally you had an habitual enhancement; right?

A.    Yeah.

Q.    What penalty did you understand that to carry?

A.    Well, if you got five years, you can get ten more added on to it with a habitual.

Q.    So -- okay.  Now, let me see.  As far as any arrangement you've had with the federal government, you had what we call a proffer letter; right?

A.    Yes.

Q.    And that proffer letter said that you would not have used against you directly anything you said in your testimony; right?

A.   Right.

Q.   And that's as far as you've gotten as far as any formal agreement or any agreement, isn't it, with the government?

A.   Yes.

Q.   Has anybody promised you anything more than that?

A.   Nothing.

Q.   Do you have an understanding whether you have any potential exposure in federal court?

A.   Rephrase that question again.

Q.   Is it your impression that you're likely to be charged with anything or not charged?

A.   I assume that I won't be, but I have no guarantees.

Q.   And have you received any other -- I mean, have you received -- when the DEA agent came to talk to you, he'd give you something to drink or something like that.

A.   Right.

Q.   But other than that, have you received any other benefits from the government?

A.   No.

          MR. COLLOTON:  That's all I have, Judge.

          THE COURT:  Thank you, Mr. Colloton.

          Mr. Parrish?

          MR. PARRISH:  Thank you, Your Honor.

                         CROSS-EXAMINATION

BY MR. PARRISH:

Q. You're how old, sir?

A. Forty-four.

Q. Are you married?

A. No.

Q. Ever been married?

A. No.

Q. Any children?

A. No.

Q. When's the last time you had a job?

A. December -- three weeks before I got arrested. I was working in Fort Worth, Texas.

Q. And how long did you work there?

A. I've been working for that guy for over a year.

Q. Doing what?

A. Hot tar.

Q. And what did you do before that?

A. Worked for Gleeson Construction.

Q. Where?

A. Right here in Sioux City.

Q. How long did you work for them?

A. About eight months.

Q. What'd you do before that?

A. I was in prison.

Q. Uh-huh. How long were you there?

A. Over a year.