**8**



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

vs.

DUSTIN LEE HONKEN,

     Defendant.

_____/



No. CR 96-3004

TRANSCRIPT OF SENTENCING

Volume 3

    The Sentencing held before the Honorable Mark W. Bennett, Judge of the United States District Court for the Northern District of Iowa, at the Federal Courthouse, 320 Sixth Street, Sioux City, Iowa, February 17, 1998, commencing at 9:02 a.m.

APPEARANCES

| | |
|---|---|
| For the Plaintiff: | PATRICK J. REINERT, ESQ.<br>STEVEN M. COLLOTON, ESQ.<br>Assistant United States Attorneys<br>Suite 400<br>401 First Street Southeast<br>Cedar Rapids, IA 52407-4950 |
| For the Defendant: | ALFREDO PARRISH, ESQ.<br>Parrish, Kruidenier, Moss,<br>  Dunn & Montgomery<br>2910 Grand Avenue<br>Des Moines, IA 50312 |
| For Witness Redden: | DOUGLAS L. PHILLIPS, ESQ.<br>Klass, Stoos, Stoik, Mugan,<br>  Villone & Phillips<br>Suite 300<br>627 Fourth Street<br>Sioux City, IA 51101 |
| Also present: | Jay Jackson, Probation Officer<br>Dave Mizell, DEA |
| Reported by: | Shelly Semmler, CSR, RMR<br>320 Sixth Street<br>Sioux City, IA 51101<br>(712) 233-3846 |

THE COURT: Morning. Please be seated. This is United States of America versus Dustin Lee Honken, Criminal Number 96-3004. This is a continuation of the sentencing/evidentiary hearing that we started sometime back whenever it was. And, let's see, Mr. Honken's personally present represented by Des Moines Counsel Alfredo Parrish. United States is represented by Assistant U.S. Attorney Pat Reinert.

Mr. Reinert, where were we in the government's case when we left off?

MR. REINERT: Your Honor, we were kind of midstream in the government's case. We have -- I have drafted up a couple of stipulations that would take care of a number of witnesses' testimony to assist the Court and save the Court some time. I faxed those to Mr. Parrish late last week, and we discussed them. One of the stipulations, there is no objection to that as a stipulation for expected testimony. The other stipulation which is -- we agree that that would be what the person would testify. However, Mr. Parrish asserts the attorney-client privilege on that issue. It's a conversation that the prior defense counsel, David Thinnes, had with the prosecutor in the case discussing future trial of the case. So it's a conversation -- it simply relays a conversation that Mr. Thinnes had with me on the telephone. Perhaps the Court needs to look at it before it can

understand. It's kind of a cryptic description of a conversation. But we do have those prepared as stipulations to cover probably four or five witnesses which we are now able to avoid by stipulation.

THE COURT: Could I see the stipulation?

MR. REINERT: Your Honor, Exhibit 1, it's my understanding there's no objection to that. It has not yet been signed by Mr. Parrish or his client, but it's my understanding there's no objection to that as a stipulation amongst the parties regarding the testimony of these witnesses.

MR. PARRISH: Oh, I'm sorry.

THE COURT: Have you had a chance to go over Exhibit 1, Joint Exhibit 1, Mr. Parrish, with Mr. Honken?

MR. PARRISH: Your Honor, I think we -- on the first two paragraphs -- on Lori Lewis's testimony we have no problem. Scott Lanagan testimony which is number 2, we have no problem. Number 3, Mark Hein, we have no disagreement with that. Number 4, Woodbury County Jail and who the particular snitches were who testified, we have no problem with that. And finally, with regard to number 5, we have some question on number 5, and that's what we'd like to get resolved. I think we're going to work it out where it won't be a problem, but I told the government we ought to put the scientific stuff on so we won't hold the experts on this, and

we can easily resolve this afterwards.

We do have objections to Exhibit 2 because it's not so much a question of research, but as I understand Judge Melloy, Judge Melloy had called me probably two or three months ago and asked me if I was doing this part of the case would I mind getting involved in the grand jury matter with regard to -- I think it's Mr. Thinnes's testimony in Cedar Rapids. And I told him I would agree, if the Court wanted me to, to work on that, and Dustin wanted me to help him on it. But I'm not prepared today to agree at all -- and that's what I told the government -- to agree at all with Joint Exhibit Number 2.

THE COURT: When you say you don't agree, do you agree that the conversation took place and that was the substance of the conversation but you're asserting an attorney-client privilege?

MR. PARRISH: Exactly. I have to assert attorney-client privilege, Your Honor, on that Joint Exhibit Number 2, and I'm not agreeing that this conversation took place because --

THE COURT: Well, then there is no stipulation.

MR. PARRISH: At this point there is not, right.

THE COURT: That's what we do with it.

Now, on Joint Exhibit 1, you're stipulating to the first four -- not really paragraphs because there are

additional paragraphs but numbers 1 through 4, and you're not stipulating to Mr. Basler at this time, but you may when you have some time --

MR. PARRISH: When Dustin finishes it, Your Honor, I think that there's a good possibility we will finish that, we will stipulate to that.

THE COURT: Well, why don't we wait and talk about Joint Exhibit 1 until after Mr. Honken's had an opportunity to review that portion that the parties have yet to work out a stipulation on. Is the government ready to proceed with your evidence?

MR. REINERT: We are, Your Honor.

THE COURT: You may call your next witness.

MR. REINERT: United States will call John Meyers at this time. We were going to -- we do have a matter, a factual matter, with Mr. Cutkomp. Due to some miscommunication between myself and the marshal, Mr. Cutkomp's not available, so we'll have to take him a little bit out of order. He will be testifying about the purchase of the five-gallon toluene can, when that toluene was purchased and whether it was full when it was purchased and things of that nature. But I think we can take the chemists out of order and put them on. It's my understanding that the defense chemist has a plane out earlier in the afternoon, so we need to accommodate that schedule.

THE COURT: As I understand the government's problem, they said the purchase of the toluene can, not can of toluene; is that correct?

MR. REINERT: A full can of toluene, Mr. Parrish.

MR. PARRISH: Well, there's a can. I don't want to screw up the record here. There's a can I think that's empty, and you're not referring to that.

MR. REINERT: There's a can that was seized at the scene that had some toluene left in it. That can was purchased in the fall of 1995 by Honken --

THE COURT: Well, why don't we -- now you're testifying. Let's just -- I'm here to take evidence from witnesses, and that's what I want to do. So if you have a witness, put the witness on.

MR. REINERT: United States would call John Meyers.

JOHN MEYERS, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated here.

MR. PARRISH: Your Honor, I will state by agreement of counsel Dr. Moriarty from Chicago is here at counsel table, and I believe that through his testimony which will be right after this the government -- we would agree that the government's expert will stay in, and I think that's part of the record in this matter.

THE COURT: So Rule 615 is being waived for purposes of expert testimony to allow the experts to sit in on each

other's testimony.

MR. REINERT: That's correct, Your Honor, and actually we have a second expert sitting here at table to assist me.

THE COURT: Would you state your full name, please, and spell your last name.

THE WITNESS: It's John A. Meyers, M-e-y-e-r-s.

THE COURT: Mr. Reinert?

DIRECT EXAMINATION

BY MR. REINERT:

Q.   Mr. Meyers, where are you employed?

A.   I'm a senior forensic chemist for the federal Drug Enforcement Administration in Chicago, Illinois.

Q.   And how long have you worked as a forensic chemist for DEA?

A.   With DEA and its predecessor agency since June of 1970, a little over 27 and a half years.

Q.   What kind of training and experience did you have initially to become a forensic chemist with DEA?

A.   The first six months with what was then the Bureau of Narcotics and Dangerous Drugs was a formalized on-the-job training program that orients the chemist towards the analysis of controlled substances and towards the techniques that were available at that time.

Over the last 27 years as the techniques have

evolved and new techniques have been added, additional training has been required and taken.

Q.   Now, as part of that initial six months, are there tests given or examinations to determine your abilities to successfully analyze substances?

A.   There's a training officer assigned to the individuals, and he or she monitors the progress of that individual along with the supervisor that the individual is working under. And they make the determination as to whether a person is qualified to start analyzing evidentiary material.

Q.   And did you successfully complete that training program such that you were allowed to analyze evidentiary material?

A.   Yes, I was.

Q.   Prior to joining DEA, what type of education and experience did you have?

A.   I have a bachelor of science degree majoring in chemistry from the American University in Washington, D.C., and I attended a semester of graduate school at the University of Wisconsin School of Pharmacy.

Q.   And I presume you successfully participated in those programs?

A.   Yes, I did.

Q.   You talked about earlier -- this is a clandestine laboratory case.  What's been your experience with investigating places where individuals illegally manufacture

drugs?

A.   I've been called out on numerous occasions to participate in seizures of clandestine laboratories.  Part of our responsibility at that time is to ensure the safety of the individuals in the laboratories because in some instances they're rather dangerous and not up to scientific standards.

          The other part is to observe the -- what is there in terms of equipment, chemicals, processes to make a determination as to the type of drug that's being manufactured, the methods that are being manufactured, and to make an estimation of the capacity of that laboratory to produce either based on the equipment or the chemicals, paperwork the sum total including the analysis of samples that were taken at that time that were analyzed in the laboratory, in our laboratory, after that time.

Q.   Approximately how many clandestine laboratories have you participated in the investigation of?

A.   I would say at least 30 directly.  Additionally, in our laboratory when an individual goes out on a clandestine lab and they come back, we have a discussion of that so at the end all of the individuals in our laboratory might be more aware of the various types of synthesis routes or maybe unique qualities that were seen in one lab over another.  So it's not only direct experience with laboratories on the site but also experience that's gained through the sharing of

knowledge in our laboratory.

Q.   What kind of specialized training have you received specifically regarding the synthesis methods for methamphetamine production?

A.   Part of the training program was actually to do a synthesis.  Over the series of years as we've had different types of laboratories, different types of synthesis available, we've collected the articles that have been available, the articles that we've normally seen at laboratory sites, and tried to expand upon that.  We have one individual in our laboratory that spent a lot of time doing that, and it is a -- an extensive resource collection for us to view and to become more knowledgeable.

Q.   Are you a member of any professional organizations?

A.   Yes, I am.

Q.   What are those?

A.   I'm a member of the American Chemical Society, the Midwestern Association of Forensic Scientists, the American Academy of Forensic Sciences, and the Society for Applied Spectroscopy.

Q.   Are those professional organizations related to your work in forensic analysis?

A.   The middle two, the Midwestern Association of Forensic Scientists and the American Academy of Forensic Scientists, are organizations for people in the forensic environment.

The American Chemical Society and the Society for Applied Spectroscopy are general chemical societies.

Q. Have you testified in court as an expert about clandestine laboratories before?

A. Yes, I have.

Q. In what courts have you testified?

A. In federal courts in Michigan, in Ohio, in Indiana, in Illinois, Wisconsin, Kansas, Missouri at least.

Q. Have you testified in state courts as well?

A. Yes, I have.

Q. And in those same states?

A. Same states including -- our laboratory covers a 13-state region, and I've testified in every state in our region.

Q. About how many times have you testified total as an expert regarding methamphetamine laboratory productions?

A. For laboratory productions I would say at least 25 times.

Q. You talked about forensic chemistry or going into a clandestine laboratory. Could you describe for the judge what you do when you go into a laboratory?

A. There currently is an established procedure in DEA. The chemists, we get involved in what is known as phase 2 or the second part which is the assessment part. The first part is the actual seizure. The agents go in to secure the premises

and the individuals. The chemist comes in as a part of a team to assess the potential dangers in the laboratory, the location of any of the equipment or chemicals, and to determine whether there are any dangers present that need to be neutralized prior to the examination, the photographing, and the collection of evidence.

Q. What do you do when you -- how do you determine the method of production in a particular lab when you get into it?

A. There's a variety of different ways. One is the equipment that's available. One is the chemicals that are available. The other is any notes or journal articles or copies of books or even books themselves that are available. In some instances the actual determination of the synthesis route is done after the fact. It's also based on the analysis, what we see from the samples that were removed.

Q. When you -- once you amass what chemicals they have on hand and the articles and things of that nature, how do you determine a production capacity for a laboratory?

A. The standard procedure with DEA irrespective of any other information is to determine based on maximum theoretical yield; that is, assuming 100 percent conversion from the precursors to the finished product.

Q. Could you explain to the judge what maximum theoretical yield is? Is that -- if you're going to take a beaker of one

thing and a beaker of another thing and mix it together in kind of wet chemistry, can you really get a maximum yield?

A.   No.   In most cases I've not seen any cases where they've gotten 100 percent yield, but this is the policy that was handed out by DEA.   And, as I mentioned, in lieu of any other information, that's how the production capacity is figured out.

Q.   Now, in the normal scientific community, is there a use for doing a maximum theoretical yield calculation on any particular experiment?

A.   Basically a chemist is -- to a certain extent when they report what their yield is is demonstrating their ability to drive the reaction in the direction that they want, to get the finished product that they're really trying to decide. If they're at 80 or 90 percent, that's a good yield.   If they're at a lower yield, there may be somebody that would come along later, try the synthesis with some variations to see if they can increase that yield over time.   But in most instances, the reactions, the syntheses that are reported in the literature, the individuals who do the reporting put some sort of a yield or some sort of a value on the ability of this reaction to create the finished product.

Q.   So if in a journal article or someone's calculations they say they got an 85 percent yield, that would be 85 percent of the maximum theoretical yield?

A.   That is correct.

Q.   When production capacity is done, do you look at batch size or a single run, or do you look at multiple runs utilizing all of the most abundant precursors?

A.   With respect -- in most instances we may look at a batch size if we can determine that.  But we're also looking at the, if you will, absolute amount that could be made based on the chemicals that were present and only the chemicals that are present unless we are given additional information as to other chemicals that may have been seized either at a different site that are related to the particular case that we're working on.  But in most instances it's based on the materials, that is, the chemicals, the glassware, the paperwork that's seized at a lab site.

Q.   What if you have certain items in a production capacity which may be missing that are easily obtained or could be made?

A.   If they're readily available, we might so state that in the production capacity report, but that doesn't eliminate the possibility of the precursor chemicals being manufactured or being used to manufacture a drug.

Q.   Were you involved -- we talked a little bit about theoretic yield, and there's another term that is sometimes used called a practical yield.  What's that?

A.   Practical yield is what an individual would reasonably

expect to receive in terms of the finished product which is always somewhat less than a maximum theoretical yield.

Q. Were you involved in the seizure of the lab in this case at Dustin Honken's residence?

A. Yes, I was.

Q. Were you present at the scene of the search?

A. Yes, I was.

Q. When you entered were you able to determine the production method?

A. There was a good indication of the production method based upon the chemicals that were there, based upon the glassware and the other apparatus that were available, also on the articles that were found in that residence. But the absolute synthesis route or route for each batch was really, to use a phrase, nailed down later on.

MR. PARRISH: I missed that.

THE WITNESS: Was nailed down later on.

BY MR. REINERT:

Q. And, in fact, did you create Exhibit 23? I think that's in front of you.

A. Yes, I did. This was a report that I wrote later after the seizure.

Q. First of all, looking at the equipment, in following the method of production that was determined at the lab, what was your first clue in the written documentation as to what was

the method of production of methamphetamine at the laboratory?

A. I believe if you look at Exhibit 23 behind the tab labeled step 1, this is a copy of a journal article that comes from Practical Methods of Organic Chemistry and describes the chlorination of toluene or the creation of benzyl chloride from toluene.

Q. Actually, sir, if you could turn about three pages before or four pages before where it says step 1, that first handwritten document -- it's page 5 --

A. Yes.

Q. -- where was that seized?

A. That was in a drawer in the kitchen. That drawer was in a cabinet that was adjacent to the doorway going into the garage where the actual laboratory was being operated.

Q. For the record, could you go through -- what does this document show on page 5?

A. This was a good indication at the time of the seizure that the individual had knowledge in this multi-step process initially starting with toluene; could also start with benzene, but I think anybody looking at it could notice that if you have to pay $75 a gallon for benzene -- you can do the same synthesis with toluene at $8 a gallon -- there's a certain economy to starting with toluene.

Then going on down through on the right-hand side

actually, it shows the toluene plus the chlorine gas making the benzyl chloride which is in the upper right-hand corner, going down on the right-hand side adding the sodium cyanide to create the benzyl cyanide, then an arrow down to the phenylacetone. Actually the benzyl chloride can be used either to make the phenylacetone or phenyl-2-propanone directly or it can be used to create the phenylacetic acid which is also written out on this particular document, below that the methyl amine which can either be commercially purchased or can be produced. And the methyl amine with the phenylacetone can produce the methamphetamine.

Q. In looking at the --

THE COURT: Mr. Reinert, I don't have a copy of Exhibit 23. Your trial exhibit book indicates it's in a separate book. I don't have a separate book.

MR. REINERT: We had provided that to the Court.

THE COURT: Well, you may have, but I don't have it, so if you want me to follow along --

THE WITNESS: He can use this copy.

MR. REINERT: I think I've got another copy here, Your Honor. I thought we had -- I think we provided it to the Court, but I do have an extra copy.

THE COURT: Thank you. Thank you.

BY MR. REINERT:

Q. In looking at the method of production you found on the

document that's on page 5 of Exhibit 23, was there any equipment that you found not to be present at the scene, to be missing?

A.    The only missing equipment was for the last stage, to take the phenylacetone with the methyl amine and produce the methamphetamine.

Q.    And what equipment was -- what's that commonly called, that piece of equipment?

A.    One of the methods used what's known as a hydrogenation reaction.  It uses a shaker where hydrogen gas is introduced into it.  It's under pressure.  There's a number of different ways that -- a number of different catalysts that can be used to cause the reaction of the phenyl-2-propanone with the methyl amine to produce methamphetamine.

Q.    What's that -- have you ever seen that device manufactured?

A.    Yes.

Q.    What's commonly used to manufacture that shaker?

A.    The ones that I've seen that are homemade usually have some sort of a board as a stable base.  It has an electric motor.  It has some sort of a can that can be pressurized.  The can is on an axle, and the motor is set up with an offset axis so that it causes the can to shake I would say somewhat similar to a paint shaker that you would see in a hardware store.  But normally that action is way too violent for what

I've seen of the hydrogenation reactions. It's more of a gentle back-and-forth rocking motion of this can that the electric motor provides. And the hydrogen is introduced from a hydrogen cylinder, compressed gas into that pressurized container.

Q. What's that shaker commonly called?

A. Well, besides a shaker, there's one company that -- Parr is the name of the company, P-a-r-r, and they refer to it as a Parr bomb because of the pressure of the hydrogen being flammable. I've had one instance when I was in college where one of those actually did explode.

Q. So would some people also call that a hydrogen bomb?

A. It can be called that, yes.

Q. In -- turning back to page 35 of your exhibit, the book called The Secrets of Methamphetamine Manufacture --

A. Yes.

Q. -- does that discuss the use of a Parr bomb or a hydrogen bomb?

A. Yes. Actually if you look at page 36 which is the next page of the table of contents, chapter 11 discusses the way of the bomb.

Q. What chemicals did you find on site?

A. We found the toluene. We found containers that had residues that turned out to be benzyl chloride, benzyl cyanide, and the reaction by-products that one would assume

or normally expect to see from a reaction of toluene to make benzyl cyanide -- excuse me, benzyl chloride and from benzyl chloride to benzyl cyanide. We found phenylacetic acid. There was a nitrogen tank. There was a large container of -- I believe it was calcium hydrochloride that could be used to make the chlorine gas. There was a gallon jug of sulfuric acid that was filled with a dark residue. There were a number of empty Everclear bottles that could be used for the alcohol in the stage. I believe there were other chemicals, but right offhand I don't remember them. There was manganese chloride also.

Q. You talked about reaction by-products. Could you explain what a reaction by-product is?

A. When a synthesis is started, chemicals are combined, they're heated. The ideal circumstances of the desired finished product is obtained. If temperatures vary even under the normal course of a reaction, some of the original ingredients react in ways that are not desired, and they create other compounds that are normally removed through distillations, through recrystallizations, through some sort of a process to clean up and get the finished material that's desired.

Q. You just used a whole bunch of words that I don't have a clue about. If you could explain what a distillation is or a recrystallization.

A.   A distillation apparatus, maybe most people would be more familiar with alcohol as a distilled spirit, basically a material that's in solution.  If the temperature is raised under that container, it creates the liquid into a vapor stage.  A distillation apparatus is basically a jacketed glass tube.  The outer jacket has cold water running through it.  The tube is placed so that it -- as the heated vapor condenses, instead of coming back into the reaction vessel, it then flows into another container.  In many instances, distillation is used in synthesis routes to clean up or to remove the desired product, either the desired product from the by-products in the starting ingredients or to remove the by-products or starting ingredients from the desired product.

Q.   How does one, if they're going to do a distillation of an item, determine what's going to come up the condensing tube first versus second versus third?

A.   If they have copies of journal articles that describe the method and they follow that method, the individuals that did it first that reported this particular synthesis have determined possibly by temperature that certain constituents come over at a given temperature.  Say a distillation temperature is held to a certain level for a period of time until a certain amount of the solvent or the liquids have come over.  That material is separated.  The temperature is raised, and another portion is removed.  By their analysis

they determined which was the desired portion and which was the portion that contained either the precursors, solvents that were used or the by-products.

Q. You talked about the toluene. In what container was the toluene found?

A. That was in a five-gallon metal can.

Q. Was the can full or partially full, empty? Could you describe that?

A. It had been opened, and a portion of that had been used.

Q. In the different methods of production that you've seen over the years, how does this method compare with other methods that you've found?

A. This is one that is not normally seen because it is and does require a greater level of sophistication of the individual partially because it's multiple steps, you're making different compounds, taking the results of that reaction, forming a different compound. In a way it's kind of like building blocks. You start with one. You add more to it to get to the final product. A lot of the synthesis routes we see are one- or two-step synthesis routes with clean-up. This requires a greater degree of sophistication upon the individuals who are using it because it is more complex, because it uses things such as the distillations that a lot of the other drug syntheses do not use.

Q. Are you aware of any -- you said you've done -- been

involved in hundreds of labs over the last number of years. Are you aware of any other laboratories utilizing this method of production?

A.    I've seen two other labs in the 27 years that I've been involved in.  I've heard of other instances, but I would say that if I were asked to give a percentage on the number of labs involving this particular multi-step process, I would say it would be less than 5 percent of the total labs that we've seen, and it could be closer to 1 percent.

Q.    Now, turning specifically to this laboratory, utilizing the toluene as your starting -- your first building block, going through the steps that you've outlined in Exhibit 23, if you could briefly summarize those for the judge -- I think you do it pretty well in the first three pages -- just as to what items are produced from the toluene.

A.    In the first step which is on page 1 of Government's Exhibit 23, the toluene is used to create or produce the benzyl chloride.  The benzyl chloride is cleaned up.  It's then used as on Government's Exhibit 23, page 2 with the sodium cyanide to create benzyl cyanide.  The benzyl cyanide is in turn used to create the phenylacetic acid.  The phenylacetic acid is in turn used to create the phenyl-2-propanone or phenylacetone.  In the final step, the phenyl-2-propanone with methyl amine creates the methamphetamine.

Case 3:10-cv-03074-LTS-KEM    Document 19-8    Filed 06/06/11    Page 24 of 209

Q.    In the first step you talked about some of the items or the equipment that we talked about.  What were some of the equipment that was used -- that would be used in the production of methamphetamine that was actually seized at the site?

A.    The -- one of the first items that I observed, there were 2 five-gallon plastic cans that were connected together with tubing that required that the lid be drilled and a fitting placed in there, actually two fittings.  That was also connected to a nitrogen tank and then subsequently brought up on to a work bench where there was a reaction flask.  This is consistent with the production of benzyl chloride from toluene.  The two large containers are used to create the chlorine gas.  The nitrogen gas is used to basically direct the chlorine gas into the reaction vessel.

Q.    Perhaps -- since we're going to be talking about what you saw at the lab, maybe it would help the Court if we went through the photos as we talked about this.

          MR. PARRISH:  May I just have one clarification, Your Honor, on one point?  Did you say connected to a hydrogen tank?

          THE WITNESS:  If I did, I misspoke.  It was a nitrogen tank.

          MR. PARRISH:  I thought so.  Thank you.

BY MR. REINERT:

Q. First in Exhibit 25 -- I think you've got that in front of you -- turn back to page 5.

A. Page 5 was the entry door into the garage area from the outside. It was the first view that anyone had from that location as to what was available in there. What you could see in this picture directly in front is the orange cylinder that's the nitrogen gas. On the right-hand side, I think the thing that draws the attention to it is a -- looks like a yellow stick which is a thermometer. That's on a distillation tube that's set up for reflux.

