**9**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

    vs.

DUSTIN LEE HONKEN,

     Defendant.



No. CR 96-3004

TRANSCRIPT OF SENTENCING

Volume 4

The Sentencing held before the Honorable Mark W. Bennett, Judge of the United States District Court for the Northern District of Iowa, at the Federal Courthouse, 320 Sixth Street, Sioux City, Iowa, February 18, 1998, commencing at 9:14 a.m.

APPEARANCES

For the Plaintiff:     STEVEN M. COLLOTON, ESQ.
Assistant United States Attorney
Suite 400
401 First Street Southeast
Cedar Rapids, IA  52407-4950

For the Defendant:    ALFREDO PARRISH, ESQ.
Parrish, Kruidenier, Moss,
  Dunn & Montgomery
2910 Grand Avenue
Des Moines, IA 50312

Also present:      Jay Jackson, Probation Officer
Dave Mizell, DEA

Reported by:      Shelly Semmler, CSR, RMR
320 Sixth Street
Sioux City, IA  51101
(712) 233-3846

Case 3:10-cv-03074-LTS-KEM    Document 19-9    Filed 06/06/11    Page 2 of 222

THE COURT: Morning.

MR. COLLOTON: Morning.

MR. PARRISH: Morning, Your Honor.

THE COURT: This is a continuation of the sentencing in United States versus Dustin Lee Honken. Mr. Honken is personally present this morning represented by Des Moines Counsel Alfredo Parrish. United States is represented by Assistant U.S. Attorney Steven Colloton. Mr. Colloton, is Mr. Reinert going to join us this morning?

MR. COLLOTON: Your Honor, I was advised early this morning by Mr. Reinert that he was up most of the night with some sort of flu and is therefore feeling like he should probably not come over. He may come by later if he feels up to it. But I told Mr. Parrish for the time being he's dealing with the second string, and we'll just do as best we can. Appreciate the Court giving us a few extra minutes in light of that. We had some other things to get organized. But we'll just proceed as best we can without Mr. Reinert.

THE COURT: Thank you, Mr. Colloton. I've never thought of you as second string.

MR. PARRISH: Well, Your Honor, I assumed it was the coach coming in at this point.

THE COURT: That's right. The clean-up hitter maybe, not second string.

Mr. Colloton, are you ready to proceed with the

government's evidence?

MR. COLLOTON: We are. I have a couple housekeeping matters, Judge, before we call a witness.

THE COURT: Okay.

MR. COLLOTON: You recall yesterday there was some discussion between Mr. Reinert and you and Mr. Parrish about a possible stipulation regarding some proposed testimony. And I'm happy to report that the parties now have reached an agreement on that stipulation which we've marked as Joint Exhibit 1.

THE COURT: So that means I ought not to rip this one up.

MR. COLLOTON: Yes. That one I think will --

THE COURT: This one you've agreed to. Mr. Parrish, have you agreed to this stipulation?

MR. PARRISH: I have, Your Honor, and I have reviewed it with Mr. Honken, and both our signatures should be on the last page.

THE COURT: They are. Joint Exhibit 1 is received.

* * * *

(Joint Exhibit 1 was received.)

* * * *

MR. COLLOTON: There was another matter that Mr. Reinert had raised with the Court at the end of the day yesterday which was an Exhibit Number 42 regarding some --

THE COURT: Material safety data sheet?

MR. COLLOTON: Right, from Citgo Petroleum Corporation. I thought, Your Honor, the best way to proceed, particularly in light of the fact that Mr. Reinert's not here, is for me -- after our one witness who we mentioned yesterday is to briefly call an agent to explain where this came from, lay whatever foundation we want to put on, and then ask the Court to consider it at that point.

THE COURT: It's not coming in by agreement, I take it.

MR. PARRISH: I thought it was coming in by agreement.

MR. COLLOTON: Oh, okay.

MR. PARRISH: My only objection is -- I told them yesterday was some material from I think, what, 1997?

MR. COLLOTON: Yeah.

MR. PARRISH: And then I objected, and you told me you faxed the material showing it was 1995. You got some new material in this morning I thought.

MR. COLLOTON: Right. Perhaps it will come in by agreement. I'll take another minute to see if we can resolve it that way. We showed Exhibit Number 42 to Mr. Parrish last night. I gather from what he's saying now is he doesn't object to the document coming in, but he expressed some concern that it was a current data sheet, that is, from 1997

and, therefore, might not address an issue about an earlier estimate of toluene. In light of that concern, the agents this morning received some additional data sheets including one from 1994, and I've provided that to Mr. Parrish. It's also from Diamond Vogel which was the company marked on the can that was discussed yesterday by Mr. Meyers.

THE COURT: We now have the evaporation rate for toluene. Did you know that? 1.9. So are you going to compute that for me now? I'm glad you put that into evidence now. Where is there something in here on the purity?

MR. COLLOTON: It's on page 7 under point 15, regulatory information.

THE COURT: Mr. Parrish, are there any objections to 42 and 42B?

MR. PARRISH: I don't, Your Honor, at this point other than to point out that it doesn't address that this particular batch or can was in that production area. I mean, it's basically a technical objection to the relevancy of the document, the particular can of toluene or Toluol which was found in the search, because they're basing it all on the fact that -- and as I understand, Mr. Cutkomp does not recall buying it or where it was purchased from. It was an agent who put that into the stipulation. Then they're now saying, well, it came from here so they're arguing something that may be fallacious from the beginning, and they have never tracked

the particular can back to the original manufacturer as far as I know, so I don't know the relevancy of this document.

THE COURT: It appears on Government's Exhibit 42 the issue date, whenever that might be, is December 8, 1997. Are you suggesting that Exhibit 42 covers the can of Diamond Vogel toluene in the photographs?

MR. COLLOTON: Are you referring to 42 or 42B?

THE COURT: 42.

MR. COLLOTON: Right. As I understood the evidence, the witness testified that the can was purchased in '95. The two exhibits taken together show shipments received by Diamond Vogel in '97 which is Exhibit 42 and '94 which is Exhibit 42B, both of which are 100 percent toluene. And if I call the agent, he would explain what Diamond Vogel told him about shipments. But I believe these exhibits show that when they get toluene to sell, whether it be '94 or currently, they're getting 100 percent toluene.

MR. PARRISH: And, Your Honor, my original objection went to '97 which they then said they would go back and try to get another one after they showed me the document yesterday. Then they came back this morning with a new document, but they have never -- first of all, my problem is -- with it is that they've never established that it was, in fact -- I assume that's a question for the Court -- that it was purchased from the particular place that supplied this

company and, second of all, that it is the can that came through them. Those are my problems that tie into the objection as to relevancy in this matter, and they've never tracked the can because the agent was on the stand and was asked was the can tracked, and he said no.

THE COURT: Mr. Colloton, I'm a little lost here. We have photographs and testimony that there's a five-gallon black can of toluene with a Diamond Vogel label on it; is that right?

MR. COLLOTON: That's right.

THE COURT: What in paragraph -- I'm sorry, in Government's Exhibit 42 ties that can to Government's Exhibit 42, because Government's Exhibit 42 is dated 12-8-97? This can I assume was purchased -- what year did Mr. Cutkomp testify it was purchased in?

MR. COLLOTON: 1995.

THE COURT: 1995. Is it this CAS number that relates to the can?

MR. COLLOTON: No. I think that the point about 1997 is a fair point. Because this was a 1997 document, we then repaired to Diamond Vogel and obtained Exhibit 42B and asking them we want the documents that reflect the supplier of their toluene back in '95. That's the purpose of Exhibit 42B.

THE COURT: What does 42 have to do with this can of

toluene? 42 is from Citgo Petroleum Corporation. I don't understand on the face of 42 what, if anything, it has to do with this Diamond Vogel can of toluene in the photographs. I mean, what in 42 ties it in any way to what's in evidence? Is there anything in this document? Where does Citgo come from? Is there any evidence in this record that Diamond Vogel purchased toluene from Citgo?

MR. COLLOTON: Here's what I'd like to do, Judge. I think those are certainly questions that we should answer, and I'd like to just call the agent who obtained these documents, have him explain what he found, and then take it up at that point if the Court would be willing to hear the testimony.

THE COURT: Sure. Would you like to do that? Or would you like to do that later?

MR. COLLOTON: Sure. We have the gentleman here. I would like to do that.

THE COURT: You may proceed.

MR. COLLOTON: I would call Special Agent John Graham.

JOHN GRAHAM, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated. When you're settled in and comfortable, would you please state your full name and spell your last name, please.

THE WITNESS: John Phillip -- 2 l's -- Graham,

G-r-a-h-a-m.

DIRECT EXAMINATION

BY MR. COLLOTON:

Q.   What is your occupation?

A.   I'm an agent with the Division of Narcotics Enforcement for the State of Iowa.

Q.   Where are you assigned?

A.   Mason City, Iowa.

Q.   Have you been involved with the investigation of this case, United States versus Dustin Honken?

A.   Yes, I have.

Q.   Yesterday did you undertake to do some research into the source of toluene sold under a Diamond Vogel label in 1995?

A.   Yes, I did.

Q.   And did you do that at Mr. Reinert's request yesterday?

A.   Yes.

Q.   Did you understand that there had become an issue regarding what was the purity of a certain can of Diamond Vogel Toluol that was pictured in Government Exhibit 20?

A.   Yes.

Q.   What efforts did you undertake to learn more about the Toluol pictured in Government Exhibit 20?

A.   I first contacted the Diamond Vogel store in Mason City, Iowa.  They informed me that they received their toluene from their Orange City location.

Q. They advised you that they received their toluene at what time from their Orange City location?

A. Whenever they needed to stock their storeroom, they would receive the toluene from Orange City, Iowa.

Q. That's their current set-up?

A. Yes, it is.

Q. Did they indicate when that process began or when that Orange City location became their supplier?

A. I asked them specifically about '95, and they said that that would have been the procedure in 1995.

Q. What did you do then to determine the likely source of Toluol sold with a Diamond Vogel label in '95?

A. I contacted Mr. John Roths, R-o-t-h-s, who is their government regulation specialist for Diamond Vogel in Orange City to determine the procedure of them acquiring toluene.

Q. What did Mr. Roths explain to you about the procedure for acquiring toluene by Diamond Vogel?

A. That they purchased it from different suppliers. He then faxed me the Exhibit Number 42 to show that the toluene received -- he gave me their last recent shipment of the MSDS form to show the percentage of toluene, and that is Exhibit Number 42.

Q. Did you inquire of Mr. Roths about the percentage purity of toluene or Toluol sold with the Diamond Vogel label?

A. Yes, I did.

Q. What information did he provide you about that?

A. He advised me that it was 100 percent and that it would be on the MSDS form.

Q. At what time did he say it would have been 100 percent?

A. He was just going off of Exhibit Number 42. I later contacted him this morning, and he then advised me and sent me the MSDS sheets for their shipments received in 1993, 1994, and two shipments in 1996.

Q. Did you go back to him and ask for more information like that because you wanted to get earlier dates?

A. Yes, I did, and I also wanted to determine if Diamond Vogel received any toluene shipments in 1995.

Q. What did Mr. Roths advise you about shipments in earlier years than '97?

A. That they had received two in 1996. He did not have any records showing that they received any toluene in 1995. They had received a shipment in 1994 and had received a shipment in 1993.

Q. What did he say about why they didn't receive a shipment in 1995?

A. He didn't have an answer.

Q. Did he say what was the supply they received in 1994?

A. Yes. He said that they were supplied by the Ashland Company and that that would have carried them through 1995.

Q. Carried them through '95. In other words, they didn't

need a new shipment in '95?

A.    That's correct.

Q.    Is Exhibit 42B the data sheet that he provided for Ashland Chemical's toluene that was provided to Diamond Vogel in 1994?

A.    Yes, it is.

Q.    Did you ask him whether there was any variation in the purity of the toluene that Diamond Vogel sells as Toluol over the years?

A.    No, I did not.  But in looking at the MSDS forms, they all show that the toluene received was 100 percent.

Q.    And when you say looking at the MSDS forms, do you mean for all of the years that you've described him sending to you?

A.    Yes, I am and including Exhibit Number 42B.

        MR. COLLOTON:  That's all I have for the witness, Judge.

        THE COURT:  Mr. Parrish?

        MR. PARRISH:  Thank you, Your Honor.

                        CROSS-EXAMINATION

BY MR. PARRISH:

Q.    I'm looking at a fax to you which is Wednesday at 9:32, and it's to your attention, and it includes the -- which is Government's Exhibit 42B.  When did you have the conversation with Mr. Roths for him to forward you the second sheet which

is Government Exhibit 42B?

A.   I contacted him prior to eight o'clock.  I believe I talked to him at approximately 7:50 a.m.

Q.   Is it your testimony then that on yesterday you had a discussion with him about their toluene purchases in 1995?  Is that your testimony?

A.   Yesterday we discussed -- I informed him that I was researching a can of toluene purchased from Diamond Vogel in 1995.  That is the time that he supplied me with Exhibit Number 42.

Q.   Well, I guess I'm sorry if I didn't make my question clear.  Did he tell you about his purchases of toluene in 1995 when you talked with him yesterday prior to the discussion that I had with Mr. Reinert?

A.   No, he did not.

Q.   So it was only this morning after my discussion with Mr. Reinert that you went back to him and talked to him about 1995 purchases.

A.   As far as Diamond Vogel, yes.  When I talked to him yesterday, I was inquiring about a can that we believed to be purchased in 1995.  And he had supplied me at that time Exhibit Number 42.

Q.   And 42, you would agree, had nothing to do with 1995.

A.   It'd be difficult, right, to have anything to do with that.

Q. Okay. Now, let's look at the other material that he furnished you this morning which I assume came in just a few minutes ago. He perhaps had his fax time set an hour ahead or it appears.

A. It appears that the time is off, yes.

Q. Right, because it's not 9:32 yet.

A. It would have been difficult to receive that at that time, yes, Mr. Parrish.

Q. Well, I know your agents have a way of doing things, and I was just curious, but getting things before it's really due --

MR. COLLOTON: Objection to that editorial.

MR. PARRISH: I didn't mean it in any bad way.

BY MR. PARRISH:

Q. But let me ask you about 1995. I notice from the sheet that it does not contain any material that was purchased by this company, Mr. Roths' company, in 1995. You agree with that.

A. That's correct.

Q. Now, did you call him back after you had received that material?

A. No. We discussed it on the first phone call about the '95 -- any possible '95 shipments.

Q. He told you then before he faxed this to you that he had not received any shipments in 1995?

A.   That's what his records indicate.

Q.   No.  My question is he told you that before he faxed this document to you which is Government's Exhibit 42B.

A.   Yes.

Q.   And your testimony is that he also told you that he had enough to sell throughout the entire year of 1995 without reordering at all.  Is that your testimony?

A.   Based on the records that he was reviewing, that's what he told me.

Q.   Well, is he telling you there may have been other records where he could have gotten some material from other suppliers?

A.   The records he was reviewing were the MSDS forms.  He had forms in his file from '93, '94, and two in '96.  He is judging his statement based on the lack of forms in 1995.

Q.   So he's not saying he didn't order toluene from another source in 1995.

A.   No, he didn't tell me that, nor do I believe that that's his job to order.  He is their government regulator, and he provided me with the forms that were in his file regarding purchases of Diamond Vogel for toluene.

Q.   All right.  So what you're saying, the company could have had toluene from other sources that would have been available in 1995 that he does not have records of.

A.   I don't know.

Q.   Well, he could for all you know.  The lumber yard could have had that.

A.   I believe Mr. Roths would have sent me anything that would have shown any purchases or the acquisition of toluene in 1995.

Q.   Well, did you talk to the records keeper at the lumber yard that you're saying the toluene was purchased at?

A.   I did not -- I talked to the records clerk in Mason City about the purchase of toluene.  I did not talk to the records person at Orange City.

Q.   And did you talk to the person at the lumber yard?

A.   Which one?

Q.   In Mason City.

A.   Yes, I did.

Q.   The person who makes the purchases, who makes the orders.

A.   The person who works in the warehouse and sells to individuals.

Q.   But not the order person.

A.   No.

Q.   All right.  Do you know who that person is?

A.   The person who makes the orders?

Q.   Right.

A.   Or the person I spoke to?

Q.   The person who makes the orders.

A. No, I don't.

Q. Okay. Would that be someone, if you were investigating this, who you'd want to talk with also to complete your investigation?

A. I talked to Mr. Roths, and he said that the Orange City location is the supplier of Diamond Vogel stores in Iowa.

Q. Did he say that was the only person who supplied material to that store, to the lumber yard?

A. I didn't ask.

Q. You didn't ask him that question?

A. No, I did not.

MR. PARRISH: I have no further questions.

THE COURT: Mr. Colloton, anything further?

MR. COLLOTON: Yes.

REDIRECT EXAMINATION

BY MR. COLLOTON:

Q. Why did you end up calling the Orange City office of Diamond Vogel?

A. That's who I was directed to from the Mason City Diamond Vogel store as their supplier of toluene.

Q. So the Mason City store said, We get our toluene from Orange City.

A. That's correct.

Q. That's why you went to Orange City.

A. Yes.

Q. And why did you talk to Mr. Roths?

A. He is their government regulations specialist.

Q. Who directed you to him?

A. Whoever answered the phone.

Q. And he -- did he say that it was his responsibility to keep the records of the shipments of toluene received by Diamond Vogel?

A. Yes.

Q. And so when he said, I couldn't find a record from '95, did he indicate in his judgment that meant they didn't receive anything in '95?

A. Yes.

Q. Because he's the custodian of these kinds of records?

A. Yes.

Q. And that's why he inferred -- this is what he told you -- that the '94 shipment must have carried them through '95?

A. That's correct.

MR. COLLOTON: All right. That's all I have. I'd like to re-offer 42 and 42B.

* * * *

(Plaintiff Exhibits 42 and 42B were offered.)

* * * *

MR. COLLOTON: I understand the point about 42 not relating to the can sold in '95, but I think the testimony

and this evidence shows that they've consistently received it from different places and received 100 percent toluene in all cases, and that I think makes it relevant to what they received before. 42B is obviously the most pertinent.

THE COURT: Well, I have some questions, Mr. Colloton. What is your understanding of the testimony by Mr. Cutkomp of where the Diamond Vogel container pictured in number 207 of Government's Exhibit 25 was purchased?

MR. COLLOTON: My understanding is that he said he bought it at a lumber yard in Mason City, Iowa, and that he said he bought it in 1995. Actually I'm sorry, Judge. My understanding is he said he couldn't remember specifically whether he or Mr. Honken bought the can but that he was of the recollection that one or the other of them bought it at a lumber yard in Mason City in 1995. That's my recollection.

THE COURT: And what's your understanding of the state of the record as to where the lumber yard that he alleges the Diamond Vogel five-gallon container of toluene got it from? Did they get it from Diamond Vogel store in Mason City, because Diamond Vogel's not a lumber yard? It's a paint store.

MR. COLLOTON: I understood the agent to say he called the lumber yard when Mr. Parrish asked him that.

THE COURT: What's your understanding of where the -- what lumber yard are we talking about in Mason City?

THE WITNESS: Diamond Vogel.

THE COURT: Well, Diamond Vogel's not a lumber yard. I'm going to take judicial notice of that. I've been in Diamond Vogel stores. They don't sell lumber. Do they sell lumber at the Diamond Vogel store in Mason City?

THE WITNESS: Not to my knowledge.

THE COURT: It's not a lumber store, is it?

THE WITNESS: No, sir.

THE COURT: It's a paint store, isn't it?

THE WITNESS: That's correct.

THE COURT: Do you know whether there are lumber yards in Mason City that sell Diamond Vogel toluene?

THE WITNESS: When I contacted the warehouse manager at Diamond Vogel in Mason City, I asked him that, and he said that they do not supply any other outlets in Mason City with their own product as resell.

THE COURT: Let's assume for the moment -- and this is a huge assumption because it's contrary to everything in the record -- and that is that the Diamond Vogel 5-gallon container, picture 207 of Government's Exhibit 25, was not purchased at a lumber yard in Mason City but was purchased at the Diamond Vogel paint store in Mason City. Do we know anything about how long this particular container of toluene in picture 207 of Government's Exhibit 25 was in the store in Mason City before it was purchased?

THE WITNESS: No, Your Honor, we do not.

THE COURT: Well, then if you don't know how long it was there, it could have been there for five or six years. If you don't know how long it was there, how could you possibly conclude that it came from Ashland Chemical Company in 1994, Government's Exhibit 42B? How could you possibly make that leap?

MR. COLLOTON: Well --

THE COURT: You don't know when it was -- you don't know when the toluene was put into this can, how long it remained in Orange City, when it was shipped to Mason City, how long it remained in Mason City. How could I possibly infer that either one of these two exhibits in any way relate to the picture of the can in photograph 207?

MR. COLLOTON: Well, I think the Court could infer that the Orange City Diamond Vogel would not be ordering more toluene until it was low or out of its earlier shipments of toluene. And so '94 shipment seems to me would have come after the '93 shipments are depleted. Therefore, I would think that if it was a '91 can of toluene it would have already been gone through the system by then.

THE COURT: What if it was at the store in Mason City in 1991?

MR. COLLOTON: Oh, you mean that store never sold any --

THE COURT: That's right. I don't think Orange City waits until Mason City sends -- sells a five-gallon jug before they reorder. That I'm not willing to infer. There's no evidence of how long it was in the store in Mason City.

MR. COLLOTON: Well, I think that the record as stated by the agent and these documents shows that there's a pattern of purchases of toluene from various sources that are 100 percent toluene, and that, if not directly, certainly circumstantially suggests that when Diamond Vogel puts a can of Toluol out, it's selling 100 percent Toluol even if the evidence doesn't tie that particular can to a particular shipment. He's testified that they've told him from Diamond Vogel that they've had five or six different shipments over the years from '93 to '97 and that they've all been 100 percent toluene and that's what they sell and that's what the regulator --

THE COURT: Well, let me ask you something about that. If -- as I understood the defendant's expert, there is a separate certificate of purity that can be issued, and there's nothing in this record about a certificate of purity. There's simply a representation by the manufacturer Citgo and Ashland that it's 100 percent pure. But let me ask you, if they're both 100 percent pure in Government's Exhibit 42 and 42B, why is it that they have different vapor pressure points and different evaporation rates if they're both 100 percent

pure? Wouldn't you expect, Mr. Colloton, if they were both 100 percent pure that you would have the same evaporation rate and the same vapor pressure and some of these physical and chemical property characteristics -- not some; that they would all be identical if they were both 100 percent pure? That's -- now there's an assumption I'm willing to make on the evidence in the record.

MR. COLLOTON: Well, I'm not a chemist, so I don't know. I notice that some are exactly the same.

THE COURT: And others are different.

MR. COLLOTON: And others are -- I agree they're different. I would say they look close to me but --

THE COURT: Well, when you're talking about 100 percent pure, I don't think we're talking about close. It's not like horseshoes or ballroom dancing. I think it's either 100 percent pure or it isn't 100 percent pure. I think that's what the experts testified to. If it's 100 percent pure, you would expect that the chemical properties would not be close; they would be identical. And I want to know if you can explain why there are differences in the chemical properties between these two exhibits.

MR. COLLOTON: No, I can't explain that. I don't think that that would make the exhibits inadmissible. I think it might go to the weight of whether the Court conclusively believes that they're both 100 percent or

whether one of them might be 99 or 98. I think it shows it's not 50 percent because they're very close even when they do differ. And we don't have a scientist here to explain why there might be variations, so I can't elaborate on it.

THE COURT: Do you think it's fair comment by me that there's a difference in the chemical properties between the two exhibits? I mean, isn't that something that would cause a reasonable person to wonder about the accuracy of the 100 percent figure if the chemical properties are different? We're talking now in nonscientific terms.

MR. COLLOTON: I don't think it's unfair comment. I'd just respond as I did, that I think a number of them are the same. The ones that are different are very close, and I would suggest that it shouldn't undermine the Court's confidence that it's very close to 100 if not 100 and that it's certainly closer to 98 or 99 than to 50.

THE COURT: Well, that assumes, of course, that the can in the photograph is related in any way, shape, or form to either one of these exhibits, and I --

MR. COLLOTON: I thought we were working on that hypothesis for the discussion.

THE COURT: Okay. Well, I want to come back to that hypothesis. What's the evidence -- I mean, do you think that's a fair conclusion that this can relates to either one of these two exhibits? I think you've already conceded that

it doesn't relate to Exhibit 42 nor could it.

MR. COLLOTON: Right, because it postdates the testimony about the purchase. I say that's relevant just because it's part of a series of documents that says they always -- or that they've -- in all the shipments Agent Graham researched they received what is registered here as 100 percent toluene.

THE COURT: What degree of confidence do you have, Mr. Colloton, that the can in the photograph, 207 there, is related to the Ashland Chemical Company Exhibit 42B, that it actually was produced by Ashland Chemical Company?

MR. COLLOTON: I think given the evidence that the Mason City place gets it from the Orange City place and the testimony about the timing that it's more likely than not, but I would say the real question is what degree of confidence do we have in the purity level of the Diamond Vogel can purchased in Mason City, and I think that based on the evidence that there should be sufficient confidence that it's more likely than not that it's 100 percent according to MSDS sheets.

THE COURT: Well, for now I'm more interested in the first question, and that is whether Exhibit 42B is related somehow to the 5-gallon container in photograph 207. And you think it's more likely than not that --

MR. COLLOTON: Because I think it's more likely than

not that the cans don't sit on the shelf for five years, that the suppliers are getting new shipments yearly or every other year and sending them out, and the normal course of commerce is that you expect the paint store in Mason City to be selling products.

THE COURT: And, of course, that assumes that this was purchased at the Diamond Vogel store in Mason City which is absolutely contrary to the evidence in the record by the witness who said he purchased it at a lumber yard.

MR. COLLOTON: I can't dispute that. I think that really the focus should be on the more general point of --

THE COURT: The purity.

MR. COLLOTON: -- a can of what's labeled Toluol with a Diamond Vogel label. I think that is clearly what we have in Exhibit 20. Now, if the Court thinks, well, because the witness said he bought it at a lumber yard and the agent says what he said about the transfer of that from Diamond Vogel lumber yards, that you don't even believe the witness, well, that's a separate question. But if you believe there's a chance he's mistaken about where he bought it, that he bought it in Mason City and he's mixed up on whether he got it at the lumber yard or the paint store, then I think you can be confident that if Diamond Vogel supplied it in Iowa it's 100 percent pure according to the MSDS sheets, setting aside the Court's concern about what I consider small

differences in some of the physical data.

THE COURT: Well, would you -- let's talk about that. Would you agree that the differences in the physical characteristics of the chemical indicate that it's more likely than not that either one or both of the batches aren't 100 percent pure, or do you think they could both be 100 percent pure and have different chemical properties?

MR. COLLOTON: That could well be. I don't know. I'm not a chemist. I would take the business record to say that they tested it for each of these and that they're honestly putting down their readings. And so if there's differences of a small degree on a couple items, it may well be that there's a variance even among pure toluene.

