# 10

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,

Plaintiff,



vs.                                No. CR 96-3004

DUSTIN LEE HONKEN,                 TRANSCRIPT OF SENTENCING

Defendant.                         Volume 5

_____/

The Sentencing held before the Honorable Mark W. Bennett, Judge of the United States District Court for the Northern District of Iowa, at the Federal Courthouse, 320 Sixth Street, Sioux City, Iowa, February 24, 1998, commencing at 9:30 a.m.


APPEARANCES

| | |
|---|---|
| For the Plaintiff: | PATRICK J. REINERT, ESQ.<br>STEVEN M. COLLOTON, ESQ.<br>Assistant United States Attorneys<br>Suite 400<br>401 First Street Southeast<br>Cedar Rapids, IA  52407-4950 |
| For the Defendant: | ALFREDO PARRISH, ESQ.<br>Parrish, Kruidenier, Moss,<br>  Dunn & Montgomery<br>2910 Grand Avenue<br>Des Moines, IA 50312 |
| Also present: | Jay Jackson, Probation Officer<br>Dave Mizell, DEA |
| Reported by: | Shelly Semmler, CSR, RMR<br>320 Sixth Street<br>Sioux City, IA  51101<br>(712) 233-3846 |

THE COURT: Good morning. Please be seated. This is a continuation of the sentencing of Dustin Lee Honken, Criminal Number 96-3004. The United States is represented by Assistant U.S. Attorneys Pat Reinert and Steve Colloton. The defendant is personally present in court represented by Des Moines Attorney Alfredo Parrish.

Where did we leave off? I believe Mr. Honken was testifying, and, Mr. Colloton, you were cross-examining; is that right?

MR. COLLOTON: That's correct.

THE COURT: Mr. Honken, why don't you resume the witness stand. You're still under oath.

DUSTIN HONKEN, DEFENDANT, PREVIOUSLY SWORN

CONTINUED CROSS-EXAMINATION

BY MR. COLLOTON:

Q. Mr. Honken, I think when we left off we were talking about Dean Donaldson. Do you recall that?

A. Yeah, I do.

Q. And you had said, as I recall, on direct examination that you had indeed bonded out Mr. Donaldson, arranged for him to be bonded out of jail while you were in the Woodbury jail?

A. Yes, sir.

Q. And you said that you arranged for him to go to the residence of Mr. Cutkomp's parents; correct?

A.    I mean, we had talked about it, yes, uh-huh.

Q.    Well, didn't you testify you supposedly arranged for him to go pick up some of Kathy Rick's belongings?

A.    Yes.

Q.    And you said that you provided him with a map that showed him how to get there; right?

A.    Yes.

Q.    And I was about to show you Exhibit 11K when we broke. Is that a copy of the -- or not a copy. Is that the actual document that Mr. Donaldson made in your presence in the jail?

A.    It looks to be the one.

Q.    Is that an accurate copy of what you had written down for him to copy?

A.    Pretty close. He didn't copy it exactly the way I had it.

Q.    What's different about his than yours?

A.    I probably had a few houses on the way there showing extra points for landmarks on how to get there.

Q.    You had a few more houses?

A.    Yeah.

Q.    But everything he had on there was on yours. Is that what you're saying?

A.    Well, I don't know about the Xs, but I think that's supposed to mean a stop sign. It looks similar. I can't

recall exactly.

Q. But you had him copy it down rather than just giving him one that you'd written; right?

A. Yes.

Q. And you say you're not sure about the Xs. What do you mean by that?

A. Well, I think I had a stop sign on mine because there's a stop sign at the end of that gravel road there.

Q. Now, you also gave Mr. Donaldson some information that he copied down on the back of that map; isn't that right?

A. Regarding what?

Q. Regarding the things that are written on the back of Exhibit 11K.

A. Yeah, I gave him the addresses, uh-huh.

Q. And you gave him the phone number for Night Scope International; correct?

A. No, I didn't do that. He wrote that down out of a magazine we were looking at in his room.

Q. So you're saying you gave him all the information on the back except Night Scope International he happened to write down on his own.

A. I didn't give him the -- I gave him the Marvea Smidt, the Kathy Rick and the Angie Johnson is what I gave him on that.

Q. So you're denying that you gave him the phone number for

Jimmy.

A.    Yes.  He knew Jimmy before I did.

Q.    Now, later you heard Mr. Rasmussen testify; right?

A.    Yes, I did.

Q.    And you also gave him a map of how to get to -- or showed him a map of how to get to Mr. Cutkomp's parents' house; correct?

A.    Actually it was the same map I showed Mr. Donaldson that I showed Dana Rasmussen because I was explaining to him about Dean Donaldson jumping bail and all that.

Q.    Well, you also gave Mr. Donaldson a copy of Mr. Cutkomp's work schedule, didn't you?

A.    I gave it for the reason for Rick Held and Jay Lien, not specifically for Mr. Cutkomp because he was supposed to go to Rick Held and Jay's, and they both work the exact same shift as Mr. Cutkomp does.

Q.    So you acknowledge that you gave a work schedule to Mr. Donaldson.

A.    Yes.

Q.    And you also gave him an address for Darrell Cobeen; correct?

A.    No, I didn't specifically give him an address.  He said that he actually had ran across Darwin Cobeen which would be Dan's younger brother or something like that.  He was in prison for kidnapping or he stabbed his girlfriend or

something. He had ran across him, and either he had -- I can't remember if his friend had knew him well or if he had knew him well. And I had the Mason City phone book there, and we just looked to see if there was a Darwin Cobeen in there, and there wasn't. The closest thing there was was the Cobeen that he had written down.

Q. So just coincidently he happened to write down the father of the witness in this case; is that what you're saying?

A. No. There's a possibility he was going to talk to Darwin Cobeen, so he wrote -- I said that would be -- the father would be the one that he wrote down. I didn't know where Darwin Cobeen lived at the time.

Q. Well, you also gave him some language that's in Exhibit 11L; namely, it would be unwise for you to testify in the upcoming drug trial for you and your relation's sake, didn't you?

A. I didn't give him any sort of thing like that.

Q. You gave him -- you and he got the address for Mr. Cobeen, but you deny giving him the language in 11L.

A. Yes, I never gave him anything like that.

Q. Well, you admit that you gave him a letter of introduction to Rick Held; right?

A. Yes, that's correct.

Q. Because that's in your handwriting; right?

A. Uh-huh.

Q. And so was the letter to Jay Lien in your handwriting.

A. Yes.

Q. So you admit that you gave him that; right?

A. Yes.

Q. And you say that -- well, the Rick Held letter was for the purpose of introducing Donaldson to Held because they had never met before; right?

A. That's correct.

Q. And Held was the fellow who had bought the gun for you while you were on pretrial release; right?

A. He bought the gun from my -- that was intended for my girlfriend, that's correct.

Q. And you had intended to pick that gun up, but you got detained before you could do it; right?

A. I never intended to pick it up. Angie was going to come up the next morning.

MR. PARRISH: I'm going to object. If he's going to go over the same testimony because he's had the weekend to work on it and rephrase the questions in a different context, I'm going to object to it because he's just going over prior ground.

THE COURT: Well, it is repetitive. We've been over this, and I'd like you to stick to some new matter.

MR. COLLOTON: Okay. I'll move on with this

Donaldson matter then.

BY MR. COLLOTON:

Q.   Well, let me ask you this:  When Donaldson came back into the jail after he'd been bonded out, you saw him there; right?

A.   Yes, I did.

Q.   And isn't it true that you started to spread word in the jail that he was a snitch?

A.   Not at first because -- I didn't say anything about that until my cell was raided by the feds.  I said he must be saying something because they took everything with his name on it, but I didn't really have any concrete knowledge of what he had done.

Q.   And then there was a later time when you made gestures pointing toward him or threatening gestures toward him; right?

A.   The gesture I made was -- it was through the window going from the recreation room to C block, and he was up high.  And all's I went -- we had eye-to-eye contact, but you can't see through the shades hardly, and I just went like this (demonstrating), and I went, Are you saying stuff about me?  That's what I did.  There was no gun gesture to it.  One of the other inmates, Shane Provost, was sticking his hand through the shades making gun gestures to everybody in C block, but it had nothing to do with Mr. Donaldson.

Q. Well, let's talk about the jail a little bit. You know a number of the people who've testified here; correct?

A. Yes, that's correct.

Q. And you're denying that you knew there was any hole in the wall in the cell in C-8. Is that your testimony?

A. I knew after it was found because they came in with metal detectors. There was a whole big spiel throughout the jail.

Q. Well, you testified that there was an occasion where Mr. Sabasta and you were in your cell with a brass door handle; right?

A. That's correct.

Q. And as I understood your testimony, you said Mr. Sabasta banged on the wall in your cell to try to make a hole; correct?

A. Yes, sir.

Q. And that's the hole or the damage that's been shown in the pictures that have been in evidence here; is that right?

A. Yes, sir.

Q. Now, do you remember writing a letter to Dennis Putzier on August 29 of 1997?

A. I believe I've seen it in the evidence somewhere when I was running across it.

Q. Have you seen Exhibit 32, or shall I show it to you? Let me show it to you. Do you remember seeing Government

Exhibit 32?

A.    Yes, I do.

Q.    Is that a letter that you -- or a copy of a letter that you wrote to Mr. Putzier back in August of '97?

A.    Yes, it would be.

Q.    Well, didn't you tell Mr. Putzier that you have witnesses to say that the hole in your wall was there before you got in the room?

A.    There was a small hole started, and that's the one that Sabasta actually made bigger.  That's correct.

Q.    I see.  So you're saying that you have witnesses to say there was a hole in your wall that was small before Sabasta started banging on it.

A.    Right.  There was like a chip out of it.  That's why he picked that specific brick.

Q.    So you say there was a chip in the wall which is what you meant by the hole in the wall when you wrote to Putzier?

A.    Yes.  It wasn't really a big hole or anything.

Q.    Well, who are the witnesses who will say there was a chip in the wall that Sabasta used to start banging on?

A.    The one who I found out about was from -- Jimmy said that Joe Sandoval -- it had happened when Joe Sandoval was in there.

Q.    Why didn't you say that there was a chip in the wall before you got in the room?

A. Just -- I don't know. I just put hole.

Q. Why didn't you explain to Mr. Putzier that Mr. Sabasta was the one who had made the hole and you didn't have anything to do with it?

A. Because I wasn't going to name Mr. Sabasta in a letter when it's going to prison.

Q. Well, after you and Mr. Sabasta were up there in your cell, you tried to pick the lock on the fire door as well; correct?

A. I did mess around with that because I told Mr. Sabasta to stop pounding on my wall because the guards were going to come in there. And I said that if you needed to get something from C block to D block that I'd figure out a different way, and I had mentioned the fire door.

Q. And you also had the way of sending things under the door; right?

A. Thin objects, yeah, you could fit through there.

Q. Like the piece of the broken step that was sent under the door; correct?

A. I'm unclear if that was -- I know some deodorant was passed under there from Putzier to Dayton, but I don't know if Dayton passed that or not. I didn't see him do it.

Q. Well, do you deny or agree with the testimony that you broke a piece of step off of the stairway?

A. Yeah, I pried loose a piece of the step.

Q. And that was because Mr. Putzier had rebar in his hole that needed to be hack sawed; correct?

A. No. I was going to use that to turn the lock actually but --

Q. The block between C and D?

A. Yeah, the cell door -- or the fire door, excuse me.

Q. So you admit you were trying to get into the C block; is that right?

A. What I'm saying was Mr. Sabasta wanted to get something from C to D block, and he wanted to pound a hole through my wall. Instead of doing that, I said I would find an alternative way because I didn't want to be in any more trouble than that hole already would have been. He couldn't get through it anyway so --

Q. You know Mr. Bregar from the jail; is that correct?

A. Yes, I do.

Q. And do you dispute his testimony about what you said to him about wanting to kill people if you'd have had another week out of jail?

A. Yes. I didn't say anything like that.

Q. You deny that.

A. Yes, I didn't say that.

Q. Do you remember you testified a little bit on direct examination about acceptance of responsibility?

A. Yes, I do.

Q. And you said you accept responsibility for attempting to manufacture the methamphetamine; right?

A. Yes.

Q. And I thought I heard you say you accept responsibility for the conspiracy except you don't agree with the dates. Is that what you said?

A. I did make that statement, yes.

Q. So you don't really accept responsibility for the conspiracies as charged from the indictment from 1992 to 1996. Is that what you're saying?

A. What I'm saying is there wasn't a -- I never had a conspiracy from '93 until '95 when we attempted to manufacture. I wasn't selling drugs or wasn't even involved in drugs at that time. That's the statement that I made. But the original conspiracy I agree with in '92, '93 and the attempt to manufacture in '96.

Q. Well, you didn't raise at your guilty plea a concern about the scope of the conspiracy, did you?

A. Actually I brought up the issue with my attorney, Mr. Parrish, and he said it wouldn't be -- it wouldn't be a problem anyway, it wouldn't affect anything, so we just left it -- I believe he talked to you guys about it.

Q. Well, on the -- you've seen the government's sentencing memo in this case; right?

A. Which one would that be?

Q.   The one that we filed recently that goes through each issue and the evidence that the government believes supports --

A.   The brief?

Q.   The brief.

A.   Yes, I've seen that.

Q.   You've had a chance to read that and study that.

A.   Yes.

Q.   And as I understand it, you do not accept responsibility for any of the obstruction alleged in the brief or the presentence report.

A.   I'm saying -- as far as trying to obstruct justice?  Is that what you're asking?

Q.   I'm asking you, yes, about the parts of the presentence report and the government's brief that set out allegations that you should get a two-level adjustment for obstruction of justice.

          MR. PARRISH:  I'm going to object to the question, as to the form of the question, whether or not he likes the government's brief or not.  It really has no bearing on the issue.  That's my objection as to the form of the question, whether or not he agrees with the government brief.

          THE COURT:  Why don't you ask a different question.

          MR. COLLOTON:  Okay.

BY MR. COLLOTON:

Q. I'm not asking, Mr. Honken, whether you like the government's brief. I was just trying to focus you on what I'm trying to ask whether you agree with or not. You understand that there are certain bases on which the probation office recommends you should get two levels for obstruction of justice.

A. Yes, I do.

Q. And you understand the government has argued in its brief that there are certain bases for that.

A. Yes, I do.

Q. And as I understand it, you deny each of those bases for an upward adjustment; right?

A. That's correct.

Q. You also, as I understand it, deny that you possessed any firearm in connection with the offense or relevant conduct; right?

A. The only weapon I ever possessed was that SKS for a short period of time.

Q. And why did you get the SKS?

MR. PARRISH: Objection. Asked and answered. He went through that last week.

THE COURT: Overruled.

A. Again, I originally bought it because they were talking about this all-weapons ban, and Bob Riepma said it'd be a good investment, that it was going to triple in price and

everything, so I originally bought it from him for that reason. Then it never did increase in value, and the kids got interested with it, and I told Mr. Cutkomp to get rid of it.

Q. All right. I don't want to dwell on that. Forgive me if I've forgotten what you said before.

Let me make sure I understand. Are you also denying that you had any kind of manager or supervisor or organizational role in the conspiracy?

A. There was never a supervisory position with regard to anything. It was each had individual roles. It wasn't something like I was telling somebody something to do or that. It was just a volunteer deal between everybody.

Q. So the answer to my question would be yes?

A. Yes, I'm denying that there was a supervisor.

Q. I just have a few more questions. I want to ask you one thing about your garage that I don't believe was asked last time. Am I right that you were using space heaters in that garage to keep it warm in the January, February period?

A. Yes.

Q. And is it right that the reactions that you and Mr. Cutkomp were trying to do are temperature sensitive; that's why you had to have space heaters in there?

A. The biggest problem was the water freezing up and breaking stuff was the biggest problem. It wasn't that

something was -- I mean, I can't think of anything off the top of my head that's very temperature sensitive but could be. I don't know.

Q. Do I understand you to say you have no knowledge whatsoever about the whereabouts of Mr. Nicholson?

A. That's correct.

Q. And you say the same as to Mr. DeGeus?

A. That's correct.

Q. And you say the same as to Mr. Nicholson's girlfriend and her children?

A. That's correct.

Q. And you have no knowledge about how they disappeared. Is that what you're saying?

A. That's correct.

Q. And as the Court has to decide what your sentence should be, I want to ask you this one last question about the one thing you said to Mr. Cutkomp. Do you remember saying to him, It doesn't matter even if I'm in prison for F'ing 15 years, whatever. When I get out, he's still dead no matter what. No matter what, I swear on my life that F'er's going to go before me? Do you remember saying that?

A. Yes, I do.

Q. And you were talking about Mr. Cobeen; right?

A. Yes, I was.

MR. COLLOTON: That's all I have, Judge.

THE COURT: Mr. Parrish?

MR. PARRISH: Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. PARRISH:

Q. I don't want to go back over every item as the government did with regard to some of the questions that were asked, but I do want to ask you a couple of questions. First of all, I'm going to start with the conversation they brought up that was taped between you and Mr. Nicholson March 21 of 1993. And in that tape does Mr. Nicholson to your best recollection, your review of the transcript, of the tape talk about the drugs being mixed as opposed to being pure that he had received?

A. We had some discussion in there about what -- he wanted to know what I had mixed it with the last time that I had brought it to him because it somehow aggravated something in his mouth or something and I told him inositol. Vitamin B is what I told him.

Q. So he brought up the conversation about the mix; is that correct?

A. Yes, that's correct.

Q. Did he ever indicate to you that the items he had received from you in terms of methamphetamine was all pure?

A. Never. That's why I was shocked in '93 when I got the lab report of the purity of 96 percent because I told my

attorney then, Dave Thinnes, that that was impossible and it must have been a different -- somebody else he was buying it from trying to hang it on me.

Q. Did anything else indicate to you from the questions asked by Mr. Colloton and the items you reviewed as to whether or not the methamphetamine that was listed at 97 percent pure by the government or 96 percent pure by the government as to whether or not that was in a container different from any container you had given to Mr. Nicholson?

A. Are you asking if it was in a different container or not? I don't know. I don't know.

Q. You don't know that.

A. No, I don't know.

Q. Do you know whether or not from reviewing of the government's discovery material if, in fact, different methamphetamine or the remains of methamphetamine were in different bottles?

A. I would have no idea on that.

Q. Is it your testimony that you ever gave Mr. Nicholson any substance that was 96 percent pure?

A. Never. He always received cut material. We were concerned about somebody overdosing, and that was a thing that we just followed religiously as far as cutting it. Everything was cut at least 50 to 75 percent.

Q. In the tape of March 23 -- I'm sorry, March 21, 1993,

did you, in fact, acknowledge to Mr. Nicholson as to why you got into the particular drug business of methamphetamine?

A.    I believe there's some discussion that involved -- the reason I got into it originally is I went down there for college down to Tucson.  I was doing pretty good at NIACC, and I had went down there with my brother, and it was a big mess when I got down there.  I didn't realize it, but he had been under some serious trouble for criminally dumping waste water, and he was talking about he was going to have to go to prison and all this.  And that's why the ten pounds of marijuana came up, to try to make money to pay for legal expenses and that, and that's why I got involved with trying to help him out initially.  I mean, I didn't need the money or anything at the time.  I had full scholarship and everything.

Q.    Were you involved at all in any manufacturing of marijuana -- of methamphetamine from 1993 to 1995 in the state of Iowa?

A.    No.

Q.    The funds that did, in fact, come in from the sale that you made in the state of Iowa, where did that money go?

A.    Almost all of it went to my brother because he said he had initial expenditures in it.  And after those were met, then it was going to start being divvied a third, a third, a third, but that never really happened that way.

Q. And comparatively speaking, between you and Mr. Cutkomp, who received more of the actual cash or returns in terms of benefit? And what I mean by benefit, that would go to apartment, living expenses, travel expenses, et cetera. Who received more of the actual cash if you divided it between the three parties, your brother, yourself, and you, and who received second, and who received third in terms of amounts?

A. My brother received the most by far, and the second most would be Mr. Cutkomp because he was renting and running the place where he was manufacturing it, and the third would be me. I was supposed to get paid X amount a month, like $1,000 a month, so I could afford an apartment and all that, but I wasn't even getting that. So I ended up skimming money just in order to pay my rent with my girlfriend and stuff.

Q. If you had to allot for the actual physical labor and manual labor of putting the equipment together, purchasing equipment, contributing to the purchase of equipment in terms to make the sale to Mr. Nicholson here in Iowa, if you had to list that in one, two, and three, list the order of who performed those functions in terms of maximum amount and minimum amount of duties.

A. Mr. Cutkomp got everything that we had in the -- in my garage except for the hydrogen tank, and I helped with getting the gas tube from the company down in Des Moines. But otherwise than that, he had everything already when he

brought it to my place.

Q. Now, we're talking about in Arizona also if you had to break that down to the maximum person who did the work, the setup, the purchasing, et cetera, the medium person, and the minimal person between your brother, Mr. Cutkomp, and yourself.

A. My brother never really did much with the manufacturing. He just was pretty much -- he was supposed to be -- he just wanted to deal with all the money. And Mr. Cutkomp did almost all of the manufacturing exclusively except for the first run which we had worked on together.

Q. The tape of the 21st of March of 1993 that was taped by the government, do you at any point talk about amounts that were brought back by you?

A. I think I'm talking in there about 5 ounces and 50 percent of it's pure, two and a half ounces of it was pure or something like that. During the time -- the four times that I brought it up, it was anywhere from -- anywhere from four to eight grams -- or four to eight ounces, excuse me. I don't know exactly where they fell. But that was one specific instance where I'm talking about five ounces.

Q. The question asked of you with regard to the conspiracy count starting from 1993 to 1996, did you, in fact, bring that up as an issue with the government before you entered your plea into this matter?

A.   For the time frame?

Q.   Yes.

A.   Yes, I did.

Q.   And did you, in fact, instruct me to discuss that with them?

A.   Yes, I did.

Q.   You're not disputing at all any of the substantive acts, are you, with -- I mean we're disputing quantity, but are you disputing any of the substantive acts that are contained within the time period that the government is talking about with regard to your conduct?

A.   With the '92 to '96?

Q.   Right.

A.   I'm saying my conduct was with the '92 to '93 conspiracy and then -- and the attempt to manufacture in '95 and '96.

Q.   And you have never disputed that conduct; is that correct?

A.   No, never.

Q.   But you did instruct me to discuss with the government as to why they had to have -- why they were so anxious to have a conspiracy count.

A.   Yes, I did.

Q.   And do you know for a fact that that was done?

A.   You told me it was, so I'm assuming it was.

Q.   And Mr. Colloton would have been aware of it.  He asked

the question. He would have been aware of that discussion; is that correct?

A. To my knowledge, yes.

Q. And do you know whether that would have taken place in Cedar Rapids or right here in the courthouse in Sioux City, Iowa?

A. Right here in the courthouse during -- when I was going to plead guilty that day actually.

Q. And do you recall whether or not there were two or three breaks in that discussion where I left to go down and talk with Mr. Colloton and Mr. Reinert and came back up and reported to you what their conversation was during that time?

A. Yes, that's correct.

Q. Now, you read, did you not, the -- and you've listened to the testimony with regard to the government's representation to the presentence officer that there were five gallons of toluene; is that correct?

A. I did read that, yes, that's correct.

Q. And you read your presentence report where the government had represented to the presentence report -- reporter that there were five gallons of toluene; is that correct?

A. That's correct.

Q. You also read in the discovery material or the reports of discovery material that, in fact, the government had

represented there were five gallons of toluene; is that correct?

A.    That's correct.

Q.    Do you of your own knowledge have any idea whether that representation to the presentence reporter by the government was fraudulent?  Of your own personal knowledge do you know whether they did that purposely and intentionally?

A.    Oh.  No, I don't know that they did that purposely.

Q.    But you do know, in fact, that was never the case.

A.    That's correct.  There was never five gallons.

Q.    And you've heard the testimony come out in this courtroom from Mr. Meyers that that was not the case.

A.    That's correct.

Q.    Do you know of your own personal knowledge why the government made that kind of representation to the presentence investigator?

A.    For a sentencing enhancement I'm assuming.

Q.    To put you in a higher category than what you would have been in?

A.    That's correct.

Q.    Do you know why the government would have done that of your own personal knowledge?

A.    Because they would like to give -- me to get as much time as possible.

Q.    In 1995 or 1996, I guess February of '96, when the

government went into the house that you had in Cerro Gordo County, were there any items in that lab that were part of any lab that was out in Arizona in 1993?

A. No. The complete lab in '93 was destroyed, thrown in a river to my knowledge. That's what I heard. Everything was totally new, bought brand new by Mr. Cutkomp.

Q. What was the biggest change that you can recall in the relationship between you and Mr. Cutkomp?

A. In late summer, early fall -- I can't remember exactly when -- was when --

Q. What year?

A. '95 when Mr. --

Q. What happened?

A. Mr. Cutkomp and myself and his ex-wife went out one night, and he got so intoxicated that he couldn't make it back in the house, so we actually took him into the house, and I went to drop her off. And then the next day she claimed that we had had a relation -- an affair, relationship, whatever, but we had not, in fact. And after that he disappeared for, like, two days, and I couldn't find him. And he was very, very, very upset about it, and our friendship kind of started to decline after that, you know, even though --

Q. What did you notice in terms of how you had observed him prior to the time that this alleged incident happened and his

relationship towards you after that particular evening or when she had indicated that there was a relationship between you and her?

A. Well, Tim and I were inseparable. We never had any other friends but each other. We just hung out with each other. And immediately after that he started hanging with another person, Brent Anderson, at work, and he'd go out to eat with him and spend all kinds of time with him, and I would very much have to try to talk to him to -- I'd have to make the initiative where that was never the case before. And he became very much more upset about my having -- not working in with the lab stuff and blamed it on -- kind of switched it around like me -- like I was making him do more work because I wasn't pulling my own share of work which I didn't want to do in the first place.

Q. In February after the government had come in and seized material, what did you do from the time of the seizure to the time of your arrest?

A. I worked at Kraft. I stayed working at Kraft.

Q. You stayed working where?

A. At Kraft Foods.

Q. Okay. Did you engage in any conduct with Tim Cutkomp during that time to damage, destroy, interfere with the process of the investigation?

A. No. At that time he explained a couple plans to me,

what he wanted to do, but nothing ever -- you know, I never engaged in any plan or anything like that. He just talked about it.

Q. What plans -- I'm sorry. Go ahead. What plans did he come up with from the time of the search warrant being issued until the time that you were arrested? What plans did he come up and discuss with you about what he could do to circumvent the seizure of these items that had taken place?

A. Well, he had located the Bondurant -- he thought it was in the Bondurant facility for some reason, and he had driven by it several times, told me about the place, and he had worked at Dahl's Manufacturing, and he put in vent work in government buildings, and he told me how he could get into the vent work because he knew how the vent work came out with the fire wall. I don't know exactly the whole mechanics of it.

Q. How long did he work with Dahl's installing vents in government buildings?

A. For a year or two.

Q. And where did he do this work?

A. Down in Des Moines.

Q. And are you familiar -- prior to February 6 were you familiar with Des Moines very well?

A. No, not at all.

Q. And who would more likely be familiar with Des Moines

between the two of you? Cutkomp or yourself?

