# 47

## DECLARATION OF RICHARD DUDLEY, Jr., M.D.
## PURSUANT TO 28 U.S.C. § 1746

I, Richard Dudley, Jr., M.D., do hereby declare, affirm, and verify under penalty of perjury the following:

1.      I am a physician licensed to practice medicine in the State of New York and am Board Certified in psychiatry by the American Board of Psychiatry and Neurology. I am engaged in the private practice of clinical and forensic psychiatry.

2.      I have been engaged as an expert witness in a wide range of civil and criminal matters, including capital cases. I have been retained by both the prosecution and defense in criminal matters. I have been retained by both the claimant and respondent in civil matters, and I have also been appointed as a court expert in various matters. I have testified as an expert in psychiatry during trials and hearings on numerous occasions in jurisdictions throughout the country in both state and federal courts. With regard to capital matters, I am familiar with legal and psychiatric standards related to questions of trial competency, penalty phase mitigation, and guilt phase diminished capacity. All opinions contained herein are stated to a reasonable degree of medical/psychiatric certainty.

3.      I am retained by current counsel for Dustin Honken to consider the presence of mental health mitigation that could have been explored and considered for presentation during the sentencing phase of Mr. Honken's capital trial. I understand that Mr. Honken is currently under federal death sentences and is incarcerated at Federal Death Row in Terre Haute, Indiana.

4.      To complete my tasks, I reviewed the various records, documents and other information that were provided to me, which included background records and transcripts of Mr. Honken's trial. In addition, I performed my own psychiatric examination of Mr. Honken on 9 & 10

1

February 2011 at Terre Haute. Further, in May, 2011, I traveled to Iowa where I interviewed one of Mr. Honken's life-long friends and members of Mr. Honken's nuclear and extended family. I also spoke at length with Jessica Johnson, who is a mitigation specialist currently working on Mr. Honken's case.

5. My evaluation reveals that Mr. Honken (whom I sometimes refer to below as Dustin, for the sake of clarity) had an extremely difficult childhood and adolescence. I also discovered that there was an absence of any significant influences that might have alleviated the serious impact of those difficulties on his psychological development. As a result, he developed emotional difficulties. Absolutely no effort was made to identify and obtain treatment for these difficulties during his important developmental years; and therefore he continued to suffer from these psychiatric difficulties. Left unrecognized and untreated, these difficulties have had a profound impact on his adult functioning.

6. During about the first 8 years of Mr. Honken's life, he lived with his biological parents, Jim and Marvea Honken, his older brother Jeff, and his younger sister, Alyssa. Mr. Honken's father's extensive criminal activity, constant threats of violence and actual violence, and alcoholism was consistently described by everyone. Upon further exploration, it appears as if these behaviors were part of an attempt to compensate for underlying feelings of inadequacy, that also included a significant degree of grandiosity, constant bragging, denigrating others, manipulating others and other similar behaviors that constituted his efforts to feel better about himself. During those first 8 years of Dustin's life, his mother failed to protect him and his siblings from their father and their father's behavior. She did not remove the children from his negative and destructive influences and she failed to provide the nurturing, support and sense that they could be protected from their father's behavior. In short, she failed to take steps to mitigate against the impact of the

2

father's behavior. Her failures can be explained in part due to her youth, her sense of being overwhelmed, and eventually from her own bouts with chronic depression. More fundamentally, it appears that her relationship with Jim Honken was characterized by fear and abuse, including in their sexual relationship, which can most charitably be described as deeply dysfunctional but more descriptively included marital rape, threats of violence, and complete emotional estrangement. There is little doubt that Marvea's repulsion and estrangement from Jim negatively affected her ability to emotionally connect with and to accept Dustin and her other children.

7. In consequence, all of the children, but especially Dustin, suffered from a profound sense of abandonment during their childhoods. Their father was away from the home during much of the week, and when he did come home he was usually drunk. Their mother spent many of her evenings out with friends and paramours and left the children to fend for themselves. Within this context, Jeffrey, as the oldest child, was best able to take care of himself – emotionally and practically – and Alyssa, as the baby girl, garnered what little attention the mother offered. Dustin, by all accounts, slipped through the cracks and had no one to rely upon for guidance, protection, or support. Further, it has been reported that, as a result of his weakness and lack of confidence, Dustin was constantly bullied and manipulated by his father, his older brother, and by other boys during this time. This left Dustin with an enormous amount of shame about the fact that he could not stand up for himself and could not meet his own emotional needs – as he was somehow expected to do.

