**49**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,          No. CR01-3046

       Plaintiff,              Sioux City, Iowa
                                 May 4, 2005
  vs.                         7:57 a.m.

ANGELA JANE JOHNSON,

       Defendant.

_____/

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

Case 3:10-cv-03074-LTS-KEM    Document 19-49    Filed 06/06/11    Page 2 of 71

impulsive person?

A. No.

Q. What was he like?

A. Dustin was very much of a thinker. He was -- he just wasn't impulsive.

Q. And when he was -- when you say he was much of -- he was a lot of a thinker, did he do a lot about the things he thought about?

A. He would think a lot before he would act upon something.

Q. Did he have dreams and plans and things that he shared with you over the years that he wanted to do?

A. Not really, no.

Q. What about his temper? Was Dustin Honken short tempered?

A. No, not at all.

Q. Was he at all violent?

A. No.

Q. Did you ever see him engage in any violence toward anyone?

A. No, not whatsoever.

Q. Was he physical with people? In other words, you know, did he ever rough anybody up or slap anybody or anything like that?

A. No.

Q. You indicated earlier in your testimony that he never seemed to have trouble getting a date. Did you know him to have a number of girlfriends over the years?

A. Yes, very much.

Q. Did you ever see him together with some of these girlfriends of his?

A. Later on, yes, but not during high school because I wasn't there.

Q. And what was his relationship like with the women that he had in his life?

A. Funny enough, it seemed to be okay to my knowledge.

Q. When you say funny enough, what do you mean by that?

A. He seemed to be able to parallel multiple -- multiple relationships at the same time.

Q. When you saw him together with any of his girlfriends, did you ever see him abusive with the girlfriends?

A. No, never.

Q. Let's have you explain a little bit to the jury, was Dustin somebody who was easily manipulated, or was he somebody who manipulated other people or something in between?

A. I wouldn't say Dustin was easily manipulated whatsoever. I can't say -- I guess he would be in between.

Q. Did you see him as a very manipulative person?

A. I didn't have really that type of relationship that I saw how he would interact with other people.

Q. Did you ever see him manipulating any of the women that he was with?

A. No.

Q. Let's talk about some of these women. Who did you know

Q. And what did you understand those charges to relate to?

A. Distributing methamphetamine again.

Q. Was he ultimately convicted of those charges to your knowledge?

A. To my knowledge, yes, he was.

Q. And was there a sentencing in 1998 where he was sentenced to prison?

A. Yes, there was.

Q. Did you participate in that sentencing at all?

A. No.

Q. Did you attend the sentencing?

A. No.

Q. Did you do anything to assist your brother in his legal troubles that he got into in 1996 up until his sentencing in 1998?

A. No.

Q. And why not?

A. Like I said, I was very upset with him.

Q. So I want to direct your attention then to after his sentencing in 1998. Did you have any contact, further contact, with Angela Johnson after that?

A. She called me on the phone.

Q. And do you recall when in relation to your brother's sentencing in 1998 that that phone call occurred?

A. I believe it was actually during the sentencing that she

called. My mother was visiting, visiting me at the same time.

Q. You're living in Phoenix at this point?

A. That's correct.

Q. And when Angela Johnson called you, what was said during the phone conversation?

MR. STOWERS: I'm going to object for the reasons previously stated, Rule 402, Rule 403.

THE COURT: Thank you. Objection's overruled. You may answer.

A. It wasn't really said. It was yelled. She yelled over the phone very loudly that if Dustin wasn't going to be able to see his kids she was going to make sure we weren't going to be able to see ours.

Q. And Angela Johnson said that directly to you.

A. That's correct.

Q. And you said she was yelling on the phone.

A. That's correct.

Q. How did the conversation start off? I mean, was that the entire conversation with her?

A. That was pretty much the entire conversation. I ended up hanging up on her, yes.

Q. How did you take that statement to you?

A. I had never been -- I had never been threatened like that before, and it just really threw me back, so I took it very seriously.

Q.   What did you do about it?

A.   We talked to the local authorities, and we also talked to the FBI about it.

Q.   Were you concerned that that was a threat to your safety or the safety of your family?

A.   Yes, I was.

Q.   The Angela Johnson that your brother introduced you to who had better connections for him in Iowa, do you see her in the courtroom here today?

A.   Yes, I do.

Q.   And could you describe for the jury where she's sitting and what she's wearing?

A.   She's right there in a yellow blazer.

Q.   And to your left?

A.   That's correct.

MR. WILLIAMS:   Thank you very much.   I have no further questions.

THE COURT:   Members of the jury, why don't you stand and take a stretch break before we begin the cross-examination.

Okay.   Please be seated.

Mr. Stowers, whenever you're ready.

MR. STOWERS:   Thank you.

CROSS-EXAMINATION

BY MR. STOWERS:

Q.   Hello, Mr. Honken.   My name's Dean Stowers, and I'm

Iowa?

A. My wife works at a day care. She's a day care school teacher.

Q. Let me just stop you, though. Let me direct your questioning here or your answers. I just want to know were you involved or did you see a traffic accident in Clear Lake at some point?

A. In Mason City you mean?

Q. Was it Mason City?

A. Yes.

Q. Okay. And while you were in Mason City, did you help out at the scene of the traffic accident?

A. Yes. Accident happened right in front of me. Nobody behind me. Cars going -- you know, it's four lane, two lanes here, two lanes here, Highway 18 going through Mason City. And if you turn this way, you go right to the main part, so it's a real busy intersection, and, boom, a car went right underneath a flatbed pickup right in front of me. Nobody behind me, nobody around. I was the first one on the scene. And a girl, college girl, was trying to start her car. Her engine's in her front seat. And I -- I'm a mechanic, and I could see gas and, you know, oil and all kinds of fluid on the ground, so I jumped out of my van, and I'm cussing her out saying, What the F and F are you doing? Trying to kill us both?

Q. Bottom line, Mr. Cobeen --

A. Excuse me?

Q. -- did you assist at this traffic accident?

A. Yes, I helped them both.

Q. While you were assisting at the traffic accident, did you see anybody go by that you knew?

A. While I was guiding traffic after I got the two injured people sat down on the curb, nobody else was still there, so I was guiding traffic by then to go around us, and a little red Suzuki come driving by, and Miss Angela Johnson was hanging halfway out the door like that.

MR. WILLETT: Excuse me. I object. Excuse me, Mr. Cobeen. Your Honor, I object. First of all, I think Mr. Cobeen had answered the question that was posed to him. Second, in the matter he's about to testify to, the defense objects based on Federal Rule of Evidence 402, 403, and 404.

THE COURT: Overruled. You may answer.

BY MR. WILLIAMS:

Q. Let me take this one step at a time. You saw Angela Johnson drive by in a red Suzuki?

A. She was in the passenger seat, yes.

Q. And did she make any gesture at you?

A. (Witness demonstrated.)

Q. And you were doing what with your hand?

A. She was acting like she had a gun in her hand and was going to shoot me.

Q.    And it was pointed at you?

A.    And she had a big grin on her face.

Q.    The Angela Johnson that you had met several times in 1995 involved in this operation with Dustin Honken, the woman who made the gesture at you at that traffic accident, do you see her in the courtroom here today?

A.    Yes, right here.

Q.    And she's sitting what direction from you, sir?  On your left or on your right?

A.    My left, straight to the east.

MR. WILLIAMS:  No further questions, Your Honor.

THE COURT:  Mr. Willett?  Why don't we give the jury a stretch break before you cross-examine.

MR. WILLETT:  Thank you, Judge.

THE COURT:  Okay.  Please be seated.

MR. WILLETT:  May I retrieve those exhibits, Your Honor?

THE COURT:  You may.

CROSS-EXAMINATION

BY MR. WILLETT:

Q.    Mr. Cobeen, my name is Al Willett.  I don't believe we've ever met.

A.    Al what was that?

Q.    Yeah, it's Al Willett.  I don't think we've ever met yet?

A.    Nice to meet you.

to you I guess.

Q.   Do you see the enlarged portion there?

A.   Yes, I do.  I started at the wrong "but."

Q.   Yeah.  If you could read at the top of that line that says, I would have been.

A.   But you could have had that with me.  I would have been a good woman for you.  I would have gone the distance, done whatever it took to get there.  I would have stood by your side.

Q.   Until?

A.   Until the end of time.

Q.   Directing your attention to Exhibit 69, page 9, is there a reference both to Kathy again and to a business relationship?

A.   Yes.

Q.   I've highlighted a portion here.  If you would read from the point about halfway down that paragraph where it says, If I ever find out.  Do you see that line?

