Q.   Where?

A.   Minimum security.

Q.   Where?

A.   Newton, Iowa.

Q.   And where were you before that?

A.   In regards to what?

Q.   Well, before you were in Newton in regards to your life where were you?

A.   Well, I've basically been in Sioux City all my life except the first years of my life I farmed around Cleghorn, Iowa.

Q.   What were you doing before you were in Newton in prison?

A.   I worked for a guy doing sheet rocking.

Q.   How long did you work for him?

A.   A year.

Q.   And what'd you do before that?

A.   Off the top of my head, I don't know what I've been doing all those years.

Q.   When's the last time you filed taxes?

A.   '94.

Q.   You did file in '94?

A.   Yes.

Q.   Where?

A.   H & R Block on Pierce Street.

Q.   And when is the last time you filed before that?

A. Probably when I farmed is when I used to make a lot of money. I worked for the federal government taking grain samples, and I farmed, made a lot of money, and I filed then.

Q. What year was that?

A. Probably '75 to '84 probably, '83. I filed every year.

Q. '75 to '83?

A. That's when I worked for the government and farmed. And since then there's times -- yeah, I filed since then too.

Q. Where did you work for the government in '75?

A. Right here in Sioux City, Iowa.

Q. Doing what?

A. Taking grain samples.

Q. What government did you work for?

A. It would be the grain division.

Q. And who was that?

A. Well, the grain division of the government. I can't -- I had a license, but that was a long time ago. I can't tell you.

Q. So you don't recall who you worked for when you worked for the federal government for eight years?

A. Well, I got paid through the grain exchange.

Q. Excuse me. Let me finish. You're telling us you don't recall who you worked for when you worked for the government for eight years?

A. No, I never saw the guy I worked for for several years.

Q. I thought you worked for the government?

A. I did. But I never saw the man that employed me for several years. Then the check came from the Sioux City Grain Exchange if you want to know where I got the check.

Q. You didn't get one of these green checks from the government?

A. No.

Q. Were you on salary?

A. No.

Q. So how did you get paid if you weren't on salary?

A. On the basis of what I did.

Q. Oh.

A. My --

Q. What kind of government job is that?

A. The most I ever made in a 3-month period was over 18,000. I made a lot of money. Yes, I did.

Q. You made 18,000 in 3 months working for the federal government?

A. I still got the receipts at my mom's garage if anybody doubted it.

Q. Well, how much did you make for a whole year working for the federal government then?

A. I think I made 40,000 the last year I worked.

Q. And that's what you filed taxes on? Excuse me. What'd you say the name of that agency was?

A. The Sioux -- grain -- Sioux City Grain Exchange.

Q. And your life just went down after that, I take it.

A. Yes, it has.

Q. You just turned into a thief.

A. If -- I worked if you want to call it that I guess -- my record -- if you want to look at a piece of paper that says I am, but it goes deeper than that.

Q. Well, that's what you are, aren't you, just a thief?

A. I'm more than a thief.

Q. What's more than a thief?

A. You classify me just a thief, never worked, don't do nothing. Well, got the wrong guy.

Q. Well, I'm just looking at your record here. You had built up a record to the point where you were such a thief that in Iowa you were charged with a habitual -- being a habitual criminal.

A. Right.

Q. So you had to have how many convictions even to get to be an habitual in Iowa?

A. The third.

Q. At least a third; right?

A. Right.

Q. But you had some others too, didn't you?

A. I have two prior felon convictions. I got a misdemeanor and two felony convictions. The third felony conviction you

get are considered habitual.

Q. You mean you had no crime problems in Texas?

A. No, I didn't, Your Honor -- or sir.

Q. Excuse me?

A. No, I didn't. I worked.

Q. Are you sure about that?

A. Yes, I am.

Q. And you said you worked in Texas?

A. Yes, I did.

Q. For a year for a construction company?

A. I worked for Steve White if you want to know, subcontracted through Robinson Roofing and another construction place, roofing place down in Fort Worth, Texas.

Q. That was after you got out of prison in Iowa?

A. Yes.

Q. You were paroled down there.

A. No, I wasn't on paper.

Q. You left Newton?

A. I went -- I worked for Gleeson Construction, if you remember right, I mentioned to you earlier.

Q. But let me make sure I understand this. You left Newton and went to Texas?

A. I did not say that. I told you I went -- I worked for Gleeson Construction. Then I went to work for this guy in Texas.

Q. How long were you on parole?

A. Probably eight months.

Q. You were only on parole for eight months from a felony charge in Iowa?

A. Yes.

Q. How did you discharge from parole in eight months from a felony charge in Iowa?

A. A five-year sentence is cut in half when you get to Oakdale, Iowa. So if you do over a year -- and another thing, I went to a halfway house in Council Bluffs, but I was paroled from them in 58 days, but I stayed longer because my job was down there. When I got done, I came to LeMars, Iowa, because that's where Gleeson's next job was at.

Q. Okay. I understand. But you're saying you paroled from Iowa in eight months. Is that what your testimony is?

A. Yes, it is.

Q. And you were allowed to leave Iowa and move to Texas?

A. I was not on parole when I left Texas -- left Iowa for Texas.

Q. You're saying you were discharged.

A. Yes.

Q. And that was just from your first felony.

A. No. You -- no. You're trying to confuse me. I'm telling you -- you asked me what the last time where I worked, and I just told you Texas. Now you're trying to go

back to the first one, from the last one to the first one. You're trying to mix it up.

Q. No, I'm just trying to understand your record. How many felony convictions did you have before you went to Texas?

A. The one from '90. There's one conviction. Conviction is different -- I had two different convictions of felonies. This is the first time I've been habitual is what I'm trying to tell you.

Q. I just asked a simple question. When was the last time you had a conviction before you went to Texas?

A. '92.

Q. What year did you go to Texas?

A. Probably '95.

Q. Before '92 is it your testimony you had no prior convictions?

A. I did not say that. I just told you '90.

Q. How many had you had?

A. My first felony conviction was in '90.

Q. And your second was in '92?

A. Yes.

Q. When was your third one?

A. April 28.

Q. What year?

A. 1997.

Q. So you went what? Four years without a -- five years

without a felony conviction?

A.    Yes.

Q.    And one of those years was spent in prison.

A.    Yes, over a year but --

Q.    Now, how many theft aggravated misdemeanor convictions did you have?

        MR. COLLOTON:  Objection.  Irrelevant.

A.    I can't even answer that.  You have to tell me.

        MR. COLLOTON:  Well, it's normally improper impeachment.  If the Court's allowing that because the rules don't apply, then I'll withdraw it; and, therefore, I apologize for breaking in.  I'm sorry, Mr. Parrish.

BY MR. PARRISH:

Q.    How many did you have?

A.    I said you'll have to tell me because I don't know.

Q.    You forgot?

A.    It can't be that many.

Q.    Excuse me?

A.    It shouldn't be that many so whatever you tell me.

Q.    No.  I want you to tell us how many you had.

A.    I don't know.

Q.    Did you lose track?

A.    I don't try to keep track.  I didn't know there was that many of them.

Q.    Well, we know you have three felonies.  You've already

told us that.

A. I've never been on probation if that answers any questions.

Q. I'm not talking about probation. I want to know how many times you were convicted --

A. I said I don't know.

Q. -- of theft.

A. I don't know.

Q. You've forgotten. You've lost track.

A. Yes.

Q. It's been so many convictions that you lost track.

A. You said that. I didn't.

Q. Well, I'm asking you.

A. I don't know I said.

Q. Why is it that you don't know?

A. Why is it that I should know? I mean, I'm supposed to keep track of these?

Q. Well, some people do keep track of their felony convictions.

A. I guess I'm not one of those guys.

Q. Well, let's talk about it. Since you acknowledged that you're not that big --

A. Obviously you have it in front of you. Why don't you tell me, and I'll agree or I'll disagree.

THE COURT: Mr. Donaldson, here's the rules. He

gets to ask the questions.

THE WITNESS: I'm just trying to make it easier. He's badgering me. I said I don't know.

THE COURT: I understand that. Why don't you try to listen to the question and do your best to try to answer the question. You're doing a nice job of trying to answer the questions. Why don't you keep that up. Thanks.

BY MR. PARRISH:

Q. Now, if you are no more than a thief, let me ask you, other than stealing Dustin Honken's girlfriend's money by getting out on bond, what else did you do?

MR. COLLOTON: I object to the form of that.

A. I thought it was given to me.

THE COURT: Do you have an objection, Mr. Colloton?

MR. COLLOTON: I was, but the answer's already in, so I'll withhold.

BY MR. PARRISH:

Q. That's what you did, isn't it?

A. No.

Q. You stole --

A. How can --

Q. You talked him in to letting his girlfriend put up bond, and you didn't pay her back.

A. I didn't talk --

Q. What you've been doing for the last ten years.

A. Who talked who into what?

Q. Well, you just said you took his girlfriend's money that she put up for a bond and you hid from her so you wouldn't have to pay her back.

A. Who hid from her?

Q. You did. You said she couldn't track you down when she called.

A. Dustin told me if I got someone killed he didn't care about no money, so how can I be taking money?

Q. Let's just talk about what you did now. You've had a chance for Mr. Colloton to explain what you did. Let me just ask my questions on it. This is what you did; right? You talked to him about his girlfriend posting property to get you out so you could be free.

A. He talked to me about it.

Q. But let's accept that. Okay. He talked to you about it, and you were out on bond; is that right?

A. I really didn't want out on bond at the end. He pushed me to go out. I didn't really care. I wanted to get it over with.

Q. But you got out on bond; right?

A. Right.

Q. His girlfriend, according to you, called and said, Where's my money?

A. Right.

Q. You stayed away from her so you didn't have to pay her back.

A. So what do you want me to do? Go steal so I had money? Is that what you're saying? I don't do that; okay?

Q. I thought that's what you did.

A. Did is the key word. I did. That don't mean I still do.

Q. Oh, so you were a hog thief; right?

A. Yes.

Q. Putzier and you were hog thieves?

A. Yes.

Q. As a matter of fact, didn't you steal a couple of trucks and that's why you were zapped for the --

A. I took possession of a truck knowing it was stolen is what I was charged with.

Q. Actually it was two trucks, wasn't it?

A. No.

Q. It was just one?

A. (Witness nodded head.)

Q. Is that right?

A. Yes.

Q. So you didn't really steal that?

A. I never have stole a truck, no.

Q. Was he the only person you asked about getting out on bond?

A. I never even asked him. He volunteered to bond me out.

Q. That was not my question. Is that the only person you asked about getting out on bond?

MR. COLLOTON: Objection. Assumes facts not in the record.

THE COURT: Sustained.

BY MR. PARRISH:

Q. Did you ask anyone else about getting out on bond?

MR. COLLOTON: Same objection.

THE COURT: Overruled.

A. Again, I never asked him to get bonded out. He asked me. He'd bond me out. He asked me what my bond was.

Q. My question --

A. I don't recall anyone asking no one, no.

Q. No. I asked -- listen to my question a second. Did you ask anyone else about getting out on bond?

A. I just said I don't recall.

Q. So you may have asked and had a discussion with someone else about getting out on bond but you don't recall?

A. No. I have no idea. I'm not going to say yes or no because I don't recall nothing.

Q. If another witness were to indicate that you discussed working out some plan to get out on bond with them, that could be true also.

A. I'd have to hear the person. And then if he said it,

yes, I would believe it. I don't recall it.

Q. Did you ever pay the money back?

A. No, I didn't.

Q. How much was it?

A. Five hundred. There was some money paid back, yes, but not the full five hundred.

Q. And who did you pay it back to?

A. Phil Parmelee paid Kathy Rick several times.

Q. How much did he pay her back?

A. You'd have to ask that man.

Q. And that was paying back for you?

A. Because I was working for him, yes, for several weeks, and he paid what he could.

Q. And what type work were you doing for him?

A. He owned a partnership in some business over in South Sioux City where they had all kinds of faulty toys and stuff that needed fixed and they fixed them. It's a big warehouse in South Sioux City.

Q. How long were you out?

A. Three months.

Q. And during that three months I assume you went to the agents right away to discuss with them what Mr. Honken had asked you to do.

A. No, I didn't. If you would have listened clearly, I just explained to him that it wasn't till he was telling

people he was going to have me killed that I went to them agents. I wasn't going to do nothing, just let it go. I was hoping I could get out of there without ever seeing him.

Q. I didn't think that you had heard him say to anyone that he was going to have you killed.

A. I just told you that someone through a window made a noose, someone in his unit, and somehow his name was brought up, and I already knew what he was talking about.

Q. And do you think he might have been a little ticked off at the fact that you took $500 from his girlfriend and didn't pay her back after you got out?

A. I can't answer that. You'd have to ask him.

Q. Well, just tell me what you think.

A. The normal person ain't going to kill somebody for 500, but maybe he would. I don't know.

Q. My question, don't you think he'd be a little upset if you promised, Look, if I get out, I'm going to pay her the $500 back?

A. That wasn't our agreement. That wasn't our agreement, sir.

Q. Do you think that someone --

A. If that was the agreement, yes, but it wasn't our agreement.

Q. Do you think that someone would have been upset?

A. Yes, if that was the agreement.

Q. And so if he thought that that's what you were going to do, you would not be upset with him for being upset if that was the case?

A. If that was the agreement, no, I wouldn't.

Q. Now let's talk about his paperwork. Did you have an opportunity to ever be in Dustin's cell?

A. Yes.

Q. And I take it he had a lot of legal papers.

A. Yes, he did.

Q. And it's true that on one occasion, at least one occasion, you were caught going through his legal papers.

A. I don't think that's true. Who told you that?

Q. You're saying you don't think you were caught or you never went through them?

A. No. No, I wasn't, no.

Q. Are you saying you never looked at his legal papers?

A. He might have handed me some papers, but I didn't go through his legal, no. Anything I went through he handed me.

Q. Have you ever been in his cell alone --

A. No.

Q. -- where he was out of his cell and you were in his cell?

A. If it was, it was only -- if he told me to go get a candy bar, if that was true, that'd be the only time.

Q. Do you remember an occasion when the toilet in your cell

was stopped up?

A. I don't recall it, no.

Q. Did that ever happen when you were there at some point prior to the time that you were --

A. It's been so long ago, I don't recall. I don't know. I don't recall it.

Q. So are you saying there has been no occasions where you've ever gone to Mr. Honken's cell without Dustin being in there?

A. I want to say no.

Q. Excuse me?

A. I don't go in anybody's cell if they're not there or they direct me towards it. Either he told me to or no, I was never in there.

Q. Are you saying you never went in there?

A. Without his permission if I did. I don't even remember, but if I did, it was with his permission.

Q. Okay. And on that occasion if you did, in fact, go in there, do you have any recollection of going through his legal papers?

A. I have never did that, never.

Q. But you have seen some of his legal papers?

A. Only what he showed me.

Q. So you have seen them.

A. What he showed me, yes.

Q. And you were aware of what he was charged with.

A. Yes, I was.

Q. And you were aware that he told you that his best friend and life-long friend had worn a wire.

A. Yes.

Q. And that he then made an admission to you under those circumstances in that cell having just met you that he had killed some people.

A. He didn't do that right away. No, he didn't. That was the progress that he made as time went -- weeks went by from bonding me out.

Q. And he also confided in you that he had buried some people.

A. At the very end, yes. Again, that was a month -- over a month from the start. We talked every day.

Q. Now, Mr. Honken through what you had told him knew you were, in fact, a hog thief.

A. Yes.

Q. And you are an admitted hog thief.

A. Yes.

Q. And how many hogs have you stolen?

A. A lot.

Q. Well, I have no idea what a lot are. Tell me.

A. I can't give you an exact number. Just a lot. I've done it many times.

Q. Well, like two hogs?

A. I don't know. Five hundred hogs.

Q. All at one time?

A. No.

Q. Over how long?

A. Bunch of years.

Q. Over how many years?

A. Ten.

Q. Okay. That goes back to 1988, doesn't it?

A. Probably '84.

Q. Oh, you started stealing hogs in 1984?

A. I believe so.

Q. And you've stole them almost every year up until the present time?

A. No, I haven't stole every year since then, no.

Q. You skipped a few years?

A. I'm just telling you I haven't stole pigs every year but from that -- that's the first time I ever stole anything in my life until as I sit here. Through them years that's probably what I have.

Q. Now, with these hogs that you've stolen, you became aware that Mr. Honken had a friend who had a farm where they kept hogs; isn't that true?

A. Right.

Q. As a matter of fact, you were going to steal some hogs

and take them up to Mr. Held, weren't you?

A.   You haven't listened closely.  We were going to use his truck and trailer with his permission to do that.  That was just what we talked about in jail.

Q.   To steal hogs.

A.   We talked about it, yes.

Q.   And that was one of the plans that you indicated that you wanted to do once you got out.

A.   To pay you, yes.

Q.   To pay me?

A.   Yes.

Q.   So you were going to steal hogs to pay me?

A.   That was part of the plan.

Q.   Now, let me ask you this:  How many hogs were you going to steal?

A.   I don't know.  Thirty or sixty.

Q.   And where were you going to steal them from?

A.   I don't know.

Q.   Well, you're the hog thief.  You tell us where you were going to get them from.

A.   He had told me some places around there that there was hogs, and that's where it was left right there.

Q.   Oh, so now a man who's been stealing hogs for ten years, you were going to go up near Mason City and start doing a little hog stealing?

A. Only to take care of what he needed taken care of, yes.

Q. I noticed that there was nothing in your notes that talk about the hog stealing plan. What happened to those notes?

A. I don't know where they're at. Dustin had give me some -- they should have been in there.

Q. Well, the only notes I saw were the notes on the drugs and the killing of people. But I don't see anything on hog stealing.

A. There wasn't much there because he was going to go to Rick Held, and he told me that there was some places around there to go.

Q. Well, you just told Mr. Colloton that the only reason he was sending you up to Mr. Held was to get a gun. Now you're saying that there was something about stealing some hogs.

MR. COLLOTON: I object to that as a misstatement of the record. That's not what he just said. He said he had two purposes to go to Held.

THE COURT: Why don't you rephrase your question, Mr. Parrish.

BY MR. PARRISH:

Q. What were the two purposes then you were going to go to Held?

A. To go get his truck and trailer.

Q. I mean to Mr. Held. I shouldn't say that.

A. And about the gun, but I didn't want the gun, so the

only purpose I would have went for would be the truck and trailer.

Q. And the truck and trailer was to use that for your hogs.

A. Yes.

Q. And then where were you going to take that?

A. He was going to take care of it if he did it, agreed to do it.

Q. I notice that you didn't mention anything about hogs when you were talking to Mr. Colloton.

A. I only asked -- I only spoke on what I was asked.

Q. Okay. But you do acknowledge now that part of the plan included the theft of hogs; is that correct?

A. That's correct.

Q. And did you when you were debriefed by any of the agents tell them that was part of the plan?

A. Yes, I did.

Q. And did you tell the grand jury that was part of the plan?

A. I believe I did.

Q. You're sure about that.

A. I'm po -- not positive, but I'm pretty sure I did.

Q. And you're also indicating that you're pretty sure that in your debriefing statements with the agents you also told them that. Is that correct also?

A. Yes, I am sure.

Q. Now, your only debriefing statements you would agree would be the statements you gave to the grand jury, the statements where you were debriefed at the Woodbury County Jail December 13, 1996, and then the statements where you were debriefed on December 9, 1996.

A. I'm not sure of the dates, but that sounds like it's right.

Q. Okay. December 26, 1996. Now, let's just talk for a second. When you were indicating that you had revealed these plans for this hog theft operation that you were going to engage in with Mr. Held, did you go into details about that?

A. There was no details.

Q. As a matter of fact, you would agree the agents weren't that interested in that.

A. There wasn't nothing to tell.

Q. Okay.

A. There was -- it was just a plan that never happened. It was get a truck and trailer, and that was the end of it. It didn't happen. I never met the man, and that was the end of it.

Q. Let's talk about your sentences that Mr. Colloton went over with you. Initially what did your lawyer tell you you were facing with regard to the state court charges?

A. I was facing five years until I missed court on my sentencing for five years and the worst possibly scenario

would be 15.

Q.   And that was for the theft of a truck?

A.   Taking possession of a truck knowing it was stolen, yes.

Q.   Was the 15 going to be added in addition to that which would have been the habitual charge?

A.   That's what that would be.

Q.   Excuse me?

A.   That would be the enhancement.

Q.   And you would have had to serve a mandatory minimum sentence on that?

A.   Probably three years.

Q.   And that would have been served after you'd served your --

A.   No.

Q.   -- sentence; is that correct?

A.   No.  It's all one sentence.

Q.   Is it required that it's all one sentence?

A.   It is.  It's just one sentence.

Q.   Are you sure about that?

A.   Yes.

Q.   So you're saying you ended up getting more time.

A.   Than I started out with for missing court, yes.  I got double the time.

Q.   How many times did they file an habitual on you?  Just once?

A. This last time, yes.

Q. And when did they dismiss it against you?

A. Well, I guess in a plea bargain. That's when it'd be dismissed.

Q. So they dismissed the habitual which would have been a 15-year sentence; is that right?

A. Habitual goes into effect if you take it to trial and lose.

Q. No. Let's just follow me a second. The habitual would have been a 15-year sentence; is that correct?

A. If you take it to trial, yes, and lose.

Q. The habitual would have been a 15-year sentence; is that correct?

A. Yes, if you take it to trial and lose.

Q. Now, the second charge was a five-year charge that was going to be placed against you; is that correct?

A. They don't -- it doesn't work like that. It'd be habitual against both of them as one. It'd still be 15. They just -- that second five was a deuce that they enhanced to a five to make a plea bargain. That's all that was. That five was dropped. That was a deuce dropped enhanced to a five on a plea bargain. That five was not even in existence. That was just a plea bargain they come up with.

