IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| DUSTIN LEE HONKEN, | ) | |
| | ) | No. 10-CV-03074-LRR |
| Petitioner/Defendant, | ) | No. 01-CR-3047-MWB |
| | ) | |
| vs. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

## GOVERNMENT'S MEMORANDUM IN OPPOSITION TO PETITIONER'S MOTION UNDER 28 U.S.C. § 2255

Case 3:10-cv-03074-LTS-KEM    Document 22    Filed 07/14/11    Page 1 of 191

## Table of Contents

I.    FACTUAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

    A.    Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

    B.    Drug Enterprise 1992-93. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

    C.    Honken Prosecution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

    D.    Hunt for Nicholson.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

    E.    Petitioner Does Not Go Through With Plea. . . . . . . . . . . . . . . . . .  5

    F.    Continuing Investigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

    G.    Disappearance of DeGeus. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

    H.    Discovery and Destruction of Murder Weapon. . . . . . . . . . . . . . . .  7

    I.    Continuation of Drug Enterprise. . . . . . . . . . . . . . . . . . . . . . . . . . .  7

    J.    Second Honken Prosecution.. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

    K.    Honken's Continued Murder Schemes. . . . . . . . . . . . . . . . . . . . . .  9

    L.    Honken's First Conviction and Sentencing. . . . . . . . . . . . . . . . . .  10

    M.    Murder Investigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

    N.    Johnson's Indictment and Arrest.. . . . . . . . . . . . . . . . . . . . . . . . .  12

    O.    Johnson's Contact With McNeese. . . . . . . . . . . . . . . . . . . . . . . .  12

    P.    Discovery of the Bodies. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

    Q.    Honken's Admissions to Inmates in the Florence Penitentiary. . . . . . . .  13

    R.    Honken's Charges in 2001. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

    S.    Merit's Phase of Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

    T.    Penalty Phase. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

    U.    Verdict.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

Case 3:10-cv-03074-LTS-KEM    Document 22    Filed 07/14/11    Page 2 of 191

V. Post Trial Motions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

W. Sentence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

X. Appeal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

II. STANDARD FOR REVIEWING A CLAIM OF INEFFECTIVE
ASSISTANCE OF COUNSEL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

A. Ineffective Assistance Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

B. Trial Counsel Are Not Held to a Standard of Perfection. . . . . . . . . . . . 21

C. Trial Counsels' Declarations That Decisions Were Not Strategic Is Not
Dispositive. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

III. CLAIM 1 – TRIAL COUNSEL WAS NOT INEFFECTIVE FOR FAILING TO
OBJECT TO ADMISSION OF PETITIONER'S PRIOR JUDGMENTS. . . . . . . 23

A. Factual Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

B. Procedural History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

C. Use of the Evidence of Petitioner's Prior Convictions. . . . . . . . . . . . . . 26

D. Trial Counsels' Performance Was Not Deficient. . . . . . . . . . . . . . . . . . 29

E. Petitioner Has Failed to Demonstrate Prejudice. . . . . . . . . . . . . . . . . . 31

IV. CLAIM 2 – TRIAL COUNSEL WAS NOT INEFFECTIVE FOR FAILING TO
OBJECT ON DOUBLE JEOPARDY GROUNDS TO CHARGES AND
EVIDENCE PURPORTEDLY RELATED TO ISSUES PREVIOUSLY
LITIGATED IN PETITIONER'S 1998 SENTENCING HEARING. . . . . . . . . . . 33

A. Petitioner's 1996 Charges and His 1998 Sentencing Hearing. . . . . . . . 34

B. Trial Counsels' Performance Was Not Deficient. . . . . . . . . . . . . . . . . . 36

C. Petitioner Has Failed to Demonstrate Prejudice. . . . . . . . . . . . . . . . . . 39

V. CLAIM 3 – THE GOVERNMENT DID NOT FAIL TO DISCLOSE
EXCULPATORY EVIDENCE AND PETITIONER'S TRIAL COUNSEL WERE
NOT INEFFECTIVE FOR FAILING TO INVESTIGATE THIS CLAIM. . . . . . . 44

A. Factual Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

| | 1. | Terry Bregar. | 44 |
| | 2. | Dennis Putzier. | 47 |
| | 3. | Anthony Johnson. | 48 |
| B. | | The Government Did Not Fail to Disclose Evidence. | 49 |
| | 1. | Coercive Tactics With Witnesses. | 50 |
| | 2. | Witnesses Testified With the Expectation of Receiving Benefits. | 51 |
| | 3. | Government's Alleged Failure to Disclose Impeachment Evidence. | 52 |
| | 4. | Witnesses Transported Together. | 54 |
| | 5. | Prior Cooperation. | 55 |
| C. | | Trial Counsels' Performance Was Not Deficient. | 56 |
| D. | | Petitioner Has Failed to Demonstrate Prejudice. | 58 |
| VI. | | CLAIM 4 – THE EVIDENCE SUPPORTED THE PETITIONER'S CCE CONVICTION. | 59 |
| A. | | Petitioner Was An Organizer, Manager and Supervisor of the CCE. | 59 |
| B. | | Trial Counsels' Performance Was Not Deficient Regarding Evidence About Jeff Honken's Role. | 63 |
| C. | | Trial Counsels' Performance Was Not Deficient For Failing to Object to the Jury Instruction Regarding Unanimity in a CCE. | 65 |
| D. | | Petitioner Has Failed to Demonstrate Prejudice. | 66 |
| VII. | | CLAIM 5 – MULTIPLICITY. | 67 |
| VIII. | | CLAIM 6 – DRUG QUANTITY VIA HEARSAY. | 69 |
| A. | | Evidence of Drug Quantity At Trial. | 69 |
| B. | | Trial Counsels' Performance Was Not Deficient. | 71 |
| C. | | Petitioner Has Not Demonstrated Prejudice. | 73 |

IX.    CLAIM 7 – TRIAL COUNSEL WERE NOT INEFFECTIVE IN
JURY SELECTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

    A.    Factual Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

    B.    Trial Counsel Were Not Ineffective For Agreeing to Eliminate
Prospective Jurors With Extreme Views About the Death Penalty
as Reflected in Their Answers to Questionnaires. . . . . . . . . . . . . . . . 78

        1.    Trial Counsels' Performance Did Not Fall Below an
Objective Standard of Reasonableness. . . . . . . . . . . . . . . . . 78

        2.    Petitioner Cannot Demonstrate He Was Prejudiced by Trial
Counsels' Alleged Error. . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

    C.    Appellate Counsel Was Not Ineffective for Failing To Appeal
*Witherspoon* Challenges. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

        1.    Juror # 538 Was Properly Struck Because She Would
Have Required A Heightened Burden of Proof.. . . . . . . . . . . . 82

        2.    Juror # 538 Was Properly Struck Because She Would Only
Consider Imposing the Death Penalty if Her Family Were
Victims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

        3.    Juror 813 Was Properly Struck Because She Would Have
Required the Government to Prove its Case by a Standard
Higher Than Beyond a Reasonable Doubt. . . . . . . . . . . . . . . 86

        4.    Petitioner's Appellate Counsel Were Not Ineffective For Failing to
Appeal the District Court's Dismissal of Jurors 538 and 813. . . . 89

        5.    Petitioner Cannot Demonstrate He Was Prejudiced by
Counsels' Failure to Appeal the Court's Dismissal of
Jurors #s 538 and 813. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

X.    CLAIM 8 – UNDER-REPRESENTATION OF MINORITIES IN JURY POOL. . 91

    A.    The Alleged *Duren* Violation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

    B.    The *Duren* Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

    C.    Trial Counsels' Performance Was Not Deficient. . . . . . . . . . . . . . . . . 95

Case 3:10-cv-03074-LTS-KEM   Document 22   Filed 07/14/11   Page 5 of 191

D.      Petitioner Has Failed to Demonstrate Prejudice. . . . . . . . . . . . . . . . . . . 95

XI.      CLAIM 9 – TRIAL COUNSEL WERE NOT INEFFECTIVE IN THEIR PRESENTATION OF MITIGATION EVIDENCE. . . . . . . . . . . . . . . . . . . . 97

     A.      Petitioner's Claim of Mental Health Mitigation Issues. . . . . . . . . . . . . . 98

     B.      Trial Counsels' Performance Was Not Deficient. . . . . . . . . . . . . . . . . 101

     C.      Petitioner Has Failed to Establish Prejudice. . . . . . . . . . . . . . . . . . . . 106

XII.      CLAIM 10 – TRIAL COUNSEL WERE NOT INEFFECTIVE FOR FAILING TO OBJECT TO ALLEGED ERRONEOUS JURY INSTRUCTIONS ON FUTURE DANGEROUSNESS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

     A.      The Jury Instructions.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

     B.      Trial Counsels' Performance Was Not Deficient. . . . . . . . . . . . . . . . . 112

     C.      Petitioner Has Not Shown Prejudice. . . . . . . . . . . . . . . . . . . . . . . . . . 113

XIII.      CLAIM 11 – TRIAL COUNSEL WERE NOT INEFFECTIVE FOR FAILING TO OBJECT TO VICTIM IMPACT EVIDENCE. . . . . . . . . . . . . . . . . . . . . 115

     A.      The Victim Impact Evidence Was Not Improper. . . . . . . . . . . . . . . . . 115

     B.      Trial Counsels' Performance Was Not Deficient. . . . . . . . . . . . . . . . . 121

     C.      Petitioner Has Failed to Establish Prejudice. . . . . . . . . . . . . . . . . . . . 123

XIV.      CLAIM 12 – TRIAL COUNSEL WERE NOT INEFFECTIVE FOR FAILING TO PRESENT PETITIONER'S CO-DEFENDANT IN A MORE NEGATIVE LIGHT, AND THE GOVERNMENT'S ARGUMENT IN THE CO-DEFENDANT'S CASE WAS NOT INCONSISTENT WITH ITS ARGUMENT IN PETITIONER'S CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

     A.      The Government's Case Was Not Inconsistent Between Trials. . . . . . 125

     B.      Trial Counsels' Performance Was Not Deficient. . . . . . . . . . . . . . . . . 132

     C.      Petitioner Has Failed to Establish Prejudice. . . . . . . . . . . . . . . . . . . . 135

XV.      CLAIM 13 – TRIAL COUNSEL WERE NOT INEFFECTIVE FOR STIPULATING TO ADMISSION OF THE MAPS DRAWN BY ANGELA JOHNSON. . . . . . . . 135

Case 3:10-cv-03074-LTS-KEM    Document 22    Filed 07/14/11    Page 6 of 191

A. Trial Counsels' Performance Was Not Deficient. . . . . . . . . . . . . . . . . 136

B. Petitioner Has Failed to Demonstrate Prejudice. . . . . . . . . . . . . . . . . 138

XVI. CLAIM 14 – TRIAL COUNSEL WERE NOT INEFFECTIVE FOR FAILING TO OBJECT TO A WITNESS'S PASSING REFERENCE TO PETITIONER'S INVOLVEMENT IN DISTRIBUTING COCAINE ONE YEAR PRIOR TO THE OFFENSE CONDUCT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139

A. Factual Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140

B. Trial Counsels' Performance Was Not Deficient. . . . . . . . . . . . . . . . . 144

C. Petitioner Has Failed To Demonstrate Prejudice. . . . . . . . . . . . . . . . . 146

XVII. CLAIM 15 – TRIAL COUNSEL WERE NOT INEFFECTIVE FOR FAILING TO OBJECT TO ADMISSION OF EVIDENCE OF PETITIONER'S ATTEMPT TO ESCAPE FROM THE COUNTY JAIL. . . . . . . . . . . . . . . . . . . . . . . . 149

A. The Escape Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150

B. The Evidence Was Admissible as Intrinsic Evidence of the Crimes. . . 151

C. Trial Counsels' Performance Was Not Deficient. . . . . . . . . . . . . . . . . 152

D. Petitioner Has Failed to Demonstrate Prejudice. . . . . . . . . . . . . . . . . 154

XVIII. CLAIM 16 – TRIAL COUNSEL WAS NOT INEFFECTIVE FOR FAILING TO PRESENT EVIDENCE THAT TERRY DeGEUS MURDERED THE FIRST FOUR VICTIMS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 155

A. There Is No Evidence Terry DeGeus Killed Anyone. . . . . . . . . . . . . . 156

B. Trial Counsels' Performance Was Not Deficient. . . . . . . . . . . . . . . . . 158

C. Petitioner Has Not Demonstrated Prejudice. . . . . . . . . . . . . . . . . . . 159

XIX. CLAIM 17 – DISMISSAL OF A JUROR. . . . . . . . . . . . . . . . . . . . . . . 160

A. Trial Counsels' Performance Was Not Deficient. . . . . . . . . . . . . . . . . 161

1. Scope of the Court's Evidentiary Hearing. . . . . . . . . . . . . . . . 161

2. Validity of the Guilty Verdict. . . . . . . . . . . . . . . . . . . . . . . . 163

B.     Petitioner Has Failed to Demonstrate Prejudice. . . . . . . . . . . . . . . . . . 165

XX.    CLAIM 18 – SECURITY MEASURES WERE REASONABLE.. . . . . . . . . . . . 165

       A.     Factual Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167

           1.     Evidence Presented at Hearing Regarding Courtroom Security. 167

           2.     Security Measures in the Courtroom. . . . . . . . . . . . . . . . . . . . . 168

           3.     Security Measures outside the Courtroom. . . . . . . . . . . . . . . . 168

           4.     Petitioner's Alleged Heart Condition.. . . . . . . . . . . . . . . . . . . . 169

       B.     The Law Regarding Adoption Of Security Measures. . . . . . . . . . . . . 169

       C.     Petitioner's Claim is Procedurally Barred. . . . . . . . . . . . . . . . . . . . . 174

       D.     Trial Counsel's Performance Was Not Deficient.. . . . . . . . . . . . . . . . 175

       E.     Petitioner Has Failed to Demonstrate Prejudice. . . . . . . . . . . . . . . . . 177

XXI.   CLAIM 19 – TRIAL COUNSEL WERE NOT INEFFECTIVE FOR FAILING
       TO CHALLENGE THE GOVERNMENT'S FORENSIC EVIDENCE. . . . . . . 178

       A.     The Allegations Regarding The Government's Forensic Evidence. . . . 178

       B.     Trial Counsels' Performance Was Not Deficient.. . . . . . . . . . . . . . . . 180

       C.     Petitioner Has Failed to Demonstrate Prejudice. . . . . . . . . . . . . . . . . 181

XXII.  CLAIM 20 – ALLEGED CUMULATIVE ERROR. . . . . . . . . . . . . . . . . . . . 182

XXIII. CLAIM 21 – MANNER OF EXECUTION. . . . . . . . . . . . . . . . . . . . . . . . . . 183

XXIV. CONCLUSION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 183

On December 13, 2010, Petitioner filed a Motion for Relief Pursuant to 28 U.S.C. § 2255. In his motion Petitioner asserts 21 grounds in which he claims his convictions and death sentences were obtained in violation of his rights under the Fifth, Sixth and Eighth Amendments to the United States Constitution. The vast majority of Petitioner's claims rely on an allegation of ineffective assistance of counsel in an attempt to justify his failure to raise these claims before the trial court and avoid procedural default. Petitioner does not claim actual innocence.

This Court previously granted Petitioner's motion for permission to file an amendment, giving him until June 1, 2011, to file such amendment. Petitioner did not amend his initial motion.

## I.      FACTUAL BACKGROUND

### A.      Introduction

Petitioner was a drug dealer from Britt, Iowa, a small town in northern Iowa near Mason City. Petitioner began selling marijuana and cocaine and eventually taught himself to manufacture methamphetamine. By 1992, Petitioner was shipping pounds of methamphetamine to two Iowa dealers. After police arrested Petitioner in early 1993, based on one of those dealer's cooperation, Petitioner and his girlfriend, Angela Johnson, murdered the cooperator, his girlfriend, and her two young children. Petitioner and Johnson bound and gagged the cooperator and the woman. Petitioner and Johnson took them and the children to some remote woods where Petitioner shot them all. Three months later, Petitioner had Johnson lure Petitioner's only other Iowa dealer to an abandoned farm where Petitioner beat him with a baseball bat and shot him before he turned informant. The authorities discovered the bodies seven years

1

later after Johnson drew a map to their locations in a failed effort to have another inmate claim responsibility for the murders.

B.    Drug Enterprise 1992-93

Beginning about 1992, Petitioner and his best friend, Tim Cutkomp, began manufacturing methamphetamine in Arizona.  (Tr. 74, 289-90, 683-715).  Petitioner's brother, Jeff, financed their operation.  (Tr. 290-98, 685-86).  Cutkomp worked at Petitioner's direction in manufacturing methamphetamine and, on a few trips, delivering methamphetamine to, or collecting drug proceeds from, Petitioner's Iowa dealers.  (Tr. 80, 683-715).  During the course of operations in Arizona, the enterprise produced pounds of methamphetamine and generated more than $100,000 in drug proceeds. (Tr. 51-53, 700-701).

Petitioner distributed methamphetamine to only two dealers, Greg Nicholson and Terry DeGeus.  (Tr. 51-53, 79, 701).  Nicholson and DeGeus had their own drug customers.  (Tr. 43-44, 53).  Among DeGeus's customers was his then-girlfriend, Angela Johnson.  (Tr. 237, 244-46, 299, 447, 711).

In early 1993, during one of Petitioner's trips to Mason City, DeGeus sent Johnson to deliver drug proceeds he owed to Petitioner.  (Tr. 246).  Johnson told Petitioner she wanted to start selling methamphetamine herself without having to go through DeGeus.  (Tr. 711).  That night, Petitioner and Johnson began a romantic relationship, and, within six months, Johnson was pregnant with Petitioner's child.  (Tr. 351, 405-406, 1815).  Petitioner confided in his brother, Jeff, that Johnson had connections to the drug world.  (Tr. 299).

In March 1993, police officers in Minnesota made a controlled buy of

2

methamphetamine from a drug dealer who immediately cooperated and gave up his source, David Patrick, a Mason City resident. (Tr.43-44). Police officers arrested Patrick, who gave up his source – Greg Nicholson – and made a controlled buy from Nicholson. (Tr. 44). A search of Nicholson's house uncovered a large amount of methamphetamine and cash. (Tr. 44-50).

Nicholson, too, decided to cooperate. (Tr. 50-54). He was concerned about his safety, however, fearful Petitioner might harm him. (Tr. 143). On March 21, 1993, officers arranged a recorded meeting between Nicholson and Petitioner during which Nicholson delivered $3,000 to pay for past methamphetamine deliveries. (Tr. 54-57, 61-63). During the meeting, they discussed past and future deliveries of methamphetamine. (Id.). When Petitioner left Nicholson's house, officers arrested Petitioner and Cutkomp, who was waiting in a car. (Tr. 65-66). Officers found the $3,000 and a note in Petitioner's pocket listing drug debts owed him by two people, "G-man" (Greg Nicholson) and "T-man" (Terry DeGeus). (Tr. 66-67, 707).

C.       Honken Prosecution

The State of Iowa charged Petitioner and Cutkomp with drug offenses, though it later dropped Cutkomp's charges. (Tr. 85, 113, 716-722). A federal criminal complaint was then filed against Petitioner, and he was transferred to federal custody. (Tr. 110-111). Petitioner was released on bond pending trial, one condition of which was Petitioner could not have contact with Nicholson, DeGeus, or Cutkomp (among others) or possess firearms. (Tr. 111-13). Petitioner ignored the prohibition and spoke with Cutkomp repeatedly. (Tr. 722, 724-25). Petitioner told Cutkomp he believed Nicholson was the witness against him. (Id.).

3

After Nicholson testified in the grand jury in April 1993, a federal grand jury indicted Petitioner for conspiracy to manufacture methamphetamine, and the state dismissed its charges. (Tr. 72-80, 85-86, 113-14). The indictment was based on Nicholson's cooperation and grand jury testimony. (Tr. 119). On June 22, 1993, Petitioner notified the court he intended to plead guilty. (Tr. 118). A plea hearing was scheduled for July 30, 1993. (Tr. 118, 155).

D.     Hunt for Nicholson

During June and July, Petitioner was looking for Nicholson. (Tr. 209-210). Petitioner and Johnson repeatedly asked Johnson's best friend, Christi Gaubatz, to babysit Johnson's daughter and borrowed Gaubatz's car, telling Gaubatz they were looking for Nicholson. (Tr. 394, 401-403). When Petitioner and Johnson searched for Nicholson, they always came home before 1:30 a.m. (Tr. 426).

For about two weeks after his arrest, Nicholson continued to live with his wife, but he acted paranoid, demanding all the curtains be shut and forbidding his wife and child to go outside during the day. (Tr. 143-44). Nicholson's wife ultimately left Nicholson, and Nicholson then lived various places. (Tr. 143-45). In mid-July 1993, a mutual friend introduced Nicholson to Lori Duncan, a single, working mother. (Tr. 476, 481-82). Nicholson soon began staying with Duncan. (Tr. 484-85). Duncan was raising her two girls, Kandi (age 10) and Amber (age 6). (Tr. 481).

On June 30, 1993, Johnson obtained a permit to purchase a handgun. (Tr. 382-84). On July 7, 1993, Johnson purchased a Tech-9 semi-automatic 9mm assault pistol at a pawn shop in Waterloo, an hour's drive from her home. (Tr. 385-86). On the night of July 24, 1993, Petitioner and Johnson again asked Gaubatz to watch Johnson's

4

daughter and borrowed Gaubatz's car so Petitioner and Johnson could hunt for Nicholson. (Tr. 402, 404). This was the last time they did so. (Tr. 405).

This night, Petitioner and Johnson did not come home until near dawn. (Tr. 404). Gaubatz heard them come in Johnson's house, whisper a moment, and then go into the bathroom. (Tr. 404-405). When Gaubatz heard the shower running, she left and went home. (Tr. 405).

On July 25, 1993, Nicholson, Lori Duncan, and Duncan's two children suddenly disappeared. (Tr. 463, 468, 475, 486-98).

### E. Petitioner Does Not Go Through With Plea

Five days later, on July 30, 1993, Petitioner appeared for his plea hearing but refused to plead guilty. (Tr. 118, 155-56). Petitioner's attorney told the prosecutor the case against Petitioner was not as strong as the government believed. (Tr. 156). Petitioner gave his attorney a videotape showing Nicholson exonerating Petitioner; Petitioner claimed some unknown person dropped it off in his car. (Tr. 156-60, 163-68, 734). Petitioner's attorney never showed the tape to the government and years later returned it to Petitioner; it was never seen again. (Tr. 160-61, 169).

### F. Continuing Investigation

Not until August did the government learn Nicholson disappeared. (Tr. 118-19, 121). While warrants were issued for his arrest, no sign of him was found. (Tr. 122-23). The Duncan family was also discovered missing. (Tr. 463, 468, 475, 486-98). The government continued its drug investigation, now focusing on Petitioner's only other dealer, Terry DeGeus, Johnson's former boyfriend. (Tr. 123-25).

On October 27, 1993, several witnesses were subpoenaed to the federal grand

5

jury, including Johnson's and DeGeus's drug associate, Aaron Ryerson. (Tr. 123-24, 249). Ryerson had obtained methamphetamine from DeGeus and saw a man matching Petitioner's description delivering methamphetamine to DeGeus. (Tr. 241-43). Ryerson also knew DeGeus supplied Johnson with methamphetamine. (Tr. 244-46). Ryerson saw Petitioner in the waiting room with Johnson before she testified in the grand jury. (Tr. 249-250).

The grand jury questioned both Ryerson and Johnson about whether there was a drug association between Petitioner and DeGeus. (Tr. 124, 251). Ryerson invoked his right to remain silent. (Tr. 251). After he appeared before the grand jury, Ryerson told DeGeus he was questioned about Petitioner and DeGeus. (Tr. 287-88). DeGeus called Johnson and reported this to her. (251-52).

Petitioner confided in Cutkomp he was worried about DeGeus testifying against him. (Tr. 736). Petitioner believed DeGeus had also been subpoenaed to appear before the grand jury. (Id.).

G.      Disappearance of DeGeus

Nine days later, on November 5, 1993, DeGeus disappeared. (Tr. 124-25; 521-). The government considered him a potential witness against Petitioner. (Tr. 125). The night of his disappearance, DeGeus told Ryerson he was going to see Johnson. (Tr. 254). DeGeus dropped his daughter off at his mother's house that night, telling his mother and 10-year-old daughter he was going to meet Johnson. (Tr. 521-25, 534, 537). DeGeus said he would return to pick up his daughter later that evening, but he never returned. (Tr. 525, 538). When DeGeus's family and police officers later questioned Johnson about DeGeus, she gave conflicting statements, telling some she

6

never saw DeGeus that night, while admitting to others she saw him but he left on his own after they talked. (Tr. 525-26; 540, 544-45).

H.    Discovery and Destruction of Murder Weapon

Johnson and Gaubatz were such close friends they had keys and free access to each other's apartments. (Tr. 407). While cleaning out a closet in early 1994, Gaubatz discovered a large, black handgun with what she believed to be a silencer in a cosmetic bag. (Tr. 408, 410). Gaubatz testified the firearm resembled a Tech-9 like the one Johnson purchased. (Tr. 408-409, 411). Gaubatz called Johnson to demand she remove the firearm. (Tr. 411). Johnson retrieved the firearm and told Gaubatz not to worry – Petitioner would take care of it. (Tr. 411-12).

In the winter of 1993 - 1994, Petitioner went to Cutkomp with a large black pistol, requesting Cutkomp's assistance in destroying the weapon. (Tr. 739). They used a torch and cut the weapon into several small, unrecognizable pieces and discarded them in ditches along county roads. (Tr. 739-46).

I.    Continuation of Drug Enterprise

Petitioner moved to Mason City in 1993. (Tr. 3097). Cutkomp also returned to Iowa. (Tr. 713). Petitioner continued with methamphetamine manufacturing efforts while the charges were pending. (Tr. 725). Petitioner, Johnson, Cutkomp, and Gaubatz made trips to Arizona to recover methamphetamine manufacturing equipment and purchase chemicals to make methamphetamine and other drugs. (Tr. 305, 399, 726-730, 747). From March 1993 through 1995, Petitioner and Cutkomp, with funding from Johnson, continued experimenting in manufacturing methamphetamine and other drugs at various locations until they ultimately moved operations in late 1995 to a house

7

Petitioner rented in Mason City.  (Tr. 746-48).

In March 1995, the court dismissed Petitioner's 1993 federal drug case for lack of prosecution because Nicholson could not be found.  (Tr. 127).  Once charges were dismissed, Petitioner and Cutkomp again traveled to Arizona for chemicals.  (Tr. 747).

In the fall of 1995, Petitioner recruited Dan Cobeen to assist with methamphetamine manufacturing.  (Tr. 576, 750).  Petitioner told Cobeen about wanting to kill law enforcement officers who investigated his prior drug activity.  (Tr. 581).  Before Cobeen was permitted to assist, Petitioner took him to see Johnson for her approval.  (Tr. 589-90).  Unknown to Petitioner and Johnson, Cobeen had gone to the police and was cooperating.  (Tr. 583-84, 630-31).  There followed an undercover investigation during which Cobeen recorded conversations with Petitioner and Cutkomp and provided up-to-date information to officers about their drug operation.  (Tr. 585-603).  During this period from mid-1995 to February 1996, Petitioner built a complex methamphetamine laboratory and, with help from Cutkomp and Cobeen and funding from Johnson, undertook significant steps toward manufacturing methamphetamine before the police seized the lab.  (Tr. 750-53).

> J.      Second Honken Prosecution

On February 7, 1996, officers executed a search warrant at Petitioner's house. (Tr. 631-32).  Officers seized a methamphetamine laboratory, chemicals, and equipment.  (Tr. 635-45).  They also seized books on manufacturing drugs and silencers and how to bind and gag prisoners.  (Tr. 648-59).  In April 1996, the federal government arrested Petitioner and Cutkomp on drug charges.  (Tr. 659, 661, 758, 2133).  While the court released Cutkomp pending trial, it restricted Petitioner to home

8

confinement, with work release, and subjected him to electronic monitoring.  (Tr. 660-61, 758-59).  In a superseding indictment, Petitioner was charged, inter alia, with conspiracy to manufacture methamphetamine from 1992 through February 7, 1996. (JA 365-66).

Petitioner immediately began to plot the murder of Cobeen and police officers and planned the destruction of evidence.  (Tr. 755-58).  Cutkomp, disturbed by these plans, decided to cooperate with the government.  (Tr. 759-60).  Cutkomp wore a wire and recorded more than eight hours of conversations with Petitioner, during which Petitioner discussed the 1993 drug charges, referenced eliminating witnesses in 1993, and recounted his plans for evading the current charges by killing witnesses and officers.  (Tr. 761-795).

Based on these recordings, the court revoked Petitioner's pretrial release and detained him in the Woodbury County Jail in Sioux City pending trial.  (Tr. 662-63). Before his release was revoked, Petitioner had persuaded a co-worker, Rick Held, to buy Petitioner a handgun, allegedly for his girlfriend.  (Tr. 1063-68).  After his detention, Petitioner had Johnson call Held to let him know Petitioner no longer needed the weapon.  (Tr. 1074-75).

> K.     Honken's Continued Murder Schemes

While incarcerated in the Woodbury County Jail pending trial, Petitioner admitted to other inmates he got out of earlier drug charges by killing witnesses with the aid of Johnson, and gave many details of the murders.  (Tr. 1093-1100, 1251-53, 1292-96, 1312-23, 1392-94, 2027-30).  Petitioner now plotted the murders of more witnesses, with Cobeen and Cutkomp at the top of his list.  (Tr. 1101, 1112, 1313, 1394-95).

9

Petitioner also wanted to murder an Assistant United States Attorney. (Tr. 1102). Petitioner had another girlfriend post her house as collateral to bond fellow inmate Dean Donaldson out of the jail; Petitioner had given Donaldson instructions to kill Cutkomp and directions to his house. (Tr. 1113-19, 1233-40). Petitioner also wanted Donaldson to send threatening letters to Cobeen to scare him from testifying. (Tr. 1119-24). Donaldson was also to hook up with Johnson and continue to manufacture methamphetamine, giving Donaldson manufacturing instructions and directing him to locations when Petitioner had manufacturing equipment stored. (Tr. 1102-12). Although Donaldson was bonded out of jail as planned, he failed to follow through with the plan and was ultimately arrested. (Tr. 1128-32).

When bonding Donaldson out of jail failed, Petitioner arranged to have Johnson bond another inmate, Anthony Altimus, out of jail to carry out the murders. (Tr. 2030-2037). Johnson was to help Altimus find Cutkomp to kill him. (Tr. 2034-36). This plan failed only because Johnson lacked sufficient funds. (Tr. 2037-38). Petitioner also attempted to escape from the jail, having worked with another inmate to break a hole in the wall of a cell, and arranged with Johnson to deliver a hacksaw and rope. (Tr. 1287-92, 1297-1306, 1315-19, 1400-1405, 1429-34). Petitioner intended to kill witnesses and others if he could escape. (Tr. 1395-97). Jailers discovered the hole and prevented the escape. (Tr. 1319-20).

     L.     <u>Honken's First Conviction and Sentencing</u>

On June 2, 1997, Petitioner pled guilty to conspiracy to manufacture methamphetamine. (Tr. 2134). Alfredo Parrish represented Petitioner at the guilty plea and sentencing hearings. The plea colloquy reflected the conspiracy to which Petitioner

10

pled was limited to the manufacturing of methamphetamine. (Tr. 2136). During a multi-day sentencing hearing in 1997 and continuing in 1998, the government presented evidence tying Petitioner to the disappearances of witnesses in 1993 and to the ongoing attempts to obstruct justice during the current charges. (Tr. 2138-39).

During the sentencing hearing Petitioner testified in an attempt to evade sentencing enhancements. (Tr. 2139). Petitioner denied there was ever a videotape of Nicholson exonerating him. (Tr. 2149). Petitioner admitted that, after his arrest in 1996, he made statements to Cutkomp about killing witnesses, but claimed he did not mean it. (Tr. 2155-58).

The court sentenced Petitioner to 293 months in prison. (Tr. 2139; Exhibit 303). The government appealed the sentence, and the Eighth Circuit Court of Appeals reversed the district court. *United States v. Honken*, 184 F.3d 961 (8th Cir. 1999). On remand, the court sentenced Petitioner to 324 months in prison. (Tr. 2139; Exhibit 304).

M.      Murder Investigation

Although in 1993 officers began an investigation into the disappearances of Nicholson, the Duncan family, and DeGeus, it was disjointed. (Tr. 2704-2713). In 1999, officers renewed the investigation. (Tr. 2713-22). In 2000, Gaubatz decided to cooperate. (Tr. 412-413). Gaubatz told the officers how Petitioner and Johnson hunted for Nicholson, used her car for the purpose, and ultimately stopped hunting for him one day in July 1993 when Petitioner and Johnson arrived home near sunrise. (Id.).

Gaubatz also told officers that, in the fall of 1993, she found a large black handgun with a silencer in a closet. (Tr. 408-409). She confronted Johnson about the

gun, believing she likely stored it there.  (Tr. 409-411).  Johnson retrieved the gun and

told Gaubatz not to worry about it as Petitioner would take care of it.  (Tr. 411-12 ).

       N.      Johnson's Indictment and Arrest

A federal grand jury indicted Johnson on July 26, 2000, charging her in relation

to the murders of witnesses.  On July 30, 2000, officers arrested Johnson and took her

to the Benton County Jail.  (Tr. 2319).

Robert McNeese was a federal prisoner serving a life sentence for an unrelated

offense.  (Tr. 2321).  McNeese had been housed in the Benton County Jail since March

2000. (Tr. 2318).

       O.      Johnson's Contact With McNeese

While in the Benton County Jail, Johnson became acquainted with McNeese.

(Tr. 2320).  Johnson and McNeese discussed Johnson's case.  (Tr. 2321).  As a ruse,

McNeese told Johnson that she could escape responsibility for the murders if McNeese

could arrange to have some other inmate who was already serving a life sentence

falsely claim responsibility for murdering the five victims.  (Id.).

McNeese told Johnson that, in order to be able to make the confession

believable, the other inmate would need to be able to furnish proof of his involvement

by leading authorities to the victim's bodies.  (Id.).  Johnson prepared and provided to

McNeese maps describing the location where the bodies of the five victims were buried.

(Id).  McNeese turned the maps over to law enforcement officers.  (Tr. 2334).

       P.      Discovery of the Bodies

Using the maps Johnson drew, officers located the bodies of all the victims.  (Tr.

2334-2374, 2495-2513).  Nicholson and the Duncan family were found buried in a

12

single hole, located in a wooded area outside Mason City. (Tr. 2334-37, 2380-2452). Nicholson and Lori Duncan were found bound and gagged, each shot multiple times including once in the head. (Tr. 2417-18, 2433-34, 2614-2634). Officers found the two young girls in the bottom of the hole; each girl had a single bullet hole in the back of her head. (Tr. 2443-2452, 2634-2640).

Officers found DeGeus's body a few miles away in a farm field behind an abandoned house. (Tr. 2495-2513). He was face-down in a shallow hole. (Id.). He had multiple gunshot wounds, and his skull was fractured into scores of pieces such that a forensic anthropologist was unable to reconstruct his skull. (Tr. 2640-2652).

Q.     Honken's Admissions to Inmates in the Florence Penitentiary

Petitioner was sent to the United States Penitentiary in Florence, Colorado. (Tr. 2191). Petitioner made admissions to a number of fellow prisoners about murdering people in 1993. (Tr. 1476-92, 1652-58, 1802-14, 1922-24, 1927-28). Petitioner also made admissions about plotting to kill witnesses, law enforcement officers, and a prosecutor after he was arrested again in 1996. (Tr. 1492-94).

Petitioner was aware officers continued to investigate his involvement in the murders. (Tr. 1658-59, 1816-17). Petitioner became convinced he would be charged with the murders and began to plot a means of escape and retribution against those he held responsible for his imprisonment. (Tr. 1496, 1792-1801, 1924-25, 1929-36, 2233-37). Petitioner recruited other inmates to help him carry out his plans. (Id.). Petitioner intended to call his associates as character witnesses when he was tried for the murders. (Id.). Once back in Iowa, Petitioner and his associates planned to overpower guards and kill trial participants, including law enforcement officers and an Assistant

13

United States Attorney.  (Id.).  In preparation for carrying out this plan, Petitioner and his associates bribed a prison guard to obtain handcuffs and a "black box" that locks over the chain between handcuffs.  (Id.).  Petitioner and his associates devised a way to defeat the restraints.  (Id.).  Petitioner and his associates also practiced martial arts, including while being shackled.  (Id.).

