# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA

_____

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | No. 10-CV-3074-LRR |
|  | : |  |
| Respondent, | : | **CAPITAL 2255 PROCEEDINGS** |
|  | : |  |
| -v- | : | HON. LINDA R. READE |
|  | : | Chief U.S.D.J. |
| DUSTIN LEE HONKEN, | : |  |
|  | : |  |
| Petitioner. | : |  |

_____ :

**REPLY BRIEF IN SUPPORT OF PETITIONER'S
SUPPLEMENTED MOTION PURSUANT TO 28 U.S.C. § 2255**

Leigh Skipper
Chief Federal Defender
By: Michael Wiseman
Chief, Capital Habeas Corpus Unit
Shawn Nolan
Supervising Assistant Federal Defender
Timothy Kane
Assistant Federal Defender
Federal Community Defender Office
Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520

Counsel for Petitioner, Dustin Lee Honken

Dated:       August 5, 2011

TABLE OF CONTENTS

PRELIMINARY STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

INTRODUCTION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

REPLY TO THE GOVERNMENT'S DISCUSSION REGARDING THE "STANDARD
FOR REVIEWING A CLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL". . . . . . . . . . 1

CLAIMS FOR RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**Claim One**
    Petitioner's Rights to Due Process, Trial by Jury, Confrontation,
Compulsory Process, and Against Cruel and Unusual Punishment Were
Violated When Trial Counsel Provided Ineffective Assistance by Failing
to Object to the Admission of the Court's Sentencing Findings in a Prior
Case; Appellate Counsel Likewise Provided Ineffective Assistance by
Failing to Raise and Litigate the Issue. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**Claim Two**
    Petitioner's Rights to Effective Trial and Appellate Counsel, Due
Process, and Against Double Jeopardy and Cruel and Unusual
Punishment Were Violated When Trial Counsel Failed to Object to the
Admission of Evidence Related to Issues Previously Litigated and
Resolved in Petitioner's Favor in His 1998 Drug Conspiracy Sentencing
Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**Claim Three**
    The Government Violated Due Process When it Failed to Disclose
Exculpatory Evidence Relevant to Cooperating Witnesses. Trial
Counsel Ineffectively Failed to Discover this Evidence. Accordingly,
Petitioner's Convictions and Sentences Violated the Fifth, Sixth and
Eighth Amendments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Case 3:10-cv-03074-LTS-KEM    Document 29    Filed 08/05/11    Page 2 of 81

**Claim Four**

Petitioner's Convictions and Sentences Resulting from His Convictions for Violation of 21 U.S.C. § 848(c) (Continuing Criminal Enterprise) were Obtained in Violation of the Fifth, Sixth and Eighth Amendments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

**Claim Five**

Petitioner's Rights to Effective Assistance of Counsel, Due Process, and Against Double Jeopardy and Cruel and Unusual Punishment Were Violated When Trial Counsel Failed to Object to Multiplicitous Charges for Drug Conspiracy Murder and Continuing Criminal Conspiracy Murder, in Violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

**Claim Six**

Petitioner's Rights Under the Fifth, Sixth and Eighth Amendments Were Violated When Trial Counsel Ineffectively Failed to Object to the Admission of Hearsay Evidence Regarding the Quantity of Drugs Alleged in the Superceding Indictment; Appellate Counsel Ineffectively Failed to Raise and Litigate this Issue. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

**Claim Seven**

Petitioner's Rights to Due Process, to an Impartial Jury, to Effective Assistance of Counsel, and Against Cruel and Unusual Punishment Were Violated Where Trial Counsel Failed to Object to the Exclusion of Qualified Jurors from the Venire, Contrary to Witherspoon v. Illinois and its Progeny; Appellate Counsel Were Ineffective for Failing to Raise and Litigate this Issue; All in Violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution. . . . . . . . . . . . . . . . . . . . . . . 32

**Claim Eight**

The Systemic Exclusion And/or Under-Representation from the Jury Pool of African Americans, Latinos and Other Minority Groups Violated Petitioner's Rights under the Fifth, Sixth and Eighth Amendments. Counsel Ineffectively Failed to Litigate Challenges to this Unconstitutional System for Summoning Venire Persons. . . . . . . . . . . . . . . 38

ii

**Claim Nine**

    Petitioner Was Denied His Sixth Amendment Right to Effective Assistance of Counsel at His Capital Sentencing. . . . . . . . . . . . . . . . . . . . . 41

**Claim Ten**

    The Court's Penalty Phase Instructions Failed to Properly Narrow the Scope of the Jury's Consideration of Future Dangerousness and Failed to Guide the Jury's Weighing of Aggravating and Mitigating Circumstances; Counsel Were Ineffective for Failing to Object in Violation of Petitioner's Fifth, Sixth, and Eighth Amendment Rights. . . . 50

**Claim Eleven**

    Victim Impact Evidence Presented to the Jury Was Received in Violation of the Fifth, Sixth and Eighth Amendments. . . . . . . . . . . . . . . . 54

**Claim Twelve**

    The Government Violated Petitioner's Rights under the Eighth Amendment and the Due Process Clause by Presenting Inconsistent Arguments at His Trial and His Co-Defendant's Trial; Counsel Were Ineffective under the Sixth Amendment for Failing to Discover and Present Readily Available Evidence that Was Presented by the Government at his Co-Defendant's Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . 57

**Claim Thirteen**

    Trial Counsel's Stipulation to the Circumstances Regarding the Alleged Acquisition of Maps Allegedly Generated by Angela Johnson in Lieu of Testimony from Robert McNeese, Violated the Fifth and Sixth Amendments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

**Claim Fourteen**

    The Government Violated the Fifth Amendment When it Repeatedly Elicited Inadmissible Testimony Regarding Petitioner's Alleged Involvement with Drugs and Violence That Was Too Remote to be Relevant. Trial and Appellate Counsel Ineffectively Failed to Object to or Litigate All of the Instances of Misconduct. . . . . . . . . . . . . . . . . . . . . . . . 62

**Claim Sixteen**

Trial Counsel Ineffectively Failed to Present Abundant, Readily Available Evidence that Would Have Supported their Theory of Defense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

**Claim Seventeen**

Petitioner Was Deprived of His Fifth, Sixth and Eighth Amendment Rights to Trial by an Impartial Jury and Due Process When the Trial Court Dismissed a Juror During Penalty Phase Deliberations but Upheld the Guilt Phase Verdict. Trial and Appellate Counsel Ineffectively Litigated these Issues. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

**Claim Eighteen**

The Security Measures Used by this Court During Trial Denied Petitioner His Rights to a Jury Trial, to the Presumption of Innocence, Due Process, the Effective Assistance of Counsel and to Be Free of Cruel and Unusual Punishment as Guaranteed by the Fifth, Sixth and Eighth Amendments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

**Claim Twenty**

Petitioner is Entitled to Relief Based Upon the Cumulative Impact of the Constitutional Violations Described in this Motion.. . . . . . . . . . . . . . . . . 73

**Conclusion**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

## PRELIMINARY STATEMENT

Petitioner's Supplemented § 2255 Motion and Memorandum of Law are cited herein as the "Petition." The Government's initial Answer is referred to as the "Answer," and its more recent Memorandum in Opposition is cited as the "Opposition." Citations to the Appendix refer to the Appendix submitted with the Petition.

All other stylistic conventions and citation formats follow those used in the Petition. All emphasis is provided unless otherwise noted. Parallel citations are generally omitted.

The ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES (2003) are published at 31 Hofstra L.Rev. 913 (2003) and are available on-line at http://www.americanbar.org/content/dam/aba/migrated/2011_build/death_penalty_representation/2003guidelines.authcheckdam.pdf (last visited July 25, 2011). They are herein referred to simply as the "ABA Guidelines."

v

Pursuant to the parties' stipulated schedule, as amended by various orders of this Court, Petitioner filed a timely § 2255 Motion on December 14, 2010, and the Government filed an Answer on January 5, 2011. On June 6, 2011, Petitioner submitted a Supplemented § 2255 Motion, and a Memorandum of Law and Appendix in support thereof. The Government submitted its Memorandum in Opposition on July 14, 2011, and this Reply Brief timely follows.

This Reply Brief does not address all of the arguments and issues discussed in the Government's Opposition. Petitioner believes that many of the Government's arguments and defenses were anticipated and adequately addressed in the Petition. Petitioner's decision not to include additional argument in this Reply Brief regarding any claim, issue, or sub-issue does not reflect any intention to abandon or waive the same.

### REPLY TO THE GOVERNMENT'S DISCUSSION REGARDING THE "STANDARD FOR REVIEWING A CLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL"

As in its initial Answer, the Government includes a general section on the law governing ineffective assistance of counsel claims. Petitioner has no quarrel with much of the Government's discussion of *Strickland v. Washington*, 466 U.S. 688 (1984), and its progeny. However, the Government makes two errors in its

1

discussion.

First, the Government incorrectly cites *Lockhart v. Fretwell*, 506 U.S. 364 (1993), as providing the applicable "two-pronged test for constitutionally ineffective assistance of counsel." Opp. 18-19. *Fretwell* considered an unusual scenario where defense counsel at trial in state court failed to object on grounds that were available under Eighth Circuit law at the time of trial but, due to a change in the case law, were not available at the time of federal habeas proceedings. *Fretwell*, 506 U.S. at 366-68. The Supreme Court ruled that Fretwell could not rely on the since-abrogated Eighth Circuit rule to establish prejudice. *Id*.

That ruling was dictated by the "the unusual circumstance where the defendant attempts to demonstrate prejudice based on considerations that, as a matter of law, ought not inform the inquiry," and the *Fretwell* holding therefore "will, in the vast majority of cases, have no effect on the prejudice inquiry under *Strickland*." *Id*. at 373 (O'Connor, J., concurring). Since *Fretwell*, the Supreme Court has repeatedly made clear that *Strickland* – not *Fretwell* – governs ineffective assistance of counsel claims like those raised here. *See Glover v. United States*, 531 U.S. 198, 202 (2001) ("our holding in *Lockhart* does not supplant the *Strickland* analysis. . . . The Seventh Circuit was incorrect to rely on *Lockhart* to deny relief . . ."); *Williams v. Taylor*, 529 U.S. 362, 397 (2000) (by relying on *Fretwell* to deny relief, the "State Supreme Court

2

mischaracterized at best the appropriate rule, made clear by this Court in *Strickland*, for determining whether counsel's assistance was effective within the meaning of the Constitution."). The Government's attempt to rely on *Fretwell* is thus misplaced.

Second, the Government cites two Eleventh Circuit cases for the unremarkable point that it "is not dispositive" when trial counsel submit sworn declarations stating that they did not have "any strategic or tactical reason for making, or failing to make, particular decisions." Opp. 22 (citing and quoting *Gillam v. Secretary for the Department of Corrections*, 480 F.3d 1027 (11th Cir. 2007) and *Provenzano v. Singletary*, 148 F.3d 1327 (11th Cir. 1998)). The Government, however, then quotes *Provenzano* for the proposition that "[w]hether a decision was strategic 'is a question of law to be decided by the court.'" Opp. 22 (quoting *Provenzano*, 148 F.3d at 1332). This is patently wrong, as *Provenzano* itself makes clear:

> Inquiries into strategic or tactical decisions challenged as ineffective assistance of counsel involve both a factual and a legal component. *The question of whether an attorney's actions were actually the product of a tactical or strategic decision is an issue of fact*, and a state court's decision concerning that issue is presumptively correct. By contrast, the question of whether the strategic or tactical decision is reasonable enough to fall within the wide range of professional competence is an issue of law not one of fact, so we decide it de novo.

*Provenzano*, 148 F.3d at 1332; *see also Wiggins v. Smith*, 539 U.S. 510, 528 (2003) (state court's finding that counsel conducted an adequate investigation was based in

3

part on "clear factual error"). Thus, contrary to the Government's assertion, whether counsel's decisions were strategic is a question of fact that will properly be addressed at the upcoming evidentiary hearing, and counsel's sworn statements are obviously relevant to that question.

