

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT

OF IOWA

\* \* \* \* \* \* \* \* \*

| | |
|---|---|
| UNITED STATES OF | \* |
| AMERICA, | \* Case No. |
| Plaintiff | \* CID-3074-LRR |
| vs. | \* CAPITAL 2255 |
| DUSTIN LEE | \* PROCEEDINGS |
| HONKEN, | \* |
| Defendant | \* |

\* \* \* \* \* \* \* \* \*

DEPOSITION OF

JOHN F. WARREN, III, PA-C, PH.D.

October 3, 2011



COPY

Any reproduction of this transcript
is prohibited without authorization
by the certifying agency.



Sargent's Court Reporting Service, Inc.
(814) 536-8908

Case 3:10-cv-03074-LTS-KEM    Document 67    Filed 11/02/11    Page 1 of 191

DEPOSITION

OF

JOHN F. WARREN, III, PA-C, PH.D.,
taken on behalf of the Defendant
herein, pursuant to the Rules of
Civil Procedure, taken before me, the
undersigned, Leslie Blake, a Court
Reporter and Notary Public in and for
the State of North Carolina, at the
United States Attorney's Office,
Middle District of North Carolina,
101 South Edgewood Street, P.O. Box
1858, Greensboro, North Carolina, on
Monday, October 3, 2011, beginning at
12:16 p.m.

Case 3:10-cv-03074-LTS-KEM    Document 67    Filed 11/02/11    Page 2 of 191

A P P E A R A N C E S

C.J. WILLIAMS, ESQUIRE

United States Attorney's Office for

the Northern District of Iowa

401 First Street, Suite 400

Cedar Rapids, IA   52401

    COUNSEL FOR PLAINTIFF

    (Via Video Conference)


SHAWN NOLAN, ESQUIRE

Capital Habeas Unit, Federal

Community Defender Office for the

Eastern District of Pennsylvania

Curtis Building

601 Walnut Street, Suite 545

Philadelphia, PA   19106

    COUNSEL FOR DEFENDANT


TIM KANE, ESQUIRE

Federal Community Defender Office for

the Eastern District of Pennsylvania

Curtis Building

601 Walnut Street, Suite 545 West

Philadelphia, PA   19106

    (Via Telephone)

Case 3:10-cv-03074-LTS-KEM     Document 67     Filed 11/02/11     Page 3 of 191

                                        4

                        I N D E X

WITNESS: JOHN F. WARREN, III,
         PA-C, PH.D.
EXAMINATION ON QUALIFICATIONS
    By Attorney Nolan            7 -   18
DIRECT EXAMINATION
    By Attorney Nolan           18 -   63
CROSS EXAMINATION
    By Attorney Williams        63 - 178
REDIRECT EXAMINATION
    By Attorney Nolan          178 - 189
CERTIFICATE                          190

Case 3:10-cv-03074-LTS-KEM    Document 67    Filed 11/02/11    Page 4 of 191

EXHIBIT PAGE

| NUMBER | DESCRIPTION | PAGE IDENTIFIED |
|---|---|---|
| | NONE OFFERED | |

Sargent's Court Reporting Service, Inc.
(814) 536-8908

OBJECTION PAGE

| ATTORNEY | PAGE |
|----------|------|
| Williams | 36, 44 |
| Nolan | 75, 158, 165 |

Sargent's Court Reporting Service, Inc.
(814) 536-8908

Case 3:10-cv-03074-LTS-KEM    Document 67    Filed 11/02/11    Page 6 of 191

P R O C E E D I N G S

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

JOHN F. WARREN, III, PA-C, PH.D.,

HAVING FIRST BEEN DULY SWORN,

TESTIFIED AS FOLLOWS:

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

EXAMINATION ON QUALIFICATIONS

BY ATTORNEY NOLAN:

Q.      Dr. Warren, please state your name for the record.

A.      John Frank Warren, III.

Q.      And what is your occupation currently?

A.      I'm a psychologist.

BRIEF INTERRUPTION

ATTORNEY NOLAN:

C.J., this is Tim.

ATTORNEY WILLIAMS:

How are you doing, Tim?

ATTORNEY KANE:

Hi, C.J.

BY ATTORNEY NOLAN:

Q.      And what does your current practice consist of, Dr. Warren?

A.      Well, as a psychologist I'm

Case 3:10-cv-03074-LTS-KEM     Document 67     Filed 11/02/11     Page 7 of 191

employed by John F. Warren and Associates. As a physician assistant, I'm employed by Ardmore Family Practice. And as a psychologist and physician assistant I'm employed by the FMRT Group.

Q. Okay. Describe what you do in your own practice first.

A. John F. Warren and Associates is a psychology practice that's limited to complex medical, clinical and forensic psychological evaluations.

Q. Okay. And the second part of your employment?

A. Ardmore Family Practice is a family practice where I see medical and psychiatric patients from right after birth, since we do OB, all the way to right before death, since we see gero folks.

Q. And when you say you see those kinds of folks, what do you do for them or with them?

A. We treat them for a variety of

medical problems.

Q. Okay. And your third position?

A. The FMRT Group is a group of medical and psychological professionals. I'm the managing member and we conduct --- well, we provide medical and psychological and drug screening services to about 250 law enforcement and public safety agencies in North Carolina from seven different offices. And I supervise the work of seven doctoral level psychologists and six PAs or nurse practitioners.

Q. And when you say law enforcement, what types of law enforcement?

A. City, county, a couple of state agencies, along with a smattering of EMS and fire agencies.

Q. So in other words, police officers. What kind of work do you do with police officers?

A. For their agencies, we conduct

Case 3:10-cv-03074-LTS-KEM    Document 67    Filed 11/02/11    Page 9 of 191

pre-employment medical, psychological, drug screening evaluations. We conduct fitness for duty evaluations when there's been some issue. We provide all sort of off-shooting services. We support peer counseling, peer support team functions. We provide the promotional evaluation services. It just depends on the agency as to what their needs are.

Q.        Okay. And what is your educational background?

A.        Completed high school in Burlington, North Carolina, where I grew up. And I completed my undergraduate degree at Duke University. I completed a Master's degree at the University of North Carolina at Greensboro. I completed my Ph.D. at Duke University. I completed my pre-doctoral internship at Durham County Community, Mental Health. And I completed a postdoctoral internship at Broughton

Hospital, one of the four state hospitals in North Carolina.

I continued my psychology education by participating in the North Carolina Psychological Association's voluntary continuing education credit program until it became mandatory in the late '90s. I participated in and completed the Winston-Salem Police Academy in 1987. I went to the University of Virginia Institute of Law, Psychiatry and Public Policy in 1988 and completed their forensic mental health evaluation program.

In 1998, I returned to undergraduate school and completed pre-medical curricula. In 2002, I matriculated into the medical training program at East Carolina University and completed a three-year program in physician assistant studies. And since that time I've continued my education in Category I continuing medical education and

psychological education to maintain my licenses in medicine and in psychology.

Q. And what's your Ph.D. in?

A. Counseling psychology.

Q. Okay. And you said that in 2002 you kind of embarked on some new educational areas. And what brought that on?

A. I decided to expand my education by picking up more medical undergraduate work. And then after that was completed, I determined to pursue the physician assistant training program since it was a nice complement to my doctorate already. And I guess what brought that on was just wanting to learn more about medication, psychopharmacology, brain behavior functioning and physiology, physiologic aspects of training that, while psychologists in general are exposed to somewhat, they're not very immersed in it, so ---.

Q. And so you're a certified

physician assistant now?

A.      I'm a licensed physician assistant by the Medical Board.  And PAs have a national certification, so I have achieved that certification. I'm a PA-C.  And what that means is that's a national credential that allows me to move from state to state without having to retake different licensing exams.

Q.      Okay.  And how do you use that training and that knowledge in your current work?

A.      Almost daily I use my skill set in both psychology and medicine to inform the type of work I do, whether it be FMRT or Ardmore Family Practice or conducting complex evaluations.

Q.      Okay.  And have you done many forensic evaluations in your career?

A.      Yes.  I think that's fair to say, many.

Q.      Many.  I guess you couldn't give us a number?

A.      No.

Q.      How long have you been working doing forensic evaluations?

A.      Well I did my first ones when I was doing my post-doc because the state hospital I was in did capacity-to-proceed evaluations, as well as mental state at the time of the offense evaluations for criminal cases.

Then when I was recruited to Winston-Salem, North Carolina to join a hospital staff in '81, I was in psychiatry and rehab medicine.  And because of the neuropsych and rehab and psychiatric evaluations that ---we as psychologists were often called into court on civil cases, personal injury and motor-vehicle accident cases.

Then when I went into independent practice in the mid '80s, I was called upon by a District in Superior Courts to conduct family law evaluations as well as criminal law

evaluations. And then certainly after I obtained more certification in the late '80s, and then subsequently went on to become Board certified in forensic psychology, a part of my practice has involved conducting evaluations where there is some medical, legal issue involved. And I probably start up four to six new evaluations a week on a regular basis. Some of them may be one-day evaluations. Some may be months to completion, depending on the type of case and how extensive the case is.

Q.    And have you previously been involved in capital cases other than this one?

A.    Yes.

Q.    How often?

A.    Frequently. I would say I probably am referred between two and four evaluations a month that involve a capital defendant.

Q.    And have you previously been involved in cases that have been

prosecuted federally, in which the prosecution was, at some point, seeking the death penalty in those cases?

A.        Yes.

Q.        And how often have you done ---?

A.        Much less frequently than the state cases since there are much fewer death penalty cases. I would say six or seven cases total in the federal system.

Q.        Okay. I'm showing you what will be marked as an exhibit, which purports to be your résumé. Can you just review that and authenticate that that's an accurate copy of your current résumé?

A.        Yes, it is.

Q.        Have you previously been qualified to testify as a forensic expert in courts of law?

A.        Yes, to the extent that I've been qualified as an expert witness in psychology and in medicine related

to psycho-legal or medical-legal cases.

Q.      Okay.  And you've provided a list of cases over the past four years that you've been involved with?

A.      Yes.

Q.      You provided that to me, I should say?

A.      I believe I did, yes.

Q.      Okay.  I would also ask to show you a copy of a declaration that you provided in this case, if I could show that to you?  Is that an accurate copy of the declaration that you provided to us in this case?

A.      Yes.

Q.      And is that your signature on the last page?

A.      It is.

Q.      And what date did you sign that?

A.      It's dated June 3rd, 2011.

                ATTORNEY NOLAN:

                All right.  I don't have any other questions on

his qualifications at this point. If you'd like to do some Cross on any of that now, it's up to you.

ATTORNEY WILLIAMS:

No, go ahead. I want you to do your entire Direct and then I'll just Cross when we're done. I don't have any doubt that he's qualified as an expert in ---.

ATTORNEY NOLAN:

Okay. All right.

Thank you.

DIRECT EXAMINATION

BY ATTORNEY NOLAN:

Q. All right. Dr. Warren, in the case of Dustin Honken, how did you become involved in this case?

A. You had contacted my office to see if I would be willing to evaluate your client.

Q. Okay. And what did I ask you to do?

A. You indicated that he was in a

post-conviction status, and that you were looking into evidence that could or might have been relevant at his trial and sentencing that had not been presented. And so you asked me to conduct a clinical interview with him. And then subsequent to that, you asked me to specifically administer an MMPI and address issues related to antisocial diagnoses.

Q. Okay. And did we also provide you with background materials?

A. You did. As part of the evaluation, you indicated you would be providing me with both information that was available at the time of his trial, as well as information that you and/or your staff had collected since his trial.

Q. Okay. I'm showing you a list. It says on the top, USA versus Honken, list of information considered by Dr. Warren. Have you seen that list before?

A. I have.

Q.    And does that accurately reflect what was provided to you?

A.    Yes.

Q.    Now, in your declaration --- I'm referring you to paragraph four on page two, you list some items that you reviewed.  Do you see that?

A.    I do.

Q.    All right.  Now, the list that you previously identified has more items of information on it than paragraph four does.  What is the reason for that?

A.    Some of the items on the list you just referenced were not available to me prior to June 3rd when I made the declaration.

Q.    And so those things have been provided since that time ---

A.    Yes.

Q.    --- is what you're saying? Okay.  All right.  Now you conducted an MMPI, you indicated; correct?

A.    Yes.

Q.    What version of the MMPI did

you conduct?

A.      I conducted the current version of the MMPI, which is called the 2-RF.

Q.      Okay. We'll come back to that in a few minutes. And did you also speak to another member of our legal team with respect to background investigation and things of that nature?

A.      Yes, your mitigation specialist, Jesse Johnson.

Q.      All right. Now, I'll be asking you at various times about your opinions. Will all of your opinions be rendered to a reasonable degree of medical and psychological certainty?

A.      Yes, unless I indicate otherwise.

Q.      All right. Thank you. Now let's talk about the diagnoses that are contained within your declaration with regard to Mr. Honken. There are basically three diagnoses; is that

fair to say?

A. Yes.

Q. And what are they?

A. Well, the generalized anxiety disorder is one. And then I also mentioned anxiety disorder NOS'. The reason I included that was because there was some features of obsessive-compulsive anxiety disorder that I thought superimposed the generalized anxiety.

Q. Okay. What does the NOS stand for?

A. Not otherwise specified.

Q. What does that mean in psychological terms?

A. It means that it doesn't really fit into the clear criteria set that's promulgated by the current diagnostic manual, which is the DSM IV-TR, the Diagnostic and Statistical Manual IV-TR, which stands for text revision.

Q. Okay. Is that a document that is --- or a book, rather, that is

typically relied upon in the field of forensic psychology?

A.     Yes, but more broadly it's the diagnostic manual that's relied upon for all mental health practitioners for making mental health diagnoses.

Q.     And is that a text that you're familiar with?

A.     Yes.

Q.     Okay.  Now I'd like to take you to some of what you discovered by reviewing documents and in your evaluation of Mr. Honken regarding his childhood.  In your declaration you describe family dysfunction.  And I'd just like you to expand on that a little bit.  What is that based on and what do your findings show?

A.     Well, I described dysfunction to represent a family that had significant numbers of social and behavioral and mental health issues. That's what I meant by the dysfunction.  And some of the specific things that I was referring

to revolved around the way Mr. Honken was reared and his exposure to his father and mother, and to a lesser extent his siblings.

Q. Let's start with his father, then. What's his father's name? What was his father's name?

A. James or Jim Honken.

Q. Okay. And what specifically about his father is relevant to Mr. Honken's upbringing?

A. Well, the most pervasive thing about his father that came through over time was his very severe alcohol abuse. But it wasn't just an alcohol abuse problem, but rather how that led to behavioral problems that the children were exposed to and your client was exposed to, primarily the emotional volatility, the aggressive language, the threats of aggression, the promulgation of an antisocial lifestyle involving theft and fraud, and the exposure of the children to some vicarious violence, both in

terms of Mr. Jim Honken's behavior toward his wife, your client's mother, up until their separation when your client was about eight, but also his behavior and threats of aggression and violence to other family members, as well as to family pets.

Q.    Now, talk about that.  What is this 25-cent solution that you've heard about?

A.    The 25-cent solution was mentioned by Mr. Dustin Honken's older brother, Jeff Honken, as something that was repetitively mentioned growing up when their father was referring to an animal, a pet that he did not want any longer or that had become sick or injured. And it specifically referred to, according to Mr. Jeff Honken, the use of a bullet, a 25-cent bullet, to solve the problem of the animal or the problem that Mr. Jim Honken perceived of the animal.

