UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF IOWA

---------

UNITED STATES OF AMERICA,

     Respondent,             Case No. C10-3074-LRR

-vs-

DUSTIN LEE HONKEN,

     Petitioner.             COPY

_____

EXAMINATION OF MELISSA PIASECKI, M.D.

Thursday, October 13th, 2011

Reno, Nevada

Reported by:KATE MURRAY, CCR #599

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

APPEARANCES:

FOR THE PETITIONER:

SHAWN NOLAN, ESQ.
AREN ADJOIAN, ESQ.
FEDERAL COMMUNITY DEFENDER OFFICE
Suite 545 - Curtis Building
601 Walnut Street
Philadelphia, Pennsylvania 19106


FOR THE RESPONDENT:

OFFICE OF THE US ATTORNEY
CJ WILLIAMS, ESQ. (Via videoconference)
Assistant US Attorney
401 First Street NE
Cedar Rapids, Iowa 52407

Case 3:10-cv-03074-LTS-KEM    Document 68    Filed 11/02/11    Page 2 of 87

I N D E X


EXAMINATION:                                          PAGE:

Direct Examination by Mr. Adjoian ------------   4

Cross-Examination by Mr. Williams ------------ 31

Redirect Examination by Mr. Adjoian ---------- 79

Case 3:10-cv-03074-LTS-KEM    Document 68    Filed 11/02/11    Page 3 of 87

BE IT REMEMBERED that on Thursday, October 13th, 2011, at the hour of 1:08 p.m., of said day at the US Attorney's Office, 100 West Liberty Street, Suite 600, Reno, Nevada, before me, KATE MURRAY, a notary public, personally appeared MELISSA PIASECKI, M.D., who was by me first duly sworn, and was examined as a witness in said cause.

---------

MELISSA PIASECKI, M.D., after having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. ADJOIAN:

Q. I will just introduce myself for the record. My name Aren Adjoian, and the last name is A-d-j-o-i-a-n.

With me is Shawn Nolan on behalf of Dustin Honken.

All right. Dr. Piasecki, can you please state your name and spell your last name for the record?

A. It's Melissa Piasecki, P-i-a-s-e-c-k-i.

Q. Have you been retained in this case as an expert

Case 3:10-cv-03074-LTS-KEM    Document 68    Filed 11/02/11    Page 4 of 87

by us --

A.  I have.

Q.  -- on behalf of Mr. Honken?

Can you tell us a little bit about your educational background, please?

A.  Sure.  I completed a four-year undergraduate degree at Washington University in St. Louis, and then I continued at the same institution for a four-year M.D. degree.

Following graduation from medical school in 1991, I went to University of Vermont for a four-year program in general psychiatry and completed residency training.

In 2004, I did a forensic psychiatry fellowship at University of Hawaii.

Q.  Great.  Can you tell us a little bit about your work history?

A.  Following my completion of residency training at University of Vermont, I moved to Nevada to join the faculty at the University of Nevada School of Medicine where I continue to work.

My position there is part-time and my roles include associate dean for faculty affairs, faculty development and continuing medical education, and then I have private activity in

Case 3:10-cv-03074-LTS-KEM    Document 68    Filed 11/02/11    Page 5 of 87

forensic psychiatry.

Q. Can you tell us a little bit about your forensic work history?

A. I began to work as a fellow and the kinds of forensic cases that I have worked on include civil and criminal cases. They include state as well as federal cases.

I am a regular expert for Washoe County because I'm a court-appointed expert for weekly civil commitment cases.

Q. In your criminal work, have you worked as both a government expert and defense expert?

A. I have.

Q. Do you have any experience working in capital cases?

A. I do.

Q. Have you worked for both the defense and prosecution in capital cases?

A. I have.

Q. Do you have any experience working in federal capital cases?

A. Yes.

Q. What is that experience?

A. There was a case, it was a federal case. I was part of a team that worked on that case and

that was for the government. The team had been retained by the government.

Q. Okay, great. Do you have any board certifications?

A. I do. I am certified by the American Board of Psychiatry and Neurology in general psychiatry as well as in forensic psychiatry.

Q. Can you tell us a little bit about your areas of research or fields of research and what primarily you do?

A. My areas of research date back to my residency training where I became interested and involved in research on nicotine and carried forth that research into some smoking-related research in Nevada, but also became interested in another stimulant, methamphetamine, and had one project related to methamphetamine.

I have also contributed to research projects looking at folks who have polysubstance dependence and different interventions for polysubstance dependence.

Q. Have you done any publication in the area of methamphetamine use and abuse specifically?

A. I have.

Q. What are the publications you have done with

respect to that?

A. I have a publication related to a study on whether or not an antidepressant medication would affect craving in methamphetamine-dependent individuals.

Q. Okay, great. How exactly did your interest in methamphetamine develop originally?

A. As I mentioned, I had some background in research related to stimulants, nicotine as a stimulant, and when I became a consultant for the Washoe County Detention Facility here in Reno, Nevada, I began to see many, many individuals who have methamphetamine dependence and became interested in the kinds of not just short-term problems but some of the long-term problems we saw as well with that group.

Following that, I did my forensic psychiatry fellowship in Hawaii where the methamphetamine use was even more prevalent than it was in Nevada, and the history of methamphetamine use was longer in terms of more generations were involved, and so I became even more aware of the short- and long-term consequences of methamphetamine on individuals and then on families and then on neighborhoods, so it originated from some of those

clinical experiences.

Q. All right. Have you been qualified as an expert before in state and federal court?

A. I have.

Q. How about military court?

A. I have been an expert in one court-martial case.

Q. I'm going to hand you a document here. Do you recognize that document?

A. Yes. That's my CV dated July 2011.

MR. ADJOIAN:

All right. At this point, I would move to offer the CV.

I understand we're going to be doing that subsequently at the hearing; is that correct?

MR. WILLIAMS:

That's my understanding as well, yeah.

MR. ADJOIAN:

Okay, great. So at this point, I would offer Dr. Piasecki as an expert in forensic psychiatry with respect to methamphetamine as well.

BY MR. ADJOIAN:

Q. Dr. Piasecki, can you tell us a little bit about what you did in this case?

First of all, were you -- did you meet

with Mr. Honken at any point?

A. I did not.

Q. Did you conduct a review of records in this case?

A. No, I did not.

Q. What records specifically or what items specifically did you look at in the preparation of your report in this case?

A. Early on in my involvement, I reviewed the direct appeal court opinion on the case, and I also received from your office, I believe it was a 1997 psychological evaluation; however, the basis of my opinion is the hypothetical that was sent to me.

It was sent to me in two documents. They're essentially the same up to a certain point. The first is a document that was sent on December 1st. The follow-up was from May 6th.

The May 6th document contains all the information from the December 1st and then includes a bit more information.

Q. All right. I'm going to show to you a document here. Do you recognize that as the December 1st hypothetical that we sent to you?

A. Yes, I do.

Q. I would later move to admit that. Then I'm

going to show you a second document here.

Do you recognize that as the May 6th hypothetical that we sent to you?

A. Yes, it is.

Q. Okay, great. I would move to admit that later as well.

Did you, based on these hypotheticals, generate a report for us?

A. Yes, I did.

Q. I'm going to hand you a document there. Do you recognize that as your report that you authored for us?

A. Yes.

MR. ADJOIAN:

Great. I would move to offer her report as well.

BY MR. ADJOIAN:

Q. Dr. Piasecki, can you tell us just generally what methamphetamine is?

A. Methamphetamine is a stimulant that has been around for a long time. Its precursor or its manufacture is based on amphetamine, and basically it's the same chemical as amphetamine with an extra methyl group, therefore, methamphetamine.

The extra methyl group makes it a little

Case 3:10-cv-03074-LTS-KEM    Document 68    Filed 11/02/11    Page 11 of 87

bit more potent and more prone to being a substance of dependence than amphetamine, although amphetamine itself is pretty addictive.

Q. What is sort of the chemical process by which methamphetamine acts on the user?

A. Well, methamphetamine is absorbed into the bloodstream through -- there's a number of routes that it could potentially be absorbed into the blood stream.

Once it gets into the blood stream, it transfers into the circulation throughout the system including brain circulation. It diffuses through the blood brain barrier and diffuses into brain cells.

So that's the first thing. All chemicals that affect our thinking or behavior typically are finding a way into our brain cells. Once within the neuron, methamphetamine causes a change in the way the neuron manages some of the chemical transmitters, specifically dopamine, serotonin and norepinephrine.

It triggers an excessive or abnormally large amount of release of neurotransmitters from the neurons in the brain.

Q. What are some of the physical effects

that methamphetamine can have on the body?

