UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF IOWA

- - - - - - - - -

UNITED STATES OF AMERICA,

  Respondent,    Case No. CV10-3074-LRR

-vs-        Case No. CR01-3047-LRR

DUSTIN LEE HONKEN,

  Petitioner.

_____

EXAMINATION OF LISA RICKERT

Friday, October 14th, 2011

New Haven, Connecticut

Reported by:Nicole Montagano

COPY

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

APPEARANCES:

FOR THE PETITIONER:

TIM KANE, ESQ.
FEDERAL COMMUNITY DEFENDER OFFICE
Suite 545 - Curtis Building
601 Walnut Street
Philadelphia, Pennsylvania 19106

FOR THE RESPONDENT:

OFFICE OF THE US ATTORNEY
CJ WILLIAMS, ESQ. (Via videoconference)
Assistant US Attorney
401 First Street NE
Cedar Rapids, Iowa 52407

Case 3:10-cv-03074-LTS-KEM   Document 69   Filed 11/02/11   Page 2 of 70

                                                           3

                              I N D E X


EXAMINATION:                                            PAGE:

Direct Examination by Mr. Kane ---------------  4

Cross-Examination by Mr. Williams ------------- 17

Redirect Examination by Mr. Kane ------------- 60

Redirect Examination by Mr. Williams ---------- 67

Case 3:10-cv-03074-LTS-KEM    Document 69    Filed 11/02/11    Page 3 of 70

BE IT REMEMBERED that on Friday, October 14th, 2011, at the hour of 11:10 a.m., of said day at the Connecticut Financial Center, 157 Church Street, Floor 23, New Haven, Connecticut, before me, Nicole Montagano, a notary public, personally appeared Lisa Rickert, who was by me first duly sworn, and was examined as a witness in said cause.

---------

Lisa Rickert, after having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY ATTORNEY KANE:

Q. Ms. Rickert, could you please tell us what you do for a living?

A. I'm a mitigation specialist.

Q. And how long have you been doing that work?

A. Since 2000.

Q. And what is your educational background?

A. I have a Bachelor's and a Master's in Social Work.

Q. And have you received any formal training in

Case 3:10-cv-03074-LTS-KEM    Document 69    Filed 11/02/11    Page 4 of 70

regards to your employment as a mitigation specialist?

A. Yes, every year there's a national conference. Initially it was through the National Association of sentencing advocates, and it was specifically for Sentencing Advocates and mitigation, capital case mitigation. And then NASA joined with NLADA, the National Legal Aid and Defender Association. And now the national conference that I attend is Life in the Balance every year. That's specifically for death penalty cases.

Q. Okay. And about how many capital cases have you worked on as a mitigation specialist?

A. Twenty-two (22).

Q. And can you identify this document for us?

A. I can. That's my resume.

Q. And if you can just look through that quickly, does that look like an accurate and updated version of your resume?

WITNESS REVIEWS DOCUMENT

A. It does.

BY ATTORNEY KANE:

Q. And did you assign a declaration in this case for Mr. Honken's current attorneys?

A. Yes.

Q. Can you please identify this document?

WITNESS REVIEWS DOCUMENT

A. Yes, that's the declaration.

BY ATTORNEY KANE:

Q. Okay. And is that your signature on the last page?

A. Yes.

Q. And where did sign that?

A. That was in Madison, Wisconsin.

Q. Ms. Rickert, how did you became involved in Mr. Honken's case?

A. I had worked on a death penalty case with Attorney Charlie Rogers, and he recommend me to the defense team for Dustin Honken, so Leon Spies, I believe, was the one who called me.

Q. And who --- Mr. Spies and Mr. Rogers, and were there any other lawyers on Mr. Honken's defense team?

A. Yes, Alfredo Parrish.

Q. And among the lawyers, who was your primary contact in your work on the case?

A. Leon Spies.

Q. Did you conduct a mitigation investigation of Mr. Honken's life and background?

A. Yes.

Q. Broadly speaking, what did your investigation

reveal regarding Mr. Honken's family and upbringing?

A.   That Dustin came from a home where there was minimal love and nurturing.  He had very little attachment to his caregivers.  His mother suffered from depression throughout her adult life and his father was a chronic alcoholic and had lived a life of crime.

Q.   And what was the --- from the children's prospective, what was their father's life of crime? I mean, how is that --- how did they see that or how did they experience that?

A.   Well, they saw it every time they were with him. He was either working or he was drunk, and when he was drunk he would actually brag about his criminal activities.  And along with bragging about his criminal activities and belittling those who would actually work at a regular job, he also would brag about his connections with the mob or with other bad guys, and he would also talk about doing away or killing those who --- you know, who got in his way.

Q.   And when you mention his talking about violence, was there --- were there threats of violence in the home itself?

ATTORNEY WILLIAMS:

Let me just interpose an objection

Case 3:10-cv-03074-LTS-KEM    Document 69    Filed 11/02/11    Page 7 of 70

here. I'm not sure where all this is going to fit in, frankly. But to the extent that any of this would have been offered --- or the theory it is would have been offered --- should have been offered during the guilt phase of the hearing --- or trial, I'll object as all of this is calling for hearsay which would not have been admissible.

To the extent that it's being offered, or would have been offered during the penalty phase of the trial, I object that it should be barred under the altered 403 analysis that applies to the penalty phase of trial.

Now, I'll just have a standing objection to anything that she relates of things she heard from other people, so I don't further interrupt the flow here.

ATTORNEY KANE:

Okay. Understood.

BY ATTORNEY KANE:

Q. Do you remember the question, Ms. Rickert, about threats of violence within the Honken family home?

A. I do.

Q. Okay. Could you please answer that?

A. Yes, Jim Honken, Dustin's father, he killed family pets. He also --- there was two significant

things in Dustin's upbringing; one having to do with his best friend, Tim Cutkomp. And Tim had an older brother who had abused Tim sexually, I believe, and there was an insinuation on Jim's part that he did away with Rodney. And Rodney, in fact, disappeared. And Dustin always believed that his father had something to do with that. And then there was another ---.

Q. And did you find that significant?

A. Extremely significant.

Q. How so?

A. Dustin believed that his father would actually do something like that. And it was further frightening to Dustin when his father said to him that if you were ever arrested, I --- they won't get you. I'll put a gun to your head and I'll blow you away, or I'll kill you. And given that Rodney, in fact, disappeared, and I'm not sure that he's ever --- I have no idea if he has ever been found, but Dustin believes that his dad may have --- had caused that and would actually kill him if the opportunity arose.

Q. So it was your impression then that Dustin took his father's threats and talk about violence seriously?

Case 3:10-cv-03074-LTS-KEM    Document 69    Filed 11/02/11    Page 9 of 70

A.   Yeah, Dustin would call his dad crazy, and yes, he believes that he would do crazy things.

Q.   Now, in the course of your mitigation investigation, what did you see as the possible impact of Dustin's background and upbringing on his character and his development?

A.   Well, it was very significant in that Dustin and his brother, Jim, were --- or Jeff.  Jeff, were basically groomed by their father to be the type of people who would join him in criminal activity.  And the mother, his mother who was very depressed and was very aware of the negative influence that Jim had on his sons but did nothing to protect them.

Q.   And did you identify --- well, let me back up.

Did you --- in your role as a mitigation investigator, did you come to believe that it was important or necessary to have a mental health evaluation of Dustin done?

A.   Yes.

Q.   Did you make any recommendations along those lines to trial counsel?

A.   Yes.

Q.   I'm going to call your attention to a document that is entitled confidential work product and dated May 15th, 2003.  Our Bates stamp number here is 2804

as the first page. Could you look through that and please explain to us what that document is?

