THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

DUSTIN HONKEN,                    )
                                  )
              Plaintiff,          )
                                  )
         vs.                      )     No. C10-3074 LRR
                                  )
UNITED STATES OF AMERICA,         )
                                  )
              Defendant.          )

       The deposition of MICHAEL GELBORT, Ph.D.,

called by the Plaintiff for examination, pursuant to

notice and pursuant to the Federal Rules of Civil

Procedure for the United States District Courts

pertaining to the taking of depositions, taken before

Susan M. Reed, Certified Shorthand Reporter for the

State of Illinois, at 219 South Dearborn Street, 9th

Floor, Chicago, Illinois, at 10:00 o'clock A.M., on the

20th day of October, A.D., 2011.

Case 3:10-cv-03074-LTS-KEM   Document 70   Filed 11/02/11   Page 1 of 77

A P P E A R A N C E S:

MR. SHAWN NOLAN
MR. TIM KANE
(Federal Community Defender, Capital Habeas Unit
 601 Walnut Street, Suite 545 West
 Philadelphia, Pennsylvania 19106
 215/928-0520)
    appeared on behalf of the Plaintiff;


MR. C.J. WILLIAMS
(United States Department of Justice
 401 First Street SE, Suite 400
 Cedar Rapids, Iowa 52407
 319/363-6333)
    appeared on behalf of the Defendant.


            *       *       *       *       *


                    I N D E X

WITNESS:

MICHAEL GELBORT, Ph.D.

        Direct Examination by Mr. Nolan          3
        Cross-Examination by Mr. Williams       24
        Redirect Examination by Mr. Nolan       57
        Recross-Examination by Mr. Williams     60
        Redirect Examination by Mr. Nolan       65


EXHIBITS:


                NO EXHIBITS MARKED


        *       *       *       *       *       *

Case 3:10-cv-03074-LTS-KEM   Document 70   Filed 11/02/11   Page 2 of 77

(10:15 a.m.)

(Witness sworn.)

WHEREUPON:

                    MICHAEL GELBORT, Ph.D.

called as a witness herein, having been first duly

sworn, was examined upon oral interrogatories and

testified as follows:

                DIRECT EXAMINATION

                by Mr. Nolan:

Q. Dr. Gelbort, could you state your name and spell it for the record please?

A. Michael M. Gelbort, G-e-l-b-o-r-t.

Q. What's your occupation?

A. I'm a clinical neuropsychologist.

Q. How long have you been a clinical neuropsychologist?

A. Seems like for forever. Since about 1985.

Q. What is your current practice?

A. I have a private practice where I provide neuropsychological evaluation services, some therapeutic treatment and consultation in neuropsychology.

Q. How long have you had that private practice?

A. I've been solo since 1993 and in this area I had a partner for four years, so I've been here since

1989.

Q. 1989 in this area?

A. In the Chicago area, yes.

Q. How about prior to coming to Chicago?

A. I spent four years in Houston, and I was in private practice there on the side. I also had a position. I was the director of neuropsychology at the Institute For Rehabilitation Research.

Q. And what did that position entail? What did you do with that position?

A. The formal position was both administrative, about 20 percent of my time running a small department, and clinical where I was evaluating and treating patients who were admitted to the rehabilitation center. I also followed a reasonable number of them as outpatients after discharge.

Q. When you say patients, what type of patients, what population, what was their problems?

A. These were folks who had been admitted to an acute rehabilitation center. The ones I was seeing had suffered neurological damage or injury. The modal case would have been someone with an acquired brain injury such as a car accident victim, someone who had taken a fall, someone who might have been beat up or mugged and suffered a brain injury.

I also worked with a lot of patients with stroke, with things like Guillain-Barre, multiple sclerosis. Most anything that affected the nervous system and might have an impact on a person's cognitive abilities were folks that were referred to me.

Q. And what was your role, in other words, what was your goal with these patients? What were you trying to achieve I guess?

A. To assess their cognitive functioning and dysfunction. In some cases to appreciate whether there was cognitive dysfunction. So, for example, I don't think I mentioned spinal cord injury patients were referred to me; and a percentage of them would have an occult injury, one that wasn't necessarily recognized. So to evaluate them and say what was working, what wasn't and what to do about it, work with a team, provide direction to the team who were treating those individuals.

Q. Is that similar to the type of role in your current practice?

A. It's a little different.

Q. How so?

A. When I was there at least in that part of my work activities, it was at a very focused, major rehabilitation center. So we were seeing pretty

significant trauma. I do work on a rehab unit now. We do see some of the same types of patients, but we see what can be viewed as more garden variety types of illnesses or injuries. Higher proportion of strokes, people with orthopedic injuries or orthopedic procedures but elderly and may have dementia or other sorts of cognitive issues. So it's a more diverse and general practice now than it was when I was in Houston.

Q. What is your role with the current practice in terms of what's your function in their treatment?

A. That part of the practice, again, is doing diagnostics, assessing what works and what doesn't, why it may be and what we can do about it. That is probably about a third of the patient population I serve now.

In addition, I also, another third would be hospitalized patients who are referred by neurologists or neurosurgeons or internal medicine doctors; and there the question is is there something wrong with them in terms of their thinking skills, their cognition. If so, what's it's attributable to and what do we do about it.

Then, again, in my current practice, another third or better is office based where I'm having the same types of referrals but they're

Case 3:10-cv-03074-LTS-KEM   Document 70   Filed 11/02/11   Page 6 of 77

outpatients rather than individuals who are in the hospital at the time.

Q. What type of neuropsychological tools do you use to make your assessments?

A. I use some of the standardized tests, ones that I have been trained with and have used for long periods of time. Quite often I use a battery that I use over and over again.

Q. Can you just describe briefly your educational background?

A. Sure. After high school I went to college at Grinnell College in Grinnell, Iowa. Lovely little place in the middle of the corn fields. I graduated with high honors in -- I had a double major, psychology and general sciences; and I finished essentially in three and a half years. Applied to doctoral programs in clinical psychology and went on to a Ph.D. program in clinical at Texas Tech University. Went through that program in a fairly typical fashion working some on the side. My minor was in applied neuropsychology.

I worked at a half-way house for criminal offenders. I worked at the medical school for two neurologists and two neurosurgeons doing their neuropsychological evaluations. I worked at a developmental disability clinic, did a fairly standard

Case 3:10-cv-03074-LTS-KEM Document 70 Filed 11/02/11 Page 7 of 77

clinical internship at Milwaukee County Medical Health Clinic and finished up there with my Ph.D.

Q. And after you received your Ph.D., did you do a post doc?

A. I did.

Q. Where was that?

A. That was at Rehabilitation Institute of Chicago here in Chicago.

Q. What were you doing?

A. That was in neuropsychology and medical psychology. I was doing diagnostics and treatment again.

Q. So you were doing test batteries and things of that nature again?

A. Correct.

Q. Let's just talk briefly about your forensic work. How long have you been involved in doing forensic work?

A. I think my first forensic involvement was somewhere in the order of 1986.

Q. And what percentage of your current practice is forensic?

A. It's about 5 percent.

Q. So 95 percent of your practice is clinical?

A. Correct.

Q.   And have you been involved in both civil and criminal matters?

A.   Yes.

Q.   In civil matters what types of civil cases have you been involved in?

A.   The most common would be to be either an expert or retained expert in personal injury lawsuits, motor vehicle accidents, other types of injuries people suffer at work, occasionally doing an IME for a medical malpractice case.

Q.   What's an IME?

A.   Independent medical examination.

Q.   Okay.

A.   Looking at almost always cognitive impairments, whether or not they're present, the nature and extent of them, what they may be attributable to, what's the eventual outcome.

Q.   How about criminal matters?  Let's talk about noncapital criminal matters first.  Have you had involvement in criminal matters?

A.   Yes.

Q.   What types of cases or what types of involvement?

A.   The cases typically are relatively significant in that someone has done something

Case 3:10-cv-03074-LTS-KEM   Document 70   Filed 11/02/11   Page 9 of 77

particularly bad and they're facing a lengthy term of years. The involvement sometimes has to do with whether or not they're fit or competent to stand trial, whether or not they understand Miranda, if their comprehension is impaired or not. Sometimes it's just to give information with regard to how they function, strengths and weaknesses that may fit into some type of legal strategy on the lawyer's part.

Q. Have you consulted with prosecution, with any prosecutors in any matters, any criminal matters?

A. Yes.

Q. What types of things or what capacity?

A. There have been a couple of occasions where I've been called and asked to look at a case, review records and even look at the patient. There are times when --

Q. When you say look -- I'm sorry to interrupt. When you say look at the patient, you mean evaluate the patient?

A. Do at least a mental status exam or an interview and come up with some sort of an impression as to what might be going on with the individual.

Q. Okay.

A. There are times when I'm retained by the court; and as a friend of the court the prosecution

Case 3:10-cv-03074-LTS-KEM   Document 70   Filed 11/02/11   Page 10 of 77

will ask, consult with me about the individual.

Q. But it's fair to say that most of your work is defense based?

A. Very much so, yes.

Q. How many capital cases have you been involved in?

A. I don't have a count, but I'm sure it's on the order of 50 or more.

Q. In the past have you been qualified as an expert in clinical and forensic neuropsychology?

A. Yes.

Q. Do you know about how many times roughly?

A. I've never not qualified. So I'm sure, you know, again, it's somewhere in the vicinity of 50.

MR. NOLAN: We would offer Dr. Gelbort as an expert in clinical and forensic neuropsychology. Do you want to do any questioning on that now or wait?

MR. WILLIAMS: No. Thank you.

(Discussion had off the record.)

BY MR. NOLAN:

Q. Just for the record, I wanted to show you a copy of your curriculum vitae from back in 2003. Does that look accurate?

A. Yes, it does.

Q. Now, at some point, Doctor, you became

Case 3:10-cv-03074-LTS-KEM   Document 70   Filed 11/02/11   Page 11 of 77

involved in the Dustin Honken case. Do you remember when that was?

A. I don't remember offhand. I have a report, an evaluation date and a report; and I don't think it was all that long before I actually saw Mr. Honken, did the evaluation and quickly put together a report.

Q. What was the date, what was the date that you saw Mr. Honken?

A. It was the 19th, yeah, July 19, 2004.

Q. I ask to show you this neuropsychological examination. Is that the report that you're referring to?

A. Yes.

Q. On the top there's a fax with a couple dates on that. Do you see one of them is the 21st?

A. July 21st, 2004, yes.

Q. Can you tell if that's the date that you faxed the report?

A. I can't tell from this, but I think there's other documentation in my file indicating that my assistant sent a report on that date -- or my report regarding Mr. Honken on that date.

Q. Was that a final report?

A. It was termed and never changed. It was termed as a draft.

Q. Draft, okay. So that would have been done within two days of your meeting with Mr. Honken?

A. That's correct.

Q. After July 22, which was the date that the lawyers had to report back to the court, did you ever hear from the lawyers on Mr. Honken's case again?

A. I don't think there was anything of substance after that point in time. So there may have been communication regarding sending a bill, something of that nature; but I don't believe there was anything of clinical significance after that date.

Q. Do you recall ever speaking to Mr. Spies about the Honken case?

A. I'm not sure. I may have spoken with him directly, but I can't tell you that for sure, and I don't have an independent recollection.

Q. Do you remember speaking with Lisa Rickert?

A. I think I did speak with Lisa; but, again, it's been a long time; and I don't recall specifics.

Q. Did you ever remember talking to Charlie Rodgers or Al Parrish, other lawyers on the case?

A. I don't believe I did, but I can't say categorically I did not.

Q. What were you asked to do by Mr. Honken's legal team?

A. My recollection is that they were requesting a neuropsychological evaluation.

Q. And what does that neuropsychological evaluation entail in your experience?

A. Generally taking some history from the individual, reviewing records if available and then administering tests, scoring the tests and interpreting the tests.

Q. What types of tests did you give to Mr. Honken?

A. He was administered a neuropsychological battery. It had an IQ test. It had a memory assessment. It had tests of higher cognitive abilities, looked at basic academic skills, basic language functions, processing speed.

Q. What is that battery test for basically?

A. It looks for general integrity of a person's cognitive systems. I tend to tailor it to look at the bigger picture questions, things that affect a person's judgment and reasoning and ability to behave in a fairly normal fashion as opposed to some things which would be seen as more esoteric, which are also parts of neuropsychological batteries but which I think have less relevance certainly to a capital case.

Q. So you're looking for cognitive functioning?

Case 3:10-cv-03074-LTS-KEM   Document 70   Filed 11/02/11   Page 14 of 77

A. Correct.

Q. Other than doing the battery of neuropsyche testing in that neuropsychological evaluation, were you asked to assess Mr. Honken for any other potential mitigation or behavioral factors?

A. No.

Q. Were you asked to assess whether or not his drug use could have impaired his behavior or his brain functioning?

A. Only in the sense that I was looking for neuropsychological integrity; and someone who is either acutely intoxicated or who has done damage to their nervous system specifically or higher cognitive abilities through drug use, that sort of information could show up on the neuropsyche evaluation.

Q. In the interview with you, did he tell you about his use of methamphetamine and other narcotic substances?

A. He stated that he had used methamphetamine in the past, and he also mentioned that he had done some other substances as well.

Q. Did you go into much detail about what his drug use was in terms of how much he used, what the timing was, what the purity was or anything like that?

A. No, I did not.

Q.   Was there a reason you did not?

A.   I found it typically is not all that helpful to ask individuals.  The information you get, you never know about the veracity of it.  If it's important or significant, my experience has been that I'm better off relying on someone else to do an investigation and consult with other sources and look at that information in greater depth rather than simply ask the patient, the individual.

Q.   So when you're talking about other information -- can we call that collateral data I guess?  What's the importance of relying on collateral data for your profession?

A.   To make a diagnosis, some of the information that you need comes from test results, direct observation, and some of the information pertinent to aspects of diagnosis will be reliant on things like collateral bits of information.  I guess the easiest way to say it is that the data you get describes how the person functioned on your test.  It measures their performance on the day you tested them in the areas that you assessed.  To interpret that oftentimes takes a broader range of information including collateral information.

Q.   Now, you had also been retained by the

attorneys for Angela Johnson; is that right?

A. Correct.

Q. Do you know when you were retained by them?

A. I couldn't tell you exactly when.

Q. If you testified at her hearing, that it was 2002, does that seem about right?

A. That seems pretty accurate.

Q. But in any case, do you recall that you were retained by her attorneys before you were retained by Mr. Honken's attorneys?

A. Yes.

Q. In the hearing in Angela Johnson's case, do you recall testifying this past summer?

A. Yes.

Q. In June. When you testified that Angela Johnson was a daily methamphetamine user, what did you rely on for that testimony?

A. I believe that was primarily on her self-report. I couldn't tell you offhand if there was other collateral information that confirmed that or not.

Q. Can drug use -- drug abuse I should say of a drug like methamphetamine cause brain damage?

A. Research has shown that it can.

Q. And when there is a brain injury of the type

that can be caused by drug abuse, can the brain heal itself over time?

A.    You probably need to define the word heal.

Q.    I'll let you define that then, or I think you get the gist of my question.

A.    What you can see is after acute suppressions due to certain types of drug use, you can see improvement in functioning over time, and I would divide that into two different types of affect.  First would be acute intoxication.  As the intoxicant leaves the system, you'll see an improvement or a reverting back for the most part to something more normal in terms of cognitive functioning, the drug has been psychoactive.  If there's been actual damage or change to the neurosubstrate to the brain tissue, as with many types of brain injury, you can see an improvement in functioning over time up to a point.

Q.    When you say over time, how much time are we talking?

A.    With most types of brain injuries, you can see improvement for up to a couple of years.  It's been demonstrated that there will be improvement over that time period.

Q.    Were you asked to do any personality testing with respect to Mr. Honken?

A. I was not.

Q. Does neuropsyche testing detect personality disorders?

A. Not per se. Personality disorders can, in some cases, affect the neuropsyche testing; but by and large, neuropsyche testing is not designed to assess personality functions.

Q. Does it measure antisocial personality disorder, for example?

A. Not per se, no.

Q. In your -- just for the record, I'd like to show you this declaration, two-page declaration. Is that your signature on the second page?

A. It is.

Q. Before you signed that did you review it --

A. Yes.

Q. -- to make sure it was accurate?

A. Yes.

Q. In your declaration, in that declaration you use the words soft signs of possible organic brain dysfunction. In other words, you said that back at the time when you did the testing of Mr. Honken, you found soft signs of possible organic brain dysfunction. Was that your opinion at the time of what the testing showed?

