IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

DUSTIN HONKEN,                )
                             )
               Plaintiff,     )
                             )
          vs.                 )     No. C10-3074 LRR
                             )
UNITED STATES OF AMERICA,     )
                             )
               Defendant.     )

The deposition of CHRISTOPHER GROTE, Ph.D., called by the Defendant for examination, pursuant to notice and pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Susan M. Reed, Certified Shorthand Reporter for the State of Illinois, at 219 South Dearborn Street, 5th Floor, Chicago, Illinois, at 1:30 o'clock P.M., on the 20th day of October, A.D., 2011.

Case 3:10-cv-03074-LTS-KEM   Document 71   Filed 11/02/11   Page 1 of 84

APPEARANCES:

MR. SHAWN NOLAN
MR. TIM KANE
(Federal Community Defender, Capital Habeas Unit
 601 Walnut Street, Suite 545 West
 Philadelphia, Pennsylvania 19106
 215/928-0520)
    appeared on behalf of the Plaintiff;


MR. C.J. WILLIAMS
(United States Department of Justice
 Assistant United States Attorney
 401 First Street SE, Suite 400
 Cedar Rapids, Iowa 52407
 319/363-6333)
    appeared on behalf of the Defendant.


                    *     *     *     *     *


                          I N D E X

WITNESS:

CHRISTOPHER GROTE, Ph.D.

        Direct Examination by Mr. Williams      3
        Cross-Examination by Mr. Kane          32
        Redirect Examination by Mr. Williams   71


EXHIBITS:

  Government Exhibit N                          3
  Government Exhibit O                         15

        *       *       *       *       *       *

Case 3:10-cv-03074-LTS-KEM   Document 71   Filed 11/02/11   Page 2 of 84

(Witness sworn.)

(1:35 p.m.)

WHEREUPON:

CHRISTOPHER GROTE, Ph.D.

called as a witness herein, having been first duly sworn, was examined upon oral interrogatories and testified as follows:

EXAMINATION

by Mr. Williams:

Q. Please state your name, sir.

A. Christopher Grote, G-r-o-t-e.

Q. In front of you, Mr. Grote, you have a copy of your curriculum vitae. It's marked as Government's Exhibit N. Do you see that there?

A. Yes.

Q. Why don't you, if you would, give a brief summary of what your educational background is?

A. I received bachelor's degree from Xavier University in 1983 where I graduated summa cum laude with a major in psychology. I was part of the scholars program and had a minor in business. I then received a fellowship and got accepted into the University of Louisville's Ph.D. program in clinical psychology, which is approved by the American Psychological Association. I received my master's at Louisville in

Case 3:10-cv-03074-LTS-KEM Document 71 Filed 11/02/11 Page 3 of 84

1987 and my Ph.D. in 1989.

Along the way I fulfilled my requirement to do a one-year internship which I went down to Nashville for and went to the Nashville VA Vanderbilt Medical Center which is an APA approved internship and completed that in 1988 to 1989. In 1989 I accepted a job at Rush University Medical Center as an assistant professor and was supervised formally for a year to get my license at that time and have been at Rush ever since where I'm now a full professor in the departments of behavioral science and neurologic sciences.

Q. Exhibit N, is that a fair and accurate copy of your curriculum vitae?

A. Yes.

Q. Is it up to date?

A. Yes.

Q. I want to go through just a few things in here. First of all, your academic appointments you talked about starting off an associate professor. Are you now a full professor?

A. I started as an assistant professor. I'm now a full professor.

Q. Down here it has under 2002 to the present you are director of neuropsychology, Behavioral Sciences. Can you explain what that?

Case 3:10-cv-03074-LTS-KEM Document 71 Filed 11/02/11 Page 4 of 84

A. We have a neuropsychology program at Rush. It's one of the oldest and best known in the country. I became director almost ten years ago.

Q. What are your duties as director?

A. As director of neuropsychology I just make sure that the service is doing a good job in terms of our seeing patients, both inpatient and outpatient. Make sure that the other faculty in the department are doing well and that their careers are on the right path and they're meeting the needs of the service in the medical center. I also make sure that my service is teaching its students, interns appropriately and make sure that we're teaching the medical students appropriately; and I make sure that an appropriate amount of research is being done in our section with people turning in grants and publishing; and I make sure that our section makes an appropriate contribution in terms of service to either the community, the university in terms of committee work and other kinds of work like that.

Q. You have down here from 2002 to 2010 you were director of education, Behavioral Sciences. Can you elaborate on that?

A. I was in charge of the Department of Behavioral Sciences' interaction with the medical

school in terms of the classes that we taught to the first- and second-year medical students. The kinds of courses that we taught of all -- across time but during the bulk of the time I was director, we did quite a bit of teaching and still do. I've always been an instructor to the medical students as well as for eight years or so was the overall administrator for what was taught to medical students from our department.

Q. You have in 2006 to the present here associate chairman of Behavioral Sciences. What are your duties in that position?

A. Well, to step in to be acting chairman as needed, which was for a full two-year stint at one time. I'm technically acting chairman right now. Our chairman is in South Africa giving lectures. So to step in as acting chairman but also to act as like the senior advisor to the chairman since I've been there so long and know the personnel and the systems at Rush to help him do his job the best way as possible.

Q. Now, on the second page of your curriculum vitae marked as Government's Exhibit N, you have down here that you were a director of Midwest Neuropsychological -- Neuropsychology Group from 1998 to 2002. Can you explain what that was and what your duties were?

A. The Midwest Neuropsychology Group or NMG for short is a loosely organized group of about 200 members where the only thing we do is have a meeting each May for two days. We're neuropsychologists in usually about a seven-state area that get together to talk about things in neuropsychology, usually new research that's coming out. It was my job for those four years to make sure the meetings went off and that we were having a good time with it and that we weren't going bankrupt.

Q. Going to your teaching and supervising which is on page 4 of Exhibit N, you indicate from 2002 to 2010 director of medical education, Behavioral Sciences Department. We talked about that before, right?

A. Yes.

Q. Then the certification and licensure at the bottom of that page, explain if you would, you're board certified in and by whom and on what?

A. I'm board certified in clinical neuropsychology through the oversights of the American Board of Professional Psychology. That's ABPP, or ABPP is how we say it. That's the oversight board under which there's ABCN, which is the ones who do the exams for neuropsychology, the American Board of Clinical Psychology. Board certification through that process

is a very rigorous four-step process the last step of which is the oral examinations, which I now host. Rush has been the host of the oral exams for the ABPP process, the ABCN process for quite sometime; and we have a very large group of examiners and examinees coming from around North America in just another two weeks that I'll be hosting in terms of giving them space so they can conduct the their oral exams of the current candidates.

Q. Then it says diplomat, clinic neuropsychology, effective 1995, what's that?

A. Yeah, that's all together. There probably should be a space there. That means I'm board certified in clinical neurology in the way I just described.

Q. There's honors on the second page, and one thing kind of leaps out at me, elected to Mark Lepper M.D. Society. What was that, and what's the significance of that award?

A. Mark Lepper Society is an honorary society at Rush Medical College. Membership's given to those people who are thought to be outstanding teachers. It's a fairly rigorous process by which you're nominated, and a lot of evidence and support has to be generated to let you in so to speak.

Q. Now, going through your bibliography, there's a number of articles and presentations you've given over the years. One thing that I noted in here, there's a number of presentations and articles dealing with ethics in this area. Is that a specialty of yours?

A. Yes.

Q. And explain that, if you would.

A. I went to a Jesuit university, and they pound that into. I guess it stuck. Didn't have a choice. So as I started practicing, I wasn't aware of that many issues in ethics that seem to be specific to neuropsychology when I first started in the field and came to realize there were a lot of things, like third-party observers and release of raw data and just developed an interest in it and I guess kind of had a knack in writing and teaching about it.

So it's led to me being I would say recognized on an international basis in terms of someone who has some interest or expertise in that area to the point that right now I'm scheduled to go to Florida next month to talk about research ethics to a conference down there. I've been asked to do a distance-learning course, which is internet-based for the National Academy of Neuropsychology where students,

other psychologists will pay a fee and get continuing education credits for the course I lead online. I've written any number of articles and books -- book chapters rather about ethics as well. It's something I'm asked to lecture about usually once or twice a year out of town someplace.

Q. Going back to the first page of your curriculum vitae, it has down the -- your Ph.D. in clinical psychology. We've had an expert testify in this case who had a counseling psychology, a Ph.D. in counseling psychology. What is the difference between clinical psychology and counseling psychology?

A. Usually the GRE scores of the people who go into those different programs, usually there's a difference in terms of who gets into a clinical program and a counseling program. That's the most significant difference in my experience. Beyond that I think it's the focus on psychopathology and impairment in trying to assess that and how to study that for the clinical program.

My understanding of the counseling programs, which I didn't go to, is that it's more about just doing psychotherapy with people who are fairly healthy is the general distinction that I've been told.

Q. When you said it's the scores may make a

difference, is it harder to become a clinical -- get into a clinical psychology track than the counseling?

A. It's extremely difficult to get into a clinical program, even more so now than back in the day I think.

Q. If you would, why don't you describe your current practice? First of all, let's go to your academic setting, what your responsibilities are in that realm and then let's talk about whether you have a private practice on the outside of it.

A. Yes, this case is being seen through my private practice. My job at Rush is a full-time job whereas we mentioned I'm now a full professor at Rush University Medical Center and Rush Medical College, director of neuropsychology; but really what it comes down to is seeing patients day to day.

I saw a patient this morning who came in from Cambridge, Massachusetts, to see us who has epilepsy and is maybe a candidate for resective surgery. That's something that Rush has a very large program in. I've been sort of their chief neuropsychologist since I got there back in 1989. So a lot of my work is with the epilepsy folks, the ones who aren't responding to medication where they're thinking about maybe doing a resection of the temporal lobe or

Case 3:10-cv-03074-LTS-KEM   Document 71   Filed 11/02/11   Page 11 of 84

perhaps the frontal lobe. It's my job or the job of my staff to do pre and postoperative assessments, doing the Wada procedure which I can explain later if need be, just really seeing how these folks might do if they had a surgery where they take out part of the brain. You want to get rid of the seizures but not lose memory and personality and speech function. So it's a cost-benefit type of thing that I'm asked to help on.

So that's a typical kind of patient, but I see patients with traumatic brain injury and dementia and psychiatric illness, personality disorders, all kinds of folks at Rush.

I'm also responsible for the internship program. We have one of the most competitive ones in the country. We get 60 people or 70 people applying each year for two, maybe three slots that we have.

I'm also in charge of our post-doctoral program where we have two fellows that are working with us for two years each and the other things I talked about before, making sure that the program runs correctly; and then I teach and I do research.

Q. You indicated that you're working on this case as part of your private practice. Why don't you explain that for us?

A. Yes. I was allowed to start doing private

practice on the side when I started at Rush. So after hours typically or on Saturdays is usually the day of my evaluation, I'm allowed to use my office and see patients who are referred through what I would call the medical/legal arena. I've done a few criminal cases but many more civil cases.

A typical civil case is one where someone is in a car accident and they have a minor head injury and they're alleging that they can't work again. I get retained typically by the insurer or the defense law firm to evaluate that person and see how they're doing. But it could be other kinds of things, including criminal cases.

Q. And the type of criminal cases you've worked on before would include what?

A. I saw a guy down at Cook County Jail a few years ago who had murdered his wife. He admitted to it. He was about 80 or so. He said she was demented; and there was evidence that she was; and it was portrayed as a mercy killing that she wouldn't want to live like that so he shot her. And then there's a question about how -- to what degree was he demented as well. I think he was actually and probably didn't know what he was doing in some ways. I saw him.

I remember seeing a bank robber for

either the FBI or Department of Justice.  I've been called by the public defender office a couple times and asked about cases, but I don't think I've actually been retained on cases.

Q.   What percentage of your time is spent on this type of forensic work versus your full-time teaching?

A.   If you look at the total number of hours I work over a year as a psychologist, I think about 5 percent of my hours, maybe no more than 10 percent are in private practice cases, which generally, again, are medical-legal.  The other 90 or 95 percent of my time is through my regular day job at Rush.

Q.   On the cases where you have worked in the forensic setting, you've been qualified as an expert before by courts?

A.   Yes.

MR. WILLIAMS:  I would tender Dr. Grote as an expert in this case.  Tim, do you want to do any cross-examination at this point?

MR. KANE:  No, I'll wait.

BY MR. WILLIAMS:

Q.   Dr. Grote, you were retained in this case by the Government to do an evaluation of Dustin Honken; is that correct?

A.   Yes.

Case 3:10-cv-03074-LTS-KEM   Document 71   Filed 11/02/11   Page 14 of 84

Q. In front of you marked as Exhibit O is a report. Is that a report that you authored?

A. Yes.

Q. And does that reflect the, I guess, summary of your interview, your testing and ultimately your opinions in this case?

A. Yes.

Q. And to the extent that you've expressed opinions in this report, Exhibit O, were they within a reasonable degree of neuropsychological certainty and scientific certainty?

A. Yes.

Q. To the extent you're expressing any opinions today in your testimony, will they be likewise based on a reasonable degree of scientific and neuropsychological certainty?

A. Yes.

Q. Why don't we have you just explain very briefly what your examination consisted of?

A. Well, as you know, there was a lot of communication between me and your office about getting the evaluation done, when it would be done, how could it be done, would there be a third party there, did I need an Indiana license to do this evaluation, which I didn't think I needed but I got one anyway. So there's

a lot of preliminary work more so in this case than most other cases I've done. Once I got to the prison, in terms of that?

Q. Yeah.

A. I was with Mr. Honken, my assistant and I were with Mr. Honken about ten hours I think all together, in that range. I want to say about six hours the first day and about four hours the second day. A lot of that time was just spent in interview. All the second day was interview. I don't remember any testing being done that day. So that's four hours of interview, and I think the first day was an hour to two hours of interview as well.

So that's at least half of the time there, and then the other half was my assistant administering psychological tests to Mr. Honken while I observed and kind of took notes and reviewed records, that type of thing and just make sure everything was going okay.

Q. Let's talk for a minute about the assistant. Who was the assistant that worked with you?

A. Dr. Emily Edmunds.

Q. Why do you use in an assistant in a situation like this?

A. She tests every day. I don't necessarily

test every day like I used to. So I wanted to make sure that it was someone who's testing every day and there was going to be absolutely no hesitation in terms of how to proceed. Frankly, I thought it might be a safer situation if there were two of us in there. I had heard about threats he made against other people and really didn't know what to expect and thought it would be better if she could help me, I could help her perhaps.

Q. Sure.

A. And really because I think so highly of Dr. Edmunds, it's another set of eyes just to make sure that I didn't miss anything in terms of observations, things he might do, just to make sure everything is done thoroughly and completely and comprehensively.

Q. What tests were administered in this case?

A. Those are listed on page 1 of my report which I could read out loud if need be.

Q. No, let's just go over them kind of briefly though. The Victoria Symptom Validity Test, what is that designed to test for?

A. Cognitive effort.

Q. How did Dustin Honken perform in that regard?

A. It's a test that looks like a memory test but it's really measuring effort. The short answer is he

did very well on the test. He answered all the items correctly. The implication is we thought it showed he was making a very good effort on that test which was concordant with our observations that he always seemed to be making his best effort on the cognitive tests that were presented to him.

Q. And you referred to page 15 of your report marked as Government's Exhibit O when you were answering that. Your kind of results are summarized back there?

A. Yes.

Q. Let's go to the next one, the Wechsler Test of Adult Reading, what was that designed to test for?

A. To measure premorbid intellectual ability.

Q. What's that mean?

A. When a neuropsychologist has to come to a case, we rarely have the benefit of knowing what -- how the person would have scored on a neuropsychological test at some previous point in time, particularly prior to some incident in question. So if there's a car accident and the guy had a head injury, there's usually not some preexisting neuropsyche report for us to compare apples and apples against.

The Wechsler Test of Adult Reading we think is a very effective way of getting a sense of a

person's preincident cognitive function. It's a test where a person is asked to read as many as 50 words out loud, most of which have an irregular pronunciation. So the word benign is pronounced benign not beniggen the way a person who doesn't know the word might try to say it. That ability to read the words correctly is very resistant to the effects of brain injury and brain disease. So even if something did happen to a person that caused their memory and other kinds of -- some of their other cognitive skills to go down, that WTAR score, Wechsler Test of Adult Reading score, typically in a lot of cases is going to be fairly constant from the preincident level of functioning.

Q. How did Dustin Honken perform on that test?

A. He did very well. His estimated premorbid full scale IQ estimate is 118 or the 88th percentile or higher. The one thing about the WTAR you have to keep mind is it truncates the highest and lowest estimate. So a person on a bell-shaped curve is clearly way out here on the low end or the high end. The WTAR typically doesn't predict that far out. So if it's predicting 118, it's either that or maybe even higher.

Q. The next test was the Wechsler Adult Intelligence Scale. What is that?

A. That's an IQ test. It also gives you

Case 3:10-cv-03074-LTS-KEM Document 71 Filed 11/02/11 Page 19 of 84

measures of different areas of cognitive ability.

Q.   How did Dustin Honken perform on that?

A.   He did very well.  His achieved full scale IQ was 119, so you can see that's just a point different than what we had guessed it might be.  So it was a very accurate estimate from the WTAR.  119 comes out to 90th percentile.

There are other factor scores that I think are more important than an IQ score.  That's a whole nother discussion maybe.  But if you look through my report, the results of the WAIS are kind of mentioned in other parts of page 15 or 16.

Q.   And without going through kind of line by line because the judge in this case will read this line by line, but give the judge kind of a summary then.  What should the judge take away from the testing that Dustin Honken performed on the WAIS IV Test?

A.   That he did very well in all areas of cognitive ability.  The WAIS gives you five summary scores.  One is the full scale IQ.  Other four are what we call factor scores.  The first of these is called working memory.  This is a measure of attention, particularly attention where it's a high demand on the person.  They don't just have to repeat information, but they have to manipulate, work with it, process it.

Mr. Honken's working memory was 122, the 93rd percentile.

A second area of cognitive ability measured by the WAIS IV is that of verbal ability. Mr. Honken, again, did extremely well, 127, which is the 96th percentile. His nonverbal ability, which is looking at visual-perceptual kinds of things was 113, the 81st percentile; and then his processing speed, how quickly he got so many things done with a pencil, which I can explain more detail later if you'd like, was in the average range, which is 97, standard score in the 42nd percentile. All those scores range between average to superior.

Q. Now, he's performing at the 90th, 91st, 93rd percentile on some tests but then he has this 42nd percentile on this processing speed. Should the judge take anything from that as significant?

A. Nothing other than that's very normal to have that kind of spread of scores, particularly among very bright people. There's been considerable literature that people who are extremely bright in one or more areas such as verbal ability or working memory should not necessarily be expected to be superior in all areas, and processing speed is the one thing that's usually more in the average range.

