UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF IOWA

- - - - - - - - -

UNITED STATES OF AMERICA,

    Respondent,           Case No. CV-3074-LRR

-vs-

DUSTIN LEE HONKEN,

    Petitioner,

-----------------------------------------------------

EXAMINATION OF RICHARD G. DUDLEY, JUNIOR, M.D.

Tuesday, October 25, 2011

Philadelphia, Pennsylvania

Reported by: Jolynn C. Prunoske

Any reproduction of this transcript is prohibited without authorization by the certifying agency.

COPY

Case 3:10-cv-03074-LTS-KEM    Document 72    Filed 11/02/11    Page 1 of 122

APPEARANCES:

FOR THE PETITIONER:

SHAWN NOLAN, ESQUIRE
FEDERAL COMMUNITY DEFENDER OFFICE
Suite 545 - Curtis Building
601 Walnut Street
Philadelphia, PA   19106

FOR THE RESPONDENT:

OFFICE OF THE U.S. ATTORNEY
C.J. WILLIAMS, ESQ.   (Via teleconference)
Assistant US Attorney
401 First Street, SE
Cedar Rapids, Iowa   52401

Case 3:10-cv-03074-LTS-KEM    Document 72    Filed 11/02/11    Page 2 of 122

I N D E X

EXAMINATION

Examination on Qualifications by Mr. Nolan ------- 6

Direct Examination by Mr. Nolan ----------------- 13

Cross-Examination by Mr. Williams --------------- 67

Redirect Examination by Mr. Nolan ------------- 116

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

Case 3:10-cv-03074-LTS-KEM     Document 72     Filed 11/02/11     Page 3 of 122

BE IT REMEMBERED that on Tuesday, October 25, 2011, at the hour of 10:56 a.m., of said day at the US District Court, 601 Market Street, 20th Floor, Philadelphia, Pennsylvania, before me, JOLYNN C. PRUNOSKE, a notary public, personally appeared RICHARD G. DUDLEY, JR., M.D., who was by me first duly sworn, and was examined as a witness in said cause.

P R O C E E D I N G S

-------------------------------------------------------

RICHARD G. DUDLEY, JR., M.D., HAVING FIRST BEEN DULY SWORN, TESTIFIED AS FOLLOWS:

-------------------------------------------------------

EXAMINATION ON QUALIFICATIONS

BY ATTORNEY NOLAN:

Q. Dr. Dudley, give your name for the record, please.

A. Richard, middle initial G, Dudley, D-U-D-L-E-Y, Junior.

Q. And what's your profession?

A. I'm a physician.

Q. And what type of a physician?

A. Specialty in psychiatry.

Q. And what does your current practice consist of?

A. I am in full-time private practice. Currently I

Case 3:10-cv-03074-LTS-KEM    Document 72    Filed 11/02/11    Page 4 of 122

--- my practice has always been split between a clinical practice and a forensic practice. And currently, I'm winding down on the clinical practice.

Q. Okay. And why are you winding down on your clinical practice?

A. I'm trying to work my way towards retirement.

Q. I see. And where is your practice located currently?

A. In New York, New York City.

Q. Prior to your current practice, which we'll come back to in a moment, have you done a fair bit of teaching during your career?

A. Yes.

Q. In what in what types of settings?

A. I've taught until a couple years ago, starting in the mid '80s at a medical school, City University of New York Medical School at City College, and also at a law school, NYU School of Law.

Q. Okay. And in the City University of New York, what were you teaching there?

A. At the City University of New York, I was the Chair of the Behavioral Sciences Program. The program there is a specially designed program, where students enter the program right out of high school and they spend five years at City College, during

which time they take all of the work required for the first two years of medical school and the work required for Bachelor's degree. And after those five years, they then go into the last two years of medical school at one of the medical schools in the state of New York. And the program was designed to really recruit from various city neighborhoods students, with the hope that they would then return to those city neighborhoods to practice. And so the Behavioral Science Program was much larger than it is in a traditional medical school, because it was focused on not only the usual things of teaching them how to interview patients and a variety of psychosocial issues, but also trying to prepare them to practice general medicine within the city, within the neighborhoods from which they came.

Q.   And what specifically was your role in that grander kind of scheme of things?

A.   Well, I chaired that department, so that the design and administration of that program, which was a full-year program, it included, as I indicated, teaching them how to interview patients. I mean, we actually took them into the hospital to practice interviewing medical patients. But it also was their introduction to psychiatry. It covered a whole range

Case 3:10-cv-03074-LTS-KEM    Document 72    Filed 11/02/11    Page 6 of 122

of issues, you know, everything from child abuse and neglect to HIV-related issues to just a range of issues that --- domestic violence, things that you would find in the city, as well as issues related to culture and ethnocultural sensitivity in the practice of medicine. Just a whole range of things.'

Q. Okay.

A. So I was running that course, picking the lecturers, organizing it.

Q. And then did you also do direct supervision of students who were doing interviewing, psychiatric interviewing?

A. Yes. But also, I mean, prior to that I had worked at New York Medical College training and supervising psychiatric residents. So that was even more intense, with regard to the direct supervision of residents who were learning, training to be psychiatrists.

Q. And those residents, were they doing clinical work or forensic work?

A. Yeah, they were doing clinical work.

Q. Okay. All right. And so talk a little bit about your experience teaching in law school. Where did you teach?

A. At NYU, at the School of Law. I taught

different courses and seminars over the years, pretty much always focused around expert evidence in one way or another, depending on the course. So that would have been, you know, everything from family law to criminal law to capital litigation. So it was, you know, different courses over the years, but always around expert evidence, the rules, what are experts attempting to do in these different settings, how do you pick experts, work with them, et cetera.

Q. And how long did you do that work?

A. I taught at NYU for about 25 years.

Q. Let's talk a little bit about you educational background. Where did you get your undergraduate degree?

A. I got my Bachelor's degree in Science from Wheaton College, in Wheaton, Illinois. Following that, I came back home to Philadelphia. And my medical degree is from Temple University School of Medicine here in Philadelphia. Then I went to Northwestern, University in Chicago, where I did my internship and my residency in psychiatry.

Q. And your internship and residency in psychiatry, what did that consist of? What were you doing then, just out of school?

A. The internship was a classic medical internship,

except that I took electives that were more oriented towards eventually going into psychiatry, because I knew that's what I wanted to do. And then the psychiatry residency was, I think, a classic psychiatry residency, where you work in the various, different psychiatric services over the course of your years there.

Q. Okay. At some point during your career, did you begin to get involved in forensic work?

A. Yes.

Q. And when did that start? Like how long into your career did you start doing that?

A. It was in --- I finished all of my training in 1975, at the very end of '75, and that's when I came to New York. And I started doing forensic work in the early 1980s.

Q. Okay. And when you --- what types of forensic work have you done over the years?

A. I've done both civil and criminal. I started out in the family court, working on abuse and neglect cases and child custody cases. So the range of things. And juvenile matters in New York. There is no separate juvenile court, it's in the family courts. I was doing juvenile matters as well.

Q. Okay.

Case 3:10-cv-03074-LTS-KEM    Document 72    Filed 11/02/11    Page 9 of 122

A. And then I eventually started doing criminal matters.

Q. And when you started doing work in family court, were you often appointed by the court, or how would you get involved in those cases?

A. I started out being retained by one side or the other. But pretty quickly in the process I started being called by the judges to be the neutral court expert. And I pretty much evolved into doing just that.

Q. Okay. And then when did you first get involved in doing capital work on a forensic level?

A. I think it was in the middle 1980s. I had started doing some postconviction cases. And then I just continued to do them since then.

Q. Okay. And how many times, roughly, have you been involved --- retained, I should say, in a capital case?

A. I would --- well, if you combine both at the trial level and post conviction, ---

Q. Yes?

A. --- I would say probably I do --- I take on five or six a year.

Q. Okay. Five or six new cases a year?

A. Right.

Q. And ---.

A. It's hard to keep track because they last for so long.

Q. They last for so long. So during the time that you've done noncapital criminal work, what has that kind of work mostly consisted of?

A. That's consisted of the range of other criminal matters. They could be robberies or drug cases or other types of assault cases. Or they could be murder cases in jurisdictions in which there is no department.

Q. And what are you typically asked to do in those cases?

A. It differs from one case to the other. It could be a question of competency. It could be a question of whether there is some other sort of affirmative defense or some sort of psychiatric problems that might raise questions about issues like contempt and things like that. So it's a --- it depends on the case. But it's been a range of those issues.

Q. And is it fair to say that for the most part you're retained by defense ---

A. Yes.

Q. --- in criminal matters?

A. That's accurate.

Case 3:10-cv-03074-LTS-KEM     Document 72     Filed 11/02/11     Page 11 of 122

Q. Have you been consulted by prosecutors in criminal matters in the past?

A. Not capital matters, but other matters.

Q. And you have --- have you previously been accepted as an expert in forensic psychiatry in courts of law?

A. Yeah.

Q. And roughly how many times?

A. I testify probably around 12 times a year, since the mid-'80s.

Q. Okay.

A. And I have never not been accepted as an expert in psychiatry.

Q. I am going to show you what's previously been marked as Plaintiff's Exhibit 17. Can you identify that?

A. This is a copy of my Curriculum Vitae. And attached to it is a list of cases for which I either testified in open court or at a deposition, over the last four years.

Q. Okay. And is that copy of your resume --- or your Curriculum Vitae, is that current?

A. That is the most recent one.

Q. The most recent one, okay.

ATTORNEY NOLAN:

We would ask that Dr. Dudley be accepted as an expert in clinical and forensic psychiatry. C.J., do you want to do any questioning now or wait?

ATTORNEY WILLIAMS:

I'll wait. Thank you.

ATTORNEY NOLAN:

Okay.

EXAMINATION

BY ATTORNEY NOLAN:

Q. Doctor, I'm going to show you what's previously been marked as P-18. Can you identify that for the record?

A. This is the declaration that I submitted in connection with this current matter.

Q. Okay. And is that your signature on the last page?

A. Yes.

Q. Okay. So Doctor, who retained you in the matter of United States versus Honken?

A. Your office.

Q. My office, okay. And what did we ask you to do?

A. You asked me to perform a psychiatric evaluation in connection with his applications for postconviction relief.

Q. Okay. And did we provide you with any documentation or background materials?

A. Yes.

Q. Okay. I'm going to show you a list that has previously been submitted to the government with our expert disclosure, and ask that you take a look at that list.

WITNESS REVIEWS DOCUMENT

BY ATTORNEY NOLAN:

Q. Perhaps actually, I should draw a line where I added the remaining stuff.

A. Well, actually it's this list.

Q. Yes. That's right. So that first page of the list, does that accurately reflect, you know, what we provided you at some point?

A. Yes.

Q. And more recently, did we provide you with some other materials?

A. Yes, since my declaration.

Q. And what did we provide you since then?

A. You provided me with the report of the methamphetamine expert, Dr. Piasecki.

Q. Piasecki. That's P-I-A-S-E-C-K-I.

A. You provided me most recently with some deposition transcripts. That included Piasecki, Dr.

Warren, and the mitigation specialist from the trial level, Lisa Rickert. I have the report of the state's expert.

Q. The government's, not the state's.

A. The government's, I'm sorry. The government's expert, Dr. Grody.

Q. Yes.

A. Okay. I have some additional old interview notes. I think specifically, Mr. Honken's sister and mother. And then I have some medical records concerning the mental health evaluation and treatment of several members of Mr. Honken's family.

Q. Okay. Now, can you just describe what the importance of collateral data is in doing a psychiatric evaluation?

A. The use of collateral data in a forensic setting is important for a variety of reasons. One, even though the person you're evaluating, certainly that psychiatric examination is a critical and central part of the evaluation process. But the collateral sources of information help you to either confirm reports from that person or raise questions about the credibility of reports from that person.

But in addition to that, the collateral sources of information often provide information that was

not available from that individual, either because they don't remember, they lack insight, it's something they can't talk about, for whatever reason, you didn't gather enough information from them. So the collateral sources of information can be very helpful in adding additional information to the information that you gathered directly as well.

You're concerned about credibility when doing forensic evaluations, because you're concerned about whether the patient is pretending to be more ill than they really are, or pretending to be --- or trying to present themselves as less ill than they really are. And so that these other sources of information help you address that as well.

Q. Okay. Did you also speak with Jessica Johnson, who is our mitigation specialist?

A. Yes, I did.

Q. And did you speak to --- did you conduct any interviews in Iowa?

A. Yes, I did.

Q. And before you tell us who you interviewed in Iowa, what is the importance of that, of doing that kind of work?

A. Well, even if you have records and interview notes or declarations, or whatever, from various



insundry family members, it's been my experience over all of these years that interviewing some of them myself often results in either a clarification of things that are in their declarations or sometimes even things that didn't come out before and weren't included in their declarations, come out with my interviews with them. And I just have an opportunity to be clearer about what they're trying to say, by being able to ask follow-up questions and gather more information from them.

So I believe it adds to the information that's usually available to me in the form of affidavits or statements or interview notes from family members. But I use those written documents, the affirmations and things like that, to --- and usually discussion with the mitigation specialists, to pick individuals who might be most helpful for me to talk to, in the sense that they are good sources of information.

