## DECLARATION OF LISA A. RICKERT, MSSW
## PURSUANT TO 28 U.S.C. § 1746

I, Lisa A. Rickert, MSSW, do hereby declare under the penalty of perjury that the following is true and correct.

1. My name is Lisa A. Rickert. I am a graduate of the University of Wisconsin at LaCrosse with a bachelors degree in Social Work. I also have a Masters of Science in Social Work obtained from the University of Wisconsin at Madison. I am licensed as a certified social worker in Wisconsin. I have been self employed as a forensic social worker since 1997 with specialties in sentencing (since 1997), and victim outreach (since 2003). Starting in 2000, I began to work as well in the area of capital case mitigation. In this capacity as a capital case mitigation specialist, I have worked on approximately twenty-two cases in state and federal courts around the country.

2. In addition to my formal training, since 2000 I have attended approximately a dozen specialized programs focused on capital mitigation. These programs have addressed both the role of a mitigation specialist and emerging themes, including mental health themes, in capital sentencing. I have held and continue to hold a number of memberships and affiliations in organizations related to capital sentencing and criminal sentencing generally.

1

3. I have been asked by current counsel for Dustin Honken to provide this Declaration regarding my work as a mitigation specialist in the case of United States v. Dustin Honken, 01-CR-3047, a case which proceeded in the federal court in the Northern District of Iowa. In preparing to complete this Declaration, I met with Mr. Honken's current counsel, and I have reviewed the file of my work on this case. I am aware that Mr. Honken's convictions and sentences, including his death sentences, were affirmed by the federal appeals court. I also understand that Mr. Honken is now engaged in the litigation of a 2255 motion, challenging his convictions and sentences. All of the facts in this Declaration are true to the best of my recollection, and where I express opinions about my involvement in the case, those opinions are expressed to a reasonable degree of professional certainty.

4. Before discussing my specific involvement with Mr. Honken's case, I think it is important to explain the role of a capital mitigation specialist. A mitigation specialist is responsible for generating a social history of the capital defendant. This is a critical and time consuming process that requires the specialist to gather and conduct an initial analysis of all documents and records related to the defendant's life. The mitigation specialist is expected to establish a close rapport with the client and with his immediate family. The specialist is expected to use these relationships to learn as much about the defendant as possible, and to conduct further mitigation

2

investigation based upon what they learn. This can include acquiring additional records, and conducting interviews based on what they have learned from earlier interviewees or record review.

5. The American Bar Association has performance standards that govern the defense of a capital case. I have been trained in these standards. Included in those standards is the requirement that at least one member of a capital defense team be qualified, either by training, experience or both, to screen for the presence of mental health issues that could impact criminal responsibility or punishment. A mitigation specialist can, and often does, play that role on a capital defense team. Based upon what the specialist learns from the creation of a comprehensive social history, it is their responsibility to point out mitigation themes that emerge, including those related to mental health defenses at the guilt or punishment phase. In this capacity, the mitigation specialist does not act as a mental health expert, but they are expected to make recommendations to counsel about areas of mental health that should be further explored by involving appropriate mental health professionals in the case. I played this role in Mr. Honken's case.

6. I was first contacted by Mr. Honken's trial counsel in late 2002 about whether I could join the defense team as a mitigation specialist. I understood that counsel, Mr. Leon Spies and Mr. Alfredo Parrish, contacted me at the suggestion of

their co-counsel, Charles Rogers, with whom I had worked in this capacity in the past. In December 2002 I was advised by Mr. Spies by letter that the Court had approved the defense request that they be able to hire me at Court expense to work for Mr. Honken. I gladly joined the team.

7. As I embarked on my duties, several prominent themes and red flags for significant mitigation themes began to emerge. In sum, the Honken family had a notable degree of dysfunction. Dustin Honken's father, Jim, was a severe and debilitated alcoholic. Mr. Honken's mother, Marvea, was an emotionally unavailable individual. She suffered from depression throughout her adult life. While she provided her family and children with physical essentials, she failed to provide her children with the degree of love, affection, attention and emotional nurturing that children require to develop into mentally healthy adults. Jim Honken also failed in these regards.

