IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

ANGELA JANE JOHNSON,                              No. C09-3064

      Petitioner,

  vs.                                          TRANSCRIPT OF
                                                  2255 EVIDENTIARY
UNITED STATES OF AMERICA,                         HEARING

      Respondent.

_____/                 Volume 10


      The Hearing held before the Honorable Mark W. Bennett, Judge of the United States District Court for the Northern District of Iowa, at the Federal Courthouse, 320 Sixth Street, Sioux City, Iowa, May 3, 2011, commencing at 8:01 a.m.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of the transcript.*

CV-10-3073-LRR/CR-01-3047-LRR-KEM   Document 74144   Filed 11/03/11   Page P1 Ex 25_Page_1

APPEARANCES:

For the Petitioner:  MARCIA A. MORRISSEY, ESQ.
                     2115 Main Street
                     Santa Monica, CA 90405-2215

                     MICHAEL BURT, ESQ.
                     Law Office of Michael Burt
                     Suite 329-E
                     600 Townsend Street
                     San Francisco, CA 94103

                     NANCY S. PEMBERTON, ESQ.
                     Pemberton & Associates
                     Suite 329E
                     600 Townsend Street
                     San Francisco, CA 94103

For the Respondent:  C.J. WILLIAMS, ESQ.
                     Assistant United States Attorney
                     Hach Building - Suite 400
                     401 First Street Southeast
                     Cedar Rapids, IA  52401-1825

Also present:        John Graham

Reported by:         Shelly Semmler, RMR, CRR
                     320 Sixth Street
                     Sioux City, IA  51101
                     (712) 233-3846

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of the transcript.*

CV-10-3007-LRR-KEM    Document 74144    Filed 11/03/11    Page 2 of 25_Page_2

THE COURT: Good morning. Please be seated.

Ready to call your next witness?

MR. BURT: Yes, Your Honor.

MS. MORRISSEY: Yes, Your Honor. We would call Alan Johnson. May I get one of the . . .

THE COURT: Sure. Good morning. Just -- you can stand right there, raise your right hand, please.

ALAN JOHNSON, PETITIONER'S WITNESS, SWORN

THE COURT: Okay. Please be seated in the witness box. And you can adjust the chair and the microphones so you can speak directly into them. And would you tell us your full name, please, and spell your last name for us.

THE WITNESS: Alan James Johnson. Last name's J-o-h-n-s-o-n.

THE COURT: Thank you.

Miss Morrissey?

MS. MORRISSEY: Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. MORRISSEY:

Q. Good morning, Mr. Johnson.

A. Good morning.

Q. Where do you live now, sir?

A. Davie, Florida.

Q. And what do you do for a living?

A. I have a painting company.

CV-10-3074-LRR Case 5:10-cv-03074-LRR-KEM Document 74-44 Filed 11/03/11 Page 3 of 25 P-Ex 25_Page_3

Q. How long have you been living in Florida?

A. Since September of 1986.

Q. And how old are you now?

A. Forty-four.

Q. How far did you go in school?

A. I have approximately two years of college.

Q. Where did you grow up, sir?

A. Britt, Iowa.

Q. Do you have a brother --

A. Yes.

Q. -- named Mark?

A. Yes.

Q. And are you twins?

A. Yes.

Q. Did Mark grow up in Britt as well?

A. Yes.

Q. Growing up in Britt, did you come to know someone named Dustin Honken?

A. Yes.

Q. When did you first meet him?

A. Well, I'm -- we were kids. I don't -- I mean, I'm not sure exactly. There was -- it's a small school. It's a small . . .

Q. Is Britt a small town?

A. Yes.

Q. And the people that go to school in Britt, do they all live

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
CV-10-3007-LRR-010-3044-LRR-KEM   Document 74144   Filed 11/03/11   Page 4 of 25   P1 Ex25_Page_4

in that area?

A.   Yes.

Q.   And have you known Dustin Honken for as long as you can remember?

A.   As long as I lived in Britt.

Q.   Okay.  Are you the same age as Dustin Honken?

A.   I believe I'm a year older.  I'm really not sure of his age.

Q.   And could you tell the Court what kind of relationship you had with Dustin.

A.   We were casual friends, I mean, like everybody in school. I mean, everybody knew everybody.

Q.   Would you say you were good friends with him?

A.   Yeah, we were friends.

Q.   Okay.  I'm going to ask you about your senior year in high school.

A.   Okay.

Q.   Was Dustin a year behind you?

A.   Yes.

Q.   Okay.  So he was a junior.

A.   Right.

Q.   And did the subject of a bank robbery come up?

A.   Well, I don't know how it came up, but yes.

Q.   And do you remember who brought it up?

A.   To be completely honest, I don't remember the context of

it.