Q. What's a reflux?

A. A reflux is basically a way of getting a reaction to go in the direction that you want. The material is heated. Again, it's created into the vapor form. This condenser is cooled, but instead of as in a distillation the liquid going to a different container, it comes back into the same container. And it basically adds energy to the reaction to cause it to go in a desired direction.

Q. What's that -- what are some of the other items in -- on page 5 that you want to point out to the Court?

A. All the way in the back towards the back door, there's a white -- large white can with -- it's hard to tell the color here, but it was a blue top that had the chemical, the calcium hypochloride that can be used to make the chlorine gas. Some of the other parts that I described earlier are

somewhat hidden behind the nitrogen tank, and other pictures show them clearer.

Q. I see there's a white can or a white jug right in the middle of that photo. What is that?

A. That's a gallon container of muriatic acid. It's a dilute hydrochloric acid solution, and it can be used to create the chlorine gas.

Q. Now, you probably should -- you'll have to give the court reporter the spellings of all these words you use later on. I'm sure she's got them flagged for you; okay?

Turning to the next page, page 7, what are those right in the middle of the photo?

A. The containers, the bottles, are empty bottles or partially empty bottles of Everclear which is ethyl alcohol.

Q. And what would Everclear be used for in this production method?

A. Certain of the reactions call for alcohol to be used as the solvent. Also it's used in some of the clean-up procedures.

Q. Turning to page 9 -- we're certainly not going to go through every one of these photos, but what do you see on page 9?

A. I think the most significant thing on page 9 is the metal tube that's mounted to the board on the left-hand side. That is a homemade furnace that's used in the reaction, the

step that takes the phenylacetic acid and creates the phenyl-2-propanone.

Q. Could you describe how that furnace is used?

A. Basically inside of the metal tube is a glass tube that's wrapped with wire and asbestos or an insulating material. The wire is used as the heating source. It's connected to some sort of a rheostat to add the current to it. Inside of that tube would be a mixture of pumice or volcanic rock that was ground up to which was added either thorium carbonate or magnesium carbonate which could be produced in this instance from the magnesium chloride. When the tube is originally heated and a flow of gas is passed through there, the carbonate is converted to the magnesium or manganese oxide. When the phenylacetic acid end solution is dripped through there, it creates the phenyl-2-propanone.

Q. Now, in Exhibit 23 we've got -- there are 5 steps or 5 tabbed steps. Which step would that furnace be used in?

A. That would be in step number 4.

Q. Turning back to page 17.

A. This is what I was describing earlier. The orange cylinder on the right side is the nitrogen tank. The two containers on the floor, you can see the hoses connected to them. Since they're under pressure, there has to be some sort of a seal placed on the tubing that goes into the tanks. At this point in time, the tube that's coming out of the

left-hand tank is not connected to anything but could easily be connected to the reaction vessel to introduce the chlorine gas into the toluene solution to create the benzyl chloride.

Q. And on 16, if you look at 16, the photo immediately before it, I see back in the corner there's a black can. What is that?

A. That was the can of toluene, the five-gallon metal can that was seized at the site.

Q. You mentioned reaction by-products and things of that nature. I see a kerosene can on Exhibit -- both 16 and page 17. What was in that kerosene can?

A. That contained a dark brown to black solution that the analysis showed was reaction by-products that had some of the desired compounds but in a percentage that was equivalent to the residue, the leftover material.

Q. In clandestine laboratories specifically, what do you find normally happens with the reaction by-product?

A. In many instances -- well, I've seen two different scenarios, if you will, one where the individuals save all of their reaction by-products. I still haven't determined a reason as to why they do that. The other is they will fill up a container of a reaction by-product and then take that to some remote site and dispose of it in some way.

Q. Why doesn't somebody just dump it down the drain or dump it outside?

A.   Well, in many instances it has odors associated to it. Clandestine laboratories have been found by those associated odors that the neighbors have noticed.  They've called in, say, the fire department because of the odors and found a lab in those instances.  An individual who again was sophisticated would realize that these odors could be readily detected by individuals, and I think today with the heightened awareness of the environmental concerns that a lot of people are more willing to come forth with -- you know, with complaints about unusual odors.  So somebody that's been doing drug synthesis for a while is going to realize that there's odors associated both in the production process and with the materials leftover and would do the best they could to eliminate the possibility of detection by those means.

Q.   Turning back to page 32, what's of significance on page 32?

A.   Again, this shows the kerosene can that had the reaction by-products.  It also has a good indication of the valve that was used.  When the pressure was created by the nitrogen to move the chlorine gas into the reaction vessel, that has to be regulated by some means and at some point in time has to be shut off.  What I see here is an individual that has some good mechanical ability to create connections that don't leak because chlorine gas is very noxious.  And if that was not sealed properly, people could become overcome by the chlorine

gas.

Q. Turning back to page 36, what does 36 depict?

A. There are several things available here or visible. One is on the left-hand side the bottle of sodium cyanide which is used in the second step to take the benzyl chloride to benzyl cyanide. There's also a portion of the reaction vessel which is to the right-hand side of the sodium cyanide container. There's a green metal ring and the glass top. The reaction vessel in this particular instance was a heavy-walled round bottom glass that had a large stem to it. This particular top had the ground glass fittings. A vessel like this is created so that the contents of that container can be removed from there easier, also the Erlenmeyer flask which is the tapered flask in the middle above it. It's not necessarily a picture of the white part which is a Buchner funnel which is used for separation. The Erlenmeyer flask has a side arm. It's that circle that's coming out of the top at the neck. That can be attached to a vacuum pump and the material, the powdered material, separating from the liquid by using the vacuum to draw the liquid through the filter paper leaving the solid on the filter paper in the Buchner funnel.

Q. Is that what some people call a vacuum distillation?

A. Not a vacuum distillation but a filtration using vacuum.

Q. Turning to page 39.

A.    That is a vacuum pump.  Could be used to create the vacuum for either the filtration process or the vacuum distillations.

Q.    And then to page 41.

A.    This is a heating plate.  We see a lot of these in clandestine laboratories.  In some instances -- in this particular laboratory they had both heating plates and heating mantles.

Q.    What's a heating mantle?

A.    Heating mantle is a cup or dish-shaped heating device that has wire in it, again similar to the furnace that I described earlier, but the wire and asbestos wrapping, they're created in sizes to fit the reaction vessel so that the vessel sits down inside it approximately about halfway.  And this with a rheostat can control the temperature that's going to the reaction vessel.

Q.    And some people have talked about round bottom flasks.

A.    Yes.  That's what I'm referring to as the reaction vessel is a round bottom flask.

Q.    So would the heating mantle also have a round bottom?

A.    It has a corresponding fitting round bottom so that the reaction vessel, round bottom flask would fit inside.

Q.    Did you find notes at the scene that talked about particular settings or using a rheostat on a hot plate, particularly page 6 of Exhibit 23?

A.   This handwritten note contains they use the hot plate on a setting of 9 for a simple distillation.  Now, I would differentiate the simple distillation from a vacuum distillation.

Q.   What's the difference?

A.   Basically it's not putting it under reduced pressure. It's running at atmospheric pressure and whatever temperature is necessary for the material to be distilled over into another container.

Q.   Turning to page 46 -- well, first of all, page 45, I see there's a wooden spoon there and a plate.

A.   Yes.

Q.   Was that wooden spoon tested?

A.   The powder that was on that wooden spoon was phenylacetic acid.

Q.   And so the record's clear, about how far up on that wooden spoon did that phenylacetic acid go?

A.   I believe it was about halfway up the handle.

Q.   So could you give the Court an inch dimension approximately?

A.   I would say from the bottom of the spoon to the top of the level of the white powder was approximately six to seven inches.

Q.   And page 46 of the photos.

A.   This was some of the material that was tested, some of

the residue from reactions. In some instances, if a powder is still moist after the reaction is completed, we've seen a lot of the Visions Corningware being used to dry the materials.

Q. What did you find in Exhibit 46 or in the page marked 46?

A. I'd have to look at my records to see exactly which exhibit that was and what the contents were. Right offhand I don't remember.

Q. Turning back to page 75, what is depicted in page 75?

A. The two things that I note in here, number one, on the left-hand side, there's a glass tube, curved glass tube, that has a black hose connected to it. This could be used to develop the vacuum for the vacuum distillation. This tube is consistent with the type of glassware that would be used for vacuum distillations. Also the fact that it's in this large plastic bucket that has water in it, in a lot of instances, the -- as I mentioned, the distillation process, the outer jacket is cooled with water. The water flows through the jacket to keep it cool. In many instances in clandestine laboratories they use a large container of cold water and circulate that rather than run it from tap water from a faucet.

Q. You talked earlier about a number of books that were seized. Turning to page 76, what's the significance of the

Ace Glass catalog depicted in --

A.   Ace Glass is one of the companies that can provide the chemical glassware that is the glassware.  It's depicted upon the front cover.  That is a round bottom flask, a reaction flask.  The joints on there are ground glass joints.  They have specific sizes.  The distillation flask or the refluxing condensers have the same ground glass fitting, so this creates a tight seal between the different components, glassware components, in a reaction process.

Q.   Go to page 78.  I see an organic chemistry textbook. What's the significance of that?

A.   Morrison and Boyd is one of the organic chemistry texts that's widely used in college level courses.  It goes through and describes from beginning to end the different types of compounds, different types of reactions that are commonly seen in organic chemistry.

Q.   And is -- the production of methamphetamine, is that an organic chemistry reaction?

A.   Yes, it is.

Q.   Page 79 and page 80, what are those?

A.   SP Scientific Products which is now owned by Baxter is a chemical supply house, not only chemical but equipment scientific supply house.  And Ace Glass again is a company that provides scientific glassware.

Q.   You talked about a number of journal articles.  What do

you mean when you say journal articles that were seized at the scene?

A. These are articles that have been -- or copies of articles that have been obtained from legitimate scientific sources. These are reactions that have been reported in the literature by legitimate chemists. We commonly see these in clandestine laboratories because this is the recipes, if you will, that the individuals will use to create the compounds that they desire.

Q. Now, in addition to normal legitimate journal articles, do you see any non-standard scientific literature?

A. Yes.

Q. What type of nonstandard scientific literature do you see?

A. The three -- actually the four that come to mind, the first one is The Secrets of Methamphetamine Manufacture. There was the -- I believe the title is The Complete Book of Ecstasy. There was The Anarchist Cookbook and the Poor Man's James Bond Volume 2.

Q. Now, on the book, The Secrets Of Methamphetamine, have you or anyone else in DEA looked at that book to determine what methods are used and whether they are scientifically valid ways to produce methamphetamine in that book?

A. The methods that are in there are accurately described in terms of -- and there's a variety of different things,

different topics, that's covered in this book. But it's all towards the manufacture of methamphetamine.

Q. In looking at page 84, 87, what are those -- I'm sorry, 83 through 87?

A. These are copies of -- 83 -- excuse me. 84 -- you said 83 through 87?

Q. Yes, sir.

A. 83 is a copy of the Merck index which is a listing of compounds. It's not all inclusive of all the compounds available but does list several thousand compounds, gives properties of these compounds. In some cases there are pharmaceutical categories, what they're used for, their toxicities, how they're produced, some of their physical characteristics. It's a book that we have seen in clandestine laboratories, certainly not every laboratory, but certainly I would expect to see one, see it in a laboratory where there is a higher level of sophistication.

Q. And what about 83 through 87? I'm sorry, eighty --

A. 84 through 86 are copies of journal articles that describe some of the synthesis routes that were used at the site. And number 87 is the preface in the third edition of the copy of The Secrets of Methamphetamine Manufacture.

Q. You talked a little bit earlier about that handwritten note which is on page 5 of Exhibit 23. Is that depicted on page 88?

A. Yes, it is.

Q. Turning to page 95, what's the photo on page 95?

A. 95 is a photograph of a rheostat. I mentioned before could be used for adjusting the heat level on a hot plate, on the furnace, on a heating mantle, on any sort of an oil bath. It's used to set the heat and regulate the heat at any desired level.

MR. PARRISH: Your Honor, may we take a five-minute break, please? Thank you. I'll approach in just a second if that's okay.

THE COURT: We'll be in recess for five minutes.

(A sidebar was had between Court and counsel.)

MR. PARRISH: Mr. Honken is on anti-anxiety medication which causes him to have to go to the bathroom quite often, and he needed to just take a break to rush out. He'll be right back.

THE COURT: Okay. That's fine.

(The sidebar was concluded.)

(Recess at 10:02 a.m.)

THE COURT: Please be seated.

MR. REINERT: We have just a few photos left yet, Your Honor.

BY MR. REINERT:

Q. Turning to page 99, what's depicted in page 99?

A. I think the main point of interest -- doesn't sound like

the sound is -- sorry. The main point of interest here is the balance that can be used to weigh out the dry powders for the different reactions.

Q. What's the brown bottle to the left of that scale?

A. That was a powdered material. When I did the analysis of it, I didn't come up with anything. It was listed as no controlled substance which indicates that there wasn't any controlled substance in it, there wasn't anything that we could readily identify. It may have been something inorganic. But as to its actual contents, the analysis did not determine it.

Q. What's the significance of any bottles that you see or that bottle in page 99?

A. There are a number of chemicals that are stored in amber bottles because they are light sensitive. So in clandestine laboratories, I routinely see amber glassed bottles. In some instances the caps are color coded to indicate if they're a mineral acid, what acid they might be.

Q. Are those kinds of bottles available commercially?

A. Yes.

Q. Do you also have in front of you Exhibit 18?

A. Yes.

Q. Turning back to the very last page of photos, what do you see depicted in those last four photos on Exhibit 18?

A. They are amber glass bottles that are similar to the one

that's depicted in photograph 99 of Government's Exhibit 25.

Q.   Photograph number 101, what is depicted in that photo?

A.   This in the center of the photograph is a rectangular block that's covered by plastic.  Also on a newspaper towards the upper right of the photograph is some more of the pumice material.  This is the material I mentioned earlier that would be used in the furnace to create the site for the manganese oxide that would be used to produce the phenyl-2-propanone from the phenylacetic acid.

Q.   Turning back to photograph number 138, what's depicted in that photograph?

A.   This is the front cover of The Complete Book of Ecstasy which mainly describes synthesis routes to produce MDMA which is 34 methylene dioxymethamphetamine.

Q.   Are some of those synthesis routes similar to the synthesis routes that you found in the production of methamphetamine?

A.   Some of them are.  Some of them are more common to some of the other synthesis routes we've seen in other laboratories.  But certainly they are not uncommon.

Q.   And then finally looking at Exhibit Number 205 -- or I'm sorry, photo number 205, where was this photo taken?

A.   This photograph and some of the surrounding photographs were taken of the material that was seized to be disposed of from that particular clandestine laboratory site.

Q. In particularly the center, what's that black can?

A. The black can was the five-gallon metal can that contained the toluene.

Q. Would you describe for the record the top of that can?

A. The top of the can -- actually the overall appearance indicated that that can had been stored, either correctly stored or was a relatively new can, and that there was no appreciable rust on it; that the label appeared to be new, didn't show any signs of weathering as if it had been stored outside.

Q. Some of these substances that you've talked about, are these items caustic?

A. They can be, yes.

Q. And, in fact, I guess on the bottom of page number 205 there's the kerosene can. Would you describe the top of that, please?

A. That shows signs of material that was poured or actually spilled on there -- I wouldn't say poured into it -- and the effect that they had on the paint on the can and on the metal of the can.

Q. In going through the analysis to determine yield, you talked earlier about a maximum theoretical yield. What would the maximum theoretical yield be for the five gallons of toluene converting that through this process to methamphetamine?

A. If the maximum theoretical yield calculation were to be employed, the 5 gallons of toluene is equivalent in weight to 16.4 kilograms of toluene. If that is multiplied by the ratio of the molecular weights, that is, 185 being the molecular weight of methamphetamine hydrochloride and 92 being the molecular weight of toluene, that ratio, the result comes out to be 32.9 kilograms. That is the maximum theoretical yield based upon five gallons of toluene.

Q. Now, we talked earlier about practical yields being a percentage of the theoretical yield.

A. That is correct.

Q. Did you go through the practical yield calculation for each step in this synthesis route?

A. Yes. In fact, the production capacity report that I prepared was based on the practical yields because that information was present at the clandestine laboratory site. When I have that indication of the actual synthesis routes used, I do go with the practical calculations. If I do not have that information, if there's no notes or documents available, then I use the DEA standard of maximum theoretical yield. In this particular instance, I did calculate the production capacity based upon a practical yield.

Q. Could you go through each step in the synthesis with a percentage off the theoretic yield?

A. Yes. Step 1 which is the manufacture of benzyl chloride

from toluene, the reported yield in the document or copy of the document that was seized at the laboratory site indicated the yield to be 73 percent.

In step 2 which is the production or creation of benzyl cyanide from benzyl chloride, the production yield or the yield reported in the document that was seized indicated a yield from 80 to 90 percent. And at that point my production capacity report shows a range because of that range reported in that particular literature document.

In step 3, creating the phenylacetic acid from the benzyl cyanide, the reported yield in the documents seized was 77.5 percent.

In step 4 which would be the creation of the phenyl-2-propanone from the phenylacetic acid, the reported yield in the documents seized indicated 55 to 65 percent yield.

In the last step, the phenylacetone or phenyl-2-propanone to methamphetamine, the reported yield was 52 percent.

Q. So how do you determine the overall percentage yield practically versus the theoretic yield when you start with the toluene and end with methamphetamine?

A. Basically the calculation that I did was to take the sum of the multiplications of all of the reported yields to create the final yield, and that would indicate essentially

the amount of toluene that was eventually used to produce the methamphetamine, and that result was 17 percent.

Q. So the actual yield would be 17 percent of that 32.9 kilos?

A. Yes.

Q. And for the record, how many --

THE COURT: Not the actual yield. It's the practical yield.

MR. REINERT: Pardon? Did I misspeak, Your Honor?

THE COURT: You called it the actual yield.

MR. REINERT: Oh, I'm sorry, Your Honor.

THE COURT: It's not the actual yield. It's the theoretical practical yield.

BY MR. REINERT:

Q. The practical yield utilizing the journal articles would then be how many kilos?

A. The number that I determined based on these calculations from all of the articles available was 5.6 to 7.4 kilograms. Again, the range was based upon the reported range of yields in the articles that were seized at the site.

Q. Did you later --

THE COURT: Can I ask a question here?

MR. REINERT: Yes, Your Honor.

THE COURT: Is that 5.6 to 7.4 percent done by taking 17 percent of the 32.9 maximum theoretical yield?

THE WITNESS: Basically it started with the five gallons of toluene and went through each step with the reported yield from each step.

THE COURT: I understand that. That's how you got to the 17 percent practical yield. But in order to reduce it to kilograms, did you take the 17 percent times the 32.9 percent -- 32.9 maximum theoretical yield?

THE WITNESS: No. It was starting from the 5 gallons of toluene, converting that into a metric weight which was the 16.4, and then going through each step with the reported yield. In other words, 16.4, the first step actually shows 73 percent which ends up still being 16.4. The reason being is that the molecule of the benzyl chloride is larger, has a higher molecular weight than the molecule of toluene. But the way that I did the calculations was to take it step by step. The end result would still be the same.

THE COURT: If you took 17 percent of 32.9 kilograms, what would you come up with?

THE WITNESS: It should show 5.6 kilograms, but instead of doing it that way and determining the maximum theoretical yield, I did it step by step based on the original amount that was present at the site.

THE COURT: But the practical yield of 17 percent times the maximum theoretical yield should result in the practical yield by weight.

THE WITNESS: That is correct.

THE COURT: I'll check your math and see how you did.

THE WITNESS: Okay.

BY MR. REINERT:

Q. Sir, were you later -- after performing your analysis, were you later given a copy of Exhibit 8P?

A. Yes, I was.

Q. For the record, what's the starting ingredient and what are the ingredients listed on Exhibit 8P?

A. The chemicals that are listed on 8P are the chemicals necessary to make methamphetamine from toluene. In fact, the first line shows 50 gallons of toluene and an associated cost.

Q. Could you go through for the Court the -- all the items that are listed on 8P just so the record's clear?

A. The top half of the document shows the chemicals in their quantities and the cost, the sum total being $20,000 for all of the chemicals.

The next line shows 200 reactions. The line below that shows 2,000 ounces which --

Q. How many kilograms would 2,000 ounces be?

A. I believe that that is -- you caught me short on that one. I don't know if I have the calculation on that. I hate to do those in my head.

Q.   Did you prepare a brief typed summary last night when you went through?

A.   Yes, and I never came up with the amount based on the 2,000 ounces.

Q.   How many grams are in an ounce?

A.   28.35 grams per ounce.

Q.   So you can multiply that times 2,000?

A.   Yes.

Q.   That would be -- if my math and calculator is correct, that should be about 56 kilos?

A.   I think that would be correct, yes.

Q.   Does the note which is marked and admitted as Exhibit 8P, does that confirm your analysis, your yield analysis?

A.   Basically, yes.  I don't know who was corresponding to whom.  But if you take the 5 gallons that I calculated and came up with 5.6 kilograms and you take the 50 gallons and the calculations that were done here, they came up to 56 kilograms.  That's a factor of ten.

Q.   Sir, there has been testimony earlier about methamphetamine production by this defendant and others earlier in like 1992 or 1993.  Would this -- utilizing this method of production, have you looked at Exhibits 26A and 26B?  First looking at Exhibit 26A which are records from Hill Brothers chemical company, turning back to the fourth page, what are some of the items that are being purchased

from Hill Brothers found in 26A?

A.    This appears to be a cylinder of compressed gas and the compressed gas was chlorine gas.

Q.    And turning to the last page of that exhibit, does that show the return of the empty cylinder?

A.    It appears to be a credit memo for an empty cylinder, yes.

Q.    Turning to 26B which is records from Adchemco Scientific, starting on the third page, what are some of the items that you see purchased from Adchemco?

A.    Denatured alcohol and glass drying tubes.

Q.    Turning back about nine pages, the page shows an invoice dated April 17 of 1992.  Have you found that page, sir?

A.    Yes, I have.

Q.    What are the items purchased on that occasion?

A.    There were naphthalene, what they refer to as benzene acid, urea, sulfanilamide, succinic acid or succinic acid, and toluene.

Q.    How much toluene is purchased?

A.    Four liters.

Q.    Going back seven pages to the invoice dated May 14 of 1992, do you find that?

A.    Yes, I have.

Q.    What's purchased on that?

MR. PARRISH:  Your Honor, I think these documents

basically speak for themselves. He did not purchase them. They serve no real impetus for this issue before the Court. We've stipulated to the documents. They're part of the record. I don't know where the government is going with this point, just having him identifying invoices that are outdated.

THE COURT: To the extent that that's an objection, it's overruled. You may continue.

BY MR. REINERT:

Q. Specifically the third line down, toluene, how much toluene does that show being purchased?

A. Five gallons of toluene.

Q. Is the -- you talked about this production method being a little more elaborate than other production methods. What has been your experience either personally when you were in school learning how to do reactions or in your experience as a chemist over the years? How does someone learn to do a reaction if they're going to do just a single reaction?

A. I would say a number of different ways. One, you could learn from another individual who was experienced in that synthesis technique. Another, if you have a desire and a level of knowledge and the ability to read documents and accumulate the knowledge from those documents, it certainly can be done. It requires a certain intellectual level to be able to look at these documents, a certain sophistication.

MR. PARRISH: Your Honor, I'm going to object now to these questions as beyond the scope of this expert's testimony. He's getting into an ability to understand or being an educator. He wasn't qualified as an expert in that area.

THE COURT: Overruled.

BY MR. REINERT:

Q. Once one has chosen a particular experiment to do and begins the actual experiment, is there some learning and fine tuning that experiment as it goes along?

A. What I have typically seen in clandestine laboratories, especially in the more sophisticated procedures such as this one, the individuals challenge themselves to improve upon their product as time goes on, and they're very proud of their end result which usually is of high purity. So yes, there is the desire to improve upon the product.

Q. Now, you talked about of high purity. The quantity calculations that you made on the laboratory, would that be a mixture of methamphetamine or the pure methamphetamine contained in the mixture that was obtained?

A. The production capacity amounts would be based upon pure methamphetamine.

Q. The quantities of toluene purchased in 1992 in Arizona, how much -- would that be consistent with the production of more than two kilograms of methamphetamine?

A.   Certainly if the same calculations were employed for those quantities of toluene as were employed for the lab that was seized in Mason City, yes.

Q.   And would that even take into account early failures when they're learning the experiments or destruction of any of the toluene?

MR. PARRISH:  Objection.  It's highly speculative.  There's no foundation for any response to these questions by the expert.

THE COURT:  I think you're right.  It is highly speculative.  I'll take it subject to your objection.