THE COURT: Well, let me ask you about something you said. You said you would take the business record that indicates they tested it. There's no indication they tested it. There's an indication that they claim it's 100 percent pure, but there's nothing in these records that indicate there was an actual chemical test performed to come up with that. And you want to assume that there's some underlying chemical test, but there -- you know, I don't know about that. If there is, it'd be nice to see it. To me it's a claim by a manufacturer about their purity level. Whether it was tested or not, I don't know. But there certainly isn't anything in this record indicating that it was actually

tested or that there's anything akin to a certificate of purity or whatever the term of art that Dr. Moriarty used. There isn't anything like that in this record. You'd agree with me there. There's no independent chemical test. There's no indication actually that it was ever tested chemically. There's simply a claim that it's 100 percent pure.

MR. COLLOTON: From the manufacturer.

THE COURT: From the manufacturer.

MR. COLLOTON: So the question is when the manufacturer sends out data sheets to the customer claiming that it's 100 percent pure, whether that's more likely than not true or whether they're -- I guess the other option is fraudulently certifying purity level to customers.

THE COURT: Not necessarily fraudulently because they may not have conducted a chemical test to know. Maybe they're just assuming it's pure. But the difference in the chemical properties indicates that -- to me that it's more likely than not that one or both could not be pure because I'm fairly confident that you could not have 100 percent pure chemical compound with differing physical properties. That's something I think is more likely than not true. So there's a lot of ifs here, setting aside for the moment the fact that if the federal rules of evidence did apply, there's absolutely no foundation for these records. I mean, you

wouldn't even come close to 803(6) business record hearsay exception on the record that you've made if the federal rules applied. You'd agree with me there, wouldn't you?

MR. COLLOTON: I would agree we wouldn't have made the business records showing because we don't have the records custodian here.

THE COURT: I'll take --

MR. PARRISH: There is one other issue on that, Your Honor. I believe we have Mr. Cutkomp's final debriefing on January 28 that may cut -- do you have that still available?

MR. COLLOTON: It's downstairs.

MR. PARRISH: You may want to go get that record. But in that most recent statement taken after the government went back to investigate this, I think they sent an agent out to a lumber store, and I could be misspeaking. That's why I wanted to look at the record because they indicated it came from a lumber store by one of the agents. I don't know which agent did that. Is that your recollection too, that it did not come from -- it came from a lumber store in the spring of '95 according to the agent?

MR. COLLOTON: Well, I can check that at a break.

MR. PARRISH: I'd like to look at that statement too because I think that would be inconsistent with what has been produced at this point. And that's what they showed yesterday in the continuation of the disclosure file, but I

would like to look at it to refresh my recollection as to what Mr. Cutkomp said and what the agent did after he took Mr. Cutkomp's statement on January 28 of 1998. That agent could be in the courtroom today. I don't know. I don't recall the agent's name.

THE COURT: Do you have the statement Mr. Parrish is referring to?

MR. COLLOTON: I have it downstairs. My understanding from the testimony yesterday was that the witness said he recalled that it was purchased at a lumber yard. He didn't know the name of it. So when Mr. Parrish asked him about the name of the lumber yard that was listed in the report, the witness said the agent must have figured out the name of the lumber yard based on the description I gave of a location, and that's what I believe to be true from talking to the agent. But I'd be happy to get the report if it would advance the matter.

THE COURT: Well, just out of an abundance of caution, why don't you.

MR. COLLOTON: Would the Court like me to go get it right now?

THE COURT: I think so. Thank you.

MR. PARRISH: Your Honor, I think we found it.

MR. COLLOTON: Oh, you did?

MR. PARRISH: And it does confirm what I'd

indicated, right, that it was a lumber yard based upon what Cutkomp had told the agent, and we have -- they just gave me this yesterday. And it's in the third paragraph down. So it goes to my argument that if that's the case, there is no basis for them to say that that can came from the store. It also goes to the question of whether it was even bought at that time that they're claiming now it was bought.

THE COURT: We don't know whether Lamperts Lumber Yard, for example, buys it from the Mason City Diamond Vogel store for redistribution. We don't know whether Lamperts Lumber Yard buys it from either the Diamond Vogel paint store -- buys it wholesale from the paint store in Mason City, buys it directly from Orange City, or gets it from some other third party or whether Lamperts Lumber Yard even sold this. There are a lot of unanswered questions about where this -- do you have the label by any chance? Is there a blow-up picture of the label? I take it you don't have the actual can.

MR. COLLOTON: From what my first team member was saying yesterday, I understand that the DEA chemist said it was discarded, and that's the best we know. I do understand there was some additional investigation done regarding Lamperts, their supplier, whether they were a successor to another business that sold Diamond Vogel products and the like, and I think Agent Graham is familiar with that. And so

with the Court's indulgence, I would pose a few more questions about that to the witness.

THE COURT: You may.

FURTHER REDIRECT EXAMINATION

BY MR. COLLOTON:

Q. Mr. Graham, did you do follow-up investigation after the interview of Mr. Cutkomp by Agent Mizell in January of 1998?

A. Yes, I did.

Q. And was it your understanding from Agent Mizell that Mr. Cutkomp had described a lumber yard in Mason City where he recalled having bought a can of Toluol?

A. Yes.

Q. Did you, based on that description, undertake to determine what lumber yard he likely was referring to?

A. Yes, I did.

Q. What did you conclude?

A. That it was located at Lamperts Lumber Yard.

Q. You mean the location he described was Lamperts --

A. Lamperts which is on Eisenhower Avenue in Mason City.

Q. Did you then do some investigation into whether Lamperts Lumber Yard was indeed a vendor of Diamond Vogel toluene?

A. Yes, I did.

Q. What did you do?

A. I first contacted Diamond Vogel, and that is when they advised me that they did not supply any other retail stores

in Mason City with any product under their label. I then went to Lamperts and asked them if they sold Diamond Vogel toluene. They said that they did not. They said that when they did sell toluene it was from a different supplier under a different label. She then showed me the shelf, and they did not have any toluene stocked. And she advised me that normally when they sold toluene it was in one-gallon containers.

Q. Did you discuss with her when Lamperts Lumber Yard came into business at that location?

A. Yes. Lamperts purchased Cashway Lumber Yard in 1994, and the lady I spoke with started working for Lamperts in 1995.

Q. Did you discuss with the Lamperts employee what inventory, if any, they inherited from Cashway, the predecessor?

A. She was not aware of that as she was not an employee at that time.

Q. Did you do any investigation into what toluene products, if any, the predecessor sold?

A. No, I did not as far as the Mason City store.

Q. Did you do any investigation into whether Cashway sells Diamond Vogel brand toluene?

A. The warehouse manager in Mason City of the Diamond Vogel store advised me that they supplied the Cashway Lumber store

Case 3:10-cv-03074-LTS-KEM    Document 19-9    Filed 06/06/11    Page 34 of 222

in Hampton, Iowa, with their products but they did not supply the Mason City Cashway store with Diamond Vogel products.

Q. You mean currently or at any time? Were you advised that that was the current situation or the --

A. Well, it wouldn't be current because I don't believe that there are any other Cashway stores open, and it would have been at the time that they were operating under the Cashway name.

MR. COLLOTON: That's all I have, Judge, if the Court --

THE COURT: Mr. Parrish, anything further?

MR. PARRISH: Yes.

RECROSS-EXAMINATION

BY MR. PARRISH:

Q. Mr. Graham, why didn't you put in your report -- well, I was just told by the government that it was not your report but you had done the investigation. You knew also as being one of the officers in this case Mr. Cutkomp said that this material came from Lamperts Lumber Yard, that it didn't come from there. Why didn't you correct that and let us know that maybe it didn't come from there rather than leaving us under the impression that it did, in fact, come from Lamperts Lumber Yard when they didn't even sell five-gallon cans?

A. I advised that to Agent Mizell that I had done that research, that there was, in fact, a lumber yard at the

location that Mr. Cutkomp described and that there was no Diamond Vogel product sold according to Lampert officials.

Q. You told this agent that, and it's not in any discovery file, and it's not been disclosed to me at this point that you'd done all of that work clearly establishing that Cutkomp was possibly lying, and you didn't disclose it?

A. I don't know if it was a matter of whether or not Cutkomp was lying.

Q. Well, you had confirmed, had you not, that they didn't sell five-gallon cans. You just testified to that. They only sold one-gallon cans if they sold any at all. There's a five-gallon can sitting in this photograph, so there was some evidence that Cutkomp was either inaccurate or was not telling the truth and that Mizell's report was inaccurate. So you're telling me then that you didn't tell them to correct their report in their disclosure and discovery material to me?

A. I have never seen the report and that the person at Diamond Vogel, the manager at the warehouse, advised me that there would be -- although it would be a remote possibility that Cashway Lumber in Hampton could have supplied the Cashway Lumber store in Mason City with any type of product obtained by them under the Diamond Vogel label.

Q. I'm going to show you what is marked as Defendant's Exhibit G. Are you telling me, sir, that you never saw the

report, paragraph 3 here, that Cutkomp's description of where he got the material was Lamperts Lumber Yard? Are you telling me you didn't go check that out and find out that that was possibly inaccurate and they didn't even sell it there and that can that is marked as Government's -- not marked as government's exhibit but is in the photograph may not have even come from that lumber yard? You never corrected that report with the additional information?

A. I never saw the report.

Q. Oh, okay.

A. I was advised over the telephone that Mr. Cutkomp had given the description of a lumber yard at that location.

Q. But you had checked as part of your follow-up and found all of the information that you just testified to just a moment ago. You found all of that out; is that accurate?

A. That's accurate.

Q. It's not in any of your reports, nor is it in any discovery file I've been given up to this point. Do you know why that's the case?

A. No, I do not.

Q. Did you tell Mr. Reinert and Mr. Colloton that information?

A. I do not -- I don't believe so.

Q. You kept it to yourself.

A. No.

Q. Who did you tell?

A. I advised Agent Mizell at the end of last week.

Q. Back when they were running around with Mr. Cutkomp trying to establish where this five-gallon can had come from, you advised him that it could not possibly have come from that lumber yard based on the information you just testified to.

A. No, I didn't advise him that it couldn't have because the manager at the warehouse in Diamond Vogel advised that they supplied, they meaning Mason City store, supplied Cashway in Hampton, and there could be a possibility that Hampton supplied Mason City Cashway with Diamond Vogel products.

Q. That's kind of a stretch, but you found no evidence of that; is that correct?

A. That's correct.

Q. All right. But you never disclosed that either, did you?

A. Not until this week.

Q. Well, not until today to me sitting on this witness stand right now you never disclosed that to us.

A. That's correct.

Q. And you were doing -- for the last three weeks or maybe three and a half weeks, all you've been doing is investigating this five-gallon -- not all you've been doing

but one of the major portions of your investigation has been to investigate the five gallons of toluene because that was pretty important in this case; isn't that correct?

A. Yes.

MR. PARRISH: I have no further questions.

THE COURT: Mr. Colloton, anything further?

MR. COLLOTON: No.

THE COURT: Agent Graham, thank you.

Mr. Colloton, let me just ask you a question. If the five-gallon container in picture 207, Government's Exhibit 25, came from Orange City, went to their Diamond Vogel store in Mason City, then went to Cashway in Hampton, then came back to the Cashway in Mason City and was sold sometime in '95, it might be unlikely that Government's Exhibit 42B relates to that can of toluene; would you agree with that?

MR. COLLOTON: Well, if I -- actually I think the scenario the Court laid out is unlikely. I thought maybe that was the only scenario the Court was suggesting by which the exhibit would relate to the can, or am I not following you? If the --

THE COURT: Well, either if the government's witness is accurate, then that's the most likely scenario. If the government witness either lied or was just mistaken -- I think it's more likely he would just be mistaken. It

wouldn't seem to me there would be much motive to lie about where he got it so that he was mistaken -- then the toluene may have come from Mason City Diamond Vogel store.

MR. COLLOTON: Yeah, I see now. I wasn't following you. But it really came through the Cashway's predecessor company and all of that --

THE COURT: And wouldn't that be the most likely scenario if you want to credit the witness that you put on and say his testimony's accurate? If he bought it at Lamperts Lumber Yard, isn't it most likely that it went on this rather circuitous route that I've described?

MR. COLLOTON: From what I've heard today, that's the only way it could have gotten to the Lamperts Lumber Yard, correct.

THE COURT: Okay. And if the witness that you proffered was accurate in his testimony and this circuitous route from Orange City to Mason City to Hampton back to Mason City took place, it's at least unlikely as it is likely that Government's Exhibit 42B covers this can of toluene.

MR. COLLOTON: I may not be following, Judge. I thought that even under that circuitous scenario it would have come through Diamond Vogel.

THE COURT: But not -- do you think it's likely that it would have come in the time frame that Government's Exhibit 42B could reasonably be expected to have covered it?

MR. COLLOTON: Well --

THE COURT: Lot of speculation, isn't there?

MR. COLLOTON: Yeah. There's just not enough evidence to figure that out. I think that the evidence suggests that the witness was wrong about where he bought the can. I think that's the most likely --

THE COURT: Why is that any more likely than he was right about where he bought the can?

MR. COLLOTON: Because the scenario described by the agent for how Lamperts could have a can of Diamond Vogel toluene seems to me, as even I think the agent said, a small possibility that they would have received it from this Hampton store and that it would have been passed on to the Lamperts. The agent said that the person at Lamperts didn't even have knowledge whether they received any inventory from Cashways so --

THE COURT: Well, did you go over any of this with Mr. Cutkomp before he testified yesterday about this five-gallon container? I mean, you knew about all this, I assume.

MR. COLLOTON: I didn't know about it.

THE COURT: Did Mr. Reinert know about it?

MR. COLLOTON: I was just trying to find that out.

THE COURT: I mean, I assume this would have been covered with him.

MR. COLLOTON: I would have too, Judge.

THE COURT: Is it reasonable for me to assume that all this information that Agent Graham went to, the other agents went to, that they would have covered that with Mr. Cutkomp before he testified yesterday?

MR. COLLOTON: I can't speak to that. I didn't speak to Mr. Cutkomp, Judge. It would have been good course if we knew that there was a chance he was mistaken to go over that with the witness. I just don't know whether Mr. Reinert did that.

THE COURT: Did that or not.

MR. COLLOTON: I just don't know. I don't know what he -- I haven't found out what he was advised by Agent Mizell or Agent Graham, and I'm unable to give any more information other than I almost feel I could have the flu.

THE COURT: I missed that. That you have to --

MR. COLLOTON: Pardon me?

THE COURT: I missed that.

MR. COLLOTON: I said other than saying I almost feel like I have the flu because I don't have the answers that you need for this issue and we have an information gap because Mr. Reinert's not here. I apologize to the Court. I tried to get out the facts as best we have them here. They're not necessarily favorable to us. But whatever we can find out about this and try to figure out what happened,

that's our goal, and I'll undertake to do that when we get a break here and see if Mr. Reinert can shed any more light on it. And if the witness is wrong, he's wrong. And if we can't show where it came from, we can't show. But I'm not sure what the bottom line answer is right now to that.

THE COURT: And I'm not critical of you, Mr. Colloton, in any way. I'm just trying to get at the facts.

MR. COLLOTON: Right.

THE COURT: And it seems to me that in the normal course of preparing witnesses when you had all this information gleaned by an agent in a very extensive investigation, in the normal course of things you would have gone over that with the witness. That would be my assumption. Now, I'm open to the possibility that for some reason you didn't in this case. But I more likely credit his testimony that he bought it at the lumber yard if all this information was disclosed to Mr. Cutkomp and he still persisted in his view that he bought it at the lumber yard. If it wasn't disclosed, then it's kind of a toss-up about whether he was just mistaken about where he bought it or not.

MR. COLLOTON: Yeah, I understand that, Judge. I'm advised here at the table that this information was learned, at least some of it, on Friday. And I don't know what communication was made with Reinert over the three-day --

Mr. Reinert over the three-day weekend and whether he communicated to Mr. Cutkomp or not. But we can provide that information for the record.

THE COURT: Well, I'm not sure. We're kind of sometimes maybe not seeing the forest for the trees here. I realize there are all these unsettled questions about it. But kind of the bottom line is -- as you tried to keep me on the path here is whether this five-gallon container of the toluene had a reasonably high level of purity and whether I doubt it was 100 percent because this is kind of industrial grade stuff that I really doubt is actually 100 percent despite the manufacturer's claim which I think suggests why there are differences in the chemical properties. There's no evidence to suggest it's anything other than a high level of purity, whatever level that might be. And there really isn't enough evidence in the record for me to make a judgment about a very high level of purity versus 100 percent level of purity as to what effect that would have on the alleged manufacturing process. So it may all be much ado about not a whole lot. But there are a lot of unanswered questions about the five-gallon container of toluene.

You may call your next witness.

MR. PARRISH: May we take a five-minute break?

THE COURT: Absolutely. Why don't we take a little longer break, and we'll be in recess until 10:40. Thank you.

(Recess at 10:22 a.m.)

THE COURT: Please be seated. Where are we, Mr. Colloton?

MR. COLLOTON: We are, I think, back to where we had one more witness we want to call. I want to note for the record last night the Court asked me did I have any objection to Defense Exhibit C, D, and E, and I wanted a chance to read them. We do not object to their --

THE COURT: So C, D, and E are received.

* * * *

(Defendant Exhibit C, D, and E were received.)

* * * *

MR. COLLOTON: We have one more witness and then one more exhibit that I just talked to Mr. Parrish about. May I proceed?

THE COURT: You may.

MR. COLLOTON: United States calls Dana Rasmussen.

THE COURT: Please come forward, and I'll swear you in.

DANA RASMUSSEN, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated. Would you state your full name, please, and spell your last name.

THE WITNESS: Dana Lynn Rasmussen, R-a-s-m-u-s-s-e-n.

DIRECT EXAMINATION

BY MR. COLLOTON:

Q. What is your city of residence?

A. Sioux City.

Q. Where do you currently reside?

A. 515 Water.

Q. What location is that? What building is that?

A. It's the residential treatment facility.

Q. Why are you there?

A. OWI.

Q. Did you spend some time in the Woodbury County Jail on account of that OWI?

A. Yes, I did.

Q. When did you go into the Woodbury County Jail?

A. December 26 of 1996.

Q. Where were you housed in the Woodbury County Jail?

A. G block.

Q. Did you at any point come to know the defendant in this case, Dustin Honken?

A. Yes, I did.

Q. How did you come to know Mr. Honken?

A. Just through being in the G block with Dustin. It was a small block. There was just a few people in there.

Q. Did you talk to Mr. Honken about why he was in the jail?

A. Yes, I did.

Q. What did he tell you about that, if anything?

A. That he was in there for manufacturing methamphetamine.

Q. What did he tell you about his case?

A. Through -- just through some conversations, just where he was from and about one of the witnesses.

Q. What about one of the witnesses?

A. Just that there was -- one of the witnesses was a friend of his or had been a friend of his.

Q. What did he say about that witness?

A. That he had been out of jail prior to coming back in but that they had put him back in jail because he had -- wasn't supposed to have contact with this individual and he did and had contact with him, and apparently he was detained then.

Q. Mr. Honken said he had been detained because of that contact with the friend?

A. Yes, sir.

Q. What, if anything, did he say about the significance of that friend as a witness in the case?

A. That he was the main witness and that without this witness that the state didn't have -- or that the government didn't have much of a case.

Q. Did he discuss with you anything further about that witness?

A. I'm not sure if I understand the question.

Q. After he told you -- Mr. Honken told you that one of his friends was an important witness and without the witness the

government didn't have much of a case, what further conversations did you have with Mr. Honken about the friend who was the witness?

A. Well, at some point while I was in the jail, he had talked about possibly killing this witness, that -- he told me where the guy lived and he -- I guess what I would say, he, like, solicited from me to do a hit on this guy.

Q. How did you respond when Mr. Honken raised that with you?

A. I had informed him that I wouldn't kill anybody.

Q. What, if anything, were you supposed to get as part of this proposal for you to go kill a witness?

A. Well, like I said, I told him that I wouldn't do that.

Q. Okay. So then did you have any further discussions about the witness?

A. Later on or at some point we had discussed trying to intimidate him.

Q. What conversation did you have with Mr. Honken about trying to intimidate the witness?

A. He explained to me that his parents lived outside of Britt in, like, a farmhouse and that they had a big picture window there, and we concocted a plan to just do, like, a drive-by and shoot the windows out of his house.

Q. Who was supposed to do the drive-by and shoot the windows out?

A.    I was.

Q.    How were you supposed to do that if you were in the Woodbury jail?

A.    He was going -- he helped me -- I was trying to get money from a friend of mine to get out, and if that didn't go through, he was going to give me money to get out.

Q.    What incentive were you supposed to have to participate in this plan?

A.    He said that after this witness got to the point where he wouldn't testify that he would be able to fire his attorney and that he had had a retainer with his attorney and that he would give me some of the money that he got back from the retainer.

Q.    What did he say about where this witness worked, if anything?

A.    I'm not positive, but I think he said Kraft.

Q.    What else, if anything, were you supposed to get in return for doing this intimidation?

A.    He had given me a recipe for meth that he kept one of the ingredients out of, and he was going to give me the final ingredient for it.  It was supposed to be a pretty easy way to make it.

Q.    What did he do with that recipe after you eventually got out of jail?

A.    I just kept it with some of the stuff that I had -- some

of my papers and stuff from jail.

Q. Were you interviewed by government people previously about this matter?

A. Yes.

Q. And did you provide that recipe that you had to the DEA agent?

A. Yeah.

Q. What further discussions did you have about this plan to intimidate a witness?

A. I was to, like, shoot the windows out of the house and then call him at his work and instruct him to get ahold of Dustin's lawyer, you know, and if he didn't that I knew where other family members -- where his other family lived and that something would happen to them too.

Q. What do you mean by that?

A. That was just I guess to -- he was to assume what I meant by that.

Q. You were supposed to say to the friend on the phone that -- I'm sorry. Why don't you explain again what you were supposed to say to the friend on the phone.

A. Well, I guess we never actually discussed what I was going to say, just that I was to intimidate him in a way that he would not testify I guess.

Q. How were you supposed to find this friend's house where you were to shoot out the window?

A. Dustin told me how to get there. He drew a map for me, and then I recopied it.

Q. Why did you recopy it?

A. He didn't want it in his writing or anything.

Q. What ended up happening with this discussion you had with Mr. Honken? How did it end up?

A. How did -- I don't --

Q. Did you end up getting out on bond at any point?

A. Yes, I did.

Q. How did you get out on bond?

A. My friend bonded me out.

Q. Did you carry out any of the plan that you --

A. No, sir, I didn't.

Q. What did you do with the drawing of how to get to the friend's house?

A. I don't know. I lost it.

Q. Did you have any other papers with you when you left the jail?

A. Yes, I did.

Q. What did you --

A. Letters and stuff.

Q. Did you have the methamphetamine recipe at the same time?

A. Yes, I did.

Q. How many of those papers do you still have?

A.   I still have the recipe and some letters that I had received while I was in there.

Q.   Did you look through your belongings for this drawing that you described?

A.   For the map?

Q.   Yeah, the map.

A.   Yes, I did.

Q.   You couldn't find it?

A.   No, sir.

Q.   When you were interviewed by one of the DEA agents, were you asked to try to replicate the drawing as best you could recall?

A.   Yes, I was.

Q.   Did you do that for the agents?

A.   Yes.

Q.   Pardon me?

A.   Yes, sir, I did.

Q.   Let me show you what's been marked Government Exhibit 40.   Do you recognize that?

A.   Yes, sir.

Q.   What is Government Exhibit 40?

A.   It's just what I remembered I guess in my head as to the directions that he had given me.

Q.   When did you draw this?

A.   When I was interviewed by the DEA.

Q.   Do you see the date 1-13-98 on the exhibit?

A.   Yes, sir.

Q.   Do you believe that's the date when you drew it?

A.   Yes.

Q.   Can you describe what you were told by Mr. Honken about the --

MR. COLLOTON:  Well, first of all, I'd offer Government Exhibit 40.

*   *   *   *

(Government Exhibit 40 was offered.)

*   *   *   *

THE COURT:  Any objection to 40, Mr. Parrish?

MR. PARRISH:  No objection, Your Honor.

THE COURT:  40's received.

*   *   *   *

(Government Exhibit 40 was received.)

*   *   *   *

BY MR. COLLOTON:

Q.   Would you describe what Mr. Honken told you about the various things depicted on Exhibit 40?

A.   Vaguely just it was -- he told me that there was a blacktop road that ran outside of Britt.  It was about five miles out, and then you would turn off from this blacktop road and go about a mile to a gravel road; that there was just a couple of houses right in this area, like three

houses; that there was a big silo and stuff outside these people's house. I remember that.

Q. And you've drawn the different objects on the Exhibit 40 as best you could recall from --

A. Yes.

Q. Let me show you what's marked Government Exhibit 41. Do you recognize Government Exhibit 41?

A. Yes, I do.

Q. What's Government Exhibit 41?

A. That's the recipe that he had given me.

Q. And this is the document or copy of the document you turned over to the DEA when you were interviewed?

A. Yes, it is.

MR. COLLOTON: We'd offer Government Exhibit 41.

*  *  *  *

(Government Exhibit 41 was offered.)

*  *  *  *

THE COURT: Any objection to 41?

MR. PARRISH: No, Your Honor.

THE COURT: 41's received.

*  *  *  *

(Government Exhibit 41 was received.)

*  *  *  *

BY MR. COLLOTON:

Q. Mr. Rasmussen, let me just make sure we've covered your

criminal history here. You said you're in the treatment center now because of an OWI; is that right?

A. Yes, and driving on barred license.

Q. Is that a felony OWI?

A. Yes, sir.

Q. Because you've had sufficient prior number of --

A. Yes, sir.

Q. Do you have any other felony convictions?

A. Burglary second degree.

Q. Was that back in -- way back in 1981?

A. I believe so.

Q. How old are you now?

A. Thirty-six -- five, something like that. Thirty-five. Thirty something.

Q. Do you have any --

MR. COLLOTON: That's really all I have for the witness, Judge.

THE COURT: Thank you, Mr. Colloton. Mr. Parrish?

MR. PARRISH: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. PARRISH:

Q. Mr. Rasmussen, are you, in fact, a methamphetamine user?

A. Not at present.

Q. What about a cocaine user?

A. Not at present.

Q. When did you stop using?

A. In July of this year -- or excuse me, last year.

Q. You stopped using both methamphetamine and you stopped using cocaine in July of 1997?

A. Yes, sir.

Q. And when were you incarcerated with Mr. Honken?

A. In December -- the end of December and January and part of February of '96 and '97.

Q. So after you got out and prior to the time you gave this statement to the officers, you were continuing to use methamphetamine and cocaine; is that correct?

A. Prior to?

Q. Well, yes. You gave the statement in December of 1997. You indicated you were in jail with Dustin in late December of '96 and into January of '97. So that's my question then. Were you then using methamphetamine and cocaine after you were released from jail?