A. Oh, Mr. Cutkomp lived down there several times.

Q. And how far is Bondurant from Des Moines?

A. Oh, ten miles maybe, somewhere around there. I'm not sure.

Q. And what years -- other than the time that's in the discovery material where he talks about having an apartment in Des Moines in '93, '94, what other times did he live in Des Moines?

A. Well, he lived in Ankeny after high school for a long time, and then I believe he lived in Des Moines after that. He lived on and off in Des Moines quite -- and then his sister lives right in Maxwell. That's right by Des Moines too, so he's down there a lot.

Q. And of the two of you, during that time period between February 6 and the date you were arrested, historically who would have had more knowledge of Des Moines, Iowa, and its immediate surrounding communities?

A. Mr. Cutkomp.

Q. Did he come up with any more harebrained ideas with regard to how he was going to engage the government or disrupt the progress of this investigation?

A. Well, he knew Mr. Cobeen was the only person tying him into it. He was worried about his fingerprints on the one glassware that was in my garage, and he knew that Mr. Cobeen

was the only one tying it into him as far as actually -- because he had worked with Mr. Cobeen on it and had met with Mr. Cobeen, had taped conversations. So, I mean, in his mind eliminating Mr. Cobeen would eliminate him from the case.

Q. From the time of the search warrant in February to the time of your arrest, when was that? In April or May? When were you arrested in '96?

A. I think it was May. I'm not sure exactly.

Q. Okay. Did you see Mr. Cobeen at all during that time?

A. No.

Q. Did you have any contact with him?

A. No.

Q. And where did you live during that time?

A. During my pretrial release?

Q. No. This was before your pretrial release, before the arrest. When the search warrant came out, when you were picked up?

A. I would have been living at my Mason City address.

Q. I'm sorry?

A. At my Mason City address, 1104 16th Street.

Q. Mr. Cutkomp has testified about the -- and I believe they asked you on direct examination to some extent about the funds. Would you specify specifically how the money in the attempt to manufacture was to be divided amongst the -- you and Mr. Cutkomp?

A.   Well, it was originally 50/50, but then when I wanted to get -- not do the manufacturing and Mr. Cobeen was brought in, Mr. Cutkomp didn't want him brought in at first because he didn't trust him.  And, second of all, he didn't want the money split.  So since it was me that introduced Dan, I split my half 25/25, Mr. Cutkomp 50 percent is what it was supposed to go so that way his money wasn't split because he was upset about me bringing him in anyway.

Q.   The can that the government has talked about and had indicated had five gallons of toluene in it, have you had an opportunity to see the discovery photos -- I believe it might be 207; I could be wrong -- but of the toluene can?

A.   Yes, I have.

Q.   And are you able to find it in here, Dustin?  I think it might be 207.  I'm not sure.  205?  Okay.  Thank you.  205.

A.   Yes, I do.

Q.   And this can, I note from the -- it's pretty obvious is an open can, open container, so to speak.  Did you ever see the can full of any substance when you went there?

A.   Never.  It was actually empty when I -- because I drained vacuum pump oil into it.  That's why the lid's not on it.  It was empty.  What would be in there would be just used oil out of the vacuum pump because I ran out of containers to dump stuff in.

Q.   Would toluene be left open if, in fact, it was being

used to manufacture?

A.    No.

Q.    Why not?

A.    Something else could get in there.  It'd evaporate.  You just wouldn't leave it open.  Flammability hazard.

Q.    Did you see the cap at all in any of the discovery material as you were going through?

A.    No.

Q.    And would you just take a look at Exhibit 205?  Except for the toluene can, do all of the other items appear to be capped in there?

        MR. COLLOTON:  Appear to be what?  I'm sorry.

        MR. PARRISH:  Appear to be capped, having been covered.

A.    The kerosene can isn't either because that was -- we didn't dump anything down the drain, so we were saving it just aside to get rid of it at some point.  I don't know.  But the kerosene can should have been completely full, the toluene can.  And then that kerosene can with the funnel out of it, we had just gotten and used the kerosene out of it, so we started using that to fill also.

Q.    But the rest of the chemicals were, in fact, capped; is that correct?

A.    Yes, that's correct.

Q.    And is that because of items that may evaporate or were,

in fact, not in use anymore and not functional anymore?

A. If it wasn't functional, we weren't concerned with putting the cap on it most likely. It'd be if something was good or was flammable or something like that, we'd have a cap on it.

Q. And I'm going to show you an even more revealing photograph which is photograph 203. Take a look at Exhibit 203 which is even more revealing on the subject. And would you say that that pretty much lays out items that would, in fact, be usable and available and those items that would, in fact, have no value because their value would have been expended?

A. That's correct.

Q. The last couple of questions I have for you, number one is when the search warrant was issued in February, was the hydrogen tank at that point in your house?

A. No. Mr. Cutkomp and I had already taken it to Jay Lien's house shortly after we got it. Like a few days after we got it we took it to Jay Lien's house because of the flammability.

Q. And did anyone ever come and question you about the hydrogen tank at all?

A. No.

Q. Had they questioned you about it -- and you had indicated at this point that there was an attempt to

manufacture -- would there be any purpose to be served or gained by you in not acknowledging there was a hydrogen tank?

A. They already had record on paper that it was purchased by Mr. Cobeen, and Mr. Cobeen said it was for me, and so there was -- I knew that they knew I already had it. It wasn't like I was -- it was just put at Mr. Lien's, and we just forgot about it there.

Q. And the process would not have worked without a hydrogen tank? The manufacturing process, would it have worked without the hydrogen tank? Let me ask it that way.

A. Not the specific one we used, no.

Q. So what would be the purpose of not acknowledging the hydrogen tank?

A. There wouldn't be.

Q. The last area I want to go over is the jail matter with regard to the passing of the matters under the cell and the attempt to open the door between cell block C -- is the fire door between C and D?

A. Yes, that's correct.

Q. By opening the fire door between C and D, does that get you to the hole that was in the wall?

A. No.

Q. Does it put you at an advantage of getting out, or does it just put you in the canteen area?

A. It just puts you in the day room area.

Q.   The day room area?

A.   Yes.

Q.   Where everybody else hangs out.

A.   That's correct.

Q.   Was there any attempt by you to escape?

A.   No, there wasn't.

Q.   And finally, Dustin, are you aware of -- were you aware early on that the government had access to every letter you wrote?

A.   I knew that from day one.

Q.   Were you aware that they -- except supposedly for my telephone conversations, every phone call you made --

A.   Yes, that's correct.

Q.   -- were you advised was, in fact, recorded?

A.   Yes, that's correct.

Q.   And you knew the government would, in fact, have access to every document you wrote or every time you were on the telephone to use at your sentencing hearing; is that correct?

A.   Yes, that's correct.

Q.   Did you ever at any point think your sentencing hearing was not going to be a lengthy and drawn-out affair by the government?

A.   No, I figured it probably would be.

Q.   Did you make any attempt when you would write someone or to talk to someone on the phone, assuming other than the

conversations you had with myself, your attorney, or your investigator, to hide anything from the government throughout the 20 months you've been there?

A.   No.

MR. PARRISH:  I have no further questions.

THE COURT:  Mr. Colloton?

RECROSS-EXAMINATION

BY MR. COLLOTON:

Q.   With regard to this toluene can, Mr. Honken, you were attempting to make methamphetamine from toluene; right?

A.   That's correct.

Q.   So at some point you had toluene that you were using to further the attempt; correct?

A.   When Mr. Cutkomp brought it over, I believe he -- he must have had it all in the flasks.  That was the chemicals that was present because there wasn't anything in the can.

Q.   Well, did you inspect the can?

A.   Yeah, because I dumped oil in it.  I made sure there was nothing in it.

Q.   So you're just disputing Mr. Cutkomp when he says that he was working from a toluene can.

A.   I'm saying he might have had it in there at some point, but I don't know that for a fact.  It was empty when I seen it.

Q.   Did you say you never saw Mr. Cobeen after the search

warrant at your house? Is that what you said to Mr. Parrish?

A. No, I never seen Mr. Cobeen after I was arrested.

Q. After you were arrested. After the indictment you mean?

A. Right.

Q. Now, Mr. Parrish asked you some questions about the methamphetamine that Mr. Nicholson had. Do you remember that?

A. Yes, I do.

Q. You said you had no idea whether the methamphetamine seized from him was in different bottles from what you had delivered to him; right?

A. That's correct.

Q. Because you said the other day that the -- you used the brown bottles to deliver it; right?

A. Yes.

Q. And you used that for Mr. DeGeus too?

A. No. I would have tooken that in a plastic baggie.

Q. And I take it you usually -- you're saying you cut the methamphetamine. That's your claim; right?

A. That's correct.

Q. And you would fill up the brown bottles and bring them to Mr. Nicholson?

A. That would be correct.

Q. And they would typically be full bottles?

A. No, not always. The first one --

Q. Pardon me?

A. I think there was two sizes of different bottles. I can't remember. I don't remember if they were full or not, to tell you the honest truth.

Q. You said that when you go -- if you were to go through the fire door from the D block to C block you'd be in the day room area; is that right?

A. Yes, that's correct.

Q. And then the day room area -- from the day room area you can go into the cells that are on the bottom level; right?

A. That's correct.

Q. And then you can go up a set of stairs and you have access to the cells that are on the top level.

A. Yes, that's correct.

Q. I want to make sure I understood what you said about the acquisition of equipment for the lab in Mason City. You said you were involved in getting the hydrogen tank; right?

A. Yes.

Q. And you said something about a glass tube. Can you explain that?

A. Yes. That would be the one that Mr. Cobeen purchased with the company that was set up down in Des Moines.

Q. Where you wrote a letter out and signed his name --

A. Right.

Q. -- and sent it?

A. Right. I actually sent the order slip out. That's correct.

Q. But you also wrote the letter that we looked at the other day; right?

A. Yes.

Q. And you sent Mr. Cobeen and Mr. Cutkomp to get the manganese chloride up in Minnesota; is that right?

A. I didn't specifically send them there. Just that was needed for a step, so they went up there because I had to do something else.

Q. But isn't it right that you wrote out the note that had the name of the chemical on it and gave it to them so they would know what to get?

A. I think we discussed it. I don't remember specifically writing out a note. Tim knew what -- Tim knew what he had to get.

Q. Now, as far as the conspiracy charge goes, you're saying that you had some concern about the dates at the time of the plea hearing; right?

A. That's correct.

Q. And you do dispute, don't you, the testimony that you arranged for Mr. Cutkomp to go to Arizona during 1993 to '95?

A. I didn't make any arrangements of the sort.

Q. And you dispute the testimony that you went down there with Angie Johnson to get chemicals or glassware?

A. Right. We went down there to get my furniture. That was it.

Q. So to that extent you dispute some of the allegations about acts between '92 and '96.

A. That's correct.

Q. Were you saying there were three breaks in the guilty plea hearing? Is that what you were saying to Mr. Parrish? Do you remember three breaks?

A. Are you asking me or Mr. Parrish?

Q. Pardon me?

A. Are you asking me or Mr. Parrish?

Q. I'm asking you.

A. I'm not certain. I know there was at least -- not during the guilty plea. It was when I was in the marshal's room in that little attorney-client room. He'd leave and go ask you guys something and come back.

Q. Oh, I see. You're saying you had multiple conferences with Mr. Parrish before the plea.

A. Yes.

MR. COLLOTON: That's all I have, Judge.

THE COURT: Mr. Parrish, anything further?

MR. PARRISH: I have no further questions of this witness, Your Honor.

THE COURT: You may step down. Thank you.

Does the defendant have any additional evidence?

MR. PARRISH: I do, Your Honor. I'd like to call Dave Mizell to the stand.

DAVID MIZELL, DEFENDANT'S WITNESS, SWORN

THE COURT: Please be seated. State your full name, please, and spell your last name.

THE WITNESS: David Mizell, M-i-z-e-l-l.

DIRECT EXAMINATION

BY MR. PARRISH:

Q. You've been assigned to this case for approximately how long?

A. Since March of '93, parts of the case.

Q. Were you responsible for conducting any of the inmate interviews at the Sioux City jail?

A. At what period of time?

Q. Any period with regard to Dustin Honken.

A. Yes.

Q. How many did you interview?

A. Well, I didn't interview any. I was present when Mr. Colloton was talking with them before their testimony.

Q. How many roughly?

A. Two.

Q. You were only present during two of them?

A. That I can recall now, yes.

Q. And how many were interviewed?

A. I only recall actually conducting an interview of

Mr. Rasmussen.

Q. Well, do you know how many different inmates at the Woodbury County Jail were interviewed as part of the process to see what Mr. Honken had done or said while he was incarcerated for 20 months?

A. I have no idea, sir.

Q. You don't have a clue.

A. No, sir. I wasn't involved in that part of the investigation.

Q. Who was?

A. Special Agent Mark Hein.

Q. So you've never seen the list of people that were interviewed for that. Is that your testimony?

A. I've never seen a list of who was interviewed, yes, sir.

Q. Have you had the occasion of going through Mr. Honken's mail for the last 20 months?

A. I've never seen his mail.

Q. Who did that?

A. I would believe that would have been Special Agent Hein again.

Q. Did you have the opportunity of reviewing each and every phone call that he made for the last 20 months at the Woodbury County Jail?

A. No, sir.

Q. Who would have done that?

A. Special Agent Hein.

Q. Now, are you in charge of the investigation, or is Mr. Hein in charge of the investigation?

A. I would characterize it as two separate investigations.

Q. Well, then you were involved with the drug investigation; is that right?

A. That's correct, sir.

Q. And you're saying Mr. Hein was in charge of investigation to see whether or not Mr. Honken had, in fact, committed any state crimes.

A. No. I would characterize it as more of his investigation was centering on the obstruction of justice parts of the case.

Q. Okay. So he's a what? Is he DEA?

A. Yes, he is.

Q. And then Mr. Hein then came up to cover the investigation of whether or not Mr. Honken had escaped from jail?

A. Again, it was part of the obstruction of justice investigation.

Q. Related to his drug crime?

A. Yes, sir.

Q. Not related to a state crime which might have been so-called making witnesses disappear.

A. Well, that would have been part of it also.

Q. And who were you working with with the state in investigating those matters? Were you at all?

A. I wasn't involved in that part of the investigation.

Q. So then you would say, if I understand you correctly, that your total part of this investigation was solely with the drug matter; is that right?

A. That's correct.

Q. And so you then were aware that the agent had not found five gallons of toluene in Mr. Honken's house.

A. I was aware that five -- a five-gallon can of toluene was found.

Q. Did you ever see it?

A. I observed it, yes.

Q. And it was full.

A. No, sir, I couldn't testify to that.

Q. Well, when you say five-gallon can, you don't mean a five-gallon can full of toluene.

A. I mean a five-gallon can. What the contents were or how full it was, I have no idea.

Q. Were you aware that the government made a representation to the presentence investigator that it was a five-gallon can and it was full?

A. I became aware of that, yes, sir.

Q. When did you become aware of it for the first time?

A. Probably three weeks ago.

Q. In this courtroom?

A. Either in this courtroom or in conversations with Mr. Reinert.

Q. And when you became aware of it, who did you alert immediately that they had made a mistake for the last year and a half with regard to the amount or quantity that might be involved in Dustin Honken's case?

A. I had discussions with Mr. Reinert about it.

Q. Are you telling me then that up until three weeks ago you did not have a clue that five gallons of toluene or a full can of toluene was not found in Mr. Honken's house? Is that your testimony?

A. Could you repeat that again?

Q. Are you telling me that you were not aware until three weeks ago that the can found in Mr. Honken's house was not full of toluene?

A. That's correct.

Q. You thought the whole time of this investigation, the lead drug agent in this case, that it was full.

A. I didn't consider it. I assumed that the chemists when they were conducting their part of the investigation noted whether it was full or not and tested the contents.

Q. Well, didn't you hear Mr. Meyers say it was not his job to do that, it was your job to do it?

A. I heard him say that, yes, sir.

Q. Are you disputing your own agent from Chicago who said it was your job?

A. I'll dispute that, yes.

Q. He was wrong.

A. I was under the understanding that he would test the contents in the lab.

Q. And find out the quantity; right?

A. Yes, sir.

Q. Because you knew that the quantity went to how much punishment this man would receive in court, didn't you?

A. It was one of the factors, yes, sir.

Q. Well, it was a big factor when you're fighting about quantity; isn't that true?

A. It's a consideration, yes, sir.

Q. And you knew that if the information with regard to the toluene was not accurate Mr. Honken could receive more than what he should have received because the government did not make a proper disclosure as to what they found; isn't that true?

A. I don't believe I understand your question.

Q. Isn't it true that had not an accurate disclosure been made with regard to the amount that Mr. Honken would have received more in quantity and consequently a greater sentence had not the proper amount of toluene and other chemicals been disclosed?

MR. REINERT: Objection, Your Honor. That's argumentative.

THE COURT: You may answer.

A. The only way I can answer that is that it would have been a factor in determining his drug quantity as would other witnesses' interviews.

Q. Well, you're talking about historical data.

A. Correct.

Q. Right. But historical data has to fit in with the actual chemicals; would you not agree as an experienced agent?

A. I would agree that it would be part of it, not the entire.

Q. Well, let me ask you this: Who didn't do their job? Did you not do your job, or did Mr. Meyers not do his job since you're both disputing each other?

A. Well, I'll accept my responsibility as the agent. It should have been -- before everybody left it should have been done, and it wasn't.

Q. And you would agree then that you failed to do your job in this case.

A. Yes.

MR. PARRISH: I have no further questions.

THE COURT: Mr. Reinert?

                    CROSS-EXAMINATION

BY MR. REINERT:

Q. Agent Mizell, the report -- there was a delay between the seizure of the lab and the indictment in the case; is that right?

A. Yes, sir.

Q. And part of that delay, we were waiting on a report from the DEA in Chicago; correct?

A. Yes, sir.

Q. And in the DEA report, lab report from Mr. Meyers, which is admitted as Exhibit 24, it lists the quantity on site of toluene of 16.4 kilograms. Do you remember that?

A. Yes, sir.

Q. And ultimately you determined during the course of preparing or assisting the United States in preparing for various hearings and the sentencing memo that that 16.4 kilos was based upon a full can of toluene; correct?

A. Yes, sir.

Q. And, in fact, based upon the testimony, that 16.4 would have been based upon the full can but not necessarily the can as it was seized; correct?

A. That's correct.

Q. And after we discussed the matter and you checked with Mr. Meyers and the disposal company, we determined that we could not precisely determine how full the can was; correct?

A. Yes, sir.

MR. REINERT: Your Honor, for the record, I'd ask the Court to rely upon our brief which was filed January 16 on the issue of disclosure to the Court regarding a partially full can. Page 7 specifically says the can was not completely full.

Nothing further, Your Honor.

THE COURT: Anything further, Mr. Parrish?

REDIRECT EXAMINATION

BY MR. PARRISH:

Q. You don't even know what was in the can, do you?

A. I do not, sir.

Q. So you can't even sit here today and represent to this Court that you knew what was in that can with the cap off that you've been calling toluene throughout this investigation, can you?

A. That's correct.

MR. PARRISH: Nothing further.

Q. And you were the agent in charge; isn't that true?

A. Yes, sir.

THE COURT: Anything further, Mr. Reinert?

RECROSS-EXAMINATION

BY MR. REINERT:

Q. Agent Mizell, were you the one that was required to draw samples and test? Are you a chemist?

A. No, sir.

MR. REINERT: Nothing further.

THE COURT: Mr. Reinert, just to make sure I understand the representations you want me to note in your brief, on page 7 there is a phrase including a 5-gallon, parentheses, 16.4 kilogram, parentheses, container that was partially full of toluene.

MR. REINERT: That's correct.

THE COURT: What's the evidentiary basis in the record that it was toluene that was in the can? The smell by Mr. Meyers?

MR. REINERT: Yes, Your Honor. The testimony of Mr. Meyers as to what he believed that was based upon his --

THE COURT: Based upon his what?

MR. REINERT: His albeit cursory review of the container.

THE COURT: Based upon his sniff of the container.

MR. REINERT: Presumably his trained sniff, but yes, Your Honor, his smell of the container and the contents.

THE COURT: There wasn't much in the record about his training with toluene. As a matter of fact, the evidence in the record was that only on one other occasion had he ever dealt with a methamphetamine case in which toluene was the initial starting subject, although toluene may have been involved in other cases.

MR. REINERT: And he also indicated that toluene is

a routine solvent used around the DEA lab, so I think he's experienced with toluene although not necessarily directly involved in the methamphetamine production. Toluene being a routine solvent, he would have had experience with that. So that is based upon that testimony by him and his experience not only in the methamphetamine area use of toluene but also in the routine use of toluene as a solvent.

THE COURT: But his sniffing of the substance is the basis for your statement in the brief that it was partially full of toluene.

MR. REINERT: And also Mr. Cutkomp's testimony that they purchased a full five-gallon can of toluene for the purpose of manufacturing methamphetamine.

THE COURT: But it was never tested by anybody to see if it was toluene.

MR. REINERT: That's correct, Your Honor. However -- and I think this goes more to argument. We can -- I'm sure we will discuss this a lot more later.

THE COURT: We will.

MR. REINERT: Regarding commercially produced toluene that's sold in packages as toluene commercially and I think we admitted -- I hope we did during the hearing when I was unfortunately ill the purity levels of toluene as commercially produced and sold by Diamond Vogel, that if it comes out on a label under a brand name it's going to be if

not pure at least substantially pure of a type when it's purchased. And those are reasonable circumstantial inferences, that this was a full five-gallon can of substantially pure toluene at least at some point during the course of the conspiracy.

THE COURT: We will discuss it later. Thank you. I guess -- I just want to ask you, Agent Mizell, just to make sure I understood, when you responded to Mr. Parrish's question that you had made a mistake or you had erred in the investigation, that the responsibility was yours for the mistake -- do you want me to recall your -- let me find your exact testimony. It was the last question he asked you if you remember.

THE WITNESS: It was -- it should have been my responsibility to make sure that Chemist Meyers took all the samples that were needed and that he had noted the quantities of the material in the lab. Now, I'm not a chemist, so I didn't mess with the chemicals, but I should have made sure that he did that, yes, sir.

THE COURT: And is that what you meant when you -- here was the question: And you would agree that you failed to do your job in this case? Answer, yes. Is that what you were referring to?

THE WITNESS: Yes, sir.

THE COURT: Okay. I just wanted to make sure I

understood that.

Anything else, Mr. Parrish?

MR. PARRISH: No, Your Honor.

THE COURT: Anything else, Mr. Reinert?

MR. REINERT: No, Your Honor.

THE COURT: Okay. Thank you, Agent Mizell.

MR. PARRISH: Your Honor, may we have a five-minute break?

THE COURT: Yeah. Actually why don't we take a 15-minute -- let me ask you this: Are we going to have any more evidence from the defendant?

MR. PARRISH: There may be one additional witness.

THE COURT: Why don't we take a 15-minute recess until 11:00.

(Recess at 10:45 a.m.)

THE COURT: Please be seated. Mr. Parrish, do you have any additional evidence?

MR. PARRISH: Yes, Your Honor. We'd like to enter into a stipulation I believe with the government. As I understand it --

THE COURT: On the total offense level or --

MR. PARRISH: I would love to do that, Your Honor. I don't think that's going to be likely. We tried all weekend, quite frankly.

With regard to Mr. Honken's mail, I believe the

government would stipulate that his mail was put on intercept since he was placed at the Woodbury County Jail, has been on intercept. All mail that he mailed out, all mail that he received was, in fact, confiscated or monitored by the government and eventually reviewed by either a government agent except his legal mail.

Further, all telephone calls while he was in Chicago at the mental health unit was, in fact, recorded. All of his -- and this has been the process since he's been at the Woodbury County Jail. I believe the government after we talked about the stipulation maybe interviewed the agent who I attempted to interview who would not interview with me for whatever reason unless I would call him on the stand said that -- might have indicated that other notes that were, in fact, in Mr. Honken's possession were, in fact, taken also. And I think they want that as part of the stipulation. I don't believe there were any phone call monitoring or recording at the Woodbury County Jail, but I believe they would stipulate to those factors, and I believe that's consistent with what Mr. Honken indicated that he was aware of since he was at the Woodbury County Jail.

THE COURT: Mr. Colloton?

MR. COLLOTON: May I respond briefly to that? What we're prepared to stipulate to is that it's actually after January of '97, it's my understanding, the mail, non-legal

mail, was monitored, or at least we were told by the jail that it was being monitored. January of '97 was the date because that was when the Donaldson matter came to the attention of law enforcement.

And the thing that Mr. Parrish said we wanted to add is that there was other mail found that did not go through the normal jail monitoring system. I just wanted to be clear that we're stipulating that all the mail was reviewed. We also obtained mail that went around the monitoring system. For example, Government's Exhibit 32 which is the Honken to Putzier letter has a return address of Britt, Iowa. It was not obtained from the jail, but as far as the -- what he says about checking mail, that's what we were told by the jail after January of '97.

We also have provided all of that to Mr. Parrish. I want to make that clear. It's been in the discovery file. There were no intercepted phone calls from the Woodbury jail. And what we received were, as he said, the calls from MCC Chicago which we also provided to Mr. Parrish. So I think that might qualify to some extent what he says, but we'd be prepared to acknowledge what I have said.

THE COURT: Well, I'm not sure what you stipulated to, but it's not going to have any bearing on any of my rulings, so I'm not going to worry about it. That's the most confusing stipulation I've ever heard by any stretch. So

whatever it is that you all think you've stipulated to, good luck, but it doesn't have any bearing on anything I'm going to rule on.

MR. COLLOTON: That's fine. It was proposed to us over the break, and we said we would agree to what we could and know to be accurate, but if it's not going to matter to the Court --

THE COURT: It doesn't, but I appreciate your efforts. And if you all understand what you stipulated to, that's fine. I don't. I'm not being critical of anybody. I'm just saying it's kind of an odd stipulation, one where one person gets up and you give different views on different things. I can't figure out what you're agreeing to and what you're not agreeing to, but it's not in my view material to any of the issues that I'm going to decide.

MR. COLLOTON: That's fine with me. The defense wanted the evidence in. We were trying to cooperate as best we could with what's accurate. We were not presented with it in time to have a nice written one that could either be signed or --

THE COURT: And I understand that too, and I'm not trying to cast any blame on anybody.

MR. PARRISH: Well, the history of the thing, I tried to interview the agent, and he for whatever reason with short notice would not agree to talk with me. Then I tried

to work out a stipulation with the government on the issue that I wanted to call him for because I didn't want to waste the Court's time calling him on two questions. And the last point which I thought we had a stipulation on was that the government did, in fact, interview more than the witnesses who they called from the jail. I believe the number is closer to 30 inmates that they did, in fact, interview as a result of their investigation at the jail.

THE COURT: Are you willing to stipulate to that?

MR. REINERT: That's accurate, Your Honor.

MR. COLLOTON: We wouldn't stipulate to a number, but there were other people who were interviewed who weren't called as witnesses.