8. When Dustin was about 8 years old, his mother finally left his father. Prior to the separation she had begun an affair with a neighbor, which his mother noted gave her the strength to leave his father. Upon the separation, Dustin's mother moved him and his siblings in with this man, who she eventually married. Although there was a relatively brief period of time after the separation when the children had no contact with their biological father, that contact quickly

3

resumed. At that point their father was already living with another woman, and continued to have an impact on their lives. With the separation and resumption of contact with his father, Dustin was subjected to new dysfunction. His father continually denigrated his mother, drank himself into fits of rage and self-pity, and concocted more and more outlandish schemes to enrich himself. And again, his mother failed to nurture or protect Dustin. Over the next number of years, his mother's focus was totally on her new husband, who was quite demanding of her time and attention. As a result, she continued to fail to focus on the developmental needs of her children. In my meeting with her, she noted that although she had some therapy at the time of the separation, it never occurred to her that any of her children needed similar help.

9. Mr. Honken, his mother, and others have reported that shortly after the separation Mr. Honken learned, from his father, that his mother had offered custody of Mr. Honken to the father, but had not offered the other children. Dustin could not believe that his mother would abandon him so completely. He confronted her and she confirmed that it was true, but that his father did not want him either. Dustin understandably noted that this episode was one of the most upsetting things that happened to him during his early childhood years. In regard to potential psychological assaults that a parent can visit on a child, abandonment, or fear of abandonment, are among the most damaging.

10. At around the same time, Mr. Honken's childhood friendships and relationships continued to be characterized by his subjugation to bullying, teasing, and manipulation.

11. When Mr. Honken was about 14 years old, there was a turning point in his relationship with his father. He explained that up until that point, he had felt that, despite his father's obvious shortcomings, that he was special in his father's eyes. Although his father had seemed to encourage his older brother to follow in his criminal footsteps, Dustin had believed that his father thought that he, Dustin, was smarter and deserved something better for him like college

4

and a career, instead of a life of crime. But after his older brother left home, his father turned to Dustin as his criminal protegee. For example, one day his father offered him $500.00 to burn a car. He noted that he was shattered by his father's encouragement to engage in criminal activity – which continued throughout his adolescence – and the implicit suggestion that he was not special after all. This constituted yet another form of parental abandonment, that would further plague Mr. Honken's development. This incident also confused Mr. Honken's understanding about what it would take to please his father. He noted that although he didn't really want to be like his father (up until that point he had avoided criminal activity, he didn't want to be viewed as or ridiculed about being a bragger like his father, and he had sworn off alcohol), he desperately wanted to please his father.

12      It is my opinion to within a reasonable degree of medical certainty that the above noted dysfunctional, painful, and extremely difficult childhood and adolescence caused Mr. Honken to develop a combination of emotional difficulties. These difficulties were first evident during Mr. Honken's childhood years, and then became increasingly complex and pronounced as he became a late adolescent and young adult. Children require a stable, nurturing and loving family to develop into mentally healthy adults. In the absence of such an environment, and particularly in the face of parental abandonment and dysfunction, children grow into adults with an impaired ability to control their impulses, to make sound judgments and to predict the consequences of their behavior. Such an environment also causes children and adult survivors of such an upbringing to develop paranoia and impaired adult relationships. It is my opinion, that Mr. Honken suffers from these emotional difficulties.

13.     Mr. Honken's father's constant threats of violence and actual violence, and Mr. Honken's experiences of being bullied by family and peers alike, were particularly traumatic for him. As a result, he developed the type of trauma-related symptoms of anxiety seen in children so

5

traumatized, such as an overwhelming and chronic fear that something horrible was going to happen, hypervigilance, and over-reactivity to perceived threats. Given the absence of nurture, support and/or protection from the traumatic threats of violence and actual violence, Mr. Honken also developed a physiologic component to his trauma response. When children are frightened, they have the same physiologic response that adults have (commonly known as the 'fight or flight response'). When children who consistently have a nurturing or protective adult around them to calm them down when they have such experiences, they will eventually learn how to manage or calm that physiologic response on their own. But when there is repeated exposure to such fear and trauma in the absence of a nurturing or protective adult, children never learn how to calm that physiologic response and end up in a constant state of hyper-arousal that is extremely difficult to manage and control. In diagnostic terms, Mr. Honken developed an Anxiety Disorder, NOS, with many of the symptoms of anxiety and avoidant behavior seen in traumatized children.