A.   Yes.

Q.   Could you read that, please, for the jury?

A.   If I ever find out that you subjected her to Kathy in any way, I can promise you this.  I will spend the rest of my life in prison for brutally killing her, and believe me when I say it will be brutal.

Q.   And when the line says -- based on the context of the letter it says, If I ever find out that you subjected her to Kathy, the "her" is in reference to whom?

A.   Ms. Johnson and Mr. Honken's daughter.

Q.   And Kathy again is who?

A.   Kathy Rick, Mr. Honken's other girlfriend.

Q.   Now, the next line down, do you see some arrows there on each side of that paragraph?

A.   Yes.

Q.   Were those arrows placed by the government or law enforcement?

A.   They were not.

Q.   Were the arrows there when you seized -- when law enforcement seized the note from Dustin Honken's house on February 7 of 1996?

A.   Yes.

Q.   And could you read that first sentence that has the arrows pointed toward it.

A.   I expect you to keep your word about our business relationship and support our daughter the best you can and treat me with nothing less than respect from here on out.

Q.   And then directing your attention to the next page, Exhibit 69, page 10, is there again a reference at the top of this page to business?

A.   Yes.

Q.   And can you read that for the jury, please.

A.   It starts out, Will be needing to talk about is Marvea and business.  Other than that, nothing else is necessary.

Q. And just so we put it in context, if you go back to the previous page, page 9, that sentence starts off with what words?

A. The only thing we will.

Q. And then it says, Be needing to talk about, and it goes on from there.

A. Correct.

Q. And again, page (sic) 69, page 10, is there another reference to Kathy in this letter?

A. Yes, there is.

Q. I've again enlarged a portion of this. Could you read that for the jury.

A. I can't promise I won't hurt Kathy. I hope I will just be able to move on and put you both behind me, but I don't know. Some revenge on her would be very, very sweet.

Q. In addition to seizing this letter from Angela Johnson, did you find any other documents in the Honken residence on February 7 of 1996 in reference to Angela Johnson?

A. Yes.

Q. Agent Graham, I've handed you what's been marked as Government's Exhibit 94. Can you identify that for the jury, please.

A. Yes, Exhibit Number 94 is a resume for Angela Johnson that was seized from the Dustin Honken residence on February 7, 1996.

Q. When I handed you Exhibit 94, it was in a green folder. Was that the manner in which it was seized from the Honken

household on February 7, 1996?

A.   Yes, it was.

Q.   And in addition to the one-page resume, was there anything else contained in that folder?

A.   Yes, there's an application for -- a job application for a company in Mason City as well as a floppy disc.

MR. WILLIAMS:   United States moves to admit Exhibit 94 into evidence, Your Honor.

*   *   *   *

(Government Exhibit 94 was offered.)

*   *   *   *

MR. WILLETT:   Objection, Your Honor.   Federal Rule of Evidence 402.

THE COURT:   Overruled.   Ninety-four is admitted.

*   *   *   *

(Government Exhibit 94 was admitted.)

*   *   *   *

MR. WILLIAMS:   Permission to publish, Your Honor?

THE COURT:   You may.

BY MR. WILLIAMS:

Q.   Showing on the screen what's marked as Government's Exhibit 94, is this the resume itself?

A.   Yes, it is.

Q.   And because of the distance, some of this is going to be hard to read.   First of all, what's the address provided by --

A. Yes.

Q. And what was her name?

A. Missy Friesenborg.

Q. Was she originally from Iowa?

A. Yes.

Q. And during what time period was she living down in Arizona if you recall?

A. Late -- probably late '92 or -- late '92 and then into '93 I know she was living there.

Q. What, if any, involvement did she have in any of this methamphetamine manufacturing or distribution operation?

A. She didn't have any. She had no knowledge of it.

Q. Now, up to this point -- and by this point I mean early 1993 -- you've now been down in Arizona for six to eight months manufacturing methamphetamine and repeatedly distributing pounds of the methamphetamine up to Iowa. And when I say you, I mean you, Dustin Honken, and Jeff Honken as part of this operation. Up to this point in early 1993, were you aware of Dustin Honken using any violence in connection with this distribution or manufacturing operation?

A. No.

Q. Was he carrying weapons with him when he went to Iowa to distribute methamphetamine?

A. No.

Q. Was he hurting anybody, any distributors or trying to hurt

any distributors involved in his operation?

A. No.

Q. Now, in early 1993, did you come to be aware that an Angela Johnson was involved with Dustin Honken?

A. Yes.

Q. And how did you first become involved -- aware of that?

A. Dustin had told me that he had met with her.

Q. Did he describe to you who she was?

A. She was -- at that time she was Terry DeGeus's girlfriend.

Q. Did Dustin Honken indicate to you whether she was involved at all in the distribution of methamphetamine that he had been sending up to Iowa, in particular to Terry DeGeus?

A. Yes, that Angie had been selling that methamphetamine.

Q. At some point did Dustin Honken ever tell you about whether Angela Johnson and Dustin Honken became involved in a romantic way?

A. Not long after that I believe they did.

Q. And we're talking about early 1993 now?

A. Yes.

Q. Did Dustin Honken share with you at all about how it was that it went from the situation of being Terry DeGeus's girlfriend and distributing methamphetamine for Terry DeGeus to becoming involved with him?

A. When they first -- when they first met, she'd called and said that Terry was using most of the drugs and she's the one

that was selling it so it should just go through her and forget about Terry.

Q.   And this is something Dustin Honken told you back in 1993?

A.   Yes.

Q.   Focusing on late 1992 and into the early months of 1993, what was going on in your life at this point as far as your desire to remain involved in this operation?

A.   In early '93 I -- well, on and off I tried moving back, but I -- eventually in '93 I moved back for good.

Q.   And why?

A.   Just to get away from the whole thing.

Q.   Now, you said several times you tried.  Did you think about moving back and getting out of it before that?

A.   Yes.

Q.   And ultimately why didn't you on those prior occasions?

A.   Dustin's my friend and I was involved with it.  I don't know.

Q.   Could you have?

A.   I suppose I could have left.

Q.   Did Dustin Honken threaten you with violence if you didn't remain as part of this operation?

A.   No.

Q.   Did he ever threaten to harm you or any of your family if you didn't participate in it?

A.   No.

talking about killing people. What was your greatest concern at that point in time if you had one?

A.    I guess I -- at that point I wasn't -- until he found out, I guess I wasn't concerned about him doing anything.

Q.    Were you afraid of whether he would actually carry out the plans he had for killing other people?

A.    Yes.

Q.    And what were you the most afraid of in relation to that?

A.    Dan, first of all.

Q.    Were you concerned about whether anybody else was influencing Dustin Honken in the decision to carry out some of these plans?

A.    I don't recall.

Q.    Would it refresh your recollection if I showed you an interview report from that initial interview?

A.    Yes.

Q.    Mr. Cutkomp, I'm showing you an interview report that was done on May 14, 1996, page 9, and at paragraph 63, and if you could read that to yourself and when you're done, let me know.

A.    Yes, I remember.

Q.    Mr. Cutkomp, did that refresh your recollection?

A.    Yes, it did.

Q.    What were you most afraid of at that point, sir?

A.    I was worried about Angie Johnson pushing Dustin to follow through of taking care of the things that needed to be taken

care of.

Q. Did you have a belief at that point that absent Angela Johnson pushing Dustin Honken that he might not go through with it?

A. Yes.

Q. Pursuant to your agreement to cooperate with the government, did you, in fact, participate in undercover operations where you wore a recording device and recorded conversations between you and Dustin Honken?

A. Yes, I did.

Q. Let's explain just a little bit of background on this. You and Dustin Honken, while on pretrial release, did you remain working at Kraft Foods?

A. Yes, we did.

Q. And did you have contact with him at Kraft Foods?

A. Yes.

Q. Were there occasions when you attempted to record conversations with him at Kraft Food?

A. Yes.

Q. Did Dustin Honken take steps while at Kraft Foods when talking to you about this case and his attempts to do something about it to make sure that he wouldn't be heard?

A. Yes.

Q. And what was that?

A. I lost track of my . . .

gun.

A.   Yes.

Q.   And I think you indicated -- your response was because he asked you to, he was your friend.

A.   Yes.

Q.   Did you make choices yourself, sir, to do acts that were asked of you by Dustin Honken?

A.   Yes, I did.

Q.   And were there times when you refused to act --

A.   Yes.

Q.   -- when he requested you to?

A.   Yes, I did.

Q.   For example, on direct examination I think you testified he asked you to lie and claim that Greg Nicholson gave you the tape.