Q. Well, let's go back and start from the beginning. You were charged with five years, and you would've been held in

prison for the five-year charge; is that right?

A.   Right.

Q.   That's what you were waiting trial on?

A.   No, I was waiting sentencing on five years, and I missed sentencing on the 7th of November.

Q.   Then you came back.  They had a charge for you for failure to appear; is that correct?

A.   Yes.

Q.   And that carried how many years?

A.   Five.

Q.   Have they added the habitual sentence to your charge before you were charged with a failure to appear?

A.   Even if they had --

Q.   No, I'm not -- just answer my question.

A.   That was their plea bargain power, yes.  It's called plea bargain power.  That's all it is.

Q.   Right.  So then before you even made your deal with the government, you were facing a 15-year sentence for habitual. You were awaiting a five-year sentence on a theft.  Just follow me a second.  And then after you didn't show up for your sentence, you were facing a failure to appear, another five-year sentence.

A.   That's not correct.

Q.   So you had a total -- just follow me.  You had a total of 5, 10, 25 years that you were facing in state court.  Now

we're not talking about what you ended up with. We're talking about what you were looking at.

A. Never did face that. No, I didn't. Never did.

Q. I think the record speaks for itself.

A. Yes, it does, but you're taking -- you're breaking it down all wrong. The five -- the second five was never enhanced until I -- we made a deal to bring it up. That was dropped and gone.

Q. Sir, with the two prior felonies, you're always facing habitual sentence on the third time as enhancements.

A. They only had so many days once we had a plea agreement that that plea agreement stuck.

Q. Okay. So just follow me then. That was the potential then. Let's keep it that way. That was the potential; is that correct?

A. No, it's not.

Q. All right. You're saying they missed the deadline.

A. Yeah. There was never 25 ever in any possibility of that.

Q. Now let's go over to after you made your deal with the government. After you made your -- and you seem to know these numbers pretty well.

A. Excuse me. We didn't make no deal, though. Me and the feds did not make no deal.

Q. After you talked then, let's put it that way. Is that

better?

A. Yes.

Q. Okay. You ended up with a five-year sentence on the theft, is that right, that you were originally supposed to be sentenced on?

A. Right.

Q. And what happened to the failure to appear?

A. They brought up a -- this was my -- I'm the one who come up with that plea agreement.

Q. Just answer my question.

A. They enhanced --

Q. Just answer my question. What happened to the failure to appear charge?

A. That was -- it's still there. It's on my record.

Q. All right. So you were convicted of that.

A. Yes.

Q. What happened to the habitual sentence after you talked?

A. That was a plea bargain. It was out.

Q. Okay. The 15-year went out. What happened to the other five-year sentence that you had?

A. It was -- there never -- the five was gone when I took the five. It was a deuce and a five. They dropped the deuce. I pleaded guilty to a five. In order to do this plea bargain, they took the deuce that was dropped, enhanced it to a 5 making it 10, and it was up to the judge on the 15, on

the 5 for failure to appear. That was a plea bargain.

Q. And then the judge decided not to do it after the DEA agent testified for you.

A. It was up to the judge, yes.

Q. Okay. So what you got then, according to your theory, is basically a five-year drop.

A. I got two tens consecutive. I got ten.

Q. But you know that the two fives consecutive once you're sent down and the parole board looks at it becomes almost like a concurrent sentence.

A. That's not true. That is not true.

Q. But under my theory you went from 25 down to basically a 10.

A. Again, it was never 25.

Q. I understand. But just follow my theory.

A. On your theory but not the right theory.

Q. Of course you know the law a lot better than me. You seem to know it.

A. I didn't say that. I just said you don't know this part of the law I guess.

Q. That's probably true. So how much time will you do on this ten-year sentence?

A. That's up to the parole board. I have no idea.

Q. Well, what do you think?

A. Two years.

Q.   So I figured about 18 months to 22 months; is that right?

A.   Yeah.

Q.   And had you -- under my theory -- and just tell me -- out of the 15 years, the plus 5 and the failure to appear, how much time would you have done?

A.   One moment.  Those numbers were never in one bunch.

Q.   I understand.  But just tell me how much time you would have done had that been the case.

MR. COLLOTON:  I object to questions about Mr. Parrish's theory because the witness is just being asked to answer questions about a hypothetical situation that he says didn't exist.

THE COURT:  It's a little late to be objecting to it.  I mean, we've been talking about --

THE WITNESS:  Well --

THE COURT:  Just a second.  We've been talking about Mr. Parrish's theory for quite a while.  Why don't you wrap it up in this area.

MR. PARRISH:  I am.  And that's what I'd like to do with this question, Your Honor, and I would state for the record Mr. Colloton just gave me this information after I had requested it because he didn't have it in his original Jencks material.  And he gave it to me after I told him that's what he had been facing.  And true enough, it does have an

habitual on there and a dismissal of the habitual right on his record, and that's part of the record in this case.

THE WITNESS: But you can't get two habituals on one.

THE COURT: Just a second, Mr. Donaldson. Okay. You continue with your questioning. You answer Mr. Parrish's questions to the best of your ability.

BY MR. PARRISH:

Q. So with the habitual and the five and the failure to appear, what kind of time would you have been facing?

A. I never faced that number, so you'd have to call the parole board.

MR. PARRISH: Your Honor, I would ask the Court then to look at -- and we think we have it as a document here -- his actual arrest and conviction sheet that Mr. Colloton furnished to me right before -- after he had finished testifying, and I think it does show the dismissal of the habitual on there.

THE COURT: Is that going to come in as an exhibit?

MR. PARRISH: That's all I have.

THE COURT: Are you just going to stipulate to it, Mr. Colloton, or there's no agreement?

MR. COLLOTON: I don't have any -- if I understand what he's asking, I don't have any problem stipulating to what he was charged with and what he ended up pleading to.

We can do that now, or we can do it after the Court -- after the witness is gone.

MR. PARRISH: So you are stipulating that he did have an habitual and that was dismissed?

THE WITNESS: On the five-year sentence.

THE COURT: Mr. Donaldson, just a second. Let's try to work this out among the lawyers.

MR. COLLOTON: I thought that's what we elicited on direct examination. I'm not sure what the debate is.

MR. PARRISH: He's saying he never had it.

THE WITNESS: On the third one. I'm sorry. I'm sorry.

THE COURT: It's hard because we're talking about something that happened to you. We don't have any -- we're leaving you out of it, I understand. For a moment let's leave you out of it. We'll get back to you on it. Hang loose for a minute here.

MR. COLLOTON: I agree that the records I've been provided by the county attorney show that initially there was a theft charge with an habitual enhancement and that eventually he pled guilty to offenses that did not have the habitual enhancement. What I don't -- I'm sorry.

THE COURT: Do you have an understanding as to what the net effect of that is in terms of the bottom line of the sentence that he received after he cooperated with the feds

versus the sentence he might have received before he cooperated?

MR. COLLOTON: No, I don't have enough knowledge to know whether what Mr. Donaldson says is accurate.

THE COURT: I'll get to you. I haven't forgot about you, Mr. Donaldson. I appreciate you raising your hand, though. That's more polite than we've had in this courtroom in a long time. So I appreciate that. And I promise you I'll get back to you and we're going to. Right now we're dealing with the lawyers.

You don't have any understanding really of kind of how it worked?

MR. COLLOTON: I can't give you a specific number, he would have had X number of years and then afterwards he gets Y.

MR. PARRISH: But under mandatory minimum, the 15 years, he wouldn't be -- even be eligible for parole until after he served the 3 years on the habitual. There's just no way in Iowa that can happen.

THE COURT: So in your view what was the benefit of his bargain here?

MR. PARRISH: They could have stacked his habitual on top of his 5 and 5 if they wanted to, and then he would have had to serve a mandatory minimum on the 15, so he received a basic overall benefit of almost 5 years in state

court had the habitual stayed there and the failure to appear stayed there.

THE COURT: Now, I'm going to let you, Mr. Donaldson -- I'm going to let you tell me what you think happened, and then I'm going to let the lawyers ask you a few questions. Then we're moving on to another area.

THE WITNESS: First of all, they never got any play. The county attorney didn't want to listen to these people, but here's the way it is. I have a five-year sentence and a two-year sentence. They dropped the two-year sentence. I got a five. He's trying to say there's a double habitual. The failure to appear wasn't even in existence, so how can he throw these two habituals together because they never existed? I had a plea bargain on one five. I missed sentencing, and we had so many days to appeal it. So instead you got one five-year sentence.

This other five, it was my idea to bring it back in order to avoid court. I brought up the five. They didn't. I did. You could ask Peter Van Etten. He was my attorney. I said, Okay, we'll go for this deal and leave the third one up to the judge, and she said -- Jill Pitsenbarger said yes. But they did not listen to -- these people didn't have any influence on them at all, none to the plea bargain. I made that. They couldn't get no influence at all. She didn't want to hear about it.

THE COURT: Okay.

BY MR. PARRISH:

Q. So let me ask you this: Who brought the DEA agent to testify at your sentencing then?

A. Peter Van Etten.

Q. And who consented to have a DEA agent appear in state court based upon evidence you had given to a federal -- about a federal prisoner?

A. Well, again, all's they said is I did -- giving them information. He asked them, What do you think he should have, and he didn't say. He said I just give --

Q. What was the purpose of him coming in then?

A. You'd have to get Peter Van Etten and ask him.

Q. Okay. It's true, is it not, that you have had a serious drug problem over the years?

A. No, it's not true. Who told you that?

Q. You've never used crack cocaine or anything like that?

A. I've been around it, yes.

Q. I asked you have you ever used it.

A. No. I've used it, yes, yes. But you're saying did I abuse it. No.

MR. PARRISH: Okay. That's fine. Nothing further.

THE COURT: Mr. Colloton, anything further of Mr. Donaldson?

MR. COLLOTON: Yes.

REDIRECT EXAMINATION

BY MR. COLLOTON:

Q.   Why did you call the -- why did you have Mr. Van Etten call the federal government originally?

A.   Because I know Dustin's past, and I knew that he was going to have something done to me.  I knew too much.

Q.   Do you feel that -- you've had a lot of questions about what happened in your state case and the like.  Do you feel this has been a good deal for you?

A.   (Witness shook head.)  As far as me getting time off, I didn't get -- you guys didn't save me nothing.

Q.   Do you feel like you're glad to be here testifying today?

A.   It's like I say.  I don't like testifying for nobody. If it's my life or your life, my life counts.

Q.   I meant to ask you before and I forgot.  You asked the other day whether the government would write letters to the parole board; is that right?

A.   Yes.

Q.   And you were told that what we've done in some cases is to send a factual statement of somebody's cooperation and the total story about their involvement and any benefits they've received to the parole board; right?

A.   Right.

Q.   And I told you we would -- I would check with my office

and consider whether it would be done here.

A.    (Witness nodded head.)

Q.    All right.  I wanted to make that -- is that a yes?

A.    Yes.  And as I told you, that's something that would help me because nothing to this point has really helped me.

MR. COLLOTON:  I think that's all I have, Judge.

THE COURT:  Do you have any other questions, Mr. Parrish?

MR. PARRISH:  Just a couple of questions, Your Honor.

RECROSS-EXAMINATION

BY MR. PARRISH:

Q.    What's your relationship with William Dean?

A.    Just a friend I knew off the streets.

Q.    Was he in jail with you at the same time?

A.    Yes.

Q.    Did you guys do drugs together?

A.    I don't do drugs with him, no.  Been around him when he's done drugs, but I wasn't doing them.

Q.    What kind of drugs are those?

A.    He does cocaine.

Q.    What about Putzier?

A.    He does a lot of drugs too.

Q.    And what's your relationship with him?

A.    As you know, we've done business together.  I stole hogs

with him.

Q. Okay. And what kind of drugs did you do with him?

A. I probably snorted, and he shoots into his veins.

Q. Okay. And just one last question.

A. Yes.

Q. Why were you paying this money back to Dustin's girlfriend when you were going to be out stealing hogs and making money to go get a hit man and pay his lawyer?

A. It was like -- if you would listen, I said it was all talk in jail. I talked big in jail, but I wasn't -- I guess I'm not a killer.

Q. Well, just to break a rule here, it's all big talk in jail. Is that what people do there, just do a lot of big talk?

A. I would want to say no, but I'm proof that it is.

MR. PARRISH: All right. I don't have anything further.

FURTHER REDIRECT EXAMINATION

BY MR. COLLOTON:

Q. Well, now, did you feel when Mr. Honken was proposing this scheme to you that from his point of view it was all talk?

A. No.

Q. Why do you say that?

A. He -- again, he give me too many -- too many points --

too many things that he had did, like people how they die and how they're heavy and all this, too many things he said.

Q. Did you tell him before you left the jail that you weren't going to do -- you weren't going to kill the witness?

A. I told him I didn't think I could, and that's when he insisted to go try, try to get somebody to do it.

Q. And then you didn't do anything; right?

A. (Witness shook head.)

Q. You have to answer out loud.

A. No. I'm sorry.

Q. And then you --

MR. COLLOTON: All right. That's all I have, Judge.

THE COURT: Anything further, Mr. Parrish?

FURTHER RECROSS-EXAMINATION

BY MR. PARRISH:

Q. Why would he bail you out if you told him you weren't going to do it?

A. Because he didn't -- he thought I was. I told him I would try to find someone to do it.

MR. PARRISH: I don't have anything further.

THE COURT: Mr. Colloton, anything further?

MR. COLLOTON: No.

THE COURT: Why don't we take a 15-minute recess until 2:35. Why don't we make it 20 minutes, till 20 to 3.

(Recess at 2:21 p.m.)

THE COURT: Please be seated. Is the government ready to call your next witness?

MR. REINERT: Yes, Your Honor. United States calls Kathy Rick.

KATHY RICK, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated here. Would you state your full name and spell your last name, please.

THE WITNESS: Kathy Ann Rick, R-i-c-k.

DIRECT EXAMINATION

BY MR. REINERT:

Q. Ms. Rick, do you know the defendant, Dustin Honken?

A. Yes.

Q. In fact, you had dated him for some time and share a child; is that correct?

A. That's correct.

Q. Directing your attention to the time period when Mr. Honken was in the Woodbury County Jail last year, did you receive any contact from Mr. Honken about bonding someone out of jail?

A. Yes, I did.

Q. How was that contact made?

A. By phone.

Q. And what did Mr. Honken ask you to do?

A. He asked me to bail out Dean Donaldson.

Q. Did he indicate why he wanted Mr. Donaldson out?

A. Yes.

Q. What did he say he wanted Mr. Donaldson out for?

A. I had borrowed money to Dustin for attorney fees, and I needed that money back, and Dean had -- if someone would bond him out, he was willing to double the amount that that cost and return that to me.

Q. Did you have any contact with Mr. Donaldson before you actually went and executed the bond when he was still in jail?

A. I don't believe so.

Q. So if he had your phone number -- first of all, I have Exhibit 11K here. On the back side of 11K, that first number where it says Kathy Rick, is that your address? I realize the paper's torn, but is that your address there?

A. It looks like it.

Q. And the phone numbers that are listed for your home and work, are those your phone numbers?

A. Yes, they are.

Q. Did Mr. Honken have your address and your phone numbers?

A. Yes.

        MR. REINERT: Nothing further, Your Honor.

        THE COURT: Mr. Parrish?

        MR. PARRISH: Just a couple questions, Your Honor.

                    CROSS-EXAMINATION

BY MR. PARRISH:

Q. Did you get paid back for bonding him out?

A. Not totally.

Q. How much did he pay you back?

A. $200.

Q. What did he say about paying you back the rest?

A. It would not be a problem.

Q. But he never got back to you; is that right?

A. That's correct.

Q. Did you try to call him to see if he would pay you the balance of it?

A. Initially I called quite a few times.

Q. Took you a lot to try to track him down?

A. Yes.

Q. Did he ever say anything or engage in any conversation with you about anything else that Dustin had bonded him out for other than to make sure you were paid back double?

A. No, we didn't have conversation.

MR. PARRISH: I have no further questions, Your Honor.

THE COURT: Anything further, Mr. Reinert?

MR. REINERT: No, Your Honor.

THE COURT: Thank you.

MR. PARRISH: She may be a witness for us when we're up, and I think she may be aware of that, but we don't want to go into that at this time.

THE COURT: You don't want to put that on at this time?

MR. PARRISH: That's correct.

THE COURT: Okay. You're excused for now.

MR. REINERT: United States calls William Walter Dean, Your Honor.

WILLIAM DEAN, PLAINTIFF'S WITNESS, SWORN

THE COURT: Be seated here, please.

Let me ask you a question. Did you make any effort to try and get a stipulation on that last witness's testimony? Nothing was controverted. Drag somebody up here all the way from Des Moines for three minutes of uncontroverted testimony?

MR. REINERT: We had talked about it, and I assumed that Mr. Parrish was going to go into what he had -- I knew he wanted to call her as well, and since we had already called her, I assumed that he would go into that at this point. I also wanted -- I wasn't a hundred percent sure of the phone number that was on that note to verify it until I had a chance to talk to her about it this morning. So we probably could have if I'd have had a chance to meet her.

THE COURT: This case isn't certainly going to turn on the accuracy of that phone number. I can assure you of that.

MR. REINERT: It's one more aspect of corroboration,

Your Honor, but it is not the critical piece.

THE COURT: You know, I realize you have the power to drag people up here like that, but I question the wisdom of you doing it in this kind of situation. But I realize you have a lot of things going on. It's not always possible to figure these things out ahead of time.

MR. REINERT: And that was not the most and foremost thing in my mind of one of many witnesses. I understand the Court's concern.

THE COURT: Appreciate it. Thank you, Mr. Reinert.

You may -- why don't you state your full name and spell your last name, please.

THE WITNESS: Name is William Walter Dean, D-e-a-n.

THE COURT: Mr. Reinert.

DIRECT EXAMINATION

BY MR. REINERT:

Q. Mr. Dean, I see that you are currently incarcerated?

A. Yes.

Q. On what types of charges are you incarcerated?

A. Failure to appear and third degree burglary.

Q. Those are felony offenses?

A. Yep.

Q. And you had previously provided information regarding Mr. Honken; is that correct?

A. Yes.

Q. And, in fact, after providing that information, you had requested that the United States Attorney's Office write a letter to the parole board informing them of the fact of that cooperation; is that correct?

A. Yeah, the parole board, yes.

Q. And, in fact, when I met with you over the weekend, you wanted to verify to make sure that happened and, in fact, you asked for a copy of that letter because you had never received it; is that correct?

A. Uh-huh.

Q. And you further asked that a copy of that letter be forwarded to the assistant county attorney here in Woodbury County and the -- your attorney in South Sioux; is that right?

A. Yeah.

Q. And you have also received copies of those letters forwarding a copy of that factual statement; is that correct?

A. Yeah.

THE COURT: Mr. Dean, it would help if you speak up and if you answer yes and no. The yeahs and uh-huhs are hard to get down for the court reporter.

THE WITNESS: All right.

THE COURT: Thank you.

BY MR. REINERT:

Q. Mr. Dean, do you go by any other names?

A.    Boo is my nickname.

Q.    When were you in the Woodbury County Jail last year?

A.    I can't specifically say when.  I mean, I can't specifically say what date it was I was in jail.  I was in; then I bonded out.  Then I got re-picked up again and stuff, you know, like that.

Q.    Do you see the defendant, Dustin Honken, here in court?

A.    Yes, I know Dustin.

Q.    Were you incarcerated in the same cell block with him?

A.    At one time, yeah.

Q.    Do you know Dean Donaldson?

A.    Yes, I know Dean Donaldson.

Q.    Was there a time when you were incarcerated in the same cell block with Mr. Donaldson and the defendant, Mr. Honken?

A.    Yeah.

Q.    Were you present when Mr. Honken made statements about his case and witnesses in his case?

A.    I was president -- present when they talked about methamphetamine.

Q.    When you talk about they, who are you talking about?

A.    Dean and -- Dean and Honkens talking about methamphetamine.

Q.    What did Mr. Honken say about methamphetamine to Mr. Donaldson?

A.    But nothing about -- the quality, making it better,

quality of methamphetamine.  You know, you could make a better quality.  He knew how to do it.

Q.  When you say he knew how to do it, who are you talking about he?

A.  Hisself I guess or -- hisself.

Q.  Do you mean Mr. Honken?

A.  Yeah.

Q.  Did they have any discussions about how he had been caught or particular witnesses in his case?

A.  Yeah, one of his -- his best friends told on him.  One of his best friends told on him.  That's mostly what I hear of how he got busted.

Q.  Did you overhear any discussions between Mr. Honken and Mr. Donaldson about what he wanted Mr. Donaldson to do?

A.  Donaldson told me what he wanted him to do.

Q.  Were you present when they discussed being -- Mr. Donaldson being bonded out?

A.  Yeah, I was present when Donaldson getting bonded out, yeah.

Q.  Would you describe for the Court the conversation you heard between Mr. Honken and Mr. Donaldson about being bonded out?

A.  Mr. Honkens asked me was Donaldson -- was he a man of his word, and I told him yeah, he was a man of his word. Then Donaldson got to talking about that Mr. Honken was

supposed to get him, you know, to bond him out of jail, and I didn't know what the reason was for at that time. That's about the extent of the conversation when -- you know, about bonding out, that he was supposed to bond Dean out of jail.