R.    Honken's Charges in 2001

On August 30, 2001, a grand jury indicted Petitioner, charging him with 17 counts.  (Docket #1).  The charges included murdering witnesses, solicitation of murder, conspiracy to commit murder and other offenses, committing murders while engaged in a drug trafficking conspiracy, and committing murders in furtherance of a CCE.  (Id.). He was brought to trial in August 2004.[1]

S.    Merit's Phase of Trial

During the trial's "merits" phase, the government produced 54 witnesses, introduced more than 300 exhibits, and presented 13 days of trial testimony.  The evidence came from officers, experts, Petitioner's former associates, co-conspirators, and inmates.  Key evidence consisted of testimony of Jeff Honken and Cutkomp that implicated Petitioner in the drug conspiracy, Gaubatz's testimony about Petitioner and Johnson hunting for Nicholson, Petitioner's attempts to escape from custody and kill witnesses and law enforcement officers after his arrest in 1996, the maps Johnson drew leading authorities to the murder victims Petitioner helped kill and bury seven

_____

[1]  At trial, Petitioner was represented by three attorneys: Alfredo Parrish, Des Moines, Iowa; Leon Spies, Iowa City, Iowa; and, Charles Rogers, Kansas City, Missouri.

14

years before, and the multiple admissions Petitioner made to fellow inmates about the murders.

The jury found Petitioner guilty of each of the 17 counts against him. Moreover, the jury found: 1) Petitioner solicited both Dean Donaldson and Anthony Altimus to kill Tim Cutkomp, as alleged in Count 6; 2) each objective of the conspiracy alleged in Count 7; 3) each of the 19 overt acts alleged in Count 7; 4) the maximum drug quantity alleged in Counts 8 through 12, and; 5) each and every one of the 13 drug violations alleged as part of the CCE murder charges in Counts 13 through 17.

T.      Penalty Phase

During the penalty phase of the trial, the government argued Petitioner was eligible for the death penalty because he intended to kill the victims and because there existed at least one statutory aggravating factor for each of the victims.  (Tr. 3904-11). The government alleged the murders showed substantial planning and premeditation, the adult victims suffered substantial abuse, and the child victims were vulnerable.  (Tr. 3905-11).  The government also argued there were multiple non-statutory aggravating factors present.  (Tr. 3912-15).  The penalty phase took place between October 18, 2004, and October 21, 2004.  (Tr. 3450-3933).  The government presented 12 witnesses, Petitioner called 9 witnesses, and the evidence lasted 3 days.

U.      Verdict

On October 27, 2004, the jury returned its penalty verdict, finding Petitioner should be sentenced to death for murdering the children and to life imprisonment for the remaining victims.  (Doc. 547).  The jury found Petitioner intentionally killed all the victims.  (Doc. 547, p. 2).  Regarding statutory aggravating factors, the jury found

15

Petitioner engaged in substantial planning and premeditation with respect to the murder of all but the child victims, the adults suffered torture and serious physical abuse, and the children were vulnerable victims. (Id., p. 3). Regarding non-statutory aggravating factors, the jury found Petitioner posed a future danger, obstructed justice, intentionally killed more than one person in a single episode, and the effects of the murders were injurious upon the victims' families. (Id., p. 4). At least one juror found the existence of 15 mitigating factors. (Id., pp. 5-7). Finally, in response to a special interrogatory provided the jury during the penalty phase, not a single juror indicated he or she had any residual doubt about Petitioner's guilt. (Doc. 513).

> V.     <u>Post Trial Motions</u>

Petitioner filed motions for judgment of acquittal and a new trial. (Doc. 578). Petitioner's trial attorneys claimed, among other things, many of the same claims habeas counsel have recycled and claimed again in Petitioner's § 2255 petition. In his post trial motions, Petitioner's trial counsel claimed:

1)     There was juror misconduct involving Juror 523;

2)     The prosecution violated Petitioner's double jeopardy rights;

3)     Security measures involving shackling Petitioner and making him wear a stun belt violated his rights;

4)     The court erroneously granted the government's motion to strike prospective jurors 538 and 813;

5)     The court erred when it admitted maps drawn by Angela Johnson;

6)     Testimony by Scott Gahn regarding Petitioner's drug distribution activity before 1992 was prejudicial; and,

7)     There was insufficient evidence to show Petitioner occupied a leadership role with regard to his brother, Jeff Honken.

16

The court denied Petitioner's post-trial motions. *United States v. Honken*, 381 F. Supp. 2d 936 (N.D. Iowa 2005).

W.      Sentence

On October 11, 2005, the court sentenced Petitioner to death on counts pertaining to the murder of the children, to life imprisonment for the murders of the adult victims, and to a total of 20 months' imprisonment on the remaining counts. (Doc. 702).

X.      Appeal

Petitioner's trial counsel filed a timely notice of appeal. (Doc. 704). Petitioner's trial counsel were dismissed and the Court appointed Petitioner three new attorneys[2] for his appeal. Appellate counsel raised 11 issues on appeal:

1)      Petitioner's conviction for conspiring to distribute methamphetamine in 1998 created a double jeopardy bar to his prosecution for committing murders in furtherance of a Continuing Criminal Enterprise;

2)      The district court abused its discretion when it admitted into evidence the maps Angela Johnson drew showing the location of the bodies;

3)      The district court abused its discretion when it restrained Petitioner during trial;

4)      The district court abused its discretion when it substituted an alternate juror during the penalty phase of trial;

5)      The district court abused its discretion when it denied Petitioner's motion for a new trial based on alleged juror misconduct involving Juror 523;

6)      The district court abused its discretion when it instructed the jury that it was not required unanimously to find the five persons with respect to whom Petitioner occupied a leadership position;

7)      The district court abused its discretion when it instructed the jury to weigh

---

[2]  Gary E. Brotherton, Columbia, Missouri; Jean DeSales Barrett, Montclair, New Jersey; and Monica Foster, Indianapolis, Indiana.

17

Petitioner's intent along with the other aggravating factors;

8)      The district court abused its discretion when it denied Petitioner's motion to allocute to the jury;

9)      The government's closing argument was improper;

10)     The death penalty is unconsitutional because of the potential for executing an innocent person;

11)     The indictment was defective because the statute did not explicitly provide for the government to submit statutory aggravating factors to the grand jury.

The Eighth Circuit Court of Appeals found no error and affirmed Petitioner's convictions and sentences.  *United States v. Honken*, 541 F.3d 1146 (8th Cir. 2008).

## II.     STANDARD FOR REVIEWING A CLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL

Though the Court is obviously familiar with the standard for reviewing a claim of ineffective assistance of counsel, it bears setting it out in at least a summary form before turning to Petitioner's claims because all but the last two turn upon a determination of whether trial or appellate counsel failed to live up to the minimum standard of reasonably competent attorneys in their representation of Petitioner.

### A.     Ineffective Assistance Standard

The Sixth Amendment to the United States Constitution provides, in pertinent part, that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his [or her] defen[s]e."  U.S. Const., amend. VI.  The Supreme Court set out a two-pronged test for constitutionally ineffective assistance of counsel in *Lockhart v. Fretwell*, 506 U.S. 364, 113 S. Ct. 838 (1993).  Counsel is constitutionally ineffective under *Fretwell* when, (1) counsel's representation falls below

an objective standard of reasonableness; and (2) the errors are so prejudicial that the adversarial balance between defense and prosecution is upset, and the verdict is rendered suspect. *Fretwell*, 506 U.S. at 368-69.

As stated by the Supreme Court in *Strickland v. Washington*:

> When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness.

*Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).

The benchmark for judging any claim of ineffectiveness is whether an attorney's conduct so undermined the proper functioning of the process that it "cannot be relied upon as having produced a just result." *Strickland,* 466 U.S. at 686. In other words the Petitioner must show that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland,* 466 U.S. at 687.

> [A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

*Strickland,* 466 U.S. at 690. In scrutinizing counsel's performance a court is to be highly deferential. *Strickland*, 466 U.S. at 689. When examining a counsel's performance, the Court should exercise a strong presumption that the representation

19

was within a wide range of reasonable assistance.  See, e.g., *Strickland,* 466 U.S. at 687; *Johnson v. United States*, 278 F.3d 839, 842 (8th Cir. 2002); *Collins v. Dormire*, 240 F.3d 724, 727 (8th Cir. 2001).  "Strategic choices made after thorough investigation of law and facts relevant to the plausible options are virtually unchallengable."  *Knowles v. Mirzayance,* --- U.S. ----, 129 S.Ct. 1411, 1420 (2009) (internal quotation omitted); *United States v. Rice*, 449 F.3d 887, 897 (8th Cir. 2006) (same).  A defendant bears a heavy burden in overcoming the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Strickland*, 466 U.S. at 689; *Lawrence v. Lockhart*, 767 F.2d 449, 450 (8th Cir. 1985).  The presumption exists to "eliminate the distorting effects of hindsight" and recognizes that "it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."  *Strickland,* 466 U.S. at 689.

A defendant must show not only that counsel's conduct fell below an objective standard of reasonableness, but show:

> that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Strickland,* 466 U.S. at 694.  The same deferential review applies to the "prejudice" portion of the test.  *Sanders v. Trickey*, 875 F.2d 205, 210 (8th Cir. 1989).  The failure to establish "prejudice" is dispositive of the case without consideration of the *Strickland* "performance" factor.  *Sanders,* 875 F.2d at 211 n.8.  Accordingly, the court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the Petitioner as a result of the alleged deficiency.  *Strickland,* 466 U.S. at

20

697.  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, the Court should do so.  *Strickland*, 466 U.S. at 697.  In order to show prejudice, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding."  *Pfau v. Ault*, 409 F.3d 93, 939 (8th Cir. 2005) (internal quotation and citation omitted).  When the allegation of ineffective assistance of counsel pertains to conduct of counsel in the penalty phase of a capital trial, it requires a defendant to demonstrate that, absent counsel's deficient performance, at least one juror would have voted for life.  *Wiggins v. Smith*, 539 U.S. 510, 536 (2003).

If a petitioner fails to demonstrate ineffective assistance of counsel as cause for the procedural default, his collateral claim cannot survive.  *Wainright v. Sykes*, 433 U.S. 72 (1977).  In the context of an ineffective assistance of counsel assertion of cause to excuse procedural default, a defendant must ordinarily demonstrate that some objective factor external to the defense impeded counsel's efforts to comply with the standard of conduct.  *Murray v. Carrier*, 477 U.S. 478, 488 (1986).

B.      Trial Counsel Are Not Held to a Standard of Perfection

The Sixth Amendment right to counsel does not guarantee criminal defendants perfect or errorless representation.  See *Brunson v. Higgins*, 708 F.2d 1353, 1356 (8th Cir. 1983) ("Counsel need not perform perfectly, and will not be held ineffective for failure to raise every tangential issue which might have a bearing on his client's case.");  *Schleicher v. Wyrick*, 529 F.2d 906, 912 (8th Cir. 1976) (in rejecting a claim of ineffective assistance of counsel for failure to object to fingerprint evidence, the court stated:

21

"'Perfect or errorless counsel is not required as a prerequisite to a fair trial consonant with due process.'") (quoting *Cardarella v. United States*, 375 F.2d 222, 232 (8th Cir. 1967)). "Lawyers, like other people, are not perfect, and the ingenuity that diligent [habeas] counsel bring to a case long after the fact cannot be the only measure of what a lawyer should have done under the pressure of trial." *Williams v. Nix*, 751 F.2d 956, 962 (8th Cir. 1985). See also *Todden v. Auger*, 814 F.2d 528, 529 (8th Cir.1987) (affirming district court's finding that an oversight by trial counsel in failing to note a discrepancy in evidence tags indicating the location of evidence seized from the defendant's house "was not unreasonable under prevailing professional norms.").

      C.     Trial Counsels' Declarations That Decisions Were Not Strategic Is Not Dispositive

With respect to several of the issues raised by Petitioner, he references declarations filed by trial counsel in which they disclaim having any strategic or tactical reason for making, or failing to make, particular decisions. "That defense counsel has refused to characterize the decision as strategic is not dispositive." *Gillam v. Secretary for the Department of Corrections,* 480 F.3d 1027, 1034 (11th Cir. 2007) (finding decision was strategic, despite declarations by defense counsel to the contrary, when the record showed counsel investigated the facts, prepared witnesses, assessed the jury and concluded the jury would be unreceptive to the evidence). Whether a decision was strategic "is a question of law to be decided by the court." *Provenzano v. Singletary,* 148 F.3d 1327, 1332 (11th Cir. 1998) ("Accordingly, it would not matter if petitioner could assemble affidavits from a dozen attorneys swearing that the strategy used at his trial was unreasonable. The question is not one to be decided by plebiscite,

22

by affidavits, by deposition, or by live testimony. It is a question of law decided by this Court.").

## III. CLAIM 1 – TRIAL COUNSEL WAS NOT INEFFECTIVE FOR FAILING TO OBJECT TO ADMISSION OF PETITIONER'S PRIOR JUDGMENTS

Petitioner claims his trial attorneys were ineffective for failing to object to admission of the district court's sentencing findings in relation to his prior drug conviction. Specifically, Petitioner claims his trial counsel should have objected to admission of Trial Exhibits 303 and 304, the Judgment and Amended Judgment in relation to his 1998 conviction for Conspiracy to Distribute Methamphetamine and Attempted Manufacturing of Methamphetamine. Petitioner claims admission of the exhibits containing the Court's factual findings relating to drug quantity and Petitioner's role enhancement violated his constitutional rights because they were not proven beyond a reasonable doubt to the jury and "effectively" constituted testimony by the judge. (Petitioner's Memorandum, at 4-5).

Trial counsel were not ineffective for failing to object to admission of the judgements of conviction. Contrary to Petitioner's assertion, the government did not rely upon the judgments to prove Petitioner's drug quantity or his aggravating role during his death penalty trial. Rather, the judgments were relied upon, in part, only as further evidence that Petitioner conspired with others to distribute methamphetamine. The government presented overwhelming evidence of Petitioner's methamphetamine conspiracy, the drug quantity, and his role in the offense. Therefore, trial counsels' decision not to object to the exhibits did not fall below an objective standard of reasonableness. For the same reason, there was no prejudice as a result of admission

23

of the judgments.  Moreover, because the government did not have to prove a specific drug quantity with respect to murders in furtherance of a Continuing Criminal Enterprise (Counts 13 through 17), any error in admission of the judgments affected only his conviction for committing murders in furtherance of a drug conspiracy (Counts 8 through 12).

### A.    Factual Background

On April 11, 1996, a federal grand jury indicted Petitioner, charging him in a three-count indictment with various drug trafficking offenses.  On July 10, 1996, the grand jury returned a superseding indictment, adding an additional drug trafficking charge.  On June 2, 1997, Petitioner pled guilty to two of the charged offenses: Count 1: conspiracy to distribute methamphetamine between 1992 and February 1996; and Count 4, attempted manufacturing of methamphetamine on February 7, 1996.  A copy of the transcript from the Change of Plea Hearing was admitted in evidence at Petitioner's capital trial as Exhibit 302.

The court presided over a protracted sentencing hearing, which began on December 15, 1997, and continued on December 16, 1997, and February 17, 18 and 24, 1998.  During the sentencing hearing, Petitioner testified in his own defense.  A copy of Petitioner's testimony was admitted in evidence at Petitioner's capital trial as Exhibit 300.

The court entered its judgment on February 25, 1998, sentencing Petitioner to 293 months' in prison.  A copy of this judgment was admitted in evidence at Petitioner's capital trial as Exhibit 303.  The government appealed the sentence, asserting the trial court erred when it found Petitioner was entitled to a reduction for acceptance of

responsibility after he obstructed justice.  The Eighth Circuit Court of Appeals agreed with the government and remanded the case for resentencing.  On February 1, 2000, the court issued an amended judgment, sentencing Petitioner to 324 months' in prison.  A copy of this amended judgment was admitted in evidence at Petitioner's capital trial as Exhibit 304.  Each of the judgments contains a short paragraph under the "Statement of Reasons" heading, stating: "The defendant was found accountable for 2.87 kilograms of methamphetamine actual for a Base Offense Level of 36; the defendant did not commit a portion of the offense while on bond; and a three level Aggravated Role enhancement was applied."  The original judgment also contained a short sentence regarding Petitioner's acceptance of responsibility.  That sentence was omitted in the amended judgment.

      B.      <u>Procedural History</u>

The government filed a pretrial motion, pursuant to Rule 104, seeking a pretrial ruling regarding the admissibility of the transcripts of Petitioner's change of plea hearings and sentencing testimony, and of the judgment and amended judgment.  (Doc. 180).  Petitioner's trial lawyers filed a resistance to the government's motion, arguing, inter alia, that the evidence was inadmissible under Federal Rules of Evidence 402 and 403.  (Doc. 194).  Trial counsel argued, in the alternative, that if admitted, the evidence of Petitioner's prior conviction "should be limited to minimize both the unfair prejudice and cumulativeness of the evidence."  *United States v. Honken*, 378 F. Supp.2d 928, 939 (N.D. Iowa 2004).  Counsel argued the damage could be minimized "by stipulating to the prior convictions and allowing only the introduction of the certified copies of the judgments."  (<u>Id.</u>).  The court found the evidence was admissible under

25

the *res gestae* doctrine, and overruled Petitioner's evidentiary objections.  *Honken*, 378

F. Supp. 2d at 946.  Petitioner's counsel did not specifically argue that the language

under the Statement of Reasons section of the judgments should be redacted.

        C.        <u>Use of the Evidence of Petitioner's Prior Convictions</u>

In this case, Petitioner's prior convictions for conspiring to distribute

methamphetamine and attempting to manufacture methamphetamine constituted

substantive evidence of the charged conduct in Petitioner's capital trial.  His convictions

tended to prove an element of the charged offense.  Specifically, under Counts 8

through 17 of the Superseding Indictment, the government had to prove Petitioner

engaged in a continuing series of federal narcotics violations.  Evidence of his prior

convictions also tended to prove the intent element of these Counts, as this evidence

provided the motive for Petitioner to kill others he believed might interfere with his drug

enterprise, or jeopardize his freedom.

At trial, the government introduced the judgments through an agent.  The agent

identified the judgments and the first page of each judgment was displayed to the jury.

(Tr. 2189-90).  No questions were asked, and the agent made no statements, regarding

the drug quantity or role issues.

Petitioner claims prejudice because it "permitt[ed] the Government to present

improper evidence as to numerous disputed issues, including Petitioner's role in the

offense, his possession and/or use of firearms,[3] and the amount of methamphetamine

involved in the drug operation, and to argue based on that improper evidence."

---

[3]  The judgments say nothing about Petitioner's possession of firearms.

26

(Petitioner's Memorandum, at 8).  At trial, however, the government did not rely on the judgments for any of these things.

The government presented evidence of drug quantity in a number of ways.  The government introduced the laboratory report of methamphetamine Petitioner supplied to Greg Nicholson, which found 148 grams of 97% pure methamphetamine.  (Trial exhibit 25).  Greg Nicholson testified in grand jury that the methamphetamine Petitioner delivered to him was "pure."  (Trial Exhibit 27, page 9).  Aaron Ryerson testified that the methamphetamine DeGeus obtained from Petitioner was pure.  (Tr. 243, 247).  In addition, Petitioner made statements to others (who would have no way to know the results of the laboratory report) that he manufactured very pure methamphetamine.  For example, Petitioner told Terry Bregar that he was able to manufacture 98% to 99% pure methamphetamine.  (Tr.1391).  Petitioner told Dan Cobeen he produced 96% to 98% pure methamphetamine.  (Tr. 578-81).

The government also played a surreptitious recording of a conversation between Petitioner and Greg Nicholson during which they discussed Nicholson distributing a quarter pound of methamphetamine to one of their dealers, Nicholson ordering another kilogram of methamphetamine from Petitioner, Petitioner bragging that the methamphetamine he manufactured was "pure," and the fact that Petitioner made more than $100,000 from drug sales to Nicholson alone in the last year.  (Trial exhibit 20). The government introduced Nicholson's grand jury testimony where he testified Petitioner supplied him with at least 900 grams of methamphetamine.  (Trial exhibit 27).

Tim Cutkomp, Petitioner's former best friend and co-conspirator, testified that he and Petitioner manufactured between five and six batches of methamphetamine.  (Tr.

27

700).  Cutkomp testified the first batch produced only two to four ounces.  (Tr. 701).

The largest amount they made was a pound to a pound and a half.  (Id.).  This was

pure methamphetamine, to which they would add "cut" either in Arizona or at

Nicholson's house.  (Id.).  On one trip alone Cutkomp delivered a pound and a half of

uncut methamphetamine (more than 680 grams).  (Tr. 705).

To establish Petitioner's role in the offense, the government relied on the

recording between Petitioner and Greg Nicholson, Greg Nicholson's grand jury

testimony, and testimony from multiple witnesses, including Jeff Honken and Tim

Cutkomp.  Jeff Honken and Tim Cutkomp explained that it was Petitioner who decided

to manufacture methamphetamine, how to manufacture the drug, what process and

chemicals to use, how much to produce, who they should sell to, how much they should

sell it for, and how they would get the methamphetamine to DeGeus and Nicholson.

Petitioner recruited the members of the conspiracy as well, persuading Jeff Honken and

Tim Cutkomp to join in the effort.  That organizational role did not change with respect

to his two main customers, DeGeus and Nicholson.  Petitioner determined whom he

would sell to, and organized it such that DeGeus and Nicholson would not have direct

contact.  Petitioner arranged it so that DeGeus would not pick up methamphetamine

directly from Nicholson, but rather, would wait for Petitioner to supply the drug.

Petitioner then also organized the flow of money from his dealers to ensure that it

flowed to him, not to others.

In closing argument, the government referenced the judgments only to argue that

the conviction helped establish the existence of the conspiracy and one of the overt

acts in furtherance of the Continuing Criminal Enterprise.  (Tr. 3285, 3288).  The

government made no reference to the drug quantity or role enhancement mentioned in the judgments.

### D.       Trial Counsels' Performance Was Not Deficient

Trial counsels' failure to object to admission of the judgments, or to seek their redaction, did not fall below an objective standard of reasonableness.  The judgments themselves were clearly admissible.  At most, trial counsel can be faulted only for not asking the court to redact the language Petitioner's new counsel now finds offending. The Sixth Amendment right to counsel does not guarantee criminal defendants perfect or errorless representation.  See *Brunson*, 708 F.2d at 1356 ("Counsel need not perform perfectly, and will not be held ineffective for failure to raise every tangential issue which might have a bearing on his client's case."); *Schleicher*, 529 F.2d at 912 (in rejecting a claim of ineffective assistance of counsel for failure to object to fingerprint evidence, the court stated: "'Perfect or errorless counsel is not required as a prerequisite to a fair trial consonant with due process.'") (quoting *Cardarella v. United States*, 375 F.2d 222, 232 (8th Cir. 1967)).  "Lawyers, like other people, are not perfect, and the ingenuity that diligent [habeas] counsel bring to a case long after the fact cannot be the only measure of what a lawyer should have done under the pressure of trial."  *Williams*, 751 F.2d at 962.  See also *Todden*, 814 F.2d at 529 (affirming district court's finding that an oversight by trial counsel in failing to note a discrepancy in evidence tags indicating the location of evidence seized from the defendant's house "was not unreasonable under prevailing professional norms.").

Here, trial counsel objected to admission of evidence relating to Petitioner's prior convictions.  From trial counsels' familiarity with the government's discovery file, trial

29

counsel would have known the government would be proving drug quantity at trial based on the drugs seized from Nicholson's house, recorded admissions by Petitioner, and sworn testimony of Petitioner's co-conspirators. Trial counsel would have realized that with all this evidence, there was no realistic possibility that the jury was going to find Petitioner responsible for everything else, including the murders of five people, but not find the government proved the drug quantity element. Accordingly, that trial counsel overlooked language in the judgments, or overlooked how others might interpret that language, did not mean their performance otherwise fell below an objective standard of reasonableness.

To the extent Petitioner claims admission of the judgments made the trial judge "in effect" a "witness against Petitioner" in violation of his Sixth Amendment confrontation rights, he is mistaken. In *Crawford v. Washington*, 541 U.S. 36, 56 (2004), the Court held that where the government offers at trial hearsay evidence that is "testimonial" in nature, the Confrontation Clause of the Sixth Amendment requires actual confrontation, i.e., cross-examination, regardless of whether the evidence meets an exception to the hearsay rule. The Court did not define what makes evidence "testimonial" in nature, but did provide some guidance on what statements would and would not be considered "testimonial hearsay." The Court stated that, "[w]hatever else the term ['testimonial'] covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." 541 U.S. at 68. On the other hand, the Court stated that certain types of statements would not constitute "testimonial" hearsay, and thus would not be subject to the requirement of actual confrontation. Examples of such non-testimonial statements are business

30

records. 541 U.S. at 56.

Whether a statement is testimonial in nature depends, in large part, on the purpose for which the statement was made. If made for the purpose of providing evidence against the accused, it is testimonial; otherwise, it is not. See *United States v. Mashek*, 606 F.3d 922, 930 (8th Cir. 2010) (holding that pseudoephedrine logs, unlike a laboratory report, did not implicate Sixth Amendment confrontation rights because they were not created for the purpose of providing evidence against the accused).

Here, the district court's judgment was not a testimonial statement. The court did not enter judgment against Petitioner for the purpose of providing evidence against him. Rather, the issuance of a judgment is a ministerial act, more akin to the creation of a business record.

Therefore, trial counsels' performance was not deficient.

E.     Petitioner Has Failed to Demonstrate Prejudice

Regardless, Petitioner was not prejudiced by admission of the judgments. To begin with, the reference to drug quantity in the judgments was buried on the last page of the judgments, was not mentioned in testimony, and was not relied upon by the government in argument. The judgments do not use the word "pure," said Petitioner was "accountable for 2.87 kilograms of methamphetamine actual," and mentions methamphetamine in relation to a "base offense level." It is doubtful any juror would have been able to make sense of these words and translate them to something relevant to the trial. Indeed, the fact trial counsel did not notice the reference to drug quantity in the judgements is likely reflective of the degree to which any juror paid attention to it. Petitioner can only speculate that any juror saw the reference to drug quantity,

31

understood it, and relied upon the language in the judgments in reaching their conclusion regarding drug quantity at Petitioner's capital trial.

In any event, the government proved drug quantity through an abundance of other evidence, in quantities far exceeding the drug quantity mentioned in the judgments, making the reference to drug quantity in the judgments superfluous. Moreover, Petitioner was charged with conspiring to distribute methamphetamine, not possession or actual distribution of methamphetamine. Therefore, it was sufficient if the jury found the object of the conspiracy was to distribute more than 100 grams of pure methamphetamine, even if they did not actually do so. Cutkomp testified to distributing pounds of methamphetamine and Petitioner stated in the undercover tape that his methamphetamine was pure. Thus, even absent the laboratory report Petitioner claims was improperly admitted, the evidence was more than sufficient for the jury to find Petitioner conspired with others to distribute more than 100 grams of pure methamphetamine.

As to role in the offense, the judgments make only a vague reference to an "aggravating role." There is no mention of number of people involved in the offense, what "aggravating" means, or what Petitioner did to occupy that role. There is nothing in the reference to role in the judgments that prejudiced Petitioner. There was no reasonable probability that, but for admission of the judgments, the result of the proceeding would have been different.

The Court should deny this portion of Petitioner's motion without an evidentiary hearing.

32

**IV.    CLAIM 2 – TRIAL COUNSEL WAS NOT INEFFECTIVE FOR FAILING TO OBJECT ON DOUBLE JEOPARDY GROUNDS TO CHARGES AND EVIDENCE PURPORTEDLY RELATED TO ISSUES PREVIOUSLY LITIGATED IN PETITIONER'S 1998 SENTENCING HEARING**

Petitioner claims his trial attorneys were ineffective for failing to argue the government was collaterally estopped from litigating whether Petitioner was engaged in a drug conspiracy and whether he possessed a firearm at the time he committed the murders in 1993.  (Petitioner's Memorandum, 10-27).  At Petitioner's 1998 sentencing hearing, the government sought an upward enhancement on the ground Petitioner continued in his drug trafficking activities while on pretrial release after his 1993 arrest and for possessing firearms in furtherance of his drug trafficking activities.  The sentencing court ruled against the government on these enhancements.  Petitioner claims the district court's rulings constituted findings of fact on issues that were re-litigated during his capital trial.  Petitioner claims his "rights to due process, constitutional collateral estoppel, and against double jeopardy precluded the government from re-litigating the factual issues that were decided in his favor in the prior criminal proceeding" (Petitioner's Motion, at 13).  This claim is subject to procedural default, so to avoid default Petitioner claims his attorneys were ineffective for failing to raise this argument.  (Petitioner's Memorandum, 12, 24-27).

Petitioner's claim is without merit.  Petitioner has failed to demonstrate his trial counsels' performance was deficient in failing to raise this novel argument for which there is no reported precedent.  Moreover, Petitioner cannot demonstrate prejudice because the argument fails on the merits.  To begin with, there is a presumption that applying collateral estoppel to sentencing findings is improper.  Further, the court's

33

sentencing findings were not on issues identical to those in the capital trial, the issues in dispute at the capital trial were not actually litigated at the sentencing hearing, resolution of the issues in dispute at trial was not necessary for the court to make its sentencing findings, and government did not have a full, fair, and complete opportunity to litigate at the 1998 sentencing hearing the issues in dispute during the capital trial.

A.    Petitioner's 1996 Charges and His 1998 Sentencing Hearing

On April 11, 1996, the grand jury indicted Petitioner, charging him in a three-count Indictment with drug offenses.  On July 10, 1996, the grand jury returned a superseding indictment, charging him with four drug offenses.  Count 1 charged him with conspiracy to manufacture and distribute methamphetamine "between about 1992 and February 7, 1996."  Count 2 charged him with possession of listed chemicals, Count 3 charged him with possession of glassware with the intent to manufacture methamphetamine, and Count 4 charged him with attempting to manufacture methamphetamine.

On June 2, 1997, Petitioner pled guilty to Count 1 and 4 of the superseding indictment.  A copy of the transcript of Petitioner's change of plea hearing was admitted into evidence at his capital trial.  (Trial Exhibit 302).  Admitted into evidence as Exhibit 1 at the change of plea hearing was a "Rule 11 letter" that set forth the factual basis for the plea, but Petitioner would not admit to the drug quantity, his role in the offense, and other matters.  (Exhibit 302, pp. 11-16).

The government sought an upward adjustment to Petitioner's base offense level for continuing to engage in his drug conspiracy while he was on pretrial release after his arrest in 1993, and for possession of a firearm in connection with his drug trafficking

34

activity. (Government's Sentencing Memorandum in case CR 96-3004, Doc. 156). For the first enhancement to apply, the government had to show that Petitioner continued the conspiracy to manufacture methamphetamine while under supervision for the 1993 Conspiracy to Distribute Methamphetamine charge. The Presentence Investigation Report scored Petitioner with this enhancement. (Exhibit I, page 29, ¶ 134). For the second enhancement to apply, the government had to show a temporal and spatial relationship between Petitioner's possession of a firearm and his drug trafficking activity, and that the firearm had the purpose or effect of facilitating the drug trafficking activity. See, e.g., *United States v. Anderson*, 618 F.3d 873, 881 (8th Cir. 2010) (requiring showing of temporal and spatial nexus between defendant, firearm, and drug trafficking activity); *United States v. Smith*, 535 F.3d 883, 885 (8th Cir. 2008) (requiring proof possession of the firearm had purpose or effect of facilitating the offense). The United State Probation office did not score Petitioner with possession of a firearm. (Exhibit I).

During the sentencing hearing, the only evidence the government presented regarding Petitioner's commission of the offense while on release was the testimony of Tim Cutkomp. (Sent. Tr. 1190-92). The district court cited Cutkomp's "credibility problems" and indicated it was "not convinced that the government carried its burden of proof that there's any corroborating evidence, and I'm not willing to credit Mr. Cutkomp's testimony on this adjustment." (Sent. Tr. 1192). The government argued that the enhancement for possession of firearms was tied to the enhancement for obstruction of justice. (Sent. Tr. 1192-93). The court found Petitioner obstructed justice enhancement, but specifically held that it was not making a factual finding regarding all

35

of the possible grounds for obstruction of justice – rather, the court based the enhancement solely on Petitioner arranging for a person to hide evidence after his 1996 arrest. (Sent. Tr. 1238-39).

The government also argued the Petitioner possessed several firearms, two of them after he was charged in 1996, and one, a Tech. 9, in 1993, which the government argued Petitioner possessed in connection with his drug trafficking activity. In particular with respect to the Tech. 9, the government presented evidence and argued Petitioner possessed that weapon to protect himself from his co-conspirator, Terry DeGeus. (Sent. Tr. 1240-42). The court declined to find Petitioner possessed firearms in furtherance of the drug conspiracy. (Sent. Tr. 1244-1246).

### B. Trial Counsels' Performance Was Not Deficient

Petitioner does not dispute that his trial attorneys vigorously litigated a claim that the Double Jeopardy Clause barred his capital prosecution as a result of his 1998 conviction. Nor does Petitioner dispute the conclusion by the district court and the Eighth Circuit Court of Appeals that his prior prosecution did not violate the Double Jeopardy Clause. See *United States v. Honken*, 541 F.3d 1146, 1159 (8th Cir. 2008) (affirming the district court's finding that "[t]he government was entitled to prosecute Honken for the drug conspiracy offense in 1996 and was not precluded from continuing to develop evidence and later prosecute Honken for the victims' murders.").

Nevertheless, Petitioner claims his trial counsel's performance was deficient for failing to argue a nuance of a double jeopardy claim – that is, that the government was collaterally estopped by operation of factual findings made by the district court during the 1998 sentencing hearing. Petitioner faults his trial counsel for failing to raise this

36

issue "despite the well-established law precluding re-litigation of the factual findings set forth above . . .." (Petitioner's Memorandum, 25). Yet, Petitioner fails to cite a single case where a court has held that a sentencing judge's factual findings in a prior sentencing hearing operates as collaterally estoppel to bar the government from charging the defendant with a different crime.

The "well established law" set forth by Petitioner in his Memorandum do not involve collateral estoppel based on sentencing findings. Petitioner cites *Ashe v. Swenson*, 397 U.S. 436 (1970), for the proposition that "it has been 'an established rule of federal criminal law' for nearly a century that, 'when an issue of ultimate fact has been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.'" (Petitioner's Memorandum, at 11). The *Ashe* case, however, did not involve findings of fact by a sentencing judge. Rather, it involved a case where the defendant was acquitted of robbing a man named Knight, one of six poker players robbed by three or four robbers. Six weeks later, the defendant was tried for robbing a different poker player during the same robbery. The Court found the second prosecution was barred by the double jeopardy clause, reasoning the jury in the first trial necessarily concluded the defendant did not participate in the robbery. *Ashe*, 397 U.S. at 438-440.

The case of *United States v. Oppenheimer*, 242 U.S. 85 (1916), upon which the *Ashe* Court relied, did not involve a case where fact finding by a sentencing judge barred a subsequent prosecution for a different crime. Rather, it involved a situation where a court dismissed a bankruptcy fraud charge on the theory it was outside the

37

statute of limitations.  When that theory was rejected by an appellate court in an unrelated case, the government attempted to recharge the defendant with the bankruptcy fraud charge.  The Court concluded that once the judgement of acquittal was entered, for whatever reason, it could not be reopened.  *Oppenheimer*, 242 U.S. at 85-87.

Petitioner cites *Nesbitt v. Hopkins*, 86 F.3d 118 (8th Cir. 1996), for the proposition that "a factual issue may not be relitigated where the issue 'was necessarily determined by the factfinder against the government and, in the second prosecution, that same fact is required to be proved beyond a reasonable doubt in order to convict.'"  (Petitioner's Memorandum, 22).  *Nesbitt* did not involve a finding of fact by a sentencing judge barring a later prosecution.  Moreover, the language petitioner cites from *Nesbitt*, however, is dicta.  In *Nesbitt*, the Court of Appeals rejected the defendant's collateral estoppel argument wherein he asserted that the jury's acquittal of him on one count necessarily decided a fact that precluded his conviction on a different count in the same indictment.  *Nesbitt*, 86 F.3d at 119-121.

Finally, Petitioner cites *State v. Butler*, 505 N.W.2d 806 (Iowa 1993), presumably for the same proposition he claims *Nesbitt* established.  *Butler* did not involve a finding of fact by a sentencing judge barring later prosecution.  Rather, it involved a claim that a prior acquittal for possession of marijuana barred a subsequent prosecution for failure to obtain a tax stamp for the same marijuana.  *Butler*, 505 N.W.2d at 808-809.

The undesigned was unable to find a single reported decision where a court has barred prosecution of a defendant pursuant to a collateral estoppel theory based on

38

factual findings made by a sentencing judge in a prior proceeding. Petitioner certainly cites none. Accordingly, Petitioner cannot establish that his trial counsels' performance was deficient for failing to raise a claim for which there is no precedent. See *United States v. Swayze*, 2008 WL 859030, at *14 (N.D. Iowa, March 28, 2008) (holding counsel was not ineffective for failing to raise a novel argument) (citing *Anderson v. United States*, 393 F.3d 749, 754 (8th Cir. 2005) (concluding no constitutional violation occurred when defense counsel failed to recognize and raise novel argument)).

C.    Petitioner Has Failed to Demonstrate Prejudice

In any event, Petitioner was not prejudiced because the claim would not have prevailed had trial counsel raised it.