4

## CLAIM ONE

**PETITIONER'S RIGHTS TO DUE PROCESS, TRIAL BY JURY, CONFRONTATION, COMPULSORY PROCESS, AND AGAINST CRUEL AND UNUSUAL PUNISHMENT WERE VIOLATED WHEN TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE BY FAILING TO OBJECT TO THE ADMISSION OF THE COURT'S SENTENCING FINDINGS FROM A PRIOR CASE; APPELLATE COUNSEL LIKEWISE PROVIDED INEFFECTIVE ASSISTANCE BY FAILING TO RAISE AND LITIGATE THE ISSUE.**

The Petition alleges that at trial the Government used exhibits containing the sentencing findings that the District Court made in the Government's favor in case CR96-3004-001-MWB, the prior drug conspiracy prosecution of Mr. Honken. These findings included that Petitioner had an aggravated role in the conspiracy, the extreme length of his prison sentence, that he was prohibited from possessing a firearm on supervised release, and that he was held accountable for 2.87 kilograms of methamphetamine. The findings were relevant to numerous factual issues at the guilt phase of this trial, including whether Petitioner was a manager of five other persons in a continuing criminal enterprise, whether Petitioner had possessed a firearm, and whether the alleged drug conspiracy and continuing criminal enterprise involved more than 100 grams of actual methamphetamine. Further, all of the sentencing findings were directly relevant to the jury's decision whether to sentence Mr. Honken to life imprisonment or to death. *See* Pet. 3-10.

5

The Government's use of these sentencing findings violated Petitioner's rights to due process, to trial by jury, to compel and confront witness against him, and against cruel and unusual punishment. In failing to object to the admission of these sentencing findings, prior counsel provided ineffective assistance. *See id.*

In its Opposition, the Government largely concedes the factual basis of the claim, *i.e.*, what the sentencing findings entailed and that at trial it introduced and presented argument based on these findings. *See* Opp. 24-25, 28-29. The Government additionally notes that, while the original judgment indicated that Petitioner had accepted responsibility, the amended judgment omitted this finding. *Id.* at 25. This omission merely underscores that Petitioner was prejudiced by the message thus conveyed to the jury that he had not accepted responsibility for his actions. Although the Government does contend that the judgments "say nothing about Petitioner's possession of firearms," Opp. 26 n.3, this contention plainly overlooks the fact that the exhibits contained the District Court's order directing that "[t]he defendant shall not possess a firearm." Gov. Trial Ex. 303 at 3, Appendix 1; Gov. Trial Ex. 304 at 3, Appendix 2.

While conceding the factual underpinnings of the claim, the Government nonetheless argues that (A) it presented other, additional evidence of these factual issues, Opp. at 27-28; (B) Petitioner's confrontation rights were not violated because

6

the court's sentencing findings were "a ministerial act, more akin to the creation of a business record," and thus admissible against Petitioner, *id.* at 30-31; (C) trial counsel was not deficient because Petitioner was not entitled to "perfect or errorless representation," *id.* at 29; and (D) Petitioner was not prejudiced because, *inter alia*, "the fact that trial counsel did not notice the reference to drug quantity in the judgments is likely reflective of the degree to which any juror paid attention to it." *Id*. at 31. The Government's arguments are unavailing, as explained below.

### A. The Government's Closing Argument at Trial Belies Its Current Claim That It Did Not Rely on the Prior Judgments.

In determining the effect of a constitutional violation at trial, "[t]he likely damage is best understood by taking the word of the prosecutor, who contended during closing arguments" that the evidence at issue was important. *Kyles v. Whitley*, 514 U.S. 419, 444 (1995). In its Opposition, the Government cites various testimony from which it argues the jury could have inferred that the statutory drug quantity amount was proven. *See* Opp. 27-28, 31-21. However, in its closing argument at trial, the Government addressed the statutory requirements for Counts 8 to 12 regarding drug conspiracy and the drug quantity by citing only two pieces of evidence – the prior Judgment in Exhibit 303 and the improperly admitted laboratory report (*see* Claim 6, *infra*). Tr. 3285-86 ("Ladies and gentlemen, as to conspiracy to commit

7

a drug crime, you have in evidence Exhibit 303 which is the judgment and sentence of conviction of two drug crimes, conspiracy to distribute methamphetamine and attempted manufacture of methamphetamine, February 1998, conspiracy involving at least 100 grams of pure methamphetamine.").  This closing argument – and not the Government's current efforts to cull the record for other possible evidence of drug quantity – reveals the "likely damage" of the improperly admitted prior sentencing findings.

**B.      The Prior Sentencing Findings in the Government's Favor Were Not "Business Records" and Were Plainly Inadmissible at Trial.**

The Government also contends that admission of the prior findings did not violate Petitioner's confrontation rights because the findings were not testimonial under *Crawford v. Washington*, 541 U.S. 36 (2004), but rather were "a ministerial act, more akin to the creation of a business record."  The Government is plainly incorrect.

*Crawford* recognized that testimonial statements are those containing a "declaration or affirmation made for the purpose of establishing or proving some fact."  541 U.S. at 52.  It is difficult to fathom the Government's contention that the District Court's factual findings were not made "for the purpose of establishing . . . some fact." *Id*.  The Government cites no case law to support its contrary contention that the factual findings were a ministerial act akin to entry of a business record.  As

8

explained in the Petition, even in civil cases, courts rule that "judicial findings of fact in a court's order in a previous case are not admissible in another case." *United States v. Jones*, 29 F.3d 1549, 1554 (11th Cir. 1994); *Nipper v. Snipes*, 7 F.3d 415, 418 (4th Cir 1993). In criminal cases, this is a rule of constitutional necessity "in view of the almost certain collision with confrontation rights." Fed. R. Evid. 803(8) adv. comm. notes; *accord United States v. DeSantis*, 134 F.3d 760, 770 (6th Cir. 1998) (finding prejudicial error where prosecutor introduced state court findings against criminal defendant). The Government's Opposition does not address this case law and does not provide any support for its contrary argument. Petitioner's confrontation rights were violated.

### C.     Counsel's Performance Was Deficient.

The Government likewise presents no persuasive argument that counsel's performance was not deficient. The Government first cites three cases for the proposition that defendants are not entitled to "perfect or errorless representation." Opp. at 29 (citing *Brunson v. Higgins*, 708 F.2d 1353, 1356 (8th Cir. 1983), *Schleicher v. Wyrick*, 529 F.2d 906, 912 (8th Cir. 1976), and *Cardarella v. United States*, 375 F.2d 222, 232 (8th Cir. 1967)). All of these cases were non-capital, and all of the cases predated *Strickland*. The cases are therefore not relevant to the Court's analysis of this claim. A fourth non-capital case cited by the Government,

9

*Todden v. Auger*, 814 F.2d 528, 529 (8th Cir. 1987), did apply *Strickland*, but is readily distinguishable. There, the Eight Circuit affirmed the District Court's unremarkable finding that counsel was not deficient in failing to notice that the evidence tags incorrectly identified various evidence as coming from the southwest part of the house, as opposed to the southeast part. *Id.* at 528-29. That irrelevant inconsistency is a far cry from counsel's failure here to object to the admission of the judge's factual findings regarding issues actually in dispute at trial.

The Government next makes a factual assertion that "trial counsel would have realized that . . . there was no realistic possibility that the jury was going to find Petitioner responsible for everything else, including the murders of five people, but not find the government proved the drug quantity element." Opp. 30. The Government's assertion creates a factual dispute that will be contested at the hearing. *Cf.* Decl. of Charles Rogers, Esq., Appendix 72, at ¶ 4 (counsel had no strategic or tactical reason for failure to object on these grounds); Decl. of Leon Spies, Esq., Appendix 74, at ¶ 4 (same); Decl. of Alfredo Parrish, Esq., Appendix 73, at ¶ 4 (same).

**D.     Petitioner was Prejudiced by Trial Counsel's Failure to Object**.

In contending that Petitioner suffered no prejudice, the Government rehashes its argument that the jury could have inferred the drug quantity element was met

10

based on evidence that the Government did not address in its closing argument. *See* Opp. 32. This argument was addressed and refuted in part A., *supra*. The Government also argues that at trial the Government sought to prove that Petitioner was accountable for more than 100 grams of "pure" methamphetamine, but that the prior judicial findings refer to 2.87 kilograms of methamphetamine "actual." Opp. 31. This is a meaningless distinction. *See United States v. Morales-Uribe*, 470 F.3d 1282, 1284 (8th Cir. 2006) (recognizing that the terms "actual" and "pure" are interchangeable in reference to drug amounts); *United States v. Nevarez-Espino*, 471 F.3d 926, 927 (8th Cir. 2006) (same); *United States v. Houston*, 338 F.3d 876, 881 (8th Cir. 2003) (same).

### CLAIM TWO

**PETITIONER'S RIGHTS TO EFFECTIVE TRIAL AND APPELLATE COUNSEL, DUE PROCESS, AND AGAINST DOUBLE JEOPARDY AND CRUEL AND UNUSUAL PUNISHMENT WERE VIOLATED WHEN TRIAL COUNSEL FAILED TO OBJECT TO CHARGES AND EVIDENCE RELATED TO ISSUES PREVIOUSLY LITIGATED AND RESOLVED IN PETITIONER'S FAVOR IN HIS 1998 DRUG CONSPIRACY SENTENCING PROCEEDINGS.**

While failing to prevent the jury from hearing the District Court's prior sentencing findings *in the Government's favor*, trial counsel also failed to assert Petitioner's double jeopardy rights as to the District Court's findings *in Petitioner's favor*. The Petition thus alleged that trial counsel were ineffective in failing to object

11

to the relitigation of these factual issues, and that effective counsel would have asserted Petitioner's rights, thus precluding Petitioner's conviction on the ten capital counts charged in the Superseding Indictment. *See* Pet. 10-27; *Ashe v. Swenson*, 397 U.S. 436 (1970).

The Government responds by contending, first, that counsel's performance could not have been deficient because the case law does not include a scenario exactly like the one presented here and, second, that Petitioner suffered no prejudice because, *in civil cases*, there is a presumption against applying collateral estoppel based on sentencing findings in a prior criminal case. *See* Opp. 36-44. The Government's arguments are off the mark.

### A.     Counsel's Performance Was Deficient.

The Government's Opposition does not contest that trial counsel's failure to raise an objection was an "oversight" that was not based on any strategic or tactical considerations. *See* Rogers Decl., Appendix 72, at ¶ 4; Spies Decl., Appendix 74, at ¶ 4; Parrish Decl., Appendix 73, at ¶ 4. The Government likewise does not dispute the plain record that counsel Mr. Parrish was well aware, during the prior sentencing proceedings, that there could be "collateral consequences" to the District Court's findings and that those findings could "be binding on any additional court." Tr. 1/25/00 at 6 (resentencing hearing), Appendix 11; Tr., 2/24/98, 1239, Appendix 10.

12

Nor can the Government dispute that the District Court specifically identified trial counsel's omission of a collateral estoppel objection in a published pre-trial opinion. *See United States v. Honken*, 271 F. Supp. 2d 1097, 1106 n.2 (July 21, 2003) ("Honken is not asserting the protection of the Double Jeopardy Clause in the sense of 'collateral estoppel,' because he is not relying on any 'ultimate fact' determined *against* the Government in his prior prosecution on the drug conspiracy charge.") (emphasis in original). And as set forth in Claim 5, *infra*, trial counsel inexplicably overlooked at least one other meritorious double jeopardy objection.

In spite of these facts establishing that counsel had notice both of the specific legal issue and of their failure to raise it pre-trial, the Government defends trial counsel's performance solely on the ground that the applicable double jeopardy case law had not confronted this precise scenario. *See* Opp. 36-39. The Government's argument fails, for several reasons.

First, counsel had a professional duty "to consider all legal claims potentially available." ABA Guideline 10.8A.1. Because of their oversight, however, they never raised this claim. It is no answer that the *Ashe* rule may not have been applied previously to this exact factual scenario. Indeed, even under the deferential review required by 28 U.S.C. § 2254 (inapplicable here), the Supreme Court has recognized that it can be unreasonable for courts to "*refuse[] to extend [a legal] principle to a*

13

*new context where it should apply.*" *Williams v. Taylor*, 529 U.S. 362, 407 (2000); *accord Wiggins v. Smith*, 539 U.S. 510, 520 (2003).