Q.      And what kind of effect would that have psychologically on the makeup of the child growing up?

A.      Well, children already see parents as pretty powerful and omnipotent.  But when there are threats of violence, when there's emotional volatility and when there are actual, you know, animals that either disappear or the child hears about the 25-cent solution or even sees an animal being put down.  It's a very intense effect on a child.  And again, it depends on the age of the child and their understanding of the situation.

But it's going to put the child in mind that this parent is even more powerful and more in control and likely more scary and more to be obeyed and more to be identified with in order not to run afoul of the parent, so that the child ends up --- particularly male children --- becoming like the parent

Case 3:10-cv-03074-LTS-KEM   Document 67   Filed 11/02/11   Page 26 of 191

or emulating the parent as being self-contained and strong and in control as a way of not going against the more all-powerful, aggressive, violent parent.

Q. In your declaration, you talk about James Honken, Mr. Honken's father, as being abusive. What did you mean by that?

A. I meant abuse in terms of the general tenor of the way he interacted with the family. His actual abuse of their mother, the abuse that came across in terms of both neglect of proper parenting but also, more importantly, the emotional abuse that comes from things like the 25-cent rule and threatening to flush a child down a toilet or talking about having, quote, capped, end quote, other people, in front of the children. That, you know, essentially creates this projection to the children that, I'm in charge. I'll take care of anybody who runs

afoul of me. I will use aggressive means to solve what I think are problems. That's pretty extreme abuse.

Q. All right. Let's talk about Mr. Honken's mother for a minute, Marvea. What was the home situation after Mr. Honken's mother and father were divorced? What was Mr. Dustin Honken's home situation at that point?

A. Mr. Honken went to live with his mother and within a year or so, she had remarried. So it was mother and stepfather. And he was eight or so at the time, according to the majority of the records. And the home situation was, at least by the reports primarily of his younger sister, but also somewhat of his older brother, that their mother was very much engaged with her new husband to the detriment of the children, that while the children did live with her and her new husband,

there was not a lot of guidance. There was not a lot of time spent with the children. There were not a lot of amenities for the children. The mother and stepfather had the only air conditioner and the only television of the home in their room. And each of the children --- because Mr. Dustin Honken is the middle of the three surviving children, the middle child, each of the children experienced not only the divorce, but the new primary living situation with the mother and stepfather, and also the visitation situation with their abusive father differently, consistent with how old they were.

Dustin Honken was described by his siblings as --- by being the middle child, kind of falling through the cracks between his younger sister, Alyssa, the only girl, and being the youngest child and the only girl, getting a bit more attention, and his older brother, Jeff, who by

virtue of his age had already --- not completely individuated or separated from the family, but had more of a young teen and mid-teen peer group and had his own life.

So your client ended up being kind of caught in the middle in a situation that was not ideal for any of the children due to the mother's emotional investment with her new husband, and in some ways, neglect of parental responsibility of the children, particularly around school issues.

Q.     Okay. Well, let's back up a little bit. Prior to the divorce, when Dustin was living with both of his parents, was he cared for at that point in a way that you would describe as healthy and proper?

A.     Well, being cared for involves a lot of parenting behaviors. And there were some parenting behaviors that were obviously adequate. He survived. He lived. But on the

other extreme, there were many parenting behaviors that were very inadequate and risk-promoting, even traumatic, such as the vicarious violence, the threats of violence, the mother's passivity related to the father, no one really able to stand up for the children, and the exposure to Father's schemes and frauds and generally what we would think of as not good parenting behaviors.

Q.      Okay.  Now, let's move forward.  After the divorce, were there times when Dustin Honken spent time with his father?

A.      There were, according to records.  Every other or every third weekend, Dustin and sometimes all the children would visit with their father, who also remarried.  And these visits were, in many ways, more of the same in terms of Father's alcoholism and bad behaviors.  And that appears to be pretty well documented by Carol Honken's

declaration in terms of how she described how her husband, James Honken, was not an adequate parent to his children at the time of their marriage and during the time she knew the children.

Q. All right. So what is the psychological effect of being subject to and witnessing the abuse that has been described in the Honken home on a child?

A. Well, a lot of it depends on the child and the child's age and stage of development. I think your client, by being the middle child, and by being a male child and by being the age that he was at the time of separation, was placed at a pretty high risk for trying to cope with the dysfunctional family in the way that it appears that he ended up coping. In other words, he minimized and tried to cover his anxiety. He appeared to identify more with the aggressor, a common psychological

Case 3:10-cv-03074-LTS-KEM    Document 67    Filed 11/02/11    Page 32 of 191

dynamic where a parent is seen as too threatening to cross, so you end up emulating the parent.

Q. And when you say that he was doing that, which parent was that?

A. The father, the one who had the control --- and emulation in a way of being strong, not showing weakness, not being vulnerable because, after all, if a pet can be put down for being sick, you know what would happen to --- pets for children are considered family members. And what would happen to me, the child, if I'm vulnerable or not what Dad wants? So essentially learning how to be stoic, defensive, not whining, not admitting problems, holding things inside, and yet, at the same time, simultaneously developing as a very alert and aroused child who looks for the next flare-up of the father or who looks for the next bad thing to happen. So on the one hand, an anxiety-prone

individual who is expecting and worried about the next thing existing within the context of a stoic individual who dare not show any vulnerability.

Q. And how about the psychological effect of the neglect and abandonment that you described a bit in terms of the mother's involvement with Mr. Honken?

A. Yes. I think if you just look at the way the story evolves, Mother being so involved with the new husband and to the lack of involvement with your client, it was only bound to reinforce not his conscious decision and insight thinking this through, but it was bound to reinforce the experience of the child that, I need to take care of myself because if I show weakness, I'm vulnerable to Dad, and I don't get what I need in terms of support and nurturing from Mom, so I'm just going to say everything's fine. I'm

Case 3:10-cv-03074-LTS-KEM    Document 67    Filed 11/02/11    Page 34 of 191

going to hold it together.

And again, that's not a conscious decision on the part of an eight or ten-year-old. It's just how they learn that, well, my needs aren't met in these other ways, this is the way I get by. It's almost a behavioral conditioning, to be careful and stoic and not confrontational with Dad, and to not depend on anything, not to expect any warmth or nurturance from Mom.

Q. Okay. So these that you've described, these kinds of psychological effects of the abuse and neglect and abandonment, are they things that help explain who Dustin Honken became as an adult?

A. I think so. It's very clear that the experiences children have at different ages and stages do affect the way they come to think of themselves and think of the way that they interact in the world and the way they see the world, their

Case 3:10-cv-03074-LTS-KEM    Document 67    Filed 11/02/11    Page 35 of 191

worldview, if you will. So I think they do help give the context for your client's later behaviors.

Q. And in your experience in doing capital work, are these the types of things that could be presented to a jury in a capital case?

A. Yes. These are things that are typically presented to juries and found to be necessary to help, again, put the Defendant in context with their entire life situation, as opposed to simply focusing on a particular crime.

ATTORNEY WILLIAMS:

Let me pose an objection to the last part of his answer. He's not qualified to give an opinion regarding what is or what is not effective mitigation evidence. It's fine for him to say --- and so the record is clear, I'm not objecting to

Case 3:10-cv-03074-LTS-KEM    Document 67    Filed 11/02/11    Page 36 of 191

the first part of his answer where he indicated, based on his experience, he's seen this type of evidence presented before. I object to the last part of it where he gives an opinion regarding his view of whether it's good or bad or ugly.

ATTORNEY NOLAN:

All right. Understood.

BY ATTORNEY NOLAN:

Q. All right. Doctor, let's move to family history of mental illness. In your review of records and declarations by various family members, have you found a history mental illness in the family?

A. Yes, I have.

Q. And let's go through each of the individuals, starting with Marvea, who is Mr. Honken's mother. What is her history?

A. Well, Marvea, while she was prone to use alcohol, was not

represented by others as having an alcohol problem to any significant extent. However, she has had issues with anxiety and depression. And this appears corroborated by some of the collateral documents that were developed by your office.

Q. Okay. And how about Mr. Honken's maternal grandmother, whose name was Opal?

A. As I recall, the documents indicated that Opal and her husband both had some alcohol issues, but Opal also had anxiety and depression.

Q. And Mr. Honken's sister, Alyssa?

A. Alyssa, the youngest surviving child of the family, reported that she has had problems with mood, depression, and I believe, anxiety as well.

Q. Okay. And Mr. Honken's maternal uncle, whose name is Tim?

A. Again, on Mother's side of the family, alcohol and depression seem

pretty well represented. And Uncle Tim reported that he had had those kinds of problems, as did an aunt, Laurel.

Q. Okay. And have you also seen indications about cousins on the mother's side as well?

A. Yes. The issue of affective disorder or mood disorder, kind of interchangeable words really, that refer to depression or bipolar or manic-depression, is well represented on that maternal side of the family. I think the aunt, Laurel, described herself as having manic-depressive symptoms. And that's really just an older phrase for what is now considered bipolar I disorder.

Q. And you've already described the father's alcoholism and difficulties. So what are the ramifications of this type of a family history of mental illness for a person like Dustin?

A. Well, depression and many

anxiety disorders, and certainly substance abuse, all have some biologic and genetic markers. That doesn't mean that everybody who has a depressed parent will have a depressive illness. But if you have a first-degree biological relative with alcoholism or depression or certain other forms of mental illness, you're much more likely to have symptoms and problems with that particular disorder than persons who do not have a genetic or biological predisposition.

Q. Okay. So when you say markers, you're talking, I guess, red flags. If you had been involved in this case early on prior to trial and had seen this family history of mental illness, what would you have recommended that the lawyers do at that point?

A. Well, I typically don't make recommendations to lawyers, but I would have said, I would like to

explore more with Mr. Honken about his prior subjective experiences growing up, the interactions within the family, how he perceived himself as handling those. And I would certainly have dug more deeply into issues related to mood disorders like depression and bipolar disorder, as well as anxiety disorders, given that they're so well represented in his first-degree and second-degree biological relatives.

I would have also been quite tuned in to the substance abuse proclivity because of both the genetic factor, but also because of the whole nurture factor, being exposed to substance abuse, and how Mr. Honken subsequently did end up experiencing substance abuse problems. So I guess the shortest answer is I would have looked very carefully into the role of depression and mood disorders, as well as anxiety disorders, along with the

substance abuse disorders of your client at the time.

Q.    And does the DSM talk about depression as a genetic risk factor for any disorders?

A.    I'm not sure I understand your question.

Q.    Okay. You've diagnosed Mr. Honken with an anxiety disorder. Does the history of depression in the family support that?

A.    I believe it does. Depression and anxiety tend to ride together in many ways, although they manifest themselves in different signs and symptoms. And people with family histories of substance abuse and depression and anxiety are, again, more prone than average to have problems with depression, substance abuse and anxiety. I ended up diagnosing Mr. Honken as having an anxiety disorder because it seemed to me that both in terms of what he experienced as a child, the way

others described him as a child and young adult, and then the way he went on to develop such extreme substance abuse difficulties, along with his medical status with his heart arrhythmia, all came together in understanding him as an anxious fellow, very wary, very tuned into potential for increased anxiety and stress, who presented himself as somewhat stoic and together and defensive and, quote, no problems here, end quote, that he had presented himself as earlier in earlier evaluations.

Q.     Okay.  A family history like we've seen in Mr. Honken's family, is this something that would explain who he developed to be or something that could be of assistance to you as an expert in explaining who he developed to be as an adult?

A.     Yes.  It provides the context for understanding him and understanding how he came to see

himself and his interactions with his friends and peers and the world.

Q. And is this something that you've seen in other capital cases, having been presented to a capital jury or a fact finding?

A. Yes, it is. In fact, when it's there, it's something that needs to be presented to help understand a defendant.

ATTORNEY WILLIAMS:

I'm going to object again as to his opinion about whether it needs or doesn't need to be presented. That's not an area of his expertise.

ATTORNEY NOLAN:

Okay.

BY ATTORNEY NOLAN:

Q. Now, let's talk specifically about anxiety disorder. How does anxiety disorder affect the person?

A. Well, in general, anxiety is worry. In some ways it's helpful to think of anxiety as worry about

something that is happening or is going to happen, whereas depression is being preoccupied with something that is happening or has happened in the past.

And therefore, with generalized anxiety, Mr. Honken did learn as a child to be very tuned in to and wary, and tried to read and recognize the things going on around him in his child life and then in his adult life that could cause him worry or fear or loss of control. These are all hallmarks of anxiety, worry, fearfulness, loss of control, being unable to keep it together.

So in Mr. Honken's case, we have a pervasive worry and anxiety about the world as he learned it through his nuclear family, and his genetic propensity to anxiety because of anxiety and depression in his biological relatives, and in the way he ended up developing a substance abuse problem in many ways, I

believe, to try to cope with some of his anxiety. But it's all kind of held in place by what --- others initially described him as a well controlled, well behaved, a friendly but not complaining and somewhat stoic teenager and young adult.

So on the one hand, as I said before, we have an I-don't-have-any-problem kind of presentation superimposed on a person who has a lot of anxieties and worries about what is happening and what is going to happen in his life.

Q. All right. And in your declaration, you describe his anxiety disorder as chronic. What do you mean by that?

A. By chronic I mean that it's not something that has come up in response to this litigation or his trial earlier or his legal problems in the '90s, but rather something that developed as a child in the context of that family that became a

longstanding and pervasive part of who he is and how he interacts with the world.

Q. And how does stress typically impact with this disorder?

A. Folks who are anxious notice stressors or challenges. They're tuned in to them and they try to respond to them by managing them, by controlling them, by avoiding them. And then when they can't, they become more overwhelmed with stress.

In other words, in your client's case, he's got some pretty good cognitive skills and some pretty good social interpersonal skills to try to manage stress. And he notices challenges and stressors when they come up, so he works hard to manage and minimize those things so that he's not anxious. But then, of course, if and when he is unable to do that, he's more prone to feel the need to do something else to manage anxiety, which I think is what

contributed to his methamphetamine problem.

Q.    Okay.  Let's come back to that in a moment.  After the time that he was arrested, the first time, what types of stressors were involved in his life then?

A.    Well, like most young adults, he had the financial stressors.  He had the legal stressors on him.  He had stressors related to a girlfriend and a separate female friend.  And depending on what exact time frame, he had situations of where he was going to live and what he was going to be doing.  There were just a number of life challenges.  And I use challenges interchangeably with stressors because challenges are what stress us.  If they're good things, we interpret it as fine and we call that eustress or good stress.  If they are perceived as negative things, we call that distress.

Q.    And can a medical condition

affect anxiety disorder?

A.      Yes.

Q.      And does Mr. Honken have a medical condition that, in your opinion, affected or could have affected his anxiety disorder?

A.      Yes.  In my opinion, his heart arrhythmia did affect his anxiety disorder because he was able to perceive when his heart was beating too fast, called tachycardia, or when it would have a missed beat or a premature beat or a skipped beat.  He has the type of condition where people can feel that and that, in a very simple way, creates kind of a vagal or vasovagal response, which then makes someone more aware of what is happening physiologically with them.  And then that can lead to more anxiety.