A.   Some of --

            MR. WILLIAMS:

            Objection.   Are we talking short-term or long-term physical effects?   Can I get a clarification on that.

BY MR. ADJOIAN:

Q.   What are some of the short-term physical effects that methamphetamine can have on the body?

A.   Short-term effects of methamphetamine include -- because it's a stimulant, it increases blood pressure, increases pulse.   It can decrease the seizure threshold and some people in the short term will have a seizure if their methamphetamine or amphetamine exposure is high enough.

            It can increase body temperature.   Some folks will have a tremor.   For some individuals, the increased blood pressure may result in a stroke.

Q.   Okay.   This knowledge of physical effects of methamphetamine, was it known to the medical and scientific community in 2004 and previous to that, the time of Mr. Honken's trial?

A.   Yes.   This is information that has been well established and distributed well before 2004.

Q.   Okay.   Is meth addictive?

A.   It is.

Q.   How long can it take to establish a physical addiction to methamphetamine?

A.   There's some difficulties in answering that question because we don't have a good research protocol or we don't have an ethical research protocol by which we can expose people to the drug in a controlled way and then see when they became addicted or dependent.

So we can look at the natural history of use and we can see some folks develop compulsive use of the drug very early on, within weeks or months.

There is also a path by which some people use the drug occasionally, and then over time, increase their use, and then at some point, which is hard to predict, lose control over their drug use.

One of the ways we can best understand addiction is loss of control over use, compulsive use, and use despite negative consequences.

Q.   All right.   I'm going to direct you to the hypothetical, the May 6th hypothetical that we sent you.

As we have sort of set forth in that hypothetical, the type of use that we have described there, daily use over the course of many months,

would that have the potential to have neurotoxic effects on a brain?

A.  Yes, it would.

Q.  Okay.  Can you tell us what neurotoxicity is generally?

A.  Neurotoxicity is damage to brain structure and/or brain function.  Methamphetamine is associated with neurotoxicity in a number of ways.

I may have lost track of your original question.

Q.  I apologize.  Just generally, does the type of use that we have set forth in the hypothetical, does that have the ability to sort of have neurotoxic effects or affect brain structures?

A.  It does, yes.

Q.  Can you tell us how it has the opportunity to or the possibility, rather, to affect brain structure?

A.  Just to clarify, the mechanism by which the drug could lead to brain damage or neurotoxicity?

The term neurotoxicity and the term brain damage, brain damage is a little bit more of a less technical term, but when we talk about neurotoxicity, we are talking about damage to brain

structures, so sometimes I will use those interchangeably.

Methamphetamine has a couple of actions that are known to be neurotoxic. There may be additional mechanisms as well.

Two that are well known is the acute and dramatic increase in those neurotransmitters that are released as a result of methamphetamine's actions on the neuron. Those neurotransmitters at such high levels are themselves considered to be neurotoxic or damaging to the cells in the immediate environment.

Another mechanism of neurotoxicity is high body temperature. What is interesting about research in this area, and this is research done with rodents, is that the body temperature that we measure from the body cavity tends to be lower than the body temperature in the brain, so people who are using methamphetamine, we believe part of the reason that they're high risk for seizures is because their brains are getting very overheated.

Q. What are the types of effects on brain structures that can result? What are the changes in the brain that can happen as a result of this neurotoxicity?

A.   Well, there are structural changes as well as functional changes.   The structural changes include shrinkage of some brain structures, again, thought to be because of neurotoxicity.

Neurons are -- either parts of the nerve cells or the entire nerve cell is damaged, and therefore, there is an actual shrinkage of brain structures comparing people who use methamphetamine to people who don't use methamphetamine.

Q.   I'm sorry.   What types of structures are we talking about?

A.   Specifically here I would be referring to the hippocampus which is a part of the brain that helps with memory and also is involved in emotions.

There's also functional -- well, let me say one more thing about structural first.

In our brains, we have gray matter and white matter, and there's a typical ratio in an adult brain of gray matter to white matter.

What we see in populations of people who use methamphetamine relative to nonusers is there are abnormal ratios of gray to white matter, which suggest a kind of inflammatory process.

Structural changes --

Q.   Before we move on to functional changes, can I

Case 3:10-cv-03074-LTS-KEM     Document 68     Filed 11/02/11     Page 17 of 87

ask you with regard to structural, can these changes be on a micro level or molecular level?

A. The structural changes, we can talk about at both levels. The macro level is the level that you'll see in whole brain studies where they can measure the volume of specific structures, and we're assuming that as structures shrink that's because the individual cells are shrinking.

However, we can also look for specific structures on the cell such as receptors or transporting proteins on the cells. We have ways of tagging those cellular structures with different kinds of radionucleotides.

It will show up on different kinds of brain imaging so we can see there are structural changes at that level as well, the proteins on the cells.

Q. With respect to structural changes, has this type of knowledge been known in the medical and scientific community since at least 2004, previous to 2004?

A. Yes, it has.

Q. If we can talk about brain function now, does methamphetamine use also have the potential to affect brain function?

A. It does, and there's two levels that we can talk about it. We can talk about brain function in terms of neuroimaging brain function looking at activity in specific areas of the brain given different tasks and different cognitive activities, and we can also look at brain function as we can observe it through an individual's performance on specific tasks.

Q. What types of ways does brain function have the potential to change as a result of methamphetamine use?

A. One notable change is memory, and sometimes it can be very dramatic that people can have memory problems following significant methamphetamine use or methamphetamine use over a significant amount of time.

Q. How about problems with executive functioning? Does that have the opportunity to affect that?

A. That's the other major area where we see changes in functioning in folks who have chronic exposure to methamphetamine.

The executive functioning encompasses a number of areas including organizing information, problem-solving, cognitive flexibility, which is related to problem-solving, judgment, impulse control, and there are tests that can be done in

controlled conditions to assess these different kinds of abilities.

If you review the literature for neuropsychological functioning in these executive functioning domains in methamphetamine populations, you see significant decreases in the performance.

Q. Again, does the type of methamphetamine use that was set forth in the hypothetical that we gave to you have the potential to result in these types of changes in brain function that you have just described?

A. Yes, it does.

Q. Have these changes in brain function been known in the medical and scientific community since prior to 2004?

A. Definitely, yes.

Q. Are there any behavioral correlates that sort of go along with these changes in brain structure and function that you have described for us?

A. Behavioral correlates have not always been linked with the neuropsychological controlled studies.

Behavioral correlates are more assessed based on research done in different contexts so people coming into treatment settings, people in the

criminal justice system.

They typically look at the behavioral correlates in those populations as opposed to the individuals who are coming into a lab and doing a very specific kind of task, so we don't have great research connecting these.

We also don't have research that shows that they're not connected. We just haven't brought all those pieces together at this time.

Q. Okay. What types of things in the types of contexts that you have described might we see in terms of behavioral correlates?

A. Individuals who have significant or chronic methamphetamine use are much more likely to have violence in their lives.

We see self-reported violence. We see association with different kinds of crimes, and we see increased death related to suicide and homicide.

Q. Is anxiety something that we might see as a behavioral correlate as well?

A. There's a number of psychiatric problems that are associated with chronic methamphetamine use.

These include psychosis or people having hallucinations, delusions, mood disorders such as

depression as well as anxiety disorders.

Q. You mentioned violence just a moment ago. Can you talk a little bit more about methamphetamine and its relation to violence and sort of what some of the research shows in that regard?

A. I'm going to refer to my report just só I can be consistent there.

Q. Sure.

A. The older drug amphetamine was noted in the 1970s or before to be associated with violence, and researchers have followed up in terms of whether or not methamphetamine also increases the risk or has a high association with violence, and it's borne true that the hypothesis was correct.

When I talked about the risk of suicide and homicide, I am referring to a controlled review of fatalities in Washington state, and compared to other substances of abuse, methamphetamine was much, much higher, had a much higher correlation with a violent death, again, either suicide or homicide.

If we look at folks in the criminal justice system, the odds of having a legal problem related to homicide is much higher in folks with recent methamphetamine use.

Folks who come in and are looking for

Case 3:10-cv-03074-LTS-KEM    Document 68    Filed 11/02/11    Page 22 of 87

treatment or are seen in the emergency room, they also are much more likely to report violence, problems with violence than folks who come in looking for treatment of other kinds of substance problems.

Q. Is, again, the type of use that we have described for you in the hypothetical something that might lead to increased risk of violence as you have just described it?

A. Yes.

Q. Now, are you saying that somebody who uses methamphetamine, even at neurotoxic levels, is definitely going to commit an act of violence in the future?

A. No. It increases the risk, however.

Q. Okay. How long has this link existed between methamphetamine and these types of behavioral correlates that you have described?

Has it been since at least 2004 and prior to that?