A. Throughout the course of my investigation I do interviews of various people, and I gather documents, and so periodically along the way I will produce a written document like this for Attorney Spies, to just give him an update of what I'm seeing and what I'm finding.

Q. So is this a memo then that you provided to Mr. Spies?

A. Yes.

Q. And turning your attention to the second page of that memorandum, could you read the last line of that, the very bottom line there?

A. Need an expert on attachment issues/disorder.

Q. And then turning to page eight of the report, and that's 2811 Bates stamp number, could you read the line in the parentheses there?

A. Recommend a psychiatric evaluation by James Gilligan, by Dr. James Gilligan.

Q. And so do both of those places in your memorandum reflect recommendations that you gave to trial counsel?

A. Yes.

Q. And turning your attention to another document

entitled confidential work product, this one dated April 27th, 2004, could you please identify this document for us?

A. That's just a later version of the same type of update that I would give to Leon Spies.

Q. And did you actually provide this to him, to Mr. Spies?

A. Yes.

Q. And on the second page could you read the line that is in parentheses there?

A. Need an expert on attachment issues/disorder.

Q. Why did you believe that it was necessary to obtain experts on attachment issue and disorder and for psychiatric evaluation?

A. Well, it was clear to me, as I was doing the investigation that Dustin did suffer from the effects of his lack of bonding with his caregivers. He did not have good social relationships later on in his adult life. It was also apparent to me that he suffered from the trauma of sort of his exposure to his father's lifestyle. The fear of his father, the threats. And one of the things that was most telling is that Dustin has very little memory of his early childhood, indicative of trauma.

Q. And did you believe that mental health experts

could shed more light on those issues?

A. Yes.

Q. Did trial counsel follow your advice to have Mr. Honken evaluated by a psychiatrist?

A. No.

Q. Did trial counsel follow your advice to have Mr. Honken evaluated by a mental health expert regarding his attachment issues?

A. No.

Q. Did trial counsel have Mr. Honken subjected to any other kind of mental health testing?

A. Dustin received a neuropsychological evaluation.

Q. And what do you recall the results of that evaluation being?

A. That there was no findings of neurological damage.

Q. Do you recall whether that neuropsychological evaluation covered the topics that you had identified regarding attachment issues and the need for a psychiatric evaluation?

A. No.

Q. And in your experience as a mitigation specialist, if trial counsel had followed your advice and had a psychiatric or psychological evaluation done, how might that evaluation had been used to

Case 3:10-cv-03074-LTS-KEM    Document 69    Filed 11/02/11    Page 13 of 70

explain Mr. Dustin --- excuse me, Mr. Honken's character and psychological development?

A.  Well, when I do my work, which is what I consider sort of the first layer of recognizing signs and symptoms that emerge from his social history or his life history, an expert in --- with specialties in the areas that I identify do a much more thorough and sort of deeper evaluation and help us as a defense team and others to just further understand how those issues affecting Dustin at certain developmental stages in his life affect his character and his emotional development later on.

Q.  Would those also do anything to help explain how he would be involved in the criminal activity for which he was convicted?

A.  It could.

Q.  In your declaration --- and if you'd like to refresh your memory, I'm looking at paragraph 13 here, in addition to discussing what your mitigation investigation found regarding Mr. Honken's parents, you also here discuss his mother's subsequent marriage to Ron Smith.  What did your mitigation investigation reveal regarding the family home and Mr. Honken's upbringing after that second marriage?

A.  Well, after the second marriage, Marvea was no

more available to Dustin than she was before the marriage. Before the marriage she was out, you know, meeting men and dating, and when she married Ron, he was a very needy man, and he had certain expectations of his wife, meaning that she would actually leave ---. She actually left her daughter's sports event one time because he demanded that supper be on the table by 6:00 p.m. And then oftentimes after dinner they would just retreat to their bedroom to be alone so that they weren't part of the family.

ATTORNEY KANE:

Just a minute, please.

OFF RECORD DISCUSSION

BY ATTORNEY KANE:

Q. Referring again to your declaration, page seven, paragraph 14, can you just read the first few sentences of that paragraph to yourself?

WITNESS COMPLIES

A. Okay.

BY ATTORNEY KANE:

Q. Does that refresh your recollection regarding why you thought it was important to have a mental health professional evaluate Mr. Honken in light of his upbringing?

A. Yes.

Case 3:10-cv-03074-LTS-KEM    Document 69    Filed 11/02/11    Page 15 of 70

Q. Can you explain a little?

A. Yes, Dustin, as he was growing up, worked pretty hard to be the opposite of his dad. He set very --- you know, he set high expectations for himself and really rigid rules for himself, and yet he was being groomed by his father. So he was very confused about who he was supposed to be.

Q. And did you believe that a mental health professional would have helped explain that internal conflict that you're describing?

A. Yes.

Q. Were there any other red flags or were there any other behaviors that Mr. Honken had that you saw as red flags for needing a mental health evaluation?

A. Yes, Dustin had kind of some obsessive behaviors in that he developed kind of bizarre eating habits such as hoarding, or he was very conscious of --- and wouldn't eat certain textures and smells, and he wouldn't want foods to touch other foods on the plate. He also was very obsessive about his hygiene and he would shower three times a day and he would be meticulous in his duress and he would even drive his motorcycle down a back road instead of the main roads just so people wouldn't see him be dusty and dirty.

Q. And how were those red flags to you or what did

those behaviors suggest needed to be looked in to by a mental health professional?

A. Once again, it was just, for me, identifying signs and symptoms. Those are clear mental health symptoms that needed to be further evaluated by a mental health professional.

ATTORNEY KANE:

That's all the questions I have. C.J.

ATTORNEY WILLIAMS:

Okay. Thank you.

CROSS EXAMINATION

BY ATTORNEY WILLIAMS:

Q. Ms. Rickert, with regard to your recommendations that counsel hire a couple of mental health experts, you're in a position really to --- only to say that you thought that would be a good idea with the idea that you believed that a mental health professional would be able to further develop the evidence; is that right?

A. That's right.

Q. Okay. You don't know that a mental health professional could have actually contributed anything to this?

A. Not until after the evaluation would have been completed. It was my professional recommendation

that we needed a further professional evaluation.

Q. Okay. Let me just go back over a couple of things. When you were talking about the reports that you provided to Mr. Spies this would be the May 15, 2003 and April 27, 2004, are these the only two that you recall providing to Mr. Spies?

A. I don't recall how many I would have done, so I don't know if there would have been more. I remember these now that I've reviewed them.

Q. Okay. If I represent to you that I've been through discovery and these are the only two I find, would that --- I mean, would it be inconsistent that these might be the only two in existence?

A. Yes, that is very recently.

Q.. Okay. And then you said the way you would write these up is you would do your interviews, you get documents and then periodically you put together these reports for Mr. Spies and kind of summarize where you were in your investigation. Do you also provide them the underlying interview reports to the attorneys?

A. I have to think a minute. There's different expectations with different attorneys on different cases, and sometimes attorneys do not want me to send them the interview summaries along the way and they

want me to just produce different reports, and I can't remember what I was expected to do. Generally I submit the interview notes to them. I can't remember what the expectation was in this case.

Q. Okay. Fair enough. Let me just go back over your background a real quick. You talked about you've been involved in 22 death penalty cases as a mitigation specialist. As of the time that Dustin Honken's case went to trial, how many death penalty cases had you worked on as a mitigation specialist?

A. I think I was mentored in three when I started, and Dustin may have bean my fifth or sixth case. I can't recall which.

Q. And you say fifth or sixth case, you did by yourself or the fifth or sixth case counting the two or three where you were mentored by somebody else first?