Case 3:10-cv-03074-LTS-KEM   Document 70   Filed 11/02/11   Page 19 of 77

A.    Yes.

Q.    You have since reviewed a report by Dr. Grote who is the government's expert in this case?

A.    Yes.

Q.    He, as you saw in this report, disagrees with you that the testing showed soft signs of possible organic brain dysfunction.  Can you explain why you made that finding and why, if you do, you still believe it's accurate?

A.    Sure.  Within the pattern of the data I collected, things -- things, scores or measured abilities were not consistently at one particular level.  We expect when we test anybody that there's going to be some variability from one cognitive ability or capacity or competency to the next; but by the same token, as we're testing different functions arising from one brain and one person, the expectation or the assumption made is that there's going to be some sort of consistency unless there's a known problem.

So, for example, if someone is showing on scans that they're growing a tumor in their occipital lobe affecting the visual areas, it won't be surprising at all, in fact, you may be actually looking for suppressions in visual cognitive abilities because you know there's a problem in the area of the brain

Case 3:10-cv-03074-LTS-KEM   Document 70   Filed 11/02/11   Page 20 of 77

that gives rise to those abilities.

When we go and test someone and we're looking for competency as well as problems, what we're actually looking for is a pattern; and the pattern that is mostly normal is when scores are typically hovering around the average range or they're hovering in the high-average range or low-average or mildly impaired; but we look for some consistency, ability to ability, score to score.

When you find something other than that, you have to wonder -- or our job is to wonder and try to figure out why that is. First off, is it different than from the normal pattern and, secondly, if it is different, why is that difference showing up.

In the scores I obtained from Mr. Honken, the majority of his scores were coming out above average; but there were some scores that were coming out in the average range and even slightly below the center of the average range; and they were statistically different enough for most of the other scores to cause me to do just what I mentioned, to wonder why is that. Is this a normal fluctuation, is this a normal variation or is this something different? And it appeared to me as the scores that were lower were showing up in areas that are most easily and most

Case 3:10-cv-03074-LTS-KEM   Document 70   Filed 11/02/11   Page 21 of 77

typically and most quickly affected by acquired brain injury, and that would be a very reasonable hypothesis to consider that maybe something had happened that while there was no clear and compelling score well into what everyone would accept as the impaired range, there were some scores that were different enough from the majority of the scores as to raise the question is there something amiss here, something different from normal and, hence, the suggestion that there may be some soft signs correlated or indicative of acquired brain injury.

Q.   And that type of brain injury, is that something that could be consistent with long-term drug abuse?

A.   Quite possibly, yes.

Q.   Now, are you saying that Mr. Honken had organic brain damage?

A.    I can't say that based on the data I collected.  I can say as you can say with most anyone, that's a possibility; and there are scores in his battery which don't answer the question, don't say, no, there's nothing wrong here, everything is just as it's expected to be; and also conversely there's nothing here that says absolutely there's a problem.  There are scores here that are so different from the rest or so

different from normal that there must be something wrong; but rather we're in something of the gray zone.

Q. Is that why you used the word soft signs?

A. Correct.

Q. Now, you were at some point retained by my office. Mr. Wiseman actually contacted you?

A. I think that's correct.

Q. And do you recall what we provided for you to review?

A. There was a report from another doctor who is, I believe, an expert in pharmacology. I'm not sure exactly how her title reads.

Q. If I could refresh your recollection, just look at paragraph 4 of your declaration.

A. Dr. Piasecki, yes.

Q. Did you review a report from Dr. Piasecki?

A. I did.

Q. Did you essentially agree with her findings?

A. I certainly didn't disagree with her findings. She has areas of expertise outside of my own, and what she said made sense to me and comports with what I know about drug use and abuse.

Q. All of the opinions that you express here today, have they been expressed to a reasonable degree of neuropsychological certainty and scientific

certainty?

A. Yes.

MR. NOLAN: I don't have any other questions.

CROSS-EXAMINATION

by Mr. Williams:

Q. I want to go over a couple things here that counsel went over with you, and then I've got a few other things I want to bring up.

First of all, you were talking about obtaining a drug use history from Dustin Honken, and you said it wasn't reliable coming from a patient and you usually look at collateral sources. That's what I understood you to say or put it in your own words if I misphrased it.

A. Yeah, I think the gist of what you're saying I think is on point. I would probably hesitate to use the word reliable just because that could be pejorative. People have their own memory. People have their own way of reporting things, and I've learned that when someone tells me about things like drug use history that more often than not it's close to accurate or it's reasonably descriptive; but if I'm doing a clinical case in my office and there's not reason to investigate further, I'll take a little bit more history and sit with that. But in legal cases it seems

more prudent to rely on other people's reporting and medical histories and the like which stand a better chance of being more objective.

Q. Okay.

A. So I hesitate to say it's not reliable. On the other hand it's not something I want to base conclusions on as a general rule.

Q. There wasn't anything that would have prevented you from taking a detailed history from Dustin Honken about his drug history, right?

A. There was some time pressure, but I certainly could have spent more time asking him about his drug history if I so chose.

Q. As a neuropsychologist as you've testified here today, you knew that a past history of drug use could have affected his neuropsychological abilities, right?

A. It could be at the root of cognitive limitations, sure.

Q. And you know that how? You know that because of your medical education?

A. I would say my education and psychology and neuropsychology which has some medical component, but, yes, there's research that shows that different types of drug use/abuse can lead to changes in the

neurosubstrate. The easiest one to point at is things like huffing where you're actually putting in chemicals that are destructive to carbon bonds which is what we're made up of and our nervous system is made up of. So those are very volatile compounds. Methamphetamine, more or less.

Q. And you testified that Honken's past use of methamphetamine could be, in your view, the cause or the source of what you saw to be soft signs of impairment?

A. I think you've summarized some of the things I said or pulled them together; but I wouldn't disagree with what you're saying, that that certainly could be a potential contributing factor to any cognitive impairments he might display.

Q. Now, the lawyers hired you to evaluate Dustin Honken, look into whether he had any neuropsychological damage. That was the task they gave you, right?

A. Neuropsychological deficits, but yes.

Q. In doing that, fair enough, they relied upon your superior education and training in this area?

A. You have to ask them, but I trust that's true.

Q. And you assume that they had -- that you have more education in that area than the lawyers would

have, right?

A. I think that that's accurate, but you'd have to ask them that question.

Q. Well, they wouldn't need to hire you, right, if they had the same level of expertise probably, right?

A. Again, that's a question that's probably beyond me; but I would suggest at the very least if they're employed as his attorney and they're trained neuropsychologists, they probably can't go and do a neuropsyche eval and testify if they're also his attorney. There may be other reasons where even if they were trained they would choose not to do it themselves.

Q. Fair enough. Now, given this background that you knew he had used some drugs, right, and you, in your opinion, found some evidence of soft signs of impairment, right, wasn't it incumbent upon you as the expert to advise counsel at that point that the drug use might be the source of the soft signs of impairment that you saw?

A. I don't believe so; and I think you're also basing that statement, at least as I hear it, on some assumptions which aren't necessarily true. So as I said, I appreciated from the patient that he was

Case 3:10-cv-03074-LTS-KEM   Document 70   Filed 11/02/11   Page 27 of 77

reporting a history of drug use. I didn't confirm, corroborate it or not; and the way you asked the question, it was as if I knew for sure. I only knew what he reported to me. I didn't know what actually had transpired. As I said, I would defer or generally rely on other people to collect that information.

I was charged with -- the request put to me was do a neuropsyche eval and is he working okay, are his cognitive abilities normal or is there something abnormal here as opposed to taking the next step, which, frankly, there wasn't enough time in that, say, so if there are abnormalities, what are those most likely attributable to.

Q. All right. But you identified in the report you gave to counsel that you thought there was soft signs of impairment?

A. I mentioned that, yes.

Q. And you've indicated today and through counsel you've linked up that the soft signs of impairment may be caused by methamphetamine use, right?

A. That's a possible etiology, yes.

Q. And that's something you knew at the time?

A. Sure.

Q. You didn't think it was your responsibility to point that out to trial counsel that that might be

the source of the soft signs, that maybe they want to do more looking into this area?

A.  I wasn't asked that.  I was asked does he think in a normal fashion.  I'm oversimplifying it, but the question I was asked which I answered is cognition, okay, not okay.  If it's not okay, to what degree is it not okay.

Q.  Okay.  And you thought that was the end of your responsibilities?

A.  Most often when I've been involved in cases, there's a discussion; and if I say there's something wrong, most often the next step is how bad is it, how does it affect him and what might it be due to, you know, from what sorts of issues might it have arisen.  For whatever reason we never had that discussion; and you ask is it incumbent on me.  I did my job the way I typically do; and, I mean really things didn't progress the way they most often have in the past.

Q.  Let's talk a little bit about then what you did here.  Do you have your CV available?  Shawn went over this with you.  He asked the question, that was the CV you provided in 2003; is that right?

A.  I think it is.

Q.  Has anything changed since then?

A.  There's nothing certainly in the past that

has changed. I've given a few more lectures and had some additional clinical experiences since then.

Q. Any other corrections to this that -- your education is the same, right?

A. It didn't change.

Q. Right. Clinical experience from 1989 to the present, is that the same?

A. Pretty much, yes.

Q. The research, have you done any research that should be added to this section?

A. No.

Q. Presentations?

A. I've done more presentations.

Q. In what areas?

A. Typically in neuropsychology. The Brain Injury Association asks me to speak sometimes. There are different groups most often around the Chicago area that ask me to speak about neuropsychology. I've presented at a couple of additional national conferences. NLADA has asked me to speak a couple of times since then, again, regarding neuropsychological evaluation.

Q. Professional affiliations the same?

A. Pretty much. Not participating, it's been a number of years since I've been involved with the

spinal cord injury group. I'm still on the board of directors of the Head Injury Association. It's now the Brain Injury Association, kind of as an emeritus affiliation.

Q. How about the certificate and licensure, has anything changed there?

A. I haven't renewed my license in either Indiana or Texas in the past number of years. Otherwise it's the same.

Q. And you're board certified; is that right?

A. I am.

Q. And that's by the American Board of Psychological Specialties?

A. Correct.

Q. And that's a subgroup of the American College of Forensic Examiners; isn't it?

A. That's right.

Q. That's the group that you're aware of has been kind of attacked from -- in the past on basically handing outboard certifications in exchange for a check?

A. There's been controversy in the past, yes.

Q. What did you have to do to get board certified?

A. When I was applying, it was early on in their

board certification process; and I was grandfathered in. So I had to submit some work samples and evidence of having completed I think at that point 50 evaluations.

Q. And do you know what the pass rate is for being board certified by the American Board of Psychological Specialties?

A. I couldn't tell you.

Q. You're not board certified as a neuropsychologist?

A. Well, the board certification I have from them is as a forensic neuropsychologist.

Q. There's other board certifications that you could have obtained, right?

A. There's other boards?

Q. Yes.

A. Yes, sure.

Q. What are some of the other boards?

A. The American -- well, there's one from the APA and then there's another one from NAN, National Association of Neuropsychologists.

Q. Have you attempted to get certified by either one of those organizations?

A. I have not.

Q. Why not?

A. It hasn't seemed necessary or important to me.

Q. Let's turn to the work you did in this case. I have the -- you talked about the scores that Dustin Honken obtained and that you saw some inconsistency, and that inconsistency -- and I'm paraphrasing here, but that inconsistency is what led you to believe there might be some soft signs of impairment; is that accurate?

A. It's where I interpreted that there might be soft signs or that may reflect soft signs, yes.

Q. So do you have your raw data there in front of you?

A. I do.

Q. Why don't you identify for me what scores you saw that fell below the average level that concerned you?

A. As I said, they were still in the average range but below the center of the average range.

Q. Okay.

A. What I'm reacting to are his Digit Span and Digit Symbol Coding scores.

Q. Let me see what you're looking at.

A. Probably the back of that packet. I don't know how you've got it assembled.

Q.   As it came to me basically.  This page?  No, that doesn't look right.

A.   You don't have the scores filled in.  That's Memory.  You need the IQ.

Q.   Let me look here.

A.   This is a copy of what was sent to, I think, Dr. Grote.

Q.   Yeah, so I'm going off that in the same order.

A.   Here's exactly what I have, so you should have that as well.

Q.   That's what I'm looking for.  Could I just take a look at what you have there then?

A.   Sure.  Actually for what it's worth, this is the cover letter with this packet.  When we send data or information when we release it --

Q.   That's what I'm looking for.

A.   There you go.  That's what you're looking for.

Q.   All right.

A.   Do you want me to finish that thought?

Q.   Yes, please.

A.   When we send data, we always attach a cover letter; and we make an extra copy for ourselves and put it in our file so I know what was sent.  It was

addressed to Jennifer Schneider, for what it's worth.

Q. I've got it now. I am on that page. It's, for the record, 016307 bates numbered for us. Point out to me on here what's the score that's within the average range but below the midline?

A. The average range is pretty much 8, 9, 10, 11, 12. Standard deviation is just under two and a half on these scores. The 9's -- these are the raw scores, raw score; and then over here the first two columns are the verbal scores and the performance scores after they've been age adjusted. Then they're repeated here because they count to different indices or scales. So the first two columns are really where all the scores are listed in terms of age correction. So here standard deviation, like I said, is between, almost two and a half; and the mean is about ten.

So you've got scores 11 on the verbal scale is 11, 11, 16, 9, 14, 11. On the performance or the nonverbal, 11, 9, 11, 14 and 11. The two scores that are notably different or lower, just from observation are the two 9's, and by the same token the one's that are a little bit higher are the 14's.

Q. Okay.

A. The 9's fall out on Digit Symbol Coding and Digital Span, both are use of verbally and nonverbally

to some degree of attention and concentration, the ability to focus and kind of organize information, juggle cognitively, if you will.

So he's relatively speaking -- absolute terms he's in the average range, but relative to his other scores those are the lowest scores. They're two points lower than the majority of his scores which are 11; and if you were to average these out, they're actually even a little bit lower than that; and they fall out or they show up on a type of cognitive ability tested more verbally, less verbally, but tapping the same sort of abilities.

Q. Okay. What other scores, if any, did you find that were below the midline average on any other test that you performed?

A. He did fine on Trails. His score on category, the absolute score is very good. There's a few spots where he has the principle or he's demonstrated that he's comprehended the principle but then has trouble applying it. That, again, in absolute terms he is actually high average; but when you look at the pattern of results, when you do a qualitative analysis, you have to start, again, wondering why is it that he had trouble at different points even though he had already come to understand the principle and was

clearly putting forth good effort; and a common interpretation of that, again, is a lapse in attention and concentration. On the memory --

Q. And I'm sorry to interrupt, but you were talking before on the Halstead test. Is that where you were referencing where those scores were --

A. The Halstead category test, correct.

Q. Okay.

A. Memory, there's just -- I don't have the numbers, the scores, but logical memory he's got a nice learning curve. He picked up quite a bit more from a second presentation of stimuli. He did okay on the academic testing. I think that's all of it.

Q. Okay.

A. So those are the areas where -- that address your question.

Q. So let's walk through the packet here a little bit. If you could tell me, looking at 16271, what is this sheet?

A. That's something I will look at as a summary sheet.

Q. Okay. Does it indicate all the scores and tests that you did in this case?

A. No.

Q. Why not?

Case 3:10-cv-03074-LTS-KEM   Document 70   Filed 11/02/11   Page 37 of 77

A.   Didn't have a chance to transcribe all the data onto the summary sheet.

Q.   And that was my pick-up too, that you had some testing you did that wasn't transferred onto here. Okay.  So we shouldn't rely on this as an accurate summary of the test scores or anything you've done in this case?

A.   The few numbers that are on there are accurate.

Q.   Right.

A.   But it doesn't give you all the numbers that were collected.

Q.   It doesn't accurately reflect all of the testing that you did?

A.   Correct.

Q.   Good enough.  There's a sheet here on 16272. What's this?

A.   That's the cover sheet for the Wechsler Memory Scale 3.

Q.   There's a section here for behavioral observations.  What's that for?

A.   You can write behavioral observations in there if you so choose.

Q.   Did you choose to do that?

A.   No.

Q.   Why not?

A.   I generally don't.

Q.   Why not?

A.   I write them down in other places if I write them down.

Q.   Okay.  Did you write any down in this case?

A.   I don't think I had any test observations written down.

(Witness peruses documents.)