Case 3:10-cv-03074-LTS-KEM   Document 71   Filed 11/02/11   Page 21 of 84

Q. Looking at the MMPI is another test you performed; is that correct?

A. Yes.

Q. Did you use the form that -- the test that was in existence back in 2004 on the MMPI?

A. Yes.

Q. What was Dustin Honken's performance there?

A. It was abnormal in, I think, two ways. First, he was mildly elevated on one of the validity scores which indicates some level of defensiveness, not an extraordinary amount. More importantly were his elevations on two of the clinical scales: Scale 4, the old name is psychopathic deviant; Scale 6, the old name is paranoia. So he's got a 4/6 profile. And I basically kind of cut and paste something from one of the interpretive guides on page 16 of my report in terms of what people tend to be like if they score high on those two scores in particular, and those are the two highest scores of the MMPI II.

Q. And what does that mean then?

A. My take-away from the MMPI for Mr. Honken is that he is a person who has issues with anger, resentment, irritability. He's hypersensitive to criticism, demands by others, he projects blame onto others and that family members in particular might be

the people that they blame for the problems that they've caused.

Q. Okay.

A. It's the kind of profile you get from someone who says I've got no problems but you've got problems and any problems that I might have had in my life, it's your fault, it's not my fault.

Q. Is that any indication that he has any type of psychological impairment?

A. No, not psychological impairment but it's more of a way of kind of interacting with the world and rejecting blame for his faults and his actions.

Q. Now, on the rest of the tests performed, is there anything else that you think is important to draw to the court's attention as far as any of the results of those tests?

A. Yes.

Q. What's that?

A. That he's an exceptionally bright guy and that he did well in all areas of testing. This is an extremely easy case for me. It's an interesting case, not only because of the context of him being on death row and things like that, but it's also very interesting to me in how hard he worked at the tests but mostly just how bright he is. I mean I test

hundreds of people a year, and Mr. Honken outscored all but one or two people probably in the course of a year's work.

We gave him a memory test on which he just knocked the ball out of the park. I mean I give this test all the time, and I can't do as well as he did even though I know the answers. I don't have it memorized. He's an extremely quick, capable fella in terms of his cognitive abilities.

Q. And when you talked about that one test, was that the -- what you reference on page 16, the CVLT II test? Is that the one you're talking about?

A. On page 15, yes.

Q. On page 15. Okay. What paragraph are you at?

A. Third paragraph from the bottom.

Q. Very good.

A. The CVLT stands for the California Verbal Learning Test, and that's a test where we read 16 words to the patient or to the person taking the test and see how many they can spit back to us. Then we give them five trials, we repeat that; and by the fourth trial he got all 16 which is remarkable, but he gave all 16 in order which is not really what the test is designed to do in a way because these 16 words are grouped into

four categories like means of transportation, or kinds of vegetables, that type of thing. He didn't need that grouping element to figure out how to give you the 16 words. He just gave them in rote order. He could memorize 16 words in a row by the fourth trial we gave to him. I've never seen that before.

Q. And you reference it underneath in your summary, you say that he quickly learned all 16 words on the list. You call that truly exceptional, is that --

A. Yes.

Q. So that's the same test we're talking about there?

A. Yes.

Q. I want to go briefly through some of the statements made by Mr. Honken during your interview of him. If you turn to page 3 with me, among the things you asked him under the first paragraph in Mr. Honken's report of family background there, you said in the last sentence of that first paragraph, Mr. Honken also denies ever being physically or sexually abused by anyone at any point in his life?

A. Yes.

Q. That's something Mr. Honken told you?

A. Yes.

LISLE COURT REPORTING SERVICE, INC.   (312) 225-9648

Q. If you go to page 4 at the last sentence of the first paragraph, you say in the current interview, Mr. Honken said he did not and does not feel as if his mom had rejected him at the time of the divorce and was never made to feel the odd man out in terms of post-divorce custody arrangements even if his father later tried to convince him of this. You indicate that's something that Mr. Honken expressed to you during the interview?

A. Yes.

Q. Now, you reference I think later there's a report by Mr. Dudley -- or Dr. Dudley. You reviewed Dr. Dudley's report?

A. Yes.

Q. And Dr. Dudley, I think, indicated that Dustin Honken identified that to him as something that was severely traumatizing to him or something of that effect. Do you remember that reference in Dr. Dudley's report?

A. Yes.

Q. Is what Dustin Honken told you inconsistent with what he apparently told Dr. Dudley?

A. It's not consistent.

Q. Again, at the bottom of page 4 in the last paragraph the first sentence, you have another

indication that Mr. Honken stated that his father James was not physically abusive in the first sentence in that last paragraph?

A. Correct.

Q. As a general matter, when you're interviewing Dustin Honken during these, I think roughly five or six hours of the total ten hours you spent with him were interviews, did he have problems just in the interviews with recall?

A. No.

Q. Any memory problems at all that you detected in the interview process?

A. No, he had very good recall.

Q. How about his ability to articulate and explain things, how was that?

A. He was very articulate.

Q. You indicated at certain points in your notes here that he was able to explain in some detail the manufacturing process that he employed in making methamphetamine?

A. He explained it in great detail.

Q. At, I think it's primarily at page 9 of your report, there's, I guess it starts on page 8 but then goes over into page 9 is kind of a summary of what he reported to you of his drug use?

A. Yes.

Q. And he reported to you that apparently there was a seven-month period of time after he first started making methamphetamine down in Arizona up until his arrest in March of 1983 where he was using it, reportedly by him, you know, on a daily basis during that time period?

A. I don't know if it was daily all seven months but it got to a point where he was using it daily during that time frame, yes.

Q. Then there was a brief period of maybe a month after his arrest where he told you that he had access to some drugs; but that apparently dried up after about a month; and after that he reported to you he didn't really use any drugs then for a while?

A. What I recall him telling me is that he had some of his own drugs available to him for that first month after his release back in about March of '93. Those were good drugs in terms of their quality; and so he and I think Angela Johnson went through those drugs for that month, maybe March to April of '93; and it's my understanding starting in April he didn't have access to high quality drugs; and he didn't like using the poor quality; and so his use rapidly tapered off to the point where he wasn't using drugs at some point in

time.

Q. Now, were you able to ask Mr. Honken direct questions about what was happening on the days that the murders occurred?

A. No, I didn't get to that.

Q. Would he refuse to answer questions regarding his involvement in the murders?

A. Yes.

Q. And so you weren't able, for example, to ask him whether he was using methamphetamine on the days the murders occurred?

A. I didn't ask that specific question, no.

Q. When it got anywhere around talking about the crimes of the murders, in fact, would he refuse to answer your questions then?

A. Yes.

Q. Starting at about page 11 and then going through page 14, you summarize review of records that you considered including the reports of Dr. Warren, the reports of the mitigation specialist, the reports of Dr. Dudley, Dr. Piasecki's opinion; and did you take all that into account when you arrived at your own opinions in this case?

A. Yes.

Q. Did you assume that what was reported by the

family members about the abusive upbringing with James Honken, the allegations of abuse, did you assume for purposes of reaching your opinion in this case that all that stuff was true?

A. More or less, yes.

Q. So at the end of this, you have a summary -- end of this meaning your report, Exhibit O, you have a summary of your findings in this case. Again, the judge will read this; but, if you would for the benefit of the judge, what's the takeaway for the judge to get from the summary that you've provided here about Dustin Honken's mental abilities and psychological damage, whether he's suffering any type of impairment? What should she take away from this?

A. I tried to summarize everything in the very last sentence in my report where I said I don't think there's any evidence of any past or current cognitive mental health or psychosocial factors to explain or account for any of his criminal activities.

His cognition is terrific. Every indication I know of is that it's always been terrific. He's a guy who seems like he's in remarkably good mental health in the time at least since he's been incarcerated and sentenced to death in terms of not appearing psychotic, not having long-standing issues

with anxiety or depression from what I could tell. He's not anxious or depressed now in my opinion.

The third factor I guess that's been raised by other folks in the case is to what degree is his dad or his family environment a significant or mitigating factor in this case, and I don't find it to be a significant or mitigating factor in this case.

Q. Anything about his upbringing -- you know, we're assuming for the sake of your opinion here that his father was drunk and abusive and did all the nasty things that are summarized in the mitigation specialist's report, Dr. Warren's report, Dr. Dudley's report. Anything that you saw that would indicate that that would have caused any mental impairment to Dustin Honken?

A. No. If one takes those reports as being true, which I do more or less, that his dad was a bad person and a bad father, it's unfortunate; and nobody would wish that on a child to have a father like that. Nonetheless, unfortunately, there are plenty of parents like that out there. That doesn't mean that the kid has to turn out in the way that Mr. Honken turned out.

I believe there's free will especially in a case like this. If you look at his siblings as I put on my report, I don't think either has ever been

convicted of crime. In fact, his sister wound up working in law enforcement. So I think the choices he made that led to the convictions that were made are his doing and his doing alone.

MR. WILLIAMS: I don't have any further questions.

CROSS-EXAMINATION

by Mr. Kane:

Q. I'm going to back up and just go over some of your qualifications that you were speaking about with Mr. Williams. You mentioned this case, this murder case where a man was at least arrested and charged with murder, initially an older man?

A. Oh, yes.

Q. Was that here in Chicago?

A. Cook County.

Q. Who were you retained by?

A. I think that was the plaintiff's psychiatrist -- or the public defender's. I'm getting my casings mixed up, civil and criminal. The public defender's psychiatrist had asked me to get involved in that case.

Q. His lawyer's psychiatrist?

A. I think it was directly from the psychiatrist somehow. I don't remember talking with a lawyer in the

case, but it's been about four or five years.

Q. So you don't know if it was for the prosecution or for the public defender that you were retained?

A. As I recall --

Q. Or for the court?

A. -- a psychiatrist had been retained by the man's lawyer. Now whether it was a public defender or private lawyer, I'm not sure.

Q. And you mentioned a bank robbery case as well.

A. Yes.

Q. Do you remember who you were retained by in that case?

A. The FBI or the Department of Justice, the United States Government.

Q. Right. The criminal cases that you mentioned, you only mentioned that one murder case. I assume that was not a capital case?

A. When you say capital case, that means that someone is facing death row?

Q. Correct. Yes.

A. Not that I recall, no.

Q. Are there any other cases that you've worked on where someone was either facing death row or already

on death row other than Mr. Honken's case?

A. I don't think so. You know, when I was in grad school back in Kentucky, I spent a year at KCPC, Kentucky Correction Psychiatric Center in La Grange. I think some of those guys were on death row, but it's been awhile.

Q. So you've never testified in a capital case before?

A. That's correct.

Q. Is that correct?

A. Right.

Q. Did you review the claim in this case of ineffective assistance of Mr. Honken's trial counsel at the time of the penalty phase? Do you know what I'm referring to in that?

A. If I do, I believe I reviewed a significant portion of it but maybe not all of it because it was lots of legal citations. If that's what you mean (indicating).

Q. Okay. Did you review that whole document? I mean I see this as -- I'm looking at this, C.J., and it looks like claim 1 of our amended petition.

MR. WILLIAMS: Mm-hm.

BY MR. KANE:

Q. And I'm assuming the rest of this going on is

the whole petition.

A. There's 192 pages, if that makes any difference.

Q. Right. You reviewed most or all of that you think?

A. I wouldn't say all of it but most it, yes, the parts that I seem to understand where it seemed kind of relevant to what my role in the case might be.

Q. On page 1 of your report the second to last sentence of the first paragraph, you say that you were retained to review records and to conduct a neuropsychological evaluation so that I might offer opinions in this case.

A. Yes.

Q. Was there a specific scope or specific opinions that you were asked to render one way or the other?

A. I don't really recall anything in writing from Mr. Williams or his office. I know we talked any number of times at length on the phone about what the case was about. Between that and I think maybe reviewing the records you just indicated and finding out more about the case, I came to understand at some point what some issues were.

Q. I just wanted to, for the record, go over a

LISTO COURT REPORTING SERVICE ING 1/02/11 (312) 225-9648

list of what I think are the documents that you reviewed and discussed in your report.

A.   Okay.

Q.   I believe we're starting on page --

A.   11.

Q.   Page 11, yes.  Thanks.  So I just listed them as I understand them, is it correct you reviewed his academic records?

A.   Yes.

Q.   The report in 1997 by a Dr. Greenstein from the Metropolitan Correction Center?

A.   Yes.

Q.   The declaration of Lisa Rickert who was the mitigation specialist at trial?

A.   Yes.

Q.   A letter from Leon Spies dated May 4, 2004?

A.   Yes.

Q.   A report and declaration of Dr. Gelbort, the report being from the time of trial and the declaration being more recent?

A.   Yes, not only that but also the raw data that he generated in the case.

Q.   The declaration from Dr. Warren in this case?

A.   Yes, and I think he sent them an MMPI as well.

Case 3:10-cv-03074-LTS-KEM   Document 71   Filed 11/02/11   Page 36 of 84

Q. And the letter written by Melissa Piasecki --

A. Yes.

Q. -- from May 26, 2011. And then a DVD of Bureau of Prison records for Mr. Honken?

A. Yes.

Q. And then finally the declaration of Dr. Richard Dudley?

A. Yes.

Q. Were there any other documents that you reviewed that are not listed in this report?

A. Well, I think this claim for relief would be one of them because I didn't see it necessary to try to summarize that.

Q. Right.

A. I have this thing (indicating). I'm not sure if that's part of it.

Q. So some other case documents?

A. I think so. Then, you know, I might have done this on my own on the internet or someone might have sent it to me. I don't remember. I think I was just trying to understand exactly what happened because a lot of this stuff was hard for me to understand exactly what happened in the case and who was killed and things like that.

MR. NOLAN: Just for the record, this stuff,

what you're referring to is that petition?

THE WITNESS: Yes.

BY MR. KANE:

Q. If I could, in terms of documents, sort of collateral background documents or declarations describing Mr. Honken's life or upbringing or past, outside of the specific case documents --

A. I believe we've reviewed everything.

Q. We've covered everything?

A. Yes.

Q. Now, you just handed me this one order, document number 35 in this case. Can you look at that and just refresh yourself with what that is?

A. Oh, I think this is in response to the issue of what I would call third-party observer. I think this is the court ruling by Judge Reed in Iowa saying that third parties which I would mean you or third-party representatives wouldn't be allowed to be in the room while I did my examination.

Q. Do you recall reading on the second page -- let me find it. The second page here in paragraph number two the first sentence, and if you could read that out loud just for the record?

A. Right here?

Q. Yes, starting with the evaluation.

A. Dr. Reed -- or Judge Reed wrote, the evaluation is limited to the issues that are raised in ground nine of the movant's motion to vacate, set aside or correct sentence.

Q. Do you understand what that means?

A. No.

Q. Do you remember having a conversation or an understanding of what it meant when you went into the interview with Mr. Honken?

A. About ground nine?

Q. Right.

A. I don't remember anything specific about that, no.

Q. You had mentioned earlier in your direct examination that Mr. Honken refused to answer some questions about, specifically about the murder, about the murders, about the guilt issues and so forth; is that correct?

A. Yes.

Q. Did his reticence or refusal to answer those questions affect your evaluation or opinion of him in one way or the other?

A. Not significantly, no. I would have liked to have heard a more clear statement from him as to whether he admitted guilt or professed innocence. It

would have been interesting to hear about his account on specific days of whether he was using drugs or how that affected him. We didn't get into that. Other than that, it didn't make a significant difference to me.

Q. If I can just refer you back to this motion that you have here, do you mind if I take this for just a moment and refer you to claim nine?

A. If it's in there. I didn't print the whole thing.

Q. You didn't print the whole thing?

A. Yeah, so I'm not sure if it's in there or not. It's 192 pages.

Q. Right.

A. I think I printed just a portion.

Q. Yeah, I'm seeing like the first 30 or so. Okay. So would it be news to you if I told you that ground nine dealt only with the sentencing issues in Mr. Honken's case and not with his guilt or innocence of the murders?

A. Yes, that would be news to me.

Q. And so in asking these questions about his guilt or innocence, I assume you did not intend or knowingly run afoul of Judge Reed's order to focus only on the issues --

A. Oh, I wasn't trying to figure out whether he was guilty or innocent. I just wanted to see what he would say about everything he's and been through and what his life's been like. I was trying to march him through chronologically as best I could: Where did you grow up, when did you go to school, then 1992. I spent hours and hours asking him hundreds of questions; and then we got sort to a gap where he said, oh, I'm not going to talk about this gap. So I was just trying to move my way through his life month to month or year to year as best as I could.

Q. But it's fair to say, right, that if you didn't know about the order or what the order meant that you weren't sort of shaping your questions around it?

A. That's true.

Q. And Mr. Honken, I believe, when you asked those questions, informed you that his lawyers had instructed him not to answer?

A. Certain questions, yes.

Q. The list of records that we went over that are listed in your report, the collateral information about Mr. Honken's life, did you review those before or after or some combination before and after the evaluation and interview?

A. A combination. I think I had all the records in my possession before I saw him, perhaps I got sent something after my evaluation. I don't remember that though. So I had gone through everything and looked through it and was fairly familiar with the records before I went down to Terre Haute. And when I came back and had to write the report, then I spent a lot more time going through things in detail making sure I was quoting people correctly, that type of thing.

Q. You mentioned your assistant, Emily Edmunds. You said she's a doctor; is that correct?

A. I wouldn't describe her as a doctor. She's someone who has already earned her Ph.D. in clinical psychology, and she's now a fellow who is not yet licensed.

Q. As I recall, you gave three reasons why she came along for the evaluation. Correct me if I'm wrong or restate them if I misstate them, but, first, that she's more familiar with these tests because she's still doing it every day?

A. More familiar with the administration, yes. Not the tests themselves.

Q. But giving it?

A. Yes, when is the cut off and how many second, that kind of a thing.

Q. The second one, that you would feel safer with Mr. Honken if there were two of you as opposed to just one of you?

A. Yes.

Q. And the third being that you wanted an extra set of eyes --

A. Yes.

Q. -- at the evaluation?

A. Mm-hm.

Q. Did Miss -- excuse me, did Dr. Edmunds take any notes during the --

A. No.

Q. Did she contribute in any way to drafting the report or to you forming your opinions?

A. No. I did ask her to read the report and catch typos and things like that.

Q. But not -- she didn't give substantive input?

A. She did not.

Q. Is it fair to say then that your interest in having her there as an extra set of eyes is something that you didn't end up needing to rely on?

A. I don't think so. I don't think anything that unusual really happened.

Q. And she administered all the testing, correct?

A. Yes.

Q. And all of the testing was done on the first day; is that correct?

A. I think so, yes.

Q. Did you still have concerns about safety when you went back the second day?

A. Sure.

Q. And was that the reason why it was necessary, maybe the main reason why it was necessary to have her there when there was no testing taking place?

A. No. We thought maybe we would do more testing; but we wanted to go through the interview first; and then as that proceeded, I reached a decision that no further testing would be needed.