Q. Okay. And is that what you did here?

A. That's what I did here.

Q. And so who did you speak to in Iowa?

A. So I spoke to his mother.

Q. Yes.

A. I spoke to his sister. I spoke to a paternal uncle.

Q. That for the record is David Honken.

A. That's David Honken. And his daughter, which is a cousin.

Q. Yes. Carol Hilgenburg (phonetic)?

A. Carol Hilgenburg. And I also spoke --- do you need the spellings of these?

OFF RECORD DISCUSSION

A. And I also spoke with Tim, a childhood --- longstanding friend of his, Tim ---.

BY ATTORNEY NOLAN:

Q. Cutkomp.

A. Cutkomp.

Q. That's C-U-T-K-O-M-P. All right. In addition to reviewing these --- the collateral data and in addition to speaking with Jessie Johnson and in addition to speaking to these individuals, did you also conduct clinical interviews with Mr. Honken?

A. Yes, I did.

Q. And over what period of time did you do that?

A. I spent two days with him.

Q. Okay.

A. Approximately six hours or so each day.

Q. And what's the importance of that or what's --- yes, what's the importance of the clinical interview?

A. Well, the direct psychiatric examination is

obviously central to the overall evaluation process. You're gathering from the individual his or her own history during the course of that. During the course of that as you --- as things come up that may have been difficult points or experiences in their life, you try to explore those. You try to gain some sort of understanding about how the person coped with it and/or responded to it.

If there's any indication of symptoms of psychiatric difficulties, you explore those in some detail with the individual as well. And you're trying to gain some sort of sense of their own understanding about their own life and what's happened over the course of their life.

You're simultaneously doing a mental status examination, where you're looking at important mental functions over the course of the time that you're with them. But also you're trying to get some sort of sense of those mental functions over the course of time.

So you are looking at everything from memory, to mood, to affect, to the content and process of the person's thinking. You're trying to get some estimate of their intellectual capabilities, of whether there's other evidence of other cognitive

deficits. So you're looking at a range of mental functions, at --- during the time of the examination itself, but also some assessment of what they were like over time.

Q. Okay. And when you're doing that kind of an interview, a clinical interview, especially in a prison setting, are there techniques that you've developed or that you've been trained in to create a certain type of environment for that type of an interview?

A. Well, I mean you're always concerned in doing --- at least this is my experience, in doing these sorts of psychiatric examinations that, you know, if there have been difficulties that the person has experienced through the course of their life, you know, what it's going to take to get them to be able to talk about those sorts of things.

So that you're always concerned about creating --- trying to create an environment in which a person can feel safe and comfortable talking about these specific things, and managing any distress that comes about when they try to talk about these sorts of things.

And so that you're looking at, you know, some concrete things like, you know, privacy, the

setting, you know, trying to have a real contact visit, as opposed to talking through glass or over a window. Trying to have it in a setting where, you know, if they do get upset, somebody else is not watching them, things like that. But then also trying to, by virtue of how you ask your questions, how you go about doing it, creating an environment in it that is non-judgemental and one that seems to be understanding of the difficulties that they had in their lives.

One of the advantages of being able to review a lot of collateral sources of information before you go in, is you go in with some anticipation of what might be difficulties. And so that you have that in mind and you try to approach things in a way, taking that into consideration.

And thereby again, hopefully trying to create a space in which somebody can talk about things that may be very difficult to them, including things they may have not have talked about with anybody else.

Q. And before you interviewed Mr. Honken, did you have the opportunity to review a good amount of the collateral data that was provided?

A. Yes.

Q. Were you alone on your visit with him?

A.   Yes.

Q.   And were you able to have a contact visit with him?

A.   Yes.

Q.   Now, the opinions that you've expressed in your declaration and the opinions that you are going to express today in this deposition, are all of those opinions to a reasonable degree of medical and psychiatric certainty?

A.   Yes.

Q.   All right.  Did you diagnosis Mr. Honken with any disorders?

A.   Yes.

Q.   What did you diagnosis him with?

A.   It was my opinion that he was suffering from what's called an anxiety disorder, NOS, not otherwise specified.  And that he was suffering from a personality disorder, mixed type, with narcissistic and borderline features.  And that he was also suffering from a methamphetamine dependence.

Q.   Okay.  All right.  We'll come back to the diagnosis in just a few minutes.  In your review of the collateral data and also in your discussions with Jessie Johnson and with family members and other people that you spoke to in Iowa, were you able to

Case 3:10-cv-03074-LTS-KEM    Document 72    Filed 11/02/11    Page 22 of 122

find out information about Mr. Honken's childhood and what his experiences were growing up in the home?

A. Yes.

Q. All right. And what type of childhood did he have, overall?

A. Well, I mean overall, I would say he had an extremely difficult childhood. It --- the --- it was characterized by an abusive and kind of threatening sort of environment, in which he was raised in. And it was made --- that was made worse by the absence of any sort of safe space or comfort that would have mitigated against the impact of that environment.

Q. Okay. Well, let's put a time frame on it, just so we are clear for the record. Let's talk first about the period of time prior to his parents' divorce. What was his relationship like with his father and what was the father's reaction to home life, I guess, at that point?

A. Well, during those years, it was the father was away a lot, working away. And but when he was home, he was a severe alcoholic, and so he was often drunk. But he was also very --- kind of a threatening presence. Verbally abusive. Leaving. Communicating the possibility that any moment he was going to explode into some sort of form of violence that made

Case 3:10-cv-03074-LTS-KEM   Document 72   Filed 11/02/11   Page 23 of 122

him sort of frightening. And was otherwise not really offering much in the way to --- for the kids at all. The mother ---.

Q. Well, before you get to the mother, how did the information that you have --- how did Jim Honken, who's the father, treat Marvea, who is Dustin's mother?

A. That he was --- he treated her the same way that he treated everybody else. That there was a --- that he was verbally abusive and threatening to her as well. She reports that there were sexual difficulties between them because of his aggressiveness, with regard to getting her to engage in sexual activity with him. And so she describes that as a verbally-abusive relationship as well, where she's kind of denigrated.

Q. Okay. All right. And then you were going to speak with about her, at that time frame.

A. During that time frame, she was pretty overwhelmed by trying to function within this environment. She also began to suffer from pretty severe depression herself. And so that she was really not available to the kids in the sense of calming them down, providing a safe space for them. And instead, you know, when she was there, she wasn't

doing that. And then she would just kind of escape from the house and go out and get away, for her own wellbeing, and just kind of just leave the children there so their own.

Q. Okay.

A. Well, on their own --- either with --- under the care of the older brother, who was really only a matter of six or seven years older than Dustin.

Q. And then at the time of the divorce, when the mother and father separated, what happened to Dustin at that point?

A. The --- both Dustin and his sister describe the divorce as just kind of suddenly out of the clear blue sky it was announced that the divorce was happening. And they were moved --- the mother moved in with a man that apparently she had been involved with before the separation, who she eventually married. Dustin described --- well, there was then a period of time that they didn't see the father and then they continued to have contact with the father after that.

Dustin described discovering not long after the separation and the move that his mother had offered to leave him with the father and just take the other two kids, his older brother and the younger sister.

The father told him this at some point when he started seeing the father again.

And that was very upsetting to him. He confronted the mother. The mother admitted it. And the fact that she would just kind of give him up to this man was --- he described to me as very upsetting to him.

When I met with the mother, I talked with her about it as well. She acknowledged that this is, in fact, what happened. She remembers when Dustin confronted her about it. She says it's one of the things that she regrets more than almost anything else. And given his response to it, really felt guilty about it.

She tried to convince him that it wasn't that he --- she didn't love him, but that she thought that maybe it would only be fair to leave one of the kids with the father, that sort of thing. That was --- and she even recognizes that that wasn't very comforting.

Q. Okay. And what about the family life, after the divorce? So the mother's remarried at this point. And what's the effect on the family life at this point on Dustin?

A. Well, there are things happening in both homes.

The --- like I said, the mother --- I mean from the beginning they're moving in this with this man that the mother had been involved with before the separation. She eventually marries him.

By all reports, her focus was totally on this new relationship. And so that she was really no more attentive to the needs of her children than she was, you know, when she was in the home with Dustin's father.

The father, by the time they had the contact with the father, the father's also with someone new. He eventually stops working. And so that his time at home and his drinking and everything becomes more severe. And his criminal activity becomes more explicit. And what I mean by that is that Dustin becomes even more aware of things that his father is doing because the father talks about it.

The other thing that happens is that the father apparently is quite angry at the mother for the separation. So there added to the mix is the father's constant degradation of the mother in front of the children, when the children are at his house. And he is similarly apparently quite degrading and humiliating of the younger sister.

Q. Okay. And in your declaration you also

Case 3:10-cv-03074-LTS-KEM    Document 72    Filed 11/02/11    Page 27 of 122

mentioned a period of some bullying that went on. Can you describe that a bit?

A.   Yes.   The --- one of the things that was very striking about the examination of him is this sort of story line that goes through it of his being this physically --- in addition to everything else, kind of physically inferior to peers, being skinny, not being athletic, not being aggressive.  And in fact, being essentially frightened.

And he describes kind of an ongoing relationship with another kid, who is the son of his mother's --- one of his mother's close friends, who was bigger, more aggressive and threatening and bullying him, throughout his early childhood years until shortly after the separation and divorce of his parents, and The impact that that was having on him.

Again, when I met with family members I asked about this kid.  Everybody clearly remembers him, clearly remembers him as being incredibly aggressive and much stronger and bigger than Dustin.

Q.   So I'd like you to talk for a few minutes about kind of the psychiatric effect of this type of a childhood.  And let's start with the, you know, psychiatric effect of abuse or witnessing abuse.

A.   The --- well, I think it's the --- it's the

affect of being in a threatening and frightening environment. The --- in whatever way that that's communicated to you. The fact that you never know what is going to happen. That you are concerned. That you're at risk. And in this case, it's going on inside the home but it's also going on outside the home, in other places.

And so the effect of that, particularly when it's kind of --- when it's ongoing is that it creates an enormous amount of anxiety and uncertainty and fear about what's going to happen next, and what we call kind of an over-reactivity in the sense of that, you know, because you're not quite sure what's going to happen next, you're always looking to protect yourself and you're are always kind of overreacting to things that might happen, thinking that it could be worse.

Q. And is that a similar kind of reaction to psychological abuse?

A. It's a reaction to any sort of abuse that is threatening. The --- when psychological abuse comes in the form of the denigration and putting you down, then you have a somewhat different response.

Q. And is there any significance to whether that type of abuse comes from a parent or someone else?

A. Well, it's significant when it comes from somebody who you would otherwise expect to be safe with. And so that that makes it, of course, all the more distressing.

And that's particularly a problem in the absence of any other safe space, when there's no other safe space to go. And the impact of that additional difficulty really shouldn't be minimized, because it adds not only a psychological-emotional response to the abused, but also then a physiological.

Q. Okay. And so when you're talking about that lack of a safe space, I guess, can you factor in, you know, how the kind of neglect by the mother, kind of factors into that combination of events?

A. Well, what happens is, is that when anyone is frightened, you have a physiologic response. You know, the kind of fight or flight response. And that so children have that too, just like the rest of us do. What you expect a parental person to do is to calm that. So you know, if you're walking down the street with your kid and some big dog comes along and the kid starts screaming and yelling and freaking out, you expect the parent to pick up the child or do something that in essence says, you know, you're safe, you're okay. Daddy's here or Mommy's here or

whatever. And that helps that physiological response to calm down.

And over time through the parent doing that, the child eventually learns how to do that on their own. So that as adults we still have that response, but we've learned how to manage it, how to kind of calm it down, before we --- and how to soothe ourselves. And then we can kind of go and function. So if you --- but it's something you have to learn how to do.

So if you don't have that going on and you --- if you don't have that kind of parenting and you never learn how to do that, eventually you end up in a state of --- and the frightening stuff is going on in an ongoing sort of way, you eventually end up in a state of kind of constantly being physiologically aroused. And that --- it contributes to the psychological anxiety in kind of a physiologic hyperness as well. So it just makes it all the more difficult to manage and all the more overwhelming.

OFF RECORD DISCUSSION

BY ATTORNEY NOLAN:

Q. All right. So Doctor, can you talk for a moment about Jim Honken, Dustin's father, and how his kind of criminal lifestyle would have an effect on Dustin growing up and modelling?

Case 3:10-cv-03074-LTS-KEM    Document 72    Filed 11/02/11    Page 31 of 122

A. Well, the --- it's my understanding that there was some sense of this from the time that he was a child, in the sense that the father was always sort of, very much bragging about escapades and always trying to present himself as having more than everybody else, in a way that didn't necessarily make that much sense. As I indicated, the older he got the more explicit the father became about the activities that he was involved in, and that he had incorporated the older brother in as well.

And then he, Dustin, describes an experience that occurs in his adolescence, where the father begins to make it clear that he wants him to do criminal things as well, and is instructing him to do criminal things as well. So it's an interesting progression over the course of his childhood and early adolescent years, in revealing this behavior and then in the context of the rest of the environment, which we've already discussed. And then beginning to instruct him to do some of these behaviors as well.

Q. Okay. Let's move for a moment to --- you indicated that in some of the collateral data that you received, actually more recently, were medical records regarding some family members. And let me



see if I can identify what they are for the record.

For the record, you received medical records from Marvea, which are P-41 to P-44 ---

A. Right.

Q. --- in our exhibit package, from Alyssa Nelson, which would be P-49 to 50 in our exhibit packet, from Laurel Christianson, which is P-51 and from Jim Honken, which is P-45 to 48. Is that accurate?