8. Another notable feature of the family was Jim's open criminality. Everybody in the immediate family knew that he was engaged in a variety of scams and criminal enterprises, such as thefts, insurance fraud (arson), and dealing in stolen property. Not only was he openly a "crook," but over the years he recruited his two sons, Jeff (the eldest) and Dustin, to join him in these enterprises.

9. I also encountered evidence that Jim was violent toward his family. I

4

was told by many sources that he threatened violence frequently against his family members. These sources, including family members, were also aware of his threats against people outside the family, which was significant to me in that it reinforced to the family that he was capable of violence. The family was afraid of him. I heard repeatedly from sources that once Dustin joined him in his criminal activities, that he told Dustin he would kill him rather than see him arrested. I was my opinion that Dustin Honken believed that his father was capable of violence and that he feared him. This fear was centered around Jim's threats, including the threats to kill Dustin. Jim Honken also bragged about intimidating people, or to making "witnesses disappear" including by burying them.

10. In one of my interviews with Dustin Honken he related his belief to me that Jim made one such person "Rodney" disappear because he supposedly abused Dustin's friend (and another of Jim's young criminal recruits), Tim Cutkomp. I do not know if Rodney abused Cutkomp, or was disappeared by Jim. I do not know whether Rodney abused Tim, or was killed by Jim. Those questions are not important in this context. Rather, I found it significant to my thinking that Dustin believed that his father murdered Rodney. I would add here that as a mitigation specialist, I always look for corroboration of all information, especially when it comes from the defendant. Dustin was deeply invested in appearing mentally

5

"normal." Therefore, while I looked to corroborate his statements when possible, I tended to credit those things he told me that made him or his family look pathological.

11. In addition to his threats of violence against people, Jim actually visited violence against animals. I heard reports that he tortured the family pets (in once instance forcibly pouring beer down the throat of the family cat), he killed the family dog, and shot small animals with a BB gun. Dustin either witnessed or knew of these instances of cruelty.

12. I personally witnessed Jim's violent proclivities when during my interview with him he drew a pistol on me. He eventually put it away and made it seem like it was just a "joke." However, it appeared to me at the time that he was serious and I was quite frightened. I reported this incident to trial counsel.

13. As Marvea's marriage to Jim became less tenable based on Jim's criminality, violence and drinking, she became even more depressed and emotionally removed from the family and her children. She took to socializing with men outside the home. She had an affair with one of Jim's friends, Ron Smidt, which led to her divorce from Jim. She married Mr. Smidt soon after the divorce. The children lived with Marvea and Ron. Although one could have hoped that the children would do better with Jim out of the household, that was not to be. Ron was a very needy

6

individual, who dominated Marvea's attention. The children were left just as emotionally alone, as when Jim and Marvea were married.

14. The facts that I have summarized above are highly significant to a mitigation specialist in a number of ways. First, it is indisputably accepted in the mental health field that parental modeling can shape the mental health of children, and how generally they grow into adults. In the case of the Honken family, Jim modeled an asocial lifestyle. As a thief, liar and bully, he, in effect, normalized this behavior for his children. They learned that it is not only acceptable, but admirable to "get by" by stealing and breaking the law, instead of working; that breaking the law was a badge of honor, and most regrettably that violence is a legitimate tool to obtain one's way in life. Second, Jim's conduct toward his children, his wife, other people and even animals was highly traumatic for those around him. There was much about Dustin Honken that struck me as similar to the profile one often sees in physically abused and traumatized children, even as they grow to adulthood. To be sure, I encountered significant reports of childhood physical abuse. However, the physical abuse in this case was overshadowed by the trauma visited by Jim upon his family. Third, the family dynamic combined with Dustin's presentation evidenced that early childhood abandonment and attachment issues were present. Such issues can lead to a host of mental health pathology, which can be highly mitigating in the

7

context of a capital case. In sum, the mitigation themes that emerged related to Dustin's parental abandonment and attachment issues; trauma-related pathology and the toll taken by the horrendously poor parental modeling.