Q. Okay.

A. It happened in a study hall.

Q. Okay. So you were in a study hall. And tell me what happened in the study hall about a bank robbery.

A. Well, me and Dustin and Tim kinda made a plan.

Q. Okay. And by Tim, who do you mean?

A. Tim Cutkomp.

Q. And what was the plan?

A. To rob the Britt bank.

Q. And could you describe the plan? Do you remember it now?

A. Well, how I remember it I could describe it. I mean, I remember we were going to -- Dustin's mom worked there, so he was going to make a key, and I believe the alarm code, it was in her purse or something, but we were going to go in at night because every Friday night the kids would drag Main so -- and everybody was -- there's always cars parked in the drive-through. So we was going to go in the back door. I don't know who was. One of us was going to go in the back door and wait. And when the lady opened it up in the morning, they were going to get her to open the safe, put her in the bathroom, and then come out, and the other ones would be waiting in the car, and we were going to take the money.

Q. All right. So this bank in Britt had a drive-through?

A. Yes.

Q. Okay. And you were going to go in the night before because there were normally kids in the drive-through area.

A. Yeah, there was always cars parked in there.

Q. And do you remember whether the -- anything about the lady who was going to go into the bank in the morning?

A. I don't remember her name. I know she worked there every morning. She always opened it at a certain time. I mean . . .

Q. Was she old or young?

A. She was old.

Q. And was there going to be a weapon involved?

A. Not that I know of. I don't -- I don't remember the particular particulars. I don't think there was.

Q. Okay. Was there going to be a -- any special clothes?

A. I believe there was going to be a mask.

Q. Now, do you remember testifying in this court in 2004?

A. Yes.

Q. And do you remember being asked about whether or not there would be a weapon used in this robbery when you were testifying in court?

A. To be honest with you, I don't remember. I know I went over my transcripts, but I -- I don't remember what I read.

Q. Okay. And do you remember -- what about the color of the clothes? Were you going --

A. Black.

Q. -- to wear any particular color of clothes?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
CV-10-3073-1-R0103077-LRR-KEM Document 74144 Filed 11/03/11 Page 7 Ex25_Page_7

A.    It'd be black.

Q.    All right.  And who else besides you and Dustin and Tim Cutkomp?  Was it just you two -- just you three?

A.    Just us three.

Q.    All right.  When you first heard about this plan in study hall, were there any -- was there any paperwork involved?

A.    What do you mean paperwork?

Q.    Well, did anybody draw anything?

A.    I -- I assume they did.

Q.    Okay.

A.    For -- I mean, I assume they did because I -- I don't remember, but I assume that there was a drawing of the inside of the bank because I'd never been in the back.

Q.    Okay.

A.    So for us to plan, you know, I assume there was.

Q.    And who came up with this plan?

A.    To be honest, I don't remember how it came about or who came up with what.  It was the three of us were talking.

Q.    Okay.  Did you ever go through with this plan?

A.    No.

Q.    Do you know if the bank was ever robbed?

A.    Yes.

Q.    And how did you find out about that?

A.    I believe my mom told me.

Q.    And when your mother told you about the bank robbery, did

it sound familiar?

A.   Yes.

Q.   Do you know who did the bank robbery?

A.   No.

Q.   Where were you at the time you heard about the bank robbery?

A.   I believe I was in Mason City.  I'm not sure.

Q.   Okay.

A.   Because I was dating a girl from Mason so . . .

Q.   What'd you do after graduation from high school?

A.   Joined the Army.

Q.   Let me ask you about Tim Cutkomp.  Do you know him?

A.   I knew him back then.

Q.   Right.  What is he like as a person?

A.   Now?  I mean --

Q.   No, back then.

A.   Because I -- back then he was good.  I mean, he was -- he was a nice guy.  I mean, but he was a follower.  He was -- you know, but he was nice.