A.   If I were to take that amount at six gallons -- first purchase was four liters; the second was five gallons -- and employ the same end result, it is assuming a certain amount of start-up reduction of capacity.

MR. REINERT:  Nothing further, Your Honor.

THE COURT:  Mr. Parrish, you may cross-examine.

MR. PARRISH:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. PARRISH:

Q.   Mr. Meyers, as I understand it, you actually went into the lab I assume because you were notified earlier that there was going to be a raid on this particular lab?

A.   That is correct.

Q.   And I take it you had some preliminary information with

regard to going into this lab as to the number of people who may have been working in this lab; is that correct?

A.    I don't remember that there was a discussion of the number of people.  As I recall it, the notification wasn't as timely as we would have preferred, so we didn't have a lot of time to get a lot of background information prior to traveling to Mason City for that particular seizure.

Q.    Let me ask you, did you get information of any more than one or two people being employed in that lab?

A.    I don't remember the number of people that were identified.  There was a number of names that were given. But as to their particular roles, that really wasn't of my concern.  I was more concerned with what was going on in the laboratory from the chemical side.

Q.    Well, from a chemical side, aren't you concerned about the number of people who might be making the chemicals?

A.    Not necessarily.

Q.    Well, isn't that one of your policies within the DEA, to find out the number of people who may be preparing the chemicals?  Are you telling me that's not your concern?

A.    As a chemist it's not necessarily my concern to determine these are the number of people.  From an enforcement standpoint, the agents that are involved, that is more of their concern than it is my concern.

Q.    Well, did you ever find throughout your work on this

case there was more than one person involved in the production of these methamphetamine --

A. There were a number of different names that were mentioned.

Q. Did you see any evidence of more than one person in the home when you were there?

A. When I was there, I believe all of the individuals that were at the house had been removed by the time I went into the --

Q. My question, did you see any evidence of more than one individual there?

A. If you could be a little bit clearer in terms of what sort of evidence, you know.

Q. Any. Any means any.

A. I would say no.

Q. Okay. Did you make any assessment of clothing or whether or not any individual was living in that residence?

A. No, sir. That wasn't a part of my job.

Q. Did you check any records dealing with utilities to make a determination if, in fact, any process had run to increase the utility bill in that house?

A. No, sir. Again, that's not part of my job.

Q. I didn't ask you whether it was your job or not. I asked you if you did it.

A. And I was trying to give you as complete an answer as I

can.

Q. So it's no; is that right?

A. That is correct.

Q. Did you make any analysis of telephone records coming from that particular house?

A. Again, no.

Q. A couple other background questions. Now, as I understand it, you have a B.S.; is that right?

A. Yes, that is correct.

Q. Do you have a master's also?

A. No, I do not.

Q. Have you ever worked in the private industry at all?

A. No, I have not.

Q. You've worked for the government your entire career?

A. That is correct.

Q. DEA your entire career?

A. DEA and its predecessor agencies.

Q. So what, in 1973 you switched over?

A. 1973 it became the Drug Enforcement Administration.

Q. And so what was its predecessor that you worked for?

A. It was the Bureau of Narcotics and Dangerous Drugs.

Q. And what did you do for them?

A. Same job. It was just a name change of -- the agency incorporated other offices under justice and moved up to an administration level.

Q. Now, one question that was asked of you and I was confused about, you indicated that you had gone through hundreds of labs or you'd only gone directly to 30 labs?

A. What I stated is that I had been on 30 lab seizures.

Q. Okay. And this was one of those lab seizures.

A. That is correct.

Q. When you talk about hundreds of labs, you're saying you might have analyzed the results of hundreds of labs.

A. Not only the analysis which would be a direct involvement in that but also, as I indicated earlier, the discussions that we have in the laboratory about sites that other chemists have been on. And there's a certain amount of knowledge that can be acquired from that.

Q. In the 30 labs, clandestine labs, that you have gone directly on, how many of those have been methamphetamine labs?

A. Probably 20 of the 30.

Q. When you say probably 20 of the 30, is that an exact number, or are you just estimating?

A. It's the best approximation I can give without looking at my records as to the particular compounds that were being manufactured at specific sites.

Q. And out of those 20 that you've gone to, how many used toluene as one of the ingredients?

A. This might have been the second lab.

Q.    Only the second in your entire career?

A.    I would say probably.  That's the best estimation that I could give you right now.

Q.    All right.  And of those two, how many had toluene still remaining when you went on the clandestine -- when you busted the clandestine lab?

A.    I believe the other one had toluene there at the time.

Q.    Well, believing.  Do you know if, in fact --

A.    I don't have specific information on hand or specific recollection.

Q.    And do you recall whether or not it was there or was it just used in the manufacturing process?

A.    At this point in time I couldn't say either for sure.

Q.    Well, you made the statement earlier that either it was stored very well or, in fact, in trying to determine -- or recently purchased.  If you've only seen it in two other occasions, how did you formulate an opinion that the can that you saw there was either recently purchased or stored very well if you're basing that on the experience?

A.    It's the exterior condition of the can.  That's not the only can I've seen in 27 and a half years.  Maybe not all of them have stored toluene, but those cans are commonly used to store chemical solvents.

Q.    Let me ask you about that toluene can.  You were asking -- I assume there was a can purchased -- according to

some of the direct examination questions purchased back in 1992. Is part of your job to check to see when an item is purchased by tracing it back?

A. That's a part of the agent's job. That's not normally part of our job.

Q. Well, as a chemist once you see the chemical and you want to find out more information about it as to determine when it was purchased, don't you notify the agent that this may be a substance of some importance that you want traced?

A. We discuss it with the agent in terms of what is there, and we use those records to determine what had been purchased by an individual or individuals.

Q. Did you do that in this case with the toluene?

A. No, I did not.

Q. Well, let me ask you this: Does the toluene maybe lose some of its potency over a period of time?

A. No, it doesn't lose its potency. It may evaporate if it's left open.

Q. If it's left open for three years, would it evaporate?

A. Right offhand I don't know its evaporation rate. That would be determined by the temperature, the ambient temperature, by the humidity. There are a lot of factors there.

Q. Well, in this instance did you check the humidity in the house to determine whether or not it was warm enough to cause

the evaporation of the toluene in the house?

A.    The can was not in the house.  It was in an unheated garage, and it was very cold that day.

Q.    Well, and you determined it had been sitting there for five years in good storage or recently purchased; is that correct?

A.    I said the condition of the can indicated that it was well maintained or it was relatively new.  The label appeared to be new, did not appear to show any signs of aging, either the loss of the adhesive or an aging of the paper.

Q.    But we know for a fact you didn't trace it to see when it was purchased.

A.    I did not, no.

Q.    Nor did you direct an agent to do that.

A.    We don't tell the agents what to do.

Q.    Well, ask them is that something --

A.    We can suggest to them that this would be important, but it's up to them to determine their time constraints as to what they can reasonably do.

Q.    Now, a final question with regard to your background. You indicated that you'd gone to possibly two methamphetamine labs with toluene in the past.  How many of those have you testified in sentencing hearings on?

A.    I don't recall testifying in that sentencing hearing for that particular case.

Q. Of the 20 other labs that you went to involving meth, how many sentencing hearings have you testified in?

A. I believe two others prior to this one.

Q. And where were they?

A. One was in Kansas City that I recall directly. The other one may have been in Kansas City, but my recollection -- I don't have a direct recollection of where that was.

Q. And how long ago would that have been?

A. Within the last five years.

Q. Would it have been in the last three years?

A. Possibly.

Q. Two things you discussed: One was the practical yield, and the other one was the maximum theoretical yield according to what you indicated was the DEA -- would that be the DEA guidelines or the DEA's policy?

A. Yes.

Q. And do they train you in a manner of how you are supposed to interpret any chemicals that you find?

A. By interpret, what do you mean?

Q. Well, you always come up with the maximum yield. Is that the way you're trained?

A. That is correct.

Q. And is that maximum yield under clandestine laboratory circumstances or under normal scientific circumstances?

A. The maximum theoretical yield is the calculated yield based upon 100 percent conversion of the precursors to the finished product.

Q. You would agree then that under the policy how you establish and were trained under DEA, you don't use it -- the result of clandestine lab result?

A. As I testified earlier, if I have information available that will give me that opportunity, I use that. If there is no information available, I'll use what the DEA guidelines are to create or to calculate the maximum theoretical yield.

Q. So I guess to answer my question directly, you don't have any information you use on the maximum theoretical yield on a clandestine lab. It would be no.

A. Any information. I'm not sure what you're asking directly.

Q. In reaching the results of maximum theoretical yield under a clandestine lab, you do not have any information as to what the maximum theoretical yield would be. You would only use what is called the DEA guidelines under normal scientific circumstances to get the maximum theoretical yield; isn't that correct?

A. But I testified as under the maximum theoretical yield that's assuming 100 percent conversion.

Q. Now, you would agree, would you not, that DEA now since 1973 and either prior to that time would have gathered

information on clandestine labs through talking with individuals it may have debriefed that there is a yield that is somewhat different than what you would get under normal scientific circumstances; isn't that true?

A.   There is information to that effect.

Q.   Well, have you ever taken that information and come up with a result as to what clandestine labs would yield as a maximum theoretical yield?

A.   There's information available on that, yes.

Q.   Did you run these analysis under this material?

A.   No, I did not.

Q.   Could you have done that?

A.   Yes, I could have.

Q.   Why didn't you do it?

A.   Because I did the calculations based on the information that was available at the laboratory site which was the best information that the individuals who were doing this analysis could expect to get as a yield.

Q.   Well, isn't it true, though, when you were using that information that you were also using literature that is acceptable not only in the clandestine labs as being accurate way of production but also using information that DEA finds acceptable because they're basically treatises?

A.   Could you restate that?

Q.   Well, you're basically using treatise information to

determine what that lab might yield, the same treatises that DEA officials use.

A.   The information that I used was the information that was available.

Q.   Well, you gave a list of treatises on your direct examination that you found in the house.  That's the same -- those are the same treatises that are considered standard information that DEA would rely on; isn't that true?

A.   They're standard scientific information, yes.

Q.   But in reaching the results of what have been produced rather than using the clandestine lab information that you had, you then take that information and you decide this is what DEA would have produced under their maximum theoretical yield as opposed to what a clandestine lab would have produced; isn't that a fact?  That's what you did.

A.   What I used was the best available information based on the treatises, if you want to call them that, the reference articles that were found at the laboratory site.  To go beyond that and say this is the average of what a clandestine operator can manufacture makes a lot of assumptions.  What I'm going on is what was available in the house and what I reasonably believed that the individuals who acquired that and were doing the synthesis reasonably believed that they could obtain by using the same synthesis routes.

Q.   Isn't it true that the result -- using the clandestine

lab that is well within the knowledge of you as a DEA chemist, the result would have been lower?

A.   There is no --

Q.   The practical yield and also the maximum theoretical yield would have been lower; isn't that true?

A.   There is no DEA document that I'm aware of that says this is what a clandestine operator will manufacture based on this particular synthesis route.

Q.   Isn't it true, though, Mr. Meyers, that the results based upon your experience, your background, your knowledge in this area, and the material that you have gained through debriefing that a clandestine lab would produce a less maximum theoretical yield than the policy set by DEA?

A.   A less maximum theoretical yield?  The answer is yes if we're dealing with maximum theoretical yield.

Q.   Now, in dealing with practical yield, isn't it true, using that same question that I couched in terms of maximum theoretical yield that in a clandestine lab the practical yield would even be less than the figures you quoted?

A.   It can be, but I have seen instances from my own analysis where the yield is the same and in some instances greater than the reported yield from reference literature because of the skill and the ability of the individual.

Q.   Well, of course.  But my question is, based upon the information you had as to the clandestine lab and your

Case 3:10-cv-03074-LTS-KEM   Document 19-8   Filed 06/06/11   Page 63 of 209

experience, your background, it's normally less for the practical yield because it's not under scientific -- the same scientific circumstances as in the DEA lab.

A.  To use the word normally less is making an assumption that I cannot make.  As I indicated based on analysis of other clandestine laboratories that I've seen, I've seen a range from somebody who either was getting started or wasn't very good to somebody that was very sophisticated and could produce a very refined, high-quality product.

Q.  Now, in this case -- and I'm talking about the case of Mr. Honken -- did you find any evidence of any substance such as methamphetamine being produced?  Yes or no.

A.  I found no finished product that was methamphetamine.

Q.  So in other words, the answer is no, you found none.

A.  I found no methamphetamine.

Q.  Did you find any product in your analysis of these chemicals that was two steps away from the production of methamphetamine?

A.  I found the phenylacetic acid which is the end of step 3.  From there the phenylacetic acid would be used to make the phenyl-2-propanone; one more step, phenyl-2-propanone to methamphetamine.

Q.  So they were two steps away.

A.  That is correct.

Q.  Was the lab in process when you came in, or had it been

stopped?

A.   It was not -- there were no reactions going at the time that we went in on that particular location.

Q.   Was there a way based upon what you saw to restart this process with the chemicals that were in place when you went in?

A.   There was a distillation -- excuse me --

Q.   Yes or no.

A.   Well, I'm trying to answer your question, sir.

Q.   Okay.

A.   There was a reflux apparatus that was on the stairwell right by the door going into the kitchen.  I'd have to look at my notes to see what was being done in there.  But the material was there.

Q.   No.  My question is, when you walked in to make your seizure, was everything there, everything, needed to complete the final two steps of the process without the addition of any other items?

A.   No.

Q.   Tell the Court what was missing.

A.   The furnace was there.  The phenyl-2-propanone could have been made.  The methyl amine was not there to make the methamphetamine.

Q.   What else was not there?

A.   The hydrogen -- if they were using the hydrogen method,

the hydrogen bomb method, that particular apparatus was not present.

Q. What else was not there?

A. I don't recall anything else at that point.

Q. So your testimony is, as I understand it -- and correct me if I'm wrong -- that you did not find in your search the items necessary to produce methamphetamine at the lab; isn't that true?

A. To complete the five-step process to make methamphetamine, that's correct. Through the third step with the capability of doing the fourth step, that is my testimony.

Q. Was a catalyst available for the hydrogenation?

A. No, it was not.

Q. And the toluene which you've already testified about, was it pure toluene?

A. It was a container of toluene. I did not specifically sample it, but the container was a container for toluene. My personal observations of that can was that it was a clear liquid. It had the same odor as toluene. There was no indication that it was not pure.

Q. Let me ask you, it's simple, isn't it? You could have tested it.

A. Yes.

Q. Did you do that?

A.   No, I did not.

Q.   So you're not representing to this Court that, in fact, the substance that you said was a basis of this methamphetamine production lab, you're not telling the Court it was there, are you --

A.   Yes, I --

Q.   -- by your test?

A.   I did not test it, but my observations indicate that it was there.

Q.   Was your observation sufficient, sir?

A.   In my rec -- in my estimations at that point, yes.  If I had any question about it, I would have tested it.

Q.   You mean it couldn't have been a mixture of some other substance?

A.   I didn't believe it was at the time.

Q.   I didn't ask you that.  You're telling me it could not have been.  The way you made the observation, are you telling me that could not have been a mixture, sir?

A.   The possibility exists, but from what I observed, I did not believe that to be the case.

Q.   And you only are basing it solely on your observation and nothing else.

A.   On my observations and my experience over the 27 years.

Q.   Let me ask you this:  Is it still sitting there where it can be tested today?

A. No, it is not.

Q. Where is it?

A. It was destroyed.

Q. When was it destroyed?

A. I don't know exactly when it was destroyed, but I know it was removed for destruction on that same date of the seizure.

Q. As a matter of fact, it would have been pretty important to determine the purity of the methamphetamine; isn't that true?

A. Yes. But I also found toluene in other exhibits.

Q. You said yes, it would have been true; right?

A. I'm sorry. What was your question so I make sure I answer it?

Q. The mixture of the toluene to determine whether or not it was pure or mixed with other substance ultimately determines the purity of the methamphetamine.

A. If it was a mixture of toluene and other components, it would affect the ultimate calculation.

Q. What would it have taken to test the toluene?

A. It's a relatively simple procedure. I could have used a number of different tests.

Q. How long would it have taken?

A. Maybe an hour total.

MR. PARRISH: I have no further questions. Thank

you.

THE COURT: I've got some questions before Mr. Reinert does some redirect. You just testified you thought it was a -- as I understand it -- I'm trying to summarize your testimony now -- you thought it was 100 percent toluene and you relied on your 27 years of experience in making that conclusion; is that right?

THE WITNESS: Also in my observation of the container, of the condition of the contents of the container, the liquid, also the odor coming from that.

THE COURT: But as I understand your testimony, you don't really have any experience with toluene except in one other situation with regard to the manufacture of methamphetamine.

THE WITNESS: With regard to the manufacture of methamphetamine, but toluene is certainly not a compound that is uncommon in our laboratory. So it's not a matter of just the experience based upon laboratories that start with toluene but the experience as a chemist with the presence of benzene toluene and other organic compounds.

THE COURT: But you assumed it was pure just by your eyeballing of the situation.

THE WITNESS: By the general observations. Not only eyeball but the general presence of the can, the contents, the way that it looked, the way the odors that came from it,

yes.

THE COURT: Are you testifying that you could tell by the odor whether it was pure or not?

THE WITNESS: Not that it was pure. There was no indication that I had at that point in time that it was not pure, that it was a mixture, that other things had been added to it.

THE COURT: But the only way to know that would be to test it.

THE WITNESS: That is correct.

THE COURT: Have you ever testified about the purity of a chemical substance in court based on your odiferous qualities of being able to smell it?

THE WITNESS: Not necessarily the purity. In most instances we're dealing mainly with the purity of the finished product.

THE COURT: But would you agree with me that the odor would be a poor substitute for actually testing something to determine purity levels?

THE WITNESS: It's certainly not the best test to use.

THE COURT: Is it any scientific test at all?

THE WITNESS: No. It wouldn't be a test that I would use for purity.

THE COURT: Have you ever seen anything in the

scientific literature that would indicate that you could test the purity of chemical compounds by their odor?

THE WITNESS: No.

THE COURT: I want to read back to you some of your testimony. Let me try and give you the context. You were testifying about the basis for this practical yield, and you testified, What I'm going on is what was available in the house. I'm going to stop right there, and I think that means the journals that were found in the house; is that correct?

THE WITNESS: It was the observation of the journal articles that were in the residence, yes.

THE COURT: And then you go on to say, And what I reasonably believed that the individuals who acquired that and were doing the synthesis reasonably believed that they could obtain by using the same synthesis routes. Here's my question for you: You don't have any knowledge of what the individuals who were allegedly manufacturing methamphetamine, what they reasonably believed the yield results would be.

THE WITNESS: That statement was based on the fact that this procedure is a very sophisticated procedure and the individuals that undertake this type of sophistication when they look at articles like this, also on the calculations that I made based on the 17 percent yield which matches the calculations that were in Government's Exhibit 8P; that based on that, based on the sophistication necessary to do this

particular multi-step process, that I believe that the individuals without discussing with them -- this is my opinion -- that they believed that they could achieve that particular yield that was reported in the literature.  And the notes, the Government's Exhibit 8P, is a handwritten note that pretty much corroborates that in my estimation.

THE COURT:  Do you know anything about the level of expertise that the -- that Mr. Honken, for example, had or Mr. Cutkomp had regarding chemistry?

THE WITNESS:  The information that I was given, that Mr. Honken had gone to college and that he had done rather well in college.

THE COURT:  What college did he go to?

THE WITNESS:  I believe it was a community college, but I don't have the specific one.

THE COURT:  Do you know how many years of chemistry he had?

THE WITNESS:  No, I do not.

THE COURT:  You don't really know anything about his educational background other than he went to a junior college.

THE WITNESS:  Not directly, no.

THE COURT:  Do you know whether he had basic chemistry or not as a course?

THE WITNESS:  No, I do not.

THE COURT: Do you know whether he had any advanced chemistry courses?

THE WITNESS: No, I do not.

THE COURT: Your opinion is really based on the assumption that the individuals who were in the process of manufacturing the methamphetamine could achieve the same level that the journals could achieve, isn't it?

THE WITNESS: That is correct.

THE COURT: Would the people who wrote these journal articles generally have a greater education in chemistry than someone who attended a community college?

THE WITNESS: Most of the people that write the journal articles either have a Ph.D. in chemistry or may be in graduate school, not all of them but most of them. But that does not preclude somebody who had little or no formal education from duplicating a synthesis that had already been conducted. The classic example that I can give you is an organic chemist by the name of Woodward who in his freshman year flunked out of school but in what would have been his senior year received his Ph.D. because of his skills and abilities. His first pass his teachers thought he wasn't very good, but he did have the skill and ability. And I think anybody that has some chemistry skills, some desire can go through a method that is already produced and duplicate it.

THE COURT: Could you duplicate this 17 percent yield figure in the DEA lab? Do you think you could?

THE WITNESS: Yes.

THE COURT: Would it be more difficult to achieve that yield in the clandestine lab that is the subject of your testimony?

THE WITNESS: If the proper equipment were obtained, no. The hazards would be greater than necessarily in a lab. But I believe that that is obtainable in a clandestine laboratory.

THE COURT: What about based on the equipment that you saw in the lab, not on whether the proper equipment could be obtained?

THE WITNESS: The equipment that I saw in the laboratory was very similar to the equipment that we would use in our laboratory to duplicate these synthesis.

THE COURT: Would the 17 percent -- I assume someone who's less proficient than you are would probably obtain a lower percentage, or isn't that necessarily true?

THE WITNESS: They could obtain a lower yield.

THE COURT: Would you reasonably expect that to be the case?

THE WITNESS: I think initially I would say yes. As the person was repeating the process, they certainly could improve upon it. It's not beyond the realm of believability

that somebody that did it the first time could do it equally as well as what was reported in the journal articles if they followed those articles and had the skills.

THE COURT: But that's a pretty huge assumption that somebody would have equal skill with a Ph.D. chemist who wrote a journal article.

THE WITNESS: I've seen some Ph.D. chemists that I wouldn't allow in a laboratory. They don't have the skills of synthesis, but they certainly have the level of knowledge. It's hard to say in looking at a person that they're going to be good or bad necessarily in doing a synthesis route until they've done it or until you have specific information. At some point in time I have to make certain assumptions, but I try to enumerate those assumptions, make sure that everybody's aware that these are the assumptions that were made in coming up to the conclusions that I drew.

THE COURT: Would you agree with me that it's more likely than not that someone with less than junior college level -- junior college level or less background in chemistry would probably not obtain the 17 percent journal article figure?

THE WITNESS: I would say not initially, but I've seen some people that haven't graduated from junior high school that were able to follow a method successfully under somebody else's guidance who may have even weighed out or

determined mixture of the agents and the precursors, put it together and said follow this, and they were successful in their endeavor.

THE COURT: And no doubt you can find the atypical unusual case. I'm dealing with kind of across the board. Would it be reasonable for me as a judge to expect that someone who has much less experience in chemistry than you do and less formal education than you do would achieve a result that's less than the journal result?

THE WITNESS: I would say yes on the first instance, but the more a person does it, the better they can become regardless of their initial skill level. We all learn by experience, and the more that it's being done, the more times this -- say in this particular instance these five steps are being done, I think the better the yield a person is going to get up to a certain plateau that above that plateau they wouldn't be able to improve. So I guess it boils down to are we looking at the first time a person was doing that and saying we don't reasonably believe that 17 percent is obtainable, or are we looking at the result of multiple synthesis being done over a period of time?

THE COURT: Well, let me ask you this: If you didn't have a thorough general understanding of chemistry, no matter how many times you repeated the process, you might not improve because you don't have the chemistry background to

know where to make the improvements; isn't that true?

THE WITNESS: That possibility always exists, yes.

THE COURT: And you're assuming that simply through repetition someone's going to improve, aren't you?

THE WITNESS: What I have typically seen in clandestine laboratories, that is true regardless of the educational background of the individuals because I think there's a certain desire there and people that have a desire to achieve are going to make a real effort to improve on what they do.

THE COURT: Well, but life is full of everyday instances where that's absolutely not true. You know, a lot of people want to be a very good golfer who have been at it for 27 years and haven't gotten any better. You see that every day.

THE WITNESS: Yes.

THE COURT: And you're making a huge assumption that through repetition there's going to be improvement in this case, aren't you?

THE WITNESS: What I'm saying is that typically from the clandestine laboratories I've been involved in that has been the case. So if it's a huge assumption, it's a huge assumption based upon prior clandestine laboratories that I've seen, been involved in, or that I've discussed with other people.

THE COURT: And let's take these prior instances. How do you know that there's been an improvement?