A. Yes.

Q. And you used it up until July for another seven months; is that right?

A. Yes, sir.

Q. You were addicted to it?

A. Yes, sir.

Q. All the time you were in jail you were, in fact, addicted to it.

A.   Yes, sir.

Q.   Did you tell the agents after you had gotten out and prior to the time that you were using methamphetamine that you were addicted to drugs prior to the time you gave them the statement?

A.   I don't believe so.  I don't recall.

Q.   Did they ask you how you were getting the drugs during that time?

A.   No.

Q.   You knew that was illegal; is that correct?

A.   Yes, sir.

Q.   And you indicated I think that you had a burglary second conviction.  Did you also have a theft third degree conviction?

A.   It's possible.

Q.   Okay.  And what other convictions did you have other than the burglary and the theft?

A.   Numerous traffic tickets and assault on a police officer in '94 I believe, '95 maybe.

Q.   Are you on probation at the present time?

A.   No.

Q.   Are you under any kind of restrictions at the present time?

A.   I am an inmate of the Iowa -- of the State of Iowa.  I'm actually in prison yet at this time.  I'm out on a work

release, state work release.

Q. You're an inmate at the present time on what charge?

A. The OWI.

Q. Was that a first, second, third --

A. Third.

Q. Third?

A. Yes, sir.

Q. And you were -- when were you incarcerated for the OWI?

A. In July.

Q. Were you ever involved in an attempt to break out of the Woodbury County Jail?

A. No, sir.

Q. Were you aware at one point that there was going to be a plot to take a rocket launcher and blow a hole in the jail and escape?

A. Yes, sir.

Q. And how did you become aware of that plot?

A. I think Dustin told me what was actually going on. They -- I --

Q. Go ahead. What? Who else told you?

A. I guess nobody actually really told me. The one point they -- when they thought this was going to happen, they called us out of the cell, and one of the guys stuck M & Ms in his ears or Milk Duds I guess it was, and he was like -- they were hovered down like by the wall. It was actually

quite comical.

Q.    During the time you were there, how many escape attempts did you hear about?

A.    Just the one.

Q.    Just the rocket launcher attempt?

A.    Yeah.

Q.    But you weren't a participant and you were not going to be one of the recipients of the benefit of that type of escape, I take it; is that right?

A.    Probably because I didn't know about it.

Q.    Well, till after it was supposed to have occurred?

A.    Right.

Q.    Now, let's talk about your conversation with Dustin. You actually met with Dustin Hoff -- Honken on two separate times. You saw him prior to the time he went to Chicago for a period of time, and you saw him after he came back; is that right?

A.    Excuse me?

Q.    You saw him prior to the time that he left to go to Chicago, and you were back in jail once he got back from Chicago?

A.    I guess I'm not aware of him going to Chicago.

Q.    You're not even aware of that.

A.    No, sir.

Q.    Okay.  So when is it that your conversation took place

with him with regard to him wanting you to do anything for him?

A. Would have been during my incarceration on this charge when -- see, first I got arrested before Christmas of '96, and I spent about two months in G block.

Q. So was that the time you had this conversation with Mr. Honken?

A. Yes, sir.

Q. You never had a conversation after that time then.

A. I was back in jail with Dustin for a very short time in July.

Q. All right. And were you in the same cell with him, cell block with him, at that time?

A. In July?

Q. Yeah.

A. For a few days I think I was.

Q. All right. And did you have any conversation with him in July of 1997 about him doing -- about you doing anything for him?

A. No.

Q. Okay. So then the total conversation you would have had would have been from December of '96 up until maybe January of 1997; would that be accurate?

A. February.

Q. February of 1997. Would that be accurate?

A.    Yes, sir.

Q.    Okay.  Did he make any complaints to you about Putzier during that time?

A.    Yes, he did.

Q.    And did he tell you at all that Mr. Putzier had, in fact, not appeared for court after he had bonded him out?

A.    Yes, he did.

Q.    Did he tell you that his girlfriend had, in fact, put up her house for him and he was supposed to pay her back?

A.    Yes, he did.

Q.    And that was not done; is that correct?

A.    Yes, sir.

Q.    And what else did he tell you about Putzier?  Anything?

A.    I guess I don't really recall.

Q.    You don't recall anything else?

A.    No, sir.

Q.    Okay.  Now, what did he tell you, if at all, about Dean Donaldson?

A.    I don't think I know who that is.

Q.    He never told you anything at all about Dean Donaldson; is that correct?

A.    I don't think I know who that is.

Q.    You've never heard his name mentioned before by Mr. Honken; is that right?

A.    I don't recall ever hearing it.

Q.   Okay.  As I understand it, Mr. Honken never gave you any money; is that correct?

A.   That's correct.

Q.   You never talked to Angie Johnson; is that correct?

A.   Correct.

Q.   Mr. Honken never bonded you out of jail or gave you any money; is that correct?

A.   Correct.

Q.   Did you ever speak directly to Mr. Putzier?

A.   No.

Q.   Did you ever report any of this activity to the jail personnel during the time it was taking place in December, January, or February of 1997 and December of 1996?

A.   No, I did not.

Q.   I'm sorry?

A.   No, I did not.

Q.   Did you ever keep any written records with regard to any of this?

A.   I guess just the recipe and possibly the map that I can't find.

Q.   Did you ever make methamphetamine yourself?

A.   No, sir.

Q.   You ever been around a clandestine lab?

A.   No, sir.

Q.   You just bought it.  Now, at the present time you

indicate you are incarcerated but on some type work release?

A. Yes, sir.

Q. Are you under restrictions of any type of work release for any conduct you've been involved in?

A. At present you mean or --

Q. Yes.

A. Yeah.

Q. What's that for?

A. Not budgeting monies and making false statements.

Q. Who did you make false statements to?

A. Allegedly my counselor.

Q. And you've been restricted right now for making a false statement to your counselor at this point; is that right?

A. Yes, sir.

MR. PARRISH: I have no further questions.

REDIRECT EXAMINATION

BY MR. COLLOTON:

Q. Mr. Rasmussen, are you saying it's your recollection that Mr. Honken told you that he had bonded out Mr. Putzier?

A. Yes, sir.

Q. And what's your recollection of what Mr. Honken told you about why he had bonded out Mr. Putzier?

A. I really can't remember for sure.

Q. What's your best recollection?

A. I think I recall him saying something about that he was

going to sell some stuff that he had and they were going to split the money. I'm not sure. I don't know.

Q. Did Mr. Honken say whether it had anything to do with his case?

A. No, he didn't.

Q. Do you remember when you were interviewed by Agent Hein on January 13 here in Sioux City?

A. Yes, sir.

Q. Did you tell Agent Hein that you remembered Mr. Honken told you that Putzier was supposed to do something to Honken's best friend to get him not to testify?

A. I don't recall, I guess. I think I might have said that.

Q. You think you might have said it to the agent?

A. Yes, sir.

Q. But did Honken say that to you or not?

A. I don't recall, I guess.

MR. COLLOTON: That's all I have, Judge.

THE COURT: Thank you, Mr. Colloton.

Mr. Parrish, anything further?

MR. PARRISH: Just a couple of questions.

RECROSS-EXAMINATION

BY MR. PARRISH:

Q. Did the government in any extent offer you anything with regard for any unfavorable testimony that you could give

against Mr. Honken?

A.    No, sir.

Q.    They didn't offer to do anything with regard to your time or give you any benefit of any sort?

A.    No.

Q.    And what you recall here today is what you remember; is that correct?

A.    I believe so.

        MR. PARRISH:    I have no further questions.

                FURTHER REDIRECT EXAMINATION

BY MR. COLLOTON:

Q.    In fact, you actually told the agents you didn't want to testify if possible; right?

A.    Yes, sir.

Q.    Because you were afraid it might have repercussions for you in the facility?

A.    Yes, sir, and it has.

Q.    It has?

A.    Yes, sir.

Q.    How so?

A.    Well, I think that the write-up that I got is -- was -- I guess I don't know how to say it, but I guess he -- my -- it was -- my counselor had asked me if the -- when the agents had interviewed me if they had asked me names and stuff, and they made it clear to make sure that the people down there

knew that I was testifying for the state, the other inmates.

Q.   I see.  And that's caused you problems because other inmates know you're a witness?

A.   Yes, sir.

Q.   And that's not a popular thing to be?

A.   No, sir.

MR. COLLOTON:  That's all I have, Judge.

THE COURT:  Mr. Parrish, anything further?

FURTHER RECROSS-EXAMINATION

BY MR. PARRISH:

Q.   Did the agents when they were talking to you tell you how difficult it would be if you did not serve as a witness?

A.   No, sir.

Q.   They never made any statement like that.

A.   No.

Q.   Who circulated the information then that you were going to be a witness?  Did you do that on your own?

A.   No.  The counselors did, I believe.

Q.   And where did the counselors get their information? From the agents who came down to talk to you?

A.   That I was going to be -- well, they called even this morning.  They had directed me to be here at 9 a.m., and then someone had called and said that I had an appointment at 8:45, and right out in the open he hollered, you know, you're supposed to be in federal court to testify at 8:45.  And, you

know, I mean, that was right in front of a room full of people.

Q.    You've been here the last couple of days, though, haven't you?

A.    Yes.

Q.    Okay.  And you're not in lock-up facility.  You're in a halfway house.

A.    Correct.

MR. PARRISH:  Okay.  I have nothing further.

MR. COLLOTON:  Nothing further.

THE COURT:  Thank you, Mr. Rasmussen.  You're excused.

Government have any additional witnesses?

MR. COLLOTON:  No additional witnesses, Judge.  I have one more exhibit that I've discussed with Mr. Parrish.  This was left for me by Mr. Reinert this morning, and it's -- in light of the questions raised yesterday about education and the like, Mr. Reinert wanted to offer this transcript from the community college in Mason City for Mr. Honken.  I understand Mr. Parrish -- well, he can speak for himself.

*    *    *    *

(Government Exhibit 43 was offered.)

*    *    *    *

THE COURT:  Any objection to Government's Exhibit 43?

MR. PARRISH: I just only wish my transcript looked like this. I went to a junior college too so --

THE COURT: Government's Exhibit 43 is received.

* * * *

(Government Exhibit 43 was received.)

* * * *

THE COURT: Government have any additional evidence?

MR. COLLOTON: Not at this time, Judge, no.

THE COURT: Well, just so that we're clear, Mr. Colloton, I'm not sure there is going to be any other time for any evidence. The evidence is going to be closed today, and so I'm always a little bit squeamish when somebody says not at this time because I just want to make sure you understand that as far as I'm concerned, there is no other time. I just want to make sure you understood that.

MR. COLLOTON: I understand that.

THE COURT: With the exception of rebuttal should the defendant put on additional evidence.

MR. COLLOTON: Right.

THE COURT: Okay.

MR. COLLOTON: I do -- I just -- maybe the reason I phrased it that way is I'm still a little concerned I don't know all the facts relating to this matter of the toluene can. And if there is something after I have a chance to look into it I feel ought to be disclosed to Mr. Parrish and then,

therefore, to the Court, we would do that. It would be something that probably wouldn't be helpful to us. But if there is anything like that, I would supplement with that.

THE COURT: I appreciate that and understand your reservation about why you said at this time.

Mr. Parrish, do you have any additional evidence to offer?

MR. PARRISH: Yes, Your Honor. I'd like to call Dustin to the stand, please.

DUSTIN HONKEN, DEFENDANT, SWORN

THE COURT: Please be seated. And we know how to spell your name, Mr. Honken, so I'm just going to turn it over to Mr. Parrish.

MR. PARRISH: Thank you.

DIRECT EXAMINATION

BY MR. PARRISH:

Q. Dustin, this is really other than your plea your first real opportunity to express what you heard and respond to the numerous allegations with regard to your case. So first of all, state your name for the record, please.

A. Dustin Lee Honken.

Q. And, Dustin, we have the presentence report. We're aware of how old you are and a lot about your family background, so I'm not going to get into that. But I do want to start out, first of all, how long have you been held at

the Woodbury County Jail?

A.    Since June of '96 it would be.

Q.    And at one point when you were picked up, Dustin, after you'd been released by Judge Jarvey, you had an opportunity, did you not, to contest your detention?

A.    Yes, I did.

Q.    And what was your decision with regard to whether or not you wanted to contest your detention after you'd been picked up and just remain in lock-up until either your plea or your trial?

A.    I discussed that with you at that time, and I just decided it was probably best to stay in lock-up because I felt while I was out there that it -- there was a lot of things that the government was pressuring me on to try to keep me back in. And I just didn't want that opportunity to grow any. I mean, I had to take eight UAs in a row which is not normal even to Jay Jackson. I reported that to him, that that was not standard, and it was just a compilation of those things. I decided that I didn't want to be back under that umbrella again.

Q.    You accepted responsibility, and you've entered your plea to both of these charges. Are you in any way disputing your plea, and do you, in fact, accept responsibility for your conduct with regard to the attempt to manufacture methamphetamine and also the prior charge of manufacturing

methamphetamine?

A. No, I don't contest it. There was an issue of the dates on one thing that I had but --

Q. You do accept that responsibility; is that correct?

A. Yes.

Q. You do, in fact, contest the amounts with regard to this matter; is that correct?

A. Very much so.

Q. Now, let's talk a little bit -- in order to establish amount, let's talk a little bit about Tim Cutkomp and your relationship with Tim Cutkomp. We know when that relationship started. Do you dispute that it started when you all were in kindergarten?

A. Our real relationship started -- well, we'd known each other since kindergarten, but I guess our serious friendship started when we were maybe 13 or 14. We were kind of best friends around that time.

Q. And you were best friends from that age till what point in time, Dustin?

A. Till I was rearrested I guess.

Q. Just for point of the record, would you establish to the Court in a summary fashion the nature of your relationship? And excluding the conversation with the methamphetamine manufacturing with the Court, just briefly outline to Judge Bennett the nature of your relationship with Tim Cutkomp.

A.   Well, I dare say Tim was probably my best friend and probably really only friend.  I wasn't really type to hang out with all kinds of friends, and we did everything together.

Q.   When you say everything, explain that to the judge.

A.   Well, you know, he was basically like a brother to me. I'll put it that way, you know.  We worked at the same place. Wherever I got a job I would get him -- you know, I got him a job at Wellborn.  I worked at Wellborn.  I went to Kraft.  I got him a job at Kraft.  Any time that, you know, he had some problems, you know, he'd usually come to me.  And if I had problems, I'd go to him.  And, you know, we hung out, went to movies, went to college together, you know, pretty much everything.

Q.   What about dating?  Did you date together when you'd go out on dates, this type of thing?

A.   We had, you know, went out on some -- I think I went out on his first date when he had met his initial wife Shelly, and I was out on a double date with him then and other times I guess too, you know, we --

Q.   What about the relationship between you and his kids and his kids and your kids?

A.   Shelly was very -- Shelly didn't like me, his wife, his ex-wife now.  She -- me and her never really clicked very well because she was rather possessive of him, didn't really

like the friendship thing that we had, the closeness that we had, so it was kind of a turmoil-type situation, pretty constant.

Q. Was there any other friend that you had or that you have had in your life that was as close to you as Tim Cutkomp?

A. Not even close.

Q. Were you a user of methamphetamine?

A. Yes, I was.

Q. For how long did you use it?

A. Ever since -- it would be the summer of '92 probably.

Q. And how did you use it? By that, what method did you get it into your body?

A. Ingestion, inhalation. No IV of any sort.

Q. Did you smoke cigarettes?

A. No.

Q. Drink coffee?

A. No.

Q. Drink alcohol?

A. Very little.

Q. What about Tim? When did, to your knowledge, he start using methamphetamine?

A. '92, same time.

Q. Did you both start using it together?

A. Yep.

Q. What about your first experience with methamphetamine?

Was that with Tim?

A.   Yes, it was.

Q.   How did that come about?

A.   It came about because that was the first time that we had ever produced methamphetamine, so I guess we tried the product, so that's the way --

Q.   And where were you when you tried it?

A.   In Tucson in Tim's apartment.

Q.   And who had obtained the methamphetamine at the time? Did you both go out together to get that methamphetamine, or was it something he bought or you bought?

A.   It was something that was produced.  I mean, at that time he had equipment in his house.  I had helped him, worked on it, and produced methamphetamine.  It wasn't bought.  It was what we had.

Q.   So you prior to this date in 1992 had never purchased any methamphetamine from the street.

A.   No, or any drug or alcohol even.  I didn't drink until then either.

Q.   Until 1992.  And how old were you at that time?

A.   I think I was 24.  I don't know.  We could count it back.

Q.   Let me ask you, what possessed you or Tim at that point, two kids from Mason City or Britt, to want to do something like this in 1992?

A.  To see if it was the right stuff I guess.

Q.  I don't know what you mean, and I don't know what you mean by I guess.  Explain it to me.

A.  Well, we didn't actually have a firm idea that's what it was that was produced.  I mean, neither one of us are high-tech chemists of any sort.  And, you know, I mean, it fit the descriptions of a white powder, and it seemed to be right according to, you know, what the book said.  So, you know, it was a thing that before you try to sell something you try it, so that's why we did it.

Q.  And once you tried it, what happened?

A.  Both of us liked it a little too much.

Q.  And how did you reach that conclusion that you both liked it a bit too much?

A.  Well, initially --

Q.  What did you start doing, and what was your activity that convinced you of the fact that it was something that you liked?

A.  Well, initially it was just going to be a thing where we were just going to try it and that was it because neither one of us was actually for really doing drugs.  I mean, we didn't really ingest in that type of behavior so -- but after trying that, it was like something that -- a feeling that was unexplainable.  I mean, I can't adequately explain it unless you've done it.  It's something that is compulsive to do

again and again in a psychological way I guess you'd say.

Q. And did you continue to do it?

A. Yes.

Q. Did you ever buy any drug off the street at any point?

A. I did from Dan Cobeen on several instances.

Q. Was that methamphetamine?

A. Yeah.

Q. And when did you buy from him?

A. It would have been when I was working at Kraft Foods. Would it be the summer of '95 I believe?

Q. Other than Mr. Cobeen, did you buy from anyone else?

A. No.

Q. Now, after you and Tim set up the structure where you prepared methamphetamine, did you ever at any point test your methamphetamine for impurity?

A. We didn't know how to do it, didn't have the ability or the stuff to do it. I mean --

Q. Once it was prepared, did you ever mix it?

A. Every time.

Q. And out of the material which you and Tim prepared in Arizona, did you ever bring it back to Iowa?

A. Yes, we did.

Q. How many times?

A. Four.

Q. Do you recall the amounts that you brought back when you

brought it back to Iowa?

A. The first amount that --

Q. Well, first of all -- I'm sorry. Before I ask that question, did you ever bring any amount back to Iowa that had been unmixed?

A. No. I never did.

Q. All right. And when you brought it back to Iowa during those four occasions, where did you take it, if anyplace?

A. To Greg Nicholson's.

Q. Did you ever take it to any other place other than Mr. Nicholson?

A. On one occasion I did give some to Mr. DeGeus, Terry DeGeus. Maybe two, but I think it was only one if I recall right.

Q. And approximately what amount total and how was it packaged that you gave to Mr. Nicholson?

A. When I brought -- the first time -- can I explain something?

Q. Sure.

A. The first time that we ever tried it that we produced it, we had obviously a difficult time because it was the first time going through things and many disasters, ended up producing two ounces of pure methamphetamine. And there was a big debate in subject on how much to cut it because, you know, we were in fear of somebody OD'ing and dying from it or

something, so basically through articles in newspapers and that we decided 25 percent. So I think we mixed six ounces of vitamin B inositol with that. As a matter of fact, I'm sure we did.

Q. All right. Now, the total amount during those four trips that you brought back was how much?

A. The first time -- I think the first -- I can think of matters of pure easier than the cut.

Q. The amount.

A. Well, it'd be probably -- the first time, like I said, it was 8 ounces at 25 percent. The second time it would have been 9 ounces at 25 percent. And then we bumped up to 50 percent after that for the last 2 shipments which would have been anywhere from 6 to 8 ounces on the last 2. I'm not exactly sure.

Q. Six to eight ounces each or --

A. Each one, yes.

Q. Okay. And the last question I asked you which we've not directed, how were the drugs packaged that you delivered to Mr. Nicholson?

A. Usually in brown bottles, those little brown bottles.

Q. Were you also using the methamphetamine during that time?

A. Yes, we were.

Q. You both were.

A. Yes.

Q. After you were arrested on those charges -- when was that? What year?

A. March of '93.

Q. -- did you ever produce any methamphetamine after that date?

A. No.

Q. Is that a no?

A. Yes.

Q. Did you try to?

A. In '96, late '95, early '96.

Q. And explain how in 1996 that came about.

A. Well, Tim had had the equipment for some time and --

Q. Where had he had the equipment?

A. Well, he had it at one time in his house. I don't remember the name of the street where it was at. And he had attempted on I don't know how many occasions -- he said yesterday I don't know how many occasions. And then before that I think he had it in his apartment that he was storing it in, but I don't think he actually attempted to do anything to my knowledge until he was in his last residence. Maybe it might be Eighth Street if I remember right. I don't remember.

But what had happened was -- because at that time the whole issue came up was -- because initially after I was

arrested and the charges were pending against me, his were dropped in the state and mine went to the federal level, of course. And I was going to enter a plea of guilty. And at that time I had discussed with him that if I indeed pled guilty, they could bring me back to testify against him because I couldn't take the Fifth Amendment in regards to him. That was his concern, that he was going to be brought into this stuff, and so that's why the whole lab stuff came up.

And then in '95 when his lease was running out on his place -- he was going to move into his ex-wife's; he no longer had a place to store it; he was thousands behind on his child support because of his investments in this -- I agreed to take it to my place.

Q. And what year and what month was that?

A. I guess I'm not --

Q. You said it was '96, but what month?

A. It'd be late -- close to the winter of '95 when it was actually moved into my garage, not too long after I rented that place.

Q. You've heard and you've observed the evidence with regard to the chemicals and other material that came in at that point. Did Tim Cutkomp move all of the material that, in fact, was located in your house from where he had it previously stored?

A.   To my knowledge, yes.

Q.   And from the chemicals and material that was there, you've already indicated there was, in fact, no methamphetamine produced; is that correct?

A.   That's correct.

Q.   Did Tim live in the house, or did you live there?

A.   I lived in it.

Q.   And how often was he there?

A.   Well, on all his days off because the deal was that he was supposed to be working on -- the whole reason I moved into my house, because he no longer had a place to do it, and the deal was it was going to be in my house, that he was going to work on it just like back in '92, '93.  I didn't want to work on it.  I didn't even want it in my house, but at that time I agreed because of the financial situation.  I mean, I wasn't doing that bad off financially, but he was doing bad off financially.  And the whole deal was is he didn't want to trash the whole deal because of the money.  And, you know, I mean, the idea of -- I guess the idea of having drugs again, you know, the decent ones because the ones that Cobeen were selling weren't very good was -- I guess that sort of appealed to me too.  That was part of, you know, why I agreed to have it in there.

So I guess your question and answer is we worked four days on, four days off shift.  Because I had my kids

during that time, I did not like to have my children around that type environment. So I couldn't work on it on the days off, and so he worked on it all the days off basically.

Q. So he was basically the person doing most of the work to this lab that was set up in 1996.

A. Yeah. I mean, I was helping out. But, I mean, I wasn't helping to the satisfaction that he wanted me to because I had my kids on all my days off so --

Q. Did he complain and did you have any disagreements about the fact you were not putting in enough time on it?

A. We had very serious disagreements about that.

Q. Did anything happen as a result of a disagreement that he had with you that you were spending too much time with your kids and not helping him with the lab?

A. Well, at that time Dan Cobeen was selling me methamphetamine, and he knew about the charges being dismissed in '95 because it was in the Mason City Globe Gazette paper. And people talked about it at work. I mean, it was pretty common knowledge. It was a big thing to talk about. And since he was selling me drugs, he started asking me -- I didn't really offer the information to him, you know. He started asking me about, you know, the quality of the drugs and stuff like that. And I said, Well, you know, they're, you know, way better than, you know, than what I would think is normally around and what he gave me was, you

know. And he asked if it was possible that I could ever come up with anything like that again. I said, Well, it's possible, because I was being pretty vague about it. I didn't know, you know, whether I could trust the guy or not.

And as time went on and Tim was more increasingly pushing about my work as far as going into the lab, that's when, you know, Dan started talking to me a lot about being interested in making methamphetamine. And I had discussions at work, you know, about -- vague at first, you know, how it could be made. I didn't say I made it. I just said, you know, how it could be. And he became very interested in that, wanted to know how to make methamphetamine.

Q. Let me ask you this: Did Dan and Tim Cutkomp ever get together to discuss Cobeen assisting him?

A. Yeah.

Q. And as I understand it, that was a direct result of your not taking the kind of interest or spending the kind of time that you had done in the past.

A. Well, in the past I never --

Q. What I mean by the past, I meant in Arizona.

A. Right. Well, in the past I didn't help manufacture, very little in Arizona. And my whole deal was I was supposed to sell, and that's kind of the whole deal I got with the end of '95 when he was putting it in my house. I was like, well, if I'm going to do any part of this -- you already got it in

my house -- I'll help with selling it, you know, because Dan Cobeen had sold me some and he wanted some, so I figured that would be an avenue.

Q. Did you ever meet with Cutkomp, Cobeen as part of what Cobeen would do to assist Cutkomp with the '96 operation?

A. Initially Tim wanted -- was very upset I didn't talk to him about it. He didn't -- there was a couple reasons he was upset.

Q. No. But did you meet with them is what my question was.

A. Yeah, yeah.

Q. And did Dan Cobeen ever come under your supervision or direction with regard to any activity that he was involved in in regard to 1996?

A. What do you mean by supervision?

Q. Well, did you supervise him in any way?

A. No. I guess he was -- he was going to help was the deal. It wasn't like I was, you know, paying him an hourly wage to be a worker or something like that.

Q. Well, did he help at all?

A. No, he never did anything.

Q. And to your knowledge did he ever meet with Cutkomp separate from ever meeting with you, and he being Cobeen?

A. On at least a couple occasions that I can remember, yes.

Q. What I'd like to turn to now is your incarceration at the Woodbury County Jail. You've heard the testimony from

various people with regard to an attempt to break out of the jail or escape from the jail. Let me ask you, did you ever make any attempt to break out of the Woodbury County Jail?

A. No.

Q. And I know you've been over there now, what, 15, 16 months.

A. Twenty.

Q. Twenty. Let me ask you briefly to describe to the Court some of the circumstances you've been faced with in terms of the inmate population at the Woodbury County Jail and how you've tried to react or respond to your situation there.

A. Well, when I was initially rearrested, I was put in Fort Dodge for a week and a half, something like that, before I was transferred to Sioux City. And at that time I knew I was being transferred, and a couple guys I was in with -- I knew I was going to Cedar Rapids. And they said, You better hope you don't go to Sioux City. The jail is terrible. And I talked to my sister, and she lives in Sioux City, and she said they had gang problems in Sioux City and everything.