THE COURT: Wait. Mr. Reinert says that's accurate. Now, Mr. Colloton, you're saying you won't stipulate to a number. The number was 30. You either stipulate to it or you don't or you say approximately 30 or --

MR. REINERT: I think it was up to 30. We don't know -- I don't know the exact number off the top of my head, but I know it was more than what we called and it would have been less than 30 total people that we talked to, and it's probably closer to 30 than closer to the number -- I think we called --

THE COURT: Here's what might be helpful. How many people did you interview that you did not call as witnesses?

MR. COLLOTON: If we knew the answer to that, we would be prepared to stipulate to it. We said over a break we can't tell you how many were interviewed. Mr. Parrish seemed to think it was important that there were others interviewed who weren't called, and we would agree to that. But I don't think that with all respect to my colleague we ought to get into how many they were until we have a chance to look at it.

THE COURT: Well, you're the one that interviewed them. What do you mean a chance to look at them? You've already looked at them. You've talked to them.

MR. COLLOTON: Well, yes, but I can't tell off the top of my head how many there were.

THE COURT: You don't have notes where you list the people you've interviewed?

MR. COLLOTON: I have reports of everyone that's been interviewed, and I can go through the book and count them up.

THE COURT: Mr. Parrish, are you satisfied with the stipulation as I understand it, that they interviewed more inmates than they called as witnesses in this sentencing hearing?

MR. PARRISH: Yes, Your Honor, barely, but there was a discussion that we said 18 had been called, and I believe Mr. Colloton indicated -- I said, well, was it more like 50

to 100 or something like that, and I believe he said it was about 30. And I said, Well, that's fine with me. I think that was about 12 more than were called. I think 18 were perhaps called. But if he wants to say more and stick with that, I have no problem.

THE COURT: Mr. Colloton, how's this? Greater than 18 but less than 30. No?

MR. COLLOTON: That's my best recollection.

THE COURT: Well, you know, a stipulation is a voluntary agreement between parties, so I'm not trying to put any pressure on anybody. I'm just -- these stipulations are just kind of awkward when there's -- both sides are making different representations as to what the stipulation is about. I don't care if you stipulate or not. But if you stipulate, you ought to stipulate. This is kind of a quasi stipulation in quasi stipulation land, you know. So why don't you tell me, Mr. Colloton, because I don't want to put words in your mouth what it is the government is stipulating to about the number of witnesses who were interviewed but not called.

MR. REINERT: To the best of our knowledge, more than 18 since 18 were called and less than 30.

MR. PARRISH: That's satisfactory with me.

THE COURT: Okay.

MR. PARRISH: I have no -- after that, Your Honor, I

have no additional witnesses to call on this matter.

THE COURT: Do you have any additional evidence?

MR. PARRISH: No, Your Honor.

THE COURT: There are a couple matters I want to take up of an evidentiary concern, but does the government have any rebuttal?

MR. REINERT: No, Your Honor.

THE COURT: Okay. We have the issue of the medical records. The first issue is there's a statement that goes with them for $34, and not that I'm trying to dodge it, Mr. Parrish, but it's actually made out to you.

MR. PARRISH: I have no problem. I'll file a proper motion with the Court on that, Your Honor.

THE COURT: Whether you pay it or not, that's between you and the patient accounts department at North Iowa Mercy Health Center.

MR. PARRISH: I'll make sure it's taken care of.

THE COURT: I have reviewed the medical records, and it gets a little bit complicated because there are some psychological records in here. And, you know, Cutkomp really is -- there's nobody on behalf of Cutkomp that's asserting a privilege as I understand it. Was Mr. Lane contacted? Is he the one who represented Cutkomp?

MR. REINERT: He was, Your Honor. And when we had the phone hearing with Magistrate Zoss, Mr. Lane was on the

phone along with myself, Mr. Parrish, and the attorney from the hospital. And at that point we discussed the issue of privilege. There could not -- Mr. Lane said he couldn't, of course, waive the privilege because he hadn't talked to his client about it. So there was no express waiver of the privilege. So I think in the absence of a waiver the privilege exists.

And it was my understanding what we proposed as a solution for the hospital was to forward the records to the Court and allow the Court to separate them out, review them, determine what was privileged and what was not and release those which were not privileged and not consider those which were privileged, to just compartmentalize that information.

And my understanding from our phone conference that we had then with Your Honor was that was basically what was going to happen. I was under the impression after that hearing that the records were a little more segregable between medical records and psychiatric records. And, of course, since I haven't looked at them, I can't tell if there's segregable portions that the Court can consider and those which it cannot. I'm not sure what's there.

But it's my understanding that based upon our earlier discussions with the Court that the psychotherapist-patient privilege was going to be applied by the Court but the medical records were going to be released

and considered but the psycho-patient privileges were not being considered.

THE COURT: Well, let me ask you this: Would either parties have any trouble -- I haven't actually segregated it out; I think it could be done -- if I simply file as a court exhibit those portions of these medical records that I deem not covered by the psychotherapist privilege that the Supreme Court recognized last term?

MR. REINERT: I think that would be acceptable, Your Honor. That way we'd have a record as to what was, in fact, considered. That would be acceptable with the government.

THE COURT: Mr. Parrish, do you have any objection if I file those portions of the record that fall within the doctor-patient privilege which doesn't apply in federal court and then I'll probably what? Just place under seal the remaining portions of the documents that fall under the psychotherapist, psychiatric privilege, whatever the Supreme Court called it.

MR. PARRISH: I think that would be appropriate, Your Honor.

THE COURT: Okay.

MR. REINERT: Your Honor, would those be -- just one point of clar -- would that be filed as a court document open to the public, or would it be filed like an exhibit? I'm not sure if trial exhibits are available to the public routinely.

THE COURT: Well, they are. Are you asking me to seal it because of the privacy concerns of Mr. Cutkomp?

MR. REINERT: There are still some privacy concerns that I think the witness would have, and I think it would be appropriate -- in the matter of discretion the Court could certainly do that -- to afford Mr. Cutkomp his privacy.

THE COURT: I think I'll do that. I think I'll file two sets under seal, one including what I consider to be the nonprivileged, at least in federal court, medical records and the other under seal to be the privileged records that I've determined are covered by the psychiatric privilege and that I'm not actually considering them in making my rulings. Does that satisfy your concern?

MR. REINERT: It does, Your Honor.

THE COURT: Thank you. I'm not sure the two exhibits, Mr. Colloton -- I'll speak to him because you were ill, Mr. Reinert -- involving the -- I don't remember the numbers now but the toluene exhibits, whatever the numbers of those, those were never offered by the government according to my law clerk who keeps track of what's been offered and what hasn't been offered. I kind of remember that they were offered, and I thought I admitted them.

MR. COLLOTON: That was my recollection.

THE COURT: Well, just in case so that we have a clear record, I assume you're now offering them?

MR. COLLOTON:  If they haven't been offered, yes. They were Exhibits 42 and 42B.

*   *   *   *

(Plaintiff Exhibits 42 and 42B were offered.)

*   *   *   *

THE COURT:  42 and 42B.  And, Mr. Parrish, you're objecting to them?

MR. PARRISH:  I am still objecting, Your Honor, that's correct.

THE COURT:  And while they're on the outer fringe of relevancy, I'm going to go ahead and admit 42 and 42B.

*   *   *   *

(Plaintiff Exhibits 42 and 42B were received.)

*   *   *   *

THE COURT:  Those are all the housekeeping matters I have.  Now why don't we turn to the numerous guideline issues that we need to resolve.  Why don't we start with drug quantity.  And I thought the approach that we would take would be just kind of go through issue by issue and I'll hear argument from counsel and then I'll resolve the issue, and we'll just go through all the contested guideline issues.  I think the first one is the base offense level and the drug quantity.  So, Mr. Reinert, are you going to take the leading oar on that one?

MR. REINERT:  Yes, Your Honor.  Since Mr. Colloton

had to fight the battle one day last week, I think I'll carry on from here. I think I'd like to address the quantity issue in a couple steps. I think that will assist the Court in walking through this.

Mr. -- and during the course of our discussions, I will have some discussions regarding credibility of witnesses. I'm not going to hit inordinately hard on it. The Court has seen these witnesses testify and can compare their testimony with all the other documentary evidence. We have filed an extensive brief on the law as well as some factual cites from the transcript, so I'm not going to belabor a lot of points because I know the Court does have a number of questions on some of these issues.

Mr. Cutkomp testified that they had produced approximately 2.1 kilograms of methamphetamine and specified who they had delivered it to. And, in fact, when we seized some of the methamphetamine, it was 97 percent pure. The defendant claims that they cut that and actually cut it by up to 75 percent. That is a credibility issue that the Court's going to have to determine.

In fact, the drugs were seized, and the defendant said he distributed the drugs in the lab bottles to Mr. Nicholson. Even the defendant admitted that, and we seized the lab bottles there. We seized a lab bottle of similar type at the defendant's residence when we did the

search in the lab. The case law allows that purity to be extrapolated across the unseized quantities. The defendant, even in his statements where he says they cut the methamphetamine, he's indicating that the methamphetamine was highly pure when it was manufactured, so he does have that as an admission as well.

Regarding the bottles themselves, there were four bottles seized, and you can look at the photos of the Nicholson search. I don't recall the number off the top of my head. One of those bottles was half full. It's reasonable in a very conservative estimate to simply extrapolate from that seized quantity and see how it compares with what Mr. Cutkomp testified. At half full, just 4 bottles would be 575 grams of methamphetamine.

Now, we know from the tape between Mr. Nicholson and the defendant in March of '93 that Mr. DeGeus was getting a similar quantity than -- as Mr. Nicholson, and we have the drug note that also corroborates that drug debt. We do have an explanation from the defendant regarding Mr. DeGeus's debt being an old debt. The Court's going to have to make a determination whether that makes sense for someone to have an old debt that he carries around on his person, an old drug debt with a person he's dealing with but then a new debt from a new individual, that when you make a payoff there's a notation made on that debt, whether that's a reasonable

statement made by the defendant. In the United States' view that is not reasonable that that drug debt on the T-man, G-man note was a debt to Mr. DeGeus -- by Mr. DeGeus for methamphetamine. So doubling that quantity just on the half full bottles would be a total quantity of 1,186 grams.

The defendant indicated he didn't know for sure if the bottles were full or not as they were brought up. Looking at that quantity full, since you have one bottle half full, simple mathematics would result in a total quantity for both DeGeus and Nicholson to be about 2.3 kilos. Actually it's 2,373.44 grams if my math serves me well. This was simple multiplication, so I might have gotten that one right because full would be 296 grams per bottle times 4 bottles would be 1.186 kilos for Mr. Nicholson. The tape indicates DeGeus got an equal amount. Doubling that, it would be 2.3.

And that corroborates very closely Mr. Cutkomp's testimony that they produced 2.1 kilos of methamphetamine. So -- and that's even assuming we were able to seize all of the bottles that Mr. Nicholson obtained. I'm not sure that we can say that we seize everything that we should seize or can seize, so I think that would be a conservative estimate, but that corroborates Mr. Cutkomp's testimony significantly that they produced 2.1 kilos in Arizona utilizing this same method of production.

The more troubling issue and I think the more

difficult issue is how to approximate a quantity on the lab. This is not the way the lab should have been done. Mr. Meyers should have seized samples from every vial, every liquid, every powder, and he should have tested it all, and he should have had it. Why that didn't happen we don't know.

THE COURT: You know, he's relatively poorly educated in terms of what you would expect from a chemist, but he certainly had the years of experience that -- you can overlook the poor education, but the years of experience didn't seem to teach him much about how to handle this type of situation. It's pretty troubling to me --

MR. REINERT: Well, I thought about --

THE COURT: -- that these things weren't tested.

MR. REINERT: I thought about that as well.

THE COURT: I'm sure you have.

MR. REINERT: And one thing that kind of dawned on me as I was driving up last night, if you look at Mr. Meyers' experience in the lab, the vast majority of his experience is on the analytical in the lab itself. He had not actually done the evidence collection as -- very frequently. I believe he testified as to how many labs he'd actually gone on. I don't have that off the top of my head, but I'm sure the Court has that in its realtime transcript.

So I think part of that, he was an experienced chemist but perhaps somewhat inexperienced in the job what

the agents usually do which is the seizure of the evidence.

But be that as it may, I'm not sure -- on the toluene can itself, just focusing on that issue which I think is appropriate, we have Mr. Cutkomp testifying that they obtained this five-gallon can of toluene for the purpose of manufacturing methamphetamine. It was full. The record would support a finding that it is of substantial purity. They were also taking steps to purify the substance as they went along doing distillations and things of that nature. So any impurities that may have been in the toluene, albeit a -- whatever amount that may be, I would suggest it probably would not be a great amount of commercially produced toluene sold as a brand name, but those distillation processes would offset any impurities that would have been in there or at least take care of a portion of them.

THE COURT: Well, let me ask you about that. What evidence is in this record that a distillation was done to remove the impurities, if any, of the toluene?

MR. REINERT: Not of the toluene but of the next steps.

THE COURT: Well, what evidence is there in the record that the distillation of the next steps would have solved any of the problems created by any impurities in the toluene? That's kind of a leap of chemical faith that isn't really supported by any testimony in the record.

MR. REINERT: I could be wrong, Your Honor, but I believe both chemists talked about distillations being run specifically to take out the target substance. And if you've got a -- he talked about -- Mr. Moriarty I think drew the diagram up on top there. If you've got a target substance and you've got an impurity in there that reacts, it's going to create two substances and then the distillations's -- I believe Mr. Moriarty and Mr. Meyers both talked about -- run at temperatures where the target substance comes off at a particular temperature.

So the first -- the first third might run out on the distillation, and that's waste product, and then the next third that's at the next temperature gradient is your target substance, so you pull that out. Well, the impurities that might react early on will create a different target substance than the one you're looking at. So the distillation process will remove a substantial portion of that.

There's -- of course, nothing's perfect. You can't get everything out. That's why we don't talk about maximum theoretic yield. You can't get everything out of the substance because it's wet chemistry, but I think there is support in the record to show that distillation processes will clean up problems in an earlier step.

The can -- whether the can was half full or half empty or partially full or totally empty, I don't think the

record would support a finding that it was totally empty. The only person who testified about that was the defendant. The defendant for a number of reasons the United States suggests has credibility concerns, and Mr. Colloton will cover that in more detail toward the end.

But I would like to address one issue he talked about. He said he never saw any toluene in the can, that the toluene always came -- that Mr. Cutkomp brought it in flasks. This is a clandestine drug operation that was set up in Mr. Honken's garage. Is it reasonable for the Court to assume that these co-conspirators are going to take the primary chemical they need, leave it somewhere else, dump it into glass flasks, and then carry the flasks over? That's just not a way that a person's going to transport a solvent like that. They're not going to transport a chemical like that. They're going to bring the big five-gallon can, and they're going to dump it where they need it, put it in the place where the lab's going to be.

THE COURT: But wouldn't it be logical to assume if that's the case that they'd at least put the cap back on the toluene can?

MR. REINERT: Well, now, the photos that were shown to -- there were the photos that were taken after the toluene -- after everything had been seized. Those were the photos that were taken outside, the 204, 205. The Court can

notice all the stuff that's sitting on the ground before it gets picked up by the hazardous waste company. So whether -- and we looked through the photo book to try and find a better photo of the can as we found it in there. We found a photo, but there's a shadow over the top of the can so you can't tell for sure if there's a lid on it.

So the fact that the lid wasn't on in the photo that shows everything stacked out being ready to be picked up by the disposal company really doesn't cut one way or the other because they had to open it -- Mr. Meyers even said he had to open it to smell it, to use his olfactory test on the toluene. So it had to be opened at that point. Whether they put the lid back on, didn't put the lid back on --

THE COURT: He didn't testify he took the lid off.

MR. REINERT: He testified he smelled it.

THE COURT: That's right. What if the lid was already off and it had evaporated over a period of time? I mean, there are a lot of unanswered questions about the can of toluene, but it's certainly not a reasonable inference and it's certainly one that I don't find reasonable that there was a cap on it and somehow the agents took the cap off, forgot to put it back on, and that's why it's uncapped in the 205, 206 series. That's not an inference that's reasonable.

MR. REINERT: And I'm not sure it's a reasonable inference to say the cap was off at all times. I don't think

the Court can really draw an inference one way or the other on the cap on the can.

THE COURT: I think I can draw the inference on the day the pictures were taken there was no cap on the can. How long it had been off I don't know.

MR. REINERT: At least on those later photos. Since the earlier photos you can't see the neck of the can when it's in place, you can't draw an inference that it was never -- that the cap was not on during the whole day. At least during part of that day I think the Court can --

THE COURT: Well, sure I can, because if you had an agent that took the cap off, I would expect the agent to be here and testify about that. That wouldn't be unreasonable to me to expect that.

MR. REINERT: I understand that, Your Honor. I'm not sure the Court would have to make that inference, but I'm sure the Court probably could if it chose to. But whether -- I think a more base question is does that make a difference because when you look at the case -- most of the cases that are out there on lab cases do talk about the seized chemical, and you extrapolate from there. Now, many of those are cases that are early on in the production process. In this case the five -- I think it's appropriate to use the full five gallons as a starting point because the five gallons was consumed during the course of -- at least in part during the

course of the conspiracy. Mr. Cutkomp testified, if memory serves me, one to four liters were used on each of the first four runs. Now, if my metric conversion's correct, that would be about three gallons that was consumed during the course of those first few attempts that were failed.

THE COURT: Can you help me out as to your recollection of the record? Is there evidence as to why the first four runs failed?

MR. REINERT: I think there's a reasonable inference as to why that happened. There's discussions where I think Dr. Moriarty and Mr. Meyers talked about these reactions being very temperature sensitive. This is in a garage in a house that is not heated. They had -- and it was in January or, you know, the winter in Iowa. You can see in the photos there's snow on the ground. They're using -- there were a couple space heaters out there in an attempt to heat the garage. When -- and even the defendant said there was problems with things, with water freezing, items freezing, breaking glassware, breaking things which would, of course, ruin the experiment.

So since these are temperature-sensitive reactions in an unheated-type garage or a poorly heated garage -- oh, and Mr. Cutkomp I believe testified starting at 241, discusses some of the problems. He says they were having problems making -- they were trying to make their own

chlorine gas initially and then they were having difficulty with the sodium metal reaction.

THE COURT: Where were the chemical compounds that were created by the first four runs? Were they seized in this seizure?

MR. REINERT: I think they were seized -- it's difficult to tell because --

THE COURT: It is.

MR. REINERT: -- the -- in part it's just the nature of the failure.

THE COURT: Were they tested by your chemist?

MR. REINERT: Yes, because remember the kerosene cans where Dr. Moriarty talked about the kerosene can having multiple different substances seized, multiple different -- some target substances, some waste product seized out of the kerosene cans. Those were tested. That was in Exhibit -- it's in Exhibit 24. For instance, it's the last page of the attachment, has the summary of the analysis of what was tested. And Agent Meyers and I think Dr. Moriarty also talked about it. I believe it was 4 and 5 were reaction by-products, and the defendant even admitted that they weren't dumping anything down the drain. They were dumping their reaction by-products and their failures into these cans that they had.

So there was -- the kerosene can which the defendant

even said was full, it was full of reaction by-products and failed attempts as they went through. So it would have a number of the different substances remaining in there.

THE COURT: Well, now wait a minute. On attachment 2 of your chemist's report --

MR. REINERT: That last page, Your Honor?

THE COURT: Yes.

MR. REINERT: Uh-huh.

THE COURT: -- which exhibit numbers there do you claim were by-products of this five-stage process? And I realize you have a superior knowledge of chemistry than the rest of us, but I'm not --

MR. REINERT: I wouldn't count on that, Your Honor.

THE COURT: I'm not asking for your opinion because, of course, opinions of counsel aren't evidence. I'm asking for the evidentiary basis in the record as to which of those exhibits the government contends constitute stages of the five-stage process that would be attachment 1 of your expert's report.

MR. REINERT: As I recall from the record, Agent -- Mr. Meyers testified that Exhibit -- whichever exhibit came from the kerosene can; I believe that was 4 -- 4 and 5 and 9A and 9B were also -- that came from the biphase solution where part came from one part of the solution and part came from another, and those would have been -- so 9A and 9B was one of

the waste products we talked specifically about with Dr. Moriarty. And I believe we talked about 4, 5, and I'm not sure if we talked about 8 or not, that those would be also evidence of reaction by-products. We also talked about the phenylacetic acid which is Exhibit Number 15. That was the white powder that was on the spoon that we showed in the photo which would have been the result of a completion at least of the third step on one occasion. So these failed attempts are getting dumped into a vat in essence, going to be disposed of at some point later.

THE COURT: Let me ask you something about the failed attempts. Do you have any cases that say you can take the failed attempt chemicals and use those to determine production?

MR. REINERT: You mean using only the failed attempt chemicals, the -- let me -- you mean using only the by-products that you find?

THE COURT: Right.

MR. REINERT: No, and you're not going to find any cases like that because it's like using a reaction by-product and then trying to use that to measure production capacity. The chemists will tell you that's impossible. It's like -- because the reaction by-products are what's drawn off after the target substance is withdrawn. What's taken is used or withdrawn from the solution so all you have is what's left

over. It's like looking at the water coming out of somebody's house or the sewage coming out and determine whether they're eating a well-balanced diet. It's too far down the chain to do an accurate production assessment based upon the use of the by-products or the seizure of the quantity of by-products in and of themselves. But when looking at the production capacity, the Court has to make a reasonable approximation of the quantity.

The cases that we've cited in our brief as well as Wagner and Beshore -- Beshore I believe we cited in there where it's 961 Fed. 2d, 1380; Wagner we cited in our brief; Fulcher we cited in our brief as well as Funk which are all Eighth Circuit cases. When you've got inexperience, use of inexperience, as a way to reduce production capacity, the courts -- the Eighth Circuit in those cases has found that the Court does not have to factor in inexperience.

THE COURT: Well, I've got a case that says just the opposite. It's United States versus Cole. As a matter of fact, they reversed the district court for failing to take that into consideration. You'll find it at 125 F. 3d, 654. It says exactly the opposite of what you just told me, exactly.

MR. REINERT: I missed that case, Your Honor. I'll have to look at that case.

THE COURT: Now, maybe I'm misreading the case.

MR. REINERT: I have not -- I did some research again last week and must have missed that case, and I apologize, Your Honor.

THE COURT: Well, we can't all find all cases.

MR. REINERT: I try, though, and I'm frankly embarrassed that I missed that case.

THE COURT: But as I read it, this case involved a cooker of methamphetamine who had four to five years' experience, and he testified about much lower yields than what the government chemist testified to, and the Eighth Circuit said it was reversible error not to consider his testimony if the Court were to give it -- the Court didn't consider it, but if the Court were to give credence to it, it was reversible error not to consider the fact that he was a lousy cooker of methamphetamine and had a poor yield rating.

MR. REINERT: Well, and I noticed -- I reread Funk last night which happened to be one of my cases, and I notice they pointed out that the defendants made some serious contentions that it should have been reduced because of it, and that was one of the more recent cases, and the Court never said that you couldn't take that into account. They just basically said, well, the judge -- these people were experienced and just kind of went on from there.

So perhaps the case law has taken a little bit more of a turn to take that into a factor. And actually the

earlier cases say you don't -- it's not driven -- even Funk says it's not driven by a single factor but a multitude of factors that the Court has to look at in determining production capacity.

THE COURT: As a matter of fact, here's what the Court said. The district court found Cole's testimony -- he was the defendant methamphetamine cooker -- irrelevant, erroneously turning the inquiry into what an average cook was capable of yielding -- that's what the expert testified to -- not what Cole could have produced based on the seized chemicals. In doing so the district court committed error. We therefore remand the case so the court can apply the correct standard in evaluating Cole's testimony in determining drug quantity.

So here's kind of my question for you. If it's error to not consider Cole's poor cooking, to what extent should I consider the fact that there were four runs that didn't result in any methamphetamine being produced? And how does that factor in?

MR. REINERT: That's an interesting question because, first of all, you're looking at -- some of the cases talk about -- a number of the cases that deal with attempts and conspiracies in the meth manufacturing area were written under 2D1.4, the attempted conspiracy section under the old guidelines. That guideline changed in about '92 and actually

took that guideline out. And there was a specific -- that note itself, that guideline itself, directed that the Court needs to sentence an attempt or conspiracy as if the attempt or conspiracy was completed.

So to a certain extent, some of the cases that were written under 2D1.4, although the commission said it just clarified it, it didn't change the law, some of those cases since we don't have that specific direction now, there may be a little more latitude on that, on whether you look at the completed offense to determine an approximation or you look at the steps along the way.

I think as a matter of course the Court is going to look at -- is going to look at the district court and require it to look at the completed offense as to what was their object of the conspiracy, what was the object of the attempt, what were they planning on doing.

THE COURT: Well, if that's true, what difference would it make whether Cole was a good cooker or a bad cooker? You'd just look at the total chemicals and you wouldn't even reach the question that the Eighth Circuit said was reversible error.

MR. REINERT: Well, I think it goes back to --

THE COURT: And that's what gives me trouble.

MR. REINERT: I don't think that's an irresolvable dispute, Your Honor. I think it goes really more toward --

and it's application note 12 I think, application note 12. Now, there was an earlier case when we were still operating under 2D1.4. I'll find it. Actually Fulcher, when we were still operating under 2D1.4, there was the application note on negotiated offenses saying you don't include the quantity -- and I'm sorry. Before I get to my argument, I'll point the Court out to the portion of application note 12.

THE COURT: Was that the one that ends in, Or was not reasonably capable of providing?

MR. REINERT: Exactly. That application in Fulcher, the Eighth Circuit said you don't look at that application note in a meth lab case. Well, it sounds like the more -- this more recent case has changed that and said you do have to look at whether they're reasonably capable of producing it but in the attempt, what were they reasonably capable of producing versus what did they actually produce.

Since Mr. Honken had the experience and Mr. Cutkomp had the experience in manufacturing methamphetamine in Arizona using this method, they clearly were capable of producing a large quantity of methamphetamine.

Now, as anybody who's -- I'm capable of trying a real good case, but sometimes I fail. Sometimes I pin myself in in corners. It just happens. No matter how good you are at your job, you're going to have failures. So what was the defendant reasonably capable of producing is a more theoretic

approach to what could the defendant have done not necessarily in a perfect world but in a reasonable methamphetamine cooking environ.

THE COURT: And that makes sense when you seize a five-gallon full container of toluene, you know, compute the theoretical abstract and then apply the practical yield and you get a result. But here you have a situation where they made four runs and failed. And I'm not sure I understand the government's position as to how that factors in. If you tell me it doesn't factor in at all, then I have a hard time understanding this Cole case. If it factors in, how does it factor in? And I don't pretend to know. I'm just asking the questions.

MR. REINERT: And always the hard questions. Since I haven't read --

THE COURT: Would you like to read it? It's a very short opinion.

MR. REINERT: I'd like to skim it real quickly.

THE COURT: Because you might have a different take on it than I do. And I should have a copy for Mr. Parrish, but I don't, and so when you're done, you can give it to Mr. Parrish to read. As a matter of fact, I'll tell you what. It's ten to noon. Why don't we do this. Why don't I have copies made for counsel which I should have done, and we'll take our noon recess and start back in at one o'clock.