14. Mr. Honken's above described childhood difficulties also resulted in severe difficulties in the development of attachment to parenting figures, severe difficulties in the development of a positive sense of himself and severe difficulties with regulation of his mood. He and others describe him as always worried about what others will think of him, being overly loyal and willing to do whatever important others want him to do without regard for the difficulties such might cause him, and consistently being worried about whether or not he has messed up or disappointed others. Mr. Honken's models for how to cope with these painful feelings were his parents. His father taught him to defend against (i.e., block out and then compensate for) these feelings with grandiosity, deception, narcissistic arrogance and substance abuse. For Mr. Honken, the content or focus of this defense eventually became that he is so much smarter than everyone else, has more girls that everyone else and that he will eventually be more financially successful than

6

everyone else. This was amplified by what he learned from his mother, which was to do whatever necessary to please important people in your life, despite the cost to self. However, these psychological defensive maneuvers are fragile and they are difficult to maintain. Thus, the underlying issues he is attempting to mask often break through the defensive efforts and surface. At such times, Mr. Honken's ability to function deteriorates quite severely.

15. In diagnostic terms, Mr. Honken developed a Personality Disorder, mixed type, with narcissistic and borderline features. The narcissistic features include his pattern of grandiosity, need for admiration, and envy/idealization of those around him, all in an attempt to compensate for underlying difficulties with self-esteem; and the borderline features include instability of interpersonal relationships (largely due to fears of abandonment), self-image and affect/mood, with marked impulsivity. It should be noted that although Mr. Honken was also clearly taught by his father and then by this brother to engage in criminal activities, and although Mr. Honken did eventually become involved in criminal activities, for Mr. Honken, involvement in such criminal behavior appears to be much more related to such learning and the above noted psychiatric difficulties rather than underlying antisocial traits.

16. Given the above, it is not at all surprising that Mr. Honken was so readily used and taken advantage of by his father, his older brother, and the two mothers of his children. It was in an effort to please his brother and father that he got involved in the manufacturing of methamphetamine, which eventually resulted in his abuse of the drug. By all reports, when he returned to Iowa, he was a wreck – overwhelmed by efforts to support himself and his two children, while also trying to manage the dysfunctional relationships he had with his childrens' mothers. When all of this was happening, those around Mr. Honken could see him deteriorating, but Mr. Honken was unable to see it. Only years later is he able to even begin to see it; and also it is only

7

more recently that he has become able to see that this was all associated with a desperate need on his part to be liked and accepted by loved ones so that he could mend the ego damaged in childhood.

17.     Although Mr. Honken had purposely avoided the use and abuse of alcohol and other substances well into his adult life, it is not at all surprising that once he tried methamphetamine and discovered how well it medicated away his anxiety, fears and sense of powerlessness, he wanted more. However, the heavy use of methamphetamine eventually exacerbated all of Mr. Honken's above noted difficulties in that such heavy use ultimately made him more fearful, paranoid, grandiose, impulsive, and frantic in his efforts to maintain some sense of security and stability in his life. The use of this powerful drug also made it more difficult for him to maintain any type of stability of his mood, and ultimately impaired his decision-making capabilities and judgment.

18.     In summary, it my opinion that at the time of the crimes for which Mr. Honken has been convicted and sentenced to death, he was suffering from a combination of an Anxiety Disorder, NOS, a Personality Disorder, mixed type with narcissistic and borderline features, and Methamphetamine Dependence, the presence of each of which exacerbated the others; that this combination of psychiatric difficulties seriously impaired his ability to function and make rational decisions; and that in this compromised mental state, his parents' abandonment, his father's modeling of a criminal lifestyle, and other negative influences impacted all the more heavily on his thinking, decision-making and judgment.

19.     Finally, I have been asked by counsel to compare – from a forensic psychiatric perspective – the mitigating value of what was presented at Mr. Honken's penalty trial, with what I have learned about Mr. Honken, and my professional opinions about his psychopathology. Trial counsel presented a narrow and superficial factual snapshot of Mr. Honken's upbringing. In addition to not presenting a full factual picture of Mr. Honken's upbringing and the events that

8

shaped his life, trial counsel failed to provide the jury with a mental health-based explanation for how these facts shaped Mr. Honken's mental health deficits. The jury never heard about why the facts mitigate from a mental health perspective. In my experience in capital cases, the opinions that I have set forth in this statement are typically presented, when available, in the penalty phase of a capital trial.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information and belief, subject to the penalties of perjury pursuant to 28 U.S.C. § 1746.



Richard Dudley, Jr., M.D.

Dated: June 2, 2011

9