A.   Yes.

Q.   And did you go along with that?

A.   No, I did not.

Q.   Would you have participated in the murders of anybody --

A.   No.

Q.   -- had he requested you to do so?

A.   No.

Q.   And then finally you were asked questions about Dustin Honken's violence.  Until Dustin Honken hooked up with Angela Johnson in 1993, were you aware of Dustin Honken engaging in any

violence against any other person?

A.   No.

MR. WILLIAMS:  No further questions.

THE COURT:  Any recross, Mr. Willett?

MR. WILLETT:  Briefly, Your Honor.

RECROSS-EXAMINATION

BY MR. WILLETT:

Q.   Mr. Cutkomp, there were some choices you did make in behalf of your best friend; correct?

A.   Yes.

Q.   You manufactured an illegal substance?

A.   Yes.

Q.   You destroyed evidence?

A.   Yes.

Q.   You scouted out a building in Bondurant for the purpose of destroying evidence.

A.   Yes.

Q.   You destroyed lab evidence as well as a weapon; correct?

A.   Yes.

Q.   And you kept to yourself discussions that Dustin Honken had with you about hypotheticals that made you suspect him of being involved in violent acts.

A.   Yes.

MR. WILLETT:  Thank you, Judge.

THE COURT:  Anything further?

Q. And you understood Dustin Honken to be a person who enjoyed guns as well.

A. Yes, I did.

Q. And he had an interest in them.

A. Correct.

Q. And the two of you talked about that at work.

A. Yes, we did.

Q. And eventually you became aware, I take it, just from being a resident of that north central Iowa area that Dustin Honken was somebody who had a fair amount of attention drawn to him in the media; isn't that right?

A. Yes.

Q. And I assume that you had read articles about Mr. Honken in the paper; is that correct?

A. Yes, I did.

Q. Including articles which connected him to some degree in the killings of five people; right?

A. Right.

Q. And you were aware of that in '95 and '96.

A. Yes, I was.

Q. And yet that wasn't the Dustin Honken that you came to know through your year and a half with him at work; is that right?

A. That's right.

Q. You didn't believe Dustin Honken was anybody in your observation capable of such a thing, killing five people.

A.   He never showed that kind of aggression.

Q.   Now, you, though, were aware that in April of 1996 he had been arrested and that he was released by the court and that he was required to wear what's called an ankle bracelet and electronic monitor; right?

A.   Correct.

Q.   And I assume you discussed that with Mr. Honken?

A.   Yes, I did.

Q.   Did he tell you he wasn't allowed to have firearms while he was on release?

A.   No, he didn't.

Q.   Did he tell you why it was that he wanted you to buy this gun for him as opposed to buying it himself?

A.   No, he never did.

Q.   Did you find that a little unusual, that he wanted you to buy it for him rather than buy it himself?

A.   Not at the time.

Q.   He had known Mr. Riepma, the person who you ultimately got this gun from, though; isn't that correct?

A.   Yes.

Q.   And yet he didn't go to Mr. Riepma.  He had you go to him for him; correct?

A.   Correct.

Q.   And then as I understand it, you acquired some money from Mr. Honken, and you said I think it was $185 is your

A. Yes.

Q. What was your impression of him?

A. Highly intelligent individual that was kinda nerdy and preppy.

Q. What was he like around Angela Johnson?

A. He was still intelligent. He always had his nose stuck in a chemical book, you know, chemistry.

Q. Did -- unlike Terry DeGeus, did Dustin Honken ever engage in any physical mistreatment of your sister?

A. Not that I'm aware of.

Q. How did he treat her generally that you observed?

A. He was a pretty quiet person.

Q. In this 1992 to 1993 time period when you made these frequent visits from Wisconsin down to your sister's in Clear Lake, on any of those occasions, did you use any methamphetamine with your sister?

A. Yes.

Q. How many occasions do you recall that would have happened?

A. Oh, not more than probably one or two times.

Q. And where would that have occurred at?

A. Her house.

Q. And was this before or after Dustin Honken became involved with her to your knowledge?

A. I'm going to say -- I'm thinking Dustin was in the picture then.

Q. And where did the methamphetamine come from that you used?

A. A little envelope.

Q. Who got the little envelope?

A. I just remember seeing it on the table.

Q. In your sister's house.

A. Yeah.

Q. Let me talk to you a little bit about -- or have you talk to the jury a little bit about your knowledge of any drug activity that existed between Terry DeGeus and Angela Johnson. Did Angela Johnson ever tell you anything about whether she was involved or whether Terry DeGeus was involved in any drugs?

A. No.

Q. Did she indicate to you at some point about how it was that she came to meet Dustin Honken?

A. I cannot remember the connection between the two. Somehow there was a connection between Dustin and Terry DeGeus, but I cannot remember how I came to know it. I can't remember.

Q. Well, what did you understand the relationship to be?

A. Terry was Angie's ex-boyfriend, and I cannot remember the connection between what or how I knew the connection between Terry and Dustin.

Q. Well, did Angela Johnson ever tell you how it was that she first met Dustin Honken?

A. Yeah, she went there.

Q. She went where?

moment before they walk in the house, before the gun is pulled out of that bag they know at that point everybody in the house is going to have to die because there's no way they can go in that house knowing that their entire intent from the beginning was to kill Greg Nicholson and walk away with witnesses there.

And so Angela Johnson knew when she engaged in the conduct she engaged in, by making entry in that house, by helping to tie up Lori Duncan, to help bind her, to gather up the girls and put them in the vehicle and to drive out there, she knew at each step along that way that in her conduct she was intending to help Dustin Honken kill everybody there because they couldn't walk away with witnesses to what they were going to do to Greg Nicholson. And she knew that. She knew at each step of the process what was going to happen.

Then let's talk about the intent involved with Terry DeGeus. Obviously Terry DeGeus could be a witness against Dustin Honken again, and that was certainly motivation for the killing there, but there was more in this case.

You've heard the testimony often brought out by the defense during cross-examination that Terry DeGeus was a mean person to Angela Johnson in their past relationship and that she wanted him dead. Remember the testimony by Christi Cole, now Gaubatz, that after that meeting outside the Kentucky Fried Chicken Angela Johnson came out and said, He can't be around anymore.

So with that in mind, with that intent in mind, she engaged in conduct after that intending for his death to occur at the hands of Dustin Honken. Only she was in a position to lure him out. Certainly by this time, Terry DeGeus was afraid. You heard the testimony that he was worried about what had happened to Greg Nicholson. He was concerned about what happened to Greg Nicholson because he knew Greg Nicholson was the only person other than himself that was getting dope from Dustin Honken, and now Greg Nicholson along with a woman and her two children are gone, and Terry DeGeus has got to be thinking to himself, what's going to happen now?

It was only too clear the grand jury investigation was continuing. Aaron Ryerson spoke with him about that investigation. He knew that Angela Johnson had been pulled down to the grand jury, and so did Angela Johnson and Dustin Honken know what was coming next. The pressure was going to be brought to bear on Terry DeGeus, and he had to be eliminated.

But Dustin Honken no way could get him out someplace where he could be killed. It was only Angela Johnson through her conduct that was able to take somebody who was very skeptical, very concerned, very worried for his own safety and lure him out to his own death.

When you're thinking about the intentional conduct in this case, think about how this event went down. You know, without confluence basically of these two individuals together,

ask yourself whether any of these murders would have occurred because you know Dustin Honken was a planner. He was a thinker. He liked to read books. He liked to think out things in advance, but he wasn't a doer. We heard that from Jeff Honken. He was a planner.

And you also heard through the testimony of Jeff Honken and Tim Cutkomp there was no violence -- Dustin Honken was not involved with violence, did not carry weapons until after he meets up with Angela Johnson. And you heard testimony about what her personality was like through a number of witnesses.

Ask yourself absent both of them coming together, Dustin Honken being the planner in this case and obviously with the motivation to kill and Angela Johnson who was somebody who acts, whether without her intentional conduct and prodding along Dustin Honken whether this murder would have happened. But for her, Dustin Honken couldn't have made entry into that house. Greg Nicholson would have seen him at that point and resisted.

But for her, there was no way to get Terry DeGeus out to a point where he could be killed. But for her, Dustin Honken, he could have come up with a gun maybe someplace, but would he have? Could he have? It's that conduct by the defendant in this case that led to these murders.

Now, as I said, during your verdict, you found that the defendant intentionally aided and abetted the intentional

murders of five people, and thereby you found that she intentionally engaged in conduct intending people to be killed. That's the intent gateway factor that I've been spending some time on, but I want to move to some of the other factors in this case.