Q. Were Mr. Donaldson and the defendant, Mr. Honken, frequent visitors? Did they talk frequently?

A. Yeah.

Q. Were you present during any conversations where deaths of individuals or methods of death were discussed?

A. Yes. They -- I think Honken -- I think he was just trying to scare Dean or whatever. I don't know what it was.

Q. What did Mr. Honken specifically say?

A. He said to Dean that something -- according to something being wrapped around their throat, a wire cord and something, and the fact of a body being lighter when he's alive. That's the only part I know of.

Q. That a body's lighter when a person's alive?

A. Yeah, a body's heavier when he's dead.

Q. You said you had bonded out.

A. Yeah.

Q. Were you bonded out by Mr. Honken?

A. No.

Q. Now, when you bonded out, was that the same time period when Mr. Donaldson was also bonded out?

A. About two weeks later Donaldson bonded out.

Q. Did you have any meetings with Donaldson during the time period when you were both out on bond?

A. Yes. Donaldson came up to my house on several occasions, and he told me the reason why Honkens -- the reason why he bonded him out of jail.

Q. What did he tell you?

A. He told me that he was supposed to move some -- or get some kind of stuff to make some amphetamine and he was supposed to get in touch with some El Forestros to help Donaldson take care of some people.

Q. Ultimately you said you had some difficulty on your release and you actually got arrested for a failure to appear?

A. Uh-huh.

Q. I presume they didn't bond you out on that anyway.

A. Who bonded me out?

Q. After you got arrested for failure to appear, did you go to jail or did they bond you out again?

A. I went to jail for the charges. I bonded out. Then I got picked up again. This last time I never -- I couldn't bond out because they put my bond at 5,000 cash bond.

Q. So once you were back in jail again, did you again see -- were you in the same cell block with Mr. Donaldson or with Mr. Honken?

A. I was in the same cell block with Donaldson, Dean, yeah.

Q. Did you observe Mr. Honken through any kind of glass windows between the cell blocks?

A. Yeah.

Q. What did you observe Mr. Honken do?

A. He -- I think he was going to rec., and he -- he told -- well, he told me that he knew that Dean was snitching on him or something like that.

Q. Now, could you hear him through the glass, or how did you know?

A. No, he just said, Snitch, snitch. You can see -- I know what he was doing, snitch, you know. Then he said -- then he went like -- like -- I don't know. I guess like he was dead or something (demonstrating).

Q. Now, the motion you just made, could you describe that as a slashing motion across your throat?

A. I guess like (demonstrating), like a person -- like Dean was dead or whatever. And then when he came back, he told me to go up -- something about go up and tell Dean or somebody should go up there and kick his ass or something like that. And I went up and talked to Dean, and that was about it.

Q. Did you observe Mr. Honken on another occasion gesturing through the window regarding Mr. Donaldson?

A. I think it was twice I remember, as I can remember. I seen him, you know.

Q. What happened on that second time?

A. He motioned -- first time I think he just motioned like his neck, and the second time he went something like this, put up his finger or something like that (demonstrating).

Q. Now, when you put up your fingers and gestured for the Court, would you describe that for the record? What kind of shape was your hand in?

A. Shaped like this (demonstrating). I don't know what -- I can't say what the man was --

Q. And what does that gesture depict when you have your first two fingers out, your last two fingers, your pinky finger --

A. To me it was a gun, but I can't say what was on the man's mind at that time.

MR. REINERT: Nothing further, Your Honor.

THE COURT: Mr. Parrish?

MR. PARRISH: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. PARRISH:

Q. Do you know Mr. Donald?

A. Mr. Who?

Q. Mr. Donald. Donaldson.

A. Donaldson? Yes.

Q. How do you know him?

A. Well, I've been knowing him for years, hanging out together on the streets, whatever, bars. I've been knowing

him for years.

Q. How many years?

A. Boy. Like I say, since about '83, '84. I've been knowing him ever since then.

Q. What do you guys do together?

A. Talk, hang out, go to bars, whatever.

Q. That's it?

A. Is that it?

Q. Yes. Is that all you do? Kind of hang out, go to bars together?

A. Mostly, yeah.

Q. You don't do anything else together?

A. As far as -- that's mostly what we do, I mean.

Q. Do you have any business that you do together?

A. Business?

Q. Yes.

A. No, I ain't got no business that we do together.

Q. You've never done any business with Mr. Donaldson before?

A. Depends on what kind of business. No, not business, business. Not that I know of.

Q. Well, what kind of business do you do together then?

A. We don't do no business.

Q. Are you telling me as you sit here today that you and Mr. Donaldson have never done any business together of any

sort?

A. Not that I -- you say business. I don't know what kind of business you're saying of. I mean, we ain't never had no business together like no store business or no business. I don't know what you're --

Q. Well, could you give me some idea of what kind of business if it's not a store business -- do you do any illegal business together?

A. Legal business.

Q. Illegal business.

A. What you mean? Like use dope or something?

Q. That's one thing. You use dope together, you and Mr. Donaldson?

A. We have.

Q. You've been using dope together since 1983, 1984?

A. Yeah, mostly.

Q. What? Crack cocaine?

A. (Witness nodded head.)

Q. Is that right?

A. (Witness nodded head.)

Q. Yeah? Is that yes?

A. Yeah.

Q. Okay. What other kind of dope did you and Mr. Donaldson use together other than crack cocaine?

A. That's about it between me and Donaldson.

Q. Okay. And you've been doing that what? About 10, 12, 14 years together?

A. Off and on.

Q. All right. And he's a pretty good friend of yours, isn't he?

A. I guess he is.

Q. Okay. Have you done any other kind of illegal business with Mr. Donaldson like steal pigs?

A. Have I?

Q. Yes.

A. I mean, I -- what you want me to do? Answer that?

Q. I think so.

A. I can't answer that.

Q. Do you want to take the Fifth Amendment?

A. I can't answer that.

Q. Well, you know whether or not you and Mr. Donaldson have stolen pigs and hogs together over the years, don't you?

A. I can't answer that. I take the Fifth on that.

THE COURT: I'm going to interject here, Mr. Dean. I just want to make sure you understand that if an answer to a question from either one of the lawyers, your answer would tend to incriminate yourself, then you have a right, as all citizens have a right, to invoke the Fifth Amendment of the United States Constitution.

THE WITNESS: That's what I do then.

MR. PARRISH: Okay.

BY MR. PARRISH:

Q. So with regard to your criminal activity that you and Mr. Donaldson have done together over the last ten years or so, you want to take the Fifth Amendment; is that right?

A. Me and his criminal activity, I'm going to take the Fifth on that question.

Q. Okay. Now, you did tell the government back April 22 of 1997 that they better give you a better deal if they wanted some statements against Mr. Honken, didn't you?

A. Yeah.

Q. Because they weren't offering you nothing as you put it; right?

A. Yeah.

Q. And if they could offer you something, maybe you could tell them something; is that right?

A. That's mostly what it was.

Q. And you admit that you and Donaldson had talked before you met with the grand jury on April 22, 1997; isn't that true?

A. I mean, we was in -- we talked because we was out on the streets together.

Q. Exactly. And he told you some things that he said that Dustin Honken had said; isn't that true?

A. No. He told me what Dustin was supposed to have him do.

Q.    That's what I'm saying.  He told you some things -- Mr. Donaldson, your buddy, told you some things like that; is that right?

A.    Yeah, that's what he did.

Q.    And some of the times you all would be doing this you'd be doing drugs together?

A.    No, not when he was -- I think we was just drink -- I mean, we might have had a drink or two, but we wasn't doing no drugs together when he was telling me that.

Q.    Just sitting around drinking a little bit when he'd tell you that?

A.    Any other time I wouldn't want to hear what he had to talk about.

Q.    Okay.  So you were basically listening to what Mr. Donaldson was telling you about what Dustin had said or wanted him to do; is that right?

A.    Uh-huh.

Q.    Is that a yes?

A.    Yeah.

Q.    Okay.  And you thought that Dustin was just trying to scare him; is that right?

A.    Yeah.

Q.    Does Donaldson also kind of talk a lot and maybe not tell the truth all the time?

A.    I don't know.

Q. Okay. You don't know whether he does or not over the years, huh?

A. No, I don't know if he tells the truth of everything he says.

Q. Okay. Now, when he told you some of the things that Dustin had said to him, you reached a conclusion based upon what he told you that Dustin was just trying to frighten him is what you told us, at least of what you said earlier; isn't that true?

A. Uh-huh.

Q. Is that a yes?

A. Yeah.

Q. Okay. And he told you that Dustin told him something about doing something about making meth; is that right?

A. Uh-huh.

Q. Is that a yes?

A. Yeah.

Q. Did he also tell him something about stealing some hogs?

A. Did Dustin --

Q. Did Mr. Donaldson tell you something that Dustin said about stealing some hogs?

A. I can't remember that, if he did or didn't.

Q. Okay. And did he ever name any names of any people that he wanted him to harm at all?

A. I think he said -- he didn't name the names, but he said

a main witness and I think the mother and father or something like that, name of his mother and father.

Q. But you didn't determine who that might have been through Mr. Donaldson's conversations?

A. I mean, no, because I didn't -- like I said, I only had a little time when I was in there to deal with these guys. I mean, I wasn't really concerned about what's what.

Q. When Mr. Donaldson didn't pay Mr. Honken's girlfriend back, did he say why he didn't pay her back for bonding him out?

A. Why he didn't pay her back?

Q. Right.

A. He didn't say nothing to me about it.

Q. Okay. Did he tell you he owed her some money? Did he ever tell you that?

A. No.

Q. Did he ever tell you where he was going to make this methamphetamine?

A. No, he didn't tell me where he was going to make it at, huh-uh.

Q. Did he tell you what kind of deal he got out of talking about Mr. Honken with the federal agent?

A. Yeah.

Q. What kind of deal did he tell you he had gotten?

A. For them to not to press charges of conspiracy to commit

murder.

Q. And what else?

A. And not give an habitual.

Q. Okay. And what else?

A. That's the only thing I know of.

Q. What about a letter to the parole board?

A. He said he was going to ask about that. I don't know. He said.

Q. And what about the failure to appear?

A. Yeah, he did say something about a failure to appear.

Q. That they were going to adjust that charge also?

A. I don't know what would become of that.

Q. But did they also drop a five-year charge against him? Did he tell you that also?

A. Yeah.

Q. So they would not file a conspiracy to commit murder. They would not file a habitual against him. They would drop or maybe do something with the failure to appear charge against him; is that right?

A. Yeah. I don't know what happened to that charge.

Q. And write a letter to the parole board; is that right?

MR. REINERT: That's been asked and answered, Your Honor.

THE COURT: It has been.

BY MR. PARRISH:

Q. Anything else you can think that he said the feds were going to do for him for making a statement against Mr. Honken?

A. No.

Q. Okay. When you first refused to talk on April 22, 1997, as you put it in your words until you can come up with a better deal, I'm not getting nothing out of this so why should I do it, what did they say they would do for you?

A. They told me all the things -- they said they couldn't release me or nothing like that. They said that's all they -- that's all they said they could do.

Q. What?

A. Write the parole board, recommend that -- recommend things.

Q. And what kind of time are you facing?

A. What kind of time I'm facing.

Q. Yes, sir.

A. What I'm facing now.

Q. I have no idea.

A. Ten, ten years.

Q. For what?

A. The burglary and failure to appear.

Q. Okay. And is that consecutive, or is that concurrent? Is the burglary a burglary third or --

A. Third.

Q. A burglary third?

A. Yeah.

Q. It's class D; is that right? Five years?

A. Yeah.

Q. Okay. And you're facing a five-year failure to appear?

A. Yeah.

Q. And how many other felony convictions did you have before this?

A. About three.

Q. And what were those? Do you know?

A. (Witness nodded head.)

Q. What were they?

A. Robbery.

Q. Okay. Robbery first or second?

A. Had to be second.

Q. Okay. That's a ten-year robbery?

A. Yes.

Q. And what else?

A. I had two robbery seconds.

Q. Okay. Two -- and they were served at two separate times for you?

A. Yeah.

Q. Okay. Were they with or without a firearm?

A. No, there wasn't no firearm.

Q. No firearm? Okay.

A.   Huh-uh.

Q.   And so when is your discharge date?

A.   2001.

Q.   Okay.  Were you and Mr. Donaldson together prior to the time of you both being released at the same time Mr. Honken was in the Woodbury County Jail?

A.   Were we together?

Q.   Yes, sir.

A.   We had to be together.  We was in the same cell block.

Q.   You were actually in the same cell block then.

A.   Yeah.

Q.   You weren't like in a different area.

A.   No, not when I first met Dustin, no.

Q.   Okay.  At the time this incident happened where you said that Donaldson observed Honken making some type of gesture toward him, were you in the same cell block at that time?

A.   Oh, no, not with -- no, no.

Q.   Okay.  So did you actually see any gesture at all with your own eyes?

A.   Yeah.  I --

Q.   And was Donaldson in the same cell block at the time?

A.   Yeah, but he was up in his room.

Q.   So he didn't see anything.

A.   No.

Q.   So if Donaldson said he saw anything like that, that

would have been inaccurate.

A. As I can remember he wasn't -- he was not in the --

Q. Okay. Was there any way Honken could have seen Donaldson from where Honken was?

A. I think yeah, he could have seen him. I think what happened is when Honken -- I mean when him and the group started coming down, Dean seen Honkens, and Dean ran up to his room because, you know, he knew -- you know, he ran to his room.

Q. Because he was afraid of Honken.

A. I guess that's what it is. He knew what the -- yeah.

Q. And he knew Honken had bailed him out and he didn't pay him back.

A. That's --

Q. And that's what Donaldson told you.

A. He didn't tell me nothing about paying him back. He knowed that he bailed him out, and whatever was supposed to have been done was supposed to have been done.

Q. And you're saying Donaldson never told you even up to this point whether or not he's paid back Honken's girlfriend?

A. I imagine he haven't. I know he haven't.

Q. How do you know that?

A. Because he got -- he's been in jail ever since a month after -- I guess about a month after he got out of jail.

MR. PARRISH: Okay. I have nothing further. Thank

you.

THE COURT: Mr. Reinert, anything further?

MR. REINERT: No, Your Honor.

THE COURT: Thank you, Mr. Dean.

MR. REINERT: Terry Bregar. Your Honor, Mr. Bregar is an incarcerated witness. They're bringing him down. He also has low vision, so they need to move him a little slow.

THE COURT: Thank you.

MR. PARRISH: He has what, Pat?

MR. REINERT: He's lost his sight.

MR. PARRISH: Oh, okay.

MR. REINERT: He was a diabetic and I believe has lost his sight.

(A discussion was held off the record.)

THE COURT: Would you raise your right hand, please?

TERRY BREGAR, PLAINTIFF'S WITNESS, SWORN

THE WITNESS: Yeah, but, Your Honor?

THE COURT: Yes.

THE WITNESS: Can I say something to you?

THE COURT: Yeah, you can. Go ahead.

THE WITNESS: Okay. I'm about blind as a bat, and I really don't want to be in this situation. I don't want to be -- whatever prison I'm at, this kind of stuff follows, and I'm too vulnerable to maybe get pushed down the stairs. I really have nothing to say.

THE COURT: Well, you've been subpoenaed by the government to testify, and so --

THE WITNESS: Do I have to say anything?

THE COURT: You have to unless you have a valid Fifth Amendment privilege which you can invoke. And what that means is if in good faith you believe that a question would incriminate you, then you have the right to take the Fifth Amendment, as does everybody have that right. But short of invoking your Fifth Amendment right on a question that would incriminate you personally, you have to respond to the questions from both sides as long as I determine that they're relevant issues in this case. Sorry for the inconvenience, but those are kind of the rules we have to live by. So if you'd please --

THE WITNESS: If I choose not to say anything, I mean, I have -- what happens?

THE COURT: I can hold you in contempt, and you can get that added on your sentence, and you don't want that to happen.

THE WITNESS: Hell, I won't get out till 2009 anyway.

THE COURT: Well, it will be longer than 2009 when I'm done with you, and you don't want that. That's not in your best interest. You're here. I suggest you answer your questions. You're under oath. You do the best job to answer

the questions that all the lawyers ask you; okay?  It won't take that long, and it will be pretty painless; okay?  Appreciate your help.  Why don't you be seated.  Would you state your full name and spell your last name, please.

THE WITNESS:  Terry William Bregar, Bregar, B-r-e-g-a-r.

THE COURT:  Okay.  Now the government lawyers are going to ask you some questions.  Mr. Colloton or -- Mr. Colloton?

MR. COLLOTON:  I'll go ahead, Judge.

THE COURT:  Okay.  Thank you.

DIRECT EXAMINATION

BY MR. COLLOTON:

Q.   Mr. Bregar, you're currently a federal inmate; is that right?

A.   Yes, sir.

Q.   What are you convicted of that led you to be in federal prison?

A.   Conspiracy on methamphetamine.

Q.   Were you convicted in this court?

A.   Yeah, by this man.

Q.   You were sentenced by this judge?

A.   Yeah.

Q.   And what was your sentence?

A.   Fifteen years, five supervised release.

Q. Now, when you went through court, were you detained for some period of time at the Woodbury County Jail?

A. Yes, sir.

Q. Do you remember when that was?

A. The first part of November.

Q. November of last year?

A. Yeah.

Q. All right. For about two weeks?

A. Yeah.

Q. What cell were you assigned to there?

A. D unit, cell 1.

Q. Do you know -- did you meet a fellow there named Dustin Honken?

A. Yes, sir.

Q. And as I understand it, you've had serious problems with your sight recently; is that right?

A. Yeah, about six months ago.

Q. Was it -- what was your sight like when you were in the Woodbury jail last November?

A. 20/20.

Q. And you had a problem at one of the federal facilities, right, with your healthcare?

A. Yeah, diabetes.

Q. So you can't see Mr. Honken here today, but you knew him at the time; is that right?

A.   Yeah.

Q.   Where was -- how did you meet Mr. Honken?

A.   New man on the block come in the door, and, you know, he was -- lived above me.  I can't remember the cell number, but he lived straight above me.  He'd come down and we'd talk about -- you know, we both had dope crimes and so forth.

Q.   Was D-1 the cell you're in on the end of the block?

A.   Yeah, under the stairs.

Q.   And what was adjacent to you on the other side of your wall?

A.   C.

Q.   C block?

A.   Yeah.

Q.   And you're saying you discussed with Mr. Honken your cases?  Is that what you're saying?

A.   Yeah.

Q.   What did he tell you about his case?

A.   That he had a methamphetamine case approximately to distribute I think nine kilos, somewheres in that area.

Q.   What did he tell you about manufacturing of methamphetamine, if anything?

A.   We talked back and forth that, you know, I knowed how to make methamphetamine, and he was -- he told me he said he did, and he showed me some pictures of some stuff that was seized at a raid at his house.  I think they were his house.

Q.   What did he tell you about the quality of methamphetamine that he could make?

A.   Said 91, 92 percent which is outstanding.

Q.   What did he tell you about where he first became involved with methamphetamine production?

A.   Elaborate.

Q.   Where -- did he tell you where or when he first got involved in --

A.   You mean location?

Q.   Yeah, start with that.

A.   In Phoenix, Arizona.

Q.   Did he tell you about any plans he had for meth production in the future?

A.   Yeah.

Q.   What did he tell you about that?

A.   About like everybody, that, you know, if we was out we could do this or do that.  He had some kind of scam that if he got out that he could make some dope and distribute it some elaborate way with computers which I don't know nothing about computers, so it's beyond my capabilities.

Q.   Did he tell you anything about the evidence against him in his pending case, in the current case that he was in for?

A.   Define that a little for me.

Q.   Did he say anything about who the witnesses might be in his current case?

A. Yeah, a friend of his. I don't believe he ever said the man's name that turned him in. I think a life-long friend or something like this.

Q. What did he say about what kind of evidence that friend had provided?

A. That he had turned over nine kilos to this guy to sell I guess.

Q. And what other kind of evidence did he say this friend had provided?

A. That his friend had come -- was with a wire.

Q. What do you mean by a wire?

A. A tape, had him -- the cops sent him with a tape, and they had a conversation on tape.

Q. What did he say was the nature of the investigation or the evidence that came up on the tapes?

A. It was something to do with maybe some witness -- disappearing witnesses back from '93, '94, something like that.

Q. What did Mr. Honken say about his statements on the tape?

A. That he was hoping to plead guilty and just get three- or four-point enhancement and not have to have the tapes played.

Q. Why didn't he want the tapes played?

A. Evidently there was some incriminating evidence on them.

Q. Did Mr. Honken ever tell you anything more about a case of his from 1993?

A. Yeah, that he had a case in '93 and it was all dismissed because nobody showed up for Court.

Q. And when he was telling you that, what else, if anything, did he do or say?

A. That the witnesses disappeared.

Q. And what else, if anything, did he do or say when he told you about the disappearances?

A. Elab -- what do you mean?

Q. Well, did he say anything else about how they disappeared? Did he make any gestures or anything like that?

A. Oh, he might have -- yeah, yeah, something like this (demonstrating), whatever, you know, that could mean. He said people disappear.

Q. And when he was saying that, he was making a gesture?

A. Yeah.

Q. All right. Why don't you describe what you're doing there with your hand.

A. I presume like a pistol. Dustin's favorite thing is he kept his hand in his pocket like that. I don't know if he thought he had a pistol with him all the time or what or just someplace to rest his hand.

Q. Did he talk to you about any strategy that he had to try to beat his '96 case?

A.   Yeah.  He said if he was out he could probably beat the whole thing.

Q.   What did he say about how he could do that?

A.   Take care of the prosecutor.

Q.   What do you mean by that?

A.   I suppose shoot him.

Q.   What else did he say he intended to do if he got out? Did he talk about anybody else besides a prosecutor?

A.   Yeah, there was somebody -- his friend, his best friend, that he could disappear.  You know, they wouldn't have no witnesses against him.