Only on rare occasions, in civil cases, have parties argued collateral estoppel in attempts to bar subsequent civil action by the government based on findings of fact made by sentencing judges. There is, in fact, a strong presumption that applying collateral estoppel based on sentencing findings is improper. In *United States v. U.S. Currency in the Amount of $119,984.00*, 304 F.3d 165 (2nd Cir. 2002), the court noted it was presented with an issue "rarely considered by this or any other Circuit: the applicability of collateral estoppel based upon earlier sentencing findings." *$119,984.00*, 304 F.3d at 171. There, the defendant attempted to use collateral estoppel against the government in its forfeiture action, asserting that in its prior criminal prosecution of him the sentencing court necessarily found the funds involved in his money laundering crime did not come from an illegal source. Id. Relying on its holding in *S.E.C. v. Monarch Funding Corp.*, 192 F.3d 295 (2nd Cir. 1999), the Court

39

adopted a "strong presumption against application of collateral estoppel based upon sentencing findings." Id., at 173. That is because the Court found that "application of collateral estoppel based upon prior sentencing findings implicates serious concerns of fairness, while appearing to offer little benefit in terms of increased efficiency." Id., at 172. See also *United States v. Real Property*, 2009 WL 806120, at *2 (N.D. Ill., March 25, 2009) (applying a presumption that collateral estoppel based on findings of sentencing court was improper).

The "underlying goal" of collateral estoppel "is to promote judicial economy and finality in litigation." *Liberty Mut. Ins. Co. v. FAG Bearings Corp.*, 335 F.3d 752, 758 (8th Cir. 2003). Generally, courts require the party asserting collateral estoppel to establish four prerequisites: 1) the issue concluded must be identical; 2) the issue must have been raised and litigated in the prior action; 3) the issue must have been material and relevant to the disposition of the prior action; and 4) the determination made of the issue in the prior action must have been necessary and essential to the resulting judgment. See *Teleconnect Co. v. Ensrud*, 55 F.3d 357, 361 (8th Cir. 1995) (setting forth the factors under Iowa state law). Other courts have also required a showing that the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the prior suit. See, e.g., $119,984.00, 304 F.3d at 172; *Allstate Ins. Co. v. Blount*, 491 F.3d 903, 909 (8th Cir. 2007) (applying Missouri law).

In this case, the issues at Petitioner's sentencing hearing were not identical to those at issue in his capital trial. Nor were the issues at trial raised and litigated in the sentencing hearing. While the issue of whether Petitioner murdered five people in 1993 may have been material and relevant to the disposition of the prior action, it was not

necessary or essential for the sentencing court to decide that issue as part of the judgment. Petitioner also cannot show the government had a full, fair, and complete opportunity to litigate the issues at the 1998 sentencing hearing.

The issues were not identical. At the sentencing hearing in 1998, one issue was whether Petitioner continued the conspiracy to manufacture methamphetamine while on pretrial release. This focused on whether Petitioner committed an act while on pretrial release in furtherance of his drug manufacturing or distribution operations. At sentencing, the government relied on the statements of a single co-conspirator, Tim Cutkomp, who testified about Petitioner's continued efforts to manufacture methamphetamine while on pretrial release. At trial, in contrast, the issue was whether Petitioner murdered people in July and November 1993 in furtherance of a drug conspiracy or Continuing Criminal Enterprise. While at trial the government introduced evidence of Petitioner's drug trafficking activity after the murders through 1996, it was not necessary during the capital trial to establish Petitioner's guilt that he continued the drug operation while on pretrial release. Moreover, the evidence at trial was not dependant upon whether Petitioner personally engaged in drug manufacturing or distribution conduct while on pretrial release. The drug conspiracy could continue without Petitioner personally acting in furtherance of the conspiracy during that time period. Indeed, it was not necessary to show the conspirators acted at all for the months while Petitioner was on pretrial release.

The other issue at the sentencing hearing for which Petitioner claims collateral estoppel was whether Petitioner possessed a firearm. The issue at the sentencing hearing was whether he possessed firearms in a time and place that facilitated his drug

41

manufacturing or distribution activities.  The government alleged Petitioner possessed two firearms after his arrest in 1996, a finding that was not necessary for the jury to resolve in the capital case.  The government also presented evidence and argued Petitioner possessed the Tech. 9 for his protection from Terry DeGeus who was a co-conspirator in the drug operation.  (Sent. Tr. 1240-42).  The issue at trial was different.  There, the issue was whether the Petitioner killed five people in furtherance of his drug operation.  That he used a firearm, the Tech. 9, was a fact, but it was not an element of the offense that he used a firearm.  It was not an element of the offense that the government show Petitioner used the firearm in furtherance of his drug trade.

Thus, neither issue in the sentencing hearing was identical to the issues in dispute in the capital trial.  The issue at trial – whether Petitioner killed five people in furtherance of his drug activity – was never actually litigated during the sentencing hearing in 1998.

It was also not necessary for the sentencing court to decide the issues in dispute at trial in order to reach its judgment regarding the issues in dispute during the sentencing hearing.  At the sentencing hearing the court found Petitioner did not continue drug manufacturing activities while on pretrial release, but that did not require a finding of whether the conspiracy continued while Petitioner was on pretrial release, or whether Petitioner killed witnesses while on pretrial release.  By focusing on Petitioner's personal conduct, the court could decline to apply the enhancement without making a broader finding about whether the conspiracy continued during the time period, or the narrower finding whether Petitioner killed witnesses while on pretrial release.  Likewise, the court's determination Petitioner did not possess firearms in

Case 3:10-cv-03074-LTS-KEM   Document 22   Filed 07/14/11   Page 50 of 191

furtherance of his drug operation did not necessarily decide the issue of whether Petitioner used a firearm to kill witnesses.

Finally, the government did not have a full, fair, and complete opportunity to litigate this issue. As Petitioner notes, the government was continuing to conduct a grand jury investigation into the murders at the time of Petitioner's 1998 sentencing hearing. The government had not completed its investigation at the time. It was not possible, once the government indicted Petitioner on the drug charges in 1996 to use the grand jury to gather evidence in furtherance of sentencing issues. That procedural opportunity of using the grand jury to investigate the murders and develop evidence proving Petitioner's guilt was available to the government only in seeking new charges against Petitioner. Thus, while the government was motivated to seek the highest sentence possible for Petitioner in his 1998 sentencing hearing, it did not have full, fair and complete opportunity to litigate whether Petitioner killed five people in July and November 1993.

It was altogether proper that the government brought charges for Petitioner's drug trafficking and sought an appropriate sentence. But it would be fundamentally unfair, and a miscarriage of justice, to find that by doing so it precluded the government from charging Petitioner with five murders. Cf. *United States v. Cole,* 293 F.3d 153, 162 (4th Cir. 2002) (citing *Garrett v. United States*, 471 U.S. at 790) ("The Double Jeopardy Clause may not 'be employed to force the Government's hand' by requiring it to prosecute [defendant] for either the earlier conspiracy or the later CCE, but not both.").

Accordingly, Petitioner cannot demonstrate prejudice because, even if his trial

Case 3:10-cv-03074-LTS-KEM    Document 22    Filed 07/14/11    Page 51 of 191

counsel had pursued this novel legal theory, it would not have been successful.

The Court should deny this portion of Petitioner's motion without an evidentiary hearing.

## V . CLAIM 3 – THE GOVERNMENT DID NOT FAIL TO DISCLOSE EXCULPATORY EVIDENCE AND PETITIONER'S TRIAL COUNSEL WERE NOT INEFFECTIVE FOR FAILING TO INVESTIGATE THIS CLAIM

Petitioner claims that one or more witnesses will assert they were "threatened, cajoled, induced and coerced" into providing "false, exaggerated, and misleading testimony implicating Petitioner." (Petitioner's Motion, at 15). Petitioner argues this violated his due process rights, under *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny. Petitioner also claims his trial attorneys were ineffective for failing to adequately investigate these witnesses and impeach them with this alleged information. Petitioner's claims are without merit. The recent change in testimony by three former cooperators is unreliable and cannot support a *Brady* violation claim. Nor can Petitioner's trial counsel be faulted for failing to investigate these cooperators who have only recently contradicted their prior testimony.

A. Factual Background

1. Terry Bregar

Petitioner alleges Terry Bregar has recently claimed he was pressured to say Petitioner confessed to the murders (but he did not give in to the alleged pressure) (Petitioner's Memorandum, 33), and that the government failed to reveal that "Mr. Bregar had a possible stroke prior to his testimony at Petitioner's trial" and "[t]he stroke left him blind and affected his memory" (Petitioner's Memorandum, 34). Petitioner

44

claims the government knew this and implies it intentionally asked Bregar a leading question about diabetes causing his blindness in an effort to conceal exculpatory evidence. (Petitioner's Memorandum, 36). The record shows something quite different.

Bregar testified at trial that he was approached by law enforcement officers in 1997 about Petitioner. (Tr. 1417). He said he heard out the agents, who said he might be able to get a reduction in his sentence for cooperating. (Tr. 1417-18). Bregar said the agents made no promises or guarantees. (Tr. 1418). Bregar said nothing about being pressured or threatened.

Bregar testified before the grand jury and at Petitioner's sentencing hearing, in exchange for which he received a reduction in his sentence. (Tr. 1385, 1418-19). By the time of Petitioner's trial, Bregar had only 13 months and two weeks remaining of his federal sentence for conspiracy to distribute methamphetamine. (Tr. 1384-85). Bregar testified that he did not think he was going to get any further benefit for testifying at trial. (Tr. 1387).

Bregar testified at Petitioner's sentencing hearing on December 16, 1997 (where he was questioned by now Eighth Circuit Court Judge Steve Colloton). Bregar testified he began having problems with his sight about six months prior to his testimony. (Honken 1998 Sent. Tr. 502). He said it was caused by diabetes. (Id.). He said nothing about memory problems. He said nothing about an alleged stroke. At trial, Terry Bregar testified his blindness was a complication from his diabetes. (Tr. 1383). He said nothing about memory problems, and his testimony reflects that he did not have memory problems.

45

Exhibit A is a collection of portions of Bregar medical records from the Bureau of Prisons, covering the period 1997 to July 2004. (Bregar Medical Records, Exhibit A).[4] To begin with, Bregar is, and since at least 1997 has been, an insulin-dependent diabetic. It is also clear from his medical records that his blindness is attributed to his diabetes (though it's also apparent that at periods Bregar was exaggerating the extent of his visual difficulties). He was admitted to the medical center in Springfield, Missouri, from October 7, 1997 to December 8, 1997, to be seen about his deteriorating vision.

There is an entry in Bregar's medical records referencing a temporal arteritis, which Petitioner claims means Bregar suffered a stroke. (Petitioner's Memorandum, 36). The October 9, 1997, entry reflects he had a "vascular accident" in his "left eye in past, possibly temporal arteritis," is in connection with an eye examination. (Exhibit A, at 9-10). It is not a conclusive diagnosis – indeed, specifically indicates it is "possible." It does not make reference to a stroke. There is no other reference in his medical records post-dating the October 9, 1997, entry, indicating Bregar ever suffered a stroke. Though Petitioner claims Petitioner suffered a "stroke," the medical records do not support his assertion.

Similarly, there is nothing in Bregar's medical records to support the assertion the alleged "stroke" in 1997 affected his memory. There is nothing in Bregar's medical records from his stay in Springfield that ever references a difficulty in his memory. The

---

[4] The portion of Bregar's medical records upon which Petitioner relies, referencing a possible temporal arteritis, is the continuation of an entry made on a prior page. While the government did not reproduce the entirety of Bregar's medical records as an exhibit, it has attempted to include a more complete collection of his medical records which more fully shows his condition.

46

only mention of alleged memory difficulties the undersigned could find in Bregar's medical records is the single complaint he made on July 1, 2004, about noticing increasing trouble with short term memory over the past several months. There is nothing in the medical records to support Petitioner's assertion that "it is now clear that some combination of seizures and the stroke contributed to his blindness and also affected his memory." (Petitioner's Memorandum, at 36).

        2.     <u>Dennis Putzier</u>

Petitioner claims that Putzier has recently stated that he was "threatened with a life sentence if he did not testify in the manner that the Government wished," was told that if he did not testify the Petitioner confessed to the murders, the government would charge Putzier with conspiracy to commit murder, and that he lied to the grand jury. (Petitioner's Memorandum, 33-34). Petitioner has not provided a declaration by Putzier in support of these allegations. Again, the record does not support these allegations.

At Petitioner's 1997 sentencing hearing, Putzier testified he entered into a plea agreement with the United States to plead guilty to aiding and abetting an escape attempt by Petitioner. (Sent. Tr. 584-85). He further testified he was concerned about being charged, including charges for conspiracy to commit murder. (Sent. Tr. 587, 596). Trial counsel had a copy of this testimony and Alfredo Parrish, one of Petitioner's trial attorneys, also represented Petitioner at the sentencing hearing.

At trial, Dennis Putzier testified he was awaiting trial on an assault charge and driving under the influence charge, and that no one on behalf of the government promised him that anything would be done regarding those charges in exchange for his testimony. (Tr. 1276). He testified that he had numerous past convictions, but never

47

received any benefit from the government in relation to those convictions in exchange for his cooperation. (Tr. 1277-78). Putzier testified he pled guilty to attempting to escape from prison and helping Honken escape, and that his sentence on that charge was reduced for his cooperation against Honken. (Tr. 1278-79). He testified that he had no expectation of getting any benefits for testifying at Honken's trial. (Tr. 1280).

 3.  Anthony Johnson

Petitioner claims Anthony Johnson has recently claimed he was threatened with criminal charges if he did not cooperate, after which Johnson got a lawyer who "negotiated a deal with the government where [Mr. Johnson] would not get new charges if [he] told them what [he] knew about Petitioner," and that there was a written agreement to this effect that was never turned over to Petitioner. (Petitioner's Memorandum, 34-35). Petitioner has not produced a copy of the alleged written agreement. Petitioner does not claim that Johnson's testimony at trial was false or inaccurate in any way. Again, the record does not support these allegations.

Johnson was approached by law enforcement in connection with Petitioner's sentencing hearing in 1998. Petitioner was provided with a proffer letter, pursuant to which he provided the information about Petitioner. (Exhibit B). Johnson's interview report, which was included in the government's discovery file provided to Petitioner's counsel, references the proffer letter in the second sentence. (Exhibit C). There was no other written agreement with Johnson. He was not prosecuted by the federal government, but there was also no written agreement that he couldn't be prosecuted by the federal government.

At trial, Anthony Johnson testified he pled guilty to his federal drug charges

without a plea agreement.  (Tr. 2088-89).  Johnson testified he served his five and a half-year sentence without receiving any reduction for cooperation.  (Tr. 2089-90).  He testified he got no benefit "whatsoever" for testifying against Petitioner. (Tr. 2090).  At the time of trial, Johnson was not in custody and was employed.  (Tr. 2087).  He testified that he was not getting anything for testifying at the trial.  (Tr. 2090).  Johnson testified he did have an agreement that his involvement in purchasing a methamphetamine recipe from Petitioner for $1,000 while they were incarcerated in the Woodbury County Jail would not be used against him.  (Tr. 2000-2001).

    B.    The Government Did Not Fail to Disclose Evidence

The government did not engage in the misconduct alleged, or fail to disclose information about the cooperators to Petitioner.  Petitioner alleges: 1) "[t]he Government used coercive tactics with many of these witnesses and failed to disclose that to the defense (Petitioner's Memorandum, at 28); 2) "many of these witnesses testified with the expectation of receiving benefits in return," and "some of these inducements was not provided to the defense"; (Id.); 3) "[t]he Government failed to disclose impeachment evidence relevant to the veracity of these witnesses and evidence of bias and motive to lie, including information that some of these witnesses had been cooperating with law enforcement agencies for years." (Id.); 4) "many of these witnesses were transported to trial together or were otherwise in the presence of one another and discussed their testimony and their expectations of favorable treatment among themselves" (Id., at 28-29); and 5) "many of these cooperating witnesses had been cooperating with the authorities in other matters and had been doing so prior to the time they claimed that Petitioner made incriminating statements to them."  (Id., at

49

38). The government will address each of these allegations in turn.

### 1. Coercive Tactics With Witnesses

Petitioner's claim fails to allege a factual basis for his claim the government used coercive tactics with "many" cooperators, except with respect to three witnesses, Dennis Putzier, Terry Bregar and Anthony Johnson. While Petitioner claims this occurred with "many" informants (Petitioner's Memorandum, at 28, 33), he only identifies these three. Each of these witnesses testified at trial about their motivations for testifying and none claimed to have been pressured or threatened. Courts look with suspicion upon motions based on recantations by trial witnesses. *Wadlington v. United States*, 428 F.2d 779, 784 (8th Cir. 2006) ("[R]ecantations of testimony generally are viewed with suspicion."); *United States v. Rouse*, 410 F.3d 1005, 1009 (8th Cir. 2005) ("We view with suspicion motions for new trial based on the recantation of a material witness because '[t]he stability and finality of verdicts would be greatly disturbed if courts were too ready to entertain testimony from witnesses who have changed their minds, or who claim to have lied at the trial.'") (quoting *United States v. Grey Bear*, 116 F.3d 349, 350 (8th Cir. 1997).

Looking carefully at the changed testimony, there is good reason to be skeptical here. None of the witnesses identify the government agents who allegedly pressured them, making it difficult for the government to counter the allegations. Bregar claims to have successfully resisted the alleged pressure, in any event, making it irrelevant. Putzier claimed he lied in the grand jury and presumably now claims to have made everything up, though other evidence corroborated his testimony. While Johnson claims to have evaded the threatened prosecution with a written agreement negotiated

50

by his attorney, Petitioner has not identified the attorney, proffer an affidavit from that attorney, or produced a copy of the alleged agreement that was a product of the alleged threats.

Petitioner cannot wait until an evidentiary hearing to assert facts which, if true, would establish a basis for this claim. "A section 2255 petition can be dismissed without a hearing if (1) the petitioner's allegations, accepted as true, would not entitle the petitioner to relief, or (2) the allegations cannot be accepted as true because they are contradicted by the record, inherently incredible or conclusions rather than statements of fact." *Delgado v. United States*, 162 F.3d 981, 983 (8th Cir. 1998) (quoting *Engelen v. United States*, 68 F.3d 338, 240 (8th Cir. 1995)). Here, Petitioner's claims are contradicted by the record, are inherently incredible because they contradict prior sworn testimony and because they are bereft of sufficient factual detail to state a claim or make them believable. The Court should deny this portion of Petitioner's motion without an evidentiary hearing.

### 2. Witnesses Testified With the Expectation of Receiving Benefits

Petitioner makes a vague allegation that "many of these witnesses [referring to a list of 15 witnesses] testified with the expectation of receiving benefits in return . . . based on either express promises made by law enforcement or implied inducements . . . [and] [i]information relevant to some of these inducements was not provided to the defense." (Petitioner's Memorandum, at 28). In the body of his argument, however, Petitioner fails to put any meat on the bones of this skeletal assertion. Nowhere does Petitioner identify which of the 15 witnesses testified with an expectation of receiving benefits. No where does Petitioner identify the law enforcement agents who alleged

51

made these "express promises."  Petitioner does not state what promises were made. Petitioner fails to identify which alleged inducements were disclosed to the defense and which were not.  At most, the reader is left with the task of discerning whether the allegations made by Bregar, Putzier, and Johnson reflect allegations that they were promised undisclosed benefits.  There is nothing in their allegations, however, that support that conclusion – to the contrary, each claim they were threatened or pressured, not that they were promised benefits in an effort to secure their testimony that was not disclosed.

Petitioner's claim lacks specific allegations of fact.  Rather, they are unsubstantiated conclusions.  While Petitioner again claims he will prove these up at an evidentiary hearing, he is not entitled to one when, as here, he fails to make a claim based upon factual allegations which raise a legitimate question of fact.  See *Bryson v. United States*, 268 F.3d 560, 562 (8th Cir. 2001) (affirming district court's summary dismissal of an ineffective assistance of counsel claim where movant's allegations were brief, conclusory and failed to cite to the record such that the district court "could not even begin to apply the *Strickland* standards on such deficient allegations."). Accordingly, the Court should deny this portion of Petitioner's motion without an evidentiary hearing.

             3.      <u>Government's Alleged Failure to Disclose Impeachment Evidence</u>

While Petitioner is not clear, his allegation that the government failed to disclose impeachment evidence presumably relates to two assertions: 1) Bregar's alleged memory problems; and 2) Putzier's alleged inability to communicate with Petitioner in the jail.  These allegations are flawed because they are based on inherently

52

unbelievable statements that are inconsistent with the record and are contradicted by their prior testimony. Moreover, the only basis Petitioner has to claim the government knew of this alleged impeachment evidence is the witnesses' own assertions without any corroboration.

Regarding Bregar's alleged memory difficulties, the medical records fail to support his claim that he suffered memory loss due to a stroke that also led to his blindness. As set forth above, the only reference to a memory problem is a complaint he made shortly before trial. Petitioner has only Bregar's own claim that he told government agents that a stroke led to his blindness and memory loss to support the allegation of a *Brady* violation. Bregar's claim is inconsistent with the record and is inherently incredible. Petitioner also claims Bregar was prescribed some medication for depression shortly before he testified. Petitioner fails to provide any records indicating that he actually consumed any of the medication prior to his testimony. Even if Bregar took the medication, Petitioner does not allege it affected his memory. Finally, Petitioner does not allege the government knew of the diagnosis, the medication, or that it would impact his testimony in any way. Regardless, Petitioner does not allege that anything Bregar said during his testimony was inaccurate.

Putzier claims he never spoke to Petitioner face-to-face. (Petitioner's Memorandum at 37). This is not new. This is generally consistent with his testimony at Petitioner's sentencing hearing in 1997, but there he testified he did talk to Petitioner one time face-to-face in church. (Sent. Tr. 567). Trial counsel had a copy of Putzier's sentencing transcript (indeed, attorney Parrish was Petitioner's attorney at the sentencing hearing). At trial, Putzier testified that the closest he had been to Petitioner

53

was talking to him through a door and that was "as face to face as you can get in that county jail." (Tr. 1347). Putzier now claims he did not believe Petitioner could have "made it to Putzier's block for the alleged escape attempt" and claims he told that to the agents. Even assuming that is true, Putzier's opinion about the likelihood of success in the escape attempt is not exculpatory and not impeaching.

Again, these allegations are contrary to the record, and are inherently unbelievable. The Court should deny this portion of Petitioner's motion without an evidentiary hearing.

### 4. Witnesses Transported Together

Petitioner claims Putzier and Bregar "have confirmed" that many of the jailhouse informant witnesses were transported to Sioux City together or were held together. (Petitioner's Memorandum at 37). Petitioner claims these witnesses assert that, while being transported, they "would discuss the case and their testimony" and "make up stories" based on the conversations. (Id., at 38). He claims they also talked about the benefits they all hoped to get from testifying, and "this information was never turned over to the defense or was denied by the witnesses during their testimony." (Id.).

This claim lacks sufficient alleged facts to support a claim or justify an evidentiary hearing. Petitioner fails to identify the other inmates. Petitioner fails to identify where and when this allegedly occurred. Petitioner fails to allege what was said between the inmates. Petitioner fails to state what "stories" were made up, or that any inmate testified to a false story as a result of this alleged contact. To the extent they talked about hoped benefits from testifying, Petitioner fails to state facts sufficient to determine if any one of them testified falsely at trial regarding their hope for a benefit for testifying.

54

Petitioner did not support this conclusory allegation with any records from the Marshals service corroborating that any of the testifying inmates were transported together or held together.

Like Petitioner's other allegations regarding cooperators, this allegation is inherently unbelievable and completely unsupported by factual allegations that give rise to a legitimate factual dispute justifying an evidentiary hearing.

### 5. Prior Cooperation

Petitioner alleges that "many of these cooperating witnesses had been cooperating with the authorities in other matters and had been doing so prior to the time they claimed that Petitioner made incriminating statements to them." (Petitioner's Memorandum, at 38). Petitioner claims, therefore, a violation of his Fifth and Sixth Amendment rights to counsel, citing *Massiah v. United States*, 377 U.S. 201 (1964). This allegation is frivolous. Even assuming the inmates were "agents" of the government simply because they had previously cooperated in unrelated cases, Petitioner had no Fifth Amendment right to counsel in relation to statements made to someone he did not know to be government agent (*Illinois v. Perkins*, 496 U.S. 292, 297 (1990)), and did not have Sixth Amendment right to counsel because he was not charged with the instant offenses at the time he made statements to any of the inmates who testified against him at trial (*Texas v. Cobb*, 532 U.S. 162, 172 (2001)).

Petitioner goes on to claim that "the fact that informant witnesses had cooperated in the past is evidence of bias and motive that should have been turned over to the defense. (Petitioner's Memorandum, at 38-39). Petitioner acknowledges in a footnote that trial counsel was aware some of these witnesses had previously

cooperated.  (Petitioner's Memorandum, at 39 n. 8).  Again, however, Petitioner fails to identify which witnesses he claims previously cooperated and of which ones Petitioner's counsel were aware and of which they were not.  Petitioner fails to allege facts establishing when, where, and for whom these witnesses previously cooperated.  Petitioner fails to allege facts establishing that the government was aware of the prior cooperation, how and when it became aware of this prior cooperation, and that the government failed to disclose that prior cooperation to Petitioner.

Petitioner is not entitled to an evidentiary hearing based on nothing but conclusory allegations lacking any factual basis.

C.      Trial Counsels' Performance Was Not Deficient

Trial counsels' performance investigating and impeaching the government's cooperators did not fall below an objective standard of reasonableness.  *Strickland*, 466 U.S. at 687-88.  Petitioner claims his attorneys were ineffective because they "could have uncovered additional evidence that was not provided by the Government regarding these jailhouse informants and cooperating witnesses."  (Petitioner's Memorandum, at 39).  He claims that, [h]ad counsel conducted a thorough investigation into these witnesses, counsel might have learned that the Government procured the testimony of these witnesses in the improper ways described above, and that some of these witnesses had long histories of cooperating with the government" and that they had "group meetings."  (Id.).  These assertions are baseless.  There is nothing to establish that this information was available to trial counsel in 2004.  To the extent that these witnesses have recently changed their testimony, it was inconsistent with what they said in grand jury and at trial.  Moreover, Petitioner fails to identify the witnesses

56

with "long histories" of cooperating which he claims his trial counsel should have known about through investigation. Finally, Petitioner provides no factual allegation about the extent of the trial attorneys' investigation into the cooperators, how they failed to "thoroughly" investigate the cooperators, or what Petitioner now claims his trial attorneys should have done, but did not.

Petitioner makes another claim of ineffective assistance of counsel unrelated to the alleged failure to disclose *Brady* information. Petitioner claims his trial attorneys should have presented evidence from other inmates to impeach the testimony of the government's cooperators. (Petitioner's Memorandum, at 40-42). Petitioner does not allege his attorneys failed to investigate these other inmates – indeed, he attaches statements Petitioner secured from these other inmates in 2000, 2001 and 2002 which he provided to his trial attorneys.[5] (See Petitioner's Appendix, ## 16-21). Trial counsels' decision not to call more inmate friends of Petitioner was not deficient. Counsel has wide discretion in deciding which witnesses to call at trial. See *United States v. Staples*, 410 F.3d 484, 488 (8th Cir. 2005) ("The decision not to call a witness is a virtually unchallengable decision of trial strategy . . ..") (internal quotations and citations omitted). These other potential witnesses were hardened criminals, with significant criminal records. Moreover, there is no basis for believing their testimony would have been any more effective than the testimony provided by the two inmates trial counsel did call.

_____

[5] Petitioner claims "some" of these witnesses were known to Petitioner's lawyers. (Petitioner's Memorandum, at 42). Petitioner fails to identify which were known and which were unknown.

57

D.   Petitioner Has Failed to Demonstrate Prejudice

Petitioner claims that the alleged impeachment information about these cooperators was "highly material" and without these cooperators, the "case against Petitioner was completely circumstantial" such that it "would certainly have resulted in the probability of a different verdict and/or sentence."  (Petitioner's Memorandum, at 43).  This is baseless.  The three cooperators with regard to which Petitioner has made any factual allegation at all, Bregar, Putzier, and Johnson, all testified primarily about an escape attempt at Woodbury County Jail and, to a very minor degree, statements Petitioner made about the crime.  This evidence went to other charges, not the murder charges.

As to the murder charges, the government presented what the district court judge who presided at trial described as a tsunami of evidence against Petitioner. *United States v. Honken*, 381 F. Supp. 2d 936, 1057 (N.D. Iowa 2005) ("To the extent that the weight of the evidence against Honken is relevant to disposition of his post-trial challenges, the court reiterates that there was a tsunami of evidence of Honken's guilt- far and away the most overwhelming proof of the guilt of a criminal defendant that the undersigned has encountered in his judicial tenure.").  There is no basis for concluding that additional impeachment evidence against these tangential witnesses would have changed anything.  See, e.g., *English v. United States*, 998 F.2d 609, 611-12 (8th Cir. 1993) (denying 2255 motion on claim of newly discovered evidence when it was, at most, impeaching); *United States v. Johnson*, 450 F.3d 366, 373 (8th Cir. 2006) (finding testimony from others that material witness recanted is merely impeachment evidence, not meriting a new trial); *United States v. Yerkes*, 345 F.3d 558, 563 (8th Cir. 2003)

58

(denying motion for new trial when alleged new evidence would only go toward impeaching a government witness).

The Court should deny this portion of Petitioner's motion without an evidentiary hearing.

## VI.    CLAIM 4 – THE EVIDENCE SUPPORTED PETITIONER'S CCE CONVICTION

Petitioner asserts he was wrongly convicted of being an organizer, supervisor, or manager of five or more other people in a Continuing Criminal Enterprise because he "did not act as an organizer or supervisor of, or other wise manage, Jeffrey Honken." (Petitioner's Memorandum, 46).  Petitioner also claims the district court erroneously instructed the jury with regard to the unanimity requirement for determining the identity of the five people Petitioner organized, supervised, or managed.  (Petitioner's Memorandum, 47-48).  Petitioner claims his attorneys' performance was deficient for failing to raise these claims. [6]

### A.    Petitioner Was An Organizer, Manager and Supervisor of the CCE

Petitioner's claims that his trial attorneys were ineffective for failing to present evidence showing Jeff Honken was not organized, managed, or supervised by Petitioner is without merit.  To prove a CCE violation, the government must prove four elements: 1) a felony violation of the federal narcotics laws, 2) as part of a continuing series of violations, 3) in concert with five or more persons for whom the defendant

---

[6]  Petitioner originally claimed, without explanation or support, the government failed to "disclose material evidence that Petitioner did not organize, supervise, or manage Jeffrey Honken in the drug operation." (Petitioner's Motion, at 28).  It appears Petitioner has abandoned that baseless claim as he makes no such assertion in his memorandum.  Indeed, he claims "evidence was available to trial counsel that would have refuted the Government's contrary allegation." (Petitioner's Memorandum 46).

59

occupied a position of organizer, supervisor or "any other position of management," and 4) from which the defendant derives substantial income or resources. 21 U.S.C. § 848(d). See also *United States v. Possick*, 849 F.2d 332, 335 (8th Cir. 1988) (setting forth elements of CCE offense). The government does not need to prove that Petitioner occupied a position of organizer, supervisor and manager, but rather, need prove he only occupied one of these, or some other leadership role, within the organization. *Possick*, 849 F.2d at 335. The terms "organizer," "supervisor," and "manager" are given their ordinary meaning. Id. Using the ordinary meaning of "organizer" and "supervisor," "[a]n organizer arranges a number of people engaged in separate activities into an essentially orderly operation and a supervisor gives orders or directions to another person who carries them out." *United States v. Hutching*, 75 F.3d 1453, 1458 (10th Cir. 1996) citing *United States v. Smith*, 24 F.3d 1230, 1233 (10th Cir. 1994) (internal quotations omitted); but see *United States v. Lindsey*, 123 F.3d 978, 986 (9th Cir. 1997) (requiring an "organizer" to exercise some form of managerial authority, but not control, in the CCE context). The term "manager" means that the person "exerted some type of influence over another individual as exemplified by that individual's compliance with the defendant's directions, instructions, or terms." *Possick*, 849 F.2d at 336. The government did not need to prove the Petitioner occupied a leadership role with regard to five people at once, that the five acted in concert with each other, that the Petitioner exercised the same type of leadership role over each of the five, or even that the Petitioner had personal contact with each of the five.

The evidence at trial clearly established that Petitioner directly supervised and

60

managed other members of the organization, but Petitioner claims he did not control, manage, or supervise his brother, Jeff Honken. Petitioner ignores the leadership role he exercised in organizing the operation, which involved his brother, instead focusing exclusively on the general relationship between Petitioner and his brother and specifically on whether there was evidence Petitioner gave his brother specific directions or instructions. Petitioner organized the operation by determining the controlled substance that would be manufactured, the method that would be used to manufacture the methamphetamine, where it was to be manufactured, how it was to be funded, how the funds were to be expended in manufacturing the methamphetamine, where and to whom the methamphetamine was manufactured, how and by whom it would be transported to Iowa, how much was charged for the methamphetamine, how the proceeds were distributed and spent, and other such details of the operation. Petitioner organized the operation in such a way that minimal contact existed between those in Arizona, like Jeff Honken who supplied the money and Tim Cutkomp who helped him manufacture the methamphetamine, and those he had peddling the dope for him in Iowa. He further organized his distribution end such that there was minimal contact between his two dealers so as to reduce the opportunity for collusion between them and the possibility that betrayal by one dealer would necessarily bring down the other.

Jeff Honken testified that in 1992, Petitioner moved back to Tucson where Jeff was living with his wife and employed at his own company. (Tr. 287). He testified the reason Petitioner gave for returning to Tucson was, in part, to manufacture controlled substances. (Tr. 288). Jeff Honken testified Petitioner asked him for financial help in

61

the drug operation. (Id.). He assumed that he was paying for the house Petitioner rented south of Tucson where the manufacturing operation took place. (Tr. 293). Jeff Honken did not know how Petitioner spent the money he supplied in support of the methamphetamine manufacturing operation. (Id.). Jeff Honken testified that it was Petitioner who had connections in Iowa for distributing the methamphetamine. (Tr. 296). Petitioner determined how, where and what controlled substance would be made, who would be involved in the manufacturing, to whom it would be sold, and how it would be distributed. (Tr. 290-97, 352). Petitioner then controlled the flow of the drug proceeds, to such an extent that Jeff Honken was not repaid his investment and became incensed after Petitioner's arrest in March 1993 when Jeff Honken discovered that Petitioner had purchased expensive personal property using the proceeds. (Tr. 297-98, 303-304).

Thus, the essence of the government's evidence was that Petitioner was the organizer of the criminal activity involving Jeff Honken. The government did not claim Petitioner directed and controlled Jeff Honken like he did the others. Nevertheless, there was at least some evidence Petitioner exercised some management over Jeff Honken after Petitioner's arrest in March 1993. At that time, Petitioner directed his brother Jeff to destroy the glassware and other equipment stored in one of Jeff's storage sheds. Jeff complied with these instructions from Petitioner. (Tr. 301-302).

Thus, with respect to the CCE, it was Petitioner who organized the operation, including Jeff Honken's place in the operation. It was Petitioner who used his brother for the financial support, and who controlled the flow of funds so that he retained the most for his own use. While Jeff Honken supplied Petitioner with funds and vehicles, it

62

reflected Petitioner's ability to control his brother, not the other way around.  In any event, there was certainly sufficient evidence for a reasonable jury to conclude that Petitioner was the organizer of his brother.

### B. Trial Counsels' Performance Was Not Deficient Regarding Evidence About Jeff Honken's Role

Petitioner claims there was evidence available to his trial counsel that he could have presented, but did not, citing affidavits from Melissa Friesenborg, Timothy Cutkomp, David Honken, Kathy Schuess, Jeff Honken, and Alyssa Nelson. (Petitioner's Memorandum 47).  The information in these affidavits does nothing to rebut Petitioner's role as the leader who organized the operation.  Neither Melissa Friesenborg, David Honken, Kathy Schuess or Alyssa Nelson were involved in the enterprise and have no first-hand knowledge of how it was organized, who organized it, or anything else about the operation.  Rather, their testimony is relegated to general opinions about the relationship they observed between Petitioner and his brother in unrelated matters.[7]  Petitioner's alleged evidence he claims his trial counsel should have presented all goes to whether Petitioner directed or controlled Jeff Honken.  The government's evidence focused on Petitioner's organization of criminal activity involving Jeff Honken, not whether he directed or controlled Jeff Honken's conduct.

Moreover, Petitioner misstates the information contained in the affidavits. Petitioner asserts Jeff Honken "minimized and misstated his role in the drug operation,

---

[7]  David Honken claims to know that "Jeff got Dustin involved in the drug making business" and "[i]t was Jeff's idea and Jeff was in charge of the drug making plans." (David Honken Affidavit, Petitioner's Appendix 24, p. 7).  He has no basis for making this assertion, as he was not involved in the operation in any way.