The same principle applies to counsel's performance here. Indeed, contrary to the Government's suggestion that counsel cannot be found deficient unless the same factual scenario has been found to warrant relief in another case, the Sixth Circuit in *Rice v. Marshall*, 816 F.2d 1126 (6th Cir. 1987), found counsel ineffective for failing to object on the grounds of constitutional collateral estoppel despite a unique factual scenario. In *Rice*, the defendant was first tried on charges of rape, kidnaping, and possessing a weapon, all arising from the same incident. 816 F.2d at 1127-28. The jury found him not guilty of the weapon charge, but hung on other two counts. *Id*. At a retrial on the remaining two charges, the evidence of the rape included the victim's testimony, in which she discussed the gun with which the defendant allegedly threatened her. *Id.* Defense counsel did not object, and likewise did not object to the prosecutor's references to the gun during opening statement and closing argument. *Id.* The court granted relief and explained:

> The present case differs factually from *Ashe v. Swenson*. . . . No doubt this is what threw counsel off. . . . Nevertheless, he failed to appreciate the fact that Rice's acquittal of the weapon charge constituted a finding that he did not have a gun and precluded the introduction of contrary evidence at the subsequent trial. . . .
>
> Rice's appointed attorney forthrightly stated at the evidentiary hearing

14

> that it did not occur to him that acquittal of the weapon charge would foreclose the admission of testimony about a gun at the second trial. This being the case, his failure to seek exclusion of that evidence cannot be attributed to trial tactics. His strategy of seeking to question the complaining witness's credibility would not have ruled out an effort to exclude the evidence of a gun. The two objectives would not have been inconsistent.
>
> Having concluded that counsel's representation was deficient, the further conclusion that Rice was prejudiced is inescapable.

*Id*. at 1131-32. The exact same concerns are present here, both as to the District Court's prior finding that Petitioner did not possess a gun, and as to the court's other findings, including that the Petitioner was not engaged in the drug conspiracy at the time of the murders. The Government's position that "[t]he present case differs factually from *Ashe*" is simply unavailing.

Indeed, there are numerous examples where courts have applied *Ashe* in unique factual circumstances. *E.g.*, *United States v. Carbullido*, 307 F.3d 957 (9th Cir. 2002) (applying *Ashe* and ruling that District Court's finding in prior prosecution that defendant was legally insane at the time of the charged offense precluded a second prosecution for another charged offense occurring in the same time period); *United States v. Gonzalez-Sanchez*, 825 F.2d 527 (1st Cir. 1987) (applying *Ashe* to find that prior acquittal on conspiracy charge precluded the Government from presenting other evidence, in subsequent prosecution, of defendant's involvement in same scheme);

15

*Humphries v. Wainwright*, 584 F.2d 702 (5th Cir. 1978) (applying *Ashe* and according preclusive effect *to the Government's decision*, in an earlier related prosecution, to *nolle prosse* the case after the Government had rested); *Delap v. Dugger*, 890 F.2d 285 (11th Cir. 1989) (applying *Ashe* and according preclusive effect to jury's prior acquittal where Government sought to prove overlapping facts to establish an aggravating factor in later capital trial); *United States v. Brown*, 547 F.2d 438 (8th Cir. 1977) (vacating conviction where prior acquittal necessarily implied factual finding which contradicted factual finding on which the subsequent conviction depended).

The purportedly "novel" circumstance relied on by the Government here is that the prior factual findings resulted from a sentencing hearing. Opp. 38-39. But, under double jeopardy law, "what constitutes an 'acquittal' is not to be controlled *by the form* of the judge's action." *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 571 (1977) (citations omitted). Instead, the Court "must determine whether the ruling of the judge, *whatever its label*, actually represents a resolution, correct or not, of some or all of the factual elements of the offense charged." *Id*. The Petition here established that the District Court's factual findings were indeed such a "resolution," and the Government's formalistic argument finds no support in principle or precedent. As the Supreme Court recognized in *Ashe*, "the rule of collateral estoppel

16

in criminal cases is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality." *Ashe*, 397 U.S. at 444. The Government's hypertechnical defense of counsel's failure is misplaced.

### B. Petitioner Was Prejudiced.

As the Sixth Circuit recognized in *Rice*, "having concluded that counsel's representation was deficient, the further conclusion that Rice was prejudiced is inescapable." *Rice*, 816 F.2d at 1131-32. The same is true here. Allegations made in the Superseding Indictment, and the evidence presented by the Government in support of those allegations at trial, covered the same ground and relitigated the same issues that Judge Bennett had already resolved in Petitioner's favor. *See* Pet. 11-22. An appropriate objection by trial counsel would have precluded relitigation of these issues and thus would have precluded Petitioner's convictions on Counts 8 to 17.

In an attempt to avoid this conclusion, the Government's Opposition first seeks refuge in the law governing collateral estoppel *in civil cases*. *See* Opp. 39-40. It requires no citation to establish that civil cases do not implicate double jeopardy concerns under the Fifth Amendment. Even from the Government's own discussion of these cases, it is apparent that the courts weigh such concerns as "fairness" and "efficiency" in deciding whether to permit a civil litigant to invoke collateral estoppel. *See id.* In the context of criminal cases, however, those policy concerns

17

were weighed and decided by the drafters of the Fifth Amendment. The courts obviously have no authority to revisit their decision. The civil cases cited by the Government have no bearing on the issues here.

Relying on this inapposite civil case law, the Government contends, *inter alia*, that the factual issues from the two proceedings were "not identical," and thus that collateral estoppel does not apply. Pet. 41. The actual standard under *Ashe*, however, is "whether a rational jury could have grounded its verdict upon an issue other than that which [was previously determined]." *Ashe*, 397 U.S. at 444. Here, for example, the Government obtained convictions for charges 8 through 17, which alleged that Petitioner, "while knowingly engaging" in a drug conspiracy and "while engaging" in a continuing criminal enterprise, committed five murders. Judge Bennett plainly ruled that Petitioner was *not* engaged in the drug conspiracy when the murders were committed. No rational jury could have grounded its verdicts on Counts 8 to 17 on a factual finding that was consistent with Judge Bennett's finding. Under *Ashe*, nothing more is required, and as such, Petitioner's convictions and death sentences cannot stand on these counts.

The Government closes by protesting that "it would be fundamentally unfair, and a miscarriage of justice, to find that . . . the government [was precluded] from charging Petitioner with five murders." Pet 43. This complaint both overstates and

18

misconstrues the issue. First, the Government's indictment of Petitioner for first degree murder for killing federal witnesses (Counts 1 to 5) is not directly implicated by this claim. Those counts most accurately describe the conduct for which Petitioner was convicted. But because the Government decided to seek the death penalty, and because state law offered no such mechanism, the Government needed to charge Petitioner with more than murder; it needed to charge Petitioner with engaging in an ongoing drug conspiracy at the time of the murders. It is primarily this allegation, among others, that was precluded by Judge Bennett's findings. Second, irrespective of the Government's apparent belief that a non-capital outcome is "fundamentally unfair," it is nonetheless an outcome dictated by the Fifth Amendment under the circumstances of this case. Nothing more is at issue here.

### CLAIM THREE

**THE GOVERNMENT VIOLATED DUE PROCESS WHEN IT FAILED TO DISCLOSE EXCULPATORY EVIDENCE RELEVANT TO COOPERATING WITNESSES. TRIAL COUNSEL INEFFECTIVELY FAILED TO DISCOVER THIS EVIDENCE. ACCORDINGLY, PETITIONER'S CONVICTIONS AND SENTENCES VIOLATED THE FIFTH, SIXTH AND EIGHTH AMENDMENTS.**

The Government begins its opposition to this claim by arguing that the very witnesses it used to build its case against Petitioner are "unreliable" because they recently came forward with the information that they were intimidated and offered

19

undisclosed deals in exchange for their testimony at trial. Opp. 44. The opposite is true. The only unreliable information was the testimony they provided at trial, when they were testifying in expectation of receiving benefits and under threat. Undersigned counsel, unlike counsel for the Government, does not have the ability to pressure witnesses with the threat of punishment or offer them lenient treatment in exchange for providing information. Petitioner's current counsel has already unearthed a significant trend of Government non-disclosure of *Brady* material. This Court should hear evidence on this claim and permit discovery and access to those Government informants to whom Petitioner's has to date been unable to locate or interview.

### A.    Petitioner's Access to Government Informants.

The Government seeks to make much of the fact that only three of the myriad jailhouse informants used by the Government at trial have now come forward with *Brady* material. *See* Opp. 58-59. The Government's argument is misplaced.

First, undersigned counsel has thus far only located and been able to speak with five of the jailhouse informants who testified at Petitioner's trial. Three of them have revealed undisclosed *Brady* material. This does not reveal, as the Government would have it, some deficiency in Petitioner's proffer, but instead underscores the need for this Court's involvement in allowing counsel access to the remaining informants. For

example, several of these witnesses are in the Federal Witness Security Program and therefore unavailable to Petitioner's counsel. Petitioner requests that the Court order the Government to provide access to these witnesses and that they be produced at the hearing in order to procure full factual development on this issue.

Second, the Government's characterization of Petitioner's proffer of undisclosed *Brady* material as involving "only" three witnesses is inappropriate. Intimidation and nondisclosure regarding any Government witness in a criminal trial – especially in a capital trial – is a serious constitutional violation. The Government's attempt to downplay this matter should be rejected.

**B.      Even With Limited Access, Petitioner Has Already Presented This Court With A Significant Pattern of *Brady* Violations.**

The evidence Petitioner has been able to proffer thus far in support of his Petition has been significant, and indicates violations of *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), *United States v. Agurs*, 427 U.S. 97 (1976), *United States v. Bagley*, 473 U.S. 667 (1985), and *Kyles v. Whitley*, 514 U.S. 419, 422 (1995) (stating that "our duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case." (quoting *Burger v. Kemp*, 483 U.S. 776, 785 (1987))). The Government's Opposition does little to refute Petitioner's contentions, other than to deny certain specific factual allegations.

21

The parties' disagreement over the pertinent facts related to this claim only serves to underscore the need for a hearing and full access to all of the jailhouse informants.

### 1. Terry Bregar.

Terry Bregar provided a sworn declaration in which he affirmed that (A) Government agents repeatedly attempted to pressure him into falsely claiming that Petitioner confessed to him; (B) he had a stroke that affected his memory and the Government knew about it pre-trial; and (C) that the Government transported multiple informant witnesses together in a van at the time of trial during which those witnesses shared stories and coordinated their testimony. App. 14. The Government has done nothing to disprove any of these factual averments. The most that can be said is that they have denied some of them, which simply means that this Court is now faced with disputes of material fact.

As to the first allegation, regarding law enforcement's attempts to coerce Bregar into providing false testimony, the Government does not point to anything to suggest that this is untrue. Instead, the Government simply deems all post-trial witness statements that vary from their trial testimony as "inherently incredible." Opp. 51. The Government also claims that this witness intimidation is "irrelevant" because Bregar refused to succumb to it. Opp. 50.

The Opposition likewise casts aspersions on Bregar and offers its medical

22

opinion regarding whether Bregar did, in fact, have a stroke. *See* Opp. 44-47. The Government surely has not refuted Bregar's allegations, and Petitioner is entitled to prove them at a hearing.

Finally, as to the third allegation – that the Government shuttled around multiple jailhouse informant witnesses together, and that those witnesses shared and conformed their stories to one another – the Government offers a curious non-denial. The Government merely faults Bregar and Petitioner for not being specific enough in its allegations (which can be confirmed by informant Dennis Putzier). Opp. 54-55. The Government additionally faults Petitioner for failing to support this allegation with corroborative accounts from the United States Marshals Service. *Id*. Notably, however, the Government never denies the allegation, and the Marshals Service is a division of the United States Department of Justice. Petitioner requests that the Court order the Government to turn over records relating to the transportation of the jailhouse informants. Petitioner has no independent access to this information.

### 2. Dennis Putzier.

Dennis Putzier has stated that Government agents visited him prior to Petitioner's trial and threatened him with a life sentence for conspiracy to commit murder if he did not testify according to their wishes. As a result, he testified – falsely – that Petitioner attempted to escape with him from the Woodbury County jail

23

and that Petitioner confessed to him about the murders in this case.

The Government responds to this allegation, first, by acknowledging that Putzier testified at trial that he had no expectations of gaining any benefit from his testimony (Opp. 48; Tr. 1280), but then by noting that Putzier testified at Petitioner's 1997 sentencing that Putzier was offering information to avoid prosecution for conspiracy to commit murder (Opp. 47; Sent. Tr. 587, 596). In so doing, the Government appears concede that Putzier falsely testified at trial that he received no benefits, but argues that trial counsel Parrish should have known it was false because he was present during Petitioner's 1997 sentencing proceeding. The Government cannot properly respond to a claim of a *Brady* violation by arguing that defense counsel should have known that the evidence they were offering was false. *See Napue v. Illinois*, 360 U.S. 264 (1959) (failure to correct known false testimony violates due process). Further, nowhere in Putzier's sentencing testimony does he state that he was threatened with a life sentence.

More importantly, nowhere does the Government address the content of Putzier's claim itself – that as a result of the Government's threats, the testimony about Petitioner's confession and escape attempt were fabricated.