Q.      Let's talk a little bit about the time when Mr. Honken was living in Arizona and when his drug use really began.  Describe his drug use

at that point when he was out living in the desert with Tim Cutkomp.

A.    Well, at that point he was engaged in trying to make a very pure form of methamphetamine, whereas earlier in his life, he had seen the bad influence of alcohol on his father. And while he didn't want to appear vulnerable to his father, he also didn't want to be an alcoholic like his father.

So in many ways, he went from being a very limited drinker or drug experimenter to having access to pure methamphetamine. And at some point, he began using methamphetamine, and because it is amphetamine and because of the effects, it made him less anxious. It made him feel more confident, and in those early dosing days, he may well have functioned emotionally at a better level.

But the trouble with amphetamines in general and methamphetamine in particular is that

it is very easy to build a tolerance, and more and more of the drug is required to achieve the same kind of effects. And then you begin getting the negative effects, the toxic effects, the negative psychiatric and behavioral effects of the drug. So he went from trying to be a teetotaler or a limited experimenter to someone who was using meth --- it made him feel better --- and then using too much meth, along with other things that came into play, including alcohol and LSD.

Q. And in your review of the declarations and the other documents that we provided to you, have you seen indications of his change in behavior?

A. Yes. Different persons, but particularly, there was one woman --- I'm blanking on her name now --- but also the Tim Cutkomp, who described him as becoming more erratic, more impulsive, more volatile, more crazy

ideas.  And this was in contrast to the way he had been described before, as a kind of a guy who kept a schedule, who needed to eat and sleep and wake in certain orderly ways, those obsessive-compulsive signs of anxiety, the way he controlled and ordered his life, went out the window with more impulsivity, volatility and insomnia and going for days and then crashing.  And then the behavioral effects, you know, being more hypersexual, being more agitated.  Again, these are common effects of amphetamine use and amphetamine misuse and the psychiatric effects and the physical effects of amphetamines.

Q.      And so those accounts, for example by Tim Cutkomp, are those consistent with your opinion of someone with this type of a disorder in combination with this kind of drug abuse?

A.      Absolutely.  In many ways, Mr.

Honken, like a lot of patients in my clinical experience, they gravitate to the medication or the substance that helps them feel more, quote, normal, end quote, to themselves. Some people gravitate more toward dopamine agonists like alcohol and downers. Others gravitate more toward dopamine antagonists, like amphetamines and cocaine and ADHD drugs, you know, Ritalin and those type drugs, because it helps them feel better therapeutically.

Q.      There's also some indication about when Mr. Honken and Tim Cutkomp were, I guess, holed up in the desert, for want of a better word, that there was some exposure to neurotoxins. Does that impact your opinion in any way?

A.      Yes. It does to the extent that we know from EPA cleanups of meth labs, we know that precursor chemicals and the byproduct chemicals of methamphetamine linger in these

sites. And that's why we spend and have spent, especially in the '90s and early 2000s, lots of money cleaning up meth labs and meth sites, because they are inherently dangerous and toxic because of the chemicals that are both used to create the drug, but also the byproduct chemicals. And we particularly know that, of course, the younger a person is, the more vulnerable the brain is to those kinds of things. So we're particularly concerned about children's exposure to them or adolescents' and young adults' exposure.

Q.      All right. So I guess this combination of the anxiety disorder combined with the drug abuse of methamphetamine, the neurotoxins he was subject to, what kind of structural effect does that have on the brain?

A.      Well, at the time of usage, it's more of a chemical effect than a

structural effect. But with increased usage, you get some dampening effect of neurotransmitter sites. But again, it's mostly on the molecular level in terms of where brain chemicals attach to nerve cells than it is on the larger structural level that you would see on imaging like MRIs.

Q.      You have seen the declaration from Dr. Piasecki; is that right?

A.      Yes.

ATTORNEY NOLAN:

And I can give you the spelling of all these names after, if that's helpful.

BY ATTORNEY NOLAN:

Q.      And Dr. Piasecki talks about the effects of methamphetamine on impulsivity. Is this something that you're familiar with as well?

A.      Yes. It's what I described.

Q.      Yeah. Now, Dr. Warren, you conducted an MMPI on Mr. Honken at our request; is that right?

A.    I did.  I administered that to him in a standardized fashion and I had him complete that while I proctored it.

Q.    Now, you have since seen a report by the government's expert, Dr. Grody.  Did you see that report?

A.    Yes.

Q.    And did he also administer an MMPI?

A.    He did.  He administered an older version of the test, but he administered an MMPI.

Q.    And so what's the version of the test that you gave?  What is that?

A.    It's called the MMPI II-RF.

Q.    And how new is that?

A.    It was introduced about three and a half, four years ago, you know, consistent with standards of educational and psychological measurement.  It's the current version of the test.

Q.    Okay.  And what's the



difference between that version and the older version that Dr. Grody administered?

A.    Well, there's kind of more of a subjective difference and an objective difference.  The subjective difference is that the older version contained 200 additional items that were neither scored on any scale or relevant, really, to any known mental disorder.  The more objective piece is, however, that the scoring of the RF version, the newer version, is standardized.  The representation of the scales is by standardized T-scores as opposed to the older MMPI was more scale-specific adjusted T-scores.

In addition, and related to that standardization of the newer one, the newer one does not add in extra points for a validity scale called the K scale.  It doesn't elevate certain scores.  In other words, the old test said, well, if

Case 3:10-cv-03074-LTS-KEM    Document 67    Filed 11/02/11    Page 57 of 191

58

somebody's really defensive and they score high on this defensive scale, you must then add in half of that value to this scale and whole to this scale and .2 to this scale to make up for how they're being defensive. The newer test doesn't do that, does not recognize that as a method.

Q. Okay. You have also indicated, I think, in your declaration and to me that you would not diagnose Mr. Honken with antisocial personality disorder. And can you explain that?

A. Sure. You know, Mr. Honken, while he has done and engaged in some antisocial behavior, he doesn't meet the criteria for antisocial personality disorder. Specifically, there's no evidence of a conduct disorder when he was younger, before the age of 15. There's also the kinds of qualitative things that we see in terms of superficiality or glibness. Those kinds of things are

missing subjectively and qualitatively. He has had friendships and peer relationships and significant relationships with others.

Q. And how does that affect whether or not someone is diagnosed with antisocial personality disorder, whether they maintain friendship and things like that?

A. Well, it's not so well represented in the DSM IV-TR, but in terms of the general psychiatric understanding of antisocial personality, the quality of interpersonal relationships is an important factor. Unfortunately, with TR, it almost comes down to whether or not a person has had a behavioral history that meets the criteria. And the bottom line for your client is he just doesn't meet the criteria for having had conduct disorder. So therefore, he doesn't meet the criteria for antisocial

personality. But beyond that, he has had qualitatively significant relationships in his life versus being predatory or glib or superficial.

Q. And having those consistent relationships, is that inconsistent with an antisocial personality disorder?

A. It is.

Q. And the results of the MMPI that you administered, are they consistent with your opinion that he does not have antisocial personality disorder?

A. They are. Scales that are designed to look at both --- well, not both, but elements such as thrill-seeking, attention-seeking, behavioral control, behavioral discontrol, appreciation of rules, violations of rules, scales and items that are designed to look into that and load for and show an antisocial scale or antisocial behavior were not

elevated to support the antisocial personality disorder.

Again, a personality disorder is something that is longstanding and pervasive, and he doesn't meet the criteria for that. He clearly has had some adult antisocial behavior.

Q. Okay. Just one moment.

OFF RECORD DISCUSSION

BY ATTORNEY NOLAN:

Q. Just a couple more questions, Dr. Warren. The information that you relied on that was provided to you by us, is that information that was available at the time of Mr. Honken's trial or that could have been available at the time of his trial?

A. Yes. It was all information that had happened before and described Mr. Honken's history before the time of the trial that could have been available. In other words, other than my interview and testing with him and some evaluations that have happened since then, most all of

the biographical information could have been available, could have been developed.

Q.    And the opinions that you've expressed here today, if you had been hired back at the time of Mr. Honken's trial, are these opinions that you could have rendered at that time as well?

A.    Yes. With the same information, I would have had the same kind of diagnostic and related opinions that we talked about.

Q.    And what is your opinion about Mr. Honken's ability to conform his conduct to the requirements of the law back at the time of these offenses?

A.    Well, my opinion is that due to his mental and substance abuse disorders, that his ability to appreciate and conform would have been impaired, again, to the level that I would have had that opinion at that time related to, you know, a

Sargent's Court Reporting Service, Inc.
(814) 536-8908

statutory mitigating factor.

Q.      Okay.  I don't have any other questions.

ATTORNEY WILLIAMS:

Leslie, how are you doing?  Are you okay?

OFF RECORD DISCUSSION

ATTORNEY WILLIAMS:

Okay.  Let's go ahead and go into Cross Examination.

CROSS EXAMINATION

BY ATTORNEY WILLIAMS:

Q.      Good afternoon, Dr. Warren.

A.      Hello.

Q.      I'm C.J. Williams and I represent the United States in this case.  Let me start off just with your background.  You have a Ph.D. in counseling psychology.  And I'm just not familiar with that term.  How does that differ from a Ph.D. in psychology or are there different types of degrees in psychology?

A.      Yes.  There are different types of degrees.  In terms of

applied psychology, clinical, counseling, school and IO are considered the applied areas of psychology, where psychology is a behavioral and a social science as applied to human issues, whether it's diagnosis, evaluation, treatment or intervention. And then there are other areas of psychology like experimental, developmental, cognitive --- there are probably --- sensory, special areas that you can get Ph.D.s in that are not applied, that are more research.

Among the applied areas, clinical and counseling are closely related in that they deal with the diagnosis and treatment of human problems. Traditionally, clinical has grown up to be more the mental disorder piece of psychology, where counseling psychology has grown up to be more the life phase, life change, vocational, interpersonal part of psychology.

Q.      Tell me about this University of Virginia Institute of Law, Psychiatry and Public Policy.  You indicated on your CV that you went through a forensic training certificate program.  What is that?

A.      That's a program for Virginia natives and other people on a per-appointment basis.  If you have the requisite coursework and seminar work, you can go through that training program, which involves ten days on campus in the first quarter of the program and then two days on campus for three subsequent follow ups, whereas during that time, you are evaluating Virginia consumers who have been charged with different crimes related to their capacity to proceed or mental state at the time of the offense.

And then you submit your work product or work samples to the faculty.  And back when I did it, it required some skill-based testing,

knowledge-based testing, definitions, psycho-legal, medical-legal definitions. And then at the end of the year, if your supervisors and the faculty agree, then you are awarded this certificate of completion.

Q. Okay. And did you receive that type of certificate?

A. Yes.

Q. Okay. You're Board Certified in what area, sir?

A. Forensic psychology.

Q. And when did you become Board Certified?

A. 2001 or 2002. I'm not sure which year it was. It was right around there.

Q. And it sounds like, and in looking at your résumé, you sort of branched out into a couple other areas that are not common for psychologists, you know, like your law enforcement testing and then the physician assistant stuff. So I'm trying to get a handle on --- what

percentage of your time do you spend treating patients as a psychologist versus maybe some of your other disciplines?

A.    Since going back to school full time in 2002, all of my treatment time has been either in the family practice clinic or supervising treatment of staff members as opposed to doing treatment myself.  Most of my psychology time has been spent conducting evaluation as opposed to doing treatment.

Q.    And you're conducting evaluations in a forensic-type setting, then?

A.    Generally, yes.  Arguably, doing pre-employment evaluations of police officers or fitness-for-duty evaluations of police officers is a forensic psychological function.  And it's not really an unusual function for psychologists.  There's a large cohort of police psychologists in the nation.  And I'm a member of the

psychological services section of the IACP, which is the big law enforcement agency in the world. And we're involved in both working for agencies directly or working for agencies independently, like FMRT works for a bunch of agencies as opposed to me working for like the New York Police Department. But those are psychological functions. And because there is some personnel law or administrative law, hiring law, arguably, those would be forensic, generally, but not criminal forensic.

Q. Okay. Counsel asked you some questions about having previously been involved on criminal cases. What percentage of your time would you say you work as a forensic psychologist in criminal cases?

A. I would say about a third to a half of my John F. Warren and Associates evaluation practice involves some type of criminal

proceeding. It can range from domestic violence to assessment of sex offenders, to assessment of capital defendants.

Q. And how often has the government had you testify as a witness on behalf of the United States or any government?

A. Rarely. Most of my practice is in North Carolina. And while I have testified 18 to 20 times for the state in criminal matters, most often, since I don't work for the state hospital that does all the pre-trial evaluations, the state has defendants evaluated at the state hospital pre-trial unit. The defense, pursuant to OCI or Ake (phonetic), has the ability to have defendants evaluated by an expert of their choosing. And since I work in private practice, I would, more often than not, get referred a defendant to evaluate by his or her attorney. And then I do those evaluations and maybe

Case 3:10-cv-03074-LTS-KEM    Document 67    Filed 11/02/11    Page 69 of 191

in one or two out of five evaluations, there might be something that would lead to some testimony.

Q. How about in the capital cases? Have you been called as a witness on behalf of any government entity in any of the capital cases?

A. No. Again, as you know, mental state at the time of the offense, as well as mitigating factors, would be things that the defense would really be ethically required --- at least under North Carolina case law --- legally to present. So the prosecution or the government is not interested in presenting evidence about those things unless they are in rebuttal. And then, of course, the experts that the State of North Carolina uses is the team at the now Central State Hospital, pre-trial forensic unit. It used to be Dorothea Dix Hospital.

Q. You indicated on Direct Examination that you had testified, I

can't remember how many times on a capital case where the United States was a party?

A.      I don't think so.  I think I was asked had I conducted evaluations in capital cases.  And I said I thought it was about eight times. I've not testified in any of those cases prior to today.

Q.      I'm sorry.  Let's talk about the --- have you performed evaluations in any capital cases where the United States was a party?

A.      Yes.

Q.      Okay.  And how many?

A.      Again, to the best of my memory, seven or eight.

Q.      Okay.  And on each of those, you were hired by the defense?

A.      Or appointed by the Court at the request of the defense, yes, because they were all indigent.

Q.      Now, going back to this University of Virginia Institute of Law, Psychiatry and Public Policy,

did you receive any legal training in that program?

A. I would have to say no, because it was a forensic or medical-legal, psycho-legal training. The faculty does include law professors, and as forensic mental health practitioners, we were required to know and understand Virginia Commonwealth law related to those things, as well as federal law related to mental health issues in criminal proceedings.

Q. Have you received any training regarding the presentation of mitigation in a capital case?

A. Yes.

Q. And describe that for me, please.

A. Well, the American Academy of Forensic Psychology, which is the educational component of the American Board of Forensic Psychology, regularly, at least twice a year, presents seminars to forensic

clinicians as well as people looking to become forensic clinicians. And one of those is dealing with evaluations for sentencing proceedings on capital cases. And I've been to at least two of those over the years and probably sat in the back of several others since I know one of the presenters who has done them.

I've also been to seminars in North Carolina that were developed for attorneys for capital defendants, where I was part of a panel in a seminar, but then also pursuant to that was able to sit in on other seminars where capital defendant attorneys were being trained on the importance of obtaining social, medical, psychological and mental health background information on their clients, and how to get records and how to develop those kinds of things in terms of a legal theme.