A. Yes. Again, if we look at the amphetamine data, it goes back to 1970s or before, so this is well established.

Q. What types of effects might the use of methamphetamine with other drugs of abuse in

combination have, and I'll specifically start with marijuana?

A.   Are you asking about behavioral or neuropsychological?

Q.   Let's start with neuropsychological.

A.   There's only a little bit of research that looks at these additive effects.

We know a lot about methamphetamine and neuropsychological deficits, and we know a lot about marijuana and neuropsychological impact.

What we see if we combine the two is that it looks like there might be some additive effect.

It's hard to extrapolate too much, however, because there really isn't a lot of controlled studies on this.

Q.   How about behavioral effects?  Is that something that has been studied?

A.   What we see with chronic and heavy marijuana use is, again, a negative effect on executive functioning, and with executive functioning we expect behavioral problems related to poor planning, judgment, impulse control.

Those dots have not yet been connected systematically in the research literature, to my knowledge.

Q. Okay. I want to talk a little bit now about sort of timing of effects that might be expected to see from methamphetamine use.

When might we expect, into a person's use of methamphetamine, some of the adverse effects, let's say, in brain structure that you have described so far?

A. We don't have controlled information because we're not allowed ethically to expose people to doses and then see what negative effects there would be.

However, it appears that a few months of use is enough for people to begin to experience some of those negative effects on thinking and behavior.

Some of it will have to do with the route of administration, the amount they use, and the frequency of use as well as the potency of the drug.

Q. On the timeline of effects, is it the case that, let's start with brain structure, that these types of changes can persist beyond the cessation of use of the drug?

A. Yes.

Q. And can you tell us a little bit about sort of how long after abstinence these effects might persist?

A. The changes at the cellular level, so the

dopamine transporter structure changes, if you do serial brain scans of individuals with chronic methamphetamine use, you will see that there is a lag time between the time people stop using and the time that there is normalization of those brain structures.

Eighteen months is the lag time that has been studied specifically, and you see normalization but not full return of those structures after 18 months.

Q. Okay. How about with brain function? Is that sort of similar in that regard?

A. It's similar but the course has been followed out a little bit longer.

What we see in terms of the testing, the controlled testing for memory, organization, judgment, planning, problem solving is that after someone stops using, there's a transient three- or four-month period where that executive functioning appears to decrease and memory gets worse, which is counterintuitive.

People expect you stop using a toxic drug, you get better, but for reasons that aren't completely clear, there's a decrease in functioning in the months following acute use followed by a



gradual return towards normal over a two-and-a-half to three-year period.

The study that has been the longest term in terms of looking at three years or almost three years, what they found is that the testing and the function, that people start to approach the population average in terms of functional performance, but they don't quite get there, so there may never be a complete return to normal, but people certainly get back into normal range.

Q. The return to normal range, about how long after complete abstinence might you expect to see that?

A. That's a two-and-a-half to three-year timeline.

Q. With the amount of methamphetamine use that we have set forth with you in the hypothetical, would it -- describing the complete cessation in 1996, would it be possible that now years later, there might have been a complete return to normalization after complete abstinence?

A. Yes.

Q. Would this normalization also occur even in brain structure?

A. Yes. The 18-month timeline, and I'm not sure if they have gone beyond 18 months, but the 18-month

timeline indicated that at 18 months, there was a trend towards normal.

Again, it didn't quite get back to that baseline or what you would expect to be a baseline in a normal person, but it certainly trended towards it.

One of the problems that we'll always find in this research in terms of if people can go back to a normal state is that we tend not to get information about people before they start using methamphetamine.

We tend to only identify these individuals after they have started to use and developed problems as a result of use, so there's always a question mark about the individual's baseline.

So we end up comparing folks to populations who have no use of methamphetamine and then using averaging to make those comparisons.

Q.   How long has the medical and scientific community known about sort of the timeline of effects for methamphetamine, the initial decrease in functioning and the later normalization?

A.   That information has been around, I would say, since the early 2000s.  I would say that we

have become more sophisticated in our neuroimaging starting around the year 2000, and so that information has become more known since then.

Q. I want to talk to you a little bit now just about the manufacture of meth. Are you familiar with the different processes for meth manufacturing?

A. To some degree, yes.

Q. Can the process of manufacturing meth in a closed environment as we have described in the hypothetical have the potential to have adverse brain and body consequences?

A. Yes. I would say there are two potential routes for those adverse consequences.

Q. What would the first route be?

A. The first route would be exposure to the substances that are used in the manufacturing, so there are some volatile compounds such as toluene that someone may be exposed to because of breathing fumes, spilling, things like that.

Q. How about the second route?

A. The second route of toxicity is when you cook methamphetamine, you are sending quite a bit of the substance into the air and it will deposit everywhere.

You will breathe it. You will absorb it through your skin, so you're exposing yourself to quite a bit of the toxic substance, methamphetamine.

Q. I would last just like to ask you about the effects of methamphetamine and sort of co-occurrence with social history and mental health factors.

We set forth in the hypothetical some social history information and mental health information.

Are you aware of any research on the risk factors related to the social history as we have sort of set forth for you and sort of how that relates to methamphetamine use and abuse?

A. Yes. The facts that I saw in the hypothetical that were significant with regards to this question included his father's substance use, his father legal criminal history, verbal abuse in the family, as well as, it sounds like, some psychological abuse, and then physical violence towards the mother.

These kinds of childhood adversities are associated with long-term problems for individuals in terms of increased risk of a number of kinds of problems including substance use, including methamphetamine use.

Q. Are all the opinions that you have given for us

here today offered to a reasonable degree of scientific certainty?

A.   Yes.

Q.   And psychiatric certainty as well?

A.   Yes.

MR. ADJOIAN:

Okay.   I have no further questions.

CROSS-EXAMINATION

BY MR. WILLIAMS:

Q.   Good afternoon, Doctor.

A.   Good afternoon.

Q.   I am CJ Williams.   I represent the United States in this case.

I want to go back over your direct testimony briefly here.   You spoke about that some people that are using methamphetamine develop a compulsive use and they lose control over the drug use over time.

Can you elaborate what you mean by "lose control"?

A.   Typically, we ask specifically if folks use more than they intended, if they were unable to cut down or able to discontinue.

An example would be asking an individual if they ever tried to quit using the drug, and if

Case 3:10-cv-03074-LTS-KEM     Document 68     Filed 11/02/11     Page 31 of 87

so, what happened.

Somebody who has compulsive use would most likely say, I tried to quit but then I went back even though I had intended to quit forever.

Q. Okay. Anything in the hypothetical as provided to you by counsel that indicates that happened with Dustin Honken?

A. I don't have information in the hypothetical about whether or not he tried to cut back or quit.

Q. Do you have any information in the hypothetical that would lead you to conclude that Dustin Honken fell in the category of compulsive meth users as you describe them?

A. Yes. There are a couple of facts from the hypothetical that suggested to me first that he was using several times a day. That is suggestive of compulsive use.

Another is that he was using for days at a time and would have these -- the term that sometimes we use is "runners" followed by crashes, and during a runner, during a continuous use without sleeping, that tends to be a pattern of compulsive use.

Q. Okay. Anything else?

A. Another piece is that he described some cardiac

symptoms, you know, heart racing, heart fluttering, and he continued to use.

Another way we try to assess for compulsive use is whether or not somebody continues to use even though there is some psychological, physical or social problems that the use seems to be associated with.

Q. Sure. That comes from the DSM, right, for methamphetamine dependence?

A. That, in fact, is a generic definition of dependence in the DSM, and we would apply it to methamphetamine in this case.

Q. Let's go back to this heart flutter thing. Where in that hypothetical does it indicate that he was suffering a heart flutter at the time he was using methamphetamine and continued to use methamphetamine despite that?

A. I'm looking at page 3, and it is the fifth paragraph down.

Q. Right.

A. It reports that he used meth for several days in a row, and he could not do it without his heart rate skyrocketing. At other times, he described his heart was racing or fluttering when he was using meth.

Q. So we're sure on this, and I think it's pretty

Case 3:10-cv-03074-LTS-KEM    Document 68    Filed 11/02/11    Page 33 of 87

clear on the record, the entirety of what you relied on in order to reach your opinion in the case is the hypothetical provided to you by counsel?

A. Yes.

Q. So you have not seen any other independent evidence to back up any of whatever is in this hypothetical, have you?

A. No, I haven't.

Q. Okay. So in all fairness, your opinion is only as good as this hypothetical is, right?

A. Yes.

Q. Okay.

A. I'm sorry. I'd like to just clarify.

Yes, except for when we talk about sort of broader things that are independent of the hypothetical, such as research, established research and things that are not specific to the case.