A. I was including those that I was mentored. So if it was by myself, it would have been the second or the third.

Q. Okay. You testified this morning that Tim Cutkomp was sexually abused by an older brother, Rodney, who ultimately disappeared. So I want to talk to you about that for a minute. First of all, you don't know that that actually happened; right?

Case 3:10-cv-03074-LTS-KEM    Document 69    Filed 11/02/11    Page 19 of 70

A. Correct.

Q. This is something that Dustin told you?

A. Correct.

Q. Okay. Did Tim Cutkomp ever tell you that?

A. He corroborated that his brother was missing.

Q. Did he corroborate that his older brother ever sexually abused him?

A. I think that came from Tim, but I can't be certain.

Q. Okay. And then the information that Jim Honken somehow had something to do with Rodney's disappearance, where did that come from? Is that something that Dustin Honken told you, that his father had told him?

A. Yeah. If I remember correctly, I believe it was Dustin who told me. And Tim was kind of treated like one of, you know, Jim's sons, and he would recruit Tim along with Dustin to help him in his various illegal schemes. And so, you know, in his sort of being overly protective or fatherly in his way toward Dustin and Tim, he --- I can't remember how it came out, but Dustin had said that his father led him to believe that he would have done something to Rodney to protect Tim.

Q. Okay. Now, you're also aware that Dustin Honken

has also explained that Tim Cutkomp killed his older brother Rodney?

A.   I don't remember that.

Q.   Okay.   Did Dustin ever share that with you?

A.   I don't recall that at all.

Q.   Okay.   You went over the two reports recommendation.   I want to go over them in a little bit more detail in a minute, but I just want to touch on something.   The May 15, 2003 report that was given to Mr. Spies, Counsel had you look at pages two and eight, and on page two was a notation by you that we need an expert on attachment issues/disorder.   And on page eight there was a line that says recommend a psychiatric evaluation by Dr. James Gilligan; okay?

A.   Yes.

Q.   We'll get to April 27th, 2004 memo to Mr. Spies, and the recommendation about Dr. Gilligan doesn't appear in this recommendation.   Why is that?

A.   It was --- it is now much further along in the mitigation investigation, and whether I was learning new things and the investigation or the analysis sort of took a different turn, it was either that or the attorneys were not in agreement with using or having him evaluated by Dr. Gilligan at the time.   I can't remember which.

Case 3:10-cv-03074-LTS-KEM     Document 69     Filed 11/02/11     Page 21 of 70

Q.   Okay.   So it's possible that by April of 2004 you yourself had come to the conclusion that for whatever reason, based on your analysis of the case that Dr. Gilligan was no longer needed?

A.   Dr. Gilligan specifically, but a mental health professional was needed.

Q.   Okay.   But there's no recommendation other than the recommendation on the attachments, slash --- I'm sorry, attachment issues/disorder in the April 27, 2004 memo to Mr. Spies for an expert; right?

A.   Except for page six I was also recommending a neuropsychological evaluation.

Q.   Which was done?

A.   Yes.   Correct.

Q.   Okay.   All right.   I want to go to your declaration briefly here.   You got that in front of you?

A.   I do.

Q.   Okay.   Well, let's a go to page five, if you would, please.   And in the middle of that first paragraph on page five is a sentence that says the family was afraid of him, and then a sentences that said I heard repeatedly from sources.   It was once Dustin joined him in his criminal activities, they told Dustin he would kill him rather than see him

arrested. Who are the sources that you heard from repeatedly about this story?

A. I know his older brother, Jeff, was one and Tim Cutkomp would have bean another.

Q. And this threat actually occurred only one time; isn't that right?

A. I'm not sure if it was once or twice.

Q. Well, it had to do with the stealing of the car; wasn't it, and Dustin said that his father told him that before he would allow the cops to get him on that, he would rather kill him first. Wasn't that the context of that statement made to Dustin Honken?

A. Yeah, there was one where that was the context, and I'm not sure if there was another similar threat when Dustin had helped his father make the key so that his father could rob the banks, the bank in Britt.

Q. So that's the only one that you are thinking of that may exist another threat?

A. Yes. Correct.

Q. So it would have to be one of those two places? Okay.

A. Correct.

Q. In both of those instances it was only Dustin Honken and his father together when that was

allegedly said to Dustin Honken; right?

A.   I don't know that for sure.

Q.   Okay.  Do you recall either Jeff Honken or Tim Cutkomp claiming to be present and hearing this threat made by Jim Honken?

A.   I'm sorry, I don't remember if they were present or how they may have known it or --- I would have to review my notes.

Q.   Okay.  You opined in here, the next line it said --- I think it's a typo.  It is supposed to say, it was my opinion that Dustin Honken believed that his father was capable of violence and that he feared him.  And so that was the opinion that you had formed, you know, through your investigation; right?

A.   Can you tell me where that is?

Q.   Yeah.  It's on the same page, page five right after the line that we just talked about, about midway down through that first paragraph.

A.   Thanks.

Q.   So it actually says I was my opinion, but I think it was supposed to be it was?

A.   Yes.  Correct.

Q.   Okay.  Now, did Dustin Honken in any of the interviews you had with him ever tell you that he was afraid of his father?

A.   I believe he did and he would add that he believed the statements because his dad was crazy. It was that kind of a a comment.

Q.   Okay.  But it wasn't a comment of I'm literally afraid of my father, I think he may harm me, or I was afraid of my father?  I mean, he never came out and told you that; right?

A.   Dustin had a very odd way of talking about his father, and he would almost say some of these really crazy things in sort of an amusing tone, and so he wasn't outwardly showing fear.  And did he actually say I was afraid when he believed that his father would kill him, I can't remember if he added and I was afraid or if it's my assumption that if a father is saying I would kill you, that I believed he was afraid.  But he certainly believed the threats.

Q.   All right.  Let's a talk about you opine going down the --- let me see here, where is this at?  I'm sorry, page six, if you would, paragraph 11.

A.   Okay.

Q.   You indicated in the second sentence that I heard reports that he tortured the family pets in one instance, forcefully pouring beer down the throat of the family cat.  He killed the family dog and shot small animals with a BB gun.  Dustin either witnessed

or knew of these instances of cruelty.

So I want to talk to you about that paragraph for a minute. First of all, today in your testimony you said that he shot family pets, plural. Are you aware of Jim Honken shooting anything more than one dog who was hit by a car?

A. No, I think that was --- Dustin was aware of that incident. I don't know if I remember another animal that was killed.

Q. And that incident was a dog was hit by a car and Jim Honken shot him to put him out of his misery. Wasn't the factual circumstances?

A. I don't remember the part about him being hit by a car, but I would have to review my notes.

Q. And the torturing of the family pets, other than the one time forcefully pouring beer down the throat of the family cat, let's a talk about that one. First of all, what's the source of that information, that his dad poured beer down the throat of the family cat?

A. I'm not exactly sure whether it first came from Dustin. When I do interviews I then follow it up and try to corroborate that information with, you know, the other family members. So in some instances, I'm not sure where it originates and who corroborated,

but ---.

Q.   Okay.

A.   So I don't know that.

Q.   All right.   Good enough.   Now that one aside, what other torturing of family pets did anyone tell you about by Jim Honken?

A.   It would have been only those that I'm stating here.

Q.   Okay.   But your report --- your declaration says I heard reports that he tortured the family pets as in plural, but the only thing you put down there was one instance of pouring beer down the throat of the family cat.   So is that the only instance of torture that you're aware of an animal?

A.   Well, and ---.

Q.   Of a pet, I'm sorry.

A.   Yeah, of a pet.   And then, you know, of course killing the dog.

Q.   Now, you talk about shooting small animals with a BB gun, what small animals?

A.   I don't know.

Q.   Do you know where they lived at the time that this was occurring?

A.   I think that was in Hutchins.

Q.   And this is --- based on your information, this

occurred before Dustin was of age eight, because that's when the parents divorced and the father moved out. So this would have occurred sometime prior to Dustin's age eight?