A.   I don't see any.

Q.   Then we go to the memory thing here, right, the memory test.  Is this a multi-page test then that's done?

A.   Correct.  You've got -- that's the score sheet or the protocol sheet for Logical Memory I from the first story.

Q.   Now, I don't see any scores down here.

A.   Correct.

Q.   Why not?

A.   They weren't put.  I didn't score it on the sheet.

Q.   Why not?

A.   Didn't get a chance to.

Q.   What do you mean you didn't get a chance to?

A.   I was running through this very quickly.  I

was under time constraints; so I didn't end up putting -- scoring it the way I typically would, which would be to have the individual numbers placed in there. So what I would have done in this case is just simply go through and count and then look at the number.

Q. When you say you were under time constraints, explain that to me. Why were you under a time constraint?

A. The attorneys needed some sort of a report within a couple of days.

Q. Okay. Were you limited in the amount of time you could spend with Dustin Honken that day when you tested him?

A. Sure, I was limited. I don't think I pushed the limits, but, yeah, I was limited.

Q. Could you have come back the next day and done more testing with him, spent more time with him?

A. I don't know.

Q. Did you ask for more time?

A. No.

Q. Did you go to the lawyers and say I need more time to do a complete testing on Dustin Honken?

A. No, I wouldn't have done that.

Q. Did you go to anybody and say I need more

time in order to do a complete testing on this individual?

A. I don't believe so.

Q. Did you tell the attorneys that you felt rushed and you were unable to do a complete evaluation on Dustin Honken because of the time constraints?

A. I don't think I said that I was unable to do a complete evaluation. I think there was an understanding that this was being done fairly quickly and that I might not be able to do everything I would want to do in that amount of time, but that's all the time that was being allotted.

Q. Now, you did this testing in July of 2004, right?

A. Correct.

Q. Do you know when the trial started?

A. No.

Q. If I told you the trial started in August of 2004 and went for another ten weeks, will you take me at my word for that?

A. Of course.

Q. Now, would there have been a time between July and the start of the trial for you to have done more testing of Dustin Honken?

A. I believe my schedule would have permitted

it.

Q. Was there any communication by you to anybody on the defense team indicating that it was your belief for a more thorough evaluation of Dustin Honken you needed more time with him?

A. No.

Q. Now, isn't the way that this Logical Memory I test, isn't the way it's supposed to be done is that you're supposed to be taking down kind of verbatim writing down what the patient's telling you as he's telling you this story, repeating the store back to you?

A. Well, it depends. If they say specifically what's listed on the paper, you can just simply, as it's done there, underline. I mean every office has its own conventions. In my office, if someone gives you the specific words, all you have to do is underline. You don't have to write it.

Q. Isn't the way that's taught to be done is to actually write down what the patient's telling you as he's telling you and then go back later and score this based on what they told you?

A. It depends where it's being taught. I've seen it taught different ways in different places.

Q. Okay.

A. I mean essentially what you're trying to do is be able to reconstruct the story so you can score it accurately, sure.

Q. In this case we have no idea what his scores were, right, because you didn't put any score down on it?

A. Well, sure you do. In this case he said the word Anna. So the score, if you wrote it down would be a one; but it's pretty clear he got that correct, he got this correct, he got this correct. So the score from this section would be three; and you can go through, and based on what's there, figure out whether or not he gets score of one or zero here as well.

Q. Okay.

A. So this is pretty typical. Most people do not, at least that I'm aware of, don't score, as you said, in the course of giving the test. They go back afterwards. So you can go back an hour later, a day later, a week later, as long as you have the data.

Q. Okay. So when there's a line next to a word, that was an indication that he had said that word?

A. Line under the word, sure.

Q. Line under the word, okay. Then there is a Logical Memory II Test. You have them repeat a story twice, right?

A. Well, you read the story to them twice. You read it to them once. They recount it. You say I'm going to read it to you again essentially and I want you to give me all the words -- all the story that you remember whether you reported it to me before or not.

Q. Okay. Again, you didn't write down any of the scores on that as well?

A. It's not scored on the sheet, that's correct.

Q. Now, if you go to the Verbal Paired Associates Test, do you have that in front of you?

A. I can, yes.

Q. You gave the first three lists there, list A, list B and list C. You didn't do list D?

A. Correct.

Q. Why not?

A. He had scored perfectly on list C. He had demonstrated to me that he was able to memorize and learn. I had the information I needed to know.

Q. If you go to what my next page is, Family Pictures, are you on that?

A. Yes.

Q. Again, there are some notations on here. There's no actual scoring that's completed on the right-hand side.

A. Correct.

Q. Again, why don't you -- why didn't you score that?

A. The data was scored. It's just I didn't record it on the sheet. Again, I was in a hurry.

Q. Spatial Span which is my next page, was that test given to Dustin Honken?

A. No, it was not.

Q. Why not?

A. It didn't seem relevant, and it seemed redundant with some of the information from the IQ testing.

Q. What did you think was not relevant about it?

A. It's looking at how well he can track information across time. He had already shown to me that he had some difficult with that. So there's a bit of overlap with the two subtests from the IQ test that I had already mentioned.

Q. Well, you didn't think it was necessary to test that -- if you thought he had a memory issue, you didn't think it was important to test that a little bit more?

A. I thought his memory actually was reasonably good.

Q. Okay. What did you see was the problem then?

A. He has some difficulty with sustained and

focused attention, concentration. He had already demonstrated that. I can test it again and again and again and again, but he's already demonstrated that he had problems with it.

Q. Isn't part of the purpose of the testing though to get as many data points as possible in order to inform your ultimate decision?

A. No. No, that's -- no, that doesn't make any sense at all.

Q. Where did you conduct this test at, by the way, these tests?

A. This was in a contact visit room, Polk County Jail.

Q. The next one I have is Logical Memory II. And kind of the same thing there, you went through the test with him, you didn't score -- you didn't actually write down the scores; is that right?

A. Well, the second part of what you said is true. The first part is not.

Q. Why don't you explain what the right answer is then?

A. Well, you said I didn't actually score. That's false. I didn't actually write down the scores. That's true.

Q. Okay. So when you say you score it, you're

talking about the notations, again, you made on the left-hand side of the first -- on the first column on left-hand side?

A. No, I actually -- that's the data that's recording. So he would have said at six o'clock Joe Garcia of San Francisco. You can see that because those are underlined. That's what he would have said. He was watching the six o'clock news. He dressed to eat. That's what he said. So you can go through and score it right now as I did. He'd get credit for at six o'clock for story unit, Joe Garcia of San Francisco. So he's got four points on the story units for the first section.

Q. Okay.

A. So I haven't written it down, but I just scored it.

Q. All right. Logical Memory II exam continued, it says recognition. What's the purpose of that test?

A. It's looking at just that. There's spontaneous or free recall where you can actually pull the story back from your memory, and then there's recognition. With some cuing or prompting or with some information supplied to you, can you come up with the correct answer.

Q. Okay.

A.  So it's a different way to test whether memory has been formed.

Q.  How did Dustin Honken do on that?

A.  He missed six.

Q.  Okay.

A.  So he has a score of 24.  Again, it's not written down there, but it was scored.

Q.  What's that mean, the score of 24?  Is that good, bad, middle, average?

A.  I'd have to go back and look at the comparison charts with other people his age.  I mean it's not bad.  It's, obviously, not perfect.

Q.  The next one I have is Faces II.  Did you administer that test?

A.  No.

Q.  Why not?

A.  Clinically it doesn't seem relevant, and he was already demonstrating that his learning was reasonable.

Q.  Verbal Paired Associates II, did you administer that test?

A.  Yes.

Q.  You did the recall portion of it, right?

A.  Yes.

Q.  And he got eight out of eight?

A.    Correct.

Q.    Did you do the recognition portion of it?

A.    Yes.

Q.    And it says circle yes or no; but then there's no circles; and there's a line straight down. Does that mean that he just got every one of those?

A.    Well, if you look at the bottom, the score is 24.  He got all of them correct, yes.

Q.    Then the next one is Family Pictures II.  Did you administer that test?

A.    No, I did not.

Q.    Why not?

A.    Again, at that point it seemed unnecessary.

Q.    And that's a two-page test; is that right? I'm looking at this next page.  Is that part of the same test here?

A.    No.

Q.    What's this page then, 16284?

A.    That's where you can start recording some of the summary scores.

Q.    Okay.  And so this is where you would collect all the scores from the prior tests?  Am I following you or not?

A.    Collect -- this is where you can start transcribing the numbers.

Q.   Okay.

A.   Yes.

Q.   You didn't do that?

A.   Correct.

Q.   Why not?

A.   I just didn't end up using this form.  I had them written down somewhere else.  Actually in this case I'm not even sure I wrote them down.  I may have scored and then looked in the book for the interpretation for the level at which he was functioning.

Q.   Okay.

A.   That's probably what I did.  I probably didn't even write them down.  I probably just had the answers in front of me, scored it, tallied it and then looked up for the level, you know, if he was above average, below average, average.

Q.   So is that reflected in writing anywhere in your materials then, what you ultimately concluded by looking up in the book?

A.   Sure.  If you look in the memory, the paragraph referring to memory, that should come largely from this, from the Wechsler Memory Scale.

Q.   The paragraph, you're referring to memory that is in your report that you sent to the lawyers?

A. Correct.

Q. Did you give the scores in there to the lawyers at all?

A. I don't think so.

Q. And so that paragraph kind of summarizes what your conclusion was from looking at this?

A. From this memory testing as well from some other clinical assessment of memory, sure.

Q. The next page I have is a profile page. What does this reflect?

A. This is where you can, again, copy more of the scores and then plot them.

Q. Next page after that is the WRAT3, and what is this?

A. It's the protocol from the Wide Range Achievement Test Third Edition.

Q. What is this supposed to test?

A. It looks at spelling abilities, sight reading abilities and math computation.

Q. How did Dustin Honken score on that?

A. Standard score is 105 reading; 105 spelling; 117 math. So he's coming out just a little bit better than the middle of the average of range on the reading and spelling and in the high average range on the math.

Q. And the HS plus on the right-hand side of

that test results, what's that mean?

A. High school, above high school level.

Q. On all of those tests, right?

A. Correct.

Q. Then we have a number of pages after that, the WRAT3. Is this the -- parts of that same test then?

A. Those are the individual data sheets.

Q. The Digit Symbol Coding, what's this page I'm looking at, 16291?

A. That's one of the subtests from the IQ test.

Q. Did you perform all the subtests from the IQ test?

A. All the ones that are used to compute an IQ. There's more that are -- can be used in lieu of others. There's some that are just holdouts or carryovers from prior IQ tests, but they're not used as part of the IQ score typically.

Q. Now, you indicated that when you were retained in this post-conviction relief litigation that you were provided with Dr. Piasecki's report. Do you recall that testimony?

A. When I was retained when?

Q. By Mr. Wiseman in relation to the post-conviction relief.

A. Correct.

Q. And in that connection did you -- you indicated in your testimony that she has an expertise that's not your expertise?

A. That's outside or beyond some areas, yes.

Q. So explain to me what's the import in your view of Dr. Piasecki's report. What importance does that have to you?

A. I don't know what you're asking.

Q. As it relates to Dustin Honken, they provided you with this report and they wanted you to opine. Now that we've given you this report, what are your thoughts about it. So tell me what your thoughts are about Dustin Honken having been provided with Dr. Piasecki's report?

A. My thoughts about Dustin Honken are that when I administered him neuropsychological evaluation, he had some relative strengths and some relative weaknesses; that there's any number of etiologies which could lead to those strengths and weaknesses; and that after reading her report, there's certainly a possibility that drug use/abuse would be one of the reasons why he was demonstrating some weaknesses on the neuropsyche evaluation.

Q. Are you in a position to conclude whether, in

Case 3:10-cv-03074-LTS-KEM Document 70 Filed 11/02/11 Page 53 of 77

fact, what you saw to be some weaknesses were, in fact, caused by his drug use?

A.   I don't think I can say that that would be the proximate cause for certain, absolutely not for certain.

Q.   You indicate in your testimony earlier that you understood there's research that indicates that methamphetamine use can cause brain impairment.  Did I summarize that accurately?

A.   That's a reasonable summarization.

Q.   Are you familiar with that research as far as what the test subjects were?

A.   There's a lot of research, and I'm giving you kind of an overview of what I've read and what I've seen and some of the summary articles I've seen.

Q.   In Dr. Piasecki's report she attached a sheet that identified the articles that she relied on in order to reach her conclusions in her report.  Did you read those articles?

A.   I may have read some of them.  I don't recall offhand.

Q.   Do you know whether any of the research that has looked into brain damage from -- resulting from methamphetamine use, do you know whether Dustin Honken in his history of drug use would be similar to the

subjects of those tests?

A. I told you that I don't have a great in-depth knowledge of his history of drug use, so I would be overstepping to try to compare and contrast.

Q. And so bottom line is you don't know whether Dustin Honken's drug use would be similar or dissimilar to the test subjects in those reports?

A. I don't think I'm in a position to have an opinion.

Q. I have some notes here, and I'm not sure whose these are. I don't think they're yours, but for the record, it's 012504, bates number. Is that your handwriting?

A. No.

MR. NOLAN: So we're clear, is that the bates number that we provided?

MR. WILLIAMS: Yes. Do you know whose handwriting that is, Shawn?

MR. NOLAN: I don't.

BY MR. WILLIAMS:

Q. When you talked with Dustin Honken, did you talk to him at all about the murders?

A. No.

Q. And why not?

A. They're not part of a neuropsychological

evaluation.

Q. You talked to him about other parts of his life, right? You talked to him about his background and drug use, for example?

A. I talked to him about his educational history, about his health history, sure.

Q. But talking to him about his involvement in murders or noninvolvement in murders is not something as a neuropsychologist you have to get into in order to test somebody?

A. Correct. Most people haven't committed one, so it would be tough to do a neuropsyche eval if you needed that bit of information.

Q. Do you remember when you were first contacted in this case?

A. I don't recall offhand.

Q. You produced a draft report that we talked about earlier that counsel had you identify. Were you ever asked to produce any further report?

A. No.

Q. Anything that Dustin Honken indicated to you during your examination of him suggest to you that he was using methamphetamine at the time of the crimes in which he was accused?

A. Didn't discuss it so I couldn't tell you.

MR. WILLIAMS: I don't have any further questions.

MR. NOLAN: Just a couple.

REDIRECT EXAMINATION

by Mr. Nolan:

Q. Mr. Williams asked you about some of the scoring sheets that they weren't transcribed or the numbers weren't written down. You had said that after July 22 of 2004, other than perhaps some billing correspondence, you had no correspondence with the lawyers. If you had been asked by the lawyers to continue working on the case, would you have gone back and completed all those scores?

A. If completing the scores would have been responsive to the questions I was asked, sure; but I can do it now for that matter. It's not hard to do. The data has been memorialized such that you can recreate what his responses were and you can score it at any time.

Q. So filling in the numbers at the time, is that important to do?

A. If you're trying to do a quantitative analysis, it's important to know what the numbers are. Whether you fill them in on that sheet or write them on a separate sheet or have them up in your head and then

check them again and then look for the interpretation, I mean it's merely a question of what do you need to do. I mean just like there are times when I will -- a doctor will refer a patient. I will administer the tests. I will score it and may or may not write down the numbers just like this and then call the doc and say here's what you got. Do you want a report? No, no, no, I have all I need right now. In that case there's not even a formal report generated.

If you can answer the question, then you answer the question. If you can't, you can't. In this case, if there had been more time, all the spaces would have been filled in; but at the point they said, okay, that's fine, that's all we need, I certainly don't go back and fill in the spaces.

Q. So if the lawyers had asked you to continue working on the case and asked you to go see Mr. Honken again and do more testing, would you have done that?

A. If they had requested it and it was something I could do, and sometimes I'll get asked to do evaluations or answer questions that are beyond me to answer and then I will most often say why don't you look at doing this, that or the other; and in this case I might have suggested that if we had that discussion, that there might be other ways to palpate,

to elicit the impairments and be able to document them or demonstrate them in other -- with other approaches.

Q. If the lawyers had asked you to continue working on the case, might you have suggested that they consult with a pharmacologist or somebody along those lines?

A. Quite likely.

Q. Is it -- when you were talking about this score, I think between the 9 and the 14, to get back to that, what is it about that deviation that is significant, if anything?