Q. Do you recall what the further testing was that you were considering?

A. Nothing in particular. We had scored the tests the first afternoon and got some sense of how things were going, but we wanted to see if anything else came up in the interview on the second day that would suggest a need to do some further testing. It didn't seem likely that that would be the case. I think -- I thought that, you know -- I'm not sure she had to come along that second day, that that would make much of a difference; but I wanted to be very thorough

and careful and have her there just in case because, as you know, once you get in there, you're not leaving and you're not going to have a second person come in necessarily.

Q. Do you have a copy of the handwritten notes that you took during the evaluation?

A. Yes.

Q. I want to go over some of these with you; and just so we're on the same page, I have about 30 pages that at least the first part of which seems to be from the evaluation itself. Is it easy for you to identify what that is? I mean the first page is, starts off with Dustin Honken, his age, date of birth.

A. Yes.

Q. And it looks like after about ten pages we have at the top the second day?

A. Yes.

Q. Actually that might be page 9.

A. Yes.

Q. I just wanted to go through some of this with you.

A. Okay.

Q. The last page, the last page of the first day?

A. Okay.

Q. That's it. It looks like, and tell me if I'm correct here, it looks like you did an interview until ten a.m.?

A. I think so.

Q. Or I guess actually down here it says break at 9:50, and then maybe you come back at 10:00 a.m. and start the testing?

A. Yes.

Q. Do you know what time you got there that morning?

A. I think we actually got to the prison about 7:45. It took awhile to get processed and admitted.

Q. Yeah. Do you know roughly how long that took that morning to actually -- until you were sitting down with Dustin?

A. I thought we were sitting down with him about 8:15 or 8:20 that day. He made a comment that he was surprised that we were there that fast. He was waiting for us when we got there on the first day.

Q. And then I see down at the bottom of that column MMPI II starts at 12:30; is that correct?

A. Yes.

Q. Can you tell me, I'm not seeing here the WAIS IV or the WTAR, and I'm guessing that maybe what you have listed here are the subtests. Can you sort of --

A. Yes.

Q. -- explain that to me, what was done when.

A. So it looks like we started with the Victoria, went on to the California Verbal Learning Test, and then you're right, we're listing WAIS IV subtests, Block Design, Digit Span, Letter Number Sequencing. Then went back to the California because there's a delay component, and then we did Matrix Reasoning. We went back to the California because there's another delay component, Similarities and Vocabulary, arithmetic, Symbol Search, Visual Puzzles, information, coding.

Q. Is that all part of the WAIS IV or are those separate tests?

A. Just about everything there is the WAIS IV except for the California and the Victoria.

Q. Okay.

A. I think everything else is WAIS IV.

Q. Then it looks like a Snickers break at 11:55?

A. Right.

Q. Then you come back at 12:05, and what follows that?

A. Looks like Wisconsin, FAS, which is a verbal fluency test, animal test, Benton naming test and the MMPI. I know we gave the WTAR. It must have been in

there someplace. I'm not quite sure where we gave the WTAR.

Q. Somewhere in there you gave the WTAR?

A. I believe so, yes. I don't think it was the second day. I think it was the first day someplace.

Q. It looks from here just from the run-through you just gave that you started the WAIS IV third, after the VSVT, which is the effort one; is that right?

A. Yes.

Q. And then the California Verbal Learning?

A. Yes.

Q. Then you get into parts of the WAIS IV?

A. Yes.

Q. Now, as I understood it on direct, you were explaining that the WTAR would sort of predict what the WAIS IV would then tell you?

A. In some ways, yes.

Q. And --

A. Not that the WAIS IV would tell us, but what should we expect out of the WAIS IV.

Q. But it doesn't look like you did the WTAR first, it looks like that was somewhere later; is that right?

A. Somewhere later, I think, yes. We usually give that towards the end. I think I just neglected to

write it down when we got to it.

Q. Is there overlap in what the WTAR tests and what the WAIS IV tests?

A. Overlap only in terms of you're measuring or predicting IQ scores; but the test itself is kind of different than what you -- the WTAR test is different than what you're doing with the WAIS.

Q. Are there subtests in the WTAR?

A. No.

Q. So it's just one straightforward test?

A. Yes.

Q. Now, in your report -- and I'm going to be going back and forth a little bit between your notes and the report. In your report on page 5, so it sound like you got there, and if we look at your notes, if we look at the first few pages of your notes, you're getting some of the basic facts about his family, where he's from, each of his family members and at least an initial touching on some of his -- I'm sorry, I'm getting ahead of you. I'll start over.

So starting at the page that says Dustin Honken 43 on top, there you go, yeah. It looks like these first few pages is that first interview portion when you get there and you're taking down some of the basics?

Case 3:10-cv-03074-LTS-KEM Document 71 Filed 11/02/11 Page 49 of 84

A. Yes.

Q. Family members, there's at least a page or so about some life events, took karate, things like that.

A. Okay.

Q. Never married. I assume at that point is there a sort of format to that, to the information you get, like almost like an intake form that you would use for anyone? Is that a structured aspect of the interview?

A. Yes. There's not a form. It's all something that I know to do.

Q. It's structured in your head?

A. Yes. Right.

Q. Fair enough. Then we got into those tests, right?

A. Yes.

Q. Now, on page 5 of your report, the first sentence of the first full paragraph, you say later on the first day of evaluation, Mr. Honken mentioned between cognitive tests that he had remembered other things about his father and family that he wanted to mention. Do you remember that?

A. In a general way, yes.

Q. Do you remember -- it says next that he was asked to keep that in mind and to return to this at a

later time in the evaluation?

A. Yes.

Q. And did that happen on that day, like did you get back to talking about those topics on that first day?

A. No. At the very beginning of the second day, I said now it would be a nice time to return to the stuff that you wanted to mention yesterday, at which point he proceeded to go on about his father and some other details.

Q. And was that with prompting or was it a back-and-forth or it was more --

A. No, it was, I thought notable in that -- it was notable for I think one or two reasons: That he gave me a prologue of not wanting to do it on that second day because he didn't want to trash his family -- I think he used the word trash -- and drag them into things. And I just listened without really saying anything, just took notes; and then after he went on for two or three minutes about how he didn't want to do it, then he did it for about half an hour with me, if anything, having to kind of move on the interview to other topics.

Q. Do you remember any of the things that he told you during that sort of recitation and memories

that he was describing about his family?  And I can refer you to -- you're right there, second day of your notes.

A.   Yes, those first three pages would be what he talked about in that first half hour or so.

Q.   And do you recall one of those things, and I'm down near the bottom of the first page being a description of his family, presumably mainly his father and brother as being akin to a prison gang, that they build you up, suck you in and have you do things for them?

A.   Yes.

Q.   Is that in your report?  Did you include that?

A.   I don't recall writing that specific sentence, no.

Q.   On the next page at the top, this is the page that starts with Alyssa was ignored, not drawn into criminal life, went into police work.

A.   Yes.

Q.   The next line, do you remember him saying that his brother is Mr. Roboto, no emotions?

A.   Yes.

Q.   Something along those lines, and that his dad could stay drunk for two weeks at a time?

A. Yes.

Q. Did those things make it into your report?

A. No, I don't think I mentioned those specifically.

Q. In the left-hand column there next to this information, it says -- can you read that actually? It says something about spontaneously?

A. There's two notes in the left-hand column. The top note says DH, meaning Dustin Honken, speaks spontaneously, no questions from me, ten or more minutes where he's kind of giving a monologue.

Q. Okay.

A. And the bottom note says very detailed stories about what dad said and did.

Q. Then you mentioned, I think it reflects this in your report -- sorry, I just need to locate this. Still on page 5, middle of the first full paragraph, you mention that attempts were made to get him to more quickly summarize his points and to otherwise move along?

A. Yes.

Q. And do you -- if you turn to the fourth page now, and this is the one that starts with grew up in Lutheran church.

A. Okay.

Q.   Actually do you want to just read that, what's in the column there, the first comment in the column?

A.   In the left column I had written insistent on getting out details about dad's capers.

Q.   And is this around the time in the interview that you're asking him, trying to get him to move along to summarize his points more quickly?

A.   It's somewhere in these pages, yes.

Q.   Does it help you to recall when you look at that next thing in the margin where it says now doesn't say much?

A.   Yes.  I think I had tried to move him on to other parts of his life beyond his father, and at that point he kind of clammed up.

Q.   I assume you understand that it's important to create a rapport or an atmosphere where someone who is being evaluated can be emotionally open?

A.   Yes.

Q.   So why then when Dustin is opening up here and starting to talk about feeling like he was raised by a prison gang and things like that, why then were you trying to hurry him up and move him along?

A.   It wasn't so much I think hurry him up as trying to get him to express the point he was trying to

make. So if the story is that his dad helped him dispose of a stolen car or poured beer in the cat's mouth or whatever the story might be, I'm very interested in hearing that; but I would like to make sure I understand in a fairly efficient way what is the point of the story. At that point of the interview, Mr. Honken seemed to get sidetracked by details. He would talk about, you know, maybe what kind of tires were on a car -- I'm making up an example, but things that just didn't seem to help me understand the point that he was trying to make.

Q. Would it be fair to say then that he had trouble sort of expressing the emotion that went with those stories he was telling you?

A. No, I don't think he had any trouble expressing the emotion. It's just that I think he was trying to sell me something. He was trying to sell me a version of what happened and the influence it had on him, which is fine; but I think he was getting caught up in what I saw, maybe rightly or wrongly, as inconsequential minor details that he would keep trying to correct and go back and try to correct later; and I was trying to get him to express what is the point you're trying to make about your dad, what is the event that transpired, how did that affect you. Instead at

times he seemed to be stuck on these details.

Q. So after you moved the interview along, do you remember what topics were addressed going forward from there.

A. First, I'm not sure I moved the interview along. I would just kind of say, well, your point would be then, something like that; and that didn't really change the way he told the story or how long he told the story.

Q. Well --

A. Once he got through the initial stories about his father's capers, for lack of a better word and how that affected him, I said does that summarize what you wanted to express, you said yesterday you had some additional things to tell me, he said yes; and then we moved on to other parts of the interview as reflected in my notes.

Q. At that point is that when he became less talkative or it says now doesn't say much?

A. Correct.

Q. You and Mr. Williams touched on a few issues where it sounds like you report a different statement or a different experience of an event than had been reported from another source.

A. From Dr. Dudley?

Q. At least one of the points.

A. Okay.

Q. I just wanted to look over that quickly.

(Discussion had off the record.)

Q. You mentioned -- actually before we get to the different events, Mr. Williams asked you about two points in your report, one on page 3 and one at the bottom of page 4 where you wrote that Mr. Honken denies ever being physically or sexually abused by anyone.

A. Yes.

Q. Did you ask him -- did you have a sort of clear definition of what physical abuse meant or did you ask him using those terms?

A. Those terms, have you been physically or sexually abused. He said no.

Q. And that was the extent of the inquiry?

A. It is.

Q. So the interview goes on; and it seems like, as you mentioned, it takes a chronological approach to moving forward through the late 80's and then the early 90's. There was a part in your report, and this is at the bottom of page 6 and then onto page 7. How did you understand Mr. Honken's description of his relationship with his brother at this time of his life? We're in like the late 80's, early 90's. What was Mr. Honken's

relationship with Jeff, his older brother, at those times, if you recall?

A.   Well, I think it fluctuated a little bit across that time frame; so I'm not sure exactly what point in time you're referring to.  In general I think it was a positive relationship.  I think at points generally later in time he seemed to become resentful of Jeff who he portrayed as being a guy making him do all the work and not getting any of the profits out of the drug manufacturing.

Q.   I wanted to ask you some questions generally, shift gears a little bit here and ask you some questions just about psychology in general.

A.   Okay.

Q.   Maybe you can help us lawyers with some basic ideas.

A.   Maybe.

Q.   I think I get -- I think I'm right about some of these basic ideas, but I want you to tell me if I'm not or if I'm wrong.

A.   Okay.

Q.   As a general matter, the family a child grows up into is going to typically affect the emotional or psychological development of the child?

A.   To some degree, yes.

Q.   To some degree?

A.   Yes.

Q.   Is it an important degree or is it --

A.   It often is, yes.

Q.   And growing up in a dysfunctional family, I assume, is going to affect a child's emotional and psychological development?

MR. WILLIAMS:  I'm going to object to the term dysfunctional unless you define dysfunctional. That's such -- it's a vague question from that standpoint.

BY MR. KANE:

Q.   You can go ahead and answer the question.

A.   Most families are kind of messed up, you know.  So where does the function and dysfunction start and stop, you know.  That's the first question or first reaction I would have.  But, sure, the worse your family environment as a kid, the more likely it is to give you some problems.

Q.   And most families have dysfunction or maybe describe themselves as dysfunctional at some time?

A.   Yes, to one degree or another.

Q.   Do most families have a parent who stays drunks for weeks at a time?

A.   Most meaning 51 percent, I would say no.

Q. Do most parents -- or do most children have at least one parent who actively recruits them into criminal behavior?

A. No.

Q. Do most children have a parent who lies constantly?

A. It's possible. I don't know about most, but that's not that unusual.

Q. It's not that unusual for one of a child's two parents to lie constantly?

A. I'd say it's not that unusual. It depends what you mean by usual or unusual. I don't think it's 51 percent of the time, but I think it happens a lot. 20 percent, 30 percent. There's a lot of crazy people out there. You know, you're talking to someone here who sees dysfunctional people every day of his career either because of cognition or because worse, because of psychological problems. Psychological problems and dysfunction are endemic. When I get to see a normal family I get excited. It's not -- it's not the usual thing in my line of work.

Q. If you're trying to understand someone who comes to you, trying to understand them as a professional, as a psychologist, it's important to understand their particular experience of dysfunction;

is it not?

A.   Yes.

Q.   In fact, that's -- psychology does a lot of that; doesn't it?

A.   Yes.

Q.   You agree that children of alcoholics and other substance abusers are at risk, at greater risk themselves to later become alcoholics or substance abusers?

A.   Yes.

Q.   At greater risk for other problems, mood problems, anxiety problems, things like that?

A.   Yes, I think so.

Q.   What about when subjectively a child sincerely and persistently fears one of their parents, fears violence from them, is that going to affect that child's psychological and emotional makeup?

A.   Certainly at that time and perhaps over the long term, yes.

Q.   I assume it's a pretty basic tenet also of psychology that attachment and emotional bonding between mother and child is an important part of emotional development?

A.   Yes.

Q.   If there's something that interferes with

that attachment and bonding in a significant way, is that going to affect who the child ends up being, how he develops emotionally?

A. It might.

Q. Is that the type of thing that psychology, one of the types of things that psychology can look into?

A. Yes.

Q. If the thing that comes between that emotional bonding between a mother and child -- consider a hypothetical situation where the mother was raped and as a result of the rape became pregnant with a child which she then gave birth to and raised, is that type of experience the type that could be detrimental to the emotional bonding between a mother and child?

A. The child who was the product of a rape?

Q. Yes.

A. Yes, it could.

Q. And are you aware of psychological research or psychological reports of situations like that?

A. Nothing specific, no.

Q. But from general principles you would understand that to be an issue?

A. Yes, it could be.

Q. I brought my DSM. Is it fair to say that there are a number of major mental illnesses which if they run in your family you are at greater risk for getting them?

A. Yes.

Q. Would that include depression?

A. Yes.

Q. Would that include bipolar disorder?

A. I don't know that specifically, but I wouldn't be surprised if there's research to that effect, yes.

Q. Substance abuse?

A. Yes.

Q. Setting aside the dysfunction of negative influence or negative events, a functional family, on those rare events when we see one of those beautiful functional families, there's this, I think in psychology they use the term nurturing. Is that something that gets used?

A. Yes.

Q. It's not a highly technical term. I think we can all understand it.

A. Yes.

Q. So if I understand correctly, there are positive influences that a child needs? A child

actually has emotional needs; is that true?

A. Yes.

Q. And those needs are either met or if they're not met, that child finds some way whether subconscious or unconscious to cope?

A. It could be, yes.

Q. If I understand correctly from Mr. Williams' direct examination and based on the fact that you have reviewed a number of documents -- let me back up.

You didn't review all of the declarations that were submitted with the motion, the petition, the claims that we submitted; is that correct?

A. I'm not sure.

Q. So you're not sure if there are any number of other family witnesses, childhood witnesses who attest to some of the dysfunction and some of the problems in Mr. Honken's upbringing?

A. I'm not aware that such adaptations exist. I haven't seen them.

Q. You've relied a fair bit, I think, in your report on Dustin's self-reporting; is that correct?

A. Yes.

Q. In the forensic setting, is it important to review collateral information from other sources to

corroborate or compare a self-report?

A. It could be, yes.

Q. And you didn't review or hear any, for lack of a better word, civilian declarations, people who knew and grew up with Dustin?

A. Indirectly, yes, in that I think Dr. Dudley reported on the results of some of his interviews. It's my understanding he went to Iowa and talked to some of these folks. So I read what they told him, but I don't remember reading their personal depositions or attestations themselves.

Q. Did you ask to see materials like that?

A. No. I didn't know that they existed.

Q. I took it from Mr. Williams' direct examination that your analysis is sort of assuming that these -- the accounts of Mr. Honken's dysfunctional upbringing, you accept that?

A. More or less, yes.

Q. So the basic sort of psychological ideas that I went through with you, you would accept them as they apply to Dustin, that whatever family of origin he had, it affected his emotional development?

A. If I understand the question, yes. He underwent -- he reportedly underwent a number of negative experiences with his dad in particular, and

that could potentially lead to him not being as happy or as well-adjusted person as he might have been had he had a better father.

Q. And that sort of ties in with the idea of parental modeling, that children often model their parents' behavior, their caregivers' behavior?

A. Yes.

Q. So you would agree with me then that there is information then or you're accepting for the purposes of this deposition that there is information indicating that dysfunction in Mr. Honken's life impacted his emotional development?

MR. WILLIAMS: Let me just pose an objection that you worded it, you started to word it one way, Tim, and you changed it, and I want to make sure I understand. You're asking him if he assumed for purposes of his opinion that there was dysfunction in the family; is that the question you're asking him, or maybe you just want to reword it?

MR. KANE: No, that's correct, but then I'm building on top of that and saying assuming that there was this dysfunctional upbringing, you accept that it had an impact on Mr. Honken's psychological development?

BY THE WITNESS:

A.   Yes, in that he reports having an unhappy childhood.

Q.   And you did not reach any actual specific diagnoses of Mr. Honken; is that correct?

A.   Correct.

Q.   Including you did not diagnose him with antisocial personality disorder; is that correct?

A.   I did not.

Q.   Your report mentions in a couple places that Mr. Honken had at some point been treated with Buspar. It's some sort of prescription medication?

A.   Yes.

Q.   What is that used to treat?

A.   I think psychiatrists use all kinds of drugs to treat a million different things.  I don't know what the specific indication was for him.  I think generally it's used to treat people who have problems with anxiety or people who have psychotic spectrum problems.

Q.   And Paxil, your report indicates that he had been prescribed with that at some point.  Do you know what that is used to treat?

A.   Typically I believe it's used to treat depression.

Q.   You mentioned and discussed with Mr. Williams on direct the methamphetamine abuse that Dustin

reported over a series of months in '92, '93 time frame; is that correct?