A. That's correct.

Q. Was there any other --- was there information about other family members, other than the records, that indicated any history of mental illness in the family?

A. Well, I mean, there were reports from other family members about other family members who had psychiatric problems. So that these were fairly detailed descriptions. But they included such things as several cousins who had committed suicide and things like that, which is, you know, fairly indicative of psychiatric difficulties.

And then when I interviewed the mother and the sister, for example, they very clearly described their own psychiatric histories, in addition to whatever other documents and things that were available to me.

Q.   Okay.

A.   So I think it was a combination of for some we have records, for some we have other detailed reports.  Some of them, you know, with various degrees of detail, But including all the way up to several family members who had committed suicide. And then I had the specific --- in addition to that, interviews, because I had records for them, for the mother and sister as well, but also talked with them about their psychiatric issues.

Q.   Right.  And you had said earlier that Marvea had talked about her depression.  What are the types of mental illnesses that seem to run in the family?

A.   Well, clearly mood disorders run in the family. There's a clear history on the mother's side of the family of various types of mood disorders and depressive disorders, but even some instances of bipolar disorder.  So mood disorders clearly run on the mother's side of the family.  It's important to recognize that, you know, have a pretty clear understanding of genetics as an etiological factor in the development of mood disorders, that they run on a continuum and they kind of run together.  So it's going to be the whole range that would run together through a family.  There's also a substantial history



of substance abuse, most notably alcohol that runs in the family.

Q. And what might be the significance of that?

A. Well again, with regards to substance abuse, there seems to be some interesting factors that contribute to the etiology of substance abuse, including some genetic factors. But when you have it in your primary residence, in the family that you live with, you add to that the kind of learning effect of people managing their issues through the use of substances, as then an additional etiologic factor for the development of substance abuse difficulties.

It's interesting because what you find is that the experience of growing up, say for example, with parents who are abusing substances, you are going have some children who just follow immediately in those footsteps. You're going to have other children who decide like I never want to touch substances, because I never want to be like that.

But we recognize the role of genetics in this because in either case, when kids begin to explore substances by --- because of whatever reason they begin to explore, then they often have an enormous difficulty not progressing to substance abuse states

because of the genetic contribution.

Q.    And just for a moment, which of these two tracks kind of did Dustin take ---?

A.    Well, it's very --- I raised this because it's interesting.  I mean, he reports and basically everybody else confirms that for years, I mean, years where you would think he would be vulnerable to exploring with substances, that he did not want to be, you know, kind of the drunken, bragging person that he watched his father as.  And pretty much avoided substances well into his 20s.  So during those adolescent years, where you would think that he would have been particularly vulnerable, didn't.  Even in his early 20s didn't.  So it's pretty impressive.

But once he did start with the methamphetamine, then he very quickly progressed to very extensive use of the drug --- I think in part because of a --- you know, the family history of the vulnerability to substance abuse, in part because of the addicting potential of the drug, and in part because of the interaction between the drug and his other psychiatric problems.

Q.    Okay.  Well, we'll come back to that.  Let's --- is there a connection between depression in the

family and anxiety disorder?

A. Yes. What I was trying to describe earlier is that there's a continuum of mood disorders that go together, that travel together. And you know, the combination of depression and anxiety is on that --- the continuum. And that's what you see with him. This anxiety disorder, NOS is an anxiety disorder, you know, with depression associated with it, as is his underlying personality disorder.

Q. Okay. All right. Well, let's talk about anxiety disorder in a little more detail then. I'd like to show you --- let's see, this is ---.

ATTORNEY NOLAN:

C.J., this is declaration of Marvea Smidt, which is P-120 in our exhibit packet.

BY ATTORNEY NOLAN:

Q. Can I show you that, Doctor? I think I have a copy of it.

A. No, I'm jus trying to keep myself organized.

Q. Okay. Did you --- that's one of the declarations you indicated we had provided to you prior to your interview with ---

A. Yes.

Q. --- Dustin. Or maybe not. But prior to your declaration, I mean. And if you could look at

paragraphs nine, ten and eleven.

WITNESS REVIEWS DOCUMENT

BY ATTORNEY NOLAN:

Q. And just describe what Marvea Smidt has indicated there and how that --- and how you factor that into your diagnosis of anxiety disorder, if you do?

A. I mean, she described --- in this declaration she described him as kind of --- as even as a child that he --- that there was just a lot of nervousness and anxiety that he exhibited as a child. And she goes on to describe, as some others did, other clusters of anxiety symptoms. So she in this declaration describes the kind of an obsessive compulsive combination of symptoms that you see often in anxious children, in their attempt to try to harness their anxiety and get some sort of focus on it. And so she describes him exhibiting that type of anxiety-related behavior, even as a child.

Q. Okay. And when you actually spoke with her, did you speak to her about these things?

A. I spoke with her about these things and she talked about, you know, him being jumpy and nervous, in a generalized anxiety sense. She talked about his --- then having these other clusters, the panicky

symptoms, obsessive-compulsive symptoms and a needing to always to please, needing always to be sure that everything was going to be okay. Lots of worry, that sort of stuff, even as a child.

Q. Okay. And let me show you Alyssa Nelson's declaration that's ---.

ATTORNEY NOLAN:

For the record that's P-113 in our exhibit packet.

BY ATTORNEY NOLAN:

Q. And I'd ask you to take a look paragraph 26 of that declaration.

WITNESS REVIEWS DOCUMENT

BY ATTORNEY NOLAN:

Q. I'm sorry. All right. So again, I'd ask you to read that paragraph 26 and describe for Judge Reade, how that impacts your diagnosis.

A. This is the sister and she --- her reports are similar in that she reports that she remembers, even as a child, that he had trouble sitting still. He'd be up pacing around. They had a lot of generalized anxiety. Then she too talks about other symptoms, clusters of anxiety, like panic attacks.

Q. And did you also meet with her?

A. Yes.

Q. And did you speak to her about this?

A. Yes, I did.

Q. And when you spoke with her about it, did she describe more of this?

A. She describes the same thing.

Q. Okay.

A. Of his always having been hyper and ---.

Q. All right. So you diagnosed Mr. Honken with an anxiety disorder, NOS. Can you describe in a little more detail what that is exactly?

A. It's my opinion that what he has are many --- you know, besides this generalized anxiety and the --- some of these other anxiety-related clusters, like obsessiveness and --- in his behavior and at times of panic. And that he --- that they are a cluster of anxiety symptoms that are seen in children, and then adolescents and adults, who have had traumatic experiences, where they're always concerned about what's going to happen to them. Lots of worry about that, having to be safe and/or how to protect yourself.

These sorts of themes are a carport of the anxiety. And that it's tinged with --- obviously this is exhausting and depressing to be dealing with this. So it's tinged with depression as well. So

Case 3:10-cv-03074-LTS-KEM    Document 72    Filed 11/02/11    Page 40 of 122

that's what I'm describing.

Q. Okay. And how does --- if it does --- does stress impact this type of a disorder?

A. Well you know, when faced with perceived threats, then of course it's going to exacerbate the symptoms associated with the disorder. But your perception about threats and the seriousness of threats, of course, are disturbed by the disorder itself. So real or perceived threats could exacerbate the symptoms of this disorder.

And of course, if there's just other stuff going on, your ability to manage and tolerate the anxiety that's associated with the disorder is going to differ.

Q. Okay. And how about stress?

A. Well, that's what I'm saying, if it's just general stress going on, even if it doesn't relate to the themes of the disorder, per se, but if you are just otherwise stressed out, you have less energy to use to manage and cope with the symptoms of this disorder.

Q. Okay. And what's your understanding of what was going on in Dustin's life, in around April and shortly thereafter of 1993?

A. Well, if he --- I mean, clearly there was stress

Case 3:10-cv-03074-LTS-KEM     Document 72     Filed 11/02/11     Page 41 of 122

that was going on at that time; right? I mean, that he had returned to Iowa, was trying to --- was dealing with the charges against him. Was dealing with two women from whom he had children, trying to establish relationships with those --- and maintain relationships with those children, with whatever difficulties he was having with the two women involved, who were in conflict with each other, and also in conflict with him.

But equally as important, and it's my opinion, that prior to that there had been a serious exacerbation of his psychiatric difficulties. And so that, you know, he comes into that period in a deteriorated state.

Q. Well, we'll come back to that in just a moment. Let's talk about personality disorder for a moment. You diagnosed him with what type of personality disorder?

A. As a personality disorder, mixed type, with narcissistic and borderline features.

Q. Can you first describe what that is, what is that type of personality disorder?

A. Well, more often than not people have different characteristics of different personality disorders. And so that's what's the case here. So narcissistic

Case 3:10-cv-03074-LTS-KEM    Document 72    Filed 11/02/11    Page 42 of 122

personality disorders are --- kind of grow out of --- well, the --- I mean, the psychological mechanism is one in which you --- there is underlying feelings about worth and value. In other words, you don't feel very good about yourself, I mean, that's maybe the clearest way to put it, and that that gets denied. So that's psychological reaction number one.

And then two, the second psychological reaction is what we call a reaction formation where then you then view yourself as the opposite. So instead of feeling like I'm worthless, I feel like I'm the most wonderful guy in the world. And that defense is you try to hold that defense in place by getting everybody else to tell you that, in fact, you are the most wonderful guy in the world. And if people who you --- whose opinions you value, kind of reenforce that, it helps you to keep that defense in place. So if you look at it in psychological defense terms, that's the best way to describe it.

If you look at it developmentally, narcissism is a normal stage of development, when you're seven or eight years old. So we're not born with a sense of self esteem and self worth. Instead, you know, when we're raised by loving caretakers, who tell us that we're great and we're good kids and, you know,

Case 3:10-cv-03074-LTS-KEM    Document 72    Filed 11/02/11    Page 43 of 122

you're daddy's little angel, you're mommy's little boy, whatever, and you grow up feeling good about yourself, because you're getting this information from these powerful people, who you call your parents, you know, who know everything, who take care of everything.

And then what happens developmentally is gradually you realize that your parents are just kind of normal human beings, and they're not like all that. But as that occurs, the goodies that they've given you, the good feeling that you have about yourself, becomes internalized into your own sense of self esteem and self worth, as opposed to it being based on I am my father's son or something like that. So that's what happened developmentally.

So what can happen is, is that if there are tragic losses, abandonment, that never really happens, you never get those goodies, you never have that positive sense of self, then you can end up being stuck in this very immature, childish sort of way of functioning, where you have no self esteem on your own, and it's --- you're relying on getting that from external factors. And in this case that's what happened. And in addition to that, that's the defenses that were modeled by his father, who really

Case 3:10-cv-03074-LTS-KEM   Document 72   Filed 11/02/11   Page 44 of 122

has very significant difficulties.

Q. When you say in this case that's what happened, can you talk about how the childhood he had is related -- is or is not related to that?

A. Well, what I'm saying is that you have to learn to feel good about yourself. And if you're not getting that --- you know, he wasn't getting that from either parent. And so that he didn't have the childhood experiences to incorporate into a positive sense of self esteem and self worth. Plus, you know, he was raised by a father who had familiar problems and was handling it in a similar way, in a very narcissistic sort of way. And everybody who describes the father makes that pretty clear. So that defense mechanism was being modeled as well.

Q. Okay. And you also talked about personality disorder with borderline features. Can you describe what those features are?

A. Right. The borderline personality also grows out of a childhood experience of about where there is difficulties with the development of attachment, because you don't have the kind of parenting that fosters attachment. And so that there are always issues about being able to connect, being able to trust, fearing abandonment. Those sorts of things

that just go on into --- you know, unaddressed, becomes part of who you are, with associated problems around self esteem and self worth, with associated problems around instability of mood and impulsivity.

So you have instability in the core areas of functioning, relationally, around attachment, trust, abandonment issues. Internally with regard to a sense of self, instability around a sense of self, and associated instability about mood and having difficulty regulating and maintaining a decent mood, and then impairment of the decision making process, as evidenced by impulsivity.

So it's a broad-based instability in core important areas of functioning that make it one of the most severe of the personality disorders because its effect is so broad reaching.

Q. And you mentioned attachment, what are the implications of an attachment problem that you're identifying with respect to Mr. Honken?

A. Well, the attachment of developing children to some significant parenting person is kind of step one in healthy development. I mean, that if there's not --- if there's difficulties with that initial stage of attachment, then it just gest magnified over the course of the years. I mean, in other words, it's

such an early impairment in the developmental process, so that that's so central to some of the later stages of development.

And that's what happened here. You know, people were just not --- parenting figures were not available for the kind of healthy attachment that's required for healthy development.

Q. Do these types of personality disorders have an effect on judgment?

A. They have an effect across the board. Both of them have an effect on judgment, in and of itself. But they also have an effect on the decision-making process. So they impair judgement in two different sorts of ways.

Q. Okay. All right. Let's go back for a moment. You had mentioned a few minutes ago about the effect of drug use and/or abuse. And so let's talk about that for a moment. When you spoke with Mr. Honken and reviewed other information, did you come to some conclusion about what his drug use was like? I know you diagnosed him in that regard. But can you say why?