15. In both my written and oral communications with counsel through the course of my preparations and investigation, I advised them of the need to have Mr. Honken evaluated by a mental health expert with a specialty in the areas of trauma, abandonment and related subjects. I also expressed my belief that it was critically important to set forth the full picture of Dustin's life, even though some aspects of it were negative and even involved Dustin's own criminal conduct. For instance, I learned that in some instances well before the capital offense Dustin engaged in conduct eerily similar to that displayed by his father. As with much capital mitigation, some of what I learned had a "two edged sword" quality to it, that is, it had the potential to mitigate or aggravate. Counsel made the determination not to present some of the potentially mitigating evidence out of fear of its potential aggravation without having obtained the opinion of a mental health professional.

16. Counsel followed my recommendations to engage a neuropsychologist, Michael Gelbort, to evaluate Mr. Honken for organic brain damage. That evaluation did not yield anything of use. They also engaged Dr. Mark Cunningham to opine about whether Mr. Honken would be a future danger in the custody of the Federal

8

Bureau of Prisons. This opinion, however, was reached without Dr. Cunningham ever meeting Mr. Honken. Rather, it was based on information, data and statistics from the BOP, and other demographic information, none of which related to Mr. Honken as an individual. Dr. Cunningham testified about future dangerousness from this perspective, but he did not perform as a comprehensive mitigation expert in this case. Counsel never followed my recommendation to engage a mental health expert to explore and possibly opine on the subjects that I have noted above, i.e., trauma, attachment, abandonment and negative parental modeling.

17. I never understood why counsel did not have Mr. Honken evaluated on these topics by an expert. I could understand that after such an evaluation counsel might decide that on balance such opinions might do more harm than good. However, I could see only an upside to having a confidential evaluation conducted. Any hope of convincing counsel that an evaluation should be conducted were dashed when the Government provided notice that they would call Dr. Park Dietz as a penalty phase rebuttal witness. Dr. Dietz is a feared name among some capital defense teams. However, again, I could see no harm in having the evaluation conducted, and seeing what benefits could be derived. Besides, without having offered any mitigating theme to the government at that point, and because Dr. Dietz never evaluated Mr. Honken, I was not sure that Dr. Dietz would even disagree with

9

the opinions that I hoped and expected would emerge from a defense evaluation. In short, counsel made this critical decision not to present the mental health related mitigation without being informed by a mental health expert's opinion.

18. The penalty phase proceeded with counsel offering a brief snapshot of the dysfunction that plagued Dustin Honken's early childhood and youth. However, there was never a mental health based explanation for why the facts about the family's dysfunction were important or how they mitigated the offenses. After the death verdict, I was not surprised to learn that only one juror found as a mitigating factor that Jim Honken was an alcoholic convict who was proud of his criminal lifestyle and who bragged to his sons about his crimes; and only one juror found the mitigating factor that as a child Dustin did not experience normal parental love and nurturing because his mother was depressed and his father was chronically intoxicated. Without an overarching mental health explanation to frame the importance of these facts, they are simply isolated, and perhaps somewhat sympathetic tidbits about Dustin Honken's life. However, placed in a proper mental health framework, these tidbits go far toward explaining and mitigating the offenses.

19. In sum, there was in my view a strong mental health based mitigation narrative to provide the Mr. Honken's jury. It was not presented. The incomplete facts about the dysfunction and pathology that predominated Mr. Honken's life failed

10

to tell this story. I suspected that to be the case at the time of trial, and I believe so today.

20.     This Declaration constitutes only a summary of my views on these topics. It is a true and accurate summary, but it is not inclusive of everything that I know about this litigation. I hereby declare pursuant to the penalties of perjury that the facts and opinions contained in this document are true.

Lisa A. Rickert, MSSW

Dated:     Madison, Wisconsin
           May 16, 2011

11