Q.   Can you describe his relationship with Dustin Honken?

A.   They were best friends.

Q.   Okay.  Was it an equal relationship?

A.   How do you mean equal?

Q.   Well, was one more in charge than the other?

A.   I believe Dustin probably was more.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
CV-10-3073-LRR 03-CR-3043-LRR-KEM   Document 74-44   Filed 11/03/11   Page 9 of 25   P9-Ex25_Page_9

Q. Okay.

A. I mean, but I didn't hang around with them every day so . . .

Q. Now, I'm going to ask you about whether Dustin talked to you ever about going to Minneapolis.

A. Okay.

Q. Did he?

A. Yes.

Q. And did he tell you what he did in Minneapolis?

A. Him and Tim told me that they would go to Minneapolis to beat up homosexuals and rob them.

Q. And when he told you about this, were you still in high school?

A. You know, I don't remember exactly. I believe I -- I think I was. I don't remember the exact -- I don't remember the exact time. It might have been when I got back from the Army. I don't remember the exact time.

Q. What about karate? Did Dustin know karate?

A. Yes, him and Tim took lessons over in Mason.

Q. And did he ever use his karate skills to destroy things?

A. Well, they told me that they would -- after class him and Tim and one of the black belts in the school would go out and punch the windows out of cars.

Q. Did -- was -- did he ever use -- did Dustin ever use force towards you? Was he ever violent? Did he ever hit you?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of the transcript*

CV-10-3074-LRR Case 1:03-cr-03044-LRR KEM Document 74-14 Filed 11/03/11 Page 10 of 25 Ex 2_5 Page_10

A.   Yes, he hit me.  I mean, I hit him first.

Q.   You hit him first?

A.   We were practicing karate in a -- because I couldn't afford karate, to go to class, so they were showing me what they learned.  We'd go to an abandoned farmhouse, and they'd show me what they learned, the forms and the sparring and stuff.  When we were sparring, I got a lucky shot in, and I hit Dustin in the face, and he was pretty vain about his looks.  And it made him mad, and he turned around, and he give me a really good side kick in the ribs.  I thought he broke my ribs, but he didn't, but, I mean, it was more a . . .

Q.   What about a bull whip?

A.   Yeah, on the bus one day.  That was -- that was probably -- I was a junior I think, junior.  I don't know if that was my senior year.  I'm not sure of the time period on that, but I don't remember what the deal was on the bus, but when he got off at Tim's house, my head was out the window.  I was saying something, and I don't know where the bull whip came from.  It was either -- Tim and Todd and Dustin were outside.  And he cracked it at the bus, and it just happened to rip the skin off the inside of my nose up under my glasses.

Q.   Had you done something to make him angry?

A.   To be honest with you, I really don't remember the context of it.  I don't -- I might have been yelling something out the window.  I don't know what happened in the bus at the time.  I

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of the transcript.*

CV-09-3041 CR-03-3047-LRR KEM   Document 74-14   Filed 11/03/11   Page 11 of 25 Ex_2_Page_11

mean, I remember the incident because it's hard to forget, but as far as -- it was 30 years ago. I don't . . .

Q. Okay. If you crossed Dustin, how would he react?

MR. WILLIAMS: Calls for speculation, Your Honor.

THE COURT: Well, can you lay a foundation for it?

MS. MORRISSEY: Sure.

BY MS. MORRISSEY:

Q. You spent time with Dustin when you were growing up; correct?

A. Yes.

Q. You knew him in school?

A. Yes.

Q. And you knew him outside of school?

A. Yes.

Q. And you played -- went to this barn and practiced karate with him?

A. Yes.

Q. And you spent time with him; correct?

A. Yes.

Q. If something made Dustin mad, would he react in a particular way that you saw and heard based on the time you spent with him?

MR. WILLIAMS: Again, I'd object to speculation. Unless there's a particular incident where he observed Dustin getting mad, that's calling for speculation about how he --

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript*
CV-10-3074-LRR   Case 1:03-cr-03047-LRR-KEM   Document 74-14   Filed 11/03/11   Page 12 of 25   Ex24_Page_12

THE COURT: Overruled. You may answer.

A. Can you ask it one more time?

Q. Sure. If Dustin were unhappy --

A. Okay.

Q. -- angry, displeased for some reason, how would he react?

A. Well, I guess it would depend -- I mean, the only time I really -- few times I seen -- like when our thing in the barn, I mean, it was -- it was a quick reaction when he kicked me when I hit him in the -- I hit him pretty square in the nose, so it had to hurt, but it was quick, and it was -- and it was decisive, you know. I'm trying to th -- I mean, I never really seen him as far as mad, mad.