THE WITNESS: I had one particular instance where an individual kept a record of every batch and the result of every batch. Now, that is atypical I would certainly assume. We don't normally see people keeping records like this, but this individual was very meticulous. We've also got an indication from the agents that the report on the street -- and again, this is secondhand knowledge -- that this material was better as the individual went on. And in certain instances, if we were lucky enough to get, say, this batch versus this batch, we could see an improvement in the overall purity of the final product.

THE COURT: How is it that the individual knows the overall purity of the final product?

THE WITNESS: Well, in a lot of instances, if he sells it on the street and individuals say, This was really good stuff, it was a good batch. If they say it's not so good, then they go back and try to improve their product.

THE COURT: But how would they know the actual percentage purity?

THE WITNESS: Usually they don't.

THE COURT: You just told me somebody kept track of it and they wrote down --

THE WITNESS: In that particular instance that

individual kept track of the yields based upon a gravimetric, that is, a weight basis saying this is the weight that was reported that I got versus all of the ingredients that I used. There are ways that people can do it. Typically we don't see that in a clandestine lab where somebody takes that meticulous of records. And typically we don't see an analysis done by the clandestine lab operators as to the purity of their resulting drugs.

THE COURT: Do you have any experience with this particular process for making methamphetamine that would bolster your opinion that as one did this particular process they would improve?

THE WITNESS: In my experience in discussions with other people, a person would have to have a certain level of sophistication to even attempt this multi-step process. It is more complex. It requires more sophistication on the part of the individual because of the various elements that are needed to complete it over the typical methamphetamine synthesis that may be as simple as mixing things in a bowl, heating it up, and then extracting it.

THE COURT: What's the advantage of using this more sophisticated process?

THE WITNESS: I think the main advantage is that these chemicals aren't watched chemicals and you stand a better chance of not being detected in manufacturing if you

go farther back in the chain to produce methamphetamine. If you go to a store and buy ephedrine or pseudoephedrine, that's a very definite tipoff that -- you know, in large quantities, that is a very definite tipoff that you may possibly be making methamphetamine. If you're buying toluene in a store, it's not a watched chemical. It's easier to obtain without drawing attention to yourself.

THE COURT: You had some chemical that was a result of the third stage of this process, didn't you?

THE WITNESS: Phenylacetic acid, yes, we found some there.

THE COURT: And did you test that for its purity level to determine how that matched the journal articles?

THE WITNESS: That was not tested for its purity level. However, if memory serves me, the infrared spectra of it done directly matched a standard which is a pretty good indication that it's very pure.

THE COURT: Mr. Reinert, and then we'll be back to you, Mr. Parrish.

REDIRECT EXAMINATION

BY MR. REINERT:

Q.  Mr. Meyers, I'm going to hand you what's been marked and admitted as Exhibit 19. Exhibit 19 is a laboratory analysis by the state DCI lab of some methamphetamine seized in 1993. What's the purity on that methamphetamine?

A.   Under section D, exhibit listed as E1, the net weight which is 148.34 grams, the percentage of methamphetamine that was reported calculated as the hydrochloride salt was 97 percent.

Q.   Now, the record previously established and discussed this methamphetamine being produced by the defendant in a clandestine setting using this method.  How does the -- that percentage of purity compare with what you find in the typical methamphetamine laboratory?

MR. PARRISH:  I'm going to object to the foundation of that question.  I have no objection to his answering.  The foundation of the question as stated by the assistant U.S. attorney on the basis of that item is not necessarily an item that categorically was, in fact, produced by -- in Arizona. I don't think that has been established.

THE COURT:  The witness can answer subject to the objection.

A.   Could you please restate the question?

Q.   The purity being 97 percent, how would that compare with the purity of the substance coming out in clandestine laboratories overall?

A.   Certainly I've seen a wide range.  97 percent is not uncommon, but to me it's an indication of a skill level of the individuals involved in manufacturing it to come up with a product that is that pure.

Q. Now, if someone were producing a product of that purity using this same method of production back in '93, would you anticipate that their yield or purity would be reduced by additional years of experimentation?

A. As I mentioned before, I think in this particular instance, this particular synthesis route has to assume a certain initial sophistication level and, in my estimation, the ability to improve over time because of the required initial sophistication level and I believe the sophistication level of the individuals that have to use this in order to be successful.

Q. Is -- you talked about following a synthesis route earlier that's published in a journal article. Is there anything in common experience where one would take different items and combine them together to make a final end product that would be like a synthesis route following a step-by-step instruction?

A. I'm not sure I understand what your question is.

Q. Maybe I just didn't ask it very well. I do that periodically. Have you ever baked a cake?

A. No, I haven't. My wife does such a good job that I don't try to compete with her.

Q. What is the -- how does one bake an item, bake a cake?

A. If you were to take a method, a recipe, if you will, and combine the ingredients at the proper ratio and follow the

technique that's described in terms of mixing -- and, by the way, I do make bread, so I've had a little experience with baking -- that the end result is usually determined by the people that eat it in that particular instance as to whether you were successful or not.

Q. Now, how does following a step-by-step method of production like you talked about in common parlance compare with following the method of production found in some of these journal articles?

A. We've commonly referred to a lot of these methods as cookbook methods because they follow the same sequence in terms of combining the ingredients in the proper ratios at the proper times, providing the proper heat or cooling depending on the type of reaction. The synthesis routes that are in the literature, whether it be the legitimate scientific literature or something that would be from a head shop such as The Secrets of Methamphetamine Manufacture set out the whole procedure to end up with the finished product, in this case methamphetamine. So many people in clandestine laboratories follow these procedures the same person, somebody new to cooking, would follow a recipe from a cookbook to get to an end result.

Q. Now, if one is following an established recipe or an established procedure versus developing a brand new procedure on their own, which person would need more formal education

in chemistry?

A. Certainly somebody that was striking out into new territory I would believe would have to have greater understanding of chemistry and chemical knowledge than somebody that was following a published procedure.

Q. We've talked earlier a bit about toluene. Is toluene a substance commonly found in laboratories, even the DEA lab?

A. Yes.

Q. What's its common routine uses?

A. We use it basically as a solvent. It's also available commercially in hardware stores.

Q. For what purpose in hardware stores?

A. A lot of times it's used as a solvent in painting, either for cleaning the brushes or possibly thinning a paint.

Q. Now, when toluene is purchased new, is it adulterated with other substances, or is it pure?

A. If it is, it would have to be listed on the container that it contained toluene and other substances. If it is pure toluene or if it is essentially pure, that is, 99 plus, it would so state on the label.

Q. And when one routinely buys toluene, would it be substantially pure?

A. Most of the toluene that I've seen is pure. I've not seen any mixtures that contain toluene other than possibly paint thinner, and that is not sold as toluene. It's sold as

paint thinner, and that ingredient would appear on the ingredients label.

Q. Now, in the photos, specifically photo number 207, off in the left corner the word on that can says Toluol, T-o-l-u-o-l.

A. Yes.

Q. What is that?

A. That's a trade name for toluene.

Q. If it's sold under that brand name or trade name, would that be a pure substance?

A. I've not seen it sold under that name where it was not just toluene.

MR. PARRISH: I misunderstood your answer.

THE WITNESS: I said I have not seen it sold under that trade name where it is not pure toluene.

BY MR. REINERT:

Q. You talked a little bit about -- with Mr. Parrish about the maximum theoretic yield. Maybe I was confused. Is the theoretic yield tied to any -- any chemist at all or any particular operation in any location?

A. It's an empirical result based on the conversion, 100 percent conversion, of the starting ingredients to a final product.

Q. Is there any practical standard that you could give the Court about how to assess all clandestine laboratories across

the board on practical yield?

A. That would be extremely difficult because even in my own experience I've seen a wide variety of abilities. What I try to do when I'm doing a production capacity is to look at all of the information that's available to me. Certainly as I mentioned before, there's assumptions that have to be made because not all of the pieces of the puzzle are there. But based on the pieces of the puzzle that I'm given, based upon the complexity of the synthesis route that's being employed, based upon the glassware, the chemicals available, and the reference literature, I come up with what I believe to be a reasonable amount based upon everything that I've observed.

Q. And in the clandestine laboratory settings themselves, the labs or physical locations, what kind of range do you find in the physical settings in which the laboratories are operating?

A. I've seen them everywhere from sheds to houses with nine-car garages to apartment buildings to a shack that I would just as soon not go into to blown-up buildings which I definitely didn't want to go into but did. It's just a wide range. I don't think that there's any demographics that could say a particular class or group of people are involved in clandestine drug manufacture. It really covers the range that's available in this country.

Q. Now, have you -- one of the ways -- you talked about

learning as an agent or as a chemist about productions. Did you ever get to talk to the chemists periodically or review interviews of the chemists?

A. I've been involved with interviews of the defendants who were later identified or even at that particular time as being the chemist or the cook, the person that was doing the actual synthesis or was responsible for seeing that done.

Q. In settings where you've had even abhorrent conditions, a shack of some sort, you know, rats on the floor, whatever, what kinds of yields have you found even in those abominable accommodations?

A. I've seen good yields in bad locations and bad yields in good locations. And by that I mean the location being something that you would look at and maybe on first glance would find difficult to locate everything that was being done as opposed to some places that were very sophisticated that you would assume would be a chemical processing area, something that you would see at a chemical site. I've seen people that weren't very good in those. I've seen some that use a minimal amount of scientific equipment and end up with good results. That's why it's very hard to come up with what you would reasonably believe a clandestine operator could do as opposed to a practical yield as opposed to a maximum theoretical yield. It's very difficult. Things can vary from batch to batch by individuals based upon a number of

different circumstances.

Q. So what is your best approximation as to how much methamphetamine could have been produced in that laboratory with just the five gallons of toluene?

MR. PARRISH: Objection. He stated that already. Really it's repetitive. He's talked about it. He's been cross-examined on it.

MR. REINERT: I'll withdraw it, Your Honor. It has been asked.

THE COURT: Anything further?

MR. REINERT: No, Your Honor.

THE COURT: I've got one more question for you before I turn it back to Mr. Parrish. Is there any relationship in your view, Mr. Meyers, between purity levels and practical yields? In other words, if you have a high purity level, is there any inferences that you would draw from that as it might relate to the practical yield level?

THE WITNESS: I would say the higher the purity level the greater the ability of the person to come up with a finished result, taking -- the only exception being if there was during the analysis of any particular sample a cutting agent involved, you can't say that that's only 50 percent pure and relate it back to the individual's ability to make a good product. If it is pure, if it's 92, 97 percent, to me that's an indication that that individual has the ability to

make a good product.

THE COURT: And so you would infer from that that there would be a higher practical yield all else being equal.

THE WITNESS: Yes, sir.

THE COURT: Would you also infer, though, that somebody with less experience and knowledge about chemistry than people who authored the journal articles would in general tend to have a lower practical yield than the journal articles predict?

THE WITNESS: I would say initially the first time through, but I still believe that especially in a particular instance that we're discussing here where it's multi-step, more complex, I feel that the individuals who undertake that have a certain confidence level that they have the skill levels to do that, and the results that I have seen have indicated that. I don't know if that directly answered your question or not.

If this was just a straight -- one of the more simple synthesis routes, I might not be able to infer that level of sophistication. But this is a route that takes somebody who has a confidence that they have the skill levels, has the ability to go out and seek these journal articles that are not necessarily -- you don't necessarily find them at your local library. You have to go to a school library or some other college library to obtain them. You

have to know how to search scientific literature in order to get these particular articles. They may not be indexed as well as you would like. There is a certain -- there are even courses in colleges on searching chemical literature. That doesn't mean that if you haven't had that course you can't search the chemical literature. But this requires a certain effort that would indicate to me at least a determination to do a good job.

THE COURT: It might indicate effort and motivation and determination. But would you agree with me that effort, motivation, and determination don't necessarily take the place of knowledge, skill, and experience?

THE WITNESS: That's true. Doesn't always, but sometimes it can be overcome, and the knowledge can be gained through the synthesis route just the same way that the first time you ride a bicycle you're probably going to fall off. But eventually most people, not necessarily all but most learn ride to bike and some very proficiently because that's their goal.

THE COURT: Most people who ride bikes don't ride bikes at the same level of the folks who ride in the Tour de France.

THE WITNESS: That is true.

THE COURT: And riding in the Tour de France is somewhat an analogy of a Ph.D. chemist writing a journal

article.

THE WITNESS: That's correct. The analogy I was going to use would be riding a bicycle versus riding a unicycle on a high wire, and that's the difference I'd make between the standard methods and this particular synthesis. There's a greater degree of skill required in order to undertake this and I think a greater degree of confidence that a person has that skill, and that's what I'm basing a lot of this information on. It is my opinion based on what I see here.

THE COURT: But confidence, like many things in life, can be misplaced, can't it?

THE WITNESS: This is true.

THE COURT: And these journal articles are written for the highly skilled scientific community, aren't they?

THE WITNESS: It's a report of a synthesis done by persons, and I think that, you know, we really need to understand that this wasn't done just once to come up with this reported result, that probably these individuals the first time that they did it did not come up with the yields that they report. But what they are reporting is the best yields that they were able to obtain using this synthesis route in the way that they describe it in the article that they're presenting in this journal.

THE COURT: And that would usually be in a

scientific laboratory with people with advanced degrees in chemistry.

THE WITNESS: That is true. But a lot of the laboratories, if you go back and look at the early pictures of the laboratories, they certainly weren't as sophisticated as they are today. But yes, they would have the scientific glassware. They would have access to more of a scientific equipment available to them.

THE COURT: In how many instances in your background and experience have you ever been able to kind of verify the actual yield with what your expected practical yield would be?

THE WITNESS: In some instances we've been able to -- say as an example an individual has made methamphetamine or PCP or any of the drugs and actually delivered it to an agent. We could then analyze that delivered product knowing that that came directly from the laboratory from the individual who made it to an agent and directly to us. In those instances we can have a very good estimation of the individual's ability based on an analytical result.

THE COURT: What percentage of all the cases you've been involved in have you been able to do that?

THE WITNESS: I would say in those maybe 10 to 15 percent. In some instances where we find the finished

product, again, we can do an analysis as to the purity of the finished product at the laboratory site and get an indication of their purity or where they were in the steps of the synthesis, whether it was at the end of the reaction before they did a final clean-up of the results or whether this was a finished product that was in a plastic bag ready to be sold.

THE COURT: But that's purity. That wouldn't necessarily dictate the percentage of practical yield.

THE WITNESS: Again, in our estimation, in my estimation, if the end result that they're selling is highly pure that it indicates an ability to come up with -- to follow through on the synthesis route successfully.

THE COURT: But from a chemistry point of view, you could have a situation where practical yield is low but the purity level is exceptionally high.

THE WITNESS: It can be, yes.

THE COURT: Mr. Parrish?

MR. PARRISH: I just have a couple of questions, Your Honor.

RECROSS-EXAMINATION

BY MR. PARRISH:

Q.   Now, Mr. Meyers, with regard to toluene, how much was left in the can that you saw?  Did you measure it?

A.   I did not measure it.  I was told that there was

approximately two gallons left.

Q. You were told by whom?

A. That was in a report. I believe that was in with the waste hauler.

Q. Well, do you recall seeing it? You say you smelled it.

A. I saw it, but I don't remember specifically the actual volume that was there. I knew that a portion of it had been removed.

Q. Well, you looked at it. What is your recollection as to what amount was remaining in there?

A. That more had been removed than was remaining.

Q. Did you make a note of that in any of your material?

A. I don't believe so.

Q. Well, so one of the most important substances you failed to even quantify as you went through the house; isn't that true?

A. I did not determine the volume that was in there.

Q. You didn't determine the volume. You didn't do the test on it. And -- for purity. And did you test the purity for the third step of the material that was there, the phenyl propanone?

A. The phenylacetic acid you mean?

Q. Yes. Did you test that?

A. What I indicated is when I did the infrared, the spec --

Q. No. Well, I know you testified about that already. But

did you test as to the purity of it?

A. What I'm trying to explain is that that test with the infrared spectra, if I don't see any other materials, if it matches the standard directly, it's an indication that it's a very pure material.

Q. Well, that's not quite accurate. When you did the -- what do you call it? The spectrum test on it?

A. Infrared spectography.

Q. All it shows is that the substance has that item in it?

A. It also can give an indication of whether or not it's a mixture.

Q. Well, do you have the color test result to show that?

A. It's not a color test.

Q. What result is it?

A. It's an instrumental technique that has a spectra that's produced.

Q. Did it show any other substances in it?

A. I did not see any other substance in it.

Q. Do you have the results of your test there?

A. I believe I do.

Q. Do you want to pull it out and see? And while you're pulling it out, did you test for any other substances?

A. Any other substances?

Q. Yes, in the material. Did you test it?

A. You mean test for any other substances?

Q. Yes.

A. If I have a moment to look at my notes, I can tell you specifically. The two tests that I ran on the -- what was our Government's Exhibit 15 for phenylacetic acid for the gas chromatograph mass spectrometer, and the results showed that there were no other compounds in there. The other test that I ran was nuclear magnetic resonance spectrometry, and that did not show any other compounds available in that sample.

Q. Well, did you match it with the pure substance when you ran it?

A. I had compared it to results, yes, pure result.

Q. Did you match it with the pure substance?

A. With results of the standard, yes.

Q. May I take a look at your report, please? Does it show the match right on there?

A. It does not show the match with respect to the MR.

Q. Oh, it does not show the match.

A. I do not have the standard included with this particular document.

Q. So what you're telling the Court then, you're just going by your memory. You don't have the match right there with it.

A. It's going on the fact that if there was anything different I would have included a standard to show the differences.

Q. And you admit it's not here; is that right?

A. The standard is not included.

Q. And you have to run it with the standard, don't you?

A. I do, yes.

Q. And does it show that you ran it with the standard on here?

A. I don't -- I'd have to look at the back of the notes.

Q. You would agree that the standard is not attached.

A. With respect to the MR, yes.

Q. And to make it clear, you have to run the standard to see if there was a match on the purity.

A. You compare it to a standard, yes.

MR. PARRISH: All right. Thank you. I have nothing further.

FURTHER REDIRECT EXAMINATION

BY MR. REINERT:

Q. You compare it to a standard. Do you have to run it, or can you get standards from -- what is a standard?

A. There's a number of different standards. There's literature standards that is standard results that are reported in the literature. There are standards that can be run on these instruments not necessarily at the same time and stored. All of the instruments nowadays are computerized, and you can store the digitized spectra, or it can be run at the same time. So there's three different standards, if you

will. Two of them are basically the same, run on the same instrument. It's a question in those two instances whether it's run at the exact same time that the sample is run or run at a previous time.

Q. Is there any requirement about which particular -- whether you use the standard out of the book or the standard on that machine to run it simultaneously or a standard run on that machine at a different time that you have to use?

A. It's preferable to compare a standard that's run under the same parameters that is on the same instrument.

Q. And did you do that in this case?

A. Yes.

Q. On the -- couple items dealing with some questions you answered for the Court. The book that was seized from the residence, The Secrets of Methamphetamine Manufacture --

A. Yes.

Q. -- is that a scientific journal?

A. No, it's not considered a scientific journal.

Q. And you mentioned -- at one point you told the Court that you looked at some pictures of earlier labs. Some of these journal articles that actually came out of legitimate scientific journals, when were some of those articles written and those experiments performed?

A. Some of those were done in the twenties and the thirties and the forties, a lot of the early reported journal

articles. That's not limited to those times, but there was a lot of the -- this type of synthesis, let's see what we can do if we add this particular constituent to this starting ingredient were done during the twenties, thirties, and forties.

Q. Now, how would the lab that then was the basis for those articles compare with the types of equipment that was available to the defendant in the laboratory at his house?

A. In a laboratory setting, they probably would not have been using plastic containers, especially in the twenties. Plastic was not readily available. They would have used all glass containers. But that doesn't preclude the synthesis being successful.

Q. That book, The Secrets of Manufacturing Methamphetamine, where did some of the articles or do you know where some of the articles came from that are republished in The Secrets of Making Methamphetamine?

A. A lot of those were -- the first edition, if I remember correctly, had literature cites to legitimate scientific articles, journal articles. The individual compiled them together to make a report on one particular type of analysis -- or not analysis but synthesis.

Q. And one other thing we talked about earlier that you talked about with Mr. Parrish. You indicated that the methyl amine was not present on scene?

A.   That is correct.

Q.   How could that be made?  How could that be obtained, rather?

A.   There were two synthesis articles available in the site that indicated the manufacture of methyl amine, or it could be purchased commercially.

Q.   And what were the building blocks to make the methyl amine?

A.   Formaldehyde is one of the ones that can be used.

Q.   Did you see on Exhibit 8P reference to the building blocks needed to manufacture the methyl amine?

A.   What is written here is formaldehyde and ammonia chloride would be used to make the methyl amine.

Q.   And you also were asked about the catalyst for the hydrogen bomb.

MR. PARRISH:  That was two cross-examinations ago. My last cross-examination was pretty narrow.  I'm going to object.  It far exceeds the cross.

THE COURT:  It is beyond the scope, but I'm going to allow it anyway.

BY MR. REINERT:

Q.   On the catalyst, what was the catalyst that was going to be used in that?

A.   There were a couple of catalysts that could be used. The information that I saw indicated that platinum -- there

was a listing for platinum.

Q.   And did he have also the recipe on how to utilize the platinum in the hydrogen bomb?

A.   That is available in The Secrets of Methamphetamine Manufacture.

MR. REINERT:  Nothing further.

THE COURT:  Mr. Meyers, I just have a couple of follow-up questions.  On the mass spectrometry and the neutron magnetic resonance spectrometry that you ran on the third stage of this process, would you agree with me that neither one of those tests can be used to determine the practical yield of the process?

THE WITNESS:  Not directly.  Either one of them could be used to quantitate or determine the amount -- the purity of in that particular instance the phenylacetic acid. But in terms of determining the practical yield, not directly.

THE COURT:  And the only way it could be used indirectly would be your inference that if one has the knowledge to generate a high purity level they may have the ability to generate a high practical yield.

THE WITNESS:  I think that would be a fair statement, yes.

THE COURT:  Any follow-up questions?

MR. PARRISH:  No, Your Honor.  I don't think -- oh,

just one question on 8P. I hope it won't generate a lot of questions by the government.

FURTHER RECROSS-EXAMINATION

BY MR. PARRISH:

Q. But on 8P, that's basically a dream lab, right, just like people draw dream cars? You found no equipment that could anywhere produce a thousand ounces of methamphetamine, did you?

A. If it's based upon what was written on here that said 200 reactions --

Q. Right.

A. -- the equipment that he had available, he could do it.

Q. Oh, okay.

MR. PARRISH: I don't have anything further.

THE COURT: Anything further, Mr. Reinert?

MR. REINERT: No, Your Honor.

THE COURT: Thank you, Mr. Meyers.

MR. PARRISH: Your Honor, one point I wanted to bring up, I know we have the hearing at 12:15, but we had brought up to the government earlier -- and with the questions I think we went a little bit longer -- Dr. Moriarty has a flight out at 2:40. And knowing you, you're probably very familiar with the flight schedule. That's what I was telling him on the way in this morning. He has a flight out at 2:40. I don't anticipate my direct examination will take

over a half an hour with him, and I wanted to alert the Court to that matter. But I don't know what the government --

THE COURT: What about your examination?

MR. REINERT: It's tough to say until I can hear it. I don't anticipate it's going to go too long.

THE COURT: Is the day today -- is today the day you're going to the jail, or is that tomorrow?

MR. PARRISH: Well, it's today, and Pat and I were talking about it earlier. I would imagine, Your Honor, we could easily put that off. I think it's scheduled at 1:30, and I don't think it would take over ten minutes for us to do that if we had to do it. But we'll work whatever the Court's schedule --

THE COURT: And your doctor's examination is going to take how long?

MR. PARRISH: I think a half an hour for me, Your Honor. We have the curriculum vita which we attached to our ex parte motion originally. The government has had a chance to take a look at it, and I anticipate it will take a half an hour for me if that much. I don't think it's going --

THE COURT: Okay. Here's what we're going to do: We're going to postpone the Lua plea until after the doctor testifies. We're going to take a ten-minute break and then come back at noon and do the doctor's testimony and then maybe take a break. You can go to the jail and then do Lua's

plea and then resume the hearing. Otherwise I'm afraid that either you wouldn't have enough time to put the doctor on or the government wouldn't have enough time to cross-examine him. And it's a very important issue.

MR. PARRISH: I think Mr. Lua also, Your Honor -- we just got it this morning -- has to go over his factual basis, and I see Charlie just walked in. He's going to go over his factual basis that they gave us this morning too.

THE COURT: Why don't we take a recess until 12:05 and then come back for your expert's testimony.

MR. PARRISH: Thank you, Your Honor.