And I ended up getting transferred to Sioux City. And as I'm going down the hallway, all's I see is I seen -- D block is the first thing when you head down. And as I'm heading down there, all's I see was tables full of Mexicans. I don't have anything against Mexicans, but from my sister there was a lot of Mexican gang activity. So I was concerned

going in there.

And the way I look I've been accused of being a cop many, many times in the past, so I was very concerned going in there, and I think I expressed my concern to the guard, you know, am I going to be all right in this place or what. He just kind of laughed it off. And I was put into D-2, and I pretty much stayed in my room. When I ate my meals, I ate alone. Nobody ate with me. And there was some kind of people being smart, you know, saying, He's a cop, he's a cop, stuff like that.

I mean, this is -- I was scared basically. I didn't know what to expect. Never been in jail before and from all the rumors, you know, and, you know, I was put next door to a guy that was in for murder and another dude for raping people -- rape, and I was in with -- 18 rooms with about 30 people in there, and it was pretty ridiculous.

Q. How would you account for the fact that these witnesses have come into this courtroom and realizing some have made deals, et cetera, with the government in their grand jury investigation and made these statements about -- specifically let's talk about Donaldson and Putzier, what they said you had done in terms of your conduct with them. First of all, is that true?

A. What they're saying I did?

Q. Yes.

A.   No.

Q.   Well, did you have any conversation with them about your case, or how would they get access to any information about your case?

A.   Well, when I went in there, like I was telling you, they were saying I was a cop because the way I looked.  And a couple Mexicans said I was an undercover marshal in there.  And actually Dean Donaldson approached me in my room and wanted to know why I was in there, who I was, where I was from because he said, you know, a lot of people are thinking I was a cop.  And he had asked to see basically paperwork to prove that I wasn't a snitch.  So, you know, I had my arrest stuff there, what I was accused of, and I basically went through the whole spiel of what I was accused of.  And pretty much, you know, I don't necessarily want to say I implied stuff, but I might have left stuff open in the fact of, you know, my dad had done prison time, and he told me that basically you don't want to come across as weak because you're burnt up, you know, if you're weak.  And I had seen people -- just in the few days I was there, I seen one dude get beat up and I seen another dude get his commissary stolen and stuff like that.  So when I came across, I guess I came across like I didn't want to be messed around with really.

Q.   So you formatted for yourself an image that you thought would be tough and protect you?

A.   As best I could, yes.

Q.   And have you had any physical altercations where anyone has beaten you up in the 20 months you've been there?

A.   Not one.

Q.   And have you made statements to imply to people that you are tough and that you're not to be messed with at the jail?

A.   I don't really think I took the stance that I'm really tough.  You know, I mean, you can physically look.  I'm not that tough.  I think I gave more the impression that the government has all these allegations against me, and I left it open at that to let them interpret it how they wanted to, you know.

Q.   You did that on purpose.

A.   On purpose.  Yes, I did.

Q.   And the reason that you did that was because it was basically a protective mechanism for you while you were at the Woodbury County Jail?

A.   Well, after that I was widely accepted.  I mean, first of all, because, you know, I said I was in for methamphetamine manufacturing made me probably one of the most popular people on the block because everybody wants to know how to make meth, how to make meth.  So, I mean, I had people coming from every corner of the block that would, you know, invite me to sit at the table and everything else.  So after that I had no problems whatsoever.  I didn't have any

problems up till then. It was just I was concerned about that possibility because I had seen it happen.

Q. And did you find that, in fact, was a tool that you had used successfully to keep you from having difficulties at the Woodbury County Jail?

A. Yes. To my knowledge nobody's lasted as long as me without getting in a fight there.

Q. And had you not done that, do you think you would have had some serious problems there?

A. I would have had serious problems.

Q. Did you ever attempt to break through the fire door, or did you ever attempt to break out of the cell through any open area that was being carved?

A. I had let Dayton Sabasta in my room to try to knock a hole through the wall, reason being --

Q. Tell us why you did that.

A. Reason being Sabasta came into the block relatively shortly before that. And he's a pretty tough person. And when I was there --

Q. How did you assess that he was a tough person?

A. Well, he took -- he had some disagreement with this Mexican guy, and he literally picked him up in the cell room -- not in the day room, in the cell room and tossed him from one side of the cell to the other, you know, pushed his head in the toilet, almost drowned the dude, you know, and it

wasn't nothing that serious that I knew of. It was some card game or something like that, called him a cheater or something.

And at that time when somebody's like that, I generally try not to be around them because you never know what you might say or do, you know. And he had been talking to Putzier through the fire door a lot. And after that time he came up to my room with the brass door handle in hand and said, Listen, I'm going to -- I need to knock a small hole through your wall because I need to get some things through here. And I said, Well, I said, Well, I don't want you to knock a hole through my wall because I'm going to get in trouble for it. And he said, Well, I'm going to give you some commissary for it. Don't worry about it. You're not going to get in any trouble. At the most it will be property damage. You'll get locked down for a few days. And when he's hanging on to a 10-, 15-pound door handle in his hand, it was a tense situation because I said, Well, you know, I said, I really don't want you to do that. He said, Why? Will you snitch me out, rat me out, you know, if I do it? And at that point I said, Well, no. I said so -- you know, I just -- I was concerned that, you know, maybe -- I didn't, you know -- concerned what the possibility of what he might do. So I figured I'd rather be locked down than be smashed around.

Q. So you never at any point had a door handle; is that correct?

A. No, I never did.

Q. And you never attempted to scratch a hole in your wall.

A. No.

Q. And just for point of reference, the hole that is the issue in the wall in your cell, did that get you into a cell that could get you outside?

A. No. I didn't know at that time. I didn't have knowledge at that time that there was even a hole in the other block to the outside.

Q. Well, that was the other block. That was not the next cell; is that right?

A. Correct. Well, it's in that next block. But I didn't have knowledge of that. The hole that he was making just goes from my cell to another guy's cell that was in lock-down for 25 days.

Q. And that's the hole that was in dispute that was in your cell.

A. That was in my cell, yeah.

Q. And the other hole that was in the wall in the top next to the window was in a different cell block.

A. That's correct.

Q. And that's the one you said you had no knowledge of.

A. Well, no. It was in that next cell block, in C block,

but it wasn't in the same room that the hole he was trying to make through my wall was.

Q.    Right.   But did you have knowledge of that hole in the wall?

A.    Not at that time I didn't, no.

Q.    Did you find out later about it?

A.    Yeah.

Q.    Let's go to Mr. Donaldson.   Did you assist Mr. Donaldson in getting out on bond?

A.    Yes, I did.

Q.    And why did you do that?

A.    It was about money.   At that time I had given you the initial retainer, and my sentencing was going to be longer, and I think I'd entered into a plea agreement with the government at that time or gave them a signed plea agreement or whatever.   But you had asked for 5,000 more.   I was concerned about money.

And during the whole conversation -- I mean, I was around Dean Donaldson a lot when I was in there because he was the first one to come up to me.   We played cards together and stuff like that.   We talked a lot.   And he had approached that he had a guy in the next block that was going to post his bond at that time, but he didn't have the $500 to get out because he had some pictures of this guy that were incriminating that he was kind of holding as collateral and

he was going to give them to him for posting the bond.

Q. Was this the gentleman with the sex abuse charge?

A. Yeah.

Q. Okay.

A. Because that same gentleman bonded out Putzier, and Putzier was supposed to bond Dean out, but Putzier never came through for him. So he talked to this Hershaw guy is his name and said that he could get these two incriminating photos that he's naked with this girl or whatever and he could get ahold of them through Phil Parmelee and for exchange for his bond, but he didn't have the $500, and I don't know why Hershaw couldn't come up with that. He put all kinds of money up for Putzier, but he wouldn't. So at that time most of the people in the county jail are burnt up as far as money goes so --

Q. Just tell us what you did with regard to the bond.

A. I had -- I was going to post -- give him the $500, and he was going to double the money. But then Hershaw ended up backing out, and I ended up having Kathy Rick bail him out.

Q. And did he ever pay her the money back for bailing him out?

A. He wired her 200 bucks, but that was it to my -- that's it to my knowledge.

Q. You're saying he never paid the money back.

A. No, he didn't.

Q. You didn't actually put up any money to bail him out; is that correct?

A. Well, no, not out of my pocket, no.

Q. Now, Donaldson indicated you had given him a map with some evidence to go in and -- with some statements to go in and assist him with eliminating a witness or harassing a witness to some extent.

A. There was never anything about eliminating any witnesses whatsoever. The map I had given him -- actually I didn't give it to him. It was on the back of my legal papers, so he copied it. It wasn't like some big hiding thing or anything. I gave him that because at the time and still Kathy Rick has a lot of possessions of Mr. Cutkomp in her garage, furniture and stuff. And at that time he -- his parents also had a television set of mine. And through the whole course of events with these hogs he was supposed to drop off and that, having a trailer over there and everything, that he agreed to take that stuff back to Mr. Cutkomp's place. It had nothing to do with killing anybody.

Q. Did you ever ask him to kill anyone or ever ask him to harm anyone?

A. No, no.

Q. Have you ever asked anyone to do anything like that?

A. No.

Q. Do you have any history or record -- I guess it's clear

from the presentence report. Do you have any history or record of any type of physical assault or violence against any person on the face of this earth?

A. No.

Q. Never have been a violent person, have you?

A. No.

Q. As a matter of fact, as you've shown how you used your skill at the Woodbury County Jail, you've tried to avoid violence all your life.

A. Yes.

Q. Dustin, there's one other area I want to go over with you, and that's the area dealing with the issue of engaging in a conspiracy to distribute methamphetamine at the time you were on bond or supervision. Did you do that?

A. No. From '93 to '95 on supervision?

Q. Yes.

A. No. I very much stayed away from criminal activity during that time.

Q. Did you engage in any activity to distribute or to manufacture methamphetamine during that time?

A. No, no.

Q. Did you use any during that time?

A. I guess I could have during that two years. It's possible.

Q. Did you have any UA drops or anything like that that

indicated you had used any?

A. No.

Q. All your UAs were clean?

A. Yes.

Q. Did you ever show up with a dirty UA at any time while you've been under supervision?

A. No.

Q. Did you do anything to mask any use of methamphetamine at all?

A. No, no.

Q. As you sit here today, how do you feel about your conduct and getting yourself involved in the use and distribution of -- the manufacture and distribution of methamphetamine?

A. It's foolish, reason being, you know, basically I guess when I think of things, I think of my children, the fact what this has done and what this has done to everybody involved and too late to change what already happened or I would.

Q. Are you willing to accept your punishment with regard to this matter at this point?

A. Sure.

MR. PARRISH: I don't think I have any further questions at this time, Your Honor.

THE COURT: Mr. Colloton, we can go about another ten minutes, and then I'm going to have to break for a

preexisting matter.

MR. COLLOTON: Okay. I'll start.

CROSS-EXAMINATION

BY MR. COLLOTON:

Q. Mr. Honken, let's see. Why don't I just start back at the beginning. You acknowledge that you and Mr. Cutkomp were good friends from Britt; correct?

A. Yeah.

Q. And you attended NIACC together with Mr. Cutkomp?

A. Yes, sir.

Q. And we've seen your transcript today. That's an accurate record of your time at NIACC?

A. I guess I didn't really look at it. I'm sure it is.

Q. You don't dispute that you took some chemistry courses there?

A. No. I took some chemistry.

Q. And you did well apparently in three different chemistry courses?

A. Not as well as I'd like to but yeah.

Q. Two A's and a B-plus?

A. The B-plus I wish was an A.

Q. And shortly after you finished that second term at NIACC you moved out to Arizona; is that right?

A. Right, be about January '93 -- or, excuse me --

Q. '92.

A. -- '92, January '92, somewhere around there.

Q. And you moved out to live with your brother Jeff; is that right?

A. Yes, I did.

Q. Because he lived in Tucson with his wife?

A. Yes.

Q. Her name was Patty I think?

A. Yes.

Q. And is it true that you then started to try to make methamphetamine in Jeff's house for a while?

A. Initially it wasn't methamphetamine. Initially it was -- I discussed with him -- we had about five pounds of old marijuana that wasn't any good and initially tried to get some equipment to try to make it -- to extract the THC out of it, but it never ended up working. And then when Tim came down -- that's why I think he stated the equipment wasn't very good or that -- that we purchased a bunch of equipment to try to start making methamphetamine.

Q. So you're saying at Jeff's house you tried to extract THC from marijuana?

A. Yeah.

Q. And did you tell his wife you were trying to extract gold?

A. Yeah.

Q. So she wouldn't know you were dealing with drug stuff.

A.   Correct.

Q.   And did you start to try to make meth at Jeff's house for a short time?

A.   If it was, it was a very short time.  I don't recall exactly.

Q.   But if Mr. Cutkomp said you'd already started to try there, you wouldn't dispute that for a short time before you came --

A.   No, I wouldn't dispute that.

Q.   And then you contacted Cutkomp who was back in Iowa about coming to Tucson; right?

A.   Well, the whole original deal I went down there was -- yes, I did -- yes to your question if I could explain a little bit more.

Q.   Sure.

A.   My brother was closing down Print Circuit Technologies which was his company there, and he had a bunch of stuff in storage sheds and that.  And Tim -- initially Tim didn't have anything for the summer to do, so he was coming down there, and he was paid through PCT also to help remove things and stuff like that.  And that's when we had started the discussions of the possibility of making methamphetamine.  I mean, we had discussed it at college, you know, about producing many different things, but methamphetamine was not a specific thing until he came down there.

Q. But you and Jeff had talked about the idea before Tim came out; right?

A. Not methamphetamine, no.

Q. You're saying you and Jeff had only discussed the extraction of THC?

A. Correct.

Q. But you personally at least had thought about manufacturing methamphetamine.

A. When I was in college with him and Russ Hill and some other people, yeah, we talked about it. A bunch of us talked about it.

Q. And did you raise that with Mr. Cutkomp when you called him back in Iowa and said to come out to Arizona?

A. Initially it was -- to come out to Arizona was not to make methamphetamine. It was an opportunity to make money through my brother with PCT. It didn't have nothing to do with making methamphetamine originally.

Q. Well, you had started to order chemicals through that company, Printed Circuit, Inc., in about March or April of '92; correct?

A. That's correct.

Q. So if Cutkomp didn't come out till May of '92, then you would have started with the chemical ordering before he got there.

A. Well, like I said, I had purchased equipment and

chemicals to try to extract THC. So I wasn't exactly sure of how to do it, so I purchased numerous stuff.

Q. Did you purchase toluene for the purpose of extracting THC from marijuana?

A. Yes, I did as a solvent actually.

Q. Pardon me?

A. Yeah, as for use for a solvent, that's correct.

Q. How does toluene help to extract THC from marijuana?

A. Well, THC is an oil and so is -- toluene's classified as like an oil. It, like, dissolves in gas, so it helps to dissolve THC. It's different than water. At least that was my idea and thinking at the time, although it didn't work correctly.

Q. Well, let me ask you this, and I'll show you the document if you'd like to see it, but Government Exhibit 26B is an Adchemco invoice. It shows a purchase of four liters of what's called toluene, comma, ACS on April 17, 1992. Does that sound like it's accurate to you?

A. Yeah, I'm sure it is.

Q. And it also shows naphthalene; benzene acid; urea, reagent; sulfan -- I can't pronounce it -- sulfanilamide; succinic acid; and Bunsen burners.

A. That was all used to calibrate the thermometer. All those are for calibration purposes for melting points. That's how I learned to do it in organic chemistry.

Q. But are you saying you made this purchase for the purpose of extracting THC from --

MR. PARRISH: Your Honor, he's asked that question six times. It's argumentative. I think he's asking this question now for the fifth time.

MR. COLLOTON: I asked about the toluene. I was trying to understand all these matters.

A. No. Those that you just described were very small amounts that were used to calibrate the mercury thermometer through a melting point thing. It had nothing to do with anything with the extractions of marijuana, nor does it have anything to do with methamphetamine manufacture. It only has to do with calibration of a thermometer.

Q. And you were using the thermometer for what at that time?

A. For heating and cooling, to record temperatures.

Q. Of what?

A. Well, I was trying to distill the THC out of the -- I guess it was like a brown residue, and you need to know the temperatures if something's going to come over it, so I had to -- in order to know what's coming over, you gotta know the correct temperature, so that's why I was going to calibrate the thermometer.

Q. Now, Exhibit 26B then shows -- and again, if you want to see this, just let me know.

THE COURT: Mr. Colloton, before we explore 26B, we're going to take a recess, and we can come back with that exhibit at 1:15; okay?

MR. COLLOTON: 1:15, yes.

(Lunch recess at 12:13 p.m.)

THE COURT: Mr. Honken, you can resume the witness stand. Mr. Colloton, any time you're ready.

MR. COLLOTON: Thank you, Judge.

BY MR. COLLOTON:

Q.   Mr. Honken, I was talking to you about Exhibit 26B which is the Adchemco receipts, but before we go to that, where did you get the five pounds of marijuana that you were trying to take the THC from?

A.   Actually my brother purchased it from somebody that used to work for me -- for him.

Q.   So you got that in Arizona?

A.   Yeah.

Q.   Now, there's a second invoice from May 14 of '92 as part of Exhibit 26B that shows a 5-gallon toluene purchase. You purchased that; right?

A.   I would be -- I don't know exactly when Tim came down, but we did purchase some things -- I mean he did using my name since I already had a relationship with Adchemco, so I'm unclear on that exactly.

Q.   Let me show you 26B here. I'll open it up to a page

about halfway through.

A.   Yeah, that's my signature.  I would have purchased that, yes.

Q.   This is a page dated 5-14-92 with a number 6206 in the top right-hand corner?

A.   Yes, it is.

Q.   And you signed -- okay.  And this says at the bottom, All merchandise purchased is for legitimate reasons only and not for drug use.

A.   That's correct.

Q.   But that wasn't correct in this case; right?

A.   That's correct.

Q.   And you're saying this five gallons then was purchased for the purpose of starting to manufacture methamphetamine; is that right?

A.   I'm not 100 percent sure on that.  I don't know.  I guess I can't answer that.

Q.   What other purpose did you have for the toluene?

A.   Well, the initial toluene that I tried using for the extraction wasn't enough because I tried many times.  So I did purchase it again.  I don't remember if it was in this specific instance or if it was from a hardware store variety. I don't recall.

Q.   When you purchased this toluene from Adchemco, did you get the highest quality that Adchemco has?

A. I don't know. I would just specify toluene I guess. I don't know there was different grades as far as that goes.

Q. It wasn't Diamond Vogel brand, though; right?

A. I don't believe so, no. No, I -- they had their own brand, I believe.

Q. Adchemco didn't sell Diamond Vogel.

A. Not to my knowledge, no.

Q. Then you see the next page. There's an invoice for beakers and clamps, acetone, et cetera.

A. Yes, I do.

Q. And did you purchase that equipment for the methamphetamine lab?

A. I had purchased on numerous occasions stuff for the initial attempting to extract that, so I'm unclear if that would be part of this or not. I don't know, because I didn't really know in the first instance what I all needed or anything. And as I go along -- went along, I just kind of bought different things.

Q. Well, eventually did you buy all the equipment you needed for the meth lab from Adchemco? Was that your primary supplier?

A. When Tim came down with the combination of the two of us, yes, that's correct.

Q. And where each of these invoices says, Verbal, Dustin as the ordering person, you don't dispute that you ordered the

items listed in the invoices; is that right?

A.   Stuff that I had signed for I don't dispute.  But as I stated, when Tim came down, he just used me as a contact when calling because I had already had -- like they didn't need money up front or something like that for it.  It was kind of like a billing-type deal.

Q.   Now, at some point after Mr. Cutkomp came out, is it right that you moved the chemicals and some equipment to a storage shed out of Jeff Honken's house?

A.   I think it was moved directly out of my brother's house into Mr. Cutkomp's apartment, but I'm unclear exactly on that.

Q.   You're talking about an apartment at the Tamarac complex?

A.   Yes.

Q.   And you and Tim lived there together; is that right?

A.   Yes.

Q.   And Jeff paid your rent; correct?

A.   Correct.

Q.   So when you say it's Tim's apartment, you mean that he was the one who was doing a lot of the work on the lab there?

A.   Well, when we initially sat down and discussed the -- trying to do this, it was basically to be split into three ways, and that was Tim was going to work on the manufacturing.  I was supposed to help in the manufacturing

to see -- you know, just to help out I guess. And I was supposed to deliver it because I knew people that had bought drugs previously. And my brother's role was he financed it, and he was supposedly going to launder all the money or how ever that worked.

Q. So the three of you sat down at some point and discussed how you were going to divide up the work?

A. Yeah, uh-huh.

Q. And you were the one who actually knew how to make the meth; correct?

A. No, I didn't at that time know how to make meth. Tim and I through a series of going to the university library and books and that had actually worked through many trial and error to be able to produce it. I never had made it before he came down there.

Q. Well, do you dispute Mr. Cutkomp's testimony that you essentially showed him how to do it at first?

A. Well, I dispute I showed him how to do it. I'd say we worked together on it. That's what my statement is.

Q. Is it correct that you were the one who went and really studied the literature and figured out how --

A. Well, we both did because when there was a stump in something, nothing could be done anyway, so we both would actually go to the library and do research on it.

Q. And the process that you ended up using is the one that

Mr. Cutkomp described when he testified?

A.   I guess I'm unclear exactly what process he stated.

Q.   Was it a -- well, do you remember the exhibit from the DEA that showed a five-step process?

A.   It wasn't that process.  It was close, but it was not the same exact one.

Q.   It was a process that started with toluene, though.

A.   That's correct.

Q.   And it went to benzyl chloride from there?

A.   That is correct.

Q.   And the next step was to go to benzyl cyanide?

A.   Yes, sir.

Q.   And then after that phenylacetic acid was a third step?

A.   No, it didn't go to that step.  It went with a sodium metal reaction I believe.

Q.   Sodium metal reaction?

A.   Yeah, uh-huh.

Q.   What happened after the sodium metal reaction?

A.   It converted -- I think it converted the benzyl cyanide to the phenylacetone, but I'm not 100 percent sure.  I can't remember exactly.

Q.   What happened after the phenyl -- what did you call it?

A.   Phenylacetone.  That would be the hydrogenation.

Q.   That's where you use the hydrogen tank to make the methamphetamine?

A. Correct.

Q. And you've said that you ended up making a first batch of two ounces?

A. Yes, sir.

Q. Of pure meth?

A. Yes, sir.

Q. Was that in about the summer of '92?

A. Somewhere around there, yes.

Q. And is it correct that you traveled back to Britt for Hobo Days in the summer of '93?

A. I don't specifically remember Hobo Days but somewhere in there.

Q. Yeah, I misspoke. I meant summer of '92. Did you deliver the first batch to Mr. Nicholson?

A. I actually delivered a portion to Mr. Nicholson and a portion of it to Mr. DeGeus.

Q. Is it true that you met Mr. Nicholson through Scott Gahn?

A. Yes, it is.

Q. And you knew Mr. Gahn because you'd had some drug dealings with him in Iowa?

A. Actually I knew Mr. Gahn from Wellborn Industries. He worked with me there in 1989. And the actual drug dealing through him would have been in reference to Greg Nicholson.

Q. Did you provide Mr. Gahn with some marijuana and some

cocaine?

A. Yeah. He basically -- he never -- I didn't know Greg Nicholson. He was getting it from me, and then he would sell it to Greg is how it went. And eventually I just met Greg through the acquaintance with him and found out that's who he was giving it to. I didn't know who he was --

Q. So you sort of cut out Mr. Gahn as the middle man; is that what you're saying?

A. Well, Mr. Gahn had marital problems, and he got kicked out of his house and disappeared, and I don't know whatever happened to him. And I had gotten to know Greg through that time.

Q. So rather than distribute the drugs to Mr. Gahn and have him give them to Mr. Nicholson, you just started to deal directly with Nicholson. Is that what you're saying?

A. Well, I didn't have any dealings with Mr. Nicholson after '89 till 1993 -- 1992. So I never could find Scott Gahn after that, so I went directly to Mr. Nicholson. That is correct.

Q. I see. So you're saying your drug transactions with Mr. Gahn were back in 1989?

A. That's correct.

Q. How did you know Mr. DeGeus?

A. His brother and I went to school together, same grade, and I had stayed at their house on -- when I was really

little and remotely knew Terry. I didn't really know him all that well.

Q. Did you collect money from Mr. DeGeus and Mr. Nicholson from your first batch of meth?

A. I collected it from Mr. Nicholson, but Mr. DeGeus never paid me.

Q. And is it correct that Jeff Honken got the money from the first batch?

A. Yes. That'd be correct, yes.

Q. Is it correct that eventually you and Tim moved out to a house in -- I think it's called Arivaca or Arivaca, Arizona?

A. Tim moved out there. I never actually moved out there.

Q. But you spent time out there with him?

A. Yes, I did.

Q. That's where the meth lab was moved?

A. That's correct.

Q. And Jeff Honken was again paying for the rent of the house?

A. I don't know if it was -- I don't know what the deal was on that. I don't know if it was coming from a portion of his money out of the deal or if he was paying the rent as part of doing it. I don't know what the deal was made on that.

Q. And at this point you were living at the house in Arivaca?

A. No. Actually I -- well, I would stay out there once in

a while, but my brother had apartments in Tucson, and I stayed a lot there until he moved to Phoenix in which my girlfriend was already moved down there by that time, my ex-girlfriend.

Q.    That was Miss Friesenborg who testified earlier?

A.    Yes, it is.

Q.    So then the production process picked up again at this house; correct?

A.    Yes.

Q.    And you're saying there were three more batches of meth produced?

A.    That's correct.

Q.    Now, if Mr. Cutkomp remembers five more, do you dispute that?

A.    With the knowledge I have, yes.  That would be incorrect.

Q.    But you agree that whatever meth was produced you brought it back to Iowa, you or Mr. Cutkomp?

A.    To my knowledge Mr. Cutkomp never brought -- oh, I take that back.  I think he did bring one time back.  But other than that, it was a combination of me, Mr. Cutkomp or me, Mr. Cutkomp, and my brother.

Q.    Your brother also brought some back?

A.    Well, we all came back around Christmas in a car together.

Q.   Who else did you deliver meth to other than Nicholson and DeGeus?

A.   Nobody.

Q.   Mr. DeGeus is from Clear Lake; is that right?

A.   He's from Britt I believe.  Yeah, he's from Britt.

Q.   He's from Britt.  Did he live in Clear Lake at the time?

A.   No, not -- no.

Q.   Was it your practice to leave the drugs with Mr. Nicholson rather -- and not leave them with Mr. DeGeus?

A.   Well, the two didn't know each other, so it's not like I left -- anything I would have left with him would have just been Greg's.  It wouldn't have been Mr. DeGeus's also.  I mean, I delivered to DeGeus on the first time, but I don't think I ever delivered anything to him again, so I wasn't involved with him as far as that goes.  Collecting money, trying to, yes, but nothing else.