MR. PARRISH: Your Honor?

THE COURT: Yes.

MR. PARRISH: May I also share a case that I pulled on an issue that I'm going to argue, and can we have it copied with regard to sentence manipulation?

MR. COLLOTON: Can you just give us the cite, Mr. Parrish?

MR. PARRISH: It's quoted in a case -- U.S. versus Angela Nolan-Cooper. It's 957 Fed. Supp., 647, 1997 case, and I'm referring to page 14.

THE COURT: A Fed. Supp. cite?

MR. PARRISH: Yes, Your Honor. Do you want me to read that again? It's -- oh, I'm sorry.

THE COURT: 957?

MR. PARRISH: Yes, 957 Fed. Supp., 647.

THE COURT: And what's the issue in that case that you --

MR. PARRISH: The sentencing factor manipulation where an agent engages in improper conduct and has the effect of increasing a defendant's sentence.

THE COURT: Okay. I'll take a look at that.

MR. PARRISH: It's on page 14.

MR. COLLOTON: You mean of the Westlaw --

THE COURT: And we'll get a copy of this Cole case made for counsel, and then we'll reconvene at one o'clock.

But on this drug quantity thing so that you can both understand what troubles me is I understand the cases to say when you seize these chemicals you look at what the lab reasonably could have produced with the chemical. At least that's kind of my paraphrase of it. But I haven't really found a case where there were multiple runs that failed and how you should treat that fact in terms of figuring out the reasonable production capacity of the lab. One way to look at it is if they kept doing what they had been doing, they wouldn't have made any. That's one way of looking at it.

MR. REINERT: Not necessarily, but that could certainly be a way to look at it.

THE COURT: Or at least maybe it ought to be -- another way of looking at it would be for the 75 percent of toluene that was already used they didn't make any. For the 25 percent that was left in the can, if that's the figure I ultimately determine as to what was in the can -- it would have been helpful had the government weighed it and measured it and tested it so we actually knew it was toluene. But setting aside all of those problems, assuming I find that there's 25 percent toluene left in the can, should I just assume that they somehow would have cured the error of their ways, figured out how to manufacture it, and made it as well as Mr. Meyers claims he could have made it in his lab? Is that the assumption I should make?

MR. REINERT: Well, I think there's another way to look at it, Your Honor, too.

THE COURT: Okay.

MR. REINERT: And we'll discuss more later --

THE COURT: Why don't you just tip me off so I can think about it.

MR. REINERT: I think the other way to look at it is remember the defendant -- even the defendant's expert said -- now, he took into account experience and conditions. He said 0 to 10 percent would be the yield. Now, that -- he said that would take -- that takes into account failures, so their expert took into account some of those failures so the Court may be able to look at it and say those first few runs were the failures that reduced it down from the 17 percent Mr. Meyers talked about. That may be an approach to look at it as well.

THE COURT: Except that while -- I don't necessarily disagree with your analysis that you ought to discount the failures. Those numbers don't make any sense as you've postulated them to me, and here's why: Seventy-five percent of the toluene has already been used and not yielded any methamphetamine. So even if there was 25 percent left that could produce the maximum 17 percent practical yield, we're talking -- that's only with regard to 25 percent of the toluene. So while that would yield a number between 0 and

10, it would be closer to 0 than to 10.

MR. REINERT: It would be what? Two, three percent probably?

THE COURT: Yeah, it would be.

MR. REINERT: So -- and that's true. It would be closer to 0 which Dr. Moriarty indicated 0 to 10, and I think ultimately when the Court pinned him down he said with more experience he might get closer to 10.

THE COURT: Here's what I understand the 0 to 10 to be. If these two guys, Cutkomp and Honken, started with a full gallon of -- five gallons, their practical yield would be 0 to 10. He didn't say that having failed 4 times using 75 percent of the toluene the total production would be 0 to 10. That isn't what he said. That isn't what he said. And --

MR. REINERT: I'll have to look at my notes. I don't specifically recall.

THE COURT: I've reread his testimony very carefully. That isn't what he testified to. But anyway, we'll take it up. It's a fascinating question.

MR. REINERT: It is.

THE COURT: And I don't know of an answer in the case law, but we'll have to come up with one, at least for district court purposes.

MR. REINERT: And one other issue -- one other thing

the Court might want to just think about, and it also -- I get some of my better thoughts when I drive I think. Some of the cases under like Fulcher and Wagner, those older cases, when they talked about the production capacity was set when they started the venture, in essence, that was their intent, maybe intent is a way -- is another way, another factor the Court needs to look at. When they started with five gallons, they intended to make X amount.

THE COURT: They intended to make as much as they could with those five gallons. They hoped at least -- maybe hope and intent are two different things. Their hope was to produce that 17 percent figure. What their intent is you don't know. Obviously to maximize the production. But the problem with intent as the measure, that kind of undermines I think this Cole case.

MR. REINERT: I don't think that there's a single factor that's going to control this issue, Your Honor. I think -- and even the other cases pointed out their most abundant precursor. Even in Funk they specifically said it's not going to be driven by a single factor. It's going to be driven by a multitude of factors. But I think the defendants' intent when they start the venture, what they anticipated getting with what we have, for example, from 8P, the note we seized from the defendant's locker, what was their intent, what were their abilities, what were their

experience, were they going to be able to correct some of their mistakes which they learn along, I think those are all factors that the Court can take into consideration in reasonably approximating the quantity. And that's -- in a lab case, maybe even more so than a lot of other cases, that's really what it is. It's a reasonable approximation.

THE COURT: Okay. Thank you. We'll see you all at one o'clock. And if you just wait in the courtroom for a moment, we'll get you copies of this Cole case. It's very short, just two-page per curiam opinion. Thank you.

(Lunch recess at 11:59 a.m.)

THE COURT: Please be seated. Mr. Reinert, did you want to wait for Mr. Colloton, or do you want to proceed?

MR. REINERT: We can proceed, Your Honor.

THE COURT: Okay.

MR. REINERT: I read Cole over the noon hour, and I thank the Court for pointing it out to me. It occurred to me why we didn't find it, and it also occurs to me why there's going to be a problem at the circuit with Cole. It doesn't cite any of the earlier cases. It doesn't distinguish the earlier cases. It doesn't do anything with them. So now we have two panel decisions on the same issue going what appears to be, could be in different directions.

THE COURT: Which they can't do by their own policy and custom knowingly; right?

MR. REINERT: Exactly, so it becomes -- that's -- how this case is dealt with on -- ultimately at the circuit is going to be the interesting issue. But in -- the Court is correct. I think the Court correctly interpreted Cole. They said that it would -- saying that it's irrelevant turns it into what the average is and isn't what can be based upon this lab that basically directly the Court had to consider that. So now Your Honor's in a dilemma from the Eighth Circuit on how to deal with these issues. And Your Honor's going to have the first chance I think to attempt to resolve the disputes between the cases and come up with some sort of reasonable interpretation of how those cases can fit together.

And I think one way to do that -- I always try to raise a problem and then try and raise the solution if I can -- goes back to the Fulcher. Fulcher is the 943 Fed. 2d, 824. That's an abandoned lab case where the individual started the lab up and abandoned the efforts. No meth was ever produced. And they sentenced it based upon what could have been produced and production capacity of the lab even though there was zero produced and there was never going to be any produced. You can look at that as one great big failed effort, but they still sentenced him based upon that reasonable production capacity. So I think that's one way to look at the failed efforts, that in Fulcher they looked at

the failed or abandoned efforts in that case and still scored them.

THE COURT: But you used the phrase reasonable production capacity. Is it proper to consider four failed runs in determining the reasonable production capacity?

MR. REINERT: I think it is because you look at the -- first of all, this is an attempt and conspiracy which raises or expands the scope of criminal culpability to a certain degree and some would say a large degree where the conspiracy focuses on the agreement to commit the crime. That's -- the crime is the agreement itself. No acts in furtherance ever be taken -- ever need be taken to be guilty of the conspiracy.

So you look at failed efforts as acts moving forward. And, in fact, we've had testimony in the record about the failed efforts and then the remedial actions taken to correct those, whether it be having heaters out there for a time when it was very cold; the production was moved inside for temperature inside the kitchen. So those kind of remedial efforts were moving them forward because they now ultimately did get to the end of stage 3 and maybe even partially to stage 4 with the use of the tube furnace.

So those remedial actions were being taken and shouldn't -- when one has to approximate the scope of the criminal activity, shouldn't a defendant who attempts and

works hard at his craft on multiple occasions, isn't that defendant -- shouldn't that defendant be treated more culpably than the defendant who tries once, fails, and stops and is caught versus the one who keeps at it and is more tenacious? I think in factoring in the failed attempts or the bad results at least when they went through is appropriate in approximating the production capacity because the guideline says look at the production capacity of the lab which is the -- overall it says size or capability of the lab involved.

THE COURT: Well, if that's true, why do you -- how do you square that with the Cole case because why would they ever look at the fact that Cole was a poor manufacturer of methamphetamine and not just look at what the lab could have produced?

MR. REINERT: I think that gets to a very fact-driven issue for the Court of -- they should be -- the failed attempts should be assessed at some amount. Should they be assessed -- and this is a question -- I'm not sure exactly what the answer is to this question. Should they be scored at the full production capacity that this first attempt should have produced X amount, or should it be produced at -- should those four failed attempts be factored in by looking at the overall amount and then -- the overall amount potential -- potentially producible and scaled back?

And I think -- what's the best way -- I think a good way to think about it to start with is to first start with -- and I suggest the Court should make findings on these issues as well -- first make a finding on the maximum theoretic yield. That is the absolute most that in theory could ever be produced and in actuality could never be produced because it's pure -- it's pure dry chemistry. There's no mixing of chemicals. But I think that's an important factor to look at because it gives a starting place at least to begin the analysis. It's a scientific known maximum.

Then on the practical yield -- because the practical yield is expressed as a percentage of the theoretic -- the Court should then make a finding on the practical yield that we've talked about going through which was the 17 percent figure. Then -- and that's assuming production all the way through. And now under Cole it looks like the Court needs to consider experience and maybe even -- although Cole didn't deal with problems encountered, it did in kind of a circumspect way. The Court has to look at, I think, all the cases to determine is Cole really a good case. It's the most recent, but it is a bit of a departure from the earlier cases. I think they can be resolved, but I'm not exactly sure how. It's a very -- it's a very difficult issue to try and resolve those two lines of cases because the old cases really went all the same way. This is the one different one.

THE COURT: It seems odd -- I mean, it seems you get like convoluted results because if you give full weight to the failed attempts, then someone who's unable to produce it gets a higher score than Cole who was not a very good cooker. So the worse the cooker you are, the higher your total offense level. That doesn't make any sense.

MR. REINERT: Now, that's assuming that the Court were to adopt Cole's testimony.

THE COURT: That's true, yeah.

MR. REINERT: So, I mean --

THE COURT: Well, of course, that's an assumption in the whole case.

MR. REINERT: Right.

THE COURT: Right.

MR. REINERT: The Court -- and I think the concurring dissenting opinion by Judge Beam pointed out that he thought that the district court basically just rejected -- considered and rejected the testimony and adopted it which certainly could be the result once it gets back for resentencing as well. We just don't know how that's going to wash.

So I think perhaps the way to resolve the issue, all the earlier cases that deal with the production capacity, they do cite the -- they all rely on the language of 2D1.4 which has been subsumed into 2D1.1 but not in quite that much

clarity. So maybe that's the answer, that the change between 2D1.4 and 2D1.1 has resulted in giving the Court a little more latitude. Unfortunately Cole doesn't say that. If Cole said that, I think we'd have a lot easier way to look at the issue.

THE COURT: So what's your position now as to the drug quantity on the lab? Do you have a specific articulable position as to quantity?

MR. REINERT: What I would suggest, I think it needs to be a little bit of a two-stage approach again looking first at the base offense level or where you would come out of the base offense level or the quantity historically, rather, with Mr. Cutkomp's testimony. Mr. Cutkomp looks at -- says about 2.1 kilograms of cocaine. The next break point in the guideline is --

THE COURT: Well, just a second. I don't think that's a proper way -- I mean, I think you have to make the call independently and whatever they add up to they add up to. You know what I mean?

MR. REINERT: I think that is one --

THE COURT: I don't think you look at break points in terms of figuring out how to calculate because that's results oriented which I am not. I'm process oriented. I think you have to make the calculations. You make them, and the chips fall where they land in terms of the calculations.

So let's just stick with how you -- your position as to how I ought to compute the meth lab, and then we can come back to the historical quantities.

MR. REINERT: If I could just finish that point.

THE COURT: You can, you can, and I did interrupt you.

MR. REINERT: I think I can answer the Court's concern on that, and I wasn't intending to say it should be result oriented. But regarding the finding that needs to be made on the meth lab, their -- the specificity of the finding is driven by the question that's being asked. Here we're talking about an approximation of the controlled substances, so let's just assume for argument that the Court were to credit two kilograms to Mr. Cutkomp. The Court then looks at this meth lab, and there's a range of -- under the practical yield it would be about 5.6 kilograms down to apparently 0 under the defendant's expert theory. Now, somewhere within there is the finding the Court needs to make.

I have seen some judges in the past -- and I think it's appropriate in some cases -- to look at all of the facts since we have to make a base offense level on everything and say I find this amount and on -- and I also find an additional quantity of at least X amount is easily attributable to the meth lab. As long as the quantity that the Court found was more than that difference of about nine

hundred and some odd grams, I'm not sure the Court would have to make a specific finding of, you know, 1.2, 1.3.

So I was simply pointing out the specificity of the finding is not necessarily -- can be looked -- you can look at that in the guideline sense as to whether it makes a difference.

And the contrary can be said as well. I find that -- if the Court were to find that it was less than that break point between the next higher level, the Court can say, well, given all of this and make that finding without coming to a precise quantity on the laboratory. So the specificity of the finding is sometimes driven by the break point.

When you look -- now, the defendant's expert did take into account -- Mr. Meyers when he testified looked at practical yield and did not take into account the failed efforts. I think the failed efforts should be scored but perhaps not fully as being as meth would have been produced because I think the defendants need to be rewarded for their tenacity to some extent. Even in the 0 to 10 percent range --

THE COURT: Punished for it, not rewarded. In terms of punishment and rewards, we're talking punishment.

MR. REINERT: That would be true. That would be true.

THE COURT: Okay.

MR. REINERT: They need to reap what they've sown at least on those attempts.

THE COURT: It would seem odd that it should be less than someone who abandoned it.

MR. REINERT: And that's true -- that's the troubling part of not fully scoring the failed attempts is someone who abandons it gets fully scored. And I --

THE COURT: On the other hand, somebody who tries to make it and can't ought to get less than somebody who could achieve the practical yield it seems to me.

MR. REINERT: Now, looking at the -- let's just -- that's true. Now, looking at the experience factor, in this case I think the Court can make a finding that Mr. Honken was an experienced meth cooker. He was experienced in developing the production process. They ran a long-term production process in Arizona, moved the lab a couple times, set it up again, were able to produce substantial quantities which are credible. This one is -- this lab was set up in a different environment, and I think the environmental factors are the most important with the cold.

Now, this defendant was soon coming into spring when he wouldn't have that huge temperature gradient as well during the -- had the conspiracy fully played out. So when the Court looks at the production capacity, I think the Court could take into account the defendant's efforts to move that

forward. There's always going to be failed efforts in a new venture, but the defendant needs to be accountable for those actions.

THE COURT: But isn't it true that you, rather than Mr. Meyers, has suggested that it was the temperature that led to the failed runs? I don't recall Mr. Meyers saying that. Did he?

MR. REINERT: The record established that some of these -- I'm making the inference from the record that's been established.

THE COURT: The record was that some of the procedures are temperature sensitive.

MR. REINERT: Exactly, and the record also shows that we're in a garage in Iowa in winter and they've got space heaters out there which obviously means it's not a heated garage other than by the space heaters. And common sense would dictate that space heaters don't do a great job of heating a whole garage area to keep it at a steady temperature which could have the effect on it, and I think that's a reasonable inference from the record that has been established about the temperature-sensitive nature of some of the reactions.

THE COURT: Well, which reactions were temperature sensitive?

MR. REINERT: I don't recall specifically, Your

Honor, which Mr. Meyers talked about. As I recall, he did mention specifically, but I don't have that off the top of my head. But there was discussions about some of those being -- and I believe even Dr. Moriarty mentioned that some of those were temperature sensitive as well.

Even within that -- even taking the defendant's expert, I think we need to start with the five gallons of toluene. I think there is adequate record for the Court to make a finding of five gallons of toluene. And the Court pointed out early on what if the Court said -- made a finding that there was 25 percent of that 5 gallons left and just assumed that that would be at the 17 percent because they were now further down the path? That certainly could be a reasonable finding which would result, if my math is correct, at about 1.4 kilograms for the laboratory. At 10 percent, which would be off the 5 gallons, it would be about 3.29 kilos, simply doing the math off the theoretic yield.

If the Court doesn't score at least the failed attempts, I think then we set up another conflict with Fulcher where the person who abandons the effort gets the full sentence which will end up creating more of a problem than it solves because Cole is somewhat inconsistent already, and I'm not sure following Cole to that extreme is prudent in light of all the other cases.

So I would suggest the failed attempts should be

scored consistent with the earlier cases. However, the quantity that would be produced -- maybe this is a way to resolve it. The quantity that would be produced by these failed efforts and by the successful efforts could perhaps be reduced by experience. Maybe that's the way to resolve the apparent conflict between the cases. That way the Court takes into account the experience of the operators in doing so. So the United States would suggest --

THE COURT: Reduced by how much?

MR. REINERT: That's one of those findings of fact issues that -- that's up to the Court's prerogative. I think the record is --

THE COURT: Well, give me a principled analytical methodology to make the reduction.

MR. REINERT: I'm not exactly sure -- I've been through meth lab cases a few times before --

THE COURT: This is my first one, so I'm at a disadvantage.

MR. REINERT: It's -- Funk -- I'll go back to Funk because that was one of my cases.

THE COURT: It was your case.

MR. REINERT: And in that case they looked at was it the least abundant precursor or the most. They were arguing they should use the least abundant precursor, and the Court said, no, you look at the most abundant precursor and fill in

the rest. But in doing so the Court said you don't focus unduly on a single factor. If you looked at the least abundant precursor, you would focus on a single factor, and I think in the case of here where now the Court has said we need to look at experience, I think it's the same thing. It's one of the factors that the Court needs to take into account, the production capacity, their past experience, their current difficulties. All of those are factors that the Court needs to take into account in coming to its conclusion.

We would suggest at a bare minimum there's more than a kilogram that was going to be produced and would suggest that the 17 percent yield would be appropriate if the Court chooses to reduce it somewhat even using the defendant's figures of 0 to 10 percent, a yield of 4 percent off 5 gallons -- now, this again is if my math is right. I took the 32.9 kilograms and multiplied times -- or I'm sorry. I took the -- right, the 32.9 kilograms and multiplied that times 4 percent.

THE COURT: Isn't that 1.316?

MR. REINERT: Yes. So apparently my math was right. So a 4 percent yield in looking at Dr. Moriarty's testimony, he said as they worked and got more experienced it would be upwards closer to the 10 percent. Even taking into account the failed efforts and assuming just a 4 percent yield,

you're looking at 1.3 kilos. That would be an extremely conservative estimate. It would -- and I'm not sure the Court would need to make additional findings beyond that. But we would suggest there is more than three kilograms of pure methamphetamine in this case. Subject to the Court's questions, I'll sit down and let Mr. Parrish talk.

THE COURT: I don't think I have any. Thanks. Mr. Parrish.

MR. PARRISH: Your Honor, I would, first of all, like to clear up some factual errors as stated by the government in its argument and then refocus on the government's chemist in this case. The Court may have a copy of it. The government indicated that the only other photograph showing the toluene inside of the building was, in fact, blocked and all of the items were outside the building. That's absolutely in error. If you look at Exhibit 32, I think that's the -- actually it's not Exhibit 32. It's Government's Exhibit 25, and turn to photograph 32. I think that's the one they referred to as a shadow covering the toluene can.

First of all, it shows the toluene inside of the building in an area that clearly is not related directly to any of the process that I'll refer to later where the chemist, Mr. Meyers, indicated that the items were held in relationship to each other. So it appears to be abandoned

from the position shown in their photograph.

Now, the government says, well, there is no photograph showing that the can inside was empty -- not empty but showed the cap on it. Well, turn to photograph 16, and I ask the Court to compare that with 205. In their own exhibit it clearly shows in 16 that there is no shadow blocking it. The top is off of it, and it's not --

THE COURT: Just a second. I'm confused here. Isn't 16 -- which can are we talking about? Not the one that says kerosene on it.

MR. PARRISH: No, the toluene all the way over in the corner.

THE COURT: You can tell either there's a cap or not a cap on that.

MR. PARRISH: Well, look at the -- then I want you to go to 205. When you do so many homicides, you learn to study these photographs over and over and over again and go over them with my spy glasses is what -- the technique I like to use and compare that to Exhibit 205, and you'll see there's something unique about the cap that goes on the toluene can, and it's white -- I mean not the top is white but the -- and you go back and compare that to photograph number 16. No, I'm sorry. You can look at 203 also. 203 shows it, and 205 will show it.

THE COURT: But what's your point about 16?

MR. PARRISH: In 16 you can see the same item, if you take a very close look at it, that it does not appear to have a top on it, and you can look at 203. The toluene can is shown right in there. That's the same can. You can also see it in 204 as opposed to comparing it with the one that the shadow is reflecting on in 32.

THE COURT: Well, your eyesight's far better than mine in 16. I'm not willing to draw anything from 16, but I am willing to make a finding of fact that at least at some point on the day in question there was no cap on the toluene five-gallon container and that it's highly unlikely, highly improbable that it's the agents that took the cap off and didn't replace it, didn't make any notations of it, didn't come into court to testify about it. So I'm willing to make a finding that the toluene five-gallon container did not have a cap on it. For how long I have no idea, but it didn't have a cap on it.

MR. PARRISH: Now, Your Honor, I would like to go to my next question on quantity that I think the Court has to resolve which the government seems to want to ignore, and that is even in their brief they talk about two ways the Court can get to the conclusion. One they say is through historical data. The next is through their laboratory which, when you have two codefendants conflicting each other, naturally the government in the past has gone to their own

agents.

Now, if we look, I believe, Your Honor, based upon the evidence that's been produced at this point that somewhere along the line the government deliberately tried to create a situation that showed a higher amount, particularly in the laboratory in Mason City. And I have several points I wish to point that out with.

If you turn to Government Exhibit 24 which is Mr. Meyers' own document that the government up until three weeks ago used as a foundation of its argument -- it also used it as a foundation in their brief -- the government's argument now is, well, we alerted you that maybe the can was not full. And they refer, I think, to page 7 of their brief where they say the container that was partially full of toluene. In that representation they clearly know at this point that the toluene was not tested.

Then they go to page 8. They talk about the Court must estimate the production capability of the laboratory I assume based upon the partially full toluene. On page 9 they refer to it again as the toluene; the intent to manufacture must be based upon the toluene seized at the residence.

But finally they go on at page 10 of their brief. They say, The DEA chemists have found that Honken could have produced 5.6 to 7.4 kilograms of methamphetamine actual by using the 16.4 kilograms of toluene. They're now back to it

in their own brief that they argued before the Court and they file. They switch back and forth adopting and then saying, well, maybe we don't know what the -- what Mr. Meyers said.

Then they go in for a conclusion in their brief. On page 10 they say, Thus the five-gallon toluene container seized from the Honken laboratory was just the first of 10 five-gallon toluene containers that Honken needed to complete his plan. They are using Meyers as their foundation to have this Court determine that the amount was 5.7 to 7 using the toluene base. They know now that their agent was incorrect. Not only did he not know the capacity and the quantity; he also did not know if it was, in fact, toluene which not only the Agent Mizell has now admitted but also their top gun from Chicago has now admitted.

So we think, Your Honor, they deliberately did this, and this is how we believe they did this. If you look at the Government Exhibit 24, they talk about the controlled substance and target compound. They want to talk now about maximum yields. But if you look at what -- based on the most abundant precursor, the first page they say this is what could have been produced: 5.58 kilograms to 7.42 kilograms.

And what do they base that on? On page 2 of the report, which is the second page of the report, Meyers writes to Mr. Beazley July 16, 1996. He's saying that toluene is the initial starting ingredient. He goes on in his report

and says at the top page of page 3 of the report right after the photograph and then to show him -- and this is why it's important I think to look at how he has it laid out because it's important, and this photograph is significant in what the government's trying to do here or their agent. He says, The locations of the chemicals and apparatus relative to each other and the amount of chemicals indicate the operators have working knowledge of the synthetic route. He's representing to his own people in his laboratory for analysis which is what we found, take a look at this photograph.

Then he goes on, and this is where he puts the hammer in to the defendant. The following table shows -- after he lays out the lab with the photograph -- shows the quantity of the end product from each step of the process that can be produced from the available essential chemicals based on the copies synthesis route seized at the site when he knew that he didn't get five gallons.

Then he says toluene, quantity on site. Right under there he has 16.4 kilograms.

Then he doesn't stop at that point. He goes back and he does it again. If you go to the next page of his report, he talks about the chemicals seized include toluene. Then he says, The number in the top row represents, Your Honor, which is a false statement, represents the amount of toluene available on site in the second paragraph. And he

knows at that point that, number one, he doesn't know it's toluene; and, number two, he knows it's not five gallons. He absolutely knows it's not five gallons even if he could pass the smell test that he's accumulating.

So he then -- he's driving this force for one reason, to up the amount because he knows if he can get the 5.6 to 7.4 kilograms he's operating within a guideline range here that is going to up the quantity.

And based upon that, Your Honor, and his testimony in Court and the fact that this came out, we believe this Court must, first of all, determine if, in fact, his testimony is acceptable or if he tried to drive up the amount knowing that it wasn't there to put Mr. Honken into that category knowing that he didn't fit based upon what he saw at the lab.

And based upon that, we believe that this Court can reject and not even consider anything from the lab and find that based upon his report, Government's Exhibit 24, that this Court cannot under these circumstances consider that evidence to determine any amount, can't even use it for an attempt but must go solely back to the amount that was brought in to be delivered because of the conduct of the government in this report to their own agency knowing that this was not accurate.

Then, Your Honor, finally on his report when he

talks about the summary of analysis which is the last page of his report -- and I did give the Court a case I think right before but I'll state it for the record, and I did give the government a copy of it. The case I relied on to some extent was 9 -- was United States versus Angela Nolan-Cooper cited at 957 Fed. Supp., 647, and where they then refer to another case, United States versus Egemonye, E-g-e-m-o-n-y-e, 62 Fed. 3d, 425, which is a First Circuit 1995 case. The First Circuit held that where government agents have improperly enlarged the scope or scale of the crime, the sentencing court has the power to exclude the tainted transaction from the guidelines computation. And they also use Egemonye quoting from United States versus Montoya, 62 Fed. 3d, which is also a First Circuit 1995 case.

And it goes on to say, While the First Circuit held that something less than a constitutional violation might suffice, sentencing manipulation could not be found absent extraordinary misconduct.