You have to find the intent, and then you have to find at least one of the statutory aggravating factors the government's identified for you to be able to consider the death penalty as to a particular def -- or as to a particular victim. In this case we've alleged substantial planning and premeditation existed as to all of the people involved in this case, so let me spend some time talking to you about that.

Now, we know up front that the defendant purchased a weapon fairly close in time with when these murders occurred. She bought this weapon, an Intratec Tec-9. She didn't buy it at any number of gun shops up in Mason City or Clear Lake or even Charles City or any of the other outlying cities. She traveled all the way down to Waterloo, Iowa, and not to a licensed dealer like a sports shop; to a pawn shop.

And she bought not just any weapon, not just a handgun but an Intratec Tec-9, a killing weapon. No other purpose for this other than to use as violence against somebody else, and she knew that.

She had to have known when she went in at Dustin Honken's request and with him to purchase that weapon there was

only one thing that was going to happen with that weapon, and that was that people were going to die.

To have bought the weapon that many days in advance of the killing meant that they were thinking about it for a long time. At any step along this way, Angela Johnson could have made a decision not to go farther. Instead the planning continues. The thinking continues. The thought process to go through with this continues. Ask yourself what kind of person can do that.

As I said before, she helped hunt down Greg Nicholson and track him to this house, Lori Duncan's house on that quiet street in Mason City, Iowa. And they used Christi Cole or Christi Gaubatz's car.

Now, there's some significance in that too. You heard during the argument by the defense during the guilt phase that the intent was just to go over and make a videotape of Greg Nicholson and that's what the defendant must have understood was the intent, get that videotape and leave.

But ask yourself, if that was the intent, right, if it wasn't intended all along, planned all along, premeditated all along to kill Greg Nicholson and necessarily anybody else present at that point, why borrow Christi's car; right? If you're going to go over there to make a videotape and leave -- Greg Nicholson's going to know you made the videotape -- why do you have to disguise the car you're in? Why not just drive your

Mr. Honken's child, by the way. There's no disagreement about that.

So this evidence is being offered really to prejudice Miss Johnson because obviously it's not one of her better moments. We'd be the first to admit that. She's swearing, and she's angry, and she's talking about beating up Mr. Honken. Mr. Honken never got beat up by Angela Johnson in his life. The government's not going to present one iota of evidence that he was ever touched by her physically, never happened.

And this is information we think the rule specifically should exclude, and I'm referring to 21, 848(j) which deals with proof of aggravating circumstances. Any other information relevant to such mitigating or aggravating factors may be presented by either the government or the defendant regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.

This both misleads the jury in terms of the relationship between this couple, and it also has great danger of unfair prejudice. It's a moment in time where Miss Johnson's particularly angry, and the danger is this, Your Honor, that a jury could use this information and decide we don't like this woman. We don't like her personality. We don't like the way

she uses profanity, and instead of making a decision based on an impartial assessment of aggravating and mitigating circumstances, they're going to rely on something like this in making a determination about life or death. That would be wholly inappropriate. It advances the arbitrary and capricious infliction of the death penalty, not prevents it.

So for these reasons and Miss Johnson's due process rights under the 5th, 8th, and 14th Amendments of the United States Constitution, we'd ask the Court to exclude Government's Exhibit Number 1148 from evidence in the penalty phase in this case.

THE COURT: Mr. Williams?

MR. WILLIAMS: Your Honor, while at least arguably this advances the government's aggravating factor of future dangerousness, we are offering it much more in response to the defense assertions in their mitigating factors that this defendant had a mitigating role because she was under the influence and under duress and under the direction of Dustin Honken.

And what this tape does more than anything else is tells you exactly what the relationship was between those two people. I mean, she's -- this is a guy who murdered five people, and she's threatening to kick his ass, he better get him (sic) home, that she told him not to fuck with her.

I mean, this is somebody who's not led, who's not been

under duress or under the influence of Dustin Honken. This is somebody who very much can stand up for herself, if anything else, is the one telling Dustin Honken what to do, where to go, where to be. And so I think this opens up a huge window into what the relationship really was like between them.

Now, if the defense wants to go through these mitigating factors and withdraw all the mitigating factors in which they claim she was under the influence of Dustin Honken and she was under duress and that he influenced her, then we won't play the tape. But to the extent that they're pushing this as what the relationship was, this tape shows what really happened between them.

THE COURT: Well, let me ask you this. Setting aside for a moment the question of its admissibility, isn't it more properly admissible, if it's admissible at all, in the government's rebuttal case than it would be in your case in chief? And maybe you weren't planning on using it in your case in chief.

MR. WILLIAMS: I wasn't at this point planning on it. I wanted to talk to Kathy Rick, and so I did tell Mr. Berrigan that until I learned more about where this came from and whether there was any actual threats carried out or anything like that, I wanted to at least reserve the option. That's where Mr. Berrigan asked me this morning was I thinking about playing it with Kathy Rick, and I said maybe. And so that's where I

Q. And is the witness protection program designed to protect you even while you're in custody?

A. Yes.

Q. And so is there a danger to people like you even in a federal penitentiary? With all the guards and all the security and everything else, you could still be harmed?

A. Yes.

Q. The attorney asked you about Ron McIntosh and the fact that Ron McIntosh was somebody that Dustin Honken was concerned about. Do you remember that line of questioning to you?

A. Yes.

Q. Is this the Ron McIntosh that used a helicopter to aid in the escape of a female prisoner from another federal penitentiary?

A. Yes, he did.

Q. The defense attorney asked you about Dean Donaldson and about bonding Dean Donaldson out. Do you remember that line of questioning?

A. Yes.

Q. Did Dustin Honken ever tell you about Angela Johnson obtaining a thousand dollars in cash and attempting to bond out another inmate from the Woodbury County Jail so he could go kill people?

A. Not that I recall.

Q. You indicated that when you're talking with Dustin Honken

at some point he said he was afraid of Angela Johnson for two reasons. One is that she had information that could hurt him. The other one you said because he said she was crazy.

A. Right.

Q. What did he tell you he meant by that?

A. Well, he said he was afraid of her, a little bit afraid of her.

Q. Physically afraid of her.

A. Yes. Said if they -- that she was pretty stout or whatever, you know. He said that they would come back from a party or something and that she would knock him down on the front lawn and wrestle around with him.

Q. He was fearful of him for -- fearful of her for his own physical safety.

A. That's what he said.

Q. Defense attorney asked you about the murder concerning Terry DeGeus and how that took place and so forth. Did Dustin Honken tell you whether this took place at night, late at night?

A. He didn't say.

Q. So you don't know whether it was dark out or not?

A. I don't know.

Q. Did he describe for you when he's shooting and beating Terry DeGeus whether he had his back turned to Angela Johnson when he's doing this?

A. He didn't say.

Q.    So for all you know from the description, this could have been right outside the car where Angela Johnson's sitting, his back is turned to Angela Johnson, he's beating him, and it's at night, and the first time she sees the blood is when he turns around and approaches.

A.    Could have been.

Q.    You were asked about this escape plan from Dustin Honken and credibility of Dustin Honken and so forth.  Artie Dufur is somebody you mentioned was part of this plan by Dustin Honken.

A.    Yes.

Q.    Are you aware of whether Artie Dufur was actually caught on the roof of the Marion penitentiary during an escape attempt?

A.    That he was what?

Q.    Caught on the roof of Marion prison?

A.    No, I'm not aware of that.

Q.    Do you know whether he successfully escaped from a federal prison before?

A.    No.

MR. BERRIGAN:  I'm going to have to object, Your Honor, as to the relevance of this.  It has nothing to do with Mr. Honken whatsoever.

THE COURT:  Well, it's already in evidence, so the objection's untimely.

MR. WILLIAMS:  I have no further questions.

THE COURT:  Any recross, Mr. Berrigan?

A. Well, I knew she was a part of his life. She was there.

Q. Did you have contact with her during that time period of 1994 to early 1996?

A. Yes.

Q. And were there periods where you would have had confrontations with her?

A. Yes.

Q. Do you recall any time where Angela Johnson was following you in a car?

A. Yes.

Q. Can you describe for the jury what happened on that occasion? How'd that come about, first of all, that she's following you in a car?

A. I stopped by Dustin's on my way to his mother's house.

Q. And let me stop you. Dustin's, is this at the Eighth Avenue or Eighth Street address with Tim Cutkomp?

A. Uh-huh, yes.

Q. Okay. So you stopped by there, and what happened?

A. I stopped there, and Dustin and Angela were outside. And he came over to the car, and I asked him what I needed to ask him. And then I left and went downtown at which point Angela was behind me. I went through the bank, through the drive-through. I came out, and she was still behind me, and I pulled over. And she got out of the car.