Q.   What was -- what was Mr. Honken's tone of voice when he was talking about best friend and the prosecutor would be taken care of, disappearing?

A.   Very stern.

Q.   Have you heard other people in jail talk about killing witnesses or prosecutors?

A.   Shit, everybody, me included, you know.

Q.   And how did Mr. Honken compare to other people who make those kind of statements?

A.   Not happy about getting his time.  You know, like I said, he was very stern.

Q.   How did he compare to other people who make statements like that when he said them?

A.   Maybe someone to be afraid of or something.  Just stern.

It wasn't bullshit. He was stern. You know, the jailhouse talk, I'm going to kill this guy, kill that guy and so forth.

Q. You didn't take it as that kind of jailhouse talk? Is that what you're saying?

A. No, it seemed above that.

Q. Did he ever talk to you about bonding somebody out of jail?

A. Yeah.

Q. What did he say to you about that?

A. He had bonded somebody out to take care of some business and some affairs for him.

Q. And what did he say happened with that?

A. The guy never showed up for Court and he lost his money. He was really irate and mad about the guy not showing up for court.

Q. Did he say what kind of matters this guy was supposed to take care of for him?

A. No, he didn't.

Q. Did he ever talk -- Mr. Honken ever talk to you about any of his girlfriends?

A. Yeah, I seen pictures of them, that and his children.

Q. Did he ever talk to you about Angie Johnson?

A. He talked about an Angie, but I don't recall him saying the last name.

Q. Okay. What did he say about Angie's role in his

criminal activity?

A.   That she could possibly hurt him.  He was more afraid, you know, of her, what she might be able to say to incriminate him than the drug -- it would be more serious than a drug case.

Q.   During the time you were in the D block in November of 1996, did you ever become aware of any effort to escape from the jail?

A.   Yeah.

Q.   Did you ever talk to Mr. Honken about that?

A.   Yeah.

Q.   How did you first find out about such a plan?

A.   He asked me if I'd be interested in going.

Q.   Who asked you that?  Dustin?

A.   Dustin.  I told him thanks for the offer but, you know, no.  I got enough problem right now.

Q.   So what did he tell you about this plan to escape from jail?

A.   He didn't really elaborate any more at that pacific (sic) time.  It might have been a couple days later.  He kind of told me some of the plans, that there was being a hole knocked through the wall.

Q.   Where was this hole?

A.   Right next -- he lived upstairs, and it would be the next cell if you stand looking at the door to the right.

Q.   In what block was the hole?

A.   C.

Q.   He told you there was a hole in the C block?

A.   Yeah.

Q.   And what did he say about how the hole had been made, if anything, or where it was?

A.   What do you mean there?  There was a couple blocks up by the ceiling knocked out, knocked loose, and try to get a hole big enough to crawl out of.  Is that what you mean?

Q.   That's fine.  I'll ask you another question.  Did he tell you anything about how the plan was to go from there once there was a hole broken in the wall?

A.   Yeah.  They needed to get a rope, big rope, up.

Q.   And what did he say was the plan with the rope?

A.   Well, to make -- they made a small rope.  It was on the other side.  He made a small rope out of blankets and was going to lower it down and hook the larger rope and drag it up.  I guess it's something like 40 feet to the ground.

Q.   Now, since this hole he told you about was in the C block and he was in the D block, what, if anything, did he say to you about how he was going to get over to where the hole was?

A.   Well, he was going to try to go through the wall between the two cells.

Q.   And what, if anything, did you see regarding that or an

attempt to do that?

A. Well, a whole lot of noise one evening, and I went up and looked, and there's a little hole about half inch or inch deep by two inches.

Q. Well --

A. And the walls are cord or poured concrete inside the block and rebar.

Q. Did you see who was creating this hole?

A. Dustin wasn't beating on that. Dayton was, Sebastian (sic).

Q. Where was Dustin?

A. Overseeing.

Q. Overseeing what Dayton was doing?

A. Yeah, watching.

Q. What did you see this fellow Dayton banging with?

A. Door handle.

Q. Did you see where the door handle came from?

A. Yeah, come off of the downstairs on number 5.

Q. Who was in cell number 5?

A. Jim Brownlee and Daniel Frye.

Q. How do you know it came from there?

A. I was sitting down by the table when the handle got broke.

Q. Who did you see with the handle downstairs?

A. Dayton.

Q. Was anybody with him?

A. Dustin.

Q. And when you saw the banging going on in the cell upstairs, was it just the door handle involved?

A. No. It was a coat hangar off the wall, one of them break-away coat hangers made out of quarter-inch steel but it breaks away. You can hang yourself by it. And he was using that for a chisel and beating on it, using the brass handle for a hammer.

Q. You said then you saw some kind of hole or damage done to the wall, but it was cord?

A. Yeah.

Q. So you mean it wasn't possible to get through the wall?

A. Oh, no.

Q. So what did you do or what happened to that hole?

A. I went down and got some soap out of the shower because it was yellow and kind of patched it and put it in the hole.

Q. Why did you do that?

A. Because I figured the cops would be there to see what all the noise was all about, and I'd hate to lose the telephone and the TV.

Q. What other efforts, if any, did you observe by Mr. Honken to try to get to the C block from the D block?

A. He messed with the fire door between them.

Q. When you say the fire door, can you explain what you

mean by that?

A. A fire door goes between all the units. For him to leave, he would have to get out of D into C, so he was trying to pick the lock on the fire door.

Q. What specifically did you see him doing with the fire door?

A. Setting on a garbage can top with a glass boat trying to rake the tumblers and that thing -- coat hook off the wall for tension, tension bar.

Q. What view do the guards have of that fire door?

A. None. It's a blind spot.

Q. Did you ever see the results of these efforts by Mr. Honken to pick the lock at the door?

A. I never did see him open the door.

Q. Did he ever say anything to you about his efforts, in other words, whether it worked or not?

A. I think he thought it did. I think he got the thing turned, but, you know, I don't know if that would open the door or not. They're not a knob. They put the key and use the big key as a knob.

Q. What, if anything, did Mr. Honken tell you about how the work was progressing in the C block with the hole that you mentioned?

A. Well, it sounded like -- he said it was doing real well.

Q. Did he say whether there were ever any problems

encountered or whether --

A. They needed to get a piece of rebar.

Q. What's rebar?

A. Half-inch steel rod that they stick down into the block.

Q. What did Mr. Honken tell you about this rebar?

A. Well, they'd take a hacksaw or something abrasive to file on it, but you could bust it off so you'd have room to go out the hole.

Q. And what, if anything, did he do or say about that problem?

A. He took the striker plate off my door and popped a piece of nosing off the steps.

Q. What's a striker plate?

A. It's on the door that slams against -- that the metal bolt comes out for the lock or comes out that strengthens the door. It's made out of eighth-inch steel.

Q. And you say he took that and took a piece of nosing off the stairs?

A. Yeah, broke a piece of nosing off.

Q. What stairs?

A. Right in front of my cell in D, five, six, seven steps up. I'm not really sure.

Q. And what is nosing?

A. It's an abrasive material that's hooked to a piece of aluminum where you won't slip on the stairs.

Q. Did you see what Mr. Honken did with this piece of abrasive nosing?

A. Yeah. Dayton put it on a piece of string and flipped it over to another guy in C.

Q. Did you see what Dayton flipped -- well, first of all, how does that work? How do you flip something over?

A. Put a piece of string, put it under the door, and make an arch and swing it in a circle, called a jigger string.

Q. And you're saying he was able by doing that to swing this object under the door over into the C block?

A. Yeah.

Q. Did you see -- could you see into the C block?

A. Yeah, real well.

Q. Did you see who received it on the other side?

A. Yeah, a guy with -- that had a shaved head.

Q. What was his name?

A. Dennis. I don't know his last name.

Q. Did you ever see any evidence that Mr. Honken was actually planning to leave soon or escape soon?

A. Yeah. He packed up all of his stuff and took it out on a visit. It's legal material and pictures and stuff.

Q. When you say he took it out on a visit, what does that mean?

A. Gave it to somebody, you know, got it out of the jail.

Q. Was there ever an occasion when Mr. Honken said to you

that he was close to leaving on this escape?

A. Yeah.

Q. And what did he say to you about that?

A. Come in and wanted to know if he could shut the light off and look out my window, and I said yeah. And he looked out, and he said, I think it's a go. There was an automobile sitting across the street.

Q. What happened after that?

A. Nobody showed up.

Q. What do you mean by that?

A. Well, evidently somebody was supposed to come with a rope, and that part never materialized.

Q. When you say evidently, how do you know that?

A. Well, that's what he said. Somebody had been paid to do this, and they didn't show.

Q. Now, when you were interviewed by the government, you talked about what's called Rule 35; is that right?

A. Yeah.

Q. You understand that that's a way that your sentence possibly could be reduced if the government decides to make a motion to the judge.

A. Right.

Q. And would you agree that you were told that the government would consider that back at the U.S. Attorney's Office but there were no promises made to you about that?

A. Yeah.

Q. Is that your understanding?

A. Yeah.

Q. Now, you said when you came in here to the judge that you didn't want to testify. Can you explain a little more why you feel that way?

A. As publicized as this thing's going to be, there's people from six or seven different prisons that I know of -- and I'm blind -- in on this thing, and word's going to be out, and I don't want to have to wear a snitch jacket. I got plenty of time. I really don't want any more time either. And with my eyesight the way it is -- they are, I'm extremely vulnerable.

MR. COLLOTON: All right. I appreciate that. Thank you for your answers, and that's all I have for the witness, Judge.

THE COURT: Mr. Parrish?

MR. PARRISH: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. PARRISH:

Q. You were sentenced you say in federal district court in the Northern District; is that correct?

A. Yes, sir.

Q. And you got how many years?

A. Fifteen plus five.

Q. And what was your weight in the methamphetamine?

A. 1,800 grams.

Q. Was it pure?

A. It's a dry case. It was conspiracy.

Q. Did you plead or go to trial?

A. Plea.

Q. And you didn't get any substantial assistance on a Rule 5K?

A. No, sir.

Q. And you've been in now since when?

A. I've been locked up since October of last year.

Q. And that's of '96; is that right?

A. Yes, sir.

Q. And did anyone get any 5K motions granted where they testified against you?

A. I really don't know. They didn't disclose all their witnesses.

Q. Who represented you?

A. Beverly Wild from Guthrie Center, Iowa.

Q. But evidently they had some witnesses against you; is that correct? That's why you entered your plea.

A. Oh, yeah. Yeah.

Q. And so they're talking about a Rule 35 motion to you now if you were to offer evidence against Dustin Honken; is that correct?

A. Yeah.

Q. Did you negotiate that on your own, or did someone on your behalf negotiate that agreement with them?

A. You mean like an attorney or something?

Q. Yes, sir.

A. No, sir.

Q. You basically did that yourself.

A. They come to me.

Q. And then they came to you with the Rule 35 or --

A. They came to me when I was in jail and said they could help me, and I told them no, they couldn't, I already got 15 years.

Q. Okay. Who came to you and said they could help you?

A. Mark O'Brien I think. That was the first guy that come to talk to me. Then the next gentleman was -- with Mark is one of these guys over here. I can't tell which one.

Q. Was it Mark Hein or Mark O'Brien? You said Mark -- was it Mark Hein?

A. Mark Hein. Excuse me. It was my error.

Q. And who was the next person? It was right over where?

A. It was one of these gentlemen over on my right.

Q. Mr. Reinert or Mr. Colloton; is that right?

A. Mr. Colloton.

Q. Okay. And they made the offer to you that they could help you?

A. They said they could possibly help me, yes, sir.

Q. Did they say what the possibilities of help would be?

A. In maybe getting some time cut off my sentence.

Q. Did they tell you how much time?

A. No, they didn't.

Q. But they indicated it would be a possible Rule 35 motion?

A. Yes, sir.

Q. And that is before you gave them any information?

A. Yeah, because I didn't want -- at first I didn't even want to talk to them. Then they said, well, time cut, and I'm thinking, time cut, yeah.

Q. So after they told you they could help you and give you a Rule 35, it was only after that that you provided information to them; is that correct?

A. Yes, sir.

Q. As you sit here today, do you have any idea when they are planning to file a Rule 35 motion on your behalf?

A. I expect never.

Q. Why do you say that?

A. Because it's just the way they operate. You know, I'm looking at 2009, and that's when -- you know, I don't see nothing happening. I don't believe anything the government says if you want to know the truth.

Q. Did you make the statement on direct examination that

over at the jail you hear all the time about people killing people or people threatening to harm somebody?

A. Sure.

Q. Who do they threaten to harm?

A. Prosecutor, judge, wives, friends.

Q. And you've been in prison before?

A. This is my third time.

Q. All in federal prison?

A. No, sir.

Q. Where?

A. First one was state -- was federal, second one state, now this one.

Q. And how many years all total have you done in prison?

A. Oh, probably seven so far.

Q. Were the charges all drug charges?

A. No, sir.

Q. What were they?

A. Misprison (sic) of a felony, failure of a federal crime and -- failure to turn it in, conspiracy of amphetamines and accessory after the fact on cocaine. It was all done at one time in 1981 by Judge Stewart, Des Moines, Iowa.

Q. Do you have any theft charges or anything?

A. Yes, sir. In 1990 I got convicted of first degree theft which was possession of $10,000 worth of stolen tools.

Q. Any other theft charges?

A.    Just that one there.

Q.    So you have what?  Five felony convictions?

A.    Yes, sir.

Q.    So that's probably another reason you had such a high prison sentence, because you had a criminal history that was pretty extensive, probably put you in a category 6 or something?

A.    Five.

Q.    Five?

A.    Yeah.

Q.    And what did you get the 5 years on top of the 15 years for?

A.    That's supervised.

Q.    All right.  So it wasn't like a 924C or anything like that.

A.    No, no.  I think everybody gets supervised release, three or five years on top of your sentence.

Q.    That's what I was trying to understand when you said on top of.  So you would agree probably that except for your health situation the only way you have out or to get any type of reduction is to provide information to the government.

A.    Yeah.

Q.    There are no other alternatives for you.

A.    No.  They are for nobody in the federal system.  They don't have no parole.  You do 85 percent.

Q. Unless you talk and get a 5K or get a Rule 35.

A. Right.

Q. Now, when you indicated early on you didn't want to talk when you first came in here, in actuality, if the government would help you, you do want to say something that would help yourself get a reduced sentence, don't you?

A. Yeah, but I don't look to get nothing.

Q. I understand. And in this information you provided with regard to Mr. Honken, as I take it, other than the one time you said you saw him -- was it fiddling with a door?

A. Yeah.

Q. -- you never saw him do anything else with regard to an escape?

A. Oh, no.

Q. And you also know that about November of last year -- well, let's zero in on the date first. You said at one point while you were incarcerated with him he packed up all of his clothes, and you responded that that gave you some indication that he was about ready to leave; is that right?

A. Yeah.

Q. Now, you were not aware that also about that time -- that would have been November of last year, 1996; isn't that correct?

A. Yes, sir.

Q. Did you also know at that time there was -- he might

have been moved over to Cedar Rapids to enter a plea because his lawyer was involved in a trial over in Cedar Rapids and that was also a possibility?

A. That was a possibility, but he would have kept his legal material and that with him.

Q. Well, let me ask you on that. Do you think that he could have packed his stuff because one of the possibilities was he was going to move to Cedar Rapids to do a plea because the judge was over there?

A. That's possible.

Q. Okay. And you heard some talk about that also.

A. He told me because he was expecting to go over there hoping -- - you know, he's been waiting a long time to get sentenced now. I'm sure he's more than tired of waiting now.

Q. And also did that happen again in May? Were you still --

A. No, I was only there a couple weeks.

Q. And you were gone at that point.

A. I was there two weeks.

Q. Okay. Let me ask you this: If he had picked the lock, what would have been the result of him picking the lock had he been able to even do that?

A. All he'd have done was got to the next unit.

Q. And could he have escaped from there?

A. If they had the hole in the wall.

Q. If they had had the hole in the wall?

A. Yeah.

Q. And did they have a hole in the wall for someone to --

A. I don't know.

Q. You don't know?

A. I don't know.

Q. And to your knowledge he never opened the --

A. No, he didn't open no door.

Q. And let me ask you this: Do people talk about escaping or breaking out of jail all the time?

A. Hell yeah.

Q. And you hear that from a lot of people?

A. Yeah, about eight out of ten.

Q. And do they have all these ideas of how to do it?

A. Everybody's got a plan.

Q. Did you hear any plans any better than Dustin's plan or any worse than Dustin's plan all the time you've been in jail all these seven years?

A. Oh, I've heard them all from helicopters to, you know, somebody storming the place. No. His plan, you couldn't force me to crawl out of a hole 40 foot in the air on a rope.

Q. The hole would have had to have been pretty big also; is that right?

A. Well, hell yeah.

Q. Okay. Did you ever see the hole?

A.    No.  I couldn't see it.  I was in D unit.

Q.    Okay.  And he didn't have any kind of rope.

A.    No.

Q.    Did he ask you to go with them?

A.    He asked if I was interested, and I said no, no thanks.
You know, I had all the problems I needed right now.

Q.    And do you think under the circumstances of what you saw
him do that it would have materialized?

A.    Seriously?

Q.    Yes.

A.    No.

Q.    And why?

A.    I just don't think it's feasible.

Q.    When you indicated in your response to Mr. Colloton's
question that Dustin's responses with regard to his comments
about his witnesses for his trial appeared to be on another
level or a little different level than the other comments you
hear, let me ask you this:  Did he appear to you to be a
rather serious person, a person not too often engaged in
small talk?

A.    He's a very intellectual and very serious person about
everything.  He don't talk bullshit.  He's very intelligent.

Q.    And would you agree that conversations with him are a
little different than conversations with other people who you
normally run into at a jail facility, not a prison facility,

a federal prison facility, but a jail facility where you have a lot of people charged with state crimes?

A. He's probably the smartest man I've ever talked to intelligent-wise, you know, carry on a complete -- a real good conversation without all the stupid shit.

THE COURT: Does that include the assistant U.S. attorneys that talked to you?

MR. COLLOTON: And the current questioner.

THE COURT: And the judge? So we're all in the same boat I guess.

THE WITNESS: No comment on the judge.

BY MR. PARRISH:

Q. So you would agree that because of his intelligence and ability to engage in conversations that people would be more apt to take anything he might say with a bit more seriousness?

A. Yeah, he's a very serious person.

Q. Okay. It didn't mean at all, did it, that his comments had any more truthfulness to them?

A. No.

MR. PARRISH: Okay. I have nothing further.

REDIRECT EXAMINATION

BY MR. COLLOTON:

Q. On that last point there, Mr. Bregar, that's not exactly what you said in the grand jury, is it?

A. I don't remember. What did I say? Read it. He's a serious person. You know, I would be --

Q. But you remember saying in there that other guys who talked like that in the jail didn't talk with the intent and the coldness that this man had. Do you remember saying that?

A. Right.

Q. And you remember saying that you just had an eerie feeling about him when he talked about it because you believed the man is very dangerous. Do you remember saying that?

A. Yeah.

Q. Do you still believe that to be true?

A. I don't know. If the man -- if the man done all the crimes they've said he's done, he's gotta be Jesse James.

Q. But when you made this statement, this was based on your own interaction with him; is that right?

A. Pardon me?

Q. When you made that statement to the grand jury, was that based on your own --

A. Yeah.

Q. -- dealings with him?

A. Yeah.

Q. It wasn't based on what somebody else told you about him; right?

A. Yeah.

Q.   Now, Mr. Parrish asked you some questions about other stories or people you've heard talk about trying to escape. Remember that?

A.   Yes, sir.

Q.   Did you see anybody else in the Woodbury County Jail try to pick the lock on a fire door?

A.   No.

Q.   Did you see anybody else at the Woodbury County Jail break a piece of nosing off a stair and arrange for it to be sent over to the C block?

A.   No.

Q.   Did you see anybody else in the Woodbury County Jail oversee the banging on a wall of a cell that was adjacent to the C block?

A.   No.

          MR. COLLOTON:  That's all I have, Judge.

          THE COURT:  Mr. Parrish, anything further?

          MR. PARRISH:  No questions, Your Honor.

          THE COURT:  Okay.  You're excused.  Is your eyesight going to get better at all?

          THE WITNESS:  No.  Diabetes got the optic nerves.

          THE COURT:  Nothing they can do for you, huh?

          THE WITNESS:  I guess not.

          MR. REINERT:  United States calls Daniel Frye.

          THE COURT:  Why don't we take a -- do they have to

get him, or is he close by?

MR. REINERT: These are all prisoners.

DEPUTY WALHOF: I called for him a couple minutes ago on the radio.

THE COURT: Will he be a short witness?

MR. REINERT: The next three or four witnesses should be relatively brief.

THE COURT: Why don't we take a 10-minute recess and -- maybe 15. We'll start at ten after four because we're going to go past five o'clock, aren't we? Is that the plan?

MR. REINERT: If the Court desires, we certainly would like to.

THE COURT: Well, it's up to you all. We're not going to finish today anyway, so I guess there's no point in killing anybody, but I'm available till six if you want to. If the parties don't want to, that's fine.

MR. REINERT: I think it would be fine with us to go till six because we've got all the incarcerated witnesses that are already here. I'm sure it would help the marshals if we didn't have to bring them back a second time.

THE COURT: I think it would be an inconvenience. Would you rather stay till six or haul them back another time?

DEPUTY WALHOF: It's haul them back from the other side of the state another time, so tonight's fine with me.

THE COURT: Let's keep going till six.

(Recess at 3:56 p.m.)

THE COURT: Please be seated. Would you raise your right hand, please?