63

including regarding financial profits, his use own use [sic] and distribution of methamphetamine, his knowledge of the operation, and his decision-making role." (Petitioner's Memorandum, 47, citing to affidavits by Allyssa Nelson and Tim Cutkomp). First, Alyssa Nelson was not involved in the operation and has no basis for stating what anyone's role was in the operation. Second, neither Alyssa Nelson nor Tim Cutkomp's affidavits say anything about Jeff Nelson using or distributing methamphetamine.[8] Third, there is nothing in these affidavits that establishes that Jeff Honken's role, as described by him at trial, was minimized or misstated.

Petitioner concedes that trial counsel elicited testimony from his sister that "Jeff was the more dominant brother," was out for himself, and that Petitioner was "loyal." (Petitioner's Memorandum, 48; Affidavit of Alyssa Nelson, Petitioner's Appendix 26, p. 7; Tr. 3085-86). Similarly, Petitioner concedes his trial counsel elicited testimony from his mother regarding his relationship with Jeff Honken. She testified that, between them Jeff Honken was "the alpha dog" and "the boss." (Tr. 3092-94). Petitioner failed to mention that his trial attorneys elicited similar testimony from Jeff Honken, focusing on his superior experience supervising 75 employees, that he supervised Petitioner when Petitioner worked at Jeff Honken's company, and that he controlled Petitioner's salary. (Tr. 311, 314). Petitioner claims his trial counsel should have called "less biased" witnesses for this purpose, but the only other witnesses he lists are friends and other family members (Tim Cutkomp excepted).

---

[8] Jeff Honken denied using methamphetamine. (Tr. 295). There is nothing in the record to support the assertion he used or distributed methamphetamine.

64

Petitioner claims the court's jury instruction was "clearly erroneous" because it did not require the jury to unanimously agree to the identity of the five persons Petitioner organized, managed, or supervised and faults counsel for failing to object. (Petitioner's Memorandum, 47).  The Eighth Circuit Court of Appeals found there was no plain error for failing to make this objection, citing *United States v. Cuervo*, 354 F.3d 969, 995 (8th Cir. 2000).  *United States v. Honken*, 541 F.3d 1146, 1170 (8th Cir. 2008).  In *Cuervo*, the Eighth Circuit Court of Appeals held the CCE statute did not require the jury unanimously to agree which "five or more persons" defendant managed or supervised, distinguishing the Supreme Court's decision in *Richardson v. United States*, 526 U.S. 813 (1999), which held jury unanimity was required when juries determine predicate offenses in the "series" necessary to support a CCE.  *Cuervo*, 453 F.3d at 994.  While the Eighth Circuit reviewed this issue under the plain error doctrine, there is no reason to suppose it would have reached a different conclusion had trial counsel objected to the instruction at trial.  The Eighth Circuit has not reversed its decision in *Cuervo*, nor found the instruction erroneous where counsel has objected to it at trial. Given that the law was not favorable to the issue, trial counsel was not ineffective for failing to raise an issue that had no chance of success.  See *Link v. Luebbers*, 469 F.3d 1197, 1206 (8th Cir. 2006) (applying a presumption that appellate counsel make a strategic decision to focus on other claims on appeal, the court rejected an ineffective assistance of appellate counsel claim where appellate counsel chose not to assert an alleged jury selection error on appeal).

65

D.      Petitioner Has Failed to Demonstrate Prejudice

In support of his claim he was allegedly prejudiced by his trial counsel's performance, Petitioner provides only a conclusory allegation: "Petitioner was prejudiced by trial counsel's [sic] failures.  Had counsel performed effectively in these regards, there is a reasonable likelihood that the jury would not have found Petitioner managed Jeffrey Honken and thus could not have reached guilty verdicts on Counts 13 to 17."  (Petitioner's Memorandum, 49).  A simple conclusory assertion is insufficient to meet Petitioner's burden of alleging facts that demonstrate prejudice.

Petitioner was not prejudiced.  The government's evidence and argument demonstrated Petitioner was the organizer and leader of the criminal enterprise that involved five other people.  The government never did claim Petitioner directly ordered his brother to perform tasks related to the drug operation (with the exception of destroying evidence).  There is no basis to believe that additional general testimony about the relationship between the brothers would have made any difference.  Trial counsel also raised the argument Petitioner now makes regarding his relationship with Jeff Honken in the criminal enterprise when they filed a motion for a new trial and judgment of acquittal.  The district court rejected that argument, finding sufficient evidence existed that Jeff Honken was supervised, managed or organized by Petitioner. *Honken*, 381 F. Supp.2d at 1013-14.  Thus, trial counsel was not ineffective.

The Court should deny this portion of Petitioner's motion without an evidentiary hearing.

66

## VII. CLAIM 5 – MULTIPLICITY

Petitioner claims his trial attorneys were ineffective for failing to object to multiplicitous counts. Petitioner claims Counts 8 through 12, which charged Petitioner with committing murders in furtherance of a drug conspiracy, were lesser included offenses to Counts 13 through 17, which charged Petitioner with committing murders in furtherance of a Continuing Criminal Enterprise ("CCE"). (Petitioner's Memorandum, 50). Petitioner claims his trial counsel should have objected to the counts or moved to dismiss them, and that the failure to do so prejudiced Petitioner. (Id.).

In the companion case of *United States v. Johnson*, the Eighth Circuit Court of Appeals found the drug conspiracy murder counts were lesser-included offenses to the CCE murder counts, and therefore were multiplicitous. *United States v. Johnson*, 495 F.3d 951, 980-81 (8th Cir. 2007). Therefore, in *Johnson*, the Court of Appeals remanded the case to the district court to vacate the drug conspiracy murder convictions.

In Petitioner's case, his trial counsel did not object specifically on the ground that the charges were multiplicitous. Therefore, the Court of Appeals found he waived that issue. *United States v. Honken*, 541 F.3d 1146, 1154 (8th Cir. 2008).

Petitioner's trial attorneys were not ineffective. They challenged the government's indictment on double jeopardy grounds. While a defendant cannot be convicted of multiplicitous counts, it is proper for the court to submit all the counts to the jury. *United States v. Moore*, 149 F.3d 773, 779 (8th Cir. 1998). A court should, however, instruct the jury that if they find the defendant guilty of the murder in

67

furtherance of the CCE, they need not consider the charge of murder in furtherance of the drug conspiracy. (Id.). Thus, at most, trial counsel overlooked requesting the court provide such an instruction. Such an oversight does not mean trial counsels' performance fell below an objective standard of reasonableness.

In any event, Petitioner cannot demonstrate he was prejudiced by the error. The jury found Petitioner guilty of committing murders in furtherance of the CCE, and sentenced him to death for those counts. There is no factual basis to conclude that the jury's decision would have been different regarding the death penalty had they been instructed that they did not have to consider the murder in furtherance of the drug conspiracy counts. Had trial counsel objected to multiplicity, like trial counsel did in Johnson's case, the remedy would have been the same on appeal – remand to vacate the murder in furtherance of drug conspiracy convictions. The outcome – that Petitioner was sentenced to death – would have been no different.

Petitioner engages in pure speculation in asserting that he would not have been sentenced to death on any counts had trial counsel not erred. (Petitioner's Memorandum, 53). In other words, Petitioner theorizes that the only reason he was sentenced to death was because when the jury filled out the verdict form, there were two boxes to check for each victim instead of one, "unduly emphasizing the option of a death sentence to the jury." (Id.). This argument ignores the overwhelming aggravating factors justifying Petitioner's execution in this case. Petitioner substantially planned and premeditated all of the murders, killed four people in one episode, brutally killed another victim several months later after he had time to contemplate the horror of his prior murders, bound and gagged two adult victims and brutally beat a third to death after

68

shooting him multiple times, obstructed a criminal investigation, slaughtered two innocent little girls, and devastated several families, not to mention that he poses a future danger to others. (Penalty Phase Verdict Form, Doc. 547, pp. 2-4). The idea that the jury would not have sentenced him to death if they had only one box to check for each victim instead of two is preposterous.

The Court should deny this portion of Petitioner's motion without an evidentiary hearing.

## VIII.   CLAIM 6 – DRUG QUANTITY VIA HEARSAY

Petitioner claims his trial attorneys were ineffective for failing to object to admission of the laboratory report regarding the quantity of drugs found in Greg Nicholson's house through an agent instead of requiring the government to introduce it through the criminalist. (Petitioner's Memorandum, 54). Petitioner claims the laboratory report was the "primary" evidence the government relied on to establish drug quantity. (Petitioner's Memorandum, 54). Petitioner claims trial counsel was successful in attacking "a similar drug quantity report" in the 1998 sentencing hearing, and should have similarly attacked the drug report here. (Petitioner's Memorandum, 56). Petitioner asserts that "[c]ross-examination of Ms. Davis would have been a fertile ground for challenging her assumptions, credentials, methods, and conclusions." (Id.).

### A.     Evidence of Drug Quantity At Trial

The government relied on a variety of evidence at trial to establish drug quantity. One part of it was the finished methamphetamine seized from Greg Nicholson's house, methamphetamine supplied by Petitioner. (Tr. 48-50). The laboratory report to which Petitioner objects pertained to this methamphetamine. The drug quantity analysis here

69

was different from the drug quantity analysis performed at the time of Petitioner's 1998 sentencing. There, the laboratory report pertained to a methamphetamine laboratory. The analysis in the 1998 sentencing hearing involved the calculation of drug quantity based upon a determination of the capacity of the laboratory. The criminalist in the 1998 sentencing hearing was John Meyers from the DEA in Chicago, Illinois. (Sent. Tr. 631). The criminalist who performed the analysis of the finished product seized from Greg Nicholson's house was Debra Davis, from the Iowa Department of Public Safety. (Exhibit 25).

In addition to relying on the drug quantity from the drugs seized from Greg Nicholson's house, the government also relied upon testimony by those involved in the drug trade with Petitioner and from Petitioner's own statements to others. For example, Greg Nicholson testified in grand jury that Petitioner delivered to him at least 900 grams of "pure" methamphetamine. (Trial Exhibit 27, pages 9-12). Aaron Ryerson testified that the methamphetamine DeGeus obtained from Petitioner was pure. (Tr. 243, 247). In addition, Petitioner made statements to others (who would have no way to know the results of the laboratory report) that he manufactured very pure methamphetamine. For example, Petitioner told Terry Bregar that he was able to manufacture 98% to 99% pure methamphetamine. (Tr.1391). Petitioner told Dan Cobeen he produced 96% to 98% pure methamphetamine. (Tr. 578-81). The government introduced a recorded conversation between Petitioner and Greg Nicholson during which they discussed Nicholson distributing a quarter pound of methamphetamine to one of his dealers, Nicholson ordering another kilogram of methamphetamine from Petitioner, Petitioner bragging that the methamphetamine was "pure," and the fact that Petitioner made more

70

than $100,000 from drug sales to Nicholson alone in the last year.  (Trial exhibit 20).

Tim Cutkomp testified at trial that he and Petitioner manufactured between five and six

batches of methamphetamine.  (Tr. 700).  The first batch produced only two to four

ounces.  (Tr. 701).  The largest amount they made was a pound to a pound and a half.

(Id.).  This was pure methamphetamine, to which they would add "cut" either in Arizona

or at Nicholson's house.  (Id.).  On one trip alone Cutkomp delivered a pound and a half

of uncut methamphetamine (more than 680 grams).  (Tr. 705).

B.    Trial Counsels' Performance Was Not Deficient

Petitioner has failed to allege facts establishing that trial counsels' performance

was deficient.  His argument that trial counsel should have attacked the laboratory

report for the seized drugs like he did for the methamphetamine laboratory ignores the

significant difference between the two.  Determining drug quantity based on the parts of

a methamphetamine laboratory seized by law enforcement is much more complicated

and involves estimating the capacity of the laboratory, necessarily requiring an analyst

to make certain assumptions and conclusions.  Determining drug quantity based on

seized finished methamphetamine is another matter altogether.  With finished product,

an analyst simply subjects a portion of the product to certain scientific tests which

indicate whether the substance is methamphetamine and the purity of the drug, and

then weighs the methamphetamine.

Had trial counsel objected to admission of the laboratory report through

Detective Stearns, the government would have simply called Criminalist Davis to testify

about her analysis.  This would have only served to emphasize the drug quantity

evidence more than it was by allowing it to come in through the detective.

71

Further, Petitioner has completely failed to allege facts establishing there are "fertile ground for challenging her assumptions, credentials, methods, and conclusions." (Petitioner's Memorandum, 56). Petitioner has alleged no facts indicating, for example, that the methodology or assumptions applied were erroneous, or that the conclusions reached were in error. Petitioner has alleged no facts that would call into question Ms. Davis's credentials. Rather, Petitioner tries to defame her by claiming she worked for the same agency who employed the criminalist who analyzed the capacity of Petitioner's laboratory in reference to the 1998 sentencing, which Petitioner claims was false. The problem with this attack is that Davis was an employee of the State of Iowa, and the criminalist who analyzed Petitioner's laboratory capacity in 1998 was an employee of the Drug Enforcement Administration. Petitioner cannot support a claim his trial attorneys were deficient in attacking the laboratory report when his habeas counsel have alleged no facts that would call that laboratory report into question.

Moreover, Petitioner has failed to demonstrate there was not a tactical or strategic reason behind the decision not to challenge the admissibility of the laboratory report. The reality is that Petitioner was already convicted of conspiring to distribute methamphetamine, and the jury would know that. Abundant evidence was admitted about the size of Petitioner's methamphetamine manufacturing operation. Petitioner was on trial for murdering five people in furtherance of a drug enterprise. It was not unreasonable for trial counsel to conclude that attempting to dispute drug quantity based on a laboratory analysis of finished product was going to be fruitful. Nothing Petitioner has alleged in his motion has shown that judgement to be faulty.

Appellate counsel was not ineffective for failing to raise this issue on appeal.

72

Petitioner's claim that admission of the laboratory report was plain error is meritless. "[A]ppellate counsel is not required to recognize and raise every conceivable constitutional claim." *United States v. Swayze*, 2008 WL 859030, at *14 (N.D.Iowa, March 28, 2008) (rejecting defendant's claim that appellate counsel was ineffective for failing to raise on appeal the admission of a drug laboratory report through an agent instead of the criminalist). Moreover, there was sufficient evidence establishing drug quantity independent of the laboratory report and Petitioner's guilt of the crimes charged. See *Middleton v. Roper*, 455 F.3d 848, 857 (8th Cir. 2006) (stating that an alleged violation of the Confrontation Clause is subject to harmless error analysis).

C.     Petitioner Has Not Demonstrated Prejudice

Petitioner has not demonstrated that, but for counsels' alleged deficient performance there was a reasonable probability that the result fo the trial would have been different. Had trial counsel objected to admission of the laboratory report through the detective, the government would have simply called the criminalist. Petitioner has alleged no facts showing that had she testified, trial counsel could have established any basis to question her findings. The evidence Petitioner was involved in a drug lab producing pounds of very pure methamphetamine was overwhelming and there is no basis to conclude that objecting to admission of the laboratory report would have led to a different result at trial. Finally, it would have made no difference in the end because Petitioner was convicted of Counts 13 through 17, which charged him with committing murders in furtherance of a continuing criminal enterprise, and those counts did not require proof of a specific drug quantity.

The Court should deny this portion of Petitioner's motion without an evidentiary

73

hearing.

## IX.   CLAIM 7 – TRIAL COUNSEL WERE NOT INEFFECTIVE IN JURY SELECTION

Petitioner alleges his attorneys were ineffective for failing to object to the

elimination of 29 allegedly qualified jurors as part of an agreement with the government.

(Petitioner's Memorandum, 58-59).  Petitioner also claims three jurors should have

been struck pursuant to the agreement, but were not.  Petitioner further alleges trial

counsel missed, through oversight, several jurors they claim should have been struck

as part of the agreement.  (Petitioner's Memorandum, 59).  Finally, Petitioner claims his

appellate counsel were ineffective for failing to raise on appeal two *Witherspoon*

objections made at trial.  (Id.).

### A.   Factual Background

Well in advance of trial, the court authorized the use of an
extensive juror questionnaire to obtain basic biographical information
about each prospective juror, as well as more detailed information about
the juror's views on trial-related issues, such as the death penalty. The
court also authorized Honken's defense team to hire a jury consultant,
who participated in the drafting of the juror questionnaire. The
questionnaire was distributed to one thousand prospective jurors.  If a
questionnaire was returned as undeliverable, Clerk's Office personnel
attempted to determine whether the prospective juror had moved or died
and, if possible, would resend the questionnaire to the prospective juror.
Based on directions from the court, the Clerk's Office excused jurors who
could not be located. Prior to trial, counsel for the parties met to review
the hundreds of responses to the juror questionnaires that had been
returned. The parties then agreed to excuse over two hundred prospective
jurors for hardship or inability to qualify to serve on the jury in this death-
penalty case. The remaining prospective jurors were randomly sorted into
panels of fifteen and each juror was notified of the day on which his or her
panel was to appear for preliminary jury selection. After panel assignment
notices were sent out, the court excused several additional jurors for
hardship based on renewed requests for excuses from service.

74

Jury selection began in Honken's trial on August 18, [sic] 2004,[9] with the appearance of the first panel of approximately fifteen prospective jurors for group and individual *voir dire.* Each day, with each new panel, by agreement with the parties, the court initiated the jury selection process. However, also by prior agreement and pursuant to certain rulings, the lawyers on both sides were provided considerable latitude in questioning the panel as a whole and then questioning each individual prospective juror. In the course of each day of jury selection, prospective jurors were excused for hardship or on challenges for cause. Prospective jurors not so excused were "qualified" for the final juror pool. Once seventy-five prospective jurors were "qualified" in this manner, the "qualified pool" was notified to appear for final jury selection. A sufficient pool of "qualified" prospective jurors was eventually obtained after twelve daily panels were interviewed.

The "qualified pool" of seventy-five prospective jurors appeared on September 8, 2004, and after further *voir dire,* three prospective jurors were excused for hardship and one was stricken for cause. The parties then exercised their peremptory challenges, and a panel of twelve trial jurors and six alternates was seated. The jurors selected were not made aware at this time whether they were trial jurors or alternates. The court then read its preliminary "merits phase" jury instructions. After the reading of the jury instructions, one juror, a local Sioux City lawyer, notified the court that she had just realized that she had read various rulings in the companion case against Angela Johnson, and the court and the parties agreed to strike that juror for cause. Therefore, trial continued with a total of seventeen jurors, five of whom were alternates.

*Honken*, 381 F. Supp.2d at 956-57.

The parties agreed to eliminate 163 jurors because of the views the potential jurors expressed on the death penalty as reflected in their questionnaires, and others on other grounds, including pretrial publicity. Question 72 in the questionnaire asked jurors to circle the subparagraph (a) through (i) which most accurately represented his or her beliefs regarding the death penalty. An (a) answer reflected someone who would never vote to impose the death penalty and an (i) answer reflected someone who would

---

[9] Jury selection actually began on August 17, 2004.

always vote to impose the death penalty.  The rest of the subsections reflected views ranging from the extremes to a neutral position for those who circled subsection (e).

Petitioner appears to claim the parties agreed to only strike those who circled 72(a) and 72(i), and those who circled (b) and (h) would be subject to further voir dire. (Petitioner's Memorandum, 61).  Petitioner therefore claims his trial counsel should not have struck 29 of these jurors who circled (b) on question 72.  (Petitioner's Memorandum, 62).  Petitioner provides no attribution for the source of this alleged agreement.  Petitioner has not provided any other contemporaneous documents purporting to reflect this agreement, nor do the declarations by trial counsel attached to Petitioner's motion address this issue.

The record reflects that the parties agreed to strike all jurors who circled 72(a), 72(b), 72(h), or 72(i), reflecting jurors with the most extreme views about the death penalty.  Attached as Exhibit D is a copy of a facsimile sent by defense counsel Leon Spies to the undersigned prosecutor listing all prospective jurors who circled question 72(a), (b), (h), and (i).  It was off this list that the parties reached an agreement to strike prospective jurors with extreme views of the death penalty.  Each of the prospective jurors identified on this list are included in the list of jurors contained in the district court's order reflecting those struck by agreement of the parties (both because of death penalty views and for hardship).  (Doc. 342).[10]  Moreover, that agreement was reflected

---

[10]  There is one exception.  Juror 53 circled question 72(b), indicating s/he would have a hard time imposing the death penalty and was on the list of jurors the parties agreed to strike because of extreme death penalty views.  Because of some oversight, that juror was not included on the list of agreed-upon strikes, an error enuring to Petitioner's benefit.

76

by a brief reference in a statement by Alfredo Parrish during jury selection. (Voir Dire Tr. 3170).

Petitioner claims trial counsel were ineffective because "multiple venire persons who answered 'yes' to 'h' (those who would have a difficult time not imposing death) were left in the qualified pool." (Id.). Petitioner identifies these persons as Jurors 24, 556, and 574. (Id.). Because of the random order in which jurors appeared before the court for jury selection, Juror 24 never appeared in court before a jury was selected. Thus, whether Juror 24 should or should not have been struck because of the agreement of the parties is irrelevant. Similarly, Juror 574 was excused for hardship, so Petitioner did not have to exercise a peremptory strike to eliminate that juror. (Doc. 398). Only Juror 556 was struck by Petitioner's exercise of a peremptory strike. (Exhibit E). With regard to Juror 556, the juror circled not only 72(i), but also 72(e) and 72(f). Moreover, Juror 556's answers to questions 73 and 74 reflect that Juror 556 did not hold extreme views on the death penalty. The court denied Petitioner's motion to strike Juror 556 for cause, showing that regardless of the juror's answers in the questionnaire, they were qualified to serve as a juror in this case. Regardless, Petitioner's exercise of a peremptory strike to remove Juror 556 removed any claim he could have for error in failing to strike the juror for cause. See *United States v. Johnson*, 495 F.3d 951, 963 (8th Cir. 2007) (finding no Sixth Amendment claim where defendant exercised peremptory strikes to remove juror defendant claimed the court should have removed for cause).

Finally, Petitioner claims that "multiple jurors' responses were misidentified as a matter of simple oversight . . .." (Petitioner's Memorandum, 63). Petitioner identifies

77

"for example" jurors 12 and 809 who were struck pursuant to the agreement. (Id.). It appears Juror 12 did circle (d) instead of (b), and may have been included on the list by mistake. Petitioner claims Juror 809 should not have been included on the list of agreed upon strikes because Juror 809 circled more than one subsection and there was allegedly an agreement among the parties that anyone who circled more than one subpart would not be struck by agreement, but would be subject to further questioning. (Petitioner's Memorandum, 63). In support of this assertion, Petitioner cites to page 3170 of the Voir Dire transcript, but that page reference does not support him. There is nothing in Mr. Parrish's comment reflecting such an agreement among the parties. Regardless, mistakes were made to Petitioner's benefit as well. For example, juror 918 circled (a) on question 72 (meaning they would never impose the death penalty), but was not included in the list of stipulated strikes. Likewise, as mentioned above, Juror 53 was on the list generated by the parties, but was omitted from the Court's order listing the jurors struck by agreement.

> B. Trial Counsel Were Not Ineffective For Agreeing to Eliminate Prospective Jurors With Extreme Views About the Death Penalty as Reflected in Their Answers to Questionnaires
>
> > 1. Trial Counsels' Performance Did Not Fall Below an Objective Standard of Reasonableness

Petitioner does not claim his attorneys erred by reaching an agreement with the government to strike jurors with extreme views about the death penalty. The agreement was to strike all jurors with extreme views about the death penalty as reflected by those who circled (a), (b), (h), or (i) on Question 72. It was not an unreasonable agreement to reach with the government. While Petitioner now believes

those who circled (b) might have been qualified and should not have been struck as part of the deal, then the government would not have agreed to strike those who circled (h) in response to Question 72. Such a quid-pro-quo agreement to strike jurors is a strategic decision that should not be second-guessed by those with the benefit of hindsight.

To the extent the parties missed a handful of jurors who should have been on the list and were not, or were on the list but did not belong there, the oversight included jurors with views on both extremes. Missing these jurors did not render trial counsel's performance deficient, particularly when it is considered that counsel was dealing with 1,000 questionnaires. Under the Sixth Amendment, "[c]ounsel need not perform perfectly . . .." *Brunson,* 708 F.2d at 1356. See also *Doss v. Quarterman*, 2006 WL 2390258, * 4 (N.D. Tex., Aug. 18, 2006) (unpublished) (finding failure of counsel to move to strike two jurors for bias did not constitute ineffective assistance of counsel, even though the state and defense counsel agreed to generally strike all prospective jurors who expressed a problem with the gruesome photographs or who expressed bias against the minimum punishment for the lesser included offenses).

        2.     <u>Petitioner Cannot Demonstrate He Was Prejudiced by Trial Counsels' Alleged Error</u>

Petitioner claims he was prejudiced by counsels' ineffectiveness because "[n]one of the jurors who answered 'b' on the questionnaire were excludable for cause simply based upon that answer." (Petitioner's Memorandum, 65).[11] Petitioner cites *United States v. Chanthadara*, 230 F.3d 1237 (10th Cir. 2000), and *Nicklasson v. Roper*, 491

---

[11] Petitioner means to reference question 72(b).

79

Case 3:10-cv-03074-LTS-KEM    Document 22    Filed 07/14/11    Page 87 of 191

F.3d 830 (8th Cir. 2007). These cases are inapposite, however, as neither involved an agreement by counsel to strike jurors. Rather, each involved a judicial decision to strike jurors, over the defendants' objections, based solely on the answers to juror questionnaires. That is not what happened here. In contrast to those cases, the 29 potential jurors struck for answering "yes" to question 72(b) were struck by agreement of the parties as part of a quid–pro-quo agreement.

Regardless, Petitioner has failed to demonstrate prejudice. Petitioner presumes each of the 29 who answered "yes" to question 72(b) were qualified. Petitioner has not alleged facts or demonstrated that these jurors were qualified. Petitioner has failed to identify what each of the jurors said in their questionnaires that demonstrated they were qualified. Similarly, Petitioner has failed to demonstrate how the apparent mistakes by counsel in creating the list (including some on the list that did not belong there, or excluding from the list some who did) had any impact on jury selection. The failure to include Jurors 24 and 574 had no impact because one never made it on a panel that appeared for jury selection and the other was struck for hardship. The failure to include Juror 556 on the list makes no difference because that juror was qualified to serve and did not belong on the list.

C. Appellate Counsel Was Not Ineffective for Failing To Appeal *Witherspoon* Challenges

In a capital case, a trial court has the task of seating a jury which can fully consider either option of imposing the death penalty if the law and the facts support such an outcome, or life imprisonment. Persons who would automatically vote against imposition of the death penalty regardless of the law and evidence are not qualified to

80

sit as jurors in a capital case. *Witherspoon v. Illinois*, 391 U.S. 510, 520-22 (1968). In addition, if a prospective juror's views about the death penalty would prevent or substantially impair the performance of their duties in accordance with the court's instructions and the juror's oath, that juror is also unqualified to serve. *Morgan v. Illinois*, 504 U.S. 719, 728 (1992). This standard applies equally to both pro-death penalty and anti-death penalty advocates. *Morgan*, 504 U.S. at 734 n.7. Juror bias need not be proved with unmistakable clarity; rather, it is sufficient if the trial judge is left with a definite impression the juror would not be able to faithfully and impartially follow the law. *Wainwright v. Witt*, 469 U.S. 412, 424-26 (1985).

The term "Witherspoon excludables" has been adopted in capital litigation as a shorthand description for such jurors properly excluded on the basis of the juror's death penalty views. See also *Lockhart v. McCree*, 476 U.S. 162,173 (1986); accord, *Buchanan v. Kentucky*, 483 U.S. 402, 407-408 n.6 (1987). In *Witt*, the Supreme Court held that potential jurors who are opposed to the death penalty must be excluded for cause because they might otherwise frustrate the government's legitimate interest in administering its capital sentencing statute. *Witt*, 469 U.S. at 413. The Court refined the *Witherspoon* standard and held that a juror is a "Witherspoon-excludable" when he or she holds views which "would prevent or substantially impair the performance of [that juror's] duties . . . in accordance with his or her instructions and his or her oath." 469 U.S. at 420 (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)). Thus, the opinion in *Witt* rejected the former, more stringent standard set forth in *Witherspoon*. *Witt*, 469 U.S. at 422. See also *Pickens v. Lockhart*, 4 F.3d 1446, 1452 (8th Cir. 1993) (juror was

81

properly excused for cause where she continuously responded: "If I had to" when asked if she could apply the death penalty if the evidence justified it, since her other answers and demeanor reflected that her opposition to capital punishment would have impaired her performance as determined under the *Witt* standard). The trial court is granted broad discretion in determining a prospective juror's impartiality, and such rulings are entitled to a presumption of correctness. *Witt*, 469 U.S. at 428-29; *Chandler*, 996 F.2d at 1103. Moreover, where the prospective juror's position on imposing the death penalty is ambiguous, courts can resolve the ambiguity in the government's favor given the trial court's superior position for assessing the potential juror's demeanor and credibility. *Antwine v. Delo*, 54 F.3d 1357, 1369 (8th Cir. 1995).

1. Juror # 538 Was Properly Struck Because She Would Have Required A Heightened Burden of Proof

During jury selection on August 18, 2004, the government moved to strike for cause Juror #538 because: 1) she stated she was unable to follow the court's instructions regarding the burden of proof, claiming she could only vote to impose the death penalty if the government proved it case beyond all possible doubt; and 2) the juror stated that she could consider the death penalty only if her own family members were victims of the murder. Petitioner's trial counsel argued the juror should not be struck because a juror's "residual doubts" of a defendant's guilt is allegedly a legitimate mitigating factor sufficient to reject the death penalty. Thus, Petitioner's trial counsel reasoned, the juror's statement that she would demand a greater burden of proof than "beyond a reasonable doubt" was permissible. Ultimately, the court granted the government's motion to strike.

82

It is undisputed that the government's burden of proof, during the guilt phase and the penalty phase of a capital trial, is proof "beyond a reasonable doubt." Proof beyond a reasonable doubt does not mean proof beyond all possible doubt. See *United States v. Simms*, 18 F.3d 588, 593 (8th Cir. 1994) (approving the language of the Eighth Circuit Model Jury Instruction 3.11). A juror who cannot follow the court's instruction, but rather, would impose a higher burden of proof on the government, is not qualified to sit as a juror. See, e.g., *United States v. Flores*, 63 F.3d 1342, 1355-56 (5th Cir. 1995) (juror properly struck because he would only consider the death penalty if he had witnessed the murder); *Wools v. McCotter*, 798 F.2d 695, 699 (5th Cir. 1986) (juror properly struck from capital case because he would hold the government to a burden of proof of beyond all possible doubt); *United States v. Blackburn*, 748 F.2d 958, 961 (5th Cir. 1985) (juror would consider the death penalty only if the defendant confessed).

In this case, Juror 538 stated she would require the government to prove its case by a standard of beyond all possible doubt. The following exchange took place during voir dire:

> Q.     Given your personal, philosophical, moral position on the death penalty, can you do that [sign name on verdict form imposing the death penalty] in this case?
>
> A.     If I could be – beyond a reasonable doubt that this man is guilty, it would have to be, I mean, near confession. It would have to be proven to me without any doubt at all.
>
> Q.     Okay. You understand that's not the burden in this case? Do you understand that the burden the government has is prove it beyond a reasonable doubt, not beyond any doubt at all? Do you understand that?
>
> A.     I understand that. I may have misspoken. Yes.
>
> Q.     Maybe you haven't misspoken. What we need to do is get your

83

personal views on this, okay? And only you can tell us what your personal views are. Let me ask it this way. If you're back in that jury room and you are faced with that decision whether to impose the death penalty or not, are you going to require – personally, are you going to require a higher burden, you know, a higher level of proof beyond a reasonable doubt but you want no doubt at all before you personally could sign off on a death penalty? And if you do, that's fine. We just need to know it.

A.      I would say no doubt at all. If my choice between life in prison with reasonable doubt, I'm sure that I would choose that before I would choose the death penalty.

Q.      And the only way you would choose the death penalty is if you had no doubt at all?

A.      I believe so.

Q.      Okay. And that's fine. We just need to get your personal views on this. The other thing you just said a minute ago is you said something about a confession, it would need –

A.      Well, that would be beyond a doubt at all, yes.

(Voir Dire Tr. 334-335). Juror # 538 went on to say that "[f]or the death penalty, reasonable doubt is not good enough." (Voir Dire Tr. 341). Juror # 538 also made it clear she could not follow the court's instruction that the government's burden of proof was limited to beyond a reasonable doubt.

Q.      There's no way you could follow the instruction on that is what you're telling us?

A.      I'm going to say yes.

(Voir Dire Tr. 341).

Petitioner's argument that a juror can retain a residual doubt does not save Juror # 538 from properly being struck for cause. "Residual doubt" refers to some lingering doubt that may exist in a juror's mind, even after finding proof beyond a reasonable doubt. The Supreme Court rejected the concept of "residual doubt" as a proper

84

mitigating factor.  In *Franklin v. Lynaugh*, 487 U.S. 164, 173-74 (1988), the Court stated that defendants do not have an Eighth Amendment right to have a capital jury consider residual doubt as a mitigating factor because such alleged doubts are not an aspect of the defendant's character, record, or circumstances of the offense.  The Court also noted that the concept is inconsistent with allowing penalty-only trials for the death penalty when evidence of guilt is not even presented.  *Franklin*, 487 U.S. at 173 n.6.  Because residual doubt is not a proper mitigating factor, a juror who would hold the government to a burden greater than proof beyond a reasonable doubt is properly struck for cause.  In any event, even if residual doubt were a legitimate mitigating factor, it would not change the burden of proof for the government, which would always remain the burden of proving its case beyond a reasonable doubt, not beyond residual doubt.

> 2.  <u>Juror # 538 Was Properly Struck Because She Would Only Consider Imposing the Death Penalty if Her Family Were Victims</u>

Juror # 538 was also properly struck for cause because she indicated that the only circumstances under which she would impose the death penalty would be if she or her family were victims.  During voir dire, the following exchange took place:

Q.  Okay.  And when you began formulating your opinion in those general discussions or chatting with people, did you ever reach a point where you thought in certain instances you could find the death penalty acceptable?

A.  In my mind I would think if someone would do harm to me or to like one of my children or something –

Q.  Right, right.

A.  – I would think, you know, that you would think that.

Q.  In that instance you're saying if someone harmed one of your kids and, you know, heaven forbid, that would happen to anyone, but if it did happen, you're saying in

85

that instance you would want the death penalty imposed on that individual; is that correct?

A.      I'm still not sure that I would, but I would think in that case maybe.

(Voir Dire Tr. 338).

Jurors who state they can only consider the possibility of the death penalty under circumstances of personal consequences are not qualified to serve in a capital case. See *Bell v. Lynaugh*, 828 F.2d 1085, 1092 (5th Cir. 1987) (juror excused after stating that perhaps she would be able to impose death sentence only if a family member was murdered.).  A juror who can only consider the death penalty under such personal circumstances cannot fairly consider the possibility of the death penalty in a case where her family members were not victims of the crime.  Juror # 538's personal views of the death penalty, therefore, substantially impaired her ability to perform her duties as a juror.  Accordingly, the court properly struck her for cause.

> 3.      Juror 813 Was Properly Struck Because She Would Have Required the Government to Prove its Case by a Standard Higher Than Beyond a Reasonable Doubt

Petitioner claims the court also erred when it granted the government's motion to strike Juror 813 for cause.  The court properly struck Juror 813 because she also indicated that she would require the government to prove its case justifying the death penalty by a standard of proof higher than beyond a reasonable doubt.  Juror 813 further indicated that she would have trouble following an instruction from the court requiring her to apply a standard of proof beyond a reasonable doubt.  Accordingly, she was properly struck.

During voir dire, it became clear that Juror 813's views on the death penalty

would "prevent or substantially impair the performance of [her] duties in accordance with [her] instructions or [her] oath." *Witt*, 469 U.S. at 424, n.5. The following exchange took place during her voir dire questioning by the government.

Q. Sure. Let me rephrase it. Some people coming in talk to us, they say, I could never impose the death penalty unless I was 100 percent sure the government proved their case. Now, I know their burden's only beyond a reasonable doubt, but, you know, before I would impose the death penalty, it's gotta be more than that. It's gotta be more than beyond a reasonable doubt. Other jurors don't require that high of a – you know, they're satisfied with beyond a reasonable doubt.

And it's a personal thing. We're not being judgmental. But it's a personal thing. Each juror knows in their mind where they're at, so I need to know from you, is it something where – do you think you could only impose the death penalty if you were convinced beyond any doubt at all that he was guilty?

A. I would have to be very, very sure.

Q. And what do you mean by very, very sure?

A. I guess I would have to have it proven to me that I – I'm still confused about what you're getting at, but I would have to know in my heart that this penalty was the correct one, the proper one to do, not just if I – if I felt that it should be. I would just have to know in my heart that it was deserved I guess. And if it was a heinous-enough crime, which obviously it would have to be if they were going for the death penalty, I could do it.

Q. Okay.

A. But it would be hard.

Q. Let me – and that's good because it should be hard. But let me put it to you this way. The government's burden beyond a reasonable doubt as the judge instructed you this morning is not proof beyond all possible doubt. Would you need it to be proven to you beyond all possible doubt before you could impose the death penalty?