### 3. Anthony Johnson.

The Government concedes that Johnson testified that he received no benefit

24

"whatsoever" for testifying against Petitioner.  Opp. 49; Tr. 2090.  The Government simultaneously notes, however, that Johnson was given a proffer letter (which was apparently never disclosed to Petitioner's counsel prior to now) that explicitly states that "[b]ased upon the information provided by your client our office would prepare a proposed agreement which would resolve the pending investigation of your client." Opp. Ex. B.  The Government claims that defense counsel should have been aware of this agreement because of an oblique reference in an interview report.  Opp. 48 & Ex. C.  Again, it is not a proper response to a *Brady* claim to argue that even though a Government witness offered false testimony, defense counsel should have been able to figure out that it was false by requesting undisclosed impeachment information. *See Napue*, 360 U.S. 264.  The Government has an affirmative obligation to turn over *Brady* material and to correct false testimony when it is offered.  *Id.*

### C.    Conclusion

The claim of constitutional error raised herein is significant.  Much of the Government's response simply underscores the need for discovery and for sworn testimony.  Indeed, Petitioner has not yet been able to uncover the full extent of the constitutional violations, because many of the witnesses who would provide relevant information are not accessible to his counsel.

25

## CLAIM FOUR

### PETITIONER'S CONVICTIONS AND SENTENCES RESULTING FROM HIS CONVICTIONS FOR VIOLATION OF 21 U.S.C. § 848(C) (CONTINUING CRIMINAL ENTERPRISE) WERE OBTAINED IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS.

The Petition alleges that trial counsel were ineffective in failing to collect and present available evidence that would have shown that Petitioner did not act as an organizer, supervisor, or manager of his older brother, Jeffrey Honken, in the alleged continuing criminal enterprise. Because the Government alleged that Petitioner managed only the statutory minimum of five other persons, *see* 21 U.S.C. § 848(c), trial counsel's failure thus permitted the Government to obtain convictions and death sentences on Counts 13 to 17. *See* Pet. 46-49.

The Government responds first by identifying the same case law cited in the Petition, which interprets the language of § 848(c) to require that Petitioner had a "leadership role" and "managerial authority" over his brother in that Petitioner "'exerted some type of influence over another individual as exemplified by that individual's compliance with the defendant's directions, instructions, or terms.'" Opp. 60 (quoting *United States v. Possick*, 849 F.2d 332, 336 (8th Cir. 1988)).

In applying this standard, the Government first points to evidence that Petitioner organized the drug scheme itself. Opp. 61. The Petition, however, does

26

not challenge that evidence and instead focuses on whether Petitioner had a leadership role *with respect to Jeffrey Honken*. *See* Pet. 46-49. On that issue, the Government identifies only two pieces of evidence: first that Jeffrey Honken financed the operation as an "investment," and second that Petitioner directed his brother to destroy evidence related to the scheme. Opp. 61-62. The Petition alleges that evidence available to trial counsel would have established that Jeffrey Honken misstated his own leadership role in financing the operation, and further alleges that evidence available to trial counsel would have established Petitioner never "directed" Jeffrey Honken to destroy evidence, or to do anything else. *See* Pet. 47.

Thus, the only two pieces of evidence that the Government can point to regarding Petitioner's leadership role *over Jeffrey Honken* are in factual dispute and will be contested at the evidentiary hearing. It is plain that, if Petitioner establishes his factual allegations in this regard, prejudice must be found because the Government could not have obtained convictions and death sentences on Counts 13 to 17 without establishing that Petitioner exercised managerial authority over Jeffrey Honken.

27

## CLAIM FIVE

**PETITIONER'S RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL, DUE PROCESS, AND AGAINST DOUBLE JEOPARDY AND CRUEL AND UNUSUAL PUNISHMENT WERE VIOLATED WHEN TRIAL COUNSEL FAILED TO OBJECT TO MULTIPLICITOUS CHARGES FOR DRUG CONSPIRACY MURDER AND CONTINUING CRIMINAL CONSPIRACY MURDER, IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

The Petition alleged that trial counsel were ineffective in failing to object to the multiplicitous counts for the drug conspiracy charges in Counts 8 through 12 and the continuing criminal enterprise charges in Counts 13 through 17. Pet. 50-53. The Government does not seriously dispute the core elements of this claim. In the Government's words:

> In the companion case of *United States v. Johnson*, the Eighth Circuit Court of Appeals found the drug conspiracy murder counts were lesser-included offenses to the CCE murder counts, and therefore were multiplicitous. *United States v. Johnson*, 495 F.3d 951, 980-81 (8th Cir. 2007). Therefore, in Johnson, the Court of Appeals remanded the case to the district court to vacate the drug conspiracy murder convictions.

> In Petitioner's case, his trial counsel did not object specifically on the ground that the charges were multiplicitous. Therefore, the Court of Appeals found he waived that issue. *United States v. Honken*, 541 F.3d 1146, 1154 (8th Cir. 2008). . . .

> Had trial counsel objected to multiplicity, like trial counsel did in Johnson's case, the remedy would have been the same on appeal – remand to vacate the murder in furtherance of drug conspiracy convictions.

28

Opp. 67-68. The Government likewise does not dispute that trial counsel had no strategic or tactical reason for failing to object. *See* Rogers Decl., Appendix 72, at ¶ 5; Spies Decl., Appendix 74, at ¶ 5; Parrish Decl., Appendix 73, at ¶ 5.

Despite these concessions, and despite recognizing trial counsel's "oversight," the Government nonetheless contends that trial counsel's performance was not deficient. Opp. 68. But this contention plainly ignores counsel's duty under the ABA Guidelines, and likewise ignores the firmly established Supreme Court and Eighth Circuit case law that was available to trial counsel at the time of trial. *See* Pet. 50-52.

The Government also concedes part of Petitioner's prejudice allegation – that "[h]ad trial counsel objected to multiplicity, . . . the remedy would have been . . . to vacate the murder in furtherance of drug conspiracy convictions." Opp. 68. At a minimum, that is the remedy required here. In addition, as set forth in the Petition, there is a reasonable likelihood that Petitioner would not have been sentenced to death on any counts if trial counsel had properly objected. *See* Pet. 53.

Case 3:10-cv-03074-LTS-KEM    Document 29    Filed 08/05/11    Page 35 of 81

**CLAIM SIX**

**PETITIONER'S RIGHTS UNDER THE FIFTH, SIXTH AND EIGHTH AMENDMENTS WERE VIOLATED WHEN TRIAL COUNSEL INEFFECTIVELY FAILED TO OBJECT TO THE ADMISSION OF HEARSAY EVIDENCE REGARDING THE QUANTITY OF DRUGS ALLEGED IN THE SUPERSEDING INDICTMENT; APPELLATE COUNSEL INEFFECTIVELY FAILED TO RAISE AND LITIGATE THIS ISSUE.**

The Petition alleged that the primary evidence the Government presented and argued to meet its burden of proving its allegations that the drug conspiracy counts and continuing criminal enterprise counts involved more than 100 grams of pure methamphetamine was the laboratory report of Criminalist Debra Davis, which was offered through hearsay testimony. The Government's reliance on this hearsay evidence violated Petitioner's rights under both the Confrontation Clause and the Federal Rules of Evidence. In failing to object, trial counsel provided ineffective assistance in violation of Petitioner's Sixth Amendment rights. *See* Pet. 50-53.

As it did in its response to Claim 1, the Government first contends that the jury could have inferred from other trial evidence that the Government's had established the drug quantity threshold. Opp. 69-71. But, as explained above in Claim 1, the import of the hearsay evidence "is best understood by taking the word of the prosecutor, who contended during closing arguments," *Kyles*, 514 U.S. at 444, that the hearsay report established the drug quantity. *See* Tr. 3285-86; *see also* Tr. 48-50.

30

The Government next argues that counsel's performance was not deficient because there was a "significant difference," Opp. 71, between the computations underlying the hearsay report and the computations involved in the drug quantity evidence presented at the 1998 sentencing proceeding, where Petitioner's counsel obtained a finding from Judge Bennett that the drug quantity report was "false, fraudulent, whatever word you want to use, and misleading." Tr., 2/24/98, 1174, Appendix 10. This contention, like the Government's contention that counsel could not have successfully challenged Ms. Davis's assumptions, credentials, methods, and conclusions, Opp. 72, simply identifies a disputed issue of fact that will be contested at the upcoming evidentiary hearing.

The Government also denies that Petitioner was prejudiced by trial counsel's failure to object. *Id*. at 73. Again identifying a factual issue that will be contested at the hearing, the Government argues that, "[h]ad trial counsel objected to admission of the laboratory report through the detective, the government would have simply called the criminalist." *Id*. The Government asserts that, in such testimony, "trial counsel could [not] have established any basis to question" the report's findings. *Id*.[1] Resolution of these issues necessarily requires her actual testimony at the hearing.

---

[1] Contrary to the Government's assertion that "Petitioner has alleged no facts" that could constitute prejudice, the Petition alleged numerous such facts. *See* Pet. 56-57.

31

Case 3:10-cv-03074-LTS-KEM     Document 29     Filed 08/05/11     Page 37 of 81

**PETITIONER'S RIGHTS TO DUE PROCESS, TO AN IMPARTIAL JURY, TO EFFECTIVE ASSISTANCE OF COUNSEL, AND AGAINST CRUEL AND UNUSUAL PUNISHMENT WERE VIOLATED WHERE TRIAL COUNSEL FAILED TO OBJECT TO THE EXCLUSION OF QUALIFIED JURORS FROM THE VENIRE, CONTRARY TO *WITHERSPOON V. ILLINOIS* AND ITS PROGENY; APPELLATE COUNSEL WERE INEFFECTIVE FOR FAILING TO RAISE AND LITIGATE THIS ISSUE; ALL IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

**A.      Trial Counsel's Informal Jury Striking Agreement Was Ineffective**.

The Petition alleged that counsel were ineffective for making a lopsided trade with the Government to exclude jurors based solely on their death penalty views as expressed in their written questionnaires. Pet. 58-66. Petitioner has alleged that this agreement was ineffective in two respects. First, by eliminating those potential jurors who have death penalty views at either end of the spectrum, but are otherwise qualified to serve on a capital jury (*i.e.* those jurors who circled answer 'b' or answer 'h' to questionnaire item 72), counsel improperly stacked the deck against their client. This is so because, while the Government requires a unanimous jury to secure a death sentence, a capital defendant only requires a single juror to vote for life in order to secure a life sentence. *See* Pet. 63-64. As such, counsel agreed to eliminate the very jurors who would be most likely to vote for a sentence of life. In its Opposition, the Government has not addressed this contention at all.

32

The Petition further alleged that Petitioner was denied the full benefit of even this bad deal, as a result of counsel's oversight and/or errors. Petitioner has identified numerous instances in which some jurors were improperly struck to his detriment as a result of this agreement. *See* Pet. 64-66. In its Opposition, the Government takes issue with some of the potential jurors that Petitioner identified as improperly struck. *See* Opp. 76-78. This Court should take evidence on this claim and make factual findings regarding the precise contours of the deal counsel brokered with the Government. While the deal was unfavorable in the first place, it became more so when the simple task of sorting through the questionnaires resulted in a further windfall to the Government. As such, counsel's decision to agree to this deal constituted deficient performance under *Strickland*.

The Government has also argued that Petitioner has failed to establish prejudice. Opp. 79-80. This is simply not so. By agreeing to allow Petitioner's jury to be chosen from an unrepresentative sample of the population – a sample that was much more likely to return a death verdict than the full set of potential jurors counsel had to work with – counsel acted to increase the likelihood that Petitioner would be sentenced to death. That was prejudicial. The Government further claims that Petitioner's citations to *United States v. Chanthadara*, 230 F. 3d 1237 (10th Cir. 2000), and *Nicklasson v. Roper*, 491 F.3d 830 (8th Cir. 2007), are "inapposite"

33

because "neither involved an agreement by counsel to strike jurors." Opp. 79-80.

Each of those cases dealt with a scenario in which *the court* decided to strike jurors,

based solely on questionnaire answers and over the objection of defense counsel.

That distinction, however, highlights the error here because it is all the more

problematic for *counsel* to have agreed to strike those jurors most likely to return a

life sentence without any indication, and certainly without a judicial determination,

that they were unqualified to serve.

**B. Appellate Counsel's Failure to Raise Preserved *Witherspoon* Challenges to Jurors 538 and 813.**

Jurors 538 and 813 were qualified to serve on Petitioner's jury. The trial court

erred in striking these two jurors over trial counsel's objection, and appellate counsel

rendered prejudicially ineffective assistance in failing to raise this meritorious issue

that involved prolonged discussion at trial. *See* Pet. 66-73.