Q. Okay. Now in this case

involving Dustin Honken, have you undertaken any evaluation to determine what type of background investigation the lawyers who represented Dustin Honken at that time did?

A. No, other than just observation and a number of the declarations that people said, I was never asked about this, or I was asked about this but I was never asked to testify about it. And I would have been willing to testify. But no, I've not done an evaluation of that and I'm not in a position to render a professional opinion about a legal service by any means.

Q. Now, Doctor, you'd gone over with Counsel a list of materials you reviewed. In your declaration, you reference Dr. Dudley's diagnosis. You also reference Dr. Piasecki's records. I didn't see those on the list of information considered by you. Is that because you'd seen

those after the date of your declaration? No, it couldn't be, because you referenced them in your declaration.

ATTORNEY NOLAN:

I guess I'll make an objection. I think they are on this list that we provided to you, Mr. Williams.

ATTORNEY WILLIAMS:

Where at, because I may just be missing them?

ATTORNEY NOLAN:

Dr. Dudley is just past the halfway point, is down from there, under Tim Cutkomp. They're all in alphabetical order, I believe.

BY ATTORNEY WILLIAMS:

Q. Got it. Got it. Okay. I was looking up above where the other doctor reports are. Okay. That's fine. I figured there was something. Now the information that was provided to you on this list, Doctor, was that

stuff that you had asked for or was that stuff that Defense Counsel has provided to you?

A.    It was information that was provided to me that had been developed by them or their team.

Q.    Okay.  Were there any additional materials that, on your own, you decided you would like to take a look at and ask for?

A.    No.

Q.    Counsel had talked to you about the fact that in your declaration, the list of documents reviewed is not as comprehensive as the list that was provided as part of the submission.  And you explained that that was because some of that stuff had not been provided to you at the time of the declaration.  Do you remember that testimony?

A.    Yes.

Q.    Okay.  Was there anything about that additional information you received after the date of your

declaration that changed, in any way, your opinion as reflected in your declaration?

A.      Changed to the extent of strengthened my opinion, because there were more contextual examples of especially family issues and perceptions of Defendant's father, James Honken, but not changed in terms of going the other way or saying that my opinions in the declaration are no longer accurate.

Q.      Right.  It didn't change your diagnosis?

A.      No.

Q.      All right.  You interviewed Dustin Honken two times; is that correct?

A.      Yes.

Q.      On October 29th, 2010 and on December 7th, 2010?

A.      Yes.

Q.      All right.  Now Counsel has provided me your information that you created here, including the raw data

78

from the administration of the MMPI, and also some notes that I see. And what I'm trying to figure out and make a little bit of sense of the note that says --- I have one note that's dated 10/29 of 2010 that takes up half a page there. Do you have that in front of you, sir?

A. Yes.

Q. Okay. And is that a two-page note then? Because there's a diagram or some family tree on the second page.

A. You know, I don't have an independent memory about whether that second page that also looks like a legal pad was from that date or from the subsequent date, so I don't know.

Q. Okay. I've noticed the second page is not dated. Can you do me a favor? Because you write like I do --- which is not a criticism, it's just an observation. I can't read your writing very well. Can you read to me what is written on that first

Case 3:10-cv-03074-LTS-KEM    Document 67    Filed 11/02/11    Page 78 of 191

page that's dated 10/29/10?

A. Yes. One on one, meaning I met with him individually. IC is my shorthand for informed consent was explained to him, risks and benefits of evaluation. LC is limits of confidentiality. He didn't have any questions about that, stating attorneys ask for things like this.

Q. Okay.

A. And then below that, I learned from him that he had been at the U.S. Penitentiary in Terre Haute for five years, that he had caught drug charges in 1994. He had been in several BOP facilities. He went to trial for murders in 2004. And then I have MMPI II-RF.

Q. Thank you. And then if we could turn to the next page, and it's obviously a diagram that you don't need you to interpret, but there's just some words right below the diagram. I think it says stress between two something --- two women?

A.        Two women fighting over seeing kids and needing money for the kids.

Q.        Okay.  And then what's the --- if you could read the other part right below that, then?

A.        No alcohol or drugs growing up.  Afraid of being like Dad.  Around 24, experimenting with alcohol.  Worked in a printer/ circuit-based industry, met folks smoking --- cannabis, in parentheses, is what they were smoking.  Saw the money was there and money has been my hang-up.

Q.        Okay.  Do you recall having any other notes that you took during your interviews with Dustin Honken?

A.        Well, I think you have a couple of pages from a structured interview that were from him.  It's very, very minimal.  The first page is called Forensic Information Checklist Assessment.  And then the second page is just referral information.  And the third page is a

brief but structured mental status examination.

Q.    I have those.  Thank you.

A.    So that would have been it.

Q.    Okay.  How long did each of the interviews with Dustin Honken take?

A.    I'd have to look back to know for sure, but in excess of three hours each time.  He was a long ways away from Winston-Salem, and arrangements were made to see him and work through for several hours.

Q.    Now, you administered the MMPI at Counsel's request, but you did not administer any other type of psychological test to Dustin Honken?

A.    That's correct.  I did not.

Q.    There are a number of other psychological tests that you can administer to subjects to examine them on things like anxiety, aren't there?

A.    Oh, gosh.  There's a host of psychological tests that could be

administered.

Q.      And why didn't you administer any of those psychological tests to Dustin Honken?

A.      I didn't think they were indicated. Psychological test's for psychologists are important, but not the ends-all and means-all. More is not necessarily better. In Mr. Honken's case, one of the things I appreciated about him early on or about his case early on was that there was going to be a lot of information, as on the list of information that we talked about earlier about him. So there's going to be a lot of biographical information from parties that had seen him or knew him or graded him in school or evaluated him for a pre-sentence investigative report or any of those things so ---.

        In addition to that, when I first met Mr. Honken, he was pretty closed and stoic and careful. And so

I ended up spending a lot of time on both meetings with him really just kind of sitting back from the table, not in the note-taking, checking off things, testing mode, but almost more in a psychiatric mode, knowing that I had a lot of other information that I could then compare what I was hearing from him to that was outside of the interview realm, but rather in the interview room just trying to get more of a qualitative idea of who he was and how he saw himself and how he was in the past and how he interpreted his life and how he saw things. So that's what I did. And I found, once I kind of put down the legal pad and stopped taking notes, that he became more relaxed during the latter half of the first visit, and then certainly was more relaxed during the latter two-thirds of the second visit.

So I knew there was a lot of background material already. I

didn't feel there was any clinical or medical need for additional testing. And if there was, if I'd have seen some evidence of a big old honking attention/concentration problem, I might have done that. If I'd seen some evidence of some brain behavior issue, I would have pursued that with neuropsych testing. But I just didn't feel the need to do a whole battery of tests on someone who was presenting the way that he was and who had a pretty well documented paper trail history in terms of grades in school and work and people that knew him.

Q. Let's talk about those sources of documents and information you had. You were asked a question about whether that information, for example, about his biographical information was available to Counsel back in 2004. And then there were questions that were worded --- the state asked you whether it could have

been available to Counsel back in 2004. And to the second reworded question you said yes, it could have been available. I just want to clarify with you. You agree with me that none of the declarations that are listed on the information that you relied on were actually available to Counsel back in 2004; correct?

A. I do agree.

Q. Okay. And for you to state that it could have been available, we have to presume, and it may be a legitimate presumption, it may not be, but we have to presume that these people would have made these same statements if questioned back by Counsel during 2004; right?

A. That's correct, if they'd been consistent with their statements and their declaration and asked earlier, that's based upon that presumption. And as I clarified on Direct, a couple of the declarants said, Counsel did ask me about these things

back then, but I was not asked to testify. So we kind of have three types of information, one, declarations that said I talked to Counsel about this, but they didn't ask me to testify and present it. Two, declarations that don't say anything about that, that clearly weren't available to Counsel but might have presumptively been the same if it had been developed. And then three would be all-new information, and I don't think there was any all-new information other than the doctor's evaluations. None of the other declarants, other than the professional ones, seem to have had any updated information about Dustin Honken since his conviction.

Q. The MMPI RF that you administered, that was available, at least from the front of the document I have here --- that was copyrighted in 2008?

A. Yes. I believe that's

correct.

Q.    And so that would have been the first year that this would have come out then?

A.    Yes.

Q.    All right.  So no expert back in 2004 could have administered the MMPI RF; right?

A.    Correct.

Q.    All right.  And you're also familiar with the practice effect?

A.    I am familiar with that term, yes.

Q.    Okay.  And a practice effect means that if you subject a person to a psychological testing and you present the same type of test to that same individual --- or the same test, frankly, to that individual fairly close in time to when that individual has already taken that same test, it can artificially alter the scoring because of the familiarity with the testing.  Is that a fair description of the practice effect?

A.        I think that's an accurate description.   But the practice effect really applies to tests where there's a right or wrong answer versus tests that are subjectively as it applies to me.   So we don't think of practice effect as pertaining to tests like the MMPI and PAI and MCMI, because essentially the person is just asked whether it's true or false or mostly true or mostly false as it applies to me.

It's not the same as remembering something from the Wexler Intelligence Scale where you remember that you were asked about the definition of a particular word or how to do digits backward or how to put together a particular set of blocks.   Those kind of right or wrong things are what you worry about practice effects with.   Personality testing, as long as the test is internally consistent within itself, you're not particularly worried or

concerned about practice effect.

Q. Okay. Among the materials provided to me by Counsel is a memo to the file by you, dated --- and there are two dates of the memo. There's a 11/11/10 and 5/20 of '11. Are you familiar with that memo to the file?

A. I am. I don't have a copy of it in front of me, but if you all have a copy --- if you're going to refer to it, I didn't bring a copy.

Q. I am.

A. Maybe ---.

ATTORNEY NOLAN:

Let me see if we can find it.

A. See if we can find it because I don't have it in the papers that I brought.

ATTORNEY NOLAN:

You know what? I think we do not have that, but why don't you go ahead and ask your question and we'll see?

BY ATTORNEY WILLIAMS:

Q. Okay. Let's go over the dates of the memo, just so I understand it. Like I said before, there's November 11th of 2010, comma, and then they put 2011. I'm just assuming from that that there was kind of a first draft and then you went back and reviewed it or maybe revised it or maybe just confirmed it with your original findings, but you went back on May 20th, 2011, on it?

A. Perhaps.

Q. Sound right?

A. At the top, it probably says, memo to file, name, date of birth, dates of evaluation.

Q. It says Social Security number and then dates of memo.

A. Dates of memo. Okay. So at some point I started the memo on the first date and completed the memo on the second date. And in between, I don't have an independent memory, but I can assure you that in between I

would have been looking at some of the list of items that had been sent to me related to Mr. Honken.

Q. Understood. Now, on the third page of this internal memo --- or I'm sorry, memo to the file, you have a section headed Clinical Impressions. And then you have the following DSM IV-TR diagnoses are offered. And under Axis I you have adult antisocial behavior, comma, history; Axis II you have no diagnosis; Axis III you have heart disease; Axis IV you have legal problems, severe; Axis V, current GAF was 81. Does that sound familiar?

A. Yes.

Q. Okay. There's nothing in this diagnosis here that talks about anxiety, an anxiety disorder or generalized anxiety disorder. So can you reconcile the fact that you've got a clinical impression that was authored about 30 days before you did your declaration, and you don't have

him diagnosed with generalized anxiety disorder?

A.      Yes, I think I can.  Prior to doing the declaration, there were documents that came in that added to my understanding of Mr. Honken' and probably immediately prior to the May 20th date, there'd been some documents that came in.  And at some point along the way, I ended up determining about his methamphetamine abuse, as well as coming to the understanding of this anxiety problem as I looked back on my meetings with him and compared that to the biographical information that had become available to and about him.

Q.      Okay.  So you're saying that sometime between the date of this memo, May 23rd, 2011, and June 3rd, 2011, which is the date where you signed the declaration, you changed your diagnosis from Axis I, diagnosis of adult antisocial behavior to generalized anxiety disorder?

A.      Well, the diagnosis evolved to that, yes.  That's what I'm saying.

Q.      Okay.

A.      And I would say ---.

Q.      And do you have --- go ahead.

A.      I would say that, again, because the memo starts on November 11th of 2010, that section that you referenced on diagnostic impressions more likely than not was an artifact of what I saw in him back in November.  And that by the time I got to June 3rd or the declaration with all the other information, the diagnosis had evolved to generalized anxiety.  I didn't change the diagnosis because I still, you know, have testified that he does have adult antisocial behavior.  But I also had added or evolved the generalized anxiety and the anxiety disorder with the obsessive-compulsive features.

Q.      Did you submit billing records to the Federal Public Defenders

Office for your work in this case, sir?

A.     Yes.

Q.     And would that reflect dates on which you performed the work on this case?

A.     Likely, yes, if they were accurate.

Q.     Okay.

                    ATTORNEY WILLIAMS:

                    Shawn, I'd like to see --- I don't care so much about what the money is, but I'd like to see his records for what dates he worked on this case.  Is that okay with you?

                    ATTORNEY NOLAN:

                    Yeah.  We'll provide the billing records.  I think that's consistent with the rule.

                    ATTORNEY WILLIAMS:

                    Okay.

BY ATTORNEY WILLIAMS:

Q.     Now, during your questioning

on Direct Examination, you talked briefly about Honken's use of drugs. And when I say briefly, the briefly part was when you guys were talking about the effect on his brain, and I think a question of something along the lines of a structural change in his brain. Do you remember those questions, sir?

A.     Yes.

Q.     Okay. Now, there is a testing that can be done, an actual imaging, brain imaging, that can be done to test for the effects of whether there's been some type of damaged caused to the brain from drug use; right?

A.     Yes. And It runs the whole continuum between imperceptible, or you can't detect at all, all the way through to big lesions in the brain.

Q.     All right. In any event, no type of brain imaging was conducted in this case; right?

A.     Not by me and not to my

knowledge. And on the basis of what I know about the history, it wouldn't be medically necessary or indicated.

Q. Now, when you say it wouldn't be medically indicated, is that a conclusion that you've reached that --- your assessment is that if we did an MRI, for example, on Honken's brain, that you wouldn't expect to see any type of brain damage on him?

A. That's accurate. I would not expect to see any findings on imaging suggestive of brain damage on MRI.

Q. All right. I want to go through your declaration, then, if you have that in front of you.

A. I do.

Q. I'm going to go through it. As I understand it or as I read it, your opinions really start on paragraph six of page two; is that correct?

A. Yes.

Q. Okay. So let's go down through the paragraphs then.

Paragraph six, you indicate Honken witnessed abuse of his mother and siblings. Do you see that?

A.    Yes.

Q.    Okay. And what's the source that you relied on to conclude that he witnessed abuse of his mother and siblings?

A.    Several sources, primarily family members, uncles, others who described his father's severe alcoholism and the constant abuse of the family by the father.

Q.    Okay. Let's do it this way. Did Dustin Honken ever tell you that he ever saw his mother being abused by his father?