Q. Yeah, very fair.

To be more narrow then, when I say your opinion is only as good as the hypothetical, as it applies to Dustin Honken, right?

A. Yes.

Q. You indicated and you used a number of times in your testimony here today the words "Chronic meth use," okay.

What is the definition that you are relying on for "chronic meth use"?

A. I don't believe there is a set definition for chronic meth use.

In my clinical practice and forensic practice, I look at each case, and if somebody uses a controlled amount or a small amount over a long period of time, that could be considered chronic use.

If somebody uses large amounts for a few months, that could be considered chronic use, and the reason why I give you these examples is that when we look at the research and how they define chronic in different research studies, they do it in all these different ways.

In this case because it appears that the methamphetamine use occurred over a four-year period and at times was quite heavy, I feel comfortable that regardless of which kind of definition we want to draw upon, this case does fit chronic use.

Q. Okay. If we're assuming it was a continuous period of use over four years?

A. Not necessarily continuous period of use, but use over a four-year period, including periods of very heavy use.

Q.   Okay.   You indicated that one of the signs of chronic meth use in a functional effect is that it affects memory of a meth user over time.   Do you remember making that statement?

A.   Yes.

Q.   And again, anything in the hypothetical that was provided to you suggesting that Dustin Honken was suffering from any type of memory problems?

A.   No.

Q.   You mentioned a Washington state study that dealt with increased risk of correlation between violence and meth use.

When was that Washington state study conducted?

A.   In my report, I include that in the appendix. That's the Logan study from 1998, and it's called, "Cause and Manner of Death in Fatalities Involving Methamphetamine."

Q.   We'll talk about that in a little bit.

Now, you indicated that there's a correlation that has been borne out from research between meth use and violence, okay.

Are you saying that meth use causes people to engage in violence?

A.   No.   I am noting this consistent correlation or

association. There is even a temporal association that has been noted, but it hasn't been clarified to the point where we can call it causation.

Q. When you say "a temporal association," what do you mean by that?

A. There is one study where they looked at people who had a history of violence and methamphetamine, and they assessed whether or not they had a violent crime prior to methamphetamine-related violence.

They found that about half of those folks had no violent crime prior to methamphetamine violence, because one of the things that you might say is, hey, we have got people who use methamphetamine and we have people who are violent. They're the same people. Maybe it's just violent people who use methamphetamine.

So you would expect there to be a history of violence throughout their life, whereas in about half the people in this one study, they didn't have any violence prior to their meth use.

Q. You could look at that same study and say having a group of people where even 50 percent of the people had prior criminal involvement with violence is a pretty high number compared to the

average population, right?

A.   Uh-huh, yes.

Q.   And then they also use meth, so it could be as you indicated that people who are prone to violent acts are also the same type of people who are prone to do risky behaviors like use drugs, right?

A.   You could say that about some of those folks, yes, but you wouldn't be able to say it about all of them.

Q.   Based on the fact there was no reported criminal history convictions?

A.   I'm not quite sure if it was established that they were convicted of the crime or just that they reported a violent crime.

Q.   Okay.  So you're either relying on self-reporting or you're relying on convictions in order to establish that baseline?

A.   Correct.

Q.   Okay.  You're aware that the codefendant in this case, Angela Johnson, was involved in these murders and had no criminal history whatsoever?

A.   I don't think I was aware of that.

Q.   Are you aware that when she was examined by a psychiatrist in 1996, she denied ever having

any violent activity in her past?

A.   I know very little outside of the hypothetical.

Q.   Okay.  Let's go to the hypothetical a little bit.  I want to find out a little bit.

First of all, is it unusual for you to be asked to render an opinion based on a hypothetical that came from the defense attorney?

A.   It's not the first time I have been asked to develop an opinion based on a hypothetical.  It's not a -- it doesn't happen very often, but it's not the first time.

Q.   There wasn't anything in this instance, for example, to keep you from actually interviewing Dustin Honken, right?

A.   When I was retained, I was informed during the discussion about my involvement that I would not be interviewing him and that I would be asked to proceed in this case based on specific questions related to methamphetamine and methamphetamine effects in a more general way.

Q.   Were you told why you were limited in that regard?

A.   What I recall from the conversation was that the defense had identified a psychiatrist that was going to examine Mr. Honken and to do a more general or

broader evaluation, and I was asked to do a more narrow specific piece of -- to review and form an opinion on a more specific or narrow element of the case.

Q. Would you agree with me that your opinion would be on firmer footing if you would have been the beneficiary of having the results of the interview conducted by that other psychiatrist?

A. My opinion specific to?

Q. As it relates to Dustin Honken?

A. As it relates to Dustin Honken, yes.

Q. Okay. I want to direct your attention then to this May 6th letter of 2011 you got from defense counsel here and talk about a few things.

If you turn with me to page 2 and the last full paragraph on page 2 of the May 6th letter, it reads that Dustin Honken -- I'm sorry.

Honken himself suffers from mental health issues as well. He has suffered from lifelong and untreated anxiety disorder.

Do you know what the factual basis was for counsel to make that assertion in May of 2011?

A. I do not.

Q. Okay. But in order for you to render an opinion, you are in a position where you just have

to accept that as being true?

A. Yes, although I'm not sure I have been asked to render an opinion on that specific issue.

Q. Same thing with the reference down below, the next sentence. He also suffers from symptoms of obsessive-compulsive disorder and attention deficit disorder.

Do you know where the attention deficit disorder came from?

A. No, I do not.

Q. Is attention deficit disorder or obsessive-compulsive disorder, can that be a consequence of methamphetamine use, to your knowledge?

A. The technical response is hopefully not too involved, and that is, in order to be diagnosed with OCD or ADD, you need to rule out the effects of substances, and although I don't know what this is based on, if he is truly being diagnosed with an attention deficit disorder, that diagnosis would imply somebody has ruled out the impact of substances.

I don't know how these diagnoses were derived, but if that is the case, they would have considered that before coming to this. Otherwise,

instead of attention deficit disorder, it would be something along the lines of cognitive disorder secondary to substance abuse.

Q. Got it. All right. Let's go to the facts that tell you about Dustin Honken's meth use.

You indicated in your testimony today that the effects of meth use depend in part on -- I'm going to get the wording wrong, but I think you said the manner of use, the quantity, the quality and other factors like that, right?

A. Correct.

Q. So let's talk about that. From this hypothetical, can you establish on these occasions, on any occasion where Dustin Honken has reported to have used methamphetamine, how much methamphetamine he used on any of these occasions?

A. No.

Q. All right. Can you tell us how often he used methamphetamine other than the statement that sometimes he would use it for days at a time, and sometimes he would use it twice a day or more than once a day?

Do we have a handle on during this time period, the four-year time period you're looking at, exactly how often he actually did use it?

A. No. I have multiple times a day, and I have for several days in a row or days at a time.

Q. We don't know whether that was one occasion -- I'm sorry. I didn't mean to interrupt you.

A. That's okay. I was done.

Q. We don't know whether that's one occasion. We don't know whether that's five times. We don't know whether that's 10 times?

A. We don't know if it was 10 times; however, the way this is written, it appears that it was more than once.

Q. Okay. On the occasions when he used the methamphetamine, do we know how he used it, what method of ingestion he used?

A. What I see in the hypothetical was smoking it, snorting it and swallowing it.

Q. Okay. Never used it with IV, right?

A. Correct.

Q. Do we know on each of the occasions that he used methamphetamine how pure the methamphetamine was that he used?

A. No. There is a statement that the manufactured drug was of high purity, but it's not clear if that is for every use or just periods of use.

Q. Okay. You know what he was doing with this drug

was actually manufacturing it to sell, right?

A.  Yes.

Q.  Okay.  Then when he sold it, he actually had it cut with other substances to decrease the purity. You know that is how the meth world works, right?

A.  I know that is how the meth world works. I don't have any specific information about that in this case.

Q.  So we don't know from the hypothetical whether on one occasion he used it in the very pure form or whether he used it every single time in a pure form.

We don't know whether he cut it down to one percent purity or 10 percent purity or 50 percent purity on any of these occasions, do we?

A.  No.

Q.  Okay.  Do we know from your hypothetical whether he increased the amount of methamphetamine he used over time?

A.  No, not from the hypothetical.

Q.  Do we know from the hypothetical whether he needed to increase the amount of methamphetamine he used over time in order to achieve the same high?

A.  I can only infer it, in that most people don't begin using multiple times a day, so I can only infer it that he started with less than

Case 3:10-cv-03074-LTS-KEM    Document 68    Filed 11/02/11    Page 44 of 87

multiple times a day and then worked his way up to that.