A. Yeah, I'm not sure. I know that Dustin, you know, kind of re-established his relationship after the divorce and would go visit his dad, and whether it also happened at that time, I'm just not sure.

Q. Okay. Are you familiar with life in rural Iowa?

A. No. Other than through ---.

Q. Are you aware that it's not uncommon for people to shoot rodents out in the country near small towns, rabbits that get into gardens, squirrels that eat stuff, things like that, not only with BB guns but sometimes 22s. Is that --- are you familiar with that, that's actually not that uncommon in rural Iowa?

A. Well, that would make sense to me, but I think there's a difference between someone who does it and you're with them and yet you feel extremely safe with this person versus having that happen when you're with a man who has really, really crazy threatening violent tendencies.

Q. All right. But let's a go back to the act of actually shooting these small animals with a BB gun.

Case 3:10-cv-03074-LTS-KEM    Document 69    Filed 11/02/11    Page 28 of 70

You don't know what animals were shot and you don't know the circumstance under which he shot them?

A.   I can't remember that now.

Q.   Okay.   Now, you said you heard reports and again, I think you covered this a little bit, just to be sure.   But you think it came from Dustin Honken, it may have also bean corroborated by other people, you just don't recall today?

A.   Yeah.   I mean, I had interviewed aunts and uncles, and --- you know, there's times when Marvea would share things with them, so I can't remember if they just --- you know, if other people knew about it through family members.   I can't remember.

Q.   Now, the two reports that you provided to Leon Spies, we talked about the one dated May 15, 2003 and the one dated April 27th, 2004, there's no mention anywhere in there about Jim Honken killing or torturing animals or shooting them with BB guns; is there?

A.   I'd have to look at it again, but I don't know, I don't think there is when I reviewed it last night.

Q.   Okay.   And if we go to this lengthy confidential work product that you did that's Bates number 4950 through 4972, it's a 23-page document that we talked about before the deposition began here, would you

take my word for it that it's nowhere in that long document either?

A. I would, yeah.

Q. Okay. And was this another document that was provided to trial counsel, ---

A. Yeah, that ---.

Q. --- this 23-page report?

A. Yeah, once again, it's sort of a continuation of kind of a preliminary, you know, mitigation look at to date.

Q. Okay, fair enough. And would you also take my word for it that in none of those three documents, the two memos dated May 15, 2003, the memo dated April 27th, 2004, then this last 23-page document we talked about, is there any mention of Jim Honken having any involvement with making this Rodney Cutkomp disappear?

A. No, I think you are accurate about that.

Q. Okay. Now, other than the two bank robberies --- and we'll talk about bank robberies in a minute. But other than the two bank robberies, based on all the interviewing you did, are you aware of any acts of physical violence that Jim Honken committed against any other human?

A. Yes, I'm aware of some physical violence towards

Dustin and his brother. His sister Alyssa reported that she witnessed her father kind of throw them against the wall or something to that effect. And there was another report that also indicated that Dustin had revealed physical abuse by his father.

Q. If you would go to your 5/13/2003 report and turn to page three of that, and in the --- I guess the, maybe the third paragraph down there it says although Dustin was not physically abused; do you see that?

A. I do.

Q. Okay. So what you're telling the attorneys back in 2003 is that Dustin Honken was not physically abused; is that what you're telling them?

A. I was. Whether I had the other information at that time, I'm not sure of the timing of all of that, but ---.

Q. Okay. Let's a go to the April 27, 2004 memo you sent to Leon Spies, and let's a take a look at the second page of that. The bottom of the page under bullet heading saying Dustin's response to absence of love/insecure attachment, you have the same line, although Dustin was not physically abused. Do you see that?

A. I do.

Q. Okay. So again in 2004, shortly before the trial starts, you're telling counsel that Dustin Honken was never physically abused?

A. Yeah. The physical abuse was not emerging as a significant mitigation theme, it was much more the emotional abuse of --- it's kind of that threat of violence that Jim imposed every day.

Q. Okay. But I just want to talk about physical abuse for a minute. In your declaration on page seven you say --- let me find out where this is. If you go down to --- three quarters of the way down the page there's a line that starts physically abused and traumatized children. Do you see that line there about the six or seven line up?

A. Yes.

Q. The next sentence says to be sure I encountered significant reports of childhood physical abuse. Okay. That's your declaration under oath, okay, and I want to know what significant reports of childhood physical abuse --- and I assume you're talking about Dustin Honken here, are you relying on in this declaration?

A. I'm relying on his sister's report of what she witnessed as well as a report that acknowledged physical abuse by Jim towards Dustin.

Q. And that report was by whom?

A. I believe it was a pre-sentence investigation from a long time ago.

Q. Okay. Well, actually the pre-sentence investigation report from Dustin Honken from 1997, he indicates he was never physically abused or sexually abused and said that he had a good childhood and his mother was perfect.

ATTORNEY KANE:

C.J., I'm going to object to the question as argumentative.

ATTORNEY WILLIAMS:

All right.

BY ATTORNEY WILLIAMS:

Q. And let me just rephrase so we make sure it's okay. The 1997 --- there is only one 1997 report that would have been in existence at the time of Dustin Honken's trial in 2004. Would you go with me on that?

A. I believe so. I don't know that, but ---.

Q. Okay. Are you aware of any other pre-sentence investigation --- well, let me do it this way. You referred it to a pre-sentence investigation report that you thought contained some information suggesting that Dustin Honken had bean physically

Case 3:10-cv-03074-LTS-KEM    Document 69    Filed 11/02/11    Page 33 of 70

abused by Mr. Honken. What report are you talking about?

A. I thought it was that same one.

Q. Okay. Are you aware that that report actually says that Dustin Honken reported to his probation officer that he suffered no physical abuse?

A. Dustin actually said that to me that, you know, when clients or defendants say that, once again ---.

Q. Ma'am, that's not my question. My question is simply, are you aware that that is what that report says?

A. I would have to look at it again, but yes.

Q. All right. So if we eliminate that report as a source of information, what you're relying on is a statement by Alyssa about her observations of physical abuse by Jim Honken as they were growing up?

A. There's that, and I may be not --- you know, I don't know where I got that from, but there was another report that indicated that he was physically abused by his father.

Q. Can you identify what that report is?

A. I can't. I reviewed it, and I can't remember. I mean, I thought it was the pre-sentence investigation, but it might not have bean.

Q. Okay. Well, let's a do it this way just in case

you need to --- or you want to supplement the record.

You know, if you find such a report between now and the time that this thing goes to a hearing, why don't you let counsel know that and then counsel can maybe either mark it as an exhibit or bring it to the court's attention or something like that?

A.    Okay.

Q.    Okay?  Now, based on your investigation, Ms. Rickert, you are not suggesting that Jim Honken threatened violence against Dustin Honken in order to get him to commit the murders in this case, that's not kind of where you're going with your investigation; is it?

A.    No.

Q.    Okay.  Do you think Jim Honken had anything at all to do with any of the murders in this case?

A.    I don't believe so.  I don't believe so.  That wasn't my understanding.

Q.    Talk to you just briefly about Ron Smidt.  You indicated he was a needy person.  Is that something that you were hearing from Dustin, or were you hearing that from Marvea, or did you talk to Ron and he was saying that?  What's the source for that information?

A.    Although I talked to all of them, including Ron,

the source of that information would have bean

Dustin, Marvea and Alyssa.

Q. Now, as far as the relationship between Dustin and Ron Smidt, Dustin actually got along pretty well with Ron Smidt; right?