A. The assumptions and the way most people or most brains work is that scores tend to cluster; and I wouldn't say that Mr. Honken is all that dissimilar in that he does have clusters. The range of his scores, for example, on the subtests, age correction for the IQ are from 9 to 14. So he doesn't have anything above a 14 and nothing below a 9. Statistically there are -- the standard deviation is a measure of central tendency, how close the numbers typically cluster; and when you're going from a 9 to a 14, that's not necessarily an undue range; but when you look at the low scores versus the high scores and start saying what sorts of abilities do these load on, you see that the

low scores come up -- and there's only a couple of them, but they're consistently having to do with things that have to do with functional attention and concentration. And, again, those are areas that we know are more apt, more prone, more at risk when you have some sort of -- a condition affecting the brain. Those are the things that tend to drop more often, more quickly than other scores.

Q. Yet his scores are still in the average range?

A. Absolutely.

MR. NOLAN: That's all I have. Thank you.

RECROSS-EXAMINATION

by Mr. Williams:

Q. Doctor, just one last question and I meant to ask you this earlier. If you go to your report to counsel on the third page of that report, at the very bottom paragraph that starts off the implications, do you see that?

A. Yes.

Q. The next sentence, and I'll just read it into the record, and I'll ask you to explain kind of for a lawyer what that means: Mr. Honken shows indication based on the current data and his history of likely having been able to reform or function at a higher

level in the past and now, while still generally testing out in the average or slightly above average range, of having a pattern indicative of an acquired dysfunction leading to relative if not absolute suppressions in his ability to perform.

Can you translate that from neuropsychology speak to a lawyer?

A. Sure. First off, the word r-e-f-o-r-m is a typo. That should be perform, p-e-r-f-o-r-m. Sorry about that.

Q. Oh, okay.

A. I seem to have shortcomings with my typists. I saw some other typos, including the last word on the first page being uptunded which is obtunded in actuality.

Q. Okay.

A. What that's saying, we've actually spoken about it, is that I'm suggesting that he probably could have been more, in this case, more consistent in function at a higher level in the past across the board rather than having some of these relative weaknesses. It's my belief, based on the pattern I saw, that those are acquired suppressions and that he probably would have been better at some point in the past and that he's displaying relative if not but not absolute

suppressions.

So if you look at him in terms of absolute scores, is he more than two standard deviations below the mean on anything, no, he wasn't. But when you look at his scores one relative to the next, you see that there's a pattern there that's somewhat unusual in that he had some weaknesses that are more than, I believe more than just likely chance variability. If it was just chance, you'd expect more likely than not to see the suppressions or the weaknesses just scattered as opposed to forming in an area that has to do with attention and concentration and the like.

Q. Now, when you talk about this is kind of an acquired -- I'm probably going to mess up the term -- the suppression of his abilities and that he probably would have performed better in the past, do you have an idea of when you're talking about the past what you're talking about?

A. Prior to whatever may have happened to him to suppress the scores, and that's where it's useful to start reconciling his performance at the present time with indications of performance in the past as well as life events which may have caused changes in his ability to perform.

LISET COURT REPORTING SERVICE ING   (312) 225-9648

Q. Let's set aside, for example, that we got lucky and he saw a psychiatrist when he was 14 and somebody did all these tests on him, we actually had the scores, and you could compare.

A. Well, he would have had to have seen a psychologist or a neuropsychologist as opposed to a psychiatrist.

Q. Sorry.

A. But that's okay.

Q. Neuropsychologist, my bad. Let's put aside that that didn't happen. What else could you look at as a neuropsychologist in his past to determine if this is something he had when he was in grade school versus high school versus college versus whatever?

A. It's an excellent question. What we would like to know is his actual ability. We don't really measure ability per se. We measure people's performance, how they actually behave, which is an outgrowth of their ability plus or minus a whole bunch of factors, things like motivation, level of arousal. So if someone comes in who is genius but they're drunk, they may not demonstrate very good -- their performance may be poor even though their underlying ability, if you could get at it, is much better.

We have various measures of performance

throughout people's lives; and the things that we'll typically look at and the reason we ask about history as to school performance, job performance, things like that, so if you want to know how he functioned in the past, those are the likely places, sans, prior neuropsychological evaluations or other evaluation which would contribute where we do have evaluations of performance and inferences into a person's ability are in some of their school activities.

Q. Or work activities you mention as well?

A. Some cases, yes. Some -- if I go to work as a laborer and all I'm doing is digging ditches, it may not give a whole lot of insight as opposed to if I go to work where my office is at the nuclear power plant and you have to pass certain tests or perform certain duties to run the nuclear board, there you're going to have a better indication how a person's thinking skills are working.

Q. So at the end of that sentence where you talk about an acquired dysfunction, that's what we're talking about, something that at some point in his life you say something occurred that, that would have caused what you think might be some impairment?

A. It could be -- we have to talk about where life begins, but it could have been a bad trip down the

birth canal. We don't know based on, at least I don't know based on the history he provided at what point was the onset of any difficulties. You've got, again, more historical information. You can probably look in his prison records and see if he was ever beat up, knocked out and had a brain injury in which case that could be the proximate cause of any difficulties he demonstrates. But you can look through his history if someone investigates that fully and see different issues which might have occurred which could have given rise to cognitive suppressions.

MR. WILLIAMS: Thank you. I was just reading the rest of it to make sure I understood.

REDIRECT EXAMINATION

by Mr. Nolan:

Q. One follow-up. If your involvement had continued after July 22 of '04, would you have likely asked for the types of collateral data that you were just discussing?

A. If questions were presented to me that would require that, of course. Most likely that's the type of questions that would have been presented. So probably that's something that would have happened or I would have asked to have occurred.

MR. NOLAN: Nothing else.

MR. WILLIAMS:  Nothing else.

MR. NOLAN:  Thank you, Dr. Gelbort.

THE WITNESS:  You're welcome.

WITNESS FURTHER SAITH NOT

(11:35 a.m.)

LISTT COURT REPORTING SERVICE, INC.  (312) 225-9648

CERTIFICATE

I, SUSAN M. REED, Certified Shorthand Reporter for the State of Illinois, do hereby certify that MICHAEL GELBORT, Ph.D., was first duly sworn by me to testify the whole truth and that the above deposition was reported stenographically by me and reduced to typewriting under my personal direction.

I further certify that the said deposition was taken at the time and place specified and that the taking of said deposition commenced on the 20th day of October, A.D., 2011, at 10:00 o'clock A.M.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel or financially interested directly or indirectly in this action.

Witness my official signature this _____ day of _____, A.D., _____.


                              _____
                              SUSAN M. REED, C.S.R.
                              License No. 084-003114

**'**

**'04** [1] - 65:17

**0**

**012504** [1] - 55:12
**016307** [1] - 35:3
**084-003114** [1] - 67:22

**1**

**10** [1] - 35:6
**105** [2] - 51:21
**10:00** [2] - 1:15, 67:11
**10:15** [1] - 3:1
**11** [9] - 35:7, 35:17, 35:18, 35:19, 36:8
**117** [1] - 51:22
**11:35** [1] - 66:5
**12** [1] - 35:7
**14** [7] - 35:18, 35:19, 59:10, 59:18, 59:19, 59:22, 63:2
**14's** [1] - 35:22
**16** [1] - 35:18
**16271** [1] - 37:18
**16272** [1] - 38:16
**16284** [1] - 49:18
**16291** [1] - 52:10
**19** [1] - 12:9
**19106** [1] - 2:4
**1985** [1] - 3:17
**1986** [1] - 8:20
**1989** [3] - 4:1, 4:2, 30:6
**1993** [1] - 3:24
**19th** [1] - 12:9

**2**

**20** [1] - 4:12
**2002** [1] - 17:6
**2003** [2] - 11:22, 29:22
**2004** [5] - 12:9, 12:16, 41:13, 41:19, 57:9
**2011** [2] - 1:16, 67:11
**20th** [2] - 1:16, 67:10
**215/928-0520** [1] - 2:5
**219** [1] - 1:14
**21st** [2] - 12:15, 12:16

**22** [3] - 13:4, 57:9, 65:17
**24** [4] - 2:18, 48:6, 48:8, 49:8

**3**

**3** [2] - 2:18, 38:19
**319/363-6333** [1] - 2:9

**4**

**4** [1] - 23:14
**400** [1] - 2:8
**401** [1] - 2:8

**5**

**5** [1] - 8:23
**50** [3] - 11:8, 11:14, 32:3
**52407** [1] - 2:8
**545** [1] - 2:4
**57** [1] - 2:19

**6**

**60** [1] - 2:19
**601** [1] - 2:4
**65** [1] - 2:20

**8**

**8** [1] - 35:6

**9**

**9** [7] - 35:6, 35:18, 35:19, 59:10, 59:18, 59:19, 59:22
**9's** [3] - 35:8, 35:21, 35:24
**95** [1] - 8:24
**9th** [1] - 1:14

**A**

**A.D** [3] - 1:16, 67:11, 67:18
**a.m** [2] - 3:1, 66:5
**A.M** [2] - 1:15, 67:11
**abilities** [13] - 5:5, 14:14, 15:14, 20:12, 20:24, 21:1, 25:16, 28:9, 36:12, 51:18, 51:19, 59:25, 62:16
**ability** [13] - 14:20, 20:14, 21:8, 36:2, 36:10, 61:5, 62:25, 63:16, 63:17, 63:19, 63:23, 64:8
**able** [5] - 41:10, 43:2, 44:17, 59:1, 60:25
**abnormal** [1] - 28:10
**abnormalities** [1] - 28:12
**absolute** [6] - 36:4, 36:17, 36:20, 61:4, 61:25, 62:3
**absolutely** [3] - 22:24, 54:4, 60:11
**abuse** [4] - 17:22, 18:1, 22:14, 23:22
**academic** [2] - 14:14, 37:13
**accept** [1] - 22:5
**accident** [1] - 4:23
**accidents** [1] - 9:8
**accurate** [9] - 11:23, 17:7, 19:17, 20:9, 24:21, 27:2, 33:9, 38:5, 38:9
**accurately** [3] - 38:13, 43:3, 54:9
**accused** [1] - 56:24
**achieve** [1] - 5:8
**Achievement** [1] - 51:16
**acquired** [7] - 4:22, 22:1, 22:10, 61:3, 61:23, 62:15, 64:20
**action** [1] - 67:16
**activities** [3] - 5:24, 64:9, 64:10
**actual** [3] - 18:14, 44:23, 63:16
**actuality** [1] - 61:15
**acute** [3] - 4:20, 18:6, 18:10
**acutely** [1] - 15:12
**added** [1] - 30:10
**addition** [1] - 6:16
**additional** [2] - 30:2, 30:19
**address** [1] - 37:15
**addressed** [1] - 35:1
**adjusted** [1] - 35:11
**administer** [4] - 48:14, 48:21, 49:10, 58:4
**administered** [2] - 14:11, 53:17
**administering** [1] - 14:7

**administrative** [1] - 4:11
**admitted** [2] - 4:14, 4:19
**advise** [1] - 27:19
**affect** [4] - 14:19, 18:9, 19:5, 29:13
**affected** [3] - 5:3, 22:1, 25:16
**affecting** [2] - 20:22, 60:6
**affiliation** [1] - 31:4
**affiliations** [1] - 30:23
**afterwards** [1] - 43:18
**age** [4] - 35:11, 35:14, 48:11, 59:17
**agree** [1] - 23:18
**AI** [1] - 13:21
**allotted** [1] - 41:12
**almost** [2] - 9:14, 35:16
**AMERICA** [1] - 1:6
**American** [4] - 31:12, 31:15, 32:6, 32:19
**amiss** [1] - 22:8
**amount** [2] - 40:12, 41:11
**analysis** [2] - 36:23, 57:23
**Angela** [3] - 17:1, 17:12, 17:15
**Anna** [1] - 43:8
**answer** [7] - 22:21, 46:20, 47:24, 58:10, 58:11, 58:21, 58:22
**answered** [1] - 29:5
**answers** [1] - 50:15
**antisocial** [1] - 19:8
**APA** [1] - 32:20
**appeared** [3] - 2:5, 2:9, 21:24
**applied** [2] - 7:16, 7:20
**applying** [2] - 31:25, 36:20
**appreciate** [1] - 5:10
**appreciated** [1] - 27:25
**approaches** [1] - 59:3
**apt** [1] - 60:5
**area** [9] - 3:24, 4:2, 4:3, 20:25, 26:21, 26:25, 29:2, 30:17, 62:12
**areas** [8] - 16:21, 20:22, 21:25, 23:20, 30:14, 37:15, 53:5, 60:4

**arisen** [1] - 29:14
**arising** [1] - 20:16
**arousal** [1] - 63:20
**articles** [3] - 54:15, 54:17, 54:19
**aside** [2] - 63:1, 63:10
**aspects** [1] - 16:17
**assembled** [1] - 33:25
**assess** [4] - 5:9, 15:4, 15:7, 19:6
**assessed** [1] - 16:22
**assessing** [1] - 6:12
**assessment** [2] - 14:13, 51:8
**assessments** [1] - 7:4
**assistant** [1] - 12:21
**Associates** [2] - 44:10, 48:20
**Association** [4] - 30:16, 31:2, 31:3, 32:21
**assume** [1] - 26:24
**assumption** [1] - 20:18
**assumptions** [2] - 27:24, 59:13
**attach** [1] - 34:23
**attached** [1] - 54:16
**attacked** [1] - 31:19
**attempted** [1] - 32:22
**attention** [5] - 36:1, 37:2, 46:1, 60:3, 62:12
**attorney** [4] - 27:9, 27:12, 67:13, 67:14
**attorneys** [5] - 17:1, 17:9, 17:10, 40:10, 41:4
**attributable** [3] - 6:21, 9:16, 28:13
**August** [1] - 41:18
**available** [2] - 14:6, 29:20
**average** [24] - 21:6, 21:7, 21:17, 21:18, 21:19, 33:16, 33:18, 33:19, 35:5, 35:6, 36:5, 36:8, 36:14, 36:21, 48:9, 50:17, 51:23, 51:24, 60:9, 61:2
**aware** [2] - 31:18, 43:16

**B**

background [3] - 7:10, 27:15, 56:3
bad [6] - 10:1, 29:12, 48:9, 48:12, 63:10, 64:25
Barre [1] - 5:2
base [1] - 25:6
based [9] - 6:24, 11:3, 22:18, 42:22, 43:12, 60:24, 61:22, 65:1, 65:2
basic [2] - 14:14
basing [1] - 27:23
bates [3] - 35:3, 55:12, 55:15
batteries [2] - 8:13, 14:23
battery [5] - 7:7, 14:12, 14:16, 15:2, 22:21
beat [2] - 4:24, 65:5
became [1] - 11:25
begins [1] - 64:25
behalf [2] - 2:5, 2:9
behave [2] - 14:20, 63:18
behavior [1] - 15:8
behavioral [3] - 15:5, 38:20, 38:22
belief [2] - 42:3, 61:22
below [8] - 21:18, 33:16, 33:19, 35:5, 36:14, 50:17, 59:19, 62:4
better [8] - 6:24, 16:5, 25:2, 51:22, 61:24, 62:17, 63:24, 64:17
between [3] - 35:15, 41:22, 59:10
beyond [3] - 27:8, 53:5, 58:21
bigger [1] - 14:19
bill [1] - 13:9
billing [1] - 57:9
birth [1] - 65:1
bit [10] - 24:24, 29:19, 35:22, 36:9, 37:11, 37:18, 45:15, 45:20, 51:22, 56:13
bits [1] - 16:18
board [10] - 31:1, 31:10, 31:23, 32:1, 32:6, 32:9, 32:11, 32:13, 61:20, 64:16
Board [2] - 31:12, 32:6
boards [2] - 32:15, 32:18
bonds [1] - 26:3
book [2] - 50:9, 50:20
bottom [3] - 49:7, 55:5, 60:18
brain [22] - 4:22, 4:25, 15:8, 17:23, 17:25, 18:1, 18:15, 18:16, 18:20, 19:20, 19:23, 20:7, 20:17, 20:25, 22:1, 22:11, 22:12, 22:17, 54:8, 54:23, 60:6, 65:6
Brain [2] - 30:15, 31:3
brains [1] - 59:14
briefly [2] - 7:9, 8:16
bring [1] - 24:8
broader [1] - 16:23
bunch [1] - 63:19
BY [2] - 11:20, 55:20