A.  Yes.

Q.  You'd agree with me that methamphetamine affects brain functioning?

A.  Not necessarily.

Q.  Would you agree that a daily habit of using methamphetamine for a few months would affect brain functioning?

A.  I think it depends on what you mean by brain functioning.  Are you talking about like performance on a test we give or a person acting goofy and high.  Those are all related to the brain I guess.

Q.  Let's start with goofy and high.

A.  Yes.

Q.  Would a person who was taking methamphetamine every day for a number of months act goofy and high?

A.  I think during the intoxication phase they potentially would, yes.

Q.  What other types of behaviors would be expected during the intoxication phase of methamphetamine abuse?

A.  I would just go back to what Mr. Honken told me were the usual effects.  I think the feeling of elation and feeling happy, happier than you usually

would are the typical effects during what I would call the intoxication phase.

Q. What about objective effects? I mean those sound like subjective, experience. Are there objective effects that the mental health professionals have identified and described?

A. Well, you know, Dr. Piasecki wrote a literature review based on some older literature about some of the typical effects, and I would just refer back to her report. It's tremendously variable. Some people can use a little bit of the drug and have some kind of effect in between periods of being high. Other people can use a tremendous amount and not really suffer any consequences in between the intoxication phases.

Q. So it's fair to say you don't have specific expertise in methamphetamine abuse or the effects of methamphetamine abuse; is that fair?

A. That's correct.

Q. You mentioned before --

A. Could we --

Q. Do you want to take a ten-minute break?

A. Just a few.

Q. Okay, let's take a break.

(Whereupon a recess was taken at 3:00

p.m. until 3:05 p.m.)

BY MR. KANE:

Q. I just have a few more questions. This is the first time you've testified in a capital case, correct?

A. Yes.

Q. And so you don't have any particular expertise in discerning what is mitigating or not mitigating in a capital case; is that fair?

A. No, I'm not sure I would agree with that.

Q. Do you know what the legal standard is for what's considered admissible mitigating evidence in a capital case?

A. No.

Q. You had mentioned in your report, at the very last page here, you say that Mr. Honken -- and I'm in the second to last paragraph. You say Mr. Honken's brother Jeff and sister Alyssa were exposed to the same genetic family environmental factors as was Dustin Honken.

A. Yes.

Q. Have you reviewed any documents regarding the extent or the existence of criminal activity by Mr. Jeff Honken?

A. Only what Dustin alleged about him. That's

the only think I know about him.

Q. So you're not aware of any corroborative information out there that would support that information, that Jeff was involved in running drugs, that sort of thing?

A. I'm aware of Dustin's claim. I'm not aware of any other evidence that either supports or refutes that.

MR. KANE: Okay. That's all we've got.

MR. WILLIAMS: I just have actually just a very short follow-up.

REDIRECT EXAMINATION

by Mr. Williams:

Q. One of the questions asked just a few minutes ago was about the Buspar and the Paxil that was prescribed to Dustin Honken at some point. Are you familiar that was prescribed to him at some point during his incarceration?

A. Yes.

Q. From your understanding and review of the bureau of prison records, was he going through a period where he was claiming to be anxious or claiming to be depressed for some period of time?

A. Yes.

Q. And let's assume it's true. Let's assume he

was depressed or anxious at that period of time. Does that indicate that he has any type of psychological impairment?

A. It does not.

Q. Why not? Why don't you explain that?

A. I think those were brief events where he felt depressed or anxious. As I recall, they seemed to be cause related. I think at one time he was being labeled a snitch and was anxious about what would happen if he got back with people who thought he was a snitch. And then, of course, you know, he's facing a trial I think at one point where they could give the death penalty. I think that was another time he became depressed or anxious, which is understandable.

Q. Can somebody go through kind of a temporary period, if you will, of anxiety or temporary period of depression and still be mentally healthy?

A. Yes.

MR. WILLIAMS: No further questions.

MR. KANE: No questions.

MR. WILLIAMS: Okay. That's it.

WITNESS FURTHER SAITH NOT

(3:10 p.m.)

CERTIFICATE

I, SUSAN M. REED, Certified Shorthand Reporter for the State of Illinois, do hereby certify that CHRISTOPHER GROTE, Ph.D., was first duly sworn by me to testify the whole truth and that the above deposition was reported stenographically by me and reduced to typewriting under my personal direction.

I further certify that the said deposition was taken at the time and place specified and that the taking of said deposition commenced on the 20th day of October, A.D., 2011, at 1:30 o'clock P.M.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel or financially interested directly or indirectly in this action.

Witness my official signature this _____ day of _____, A.D., _____.

_____
SUSAN M. REED, C.S.R.
License No. 084-003114

**'**

'92 [1] - 68:1
'93 [3] - 28:18, 28:21, 68:1

**0**

084-003114 [1] - 73:22

**1**

1 [3] - 17:17, 34:22, 35:9
10 [1] - 14:9
10:00 [1] - 46:6
11 [3] - 29:17, 36:5, 36:6
113 [1] - 21:7
118 [2] - 19:16, 19:22
119 [2] - 20:4, 20:6
11:55 [1] - 47:19
122 [1] - 21:1
127 [1] - 21:5
12:05 [1] - 47:21
12:30 [1] - 46:21
14 [1] - 29:18
15 [5] - 2:22, 18:7, 20:12, 24:13, 24:14
16 [10] - 20:12, 22:16, 24:11, 24:19, 24:23, 24:25, 25:3, 25:5, 25:8
19106 [1] - 2:4
192 [2] - 35:2, 40:13
1983 [2] - 3:19, 28:5
1987 [1] - 4:1
1988 [1] - 4:6
1989 [4] - 4:1, 4:6, 11:22
1992 [1] - 41:6
1995 [1] - 8:11
1997 [1] - 36:10
1998 [1] - 6:23
1:30 [2] - 1:15, 73:11
1:35 [1] - 3:2

**2**

20 [1] - 60:14
200 [1] - 7:2
2002 [4] - 4:23, 5:21, 6:24, 7:12
2004 [2] - 22:5, 36:16
2006 [1] - 6:9
2010 [2] - 5:21, 7:13

2011 [3] - 1:16, 37:3, 73:11
20th [2] - 1:16, 73:10
215/928-0520 [1] - 2:5
219 [1] - 1:14
26 [1] - 37:3

**3**

3 [4] - 2:17, 2:22, 25:17, 57:7
30 [3] - 40:16, 45:9, 60:14
319/363-6333 [1] - 2:9
32 [1] - 2:18
35 [1] - 38:12
3:00 [1] - 69:25
3:05 [1] - 70:1
3:10 [1] - 72:23

**4**

4 [6] - 7:12, 22:12, 26:1, 26:24, 36:16, 57:8
4/6 [1] - 22:14
400 [1] - 2:8
401 [1] - 2:8
42nd [2] - 21:12, 21:15
43 [1] - 49:22

**5**

5 [4] - 14:8, 49:14, 50:17, 53:17
50 [1] - 19:2
51 [2] - 59:25, 60:13
52407 [1] - 2:9
545 [1] - 2:4
5th [1] - 1:14

**6**

6 [2] - 22:13, 57:22
60 [1] - 12:15
601 [1] - 2:4

**7**

7 [1] - 57:22
70 [1] - 12:15
71 [1] - 2:18
7:45 [1] - 46:12

**8**

8 [1] - 27:23
80 [1] - 13:18
80's [2] - 57:20, 57:25
81st [1] - 21:8
88th [1] - 19:16
8:15 [1] - 46:17
8:20 [1] - 46:17

**9**

9 [3] - 27:22, 27:24, 45:18
90 [1] - 14:11
90's [2] - 57:21, 57:25
90th [2] - 20:6, 21:14
91st [1] - 21:14
93rd [2] - 21:1, 21:14
95 [1] - 14:11
96th [1] - 21:6
97 [1] - 21:11
9:50 [1] - 46:6

**A**

A.D [3] - 1:16, 73:11, 73:18
a.m [2] - 46:3, 46:6
ABCN [2] - 7:23, 8:4
abilities [2] - 24:9, 30:12
ability [9] - 18:14, 19:6, 20:1, 20:19, 21:3, 21:4, 21:6, 21:22, 27:14
able [3] - 27:18, 29:2, 29:9
abnormal [1] - 22:8
ABPP [3] - 7:21, 8:3
absolutely [1] - 17:3
abuse [7] - 30:2, 57:12, 63:12, 67:25, 68:22, 69:17, 69:18
abused [3] - 25:21, 57:9, 57:15
abusers [2] - 61:7, 61:9
abusive [3] - 27:2, 30:1, 31:10
academic [3] - 4:18, 11:8, 36:8
Academy [1] - 9:25
accept [3] - 65:17, 65:20, 66:22

accepted [2] - 3:22, 4:6
accepting [1] - 66:9
access [2] - 28:13, 28:23
accident [2] - 13:8, 18:21
account [3] - 29:22, 30:19, 40:1
accounts [1] - 65:16
accurate [2] - 4:12, 20:6
achieved [1] - 20:3
act [2] - 6:16, 68:17
acting [4] - 6:12, 6:14, 6:16, 68:12
action [1] - 73:16
actions [1] - 23:12
actively [1] - 60:2
activities [1] - 30:19
activity [1] - 70:23
actual [1] - 67:3
adaptations [1] - 64:19
additional [1] - 56:15
addressed [1] - 56:3
adjusted [1] - 66:2
administered [2] - 17:16, 43:24
administering [1] - 16:16
administration [1] - 42:21
administrator [1] - 6:7
admissible [1] - 70:12
admitted [3] - 13:17, 39:25, 46:12
Adult [4] - 18:13, 18:24, 19:11, 19:23
advisor [1] - 6:17
affect [7] - 39:21, 55:25, 58:23, 59:6, 61:16, 62:2, 68:8
affected [3] - 40:3, 56:13, 65:22
affects [1] - 68:5
afoul [1] - 40:24
Africa [1] - 6:15
afternoon [1] - 44:18
age [1] - 45:13
ago [3] - 5:3, 13:17, 71:15
agree [5] - 61:6, 66:8, 68:4, 68:7, 70:10
ahead [2] - 49:20, 59:13
akin [1] - 52:9

alcoholics [2] - 61:6, 61:8
allegations [1] - 30:2
alleged [1] - 70:25
alleging [1] - 13:9
allowed [3] - 12:25, 13:3, 38:18
almost [2] - 5:3, 50:7
alone [1] - 32:4
Alyssa [2] - 52:18, 70:18
amended [1] - 34:22
AMERICA [1] - 1:6
America [1] - 8:6
American [3] - 3:24, 7:20, 7:24
amount [3] - 5:15, 22:11, 69:13
analysis [1] - 65:15
Angela [1] - 28:20
anger [1] - 22:22
animal [1] - 47:24
answer [7] - 17:25, 29:6, 29:15, 39:15, 39:20, 41:19, 59:13
answered [1] - 18:1
answering [1] - 18:9
answers [1] - 24:7
antisocial [1] - 67:7
anxiety [4] - 31:1, 61:12, 67:18, 72:16
anxious [6] - 31:2, 71:22, 72:1, 72:7, 72:9, 72:14
anyway [1] - 15:25
APA [1] - 4:5
appeared [2] - 2:5, 2:10
appearing [1] - 30:25
apples [2] - 18:23
apply [1] - 65:21
applying [1] - 12:15
appointments [1] - 4:18
approach [1] - 57:19
appropriate [2] - 5:14, 5:17
appropriately [2] - 5:12, 5:14
approved [2] - 3:24, 4:5
April [2] - 28:21, 28:22
area [4] - 7:5, 9:5, 9:20, 21:3
areas [5] - 20:1, 20:18, 21:22, 21:24, 23:20
arena [1] - 13:5

arithmetic [1] - 47:11
Arizona [1] - 28:4
arrangements [1] - 26:6
arrest [2] - 28:5, 28:12
arrested [1] - 32:12
arrived [1] - 29:22
articles [3] - 9:2, 9:4, 10:3
articulate [2] - 27:14, 27:16
aside [2] - 39:3, 63:14
aspect [1] - 50:8
assess [1] - 10:19
assessments [1] - 12:2
assistance [1] - 34:13
Assistant [1] - 2:8
assistant [8] - 4:7, 4:21, 16:5, 16:15, 16:20, 16:21, 16:23, 42:10
associate [2] - 4:19, 6:10
Association [1] - 3:25
assume [10] - 29:25, 30:2, 33:19, 40:23, 50:5, 54:16, 59:6, 61:20, 71:25
assumed [1] - 66:16
assuming [4] - 31:9, 34:25, 65:15, 66:21
atmosphere [1] - 54:17
attachment [2] - 61:21, 62:1
attempts [1] - 53:18
attention [3] - 20:22, 20:23, 23:15
attest [1] - 64:16
attestations [1] - 65:11
Attorney [1] - 2:8
attorney [2] - 73:13, 73:14
authored [1] - 15:2
available [1] - 28:17
average [3] - 21:11, 21:13, 21:25
award [1] - 8:19
aware [6] - 9:11, 62:20, 64:19, 71:2, 71:6
awhile [2] - 34:6, 46:12

**B**

bachelor's [1] - 3:18
back-and-forth [1] - 51:12
background [3] - 3:17, 25:19, 38:5
bad [2] - 31:17, 31:18
ball [1] - 24:5
bank [2] - 13:25, 33:10
bankrupt [1] - 7:10
based [4] - 9:24, 15:14, 64:8, 69:8
basic [5] - 49:17, 58:15, 58:19, 61:20, 65:19
basics [1] - 49:25
basis [2] - 9:19, 28:6
beautiful [1] - 63:16
became [4] - 5:3, 56:18, 62:12, 72:13
become [3] - 11:1, 58:7, 61:8
beer [1] - 55:2
beginning [1] - 51:6
behalf [2] - 2:5, 2:10
behavior [3] - 60:3, 66:6
behavioral [1] - 4:11
Behavioral [5] - 4:24, 5:22, 5:25, 6:10, 7:13
behaviors [1] - 68:20
bell [1] - 19:19
bell-shaped [1] - 19:19
benefit [3] - 12:8, 18:17, 30:9
beniggen [1] - 19:4
benign [2] - 19:4
Benton [1] - 47:24
best [5] - 5:2, 6:19, 18:5, 41:5, 41:11
better [4] - 17:8, 56:12, 65:4, 66:3
between [12] - 10:11, 15:21, 21:12, 35:21, 49:13, 50:20, 61:22, 62:9, 62:10, 62:15, 69:12, 69:14
beyond [2] - 10:17, 54:14
bibliography [1] - 9:1
bipolar [1] - 63:8
birth [2] - 45:13, 62:13

bit [6] - 6:4, 49:13, 58:3, 58:12, 64:21, 69:11
blame [3] - 22:24, 23:1, 23:12
Block [1] - 47:6
board [5] - 7:17, 7:19, 7:22, 7:25, 8:13
Board [2] - 7:21, 7:24
bonding [4] - 61:21, 62:1, 62:10, 62:15
book [1] - 10:3
books [1] - 10:3
bottom [8] - 7:17, 24:16, 26:24, 46:20, 52:7, 53:13, 57:8, 57:22
brain [8] - 12:5, 12:10, 19:7, 68:5, 68:8, 68:10, 68:13
break [4] - 46:5, 47:19, 69:22, 69:24
brief [3] - 3:16, 28:11, 72:6
briefly [3] - 15:19, 17:19, 25:15
bright [4] - 21:20, 21:21, 23:19, 23:25
brother [5] - 52:9, 52:22, 57:24, 58:1, 70:18
brought [1] - 63:1
build [1] - 52:10
building [1] - 66:21
bulk [1] - 6:4
Bureau [1] - 37:4
bureau [1] - 71:21
business [1] - 3:21
Buspar [2] - 67:10, 71:15
BY [6] - 14:21, 34:24, 38:3, 59:12, 66:25, 70:2

**C**

C.J [2] - 2:7, 34:21
C.S.R [1] - 73:21
C10-3074 [1] - 1:5
California [6] - 24:18, 47:4, 47:7, 47:9, 47:16, 48:10
Cambridge [1] - 11:18
candidate [1] - 11:19
candidates [1] - 8:9
capable [1] - 24:8
capers [2] - 54:5,

56:12
Capital [1] - 2:3
capital [6] - 33:19, 33:20, 34:7, 70:4, 70:9, 70:13
car [4] - 13:8, 18:20, 55:2, 55:9
career [1] - 60:16
careers [1] - 5:9
careful [1] - 45:1
caregivers' [1] - 66:6
case [48] - 10:10, 11:11, 12:23, 13:7, 14:18, 14:22, 15:6, 16:1, 17:16, 18:17, 20:14, 23:21, 29:23, 30:3, 30:8, 31:4, 31:6, 31:7, 31:24, 32:11, 32:12, 32:22, 33:1, 33:10, 33:14, 33:18, 33:19, 33:20, 34:1, 34:7, 34:12, 35:8, 35:13, 35:21, 35:23, 36:22, 36:23, 37:17, 37:23, 38:7, 38:12, 40:19, 44:22, 45:1, 70:4, 70:9, 70:13
cases [12] - 13:5, 13:6, 13:13, 13:14, 14:3, 14:4, 14:10, 14:13, 16:2, 19:12, 33:17, 33:24
casings [1] - 32:20
cat's [1] - 55:2
catch [1] - 43:16
categories [1] - 25:1
caught [1] - 55:19
caused [3] - 19:9, 23:2, 31:14
Cedar [1] - 2:9
center [1] - 5:11
Center [5] - 4:5, 4:7, 11:14, 34:4, 36:11
CENTRAL [1] - 1:2
certain [2] - 27:17, 41:20
certainly [1] - 61:18
certainty [3] - 15:10, 15:11, 15:16
CERTIFICATE [1] - 73:1
certification [2] - 7:16, 7:25
Certified [2] - 1:13, 73:2
certified [3] - 7:18, 7:19, 8:14
certify [3] - 73:3, 73:8, 73:12
chairman [6] - 6:10,

6:12, 6:14, 6:15, 6:16, 6:17
change [1] - 56:8
changed [1] - 66:15
chapters [1] - 10:4
charge [2] - 5:24, 12:17
charged [1] - 32:12
Chicago [2] - 1:15, 32:15
chief [1] - 11:21
child [13] - 31:19, 58:22, 58:24, 61:14, 61:22, 62:2, 62:10, 62:13, 62:16, 62:17, 63:25, 64:4
child's [3] - 59:6, 60:9, 61:17
childhood [2] - 64:16, 67:2
children [4] - 60:1, 60:5, 61:6, 66:5
choice [1] - 9:10
choices [1] - 32:2
CHRISTOPHER [4] - 1:8, 2:16, 3:4, 73:4
Christopher [1] - 3:11
chronological [1] - 57:19
chronologically [1] - 41:5
church [1] - 53:24
citations [1] - 34:18
Civil [1] - 1:11
civil [3] - 13:6, 13:7, 32:20
civilian [1] - 65:4
claim [5] - 34:12, 34:22, 37:11, 40:8, 71:6
claiming [2] - 71:22
claims [1] - 64:12
clammed [1] - 54:15
classes [1] - 6:1
clear [2] - 39:24, 57:12
clearly [1] - 19:19
clinic [1] - 8:10
clinical [12] - 3:23, 7:19, 8:14, 10:9, 10:12, 10:15, 10:19, 11:1, 11:2, 11:4, 22:12, 42:13
Clinical [1] - 7:24
coding [1] - 47:12
cognition [2] - 30:20, 60:17
cognitive [10] - 17:22, 18:5, 19:1,