A. The --- it's my understanding based on all the information that was available to me, that the first times that he tried methamphetamines that he

discovered that they had a calming effect, or it was his experience that they had a calming effect on the anxiety that he was feeling ---

Q.   And in your opinion ---.

A.   --- which is --- well, what happens is, is that the use of methamphetamine makes you feel bolder and more competent, which in turn decreases your anxiety. The --- but that's if you are just kind of using a little of it; right?  The problem is he continues to use more and more, and as it interacts with the underlying --- as the direct effect of methamphetamine interacts with these other psychiatric problems, that it's in my opinion that he suffers from, ---

Q.   Right.

A.   --- then you have --- begin to have much more of a problem.  Because the combination of the direct effect of methamphetamine with the narcissistic elements, right, makes the grandiosity and the sense of power just totally over the top.

The inner --- when you use enough methamphetamines, you also become more anxious, more fearful.  The interaction of that with the anxiety disorder and the underlying borderline disorder can elevate that anxiety and fear to the point of being

Case 3:10-cv-03074-LTS-KEM   Document 72   Filed 11/02/11   Page 48 of 122

paranoid. And he talks about at times becoming quite paranoid on methamphetamines. People, I mean, if you use enough methamphetamines, you're going to become paranoid --- anybody's going to become paranoid. People who have underlying borderline personality disorders are at more risk of becoming paranoid with the use of methamphetamines. And when you have the kind of anxiety disorder that he has, you know, you add those things together, it's not at all surprising that it has that effect on him.

And so that it's a combination of the direct effects of being high on large quantities of methamphetamine, and the interaction of those effects with his other psychiatric problems.

Q. Okay. I want you to look at a declaration of Tim Cutkomp, if you would. Is that one of the declarations that you reviewed at some point?

A. Yes.

ATTORNEY NOLAN:

I'm just looking to see if I can find out what number that is. Excuse me, C.J., just give me a minute. I'm trying to find out what exhibit number that is.

ATTORNEY WILLIAMS:

Sure.

BY ATTORNEY NOLAN:

Q. While I'm doing that, Doctor, if you could just take a quick look at paragraph 11 and thereafter.

WITNESS REVIEWS DOCUMENT

ATTORNEY NOLAN:

For the record, this is Exhibit Number P-111.

BY ATTORNEY NOLAN:

Q. And Doctor, again, I ask you to take a look at those couple of paragraphs there and describe, you know, whether the information that you reviewed in that declaration impacted your opinion?

A. Yes. I mean, there's actually two sections to this declaration. One in which he talks about the actual pattern of use and how the pattern of use increased very rapidly over the time that he was employing methamphetamines.

And then there's another section of this declaration where he talks about how the drugs seemed to affect him, how These drugs seemed to affect Dustin. And he talked about how, you know, his schemes became more over the top and that his following through on them became more exaggerated, how he was less focused, how he was more impulsive, how he'd be up using, crash, up, this pattern of up,

using and crashing. And the --- that went along with it. And how that really continued even after they came back to Iowa.

I met with --- I mean, I reviewed this, of course, when I interviewed him, interviewed Tim, and so it was an opportunity to hear even a little bit more about this matter.

Q. Okay. And how does that information that you got from Tim impact on your opinion about this kind of effect of drug abuse in combination with these other disorders?

A. Well, it's --- in talking with Tim, it became, you know, clear that, you know, he could see the kinds of things that he --- I mean, he wasn't totally unaware of --- I mean, not at all actually. I mean, he was quite aware of Dustin's difficulties before they ever used drugs. And so that he was able to talk about how all of those difficulties became more exaggerated and became more severe during the use of --- during the time that he was actively using methamphetamines. And so that that was very helpful --- but and mixed with the other sources of information that I had, and Dustin's own reports about the effect of the drugs on him, were all very consistent.

Case 3:10-cv-03074-LTS-KEM    Document 72    Filed 11/02/11    Page 51 of 122

Q. Can you --- there's some differing of opinions --- and we'll get to this when we talk about Dr. Grody's report, about when Dustin was using and not using.

A. Okay.

Q. What did he tell you about that?

A. Well, he --- you mean as to whether he was using after he returned to Iowa?

Q. Yes.

A. His report to me was that he continued to use after his return to Iowa. And that for some months he still had access to methamphetamines.

Q. Did you get a specific time from him about when he stopped or how much he was using around that time?

A. It was my understanding that he didn't always --- that he --- that, first of all, there was a period of time where he still had access to his own methamphetamine. And that he then had a stash of methamphetamine from wherever. And that he --- it was continuing --- all I know is that he was continuing to use for some months. It's vague for me how long. But it didn't stop on the day of the arrest and it didn't stop within a week or two of the arrest.

Q. Okay. Well, let's say for the sake of argument

that it stopped maybe a month after the arrest or sometime in April, do you have an opinion about whether or not his drug use, leading up until that time, in combination with his other psychiatric disorders, would have still affected his mental state for the next several months?

A.   Well, I think you have several things going on. One is that it's --- I believe it's quite clear to me that in Arizona at the height of the heavy use of methamphetamines, as I indicated before, you had the direct effect of the use of methamphetamines themselves, and you have the interaction between his other psychiatric problems and that direct effect of methamphetamines, which caused a pretty severe deterioration --- exacerbation of symptoms, and the deterioration in his ability to function.  It would be my opinion that as he continued to use methamphetamines, you know, that that interaction would continue to exist.

     If he stopped using methamphetamines, on whatever day he stops using methamphetamines, he's still --- he's at that point still in the deteriorated state, with regard to his other psychiatric problems.  And so he'd have to work towards some restabilization from the deteriorated

state of his other psychiatric problems and the disfunction that's associated with that. Clearly made difficult by all the other stuff that we were talking about a few seconds ago, that were also going on in his life at the time. So you have the interaction of those factors as well.

Q. All right. So let's just talk about the overall picture for a moment. The combination of these disorders, what effect would that have on his judgment?

A. Well, it's my opinion that it would have --- let me step back for a second. I mean, what you're talking about is the ability to make reasonable decisions. And so you're talking about that when you're faced with a problem that you can adequately assess the nature of that problem and that you then can come up in your head with alternative ways to address that problem, that you can hold those alternatives in your head and weigh the pros and cons of each and choose the alternative that would be the best. So that's healthy adult decision making. The combination of problems that he has impairs every step of that process. The high level of anxiety and fear that he has that something else is going to happen, particularly when elevated to the level of

paranoia when he's actively using drugs, is going to affect his perception of what the situation is that he finds himself in. Or in other words, affect his assessment of the problem.

The impulsivity, what I describe as impulsivity is his capacity to really come up with a reasonable range of hypothetical alternative solutions to the problem that he finds himself in, as opposed to moving so quickly on that that he can't come up with alternatives, or that is a passage through that is impaired. And then he has to be able to hold them long enough in his head to weigh the pros and cons of each. So when we talk about impulsivity we also talk about that, the inability to tolerate holding them in your head while you weigh the pros and cons of that.

And of course in psychiatric difficulties, the grandiosity, the narcissism, the borderline stuff is going to interfere with his ability to weigh these in some sort of reasonable way, in some sort of reality-based way.

Q. And do you have an opinion about in July of '93 and November of '93 whether his judgment was impaired?

A. It'd be my opinion that his judgment was

impaired. That, as I indicated, you have, you know, clearly by the time he comes back from Arizona he's in a very bad state with regard to the interaction between the substance abuse and his underlying psychiatric problems. He continues --- and now he's in a different sort of stressful and more stressful situation because of the combination of the things that are going on back in Iowa, in addition to the charges against him. And it's my understanding that he continues to use at least for some period of time after that while he's now facing that stress.

So it'd be my opinion that his ability to function and make important decisions, particularly affect-laden ones, is going to be at its all-time low.

Q. When you say the affect-laden ones, what do you mean by that?

A. What I mean by that is decisions that will --- for which a factor is that it makes him more anxious, it makes him more nervous, it makes him more fearful. It affects hits feelings in that sense, as opposed to the decision about what to put on today, you know.

Q. Okay. All right. Let's move to Dr. Grody's report ---

ATTORNEY NOLAN:

--- which is for the record, Government Exhibit O.

BY ATTORNEY NOLAN:

Q. Have you had a chance to review Dr. Grody's report?

A. Yes.

Q. All right. Now there were several areas --- if I can find it. That's the trick if I can find it. Oh, I have it. Here it is. Dr. Dudley, in reviewing his --- Dr. Grody's report, there were several areas where he indicates that the version of events that he received from Mr. Honken was different than what you reported in your report. And let's be specific and we'll go to page 14 of his report. Are you with me?

A. Yeah.

Q. All right. So the first one is he says --- he states his father did not want him either after the divorce. And then in parentheses Dr. Grody writes this description of events is different than what was obtained during my interview with Mr. Honken.

The second one, just to move down, he states that Mr. Honken got involved in the manufacturing of methamphetamine to please his brother and father. And in parentheses this is not the account that I received in my interview.

Case 3:10-cv-03074-LTS-KEM    Document 72    Filed 11/02/11    Page 57 of 122

And then in the next sentence, Dr. Dudley states that when Mr. Honken returned to Iowa, he was a wreck, overwhelmed by efforts to support himself and his children, while also trying to manage the dysfunctional relationships he had with the children's mothers. And then in parentheses, this is not the timeline I received in my interview.

Q. So Dr. Dudley, he is saying that he got different information than you. Can you first tell us whether the information that you reported in your report was accurate?

A. Well, I believe that in --- and, I mean, I believe that as a general matter and I certainly believe that in relationship to these specifics that were pointed out here. And in each case they were the reports that I got from Mr. Honken himself. In each of these cases, they were supported by my interviews with family members and other documents, the declarations from other family members and other documents that were available to me, but also from my own interviews with family members. So I feel ---.

Q. Well, let me stop you there. Do you know whether Dr. Grody reviewed the declarations of family members?

A. Well, not that he indicated here.

Q. And do you know whether Dr. Grody interviewed anybody ---

A. Not that I'm aware of.

Q. --- other than Mr. Honken? Yeah, not that I'm aware of.

A. Okay. So I feel --- I'm pretty confident about the information that I have.

Q. Is there anything significant about the types of information that these three things represent?

A. Well, I mean, I --- when you look through like all of this information and old reports and things like that, it's --- and also when you meet with Mr. Honken, it's pretty clear that he has --- it's difficult for him to talk about his own vulnerabilities. It's difficult for him to talk about things that make him anxious.

You know, obviously, by definition, he has an underlying personality disorder and defensive structure that, by definition, is making him try to hold himself forth as I am okay, I'm fine, in fact, I'm superfine, you know, as opposed to being able to acknowledge those and face those vulnerabilities.

What I'm saying is that it's obvious, even when you exam him, because when he talks about them, he becomes more anxious. It's obviously hard for him

Case 3:10-cv-03074-LTS-KEM    Document 72    Filed 11/02/11    Page 59 of 122

to talk about these sorts of things. And so that the --- and these all fall into that category, you know, talking about things that distress him, that he's emotionally --- that are emotionally-laden for him.

Q. All right. When you earlier --- sometime ago, when you were talking about your clinical interview with Mr. Honken, I asked you about setting up an environment and you discussed that a bit about techniques to try to do that.

Is there any indication that you've identified in Dr. Grody's report, regarding rapport or environment?

A. Well, I mean Dr. Grody reports some things in his report that would suggest that it was challenging, you know. I mean, that he was referred to as the state's hacks or whatever, you know, things that would suggest that Dustin was not getting into some sort of space, you know, where he was feeling safe and comfortable and able to talk about feelings that were the most difficult for him to talk about. And the, I think, --- I'm not clear from Dr. Grody's report whether he was trying --- you know, what steps he was taking to trying to kind of get past that. But you know, it wasn't as private. It ---.

Case 3:10-cv-03074-LTS-KEM    Document 72    Filed 11/02/11    Page 60 of 122

Q. When you say as private, as what?

A. As mine, As my setting.

Q. Why is that?

A. Well, with two people there instead of one. The --- you know, it seems like the tests that he --- his time with him was interrupted by testing, which is different than really trying to spend all the time to just simply try to engage him and try to make him feel more comfortable. I mean, there were ---.

Q. Did you do ---?

A. There are just other qualities that, you know, I suspect made it difficult to overcome all of that.

Q. Okay. And in Dr. Grody's deposition he indicated at one point that he was a afraid of Dustin. Would that have an impact on the environment of an interview like this?

A. Well, that would certainly have an impact. I mean, people read --- I mean, he --- Dustin's not --- there's nothing cognitively wrong with Dustin. And I would think that he'd be able to read any discomfort on the part of the interviewer. And that would certainly influence how comfortable he's going to be.

Q. Okay. In his deposition testimony I can tell you that he indicated that when he asked Dustin about any abuse, he asked the question in this way, did

anyone ever physically or sexually abuse you. That was the extent of his question. And he indicated that Dustin said no.

Would you have asked the question in that way, in this type of a setting?

A. I don't know that I would ask it that way in any type of a setting. But in this type of a setting, I would expect to get a no.

Q. Okay. I'd like you to look at Dr. Grody's report on page 16 at the top. And he's talking about the scales of an MMPI. And he says --- he talks about key features. You can see where I am there?

A. Yes, I do.

ATTORNEY NOLAN:

Are you with me C.J.?

ATTORNEY WILLIAMS:

Yeah, I'm with you.

ATTORNEY NOLAN:

Okay. That's quite a delay.

A. Yes.

BY ATTORNEY NOLAN:

Q. So he says key features are anger, resentment, distrust, sullenness, irritability, hypersensitivity and criticism or demands by others and projections of blame on others. Are these types of features

Case 3:10-cv-03074-LTS-KEM    Document 72    Filed 11/02/11    Page 62 of 122

consistent with anything else?