Q. Uh-huh.

A. I mean.

Q. Do you know Angela Johnson who's sitting in court today?

A. No.

Q. Were you ever contacted by anyone from Angela Johnson's defense in 2000 to 2005?

A. No.

Q. If you had been contacted, would you have given the information that you've given us today?

A. Yeah.

MS. MORRISSEY: Thank you. I have nothing further.

THE COURT: Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. WILLIAMS:

Q.   Morning, Mr. Johnson.

A.   Good morning.

Q.   Do you recall being visited by counsel for Miss Johnson to -- and being interviewed and then them having a declaration they wanted you to sign?

A.   Yeah.  I mean, I don't know if he was counsel.  I don't know if he was like an investigator.

Q.   Okay.

A.   I mean, but . . .

Q.   Somebody on behalf of Angela Johnson came to visit you, though, and wanted you to sign a declaration?

A.   Yeah, they interviewed me.  He interviewed me for like a couple hours.

Q.   Okay.  Did he take notes while he was interviewing you?

A.   Yes.

Q.   Okay.  And then after that did he come up with a written declaration he wanted you to sign?

A.   Yes.

Q.   And did he do it right there, or was this something sent to you at some later time?

A.   Well, we met at my house, and then he went and transposed the stuff, and then he e-mailed me, e-mailed it to me to review.

Q.   All right.  And did you -- was the first draft he sent you

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of the transcript.*

CV-00307-LRR    Case 1:03-cr-03047-LRR-KEM    Document 74-14    Filed 11/03/11    Page 14 of 25    Ex.2_Page_14

Q. satisfactory?

A. No.

Q. And why not?

A. Well, there was discrepancy -- there was things in there that, I mean, I guess if you read it -- I don't -- I didn't save a copy. I guess if you read it, it was probably what I said, but it was kind of not what I said. I don't know how to explain it.

Q. Okay. Maybe used words that you wouldn't have used?

A. Yeah.

Q. Descriptions maybe that you wouldn't have given quite that way?

A. Yeah.

Q. Okay.

A. I mean, I told him I didn't feel comfortable, I mean, and so he --

Q. So what happened after that then?

A. Well, he revised it, and he sent it again.

Q. Okay. And did you sign it the second time then when it came to you?

A. No, I had to send it one more time.

Q. Okay.

A. Before it got to where I felt comfortable signing it.

Q. Okay. Now, you were asked about this bank robbery plan that came together at some point. In the end you did not go

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of the transcript.*

CV-03-3074-LRR KEM Document 74-14 Filed 11/03/11 Page 15 of 25 Page_15

through with the bank robbery; right?

A.   No.

Q.   Okay.  And why not?

A.   Well, we were kids.  I mean, I -- I mean, I wasn't going to do it anyway.

Q.   Sure.

A.   I mean, but we were kids in school.  It was -- you know, it was I guess things kids talk about to make money, you know.  I mean, what was -- how much could we get?  Where would we go?  I mean, I was still living at home at the time, so, I mean, I guess I didn't do it because I really didn't think we were going to do it anyway.

Q.   Right.

A.   I mean, we just planned it, I mean.

Q.   Did Dustin Honken get angry with you for backing out of the plan?

A.   No.

Q.   Did he retaliate against you in any way?

A.   No.

Q.   Didn't harm you?

A.   No.

Q.   Didn't threaten to harm you?

A.   No.  I mean, we never really set up a date or a time to do it.  I mean, it was just a plan to do, so no.

Q.   Okay.  Now, you said that at one point Dustin and Tim

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of the transcript.*

CV-Case 3:07-CR-03047-LRR-KEM   Document 74-14   Filed 11/03/11   Page 16 of 25 Page_16

Cutkomp told you that they would go to Minneapolis and rob homosexuals.

A.   Yes.

Q.   Do you remember giving that testimony?

A.   Yes.

Q.   Was this something they told you once or more than once?

A.   To be honest, I don't remember how many times.

Q.   Okay.

A.   I don't remember if it was -- I know it was at least once.

Q.   Okay.

A.   I mean, because it just -- it stuck out in my mind as not being the best way to get money.  I mean, it just stuck out in my mind.  I don't know how many times.  It might have been once. It might have been more, I mean.