THE COURT: And then with the understanding that we're going to finish the expert's testimony and then you can go to the jail and then we'll do Mr. Lua's plea.

MR. PARRISH: Thank you, Your Honor.

THE COURT: Okay. Thank you.

(Recess at 11:52 a.m.)

THE COURT: Please be seated. Mr. Parrish, are you ready to call your expert?

MR. PARRISH: I am, Your Honor. Dr. Moriarty, please, would you come forward and raise your right hand and be sworn?

ROBERT MORIARTY, DEFENDANT'S WITNESS, SWORN

THE COURT: Please be seated.

DIRECT EXAMINATION

BY MR. PARRISH:

Q. Doctor, I'm going to get this blackboard here or greenboard where I can see you also and where you can use that. First of all, would you state your name, spell both your first and your last name for the record, please.

A. Robert M. Moriarty, M-o-r-i-a-r-t-y.

Q. And give us your employment address.

A. The University of Illinois, Chicago, Department of Chemistry and also Steroids Limited Chemical Company in Chicago.

Q. And, Doctor, would you tell us what you do at the University of Illinois, please?

A. At the University of Illinois I do teaching as a full professor, and I conduct research directing the research of graduate students in Ph.D. program, and I also work with postdoctoral people, that is, people who have gotten their Ph.D.s already and come to me for some advanced specialized training.

Q. And, Doctor, you did bring a copy of your curriculum vita with you, and you have it present marked as Defendant's Exhibit A, do you not?

A. Yes, I do.

Q. Just briefly, Doctor, before we introduce it, would you tell us where you received your doctorate degree from?

A. I received my doctorate degree from Princeton University

in New Jersey.

Q.   And do you have any postdoctoral work?

A.   Yes, I do.  I did one year at the University of Munich and one year at Harvard University in Cambridge both in departments of chemistry.

Q.   I would like to also ask you, prior to us contacting you or retaining you on this case, did you know me or have any contact with my office?

A.   No.

Q.   Okay.  Have you ever testified in the state of Iowa before?

A.   No, I have not.

Q.   You also mentioned your business, Doctor.  Would you tell us what business involvement you have?

A.   Yes.  Almost as an extension of what I do at the university constitutes what I do in my company, that is, synthesize final drug products or synthesize parts of drugs for assembly into final drug products, and this would be working with major pharmaceutical companies like Abbott Labs or Merck or SmithKline Beecham or with small start-up companies that need a pure chemical compound in order to enter into clinical trials with the compound to evaluate its activity for a given disease indication.

Q.   Doctor, you have marked -- you have what is marked as Defendant's Exhibit A, and you've indicated what that is, and

I've shown a copy to the government earlier.

MR. PARRISH: If there are no objections, I'd like to introduce this as Defendant's Exhibit A which is the doctor's curriculum vita and just ask him, Your Honor, to highlight briefly some background in his career.

* * * *

(Defendant Exhibit A was offered.)

* * * *

THE COURT: Any objection?

MR. REINERT: None, Your Honor.

THE COURT: Defendant's Exhibit A is received.

* * * *

(Defendant Exhibit A was received.)

* * * *

BY MR. PARRISH:

Q. Dr. Moriarty, would you please outline briefly what you would consider some of the highlights of your career?

A. Well, I've had a number of visiting appointments. I spent a year at the National Institutes of Health working on chemical causation of cancer. I was a visiting professor at the University of Marseille, University of Erlangen, University of Geneva, Karolinska Institute in Stockholm working on biomedical problems and also for a year as a visiting professor at the University of Strasbourg in France.

I'll skip the honors and awards and go on to say

that I've taught biochemistry, organic chemistry, organic synthesis, structural determinations, and this -- I've also had pretty good support for my research. This support comes from the U.S. Army Medical Research and Development Command. That was for about a million dollars to assess the effect of certain drugs on nerve transmission. I've gotten support from the Office of Naval Research, the Proctorial Research Foundation, the Office of Air Force Research, and the ONR, the Office of Naval Research, and this goes up to 211 publications as of 1995, so I'm probably up to about 240, 245 publications in peer review and scientific journals.

Q. And, Doctor, would you tell us approximately how many Ph.D.s have you produced in your career in terms of students who have studied for you and you've granted Ph.D.s to?

A. About 50.

Q. And were you forwarded some material, Doctor, to review in this case with regard to some analysis done by DEA agents?

A. Yes, I was.

Q. After you reviewed the material initially, Doctor, did you make an inquiry for some additional information you might have needed?

A. Yes, I did.

Q. And who did you call?

A. Well, I contacted your office telling them what additional information I thought would be useful.

Q. And did you also get in touch with DEA offices in Chicago?

A. Yes. Yes. I had a conversation with Chemist Meyers about the information I had because it was unclear what it actually meant. And during that conversation I think I also indicated that other information would be useful in reaching an opinion.

Q. Now, Doctor, in reaching an opinion, tell us, have you in the past had an opportunity to become familiar with the work of DEA, other state chemistry labs, and labs that exist in the private sector also?

A. Well, I certainly have experience, extensive experience, with commercial labs in the private sector because I'm the president of one of them and I'm responsible for its operation. That is the synthesis of final products. My familiarity with the DEA is I've been an expert witness in about three or four cases that involved the DEA, and I've never visited their labs. So my knowledge is mainly based on looking at documents that were provided to me in those cases but not actually seeing their laboratories.

Q. Are their laboratories from what you're aware of considered laboratories where they conduct synthesis?

A. No. I would think the -- I'm sure the predominant effort in a DEA lab is analytical chemistry to determine the identity and purity of contraband or controlled substances

that have been sealed -- seized. I think I inferred from the testimony that some synthesis is done on a kind of demonstration basis to confirm literature on syntheses, whether they work or work up to the yields that have been reported.

Q. But mainly you would think that they would be analytical laboratories; is that correct?

A. Yes. I'm certain of that. I mean, that would be -- their job basically is to analyze controlled substances.

Q. And the clandestine lab, judging by the photographs you reviewed, the materials you reviewed including the search warrant material from DEA taken from the lab that Mr. Honken had, did you make a determination whether or not that was an analytical lab or a synthesis laboratory?

A. Well, I hate to say this, but I don't want to dignify it with the term synthesis lab. It was a lab in which chemicals would have been mixed, and I don't think they would have been analyzed. There certainly was no evidence of analytical equipment, but there was some evidence that containers there could be used to mix chemicals.

Q. Is there a distinction, Doctor, of people who have the ability to operate an analytical lab and the people who have the ability to operate a synthesis lab?

A. Yes. It's a totally, totally different enterprise, requires totally, totally different instrumentation and

skills.

Q. Would you just give us a brief analysis of what those distinctions might be?

A. Well, in cases of controlled substance, there are two aspects. There's the quantitative and qualitative. So you would want to weigh the material, and then you would want to analyze it to see what percentage of that weight corresponds to the controlled substance. Now, that's all analytical. It involves weighing, and it involves analytical measurements. Now, somewhere along the line, that material had to come into being. It had to be produced. Now, it could have been produced any number of places. It could have been produced in a, quote, unquote, clandestine lab; or it could have been produced in a legitimate laboratory; or it could have been bought from a chemical supplier who supplies controlled substances.

Q. Now, Doctor, judging from your background, experience, and knowledge gathered through teaching, is there a difference between what we would call controlled laboratory settings and clandestine laboratories?

A. Yeah. There certainly is. These reports, these literature reports, have all been carried out in chemical laboratories, and there's a certain level of control there. There's a certain level of things as simple as lighting, electricity, equipment, bench base, exhaust. We all know

what a -- well, I don't know if we all know, but certainly people in the trade know what a chemical laboratory looks like. And, for example, I've been in the business of designing chemical laboratories. I certainly know what they look like and what's required.

Now, of course, there's different levels of cleanliness. A university laboratory would tend to be pretty sloppy where a place making drugs that's doing it under FDA-mandated requirements would have to be a much higher level. But something that's done in a garage or out in a shed is really not a chemical laboratory, and you couldn't expect it to have the same facility, same equipment as you would as what's described in a legitimate article from the scientific literature.

Q. Now, Doctor, based upon your background and experience, would you expect the production or yield to be the same in a controlled setting as it would be in an uncontrolled clandestine setting similar to the type of material you've reviewed from Mr. Honken's seizure?

A. Well, it has to be lower for the following reasons: Number one, the starting point for any synthesis depends upon quality control of the things that you put into it. You have to make sure you're starting with the right stuff. And, therefore, in a legitimate laboratory, you either analyze the starting materials to make sure, number one, the identity is

correct; number two, the purity is correct.

Now, in a -- usually that's taken care of by a certificate of analysis from a certified vendor like Aldridge Chemical Company or Eastman. But a person who's just doing clandestine work wouldn't have that opportunity. They might go into a hardware shop or a paint store and buy a material, and it certainly doesn't have a certificate of analysis, and it's impure. Nor does the operator have the ability to determine the purity. He's starting out with one unknown and carrying it through a chemical reaction just hoping for the best.

Q.   Doctor, you've had a chance to hear Mr. Meyers talk about the articles that, in fact, he observed and where they may be acquired and whether or not simply relying on those articles an individual is able to produce results of yield matched in those articles. Are you able to formulate an opinion based upon your background and experience as to whether or not that would be accurate?

A.   Those yields refer strictly to carrying out the reaction in a legitimate chemical laboratory. We heard the cake baking analogy; okay? Now, there are some similarities and big differences, but it would be tantamount to saying, okay, I'm going to make a cake, but I'm not going to do it in a kitchen. I'm going to do it out in the garage or I'm going to do it out in the backyard or something.

And that's kind of like what we're dealing with here. You have a recipe to make the cake, but the assumption is you have a kitchen to do it in. Well, you have the recipe from the chemical literature to do the experiment, but you're not doing it in a laboratory. You're doing it in a garage or something like that, and you couldn't expect to get the same result.

Q. And in your opinion it would be significantly lower.

A. Yeah. It would be lower for a number of reasons, and maybe I can illustrate it just very briefly on the blackboard.

Q. Yes.

A. We've been talking about A yield B yield C yield D. And we can assess the yield here. If we start with 10 and if it's 80 percent yield, we have 8 if it's an 80 percent yield. We have 64 if it's an 80 percent yield. We have 48 and so on. But that isn't the real world. The real world is you go up here to get B so A equals B, but it also yields a certain amount of a by-product, so now you're dealing with B plus the by-product.

Now, when we say yield is 80 percent, the other 20 percent is something that's up here. Now, you have to remove that in order to continue because if you don't, then this is going to give its products here and this is going to give its products here. So instead of having one thing, you have two

here. Here you have four and you go to the next and you have eight. And the problem is once you get out here, then all bets are off because the stuff just won't give you the desired result.

Now, that's the big challenge of doing the reaction under the best conditions. Now, of course, industry lives and dies on this sort of thing because if you're in the business of having or producing, let's say, ton quantities of something, you have to optimize yield. And that's what Ph.D. chemists do when they go into industry. They say, well, how can I cut out this branch and make sure that A goes predominantly to B? It's dollars and cents. If you're making money off producing ton quantities of B, if you're not getting -- if you're getting 90 percent and you can get it up to 95 percent, that might reflect millions of dollars. So yield is a terribly, terribly important concept in this whole thing.

Well, tied in with yield is how you get rid of the by-product, and that's something that I don't think the laboratory's equipped to do. Now, if you don't get rid of the by-product, then you jeopardized succeeding steps. And insofar as you have impurities in the succeeding materials, you can't help to get a good yield.

Q.   Now, did you find material -- just looking at the clandestine lab report that you saw and in the photographs

any material to remove the by-products?

A. No, I didn't see any evidence of -- any evidence that that was an issue trying to purify the material. There was distillation, but in the case of the benzyl chloride and the benzyl cyanide, I don't think that would be a very effective way of doing it.

Q. And impurities would remain in the substance; is that correct?

A. Yes, it would.

Q. All right. Doctor, you talked about the reports from the DEA you saw and the additional material you wanted to request, and you did, in fact, review the photographs of the lab and followed Mr. Meyers' testimony here in court today; is that correct?

A. Yes.

Q. Now, Doctor, after you reviewed this material, prior to coming into court today, did you reach an opinion as to whether or not methamphetamine could have been produced in the lab with the material that was seized from -- that you acknowledged and the government acknowledged being received from where Mr. Honken was operating?

A. Yes, I did.

Q. And what is that opinion, Doctor?

A. The conclusion was -- my conclusion was that it could not have been produced.

Q.    And could you tell us why it could not have been produced?

A.    Well, again, if we go back to baking the bread analogy, you start out to make the bread and cake, and you find out at the last moment you don't have any eggs.  Well, you can't do it.  You have to go out and buy eggs.  You have one of the critical ingredients missing.  So the question is could the person have made the cake.  No, he couldn't because he doesn't have all the parts and the critical parts were missing, methyl amine, palladium catalyst, platinum catalyst which is very, very difficult to come by.  There was an alternative that could have been used, sodium borohydride, b-o-r-o-h-y-d-r-i-d-e, but that is only written on a piece of paper.  So there are a number of reasons why the substance could not have been made in any quantity because the materials weren't there.

The second thing was could it have been made in any quantity were the materials there, and that's doubtful given the equipment.  We heard earlier that using equipment similar to the equipment that was used in the clandestine lab, the process was repeated in the DEA lab.  Well, I can't believe that the equipment in any DEA lab would be similar to -- the plastic pots and pans and things that were found at the clandestine lab site would have been used in a DEA lab.

Q.    So even if the equipment that the government is

indicating could have been placed there based upon the material you reviewed and the -- and your experience, it still could not have been produced with what you saw.

A.     In my opinion it could not have been.

Q.     Let's talk a little bit about the toluene in the case. Were you familiar at all with the purity of the toluene from reviewing the -- toluene, I should say, from reviewing the government's material that we furnished to you here for this?

A.     Well, I originally got a DEA report that's called a clandestine laboratory report summary analysis where there was no mention of toluene.  Then in another document there was a mention of seizing 16.4 kilograms of toluene.  Now, toluene is a fairly common chemical.  It's used widely now as a replacement solvent for benzene, so there's nothing really exotic about having toluene.

The second point is, as I mentioned earlier, in starting any synthesis you have to have an idea of the identity and purity of the material you start with.  I saw no indication from the laboratory reports that the toluene had ever been analyzed with respect either to its identity or its purity.

Q.     Is it easy to analyze toluene if it had been found and kept to determine the purity level?

A.     Oh, it's a routine chemical analysis.  There are any number of ways of doing it.  GC, gas chromatography, probably

would be the most easy way at hand. That would probably identify it as being both toluene and also give you an indication of the purity.

Q. Would the toluene's purity have affected the purity of any -- and I realize you indicate that no product could have been made, but let's say all of the other factors were present and there was a magical formula in this instance to complete the methamphetamine. Would the purity of the toluene, the two gallons or approximately two gallons that they may have recalled seeing there, have affected the purity of the methamphetamine?

A. Yes, it would, and you can see it from the drawing here. If you start out with something that's 70 percent pure toluene and 30 percent something else, then that 30 percent acts in the next chemical reaction to give its own set of products where the 70 percent gives the expected product, and that would be carried through the entire synthesis. So the result would be the final product would reflect those impurities unless they were removed.

Q. You also mentioned, Doctor, a couple of other factors other than the toluene that would have affected the outcome in this case. Could you explain to the Court and, if necessary, use the board to outline what other factors would have prevented the production of methamphetamine under these circumstances?

A.     Well, there are four things we would want to look at. We would want to look at the equipment available. We would want to look at the quantities of chemicals available. We would want to look at the physical layout of the site where the syntheses were being done and the level of competence of the coworkers.

Now, I don't see any evidence of quantities of chemicals, pure chemicals, that could be extrapolated to yield any amount of methamphetamine. The equipment that was used, the volumes weren't big enough. I mean, there were no 22-liter flasks. There were no 50-liter flasks. There were tiny -- the maximum sized flask I saw in the photographs was about 250 milliliters. The -- if you read the articles and you read the scientific description how it's done in a lab, those pieces of equipment do not exist in the clandestine laboratory. And now maybe analogs of them do, but then again, the analog is not going to really be effective in getting a good yield.

The place in which it was done would present a lot of dangers. I mean, there was a lot of gas being evolved, corrosive gases, chlorine, hydrochloric acid, sulfuric acid. This would make it a dangerous working place, and I think that would have an effect on the productivity of the laboratory.

Then finally the competence of the co -- of the

people working on it. The scientific articles were done by professors, by Ph.D.s, professors guiding Ph.D. research. There were no highly trained synthetic organic chemists as far as I can see from the documents. I don't see the level of competence that would be consonant with the complexity of this synthesis existing in the clandestine laboratory.

Q. And did you, Doctor, in your draft report which would now be your final report reach a conclusion as to the competence level of the individuals who were conducting this clandestine laboratory?

A. Yes, I did. It was based on analytical data that was given, supplied for some of the confiscated intermediate. So, for example, 29 milliliters of benzyl chloride, benzyl chloride was isolated. Now, this is going to be tough. It contained other ingredients, 1-methyl-2-(phenylmethyl)-benzene, 1-methyl-4-(phenylmethyl)-benzene, chloromethyldiphenylmethane.

There was another sample of a benzyl cyanide, 30 milliliters of benzyl cyanide, analyzed. It contained 1-methyl-2-phenyl -- 1-methyl-2-(phenylmethyl)-benzene, 1-methyl-4-(phenylmethyl)-benzene, chloromethyldiphenylmethane, 2-chloro-ben -- benzacetonitrile, 4-chloro-benzacetonitrile, and benzacetamide.

Now, what this means to me, if a student is working

in a lab and they come in with a product and they say this is benzyl cyanide but it contains five or six or seven other things, then I would have to say you're not doing very well. You're not controlling your reaction conditions. You're not purifying the product. This is useless for the purpose of doing what I asked you to do, convert A to B. You've converted A to B plus X plus Y plus Z plus W. So that goes to the competence of the person doing the experiment.

Q. And, Doctor, do you have a copy of your report with you now that is --

A. Yes, I do.

Q. And we've furnished it now to the government, and I'd like to mark this as -- and this is the same report you had furnished to me earlier; is that correct?

A. That's correct.

MR. PARRISH: I'd like to mark this as Defendant's Exhibit B.

THE COURT: Is there any objection, Mr. Reinert, to Defendant's Exhibit B?

MR. REINERT: No, Your Honor.

MR. PARRISH: And move to introduce this two-page report.

* * * *

(Defendant Exhibit B was offered.)

* * * *

THE COURT: Defendant's Exhibit B is received.

* * * *

(Defendant Exhibit B was received.)

* * * *

MR. PARRISH: Thank you, Doctor. I have no further questions.

THE COURT: Mr. Reinert?

MR. PARRISH: Yes, I do. I'm sorry. I do, Your Honor. Sorry about that. I do have one last question.

BY MR. PARRISH:

Q. Doctor, I'm going to show you what is considered the summary of the analysis of the clandestine laboratory report which is the last page but it's listed as page 1. This is page 1, and actually it's the last page that was contained on the report from your agent. Did you have a chance, Doctor, to review the summary of analysis at the end of that report?

A. Yes, yes, I did.

Q. Okay. Doctor, would you explain what you found, and would you give a summary on this analysis, please?

A. Well, what I found, these are very, very small amounts of material, 29 milliliters, 30 milliliters, 4 -- there's 4 milliliters of toluene here, 4 milliliters. So the five-gallon drum if it were filled would contain 20 liters which would be 80,000 times greater than the amount that was reported here, so there's a big discrepancy. I mean, these

are very, very small amounts of materials that were analyzed.

MR. PARRISH: I have nothing further. Thank you.

CROSS-EXAMINATION

BY MR. REINERT:

Q. Now, the small amounts of materials that were analyzed, that's the amount of the sample that was taken, not the total that was seized; correct?

A. There's nothing on this report to indicate that that's the case.

Q. Well, sir, you're familiar with DEA procedures to take samples of seized items and not the entire item from a clandestine laboratory; correct?

A. That's correct.

Q. So that would be consistent that those weights and the items that are given there are, in fact, the size of the sample, not the size of the total amount seized; correct?

A. That's correct, but I don't have the total amount seized.

Q. I understand that, sir. I just wanted to clarify that the weights that are in there are the sample sizes, not the sizes seized. Some of the items you talked about that would have multiple substances in them --

A. Yes.

Q. -- you talked about doing distillations or taking steps to purify a substance.

A.    Yes.

Q.    Do you recall that?  Now, when one purifies a substance and removes the target substance, whatever that may be, what's left over as the reaction by-products is going to have the rest of those items in it; correct?

A.    That's correct.

Q.    So many of those items you have there which are mixtures of a number of things could very well be just the reaction by-product after the target substance was removed; correct?

A.    They could be, but that certainly isn't indicated.  What you say is true, but we don't know what they are.

Q.    And it may depend upon, let's say, there was a waste can -- you heard about the kerosene can being a waste can that things were dumped into; correct?  Did you hear about that?

A.    Yeah, I heard that.

Q.    So a sample drawn from that is certainly going to be a mixture of a number of different substances because that's just the waste that's thrown away or discarded; correct?

A.    Yes, but why weren't the analyses of the pure materials on this same document?

Q.    Well, sir, if I could ask the questions, this might work a little better.

A.    I'm sorry.

Q.    And actually when you drew your little chart there on

the top, now, if there are steps being taken to distill or purify the substance through whatever means, you're going to have a reduced quantity of those by-products; correct?

A.   Yes, depending on how efficient the separation is.

Q.   Certainly.  And, in fact, some of the by-products that might inadvertently be left with the target substance don't react necessarily in the next reaction.  They don't always react; isn't that correct?

A.   In the actual chemistry that's being discussed, they do react, the principal ones.  They do react in the second step.

Q.   In the second step but not in every step.

A.   Well, let me think now.  They'd also react in the third step and the fourth step.

Q.   But if they're taking steps to purify it, you're going to have a very small amount of that; is that correct?

A.   That's purely a function of how efficient the purification is.

Q.   And the longer they had done -- some of the purification steps are relatively simple to carry out.  You teach students how to do them all the time; right?

A.   Well, there's a difference between teaching something and whether it's simple or not.  I mean, distillation is a complicated operation.

Q.   But once it's learned, it's something the student can do routinely; correct?

A. No, because every case is different. I mean, the technique is there, but it's modified according to the case at hand. It's not an all-purpose technique that you don't change for each individual case.

Q. Certainly. But if someone is doing the same reaction, using the same technique again and again and again, you would agree that they tend to get better -- their technique gets better and their production gets better; correct?

A. Well, sure. People do tend to get better with practice in general.

Q. You talked about, first of all, that there would be some items that would be missing.

A. Yes.

Q. And you used the baking a cake analogy or baking a bread analogy about having some eggs missing; is that correct?

A. That's correct.

Q. But you're aware that the Court in trying to make a determination in this case is allowed to consider that those eggs would be there or they would be purchased or may be manufactured on site; correct?

A. Am I aware that that's the Court's position that they could in principle be gotten?

Q. Are you aware that that's the state of the law, that some of those missing chemicals can be assumed to be present?

A. I don't follow the logic of that. If they're missing, I

don't think they can be assumed to be present.

Q. I understand you may not understand the logic of it, sir, but I want you to go with me on this; okay?

A. Okay.

Q. Let's just assume, for instance, that those missing chemicals that you said were missing, the methyl amine and the palladium, that those -- the platinum, I'm sorry, I misspoke, that those two items were, in fact, there.

A. They were, in fact, there.

Q. Let's assume that, there, for the sake of questions; okay?

A. If I assume that the missing ingredients were, in fact, not missing but, in fact, were there, then I'd have to change my opinion.

Q. And then your opinion would be that all of those chemicals would be present to manufacture methamphetamine.

A. If you posit that virtually they are present but I don't know about them, then I would have to say that the necessary chemicals are virtually there.

Q. And they could manufacture methamphetamine assuming that those chemicals were there?

A. Assuming that the chemicals really were there but I don't know about it, then I would have to say I would have to conclude that the chemicals necessary for the synthesis of methamphetamine are there.

Q.   And same for the equipment.  The only piece of equipment that was missing was the hydrogen bomb apparatus; correct?

A.   Well, there were not the appropriate sized flasks.  Okay.

Q.   Just bear with me here, sir.

A.   Okay.

Q.   First of all, you said the appropriate sized flasks.  Now, you produce drugs at your company; correct?

A.   Right.

Q.   And in the mass production of large quantities, you use the large 22-liter round bottom flasks and vessels of that size; correct?

A.   That's correct.

Q.   And you can make larger quantities in that; right?

A.   That's correct.

Q.   But you can also use smaller round bottom flasks to make smaller amounts; correct?

A.   That's correct.

Q.   Because chemistry's the same.  Just kind of cut down on the proportions; correct?

A.   That's correct.

Q.   So the types of glassware although -- you may not think it would be a commercial production because they didn't have 22-liter vessels, but the types of glassware they had available were the types of glassware that they needed for a

small methamphetamine laboratory making small batches at a time.