Q.   Are you saying you only made one delivery of methamphetamine ever to Mr. DeGeus?

A.   Yes, sir.

Q.   And so you're saying that was part of the two ounces from the first batch.

A.   That's correct.

Q.   Is it true that you kept records of your drug transactions with Mr. DeGeus and Mr. Nicholson?

A.   I kept some rough -- yeah, I did, some.

Q.   And did you in those rough notes or whatever you want to call them refer to Mr. DeGeus as T-man?

A.   Yes, I did.

Q.   And Mr. Nicholson, did you refer --

A.   Actually T-man -- Mr. DeGeus is T-man.  Yes, that's correct.

Q.   And did you refer to Mr. Nicholson as G-man?

A.   Yes, sir.

Q.   Is it true that Mr. DeGeus ended up running up a substantial debt with you for methamphetamine?

A.   He actually had a substantial debt from -- partially from 1989 and partially from -- it'd be prior to when I went down to Arizona for what was not methamphetamine.

Q.   Did he end up owing you between twenty and thirty thousand dollars?

A.   I don't think it was that much because actually he gave me some money, but it was somewhere in that proximation.

Q.   What was the rest of the debt for?

A.   Ten pounds of marijuana that was delivered to him in -- it would be 1991 when I was at college, and I don't remember.  Two or three ounces of cocaine.  That would have been 1989.

Q.   Do you remember seeing Government Exhibit 21 which was the note that was received in evidence that had G-man and T-man written on it?

A.   Yes, I did.  Yes, I did.

Q. Do you remember seeing on there a T-man total of 27,725?

A. I believe I remember seeing that, yes.

Q. Is Government Exhibit 21 your writing?

A. Yes, sir, it is.

Q. And it reflects that Mr. DeGeus owes $27,725 to you; is that right?

A. Actually this note -- I believe Tim collected money from him, so that isn't -- it was owed at one time, yes, that's correct. But it is -- wasn't owed that after Tim collected money. I'm unsure of how much he collected.

Q. And does this note not mean that at one point he owed 15,000 something and another 12,000 was added to the debt?

A. That's correct. It does mean that.

Q. It does mean that?

A. Yes, sir, it does.

Q. And the 12,000 was for methamphetamine?

A. No. Actually the -- I think the 12 -- I had many pieces of paper over the times I went. This was a culmination of them I guess. I believe, if I remember correct, the 15,000 was for marijuana and the 12,000 was a combination of what was owed from the cocaine and the one methamphetamine shipment if I remember correctly. And, well, also there was -- I guess for -- when I initially gave him that in 1989, it was -- wasn't mine. It was through my brother. And he said that he should be charged interest, so there's some

fictitious interest number in there or something.

Q. Now, do the notes on the G-man part indicate that at one point Mr. Nicholson received upwards of $15,000 worth of drugs from you?

A. Yes, that would be correct.

Q. And that would have been all for methamphetamine?

A. Yes.

Q. And that would have been all for methamphetamine beginning with what you produced in Arizona?

A. Yes, that's correct.

Q. And were you charging the price of somewhere in the range of 1,400 to $1,800 per ounce?

A. It was 1,800, and I think it went down to 16. I don't ever remember it going down to 1,400.

Q. So it started higher and went down over time?

A. Correct.

Q. Is it true that at some point you found out Mr. DeGeus was using the drugs that you were giving to him?

A. I assumed he was always using them, but he wasn't -- he would always have a reason that he didn't have money so --

Q. Did you learn that through Angie Johnson?

A. No. I actually learned that through his brother who came back for Christmas.

Q. Was Angie Johnson at one point dating Mr. DeGeus?

A. Yes, she was.

Q. Did she come to you and say that Mr. DeGeus was using the drugs that you were providing him?

A. She didn't know that I was providing drugs to Mr. DeGeus.

Q. So you're saying she never came to you and talked about the problem with Mr. DeGeus as a drug customer of yours?

A. That's correct.

Q. Was Ms. Johnson familiar with your drug business?

A. No, she's not except for through the papers and all the recent stuff.

Q. Only what's come out in court you're saying?

A. That would be correct.

Q. Or publicly? Well, now, you were arrested back -- I guess it was March 21 of 1993; right?

A. Yes, sir.

Q. That was after you stopped at Mr. Nicholson's to make a collection of money; right?

A. That's correct.

Q. And at the time there was a tape-recorded conversation made between you and Mr. Nicholson; right?

A. Yes, sir.

Q. And isn't it true that you told Mr. Nicholson that you had another customer who was getting rid of about the same amount of methamphetamine as Nicholson?

A. I could have stated that.

Q.   And isn't that true, that you had another customer of that magnitude?

A.   Not of that magnitude.  That's not correct.

Q.   So you're saying if you said that to Mr. DeGeus it was -- I mean if you said that to Mr. Nicholson, it's not true?

A.   That's correct.  He kept trying to lower me down on prices and money and everything else.  So I basically stated there was somebody else out there so he didn't have that control over me.  It was a bluff I guess you would say.

Q.   Do you recall telling Mr. Nicholson that there was a guy who owed you 20 grand?

A.   Yes, I do.

Q.   And that would have been Mr. DeGeus?

A.   Yeah.

Q.   So if Mr. Nicholson said, How much that guy at the lake get rid of, and you eventually said, About the same as you guys do, that would have been a discussion about Mr. DeGeus?

A.   Yeah, it would have been.

Q.   Now, you've testified, as I understand it, that you always mixed the drugs before you brought the meth back to Iowa; correct?

A.   That's correct.

Q.   And you're saying that you never brought any pure meth back.

A.    That's correct.

Q.    Do you remember telling Mr. Nicholson that you brought pure meth back in this tape recorded conversation?

A.    When we first started with him it was 25 -- you know, around 25 percent.  I'm not exactly sure.  And then he complained about it not being quite good enough, so that way we cut it less in the later shipments, and I just said it was pure, you know, because it was better than what we originally started with.  And I just said it was pure because he had no way of testing, and I didn't have any, and he just believed me so --

Q.    So you're saying you lied to Mr. Nicholson about the purity of the methamphetamine?

A.    That's correct.

Q.    Do you remember a fellow named Brown that was sort of a competitor of yours in the drug business?

A.    No, I don't.

Q.    Do you think it would refresh your memory to take a look at the transcript of your discussion with Mr. Nicholson?  Do you think it might?

A.    Yes.

        MR. PARRISH:  Do you have a copy of that for me too?

        MR. COLLOTON:  It's Exhibit 20B.

        MR. PARRISH:  Thank you.

BY MR. COLLOTON:

Q.   Let me ask you to look at page 4, Mr. Honken, at the bottom of the page.

MR. PARRISH:  20B?  I have a tape and then it's blank.

MR. COLLOTON:  It's right there.

MR. PARRISH:  You just gave it to me?

MR. COLLOTON:  No.

MR. PARRISH:  No holes are punched in it.  There are no holes punched in it.  And it would have been in my book with holes punched in it.

MR. COLLOTON:  I can't tell you where it came from. I didn't just give it to you.

MR. PARRISH:  Okay.  Thanks.

BY MR. COLLOTON:

Q.   Do you see at the bottom of page 4 you're saying -- you said, I know there's nothin' around?

A.   I know there's nothing around.  I don't -- I guess I don't see that.  Oh, nevermind.  I'm looking at --

MR. PARRISH:  Page 4?

MR. COLLOTON:  Page 4.

A.   Yes, I do see that.

Q.   You were having a discussion with Mr. Nicholson about the possibility of selling a kilo of methamphetamine; correct?

A.   It appears to be that.

Q.   And you were talking about who might compete with you in selling methamphetamine; correct?

A.   If I remember right, I think we were talking about what the price of a kilo would cost, not as far as being a competitor.

Q.   But at the end of page 4 you said, quote, Angie knows all those people.  She said, you know, there's that one guy, that Brown shithead, but there's nothing else going around better than what we got.

MR. PARRISH:  Let me see what you're talking about.  There are two page 4s on the document.

Q.   Did you say that to Mr. Nicholson, Mr. Honken?

A.   I believe I said that.

Q.   And when you said, There's nothin' else going around better than what we got, you were referring to your methamphetamine; right?

A.   Yes, I was.

Q.   And so when you said, Angie knows all those people, there's that one guy, that Brown, you were talking about another guy that sold meth; right?

A.   I was unclear if Brown -- I think it's Alan Brown if I'm correct.  He used to live in Britt, my hometown, like a block away.  And I knew he was involved in drugs, but I don't know if he was selling methamphetamine or what.  I was probably just throwing a name out, to be honest.

Q. And you told him that Angie knew all those people;
right?

A. That's what I said, yes.

Q. Meaning she knew all those people who might be selling
drugs in Mason City?

A. Meaning that she knew Al Brown from Terry DeGeus. I'm
assuming that she knew that.

Q. What did you mean by those people?

A. Al Brown and Terry DeGeus knew each other I don't know
how. And I'm assuming that she would have known anybody that
would have hung around with them, not saying that all the
people that hung around with Brown were drug dealers. I
don't know. I didn't even know if he was selling
methamphetamine. I had never personally talked to the man or
even seen him in person.

Q. Let me ask you to look at page 11 while we're on this
document. This is now the page 11 that's typed on the
transcript, not the fax number.

A. Okay.

Q. Do you see about two-thirds of the way down you made a
statement to Mr. Nicholson about how you're stuck between a
rock and a hard place?

A. I see the beginning of that, yes.

Q. Is that a statement about Mr. DeGeus?

A. I was implying -- I was implying that -- the whole time

with Mr. Nicholson I implied that there was another person out there moving as much as he was because he kept trying to say that it was too expensive or this or that. So I never led him on that he was the only one involved because then I would be pretty much under his heel. So I played it up with Mr. DeGeus, or I never even said Mr. DeGeus. I played it up that there was another person out there that I could rely on besides him, so that's what this whole conversation would be in reference to.

Q. Did you have some drug paraphernalia and drugs back at Missy Friesenborg's house in Arizona when you got arrested?

A. Any -- I don't remember -- I guess I don't remember any drugs being there. I don't know what was there because what she got rid of, I have no idea what exactly that was that she testified to because Tim was living in the den at that time. And so I don't know what he could have had because he no longer lived out at Arivaca anymore.

Q. Well, you -- is it true that you talked to Mr. Cutkomp about having her get rid of some things that were in the house?

A. We were not -- no. I never discussed that with him.

Q. You and he were taken to the Cerro Gordo jail together; right?

A. Well, we were separated, though, right from the get-go. We never seen each other until I actually got out of Cedar

Rapids. I never even talked to him till after that.

Q. Eventually you got charged in federal court; correct?

A. Yes, that's correct.

Q. And you learned that Mr. Nicholson was the -- a primary witness in your case; correct?

A. Yes, I did.

Q. Did you have contact with Mr. Nicholson while you were on pretrial release?

A. No, I didn't.

Q. None at all?

A. None at all.

Q. Did you make attempts to locate Mr. Nicholson?

A. No, I didn't.

Q. Did you talk to Scott Gahn about Mr. Nicholson while you were on pretrial release?

A. I believe I ran into him one time outside of someplace he was trying to convert to a bar. We had a discussion about Mr. Nicholson because he was an acquaintance, and he knew what had went on from I don't know who. But that was as far as the discussion went.

Q. Now, fast forwarding ahead to 1996, you had some conversations with Mr. Cutkomp that you later found out had been tape recorded; right?

A. Yes, sir.

Q. And isn't it true that during one or more of those

conversations you talked about what had happened with the case in 1993?

A. Over the duration I might have. I'd have to see it specifically.

Q. All right. Well, let me show you Exhibit 2B and ask you to look at page 39. Do you see at the fourth clause down you made the statement, I mean, you gotta remember both those guys were skeptical?

A. Yes, I do see that.

Q. Who were you talking about there?

A. I believe I'm referring to Mr. DeGeus and Mr. Nicholson.

Q. So does this refresh your memory that you did talk about the 1993 case during some of these conversations?

A. Yes.

Q. And do you see down from there three more times when you're speaking, you said to Mr. Cutkomp, I mean, the one fucking moved, vanished? Do you see that?

A. Yes, I do.

Q. Who did you mean there?

A. At that time I could have meant either one of them because they both vanished.

Q. All right. Well, see further down Mr. Cutkomp asked you, How did you find him?

A. Yes, I do see that.

Q. And do you see then you say, Looked for a long time. I

was worried about that. I didn't find him. Just left on their own. Mister one of his friends that has a very big mouth? Do you see that?

A. Yes, I do.

Q. Who did you mean when you said, One of his friends that has a very big mouth?

A. I believe I was talking about Scott Gahn there.

Q. And then do you see two more clauses down of yours, you say, Just happened to know where, by the stroke of luck? What did you mean by that?

A. I believe I was talking about Scott Gahn there. I ran into him by a stroke of luck outside of his disco that he was building because at that time I -- I don't -- that's what I was talking about.

Q. Well, didn't you mean that you were lucky that Mr. Gahn happened to know where Mr. Nicholson was?

A. No. Mr. Gahn didn't know where Mr. Nicholson was. When we talked, he talked about my case and all that stuff, and he said that Greg had disappeared, took off, and he didn't know where he was at during the course of the conversation. That's why it says the big guy up there.

Q. When you say the big guy, you mean Scott Gahn; right?

A. Yes, uh-huh.

Q. And then you say, I mean, I was difficult. I was very worried; right?

A.    Where?  Oh.  Yeah, I see I said that.

Q.    What were you worried about?

A.    I don't even recall at this time what I was worried about.  I think I was -- could I take a second to review this just to look at the preceding conversation?

Q.    Sure.

A.    I believe I meant I was very worried about Nicholson coming back to testify.

Q.    Okay.  So then down there the last time you speak on the page when you say, So anyway, I'm not that worried this time, what did you mean by that?

A.    That I wasn't as worried this time about the actual evidence is what I was talking about this time.  I was referring to -- I believe in the unintelligible there I was discussing the actual case against us this time was much less than it was before.

Q.    Well, then you said, Not yet at least.  I was last week.  What did you mean by that?

A.    Well, I believe -- I don't know if this was -- I think this was after I had looked in the evidence file to see actually what the evidence was.  And after I had and reviewed of what actually was at my house and all that, I was not nearly as concerned after looking it over and thinking about it as from what he was told and also of what was initially told through -- when we were -- during that grand

jury thing we were subpoenaed.

Q. Okay. Well, then on the top of the next page, the conversation goes on, and you said, Not that worried, this week now. If they haven't by now, they're not going to. What did you mean by that, if they haven't by now they're not going to?

A. I have no idea at this point.

Q. Isn't it true that you meant if they hadn't moved Mr. Cobeen by now they're not going to move him?

A. I did have discussions with that because that was the whole idea that came from these tapes or these discussions when I had them with Mr. Cutkomp because of his concern of Mr. Cobeen tying him into the whole case.

Q. So you agree that you meant if they haven't moved Cobeen by now they're not going to?

A. I could have been talking about that. I guess I don't know exactly.

Q. And isn't it true that when you were talking back on page 39 about how you were worried and you didn't find him, you were talking about whether you could find Mr. Nicholson back in 1993?

A. No. I believe that was Mr. Gahn I was talking about there. The whole course of the conversations were in order to keep Mr. Cutkomp from basically flipping out because he was so concerned about being tied into this, that he was

going to do 15 years and his attorney told him that they had a pound of methamphetamine on him. And prior to us being arrested and during the course of when my house was raided, the whole issue centered on Cobeen, how he was the one that was setting us up. And I very much disagreed that whole time because I didn't think it was him. And during that time, he, Mr. Cutkomp, wanted to deal with Mr. Cobeen at that time because he was the only one tying Mr. Cutkomp into the attempt to manufacture.

Q. What do you mean Mr. Cutkomp wanted to deal with Mr. Cobeen at that time?

A. Make sure he could not testify no matter what happened because I didn't think it was him. And even in these tapes I'm saying I didn't think it was him, it was my fault and all that because I didn't. So during that whole time I was convincing him it wasn't him, it wasn't him. But he was concerned to take action. He was going to go break in this place and destroy the evidence because he was afraid his fingerprints would be on this beaker and everything else.

And so at this time after he was arrested, found out it was Cobeen, this is when I -- during discussions at work and at home -- which he talked much different when he was at my house because he thought my house was being wired and my house arrest thing was bugged and he wouldn't want to talk there. He'd talk to me at work about what he wanted to do to

Mr. Cobeen.

Q. Well, isn't it true that in your recorded conversations Mr. Cutkomp said on a number of times that he couldn't kill anyone?

A. Mr. Cutkomp changed his mind many times of what he could and couldn't do and all depended on the rationality of how he was. When he was in Linn County with me, he was going to do whatever it took to make sure it didn't happen because he found out Mr. Cobeen was cooperating against us first. Until he was arrested, I didn't believe it and during the detention hearing, and he came back to the cell block and told me, and he got out two days before me. His wife and kids had moved and gone without him knowing. And his state of mind was fluctuating back and forth, back and forth. So at work he would talk differently. Sometimes he'd talk differently on this. Sometimes he'd talk differently at work. All depends on the situation.

Q. Well, we'll come back to what happened in '96, but let me finish up with 1993. While you were on pretrial release, did you have any knowledge of a videotape of Mr. Nicholson that was created during that time?

A. There never was no videotape created. It was a bluff for the prosecution not to go to trial.

Q. So you actually talked about a videotape.

A. Oh, yes, I did.

Q. And it was just a bluff. You're saying you made it up.

A. That is correct.

Q. And you told Mr. Cutkomp you had such a videotape?

A. I believe he knew it was a bluff too because he was concerned about them going to trial. My attorney at the time said they would probably still go to trial without Mr. Nicholson, and that's when I came up with that idea and told my attorney that we had a tape saying I didn't do it. So there never was any tape.

Q. My question was did you tell Mr. Cutkomp about this videotape?

A. Yeah, I'm sure I did.

Q. You told him it was a tape of Nicholson exonerating you?

A. No, I told him it was a bluff to my attorney.

Q. Oh, you weren't faking out Mr. Cutkomp.

A. No.

Q. He was in on the bluff; is that what you're saying?

A. Yeah, he should have been.

Q. And was it part of this bluff that you told Mr. Cutkomp a hypothetical about someone being held against his will and forced to make a videotape?

A. Actually Mr. Cutkomp was the one who talked about that in reference to Mr. Cobeen because he actually worked at Domino's Pizza as a delivery person and described that scenario where -- he described that to me. I never described

that to him. And the videotape idea came off of how well it worked that Mr. Reinert dropped the case because of that.

Q. Well, you were talking about a videotape while the case was still pending, weren't you?

A. Well, we were slated for trial even after Mr. Nicholson disappeared. And shortly after that -- well, I met with my attorney, pled not guilty. We were slated for trial. My attorney thought we would go through trial anyway. And at that point is when I came up and said I have evidence contrary to my involvement, told that to my attorney. And he talked to Mr. Reinert, and shortly after that it was put on hold until it was dropped in 1995. And I believe that's the reason why it was put on hold.

Q. Well, wasn't it put on hold after Mr. Nicholson disappeared?

A. Yes.

Q. And before it was put on hold, you had, as you said before, notified an intention to plead guilty; is that right?

A. That's correct.

Q. And on the date of the plea hearing, you notified the Court that you changed your mind and you wanted to stand trial; right?

A. That's correct.

Q. And then on that day you met with Mr. Reinert and your attorney all together in the U.S. Attorney's Office; right?

A.    Yes, that's correct.

Q.    And isn't it true that you or your attorney at that point told Mr. Reinert that his case wasn't as strong as he thought it was?

A.    Yes, sir.

Q.    And isn't that because you knew Mr. Nicholson was going to be missing?

A.    Mr. -- my attorney called, and he had already missed his court date, so that's how we found out actually.  Actually I believe the FBI went to my dad's house because he actually called my mom, and my mom informed me -- I had no idea that Mr. Nicholson was gone till basically the day I went down there to testify -- or not testify but to plead guilty.  And when I got down there, I told my attorney that I had heard that he was not around, and he called the county whoever, and they said there was a warrant issued on Mr. Nicholson for the failure to appear, and that's how that all came about.

Q.    Did you have contact with Mr. DeGeus during your pretrial release?

A.    No, I didn't.

Q.    Did you learn at some point that Mr. DeGeus had been subpoenaed to the grand jury?

A.    I didn't learn that he was subpoenaed to the grand jury. I learned Angie Johnson was subpoenaed to the grand jury.

Q.    Were you concerned, though, that Mr. DeGeus might be a

witness against you?

A.    I guess that would be a consideration, but I wasn't that concerned of it given to my relatively little dealings with him as far as methamphetamine goes.

Q.    When did you last see Mr. DeGeus?

A.    Months before I was arrested in '93.  I have no clue.

Q.    Have you ever possessed a Tech. 9 firearm?

A.    No, sir, I have not.

Q.    Did you see -- well, are you aware that Ms. Angela Johnson purchased a Tech. 9 firearm in July of 1993?

A.    I was aware that she bought some gun, but I wasn't -- it wasn't a big issue to me at the time.

Q.    Well, isn't it true that at some point you talked to Mr. Cutkomp about disposing of a gun?

A.    The actual gun that I had that he disposed of was the SKS that Robert Riepma had sold to me.  He's stating it's a Tech. 9, but that's not true.  That's not the one.

Q.    And this was shortly after Mr. DeGeus disappeared; right?

A.    No.  This would be '95.

Q.    So you're saying that you did not contact Mr. Cutkomp in late '93, early '94 about destroying a firearm.

A.    That's correct.

Q.    But you're saying you did melt down a gun with him but it was the one you got from Bob Riepma?

A. I didn't even melt down a gun with him. I gave it to him to get rid of because my children were so interested in it because I made the mistake of opening up the trunk, and it was sitting in the gun case. And I opened up the trunk, and my kids seen it, and ever since then they wanted to see the gun, they wanted to see the gun, so I gave it to Tim just to do whatever he wanted to it.

Q. Well, didn't you tell Mr. Cutkomp that you'd obtained a gun for protection from Mr. DeGeus?

A. I never obtained a gun ever for protection from DeGeus. I didn't feel I had a need for protection from Mr. DeGeus.

Q. Didn't you tell Mr. Cutkomp that you didn't want to have a gun after Mr. DeGeus had disappeared?

A. I don't remember ever stating that. I was never a big person on owning guns in the first place.

Q. Well, you bought an SKS military rifle from Bob Riepma.

A. That's correct.

Q. And Angie Johnson bought a Tech. 9 in Waterloo.

A. Angie Johnson's purchase of that Tech. 9 has nothing to do with me.

Q. Didn't you tell Mr. Cutkomp after Mr. DeGeus disappeared that it would look bad for you to have a gun?

A. No, I didn't. I don't remember ever stating that to him. I didn't have a gun, so I wasn't concerned about that.

Q. Well, you had some other conversations with Mr. Cutkomp

on the tape about the 1993 case; isn't that right?

A. I had conversations on -- I've already admitted to that, yes.

Q. I mean other than the ones we've talked about.

A. I don't know. You'll have to specifically point them out. I haven't reviewed these for months.

Q. All right. Well, let me just ask you about a few passages. I'm just going to give you 1B through 5B so you'll have them all in front of you. Let me ask you to look at Exhibit 2B. At pages --

A. I don't have a 2B. I got 1B and 3B.

Q. I think 2B's the one you had before. Do you have it in front of you?

A. Yes, sir.

Q. All right. Why don't you look at pages 7 and 8. Do you see actually at the top of page 8?

A. Yes, I do.

Q. Do you see where Mr. Cutkomp says, But that happening is very unlikely, and you said, No, it's not very unlikely. That's very likely?

A. Yes, I do see that.

Q. What were you talking about?

A. I believe I was talking about Mr. Cobeen, taking care of Mr. Cobeen.

Q. You were saying it's very likely that Cobeen will be

eliminated or prevented from testifying?

A. As I stated before, I stated many statements of -- no matter what I had to do to keep him from doing anything -- harming Mr. Cobeen or anything, so he was so concerned about the case. I was trying to pacify him until we actually had the chemical evidence back because he was so concerned that we were going to do all this time and all this time, so he was going to wig out and do stuff that would have got me deeper in trouble.

Q. You were afraid Mr. Cutkomp was going to kill Mr. Cobeen.

A. Yes. Very much so, yes.

Q. What did you mean on page 8 there when you said a couple lines down, I've climbed far bigger hills than that little hill?

A. I would have been bolstering the thing that it wasn't going to be a problem. All throughout these conversations I'm reassuring him that no matter what for him not to worry, for him not to worry, for him not to worry.

Q. Okay. Well, let's be specific. What did you mean by that little hill?

A. I'm sure I meant Dan Cobeen there.

Q. And what did you mean by far bigger hills?

A. Meaning -- I just made the statement I guess. I was just trying to simplify that it wasn't going to be any

problem for Mr. Cobeen because he was so concerned that this Cobeen was going to be such a problem, that he was going to take care of it. So I was just appeasing him and saying it wasn't going to be a problem so that way I wouldn't have to worry about him doing it if he had assurance that I was going to take care of it.

Q. Well, didn't you mean that Mr. Nicholson and Mr. DeGeus were far bigger hills than Mr. Cobeen?

A. I might have implied that in order to make it look like this wasn't going to be a problem.

Q. I see. So you're saying you were pretending like you were going to kill Cobeen so that Cutkomp wouldn't kill him; is that right?

A. I was pretending I was going to do whatever was necessary in order to make sure that his worst nightmares of this case was not going to transpire. And he was in full agreement with that, that he was not going to do anything because I was going to take care of it. So that was the whole concept of all those conversations, that's correct. And times when I would veer off and start talking about legal ways of doing things, he'd roll his eyes up in the air and just shake his head, but he would never talk about stuff because he'd have me cover my house arrest leg brace with a blanket every time he came over because he was concerned about being bugged.

Q. Well, when you say you might have implied that when I asked you about whether Nicholson and DeGeus were far bigger hills, are you saying that's what you meant or not?

A. I'm saying I could have meant that. I'm just saying that I implied that Mr. Cobeen wasn't going to be a problem and that for him not to worry about it; it wasn't a concern; that no matter what he wasn't going to have to worry about anything because he was so worried about stuff and not too long ago before that he had a nervous breakdown and did things which I had no clue he was going to do, so I had to take him seriously at what he was talking about.

Q. Well, let me ask you to turn to page 26. Do you see where halfway down the page Mr. Cutkomp said, I'm worried about the other stuff still?

A. Yes, I do see that.

Q. And then you said, What does that have to do with you? Do you see that?

A. Yes, I do.

Q. What were you talking about there?

A. I believe I was talking about the '92, '93 lab stuff for the arrest that I was arrested on, because that was the case that I was -- the potential of being brought up on relevant conduct was also being talked about at that time as far as bringing it in into this '96 case.

Q. Which lab are you talking about?

A.  The '92, '93 stuff.

Q.  What lab are you talking about, though, in '92, '93?

A.  The only one --

Q.  Out in Arizona you mean?

A.  Yes, sir.

Q.  The one that you and Mr. Cutkomp ran together?

A.  The one that Mr. Cutkomp put in -- finished up on, that's correct, that one.

Q.  Yeah.  And, in fact, what you were testifying to before -- correct me if I'm wrong -- is that it was really Mr. Cutkomp you're saying who was doing most of the work in there, not you because you were living with Miss Friesenborg.