We believe, Your Honor, the extraordinary misconduct occurs here because, number one, for almost a year and a half they concealed this. Not only did they conceal it from the Court; they concealed it from the presentence investigator. They also concealed it, it appears, maybe from their own lawyers in this case. It didn't come out until by accident, so to speak, or by guise or whatever through

cross-examination and the hiring of an expert by the defense counsel to study the process that the government had utilized to be able to perfect cross-examination questions to see if the government had, in fact, followed the proper procedure.

But we not only find, Your Honor, that the government in this case did not represent accurately to the Court what existed; even through his direct examination he did not -- was not completely frank with the Court but in his cross-examination admitted that he had not tested the product which his own agent, Mr. Mizell, now says should have been done.

And so we believe based upon that and the fact that he wrote internal documents to his own agents telling them that this is the driven amount, this toluene is the driven amount here, that puts the government in a position where they should now not be able to utilize any of the laboratory materials seized in Mason City as a quantity analysis. And we believe if the Court does, in fact, consider it as a quantity analysis in the final opinion of this Court, it should then go back and then determine whether or not it should depart based upon this conduct by the government agents and the representation that it has made through this process.

The second point we want to make with regard to the quantity, I believe the government has to do two things. I

believe, first of all, we have to focus Your Honor on the fact that in Mr. Honken's plea, he really starts out with the conduct of the manufacturing process in Arizona. So if that's the case and the government is not charging him with any manufacturing, only comparing the similarities of what he said and what Mr. Cutkomp said, but really there's no government agent out there or anyone who has any photographs of the lab.

So I think in that analysis the Court has to compare the testimony of these two young men to find out what they said, who saw the lab, what was a result of it. So there's really no corroborative factor in that analysis except through what these two young men observed and what they were trying to do then.

So if we put it in that context -- and I think the government doesn't really agree with that because if they had any agents who had been through the lab, had seen it, had photographed it, they perhaps would have brought that testimony into Court. So we have to just take what these two young men have said who have been buddies all their lives to try to reach where they were going.

The real difference here is this: Dustin says he recalls bringing back mixed product four times. Cutkomp says, well, I think it was seven. Both of them, however, agree that Dustin was the person who was responsible for

bringing it back. So his recollection should be more reasonable to accept by this Court. Also Cutkomp got pretty screwed up for a while. So I think including his public exposures which I questioned him seriously on, the other problems he was having, the breakup of his marriage, we can't separate that, Your Honor.

But what's so interesting about it, he was going through all of these problems. He turns on his best friend because of whatever problems, whether it was a wife problem or whatever other problem. He turns on his best friend, but yet he never tells the agents and they never know until he's on the witness stand in December that he had all of these problems that led him to do all of these things.

Dustin, conversely, never had this type of difficulty. He knew what he was doing. He admitted it. He has recollection of it. They don't have anything to dispute that his conduct was anything unusual, erratic that led him to go to counseling, that led him to lie to agents. But Mr. Cutkomp, on the other hand, he can't even remember where he got the toluene can from. They had to send three agents out to check on that, and now they've changed his testimony three or four times on that point. So they now say, Judge, accept him fully as credible as to the number of trips he brought back when he was all screwed up. We ask the Court to reject that.

It appears, Your Honor, that the more reasonable explanation is the 4 trips of the 8 ounces or less which came to a total of approximately 32 ounces that Mr. Honken brought back and he has admitted that he brought back.

Further, it would appear that their own tapes that were done surreptitiously by Mr. Nicholson when he brought it into Mr. Nicholson's house verifies that fact that it was cut because he says, It screwed up my teeth. It screwed up my gums. What did you cut that stuff with, Man? That's their own witnesses now that they want you to fall back on that say it wasn't cut because we want you to accept a separate bottle that was found.

If there were seven bottles, Your Honor, where are the seven in Mr. Nicholson's house? They found four in there. That corroborates what Dustin has said. All of a sudden he got rid of three other bottles? But also I think you can't ignore the fact that in these cases which is traditional, which is acceptable, which we all understand happens, the larger you dump on your buddy, the better you're going to get for substantial assistance, and that hasn't changed since the guidelines came into effect. It's not going to change until the guidelines end if they ever end. That's the process that takes place in a courtroom. So the burden is on the Court to decide under these circumstances who do we properly assess.

Now, the government has said simply to the extent that Mr. Cutkomp gets, what, 54 months and yet they want to dump on Mr. Honken and give him 19 years --

THE COURT: No, they want to give him life.

MR. PARRISH: Well, absolutely life, but I mean even when they're reasonable and not upping theirs they want to give him life. You're absolutely correct. But in this instance they want to give him 54 months and then turn around and in the same instances of quantity dump his up when both of these people were involved in the same transactions, and the evidence seems to appear from the flow of it that Cutkomp was just as involved intricately as Dustin was involved in this process.

So we ask the Court to consider 32 ounces as the amount that was brought back as opposed to the amount that the government said came through Mr. Cutkomp based upon the reasonableness of his testimony on that point.

As to the lab, I made my argument as to why the Court ought not to consider any of it, and I think that argument is vested well within the law that we quoted to the Court.

However, if the Court does not accept that argument, we believe that this Court ought to look at the expert brought in, Dr. Moriarty, and I think two things are key as to what he says, and I think it's key to all methamphetamine

cases, and it's unfortunate. I realize what the government has to do in their cases.

But, first of all, if you look at these cases that have come up from the Eighth Circuit -- and I've been involved with them ever since the guidelines have been in existence -- you normally don't have an expert who comes into court to testify about several factors.

One, is an outlaw lab, so to speak, able to produce with the same quantity of the controlled lab because people don't bring these experts into these cases? So if the Eighth Circuit hadn't met it and very few federal judges have had that opportunity in this state based on my experience in the last ten years based on these cases that the guidelines have been -- existed, they just don't have the evidence they have in these cases because the stakes clearly have not always been so high, so you haven't had that. But the Court does have that in this instance.

Second of all, you have to look at the articles that Mr. Meyers based his evidence on and what Dr. Moriarty said about those articles. It reminds me of the story that was on CNN last night or two nights ago about Dolly. There's a big question now whether Dolly over in England is really true, and it really brought to life what Dr. -- literally to life what Dr. Moriarty said about the checkers. These articles are written for checkers. The government wants to represent

to this Court that those articles were written because they were absolute, this is what happens. Dr. Moriarty laid it out. These articles are written because some guy somewhere in some lab or some woman produced a certain amount of chemical at that rate using these products. Two other people may try the same thing. Then they try to work out a balance.

Now they're saying Dolly wasn't real. Either Dolly was a miracle or she would have to be reproduced at that level because the checkers have found out they can't reproduce this same experiment. So maybe they got the wrong cell and when Dolly was produced that's what happened. So I think that's what Dr. Moriarty was saying about these articles that were found.

But the government wants to take it and put a different spin on it. They're saying these articles were found because Mr. Honken, this two-year junior college student, could have been able to produce at this amount as these top experts -- he had a different word for them -- could have produced this type of yield. He says -- and he gave the cookbook analysis, and I ask the Court to consider that analysis in what Dustin and Mr. Cutkomp was working with and what they ended up with. So that's the second factor I think the Court has to consider in the analysis.

The third factor is the actual production, and I think the Cole case which I read over the lunch hour which I

have to admit I was not aware of either, but that was kind of the thrust of my argument of what I was trying to establish here. You have to look at the ability, look at what these people were doing. You have to look at their equipment. You have to look at what they have tried to do and look at the end result. It's absolutely unfair not to consider those factors, but the government wants to say if you have it in your mind and if it's intent, forget about everything else. We don't care what you ultimately produce. Then the government's case becomes so simple. Get the equipment. Throw a couple articles together. Walk into the courtroom in front of a judge and say good-bye, Mr. Defendant, because you get life. That's just the way it works.

But I think the Eighth Circuit is saying in -- Beam and I believe it was Morris Arnold was saying, well, no, we have to look here at what was happening, what they were doing, what their abilities were, and I think it's a good signal to all of the judges and prosecutors, defense lawyers, and presentence reporters. You can't just throw these figures together like Mr. Meyers did and say this is the yield, forget about everything else because we're dealing with human beings here, not machines.

And I think Dr. Moriarty's testimony is directly on point. Simply because -- even if you get a 97 percent yield one time, it doesn't mean that you're going to turn around

the next time and get a 97 percent. You may get zero the next time. There may be a process -- and here four times they produced zero, and they didn't even -- they talk about the analysis. If you look at the summary of analysis on the back of the page of Dr. -- of Mr. Meyers' report, he doesn't talk about this being samples. Nowhere in this report does he call -- in Exhibit 24 does he call this a sample. Only in the cross-examination does he call it samples when Mr. Reinert brings it up.

From this report, Your Honor, if that's the evidence in this case, this is the full amount of what they found. This is the residue. There is no evidence to contradict it at all. They asked some cross-examination questions, but I've gone through this material for the last year or so. I haven't found it. Now, maybe they have it somewhere in here that shows the weight of the total amounts of the results. I don't see it. Now, maybe the government has it. I don't know where it is. And it surely doesn't say in summary of analysis that it's samples. So it appears that the 4 millimeters (sic) of toluene, that's it, or the 32 milliliters of benzyl cyanide. It doesn't say it was a sample taken from anywhere.

So I think that's what the Court has to look at. If the government has an amount that maybe we haven't found or haven't seen, I'd be willing to look at it, but I haven't

seen it at this point.

So we believe that the Court should use the case that is referred to under Cole and go back and analyze what the people were doing. And I think what the government wants to argue and has argued, that this sheet that was found, as Dr. Moriarty kind of looked at it and laughed, I mean, it's like a dream sheet, something that you can't do, something that would not be expected. And he talked about what percentage range he would put this lab in even given the best circumstances of the cookbook -- of the baking a cake analysis. And I don't think he even came close, Your Honor, to what the government is saying you should assess.

I believe, Your Honor, on the quantity based upon the evidence that's been submitted in the record we should be at a level 32.

THE COURT: Mr. Reinert? And if you could, focus on Mr. Parrish's allegations regarding Government Exhibit 24.

MR. REINERT: Yes, Your Honor.

THE COURT: And I'm curious whether you're troubled by 24 at all.

MR. REINERT: I am, Your Honor, and that's why -- in fact, Mr. Parrish claims he's never seen that these were samples. Even Dr. Moriarty knew they were samples. The DEA -- the lab reports themselves were in our discovery file that Mr. Parrish reviewed that shows these are samples taken

from other containers. They were there. Twenty-four is --
where he starts out that -- quantity on site, that is a
little misleading because -- it's a little inaccurate. I
won't say it's misleading. It wasn't on site on the day they
seized it because it wasn't full.

THE COURT: But it implies that, doesn't it?

MR. REINERT: It does.

THE COURT: When you pick up a partially empty
bottle, you don't give the full quantity and say that's
what's on site. I mean, that's just common sense.

MR. REINERT: But when looking at it from the
context of a conspiracy where it was known that there were
attempts made so there would have been some withdrawn, it was
available on site during the course of the conspiracy.

THE COURT: But, Mr. Reinert, that's for me to
decide. That's not for a chemist to decide. Do you agree
with that?

MR. REINERT: I do.

THE COURT: That the proper thing would have been to
disclose the amount of toluene found on site and you make the
arguments and let me make the judgments about whether it was
used in the course of the conspiracy, but you can't delegate
that task to a chemist to make those findings and really -- I
mean, I find that Exhibit 24 is false, fraudulent, whatever
word you want to use, and misleading, the whole thing. I

mean, I couldn't -- you know, I'm not very happy about it, and I don't think you are either. You wouldn't condone it.

MR. REINERT: No, Your Honor. And, in fact, we discovered the problem with Exhibit 24 and -- when we were preparing back in December, December or early January, putting our memo together trying to point out the photos and provide that in discovery using the reports and the exhibit numbers that there hadn't been a sample -- or there hadn't been a full quantity out of that toluene can. And that's when we started checking with the hazardous waste companies and those other things to try and determine that because we realized that that was a problem. And it should have been done, and Mr. Meyers has heard in no uncertain terms what I thought about that, but we won't certainly go into that at this point. But we certainly disclosed it. Mr. Parrish pointed out in a few places, but throughout our whole base offense level in our sentencing memo we point out that it was a partially seized can, that the toluene seized in his residence and the toluene already used in the manufacturing process, and that's where the 16.4 comes from is from both.

But the United States agrees Mr. Meyers should have specifically put on exactly how much was there. He certainly could have still used the 16.4 in his analysis, but he should have been more accurate and more diligent in that.

THE COURT: Do you have any explanation as to why a

government chemist testifying as to something as important as drug quantity in a criminal case could be at best incredibly sloppy and at worst outright fraudulent and deceitful? Do you have any explanation at all?

MR. REINERT: No, Your Honor. In my dealings with Mr. -- I, of course, can't testify or provide credibility evidence on -- in my dealings with him, when I pointed out to him that we didn't have that, at first he was shocked. He thought he had. Went back through his notes. He realizes he made a grave error, that it was a mistake. I don't think it's going to be one that will ever be repeated, but that was incredibly sloppy.

The only thing I can attribute that potentially to is his experience as a chemist as we talked about earlier is, for the vast majority, the bench chemistry at the DEA lab, not as the seizing chemist. Perhaps he just didn't have enough experience in that area, although one would hope he would if he's going to be going out on a methamphetamine lab.

But as soon as we knew that there was an issue, we disclosed that. We put it out, and we discovered the issue by using our own open discovery file that Mr. Parrish had, so his allegations of misconduct on the government's part I think are unfounded in that as soon as we knew, the prosecution knew, we disclosed it. And we knew it because we had used our enlarging glasses on the photos like Mr. Parrish

does, and we went through the evidence with a fine-tooth comb and discovered the issue. And we went through the evidence that was available to the defendant to discover that issue.

Mr. Moriarty did concede --

THE COURT: Actually he was the only doctor who testified.

MR. REINERT: Oh, I'm sorry. Dr. Moriarty did concede that methamphetamine could be produced using those articles, so to say that these are just articles that are made up and nothing's going to happen I think is not founded.

Mr. Cutkomp in looking at -- defendant claims he's now fabricated and boosted all these quantities. Well, Mr. Cutkomp also accepted all those quantities himself, so he did have an incentive to be conservative when talking. He stipulated to a base offense level 38. He stipulated to the quantities involved in the production in Arizona.

THE COURT: Of course he knew he was getting a 5K1 motion.

MR. REINERT: He didn't know that when he stipulated to it, Your Honor. He stipulated to it in the plea agreement, and in our plea agreement we certainly don't ever promise a 5K motion.

THE COURT: He knew he was getting a 5K1 motion as -- Mr. Reinert, he had a greater expectation of getting a 5K1 motion than any defendant I've ever known about. Do you

dispute that?

MR. REINERT: When he signed the plea agreement or later, Your Honor?

THE COURT: Well, I wouldn't be privy to the timing like you were. But I suspect at the time he signed the plea agreement his lawyer was able to tell him that he had a very, very, very, very high probability of getting a substantial 5K1 motion.

MR. REINERT: I would disagree with that.

THE COURT: Okay. Tell me why.

MR. REINERT: In one regard because when the plea agreement was signed -- I think later on he probably did have an expectation he was going to get a 5K because he'd already done a number of tapes and that kind of thing, but the plea agreement was signed all before that. The only thing that had occurred before the plea agreement was a single proffer interview.

THE COURT: But he was going to do whatever he needed to do to get that 5K1 motion, and John Lane knew that, you knew that.

MR. REINERT: I think they were going to work hard for it, but I think to say he expected it would be an overstatement because John Lane has been through many, many cases where people have cooperated and haven't gotten it; and sometimes that first proffer, maybe, maybe not. You just

can't tell for sure. But I think to say that he had a high expectation to get it, he may have had high hopes to get it, but high hopes -- Mr. Lane is a very experienced attorney. Hopes are something that he's not going to tell a client go ahead. Boost everything up. Boost the quantities because we know it's coming down because he knows that potentially may not happen.

THE COURT: Of course, the quantities he gave in the proffer were less than what he testified to. Oh, yes.

MR. REINERT: That I don't recall.

THE COURT: Well, I'm going to make findings about that.

MR. REINERT: I don't recall what he found.

THE COURT: That's my judgment in this case. So something happened between the proffer and the testimony.

MR. REINERT: Well, in certain --

THE COURT: I've gone through and made the comparisons.

MR. REINERT: I have not, Your Honor, and I'll rely on the Court to do that. And sometimes -- and I'm sure the Court has seen and understands this, that the proffer is done early on kind of cold. Later on when agents are able to go through and look at documents, show documents to the defendant, many times defendants begin to remember more because they remember trips, they're reminded of things. So

quantities --

THE COURT: And many times they remember more for other reasons as well too.

MR. REINERT: That is a potential issue that certainly I'm not going to tell the Court that that may not be a motive.

THE COURT: And I have to try and sort that out as best I can.

MR. REINERT: Exactly. I think there are many innocent reasons as to why something might be different in a proffer and later, and there's also some sinister reasons that are potentially there, and we hope that the sinister reasons are reduced as much as possible. But as in anything in humanity, you have to deal with the human creatures as we have them, and sometimes you're going to get a mixed motive.

I think that's all we have, Judge -- oh, other than Mr. Parrish did point out this issue of a departure issue like in that F. Supp. case. First of all, this is an extremely late objection on a departure issue that he raised. And as I recall on that case -- I skimmed it over -- that was more of an entrapment kind of case. I'm not sure it's analogous. It's also an F. Supp. case which is not binding on this Court.

THE COURT: I do want to make some further evidentiary record, and either I can call Jay Jackson as a

witness or you can stipulate to it, but my understanding is that in the presentence report, paragraphs 28 through 32 -- which I don't understand really the government to have objected to. Did you object to those paragraphs? I realize the defendant objected to them.

MR. REINERT: I don't believe we objected to them, Your Honor. This was based upon the proffered information of Mr. Cutkomp.

THE COURT: In the discovery file.

MR. REINERT: As I recall, yes, Your Honor.

THE COURT: Yes. And if Mr. Jackson were to make a professional statement -- why don't I just ask him actually. Mr. Jackson, would you make a professional statement as to where the amounts in paragraphs 28 through 32 of the presentence report come from?

MR. JACKSON: Yes, Your Honor. They were taken from an independent review of the discovery -- the government's discovery file which included the offense reports, debriefing statements, and facts of that matter.

THE COURT: Anybody dispute that?

MR. REINERT: No, Your Honor.

MR. PARRISH: No, Your Honor.

THE COURT: Okay. On the historical drug quantities, what I'm doing essentially is taking the low estimate, the low testimony, that Mr. Cutkomp gave either in

a debriefing or, if his testimony in court was lower, I'm taking the low end range. And my ultimate finding would be that even using the low end range that that would be the high end of what drug quantity I would find. In other words, it's very likely that it's substantially less than that, that there was some degree of exaggeration going on by Mr. Cutkomp, so in no event would it be higher in my view than the low end for each of the transactions.

And I'm also giving the government the benefit of the doubt here as to the number of transactions. I mean, I'm tempted to simply say Mr. Honken says four, Cutkomp says seven, they both have incentives to be less than accurate. Who knows, in fact, exactly what happened? The easiest thing to do would be to split the difference, but I'm going to give the government the benefit of the doubt because on drug quantity in general I would find Mr. Cutkomp a little more credible; although as to the amounts, I think it's prudent to use the low end.

So for paragraph 28 of the presentence report, the first batch in 8-92, I find 4 ounces; the second batch in paragraph 29, in 9-92, I find 8 ounces; the third batch in 11-92, paragraph 30, I find 8 ounces; paragraph 31, the fourth batch on 12-92, I find 6 ounces; paragraph 32 which would be the fifth, sixth, and seventh batches from 1-93 to 3-93, I find 2 pounds for a total of 58 ounces. I'm reducing

that 58 ounces by the 97 percent purity attributing to the cocaine that was found from Gregory Nicholson. And, therefore, I come up with an actual amount of 56.26 ounces. In other words, it could be no higher than 56.26 ounces. It very well could be lower in my view, and I believe that translates to 1,594 grams.

On the meth lab, just in terms of general credibility, I found Dr. Moriarty to be considerably more qualified professionally than Mr. Meyers. As a matter of fact, in terms of professional qualifications, that wasn't a close call at all. I didn't find Mr. Meyers to be particularly well qualified for his testimony in this case. I thought Dr. Moriarty was exceptionally well qualified, although I didn't believe all of his testimony either. There were certain things that I found to be exaggerated but weren't necessarily material to my ultimate findings of fact.

I think as you recognize, Mr. Reinert, and one of the reasons why I enjoy working with you is I've always found you to be exceptionally candid in your appraisal of -- an advocate, zealous advocate, but always candid. And you suggested actually a 4 percent figure.

And after weighing all of the factors, the fact that the toluene wasn't tested, the fact that we don't really know if it was 100 percent pure or not -- I'm willing to make a finding that there was a five-gallon can of toluene

purchased, that it's kind of industrial grade or commercial grade toluene, that in all likelihood it has a high level of purity. I doubt very much that it's 100 percent pure. Even based on the documents that you claim support it's 100 percent pure to me prove it's not 100 percent pure because each of those two documents -- I don't remember their exhibit numbers now -- that actually don't really relate to this can of toluene -- I'm willing to find that -- but they have different physical properties for the same toluene that you all want me to believe is 100 percent pure. And I didn't do well in physics -- I didn't do well in physics either. I didn't do well in chemistry either, but I do remember that you can't have a subject 100 percent pure and have it have different physical properties. It just can't be, so there have to be some impurities in it. I don't know enough about chemistry to know whether that would have made a difference here. And while Dr. Moriarty testified in the abstract that it could, we don't have any specific testimony that it did in this case.

And so I think the reasonable inference from all of the circumstances is that it was a five-gallon can of toluene purchased somewhere in Mason City of a relative high degree of purity. Whether it had some incremental impact on the production of methamphetamine, I suspect it might have, but I'm not in a position to measure what it would have been.

But I think 4 percent, given the failure of the 4 different runs, the fact that they really weren't all that experienced, although they had made it on a prior occasion, they did have different equipment, they weren't successful in making it here. I did think Dr. (sic) Meyers was somewhat of an advocate rather than an independent expert in his testimony when he was talking about the likelihood of these folks achieving a 17 percent figure. I didn't believe his testimony in that regard. I thought Dr. Moriarty was much more believable and credible in his 0 to 10 percent figure. And 4 percent is my best judgment looking at all of the factors as to what the likely practical yield would be.

The maximum theoretical yield would be 32.9 kilograms. I find that the practical yield would be 17 percent, but I also find that the practical yield could only be obtained, if at all, by a highly skilled chemist in a controlled laboratory with top flight equipment, not by somebody even who got an A in chemistry at NIACC in the kind of conditions we see in the pictures in Government's Exhibit 25 I believe, with their lack of knowledge of chemistry, their lack of knowledge to solve problems that arise in the process, and the fact that they tried four times and they weren't able to produce it. And if you take all of those factors coupled with the toluene and their experience, the equipment, everything else, I think 4 percent is in my view

generous to the United States government.

Now, I'm tempted to say that the four runs actually count nothing towards the government's calculation of drug quantity because they weren't able to produce any. You actually have a track record here, so it's different than the case where precursor chemicals are seized initially and there's no real track record.

But I'm going to take a more cautious approach and assume that the 5-gallon container is full and apply the 4 percent across the board to the full 5 gallons of toluene. And so that calculation using the 32.9 kilograms of maximum theoretical yield, applying the 4 percent would result in a drug quantity of 1,316 grams of methamphetamine. Taking 97 percent purity level would result in 1,276 grams of actual methamphetamine. And if you add the two together, my total finding is 2,870 grams or 2.87 kilograms of methamphetamine actual for a total offense level of 36.

Are there any additional findings of fact on drug quantity that either side wants me to make? I've kind of just given a stream of consciousness findings of fact.

MR. REINERT: I can't think of any additional findings, Your Honor. The Court has made credibility findings on each of the issues and scored it. Unless the Court wants to make a final overall finding that the quantity found by the Court in the methodology is its best reasonable

approximation of the quantity scored to the overall conspiracy, I think that would be an appropriate finding.

THE COURT: It is, and it's my best judgment as to the overall quantity with regard to the conspiracy here. And I think I'm being generous to the government, not to the defendant in making these findings. I don't think I'm using exceptionally conservative findings at all. I think it could easily be less than that, and my findings would be that the 2,870 would be the maximum that one could find here. It well could be less than that.

MR. REINERT: But, Your Honor, if the -- if, for instance, each of those could have been less, is the Court comfortable making a finding that --

THE COURT: It would be more than one kilogram which -- is that the break point? I'm not sure what the break point is.

MR. REINERT: The break point is 1 kilogram for the 36.

THE COURT: In no event in my opinion could the drug quantities that I found be less than one kilogram, under any set of facts or assumptions about the drug lab and the like could it be less than that because my historical findings exceed one kilogram. And so even if you were to give nothing to the lab, I wouldn't make a total offense level finding of 34. Mr. Parrish?

MR. PARRISH: Your Honor, I'm just curious as to -- not that it would make a tremendous amount of difference as to why you found actual as opposed to mixed based upon the evidence.

THE COURT: Well, because -- that's a good point. I think the numbers that I've given for the paragraphs 28 through 32 based on my review of the testimony of Mr. Cutkomp and even consistent with the testimony of Mr. Honken, that those numbers were based on the production of the methamphetamine before it was cut with the cut, and that's why I decided to go that route.

MR. PARRISH: Because then when the cut was delivered -- when the meth was delivered, it was then cut and that's the weight that it ended up being.

THE COURT: I understand that, but that would be -- I would simply have to add more weight in and then take it out again to get to my figure, so I just did it without cut, without the cut, to get to the actual. Is there some problem with that meth -- I admit this is maybe the first -- I've had very few contested drug quantity cases, and so is there any problem analytically in the methodology that I've used from the government's perspective, Mr. Reinert?

MR. REINERT: No, Your Honor, and I think it's actually consistent with the physical evidence seized from Mr. Nicholson's residence as 97 percent, that at least the

Court knows from that seizure that the drugs produced would be 97 percent. So to start with -- actually to add in the cut and then try and take it back out, that's kind of a two-stage process. You have to estimate the amount of cut. You have to take it back out. That seems to be an exercise in futility if you can just start with the actual and multiply it to get -- or take the purest amount you can find and multiply it times the purity. I think that's a more accurate way and an easier way to approximate the quantity.

THE COURT: I agree with you, and I went back through and reread the testimony of Mr. Cutkomp, and I'm real clear that that's what we're dealing with here is before-the-cut quantities. And so I didn't see any value in adding it in and taking it out again.

Anything else, Mr. Parrish?

MR. PARRISH: No, Your Honor.

THE COURT: Just as a practical matter, Mr. Reinert, when you didn't -- well, nevermind.

MR. PARRISH: I did have one other point to add.

THE COURT: Yes.

MR. PARRISH: And that is the government had raised the issue about the departure request being late, and I notice the Court did not address that. But we believe it's timely based upon the evidence that came out during the trial -- I mean during the sentencing process.