Q. What happened when she got out of the car?

A. She banged on the car windows. I rolled the window down, and she yelled and screamed.

Q. Anybody with you at that time?

A. My three children.

Q. And what was she yelling and screaming at you about?

A. I don't know specifically.

Q. Did you take anything that she was yelling and screaming about as threatening to you?

A. Yeah.

Q. Did you have concern about your safety at that point?

A. Yeah, I wanted to get out of there.

Q. What ultimately happened? Were you able to leave?

A. Yes, she went back to her car, and I left and drove to Dustin's mother's house.

Q. And what were you going to Dustin's mother's house for? Was there some occasion you were going to?

A. We were taking the kids to carnival.

Q. And what happened when you got to Dustin's mother's house?

A. She said Dustin had called her and indicated Angie may be on her way over there and that she may have a gun and we needed to leave.

Q. And so did you?

A. Yes.

Q. Were there other occasions where you had confrontations with Angela Johnson?

A.  Yes.

Q.  In particular was there an occasion one night or early, early in the morning when Angela Johnson came to your house?

A.  Yes.

Q.  Can you tell the jury about that event?

A.  It was a weekend day.  The kids and I were sleeping.  And somebody was banging on the door.

Q.  About what time of day or night was this?

A.  Five, six in the morning.  I'm not sure.

Q.  Was it still dark outside?

A.  It may have been starting to get light.  I don't know.

Q.  So what happened at that point?

A.  I looked out the window and saw it was Angie.  She was screaming to get in the house.  I called Dustin and asked him why Angie would be at my house.

Q.  And what was Dustin Honken's response?

A.  He said he didn't know, that I should call the police.

Q.  So did you?

A.  Yes.

Q.  What happened at that point?

A.  She had left the property, and then she returned.

Q.  Did the police come at some point?

A.  Yes.

Q.  And so when she returned, were the police still there?

A.  I called the police again when she was pounding at the door

and --

Q. This is a second time?

A. Right.

Q. Okay. And what was happening then at that point?

A. She was threatening to break into the house if I didn't open the door, and the dispatcher said yes, she could hear her at the door because I said, She's not gone; she's back.

Q. What was -- did -- Angela Johnson, when she was screaming, why was it she was trying to get into your house?

A. I believe she thought that Dustin was at my house.

Q. And you had your children there at that time?

A. Yes.

Q. At some point in early or mid-1996, was there an occasion when your car was vandalized?

A. Yes.

Q. What happened to your car?

A. It was parked in my garage, and when I went and loaded my kids in the car to go to work, I had four slashed tires and damage to the inside and outside of the car.

Q. And explain the damage to the outside of the car if you would.

A. There was cuts on the inside on the seat and the steering wheel, and there was a lot of scratching on the hood.

Q. And was there anything noticeable about the scratching on your car?

A.    It looked like it could resemble an A.

Q.    An A?

A.    Yes.

Q.    On -- someplace scratched on your car?

A.    Yes.

Q.    Did you become aware at some point that during a search of Dustin's house on February 7 of 1996 that a letter from Angela Johnson to Dustin Honken dated October 26, 1995, was seized?  It was actually introduced into evidence in this case as Exhibit 69.

A.    Yes.

Q.    That referenced the vandalism to your car?

A.    Yes.

Q.    Did you ever talk to Dustin Honken about that vandalism?

A.    When it happened.

Q.    What'd he say?

MR. BERRIGAN:  For the record, Your Honor, I'm going to object to Mr. Honken's testimony coming through this witness for the same reasons previously lodged about Mr. Vest, and that is that it deprives Angela Johnson of her ability to cross-examine Dustin Honken in violation of her 6th Amendment rights and her due process rights under the 5th, 8th, and 14th Amendments.

THE COURT:  Overruled.  You may answer.

MR. BERRIGAN:  May I have a continuing objection so

A.   No.

Q.   Did you ever see him with a weapon?

A.   No.

Q.   Did you ever see him use force against anybody else?

A.   No.

MR. WILLIAMS:  Nothing else.

RECROSS-EXAMINATION

BY MR. BERRIGAN:

Q.   Very briefly, ma'am, but were you anywhere near Dustin Honken on July the 25th, 1993?

A.   I don't know where I was on July --

Q.   You certainly didn't see him execute four people in a field off of Lark Avenue in Mason City, did you?

A.   No.

Q.   And on November the 5th, 1999, were you anywhere near Dustin Honken when he shot and beat to death Gregory Nicholson?

A.   No.

Q.   That sounds like use of force, doesn't it, killing somebody with a baseball bat and a shovel?  Would that be use of force to you?

A.   Yes.

THE COURT:  Mr. Berrigan, I think you misspoke.  You said Gregory Nicholson.

MR. BERRIGAN:  And I apologize.  Terry DeGeus.  I apologize, ma'am.

That's all I had, sir.

MR. WILLIAMS: Nothing else, Your Honor.

THE COURT: Anything further? Okay. You may step down.

Jury can take a stretch break.

Is the government ready to call its next witness?

MR. WILLIAMS: Yes, Your Honor. The United States calls Alyssa Nelson.

ALYSSA NELSON, PLAINTIFF'S WITNESS, SWORN

THE COURT: Okay. Please be seated. Please adjust the chair, scoot it up so you can speak directly into the microphones. And when you're ready, would you state your full name, please, and spell your full name.

THE WITNESS: My name is Alyssa, A-l-y-s-s-a, Marvea, M-a-r-v-e-a, Nelson, N-e-l-s-o-n.

THE COURT: Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Miss Nelson, where are you from originally?

A. I'm originally from Britt, Iowa.

Q. And where are you living now?

A. I'm living in South Sioux City, Nebraska.

Q. What do you do for a living, ma'am?

A. I am employed by the state of Nebraska as a probation

officer.

Q. And are you married?

A. Yes, I am.

Q. And what's your husband do?

A. My husband is employed by the city of South Sioux City as a police officer.

Q. How far did you go through school, ma'am?

A. I graduated with a bachelor's degree in criminal justice from Morningside College in 1993.

Q. Morningside College here in Sioux City?

A. Yes, I did.

Q. And it's after that that you began your career in law enforcement?

A. No. I worked five years at the Boys and Girls Home here in Sioux City, Iowa, and then I started as a probation officer in 1998 for the state of Nebraska.

Q. Dustin Honken is your brother.

A. Yes, he is.

Q. Can you share with the jury a little bit of information about what your brother was like growing up with him and over the years? What's his personality like? If you were going to describe him to somebody else, how would you describe him?

A. Well, my brother and I, he's three years older than I am. And growing up, you know, it's a regular brother-sister relationship. And we got along, you know, quite well. Of

course, you know, as any brother-sister relationship, you know, we would have our arguments and that kind of thing. And we got to be --the older we got, the closer we got where I could confide in him if I had any problems and vice versa.

Q. During his years growing up and through the point of 1993, did you maintain contact with him during that time period?

A. Yes, I did, sporadically.

Q. I'm sorry?

A. Sporadically I did since I was in college and I also got married and things like that.

Q. And up to that point, up until 1993, did you ever know Dustin Honken to engage in violence with anybody?

A. No, never.

Q. Did you ever see him use force up until 1993 against anybody?

A. Never.

Q. Did -- growing up with Dustin Honken, did he have a lot of plans and projects in mind?

A. You mean as far as like careerwise?

Q. More just on an ongoing basis. Did he have different projects or different things he got interested in and pursued for periods of time?

A. Well, he was in -- started out in high school in like karate for quite a while, and that lasted for quite a while with him, and then he stopped that. Other than that, you know, he

Q.   So did you ultimately meet this woman Angela Johnson?

A.   Yes, I did.  I don't exactly remember the day or the time or anything like that.  But yes, I did eventually meet Angie.

Q.   And was it on one occasion or multiple times you would have met her over the years?

A.   I met her probably I'd say multiple times.  I mean, I don't exactly remember the number of times, but it was, you know, multiple times.  She came to my wedding, you know, with my niece Marvea.  And she actually was there when I went into labor with my son Nolan because my brother was -- my brother was in jail in Woodbury County.  She was up here to visit.  I think she came for a holiday once.  And I don't remember a lot of other times. I went to her house once I think for a Thanksgiving that she had at her home.

Q.   Did you have occasion to observe the interaction between your brother and Angela Johnson on occasion?

A.   Yes, I have.

Q.   And would you describe what they were like when they were together?

A.   The times that I've seen is -- just the couple of times that I've seen them together when they were together is just, you know, usually, you know, if Angie needed something for, you know, the baby Marvea, she'd say, Dustin, go get me this. Dustin, he'd jump up, and he'd get it.  Dustin was very good with his children.  You know, he'd jump up and he'd get it.  Or,

you know, she'd plop the baby on Dustin, you know.  He'd take care of the baby, that kind of stuff.