DANIEL FRYE, PLAINTIFF'S WITNESS, SWORN

THE COURT: Okay. Please be seated over here. Would you state your full name and spell your last name.

THE WITNESS: Daniel Lester Frye, F-r-y-e.

DIRECT EXAMINATION

BY MR. REINERT:

Q. Mr. Frye, are you currently incarcerated on an offense?

A. Yes, I am.

Q. And what offense is that?

A. Intent to deliver methamphetamines.

Q. And is that a felony offense?

A. Yes, it is.

Q. Have you been convicted of any other prior felony offenses?

A. No, I have not.

Q. As part of that drug offense, did you spend some time in the Woodbury County Jail?

A. Yes, I did.

Q. When was that?

A. October, November, and December of last year.

Q. Of 1996?

A.   Yes.

Q.   Do you know Dustin Honken?

A.   Yes, I do.

Q.   Were you incarcerated with Mr. Honken?

A.   Yes, I was.

Q.   What cell block were you in at that time?

A.   D block.

Q.   D as in dog?

A.   Yeah.

Q.   Did you have the opportunity to have some discussions with Mr. Honken about why he was in prison?

A.   Yes, I did.

Q.   What offense did he tell you he was in jail for?

A.   Manufacturing methamphetamines.

Q.   Did you discuss the evidence or some of his conduct that resulted in him being in jail?

A.   I don't understand the question.

Q.   Did you discuss some of the evidence and who are some of the witnesses against him?

A.   Not the witnesses.  He just said that they raided a garage or something and found some glassware and some chemicals or something.

Q.   Did he indicate what his starting ingredient was to manufacture the methamphetamine?

A.   No, I'm not sure what his starting ingredient was, but

he mentioned toluene.

Q. Toluene?

A. Toluene or something like that, toluene.

Q. Did he talk about any other person who was involved in the manufacture of methamphetamine with him?

A. No.

Q. Did you have a discussion with Mr. Honken regarding bonding anyone out of jail?

A. Yeah. He approached me one day and said he bonded someone out and that they jumped bond on him, and he was trying to locate that person to get him arrested.

Q. Did he indicate to you why he had bonded that individual out?

A. No, I don't believe he did.

Q. Did you ever have a door handle on your cell door come up missing?

A. Yeah.

Q. What cell were you in?

A. I'm thinking 7, but I'm not sure.

Q. Now, when we talk about door handle, is it like a small doorknob? Could you describe that for the judge?

A. It's kind of a U-shaped handle. It's like brass. It's about this big, about that big (indicating).

Q. About 12 inches long?

A. Yeah, it's a pretty good-sized door handle.

Q. About how heavy is it?

A. I know it'd have to be a couple pounds. It's supposed to be solid brass I guess or something, so it's pretty heavy.

Q. On the day that your door handle turned up missing, did you see anything when you walked back into the cell and saw the door handle was gone?

A. I saw my celly. He was in there.

Q. Your celly, is that your cell mate?

A. Cell mate, yeah, he was in there eating a candy bar. I asked him what happened to the door handle, and he just kind of smiled and didn't say anything so --

Q. Who was your cell mate at that time?

A. Jim Brownlee.

Q. Now, about the time when you heard or when you saw that the door handle was missing, did you hear anything in the cell block?

A. A little while after that I heard some pounding.

Q. Do you know where the pounding was coming from?

A. Cell 2.

Q. And whose cell was that?

A. Dustin Honken's.

Q. At any time did you get the door handle back?

A. I did not, but it was given back to my cell mate, and he turned it in before lockdown.

Q. Who gave the door handle back to your cell mate? Do you

know?

A.   I'm not sure who did.

Q.   Did you observe who was banging up in the cell?

A.   When I heard the pounding, I went up there and seen Dustin Honken pounding on the wall with the door handle.

Q.   Who else was present?

A.   Dayton Sebastian (sic).

Q.   Did you ask -- have any discussion with Mr. Honken or Mr. Sabasta about what he was doing with your door handle in his cell?

A.   Kind of was like, What the fuck you doing?  And they said, Is that pretty loud?  I said, Well, fuck yeah, it's loud.  I mean, and they were basically like, you know, come in or out, you know, because I had the door open standing in the doorway.

Q.   So in response to their in-or-out request, what did you do?

A.   I went back down into the day area.

        MR. REINERT:  No further questions.

        THE COURT:  Mr. Parrish?

        MR. PARRISH:  I don't have any other -- any questions, Your Honor.  Thank you.

        THE COURT:  Thank you.  You're excused.

        MR. REINERT:  United States calls James Brownlee.

        JAMES BROWNLEE, PLAINTIFF'S WITNESS, SWORN

THE COURT: Okay. Be seated over here, please. State your full name, please, and spell your last name.

THE WITNESS: James Jonathan Brownlee, B-r-o-w-n-l-e-e.

DIRECT EXAMINATION

BY MR. REINERT:

Q. Mr. Brownlee, I see that you're currently incarcerated; is that correct?

A. Yes, I am.

Q. And you're incarcerated on a felony offense?

A. Yes.

Q. And what offense is that?

A. Possession of methamphetamine with intent to deliver.

Q. And have you had some prior felony convictions for drugs and alcohol?

A. Yes.

Q. When were you sentenced on your last drug case?

A. I believe it was November -- about November 15, 1996.

Q. And were you housed in the Woodbury County Jail?

A. Yes.

Q. And what -- do you know Dustin Honken?

A. Yes, from jail.

Q. And were you in the same cell block with him?

A. Yes.

Q. Mr. Brownlee, who was your cell mate when you were in

Woodbury County?

A.   Dan Frye.

Q.   Was there a day when your door handle was removed from your cell door?

A.   Yes, there was.

Q.   Were you present when that occurred?

A.   Yes.

Q.   Do you recall who broke the door handle off?

A.   I'm not real sure because it's quite a while ago, but I think it was -- now I can't remember his name again.  I'd know it if I heard it but I --

Q.   And we've -- we discussed this I believe Sunday night, and do you recall when we talked at that time you said it could have been Dayton?

A.   Yeah.

Q.   What --

A.   Not real sure but --

Q.   And was Dayton someone that hung around with Mr. Honken?

A.   Kind of.

Q.   What, if anything, did you get in return for loaning your door handle to Dayton?

A.   I got a candy bar.

Q.   After the door handle was removed from your door, what, if anything, did you hear?

A.   I heard a couple loud thuds coming from one of the

cells.

Q. What cell did you hear that loud banging?

A. It was upstairs.

Q. In which cell upstairs?

A. I don't know what number it was.

MR. PARRISH: Do you want to tell him that too?

MR. REINERT: Pardon me?

MR. PARRISH: Do you want to tell him that also? You can go ahead and tell him. I don't care.

BY MR. REINERT:

Q. Do you know who was residing in the cell in which you heard the noise?

A. I believe it was Dustin's room.

Q. Was the -- did you get the door handle back?

A. Yeah.

Q. When did that take place?

A. Just shortly after.

Q. Do you recall who brought that back to you?

A. No, I don't.

Q. When you mean shortly after, about what time would you have gotten that back in regard to when it was lockdown or the bed check time?

A. Shortly before ten o'clock lockdown.

Q. What happens at ten o'clock lockdown?

A. We all have to lock our doors, lock ourselves in our

cell, and they come in and look in each cell.

Q. What did you do with the door handle when you got it back at lockdown?

A. I laid it out by the sink.

Q. Did you tell anybody about it?

A. Yeah, I told the guard that it got broke off.

MR. REINERT: No further questions, Your Honor.

THE COURT: Mr. Parrish, any questions for Mr. Brownlee?

MR. PARRISH: Let me think just a second, Your Honor.

CROSS-EXAMINATION

BY MR. PARRISH:

Q. Do you know whether or not you saw Dustin Honken pounding on the wall?

A. No, I didn't see him pounding on the wall.

Q. Do you know how people get attention from someone else if they want them to listen to what they have to say? They pound on the wall. Is that something -- a process they use there?

A. Uh-huh.

Q. Is that a yes?

A. Yes.

Q. And that's a normal procedure that you observed in Woodbury County Jail?

A.   Yes.

MR. PARRISH:  I have nothing further.

MR. REINERT:  Just one, Your Honor.

REDIRECT EXAMINATION

BY MR. REINERT:

Q.   Is it normal procedure to get somebody's attention to pound on the wall with a door handle?

MR. PARRISH:  Well --

A.   Well, that was -- that was the first time I had experienced that but --

MR. REINERT:  No further questions.

RECROSS-EXAMINATION

BY MR. PARRISH:

Q.   Did you see someone pound on the wall with a door handle?

A.   No.

MR. PARRISH:  Okay.  I have nothing further.

THE COURT:  Thank you, Mr. Brownlee.  You're excused.

MR. REINERT:  James Derrick.

MR. PARRISH:  You didn't have any notes on this gentleman, did you --

MR. REINERT:  Huh-uh.

MR. PARRISH:  -- who just finished, Mr. Brownlee?

MR. REINERT:  Huh-uh.  First time I interviewed him

was Sunday night.

MR. PARRISH:  It shows.

THE COURT:  Mr. Reinert, we'll hold your induction ceremony for just-the-one-question club later.  You're now an official member.

MR. REINERT:  And I presume Mr. Parrish's comments were in no manner some kind of objection to my conduct.

MR. PARRISH:  Well, you told him two or three answers, Mr. Reinert.  That's the only problem I had.  And I didn't have any problem.  I just wanted to speed up the process.  He didn't know the answer, and I said just tell him.  I don't mind.

MR. REINERT:  Mr. Parrish, if you have an objection to my form of question, please pose the objection and we'll deal with it.

THE COURT:  Would you raise your right hand, please?

JAMES DERRICK, PLAINTIFF'S WITNESS, SWORN

THE COURT:  Please be seated over here.  Would you state your full name and spell your last name, please.

THE WITNESS:  James David Derrick, D-e-r-r-i-c-k.

DIRECT EXAMINATION

BY MR. REINERT:

Q.    Mr. Derrick, I see that you're currently incarcerated.

A.    Yes, I am.

Q.    On what offense?

Case 3:10-cv-03074-LTS-KEM    Document 19-86    Filed 06/06/11    Page 106 of 189

A. I have a contempt of court charge.

Q. And is that a felony offense?

A. No, it's not.

Q. Have you had some prior felony convictions, sir?

A. Yes, I have.

Q. And what are those?

A. I had one a couple years ago. It was a serious assault charge and a child endangerment back in February '95.

Q. Were you incarcerated last year in the Woodbury County Jail?

A. Yes, I was, from September '96 to May '97.

Q. And in what cell block were you?

A. I was in D.

Q. Do you know Dustin Honken?

A. I know who he is. I didn't know him very well.

Q. Do you see him here in court?

A. Yes, I do.

Q. Did you know him -- where did you know him from?

A. We were in the same section together for, oh, I guess maybe a couple months.

Q. Do you know an individual named Dayton Sabasta?

A. He was in there also at the same time I was.

Q. Did you observe any interaction between Mr. Sabasta and Mr. Honken?

A. Yeah. I'd seen them talking together at various times.

Q. Did you observe Mr. Honken do anything regarding the door between C block and D block?

A. I might have -- well, I'll have to say a lot of inmates stand next to the fire door and talk to other inmates in the next section. You can't see them, but they'll stand and just, you know, converse.

Q. Other than just standing there and conversing, did you see Mr. Honken do any other activities regarding specifically the lock on the fire door?

A. Not the fire door, no.

Q. To any door in the cell block.

A. Well, yes, to the main entrance door I saw him stick something in there like a key one day in the locking mechanism to see if it would fit because he'd been working on filing something for a couple hours, and I just observed him to walk up to the main door and stick this thing in there and see if it fit, and he went back to his filing.

Q. Now, where was he filing?

A. He was sitting up by his room at the top of the stairs, and his cell was just right across.

Q. Did you see what he was using as an abrasive material to file?

A. No. He was just using the concrete on the stairwell.

Q. Did you ever hear any loud banging noises when you were in D block with Mr. Honken?

A.    Yeah, yes, I did.

Q.    Would you describe that for the Court?

A.    One night while we were all just -- it was a peaceful evening. Everybody was watching TV, and next thing you know you hear this loud banging noise. And it was behind their closed door, so we couldn't really actually see them doing it, but we sure could hear it.

Q.    You said behind their closed door. Whose closed door?

A.    Well, it was Dustin's cell, and there was just a loud banging noise like they were pounding the wall or pounding the concrete slab. I couldn't see. They had the door shut.

Q.    Now, you talked a little bit earlier about meeting at the cell doors, and you talked about this other door into the hallway. Is there a way other than passing things underneath that main fire door to get items from C block to D block?

A.    Well, a lot of notes are passed through that fire door, but the door -- it's mostly flush with the door, but through the side you can stick a paper. I've even seen newspapers go through there.

Q.    What about through the other door that you were talking about?

A.    Well, yeah. There's a little bit more leeway on the bottom. Yeah. If we have notes we need passed to the jailors or if they pass our mail to us or newspapers, yeah, they use the bottom of the door.

Q. Now, on the bottom of that particular door, is there a method you have observed prisoners use in that block to get an object to C block?

A. Have I noticed?

Q. Have you seen anyone do that?

A. Oh, sure, sure.

Q. What do they do?

A. What do they pass?

Q. No. What's the procedure they do?

A. Oh, they just knock on the door to get someone's attention next door.

Q. I think I just confused myself.

A. Or you confused me.

Q. Let's not talk about the fire door anymore.

A. Okay.

Q. We'll talk about the other door that has the larger gap underneath it.

A. Okay.

Q. Have you seen people utilize that door and the large gap underneath it to pass items to the other cell block?

A. No.

Q. You had talked about -- we had mentioned Mr. Sabasta earlier. Had you seen Mr. Sabasta do any of that type, passing items?

A. Yes. Now I know what you're trying to say. I observed

Dayton one night. He unraveled a cotton string from his sock, and he was wrapping it around a slab of concrete. He was trying to pass it to C-section. He was out there trying to fish it -- I'd say it's maybe only ten feet to the C-section door, but he kept trying to pass it from our section under our door through the hallway to the next section, and he must have tried this, oh, on and off for maybe ten minutes.

Q. Do you know if he --

A. And I don't know if he succeeded in doing it, but I did notice when he was through doing it he wrapped it up and went back up, started talking to Dustin.

MR. REINERT: No further questions, Your Honor.

THE COURT: Mr. Parrish?

MR. PARRISH: Thank you.

CROSS-EXAMINATION

BY MR. PARRISH:

Q. As I understand it, Mr. Derrick, there's a lot of pounding going on in the jail to get attention.

A. Yeah, you could say that. It's pretty noisy in there.

Q. And if you want to get someone at the next cell or something like that, you have to pound on the wall?

A. Yes, sir.

Q. What kind of things do they use to pound on the wall?

A. Oh, usually just a fist.

Q. What about shoes?

A. Yeah, yeah. They kick the door also.

Q. They kick the door?

A. Yeah, with their heel.

Q. What about -- I'm sorry. Go ahead.

A. Yeah, they'll kick it with their heel just a couple times, you know, a loud knock.

Q. What about if someone is walking down along the street or something like a woman and they want to get their attention? What do they bang with then?

A. I guess their fist.

Q. And this item -- you indicated you saw Mr. Honken at one time sharpening an item or filing an item?

A. Right.

Q. Do you know what he was making?

A. Well, the gossip around the jail was he was trying to file it into the style of a key that would fit the locking mechanism to the main door.

Q. And did you ever see him do that?

A. I saw him filing, and I just saw him walk up to the door and stick it in there to see, like, if it would fit.

Q. And did it -- did you notice whether it fit or not?

A. It didn't take him two seconds. He just stuck it in and removed it.

Q. And did you ever see the object?

A.   It was a piece of slab.  Yes.

Q.   I'm sorry?

A.   A piece of slab concrete.

Q.   That's what it was?

A.   Yeah.

Q.   So it was not a piece of metal.

A.   No.

Q.   And the slab concrete, do you know whether or not it was being used for a weapon or whether or not it was being used for a key?

A.   As a weapon I don't know.  But from what I observed, he was trying to make it into the form of a key.

Q.   From the room --

A.   From the filing -- from other filing he'd been doing with it.

Q.   But you don't know whether it was being made into a weapon.

A.   I have no idea.

Q.   And you saw it from about 50 feet away; is that right?

A.   Well, no, it wasn't 50 feet.  After he went down the stairs to the door, I was up on the upper tier.  I'd say maybe 25 feet, 30 feet.

Q.   And what did it look like to you?

A.   Just a gray object is really all -- maybe this big (indicating).

Q. And you're describing an object about two inches?

A. Two or three inches.

Q. Two to three inches? And the door that you saw him go up to, what does that go into, the main door? What does it go into?

A. It goes out -- well, into our section or if you go out of it it goes out into the corridor.

Q. It does not go into C block, does it?

A. Well, C block is ten feet from us, next door to us. Yeah, it's the main hallway.

Q. It goes out into the main hallway.

A. Right, uh-huh.

Q. And that's the only door in there; is that correct?

A. Well, no. Actually there's two doors that can be used.

Q. And the other door goes into where?

A. The hallway or into our -- that D section.

MR. PARRISH: I have nothing further.

MR. REINERT: Nothing.

THE COURT: Thank you. You're excused.

MR. REINERT: David Leavitt.

MR. PARRISH: What was that last name?

MR. REINERT: Leavitt.

MR. PARRISH: How many more do you have?

MR. REINERT: Not too many.

MR. PARRISH: What's not too many?

MR. COLLOTON: I think three including this one.

MR. PARRISH: Including this one?

MR. COLLOTON: Yeah.

THE COURT: Would you raise your right hand, please?

DAVID LEAVITT, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated over here, please. Would you state your full name, please, and spell your last name.

THE WITNESS: Full name, David Leavitt; last name, L-e-a-v-i-t-t.

THE COURT: Mr. Colloton.

MR. COLLOTON: May I go ahead, Judge?

DIRECT EXAMINATION

BY MR. COLLOTON:

Q. Mr. Leavitt, are you in federal custody right now?

A. Yes, I am. I'm currently under the Federal Bureau of Prisons in Rochester, Minnesota.

Q. And for what offense are you in federal prison?

A. Possession of a controlled substance.

Q. With intent to distribute?

A. Yes, sir.

Q. Were you sentenced in this court?

A. Yes, I was, by Mr. Bennett.

Q. And what'd you get from Mr. Bennett?

A. Mr. Bennett was real lenient on me. He gave me the

lower end of the sentence, 46 months.

Q. And after you were sentenced, where were you incarcerated right after you got sentenced?

A. Right here in Sioux City, Woodbury County Jail.

Q. What was your sentencing date?

A. November 1, I believe.

Q. Last year?

A. Yes, sir.

Q. How long were you there at Woodbury before you moved?

A. I can't give an exactly time period, but I'd say about 20 to 30 days after I was sentenced.

Q. What cell block were you in when you were housed at the Woodbury County Jail?

A. C block.

Q. During the period you were there in November, did you observe anything unusual in cell block C-8 or cell C-8?

A. Yes, sir. Apparently there was a hole in the -- on the ceiling, on the wall, and they were trying to get through to the other side.

Q. What did you actually see in there yourself?

A. I saw them patching the hole.

Q. Where was the hole?

A. As you walk in and you face the wall, it's on the upper right-hand corner on your left-hand side.

Q. What was the condition of the hole when you saw it, when

you first saw it?

A.   About a block missing.

Q.   What kind of -- did you say you saw some work going on there?

A.   Yeah, it was getting patched.

Q.   What do you mean by that?

A.   Cardboard was being placed on there and redone with some soap.

Q.   Who did you see doing that?

A.   Mr. Putzier.

Q.   Do you know his first name?

A.   Dennis.

Q.   Did you see anybody else working with him?

A.   Another person that I don't recall which I have told you.

Q.   Do you remember where that other fellow was incarcerated?

A.   In cell block C-2.

Q.   Did you ever do anything to assist Mr. Putzier?

A.   As a favor I did.

Q.   What'd you do for him?

A.   I threaded some rope for him.

Q.   What kind of rope?

A.   Some rope.

Q.   What was it made out of?

A.   Out of a bed sheet.

Q.   And did he tell you why he wanted the rope?

A.   At first, no, he didn't tell me.  But when I got to the amount of rope he wanted, you know, it's obviously clear what his intentions were.

Q.   Did he ever say anything to you what he was going to use the rope for?

A.   Possibly escape, escape from the jail.

Q.   Did he say specifically what he would use a rope like that for?

A.   Yeah, try to escape.

Q.   But I mean --

A.   Oh, okay.  Yeah.  Apparently he wasn't going to be able to get out of the jail because there were some bars running through the cement, through the blocks, so he needed some sort of assistance like a sledge hammer or a file to cut through the --

Q.   And your rope was supposed to help get that stuff.  Is that what you're saying?

A.   Yeah.

Q.   Did you ever see Mr. Putzier communicating with anybody in the D block?

A.   Yes, I did.

Q.   Is the D block adjacent to the C block?

A.   Yes.

Q. Where did you see him communicating?

A. At the fire door.

Q. From the C block could you see into the D block to see with whom he was communicating?

A. No, I couldn't see who he was speaking to.

Q. And you had an agreement -- you've reached an agreement with the government whereby if you gave what the government considered to be truthful testimony then you would not be prosecuted for any involvement in this escape attempt; is that right?

A. Yes, sir.

Q. You received no other consideration?

A. No, sir.

MR. COLLOTON: That's all I have for this fellow, this witness.

THE COURT: Thank you, Mr. Colloton.

Mr. Parrish?

CROSS-EXAMINATION

BY MR. PARRISH:

Q. You know, I kind of missed that last part of it. You said you are getting some assistance or not getting any assistance from the government.