A. I think so.

Q. And if the judge said, Well, no, the government only has to prove it beyond a reasonable doubt, like I said, some people can follow that; some people can't. Some people require, no, it's gotta be more. It's gotta be beyond all possible

87

doubt.  Is that where you're at?

A.  Probably, yes.

Q.  And so you'd have a hard time following an instruction if you still – if the instruction was the government only has to prove it beyond a reasonable doubt, you'd have a hard time following that instruction?

A.  I guess if you put it that way, yes.

(Juror 813 Voir Dire Transcript, 11-13).

Defense counsel then questioned Juror 813 on this issue as well.  Juror 813 clarified that, with respect to the merits phase, she did not have a difficulty with, and would not impose a burden higher than, proof beyond a reasonable doubt.  (Juror 813 Voir Dire Transcript, 18).  Then the following exchange took place:

Q.  Okay.  Now, if and only if the jury finds Mr. Honken guilty beyond a reasonable doubt of some capital offense would the issue of punishment ever arise; okay?  Now, what I think I heard you telling Mr. Williams was if I'm in that situation, if I had any doubt whatsoever in my mind, even though it wasn't enough to keep me from finding him guilty, that might keep me from imposing the death penalty.  Is that what you were saying?

A. Yes.

Q.  And would that be the same as saying if there's still some – I'll call it leftover doubt, not – because we've already had proof beyond a reasonable doubt, there's some leftover doubt as to guilt, would you consider that as some reason not to impose the death penalty?

A.  All I can say is what I've said before.  I would find it very hard to do that, and I guess I would just have to know in my heart that it was warranted.

Q.  Okay.  And that would include being very sure, as you put in the questionnaire, that he was guilty of the capital offense; right?

A.  (Witness nodded head).

Q.  Is that yes?

A.  Yes.

88

Q. But it wouldn't mean you would not be able to consider and weigh everything that you've heard in making that decision.

A. No sir.

Q. And it wouldn't mean that the decision's already been made in your mind, would it?

A. Oh, no.

(Juror 813 Voir Dire Transcript, 18-19).

After the questioning, the court found that:

The way the questions were phrased, it is reasonable for me to conclude that she would require the government to prove an aggravating factor beyond all possible doubt. In other words, she'd have to be a hundred percent sure. It wouldn't be enough for the government to prove an aggravating factor beyond a reasonable doubt. That's how I understood her testimony."

(Juror 813 Voir Dire Transcript, 24-25). The court's finding is entitled to deference, given the court's unique ability to evaluate Juror 813's credibility and her demeanor during her questioning. The totality of Juror 813's answers made it clear she was sufficiently opposed to the death penalty, and that imposition of it would be so very hard for her, that she would require a level of proof greater than beyond a reasonable doubt. As such, her ability to perform her duties as a juror, and to follow the court's instructions, would have been substantially impaired. Therefore, the court did not abuse its discretion in striking Juror 813 for cause.

        4.      Petitioner's Appellate Counsel Were Not Ineffective For Failing to Appeal the District Court's Dismissal of Jurors 538 and 813.

Appellate courts review under the deferential abuse of discretion standard a district court's decision not to strike a juror for cause. *United States v. Thompson*, 450 F.3d 840, 843 (8th Cir. 2006). "Because the trial judge is in the best position to analyze

the demeanor and credibility of a venireman, we will not reverse a court's rulings absent an abuse of discretion." *United States v. Ortiz*, 315 F.3d 873, 888 (8th Cir. 2002).

In this case, the district court filed an order denying Petitioner's motion for a new trial in which Petitioner claimed, among other things, the court erred in refusing to strike jurors 538 and 813. The court explained at length the basis for its decision and denied Petitioner's motion for a new trial. *United States v. Honken*, 381 F. Supp.2d 936, 984-994 (N.D. Iowa 2005). On July 30, 2007, some 60 days prior to when Petitioner filed his appellate brief, the Eighth Circuit rejected a similar jury selection claim filed by Angela Johnson's appellate counsel. See *United States v. Johnson*, 495 F.3d 951, 963-64 (8th Cir. 2007). It was well within an appellate attorney's strategy decision to choose not to waste limited space and time in drafting an appellate brief to forego raising an issue that stood no likelihood of success on appeal. See *Link*, 469 F.3d at 1206 (applying a presumption that appellate counsel make a strategic decision to focus on other claims on appeal, the court rejected an ineffective assistance of appellate counsel claim where appellate counsel chose not to assert an alleged jury selection error on appeal).

> 5. <u>Petitioner Cannot Demonstrate He Was Prejudiced by Counsels' Failure to Appeal the Court's Dismissal of Jurors #s 538 and 813.</u>

Petitioner has an obligation to assert facts showing prejudice. Instead, Petitioner merely claims "[t]here is a reasonable probability that raising this claim would have resulted in the reversal of Petitioner's sentences." (Petitioner's Memorandum, at 74). "It is not enough for [a] defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 690. Here, Petitioner has

90

shown nothing, but rather, has simply proclaimed prejudice. This is nothing but an unsupported, conclusory statement that does not suffice. <u>See</u> *Bryson v. United States*, 268 F.3d 560, 562 (8th Cir. 2001) (conclusory allegations are insufficient to establish a claim of ineffective assistance of counsel). Moreover, the Eighth Circuit Court of Appeal's rejection of a similar claim in the *Johnson* case undercuts Petitioner's confident assertion that the Court of Appeals would have ruled in his favor had his appellate counsel raised this issue on appeal.

The Court should deny this portion of Petitioner's motion without an evidentiary hearing.

## X.      CLAIM 8 – UNDER-REPRESENTATION OF MINORITIES IN JURY POOL

Petitioner claims his attorneys were ineffective for failing to challenge the allegedly unconstitutional system for summoning venire persons, claiming he was denied a fair cross-section of the community in violation of the Fifth, Sixth, and Eighth Amendments. (Petitioner's Memorandum, 75). Petitioner claims African Americans and Latinos were systematically under-represented in the jury venire, claiming he has established a *prima facie* case of a Sixth Amendment violation. (<u>Id.</u>). Petitioner's claim is without merit. Petitioner cannot establish a violation of his right to a fair cross-section of the community. Therefore, his attorneys' conduct did not fall below an objective standard of reasonableness. Nor can he demonstrate he was prejudiced by the alleged failure to raise this claim.

### A.      The Alleged *Duren* Violation

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and

public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . ..” U.S. Const. amend. VI. “[T]he American concept of the jury trial contemplates a jury drawn from a fair cross section of the community.” *Taylor v. Louisiana*, 419 U.S. 522, 527 (1975). In *Duren v. Missouri*, 439 U.S. 357, 360 (1979), the Supreme Court held that “systematic exclusion” of a “distinctive” group of the community from jury venires violates the constitution’s fair cross-section requirement. The *Duren* Court established a three-part test for proving a violation, requiring a defendant to show: 1) that the group alleged to be excluded is a “distinctive” group in the community; 2) that the representatives of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and 3) that this under-representation is due to systematic exclusion of the group in the jury selection process. *Duren*, 439 U.S. at 364. With regard to the third prong of the test, the Petitioner must show that the distinctive group faced obstacles to being included in the jury pool. *United States v. Greatwalker*, 356 F.3d 908, 911 (8th Cir. 2004) (per curium); *United States v. Garcia*, 991 F.2d 489, 492 (8th Cir. 1993).

B.      The *Duren* Analysis

Before Petitioner can demonstrate ineffective assistance of counsel for failing to make a *Duren* challenge, he must first show that there was a basis for the challenge. That he has failed to do.

The government agrees that African-Americans and Latinos are a distinctive group in the community, thus satisfying the first prong of the test. Petitioner has failed to demonstrate, however, that their representation in venires from which juries were

92

selected is unfair or unreasonable in relation to the number of such persons in the community.  Further, Petitioner has not demonstrated that there were obstacles in place resulting in a systematic under-representation of these groups in jury venires.

As to the second prong, Petitioner's factual allegations are flawed.  First, Petitioner's factual allegation regarding the number of minorities in the population included the entire Northern District of Iowa.  For trial in Sioux City, the Clerk of Court for the Northern District of Iowa randomly selects jurors from a limited number of counties in Northwest Iowa.  In Petitioner's case, jurors were selected from 14 counties in northwest Iowa.  (Exhibit F, Amended Plan for the Random Selection of Grand and Petit Jurors for the United States District Court for the Northern District of Iowa, dated December 11, 1996, page 1).  Thus statistics for the entire state of Iowa, or even the Northern District of Iowa, do not reflect the population from which jurors are selected for the venire in this case.  See *United States v. Sturdy*, 1997 WL 33559973, *2 (N.D. Iowa Nov. 26, 1997) (criticizing the statistics relied on in a *Duren* challenge because they did not reflect the population from which jurors were selected).

Further, Petitioner has not alleged facts establishing the percentage of African-Americans or Latinos who have been included in the venire or served on juries in any other case.  Rather, Petitioner has alleged systematic under-representation based solely on the number of African-Americans and Latinos that happened to be included, by random selection, in his venire and on his jury.  There is no basis for concluding that the percentage of minorities in Petitioner's venire and jury is the same for other venires and juries selected in the Northern District of Iowa.  While Petitioner claims the Northern District of Iowa has engaged in long-term, substantial and systematic

93

Case 3:10-cv-03074-LTS-KEM   Document 22   Filed 07/14/11   Page 101 of 191

exclusion of minorities, Petitioner has based his claim on a snapshot in time and on a single case.  This is a wholly inadequate factual showing.

Regarding the third prong of the *Duren* test, Petitioner has failed to allege facts demonstrating the Northern District of Iowa systematically excludes members of the distinctive groups.  To prove systematic exclusion, Petitioner must prove the exclusion is inherent in the jury-selection procedure used by the court.  *United States v. Ireland*, 62 F.3d 227, 231 (8th Cir. 1995).  Petitioner has failed to even allege facts establishing the procedure the Clerk of Court for the Northern District of Iowa used in selecting citizens to be part of jury venires in 2004, let along allege facts showing that it unfairly results in the exclusion of minorities.[12]  It is not sufficient for Petitioner simply to allege numeric disparity.  He must prove the qualifications for being included in the jury venire – be it voter registration qualifications or drivers' licence qualifications – are themselves suspect, or that the jury selection procedure was administered in a discriminatory manner.  *Ireland*, 62 F.3d at 231.  Petitioner has failed to allege facts sufficient to meet this third prong of the *Duren* test.

Petitioner at least acknowledges the Eighth Circuit Court of Appeals' decision in *United States v. Garcia*, 991 F2d 489, 491 (8th Cir. 1993), and recognizes that it defeats the type of numeric attack Petitioner launches here.  Recognizing that it is binding precedent, Petitioner is relegated to criticizing the decision, citing *United States v. Rogers*, 73 F.3d 774, 776 (8th Cir. 1996), and tilting at windmills by protesting that under

---

[12]  In fact, the Clerk of Court for the Northern District of Iowa relied on Department of Motor Vehicle and voter registration records provided by the Secretary of State, from which names are selected by random by computer.  Exhibit F, pages 2-3.

94

*Garcia* "a defendant can never establish that a violation is systematic." (Petitioner's Memorandum, 78). While Petitioner remarkably claims "the debate remains alive," the fact remains that the law in the Eighth Circuit Court of Appeals requires something more than mere numeric disparity to make a Sixth Amendment claim.

C.   Trial Counsels' Performance Was Not Deficient

As stated above, when this case went to trial in 2004, the law in the Eighth Circuit Court of Appeals required a showing of something more than mere numeric disparity to prove a Sixth Amendment violation in the manner in which a judicial district selected jurors. At the time this case went to trial in 2004, the Eighth Circuit Court of Appeals had repeatedly rejected *Duren* challenges to the manner in which petit jury pools were selected in the Northern District of Iowa. See *United States v. Deering*, 179 F.3d 592, 597 (8th Cir. 1999) (in rejecting a *Duren* challenge, the Court noted it had previously "rejected similar attacks on the manner in which petit jury pools are selected in the Northern District of Iowa."); *United States v. Einfeldt*, 138 F.3d 373, 379 (8th Cir. 1998) (rejecting a *Duren* challenge regarding jury pools in the Northern District of Iowa). Trial counsels' decision not to make a *Duren* challenge based on alleged numeric disparities to the juror selection method in the Northern District of Iowa that had been sanctioned by the Eighth Circuit Court of Appeals does not reflect performance below an objective level of reasonableness.

D.   Petitioner Has Failed to Demonstrate Prejudice

As shown above, Petitioner's claim that the manner in which petit jury pools were selected in the Northern District of Iowa violates the Sixth Amendment is without merit.

95

Therefore, even had trial counsel made such a challenge, there is no reasonable probability that it would have been successful. Regardless, Petitioner cannot establish he was prejudiced by the attorney's failure to make such a challenge as he cannot demonstrate that it was reasonably probable that a jury pool consisting of a higher percentage of African-Americans or Latinos would have resulted in a different racial makeup of the actual jury, or that it would have resulted in a different outcome to the case.

While Petitioner asserts he "will be seeking further discovery on this issue and will present the full picture of the systematic under-representation at a hearing on this matter" (Petitioner's Memorandum, 79 n. 15), he is not entitled to such discovery or hearing. Petitioner has the duty to allege facts in his petition sufficient to establish a basis for his claim. He has failed to do so. Petitioner could have obtained historic data from the Court regarding jury selection procedures in the Northern District of Iowa, could have obtained statistics regarding the minority representation of jury venires and petit juries historically in the Northern District of Iowa, and could have alleged facts demonstrating how the method of selecting members of the population to serve on juries was flawed (assuming there was a factual basis to make the claim). Petitioner has failed to do so and he is not entitled to an evidentiary hearing for the purpose of conducting a fishing expedition with the hope of developing facts to back up his allegation. See *Ringo v. Roper*, 472 F.3d 1001, 1009 (8th Cir. 2007) (affirming a lower court's denial of a discovery request to show alleged racial disparity in the jury selection process).

The Court should deny this portion of Petitioner's motion without an evidentiary

hearing.  The Court should also deny Petitioner's request to conduct discovery on this issue.

## XI.  CLAIM 9 – TRIAL COUNSEL WERE NOT INEFFECTIVE IN THEIR PRESENTATION OF MITIGATION EVIDENCE

In his Motion, Petitioner alleged his trial counsel were ineffective during the penalty phase in the presentation of mitigation evidence.  Petitioner alleged his attorneys were ineffective for failing to make a better presentation of evidence allegedly showing his father was a bad man who's influence adversely affected Petitioner.  He claimed he was subject to abuse and grew up in a dysfunctional relationship with his father.  Petitioner claimed that, while his attorneys were aware of some of this evidence and presented some of it at the penalty phase of trial, they were ineffective and should have done better.  Petitioner also claimed his attorneys failed to discover and present evidence that his mother and paternal uncle and other relatives suffered from depression.  Petitioner claimed his counsel were ineffective for failing to present evidence regarding the effect his past drug use had on him.  Petitioner claimed he will present expert testimony that he suffers from a "life long anxiety disorder" which is "the leading edge of the symptoms secondary to his history of abuse, trauma and family dysfunction."  (Petitioner's Motion, at 49).

By the time Petitioner submitted his Memorandum in support of this issue, it morphed into a claim focused entirely on the failure of his trial counsel to investigate and present mental health expert testimony that Petitioner now claims would explain "the impact of Petitioner's extensive use of and manufacture of methamphetamine" and "the aggravating evidence presented by the Government," (e.g., his poor upbringing

97

caused emotional trauma and anxiety).  (Petitioner's Memorandum, 81-104).

> A.    Petitioner's Claim of Mental Health Mitigation Issues

Petitioner was evaluated by the Bureau of Prisons in 1997 at a time he was represented by trial counsel Alfredo Parrish.  That evaluation resulted in an Axis I diagnosis of: "309.24 Adjustment Disorder With Anxiety[;] 305.7 Methamphetamine Abuse[;] and V71.01 Adult Antisocial Behavior."  (Exhibit G).  Petitioner stated then that he did not use controlled substances between his arrest in March 1993 and 1995 because he was on pretrial release and subject to urinalysis tests.  (Exhibit G, page 4). Trial counsel were aware of this evaluation and diagnosis as Petitioner's habeas counsel provided a copy to the undersigned Assistant United States Attorney as part of the trial attorneys' files.

Trial counsel also hired Dr. Michael Gelbort, a clinical psychologist, who conducted a neuropsychological evaluation of Petitioner in July 2004.  (Exhibit H).  In this evaluation, Dr. Gelbort explored Petitioner's history of drug abuse, including his use of methamphetamine.  Dr. Gelbort determined Petitioner had a higher-than average IQ, and was unable to identify any mental health deficiencies.

Petitioner's habeas counsel have shopped around and found several new experts.  Dr. Richard Dudley, Jr. concludes Petitioner's upbringing caused him "to develop a combination of emotional difficulties" resulting in "trauma-related symptoms of anxiety."  (Petitioner's Memorandum, 96-97).  In diagnostic terms, Dr. Dudley opines Petitioner developed "Anxiety Disorder, NOS."  (Petitioner's Memorandum, 97).  Dr. Dudley also opines that the mitigation evidence presented by trial counsel was deficient, though his qualifications for giving such an opinion are not clear.

98

Dr. John F. Warren, III, who "largely agrees with the views expressed by Dr. Dudley about the existence and impact of Mr. Honken's upbringing" and further concludes Petitioner does not have anti-social personality disorder. (Petitioner's Memorandum, 99-100). Dr. Warren also steps beyond his expertise to opine that trial counsel were ineffective and even further purports to opine that the evidence "would have been substantially mitigating." (Petitioner's Memorandum, 100).

Both new experts apparently also conclude that Petitioner's methamphetamine use "profoundly exacerbated the psychological and emotional crisis that Petitioner was experiencing at the time of the crimes." (Petitioner's Memorandum, 100). Another new expert, Dr. Melissa Piaskecki, apparently would testify about the effects methamphetamine use, and exposures to chemicals used in the manufacturing of methamphetamine, could have on a person. (Petitioner's Memorandum, 101). Dr. Piaskecki, however, did not examine Petitioner or base her opinion on the facts of this case, but, rather, responded to hypothetical questions. (Petitioner's Memorandum, 100).

It appears that the foundation for Petitioner's new experts' opinions rests largely on the allegedly corrupting influence of Petitioner's father and the inattention of his mother. (Petitioner's Memorandum, 85-87, 96-104). Petitioner concedes that trial counsel, through their mitigation specialist, uncovered evidence of this as part of their investigation. (Petitioner's Memorandum, 85-87). Petitioner's habeas counsel claim, however, they "have elicited a variety of important mitigating facts of which the trial defense team never learned." (Petitioner's Memorandum, 102). Those alleged additional facts (Petitioner's Memorandum, 102-104), however, are merely cumulative

99

of the type of evidence trial counsel developed in their investigation and presented during the penalty phase of the trial.

At trial, Petitioner's attorneys elicited during the penalty phase a significant amount of evidence regarding Petitioner's bad dad and his alleged influence over Petitioner. Trial counsel solicited this type of testimony from Carol Honken (Tr. 3540-3551), David Honken (Tr. 3551-3561), Alyssa Nelson (Tr. 3618-3646), and Marvea Smidt (Tr. 2782-3852). The district court instructed the jury regarding, and at least one juror found, Petitioner's trial counsel proved the following mitigating factors:

1) Dustin Honken's father, Jim Honken, was an alcoholic convict who was proud of his criminal lifestyle and who bragged to his sons about his crimes;

2) As an infant, Dustin Honken did not experience normal parental love and nurturing, because his mother, Marvea, was depressed and unhappy in her marriage to Jim Honken, Jiim Honken worked out of town Monday through Friday, and Jim Honken was usually intoxicated all weekend;

3) Dustin Honken's father, Jim, never participated in caring for Dustin by holding him, feeding him, or changing his diapers, never played ball with him, or participated in any one-on-one father-son activities with Dustin;

4) Dustin Honken's natural parents, Jim and Marvea Honken, were divorced when Dustin was only eight years old, and Dustin had only sporadic contact with Jim Honken between the ages of eight and fifteen.

(Penalty Phase Verdict Form, Doc. 547, pages 6-7).

## B. Trial Counsels' Performance Was Not Deficient

Trial counsel's performance was not deficient in presenting lay testimony about Petitioner's allege disadvantageous childhood. The additional information habeas counsel has collected and claims should have been presented is cumulative. See., e.g., *Winfield v. Roper*, 460 F.3d 1026, 1033 (8th Cir. 2006) (holding that trial counsel's decision not to present cumulative evidence during penalty phase not deficient); *Paul v. United States*, 534 F.3d 832, 842 (8th Cir. 2008) (holding trial counsels' performance not deficient for failing to present additional mitigation evidence that was cumulative and duplicative).

Trial counsel's decision to forego presenting alleged mental health mitigation evidence was also not deficient. A conscious decision not to pursue or introduce psychological evidence as a matter of trial strategy is "virtually unchallengable" in a collateral attack. *Link v. Luebbers*, 469 F.3d 1197, 1204 (8th Cir. 2006). In this case, trial counsel had the benefit of two psychological evaluations of Petitioner. Trial counsel concluded the findings were not sufficiently mitigating to warrant presentation, especially given that, if Petitioner presented mental health evidence. Moreover, the jury would have learned Petitioner was of higher than average intelligence, hardly a mitigating factor in his favor. The decision not to call Dr. Gelbort to testify about Petitioner's mental health was, therefore, a strategy decision. *Winfield*, 460 F.3d at 1033 ("Counsel's decision not to call a particular witness during the penalty phase of trial must be view as of the time it was made and his decision is presumed to be one of trial strategy unless clearly shown to be otherwise.") (internal quotation and citations omitted).

Trial counsel's decision not to pursue mental health evidence about alleged mental health problems that would have impacted his state of mind at the time of the offense was also sound given that doing so would open the door the government presenting expert evidence regarding Petitioner. See ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Guideline 10.11(G) (February 2003) ("ABA Guidelines")("In determining what presentation to make concerning penalty, counsel should consider whether any portion of the defense will open the door to the prosecution's presentation of otherwise inadmissible aggravating evidence."). Petitioner criticizes trial counsels' explanation for not seeking further mental evaluations – that if they did so, the government would have the opportunity to rebut it – on the ground they could have conducted the evaluations without disclosure to the government under Rule 12.2. (Petitioner's Memorandum, 91-93). This criticism is empty, for Petitioner's entire claim here is premised on the assumption that he has new mental health evidence that should have been presented, which necessarily would have opened up the door to a government rebuttal. Conducting a secret examination would not have helped Petitioner's mitigation case if it were kept secret.

The record belies Petitioner's claim that "counsel's [sic] failures here resulted from decisions made after no investigation of the mental health impacts of Petitioner's 'difficult family history.'" (Petitioner's Memorandum, 91). Trial counsel thoroughly investigated Petitioner's family history. Trial counsel was aware of his 1997 evaluation, and hired a psychiatrist to evaluate Petitioner again in 2004. "Counsel is required to make a reasonable investigation in preparing his defense, including reasonably

deciding when to cut off further investigation." *Winfield*, 460 F.3d at 1034.  This was not a case of "no investigation" or even an investigation so inadequate that it fell below an objective standard of reasonableness.

When, as here, trial counsel conducted an investigation into a Petitioner's mental health and hired an expert for that purpose, counsels' performance cannot be deemed so deficient that it amounts to ineffective assistance of counsel.  In *Cole v. Roper*, 623 F.3d 1183, 1189-90 (8th Cir. 2011), the Eighth Circuit Court of Appeals rejected a similar ineffective assistance of counsel claim where habeas counsel hired a new expert who, like here, would allegedly have testified the defendant was "suffering from extreme emotional distress" at the time of the offense.  The Court noted that trial counsel had hired experts who evaluated the defendant and that "was enough of an investigation to clear *Strickland's* performance prong."  (Id.).

Similarly, in *Ringo v. Roper*, 472 F.3d 1001, 1003-1006 (8th Cir. 2007), the Eighth Circuit Court of Appeals rejected another claim of ineffective assistance of counsel. There, trial counsel hired an expert who found little to say that was helpful, but the expert suggested trial counsel may want to hire a different type of expert to look into another area of the defendant's mental health.  *Ringo*, 472 F.3d at 1004.  Though the Eighth Circuit panel opined that a reasonable attorney might have further investigated the issue, under the deferential *Strickland* standard the Court concluded trial counsels' performance was not deficient.  *Ringo*, 472 F.3d at 1006.  The *Ringo* Court noted "that this is not a case where counsel failed to investigate the defendant's family background or to consult with any mental health professionals."  (Id.).

In *Link v. Luebbers*, 469 F.3d 1197, 1203-1205 (8th Cir. 2006), habeas counsel hired new experts who purported to show the defendant suffered from mental health illnesses not presented by trial counsel. The *Luebbers* Court found it was reasonable for trial counsel "to believe that it would be better to avoid . . . 'a battle of the experts' over [the defendant's] psychological makeup." *Luebbers*, 469 F.3d at 1203. Considering the anticipated government response to the presentation of mental health testimony, avoiding the so-called battle of the experts is a proper basis for choosing to abandon a mental health mitigation presentation. *Luebbers*, 469 F.3d at 1204 (giving credence to the lower court's conclusion that, had defendant presented mental health evidence, the government "would have presented devastating testimony about [the defendant's] state of mind.").

That Petitioner's habeas counsel has since found additional experts who would give a new diagnosis is not the test for effective assistance of counsel. See, e.g., *Forsyth v. Ault*, 537 F.3d 887, 892 (8th Cir. 2008) (holding the Sixth Amendment does not require trial counsel to shop for favorable experts, and finding no ineffective assistance of counsel where trial counsel hired a mental health expert and chose to cut off the investigation without hiring additional experts or seeking further opinions); *Winfield*, 460 F.3d at 1041 ("Counsel is not required to shop for experts who will testify in a particular way, and penalty counsel's decision not to investigate this issue further was reasonable given the two concurring opinions of different doctors."); *Sidebottom v. Delo*, 46 F.3d 744, 753 (8th Cir. 1995) (holding that mere fact trial counsel did not shop around for experts with more favorable opinion does not mean trial counsel was

104

ineffective).

Further, presenting a mental health mitigation case regarding Petitioner's alleged state of mind at the time of the offense would have been completely inconsistent with his defense.  As the ABA Guidelines advises, "[c]onsistency [between the guilt phase and penalty phase presentations] is crucial because, as discussed in the Commentary to Guideline 10.10.1, counsel risks losing credibility by making an unconvincing argument in the first phase that the defendant did not commit the crime, then attempting to show in the penalty phase why the client committed the crime."  ABA Guidelines, § 10.11 (commentary) (further noting that a guilt phase defense denying involvement is more likely to be inconsistent with mitigation evidence of mental illness, domination by a co-defendant, substance abuse, or trauma).  Petitioner maintained his innocence during the guilt phase, claiming to have had no involvement in the murders. Where a defendant maintains he wasn't present at a murder, trial counsel are not ineffective when they make the strategic decision not to present a mental health defense in conflict with a claim of innocence.  *Middleton v. Roper*, 455 F.3d 838, 848-49 (8th Cir. 2006) (holding trial counsel was not ineffective for not presenting a duress mental health defense when the defendant claimed he was not present at the murder scene).  Courts must "give great deference to counsel's informed strategic decisions . . . [and] must resist the temptation to second-guess a lawyer's trial strategy."  *Middleton*, 455 F.3d at 848-49 (internal quotation and citation omitted).  See also *Strong v. Roper*, 2011 WL 2600241, * 35 (E.D. Mo., June 29, 2011) (holding that trial counsel was not ineffective when presenting evidence during penalty phase would have been inconsistent with guilt phase evidence, creating a danger of incensing the jury).

105

Petitioner has "significant obstacles" to prove he was prejudiced by trial counsel's decision to cut off further investigation of his mental health and not present mental health mitigation evidence at trial. *Ringo*, 472 F.3d at 1006. First, Petitioner would have to show that it was reasonably probable that if counsel would have retained the type of experts he claims they should have, they would have reached the same diagnosis. <u>Id.</u> Second, Petitioner would have to establish there was a reasonable probability that the mental health evidence would have altered the outcome of the penalty phase. <u>Id.</u> Petitioner fails to allege facts that would overcome those obstacles.

The most Petitioner does is make conclusory allegations that "the views of Dr. Piasecki, or a like forensic practitioner, <u>could</u> have resulted in a sentence of life imprisonment" (Petitioner's Memorandum, 101) (emphasis added), and that the failure to conduct a further investigation and present mental health mitigation evidence "caused Petitioner prejudice" (Petitioner's Memorandum, 100). Petitioner has attached declarations from trial counsel in support of this argument, but in those declarations trial counsel have only stated that they "would have strongly <u>considered</u> using" such expert opinions had they been available at the time. (Petitioner's Memorandum, 99) (emphasis added). This is a far cry, however, from establishing that trial counsel would have made the strategic decision to use them, or that had they used them, there was a reasonable probability that it would have changed the outcome of the trial. Moreover, Petitioner has failed to allege facts demonstrating how a mental health mitigation presentation regarding Petitioner's state of mind at the time of the offense would not have been inconsistent with his guilt phase defense where he claimed he was not

106

present at the offense.

Finally, in discussing alleged prejudice, Petitioner completely fails to consider the weight of the government's aggravating evidence in discussing the prejudice prong. In assessing prejudice, the court must take into account the aggravating evidence presented at trial.

> We recognize that the jury's findings do not preclude the possibility that more detail about Paul's difficult and abusive childhood or his compassionate character may have caused the jury to give more weight to mitigating factors that some or all of the jurors already found, but we must consider the incremental benefit of the proffered evidence in the context of the entire record. Nothing that Paul offers detracts from the government's strong case in aggravation, and the weight of this evidence is a proper and significant factor in considering whether Paul has established prejudice.

*Paul*, 534 F.3d at 843. The evidence showed Petitioner killed five people (including more than one person in a single episode), bound with duct tape, and gagged (with one of the girl's socks) the two adult victims, slaughtered two innocent little girls (ages 6 and 10), shot and beat Terry DeGeus to death several months later, and irrevocably devastated the lives of the victims' family members. The jury found the government proved the following aggravating factors beyond a reasonable doubt:

1) The defendant committed the offense in question after substantial planning and premeditation (as to all adult victims) ;

2) The defendant committed the offense in question in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse of the victim (as to all adult victims);

3) The victim was particularly vulnerable due to her young age (as to both children);

107

4) The defendant would be a danger in the future to the lives and safety of other persons;

5) The defendant obstructed justice by preventing the victim from providing testimony or by retaliating against the victim for cooperating with authorities (as to all victims);

6) The defendant intentionally killed more than one person in a single criminal episode; and

7) The effect of the crime upon the victim's family was injurious.

(Penalty Phase Verdict Form, Doc. 547, pages 2-3). In this case, the aggravating evidence was overwhelming. There is no reasonable likelihood that the additional mitigating evidence Petitioner claims his trial attorneys could have presented would have altered the outcome of the penalty phase of the trial.

The Court should deny this portion of Petitioner's motion without an evidentiary hearing.

## XII. CLAIM 10 – TRIAL COUNSEL WERE NOT INEFFECTIVE FOR FAILING TO OBJECT TO ALLEGED ERRONEOUS JURY INSTRUCTIONS ON FUTURE DANGEROUSNESS

Petitioner claims the district court erroneously instructed the jury regarding future dangerousness. He asserts the court erred when it included a "high custody classification" in a list of factors the jury may consider in determining future dangerousness. Petitioner claims the inclusion of this factor showed the court "took sides" with the government's view regarding custody classifications. (Petitioner's Motion, at 57). Unrelated to future dangerousness, but included in the same section of his motion, Petitioner also claims the district court erred regarding instructing the jury on

108

the burden of proof during the jury's process of weighing the aggravating and mitigating factors. According to Petitioner, the court should have instructed the jury that before it could "return a verdict of death, it must be convinced beyond a reasonable doubt of the relative weight of the aggravating and mitigating circumstances." (Id.). Petitioner seeks to avoid procedural default for failing to raise these alleged errors before now by blaming his counsel, claiming they were ineffective.

A.      The Jury Instructions

The trial court instructed the jury that the government alleged Petitioner posed a future danger. The instruction set forth the government's allegation (which followed the language of its Notice of Intent to Seek the Death Penalty), stating:

> Evidence that the defendant would be a danger in the future to the lives and safety of other persons may include one or more of the following: (a) specific threats of violence; (b) a continuing pattern of violence; (c) low rehabilitative potential; (d) lack of remorse; and (e) a high custody classification. In addition, the prosecution must prove that the defendant's dangerousness tends to support imposition of the death penalty.

(Penalty Phase Instruction No. 4, Doc. 524, p. 23).

Regarding the jury's weighing process, the trial court provided a lengthy instruction regarding the weighing process:

> At **Step Five**, you must consider whether the "aggravating factors" you found to exist in **Steps One** and **Two**, and any additional "aggravating factor" or "aggravating factors" that you found in **Step Three**, taken together, sufficiently outweigh any "mitigating factors" that you found in **Step Four**, so that the count in question calls for a sentence of death. In the absence of any "mitigating factors," you must consider whether the "aggravating factors" are themselves sufficient to call for a sentence of death. Based on your weighing of *all* of the factors, you will decide whether to impose a sentence of death rather than a sentence of life imprisonment without possibility of release for the count in question.

In determining the appropriate sentence, all of you must weigh the aggravating factors that you unanimously found to exist, and each of you must weigh any mitigating factor or factors that you individually found to exist. Each of you may also weigh any mitigating factor or factors that another or others of your fellow jurors found to exist. In engaging in the weighing process, you must avoid any influence of passion, prejudice, or undue sympathy. Your deliberations should be based upon the evidence you have seen and heard and the law on which I have instructed you.

The process of weighing aggravating and mitigating factors against each other—or weighing aggravating factors alone, if you find no mitigating factors—in order to determine the proper punishment is not a mechanical process. You must not simply count the number of "aggravating factors" and "mitigating factors" to reach your decision; rather, you must consider the weight and value of each factor.

The law contemplates that different factors may be given different weights or values by different jurors. Thus, you may find that one mitigating factor outweighs all aggravating factors combined, or that the aggravating factor(s) proved do not, standing alone, call for imposition of a sentence of death on a particular count. If one or more of you so find, you must return a sentence of life in prison without possibility of release on that count. On the other hand, you may unanimously find that a particular aggravating factor sufficiently outweighs all mitigating factors combined to call for a sentence of death. Each of you must decide what weight or value is to be given to a particular aggravating or mitigating factor in your decision-making process.

*Your determination to impose a death sentence must be unanimous.* On the other hand, if, after weighing the "aggravating factors" proved in the case and all of the "mitigating factors" found by any juror, any one of you finds that a sentence of death is not called for on a particular count, then the death sentence *cannot* be imposed on that count, and you must then enter a verdict imposing life imprisonment without possibility of release for that count.

Regardless of your findings with respect to "aggravating factors" and "mitigating factors," you are *never* required to impose a death sentence. Again, whether or not the circumstances of a particular count call for a sentence of death is a decision that the law leaves entirely to you.

(Final "Penalty Phase" Instruction No. 6, Doc. 524, pp. 28-29). This language follows

the Eighth Circuit Pattern Jury Instruction 12.11. The court repeatedly instructed the

110

jury that the government had to prove all aggravating factors beyond a reasonable doubt.  (Penalty Phase Instructions, Doc. 524, pp. 4, 5, 6, 9, 12, 17, 18, 19, 22, 23, and 24.

The government presented no evidence regarding Petitioner's custody classification.  In contrast, the government presented significant evidence that Petitioner made specific threats of violence while incarcerated,[13] participated in a continuing pattern of violence beginning in 1993 and afterwards, including at times when Petitioner was incarcerated,[14] and that Petitioner showed no remorse for the horrendous crimes he committed.[15]  In his mitigation case, Petitioner presented testimony by Dr. Mark Cunningham to argue Petitioner would not pose a future danger, in part because the Bureau of Prisons would house him in a high-security-level

---

[13]     See Testimony of William Dean (Tr. 1255-56); Dean Donaldson (Tr. 1102); Terry Bregar (Tr. 1395-1397).

[14]     See Testimony of Anthony Altimus (Tr. 2030-2036); Dean Donaldson (Tr. 1112-1128).

[15]     Petitioner was captured on tape making the following statements regarding the murders he committed:

Cutkomp:     Does it bother you?

Honken:     Nope.  Never think about it.  Never.  Never bothers me.  Honestly. Thought it would for a long time.  Never has.  Maybe someday it will.  I don't know.  Never dream about it.  Never nothing.  Always, always worried about that.  Thought I'd have nightmares all kinds of nasty shit.  Never thought about it.  I just went (whif sound) over. Part of my life over.  Go on.  Don't even worry about it. (Unintelligible) no conscience (unintelligible).

(Trial Exhibit 207, page 17).  See also Tr. 1099-1100 (Petitioner told Dean Donaldson it did not bother him to kill the kids "because they were trying to take him away from his kids.").