**1. Juror 538.**

The Government argues that Juror 538 was properly struck for cause, for two

reasons. First, the Government claims that this juror would have held the

Government to a heightened burden of proof. Opp. 82-85. This is simply not the

case. As trial counsel pointed out, Juror 538 simply testified that she would be

unwilling to sentence Petitioner to death *if she harbored a residual doubt as to his*

34

*guilt at the penalty phase.* Residual doubt is a proper mitigating consideration, as the trial court correctly ruled in this case. *United States v. Honken*, 378 F. Supp. 2d 1040 (N.D. Iowa 2004). Indeed, it is only natural that a person sitting in judgment over whether a person lives or dies may be hesitant to sentence that person to death if she harbors doubt as to whether the person is actually guilty of the crime, even if that doubt does not amount to a reasonable doubt.

Second, the Government argues that Juror 538 was properly struck because "the only circumstances under which she would impose the death penalty would be if she or her family were victims." Opp. 85. This is incorrect, as the Government's own quotation of this juror's testimony indicates. Juror 538 never stated that the only instance in which she could vote for death would be the death of a family member; she merely cited the murder of a family member as an example of a time in which she could impose the death penalty. Opp. 86-86; Voir Dire. Tr. 338.

### 2. Juror 813.

With respect to Juror 813, both Petitioner and the Government have quoted large passages from her voir dire testimony. Pet. 68-72; Opp. 87-89. With one notable exception, the passages quoted by the parties are essentially the same. The exception, however, is that the Government omitted that Juror 813 was asked by the prosecution whether she believed her "views on the death penalty are so strong that

35

it's going to impair your ability to really consider the death penalty as an option when you go back in that room?" Voir Dire Tr. 2423-24; Pet. 72. The juror replied, "No, I do not." Tr. 2424. While the transcripts speak for themselves, the Government's omission of Juror 813's clear statement that she would serve as a fair and impartial juror speaks volumes. Juror 813 was qualified to serve on Petitioner's jury, and the court's decision to exclude her was error.

### 3. Appellate Counsel Were Ineffective.

Petitioner will establish at a hearing that appellate counsel had no strategic reason for their failure to raise this claim on appeal. The issue was well-preserved after lengthy arguments and written submissions. The trial court initially indicated with respect to Juror 538 that it was inclined to let her remain on as a qualified juror, indicating the closeness of this issue. Voir Dire Tr. 3323; Pet. 73-74. It was standard professional practice at the time of Petitioner's capital appeal to raise all meritorious claims, and appellate counsel's actions fell below that standard.

The Government's suggestion that appellate counsel may have made a reasonable strategy decision to forego this claim based upon the Eighth Circuit's denial of a "similar" (Opp. 90) claim in Angela Johnson's appeal is unsupported. The Government offers mere speculation that the Johnson decision in any way informed appellate counsel's decision process. Further, the jury selection claim raised in

36

*United States v. Johnson*, 495 F.3d 951, 963-64 (8th Cir. 2007), is only "similar" to the claim here insofar as they are both jury selection claims. The claim at issue in the *Johnson* appeal dealt with a juror who was challenged for cause by the defense on issues of bias, not on his death penalty views. The voir dire answers given by the juror in *Johnson* and the Eighth Circuit's discussion of the claim do not bear even slight resemblance to the answers and claim at issue here.

The Government also claims that Petitioner has failed to establish prejudice, but fails to address the binding Eighth Circuit and Supreme Court case law cited in the Petition. As held in *Gray v. Mississippi*, 481 U.S. 648, 667-68 (1987), and *Kinder v. Bowersox*, 272 F.3d 532, 543 (8th Cir. 2001), prejudice is established if even one potential juror is improperly excluded for cause based upon their death penalty views. If either Juror 538 or Juror 813 was improperly excluded over defense objection, as Petitioner has alleged they both were, then Petitioner is entitled to a new penalty phase. Appellate counsel's failure to raise a meritorious claim that would have resulted in Petitioner's sentences being overturned clearly resulted in prejudice.

37

**THE SYSTEMIC EXCLUSION AND/OR UNDER-REPRESENTATION FROM THE JURY POOL OF AFRICAN AMERICANS, LATINOS AND OTHER MINORITY GROUPS VIOLATED PETITIONER'S RIGHTS UNDER THE FIFTH, SIXTH AND EIGHTH AMENDMENTS. COUNSEL INEFFECTIVELY FAILED TO LITIGATE CHALLENGES TO THIS UNCONSTITUTIONAL SYSTEM FOR SUMMONING VENIRE PERSONS.**

As noted in the Petition, a criminal defendant's right to a jury drawn from a fair cross-section of the population is violated if (1) a group alleged to be excluded from jury service is a distinctive group in the community; (2) the representation of the distinctive group in the venire or jury pool is not fair and reasonable in relation to the population of the group in the community; and (3) this under-representation resulted from systematic exclusion of the group from the jury selection process. *Duren v. Missouri*, 439 U.S. 357, 364 (1979). Petitioner has alleged that African Americans and Latinos are distinctive groups in the community that have been systematically excluded from jury service in the Northern District of Iowa.

In response, the Government has conceded that Petitioner satisfies the first prong of the test, *i.e.*, that African Americans and Latinos both represent distinctive groups in the community. Opp. 92. The Government, however, argues that Petitioner does not satisfy the final two prongs.

As to the second prong, the Government faults Petitioner for discussing the

38

relevant statistics for the Northern District of Iowa as opposed to the fourteen county Western Division of the Northern District of Iowa. Opp. 93. Notably, however, the Government does not allege that the percentage of African Americans and Latinos included in Petitioner's jury pool is representative of the Western Division. In fact, they are not representative. As noted in the Petition, as of the 2000 Census, African Americans made up 1.65% of the population in the Northern District, yet were only 0.17% of the larger venire, and 0.00% of the qualified pool. Pet. 76. In the Western Division, African Americans comprise 0.86% of the population, thus while the disparity is not as large as it is when using the entire Northern District as the base population, it still represents a comparative disparity of 80%. This remains a significant disparity.

With respect to the Latino population of the Western Division, however, the disparity between Petitioner's jury pool and the overall population is even more pronounced than it is in the full Northern District. Latinos make up 5.11% of the population of the fourteen counties in the Western Division (as compared with 2.39% of the Northern District), yet made up only 0.33% of the venire and 0.00% of the qualified pool in Petitioner's case. The comparative disparity in the Western Division thus sits at 93.54% .

In sum, the Government's argument makes no practical difference. Whether

39

this Court deems it more appropriate to assess the exclusion of minorities from jury service using the Western Division as a baseline or using the entire Northern District as a baseline, the numbers in either case are unfairly and unreasonably unrepresentative. In particular, the exclusion of Latinos from jury service when viewed using the Western Division as a backdrop is truly remarkable. A group that represents fully 5% of the population has been almost completely excluded from jury service.

With respect to the third prong, the requirement that the exclusion be systemic, it is clear that there is a problem "inherent in the jury-selection procedure used by the court" (Opp. 94) where African Americans are under-represented by a factor of 80% and Latinos are under-represented by an astounding 93.5%. Petitioner will prove that there has been systemic under-representation of African Americans and Latinos at the hearing on this matter. Further, contrary to the Government's claim, Petitioner has made a prima facie showing of a *Duren* violation and should be permitted discovery.

Counsel were ineffective for failing to raise this issue at trial. Although counsel do not address this claim in their declarations, Petitioner alleges that counsel had no strategic reason for failing to raise this issue at trial. With regard to prejudice, the Government's position in opposition to this claim is off-base. A defendant need not show that a trial by a representative jury "would have resulted in a different

40

outcome to the case." Opp. 96. A fair cross-section violation is structural error, which does not require a showing of specific prejudice. *Vasquez v. Hillery*, 474 U.S. 254, 263-64 (plurality opinion).

This Court should grant discovery in advance of the evidentiary hearing on this claim. The systemic under-representation of minorities under the Northern District of Iowa's jury selection plan is a significant constitutional error. There are significant disagreements as to material facts between the parties, and this Court should resolve those disagreements after it has been fully informed through factual development in discovery and at the hearing.

**CLAIM NINE**

**PETITIONER WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AT HIS CAPITAL SENTENCING.**

The Petition alleged that trial counsel was ineffective for failing to follow the recommendation of their mitigation specialist to engage a mental health expert to explore the significance of Petitioner's upbringing and background, to place the information uncovered by the mitigation specialist into a mental health perspective, and to assist in the discovery of additional facts from the various witnesses. Counsel thus failed to meet their duty to thoroughly investigate the available mitigating evidence, a failure based in part on their misunderstanding of the applicable federal

41

rules.  Counsel's failure prejudiced Petitioner because, if the available mitigating evidence, as set forth in detail in the Petition, had been collected and presented at trial, there is a reasonable probability of a difference outcome.  *See* Pet. 81-104.

### A.    **Deficient Performance**.

The Government first asserts that trial counsel had strategic reasons for their failure to pursue the recommended mental health evaluation, but none of the asserted strategic grounds withstand scrutiny; at most, the Government's assertions simply identify the factual issues that will be in dispute at the hearing.

The Government first claims that counsel's "decision not to call Dr. Gelbort to testify about Petitioner's mental health was [] a strategic decision."  Opp. 101.  The Government posits that counsel made such a decision because "Petitioner was of higher than average intelligence," and because Dr. Gelbort's findings "were not sufficiently mitigating."  *Id*.

The declarations of Dr. Gelbort and trial counsel refute the Government's theory.  Trial counsel did not ask Dr. Gelbort to conduct a general psychological examination, a mitigation evaluation, or to consider the impact of Petitioner's methamphetamine addiction on his functioning at the time of the crimes.  Decl. of Michael Gelbort, Ph.D., Appendix 46, at ¶¶ 1-5.  Had trial counsel done so, they would have uncovered the same mitigating evidence presented in the Petition.

42

Instead, they asked Dr. Gelbort to conduct only a neuropsychological evaluation to determine only whether Petitioner was suffering from brain damage. *See id.* at ¶ 1-5.

Further, counsel made the decision to cut short their investigation into the impact of Petitioner's mental health because of a unreasonable fear that an evaluation would have resulted in some harmful information being developed and disclosed to the Government. *See* Decl. of Lisa Rickert; Appendix 44, at ¶ 17; Decl. of Charles Rogers, Appendix 72, at ¶ 8; Decl. of Leon Spies, Appendix 74, at ¶ 11; Decl. of Alfredo Parrish, Appendix 73, at ¶ 7. Counsel failed to appreciate that the results of any such evaluation would have remained confidential until such time – if ever – counsel reviewed all reports from both sides and were then in a position to make a fully informed decision on whether to present evidence at the penalty phase based on a complete investigation of the issue. *See* Fed. R. Crim. Pro. 12.2. Accordingly, counsel did not make a strategic decision to which this Court should apply deference. Rather, "[t]heir decision to end their investigation when they did was neither consistent with the professional standards . . . nor reasonable in light of the evidence counsel uncovered . . . that would have lead a reasonably competent attorney to investigate further." *Wiggins*, 539 U.S. at 534; *id*. at 527 ("*Strickland* [*v. Washington*, 466 U.S. 688 (1984)] does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy. Rather, a reviewing

43

court must consider the reasonableness of the investigation said to support that strategy.").

The Government nonetheless claims that "counsels' [sic] performance cannot be deemed so deficient that it amounts to ineffective assistance of counsel," where counsel hired a mental health expert. Opp. 103. The cases cited by the Government in support of this proposition actually undermine its position here. *Id*. (citing *Cole v. Roper*, 623 F.3d 1183 (8th Cir. 2010) and *Ringo v. Roper*, 472 F.3d 1001 (8th Cir. 2007)).

In *Cole*, applying AEDPA's deferential standard of review to the decision of the state courts, the Eighth Circuit affirmed that the state court's decision was not an unreasonable application of Supreme Court law. *Cole*, 623 F.3d at 1189-90. There, defense counsel obtained two unhelpful pre-trial psychiatric evaluations of the defendant, but in post-conviction a third psychiatric opinion was obtained and provided mitigating evidence. *Id*. Here, by contrast, trial counsel obtained no psychiatric evaluations of Petitioner, and the only limited neuropsychological testing they obtained covers none of the same ground of the mental health evaluations proffered here.