A.    Not in those words, but he described Father's behavior in ways that were clearly abusive. In other words ---.

Q.    What do you mean by abusive?

A.    Well, again, emotionally volatile, threatening, aggressive, talking aggressively about others,

talking about schemes and frauds in a way of getting over on others, and how Dustin had to go along with that, talking about Mother and Father's volatile relationship, primarily an aggressor and a passive relationship prior to their divorce. In talking with Dustin Honken and in reviewing the collateral data, it's well depicted among the sources of information about how extremely abusive Mr. James Honken was to his wife and children --- wives and children, really.

Q. Okay. I want to break this down a little bit, though, and just get at the source that you relied on for this. When you talk about, for example, James Honken's schemes and frauds that he tried to get Dustin Honken to go along with and so forth, those didn't occur during the time period prior to his age of eight when his parents divorced; did it?

A. Correct. Those occurred

later, around 16, 17, 18, those ages. Prior to ---.

Q.      Okay. And when you --- go ahead.

A.      I'll just stop.

Q.      And I'm not trying to interrupt you. I think what's happening is the time delay in the VTC. So please finish your answer. If it ever seems like I'm interrupting you, I don't mean to.

A.      Sure.

Q.      Okay. When you were talking about abuse of his mother and siblings there, are you talking physical abuse or are you talking about the abusive behavior as you described it before, where he was maybe threatening and aggressive and so forth.

A.      The latter, but with clear references to physical violence, like capping people, taking care of --- the 25-cent solution remedy, those kinds of emotionally abusive and

physically threatening types of language.

Q.      Okay.  And just so I'm clear, here are you aware of anybody indicating that they ever saw --- I'm sorry.  Let me rephrase that.  Are you aware of any witness or any document that reflects that Dustin Honken ever observed his father engage in any type of physical violence against his mother or any other family member?

A.      I don't recall off the top of my head about the physical violence, direct physical violence, in contract to the direct physical threats.

Q.      Understood.  Now the 25-cent remedy, again, is that something that Dustin Honken told you that he heard his father say or is that coming from a different source?

A.      That, I believe, came from Jeff Honken.

Q.      Okay.

A.      Maybe Alyssa, but I think it

was Jeff.

Q.    And I don't recall Jeff Honken's declaration right now.  Is Jeff Honken claiming that Dustin Honken heard his father make those references?  Or is that something that Jeff Honken recalls himself, his father saying to him?

A.    I'm pretty sure it was the latter.  And my understanding or recollection was that whoever talked about that depicted it as somewhat common and that it had happened more than once in their childhood.  It actually happened as well as was discussed as a remedy.  But I don't recall the specifics from that declaration myself.

Q.    Okay.  And you indicated again in paragraph six that Dustin Honken was himself subject to abuse.  And again, just so we're clear, we're not talking physical abuse, we're talking the other abuse that you talked about, the aggressiveness, the

threats and that kind of thing?

A. Yes. That's correct.

Q. Okay. You're not aware of anything in the record, any statements made where you witnessed that Dustin Honken's father ever physically abused him?

A. I don't recall. So I guess the answer would be, no, at this point.

Q. Now, among the documents that you reviewed was a pre-sentencing investigation report dated March 15th, 2005. Do you recall that? I assume that's Dustin Honken's pre-sentencing investigation report?

A. I do recall that document.

Q. Okay. And I'm trying right now just to deal with the date on it, because the pre-sentence investigation report --- okay. It appears that you reviewed the draft copy of the first responder (phonetic) of the pre-sentencing investigation report or you --- I

guess you're going off of the dates that the report was prepared versus the date it was reportedly revised because the revised date is September 20th, 2005. And I just want to ---.

ATTORNEY NOLAN:

The original date was March 15th, 2005?

ATTORNEY WILLIAMS:

The report was prepared on March 15th and then it was revised on September 20th, 2005. And that's fine. I just want to make sure we're talking about the same document, and we are.

ATTORNEY NOLAN:

I have that here if I can place that in front of him?

ATTORNEY WILLIAMS:

Yes.

BY ATTORNEY WILLIAMS:

Q. When you were trying to determine the accuracy of the

information you were getting, either from Dustin Honken or from the various collateral sources in the declarations, did you reconcile that with what he reported in his pre-sentencing investigation report about his upbringing?

A.        No, because I didn't feel like it was my job to reconcile different reports or to investigate the accuracy of any declarant.  But I was aware of discrepancies in reported history from different sources, including this PSR.

Q.        Okay.  And actually, there was an earlier PSR as well, in 1997, when he was convicted of his first drug charges.  There was a PSR at that time as well.  And that also, as does the 2005 PSR, indicates that he reported he was never abused or neglected.  And these are words that Dustin Honken provided to the probation officer.  Are you aware that that was his report to the

probation officer, both in 1997 and again in 2005?

A.    I am aware in 2005 that that's what's recorded in that report. Correct.

Q.    And you've not looked at the 1997 pre-sentencing investigation report?

A.    I don't recall that one. So at this very moment I would have to say I don't recall seeing it. But it may be in the documents that I reviewed.

Q.    To the extent that --- again, in paragraph six of the declaration, you indicate --- and also in your testimony today, you indicate that Dustin Honken's mother neglected him. You're basing that, again, on statements made by various family members?

A.    Yes, statements describing her lack of action, lack of attention, her behaviors with her new husband, her behaviors with Dustin Honken's

father. Yes.

Q. Okay. Did Dustin Honken ever tell you in the two interviews that you conducted of him that his mother neglected him?

A. No. In fact, Mr. Honken really, as I described it on Direct, is very stoic and almost protective and defensive about anyone saying anything negative about his father or his mother, or until recently, even his brother. I think when I saw him in late 2010, he was still in the same mode as he was in the pre-sentencing investigative report in 2005. And that was, it was fine. There were no problems, you know? Next question. No symptoms, no, sir. No, thank you. Next question. And I think that's how he presented himself pretty consistently through much of his life, when, in fact, the ancillary information, the biographical information, seems to me to clearly reveal something very

different.

Q.     Okay.  But to be clear, Dustin Honken has never told you in the two interviews that you conducted of him that he was neglected by his mother?

A.     Correct.  He's not provided exculpatory or blaming information like that.  However, he has described things like she was pretty lax on us in terms of our homework.  She wasn't there a lot when we were younger.  She spent a lot of time with her new husband and not with us, but again, not in any kind of way to suggest blaming her or anything.  These were more just in discussions and descriptors.

And this fits pretty consistently with my experience that even with a patient who comes into my exam room in family practice and says, I've got a headache.  And I'm asking, where and how much and the types of pain and the intensity?  What makes it better?  What makes it

worse? The patients, even in that acute setting, are frequently not the best reporters in terms of being self-aware of what causes or what minimizes, much less people involved in the medical-legal settings and talking about things that have happened. In other words, people like Mr. Honken are simply --- they're able to provide data, but they simply aren't very insightful at times about how that data or how those experiences affected them in their subsequent life.

A. Well, candidly, Doctor, I have to assume that you have patients come in to you all the time telling you that they were neglected by their parents or they were abused by their parents. That has to be a common theme in your psychological practice, I would imagine.

Q. Well, while neglect and abuse are common findings, they are often not described even by the client or

the defendant. Because if you grow up in a family, that is the way it is. And we all grow up in the family we have. We don't know anything different. And it is only through the experience of time and perspective that we can, if we are so inclined, begin to examine our experiences in our family and contrast and compare those to what others' experiences might have been. And then it's a stretch beyond that to even think about whether or not it's pathological or dysfunctional.

Again, it's my experience that frequently folks from very dysfunctional families, you ask them, how was your growing up? Oh, it was fine. And unless you're really interested in learning more or hearing more or talking more about that, you won't even get the data points. Well, sure I saw two or three stabbings before I was eight years old, or sure, Dad said things

about capping people, like in Mr. Honken's case, that they don't even put it together, that it was significant for them. And yet I think that's among the most significant information that is available in Mr. Honken's family background, how very dysfunctional this family was, and how, for the most part, the children didn't even recognize it until later in life, and how Mr. Honken still in many ways doesn't recognize it.

Q.    This would be the same dysfunctional family where the daughter is in law enforcement, involved in law enforcement as a probation officer?

A.    Exactly the same family. She was younger. She was a girl. She experienced the stressors in a different way. She expressed her problems by manifesting, you know, depressive problems, according to her. She was able to acknowledge the

signs and symptoms of depression.

But beyond that, I can tell you it's very common --- and I've probably evaluated several thousand law enforcement applicants and officers over the years now. It's very common when I ask the standard question, has anyone in your family had any significant criminal problems for them to report an older or younger sibling who is in prison for drugs all the way through homicide. And these people all come from the same family, too.

So this notion that kids of different sex, gender and different ages going through the same family experience, the same thing or cope with it in the same way, is not a very sound one because experience tells us that people turn out so very differently coming from those kinds of same families.

Q.      Let's talk about your conclusion that the other family

members suffered from various psychological illnesses. You went through parents. You went through siblings. You went through cousins and uncles and so forth. Do you remember that line of testimony on Direct Examination?

A.       Yes.

Q.       Okay. Have you seen any medical or psychological records that would corroborate that any of those people had any type of mental illnesses or problems? Or is this all coming from their own statements or statements of other family members?

A.       It's coming from both, coming from their statements and statements of other family members. But again, for fairness and accuracy and perspective, I would say that Charlie Manson didn't have a documented mental health history prior to his arrest.

You know, lots and lots and

Case 3:10-cv-03074-LTS-KEM    Document 67    Filed 11/02/11    Page 112 of 191

lots of people have mental illness, mental problems and never get medical treatment or develop a paper trail for those. Now I don't know whether any of Mr. Honken's family have actually been treated. I presume that at least the one who described herself as having manic-depression has, because that's not the kind of thing one would necessarily attribute to themselves. But depression and anxiety, such generalized terms, they may or may not have received any formal treatment.

Q. Okay. The bottom line is you did not receive any documentation that would corroborate the statements by those witnesses, though?

A. No, nor did I receive any corroboration, blood alcohol levels, driving records, other than narratives about Mr. Honken's father's alcohol problem.

Q. And Doctor, this is going to go a lot faster if you simply answer

my questions instead of adding on to your thoughts. And if Counsel wants you to elaborate, why don't we let him do that? Is that all right with you?

A.     Given that, I'll try to answer my questions as best as possible. I presume we are informing the finder of fact here. And I just want to be clear and put things in perspective, so ---.

Q.     That's fine, but my question was pretty simple. Did you receive any documentation or any psychological records corroborating that any of these family members had mental illnesses? And I think the answer is no. Then you gave an explanation about why you didn't get blood alcohol documentation on James Honken. That's not my question and that doesn't help us try to get through this examination. So if you would simply leave your answers to my questions, I would appreciate it.

Otherwise, we'll just spend a lot of time going through this and you can add on your thoughts whenever you feel like it.

A.     Well, that's probably what I will continue to do and you can object as need be.

Q.     I can do that.

                    ATTORNEY NOLAN:

                    That's fine.  I think that last part of his answer did explain his answer, so let's take it one question at a time.

BY ATTORNEY WILLIAMS:

Q.     All right.  You've diagnosed Dustin Honken with a generalized anxiety disorder, but I didn't see a reference to the DSM manual.  What is that reference?

A.     What do you mean when you say reference?

Q.     Well under the code section. I mean, for example, when you came up with the memo to the file here, you

did give a reference to the DSM IV. So what reference is that? Because I don't know the DSM like you do and I'd like to make sure I went to the right one --- you know, like 3.8 whatever, you know the numbers' system I'm talking about there?

A.      I do.  You're looking for the numerical code.  I believe it's 300.2, but I certainly don't memorize the codes.  Two zero --- 300.20.

Q.      Okay.  And you indicated it was severe.  Is that a DSM terminology or is that something else?  I'm looking at paragraph eight of your declaration saying Mr. Honken suffers severe anxiety disorder.

A.      Well, that's not a diagnostic descriptor there.  That's kind of a subjective or contextual.  And I think that's true.  He does suffer from severe anxiety disorder.  I go on to give the diagnostic name and the additional information about anxiety disorder not otherwise

specified, including the features of obsessive-compulsive disorder.

Q.    Okay. And you used the word trait studies. So you said he had the traits of generalized anxiety disorder and anxiety disorder NOS, reporting features of obsessive-compulsive disorder. And I'm assuming you're saying he has generalized anxiety disorder, not just traits of it.

A.    Well, let me be clear. I think he has anxiety disorder and that it is composed of traits of generalized anxiety disorder and anxiety disorder NOS, including features of obsessive-compulsive disorder. That's what I wrote and that's what I intended to write.

Q.    Okay. And then you indicate in that same paragraph that such a condition, referring to the anxiety disorder, can be substantially worsened by a general medical condition. And Mr. Honken has a

physical heart disorder that likely exacerbates his anxiety disorder. And all I ask about that is, first of all, what documentation are you relying on to establish that Dustin Honken has some type of heart disorder?

A. The documentation that I relied upon for that is his report of procedure and references in his medical records during his incarceration.

Q. All right. Are you aware of any medical records that would establish or corroborate the fact that he had any type of heart condition at the time of the murders in 1993?

A. No. The records for that would be contemporaneous information. I think it was from Tim --- and I can't pronounce his last name --- Cutclamp (phonetic) or whatever ---

Q. Cutkomp, yes.

A. --- where he talked about Mr.

Honken's concerns regarding his heart problems. But no medical records.

Q. Now, in paragraph nine you indicate that you agree with Dr. Dudley's diagnosis of personality disorder with narcissistic and borderline features. So are you diagnosing him as well with personality disorder with narcissistic and borderline features?

A. Well, I did not diagnose him with that. But I concur that that's a likely accurate diagnosis. I agree with that based on my reading of Dr. Dudley's declaration. I think it fits with what I have seen in Mr. Honken in terms of his anxiety, his desire to be in control and take care of things and be seen as competent and in control, as well as his kind of erratic and impulsive behaviors at times. So I agree with it.

It wasn't my principal and primary diagnostic finding. I guess to the extent that I agree with it

Case 3:10-cv-03074-LTS-KEM    Document 67    Filed 11/02/11    Page 119 of 191

I'm saying, yes, I think it's a valid piece of the diagnostic puzzle.

Q.     You just talked about impulsive behavior by Dustin Honken. What impulsive behavior are you talking about by Dustin Honken?

A.     Well, from corroborative information, you know, it talks about him becoming preoccupied with kind of crazy ideas and his impulsivity and his hyperactivity as he became more and more involved with the methamphetamine abuse.

Q.     Okay.  But I mean, can you give me an example of some behavior he engaged in which showed his impulsivity?

A.     Perhaps arguably you could consider it impulsive the way he moved from place to place, you know, moving from Iowa, I guess, to then taking up roots, and to work for his brother, some kind of impulsive decision-making like that preexisting the drug abuse.

Q.        Okay.

A.        Impulsive decisions about interpersonal relationships, dating.

Q.        Is there anything about the murders and the way he committed the murders that you would say was impulsive?

A.        I don't know anything about the murders. I didn't talk to him about those, so I don't know.

Q.        Okay. You never questioned him about what his state of mind was at the time of the murders?

A.        No. That wasn't something that I was asked to address. It's already been adjudicated and --- no. I didn't go there.

Q.        You didn't ask him if he was feeling anxious at the time of the murders?

A.        No.

Q.        All right. Do you know what the facts are about the murders?

A.        Generally. I recall reading through the sentencing transcripts,

and I think there was some factual information in there. But for the most part, no, I didn't address those.