Q. Okay. Do we have any evidence from the hypothetical that he wasn't getting high on the same amounts of methamphetamine, again without inferring from the fact that he used more than one time a day?

A. No.

Q. And again, we don't know whether that multiple times a day was one time or five times or 10 times, do we?

A. No.

Q. Do we know whether he suffered any physical problems resulting from the use of methamphetamine?

A. No. It appears that it may have exacerbated an existing problem, but I don't see any new problems other than an occasion noted on page 3 where he was feverish and light-headed.

Q. Okay. Do we know what happened with his behavior after he quit using methamphetamine?

In other words, do we know whether he suffered from depression? Do we know whether he suffered withdrawal symptoms? Do we know whether he needed treatment or anything like that, from the hypothetical?

A. No.

Case 3:10-cv-03074-LTS-KEM     Document 68     Filed 11/02/11     Page 45 of 87

Q. Do we have any evidence in the hypothetical that he ever took methamphetamine in a larger amount than what he intended?

A. No.

Q. Do we have anything in the hypothetical that said he took it over a period of longer than what he intended?

A. No.

Q. Do we have anything in the hypothetical that showed that he made efforts to cut down or control his use of methamphetamine that was unsuccessful?

A. Not from the hypothetical.

Q. Do we have any evidence from the hypothetical about how much time he was using to obtain the drug or whether it was interfering with his ability to carry on social functions, jobs or other interests?

A. Only through the description of the several days of use and then sleeping for up to two days.

Q. There's reference in the hypothetical to use of LSD, alcohol and marijuana.

Essentially, the same questions to you, we don't know how often he used those other substances, what quantity of those other substances he used, whether he used them at the same time he used methamphetamine, or whether he used them on

alternating days or anything like that?

We just don't know any details at all about the consumption of these other drugs, do we?

A.   With the exception of marijuana being mixed with methamphetamine and smoked together.

Q.   Okay.  How many times was that done?

A.   I don't know.

Q.   Based on the hypothetical you received, what do you understand his methamphetamine use was like after he was arrested in March of 1993 up until the murders that occurred in July and November of 1993?

A.   That his methamphetamine had decreased and become sporadic or intermittent.

Q.   During that time period do we know how often he used meth?

A.   No.

Q.   Do we know the quantity of meth?

A.   No.

Q.   Do we know the manner of ingestion of the meth?

A.   No.

Q.   Do we know the purity of the meth during that time period?

A.   No, not from the hypothetical.

Q.   All right.  Did the hypothetical inform you that during that time period he was subject to random

urinalysis testing?

A. No.

Q. Did the hypothetical inform you that in the presentence investigation report, he told the probation officer he had not used any methamphetamine after March 1993 up until the time of his subsequent release from charges, I think in 1995?

A. No.

Q. Counsel didn't -- I think you said you reviewed the 1997 psychological report from federal prison?

A. Yes.

Q. Did you pick up in there that he had reported to that psychiatrist the same thing, that he had stopped using methamphetamine after his arrest in March of 1993?

A. Yes.

Q. Now, on page 3 of this hypothetical, it says on the first full paragraph, it says, When Honken returned to Iowa from Arizona, and then it goes on to talk about what his meth use was and things like that.

Do you know when that was, when he returned to Iowa from Arizona?

A. No.

Q. So if we're trying to figure out how many months this is or how many weeks that he was under this circumstance, we can't tell that from the hypothetical, can we?

A. No.

Q. All right. In the hypothetical counsel gave you there is an indication here and the next paragraph says, After 1993 until his arrest he continued to use meth.

Do they tell you when he was arrested?

A. The last sentence of that paragraph says, This use continued until his 1996 arrest.

Q. Okay. Do you know when in 1996 he was arrested?

A. I do not.

Q. All right. From the hypothetical that was provided to you by counsel, is there anything indicating to you that Dustin Honken was under the influence of methamphetamine at the time that he committed the murders in July and again in November of 1993?

A. No.

Q. Turning to the manufacturing for a minute, the hypothetical indicates to you that this was in some type of enclosed structure.

From the hypothetical, do you know what

kind of structure this was?

A. It says it was a remote house.

Q. Okay. Do you know where in the house the manufacturing took place?

A. No.

Q. Do you know if it even took place in the house versus a shed outside the house?

A. It said, In a remote house, so I was led to believe it was in the house itself.

Q. Okay. Do you know whether any ventilation system was used?

A. The hypothetical indicates that there was some ventilation, but it wasn't consistent, and I can find that for you, I believe.

Q. I think it's on page 4, first full paragraph. It says, The place Honken used to manufacture meth was not always well ventilated, but that's a little bit different from what I asked.

Well ventilated could mean just opening windows, right?

My question to you is you don't know whether he used a ventilation system designed to withdraw the fumes from the location, do you?

A. Correct. I do not.

Q. From this hypothetical, we don't know how many

hours Dustin Honken was actually involved in the manufacturing process, do we?

A.   Not from the hypothetical, no.

Q.   Okay.  In fact, from the hypothetical, we don't know what his involvement was in the manufacturing process, so in other words, as you know, there are multiple steps in the manufacturing process.

The use of toluene occurred at an early step in the process, right?  We don't know if Honken was involved in that step, or if he was involved in a later step, right?

A.   Correct.

Q.   So is it fair to say, Doctor, from this hypothetical, you can't really determine if Honken was exposed to any chemicals at all, can you?

A.   From this hypothetical, if he was -- well, I don't want to be -- I don't want to exclude methamphetamine from a chemical that he was exposed to, but in terms of the chemicals of the manufacturing, if I accept the facts of the hypothetical that he was involved in the manufacturing, then I would believe that he was exposed to chemicals.

Q.   Okay.  But you don't have enough details here to know what chemicals he would have been exposed to,

when he would have been exposed to them, how long he would have been exposed to them, how he would have been exposed to them.

You don't have any of those details, do you?

A. I don't have any of the details, if somebody else produced with him, if he was involved in all of the steps or only some of the steps, that's correct.

Q. There is another paragraph here in the letter. The next paragraph down talks about exposure to chemicals in a workplace.

Are you relying upon anything in that paragraph to form your opinions?

A. No, I am not.

Q. Okay. Going to your opinion, Doctor, I want to go to the second page of your opinion.

If you go to the third paragraph and the third sentence of that paragraph, you indicate that over time, methamphetamine has toxic effects on brain cells which lead to changes in brain structure and function.

I'm just curious. When you say, "Over time," what do you mean by that?

A. Again, because so much of the research uses

different timeframes, it's difficult to give you a single response.

I would say the period of time is everything from acute exposure that they use in animal studies where they give a baboon a big dose of methamphetamine and then look at the baboon brain right away, to adult studies where the association is six months or 12 months down the road.

Q. Now, in your direct testimony, you were talking about imaging, brain imaging here. You're not aware of any brain imaging done on Dustin Honken at any point, are you?

A. I am not.

Q. When we were talking about the association between violent behavior and methamphetamine use, if I recall correctly, your testimony was that this is largely in a nonclinical setting.

This is where it's self-reporting by people coming in and having exposure to the medical community or legal community, and in that process, questions are asked about their involvement in violence and so forth. Did I get that right?

A. Yes.

Q. Okay. In those instances, did the research or

the studies indicate whether that violence that they had engaged in was while they were intoxicated with methamphetamine or whether there was any association with their use of methamphetamine or not?

A. There are several approaches to that. One is whether or not somebody is intoxicated. Another is if somebody has had lifetime use of methamphetamine, and another is whether people have had methamphetamine within a window of time prior to, but not necessarily at the time of the violent act.

Q. All right. So what is the bottom line on this then?

When you are relying on these studies for the association between violence and methamphetamine, is the violence occurring while people are intoxicated, or is there no association necessarily with that?

A. It is associated while people are intoxicated, and there are specific kinds of violence that are associated with intoxication.

Sometimes, when people are intoxicated, they become psychotic and they have paranoid beliefs and act sometimes on these delusional beliefs in

violent manners.

There is also a more general association that if you have been using methamphetamine over a period of time, you are more likely to have had a violent act.

So there are different approaches that they have taken. The association is there. It's just there to different degrees for these different kinds of specific questions.

Q. Okay. We're not in a position today with the research to be able to say, you have a 20 percent more likelihood of engaging in violent acts if you're a meth user over a long period of time versus 10 percent versus 90 percent. We just don't know?

A. I agree. We don't know to that specificity.

Q. If you go to page 4 of your report and the first full paragraph, in about the middle of that paragraph, there's a sentence that says, There is a positive relationship between adult methamphetamine use and childhood physical abuse, sexual abuse, neglect, so forth and so on.

Do you see that sentence?