A. Yes.

Q. Called him a good man?

A. Yes.

Q. Said he was always supportive of Dustin?

A. Yes.

Q. Isn't that what Dustin said?

A. Yes.

Q. Okay. Now, let's talk a moment about this bank robbery that occurred. You indicated that it was your recollection that Jim Honken had maybe threatened Dustin Honken on an occasion and having him get the key to the bank, do you remember that testimony?

A. Yeah, I don't remember if he threatened Dustin to get the key, but his father was in a very desperate state, and I don't think he needed to be threatened. It was a very powerful, I guess, coercion that Dustin participated because his dad needed it.

Q. And again, this is an version of events that is

related to you by Dustin Honken; right?

A.   Correct.

Q.   He's the source of this information?

A.   Correct.

Q.   Okay.  Did anybody else give you any information about the bank robbery other than Dustin?

A.   I can't recall.

Q.   Now, you didn't know this at the time, but did you sit all the way through the penalty phase of the Honken trial?

A.   I did.

Q.   Okay.  So you know after the defense counsel put on Alyssa Nelson to testify about this event, that she had understood that her dad had pressured Honken to get the key from his mother to help rob the bank. You're aware that after that happened the government came back and put on evidence to establish that Honken had actually planned this bank robbery two years before?  Do you remember that testimony?

A.   I'm sorry, I don't.

Q.   Do you remember that there was this plot during high school where Honken approached a couple of other guys and tried to get them to commit the bank robbery and actually laid out a very elaborate scheme on how the bank robbery should occur, how they were going to

make entry into the bank, how the bank robbers should dress, what they should do with the cleaning lady when they make entry into the bank, how there going to split up the money, and then had a plan for killing, the guy that he was going to talk in to committing the bank robbery and dispose of the body in a pond nearby. Do you remember that testimony and all that occurred in high school two years before this bank robbery took place. Do you remember that now?

A. I do vaguely remember that. I don't remember all those details that you said, but I do vaguely remember that, yes.

Q. Okay. Do you remember the testimony being that the way that the bank robbery actually was executed Bill Basilor(phonetic) testified about how the bank robbery was actually executed by Jim Honken actually matched the plan that Honken had advised two years before. Do you remember that testimony?

A. I don't remember the specific testimony, but I'm vaguely aware of this situation, yes.

Q. Okay. In all the times you talked to Dustin Honken, did he ever tell you about the plan to rob the bank that he had developed in high school?

A. I'd a have to review my notes, but I don't



recall the bank, the bank plan. I would have to review my notes.

Q. Okay. You would agree with me that Dustin Honken has some credibility issues; right?

A. Yes, that was one of his many, you know, parts of him that are damaged.

Q. Okay. In fact, he gives you this hypothetical at one point about how the murder occurred in which he claims that Dustin --- I'm sorry, that Terry DeGeus and Angela Johnson killed Greg Nicholson and the Duncan family, and that Angela Johnson later killed Terry DeGeus. He gave you that story one time; right?

A. Yes.

Q. And even though he posed it as a hypothetical, you understood what he was telling you is this was his version of the events?

A. Yes.

Q. Okay. And then he also sent a letter, and I don't know if you ever saw this. He sent a letter to Alfredo Parrish based on March 11, 2004, with a Bates number 1636 through 1638, and in it he indicates you had visited him that day in jail. By the way, you always make him feel bad when you talk with him, according to Dustin Honken. But then he goes on to

say at the bottom of the first page, everything I do is for a reason not some impulsive, irrational momentary lapse of judgment. Did you ever see that letter from Dustin Honken to Alfredo Parrish?

A. No, I don't recall seeing it.

Q. And were you aware that he goes on in this letter also with the same --- pushing that same story, that it was Angela Johnson and Terry DeGeus who committed the murders? Were you aware that he was kind of maintaining that same version of events to trial counsel?

A. I wasn't --- I'm assuming he was, just because I directed him to not talk to me any further about it, to talk to his defense counsel.

Q. During your testimony here today, what I understand to be kind of the essence of it is, from your investigation as a mitigation specialist, you identified what you thought were signs of mental illness that should be investigated further by trial counsel. Did I get that right?

A. Correct.

Q. Okay. And it was your belief, based on your investigation that Dustin Honken had grown up in a family that, through neglect, through abuse of the father, through modeling by the father and so forth,

would have damaged him mentally and emotionally during his upbringing; right?

A. That's correct.

Q. If we actually look at Dustin Honken's performance as a child, there isn't a lot of outward signs in his behavior, performance that would suggest that he was terribly damaged; is there?

A. Oh, I guess I would disagree.

Q. Okay. Well, he did actually pretty well in school; right?

A. He did.

Q. Okay. You interviewed a bunch of his teachers; didn't you?

A. That's correct.

Q. And the teachers all said he wasn't a behavioral problem in school; right?

A. That's correct.

Q. They said he was polite; right?

A. Yes.

Q. They said he was --- one said he was not terribly popular, another one actually said he was popular; right?

A. Yes.

Q. His grades were actually not that bad in elementary school and high school, and by the time he

got to college he actually pulled straight A one year; right?

A.   Yes, he was a good student.

Q.   Okay.   He actually was described by one teacher as always being happy.   Do you remember having that in your interview report?

A.   Yes.   Yes.

Q.   Okay.   You wrote actually --- in this 23-page document you wrote that Dustin Honken was a compliant child who generally obeyed the house rules and the rules of the community.   In his free time he played with friends, watched television, read and liked to cook with Marvea.

A.   Correct.

Q.   Do you remember writing that?

A.   Yes.

Q.   You had an entry in there about him working at the A and W when he was a teenager, and the employer there described Dustin Honken as an excellent worker, very conscientious, respectful of authority and fun to work with.   Do you remember writing that?

A.   Yes.

Q.   Dustin Honken actually did graduate from high school; right?

A.   Yes.

Q.    He was in Cub Scouts for a period of time?

A.    Yes.

Q.    Went out for a variety of sports?

A.    Yeah, briefly.

Q.    Socially and economically this was kind of a middle class family; wasn't it?

A.    Yes.

Q.    Weren't poor; were they?

A.    Correct.

Q.    Honken didn't smoke cigarettes or drink alcohol or do drugs until he was in his 20s; did he?

A.    Correct.

Q.    When you recommend to counsel that they hire an expert in the area of trauma --- I'm sorry, let's go back for a minute.

      In your declaration, at page eight, if you could turn to that for a minute, please?  And if you look at paragraph 15, the first sentence of paragraph 15, you say in both my written and oral communications with counsel through the course of my preparations and investigation, I advised them of the need to have Mr. Honken evaluated by a mental health expert with the specialty in the areas of trauma, abandonment and related subjects.  Do you see that sentence there?

A.   Yes.

Q.   Other than the two memos that we've already discussed here, the one dated May 15, 2003 and April 27, 2004, can you identify any other written documents in which you make any documentation to trial counsel about who they should higher as experts in this case?

A.   No, I can't recall other documents.  There is just defense team meetings along the way that we would discuss it as a team.

Q.   Okay.  And do you have notes from those meetings that would reflect that you gave that kind of advice?

A.   I would have, I would imagine.

Q.   Okay.  I would ask the same thing, that if you can find any notes like that, that contain references that you made recommendations concerning this hiring experts, that you let Counsel know where those are.

A.   Okay.

Q.   Now, in here in the declaration you talk about experts in the area of trauma, abandonment and related subjects.  In the two written recommendations that we have, you indicate a need for an expert on attachment issues/disorder.  You don't really say anything about trauma abandonment, but why don't you explain to me, is that essentially the same thing

Case 3:10-cv-03074-LTS-KEM     Document 69     Filed 11/02/11     Page 44 of 70



you're getting at there, you are just calling it slightly different things, or are we talking about different things?