**C**

C.J [1] - 2:7
C.S.R [1] - 67:21
C10-3074 [1] - 1:5
canal [1] - 65:1
capacity [2] - 10:12, 20:15
capital [2] - 11:5, 14:24
Capital [1] - 2:3
car [1] - 4:23
carbon [1] - 26:3
carryovers [1] - 52:16
case [29] - 4:21, 9:10, 10:14, 12:1, 13:6, 13:13, 13:21, 14:24, 17:8, 17:12, 20:3, 24:23, 33:3, 37:23, 38:7, 39:6, 40:4, 43:4, 43:7, 50:8, 56:15, 57:12, 58:8, 58:12, 58:17, 58:24, 59:5, 61:19, 65:6
cases [9] - 5:10, 9:4, 9:22, 9:24, 11:5, 19:5, 24:25, 29:10, 64:11
categorically [1] - 13:23
category [2] - 36:17, 37:7
caused [5] - 18:1, 28:20, 54:2, 62:24, 64:22
Cedar [1] - 2:8
center [5] - 4:15, 4:20, 5:25, 21:19, 33:19
central [1] - 59:20
CENTRAL [1] - 1:2
certain [5] - 18:7, 54:4, 54:5, 64:15
certainly [7] - 14:24, 23:19, 25:11, 26:13, 29:25, 53:21, 58:14
certainty [2] - 23:25, 24:1
certificate [1] - 31:5
CERTIFICATE [1] - 67:1
certification [2] - 32:1, 32:11
certifications [2] - 31:20, 32:13
Certified [2] - 1:13, 67:2
certified [5] - 31:10, 31:24, 32:6, 32:9, 32:22
certify [3] - 67:3, 67:8, 67:12
chance [6] - 25:3, 38:1, 39:23, 39:24, 62:8, 62:9
change [2] - 18:14, 30:5
changed [4] - 12:24, 29:24, 30:1, 31:6
changes [2] - 25:25, 62:24
charged [1] - 28:7
Charlie [1] - 13:20
charts [1] - 48:11
check [2] - 31:21, 58:1
chemicals [1] - 26:2
Chicago [6] - 1:15, 4:3, 4:4, 8:8, 30:17
choose [3] - 27:13, 38:23, 38:24
chose [1] - 25:13
circle [1] - 49:4
circles [1] - 49:5
civil [3] - 9:1, 9:4
Civil [1] - 1:10
clear [3] - 22:4, 43:9, 55:15
clearly [1] - 37:1
clinic [1] - 7:25
Clinic [1] - 8:2
clinical [14] - 3:14, 3:15, 4:13, 7:17, 7:18, 8:1, 8:24, 11:10, 11:16, 13:11, 24:23, 30:2, 30:6, 51:8
clinically [1] - 48:17
close [2] - 24:21, 59:21
cluster [2] - 59:14, 59:21
clusters [1] - 59:16
Coding [3] - 33:22, 35:24, 52:9
cognition [2] - 6:21, 29:5
cognitive [17] - 5:4, 5:9, 5:11, 6:7, 9:14, 14:13, 14:18, 14:25, 15:13, 18:13, 20:14, 20:24, 25:18, 26:14, 28:9, 36:10, 65:11
cognitively [1] - 36:3
collateral [7] - 16:11, 16:12, 16:18, 16:23, 17:20, 24:12, 65:18
collect [3] - 28:6, 49:21, 49:24
collected [3] - 20:11, 22:19, 38:12
College [2] - 7:12, 31:15
college [2] - 7:11, 63:14
column [1] - 47:2
columns [2] - 35:10, 35:13
coming [5] - 4:4, 21:16, 21:18, 24:11, 51:22
commenced [1] - 67:10
committed [1] - 56:11
common [2] - 9:6, 37:1
communication [2] - 13:9, 42:2
Community [1] - 2:3
compare [2] - 55:4, 63:4
comparison [1] - 48:11
compelling [1] - 22:4
competency [2] - 20:15, 21:3
competent [1] - 10:3
complete [4] - 40:23, 41:1, 41:5, 41:8
completed [3] - 32:3, 44:23, 57:13
completing [1] - 57:14
component [1] -
comports [1] - 23:21
compounds [1] - 26:5
comprehended [1] - 36:19
comprehension [1] - 10:5
computation [1] - 51:19
compute [1] - 52:14
concentration [5] - 36:1, 37:3, 46:1, 60:4, 62:12
concerned [1] - 33:16
conclude [1] - 53:25
concluded [1] - 50:19
conclusion [1] - 51:6
conclusions [2] - 25:7, 54:18
condition [1] - 60:6
conduct [1] - 46:10
conferences [1] - 30:20
confirm [1] - 28:1
confirmed [1] - 17:20
connection [1] - 53:2
consider [1] - 22:3
consistency [2] - 20:19, 21:8
consistent [2] - 22:13, 61:19
consistently [2] - 20:12, 60:2
constraint [1] - 40:9
constraints [3] - 40:1, 40:7, 41:6
consult [3] - 11:1, 16:7, 59:6
consultation [1] - 3:21
consulted [1] - 10:9
contact [1] - 46:12
contacted [2] - 23:6, 56:14
continue [3] - 57:12, 58:16, 59:4
continued [2] - 47:17, 65:17
contrast [1] - 55:4
contribute [1] - 64:7
contributing [1] - 26:14
controversy [1] - 31:22
conventions [1] - 42:16

3

| | | | | 33:4, 40:13, 40:23, 41:6, 41:24, 42:4, 45:6, 48:3, 51:20, 53:10, 53:14, 53:16, 54:24, 55:6, 55:21, 56:21 |

**conversely** [1] - 22:23
**conviction** [2] - 52:20, 52:25
**copy** [4] - 11:22, 34:6, 34:24, 51:11
**cord** [2] - 5:12, 31:1
**corn** [1] - 7:13
**correct** [27] - 8:15, 8:25, 13:3, 15:1, 17:2, 23:4, 23:7, 31:14, 37:7, 38:15, 39:14, 39:18, 41:15, 43:9, 43:10, 44:8, 44:14, 44:25, 47:24, 49:1, 49:8, 50:4, 51:1, 52:4, 53:1, 56:11
**correction** [2] - 35:14, 59:17
**corrections** [1] - 30:3
**correlated** [1] - 22:10
**correspondence** [2] - 57:10
**corroborate** [1] - 28:2
**counsel** [9] - 24:7, 27:19, 28:15, 28:19, 28:25, 56:18, 60:17, 67:13, 67:14
**count** [3] - 11:7, 35:12, 40:5
**County** [2] - 8:1, 46:12
**couple** [9] - 10:13, 12:14, 18:21, 24:6, 30:19, 30:20, 40:11, 57:3, 60:1
**course** [3] - 41:21, 43:17, 65:21
**court** [3] - 10:25, 13:5
**COURT** [1] - 1:1
**Courts** [1] - 1:11
**cover** [3] - 34:15, 34:23, 38:18
**credit** [1] - 47:10
**crimes** [1] - 56:23
**criminal** [6] - 7:22, 9:2, 9:18, 9:19, 9:20, 10:10
**CROSS** [1] - 24:4
**Cross** [1] - 2:18
**CROSS-EXAMINATION** [1] - 24:4
**Cross-Examination** [1] - 2:18
**cuing** [1] - 47:22

**current** [6] - 3:18, 5:20, 6:9, 6:23, 8:21, 60:24
**curriculum** [1] - 11:22
**curve** [1] - 37:11
**CV** [2] - 29:20, 29:22

**D**

**daily** [1] - 17:16
**damage** [7] - 4:21, 15:12, 17:23, 18:14, 22:17, 26:18, 54:23
**data** [17] - 16:11, 16:13, 16:19, 20:10, 22:18, 33:12, 34:15, 34:23, 38:2, 43:19, 45:3, 46:6, 47:4, 52:8, 57:17, 60:24, 65:18
**date** [8] - 12:4, 12:7, 12:17, 12:21, 12:22, 13:4, 13:11
**dates** [1] - 12:14
**days** [2] - 13:2, 40:11
**Dearborn** [1] - 1:14
**decision** [1] - 46:7
**declaration** [5] - 19:12, 19:19, 23:14
**Defendant** [2] - 1:7, 2:9
**Defender** [1] - 2:3
**defense** [2] - 11:3, 42:3
**defer** [1] - 28:5
**deficits** [1] - 26:19
**define** [2] - 18:3, 18:4
**degree** [3] - 23:24, 29:6, 36:1
**dementia** [1] - 6:6
**demonstrate** [2] - 59:2, 63:22
**demonstrated** [5] - 18:22, 36:19, 44:17, 46:2, 46:3
**demonstrates** [1] - 65:8
**demonstrating** [2] - 48:18, 53:23
**Department** [1] - 2:7
**department** [1] - 4:12
**deposition** [4] - 1:8, 67:5, 67:8, 67:10
**depositions** [1] - 1:12
**depth** [2] - 16:8, 55:2
**describe** [1] - 7:9

**describes** [1] - 16:19
**descriptive** [1] - 24:22
**designed** [1] - 19:6
**destructive** [1] - 26:3
**detail** [1] - 15:22
**detailed** [1] - 25:9
**detect** [1] - 19:2
**determine** [1] - 63:12
**developmental** [1] - 7:25
**deviation** [4] - 35:7, 35:15, 59:11, 59:20
**deviations** [1] - 62:4
**diagnosis** [2] - 16:14, 16:17
**diagnostics** [2] - 6:12, 8:11
**difference** [1] - 21:14
**different** [20] - 5:21, 18:9, 20:16, 21:12, 21:14, 21:20, 21:23, 22:6, 22:8, 22:25, 23:1, 25:24, 30:17, 35:12, 35:20, 36:24, 42:24, 48:1, 65:9
**difficult** [1] - 45:15
**difficulties** [2] - 65:3, 65:7
**difficulty** [1] - 45:25
**digging** [1] - 64:12
**Digit** [4] - 33:21, 33:22, 35:24, 52:9
**Digital** [1] - 35:25
**Direct** [1] - 2:18
**direct** [1] - 16:15
**DIRECT** [1] - 3:8
**direction** [2] - 5:17, 67:7
**directly** [2] - 13:15, 67:15
**director** [1] - 4:7
**directors** [1] - 31:2
**disability** [1] - 7:25
**disagree** [2] - 23:19, 26:12
**disagrees** [1] - 20:5
**discharge** [1] - 4:16
**discuss** [1] - 56:25
**discussing** [1] - 65:19
**discussion** [4] - 11:19, 29:11, 29:15, 58:25
**disorder** [1] - 19:9
**disorders** [2] - 19:3, 19:4
**display** [1] - 26:15
**displaying** [1] - 61:25

**dissimilar** [2] - 55:6, 59:15
**DISTRICT** [2] - 1:1, 1:1
**District** [1] - 1:11
**ditches** [1] - 64:12
**diverse** [1] - 6:7
**divide** [1] - 18:9
**DIVISION** [1] - 1:2
**doc** [2] - 8:4, 58:6
**Doctor** [1] - 11:25
**doctor** [3] - 23:10, 58:4, 60:15
**doctoral** [1] - 7:16
**doctors** [1] - 6:19
**document** [1] - 59:1
**documentation** [1] - 12:20
**documents** [1] - 39:9
**done** [17] - 9:25, 13:1, 15:12, 15:20, 30:9, 30:13, 38:6, 39:13, 40:4, 40:18, 40:24, 41:9, 41:23, 42:8, 42:15, 42:19, 58:18
**double** [1] - 7:14
**down** [22] - 39:4, 39:5, 39:6, 39:8, 39:17, 42:9, 42:10, 42:20, 43:5, 43:8, 44:6, 46:17, 46:23, 47:15, 48:7, 49:5, 50:7, 50:8, 50:14, 57:8, 58:5, 64:25
**Dr** [10] - 3:10, 11:15, 20:2, 23:16, 34:7, 52:21, 53:7, 53:15, 54:16, 66:2
**dr** [1] - 23:15
**draft** [3] - 12:25, 13:1, 56:17
**dressed** [1] - 47:8
**drop** [1] - 60:7
**drug** [25] - 15:8, 15:14, 15:23, 17:22, 17:23, 18:1, 18:7, 18:13, 22:13, 23:22, 24:10, 24:20, 25:10, 25:12, 25:15, 25:25, 27:19, 28:1, 53:22, 54:2, 54:25, 55:3, 55:6, 56:4
**drugs** [1] - 27:16
**drunk** [1] - 63:21
**due** [2] - 18:7, 29:13
**duly** [2] - 3:5, 67:4
**during** [1] - 56:22
**Dustin** [20] - 12:1, 24:10, 25:10, 26:16,

**DUSTIN** [1] - 1:3
**duties** [1] - 64:16
**dysfunction** [7] - 5:10, 5:11, 19:21, 19:23, 20:7, 61:4, 64:20

**E**

**early** [1] - 31:25
**easiest** [2] - 16:18, 26:1
**easily** [1] - 21:25
**eat** [1] - 47:9
**Edition** [1] - 51:16
**education** [5] - 25:21, 25:22, 26:21, 26:25, 30:4
**educational** [2] - 7:10, 56:5
**effort** [1] - 37:1
**eight** [2] - 48:25
**either** [4] - 9:6, 15:11, 31:7, 32:22
**elderly** [1] - 6:6
**elicit** [1] - 59:1
**emeritus** [1] - 31:3
**employed** [1] - 27:9
**employee** [2] - 67:13, 67:14
**end** [4] - 29:8, 40:1, 50:6, 64:19
**entail** [2] - 4:9, 14:4
**esoteric** [1] - 14:22
**essentially** [4] - 7:15, 23:18, 43:1, 44:3
**etiologies** [1] - 53:19
**etiology** [1] - 28:21
**eval** [3] - 27:11, 28:8, 56:12
**evaluate** [3] - 5:15, 10:18, 26:16
**evaluating** [1] - 4:13
**evaluation** [15] - 3:20, 12:4, 12:6, 14:2, 14:4, 15:3, 15:15, 30:22, 41:5, 41:8, 42:4, 53:17, 53:24, 56:1, 64:6
**evaluations** [5] - 7:24, 32:4, 58:21, 64:6, 64:7

events [1] - 62:24
eventual [1] - 9:17
evidence [2] - 27:17, 32:2
exactly [3] - 17:4, 23:12, 34:10
exam [2] - 10:20, 47:17
examination [4] - 1:9, 9:12, 12:11, 56:22
Examination [5] - 2:18, 2:18, 2:19, 2:19, 2:20
EXAMINATION [5] - 3:8, 24:4, 57:4, 60:13, 65:14
examined [1] - 3:6
Examiners [1] - 31:16
example [6] - 5:11, 19:9, 20:20, 56:4, 59:17, 63:1
excellent [1] - 63:15
exchange [1] - 31:20
EXHIBITS [2] - 2:21, 2:23
expect [2] - 20:13, 62:9
expectation [1] - 20:17
expected [1] - 22:23
experience [3] - 14:4, 16:5, 30:6
experiences [1] - 30:2
expert [7] - 9:7, 11:10, 11:16, 20:3, 23:11, 27:19
expertise [4] - 23:20, 27:5, 53:3, 53:4
explain [5] - 20:7, 40:8, 46:20, 53:6, 60:22
express [1] - 23:23
expressed [1] - 23:24
extent [1] - 9:16
extra [1] - 34:24

## F

Faces [1] - 48:13
facing [1] - 10:1
fact [3] - 20:23, 54:1
factor [1] - 26:14
factors [2] - 15:5, 63:20
fair [3] - 11:2, 26:20,

27:15
fairly [4] - 7:19, 7:25, 14:21, 41:9
fall [3] - 4:24, 35:24, 36:10
false [1] - 46:23
familiar [1] - 54:11
Family [2] - 44:19, 49:9
far [1] - 54:11
fashion [3] - 7:19, 14:21, 29:4
fax [1] - 12:14
faxed [1] - 12:18
Federal [2] - 1:10, 2:3
fell [1] - 33:16
felt [1] - 41:4
few [4] - 24:7, 30:1, 36:18, 38:8
fields [1] - 7:13
figure [2] - 21:12, 43:12
file [2] - 12:20, 34:25
fill [2] - 57:24, 58:15
filled [2] - 34:3, 58:13
filling [1] - 57:20
final [1] - 12:23
financially [1] - 67:15
findings [2] - 23:18, 23:20
fine [2] - 36:16, 58:14
finish [1] - 34:21
finished [2] - 7:15, 8:2
First [1] - 2:8
first [18] - 3:5, 8:19, 9:19, 18:9, 21:12, 24:9, 35:9, 35:13, 39:16, 44:12, 46:19, 47:2, 47:13, 56:14, 61:8, 61:14, 67:4
fit [2] - 10:3, 10:7
Floor [1] - 1:15
fluctuation [1] - 21:22
focus [1] - 36:2
focused [2] - 5:24, 46:1
folks [2] - 4:19, 5:5
follow [1] - 65:16
follow-up [1] - 65:16
followed [1] - 4:15
following [1] - 49:22
follows [1] - 3:7
forensic [7] - 8:16, 8:18, 8:19, 8:22,