19:10, 20:1, 20:19, 21:3, 24:9, 30:17, 50:20

collateral [3] - 38:5, 41:22, 64:25
College [2] - 8:21, 11:14
column [6] - 46:21, 53:5, 53:8, 54:2, 54:3, 54:4
combination [2] - 41:24, 42:1
coming [2] - 7:7, 8:6
commenced [1] - 73:10
comment [2] - 46:17, 54:2
committee [1] - 5:19
communication [1] - 15:21
community [1] - 5:18
Community [1] - 2:3
compare [2] - 18:23, 65:1
competitive [1] - 12:14
completed [1] - 4:6
completely [1] - 17:15
component [2] - 47:8, 47:10
comprehensively [1] - 17:15
concerns [1] - 44:5
concordant [1] - 18:4
conduct [2] - 8:8, 35:11
conference [1] - 9:23
consequences [1] - 69:14
consider [1] - 62:11
considerable [1] - 21:20
considered [2] - 29:19, 70:12
considering [1] - 44:16
consisted [1] - 15:19
consistent [1] - 26:23
constant [1] - 19:12
constantly [2] - 60:6, 60:10
context [1] - 23:22
continuing [1] - 10:1
contribute [1] - 43:13
contribution [1] - 5:17

conversation [1] - 39:7
convicted [1] - 32:1
convictions [1] - 32:3
convince [1] - 26:7
Cook [2] - 13:16, 32:16
cope [1] - 64:5
copy [3] - 3:12, 4:12, 45:5
correct [27] - 14:24, 22:2, 27:4, 33:22, 34:9, 34:10, 36:7, 39:4, 39:18, 42:11, 42:17, 43:25, 44:3, 46:2, 46:21, 55:22, 56:20, 64:13, 64:22, 66:20, 67:4, 67:5, 67:7, 68:2, 69:19, 70:5
Correction [2] - 34:4, 36:11
correctly [6] - 12:21, 18:2, 19:6, 42:9, 63:24, 64:7
corroborate [1] - 65:1
corroborative [1] - 71:2
cost [1] - 12:8
cost-benefit [1] - 12:8
counsel [3] - 34:13, 73:13, 73:14
counseling [6] - 10:10, 10:11, 10:12, 10:16, 10:21, 11:2
country [2] - 5:2, 12:15
County [2] - 13:16, 32:16
couple [2] - 14:2, 67:9
course [4] - 9:24, 10:2, 24:2, 72:11
courses [1] - 6:3
COURT [1] - 1:1
court [2] - 33:6, 38:16
court's [1] - 23:15
courts [1] - 14:15
Courts [1] - 1:11
covered [1] - 38:9
crazy [1] - 60:14
create [1] - 54:17
credits [1] - 10:2
crime [1] - 32:1
crimes [1] - 29:14
criminal [9] - 13:5,

13:13, 13:14, 30:19, 32:20, 33:17, 52:19, 60:3, 70:23
criticism [1] - 22:24
CROSS [1] - 32:7
cross [1] - 14:19
Cross [1] - 2:18
CROSS-EXAMINATION [1] - 32:7
cross-examination [1] - 14:19
Cross-Examination [1] - 2:18
cum [1] - 3:19
current [4] - 8:9, 11:7, 26:2, 30:17
curriculum [4] - 3:13, 4:13, 6:20, 10:8
curve [1] - 19:19
custody [1] - 26:6
cut [2] - 22:15, 42:24
CVLT [2] - 24:11, 24:18

## D

dad [7] - 31:5, 31:17, 52:24, 53:14, 55:1, 55:24, 65:25
dad's [1] - 54:5
daily [4] - 28:6, 28:8, 28:9, 68:7
damage [1] - 30:12
data [2] - 9:15, 36:21
date [2] - 4:15, 45:13
dated [1] - 36:16
days [4] - 7:4, 29:3, 29:10, 40:2
dealing [1] - 9:4
dealt [1] - 40:18
Dearborn [1] - 1:14
death [7] - 23:22, 30:24, 33:21, 33:25, 34:1, 34:5, 72:13
decision [1] - 44:13
declaration [5] - 36:13, 36:18, 36:19, 36:23, 37:6
declarations [3] - 38:5, 64:11, 65:4
Defendant [3] - 1:7, 1:9, 2:10
defender [3] - 14:2, 33:3, 33:8
Defender [1] - 2:3
defender's [2] - 32:19, 32:21
defense [1] - 13:10

defensiveness [1] - 22:10
define [1] - 59:9
definition [1] - 57:12
degree [9] - 3:18, 13:22, 15:10, 15:15, 31:4, 58:25, 59:1, 59:3, 59:22
delay [2] - 47:8, 47:10
demand [1] - 20:23
demands [1] - 22:24
demented [2] - 13:18, 13:22
dementia [1] - 12:10
denies [2] - 25:21, 57:8
Department [5] - 2:7, 5:24, 7:14, 14:1, 33:15
department [2] - 5:8, 6:8
departments [1] - 4:10
deposition [5] - 1:8, 66:10, 73:5, 73:8, 73:10
depositions [2] - 1:12, 65:10
depressed [5] - 31:2, 71:23, 72:1, 72:7, 72:14
depression [4] - 31:1, 63:6, 67:23, 72:17
describe [3] - 11:6, 42:12, 59:21
described [2] - 8:15, 69:6
describing [2] - 38:6, 52:1
description [2] - 52:8, 57:23
Design [1] - 47:6
designed [3] - 17:21, 18:13, 24:24
detail [4] - 21:10, 27:18, 27:21, 42:8
detailed [1] - 53:13
details [5] - 51:10, 54:5, 55:7, 55:21, 56:1
detected [1] - 27:11
detrimental [1] - 62:15
developed [1] - 9:16
development [6] - 58:24, 59:7, 61:23, 65:22, 66:12, 66:24
develops [1] - 62:3

deviant [1] - 22:13
DH [1] - 53:9
diagnose [1] - 67:6
diagnoses [1] - 67:4
difference [7] - 10:11, 10:15, 10:17, 11:1, 35:3, 40:4, 44:25
different [9] - 10:14, 20:1, 20:4, 49:6, 56:22, 56:23, 57:6, 67:15
difficult [1] - 11:3
Digit [1] - 47:6
diplomat [1] - 8:10
Direct [1] - 2:17
direct [6] - 29:2, 39:14, 48:14, 64:8, 65:14, 67:25
direction [1] - 73:7
directly [2] - 32:24, 73:15
director [9] - 4:24, 5:3, 5:4, 5:5, 5:22, 6:4, 6:22, 7:13, 11:15
discerning [1] - 70:8
discussed [2] - 36:2, 67:24
discussion [2] - 20:10, 57:4
disease [1] - 19:8
disorder [2] - 63:8, 67:7
disorders [1] - 12:11
dispose [1] - 55:2
distance [1] - 9:24
distance-learning [1] - 9:24
distinction [1] - 10:24
DISTRICT [2] - 1:1, 1:1
District [1] - 1:11
DIVISION [1] - 1:2
divorce [2] - 26:4, 26:6
doctor [2] - 42:11, 42:12
doctoral [1] - 12:17
document [2] - 34:20, 38:12
documents [8] - 36:1, 37:9, 37:17, 38:4, 38:5, 38:7, 64:9, 70:22
done [12] - 5:15, 13:5, 15:22, 15:23, 16:2, 16:11, 17:15, 21:9, 37:19, 44:2, 47:2

**down** [18] - 4:3, 4:23, 5:21, 6:21, 9:23, 10:8, 11:16, 13:16, 19:10, 28:4, 42:6, 46:5, 46:14, 46:16, 46:20, 49:1, 49:24, 52:7
**Dr** [22] - 14:17, 14:22, 16:22, 17:12, 26:12, 26:13, 26:15, 26:18, 26:22, 29:19, 29:21, 31:12, 36:10, 36:18, 36:23, 37:7, 43:10, 56:25, 65:6, 69:7
**dr** [1] - 39:1
**drafting** [1] - 43:13
**drag** [1] - 51:17
**draw** [1] - 23:14
**drawn** [1] - 52:18
**dried** [1] - 28:13
**drug** [3] - 27:25, 58:10, 69:11
**drugs** [10] - 28:13, 28:15, 28:17, 28:19, 28:20, 28:23, 28:25, 40:2, 67:14, 71:4
**drunk** [2] - 31:10, 52:25
**drunks** [1] - 59:24
**DSM** [1] - 63:1
**Dudley** [8] - 26:12, 26:15, 26:22, 29:21, 37:7, 56:25, 65:6
**Dudley's** [3] - 26:13, 26:18, 31:12
**duly** [2] - 3:5, 73:4
**during** [13] - 6:3, 25:16, 26:9, 27:6, 28:6, 28:10, 43:11, 45:6, 51:25, 68:18, 68:21, 69:1, 71:18
**DUSTIN** [1] - 1:3
**Dustin** [22] - 14:23, 17:23, 19:14, 20:2, 20:17, 22:7, 26:16, 26:21, 27:6, 30:11, 31:14, 45:13, 46:15, 49:21, 53:9, 54:20, 65:5, 65:21, 67:25, 70:19, 70:25, 71:16
**Dustin's** [2] - 64:22, 71:6
**duties** [3] - 5:4, 6:11, 6:25
**DVD** [1] - 37:3
**dysfunction** [8] - 59:15, 59:20, 60:19, 60:25, 63:14, 64:17, 66:11, 66:17
**dysfunctional** [7] -

59:5, 59:9, 59:21, 60:16, 65:16, 66:22

## E

**early** [2] - 57:20, 57:25
**earned** [1] - 42:13
**easy** [2] - 23:21, 45:11
**Edmunds** [4] - 16:22, 17:12, 42:10, 43:10
**education** [3] - 5:22, 7:13, 10:2
**educational** [1] - 3:17
**effect** [3] - 26:18, 63:11, 69:12
**effective** [2] - 8:11, 18:25
**effects** [7] - 19:7, 68:24, 69:1, 69:3, 69:5, 69:9, 69:17
**efficient** [1] - 55:5
**effort** [5] - 17:22, 17:25, 18:3, 18:5, 48:8
**eight** [1] - 6:6
**either** [8] - 5:18, 14:1, 19:22, 31:25, 33:25, 60:17, 64:3, 71:7
**elaborate** [1] - 5:23
**elation** [1] - 68:25
**elected** [1] - 8:17
**element** [1] - 25:3
**elevated** [1] - 22:9
**elevations** [1] - 22:12
**Emily** [2] - 16:22, 42:10
**emotion** [2] - 55:13, 55:16
**emotional** [10] - 58:23, 59:6, 61:17, 61:21, 61:23, 62:10, 62:15, 64:1, 65:22, 66:12
**emotionally** [2] - 54:18, 62:3
**emotions** [1] - 52:22
**employed** [1] - 27:19
**employee** [2] - 73:13, 73:14
**end** [6] - 19:20, 30:6, 30:7, 43:21, 48:25
**endemic** [1] - 60:19
**ends** [1] - 62:2

**enforcement** [1] - 32:2
**environment** [2] - 31:5, 59:18
**environmental** [1] - 70:19
**epilepsy** [2] - 11:19, 11:23
**especially** [1] - 31:23
**estimate** [3] - 19:16, 19:18, 20:6
**estimated** [1] - 19:15
**ethics** [4] - 9:5, 9:12, 9:22, 10:4
**evaluate** [1] - 13:11
**evaluated** [1] - 54:18
**evaluation** [16] - 13:3, 14:23, 15:22, 15:24, 35:12, 38:25, 39:2, 39:21, 41:25, 42:3, 42:17, 43:8, 45:6, 45:11, 50:19, 51:1
**event** [2] - 55:24, 56:23
**events** [5] - 50:3, 57:6, 63:15, 63:16, 72:6
**evidence** [5] - 8:24, 13:19, 30:17, 70:12, 71:7
**exactly** [3] - 37:21, 37:23, 58:4
**examination** [7] - 1:9, 14:19, 15:19, 38:19, 39:15, 64:8, 65:15
**Examination** [3] - 2:17, 2:18, 2:18
**EXAMINATION** [3] - 3:8, 32:7, 71:12
**examinations** [1] - 8:2
**examined** [1] - 3:6
**examinees** [1] - 8:5
**examiners** [1] - 8:5
**example** [2] - 29:9, 55:9
**exams** [3] - 7:23, 8:3, 8:8
**except** [1] - 47:16
**exceptional** [1] - 25:9
**exceptionally** [1] - 23:19
**excited** [1] - 60:20
**excuse** [1] - 43:10
**exhibit** [1] - 4:12
**Exhibit** [9] - 2:22, 2:22, 3:14, 6:21, 7:12,

15:1, 15:9, 18:8, 30:7
**EXHIBITS** [1] - 2:20
**exist** [1] - 64:19
**existed** [1] - 65:13
**existence** [2] - 22:5, 70:23
**expect** [2] - 17:7, 48:20
**expected** [2] - 21:23, 68:21
**experience** [5] - 10:17, 56:23, 60:25, 62:14, 69:4
**experiences** [1] - 65:25
**expert** [3] - 10:9, 14:14, 14:18
**expertise** [3] - 9:20, 69:17, 70:8
**explain** [13] - 4:25, 6:24, 7:17, 9:8, 12:3, 12:24, 15:18, 21:10, 27:15, 27:18, 30:18, 47:2, 72:5
**explained** [1] - 27:21
**explaining** [1] - 48:15
**exposed** [1] - 70:18
**express** [3] - 54:25, 55:23, 56:14
**expressed** [2] - 15:8, 26:8
**expressing** [3] - 15:13, 55:13, 55:16
**extent** [4] - 15:8, 15:13, 57:16, 70:23
**extra** [2] - 43:5, 43:20
**extraordinary** [1] - 22:11
**extremely** [5] - 11:3, 21:5, 21:21, 23:21, 24:8
**eyes** [3] - 17:12, 43:6, 43:20

## F

**facing** [3] - 33:21, 33:25, 72:11
**fact** [4] - 29:14, 32:1, 61:3, 64:8
**factor** [5] - 20:8, 20:21, 31:3, 31:6, 31:7
**factors** [2] - 30:18, 70:19
**facts** [1] - 49:17
**faculty** [1] - 5:8

**fair** [10] - 4:12, 41:12, 43:19, 50:14, 55:12, 63:1, 64:21, 69:16, 69:18, 70:9
**fairly** [5] - 8:23, 10:23, 19:12, 42:5, 55:5
**familiar** [4] - 42:5, 42:19, 42:21, 71:17
**families** [4] - 59:14, 59:20, 59:23, 63:17
**family** [21] - 22:25, 25:19, 30:1, 31:5, 49:17, 49:18, 50:2, 50:21, 51:17, 52:1, 52:8, 58:22, 59:5, 59:18, 60:20, 63:3, 63:15, 64:16, 65:21, 66:18, 70:19
**far** [2] - 19:21, 23:15
**FAS** [1] - 47:23
**fast** [1] - 46:18
**father** [10] - 26:6, 27:1, 31:10, 31:18, 31:19, 50:21, 51:9, 52:8, 54:14, 66:3
**father's** [1] - 56:12
**fault** [2] - 23:7
**faults** [1] - 23:12
**FBI** [2] - 14:1, 33:15
**fears** [2] - 61:15, 61:16
**Federal** [2] - 1:10, 2:3
**fee** [1] - 10:1
**fella** [1] - 24:8
**fellow** [1] - 42:14
**fellows** [1] - 12:18
**fellowship** [1] - 3:22
**felt** [1] - 72:6
**few** [10] - 4:17, 13:5, 13:16, 49:16, 49:23, 56:21, 68:8, 69:23, 70:3, 71:14
**field** [1] - 9:13
**figure** [2] - 25:3, 41:1
**finally** [1] - 37:6
**financially** [1] - 73:15
**findings** [1] - 30:8
**fine** [1] - 55:19
**firm** [1] - 13:11
**First** [1] - 2:8
**first** [47] - 3:5, 4:18, 6:2, 9:13, 10:7, 11:7, 16:8, 16:12, 20:21, 22:9, 25:18, 25:20, 26:2, 26:25, 27:2, 28:3, 28:17, 35:10, 38:22, 40:16, 42:18,

44:2, 44:13, 44:18, 45:10, 45:12, 45:23, 46:19, 48:5, 48:22, 49:16, 49:23, 50:17, 50:18, 50:19, 51:4, 52:4, 52:5, 52:7, 53:17, 54:2, 56:5, 59:16, 70:4, 73:4