A. Well ---.

Q. Or anything that you've diagnosed?

A. Well, these are clearly the features that are consistent with the combination of narcissistic personality disorder and borderline personality disorder.

Q. Okay. And are those features consistent with a child who experienced controlling caregivers using harsh punishments, things along those lines?

A. Yes.

Q. And are they consistent with childhood situations where someone would feel unfairly treated, humiliated or emotionally let down?

A. Yes. And where there's also, you know, this kind of history of attachment difficulties that we talked about.

Q. Okay. All right. I'd ask you then look at the last page of Dr. Grody's reports. The last sentence, he says, in conclusion, there is no evidence of any past or current cognitive mental health or psychosocial factors to explain or account for any of Mr. Honken's criminal activities. Do you agree with that sentence?

A. No.

Q.  Why not?

A.  Well, it's my opinion that his engagement in so many of the criminal activities that he was involved in are really a product of the psychosocial history, which we've been summarizing here, and the mental health problems that resulted from that.

Q.  Okay.

A.  What is that?

Q.  He uses the ---?

A.  Oh.

Q.  He uses the phrase factors to explain or account for any of Mr. Honken's criminal activities.  Is that your understanding of what mitigating evidence is?

A.  My understanding is much broader than that, I believe.

Q.  Could you describe that?

A.  Well, it's my understanding that you're able to offer any psychosocial factors and resultant mental health difficulties that impair the persons's ability to function in any way.

Q.  Is it your understanding that mitigation has to be connected to the crime itself?

A.  Not specifically.

Q.  Did you review the penalty phase transcript in this case?

A. Yes.

Q. And did you note whether or not any mental health mitigation was presented?

A. Did I note that?

Q. Yes.

A. No, it wasn't. There wasn't any that I saw.

Q. Okay. If lawyers had consulted with you in this case, and they said that they were not having an evaluation of Mr. Honken done, because they were afraid of Park Dietz coming in and saying he was antisocial, what would you have said to those lawyers?

A. You mean after having seen Mr. Honken or before having seen him?

Q. Before. If they said to you we're not even --- we don't even want him to be seen, but we want to ask your opinion, what would you have said to them?

A. I would have said that without seeing him, it's hard to even make a good decision about this. And that --- you know, because you don't know what the range of issues are that could be presented, number one. And then whether that was even a diagnosis that could be developed or whether there were other psychiatric difficulties that would be --- that would so more define his ability to function.

Q. Okay. And when you were evaluating Mr. Honken and you were considering various personality disorders, did you think about antisocial personality disorder?

A. I thought about all of the personality disorders.

Q. Okay. And did you diagnose him with antisocial personality disorder?

A. No.

Q. Okay. In your experience in doing capital work, Dr. Dudley, and in reviewing this penalty phase, was there mitigation that was available that was not presented?

A. Well, it seems to me that all the things we've talked about today were --- would have been available.

ATTORNEY NOLAN:

Okay. I don't have any other questions.

OFF RECORD DISCUSSION

A. Can we take a minute?

ATTORNEY NOLAN:

Yeah.

SHORT BREAK TAKEN

EXAMINATION

BY ATTORNEY WILLIAMS:

Q. All right. Good morning, Doctor. I'm C.J. Williams. I represent the United States. You talked about your practice has changed a little bit recently. Can you tell the Judge what percentage of time you currently work on forensic work versus clinical work?

A. For the years I have been in private practice, it was about 50/50. And what's happened is, is that when I turned 60, I just stopped accepting new patients into the clinical practice. So I'm trying to decrease my overall --- and I'm not taking more forensic. I'm just not taking any more clinicals. I'm trying to decrease my overall workload. So I have just about gotten to the point where I think I have like one or two patients left. And I continue to do the forensic work at the same rate that I was doing it before. I don't know if that is clear.

Q. So will you say that -- what percentage of your work now is just forensic and what percentage is clinical, let's say, in the last three years?

A. Well, that's --- well, the last years is when this has happened, I guess. So three years ago, it was about 50/50 and now it's almost a hundred percent forensic. But I --- so the amount of forensic I'm

doing is the same as it was three years ago, it's just that I'm not doing the clinical work as well.

Q. All right. And you'd agree with me that one of the risks of doing all forensic work is that you lose some of the clinical sharpness?

A. No. I would say that --- what I would say, however, is that the combination of clinical and forensic work gives you a very different perspective than doing only forensic work, because your see --- you have a different sort of notion about the impact of psychiatric difficulties on a person's ability to function, from being a clinician as well. But I wouldn't say that you --- that I started to lose clinical sharpness, other than I'm getting older.

Q. You authored an article, or coauthored an article in Hofstra Law Review in the spring of 2008; do you remember that?

A. Yes, I do.

Q. Okay. And do you remember stating at page 977 to page 978, quote, experts who work solely in a forensic setting may keep their composure during testimony, but they may risk losing clinical sharpness in their field? Do you remember writing that?

A. Yes.

Q. You testified that you have always testified on behalf of the defense in capital cases?

A. Yes.

Q. And what are your views about the death penalty?

A. It's difficult for me to formulate views on the death penalty. I've been doing a lot --- on the civil side, I do a lot of the innocence cases. And so it's made it very difficult for me, because of the issues that come up in doing those cases to really be able to look at the --- to really formulate a view about the penalty.

Q. Well, to be fair, Doctor, I mean, you'd agree that you are against the death penalty, as reflected in the work you've done in this field; isn't that right?

A. No, I wouldn't agree with that.

Q. I'm sorry. Could you repeat that?

A. I said I wouldn't agree with that.

Q. Okay. You've authored articles that are defense-oriented articles; right?

A. That's correct.

Q. And every case you've testified in, in a capital setting, was for the defense; right?

A. That's correct.

Q. Have you ever served as an expert on behalf of

the government in any death eligible case?

A.    No.

Q.    And have you ever served as an expert for the government in any criminal case?

A.    Yes.

Q.    And what criminal case?

A.    You mean, the name of the case?

Q.    Yeah.  Well, let's do it this way, was there more than one case where you worked on behalf of the government in a criminal case?

A.    I think there were two.

Q.    Okay.  And what type of cases were they?

A.    One was a murder case.  And the other was not a --- was a non-murder case.

Q.    And when was this that you worked for the government?

A.    This was years ago, like maybe 15 years ago.

Q.    Okay.  During your Direct Examination you talked about the genetic connection between Dustin Honken's mental impairments that you've diagnosed him with and his family history of mental problems.  Do you remember that part of your testimony?

A.    Yes, I do.

Q.    Okay.  And so Marvea --- you mentioned a number of people, Marvea and Alyssa, I think a sister, and

somebody else, and I wanted to kind of get some details on this. And the Defense provided me with some medical records, but I don't have them here. What did Marvea suffer from?

A. It's my understanding that she suffered from a depressive disorder.

Q. And during what time period did she suffer from that?

A. It's my understanding that it's been longstanding. It goes back to the days that she was married to Dustin's father ---.

Q. And the medical records back that up then?

A. The medical records back up the diagnosis of the depressive order with anxiety and the treatment of that with medication.

Q. And that --- it started back in, you know, that time period?

A. The records don't --- I don't believe the records go back that far. But I mean that from the beginning they report this is --- that it's reported as a longstanding difficulty.

Q. Okay. And then the sister you mentioned, Alyssa, what mental problems does he she have?

A. She too has suffered from depression and anxiety. She --- I believe it was as an adolescent

Case 3:10-cv-03074-LTS-KEM   Document 72   Filed 11/02/11   Page 71 of 122

that she first ended up in treatment, which was the discussion I had with her and her mother. The --- but that she has suffered for some time from depression and anxiety as well.

Q. Okay. And again, the medical records support when that started up and the problems she's' had?

A. The medical records report the nature and severity of the difficulties that she's had. And also indicate the longstanding nature of those difficulties.

Q. Do you have medical records going back to her childhood in trauma?

A. There are no childhood records. She was never --- I don't believe she was taken to treatment as a child. Although, there was a report, ---

Q. Okay.

A. --- I think, by her, the mother, that the mother says, quite honestly, although she probably should have recognized the need for her to go to treatment as a child, that --- and that the mother like, even at the time of the divorce, was going to treatment for herself, but it never really occurred to her to see how the children were doing. And that it was only later that it became so clear to her that the sister was having difficulties that she took her for

treatment.

Q.   Okay.   How about Jeff Honken, what do the medical records show for him?

ATTORNEY NOLAN:

C.J., there are no for Jeff.

A.   There are none.

BY ATTORNEY WILLIAMS:

Q.   Okay.   Who else do you have then?

A.   I believe it was --- well, we had some records for the father.

Q.   Okay.   And is that the one that showed the substance abuse problem?

A.   Correct.

Q.   Did he have any other diagnosed problems in those medical records?

A.   Not that were diagnosed.

Q.   And then I think you mentioned there was one more, though.   I had four down, but I didn't write them down fast enough.

A.   I believe it was a cousin.

ATTORNEY NOLAN:

Laurel Christianson.   C.J., I identified for the record as ---.

ATTORNEY WILLIAMS:

And ---.

A.   Do you want the name?

ATTORNEY NOLAN:

I had identified for the record as ---

ATTORNEY WILLIAMS:

Yes, please.

ATTORNEY NOLAN:

--- it's P-51 in the exhibits.  It's Laurel Christianson.

ATTORNEY WILLIAMS:

Thank you.

BY ATTORNEY WILLIAMS:

Q.   And what was her diagnosed problem, Doctor?

A.   There were --- this is the --- I think this is the bipolar disorder.  This is --- actually it's an aunt, I believe.

Q.   All right.  In your declaration you indicate --- at paragraph seven, you indicate that all of the children suffered from a profound sense of abandonment during their childhoods.  Is that something that they told you or what's the source for that?

A.   It's really the --- their various reports.

Q.   And so did you interview Jeff?

A.   I had some old --- I had some --- a declaration from him.  Or --- was it an interview?  Was it an

Case 3:10-cv-03074-LTS-KEM   Document 72   Filed 11/02/11   Page 74 of 122

interview from him? I had --- I had --- I did not interview Jeff, I interviewed the sister. But I had information from an interview with Jeff. I'm trying to remember what form it was in. I think it was in the ---.

Q. Okay. Did you ever interview Ron Smidt?

A. Say that --- I'm sorry.

Q. Did you ever interview Ron Smidt?

A. No.

Q. There's a number of allegations made by Dustin and other family members that Ron was demanding of Marvea and demanded all of her time and attention, so forth. Have you ever see a declaration from Ron Smidt?

A. I --- I don't think so. No.

Q. If you could turn to paragraph 12 of your declaration, Doctor? And if you look at the third sentence, it states that children require a stable, nurturing and loving family to develop into mentally health adults. Do you see that line?

A. Yes.

Q. Okay. You are not suggesting that any child who lacks a stable, nurturing and loving family necessarily ends up mentally ill, are you?

A. No.

Case 3:10-cv-03074-LTS-KEM    Document 72    Filed 11/02/11    Page 75 of 122

Q.   Okay.   You say in the next line that in the absence of such an environment, and in particularly in the face of parental abandonment and disfunction, children will grow into adults with an impaired ability to control their impulses, to make sound judgments, and to predict the consequences of their behavior.   Again, you're not saying that they absolutely will go grow in that way, you're just saying that that's a possibility; right?

A.   A distinct possibility.

Q.   Okay.   And then the last sentence is such an environment also causes children and adult survivors of such an upbringing to develop paranoia and impaired adult relationships.   Again, you're not saying that they absolutely will develop in that way, you're just saying, again, that they may develop in that way?

A.   That's correct.

Q.   Okay.   All right.   You talked in your Direct Examination today about Dustin Honken being anxious, growing up anxious and so forth.   What are the outside or the behavioral manifestations of the anxiety that he was suffering as a child?   If somebody looking at him from the outside were looking for signs and symptoms of that anxiety, what were the

signs and symptoms?

A.   That he was nervous, jumpy, couldn't sit still, always up and around, always worried about things. Then he had these other kind of clusters like obsessiveness and worry sort of behaviors as well. And always anxious that he was pleasing, nervous about whether he was pleasing.

Q.   Let's talk about the obsessiveness for a minute. And the one thing is he was apparently a picky eater; right?

A.   Yes.

Q.   A lot of children are picky eaters; right?

A.   Yes.

Q.   Okay.   Being a picky eater doesn't mean you necessarily have a mental illness; right?

A.   In and of itself?

Q.   Yes, sir.

A.   Correct.

Q.   Okay.   Another obsessive behavior identified by witnesses is that he was concerned about his neat appearance; right?

A.   Yes.

Q.   Okay.   And all children go through a period where they are very obsessed about their appearance; isn't that fair to say?

A. No.

Q. Okay. Let's do it this way, you agree with me that a lot of children go through a period where they're obsessed with how they look and how they appear to people; right?

A. Many children do.

Q. All right. What other obsessive, compulsive behaviors were identified for you?

A. The way he arranged his plate, that he was afraid of food --- different kinds of food touching each other on the place. And there was something else in an early statement by the mother, which I can't think of right now.

Q. Okay. Let's talk about Jim Honken for a little bit. You indicate at paragraph six of your declaration, if you can turn to that, please. You say that Mr. Honken's father's extensive criminal history and constant threats of violence and actual violence was consistently described by everyone. I want to kind of break down that sentence a little bit. What was the extensive criminal history that you are talking about there?