Q.   Did you ever see them take off to go up to Minneapolis to go do it?

A.   No.

Q.   Ever see them come back from Minneapolis after they'd done it?

A.   No.

Q.   Did they ever show you the cash they had robbed from homosexuals allegedly?

A.   No.

Q.   Was this just talk, Mr. Johnson?

A.   I don't -- to be honest, I don't know.  I mean -- it

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of the transcript.*

CV-09-741-CR-03047-LRR-KEM   Document 74-14   Filed 11/03/11   Page 17 of 25   Ex2_5 Page_17

just -- I don't know if --

Q.   You have no idea whether they actually --

A.   Yeah, I just don't -- I mean, I know they told me.

Q.   Dustin Honken is a pretty bright guy, isn't he?

A.   In high school, I mean.

Q.   Okay.  And did he ever force you to do something you didn't want to do?

A.   No.

Q.   Ever manipulate you into doing something you didn't want to do?

A.   No.

Q.   Now, you talked a little bit about the couple occasions where I guess there was some interaction with him where you were harmed; okay?  One was where you're practicing karate and you get him pretty good in the ribs, and he turns around and hits you with a side kick in the -- I'm sorry, the other way around.

A.   I hit him in the face.  He hit me in the ribs, yeah.

Q.   But you're practicing karate at that point; right?

A.   Yeah.

Q.   And necessarily involves people hitting each other.

A.   Yeah.

Q.   Right.  Okay.  Outside of the context of practicing karate, did Dustin Honken ever hit you?

A.   Well, with the bull whip, I mean.

Q.   Okay.  Let's talk about that for a minute.  On the bull

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of the transcript.*

CV-06-3077-LRR   Case 3:01-cr-03047-LRR-KEM   Document 74.14   Filed 11/03/11   Page 18 of 25   Ex2_Page_18

whip, he's outside the bus, you're inside the bus looking out the window. He snaps it at the bus, and it happens to hit you in the face.

A. Right.

Q. Okay. Do you think he was trying to intentionally harm you at that point?

A. To be honest, I don't know. I probably could answer that better if I remembered what I said or what he said or what the whole context was. But to be honest, I don't know.

Q. Okay. So we have the karate incident and the bull whip incident.

A. Right.

Q. Any other occasions where he ever caused you harm?

A. Not that I can remember.

Q. Ever see him cause harm to anybody else?

A. I never had.

Q. Ever see him shoot anybody?

A. No.

Q. Ever see him shoot at anybody?

A. I've never seen anybody sh -- I mean.

Q. Do you remember on this bank robbery plan what role -- did it ever get put to the point where you knew what role Dustin Honken was going to play in the bank robbery plan?

A. To be honest, I don't remember. I don't remember my role, Tim's r -- I don't remember if we planned that far ahead, but, I

mean, I don't remember the -- like I say, it was 30 years ago.

Q. Sure.

A. So, I mean, but I remember the specifics of it and the -- I mean, like the key because his mom worked there.

Q. Right.

A. And stuff like that, but as far as who was going to do what and when, I -- I mean, I just don't remember it.

Q. Right. And how ever much it might have been planned at that point, wasn't carried through during the time period you were in town.

A. Not that I knew, I mean. I think it -- I'm pretty sure it happened when I got back from the Army.

MR. WILLIAMS: No further questions, Your Honor.

THE COURT: Miss Morrissey?

MS. MORRISSEY: Thank you.

REDIRECT EXAMINATION

BY MS. MORRISSEY:

Q. Mr. Johnson, you said that the investigator sent you declarations?

A. Yes.

Q. And you disagreed with them?

A. Well, I didn't say I disagreed. I said I didn't feel comfortable signing them.

Q. Okay. So you didn't feel comfortable signing them because it wasn't your words or the words you would have used.

A. Well, yeah. It wasn't -- I mean, it was -- if I had them, I could -- I mean, if I had them to show you, I could explain it better.

Q. Okay. Okay. So he had something wrong, and you said, "You've got it wrong."

A. Yeah, basic -- well, I didn't say wrong. I said I don't feel comfortable like this. I mean, I don't know.

Q. And the investigator didn't try and force you to sign anything you weren't comfortable with, did he?

A. No.

Q. And you stood your ground until you had something you were comfortable with.

A. Yeah.

Q. Okay. Nobody was forcing you to sign things.

A. No.

Q. Nobody was putting words in your mouth.

A. No.

Q. Let me return to the couple things that was covered by Mr. Williams. You were playing karate. And you got a lucky kick into Dustin; right?