A. For a very small production batch.

Q. They could make what? Upwards of a pound probably each batch?

A. Oh, heavens, no. That would be half a kilogram. No, no. I'm talking fractions of ounces.

Q. You're talking fractions of ounces not like --

A. Well, the total amount we're talking about are 10 pounds on the best of conditions, 5.6 kilograms. So to me a pound is -- or half a pound is a huge amount of material.

Q. You -- so putting aside the -- your concern that the glassware wouldn't be large enough for a large scale commercial production, and let's just assume we're talking about a smaller batch size over multiple times; okay?

A. Okay.

Q. Now, assuming that and that the glassware they were using would regulate their batch size, then the only piece of equipment that was missing was the hydrogen bomb; correct?

A. No, I can't agree with that because if we analyze each of the steps individually, there are critical parts of the equipment that's required by the step that weren't present.

Q. Many of those pieces of equipment are relatively easy to put together; correct?

A. Do you mean virtually they exist somewhere or they could

be fabricated on site?

Q. Both, sir.

A. Well, certainly virtually they exist somewhere. I mean, they would be in a chemical laboratory. Whether they could be fabricated on site, I don't think they could be.

Q. Sir, you're aware that the furnace was manufactured on site, are you not?

A. Yes, that's one part that was there.

Q. And that's not an easy feat; wouldn't you agree?

THE WITNESS: Is this water?

THE COURT: It should be.

THE WITNESS: Excuse me.

THE COURT: Hasn't been tested for purity, though.

THE WITNESS: No certificate of analysis. Smells good.

THE COURT: Well, we know that's the test.

A. Yes, the furnace was one of the required pieces of equipment, and that was manufactured on site.

Q. And that was not an easy feat for one to manufacture that; wouldn't you agree?

A. It would be relatively -- yeah, it's a relatively complicated thing to make.

Q. But one can follow the steps through an article and learn how to manufacture something of that nature; correct?

A. Yes.

Q. You said you produce chemicals for medications or intermediate products; isn't that correct?

A. That's correct.

Q. And I presume -- maybe I shouldn't presume. I would presume that you make sure you have good quality control.

A. Absolutely.

Q. Because it's your name at stake when you sell this substance to Abbott Labs or whatever company you're selling it to; right?

A. That's correct.

Q. So you want to make sure that your substance is pure; correct?

A. That's correct.

Q. Kind of a little bit of brand name pride almost?

A. Well, it goes beyond that. I mean, it's either pure or not pure. If it's not pure, it's a rejection batch.

Q. And there's -- aside from the safety concerns and other things, you want to make sure that your product that comes out commercially is pure.

A. That's correct.

Q. And other companies I'm sure routinely have the same kind of quality checks and quality control to make sure that their product is pure.

A. That's the reason the FDA exists.

Q. And you heard Toluol is a brand name of pure toluene;

correct?

A. No, I did not hear that at all. I did not hear that Toluol is a brand name for pure form of toluene.

Q. It's a brand name for toluene.

A. That's correct.

Q. And you heard testimony that Mr. Meyers was unaware of any occasion when the toluene sold under the brand name Toluol was anything less than pure. That matches with your background, doesn't it, sir?

A. Well, it doesn't. My background is if I buy toluene, I get a certificate of analysis, and that needs to come from a legitimate chemical supplier. I think if I bought the toluene in a hardware store, I wouldn't expect that level of purity.

Q. Now, when the chemical suppliers, when they test their production run -- let's say they're making toluene -- they might make 5,000 gallons.

A. That's correct.

Q. Test it, and then they put it all into the cans and sell it; right?

A. Well, not really because there are grades of solvents. There's commercial grade. There's reagent grade, and they all have higher level of purity.

Q. But they don't test each individual can.

A. No, but there's a statistical requirement for testing

batches to assure that all of the batches have the same purity.

Q. But if it's going to be sold under a brand name as toluene, it's going to have a very high purity as opposed to being sold as a paint thinner or a mix; correct?

A. I really would have to disagree because the mere fact that it's sold under the brand name toluene doesn't say anything at all about purity.

Q. Sir, where is the methamphetamine that makes it on to the streets manufactured? Is that manufactured in commercial laboratories or elsewhere?

A. Well, it's -- a certain amount is manufactured in legitimate controlled laboratories because Sigma Chemical Company sells pure --

Q. Let me clarify. Dextro-methamphetamine, sir.

A. Yes.

Q. I understand levo-methamphetamine does have some medicinal use. I'm talking about dextro-methamphetamine. It hits the streets illegally and is called crank. Where is that manufactured? Is that manufactured in perfect lab settings or other locations?

A. Well, dextro-methamphetamine is not synthesized -- it certainly isn't synthesized in clandestine labs.

Q. Methamphetamine is not --

A. Dextro-methamphetamine. That was your question.

Q.   If you start with, say, ephedrine, for instance, L-ephedrine, you make D-methamphetamine; correct?

A.   Yes.  But now, of course, you're not using chemistry here.  You're using a different method.

Q.   I understand that, sir.  But you just told me that D-methamphetamine is not made in clandestine laboratories.

A.   I misspoke.  I thought we were still talking about meth. You're correct.  It isn't.

Q.   So methamphetamine predominantly that we find is made in clandestine laboratories of all varieties and types; correct?

A.   It's a material that is made in clandestine labs, yes.

Q.   Now, have you ever manufactured methamphetamine yourself, sir?

A.   No, I have not.

Q.   Have you ever directed your students to manufacture methamphetamine as any kind of experiment?

A.   No, I have not.

Q.   Have you ever been involved in personally going out and going to clandestine laboratories and doing production analyses of the laboratories other than these couple of times you've talked about earlier?

A.   Well, I'll agree with the end of the question.  I have been asked to reanalyze materials that were alleged to be methamphetamine, but I haven't actually been involved in the seizure of the materials.

Q.   And the reanalysis, was that done at the government's request or defense requests?

A.   The defense request.

Q.   Did you interview the cooks or the operators of clandestine laboratories to gain experience in clandestine production of methamphetamine?

A.   I've spoken to them in the course of working in their defense.  Yes, I have.

Q.   So the vast majority of your knowledge on clandestine laboratory analysis comes from just talking to various -- a few defendants.

A.   That's correct, yeah.

Q.   The steps that we have talked about here -- now, in fact, you can convert toluene to benzyl chloride; correct?

A.   You can, yes.

Q.   And you can do so in the method that's described -- you've reviewed Government's Exhibit 23; correct?

A.   Yes, I have.

Q.   And that method, in fact, works; correct?

A.   It works but has problems because if you're not very careful, you get the dichlorinated or trichloronated product, so it's not at all a straightforward reaction.

Q.   I understand, sir, that -- I was a political science major, not a chemist, so I certainly understand that chemistry's not an easy thing, but people can do it.  And, in

fact, benzyl chloride can be produced from toluene using this method; correct, sir?

A.   That's correct.

Q.   And benzyl chloride with sodium cyanide can also be produced into benzyl cyanide just as described in the articles seized at the lab; correct?

A.   That's correct.

Q.   And benzyl cyanide can be converted to phenylacetic acid; correct?

A.   That's correct.

Q.   Phenylacetic acid can also be converted to P-2-P using that furnace; correct?

A.   That's correct.

Q.   And the P-2-P can ultimately be converted to methamphetamine; is that not correct --

A.   Well --

Q.   -- using the method --

A.   Well, it certainly can't by the documents I had.  I mean, the flow sheet didn't indicate that, and the testimony that was given by Chemist Meyers was the last step, step 5, just involves methyl amine and the benzyl methyl ketone, and that's not correct.

Q.   But it can be produced using the platinum metal and the hydrogen bomb as was described; correct?

A.   Yes.  If you have that, then that's correct, it could

be. It would be racemic methamphetamine.

Q. And, in fact, Agent Meyers' or Mr. Meyers' math is correct on the production with the theoretical yield being 32.9 kilos from the 5 gallons of toluene?

A. That is something that I'm -- that's -- I'm unfamiliar with that as a scientist. It looks like you just look at the form of toluene and you add on to the molecular weight of the groups and then come up with a number. It really has no meaning in real life because synthesis doesn't work that way.

Q. I understand that, sir, and maybe I didn't ask a good question for you. But a maximum theoretical yield is something that chemists do routinely as kind of a benchmark. I understand it's not -- no one's going to reach a theoretical yield, but that is a benchmark by which you measure your progress.

A. No, it really isn't. I mean, it's something that just doesn't apply in organic synthesis. What does apply is following the literature procedure and trying to duplicate the yield that they get, and that's the predicted yield, and that's the one you try and get. That's the only yield that has any meaning. So when A goes to B as reported in 73 percent yield, that's what you're aiming for because that's the reported yield.

Q. But, sir, you said that if you could boost the yield from 73 to 75 percent or from 90 to 95 percent that might

make millions of dollars of difference to a company.

A.   Absolutely.

Q.   Well, at some point you have to understand when you look at a reaction and somebody says, I can get X amount, at some point you know you can't go any higher because you've hit the maximum theoretical yield or so close to it that you can't get any higher; right?

A.   Well, you can't get any higher because of the preservation of matter.  You can't get more out than you put in; okay?  And in synthetic organic chemistry, you simply don't get 100 percent.  That doesn't happen.

Q.   And, sir, that's why the maximum -- that's why it's called the maximum theoretical yield because you can't get any more than that.  If everything was perfect --

A.   Okay.  Well, I'll -- okay, fine.

Q.   So we do talk about maximum theoretical yields routinely in chemistry.

A.   No, we do not.

Q.   But you went through and checked the steps based upon the journal articles and the yields obtained; correct?

A.   Right.  Yes, I did.

Q.   And, in fact, when you start with the 5 gallons of toluene, 16.4 kilos, you would end up with 5.6 kilos of methamphetamine according to the journal articles; is that not correct?

A. Yeah, I trust that calculation if you've got the yields that were reported in the literature. Although I didn't actually see a yield for the final step, the reductive amination of the ketone to get the methamphetamine, I didn't see any report of that in the literature. I think it's reported as 52 percent, but I don't know where that number came from.

Q. And you did, in fact, review Exhibit 8P; isn't that correct?

A. Yeah, I did, right.

Q. And that was the 50-gallon note?

A. Yeah, I think so.

Q. I've got it here, sir, if you'd like --

A. Yeah, I'd like to see it. Thank you. Yes, I had a look at this one.

Q. And, in fact, that yield that's down -- part the way down that page matches with Mr. Meyers' yield by a difference of 10.

A. Yeah, I think we did that calculation earlier.

Q. You were reluctant to call the laboratory at the garage at Mr. Honken's house as a synthesis laboratory. Now, synthesis is in laymen's terms basically mixing the items together in the correct proportions and then treating them in a way that they're supposed to be treated under the articles, whether that be heated or cooled or whatever; correct?

A.   That's correct, but there's a very important issue of control.

Q.   I understand your concerns about control, sir.

A.   Uh-huh.

Q.   But would you agree, sir, that if one has an appendix ruptured and they need to have their appendix taken out it's better to have it done in a hospital?

A.   Yes, I would agree with that.

Q.   But if you couldn't get to a hospital -- let's say you were snowed in.  Sometimes that happens even in Chicago. Let's say you're snowed in and your appendix ruptured.

A.   Right.

Q.   Now, even though it might not be the best environment, the doctor could still remove your appendix on your living room floor, couldn't he?

A.   Yes, but I want to make sure it's a doctor.

Q.   Even a paramedic.

A.   Well --

Q.   Even some people that get other specialized training, for instance, soldiers many times have first aid skills that can do that.

A.   A soldier removes appendix under emergency conditions?

Q.   Certainly, sir.  And sometimes people can learn their craft, hone their skills by doing, for instance, a chemical experiment again and again and again; correct?

A.   Well, yes, but there's something to be added there also if you'd allow me.

Q.   And sometimes when they -- for instance, they might even get some validation of their skills by having some of their, say, drugs they produced seized.  Let me restate that question.  You looked at me like I lost you there, and I probably did.

For instance, if one is involved in the illegal production of drugs and some of those drugs are seized and shown to be of a high purity, that certainly validates in the operator's mind his ability to produce a high quality product; correct?

A.   Yes.

Q.   And that would especially be important if one's using the same method of production over an extended period of time; correct?

A.   Yeah, where producibility would be important.

Q.   When -- in your company are all the people who pour the chemicals into the flask for reaction, is each one of those people a Ph.D.?

A.   No.

Q.   In fact, a lot of people are technicians that work.

A.   No.  Actually the majority are Ph.D.s.  It's about 80 percent Ph.D.s, about 20 percent at least bachelor's degrees in chemistry.

Q. But some of the -- in your teaching experience, for instance, a lot of those people are certainly less well trained especially than your years.

A. Absolutely.

Q. But they can -- we're not saying people who don't go to school can't be educated, are we?

A. No.

Q. And, in fact, they could learn some of those technical skills of, say, a particular production method of manufacturing methamphetamine, for instance.

A. In a kind of apprenticeship role where they fail a few times and then they hit it once and then they try another 10 and they hit it once and eventually they proved a score over 100 runs over a period of 3 or 4 years?

Q. Or ultimately when they start out they might have some missteps which you would expect a few missteps early on, would you not?

A. Yeah, and this is a common experience in teaching where people go in the lab and break everything and then at the end of the year they're not quite as bad at it. But it's hard to compare the two really, at least I find in my own mind.

Q. Now, the learning curve that you're talking about on teaching students, those students are doing a number of different types of reactions and different types of techniques over the course of a year; correct?

A.    That's correct.

Q.    Whereas the learning curve would certainly be shorter if one focused on a single set of discrete techniques; correct?

A.    Yeah, that's true.  But, of course, in multi-step synthesis, you have multi steps to master.

MR. REINERT:  Nothing further, Your Honor.

THE COURT:  Mr. Parrish?

MR. PARRISH:  I just have a couple of questions for you.

REDIRECT EXAMINATION

BY MR. PARRISH:

Q.    On the summary sheet that you saw, Dr. Moriarty, does it appear to you -- and let me see if we have it back here.  I think it's page 1.  Does it talk about --

MR. REINERT:  Mr. Parrish, which summary sheet --

MR. PARRISH:  The same one we referred to before coming from the lab.

MR. REINERT:  Was that Exhibit 24?

MR. PARRISH:  I don't know whether it's listed as an exhibit.  I'll just show it to you.

BY MR. PARRISH:

Q.    Mr. Reinert asked you of the items seized.  Does it appear to you those are the items seized, or does it talk about a sample of items?  Which one?

A.    My impression is that these are representative samples

taken out from larger lots, and that's the reason it was explained to me why they're relatively small. In other words, the four milliliters of toluene wasn't the total amount of toluene. It was the amount analyzed. And 30 milliliters of benzyl cyanide were analyzed. Now, if it's a representative sample, that means the whole sample has this impurity profile.

Q. Exactly. And the next question I have for you is benzene chloride, is that a clear liquid, or is it an off-white powder substance?

A. It's clear liquid.

Q. Did you find out there was a mistake in the lab report with regard to that substance?

A. Well, yeah, I think so. The way I read it, it's 1.21, and if it's liters -- if it's kilograms, then that can't be correct. It would have to be liters. Or then again, it's not clear what it is, whether it's 1.21. This is the very first item. It's very unclear actually what's being measured there, whether it's a solid or liquid or what the actual weight is.

Q. Benzene chloride is a liquid; is that correct?

A. Yes, it is, not a solid.

Q. And in the analysis of Mr. Meyers, you agree or disagree with his analysis that you could, in fact, produce methamphetamine from the material you saw and that you heard

him testify about.

A.    Well, my position is you couldn't because key ingredients are missing.  That's the most fundamental reason.  You can't make it without having the stuff.  And then the secondary one is the equipment didn't allow for the production.

Q.    And Mr. Reinert asked you another question before you could complete your answer to the equipment.  You were talking about the small beakers or flasks that were there, and were you listing other items also that you saw that would have interfered with the production?

A.    Yeah.  For example, I didn't see any temperature controls.  I don't think I saw any thermometers.  I didn't see any -- the balance that was shown there looked like a pretty poor quality one.  The controls that we're concerned about are control of temperature, control of weight, control of volumes because if you're not putting the right amount of stuff in, you're not going to get the right stuff out.  You're going to get the ratios wrong.  So there's no evidence of any of those controls in place.  That was the -- the other thing is if you say, okay, I'm going to make this in 50 batches, then statistically some of those batches are not going to work.  So you end up decreasing the yield by repetition, and that has the ultimate result of having you not produce the amounts that you anticipate because the

repetition involves failed runs which decrease the final yield.

Q. The final question I have for you with regard to Government's Exhibit P8 I believe -- and they've shown you that.

A. Yes.

Q. -- and is it your opinion that you agree or disagree that that could have been produced in the lab with the equipment -- material and equipment you saw?

A. No, absolutely not. These are huge amounts, and this is just way out of range for anything that could be produced given the equipment that I saw.

MR. PARRISH: I have no further questions.

THE COURT: Mr. Reinert?

MR. REINERT: Thank you, Your Honor.

RECROSS-EXAMINATION

BY MR. REINERT:

Q. You said it couldn't be produced due to size. Is that simply because you would have had to make so many runs to do it?

A. Well, it's not only that. It's also just disposal of waste solvents and so on becomes a tremendous problem.

Q. Let's just assume that our guy doesn't care about waste solvents.

A. Okay.

Q.   He's going to put them in a jug and throw them in a ditch somewhere.  He's not going to have to pay a hazardous waste carrier to get rid of it.  If he's going to use this equipment, he could get to that range if he had a number of reactions and, in fact, we -- I think the note talks about two hundred some reactions, two hundred and some passes through from toluene to methamphetamine; correct?

A.   Well, what's unclear here, what was the amount that he was producing per run?  I don't -- do you know?  I don't know the amount that he was producing per run for the 200.

Q.   If you divided that out -- with a 2,000 ounce for 200 reactions, that would be 10 ounces per reaction; correct?

A.   Okay.  So 10 ounces per reaction and he's going to do it 200 times?

Q.   That's what the note says.

A.   Yeah.  I mean, the problem that I would see is just repeating a multi-step synthesis, a five-step synthesis, with all the things that go wrong and expect that you would get it to work every third time.  I think that would be good if you got between 40, 50 percent of them in this zero reaction actually yield product because it's very complicated synthesis.  It's one that would not lend itself well to repetitions.

Q.   So you would take that 2,000 ounces and about quarter it?  Is that what you're saying?

A. Well, first of all, I disagree with the whole concept because to me this is -- you can multiply the thing by ten and it would have the same value. I mean, it's just a theoretical calculation.

Q. But that theoretical calculation tracks the practical calculation.

A. It does, yeah. It's like if I had a million dollars and I invest it at 10 percent, well, I don't have a million dollars, but still I can say how much I would get.

Q. So when you talk about theoretical, you're talking about simply because he didn't happen to have 50 gallons at this point.

A. I don't know the answer to that. I don't think he did.

Q. Some of the -- you talked about the benzene -- benzyl cyanide being normally a solid; is that right?

A. Yes. Well, it's not a solid. It's a liquid. But this report seems to indicate that it's a solid.

Q. I'm sorry, the benzyl chloride.

A. Benzyl chloride, yes.

Q. But if that's put into, for instance, toluene, toluene's a solvent. It would go into the liquid; correct?

A. Yeah, you'd have a homogenous solution, a clear solution.

Q. And you said some of the products that you saw on Exhibit 24, that last page, had a number of different

chemicals in them. You said that would be uniform throughout the solution.

A. That's correct.

Q. Now, some of those exhibits -- in fact, there's one exhibit called 9A and 9B. And, in fact, those are two different samples drawn from the same solution container. Are you aware of that?

A. If it was it doesn't make any sense because if they're drawn from the same solution, they have to be the same. They can't be 9A and 9B.

Q. You've never heard of a biphase solution, sir?

A. It doesn't say biphase. You're saying solution which to me is a homogenous solution.

Q. Well, let's say we have a bucket of water and you pour oil on top. You draw one sample from the top; you're going to get oil and one sample from the bottom; you're going to get water; right?

A. Absolutely.

Q. So that's a biphase solution.

A. That's correct.

Q. So if you have 9A and 9B drawn from two different locations within the same solution, that means what you had there was a biphase solution; correct?

A. You sure do, but it didn't say anything about biphase. I mean, it could be triphase and what not.

Q. And you were present and looked at the photographs even before court, and you saw and heard about thermometers, rheostats and scales as control measures; correct?

A. I didn't see thermometers there.

Q. You didn't see the big yellow thermometer in one of the first pictures that was shown to the Court by Mr. Meyers?

A. No, I don't believe I did. Was that in the distillation column?

Q. Yes, sir.

A. Okay. I'll admit there was one in the distillation column, but I didn't see one in the heating systems.

MR. REINERT: Nothing further.

THE COURT: Mr. Parrish?

MR. PARRISH: I have no questions, Your Honor.

THE COURT: Doctor, I just have a few questions for you. Do you have an opinion as to whether or not there's a relationship between the purity level as a result of this process and the practical yield?

THE WITNESS: Yes, I do.

THE COURT: And what is that opinion?

THE WITNESS: It's complicated. If you start out with 50 grams of something that's 9 percent pure, okay, you've achieved a yield of 50 grams let's say. But then to improve the purity, you start doing processing that reduces the yield. So in other words, to up the purity, it's at the

expense of the amount you started with. So the relationship is the pure material is always going to be associated with a lower yield than the less pure material. It's like if you have -- let's say you have a hundred units of something that's --

THE COURT: Well, there's an inverse relationship.

THE WITNESS: Exactly. There's an inverse relationship between the two. That's the simple answer. And that relationship increases. As you go to higher purity, you lose more of the material.

THE COURT: Now, I want to focus on Mr. Meyers' testimony about -- as I understand his testimony, he has projected a 17 percent practical yield using this 5-step process, and the assumption is that that's what the journal or book articles that were seized from the residence indicate one could expect, so that's the assumption.

And I want you to further assume that they have all the necessary chemicals and the equipment that's missing. Would you expect either Mr. Cutkomp or Mr. Honken to achieve a 17 percent practical yield?

THE WITNESS: No, I would not.

THE COURT: Can you tell me why not?

THE WITNESS: Okay. At least one of these methods is from the collected volumes of the organic synthesis, and the way that originates is a scientist is out there working

in a -- let's say university laboratory, comes up with a method, let's say, to make one of the steps in this, and he's asked to write up a recipe basically and submit it to this journal. And the journal in turn sends it out to three scientists in the world basically to repeat it, first of all, to see whether the thing really works.

Now, this kind of sending it out to people to check -- they're called checkers -- you're going to the best and most competent people. Then they come back. They write a report and say, yes, two of us got the 70 percent yield. One guy only got 60 percent, so it probably would be an average yield then. But that's working at the highest possible level using the best possible equipment using the best and most competent workers. That is how you would achieve that yield. I mean, it's like the holy grail. That's the highest that you could get under those operating conditions.

That's basically the reason that I don't think that given Mr. Honken's training, given the laboratory he was working in or lack thereof, given the analytical qualification of the starting materials, questionable purity, and so on that he could ever hope to get that yield.

Basically we have the literature description that describes the yield that is obtained under the optimal conditions by repetition by the best possible workers. And

then we say, okay, a fellow working under the circumstances that we see in the pictures, the chemicals we have, the analytical data that was supplied could achieve that as yields, and I just don't think it's possible.

THE COURT: Do you have an opinion to a reasonable degree of professional certainty as to what the likely yield would be for this clandestine lab using the five-step process with individuals with the educational background in chemistry of a junior college level?

THE WITNESS: Given all the chemicals.

THE COURT: Given all of the chemicals and the equipment.

THE WITNESS: I would be surprised if it were much better than 10 percent if you averaged out all the failed runs and all the possible things that could go wrong. I would be -- I would think it'd be doing well if he got 10 percent. That would be -- that's the best I would think, and that would be with multiple runs, and I could see a situation where after a number of runs a person would say, This isn't working; let's try something else. So I guess my answer would be it would range from 0 to a maximum of about 10 percent.

THE COURT: Mr. Parrish, do you have any additional questions?

MR. PARRISH: No, Your Honor.

THE COURT: Mr. Reinert, do you have any additional questions for the doctor?

FURTHER RECROSS-EXAMINATION

BY MR. REINERT:

Q. Sir, you're aware that Mr. Cutkomp and Mr. Honken had previously produced methamphetamine using this method. There's been testimony in the record already about them producing well over two kilos using this method in a -- five different runs. Are you aware of that, sir?