A.  That's correct.

Q.  And you told him, well, that has nothing to do with him, Cutkomp.

A.  I'm talking about my arrest in Nicholson's house.  He was just sitting out in the car.  So I'm saying as far as the arrest goes in '93, he not even has to worry about that because I am the one that all the eyes were focused on which is true.  That's the way it always looked.

Q.  I thought you just said you were referring in the tape when you were talking about the other stuff to the lab in 1993 and '92.

A.  Well, the lab was -- my brother destroyed the lab in '93.  That was in the storage shed that Mr. Cutkomp put in

the storage shed, and I am unclear if he meant about that specific stuff coming back on him or the arrest. I guess I generically said don't worry about the '93 stuff. Everybody's looking at me, so don't even worry about it.

Q. Well, obviously Mr. Cutkomp could have been implicated in the '93 drug business.

A. Sure he could have. Sure he could have.

Q. Because he was, as you said, one of the people working in the lab in Arizona.

A. Yes, yes.

Q. So why did you tell him two lines down from there that he could take a lie detector test?

A. Where am I saying that?

Q. Go ahead and take a minute. Down two phrases where it says, There's no possible way on earth it could come back to you. No way. Impossible. You could go take a lie detector test.

A. I meant as far as destroying the lab because he did not destroy the lab.

Q. So now it's just the destruction of the lab that you thought this conversation was about. Is that what you're saying?

A. The problem is you're taking me through little segments and little segments and you don't let -- I don't know exactly for -- you give me three lines of where the conversation is

going. So what I'm saying is this conversation involves in 1993 and stating not to worry about it and stating, you know, he was concerned about stuff coming back on him for the '93 lab. Well, it was destroyed. He did not destroy it, so I'm saying don't worry about it. You can take a lie detector test on it because he didn't destroy it. So my conversation there would have been involving the '93 as far as the drugs and conspiracy, not to worry about it.

I basically was trying to tell him -- because he was trying to worry about everything under the sun, and I was basically trying to tell him that not to worry about this, not to worry about that. And as soon as -- if he would have seen the chemical evidence, which we didn't get for a considerable amount of time, the laboratory report, then it wouldn't have been near as bad off as what he thought. And that's why I was appeasing him in any way I could because at work he's talking to me one way. At my house he's talking to me another way, but I'm assuming he thinks it's because my house is wired. You know, I trusted the guy with my life, you know. I had no clue, you know, of what was going on.

Q. Just so we finish up this thought -- and if you need more time to read it, to understand it, refresh your memory, I want you to be sure to ask for it and take whatever time you need. But at the end of that page 26 after you've talked about the lie detector test, do you see Mr. Cutkomp says, I'm

worried that you took a little thing threw in there or something?

A.   Yes, I do see that.

Q.   And you said, How?  Why would I do that?

A.   Yes, I see that.

Q.   What were you talking about there?

A.   I believe I'm talking about the '93 lab.  He's talking about me throwing a little piece of glassware in his residence or involved with him when it comes to anything from the 1993 stuff or leaving --

Q.   Okay.  So this doesn't have to do with the destruction of the lab anymore then, this last couple lines.

A.   No.  What I'm saying is is that has to do with the '93 lab saying he's worried I threw something here, threw something there as far as planting evidence on him.  I mean, that's why I'm thinking he's so paranoid.

Q.   But I thought you had said on the lie detector part you were only referring to the destruction of the lab itself.

A.   From that, yes, it appears that I'm talking about the destruction of the lab and he's worried about me throwing a little piece of lab that wasn't destroyed here, a little piece of lab that wasn't destroyed there is what he's concerned -- that's what I believe he's concerned with. That's at least what I took from his conversation.

Q.   Well, let me ask you to turn to page 38 and take

whatever time you need to orient yourself here in the conversation, but eventually I want to ask you about the last part of the page.

A. Okay.

Q. Now, starting with the fourth Dustin block up from the bottom, do you see where you said, We're not talking a mountain to get out of this in the middle of that block?

A. Actually I see -- well, from where I'm standing this is a step back from. That's where I'm seeing the fourth block. That's the third block. I don't see anything about mountain in this.

THE COURT: He's referring to the fourth D from the bottom of the page, that kind of paragraph in the middle of the page there.

THE WITNESS: Oh, okay.

THE COURT: That starts, No, you can't.

THE WITNESS: Okay.

MR. COLLOTON: See it, sir?

THE COURT: Halfway through that paragraph I think is where he's referring to.

BY MR. COLLOTON:

Q. Do you see that now, Mr. Honken?

A. Yes, I do.

Q. Were you talking there about getting out of the '93 charges -- '96 charges, '96 charges?

A. Yeah, I believe so, yes.

Q. And then the next block that starts with D, you say, It's not a whole lot that needs to be done for this situation to be changed. Do you see that?

A. That says, But I don't think in this situation we're in it requires that much. Is that what you're talking about?

Q. Right.

A. Yes, I see that.

Q. And then you go on to say, It's not a whole lot that needs to be done for this situation to be changed?

A. That's correct.

Q. And by that did you mean if one witness were eliminated then the case would be substantially weakened?

A. Yes, I did mean that.

Q. Then do you see the next Dustin line says, Well, from where I'm standing, this is a step back from last time?

A. Yes, I do see that.

Q. And there you're saying it's easier to get out of this case than it was to get out of the '93 case?

A. Yeah. Yes, I'm implying that, yes.

Q. And then as you go on to the top of the next page, feel free to read the lines.

A. Okay.

Q. But then we're back to where we were before. I mean, you gotta remember both those guys were skeptical. Do you

see that on the top of 39?

A.    Yes, I see that.

Q.    And that you said you're referring to Nicholson and DeGeus; right?

A.    Yes, uh-huh.

Q.    So this conversation is about how it's going to be easier to get rid of Cobeen than it was to get rid of Nicholson and DeGeus; is that right?

A.    Yes, I'm implying that, yes.

Q.    And you're saying, though, you had nothing to do with getting rid of Nicholson and DeGeus.

A.    Absolutely I had nothing to do with it.

Q.    So you were just making it up here in the conversation with Cutkomp.

A.    I was bolstering the point that -- that there is not going to be any problem in this case as far as that because he was so concerned about doing all this time.  And as I stated before, this is an appeasement until we could get a chance to look at -- we didn't even look at the evidence, and he's already -- even before we were charged with a crime he's talking about wiping out Cobeen because he's the only person that tied him into all this.  He's talking about going and destroying the evidence, crawling through duct work and stuff and cutting through fire walls to get to a glass beaker that he has his fingerprints on, and fingerprints weren't even

taken.

But he went through all these steps and had all these conversations with me at work as far as Cobeen, as far as this laboratory equipment that was seized and all that stuff. And all throughout these I am stating that don't worry about it. I'm going to take care of it. I'm going to take care of it and just so he does not go off and do something stupid because he didn't tell me before he went and snapped and went and exposed himself and ended up in -- where he did and he didn't even tell me during that time.

So -- and losing his children like he did, with his ex-wife taking off with his children, and he had expressed great con -- even he went to Kathy Rick's house right when he got out about his children and was not in his right state of mind. Even she said that. So I had to take him seriously. I didn't have, you know --

Q. All right. Well, I want to continue to focus for a few more minutes on your conversations about the '93 case during these tape recorded calls, and I'd ask you to look at the next exhibit, Number 3B. Would you please -- take a look at page 19 if you would, please. Actually the bottom of 18 you'd probably want to look at to get the context starting down there where Mr. Cutkomp says, I'm worried about the stuff that happened before in '93. Do you see that?

A. Yes, I do.

Q.   Then do you see right after that, you said, Nothing even possible that could affect you in any way?

A.   Yes, I do.

Q.   What were you referring to there?

A.   I'm talking about the laboratory equipment again that was destroyed.

Q.   You're saying that there's nothing about the destruction of the laboratory that could affect Mr. Cutkomp; is that what you're saying?

A.   I'm stating that the stuff was destroyed and it's not going to come up and haunt him like he is saying that I'm throwing pieces here and there to somehow incriminate him involved -- in planting evidence on him is what he's talking about as far -- comes back from that other conversation. He's acting paranoid about me like I'm trying to set him up to do things to him.

Q.   Okay.  Well, then let's go to the next page, 19.  And do you see the third block down that starts with D where you say, Don't even waste your time worrying about that.  There's not a snowball's chance in hell you'll be charged with anything?

A.   Yeah, I see that.

Q.   Now, are you saying that's another reference to charges against Cutkomp for the drug activity from '93?  Is that your testimony?

A. Well, at some point in this conversation he talked about that gun that I gave him from Robert Riepma, that SKS that he got rid of. And he was -- at one time -- I don't know if it was in this conversation, but he implied that maybe it was stolen or something and that he was destroying something that was criminal. And I said there was nothing criminal about it. And that's why when he's saying, That gun, right there, I say, What, and at the top of page 19 he said, I helped you get rid of it, that's what he's talking about as far as that goes.

Q. Now, can you explain to us, since you've known Mr. Cutkomp all these years, why right after discussion about the laboratory activity in '93 and whether he might get charged based on that he would then bring up a gun that you say you bought in 1995?

A. I don't know. He just brought up that gun. I don't know why he's bringing everything else up because I guess I never told him exactly when I bought the gun or even that I had bought it from Bob Riepma.

Q. But he would know when it was destroyed, right, because you say he was the one who destroyed it.

A. Yeah, he destroyed it in '95.

Q. So if what you're saying is correct, we'd have to believe that Mr. Cutkomp is talking in the second T line from the bottom on 18 about the lab and then switches immediately

to a gun that he destroyed some time after 1995.

MR. PARRISH: Your Honor, he doesn't have to decide what Mr. Colloton has to believe or disbelieve. I didn't like the form of that -- I would object to the form of that question as to what he has to believe.

MR. COLLOTON: Okay.

BY MR. COLLOTON:

Q. Well, let me rephrase the question then and ask you whether what I just said in substance is what you're saying is true.

A. What I'm saying is that all throughout these conversations he's talking about multiple avenues where supposedly I'm planting evidence on him or he could be tied into this or that, and I'm reassuring him that there isn't any problem. That's why I didn't -- and a lot of these conversations -- and that's part of the reason why I didn't know the state of his mentality because one minute he'd be talking one way, the next minute he'd be talking another way. He'd imply stuff to me by his looks, rolling his eyes or shaking his head when I'd start talking about things so --

Q. Okay. Well, let me go back to my original question on page 19, the third D block from the top where you said, There's not a snowball's chance in hell you'll be charged with anything, not even a remote chance. What were you talking about when you said that?

A.   I believe that ties into him destroying that SKS rifle.

Q.   Okay.  And then you see there's two more D blocks down from there a statement that begins with, Nothing to worry about.  Do you see that?

A.   Yes, I do.

Q.   And then it says, If something bad did happen to those things, very little, the only thing they got looking at me is that there are witnesses against me.  What did you mean by that?

A.   Would you repeat that again, please?

Q.   Well, why don't you just read to yourself the block beginning D, Nothing to worry about.  Were you still there talking about the SKS rifle?

A.   I believe that is involved in the same conversation, yes.

Q.   And then Mr. Cutkomp said, What is the possibility of one showing up?  He said the same thing essentially twice. Do you see that?

A.   Yes.

Q.   And then you said, It ain't going to happen.  They ain't going to come walking in and that I know of.  What did you mean by that?

A.   Well, I'm --

Q.   Does that refer to the SKS rifle?

A.   No.  That is referring to the witnesses coming from '93

there.

Q. Okay. So can you point out where the conversation switched from the SKS rifle to the witnesses in '93?

A. A lot of time -- if you were to -- when he says, What is the possibility of one showing up, I'm -- I'm assuming he's talking about the witnesses I guess because obviously the destruction of a gun is no problem so the conversation changed.

Q. It wouldn't really make sense for that to be about an SKS rifle; right?

A. No, no, it would not at all.

Q. So it has to be switching from an SKS rifle to --

A. There were times in the conversation when he'd gesture like to -- or make gestures. I mean, we did make gestures back and forth with things. I mean, I was concerned at work when we'd talk because I was concerned about people seeing us together at work and getting yanked off my pretrial release. And there were other times when he would come to my house and he would be concerned about being tape recorded and my house arrest thing bugging him, and so it was a no-win situation, so I just took it as he was -- when he would make gestures regarding things and not speak about it that he was concerned about being wired because he explained to me that at work, but I didn't want to meet at work because I was concerned about people seeing us together.

So the conversation shifted a lot on gestures sometimes as far as the witnesses go or as far as the gun. I mean, you can make a hand gesture with a gun. You can make a hand gesture as far as number of witnesses. I mean, I knew from being around him long enough that that's what he was talking about.

Q. Well, do you have a recollection of this conversation and a particular gesture or something, or are you just saying that as sort of your assumption as to what happened?

A. That is sort of my assumption to what happened, that he would be making a gesture of some sort that would switch the conversation, and I believe he testified also that we had made gestures before back and forth regarding stuff.

Q. All right. Well, let me switch to number 4B and ask you to turn to page 16 and take a minute to get yourself oriented there.

A. You said 16, sir?

Q. Yeah, 16 starting up at the second T block where Tim says, I just don't -- I'm sorry. I just want you to remember that I'm not going to have any part of doing that. Do you see that?

A. Yes, I do.

Q. Why don't you take a minute and read that page and the top of the next page.

A. Yes, I see it.

Q.   When Mr. Cutkomp said what I just read and then you said, Don't even remotely worry about that.  I have enough anger in me that there is no problem, what did you mean?

A.   I'm talking about Cobeen.

Q.   In other words, Tim doesn't have to worry about doing anything to Cobeen because you have enough anger to do it yourself.

A.   Yeah, that's what I was saying, yes.

Q.   So here Cutkomp really isn't saying he's off on a rampage to kill Cobeen.  He's saying, I don't want to have anything to do with it.  Would you agree with that?

A.   At this particular moment, yes, I would agree with that.

Q.   And then on the next D block, Dustin block, there, go ahead and read the whole thing, but I want to focus on the last sentence --

A.   The one, There is no problem with that?

Q.   Yeah.

A.   Okay.  I see it.

Q.   Do you see at the end you said, If it has to go to those measures, then it will not bother me one bit?  What did you mean by those measures?

A.   If it has to go to the regards of taking care of Dan Cobeen, it wouldn't bother me one bit is how I'm stating that.

Q.   You killing him?

A. Yes.

Q. And then Mr. Cutkomp asks you, Do you close your eyes like a pinata or something? Do you see that?

A. Yeah, I see that.

Q. And then you said, You know what you feel like before a big football game? What were you talking about there?

A. I guess -- I don't know. I guess --

Q. Weren't you talking about the kind of --

A. Probably being psyched up or something like that I suppose.

Q. You're talking about the kind of mind-set you have to be in to go kill somebody?

A. Yeah, uh-huh.

Q. Is that right?

A. Yes, I would be saying that, yes.

Q. And then down at the very bottom of the page -- go ahead and read the stuff in between if you'd like. I don't want you to get lost. But do you see in the last line, the last Dustin line --

A. Yes, I do.

Q. -- you say, Once you go a certain distance, there ain't no turning back?

A. Yes, I see that.

Q. What did you mean by that?

A. I'm just saying -- I guess I'm just stating it as it's

stated. Once you go a certain distance, there ain't no turning back.

Q. You mean in the context of killing Cobeen?

A. Yeah, I guess I would be stating that. That would be an assumption I guess.

Q. Well, I don't want to assume anything. It's your statement. I just want to understand what you meant.

A. During these conversations, yes, I'm stating that -- again, that it's all based on not to be worrying about it, that -- as you can see, I'm saying I'm going to take care of it. And besides just the points that you're picking out here, there's many other ways where I'm saying don't worry about it, don't worry about it. I'm saying it's not even going to affect me if Mr. Cobeen isn't there or there, that I'm doing it for you. There's many times I'm saying that in these conversations, and that ties into that. So I'm just saying I have the mind-set to take care of it, don't worry about it because he's constantly pushing me at work to be defeating my house arrest, what are you doing about this, how come -- trying to, you know, bring me magazines to help me to figure that out and saying, I'm not going to do it, I'm not going to go through with it and stuff like that. So I'm just reassuring him in any way possible that not to worry about it, that I can take care of it.

Q. Okay. And then what did you mean at the rest of that

block where you said, I'm not that worried about it. I've seen worse things that I never care to speak of?

A. I'm talking about instances from -- that I have seen, bad things.

Q. Worse than killing somebody like Cobeen you mean?

A. Well, I guess I'm referring on a couple of past instances where I seen -- I'm trivializing the fact that it isn't going to be any problem for me because he's so concerned I'm not going to go through with this, I'm not going to do this and this and that because I've never done anything of that magnitude. I'm just trivializing it. Don't be concerned about it. I'm going to do it because as soon as I start backing off that position, then he starts talking different like he's going to take care of whatever needs to be done, you know, I mean.

Q. Well, had you seen worse things than killing a witness?

A. Well, I never killed anybody, so I can't personally say that, but I have seen some pretty terrible things, yes.

Q. Well, on the top of the next page, the next question from Cobeen -- pardon me, from Cutkomp is, Does it bother you? Do you see that?

A. Yes, I see that.

Q. This is after you've just said you've seen worse things you never care to speak of; right?

A. Yes, I see that.

Q.   And you say, Nope, never think about it, never, never bothers me.  What were you talking about there?

A.   I was talking about a couple different instances.  When I was around 14, 15 years old, I rode with my brother.  He worked for Snells ambulance.  And on a routine call for a motorcycle accident, a guy was blown apart, pieces all over the place, decapitated, and they were shuffling through the weeds to try to find his head and stuff like that.

And another time when I worked down at Burger King in 1986 I was supposed to be taking out the trash.  We're not supposed to leave the back door open.  Actually the back door to the business is left open.  We had an outside area that was fenced in, and we weren't supposed to leave the fence open, and I left it open.  And the door came sliding open, and I thought somebody was coming in to rob us because people had robbed people that way.  That's why we're supposed to shut the outer gate.  And what it was was a woman that was left -- was beaten and raped and stabbed the night before and crawled up through the back area of the garbage thing.  They had left her for dead.  And that was one of the most horrid sights I'd ever seen.

That's exactly what I'm talking about when I say I've seen terrible things, and I don't think about it.  I don't like to think about it, and I don't talk about it.

Q.   So you were telling Cutkomp you've had these two bad

experiences that you've just described. Therefore, he shouldn't worry. You're capable of killing Cobeen?

A. No. I'm just stating that -- bolstering that don't worry about it, that it's not going to bother me, whatever, because obviously if -- I'm trying to appease him so that he doesn't do something like this. I'm not going to start saying that I'm going to have a problem with this, I'm going to back out, I can't stand this, or I can't stand that. If I start doing that, then who's to say what his actions are going to be? One minute they're one thing. One minute they're another.

Q. Well, had you told Tim about these incidents prior to this conversation?

A. I believe I told him about the guy that got his -- was decapitated with the Snells ambulance thing, but I don't ever know that I discussed the Burger King incident with him. There was a period of time there for several years when he lived up in Iowa and I lived in Arizona, and I might have discussed that with him. I might not have. But I was in high school when the stuff happened with the other stuff, so I remember that.

Q. Well, then how do you suppose he knew what you were talking about when he says, Right, after that, Maybe I thought about it enough?

A. I'm taking that to say that maybe he thought about the

killing of Dan Cobeen enough. That's what I'm taking it as he's saying there.

Q. In the block that you just talked about where you said, It never bothers me, and then you go on and say you thought you'd have nightmares, do you see that?

A. Yes, I do.

Q. Then as I read it, you said, Never thought about it. I just went, whif, over. Part of my life is over. What did you mean by that, I just went, whif, over?

A. I'm stating that I put those incidences behind me, I don't try to dwell on them, and, you know, I was concerned of having nightmares after you see stuff like that for a long time, so I try not to think about it and bring it up so that way it's an issue. So I don't think about it, so, you know, it doesn't bother me. If I think about it, it does.

Q. So you deny that this conversation is about the disappearances of either Mr. Nicholson or Mr. DeGeus.

A. Yes. That conversation right there had nothing to do with Mr. Nicholson or Mr. DeGeus.

Q. Would you please turn ahead to page 22 on that same document?

A. Yes, I see it.

Q. Just a second here. I'm afraid my notes are off. Well, I'll skip that for now, Mr. Honken. My notes are off here on the page number. Why don't you take a look at number 5B,

please, and look at page 22 of that document. Do you see at the top of page 22 the first Tim block says -- he says, It's partly why I want to know about the others?

A.   Uh-huh.

Q.   And you said, I don't know. There's nothing to know about.

A.   Yes, I do.

Q.   What were you talking about there?

A.   I'm assuming he's talking about the missing witnesses there.

Q.   You mean Mr. Nicholson and Mr. DeGeus?

A.   Yes.

Q.   And then as the conversation goes on, there's a statement where you begin, Yeah, there's always something to worry about.

A.   Yeah, I see that.

Q.   And then at the end of that statement you said, Well, I can guarantee you with one thing. There's no possible way ever. There's only one thing in my mind.

A.   Right.

Q.   What were you talking about there?

A.   Let me read ahead here for a second. I believe I'm still talking about the missing witnesses there.

Q.   What did you mean by, With one thing there is no possible way ever?

A. I can't tell you exactly what I meant at that time. I'm just saying I'm not worried about the missing witnesses affecting our case as far as the '96 goes.

Q. Well, then you again said in the next statement of yours, There's only one. Do you see that?

A. Yes, I see that.

Q. And then you said, There's only one possibility in my mind. Do you see that?

A. Yes, I see that.

Q. And then Tim says, I know exactly which one you're talking about too, and you said, The one. Do you follow that?

A. Yes, I do.

Q. Weren't you talking about the possibility of one body surfacing?

A. No, I wasn't talking about that. I was talking about the possibility of Greg Nicholson coming back and testifying against me because he testified before.

Q. So it was a reference to Greg Nicholson?

A. That's how I would take it. That's the only possibility of coming up and stirring up stuff from '93.

Q. So you're saying the only possibility in your mind is that Mr. Nicholson might come back and testify. Is that what you're saying?

A. From what I get from the conversation that we're

discussing about '93 and the possible -- the missing witnesses and the possibility of coming back and testifying, yes.

Q. Well, when you said two statements up from that where I asked you before, I can guarantee you with one thing, there's no possible way ever, did you mean there's no possible way ever Mr. DeGeus will be back?

A. Where are you seeing that at?

Q. This is the statement of yours beginning with, Yeah, there's always something to worry about, toward the end of that one.

A. I guess I could have been talking about either the destruction of the lab in '93 coming up or the -- well, I was never concerned about Mr. DeGeus testifying against me. I mean, he was concerned about it, but I wasn't because he had never made any statements against me. All these conversations are taking place about potential evidence in regards to '93 case, '96 case. It's not one specific incident as you're trying to state it as. He's just asking questions in a generic fashion as far as evidence that could possibly come up and affect us or affect him in some way. And some of it was so random and out of order as far as he was going, but I was figuring that was just his train of thinking at the time because he's not a real well-organized person with the way he thinks about things in the first

place.

Q. And you say he was sort of paranoid. He was afraid your house was bugged and that sort of thing?

A. Exactly.

Q. Why were you afraid that he might have been wearing a wire?

A. Because of the questions he started asking, because he would talk at work one way. And toward the end of these conversations -- like this one's 5B and 6B -- he kept pondering on these missing witnesses trying to imply that I had done something to these missing witnesses. He kept -- and I told him already at work -- we had many indepth discussions that I had no idea of what had happened to these people and no contact with them whatsoever in any fashion, but yet he keeps pondering it and pounding me on these issues, and so I start to wonder why he's asking me these questions.

Q. And then eventually you told him, well, you'll talk to him -- let's see, So some other day I'll talk to you about it. That's how you ended it up, right, on page 22?

A. Right.

Q. Because you didn't want to talk to him about it while he might be wearing a wire.

A. I didn't actually consider him wearing a wire. Otherwise I wouldn't have talked to him at all. I would have

searched him.

Q. Well, let me ask you about page 14 of this transcript then. Do you see where in the first D block toward the end of that statement you say, That's why I'm scared to talk about anything until I can get somewhere where I can sit there and check to make sure there ain't nothing?

A. Yes, I do see that.

Q. And Tim says, Get the bubble of silence, and you say, Something?

A. Right.

Q. Weren't you there talking about the fact that you didn't want to have certain discussions until you could make sure there was no monitoring device?

A. I'm just stating that because for one, he's concerned about my house being bugged and stuff like that because of the questions that he's saying. I'm just saying that any indepth conversations regarding anything I, you know, wasn't going to discuss about. I wasn't stating for a specific reason as far as the missing witnesses goes. I'm just stating for general fact there.

Q. So were you or were you not concerned that he might be wearing a wire?

A. I guess I just casually joked about it. We joked about that back and forth over the years. I mean, we have. But I guess I wasn't seriously concerned about it, him wearing a

wire. I just kind of poked at it. I also looked at the possibility that in the future that I would potentially maybe be in that situation because if the evidence didn't show up favorable to us as far as the chemical evidence like I anticipated, then I might be put in that situation to do exactly what he was doing to me. So, I mean, I joked about him wearing a wire and that because just in case -- I didn't want to go forward to my attorney or to the feds when we started these conversations because, for one, I'm on pretrial release, and the government wanted me more than anybody, and they made that very clear in the detention hearings. I had a no-contact order against him, but he did not have one against me. So I'm meeting with him at work, and he's telling me these conversations about what he's going to do to Dan Cobeen and that. Well, if I go call the feds and say I'm talking to him, I get my pretrial release yanked.

Q. So you were concerned Mr. Cutkomp was very unstable and might go kill a witness; right?

A. I was concerned about that at times. At other times I wasn't. It depended on if he got to see his kids, if he didn't see his kids, you know. I mean, he had changed his -- in different conversations he had stated different things. He was never consistent with one thing. He was --

Q. But if I understand your testimony, it is that you were pretending like you would kill Dan Cobeen to prevent Cutkomp

from killing him; is that right?

A.   Yeah, or anything to prevent Mr. Cutkomp's case from becoming as serious as what he thought it was.  That's correct.  And that's why I started talking about agents and I defeated my electronic monitoring.  I didn't even have a clue about that.

Q.   So you don't dispute that the substance of many of these conversations is about a plan to kill Dan Cobeen.  You're just saying --

A.   There was never a formal plan to do anything.  I'm just saying that I am telling him as far as the statement that don't do anything, don't worry about it, I'll take care of it, it's my fault.  You know, I didn't -- you know, he was insistent.  He told me this all the time along.  So I'm stating that I'm appeasing him in any way for a certain amount of time until I figured out what I was going to do one way or another as far as if I was going to cooperate and go forward and try to stop him or he'd got off that kick or the evidence came back as it has now.