THE COURT: Yeah. I agree that it is timely based on the evidence presented.

MR. PARRISH: That's all I have.

THE COURT: So to the extent that the government's objected to your request for a departure on the timeliness basis, that's overruled.

Okay. Why don't we go to the adjustments, the specific offense characteristics, excuse me, the 2J1.7 enhancement adding three levels to the offense level for an offense committed while on release. Mr. Reinert?

MR. REINERT: Yes, Your Honor. We also have a firearms adjustment.

THE COURT: Pardon me?

MR. REINERT: There's a firearms adjustment as well.

THE COURT: Well, you can take them in any order you want. I was going to do that one, then the firearm. But if you want to take the firearm first, that's fine.

MR. REINERT: We can do 2J1.7. I think it's relatively straightforward. The defendant was on release. The record shows the conspiracy period from '92 through '96. He was on release from March 26, 1993, through March 21 of 1995. If there's any acts committed during the course of that time period, the defendant would be subject to the three-level enhancement for commission of offense while on release. Mr. Cutkomp testified that in 1993 he went to go

get additional chemicals. He also testified in 1994 he went to go get additional chemicals. In early 1995 -- which I don't recall if there's a specific date in early 1995 when the defendant and Cutkomp made another trip to get chemicals. Now, the defendant was off pretrial release as of March 21, so whether that act occurred before March 21 or after, that's difficult to tell from the record at this point. And then during 1994 and early 1995 there were attempts to manufacture drugs on two occasions before they moved the lab to Mr. Honken's residence.

The defendant, of course, denies that and claims that there was no productive activities during the course of that. The Court is going to have to make a credibility finding of both Mr. Cutkomp and the defendant on that regard. The defendant's testimony in many regards has a number of credibility problems including looking at the obstructive conduct and the denials and his statements. The Court can reasonably credit Mr. Cutkomp's testimony on the basis of credibility and reject the defendant's testimony on that same basis.

THE COURT: Or I could reject both of them.

MR. REINERT: That certainly is the Court's prerogative.

THE COURT: Mr. Parrish?

MR. PARRISH: Your Honor, I'm going to be very brief

on that. There's absolutely nothing in the record from Mr. Cutkomp that bolsters or supports or corroborates his testimony as to purchases. The government has not produced anything with regard to that. His memory has clearly shown to be fallacious on many points. We believe that based upon the record that's been produced solely on historical data or testimony from Mr. Cutkomp that there is absolutely nothing to warrant an enhancement under 2J1.7. That's all the argument I want to make on that.

THE COURT: I just don't think the government's carried its burden of proof on this issue. You know, Mr. Cutkomp has his own set of problems including his own credibility problems, and I'm not convinced that the government carried its burden of proof that there's any corroborating evidence, and I'm not willing to credit Mr. Cutkomp's testimony on this adjustment. So the three-level increase under 2J1.7 is denied.

Do you want to go to the -- what do you want to do next, Mr. Reinert?

MR. REINERT: We can do the firearms. That way I can have Mr. Colloton do some talking.

THE COURT: Okay. Mr. Colloton?

MR. COLLOTON: Well, Your Honor, we've set out in our brief the different firearms that have been mentioned in the evidence. And as we say in our brief, it seems to us

that the evidence really goes to more the use or possession of a firearm in connection with the obstruction evidence. So in order to discuss the firearm, I think I'd be incorporating some thoughts on obstruction as well if that's --

THE COURT: Why don't we -- do you want to skip the firearm and we'll come back to it after the obstruction?

MR. COLLOTON: I think that might make more sense.

THE COURT: That might be a little easier. There's no real reason we have to do it in the normal course of events. Would that be okay?

MR. COLLOTON: That would be better, in fact, from my point of view because my argument on the guns is going to be related to obstruction. And if the Court makes findings one way or the other on obstruction, that will affect the argument on the guns.

THE COURT: You'll be sure and remind me to come back to it.

MR. COLLOTON: Yes, sir.

THE COURT: Why don't we go to the adjustment for role in the offense. Mr. Reinert, a nice attempt to get off the hot seat, but you're back quickly.

MR. REINERT: I tried to sit down a little bit. On role in the offense, the Court has to answer two questions. First of all, are there five or more participants? Who are the participants in the activity? And a participant is any

person who is criminally responsible for part of the offense. We certainly have -- based upon the record we have Mr. Honken as a participant, Mr. Cutkomp as a participant, Jeff Honken as a participant as a money backer, Mr. Nicholson as a participant obtaining large quantities of methamphetamine, and Mr. DeGeus as a participant.

Angela Johnson as an investor based upon the testimony of Cutkomp -- I believe Mr. Cobeen talked about that as well -- is a participant. Mr. Cobeen until he became a cooperator for that very brief time period was a participant when he was solicited by Mr. Honken to give him methamphetamine. And then ultimately he became a cooperator, and from that point forward he would not be a participant, but at least for a brief time period he was a participant. Mr. Gahn was solicited to distribute cocaine for the defendant and find others to obtain drugs.

Then there's also the obstructive participants which just -- we put that in our footnote, that a reading of the guideline would show that you can rely on all of the adjustments on relevant conduct. In looking at those participants, it would include Dennis Putzier, Mr. Sabasta, and Mr. Leavitt at a minimum. So there are clearly more than five participants in the criminal activity overall.

Then the next question, once the Court determines the numbers of participants, is what was the defendant's

relationship to at least one of those participants. The defendant does not have to supervise or lead all of the participants but has to supervise at a minimum one.

THE COURT: And is there case law that deals with the temporal requirement or lack of a temporal requirement? In other words, there doesn't have to be five participants at a given moment in time, or does there? You can't have one person participate and then drop out and one person participate and then drop out and aggregate the five, or is there a temporal requirement?

MR. REINERT: Mr. Colloton tells me he thinks there's a case on it, and he's going to try and locate it to respond to the Court's question. I'll let him try and find the case without going off the top of my head. I don't specifically recall. But even looking at -- even if the Court were to look at some kind of temporal requirement, just looking back at '93, you've got Mr. Honken, Mr. Cutkomp, Jeff Honken, Nicholson, and DeGeus. That's five right there. And actually during that same time period was when Mr. Gahn was involved, so that would be six at that point because he was involved during the same time period as Mr. Nicholson and Mr. DeGeus.

When looking at the supervisory thing, the supervisory activities, the defendant -- and the application note says the Court should consider a number of factors.

I'll discuss a few of them. The defendant recruited Mr. Cobeen into the operation. He recruited Mr. Cutkomp, and he recruited Mr. Gahn. He exercised decision authority during the course of the offense. He directed purchase of chemicals. We have that from Mr. Cutkomp as well as from Mr. Cobeen. He actually wrote out the drug, the manganese chloride, provided that note when they went up to Minnesota to get the drugs. He directed specific activities within it. He wrote a note to Tim telling him to perform a simple distillation and gave him detailed instructions on what setting to put the hot plate on to make sure he could do the distillation. He developed the synthesis route. He came up with this idea to develop the synthesis route. He wrote it out. It was in his handwriting at the lab.

So his scope of authority, he chose who participated, what they were going to do. His degree of participation in the planning, the share of assets, he was getting a bigger share. Mr. Cutkomp indicated he got very little money in hand and had to get everything from Mr. Honken. Mr. Honken maintained the records of the conspiracy. That is an indication of a leadership role. He's maintaining the books as to who owes money with Terry DeGeus and Greg Nicholson and later with determining what the cost of the chemicals and keeping track of the budget of the lab itself.

The defendant when he testified said that each of the individuals had their own separate voluntary roles. But one doesn't have to be a tyrant to be an organizer or leader. You don't have to run the organization or conspiracy with an iron fist, but he is the controlling feature.

He points out that Mr. Cutkomp was -- did most of the labor in the lab. Seemingly, you could point out that Mr. Cutkomp's in charge of the lab, but one has to think about this in an activity conducted. When one is driving by a construction site and sees one person with a shovel digging the ditch and one person standing up on the ditch watching him dig the ditch, who's the foreman of the job? It's the guy standing up on top not with his foot on the shovel.

So Mr. Cutkomp was the hands. He was the manual labor, the skilled laborer in the meth lab and in the production with Mr. Honken being the brains of the operation. He came up with the synthesis route. He came up with the instructions to Mr. Cutkomp, taught Mr. Cutkomp how to do it, sent Mr. Cutkomp to -- and later on with Mr. Cobeen, even when Cobeen was a cooperator, he got Cobeen to do things which shows his degree of control over the offense. Since there are five or more participants and this defendant organized or led that, he should be subject to a four-level enhancement for role.

THE COURT: Thank you, Mr. Reinert. Mr. Parrish?

MR. PARRISH: I think at some point in time I visited this same issue with you before in a different case, so I would start my argument basically by saying that I believe that the only way that the Court could get to a role that the government is asking for -- and I realize I don't think probation agreed with them, with the government saying it should be a four-point. I think four points is pretty rare in any finding by a Court.

I think, second of all, perhaps the only way it could be gone through is otherwise extensive as opposed to just looking at the number of people. The government comes up with a list of people who they say were involved. One, they mentioned Angela Johnson. They said, well, based upon Cutkomp's testimony, she was financing it, and I think that is clearly contradicted by Mr. Honken's testimony about what relationship existed with regard to child support payments, et cetera. And they have not produced any evidence as I know on this record with regard to Miss Johnson being a participant of any sort with regard to any distribution or building of a lab.

The second they mention is Mr. Gahn. Mr. Gahn, there's no evidence that he received anything in this case, nor is there anything in the record of it other than the government's statements when their attorney's arguing, well, yeah, he played some role of some significance.

Then they said, well -- then they go to Mr. Cobeen. They concede, I believe, that in the second part other than discussion, which is the lab in Mason City, that's basically all they had was some discussion. To some extent I think Mr. Reinert basically conceded that in his argument.

So that brings us really back to Mr. Cutkomp, Mr. Honken, and Mr. Nicholson, and that doesn't qualify under the five-person analysis of the four-point increase in role or aggravating role for leadership.

Then I think the -- and I don't want to go through each step because the Court's heard them several times and is familiar with the factors that have to be outlined. But I think it's important to talk about the relationship between Mr. Cutkomp and Mr. Honken.

And without belaboring the other arguments and renewing those old arguments I made as to that relationship, I would like to add a couple of factors. Number one, the government's analysis says, well, look what Mr. Honken told Mr. Cutkomp. Well, because there were like four notes I think that they brought into the record, one dealing with what someone should do at a particular time with regard to a thing in the lab, and they said, well, that shows he controlled. I thought Mr. Cutkomp's testimony was that Mr. Honken was the deliverer. He, in fact, built the lab and did the manufacturing. He had to produce the product that

Dustin had to, in fact, deliver, so I don't know how they automatically assume from there that Mr. Honken is automatically the boss of Mr. Cutkomp based upon two or three notes that were found.

Then they said, well, he kept the records. He kept the records of the delivery. Does the records of the delivery bear any greater responsibility or relationship as opposed to the records of a building of a lab, the purchasing of the items, the names that they fall in in the final analysis, or should they be balanced out? Which one gives a particular note greater significance in terms to determine leadership role? A purchasing of an item that's key to the lab or a record that shows Mr. Nicholson owed some money to their group? It seems that neither one bears any greater leadership role than the other.

And so there is no argument, I don't believe, under the circumstances of the notes to add that Mr. Honken should get a four-point assessment based upon any notes that was, in fact -- were, in fact, left.

I think if you take both statements again, put them together as to what these people did, they appeared to be working together, and it appeared to be basically Honken and Cutkomp. From the relationship that existed in establishing the lab, one built; the other made the delivery. It didn't seem that one was the boss over the other. It seems like

that relationship really existed once Mr. Cutkomp knew he was on tape and he played up that role to some extent. And the only other time he played it up was when he came in to testify.

But -- and then finally, Your Honor, they argue about the economic benefit. They seem to want to exclude the economic benefit that Mr. Cutkomp received by living in the house, by getting food, by getting clothing, by getting travel expenses, by getting money, and he didn't add that into the total amount of money that he received.

So it would appear to me that they can't do just a pure money analysis without taking into consideration the other benefits that were coming from this particular operation which would show that they did share almost mutually in this operation. If one receives an apartment at six or seven, eight hundred a month or five hundred a month, whatever the cost was, and the other received the money after it was collected and brought back and paid the rent, what difference does it make that Mr. Honken did that particular role and Mr. Cutkomp did the other role in terms of the role in the offense, because their both roles seem to be mutual? One did not take a leadership role over the other.

So we believe, Your Honor, based on that analysis as to the money that should not be a factor that the Court should utilize to increase to a four-point -- increase

adjustment by four points to a leadership role.

And finally I think that the courts have said that you can't go by whether one person might have been more culpable than the other one. I guess that's what the government's final analysis seems to be. Well, it appears that Dustin might have done a little bit more. That's not enough. I think the courts have said you have to go back and you have to look at each specific item that fits into the role before you can determine that that person should get the enhancement, not just because one may appear to be more culpable than the other. And I ask the Court to consider that factor.

THE COURT: What -- I have not reviewed Mr. Cutkomp's presentence report. What level was he given?

MR. PARRISH: We had his presentence report before. I can't recall.

THE COURT: I'm sure Mr. Jackson will find it. We need to take a recess and give our court reporter a break anyway. And, Mr. Colloton, do you know about the answer to my temporal question? I don't know the answer. I suspect the answer is five at any time and there's no requirement that at any given day there have to be five participants. But do you know a case?

MR. COLLOTON: What I said to Mr. Reinert is I have a recollection of seeing a case on that point, but I could

not find it in my files here, so maybe over the break I can see if I can find it on Westlaw.

THE COURT: Would you be able to take a look?

MR. COLLOTON: Sure.

THE COURT: Okay. Thank you. We'll be in recess until three.

(Recess at 2:45 p.m.)

THE COURT: Please be seated. Mr. Colloton, you are a fast researcher.

MR. COLLOTON: Your Honor, I did find one case on the point in question. I note that it's a table opinion, but it I think has potentially at least persuasive value on a material issue, and I could find no published opinion that would serve as well. So I proffer United States versus Moore which is cited at 1996 Westlaw 50743, and I see at the end of that one-page Westlaw opinion the Court says that, quote, We reject Moore's assertion that the criminal activity must involve five or more participants, quote, at any one time, close quote, close quote. And I've handed one to Mr. Parrish as well.

THE COURT: Mr. Parrish, any thoughts on the matter?

MR. PARRISH: I'm just looking at it, Your Honor. No, Your Honor. I don't have anything to add on that.

THE COURT: Do I understand this correctly, Mr. Colloton, that this is an unpublished Westlaw opinion but

it appears in the table at 76 F. 3d, 383? Therefore, under Eighth Circuit rules I think it's not really controlling authority or it can't be cited. It's not supposed to be cited at least to the circuit.

MR. COLLOTON: Yeah. I was just reading the notice that is actually printed at the beginning of the printout, and it says that under Eighth Circuit rules they are not precedent and then generally should not be cited, and then there are some exceptions. So I guess I proffer it in the spirit of trying to answer the Court's question.

THE COURT: Absolutely.

MR. COLLOTON: I don't claim that it's precedent because the rule says that it's not precedent. I suggest it may have persuasive value in the sense that three judges at least were comfortable enough with it to decide a case on that basis. But I think as I understand the rules, if it were to go to the circuit on this issue, they would not be bound following U.S. v. Moore nor is this Court bound in terms of precedent.

THE COURT: Thank you.

MR. PARRISH: The only other point I would add, Your Honor, I know the Court left an issue pending as to Mr. Cutkomp's adjustment for role that I think is a factor that the Court should look at. I'm not saying it's controlling in any way either, but the Court should look at

it.

THE COURT: I am, but I want to take them one at a time.

MR. PARRISH: Okay.

THE COURT: I don't feel bound by this decision, but in the absence of anything else, I find it persuasive. It seems to me if the sentencing commission or Congress wanted to put in a temporal requirement they could have done so, and I would not read one into a statute. I think in the absence of language suggesting one -- I did read one into one federal statute. It was a gambling conspiracy case that requires 5 or more individuals in a 30-day period, but it didn't say whether the 5 all had to be in the same 30-day period and I held that it did, but that's a little different, and the statute itself created a temporal requirement. It was a question of interpretation. But I feel persuaded by this unpersuasive opinion that they're probably correct and that I should out of prudence follow it.

Let me tell you the issue that troubles me more, and that is my understanding is that Mr. Cutkomp got a two-level reduction for minor role, and that's troubling, a five-level or a six-level swing. The evidence does not justify a six-level disparity, and there ought to be some estoppel argument that prevents the government from seeking that kind of a disparity when there aren't facts to justify it. I

mean, I'm really concerned about this, and I didn't think about it until, you know, just on the break now. I'm real, real, real troubled by it. I'm not saying I know what to do about it, but it's very troubling to me. Is it troubling to you at all, Mr. Reinert?

MR. REINERT: Well, and we were discussing some matters at the break, and we had some discussions with Mr. Parrish and didn't have a chance to complete those discussions either on the issue that the Court discussed with us at the break.

THE COURT: Would you like more time?

MR. REINERT: We would like a little more time.

THE COURT: Would you like to take another recess?

MR. REINERT: If we could have just a few minutes, Judge, I think we could -- because we had to make some phone calls, and it took us a while to get that done.

THE COURT: I understand. Mr. Colloton -- and I don't mean to pick on you, but you seem to be the preeminent legal scholar in the courtroom, so I'm going to pick on you. Is there -- not that Mr. Parrish is not excellent on the law. He is. I work hard at it.

MR. PARRISH: I may not agree with that.

THE COURT: I'm only going to give you so much deference, and you proved the point by finding this other case so quickly. But gee whiz, is there some kind of

estoppel argument, you know, that ought to prevent the government -- I mean, my reading of the facts is you just can't justify a six-level swing on the facts of this case, no way, no how. And maybe I got hoodwinked on going along with it in Cutkomp. I don't remember. I don't have any independent knowledge of it. I don't think the government objected to it there, and I'm just real troubled by it. I mean, there ought to be some estoppel argument because while you can fancy some differences between the two, they offset each other in my view, and I'm not really saying he ought to get a two-level minor reduction. I don't think that's reality. But a four-level increase when the codefendant got a two-level reduction, I'm not going to do it even if -- I just -- I can't hold my nose like that and do what the government's requesting me to do because it's just not equitable.

MR. COLLOTON: As far as estoppel goes, Judge, I can't say I've researched it. I know that generally estoppel doesn't apply against the government.

THE COURT: That's right. That's the general rule.

MR. COLLOTON: And so I think that is the rule that has to apply. I've had cases where -- and this is actually one, Judge, if you think about it. Cutkomp, also remember, stipulated to a level 38 quantity which now the Court finds may not have been warranted. So there is a little bit of

play both ways here. And if you think in terms of, well, maybe the Court shouldn't have given him 2 off for role but I shouldn't have given him 38 either for quantity, if everybody really focused on the issues, that makes it I think perhaps less of a disparity in the aggregate.

THE COURT: Yeah. There's some truth to that.

MR. COLLOTON: And I think sometimes with the development of facts in a hearing like this or even additional investigation that the government finds out things that are different than what it thought before. But maybe while Mr. Reinert's visiting with Mr. Parrish I can take another ten-minute shot at just seeing if there is any authority that would address this one way or the other.

THE COURT: Well, I'd appreciate it, and I'd really like both your views as to the equity of doing it this way. I understand that the government thinks Mr. Honken should get a substantially more severe sentence than Mr. Cutkomp, and I don't disagree with that, and he's going to by any standard. But that's a different issue than on a specific guideline calculation that they ought to -- that there ought to be a six-level swing. And that's very troubling. It's just very troubling to me. Does it trouble you, Mr. Colloton?

MR. COLLOTON: I think we understand -- well, you know, I'm troubled when co-conspirators get different drug quantities, when they get different things where I think they

should be the same analytically. I've had that happen where -- in other cases where witnesses cooperate and they get a higher base offense level than the person who is at the top of the chain. And I know sometimes the Court is concerned -- and I don't always say it's not proper concern -- that maybe the person was willing to stipulate to more because it was part of a plea agreement and, you know, maybe they thought they could get a better deal and the like.

But we think about -- we try, I think, to be consistent on those things whether it be on the quantity or the role, so I think we ought to visit about it at the break here, try to reconstruct how Mr. Cutkomp got where he got on that, what the thinking was at that time, think about how the quantity disparity factors into that since it's an aggregate disparity and see if there's anything we can resolve between the parties. And if not, we'll give you our best judgment after the break.

MR. PARRISH: May I add one point, Your Honor --

THE COURT: Yes.

MR. PARRISH: -- I think the Court ought to think about? I think Mr. Colloton's response about the 38, level 38, that Mr. Cutkomp stipulated to should be taken in light that he's correct. A lot of things come out of humans that are quite different. He didn't have an expert. Save for the expert Mr. Honken would have been basically in this same

situation as Mr. Cutkomp was because the government's own lawyers didn't know that that lab guy had done what he did. So consequently, to use that as a balancing factor is not quite fair because Mr. Cutkomp's attorney didn't hire an expert to go through the records to find out the lab guy wasn't being honest with everybody.

So that's not a good balancing test there to say he stipulated to a 38 as a reason why now there should be a disparity here of a minus 2. I thought he didn't get any adjustment, but I now understand correctly that it appears to be a minus 2 as a minor participant in a conspiracy.

MR. COLLOTON: I see the point Mr. Parrish is making. I only brought it up because we're talking equity.

THE COURT: Right.

MR. COLLOTON: I do think it's relevant to equity. There's an argument that Mr. Cutkomp inequitably got level 38 in light of the Court's findings here and the problems with the evidence. That's why I brought it up.

THE COURT: Except it wasn't inequitable -- it depends upon what your time frame is. At the time if you assume the legitimacy of the government's report, there was nothing inequitable about stipulating to a 38.

MR. COLLOTON: I see.

THE COURT: In hindsight, it doesn't look too smart, but that's hindsight. And I think your point is well taken.

Some stipulations, some people -- some you win, some you lose.

MR. PARRISH: On the basis of the record, Your Honor, isn't he entitled -- I mean, I don't know without any ruling. He may be entitled to a 2255 motion based upon what's come out of the hearing, Mr. Cutkomp.

THE COURT: Well, except that he got a 5K1, so all of this stuff goes out in the wash I think with the 5K1 motion, but it's troubling that -- Mr. Reinert, are you troubled by this at all?

MR. REINERT: I am, and I recall at least -- it's been a long time since I went through it, but the record here, we've got a lot more record here to deal with as to the relationship of what people were doing and who was doing what, who recruited whom. We've got a substantially better record now than we had at the very beginning of the case because we've had a lengthy hearing here and more investigation, more interviews.

My recollection with Mr. Cutkomp was the activities that we had in the -- we, of course, did not have any interview with Mr. Honken at all to weigh against Mr. Cutkomp. My recollection was a lot of his activities were Mr. Honken set the price. I think that even came out in the hearing. Mr. Honken set the price. Mr. Honken came up with the recipe. Mr. Honken directed me what to do. He

taught me how to do everything. I ran errands. So is it -- my recollection was it was more I was the errand boy, the annual -- the manual laborer working under the tutelage of the supervisor.

I think in the hearing that we've had here now over the last five days, two months, five days over the last two months has shown a little more detail that we didn't have at that point. I'm sure Mr. Parrish wishes we knew everything or maybe wishes we didn't know everything. There are times when, you know, I wish we could know everything up front, but we just can't. We do the best we can with the evidence we have at that point. When we entered into it, I don't recall if it was a stipulation or just a request even. It may have even been a stipulation. That was based upon the best evidence that we had at the time, just like the base offense level 38. Unfortunately hindsight's always 20/20. Maybe it was wrong to give him two off at that point. I'm not sure. We can't do anything about it at this point.

THE COURT: And in some respects it's less of a problem because of the 5K1 motion.

MR. REINERT: Certainly.

THE COURT: I mean, I'd be even more troubled by it if there wasn't a 5K1 motion because the 5K1 motion in some sense certainly lessens the impact of any inequity or maybe perhaps even eliminates it because as I recall you made a 5K1

and a 3553(e) motion, and I was able to just give the sentence that I thought was appropriate regardless of the guideline calculations.

MR. REINERT: It does, but as the Court has noted, when we've gone through stipulations with counsel even at this hearing, when we stipulate to something, we want it to be accurate. We don't want any ambiguity. We don't want any problems. If it's a stipulation, it's a stipulation. And we're trying to be as accurate as we can, and we try that in our plea agreements as well. When we go through it, if a defendant wants to stipulate to adjustments or acceptance or whatever, we do our absolute level best to make it right. Unfortunately there are going to be cases where you're going to be wrong, and we hope to keep those to a minimum.

THE COURT: How long of a recess would you like, Mr. Reinert?

MR. REINERT: If we could have maybe 10 minutes or so, Judge, maybe 15.

THE COURT: Why don't we be in recess until 3:45.

(Recess at 3:26 p.m.)

THE COURT: Please be seated. Mr. Reinert, are you ready to start without Mr. Colloton, or should we wait?

MR. REINERT: We can start, Your Honor. Your Honor, sometimes a few minutes spent in discussion with opposing counsel will save everyone some time. I believe we've come

to a stipulation regarding role. The defendant and the United States would stipulate that a three-level role enhancement would be appropriate showing the defendant to be a manager or supervisor of the criminal activity involving five or more persons.

THE COURT: Is that so stipulated?

MR. PARRISH: We would so stipulate, Your Honor.

THE COURT: I think the evidence supports that, and while it's troubling that there's a disparity on the issue between the defendants, that's not necessarily anybody's fault. I think that happens as cases evolve over time and the like, and it's probably what I would have found, but I'm not sure, but I think it's clearly supported by the evidence. And appreciate counsel's efforts in reaching the stipulation on the adjustment for the role in the offense under 3B1.1.

Okay. What should we take up next? Obstruction? Is that your area, Mr. Colloton?

MR. COLLOTON: It's been assigned to me by Team Leader Reinert, yes, sir, so I will be happy to discuss it.

MR. REINERT: Your Honor, the agents did note when the Court was pointing out the legal scholars in the courtroom that there's only one name absent from the list of the attorneys in the room, but that's okay.

MR. COLLOTON: Well, we've cited, Your Honor, in our brief multiple bases on which we think an adjustment is

warranted, and I will I think touch on each of them, particularly in light of some of the evidence since the filing of the brief and respond to some of that.

The first thing we talk about are the attempts to kill Mr. Cobeen and others that are, as we see it, demonstrated by the tapes which are Government Exhibits 1B through 5B as well as testimony of Mr. Cutkomp.

And as I understand the defendant's position in relation to ours, there really are two questions here. One is whether the defendant intended to kill or harm, intimidate in any way Mr. Cobeen or others. And second, in his brief he makes a legal argument relating to whether -- even if he did have -- that he actually did an attempt or whether he was simply in the prep -- what I think the cases call the mere preparation stage of something along those lines.

So let me start first with the question of intent. Mr. Honken's version of these recordings that I know the Court has listened to is that he was indeed talking about killing Mr. Cobeen, talking about finding and harming agents, chemists and the like but that he was just doing that, he says, to keep Mr. Cutkomp from killing someone. Well, Your Honor, I suggest that the tapes themselves show that that is just an unreasonable -- an unreasonable thing for the Court to believe. Not at one time on these tapes does Mr. Honken try to talk Mr. Cutkomp out of doing anything obstructive.