Q.   Did you observe Dustin your brother controlling Angela Johnson?

A.   No.

Q.   Did you observe him ordering her around?

A.   No.

Q.   Ever see her -- I'm sorry.  Ever see him get physical with Angela Johnson at all?

A.   Never.

Q.   Ever see him intimidate her in any way?

A.   No.

Q.   Did Dustin Honken ever tell you about Angela Johnson's temper or violence?

A.   Yes, he did tell me.  At one time he was just saying that -- like I said, I can't remember specific time, date, anything like that.  But he just made reference, he said, you know, Angie, she has a horrible temper, Alyssa.  And I said, Well, you know, what do you mean by that?  He says, Well, you know, she just -- she flies into rages, Alyssa, he goes, you know.  And I go, What do you mean by rages, you know?  And he goes, She gets so angry sometimes, you know, he goes, She scares me sometimes.  She just -- she goes crazy.  She just flies into rages.  And that's all he said.

Q.   Ever tell you about any involvement with a weapon in

connection with Angela Johnson?

A. At one time he just said that he had been sleeping and he was woken up by something being pressed to his head and he woke up and Angie was standing over him with a gun being pressed to his head and she was -- he didn't really tell me what was being said or anything like that. But it scared him. He woke up. He had a gun pressed to his head by Angie and that she was just screaming at him and that he had to talk her down, that kind of stuff, and that usually that was -- you know, Dustin, you know, would talk her down out of these getting angry or something like that.

Q. Now, you know that your brother has been convicted of murdering five people.

A. Yes, I'm aware of that.

Q. Knowing what you know about his personality absent some outside influence, can you see Dustin Honken murdering five people?

MR. BERRIGAN: I'm going to object to that as calling for speculation and conjecture on the part of this witness.

THE COURT: Sustained.

BY MR. WILLIAMS:

Q. Let me direct your attention to 1998. Are you aware that in 1998 your brother Dustin Honken was sentenced on drug charges?

A. Yes.

Q.   And that took place here in Sioux City in this courtroom.

A.   Yes, it did.

Q.   Did you attend that sentencing in February of 1998?

A.   Yes.

Q.   And while you were there, did you see Angela Johnson also at the sentencing hearing?

A.   Yes.

Q.   Did you have conversations with her, first of all, outside of the courthouse?

A.   I don't remember any specific conversations.  I remember, you know, being outside of the courthouse with her like during a break.  I do remember that.

Q.   And what happened outside the courthouse?

A.   Well, I remember during a break that, you know, it was a nice day and there were people sitting outside on the steps, and that was like facing the library parking lot.  And I had kind of went out there and was just kind of watching facing the library, and Angie had said, Well, I need to go to my car.  And her car was out in the library parking lot.

And she walked across the street, went into her car, and she kind of rummaged around in there for a while.  She got out, and she had a camera, and she started facing the direction of the people that were sitting on the steps of the courthouse where they were all sitting.  And she started taking a picture of the people that were sitting on the steps of the courthouse

sitting there.

And then after she got done doing that, she put -- she put the camera back into her car, and then she came back over across the street. And she came back inside because the break was over. And then she came in. And I said, you know, Angie, what were you doing? And she says, You don't want to know. And I left it at that because I did not want to know.

Q. So did you sit with her at any point in this courtroom during your brother's sentencing in February of 1998?

A. Yes, she came and sat beside me.

Q. And when she was sitting beside you -- back in these rows back here?

A. Yes.

Q. -- what happened at that point?

A. Well, I believe my brother was sitting at one of these tables here, and she was sitting beside me, and as we were listening to the sentencing and that kind of stuff, I was, of course, getting quite distraught. You know, my brother's being sentenced to 25 years, something like that, and, you know, I'm starting to cry and what not.

And she started taking out like a small gold or silver like little cigarette case, and she just told me kind of calm down, that kind of stuff. And she took out a cigarette, and she started kind of playing with it, and then she says, Oh, you know, Alyssa, you know, put this between your fingers, you know;

this will make you feel good; this will make you feel good.

And I don't smoke, and I'm like, Oh, Angie, put it away. And she's like, Oh, no, it will make you feel good; it will make you feel good.

So just to kind of appease her to make her be quiet and kind of -- you know, we're in the courtroom and --

Q.   Let me ask you this:  At any point did she sing at all?

A.   Yeah, it was quite strange.  She -- I don't remember all the words since it was so long ago, but the one thing that stuck in my head, it was something ding, dong, whatever, and she was making implications towards the prosecutor at that time, something Angie's coming for you and made it toward the prosecution at that time.

And I just kind of looked at her, and, you know, of course, I was just -- kind of was trying to stay away, you know, of course, and I was very much crying because of my brother so . . .

Q.   At the end of that sentencing, were you in the courtroom as everybody kind of got up and ultimately walked out of the courtroom?

A.   Yeah, everybody got up and walked out.  I was standing up, and she stood up with me, and I believe it was a bunch of people that worked in the courthouse that were standing up against the back of the wall, and it was a bunch of males except for one female, and we turned around, and Angie turned around and

relationship with her boss. That was the conversation unrelated and not real specific to anything. But then we did have some conversations there that were specific in her involvement in the drug trafficking and her involvement with Mr. Honken and some other things.

Q. And just on a side, she had a conversation about the relationship she had with her boss there at the waterfront --

A. Yeah, at North Beach. That's what I recall.

Q. And what was the name of this individual if you recall?

A. The name of the individual I have here is George. Last name is B-a-r-l-a-s. Barlas is how I'd pronounce it. And there's actually part of Government's Exhibit 83 -- I believe during part of that meeting at the bar, she actually provided us with a business card, and it's also in Exhibit Number 83 here. And on the back of it is her home phone number I believe and then her cell number, Miss Johnson's.

Q. So during this kind of free-flowing conversation you had with her -- and just give the jury an idea how long were you at this restaurant/bar having a conversation with her roughly?

A. Without actually looking at my notes, I'd say we were there 45 minutes to an hour I would say. Like I said, I don't have my specific notes here, but that's what I recall.

Some of the things that were related to the drug conversations that I recall, one of the things that kind of caught my attention was the fact that she was talking about her

daughter, and I think it was her older daughter that was school age, and she indicated that when the other school kids would talk about what their parents do for a living, her daughter didn't know what to say about how to tell them that her mom and dad were dope dealers and that actually I also recall specifically that her daughter liked it when she smoked marijuana because she was easier to deal with. So that goes to show me that even a young elementary school age girl knew what was going on somewhat.

Q. Did she have any conversations with you talking about Dustin Honken's continued involvement even though he's in prison with any drug activity she was involved with?

A. She indicated that she actually either had or was attempting to smuggle methamphetamine into the correctional -- the federal correctional facility where he was at in Colorado. She indicated if I remember correctly that she could get a sizable amount of cash or he could get a sizable amount of cash if he indeed could get methamphetamine into the correctional facility.

Q. It would sell for a lot more inside the prison than it would on the street.

A. Yes, sir, that's correct.

Q. Did she make any statements concerning a desire to be a hit woman?

A. As a matter of fact, she did. We were talking about

Mr. Honken. In Colorado, in Florence, it's actually defined as the federal facility, kind of a super max facility. And there were other inmates that were there with Mr. Honken. Some of those inmates were individuals involved with John Gotti. Mr. Gotti was in control of the New York mafia and mob back in the -- I believe it was the early '90s if I remember correctly. Some of those people that worked for Mr. Gotti were actually in prison with Mr. Honken. Miss Johnson indicated that Mr. Honken had made contacts with those people and was offering her to be hired as a hit woman for them. And when she talked about that, she was very animated about wanting to do that.

Q. When you say animated, what do you mean by that?

A. I mean, I don't know how to describe it other than her eyes kind of lit up when she talked about doing it. I mean, it's not obviously your normal nine-to-five job, nor would it be -- you know, it just caught me -- it just really stuck in my mind that obviously I knew what had happened in the past, and when she started talking about being a hit woman, it just really -- it really set in deep.

Q. After this meeting on July 1 when you get these instructions, these detailed instructions from Angela Johnson, to go find and bring her Jimmy Rodriguez, what happens then after that in your continuing involvement with Angela Johnson?

A. We actually had made several attempts to find Mr. Rodriguez. We went to his last known locations. We

instructions at their request?