A. I'm just not going to be prosecuted for this. You see, my intentions of this, I had nothing to do with it. I just did him a favor. Know what I'm saying? But my name came up

in this, and apparently they think that I had some involvement as to try and escape myself which I wasn't going to escape.

Q. I see. So by making the rope from the sheets, you had no idea what they were doing?

A. After I have -- he told me the amount of rope, yes, I kind of -- and seen the hole on the roof, I got an idea what they were going to do, you know. It doesn't take no genius to know exactly what was going on.

Q. But the rope was finished before then; is that right?

A. Excuse me?

Q. The rope was already finished at that point.

A. No. The hole was done, and I did the rope.

Q. Well, no. That's what I'm saying. Your work was done before you knew what they were going to do.

A. Yes.

Q. And then after you had finished with your rope, you figured out what they were going to do.

A. Yep.

Q. And while you were making the rope, you had no idea what was going on.

A. Well, like I said, when 40 -- 40 feet of rope, you know, you kind of assume, you know, what's going on and you see a hole in the wall.

Q. Okay. I understand what you're saying. But I was

trying to get your benefit here. If you're sitting there and you're watching and you're making a rope up in your jail cell, are you telling me that you were just doing them a favor and you didn't have any idea that Putzier was going to try to escape with the rope that you were making?

A. He was going to try to escape with the rope.

Q. That you were making.

A. Yeah.

Q. And you knew that at the time you were making it.

A. But he couldn't escape. The reason why he wanted that rope is to bring in some heavier rope and some other things, you know, to finish the job, you know.

Q. So the rope you were making you are saying was not going to be used to escape with.

A. No, because --

Q. It wouldn't have been strong enough, number one.

A. It wouldn't have been strong enough, no.

Q. And while you were making that, did you know that the rope was going to be used to bring in other material?

A. No, not until the end. When I found out they couldn't because there was bars running through, that's when I knew the rope was going to be used to bring in some other stuff.

Q. What did you think the rope was going to be made for the first time while you were sitting there making it?

A. Probably to escape, you know.

Q. And so you knew you were doing wrong at that time.

A. Yes, I did.

Q. And so you knew that the government had a pretty good case against you.

A. Well, yes.

Q. And so what you are trying to do is offer them some testimony to help you get out of the predicament you found yourself in.

A. Yes.

Q. And that information that you offered to them under those circumstances is that you saw Putzier do something with regard -- and a gentleman named Mike; is that right?

A. Mike who?

Q. You said it was a gentleman named Mike who you thought was assisting Putzier.

A. I don't remember no Mike.

MR. COLLOTON: I object to that. I don't think that's a correct statement of the record.

THE COURT: The record speaks for itself.

MR. COLLOTON: Oh, I'm sorry.

THE COURT: No, that's okay. He said no.

BY MR. PARRISH:

Q. So you're saying you didn't see a gentleman by the name of Mike or you thought his name was Mike working with Putzier in an escape?

A. Mike who?

Q. I don't know. You didn't know his last name.

A. No.

Q. You're saying you never made a statement like that.

A. Like I said, the only person that I saw was someone in C-2, but I don't remember his name, and I don't think I mentioned his name either.

Q. Did you ever stay at the Linn County Jail in Cedar Rapids, Iowa?

A. Yes, I did.

Q. And were you interviewed there by a person by the name of Mr. Mark Hein?

A. I guess so. I can't remember who it was.

Q. And did a Mr. Colloton also come in and interview you along with Mr. Hein while you were there?

A. Yes.

Q. And did you ever make a statement to them when you were interviewed at the Linn County Jail in Cedar Rapids, Iowa, concerning his knowledge of an attempted escape from the Woodbury County Jail in Sioux City, Iowa, where you stated that in November 1996 Dennis Putzier and an individual he thought was named Mike but he wasn't sure were making a hole in cell C-8 of C block of the Woodbury County Jail? You're saying you never made that statement?

A. I don't recall the word -- the name Mike.

Q.   So if Mr. Hein indicated that you'd made that statement, would Mr. Hein be mistaken?

A.   No.  If he said I said it, then I said it.

Q.   Okay.

A.   But I don't remember if I said the name Mike.

Q.   Okay.  You mean you might have said that and just might have forgotten about it.

A.   Possibly, yes.

Q.   Okay.  And you never saw Mr. Honken do anything.

A.   No, I don't even know who Mr. Honken is.

MR. PARRISH:  Thank you.  I have nothing further.

THE COURT:  Mr. Colloton?

MR. COLLOTON:  I just want to make sure for the record here.

REDIRECT EXAMINATION

BY MR. COLLOTON:

Q.   While you were on -- you've got no other felony convictions; right?

A.   I have one, yes.

Q.   Well, while you were on pretrial release in this case, you had another case where you got a deferred judgment; right?

A.   Yes, I did, sir.

Q.   And that was in Oklahoma?

A.   Yes.

Q. For possession of a controlled --

A. Substance.

Q. -- controlled substance.

MR. COLLOTON: That's all.

THE COURT: Anything further, Mr. Parrish?

MR. PARRISH: Yes, just one thing.

RECROSS-EXAMINATION

BY MR. PARRISH:

Q. You had been sentenced already in this case --

A. Yes, I have.

Q. -- when you were making the rope?

A. Yes, I have.

Q. You had been sentenced at that point.

A. Yes, I had been.

Q. And you were just waiting to be transferred --

A. Yes, to my --

Q. -- to a federal institution?

A. Yes, I have -- I was.

Q. And no state charges were filed against you?

A. No, sir.

Q. And no federal charges were filed against you.

A. No, sir.

Q. And no enhancement was placed on your sentence because of your conduct in making a rope in this instance.

A. No, sir.

MR. PARRISH: Okay. Thank you.

THE COURT: Anything further, Mr. Colloton?

MR. COLLOTON: No.

THE COURT: Thank you, Mr. Leavitt.

MR. REINERT: Derek Boggs.

DEREK BOGGS, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated here. Would you state your full name, please, and spell your last name.

THE WITNESS: Middle name too?

THE COURT: That's fine.

THE WITNESS: Derek Vaughn Boggs; last name, B-o-g-g-s.

THE COURT: Thank you.

THE WITNESS: Uh-huh.

DIRECT EXAMINATION

BY MR. REINERT:

Q.   Mr. Boggs, are you currently incarcerated for a felony offense?

A.   Yes, sir.

Q.   And what is that?

A.   Class D and class C felony.

Q.   And what offense is that?

A.   Theft, both of them.

Q.   And actually you're toward the end of your incarceration period.

A.   I'm at the end.

Q.   And why do you say that?

A.   I got a parole last Wednesday, so I can be home in a matter of days.

Q.   Were you housed in the Woodbury County Jail last year?

A.   Yeah.

Q.   About when?

A.   First part of November, something to that effect.

Q.   And specifically what was your cell?

A.   8, C-8.

Q.   Was there anything unusual about C-8 when you got there?

A.   Yeah.

Q.   What was unusual about C-8?

A.   There was a hole in the wall.

Q.   Did you get any guidance when you first got into C-8 as to who was making the hole in your cell?

A.   Yeah.

Q.   And what -- who told you about who was making the hole?

A.   Dennis Putzier told me that he was making the hole.

Q.   Were you -- what instructions, if any, were you given regarding whether you were going to be involved in making the hole?

A.   I could be.  Otherwise I didn't have to be.

Q.   And what decision did you make?

A.   Not to.

Q.   So what did you do when people wanted to work on the hole?

A.   Went into the day room.

Q.   Did you ever observe Mr. Putzier conversing with anyone in the cell block next door in D block?

A.   Yeah.

Q.   Who did you see him talking to?

A.   Oh, I saw him talking to a couple of different people through the fire door.

Q.   Did you see him -- do you see Mr. Honken here in court?

A.   Yeah.

Q.   Did you observe Mr. Putzier talking with Mr. Honken on any occasions?

A.   Yeah.

Q.   Did you observe any other conduct between Mr. Putzier and Mr. Honken at the fire door?

A.   Notes being passed through.  That's common.

          MR. REINERT:  Nothing further, Your Honor.

          THE COURT:  Mr. Parrish?

          MR. PARRISH:  I have no questions, Your Honor.

          THE COURT:  You're excused, Mr. Boggs.  Good luck to you on your release.

          THE WITNESS:  Thank you.

          MR. REINERT:  Dennis Putzier, Your Honor.

          DEPUTY WALHOF:  It will be a minute, Your Honor.

They're still upstairs.

THE COURT: Why don't you all stand and take a stretch break.

MR. PARRISH: This is the last one?

MR. COLLOTON: I thought. I may have spoken out of turn. I thought we were going to stop after that, but Pat's telling me maybe we have one more. Getting tired?

MR. PARRISH: Yeah.

(A discussion was held off the record.)

DENNIS PUTZIER, PLAINTIFF'S WITNESS, SWORN

THE COURT: Okay. Why don't you be seated right over here. State your full name, please, and spell your last name.

THE WITNESS: Dennis Leroy Putzier, P-u-t-z-i-e-r.

DIRECT EXAMINATION

BY MR. COLLOTON:

Q. Mr. Putzier, are you currently in state custody?

A. Yes, sir.

Q. And for what offense are you in state custody?

A. Five years for failure to appear, five years for theft of some hogs, and five years for forgery all back to back.

Q. In connection with those charges, were you housed for a time at the Woodbury County Jail?

A. Yeah, I was.

Q. When were you in there?

A. Like from June, the end of June, till December.

Q. Of last year? '96?

A. Yeah.

Q. And what block were you in in the summer?

A. First block I was in was E block. I got in an altercation, and they moved me to C block.

Q. All right. Well, when you were in E block, did you have any contact with an inmate named Dean Donaldson?

A. Yeah.

Q. Did you know Donaldson from before you got in jail?

A. Yeah.

Q. And what -- how did you communicate with Donaldson when you were in E block?

A. I talked to him through the door.

Q. You mean the fire door?

A. Yeah, yes, sir.

Q. What did Donaldson talk to you about at that time?

A. Asked me how to get ahold of my brother.

Q. Anybody else?

A. Asked me about LaDean. He asked me --

Q. Hold on, Mr. Putzier. When you say LaDean, who do you mean by that?

A. LaDean Hummel.

Q. What did he ask you about LaDean Hummel?

A. What he was -- if he was still down in Cushing and if he

was -- if he could talk to him.

Q. Did he say anything about why he wanted to talk to LaDean Hummel?

A. Not really. I mean, not at that time.

Q. All right. Did you ever come to know the defendant in this case, Dustin Honken?

A. Yeah.

Q. How did you first meet Mr. Honken?

A. I got a letter, note slid through the door.

Q. Where were you when that happened?

A. I was in E block.

Q. What kind of notes did you get? Or you said a note. What note did you get?

A. Just like he send me a note and said, Hey, you don't know me. My name's Dustin Honken. I'm the one that bonded Dean out.

Q. Did you know what he meant at that time?

A. Yeah, I knew what he meant.

Q. How did you know about bonding out Dean?

A. Because when I was talking to Dean through the door, he said he had -- that this guy's going to bond him out. I didn't know at the time that it was Dustin, and he said he don't want me to talk to the guy, this and that, and he was in lock-up anyways.

Q. Did Dean tell you about getting bonded out at the same

time he was asking you about LaDean Hummel?

A.   Yes.

Q.   Now, what else did Mr. Honken say to you in his note or notes about bonding out Dean?

A.   He asked me what I thought about Dean, if he could trust Dean.

Q.   Why did -- what did he say about why he wanted to know that?

A.   Some time during the period of time when I talked to Dustin he said he gave him some things, some important things, to take care of.

Q.   Did you ever at some point have further conversations with Mr. Honken about that whole topic?

A.   Yeah, throughout the period I was locked up in the jail.

Q.   Well, at first you said you just got some notes; right?

A.   Yes.

Q.   Did you ever come to have face-to-face contact with Mr. Honken?

A.   I don't know -- never face to face.  One time in church is the only time I've ever been face to face with him ever.

Q.   All right.  Did you have occasion to actually talk to him as opposed to have notes?

A.   Oh, yeah.

Q.   How did that come about?

A.   Just everybody goes in them jails to the fire doors and

talks, you know.

Q. So you started to talk to Mr. Honken through a fire door. Is that what you're saying?

A. Yeah, he came and asked me questions. Like I said, I didn't know the guy and then --

Q. Where were you when these conversations started?

A. I was in E block when the conversations first started.

Q. Where was Mr. Honken?

A. D block.

Q. What conversations did you have with him?

A. Several different conversations about his case and about my case and why I was in there, and he asked me about Dean, and I told him, you know, Dean had told on me for stealing the hogs with him.

Q. What did Mr. Honken say to you about this business of bonding out Dean?

A. He said that he'd given him a map -- I know that -- and some other things to do. I can't, you know, really say what it was. But some time during the time he asked if my brother LaDean was capable of killing somebody.

Q. What did he say about why he wanted to know that?

A. Because the dude, this Tim, his partner, was supposed to be telling on him. If he could get him killed, he could get out.

Q. Do you know what happened with Donaldson's bond when he

was out?

A.   Yeah.  He never came back.  The dude took off.

Q.   Did you talk to Mr. Honken about that?

A.   Yeah, several times.  That's why I started talking to him.  That's why I felt sorry for the dude, man.  I mean, I felt like I was in a bad position, and, you know, I just felt like he was getting the bad end of the deal.

Q.   What did he say to you about the fact that Donaldson had taken off?

A.   He said his wife and kids are going to lose the house.

Q.   What other concerns, if any, did he express?

A.   Just he said, you know, I sent him some paperwork and some other things.  You'd think he'd give them to the feds or you think he'd use them against me to get out of his time.

Q.   What did he say about the paperwork?

A.   Just that there was one map maybe, and he thought that was the only thing with his handwriting, and the other things -- I can't really recall what the other stuff was so -- I think it had something to do with -- I know there was supposed to be something to do with some kind of drugs.  I don't know, you know, if the dude was going to make some for him or sell some for him or what.

Q.   Was there a time when you eventually moved to the C block?

A.   Yeah.  That's -- I said that before.  I'd got into a

fight, and they moved me from E block to C block.

Q. You said that before. You mean when you got interviewed?

A. No.

Q. Or did you say it here? I'm sorry.

A. Yeah.

Q. I missed it. And you moved to C block. And did you have any more conversations with Mr. Honken while you were in C block about his case?

A. I had several conversations with him throughout the day every day, you know.

Q. So you had regular conversations with him through the door?

A. Yeah.

Q. What else did you talk to him about concerning his pending case?

A. Just he showed me his paper, his paperwork with all the charges and shit, you know, said, Don't let nobody read it. I didn't. I kind of looked at it. You know, I ain't very good at reading and shit, and I just kind of looked at it, you know, kind of curious. And, you know, he just -- we talked about lots of different things, just that he beat one in '93 because a bunch of people disappeared.

Q. What did he say to you, if anything, about how he hoped to beat the '96 case?

A. Have the witness disappear like they did in the one in '93.

Q. Is that what he said?

A. (Witness nodded head.)

Q. You have to answer out loud.

A. Yeah.

Q. What specifically did he talk to you about concerning having a witness disappear in '96?

A. The only person that's really got anything on him is this Tim, this friend of his.

Q. What did he say to you about that?

A. You know, if he'd get rid of him he could get out. They'd have to let him go.

Q. Did he ever talk to you specifically about how to do that?

A. Some time in there we talked about it.

Q. How did that come up?

A. Me and Terry Davenport busted a hole in the wall. I thought I might be getting out of the jail. I was trying to escape.

Q. And what -- where were you busting a hole in the wall?

A. In C block, C-8.

Q. Who was staying in that cell at the time?

A. A dude named Boggs and a little dude named Lon Daley or something, Little Lon. I don't know his last -- I can't

remember. It's been a long time.

Q. And you said that you and Terry Davenport were trying to break this hole out and escape; is that right?

A. Yeah.

Q. And you said that somehow you connected that to Mr. Honken; is that right?

A. Somehow after he -- everybody knew about -- you know, a lot of people knew about it, and we ended up talking about it one time. I'm not sure how it got started or why.

Q. What conversation did you have with Mr. Honken about your hole in the wall?

A. Just if I could get out there, you know, take care of that business for him as in getting rid of that friend of his, that Tim, that he'd take care of me forever and all this shit. I mean, we talked about so much stuff it's hard to remember everything, and it ain't like I sat down and took notes trying to get out of some time, you know. I never planned on ever having to be up here on this stand testifying against nobody.

Q. When he talked to you about getting out and taking care of Tim, what did he tell you about how that could be done?

A. He just said the dude lived on a farm down somewhere by Des Moines and he lived with his mom and dad, that if I could get out that hole, you know, and I couldn't get out the hole, and we kept trying to figure how we'd get out and this and

that and that his girlfriend would come take me out there to the place.

Q. Did he tell you who the girlfriend was, the name I mean?

A. Yeah.

Q. What did he say was her name?

A. Angie.

Q. What happened with your hole in the wall in cell C-8?

A. I busted a bunch of brick out.

Q. And did you ever run into any problems in the hole?

A. Several different times.

Q. What kind of problems?

A. Ran into bars. There was a bar I couldn't get -- you know, even if I got the whole bricks out, I couldn't get through with that bar.

Q. So did you ever talk to Mr. Honken about the problem with the bar?

A. Yeah.

Q. What conversation did you have with him about that?

A. Just trying to figure out ways to -- I could get that bar out of there.

Q. And what did you talk to Mr. Honken about?

A. Several different things. I mean, one was a piece of step. One was maybe getting a hacksaw blade in. One was through a book or something.

Q. Let me take you through --

A.    One was knocking just a hole in, putting a rope out and pulling up a hacksaw, a hammer, and chisel.

Q.    All right.  Let me ask you about this piece of step you mentioned.  What happened with regard to that?

A.    It didn't work.

Q.    No.  I mean what happened?  What did you do with it?

A.    I'm not sure what I did.  I mean, I got it sent over to me.

Q.    Who sent it over to you?

A.    I believe Dayton sent it to me.

Q.    Did you talk to Mr. Honken about the piece of the step?

A.    Yeah.

Q.    What conversation did you have with him about the piece of the step?

A.    He just told me that he had a piece of step he'd broke off that he was going to get sent over to me.

Q.    How did it get sent over to you?

A.    Slid under one door from B block over to the one E block -- or C block, excuse me.

Q.    I'm sorry.  I'm mixed up on the blocks.  Say that again now.

A.    He slid it from D block to C block.

Q.    And how -- what mechanism do you use to slide something?

A.    You tie a comb or something on a piece of string and slide it out under the door, hook another piece of string

that slid from the other door, and then just pull it in.

Q. How was the piece of step supposed to help with the bar?

A. Maybe it could have cut through the bar to get it out of the way.

Q. You mentioned that you also talked about a rope that would be used to pull up some other items; is that right?

A. Yeah.

Q. Did you talk about that with Mr. Honken?

A. Yeah.

Q. What conversation did you have with him about this rope?

A. Just I was trying to make a rope so I could maybe knock a hole all the way through and get something hooked on so I could pull another rope up, a good rope with a hammer, chisel, and a hacksaw. That way, you know, we could get through.

Q. What involvement, if any, was Mr. Honken going to have with that?

A. He was going to get the rope and stuff dropped off.

Q. The rope and stuff. What do you mean by stuff?

A. The rope, the hacksaw, a chisel, and a hammer.

Q. What did he say about how he was going to get that dropped off?

A. He could have Angie drop it off over there.

Q. Did you ever make any kind of rope?

A. Yeah, I made rope a couple different times, one when I

thought I was going to be able to get out. Then I ran into that bar. We had to tear it apart. Then we made one that we could slide out.

Q. Who, if anyone, helped you make the one that you could slide out?

A. David Leavitt, Leavitt. I think Terry Davenport helped make it too.

Q. Did you ever -- what involvement, if any, was Mr. Honken to have in the actual escape?

A. Have a ride set up for me, have the stuff dropped off, and have a place for me to be.

Q. Was there ever a time when Mr. Honken talked to you about whether he was going to go on the escape?

A. Towards the end.

Q. What happened towards the end?

A. He decided maybe he could go with us.

Q. And what conversation did you have with him about that?

A. Making a hole through the wall from C block to D block or from D block to C block. He wanted to see if I could get through there, and I thought about it, and Davenport said, No, tell him to come through if he wants to come through.

Q. So you told him that?

A. Yeah. I said --

Q. What, if anything, did you observe him doing after you told him that?

A.   I can't say I observed him doing nothing.  I can say --

Q.   What, if any -- I'm sorry.  Go ahead.

A.   -- that he tried to come through his wall.  You know, he told me.  I can't say I seen anything because I didn't.

Q.   Fair enough.  What did he tell you?

A.   That he got a door handle and tried to come through the wall.

Q.   What did he tell you about how he got the door handle?

A.   Like I said, it's been a long time.  I know they broke it off of J. B.'s door.  I mean --

Q.   Who's J. B.?

A.   Jim Brownlee.

Q.   When you say they broke it off, who do you mean?

A.   I'm not sure who broke it off for sure.  It's either him or Dayton.

Q.   Did you ever -- well, the idea was to do what with the door handle?

A.   Knock a brick out so he could come from D block over to C block.

Q.   Did you ever have any reason to believe he tried to do that?

A.   Yeah.

Q.   What reason did you have to believe that?

A.   Because I heard him pounding on the wall.  About knocked -- you know, you could hear it from one end of the jail to

the other, and there's a little oriental dude in a cell block where they was coming from D into his cell. He's in lock-up, and he's saying, Tell the cop, you know. Hey, what happened? I don't know. Don't tell nobody, I said, you know. Just be quiet.