111

institution.  (Tr. 3740).  When, during closing arguments, the government argued Petitioner posed a future danger, it focused on his lack of remorse (playing the portion of the tape recording where Petitioner stated the murders did not bother him), and on Petitioner's threats of and plots to commit violence while incarcerated.  (Tr. 3911-3914). The only reference to custody classification was in an attempt to counter Dr. Cunningham's testimony by noting that, while Petitioner's higher custody classification may keep society safe for a while, Petitioner would eventually get moved to a lower custody classification.  (Tr. 3913-14).

B.  Trial Counsels' Performance Was Not Deficient

Petitioner's claim that his trial counsel were ineffective for failing to object to the jury instructions is flawed.

Regarding the instruction on future dangerousness, trial counsels' presentation of Dr. Cunningham's testimony effectively negated the possibility that the jury would consider custody classification as proof of future dangerousness.  The instruction set forth what the government alleged constituted proof of future dangerousness.  The instruction was not an endorsement of that allegation, or a factual assertion that a high custody classification equaled future dangerousness.  Accordingly, trial counsel were not ineffective for failing to object to that instruction and, to the contrary, deftly negated one of the factors the government alleged would show future dangerousness.  Indeed, this was so successful, the government was left to arguing that the jury should ignore the custody classification in determining future dangerousness.  (Tr. 3913-14).

Regarding the instruction about the weighing process, that instruction followed almost verbatim the Eighth Circuit Pattern Instruction regarding the weighing process.

112

Contrary to Petitioner's argument, the weighing stage of penalty phase deliberations is a process for the jury to conduct, not a finding of fact.  <u>See</u> *United States v. Purkey*, 428 F.3d 738, 750 (8th Cir. 2005) (characterizing the weighing process as "the lens through which the jury must focus the facts that it has found" to reach its individualized determination).  Accordingly, the jury does not have to somehow find the aggravating factors outweigh the mitigating factors beyond a reasonable doubt.  <u>See, e.g.</u>, *United States v. Mitchell*, 502 F.3d 931, 993-94 (9th Cir. 2007) (rejecting argument that the jury must find beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors); *United States v. Sampson*, 486 F.3d 13, 31-32 (1st Cir. 2007) (same).  <u>See also</u> *Allen v. United States*, 2011 WL 1770929, at * 50 (E.D.Mo., May 10, 2011) (holding that the jury's weighing decision does not need to be made beyond a reasonable doubt); *United States v. O'Reilly*, 2010 WL 2697140, at *1-2 (E.D.Mich., July 7, 2010) (same); *United States v. Diaz*, 2007 WL 656831, at *4 (N.D.Cal., February 28, 2007) (same).  Given that the weighing stage is a "process," it is unclear even how a jury could conduct a process "beyond a reasonable doubt."

Petitioner has failed to demonstrate that his trial attorneys' failure to object to these instructions fell so far below an objective standard of reasonableness as to constitute ineffective assistance of counsel.

C.     Petitioner Has Not Shown Prejudice

Again, Petitioner resorts to conclusory assertions to establish the prejudice prong of the *Strickland* test.  Petitioner simply proclaims "[t]rial and appellate counsel's [sic] failure to raise these instructional claims prejudiced Petitioner. . . . [and] [t]here was a

113

reasonable likelihood of a different penalty verdict and/or a different outcome on direct appeal." (Petitioner's Memorandum, 111). As shown above, the instructions were not erroneous, but if they had been altered to fit Petitioner's perception of the law, it would not have made any difference.

The evidence of Petitioner's future dangerousness was overwhelming. Petitioner threatened others while incarcerated, bonded and attempted to bond out other prisoners with instructions to kill witnesses, attempted to escape, plotted to escape from custody during his capital trial and kill witnesses and government officials, and showed not a shred of remorse for the brutal murders of five people, including two innocent little girls. There is no reasonable probability the jury would not have found Petitioner posed a future danger had the custody classification portion of the instruction been omitted. Or, stated another way, there is no reasonable probability that the inclusion of a high custody classification as a factor the jury could consider in determining whether Petitioner posed a future danger was the deciding factor in their conclusion he did pose a future danger. This is particularly true because trial counsel cleverly turned that factor into a mitigating factor through the testimony of Dr. Cunningham. Moreover, given the other overwhelming aggravating factors, there is no reasonable probability that the jury would not have sentenced Petitioner to death, even if it had not found the future dangerousness aggravating factor.

Likewise, even if the jury had been instructed that they had to weigh the factors under a standard of beyond a reasonable doubt (however that might occur), there is no reasonable probability a jury would have voted not to impose the death penalty. The aggravating evidence in this was overwhelming. The jury unanimously found the

114

government proved every aggravating factor by evidence beyond a reasonable doubt. While one or more jurors found Petitioner's trial counsel proved by a preponderance of the evidence facts that supported 15 mitigating factors, those mitigators paled in comparison to the aggravating factors found by the jury.

The Court should deny this portion of Petitioner's motion without an evidentiary hearing.

## XIII. CLAIM 11 – TRIAL COUNSEL WERE NOT INEFFECTIVE FOR FAILING TO OBJECT TO VICTIM IMPACT EVIDENCE

Petitioner claims the presentation of victim impact evidence in this case was "far too emotional, highly charged, and speculative, and therefore was unduly prejudicial and failed to comport with the Eighth Amendment." (Petitioner's Motion, at 58). Petitioner claims the victim impact evidence "caused the Court to have an emotional reaction, which may have been seen by some jurors," which Petitioner then speculates may have tainted their views. (Petitioner's Motion, at 59). Petitioner goes on to allege the government's victim impact evidence painted an "untrue picture" of DeGeus, which trial counsel allegedly failed to challenge. Finally, Petitioner claims the Court's instruction regarding victim impact evidence failed to allow the jury to "narrow those deserving of the death penalty." (Id.). Again, to avoid procedural default for failing to raise these arguments below, Petitioner blames it on allegedly ineffective assistance counsel. Without explanation or factual basis, Petitioner claims "[t]hese failures caused Petitioner prejudice at trial and on appeal." (Petitioner's Motion, at 63).

A. The Victim Impact Evidence Was Not Improper

In *Payne v. Tennessee*, 501 U.S. 808, 817-824 (1991), the Supreme Court

115

reversed prior decisions regarding victim impact evidence, and held that victim impact evidence should be treated like any other relevant evidence. The Court held that "a State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant." *Payne*, 501 U.S. at 825. Victim impact evidence "should show the victim's uniqueness as an individual and the resulting loss to society. . .." *Storey v. Roper*, 603 F.3d 507, 518 (8th Cir. 2010). Only if the evidence is "so unduly prejudicial that it renders the trial fundamentally unfair" can the presentation of victim impact evidence constitute a due process violation. *Payne*, 501 U.S. at 825.

Petitioner's claims have no merit. The evidence was not "too emotional, highly charged, or speculative" such that it rendered Petitioner's trial fundamentally unfair. The district court judge who witnessed the victim impact evidence first hand found "the federal prosecutors in Honken used admirable restraint in terms of the scope, amount, and length of victim impact testimony." *United States v. Johnson*, 362 F. Supp.2d 1043, 1107 (N.D. Iowa 2005). Indeed, the district court found essentially the identical penalty phase presentation in Johnson did not violate her due process rights. *United States v. Johnson*, 403 F. Supp.2d 721, 854-57 (N.D. Iowa 2005).

On the first day of the penalty phase of the trial, the parties gave opening statements and the government called six victim impact witnesses regarding the murder of five victims. (Tr. 3472-3533). Ronda Francis testified about the impact the murder of her brother, Terry DeGeus, had on her, and about Terry DeGeus's uniqueness as an

individual.  Wendy Jensen, Terry DeGeus's ex-wife, also testified about his uniqueness as an individual and the impact his murder had on her and the daughter they shared. Ashley DeGeus, Terry DeGeus's daughter, testified about the impact the murders had on her life.  After a half-hour morning break, from 10:15 to 10:45, the government called Kathy Nicholson, Greg Nicholson's ex-wife, to testify about Greg Nicholson's uniqueness as an individual and the impact his murder had on his family, including the two children they shared.  Robert Milbrath testified about the uniqueness of his sister, Lori Duncan, and his nieces, Kandi Duncan and Amber Duncan, and the impact the murders had on the family.  Finally, Brittany Asbe testified.  She was a childhood friend of the youngest victim, Amber, and she testified about Amber's uniqueness as an individual.  The entire presentation of the government's victim impact evidence took less than three hours and concluded before the noon recess at 12:45.  (Tr. 3533).

Following the government's presentation of victim impact evidence, Petitioner presented his mitigation case.  Petitioner called nine witnesses during his presentation, consuming two trial days, and consuming 318 pages of transcript.  (Tr. 3534-3852). The government presented a short rebuttal case consisting of four witnesses, lasting a half day, none of whom addressed victim impact, and consumed 30 pages of transcript. (Tr. 3852-3882)

Petitioner faults the presentation of the victim impact evidence on the ground that "it was extraordinarily moving and emotional."  (Petitioner's Memorandum, 113). Victim impact evidence is inherently emotional.  The mere fact that the evidence is emotional does not make it violative of Petitioner's due process rights.  <u>See, e.g.</u>, *Storey*, 603 F.3d at 519 (holding that the fact victim witness testimony "was extremely

117

emotional" did not mean it so infected the proceedings as to render the trial fundamentally unfair); *United States v. Nelson*, 347 F.3d 701, 712-14 (8th Cir. 2003) (holding that "emotional and, on occasion, tearful testimony" of six victim impact witnesses, including one witness who "was unable to compose herself," did not violate defendant's due process rights).  To the extent the evidence was extraordinarily moving and emotional in this case, it was the product of Petitioner's extraordinarily horrendous conduct in murdering five people, including a single mother and her two little girls.

Petitioner faults the presentation of victim impact evidence as "speculative" on the ground that Ronda Francis compared Terry DeGeus to her father (which Petitioner claims was irrelevant, not speculative) and testified the death of her brother caused her father to develop diabetes and suggested most of the family had high blood pressure. (Petitioner's Memorandum, 114).  The comparison of Terry DeGeus to his father was relevant to help show the impact the murders had on the family, including the father of the victim.  As to the passing comments about diabetes and blood pressure, they were hardly prejudicial compared to her other testimony (to which Petitioner has no objection) that her mother "has had to take antidepressants and sleeping pills."  (Tr. 3480).

Surprisingly, Petitioner then goes on to claim that Ms. Francis's testimony was "false" when she testified Terry DeGeus was "always kind and always loving." (Petitioner's Memorandum, 115).  Ms. Francis was testifying about how Terry DeGeus behaved in relation to his family members.  The evidence of DeGeus's violent conduct toward women and law enforcement officers was not disputed and much of it was presented by the government.  That does not mean that a person violent to others cannot be loving and kind to his own parents and siblings.  Petitioner has alleged no

118

facts showing otherwise.

Petitioner faults the testimony of Kathy Nicholson, claiming it was "improper, speculative, and highly prejudicial" because she spoke about the impact Greg Nicholson's murder had on Greg's father. Ms. Nicholson testified that Greg Nicholson's father "had a hard time dealing with [the seven-year period between the murders and the discovery of the bodies]. He was really affected by the media, the articles in the newspaper. His health started going bad. He ended up having to retire early. The stress of the situation worsened him being sick." (Tr. 3503). She also testified that he died "a short two weeks after we buried Greg." (Tr. 3504). There is nothing improper or highly prejudicial about this testimony. The only portion of her testimony that was, perhaps, non-factual was her opinion that the stress "worsened him being sick." This was, however, her observation. She was not purporting to be testifying as an expert witness.

Remarkably, Petitioner attacks Lori Duncan, suggesting that her brother's testimony that she was against drugs "was obviously in significant conflict with the fact that she dated men who were deeply involved in drugs, including Mr. Nicholson." (Petitioner's Memorandum, 116). First, Petitioner does not identify the "men" she dated other than Nicholson, and fails to allege facts supporting the assertion that the unidentified men were "deeply into drugs." As to Nicholson himself, the evidence at trial was that Nicholson was trying to turn his life around and had told Lori Duncan that he was in drug rehabilitation. (Tr. 485-86). Petitioner has no factual basis to contest that Lori Duncan was against drugs.

Petitioner faults his attorneys for failing "to properly sanitize" the "obviously

119

emotionally wrenching" testimony about the murders of Lori Duncan and her little girls, speculating that the testimony "could only have caused undue prejudice." (Petitioner's Memorandum, 116). Petitioner fails to state what it was that his trial counsel should have done to "sanitize" the evidence, or what part of the evidence needed to be sanitized, other than a reference to a photograph of the girls in Halloween costumes. (Id.). There is nothing about a photograph of the girls in Halloween costumes that was particularly "emotionally wrenching."

Petitioner faults the district court as well, asserting that the judge "engaged in an emotional display" by "crying." (Petitioner's Memorandum, 116). The district court denied crying, but admitted that "there was some emotion in my voice." (Tr. 3674). "Judges, while expected to possess more than the average amount of self-restraint, are still only human." *United States v. Weiss*, 491 F.2d 460, 468 (2nd Cir. 1974). Thus, "[j]udges are not required to sit stone-faced and erect at all times and to refrain from reacting to an event at which they are presiding." *Lamborn v. Dittmer*, 726 F. Supp. 510, 517 (S.D.N.Y. 1989). As previously stated, to the degree the victim impact evidence was extraordinarily moving and emotional, Petitioner is hardly in a position to protest when it was a product of his own criminal conduct.

Petitioner also claims the jury instruction "failed to provide the constitutionally required narrowing concepts to the jury." (Petitioner's Memorandum, 117-118). The instruction was not erroneous. The purpose of statutory aggravating factors are to narrow the class of defendants eligible for the death penalty. Victim impact evidence is not a statutory aggravating factor. Rather, it is a nonstautory aggravating factor that is presented as part of the selection phase of sentencing. It does not serve a narrowing

120

function – rather, it serves the function of individualizing the case for a defendant the jury has found eligible for the death penalty.  See *Buchanan v. Angelone*, 522 U.S. 269, 276 (1998) (explaining that the purpose of the eligibility phase is to narrow the class of defendants eligible for the death penalty, while the purpose of the selection phase is to allow the jury to determine whether the sentence should be imposed on the particular eligible defendant).

Regardless, Petitioner's interpretation of the jury instruction is tortured, focusing on the language he bolds in his Memorandum and ignoring the rest of the instruction.  Petitioner claims the instruction requires the government only show the murder "deprived the surviving members of the victim's family of the benefit of having the victim in their lives" and argues that "[a]ny death 'deprives the surviving family members' from the benefits of having the victim in their lives . . .."  (Petitioner's Memorandum, 117-118).  The rest of the instruction qualifies the introductory language, requiring the government to prove that "as a result, their lives have changes and they have experienced significant emotional trauma, and that such injurious effect tends to support imposition of the death penalty." (Doc. 524, p. 24).  Read in its entirety, the jury instruction does not equate victim impact evidence with loss of a family member.

B.      Trial Counsels' Performance Was Not Deficient

Petitioner did not object to the victim impact evidence, assert it as error in his motion for a new trial, or raise the issue on appeal.  Accordingly, that issue is procedurally defaulted.  To evade procedural default, Petitioner claims his trial and appellate attorneys were ineffective for failing to object and raise these arguments. Even assuming there was error, his attorneys' performance was not so deficient that it

121

fell below an objective standard of reasonableness.

Petitioner's counsel would have run a significant risk objecting to the testimony by family members of the murder victims. The decision whether to object, particularly to testimony by crime victims about the loss of their loved ones, is fundamentally a strategy decision for trial counsel to make with the benefit of being in the court room, being able to evaluate the witnesses, assess the impact the testimony is having with the jury, and judge the response by the jury should defense counsel interrupt the testimony with an objection. See, e.g., *Jenner v. Class*, 79 F.3d 736, 739 (8th Cir. 1996) (trial counsel's failure to object to questioning was well within the range of professionally reasonable judgement and does not constitute ineffective assistance of counsel); *Bruner v. Dunning*, 731 F.2s 527, 528 (8th Cir. 1984) (affirming district court's finding that trial counsel's decision not to object to evidence was a tactical choice rather than dereliction of duty); *Wiley v. Puckett*, 969 F.2d 86, 102 (5th Cir. 1992) (finding trial attorney "could reasonably have decided not to risk antagonizing the jury by objecting"). Moreover, the rules of evidence are relaxed during the penalty phase of a capital trial. See *United States v. Montgomery*, 635 F.3d 1074, 1091-92 (8th Cir. 2011) ("During the penalty phase of a capital trial, '[i]nformation is admissible regardless of its admissibility and the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusion of the issues, or misleading the jury.'") (quoting 18 U.S.C. § 3592(c)).[16]

---

[16] Petitioner was tried under the same provisions then in effect under 21 U.S.C. § 848(j).

122

For the reasons set forth above, Petitioner's claims had no merit and with the inapplicability of the rules of evidence, the trial court would not have sustained any objection even if trial counsel had made one.  Their decision not to object was a wise one, not an example of deficient conduct.  Similarly, the jury instruction on victim impact evidence was not erroneous, and therefore trial counsel's decision not to object to the instruction was not deficient.  For the same reasons, appellate counsels' performance was not deficient for failing to raise on appeal and issue that stood no chance of success.  See *Link*, 469 F.3d at 1206 (applying a presumption that appellate counsel make a strategic decision to focus on other claims on appeal, the court rejected an ineffective assistance of appellate counsel claim where appellate counsel chose not to assert an alleged jury selection error on appeal).

    C.    <u>Petitioner Has Failed to Establish Prejudice</u>

Petitioner has failed to adequately allege prejudice, let alone allege facts demonstrating he was prejudiced by the alleged error.  Petitioner again only makes the conclusory assertion that "[t]hese failures caused Petitioner prejudice at trial and on appeal" and "surely had a significant impact on the jury."  (Petitioner's Memorandum, 119).  That is not enough.  *Bryson*, 268 F.3d at 562 (affirming district court's summary dismissal of an ineffective assistance of counsel claim where movant's allegations were brief, conclusory and failed to cite to the record such that the district court "could not even begin to apply the *Strickland* standards on such deficient allegations.").  Even assuming the evidence was objectionable, it was a small portion of the penalty phase, and the nature of Petitioner's horrendous crimes makes it unlikely barring the objected-to evidence would have changed the outcome of the trial.  See *Storey*, 603 F.3d at 521

123

("In light of all of the other evidence, including the other properly admitted victim impact testimony and the grisly nature of Storey's crime, it is unlikely that the allegedly improper admission of this testimony rendered the penalty-phase trial fundamentally unfair."). Petitioner has simply failed to allege facts demonstrating that presentation of the victim impact evidence was "so unduly prejudicial that it render[ed] the trial fundamentally unfair." *Payne*, 501 U.S. at 825.

To the extent Petitioner seeks to conduct discovery to "interview jurors in regard to the trial judge's emotional response and in connection with the impact this testimony had on the jury" (Petitioner's Memorandum, 117), the Court should deny such a request. Evidence "as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the jury to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith" is inadmissible under Rule 606(b) of the Federal Rules of Evidence.

The Court should deny this portion of Petitioner's motion without an evidentiary hearing.

## XIV. CLAIM 12 – TRIAL COUNSEL WERE NOT INEFFECTIVE FOR FAILING TO PRESENT PETITIONER'S CO-DEFENDANT IN A MORE NEGATIVE LIGHT, AND THE GOVERNMENT'S ARGUMENT IN THE CO-DEFENDANT'S CASE WAS NOT INCONSISTENT WITH ITS ARGUMENT IN PETITIONER'S CASE

Petitioner claims the government presented a different case in the trial of his co-defendant, Angela Johnson, allegedly representing Petitioner as nonviolent and "suggesting" he was incapable of murder. (Petitioner's Motion, at 64). Petitioner claims this was improper and violated his Eighth Amendment rights and right to due process.

124

These claims are procedurally barred, however, as he could have raised them before and failed to do so. Petitioner offers no explanation for his failure to raise this issue below. Johnson was tried between April and June 2005. Petitioner filed his post-trial motion for a new trial on March 8, 2005, prior to Johnson's trial, but the district court did not entertain oral arguments on the motion until July 13, 2005, affording Petitioner ample opportunity to raise this issue to the district court. Similarly, Petitioner could have raised this issue when he filed his appellate brief on October 10, 2007 (two years after he filed a notice of appeal), but did not. Therefore, this claim is procedurally defaulted.

Petitioner tries to evade procedural default by claiming that, "to the extent that the favorable evidence subsequently used by the Government at Johnson's trial was available to Petitioner's counsel, they were ineffective for failing to investigate and present this evidence, which tended to show that Petitioner was less culpable and less deserving of a death sentence." (Petitioner's Memorandum, 121). Petitioner has failed to allege facts sufficient to establish his trial attorneys were deficient in investigating or presenting evidence regarding Johnson, and has not alleged facts sufficient to demonstrate prejudice.

A.    The Government's Case Was Not Inconsistent Between Trials

Petitioner alleges "[t]he Government repeatedly argued during Angela Johnson's trial that Johnson was the more culpable of the two defendants for purposes of punishment." (Petitioner's Memorandum, 119). Petitioner asserts "[t]he Government elicited substantial testimony that Petitioner had no history of violence prior to his meeting Johnson" and "went so far as to suggest that Petitioner was not even capable

125

of murder absent the manipulation and negative influences of Johnson." (Id.). Petitioner claims "the Government followed a much different course during Petitioner's trial" where the government allegedly "described the Petitioner as the manipulator." (Petitioner's Memorandum, 120).

Petitioner does not allege the government presented inconsistent evidence at the two trials. In other words, Petitioner does not allege, for example, that the government presented evidence in one trial that Petitioner was the shooter and in the other trial that Johnson was the shooter. Petitioner does not claim the government presented evidence that he engaged in violence prior to 1993 in his case, but presented contrary evidence in Johnson's trial. Rather, his claim is premised on the theory that the government's arguments based on the evidence were inconsistent. They were not.

In the closing argument during the penalty phase of Petitioner's trial, the government argued that Petitioner "developed a plan" for the murders (Tr. 3905), and "planned out" how to kill DeGeus (Tr. 3907). The government argued Petitioner "plans, schemes, thinks out these things long in advance." (Tr. 3908).[17] No where during the closing argument did the government argue that Petitioner engaged in violence prior to the murders in 1993. No where did the government argue that Johnson was not violent or impulsive. No where did the government argue Petitioner manipulated Johnson into participating in the crimes. Indeed, neither the word "manipulate" nor any of its derivations appear in the transcript of the government's closing argument. The

---

[17] See also Tr. 3910 ("Now, think back about the way this defendant thinks, the way he plans, the way he schemes."); Tr. 3912 ("You know how he schemes and plans and thinks.").

126

government argued that Johnson participated in the crimes and manipulation of Terry DeGeus.  The government said "they used Angela Johnson and his [Terry DeGeus's] affection for Angela Johnson as a method to do that [lure DeGeus to a remote site to kill him].  (Tr. 3907).

In the closing argument during the penalty phase of Johnson's trial, the government of course emphasized Johnson's conduct over that of Petitioner, but did not present an argument inconsistent with its argument in Petitioner's case.  During its closing argument during the "eligibility" portion of Johnson's bifurcated penalty phase of the trial, the government argued: "Ask yourself absent both of them coming together, Dustin Honken being the planner in this case and obviously with the motivation to kill and Angela Johnson who was someone who acts, whether without her intentional conduct and prodding along Dustin Honken whether this murder would have happened."  (Johnson Tr. 2465).  The government argued Johnson got herself to the top of Petitioner's drug organization through manipulation (Johnson Tr. 4011), and used manipulation to lure DeGeus to his death (Johnson Tr. 4015).[18]  The government argued Johnson "was violent" (Johnson Tr. 4019), that the jury should not "jump to the conclusion that the person who pulls the trigger is the person who's the most morally culpable for the crime," and that Johnson was violent, impulsive, "egg[ed]" Petitioner on and "push[ed]" him to commit the crimes (Johnson Tr. 4026-27).  In rebuttal to Johnson's closing argument, the government argued it was up to the jury to determine if

---

[18]  See also Johnson Tr. 4017 (pointing out that Johnson "was the one in a position to manipulate Terry DeGeus to appear and put himself in a position where he was going to be murdered.").

127

it believed the evidence showed "Angela Johnson [was an] unwitting, innocent person who gets duped into killing or [an] Angela Johnson who's violent, who's pushing, who's cajoling Dustin Honken to commit these crimes?" (Johnson Tr. 4080). The government did not allege Johnson planned the murders.[19]

The government's position in the two trials was not inconsistent. Petitioner claims that "[t]he Government also clearly believed that as between Petitioner and Johnson, it was Johnson who was the manipulator, not Petitioner." (Petitioner's Memorandum, 123). This presumes that only one of them could be manipulative. Both Petitioner and Johnson were capable of manipulating other people. Petitioner manipulated his father into committing the bank robbery, and manipulated his brother to fund the methamphetamine operation and Tim Cutkomp to be his helper, while Johnson manipulated Petitioner and Terry DeGeus. The government argued in both cases that Petitioner was the planner and schemer, but Johnson was not ignorant of the plans and knowingly participated. Petitioner was not a violent person prior to the murders, and the government never alleged otherwise during his trial. In contrast, Johnson was impulsive and violent before and after the murders. Separately, each defendant was bad enough, but together they made a lethal combination.

The government's theme during Petitioner's trial was that Petitioner was an evil planner and schemer who personally killed five people, including two little, innocent girls, and for that, he deserved to be executed. The government's theme during Petitioner's trial was that, anyone capable of killing four people, including the little girls,

---

[19] The only reference to planning assert that Johnson was in on the plans. (Johnson Tr. 4011, 4017).

128

then after months to deliberate on the horror of his crimes, murders yet another person, deserves to be executed. The government's theme during Petitioner's trial was that a person who commits these crimes in cold blood, then plots and takes steps to escape and kill again when arrested a second time, poses a future danger to society and deserves to be executed. That Johnson was a violent hothead who pushed him to commit the murders and also deserves to be executed for her role in the crime does not make the government's presentation inconsistent.

The authority upon which Petitioner bases this claim does not help him. Petitioner cites *Bradshaw v. Stumpf*, 545 U.S. 175 (2005) for the proposition that the Court remanded the case on the issue of whether "'[t]he prosecutor's use of allegedly inconsistent theories may have a more direct effect on Stumpf's sentence . . . for it is at least arguable that the sentencing panel's conclusion about Stumpf's principal role in the offense was material to its sentencing determination.'" (Petitioner's Memorandum, 120, quoting *Bradshaw*, 545 U.S. at 175). *Bradshaw* is factually distinguishable, however, because in that case the government took factually inconsistent positions, claiming in the prosecution of Stumpf that he had killed the victim, while in the prosecution of Wesley, claimed Wesley shot the victim. *Bradshaw*, 545 U.S. 178-180. Further, Petitioner fails to quote the Supreme Court's admonition, cautioning that it "express[es] no opinion on whether the prosecutor's actions amounted to a due process violation or whether any such violation would have been prejudicial." *Bradshaw*, 545 U.S. at 187. Thus, *Bradshaw* stands for nothing but the fact that the Supreme Court remanded a case for further findings.

Petitioner cites *Smith v. Groose*, 205 F.3d 1045 (8th Cir. 2000), for the proposition that habeas relief was granted when the government presented inconsistent theories at separate trials. (Petitioner's Memorandum, 120). In *Smith*, the government argued in one trial that Smith was guilty of felony murder because one of his associates killed the victims during a robbery, but in a subsequent trial, argued that another person killed the victims prior to Smith and his associates arriving. *Smith*, 205 F.3d at 1048. Thus, it was not simply a case where the government argued allegedly inconsistent theories. Rather, the government presented factually contradictory theories about who committed the murder and when the murder was committed, both of which could not be correct. *Smith*, 205 F.3d at 1050-51. The *Smith* Court went on to state, however, that "We do not hold that prosecutors must present precisely the same evidence and theories in trials for different defendants. Rather, we hold only that the use of inherently factually contradictory theories violate the principles of due process." *Smith*, 205 F.3d at 1052. In this case, the government did not present inherently factually contradictory theories.

Petitioner cites *United States v. Paul*, 217 F.3d 989 (8th Cir. 2000), for the proposition that "due process [is] violated where [the] Government relies on 'factually inconsistent irreconcilable evidence at the two trials.'" (Petitioner's Memorandum, 120-21). Petitioner's citation to this case is misleading as the language he cites is only dicta, not the holding. In *Paul*, the Eighth Circuit found that the government's argument in separate trials that the defendant in each trial was the triggerman was not even inconsistent given the facts of the case. *Paul*, 217 F.3d at 998-99. Moreover, the *Paul*

130

Court pointed out that the defendant there "only argue[d] that the prosecutor made inconsistent *arguments* at the two trials, but [could not] point to the use of evidence at the different trials which was factually inconsistent and irreconcilable." *Paul*, 217 F.3d at 998 (emphasis original). In Petitioner's and Johnson's cases, the government did not present inconsistent and irreconcilable evidence. Its theory of who pulled the trigger in each case was the same. Its theory of who planned the murder was the same. Its argument that each was deserving of the death penalty for their roles in the offense were the same. The government's argument was not factually irreconcilably inconsistent.

Petitioner cites *United States v. Higgs*, 353 F.3d 281 (4th Cir. 2003), noting that it cited *Smith* and *Paul* "with approval." What Petitioner does not point out is that the *Higgs* Court found no error when the prosecutor argued in one case that the shooter deserved the death penalty and in the other case that the aider and abetter was more morally culpable for providing the weapon and instructing the shooter to kill. *Higgs*, 353 F.3d at 326. There, the court found the government maintained a consistent position on who pulled the trigger. The court found the government did not violate the defendant's due process rights by arguing what the jury should conclude about the moral culpability of the defendants based on their roles. (Id.). In that regard, *Higgs* is very similar to this case, and the Court should reach the same conclusion.

Finally, Petitioner cites *Thompson v. Calderon*, 120 F.3d 1045 (9th Cir. 1997), but provides no indication regarding the holding of *Thompson*. (Petitioner's Memorandum, 121). *Thompson* is factually similar to *Smith*, in that the government presented

131

evidence and argued in two separate trials first that one man killed the victim before the second man arrived, and in the second that the second man killed the victim. *Thompson*, 120 F.3d at 1055-58. These were factually irreconcilable inconsistent theories. That did not happen in the trials of Petitioner and Johnson.

The government's presentation of evidence and argument in the two trials was not improper or in any way inconsistent. The "government's theory in Honken's case was that Honken and Johnson acted in concert, perhaps with varying degrees of direct involvement, in the killings of all five individuals." *United States v. Johnson*, 377 F. Supp.2d 689, 693 (N.D. Iowa 2005). Its theory then and today is that it is unlikely that either defendant would have committed the horrendous murders but for the participation of the other. Petitioner was the planner, the schemer, the organizer, and the evil genius behind the murders. He planned violence, threatened violence, and prepared to engage in violence. He had not personally, however, committed any significant act of physical violence himself. Rather, until he met Johnson, Petitioner had others engage in physical violence for him. Johnson, however, was an emotional, manipulative, hotheaded, and violent woman who pushed Petitioner to carry out his evil plans. Johnson was Lady Macbeth and Petitioner was Macbeth.

B. Trial Counsels' Performance Was Not Deficient

Petitioner's attorneys were not ineffective for failing to investigate or present evidence vilifying Johnson. First, Petitioner makes no factual allegations regarding what investigation his attorneys undertook, or should have undertaken, regarding Johnson. While Petitioner claims "some" of the evidence presented by the government at Johnson's trial was available to Petitioner's trial counsel, all of the evidence cited by

132

Petitioner in relation to this argument was available to Petitioner's trial counsel as part of the government's discovery file.[20] Therefore, this is not a case where Petitioner has alleged facts demonstrating his counsel failed to investigate his case.

Moreover, a significant amount of evidence was presented during Petitioner's trial about Johnson's impulsiveness, violent nature, and pushing Petitioner to act. Aaron Ryerson testified about how Angela Johnson hated him. (Tr. 262-62). Jeff Honken testified about Angela Johnson threatening him and his children. (Tr. 309). Petitioner's trial counsel elicited testimony from Tim Cutkomp that Petitioner was afraid of how Angela Johnson was hot headed, while Petitioner was someone who did not get into fights and avoided fights. (Tr. 972). Marcy Hyde testified that Petitioner was worried about Angela Johnson being violent and that Johnson had threatened to kill him. (Tr. 1020). Finally, the jury heard hours of audio taped statements by Petitioner, during part of which Petitioner himself described Johnson as impulsive and suggested she acted too quickly and without sufficient planning in the 1993 murders such that he did not want to involve her in the murders he was planning in 1996.

> Honken: Yeah, if I'm in jail, then you're right down at the end of the rope with me. So I can't get thrown back in Linn County or I'm in bad shape. We both are then. 'Cause you ain't going to do nothing. So, (unintelligible) back to me, obviously.
>
> Cutkomp: I would, would anyone else?
>
> Honken: Maybe. Probably, but it's so hard to get that person to do anything. They're all so bitchy about it. Well, hurry up. I ain't gonna fuck around all day. I'm gonna do it right now, you know. You know, they will, they just want to go. I don't want it like that.

---

[20] Petitioner makes no effort to identify what evidence he claims was available and what evidence he claims was not available to trial counsel.

133

Cutkomp: So she'd just go up and – right there at the door, huh?

Honken: Yeah, (unintelligible). Yeah, that person probably would, but I'd be, I'd be scared with that one. And, uh, that, that one's too bold, doesn't like to plan things out, doesn't like to take time. Likes to hurry, everything right now. That's when you end up in bad shape.

(Exhibit 303, p. 17)

Contrary to Petitioner's conclusory assertion that "[c]ounsel had no strategic basis for failing to introduce this evidence" (Petitioner's Memorandum, 127-28), Petitioner fails to allege a factual basis for this claim. Petitioner has attached declarations from trial counsel in support of his motion. Nothing in these declarations addresses this issue.

There are actually good strategic reasons for not presenting evidence or arguing that Johnson was violent, impulsive, and pushed Petitioner to commit the crimes. Petitioner took the position at trial that he was innocent. It would be inconsistent for him to then allege during the penalty phase that he was guilty, but killed everyone only because he was pushed to do so by Johnson. As the ABA Guidelines advises, "[c]onsistency [between the guilt phase and penalty phase presentations] is crucial because, as discussed in the Commentary to Guideline 10.10.1, counsel risks losing credibility by making an unconvincing argument in the first phase that the defendant did not commit the crime, then attempting to show in the penalty phase why the client committed the crime." ABA Guidelines, § 10.11 (commentary)

Regardless, Petitioner's attorneys' performance did not fall below an objective standard of reasonableness.

134

### C. Petitioner Has Failed to Establish Prejudice

Petitioner has alleged no facts establishing that he was prejudiced by his trial attorneys' allegedly deficient performance. At most what he can muster is the same speculation the Supreme Court made in *Bradshaw*, that it "may well have been 'material to [the jury's] sentencing determination.'" (Petitioner's Memorandum, 123). The *Bradshaw* Court, in contrast, recognized it was speculation and was cautious to note that it expressed no opinion about whether there was prejudice. *Bradshaw*, 545 U.S. at 187. Petitioner would have this Court take that same speculation and find it constitutes proof of prejudice. The Court should decline to do so and deny this portion of Petitioner's claim without a hearing.

## XV. CLAIM 13 – TRIAL COUNSEL WERE NOT INEFFECTIVE FOR STIPULATING TO ADMISSION OF THE MAPS DRAWN BY ANGELA JOHNSON

Petitioner signed a stipulation that provided:

> During August and September of 2000, Angela Johnson was in the Benton County Jail, awaiting trial on federal criminal charges relating to the deaths of Greg Nicholson, Lori Duncan, Kandi Duncan, Amber Duncan, and Terry DeGeus. While in the Benton County Jail, Johnson became acquainted with a fellow jail inmate named Robert McNeese. McNeese was, and currently still is, serving a federal sentence of life in prison on matters unrelated to the case.

> Johnson and McNeese discussed Johnson's case. As a ruse, McNeese told Johnson that she could escape responsibility for these deaths if McNeese could arrange to have some other inmate who was already serving a life sentence falsely claim responsibility for murdering the five victims. McNeese told Johnson that, in order to make the confession believable, the other inmate would need to be able to furnish proof of his involvement by leading authorities to the victims' bodies. Johnson prepared and provided to McNeese certain maps and notes describing the location where the bodies of the five victims were buried. McNeese then turned over these maps and notes, Government's Exhibits 310, 311, and 312, to Iowa law enforcement authorities.

135

Exhibits 310, 311 and 312 have been analyzed at the Iowa D.C.I. Criminalistics Laboratory. Both fingerprint and handwriting analysts conclude that Angela Johnson authored, or could not be eliminated as authoring, Exhibits 310, 311 and 312.

(Doc. 471). With the clear vision of hindsight, Petitioner faults his attorneys for agreeing to this stipulation. (Petitioner's Memorandum, 128-32). Petitioner's habeas counsel argue that trial counsel should not have entered into this stipulation, but instead should have required the government to call Robert McNeese to testify about how he obtained the maps. Petitioner's habeas counsel reason that there was much to be gained by attacking McNeese, the fingerprint and handwriting analysis, and the conclusion that Johnson actually drew the maps.