In *Ringo*, trial counsel ignored an expert's recommendation to consult with a clinical psychologist about possible trauma related mental health problems. Because

44

their review was circumscribed by AEDPA, the Eighth Circuit ruled that the state court did not apply *Strickland* in an objectively unreasonable manner. *Ringo*, 472 F.3d at 1006. However, the court "believe[d] that counsel in a death penalty case generally should obtain an expert opinion on a significant issue that can be addressed only by someone with technical expertise." *Id.* at 1004. The court then stated that, if it was "reviewing the case de novo . . .a good case could be made that counsel here had a significant 'lead that should have been explored,' but 'chose to abandon their investigation at an unreasonable juncture.'" *Id.* at 1005 (quoting *Wiggins*, 529 U.S. at 527). Here, de novo review applies[14] and, as in *Ringo*, counsel ignored a recommendation to obtain mental health evidence.

The Government also contends that counsel was not deficient because presenting mental health expert evidence at trial "would have opened up the door to a government rebuttal." Opp. 102. Contrary to the Government's argument, in

---

[14]This is in contrast to *Ringo*, which involved a federal habeas challenge to a state court conviction under 28 U.S.C. § 2254. Under § 2254 of AEDPA, federal courts may only grant habeas relief from state court convictions if the state court ruling on the matter "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" under § 2254(d)(1), or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" under § 2254(d)(2). Because this is a federal challenge to a federal conviction under 28 U.S.C. § 2255, there is no previous state court adjudication to which to defer, and de novo review applies.

45

*Williams v. Taylor*, 529 U.S. 362 (2000), the Supreme Court found deficient performance and prejudice from trial counsel's failure to investigate and present evidence of Williams's difficult childhood and mental health problems where the unpresented information would have opened the door to rebuttal evidence concerning Williams' prior convictions and criminal behavior. *Williams*, 529 U.S. at 396. Petitioner's situation is even more favorable than the situation the Court addressed in *Williams*, as the presentation of mental health evidence at trial would not have opened the door to any new bad facts (such as prior criminal behavior), only to a potentially conflicting mental health opinion. In that regard, it is crucial to note that the Government's mental health opinions may have been entirely consistent with the defense presentation. Trial counsel did not know at the time – and we still do not know to this day – what a Government mental health expert would have opined. For purposes of deficient performance, the analysis stops there. Trial counsel cut off their investigation before they even knew what the rebuttal evidence would be, due simply to a mistake of law.

Finally, the Government claims that counsel was not deficient in failing to a present a mental health expert at penalty because "presenting a mental health mitigation case regarding Petitioner's alleged state of mind at the time of the offense would have been completely inconsistent with his [innocence] defense" at the guilt

46

phase.  Opp. 105.  In *every* capital case, there is inherent tension between counsel's role at guilt phase in contesting the defendant's responsibility and their role at penalty phase in explaining and mitigating the defendant's crime.  This tension does not relieve counsel's duty to zealously present both a guilt phase defense and a mitigation case, as the Eighth Amendment does not require presentation of mitigating evidence only where a capital defendant admits his guilt.  The Supreme Court has made this point quite clearly:

> Rompilla's sentencing strategy stress[ed] residual doubt [as to his guilt] . . . five of his family members argued in effect for residual doubt, and beseeched the jury for mercy, saying that they believed Rompilla was innocent and a good man.

*Rompilla v. Beard*, 545 U.S. 374, 378, 386 (2005).  Despite Rompilla's insistence at penalty phase that he was innocent, the Supreme Court had no difficulty in finding counsel ineffective for failing to investigate and present mitigating evidence which would "have destroyed the benign conception" of Rompilla's background .  *Id*. at 391.

At penalty, trial counsel presented a narrow and superficial snapshot of Mr. Honken's upbringing, which the Government derided in its closing argument.  The Government argued, for example, that the defense's presentation of Petitioner's "unfortunate childhood," was not "that different from the vast majority of people."

47

Tr., 3915. It described Petitioner as "a relatively privileged person" and declared that "[h]e wasn't forced" to commit murder but "knew that he was choosing that." *Id*. Without a mental health-based explanation for how Mr. Honken's dysfunctional and traumatic upbringing and methamphetamine addiction affected his behavior and mind set at the time of the crimes, the defense was unable to effectively refute the Government's argument. jury never heard why the facts presented mitigated.

**B.    Prejudice**.

The Government accurately describes the prejudice standard as requiring Petitioner to show "it was reasonably probable that if counsel would have retained the type of experts" retained by current counsel, "they would have reached the same diagnosis; and that, "there was a reasonable probability that the mental health evidence would have altered the outcome of the penalty phase." Opp. 106. This is precisely what the evidence proffered in the Petition, and which will be presented at the evidentiary hearing, will show.

The Government nonetheless makes two argument as to why Petitioner cannot make that showing. First, the Government rehashes its argument that prejudice cannot be shown where a defendant maintains his innocence at the guilt phase then seeks to explain and contextualize his guilt at the penalty phase. *See* Opp. 106-07. As noted above, the Government's argument would turn the Supreme Court's capital

48

jurisprudence on its head.  *See Rompilla*, *supra*; *see also Wiggins v. Smith*, 539 U.S. 510, 536 (2003) (finding counsel's failure to present history of abuse and neglect at sentencing phase prejudicial, where guilt was contested at first phase).

Second, the Government recounts the seven aggravating factors found by the jury and argues that prejudice cannot be shown because "the aggravating evidence was overwhelming."  Opp. 107-08.  This argument "is a non-starter."  *Walbey v. Quarterman*, 2009 WL 113778, *8, 309 Fed. Appx. 795 (5th Cir. 2009) (unpublished) ("Texas's next argument – that Walbey suffered no prejudice because the brutality of his crime eclipses any mitigating evidence – is a non-starter. . . .  To permit a jury to impose the death sentence solely because the facts are heinous and egregious would be to return to the days of inflicting capital punishment based on emotion and revenge. . . .  Almost without exception, the cases we see in which conviction of a capital crime has produced a death sentence arise from extremely egregious, heinous, and shocking facts.  But, if that were all that is required to offset prejudicial legal error and convert it to harmless error, habeas relief . . . would virtually never be available, so testing for it would amount to a hollow judicial act.").

Further, the Government overlooks the fact that the jury reached life verdicts as to six of the ten counts, despite the fact that two of the aggravating factors found applied only to the adult victims, for whom the jury reached the six life verdicts.  *See*

49

*id.* Given the split nature of the penalty verdicts, and the fact that just one aggravating factor applied only to the child victims, it is clear that the jury did not find that "the aggravating evidence was overwhelming." To the contrary, the penalty phase verdicts were obviously close, and there is a reasonable probability that an effective mental health investigation and presentation would have tipped the balance in favor of life.

<h3 align="center">CLAIM TEN</h3>

**THE COURT'S PENALTY PHASE INSTRUCTIONS FAILED TO PROPERLY NARROW THE SCOPE OF THE JURY'S CONSIDERATION OF FUTURE DANGEROUSNESS AND FAILED TO GUIDE THE JURY'S WEIGHING OF AGGRAVATING AND MITIGATING CIRCUMSTANCES; COUNSEL WERE INEFFECTIVE FOR FAILING TO OBJECT IN VIOLATION OF PETITIONER'S FIFTH, SIXTH, AND EIGHTH AMENDMENT RIGHTS.**

Trial counsel failed to object to the court's future dangerousness instruction, which was overly broad, and to the weighing instruction, which failed to properly guide the weighing of aggravating and mitigating instructions. Thus, Petitioner was denied his Sixth and Eighth Amendment rights. *See* Pet. 105-11.

### A. The Future Dangerousness Instruction.

The Government does not directly address Petitioner's contention that the court's instruction regarding future dangerousness was overly broad. Rather, the Government asserts that it "presented no evidence regarding Petitioner's custody

50

status." Opp. 111. That is precisely the point. Because the instruction failed to properly channel the sentencer's discretion, the jury was free to find this aggravating circumstance based solely on Petitioner's classification status even though the Government did not put on any evidence to support its contention that high custody status equated to future dangerousness.

## B.     Trial Counsel Were Ineffective.

The Government asserts that trial counsel reasonably decided not to object to the court's instructions. Opp. 112. The Government errs. As the Government admits, the evidence counsel did pursue – namely the testimony of Dr. Mark Cunningham – was designed to "negate[] the possibility that jury could consider custody classification as proof of future dangerousness." *Id*. Thus, counsel did not make a reasoned choice between two contradictory approaches. The objection counsel failed to make would have been entirely consistent with the approach counsel took. Counsel's failure to object to the court's instruction cannot be attributed to a reasonable strategy or tactic. *Griffin v. Warden*, 970 F.2d 1355, 1358 (4th Cir. 1992) ("courts should not conjure up tactical decisions an attorney could have made, but plainly did not").[15]

---

[15] Contrary to the Government's contention, it did not argue that the "jury should ignore the custody in determining future dangerousness" in the face of trial counsel's presentation. Opp. at 112. Rather, the Government forcefully argued that

51

## C. The Weighing Instruction.

As to the "weighing" instruction, the Government asserts that "the weighing stage of penalty phase deliberations is a process for the jury to conduct, not a finding of fact," citing to *United States v. Purkey*, 428 F.3d 738, 750 (8th Cir. 2005). Opp. 113. The Government's reliance on *Purkey* is misplaced. *Purkey* raised a claim regarding the sufficiency of the indictment. 428 F.3d at 748. Petitioner is not attacking the sufficiency of the indictment but rather challenges the court's failure to instruct the jury that aggravating factors must outweigh mitigating factors beyond a reasonable doubt as required by *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and *Ring v. Arizona*, 536 U.S. 584 (2002). Of particular note, the Sixth Circuit granted relief on this precise issue in a Federal Death Penalty Act case two days ago. *United States v. Gabrion*, No. 02-1386, 2011 WL 3319532, at *12 (6th Cir. Aug. 3, 2011).

The remaining cases cited by the Government in support of its contention that "the jury does not have to somehow find the aggravating factors outweigh the mitigating factors beyond a reasonable doubt" rely heavily on *Purkey* and are likewise unavailing. *See* Opp. 113. Moreover, those decisions fail to adequately address the effect of two recent Supreme Court opinions that applied the Fifth

---

Petitioner would "behave as he needs to do for a while until he gets down into a lower classification," where he would then pose a danger to other inmates and those outside of prison. Tr., 3913-14.

Amendment right to due process and the Sixth Amendment right to jury trial as announced in *Apprendi* – *Blakely v. Washington*, 542 U.S. 296 (2004) and *Cunningham v. California*, 549 U.S. 270 (2007).

In *Blakely*, the Court made clear that the test for whether a determination is subject to *Apprendi* is functional, not formal – the relevant statutory maximum is the sentence that may be imposed based on the findings made by the jury beyond a reasonable doubt. 542 U.S. at 303-04, 306-07. In *Cunningham*, the Court further applied this functional test for whether a sentencing determination is subject to *Apprendi* by invalidating a determinate sentencing statute that allowed an upward departure when "justified by circumstances in aggravation or mitigation" not found by the jury beyond a reasonable doubt. 549 U.S. at 278-79, 288-89. Several recent circuit decisions further support the view that, under the functional standard of *Blakely* and *Cunningham*, weighing-type determinations are subject to *Apprendi*. *See e.g.*, *Harrison v. Gillespie*, 596 F.3d 551, 563-64 (9th Cir. 2010); *Besser v. Walsh*, 601 F.3d 163, 181 (2nd Cir. 2010); *United States v. Villagarcia*, 599 F.3d 529, 536 (6th Cir. 2010).

In light of *Blakely*, *Cunningham*, *Gabrion*, and the facts of this case — in which the jury reached life verdicts on six of the ten capital counts and thus might well have imposed life sentences on the remaining four counts under the proper

standard of proof — trial counsel's failure to object was prejudicial.

**CLAIM ELEVEN**

**VICTIM IMPACT EVIDENCE PRESENTED TO THE JURY WAS RECEIVED
IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS.**

The victim impact evidence in this case was highly emotional, speculative and in some respects created a false impression of the impact of the deaths of Terry DeGeus and Greg Nicholson. The presentation rendered Petitioner's sentencing proceedings fundamentally unfair in violation of the Due Process Clause. *See* Pet. 112-19.

The Government first argues that the victim impact evidence did not violate Petitioner's right to a fair penalty phase proceeding because Petitioner presented a significant amount of mitigating evidence at the penalty phase. Opp. 116-17. This analysis is misguided. The effect of victim impact testimony cannot be reliably weighed simply by counting the number of transcript pages. A single emotional appeal can have more impact on the fairness of the proceedings than multiple pages of more mundane testimony. In this case, the highly emotional evidence presented, together with the prosecutor's emotion-laden argument, violated the Eighth Amendment.