Q. So let me see if I can fit these together then. I mean, to the extent that Honken --- you know, in Dr. Dudley's diagnosis, he suffers from personality disorder. Are you tying that personality disorder to any causal effect for him to have engaged in the criminal activity, in the murders?

A. No, to the extent that I haven't addressed any causal effect. Yes, only generally to the extent that a personality disorder is longstanding and pervasive. His anxiety disorder with the components that I mentioned in my declaration, I think, was chronic, in other words, existing since early in childhood, that those would have been present in his life, both the year before the homicides, the year after the

Case 3:10-cv-03074-LTS-KEM    Document 67    Filed 11/02/11    Page 122 of 191

homicides, five years before, five years after, because they're pervasive and chronic and not specific to the murders.

Q. All right. And do you have an opinion about whether this personality disorder in any way impaired his ability to appreciate the wrongfulness of his conduct at the time he engaged in the murders?

A. Yes, but to the limited extent that borderline features and narcissistic features impair our ability to --- impaired the patient's ability to self-regulate, to self-monitor, to see things from a bigger perspective, but only generally in those ways.

Q. All right. Let me do it this way. You'd agree with me that Dustin Honken knew it was wrong to kill five people?

A. Yes.

Q. In other words, there wasn't anything about his generalized

anxiety or his personality disorders or anything else that prevented him from knowing that what he was doing was wrong?

A.     That would be my opinion, that there was nothing in terms of his evaluation that would suggest that he would meet the first prong of McNaughton, that he didn't know ---

Q.     Okay.

A.     --- the nature of what he was doing, or the second prong, that is, wrongfulness.

Q.     I want to talk a little bit about the drug use now.

A.     We've been going at it now for two or two and a half hours.  Could we take a short break?

SHORT BREAK TAKEN

BY ATTORNEY WILLIAMS:

Q.     I'm turning now to the drug use by Dustin Honken.  In particular, I'm looking at page ten of your declaration --- I'm sorry, paragraph ten of your declaration.  And you say

in there that at the time that he was living in Arizona, Mr. Honken began to use heavy quantities of extremely pure methamphetamine. And I just want to talk about that for a few minutes. First of all, what's the source of information that you relied upon in order to know what his drug use was in Arizona?

A. Well, I think even when there's third-party information, it really comes basically from him except for there was at least one declarant who mentioned his increasingly heavy use and how it affected him. I think that was Tim Cutkomp. How do you pronounce his name, again?

ATTORNEY NOLAN:

Cutkomp (changes pronunciation).

A. Cutkomp.

BY ATTORNEY WILLIAMS:

Q. Cutkomp.

A. And there may have been others

who noticed that, but I think even with the sentencing report and those kinds of things, it really came from him about the extent of his use.

Q.    Okay.  And when you interviewed him on the two occasions, did he tell you about his drug use?

A.    Yes.

Q.    All right.

A.    Yes, he did.

Q.    When you talk about heavy quantities then, what quantities are you talking about?

A.    Well, I guess I should say frequent, increased frequency, which yields to a daily dose in quantity. But it was getting to be where he would go for days at a time using, and then he would crash.  And he talked about that and then Tim Cutkomp talked about that.  And Mr. Honken also juxtaposed that by saying, you know, at the time, I didn't really see it as a problem.  I thought I was managing better and

better, when, in fact, at least Tim Cutkomp says he was becoming more and more erratic.

Q.    You don't know the actual quantities of methamphetamine being used, though?

A.    No, I don't. And I know there was some discussion about how pure it was in the sentencing transcripts and those kinds of things. So a lot would depend on purity and quantity. I know frequency, though. It was frequently during the day.

Q.    Okay. And during what time period did you understand he was using methamphetamine?

A.    I think that's unclear in the records. There are different things in the records, so I don't know for sure. But I got the picture where he used it pretty regularly up until the time of his arrest. And then when he was released, he went back to using it although I think he described in the PSR that it was not as regular,

but at least --- he also described in other --- maybe again Tim Cutkomp is the source --- described as using and then using some GNC liquids or tablets to try to pass drug screens or things like that. So I think at the time, it's hard to know with precision how much he was using throughout those months.

Q. Okay. And focusing really on the time period from his arrest in March of 1993 and through the murders in November of 1993, you're familiar with the fact that Dustin Honken, both in his 1997 pre-sentencing investigation report and again in his 2005 pre-sentencing investigation report, denied any meth use during that time period?

A. No. I'm not familiar with that. That goes against my memory, but you may be accurate. But I was thinking that in his pre-sentence report ---.

ATTORNEY NOLAN:

Case 3:10-cv-03074-LTS-KEM    Document 67    Filed 11/02/11    Page 128 of 191

Can we clarify which report we're talking about, Mr. Williams, '97 or 2005?

ATTORNEY WILLIAMS:

It's in both reports. But let's go to the 2005 report.

BY ATTORNEY WILLIAMS:

Q.      If you go to page 19 of the 2005 report, paragraph 80 ---.

A.      Can you hold on?  Let me find that.

Q.      Yes.

ATTORNEY NOLAN:

I'm sorry. Which paragraph again?

ATTORNEY WILLIAM:

Page 19, paragraph 80.

ATTORNEY NOLAN:

Okay.  I'm handing him that.

WITNESS REVIEWS DOCUMENT

A.      And tell me your question again.

BY ATTORNEY WILLIAMS:

Q. Sure. My question was you're aware that Dustin Honken denied any use of controlled substances, particularly methamphetamine I think is what I said, but he --- at the bottom of this paragraph 80 it says the Defendant advised that while he was on pre-trial release for the 1993 arrest, he did not use any drugs after his release --- may have implied (phonetic) that he used methamphetamine on an occasional basis. And after his release in May of 1995, he used it on an occasional basis. So from the time he was arrested in March of 1993, he says until he was released in May of 1995, he didn't use any controlled substances.

A. That's correct. That's what paragraph 80 says.

Q. All right. And did you review the 1997 forensic report from the Bureau of Prisons of Dustin Honken as well?

ATTORNEY NOLAN:

Just so I can clarify, C.J., is that the one that says on the top, Metropolitan Correctional Center of Chicago?

ATTORNEY WILLIAMS:

Let me grab it and make sure here. I have two versions of it here.

ATTORNEY NOLAN:

Well, I can tell you what he did review, which is the 1997 forensic report of Dr. Greenstein, which I think was part of that. Is that what you're talking about?

ATTORNEY WILLIAMS:

Yes. That's what I'm talking about.

ATTORNEY NOLAN:

All right. I'll hand him that then.

A.      I did review that, yes.

BY ATTORNEY WILLIAMS:

Q.    Okay.  And if you go to page four of that, there's a subsection there that says Substance Abuse History.

A.    Yes.

Q.    Okay.  And you're aware that he again said between 1993 and 1995, denied using psychoactive substances?

A.    Yes.

Q.    And when you say that he was using it in an extremely pure form, are you aware that Cutkomp and Honken would, what they call, cut or step on the methamphetamine prior to the use of the methamphetamine in Arizona?  Or are you basing it on something that says that they used the pure form?

A.    I'm basing it ---.

Q.    Or do you know?

A.    I guess I don't know is the most accurate answer.  But I am basing it on the fact that it was reported in his sentencing and he reported to me himself that they were

manufacturing an extremely pure form of the drug. And also, it was reported in the sentencing transcript that they would cut it before selling it because they were concerned about how pure it was. But I don't know as to, you know, what dosage he was taking.

Q.      Okay. So you don't know whether he was using it in a pure form or whether he stepped on it or cut it to make it less pure? We just don't know at this point?

A.      I think we don't know. We know that it was available to them, that he was in the setting where he was making it. And he had the capability to dose himself as he chose and that it did not kill him, even with his heart arrhythmia, and even when I think Cutkomp said he had some palpitations and heart problems one time and couldn't get out of bed or something like that --- but I think we don't know what the dosage

was.

Q.      Now when you were testifying on Direct Examination about Honken's drug use, you indicated that --- and I'm just paraphrasing --- but it was your view that he was using the drugs to deal with his anxiety.  Is that a fair description?

A.      Not exactly.  I testified that when he used methamphetamine, he found that it did help with his anxiety and then he began that.  I don't think he thought, well, this is going to help and he did it, but rather he used, he felt better.  He had all the effects of amphetamine, ten feet tall, bulletproof, self-confident, nothing is a problem.  And then that became not only --- there's some therapeutic value to that, arguably, but it also became part of the fact of why he kept using it and using more and more.

Q.      All right.  Now in your declaration again, paragraph ten, you

Case 3:10-cv-03074-LTS-KEM    Document 67    Filed 11/02/11    Page 134 of 191

say that by the time of the crimes in question, Mr. Honken was suffering severe effects of the drug use in combination with his other mental health problems. Do you see that in your declaration?

A.      Okay. What evidence are you pointing to that shows that at the time of the crime, Honken was suffering severe effects of the drug use?

A.      Well, I think again I relied a lot on Tim Cutkomp in terms of talking about how Dustin was behaving prior to that, and relying a lot upon just knowing the effects of methamphetamine use on mental status. And then the situational factor being that he knew how to manufacture it, he had manufactured it. Even by the PSR where he admits to the drug use at different times, he says that he had developed a serious problem with it, even to the extent where the folks at MCC diagnosed him with

Case 3:10-cv-03074-LTS-KEM     Document 67     Filed 11/02/11     Page 135 of 191

methamphetamine abuse.

Q. Okay. But I guess where I'm going to is that when you say at the time of the crimes in question, okay, and that's a very precise time; right? We're talking about July 25th, 1993 and November 5th, 1993. At the time he committed these murders, is there anybody who describes him as suffering from the severe effects of drug use at the time of the murders?

A. I don't know because I didn't go into the time of the murders. And I was not so precise in terms of talking about the murders as to the entire arrest for the '93 charges, the crimes in question, the use that had led up to the '93 arrest. I was looking at it more general and less precise with regard to that paragraph.

Q. Okay. And I appreciate that, Doctor, but I just want to make sure that I've got this nailed down then.

I mean, when I read the sentence, you know, by the time of the crimes in question, he was suffering from severe effects of drug use, I read that maybe differently than what you intended it. I read that as you were indicating that he was suffering from effects of drug use at the time he committed the murders. That's not what you're saying?

A. I'm not saying that as a precise mental state at the time of the offense of homicide, but rather the general state leading up to the '93 arrest, and then through the rest of '93.

Q. Okay. I'm sorry. I misunderstood what you were saying, then. All right. And then again on paragraph ten of your declaration, you talk about Honken using LSD, cocaine, marijuana and grain alcohol. And I want to go again to his use of those prior to the murders. Do you have evidence that he used LSD,

cocaine, marijuana or grain alcohol prior to the murders?

A.      No, not in the proximate time in terms of affecting his mental state at the time of the offenses, but rather more in the general sense, as in the preceding line of questioning.

Q.      Okay.  And let's just broaden out the time frame here a little bit then, because I'm seeing mixed information here and I'm just trying to figure out what you're relying on here.  Are you aware of any evidence that established that he ever used LSD at any point prior to the murders?

                    ATTORNEY NOLAN:

                    Can we just clarify what you mean, prior to the murders?

                    ATTORNEY WILLIAMS:

                    Any time prior to July 25th, 1993, back to the day he was born.

BY ATTORNEY WILLIAMS:

Q.    Is there any evidence that he ever used LSD prior to the murders, during that time frame?

A.    You know, I don't recall about that so ---.

Q.    Okay.

A.    I'd have to say I don't know.

Q.    Cocaine?

A.    He reported to me that he had experimented with cocaine and had used marijuana and grain alcohol prior to '93.

Q.    Okay.  And that's something Honken told you?

A.    Yes.  And again, my memory is that the early part of '93 is when he saw himself as having more substance abuse problems.

Q.    All right.  And then I want to go to the exposure to the neurotoxins that you testified about.  Again, what factual information are you relying on to establish that he was exposed to, as you say in your report

or your declaration, significant neurotoxins in a closed environment for substantial periods of time?

A.      I think the basis for that observation is that he was manufacturing methamphetamine by knowledge of the precursor and byproduct of neurotoxins that are part of that process in general.  And in the fact that, in general, EPA clean-up of drug sites like that is a high priority because of the level of neurotoxicity of primarily the byproducts that linger.  And that he was manufacturing and he was doing that and he was there.  So most of the information would be from him and from the particular sentencing information where they were testifying about precursor chemicals and what they found and that sort of thing.

Q.      Okay.  And what was the physical layout, then, of the house they were renting in Arizona where

they were manufacturing the methamphetamine?

A.    I don't know.  I understand that it was an isolated environment, that the nearest people were miles away.  But I don't know the physical layout of the house.

Q.    Okay.  You don't know where in the house they were manufacturing it?

A.    I don't.

Q.    You don't know whether the windows were open or not open?

A.    I don't.

Q.    You don't know whether, like he did in 1987 when he had a meth operation at his house in Mason City, he had a venting operation where he actually vented the air out of the facility?  Are you aware of whether he had that down in Arizona?

A.    I'm not aware.

Q.    Okay.  What chemicals are you saying that he was exposed to that were neurotoxins?

A.    I don't know the specific

names of the chemicals. That's not my area of expertise. I do know certain factoids about those kinds of things, like many of the aromatics are heavier than air, that they seek lower levels. They're somewhat pernicious in terms of getting out of flooring, carpeting, furniture. But beyond that, that's about it as far as what I know about those things.

Q. Okay. Now, one of the things you were referencing was the clandestine meth lab epidemic that existed in the 1980s and 1990s in your prior testimony; right?

A. Yes.

Q. Okay. And you're aware that that method was often the liquid ammonia method of manufacturing methamphetamine?

A. That's beyond my knowledge at this point.

Q. Okay. Are you aware that the manner of manufacturing methamphetamine that Dustin Honken

developed was night-and-day different from the clandestine meth lab problems, the so-called Nazi method of manufacturing methamphetamine during the 1980s and 1990s?

A.    I don't know.

Q.    All right. When you say he was exposed to this for substantial periods of time, what are you basing that on?

A.    I'm basing that on the fact that he lived in this residence for the period of time that he was there and that he manufactured in that residence, by all accounts.

Q.    Okay. When you say by all accounts, who told you that he lived in that residence?

A.    He indicated to me that he ended up staying there while someone else came and went with supplies. And so he was left there at times for days by himself.

Q.    Okay. Did you review the trial testimony by Tim Cutkomp about

that manufacturing operation?

A.    No.   I think I had sentencing transcript information, and again, not trial testimony.  I may have, but I don't recall.

Q.    Okay.  How about the trial testimony of his girlfriend in Arizona?  Did you review that at all?

A.    Not that I recall.

Q.    Okay.  If I told you the testimony at trial was that Dustin Honken had a girlfriend by the name of Melissa Friesenborg and that he spent a lot of time at her apartment, and that Tim Cutkomp was the one that was left at this house for days and weeks at a time by himself, manufacturing the methamphetamine, that would be inconsistent with Dustin Honken's assertion that he was exposed for substantial periods of time to the neurotoxins and the manufacturing process, wouldn't it?