A. Yes.

Q. Then the next sentence goes on to

describe what you have been told about Honken's

family, having multiple adversities including

parental mental illness, parental incarceration,

paternal alcoholism, and violence against his mother

as well as possible psychological neglect and

physical abuse of Mr. Honken.

Do you see that?

A. Yes.

Q. Okay. Now, I'm trying to figure out what is the

source for you to -- where you concluded that there

had been physical abuse of Mr. Honken?

A. I think the phrase, "Possible physical abuse" is

directly linked towards, "Jim was violent towards his

family."

I thought it was possible that that

violence towards his family included physical abuse

of Mr. Honken.

Q. All right. You're not aware of any

actual evidence of establishing physical abuse of

Mr. Honken, are you?

A. No.

Q. While I understand your position that there is a

correlation again between childhood adversity and use

of drugs, people can just choose

to use methamphetamine without having those kind of

backgrounds, right?

A. Yes.

Q. Do you know what the circumstances are behind Honken's decision to use methamphetamine?

A. No.

Q. If we look at these factors you were talking about, we have, let's see, parental substance abuse. We're talking about with regard to Honken, that was his father, right?

A. Yes. His father's alcoholism.

Q. Okay. You're aware that Honken wasn't living with his father after age eight?

A. I believe the hypothetical indicates that the family broke up and that -- let me just get it for you.

They divorced when Honken was a child; however, the earlier paragraph on page 2 indicates that the father enlisted Dustin and his older brother to participate in some of his schemes, which suggested to me that there was some ongoing contact.

I don't know when the contact stopped, if it ever did.

Q. Okay. You just don't know from the hypothetical the extent of any contact that occurred after that, right?

A. Correct.

Q. Okay. When Mr. Wiseman had provided you with the facts in these letters, did he inform you that Dustin Honken again described to the probation officer that he grew up without any neglect or abuse in his family?

A. No.

Q. Did Mr. Wiseman alert you that Dustin Honken described his mother as "perfect"?

A. No.

Q. Looking at these factors, you're not aware of any partner violence, are you, involving Dustin Honken where he was violent against any of his partners or any of his partners were violent against him?

A. I don't think there is anything in the hypothetical that relates to that. Is that your question?

Q. Yes, ma'am.

A. Okay.

Q. Are you aware of any prior substance abuse prior to his methamphetamine abuse?

A. Not that I'm aware of. It looked to me from the hypothetical that methamphetamine started at age -- in 1992, and then it was 1993, it looked

as if, from the hypothetical, that during this time, he was sporadically using other substances. I inferred that the methamphetamine came first.

Q. Okay. Now, the last sentence of this paragraph we have been looking at says, Predictors of violence in adult methamphetamine users group are family deviance and so forth, and one of the things you have down here is social functioning problems such as school, family and work problems.

The hypothetical that was provided to you by Mr. Wiseman, did he provide you with any indication that Dustin Honken suffered any school problems?

A. No.

Q. Are you aware that he actually did pretty darn well in school?

A. No. I mean, I don't doubt your representation if that is what you're asking. I have no reason to doubt.

Q. I'm just asking you whether you know --

A. I don't know either way.

Q. Okay. How about work history? Anything in the hypothetical indicate to you that Dustin Honken had any problems with his work history?

A. Only that he may not have complied with some of

the safety rules when he worked at this company, that he didn't always follow safety procedures and put his arm into a tank of solutions.

Q. Okay. Nothing in the hypothetical indicating that he had an absenteeism problem, right?

A. No.

Q. Nothing indicating he had behavioral problems at work, right?

A. Correct.

Q. You referenced your appendix earlier about the articles, and I would like to turn to that for a minute.

You indicate, and I'm sorry to do this. The last paragraph of your opinion, you indicate that in the attached appendix are some articles from peer-reviewed scientific publications prior to the fall of 2004 that present or summarize research findings related to childhood adversity and methamphetamine affects on brain and behavior.

Do you see that sentence there?

A. Yes.

Q. You had cited some prior articles or research studies in this opinion dating after 2009, and what you're indicating here, if I understand, is

even though I have cited some later articles or later studies that occurred after 2004, here are the articles that I'm basing my opinion on as to what the scientific community knew back in 2004. Am I getting that right?

A. Yes. It's not explicitly stated, but that is exactly correct.

Q. Okay. Got it.

You actually say in there that, Although I also refer to more recent research in my report, the articles below form the basis of my findings. That's on the appendix?

A. Yes.

Q. Okay. So I want to talk to you for a minute about these studies then.

Just going down the list of the studies here, the first one in there was actually published in June of 2004 about two months prior to the trial in this matter.

It was designed to demonstrate the brain structural deficits in meth users, right?

A. Yes.

Q. Okay. In that article, it acknowledges limitations of the study, and it says, It is not yet clear how these deficits emerge over time, whether

they are progressive and to what extent therapy or abstinence may reverse them.

That was the state of the art in 2004 right before the trial, right?

A. Yes.

Q. Now, in this study, they use -- number one, this was a study of chronic methamphetamine users, right?

A. Yes.

Q. Whatever that term may mean?

A. They probably -- let me see if they defined it. It's always a bit of a --

Q. They do. They have 22 meth users subject to the study, and each one of them met the diagnosis under the DSM for meth dependence?

A. Right.

Q. They had used meth for an average of 10.5 years, and they consumed about three grams of meth per week.

A. Okay.

Q. Okay. Now, first of all, that's not anywhere near Dustin Honken, right?

A. In terms of the chronicity, correct. My information is that his methamphetamine was across a four-year period, which is less than the average 10 years of the subjects in this study.

Q. Okay. If that four-year period is wrong, then

Case 3:10-cv-03074-LTS-KEM    Document 68    Filed 11/02/11    Page 62 of 87

it's even less like the study done in 2004, right?

A.   Yes.

Q.   This study also used PET scans and MRI imaging, right?

A.   Yes.

Q.   You don't know whether that was done in this case at all, right?

A.   Correct.

Q.   Okay.  The second study that you relied on was, "Higher Cortical and Lower Subcortical Metabolism in Detoxified Methamphetamine Abusers"?

A.   Yes.

Q.   In that article, it notes, number one, that the data from human studies is very limited, right?

A.   Yes.

Q.   It basically concluded that evidence of meth abuse results in changes in function of dopamine and non-dopamine innervated brain regions. That was really the conclusion from that study, right?

A.   It also talks about metabolism in parts of the brain that I haven't talked about so far. It's called the striatum and the thalamus, so it talks about some of these deep brain structures and change in the metabolism of dopamine.

Q.   Okay.  Again, this study used PET scans in order to do imaging to see these changes, right?

A.   Yes.

Q.   Now, this study involved 15 detoxed meth users, each of which met the DSM criteria for meth dependence, right?

A.   Yes.

Q.   They did not include anybody in the study unless the average meth use was involved for at least one and a half grams a day, five days a week for two years.

That was the body of meth users they studied in this imaging, right?

A.   I can confirm that if you would like.  I have the study in front of me.  I don't know off the top of my head.

I see it right now.  Yes, that was the study criteria.

Q.   Okay.  So again, to the extent, if Dustin Honken doesn't meet anywhere near that type of a meth user, then relying on this study is kind of hard to do applying it to Dustin Honken, right?

A.   It decreases your confidence in making opinions about his brain two weeks after he stopped using methamphetamine because this is really based

on short-term abstinence, two weeks of abstinence.

Q. Okay. In fact, if Dustin Honken had stopped using methamphetamine from March up until July of 1993, before the first murders occurred, we're talking about a four-month abstinence, and this study is -- again, you don't have a lot of confidence in applying this study to Dustin Honken's situation?

A. I have less and less confidence as we deviate from the population that was studied.

Q. Okay. Going to the next, "Cause and Manner of Death in Fatalities Involving Methamphetamine." This involved autopsies and toxicology reports, about 146 cases where meth was detected in a deceased person's blood, right?

A. Yes.

Q. And it looked at the concentrations in the blood?

A. Yes.

Q. And it concluded that methamphetamine concentrations in blood alone should not be used to establish conclusively whether a death is attributable to meth use. Rather, it should be a complete death investigation.

That was the substance of what that study

was about, right?

A. Yes, and I think what Dr. Logan was inferring is that you can't just take a lab test and say that this person died of methamphetamine

toxicity because some people can really tolerate high, high blood levels, levels that would kill somebody who has never used before.

So you can't just take the numbers and assume that the cause of death was directly related to the toxicity of methamphetamine.

Q. Okay. Fair enough. The next article is, "Relationship of Adverse Childhood Experiences to Adult Health."

That study involved asking 26,000 adults about childhood abuse and household dysfunction, and determined whether there was a correlation with later physical and mental health problems, right?