A.  No, I am calling it different things. Abandonment and attachment issues, you know, are kind of lumped together.

Q.  Okay.

A.  The trauma, you know, relates to his life with his father, and I think the related subjects relate to his obsessive behaviors.

Q.  Okay.  And then did you have an expert in mind then when you make this recommendation in these two memos that you gave to Leon Spies when you're talking about an expert on attachment issues/disorder?  Did you have somebody in mind on that?

A.  I don't think I did.

Q.  Okay.  Now, when you're having these conversations with defense counsel in these meetings, or you send these recommendations to Leon Spies, did you have a conversation with any of the defense counsel about why they weren't complying with your recommendations?

A.  I'm not sure.  We had conversations about my recommendation.  So we had conversations about that. I'm not sure why we had a specific conversation about

why you're not going along with what I'm saying. I think it was all sort of together, so I can't remember the specifics of it, but sure, we had those conversations.

Q. Okay. Well, what explanation did they give you for why they didn't hire experts like you suggested?

A. If I remember correctly, they were --- we were having discussions on --- I got to think a minute. I can't remember if this had to do with Park Dietz being that if we had a mental health expert that then they'd be sort of going against Park Dietz, or ---. You know, I can't remember if that was all tied into that.

Q. Okay. Can you remember them giving you any other explanation other than maybe Park Dietz?

A. I can't. I remember --- I remember feeling that we could just do it, and if it was --- and just so we knew where we were at, and then they could make decisions about it, but I can't remember specifically their reasoning against it other than they just weren't --- other than their idea of the penalty phase presentation was different than what I was recommending.

Q. In what way?

A. Well, different in that my --- the life story

that shaped Dustin was larger than what ended up being presented, so that there was that difference.

Q. And so what do you mean, the --- you had a theory about what ought to be presented as a larger story about his life history than the trial counsel had; is that what you're saying?

A. Yes.

Q. Okay. Did the trial counsel explain to you why they went with the presentation they did instead of doing the larger story as you described it?

A. Well, I would imagine they did. I can't remember the specifics, but they determined that the witnesses they chose and the part of the life story that they chose to present to the jury was --- you know, was adequate to present as mitigation.

Q. Okay. So you had told them kind of about all of the things that you had found during the investigation, you had kind of made recommendations to them about the way you thought it ought to be presented, and then they came up with the way they were going to present it and they thought that was good enough. Is that what I'm taking it to be?

A. Yes, I think that --- you know, my idea was that we certainly needed a further explanation that just these bits and pieces of Dustin's life didn't fully

explain how his childhood and his upbringing and the trauma related issues and attachment issues, how it contributed to who he became and what his behaviors were later in life. And so they made different decisions about that, that I felt were --- you know, ended up feeling incomplete.

Q. Okay. Ms. Rickert, you're not shy about expressing your opinion, certainly not in the declaration. I'm guessing that in these two meetings you had with defense counsel you expressed your thoughts during these meetings like you are today; is that fair to say?

A. I do express my thoughts, keeping in mind that they're the leaders of the team.

Q. Okay. And so when you're expressing your thoughts, boy guys, I think we ought to do a bigger presentation, and why don't we just hire an expert and see what he has to say and then later worry about Park Dietz. Did you express those thoughts to trial counsel?

A. I can't remember the specifics of my words. I certainly remember a discussion, but you know, the specifics of how I worded it, or how forceful I was, you know, that's hard for me to say.

Q. Okay. You got the themes across though; right?

A.    Yes.

Q.    Those themes?

A.    Sure, in writing and orally.

Q.    Okay.    And then what, in general, was the response you got from trial counsel for --- and let's just take them one at a time for the idea that, well, let's hire the psychiatrist and figure out what they're going to say and worry later about Park Dietz.    What was the response by trial counsel when you said that?

A.    I don't know that that's how I said it.    I truly don't.    I can't remember if our discussion had to do with Park Dietz at the time.    And I don't remember us kind of going through, you know, one by one or me pushing and saying why don't we just do it and let the chips fall where they may.    I don't remember exactly how I would have worded it.    We certainly had a discussion about it.    You know, how that was presented or their exact response and decision to go another way is --- sorry, you know, I don't know the actual details or remember the specifics.

Q.    Okay.    And who all do you remember being involved in these discussions, the whole trial team?

A.    Usually when we had a team meeting, it would be all of the attorneys, all three, and yet there was

many discussions or --- you know, where it would just be Leon and I and that he would talk to the rest of the team. So again, I can't remember the --- you know, the dynamic of that, who was all present during maybe that particular conversation.

Q. Now, if we go back to this memo of 5/15 of '03, which is the first document apparently we have that talks about recommending the hiring of these experts. There's a memo that you wrote to Leon Spies dated December 16, 2003, so you know, six months or so after that memo to Leon, in which you talk about you're going to be on vacation in December through January, and then you have a line there saying did you get approval for Dr. Mark Cunningham. And then the next paragraph says regarding the neuropsychological recommendation, I'm recommending Dr. Michael Gelbort, and you go on to talk about how you know about him and his CV and so forth.

So I want to talk to you a little bit about this memo to begin with. First of all, there's nothing in this memo about hiring any other experts other than the two you mention, so I don't know if you've had a chance to read that, but you take my word that there's no other mention of any other experts on there?

Case 3:10-cv-03074-LTS-KEM   Document 69   Filed 11/02/11   Page 50 of 70

A. Yes.

Q. Okay. And what did you understand that Dr. Mark Cunningham was going to be hired to do?

A. I recall that Dr. Cunningham would have done the kind of institutional adjustment piece, and how, you know, Dustin would be --- you know, that the Department of --- I'm sorry, the Bureau of Prisons would be able to keep him and others safe if he were to be in the prison for the rest of his life.

Q. Okay. Was there ever a discussion about Mark Cunningham evaluating Dustin Honken or doing any more of the psychological workup of Dustin Honken?

A. No. He was strictly hired for that piece.

Q. So it wasn't even contemplated by anybody that he was going to be hired for any other purpose?

A. I don't remember. I don't remember that.

Q. Okay. And what I'm getting at is, when you're talking about the experts on attachment and trauma and all that kind of stuff Dr. Cunningham's qualified to do that; right?

A. That's correct.

Q. I'm just trying to figure out, was there any discussion --- when you get to talking about maybe hiring Mark Cunningham, was there discussion about him stepping into the place of maybe serving that

role? Do you remember that at all?

A. I don't specifically. That would make sense, but I truly don't remember it specifically.

Q. Okay. And I think I know the answers. Do you remember him being rejected as somebody to do that for some reason?

A. I don't remember that.

Q. Now, in your declaration you suggest though that counsel should have had Cunningham evaluate, or at least meet Dustin Honken. If you look at paragraph 16 of your declaration, you talk about the engagement of Dr. Mark Cunningham, you say it was reached without Cunningham ever meeting Dustin Honken, it was based on information, data and statistics from the BOP and other demographic information, none of which related to Mr. Honken as an individual. Do you see that?

A. I don't. Will you tell me what page?

Q. Yeah, I'm sorry. It starts actually on page eight and on page nine.

A. Okay.

Q. Paragraph 16. Why don't you just take a minute to refresh your recollection on that paragraph?

A. Okay.

WITNESS REVIEWS DOCUMENT

A.   Okay.

BY ATTORNEY WILLIAMS:

Q.   Okay.   And you indicate that --- in particular, the line I'm focused on is rather it meaning Dr. Cunningham's opinion was based on information, data and statistics from the BOP and other demographic information, none of which related to Mr. Honken as an individual.   Do you recall actually sending a memo to Dr. Mark Cunningham dated May 19, 2004, the Bates number is going to be 4876, in which you enclose documents concerning Dustin Honken?