11:10, 11:16, 32:12
Forensic [1] - 31:16
forever [1] - 3:17
form [1] - 50:6
formal [2] - 4:11, 58:9
formed [1] - 48:2
forming [1] - 62:11
forth [1] - 37:1
four [3] - 3:25, 4:5, 47:12
Francisco [2] - 47:6, 47:12
frankly [1] - 28:11
free [1] - 47:20
friend [1] - 10:25
front [3] - 33:12, 44:10, 50:15
fully [1] - 65:9
function [4] - 6:10, 10:6, 60:25, 61:20
functional [1] - 60:3
functioned [2] - 16:20, 64:4
functioning [7] - 5:9, 14:25, 15:9, 18:8, 18:13, 18:17, 50:11
functions [3] - 14:15, 19:7, 20:16
FURTHER [1] - 66:4

## G

G-e-l-b-o-r-t [1] - 3:12
Garcia [2] - 47:6, 47:11
garden [1] - 6:3
Gelbort [3] - 3:10, 11:15, 66:2
GELBORT [4] - 1:8, 2:17, 3:4, 67:4
gelbort [1] - 3:12
general [4] - 6:8, 7:15, 14:17, 25:7
generally [4] - 14:5, 28:5, 39:2, 61:1
generated [1] - 58:9
genius [1] - 63:21
gist [2] - 18:5, 24:15
given [5] - 27:15, 30:1, 45:6, 53:12, 65:10
goal [1] - 5:7
government's [1] - 20:3
grade [1] - 63:13
graduated [1] - 7:13
grandfathered [1] -

32:1
gray [1] - 23:2
great [1] - 55:2
greater [1] - 16:8
Grinnell [2] - 7:12
Grote [2] - 20:2, 34:7
group [2] - 31:1, 31:18
groups [1] - 30:17
growing [1] - 20:21
guess [3] - 5:8, 16:12, 16:18
Guillain [1] - 5:2
Guillain-Barre [1] - 5:2

## H

Habeas [1] - 2:3
half [4] - 7:16, 7:21, 35:8, 35:16
half-way [1] - 7:21
Halstead [2] - 37:5, 37:7
hand [5] - 25:6, 44:24, 47:2, 47:3, 51:25
handing [1] - 31:20
handwriting [2] - 55:13, 55:18
hard [1] - 57:16
Head [1] - 31:2
head [1] - 57:25
heal [2] - 18:1, 18:3
health [1] - 56:6
Health [1] - 8:1
hear [2] - 13:6, 27:23
hearing [2] - 17:5, 17:12
helpful [1] - 16:2
hence [1] - 22:9
hereby [1] - 67:3
herein [1] - 3:5
hesitate [2] - 24:16, 25:5
high [9] - 7:11, 7:14, 21:7, 36:21, 51:24, 52:2, 59:24, 63:14
high-average [1] - 21:7
higher [6] - 6:4, 14:13, 15:13, 35:22, 60:25, 61:20
hire [1] - 27:4
hired [1] - 26:16
historical [1] - 65:4
histories [1] - 25:2
history [17] - 14:5, 24:10, 24:21, 24:25,

25:9, 25:10, 25:13, 25:15, 28:1, 54:25, 55:3, 56:6, 60:24, 64:2, 65:2, 65:8
holdouts [1] - 52:16
Honken [33] - 12:1, 12:5, 12:8, 12:22, 13:2, 13:13, 14:10, 15:4, 18:25, 19:22, 21:16, 22:16, 24:10, 25:10, 26:17, 33:5, 40:13, 40:23, 41:6, 41:24, 42:4, 45:6, 48:3, 51:20, 53:10, 53:14, 53:16, 54:24, 55:21, 56:21, 58:17, 59:15, 60:23
HONKEN [1] - 1:3
Honken's [5] - 13:6, 13:24, 17:10, 26:7, 55:6
honors [1] - 7:14
hospital [1] - 7:2
hospitalized [1] - 6:17
hour [1] - 43:18
house [1] - 7:21
Houston [2] - 4:5, 6:8
hovering [2] - 21:5, 21:6
HS [1] - 51:25
huffing [1] - 26:2
hurry [1] - 45:4
hypothesis [1] - 22:2

## I

idea [2] - 43:4, 62:18
identified [2] - 28:14, 54:17
identify [2] - 33:15, 56:18
Il [6] - 43:24, 46:14, 47:17, 48:13, 48:20, 49:9
Illinois [3] - 1:14, 1:15, 67:3
illnesses [1] - 6:4
IME [2] - 9:9, 9:11
impact [1] - 5:4
impaired [4] - 10:5, 15:8, 21:7, 22:5
impairment [8] - 26:10, 27:18, 27:20, 28:16, 28:20, 33:8, 54:8, 64:23
impairments [3] - 9:15, 26:15, 59:1

implications [1] - 60:18

import [1] - 53:6

importance [2] - 16:12, 53:7

important [5] - 16:4, 33:1, 45:20, 57:21, 57:23

impression [1] - 10:21

improvement [5] - 18:8, 18:11, 18:16, 18:21, 18:22

in-depth [1] - 55:2

including [2] - 16:23, 61:13

inconsistency [3] - 33:5, 33:6, 33:7

incumbent [2] - 27:18, 29:16

independent [2] - 9:12, 13:16

Indiana [1] - 31:8

indicate [2] - 37:22, 54:6

indicated [4] - 28:18, 52:19, 53:3, 56:21

indicates [1] - 54:7

indicating [2] - 12:20, 42:3

indication [3] - 43:21, 60:23, 64:17

indications [1] - 62:23

indicative [2] - 22:10, 61:3

indices [1] - 35:12

indirectly [1] - 67:15

individual [7] - 10:22, 11:1, 14:6, 16:9, 40:3, 41:2, 52:8

individuals [3] - 5:18, 7:1, 16:3

inferences [1] - 64:8

inform [1] - 46:7

information [20] - 10:6, 15:14, 16:3, 16:7, 16:11, 16:14, 16:16, 16:18, 16:23, 16:24, 17:20, 28:6, 34:16, 36:2, 44:18, 45:10, 45:14, 47:23, 56:13, 65:4

injuries [4] - 6:4, 6:5, 9:8, 18:20

Injury [3] - 30:16, 31:2, 31:3

injury [13] - 4:21, 4:22, 4:25, 5:12, 5:14, 9:7, 17:25, 18:16,

22:2, 22:11, 22:12, 31:1, 65:6

insight [1] - 64:13

Institute [2] - 4:8, 8:7

integrity [2] - 14:17, 15:11

interested [1] - 67:15

internal [1] - 6:18

internship [1] - 8:1

interpret [1] - 16:22

interpretation [3] - 37:2, 50:10, 58:1

interpreted [1] - 33:10

interpreting [1] - 14:7

interrogatories [1] - 3:6

interrupt [2] - 10:17, 37:4

interview [2] - 10:21, 15:16

intoxicant [1] - 18:10

intoxicated [1] - 15:12

intoxication [1] - 18:10

investigate [1] - 24:24

investigates [1] - 65:9

investigation [1] - 16:6

involved [7] - 8:17, 9:1, 9:5, 11:5, 12:1, 29:10, 30:25

involvement [6] - 8:19, 9:20, 9:23, 10:2, 56:7, 65:16

IOWA [1] - 1:1

Iowa [2] - 2:8, 7:12

IQ [10] - 14:12, 34:4, 45:10, 45:16, 52:11, 52:12, 52:14, 52:17, 59:17

issue [1] - 45:19

issues [3] - 6:7, 29:14, 65:10

itself [1] - 18:2

### J

Jail [1] - 46:13

Jennifer [1] - 35:1

job [3] - 21:11, 29:16, 64:3

Joe [2] - 47:5, 47:11

Johnson [2] - 17:1, 17:16

Johnson's [1] - 17:12

judgment [1] - 14:20

juggle [1] - 36:3

July [7] - 12:9, 12:16, 13:4, 41:13, 41:23, 57:9, 65:17

June [1] - 17:15

Justice [1] - 2:7

### K

KANE [1] - 2:3

kind [9] - 31:3, 31:19, 36:2, 42:9, 46:15, 51:5, 54:14, 60:22, 62:14

knocked [1] - 65:5

knowledge [1] - 55:3

known [1] - 20:19

### L

laborer [1] - 64:12

language [1] - 14:15

lapse [1] - 37:2

large [1] - 19:6

largely [1] - 50:22

last [2] - 60:15, 61:13

lawsuits [1] - 9:7

lawyer [2] - 60:23, 61:7

lawyer's [1] - 10:8

lawyers [12] - 13:5, 13:6, 13:21, 26:16, 26:25, 40:22, 50:25, 51:3, 57:11, 58:16, 59:4

lead [2] - 25:25, 53:20

leading [1] - 61:4

learn [1] - 44:18

learned [1] - 24:19

learning [2] - 37:11, 48:18

least [6] - 5:23, 10:20, 27:8, 27:23, 43:16, 65:1

leaves [1] - 18:10

lectures [1] - 30:1

led [1] - 33:7

left [2] - 47:2, 47:3

left-hand [2] - 47:2, 47:3

legal [3] - 10:8, 13:25, 24:25

lengthy [1] - 10:1

less [3] - 14:24, 26:6,

36:11

letter [2] - 34:15, 34:24

level [9] - 20:13, 27:5, 33:16, 50:10, 50:16, 52:2, 61:1, 61:20, 63:20

license [1] - 31:7

License [1] - 67:22

licensure [1] - 31:5

lieu [1] - 52:15

life [4] - 56:3, 62:24, 64:21, 64:25

likely [8] - 28:13, 59:8, 60:24, 62:8, 62:10, 64:5, 65:17, 65:21

limitations [1] - 25:19

limited [3] - 40:12, 40:15, 40:16

limits [1] - 40:16

line [5] - 43:20, 43:22, 43:23, 49:5, 55:5

lines [1] - 59:7

linked [1] - 28:19

Lisa [2] - 13:17, 13:18

list [5] - 44:12, 44:13, 44:16

listed [2] - 35:14, 42:14

lists [1] - 44:12

litigation [1] - 52:20

lives [1] - 64:1

load [1] - 59:25

lobe [1] - 20:22

logical [2] - 37:10, 47:17

Logical [4] - 39:15, 42:7, 43:24, 46:14

long-term [1] - 22:13

look [29] - 10:14, 10:15, 10:17, 10:18, 11:23, 14:18, 16:7, 21:8, 23:14, 24:12, 26:17, 34:2, 34:5, 34:13, 36:21, 37:20, 40:5, 48:10, 49:7, 50:21, 58:1, 58:23, 59:23, 62:2, 62:5, 63:11, 64:2, 65:4, 65:8

looked [4] - 14:14, 50:9, 50:16, 54:23

looking [18] - 9:14, 14:25, 15:10, 20:23, 21:3, 21:4, 29:2, 33:23, 34:12, 34:17,

34:18, 37:18, 45:13, 47:19, 49:15, 50:20, 51:6, 52:10

looks [2] - 14:17, 51:18

lovely [1] - 7:12

low [3] - 21:7, 59:24, 60:1

low-average [1] - 21:7

lower [4] - 21:24, 35:20, 36:7, 36:9

lowest [1] - 36:6

LRR [1] - 1:5

lucky [1] - 63:2

### M

major [2] - 5:24, 7:14

majority [3] - 21:16, 22:7, 36:7

malpractice [1] - 9:10

MARKED [1] - 2:23

materials [1] - 50:19

math [3] - 51:19, 51:22, 51:24

matter [1] - 57:16

matters [7] - 9:2, 9:4, 9:18, 9:19, 9:20, 10:10

mean [13] - 10:18, 29:17, 35:16, 39:24, 42:15, 43:1, 48:8, 48:11, 49:6, 52:1, 58:2, 58:3, 62:4

means [1] - 60:23

meant [1] - 60:15

measure [4] - 19:8, 59:20, 63:17

measured [1] - 20:11

measures [2] - 16:20, 63:25

medical [7] - 7:22, 8:10, 9:9, 9:12, 25:2, 25:21, 25:23

Medical [1] - 8:1

medicine [1] - 6:18

meeting [1] - 13:2

memorialized [1] - 57:17

memorize [1] - 44:17

Memory [8] - 34:4, 38:19, 39:15, 42:7, 43:24, 46:14, 47:17, 50:23

memory [16] - 14:12, 24:18, 37:3, 37:9, 37:10, 39:11, 39:12,

45:19, 45:22, 47:21, 48:2, 50:21, 50:22, 50:24, 51:7, 51:8

**mental** [1] - 10:20
**mention** [1] - 64:10
**mentioned** [5] - 5:12, 15:20, 21:21, 28:17, 45:17
**merely** [1] - 58:2
**mess** [1] - 62:15
**methamphetamine** [10] - 15:17, 15:19, 17:16, 17:23, 26:5, 26:8, 28:20, 54:8, 54:24, 56:23
**MICHAEL** [4] - 1:8, 2:17, 3:4, 67:4
**Michael** [1] - 3:12
**middle** [3] - 7:13, 48:9, 51:23
**midline** [2] - 35:5, 36:14
**might** [16] - 4:24, 5:4, 10:22, 26:15, 27:20, 28:25, 29:13, 29:14, 33:8, 33:10, 41:10, 58:24, 58:25, 59:5, 64:23, 65:10
**mildly** [1] - 21:7
**Milwaukee** [1] - 8:1
**minor** [1] - 7:20
**minus** [1] - 63:19
**Miranda** [1] - 10:4
**misphrased** [1] - 24:14
**missed** [1] - 48:4
**mitigation** [1] - 15:5
**modal** [1] - 4:21
**most** [21] - 5:3, 9:6, 11:2, 18:12, 18:20, 21:20, 21:25, 22:1, 22:19, 28:12, 29:10, 29:12, 29:18, 30:17, 43:15, 56:11, 58:22, 59:13, 59:14, 65:21
**mostly** [1] - 21:5
**motivation** [1] - 63:20
**motor** [1] - 9:8
**MR** [18] - 2:2, 2:3, 2:7, 11:15, 11:18, 11:20, 24:3, 55:15, 55:17, 55:19, 55:20, 57:1, 57:3, 60:12, 65:12, 65:25, 66:1, 66:2
**mugged** [1] - 4:24
**multi** [1] - 39:12
**multi-page** [1] - 39:12

**multiple** [1] - 5:2
**murders** [3] - 55:22, 56:8
**must** [1] - 23:1

## N

**name** [1] - 3:10
**NAN** [1] - 32:20
**narcotic** [1] - 15:17
**national** [1] - 30:19
**National** [1] - 32:20
**nature** [3] - 8:14, 9:15, 13:10
**necessarily** [3] - 5:14, 27:24, 59:23
**necessary** [2] - 33:1, 45:18
**need** [9] - 16:15, 18:3, 27:4, 34:4, 40:22, 40:25, 58:2, 58:8, 58:14
**needed** [4] - 40:10, 42:5, 44:18, 56:13
**nervous** [3] - 5:3, 15:13, 26:4
**neurological** [1] - 4:21
**neurologists** [2] - 6:18, 7:23
**neuropsyche** [9] - 15:2, 15:15, 19:2, 19:5, 19:6, 27:11, 28:8, 53:24, 56:12
**neuropsychologica l** [18] - 3:20, 7:3, 7:24, 12:10, 14:2, 14:3, 14:11, 14:23, 15:3, 15:11, 23:25, 25:16, 26:17, 26:19, 30:21, 53:17, 55:25, 64:6
**neuropsychologist** [9] - 3:14, 3:16, 25:14, 32:10, 32:12, 56:9, 63:6, 63:10, 63:12
**Neuropsychologist s** [1] - 32:21
**neuropsychologist s** [1] - 27:10
**neuropsychology** [10] - 3:22, 4:7, 7:20, 8:10, 11:10, 11:16, 25:23, 30:15, 30:18, 61:7
**neurosubstrate** [2] - 18:15, 26:1
**neurosurgeons** [2] - 6:18, 7:23
**never** [4] - 11:13,