**five** [4] - 20:19, 24:22, 27:6, 33:1

**Floor** [1] - 1:15

**Florida** [1] - 9:22

**fluctuated** [1] - 58:3

**fluency** [1] - 47:24

**focus** [2] - 10:18, 40:24

**folks** [5] - 11:23, 12:4, 12:12, 31:4, 65:9

**follow** [1] - 71:11

**follow-up** [1] - 71:11

**follows** [2] - 3:7, 47:21

**forensic** [3] - 14:6, 14:14, 64:24

**form** [3] - 22:4, 50:7, 50:10

**formally** [1] - 4:8

**format** [1] - 50:6

**forming** [1] - 43:14

**forth** [3] - 39:17, 49:13, 51:12

**forward** [2] - 56:3, 57:20

**four** [7] - 7:7, 8:1, 16:8, 16:11, 20:20, 25:1, 33:1

**four-step** [1] - 8:1

**fourth** [3] - 24:22, 25:5, 53:22

**frame** [3] - 28:10, 58:4, 68:2

**frankly** [1] - 17:4

**free** [1] - 31:23

**front** [2] - 3:12, 15:1

**frontal** [1] - 12:1

**fulfilled** [1] - 4:2

**full** [12] - 4:10, 4:20, 4:22, 6:13, 11:12, 11:13, 14:6, 19:16, 20:3, 20:20, 50:18, 53:17

**full-time** [2] - 11:12, 14:6

**function** [3] - 12:7, 19:1, 59:15

**functional** [2] - 63:15, 63:17

**functioning** [4] - 19:13, 68:5, 68:9,

68:11

**FURTHER** [1] - 72:22

**G**

**G-r-o-t-e** [1] - 3:11

**gang** [2] - 52:9, 54:22

**gap** [2] - 41:8, 41:9

**gears** [1] - 58:12

**Gelbort** [1] - 36:18

**general** [7] - 10:24, 27:5, 50:23, 58:5, 58:13, 58:22, 62:23

**generally** [4] - 14:10, 58:7, 58:11, 67:16

**generated** [2] - 8:25, 36:22

**genetic** [1] - 70:19

**given** [2] - 8:21, 9:2

**goofy** [3] - 68:12, 68:14, 68:17

**Government** [4] - 2:22, 2:22, 14:23, 33:16

**Government's** [3] - 3:13, 6:21, 18:8

**grad** [1] - 34:3

**graduated** [1] - 3:19

**Grange** [1] - 34:4

**grants** [1] - 5:16

**GRE** [1] - 10:13

**great** [1] - 27:21

**greater** [3] - 61:7, 61:11, 63:3

**greenstein** [1] - 36:10

**grew** [2] - 53:23, 65:5

**Grote** [4] - 3:11, 3:12, 14:17, 14:22

**GROTE** [4] - 1:8, 2:16, 3:4, 73:4

**ground** [3] - 39:3, 39:10, 40:18

**Group** [2] - 6:23, 7:1

**group** [2] - 7:2, 8:5

**grouped** [1] - 24:25

**grouping** [1] - 25:3

**grow** [1] - 41:6

**growing** [1] - 59:5

**grows** [1] - 58:22

**guess** [7] - 9:10, 9:16, 15:4, 27:23, 31:3, 46:5, 68:13

**guessed** [1] - 20:5

**guessing** [1] - 46:24

**guides** [1] - 22:16

**guilt** [4] - 39:17,

39:25, 40:19, 40:23

**guilty** [1] - 41:2

**guy** [5] - 13:16, 18:21, 23:19, 30:22, 58:8

**guys** [1] - 34:5

**H**

**Habeas** [1] - 2:3

**habit** [1] - 68:7

**half** [4] - 16:14, 16:15, 51:21, 52:5

**hand** [2] - 53:5, 53:8

**handed** [1] - 38:11

**handwritten** [1] - 45:5

**happier** [1] - 68:25

**happy** [2] - 66:1, 68:25

**hard** [2] - 23:24, 37:22

**harder** [1] - 11:1

**Haute** [1] - 42:6

**head** [3] - 13:8, 18:21, 50:12

**health** [3] - 30:18, 30:23, 69:5

**healthy** [2] - 10:24, 72:17

**hear** [2] - 40:1, 65:3

**heard** [2] - 17:6, 39:24

**hearing** [1] - 55:4

**help** [7] - 6:19, 12:8, 17:8, 54:10, 55:10, 58:15

**helped** [1] - 55:1

**hereby** [1] - 73:3

**herein** [1] - 3:5

**hesitation** [1] - 17:3

**high** [8] - 19:20, 20:23, 22:17, 28:23, 68:12, 68:14, 68:17, 69:12

**higher** [2] - 19:17, 19:22

**highest** [2] - 19:18, 22:19

**highly** [2] - 17:11, 63:21

**hm** [2] - 34:23, 43:9

**HONKEN** [1] - 1:3

**Honken** [42] - 14:23, 16:5, 16:6, 16:16, 17:23, 19:14, 20:2, 20:17, 21:5, 22:21, 24:1, 25:16, 25:20, 25:24, 26:3, 26:8,

26:16, 26:21, 27:1, 27:6, 29:2, 30:2, 31:15, 31:22, 37:4, 39:9, 39:15, 41:17, 43:2, 45:13, 49:22, 50:19, 53:9, 55:7, 57:8, 67:4, 67:10, 68:23, 70:16, 70:20, 70:24, 71:16

**Honken's** [16] - 21:1, 22:7, 25:18, 30:12, 34:1, 34:13, 38:6, 40:19, 41:23, 57:23, 57:25, 64:18, 65:16, 66:11, 66:23, 70:17

**honorary** [1] - 8:20

**honors** [1] - 8:16

**host** [2] - 8:2, 8:3

**hosting** [1] - 8:7

**hour** [3] - 16:12, 51:21, 52:5

**hours** [12] - 13:2, 14:7, 14:9, 16:6, 16:7, 16:8, 16:11, 16:13, 27:7, 41:7

**hundreds** [2] - 24:1, 41:7

**hurry** [2] - 54:23, 54:24

**hypersensitive** [1] - 22:23

**hypothetical** [1] - 62:11

**I**

**idea** [1] - 66:4

**ideas** [3] - 58:16, 58:19, 65:19

**identified** [2] - 26:16, 69:6

**identify** [1] - 45:11

**ignored** [1] - 52:18

**II** [3] - 22:19, 24:11, 46:21

**Illinois** [3] - 1:14, 1:15, 73:3

**illness** [1] - 12:11

**illnesses** [1] - 63:2

**impact** [1] - 66:23

**impacted** [1] - 66:11

**impairment** [6] - 10:18, 23:9, 23:10, 30:13, 31:14, 72:3

**implication** [1] - 18:2

**important** [7] - 20:9, 23:14, 54:16, 59:3, 60:24, 61:22, 64:24

**importantly** [1] -

22:11

**IN** [1] - 1:1

**incarcerated** [1] - 30:24

**incarceration** [1] - 71:18

**incident** [1] - 18:20

**include** [4] - 13:15, 52:13, 63:6, 63:8

**including** [3] - 13:13, 29:19, 67:6

**inconsequential** [1] - 55:21

**inconsistent** [1] - 26:21

**Indiana** [1] - 15:24

**indicate** [4] - 7:12, 26:7, 31:13, 72:2

**indicated** [4] - 12:22, 26:15, 27:17, 35:22

**indicates** [2] - 22:10, 67:19

**indicating** [1] - 66:10

**indicating)** [2] - 34:19, 37:15

**indication** [4] - 23:8, 27:1, 30:21, 67:16

**indirectly** [2] - 65:6, 73:15

**ineffective** [1] - 34:13

**influence** [2] - 55:18, 63:15

**influences** [1] - 63:25

**information** [10] - 20:24, 41:22, 47:12, 50:6, 53:6, 64:25, 66:9, 66:10, 71:3, 71:4

**informed** [1] - 41:18

**initial** [2] - 49:19, 56:11

**injury** [4] - 12:10, 13:9, 18:21, 19:7

**innocence** [3] - 39:25, 40:19, 40:23

**innocent** [1] - 41:2

**inpatient** [1] - 5:7

**input** [1] - 43:17

**inquiry** [1] - 57:16

**insistent** [1] - 54:4

**instead** [1] - 55:25

**instructed** [1] - 41:19

**instructor** [1] - 6:6

**insurer** [1] - 13:10

**intake** [1] - 50:7

**intellectual** [1] - 18:14

**Intelligence** [1] - 19:24
**intend** [1] - 40:23
**interacting** [1] - 23:11
**interaction** [1] - 5:25
**interest** [3] - 9:16, 9:20, 43:19
**interested** [2] - 55:4, 73:15
**interesting** [3] - 23:21, 23:24, 40:1
**interferes** [1] - 61:25
**international** [1] - 9:19
**internet** [2] - 9:24, 37:19
**internet-based** [1] - 9:24
**interns** [1] - 5:12
**internship** [3] - 4:3, 4:5, 12:13
**interpretive** [1] - 22:16
**interrogatories** [1] - 3:6
**interview** [23] - 15:5, 16:9, 16:10, 16:12, 16:13, 25:16, 26:2, 26:9, 27:12, 39:9, 41:25, 44:12, 44:20, 46:2, 49:23, 50:9, 51:23, 54:6, 55:6, 56:2, 56:5, 56:16, 57:18
**interviewing** [1] - 27:5
**interviews** [3] - 27:8, 65:7
**intoxication** [4] - 68:18, 68:21, 69:2, 69:14
**involved** [2] - 32:21, 71:4
**involvement** [1] - 29:7
**Iowa** [3] - 2:9, 38:16, 65:8
**IOWA** [1] - 1:1
**IQ** [6] - 19:16, 19:25, 20:3, 20:9, 20:20, 49:5
**irregular** [1] - 19:3
**irritability** [1] - 22:23
**issue** [2] - 38:14, 62:24
**issues** [9] - 9:12, 22:22, 30:25, 35:24, 39:2, 39:17, 40:18, 40:25, 56:21

**items** [1] - 18:1
**itself** [2] - 45:11, 49:5
**IV** [13] - 20:17, 21:4, 46:24, 47:5, 47:13, 47:15, 47:18, 48:7, 48:12, 48:16, 48:19, 48:20, 49:3

**J**

**Jail** [1] - 13:16
**James** [2] - 27:1, 30:1
**Jeff** [5] - 58:1, 58:8, 70:18, 70:24, 71:4
**Jesuit** [1] - 9:9
**job** [9] - 4:7, 5:6, 6:19, 7:7, 11:12, 12:1, 14:12
**Johnson** [1] - 28:20
**Judge** [3] - 38:16, 39:1, 40:24
**judge** [7] - 20:14, 20:15, 20:16, 21:16, 30:9, 30:10
**Justice** [3] - 2:7, 14:1, 33:15

**K**

**KANE** [9] - 2:3, 14:20, 34:24, 38:3, 59:12, 66:20, 70:2, 71:9, 72:20
**Kane** [2] - 2:18, 32:8
**karate** [1] - 50:3
**KCPC** [1] - 34:3
**keep** [3] - 19:17, 50:25, 55:21
**Kentucky** [2] - 34:3, 34:4
**kid** [2] - 31:21, 59:18
**killed** [1] - 37:23
**killing** [1] - 13:20
**kind** [25] - 8:17, 9:16, 12:9, 16:17, 17:19, 18:9, 20:11, 20:13, 20:15, 21:19, 22:15, 23:4, 23:11, 27:24, 35:8, 42:25, 49:5, 51:22, 53:11, 54:15, 55:8, 56:6, 59:14, 69:12, 72:15
**kinds** [8] - 5:19, 6:2, 12:12, 13:12, 19:9, 21:7, 25:1, 67:14
**knack** [1] - 9:17
**knocked** [1] - 24:5

**knowing** [1] - 18:17
**knowingly** [1] - 40:24
**known** [1] - 5:2

**L**

**labeled** [1] - 72:9
**lack** [2] - 56:12, 65:3
**large** [2] - 8:5, 11:20
**last** [11] - 8:1, 25:19, 26:1, 26:24, 27:3, 30:16, 35:9, 45:23, 70:16, 70:17
**late** [2] - 57:20, 57:25
**laude** [1] - 3:19
**law** [2] - 13:11, 32:2
**lawyer** [3] - 32:25, 33:8, 33:9
**lawyer's** [1] - 32:23
**lawyers** [2] - 41:18, 58:15
**lead** [2] - 10:2, 66:1
**leaps** [1] - 8:17
**learned** [1] - 25:8
**learning** [1] - 9:24
**Learning** [3] - 24:19, 47:4, 48:10
**least** [8] - 16:14, 30:23, 32:12, 45:10, 49:18, 50:2, 57:1, 60:2
**leaving** [1] - 45:2
**lecture** [1] - 10:5
**lectures** [1] - 6:15
**led** [2] - 9:18, 32:3
**left** [3] - 53:5, 53:8, 54:4
**left-hand** [2] - 53:5, 53:8
**legal** [3] - 14:11, 34:18, 70:11
**length** [1] - 35:20
**Leon** [1] - 36:16
**Lepper** [2] - 8:17, 8:20
**less** [4] - 30:5, 31:17, 56:18, 65:18
**letter** [2] - 36:16, 37:1
**Letter** [1] - 47:6
**level** [2] - 19:13, 22:10
**license** [2] - 4:9, 15:24
**License** [1] - 73:22
**licensed** [1] - 42:15
**licensure** [1] - 7:16
**lie** [1] - 60:10

**lies** [1] - 60:5
**life** [10] - 23:6, 25:22, 38:6, 41:10, 41:23, 50:3, 52:19, 54:14, 57:24, 66:11
**life's** [1] - 41:4
**likely** [2] - 44:22, 59:18
**likewise** [1] - 15:14
**limited** [1] - 39:2
**line** [6] - 20:13, 20:14, 20:15, 52:21, 60:21
**lines** [1] - 52:24
**Lisa** [1] - 36:13
**list** [3] - 25:9, 36:1, 41:21
**listed** [5] - 17:17, 36:6, 37:10, 41:22, 46:25
**listened** [1] - 51:18
**listing** [1] - 47:5
**literature** [3] - 21:20, 69:8
**live** [1] - 13:21
**lobe** [2] - 11:25, 12:1
**locate** [1] - 53:16
**long-standing** [1] - 30:25
**look** [10] - 14:7, 20:10, 31:24, 38:12, 48:21, 49:15, 49:16, 54:10, 57:3, 62:6
**looked** [1] - 42:4
**looking** [3] - 21:7, 22:1, 34:21
**looks** [11] - 17:24, 34:22, 45:15, 46:1, 46:2, 47:3, 47:19, 47:23, 48:6, 48:22, 49:22
**loosely** [1] - 7:2
**lose** [1] - 12:6
**loud** [3] - 17:18, 19:3, 38:23
**Louisville** [1] - 3:25
**Louisville's** [1] - 3:23
**low** [1] - 19:20
**lowest** [1] - 19:18
**LRR** [1] - 1:5
**Lutheran** [1] - 53:24

**M**

**M.D** [1] - 8:18
**main** [1] - 44:9
**major** [2] - 3:20, 63:2
**makeup** [1] - 61:17

**man** [3] - 26:5, 32:12, 32:13
**man's** [1] - 33:8
**manipulate** [1] - 20:25
**manufacturing** [2] - 27:19, 58:10
**march** [1] - 41:4
**March** [3] - 28:5, 28:18, 28:21
**margin** [1] - 54:11
**Mark** [1] - 8:17
**mark** [1] - 8:20
**marked** [4] - 3:13, 6:21, 15:1, 18:8
**married** [1] - 50:5
**Massachusetts** [1] - 11:18
**master's** [1] - 3:25
**materials** [1] - 65:12
**Matrix** [1] - 47:9
**matter** [2] - 27:5, 58:22
**mean** [12] - 18:15, 22:20, 23:25, 24:5, 31:21, 34:18, 34:21, 38:17, 45:12, 60:12, 68:10, 69:3
**meaning** [3] - 30:7, 53:9, 59:25
**means** [4] - 8:13, 25:1, 33:20, 39:5
**meant** [3] - 39:8, 41:13, 57:12
**measure** [2] - 18:14, 20:22
**measured** [1] - 21:4
**measures** [1] - 20:1
**measuring** [2] - 17:25, 49:4
**medical** [8] - 5:11, 5:13, 5:25, 6:2, 6:6, 6:8, 7:13, 14:11
**Medical** [5] - 4:5, 4:7, 8:21, 11:14
**medical-legal** [1] - 14:11
**medical/legal** [1] - 13:5
**medication** [2] - 11:24, 67:11
**meeting** [2] - 5:10, 7:3
**meetings** [1] - 7:8
**Melissa** [1] - 37:1
**members** [5] - 7:2, 22:25, 30:1, 49:18, 50:2
**membership's** [1] - 8:21

memories [1] - 51:25
memorize [1] - 25:5
memorized [1] - 24:8
memory [8] - 12:6, 17:24, 19:9, 20:22, 21:1, 21:22, 24:4, 27:11
mental [6] - 30:12, 30:18, 30:23, 31:14, 63:2, 69:5
mentally [1] - 72:17
mention [3] - 50:22, 51:8, 53:18
mentioned [16] - 11:13, 20:12, 32:11, 33:10, 33:18, 39:14, 42:10, 50:19, 53:3, 53:15, 57:5, 57:19, 67:24, 69:20, 70:15
mentions [1] - 67:9
mercy [1] - 13:20
messed [1] - 59:14
met [2] - 64:3, 64:4
methamphetamine [10] - 27:20, 28:4, 29:10, 67:25, 68:4, 68:8, 68:16, 68:22, 69:17, 69:18
Metropolitan [1] - 36:11
middle [1] - 53:17
Midwest [2] - 6:22, 7:1
might [15] - 12:4, 17:4, 17:14, 19:5, 20:5, 22:25, 23:6, 35:8, 35:12, 37:18, 37:19, 45:18, 55:3, 62:4, 66:2
mildly [1] - 22:9
million [1] - 67:15
mind [3] - 19:18, 40:7, 50:25
minor [3] - 3:21, 13:8, 55:21
minute [2] - 16:20, 69:22
minutes [3] - 51:20, 53:11, 71:14
Miss [1] - 43:10
miss [1] - 17:13
misstate [1] - 42:18
mitigating [5] - 31:6, 31:7, 70:8, 70:9, 70:12
mitigation [3] - 29:20, 31:11, 36:14
mixed [1] - 32:20
mm-hm [2] - 34:23, 43:9

MMPI [7] - 22:1, 22:5, 22:19, 22:21, 36:24, 46:21, 47:25
model [1] - 66:5
modeling [1] - 66:5
mom [1] - 26:4
moment [1] - 40:8
monologue [1] - 53:11
month [8] - 9:22, 28:3, 28:12, 28:14, 28:18, 28:21, 41:10
months [4] - 28:8, 68:1, 68:8, 68:17
mood [1] - 61:11
morning [3] - 11:17, 46:10, 46:14
most [14] - 10:16, 12:14, 16:2, 19:3, 35:4, 35:6, 59:14, 59:20, 59:23, 59:25, 60:1, 60:5, 60:7
mostly [1] - 23:25
mother [4] - 61:22, 62:10, 62:11, 62:15
motion [3] - 39:3, 40:6, 64:11
mouth [1] - 55:3
movant's [1] - 39:3
move [6] - 41:10, 51:22, 53:19, 54:7, 54:13, 54:23
moved [3] - 56:2, 56:5, 56:16
moving [1] - 57:20
MR [21] - 2:2, 2:3, 2:7, 14:17, 14:20, 14:21, 32:5, 34:23, 34:24, 37:25, 38:3, 59:8, 59:12, 66:13, 66:20, 70:2, 71:9, 71:10, 72:19, 72:20, 72:21
murder [4] - 32:11, 32:13, 33:18, 39:16
murdered [1] - 13:17
murders [6] - 29:4, 29:7, 29:11, 29:14, 39:17, 40:20
must [1] - 47:25

**N**

name [3] - 3:10, 22:13
naming [1] - 47:24
Nashville [2] - 4:4
nasty [1] - 31:10
National [1] - 9:25

near [1] - 52:7
necessarily [4] - 16:25, 21:23, 45:4, 68:6
necessary [3] - 37:12, 44:8, 44:9
need [6] - 12:3, 15:24, 17:18, 25:2, 44:21, 53:16
needed [3] - 6:13, 15:25, 44:14
needing [1] - 43:21
needs [4] - 5:10, 63:25, 64:1, 64:3
negative [3] - 63:14, 63:15, 65:25
neglected [1] - 48:25
neurologic [1] - 4:11
neurology [1] - 8:14
neuropsyche [1] - 18:22
Neuropsychological [1] - 6:23
neuropsychological [4] - 15:10, 15:16, 18:18, 35:12
neuropsychologist [2] - 11:22, 18:16
neuropsychologists [1] - 7:4
neuropsychology [9] - 4:24, 5:1, 5:5, 7:6, 7:20, 7:24, 8:11, 9:13, 11:15
Neuropsychology [3] - 6:23, 7:1, 9:25
never [4] - 25:6, 26:5, 34:7, 50:5
new [1] - 7:6
news [2] - 40:17, 40:21
next [8] - 9:22, 18:12, 19:23, 50:24, 52:17, 52:21, 53:5, 54:11
nice [1] - 51:7
nine [4] - 39:3, 39:10, 40:8, 40:18
NMG [1] - 7:1
nobody [1] - 31:18
NOLAN [2] - 2:2, 37:25
nominated [1] - 8:24
nonetheless [1] - 31:20
nonverbal [1] - 21:6
normal [2] - 21:18, 60:19
North [1] - 8:6
NORTHERN [1] - 1:1