A. The --- what I was talking about as the criminal activity that everybody had talked about, his involvement in different sorts of scams and stealing

and directing the kids to steal at some point. The things like that.

Q. Okay. Have you ever seen his criminal history?

A. Did I ever see --- you mean his total criminal history?

Q. Yes, sir.

A. Um --- I don't believe --- I don't think I've seen the total criminal history.

Q. Okay. Do you know --- well, let's do it this way. Part of what you've talked about is this guy was a bragger; right?

A. That's correct.

Q. Okay. So to the extent that he told people that he was involved in criminal activity, do we know any of that to be true ---

A. Well, we know ---.

Q. --- other than the bank robberies that we know he's convicted of?

A. Well, we know some of it to be true, to the extent that it involved engaging his children.

Q. And what are you talking about there, the boat motors and the car theft?

A. Those sorts of activities, yes.

Q. All right. You talked about the constant threats of violence and actual violence in this

sentence. Are you aware of Jim Honken ever threatening physical violence against Dustin Honken?

A. Yes.

Q. Okay. In what instance was that or instances?

A. I think the most dramatic when he was --- there was a time where I think there was a concern about whether he was going to be arrested, and the father threatened to kill him.

Q. Okay. Any other threats?

A. I think that was the most direct.

Q. Okay Any indirect threats?

A. Well, I believe that the Uncle described it the best, in a way that at least helped me to understand it the best, was that there was always a sadistic quality about him, like some of the --- the pets being killed and things like that, and a sense that he was not in control, particularly when he was drinking, that made people always feel frightened that something could happen, that they would be harmed. And the Uncle describes this as always a part of their relationship. And the concern that adults had with regard to the children as well.

Q. Okay. But it's fair to say, Doctor, you can't identify me any other single statement made by Jim Honken in which he threatened Dustin Honken, can you?

Case 3:10-cv-03074-LTS-KEM   Document 72   Filed 11/02/11   Page 80 of 122

A. Not as a direct threat.

Q. All right. And I don't want to play games with you. But you can't identify any statement made by James Honken to Dustin Honken of any --- even an indirect physical threat, can you?

A. Well, I believe that the description I gave you was what I'm talking about.

Q. All right. But that's not a statement made by Jim Honken to Dustin Honken, is it, Doctor?

A. No. But the fact that it's not a statement, it's an environment in which these kids grew up.

Q. All right. What actual violence was committed by Jim Honken against Dustin Honken?

A. I mean, I would stick with what I just described, that --- the kind of sadistic violence that he demonstrated in that environment. Like for example against the pets, was part of what contributed to that --- to the environment of his being out of control.

Q. All right. So you're not aware of any actual physical violence that Jim Honken committed on Dustin Honken; are you?

A. Well, I think --- I believe everybody says that he never really hit the kids directly. That he never hit the kids. The mother says that. The kids say

that.

Q. You talked about the way that Dustin Honken grew up affected his ability to have an attachment and a close relationship with his mother. Do you remember that testimony?

A. Yes, I do.

Q. Okay. You indicated that you reviewed a number of documents here in preparation for your opinion and testimony. Does that include documents made by Lisa Rickert?

A. I did see a, I guess it would be called, a memo from her. And I did see the transcript --- well, subsequent to writing my declaration, I saw the transcript of her deposition or whatever it is.

Q. Okay. Did you review the presentence investigation reports for Dustin Honken? I'm looking at your list. I just don't remember if they're on here.

A. I think I --- yes, I did. The --- I think ---

Q. Okay. There's one in 2005 anyway.

A. --- the Lisa Rickert report --- the Lisa Rickert report and declaration I saw. And the transcript I saw after I did my declaration.

Q. Okay.

A. But the presentence reports I saw before I did

them.

Q. All right. So you are aware in the presentence investigation report, at least from 2005, Dustin Honken reported that he had a good upbringing; right?

A. Yes, I am aware of that.

Q. Told a probation officer at that time that he was never abused or neglected?

A. Yes, I'm aware of that.

Q. Told the probation Officer he had a good relationship with his mother and stepfather?

A. Yes, I'm aware of that.

Q. You're aware he described his mother as perfect?

A. I don't remember that, but I don't question your report of it.

Q. Okay. And are you aware that he made the same statements in 1997 to a probation officer in connection with a presentencing investigation report that was generated in 1997?

A. I believe I know that.

Q. Did you review the interview report notes from Lisa Rickert of her interviews of Dustin Honken January 28, 29 and 30th of 2003?

A. No.

Q. So you are not aware that in that interview the Defendant's, Dustin Honken, told Lisa Rickert that he

and his mother were very close?

A. I didn't read that report.

Q. Okay. So you aren't aware then in that same interview that he told Lisa Rickert that there were never any threats of violence?

A. I didn't read that report.

Q. So you're not aware then that report also said he told Lisa Rickert in 2003 that he was never verbally abused?

ATTORNEY NOLAN:

I'm going to pose an objection. The Doctor said he hasn't looked at those notes. And then you can answer the question. That's the way we have to do it, Doctor.

A. No.

BY ATTORNEY WILLIAMS:

Q. You talked about Dustin Honken growing up in a situation where he didn't have a safe place. Do you remember that testimony?

A. Yes, I do.

Q. All right. Now --- all right. His mother separates from Jim Honken when Dustin is eight years old; right?

A. That's my understanding, yes.

Q. Okay. And at that point he moves with his

mother and siblings into a house with Ron Smidt; right?

A.   That's my understanding, yes.

Q.   Okay.   And from all accounts you have of anybody, Ron Smidt, while he might not be a real warm guy, is not abusive or anything even close to that, is he?

A.   That's correct, as I understand it.

Q.   Okay.   He actually has the boys working in the shop as they're growing up; right?

A.   Yes.

Q.   Okay.   From age eight up until Dustin leaves home, he has contact with his father, kind of episodically, once in a while on weekends; right?

A.   He continues to have contact with his father.   I believe that the frequency varies over time.

Q.   Okay.   And as he's growing up, one of his favorite pastimes is to actually cook with his mother, Marvea; right?

A.   I think they mentioned that.   But I don't know that they mentioned that as his favorite pastime.

Q.   Okay.   But his mother was the den mother of his Cub Scout troop; right?

A.   Technically.

Q.   I'm sorry.   What was your answer?

A. Technically.

Q. Technically?

A. Yes.

Q. Well, what do you mean by technically then?

A. That she had that title.

Q. All right. Are you suggesting she did not carry through with the duties of being a den mother of his Cub Scout troop? Is that what you are saying?

A. I'm saying in the fullest sense of the word.

Q. Okay. And how do you know that?

A. Both by --- her own reports are --- is that --- I mean, she acknowledges that she was distracted by and focused on other things. And he doesn't ---.

Q. Okay. Now, I'm going to go directly to her --- I'm sorry for interrupting you, Doctor, because of the delay here, it causes problems. Please finish your answer.

A. And that he doesn't present her as emotionally available in that sense. I mean, that is as his experience.

Q. All right. What statements, if any, did either Dustin Honken or Marvea Smidt give you in relation to her role as a den mother of his Cub Scout troop?

A. In trying to explore with him his sense of her availability to him, he never had any sort of sense

of her availability to him, even in that role.

Q. Did Dustin Honken specifically mention his mother's role as a den mother in his Cub Scout troop?

A. I --- what I said to him is -- well, I tried to get some sort of sense about what they did. You know, were there family trips? Were there other times that you spent time with either your mother or your father? And in going through that litany, I couldn't come up with anything that he felt gave him some sort of sense of her availability to him.

Q. All right. So your answer is no, he never specifically mentioned her role as den mother to his Cub Scout troop?

A. Yes. That there was some great opportunity there.

Q. Well, the question is pretty limited, Doctor.

A. I understand.

Q. Did Dustin Honken ever mention, even once, his mother's role as den mother to his Cub Scout troop, yes or no?

A. No. And that's my point.

Q. Did Marvea Smidt ever describe what she did in her role as den mother to Dustin Honken's Cub Scout troop?

A. No, she did not.

Q. All right. So when you claim that she only technically occupied the position of den mother to his Cub Scout troop, you have no personal knowledge about whether she technically or completely fulfilled the duties of the den mother to his Cub Scout troop; do you?

A. Only in the absence of being able to describe it as an opportunity for her.

Q. You indicated in your testimony that when Dustin Honken came back up to Iowa in April of 1993, he had a number of things he was dealing with that were stressors; do you remember that part of your testimony?

A. Yes.

Q. And you indicated that one of those is he had two women with children of his that he was dealing with at the time?

A. Yes.

Q. Okay. And that was part of the stress that he was going through that affected his judgment?

A. That was part of the stress that he was going through that affected his overall mental state.

Q. All right. What children are you talking about, Doctor?

A. Ryan and Marvea.

Q. Okay. When were they born? Well, let me save you some trouble, Doctor. Let me tell you that neither of those children were born until after --- at least after July of 1993; does that sound right?

A. That sounds right.

Q. All right. So when he came back up to Iowa in April of 1993, up until July of 1993, he didn't have two children he was worried about at that point, did he?

A. He had these relationships.

Q. All right. But that's not what you said. You indicated that one of the indications that --- well, let me see how you worded it. You said that he has these borderline features, and that it creates difficulty in decision making, as shown by impulsivity. Did I get that --- right?

A. He has borderline features --- that contribute along with the other psychiatric difficulties that he has, to impair decision making, as evidenced by impulsivity in the decision making process.

Q. Okay. So give me some examples of his impulsive decision making, please?

A. The issue is his --- is his ability to actually think things through, in some sort of reasonable way. And what was described was increasingly grandiose

Case 3:10-cv-03074-LTS-KEM   Document 72   Filed 11/02/11   Page 89 of 122

schemes and impulsive acting out on those schemes as his methamphetamine use escalated. And so that they were schemes for marketing, schemes for how he would store up enough methamphetamine to last and be able to market forever in underground vaults. And actually moving towards doing some of these sorts of things and not really thinking through not only the consequences but the issues related to being able to successfully do that in some sort of ongoing way.

Q. All right. Well, what that describes to me is some fairly grandiose thinking. But where is the impulsivity? I mean, what I'm looking for is for you to give me some examples that we can point out to the Judge and say here, Judge, I think he's impulsive. That's a sign and symptom of his mental illness. So let me give you some examples, Judge, of his impulsive behavior over time that shows he suffers from this mental illness. And so that's what I'm asking you to do is give me some examples of impulsive behavior by Dustin Honken.

A. Well, what I mean by impulsive is an inability to reasonably think through some of those decisions. That's what I mean by impulsive.

Q. Okay. But can you give me even a single example of behavior by Dustin Honken that shows that he acted

impulsively?

A. I don't know what else to say. I think we are ---.

Q. Well, the fact is, Doctor, that ---? I'm sorry. Again, I didn't mean to interrupt you. Go ahead.

A. No. I --- when I --- I'm not sure what you're --- when I talk about impulsivity, what I am talking about is an inability to rationally work through the decision making process, that you're unable to slow down enough to think through the decision making process. And so I'm talking about a capacity for cognition. So I don't know how to answer you differently.

Q. All right. Well, it seems to me, Doctor, that if you've got somebody who is impulsive and doesn't think through decisions and moves too quickly, you're going to have a series of behaviors over their lifetime that you can look at and say that was impulsive decision. So for example, you know, marrying somebody the next day after they meet them. Or buying a car, you know, having walked onto a lot and immediately buying a car. Or you know, some other impulsive behavior that is a manifestation of the lack of planning and thinking things out. And so I'm simply asking you if that's what he's suffering

from, can you give me an example in his life history that would show that Dustin Honken was impulsive?

A. See, I --- well, I would say that his involvement in multiple relationships simultaneously is an indication of his impulsivity. That it's a failure to be able to consider and to act without thinking through the consequences. I don't think that that means that he's unable to do --- that he has that sort of impulsivity does not translate to me that he can't organize or do anything.

Q. Okay. Dustin Honken, in fact, thinks things out very thoroughly, doesn't he, before he acts?

A. I think it depends on what they are.

Q. You talked about Dustin Honken being paranoid at some point as another symptom of his mental illness. Do you remember that testimony?

A. Yes.

Q. Okay. You would agree with me that from about 1992 on Dustin Honken had some pretty good reasons to be paranoid and worried, didn't he?

A. He had reasons to be worried. I don't know that he had reasons to be paranoid.

Q. Okay. Well, he was engaged in manufacturing an illegal substance and distributing it to Iowa; right?

A. That's a reason to be worried.

Q. Okay. That's a reason to be worried about law enforcement, a reason to be worried about competitors, people robbing you. I mean, he had a lot of reasons to be worried about that, didn't he?

A. Yeah. But that's not being paranoid.

Q. So give me an example again, if you would, when you say he was paranoid, how did that manifest itself in his behavior? What example of his behavior showed that he was paranoid?

A. Well, he --- I mean, he describes being fearful of things that aren't even there, in the sense about being afraid about being watched and being --- for example, when he's not being watched.

Q. Well, who was he afraid of was watching him?

A. Well, that's what I am saying. A fear, you know, not specifically attached to anybody, not identifying a competitor, not --- just this overall sort of paranoid feeling. That's what I'm talking about. That it's not based in reality, not based in the sort of reasonable reasons that he had these transient feelings.