A. Punch.

Q. Punch.

A. But yeah, I mean, yeah. It was . . .

Q. And he reacted by really kicking you or punching you; correct?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of the transcript.*

CV-09-30741-CR-03047-LRR-KEM   Document 74-14   Filed 11/03/11   Page 21 of 25   Ex_24_5   Page_21

A.   Yeah.  Well, yeah, he spun pretty fast, and it was -- but he'd been taking classes for I think a year already.  I don't know how long already, I mean.  They just started showing me so . . .

Q.   You mentioned not having money for classes.  Did Dustin seem to have money to do things like take karate classes?

A.   Yeah, he was -- he always had a job.  He was one of the -- I mean, he had more money than any other kid in school that I knew so . . .

Q.   And what about did his parents help out?

A.   Help out how?

Q.   Money.

A.   Yeah, I think he worked for his dad.

Q.   And his dad or his stepdad?

A.   Well, his stepdad.  I never knew it was his stepdad.  I never really knew until I -- later.

Q.   And did his stepdad own a business in town?

A.   Yeah, he owned auto body outside of town.  I forget the name.  Smidt Auto Body or something like that.

Q.   Smidt Auto Body?

A.   Yeah.

Q.   And you said that you were saying something to him from a school bus and he hit you with a bull whip.

A.   The whole -- I know my head was out the window and they were off the bus on the ground, and so I'm assuming I was saying

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

CV-Case 41:10-cr-03047-LRR-KEM   Document 74-14   Filed 11/03/11   Page 22 of 25   Page_22

something to him out the window.

Q. Let me ask you about Mr. Honken's relationships with women. Did you have a chance to see him interact with women?

A. With one.

Q. And was that -- who was that particular woman?

A. Sherry Slauson.

Q. How did he treat her?

A. In my opinion?

Q. Yes.

A. Not as good as I could have or I would have, I mean.

Q. Is Sherry somebody that you admired?

A. S --

Q. Was Sherry somebody who you admired?

A. Yeah, I liked her. I liked her a lot.

Q. And when you say that he didn't treat her as good as you would, could you explain that more?

A. Well, he's one of the guys who would -- I guess when he was with her he wanted to do things his way where I'm a guy who more or less does things the way the girl I'm dating does them. I mean, he was different than me.

Q. Okay. And did something happen that caused you to talk about -- to talk to Sherry about Dustin and warn her about him?

A. Yeah, I stopped over at his house one evening. It was about five or six o'clock. And when I knocked on the door, nobody answered, but there was -- his car was there, so I went

in, and him and Tim were in there on the couch with a couple of girls that were over.  His younger sister I think was having a slumber party, and Tim and him were kind of making out with some girls from her slumber party.

Q.   And how old was his younger sister?

A.   I think -- I think she was a year or two younger than him so . . .

Q.   Did you talk to Sherry about that?

A.   Yeah, I called and told her.

Q.   And what did she do?

A.   Broke up with him.

Q.   Did Dustin talk to you about that?

A.   Yeah, he was pretty upset that I did that.  I mean, he was pretty -- he asked why I did it, couldn't understand why I told her because he wasn't doing nothing anyway.

Q.   He wasn't?

A.   I mean, what he said.

Q.   Was Dustin a good talker?

A.   Yeah, he was -- he was a -- I mean, yeah, he was a good talker.

Q.   Could he convince people to do things?

A.   Well, how do you mean convince?  I mean, I guess it depended how bad he wanted something, I mean.

Q.   Would you describe him as a good salesman?

A.   Yeah.

Q. When did you come back from the Army?

A. In February of 1986.

Q. Okay. So that was before 1993; correct?

A. Oh, yeah.

Q. Before that. And in 1993 where were you living?

A. In 1993? I was in Florida.

Q. You were in --

A. In Florida.

Q. In Florida, okay.

MS. MORRISSEY: All right. Thank you. I have nothing further.

THE COURT: Mr. Williams?

MR. WILLIAMS: Nothing further, Your Honor.

THE COURT: I believe I have one question for you. You talked about events that occurred during your senior year in high school. Would that be -- but you didn't say the year. Would that be 1985?

THE WITNESS: Yeah, it'd be from -- it'd be from August of 1984 to May of 1985.

THE COURT: Okay. Thank you.

Any follow-up questions?

MS. MORRISSEY: No, Your Honor.

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay. You're excused. Thank you. You may step down. Thank you.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of the transcript.*

CV-10-3074-LRR Case_1:03-cr-03044-LRR Document 74-14 Filed 11/03/11 Page 25 of 25 Ex-24_Page_25