A. From 1992, '93?

Q. Yes, sir.

A. No. I know what I've read. Apparently they made some before, but I don't have that information, that quantitative information.

Q. So the fact that they would have produced two kilos or more than two kilos over the course of five runs earlier, already had experience with this method of production, would raise their abilities, would certainly show they had better abilities; correct?

MR. PARRISH: I'm going to just impose just an objection here, Your Honor, with regard to the amounts because there is some serious question as to the mixture of that amount that came out during the last hearing in December. So we're not conceding that that was, in fact, accurate.

THE COURT: The objection's noted, and the witness can answer the hypothetical.

A.    Is the hypothetical that it was five successive successful runs that eventuated in two kilograms?

Q.    Sir, for purposes of the question, the testimony talked about some initial false steps. Ultimately when they started producing, there were five different production runs which produced more than two kilos of methamphetamine using this same method of production. So assuming that for purposes of our question, then that would raise the percentage that you would expect to get certainly well above zero.

A.    The assumption is that they succeeded in producing five kilograms -- how many --

Q.    Two kilograms.

A.    Well, if that were a fact, then I would say they produced two kilograms in five runs.

Q.    So certainly on future production their ability to produce would certainly be up higher than zero since they already had some success with this method; correct?

MR. PARRISH: I'm going to object. Is that still based upon the assumption?

MR. REINERT: Yes, sir.

MR. PARRISH: Oh.

A.    I've had far too many 0 percent yields in organic synthesis and not know why that it's very hard for me to

answer that question with a yes or no.

Q. Sir, you already said you assumed they had some zero production through the synthesis and they would get about maybe 10 percent. That's assuming some failures.

A. Yeah, I said the range was 0 to 10 percent.

Q. And that's assuming some failures.

A. Well, if overall was 0 percent, it would mean they were all failures. If they averaged 10 percent, it would mean it was 10 percent. It's very hard to actually say what the average percent would be over, let's say, ten runs.

Q. So you're saying even though these people had produced -- assuming these people had produced two kilos of methamphetamine using this exact method of production, that doesn't change your estimate on what they could produce in the future in this laboratory?

A. Well, hypothetically, if they had exactly the same equipment, if they're using exactly the same method, if it was exactly the same coworkers, if they had the exact purity, the starting materials, if they had the starting materials, if all of those things were in place, then I would say that they did, in fact, produce 2 kg of material.

Q. And in the future they would still be able to use about the same amount of starting material and produce probably at least that much finished product; correct?

A. If they had all those materials and so on?

Q.   Yes, sir.

A.   Well, if that were the case and they had succeeded in doing that, then their chances of success in a future experiment probably would be better than somebody who just walks in and decides to get into the game of synthesizing methamphetamine.

MR. REINERT:  Thank you, sir.  I have no further questions.

THE COURT:  Mr. Parrish, anything further?

MR. PARRISH:  No, Your Honor.

THE COURT:  Let me ask you this, Doctor:  The fact that they succeeded on five prior occasions doesn't address the question of what the practical yield would be.

THE WITNESS:  No, it certainly wouldn't.

THE COURT:  Other than it's more likely that there would be a practical yield.

THE WITNESS:  That's correct.  It doesn't at all address that question.

THE COURT:  So does it affect your opinion that it would be in the 0 to 10 percent practical yield range?

THE WITNESS:  No, no, it doesn't because given the complexity of the synthesis and what I know about the case, I would say that that's probably the yield that they would achieve.

THE COURT:  But given the fact that they did produce

methamphetamine on 5 prior occasions, is it more likely that your opinion would be closer to the 10 percent range rather than the 0 range?

THE WITNESS: Well, I have to qualify that by the pictures I've seen of the facility, the chemicals that were seized and so on. I have all that information. I have absolutely no information about the prior situation except a hypothetical. So I'm just going by what I see, and that's really the basis for my 0 to 10 percent estimate.

THE COURT: Anything further, Mr. Parrish?

MR. PARRISH: No, Your Honor.

THE COURT: Anything further, Mr. Reinert?

MR. REINERT: I think one, Your Honor.

FURTHER RECROSS-EXAMINATION

BY MR. REINERT:

Q. Why don't we assume that the lab in Arizona is exactly like the lab here, the same types of equipment, same types of setup, same types of conditions which you don't like. That would still make it closer to the 10 percent in your estimate.

A. Yes, it would make it close to 10 percent because I'm putting 0 -- well, no, I misspoke. It wouldn't make it closer to 10 percent. I would still stick by the 0 to 10 percent range.

MR. REINERT: Nothing further.

THE COURT: Mr. Parrish, anything further?

MR. PARRISH: No, Your Honor, I have nothing further.

THE COURT: Thank you, Doctor. You're excused.

Why don't we take a 15-minute recess, and then we'll adjourn the Honken sentencing and come back at 1:45 for the Lua plea. And the record should reflect that I neglected to mention that Mr. Colloton was also here this morning. I didn't mean to overlook you, Mr. Colloton. I just looked down the row of folks, and you didn't catch my eye initially when I walked on the bench that you were also representing the government in this case. Apologize for that oversight.

MR. COLLOTON: Shall we, Judge, on the jail visit notify the jail that we would come over after the plea hearing at about 2:45? Is that --

THE COURT: Let me just ask one question. Mr. Parrish, are you going to be here for the plea hearing?

MR. PARRISH: Yes, I will, Your Honor.

THE COURT: That'd be a good idea, Mr. Colloton.

MR. COLLOTON: Very well. We'll set that up.

(Recess at 1:32 p.m.)

THE COURT: Please be seated. Are we back to the government's case now?

MR. COLLOTON: No. I think we're back --

THE COURT: Back with the defense?

MR. COLLOTON: One witness who's not available tomorrow.

MR. PARRISH: Right. I think Lieutenant Redden is not available tomorrow. I think we agreed she could come over today, and her testimony will be fairly brief, and the government's going to cross-examine, and they brought the documents, so I think we're ready to go with her.

THE COURT: Okay. You may call her.

MR. PARRISH: Thank you. Lieutenant, do you want to come forward, please, raise your right hand and be sworn?

THE COURT: Mr. Phillips, are you representing this witness?

MR. PHILLIPS: Yes, I am, Your Honor.

THE COURT: Okay. Thank you.

LYNETTE REDDEN, DEFENDANT'S WITNESS, SWORN

THE COURT: Please be seated here. And when you're comfortable and settled in, would you state your full name, please, and spell your last name.

THE WITNESS: Okay. My name is Lynette Redden, R-e-d-d-e-n L-y-n-e-t-t-e.

DIRECT EXAMINATION

BY MR. PARRISH:

Q. Have you already spelled your last name for the record?

A. Yes, I have.

Q. Okay. Thank you. Tell us what your occupation is,

please, and your employment address.

A.   I'm the jail administrator for Woodbury County Sheriff's Office.   The address is 407 Seventh Street, Sioux City, Iowa.

Q.   How long have you held that position, Lieutenant?

A.   Since 1981.

Q.   Would you briefly tell us what your duties are?

A.   My responsibilities are for the Woodbury County Jail, anything that deals with the jail facility.

Q.   Okay.   When you say anything, could you just give us like a brief description of what that might be, whether it's security or checking people in or out?   Just give us some idea.

A.   It's basically overall administration of the facility, over 46 officers, 1 nurse; the responsibilities, care of the Woodbury County inmates.

Q.   And let me ask you, did you have this same position during the time Dustin Honken has, in fact, been an inmate at the Woodbury County Jail?

A.   Yes, I did.

Q.   Were you responsible at all for handling any grievances he might have filed with the jail, or did that responsibility go to someone else?

A.   It would either be me or one of my supervisors.

Q.   So in the chain of command, did it go to you first and then to one of your supervisors, or did it first go to one of

your supervisors and they would send it down to you for some type of resolution?

A. It would depend how it was directed. A lot of time the sergeants will take care of them. If not, I would.

Q. Would you agree that during the time Mr. Honken was there that numerous grievances were, in fact, filed by him?

A. Yes.

Q. You didn't keep any track or have any printout as to the number of them that you would have available right now; is that correct?

A. No.

Q. And would the recordkeeper have possession of those documents and do you keep those documents in the ordinary course of business?

A. Yes.

Q. I'm going to show you, Lieutenant, what is marked as Defendant's Exhibit C and just have you flip through these documents. I'm just marking them for identification. I've showed them to the government. And just flip through that and tell me whether or not that would be a series of letters that have been received from Dustin Honken while he has, in fact, been held over at the Woodbury County Jail.

A. Yes, it would. The documents that I saw from the records officer this morning was in two packets.

Q. I did have another list marked current. And I have

these, Lieutenant, marked Defendant's Exhibit D for identification. Would that be the second packet you referred to?

A. Yes, it would.

Q. And these would be copies of his records of complaints or matters of inquiry he wrote to jail staff; would that be correct?

A. Anything that pertained to Mr. Honken.

Q. Thank you. What I'd like to focus your attention on now is --

MR. PARRISH: And, Your Honor, we're going to refer to one of the government's exhibits. I believe it's already in; is that correct? Have you given the Court one already? Government's Exhibit 14. Is this the original? Thank you.

Q. Take a look at Government's Exhibit 14. And would you flip through it, please, ma'am, and tell me what that particular exhibit represents if you know?

A. These are pictures of the jail.

Q. And would it show -- if you look at Government Exhibit 14A, outside you see a door which is labeled C-8, and inside you would see 14B. Would that be the inside of C-8?

A. Yes, it would.

Q. Is that a cell where Mr. Honken was ever placed in?

A. No.

Q. Did he have direct access to that cell at all during the

time he has been incarcerated there?

A.   No.

Q.   To your knowledge, did he do the damage to that particular cell?

A.   No.

Q.   Okay.  And if you would turn over to Exhibit 14C, 14D, 14E, 14F, G, H, would those also be various photos of C-8, the inside?

A.   Yes, they are.

Q.   Getting through that wall, does that allow anyone to get outside to your knowledge?

A.   If they got through the wall, yes, it would get them outside.

Q.   If they got through this particular wall, they would get completely outside.

A.   Yes.

Q.   And how many walls -- walls of bricks would they have to go through?

A.   Mr. Parrish, for security reasons I'd rather not answer that.

Q.   Would it be more than one?  That would be pretty obvious, wouldn't it?

A.   It would be more than the block here.

Q.   Now, if we go to Government's Exhibit 14M, would you turn to that exhibit, please?

A.   N?

Q.   M as in man.

A.   Okay.

Q.   What is that an exhibit of, which cell block?

A.   14-M as in Mary is a hole in Charlie-12, cell Charlie-12.

Q.   And Exhibit 14L, is that the same photograph, L and M, taken from a different angle?

A.   Say that again.

Q.   Is that the same hole taken from a different angle?

A.   L and M?

Q.   Yes.

A.   No.

Q.   They're two separate ones?

A.   Those are two different cells.

Q.   All right.  Was Mr. Honken ever in the one that's 14L?

A.   L?

Q.   Yes, ma'am.

A.   Yes.

Q.   Did you have any reports that he, in fact, did the damage to 14L?

A.   Yes.

Q.   How many individuals made those reports?  Do you recall?

A.   No.

Q.   Was he ever given any administrative sanction for

anything having to do with 14L?

A.    Disciplinary hearing, yes.

Q.    And what was the charge?

A.    I'd have to see.  There were several charges, rule infractions.

Q.    And what were the rule infractions?

A.    Without referring to the disciplinary, I wouldn't know.

Q.    Would any of them be escape?

A.    I would say probably, yes.

Q.    Do you know for a fact?

A.    Like I said, I'd need to see that disciplinary.

Q.    Okay.  Would that be in this particular stack?

A.    Yes.

Q.    Well, why don't I give you what is marked as Defendant's Exhibit D and C.  Are you able to find that rather quickly?  Would you have any idea?

A.    I would try.

Q.    Okay.  Would it help you if you looked at November of '96?

A.    I'm looking at November of '96.

Q.    Okay.

A.    Okay.  I have a document from November 25, '96, at 10:41 a.m. hours.  Complaint number was 962403.  I show that Inmate Honken was written up for the following rule infractions: 1.5, attempting or planning escape; 2.3, damaging jail

property; 2.6, disrupting or interfering with the security of the jail; 3.14, affixing any object to jail wall; and 4.11, altering county property.

Q. And did you investigate that complaint or someone from the jail staff investigate that complaint?

A. This was done by our investigative division in the sheriff's office.

Q. And did they prepare a report?

A. I think there was an extensive report, yes.

Q. And do you know where that report is? Is it contained in that material?

A. Mr. Parrish, it would be in the subpoena -- security stuff from the subpoena on December, I believe, 15 of '97 that you requested.

Q. And that would be the material that was just brought over; is that correct?

A. Yes, sir.

Q. And was there a finding made in this report, or do you need to take a look at this report? I have this marked as Defendant's Exhibit E. And tell me whether or not you can find the results of that investigation in Defendant's Exhibit E.

A. Mr. Parrish, could you clarify if we're talking about disciplinary procedures in the jail or criminal?

Q. The investigative report as a result of this damage done

to 14L and 14M.

A. My understanding -- and I can tell you from memory -- on the criminal end the county attorney's office rejected any charges against Mr. Honken.

Q. That information was given to the county attorney in Woodbury County based upon the investigation done by jail investigators; is that correct?

A. No, sir. It was done by sheriff officials. They're a separate -- it'd be separate.

Q. From the jail.

A. From the sheriff's department. It would be a different division the investigators are in.

Q. Well, okay. Let's say investigators from Woodbury County then conducted an investigation, turned the report over to the Woodbury County Attorney's Office, and the Woodbury County Attorney's Office after reviewing the reports rejected going forth with any charges. Is that your testimony?

A. Yes.

Q. And they have all of the material which you gave them including the photographs marked as Government's Exhibit 14; is that correct?

A. Mr. Parrish, I wouldn't be sure what the investigators would have sent to the county attorney's office, so I don't know what they sent to them.

Q. Is there any reason in your mind to doubt whether or not they conducted a full investigation and made a report to the county attorney when they rejected it?

A. No, sir.

MR. PARRISH: All right. I have no further questions. Thank you.

MR. COLLOTON: Your Honor, may I see that last exhibit that --

THE COURT: Mr. Parrish --

MR. PARRISH: Sure.

THE COURT: -- while Mr. Colloton's looking, maybe you offered it and I didn't rule on it. Are you offering C, D, and E?

MR. PARRISH: I have not at this point, Your Honor. I intend to, but they have not been offered. I think Mr. Colloton had not finished looking at all of them, and I wanted him to finish looking at them before they were, in fact, offered.

MR. COLLOTON: Well, this stack here I just got as we came in, so I will try to look through it. But if the Court would reserve ruling till maybe I have a chance to see what all is in there, I'd appreciate it.

THE COURT: I will.

CROSS-EXAMINATION

BY MR. COLLOTON:

Q. Lieutenant Redden, do you know whether there is under Iowa law an offense of attempted escape from a county jail?

A. Yes.

Q. Is there or is there not?

A. There is.

Q. Do you know that in Exhibit E -- you don't have it in front of you anymore, do you?

A. No.

MR. PARRISH: I think the copy you have may be the same, so she could probably have that one and you could use the other one that she gave -- that Doug gave you.

MR. COLLOTON: That would be sensible. If I do have a copy, I fully agree.

BY MR. COLLOTON:

Q. Are there certain documents in Exhibit E that refer to the possible referral of criminal charges to the county attorney?

A. Yes.

Q. And are there some references to attempted escape in there as a potential charge?

A. Yes.

Q. And do you agree that none of those has a code section next to them?

A. Not on the routing slips, no.

Q. Has the county attorney's office ever told you that they

don't believe there's an offense they can charge for attempted escape?

A.   I don't show anything like that.

Q.   And has the county attorney's office ever told you that there's not a charge they can bring for attempted escape?

A.   Not to me, no.

Q.   But there's no code section listed in these papers, and you're not aware of the code section, are you?

A.   No, I'm not.

Q.   Now, has the DEA conducted additional investigation at the jail since November of '96?

A.   Yes, they have.

Q.   Have you assisted the DEA in that investigation?

A.   As far as letting them interview people, yes.

Q.   Are you familiar with all of the information that was gained or gathered by the jail in its investigation of potential escape in November of '96?

A.   Yes, I am.

Q.   Do you know whether the jail received any information from Dennis Putzier?

A.   Yes, they did.

Q.   And was his information essentially that he didn't know anything?

A.   Yes.

Q.   Do you know whether the jail received any information

from Daniel Frye?

A.    I don't remember Daniel Frye, no.

Q.    Do you remember if the jail received any information from James Brownlee?

A.    No.

Q.    Do you remember if the jail received any information from Terry Bregar?

A.    No.

Q.    Did the jail receive any information from James Derrick?

A.    Derrick, yes.

Q.    And then the jail had some information from William Garrison; is that right?

A.    Garrison, yes.

Q.    So if the DEA conducted interviews of others that I've mentioned there, that would have been investigation beyond what the jail did; is that right?

A.    Yes.

Q.    You mentioned that Exhibit 14L is a cell in which Mr. Honken was placed at one time; is that correct?

A.    Without seeing that picture, I couldn't tell you.

        MR. PARRISH:  I'll give her my copy.

        THE WITNESS:  Thank you.

BY MR. COLLOTON:

Q.    Is the cell depicted in Exhibit 14L a cell in which Mr. Honken was incarcerated in November of '96?

A.   Yes.

Q.   What cell is that?

A.   That's David-2.

Q.   Where is David-2 located within the D block?

A.   It's the -- it would be the southwest corner of David block.

Q.   Is it on the upper level or the lower level?

A.   Upper.

Q.   If it is in the corner, what is on the other side of the wall depicted in Exhibit 14L?

A.   C block.

Q.   And just so we're clear, the exhibits -- I guess Exhibits 14C, D, E, and F depict a hole in a wall; correct?

A.   C, D --

Q.   E and F.

A.    -- E and F?

Q.   Is that a hole in a cell?

A.   Yes.

Q.   And that was C-8; is that right?

A.   It was C-8.

Q.   Were these photographs taken, that is, Government's Exhibit 14A through L, on or about November 25, 1996?

A.   Yes, they were.

Q.   Is there a fire door in the D, David, block?

A.   Yes.

Q. Where is the fire door located?

A. It's in the southwest corner.

Q. To what does the fire door give access?

A. The southwest fire door would give access to C block.

Q. Let me ask you to look at Exhibit 14R. What is pictured in Exhibit 14R?

A. It's a picture of D block and the stairs, fire door going into C block and a picture of the door to David-1.

Q. What is pictured to the left of the door of David-1?

A. To the left of the door? Oh. The fire door.

Q. What is pictured in Exhibit 14T as in Thomas?

A. That is a picture of the officers' view from outside of D block. If they were looking in to the D block area, that's what they could see.

Q. Where is the fire door located with respect to what's shown in photograph 14T?

A. The fire door would be past the large pillar, past the stairs, and to your left.

Q. Does the officer have vision of the fire door from his vantage point?

A. No.

Q. What is pictured in Exhibit 14V as in Victor?

A. That is a picture of D-2 when the hole was repaired.

Q. Was this photograph, Exhibit 14V, taken at a later date then?

A. Yes, it was.

Q. In March of '97?

A. Yes.

Q. What is pictured in Government Exhibit 14W?

A. 14W is a picture of the stairs going up to the upper tier of D block.

Q. Are those the same stairs shown in Exhibit 14R?

A. Yes, they are.

Q. What was the purpose of your taking or your office staff taking the picture 14W?

A. 14W was a picture of a piece of a skid-resistant material removed from the stair.

Q. What's pictured in Exhibit 14X?

A. 14X is a picture of a clothes hook.

Q. Where are the clothes hook -- where is that clothes hook located?

A. This picture is a clothes hook in, I believe, David-2.

Q. Is there a clothes hook in each cell?

A. Yes. There's more than one.

MR. COLLOTON: Those are all the questions I have, Judge.

THE COURT: Thank you. Mr. Parrish?

MR. PARRISH: Just a couple of questions, Your Honor.

REDIRECT EXAMINATION

BY MR. PARRISH:

Q.   Number one, I looked at those windows over at the jail just a few minutes ago.  They're about what?  Four inches across?

A.   Probably a little bit wider than that.

Q.   They're bolted down?

A.   Yes.

Q.   And a human being can't get through them?

A.   They're not supposed to.

Q.   Okay.  Because -- well, anyway, also I'm just curious. Did you ever have an escape where somebody dug a hole and got through over at the Woodbury County Jail?

A.   Say that again, Mr. Parrish.

Q.   Has anybody dug a hole through a sidewall in a cell and escaped over at the Woodbury County Jail?

A.   No.

Q.   And it's been there for how long?

A.   Since 1987.

         MR. PARRISH:  Thank you.  I have nothing further.

         THE COURT:  Mr. Colloton, anything further?

         MR. COLLOTON:  No.

         THE COURT:  Thank you.  You're excused.

         THE WITNESS:  Thank you.

         MR. PARRISH:  If there's no objection, I'd like to introduce Defendant's Exhibit C, D, and E, please.

* * * *

(Defendant Exhibits C, D, and E were offered.)

* * * *

MR. PARRISH: Thank you, Lieutenant. I appreciate it.

MR. COLLOTON: Your Honor, I'd ask for an opportunity to take some time to read through these documents unless there's some particular ones that Mr. Parrish feels are important and then have a chance to make an objection or no objection.

THE COURT: Why don't you -- I'll reserve ruling on it till tomorrow morning. But as the government frequently reminds me in sentencings, the federal rules of evidence don't apply.

MR. COLLOTON: I'll bear that in mind in determining whether to pose an objection.

THE COURT: You can make whatever record you'd like to make on them.

MR. COLLOTON: Thank you.

THE COURT: Okay. Government --

MR. PARRISH: That's all I have, Your Honor. Thank you. Thanks.

THE COURT: Government have any witnesses now, or do you want to --

MR. REINERT: We would call Timothy Cutkomp, Your

Honor.

MR. COLLOTON: We have a couple more, Judge, that if you wanted to finish we could do quickly in the morning I think.

THE COURT: Well, whatever's most convenient for counsel really. If you want to keep going for a while, we can keep going.

MR. PARRISH: I'm fine with keeping going. I'm fine. I assume at the rate we were going from our discussions, I think we're going to be through at noon, around noon anyway tomorrow.

THE COURT: Hi. Raise your right hand, please.

TIMOTHY CUTKOMP, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated.

DIRECT EXAMINATION

BY MR. REINERT:

Q. Mr. Cutkomp, I've placed before you a book of photos admitted as Government Exhibit 25 and would direct you to page 207. Down in the lower left corner there's a black can. What is that black can?

A. Toluene.

Q. Were you involved in the purchase of that can of toluene?

A. I was involved in it. I don't remember if I bought it or if I was with him when we bought it or what.

Q. With who when you bought it?

A. Dustin.

Q. Do you recall when that was purchased?

A. Would have been the spring or summer of '95.

Q. Do you recall where that was purchased?

A. At a lumber yard in Mason City.

Q. When it was purchased, was it full or partially empty?

A. It was full.

Q. What did you do with the -- you or Mr. Honken do with the contents of the black can of toluene?

A. We started to try to manufacture methamphetamine with it. We started bubbling chlorine through it.

Q. About how much toluene would you remove from the can on each of the occasions?

A. Somewhere between 1,000 and 3,000 milliliters.

Q. About how many times did you start the process where you would have removed that much?

A. Four or five times.

Q. How big a container of toluene is that if you can recall?

A. I think it's five gallons.

MR. REINERT: Nothing further, Your Honor.

THE COURT: Mr. Parrish?

MR. PARRISH: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. PARRISH:

Q. As I understand it -- I was just given a discovery report by the government, Mr. Cutkomp, and I understand that you were just debriefed on this January 28, 1998; is that right?

A. Yes.

Q. Did they tell you they had received a chemist's report and they were calling you back in for additional information about the toluene?

A. No, I didn't know that.

Q. They just called you in and began asking you questions after all of your cross-examination and after all of your other debriefing.

A. Yes.

Q. Weren't you curious as to why they were doing that at this point on January 28?

A. I assumed that they were just wondering how much was left in the container.

Q. You had deducted that something had gone awry here, the reason you were called back in on this point; right?

A. I didn't know what was going on, no.

Q. And as you sit here today, did they show you any items to refresh your recollection on when there had been a purchase of this substance?

A. No, just today they did.

Q. When today?

A. Just now.

Q. I mean prior to just now did they show you any items or receipts?

A. No.

Q. Did they ask you prior to this time had you ever purchased any toluene before?

A. From this time or in --

Q. Yes, when they interviewed you on January 28.

A. I don't remember if they did or not.

Q. Well, isn't it true that you told them, number one, you could not remember if you had ever purchased any? Didn't you tell them that?