Q.   But you don't dispute that many of these conversations are about killing Dan Cobeen.

A.   No, definitely not.

Q.   And you're saying many of your statements are about that though you claim you didn't actually mean it; right?

A.   That's correct.  I mean, I even had a --

Q. And you don't dispute that you talked about trying to avoid electronic monitoring.

A. No. That was part of all the conversations, correct.

Q. And you don't dispute that you asked Cobeen to go -- I mean Cutkomp, pardon me, to go get a frequency meter from Radio Shack as part of that discussion about electronic monitoring.

A. He started pushing me towards how I was going to go through with all these things as far as my feasibility and started not believing I was going to follow through with what I was saying when we would be at conversations at work. So he started asking what can I do, what can I do, start bringing me magazines to work on how to defeat the electronic monitoring. And so to appease him to show that I was actually making -- doing something to convince him that I was going to do what I was going to do, I mean, he kept pushing me, you know, we need to make a plan, we need to make a plan, we need this, you know. So I told him, Go ahead, you know. Here's what you can do.

You know, I had him go -- I actually said, Well, I can't go anywhere on electronic monitoring. Go look at this. Go look at that. At least I'd have some evidence to go forward with.

Q. You mean you actually talked to him about going to do surveillance, for example, on Dan Cobeen; right?

A.    That is correct.

Q.    And you talked about him going to Brian Beach's house and seeing where Mr. Cobeen might be living.

A.    We talked about scenarios --

Q.    Do you agree with that?

A.    Yeah.

Q.    Okay.  And you talked to him about going to do surveillance where Mr. Cobeen was working.  Wasn't he working on some docks or something?

A.    Actually he told me that.  I didn't know that he was working on docks.  But the whole idea was that he kept pushing me, so I said, Go ahead.  Look at this.  Look at that.  That way if I did have to go forward at some point and say -- with my attorney and that, I would at least have something to show that what I'm saying is not a bunch of bullshit, that he actually was making steps to do certain things because, you know, I didn't know this was being recorded, so I wouldn't have any recordings whatsoever.  The conversations that were being recorded -- which I don't understand why if all my conversations -- I don't understand why they shouldn't have all been recorded.

Q.    And you don't dispute that you talked in the tapes about how electronic monitoring -- pardon me, the avoidance of electronic monitoring would be a great alibi if you were to kill somebody.

A.   Sure.  I talked all about the electronic monitoring.

Q.   Including what I just said; right?

A.   I believe I specifically talked about that.

Q.   But you never went to the authorities through your attorney or through anyone and said Mr. Cutkomp is a threat to potentially kill someone; is that right?

A.   No, for the reasons I already stated.  I mean, he's my best friend.  I didn't want to turn informant on him.  I didn't like that idea.  I didn't feel at that point I had anything to really say besides my word that he is contemplating this or contemplating breaking into the Bondurant facility or this or that.  And all's it would have done is get my pretrial release yanked is all it would have done.

Q.   Is it right you went out to the Bondurant facility with Mr. Cutkomp on some occasions?

A.   Mr. Cutkomp came when I was down in Des Moines prior to when we were arrested and took me --

Q.   I want to give you a chance to explain as much as you can, but I really would appreciate it if you could try to at least answer my question first.  And then if you feel like you need to explain, go ahead.

A.   Okay.  I'm sorry.

Q.   Is it correct that you went to the Bondurant facility on some occasions with Mr. Cutkomp?

A.    Mr. Cutkomp drove me out by the Bondurant facility one time, yes, that's correct.

Q.    So you say you were only out there once with him?

A.    That's correct.

Q.    And that was for the purpose of trying to determine whether the evidence from your case was located there?

A.    No.

Q.    Okay.  What was the purpose of that?

A.    Well, supposedly he had determined that that could have been the only place the evidence was at.  And he had surveillanced this several times, picked me up at my girlfriend's house, didn't really say where we were going. We ended up going out that night.  He drove me by this facility, parked by it, and said, That's where the evidence is being kept, asked me what I thought was the likelihood of being able to get in it and destroy it.  And I see cameras all over the place, and I told him he's crazy.  I said there's no way knowing it's even in there for one thing because he's concerned about his fingerprints being on this one piece of glassware that ties him into the alleged lab besides what Dan Cobeen's saying.

Q.    Well, you later told Mr. Cutkomp you thought the evidence was in Oklahoma; right?

A.    Yes, I did.

Q.    You also talked to Mr. Cutkomp about efforts to locate

Special Agent Graham, right, because he was a potential witness?

A. He was a potential witness -- after --

Q. Just, again, if you would first answer my question, then go ahead if you need to respond.

A. I did talk to Mr. Cutkomp in regards to Agent Graham being a witness with the tapes with our conversations -- with Mr. Cutkomp and myself and Dan Cobeen. Yes, I did talk to him in reference to that.

Q. Because you knew Mr. Graham was the agent who had monitored the undercover tapes made by Cobeen.

A. Yes, sir.

Q. And so you were talking to him about how the government might still be able to get in the tapes if Cobeen were gone through Agent Graham. Do you remember that?

A. Yes, I do.

Q. And so you were discussing the fact that if Agent Graham were also unavailable, then that might eliminate the use of the tapes.

A. I did state that, I believe, somewhere, yes.

Q. And you actually undertook some efforts outside of your discussions with Cutkomp to find out where Agent Graham lived; correct?

A. I never looked anywhere how to find Agent Graham.

Q. Did you ask Marcy Hyde where Agent Graham lived?

A.   The conversation that took place with Marcy Hyde was when my house was originally raided, Agent Graham, I believe Agent Mizell, and Agent Basler came to my door.  And I stated how they came, and I named them, and I didn't recognize Agent Graham.  And she said that she had known him, and I said, Well, he's following me all over town, you know, I said, Every time I leave my house on 16th Street.  And she said, Well, I think that he lives near some Brenda person that's by there.  That's what that -- it wasn't that I specifically went out to find where he lived or anything.  She just stated that.

Q.   Well, do you disagree with her testimony that you asked her where Graham lived?

A.   Yes.  I did not ask her directly where John Graham lived.

Q.   And in your locker at the Kraft Foods plant where you worked, you had a page of the Mason City city directory; right?  Do you recall that or not?

A.   I seen the exhibit.  I guess I don't exactly recall it.  I've looked at the exhibit.  I know what you're talking about.

Q.   You do know what I'm talking about?

A.   Yes, I do.

Q.   Okay.  So you remember there was a page from the Mason City city directory for part of the alphabet beginning with

G; right?

A.    That's correct.

Q.    And it was the part of the alphabet beginning with G that would include Graham.  Do you remember that?

A.    Right.  That specific piece of paper was given to me by Mr. Cutkomp to try to ascertain where Mr. Graham lived.  He handed it to me in the locker room, and I stuffed it into my locker because in one of these conversations, we're talking about Agent Graham and Agent Dan Cobeen and how to find Agent Graham.  Well, he goes and copies this thing out of the notebook, and he goes, Which one do you think it is?  And I didn't even have time to talk to him because people come in and out of the locker room, and at another one of these conversations I'm stating we're not going to look him up in the phone book so --

Q.    So you agree that that page was in your locker because it related to efforts to find Mr. Graham.

A.    I'm stating that yeah, he gave it to me to try to find him.  Yeah, he did.

Q.    But you're claiming it was Cutkomp who produced it to you.

A.    Right.  He gave it to me.

       MR. COLLOTON:  That's Exhibit 8C for the record, Mr. Parrish.

Q.    We jumped ahead a little bit to 1996, but I want to ask

you about the time when you were on pretrial release after the disappearances of Mr. Nicholson and Mr. DeGeus.

MR. COLLOTON: If we need to take a break, Judge, for the court reporter, that's fine.

THE COURT: We do, and we'll be in recess until 25 minutes of 4.

(Recess at 3:14 p.m.)

THE COURT: Please be seated. Mr. Colloton?

BY MR. COLLOTON:

Q. Mr. Honken, there was one part I wanted to ask you about in one of the tapes where I couldn't find it in my notes, and I had a chance to find it over the break. It's Exhibit 5B starting on page 14. The block or the Dustin line that's fourth from the bottom is where I want to start, but I want you to look at whatever you feel you need to review to understand it.

A. What is your specific question regarding?

Q. I just wanted to make sure you had a chance to read it. Do you see there where you're saying, I'm saying now do you know why a month or two ago you were talking about you didn't want to know nothing, hear nothing, talk about nothing? Do you see that --

THE COURT: Middle of the page?

MR. COLLOTON: Middle of the page.

A. Yes, I see that paragraph.

Q. -- where you talk about how Mr. Cutkomp previously didn't want to know anything about the disappearances of the witnesses in 1993?

A. I'm talking about he never really asked about -- as many pointed questions as he was asking at this time, correct.

Q. About the disappearances in '93?

A. That and that gun of Robert Riepma's and a lot of things, I guess, in general.

Q. Well, do you see down at the bottom of that page you said, You're talking about the sole person taker care of right here?

A. Uh-huh.

Q. That's me. What did you mean by that?

A. As far as taking care of -- making sure that this case isn't going to come against him the way he thinks that it's going to.

Q. So that's a reference, you say, to taking care of witnesses in the current case?

A. Let me read ahead, but I believe so. I believe that's what the conversation's composed of.

Q. You believe that when you said, The sole person taker care of right here, you were referring to taking care of witnesses in the current case?

A. Yes, I believe so.

Q. How about the next three sentences after that where you

say, You know, some things are better left forgotten about. No use opening a can of worms. You know, why would you want to get into something that you're not even into? What did you mean by that?

A. I was probably talking about the missing witnesses there, you know, implying -- implying that or --

Q. Why would Tim want to get into that you're saying?

A. Right, because he kept hounding on that issue. I didn't understand where he was trying to go with it.

Q. Okay. And he says, I think I'm already in; correct?

A. That's correct.

Q. And then you say, No, you're not.

A. It has to do with a combination of the missing witnesses and the case in '93, bringing it up again, the same things.

Q. Well, do you see the statement of yours that begins with, You're not?

A. Yes, I do.

Q. There you're telling Tim that he's not in, as he put it, the disappearances of the people in '93; is that correct?

A. I'm saying anything to be involved with '93 because he wasn't being really looked at as a central figure involved in '93.

Q. But you're talking about the disappearances; is that right?

A. I'm talking about that. He's not involved in that. To

my knowledge he wasn't and also with the '93 drug case, you know, because he's worried about all this stuff coming back on him is what he's concerned about in these tapes.

Q.   Well, but when you said, No use opening a can of worms. You know, why would you want to get into something that you're not even into, you weren't referring to the drugs at that point, were you, because he was into the drugs; right?

A.   You have to realize in these conversations I implied a lot of things to gain his confidence, and I had the abilities to do certain things.  And, I mean, I've known this guy forever, my best friend in the world, trust him with everything, had no idea he was taped.  And I'm not in here sitting here saying I killed anybody, and I hadn't, and I would have stated that if I would have to him of all people being my best friend in the world.  I had no idea he was taped.

So during these conversations, he's asking me about this which many times in the past he knows I've answered that I had nothing to do with them.  So I just started letting him go with the way he wanted it and making me up to be what he thought in his mind would be that type of person, individual to take care of these things.

Q.   Well, you say if you killed somebody you would have told him because he was your best friend.

A.   Sure, I would have said it right on the tapes that I

killed somebody, you know, if I truthfully would have done something like that, but I didn't. So that's why I didn't know where he was going with these questions about asking about these missing witnesses.

Q. Well, what did you mean in the statement that begins with, You're not, when you said in the fourth line down, You are my best friend, and I have never said outright things to you, right, never?

A. Are you talking about page 14 or 15?

Q. Fifteen.

A. The fourth line down?

Q. The statement beginning, You're not, the fourth line of that statement.

A. Okay. I'm just stating he's not involved in anything is what I'm stating, that he doesn't have to worry about it. It's not going to come back, and anything from the past is not going to come back and haunt him. It's me, if anything.

Q. No. My question is when you said, I have never said outright things to you, right, what did you mean by outright things?

A. Meaning saying I've never killed anybody.

Q. You're saying, I've never said outright things to you.

A. That's what I meant, that I've never said I've done anything to anybody, and I haven't.

Q. Well, isn't it true that you're really saying you've

never said it to Mr. Cutkomp?

A. I guess if you want to be specific about it, that's what I said. But during the context of that conversation, I'm saying I've never -- he's asking in these conversations if I ever stated I did anything to anybody else to other people, and I'm saying I've never even said that to you before so I've never said anything like that is what I'm stating, you know. This is five years or three years later and --

Q. Well, but Mr. Cutkomp's saying he's concerned that he might somehow be implicated in the disappearances; right?

A. That, and I'm taking it as that and as the '93 drug case, that's correct.

Q. And he's previously said in some other excerpts that we've looked at that he's concerned that he helped destroy a gun; right?

A. The Robert Riepma -- the one I bought from Robert Riepma, that's correct.

Q. That's what you say it is; right?

A. That's what it was, yes.

Q. So when you say, I've never said outright things to you, didn't you mean that you've never made any outright admissions about your involvement in the disappearances?

A. I'm stating I said I was never involved in the disappearances in any fashion or form because I wasn't because he's concerned I've been around spouting off this

type of stuff to other people and about the case in '93, that these people are going to come forward and say certain things. And I'm just stating to him that I didn't say anything to anybody, you know. That's what I'm stating.

Q. You're saying he was expressing concern that you were out spouting things about how he and you were involved in the disappearances?

A. No, in the drug case in '93. That's what -- the context of all these conversations go with his paranoia on what I've said and planting evidence and --

Q. Well, Mr. Cutkomp was involved in the drug activity in '93; right?

MR. PARRISH: Your Honor, Mr. Colloton now is asking the same question over and over and over again because he's not getting the answer he wants. I'm going to object because it's argumentative and that he's repeating himself on the same question because he's not happy with the answer.

THE COURT: Overruled.

BY MR. COLLOTON:

Q. You probably don't remember the question.

A. No, I don't remember your last question. I'm sorry.

Q. After Mr. Nicholson disappeared and you decided to prepare to stand trial, you continued to have contact with Mr. Cutkomp; correct?

MR. PARRISH: What trial are you talking about?

MR. COLLOTON: After --

MR. PARRISH: Well, let me make an objection --

MR. COLLOTON: I'll rephrase.

MR. PARRISH: -- as to the date you're talking about.

MR. COLLOTON: I'll rephrase the question.

BY MR. COLLOTON:

Q. In late summer and fall of 1993, did you continue to have contact with Mr. Cutkomp?

A. We had -- well, I had a no-contact order for a while, but after that was dropped, I did have a lot of contact with him, that's correct.

Q. Is it true that you asked Mr. Cutkomp to go to Arizona to pick up some chemicals?

A. He took that endeavor entirely upon himself.

Q. So you're saying you're aware he did go to get some chemicals in Arizona in '93?

A. He wanted to go get the old lab in '93, but it was already destroyed, and he was furious about that because of the work that he had that was already there I guess. I don't know if he had stuff partially processed or what. He didn't know it was destroyed, that my brother destroyed it or that he was ever intending on destroying it. But he was concerned about these charges coming back up again if I pled guilty because I'd be compelled to testify against him based on I

can't take the Fifth Amendment. We had discussed that.

And so he had took it upon himself to start producing methamphetamine again so he could either, A, pay for the legal defense that he wanted, or, B, be able to flee. So I had no part of involvement with that methamphetamine, rebuilding anything until '95.

Q. You were aware that he went to Arizona in '93 to get chemicals; is that right?

A. The only time I was aware of it is when he told me that he had went on a trip with Christy Cole and purchased some things, but it wasn't -- I didn't know exactly what or how much or anything like that.

Q. Well, didn't you talk to him about that trip before he went with Christy Cole to Arizona?

A. Not specifically in regards to building a lab, no. He was dating Christy Cole at the time and offered to drive her down there to pick up or to drop off her little girl. That was the whole spiel.

Q. Were you aware that chemicals he obtained were stored at your father's house in '93 or '94?

A. I don't believe they were stored there in '93 or '94. I believe in '95 for a couple days during the transition he stored them there, but I don't believe they were there in '93 or '94.

Q. When do you believe chemicals were stored at your

father's house in 1995?

A. I guess I can't say exactly when. I don't know when he moved out of where. He had them stored at his parents' farm for a while, so I don't know exactly what time frame it was.

Q. Did you help to arrange him or arrange storage at your father's house for some of the chemicals?

A. He had a good enough rapport with my dad where he could just call. And I believe he just told my dad it was for me, it was my stuff there anyway, so it wasn't really a big issue. And my dad had no idea what it was because it was only one little carton or two cartons or something. I don't even remember what he said it was.

Q. But did you help to arrange the storage?

A. No, I didn't help to arrange it. He just called and asked because he asked me what I thought, if there was a place, and I said, I don't know. And he said he was going to ask Dad. I mean, he'd asked him for money on his own and everything before.

Q. After your travel -- were your travel restrictions lifted in 1994 for your pretrial release?

A. I don't recall exactly when they were. They were lifted at some point, that's correct.

Q. And after they were lifted, is it true that you and Angie Johnson traveled to Arizona?

A. Yes, we did.

Q. Did you pick up glassware and chemicals on that trip?

A. No. We went and picked up my furniture from Melissa Friesenborg.

Q. But you're saying you didn't pick up any glassware or chemicals?

A. I never picked up any glassware, chemicals, or anything to do with that.

Q. Isn't it true that some of -- that you and Tim Cutkomp together stored glassware and chemicals at Christy Cole's house during 1994?

A. As I said, he was dating her. I don't know whether he stored stuff there or not. I didn't frequent her house. I didn't particularly get along with her.

Q. Were you dating Angela Johnson at that time?

A. Yes, I was.

Q. And she was living in Clear Lake at the time?

A. Yes.

Q. Isn't it true that at some point equipment -- and this would be 1994 for my first question -- equipment and glassware were stored in a shed at her house?

A. At whose house?

Q. Angela Johnson's.

A. No equipment was ever stored in her place.

Q. Never at any time?

A. The only thing that was ever put there was after my

house was raided and I had to move out, I took some things that the DEA had left and put there, but other than that, no, nothing was ever there.

Q.   So you're saying after your house was searched in February of '96 --

A.   Yes, that's correct.

Q.   -- you took some glassware the DEA had left behind and put it --

A.   They left broken glass.  They left a container of some acid out in the snow bank.  They left some empty buckets.  They left fittings.  They left some -- they left a whole bunch of stuff.

Q.   And you took that stuff and stored it at Angela Johnson's house?

A.   I took and put some things in the shed and threw -- threw the rest off to the side.  I think I had my old dryer there and all kinds of stuff from my house.

Q.   Well, you heard Mr. Cutkomp testify that you and he had experimented on methcathinone at Angela Johnson's house during 1994, '95.  Do you remember that?

A.   I've never tried to make methcathinone.  I don't know how to make it actually.  Nothing was ever made in that house or even attempted to be made in that house.  She had a 13-year-old daughter there, my daughter there.  We weren't going to mess around with chemicals.

Q. Did you experiment making MVA which is a hallucinogen at your father's house?

A. No. He didn't even have knowledge of the chemicals being there. He would have flipped out about that, so he definitely wouldn't be letting people mess around in that.

Q. So your testimony is you were totally out of the drug business until sometime in 1995.

A. Around the fall of '95, somewhere in the late summer, early -- whenever I started renting my house. Soon after that he wanted to move his stuff to my place. That's correct.

Q. He started moving stuff to your place in Mason City.

A. Correct.

Q. Your house you mean?

A. Uh-huh.

Q. You have to answer yes or no.

A. Yes, sir.

Q. This is the one where the DEA did the search; right?

A. Yes, sir.

Q. Well, before that were you aware that Mr. Cutkomp had a house in Mason City in the spring of '95?

A. Yeah, I believe that was the Eighth Street address. I'm not exactly sure.

Q. And isn't it true that you and he had set up a lab in the basement of that house?

A.   He had a lab set up.  I was not involved in that typical -- that -- anything to do with that until it entered my residence.

Q.   Well, you were aware of it in his house; correct?

A.   I was -- I was aware he was trying to work on things, but I didn't know how frequent or what was going on or what step he was at or anything like that.

Q.   Were you talking to him about the process of making methamphetamine?

A.   He would -- well, he had asked me several times if I would help out, and I said I -- I was concerned of being followed and that while I was on pretrial release, so I said I didn't want nothing to do with anything because I could lead somebody right to him and what he was doing he needed to keep to him and that at that point I wasn't interested in anything to do with it.

Q.   Did you have an understanding with him that if he produced some methamphetamine you would help sell?

A.   Not while it was in his house, not till it was moved into my house in Mason City.

Q.   And then you decided at some point that the lab should be moved to your house and you would get back involved?

A.   I didn't decide that.  That was listed as pretty much an only alternative because he had no place to store it.  He didn't feel comfortable storing it at my dad's because of his

drinking habits, and he was left with all -- I wanted to at one point -- this is actually after my house -- have it stored at Rick Held's and concentrate on using all the literature and what we knew and writing one of them underground books, but he refused in doing that and was very upset at the notion that I even talked to Rick about that situation. I wasn't interested in the methamphetamine because of all the stuff that comes with it as far as the legalities. I feel we could have made a lot of money legally.

Q. Could have made a lot of money what?

A. Legally off writing a book like Uncle Fester's book. That's why I had so much research in my house.

Q. Well, but you did agree then you're saying at some point in '95 to set up the lab in your house.

A. Yes, I did.

Q. And isn't it true that Angie Johnson had invested some money in that lab by purchasing equipment or chemicals?

A. She never -- all the -- everything that was in my place was -- except for the hydrogen tank and that glass tube was purchased by Mr. Cutkomp prior to that. Angela Johnson had nothing to do with financing any part of the laboratory. I mean, I personally owed her money from me not working and stuff like that for child support, but she never financed any part of the lab, and she had no idea about it.

Q. Was your brother still involved in financing the lab in '95?

A. No, he had nothing to do with it. He was never after March of '93.

Q. And as I understood your -- well, I thought I understood your testimony -- you began to have a relationship with Mr. Cobeen in 1995; right?

A. Sometime in '95.

Q. Because you knew him from work at Kraft.

A. Correct.

Q. And he was providing you with drugs; is that what you said?

A. Yes, that's correct.

Q. And you at some point decided that it would be good for him to be involved in the methamphetamine manufacture.

A. He was very eager to be involved in it. It wasn't like I was trying to talk him into anything. Initially started as he wanted to see if I could get any like that I had in '93, and then he wanted to sell it, and then it turned to we talked -- like I said, we talked about manufacturing, and then he wanted to know how to manufacture. And I no longer wanted to work anything with the lab because that wasn't the agreement moving into my place. So that's why Mr. Cobeen -- you know, I talked about it with him, about him, if he wanted to, you know, help with Tim because I didn't want to do it.

Q.   Did you and Mr. Cobeen meet with Angie Johnson about -- or did you three meet at any time?

A.   I think he came over for New Year's Eve or something like that at my house one time, but it was never any formal meetings between any of us, no, not any arranged or anything.

Q.   Well, once the lab was set up in your house in the fall of '95 and spring of '96, there were attempts made to manufacture methamphetamine; right?

A.   One attempt.

Q.   And you were involved in that attempt; right?

A.   I was -- I watched some of the things when it was running.  Tim set it up because I was working, and I'd watch him at night.  But on my days off was when he would try to do most of the reactions that could be done because, again, I wouldn't be there with my children.

Q.   Well, weren't you still providing directions to Mr. Cutkomp about how to operate the lab?

A.   He knew far better than me how to manufacture.  He had done it all --

Q.   Were you providing directions to him at that time about how to operate the lab?

A.   If I had -- if we would take turns on -- like I would watch it at night, and he would watch it during the day.  I might tell him where I left off, and he'd tell me where he left off, but there was no directions of specifically, you

know, how to do a reaction or anything like that because he knew far better than I -- he had far more experience than I as far as manufacturing. That was partly why we had so many problems is because I had done some things wrong to, you know --

Q. Well, let me show you -- let me mark this for identification. We're up to Number 43.

MR. PARRISH: It seems like that was when the chemist was testifying yesterday.

MR. COLLOTON: Well, if it's redundant, I apologize.

BY MR. COLLOTON:

Q. Let me show you what I've marked for identification as Government Exhibit 43. Do you recognize that document, Mr. Honken?

A. Yes, I do.

Q. Is that a document that you wrote?

A. Yes, it is.

Q. And was that -- would you dispute if that were found in your house at the time of the search in February of '96?

A. No, I wouldn't.

Q. Is that a note that you left for Mr. Cutkomp?

A. Yes, it would be.

Q. And would you agree that in this note you're giving him directions about how to operate the lab?

A. That wasn't on a how-to thing. It was where I left off

and what needed to be done next, and he would do the same with me.

Q. So it wasn't a direction how to do something, but it was a direction that he should do something; would you agree with that?

A. I'm stating that if he was going to -- if he's going to work on it, that's what needed to be done next. You know what I mean? There was an exchange between us. If I wasn't there, I would leave a note. If he wasn't there -- if I didn't show up by the time he was going to leave, he'd leave me a note or he'd call me, and it'd be the same thing with me. It wasn't that I was instructing him how to do a reaction or he was instructing me how to do things. It wasn't like that.

Q. All right.

MR. COLLOTON: I'm not sure whether that was admitted previously. I didn't think it was.

MR. PARRISH: I think it was in the DEA notes that the chemist had and was also in the large notebook that he used from Mr. Meyers, and that's what was referred to yesterday when we went through it.

MR. COLLOTON: I see. It's part of Exhibit 23.

MR. PARRISH: Right.

MR. COLLOTON: I stand corrected.

BY MR. COLLOTON:

Q.   Now, with respect to Mr. Cobeen, is it true that you arranged for him to buy the hydrogen tank?

A.   Yeah.

Q.   You had ordered it somewhere?

A.   Actually he ordered it as part of being involved.  He ordered the hydrogen tank and the regulator and --

Q.   But you had arranged for him to make the order because you knew that it was a needed component; is that right?

A.   Right.  It was something that was needed, that's correct.

Q.   So you told him what we needed and where we would get it and that sort of thing?

A.   I actually went there with him, that's correct.

Q.   And did you also order some glassware from Adchemco in Mr. Cobeen's name?

A.   Yes, that's correct.  If you're talking about the long glass tube, that's correct.  If you're talking about the -- there's a long glass dispersion tube or something.  Yeah, that's correct.

Q.   Actually I'm talking about a letter that I'll show Mr. Parrish to Adchemco talking about a $20,000 allotment for glassware.  Do you remember that?

A.   Oh, yeah.  I remember writing that letter, yes.

Q.   You wrote a letter to Adchemco asking for that glassware; is that right?

A.   Yes, that's correct.

Q.   And you signed Dan Cobeen's name?

A.   I believe so.

Q.   And that was in what?  Fall '95, spring '96?  Do you recall?

A.   Somewhere in there.  I don't recall exactly when it was, but it was around there.

Q.   Do you remember using a return address of Cytomex in Urbandale, Iowa?

A.   Yeah.

Q.   Was that just sort of a mailing address you'd use to receive glassware?

A.   Yeah.  It was just -- I guess you'd call it a dummy company set up.

Q.   So that was something you did, not Mr. Cobeen.

A.   Actually Mr. Cobeen went in and did it.  He went in and got the stuff.  All I did was mail the letter.

Q.   Well, do you agree that that's a letter that you wrote to Adchemco which I've marked as Exhibit 44?

A.   Yes.

          MR. COLLOTON:  All right.  I'd offer Exhibit 44.