If that were really his state of mind, we would certainly hear him saying to Mr. Cutkomp, We don't want to do anything like that. Stop what you're thinking about doing. Let's just go to our attorneys and prepare a defense or whatever. That is a glaring absence.

Second -- and I won't dwell on the transcripts too much unless the Court wants more citations -- but there are several places throughout where Mr. Cutkomp himself says that he couldn't do it, he couldn't kill someone. He says that on Exhibit 3B at page 17. I can help you get stuff, but I can't do that. There's a discussion later in that same transcript about what Mr. Honken calls the rules in war where Mr. Cutkomp is saying, No, none of that, after Mr. Honken suggests he could go around and clean house if he had to.

In the last tape at page 23 Mr. Cutkomp says, I could never pull it, meaning I think in the context the trigger or something to that effect. And Mr. Honken himself in the conversations acknowledges that he understands that Cutkomp couldn't do this. In fact, right after Cutkomp says, I could never pull it, Mr. Honken says, I know, I know, I know, I'm glad you know your limitations.

There's another place in an earlier transcript where he says, If I was like you, I would be very scared. And if you read the whole excerpt which is at page 30 of Exhibit 2B, he's saying if I was like you and didn't have the wherewithal

to actually go out and take care of witnesses, I would be scared because I might face liability.

He also talks about how if he, Mr. Honken, is put into the Linn County Jail, meaning detention, then we're all F'ed as he puts it because there would be no one who could take care of the witnesses. That's Exhibit 4B at page 23.

There's even one place, again, totally contrary to Mr. Honken's testimony, where he gives advice to Mr. Cutkomp about how Mr. Cutkomp could carry out the plan if Mr. Honken were detained. That's Exhibit 3B at page 19. He says, Your best bet would be if something did happen to me, get one of those little cheap red lights, look like an undercover car, get somebody else's vehicle, borrow somebody's, wait till he goes somewhere at night, pull him over, walk up, poof.

Now, if that is the statement of somebody who is so concerned that Mr. Cutkomp is going to kill somebody and is trying to talk him out of it, then the world is upside down. It just doesn't make any sense.

So I submit the Court ought to just discredit Mr. Honken's testimony about what was going on here in terms of his intent. He had to admit that they were talking about harming witnesses because it's obvious from the tapes. And so it seems to me the only issue can be whether it's an attempt for purposes of guidelines.

Now, Mr. Parrish's brief cites a case -- I believe

it's called Monholland from the Tenth Circuit -- and a case called Ivic, I-v-i-c, from the Second Circuit for the proposition that the evidence here does not support a finding of an attempt to kill someone. Monholland has been cited a couple times by the Eighth Circuit, once in the case we cite called U.S. versus Johnson and once in a case called U.S. versus Mims which is 812 F. 2d, 1078. And both of those characterize Monholland as essentially abstract general discussions. Mere abstract talk is the way Johnson describes it. And I think the Mims case has similar language.

What we have here, I submit, is more than mere abstract talk. We have specific actions taken by this defendant and Mr. Cutkomp at his direction, though he's a cooperator to further this plan to kill witnesses.

And I specifically want to note the Ivic case which is cited, as I said, by Mr. Parrish. There's a footnote in that Ivic case where the Court says, Relevant to our task is the immediately following sentence of the Model Penal Code, which we set forth in the margin. Then in a footnote it says, Without negativing the sufficiency of other conduct, the following, if strongly corroborative of the actor's criminal purpose, shall not be held insufficient as a matter of law, meaning insufficient to show an attempt. Two of those examples are these: One, reconnoitering the place contemplated for the commission of a crime; two, possession

of materials to be employed in the commission of a crime which are specially designed for such unlawful use or which can serve no lawful purpose of the actor under the circumstances. That's from Mr. Parrish's case.

Now, in these transcripts, we have specific evidence that Mr. Cutkomp was sent to reconnoiter, in the words of Ivic, the place where the crime was being committed. He was told Exhibit 3B in pages 2 to 4, Exhibit 4B at page 13 and also in the first exhibit at a page I don't have handy that Mr. Honken needs him to go do surveillance, find out where Mr. Cutkomp (sic) is, what the setup is. There's one discussion where Mr. Honken complains that he can't lie in wait at a particular location because it wouldn't be a good way to carry out the crime.

There's also, I believe, in the last transcript a discussion of Mr. Honken having been driving around and found out, as I understand it, by Mr. Jackson or someone who then tried to clamp down on his pretrial release.

We have with regard to the possession of materials to be employed in the commission of the crime two pieces of evidence relating to a firearm. They're talking about, of course, shooting somebody. We have poof throughout the transcript. We have evidence of Mr. Honken -- and we'll get to this with the gun adjustment too -- but trying to buy a firearm while he's on pretrial release. The Court heard from

Mr. Zirbel who wouldn't sell it because he was smart enough to know it was not a good thing for him to do. He told Mr. Honken if he didn't have a permit he wouldn't sell it to him. So Mr. Honken goes to Rick Held who, as the Court knows, says he got the gun from Mr. Riepma, told Mr. Honken that it was in his truck and he could get it when he wanted to. Mr. Honken's explanation for that gun is, It was for my girlfriend. She's moving to Des Moines.

I suggest to the Court that that is not credible and the evidence shows isn't credible for this reason -- these reasons: Number one, Mr. Held himself said that as soon as Mr. Honken was detained he got a phone call from a woman identifying herself as the girlfriend saying that Dustin doesn't need that pup anymore. If it really were for the girlfriend, his detention would have no bearing on her need for the gun, and I think that's the main reason why the story given by Mr. Honken is not believable.

Second, though, we did put on evidence that the girlfriend herself already had bought a gun which is I think Exhibit 6 or 7. It's the Tech. 9 that was purchased in the Waverly/Waterloo area.

Now, you know, our -- this really is really only a point to consider if the Court believes Mr. Honken on another matter about the destruction of a gun. I mean, our interpretation of the evidence is that the Tech. 9 was

destroyed by Mr. Cutkomp and Mr. Honken by melting it down with a torch and that gun was gone as of sometime late '93. But Mr. Honken's testimony is the gun was never destroyed, and so he doesn't explain how if the gun destroyed was not Angela Johnson's gun why she needed another gun to go protect herself in Des Moines, assuming you even believe that Des Moines is a place where she would need one.

There's also, of course, Mr. Honken's own description of a gun that he had that fired 1,400 rounds a minute or over 1,000 rounds a minute. Now, we submit what the evidence shows is that the gun destroyed with the torch situation was the Tech. 9. That's what Mr. Cutkomp says. The transcripts show the discussion of the gun clearly in the context of what happened in 1993. I can point out specific places on that, but the evidence just doesn't support a finding that the '95 time period is when the gun was destroyed.

So when Mr. Honken says, Well, I didn't have the SKS rifle and I was just making up the existence of another gun on the tapes, I think the Court has to view that testimony in light of whether it finds the testimony about the destruction of the SKS credible. And I suggest it's not credible. And the inference the Court can draw from that is he's trying to hide something about what gun he had then. And he did, in fact, have another unexplained gun which is this Chinese SKS

rifle that Mr. Riepma said he sold him. And that matches with the testimony -- I mean the statements on the tapes about the gun.

The third thing I'd mention, of course, is the efforts discussed and taken to avoid electronic monitoring. Mr. Honken it doesn't sound like actually got to the point where he could avoid it, but he had taken steps in that regard. He had sent Mr. Cutkomp to the Radio Shack to get a device, a frequency meter, that could be used for that purpose. He had literature in his locker that is at least suggestive of an intent to do something along the lines of what he said in the tapes.

And so we don't have to prove that everything was done but the last act before killing someone in order to show an attempt. I don't think law enforcement would have been serving the public well to let this go on to a point where maybe something would happen where somebody would get killed or somebody would get hurt.

And to say that because they stopped it when they did this is not an attempt would really, I think, be inconsistent with the case law, and it would just not make sense because it would give law enforcement the wrong incentive to solve these crimes after they can be sure that they've corroborated the attempt but before somebody gets hurt. So that's our view on point 1 or point A of our brief.

Point B in our brief relates to attempts to kill Mr. Cutkomp. These go together, of course, because you see a pattern of behavior here by Mr. Honken that itself corroborates the testimony of the witnesses. But the principal source of the information here was Mr. Donaldson, and the Court's heard testimony from him. We've addressed it in the brief. But the thing that makes Donaldson believable are these documents. I can understand the Court would wonder, you know, this fellow is in prison who's ambiguous as to exactly what benefit he got, but I think he was candid to say he wanted some benefit for the testimony, so the Court has to say is there corroboration for his testimony such that I can believe that he really was solicited to go out and kill somebody.

Now, we have produced documents that Agent Hein seized from the place where Donaldson said he had kept his belongings, and Mr. Honken, of course, will agree to certain of the documents and he'll explain those, but he won't agree to the other ones that are more incriminating. And the documents are of a piece. It just doesn't make sense for Mr. Honken to say, Well, we talked about the address for Darrell Cobeen, but the other piece which is the note that goes to Dan Cobeen's family as a part of the plan is not something I talked about. He says implausibly, I suggest, that he bonded a guy out of jail to go to Rick Held to

eventually get some furniture for his girlfriend from Cutkomp's house. Talk about a roundabout way to get your property moved. It just -- it just doesn't make any sense.

And I think that if you look at the totality of the evidence on this matter, particularly these documents, it is not reasonable to believe and certainly not more likely than not that Mr. Donaldson somehow concocted this plan to put documents in a storage area, get rearrested, wait a little while in the jail, call up the DEA, and then tell them, I've got a treasure trove of evidence in a house and have planned out where he's going to somehow use all of that to get what he doesn't think was a very good deal but which, you know, was some kind of benefit to him in the state proceeding.

If it were just his testimony standing alone, we'd have obviously a different question. But here there's corroboration that is not explained in a believable way or unexplained and, therefore, is strong evidence that it's part of a pattern of behavior by Mr. Honken.

We address next the matter of the hydrogen tank. Jay Lien says, of course, that he got it from Mr. Honken and then later Mr. Honken asked him to move it. As I recall -- I don't recall his exact words, but it was -- I believe that Mr. Honken told him to move it to another location. And that hydrogen tank was a part of the manufacturing process.

I understand Mr. Honken says today there was no

incentive for him to hide that, but I would be shocked, Your Honor, if we were here in a case, either a trial or a sentencing hearing, where we didn't have a hydrogen tank and they weren't hearing they don't even have a hydrogen tank, they weren't capable of producing anything. There's an obvious reason for a defendant in this kind of case to want that hydrogen tank to be gone.

Now, they do, as I recall, raise in their brief a question about the timing of the direction from Honken, assuming you believe Mr. Lien. And as we reread the transcript, we didn't think that the defendant's position on that was correct. As I read the testimony at 191 and 192 of the transcript, Mr. Lien is saying he wasn't sure about the timing of when he first got the hydrogen tank from Mr. Honken. In other words, as to when he first got the tank, he's not sure whether it was before or after the search. But as to the movement of the tank, he said it was after the search. It's at the bottom of 1 -- if this is important to the Court, it's at the bottom of 191, the top of 192, the carryover where he clarifies that it's as to the time when the tank was put into his residence that he doesn't know for sure. That's how we read it.

THE COURT: Run that by me again because I'm trying to follow here. It seems to me he says he doesn't know about the timing of it at the bottom of 191, top of 192.

MR. COLLOTON: Yeah. As I read that, Mr. Reinert had asked him, Did he put it in your residence after the house was searched, so that question goes to when the tank first came over to the house. And on that he says, That one I don't know for sure on the time as to when his house was searched.

THE COURT: Well, doesn't it have to be -- they didn't seize it at his house when his house was searched?

MR. COLLOTON: No, no. I hope this -- as I understand what's in the record on this, Judge, the tank was seized from a Mr. Flaherty --

THE COURT: That's right.

MR. COLLOTON: -- who was a friend of Mr. Lien, and what Mr. -- as I understand Mr. Lien's testimony, he was --

THE COURT: Well, why does it make a difference for obstruction of justice purposes if he was asking it to be transferred for concealment purposes whether it took place before the search or after the search? Does it make a difference?

MR. COLLOTON: Well, I don't think it does. I should have probably prefaced my comments by saying that I don't think as a matter of law if his intent is to hide it, conceal it, it matters whether it's before or after the search, and I think that is the right answer legally. If the Court finds that intent, then it satisfies the guidelines. I

probably should have not jumped right to the factual question, but that was Mr. Parrish's argument, so I wanted to respond to it.

Mr. Honken's testimony is that Lien moved it because it was flammable and he was concerned about the flammability of the tank. You'll note there's nothing in here about that from Mr. Lien. He never said he moved it because it was flammable. It was never suggested to him that that's why. And he says on page 192, line 6, He told me to remove it and take it elsewhere, line 8, take it to a friend's house or to get rid of it away from my house. Mr. Cutkomp says in his testimony that Mr. Honken advised him at some point after the search that the hydrogen tank was in a safe place. That's consistent with what Mr. Lien says, inconsistent with what Mr. Honken says.

Let me turn to the matter of the attempt to escape from custody. We've had, of course, I'm told now 18 witnesses. I don't know exactly how many were interviewed, but, again, we understand the Court's potential concern with credibility of people who are parading in in orange jumpsuits, and we appreciate the Court's indulgence in hearing so many witnesses, but that's the nature of our having the burden. When we have the burden on an issue like that, we feel like we need to bring in sufficient people so the Court can decide whether something that's alleged here

did happen.

THE COURT: It has to be a record, though, for two points in a sentencing hearing.

MR. COLLOTON: Well, we appreciate the Court's guidance.

THE COURT: That's a compliment to your thoroughness and zealousness, not a complaint or objection.

MR. COLLOTON: Well, I think part of the reason here, Judge, obviously is the government was concerned about the magnitude of the conduct here, and we submit that the first two issues show that Mr. Honken had intentions and took actions to take some very serious steps toward obstructing justice, and that's why we think that the fact that he was involved in an effort to get out of the jail is more relevant than it would be in some other case.

We've had witnesses here from Mr. Putzier to Mr. Bregar, Mr. Frye, Mr. Brownlee who said that Mr. Honken was involved in this plan one way or another. There's physical evidence that the Court has seen in pictures that corroborates that testimony. Mr. Honken's explanation seems to be that Mr. Sabasta was an intimidating fellow, and he, therefore, let Mr. Sabasta bang on his wall. Conveniently he says there was already a small hole or a chip, as he put it. And so his letter to Dennis Putzier about how there are witnesses who could say the hole is already there is

consistent with his view of the evidence. That, Your Honor, is just too convenient, I suggest, and it just shows again that Mr. Honken is not credible in his testimony about these issues.

I know there has been some suggestion, well, this was -- I don't want to use the words nickel-dime stuff but, you know, that it was an attempt to get through a hole in a wall in a jail that's never been escaped from before and the county attorney didn't charge it, et cetera, et cetera.

We don't know why the county attorney didn't charge it. I think the Court should not give weight to that. You know, there was no record made as to whether they just thought in their discretion it wasn't worth their time since the federal government's working on the case, if they thought there was insufficient evidence based upon what they had at the time. But the point is under the law as we've seen it, this is certainly sufficient for the adjustment if the Court doesn't find it on the other bases.

We've cited some cases in here including one that I thought was remarkable in the sense that there was a guy with a dislocated ankle wearing chains, leg irons, and handcuffs who attempted to open an emergency door and said, I had nothing to lose by trying, and the Court rang him up for two levels, and the circuit affirmed. So if that's obstruction, then this is obstruction because we had, you know, a pretty

sizable hole in the wall of the jail. I understand maybe they couldn't fit through it there, but that was a fairly elaborate attempt involving the activity in cell block C and activity in D trying to get over to C.

Finally and certainly not least, we have the matter of Mr. Nicholson and Mr. DeGeus. This is a matter of, of course, grave importance to all parties I think. And, you know, I think the Court has been presented with an abundance of obstruction evidence here. The Court may not have to resolve all of these issues, and this is one that's, of course, very weighty. We think the preponderance of the evidence supports a finding that Mr. Honken was involved in or responsible for these disappearances. We base that on the information that we've put in through Agent Basler about the disappearance of these people, Mr. DeGeus, Mr. Nicholson, his girlfriend, Ms. Duncan, and the children. The timing of it, the fact that there's been no trace of them since all makes it more likely than not in our view that they are deceased. And we have, of course, testimony from Mr. Cutkomp about his conversations with Mr. Honken.

But the most powerful evidence here again are these tapes, and I think it was telling when Mr. Honken tried to explain some of the discussion of 1993. I don't know how the Court took that. The Court will have to make its own judgment on that. But there were times when we were talking

through some of those excerpts about the discussion of '93 where Mr. Honken was jumping from one topic to another topic to another topic within one page, and he was saying things about how in 1993 the concern that Cutkomp had was the dismantling of the lab. And then there would be a couple lines later something about a gun, and he'd say, Well, that was a gun from 1995. And then there was a line, as I recall it, shortly thereafter about the possibility of one of them showing up, and that didn't fit his explanation, so he had to switch back to something about the witnesses.

I don't mean to misstate the record. I'm going by memory. But there were times when the explanations were so incredible that it just made the tapes themselves in our view more powerful than they were already.

So I don't want to -- the Court obviously has said it's a two-level adjustment and we spent a lot of time on it with evidence. I don't want to burden the Court unnecessarily with further argument. But suffice it to say that with all of that spectrum there certainly is a basis for a two-level adjustment and perhaps some additional sanction that we can talk about later. Thank you.

THE COURT: Thank you, Mr. Colloton. Mr. Parrish?

MR. PARRISH: Thank you, Your Honor. What I would like to start with and perhaps go maybe in some order not in the same way that was presented by Mr. Colloton is the fact

that I think standing here today in this courtroom we would all be perhaps fooling ourselves if we didn't think that the driving force for the government in this matter was not the act of the disappearance of the other witnesses. And I think that what we have to look at, Your Honor, is put this obstruction of the two points in its proper perspective and stand back a couple of seconds as we take a look at it.

We've had the grand jury since 1993 review this case. Agents perhaps scoured the countryside and all other aspects of Iowa interviewing witnesses, intercepting every letter written by Mr. Honken, monitoring his phone calls, taping his phone calls, having his best friend at some point tape him for approximately 11 -- 9 to 11 hours, agents perhaps for whatever reasons not disclosing the full amount of what meth was found.

If you put that in its entire context, the government comes in on the obstruction with regard to that and tells the Court let's take a leap of faith here, and the leap of faith is there's something out there, Judge, and we can find it by making a leap of faith not with any evidence that has come from any of these items including 11 hours of taped conversations, intercepting of all the mail that was, in fact, found there, and not have one iota of physical evidence, one iota of evidence from this entire investigation, to support the fact that Dustin Honken other

than a conversation where he and a lifetime friend were engaged in -- and even in that conversation I think the government would agree there's not one admission by Dustin that he did anything to harm these people. And that's the driving force, and the government has nothing, Your Honor, to support that allegation other than having the Court or any other person take a leap of faith with regard to that conduct.

And that's why for two points the government harnessed all of its evidence, everything you could find both in state court and in federal court and all their agents to come in and say this is what we have.

Now, to take a second look at the comparison with the attempt to escape that Mr. Colloton compares which is somewhat interesting, here is an injured prisoner I assume guarded by deputies if he's in chains going through an emergency door and making the admission in front of guards, and he says compare that to every witness who came into this courtroom who testified about Dustin had a record not for just some violent act but for lying, every state witness who came in and testified, and those are not all of the witnesses they had. They indicated they had talked to at least 10 more by the stipulation that they had or 12 more by the stipulation that they had.

And yet through this testimony and the testimony of

the jail personnel did the state, first of all, get any evidence that was adequate to file any charges against Mr. Honken. And not saying that that should be, in fact, the standard this Court ought to look at, but not one single charge was filed, not even a simple misdemeanor.

If you look at what he said to compare to what the other people said about the escape and the fact that he was in this institution which appears to be from the records we introduced a somewhat unfriendly place to him, and for whatever reason it appears clear that it was an unfriendly place to him, not just in the inmates who were there but also within the jail personnel who had to deal with him.

Now, who put the rumors, who put the innuendos out? We don't know, but someone made the effort of putting him in that position for 20 months for whatever belief they might have had as to his conduct or what they thought his conduct might have been. So he had to put himself in a posture for those months while he was there to protect himself. And his conduct does not warrant an obstruction based upon what he did, whether or not it's manipulating inmates against each other or to protect himself from physical harm or whether it was not to make sure that the jail did not impose some sanction on him that he would consider to be unfair.

When individuals are placed in that situation, I think within reason they are allowed to be manipulative to

protect themselves. But manipulative to protect yourselves and then coming to a level where he is charged with obstruction and adding two points to already a fairly severe sentence based upon the resultant quantity does not seem fair in this instance.

So we believe, Your Honor, that the attempt to escape -- and without going through the detail of each of these witnesses who came in and clearly talked about their past in the sense that does not warrant any credibility being given to them, does not warrant this Court taking any testimony of theirs and using it against Mr. Honken to get any obstruction for an attempt to escape.

The hydrogen tank, I would say what's the difference in the whole context of the tank if his admission to the attempt to manufacture is in place? What does the tank hide, or what does the tank show? They have the photograph of the tank. They knew the tank existed. They knew the tank had to be there in order to produce the item. And their witness, Mr. Lien, cannot substantiate any particular dates that the tank was, in fact, removed. Whether it was before or after the search he wasn't quite clear on or whether he did it solely at the direction of Mr. Honken.

And does it tie in at all to the ultimate factor of the attempt to manufacture sufficient to add an obstruction for the fact that it wasn't there even if, in fact, he did

tell him to move it?

I want to make sure I've covered -- I believe he argued -- did you argue possession of the firearm at this point?

THE COURT: We're not into the firearm. We're just on obstruction.

MR. PARRISH: All right. I think -- go ahead, Your Honor.

THE COURT: No. I was just going to -- no. Why don't you finish up on obstruction.

MR. PARRISH: Okay. I believe the last two points with regard to obstruction that the government made is the testimony about the attempt to kill Mr. Cobeen I believe and others, and I assume Timothy Cutkomp would be in that. Now, except for the tapes, I don't believe the government is arguing that any other evidence exists. I believe that's the ultimate argument that they make.

Now, I would think, Your Honor, that this Court -- and I don't want to go back and repeat all of the arguments I made earlier about the tapes, but I do think that the tapes have to be put in context, and this is the context that they ought to be put in. Number one, clearly these people were friends who had been friends for a number of years. Clearly the evidence appears that they had engaged in conversation prior to the time that the tapes were going to be made.

Clearly they had talked at work, and that was evidence that was not disputed by Mr. Cutkomp, nor was it disputed by Mr. Honken.

And further, the evidence shows that Mr. Cutkomp, according to his testimony, was under psychiatric or trying to get psychiatric care during that time. What's important here is that Mr. Honken, not being knowledgeable of this fact, did over and over in the tapes talk about Cutkomp losing it. And his testimony which took place after all of this shows that he believed at this point, looking back, that he was right, that his relationship changed drastically with Mr. Cutkomp in 1995 and, number two, that Mr. Cutkomp's conduct was consistent with an individual who he had known all of his life that now had changed to a human being that was entirely different than what he had experienced.

Under those circumstances, I think that it's clearly plausible and reasonable that his conduct during that period of time with him on tape shows that he was basically trying to placate him, trying to calm him, trying to get him to understand that nothing was going to happen to him. And I think that is a reasonable interpretation of the tapes considering Mr. Cutkomp's conduct, how he was acting, and his background in dealing with Mr. Honken.

Finally with regard to the taped conversation, they have to be put in context with the actions of Mr. Cutkomp

also, the fact that he was now an agent telling Mr. Honken earlier that he thought his conversations were being taped at Mr. Honken's house. So he knew at the time Mr. Honken well enough to soothe him or get him to try to make as many admissions as possible. And here you have 11 hours of conversation where Cutkomp knows he's a government agent working with a person he's known all of his life and manipulating him in a fashion to get the greater admissions, and this is all you end up with. Then you take that, and you say can you turn that into an attempt without any follow-up conduct on Mr. Honken's part? The government's argument is that, well, at some point good law enforcement comes in and interferes and stops it. Well, the cases that we cite -- and I won't go through the argument in the cases, but it takes a lot more than a mere discussion. It takes some act. It takes some follow-up and doesn't take just the thought process, and it needs a lot more, Your Honor, to get to obstruction of justice.

THE COURT: Is that it, Mr. Parrish, on obstruction? I hope so. I'm ready to rule on obstruction.

MR. PARRISH: Okay. That's fine.

THE COURT: I find that the government has carried its burden of proof to establish a two-point increase or adjustment for obstruction of justice. I'm going to try and finish this sentencing tonight, so I'm just going to make one

factual finding. I'm confident it will not be overturned on appeal. If it is, you can come back to me, and I'll make additional findings of fact. And I'm taking the easiest one. I normally don't take the easiest one, but I am. I find that government's carried its burden of proof in establishing that Mr. Honken requested Jay Lien to transfer the hydrogen tank from his house to another location -- from Mr. Lien's house to another location, that is, the location of an individual named Jerry Flaherty, and that was done for the purpose of concealment and to obstruct justice in the case, the connection being that it would allow the defendant to argue that there was a missing step in the chain of command with regard to the production of the methamphetamine.

And I often do make alternative findings of fact. I'm not going to make alternative findings of fact on the other obstruction of justice issues at this time. I think it's unlikely I'll ever have to make them. And there are some reasons why I don't particularly want to make the findings of fact. Now there are some collateral consequences in terms of grand jury proceedings and the like. And unless I'm absolutely required to make those findings of fact, I'm simply not going to do it at this time. I hope the government understands my position, whether you agree with it or not.

MR. COLLOTON: (Attorney nodded head.)

THE COURT: The gun adjustment.

MR. COLLOTON: I'll speak to that too, Judge, if I may.

THE COURT: We're now I believe at a level -- just so everybody's tracking, base offense level 36, adjustment for role in the offense takes it to a 39, adjustment for obstruction of justice, we're at a 41.

MR. COLLOTON: I do understand the Court's thinking on the obstruction and not wanting necessarily to make findings on everything. I'm a bit chagrin to say that I have to raise at least one of those in the context of the gun.

THE COURT: No. And I understand that.

MR. COLLOTON: And that may require the Court -- may or may not require the Court to make a finding at this stage.

THE COURT: I understand, Mr. Colloton.

MR. COLLOTON: But let me start with one that I don't think would require the Court to make a finding on on some of the other obstruction issues, and that is the testimony about the Tech. 9 firearm.

There's a record that Angela Johnson purchased that in July of '93 that's in evidence. There's testimony from Mr. Cutkomp that Mr. Honken came to him and asked him to help destroy that by melting it down with a torch. There is -- there are statements on the tapes about the use of a torch to destroy a gun. There's discussion about a gun that

Mr. Cutkomp is worried about.