A. Yes.

Q. How long have you worked at the Benton County Jail?

A. Eight years.

Q. In July to October of 2000, were you working in that capacity then?

A. Yes.

Q. And did you have a particular shift that you worked?

A. Yes, I worked four-to-midnight shifts. I believe I was four to midnight at that time. It's been a while. I think my shift's changed once since then but . . .

Q. Mike Merino testified earlier in this trial. He's a jailer at the Benton County Jail?

A. Correct.

Q. And he explained that it's a fairly small jail, perhaps as many as 30 inmates, somewhere in there?

A. Right.

Q. Back in the period of July to October of 2000, was one of the inmates Angela Johnson?

A. Yes.

Q. Could you describe for the jury given your position as a dispatcher there what kind of contact did you have with Angela Johnson between July of 2000 and October of 2000?

A. She was in her jail cell, and she did not have her uniform on properly. And we viewed it in the camera that she did not

have her jail uniform on correctly. She did not have her pants on. I at that time had told her over the intercom, Do you have your -- Angela, do you have your pants on? And she at that time had said to us yes, she did, and then said to the other inmate that was in there at the time, How do they know I don't? and then went to her cell to get them.

Q. And when you say the intercom, you're actually able to communicate to individual cells through the --

A. From the dispatch room.

Q. And this occurrence occurred on August 30 of 2000?

A. Yes.

Q. Now, prior to that occasion, had you had much contact with Angela Johnson?

A. Just maybe in passing.

Q. Your day-to-day responsibilities didn't call for you to have a lot of contact with the inmates there; is that fair to say?

A. No. Yes.

Q. And so when you confronted her about having the -- not having her clothes on correctly, what was the response after that?

A. Well, after she said that she had them on, I said that she shouldn't lie to us because she didn't have them on. And then at that time she said to me, I'll find out who you are; you're dead.

Q. What was your response to that?

A. I was shocked I guess, scared.

Q. Did you take that as a serious threat?

A. Yeah, yes.

Q. Now, inmates I assume from time to time get angry when they're in jail there?

A. Yes.

Q. Sometimes they say things to you and other jailers on occasion as well.

A. I had never had anybody say anything to that effect to me before. Maybe the jailers have, but me as being a dispatcher, no, I have not had anybody say that to me.

Q. And did you actually take that as a serious threat to you?

A. Yes, I did.

Q. When she said she'll find out who you are -- is that what she said?

A. Uh-huh.

Q. -- are you aware of whether after that occurrence any steps were made by anybody to find out who you were or where you went?

A. I had found out later that they were. I didn't know at that time, but I found out later that she did try to find out who I was and what I drove and where I lived.

Q. The woman who threatened you, the Angela Johnson in the Benton County Jail, do you see her in the courtroom here today?

A. Yes.

A. Actually I went there to pick up our daughter, and Mr. Honken was there.

Q. You mentioned several times being at Angela's house to pick up your daughter. How often would you do that, Mr. Johnson?

A. I would say -- when I went through my second divorce, there was issues between my second wife and our daughter Alyssa, so it was not on an every-other-week basis. But I'd at least try to make it once a month.

Q. All right. And so on these occasions where you saw your daughter once a month, were you typically picking her up at Angela Johnson's house?

A. That's correct.

Q. So you'd go inside?

A. Yes, I would.

Q. All right. Mr. Honken, you said you saw him at Angela's house. Did she introduce you to him?

A. Yes, she did.

Q. Okay. How many times would you say you actually met Mr. Honken all together?

A. There were several times that I would go to pick up Alyssa and he was there.

Q. What were your impressions of him during the several times that you met him?

A. I felt that he seemed like a great individual. We had conversations about our children and vehicles.

Q. You thought he was a good choice for Angela?

A. Yes, he seemed better.

Q. Okay. Than -- comparatively than Mr. DeGeus you mean.

A. That's what I'm saying, yes.

Q. I want to ask you a couple of questions about your daughter Alyssa. She's 21 or 22 now?

A. She's 21.

Q. Twenty-one, okay. And obviously it sounds like you've had a fairly close relationship with her through her whole life?

A. Yes, we have.

Q. And have there been periods of time where she's actually lived with you?

A. There has been a couple occasions, yes.

Q. All right. And have you also been able to observe Alyssa's relationship with her mother over the course of the last 21 years?

A. Of course.

Q. And what has that been like?

A. Both of them are very important to each other. They have always for the most part gotten along well. And they care for each other dearly.

Q. What's your observations of how often they communicate with each other?

A. In what time frame?

Q. Well, I guess -- that's a good question. What about

A.   Yes, I would, definitely.

Q.   For how long?

A.   As long as I live.

          MR. BERRIGAN:  That's all I have.  Thank you.

          THE COURT:  Mr. Williams, anything?

          MR. WILLIAMS:  Thank you, Your Honor.

                         CROSS-EXAMINATION

BY MR. WILLIAMS:

Q.   Miss Dirksen, you testified about Dustin Honken.  During the time period that you knew your sister to have a relationship with Dustin Honken, you would agree he was never violent with her.

A.   That's correct.

Q.   In fact, from all appearances to you, it appeared they had a very normal relationship, didn't they?

A.   I wouldn't call it normal but . . .

Q.   Well, do you remember being interviewed on February 17 of 1997 and calling their relationship a normal relationship?

A.   I might have.

Q.   When were you exactly in drug treatment?  What year was that?

A.   I don't remember the year, but I was very young.  I was I believe -- I was either -- I was 14 or 15 years old.

Q.   So it would have been approximately what year?

A.   Let's see.  I can't recall right now.

MR. WILLIAMS: It's not a big deal, Your Honor, one way or the other. I do differ with the defense. There was evidence that Miss Johnson quit using methamphetamine during both of her pregnancies, but regardless, it's not something that's that important to me. I don't think there's evidence of addicted, and if they want to keep it in, I'll point out to the jury they didn't prove it.

THE COURT: Well, I think I'll leave "addicted" in.

The next one in contention is 20. What's the evidence of that, Mr. Berrigan?

MR. BERRIGAN: We argued this at length also, Your Honor, at the last day of the trial. Our contention is that when Miss Johnson went to the Nicholson house with Mr. Honken on July the 25th, 1993, she believed the plan to be that they were to get a videotape of Greg Nicholson and move on. We think our position is substantiated at least in part by the jury's determination that they found no substantial planning and premeditation, or, more accurately, I should say they didn't agree beyond a reasonable doubt it was present.

So the circumstances at the time were that during the course of the time they were in the house Mr. Honken either reveals his plan directly or it becomes obvious to Miss Johnson that this is not going to be merely obtaining a videotaped statement from Greg Nicholson but that people were going to be murdered, and that's the plan of Dustin Honken. That was his

intention from the beginning, and the change in circumstances we believe is what caused Miss Johnson to be under stress, anxiety, and impairment of her normal judgment, and those circumstances were under the direct influence of Dustin Honken. So that's our justification for mitigating circumstance number 20.

THE COURT: Mr. Williams?

MR. WILLIAMS: I just fundamentally disagree. I don't think there was a shred of evidence to suggest that at any point she was under substantial influence of Dustin Honken. Even if you accept the defense argument for how the murders went down, all that shows is that he's the one who planned it and maybe advised her what the plan was at that point, but there's nothing indicating that he had substantial influence on her.

The thing that even causes me more concern the more I've thought about this is the language that on the date of the murders, so forth and so on, she was under unusual stress, anxiety, and impairment. And the defense specifically kept out of the evidence in this case and out of our ability to examine the defendant what her state of mind was at the time of the murders. And so for them to tie the date of the murders to anything to do with her state of mind is completely inappropriate, and we would ask that that language be struck.

MR. BERRIGAN: I would agree with Mr. Williams' last comments if the stress, anxiety, and impairment weren't directly tied to the substantial influence of Mr. Honken, Your Honor.

We're not claiming that this is some result of some mental disease or defect she suffered stress, anxiety, or impairment, and I've modified that language as you'll recall because I think earlier there was a suggestion there might be a mental defect. I don't remember what we earlier proposed, but it's only because of the influence of Mr. Honken that we're alleging that there's stress, anxiety, and impairment, not because of some mental disease or some type of a mental illness that was present on that day.

THE COURT: And, Mr. Williams, you don't think there's evidence to support 20 at all.

MR. WILLIAMS: I don't.

THE COURT: I don't either, so I'm going to strike 20.

Okay. I think that resolves the -- are there any other contested issues on the mitigators themselves other than the prefatory language issue? And then there are some other matters but . . .

MR. WILLIAMS: No, Your Honor.

THE COURT: What's the government's position with regard to the prefatory language about "Angela Johnson contends"?