Q. What kind of success did Mr. -- did you ever talk to Mr. Honken about whether he had any success with that?

A. Yeah, there wasn't no way they could make it through. Way too much pounding and too little progress.

Q. Did he tell you that?

A. Yeah.

Q. What other efforts, if any, did you learn about from the part of Mr. Honken to get from D block to C block?

A. Me and Dustin tried to open the fire door.

Q. What did you do to try to open the fire door?

A. Took door handles and pried in there and turned it while we pushed a bolt up in there and tried to move the mechanisms or whatever you call them, tried to just jimmy the door.

Q. Were you both working on that from either side?

A. Yeah. I'd be turning on one side, and he'd be trying that side. He'd turn it. I'd try it. Couldn't get it.

Q. What else, if anything, did Mr. Honken do to assist in this escape plan?

A. He gave me that piece of bolt that he filed down, I mean.

Q.   How did he give you a piece of bolt?

A.   I had that slid under the doors too.

Q.   What was the purpose of the piece of bolt?

A.   Try to make that -- open that door.

Q.   You mean the fire door?

A.   Yeah.

Q.   Did you have -- well, what happened to the escape plan in the end?

A.   In the end we was -- you know, we was still talking about it every day, was going to get that stuff dropped off. Well, I was shaving my head one day, and I got called into the hallway by a jailor. And they told me, you know, you can't -- this shaver ain't for shaving heads. Woo-woo this, woo-woo that. I said, Well, I'm going to finish shaving my head. They said, No, you're not. I said, Yeah, I am. I said, I'm not going to go around here looking dumb. They said, You look dumb anyway. I said, You look dumb too. That's it, something like that. Maybe a little more. Next thing I know, they're telling me I'm moving. Pack your shit.

Q.   So you were moved out of C block?

A.   Yeah.

Q.   And therefore you couldn't pursue the plan anymore?

A.   Yeah.

Q.   Do you remember about when that was?

A.   It would have been the end of -- like towards the end of

November.

Q. Did you have correspondence with Mr. Honken after that?

A. Yeah.

Q. And did you send some letters to him in December of '96?

A. Yep.

Q. Do you remember reading those letters previously when they were shown to you?

A. Yeah.

Q. And do you remember there's some statements in there about Dean?

A. Yeah.

Q. What was the purpose of your correspondence with Mr. Honken in December?

A. I was writing him telling him I was trying to help him get Dean back in jail so Kathy wouldn't lose her house, her and the kids, you know. I was just doing what I thought at the time was best, you know.

Q. Back when you were still in C block, did you ever have any -- well, I'm sorry. Strike that.

Let me show you what's marked Government Exhibit 32. Do you recognize that?

A. Yeah.

Q. Pardon me?

A. Yes.

Q. What's Government Exhibit 32?

A.    It's a letter from Dustin.

Q.    Did you receive it?

A.    Yeah.

Q.    You received it at the Clarinda facility?

A.    Yeah.

Q.    And do you see in there on the second page of the letter there's a paragraph beginning about the escape stuff and then there's a colon?

A.    Yeah.

Q.    And then there's another paragraph that says, I know it's crazy because you weren't even in there when that hole was there?

A.    Uh-huh.

Q.    You have to answer out loud.

A.    Yes.

Q.    Is that true, that you weren't even in cell C-8 when the hole was there?

A.    It's true that I wasn't in that cell, but I was in the cell block because I was never -- I mean, I've been in and out of that cell.  I was never living in that cell.  But the hole wasn't there until I went into the cell.

Q.    What was your understanding of this letter when you read it?

A.    The understanding to me is, you know, saying, hey, say the hole was already there, that you didn't have nothing to

do with it. That's my understanding.

Q. And based on your conversations with Mr. Honken, was he in a position to know whether that was true or false?

A. Yes, he was.

Q. And you're saying that's false because you had something to do with it?

A. I'm saying it's false because I made the hole.

Q. Let me show you what have been marked Government Exhibits 38 and 39.

MR. COLLOTON: Your Honor, these were not included in our original set.

THE COURT: Have you given copies to Mr. Parrish?

MR. COLLOTON: We have. I gave him some over the noon hour, and I believe Mr. Reinert just gave him a marked copy. I apologize for not getting them to the Court sooner. We just received these when we arrived in Sioux City.

THE COURT: Yesterday?

MR. COLLOTON: Yes.

BY MR. COLLOTON:

Q. Mr. Putzier, do you recognize Exhibits 38 and 39?

A. Yes.

Q. What are Exhibits 38 and 39?

A. Some notes sent to me from Dustin.

MR. COLLOTON: Have you got two copies of that, Mr. Parrish?

MR. PARRISH: I have 38 and 39.

MR. COLLOTON: Do you have the earlier copies that we gave you by chance?

MR. PARRISH: No. You needed it for something? You can use these.

MR. COLLOTON: If I may.

MR. PARRISH: There you go.

BY MR. COLLOTON:

Q. When did you receive these documents?

A. After I got here this time like on a Sunday and probably maybe a Tuesday or Wednesday. I'm not positive.

Q. How did you receive them?

A. From somebody out of a different block slid through a door to me.

Q. And is there some additional writing on there that wasn't on there when you got them?

A. Yeah.

Q. What's on there that wasn't there when you got them?

A. Looks like, Received from Honken by Putzier.

Q. Other than that, are they accurate copies of -- or accurate actual documents that you received?

A. Yes.

MR. COLLOTON: We'd offer Exhibits 38 and 39.

* * * *

(Government Exhibits 38 and 39 were offered.)

* * * *

MR. PARRISH: No objection.

THE COURT: Thirty-eight and thirty-nine are received.

* * * *

(Government Exhibits 38 and 39 were received.)

* * * *

BY MR. COLLOTON:

Q. You've entered into a plea agreement recently; is that right?

A. Yep.

Q. And that's with the United States?

A. Yes, sir.

Q. And what's the agreement as you understand?

A. I had to plead guilty to aiding and abetting a felon to escape.

Q. Aiding and abetting what?

A. A felon prisoner to escape.

Q. And do you understand that it has to be a federal prisoner?

A. Or a federal prisoner, yeah, that's -- yes.

Q. And who are you going to plead guilty to aiding and abetting to escape?

A. Dustin.

Q. Did you also agree to cooperate with the United States?

A. Yeah.

Q. And do you understand that you have the potential to get some kind of reduction from your sentence?

A. Yes.

Q. And do you understand how that works?

A. I gotta completely, you know, say everything I know and be honest about everything or get burnt up worse.

THE COURT: Takes you all about eight paragraphs in your plea agreement to explain that, and I thought Mr. Putzier did it quite well.

MR. COLLOTON: I'll take that back to Mr. Teig, Mr. Murphy.

THE COURT: You do that. You have the transcript made for them.

BY MR. COLLOTON:

Q. You got some prior felony convictions other than the one you're in for now?

A. Yes, sir.

Q. Does that include an attempted burglary back in 1990?

A. Yes, sir.

Q. And does it include a delivery of a controlled substance in 1990 as well?

A. Yeah.

Q. Or 1991?

A. Yes.

Q. Does it include another attempted burglary in 1991?

A. Yes.

Q. And a theft second in 1991?

A. Yes.

Q. You were called to testify in the grand jury about some of these matters previously; right?

A. Yes.

Q. Were you truthful in the grand jury?

A. No.

Q. Basically you lied about much of the stuff you said here today; isn't that right?

A. Yes.

Q. Why did you do that?

A. Like I said when I got here, you know, I didn't sit there. I didn't take notes. I ain't in here for telling on people. You know, I do my crimes. I do my time. I've always done that. But, I mean, the further I got -- the more I tried to stay out of it, the worse I was in it. I mean, I can't see doing, you know, no 10, 15, 20 years fed time for trying to -- for feeling sorry for somebody else and lying for somebody else. I ain't doing it.

Q. What do you mean by that, doing 10, 15, 20 years for feeling sorry for somebody?

A. I mean I lied on the -- in front of the grand jury because I felt like, you know, I ain't no rat and I ain't

going to get up there and just tell on somebody. Next thing I know, you're getting charged for escape. You're getting charged for perjury. You're getting charged for aiding and abetting or -- yeah, aiding and abetting the escape and conspiracy to commit murder. Come on. I ain't trying to kill nothing. I ain't trying to -- you know, I already got 15 years state time. You know, I couldn't see getting another 10, 20 years fed time.

Q. Now, you were never charged with any of that stuff. You're saying you were -- you're not saying you were charged with that.

A. No.

Q. You were concerned about that?

A. Yes.

Q. And how did you end up having contact with the government about this?

A. I talked -- after I left the grand jury, I talked to one of -- I believe Mark.

Q. You called up the DEA; is that right?

A. Terry Davenport called up the DEA and said -- had his sister say that we wanted to talk to them.

Q. Then you eventually talked to the DEA?

A. Yes.

Q. And eventually had a plea agreement set up; right?

A. Yeah.

Q. And with respect to your perjury, what's your understanding of how that factors into your plea agreement?

A. For perjuring myself I get some points added on. I really don't understand it. I know I don't get charged for perjury, but I still get time for perjuring myself whether I get charged for it or not.

Q. Points added on, you mean under the federal guidelines?

A. Yeah.

MR. COLLOTON: That's all I have for this witness, Judge.

THE COURT: Thank you, Mr. Colloton.

Mr. Parrish?

CROSS-EXAMINATION

BY MR. PARRISH:

Q. Mr. Putzier --

A. Yes, sir.

Q. -- are you from Iowa, or are you from Texas?

A. I'm from Iowa.

Q. Were you in Texas for a while?

A. No.

Q. So you never went to Texas with Dean.

A. No.

Q. But you reached a conclusion that Dean was a big liar.

A. He can be.

Q. And you told the grand jury that; is that correct?

A. I told the grand jury that because of the fact that he told on me, you know.

Q. Well --

A. And I was mad at him.

Q. Well, were you telling the grand jury the truth when you said that Dean was a big liar?

A. I don't think there's no totally honest person in this world.

Q. That's not what I asked you. Were you telling the truth to the grand jury --

A. No.

Q. You were lying to the grand jury about Dean Donaldson being a liar.

A. Yeah.

Q. Are you saying Dean Donaldson is an honest human being?

A. Like I said, I don't think there's no honest human being in this world.

Q. That's not what I asked you. You're telling us now in your testimony today that Dean Donaldson is an honest human being.

A. On certain things. I can't say he's completely honest in everything and every day of his life.

Q. But you agree you have been involved in dishonest conduct with him.

A. Yes, I have.

Q. And some of the matters which you told the grand jury about his dishonesty was, in fact, the truth.

A. I didn't understand that.

Q. Some of the matters that you spoke to the grand jury about indicating that Dean Donaldson was dishonest was, in fact, the truth.

A. I don't remember what all I said he was dishonest about.

Q. Well, when you were asked by Mr. Colloton, I'll give you one last chance if you can remember anything about what you heard about where Dean got bonded out and you says, I'm not sure. I really don't know. Then you proceed to tell him, I don't believe Donaldson being bonded out was important to anybody. He was going to do nothing but run down, smoke some crack, sit on a corner, and not have nothing. That's all he's gonna do, steal some pigs. Was that the truth, or was that a lie?

A. Well, I believe it depends on what he had in it what he was going to do for anybody.

Q. Well, I just ask you is that statement there --

A. And I'm sure he probably went out, maybe smoked some crack. I don't know if he sat on a street corner.

Q. And that he was going to steal some pigs which he'd done for about ten years before that; right?

A. He steals pigs, yeah.

Q. That's how he makes his living.

A. Yeah.

Q. That was the truth?

A. That ain't the only -- yeah, that's the truth that he steals pigs.

Q. And when you made that statement to the grand jury in relation to him being bonded out, that was the truth?

A. I'd have to say yes and no. I know he was going to go out and steal pigs, but I also knew he had something else to do, and I was just lying for him.

Q. Who were you lying for?

A. Dustin.

Q. Well, how were you lying for Dustin when you were talking about Dean?

A. Because I was in front of the grand jury for Dustin, not for Dean.

Q. So you were lying to the grand jury about Dustin but actually telling the truth about Dean.

A. Yeah.

Q. So when you were in front of the grand jury, you were telling the truth when you made that statement.

A. That he'd go out and steal hogs, yeah.

Q. Now, were you lying to the grand jury when you told the grand jury that Dean -- strike that question.

Were you telling the truth to the grand jury when you told the grand jury that you told Dustin Honken that Dean

was a snitch?  Was that the truth?

A.  No, I wasn't lying to the grand jury.

Q.  That was the truth also.

A.  Yeah, Dean is a snitch.

Q.  And you did, in fact, tell Dustin that he was a snitch.

A.  Yes, I did.

Q.  And you told him he was a snitch before he was released.

A.  No.

Q.  You're saying you did not?

A.  I did not tell Dustin he was a snitch before he was released.  I never talked to Dustin until after Donaldson was released.

Q.  And that's when you told him that.

A.  Yeah.

Q.  And how long after that did you tell him?

A.  I can't be for sure.  You know, he started writing me letters.  Probably a week or two maybe, maybe more.  I'm not sure.

Q.  Did you tell him anything about Mr. Hershaw?

A.  Mr. Hershaw?

Q.  Yes.

A.  Who's Mr. Hershaw?

Q.  Well, why don't you tell me who Mr. Hershaw is.  Do you know who he is?

A.  Not for sure.  Can you --

Q. In relation to Dean Donaldson being bonded out, do you know anything about Mr. Hershaw?

A. Oh, he's -- Mr. Hershaw bonded me out.

Q. And how did Mr. Hershaw bond you out?

A. Richard Hershaw? Is this the one, same one?

Q. Yes.

A. Yes, he bonded -- he put two cars up for me.

Q. And what is his relationship to Mr. Dean?

A. Nothing.

Q. I mean not Mr. Dean but Mr. Donaldson.

A. Nothing. Hershaw and --

Q. Didn't Mr. Donaldson try to get Mr. Hershaw to bond him out also?

A. I'm not sure. I wasn't there. I couldn't -- you know, can't answer that.

Q. You were out.

A. Yeah.

Q. And while Mr. Donaldson was still in.

A. Yeah.

Q. And you and Mr. Donaldson were good friends.

A. No, we ain't good friends. I cannot say that.

Q. Well, he's kind of messed over you a little bit and snitched on you, so you're no longer friends; right?

A. Yeah, and that was from the whole time we was in jail, so that started a long time ago.

Q. Well, what I mean, though, is that part of the reason you're in jail is because Dean set you up to do these hogs with him and then turned on you and confessed to everything; isn't that right? That's part of the reason --

A. Nobody forced me to do nothing. If I want to do something, I'm going to do it.

Q. Well, but he told on you after you did it.

A. Yeah, he told on me after he got caught for doing it.

Q. Right. So you had a dislike at that point for Dean Donaldson.

A. Yeah, you could say that.

Q. All right. But when you went in and you got into this mess that landed you at the Woodbury County Jail, you then used Hershaw to bond out, so wouldn't it be natural to think that Dean Donaldson would also have tried to contact Mr. Hershaw to get out also?

A. No. How could that be, you know? I wouldn't know that.

Q. You wouldn't know it.

A. No. I wasn't in the jail.

Q. But it's possible?

A. It could be possible because the dude was, like, kind of easy. You know what I'm saying? I just talked him into bonding me out. I tricked -- I told him a lie so he could bond me out.

Q. Well, okay. So you lied to the bondsman. You also lied

to the grand jury.

A. I didn't lie to the bondsman. I lied to Hershaw.

Q. Well, to put up the car, your friend.

A. He ain't my friend. I didn't know the dude. He molested a kid.

Q. Okay. But he bonded you out.

A. Yeah.

Q. And what did you lie to him about?

A. About going to kidnap his daughter, going to, you know, set his other daughter up for drugs so he could get out of his case, see.

Q. Oh. You lied for him to benefit him.

A. I didn't lie for nobody. I lied to him to benefit me.

Q. And how did you benefit yourself by lying to him?

A. I had him bond me out. Then I went out there and told his wife, you know, Here, this is what the dude wants you to do -- wants me to do. I wasn't going to get that little girl hurt for nothing. You know, he had already molested her for years, her and the other kid.

Q. I see what you're saying. So Hershaw then helped you bond out so you could go out and get some information -- some things done for him.

A. Yeah.

Q. Is that right?

A. Uh-huh.

Q. Okay. So then you don't know whether or not Donaldson went to Hershaw to try to get him to bail him out too?

A. Yeah, I don't know nothing about that because I was out. But they also contacted me, tried to offer me immunity to everything to testify against this Hershaw, and I wouldn't do it.

Q. So why didn't you take immunity to testify against Hershaw since he had done such bad things?

A. Because that's not me, you know. I already felt like I, you know, got him.

Q. How did you get him?

A. Sold everything he had on the outside.

Q. And you didn't take immunity; is that right?

A. That's exactly right.

Q. But in this case because they were going to file these additional charges against you, escape, perjury, aiding and abetting a felon -- a federal felony prisoner, conspiracy to commit murder, you decided that you would testify.

A. Yeah, because I had nothing to -- you know, all I did was feel sorry for this dude, try to not let him lose his house and not have Dean give him a life sentence. I ain't going to do no time. I mean, I ain't -- I'm not doing no time for somebody, you know. I could see getting some state charges for trying to break out of this jail, for attempted escape. I can't see doing no 5, 10, 15 years federal time

for just trying to be somebody's friend, you know, and don't want to do nothing for you unless you're in some kind of jam, write you a letter, hey, I've been thinking about you. Yeah, my ass you been thinking about me.

Q. So tell me how Dean was going to get him a life sentence.

A. Huh?

Q. How was Dean Donaldson going to get him a life sentence?

A. I ain't talking about Dean Donaldson getting a life sentence. I'm talking about Dustin Honken getting a life sentence.

Q. Well, how was Dean Donaldson going to get Dustin Honken a life sentence?

A. Tell on him about Dustin trying to get him to hire somebody to kill some Tim for him, tell on him because he wrote him a map to this Tim's house, you know. That's why I went in front of that grand jury and did what I could at that time.

Q. Well, did you ever see a map that Dustin wrote for him?

A. No, I haven't.

Q. So how do you know he wrote a map?

A. Because Dustin told me, I gave him -- the only thing that I'm worried about is I gave him a map that I put in my handwriting.

Q. Well, have you heard what Dean Donaldson had to say

about the map?

A. No.

Q. So you're saying that Dean -- that Dustin told you that he wrote it out in his own handwriting?

A. He gave him some paperworks -- like I said, it's been a year ago. It could have been a map that he gave him in his own handwriting or another piece of paper in that papers, but there was something in there in his own handwriting.

Q. So when you said that Dustin gave him a map in his own handwriting, that could be a mistake.

A. Maybe the map or the piece of paper. Something in that paper, but I believe to the best of my knowledge that it was a map, and I know when Dustin asked me about my brother, if my brother LaDean would kill the dude for him, I knew he was serious.

Q. And tell me why you knew he was serious.

A. Just by the way he talked. I mean, I knew he wanted it done. And then he said, Hey, I took care of them in '93, you know.

Q. Is that what he said?

A. Yeah.

Q. And he told you, a perfect stranger, that that's what he did in '93?

A. He sure did. That's why this perfect stranger's sitting right here.

Q. Why is that?

A. Because I talked to that dude and he talked to everybody else in the whole God damn jail.

Q. And he told them all the same thing?

A. I'm sure he told them -- I don't know about the same thing, but he sure told them enough.

Q. And everybody thought he was serious.

A. What would you think?

Q. I'm asking you.

A. That's all I got --

Q. Based upon what you observed, everyone thought he was serious.

A. I'm sure they did.

Q. Based upon what?

A. Based upon the evidence of his last case; based upon the people that had disappeared; based upon bonded some stranger out he does not know; based upon, you know, saying, Yeah, you go out there and get rid of him, I'll give you, you know, this much money, this here.

Q. How much money did he give someone?

A. He didn't give nobody nothing. He just offered me something.

Q. How much did he offer you?

A. Like $10,000.

Q. And where was he supposed --

A.   And some drugs.

Q.   I'm sorry.  Where was he supposed to get the $10,000 from?

A.   He would take care of it when I got out there.

Q.   And did he ever offer to bond you out?

A.   I think we talked about it.  But my bond was so high, there wasn't no bond to me.

Q.   How much was your bond?

A.   It was over 100,000.

Q.   When you were in when you used the cars to get out?

A.   No, that's after I got -- they rearrested me.

Q.   But you never discussed getting out beforehand; is that right?

A.   I never knew him beforehand.

Q.   So if I understand you correctly now -- correct me if I'm wrong -- Dustin was talking with everyone around.  He was telling everyone all of this information; is that correct?

A.   All I can go on --

Q.   Wait.

A.   -- is I'm sitting up in a cell with ten people, and they're all talking about what Dustin told them what they did, you know.  That's all I can base that on is at least 10 up there, and there's 20 more somewhere else.

Q.   Who say the same thing.

A.   That say -- I don't know about the same thing but say a

lot of different things.

Q. The point I want to make and the question I want to ask you, if you thought he was serious, other than his conversation, what else do you have to base it on?

A. Just his last case where they all disappeared and him trying to have Angie come and get me and asking me to do it.

Q. You never talked to Angie.

A. What do you mean I never talked to Angie?

Q. Did you ever talk with Angie?

A. Uh-huh.

Q. When?

A. On the phone when I went to Cedar Rapids.

Q. And what did you say to her?

A. I don't remember. It's been a while back.

Q. Did you say anything --

A. We was talking about -- she said Tim's there and the one that told on him, all this shit. She's going to send me some money down there and I'll help you get this. I'm sorry you got in all this mess, woo, woo, woo. They ain't sent me shit. Only thing they ever sent me was DEA agent and a --

Q. Well, let me ask you -- I'm kind of confused. What mess did he get you in? I thought you were the one trying to escape.