A.     Trial Counsels' Performance Was Not Deficient

Petitioner's claim of error in this regard betrays a fundamental failure to comprehend the nature of the evidence, which explains why trial counsel chose not to challenge its admission. The circumstantial evidence surrounding Johnson's arrest, the production of maps, and the discovery of the bodies so overwhelmingly demonstrated Johnson drew the maps and knew the location of the bodies that any attempt to suggest otherwise would have jeopardized any credibility counsel would have had with the jury. The evidence Johnson drew the maps was sufficient without McNeese's testimony. No other inmates were housed in the Benton County Jail who could have led authorities to the bodies. Regardless of McNeese's credibility, he could not fabricate maps that, in fact, led to the bodies of Petitioner's murder victims. While Petitioner claims his trial counsel should have challenged "that the maps were actually generated by Johnson" (Petitioner's Memorandum, 129), he alleges no facts purporting

136

to show who else in the Benton County Jail would have been in the position to draw maps leading directly to the location of five murder victims.

Indeed, Petitioner's argument presumes the government would have called McNeese. The reality is that McNeese was entirely unnecessary to admission of the maps. It would have been sufficient to introduce evidence that:

1. Johnson was Petitioner's girlfriend;

2. Johnson purchased a firearm weeks before the murders;

3. Johnson was arrested for the murders on July 30, 2000;

4. Johnson was placed in the Benton County Jail;

5. The Benton County Jail housed no other inmates from Mason City;

6. Approximately two months after Johnson is arrested and placed in the Benton County jail, law enforcement personnel seized the maps from inmate Robert McNeese;

7. Robert McNeese was a government cooperator; and

8. The maps led to the bodies.

That the maps came from Angela Johnson, Petitioner's girlfriend, the mother of his child, and the purchaser of the murder weapon, was a foregone conclusion. McNeese's testimony was superfluous.

Even assuming the government had to call McNeese to lay the foundation for admission of the maps, McNeese would have been a difficult witness to control, particularly on cross examination. Petitioner claims this was not a case "where McNeese's testimony would have opened the door to or 'highlighted damning evidence.'" (Petitioner's Memorandum, 132). That is simply not true. Johnson made

137

many statements about Petitioner that never made it before the jury, and could not because of the stipulation. Once McNeese took the stand, however, there was the ever present danger that a question would elicit from him statements Johnson made about Petitioner – a danger avoided by means of the stipulation.

Moreover, McNeese and his relationship with the government and Johnson was tangential to Petitioner's case. It was not unreasonable for trial counsel to view attacking McNeese and the government on a matter that did not directly involve Petitioner as unproductive.

Finally, Petitioner repeats his argument that trial counsel should not have stipulated to admission of the maps so that he could have challenged the "junk science" handwriting and fingerprint evidence. (Petitioner's Memorandum, 129-30). Petitioner makes a conclusory assertion that the forensic evidence could have been successfully challenged, much as he does in Claim 19. As with Claim 19, Petitioner fails to allege facts sufficient to make a claim demonstrating the forensic evidence would have been inadmissible. Merely claiming it would have been subject to challenge is not sufficient to meet the standard of demonstrating trial counsels' conduct was deficient for failing to challenge the evidence.

Therefore, Petitioner cannot demonstrate his attorneys' performance fell below an objective standard of reasonableness.

B.      Petitioner Has Failed to Demonstrate Prejudice

Petitioner has also failed to demonstrate he was prejudiced by the stipulation. Petitioner has failed to establish that McNeese was a critical witness that was necessary to admission of the maps. Petitioner claims that by stipulating to the

138

evidence he was prejudiced because "trial counsel gave up challenging the admissibility and/or credibility of the testimony that provided the context, background and meaning of the maps" and foreclosed the opportunity to impeach McNeese's relationship with the government and the authenticity of the maps. (Petitioner's Memorandum, 132). Petitioner fails, however, to allege any facts calling into question that Johnson drew the maps and provided them to McNeese. Even assuming McNeese was called, Petitioner has failed to establish that impeaching McNeese would have in any way called into doubt Johnson's authorship of the maps leading to the bodies. It is pure speculation to suggest that contesting this evidence and attacking McNeese's credibility would have had any impact at all on the outcome of this trial.

The Court should deny this portion of Petitioner's motion without an evidentiary hearing.

## XVI. CLAIM 14 – TRIAL COUNSEL WERE NOT INEFFECTIVE FOR FAILING TO OBJECT TO A WITNESS'S PASSING REFERENCE TO PETITIONER'S INVOLVEMENT IN DISTRIBUTING COCAINE ONE YEAR PRIOR TO THE OFFENSE CONDUCT

Petitioner faults his attorneys for failing to adequately object to statements by Scott Gahn about Petitioner's prior drug activity and threats of violence. Petitioner alleges the government engaged in misconduct when the "prosecutor deliberately asked a question on redirect examination that he knew, or should have known would elicit testimony that the Court had previously ruled inadmissible." (Petitioner's Motion, at 76). The question was: "How do you know that to be true?" Gahn replied that one time he owed Petitioner money for "coke" and felt that if he didn't pay "it could be bad news." (Tr. 225-226). Petitioner further faults his attorneys for failing to adequately

139

raise this alleged error in his motion for a new trial. Incredibly, in a case involving evidence Petitioner distributed pounds of 97% pure methamphetamine and murdered five people, including two little girls, Petitioner claims Gahn's passing comment was prejudicial.

The government did not engage in misconduct. Petitioner fails to fully set forth the context of the government's question and Gahn's answer so as to allow this Court to assess whether the government knew, or should have known, that it's question would have caused Gahn to bring up past drug activity. Petitioner has failed to establish trial counsel's performance fell below an objective standard of reasonableness, or that he was prejudiced by Gahn's passing comment.

A.    Factual Background

During trial, Scott Gahn testified as a government witness. During his direct examination, Mr. Gahn testified about how he came to meet Petitioner, and how he ultimately came to introduce one of the murder victims, Greg Nicholson, to Petitioner. During Mr. Gahn's direct examination, the following exchange took place:

Q. To your knowledge, sir, did the defendant in this case, Dustin Honken, and Greg Nicholson ever develop an acquaintanceship?

A. Yes.

Q. And how do you happen to have personal knowledge of that fact?

A. Because I delivered the money and drugs.

Q. Describe that. When was this, sir? When was this? First just tell us when this was.

A. It was after I met Dustin at Wellborn and before '91. I know that for sure.

Q. And that relationship continued for about how long, sir?

140

A. The only thing that I'm aware of firsthand between Dustin and Greg was a sampling amount of cocaine and seven ounces of marijuana where I delivered those to Greg, picked up the money from Greg, gave the money to Dustin.

Q. Were there any problems with that transaction, Mr. Gahn?

A. Not specifically, no. I wound up doing a bunch of the coke, and I had to pay Dustin off for that, and he was upset with that, but we squared it away.

Q. Can you describe how that got squared away, Mr. Gahn?

A. I paid him.

Q. Did he have any difficulty in collecting that payment?

A. Yeah, it took me some time to come up with the money.

Q. But you did pay him?

A. Yeah.

Q. Why?

A. I didn't feel that Dustin was anybody that you shortchanged. If you owed him the money, you paid him. He wasn't the type of person that would just let it slide.

Q. I don't want any speculation as to what type of person he was. I just want to know what, if anything, he told you that encouraged you to pay him that cocaine debt.

A. One time we were out talking in front of my house –

MR. PARRISH: Objection. Time. My objection is to voir dire the witness as to the time this conversation took place.

THE COURT: That's fine.

MR. PARRISH: For purposes of making an objection.

THE COURT: You're being kind of argumentative so just –

MR. PARRISH: Oh, I don't mean to be.

THE COURT: Okay.

141

MR. PARRISH: That's my objection.

THE COURT: Okay.  Objection's sustained.  You may voir dire the witness.

MR. PARRISH: Thank you, your Honor.

BY MR. PARRISH:

Q.  Sir, Mr. Gahn, would you tell us the time this conversation took place, the year?

A.  I can only narrow it down.  This is 15 years ago.  To the best of my recollection, it was '89, '90, or '91, and that's the best I can do.

MR. PARRISH: I'm going to object, move to strike, admonish the jury, Your Honor, to strike any and all testimony as irrelevant, immaterial, no probative value and 403.

THE COURT: Let me see the lawyers at sidebar.

(Tr. 191-94).

There ensued a sidebar, during which Petitioner moved for a mistrial, which the court denied.  The Court indicated it found the conduct irrelevant, given the dates of the charged conspiracy, and the prosecutor said he would move on.  The following exchange then took place:

Q.  You indicated that you are the one who introduced Mr. Nicholson to Mr. Honken.

A.  That's correct.

Q.  And without giving us the exact circumstances of the introduction, please tell us when to the best of your recollection this introduction occurred.

A.  It was – had to be in the spring when Dustin was finishing up NIACC.  After he got fired from Wellborn, he went to NIACC, and he graduated with straight As, but I remember taking the money –

MR. PARRISH: I move to strike.  Irrelevant, immaterial, no probative value, have the jury admonished to disregard the comment about getting fired at Wellborn.

142

(Tr. 195-96). The jury was then sent out of the courtroom and a discussion was held outside the presence of the jury. The Court indicated that it did not find Mr. Gahn's comment about Petitioner being fired "very prejudicial," but offered to tell the jury to disregard the comment. (Tr. 197). With regard to discussion of the cocaine distribution between Petitioner, Mr. Gahn, and Mr. Nicholson, the government asserted that it was admissible to show the context of how the three of them came to form a drug relationship. (Tr. 200-202). The Court agreed that the government was "entitled to show the context in which they met." (Tr. 203). The government also indicated that the discussion of the prior cocaine distribution was admissible pursuant to Rule 404(b) of the Federal Rules of Evidence. (Tr. 198-99). At the end of the discussion, the jury was brought back into the courtroom and the Court gave the following instruction to the jury:

> THE COURT: Thank you. Please be seated. I'll try and take these in order. Mr. Parrish objected to testimony by this witness about Mr. Honken allegedly losing a job at Wellborn. I'm sustaining that objection. You're instructed to disregard it which leads to the note that I received from one juror. [The court then instructed the jurors to cross out of their notes any reference to testimony the court instructed them to disregard.]. And I'm not going to be specific about what time frame, but each time I told you to disregard the testimony, it was a time frame earlier than 1991, and when I told you to disregard that testimony, you should disregard it.

(Tr. 204). No further mention was made during Mr. Gahn's direct examination concerning activities prior to 1991, or to Petitioner's firing from Wellborn.

On cross examination, Petitioner's counsel inquired into Petitioner's tone when asking about the location of Greg Nicholson. The following exchange took place:

> Q. I do have one last area with you. Would you agree that in 1993 you told the grand jury, when they asked you about this, that Mr. Honken – when he did ask for Greg Nicholson – just said, "I want to talk to him"?
>
> A. Absolutely.

143

Q. And you would agree that, when you testified here today you said – some 11 years later, you said he was emphatic, he was insistent, he was almost desperate?

A. I know that to be the truth.

Q. Thank you so much.

A. You're welcome.

Court: Mr. Miller, anything further?

Miller: Yes, your honor. How do you know that to be true?

(Tr. 225) (punctuation changed to make it more understandable).

It was in response to this last question by Mr. Miller, one of the prosecutors, that Gahn replied:

> There was two times that Dustin ever made me real nervous, and you get that gut feeling where you know something's a little bit off. Once was when he told me to pay up for the money – pay him the money for the coke that I did. I had a little feeling that if I didn't pay this guy his money, it could be bad news. I had that same feeling the afternoon he was in my club looking for Greg Nicholson, and I know that's all opinion or whatever, but that's how I know.

(Tr. 225-26).

B.    Trial Counsels' Performance Was Not Deficient

Trial counsel previously objected to references to Petitioner's historic involvement in distributing drugs prior to 1992. The court instructed the jury to disregard the evidence. It is well-settled that the admission of allegedly prejudicial testimony is ordinarily cured by an instruction to the jury to disregard the evidence. *United States v. Encee*, 256 F.3d 852, 854 (8th Cir. 2001) (officer's prejudicial statement cured by instruction to jury to disregard). Unless there is evidence to the contrary, a court must assume the jury will follow a curative instruction. *United States v. Johnston*,

144

353 F.3d 617, 623 (8th Cir. 2004) (any prejudice to defendant from witness's testimony of drug dealing in 1995, when the charged conspiracy began in 2001, was cured by court's striking of the testimony and instructing jury to disregard the evidence).  Whether a curative instruction is sufficient must be evaluated in the context of the entire trial, including the strength of the government's evidence.  *United States v. Maza*, 93 F.3d 1390, 1397 (8th Cir. 1996).

When the witness blurted out another reference to drug activity prior to 1992 in response to a question that could not have anticipated such an answer, it was a tactical decision by trial counsel to make whether to object to this testimony.  Objecting always raises the possibility that it will draw the jury attention to the evidence.  See, e.g., *United States v. Caver*, 470 F.3d 220, 244 (6th Cir. 2006) ("[N]ot drawing attention to [a] statement may be perfectly sound from a tactical standpoint."); *United States v. Vaughn*, 228 F.3d 178, 205 (3rd Cir. 2000) (holding trial counsel was not ineffective because "[c]ounsel's decision not to draw attention to remarks cannot be deemed unreasonable trial strategy in light of the facts of this case."); *United States v. Allison*, 59 F.3d 625, 629 (7th Cir. 1995) ("Counsel's failure to object to a single improper statement does not establish objective deficiency, particularly where it may have been sound trial strategy to let the comment pass rather than draw attention to it . . ..").

Moreover, trial counsel was aware the court had already instructed the jury to disregard such evidence.  It was not unreasonable for trial counsel to trust the jury to remember and follow that instruction.  It was reasonable for trial counsel to believe that the risk of drawing the jury's attention to the evidence that would result from an

145

objection outweighed the danger the jury would consider the testimony when they had previously been instructed to disregard the same. Whether to object is a strategy decision within the discretion of trial counsel. *Class*, 79 F.3d at 739 (trial counsel's failure to object to questioning was well within the range of professionally reasonable judgement and does not constitute ineffective assistance of counsel); *Bruner*, 731 F.2d at 528 (affirming district court's finding that trial counsel's decision not to object to evidence was a tactical choice rather than dereliction of duty); *Wiley*, 969 F.2d at 102 (finding trial attorney "could reasonably have decided not to risk antagonizing the jury by objecting").

### C. Petitioner Has Failed To Demonstrate Prejudice

It is almost absurd to suggest that, in a case where the government presented a "tsunami" of evidence showing Petitioner guilty of committing five brutal murders in furtherance of a Continuing Criminal Enterprise, including the murder of two innocent little girls, that he was prejudiced by a passing reference to his involvement in selling cocaine. Petitioner can offer nothing but base conjecture to support such an argument. It flies in the face of common sense. In any event, there was no prejudice because the evidence was admissible, even though the court ruled otherwise.

Evidence of uncharged conduct is admissible, without reference to Rule 404(b), when it is "intrinsic evidence," such that it is inextricably intertwined as an integral part of the immediate context of the crime charged. See, e.g., *United States v. O'Dell*, 204 F.3d 829, 833 (8th Cir. 2000) ("Our cases have firmly established that crimes or acts which are 'inextricably intertwined' with the charged crime are not extrinsic and Rule 404(b) does not apply."); *United States v. Rolett*, 151 F.3d 787, 790 (8th Cir. 1998)

146

(crimes or acts inextricably intertwined with context of charged conduct are admissible and are not evaluated under Rule 404(b)); *Moore*, 735 R2d at 292 (res gestae is context evidence for crime charged).

As the government argued at trial, the cocaine transaction in 1991 between Petitioner, Gahn and Nicholson was part of the context of the conspiracy. It explained how Petitioner came to start dealing drugs with Nicholson and formed the drug dealing relationship that continued through the spring of 1993. See, e.g., *United States v. Holliman*, 291 F.3d 498, 502 (8th Cir. 2002) ("Even if this evidence were construed in some manner to be evidence of a prior bad act, outside the conspiracy, the evidence was also admissible as intrinsic evidence to show the full context of the crime charged and as 'direct proof of a charged crime that includes a plan or scheme element' due to the proximity in time and the ongoing nature of the theft ring at issue."), quoting *United States v. Carroll*, 207 F.3d 465, 468 (8th Cir. 2000).

Even if the evidence were not admissible as res gestae, it was admissible pursuant to Rule 404(b) of the Federal Rules of Evidence. (Order, 10/17/03, Docket No. 135). Rule 404(b) permits the introduction of other acts by a defendant to prove such things as his motive, intent, knowledge, and absence of mistake. Fed. R. Evid. 404(b). See also *United States v. Fischl*, 16 F.3d 927, 928 (8th Cir. 1993) (evidence of other bad acts admissible if it goes to defendant's contested state of mind in relation to the charged crime). Rule 404(b) is a "rule of inclusion" such that it prohibits only that evidence which "tends solely to prove the defendant's criminal disposition." *United States v. Shoffner*, 71 F.3d 1429, 1432 (8th Cir. 1995). To be admissible under Rule

147

404(b), the evidence must be: 1) relevant to a material issue; 2) proved by a preponderance of the evidence; 3) higher in probative value than prejudicial in effect; and 4) similar in kind and close in time to the crime charged.  Id.

In this case, the evidence was admissible to show the context of how a drug dealing relationship began between the murderer and his victim, as explained above.  It was also admissible to prove that Petitioner intentionally entered into a conspiracy to distribute and manufacture methamphetamine.  *United States v. Felix*, 867 F.2d 1068, 1072 (8th Cir. 1989) ("a defendant's complicity in other similar [drug] transactions serves to establish intent or motive to commit the crime charged.").  The Eighth Circuit Court of Appeals noted that "[t]he intent with which a person commits an act on a given occasion can many times best be proven by testimony or evidence of his [prior] acts . . .."  *United States v. Hill*, 249 F.3d 707, 713 (8th Cir. 2001) (internal quotation and citation omitted).  It was proven by a preponderance of the evidence through Mr. Gahn's testimony.  *United States v. Williams*, 895 F.2d 1202, 1205 (8th Cir. 1990) (sufficient evidence exists to admit Rule 404(b) evidence if the jury could reasonably find by a preponderance of the evidence that the act occurred and that the defendant was the actor.").  It was higher in probative value than in prejudicial effect, particularly given the nature of the charges for which Petitioner was on trial.  Generally, the concern is that a jury will decide a defendant's guilt on improper grounds, often an emotional one, as a result of the introduction of Rule 404(b) evidence.  See *United States v. Dennis*, 625 F.2d 782, 796 (8th Cir. 1980).  That Petitioner was involved in cocaine distribution two years before he brutally murdered five people was hardly likely to inflame the jury's passion.  Further, the same evidence of Petitioner's drug distribution in the early 1990s, including

148

the cocaine, came into evidence without objection in the grand jury testimony of Greg Nicholson. (Trial exhibit 27, pp.6-9). Finally, it was similar in kind (distributing a controlled substance) and close in time (approximately two years from the date of the murders and charged conspiracy) to the charged conduct. See, e.g., *United States v. Foster*, 344 F.3d 799, 803 (8th Cir. 2003) (no error to admit nine-year-old conviction pursuant to Rule 404(b)); *United States v. Williams*, 308 F.3d 833, 837 (8th Cir. 2002) (Twenty-year-old conviction not too remote in time).

Even if trial counsel should have objected to the passing comment, it was harmless. Gahn was only one of the 54 witnesses who testified during the guilt phase of the trial, in which hundreds of pieces of evidence were admitted against Petitioner. The evidence overwhelmingly proved Petitioner guilty, as reflected in jury's finding during the penalty phase that it had absolutely no residual doubt of Petitioner's guilt.

The Court should deny this portion of Petitioner's motion without an evidentiary hearing.

## XVII. CLAIM 15 – TRIAL COUNSEL WERE NOT INEFFECTIVE FOR FAILING TO OBJECT TO ADMISSION OF EVIDENCE OF PETITIONER'S ATTEMPT TO ESCAPE FROM THE COUNTY JAIL

Petitioner claims the trial court admitted evidence of his attempt to escape from the Woodbury County Jail improperly as "intrinsic evidence" of charged conduct and pursuant to Rule 404(b) of the Federal Rules of Evidence. Petitioner claims this evidence should have been barred because it was "not necessary" to prove the charged conduct and "its relevance was marginal at best." (Petitioner's Memorandum, 140). Petitioner concedes his trial counsel objected to the evidence, but faults them for

149

allegedly failing "to argue the proper basis for excluding it." (Petitioner's Memorandum, 140). While it is not entirely clear what habeas counsel believes to have been the "proper basis" for excluding the evidence, it appears that Petitioner claims trial counsel should have argued that it was propensity evidence. (Petitioner's Memorandum, 142-146). Petitioner also faults his appellate counsel for failing to raise this issue on appeal. (Petitioner's Memorandum, 146-47).

A.      The Escape Evidence

Petitioner attempted to escape from the jail. Dennis Putzier was housed in the cell block next to Petitioner and had managed to break through part of the outside wall, making it to the brick facing on the building. (Tr. 1287-88; 1297-1306). He communicated with Petitioner through a door adjoining the cell block where Petitioner was housed about his success. (Tr. 1288-89). It was agreed that if Petitioner could find a way to get into Putzier's cell block, Putzier would help Petitioner escape in exchange for getting Putzier money and drugs. (Tr. 1288). Angela Johnson was going to help them from the outside. (Tr. 1402). Putzier understood that Petitioner's motivation for getting out was to harm witnesses. (Tr. 1287-88; 1298-99). To get to Putzier's cell block, Petitioner tried to break through the walls adjoining the two cell blocks, but determined that would not work. (Tr. 1317-18; 1402-1404; 1431-33). Petitioner then tried to "jimmy the lock" on the door adjoining the two cell blocks. (Tr. 1317-19; 1400-1401). Jailers discovered the hole and prevented the escape. (Tr. 1319-20). Putzier pled guilty to aiding and abetting Petitioner's attempt to escape from the jail. (Tr. 1319-20).

150

### B. The Evidence Was Admissible as Intrinsic Evidence of the Crimes

Petitioner's attempt to escape from the Woodbury County Jail was relevant as intrinsic evidence of the crimes charged in Count 6 of the Superseding Indictment, soliciting Dean Donaldson and Anthony Altimus to kill government witnesses Timothy Cutkomp and Daniel Cobeen, and Count 7 of the Superseding Indictment, conspiring to commit a number of offenses, including the murder of witnesses. In the alternative, Petitioner's involvement in the escape attempt constituted evidence of other wrongs, admissible pursuant to Rule 404(b) to show motive, intent, preparation, and plan. Regardless, evidence of Petitioner's escape attempt was admissible in the penalty phase of the trial as proof of his future dangerousness.

Evidence of uncharged conduct is admissible, without reference to Rule 404(b), when it is "intrinsic evidence," such that it is inextricably intertwined as an integral part of the immediate context of the crime charged. See, e.g., *United States v. O'Dell*, 204 F.3d 829, 833 (8th Cir. 2000) ("Our cases have firmly established that crimes or acts which are 'inextricably intertwined' with the charged crime are not extrinsic and Rule 404(b) does not apply."); *United States v. Rolett*, 151 F.3d 787, 790 (8th Cir. 1998) (crimes or acts inextricably intertwined with context of charged conduct are admissible and are not evaluated under Rule 404(b)).

Petitioner's attempt to escape from jail was inextricably intertwined with his attempts to murder, and have others murder, government witnesses. Petitioner's motive for killing the witnesses was to avoid serving time in prison. His attempt to escape his custody, therefore, was evidence supporting this motive. Petitioner sought to kill the witnesses himself if he escaped, or through others if he could not. Under

151

these circumstances, Petitioner's escape attempt was intrinsic evidence of the offenses charged in Counts 6 and 7.  See *United States v. Bass*, 794 F.2d 1305, 1311-12 (8th Cir. 1986) (finding evidence that defendant and co-defendant escaped from prison before stealing a vehicle and transporting firearms across state lines was admissible as an integral part of the crimes of interstate transportation of stolen vehicle and firearms). Furthermore, Petitioner's attempt to escape from the Woodbury County Jail was admissible to show his consciousness of guilt for the charged offenses.  See, e.g., *United States v. Williams*, 295 F.3d 817, 819 (8th Cir. 2002) (in rejecting claim of prejudicial joinder of conspiracy to distribute cocaine and escape charges, court noted that escape evidence would have been admissible in a conspiracy trial as consciousness of guilt); *United States v. Barnes*, 140 F.3d 737, 738 (8th Cir. 1998) ("Evidence of flight or escape is admissible and has probative value as evidence of consciousness of guilt.").

### C.    Trial Counsels' Performance Was Not Deficient

Petitioner argues his trial attorneys "were ineffective for failing to object to the admission of the evidence under Rule 404(b) and the case law defining "intrinsic" evidence and for failing to request that the court instruct the jury as to the narrow purpose for which the evidence was admitted."  (Petitioner's Memorandum, 146).  Trial counsel did, however, object to the admission of the evidence under Rule 404(b). *United States v. Honken*, 378 F. Supp.2d 970, 1001 (N.D.Iowa 2004) ("Honken contends that evidence that he attempted to escape from the Woodbury County Jail does not make it any more or less likely that he committed the offenses charged in this case and, therefore, is not relevant.  Moreover, he contends that such evidence is not

152

admissible under Rule 404(b) because it is irrelevant, does not involve any conduct similar to the crimes charged, and is not 'intrinsic' evidence of the crimes charged."). Petitioner's current arguments are no different from the arguments trial counsel made before the district court.

To the extent Petitioner claims trial counsels' performance was deficient because they should have argued that the escape attempt evidence was improperly used to show propensity and bad character, his argument is meritless. First, by objecting to admission of the evidence under Rule 404(b), trial counsel was objecting on the ground that it was improper propensity evidence. Second, Petitioner fails to fully explain how evidence of an escape attempt tended to show propensity, and propensity to commit what crime. The court properly admitted the evidence as intrinsic to the charged conduct of conspiracy to tamper with witnesses and solicitation to commit murders in that the evidence demonstrated Petitioner was trying to escape from jail to kill witnesses. Petitioner resorted to soliciting others to commit the crimes he could not do himself while he was in jail.

Trial counsel was not ineffective for failing to request a limiting instruction. The district court found the evidence of Petitioner's attempted escape was admissible as intrinsic evidence of the crimes charged. *Honken*, 378 F. Supp.2d at 1001-1002. Therefore, Petitioner was not entitled to a limiting instruction and trial counsel was not ineffective for failing to request one. See, e.g., *United States v. Dungy*, 2002 WL 31609890, at * 2 (8th Cir., Nov. 21, 2002) ("Further, Dungy's counsel did not err by failing to request a Rule 404(b) limiting instruction. As we noted above, Rule 404(b) is not implicated in this case. It thus would have been inappropriate for counsel to

153

request such an instruction."); *United States v. Held*, 2001 WL 369777, at * 1 (8th Cir., April 13, 2001) ("Because the motel receipt and handwritten note were admissible as direct evidence, a request for a Rule 404(b) limiting instruction and a motion for a new trial on Rule 404(b) grounds would have been meritless.").

Petitioner's appellate counsel were not ineffective for failing to raise this meritless claim on appeal. *Held*, 2001 WL 369777, at *1 ("Likewise, raising the Rule 404(b) issue on appeal would have been fruitless. Held's trial and appellate attorneys acted reasonably in not pursuing claims we find to be without merit.").

### D. Petitioner Has Failed to Demonstrate Prejudice

Petitioner claims he was prejudiced by trial counsels' allegedly deficient performance. (Petitioner's Memorandum, 147). In support of this assertion, Petitioner claims "there is a reasonable likelihood that the jury, without proper guidance from the court, considered evidence of the alleged escape attempt as propensity and bad character evidence and that it would not have reached the guilty verdicts on the relevant charges and would not have sentenced Petitioner to death on any counts, if trial counsel had not performed deficiently." (Petitioner's Memorandum, 147). First, because the evidence was intrinsic to the charged crimes, trial counsel was not deficient in failing to obtain "proper guidance from the court." Second, there was overwhelming evidence through the testimony of Dean Donaldson (Tr. 1085-1226), Daniel Lederman (Tr. 1226-1240), William Dean (Tr. 1241-1274), Dennis Putzier (Tr. 1275-1382), Anthony Altimus (Tr. 2016-2086), and Anthony Johnson (Tr. 2086-2105), among others, to establish Petitioner's guilt on those charges. Even if the escape evidence was "not necessary" for the government to prove those charges (Petitioner's

154

Memorandum, 140), that is not the test for admissibility.

Petitioner's argument that admission of this evidence affected the death verdict is baseless. Regardless of its admissibility during the guilt phase of the trial, evidence that Petitioner attempted to escape from custody was relevant and admissible during the penalty phase of trial. One of the aggravating factors alleged by the United States in favor of the death penalty was Petitioner's future dangerousness. Petitioner's attempt to escape from custody in the past was evidence that he will remain a danger to society if he is not executed. See *United States v. O'Driscoll*, 250 F. Supp.2d 432, 440-41 (M.D. Penn. 2002) (finding evidence of multiple escape attempts admissible at penalty phase of capital case).

The Court should deny this portion of Petitioner's motion without an evidentiary hearing.

## XVIII. CLAIM 16 – TRIAL COUNSEL WAS NOT INEFFECTIVE FOR FAILING TO PRESENT EVIDENCE THAT TERRY DeGEUS MURDERED THE FIRST FOUR VICTIMS

Petitioner claims his trial attorneys were ineffective for failing to present evidence that would have further supported his defense that Terry DeGeus killed Nicholson and the Duncan family. (Petitioner's Memorandum, 148-155). Petitioner claims DeGeus was the "primary suspect" for the murders and, while his attorneys presented some evidence pointing to DeGeus, it was inadequate. This claim fails on the merits. The idea that Terry DeGeus murdered anyone is baseless. Regardless, Petitioner has not alleged facts sufficient to establish his trial attorneys failed to perform at an objective level of reasonableness, and Petitioner has not alleged facts sufficient to demonstrate

155

prejudice.

A.        There Is No Evidence Terry DeGeus Killed Anyone

DeGeus was not the "primary suspect" for the murders, contrary to Petitioner's contention.  (Petitioner's Memorandum, 150).  While law enforcement officers kept an open mind about the possibility Terry DeGeus was involved in the murders, it was only to the extent that he might have been Petitioner's accomplice.  For a time, law enforcement officers hypothesized that DeGeus might have been involved with Petitioner in killing Nicholson and the Duncan family, and that Petitioner then killed DeGeus because he was a witness to those murders.

Contrary to Petitioner's claim, DeGeus had no motive to kill Nicholson.  Other than a statement by Mike Billick that Nicholson and DeGeus were competitors in selling methamphetamine, there is nothing to suggest animosity between them.  Moreover, Petitioner intentionally kept Nicholson in the dark about DeGeus.  Nicholson had no personal dealings with DeGeus and Nicholson testified in the grand jury that the only thing he knew was that Petitioner once told him that he was supplying methamphetamine to Terry DeGeus.  (Trial exhibit 27, p 13).  Accordingly, DeGeus would have had no reason to know of Nicholson or be concerned that Nicholson would incriminate him.

Contrary to Petitioner's assertion, DeGeus's concern about receiving a grand jury subpoena occurred after Nicholson's murder, not before.  Joanne DeGeus, Terry DeGeus's mother, testified that it was after Greg Nicholson testified that Terry DeGeus was worried about whether anyone had delivered a subpoena for him to testify.  (Tr. 519-520).  She testified that DeGeus was very worried and upset at this time.  (Tr. 520).

156

This comports with the observation made by Christi Gaubatz who testified that after Nicholson disappeared, she ran into Terry DeGeus.  (Tr. 447).

> We had seen each other or he saw me on the – on a road that connects Clear Lake to Mason City, and I could see in my rear view mirror that he was turning around to follow me, so I pulled over and he got in my car, and that was the incident in which I noticed he – there was an odor, and he said he had not slept in a long time and he was very upset, very nervous, and he pulled out a – I don't know if it was a note.  It was just a piece of paper, and it had Greg's name on it, and he asked me did I know who he was, and I said no.  And he said, Well, I can't find him.  He's been missing, and I said, I don't know what you're talking about, and he was just ranting."

(Tr. 448).

Moreover, the idea that DeGeus was motivated to kill Nicholson never made any sense unless it was tied to Petitioner's involvement in the murders.  Nicholson wore a wire on Petitioner, causing Petitioner's arrest; he did not wear a wire on DeGeus causing DeGeus's arrest.  Nicholson testified in the grand jury against Petitioner, not against DeGeus.  DeGeus was not charged with any criminal offense at the time of Nicholson's murder; Petitioner was.  Petitioner withdrew his intent to plead guilty to drug charges immediately after Nicholson's disappearance; DeGeus had no pending federal drug charges.  DeGeus himself later disappeared shortly after Angela Johnson and Aaron Ryerson were questioned by the grand jury about drug activity between Petitioner and DeGeus.  The last person known to talk with DeGeus was Angela Johnson, Petitioner's girlfriend.

Petitioner points to DeGeus's involvement in excavation work as evidence he was involved in the murders.  Again, law enforcement officers considered the possibility that he helped Petitioner murder Nicholson and the Duncan family or helped bury the

157

bodies, but only because of his connection to Petitioner.

While there was evidence DeGeus was violent and aggressive, his violence was limited to beating or threatening girlfriends and scuffling with law enforcement officers. Evidence DeGeus stalked and beat Johnson does nothing to establish a motive for him to kill Greg Nicholson, Lori Duncan, and her two little girls.

B.      Trial Counsels' Performance Was Not Deficient

To the extent Petitioner claims his attorneys could have done more to point the finger at DeGeus, he cannot demonstrate the presentation they did make was so deficient that it fell below an objective standard of reasonableness. Petitioner does not claim trial counsel failed to investigate the theory DeGeus was involved in the murders; rather, his criticism is limited to how they presented the evidence. (Petitioner's Memorandum, 154). Trial counsel elicited testimony of DeGeus's involvement in violent conduct through cross examination of government witnesses. Trial counsel elicited testimony from Aaron Ryerson that Terry DeGeus was involved in a stand-off with police officers and resisted arrest. (Tr. 259-61). Trial counsel also elicited testimony from Christi Gaubatz that DeGeus threatened a man who was seeing Angela Johnson, that Johnson was fearful of DeGeus, and that DeGeus was involved in a high-speed chase of Johnson that ended at a police station. (Tr. 417-425). To the extent Petitioner claims trial counsel should have called additional witnesses on this issue, that decision "must be viewed as of the time it was made." *Winfield*, 460 F.3d at 1033. There was no credible evidence linking DeGeus to the murders of Nicholson and the Duncan family. Petitioner simply claims trial counsel could have presented additional evidence, but whether and which witnesses to call are fundamentally a strategy decision to be

158

made by trial counsel.  *Winfield*, 460 F.3d at 1033 (decision whether to call witnesses is presumed to be one of strategy).  <u>See also</u> *Hanes v. Dormire*, 240 F.3d 694, 698 (8th Cir. 2001) (witness selections are left to counsel's judgment).

### C.      Petitioner Has Not Demonstrated Prejudice

The attempt to blame DeGeus for the murders of Nicholson and the Duncan family was and is completely untenable.  The evidence overwhelmingly demonstrated that Petitioner and his girlfriend, Angela Johnson, murdered those four victims. Moreover, it also showed they murdered Terry DeGeus.  Petitioner's claim that DeGeus murdered Nicholson and the Duncan family does nothing to explain DeGeus's own brutal murder.

It is telling that Petitioner's claim of prejudice is limited to a repetitive series of conclusory statements.[21]  It is as if Petitioner believes that mere repetition of his conclusion makes it so.  Petitioner dispenses with the entirety of the government's "tsunami" of circumstantial evidence in three sentences.  (Petitioner's Memorandum, 154).  The reality is the evidence overwhelmingly proved Petitioner guilty to the point that not only did the jury find him guilty beyond a reasonable doubt – not a single juror harbored even a fictitious "residual doubt" about his guilt.  (Penalty Phase Verdict Form,

---

[21]  "Counsel's [sic] failure to introduce this evidence prejudiced Petitioner.  Had counsel presented the facts that led law enforcement agencies to suspect DeGeus, there is a reasonable probability that the jury would have had a reasonable doubt as to Petitioner's guilt. . . . Had the defense followed through on their attempt to cast suspicion on DeGeus, there is a reasonable probability that the jury would have reached a different verdict.  *Strickland*.  Counsel's [sic] failures also detrimentally affected Petitioner's sentence, in violation of the Sixth and Eighth Amendments. . . . Had counsel put up the evidence outlined above, there is at least a reasonable probability that one juror would have found residual doubt at the penalty phase and thus spared Petitioner's life."  (Petitioner's Memorandum, 154-55).

159

Doc. 547, p 7).

The Court should deny this portion of Petitioner's motion without an evidentiary hearing.