The Government also asserts that "[t]he mere fact that the evidence is

54

emotional does not make it violative of Petitioner's due process rights." Opp. 117. Petitioner fully recognizes this principle, and the Petition clearly alleges that the victim impact presentation was unduly prejudicial because it was too emotional, highly charged, and speculative. Pet. 112. For a death sentence to comply with the Eighth Amendment, it must be based on the jury's "reasoned moral response" to the evidence. *Penry v. Lynaugh*, 492 U.S. 302, 322 (1989). While the Court in *Payne v. Tennessee*, 501 U.S. 808 (1991), permitted the introduction of limited victim impact evidence, it did not eviscerate the capital defendant's Eighth Amendment right to a reliable, individualized sentencing determination, based on the jurors' reasoned moral response. Nor did it transform capital sentencing proceedings into contests between the worth of the victims and that of the defendant, as was the case here. *See, e.g.*, *United States v. Johnson*, 713 F. Supp. 2d 595, 624-26 (E.D. La. 2010).

The Government next disputes Petitioner's contention that the trial judge cried during portions of the victim impact presentation and argues that even if the judge showed "some emotion in [his] voice," Petitioner was not harmed by such a display. Opp. 120. The Government errs. The trial court's emotional response on the bench indicates that he was greatly affected by the impact testimony. "It is obvious that under any system of jury trials the influence of the trial judge on the jury is necessarily and properly of great weight, and that his lightest word or intimation is

55

received with deference, and may prove controlling." *Starr v. United States*, 153 U.S. 614, 626 (1894). For this reason, judicial conduct that "preclude[s] a fair and dispassionate consideration of the evidence" violates due process. *Quercia v. United States*, 289 U.S. 466, 472 (1933). The judge's emotional display during testimony likely had a strong effect on the jury and may have unduly influenced its sentencing decision. There should at least be an evidentiary hearing at which witnesses can testify in support of Petitioner's allegations.[16]

Finally, the Government argues there was no prejudice because Petitioner "only makes [a] conclusory assertion" of harm, citing to *Bryson v. United States*, 268 F.3d 560, 562 (8th Cir. 2001). Opp. 123. Contrary to the Government's assertion, in *Bryson*, the Eighth Circuit did not affirm the district court's dismissal of an ineffective assistance counsel claim for the reasons stated in the Opposition. The Eighth Circuit affirmed the district court's opinion, without addressing the merits of the claim, because the defendant failed to argue the ineffectiveness claim at all on appeal. Moreover, where, as here, a single juror's vote would result in a life sentence,

---

[16]The Court should deny the Government's request to preclude Petitioner from conducting juror interviews. Federal Rule of Evidence 606(b) expressly permits testimony as to "whether any outside influence was improperly brought to bear upon any juror." Fed. R. Evid. 606(b). Petitioner should be permitted to interview jurors with regard to the emotional response of the trial judge to the victim impact presentation.

56

the prejudice analysis properly focuses on the likelihood that the error in question would have affected the vote of even a single juror. *Wiggins v. Smith*, 539 U.S. 510, 537 (2003) (test for harm is likelihood "that at least one juror would have struck a different balance").

As set forth in the Petition, Petitioner was prejudiced by counsel's failure to properly litigate the issues arising from the victim impact evidence at trial, which had significant effect on the jury.

### CLAIM TWELVE

**THE GOVERNMENT VIOLATED PETITIONER'S RIGHTS UNDER THE EIGHTH AMENDMENT AND THE DUE PROCESS CLAUSE BY PRESENTING INCONSISTENT ARGUMENTS AT HIS TRIAL AND HIS CO-DEFENDANT'S TRIAL; COUNSEL WERE INEFFECTIVE UNDER THE SIXTH AMENDMENT FOR FAILING TO DISCOVER AND PRESENT READILY AVAILABLE EVIDENCE THAT WAS PRESENTED BY THE GOVERNMENT AT HIS CO-DEFENDANT'S TRIAL.**

The Government begins its response to this claim by alleging, without citation to any authority, that the claim is "procedurally barred" because it was not raised in Petitioner's motion for new trial or on direct appeal. Opp. 124-25. This argument is without merit. First, the Government offers no authority – and Petitioner is aware of none – for the proposition that a claim of constitutional error raised in § 2255 proceedings is procedurally barred if it might have been raised in a motion for new

57

trial.[17]  Second, the Government again offers no authority – and Petitioner again is aware of none – for the proposition that a § 2255 claim that depends on evidence outside the trial record is procedurally barred unless it is raised on direct appeal. Section 2255 proceedings are the proper venue for this claim, and this Court should address it on its merits.

As to the merits of the claim, the Government significantly minimizes the arguments it made during Johnson's trial in an attempt to make its presentations at the two trials appear consistent.  They were not.  As set forth in the Petition, the Government attempted to elicit during Johnson's trial the fact that Petitioner *was not capable of murder* absent Johnson's influence.  Pet. 122-23.  Hence, the Government argued during Johnson's trial that she was more morally culpable than Petitioner and that Petitioner's crimes depended directly on Johnson's influence.  Pet. 124-25; Johnson Tr. 4026.

The Government's argument that it did not present contradictory evidence, for example, that Petitioner was the shooter (at his trial) and that Johnson was the shooter

---

[17]Further, as the Government acknowledges in its Opposition, Petitioner filed his new trial motion before Johnson's trial began.  Opp. 125.  The Government's proposition thus depends on the novel idea that Petitioner was required to amend his motion for new trial in the three week period between the conclusion of Johnson's trial and the oral argument on his motion or forever have the claim barred.  There simply is no support for the Government's position.

58

(at her trial) misses the point. *See* Opp. 126. While it is true that the Government did present relatively similar evidence at the guilt phase of both trials, it presented very different evidentiary pictures and arguments at the penalty phase of each trial. As such, this claim was raised as, and continues to be litigated as, a claim that Petitioner's sentence cannot stand, not that his convictions must be overturned.

The Supreme Court has "long recognized that a sentencing jury must be able to give a 'reasoned moral response' to a defendant's mitigating evidence – particularly evidence which tends to diminish his culpability – when deciding whether to sentence him to death." *Brewer v. Quarterman*, 550 U.S. 286, 289 (2007) (quoting *Penry v. Lynaugh*, 492 U.S. 302, 323 (1989)). As noted in the Petition, evidence that Petitioner was not capable of murder absent some outside influence is quite clearly "evidence which tends to diminish his culpability." *Id.*

Although the type of evidence and argument offered by the Government at the penalty phase at each trial was no doubt less concrete than a simple question of who fired the gun, the Government's improper change of tactics was no less damaging to Petitioner. As it stands, Petitioner's jury sentenced him to death for only four of the ten capital counts. Had the Government acknowledged at Petitioner's penalty phase that, as the Government argued at Johnson's trial, he was incapable of murder absent Johnson's influence and was therefore less culpable than she was – instead of

59

attempting to portray him as the evil mastermind – there is more than a reasonable probability Petitioner would not have been sentenced to death.

Contrary to the Government's characterization, *Bradshaw v. Stumpf*, 545 U.S. 175 (2005), did expressly leave open the possibility that inconsistent presentations on the issue of relative culpability may result in a prejudicial due process violation. *Id.* at 187.[18]  Further, although the facts of *Bradshaw* did involve the prosecution's presentation of inconsistent evidence on the identity of the shooter, nothing about the case requires it to be read as concretely and narrowly as the Government would have it.  Penalty phase evidence about the character of a human being obviously can be, and usually is, more amorphous than the specific facts of a guilt phase proceeding.

While this claim focuses on the violation of Petitioner's due process and Eighth Amendment rights where the Government's improper change of tactics, to whatever extent the evidence subsequently relied upon by the Government at Johnson's trial was available to Petitioner's counsel, they were ineffective for failing to present it. Petitioner will prove at the hearing that counsel had no reasonable strategic reason for failing to present the relevant evidence, and that Petitioner was prejudiced by this failure.

---

[18]The fact that the *Bradshaw* Court remanded the case for the lower court to conduct the analysis in the first instance does not diminish the legitimacy of the legal principle.

60

**TRIAL COUNSEL'S STIPULATION TO THE CIRCUMSTANCES REGARDING THE ALLEGED ACQUISITION OF MAPS ALLEGEDLY GENERATED BY ANGELA JOHNSON IN LIEU OF TESTIMONY FROM ROBERT MCNEESE, VIOLATED THE FIFTH AND SIXTH AMENDMENTS. APPELLATE COUNSEL'S FAILURE TO RAISE CLAIMS RELATED TO THE STIPULATION WAS INEFFECTIVE.**

Petitioner's rights to confrontation and to the effective assistance of counsel were violated when trial counsel agreed to a stipulation that furnished the only evidence establishing the foundation and authenticity of maps, purportedly generated by Angela Johnson, describing the location of the bodies of the five victims, rather than insisting on the presentation of the testimony of handwriting and fingerprint experts, and of Robert McNeese, a Government agent with well-documented credibility problems. *See* Pet. 128-32.

The Government asserts that defense counsel's stipulation was not error because Petitioner cannot show that the maps were not generated by Angela Johnson. Opp. 136, 139. The Government is wrong. The Government's argument is based on its claim that, even if McNeese did not testify, there was other evidence admitted at trial which purports to link Johnson to the maps and Petitioner to Johnson. Opp. 137 ("McNeese was entirely unnecessary to the admission of the maps."). The Government then concludes that because there is some other evidence that supports

61

the inference that Johnson created the maps, counsel did not err in agreeing to the stipulation. The argument ignores that the stipulation provided evidence that Petitioner knew the location the bodies (because Johnson knew) but prevented counsel from challenging McNeese's relationship with the Government, his relationship with Johnson, including Johnson's responses to his advances, and the authenticity of the maps. Pet. 129-30.

For the same reasons, the Government contends that Petitioner was not prejudiced by the stipulation. Opp. 138-39. The Government, however, repeatedly urged the jury to convict Petitioner of the murders based on the maps, arguing that because Johnson was guilty, Petitioner must be guilty as well. *See* Pet. 131. The mere fact that there is some other evidence, unaffected by counsel's error, does not show that prejudice is lacking. *See Smith v. Horn*, 120 F.3d 400, 417 (3d Cir. 1997) (quoting *Yohn v. Love*, 76 F.3d 508, 523 (3d Cir. 1996)).

### CLAIM FOURTEEN

**THE GOVERNMENT VIOLATED THE FIFTH AND EIGHTH AMENDMENTS WHEN IT REPEATEDLY ELICITED INADMISSIBLE TESTIMONY REGARDING PETITIONER'S ALLEGED INVOLVEMENT WITH DRUGS AND VIOLENCE THAT WAS TOO REMOTE TO BE RELEVANT. TRIAL AND APPELLATE COUNSEL INEFFECTIVELY FAILED TO OBJECT TO OR LITIGATE ALL OF THE INSTANCES OF MISCONDUCT.**

On redirect examination of Scott Gahn, the Government deliberately elicited

62

inadmissible testimony regarding Petitioner's alleged drug distribution prior to the time of the charged conspiracy in this case (1993-2000) and the original case (1991-1993) in violation of Petitioner's due process and Eighth Amendment rights. *See* Pet. 133-39.

The Government contends that Gahn blurted out the reference to inadmissible drug activity "in response to a question that could not have anticipated such an answer." Opp. 145. The Government is wrong. On direct examination, Gahn gave a similar answer to the prosecutor's question as to why he paid Petitioner money for a drug debt, which implied that Petitioner was a dangerous person to betray. *See* Tr., 192-93. Thus, when the prosecutor asked Gahn on redirect examination why he considered Petitioner to be dangerous on the day of Greg Nicholson's disappearance, the prosecutor knew, or should have known, that Gahn would answer the question by referring to evidence that the court had already ruled inadmissible. Indeed, the questioning invited comparison of Mr. Honken's behavior on the day of Greg Nicholson's disappearance and Gahn's "feelings" on that day to his earlier "feelings." *See* Tr., 226 ("I had the same feeling the day he was in my club looking for Greg"). Because the Government chose to elicit this improper testimony not once, but three times, it should be "estopped [from] deny[ing] the prejudicial effect on the jury on the jury regardless of the strength of its case." *United States v. Haley*, 452 F.2d 391, 396

63

(8th Cir. 1971).

The Government also asserts that it was reasonable trial strategy for counsel not object to Gahn's testimony on redirect because an objection would have drawn the jury's attention to the inadmissible evidence and because the court had already instructed the jury to disregard the evidence. Opp. 145. The factual premises for this argument are belied by the record. During Gahn's direct examination, trial counsel repeatedly objected to Gahn's testimony about Petitioner's alleged drug activity prior to the time of the charged conspiracy and requested a mistrial and curative instructions. Opp. 141-44. Clearly counsel wanted to keep the jury from hearing this prejudicial information. Counsel could have no reasonable strategic or tactical reason not to object to this improper evidence the third time it was elicited, especially given that the court had previously ruled in Petitioner's favor. *See Griffin v. Warden*, 970 F.2d 1355, 1358 (4th Cir. 1992) ("courts should not conjure up tactical decisions an attorney could have made, but plainly did not").