A.    If accurate, that could be inconsistent, yes.

Q.     You referenced Dr. Piasecki's report that talks about the changes in the brain.  And I think the reason Counsel used the word structural changes is because that's in your report.  In paragraph 11, you indicate that such drug abuse and exposure to chemicals used in methamphetamine causes neurotoxicity which results in structural changes in the brain and adversely impacts brain functioning.  Do you see that in your declaration?

A.     All right.  But I think on your Direct Examination, you said it's not so much structural changes in the brain?

A.     Correct.  You know, in 11, I am describing what Dr. Piasecki says.  And in answer to Direct, I'm trying to point out the difference between molecular changes and neurotransmitter site changes versus large structure, lesion-type changes.

Q.     Okay.  And I appreciate that.

Case 3:10-cv-03074-LTS-KEM     Document 67     Filed 11/02/11     Page 145 of 191

So you're not indicating yourself that there's any evidence of structural changes in Dustin Honken's brain as a result of his meth use or exposure to neurotoxins?

A.      I don't think there is. At the time I have seen him, and I think even in 2003 and 2004, there was no consistent information of any neuropsychological dysfunction. But that had been several years since the last exposure. And I think what happens is whether you're exposed to alcohol or methamphetamine, it does have effects on the brain. That's why human beings use substances, and that depending on the substances, it does change uptake and neurotransmitter sites. And I was trying to make it more clear that it's more of a molecular thing than a structural thing. And it's more related to the proximate time of using the substance than years later. But we do know that many substances

exert effects days, weeks or even months after last ingestion, depending on the substance and its effect on different molecular sites within the brain. So that's the overview of my thoughts about that.

Q. Okay. And then you conclude this paragraph 11 with the sentence there is no question that the methamphetamine abuse caused changes in Mr. Honken's brain functioning and in his behavior that were present at the time of the homicides. And I want to talk to you about that sentence a little bit.

Again, you never questioned Honken about what happened at the time of the homicides; right?

A. Correct.

Q. Okay. And so when you're saying that his methamphetamine abuse caused changes in his brain functioning at the time of the homicides, what are you basing that on?

A.    The information that he was an extremely heavy user of methamphetamine in the early part of 1993, the information from Dr. Piasecki that those effects can last months afterwards before they resolve, and the general knowledge that methamphetamine does cause changes in brain functioning and behavior.

Q.    Okay. But you used the words, there is no question that that abuse ---. And I want to go back to that a little bit. Now we just went over both Dr. Greenstein's report and the PSR that established that he didn't use any methamphetamine between the time of his arrest in March of 1993 up until 1995, which would include, obviously, the time periods of the murders in this case; right?

A.    We did go over those reports. I'm not sure that the reports of Mr. Honken to the PSR or to Dr.

Greenblatt (sic) as memorialized in their reports established that because, again, we've got someone who had abused methamphetamine and was not looking for an exculpatory reason for his behavior, who has traditionally not been a good self-reporter of his behavior and his internal psychology. But presuming that it's accurate that he didn't use any from mid 1993 to the latter part of 1993, I think Dr. Piasecki's report would suggest, and I would concur, that the level of methamphetamine he reported using prior to that would still be having some effects on his brain and behavior functioning, but certainly not, as you have made clear, to the extent that he wouldn't know what he was doing or wouldn't know that it was wrong.

It's just a matter of how it affects his dopamine receptors, how it affects his anxiety. It probably

was worse at that time if he was not using. If he was using, he was probably exceedingly more grandiose and impulsive. So it could be either way, in my opinion.

Q. Okay. Well, let's look at it a couple different ways then. Let's assume, first of all, that his self-reporting is inaccurate and let's assume that he was using methamphetamine up through the time period of the murders. We really don't have a handle anywhere in the record of what that use would have been though; right?

A. Right. We don't have any corroboration of that.

Q. Okay. So we had no idea how much meth he was using, how often he was using the meth, whether he was using any other controlled substances. There just isn't anything in the record to establish that; is that fair?

A. Yes.

Q.      Okay.  Well let's assume he's using some meth at some point between March of 1993 through the time period of the murders.  Let's just assume he was using meth during that time period.  Do you have an opinion or is it your opinion that that meth use would have affected his ability to know the wrongfulness of his conduct in committing the murders?

A.      Not as in any kind of insanity standard.  No, not at all.  But in terms of a general ability to appreciate and conform, yes, because I think that's a lower standard.  You know, things are going on in someone's life, including ingestion of any psychoactive substance, including any particular challenges or stressors, can and does affect their ability to appreciate and conform their behavior with regard to the law so ---.

Q.      Well, let's --- I'm sorry.

A.      So with regard to that lower

standard, yes. With regard to not knowing what he was doing or knowing that it was wrong, no. Even if he was using meth then, there's no evidence of any kind of methamphetamine-related psychosis that would have prevented him from knowing what he was doing or knowing that it was wrong.

Q. And the lower standards you're talking about, what standard are you talking about? That he can't appreciate the wrongfulness of his conduct, but you say it's a lower standard. What are you referencing?

A. I'm referencing --- and I think verbatim, but maybe not exactly --- one of the statutory mitigating factors that I'm familiar with.

Q. Okay. So let's go to that statutory mitigating factor even. Are you suggesting that his methamphetamine use, even assuming he used it during that time period, even under that lower standard it meant

that he didn't appreciate taking two little girls out in the woods and putting a bullet in the back of their heads was wrong? He didn't appreciate that?

A.      Well, appreciate the criminality. I think if he was using meth and he was feeling that kind of grandiosity and self-assurance and solving problems and going to take care of things. It's going to work out fine. Don't have to worry about consequences, all that kind of thing that goes with amphetamine use would impair his ability. Not obliterate it, but impair his ability to appreciate and conform. Yes.

Q.      Okay. Impaired to the point where he didn't appreciate the wrongfulness or impaired to what degree? I don't believe I understand what you're saying there.

A.      Well, my understanding is it's not a yes or no, but it's a continuum of impairment and appreciation. And

clearly when folks are under the influence of an aroused emotional state or a drug or a medication that affects their psychological functioning or their sense of wellbeing, then they don't take the time. They don't think about consequences as much. They just feel like what they're doing is what has to be done, and particularly with amphetamines which give such a sense of false security and confidence and grandiosity and impulsivity that go along with that.

Q. Okay. And so I understand what you're doing here, you have taken the information you know about methamphetamine use generally, what that does to a person, how that can affect their minds, you've combined that with the fact that Honken used some methamphetamine at some point in some amount prior to the murders, and reached a conclusion based on those two things about what he was likely

Case 3:10-cv-03074-LTS-KEM    Document 67    Filed 11/02/11    Page 154 of 191

to have felt? Is that fair?

A. Reached a conclusion that it would have diminished or impaired his ability to appreciate and conform to that lower standard of sentencing, not as an exculpatory, not as an affirmative defense, not even as a diminished capacity defense. But rather, this was something that may have been going on, likely was going on, could have been going on, in combination with his background that would have contributed to him not being just cool, calm, collected, rational, thoughtful, insightful, non-aggressive or whatever that was his more normal state.

Q. And the same thing with his anxiety then, too, I assume?

A. Yes. And in fact, let's presume the other side, which is that he wasn't able to get or wasn't using methamphetamine then. His chronic anxiety, lifelong, would likely have been much worse --- worry, out of

control from both the anxiety perspective, but also from the fact that methamphetamine has sensitized those neurotransmitter receptors in his brain. So he's experiencing the molecular structural effect of having those transmitter sites having been sensitized by the methamphetamine load earlier in the year. And yet nothing is attaching to them to calm them.

So that's going to increase more agitation, more anxiety during that time if he weren't using it. So in some ways it's bimodal. If he was using, it would have caused the kind of effects that meth causes. If he wasn't using it, the meth sensitization would cause more anxiety and problems unless he was taking or using some therapeutic or medical care to help deal with that.

A.     Okay. And I understand where you're coming from and I'm not taking issue with it. I just want to make

sure we're clear on this. Again, you're basing this on your understanding of the general effects that anxiety disorder has on somebody, combined with their conclusion that he had chronic anxiety disorder. So therefore, he would have had it both before and after and through the murders; right? And then you reached a conclusion based on those two observations about what he must have been feeling or going through at the times of the murders; is that fair?

A.      Yes.

Q.      Okay. But because you didn't interview him about what he was actually going through during the murders, you're not relying on anything from him directly to reach that conclusion?

A.      Correct.

Q.      Okay. And are you familiar with how he went about committing the murders? I think we covered this a

little bit before. But do you know what planning he went through to do that?

A. No.

Q. Do you know how kind of calculated this thing was over a period of weeks and months, that he went hunting for the victims in this case?

A. No.

Q. Do you know he came up with a ruse by way to gain entry into this house where the witness against him was residing with Lori Duncan and her two little girls? Do you know anything about how he made entry into that house?

ATTORNEY NOLAN:

I would pose an objection because the Doctor has already said that he doesn't know the details in that way. You know, let him answer and then the Court can rule.

BY ATTORNEY WILLIAMS:

Q.     Okay.

A.     No.

Q.     Okay.  Let me ask you this, Doctor.  When you're trying to figure out how somebody was or was not affected by mental disorders during the time period of committing an offense, whether under the heightened standard or the lower standard, would you agree with me that it's important to know how that offense was committed and whether they acted coolly and rationally and carefully during that murder?  Or is that, in your view, just not important to know?

A.     In my view, in the context of this case, it's not important to know given that the methamphetamine appears pretty well documented, at least at some points in time.  And his biographical history appears very well substantiated.  And given that those things are pervasive and

chronic, including the aspects of his personality that Dr. Dudley and even Dr. Greenstein talked about, that those would not have popped up then and gone away. They would have been pervasive through that time. So given that he's already been adjudicated and found guilty of these five --- I think, homicides, then the specifics related to the planning and the rationality related to this prong of criminality and conform for mitigation purposes was not something that I felt necessary to explore or recapitulate with Mr. Honken.

Q.    All right. Paragraph 12 of your report --- or I'm sorry, your declaration talks about that the combined effects of all these factors would have been significantly mitigating. Do you see that sentence there?

A.    Yes.

Q.    Okay. And I just want to make sure --- and I think we're on the

same page of this, you don't consider yourself a mitigation specialist; right?

A.    No.  That's not a title that I use or ---.

Q.    Okay.  Whether something is mitigating or not mitigating, that's not something that you're taught to determine as part of your psychological-medical training, is it?

A.    No, it's certainly not part of psychological or medical training in general.  It's certainly part of the forensic or psycho-legal, medical-legal ---.  You know, jurors do want to know what makes a person tick, what was going on, what were the factors that contributed?  And as I testified to earlier, in North Carolina, there's even case law that says the attorneys must explore those kinds of things for the jury at sentencing phase.

Q.    Are you familiar with the

studies of jurors concerning voluntary use of controlled substances and whether they find that to be mitigating or not mitigating?

A.    I am.  In general, they don't find it --- in general, they find it to be mitigating but not to outweigh the aggravating circumstances.  So they usually find the factor but don't find that it outweighs some aggravating factors in specific cases.

Q.    You indicate in that same paragraph, 12, that his condition would result in serious lack of judgment and little or no impulse control.  Do you see that sentence?

A.    Yes.

Q.    Okay.  And again, we're talking about --- are you attributing that at the time of the murders?

A.    In general, during that time frame, compared to his normal --- he would have had a more serious lack of judgment and little or no impulse

control compared to his normal, which was historically pretty good judgment and pretty good impulse control except in certain psycho-social areas, like residential changes and women.

Q. And again, wouldn't it be helpful to know how he actually committed these murders in order to know whether he was actually acting impulsively during that time period, or lacked control in any way?

A. Not from my perspective and not for this proceeding, because I kind of rely on how I stated that earlier. But in general, these murders he'd already been adjudicated for, and the fact that he did commit these murders suggests there were things going on, and some of those things going on --- I'm certainly not saying that the psychological or substance abuse account for all of the things going on --- but some of the things going on are in the

context of how he was raised, what happened to him earlier in his life, what happened to him in the preceding months and years, the effect of the challenges and stressors and money situation and substance use on his life, those are all factors that I think are worthy of being considered in terms of understanding who he is in the bigger picture. But I didn't define or even address things that had already been adjudicated in terms of the guilt/innocence.

Q. All right. Except in the extent, though, that you're suggesting that all of this is mitigating in the sense of his ability to exercise judgment and exercise control at the time of the murders; right?

A. Correct.

Q. All right. I mean, all of this is meaningless unless we're talking about what was going on in his head at the time of the murders;

right?

ATTORNEY NOLAN:

Objection. That's not the law.

A. You know, my answer would be no, it's not meaningless. It's not a bright line, yes or no, black or white, but looking at a defendant's context and history and how that contributes to who they were in the days, weeks or months preceding and during and perhaps even following an offense, including homicide, is important information for juries to have. And then they decide whether those things weigh or outweigh each other.

BY ATTORNEY WILLIAMS:

Q. Do you know if any aggravating factors ever were presented in this case, by the way?

A. I don't off the top of my head. I mean, I can almost guess at what they might have been. But again, I didn't look at aggravating

factors.

Q. Okay. Are you familiar with the guidelines, the ABA guidelines for defense counsel handling capital cases? Are you familiar with those guidelines?

A. No, I'm not. I know that there are guidelines, but I'm not familiar with them.

Q. You testified on Direct that you concluded that Dustin Honken doesn't suffer from antisocial personality disorder. But then you also stated that he engaged in antisocial behavior as an adult. And if I understand, your conclusion here is it's, at least in part, because he didn't exhibit any type of antisocial behavior prior to the age of 15, which is one of the preconditions for antisocial personality disorder diagnosis under the DSM?

A. Yes.

Q. Did I get that right?

A. You did.

Q.      Okay.  And when you were talking about his antisocial behavior as an adult, what behavior are you talking about?

A.      Deciding earlier to sell some limited amount of marijuana, then deciding to embark upon manufacturing an illegal substance such as methamphetamine, things that were clearly against the law.

Q.      Okay.  Certainly killing five people; right?

A.      Certainly homicide/murder is against the law.

Q.      Okay.  What do you know about his planning of a bank robbery that his father later committed?  Do you know about that?

A.      I have heard and seen references to that.  And I don't know much about that right off the top of my head other than it seemed to fit into the context of Father's schemes and frauds and preoccupation with money.  And one of the things that he

imparted to apparently both of his sons was, you know, that money made you who you were. And money was an important way of validating yourself. But I don't recall a lot about the father's bank robbery and whether or not Dustin Honken had any substantial role in that. I only remember how old he was at the time.

Q. Okay. And the answer may just be no, but you're not familiar, again, with the trial testimony where three of his former high school classmates testified about him planning the bank robbery while they were still in high school, and then his father actually committing the bank robbery in a manner that matched exactly what Honken had planned a couple years later after they were out of high school? That doesn't sound familiar to you?

A. That does not sound familiar to me.

Q. Okay.

169

A.      It sounds like high school, but ---- if I could go back in terms of the adult antisocial behavior, I note that Dr. Greenblatt, even back some 13 or 14 years before I saw Honken, said adult antisocial behavior, but didn't diagnose him with antisocial personality disorder. And that was because even back then he knew he had a methamphetamine problem.  And Dr. Greenblatt even identified an anxiety component back in 1997.

                    ATTORNEY NOLAN:

                    So we can correct that for the record, it's Greenstein.