A. Yes.

Q. What that study found was that the people who suffered these adverse childhood dysfunctions, childhood abuse, had a greater likelihood of, one, smoking; two, obstructive pulmonary disease; three, IV drug use; four, depression; five, suicide attempts; six, diabetes; seven, obesity; eight, sexually transmitted diseases; nine, alcoholism, and

ten, job performance problems, right?

A.    Yes.

Q.    All right. From the hypothetical given to you, other than smoking methamphetamine, are you aware that Dustin Honken ever smoked any other substances?

A.    Just marijuana.

Q.    Okay. You don't know anything from the hypothetical that he ever had any type of obstructive pulmonary disease?

A.    Correct.

Q.    We don't know -- in fact, we know that he never used drugs by IV, right?

A.    Yes. At least it is stated in the hypothetical what his routes were, and IV was not listed among them.

Q.    Okay. There is nothing in the hypothetical that would establish he ever had depression?

A.    Correct.

Q.    Ever attempted suicide?

A.    Correct.

Q.    That he doesn't have diabetes or obesity according to the hypothetical?

A.    Correct.

Q.    We're not aware from the hypothetical he has any

sexually transmitted disease, alcoholism, or job

performance problems, right?

A.   Correct.

Q.   Now, this study did not look at the likelihood

of engaging in violence, did it?   That wasn't one of

the things it tested for?

A.   No.

Q.   And it didn't specifically test for the

likelihood of somebody abusing methamphetamine as

opposed to IV drug abuse?

A.   Correct.

Q.   Okay.   The next article is, "Neuropsychological

Effects of Chronic Meth Use,"

and that article wasn't an article about a study

that the authors themselves performed.

This was actually kind of a summary of

the literature that was out there in the field at

the time?

A.   Yes.   This is a review article.

Q.   Okay.   Again, the other studies that it relied

on and was kind of reviewing, those studies used MRI

and PET scan brain imaging in order to

reach the conclusions, right?

A.   They reference a large number of studies, some

of which were PET scans.

Q. Okay. Some of which were also MRI's, right?

A. Right, and some were rat studies where they did basic science research on rats, so if I look at the bibliography, there are 88 studies and there's a wide variety of research methods described within those 88 studies.

Q. Okay. By the very caption of the title of this, what it was looking at was chronic methamphetamine use, but the article never defines what chronic means for purposes of this article, does it?

A. No, and that's likely because of those different research articles that they're reviewing, the definition of chronic varies so much.

Q. Right. So again, we don't know whether any of those definitions necessarily would fit Dustin Honken?

A. I would say it's very, very likely that a four-year period of use would constitute chronic use, although I haven't looked at each of the studies reviewed in this bibliography that relate to human subjects.

I think it's really unlikely that four years would not be well within the window of chronic use.

Q. Okay. Now, this was published in summer of 2003, right?

A. Yes.

Q. In summer of 2003, it indicates that, and this is at page 321 of the article, that less is known about the long-term cognitive effects of methamphetamine use, right?

A. Correct.

Q. Again, at page 321, it indicates that clinically, methamphetamine dependent individuals appear distractible and exhibit difficulties in sustaining attention.

Do you see that, top of the paragraph, bottom of the page?

A. On page 321? Yes.

Q. On the left-hand column?

A. Yes. I do see that.

Q. Okay. Anything in the hypothetical that was provided to you by Mr. Wiseman that indicated that Dustin Honken exhibited behavior that showed him to be distractible or had difficulty sustaining attention?

A. No. There is nothing specific that points to that.

Q. Going to the next article, "Abuse and Violence

History of Men and Women in Treatment for Methamphetamine Dependence," and again, this was a study of people who met the DSM criteria for meth dependence, right?

A. I'm pulling up that article so that I can respond to your questions about it.

Q. Okay.

A. This is Cohen? Is that what we're looking for? Yeah, I have it right here.

Q. Yes.

A. Got it.

Q. Even by the caption, the title itself, it's for people with methamphetamine dependence, right?

A. Yes, and I see the study criteria on page 379.

Q. Okay. Now, this study, the title can be a little misleading, but this study was, in fact, a study that discussed the correlation between those who are meth dependent and those who suffered from abuse and violence as children, right?

Not a correlation between meth users and people who engage in abuse and violence?

A. Correct. These are folks who experienced past interpersonal violence or current interpersonal violence.

Q. Going to the next article, it's the Assault and

Homicide Associated with Amphetamine

Use.

A. The Ellenwood article?

Q. Yes, Doctor.

A. From 1971, yes.

Q. Yeah. Actually, the title is "abuse" not "use," right?

A. I will confess to you that I could not find my copy of this article in my files, and so I don't have this article in front of me to refer to at this time.

Q. Okay. Do you remember enough about that to recognize that this was a study of -- a history of 13 people who killed other people, but it was while they were intoxicated on amphetamine?

A. I am sorry. I have not had a chance to review this article in a number of months.

Q. Okay. That's fine. Then I think the last article then is, "Psychiatric Symptoms in Methamphetamine Users," the Zweben article?

A. Yes.

Q. That was published in March and April of 2004, again, just a few months prior to the trial in this case?

A. Yes.

Case 3:10-cv-03074-LTS-KEM    Document 68    Filed 11/02/11    Page 72 of 87

Q. It states that the state of knowledge of meth use or meth symptoms and so forth in 2004 is that relatively little is written about psychiatric symptoms of this meth-dependent population.

Isn't that kind of how they start off the second paragraph?

A. Yes. That is part of their introduction to their paper.

Q. Okay. Now, this was a study involving 1,016 subjects, each of which, again, met the DSM criteria for meth dependence, right?

A. Yes.

Q. This was the study that you were talking about, in part, I think that found a correlation between the population and involvement in violence?

A. Yes.

Q. In the study, though, it doesn't set out whether the acts of violence occurred while the subjects were intoxicated on methamphetamine, does it?

A. I think they're only looking for a broad report of violent behavioral problems and not necessarily any specific acts of violence at any time within a specific time period of use or nonuse.

Q. Okay. My point, Doctor, is that to the extent that is there a correlation between violence and meth

use found by this study, we can't -- from reading the article itself, we can't tell whether that violence was while the people were intoxicated on meth or not, right, because they don't say?

A. Correct. It's just an association between having methamphetamine dependence at the time you come into the study and having lifetime behavioral problems.

They also looked at some other specific kinds of behaviors, but lifetime violent behavior problems.

Q. Okay. But for all we know, from this study, every time somebody would have committed violence that came up in the study, it would have been they were high on methamphetamine at the time?

A. It could have been.

Q. Okay. We just don't know?

A. We just don't know.

Q. Okay. In fact, this study found that the greatest frequency of violence was with IV meth users, right?

A. Yes.

Q. It was like three times higher?

A. Yes.

Q. The violence that it studied in here, according

to report itself or the study itself, it says that when it defined violence, it defined it as legal charges for violent crime, e.g., assault, weapons, and self-assessment of difficulty in controlling violent behavior or anger. That's at page 184.

That was their definition of violence, right?

A. Yes.

Q. There is nothing in this study that studied whether there is a correlation between meth use and murdering people, right?

A. No.

Q. Are you aware of any study that exists out there that study whether there's a correlation between meth use and murdering people?

A. Yes. I'm not sure I have it with me, but let me look.

Q. Okay.

A. I don't have it with me, but there is a study specific to methamphetamine use and homicide.

Q. Do you know when that study was done?

A. I'm not sure.

Q. Okay. It's not listed on the articles that you relied on in forming your opinion.

Did you rely on that article in order to

form your opinion?

A. I did. I didn't include it because I restricted those articles to articles that were published before fall of 2004, so I don't remember specifically when it was published, but I am pretty sure it was after 2004.

Q. Okay. From my own curiosity, I'd like to know about that article just because I'd like to read it at some point, so if you get a chance to let counsel know what that article is at some time, I'd sure appreciate it.

A. I just noted that I referenced that study on page 2, and that article was a 2009 article. This is the homicide risk.

Q. Okay. That's the one you are referencing? Okay.

A. Yes.

Q. Do you know what the title of that is or the author?

A. No. I'll have to find it and send it along.

Q. Yeah. If you get a chance, that would be great.

Would you agree with me that the most relevant data for assessment of current risk of violence is past behavior?

A. I would break it down a little bit further. I

would say that there are several

domains, and past behavior is one important domain.

Q. Okay. Do you remember authoring an article

entitled, "Assessment of Psychiatric Patients' Risk

of Violence Toward Others," published at Volume 49,

Psychiatric Services, 1129, 1998 article?

A. Yes.

Q. Do you remember making that statement in that

article?