A.   I don't recall that.

Q.   Okay.   You basically sent him the same documents that you sent to Dr. Gelbort, including Honken's Bureau of Prisons records, chronological history of Dustin Honken, a preliminary summary of mitigation issues, medical records for Dustin Honken, school records for Dustin Honken, employment records for Dustin Honken and then records --- medical records for James Honken.   Do you remember saying all that stuff to Dr. Cunningham?

A.   Yeah, that makes sense that I did that.

Q.   Okay.   Now, are you aware of Dr. Cunningham ever saying to trial counsel, hey, guys, you know, in addition to talking about this future dangerous

Case 3:10-cv-03074-LTS-KEM     Document 69     Filed 11/02/11     Page 53 of 70

thing, you know, I really could give you an opinion on these other issues. Are you aware of any conversation like that with Dr. Cunningham?

A. No, I'm not.

Q. Now, going to your declaration at page eight let me get you to the point I'm looking for here, paragraph 15, and the second sentence there says I also expressed my believe that it was critically important to set forth the full picture of Dustin's life even though some aspects of it were negative and even involved Dustin's own criminal conduct. Do you see that line?

A. Yes.

Q. So I want to talk to you about that for a minute. Did you recommend them putting on witnesses during the mitigation phase that they did not put on expert aside --- the expert aside?

A. Yes.

Q. Okay. And who did you remember they put on that they did not put on?

A. I don't know that I'd be able to say that. I certainly interviewed many people, and the attorneys make decisions about who is put on. I don't remember, you know, which ones I would have thought, you know, should have bean put on that weren't.

Q. Okay. You talked about some aspects involve Dustin's own criminal conduct, what criminal conduct are you referencing there?

A. It's probably the high school --- there's a stealing of the car, so it was probably those high school friends that were called as witnesses.

Q. Okay. You were aware that as part of that stealing the car scheme, Honken had a plan to actually kill one of the accomplices in that crime?

A. I am vaguely aware of that. I can't remember where I got that information.

Q. Okay. And where I'm getting it from is this letter from Leon Spies to Alfred Parrish and Charlie Rogers dated May 4th, 2004, and he talks about having just met with you on Wednesday, April the 28 to talk about the mitigation case. And in it he indicates --- and this is Bates number 12700, and in it on the second paragraph he says, quote, Lisa has also uncovered a substantial amount of information that tends to cast Dustin in a very bad light. Some of this information has not been recovered by the government investigators, including Dustin's scheme to kill one of his a accomplices after the car theft in 1986. Does that sound familiar to you, that you were aware of that plan?

A.   Yes.

Q.   You would agree with me, it was a pretty good idea not to call anybody to come in to talk about that plan; right?

A.   Correct.

Q.   You go on in this letter to also talk being aware that Dustin Honken raped a girl and then threatened her.  Do you have that letter in front have you now?

A.   I do, yes.

Q.   Does that ring a bell with you as well that you uncovered information about him raping a girl?

A.   Yes.

Q.   And threatening her?

A.   Yes.

Q.   And so when you talk about you thought it was critically important to set forth the full picture of Dustin's life even own though some aspects of it were negative and even involved Dustin's own conduct. You're not talking about putting this kind of evidence on; right?

A.   No.   No, not these specifically.

Q.   Okay.   So it's not a full picture of Dustin Honken's life; would it be?

A.   No.

Case 3:10-cv-03074-LTS-KEM     Document 69     Filed 11/02/11     Page 56 of 70

Q. It would be kind of a selected picture of Dustin Honken's life kind of giving a version of it that is cleaned up; right?

A. Well, the attorneys make decisions about what is presented in a penalty phase, you know, based on all the things that I uncover in a mitigation investigation.

Q. And that's really the role of the attorneys; right, and they have to balance their perception of what they think's going to be positive and what's going to be negative, how that's going to play in front of the jury and ultimately make the judgment call about what would be presented; right?

A. That's correct, yes.

Q. Going to your declaration of page 10 you indicate that --- at paragraph 18 you say the penalty phase proceeded with counsel offering a brief snapshot of the dysfunction that plagued Dustin Honken's early childhood and youth, okay? And I want to just talk to you about that for a minute. We'll talk about the fact that you recommended maybe some additional witnesses that were on call. What else are you saying --- and the experts; right, what else, if anything, are you saying that defense counsel should have done in the presentation of the

mitigation case, other than the experts that you recommended and calling some additional witnesses you can't remember who those are necessarily today, by calling some additional witnesses. Is there something else you're saying that they should have done?

A. Yeah. If I remember correctly, there was much more about the influence of Jim Honken on Dustin's life and even the influence of his older brother Jeff on Dustin's life and his development that was not presented fully.

Q. And do you know why it wasn't presented fully?

A. You know, I can't remember the specifics of what the attorneys would say about that. I'm assuming --- you know, I can't remember what the attorneys said as to why it wasn't fully --- fully offered.

Q. And I take it from that there was a discussion about it?

A. Yeah, there would have been.

Q. Okay. Going to this Dr. Gilligan that you had recommended at some point, how did you arrive at Dr. Gilligan as somebody that you would recommend?

A. You know, that was early on in the case, and I had just gotten done reading a book by him, and I was seeing a lot of parallels to his sort of theory and

explanations about shame and how powerful that can be and the preservation of self and that kind of thing. So I was kind of using that book as a guide to help me even analyze and understand Dustin, and so that's how that came out initially, and then we didn't --- the attorneys decided not to pursue that particular expert.

Q. Okay. And to this day, you don't have any idea what Dr. Gilligan would say about Dustin Honken, do you?

A. No.

Q. You described this as a brief snapshot of dysfunction. Do you recall that defense counsel called nine witnesses over two days during the penalty phase, the transcript is 323 pages of transcript from testimony during the mitigation phase? Do you recall that?

A. I can't remember how many, but it didn't feel complete to me when it was all over.

Q. Now, on page 10 of your declaration at the very bottom paragraph 19 you say in sum there was, in my view, a strong mental health based mitigation narrative to provide to Mr. Honken's jury. Do you see that line, ma'am?

A. I do.

Q. Okay. In going back to this letter from Leon Spies to Alfredo Parrish and Charlie Rogers, that he wrote after meeting with you on April 28th, 2004, in the second paragraph, he writes in speaking frankly about the mitigation potentials in this case, Lisa's concluded that she has bean unable to identify very much that is sympathetic about Dustin. Do you remember that that --- or did you ever see this letter by the way?

A. I did, yes, just recently again.

Q. Okay. And do you remember having that kind of frank conversation with Leon Spies on April 28, 2004?

A. Well, not specifically, but I've reviewed the memo.

ATTORNEY WILLIAMS:

Okay. I have no other questions at this time, thank you, Ms. Rickert.

A. You're welcome.

REDIRECT EXAMINATION

BY ATTORNEY KANE:

Q. Mr. Williams was asking you some questions about what is discussed in --- let me find it in your declaration. In paragraph ten of your declaration regarding Rodney's disappearance, the disappearance of Tim Cutkomp's brother. Did you --- in discussing

this with Mr. Honken, did you consider the truth of the matter of whether Jim Honken had a role in Rodney's disappearance to be crucial one way or the other?

A. Certainly Dustin's belief that his father could have played a role was crucial.

Q. Okay. Mr. Williams drew your attention to paragraph 11 of your declaration regarding Jim's treatment of family pets and other animals. Do you have a recollection of anyone telling you about Jim having a, quote, 25 cent solution, end quote, for animals or for pets in the family?