12:24, 16:3, 29:15
**news** [1] - 47:8
**next** [15] - 20:15, 28:10, 29:12, 40:17, 43:20, 44:19, 45:5, 46:14, 48:13, 49:9, 49:15, 51:9, 51:13, 60:21, 62:6
**nice** [1] - 37:10
**NLADA** [1] - 30:20
**NO** [1] - 2:23
**NOLAN** [10] - 2:2, 11:15, 11:20, 24:3, 55:15, 55:19, 57:3, 60:12, 65:25, 66:2
**Nolan** [5] - 2:18, 2:20, 3:9, 57:5, 65:15
**nolan** [1] - 2:19
**noncapital** [1] - 9:19
**noninvolvement** [1] - 56:8
**nonverbal** [1] - 35:19
**nonverbally** [1] - 35:25
**normal** [10] - 14:21, 18:12, 21:5, 21:13, 21:22, 21:23, 22:9, 23:1, 28:9, 29:4
**NORTHERN** [1] - 1:1
**NOT** [1] - 66:4
**notably** [1] - 35:20
**notations** [2] - 44:22, 47:1
**notes** [1] - 55:10
**nothing** [6] - 22:22, 22:23, 29:25, 59:19, 65:25, 66:1
**notice** [1] - 1:10
**nuclear** [2] - 64:14, 64:16
**number** [8] - 4:15, 30:25, 31:8, 40:6, 52:5, 53:19, 55:12, 55:16
**numbered** [1] - 35:3
**numbers** [10] - 37:10, 38:8, 38:11, 40:3, 49:25, 57:8, 57:20, 57:23, 58:6, 59:21

## O

**o'clock** [5] - 1:15, 47:5, 47:8, 47:11, 67:11
**objective** [1] - 25:3
**observation** [2] - 16:16, 35:21

**observations** [3] - 38:21, 38:22, 39:7
**obtained** [3] - 21:15, 32:14, 33:5
**obtaining** [1] - 24:10
**obtunded** [1] - 61:14
**obviously** [1] - 48:12
**occasionally** [1] - 9:9
**occasions** [1] - 10:13
**occipital** [1] - 20:22
**occult** [1] - 5:14
**occupation** [1] - 3:13
**occurred** [3] - 64:22, 65:10, 65:24
**October** [2] - 1:16, 67:11
**OF** [2] - 1:1, 1:6
**offenders** [1] - 7:22
**offer** [1] - 11:15
**offhand** [4] - 12:3, 17:19, 54:21, 56:16
**office** [6] - 6:24, 23:6, 24:23, 42:15, 42:16, 64:14
**official** [1] - 67:17
**often** [8] - 7:7, 24:21, 29:10, 29:12, 29:18, 30:17, 58:22, 60:7
**oftentimes** [1] - 16:22
**once** [1] - 44:2
**one** [22] - 5:14, 12:15, 20:12, 20:14, 20:17, 26:1, 32:19, 32:20, 32:23, 43:9, 43:13, 46:14, 48:13, 49:6, 49:9, 52:11, 53:22, 56:11, 60:15, 62:5, 65:16
**one's** [1] - 35:22
**ones** [3] - 4:20, 7:5, 52:14
**onset** [1] - 65:3
**opine** [1] - 53:11
**opinion** [3] - 19:24, 27:17, 55:9
**opinions** [1] - 23:23
**opposed** [5] - 14:21, 28:10, 62:11, 63:6, 64:13
**oral** [1] - 3:6
**order** [7] - 8:20, 11:8, 34:9, 41:1, 46:6, 54:18, 56:9
**organic** [4] - 19:20, 19:23, 20:7, 22:17
**organizations** [1] - 32:23

**organize** [1] - 36:2
**orthopedic** [2] - 6:5
**otherwise** [1] - 31:9
**ourselves** [1] - 34:24
**outboard** [1] - 31:20
**outcome** [1] - 9:17
**outgrowth** [1] - 63:19
**outpatients** [2] - 4:16, 7:1
**outside** [2] - 23:20, 53:5
**overlap** [1] - 45:16
**oversimplifying** [1] - 29:4
**overstepping** [1] - 55:4
**overview** [1] - 54:14
**own** [5] - 23:21, 24:13, 24:18, 24:19, 42:16

## P

**p-e-r-f-o-r-m** [1] - 61:9
**packet** [3] - 33:24, 34:15, 37:17
**page** [16] - 19:12, 19:13, 34:1, 35:2, 39:12, 44:19, 45:5, 49:14, 49:15, 49:18, 51:9, 51:13, 52:9, 60:17, 61:14
**pages** [1] - 52:5
**Paired** [2] - 44:9, 48:20
**palpate** [1] - 58:25
**paper** [1] - 42:14
**paragraph** [5] - 23:14, 50:22, 50:24, 51:5, 60:18
**paraphrasing** [1] - 33:6
**Parrish** [1] - 13:21
**part** [10] - 5:23, 6:11, 10:8, 18:12, 46:5, 46:18, 46:19, 49:15, 52:17, 55:25
**participating** [1] - 30:24
**particular** [1] - 20:12
**particularly** [1] - 10:1
**parties** [1] - 67:13
**partner** [1] - 3:25
**parts** [3] - 14:22, 52:6, 56:2
**pass** [2] - 32:5, 64:15

past [18] - 11:9, 15:20, 17:13, 25:15, 26:7, 29:18, 29:25, 31:8, 31:19, 31:22, 61:1, 61:20, 61:24, 62:17, 62:18, 62:23, 63:12, 64:5
patient [8] - 6:14, 10:15, 10:18, 10:19, 16:8, 24:11, 27:25, 58:4
patient's [2] - 42:10, 42:20
patients [8] - 4:14, 4:17, 5:1, 5:7, 5:12, 6:2, 6:17
pattern [8] - 20:10, 21:4, 21:13, 36:22, 61:3, 61:22, 62:6
pejorative [1] - 24:18
Pennsylvania [1] - 2:4
people [9] - 6:5, 9:8, 24:18, 28:6, 43:15, 48:11, 56:11, 59:13
people's [3] - 25:1, 63:17, 64:1
per [3] - 19:4, 19:10, 63:17
percent [3] - 4:12, 8:23, 8:24
percentage [2] - 5:13, 8:21
perfect [1] - 48:12
perfectly [1] - 44:16
perform [5] - 52:12, 61:5, 61:9, 62:25, 64:15
performance [11] - 16:21, 35:10, 35:18, 62:22, 62:23, 63:18, 63:22, 63:25, 64:3, 64:8
performed [2] - 36:15, 62:17
perhaps [1] - 57:9
period [1] - 18:23
periods [1] - 7:7
permitted [1] - 41:25
person [2] - 16:20, 20:17
person's [5] - 5:4, 14:17, 14:19, 64:8, 64:17
personal [2] - 9:7, 67:7
personality [5] - 18:24, 19:2, 19:4, 19:7, 19:8
pertaining [1] - 1:12

pertinent [1] - 16:16
peruses [1] - 39:9
Ph.D [7] - 1:8, 2:17, 3:4, 7:17, 8:2, 8:3, 67:4
pharmacologist [1] - 59:6
pharmacology [1] - 23:11
Philadelphia [1] - 2:4
Piasecki [2] - 23:15, 23:16
Piasecki's [4] - 52:21, 53:7, 53:15, 54:16
pick [1] - 38:3
pick-up [1] - 38:3
picked [1] - 37:11
picture [1] - 14:19
Pictures [2] - 44:20, 49:9
place [2] - 7:13, 67:9
placed [1] - 40:3
places [3] - 39:4, 42:24, 64:5
Plaintiff [3] - 1:4, 1:9, 2:5
plant [1] - 64:14
plot [1] - 51:12
plus [2] - 51:25, 63:19
point [15] - 11:25, 13:8, 18:17, 23:5, 24:16, 26:1, 27:19, 28:25, 32:3, 35:3, 49:13, 58:13, 61:24, 64:21, 65:2
points [4] - 36:7, 36:24, 46:6, 47:12
Polk [1] - 46:12
poor [1] - 63:23
population [2] - 4:18, 6:14
portion [2] - 48:23, 49:2
position [6] - 4:7, 4:9, 4:10, 4:11, 53:25, 55:8
possibility [2] - 22:20, 53:22
possible [5] - 19:20, 19:23, 20:6, 28:21, 46:6
possibly [1] - 22:15
post [3] - 8:4, 52:20, 52:25
post-conviction [2] - 52:20, 52:25
potential [2] - 15:4, 26:14

power [1] - 64:14
practice [11] - 3:18, 3:19, 3:23, 4:6, 5:20, 6:8, 6:9, 6:11, 6:23, 8:21, 8:24
present [3] - 9:15, 30:7, 62:22
presentation [1] - 37:12
presentations [2] - 30:12, 30:13
presented [3] - 30:19, 65:20, 65:22
pressure [1] - 25:11
pretty [7] - 5:25, 17:7, 30:8, 30:24, 35:6, 43:9, 43:15
prevented [1] - 25:9
primarily [1] - 17:18
principle [3] - 36:18, 36:19, 36:25
prison [1] - 65:5
private [3] - 3:19, 3:23, 4:6
problem [4] - 20:19, 20:25, 22:24, 45:24
problems [3] - 4:18, 21:3, 46:4
Procedure [1] - 1:11
procedures [1] - 6:6
process [1] - 32:1
processing [1] - 14:15
produce [1] - 56:19
produced [1] - 56:17
profession [1] - 16:13
professional [1] - 30:23
profile [1] - 51:9
program [2] - 7:17, 7:19
programs [1] - 7:16
progress [1] - 29:17
prompting [1] - 47:22
prone [1] - 60:5
proportion [1] - 6:4
prosecution [2] - 10:9, 10:25
prosecutors [1] - 10:10
protocol [2] - 39:15, 51:15
provide [2] - 3:19, 5:17
provided [7] - 23:8, 29:22, 52:21, 53:10, 53:14, 55:16, 65:2
proximate [2] - 54:4,

65:7
prudent [1] - 25:1
psychiatrist [2] - 63:2, 63:7
psychoactive [1] - 18:14
Psychological [2] - 31:13, 32:7
psychologist [1] - 63:6
psychology [4] - 7:14, 7:17, 8:11, 25:22
pull [1] - 47:20
pulled [1] - 26:12
purity [1] - 15:24
purpose [2] - 46:5, 47:18
pursuant [2] - 1:9, 1:10
pushed [1] - 40:15
put [7] - 12:6, 24:13, 28:7, 34:24, 39:20, 43:5, 63:10
putting [3] - 26:2, 37:1, 40:2

**Q**

qualified [2] - 11:9, 11:13
qualitative [1] - 36:22
quantitative [1] - 57:22
questioning [1] - 11:17
questions [7] - 14:19, 24:3, 57:2, 57:15, 58:21, 65:20, 65:22
quickly [5] - 12:6, 22:1, 39:25, 41:9, 60:8
quite [4] - 7:7, 22:15, 37:11, 59:8

**R**

raise [1] - 22:7
range [17] - 16:23, 21:6, 21:7, 21:18, 21:19, 22:5, 33:19, 35:5, 35:6, 36:5, 51:23, 51:24, 59:16, 59:23, 60:10, 61:3
Range [1] - 51:15
Rapids [1] - 2:8
rate [1] - 32:5

rather [4] - 7:1, 16:8, 23:2, 61:21
raw [3] - 33:12, 35:8, 35:9
reach [1] - 54:18
reacting [1] - 33:21
read [7] - 44:1, 44:2, 44:3, 54:14, 54:19, 54:20, 60:21
reading [5] - 51:18, 51:21, 51:23, 53:21, 65:12
reads [1] - 23:12
really [3] - 29:17, 35:13, 63:16
reason [4] - 16:1, 24:23, 29:15, 64:2
reasonable [5] - 4:15, 22:2, 23:24, 48:19, 54:10
reasonably [2] - 24:22, 45:22
reasoning [1] - 14:20
reasons [2] - 27:12, 53:23
received [1] - 8:3
recognition [3] - 47:18, 47:22, 49:2
recognized [1] - 5:14
recollection [3] - 13:16, 14:1, 23:13
reconciling [1] - 62:22
reconstruct [1] - 43:2
record [8] - 3:11, 11:19, 11:21, 19:11, 35:3, 45:4, 55:12, 60:22
recording [2] - 47:5, 49:19
records [3] - 10:15, 14:6, 65:5
recount [1] - 44:2
recreate [1] - 57:18
Recross [1] - 2:19
RECROSS [1] - 60:13
Recross-Examination [1] - 2:19
RECROSS-EXAMINATION [1] - 60:13
REDIRECT [2] - 57:4, 65:14
Redirect [2] - 2:19, 2:20
reduced [1] - 67:6
redundant [1] - 45:10

Reed [1] - 1:13
REED [2] - 67:2, 67:21
refer [1] - 58:4
referencing [1] - 37:6
referrals [1] - 6:25
referred [3] - 5:5, 5:13, 6:17
referring [3] - 12:11, 50:22, 50:24
reflect [3] - 33:11, 38:13, 51:10
reflected [1] - 50:18
reform [1] - 60:25
REFORM [1] - 61:8
refresh [1] - 23:13
regard [1] - 10:6
regarding [3] - 12:22, 13:9, 30:21
rehab [1] - 6:1
Rehabilitation [2] - 4:8, 8:7
rehabilitation [3] - 4:14, 4:20, 5:25
relates [1] - 53:10
relation [1] - 52:24
relative [9] - 36:5, 53:18, 61:4, 61:21, 61:25, 62:5, 67:12, 67:14
relatively [2] - 9:24, 36:4
release [1] - 34:16
relevance [1] - 14:24
relevant [3] - 45:9, 45:12, 48:17
reliable [3] - 24:11, 24:17, 25:5
reliant [1] - 16:17
relied [2] - 26:20, 54:17
relief [2] - 52:20, 52:25
rely [4] - 17:17, 25:1, 28:6, 38:5
relying [2] - 16:6, 16:12
remember [6] - 12:1, 12:3, 13:17, 13:20, 44:5, 56:14
renewed [1] - 31:7
repeat [1] - 43:24
repeated [1] - 35:12
repeating [1] - 42:11
report [31] - 12:3, 12:4, 12:6, 12:11, 12:18, 12:21, 12:23, 13:5, 17:19, 20:2, 20:5, 23:10, 23:16,

28:14, 40:10, 50:25, 52:21, 53:7, 53:11, 53:12, 53:15, 53:21, 54:16, 54:18, 56:17, 56:19, 58:7, 58:9, 60:16, 60:17
reported [3] - 28:4, 44:5, 67:6
Reporter [2] - 1:13, 67:2
reporting [3] - 24:19, 25:1, 28:1
reports [1] - 55:7
request [1] - 28:7
requested [1] - 58:19
requesting [1] - 14:1
require [1] - 65:21
research [8] - 17:24, 25:24, 30:9, 54:7, 54:11, 54:13, 54:22
Research [1] - 4:8
respect [1] - 18:25
responses [1] - 57:18
responsibilities [1] - 29:9
responsibility [1] - 28:24
responsive [1] - 57:15
rest [2] - 22:25, 65:13
resulting [1] - 54:23
results [3] - 16:15, 36:22, 52:1
retained [9] - 9:7, 10:24, 16:25, 17:3, 17:9, 23:5, 52:20, 52:23
reverting [1] - 18:11
review [4] - 10:14, 19:15, 23:9, 23:16
reviewed [1] - 20:2
reviewing [1] - 14:6
Rickert [1] - 13:17
right-hand [2] - 44:24, 51:25
rise [2] - 21:1, 65:11
risk [1] - 60:5
Rodgers [1] - 13:21
role [3] - 5:6, 5:19, 6:9
room [1] - 46:12
root [1] - 25:18
roughly [1] - 11:12
rule [1] - 25:7
Rules [1] - 1:10
run [1] - 64:16
running [2] - 4:12, 39:25

rushed [1] - 41:5

**S**

SAITH [1] - 66:4
samples [1] - 32:2
San [2] - 47:6, 47:11
sans [1] - 64:5
saw [11] - 12:5, 12:8, 20:5, 26:9, 27:21, 33:5, 33:16, 54:1, 61:13, 61:22, 63:2
scale [1] - 35:18
Scale [2] - 38:19, 50:23
scales [1] - 35:13
scans [1] - 20:21
scattered [1] - 62:11
schedule [1] - 41:25
Schneider [1] - 35:1
school [8] - 7:11, 7:22, 52:2, 63:13, 63:14, 64:3, 64:9
sciences [1] - 7:15
scientific [1] - 23:25
sclerosis [1] - 5:3
score [30] - 21:9, 22:4, 35:4, 35:9, 36:16, 36:17, 39:14, 39:20, 42:21, 43:2, 43:5, 43:8, 43:10, 43:13, 43:16, 45:1, 46:16, 46:22, 46:25, 47:10, 48:6, 48:8, 49:7, 51:20, 51:21, 52:18, 57:18, 58:5, 59:10
scored [7] - 44:8, 44:16, 45:3, 47:16, 48:7, 50:9, 50:15
scores [52] - 20:11, 21:5, 21:15, 21:16, 21:17, 21:21, 21:24, 22:6, 22:7, 22:20, 22:25, 33:4, 33:15, 33:22, 34:3, 35:8, 35:9, 35:10, 35:11, 35:14, 35:17, 35:19, 36:6, 36:7, 36:13, 37:6, 37:10, 37:22, 38:6, 39:17, 43:4, 44:7, 46:17, 46:23, 49:20, 49:22, 51:2, 51:12, 57:13, 57:14, 59:14, 59:16, 59:24, 60:1, 60:8, 60:9, 62:3, 62:5, 62:21, 63:4
scoring [4] - 14:7, 40:2, 44:23, 57:7