NOT [1] - 72:22
notable [2] - 51:13, 51:14
note [2] - 53:9, 53:13
noted [1] - 9:3
notes [11] - 16:17, 27:17, 43:11, 45:5, 49:13, 49:15, 49:16, 51:19, 52:3, 53:8, 56:17
nother [1] - 20:10
nothing [3] - 21:18, 44:17, 62:22
notice [1] - 1:10
number [12] - 9:2, 9:4, 10:3, 14:7, 35:20, 38:12, 38:22, 63:2, 64:9, 64:15, 65:24, 68:17
Number [1] - 47:6
nurturing [1] - 63:18

**O**

o'clock [2] - 1:15, 73:11
object [1] - 59:8
objection [1] - 66:13
objective [2] - 69:3, 69:4
observations [2] - 17:13, 18:4
observed [1] - 16:17
observer [1] - 38:15
observers [1] - 9:15
occurred [2] - 29:4, 29:11
October [2] - 1:16, 73:11
odd [1] - 26:5
OF [2] - 1:1, 1:6
offer [1] - 35:12
office [4] - 13:3, 14:2, 15:21, 35:19
official [1] - 73:17
often [2] - 59:4, 66:5
old [2] - 22:13
older [3] - 32:13, 58:1, 69:8
oldest [1] - 5:2
once [4] - 10:5, 16:2, 45:2, 56:11
one [44] - 4:3, 5:2, 6:13, 8:16, 9:3, 12:14, 13:7, 15:25, 18:12, 19:17, 20:20, 21:21, 21:24, 22:9, 22:15, 24:2, 24:10, 24:12, 31:16, 33:18, 35:16,

37:12, 38:11, 39:22, 43:1, 43:3, 48:8, 49:10, 51:14, 52:6, 53:23, 57:1, 57:7, 59:22, 60:2, 60:9, 61:15, 62:6, 63:16, 66:14, 71:14, 72:8, 72:12
one-year [1] - 4:3
ones [3] - 7:23, 11:23, 12:14
online [1] - 10:2
open [1] - 54:18
opening [1] - 54:20
opinion [6] - 29:21, 30:3, 31:2, 31:9, 39:21, 66:17
opinions [7] - 15:6, 15:9, 15:13, 29:23, 35:13, 35:16, 43:14
opposed [1] - 43:2
oral [4] - 3:6, 8:2, 8:3, 8:8
order [6] - 24:24, 25:4, 38:11, 40:24, 41:13
organized [1] - 7:2
origin [1] - 65:21
otherwise [1] - 53:19
outpatient [1] - 5:7
outscored [1] - 24:1
outside [2] - 11:10, 38:7
outstanding [1] - 8:22
overall [1] - 6:7
overlap [2] - 49:2, 49:4
oversight [1] - 7:22
oversights [1] - 7:20
own [3] - 28:17, 29:22, 37:19

**P**

p.m [4] - 3:2, 70:1, 72:23
P.M [2] - 1:15, 73:11
page [44] - 6:20, 7:12, 7:17, 8:16, 10:7, 17:17, 18:7, 20:12, 22:16, 24:11, 24:13, 24:14, 25:17, 26:1, 26:24, 27:22, 27:23, 27:24, 29:17, 29:18, 35:9, 36:4, 36:6, 38:20, 38:21, 45:9, 45:12, 45:18, 45:23, 49:14, 49:21, 50:2,

50:17, 52:7, 52:17, 53:17, 53:22, 57:7, 57:8, 57:22, 70:16

**pages** [8] - 35:2, 40:13, 45:9, 45:15, 49:16, 49:23, 52:4, 54:9

**paragraph** [12] - 24:14, 24:16, 25:18, 25:20, 26:2, 26:25, 27:3, 35:10, 38:21, 50:18, 53:17, 70:17

**paranoia** [1] - 22:14

**parent** [3] - 59:23, 60:2, 60:5

**parental** [1] - 66:5

**parents** [4] - 31:20, 60:1, 60:10, 61:15

**parents'** [1] - 66:6

**park** [1] - 24:5

**part** [8] - 3:20, 12:5, 12:23, 37:16, 45:10, 47:13, 57:21, 61:22

**particular** [6] - 22:18, 22:25, 44:17, 60:25, 65:25, 70:7

**particularly** [3] - 18:19, 20:23, 21:19

**parties** [2] - 38:17, 73:13

**parts** [5] - 20:12, 35:7, 48:12, 54:14, 56:16

**party** [4] - 9:15, 15:23, 38:15, 38:18

**past** [2] - 30:17, 38:6

**paste** [1] - 22:15

**path** [1] - 5:9

**patient** [3] - 11:17, 12:9, 24:20

**patients** [4] - 5:7, 11:16, 12:10, 13:4

**Paxil** [2] - 67:19, 71:15

**pay** [1] - 10:1

**penalty** [2] - 34:14, 72:13

**pencil** [1] - 21:9

**Pennsylvania** [1] - 2:4

**people** [22] - 5:16, 8:22, 10:13, 10:23, 12:15, 17:6, 21:20, 21:21, 22:17, 23:1, 24:1, 24:2, 42:9, 60:14, 60:16, 65:4, 67:17, 67:18, 69:11, 69:13, 72:10

**percent** [7] - 14:9, 14:11, 59:25, 60:13,

60:14

**percentage** [1] - 14:5

**percentile** [8] - 19:16, 20:7, 21:2, 21:6, 21:8, 21:12, 21:15, 21:16

**perceptual** [1] - 21:7

**perform** [3] - 17:23, 19:14, 20:2

**performance** [2] - 22:7, 68:11

**performed** [3] - 20:17, 22:2, 23:13

**performing** [1] - 21:14

**perhaps** [4] - 12:1, 17:9, 42:2, 61:18

**period** [8] - 28:3, 28:7, 28:11, 71:21, 71:23, 72:1, 72:16

**periods** [1] - 69:12

**persistently** [1] - 61:15

**person** [14] - 13:11, 18:18, 19:2, 19:5, 19:8, 19:19, 20:24, 22:22, 24:20, 31:18, 45:3, 66:2, 68:12, 68:16

**person's** [1] - 19:1

**personal** [2] - 65:10, 73:7

**personality** [3] - 12:7, 12:11, 67:7

**personnel** [1] - 6:18

**pertaining** [1] - 1:12

**petition** [4] - 34:22, 35:1, 38:1, 64:12

**Ph.D** [9] - 1:9, 2:16, 3:4, 3:23, 4:1, 10:8, 10:10, 42:13, 73:4

**phase** [4] - 34:14, 68:18, 68:21, 69:2

**phases** [1] - 69:15

**Philadelphia** [1] - 2:4

**phone** [1] - 35:20

**physical** [1] - 57:12

**physically** [4] - 25:21, 27:2, 57:9, 57:14

**Piasecki** [2] - 37:1, 69:7

**Piasecki's** [1] - 29:21

**place** [2] - 44:10, 73:9

**places** [1] - 67:9

**Plaintiff** [2] - 1:4, 2:5

**plaintiff's** [1] - 32:18

**plenty** [1] - 31:20

**point** [25] - 9:21,

14:19, 18:19, 20:4, 25:22, 28:9, 28:25, 35:24, 50:5, 51:9, 54:15, 54:25, 55:6, 55:10, 55:23, 56:6, 56:18, 58:5, 67:10, 67:20, 71:16, 71:17, 72:12

**points** [6] - 27:17, 53:19, 54:8, 57:1, 57:7, 58:6

**police** [1] - 52:19

**poor** [1] - 28:24

**portion** [3] - 34:17, 40:15, 49:23

**portrayed** [2] - 13:20, 58:8

**pose** [1] - 66:13

**position** [1] - 6:11

**positive** [2] - 58:6, 63:25

**possession** [1] - 42:2

**possible** [2] - 6:19, 60:7

**post** [2] - 12:17, 26:6

**post-divorce** [1] - 26:6

**post-doctoral** [1] - 12:17

**postoperative** [1] - 12:2

**potentially** [2] - 66:1, 68:19

**pound** [1] - 9:9

**poured** [1] - 55:2

**practice** [6] - 11:7, 11:10, 11:12, 12:23, 13:1, 14:10

**practicing** [1] - 9:11

**pre** [1] - 12:2

**predict** [2] - 19:21, 48:15

**predicting** [2] - 19:22, 49:5

**preexisting** [1] - 18:22

**pregnant** [1] - 62:12

**preincident** [2] - 19:1, 19:13

**preliminary** [1] - 16:1

**premorbid** [2] - 18:14, 19:15

**prescribed** [3] - 67:20, 71:16, 71:17

**prescription** [1] - 67:11

**present** [2] - 4:23, 6:9

**presentations** [2] - 9:2, 9:4

**presented** [1] - 18:6

**presumably** [1] - 52:8

**pretty** [1] - 61:20

**previous** [1] - 18:19

**primarily** [1] - 27:22

**principles** [1] - 62:23

**print** [2] - 40:9, 40:11

**printed** [1] - 40:15

**Prison** [1] - 37:4

**prison** [5] - 16:2, 46:11, 52:9, 54:22, 71:21

**private** [6] - 11:10, 11:12, 12:23, 12:25, 14:10, 33:9

**problems** [15] - 23:1, 23:5, 23:6, 27:8, 27:11, 59:19, 60:18, 61:11, 61:12, 64:17, 67:17, 67:18

**Procedure** [1] - 1:11

**procedure** [1] - 12:3

**proceed** [1] - 17:4

**proceeded** [2] - 44:13, 51:9

**process** [8] - 7:25, 8:1, 8:4, 8:23, 20:25, 27:12, 27:19

**processed** [1] - 46:12

**processing** [3] - 21:8, 21:16, 21:24

**product** [1] - 62:17

**professed** [1] - 39:25

**Professional** [1] - 7:21

**professional** [1] - 60:24

**professionals** [1] - 69:5

**professor** [7] - 4:8, 4:10, 4:19, 4:20, 4:21, 4:22, 11:13

**profile** [2] - 22:14, 23:4

**profits** [1] - 58:9

**program** [11] - 3:21, 3:23, 5:1, 10:15, 10:16, 10:20, 11:4, 11:21, 12:14, 12:18, 12:20

**programs** [2] - 10:14, 10:22

**projects** [1] - 22:24

**prologue** [1] - 51:15

**prompting** [1] - 51:11

**pronounced** [1] - 19:4

**pronunciation** [1] - 19:3

**prosecution** [1] - 33:3

**provided** [1] - 30:11

**psychiatric** [1] - 12:11

**Psychiatric** [1] - 34:4

**psychiatrist** [5] - 32:19, 32:21, 32:23, 32:24, 33:7

**psychiatrists** [1] - 67:14

**Psychological** [1] - 3:24

**psychological** [14] - 16:16, 23:9, 23:10, 30:12, 58:24, 59:7, 60:18, 61:17, 62:20, 62:21, 65:19, 66:23, 72:2

**psychologist** [2] - 14:8, 60:24

**psychologists** [1] - 10:1

**psychology** [15] - 3:20, 3:23, 10:9, 10:10, 10:11, 10:12, 11:2, 42:14, 58:13, 61:3, 61:21, 62:5, 62:6, 63:18

**Psychology** [2] - 7:21, 7:25

**psychopathic** [1] - 22:13

**psychopathology** [1] - 10:18

**psychosocial** [1] - 30:18

**psychotherapy** [1] - 10:23

**psychotic** [2] - 30:25, 67:18

**public** [5] - 14:2, 32:19, 32:20, 33:3, 33:8

**publishing** [1] - 5:16

**purposes** [3] - 30:3, 66:9, 66:17

**pursuant** [2] - 1:10

**put** [1] - 31:25

**Puzzles** [1] - 47:12

## Q

**qualifications** [1] - 32:10

**qualified** [1] - 14:14
**quality** [3] - 28:19, 28:23, 28:24
**questions** [18] - 29:3, 29:6, 29:15, 32:6, 39:16, 39:21, 40:22, 41:7, 41:14, 41:18, 41:20, 53:10, 58:11, 58:13, 70:3, 71:14, 72:19, 72:20
**quick** [1] - 24:8
**quickly** [5] - 21:9, 25:8, 53:19, 54:8, 57:3
**quite** [3] - 6:4, 8:4, 48:1
**quoting** [1] - 42:9

**R**

**raised** [4] - 31:4, 39:2, 54:21, 62:13
**range** [4] - 16:7, 21:11, 21:12, 21:25
**rape** [2] - 62:12, 62:17
**raped** [1] - 62:12
**rapidly** [1] - 28:24
**Rapids** [1] - 2:9
**rapport** [1] - 54:17
**rare** [1] - 63:16
**rarely** [1] - 18:17
**rather** [1] - 10:4
**raw** [2] - 9:15, 36:21
**reach** [1] - 67:3
**reached** [1] - 44:13
**reaching** [1] - 30:3
**reaction** [1] - 59:17
**read** [11] - 17:18, 19:2, 19:6, 20:14, 24:19, 30:9, 38:22, 43:15, 53:6, 54:1, 65:9
**reading** [2] - 38:20, 65:10
**Reading** [3] - 18:13, 18:24, 19:11
**realize** [1] - 9:14
**really** [12] - 11:15, 12:4, 17:7, 17:11, 17:25, 24:24, 28:15, 35:18, 43:23, 51:18, 56:8, 69:13
**realm** [1] - 11:9
**reason** [2] - 44:8, 44:9
**reasonable** [2] - 15:10, 15:15
**Reasoning** [1] - 47:9

**reasons** [2] - 42:16, 51:14
**received** [3] - 3:18, 3:21, 3:25
**recent** [1] - 36:20
**recess** [1] - 69:25
**recitation** [1] - 51:25
**recognized** [1] - 9:19
**record** [4] - 35:25, 37:25, 38:23, 57:4
**records** [10] - 16:17, 29:18, 35:11, 35:22, 36:8, 37:4, 41:21, 42:1, 42:5, 71:21
**recruits** [1] - 60:2
**REDIRECT** [1] - 71:12
**Redirect** [1] - 2:18
**reduced** [1] - 73:6
**Reed** [3] - 1:13, 38:16, 39:1
**REED** [2] - 73:2, 73:21
**reed** [1] - 39:1
**Reed's** [1] - 40:24
**refer** [4] - 40:6, 40:8, 52:2, 69:9
**reference** [4] - 24:11, 25:7, 26:11, 26:18
**referred** [2] - 13:4, 18:7
**referring** [3] - 34:15, 38:1, 58:5
**reflect** [1] - 15:4
**reflected** [1] - 56:16
**reflects** [1] - 53:15
**refresh** [1] - 38:13
**refusal** [1] - 39:20
**refuse** [2] - 29:6, 29:14
**refused** [1] - 39:15
**refutes** [1] - 71:7
**regard** [1] - 17:23
**regarding** [2] - 29:6, 70:22
**regular** [1] - 14:12
**rejected** [1] - 26:4
**rejecting** [1] - 23:12
**related** [2] - 68:13, 72:8
**relationship** [3] - 57:23, 58:1, 58:6
**relative** [2] - 73:12, 73:14
**release** [2] - 9:15, 28:18
**relevant** [1] - 35:8
**relied** [1] - 64:21
**relief** [1] - 37:11

**rely** [1] - 43:21
**remarkable** [1] - 24:23
**remarkably** [1] - 30:22
**remember** [15] - 13:25, 16:10, 26:18, 32:25, 33:13, 37:20, 39:7, 39:12, 42:3, 50:22, 50:24, 51:24, 52:21, 56:3, 65:10
**remembered** [1] - 50:20
**render** [1] - 35:16
**repeat** [2] - 20:24, 24:22
**report** [45] - 15:2, 15:9, 17:17, 18:7, 18:22, 20:11, 22:16, 25:19, 26:12, 26:13, 26:19, 27:23, 30:7, 30:16, 31:12, 31:13, 31:25, 35:9, 36:2, 36:10, 36:18, 36:19, 37:10, 41:22, 42:7, 43:14, 43:15, 49:12, 49:14, 50:17, 52:13, 53:2, 53:16, 56:22, 57:7, 57:21, 64:22, 65:1, 67:9, 67:19, 69:10, 70:15
**reported** [8] - 27:25, 28:2, 28:14, 29:25, 56:24, 65:7, 68:1, 73:6
**reportedly** [2] - 28:6, 65:24
**Reporter** [2] - 1:13, 73:2
**reporting** [1] - 64:22
**reports** [6] - 29:19, 29:20, 31:16, 62:21, 67:1
**representatives** [1] - 38:18
**requirement** [1] - 4:2
**research** [6] - 5:15, 7:6, 9:22, 12:21, 62:20, 63:10
**resection** [1] - 11:25
**resective** [1] - 11:19
**resentful** [1] - 58:7
**resentment** [1] - 22:23
**resistant** [1] - 19:7
**responding** [1] - 11:24
**response** [1] - 38:14
**responsibilities** [1] - 11:8

**responsible** [1] - 12:13
**rest** [2] - 23:13, 34:25
**restate** [1] - 42:18
**result** [1] - 62:12
**results** [4] - 18:9, 20:11, 23:15, 65:7
**retained** [8] - 13:10, 14:4, 14:22, 32:17, 33:4, 33:7, 33:13, 35:11
**reticence** [1] - 39:20
**return** [2] - 50:25, 51:7
**review** [10] - 29:18, 34:12, 34:20, 35:11, 41:23, 64:10, 64:25, 65:3, 69:8, 71:20
**reviewed** [10] - 16:17, 26:12, 34:16, 35:4, 36:2, 36:7, 37:10, 38:8, 64:9, 70:22
**reviewing** [1] - 35:22
**reword** [1] - 66:19
**Richard** [1] - 37:7
**Rickert** [1] - 36:13
**rid** [1] - 12:6
**rightly** [1] - 55:20
**rigorous** [2] - 8:1, 8:23
**risk** [4] - 61:7, 61:11, 63:3
**robber** [1] - 13:25
**robbery** [1] - 33:10
**roboto** [1] - 52:22
**role** [1] - 35:8
**room** [1] - 38:19
**rote** [1] - 25:4
**roughly** [2] - 27:6, 46:13
**row** [6] - 23:23, 25:5, 33:21, 33:25, 34:1, 34:5
**Rules** [1] - 1:10
**ruling** [1] - 38:16
**run** [3] - 40:24, 48:6, 63:3
**run-through** [1] - 48:6
**running** [1] - 71:4
**runs** [1] - 12:20
**Rush** [13] - 4:7, 4:9, 5:1, 6:18, 8:2, 8:21, 11:12, 11:13, 11:14, 11:20, 12:12, 13:1, 14:12