Q. I want to talk to you briefly about Dustin's drug use. It's fair to say you don't really know how much he's used of methamphetamine during his life, do you?

A.  I think that's fair to say.

Q.  Okay.  And I don't want to get into the details a lot, but the reality is nobody really knows how often he used it and how much he used it and how long he used it.  All we know is that for some period of time he used meth while he was in Arizona and possibly continued to use meth when he got back up here to Iowa.  That's really the most that we can say about his meth use, isn't it?

A.  Well, I mean, are you talking about in terms of an opinion or in terms of as a fact?

Q.  Thank you for the clarification.  No, I meant just talking in terms of the fact of his meth use.

A.  I mean, I don't think --- yeah, none of us were there and, you know, and able to get some sort of factual say how much of it was, what the purity of it was.  I think that no, no one's able to do that.  Or I'm not able to do that.

Q.  Do you have any anything indicating that he suffered any physical problems from the meth use?

A.  Physical meaning somatic or physical meaning --- I'm not --- I'm ---.

Q.  Any way you want to define physical.

A.  I mean --- well, there --- I mean, there are reports of a couple incidences that appear to be kind

of overdose related. There are reports of certainly some physical adverse effects, like insomnia, kind of that sort of thing. Clearly a direct physiologic affect is the mood instability and crashing. So there's those sorts of things. I don't have any reports that he had some sort of actual ongoing physical health problem, secondary to his use of the drugs.

Q. Okay. Any evidence that he took meth in larger amounts than what he intended?

A. I believe that there was --- well, that's an interesting question. I believe that there was at least one incident, I'm trying to remember the details now, where he clearly took a dangerous amount to the point where he had an enormous difficulty with it. Whether he'd intended to do that or not, I think is unclear.

Q. Okay. Any evidence that he took methamphetamine over a longer period of time than what he intended?

A. I don't know how to answer that.

Q. Well, are you aware of any evidence indicating that he took it over a longer period of time than what he intended?

ATTORNEY NOLAN:

I guess I will pose an objection,

Case 3:10-cv-03074-LTS-KEM    Document 72    Filed 11/02/11    Page 95 of 122

because I am not sure if that means involuntary taking of it.

A. I don't believe that I understand the question. I don't understand your question.

BY ATTORNEY WILLIAMS:

Q. All right. Well, it comes from the DSM as one of the indications of methamphetamine dependance ---

A. Oh, okay.

Q. ---- is that the patient takes the methamphetamine over a longer period of time than intended. So I'm pulling it right from the DSM.

A. Well, I would say, I mean, if that's what you're asking me, that he --- that when he first tried it, it was not his intent to continue to take it. And so in that sense, yes. Also in the DSM sense that he continued to take it, despite the difficulties that he was having with it, particularly when it no longer gave him the positive effects that it had when he first took it. And in that sense he continued to take it longer than he was taking it.

Because initially the reason for taking it was because that he thought he had positive benefits from it. But then he describes that when those positive benefits stopped being there, and that they were replaced by negative consequences, he continued

to take it.

Q.   Do you know if he ever tried to cut down or stop using the methamphetamine, and he just couldn't?

A.   He didn't try to stop --- or, I mean to cut down, but instead the dose escalated.

Q.   Okay.   And how do you know the dose escalated?

A.   By his reports and by not only --- by his reports but also by the reports of Tim that he started ingesting it in other sorts of ways, which effectively does the same thing.

Q.   You talked about his meth use and what that does to somebody, as far as causing them to --- let's see. You talked about how it affected their ability to think when they're high on the drug.   Do you remember talking about that?

A.   Well, I remember talking about how the direct affect of the methamphetamine plus the interaction of that with other psychiatric problems collectively impairs his ability to think.

Q.   Okay.   Now, did you ask Dustin Honken about whether he was using any drugs at the time that he murdered the five people?

A.   Did I ask him that question, is that what you ---?

Q.   Yes, Doctor.

A. No, I didn't.

Q. Did you ask him at all about what was happening during the time of the murders?

A. Well, I explored what his mental state was at that time period.

Q. Okay. Did you ask him at all about what he was thinking when he committed the murders?

A. No.

Q. All right. But it's your opinion that his judgments in making the decision to commit the murders was impaired because of these mental illnesses?

A. Yes.

Q. Was there anything keeping you from asking him what were you thinking when you committed the murders?

A. No.

Q. Was there anything that kept you from asking him whether he was high on drugs at the time he committed the murders?

A. No.

Q. You don't know whether he used meth the day of the murders?

A. No, I don't.

Q. You don't know whether he used meth the day

before he committed the murders?

A. Not specifically, no.

Q. You don't know whether he used meth the week before he committed the murders, do you?

A. Not specifically, no.

Q. When did Dustin Honken stop using methamphetamine?

A. Sometime in 1993.

Q. Okay. And when he quit, what would happen?

A. Pardon?

Q. When he quit, what happened with him?

A. Um ---.

Q. Let me be more precise. When Dustin Honken quit using methamphetamine, did he suffer from depression?

A. There would be --- when he would stop using, there would be the interaction of a variety of phenomenon. One is that his anxiety and depression and other underlying psychiatric problems were made more severe by the use of --- were exacerbated by the use of methamphetamine. So and at the time that he would stop, he would be faced with those problems. Then in addition to that, he would have the actual effect of the aftereffect of the use of methamphetamine. Which, as I understand it, would include mood disturbances and cognitive difficulties.

Case 3:10-cv-03074-LTS-KEM    Document 72    Filed 11/02/11    Page 99 of 122

That would help him then remit.

Q. All right. Is there any evidence from Dustin Honken or anybody elsewhere where he stated or anybody else stated that after he quit using methamphetamine, he suffered from depression?

A. I don't know that anybody said that.

Q. Okay. Is there any evidence indicated by Dustin Honken or anybody else that after he stopped using methamphetamine, he suffered from fatigue?

A. I don't think that anybody made those sorts of distinctions.

Q. Okay. And is there any evidence in the record to establish that he suffered from any unpleasant dreams after he stopped using methamphetamine?

A. Not that I'm aware of.

Q. Anything in the record that suggested that he suffered from insomnia or hypersomnia, after he stopped using methamphetamine?

A. I don't see anything in the record that talks specifically about any sort of difficulties attributed to his discontinuation of methamphetamine.

Q. All right. So we just don't have anything in the record at all that would tell us what, if anything, he went through after he stopped using methamphetamine, whether he had any withdrawal

symptoms or anything like that; right? There's just nothing in the record?

A. Nothing specifically, no, that I remember seeing.

Q. Counsel went over with you the parts of Dr. Grody's report, in particular at page 14, where he talked about, you had indicated in your report that Dustin Honken got involved with meth manufacturing to please his brother and his father. And Dr. Grody said that's not what he was told. And then you indicated today in your testimony that you believe your report's accurate. And in each case statements by Dustin Honken were supported by interviews and other documents. And you feel confident in the accuracy of your statement.

So what interviews or other documents supports the statement that Dustin Honken got involved in meth manufacturing to please his brother and father?

A. That comes from my interview with his --- I mean, support from that comes from my interview with his mother.

Q. His mother told you that he got involved in meth manufacturing to please his brother and father?

A. That's her opinion, yes.

Q. All right. I want to go to your diagnosis of

meth dependence here. And you had based that on the DSM-IV-TR?

A. Yes.

Q. All right. And you're aware then that that requires that there be a cluster of three or more of a number of symptoms that are laid out within the DSM? There are seven symptoms there; right?

A. I believe there is --- I don't remember exactly the number. I believe you're right.

Q. Well, what symptoms, under the DSM, are you saying that --- what three or more symptoms under the DSM are you saying that Dustin Honken suffered from that establishes a basis of your diagnosis of methamphetamine dependence?

A. I believe that he continued to use despite negative adverse effects of the drugs, that he used more and more of it over time, that he relied on it to, in his view, be able to function better ---.

Q. Okay. Well, let's go through these, because ---

A. All right.

Q. --- I want to make sure I understand your testimony. The first symptom is tolerance?

A. Yes.

Q. As defined as the need for greatly increased amounts of substance to achieve intoxication or a

Case 3:10-cv-03074-LTS-KEM   Document 72   Filed 11/02/11   Page 102 of 122

markedly diminished effect with continued use of the same amount of substance. Are you saying he suffered from that?

A. Yes.

Q. Or had that symptom?

A. Yes.

Q. Okay. The second one is withdrawal and withdrawal symptoms, I think we went through. There's really no evidence of whether he suffered any withdrawal symptoms in this case, is there?

A. What I said is that I don't believe that there's any specific reports of withdrawal symptoms. The --- I mean, nobody said like after I stopped taking methamphetamine, I had these particular symptoms. That's not my understanding. I believe, however, that the methamphetamine expert talks about that in a different sort of way that I don't have the knowledge to separate out.

Q. Well, the methamphetamine expert testified about what in theory could occur when you get off of methamphetamine. What I'm interested in is for you to diagnose Dustin Honken as having meth dependence, are you saying that you have evidence that he suffered any of the symptoms of withdrawal that would support that diagnosis?

Case 3:10-cv-03074-LTS-KEM    Document 72    Filed 11/02/11    Page 103 of 122

A.   What I am saying is that it's very difficult for anybody to tease that out, because there's so much going on with him, that I've tried to describe.

Q.   Well, you could have asked him, Doctor; right?

A.   I don't think that he or anybody else would have difficulty separating out some of the symptoms of meth withdrawal from the other stuff that was going on with him, to identify them specifically.

Q.   All right.   So let me do it this way.   Can you identify any evidence at all that to you shows withdrawal symptoms from his use of methamphetamine?

A.   Not anything that I haven't said.   I don't know what else to say.   There's no --- I can't identify specific symptoms.

Q.   Another symptom is a persistent desire or unsuccessful efforts to cut down or control a substance use.   Are you claiming he suffered from that?

A.   I'm claiming he suffered from persist desire.

Q.   Another one is a great deal of time spent in activities necessary to get meth or to recover from its use.   Is that a symptom you are claiming fit within your diagnosis?

A.   To get it.

Q.   And you realize that at the time he was spending

a great deal of time to get, he was actually spending a great teal of time manufacturing methamphetamine to sell it for large quantities of money, wasn't he?

A.   Well, then he began to have --- but he then began to have schemes about how to store it, how to save it, how to make sure that he also had a stash. I mean, it started out as a --- I think, it started out as a purely financial thing, but then his own investment became to be an issue.  He reports that. Tim reports that.

Q.   Were there any important social, occupational or recreational activities that he gave up or reduced because of the substance abuse?

A.   Not that he gave up, but that was impaired.

Q.   Okay.  What occupational, social or recreational activities were impaired because of his substance abuse?

A.   Well, his personal relatedness was impaired because of his substance abuse.

Q.   How?

A.   The exacerbation of his other --- the grandiosity, the increased sexuality.  Those sorts of issues became, I believe, issues in his interpersonal life?

Q.   Doctor Warren diagnosed Dustin Honken as having

Case 3:10-cv-03074-LTS-KEM    Document 72    Filed 11/02/11    Page 105 of 122

a generalized anxiety disorder. Is that the same thing as your anxiety disorder, not otherwise specified?

A. No.

Q. Okay. Do you disagree with his diagnosis of generalized anxiety disorder then?

A. I believe that with the additional information --- with the information --- I think it's better described as an anxiety disorder, not otherwise specified.

Q. All right. So you disagree with his diagnosis then?

A. I think it's better described as an anxiety disorder, not otherwise specified.

Q. All right. So you're not going to answer my question about whether you agree or disagree with his diagnosis?

A. Well, I have a different diagnosis. And I feel that that's a more accurate description.

Q. When you were reaching your diagnosis, did you take into account that Dustin Honken told Lisa Rickert that he had never felt anxious?

A. Yes, I did.

Q. And how were you aware of that statement to Lisa Rickert?

A. Well, I know that he had denied to everybody that he had had psychiatric problems. That the --- and I think I had an early --- I had psychologicals that were done back then. So that I know that he had minimized the psychosocial difficulties that he had had, as well as any actual psychological problems that he had.

Q. Okay. Well, my question to you is pretty precise, Doctor. I asked if you took into account in your diagnosis the fact that Honken told Lisa Rickert he had never felt anxious and your answer was yes. That actually comes from the report of interview of Dustin Honken on January 28th, 29th and 30th that you earlier in your testimony said you had never seen?

A. I never did see that.

Q. So you did not take into account his statement to Lisa Rickert that he never felt anxious then, did you?

A. Well, I think I --- knew, well, I knew that when I took on the case that the issue was is that he had previously reported that. I mean, in discussions with the legal team, that he had previously reported that. That he had denied childhood difficulties. And so that's what I knew when I went in to see him. So you're probably right, I didn't know that that

Case 3:10-cv-03074-LTS-KEM    Document 72    Filed 11/02/11    Page 107 of 122

statement was made by Lisa Rickert.

Q. Your personality disorder, mixed borderline, narcissistic diagnosis, I want to go to that diagnosis now. First of all, on the borderline features. In order for the DSM diagnosis to be made, there has to be five or more of the following nine symptoms. And I want to have you identify for the Court which ones you are asserting Dustin Honken had. Okay?