A. I said I didn't know if it was me or Dustin.

Q. Right. And you -- as you sit here today, that's your same testimony, that you have no recollection; is that correct?

A. That's correct.

Q. As a matter of fact, what you indicated was purchased was Toluol, not toluene; is that correct?

A. Yes.

Q. Is that correct?

A. Yes.

Q. Okay.

A. If that's how you pronounce it.

Q. They also asked you whether or not you took certain of the substances out; is that correct also?

A. What substances?

Q. Toluol or toluene.

A. If we had used some of it?

Q. Right.

A. Yes.

Q. You didn't tell them all the occasions that you used it for; is that correct?

A. Four or five times.

Q. Well, isn't it true that it was used on occasion to clean or for extractions and other purposes other than just to manufacture?

A. I don't remember if we used it for anything else or not.

Q. It's possible, I take it.

A. It would be possible.

Q. And you say when it was purchased it was purchased from Lamperts Lumber Yard?

A. I don't know what the name of it is.

Q. So you have no idea where it was purchased from.

A. I explained where it was, the location, but I don't know what the name is.

Q. So who came up with the idea that it was Lamperts Lumber Yard? Was that you, or was it one of the agents?

A. I explained where it was. The agent would have wrote

down what -- the name of the place I told him it was.

Q. It's also true that you told them that you were never successful in making any methamphetamine; is that correct?

A. Yes.

Q. Is this the first time you told them this?

A. I don't believe so.

Q. You had told them this prior to January 28, that you had never been successful in making any methamphetamine.

A. Never or in '95?

Q. At this point.

A. In '95, yes.

Q. Would it be accurate also that you never tested the purity level of the Toluol or toluene?

A. I've never tested the purity level.

Q. And the items that were left or the substance that was left in the black can, you have no idea of the purity level of it; is that correct also?

A. That would be correct.

Q. Do you have any recollection as to whether or not any other substance was, in fact, put into the toluene can or Toluol can?

A. What substance?

Q. Any other type of material, chemicals, waste material, or anything. Do you have any recollection of that?

A. No, I don't have any recollection of that.

MR. PARRISH: I have no further questions at this point on this issue at least.

REDIRECT EXAMINATION

BY MR. REINERT:

Q. About how much was left in that Toluol can that you recall?

A. It seems like it was a quarter to half full.

Q. In response to Mr. Parrish's questions about the statement you made about you were never successful in making methamphetamine, could you explain what you meant by that?

A. In '95 we attempted to make it several times, but we were not successful then. But in '92 and early '93 we were able to.

Q. What was happening to -- you talked about impurities or putting impurities into the Toluol can. What was happening to some of the waste by-products for the various reactions?

A. We would put them in a container and throw them away.

Q. Do you recall any particular containers you all were using?

A. Seems like we had an ether can we dumped some in. That's all I --

MR. REINERT: Nothing further.

MR. PARRISH: I have nothing further, Your Honor. Thank you.

THE COURT: Thank you. You can step down.

Mr. Reinert, how many more witnesses does the government have?

MR. REINERT: We have --

MR. COLLOTON: I think two. We need to talk to Mr. Parrish about the stipulation. And if there's a problem with that, we may have some coming tomorrow morning.

THE COURT: Do you want to break now, or would you like to keep going?

MR. COLLOTON: We've got one fellow here who's been waiting quite a bit today. I'd like to do him. We can break after that.

MR. PARRISH: I think he's pretty short.

MR. COLLOTON: Yeah, yeah. We'll go ahead with one more witness then. United States calls William Garrison.

WILLIAM GARRISON, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated. State your full name for the record, please, and spell your last name.

THE WITNESS: William Clyde Garrison, G-a-r-r-i-s-o-n.

DIRECT EXAMINATION

BY MR. COLLOTON:

Q.   What is your city of residence?

A.   Sioux City.

Q.   Mr. Garrison, in the latter part of 1996 were you incarcerated at the Woodbury County Jail?

A.    Yes, I was.

Q.    When did you enter the jail approximately?

A.    October 28, 1996.

Q.    Why were you entering the jail at that time?

A.    Probation violation.

Q.    How long were you in the jail?

A.    From October 28, 1996, till December 22, 1996.

Q.    Where were you housed when you were placed in the Woodbury County Jail?

A.    I was housed in two different cells.  I was housed in B block for approximately seven days.  And then I spent the remainder of the time in D block.

Q.    D as in David?

A.    D as in David.

Q.    Did you ever come to know the defendant in this case, Dustin Honken?

A.    Yes.

Q.    Where did you meet Dustin Honken?

A.    D block, Woodbury County Jail.

Q.    How did you meet Mr. Honken?

A.    Through another inmate, Aaron Peterson.  We were engaged in a card game.

Q.    Who was engaged in a card game?

A.    We all were.

Q.    So how did you come to meet Mr. Honken?

A.    Oh.    Through Aaron Peterson.    Aaron Peterson invited me to play a game of cards with him and Dustin Honken and Sabasta.

Q.    What were the circumstances of your first getting to know Mr. Honken then?    Did you start to talk to him at this card game?

A.    We talked a little.

Q.    And how did you come to get to know him better if you did?

A.    Aaron came to me, pulled me aside, and said that these guys think you're a cop, he said, but I don't and so -- and after I said, No, I'm not a cop, and I guess after Aaron -- and I just says -- I assume after Aaron told him that I wasn't a cop, then we began to associate.

Q.    Did you -- was -- did Mr. Honken express suspicion of inmates, other inmates, being cops or informants?

A.    Well, he appeared to be paranoid of new inmates, yes.

Q.    What other example, if any, can you give of that trait?

A.    For instance, there was this old guy transported from Cedar Rapids.    He was early fifties.    Mr. Honken suspected him of being an undercover cop.    And while we kept the older guy's attention, Dustin searched his cell to see if he could find any information on him to see if he was a cop or not.

Q.    Did you ever learn what this older fellow was in jail for?

A.    No. Strangely, he was there maybe a week or two, and he just moved in as quickly -- they moved him in as quickly as they moved him out.

Q.    Did you ever observe him and Mr. Honken talking after the occasion you described where Mr. Honken looked through his cell?

A.    Yes.

Q.    What did you observe?

A.    Well, they engaged in conversation about the making of methamphetamines.

Q.    Did you at any point while you were in the jail observe Mr. Honken communicating with anybody outside of the D block?

A.    Yes.

Q.    What did you observe about that?

A.    One Dennis Putzier, C block, they would communicate through the fire doors whispering.

Q.    What was the last thing you said?

A.    Whispering, talking through the fire doors.

Q.    How do you know he was talking to Dennis Putzier?

A.    Well, I never met Dennis personally, but he was real loud and obnoxious, and I just knew his voice. Everyone did.

Q.    Was there ever a point in which you learned about an alleged attempt to escape from the jail?

A.    Could you repeat that, please?

Q.    Was there a point while you were in the D block where

you learned about an attempt to escape from the jail?

A. Yes.

Q. How did you come to know about that?

A. I wasn't told personally, but it was just like, you know, floating around. You know, you could hear it. Everybody was talking about it.

Q. Did you ever hear Mr. Honken talk about it in any way?

A. He said that he had to get out of there. I remember him saying -- hearing him say that.

Q. Did you ever see anyone do any physical damage to any part of the D block during the time you were in there?

A. Some.

Q. What did you see happening?

A. I saw one Sabasta yank a door handle off a cell door. I saw Sabasta break a hook off the wall for -- in which we used to hang our towels and underwear and stuff. And I saw one Dustin chip maybe a three-by-three inch of the stairs, break a piece out of the stairs. It's real coarse like sandpaper or something.

Q. Who is Sabasta? He's another inmate?

A. Yes. He was another inmate. I was trying to think of the first name, but he was close personal friend of Dustin's while we was in D block.

Q. Where did you see him break a handle off a cell door?

A. Forgot which number, but the guy that lived in there's

name was James Brownlee, and I think it was D-5.

Q. What did you see happen with respect to that door handle after it got broken off?

A. Pardon?

Q. Did you ever see the door handle again after you saw Mr. Sabasta break it off?

A. Yes, I did.

Q. Where did you see it again?

A. The next time I saw it was in D-2 which was Dustin Honken's cell.

Q. How did you happen to see it there?

A. Well, I knew -- I mean, everyone knew of the attempt to break out, and so out of curiosity I walked up the stairs and peeked into Dustin's window, and Sabasta was beating a hole, you know, trying to beat a hole in the wall.

Q. Where?

A. Like at the bottom of the door but behind the door but into the wall.

Q. Who else was present?

A. Aaron Peterson was.

Q. Who else? Was there anyone else present in the cell?

A. Oh. Dustin Honken was.

Q. Did you ever see the coat hook again after it was broken off the wall by Mr. Sabasta?

A. Yes, I did.

Q. Where did you see it again?

A. I saw it in the hands of Dustin Honken, Sabasta, and Peterson.

Q. What were the circumstances when you saw it in their hands?

A. Shaving it on the steps getting it real, real thin. In one instance, Mr. Honken stuck it in the fire door and tried to turn it, but it didn't work.

Q. Stuck it in the lock you mean?

A. Yes, that's what I mean.

Q. What, if anything, did you see Mr. Honken do with this piece of stair that you described seeing him break off?

A. Somehow it ended up in the hands of Sabasta, and he tied a string around one end of it and an ink pen around the other end and shoved it underneath D door all the way to C door.

Q. Let me show you what's been marked Government Exhibit 35. Do you recognize Exhibit 35, Mr. Garrison?

A. Yes, I do.

Q. What is Government Exhibit 35?

A. It's a note I wrote to Sergeant Harlow.

Q. When did you write this note approximately?

A. It's been so long, it's real foggy right now. I can't say, but it has here 11-15-96, so I'm pretty sure that was the approximate date.

Q. Why did you write this note to Sergeant Harlow?

A. I wrote the note because I knew that sooner or later Sarg. would find out that there was going to be a jail break or attempt jail break, and I wrote it because I didn't want to be locked down twice, and that means I was already in jail, but the whole cell block would have got locked down, and we all would have been in deadlock, and it was already bad enough being in jail. That's why I wrote the note.

Q. Was the note true and accurate as far as you knew at the time you wrote it?

A. Yes.

Q. What happened to the note?

A. It laid on my desk in my room for about three days, and we have random shakedowns, and a corporal that shook down my room saw it on there. He said, What's this? I said, It's to Sergeant Harlow. He said, Well, do you want me to give it to him? I said, I don't know. He said, Well, do you want to throw it away? I said, I don't know. Then I said, Go ahead, give it to him, and he did.

Q. How did you first get contacted by the United States government in connection with the information you're talking about today?

A. Through Special Agent Mark Hein.

Q. Did he come to interview you?

A. Yes, he came to my apartment in Morningside around approximately March.

Q. Did you get any kind of benefit from the government in connection with this investigation?

A. No.

Q. You've been subpoenaed to come here today?

A. Yes, I have.

Q. And are you working in Sioux City?

A. Yes.

Q. So you took off work because of your subpoena today?

A. Yes, I did.

MR. COLLOTON: Those are all the questions I have, Judge.

THE COURT: Thank you, Mr. Colloton.

Mr. Parrish?

MR. PARRISH: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. PARRISH:

Q. Mr. Garrison, you indicated you were in jail from the 28th of October through December 22; is that correct?

A. Yes, sir.

Q. On what charge?

A. This was probation violation.

Q. Okay. Probation violation for what charge?

A. Theft.

Q. Theft what degree?

A. I think it was third degree, but I was -- I had numerous

charges that go along with the probation, though.

Q. Okay. What other numerous charges did you have?

A. Forgery -- two counts of forgery.

Q. And you were convicted of both of those?

A. Yes, I was.

Q. Okay. You have a theft third and two forgeries. That's Iowa forgery?

A. Yes.

Q. False use of a financial instrument?

A. Yes.

Q. Is that what it was, a FUFI?

A. Pardon?

Q. FUFI?

A. I don't understand.

Q. Okay. Go ahead. What else did you have? Two forgeries and what else?

A. And the theft.

Q. Okay. You said numerous. Were there any others?

A. No.

Q. So those are the only convictions you have then. You just have three convictions.

A. Yes.

Q. Okay. The theft third is an aggravated misdemeanor, and the two forgeries are two felonies?

A. Yes.

Q. So you've never been to prison.

A. No.

Q. And this probation violation was what? What did you do to violate your probation?

A. I left town without my probation officer's consent.

Q. Was that all?

A. Yes.

Q. So that was the only charge that you were put back in jail for what? Sixty days?

A. Seventy-two.

Q. Was that a violators' program or something like that?

A. Yes. They did violate me. Yes, I was violated. Yes, it was.

Q. So as opposed to sending you to prison, they had, in fact, put you in jail in Woodbury County Jail for those 72 days.

A. Yes, sir.

Q. And had you gotten in trouble in jail, you would have been facing prison.

A. Yes.

Q. Now, your probation officer was whom?

A. Colleen Goodwin at the time.

Q. And was that the only time you had been charged with violating your probation, terms of probation?

A. Yes.

Q. How long were you gone out of town?

A. Five months.

Q. Oh. It wasn't just an overnight trip.

A. No.

Q. And how did they track you down?

A. I have no clue.

Q. Where did they find you?

A. Fort Dodge, Iowa.

Q. They arrested you there?

A. October 25, 1996.

Q. And brought you back to Woodbury County Jail.

A. October 28, 1996.

Q. Now, you don't have any other misdemeanor convictions either?

A. I have a domestic violence, aggravated assault, but it's deferred judgment because I'm taking batterer's class.

Q. What about the false police report?

A. Oh, that was the time with the forgery. I lied to the police officer and told him that I was the guy whose name was on the check. I said that I was him, but I wasn't, so I lied to him.

Q. So that was a mistake when you said you only had three convictions, the two forgery and the theft third. You actually had another conviction also, and that's a false police report; is that right?

A.  That's right.

Q.  Okay.  So you actually have four prior convictions.

A.  Yeah.  Yes.

Q.  How old are you now?

A.  Thirty-four.

Q.  Can you think of any other convictions that you had?

A.  At this particular time or in the past?

Q.  In the past.

A.  I had a going armed with intent in 1990 I think.  I'm not sure.  '91 maybe.

Q.  Any others?

A.  Middle grade theft when I was 17 in my hometown in Louisiana.

Q.  Any others since you've been an adult other than going armed with intent?

A.  No.

Q.  So actually you have five or six.

A.  Yes.

Q.  Okay.

A.  Numerous.

Q.  Now, one question I have for you, initially you went before the grand jury in Cedar Rapids; is that right?

A.  I didn't go to Cedar Rapids.  Oh.  Here.

Q.  Well, the grand jury in Sioux City?

A.  Yes.

Q. And did you tell them about the convictions you had before you gave them testimony in this case?

A. No.

Q. And no one asked any questions like that, did they?

A. No.

Q. At one point, though, you indicated to them that you thought you'd seen Dustin stick a pencil through the fire wall door; is that right?

A. Yes.

Q. I went over there today, and I looked at the fire wall door. A pencil won't fit through that -- do you disagree with that? -- through the key hole. A pencil will not fit in there because I took my finger, and I put it up to that door, to that key. Are you telling me that a pencil will fit through it?

A. If my memory's correct, I thought I said a pencil or a piece of plastic.

Q. Oh. So now you think you might have told them a piece of plastic as opposed to a pencil? Is that your recollection now?

A. Yes, pencil or plastic.

Q. Okay. You said -- and I don't know whether this will refresh your recollection. I think he used a pencil and poked it all the way through. And when you said all the way through, you mean you thought the pencil went from one side

of the fire door all the way to the other?

A.   Yeah, that's what I thought.  That's what it appeared to me at the time.

Q.   It just appeared to you like that.

A.   Yeah, that's the way it looked.

Q.   It may not have been accurate?

A.   It may not have been, Counsel.

Q.   You also said you don't know what the foreign object was.  Were you still referring to the fire door?

A.   I don't understand what you're talking about.

Q.   You said, I don't know what the foreign object was.  Are you still referring to the fire door?

A.   Oh.  Yes, yes.

Q.   The other questions I have for you is when you indicated to the grand jury -- strike that.

When you indicated to the Court just a few minutes ago that there was a hole in one cell block and you heard rumors about the fact that there was going to be an escape, Dustin Honken was not in the cell block next to the place where there was a hole in the wall, was he?

A.   Yes.

Q.   He was?

A.   You mean -- the cell that I heard that there was a hole in the wall?

Q.   Was he in the adjoining cell?  Was Dustin in the

adjoining cell?

A.    In the cell block, adjoining cell block.

Q.    So he was about four cells away then, wasn't he?

A.    No.

Q.    Oh, all right.

        MR. PARRISH:   I have no further questions.

        MR. COLLOTON:   I have a few, Judge.

                    REDIRECT EXAMINATION

BY MR. COLLOTON:

Q.    Dustin was in cell D-2 you said; right?

A.    Yes.

Q.    And how many cells between D-2 and the wall that adjoins the C block?

A.    How many cells in between?

Q.    Yeah.

A.    None.

Q.    It's right at the --

A.    Just the wall dividing.

Q.    All right.   Then do you know which cell in C block had the hole in the wall?

A.    No, I'm not sure.   I mean, I can picture it in my mind, but I don't remember the number on the door.

Q.    So do you have any way to know how many cells into C block was the one with the hole?

A.    Repeat.

Q. Do you know how many cells you would have to go into C block to find the one that had the hole in the wall?

A. Oh. Not exactly.

Q. Because you were in the D block.

A. Right.

Q. Now, you remember Mr. Parrish was telling you about some things you said in the grand jury?

A. Yes.

Q. Let me ask you to take a minute and read actually what he was showing you; okay? All right?

A. All right. Okay.

MR. COLLOTON: I'm going to show him page 28, Mr. Parrish, lines 4 through 8.

Q. And I'll ask you just to read that to yourself; okay? Have you had a chance to read the part that Mr. Parrish was asking you about?

A. Yes.

Q. Now, when you said -- was your complete answer, I think he used a pencil and poked it all the way through. I don't know what the foreign object was, but it was something?

A. Yes.

Q. When you said, I don't know what the foreign object was, but it was something, what were you referring to?

A. What I mean is I think it was a pencil, but I'm not sure, but it was some type of a foreign object, you know.

Q. Okay. And you were talking about what you'd seen Mr. Honken doing at the lock on the fire door; is that right?

A. Right.

MR. COLLOTON: That's all I have.

THE COURT: Anything further, Mr. Parrish?

RECROSS-EXAMINATION

BY MR. PARRISH:

Q. As I recall --

MR. PARRISH: I do, Your Honor.

Q. You indicated he got something stuck in there; is that right?

A. Yes.

Q. That he couldn't get out.

A. Yes.

Q. And who got it out?

A. I don't know. Maybe I walked away or something. I'm not sure.

Q. So you don't know whether deputies ever found anything stuck in there that Mr. Honken put in there, do you?

A. I know the deputies didn't. I'm sure of that.

Q. But that's what you told the grand jury -- he got something stuck in there -- didn't you?

A. Yes.

MR. PARRISH: I have nothing further.

THE COURT: Mr. Colloton, anything further?

MR. COLLOTON: No.

THE COURT: Mr. Garrison, you're excused. Thank you.

THE WITNESS: You're welcome.

MR. REINERT: Your Honor, we do have one additional exhibit. I have not had a chance to get this to Mr. Parrish yet, so we probably shouldn't take up the admissibility of that necessarily today. I'll let him look at it. We called Diamond Vogel about toluene and the purity, and they indicated they buy it from Citgo. I've marked as Exhibit 42 the material safety data sheet that they use that Citgo provides to them. They basically buy it in bulk from Citgo, and then they repackage it under the brand name Toluol which is -- in fact, even in 207 you can see their number is N3011 on the can which is their toluene brand, so they use -- Exhibit 42 is the material safety data sheet on the toluene under the brand name of Toluol sold by Diamond Vogel.

THE COURT: Why don't we take up the admissibility of Government's Exhibit 42 in the morning.

How many additional witnesses does the government believe it will have in the morning?

MR. REINERT: We have -- the only issue we have at this point, we have a stipulation that has one paragraph that Mr. Parrish has not yet told us for sure whether he would be willing to stipulate to that. If that paragraph is not

stipulated to, we will have two witnesses. If it is stipulated to, we will only have one.

MR. PARRISH: I spoke with Mr. Honken on that, Your Honor, and I think except for one sentence that I'll bring up with them, we would agree to the stipulation, and maybe we could work that out, and I'll meet with them right away and see if we can get that done. But all of the rest of them, as I've told the Court, we agree with, and there's just one sentence in there that we disagree with.

THE COURT: And when do you think you'll be finished with your evidence if we start at nine o'clock tomorrow morning?

MR. REINERT: Assuming we only have one witness -- I should restate. In the event there's a problem or there's some kind of evidentiary foundation to the information we obtained from Diamond Vogel, we'd have to put a witness on for that, of course. In light of this being a sentencing and the fact that we have admitted all documents with virtually no foundation, I don't anticipate that. But we would have an additional witness on that. But I think our witness tomorrow morning, assuming we just have one, would only be --

MR. PARRISH: Who is that?

MR. REINERT: -- about as long as Mr. Garrison I would anticipate.

MR. COLLOTON: I think we'd be done by probably

quarter to ten.

THE COURT: Mr. Parrish, what's your evidence?

MR. PARRISH: Well, we took two of our witnesses today. I think, Your Honor, I would -- I may anticipate two hours at most, and that's looking at the long side of it, and I think I might be considering some of their cross in that also. So I'm thinking clearly before noon if they finish at a quarter till.

THE COURT: As I indicated to counsel on a break, I'm probably not going to make all of the factual findings tomorrow because I haven't had a chance to re-read the transcript from December, and I really want to do that. If I have the energy -- I've got a few other things to do this evening, but if I have the energy and I can get to it tonight, there's an outside chance that I may be ready to go with regard to the factual findings tomorrow, but I'm going to want to hear argument on the contested factual issues before I make my findings obviously, and then we have some legal issues to address. So it's kind of doubtful that we'll finish this sentencing tomorrow. We'll probably reconvene it at some point down the road. Is there anything further?

MR. PARRISH: No, Your Honor.

THE COURT: Okay. We'll see you all tomorrow at 9 a.m. Thank you.

(The foregoing sentencing was adjourned at 5:06 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_Shelly Semmler_
Shelly Semmler, CSR, RMR, CCR

3.24.98
Date

**I N D E X**

JOHN MEYERS

DIRECT EXAMINATION
BY MR. REINERT................................................ 630:16
CROSS-EXAMINATION
BY MR. PARRISH............................................... 674:19
REDIRECT EXAMINATION
BY MR. REINERT............................................... 703:20
RECROSS-EXAMINATION
BY MR. PARRISH............................................... 716:21
FURTHER REDIRECT EXAMINATION
BY MR. REINERT............................................... 720:15
FURTHER RECROSS-EXAMINATION
BY MR. PARRISH.............................................. 725:3

ROBERT MORIARTY

DIRECT EXAMINATION
BY MR. PARRISH............................................... 727:23
CROSS-EXAMINATION
BY MR. REINERT.............................................. 747:3
REDIRECT EXAMINATION
BY MR. PARRISH.............................................. 767:10
RECROSS-EXAMINATION
BY MR. REINERT............................................... 770:16
FURTHER RECROSS-EXAMINATION
BY MR. REINERT............................................. 778:3
FURTHER RECROSS-EXAMINATION
BY MR. REINERT............................................... 782:14

LYNETTE REDDEN

DIRECT EXAMINATION
BY MR. PARRISH............................................... 784:15
CROSS-EXAMINATION
BY MR. COLLOTON............................................. 793:24
REDIRECT EXAMINATION
BY MR. PARRISH............................................. 799:25

TIMOTHY CUTKOMP

DIRECT EXAMINATION
BY MR. REINERT.............................................. 802:13
CROSS-EXAMINATION
BY MR. PARRISH............................................. 803:25
REDIRECT EXAMINATION
BY MR. REINERT............................................. 808:3

WILLIAM GARRISON

DIRECT EXAMINATION
BY MR. COLLOTON...................................... 809:15
CROSS-EXAMINATION
BY MR. PARRISH....................................... 817:15
REDIRECT EXAMINATION
BY MR. COLLOTON....................................... 824:8
RECROSS-EXAMINATION
BY MR. PARRISH........................................ 826:6


(Defendant Exhibit A was offered.)..................... 730:7
(Defendant Exhibit B was offered.).................... 745:24
(Defendant Exhibits C, D, and E were offered.)........ 801:2

(Defendant Exhibit A was received.) .................. 730:13
(Defendant Exhibit B was received.) .................. 746:3