                    *   *   *   *

          (Plaintiff Exhibit 44 was offered.)

                    *   *   *   *

          MR. PARRISH:  No objection.

THE COURT: 44 is received.

* * * *

(Plaintiff Exhibit 44 was received.)

* * * *

BY MR. COLLOTON:

Q. Were you the person who came up with the Cytomex company name?

A. It was a culmination of Tim and I.

Q. And you took Mr. Cobeen to open up the drop box in Urbandale; is that right?

A. Both Tim and I did. We both went.

Q. And then Mr. Parrish reminded me that Exhibit 23 had the note to Tim, and it also had a handwritten diagram of what appears to be methamphetamine production. Do you remember that in Exhibit 23?

A. I've written hundreds of them. I'm sure it's one I wrote.

Q. Let me show you what's page 5 of Exhibit 23. Is that a --

A. Yeah, that's --

Q. -- formula for making methamphetamine? Is that what you'd call that?

A. It's just actual molecules. It's not how to make it.

Q. It's the molecules involved in the production of methamphetamine?

A.   Right, right.   It's not a procedure or anything like that.

Q.   This is something you had written up after doing some research?

A.   Yeah, I'm sure.

Q.   And why was it in your house?

A.   Well, I had tons of -- I was constantly drawing stuff like that, figuring out numbers, figuring out formulas because I was intending on writing a book about it, so, I mean, that's --

Q.   And then you had these journal articles that the chemists talked about yesterday --

A.   Right.

Q.   -- in your house; right?   And you had planned in this attempt to make the methamphetamine to try to follow that production method; is that right?

A.   I guess some journals, yes, but other journals had to do with totally other types of drugs and other things.   It wasn't just strictly methamphetamine.   It was journals that was in my house.   There was tons of different stuff.

Q.   But there was some in there relating to methamphetamine, and you were going to use those.

A.   Yes, there was.

Q.   And your goal was to make as much -- well, let me put it this way.   You've also seen a handwritten note that was found

in your locker at Kraft; right?

A.    Right.

Q.    And that --

MR. PARRISH:  P8?  You're talking about 8P?

MR. COLLOTON:  Yeah.  I'm talking about Exhibit 8P, 8P.

BY MR. COLLOTON:

Q.    And that's one that starts with 50 gallons of toluene at the top.  Do you remember seeing that?

A.    Yeah, I've seen it.

Q.    Now, isn't that a projection of a goal that you had for the laboratory in your house?

A.    Well, actually no.  Dan Cobeen asked me how much it'd take to take -- how much money it'd take to make 500 pounds, so I figured it up for him.  I think it was five hundred pounds if I remember right or four or five million dollars worth.  I don't remember what he said, but he wanted to know. So I sat out there by the case packer and drew it up for him and told him that's about what it'd cost.  That's during one of the discussions, you know.  We had a lot of discussions about manufacturing methamphetamine and costs associated and all that stuff.

Q.    So you agree that you were the one who --

A.    Yeah, I wrote that.

Q.    And you agree that it is a projection of how much

methamphetamine you thought you could make starting with 50 gallons of toluene.

A.   If a person had 50 gallons of toluene, that's a projection they probably could given the right circumstances if they had the right stuff, I suppose.

Q.   Well, you were making it a projection for Cobeen; right?

A.   Right, not based on the equipment we had or not based on what we were going to do or anything.  That was just a dream sheet that he wanted to know how much -- one 55-gallon barrel would be about 500 pounds.  He said, How much would it take to fill a 55-gallon barrel for?  He said, How much money?

Q.   Wasn't Cobeen interested in how much you guys could produce to make money?

A.   At times he was I'm sure.  Like I said, that was just a sheet of just a fictitious number.  I mean, that'd take years to produce that given the equipment that was at my place.

Q.   And so you kept this fictitious dream sheet in your locker at Kraft.

A.   I kept all kinds of papers I never threw away in my house and there.  It was probably in my tool box if I would have to guess.

Q.   Well, isn't it true this really was your objective?

A.   That was never our objective.  We could never have achieved that.  We couldn't even achieve making one run through of methamphetamine let alone 50 gallons.

Q. Well, you successfully made methamphetamine in Arizona; right?

A. Using a different method, correct.

Q. So you dispute Mr. Cutkomp's testimony that you used the same method in Arizona that you used in Iowa?

A. We did not use the exact same method, at least the time that I was there. We used sodium metal reaction. We did not use the tube furnace.

Q. For the last step or for the -- I guess it's the next to last step before the hydrogen?

A. Right. And also we had a chlorine tank instead of the -- that mock setup that wouldn't work. There was a lot of things that were different that were better than the situation that was in my house.

Q. Didn't you switch to the tube furnace because you were having trouble with the other reaction, the sodium metal?

A. Yeah. We tried something different, and that didn't work either.

Q. But both methods were based on starting with toluene and taking it through --

A. Yes, yes.

Q. -- the same general steps; right?

A. Yes.

Q. So you knew that methamphetamine could be made. You didn't have any question about that, did you?

A.   No.   If the steps were followed and the equipment's right, methamphetamine can be made.

Q.   Now, we've talked about the search in February, and then you were eventually charged by the grand jury in April of '96; right?  Does that sound right?

A.   Yeah, somewhere around there.

Q.   Approximately?  And then you were put on pretrial release and subject to electronic monitoring; correct?

A.   Right.

Q.   During the time you were on pretrial release, is it true that you tried to purchase a gun?

A.   I tried to purchase one for my girlfriend living in Des Moines for her, that is correct.

Q.   And you went to Kurt Zirbel at Kraft to try to buy the gun?

A.   Yes.

Q.   And as he testified at the last hearing, he declined to do that; right?

A.   Yeah.

Q.   And then you went to Rick Held about a gun; is that correct?

A.   Yes, that's correct.

Q.   And you suggested to him that Bob Riepma could maybe provide one.

A.   That's correct.

Q.    And you're saying you had already purchased a gun previously from Riepma in 1995.

A.    Correct.

Q.    Which is this SKS military rifle.

A.    Correct.

Q.    So you had asked Mr. Held to buy a .380 pistol for you from Riepma.

A.    Correct.

Q.    That would be in '96 while you're on pretrial release.

A.    Correct.

Q.    And isn't it true, as Mr. Held said, that he eventually told you that he had it in his truck and you could get it whenever you wanted it?

A.    He said something to that effect, yeah.

Q.    And Mr. Held was a coworker of yours at Kraft?

A.    Yeah.

Q.    And shortly -- very shortly after he told you that before you could get the gun you ended up getting detained; right?

A.    Right.

Q.    And that's why you didn't get the gun?

A.    No.  My girlfriend was supposed to -- I think I got detained on the third night of my work if I remember right. It'd be the morning after -- well, we had one more night of work.  She was supposed to be coming up from Des Moines, and

I told her that I can't even have possession of that gun because of my pretrial release conditions and that she needed to pick it up from him. That's why I never grabbed it out of his truck or anything. So -- and then I got arrested and, you know --

Q. And then Mr. Held testified, of course, that the girlfriend called and said that Dustin didn't need the pup anymore. Do you remember that?

A. Yeah, I remember him saying that.

Q. So your girlfriend never got the gun from Mr. Held as far as you know.

A. No, she didn't.

Q. You told Mr. Cutkomp in these recorded conversations that you had another gun; right?

A. Are you talking about the machine gun one?

Q. You made reference in the tapes to a machine gun; right?

A. Yeah, I did.

Q. You said it could fire -- I think you said it could fire over 1,000 a minute?

A. I think I said some wild number.

Q. I think there was one place where you said 1,000 and one place where you said 1,400 and some.

A. Right, okay.

Q. Do you remember that?

A. Yeah, I remember saying that.

Q. Where is that gun?

A. There was never such a gun. It was a fictitious gun.

Q. You just made that up to tell Mr. Cutkomp you had a gun.

A. Correct. He was concerned of how I was going to deal with Mr. Cobeen, how I was going to get him, how I was going to get these agents and all those people, so I said I had a machine gun. And then he wanted to see it, and I said, well, I couldn't show it to him. I didn't even actually have it.

Q. Why did you feel like you needed to buy a gun for Angie Johnson?

A. Because she's living down there alone and worked at the country club, had my little girl, and she was concerned about her safety down there in Des Moines. She'd never lived in a big city before.

Q. But I mean what made you think she couldn't just buy one for herself?

A. She could have. I guess she could have went and bought one herself. She had a pistol permit and everything. She just asked because I knew a bunch of guys at work that had guns and for a series of just price break, getting it secondhand which would have been cheaper and --

Q. So you felt she needed a gun in the house with the kids to protect them in Des Moines?

A. I felt she needed a gun for protection, that's correct.

Q. Did you say before you got rid of the SKS rifle because

you didn't want it around the kids?

A. I got rid of the SKS rifle because the kids knew about it, kept asking for it wanting to play with it, wanting to see it and stuff like that, and I didn't feel comfortable -- I didn't feel I needed a gun around my house. But if you're a woman living in Des Moines, you know, there's a lot more serious safety concern than me living in Mason City.

Q. Did you ask Belen Butterfield to order some literature for you while you were on pretrial release?

A. Yes, I did.

Q. You asked her to do that in her name rather than in your name?

A. That's correct.

Q. And among the things you asked her to order were a book on home workshop explosives?

A. Yes.

Q. And Poor Man's James Bond?

A. Yes.

Q. Ragnar's Homemade Detonators?

A. That's correct.

Q. And then did you also ask her to order -- I'm referring to Exhibit 8A and 8E -- a book or literature on full auto conversion of the SKS rifle?

A. I don't know if I asked her -- I never asked her to order it. I just mailed that one in. I just told her that I

was going to get a package at her house that was for me and that she agreed to take it. And as far as the one with the SKS and all that, it was never ordered, and it was prior to the one that I ordered with the explosives and all that stuff. I had gotten rid of that SKS and all that stuff, so I no longer wanted it. It just sat in my locker.

Q. So you had prepared an order form in Belen Butterfield's name that you kept in your locker?

A. Right.

Q. But you're saying you never sent it in?

A. No, I never sent it.

Q. And that was the one for a full auto conversion of the SKS rifle?

A. Right, right, right.

Q. And also a book on how to make a silencer for a .22?

A. Yes.

Q. And a book on how to make disposable silencers.

A. Yes.

Q. Why did you want those books?

A. I read a lot of those clandestine books. I was just curious in it, I guess. Not for any specific reason.

Q. If you'd already discarded the SKS rifle by burning it with a torch, why did you fill out an order form for a book on full auto conversion of the SKS rifle?

A. As I said, that was printed out prior to the one that I

actually ordered, so back how many months before that I was going to order those books. But when I no longer had the SKS rifle, I didn't need it anymore, so it sat in my locker. And then at a later time I asked her again if I could send something there, and that's when I actually ordered those other books.

Q. So you're saying the one order form for the full auto conversion of the SKS rifle was filled out before you melted down the SKS rifle?

A. I believe so.

Q. And why did you want to convert your S -- did you want to convert your SKS rifle to fully automatic state?

A. No. Bob Riepma and myself and Kurt Zirbel used to talk about all kinds of conversions and things and how to do it and that. It was a subject at work that came up and just for discussion purposes, you know. It wasn't that any -- they had SKSs. They weren't going to convert theirs either. It was just curiosity.

Q. And you felt that you needed to order these in someone else's name?

A. Well, it wasn't that I -- at that time with that specific order, I wasn't -- I was living at Angela Johnson's part time. And I just asked Belen to send it there because her dad lives there and all during the day he's home and he could accept the package where nobody's home at our place

and the same thing in '96 when I actually did order those books. It was for the reason, one, I had that lab in my house and -- no, maybe I didn't have the lab in the house. Maybe I was already raided then. I don't remember but --

Q. Well, the order form that you say you sent in just from the record is dated April 11, '96.

A. Oh, okay.

Q. So it'd be after the lab was --

A. That was when I -- I believe I was in transition moving out of my house or --

Q. Just some reason you didn't want to use your own name, huh?

A. Right. Well, I'd rather not, especially with the government looking at me, and they think I buy books like that and they start thinking crazy things that aren't true.

Q. Now, the hydrogen tank that Mr. Cobeen and you obtained was in court last time when we had the hearing downstairs. Do you remember that?

A. Yes, sir.

Q. And do you agree that the tank that you saw in court at least appeared to be the same one that you had in --

A. Yes, sir.

Q. And you had given that to Jay Lien; correct?

A. Tim and I both did. We took it in his car over there.

Q. And Mr. Lien had it at his house for a time. Is that

your understanding?

A.    Right.  We moved it out of the lab location because we were concerned about flammability reasons.

Q.    Then after the search of your house, you asked Mr. Lien to move it to somewhere else; right?

A.    Actually Mr. Lien came to me with the -- we talked about it, and he was concerned about the flammability reasons in his place because he kept his classic car in there and he didn't want nothing to happen to it.  So I said, Well, move it out of there then if you're worried about the flammability.  I didn't specifically tell him to -- it really wasn't an issue.  It was fine where it was at in my opinion, but he was concerned about it.

Q.    So you're saying Jay Lien came to you with a concern about the flammability.

A.    I'm saying we talked at work all the time, Jay and I did, you know, so after my --

Q.    And he expressed concern about the flammability of --

A.    Well, it has a big flammable sign on it, and he didn't know nothing about it, so he was concerned about it.  He was storing his very expensive car in there, and he worked on it, and he was concerned about it, the possibility of danger too.  So I said, Well, you know, move it someplace else if that's what you're concerned about.

Q.    So you'd disagree with the testimony he gave as to why

he moved the --

A.   Well, I told him to go ahead and move it if he was concerned about it, and that's what he said, that I said to go ahead and move it.  It wasn't for concealment purposes.

Q.   But -- so you agree with his testimony.

A.   I don't think he stated that.

Q.   Well, do you recall him saying anything about concern about flammability of the tank when he testified?

A.   No, I don't recall him saying that.

Q.   So -- all right.  Was it also part of your discussions with Mr. Cutkomp that you would try to locate Agent Mizell while you were on pretrial release?

A.   In those taped conversations, I've talked about locating all kinds of people that could possibly -- I'm sure that was part of that.

Q.   You're sure that finding Mizell was part of it?

A.   I'm sure that it was probably discussed is what I'm saying as a possible option to make sure that this case wasn't going to be as serious as he thought it was.

Q.   So you agree that there was discussion in the tapes about killing Agent Mizell.

A.   As well as many other people.  Yes, I do.

Q.   Other people like the chemists, for example?

A.   Chemists, Graham, Cobeen, you know.

Q.   Did you talk to Mr. Cobeen about the possibility that

Angie Johnson -- did you talk to Mr. Cutkomp about the possibility that Angie Johnson would be involved in this plan to eliminate a witness or witnesses?

A.   I don't think I said she would be involved in anything, you know.  I might have implied that she was mad at people and stuff like that but nothing as far as going and doing anything like that.

Q.   Let me ask you to look at page 29 of Exhibit 2B, please.

A.   What exhibit was that, sir?

Q.   2B.  It's one of the transcripts.

A.   What page is that?

Q.   Twenty-nine.  I'm looking at the bottom part of the page.

A.   Yeah, I see that.

Q.   Do you see where Mr. Cutkomp asks, Would anybody else?  It's about the third T up from the bottom.

A.   Yes, I do.

Q.   Then you said, Maybe.  Probably, but it's hard -- pardon me, it's so hard to get that person to do anything.  They're all so bitchy about it.  Who were you talking about there?

A.   I might have been implying Angie Johnson there.

Q.   Then further down in that statement, do you agree that you said, You know, they will -- they just want to go -- and then the transcript indicates sounds like shots being fired?

A.   Well --

Q. In other words, you're saying that Angie Johnson would just want to go bang, bang, bang or something like that.

A. I'm stating to him -- and Tim knows about my girlfriend's temper is pretty ferocious in a nonphysical way, but she might talk about things like that. That's correct. You know, so, I mean, it's not like she's going to go out and do that.

Q. So you agree this discussion was about the possibility that Angie Johnson might go out and kill these people, but your position is it's, again, all part of this pretend story you were giving to Cutkomp.

A. I'm just saying that any option that he wants to feel is plausible in order to help to make sure this gets handled. I'm implying that it's not going to be a problem so, you know --

Q. Including that Angie Johnson might get involved.

A. I guess I implied that from the statement. I guess so.

Q. Now, as a result of these transcripts or these tapes, you ended up getting detained; right?

A. That's why I initially got rearrested, yes.

Q. And then you were taken to the Woodbury County Jail; correct?

A. That's correct.

Q. And you were placed in the D block pretty soon thereafter?

A.    Yes, right away.

Q.    Oh, right away?

A.    Well, I guess I was in Fort Dodge first for a week and a half, and then I was taken to Sioux City.

Q.    When you were in the D block, you agree, of course, you met Dean Donaldson.

A.    Yes, sir.

Q.    And you say that you arranged to bond him out.

A.    Yes.

Q.    Through Lederman Bonding Company.

A.    Yes.

Q.    And you agree, of course, that Kathy Rick put up her house as part of the bond.

A.    That's correct.

Q.    You had no prior relationship with Mr. Donaldson before you met him in jail; correct?

A.    No.

Q.    Now, is it true that you asked Mr. Donaldson to go out and get certain chemicals and drug-related literature for you?

A.    Dean Donaldson wanted to know how to make methamphetamine and had asked me how to obtain information on it.  I gave him a whole list of books on how to do it.  There's other people sitting around too.  You know, everybody was interested, as I said.  And he wrote down a list of books

and a few chemicals that I spouted out, but it was never a thing where he was supposed to go out and purchase all these things or that for me as he was stating. That's incorrect.

Q. But you don't dispute that the papers he had with drugs or chemicals, rather, and literature on them --

A. No, I --

Q. -- contained information that he got from you.

A. Yeah, I told him about books, how to find out about doing it if he's that interested in it. He wanted to sell this formula for 500 bucks when he goes to prison to everybody, and I told him he couldn't possibly sell the one that I was working with because it was complex. And I told him if he really wanted to do that he could get all the various literature that tells you how do it.

Q. Well, isn't it true you also arranged for him to go get the hydrogen tank from Jay Lien?

A. He thought he could sell that potentially because it was supposedly drug-related, and I tried to tell him he was wasting his time because it wasn't normally used in the cookbook recipe ones, you know, like that he was interested in.

Q. Because your method was a lot more sophisticated than those cookbook kind?

A. It was a lot harder to do than the very simple ones, yes, that's correct.

Q.   And so you don't dispute that you gave Mr. Donaldson a letter of introduction to Jay Lien?

A.   No, I had three Nagel prints that were worth over 500 that he was supposed to pick up also, and he was supposed to talk to Jay.  I didn't even know if Jay still had the thing or not.  I just said that he had had that, and he got all excited saying he'd like to have that.  He thought he could sell it to these El Forestros people or something.  I said, If he still has it, you know, but you'll have to work with him on that.

Q.   Do you dispute Mr. Donaldson's testimony that you discussed with him starting up a drug business in which he would be involved?

A.   I had no plans to start a further drug business of any sort.

Q.   You say you also agree that you gave Mr. Donaldson a diagram of how to find Mr. Cutkomp's house?

A.   Yes, I do.

Q.   Let me just show you that so there's no doubt.

THE COURT:  Mr. Colloton, here's my problem.  I thought this was the case that the lawyers told me yesterday we'd be done by noon on.  Maybe that was some other group of lawyers I was talking to, but I kind of relied on that in planning my schedule.  And it's a little bit past noon.  I want to give you all the leeway you're entitled to on your

cross-examination, but I think we're going to have to continue this to another day. And I just got an e-mail a little while ago that my civil case for next week has settled, and so I'd be available any time next week to maybe try and get this resolved. I realize that's very short notice to busy lawyers and you may not be able to do it next week. I just thought I would offer that because I just became available.

MR. COLLOTON: I'm sure we can be available next week.

THE COURT: Do you know -- are you going to be in trial in Cedar Rapids? What about Mr. Reinert?

MR. COLLOTON: No.

THE COURT: I think Judge Melloy is starting --

MR. COLLOTON: I'm not going to be in trial. I had one scheduled, but it was continued. I'm not sure about Mr. Reinert. I don't think so. I think Judge Melloy has a trial with another one of our colleagues.

THE COURT: Okay. Mr. Parrish, do you know what your schedule's like next week?

MR. PARRISH: Well, Your Honor, I just want to maybe express my frustration. Part of the reason of the delay was the fact that the government had information they didn't turn over and some of their agents didn't turn over, and that caused a long delay this morning and --

THE COURT: Well, that's kind of water over the dam, though.

MR. PARRISH: I understand that, Your Honor. And I think my examination was about 35 minutes, and I understand they can take as long as -- the government can take as long as they want. But I guess tomorrow -- next week I have two problems. One, I have a case with Judge Wolle that has been mistried once, and we have a major motion for a new trial in the case due to law enforcement officers not being honest on the witness stand, and he set that because he decided my client is going to be released if, in fact, we have our experts present that information which we just got in a fax last night that supports our position. So he set that for the 26th.

I know I have a couple other matters, and I need to check my calendar. I did not anticipate having to come back next week, but I will make every effort to try to do it. My schedule is not as flexible as Mr. Reinert and Mr. Colloton, quite frankly.

THE COURT: I know that, because they really have two judges that they appear in front of, and you appear in federal court in both districts and all over the state and you're booked months in advance. I understand that. I didn't really expect you to be available next week. I simply offered it in the unlikely event you could be.

MR. PARRISH: I would like to, Your Honor. I would like to see what I can do to my schedule. I know Judge Wolle's hearing I may not be able to. I think that's on the 26th.

THE COURT: What day is the 26th next week?

MR. COLLOTON: That's I think Thursday. I think it's Thursday. I think I actually have a hearing that day too, but we certainly can try to have others cover that if that's the day Mr. Parrish can be here because I agree his schedule is --

MR. PARRISH: I'm saying that's the day I cannot be here. I will need to call my office --

MR. COLLOTON: Monday is the 23rd.

MR. PARRISH: -- and try to see what I can do.

THE COURT: Do you want to talk to Mr. Reinert and see if he's available or is he in transit or --

MR. COLLOTON: I think he's downstairs, and I can check with him right now on his schedule next week.

THE COURT: Well, I would suggest not Monday but Tuesday or Wednesday, probably maybe both days. I don't know how long the evidence is going to go. And then we have a lot of issues to work through. I have a lot of factual findings that I need to make, and there are a lot of legal issues to resolve, so I think it's going to take at least a full day depending on how much argument you have on each of the

issues.

MR. PARRISH: You're talking about, I take it, Your Honor, finishing up what we had anticipated yesterday on the date to come back, finishing all of that up in one day.

THE COURT: Maybe trying to finish everything next week and get the sentencing resolved and have you both on your way to the Eighth Circuit by the end of next week.

MR. PARRISH: Well, Your Honor, I will make every effort to rearrange my schedule, and I'll have to look because right now the big problem, quite frankly, is that I was supposed to be in a trial that's now going on in Ottumwa right now that I'd exchanged lawyers for, but I will try to make an effort since they are trying that case down there now -- it's a medical malpractice case -- to come back on maybe Tuesday if I could be assured maybe we'll finish up and I'll just cancel my appearance down there.

THE COURT: The other option is we can go out sometime in March and I can probably find some time. It's not going to be easy. I'm pretty booked up.

MR. PARRISH: I'd like to finish it as soon as possible. And if we can maybe take a five-minute recess, I can call my office right now, Judge, and then I could let you know.

THE COURT: And you can talk to Mr. Reinert. Why don't we meet back up here at -- in ten minutes.

MR. PARRISH: Are you talking about Tuesday or Wednesday?

THE COURT: Tuesday or Wednesday. I mean, I'm not sure we can finish in one day. Mr. Colloton, are you pretty sure you can finish in one day?

MR. COLLOTON: I'm gun shy now because of our estimates earlier today.

MR. PARRISH: I stuck with mine, Your Honor.

THE COURT: Well, I understand that, but we're not going to go back and revisit that. I'm not trying to blame anybody. It's a very important matter. There's a lot at stake, and I'm not going to rush the lawyers, and I'm not going to be rushed to make a decision. But I've got a lot of questions about this case, and I want them answered the best counsel can, things that you all haven't thought about so --

MR. COLLOTON: Well, whether we can do it in one day I guess depends in part on how well we can answer the questions.

THE COURT: We can start early. Why don't you see if you can be available on Tuesday with the possibility of going into Wednesday if we need it, and we'll be back here in ten minutes. Otherwise we'll recess until we reconvene at some later date.

(The foregoing sentencing was

adjourned at 4:40 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Shelly Semmler, CSR, RMR, CCR

3.24.98
Date

Case 3:10-cv-03074-LTS-KEM    Document 19-9    Filed 06/06/11    Page 221 of 222

**I N D E X**

JOHN GRAHAM

DIRECT EXAMINATION
BY MR. COLLOTON.......................................... 840:21
CROSS-EXAMINATION
BY MR. PARRISH.......................................... 844:20
REDIRECT EXAMINATION
BY MR. COLLOTON.......................................... 849:15
FURTHER REDIRECT EXAMINATION
BY MR. COLLOTON.......................................... 864:4
RECROSS-EXAMINATION
BY MR. PARRISH.......................................... 866:13

DANA RASMUSSEN

DIRECT EXAMINATION
BY MR. COLLOTON.......................................... 876:20
CROSS-EXAMINATION
BY MR. PARRISH.......................................... 886:20
REDIRECT EXAMINATION
BY MR. COLLOTON.......................................... 894:16
RECROSS-EXAMINATION
BY MR. PARRISH.......................................... 895:22
FURTHER REDIRECT EXAMINATION
BY MR. COLLOTON.......................................... 896:10
FURTHER RECROSS-EXAMINATION
BY MR. PARRISH.......................................... 897:9

DUSTIN HONKEN

DIRECT EXAMINATION
BY MR. PARRISH.......................................... 900:10
CROSS-EXAMINATION
BY MR. COLLOTON.......................................... 928:3


(Plaintiff Exhibits 42 and 42B were offered.)........ 850:22
(government Exhibit 40 was offered.).................. 884:10
(Government Exhibit 41 was offered.).................. 885:16
(Government Exhibit 43 was offered.).................. 898:22
(Plaintiff Exhibit 44 was offered.).................. 1026:23


(Joint Exhibit 1 was received.) ..................... 835:21
(Defendant Exhibit C, D, and E were received.) ...... 876:11
(Government Exhibit 40 was received.) ............... 884:16
(Government Exhibit 41 was received.) ............... 885:22
(Government Exhibit 43 was received.) ................ 899:5
(Plaintiff Exhibit 44 was received.) ................ 1027:3