We've already said our view of that evidence, that it is about the Tech. 9 in '93, and the context makes it clear it's not about something that happened in 1995. And Mr. Cutkomp said he was told by Honken that one of the reasons he had the gun was for protection from Mr. DeGeus who was a co-conspirator in the conspiracy. If the Court finds that testimony to be credible, finds that Mr. Honken did have the gun for that purpose of protection during the conspiracy, then that is a sufficient basis for a two-level adjustment for possession of a firearm.

If the Court does not find that way, then I would have to ask the Court to consider the Rick Held gun which is the .380 gun and to -- and our position on that gun, as we set out here, is that Mr. Honken did constructively possess it. I've gone through the analysis on that. I think that Held was an agent of his trying to buy that gun for him. He told him it was available for him to pick up in his truck, and he was a person who because of their relationship could have produced it and would have produced it I think the evidence shows if requested by Honken.

So the evidence is that he tried to get that gun during pretrial release while the matter of the Cobeen witness intimidation was discussed on the tapes. And so that gun was possessed, we submit, with respect to the obstructive

conduct, the attempt to intimidate or kill Cobeen.

We also submit that the high-powered gun described on the tape was possessed for that purpose. And with respect to the claim that there was no such high-powered gun and that Mr. Honken was just making it up, I ask the Court to focus on page 24 of Exhibit 3B where Mr. Honken says he's scared and he says that he's worried about Mr. Cutkomp being wired. He says that right before he then describes this gun that fires over 1,000 a minute.

And we submit, Judge, that if he really were just puffing here, he would not be talking about somebody being wired and saying, I'm scared, man, I'm scared, I'm scared. That makes his statement believable. He's worried that it's going to be monitored for the very reason that we're here today.

So I guess in summary, we think the evidence would support a finding that he possessed this Tech. 9 for protection and that would warrant the adjustment. If the Court doesn't find that, we'd ask the Court to make a finding whether he possessed the .380 pistol, whether he possessed the gun described on the tape and, if so, whether that was used -- possessed in connection with the obstruction that was relevant conduct of the offense.

THE COURT: Mr. Parrish?

MR. PARRISH: Your Honor, I would have no argument

with regard to that and just ask that the Court adopt the probation officer's response on that matter.

THE COURT: Can you refresh my recollection, Mr. Colloton, about -- wasn't this gun from the coemployee at Kraft in the person's truck or something?

MR. COLLOTON: Yes. Mr. Held testified that he obtained it from Mr. Riepma, put it in his truck, and told Mr. Honken -- I can get the exact words but something to the effect that it's in the truck and you can get it if you want.

THE COURT: And he never got it; right?

MR. COLLOTON: He never got it, and the evidence was that he was arrested within a matter of days thereafter.

THE COURT: I understand that, but he had a couple days to get the gun, and he never got the gun, and your argument is but he was in constructive possession of it. I just want to make sure I'm --

MR. COLLOTON: Yeah, I think the record is there was some small period of time of when he was notified that the gun was there and the time he was detained. He was on notice that he could get it, but he didn't get it until -- I mean he never got it because he got detained. Then Mr. Donaldson testified that when he was bonded out, Mr. Honken told him he could go to Rick Held and get a gun.

THE COURT: Had he paid for the gun?

MR. COLLOTON: Held says that Honken had paid him

and that Held had paid Riepma. The exact testimony that I quoted in our brief is that the gun was in Held's pickup truck, quote, if he wanted to get it at any time, unquote, page 164 of the transcript.

THE COURT: And at least your argument is that he was getting the gun to further his obstruction of justice activities.

MR. COLLOTON: Yes.

THE COURT: That's the inference.

MR. COLLOTON: Pardon me?

THE COURT: That's the inference.

MR. COLLOTON: The inference, and that's based on two things: One, the timing because it's right before his detention when he's in the midst of these conversations and, second, what I submit is a false exculpatory explanation that he was getting it for the girlfriend which is contradicted by the phone call Held gets right after that and the fact that Held still had the gun, the girlfriend never got it.

THE COURT: I'm going to take a five-minute recess.

(Recess at 4:45 p.m.)

THE COURT: Please be seated. What's the application note on the definition of the firearm that talks about the clearly improbable language? 3, application note 3 to United States Sentencing Guideline 2D1.1? That's the operative application note, isn't it, Mr. Colloton?

MR. COLLOTON:  I believe it is, yes, sir.

THE COURT:  The application note says the adjustment should be applied if the weapon was present.  It doesn't talk about possession, so I don't think your constructive possession argument -- while I think it's arguable -- I think you made a very good point that maybe you met the elements of constructive possession with this gun in the truck, but the application note talks about it being present.  That's different than possession.  Do you disagree with that, Mr. Colloton?  That's what the note says.

MR. COLLOTON:  I don't disagree that's what the note says.  The guideline itself says if a firearm is possessed which is 2D1.1(b)(1).  Now, the application note does use the word present, and I agree that's -- usually someone argues that's less demanding for the government than to show possession in the context of -- I think it's actual possession.  Well, whatever the application note, the guideline is controlling.  If the application note's inconsistent with the guideline, then the guideline has to control.  It may be that the application note is addressing a particular fact situation because it goes on to give an example of a defendant arrested in his residence.

But I did cite in our brief, Judge, some cases where constructive possession was held sufficient to warrant the adjustment, so I think the Eighth Circuit is in those cases

saying maybe not explicitly but at least implicitly that although it's not present, if it's constructively possessed, it can warrant the adjustment. That's on page 26 of our brief. I cited three cases there.

THE COURT: Well, again, this is a close question, but I'm going to go with probation and hold that the government failed to carry its burden of proof on this issue with regard to all three of the guns.

Acceptance of responsibility? You know, I've given this matter a lot of thought. I've read all the Ninth Circuit cases. I've looked at additional case law from other circuits. I don't need extensive argument on it, but I'd be happy to hear --

MR. PARRISH: Well, that's what I was thinking. I was going to tell Your Honor I think we have outlined our position. I guess the only troubling aspect is the acceptance allotted in this case, whether the circumstances allow it. We believe it does. I'm not going to make a lengthy argument about it. I know you've heard Mr. Honken's testimony and is very familiar with the record on this matter. Unless the Court wants to direct me to some specific point it wants me to respond to, I would forgo any argument on that issue.

THE COURT: Well, let me talk to the government. Then I may come back to you on a point. Are you addressing

acceptance?

MR. COLLOTON: I will, Judge.

THE COURT: What do you think of this Ninth Circuit case?

MR. COLLOTON: Well, I was embarrassed last time that I wasn't up on that case, so I did study it and the others. What I think of that case is that some of the language in there is much broader than the facts of the case. If the broad language is the holding, then we don't think it's correct. In other words, we don't think that mere cessation of obstructive activity after a guilty plea should automatically make a case extraordinary for purposes of the application notes. In that case, as I understand it, the defendant not only pled guilty and ceased obstruction -- obstructive activity; he had done one obstructive thing shortly after the offense. The Court said it was not a methodical continued effort to obstruct justice. And then the guy came in and confessed guilt and told information about the crime, as I understand it, about the obstruction.

So at most I would read it narrowly for the proposition that under those circumstances the case is extraordinary. I think the Tenth Circuit case that we mention, Hawley, doesn't read it as broadly as one might try to read Hopper.

I also think, Judge, that frankly Mr. Honken's

testimony has to bear on this finding because I know the Court didn't want to make findings on all the obstruction issues, but you did make a finding on at least one, and he specifically denied in his testimony that he transferred that tank for the purpose of concealing it. He testified that it was moved because it was flammable at Jay Lien's own initiative.

So I think even if we didn't have obstruction we'd have an issue here whether he's falsely denied relevant conduct. But given that he's got obstruction, you have to find the case extraordinary, and then on top of that he denied the obstruction in his testimony. It seems to me that it's very hard to find that extraordinary in the favor of the defendant.

THE COURT: Mr. Parrish?

MR. PARRISH: Well, I don't think there's any doubt that he admitted his conduct with regard to the drug activity. I think to focus specifically on the tank, I think the Court has made its finding and we're not disputing the Court finding about any meanings. He did not indicate the tank was not moved. His statement was that it didn't make any difference in the overall scheme of his conduct as to whether or not the government found the tank because they knew the tank existed and was aware of the tank. So if he's going to say, well, it's his testimony that it's the key for

the Court to judge by, there's nothing contradictory about this Court finding with regard to his testimony.

Now, whether or not his testimony disputes Mr. Lien's testimony is an entirely different question, and Mr. Lien's testimony was, I think, he could not recall the date, et cetera. And the government says, well, he didn't argue solely because it was flammable, that's why -- no one asked him that question or explored that question with him. But the government wants to say, well, because no one asked him, therefore, it's contradictory because Mr. Honken testified adverse to that.

But I think, Your Honor, with regard to his guilty plea, the fact of his acceptance of responsibility, the fact of him acknowledging all of his conduct, I think the Court has to take all of that into consideration to reach that conclusion. He doesn't have to say, you know, he's terribly sorry for all of his conduct or anything like that. I don't think that's required.

But the guilty plea -- and I think this Court is aware of what came out during the course of this trial, that this was a tough, hard fight over quantity, and that's all this case was about. And we knew it when it started. We knew it when it got in the middle of the trial, and we knew it now at the end of what this -- what I would call one of the longest sentencing hearings I know that I've been

involved in in 27 years, and we know it now, and that's what he's admitted to. That was the charge. That's the only charge here, and he has accepted his responsibility and should be given credit. This is the extraordinary case without doubt. The government wouldn't put on 18 witnesses to talk about an attempted jail break if this was not an extraordinary case. And we believe, Your Honor, that this Court ought to give him credit for this.

THE COURT: Well, I agree that the case is extraordinary in many regards, but I'm not sure that's what the sentencing commission had in mind on this tension because of obstruction of justice and acceptance of responsibility. You know, it's a tough call again. There are too many tough calls in this case for one case, but, you know, he did plead guilty. In at least my way of thinking, that is the number one factor for acceptance, and we have situations all the time where I have discretion to deny acceptance when somebody pleads guilty, positive UAs and all. And I realize I have discretion to deny acceptance here, but, you know, he did plead guilty to these charges.

I'm troubled by the comment you raised. I mean, his testimony on this hydrogen tank, you know, is not exactly in line with my findings on obstruction of justice.

MR. COLLOTON: Well, yeah. Let me be clear. I did not mean to say that's the only reason we think this is not

extraordinary in the favor of the defendant. I mean, we've put on a lot of evidence about obstruction. We think that the evidence warrants finding that he did all that stuff. And to us that makes this case extraordinary the other way. That's why we've had 18 witnesses in here. That's why we had hours of tapes that the Court had to listen to. And if this case is extraordinary -- well, I point out the testimony on the tank because I do think there is tension there and --

THE COURT: But under the Ninth Circuit holding, I mean, if I were to follow -- is it Hooper or Hopper?

MR. COLLOTON: I pronounced it Hopper, Judge.

THE COURT: Hopper -- I think you're right -- 27 Fed. 3d, 378, United States versus Hopper. They said what makes it extraordinary is if there's obstruction of justice and somebody pleads guilty and the obstruction stops, it's extraordinary within the meaning of the guideline and the application note. Whether you agree with that or not, that is a correct summary of the case, isn't it?

MR. COLLOTON: Well, as I said before, they do say that in language in the case. I don't think the facts are as broad as that. But if that's the Court's view of the law, then we would just appreciate that we make clear what standard we're applying. If that's the standard, then if we don't agree with that, we'll have a chance if we want to to --

THE COURT: And you will.

MR. COLLOTON: Well --

THE COURT: But I think -- I'm saying I think that's the holding of the Ninth Circuit. I'm not saying that that's cast in stone in every circuit or the Eighth Circuit has adopted it. The Eighth Circuit hasn't adopted it as far as I know. I think there is a case that, without citing it, is consistent with it, and I've got so many cases up here, I'm not sure I can find it right now. United States versus T-a-l-l-a-d-i-n-o, 38 Fed. 3d, 1255, a 1994 First Circuit case I think has a similar holding.

MR. COLLOTON: I understand, Judge, on the guilty plea that that's a factor. I think -- I know the Court knows this because it says it right in the guidelines, but that doesn't entitle somebody as a matter of right. There's still, as you point out, discretion to deny it for dirty UAs and the like. But this is not a dirty UA case.

THE COURT: And, you know, I went back and reread your briefs, and you cite two instances of what you allege to be post-plea obstruction of justice. Do you recall that in your brief? I reread those letters very carefully at 9:30 last night. I didn't see it at all. I thought you were really overstating your case trying to claim that those constitute -- as a matter of fact, it was the letters he wrote to two of the potential witnesses. I venture to say

that the government leans on witnesses a heck of a lot harder than anything contained in those letters as a matter of routine, and it kind of sticks in my craw, Mr. Colloton.

You otherwise wrote a superb brief, and you made a lot of great points, and you're a tremendous advocate for the government. But to argue that those letters constitute post-plea obstruction of justice, I wonder about you in making that argument. I just don't read those letters that way. Do you know what I'm talking about?

MR. COLLOTON: I do.

THE COURT: I think I can find it for you.

MR. COLLOTON: No, I have it, Judge.

THE COURT: I put a sticky on it. It's the only sticky on your brief.

MR. COLLOTON: I have it in front of me.

THE COURT: I read Exhibit 32 and Exhibits 38 and 39. I read them. I reread them. I read them a third time. I didn't see what constituted obstruction of justice in there.

MR. COLLOTON: Well, and we didn't put it in our section on obstruction of justice for that reason. I'm not saying -- I mean, I say that it was an effort to influence testimony.

THE COURT: In the same way that the government tries to influence testimony on a routine basis. You

can't -- you can't have it both ways.

MR. COLLOTON: We're not asking the Court to find that he should not get acceptance simply because of those letters. I point that out because the Court had raised it at the last hearing.

THE COURT: And I wanted to know any post-plea obstruction of justice, and this is what you came up with.

MR. COLLOTON: Yeah. We're not citing anything happening post-plea that we're prepared to say would warrant a two-level adjustment. I'm citing these because I think they may not be enough to make obstruction. Whether they're consistent with acceptance I think is another question, I mean, but the one exhibit I think it's fair to point out is the one where he writes to Putzier and says, I have witnesses who will come in and say there's no hole in the wall. Now, that is inconsistent with the evidence that the hole was made while he was in there.

And so, you know, I'm not here to argue that he should get two levels for that. I'm here to say that we don't think that broad reading of Hopper is a correct reading of the law, and we think the other obstruction -- obstructive activity that was pre-plea takes this out of the extraordinary category.

THE COURT: Do you read Hopper as saying that if the -- if you waive a level of obstruction -- you know, in

other words, if you were to have a scale of obstruction of justice of zero to ten with ten being the most obstruction of justice that you somehow look to see where you are on the scale in determining once it stops whether acceptance should be given? See, I don't read the cases saying that at all, and I kind of -- you say -- and I kind of think you're arguing that. You say, well, there's extraordinary. We're at or near a ten in terms of the amount of obstruction of justice, and, therefore, you shouldn't give acceptance.

MR. COLLOTON: We're saying that's our view of how the analysis ought to go. I'm not saying that's what Hopper says. Was that the question?

THE COURT: Yes.

MR. COLLOTON: No. I understand what Your Honor's saying about Hopper. There is language in there that says if the person pleads and there's no obstruction after the plea, then that makes the case extraordinary. We don't agree with that statement of the law. We think the analysis ought to be more --

THE COURT: Of a balancing.

MR. COLLOTON: Exactly, and that it ought to take into account the nature of the obstruction and the degree of acceptance of responsibility, and I point out in Hopper the guy came in and admitted to his obstructive conduct. Now, they had broader language after that that suggests you don't

have to admit to it. But I point out that here the defendant didn't do that.

THE COURT: I'll help you out on your appeal. If that is the law, that you balance the degree of obstruction in determining whether or not post-plea cessation of obstruction of justice qualifies for acceptance of responsibility, I would not give acceptance of responsibility in this case. But I don't read Hopper as saying that, and I don't think there's enough guidance -- I'm not being critical of the circuit. I just don't think they've had an opportunity to espouse their views on it. And if you do weigh the obstruction on the one hand and acceptance on the other, this case would not qualify for acceptance of responsibility in my view. So if I give it, that will make your job easier on appeal if that's the law.

MR. COLLOTON: We appreciate the Court defining what standard it's applying.

THE COURT: But in the absence of a standard in the Eighth Circuit and in the absence of anybody suggesting another standard, you discussed the Ninth Circuit standard in your brief. The defendant discussed it in their brief, and I'm going to try and apply it. So based on -- and I don't really have a view as to what the law necessarily ought to be. I'm just saying that it's the clearest standard to apply, applying the Ninth Circuit standard.

I think I'm going to give acceptance of responsibility in this case because I think the defendant accepted responsibility by pleading guilty and saving the government a trial in the case.

So that brings us to a thirty -- adjusted offense level of 38, criminal history category 1. Is that correct? Is my math at least correct? 38, Mr. Reinert?

MR. REINERT: It is, Your Honor.

THE COURT: 235 to 293. Government also has a motion for upward departure. I recognize that I have the discretion to depart upward, but I'm not going to depart upward from the guideline range.

I'd hear argument now from defense counsel about what the appropriate sentence ought to be within the guideline range, and then I'd hear an allocution from Mr. Honken. In other words, Mr. Honken, you have a right to address me and say anything you want me to consider before I sentence you.

MR. PARRISH: Your Honor, are you going to consider a downward departure?

THE COURT: I'm not going to consider a downward departure. There's no basis for a downward departure that I see.

MR. PARRISH: We would just make it, Your Honor, from the record that was made with regard to Mr. Meyers'

testimony and the record of the over -- of putting the quantity substantially over what it should have been until the date of sentencing. That should be something the Court should consider in reducing the sentence in a downward departure.

THE COURT: I understand that, and I think if I thought that the U.S. attorneys had anything to do with it I would consider the motion for downward departure, but I think it was an aberrant act of an agent, and I think the U.S. attorneys addressed it properly and promptly, and I think because the U.S. Attorney's Office was not involved in my view, even if I had discretion to do a downward departure, I wouldn't, and I doubt if I'd do a downward departure even if the U.S. attorneys were involved in it.

MR. PARRISH: I would agree perhaps they're not involved. I would say that because they are part of the prosecution team that the analysis ought to be that the conduct of the agent and the impact that it had on Mr. Honken had it not been discovered and on the presentence part of the process, that it should be considered as part of the prosecution team and that the Court under those circumstances should consider it.

THE COURT: Motion's denied for a downward departure.

MR. PARRISH: Did you want us -- oh, go ahead.

THE COURT: Mr. Reinert?

MR. REINERT: Your Honor, on the upward departure issue, I understand the Court's -- and our basis, of course, was our view of the obstructive conduct. I understand the Court's concern about not wanting to make specific findings on each of the obstructive acts. However, we would request that there is a finding that would be required on the upward departure or a denial of an upward departure that the facts as taken don't take it out of the heartland of the case, and that's a finding of fact that would be required I think to deny the obstruction. I'm not sure if the Court wants to make that --

THE COURT: Well, even if I made all the obstruction of justice findings in favor of the government, I would not depart upward in the case. Thank you.

Mr. Parrish?

MR. PARRISH: You want me to address now the issue within the guideline range; is that correct?

THE COURT: Correct.

MR. PARRISH: Okay. So we're at level 38, 235 to 293. Your Honor, I won't argue for a long time on this because I think, again, there's no point in regurgitating all of the issues involved in this case, but I do want to point out some specific things I think the Court should take into consideration.

I think one and foremost is the sentence -- and I think the Court has alluded to it on several occasions -- given to Mr. Cutkomp and the role that either -- both these parties played in this. I think not only this Court but I know other judges take that as a factor into consideration at the time of sentence.

I think the second thing this Court needs to look at in evaluating where he falls within the guidelines is the 20 months that have, in fact, been spent preparing this case and the unusual and complex nature of this case with the issues, the quantities, the expert testimony involving the fact that he has had to stay in a facility such as the Woodbury County Jail under unusual circumstances. And what I mean by that, under circumstances where he can only be transferred to a facility in Chicago where he was evaluated and then subject to a small cell in Woodbury County for approximately 20 months.

The next thing the Court ought to consider is the report that came from the federal government's own psychiatrist who evaluated Mr. Cutkomp (sic) and made the decision, number one, that he was not a violent risk and also that he was a user of methamphetamine and also the determination that he was an individual who had been addicted to methamphetamine at some point.

I think also the Court needs to consider the high

level that is placed on the offense and the quantities that were found in this case and that it does put him at a level for -- I believe the Court's finding was 2.87 or something along that line of actual which put him into a pretty high category in and of itself where ordinarily if a mixture had been found of that amount he would have been in a -- or a smaller quantity, he would have been in a much lower category similar to where Cutkomp would have been in prior to his 5K motion.

Also I think the Court needs to consider his age, the fact he can be rehabilitated. He is an intelligent young man who has the ability to lead a life that is free of crime. I think a sentence within the low end range of the guidelines is appropriate because it would, in fact, allow punitive action to take place for his conduct, rehabilitation, an ability to show that he can function within the prison system and rehabilitate his life upon release. It also, I believe, would give him an opportunity to -- once he is, in fact, released to reestablish himself and make him a productive member of society.

Those are the arguments I want to make with regard to why this Court should find at the low end of the guidelines, Your Honor.

THE COURT: Thank you, Mr. Parrish.

Mr. Honken, is there anything you'd like to say

before you're sentenced?

THE DEFENDANT: Well, I did have a speech all ready, but that kind of went out the window. I guess I wasn't expecting things to go the way they did today. You know, I just feel I've let down my family, my children most of all. And I was hoping that I would again be able to be a substantial part of my children's life, but it's not looking like it gets to be that way.

You know, I've had a lot of thinking in the last year and a half in jail and changed a lot of ways that I think about things, and you don't know what you got until it's gone. That's for sure. And I just wish there was some way to go back and start over, but there's not. So I'd just ask that I get a fair judgment so if there is a possibility I can be with my children again, that I get that chance. Thank you.

THE COURT: Thank you, Mr. Honken.

Mr. Reinert?

MR. REINERT: There aren't many times when I've stood up and requested the top of the range. I'm doing so today for a number of reasons.

The defendant points out the lengthy pretrial confinement. The defendant chose to be in pretrial confinement when he chose to engage in the obstructive activities that were found by the magistrate judge to have

occurred. His actions landed him there. The conduct that the defendant engaged in from 1993 on was extreme obstructive conduct. It involved -- I know the Court hasn't made findings on it and I'm sure won't make findings on it -- involved the disappearance of a government witness, his girlfriend, and her two children. There has been found no evidence that these people are still alive, and, to the contrary, it appears that they are, in fact, dead. There's defendant's statements on the tape in discussing the '93 conduct, the circumstantial evidence that he was involved in that.

Mr. DeGeus similarly, there's no evidence that we can find that he is alive and, in fact, evidence to the contrary, that he is dead and that the defendant was involved in that.

The defendant then when the new case began started working with Mr. Cutkomp to take steps to take out Mr. Cobeen. The Court heard lengthy tapes about that. The defendant learned from his past conduct in '93 and wanted to do that again. Once he realized Mr. Cutkomp was then on the other side, was then cooperating, there were steps taken again to manipulate the system through acts of violence.

This defendant's extreme conduct shows an absence of the ability to be rehabilitated. Hopefully he can be rehabilitated and deterred from future conduct. And a

sentence at the top of the range sends a message to this defendant and other defendants who are sitting out there thinking about maybe taking things into their own hands, whether it be by kidnapping or killing or intimidating witnesses, that that kind of conduct won't be tolerated and can't be tolerated.  Your Honor, a sentence at the top of the range is appropriate.

THE COURT:  Thank you, Mr. Reinert.

I find, Mr. Honken, that your total offense level is 38, your criminal history category is 1 for a United States Sentencing Guideline range of 235 to 293 months.  I usually sentence at the low end of the guideline range, particularly with a first offender, but I'm going to sentence you to the very high end of the guideline range.

It's my judgment that you are hereby committed to the custody of the Bureau of Prisons to be imprisoned for 293 months on Count 1 and 4 to be served concurrently.  I'm selecting the guideline range based on the drug quantity at the high end of level 36.  That's reason enough to impose the high end, but I would also add it's also based on some of the -- on the testimony on the -- even though I didn't make findings of fact on the obstruction of justice.  But wholly apart from that, the high end of the drug quantity would justify in this case a sentence of 293 months.

Upon release from imprisonment, you'll be placed on

supervised release for 5 years to be served on each count concurrently. Within 72 hours of release from prison, you shall report to the probation office in the district in which you are released. While on release, you shall not violate any state, local, or federal law. You shall not possess a firearm or other destructive device, and you shall comply with the standard conditions of supervised release.

In addition, I'm going to impose two special conditions: You submit to one drug urinalysis test within 15 days of being placed on supervision and at least 2 tests thereafter; and you shall participate in a program of testing and treatment for substance abuse as directed by the probation office while you're on supervised release.

I'm imposing a fine of $500 on each count for a total fine of $1,000. You shall pay a $50 special assessment on each count for a total special assessment of $100. Both the fine and the assessment are due immediately. You're remanded to the custody of the United States marshal.

You have a right to appeal the sentence that I've imposed. If you desire to appeal, you need to file a notice of appeal within ten days. If you can't afford an attorney or if you can't afford the costs of counsel and if you're indigent, the Court will appoint one to represent you on appeal.

It's a long sentence, but a couple guideline

calculations the other way, Mr. Honken, you could have been looking at a mandatory life sentence. In my view, you're a lucky man today.

Is there anything further on behalf of the government, Mr. Reinert?

MR. REINERT: Yes, Your Honor. Pursuant to the plea agreement, we dismiss the remaining counts.

THE COURT: Remaining counts are dismissed. I did -- anything further on behalf of the defendant, Mr. Parrish?

MR. PARRISH: No, Your Honor.

THE COURT: I did want to commend both the assistant United States attorneys and Mr. Parrish for your fine efforts on behalf of your respective clients. It was tremendously well organized, well presented, exceptionally well briefed, and well argued on all sides presenting me with too many difficult issues for one case, but I did the best I could to resolve them to the best of my ability, and I appreciate the efforts of counsel. Thank you.

(The foregoing sentencing was concluded at 5:29 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____          3.24.98
Shelly Semmler, CSR, RMR, CCR                Date

I N D E X

DUSTIN HONKEN

CONTINUED CROSS-EXAMINATION

BY MR. COLLOTON...................................... 1055:13

REDIRECT EXAMINATION

BY MR. PARRISH...................................... 1071:3

RECROSS-EXAMINATION

BY MR. COLLOTON...................................... 1089:7


DAVID MIZELL

DIRECT EXAMINATION

BY MR. PARRISH...................................... 1094:3

CROSS-EXAMINATION

BY MR. REINERT...................................... 1100:25

REDIRECT EXAMINATION

BY MR. PARRISH...................................... 1102:8

RECROSS-EXAMINATION

BY MR. REINERT...................................... 1102:21


(Plaintiff Exhibits 42 and 42B were offered.)........ 1117:4


(Plaintiff Exhibits 42 and 42B were received.) ..... 1117:13