MR. WILLIAMS: I think it's fine. I think you have the same prefatory language on page 17 on the government's aggravating factors, and I think it's important that the jury know that these are contentions and not evidence. I understand

the defense concerns, but I think they're speculative that the jury's somehow going to read something into that that it's a judgment by the Court of anything.

THE COURT: Mr. Berrigan, anything else you want to add?

MR. BERRIGAN: I'm not sure my letter to you is part of the record, Your Honor.

THE COURT: Only if you file it.

MR. BERRIGAN: Okay. So it isn't, so I should add yes because otherwise it's a complete omission as to our objection. The Court immediately preceding the discussion of the mitigating factors has language in there that says it's the defendant's burden to establish any mitigating factor and then explains what the burden is. Even the sentence that immediately introduces the list of mitigating factors says, Angela Johnson contends that the following mitigating factors have been established by the greater weight of the evidence.

In the preliminary instructions, number 4 specifically, the burden of proof regarding mitigating circumstances being on the defendant and what that is, is again set out in the preliminary instructions that the jurors already have. And for the Court to repeat this language for each and every mitigator we believe suggests to the jury that these mitigating factors are less worthy of consideration by the jury than other elements that they've been allowed to determine

near her house she looks at the house where her daughter lived and her granddaughters lived.

And Dave Milbrath, Dave Milbrath who blames himself, inappropriately blames himself because remember Amber came over that day and wanted to stay overnight with Grandpa and Grandma. Dave said no, blames himself to this day for telling Amber no because had he said yes, at least Amber would be alive today.

And Jay Duncan and Jay Duncan's family, his parents, other grandparents of the Duncan girls, they're without anyone in that branch of the family. Remember Jay Duncan, though, that didn't testify before you because the same summer, same summer these murders took place, Jay Duncan was down in Des Moines volunteering trying to fight the flood and in the process contracted a disease that afflicted him to the point where he was in a wheelchair, cannot walk. He's paralyzed, and it affected his mind to the point that now all he does is can barely remember that he had daughters. He doesn't know what happened to them and doesn't understand that they were murdered.

I beg you not to forget the suffering of these victims and the suffering of these family members when you're back there trying to figure out what's the appropriate punishment for this crime.

I want to talk to you about the mitigating factors the defendant has identified. Now, you have a list of about 20 in there, in the jury instructions, but you may have noticed

yourself when you're listening to them a lot of them sound alike. If you condense those, there's really only about seven categories of mitigating factors that have been talked about here. Let's talk about them.

The role in the offense, we've got -- 1, 4, and 19 deal with role in the offense. When you're back thinking about role in the offense, do not, do not, just jump to the conclusion that the person who pulls the trigger is the person who's the most morally culpable for the crime. Think about what you know about this defendant and her violence, her impulsivity, her ability to manipulate Honken, Terry DeGeus. And ask yourself this question: Is it more morally culpable to pull the trigger, or is it more culpable for somebody to egg on, to push?

Remember the testimony from Tim Cutkomp who talked about when they were dealing drugs in 1996, 1995, it was the defendant who kept pushing and pushing and pushing and pushing Dustin Honken to get done with manufacturing methamphetamine. This is a person who is manipulating and pushing Dustin Honken.

And then remember the testimony? You may have forgotten it by now. I want to remind you of it. Testimony by Tim Cutkomp, he said -- and this is at the point where he came in and he was going to cooperate with law enforcement. He sat down at the first debriefing, and he told everything, told everything he knew about what happened, told about Dustin Honken and what he knew and suspected about his involvement in the

murders back in 1993, talked about Dustin Honken wanting to murder again and wanting to kill people. And he was asked this question during the debriefing: What are you afraid of, or are you afraid of anything now? And his answer was what? You remember? His answer was, I am most afraid of Angela Johnson, not Dustin Honken. I'm not afraid of Dustin Honken, the guy who killed. I'm afraid, I'm the most afraid of Angela Johnson. And why? Because she's pushing Honken to kill again.

So when the defendant talks to you about role in the offense, don't accept their premise that the person who pulls the trigger is more morally culpable than the person who's egging on and pushing and cajoling and putting the person in the position of pulling that trigger.

In that same category of role in the offense, the defendant suggests to you that because she was pregnant that somehow she was not in a position to control her actions. Now, I beg you to go through the evidence the defendant presented during the penalty phase and ask you where that evidence was.

Now, they had experts. They had a multitude of experts come in and talk about her mental state. Not one of them testified that her mental state was such at the time of these murders that because she was pregnant somehow she didn't have the ability to control her actions or that her judgment was impaired or somehow she couldn't turn him in or walk away or save those children, not one of them. There's no evidence of

that, not a shred. Don't find that.

No prior criminal record, this is an interesting mitigating factor. Does she have a prior criminal record? No, she doesn't. You should find that factor. But keep in mind it's not simply whether the defendant proved those factors. You need to find, first of all, did they prove those factors, and they've proved she had no prior record. There's no evidence she had a prior criminal record.

Then you have to determine what weight you give to that, what weight you give to those factors, because simply because you find they proved it you should give it no weight.

This is under give no weight to for this reason: The fact she has no prior criminal record is simply a product of the fact she was not caught. We know from the testimony that she was distributing drugs for a year or two prior to these murders taking place. We know she was distributing methamphetamine during that time period. We know after these murders took place she continued to distribute drugs, and we know even after Honken went to prison in 1996 the defendant on her own was out there distributing methamphetamine again. We know that she tried to hire Mike Mittan to inflict violence on people to collect drug debts. We know that she tried to hire them to kidnap another person. So while she has no criminal record, that should carry no weight with you.

Defendant's family, there's a number of factors that

you could have crushed it, and you chose life. You choose life over death. You chose hope over despair. You chose mercy over vengeance.

God bless you all, and thank you for your service, and Godspeed in your deliberations.

THE COURT: Mr. Williams? Why don't we give the jury a stretch break before your argument.

Please be seated.

Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

Defense asks you to sentence the defendant to life in prison without parole. He talks about 10 years from now she'll be 51 years old and 20 years from now she'll be 61 years old and so forth and so on.

Those victims have been dead for 12 years. This defendant has lived for 12 years after being involved in the murder of 5 people.

Ten years passes from now, and Kandi and Amber will still be dead. Twenty years will pass while Angela Johnson's living in prison, and Lori Duncan will still be dead. Thirty years from now, Kandi Duncan will still be ten years old, and Amber Duncan will still be six years old.

No matter how small Angela Johnson's cell may be, it's going to be larger than the coffin that Amber and Kandi Duncan are laying in now. I make no apologies for focusing on the

murder of those kids. That was the facts of this case. They are horrendous facts, and they are facts that justify the imposition of the death penalty in this case.

If you send Angela Johnson to prison for life without parole, you are sending her back to her room. You heard the defense evidence. She's institutionalized at this point. She's quite comfortable in prison. She knows what she's doing at this point. She has her TV. She can control her cells, control her other cellmates. Sending her back so she can go back to the institution that, as the defense themselves said, is home to her is not punishment for the crimes that she committed.

Now, it's interesting that, as you would expect, the lawyers are in a position of painting basically two different pictures. What I was trying to describe to you is the Angela Johnson who manipulated her way to the top of the Honken organization, who constantly pushed and pressured Honken to get with it and make that methamphetamine so she could get her money back, who has kept pushing Dustin Honken after he was caught again in 1996 to kill again, and that's the image that I asked you to accept.

The defense gets up and gives you a different image of her and what her role is and that Dustin Honken was the one in charge and so forth. I'm not going to go back over that stuff. That's for you to determine.

But I ask you to look very carefully at the evidence

and consider all the evidence and ask in your own mind what picture do you see? Angela Johnson, the unwitting, innocent person who gets duped into killing or the Angela Johnson who's violent, who's pushing, who's cajoling Dustin Honken to commit these crimes?

Defense spent some time with you talking about this abuse that she suffered as a child, and defense counsel says over and over again it's not offered as an excuse, it's not offered as an excuse, it's not offered as an excuse.

Of course it is. Of course it is. Listen to what he said. Why am I talking to you about this? Because it explains her choices. It explains it. It excuses her choices. She didn't have the same choices as other people, so, therefore, take that into account. It's the old abuse excuse that we get.

Aren't we tired as a society already of people not taking personal responsibility for what they've done? You think there's a defendant facing a capital case that doesn't have some excuse, doesn't have something in their background they point to to excuse, to differentiate themselves from other people and to explain their behavior?

But you know what the defense did not do and they had the opportunity to do it with all those experts? They never once put an expert up there to explain how any of this affected her state of mind whatsoever at the time that she engaged in these murders. They gave you a bunch of statistics.