A. It went from me escaping to him wanting to go with me; okay? The mess would have been me getting state time.

That's nothing. But when it turns into federal time, that's a lot. That's a mess.

Q. You're a little upset about that, I take it; right?

A. Yeah, yeah, I'm a little upset about that.

Q. So now if I understand you correctly, Dustin indicated prior to the time that you were going to escape that there was no way he could escape?

A. He said yeah, he could. That's why he's trying to go through the wall.

Q. I thought you answered Mr. Colloton that he decided beforehand that there was no way he could do it.

A. At which time? If I said that --

Q. When he was asking you on direct --

A. Because we couldn't get through the wall, see, but then we tried to jimmy the door. But then the hacksaw, the sledge hammer, and the chisel come into play. That was going to get him through the wall.

Q. But I thought that never got up there.

A. None of that got up there because I got moved.

Q. And how do you know any plans were made to get that there?

A. Because he told me, you know, I just talked to Angie.

Q. So other than his talking to you, you're saying you have nothing else independent of that to substantiate any of the statements he's made.

A.    Yes, sir.

Q.    Is that true?

A.    Yes, sir.

Q.    All right.  And as far as you know, other than what Dustin said or what other people said to you that Dustin said, you have nothing else independent of that to support that statement?

A.    Which statement we talking about now?

Q.    All of the statements.

A.    What do you mean all these statements?  He sat there and talked to me.  I don't know what you're trying to throw all these into one for when it's not one.  It's several different statements at several different times.

Q.    All right.  Well, name anything independent other than Dustin's word that you have to support anything that he said.

A.    As in --

Q.    Other than his conversation to you.

A.    As in talking to Kathy on the phone three-way and Phil wiring her money for him bonding Dean out, you know.  What else?

Q.    Yeah.  Other than that.

       MR. COLLOTON:  I object to this as a compound question.  I think that Mr. Parrish ought to ask a specific question on a specific statement.

       THE COURT:  Overruled.

BY MR. PARRISH:

Q. Anything else you can think of?

A. Just about the map that he sent with Dean and all the paperwork, okay, about Angie taking me out to the dude's house that lived on a farm with his parents, you know.

Q. That never happened, did it?

A. No, that didn't happen.

Q. I'm talking about other than his --

A. But how would I know that he lived out on a farm with his parents if that didn't, you know --

Q. Well, the question I'm asking you --

A. The question you're asking me, you're trying to get me all tangled up in a bunch of shit that I'm already in like he got me in.

THE COURT: Well, just a second. Mr. Parrish is going to ask you the question. You try and listen to his question, and you do the best job of trying to answer his question, not ask him another question; okay?

THE WITNESS: Yes, sir.

THE COURT: I know this is stressful for you.

BY MR. PARRISH:

Q. Other than Mr. Honken's conversation with you, do you have anything else that indicates to you that what Mr. Honken was telling you was, in fact, the truth?

A. Besides what I've said, no.

Q.    So you would agree then that it was basically his demeanor and how he conversed with you that led you to believe that what he said was truthful.

A.    Yeah.

Q.    Would you agree with that?  Is it the fact that he appears to be a very intelligent human being?

A.    He don't appear to be intelligent to me.  Maybe to you.

Q.    You said he appears to be what?

A.    I said he doesn't appear to be that intelligent to me. He may to you, not to me.  That must be yours.

Q.    Okay.  Is it a fact that he does not have much time for small talk?  Does that make you think that what he says is truthful?

A.    I don't understand the small talk.  He talked to me 24 hours a day every day about nothing.

Q.    Is it the fact that -- oh, you said about nothing?  So he engaged in a lot of small talk with you?

A.    No.  You just said that.

Q.    Did he --

A.    I said about nothing.  You said small talk.  See, at first it wasn't small talk.  Now it is.  Which is it?

Q.    Well, did he engage in a lot of small talk with you?

A.    Yeah, some, and some in some other talk.  You know what I'm saying?

Q.    Well, what was it about his conversation that led you to

believe that what he said was, in fact, truthful?

MR. COLLOTON: Objection. Asked and answered.

THE COURT: Overruled.

A. On which -- what are you talking about now?

Q. Well, you said you believed him, and I asked you -- I gave you the follow-up question on that. Now my question is what was it about the conversation that he had with you that led you to believe --

A. That I believed --

Q. Yes, to believe him.

A. When I read through some of his papers where he got busted the first time in '93 and that the witnesses had disappeared, that led me to believe that he did kill them, like I said; okay? And it also led me to believe that he'd go to any length, you know, to get somebody, to get rid of this person like he was talking to get him out of this charge.

Q. Well, didn't you tell the grand jury that you would not believe that Mr. Honken would harm anyone?

A. Yes, I did, but the reason I did that was like I said --

Q. No.

A. I can't answer this now?

Q. You can answer whatever you want to.

A. The reason I said that was because they had me there in front of them. I did not want to be there. I was not happy

about being there. And I told him I'd be there for him all the way through this.

Q. Well, let me ask you this question: Did you, in fact, tell the grand jury when you were under oath there that you did not believe he had harmed anyone?

A. Yes, I did, but I also perjured myself.

Q. Was that -- so you're now admitting that you committed perjury.

A. Yeah.

Q. And you committed perjury to the grand jury on several occasions.

A. Yep.

Q. So why do you think we should believe you now if you lied when you had taken an oath to tell the truth before the grand jury?

A. That's gotta be up to you. You can believe me if you want to.

Q. The only thing different is that now you're saying that you're telling the truth to avoid additional charges being placed against you; isn't that true? That's the only thing that's different.

A. Oh, I don't know if that's the only thing that's different, but it's because I talked to this dude I got the charges. You know what I'm saying? The reason I'm in here right now today is because I tried to talk to Dustin.

Q. So you're saying the only thing that is different now about the oath you took when you said you would tell the truth before is that they filed additional charges with you and you're now blaming Dustin for putting you in that position. Other than that, that's the only two things that are different.

A. I'm blaming myself for getting in that position, but I wouldn't have been in that position if I wouldn't have had to listen to him every day.

Q. Are those the only two things that are different then; is that right?

A. Yes.

MR. PARRISH: All right. I have nothing further.

THE COURT: Mr. Colloton?

REDIRECT EXAMINATION

BY MR. COLLOTON:

Q. Let me just clear up one thing about additional charges, Mr. Putzier. The government never came to you -- well, the government didn't come to you in the first instance and say, We're going to charge you with escape, perjury, and conspiracy to murder a witness, did it?

A. No.

Q. In fact, you contacted the government or through Terry Davenport?

A. Yeah, Terry Davenport contacted them.

Q. Because you were concerned based on what you've been involved with that somebody might try to charge you with those things; is that right?

A. Yes.

Q. And that's how your series of interviews or your interview got set up.

A. Yes.

MR. COLLOTON: That's all I have.

THE COURT: Just for my information, is he represented by -- is it pre-indictment?

MR. COLLOTON: Yes, he's represented by a court-appointed counsel.

THE COURT: Has he been indicted yet?

MR. COLLOTON: No. The -- no, there's a pre-indictment agreement and a waiver of indictment and a draft information, and it's not been put on file yet.

THE COURT: Okay. Mr. Parrish, did you have any additional questions?

MR. PARRISH: No, Your Honor.

THE COURT: And you had nothing further, Mr. Colloton?

MR. COLLOTON: That's all I have.

THE COURT: Thank you. You're excused, Mr. Putzier.

MR. REINERT: Well, Your Honor, we were close to our attempted timeliness.

THE COURT: Very close. I'm going to continue the matter now until -- I believe it's February --

MR. PARRISH: 17.

THE COURT: -- 17.

MR. PARRISH: And it looks like we're going to go three days. I think we said we could start on the 16th.

THE COURT: Are we going to go three days?

MR. PARRISH: I don't think so. We're going to have my witnesses lined up.

THE COURT: We still have how many more government witnesses?

MR. COLLOTON: Some of these have dropped, Judge.

THE COURT: Oh, okay.

MR. COLLOTON: I think that -- and also as to the agents, I think I mentioned this morning we're going to see if we can't get some kind of stipulation at least as to summary matters or matters that --

MR. PARRISH: I think we can do that.

MR. COLLOTON: So --

THE COURT: I still think you have nine or ten witnesses. You have ten witnesses I think.

MR. COLLOTON: Well, we had the lab gentleman.

THE COURT: Well, without the experts. Who's your expert? What's his name?

MR. REINERT: John Meyers.

MR. COLLOTON: Number 5 on the list. We have Mr. Skadburg who should be very short.

MR. REINERT: And may even be by stipulation.

MR. COLLOTON: Right.

MR. PARRISH: What I'd like to see us do, Your Honor -- and I don't know if the next time we could call our drug people first because mine is coming from Chicago. I don't know whether your guy's coming from Chicago -- get them on. I think that may knock down a lot of the heavy stuff and then save the other people until afterwards because I think a lot of the other people we might be able to do by stipulation.

THE COURT: Is your expert going to want to sit in and hear their expert?

MR. PARRISH: Right, and I think we worked out some arrangement on that already.

THE COURT: Whatever you work out is going to be fine with me. Maybe we should start at 9 a.m. or whenever you want to start with your expert. Then we'll try and get the experts out of the way. And then you can call the non-expert witnesses.

MR. REINERT: And we anticipate at this point having our expert, Mr. Meyers, testify. Their expert would be present during court. And then when their expert testifies, we would have either Mr. Meyers or another chemist. And

whether we'd have to call that person or not, I don't know, but at least we'd have a number of experts around or people experienced in chemistry to lead us through the process.

THE COURT: Now, I hate to burden the parties, but, you know, there are a lot of issues in here. So did you envision like as soon as you're done with the evidence -- I mean, somebody was talking about filing briefs but they wanted to wait till the evidence was in. I think that was your statement, Mr. Colloton. Do you want me to then just start boom, boom, boom deciding everything? Or are we going to have arguments? Are we going to do all this in two days?

MR. COLLOTON: If the Court -- well, I guess the Court's going to have to make some decisions here. If it would be helpful for the Court to have time after that to make the decisions with briefing after the evidence, that'd be acceptable to us I'm sure. If you'd like a brief between now and the next hearing based on the evidence that's come in and on at least what we expect the evidence to be so the Court would be able to make rulings at that time, we'd be happy to do that as well.

THE COURT: What do you think?

MR. COLLOTON: I think -- I think we could probably submit a good brief before the next hearing but -- and then if there are differences in the evidence or nuances in the evidence take them up at oral argument which might alter or

move somewhat from what the briefs were. But I think we all have a pretty good idea of what the experts are going to say or at least what our position's going to be on that and as to the other issues.

THE COURT: Mr. Parrish?

MR. PARRISH: I'm not so sure because on the obstruction, I think the Court -- you know, you guys have the burden on that, and you haven't heard our evidence on the obstruction issue yet, and I think the legal issue about whether or not it's applicable to the other thing, we could perhaps work that out. But I can't see how we're going to use any factual basis to work up the obstruction issue prior to the time the Court hears all the evidence.

My thought would be perhaps we get it in, then file our briefs then because I think my expert's going to want the historical testimony on the drugs that came from Mr. Cutkomp.

MR. REINERT: Well --

MR. PARRISH: And your guys might want it also.

MR. REINERT: I think on the first issue on the brief on the obstruction, I think we could probably -- I'm not sure how much you've talked to your people. You probably anticipate Y, and we anticipate the facts our witnesses would say would be X. We've seen what the government witnesses are, do the legal argument. So I think we could probably still put a brief in on all of the issues between now and

then.

THE COURT: Let me ask you, what's the legal question on obstruction?

MR. COLLOTON: I don't know. Mr. Parrish raised one with us earlier in the day.

MR. PARRISH: Well, is it applicable in his instance, the escape charges, part of an obstruction that takes away his acceptance of responsibility under the way the -- each party has outlined it. I think probation is saying that -- and I think also the government is saying that the obstruction takes away his acceptance, his three levels on acceptance.

THE COURT: Well, yeah.

MR. PARRISH: Because of the so-called attempted escape.

THE COURT: Okay.

MR. PARRISH: I think that's what --

MR. REINERT: But, of course, we're asserting more than one obstructive ground as well.

THE COURT: Yes. I understand that.

MR. COLLOTON: I guess I thought maybe Mr. Parrish had a legal argument that if obstructive conduct is found but it's all before the guilty plea then there cannot -- then the application note that says you cannot get acceptance if you get obstruction --

THE COURT: Doesn't say that.

MR. COLLOTON: Except in extraordinary cases.

THE COURT: Right.

MR. COLLOTON: Doesn't apply. Now, if that's a legal argument, then that's something we could --

THE COURT: Some circuits have held that.

MR. COLLOTON: We'll have to study that and see if --

THE COURT: I've already studied it. But you guys --

MR. REINERT: But on the issue of -- the second issue raised by Mr. Parrish on Mr. Cutkomp's testimony, I think that would be a good thing for both experts to review. It's certainly something that we can talk about, and I'm sure we can get transcripts ordered of that. I would presume if we're ordering one witness's testimony it won't take too long to get.

THE COURT: You have two months.

MR. REINERT: So I'm sure we can get that well in time to have the experts look at it and review.

MR. PARRISH: Does the Court have a suggestion as to how we could handle this?

THE COURT: Well, right now the only evidence in the record on this obstruction and acceptance issue, I think the only evidence in the record that there's any obstruction

after the guilty plea is Government's Exhibit 32 and perhaps Government Exhibits 38 and 39 that I'm aware of in the record that I've heard. Now, maybe there's more. I don't know. But that is an important point for my determination because I'm inclined as I read the case law -- I haven't made any final decisions yet, but if I were to find that there was no obstruction after the guilty plea, my inclination would be that this would be an extraordinary case that would allow for obstruction should I find that and for acceptance of responsibility.

So that's going to be an important question, whether there was an obstruction -- whether there was evidence of obstruction of justice after the date of the guilty plea. At least that's an important question in my mind, and it's an important question as I read the case law from the circuits on the question of what's an exception case and when is it that -- the rare case that you can get both. But --

MR. REINERT: And, Your Honor, for completion of the record purposes, we do have one more witness that would provide some information about post-plea obstructive conduct. We just didn't get to him today.

THE COURT: Get to him today. Sure. And I realize all the evidence isn't in. I think what I probably want to do is hear all of the evidence and then set a briefing schedule, have the briefing and argument on it, and then I'll

decide all the issues and impose the sentence. So I guess that means there will be a third day beyond what we scheduled in February to complete the sentencing.

MR. PARRISH: Your Honor, let me suggest this. I don't know -- and a lot of this evidence we could narrow I think. Maybe the government and I should get a summary of our witnesses, exchange just a paragraph or a page summary, and see if we could stipulate to a lot of the facts that are remaining except for the chemical -- the chemists. I think we could perhaps do that. I think the chemists are going to take all day, but I think we could perhaps do that with a lot of the evidence here.

THE COURT: Well, here's what I think I'm going to do. I'm not going to -- I mean, I don't hear anybody saying really they want to file briefs, or do you?

MR. PARRISH: I think we do.

MR. COLLOTON: Yes, I think we should.

MR. REINERT: Your Honor, in my experience especially on --

MR. PARRISH: I'm not begging to file it, Your Honor.

MR. REINERT: Especially on the lab issue, that can be a cumbersome legal issue on determining --

THE COURT: You could file that before the February hearing.

MR. REINERT: Certainly. In fact, we've got a brief about three quarters of the way drafted that covers all of the issues, that we would be able to file a brief before that --

THE COURT: When can you file the brief?

MR. REINERT: Pardon me?

THE COURT: Well, when can you file this brief that covers all the issues?

MR. REINERT: We should be able to have that put together in the next couple weeks I would think.

THE COURT: If it's three quarters done, I would think so.

MR. REINERT: There's always more research to do, and it's never quite good enough.

THE COURT: You got that right. That's been my experience anyway.

MR. REINERT: So, you know, we wanted to get this so the brief will be helpful to the Court, so we do have it basically in rough form getting there toward being done. So we could certainly get that filed before the February hearing. But if the Court wants --

MR. PARRISH: Is it January or February?

MR. REINERT: February.

THE COURT: February 16 because your expert needed -- your expert needed more time.

MR. PARRISH: Yeah, two weeks.

MR. COLLOTON: Would it be helpful to the Court if they came in the 1st of February? Would that be enough time to consider them before the hearing?

THE COURT: Why don't you file your brief by January -- can you file it by Friday, January 9? I mean, I realize there's some holidays in here, but, you know, if it's three quarters done --

MR. COLLOTON: If that -- sure.

THE COURT: Well, is that too burdensome? If it's too burdensome, tell me.

MR. REINERT: We should be able to get it in by then I would think, Your Honor. If we run into a snag --

THE COURT: Then I'll extend the time.

MR. REINERT: -- we'll contact the Court.

THE COURT: Yeah. And I'm always liberal on extending time for filing briefs.

MR. COLLOTON: I would think by mid January for sure, but we'll shoot for the 9th.

THE COURT: Well, here's what we'll do. You file your brief by the 16th. How's that? That's a Friday. And Mr. Parrish can have until February 9 in which to file any reply brief and --

MR. PARRISH: That's fine.

THE COURT: -- any other issues that you want to

brief that the government didn't brief in their brief, and then I'll just try and decide it at the end of the evidence so we won't have a third episode of this sentencing.

MR. REINERT: Sounds great, Judge.

THE COURT: Because I'm not sure there are all that many difficult legal issues. I think it's mostly factual issues in this case.

MR. PARRISH: I agree. I think the factual issue particularly on the scientific stuff.

THE COURT: You're the legal whiz, Mr. Colloton. What are the tough legal issues in this case?

MR. COLLOTON: Well, I'm embarrassed to say I'm not up on those cases about obstruction and acceptance, but we'll study those.

THE COURT: That's okay because I feel I'm very up on it.

MR. COLLOTON: May we still submit something on that?

THE COURT: Of course you can. Sure. That's obviously a big issue, so I took a close look at it even though the parties chose not to file briefs at all which kind of surprised me. You know, it's my job to try and get it right whether I get help from the parties or not. So we'll see you all on the 16th -- or I guess the 17th.

MR. PARRISH: 17th.

THE COURT: 17th.

MR. PARRISH: Thank you, Judge.

THE COURT: We'll be in recess.

(The foregoing sentencing was adjourned at 6:16 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____        1·12·98
Shelly Semmler, CSR, RMR          Date

# I N D E X

### TIMOTHY CUTKOMP

CONTINUED DIRECT EXAMINATION
BY MR. COLLOTON........................................ 263:9
CROSS-EXAMINATION
BY MR. PARRISH........................................ 282:9
REDIRECT EXAMINATION
BY MR. COLLOTON........................................ 375:20
RECROSS-EXAMINATION
BY MR. PARRISH........................................ 381:19
FURTHER REDIRECT EXAMINATION
BY MR. COLLOTON........................................ 388:7

### DEAN DONALDSON

DIRECT EXAMINATION
BY MR. COLLOTON........................................ 389:25
CROSS-EXAMINATION
BY MR. PARRISH........................................ 434:24
REDIRECT EXAMINATION
BY MR. COLLOTON........................................ 471:1
RECROSS-EXAMINATION
BY MR. PARRISH........................................ 472:11
FURTHER REDIRECT EXAMINATION
BY MR. COLLOTON........................................ 473:18
FURTHER RECROSS-EXAMINATION
BY MR. PARRISH........................................ 474:14

### KATHY RICK

DIRECT EXAMINATION
BY MR. REINERT........................................ 475:5
CROSS-EXAMINATION
BY MR. PARRISH........................................ 476:24

### WILLIAM DEAN

DIRECT EXAMINATION
BY MR. REINERT........................................ 478:7
CROSS-EXAMINATION
BY MR. PARRISH........................................ 486:17

### TERRY BREGAR

DIRECT EXAMINATION
BY MR. COLLOTON........................................ 499:16
CROSS-EXAMINATION
BY MR. PARRISH........................................ 517:19
REDIRECT EXAMINATION
BY MR. COLLOTON........................................ 527:22

### DANIEL FRYE

DIRECT EXAMINATION
BY MR. REINERT........................................ 531:5

624

JAMES BROWNLEE
DIRECT EXAMINATION
BY MR. REINERT.......................................... 535:25
CROSS-EXAMINATION
BY MR. PARRISH......................................... 539:12
REDIRECT EXAMINATION
BY MR. REINERT.......................................... 540:4
RECROSS-EXAMINATION
BY MR. PARRISH......................................... 540:12

JAMES DERRICK
DIRECT EXAMINATION
BY MR. REINERT......................................... 541:17
CROSS-EXAMINATION
BY MR. PARRISH......................................... 546:16

DAVID LEAVITT
DIRECT EXAMINATION
BY MR. COLLOTON........................................ 550:5
CROSS-EXAMINATION
BY MR. PARRISH......................................... 554:18
REDIRECT EXAMINATION
BY MR. COLLOTON........................................ 559:15
RECROSS-EXAMINATION
BY MR. PARRISH......................................... 560:7

DEREK BOGGS
DIRECT EXAMINATION
BY MR. REINERT......................................... 561:6

DENNIS PUTZIER
DIRECT EXAMINATION
BY MR. COLLOTON........................................ 564:10
CROSS-EXAMINATION
BY MR. PARRISH......................................... 588:13
REDIRECT EXAMINATION
BY MR. COLLOTON........................................ 608:15

(Government Exhibits 38 and 39 were offered.)........ 583:25
(Government Exhibits 38 and 39 were received.) ....... 584:6