## XIX.    CLAIM 17 – DISMISSAL OF A JUROR

Petitioner argues: 1) the district court erred in questioning a dismissed juror; 2) that the court's improper questioning may have impacted its evidentiary findings; and, 3) the Court of Appeals decision affirming the dismissal and replacement of the juror, which did not rely on the improper questioning, was nonetheless erroneous because it relied upon the district court's evidentiary findings which might have been improperly influenced by the district court's improper questioning.  All this was litigated before and would be barred from collateral attack, but to avoid procedural default Petitioner claims his counsel were "ineffective for failing to properly litigate this claim."  (Petitioner's Motion, at 93).

Thus, it should be clear that to the extent Petitioner claims the trial court erred, or that he's allegedly entitled to a new trial because the trial court relied on evidence inadmissible under Rule 606(b) of the Federal Rules of Evidence, Petitioner must get over the hurdles of establishing ineffective assistance of counsel under the *Strickland* test.  Petitioner cannot here relitigate whether the district court's findings were erroneous, but that is exactly what he attempts to do.  Petitioner claims "[t]here is little evidentiary support for the court's conclusions."  (Petitioner's Memorandum, 159).  That issue has been fully litigated before the district court and on appeal.  Petitioner is barred from re-litigating it under Section 2255.  See *United States v. McGee*, 201 F.3d 1022, 1022 (8th Cir. 2000) (per curium) (issue raised on direct appeal may not be re-litigated

160

under § 2255).  Rather, the only way Petitioner can maintain any claim tied to Juror 523 is to demonstrate ineffective assistance of counsel.  He cannot do so.

### A.      Trial Counsels' Performance Handling the Juror Issue Was Not Deficient

Petitioner's trial counsel vigorously litigated the issues that arose involving juror 523.  They moved for a mistrial, questioned Juror 523 and the other jurors, questioned Juror 523's co-workers and boss, objected to testimony they believed violated Rule 606(b), moved for a new trial based on the issue, and raised the issue on appeal. Petitioner faults his trial attorney's vigorous efforts by asserting his trial counsel failed to:

> 1) "fully challenge the scope of the court's evidentiary hearing and the impact on the court's factual findings of testimony from Juror 523, minimizing the effect of her boss's comments on her ability to be impartial"; and,
>
> 2) "challenge the validity of the guilty verdict, if the court's finding that Juror 523 lied to finish deliberations more quickly is presumed correct."

(Petitioner's Memorandum, 163).  Petitioner also faults his appellate counsel for failing to challenge the "scope of the post-trial evidentiary hearing and, alternatively, Juror 523's dishonesty."  (Id.).

### 1.      Scope of the Court's Evidentiary Hearing

While Petitioner claims his trial counsel failed to "fully challenged the scope of the court's evidentiary hearing," Petitioner does not specifically indicate what he means by the "scope" of the court's evidentiary hearing.  The only issue regarding scope Petitioner mentions has to do with the district court admitting testimony the Eighth Circuit Court of Appeals later found violated Rule 606(b).  (Petitioner's Memorandum, 158-59).  Petitioner's trial counsels' performance was not deficient regarding this issue

as they objected to admission of the testimony.  (Tr. 12/16/04, 62-63, 65-67).  This was particularly effective assistance of counsel given that at the time there was "no Eighth Circuit case specifically addressing whether a district court may, at a post-verdict hearing, ask a juror whether an outside influence affected that juror's ability to be impartial."  *Honken*, 541 F.3d at 1168.  With regard to the scope of the district court's evidentiary hearing, Petitioner fails to allege what else trial counsel should or could have done.

Appellate counsels' performance likewise was not deficient with regard to the scope issue because they successfully raised this issue on appeal.  *United States v. Honken*, 541 F.3d 1146, 1167-68 (8th Cir. 2009).  While his claim is not clear, at best, one can read Petitioner's Memorandum as suggesting that appellate counsel should have argued that the district court's conclusion that the boss's comment "amounted to nothing more than an unsolicited, passing remark which was made, and taken, in jest" (*Honken*, 541 F.3d at 1169) was somehow influenced by the court considering the testimony barred by Rule 606(b).  (Petitioner's Memorandum, 160).  Petitioner's argument is without merit because the barred testimony went to whether Juror 523 believed her boss's comments affected her ability to be a fair and impartial juror.  *Honken*, 541 F.3d at 1167.  The juror's answer to that question is factually distinct from the district court's finding whether her boss's comment was "an unsolicited, passing remark which was made, and taken, in jest."  Moreover, the Eighth Circuit Court of Appeals found that remand for a new trial was not necessary because it could disregard

162

the testimony and make its own judgment on the record.  *Honken*, 541 F.3d at 1169.[22]

The Court did so, and found Petitioner's claim wanting.  Again, Petitioner fails to allege

what appellate counsel should have or could have done differently.

2.        Validity of the Guilty Verdict

Petitioner asserts that his trial and appellate counsel were ineffective for failing to

assert that he was entitled to a new trial on the theory that, because the district court

found Juror 523 was not truthful about what her boss said to her, that she must have

been untruthful during voir dire and her untruthfulness tainted the guilty verdict.

(Petitioner's Memorandum, 160-162).  Petitioner's fails to allege any facts showing

Juror 523 lied during voir dire.  Petitioner has failed to set forth any question posed to

Juror 523 to which she allegedly lied in response.  Petitioner has failed to allege facts

showing any answer was dishonest, that she was motivated by partiality, or that the true

facts would have supported a motion to strike her for cause.  *McDonough Power*

*Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984).  It is not sufficient for Petitioner

simply to make a conclusory assertion that Juror 523's statements "revealed a strong

bias against Petitioner."  (Petitioner's Memorandum, 161).  This is not a case where

Petitioner has alleged facts showing Juror 523 was asked a specific question about a

fact, that she lied about the fact, that her reason for lying was due to bias against

Petitioner, or had she disclosed the boss's comments, it would have supported a

---

[22]  Petitioner argues that, "[b]ecause it is unclear the extent to which the
inadmissible evidence regarding the effect of the comments on Juror 523 influenced the
trial court's findings of fact, Petitioner is entitled to a full and fair evidentiary hearing that
comports with the dictates of Rule 606(b)."  (Petitioner's Memorandum, 160).  That is
precisely what the Eighth Circuit Court of Appeals determined Petitioner was not
entitled to.  Its holding is the definitive answer to this argument.

163

motion to strike her for cause.[23]

Frankly, trial counsel did a better job than habeas counsel has done here. Trial counsel alleged that Juror 523 was untruthful in voir dire, identifying specific questions to which trial counsel believed she provided untrue answers. *Honken*, 381 F. Supp.2d at 1035-36. The district court held otherwise. *Honken*, 381 F. Supp.2d at 1055-56.

Moreover, trial counsels' performance litigating this issue was thorough and professional. Trial counsel moved for a mistrial based on the boss's alleged comments to Juror 523 and asserted the alleged comments infected the guilt findings. (Tr. 3991-993l 4002). Trial counsel moved for a new trial on this issue after the verdict. *Honken*, 381 F. Supp.2d at 1036. Trial counsel argued that the comments to Juror 523 infected the guilt phase of the trial as well, but the district court disagreed. *Honken*, 381 F. Supp.2d at 1047-49. Again, while Petitioner makes a broad allegation without alleging facts to support it, he completely fails to indicate what more his trial counsel should or could have possibly done with respect to the guilty verdict issue.

Similarly, Petitioner has failed to allege a factual basis showing that appellate counsels' performance was deficient with respect to asserting the comments to Juror 523 affected the guilty verdict. Appellate counsel made this argument on appeal – the Eighth Circuit Court of Appeals rejected it. *Honken*, 541 F.3d at 1166-67 ("The evidence uniformly pointed to one conclusion – Juror 523's boss's comment was

---

[23] Interestingly, the very testimony the Eighth Circuit Court of Appeals found should not have been considered by the district court would be critical to this last factor, had Petitioner been able to establish the first two factors. Juror 523 testified that her boss's comments had no effect on her ability to remain fair and impartial, which would have been sufficient to deny a motion to strike her for cause.

164

completely insignificant and the comment had no affect on the jury's deliberations or its verdict."). Petitioner fails to establish what more effective appellate counsel could or should have done.

### B.     Petitioner Has Failed to Demonstrate Prejudice

Petitioner makes the conclusory assertion that he was prejudiced, but fails to allege facts to support that conclusion. (Petitioner's Memorandum, 163 – "But for counsel's [sic] failure, there is a reasonable probability that the outcomes of the guilt and penalty phases of Petitioner's trial would have been different."; "Appellate counsel's [sic] failure to raise the issue prejudiced Petitioner."). The district court, and the Eighth Circuit Court of Appeals, both found the comment made by Juror 523's boss was an unsolicited, passing remark which was made, and taken, in jest, and had no effect on the jury's deliberations or verdict. Indeed, the Eighth Circuit Court of Appeals specifically found "Honken was not prejudiced by Juror 523's exposure to her boss's relatively insignificant comment." *Honken*, 541 F.3d at 1167. Petitioner has failed to establish he was prejudiced in any way by his trial or appellate counsels' performance in litigating the issues surrounding Juror 523.

The Court should deny this portion of Petitioner's motion without an evidentiary hearing.

## XX.    CLAIM 18 – SECURITY MEASURES WERE REASONABLE

Petitioner claims the security measures used by the Marshals during trial violated his Fifth, Sixth, and Eighth Amendment rights. He claims the security measures "interfered with Petitioner's right to counsel" and "impacted the jury, who [sic] were led to believe that Petitioner was an extraordinary dangerous person." (Petitioner's Motion,

165

95; Petitioner's Memorandum, 164).  Though this issue was thoroughly litigated before the district court and on appeal, Petitioner here attempts to keep this claim alive in this collateral attack by asserting he has "additional facts" to support the claim.  (Petitioner's Motion, 97 n. 10).  Namely, Petitioner asserts the security measures were implemented based on "information from jail house informants that was not subject to adversarial testing and was compromised by due process violations" and "because counsel failed to present evidence of Petitioner's severe heart problems . . .."  (Id.).  Petitioner further claims that "the Government suppressed exculpatory information of which the court was unaware."  (Petitioner's Memorandum, 166 n. 25).  To that degree, this claim is bootstrapped to and dependant on his claimed *Brady* violations, which are themselves viable only to the extent Petitioner can demonstrate trial counsel were ineffective for failing to properly investigate the cooperators.  (See Petitioner's Claim 3).

Finally, Petitioner expands his claim to assert that he was prejudiced by "[a]dditional onerous and unnecessary security measures" "also put in place with respect to the jury that could have only had an objective and profound impact on the individual jurors."  (Petitioner's Memorandum, 170).  Petitioner claims that when jurors arrived at the courthouse, "they were ushered inside also under very tight security and were able to see snipers and other uniformed and armed law enforcement personnel in many areas in and around the courthouse," speculating that "[s]uch drastic security measure were surely to have effects on the jurors' view of Petitioner and their analysis of the evidence . . .."  (Id.).

Petitioner's claim is without merit.  This claim is barred because it was raised and thoroughly litigated in the criminal case.  Petitioner has failed to allege facts

166

demonstrating that his trial counsels' investigation and litigation of the security issue was deficient.  Petitioner has failed to allege facts demonstrating that he has obtained newly discovered evidence.  Finally, Petitioner has failed to allege facts demonstrating that he was prejudiced by the security measures adopted at his trial.

### A.    Factual Background

#### 1.    Evidence Presented at Hearing Regarding Courtroom Security

After his arrest in 1996, Petitioner attempted to buy firearms and murder federal witnesses and law enforcement officers.  (Security Tr. 15, Exhibit 2-9).  While Petitioner was detained pending trial upon discovery of these plans, he attempted to escape from jail and hire others to kill federal witnesses.  (Security Tr. 25).  While incarcerated at the United States Penitentiary in Florence, Colorado, Petitioner trained in martial arts, in part so he could attempt to escape from custody and harm trial participants.  (Id.)  In particular, Petitioner trained in hand-to-hand combat while in leg shackles.  (Id.).  Petitioner was a member of the Odinists, a supremacist prison group with whom Petitioner was planning an escape during his trial.  (Security Tr. 29-30; Hearing exhibit 1).  Petitioner's witness list included a number of such Odinists and others with violent criminal records.  (Security Tr. 29-30).  Roger Arechiga, acting U.S. Marshal, testified Petitioner posed a substantial escape risk and danger to others in the courtroom.  (Security Tr. 28).  Because of Petitioner's threats and efforts to injure potential witnesses, several government witnesses were placed in the Witness Security Program.  (Security Tr. 28; Tr. 1626, 1735).

The court found it appropriate to adopt security measures in this case.  See *United States v. Honken*, 378 F. Supp. 2d at 1013-1026 (setting forth district court's

167

extensive factual findings regarding security risk posed by defendant). The court

ordered the United States Marshals to place Petitioner in leg shackles and, while in the

courtroom, have the shackles be connected to a bolt in the floor. *United States v.*

*Honken*, 378 F. Supp. 2d 1010, 1039 (N.D. Iowa 2004). The court also ordered the

United States Marshals to place Petitioner in a stun belt that could be activated by

Marshals if Petitioner became violent in the courtroom or hallway. Id. The court

ordered the Marshals to take extensive precautions to prevent the jury from discovering

the restraints. Id.

### 2.     Security Measures in the Courtroom

In this case, the court took extraordinary precautions to ensure the jury never

learned Petitioner was restrained, including dipping the chains in plastic coating to

prevent noise, painting the chains black, and covering counsel tables with skirts.

*Honken*, 378 F. Supp. 2d at 1039; *Honken*, 381 F. Supp. 2d at 979. The shackles were

sufficiently loose to ensure Petitioner could move enough to fully consult with counsel

during the trial and not appear shackled. *Honken*, 381 F. Supp. 2d at 797. The court

ordered the courtroom cleared of the jury and the public any time the Petitioner was

removed from the courtroom, and ordered the hallway cleared of all people any time the

Petitioner was moved down the hall to the Marshal's holding cell. *Honken*, 378 F.

Supp. 2d at 1039.

### 3.     Security Measures outside the Courtroom

Petitioner was transported to and from the courthouse before and after the jurors

were transported to the courthouse. (Affidavit of Duane Walhof, Exhibit J). Security

measures in place while Petitioner was in transport into and out of the courthouse were

not visible to the jurors when they arrived and left the courthouse.  (Id.).  While Deputy Marshals were armed while transporting the jurors from remote locations, they wore only sidearms concealed by their plain clothes.  (Id.).  While transporting the jurors, the Deputy Marshals did not display any long guns.  (Id.).  Neither "snipers" nor counter snipers were used or deployed during the trial of Petitioner in Sioux city, Iowa, in 2004.  (Id.).

### 4.      Petitioner's Alleged Heart Condition

Petitioner claimed heart problems at the time of his 1997 sentencing.  (Honken 1997 PSR, ¶ 155, Exhibit I).  Petitioner's alleged heart "flutter" condition was referenced in the 1997 evaluation from the Bureau of Prisons.  (Exhibit F, page 4).  Petitioner's history of concerns about his cardiac condition and what he described as tacchyardic episodes was also referenced on the first page of Dr. Gelbort's report.  (Exhibit G, page 1).

### B.      The Law Regarding Adoption Of Security Measures

It is beyond dispute that some criminal defendants pose a serious threat to courtroom safety.  As the case law amply demonstrates, the stress of a criminal proceeding, combined with the adversarial nature of the process and the potential for conviction and punishment can cause a defendant to lash out at the presiding judge, jurors, clerks, counsel, and others.  See *King v. Rowland*, 977 F.2d 1354 (9th Cir. 1992) (defendant attacked counsel in court); *Hamilton v. Vasquez,* 17 F.3d 1149, 1154 (9th Cir.) (describing defendant's attacks on counsel and deputies), *cert. denied,* 512 U.S. 1229 (1994); see also *Spain v. Rushen,* 883 F.2d 731 (9th Cir. 1989) (Noonan, J., dissenting) ("[w]hat could be done in a prison could be done in a courtroom by a

169

prisoner . . .   ill-disposed to the system . . .").

It is similarly beyond dispute that a court has a compelling interest in maintaining security in its courtroom.  See, e.g., *Holbrook v. Flynn*, 475 U.S. 560 (1986) (stating that maintaining control over defendants who were denied bail outweighed the defendants' interest in avoiding any prejudice caused by the jury seeing four security officers seated in the front row of courtroom's viewing gallery during trial); *Hamilton*, 17 F.3d at 1155 (stating that maintaining courtroom security justified the use of shackles on defendant, outweighing the defendant's due process rights); *McMorris v. Alioto,* 567 F.2d 897, 899-900 (9th Cir. 1978) (finding that the court's interest in maintaining a secure courtroom justifies magnetometer searches of courtroom entrants).

In evaluating courtroom security measures, a court must balance security needs against a defendant's Sixth Amendment rights to a fair trial and the presumption of innocence.  *Mahasin*, 442 F.3d at 691.  As the Supreme Court has instructed, "every practice tending to single out the accused from everyone else in the courtroom" need not be "struck down."  *Holbrook,* 475 U.S. at 567.  Rather, "when the proceedings present legitimate security concerns to which the presiding judge must respond," a defendant's constitutional rights must give way.  *Holbrook,* 475 U.S. at 567; *United States v. Childress,* 58 F.3d 693, 705 (D.C. Cir. 1995); *United States v. Edmond,* 52 F.3d 1080, 1090 (D.C. Cir. 1995) ("[T]he right to a presumption of innocence . . . is [not] a constitutional absolute; . . . at times, [it] must yield to the legitimate demands of trial administration and courtroom security so long as steps are taken to ensure that the defendant receives a fair trial.").  The shackling of a defendant during trial is not

170

prejudicial to a defendant if steps are taken to keep the jury from observing the defendant in restraints.  *Gilmore v. Armontrout*, 861 F.2d 1061, 1071-72 (8th Cir. 1988).

In determining what security measures to order, the Court must make essentially two predictive judgments:  (1) whether there is a need for special security; and (2) "whether the measures adopted . . . are appropriate to that end," including "whether there are other less burdensome alternatives . . . available."  *United States v. Whitehorn*, 710 F. Supp. 803, 835, 838-39 (D.D.C. 1989); see also *United States v. Gray*, 254 F. Supp. 2d 1, 3-4 (D.D.C. 2002);  *United States v. Edelin*, 175 F. Supp. 2d 1, 1-8 (D.D.C. 2001).

Nearly every jurisdiction has ruled the shackling of a defendant is appropriate when it is necessary to ensure court room safety and decorum.  See, e.g., *Gilmore*, 861 F.2d at 1071-72 (court order requiring defendant to wear leg irons in court did not pose an unacceptable threat to defendant's right to a fair trial); *Wilson*, 770 F.2d at 1485 ("Shackling is proper where there is a serious threat of escape or danger to those in and around the courtroom [citation omitted], or where disruption in the courtroom is likely in the absence of shackles [citing *Illinois v. Allen*, 397 U.S. 337, 343 (1970)]."); *Way v. United States*, 285 F.2d 253, 254 (10th Cir. 1960) ("[shackling or handcuffing of the defendant] should not be permitted except to prevent the escape of the accused, to prevent him from injuring others, and to maintain a quiet and peaceable trial."); *United States v. Brazel*, F.3d 1120, 1156 (11th Cir. 1997) (district court did not abuse its discretion by requiring defendants to wear leg shackles for last four weeks of trial); *United States v. Theriault*, 531 F.2d 281, 284 (5th Cir. 1976) ("The decision to shackle

171

lies within the sound discretion of the trial court and will not be overturned by reviewing courts unless that discretion was abused.").

According to the Supreme Court, the primary concerns in deciding whether it is appropriate to shackle a defendant are the: (1) prejudicial effect on the jury; (2) dignity and decorum of the judicial proceedings; and (3) defendant's ability to communicate with his attorney during trial. *Allen*, 397 U.S. at 344. "Measures which single out a defendant as a particularly dangerous or guilty person threaten [the defendant's constitutional right to a fair trial.]" *Hellum v. Warden, United States Penitentiary - Leavenworth*, 28 F.3d 903, 907 (8th Cir. 1994).

In *Hellum*, the Eighth Circuit Court of Appeals held the trial court did not abuse its discretion by requiring a defendant to wear handcuffs and leg shackles during his murder trial. *Hellum*, 28 F.3d at 906. The trial court also seated the defendant separately in the courtroom, placed armed, uniformed guards in the courtroom, and required all people entering the courtroom, including jurors, to walk through a metal detector. Id. All of these security measures, the Court held, were appropriate under the circumstances. The Court noted the defendant's table concealed his physical restraints from the jury's view, except when the defendant intentionally made them viewable, thus satisfactorily reducing the chance of jury prejudice toward the defendant. *Hellum*, 28 F.3d at 906. The Court said the reasons listed by the trial court for the security precautions, which included multiple prior escape attempts, threats of killing security personnel, and threats of taking hostages during the trial, were sufficient to warrant the added security measures. *Hellum*, 28 F.3d at 907-8. It noted that "physical

restraints such as handcuffs and leg shackles are a commonly employed means of controlling potentially violent persons," and even more extreme measures than those taken by the trial court would be constitutional under *Allen*. *Hellum*, 28 F.3d at 908.

In *Gilmore v. Armontrout,* 861 F.2d 1061 (8th Cir. 1988), the Eighth Circuit Court of Appeals held a trial court did not abuse its discretion by ordering a murder defendant to wear leg shackles. The Court emphasized counsel's table concealed the defendant's legs from the jury's view, thus not unduly prejudicing the jury against him. *Gilmore*, 861 F.2d at 1071. Further, the Court noted the defendant was not moved in the presence of the jury so as to further reduce any chance of jury prejudice. "In these circumstances," said the Court, "we have little difficulty concluding that the jury did not observe anything 'so prejudicial as to pose an unacceptable threat to [the defendant's] right to a fair trial.'" *Gilmore*, 861 F.2d at 1072 (quoting *Holbrook*, 475 U.S. at 572).

Petitioner cites *Gonzalez v. Pliler*, 341 F.3d 897 (9th Cir. 2003) and *United States v. Durham*, 287 F.3d 1297 (11th Cir. 2002), for the proposition that Circuit Courts of Appeal "have reversed convictions when the use of stun belts was not amply justified on the record, as it was not justified here." (Petitioner's Memorandum, 167-68). These cases do not support Petitioner. In *Gonzalez*, a bailiff made the decision to require the defendant to wear a stun belt and the court made no findings supporting the restraint. *Gonzales*, 341 F.3d at 901-902. Similarly, in *Durham*, court security personnel made the decision to require the defendant to wear a stun belt and when the defendant filed a motion seeking an evidentiary hearing on the issue, the court ruled against the defendant without hearing any testimony or considering any evidence. *Durham*, 287

173

F.3d at 1301, 1305.  These cases are a far cry from the close judicial scrutiny, both at the district court and appellate court levels, to which the decision to have Petitioner wear a stun belt was exposed.  The district court here held an evidentiary hearing, made significant factual findings, considered alternatives, and stated its rationale. *Honken*,  378 F. Supp. 2d at 1013-1039.  The Eighth Circuit Court of Appeals reviewed the district court's decision to impose restraints on Petitioner and found no error. *Honken*, 541 F.3d at 1162-64 ("After conducting an evidentiary hearing, the district court found the need to shackle Honken arising from Honken's prior escape attempts and his threats against witnesses, law enforcement officers, and prosecutors. . .  We could not agree more. . . . Considering Honken's dangerousness, martial arts training, and compelling desire to escape, we conclude the district court did not abuse it reasoned discretion in ordering Honken to be shackled, bolted to the floor, and forced to wear a stun belt during trial).

> C.  Petitioner's Claim is Procedurally Barred

This claim is procedurally barred.  Petitioner fully litigated the propriety of the stun belt and shackles before the district court and the court of appeals.  Petitioner has not sufficiently alleged facts establishing ineffective assistance of counsel prevented him from fully litigating these issues.

To the extent Petitioner claims there is new evidence regarding security measures seen by the jurors or his alleged heart condition, he has failed to make an adequate showing.  "When newly discovered evidence is the ground for a section 2255 motion, the district court must apply a substantive standard that includes five

174

prerequisites: (1) the evidence must have been discovered after the trial; (2) the failure to discover the evidence must not be attributable to a lack of diligence on the part of petitioner; (3) the evidence must not be merely cumulative or impeaching; (4) the evidence must be material; and, (5) the evidence must be likely to produce an acquittal if a new trial is granted." *English v. United States*, 998 F.2d 609, 611 (8th Cir. 1993).

Petitioner's alleged heart condition (to the extent he even has one) was documented years before the trial and was part of the evaluation report generated by Petitioner's expert at trial. There is nothing "newly discovered" about this evidence. Similarly, Petitioner has failed to allege facts showing the basis for his claim that jurors were exposed to security measures, let alone allege a factual basis showing that this information was not discoverable until after the trial or that Petitioner engaged in due diligence to discover such evidence.

### D. Trial Counsel's Performance Was Not Deficient

Trial counsel resisted the government's motion to have Petitioner secured during trial. Petitioner vigorously cross examined the government's witness at the hearing on security measures. Petitioner raised the arguments before the district court and appellate court that his habeas counsel have repeated in his motion. The security measures adopted by the Marshals Service were fully justified in this case. Petitioner was charged with murdering federal witnesses and an innocent mother and her children. The very nature of the charge and brutality of the crimes reflected a disregard for the judicial system and its consequences. More than that, there was evidence Petitioner plotted additional murders when arrested in 1996, including murders of witnesses and law enforcement officers. Finally, Petitioner plotted an escape and the

murder of government officials in connection with his trial.  These very real threats justified the restraints used here.  Petitioner has failed to demonstrate that his trial counsels' efforts to resist implementation of the security measures fell below an objective standard of reasonable performance.

Regarding Petitioner's alleged heart condition, Petitioner has failed to allege facts establishing that he even has a heart condition.  Petitioner has provided no medical records or test results that show he has a heart condition – rather, the only references to any heart issue reflect Petitioner's subjective complaints that he allegedly feels his heart skip a beat while exerting himself.  Petitioner has failed to allege facts demonstrating that this alleged heart condition impacted, or was impacted by, the security measures adopted in this case.  Therefore, Petitioner cannot demonstrate that his trial counsel's performance was deficient for failing to raise this alleged medical condition in relation to the security measures adopted.

Regarding the alleged exposure of jurors to observe security measures adopted by the Marshals, Petitioner's claim is based on pure conjecture and without a factual basis.  Petitioner's attorneys claim these facts "by information and belief."  (Petitioner's Memorandum, 170 n. 27).  They fail to give attribution upon what they base this belief. They provide no affidavit or declaration in support of this assertion.  They made no effort to speak with the Marshals Service to inquire about the security measures and efforts made to ensure jurors did not observe the security measures.  In fact, the security measures adopted by the Marshals for Petitioner were not in place when jurors were transported into and out of the courthouse and were not visible to them.  Because Petitioner has no factual basis for this claim, he cannot demonstrate that his trial

176

counsel were ineffective for failing to investigate these alleged facts, or that, had they conducted such an investigation, they would have discovered anything to support Petitioner's claim.

### E. Petitioner Has Failed to Demonstrate Prejudice

Petitioner cannot demonstrate that he suffered any prejudiced as a result of the security measures. Indeed, Petitioner completely fails to allege facts that would establish prejudice. Petitioner has only made a conclusory allegation that security measures caused him prejudice. He cannot prove prejudice.

A defendant suffers no prejudice from security measures adopted during trial when the measures are concealed from the jury. The district court found there was no evidence any juror ever became aware of the restraints. *Honken*, 381 F. Supp. 2d at 980. Petitioner does not claim the jury ever became aware of the restraints at any time. Indeed, in his motion for a new trial, the Petitioner admitted he could not "establish that any members of the jury observed the leg shackles or stun belt used in the court room." (Doc. 578, p. 50).

Petitioner claims, without citation to any factual support, the stun belt "severely interfered with Petitioner's ability to consult fully with counsel and to participate in the litigation of his case." (Petitioner's Memorandum, 169). Petitioner does not cite to a declaration by any of his attorneys, his jury consultant, his mitigation specialist, or anyone else to support this conclusory assertion.

Petitioner cites his alleged heart condition as a factor, but completely fails to allege facts that could support a conclusion that his heart condition affected his ability to assist his trial attorneys or understand the proceedings in any way.

177

Finally, Petitioner engages is base conjecture when he alleges the security measures he imagines existed with respect to jurors "surely" affected the jurors. Petitioner must do more than merely speculate to establish prejudice. Moreover, to the extent Petitioner seeks to prove this by interviewing jurors, that evidence would in any event be barred by Rule 606(b) of the Federal Rules of Evidence.

The Court should deny this portion of Petitioner's motion without an evidentiary hearing.

## XXI. CLAIM 19 – TRIAL COUNSEL WERE NOT INEFFECTIVE FOR FAILING TO CHALLENGE THE GOVERNMENT'S FORENSIC EVIDENCE

Petitioner is critical of the government's expert testimony, claiming it all "suffered from serious flaws in methodology and accuracy, and generally lacked a sound scientific basis." (Petitioner's Motion, 100; Petitioner's Memorandum, 172-73). To evade procedural default, Petitioner couches this claim in terms of ineffective assistance of counsel, asserting his attorneys "were ineffective for failing either to attempt to exclude this evidence pre-trial via a _Daubert_ hearing, present contrary scientific evidence of their own, or, at a minimum, effectively challenge the Government's evidence through cross-examination." (Id.). Petitioner cites a 2009 report by the National Academy of Sciences which he asserts calls into question the forensic evidence presented by the government. Petitioner claims this is "new evidence" such that it is not procedurally defaulted. (Petitioner's Memorandum, 173-74).

### A. The Allegations Regarding The Government's Forensic Evidence

Petitioner's claim is wholly lacking in specificity. He claims the government's

scientific evidence was defective, but fails to identify specifically what evidence was deficient and how it was allegedly deficient.  At best, he broadly asserts all the government's handwriting, ballistics, pathology, dental, and anthropology forensic evidence "suffered from serious flaws in methodology and accuracy, and generally lacked a sound scientific basis."  (Petitioner's Memorandum, 172-73).  Petitioner completely fails to allege facts specifying what it was about the methodology or accuracy or scientific basis that was lacking.  Petitioner fails to tie any allegations to the specific *Daubert* factors.  In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593-4 (1993), the Court indicated that trial judges should consider four nonexclusive factors in determining whether to admit expert testimony: (1) whether the theory or technique "can be (and has been) tested," (2) "whether the theory or technique has been subject to peer review and publication," (3) "the known or potential rate of error," and (4) "general acceptance" of the theory or technique.  Petitioner fails to specify which of these factors were allegedly lacking in the government's forensic evidence, other than his broad "methodology" allegation.  Without making factual allegations regarding precisely in what way he alleges the government's forensic evidence was lacking, Petitioner's claim is facially insufficient to state a claim.

Petitioner's cites a 2009 report by the National Academy of Sciences which is critical of some forensic sciences, such as fingerprint and handwriting analysis. Recognizing this report did not exist in 2004, he declares it "new evidence." (Petitioner's Memorandum, 173).  This is not "new evidence" that would excuse Petitioner's failure to raise these claims below.  There was literature critical of handwriting and other forensic evidence in existence prior to Petitioner's trial, much

179

along the same lines as the criticism in the 2009 report.  <u>See, e.g.</u>, D. Michael Risinger, et al, <u>Exorcism of Ignorance as a Proxy for Rational Knowledge: The Case of Handwriting Identification "Expertise</u>," 137 U. Pennsylvania L. Rev. 731 (1989) (criticizing the alleged limited empirical research and testing on handwriting analysis); Michael J. Saks, <u>Evaluation of Forensic Science</u>, 33 Steton Hall L.Rev. 1167, 1171 (2003) (critical of the alleged lack of scientific basis for fingerprint forensic evidence). Thus, there is nothing really new about the 2009 report.  Moreover, while Petitioner claims the report "reveals that Petitioner's convictions and death sentence [sic] were based on unreliable evidence" (Petitioner's Memorandum, 174), he again completely fails to allege facts establishing specifically what in the report shows specifically what was deficient about the government's forensic evidence.

B.     <u>Trial Counsels' Performance Was Not Deficient</u>

The same lack of specificity and factual allegations apply to Petitioner's allegation that his trial attorneys were ineffective with regard to the forensic evidence. Petitioner broadly alleges his trial attorneys were ineffective for 1) failing to attempt to exclude this evidence, 2) present contrary scientific evidence of their own, or 3) effectively challenge the Government's evidence through cross examination. (Petitioner's Memorandum, 173).  As to attempting to exclude the government's forensic evidence, Petitioner fails to allege any facts that would have provided trial counsel a basis for doing so.

Similarly, while Petitioner claims his trial counsel should have presented contrary scientific evidence of their own, Petitioner has not alleged any facts that would establish that there is or could be scientific evidence that would reach contrary conclusions.  In

180

reality, Petitioner's trial counsel hired Dr. Earl F. Rose to review the government's pathological and anthropological forensic evidence. Dr. Rose found "he could not disagree with the conclusions reached in the government's investigation," and that "the investigation and documentation was some of the most thorough work he has ever seen in his professional life." (Exhibit K, letter from Leon Spies to Alfredo Parrish and Charles Rogers, dated 12/19/2002). Finally, Petitioner fails to allege any facts showing that the cross examination of the government's forensic witnesses was in any way flawed. Petitioner's reliance on the 2009 report by the National Academy of Sciences is, of course, completely misplaced as he cannot fault his attorneys' performance in 2004 for findings made in 2009.

### C. Petitioner Has Failed to Demonstrate Prejudice

Petitioner also fails to allege any facts showing prejudice. Rather, as he has done in the rest of his Motion, Petitioner simply makes a conclusory assertion that, "[b]ut for counsel's [sic] failing in this regard, there is a reasonable probability that the outcomes of the guilt and penalty phases of Petitioner's trial would have been different." (Petitioner's Memorandum, 173). Simply declaring it so does not make it so. This case was never about whether or how the victims were killed, the identity of the victims, or even who drew the maps leading to the bodies. The forensic evidence was corroborative, but hardly determinative of the outcome of the case. To the extent there was any real issue during the guilt phase, it was about who murdered the victims. None of the forensic evidence identified the killer, and was therefore not important to that central issue. The evidence at trial proving Petitioner's guilt and justifying his execution was overwhelming. There is simply no factual basis to conclude that a successful

181

challenge to the government's forensic evidence would have had any impact on the outcome oft he case.

The Court should deny this portion of Petitioner's motion without an evidentiary hearing.

## XXII.  CLAIM 20 – ALLEGED CUMULATIVE ERROR

Petitioner argues that, "should this Court find error, but believe that individually they [the individual claims] do not merit relief, the Court should consider the cumulative impact of the constitutional violations." (Petitioner's Motion, 101).  Petitioner repeated this argument in his Memorandum.  (Petitioner Memorandum, 175-77).  In his Motion, Petitioner failed to acknowledge the Eighth Circuit Court of Appeals has repeatedly rejected "cumulative error" arguments as a basis for relief in relation to § 2255 petitions. See, e.g., *United States v. Brown*, 528 F.3d 1030, 1034 (8th Cir. 2008) ("[W]e have repeatedly rejected the cumulative-error theory of post-conviction relief."); *Middleton v. Roper*, 455 F.3d 838, 851 (8th Cir. 2006) ("We have repeatedly recognized 'a habeas petitioner cannot build a showing of prejudice on a series of errors, none of which would by itself meet the prejudice test.'") (quoting *Hall v. Luebbers*, 296 F.3d 685, 692 (8th Cir. 2002)).  Remarkably, Petitioner again failed to cite this controlling authority in his Memorandum, even after the government pointed it out in its answer.

This ground was, and remains, without any legal basis.  The Court should deny this portion of Petitioner's motion without an evidentiary hearing.

182

### XXIII.  CLAIM 21 – MANNER OF EXECUTION

Petitioner claims the manner of his execution would violate his Eighth Amendment rights.  This Court does not have jurisdiction to address this claim.  A prisoner may challenge the manner, location, or conditions of a sentence's execution under 28 U.S.C. § 2241.  Petitions filed under § 2241 are heard in the district where the prisoner is in custody, while § 2255 petitioners are heard in the district that sentenced the prisoner.

Moreover, this claim is not ripe, as Petitioner acknowledges.

Regardless, Petitioner's claim is without merit.  Petitioner fails to state what it is about the drugs, protocol, personnel or physical space for the execution which violates the Eighth Amendment.  As such, Petitioner has not sufficiently stated a claim, so he has not preserved it.

The Court should deny this portion of Petitioner's motion without an evidentiary hearing.

### XXIV.  CONCLUSION

WHEREFORE, for the reasons set forth above, the United States respectfully requests that the Court deny Petitioner's motion under 28 U.S.C. Section 2255.

Respectfully submitted,

STEPHANIE M. ROSE
United States Attorney

By: s/ C.J. WILLIAMS

C.J. WILLIAMS
Assistant United States Attorney
401 First Street SE, Suite 400
Cedar Rapids, Iowa 52401
319-363-6333; (Fax 319-363-1990)
cj.williams@usdoj.gov

CERTIFICATE OF SERVICE

I certify that I electronically served a copy of the foregoing document to which this certificate is attached to the parties or attorneys of record, shown below, on July 14, 2011.

UNITED STATES ATTORNEY

BY:   s/S. Van Weelden

COPIES TO: Counsel of Record

183