## CLAIM SIXTEEN

### TRIAL COUNSEL INEFFECTIVELY FAILED TO PRESENT ABUNDANT, READILY AVAILABLE EVIDENCE THAT WOULD HAVE SUPPORTED THEIR THEORY OF DEFENSE.

As recently as October 1999, more than six years after the disappearance of Nicholson and the Duncans, Mason City Police excavated a field that DeGeus was

64

known to be working in at the time of the Nicholson/Duncan disappearances because law enforcement continued to view DeGeus as a prime suspect in their murders. Pet. 151 & Appendix 56. DeGeus was a paranoid, volatile, and violent methamphetamine dealer, he had multiple motives to want Nicholson dead, and he was saying and doing bizarre things around the time of the Nicholson and Duncan disappearances.

In an attempt to show that trial counsel was reasonable for failing to put on readily available evidence that supported their theory of defense, the Government now tries to rewrite the history of this case, and of DeGeus. The Government alleges, for example, that "DeGeus was not the 'primary suspect' for the murders," and makes the unsupported comment that while law enforcement did suspect DeGeus, "it was only to the extent that he might have been Petitioner's accomplice." Opp. 156. While the Government offers nothing to back its allegations, it is indisputable that law enforcement's suspicion of DeGeus was strong enough that they undertook the time and expense to conduct multiple excavations of the site of his known whereabouts at the time of the Nicholson and Duncan disappearances.

The Government also makes the claim that "DeGeus had no motive to kill Nicholson." Opp. 156. The Government makes this claim despite its acknowledgment that Nicholson named DeGeus as a methamphetamine purchaser during grand jury proceedings (Opp. 156) and despite the fact that law enforcement

65

apparently believed that DeGeus had such a motive.

Finally, although the Government concedes that "there was some evidence DeGeus was violent and aggressive" (Opp. 158), it makes the remarkable comment that "his violence was limited to beating or threatening girlfriends and scuffling with law enforcement officers." *Id.* While DeGeus's numerous threats to kill ex-girlfriends, police officers, and others, as well as his actual assaults on ex-girlfriends, police officers, and others my qualify as "limited" violence in the eyes of the Government, there is no question that DeGeus's history of violence far eclipsed that of Petitioner.

As to deficient performance, although the declarations of trial counsel submitted in this case did not specifically address this claim, Petitioner specifically alleges, and expects to show at a hearing, that counsel did not have a reasonable strategic basis for failing to introduce most or all of the significant evidence casting suspicion on DeGeus. As to prejudice, as the Government notes in opposition, "not a single juror harbored even a fictitious 'residual doubt' about his guilt." Opp. 159. This is precisely Petitioner's point – had defense counsel presented the evidence that was available to them, there is a reasonable probability that at least one juror would have harbored a reasonable doubt as to Petitioner's guilt, or at a minimum harbored a residual doubt and sentenced Petitioner to life. This Court should hear evidence on

66

this claim and reverse Petitioner's convictions and/or sentences.

**CLAIM SEVENTEEN**

**PETITIONER WAS DEPRIVED OF HIS FIFTH AND SIXTH AMENDMENT RIGHTS TO TRIAL BY AN IMPARTIAL JURY AND DUE PROCESS WHEN THE TRIAL COURT DISMISSED A JUROR DURING PENALTY PHASE DELIBERATIONS BUT UPHELD THE GUILT PHASE VERDICT. TRIAL AND APPELLATE COUNSEL INEFFECTIVELY LITIGATED THESE ISSUES.**

Juror 523 was replaced by an alternate juror during penalty phase deliberations after she reported that her employer made inappropriate comments about Petitioner, including "killer, killer, killer" and "fry him, fry him, fry him." Tr., 3945. Petitioner's rights to trial by an impartial jury and due process were violated by counsel's ineffective handling of this matter. *See* Pet. 156-64.

The Government first asserts that this claim is procedurally defaulted. Opp. 160. However, as the Government appears to acknowledge, ineffective assistance of counsel overcomes any procedural default. *See* Opp. 161; *Murray v. Carrier*, 477 U.S. 478, 488 (1986) ("if the procedural default is the result of ineffective assistance of counsel, the Sixth Amendment itself requires that responsibility for the default be imputed to the State, which may not conduct trials at which persons who face incarceration must defend themselves without adequate legal assistance").

The Government also contends that Petitioner is not entitled to relief on the grounds of ineffective assistance of counsel because Petitioner's claim that prior

67

counsel failed to argue that "because the district court found Juror 523 was not truthful about what her boss said to her, that she must have been untruthful during voir dire and her untruthfulness tainted the guilty verdict" lacks merit.  Opp. 163. The Government misunderstands the nature of Petitioner's argument.

Petitioner does not argue that counsel were ineffective because they failed to raise Juror 523's honesty during voir dire.  Petitioner alleges that Juror 523 lied during deliberations when she falsely claimed that her employer made comments about Petitioner's guilt in order to "finish deliberations as quickly as possible . . . to 'get her life back.'"  Pet. 161 (quoting *United States v. Honken*, 381 F. Supp. 2d 936, 1034 (N.D. Iowa 2005)).

After conducting a post-trial evidentiary hearing, the court found that Juror 523 was not credible; that the only comment supported by credible testimony was that Juror 523 should have said something "outrageous" to get out of jury duty, which was made and taken in jest; that no other comment was made to Juror 523 by her boss or any other employee at her company; and that the boss's testimony that he never made any comments like "guilty, guilty, guilty" or "fry him" was credible.  *Honken*, 381 F. Supp. 2d at 1032-33.  Thus, the court found that the allegations made by Juror 523 during penalty phase deliberations were untrue.

Juror 523's willingness to mislead the court by claiming that Petitioner was

68

"guilty" in order to get off the jury, suggests that she was a biased juror and calls into question the validity of her guilty verdicts. Despite being on notice and actively litigating related issues, neither trial nor appellate counsel challenged the verdicts on these grounds. Counsel did not have a reasonable strategic or tactical reason for not doing so. Pet. 162-64.

The Government also argues that Petitioner was not prejudiced by Juror 523's exposure to "an unsolicited, passing remark which was made, and taken, in jest." Opp. 165. The Government errs. The trial court made findings that suggest that Juror 523 was biased against Petitioner. The court found that Juror 523 falsely claimed that her boss made comments about Petitioner's guilt in order to finish deliberations as quickly as possible, which indicates that Juror 523 rushed to judgment and found Petitioner guilty for reasons other than the evidence presented. "Even if only one juror is unduly biased or prejudiced, the defendant is denied his constitutional right to an impartial jury." *United States v. Eubanks*, 591 F.2d 513, 517 (9th Cir.1979); *see also United States v. Dean*, 647 F.2d 779, 785 (8th Cir. 1981) (new trial warranted in light of finding that juror did not decide the case on an impartial consideration of the evidence presented).

69

## CLAIM EIGHTEEN

**THE SECURITY MEASURES USED BY THIS COURT DURING TRIAL DENIED PETITIONER HIS RIGHTS TO A JURY TRIAL, TO THE PRESUMPTION OF INNOCENCE, DUE PROCESS, THE EFFECTIVE ASSISTANCE OF COUNSEL AND TO BE FREE OF CRUEL AND UNUSUAL PUNISHMENT AS GUARANTEED BY THE FIFTH, SIXTH AND EIGHTH AMENDMENTS.**

As acknowledged in the Petition, this claim was partially litigated at trial and on direct appeal. Pet. 169-70 n.26. The Petitioner clearly alleges, however, that this claim was not fully and appropriately litigated by prior counsel. This is so for several reasons. First, the trial court failed to hold a full and fair hearing on the matter. The Government was permitted to place Petitioner in a stun belt, shackle him, and bolt him to the floor – techniques that should be used as a "last resort," *Illinois v. Allen*, 397 U.S. 337, 344 (1970) – based on the dubious hearsay testimony of cooperating informants, as relayed by a law enforcement agent. Second, the Government failed to disclose to defense counsel key impeachment information regarding these informants, *see* Claim 3, *supra*, so the trial court was not in a position to evaluate the true nature of the alleged escape attempts and threats made by Petitioner. And finally, the trial court was unaware of Petitioner's serious medical condition, which greatly exacerbated his anxiety and ability to communicate with his attorneys while he was fitted with a stun belt, because trial counsel did not bring it to the attention of the

court. *See* Pet. 175-77.

Petitioner has thus raised serious questions as to whether he received a constitutionally permissible trial in the face of oppressive security measures that were ordered after a superficial and materially incomplete inquiry. The Government, in opposition, disputes many of the factual allegations made in the Petition. Petitioner submits that this Court should hold a full and fair hearing on the issue so that these factual disputes can be resolved.

Further, Petitioner has raised additional serious concerns, not the subject of litigation on direct appeal, as to whether jurors were exposed to prejudicial extraneous influences when they were transported each day under heavy guard and in secretive conditions, and when they observed significantly heightened security measures in and around the courthouse each day. In this case, as in many capital cases, the question of whether a defendant will be a future danger to society often plays a significant role in determining his sentence. Extraneous, non-judicial information such as the viewing of extraordinary security measures surrounding the proceedings cannot help but shape a juror's view on this important question.

Contrary to the Government's suggestion, testimony from jurors on whether they were subjected to inappropriate extraneous influences is not barred by Fed. R. Evid. 606(b). It is true that this rule prevents jurors from testifying about "any matter

71

or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent or to dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith." Fed. R. Evid. 606(b). The rule affirmatively states, however, that "a juror may testify about (1) whether any outside influence was improperly brought to the jury's attention," or "(2) whether any outside influence was improperly brought to bear upon any juror." *Id.* This is a claim about such extraneous influences on the jury, not about the mental processes or deliberations of the jurors.

Indeed, on direct appeal the Eighth Circuit specifically noted that Petitioner presented no evidence that any member of the jury was aware of the enhanced security measures. *United States v. Honken*, 541 F.3d 1146, 1163 (2008). The Eighth Circuit's opinion thus necessarily implies that this type of evidence is relevant to this claim. Petitioner has specifically alleged that the jury did observe and was subjected to undue influence in viewing these enhanced security measures, and as such, this Court should authorize discovery on this claim.

**CLAIM TWENTY**

**PETITIONER IS ENTITLED TO RELIEF BASED UPON THE CUMULATIVE IMPACT OF THE CONSTITUTIONAL VIOLATIONS DESCRIBED IN THIS *MOTION*.**

Each of the claims of constitutional error in his Petition is independently prejudicial and requires relief from his convictions and/or sentences. Nevertheless, Petitioner maintains that this Court must also consider the cumulative impact of the errors raised in the motion. In response to the cumulative error point, the Government has alleged that cumulative error is "without any legal basis." Opp. 182. The Government is wrong. While it is true that some Eighth Circuit cases reject cumulative error as a basis for relief (Opp. 182), Petitioner has cited both United States Supreme Court cases and Eighth Circuit cases that embrace it. Pet. 175-76. The Government has not addressed these cases in its Opposition. To the extent that the cases are in conflict, of course, Supreme Court decisions trump Eighth Circuit decisions. Petitioner maintains that cumulative error is a valid legal principle and this Court must undertake a cumulative error analysis.

73

## CONCLUSION

For all of the above reasons, for those reasons set forth in the prior pleadings in this case, and based upon the entire record herein, Petitioner requests that the Court grant the relief sought in the Supplemented § 2255 Motion.

Respectfully Submitted,

/s/ Michael Wiseman

Michael Wiseman
Shawn Nolan
Timothy Kane
Federal Community Defender
Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
Phone: 215-928-0520
Fax: 215-928-0826
michael_wiseman@fd.org

Counsel for Petitioner, Dustin Lee Honken

Dated:      August 5, 2011
            Philadelphia, Pennsylvania

74

**CERTIFICATE OF SERVICE**

I, Michael Wiseman, hereby certify that on this 5th day of August 2011 I served the foregoing on the following person by ECF filing and by placing two copies in the United States Mail, postage prepaid, to the following:

C.J. Williams, Esq.
Assistant United States Attorney
United States Attorney's Office
Northern District of Iowa
401 First Street, S.E.
Hach Building, Suite 400
Cedar Rapids, IA 52401-1825

/s/ Michael Wiseman

_____
Michael Wiseman