A.      Oh, Greenstein.

BY ATTORNEY WILLIAMS:

Q.      And Dr. Greenstein, though, with the anxiety, he had that as situational anxiety, didn't he?  He says in connection with his legal problems, the fact that he was facing trial, all that kind of stuff; right?

A.    Well, he did have it as an adjustment disorder with anxiety. And he did talk about the situational events, but I think in retrospect, and given what we now know about Mr. Honken's early life history, and the anxieties that were caused by Father's egregious behaviors, it's worthy to note that even 13, 14 years ago that anxiety was a feature of how Mr. Honken presented, even though back then he still typically tended to say, oh, everything was fine. There were no problems with childhood. Again, consistently stoic and minimizing and defensive about appearing vulnerable or symptomatic, even then was that way.

Q.    And I'm trying to see if I fully understand this. I mean, one of the things that you're saying about the reason he's not suffering from antisocial personality disorder is there's nothing prior to age 15 indicating antisocial behavior. So

what, if anything, can you point to in his behavior prior to age 15 that would demonstrate that he was suffering from anxiety or suffering from Dr. Dudley's diagnosis of personality disorder with narcissistic and borderline features? What is the judge going to be looking for in his behavior prior to age 15 that would demonstrate that he was suffering from those back then?

A.      Well, with regard to Dr. Dudley's diagnosis of personality disorder, those really aren't diagnosed until someone is 17, 18 or older.  So that's not an issue.  With regard to antisocial personality disorder, the specific requirement is a conduct disorder before age 15. And we don't have any conduct disorder problems.

But with regard to anxiety-type issues, we know of the environment that he was living in. We know that his school performance

by high school was suffering. We know that his brother and sister talk about how difficult and fearful things were in the family. We know that Dustin Honken became a stoic, defensive, non-complaining child and adolescent. And we know from children of alcoholics and children of emotional abuse that emotional abuse --- and especially with a volatile, intermittent reinforcement schedule that alcoholic parents present --- that these children actually had more trouble adjusting with anxiety and depression than do children who were physically abused. Because oftentimes physical abuse, when it's regular or, you know, it's predictable, is easier to deal with and control, whereas volatile parents and aggressive threats are less (sic) difficult to cope with because you never know what or if something is going to happen.

We don't have any medical

173

records. We don't have any school psychology records saying that he was an anxious child. He was just kind of a child that was below the radar, that didn't attract a lot of attention, that was compliant.' And I would suggest to you that those are signs of how he managed his anxiety. He kept his head low and his eyes open and he'd avoided situations that could make it worse.

Q. Any indication that his anxiety disorder was affecting his ability to make judgments or appreciate the wrongfulness of his conduct up until the time of the murders? In other words, as he was growing up, through his teen years and into his early adulthood, are there things you can point to that say, hey, here's a sign that he was having poor judgment or having an inability to control himself because of anxiety?

A. Yes, mostly to the extent that

Case 3:10-cv-03074-LTS-KEM    Document 67    Filed 11/02/11    Page 173 of 191

he was preoccupied on being stable, being in control, having enough money and structure in his life. And that led him to sell the little bit of cannabis that he reported that he did prior to going in in a big way with manufacturing methamphetamine. It impaired his judgment. He became more focused on how to take care of things by making money than by appreciating the criminality of that and fully considering that.

Q.      Have you reviewed Dr. Gelbart's (phonetic) report, sir?

A.      Yes.

Q.      And did you have any criticism or complaint or find any defect in his report?

A.      Well, I didn't review any of the doctors with the idea of criticizing or complaining or pointing out problems. So I guess the answer would be no. In general, I don't have any critique. That wasn't my role in this. This was not

a civil case. It was not a standard of care case where I might be asked to do something like that.

Q. You talked in Direct Examination about James Honken and the 25 cents branding (phonetic) and so forth. By the way, did you ever interview James Honken as part of your --- or read an interview of James Honken?

A. No.

Q. All right. And I'm not sure if I get this, one or the other. Are you saying that at some point he put an animal down? He killed an animal or killed a pet? Or are you saying he talked about doing it?

A. I'm saying that he talked about it. And I don't know if he actually did or not, that if the children actually either witnessed or that a pet went missing. But it was a remedy that he talked about and really that's all I know.

Q. Okay. In Direct you were

Case 3:10-cv-03074-LTS-KEM    Document 67    Filed 11/02/11    Page 175 of 191

talking about his neglect and so forth. And at some point you talked about him having school issues. Is that the grades you're talking about? Or are there other school issues you were referencing?

A.      It was the grades that I was thinking about as I said that, in conjunction with what others have said, that when the children went to live with their mother, that they really didn't have much structure or supervision or school orientation from that time.

Q.      Okay. But you're not aware of like behavioral problems in school or anything like that?

A.      No, I'm not.

Q.      You were talking on Direct Examination that while he was engaged in antisocial behavior, that he didn't meet the standard. And to explain that you said, there's no glibness, as well. What did you mean by the word glibness?

A.     I was referring to, in general, the fact that he was able to establish and maintain interpersonal relationships with some depth and that he has shown commitment to and loyalty to some of those relationships.

Q.     Did you ever listen to the undercover tape that was recorded from Cutkomp and Dustin Honken where Dustin Honken is talking about the murders and the fact that he never thinks about them.  Thought he was going to have nightmares; never did.  Doesn't mean anything to him at all.  Doesn't bother him at all.  Did you ever listen to any of those undercover tapes?

A.     No, but I did read a transcript of some of the information presented from one, maybe perhaps more, at his sentencing where those things were elicited from a witness and then how they were countered by his attorney.

Q.      Okay.  All right.  That's all the questions I have.  Thank you, Doctor.

A.      Thank you.

REDIRECT EXAMINATION

BY ATTORNEY NOLAN:

Q.      I'm going to ask a few follow up.  Let's start with the 25-cent solution.  I want to show you Jeff Honken's declaration and point you to paragrah 12, if you would review that?

WITNESS REVIEWS FILE

BY ATTORNEY NOLAN:

Q.      Have you seen that before today?

A.      Yes.

Q.      That's one of the things you relied on?  And what Jeff says in that paragraph, how does that impact this information that you had about the 25-cent solution?

A.      Well, in answer to a question on Cross, I said I didn't recall if the father had ever implemented the

25-cent solution.

Q.      Does that refresh your recollection?

A.      It does.  In paragraph 12, Jeff Honken declares that one of the dogs was hit by a car but survived with just a limp in his back leg.  He got the 25-cent solution.  After a while, Dustin had learned to not have pets.  And when I read that prior to testifying and reporting back at some point, I interpreted that to mean it sounded like it had occurred on at least one occasion, perhaps more, if they learned not to have pets at all.  Because then above he says he had three dogs as a child and each one got the 25-cent solution.

Q.      All right.  I want to ask you a question about anxiety disorder.  Mr. Williams asked you a question about if there was any evidence of an anxiety disorder prior to the age of 15.  Is there a prerequisite in the DSM for an anxiety disorder relevant

to age or for an antisocial personality disorder?

A.      No.    With personality disorders, the requisite is that there has to be a conduct disorder. And personality disorders aren't diagnosed until late teens.    Anxiety disorders often begin in childhood and include the separation anxieties and the obsessive-compulsive disorders, and the generalized fearfulness and worry that kids who grow up and are timid and overly controlled and fly below the radar and don't take risks, that that is common presentation of anxiety in childhood that by many accounts in the background documents would describe Dustin Honken.

Q.      All right.   Dr. Warren, Mr. Williams had asked you about whether or not you had actual information about whether Dustin used the pure form of meth that was made.   I want to show you the declaration of

Timothy Cutkomp, paragraph eight.

Have you previously reviewed that?

A.      Yes.

Q.      Okay.  Can you review that for a moment?

WITNESS REVIEWS FILE

BY ATTORNEY NOLAN:

Q.      Doctor, does that refresh your recollection as to what information you may have had in that regard?

A.      Yes, it does.  Mr. Cutkomp talks about how in Arizona when they were making methamphetamine, both he and Mr. Honken began using it and that Dustin became addicted and used it almost every day, often multiple times a day, smoking it with marijuana, snorting it, swallowing it in powder and liquid form, putting it in gel caps that he would swallow.  And quote, Dustin used the pure form of meth that we made.

Q.      Okay.  Also, with respect to the timing of when Mr. Honken was using methamphetamine, there was some

back-and-forth questioning about whether he used it after his arrest. And again I'd like to point you to the declaration of Tim Cutkomp on paragraph ten. Can you just review that to yourself?

WITNESS REVIEWS FILE

BY ATTORNEY NOLAN:

Q.       And Doctor, does that refresh your recollection as to whether there was evidence that you relied on about when Mr. Honken used drugs?

A.       Yes. As I testified to, Mr. Cutkomp provided most of the information about that. But in this paragraph ten, he talks about when he and Mr. Honken went back to Iowa from Arizona, that Mr. Honken still had people at work that he would get meth from and that every time that he saw --- almost every time that Tim Cutkomp saw Dustin, he had meth on him and was using almost every time he saw him and was addicted

Q.       And that's described as the

Case 3:10-cv-03074-LTS-KEM    Document 67    Filed 11/02/11    Page 182 of 191

time frame after they came back from Arizona?

A.    He reports that that was after the time that we came back from Arizona.  Yes.

Q.    And does Mr. Cutkomp talk about how the methamphetamine affected Mr. Honken's personality?

A.    Well, in the next paragraph --- I think I had referred to this generally --- but it talked about how after Dustin Honken was addicted, his ideas just got crazier.  And he started following through on more crazy ideas and that he was less focused, more impulsive, stayed up long hours ---.

Q.    All right.  So Mr. Cutkomp described some of that impulsivity that I believe Mr. Williams was asking you about on Cross?

A.    Yes.

Q.    And I'd also like to show you the declaration of Kathy Schuees.  That's S-C-H-U-E-E-S.  I'd ask you to

read paragraph 12 of that.

WITNESS REVIEWS FILE

A.     Yes.

BY ATTORNEY NOLAN:

Q.     Did you review that previously?

A.     I did.  And I referred to it earlier as there was at least one report that he was more hypersexual. But more specifically in paragraph 12, it talks about how when he came back from Arizona, he seemed like a different person in a lot of ways: staying up all night, more energetic, more on-the-go, more antsy and jittery, more sexual.

Q.     And was that something that you took into consideration when you described his behavior as impulsive?

A.     Yes.  And it was something I took into consideration in terms of his overall psychological functioning during that series of months in and around that time.

Q.     Okay.  One other thing about

Mr. Cutkomp's declaration I forgot about. If you could look at paragraph 13 of his declaration? And again, this goes to the question of the timing of drug use by Mr. Honken.

WITNESS REVIEWS FILE

A.    Yes. I recall reading this and how he talked about using liquids and all to get drugs out of their system. And Dustin Honken and he worked to fool the drug tests they were having to take.

BY ATTORNEY NOLAN:

Q.    I believe Mr. Williams also asked you a question about whether there was anything you relied on other than Mr. Honken for information that he used marijuana, grain alcohol, cocaine and LSD. Again, I would point you to paragraph ten of Mr. Cutkomp's declaration. Did you consider that in forming your opinion?

A.    I did. He reports that Mr. Honken smoked marijuana, drank grain

alcohol and even used cocaine and LSD, but that meth was his main drug.

Q.     All right.  Again, talking about the impulsivity, if you could review just quickly the declaration of Melissa Friesenborg.  Let me spell that for you, F-R-I-E-S-E-N-B-O-R-G. I'm referring to paragraphs three and four.  Just take a look at those.

WITNESS REVIEWS FILE

A.     Yes.

BY ATTORNEY NOLAN:

Q.     And is that something that you considered when you were talking about impulsivity?

A.     It is.  She described him as being awake all hours, getting up and going for no reason, and that he would become really preoccupied on things that he was thinking and talking about.  It was hard to follow him, and that he had developed what she called some weird rules about food he ate, end quote, although he wasn't eating much.

Q.      Okay.  All right.  Mr. Williams asked you about information about the heart condition that Mr. Honken has.  And you indicated that you had reviewed some Bureau of Prison records that were more recent in time --- in other words, postdated the trial.  And you had indicated that you had also reviewed Dr. Greenstein's report from October 21st, 1997.  And I'd ask to refer you to page four of that report.  That obviously pre-dated the trial.  Is there information in there that talks about this medical condition?

A.      Yes.  Mr. Honken reported to Dr. Greenstein a history of having a heart flutter and indicating that it might be an irregular beat, and that I think those are the main things.

Q.      That's fine.

A.      He reported no prior health problems on his pre-sentencing report, but noted that he may have an irregular heartbeat.

Q.      Okay.  Thank you.  Just one moment.

OFF RECORD DISCUSSION

BY ATTORNEY NOLAN:

Q.      With respect to the family history of --- not the generational family history, but the immediate family history of Mr. Honken, Mr. Williams was asking you questions about any corroboration of abuse. And I'd ask you to look at the declaration of Alyssa Nelson, paragraph four.

WITNESS REVIEWS FILE

A.      Yes.

BY ATTORNEY NOLAN:

Q.      Now, is that something that you considered in formulating your overall opinions regarding Mr. Honken's --- the abuse in the family, that he was exposed to the abuse in the family?

A.      Yes.  This is his sister, Alyssa Nelson.  And she declared about how their father was verbally

189

and emotionally abusive, critical, describing their mother as mutilated because of her Cesarean section, really making others feel terribly and how their father emotionally and verbally abused all the children, and was also neglectful because he didn't encourage or help the children in any positive way.

Q.    All right.  I think that's all the questions I have.

ATTORNEY WILLIAMS:

I have no follow up.

A.    Great.  Thanks.  Good to meet you.

*  *  *  *  *  *  *  *

DEPOSITION CONCLUDED AT 3:51 P.M.

*  *  *  *  *  *  *  *

190

STATE OF WEST VIRGINIA)

CERTIFICATE

I, Leslie Blake, a Notary Public in and for the State of West Virginia, do hereby certify:

That the witness whose testimony appears in the foregoing deposition, was duly sworn by me on said date and that the transcribed deposition of said witness is a true record of the testimony given by said witness;

That the proceeding is herein recorded fully and accurately;

That I am neither attorney nor counsel for, nor related to any of the parties to the action in which these depositions were taken, and further that I am not a relative of any attorney or counsel employed by the parties hereto, or financially interested in this action.

OFFICIAL SEAL
STATE OF WEST VIRGINIA
NOTARY PUBLIC
LESLIE BLAKE
Sargent's Court Reporting Service
179 Summers St., Suite 617
Charleston, WV 25301
My commission expires February 15, 2021

*Leslie Blake*

Case 3:10-cv-03074-LTS-KEM    Document 67    Filed 11/02/11    Page 190 of 191

# LAWYER'S NOTES

| Page | Line | |
|------|------|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

PITTSBURGH, PA
HARRISBURG, PA
GREENSBURG, PA
ERIE, PA
INDIANA, PA
HOLLIDAYSBURG, PA

**SARGENT'S
COURT REPORTING
SERVICE, INC.**

210 MAIN STREET
JOHNSTOWN, PA 15901
(814) 536-8908

PHILADELPHIA, PA
WILKES-BARRE, PA
OIL CITY, PA
SOMERSET, PA
CLEARFIELD, PA
*CHARLESTON, WV*