A. Not specifically, but I --

Q. Quoting from it at page 1129, the statement that

you wrote was, "The most relevant

data for assessment of current risk of violence are

past behaviors." Does that ring a bell?

A. Yes, it does.

Q. Now, was there anything in this case that you

asked for from counsel that was not provided to you?

I understand that you got these two

letters. Did you ask to see more?

A. At the outset, we had a discussion about what my

involvement would be, and so I understood that I

would be receiving a hypothetical, so I had

no expectation that I would be requiring additional

information based on my role.

MR. WILLIAMS: I understand. All

right.

I have no further questions.

MR. ADJOIAN:  If I could just have a moment, please?

MR. WILLIAMS:  Thank you, by the way, Doctor.

DR. PIASECKI:  You're very welcome.

REDIRECT EXAMINATION

BY MR. ADJOIAN:

Q.  Thank you, Counsel.

Doctor Piasecki, just to begin, you were asked a number of questions on cross-examination about the hypothetical, and you know, your opinion being as good as the hypothetical and that sort of thing.

Just to be clear, is the scientific information that you have given us in your report and in your testimony based on the specific facts of the hypothetical?  That is to say, is the science behind methamphetamine valid?

A.  I believe it is, yes.

Q.  Okay.  You were asked at the beginning about whether or not Mr. Honken's drug abuse could be considered -- whether he had an ability to control his drug use.

If I could direct you to page 3 of the May hypothetical, did you note about halfway down the page that he was arrested in 1996?

A.   I see that, yes.

Q.   Would an arrest be the type of thing that might cause someone to cease methamphetamine use?'

A.   Yes.

Q.   You were asked also a number of questions about whether or not you had observed anything in the hypothetical about, say, problems with school, problems with work, that type of thing.

Is methamphetamine use something that would necessarily cause a user to have deficits in all aspects of his or her life?

A.   No.   People may have deficits or difficulties that are more prominent in some areas than others.

There are, however, some folks who have such terrible substance use problems or are end stage with substance use where they have been using throughout their life that sometimes they get to a point where they do have fairly global deficits.

Q.   You were also asked if you had information regarding a number of things regarding Mr. Honken's use such as the specific number of times per day or times per week, the percentage

purity.

In all of the studies that you have seen in your career, is it often the case that information is available to the degree of specificity that you were asked about on cross-examination?

That is to say, precise purity, precise number of times that the drug has been used?

A. Typically, what you see in research studies is just the time period of use, and as we have gone through some of these research studies, you have heard that some studies also ask or estimate the number of grams per week or the number of times per week.

However, that is based on self-report, and so when I read those studies, I understand that there is going to be some variability even within their own parameters because they can't go back and verify that this person has been using for 10 years.

There is typically some variability, and even if they were looking for that level of specificity, they probably couldn't get it in a valid way because people don't remember, keep records, or accurately report for other reasons.

Q. In your clinical experience, is it often the

case that a person will come in and speak with you and be able to tell you the precise purity of meth that they have used?

A. No. People tend to have some general sense of whether or not it was good stuff or not good stuff, but I haven't had the clinical experience of people being able to get more specific than that.

Q. All right. Okay. I believe you were asked questions about urinalysis testing post arrest in 1993, and whether or not you were aware that urinalysis testing came up clean after Mr. Honken's arrest at that time.

If we could just go back to talking about the timeframe testimony that you gave a little bit earlier on direct, would somebody -- even if we were to assume complete cessation of methamphetamine use in, say, March of 1993, might a person still have lingering effects in July or November of that same year?

A. The time course of methamphetamine -- of the correlated neuropsychological problems with methamphetamine is over a time period of up to three years.

If you study a population with heavy

methamphetamine use and you retest their abilities in terms of neuropsychological executive functioning, you see an initial deterioration of functioning, and then after four months, five months, a trend back towards normalization.

That trend gets close to normalization at two and a half to three years. The studies that I'm aware of have not gone beyond two and a half to three years, if it actually gets up to the level of population average.

So we really don't know if people ever get normal, but we do know that over a two-and-a-half to three-year period, it trends towards normal.

Q. I believe you just said that a person's functioning can get worse over a period of four to five months after complete cessation, so is it, in fact, the case then that someone might be worse off five months after abstaining from drugs, from methamphetamine, than that person was at the last moment of use?

A. It's possible.

Q. And then I believe you said that that gets gradually better over two years, two and a half, three years?

Case 3:10-cv-03074-LTS-KEM    Document 68    Filed 11/02/11    Page 82 of 87

A. Yes. This is averaged for populations of users, yes.

Q. Okay. So is there a specific timeline that can be given for every methamphetamine user?

A. No.

Q. What effect does -- can you just tell us a little bit about what effect the abstinence has on a person's brain as compared to when they were using?

A. What has received the most study is memory problems following abstinence.

During the initial period of abstinence, folks are -- populations of methamphetamine users show pretty marked deficits in memory.

The hypothesis of why you would have worse problems following cessation of a toxic drug rather than while you're taking the toxic drug, the hypothesis is that following cessation of the drug, there is some inflammatory process that is part of the brain's healing, so to speak, but that is really hypothetical.

We don't know exactly what the factors are that contribute to that transient worsening of cognitive functioning.

Most of the work has been on memory, but

what we see from smaller studies is that all of the executive functioning averaged together for a population of users takes a hit in the first three, four, five months, and then trends back towards normal over three years.

Q. Okay. You were asked a couple of questions about brain imaging, and whether or not it was done in the case and whether you were aware of it.

If brain imaging had been done in a case more than three years after a person stopped using methamphetamine, might that reflect normal or close to normal at least with respect to that person's baseline brain function and structure?

A. Yes.

Q. Okay. Just to finish up here, you were asked a number of questions about the articles that you have cited in your report and, you know, whether or not certain specifics with regard to each population was present in this hypothetical.

Is it often the case that a study is going to involve a precise 100 percent match with a patient you might be seeing or in a forensic context, someone who you have evaluated or are talking about?

A. Although we always try to find the

85

closest match possible in terms of demographics and history and so forth, often we end up with an approximate match.

Q. Are all of the opinions that you have offered in your report, are they drawn from the body of research that you have cited in your appendix?

A. They're drawn not only from those but from my clinical training, experience and reading beyond the materials that I specifically reviewed for this case.

MR. ADJOIAN:

I have no further questions. Thank you.

MR. WILLIAMS:

I have no further recross. Thank you.

(Examination concluded at 2:56 p.m.)

Case 3:10-cv-03074-LTS-KEM   Document 68   Filed 11/02/11   Page 85 of 87

STATE OF NEVADA            )
                          )    ss.
COUNTY OF WASHOE          )


          I, KATE MURRAY, a duly commissioned and
licensed court reporter, Washoe County, State of
Nevada, do hereby certify:

          That I reported the taking of the
examination of MELISSA PIASECKI, M.D., commencing on
Thursday, October 13th, 2011, at 1:08 p.m.

          That prior to being examined, the witness
was duly sworn to testify to the truth.  That I
thereafter transcribed my said shorthand notes into
typewriting and that the typewritten transcript of
said examination is a complete, true and accurate
transcription of said shorthand notes.

          I further certify that I am not a
relative or employee of an attorney or counsel of
any of the parties, nor a relative or employee of an
attorney or counsel involved in said action, nor a
person financially interested in the action.


          DATED:  At Reno, Nevada this 18th day of
October, 2011.

                          _____
                          KATE MURRAY, CCR #599

Page 88

Case 3:10-cv-03074-LTS-KEM Document 68-7 Filed 11/02/11 Page 86 of 87

| Page | Line | |
|------|------|--|
|      |      |  |
|      |      |  |
|      |      |  |
|      |      |  |
|      |      |  |
|      |      |  |
|      |      |  |
|      |      |  |
|      |      |  |
|      |      |  |
|      |      |  |
|      |      |  |
|      |      |  |
|      |      |  |
|      |      |  |
|      |      |  |
|      |      |  |
|      |      |  |
|      |      |  |
|      |      |  |
|      |      |  |
|      |      |  |
|      |      |  |
|      |      |  |
|      |      |  |
|      |      |  |
|      |      |  |
|      |      |  |
|      |      |  |
|      |      |  |
|      |      |  |

PITTSBURGH, PA
HARRISBURG, PA
GREENSBURG, PA
ERIE, PA
INDIANA, PA
HOLLIDAYSBURG, PA
SEA BELO, MEOB, PA



SARGENT'S
COURT REPORTING
SERVICE, INC.

210 MAIN STREET
JOHNSTOWN, PA 15901
(814) 536-8908

PHILADELPHIA, PA
WILKES-BARRE, PA
OIL CITY, PA
SOMERSET, PA
CLEARFIELD, PA
*CHARLESTON, WV*