A. I don't.

Q. Mr. Williams was --- drew your attention to paragraph 14 of page 7 of your declaration regarding reports of childhood physical abuse that you learned of in your investigation?

A. Yes.

Q. I'm going to show you a document that begins at page 5642 of the Bates stamp discovery that was provided to the government. It's entitled final forensic report and dated October 21st, 1997. Can you review this, turning to page three when you familiarize yourself with it?

A. Okay.

Q.   And does that refresh your recollection of one of the sources that had --- from which you had learned about physical abuse in the family?

A.   Yes.

Q.   And could you just read that portion starting with he stated referring to Dustin Honken through the end of the paragraph there?

A.   He stated I don't really remember my childhood. Despite the statement he described that his father was an alcoholic, the home environment was typified by emotional turmoil mainly related to his father's alcoholism.   Mr. Honken reported several instances in which his father physically struck him although the extent of physical abuse is not known.

Q.   Thank you.

ATTORNEY KANE:

And that is from page 5644, C.J., of the discovery.

ATTORNEY WILLIAMS:

Thank you.

BY ATTORNEY KANE:

Q.   I'm also going to show you a document titled confidential work product then interview notes of Alyssa Nelson.   This begins at Bates stamp number 2166 of discovery that was provided to the

government. And I'd like you to familiarize yourself with this document and then look at the last paragraph on page 2169?

WITNESS REVIEWS DOCUMENT

A. Yes.

BY ATTORNEY KANE:

Q. Does that refresh your recollection about the incident of physical violence that Alyssa reported regarding Jim and Dustin and Jeff?

A. Yes.

Q. Could you just read that last paragraph, please?

A. Alyssa recalls only one incident when dad was physical with the boys. Dad was supposed to be watching Alyssa while mom was gone. Dad got drunk and had the boys watch Alyssa. Alyssa was left alone and she went to find her mother. Marvea was angry. Dad blamed the boys and threw them across the room.

Q. Do you recall how old Alyssa was when Jim and Marvea divorced?

A. Dustin was seven or eight or --- seven I think. She would have been, I think, around four.

Q. Okay. Mr. Williams asked you a number of questions about communications you had with trial counsel. Is it possible that not all of your oral communications and recommendations were reflected in

notes that you took?

A. Sure. Yes.

Q. I'm going to show you a letter --- this is a two-page letter beginning at Bates stamp number 11270 from Al and --- I'm sorry, from Mr. Spies to Mr. Parrish and Mr. Rogers. Could you look at paragraph six, or bullet number six down there?

WITNESS REVIEWS DOCUMENT

A. Yes. Okay.

BY ATTORNEY KANE:

Q. Could I get that back from you?

A. Absolutely.

Q. Do you ever recall seeing this letter at the time?

A. I don't.

Q. Can you just read number six there, please?

A. If we decide to pursue Lisa Rickert's theory that if guilty, Dustin's depravity was due to some psychiatric or psychological condition, should we also include a series of questions about jurors feelings toward mental health issues and mental health experts?

Q. And what's the date of that letter?

A. June 9th of 2003.

Q. Does that letter --- is that letter consistent

with your memory that you did recommend orally and in writing to trial counsel that they pursue a psychiatric or psychological evaluation of Mr. Honken?

A.   Yes.

Q.   Mr. Williams mentioned that this penalty phase presentation by trial counsel involved nine witnesses and 300 pages of transcript.  Is that --- in your experience, as a mitigation specialist, is that length of a penalty phase presentation necessarily inconsistent with one that does not adequately explain a client's life and upbringing that was --- maybe I can rephrase that.

Is there anything about the length of that, nine witnesses and 300 pages of transcript, you had described in your declaration that there was only a brief snapshot of Dustin presented.  Does Mr. Williams telling you what the length of the penalty phase presentation, does that make you rethink your opinion?

A.   Well, now that I'm, you know, 22 cases later and certainly not all of them have gone to trial, that's a fairly low number of witnesses that might have been adequate to explain the story, his life story, but in this particular case it didn't.  It was short.

Q. Mr. Williams drew your attention to the letter dated May 4, 2004 from Mr. Spies to Mr. Parrish and Mr. Rogers, and he said that the letter indicates that you did not find very much sympathetic about Dustin, is that an accurate representation of what your opinion of Dustin was and your opinion of the mitigation potentials?

A. No, I think when I said that, there's information that we gather that identifies the damage done to our clients because of their upbringing or different things that have happened to them, and if the response of the defendant because of all this trauma and other issues is that he goes out to do bad things, that doesn't feel very sympathetic, and yet when you get the entire picture and understanding of what happened and how it relates to his development and his behaviors later on, that gives you a very much deeper and clearer understanding and would hopefully generate sympathy. But when you're just saying, you know, he grew up to commit some crimes like his father, it doesn't feel very sympathetic. But when you put the whole thing together, that's the clear picture.

ATTORNEY KANE:

That's all I have right now.

ATTORNEY WILLIAMS:

I just have one follow-up question.

RECROSS EXAMINATION

BY ATTORNEY WILLIAMS:

Q.   You were asked on Redirect about Rodney's disappearance and the question was something along the lines of in discussing with Dustin Honken did you consider the truth of when, in fact, Jim Honken caused the disappearance to be a crucial --- you explained no, the essence of what your testimony was that when it happened or not wasn't as important is the fact that Dustin Honken believed that it happened by his father or that his father caused that.  Do you remember that testimony?

A.   Yes.

Q.   And did I summarize that accurately?

A.   If I can say it again, that the most crucial part of that is that Dustin believed his dad either had something to do with it or could have had something to do with it, you know, we just don't know.  But the fact that Dustin believed that his dad was serious and certainly was capable of doing something like that.

Q.   Okay.  Now in attaching any importance at all to that, would you agree with me that it would also

really be important to know whether Dustin Honken had claimed to other people that he actually believed that Tim Cutkomp killed Rodney as opposed to his father?  Wouldn't that cause you to doubt Honken's story to you, that he believed that his father was actually involved in it, if he's telling other people he believed that Cutkomp was the one who did it?

A.   Well, not necessarily.  That belief was one of many, many instances of him believing in sort of the dangerous nature of his father, that wasn't like the most significant one, or you know, there was just one of many.

Q.   Okay.  But as that one standing alone, you would agree with me that if there's evidence that Honken claimed to other people that he believed Tim Cutkomp was involved in causing his brother's disappearance, then that kind of calls into question whether Dustin Honken really believed his father was involved in Rodney's disappearance?

A.   Yeah, and I guess that's why I'm saying it's --- that he certainly believed his father was capable of doing something like that.  That just sort of added to what he knows and understands about his father.

ATTORNEY WILLIAMS:

All right.  I have nothing else.

Case 3:10-cv-03074-LTS-KEM     Document 69     Filed 11/02/11     Page 68 of 70

ATTORNEY KANE:

Thanks, C.J.

DEPOSITION CONCLUDED AT 12:52 P.M.

Case 3:10-cv-03074-LTS-KEM     Document 69     Filed 11/02/11     Page 69 of 70

COMMONWEALTH OF PENNSYLVANIA)

CERTIFICATE

I, Nicole Montagano, a Notary Public in and for the Commonwealth of Pennsylvania, do hereby certify:

That the witness whose testimony appears in the foregoing deposition, was duly sworn by me on said date and that the transcribed deposition of said witness is a true record of the testimony given by said witness;

That the proceeding is herein recorded fully and accurately;

That I am neither attorney nor counsel for, nor related to any of the parties to the action in which these depositions were taken, and further that I am not a relative of any attorney or counsel employed by the parties hereto, or financially interested in this action.

*Nicole Montagano*

Case 3:10-cv-03074-LTS-KEM    Document 69    Filed 11/02/11    Page 70 of 70