SE [1] - 2:8
se [3] - 19:4, 19:10, 63:17
second [3] - 19:13, 37:12, 46:18
secondly [1] - 21:13
section [4] - 30:10, 38:20, 43:11, 47:13
see [20] - 6:2, 12:15, 18:6, 18:7, 18:11, 18:16, 18:21, 33:23, 39:10, 39:17, 45:24, 47:6, 58:17, 59:25, 60:19, 62:6, 62:10, 65:5, 65:9
seeing [2] - 4:20, 5:25
seem [4] - 17:6, 45:9, 48:17, 61:12
self [1] - 17:19
self-report [1] - 17:19
send [2] - 34:15, 34:23
sending [1] - 13:9
sense [3] - 15:10, 23:21, 46:9
sent [4] - 12:21, 34:6, 34:25, 50:25
sentence [2] - 60:21, 64:19
separate [1] - 57:25
serve [1] - 6:15
services [1] - 3:20
set [1] - 63:1
Shawn [2] - 29:20, 55:18
SHAWN [1] - 2:2
sheet [13] - 37:19, 37:21, 38:2, 38:16, 38:18, 39:15, 39:21, 44:8, 45:4, 54:16, 57:24, 57:25
sheets [2] - 52:8, 57:7
shortcomings [1] - 61:12
Shorthand [2] - 1:13, 67:2
show [5] - 11:21, 12:10, 15:15, 19:12, 36:10
showed [2] - 19:25, 20:6
showing [3] - 20:20, 21:14, 21:25
shown [2] - 17:24, 45:14
shows [2] - 25:24, 60:23

side [6] - 4:6, 7:20, 44:24, 47:2, 47:3, 51:25
sight [1] - 51:18
signature [2] - 19:13, 67:17
signed [1] - 19:15
significance [1] - 13:11
significant [4] - 6:1, 9:25, 16:5, 59:12
signs [14] - 19:20, 19:23, 20:6, 22:10, 23:3, 26:9, 27:17, 27:20, 28:16, 28:19, 29:1, 33:8, 33:11
similar [3] - 5:19, 54:25, 55:6
simply [3] - 16:8, 40:5, 42:14
sit [1] - 24:25
six [4] - 47:5, 47:8, 47:11, 48:4
skills [3] - 6:20, 14:14, 64:17
slightly [2] - 21:18, 61:2
small [1] - 4:12
soft [14] - 19:20, 19:23, 20:6, 22:10, 23:3, 26:9, 27:17, 27:20, 28:15, 28:19, 29:1, 33:8, 33:11
solo [1] - 3:24
someone [12] - 4:22, 4:23, 4:24, 9:25, 15:11, 16:6, 20:20, 21:2, 24:20, 42:16, 63:21, 65:9
sometimes [4] - 10:2, 10:5, 30:16, 58:20
somewhat [1] - 62:7
somewhere [3] - 8:20, 11:14, 50:7
sorry [4] - 10:17, 37:4, 61:9, 63:8
sort [6] - 10:21, 15:14, 20:18, 36:12, 40:10, 60:6
sorts [3] - 6:7, 29:14, 59:25
source [3] - 26:9, 27:20, 29:1
sources [2] - 16:7, 24:12
South [1] - 1:14
spaces [2] - 58:12, 58:15
Span [3] - 33:21,

35:25, 45:5
**spatial** [1] - 45:5
**speaking** [3] - 13:12, 13:17, 36:4
**Specialties** [2] - 31:13, 32:7
**specific** [1] - 42:17
**specifically** [2] - 15:13, 42:13
**specifics** [1] - 13:19
**specified** [1] - 67:9
**speed** [1] - 14:15
**spell** [1] - 3:11
**spelling** [3] - 51:18, 51:21, 51:24
**spend** [1] - 40:13
**spent** [3] - 4:5, 25:12, 40:18
**Spies** [1] - 13:12
**spinal** [2] - 5:12, 31:1
**spoken** [2] - 13:14, 61:17
**spontaneous** [1] - 47:20
**spots** [1] - 36:18
**stand** [2] - 10:3, 25:2
**standard** [6] - 7:25, 35:7, 35:15, 51:21, 59:20, 62:3
**standardized** [1] - 7:5
**start** [6] - 36:23, 41:23, 49:19, 49:24, 59:24, 62:22
**started** [2] - 41:16, 41:18
**starts** [1] - 60:18
**state** [1] - 3:10
**State** [2] - 1:14, 67:3
**statement** [1] - 27:23
**STATES** [2] - 1:1, 1:6
**States** [2] - 1:11, 2:7
**statistically** [2] - 21:20, 59:19
**status** [1] - 10:20
**stenographically** [1] - 67:6
**step** [2] - 28:11, 29:12
**still** [5] - 20:8, 31:1, 33:18, 60:9, 61:1
**stimuli** [1] - 37:12
**store** [1] - 42:11
**story** [9] - 39:16, 42:11, 43:2, 43:24, 44:1, 44:4, 47:11, 47:12, 47:21
**straight** [1] - 49:5
**strategy** [1] - 10:8

**Street** [3] - 1:14, 2:4, 2:8
**strengths** [3] - 10:7, 53:18, 53:20
**stroke** [1] - 5:2
**strokes** [1] - 6:4
**subgroup** [1] - 31:15
**subjects** [3] - 54:12, 55:1, 55:7
**submit** [1] - 32:2
**substance** [1] - 13:7
**substances** [2] - 15:18, 15:21
**subtests** [4] - 45:16, 52:11, 52:12, 59:17
**suffer** [1] - 9:9
**suffered** [2] - 4:21, 4:25
**suggest** [2] - 27:8, 56:22
**suggested** [2] - 58:24, 59:5
**suggesting** [1] - 61:18
**suggestion** [1] - 22:9
**Suite** [2] - 2:4, 2:8
**summarization** [1] - 54:10
**summarize** [1] - 54:9
**summarized** [1] - 26:11
**summarizes** [1] - 51:5
**summary** [5] - 37:20, 38:2, 38:6, 49:20, 54:15
**summer** [1] - 17:13
**superior** [1] - 26:21
**supplied** [1] - 47:23
**supposed** [3] - 42:8, 42:9, 51:17
**suppress** [1] - 62:21
**suppression** [1] - 62:16
**suppressions** [7] - 18:6, 20:24, 61:5, 61:23, 62:1, 62:10, 65:11
**surprising** [1] - 20:23
**SUSAN** [2] - 67:2, 67:21
**Susan** [1] - 1:13
**sustained** [1] - 45:25
**sworn** [3] - 3:2, 3:6, 67:4
**Symbol** [3] - 33:22, 35:24, 52:9
**system** [4] - 5:4, 15:13, 18:11, 26:4

**systems** [1] - 14:18

## T

**tailor** [1] - 14:18
**tallied** [1] - 50:15
**tapping** [1] - 36:11
**task** [1] - 26:18
**taught** [3] - 42:19, 42:23, 42:24
**team** [4] - 5:16, 5:17, 13:25, 42:3
**Tech** [1] - 7:18
**ten** [2] - 35:16, 41:19
**tend** [3] - 14:18, 59:14, 60:7
**tendency** [1] - 59:21
**term** [3] - 10:1, 22:13, 62:15
**termed** [2] - 12:24, 12:25
**terms** [8] - 6:10, 6:20, 15:23, 18:13, 35:14, 36:5, 36:21, 62:2
**test** [38] - 8:13, 14:12, 14:16, 16:15, 16:20, 20:13, 21:2, 36:15, 37:5, 37:7, 38:6, 39:7, 39:12, 42:8, 43:17, 45:6, 45:16, 45:19, 45:20, 46:2, 46:10, 46:16, 47:18, 48:1, 48:14, 48:21, 49:10, 49:14, 49:16, 51:17, 52:1, 52:6, 52:11, 52:13, 54:12, 55:7, 56:10
**Test** [3] - 43:24, 44:10, 51:16
**tested** [3] - 16:21, 36:11, 40:14
**testified** [5] - 3:7, 17:5, 17:15, 25:14, 26:7
**testify** [2] - 27:11, 67:5
**testifying** [1] - 17:13
**testimony** [4] - 17:17, 52:22, 53:3, 54:6
**testing** [22] - 15:3, 18:24, 19:2, 19:5, 19:6, 19:22, 19:24, 20:6, 20:16, 37:13, 38:4, 38:14, 40:18, 40:23, 41:1, 41:13, 41:24, 45:11, 46:5, 51:7, 58:18, 61:2
**tests** [15] - 7:5, 14:7, 14:8, 14:9, 14:13, 37:23, 46:11, 49:22, 52:3, 52:17, 55:1, 58:5, 63:3, 64:15
**Texas** [2] - 7:18, 31:8
**THE** [2] - 1:1, 66:3
**themselves** [1] - 27:14
**therapeutic** [1] - 3:21
**they've** [1] - 35:11
**thinking** [2] - 6:20, 64:17
**Third** [1] - 51:16
**third** [4] - 6:14, 6:16, 6:24, 60:17
**thorough** [1] - 42:4
**thoughts** [3] - 53:13, 53:16
**three** [3] - 7:16, 43:11, 44:12
**throughout** [1] - 64:1
**TIM** [1] - 2:3
**timing** [1] - 15:24
**tissue** [1] - 18:15
**title** [1] - 23:12
**today** [3] - 23:24, 25:15, 28:18
**together** [2] - 12:6, 26:12
**token** [2] - 20:16, 35:21
**tools** [1] - 7:3
**top** [1] - 12:14
**tough** [1] - 56:12
**track** [1] - 45:13
**Trails** [1] - 36:16
**trained** [3] - 7:6, 27:9, 27:13
**training** [1] - 26:21
**transcribe** [1] - 38:1
**transcribed** [1] - 57:7
**transcribing** [1] - 49:25
**transferred** [1] - 38:4
**translate** [1] - 61:6
**transpired** [1] - 28:5
**trauma** [1] - 6:1
**treating** [2] - 4:13, 5:17
**treatment** [3] - 3:21, 6:10, 8:11
**trial** [5] - 10:3, 28:25, 41:16, 41:18, 41:23
**trip** [1] - 64:25
**trouble** [2] - 36:20, 36:24
**true** [4] - 26:23,

27:24, 46:19, 46:24
**trust** [1] - 26:22
**truth** [1] - 67:5
**try** [2] - 21:11, 55:4
**trying** [3] - 5:8, 43:1, 57:22
**tumor** [1] - 20:21
**turn** [1] - 33:3
**twice** [2] - 43:25, 44:1
**two** [15] - 7:23, 13:2, 18:9, 19:12, 35:7, 35:9, 35:13, 35:16, 35:19, 35:21, 36:6, 45:16, 49:14, 62:3
**two-page** [2] - 19:12, 49:14
**type** [8] - 4:17, 5:19, 7:3, 10:7, 17:25, 22:12, 36:10, 65:21
**types** [15] - 6:2, 6:3, 6:25, 9:4, 9:8, 9:22, 10:12, 14:9, 18:7, 18:9, 18:16, 18:20, 25:24, 65:18
**typewriting** [1] - 67:7
**typical** [2] - 7:19, 43:15
**typically** [10] - 9:24, 16:2, 21:5, 22:1, 29:17, 30:15, 40:2, 52:18, 59:21, 64:2
**typists** [1] - 61:12
**typo** [1] - 61:9
**typos** [1] - 61:13

## U

**ultimate** [1] - 46:7
**ultimately** [1] - 50:19
**unable** [2] - 41:5, 41:7
**under** [7] - 35:7, 40:1, 40:7, 40:8, 43:22, 43:23, 67:7
**underline** [2] - 42:15, 42:18
**underlined** [1] - 47:7
**underlying** [1] - 63:23
**understood** [3] - 24:13, 54:7, 65:13
**undue** [1] - 59:23
**unit** [2] - 6:1, 47:11
**Unit** [1] - 2:3
**UNITED** [2] - 1:1, 1:6
**United** [2] - 1:11, 2:7
**units** [1] - 47:12
**University** [1] - 7:18

unless [1] - 20:19
unnecessary [1] - 49:13
unusual [1] - 62:7
up [25] - 4:24, 8:2, 10:21, 15:15, 18:17, 18:21, 21:14, 21:25, 24:8, 26:4, 28:19, 36:10, 37:11, 38:3, 40:1, 47:23, 50:6, 50:16, 50:20, 57:25, 60:1, 62:15, 65:5, 65:16
uptunded [1] - 61:14
use/abuse [2] - 25:25, 53:22
useful [1] - 62:21
user [1] - 17:16

## V

variability [2] - 20:14, 62:9
variation [1] - 21:23
variety [1] - 6:3
various [1] - 63:25
vehicle [1] - 9:8
veracity [1] - 16:4
verbal [3] - 35:10, 35:17, 48:20
Verbal [1] - 44:9
verbally [3] - 35:25, 36:11
verbatim [1] - 42:9
versus [4] - 59:24, 63:13, 63:14
vicinity [1] - 11:14
victim [1] - 4:23
view [2] - 26:8, 53:7
viewed [1] - 6:3
visit [1] - 46:12
visual [2] - 20:22, 20:24
vitae [1] - 11:22
volatile [1] - 26:5
vs [1] - 1:5

## W

wait [1] - 11:17
walk [1] - 37:17
Walnut [1] - 2:4
watching [1] - 47:8
ways [2] - 42:24, 58:25
weaknesses [8] - 10:7, 53:19, 53:20, 53:23, 54:1, 61:21,

62:7, 62:11
Wechsler [2] - 38:18, 50:23
week [1] - 43:19
weeks [1] - 41:19
welcome [1] - 66:3
West [1] - 2:4
WHEREUPON [1] - 3:3
whole [3] - 63:19, 64:13, 67:5
Wide [1] - 51:15
WILLIAMS [7] - 2:7, 11:18, 55:17, 55:20, 57:1, 65:12, 66:1
Williams [5] - 2:18, 2:19, 24:5, 57:6, 60:14
wiseman [2] - 23:6, 52:24
Witness [1] - 67:17
WITNESS [3] - 2:16, 66:3, 66:4
witness [3] - 3:2, 3:5, 39:9
wonder [3] - 21:11, 21:22
wondering [1] - 36:23
word [11] - 18:3, 23:3, 24:17, 41:20, 43:8, 43:20, 43:21, 43:22, 43:23, 61:8, 61:13
words [6] - 5:6, 19:20, 19:21, 24:13, 42:17, 44:4
works [1] - 6:12
worth [2] - 34:14, 35:1
WRAT3 [2] - 51:13, 52:6
write [12] - 38:22, 39:4, 39:6, 42:18, 42:20, 44:6, 46:17, 46:23, 50:14, 57:24, 58:5
writing [2] - 42:10, 50:18
written [5] - 39:8, 47:15, 48:7, 50:7, 57:8
wrote [2] - 43:8, 50:8

## Y

years [7] - 3:25, 4:5, 7:16, 10:2, 18:21, 30:25, 31:8

## Z

zero [1] - 43:13
zone [1] - 23:2