**S**

**safer** [2] - 17:5, 43:1
**safety** [1] - 44:5
**SAITH** [1] - 72:22
**sake** [1] - 31:9
**Saturdays** [1] - 13:2
**saw** [6] - 11:17, 13:16, 13:24, 31:13, 42:2, 55:20
**scale** [4] - 19:16, 20:3, 20:20, 22:12
**Scale** [2] - 19:24, 22:13
**scales** [1] - 22:12
**scheduled** [1] - 9:21
**scholars** [1] - 3:20
**school** [3] - 6:1, 34:3, 41:6
**science** [1] - 4:11
**sciences** [1] - 4:11
**Sciences** [4] - 4:25, 5:22, 6:10, 7:13
**Sciences'** [1] - 5:25
**scientific** [2] - 15:11, 15:15
**scope** [1] - 35:15
**score** [5] - 19:11, 20:9, 21:11, 22:17
**scored** [2] - 18:18, 44:17
**scores** [11] - 10:13, 10:25, 20:8, 20:20, 20:21, 21:12, 21:19, 22:10, 22:18, 22:19, 49:5
**SE** [1] - 2:8
**Search** [1] - 47:11
**second** [21] - 6:2, 6:20, 8:16, 16:8, 16:10, 21:3, 35:9, 38:20, 38:21, 42:24, 43:1, 44:6, 44:20, 44:24, 45:3, 45:16, 48:5, 51:6, 51:16, 52:2, 70:17
**second-year** [1] - 6:2
**section** [2] - 5:15, 5:17
**see** [15] - 3:14, 11:18, 12:10, 13:3, 13:11, 20:4, 24:20, 34:21, 37:12, 41:2, 44:19, 46:20, 60:19, 63:16, 65:12
**seeing** [6] - 5:7, 11:16, 12:4, 13:25, 40:16, 46:23
**seem** [4] - 9:12, 35:7,

Case 3:10-cv-03074-LTS-KEM Document 71 Filed 11/02/11 Page 82 of 84

44:22, 55:10
**sees** [1] - 60:16
**seizures** [1] - 12:6
**self** [2] - 64:22, 65:1
**self-report** [1] - 65:1
**self-reporting** [1] - 64:22
**sell** [2] - 55:17
**senior** [1] - 6:17
**sense** [2] - 18:25, 44:18
**sent** [3] - 36:24, 37:20, 42:2
**sentence** [10] - 25:20, 26:1, 26:25, 27:2, 30:16, 35:10, 38:22, 39:4, 50:18, 52:16
**sentenced** [1] - 30:24
**sentencing** [1] - 40:18
**separate** [1] - 47:14
**Sequencing** [1] - 47:7
**series** [1] - 68:1
**service** [4] - 5:6, 5:10, 5:11, 5:18
**set** [4] - 17:12, 39:3, 43:6, 43:20
**setting** [4] - 11:8, 14:14, 63:14, 64:24
**seven** [3] - 7:5, 28:3, 28:8
**seven-month** [1] - 28:3
**seven-state** [1] - 7:5
**severely** [1] - 26:17
**sexually** [3] - 25:21, 57:9, 57:15
**shaped** [1] - 19:19
**shaping** [1] - 41:14
**SHAWN** [1] - 2:2
**shift** [1] - 58:12
**short** [3] - 7:2, 17:25, 71:11
**Shorthand** [2] - 1:13, 73:2
**shot** [1] - 13:21
**showed** [1] - 18:2
**siblings** [1] - 31:24
**side** [1] - 13:1
**sidetracked** [1] - 55:7
**signature** [1] - 73:17
**significance** [1] - 8:19
**significant** [7] - 10:16, 21:17, 31:5, 31:7, 34:16, 40:4,

62:1
**significantly** [1] - 39:23
**Similarities** [1] - 47:10
**sincerely** [1] - 61:15
**sister** [2] - 32:1, 70:18
**sitting** [2] - 46:14, 46:16
**situation** [3] - 16:23, 17:5, 62:11
**situations** [1] - 62:21
**six** [2] - 16:7, 27:6
**skills** [1] - 19:10
**slots** [1] - 12:16
**Snickers** [1] - 47:19
**snitch** [2] - 72:9, 72:11
**Society** [2] - 8:18, 8:20
**society** [1] - 8:20
**someone** [11] - 9:20, 13:8, 17:2, 23:4, 33:21, 33:25, 37:19, 42:13, 54:17, 60:15, 60:22
**someplace** [3] - 10:6, 48:1, 48:5
**sometime** [1] - 8:4
**somewhere** [4] - 48:3, 48:22, 48:24, 54:9
**sorry** [2] - 49:19, 53:16
**sort** [15] - 11:21, 38:4, 41:8, 41:14, 46:25, 48:15, 50:6, 51:25, 55:13, 57:11, 65:15, 65:19, 66:4, 67:11, 71:5
**sound** [2] - 49:14, 69:4
**sounds** [1] - 56:22
**source** [1] - 56:24
**sources** [1] - 64:25
**South** [2] - 1:14, 6:15
**space** [2] - 8:8, 8:13
**Span** [1] - 47:6
**speaking** [1] - 32:10
**speaks** [1] - 53:9
**specialist** [2] - 29:20, 36:14
**specialist's** [1] - 31:12
**specialty** [1] - 9:5
**specific** [12] - 9:12, 29:12, 35:15, 38:7, 39:12, 40:2, 52:15, 62:22, 67:3, 67:16,

69:16
**specifically** [3] - 39:16, 53:4, 63:9
**specified** [1] - 73:9
**spectrum** [1] - 67:18
**speech** [1] - 12:7
**speed** [3] - 21:8, 21:16, 21:24
**spent** [6] - 14:5, 16:9, 27:7, 34:3, 41:6, 42:7
**Spies** [1] - 36:16
**spit** [1] - 24:21
**spontaneously** [2] - 53:7, 53:10
**spread** [1] - 21:19
**staff** [1] - 12:2
**standard** [2] - 21:11, 70:11
**standing** [1] - 30:25
**standpoint** [1] - 59:11
**stands** [1] - 24:18
**start** [5] - 12:25, 46:7, 49:20, 59:15, 68:14
**started** [8] - 4:21, 9:11, 9:13, 13:1, 28:3, 47:3, 48:7, 66:14
**starting** [7] - 4:19, 28:22, 29:17, 36:4, 38:25, 49:21, 54:21
**starts** [5] - 27:23, 45:12, 46:21, 52:18, 53:23
**state** [2] - 3:10, 7:5
**State** [2] - 1:14, 73:3
**statement** [2] - 39:24, 56:22
**statements** [1] - 25:16
**STATES** [2] - 1:1, 1:6
**States** [4] - 1:11, 2:7, 2:8, 33:16
**stay** [1] - 52:25
**stays** [1] - 59:23
**stenographically** [1] - 73:6
**step** [4] - 6:12, 6:16, 8:1
**still** [5] - 6:5, 42:20, 44:5, 53:17, 72:17
**stint** [1] - 6:13
**stolen** [1] - 55:2
**stop** [1] - 59:16
**stories** [3] - 53:14, 55:14, 56:11
**story** [5] - 55:1, 55:3, 55:6, 56:8, 56:9
**straightforward** [1] -

49:10
**Street** [3] - 1:14, 2:4, 2:8
**structured** [2] - 50:8, 50:12
**stuck** [2] - 9:10, 56:1
**students** [6] - 5:12, 5:13, 6:2, 6:6, 6:8, 9:25
**study** [1] - 10:19
**stuff** [4] - 30:4, 37:22, 37:25, 51:8
**subconscious** [1] - 64:4
**subjective** [1] - 69:4
**subjectively** [1] - 61:14
**submitted** [2] - 64:11, 64:12
**substance** [3] - 61:7, 61:8, 63:12
**substantive** [1] - 43:17
**subtests** [3] - 46:25, 47:6, 49:8
**suck** [1] - 52:10
**suffer** [1] - 69:14
**suffering** [1] - 30:13
**suggest** [1] - 44:21
**Suite** [2] - 2:4, 2:8
**summa** [1] - 3:19
**summarize** [6] - 29:18, 30:15, 37:13, 53:19, 54:8, 56:13
**summarized** [2] - 18:9, 31:11
**summary** [9] - 3:17, 15:4, 20:15, 20:19, 25:8, 27:24, 30:6, 30:8, 30:11
**superior** [2] - 21:13, 21:23
**supervised** [1] - 4:8
**supervising** [1] - 7:11
**support** [2] - 8:24, 71:3
**supports** [1] - 71:7
**surgery** [2] - 11:20, 12:5
**surprised** [2] - 46:18, 63:10
**Susan** [1] - 1:13
**SUSAN** [2] - 73:2, 73:21
**sworn** [3] - 3:1, 3:6, 73:4
**Symbol** [1] - 47:11
**Symptom** [1] - 17:20
**systems** [1] - 6:18

**T**

**take-away** [1] - 22:21
**takeaway** [1] - 30:10
**talkative** [1] - 56:19
**tapered** [1] - 28:24
**taught** [3] - 6:1, 6:3, 6:8
**teach** [1] - 12:21
**teachers** [1] - 8:22
**teaching** [6] - 5:12, 5:13, 6:5, 7:11, 9:17, 14:6
**technical** [1] - 63:21
**technically** [1] - 6:14
**temporal** [1] - 11:25
**temporary** [2] - 72:15, 72:16
**ten** [7] - 5:3, 16:6, 27:7, 45:15, 46:3, 53:10, 69:22
**ten-minute** [1] - 69:22
**tend** [1] - 22:17
**tender** [1] - 14:17
**tenet** [1] - 61:20
**term** [4] - 59:9, 61:19, 63:18, 63:21
**terms** [19] - 5:6, 5:18, 5:19, 6:1, 8:7, 9:19, 10:15, 16:3, 17:3, 17:13, 22:17, 24:9, 26:5, 28:19, 30:24, 38:4, 49:4, 57:13, 57:14
**Terre** [1] - 42:6
**terrific** [2] - 30:20, 30:21
**Test** [7] - 17:20, 18:12, 18:24, 19:11, 20:17, 24:19, 47:5
**test** [30] - 17:1, 17:21, 17:24, 18:1, 18:3, 18:13, 18:19, 19:1, 19:14, 19:23, 19:25, 22:1, 22:4, 23:25, 24:4, 24:6, 24:10, 24:12, 24:19, 24:20, 24:24, 25:12, 47:24, 49:5, 49:6, 49:10, 68:12
**testified** [3] - 3:7, 34:7, 70:4
**testify** [2] - 10:9, 73:5
**testimony** [1] - 15:14
**testing** [13] - 15:5, 16:10, 17:2, 20:16, 23:20, 43:24, 44:2,

44:10, 44:12, 44:14, 44:15, 44:21, 46:7
**tests** [16] - 16:16, 16:25, 17:16, 18:5, 21:15, 23:13, 23:16, 23:24, 42:19, 42:22, 44:18, 47:14, 49:2, 49:3, 50:14, 50:20
**THE** [3] - 1:1, 38:2, 66:25
**themselves** [4] - 42:22, 59:21, 61:8, 65:11
**they've** [1] - 23:2
**thinking** [1] - 11:24
**third** [9] - 9:15, 15:23, 24:16, 31:3, 38:15, 38:17, 38:18, 43:5, 48:7
**third-party** [3] - 9:15, 38:15, 38:18
**thorough** [1] - 44:25
**thoroughly** [1] - 17:15
**threats** [1] - 17:6
**three** [4] - 12:16, 42:16, 51:20, 52:4
**ties** [1] - 66:4
**Tim** [2] - 14:18, 66:15
**TIM** [1] - 2:3
**tires** [1] - 55:8
**today** [1] - 15:14
**together** [3] - 7:5, 8:12, 16:7
**took** [7] - 16:17, 45:6, 46:12, 46:13, 50:3, 51:19, 65:14
**top** [5] - 45:16, 49:22, 52:17, 53:9, 66:21
**topics** [3] - 51:4, 51:23, 56:3
**total** [2] - 14:7, 27:7
**touched** [1] - 56:21
**touching** [1] - 49:19
**towards** [1] - 48:25
**town** [1] - 10:6
**track** [1] - 11:2
**transpired** [1] - 55:25
**transportation** [1] - 25:1
**trash** [2] - 51:16, 51:17
**traumatic** [1] - 12:10
**traumatizing** [1] - 26:17
**treat** [5] - 67:13, 67:15, 67:17, 67:21,

67:22
**treated** [1] - 67:10
**tremendous** [1] - 69:13
**tremendously** [1] - 69:10
**trial** [6] - 24:22, 25:5, 34:13, 36:14, 36:19, 72:12
**trials** [1] - 24:22
**tried** [3] - 26:7, 30:15, 54:13
**trouble** [2] - 55:13, 55:15
**true** [5] - 30:4, 31:17, 41:16, 64:1, 71:25
**truly** [1] - 25:9
**truncates** [1] - 19:18
**truth** [1] - 73:5
**try** [3] - 19:5, 37:12, 55:22
**trying** [17] - 10:18, 37:21, 41:1, 41:4, 41:9, 54:7, 54:23, 54:25, 55:11, 55:17, 55:21, 55:23, 55:24, 60:22, 60:23
**turn** [3] - 25:17, 31:22, 53:22
**turned** [1] - 31:22
**turning** [1] - 5:16
**twice** [1] - 10:5
**two** [21] - 6:13, 7:4, 8:6, 12:16, 12:18, 12:19, 16:12, 17:5, 22:8, 22:12, 22:18, 22:19, 24:2, 38:22, 43:2, 51:14, 51:20, 52:25, 53:8, 57:6, 60:10
**two-year** [1] - 6:13
**type** [12] - 12:8, 13:14, 14:6, 16:18, 23:8, 25:2, 30:13, 42:9, 62:5, 62:14, 72:2
**types** [2] - 62:6, 68:20
**typewriting** [1] - 73:7
**typical** [4] - 12:9, 13:7, 69:1, 69:9
**typically** [6] - 13:2, 13:10, 19:11, 19:21, 58:23, 67:22
**typos** [1] - 43:16

## U

**ultimately** [1] - 15:5

**unconscious** [1] - 64:5
**under** [4] - 4:23, 7:22, 25:18, 73:7
**underneath** [1] - 25:7
**understandable** [1] - 72:14
**understood** [1] - 48:14
**underwent** [2] - 65:24
**unfortunate** [1] - 31:18
**unfortunately** [1] - 31:20
**unhappy** [1] - 67:1
**Unit** [1] - 2:3
**UNITED** [2] - 1:1, 1:6
**United** [4] - 1:11, 2:7, 2:8, 33:16
**University** [4] - 3:19, 3:22, 4:7, 11:14
**university** [2] - 5:19, 9:9
**unless** [1] - 59:9
**unusual** [5] - 43:23, 60:8, 60:9, 60:11, 60:12
**up** [24] - 4:15, 28:4, 28:13, 32:1, 32:9, 32:20, 41:6, 43:21, 44:20, 52:10, 53:23, 54:15, 54:20, 54:23, 54:24, 55:9, 55:20, 58:23, 59:5, 59:14, 62:2, 64:9, 65:5, 71:11
**upbringing** [6] - 30:1, 31:8, 38:6, 64:18, 65:17, 66:22
**usual** [3] - 60:12, 60:20, 68:24

## V

**VA** [1] - 4:4
**vacate** [1] - 39:3
**vague** [1] - 59:10
**validity** [1] - 22:9
**Validity** [1] - 17:20
**Vanderbilt** [1] - 4:4
**variable** [1] - 69:10
**vegetables** [1] - 25:2
**verbal** [3] - 21:4, 21:22, 47:23
**Verbal** [3] - 24:18, 47:4, 48:10
**version** [1] - 55:18

**versus** [1] - 14:6
**Victoria** [3] - 17:20, 47:4, 47:16
**violence** [1] - 61:16
**Visual** [1] - 47:11
**visual** [1] - 21:7
**visual-perceptual** [1] - 21:7
**vitae** [4] - 3:13, 4:13, 6:21, 10:8
**Vocabulary** [1] - 47:11
**vs** [1] - 1:5
**VSVT** [1] - 48:8

## W

**Wada** [1] - 12:3
**WAIS** [16] - 20:11, 20:17, 20:19, 21:4, 46:23, 47:5, 47:13, 47:15, 47:18, 48:7, 48:12, 48:16, 48:19, 48:20, 49:3, 49:7
**wait** [1] - 14:20
**waiting** [1] - 46:18
**Walnut** [1] - 2:4
**Warren** [2] - 29:19, 36:23
**Warren's** [1] - 31:12
**ways** [3] - 13:24, 22:8, 48:17
**Wechsler** [4] - 18:12, 18:24, 19:11, 19:23
**weeks** [3] - 8:7, 52:25, 59:24
**well-adjusted** [1] - 66:2
**West** [1] - 2:4
**whereas** [1] - 11:13
**WHEREUPON** [1] - 3:3
**whole** [6] - 20:10, 34:20, 35:1, 40:9, 40:11, 73:5
**wife** [1] - 13:17
**WILLIAMS** [9] - 2:7, 14:17, 14:21, 32:5, 34:23, 59:8, 66:13, 71:10, 72:21
**williams** [2] - 2:17, 72:19
**Williams** [8] - 2:18, 3:9, 32:11, 35:19, 56:21, 57:6, 67:24, 71:13
**Williams'** [2] - 64:7, 65:14
**Wisconsin** [1] -

47:23
**wish** [1] - 31:19
**WITNESS** [4] - 2:15, 38:2, 66:25, 72:22
**Witness** [1] - 73:17
**witness** [2] - 3:1, 3:5
**witnesses** [2] - 64:16
**word** [6] - 19:4, 19:5, 51:17, 56:12, 65:4, 66:14
**worded** [1] - 66:14
**words** [7] - 19:2, 19:6, 24:19, 24:25, 25:4, 25:5, 25:8
**world** [1] - 23:11
**worse** [2] - 59:17, 60:17
**wound** [1] - 32:1
**write** [2] - 42:7, 49:1
**writing** [3] - 9:17, 35:18, 52:15
**written** [3] - 10:3, 37:1, 54:4
**wrongly** [1] - 55:20
**wrote** [3] - 39:1, 57:8, 69:7
**WTAR** [13] - 19:10, 19:17, 19:20, 20:6, 46:24, 47:25, 48:2, 48:3, 48:15, 48:21, 49:2, 49:6, 49:8

## X

**Xavier** [1] - 3:18

## Y

**year** [11] - 4:3, 4:8, 6:2, 6:13, 10:5, 12:16, 14:8, 24:1, 34:3, 41:10, 41:11
**year's** [1] - 24:3
**years** [7] - 5:3, 6:7, 7:7, 9:3, 12:19, 13:17, 33:1
**yesterday** [2] - 51:8, 56:14
**yourself** [1] - 38:13