A. Well, that's to make the diagnosis of borderline personality disorder.

Q. Okay.

A. And I'm saying ---.

Q. Your diagnosis was the personality --- I'm sorry. Go ahead, Doctor.

A. My diagnosis is personality disorder with borderline narcissistic features.

Q. Okay. So let's do it this way. What features are you saying he has of borderline personality disorder?

A. I'm saying that he has the interpersonal instability, due to frantic efforts to avoid real or imagined abandonment, that he has affective instability, that he has the --- some of the risky, risk-taking behavior, that he has --- and that in an

underlying sense, there's the feelings of emptiness.

Q. Okay. What of the narcissistic features does he have then?

A. That he feels that he is special and that people should recognize his specialness and that he --- evidence is a dismissal of them when they fail to do that and anger when they don't do that. And there's another one that I'm blocking.

ATTORNEY NOLAN:

Just for the record we don't --- I was just going to say we don't have the DSM with us, or I would show it to him.

ATTORNEY WILLIAMS:

Okay. That's fine.

BY ATTORNEY WILLIAMS:

Q. I'm not sure what this one means. And if I can have you explain it. When you say evidence that he dismissed them when they failed to recognize that he was special, what do you mean by that? Can you give me an example of what that would look like?

A. He talks about kind of what characteristics he relies on as showing that he is special and superior. And that if --- and that as long as that's acknowledged, he's fine. When he's not acknowledged, he can be --- become angry and devalues the person

who doesn't acknowledge it. I can't remember the wording in ---.

Q. And so we're --- what are the things that he thinks makes him special?

A. Well, he talks about having always relied on thinking that he was smarter than everybody else. And that that's about the only thing that made him special. And then at some point he decided that his capacity to attract women was another thing that would make him special. But he continued to rely really on his narcissistic belief that he was just so much smarter than everybody else.

Q. And I think it was in Doctor Warren's, if I remember correctly, but I think somebody was talking about him having antisocial behavior. Do you recall seeing that, I think, in Dr. Warren's report?

A. I recall seeing it. I think --- but I don't --- I recall seeing it. I'm trying to remember exactly where it was.

Q. And you agree --- well, let's do it this way, Doctor, do you agree that Dustin Honken has engaged in antisocial behavior?

A. Yes.

Q. Okay. And do you agree that he has --- over the years he's been deceitful to other people; right?

He's lied about his relationship, he's lied about his drug activity, he's been deceitful in a number of ways over the years, hasn't he?

A. I believe that in some of those instances he's been deceitful. I think in other ways it's really --- that's not probably the most accurate description of it.

Q. Okay. Will you agree with me that he kind of lacks empathy and remorse?

A. No.

Q. Can you give me an indication of anything he said at any point during your interviews of him that reflect that he had any remorse for anything he's done?

A. I believe that he has some remorse, even, I think in a way that he's --- in talking about drugs and talking about the end result of drugs and the --- and even in his own realization about his own drug use, and therefore in turn what he had subjected others to through the sale of these drugs. He talks about the poor choices that he had made with regard to relationships and how he had previously justified some of that by feeling that well, he's being manipulated by these people or used by these people. But then recognizing that fact and feeling bad about

the fact that resulted in decisions that caused difficulty for them and for the --- and for others related to them. And that that wasn't really assuming responsibility for his role.

Q. And this is all reflected in your notes of interview of Dustin Honken?

A. It's reflected in my discussions with him.

Q. Is it reflected in your notes of your discussion with him?

A. I probably --- I'm sure I didn't use the word remorse, if that's what you mean.

Q. Well, even the statements that you just talked about him making to you, are those reflected in your notes?

A. I believe the statements about the women are reflected in my notes, as well as his feelings about his own dad. And how in the end he tried to --- still tried to care for his father.

Q. You talked with Counsel about your view that this combination of problems you diagnosed Dustin Honken with you think affected his decision making ability and judgment. Did I get that right?

A. Yes.

Q. Okay. Are you saying that his ability to understand what he was doing at the time of the

crimes was impaired to the point where he didn't understand what he was doing?

A. No.

Q. It's true that Dustin Honken fully understood the consequences of murdering five people, didn't he?

A. I'm not sure.

Q. He fully understood that he had the choice about whether to kill or not to kill; right?

A. That he had that choice, I would think so.

Q. Yes? Are you familiar with how the murders were committed, Doctor?

A. Pretty much.

Q. You're familiar with the weeks and weeks prior to the murders, of Dustin Honken trying to find Greg Nicholson, for example?

A. Yes.

Q. You are familiar with fact that they came up with a kind of a ruse to get into the house where Greg Nicholson was at?

A. I know they had to come up with a way to get in there, yes.

Q. You're familiar with there was a lot of planning going into the murders, just including taking duct tape and rope, a videocamera, all that kind of stuff, you knew that was all planned in advance; right?

Case 3:10-cv-03074-LTS-KEM    Document 72    Filed 11/02/11    Page 113 of 122



A. I believe so.

Q. Okay. You're aware that they had to borrow a car to make sure that nobody would recognize a car belonging to Dustin Honken or to Angela Johnson? They thought that out; right?

A. I know they had another car. That's the reasonable presumption about why.

Q. You'd agree with me there wasn't really anything impulsive in the manner in which Dustin Honken murdered Greg Nicholson, Lori Duncan or the two little girls; right?

A. I would agree that there appears to have been a plan to implement the decision that was made.

Q. You know, as you talk about Dustin Honken growing up in this --- and as you used different terms at different times, like severely or, you know, significant, extremely difficult childhood and adolescence, you know, the reality is it Dustin Honken grew up in kind of a middle class Iowa family, didn't he?

A. I'm not sure what that has to do with what I said.

Q. All right. Well, let's just go through this. He grew up in a middle class Iowa family, did he not?

A. Well, clearly he grew up in an Iowa family. I'm

not quite clear where to put them in that sense.  I would say they were definitely not impoverished or poor.

Q.  Okay.  He graduated from high school; right?

A.  That's true.

Q.  Had some college; right?

A.  That's true.

Q.  Not until his 20s did he get involved in any type of substance abuse; right?

A.  That's correct.

Q.  He went out for sports from time to time; right?

A.  I don't remember that.  Are you there?

Q.  Yeah, I am.  Thank you?

A.  It looked like something had happened to you. I'm sorry.  The screen suddenly looked like something had happened.

OFF RECORD DISCUSSION

ATTORNEY WILLIAMS:

Give me just a second here, guys.

ATTORNEY NOLAN:

Take your time.

ATTORNEY WILLIAMS:

All right.  I don't have any other questions.

ATTORNEY NOLAN:

Case 3:10-cv-03074-LTS-KEM   Document 72   Filed 11/02/11   Page 115 of 122

I just have a few.  Are you guys okay to keep going for five minutes?  Are you okay for five minutes, C.J.?

ATTORNEY WILLIAMS:

Yeah, good for me.

REDIRECT EXAMINATION

BY ATTORNEY NOLAN:

Q.   Dr. Dudley, you --- on Cross Examination you were asked about paragraph seven of your report where in the first sentence you said, in consequence, all of the children, but especially Dustin, suffered from a profound sense of abandonment during their childhoods.  And you were asked about whether you spoke with Jeff Honken, which you've indicated you did not.  Did you review Jeff Honken's declaration?

A.   Yeah.  I thought I said that that I didn't speak with him but I saw the declaration.

Q.   Okay.  I'd ask to show you that ---

ATTORNEY NOLAN:

--- which is for the record --- I have it.  One second.  I'll have to figure out what that is for the record.  P-114 for the record.

BY ATTORNEY NOLAN:

Q.   So Doctor, I'd ask to show you that and have you review paragraph four?

Case 3:10-cv-03074-LTS-KEM    Document 72    Filed 11/02/11    Page 116 of 122

WITNESS REVIEWS DOCUMENT

BY ATTORNEY NOLAN:

Q.   And I'd ask you if that paragraph gives you any indication of Jeff feeling abandoned or --- or what from a psychiatric standpoint, what you might consider feeling abandoned?

A.   Yeah.

Q.   And what does it say?

A.   Well, he talks about the responsibilities that he --- how they were left and how they had the --- how he had to assume the responsibilities for taking care of the younger ones.  But then he goes on to say that how scary it was for him and how they were much too young to be left alone.  So he expresses some of the kinds of things that we would associate with them?

Q.   Okay.  You were also asked about physical violence, was there ever any physical violence in the home.  And I would ask you to take a look at the 1997 report of Dr. Greenstein, which was part of a presentence investigation report.  And it's P-4 in our exhibit package.  And if you could take a look at page three of that report and read that for the record where I've highlighted it?

WITNESS REVIEWS DOCUMENT

Case 3:10-cv-03074-LTS-KEM   Document 72   Filed 11/02/11   Page 117 of 122



BY ATTORNEY NOLAN:

Q. Could you read it out loud?

A. Read the highlighted section?

Q. Yeah.

A. Despite the statement he described that his father was an alcoholic, the home environment was typified by emotional turmoil, mainly related to his father's alcoholism. Mr. Honken reported several instances in which his father physically struck him, though the extent of physical abuse is not known.

Q. And have you seen that before today, before your testimony?

A. Yes. Or actually ---. Actually, it reminded me that there was another report by the sister of another incidence that I had forgotten about.

Q. All right. You had talked about in April of 1993 about stressors that Mr. Honken was undergoing and you talked about his children, which it turns out were born after that, after July of 1993. Does that change your opinion about the stressors that he was undergoing at the time?

A. Well, I mean, no, I think it was still a very stressful situation with him, with these two women, both expecting. The --- and the charges against him and then trying to work and being back in Iowa, I



Case 3:10-cv-03074-LTS-KEM    Document 72    Filed 11/02/11    Page 118 of 122

still think it was a very stressful time for him, which continued to get worse over the course of the year.

Q. Okay. You were also asked about some questions about impulsivity. And I would like to refer you to the Government's Exhibit O, which is Dr. Grody's report. And if you could look at page 16, towards the top of the page? And just read that and tell us whether in your opinion that indicates any sense of impulsivity in Dr. Grody's report?

A. Well, I think that it's --- to me it's describing what I was trying to describe, which is not thinking things through, not considering all the information that needs to be considered. That it's an impaired decision making process.

Q. Okay. You were also asked about whether or not Mr. Honken had any physical problems from meth use, any evidence that he ever took a larger amount that he intended and you spoke a bit about one incident. And I'd ask if I can refresh your recollection, if you could take at look at the declaration of Tim Cutkomp, which is P-111, as the exhibit? And take a look at paragraph 12, if you could read that? If you could read that into the record and then describe in your opinion what that means?

Case 3:10-cv-03074-LTS-KEM    Document 72    Filed 11/02/11    Page 119 of 122

A. This is the one I was trying to remember. This is in --- where he describes an incident where Dustin overdosed on meth at --- this is back when they were in Iowa, at Marvea and Ryan's. He became feverish, felt like his heart was going to jump out of his chest. Couldn't get out of bed without feeling like he would pass out. He couldn't move without his heart rate skyrocketing. It was so bad he was scared to get out of bed, even to go to the bathroom. He had to stay in bed for days. And he just told Marvea that he was sick.

Q. Okay. Is that consistent, the part about staying in bed, is that consistent with any withdrawal symptoms that you're aware of? Or is it still --- or is it --- is it still part of the whole overdose situation?

A. I believe it's part of the use situation.

Q. Okay. You were also asked about Dr. Warren's diagnosis about generalized anxiety disorder. I'd ask to direct you to Dr. Warren's declaration, paragraph eight. And take a look at what he actually says in that declaration.

A. Mr. Honken --- oh, you mean just read it to myself?

Q. No, you can read it out loud.

A.    Mr. Honken suffers severe anxiety disorder.    He has traits of generalized anxiety disorder and anxiety disorder, NOS, including features of obsessive-compulsive disorder.

Q.    So when he says traits, is he diagnosing? According to what he wrote there, in your opinion, is he diagnosing Mr. Honken with that disorder or is he discussing traits?

A.    Well, he's saying that --- I believe he's saying that he has traits or characteristics of several anxiety disorders.    I mean he's using terms like traits and features.

ATTORNEY NOLAN:

Thank you.   Nothing else.

ATTORNEY WILLIAMS:

No follow up.

ATTORNEY NOLAN:

Okay.   All right, thanks, C.J.

ATTORNEY WILLIAMS:

Thank you.

                *    *    *    *    *    *

        DEPOSITION CONCLUDED AT 2:13 P.M.

                *    *    *    *    *    *

Case 3:10-cv-03074-LTS-KEM    Document 72    Filed 11/02/11    Page 121 of 122

COMMONWEALTH OF PENNSYLVANIA)

COUNTY OF DAUPHIN                )

CERTIFICATE

I, Jolynn C. Prunoske, a Notary Public in and for the Commonwealth of Pennsylvania, do hereby certify:

That the witness whose testimony appears in the foregoing deposition, was duly sworn by me on said date and that the transcribed deposition of said witness is a true record of the testimony given by said witness;

That the proceeding is herein recorded fully and accurately;

That I am neither attorney nor counsel for, nor related to any of the parties to the action in which these depositions were taken, and further that I am not a relative of any attorney or counsel employed by the parties hereto, or financially interested in this action.

NOTARIAL SEAL
JOLYNN C. PRUNOSKE, Notary Public
Harrisburg, Dauphin County, PA
My Commission Expires July 12, 2014

*Jolynn C. Prunoske*

Case 3:10-cv-03074-LTS-KEM   Document 72   Filed 11/02/11   Page 122 of 122