IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

ORIGINAL

vs.

No. CR 96-3004

DUSTIN LEE HONKEN,

TRANSCRIPT OF SENTENCING

Defendant.

VOLUME 1

The Sentencing held before the Honorable Mark W. Bennett, Judge of the United States District Court for the Northern District of Iowa, at the Federal Courthouse, 320 Sixth Street, Sioux City, Iowa, December 15, 1997, commencing at 9:40 a.m.

APPEARANCES

For the Plaintiff: PATRICK J. REINERT, ESQ.
STEVEN M. COLLOTON, ESQ.
Assistant United States Attorneys
Suite 400
401 First Street Southeast
Cedar Rapids, IA 52407-4950

For the Defendant: ALFREDO PARRISH, ESQ.
Parrish, Kruidenier, Moss, Dunn & Montgomery
2910 Grand Avenue
Des Moines, IA 50312

Also present: Jay Jackson, Probation Officer

Reported by: Shelly Semmler, CSR, RMR
320 Sixth Street
Sioux City, IA 51101
(712) 233-3846

1998

THE COURT: Please be seated. This is United States of America versus Dustin Lee Honken, Criminal Number 96-3004. The United States is represented by Assistant U.S. Attorneys Patrick J. Reinert and Steve Colloton. The defendant, Dustin Lee Honken, is personally present in court represented by Des Moines counsel Alfredo Parrish. We're here for purposes of a contested sentencing hearing. Is the government ready to proceed? Are you like lead counsel, Mr. Reinert, so I don't always have to address both of you?

MR. REINERT: Yes, Your Honor. The Court can address me, and whoever's in charge of that part of it can respond.

THE COURT: Great. Thank you. Is the government ready to proceed?

MR. REINERT: We are, Your Honor.

THE COURT: Have you had an adequate opportunity to review the presentence report and file all your objections to the presentence report?

MR. REINERT: We have, Your Honor.

THE COURT: Have any -- I have read the presentence report, the objections, and I notice -- I know there are a number of contested matters. And I don't really think we need to list them. We'll take those up after we've heard all the evidence in the case. But have any of the contested matters become uncontested for whatever reason which

CV10-3074; CR01-3047-LRR P-Ex55_Page_2

frequently happens in sentencings?

MR. REINERT: I don't believe so, Your Honor. I think the contested issues are still base offense level, role in the offense, obstruction, acceptance, firearm, and commission of an offense while on release, although some of those arguments are factual objections versus legal arguments.

THE COURT: Thank you, Mr. Reinert.

Mr. Parrish, have you had an adequate opportunity to review the presentence investigation report with Mr. Honken?

MR. PARRISH: I have, Your Honor.

THE COURT: And I have continued part of the sentencing hearing at your request.

MR. PARRISH: That's correct.

THE COURT: And tomorrow morning we're all going to gather on the record with our calendars and try and pick a time when we can conclude the sentencing. Is it -- it's unlikely to be in December, I assume.

MR. PARRISH: I would think so based upon what my expert has indicated to me with regard to the drug quantity.

THE COURT: So we're probably talking in January or February.

MR. PARRISH: That's correct, Your Honor.

THE COURT: Okay. Have you had an adequate opportunity to consult with Mr. Honken about the presentence

CV10-3074; CR01-3047-LRR P-Ex55_Page_3

report?

MR. PARRISH: I have, Your Honor.

THE COURT: Is Mr. Reinert correct that none of the matters that are contested in the presentence report have been resolved by the parties voluntarily?

MR. PARRISH: That is correct. We've tried very hard to do that, but unfortunately we've been unable to do that in this case.

THE COURT: Okay. Thank you. Mr. Honken, have you had an adequate opportunity to review the presentence report with your counsel, Alfredo Parrish?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Mr. Parrish, are you ready to proceed with the sentencing?

MR. PARRISH: We are, Your Honor.

THE COURT: Okay. Mr. Reinert, you may call your first witness.

MR. REINERT: Yes, Your Honor. Before we call the witnesses --

THE COURT: Do you have some preliminary matters? I'm sorry. I neglected to raise those.

MR. REINERT: We do, Your Honor, have one preliminary matter, and that deals with the exhibits. We previously submitted copies of all the exhibits, including the audio tapes, to the Court as well as to counsel. I've

talked to Mr. Parrish, and we have agreed that the exhibits that we previously submitted could be admitted by the Court without objection, and I will briefly summarize.

Exhibit 1 is a conversation between Mr. Cutkomp and Mr. Honken on May 1996. 1A is the conversation; 1B is the transcript. 2A and 2B deal with the May 24 conversation, tape and transcript. 3A and 3B are May 29 tape and transcript. 4A and 4B are the June 4, 1996, tape and transcript. 5A and B are the June 6, 1996, tape and transcript.

Exhibit 6 is a firearm transfer record showing a purchase of a Tech. 9 firearm by Angela Johnson in July of 1993. This was obtained from a pawn shop in Waterloo, Iowa. Exhibit 7 is a P .380 semi-automatic handgun seized from Rick Held on February 6, 1997. Exhibit 8 are documents -- it's 8A through 8Q -- are documents seized from Mr. Honken's locker at Kraft Foods in Mason City, Iowa, on June 14, 1996. Exhibit 9A through H are documents seized from Dustin Honken's second locker at Kraft Foods on August 2, 1996. Exhibit 10 is a hydrogen tank seized from Jay Lien.

And, Your Honor, on the hydrogen tank, I think for the record we'll probably take a photograph of that because I'm sure the clerk's office won't want to keep it because it is a flammable -- it's flammable.

THE COURT: I think we'd appreciate that.

MR. REINERT: So we will have that I think probably for today, and then we will remove it from the court if that's not objectionable.

Exhibit 11 are documents seized from 1922 Virginia Street, Sioux City, Iowa. It's a storage location utilized by Dean Donaldson, and that's Exhibits 11A through P. Exhibit 12 are documents received from Lederman Bonding Company regarding the bonding of Dean Donaldson out of jail, and that's Exhibits 12A through D. Exhibit 13 is a note seized from Kathy Rick's residence. Exhibit 14 are photographs of the interior of the Woodbury County Jail, portions of it related to the attempted escape. Exhibit 15 is the order setting conditions of release from the 1993 case.

Exhibit 16 is the indictment in that case. And Exhibit 17 is the order dismissing that indictment in Case Number CR-93-3019. Exhibit 18 are the search warrant photographs taken at Nicholson's residence on March 17, 1993. Exhibit 19 is a laboratory report of the drugs and items seized in that search. Exhibit 20A is the tape recording made between Nicholson and Mr. Honken on March 21, 1993. 20B is a transcript. 20C is a handwritten statement made by Nicholson immediately after that transaction.

Exhibit 21 is a note seized from Mr. Honken's person on March 21, 1993. Exhibit 22 is the curriculum vitae of

John Meyers, the DEA chemist. Exhibit 23 is a method of production and copies of documents seized from the laboratory site at the defendant's garage. Handwritten notations at pages 5 through 9 were examined for handwriting and were found to be Defendant Honken's handwriting. Exhibit 24 is the DEA lab yield calculation. Exhibit 25 are copies of all the photos taken during the search.

26A and 26B are documents obtained from Hills Brothers and Adchemco, two chemical supply houses in Arizona, showing purchases of chemicals from 1992 and 1993. 27 is a sales invoice showing a purchase of a hydrogen tank. 28 is a catalog seized from the laboratory site on the day of the search. 29 is Poor Man's James Bond, again seized from the laboratory site the day of the search. Exhibit 30 is the Merck index, M-e-r-c-k, seized at the lab on the day of the search.

Exhibit 31A through E are items seized from Defendant Honken's cell on December 12, 1996. Exhibit 32 is a letter from Defendant Honken to Dennis Putzier dated November 29, 1997. Exhibit 33 are objects seized from cell C-14 on November 23, 1996. Exhibit 34 is a property receipt. Exhibit 35 -- from the Woodbury County Jail. Exhibit 35 is a handwritten anonymous note regarding the escape attempt in November of 1996.

36 is a hand drawing of a firearm made by Robert

Riepma. And 37 is a drawing of a firearm made by Timothy Cutkomp.

We would offer Exhibits 1 through 37 and all subexhibits into evidence.

* * * *

(Government Exhibits 1 through 37 were offered.)

* * * *

THE COURT: Mr. Parrish?

MR. PARRISH: Your Honor, the record should reflect I've had an opportunity, and thanks to the United States Attorney's Office affording all the material to me. In the discovery file I had the opportunity to review most of it. They then put the list together, forwarded it to me, and I've reviewed it and decided prior to the hearing we would have no objections to any of the exhibits listed by Mr. Reinert in this matter.

THE COURT: Before I receive the exhibits, I want to talk about the tapes that I listened to. I don't think all of the tapes have exhibit stickers on them -- I think just a couple of them do -- or at least exhibit stickers that correlate with your latest index of exhibits. And so I think you need to -- I don't know how you want to organize them, but, I mean, you can correlate the dates with your description of the exhibit, but they don't bear the exhibit number.

MR. REINERT: Yes, Your Honor. I can renumber those.

THE COURT: A couple of them do. I think 1 and 2 do as I recall, but some of them don't have an exhibit number on them. They have other forms of evidence identification and the like, but it doesn't correlate in any way with the exhibit list that you gave me that I recall. I may be wrong about that.

MR. COLLOTON: The DEA, Your Honor, had those in their custody, and we were dealing with them long distance from Cedar Rapids. We directed them to put a yellow sticker on each one.

THE COURT: I take that back. I think they're on the back. I couldn't see it when I was looking at them, and I remember some had them. So I think they're probably all here. You may want to double-check it. There's no objection, so all of the exhibits are received.

* * * *

(Government Exhibits 1 through 37 were received.)

* * * *

THE COURT: There really isn't any problem with chain of custody regarding the tapes, but just for the thoroughness of making a record, I did receive -- how many tapes are there? Five or six? I don't even remember now -- five tapes that were delivered -- I don't know from

CV10-3074; CR01-3047-LRR Def Ex55_Page_9

whom -- to my chambers while I was out of town. We took custody of them. They've been in my continuous custody. They were in DEA evidence bags that were sealed. I am the one who broke the seal. I broke the seal yesterday at my residence. The tapes were never outside my sight because I sat there and listened to them all consecutively. I would open a bag with a scissors, take the tape out and play it, put it back in the bag because knowing how absent minded I am, if I had five tapes out there, I'd never get them back in the right bag. So I did them one at a time, did not open any of the other bags until I used a scissors to open a bag. And then I would put the tape back in a bag, and then I listened to them all.

I'm probably going to want to listen to them again, but I did -- I have heard all of the tapes, and I did use the transcripts to follow along. So I'll just kind of -- we'll double-check. I'll have my clerk double-check now to make sure that all of the tapes actually have an evidence sticker on them that correlates to your list.

MR. REINERT: And there was also the additional tape that was submitted that was not in an evidence bag, and that was Exhibit 20A, Your Honor.

THE COURT: 20A. That would be the Nicholson tape?

MR. REINERT: Yes, Your Honor.

THE COURT: Yes. Okay. Are there any other

CV10-3074; CR01-3047-LRR DOEx55_Page_10

preliminary matters?

MR. REINERT: No, Your Honor.

THE COURT: Are you ready to proceed with your evidence?

MR. REINERT: We are, Your Honor.

THE COURT: Mr. Parrish, did you have any preliminary matters?

MR. PARRISH: No, Your Honor. The only thing, if Mr. Cutkomp is called early, I believe they're trying to get a copy of the sealed document from the plea matter, and we may need a short break to review that. Otherwise I can't think of anything.

THE COURT: You just remind me if you need a break to review that. Was that document over in Cedar Rapids, or is that here?

MR. REINERT: It was over in Cedar Rapids. I had my secretary pull up the Rule -- it's the Rule 11 letter that we filed, and she was going to fax that over to us.

THE COURT: Okay. If for some reason you can't get it, I probably have a copy of it in my judge's file, but it might take me a while to locate it. So if for some reason you can't get it from Cedar Rapids, you let me know. Why don't you go ahead and call your first witness.

MR. REINERT: United States calls Frank Stearns.

THE COURT: Would that be pleading number 128 by any

chance?  There is a sealed order in the file.

MR. COLLOTON:  This would be part of the Cutkomp file rather than the Honken file.

THE COURT:  Weren't they combined?

MR. COLLOTON:  Oh, I see.

THE COURT:  Same number, isn't it?

MR. REINERT:  It is the same number.  I'm not sure.  Sometimes the courts keep a separate case number.  It could very well be number 128.  I don't know off the top of my head.

THE COURT:  It wouldn't be because it's dated 12-10-97.  That would not be it.  I just wondered if I could find it.  Why don't we proceed.

FRANK STEARNS, PLAINTIFF'S WITNESS, SWORN

THE COURT:  Please be seated.  I have a lot of courtrooms I use, and I always have to readjust as to where the witness stand is.  Would you state your full name, please, and spell your last name for our court reporter.

THE WITNESS:  Frank Stearns, S-t-e-a-r-n-s.

THE COURT:  Mr. Reinert?

DIRECT EXAMINATION

BY MR. REINERT:

Q.   Detective Stearns, by whom are you employed?

A.   Mason City Police Department.

Q.   And how long have you been a police officer with Mason

City?

A. Thirteen years.

Q. Did you participate in the investigation of Gregory Nicholson and Dustin Honken?

A. Yes, sir, I did.

Q. How did that investigation begin?

A. Received a tip from the drug task force out of Minnesota, and we followed that tip up in doing a search warrant in Carpenter, Iowa.

Q. And whose residence was that in Carpenter, Iowa?

A. I believe it was David Patrick.

Q. After doing the search at Mr. Patrick's residence, was there additional searches conducted?

A. Yes, sir.

Q. Where was that at?

A. Next search warrant was at Greg Nicholson's residence.

Q. And did you participate in the search of that residence?

A. Yes, sir, I did.

Q. Were there photographs taken of the search of that residence?

A. Yes, sir, there was.

Q. I'm going to hand you what's been admitted as Exhibit 18. Just for the Court, can you go through the photographs? First, as you open the document going through the -- from the front to the back, the bottom right-hand photograph, that

CV10-3074; CR01-3047-LRR PoEx55_Page_13

individual sitting in the recliner, who's that?

A.    That would be Greg Nicholson.

MR. PARRISH:  Your Honor, for the purpose of the record, can we have a date that this started -- I realize all of that is replete throughout the record -- but for his testimony as to the date this investigation started.

MR. REINERT:  Yes, Your Honor.

BY MR. REINERT:

Q.    When was the Patrick search?

A.    March 16, 1993.

Q.    And when was the Nicholson search?

A.    March 17, 1993.

THE COURT:  Mr. Reinert, do you know -- I noticed when I got to that -- I did try and read most of the exhibits ahead of time -- it says, See separate booklet.  To my knowledge, I don't have a separate booklet.  Now --

MR. REINERT:  There should be, Your Honor.  I put the boxes together myself.  There should have been a small booklet like this that has photos in it.  It should have been in the book.

THE COURT:  I've never seen it.  I know that.  I'll ask my clerk to go up and look for it, but I don't know -- I mean, it came when I was out of town.  I've got everything else.  But I don't -- I noticed this when I was looking through this last night it said see a separate booklet, but

I've never seen a separate booklet.

MR. REINERT: There are a couple ones that have that. One is Exhibit 25 which is all the lab photos which is another large book, and we have the Woodbury County photos.

THE COURT: So there should be how many separate volumes besides the --

MR. REINERT: We've got the large book. Exhibit 14 is a separate book; Exhibit 18 is a separate book; and Exhibit 23 is a separate book.

THE COURT: Okay.

MR. REINERT: And 25 is the lab photos.

BY MR. REINERT:

Q. Detective Stearns, so the Court can follow along with your testimony, if you could go through the photos identifying which photo you're looking at for the record and tell the Court what it depicts.

A. The top left-hand picture depicts storage shelves down in the basement of the Nicholson residence. The top right-hand is a large Ziplock baggie of marijuana that was found down behind the bar in the basement I believe. And the bottom left-hand picture shows a handgun that was found in the bedroom. Bottom right-hand picture is Greg Nicholson.

Flipping the page, top-left hand picture is a personal use kit found also in the bedroom.

Q. And what kind of drug could one use with that personal

use kit?

A.   That was methamphetamine.  Top right-hand picture would be a Diet Coke can, a stash can.

Q.   What do you mean by a stash can?

A.   It's a look-alike pop can where you can unscrew the top or the bottom and stash either money or drugs in it or valuables.  On that same page, bottom left-hand picture is another smaller personal use kit including I believe a scale in there for methamphetamine.  I believe that baggie in there is methamphetamine and did test out.

Bottom right-hand picture on that same page shows the basement with the pool table and foos ball table.  Next page, top left-hand picture shows one of the stashes of money that was found inside a speaker down in the basement.

Q.   Now, ultimately did you also seize a larger amount of methamphetamine, and was that photographed?

A.   Yes, sir, it was.

Q.   Which of the photographs depict that seizure?

A.   You have to flip the page.  That would be the last page.

Q.   And what -- could you describe what is depicted in that last page?

A.   That would be myself pulling out the bottles of methamphetamine that were hidden up in the ceiling.

Q.   Were all those bottles full?

A.   No, sir.

Q. How many of those four bottles were full?

A. One.

Q. And was that substance subsequently tested along with the empty bottles for residue?

A. Yes, sir, it was.

Q. And what did it find? Did it find that to be methamphetamine?

A. Yes, sir, it did.

Q. After doing the search at Mr. Nicholson's residence, what was your next investigative step?

A. Mr. Nicholson agreed to cooperate with us and assist us in building a case against Mr. Honken.

Q. How did Mr. Honken come into the picture with regard to Nicholson?

A. Mr. Nicholson told us that Dustin Honken was his supplier out of Arizona.

Q. And was there a controlled meeting between Mr. Nicholson and Mr. Honken?

A. Yes, sir, there was.

Q. And when did that take place?

A. March 21 of 1993.

Q. And where did that meeting take place?

A. At Mr. Nicholson's residence.

Q. What steps did you take to control that meeting to determine who was actually present?

A. We placed a tape recorder on Mr. Nicholson as well as a body monitor.

Q. Did you have surveillance observing the people coming and going to Mr. Nicholson's residence?

A. Yes, sir, we did.

Q. What was the purpose of that meeting?

A. Mr. Nicholson was to pay off Dustin Honken for the last shipment of methamphetamine that he delivered to him.

Q. Did you observe anyone go into the residence to meet with Mr. Nicholson?

A. Yes, sir, I did.

Q. Who did you see?

A. Dustin Honken.

Q. Do you see Mr. Honken in court here today?

A. Yes, I do.

Q. And is he the defendant in this case?

A. Yes, sir.

Q. After the meeting, Exhibit 20B, that was a transcript prepared by the Mason City Police Department of the audio tape; is that correct?

A. Yes, sir.

Q. After the controlled meeting where you obtained the tape recording of Mr. Honken, what happened next?

A. Mr. Honken and Mr. Cutkomp were placed under arrest.

Q. Where was Mr. Cutkomp at that time?

CV10-3074; CR01-3047-LRR PCEx55_Page_18

A. At the time of the arrest?

Q. Yes, sir.

A. They were in a vehicle leaving the Nicholson residence.

Q. Did Mr. Cutkomp go into the residence with Mr. Honken?

A. Yes, sir, he did.

Q. Did you then take steps to search Mr. Honken's person or any rooms associated with Mr. Honken?

A. Yes, sir, we did. We searched his person as well as a motel room in Mason City.

Q. I'm going to show you what's been admitted as Exhibit 21. Do you recognize Exhibit 21?

A. Yes, sir, I do.

Q. What is Exhibit 21?

A. That's a copy of a note that was taken off of Dustin Honken.

Q. Was that in his room or on his person?

A. That was on his person.

Q. How much money was given to Mr. Honken by Mr. Nicholson in the controlled meeting?

A. $3,000.

Q. Does the note in any way reflect the quantity of money given to Mr. Honken by Mr. Nicholson?

A. No, sir.

Q. Does the audio tape reflect discussions about a debt being still owed to Mr. Honken by Mr. Nicholson?

A.   Yes, sir, it does.

Q.   And in the tape the reference is to 2,000 plus?

A.   Yes, sir.

Q.   Does that annotation appear on that drug note?

A.   Yes, sir.

Q.   And what -- does the drug note show one or two customer names?

A.   Two.

Q.   What does it show?

A.   It shows G-man and T-man.

Q.   And the reflection where you said the 2,000 plus annotation is made, which part of the ledger does that appear?

A.   On G-man.

Q.   And Mr. Nicholson's first name was what?

A.   Greg.

      MR. REINERT:  Nothing further, Your Honor.

      THE COURT:  Mr. Parrish?

                      CROSS-EXAMINATION

BY MR. PARRISH:

Q.   With regard to the weapon that was found, did you do any tracing of that weapon, Detective?

A.   I don't know if we did or not.

Q.   But you did not do it; is that correct?

A.   No, I did not.  No, sir.

Q. With regard to the drugs, did you have any in-house investigation with regard to any of the items that were seized to see if the fingerprints or any of those -- any other identifying marks matched up with Mr. Honken?

A. No, sir, we didn't.

Q. Did you view any -- interview any witness with regard to the photographs that you outlined were items found in the Nicholsons' residence where anyone pointed out that those specific items were, in fact, connected to Mr. Honken other than what you've testified to about what Mr. Nicholson said to you about the drugs?

A. No, sir.

Q. Now, I see the weapon being laid out on the couch I assume in a bedroom from your testimony. Was that where it was found? And we're talking about the photograph on Government Exhibit 18, the bottom left. Is that where it was actually found, or do you know?

A. I believe it was found in the bedroom.

Q. No. Exactly where the photograph is taken, is that where it was found?

A. You're referring to --

Q. Do you want to take a look at the photograph?

A. No, that's not where it was found, no, sir.

Q. Could you tell us where it was found?

A. It was found in the bedroom. Exactly where in the

bedroom, I'm not sure.

Q.    And who lived in that bedroom to your knowledge?

A.    Greg Nicholson.

Q.    Do you know for a fact Mr. Honken did not live in that bedroom?

A.    I've never known him to, no, sir.

Q.    No one's ever told you that he did, in fact, live in there?

A.    No, sir.

Q.    Did you ask Mr. Nicholson about the weapon?

A.    I don't recall.

Q.    Do you have any notations where you asked him about the weapon at all in your reports?

A.    I don't believe there was, no, sir.

Q.    And in relation to where any of the drugs were found, where this weapon was found, Government Exhibit 18, did you, in fact, find any drugs in close proximity to it?

A.    I believe we did, yes, sir.

Q.    Where?

A.    In the bedroom.

Q.    But where in relation to where the gun was found?

A.    I believe the drugs were found on the dresser.

Q.    You believe.  Do you know for a fact?

A.    I don't recall, no, sir.

Q.    Do the photographs help refresh your recollection?

A. They possibly could have.
Q. Do you want to take a look and see?
A. No, sir. Nothing in there reflects, in these photos.
Q. So as you sit here today, your testimony is you have no recollection of where exactly the gun was found, and you have no recollection of where, in fact, the drugs were found in the house except possibly on the dresser.
A. In the bedroom, that's correct.
Q. And as I understand it, do you know for a fact Mr. Honken was not in that bedroom, is that correct, or had nothing to do with the residence? That's correct also?
A. He did not live in that bedroom.
Q. Now, Mr. Cutkomp you indicated came into the house. Do you have any notes to reflect that he came into the house on that date when you were at the Nicholson residence?
A. Not unless it's in my officer's report.
Q. In your what?
A. Officer's report.
Q. Did you review your report before you came in here today?
A. I did last night, yes, sir.
Q. And from your recollection of your officer's report, did it indicate that Mr. Cutkomp came into the residence?
A. I don't believe so.
Q. Okay. But you just indicated to the Court that he did

CV10-3074; CR01-3047-LRR Def Ex55_Page_23

come into the residence. Could you have been mistaken?

A. No, sir. He did.

Q. You remember that.

A. Yes, sir.

Q. Yet it's not in anything that you wrote down.

A. That's correct.

Q. How long was he in the residence then?

A. The whole time that Mr. Honken was.

Q. And you could not be mistaken on that. Is that what you're telling us here today?

A. It's possible I could be mistaken. I'm attempting as far as I can remembering facts from 1993.

Q. Well, wouldn't it be accurate, sir, or wouldn't it be -- if this gentleman was part of the conspiracy, Mr. Cutkomp, and wouldn't it be significant if Mr. Honken came into the residence that you would also put Mr. Cutkomp into the residence at the same time?

A. Yes, sir.

Q. Wouldn't that be significant?

A. Yes, sir.

Q. And if it is significant as part of your drug investigation, you would normally have a notation of him being in the residence; isn't that correct?

A. That's correct.

Q. But you have no notation of that; is that correct?

CV10-3074; CR01-3047-LRR PCEx55_Page 24

A. That's correct, not in my report.

Q. Have you seen it in anyone else's report?

A. I haven't reviewed anybody else's reports.

Q. So you could be mistaken.

A. Yes, sir.

Q. Did you have any evidence at all, sir, that Mr. Honken handled this weapon that you saw in the living room at all?

A. No, sir.

Q. And Mr. Nicholson never advised you of that; is that correct?

A. That's correct.

Q. Mr. Cutkomp never advised you of that.

A. That's correct.

MR. PARRISH: I have no further questions.

THE COURT: Mr. Reinert, anything further?

MR. REINERT: Yes.

REDIRECT EXAMINATION

BY MR. REINERT:

Q. Detective Stearns, on the issue of where the firearm was specifically found, that semi-automatic handgun with relation to the drugs, would reviewing your report assist you in refreshing your recollection?

A. That's possible.

Q. I'm going to hand you a report dated March 19 of 1993, and I would direct your attention down to the bottom portion

CV-10-3074, CR01-3047-LRR Pet.Ex55_Page_25

if you would read that to yourself, please.

A. Okay.

Q. Does reading that portion of the document of your report assist to refresh your recollection on specifically where the firearm was seized?

A. Yes, sir, it does.

Q. Could you tell the Court where that firearm was seized in relation to any drugs?

A. Firearm was seized on the bed, and the drugs were found on the dresser.

Q. And based upon your discussions with Mr. Parrish, your reports as well as your recollection is you just don't recall for sure if Mr. Cutkomp went into the residence or not?

A. Yes, sir.

MR. REINERT: No further questions.

RECROSS-EXAMINATION

BY MR. PARRISH:

Q. Let me see if I understand you. You say from your report the weapon was found on the bed?

A. Yes, sir.

Q. On top of the bed out in plain view.

A. Yes, sir.

Q. Had anyone gone into the house prior to the time that you went into the -- into the bedroom, I'm sorry. Had anyone gone in the bedroom prior to the time of your going into the

CV10-3074; CR04-3047-LRR PoEx55_Page_26

bedroom?

A.    Yes, sir.

Q.    Other officers?

A.    Yes, sir.

Q.    So you don't know where they found the weapon.

A.    No, that's where I -- they told me that's where they found the weapon.

Q.    Oh, okay.  But they could have actually pulled it out from somewhere else for all you know and put it on the bed.

A.    That's possible.

Q.    Well, do you say in your report that they told you they found it on top of the bed?

A.    I believe so, yes.

Q.    Who told you that they found it on top of the bed?

A.    I don't recall.

Q.    I thought you just read it in your report.

A.    Yes, sir, I did, but I don't recall who told me that.

Q.    They could have been mistaken too, is that correct, if you're relying on someone who told you and you can't recall who told you where the weapon was found?

A.    They could be mistaken on where they told me they found it?

Q.    Yeah.

A.    I would hope not.

Q.    Well, how did it end up on the couch?

A. That's where our ID man took -- carried it over to bag it up.

Q. Is there any notation of that?

A. No, sir.

Q. So if we were just looking at the photograph, it would make it appear that it was just found on the couch.

A. That's correct.

Q. And I assume that when they're touching all this stuff and moving it around, they make sure they protected it for fingerprint identification; is that right?

A. I don't know if they did or not.

Q. Well, that would be pretty important in a drug investigation; wouldn't you agree?

A. Yes, sir.

Q. And they would probably be handling this weapon with gloves on to make sure they wouldn't smear any fingerprints; would you agree?

A. Yes, sir.

Q. Who's this gentleman here in Government Exhibit 18 handling -- in the top handling drug paraphernalia?

A. Top left?

Q. Yes.

A. That's Dave Martin.

Q. He's a police officer?

A. Yes, sir.

Q.   Does he have gloves on?

A.   No, sir.

Q.   And who's the gentleman there handling the gun right down at the bottom?

A.   That'd be Lowell Willock (phonetic).  He's our identification man.

Q.   And somebody you said moved it from the bed over to the -- according to you, from the bed over to the couch, right, to ID it?

A.   That's correct.

Q.   Your ID man you thought did that.

A.   Yes, sir.

Q.   You just said that, didn't you, earlier?

A.   Yes, sir.

Q.   Does he have gloves on?

A.   No, sir, not there.

        MR. PARRISH:  I have nothing further.

        THE COURT:  Mr. Reinert, anything further of this witness?

        MR. REINERT:  No, Your Honor.

        THE COURT:  Thank you.  You're excused.

        MR. REINERT:  United States calls Scott Tracy Gahn.

        THE COURT:  Please come forward, and I'll swear you in.

        SCOTT GAHN, PLAINTIFF'S WITNESS, SWORN

THE COURT:  Please be seated here.  Would you state your full name and spell your last name, please.

THE WITNESS:  My name is Scott Tracy Gahn.  Last name is G-a-h-n.

THE COURT:  Mr. Reinert?

DIRECT EXAMINATION

BY MR. REINERT:

Q.   Mr. Gahn, do you know the defendant, Dustin Honken?

A.   Yes, I do.

Q.   Do you see him here in court today?

A.   Yes, I do.

Q.   How long have you known Mr. Honken?

A.   I think I met him six or seven years ago.

Q.   How did you first meet Mr. Honken?

A.   He was the night plant supervisor at Wellborn Industries.

Q.   Who -- did you have a mutual friend?

A.   At the time I met him, no.

Q.   During the -- during the course of our investigation back in 1993, you were given use immunity; is that correct?

A.   Yes.

Q.   Did -- were you a drug user at that time?

A.   Yes.

Q.   And what drug were you using primarily?

A.   Marijuana.

Q. Any other drugs?

A. Some cocaine, some methamphetamine.

Q. Who were you obtaining most of your drugs from?

A. Greg Nicholson.

Q. Did you obtain any drugs from Mr. Honken during that time period?

A. At one time I obtained about six ounces of marijuana from Dustin, and at one time I obtained about a -- maybe a third or a fourth canister of cocaine.

Q. When you got the cocaine from Mr. Honken, did you have any discussions with Mr. Honken regarding what you were supposed to do with the cocaine?

A. I was supposed to sample it out to people, to give it to people to try.

Q. Why did Mr. Honken want you to provide samples of this cocaine to people?

A. I assume to establish business.

Q. Did you have a specific discussion about whether you could find anyone to sell cocaine for Mr. Honken?

A. Yeah.

Q. And would you describe that conversation for the Court?

A. I guess Dustin was just looking for somebody to get rid of some stuff, and I introduced him to Greg Nicholson, and it went from there.

Q. About when was that that you introduced him to Mr.

Nicholson?

A. It's been so long ago. I would say within four months of when I met him, four to five months maybe.

Q. Four to five months of when you met --

A. Dustin at Wellborn.

Q. And about what date did you -- when you started at Wellborn, was he already working there?

A. Yeah, Dustin was the night plant manager, kind of a plant manager type guy. And I was there on a 90-day temp. job, and I'm going to say it was in the late winter of six or seven years ago.

Q. So about 1992 or so?

A. That sounds about right.

Q. Was there a time -- do you recall when Mr. Honken was charged in 1993?

A. Yes.

Q. Was there a time after that when you and Mr. Honken had a discussion?

A. Yes.

Q. What kind -- would you describe that discussion for the Court?

A. The best I can recall is I was trying to get a dance club in Mason City open, and I'd ran into Dustin, and he seemed anxious to know if I knew where Greg was, where he lived, anything like that.

Q. Did -- do you recall what you told him in response to those questions looking for Mr. Nicholson?

A. I honestly didn't know where Greg was. After that bust went down, he kind of -- he moved. They took his house. And it's my understanding he was working in the area and had a house in Mason City, but that was about it.

Q. The cocaine that you had gotten earlier from the defendant with the instructions to spread it around, did you have to -- did you pay for that right away?

A. No, I didn't pay for it, and I wound up doing the cocaine, and I owed Dustin the money for it.

Q. Could you describe any collection efforts that the defendant partook of?

A. It was a period of time before I was able to get the money together, and I eventually did pay him off.

Q. Would you describe -- was he pretty laid back about getting the money back or more intense?

A. I would say he was fairly laid back because he knew me.

Q. During the course of your relationship with Mr. Honken, did you ever see Mr. Honken with any firearms?

A. At one time if I remember correctly, we were at an apartment once, and there was a gun in the case, and it was a shotgun or a rifle of some sort.

Q. Was it like all in one piece or multiple pieces?

A. No, no, not that I remember. It was multiple pieces.

Q. About how big was the case?

A. About like so (indicating), two foot by --

Q. About 2 foot by 18 inches or so?

A. Yeah, looked like a target rifle or something like that.

Q. When was that? Do you recall?

A. Again, it was within the first six to eight months that I met him. We were over at an apartment, at some people's house, and I think I remember seeing a gun in a case.

Q. Was there any drug use occurring during that time period?

A. No, I never knew Dustin to use any drugs to the best of my knowledge.

Q. Were there other people using drugs at the time?

A. Drinking beer, alcohol.

Q. Going back to the discussion you had with Mr. Honken about Mr. Nicholson's whereabouts, do you have a specific recollection of whether you told Mr. Honken anything or even gave him some suggestions on where to look?

A. Honestly I don't think I had the information he wanted. I don't -- at the time Dustin was looking for him, I didn't know where Greg was.

Q. Is it possible that you may have told him some possible locations for people?

A. Yes, yes.

MR. PARRISH: I'm going to object. Anything is

possible. That's much too much speculation. It has no probative value.

A. That was a long time ago.

THE COURT: Just a second.

MR. PARRISH: It really has no probative value even in a sentencing hearing, what the possibilities are.

THE COURT: Objection's overruled. I think the witness has already answered, but you can ask a follow-up question if you'd like.

MR. REINERT: No, Your Honor. I think the answer is already in. No further questions.

THE COURT: Mr. Parrish?

MR. PARRISH: Thank you.

CROSS-EXAMINATION

BY MR. PARRISH:

Q. As I understand it -- and let me be clear on this -- you never saw Mr. Honken with a weapon; is that correct?

A. I couldn't even say that it was Dustin's weapon. I remember seeing -- I think I remember seeing a gun in a case at that apartment. Who it belonged to, what it was used for, I don't know.

Q. That's not my question. You never saw Dustin with a weapon is my question.

A. No.

Q. Okay. And even the gun you saw in a case, you don't

know the date that you saw it.

A. No.

Q. Okay.

MR. PARRISH: I have no further questions, Your Honor.

THE COURT: Anything further, Mr. Reinert?

MR. REINERT: No, Your Honor.

THE COURT: Thank you. You're excused.

MR. REINERT: United States calls Daniel Cobeen.

THE COURT: Please come forward, and I'll swear you in.

DANIEL COBEEN, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated here. Would you state your full name, please, and spell your last name.

THE WITNESS: Daniel Ross Cobeen, C-o-b-e-e-n.

THE COURT: Mr. Reinert?

DIRECT EXAMINATION

BY MR. REINERT:

Q. Mr. Cobeen, do you know the defendant, Dustin Honken?

A. Yes, I do.

Q. And is he here in court?

A. Yes, he is.

Q. When did you first meet Mr. Honken?

A. When I first started working at Kraft Foods, about the beginning or middle of '95, 1995.

CV10-3074; CR01-3047-LRR Def Ex55_Page_36

Q.   When you were working at Kraft Foods, was that a temporary job or a permanent job?

A.   It was a temporary job.

Q.   And how did you meet Mr. Honken there at the plant?

A.   At the time I was in B. G. Clark or a halfway house, and they sent me to Manpower to get a job.  I had to get a job because I had to pay the rent.  So I went to Manpower, and they sent me to Kraft Foods as a temporary worker.  And you gotta work a thousand hours through Kraft Foods.  Well, they put me right away on a -- case packer was the name of the machine, and it just happened to be right -- sitting right beside Dustin.

Q.   What kind of offense were you in the halfway house for?

A.   I was accused of stealing 32 sheets of plywood with my Ford Escort.

Q.   Did you have some -- do you have any -- was that a felony offense?

A.   Yes, it was.

Q.   Did you have any discussions with Mr. Honken there at the plant about methamphetamine or other drugs?

A.   Right away when I started working there?

Q.   Just did you have any conversations with him?

A.   Yes, we did.

Q.   And how soon after you started working did you start to have conversations about methamphetamine?

A. Probably about three weeks to a month after I started working there, he asked me, and I just plain ignored him the first time because I was in a halfway house. I didn't want nothing to do with trouble.

Q. What did he ask you the first time?

A. That he had asked a few people about me and they had said that I was trustworthy and a little bit on the crazy side and that I could probably help him out.

Q. What was he asking you to help him do at that point?

A. At that point it was -- the people I knew distribute methamphetamine.

Q. Did he ultimately approach you on another occasion to obtain methamphetamine for him?

A. Yes, he did.

Q. And did you do that?

A. Yes, I did.

Q. How much methamphetamine did you obtain for the defendant?

A. I think it was an eight ball if I'm right.

Q. After obtaining that eight ball of methamphetamine for the defendant, did you have any further discussions with other aspects of methamphetamine?

A. He said he'd asked around about me, and the people he had asked, like I said, said that I could be trusted. And then I started talking a little bit more about him with it,

CV10-3074; CR07-3047-LRR Pet.Ex55_Page_38

and then I decided that no, I don't need no trouble, so I went and approached my lawyer.

Q. What was the -- what types of activities was he talking about on methamphetamine before you approached your lawyer?

A. Manufacturing then.

Q. Where would these conversations take place to manufacture methamphetamine?

A. Well, he always liked the idea that the machines covered all the talking, so we always talked around the machine we were working at.

Q. When he brought up the subject of manufacturing methamphetamine, did he tell you any details about his past conduct regarding manufacturing of methamphetamine?

A. He had said a few years before he had been involved in it and that he asked me if I -- he quoted a few names, and I said, Yeah, I remember that stuff. That was some killer meth. In other words, it was real good.

Q. What were some of the names that he provided as references for the methamphetamine?

A. Greg Nicholson was the one that I happened to know.

Q. And had you obtained methamphetamine from Mr. Nicholson before?

A. About two years prior. I guess it was the stuff that he had manufactured the first time. It was the lower basement of a bar called the Dugout in Clear Lake, and I just --

that's always been my problem. I knew too many of the wrong people. And I happened to go there, and there was a band playing. I knew all the band members. And by invitation only you could get downstairs to the band members, and they were selling it right out of the little room down there, and it happened to be Nicholson that was selling it. And I happened to be one of the lucky few, if you could call it that anyway, to be invited. And I happened to have some money for a few other people that wasn't invited, so I was getting some for about three or four people.

Q. Did -- ultimately when you talked to your lawyer, did you have a meeting with the agent, with Agent Graham and Agent Mizell and Agent Lewis?

A. I was still in B. G. Clark at the time. I got two kids and a wife. And my kids, from seven years old at the time, was like three years. She was in a body cast, my youngest daughter was, and I felt like shit because here I am in a halfway house and all this for something like to this day I still felt I didn't do. So I went and told my lawyer. I go, I didn't want to get involved in any trouble anymore. I mean, I never had a criminal record. Boom. Now I got a criminal record for something I felt I didn't do. No way. I'm not getting in trouble anymore. And I approached my lawyer and said I'll get -- about four hours later I talked to my attorney or she called me up and she said meet her

tomorrow in the district attorney's office in the basement of Mason City courthouse. I said, I know where that is.

Okay. I walked into this room, and there sat a couple people in this room and a few other people and a camcorder on a tripod, and I was basically scared shitless, pardon the expression, but that was my --

THE COURT: I've heard that expression before.

A. And I sort of just, you know, grabbed my pants, pulled them up, went in there and sat down, and they told me that Nicholson had been involved in something before and they would like to know if I could help them out. I said yes, if it's going to keep me out of trouble.

Q. You said there was a camcorder. Ultimately you determined that camcorder was not on; correct?

A. I was told it was not on a few days later.

Q. And ultimately did you agree to cooperate with the agents and actually work in an undercover capacity with Mr. Honken?

A. I agreed to work undercover, and I reported to a guy by the name of John Graham.

Q. During the course of your meetings with Mr. Honken after you had begun to cooperate, did you have discussions with Mr. Honken about how much methamphetamine he wanted to make?

A. At first it was the sum of about $100,000 worth, street value, I presume. And then at the end of it it ended up

CV10-3074; CR01-3047-LRR PCEx55_Page_41

being a couple cake pans full or $200,000 worth.

Q. Did he show how big the cake pans would be and how deep the meth would be?

A. About this deep across the pan (indicating) and about half inch deep and like a 9-by-13 cake pan, about 2, 3 inches high.

Q. Did he describe for you how much money he had invested in the laboratory?

A. He had said that him and his partner the first time had invested about five to seven thousand dollars worth of glassware and equipment.

Q. Did he indicate who had money invested in the lab he was operating at this point?

A. He basically said a few people had money tied up in it.

Q. Did he indicate who had money tied up in it?

A. Him, Tim, and I think his girlfriend at the time had about 1,500 bucks invested.

Q. Now, Tim, is that Tim Cutkomp?

A. Yes, it is.

Q. And his girlfriend, who was that?

A. Not his first girlfriend, Kathy Rick. It was the other one. To be honest with you, I can't remember her name. I'd have to hear it.

Q. Does the name Angela Johnson sound familiar?

A. That's her name. He had just had a sweet little baby

CV10-3074; CR01-3047-LRR PCEx55_Page_42

daughter with her.

Q. During the course of your cooperation, did you and Mr. Honken and Mr. Cutkomp set up any kind of mail drop or a place where you could obtain mail?

A. He -- me, him, and Tim went to Des Moines one day, and he gave me the name and some paperwork and on -- the name was Cytomax or something like that. And I went into this little building and set up a mailbox drop.

MR. REINERT: Cytomax for the record is C-y-t-o-m-a-x.

Q. Whose idea was it to go down and set up this mail drop?

A. Dustin's.

Q. Did you or Mr. Cutkomp ever go travel anywhere to get any kind of chemicals?

A. Tim Cutkomp; right? Is that who you're referring to?

Q. Yes, sir.

A. Yeah. We -- he had kept saying that we were going to go -- I had to go up to Minneapolis, me and --

Q. Mr. Cobeen, he --

A. Dustin kept saying that me and Dustin were going to go up to Minneapolis and pick something up. And what happened was he kept putting it off and it ended up being his girl Angela's birthday at the time, so finally he sent me and Tim. And we went up to Minneapolis, and I went into this -- what it looked like was a glassware company. They had all kinds

of glass bottles everywhere and everything. And I picked up a couple bottles of what was known as a catalyst.

Q. And was there a -- did you know the item or the name of what you were picking up when you went up there? Did you have that memorized?

A. No. I just -- when I got there, we pulled into this building. And we kept getting lost at first, and then finally we found the right place. And Tim pulled this piece of paper out, and it said what to get. And that's when I read the piece of paper and walked in the building so I was presumed to know what I was talking about when I asked for it.

Q. Did you observe where Mr. Cutkomp got that piece of paper instructing you all what to pick up?

A. Before we left, Dustin wrote down exactly what he needed and gave it to Tim.

Q. Was there a time when you were involved in purchasing a hydrogen tank?

A. Yes, there was. And yes, that does look like the tank.

Q. I just showed you what's been admitted as Exhibit --

A. I purchased that tank or one identical to it and a regulator, what goes on top to open and close the pressure coming out.

Q. That was Exhibit 10. That blue tank, you said you had purchased that?

CV10-3074; CR01-3047-LRR DoEx55_Page_44

A.   Yes.

Q.   What about -- was there any paperwork associated with the purchase of Exhibit 10, of that hydrogen?

A.   What took place that day that I purchased the tank for him was he picked me up at my apartment, and I lived right uptown in Mason City, and he had his dad's red four-by-four pickup truck, and we went.  He picked me up.  We took off from there.  And a couple blocks from my apartment was Norwest Bank.  We stopped at Norwest Bank, and he went in and got some money out.  Then he came back out, and he had me drive.  And I drove to Shopko in Mason City, and a block from Shopko is where the Barclay Welding store was which is where I presume -- where I bought the tank at, the regulator.  And I dropped him off at Shopko because he didn't want to be seen around the place, Barclay's.  Then I went and proceeded a block down the street and went and purchased that tank and a regulator.  And he had given me the money that he got at Norwest Bank to purchase it.

Q.   Did you actually see the laboratory in Mr. Honken's residence?

A.   Yes, I did.  Can I finish up that last story, though?  The receipt I got on the tank, I kept it and gave it to FBI Agent Graham.  And yes, I did see the laboratory in his house.

Q.   Did Mr. Honken describe to you what the starting

ingredient was in his methamphetamine recipe?
A. I can't recall the names of them all right now, but yes, I knew -- there was like nine steps, and he had said every step to me. And there was like four cyanide reaction steps in the middle of it all and everything.
Q. Do you have a friend by the name of Brian Beach?
A. Yes, I know him.
Q. Had you spent time at Mr. Beach's residence?
A. Yes, I've spent time there before.
Q. And were you spending time with him in his residence during the May and June of 1996 time frame?
A. I can't recall for sure. Probably. I was taking docks out with him too. I was taking docks out of Clear Lake because he owns a dock business.
Q. After the -- after Mr. Honken was arrested on this charge or initially charged in this case, were you given some money to cover your expenses to allow you to move out of the area?
A. I was approached by Dave Mizell and John Graham, and they told me that they wanted me to relocate because the last time Dustin was involved in all this a family disappeared.
Q. And did they ultimately give you some money to assist you in relocating?
A. They gave me seven -- about seven grand, and I took off, and we went to Florida and stayed at my dad's trailer, me and

CV10-3074; CR01-3047-LRR PoEx55_Page_46

my wife and my two kids.

Q. When did -- do you recall when it was that you actually left the area, that you'd gotten the expense money?

A. It was like three days to a week after they had raided his house. It wasn't long after that.

Q. So ultimately -- so you took off after we did the search at the house and then --

A. It was like two weeks after that.

Q. Now, did you stay relocated, or did you move back?

A. I was gone for about maybe 30 to 40 days, and it was so friggin' hot in Florida, to be honest with you, I couldn't take it anymore. I couldn't -- all I could wear was my underwear around the house, and I couldn't go nowhere. I was sweating constantly. So I told the wife, I'm taking off for Iowa. This ain't worth it. So yes, about 40 days after we were down, yes, I packed up the family, and we moved back up.

MR. REINERT: Nothing further, Your Honor.

THE COURT: Mr. Parrish, you may cross-examine.

CROSS-EXAMINATION

BY MR. PARRISH:

Q. Did you spend the $7,000 in 30 to 45 days?

A. Yeah, we spent most of it, yeah. I think we had about 800 bucks left to come back on.

Q. So you spent roughly what? $6,200?

A. Yeah. At first I used 2,300 of it to buy the van that

my dad owned so we can travel because my dad's a master mechanic and he knew it was reliable and he knew we could get there and get back if we had to. And that was what he was worried about, and it had full coverage insurance on it. So that's where most of the money went right off the bat.

Q. Did you declare that money on your income tax return?

A. I hadn't worked for ten years, so no, I didn't. I didn't work that whole year, and neither had the wife.

Q. So I take it then the government paid you $7,000 that you spent in 30 to 45 days and you had other income coming in; is that right?

A. No.

Q. Because you said you worked right alongside Dustin Honken.

A. Yeah, but that money -- that was paying rent and everything and then boom. I had to quit that job because it was -- no -- well, they let me go a month before I put a thousand hours in, and I started in May of '95, so I worked there like six months. So before all this was done with, I had probably not had a job for six months.

Q. You just said ten years. Which one is true, the one for ten years or six months?

A. For ten years I didn't have a job until I started working at Kraft Foods.

Q. So your first statement before you got the $7,000 you

had not worked in 10 years was not the truth, was it?

A. I worked at Kraft Foods to pay for the halfway house, to get out of there, yeah, so it was not true.

Q. Now, other than working at Kraft Foods, are you telling us that you had no other job for the last 10 years prior to the time that the government paid you $7,000? Is that your testimony?

A. No job that would -- I could claim exempt every year on my taxes, put it that way. Does that answer your question?

Q. That's not what I asked you. My question is, other than the job that you had at Kraft Foods for six months, prior to the time the government gave you $7,000 that you spent in 30 to 45 days, did you have any other job in the past 10 years?

A. Part-time jobs here and there.

Q. All right. What other jobs did you work?

A. During the summer months I might have took docks out for one month, and that was about it.

Q. Are you telling us you only had one other job other than the Kraft Food job?

A. And every summer I did it for about one or -- one month to a month and a half, and that was taking docks out for a Brian Beach.

Q. So you worked that job for about -- every summer for ten years; is that right?

A. No, it was only three years.

CV10-3074; CR01-3047 Def Ex55_Page_49

Q.   For three years.  Did you work any other job?

A.   I worked for Zilge's Appliance for a month.  Then I got hit by a car, so I quit.  Maybe might have worked two or three weeks here and quit.  I never found a job I liked until right now.

Q.   So to just clarify your initial statement then, you did have jobs; is that right?

A.   Yeah, part-time jobs.

Q.   What you did, you just didn't file your taxes.

A.   I never made enough to file.

Q.   Well, what did you make that year they gave you $7,000?  What was your total income?

A.   I can't remember if I filed that year or not.  I'd have to look at my H & R Block statements because that's where we had filed if we did.

Q.   You just said you didn't declare that year, though; right?  That $7,000 you never declared.

A.   Right.

Q.   And you're saying you may have filed that year then with other income that you had?

A.   My wife might have.  See, we file jointly.  My wife, she might have been working.  I can't tell you unless I look at my H & R Block things if we even filed that year.  My personal opinion is we did not.

Q.   Now, let me ask you this:  You indicated that you only

had one felony conviction; is that right?

A. I think two of them came up on that charge for stealing that plywood. One was for, I guess, trespassing on the property, and the other one was for stealing the plywood. One was theft, and one was burglary if I remember right.

Q. Theft and one was burglary?

A. I think. I can't recall for sure. I'd have to look at the paperwork.

Q. Did you have any other charges dealing with --

A. Never had another criminal charge since I was -- till I was older -- well, when I was younger -- when I was 7 years old to 13 years old I had a criminal record probably that big (indicating).

Q. How old are you right now?

A. Thirty-four.

Q. And during those three years from 1993 through 1996, how did you get money to support your two kids?

A. I didn't. That was my problem. Everybody always complained that, well, you got two kids. Why don't you work to support them? Well, I'm the type of person, if I don't like the job, I ain't going to work it.

Q. I understand that. But my question was, how did you support your two kids?

A. My wife was on ADC at the time.

Q. And were you on ADC at the time that you received the

CV10-3074; CR01-3047-LRR DoEx55_Page_51

$7,000 from the government?

A. No. We were canceled because I had been working at Kraft Foods.

Q. And how long had you been out of work at Kraft Foods before you declared -- before the government paid you the $7,000?

A. About a month and a half.

Q. As I understand it, you visited with Dustin Hoffman for -- Honken for quite a bit of time while you were working for the government, is that correct, as a confidential informant?

A. Yes.

Q. You visited him in his home on occasion?

A. Yes.

Q. He visited in your home?

A. Yes.

Q. You rode around with him in a vehicle.

A. Couple times, yes.

Q. And would you say over the course of the time that you worked as a confidential informant you were with him approximately how long -- I mean how many times? Over a hundred?

A. That might be an exaggeration, but somewhere around there, maybe a little less.

Q. Did you ever see him with a weapon?

A. Not seen him with one, no.

CV10-3074; CR01-3047-LRR PCEx55_Page_52

Q. Did you ever see him carry one?

A. Specify weapon.

Q. A firearm.

A. A gun?

Q. Yes.

A. No.

Q. Did he ever threaten you at all?

A. Yeah.

Q. On how many occasions?

A. Threaten -- threats to me ain't a threat because people know me. I don't take threats because they don't bother me. But he had threatened my wife and kids in my house my wife told me. That I took as a threat.

Q. You say your wife told you that.

A. (Witness nodded head.)

Q. My question, has he ever threatened you?

A. Yes.

Q. Where he said he's threatened you to your face.

A. Verbally, yeah. He said if I ever crossed him that he knew somebody that could knock on my door and boom.

Q. And when did he tell you that?

A. Approximately a month after we knew each other, two months after we knew each other, right when we started processing -- getting ready to manufacture meth.

Q. He told you that a month and a half before you began to

manufacture meth? Is that your testimony?

A. About -- well, we had talked a few times at Kraft Foods. And I basically started -- you know, started to get to know the guy. And then I talked to my lawyer and got with John Graham and everything, and then maybe a month to two weeks later he said if I ever crossed him that he knew somebody, that if I knocked -- all they could do is knock on the door and I'd answer the door and boom.

Q. And you took that as a direct threat against you by him for something that you had done or if you had done something in the future; is that what --

A. If I crossed him in the future that that's what could happen to me is the way I took it.

Q. But he never -- did he ever tell you that he had ever harmed anyone in all the conversations you had with him?

A. Well, we had talked about karate and a few other things, so yeah, I guess you could say that but not really straight out deliberately going and harming somebody.

Q. And I take it you built up confidence in him or he had confidence in you from the fact that you all were working together on an illegal enterprise; is that correct?

A. My whole idea was to get his confidence, yes.

Q. And I take it that you did get his confidence.

A. I think we got one another's, yes.

Q. And you would agree that from what you observed about

him he confided in you things that were on his mind about illegal activity that he was engaged in; is that correct?

A. He confided in me, yeah.

Q. And did he ever confide in you off the record when you were not on tape or in any other setting that he had ever harmed anyone?

A. He had said that he had had Dustin -- or a guy by the name of -- who was his name again? He had somebody disappeared. He had some -- you know, that was working with him prior. Nicholson was the guy's name.

Q. What was his name?

A. Greg Nicholson I think.

Q. Nixon?

A. Nicholson, Greg Nicholson.

Q. And said that he had had him disappear?

A. Disappeared.

Q. That was his statement to you.

A. (Witness nodded head), and that the way I took it was he had had -- probably the same guy that was going to knock on my door and blow my head off is the guy I figured probably done it.

Q. So as I understand it now, you said he had this conversation with you about a month and a half after you started working with him, and that was the conversation that he told you about Nicholson; is that correct?

A.   No, this happened later on.

Q.   So it was not the same conversation.

A.   No.

Q.   And I take it you told the agents this in your numerous statements of debriefing, that he, in fact, said he had done that to Nicholson; is that correct?

A.   I think I said something about that, yeah.

Q.   Do you know for a fact whether you did?

A.   Yeah, I told them what he had told me.

Q.   And when do you think you told them that?

A.   Somewhere within the time span of all that paperwork you got there.

Q.   And you're pretty sure about that.

A.   I'm pretty sure about that, yeah.

Q.   You couldn't be mistaken about it?

A.   No, because I told them quite a few things about him wanting to purchase guns and a bunch of stuff.

Q.   No, no.  Let's just stick to where we are, that you told the agents at some point in this time you were working as a confidential informant that --

A.   He had Nicholson disappeared, yes, I said that.

Q.   And that you told them that you believed he had harmed Nicholson.

A.   He had had Nicholson disappeared.  I don't think he done it personally.  I do not know.

Q. So you never told them that?

A. I told them that he had had Honken -- or Nicholson disappeared is what I told them.

Q. Let me make it clear then so we'll have a clear understanding of the question I'm trying to ask, and I apologize if I'm not being clear. But did you ever tell any undercover agent that Dustin Hoffman had nothing -- anything -- I keep calling him -- Dustin Honken --

THE COURT: Been watching too many movies, Mr. Parrish.

MR. PARRISH: I haven't seen enough lately. That's my problem. It's a wish I think.

THE COURT: When I lived in Des Moines I always used to run into Mr. Parrish at the video store. You'd be reading about him in the papers trying a first-degree murder case, and he'd be at the video store all relaxed.

MR. PARRISH: Since I had my ten-month-old, it doesn't happen anymore.

BY MR. PARRISH:

Q. But have you made the statement that Dustin Honken did anything to harm Mr. Nicholson himself? Did you ever make that statement is my question.

A. No.

Q. As a matter of fact, you reached the conclusion you said based upon a conversation that you had with him about a month

CV10-3074; CR01-3047-LRR DoEx55_Page_57

and a half after you started working with him that he would have someone else harm you and, therefore, you reached the conclusion that maybe he would have had someone else harm Nicholson.

A. Yes.

Q. Did you see any physical evidence yourself or hear any admission by Mr. Honken that he had done anything to harm any individual other than what you mentioned about Mr. Nicholson throughout the whole time you were working with the government on or off the record?

A. Yeah.

Q. What?

A. He had stated a few times that he'd like to shoot some cop by the name of Stearns.

Q. No. That he had done anything, not saying what he said he would do.

A. No, no. I don't think he had ever said he had done it himself, no.

Q. So let's make sure we have that question clear then. Based upon the entire time you worked with the government including the money you were paid, the time after that, including all the conversations you'd had with him on and off the record -- when I mean on and off the record in terms of taped and non-taped conversations -- did you observe any physical evidence or did he ever make any statement to you

CV10-3074; CR01-3047-LRR DoEx55_Page_58

that he had ever done anything to harm any individual other than what you said about Mr. Nicholson?

A.   Could I ask you to repeat it again?

MR. PARRISH:  Would you read that back?

(The requested portion of the record was read.)

A.   Just he had made threats, physical.  And seeing him harm anybody?  No.

Q.   Or never saw any after-results such as physical evidence that he had harmed anyone.  You did not do that -- you did not see that.

A.   I didn't see no evidence of him harming anybody.

Q.   Did he ever show you any weapons or anything like that indicating he had harmed someone with that particular weapon?

A.   Just showed me some gun magazines and guns he'd like to have is about it.

Q.   And you did see a lot of those around; is that correct?

A.   Gun magazines?

Q.   Yes.

A.   He always managed to have one at work.

Q.   And that's when you were still working as a confidential informant that you saw all of those too?

A.   Sort of, because I had probably seen them before I started working for them.  When I first started working there and I didn't want nothing to do with nothing, I might have seen the magazine.

Q. Let me just ask you a few questions about the issue of drugs. If I understand it correctly, were you selling drugs initially before you met Mr. Honken?

A. No. I was going sometimes and -- at the time, no, because I was in a halfway house. But a year prior to me getting into trouble, I was -- I -- somebody -- I knew everybody. I knew all the wrong people was my problem. If somebody would come up and say, Hey, Dan, can you get this for me, I'd go get it for them.

Q. So it was always other people's fault, I take it, is what you're saying?

A. No, because I knew the wrong people. I was like the middle person.

Q. So let me get this straight now. Before you met Mr. Honken, were you or were you not doing drugs?

A. No.

Q. You were not.

A. I was clean as a whistle because I had to take a pee test every day in the halfway house.

Q. Well, if you weren't doing drugs, why did you have to take a urine test?

A. Because they make you just to make sure you're not doing drugs.

Q. So you had not done drugs before that. Is that your testimony?

CR01-3047-LRR PoEx55_Page_60

A.   I'd say I was in there six months.  Six months prior to meeting Dustin Honken I had not had any drugs in my system.

Q.   But you had done drugs before you met Mr. Honken then?

A.   In my lifetime?  Yes.

Q.   And you had done, I assume, methamphetamine.

A.   I'd probably tried every drug there is.

Q.   Okay.

A.   I don't believe a person should be able to knock something if you don't try it.

Q.   Right.  So I assume that you have never made the allegation that Mr. Honken introduced you to drugs.

A.   He introduced me to manufacturing drugs.

Q.   Right.  Now, let's talk about that a second.  You were never familiar with the manufacturing process before you met Mr. Honken?

A.   Never.

Q.   And did you ever see a result of anything that he manufactured along with what you manufactured?

A.   When me and him were doing it together?

Q.   Right.

A.   Just each step as we were going.

Q.   The total result.

A.   The end result, the powdered meth?

Q.   Yes.

A.   We never got that far.

Q. And you've never made any allegation that, in fact, Mr. Honken did produce any drugs from attempting to manufacture; is that correct?
A. Can you repeat that?
Q. You never made any allegation that you saw any drug result from any manufacturing process that Mr. Honken was involved in; is that correct?
A. Two years prior I had gotten some that he had manufactured.
Q. Well, did you see him manufacture it?
A. No, but the words of his mouth was, I had manufactured it.
Q. I understand what you're saying. But you never saw it.
A. Saw him with the finished product in the manufacture? No.
Q. And the total amount you saw that he had indicated he had manufactured was what?
A. Just what I had purchased from Greg Nicholson was like --
Q. Six ounces?
A. No, it was like three quarters of a gram.
Q. But you got that from Mr. Nicholson. You didn't get that from Mr. Honken.
A. Exactly.
Q. So Mr. Nicholson told you that Mr. Honken had

CV10-3074; CR01-3047-LRR PoEx55_Page 62

manufactured it.

A.   No, Dustin had told me when me and him was involved that Nicholson was selling his stuff.

Q.   Did Mr. Nicholson ever tell you that?

A.   Mr. Nicholson, I just knew him on a how are you doing, here you go, and that was it.

Q.   So the answer is no?

A.   Right.

Q.   He never told you that.

A.   No.

Q.   So the most from the two years prior to that time that you indicated you attributed to Mr. Honken was about three-fourths of an ounce?

A.   Yes.

Q.   So if we had to look at the total amount of drugs you had seen Mr. Honken give to anyone throughout the time that you were involved as a confidential informant or otherwise, how much would it be?

A.   Probably a gram.

Q.   Total?

A.   Total.  That's finished product.

Q.   All the rest is just talk.

A.   No.  The laboratory that we were working in, a lot of the chemicals around there were deadly.

Q.   I'm not concerned about that at the moment.  So all the

rest about drug production is just talk. Would that be accurate?

A. Yeah.

Q. And you would agree drug dealers talk a lot, don't they?

A. That depends on the drug dealer.

Q. Well, they brag about their product as being an excellent product; is that correct?

A. I would say yes.

Q. As a matter of fact, you can't sell it unless it's an excellent product; is that correct?

A. That's why they brag about it, so they can sell it, I presume.

Q. And you bragged that your product is better than someone else's product, is that correct also, from your experience in being a middle man in all of this?

A. I've never had a product.

Q. But you were kind of the bag man carrying it back and forth, that product.

A. If somebody wanted something and at the time if I could get it, I would get it, and I didn't ever say if it was good or bad. I just presumed every time I got it it was good.

Q. And other than that less than one gram -- that gram, you had never seen any of Dustin's product, had you?

A. No.

MR. PARRISH: I have nothing further. Hold on just

CV10-3074; CR01-3047-LRR DoEx55_Page_64

a second.

BY MR. PARRISH:

Q. Did you ever sell Mr. Honken any drugs yourself?

A. I had gotten him some stuff before.

Q. Okay. What drugs did you sell him?

A. I had gotten him some meth, and I had gotten him some pot before.

Q. What about LSD?

A. No.

Q. And you knew at the time he was a user too -- is that right -- Dustin?

A. When I was involved in all this?

Q. Yes.

A. Yeah, I knew he was a user.

MR. PARRISH: I have nothing further. Thank you.

THE COURT: Mr. Reinert?

REDIRECT EXAMINATION

BY MR. REINERT:

Q. Mr. Parrish asked you some questions about finished product and the talk about the product. Did you see the defendant take any steps to move from pure talk to getting the finished product?

A. I was involved in setting up the very end steps of the laboratory that he had, and I went and got a few of the products; like the catalyst I went and got. I went and got

CV10-3074; CR01-3047-LRR PoEx55_Page_65

-- ordered some big glass tubes for him in that mailbox drop. And I was there a few times when we were making -- from the first step 1 to about step 4 is what I know of.

Q. Mr. Parrish -- you talked about earlier on Mr. Nicholson, that he had had Mr. Nicholson disappeared or Mr. Nicholson disappeared. And you'd indicated to Mr. Parrish that you had told that to one of the agents; is that correct?

A. Yes.

Q. I'm going to hand you what's a DNE Exhibit Number 8-1. Have you reviewed 8-1 as part of your preparation to testify, specifically the last page, page 3 of 3?

A. Yeah, I had seen this.

Q. And is that document part of the DNE report where you describe Mr. Honken's comments about Mr. Nicholson's disappearance?

A. Yes.

Q. And that was dated January 22 of 1996?

A. Yes.

Q. And you further discussed the defendant's comments about Mr. Nicholson in your May 14, 1997, grand jury; is that correct?

A. Last time I was to see the grand jury, they had asked me, and I had talked about what he had said about Nicholson's disappearance, yes.

Q. On the issue of -- you and Mr. Parrish had a discussion

CV10-3074; CR01-3047-LRR PoEx55_Page_66

about income tax and the $7,000 payment. You said at one point you were on food stamps; is that correct?

A. ADC, welfare, food stamps, yes.

Q. Did you subsequently have to reapply to get on to food stamps or ADC when you returned to Iowa?

A. As soon as we returned to Iowa, we had to wait about 15 days to make it 60 days, and then we had been off for like 120 or 90 days, the limit that we could reapply. And then we reapplied, yes.

Q. And at that point did you disclose that $7,000 payment to the DHS people and have a discussion with them about whether it was expense payment or whether it counted as income?

A. I reported it to my case worker which was assigned to me and my wife and my kids, and she turned me over to the main official lady because she didn't understand it. And the main lady at the DHS office had me give her John Graham's name and to confirm that the money that they gave me, and then she asked me to let her know basically what I had spent the money on.

Q. And ultimately after going through that analysis with DHS, was it determined that --

A. We were approved and put back on ADC and food stamps.

Q. You had talked earlier about some threats that Mr. Honken had made to you. Are you aware of any other threats

C10-3074; CR01-3047-LRR DoEx55_Page_67

that he made to you or any other person that he told you about?

A. He had threatened me and my family, and he had threatened, from what he had said, Nicholson.

Q. And when you talk about Nicholson, is that what you've already talked about, or is there something in addition?

A. Well, just that he had said that he had threatened Nicholson because Nicholson had set him up.

Q. You had mentioned the defendant's disdain for Mr. Stearns or Detective Stearns. Did the defendant talk to you about any other individuals that he felt needed some extreme violence or that he had made threats or threatening comments about?

A. He had named them by name, and one was a Dave Mizell, and he had named a John Graham and a police officer by the name of Stearns or whatever he is in the force, and those three I know of.

Q. What did he indicate that he wanted to do to those individuals?

A. Have them killed, shoot them.

Q. Did he indicate why he wanted to have those individuals killed?

A. Because the prior case and all the stuff involved with Nicholson the first time he was manufacturing.

MR. REINERT: No further questions, Your Honor.

CV10-3074; CR01-3047-LRR Def.Ex55_Page_68

THE COURT: Anything further, Mr. Parrish?

MR. PARRISH: I just have a few other questions.

RECROSS-EXAMINATION

BY MR. PARRISH:

Q. Didn't you indicate to the grand jury that the statements you thought Dustin was making was just part of a scare tactic?

A. I might have said that.

Q. You did say that was part of the scare tactic. That's the way I saw it because he was telling me that he made him disappear.

A. Yes.

Q. And I take it dealing in the drug culture people do things like that, say they're going to scare somebody or try to keep control of their operation or have people not talk. That happens; is that correct?

A. Yes.

Q. And you heard that kind of talk all the time, is that right, in the drug culture that you operated in for a while?

A. No, not too many of them really were threatening.

Q. Well, you would agree that your mind might not have been up to snuff during the time you were doing this; is that correct?

A. Run that by me again.

Q. Your mind may not have been up to snuff because of your

CV10-3074; CR01-3047-LRR PoEx55_Page_69

crack cocaine addiction that you had?

A. No, not then. I had no problems with no drugs.

Q. But you did have a crack cocaine addiction problem; is that correct?

A. Probably two years prior.

Q. And how many times were you in treatment?

A. I've been in treatment I think three times, and they were all voluntary.

Q. Well, didn't you say either you were going to be in treatment voluntary -- somebody was going to have to commit you or you were going to go in voluntary? Didn't you say that?

A. I said that if I don't get committed I won't stay there, so I had my wife and my mom commit me so I would stay there.

Q. I just thought you just said they were all voluntary.

A. I went up to my wife and said, Have me committed.

Q. That was involuntary commitment, though, wasn't it?

A. I'm the one who brought up the idea, though.

MR. PARRISH: I don't think I have any further questions. Thank you.

FURTHER REDIRECT EXAMINATION

BY MR. REINERT:

Q. When you and Mr. Honken were having the discussion about Mr. Nicholson disappearing as you described to the grand jury -- it may have been a scare tactic or not -- would you

CV10-3074; CR01-3047-LRR PoEx55_Page_370

describe Mr. Honken's demeanor?

A.    I took him serious.

Q.    Why did you take him seriously?

A.    Because nobody had heard from Nicholson, and nobody had heard from another guy that was involved in it and the whole family, Nicholson's whole family.

            MR. REINERT:  Nothing further.

                    FURTHER RECROSS-EXAMINATION

BY MR. PARRISH:

Q.    Dustin is not a person with a big sense of humor, is he?

A.    I don't think so.

Q.    And he's generally a fairly serious human being, isn't he?

A.    He's into his mind.

            MR. PARRISH:  I don't have anything further.

            THE COURT:  Anything further, Mr. Reinert?

            MR. REINERT:  No, Your Honor.

            THE COURT:  Thank you, Mr. Cobeen.  You're excused.

            THE WITNESS:  It's been a pleasure.

            MR. REINERT:  United States calls Melissa Friesenborg.

            THE COURT:  Come forward, please.  I'll swear you in.

       MELISSA FRIESENBORG, PLAINTIFF'S WITNESS, SWORN

            THE COURT:  Okay.  Please be seated here.  Would you

state your full name, please, and spell your last name for our court reporter.

THE WITNESS: Melissa Marie Friesenborg. And what was the last part?

THE COURT: Spell it.

THE WITNESS: Oh. F-r-i-e-s-e-n-b-o-r-g.

MR. PARRISH: Your Honor, before we go on this witness, I was just asking the government about any type of agreement or use immunity agreement or anything they had with Mr. Cobeen. If they have that or a confidential agreement, that should go into the record for this time. It doesn't have to go right away, but at some point we would ask the Court to look at it for the purpose of us being able to argue that at the conclusion.

THE COURT: Was there some kind of immunity agreement with Mr. Cobeen?

MR. REINERT: I didn't see a copy. I'm going to double-check the transcript because we always cover those.

THE COURT: All right. Why don't you do that on your noon break, and we'll proceed with this witness.

DIRECT EXAMINATION

BY MR. REINERT:

Q. Miss Friesenborg, do you know the defendant, Dustin Honken?

A. Yes, I do.

CV10-3074; CR01-3047-LRR PCR Ex55_Page_372

Q. And is he the defendant sitting here in court?

A. Yes, he is.

Q. How did you first meet Mr. Honken?

A. Well, on a couple occasions. One, when we were 18 or 19 I had met him. And then I hadn't -- I had lost contact with him for several years until I think it was mid summer around '92 that he recontacted me.

Q. And were you living up in the Mason City area at that time?

A. No. I was actually living in Des Moines.

Q. At some point did you then move down to Arizona where the defendant was residing?

A. Yes, I moved to Tucson.

Q. And do you recall when that was?

A. I think it was around September, October perhaps. I can't remember the exact month, but it was around then.

Q. Of 1992?

A. Yes.

Q. Who else was living down in Arizona with the defendant?

A. Tim was down there.

Q. And that's Tim Cutkomp?

A. Yeah. I'm sorry.

Q. Did you ever obtain any methamphetamine from the defendant while down in Arizona?

A. Obtain, how do you mean?

Q. Did he ever give you any methamphetamine?

A. There had been one occasion.

Q. And where did that take place?

A. Where did I -- where was it? It was at my apartment in Tucson.

Q. Was the -- did you have any knowledge or have any discussions with the defendant about what he was doing down in Arizona?

A. Well, he was going to school at Pima, what I knew of, and that he was also involved -- what he had told me was consulting with area computers and doing like consulting, setting up and, you know, doing any type of repair work from what I understood.

Q. Did you find -- did you ever find out at some point that he had a laboratory down in Arizona?

A. Yes.

Q. And how did you find that out?

A. I was there a couple times. I really didn't know what it was. It was a house, and it had a little addition on to the house, but I didn't know what it was.

Q. Could you describe the odor?

A. The odor was -- how I would describe it would be like when you burn a Styrofoam cup, that kind of -- that smell, kind of a stale smell.

Q. What type of items did you see at that house?

A. It was kind of like big garbage cans like ones that we use for leaves, about that size, and some tubing and some glass stuff, but I didn't really think anything of it.

Q. Did Mr. Honken reside or spend a lot of time at your residence when he was in Arizona?

A. Yeah. He'd come in. He was gone a lot during the weekends, but he would come in during the night times.

Q. Who else would you see over at that house where you said the lab was?

A. Tim Cutkomp.

Q. Do you recall an occasion when the defendant came up to Iowa and was arrested?

A. Yeah. It was in March '93.

Q. Did you receive any contact from either the defendant or Mr. Cutkomp by telephone?

A. Not by Dustin but by Tim I did.

Q. And what was the purpose of that call? What instructions did you receive?

A. I wasn't really told what had happened or where they were. They just said that they had gotten in trouble and that basically to go through my house. They didn't tell me what to look for or what might be there but to go through my house and specifically check the freezer.

Q. And when you went through your house and specifically checked the freezer, what did you find?

C10-3074; CR01-3047-LRR Def Ex55_Page_75

A. I didn't know what it was. I'd never seen it. I don't know how it got there. I know it wasn't mine. It was -- they were little vials, little brown vials. They were liquid in there. I don't know what they were.

Q. Where were the little brown vials with the liquid?

A. They were tucked under some stuff in my freezer that I would never -- they didn't look like they'd been there that long, but I don't know.

Q. Could you show the judge about how big the vials were or how much fluid would be in those small vials?

A. They were probably about like the width of my finger. They were little ones. They were about that high (indicating), and they were brown, and they were full.

Q. So they were probably about a half inch across and maybe three quarters of an inch or an inch tall?

A. Yeah.

Q. What did you find -- other than finding those vials in the freezer, what else did you find in the house?

A. In my apartment I had like a little den area that was basically just storage stuff and had -- and some stuff was -- some marijuana, a pipe, and some glassware. I don't know what it was. It was like little tubing stuff.

Q. Did -- how did the odor of the tubing and glassware and other materials that you found in your house compare to the odor that you had smelled out at the lab at the other house?

CV10-3074; CR04-3047-LRR Pet.Ex55_Page_76

A. It was the same smell.
Q. Did Mr. Cutkomp also have items stored at your house? Do you recall?
A. Not that I can recall. I don't know.
Q. What did you do with the materials that you found in your house?
A. I threw them down the toilet, and then the other stuff I threw out in the big trash can out in my apartment complex.
Q. Why did you do that?
A. One, I didn't know what they were. I knew that they weren't mine. I was afraid that whatever Dustin was in trouble with this was what he was in trouble for, and I didn't -- I had no knowledge of it, so my thought was I didn't want to be in trouble for something that I wasn't responsible for.
Q. And, in fact, once you ultimately met with us, you were given use immunity that nothing you said could be used to prosecute you; is that correct?
A. Right.
Q. Ultimately after you ended up cleaning out your house, did you travel up to Iowa to see the defendant?
A. Yeah, a couple times.
Q. During any of those travels up here, did you have any -- did that occur before his intended court date when he was supposed to go to trial?

CV10-3074; CR07-3047-LRR Def Ex55_Page 77

A. I can't remember that. I know that -- it was some time April or May. I'm not certain, so I don't know when his trial was.

Q. In April or May of '93?

A. I believe so. I don't remember.

Q. When you traveled up here, did you have discussions with the defendant about his case or how he was going to get out of this?

A. We didn't really talk about it too much. The only thing that I brought up to him was that, you know, I was -- how is he going to get out of this because I didn't know much of the case. I did not know that he was selling or what he was doing, so I had no -- we didn't -- I didn't know any details. He wouldn't give them to me. And when I asked, I said I knew that the witness because he had gotten -- I'd heard that.

Q. You mean the witness, the person with the tape?

A. Yeah. I knew that there had been some other person involved, that it wasn't Tim. That's all I really knew. I didn't know his name. I didn't know who he was.

Q. And what did Mr. Honken tell you about that person with the tape?

A. Really said, you know, there's nothing to worry about. He wouldn't be a problem.

MR. REINERT: Nothing further, Your Honor.

THE COURT: Mr. Parrish?

CV10-3074; CR01-3047-LRR DoEx55_Page_378

CROSS-EXAMINATION

BY MR. PARRISH:

Q. At the time the brown vials were found in your refrigerator, who was living with you at that time?

A. Just myself.

Q. Who was living in the den? Who was sleeping in the den?

A. Tim and Dustin would come, you know, and stay, but they weren't living there. I was the only person on the lease.

Q. When you say that they would come and stay, would -- and we're not talking about who was on the lease. We're talking about whether or not Mr. Cutkomp lived in the apartment on occasion.

A. I don't know what you consider living other than he'd just stay, not for --

Q. Well, was he staying there around the time the brown vials were found in the refrigerator?

A. I don't know. Like I said, I don't know where they came from, how long they'd been there.

Q. That's not my question. My question is, was he staying there on occasion, Mr. Cutkomp, when the brown vials were found in the refrigerator?

A. He probably -- he had been staying at times. I don't know if that was one time.

Q. And he would sleep in the den; is that right?

A. That's where they -- yeah, if they stayed that's where

they stayed. Tim did.

Q. When you say they, we're just talking about Mr. Cutkomp right now. Did Mr. Cutkomp ever stay in your place by himself without Mr. Honken being with him?

A. I can't remember. He might have. I don't know. I can't remember.

Q. You did sign with the government what you call a use agreement, use immunity agreement, with them; is that correct?

A. Right.

Q. And you've talked with Mr. Cutkomp about that; is that correct?

A. No, I haven't talked to Tim for a long time.

Q. Well, at the time you went to meet with the U.S. Attorney's Office, did Mr. Cutkomp show up?

A. He showed up, but we couldn't talk. I mean, we were asked not to.

Q. Well, why is it that he showed up? Did you let him know you were going to be there?

A. (Witness nodded head.)

Q. Because of your relationship with him?

A. With him?

Q. Yes.

A. Or with Dustin?

Q. With Mr. Cutkomp.

CV10-3074; CR01-3047-LRR PCR Ex55_Page_80

A. I had been -- I had told Tim -- I had told Dustin, and Dustin told Tim because Dustin couldn't come down there because it would have gone against his violation where he could go. They sent -- he sent Tim.

Q. And who told you that?

A. I don't know. No one told me that, but I know that Dustin couldn't leave.

Q. Now, if I understand it correctly -- and correct me if I'm wrong -- there was some question as to whether or not Cutkomp told the agent that you told him to appear there and you denied it; isn't that correct?

A. They asked me if they wanted him to come down and I said, Well, you know, there's nothing more that you can do.

Q. Well, let me go back a little bit. When you went down to appear before the grand jury, Cutkomp showed up.

A. At the office.

Q. Right. And you -- he told the agents you told him to come.

A. (Witness shook head.) It was inaccurate.

Q. Well, I understand you're saying it's inaccurate, but that's what he told the agents.

MR. REINERT: Your Honor, what's the relevance of what Mr. Cutkomp may have told the agents about this?

THE COURT: I think it's a credibility issue, isn't it, Mr. Parrish?

CV10-3074; CR01-3047-LRR Def Ex55_Page 81

MR. PARRISH: Absolutely, Your Honor. And both of them are now cooperating individuals, and we think they contradict each other on a critical juncture of their testimony.

MR. REINERT: Your Honor, the question might be more appropriately posed to Mr. Cutkomp.

THE COURT: Just a second. We're going to let Mr. Parrish decide who the most appropriate witness to ask the question, and I suspect he may ask it of more than one witness. You may continue with your questioning. Objection's overruled. To the extent that there was an objection -- I guess there was on relevancy -- it's overruled.

BY MR. PARRISH:

Q. You told the agent, Mr. Mizell, that you never told Cutkomp to come down; is that correct?

A. Yes.

Q. Now you're saying that you said it was Mr. Honken who told him to come down. That's what you just testified to; isn't that correct?

A. I don't know.

Q. I'm just asking what you just said a few minutes ago.

A. Right. If that's what I'm saying before, yes.

Q. Is that true, that Mr. Honken told him to come down to the U.S. Attorney's Office?

A.    I didn't ask him.

Q.    Well, where did you get the idea to just state in court that it was Mr. Honken who told him to come down?

A.    I told Dustin that I had to testify or that I was going to Cedar Rapids.

Q.    Well, did you tell the agents that you told Dustin that when they debriefed you in December of 1993?

A.    I'm sorry?

Q.    Did you tell the agents that it was Mr. Honken you had told?

A.    No.

Q.    Why didn't you tell them that back in 1993?

A.    I didn't really see that it was relevant.

Q.    Well, weren't they concerned about how did Mr. Cutkomp know to come down there that day?

A.    They asked me if I had told them, and I said yes, I had spoken to them.  And that's when he was asked to leave.
And --

Q.    And they were concerned about it enough to want to know how Mr. Cutkomp knew about it, isn't that correct, because they asked you that?

A.    Right.

Q.    You never told them on that date that it was Mr. Honken or you thought it was Mr. Honken who sent Mr. Cutkomp down there, did you?

A. I didn't see that it was --

Q. I understand you didn't see it was relevant. But you would agree that you didn't even tell them that; is that correct?

A. That's correct.

Q. But now you're saying that it was Mr. Honken who sent Mr. Cutkomp down when you went down to the U.S. Attorney's Office; isn't that correct? That's what you just said; isn't that correct?

A. Right.

Q. Where did you get that information from?

A. Okay. I guess it would be an assumption because I had told Dustin that.

Q. Did you speak to him that day?

A. To Tim?

Q. Yes.

A. Not for very long because they asked what he was there for, and I don't remember what was said.

Q. But you did talk with him.

A. I don't remember what was said.

Q. My question is you did speak with him.

A. When he was in the waiting room?

Q. Yes.

A. I just said, Hi, Tim. I don't understand what the --

Q. Did you speak with him that day? Did you talk with him?

CV10-3074; CR01-3047-LRR PoEx55_Page_84

A.   Not about anything that we were discussing.

Q.   Well, I'm not asking about anything you were discussing. My question, did you talk with him?

A.   I suppose if hi, Tim, is it, then yeah, then we did.

Q.   Have you spoken with him since that date?

A.   With Tim?

Q.   Yes.

A.   I think I spoke to him -- I don't remember the day.  I don't remember the month.  I had called him and said that I was going to be -- because I have family up here, and I said that I would be up in the area.  And I asked how Dustin was doing, and that was it, nothing of how things are going or anything.

Q.   When was this?

A.   I don't know.  I don't remember what trip because I've made several trips up to Iowa but not to Mason City area.

Q.   But it was after the meeting where you presented yourself to the U.S. Attorney's Office; is that correct?

A.   It was way after even Dustin's trial the first time.

Q.   Well, Dustin didn't have a trial.

A.   I don't know what he had.  After July I quit talking to him.

Q.   July of what year?

A.   '93.

Q.   Then why then six months later you were asking about

Dustin with Tim Cutkomp?

A.    Just to see how he was doing.

Q.    And what did Mr. Cutkomp tell you?

A.    Said he was doing fine.  There was no discussion of how things otherwise.

Q.    Well, didn't you at some point take a position where you liked Cutkomp more than you liked Dustin?

A.    Tim was my friend first, but no, there was no -- I don't understand your question.

Q.    Well, didn't you take a position that you liked Cutkomp better than you liked Honken at some point since 1993?

A.    I don't think so.

Q.    Well, didn't you tell the agents that at some point you were friends with Cutkomp and you believed that Honken was negatively influencing him?

A.    I might have.

Q.    Well, did you say that or not?  Do you recall making that statement and taking a position favorable to Cutkomp but against Mr. Honken?

A.    Yes.

Q.    And why did you take that position?

A.    Because I had seen just being down there how -- and I was mad at Dustin and why I would have said that.

Q.    You got mad at him, didn't you?

A.    At Dustin?

Q. Yes.

A. Very mad.

Q. Okay. And why did you get mad at him?

A. Well, for the situation that he got himself into, and I'm down in Tucson, and there was nothing I could do.

Q. Is that the only reason you got mad at him?

A. That would be the most important ones.

Q. That's not what I asked.

A. Other than I'd been put in a place where I couldn't afford everything that I was -- when I was living in Tucson, I don't know.

Q. So you were a little upset because he wasn't providing you the additional kind of support that you were used to, you had become accustomed to?

A. No.

Q. Well, what do you mean by you couldn't afford the kind of things that -- you got yourself in a position where you couldn't afford to keep the things? What did you mean by that?

A. I just moved out of an apartment.

Q. It was too expensive.

A. (Witness nodded head.)

Q. And you were a little upset with Dustin about that.

A. I was -- yes, and upset that he was up in Mason City and I had been lied to.

Q. Lied to about what?

A. He had told me that he was going to Texas that same day, and I get a call that he's up in Iowa.

Q. Uh-huh. Did you tell the agents this, that you were upset with him at the point that you began to give a statement against him and in favor of Cutkomp?

A. I didn't feel that -- it wasn't in favor of Cutkomp.

Q. Well, you just said you thought it was because you said that Honken was negatively influencing Cutkomp. And my question to you is, did you tell the agents part of the reason you were upset with him is because Dustin had lied to you, you were having some problems financially because you were stuck out in Arizona, and you were blaming Dustin for putting you in that position because he had gotten himself in trouble? My question is simply did you tell the agents this when they were debriefing you?

A. That he told me he was in Texas?

Q. Right.

A. Yes.

Q. You did? Do you know where -- do they have a report on that somewhere?

A. If it's not there.

Q. Did you read your reports before you testified here today?

A. No.

CV10-3074; CR01-3047-LRR PoEx55_Page_88

Q. They didn't give them to you to review, any statements that had been made by you?

A. (Witness shook head.)

Q. Is that a no?

A. Correct.

Q. So if I understand it correctly now, you would agree that when the agents interviewed you, you were pretty upset with Dustin; is that right?

A. Uh-huh.

Q. And you were upset with him because of some personal differences you all had developed; isn't that correct?

A. That's not all of it. I was afraid for also myself.

Q. You were afraid for yourself for what?

A. Because of the type of lifestyle that he had also. I mean, I was also being told at the time that I went up to Iowa that -- when I asked about the witness and he said it's nothing to worry about and I felt very much in -- afraid for myself and my safety, that if I said anything or if I did anything, that I wasn't certain what was going to happen to me.

Q. Okay. If that was the case, you didn't tell the agents that, did you?

A. I was too afraid honestly.

Q. So you were too afraid to be completely honest with the agents; is that what you're saying?

A.   I didn't know what my place was either.

Q.   No.  Would you answer the question?  You're telling us now that you were too afraid to be truthful with the agents about Dustin?

A.   Uh-huh.

Q.   Is that a yes?

A.   To tell about Dustin?

Q.   Yes.

A.   Yes.

Q.   But you did tell about him, didn't you, and you shifted the blame to Mr. Cutkomp -- to Mr. Honken as opposed to Mr. Cutkomp; isn't that true?

A.   That I'm saying that it was all about Tim?

Q.   No, you're saying it was more Mr. Honken's doing as opposed to Mr. Cutkomp's doing.

A.   I'm sorry.  I'm not getting it.

Q.   You told them in your statement that you gave them in 1993 that the drug conduct was more Mr. Honken than it was Mr. Cutkomp.  You agree with that, don't you?

A.   Uh-huh.

Q.   But yet you said you were so afraid of him you didn't want to tell them anything about Dustin, but you did, did you not?  You told them things?

A.   (Witness nodded head.)

Q.   Isn't that true?

A. Uh-huh.

Q. Now, you also didn't tell them everything about the fact that Mr. Honken made you angry, upset because he left you with a financial situation you couldn't cope with. You didn't tell them that, did you?

A. (Witness shook head.)

Q. Because you said that wasn't their business; isn't that correct?

A. No, because it -- no.

Q. Well, why didn't you tell them that too?

A. Because it wasn't a problem. It got solved.

Q. I know it got solved. But at the time you gave the statement it wasn't solved, was it?

A. When did I give my statement?

Q. In November of 1993.

A. Yes, it was solved.

Q. And you had resolved your relationship with Dustin at that point?

A. I'd resolved it back in July.

Q. Well, then why were you calling then six months after you gave the statement to ask about Dustin when you were talking to Tim?

A. To see how they were doing.

Q. And so you didn't --

A. Because they were my friends. I'm really sorry this

happened to them.

Q.   I guess my question is if he was your friend then and you were still concerned about him and you tell us now on the witness stand that you were so afraid of him you didn't tell the agents everything, which one is the truth?  Was he your friend when you gave the statements to the agent?

A.   I didn't know what I was.

Q.   Were you in fear of him when you gave the statement to the agents?

A.   Yes, I was.  So why wasn't I?  I don't know.

Q.   Why you didn't tell the truth you're saying you don't know?

A.   Because I was down here and he was up there.

Q.   He was up where?

A.   He was in Mason City.

Q.   Then why were you shifting more of the blame on to him than on to Cutkomp when you were giving your debriefing if it wasn't other than your anger toward Dustin?

A.   If it wasn't -- I'm losing track.

Q.   If it wasn't just your anger toward Dustin, why else did you shift the burden to Mr. Cutkomp -- I'm sorry, to Mr. Honken?  Why did you shift the burden to Mr. Honken as opposed to Mr. Cutkomp?

MR. REINERT:  Your Honor, I think I'm confused on the question now.

Q. Why did you shift the burden --

THE COURT: Well, it's the witness's decision to answer. If she understands the question she can answer.

THE WITNESS: I don't.

BY MR. PARRISH:

Q. Why did you shift the burden to Mr. Cutkomp as opposed to Mr. Honken?

A. That's the opposite of what you just said.

Q. I'm sorry. That's opposite. Why did you shift the burden to Mr. Honken as opposed to Mr. Cutkomp?

A. Why I made a choice? Is that what you're saying?

Q. Yes, exactly.

A. It was out of that place of anger. I don't have anything other than that.

Q. That's exactly what I wanted to know. Now, finally, you visited with Mr. Honken quite a number of months, did you not?

A. Up until July.

Q. You had a good relationship with him; is that correct?

A. (Witness nodded head.)

Q. Is that true? Yes? You have to answer out loud.

A. Yes.

Q. You saw him in Arizona, and you saw him also in Iowa on occasion.

A. Not from when he got caught.

Q. Oh, I understand that.

A. You mean before?

Q. Prior to that time, right.

A. Yeah.

Q. And you had long and intimate conversations with him; is that correct?

A. Not about what he was doing.

Q. I know, but you trusted him.

A. Yes.

Q. And you had his confidence you would believe.

A. I had his?

Q. Yes, to some extent.

A. Yeah.

Q. Did you ever see him engage in any acts of violence?

A. As far as physical?

Q. Yes.

A. No, but he had a temper at times.

Q. Well, granted. But my question is, did you ever see him engage in any act of violence toward anyone?

A. I didn't see him outside of my apartment.

Q. Did he ever engage in any acts of violence towards you?

A. No.

Q. Did he ever threaten you in any shape, fashion, or form?

A. Not anything prior.

Q. Did you ever see him with a weapon?

A.   There was a gun.

Q.   Where?  I mean where you saw him with a gun.

A.   It was in my apartment for -- I don't -- it wasn't there.  Maybe it was just with him.  And then it was out to the house, the other house where the lab was.

Q.   Okay.  I'm asking you did you see him with a gun?

A.   I didn't see him use it.

Q.   Did you see him with it?

A.   Yes.

Q.   What did he do with it?

A.   He didn't carry it with him.

Q.   That's what I'm asking.  You never saw him carry it with him?

A.   Not on a daily basis.

Q.   Well, on a non-daily basis did you ever see him carry it?

A.   Not for long periods of time.

Q.   Well, for any period of time.

A.   (Witness shook head.)  No.

Q.   Is that a no?

A.   No.

Q.   You saw him with Mr. Cutkomp; is that correct?

A.   I saw what?

Q.   Mr. Honken with Mr. Cutkomp on numerous occasions.

A.   Yeah.

Q. Did you ever see him in your presence threaten Mr. Cutkomp?

A. I don't remember.

Q. Did you ever see Mr. Cutkomp threaten Dustin?

A. No, I've never seen that either. I don't know.

Q. And other than the one instance where you said you did, what, one line or two lines of meth and you didn't like it --

A. Uh-huh.

Q. -- you never saw him with any methamphetamine; is that correct?

A. Who's he? Dustin?

Q. Dustin, yes, ma'am.

A. Other than with that one time with myself.

Q. And how long did you know this young man? How many months or years did you know him?

A. Well, I've known him since I was 18, but the time that I knew him the last time that we got reconnected, it was around -- like I said, I thought it was June or July of '92.

Q. And you would agree then of all those times that you had known him since you were 18 up until and including his arrest other than seeing him that one time with a line or two of meth, you never saw him with methamphetamine; is that correct?

A. (Witness nodded head.)

Q. Is that a yes?

A.   Yes.

          MR. PARRISH:  I have nothing further.

                    REDIRECT EXAMINATION

BY MR. REINERT:

Q.   Miss Friesenborg, who had a key to your apartment?

A.   Myself, Dustin.

Q.   Did Mr. Cutkomp have a key to your apartment?

A.   Huh-uh, not unless Dustin gave it to him.  I don't know.

Q.   Your statement that you gave back in late 1993 as well as your testimony today, is that factually accurate to the best as you recall?

A.   As best as I can recall.

Q.   Are you angry with Mr. Honken yet today?

A.   No, I'm not.

Q.   You had indicated at one point during your testimony you thought Mr. Honken was a bad influence on Mr. Cutkomp.  Why do you say that?

A.   Just -- I guess because I could see that he would talk him into stuff, I mean, just daily things, you know, to -- buying something or doing something like he shouldn't.  You know, if Tim wanted to go out, well, tonight's not a good night if they wanted to go out, so it was -- he could just -- there were certain ways that he could do it, I mean, talk him into stuff or not talk him into it, you know, talk him out of it I guess.

Q. Mr. Parrish had asked you some questions about whether Mr. Honken had ever threatened you, and you thought for quite a while on that question and said no threats prior. What did you mean by that?

A. Well, there was a time -- and I forgot this part -- that several months after Dustin had been released or whatever he -- I was in my new apartment, and there was some furniture that we had purchased together that he wanted back. And so he came down, and I was angry because I thought I had said in July I didn't want any more contact. And he came down, wanted the furniture. And I didn't realize he was in town when he was calling other than -- because I would never answer his phone calls. And he had said that, you know, he was getting ready to go back into town. It was like his last night there, and I finally just said, you know, I just want to be done with this, you know, and I put the furniture outside, and I didn't see him. I didn't talk to him in length. He just came down and got the furniture. And he was angry with me because I wasn't answering his calls. And there had evidently -- I had said, you know -- in kind of a moment I didn't think he'd ever be coming down again, I'd said in a moment, All right, if you want the furniture, just take it. I don't remember saying when that would be, but he showed up in Tucson, and I didn't know he was coming down. And he was angry with me that I had not answered him, and he

says, you know -- he was yelling at me and said that, you know, You don't want this to happen. I don't remember exactly what he said, but he was very angry with me. He was yelling at me.

Q. And was that during that summer of 1993?

A. I think so because -- yeah, because I moved to another place. Yeah, it was later, like whenever he could move around again.

Q. But it would have been before you had -- before you came back up to Iowa, to Cedar Rapids?

A. I think it was after. I don't remember. I don't.

Q. You said that the defendant had had a firearm at your apartment. What type of firearm was it? Could you describe that?

A. It was just a handgun. It wasn't anything big. I don't know what kind it was or what it was, but it wasn't big.

Q. About how many inches long would you say it was?

A. How ever long that is (indicating).

Q. About six, eight inches?

A. Yeah, that was from the back to the front.

Q. Do you recall what color it was? Was it silver? Black?

A. It was black.

Q. Did it have a round part on it that would spin around, or was it kind of square on top?

A. Square.

Q. Do you recall if it had any kind of pieces that would -- that you could remove from the firearm?

A. I never looked at it. I didn't. I just know it was there. And I don't -- you know, maybe it wasn't the shooting gun. I don't know.

Q. Where in the apartment did you see that firearm?

A. The other room, in the -- the stuff where stuff was stored, the room.

Q. Is that the same -- the den area that you talked about earlier?

A. Yeah.

Q. What other -- who else had materials stored there in that room?

A. I don't know. I don't -- it was -- it was just stuff. It just had kind of -- I was thinking about it. I don't even know how it all got there.

Q. What leads you to believe that that firearm was Mr. Honken's firearm as opposed to somebody else's?

A. They were the only ones in my apartment, so I don't know who else it could have been.

Q. Now, you'd mentioned Mr. Cutkomp had been at the apartment. Why didn't you think it was Mr. Cutkomp's firearm?

A. It could have been either one of them. I don't know. You know, I didn't really discuss it. I didn't -- it was

just -- I didn't like it there.

Q.   Did you have a discussion with Mr. Honken about getting the firearm out of your house?

A.   I don't remember the discussion, but I don't know it was -- I know I probably would have said if I would have remembered it, but I don't know.

MR. REINERT:  Nothing further.

THE COURT:  Mr. Parrish, anything further of this witness?

MR. PARRISH:  I do have a couple of questions, Your Honor.

RECROSS-EXAMINATION

BY MR. PARRISH:

Q.   First with regard to where Dustin stayed when he was in your apartment, he stayed in the bedroom with you; isn't that correct?

A.   Correct.

Q.   Now, you saw the weapon in the den; is that correct?

A.   Right.

Q.   And who slept in the den?

A.   We already went through this.  Tim did at times.

Q.   Tim Cutkomp; is that correct?

A.   Other people -- I mean, Dustin's and his stuff were stored in there.  It wasn't in my area.

Q.   I understand.  Did you ever see a gun in the bedroom?

A. Where I slept?

Q. Yeah.

A. No.

Q. And that's where Dustin slept.

A. Right.

Q. And you said the gun could belong to either one of them; isn't that correct?

A. It could have.

Q. And you've been debriefed how many times prior to today's date by agents in terms of telephone conversations, meetings, and going to Cedar Rapids to meet with them, how many separate occasions?

A. It was only that one time up in Cedar Rapids. Wednesday evening of last week I was called.

Q. How many other times have you been talked to by agents?

A. I talked to an agent on Wednesday -- that was a female -- and then Friday afternoon a few days ago by two agents.

Q. And then back in December of '93; is that correct -- November of '93?

A. Is that what I was brought up there?

Q. Yes.

A. Yes.

Q. And you never mentioned to any of them that you saw Dustin with a gun; isn't that correct?

CR07-3047-LRR DoEx55_Page_3102

A. (Witness shook head.)

Q. Isn't that correct?

A. That's correct.

MR. PARRISH: Thank you. I have nothing further.

THE COURT: Anything further of this witness?

MR. REINERT: No, Your Honor.

THE COURT: Thank you. You're excused. Would now be a good time to take the noon recess?

MR. REINERT: Yes, Your Honor. I anticipate the next witness will be Timothy Cutkomp, and I expect he'll be long.

THE COURT: We can go today till -- let's see, just till five today. Tomorrow we can go a little later, till probably six if you'd like to, and we can start earlier now that everybody's here in town tomorrow. But if we're going to start earlier, we need to let the marshal's office know that, and then we have to see if that's going to be a problem because is it a fair assumption that several of your witnesses tomorrow will be in-custody witnesses?

MR. REINERT: Yes, Your Honor. I think starting early tomorrow would be fine. We do have some civilian witnesses, and I'm not sure -- we might take some of the civilian witnesses out of order since they're very quick.

THE COURT: Could you take them first in the morning?

CR07-3047-LRR DoEx55_Page_103

MR. REINERT:  Either first in the morning or take them first this afternoon before even Mr. Cutkomp.

THE COURT:  Are there any civilian witnesses you'll be able to call first thing in the morning or not?

MR. REINERT:  I believe we've got some -- we can work on -- the -- number 7, 8, 9, 11, and 12 --

THE COURT:  Skadburg you can call any time.  He's upstairs.

MR. REINERT:  Right -- 13 and 14, those are all relatively quick witnesses.  They're all from Kraft other than Mr. Skadburg who's number 8.  We've got them coming today.  Are they here?

MR. BADGER:  They're all here.  The marshals, though, have indicated they'd like to get Mr. Cutkomp done today if possible because he's in a facility too, but we have those seven people here.

MR. REINERT:  But I would anticipate those seven will be real quick witnesses, so I think we can probably get Mr. Cutkomp done as well as these.

THE COURT:  What time could we start in the morning if you have to transport in-custody witnesses?

DEPUTY WALHOF:  7:30, 8:00.

THE COURT:  Would eight o'clock be okay?

DEPUTY WALHOF:  That will be fine.

THE COURT:  Would any of the lawyers have any

problem starting at eight o'clock?

MR. PARRISH: None, Your Honor.

MR. REINERT: No.

THE COURT: Is an hour enough recess this afternoon for everybody? Is that enough for the marshals?

DEPUTY WALHOF: Fine.

THE COURT: Okay. We'll be in recess until one o'clock. Thank you.

(Lunch recess at 12:01 p.m.)

THE COURT: Please be seated. Is the government ready to call its next witness?

MR. COLLOTON: We are, Judge. I think what we're going to do is take some civilians who are down here under subpoena --

THE COURT: Okay.

MR. COLLOTON: -- and then take Mr. Cutkomp after that and work with the marshals as best we can about his transportation. So we're ready to go.

THE COURT: Okay. Call your next witness.

MR. COLLOTON: United States calls Marcy Hyde.

MARCY HYDE, PLAINTIFF'S WITNESS, SWORN

THE COURT: Okay. Please be seated here. Would you state your full name, please, and spell your last name.

THE WITNESS: Marcy Hyde, H-y-d-e.

DIRECT EXAMINATION

BY MR. COLLOTON:

Q. And what is your city of residence?

A. Garner.

Q. Where are you employed?

A. Kraft.

Q. When you say Kraft, what is that?

A. What do you mean?

Q. What do you mean by Kraft?

A. Kraft. Philip Morris owns it. It's Kraft.

Q. And where are you specifically?

A. Mason City.

Q. All right. And what kind of work place do you have?

A. We make Jell-O pudding, cheese cake.

THE COURT: Bring any samples today?

THE WITNESS: No, I didn't.

BY MR. COLLOTON:

Q. I see you have your Jell-O T-shirt on for the occasion.

A. Yes, I do. Yes.

Q. How long have you worked at Kraft?

A. Almost four years.

Q. So when did you begin working there?

A. January 17.

Q. Of what year?

A. '94.

Q. Did you come to know the defendant in this case, Mr.

CV 03-3074, CR 01-3047-MWB DOEx55_Page_106

Honken, while you worked at Kraft?

A. Yes, I did.

Q. When did you get to know him?

A. First day we started together.

Q. So he started with you in January of '94?

A. Yep.

Q. Are you aware -- let me ask you this: Did you become aware in the spring of 1996 that Mr. Honken had been charged in a federal drug case?

A. Yeah. I read it in the paper.

Q. Did you see Mr. Honken at work after that?

A. Yes.

Q. What restrictions, if any, were you aware of that were placed on him as part of his federal case?

A. In the paper it said he was supposed to wear a monitoring device or some kind of thing.

Q. Can you describe the hours that are worked by employees at the Kraft plant where you work?

A. We work from 6:15 to 6:30 depending -- we work four days, four -- then four days off, then four nights, then four days off.

Q. And you work either from 6:15 a.m. to 6:30 p.m. --

A. Uh-huh, or vice versa.

Q. -- if you work in the day or 6:15 p.m. to 6:30 a.m.? Is that what you're saying?

A. Yeah.

Q. What kind of breaks are you typically allowed?

A. Typically allowed or typically took?

Q. Well, let's start with what is the work place policy on breaks?

A. Policy is for breaks 15, 20 minutes and 40 minutes for lunch.

Q. Now, did you actually work together with Mr. Honken during the time that he was on pretrial release in his federal case?

A. Yes, I did.

Q. What was the nature of your job?

A. I ran caser. He ran sleever.

Q. Can you explain what that means?

A. We worked on the same line together, and the sleever's connected to the case packer. So we worked together on these two machines.

Q. Prior to the time Mr. Honken was charged, did you also work on the same shift with him?

A. Yeah.

Q. And the same line with him?

A. Yes.

Q. How did the two of you coordinate your break schedule if at all prior to the time he was on pretrial release?

A. He usually liked to take first break. He took first

CV-03074, CR01-3047-MWB ExhibitPage_108

break. I took second break.

Q. Why did you alternate like that?

A. Because we had to watch each other's machines.

Q. So when one person's on break, the other person would keep the machine going and cover for the person on break?

A. Yes.

Q. What was the typical length of a break for Mr. Honken prior to the time he was on pretrial release?

A. Typically a half an hour for regular breaks.

Q. And what about for the meal breaks?

A. An hour.

Q. Did you notice any change in that practice during the period when Mr. Honken was on pretrial release?

A. Yeah, he took a little bit longer at night first break.

Q. What time is the night first break?

A. Eight o'clock is the first break.

Q. When you say he took a little bit longer, how long do you mean the breaks were?

A. Well, it varied, but he left a little before 8, and he'd get back around 9, 9:30.

Q. What were the longest breaks you remember Mr. Honken taking during the time he was on pretrial release?

A. I think he took about a two-hour break at one time.

Q. How often would you say he was gone for a couple of hours on break?

CV-03074, CR01-3047-LRR D-Ex55_Page_109

A.   Just a couple of times when he was on his pretrial release thing or whatever it was called.

Q.   At least a couple of times out of you mean a four-night shift?

A.   Yeah.  We -- I didn't always work with him, you know.  Sometimes he was on other lines.  We moved around too.  Normally we were on seven, but if somebody's sick or what not, he'd work someplace else.

Q.   But did you generally work with him on four-night shifts in a row?

A.   Generally, yes.

Q.   And are you saying that on two of the four nights he would typically take two-hour breaks or just two nights in the whole time he was on pretrial release?

A.   Probably about two nights of the whole time he was on pretrial release.

Q.   Now, were there -- was there more than one four-night shift during the time he was on pretrial release --

A.   I think so.

Q.   -- that you worked with him?

A.   Yes.

Q.   Do you remember -- you were in the grand jury earlier, and you were asked these kinds of questions.  Do you remember that?

A.   Uh-huh, yes.

Q. And do you remember being asked how often would you say he was gone for a couple of hours?

A. Uh-huh.

THE COURT: Well, that's an improper -- you can't -- that calls for hearsay, and you can't ask her what she said in the grand jury. You can refresh her recollection, but you can't -- that's not a proper question because it calls for a hearsay answer.

MR. COLLOTON: I see. I thought it was perhaps impeachment if it's an inconsistent statement, but I can do it through refreshing recollection.

THE COURT: Well, yeah, you're right if you were trying to impeach her testimony.

MR. COLLOTON: That's what I was trying to get at, yes.

THE COURT: Okay. Well, it was lost on me, but go ahead.

MR. COLLOTON: Probably a poor form, but I'll try it again.

THE COURT: No, I think the form was okay.

BY MR. COLLOTON:

Q. Well, let me just ask you a direct question again before I get into this.

A. Okay.

Q. Each time that he had a four-night shift with you during

CR07-3047-MWB Doc 55 Page 111 DEx55_Page_111

the time he was on pretrial release, would he be gone a couple of hours on two of those four nights?

A. He did at one time.

Q. Did he do that on each time that you had a four-night shift with him?

A. I am not even sure if we had a whole four-shift block at nights together because there's a lot of people that call in sick. He fills in for the people who call in sick on other lines.

Q. What explanation did he give you as to why he was taking longer breaks while he was on pretrial release?

A. He said he had to go to the hospital to leave urine and blood samples.

Q. Why did he say he had to leave urine and blood samples?

A. Because he was arrested.

Q. Do you know a law enforcement agent named John Graham?

A. Yes.

Q. How do you know Mr. Graham?

A. Through my husband.

Q. Do you know whether Mr. Graham was involved at all in the investigation of Mr. Honken?

A. Yeah.

Q. How did you find out about that?

A. Dustin told me.

Q. What other conversations did you have with Mr. Honken

CR01-3047-LRR Def.Ex.55_Page_312

about Mr. Graham?

A. What do you mean?

Q. Did you ever have any other conversations with Mr. Honken about Mr. Graham?

A. Yeah.

Q. What conversations did you have with him about Mr. Graham?

A. Well, he asked me where John Graham lived.

Q. What did you tell him about where Mr. Graham lived?

A. I told him I didn't know where he lived.

Q. Did you give him any information in response to that question?

A. I said he could possibly live near Brenda because we were over there and Randy, my husband, called John, and he was over -- he was there in a split minute, so I figured it was close, but I didn't know where.

Q. Who is Brenda?

A. Brenda is Randy's sister.

Q. And Randy is your husband?

A. Yes.

Q. What did Mr. Honken say to you about why he wanted to know where Mr. Graham lived?

A. He didn't say why.

Q. Let me see if this is okay to see whether you remember being asked in the grand jury whether -- why Mr. Honken said

he wanted to know where Agent Graham lived. Do you remember being asked that?

A. I read it in my transcript, yes.

Q. Do you remember what you said in the grand jury?

A. No.

Q. Do you think it would refresh your recollection as to what Mr. Honken said to you about why he wanted to know where Mr. Graham lived if you saw the transcript?

A. Well, I think he was just curious because John Graham was in the trial with -- or, you know, part of the investigation against him.

Q. That's your recollection now of what --

A. That's my recollection.

Q. -- of what he said to you?

A. Yeah.

Q. Okay.

MR. COLLOTON: Those are all the questions I have, Judge.

THE COURT: Thank you, Mr. Colloton.

Mr. Parrish?

MR. PARRISH: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. PARRISH:

Q. Miss Hyde, you're married; is that correct?

A. I'm married?

Q.   Yes.

A.   Yes.

Q.   And do you have children?

A.   Yes.

Q.   And how far did you go in school?

A.   I have a B.A.

Q.   From where?

A.   Buena Vista.

Q.   In what year?

A.   In what year?

Q.   Yes.  Do you recall?

A.   Oh, jeez.  I'm not sure.

Q.   Okay.  In the seventies?  Eighties?

A.   No, nineties.  '93, '92.  I don't know.

Q.   What field do you have your degree in?

A.   Finance and banking.

Q.   And I take it your memory is fairly good; is that correct?  Even though you didn't know what year you graduated from college, it's probably a pretty good memory?

A.   Well, my college got strung out because I was pregnant with my children, so I went to school at night, and it was like for years and years, so I don't know.

Q.   And you had an opportunity, did you not, to visit with Honken on several occasions when you all would be working together?

A.   Yes.

Q.   Okay.  And you were asked several questions not only by the grand jury but also by special agents interviewing you about the nature of your conversations you had with Mr. Honken, did you not?

A.   Yes.

Q.   They asked you as to whether or not he had in any way threatened to harm anyone throughout any of the conversations you had with him; is that correct?

A.   Yes.

Q.   Did he?

A.   No.

Q.   They also asked you what you thought of him as an individual; is that correct?

A.   Yes.

Q.   You said you had a degree in business and finance.  You thought he was a fairly intelligent human being?

A.   Yes, he is.

Q.   And his conversations would be such that he was not one for a lot of small talk would you think?

A.   Well, no.

Q.   I mean small talk in the sense that his conversations were generally pretty serious.

A.   Well, no.  We small talked.

Q.   Did he joke around a lot?

A. Well, yeah.

Q. About what type things?

A. Well, we -- this is kind of personal stuff, just personal stuff between him and me and the kids and our families and -- yeah, we small talked.

Q. And did he have a great interest in kids from what you observed in the nature of this conversation?

A. Yes.

Q. And he shared that with you, did he not?

A. Yes, he talked about his kids all the time.

Q. Would you also agree that he -- you never saw him with a weapon of any sort?

A. No.

Q. Did you hear other people around talking about hunting and weapons and things like that a lot, the people who worked at the plant?

A. Well, at work, yeah.

Q. Did he talk about weapons?

A. He's not a hunter.

Q. And he never talked about weapons to your knowledge?

A. Well, him and Kelly would look at bow books or whatever, you know, on the line but nothing serious.

Q. He did have a conversation with you about drugs, did he not?

A. He asked me if I did them, yes.

CR07-3047-MWB Def Ex 55_Page_117

Q.   Okay.   Did he acknowledge to you that he had done drugs?

A.   No.

Q.   Are you sure he never acknowledged to you that he had done drugs in the past?

A.   Well, I knew that he was in with drugs or whatever, but he didn't really say, I'm doing drugs or --

Q.   No, I didn't say that he was doing drugs.   That he had done drugs, did he acknowledge that to you?

A.   Oh, yeah.

Q.   As a matter of fact, he indicated he thought drugs were --

A.   Better than alcohol.

Q.   -- better than alcohol?

A.   Yeah, he did say that.

Q.   And that was his preference, to use drugs as opposed to alcohol --

A.   Yes.

Q.   -- when he did, in fact, indulge; is that correct?

A.   I guess.

Q.   Did you ever meet an individual by the name of Mr. Cutkomp?

A.   Yes.

Q.   And where did you meet Mr. Cutkomp?

A.   At work.

Q.   And what was your relationship with him like?

A.   Barely.   He worked in process.   I worked in packaging but --

Q.   Did he and Mr. Honken ever get together when you were present with the two of them?

A.   A little bit at break, not much.

Q.   Did you observe any interaction between the two of them while you were working there?

A.   Just as friends.

Q.   And if you had to describe that interaction at all -- and this may be too general a question.   If it is, let me know, and I'll try to specify it a little bit -- how would you describe the interaction between Mr. Honken and Mr. Cutkomp from what your observations were?

A.   They were good friends.

Q.   Did it seem to be a mutual friendship thing?

A.   Yes.

Q.   Did it appear to you from your observation as to whether or not one individual dominated the other in terms of conversation, in terms of conduct?

A.   No.

Q.   And I assume during the course of your working in that position you had opportunities to observe numerous males and females who would, in fact, be friends; is that correct?

A.   Yes.

Q.   And you could make an assessment as to whether or not

one was a dominant force as opposed to the other one in terms of a conversation or conduct.

A.   Yes.

Q.   Would that be a fair statement?

A.   Yes.

Q.   And in the assessment of the two of them, you saw nothing other than a mutual friendship; is that correct?

A.   Yes.

Q.   Do you recall whether or not Mr. Honken in discussing with Mr. Graham -- discussing Mr. Graham indicated to you that he thought Mr. Graham was following him?

A.   Yes.

Q.   And did he indicate that that's one reason why he was curious about where he lived, because he seemed to be bumping into him on several occasions when he would be coming back and forth from work?

A.   Yes.

Q.   You've stated to the government this in response to their question.  But Mr. Honken indicated to you, did he not, that he had to take urine tests on occasion or do what he called pee drops.  Is that how he referred to them, as pee drops, or how he referred to them?

A.   I don't think he said pee drops.

Q.   What did he refer to them as?

A.   Urine samples.

Q. He also indicated to you, did he not, that he thought based upon his conduct or his charge that he would have to go to jail for some time?
A. Yes, he did.
Q. He seemed to acknowledge the fact that his conduct was wrong but at some point he would eventually get out and he wanted to go back and reestablish his relationship with his children?
A. Yes, he did.
Q. Did he ever in any manner, shape, fashion, or form indicate to you or in your presence that he would try to harm somebody, hurt somebody physically or interfere with someone's enjoyment of their lives in order to stop him from going to jail?
A. No.

MR. PARRISH: I have nothing further.

THE COURT: Mr. Colloton, anything further of this witness?

MR. COLLOTON: One question if I may, Judge.

REDIRECT EXAMINATION

BY MR. COLLOTON:

Q. With respect to the reason Mr. Honken gave you for why he had to take long breaks, did you mention that he said both urine and blood samples he had to give?
A. Yes.

CR01-3047-LRR DoEx55_Page_121

MR. COLLOTON:  That's all, Judge.

THE COURT:  Mr. Colloton, you join a very select crowd.  Did you know that?

MR. COLLOTON:  I do not, Your Honor.

THE COURT:  Well, for six years I've been keeping track of lawyers who say just one more question.  The high is 67 questions.  The average is 6.5 questions.  And only twice before has a lawyer ever just asked one additional question. And so you now join that very select group.  One of them was a law student, so I don't know if that counts or not.  But you're in a very, very select group of lawyers who said one more question and only asked one more question.  And I wanted you to know that.

You're excused.

MR. PARRISH:  I have one.

THE COURT:  You have some more questions?

MR. PARRISH:  I have one.

THE COURT:  You have one, Al?

MR. PARRISH:  I want to join that group, Your Honor.

THE COURT:  You can just say a few.

MR. PARRISH:  I have a few questions then.

RECROSS-EXAMINATION

BY MR. PARRISH:

Q.   It's true, is it not, that people who do take breaks such as the one that was referred to you by Mr. Colloton in

his questions will on occasion take advantage of a break and extend that break? That's not unusual?

A. No, it's not.

MR. PARRISH: Okay. I have nothing further.

THE COURT: Anything further, Mr. Colloton?

MR. COLLOTON: (Attorney shook head.)

THE COURT: Thank you.

MR. COLLOTON: United States calls Art Ketchum.

THE COURT: Thank you. Just for the court reporter, Graham is G-r-a-h --

MR. COLLOTON: A-m.

THE COURT: -- a-m.

ARTHUR KETCHUM, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated here. When you're comfortable, would you state your full name, please, and spell your last name.

THE WITNESS: It's Arthur Allen Ketchum, K-e-t-c-h-u-m.

THE COURT: Mr. Colloton?

DIRECT EXAMINATION

BY MR. COLLOTON:

Q. What's your city of residence?

A. Mason City.

Q. Where are you employed?

A. Kraft Foods.

CV03-3074, CR07-3047-LRR DoEx66_Page_123

Q.   What's your job at Kraft Foods?

A.   Process technician.

Q.   Do you know the defendant in this case, Dustin Honken?

A.   Yes, I do.

Q.   How did you come to know him?

A.   When he first got hired, I did a new hire orientation, and I met the group then.

Q.   Do you mean when he first got hired at Kraft Foods?

A.   Right.

Q.   So you've worked with him at Kraft Foods?

A.   Yes.

Q.   Did you work on the same shift with Mr. Honken in 1996?

A.   No.

Q.   What was the relationship between your work schedule and his if you know?

A.   I was on a different shift than his.

Q.   Did you learn at some point that Mr. Honken had been charged in a federal drug case in 1996?

A.   Yes.

Q.   How did you learn about that?

A.   Local newspaper.

Q.   Did you see Mr. Honken again after that?

A.   Yes.

Q.   Where did you see him after that?

A.   At Kraft Foods.

Q. What interaction did you have with him at Kraft Foods during the time after he was arrested on the drug case?

A. I worked around his area when I worked overtime, so I'd work with Dustin.

Q. Did you have any specific occasions to communicate with him about his work schedule?

A. No.

Q. Did you ever do any work for Mr. Honken?

A. Yes.

Q. How did that come about?

A. I traded days with him. I worked his shift, and he'd -- I get paid for it, and then he'd take the time off.

Q. How many times did you work a shift for Mr. Honken during the time when he was on pretrial release after he was arrested?

A. I believe two times.

Q. Two times?

A. Uh-huh.

Q. Now, how did that work? If you worked for him, what, if anything, did he do in return for you?

A. He could have worked for me to pay back the time, or else he could have just not worked at all, and I would have got paid for it.

Q. And did he work for you?

A. No, he didn't.

Q. So you just got paid overtime?
A. Right.
Q. What statements did Mr. -- well, do you remember these two separate times when you worked for Mr. Honken?
A. Right.
Q. Can you describe the first time?
A. Yeah. It was May 22, and I got a call from Dustin. He wanted me to work for him that -- he wanted to spend some time with his kids, so I went and worked for him that day.
Q. How much of that day did you work for him?
A. I worked the entire day, 12 and a half hours.
Q. What was the second occasion?
A. I worked a morning for him, 6.25 hours.
Q. Do you recall when that was?
A. Yeah. It was June 2.
Q. What did he say to you -- first of all, how did that come about?
A. He called me and said he had some unfinished business to take care of and wanted to know if I could work that morning for him.

MR. COLLOTON: Those are all the questions I have, Judge.

THE COURT: Thank you, Mr. Colloton.

Mr. Parrish?

MR. PARRISH: Thank you, Your Honor.

CR01-3047-LRR DOEx55_Page_126

CROSS-EXAMINATION

BY MR. PARRISH:

Q. You worked around Mr. Honken for approximately how long if you recall?

A. On and off?

Q. Yes, sir.

A. Do you mean a specific time or just --

Q. I mean six months, a year, two years.

A. It'd probably be about a year.

Q. Are you married, sir?

A. Yes.

Q. And what's your educational background briefly?

A. High school.

Q. And how old are you?

A. Forty-one.

Q. You've been employed at Kraft for approximately how long?

A. Ten years.

Q. Prior to that where were you employed?

A. Chicago Northwestern Railroad.

Q. And what did you do for them?

A. I was a track laborer.

Q. Sir, do you believe with regard to your conversations you have a pretty good recollection of conversations you had with Mr. Honken during the time he was working there?

A.   I seem to think so, yes.

Q.   And there's nothing that's impaired your memory about working with him or anything like that; is that correct?

A.   No.

Q.   Okay.  Let me just ask you a few questions about that relationship.  Did you ever see him around a gentleman by the name of Tim Cutkomp?

A.   Yes.

Q.   All right.  And did you ever see any conversation going on between the two of them when you were around?

A.   Yeah.

Q.   And in that conversation did you make an assessment of the relationship between the two of them?

A.   Yeah.

Q.   What was that assessment of the relationship?

A.   They were pretty good friends.

Q.   And did it appear to you to be a mutual friendship?

A.   Yeah.

Q.   Did it appear that one dominated the friendship as opposed to the other dominating the friendship?

A.   Not from my opinion, no.

Q.   Not from your opinion?

A.   Right.

Q.   And you've been around, I assume, a lot of coworkers over the years; is that correct?

A.   Yeah.

Q.   During the conversations that you had with Mr. Honken, did he in any way express any anger toward anyone who might be a witness against him?

A.   Not that I was aware of, no.

Q.   Did he ever in any way express any belief or intent to do any physical harm to anyone?

A.   Not to me he didn't say anything.

Q.   As a matter of fact, you reached the conclusion that he was the type individual who did not have a temper; is that correct?

A.   That's what I gathered, yes.

Q.   And as you assessed this individual, Mr. Honken, you also reached the conclusion that he was a very intelligent person from the conversations you had with him?

A.   Yes.

Q.   What led you to that conclusion if you could state rather briefly what led you to those conclusions?

A.   He was quite articulate in the way he explained things, and I just gathered that upon myself.

Q.   Did he make any secret to you about the fact that he had in the past used drugs or that he had in the past sold drugs?

A.   No.

Q.   Did you ever hear him talk about weapons or attempt to buy any weapons from you?

A. He never attempted to buy any weapons from me, no.

Q. Did you ever see him with weapons?

A. No.

Q. But he did engage in conversation with you about drugs?

A. Yeah.

Q. And you rejected those conversations; is that correct? You told him you had no interest.

A. Right.

Q. The last question I have for you is during any of the times, did you see Mr. Honken leave his position of employment or where he was supposed to be working and go anywhere else?

A. I never did, no.

Q. Let me ask you, Mr. Ketchum, my last question, and that is in your experience working with Kraft for approximately ten years and seeing how employers -- employees work and the type of breaks they take, would you give us some idea of whether or not people take the breaks they're entitled to, or do they stretch their breaks to some extent and take advantage of the break policy?

A. I'd say 75 percent of the people take advantage of their breaks.

Q. And take longer than they're entitled to?

A. Right, take longer.

Q. So if anyone did take a break longer than what they

would be entitled to, that would not be unusual in the company?

A. Not at all.

MR. PARRISH: Thank you. I have no further questions.

THE COURT: Mr. Colloton, anything further?

MR. COLLOTON: Yes.

REDIRECT EXAMINATION

BY MR. COLLOTON:

Q. Mr. Ketchum, did you know prior to the time the charges in this case became public that Mr. Honken and Mr. Cutkomp were in a drug manufacturing conspiracy?

A. No, I didn't.

Q. Do you have any insight into the relationship that they had in that conspiracy?

A. No.

Q. You don't know anything about who was in charge of the drug business or anything like that?

A. No.

MR. COLLOTON: Okay. That's all I have, Judge.

THE COURT: Mr. Parrish, anything further for Mr. Ketchum?

MR. PARRISH: I have nothing further, Your Honor. Thank you.

THE COURT: Thank you, Mr. Ketchum. You're excused.

CV-03074, CR01-3047-MWB DoEx55_Page_131

MR. COLLOTON: United States calls Kurt Zirbel.

KURT ZIRBEL, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated here. Would you state your full name, please, and spell your last name.

THE WITNESS: Kurt Douglas Zirbel, Z-i-r-b-e-l.

DIRECT EXAMINATION

BY MR. COLLOTON:

Q. What is your city of residence?

A. Mason City.

Q. What is your occupation?

A. I'm self employed.

Q. What is your self employment?

A. I own a gun and bow shop.

Q. Where is the gun and bow shop?

A. Mason City also.

Q. Where were you employed, if anywhere, before you ran the gun and bow shop?

A. Kraft General Foods.

Q. When were you employed there?

A. Up until June of '96.

Q. Do you remember about when you started working there?

A. Would have been June of '88.

Q. Do you know the defendant in this case, Dustin Honken?

A. Yes, I do.

Q. How did you come to know him?

A.    We worked together.

Q.    At Kraft?

A.    Yes.

Q.    Did you learn at some point that Mr. Honken had been charged in a federal drug case in the spring of 1996?

A.    Yes, I did.

Q.    How did you find out about that?

A.    I believe Dustin and I were talking about it.

Q.    So you had contact with him after he was charged in the drug case?

A.    Oh, ninety -- I'm sorry.  I'm sorry.  I was -- I thought you meant the -- the '96?

Q.    Yes.

A.    No.  Dustin and I didn't talk about that right away.

Q.    But did you find out at some point?

A.    Yes.

Q.    And you found out about that through some other --

A.    Yeah, Dustin was gone from work, and it kind of just got spread around.  It was in the paper and stuff.

Q.    Did he then come back to work at some point?

A.    Yes.

Q.    What restrictions, if any, did you learn about concerning Mr. Honken?

A.    Dustin showed us an electronic monitoring device.

Q.    What did he show you?

A. It was an ankle bracelet.

Q. What statements, if any, did he make about the bracelet?

A. That he'd like to have it off and that it was -- his attorney was going to have it off within a month, but if he could get it off he could -- if he could figure out the frequency it would make a lot of money.

Q. What kinds of things do you sell at your shop that you run now?

A. Bow and arrows, guns, ammunition.

Q. Did you sell guns before you started your own shop?

A. No.

Q. Did you ever own guns before then?

A. Yes.

Q. Did you ever talk with Mr. Honken about firearms at all during the time after he was charged in 1996?

A. Yes.

Q. Was this during the time when he was on the electronic monitoring device?

A. Yes, it was.

Q. What conversations did you have with Mr. Honken about guns in that period?

A. Dustin asked me if I had any guns I'd like to sell and handguns in particular.

Q. What did you say?

A. I said I had one that I wouldn't mind getting rid of.

Q. What kind of gun was that?
A. It was a .25 caliber Raven.
Q. And how did the conversation go from there?
A. Well, he asked if I would sell it and what it was worth.
Q. What did you tell him?
A. I told him, oh, 40, $50.
Q. How did he respond to that?
A. Well, I realized that I shouldn't have said any -- I shouldn't have said -- I shouldn't have started the conversation at all.
Q. Why did you feel that way?
A. Well, I kind of stuck my foot in my mouth. I realized where it was going.
Q. What do you mean by that?
A. Well, then Dustin wanted to buy the gun.
Q. And what was your concern with that?
A. Well, he was on the electronic monitoring, and I thought he was probably in enough trouble as it was.
Q. So what happened after you told him how much the gun was worth?
A. Well, after I had balked about selling it then, he told me he'd give me -- it was either seventy or a hundred dollars. I don't remember which.
Q. What happened then?
A. Well, then I just kind of tried to stall it off as long

CR07-3047-LRR PCR Ex55_Page_135

as I could. He asked me pretty much daily whether or not I would sell this gun or bring it to work.

Q. What sort of records, if any, did you think you would have to keep of that kind of transaction?

A. Well, I told Dustin that a person would need a permit to purchase.

Q. What did he say in response to that, if anything?

A. He didn't really want any paperwork on it.

Q. So what happened then after these conversations?

A. Well, really nothing. Dustin was -- left the plant again.

Q. So you ended up never making the transaction with him?

A. No, no.

MR. COLLOTON: That's all I have for this witness, Judge.

THE COURT: Thank you, Mr. Colloton.

Mr. Parrish?

MR. PARRISH: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. PARRISH:

Q. Mr. Zirbel, you were asked about facts you never completed making the transaction with him. Did you ever start making a transaction with Mr. Honken about any gun?

A. We talked about it, and like I said, I balked at it. I realized shortly after I said that I even had a gun that I

CV03-3074, CR01-3047-MWB DoEx55_Page_136

would sell that it was a bad idea.

Q. You mean all you did was talk about it.

A. Yes.

Q. Did he ever tell you to bring the gun?

A. He asked me to bring the gun, yes.

Q. And where did he ask you to bring it?

A. To work.

Q. To look at or to buy?

A. He said he wanted to buy it.

Q. Have you had anyone buy a gun from you without looking at it first?

A. Excuse me?

Q. Have you ever had anyone buy a gun from you without looking at it first?

A. No.

Q. Did you ever show him a gun at all?

A. No, I didn't.

Q. Have you ever shown him a gun?

A. No, I didn't.

Q. No. I said have you ever -- no, you didn't? You've never shown him a gun of any sort?

A. Not to my recollection.

Q. Okay. And have you ever seen Mr. Honken with a gun?

A. No, I haven't.

Q. Have you ever heard Mr. Honken indicate that he had

CR01-3047-MWB DoEx55_Page_137

harmed anyone?

A. No.

Q. As a matter of fact, with regard to Mr. Nicholson, he stated just the opposite; isn't that true?

A. He told me that Nicholson had taken off.

Q. Well, didn't he indicate to you that law enforcement officials were saying that he had harmed him in some way or had killed him? As a matter of fact, he indicated to you that he had not done anything of sort but they were just trying to pin it on him. Didn't he tell you that?

A. Yes, he did.

Q. So he denied to you that he had any involvement in Mr. Nicholson taking off; is that correct?

A. Yes.

Q. As a matter of fact, didn't you tell the law enforcement officials at some point that Mr. Nicholson had tried to contact you after the date they'd indicated that he had disappeared?

A. No.

Q. He'd never told you that?

A. That Mr. Nicholson tried to contact me?

Q. Had tried to contact you in any fashion.

A. No, no. I don't -- I don't know Mr. Nicholson at all.

Q. And he never tried to contact you?

A. I don't -- no. I don't see why.

CV-03074, CR07-3043-LRR DefEx55_Page_138

Q. When did you have a conversation with Mr. Honken about the weapon?
A. It was shortly after he had come back to work.
Q. In 1996?
A. Yes.
Q. And how many times did you have this conversation with him?
A. I would say the conversation, maybe twice, the basic conversation. Then he asked me to bring the gun maybe four or five other times.
Q. You had the conversation with him twice about the weapon; is that right?
A. Yes.
Q. And how did he know you had a specific type weapon?
A. He asked me. He asked me -- when he asked me if I had any guns I wanted to sell, he asked what it was, and I explained it.
Q. Okay. And why did he approach you? Do you know?
A. I would imagine it's fairly common knowledge that I had guns and I do a lot of hunting, and I -- everybody -- we spend a lot of time together when we work there, and everybody kind of knows what everybody else is into.
Q. And so as I understand it, the weapon was talked about twice, and he may have asked you on four occasions to bring the gun; is that correct?

CR01-3047-LRR Def Ex 55_Page_139

A.   Four or five.  I'm not clear on exactly how many times.

Q.   And did you tell him no, you weren't going to do it, or did he just drop the conversation?

A.   I'm not sure how it ended.  I don't know if -- I believe that he was taken back into custody again, and that was the last I'd ever heard of it.

Q.   And when was the last time he had asked you anything about a weapon prior to the time he was taken into custody in 1996 if you can recall?

A.   I can't recall.

Q.   So you can't relate that at all in terms of your memory until the date he was taken into custody; is that correct?

A.   Not exact dates, no.

Q.   Have other people asked to purchase weapons from you while you're working at the plant since you indicated it was common knowledge you had weapons and you on occasion sold those weapons?

A.   Oh, other people had asked me if I could find certain weapons, yeah.

Q.   You say other people have?

A.   Yes.

Q.   How long have you worked there?

A.   I worked there for eight years.

Q.   And in the eight years how many times have you had discussions about selling people weapons?

A. Maybe two, three.

Q. Two or three total?

A. Uh-huh.

Q. And how many times have you actually sold weapons to people?

A. I haven't sold any there.

Q. And how many have asked you to purchase weapons?

A. No one specifically had asked me to purchase weapons. They'd asked me if I could get ahold of, say, a certain shotgun or something for hunting, if I knew where they could find one. That's all.

Q. Is that it?

A. Yeah.

Q. And in your discussion with Mr. Honken about a weapon, did he ever relate to you why he wanted a weapon?

A. Later on he told me he wanted it for his girlfriend because she was moving to Des Moines and he was worried about her.

Q. And did he ever indicate to you that he was interested in purchasing a weapon for himself in any of the conversations?

A. Not specifically, no.

Q. And the conversation about he was purchasing it or he was interested in it for his girlfriend, did he ever tell you who would, in fact, come and purchase the weapon?

A. No.

Q. Did he ever offer you any money for the weapon?

A. Yes.

Q. Where you saw the money and he pulled it out and offered it to you?

A. He told me he had the money with him one night.

Q. But you never saw the money.

A. No.

Q. And he never pulled the money out as I indicated and offered it to you in any way.

A. Not that I can recall, no.

Q. Now, his girlfriend, in fact, came to the plant on occasion; isn't that correct?

A. I -- yes.

Q. And you had seen her at the plant; isn't that correct?

A. Yes, I had.

Q. And other people had seen her at the plant; is that correct?

A. I would imagine.

Q. And she would on occasion bring -- did she ever bring a kid to the plant from your observation?

A. I believe so.

Q. Okay. And would they be sitting around during some of the breaks or something?

A. Yes.

Q. All right. And had he wanted to purchase a weapon for her or have her purchase a weapon, you easily could have had an arrangement where she could have met you and could have given you the money and purchased the weapon because she was moving to Des Moines; isn't that correct?

A. I suppose.

Q. Would you have had any reservations about selling the weapon to her based upon what he told you about the fact that she was moving to Des Moines and wanted the weapon for that purpose?

A. If she would have had a permit to purchase, I could have sold it to her.

Q. And you would have done so; isn't that correct?

A. Probably so.

Q. So based upon what he told you about the purchase of the weapon and had she shown up with a permit, you would have, in fact, sold the weapon to her, the same weapon that he had a discussion with you about; isn't that correct?

A. Yes.

Q. And you didn't see anything wrong with that.

A. As long as there's paperwork, it would be perfectly legal.

Q. And that's what he told you he wanted to do; isn't that correct? He told you his girlfriend wanted the weapon because she was moving to Des Moines.

CV10-3074, CR07-3043-LRR D-Ex55_Page_143

A. Correct.
Q. Did he ever relate to you that he wanted it for any other purpose?
A. No.
Q. He also openly discussed the fact that he had done drugs, is that correct, that he had done methamphetamines or -- didn't he have that discussion with you?
A. I can't recall.
Q. Do you recall any conversations he had with you about the use of drugs or the sale of drugs or anything like that?
A. No.

MR. PARRISH: Okay. Thanks. I have nothing further.

MR. COLLOTON: I have a few, Judge.

REDIRECT EXAMINATION

BY MR. COLLOTON:

Q. I believe you said later on Mr. Honken said he wanted the gun for his girlfriend; is that right?
A. Yes.
Q. What do you mean by later on?
A. Oh, that would be maybe a week after -- when I wouldn't bring it to work, then I told Dustin that you can't have -- you can't get the gun -- you can't buy the gun without a permit and there's no way you can get a permit. Then he told me that he wanted it for his girlfriend.

CV-03074, CR01-3047-LRR Def Ex55_Page_144

Q. Now, he told you that, and Mr. Parrish suggested that if the girlfriend had shown up with a permit and all the paperwork then you would have sold it to her; right? Wasn't that what you --

A. I could have.

Q. You could have. And that's not what happened, is it?

A. No.

Q. The girlfriend never came to you with a permit to buy the gun.

A. No.

Q. Mr. Honken was the one who came to you to try to buy the gun; right?

A. Yes.

Q. And Mr. Honken you said told you he didn't want any paperwork associated with the gun; is that right?

A. He said he would rather not.

Q. He would rather not have any paperwork; correct?

A. Right.

Q. So that would be inconsistent with having a permit and all the paperwork that Mr. Parrish talked about; correct?

A. Yes.

MR. COLLOTON: That's all, Judge.

THE COURT: Mr. Parrish, anything further?

MR. PARRISH: Yes, Your Honor.

RECROSS-EXAMINATION

BY MR. PARRISH:

Q. Did Mr. Honken tell you he did not want any paperwork?

A. He said he would rather not.

Q. Did you ever specifically tell him that if his girlfriend came with the paperwork that you would sell him the weapon?

A. No, I don't think I did.

Q. But when he asked you about her needing the weapon because she was moving to Des Moines, you didn't outline those factors to him as to what she would have to do.

A. I had already told Dustin that he would have to have a permit to purchase.

Q. That he would have to have one.

A. (Witness nodded head.)

Q. Is that a yes? You're nodding your head.

A. Yes.

Q. And in your conversation with Mr. Colloton, you had indicated that during the course of the conversation you had indicated to him that you thought he couldn't have a gun, and I assume based upon the earlier direct examination it was based upon the fact that he had a bracelet on.

A. Yes.

Q. Did you ever discuss the context of him having a bracelet on and not having a weapon that he could purchase? Did you discuss it in that context?

A. With Dustin?

Q. Right.

A. Yes.

Q. And did he offer you a further explanation of the weapon, what the weapon was --

A. I believe that's the time he told me that it was for his girlfriend.

Q. And that was all in one course of conversation, not like Mr. Colloton is saying, some great time later, was it? It was all in the course of one conversation that he said -- when you said, You can't have it because you have a bracelet on when he mentioned, Well, it's for my girlfriend; isn't that correct?

A. This conversation took place later. From the time when I was first -- when we first talked about it to the time when this conversation took place, there was a span of maybe a week, week and a half.

Q. But when -- I guess the context I want to put it in, when you said, Well, because of the bracelet I feel uncomfortable or don't particularly want to sell you the weapon, that's when he had indicated to you it was for his girlfriend because she was moving to Des Moines.

A. Yes.

Q. That was all at one time.

A. Yes.

Q. So that was his explanation -- whether it's right or wrong, that was his explanation of why he wanted the weapon?
A. Yes.
MR. PARRISH: Okay. I have nothing further.
MR. COLLOTON: May I, Judge?
THE COURT: You may, Mr. Colloton.

FURTHER REDIRECT EXAMINATION

BY MR. COLLOTON:
Q. What did he -- what reason did you give him for the first week, week and a half as to why you wouldn't sell him the gun?
A. I just tried to stall it off. I just would say I forgot it at home or I wasn't going to -- you know, I didn't know exactly how to get out of it gracefully.
Q. And in the first week and a half, who did he say the gun was for?
A. He just said he wanted to buy the gun. He didn't say for anyone.
Q. When was it you told him he would have to have a permit?
A. It was probably about a week and a half after the first conversation.
Q. Now, does that mean it was at the same time when he said it was for the girlfriend?
A. Yes.
Q. Okay. So he said it was for the girlfriend, and you

CV03074, CR07-3047-LRR DeEx55_Page_148

also in that same conversation said you need a permit?

A. Yeah. I thought if I told him about the permit that I could get out of this thing gracefully without, you know, making a big fuss and --

Q. So then after you told him about the permit and he said it was for the girlfriend, did he ever come back to you with a permit or with the girlfriend?

A. No.

Q. Did he continue to try to get you to sell him the gun after that?

A. No, I don't -- no, he didn't because shortly after that he was taken into custody again.

Q. I see. And it was in the conversation after Mr. Honken said it was for his girlfriend that you said he would need the paperwork.

MR. PARRISH: Your Honor, he's asked that question about four times so far.

MR. COLLOTON: I was trying to lead up to another question, so I'll take that one as asked and answered. Excuse me.

BY MR. COLLOTON:

Q. Was it the same conversation when Mr. Honken told you the gun was for his girlfriend that he said he'd rather not have any paperwork?

A. Yes.

MR. COLLOTON: That's all. Thank you.

THE COURT: Mr. Parrish, anything further?

MR. PARRISH: No, Your Honor.

THE COURT: Thank you. You're excused.

MR. COLLOTON: United States would call Robert Riepma.

ROBERT RIEPMA, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated here. When you're settled in, would you state your full name, please, and spell your last name.

THE WITNESS: Robert A. Riepma, R-i-e-p-m-a.

THE COURT: Thank you. Mr. Colloton?

DIRECT EXAMINATION

BY MR. COLLOTON:

Q. What is your city of residence, Mr. Riepma?

A. Clear Lake, Iowa.

Q. What is your occupation?

A. I work at Kraft Foods.

Q. How long have you worked at Kraft Foods?

A. Just over four years now.

Q. Do you know the defendant in this case, Dustin Honken?

A. Yes, I do.

Q. How do you know Mr. Honken?

A. I worked with him when he started there. I trained him.

Q. And do you see Mr. Honken here today?

CR01-3047-LRR Ex55_Page_150

A.    Uh-huh, yes.

Q.    During the time -- well, let me ask you this:  Do you own any firearms?

A.    Yes, I do.

Q.    Have you ever bought or sold firearms?

A.    Yes.

Q.    How often do you buy and sell firearms?

A.    I've probably sold five or six within the last ten years.

Q.    Have you ever sold a firearm to Mr. Honken?

A.    Yes.

Q.    Approximately when did that come about?

A.    It was around about September of '95.

Q.    How did that come about?

A.    Some people at work knew that I had some guns and that I sell them now and then, and we just got together and working, and he asked me if I'd be interested in selling one.

Q.    What kind of firearm did you talk to Mr. Honken about?

A.    An SKS Chinese Army rifle.

Q.    Can you give a description of that, please?

A.    It's got a wood stock.  It's approximately 40 to 44 inches long.  It's a semi-automatic with a banana clip and with a bayonet.

Q.    And let me show you what's been received as Government Exhibit 36.  Do you recognize that?

A.    Yes, I do.

Q.    Is that a drawing that you personally made?

A.    Yes.

Q.    What is depicted in that Exhibit 36?

A.    My attempt at drawing an SKS Army rifle.

Q.    Now, is that an attempt to draw an SKS Army rifle of the kind sold to Mr. Honken?

A.    That's correct.

Q.    What did Mr. Honken say to you about why he wanted to purchase that weapon?

A.    He did not say.

Q.    Did you sell any ammunition with the rifle?

A.    Four boxes of shells.

Q.    Did you learn at some point in 1996 that Mr. Honken had been charged in a federal drug case?

A.    Yes.

Q.    Did you ever talk to him about the charges?

A.    Not very specifically, no.  Just, you know, during breaks when he came back to work and stuff.

Q.    Did you talk to him about a search that was done at his garage?

A.    I don't think so.

Q.    Did he ever give you an explanation for the reason why the charges were brought or his conduct?

A.    No.

Q. Do you remember telling the grand jury about an explanation that he gave?
A. I'm sorry. I don't remember.
Q. Do you think it might refresh your memory to look at the transcript?
A. Yes, it would.
Q. Let me ask you to look at page 26, lines 1 through 4 and just read it to yourself.
A. Okay.
Q. This is of your testimony on February 20, 1997. Would you agree with that?
A. Yes, I remember that. I'm sorry.
Q. Have you had a chance --
MR. PARRISH: What page did you show him?
MR. COLLOTON: Page 26, lines 1 through 4.
BY MR. COLLOTON:
Q. Have you had a chance to read that?
A. Yes.
Q. Does that refresh your memory about any conversation you had with Mr. Honken?
A. Yes, it does.
Q. What statements did he make to you about evidence that was found in his house?
A. That he was going to write a book about making drugs.
Q. Do you know a man named Rick Held?

Cr01-3047-MWB Def Ex 55_Page_153

A. Yes.
Q. Who is Rick Held?
A. He's also an employee of Kraft that works the same shift that I do.
Q. Have you ever sold a gun to Mr. Held?
A. Yes.
Q. What's your best recollection as to when that happened?
A. Spring or summer of '96.
Q. What kind of gun did you sell to Mr. Held?
A. A .38 semi-automatic pistol -- a .380, excuse me.
Q. A .380 --
A. .380 semi-automatic pistol.
Q. What kind of gun was it?
A. I think it was a Davis.
Q. And where did you sell it to Mr. Held?
A. Well, at work. Then I delivered it out in the lot, parking lot.
Q. Parking lot at work?
A. Yeah, Kraft.
Q. What explanation, if any, did Mr. Held give you as to why he wanted that gun?
A. Did not give me any.
Q. Let me show you what's been marked Government Exhibit 7 and received as Exhibit 7. Do you see that exhibit?
A. Uh-huh.

CR07-3047-LRR DoEx55_Page_154

Q.   How does that compare in appearance to the gun that you sold to Mr. Held?

A.   It looks the same.

Q.   Did you sell Mr. Held any ammunition?

A.   I did not remember selling him any ammunition.

Q.   Are you confident one way or the other whether you sold him ammunition?

A.   No, I'm not.

MR. COLLOTON:  I believe that's all I have for Mr. Riepma, Judge.

THE COURT:  Thank you, Mr. Colloton.

Mr. Parrish?

MR. PARRISH:  Thank you.

CROSS-EXAMINATION

BY MR. PARRISH:

Q.   Mr. Riepma, let me just ask you a couple of questions first.  Is it true that lots of people who worked at Kraft would take extended breaks, so to speak?  That was not unusual.

A.   Not at all.

Q.   So if Mr. Honken took extended breaks, that's basically what the majority of the people did at the plant; is that right?

A.   That's correct.

Q.   You never saw Mr. Honken display any anger or anything

like that --

A. No.

Q. -- at work to show that he had a temper of any sort?

A. No.

Q. Did he have a discussion with you about one of the witnesses in this case disappearing at some point?

A. When he first started work there, he told me that he had been up on charges of some kind and that there was a witness that never showed up.

Q. Did he indicate to you that he had in any shape, fashion, or form harmed this witness in any way or threatened this witness in any way?

A. No.

Q. As a matter of fact, it's true, is it not, that prior to the time that you sold him a weapon you called the Mason City Police Department to find out if, in fact, you could do that legally?

A. The Clear Lake Police Department.

Q. I'm sorry, Clear Lake Police Department.

A. Yes.

Q. And you found out you could; is that correct?

A. That's correct.

Q. Did you specifically check whether or not you could sell the weapon to Dustin Honken or just sell the weapon at all?

A. Just sell the weapon.

CR01-3047-MWB DefEx55_Page_156

Q. And there was any -- there was no unnecessary paperwork that he had to go through in order to buy that weapon from you; is that correct?

A. No. That's correct.

Q. If it had some type of scope on it or silencer on it or something like that, then you're aware you probably could not have sold that?

A. I'm not aware of that, but I described it to the police department in Clear Lake, and they told me I could sell it.

Q. And you wanted to make sure that everything about the sale was legitimate; is that correct?

A. That's correct.

Q. Mr. Honken had had a discussion with you prior to the time that you sold the weapon about his prior drug charge.

A. Yes.

Q. And you knew it had, in fact, been dismissed.

A. Yes.

Q. Did you do any checking on that at all, or did he show you any documents on the dismissal of that charge prior to the time you sold it to him?

A. I don't remember any documents on a dismissal.

Q. But he did freely discuss with you and show you paperwork on the charges that had been pending against him.

A. He showed me some paperwork after he first started there that was handwritten papers that was something to do with the

CR01-3047-LRR Def Ex 55_Page_157

court hearing or court papers or something, but they were, like I said, handwritten.

Q. Did you become aware at all that one of his girlfriends -- you knew he had two girlfriends; is that correct?

A. Yes, I did.

Q. Did you ever become aware of it that one of them was moving to Des Moines?

A. He told me that, yes.

Q. Okay. When did he tell you that? Shortly before he was arrested?

A. It was before that, but I don't remember what time frame, but it was before that.

Q. Do you know Mr. Zirbel at all?

A. Yes.

Q. Were you present at the time he told Mr. Zirbel that his girlfriend was -- one of his girlfriends was moving to Des Moines?

A. Not that I remember.

Q. You just recall that independently that he had told you that; is that correct?

A. Right.

Q. You had not told any of the agents who had interviewed you that prior to today's date, have you?

A. I don't recollect.

Q. That's not anything that's come up before?

CR07-3047-MWB Def Ex 55_Page_158

A. I don't think so, that I remember.

Q. And how do you recall him telling you or being aware that one of his girlfriends was, in fact, moving to Des Moines shortly before he was arrested?

A. Well, I remember one of the discussions that came about is that there was a freezer that was left in the house after she had left it, and he wanted me -- about getting the stuff out of the freezer because it had spoiled.

Q. And you knew at that point from that conversation that she had moved to Des Moines.

A. Uh-huh.

Q. Is that a yes?

A. Yes.

MR. PARRISH: Okay. I believe those are all the questions I have. Thank you.

THE COURT: Thank you, Mr. Parrish.

Mr. Colloton.

REDIRECT EXAMINATION

BY MR. COLLOTON:

Q. Mr. Riepma, remember Mr. Parrish asked you about extended breaks at Kraft and whether that was unusual?

A. Uh-huh.

Q. Do you know anything about electronic monitoring devices that are used in federal court?

A. Very little.

Q. Did you know that Mr. Honken was on one?
A. Yes.
Q. Did he tell you that?
A. I don't know if he actually told me, but I had heard it through the plant that he had electronic device on him, yes.
Q. Do you know anything about how extended breaks at Kraft affect the ability of the probation office to monitor Mr. Honken's whereabouts?
A. No, I don't.

MR. COLLOTON: That's all I have, Judge.

THE COURT: Anything further, Mr. Parrish?

MR. PARRISH: Just one last thing.

RECROSS-EXAMINATION

BY MR. PARRISH:

Q. It wasn't a big secret at the plant that he was on electronic monitoring, was it?
A. No, it wasn't.
Q. To your knowledge it seemed like everyone knew it.
A. Yes, sir.

MR. PARRISH: I have nothing further.

THE COURT: Mr. Colloton, anything further?

MR. COLLOTON: No.

THE COURT: Okay. Thank you. You're excused.

MR. COLLOTON: United States calls Rick Held.

RICK HELD, PLAINTIFF'S WITNESS, SWORN

CV-03074; CR01-3047-LRR DOE Ex 55_Page_160

THE COURT: Okay. Please be seated here. State your full name, please, and spell your last name.

THE WITNESS: It's Rick Donald Held. Last name is spelled H-e-l-d.

THE COURT: Thank you. Mr. Colloton?

DIRECT EXAMINATION

BY MR. COLLOTON:

Q. What is your city of residence?

A. Geneva.

Q. Geneva, Iowa?

A. Iowa.

Q. Where are you employed?

A. I'm employed at Kraft Foods, and then I also farm.

Q. Where are you employed at Kraft Foods?

A. I run a machine called a Homba.

Q. And at what Kraft facility?

A. In Mason City.

Q. What kind of farming do you do?

A. I raise corn and beans and hogs.

Q. Do you have -- how much property do you have?

A. 260 acres I farm.

Q. Do you have farm equipment in connection with that?

A. Yes, I do.

Q. Do you have trucks and trailers and things like that?

A. A pickup truck.

CV-03074, CR07-3047-LRR DefEx55_Page_161

Q. Pickup truck?

A. And as far as equipment goes, tractors and wagons, combine.

Q. Do you know the defendant in this case, Dustin Honken?

A. Yes, I do.

Q. Do you see him here today?

A. Yes, I do.

Q. And how do you know Mr. Honken?

A. I worked with him at Kraft Foods.

Q. Did you learn at some point that federal drug charges had been brought against Mr. Honken in the spring of 1996?

A. Yes, I did.

Q. How did you find out about that?

A. Through the -- it was on TV or in the newspaper.

Q. What contact, if any, did you have with Mr. Honken after that? Did you see him at work anymore?

A. Yes, he came back to work for a period of time.

Q. Did he ever make known to you any restrictions that were put on his conduct as a result of these charges?

A. Yes. He had told me that he was supposed to go from work to home to work again.

Q. What, if anything, did he tell you about how the government or the courts were monitoring that?

A. He told me that he had a monitor on his leg.

Q. Have you ever had any conversation with Mr. Honken about

firearms or guns?

A.   We talked about firearms a lot I guess at work.

Q.   Did you have any specific conversations with him that you remember after the time he was on the pretrial release as we call it here in the federal drug case?

A.   Yes.  He -- at that time he asked me if I would purchase a pistol for his girlfriend that was moving to Des Moines. He was worried about her safety at that time.

Q.   That's what he told you?

A.   Uh-huh.

Q.   You have to answer yes or no.

A.   Yes.

Q.   What kind of gun did he talk to you about?

A.   About a .380.

Q.   When you say a .380, what do you mean by that?

A.   Caliber.

Q.   What kind of gun is that?

A.   A pistol.

Q.   What did he say to you about it?

A.   He asked me if I would purchase a .380 pistol for him or for his girlfriend.

Q.   What did he say about -- if anything about where he wanted you to purchase it?

A.   He had told me that there was a guy that we work with that deals in guns for a little money on the side, that I

might be able to get one from him.

Q. Whom did he suggest in particular?

A. Bob Riepma.

Q. Did you know Mr. Riepma?

A. Yes, I do.

Q. What conversations did you have with Mr. Honken about how to pay for any such gun?

A. He asked me to look at it and -- which I did, took it home. I fired it four or five times. Seemed to be okay. I came back, and I told Dustin that everything seemed okay to me and, you know, it was okay.

Q. And how did you -- well, what happened after that?

A. Then Dustin told me to go ahead and purchase it.

Q. How much -- or how did you go about paying for it?

A. I asked how much Mr. Riepma wanted. He wanted $85. Dustin had given me 90. He told me to go ahead and keep the five dollars for helping him.

Q. What did you do with the gun after you got it -- did you get the gun from Mr. Riepma?

A. Yes, I did.

Q. What did you do with the gun?

A. I brought it back with me. I told Dustin that it was in my pickup if he wanted to get it at any time.

Q. Did you get any ammunition from Mr. Riepma?

A. Yeah. There was a partial box of shells with it.

Gov. Ex. 55_Page_364

Q.   What happened to the gun then after you put it in your truck and told Mr. Honken he could get it at any time?

A.   He never picked it up.

Q.   Do you know what happened to Mr. Honken after that?

A.   I guess a few days later then he was rearrested.

Q.   How did you find out about that?

A.   His girlfriend had called me -- it was a Sunday night -- called me at home.

Q.   How do you know it was his girlfriend?

A.   She told me it was.

Q.   What did she say to you?

A.   She said, This is Dustin's girlfriend.

Q.   What did she say in the phone call?

A.   She told me that Dustin didn't want the pup anymore.

Q.   What did you understand her to mean by that?

A.   Well, at that time I guess I understood it to mean that he didn't want the pistol anymore.

Q.   Had you ever talked to Dustin about selling him a pup?

A.   No.

Q.   So that wouldn't have made any sense to you if they were talking about a pup?

A.   That's how I took it, that that's what it must have meant.

Q.   You mean about a gun?

A.   Uh-huh.

Q. So what did you do -- well, actually let me back up one second. When you talked to Mr. Riepma about buying the gun, what did you say to Mr. Riepma, if anything, about why you wanted the gun?

A. Didn't tell him anything.

Q. Why didn't you tell him anything?

A. It's none of his business. It was for me.

Q. What statements, if any, did Mr. Honken make to you about what you should tell Mr. Riepma?

A. He didn't tell me anything. He told me to keep it to myself.

Q. Now, what did you do with the gun after you got this phone call?

A. I had taken it out of my truck. I put it in a building that I call farrowing house. I left it there for the time being.

Q. Did you see Mr. Honken again after that?

A. No.

Q. Was he taken to jail and detained after that?

A. Uh-huh, yes.

Q. So you put the gun in your farrowing house, and you left it there for a time?

A. Right.

Q. How long did you leave it there?

A. Oh, a month or two months maybe.

Q. What did you do with it after that?

A. I decided I didn't want it to be on -- I didn't know what I was going to do with it. I didn't know what I was going to do with it, and I decided I didn't want it on my farm. I didn't want my kids to find it. And so I took it down to a place where I go hunting, and there was three culverts down there, and I wrapped it up, and I put it inside a -- or beside a culvert.

Q. How did you wrap it up?

A. Just in a plastic bag and some gray tape.

Q. Why did you take it -- wrap it up and hide it in a culvert?

A. Because I have a passion for guns, and I guess I -- just to throw it in there to have the moisture and whatever else to abuse it.

Q. Why did you take it out of the farrowing house?

A. Because I didn't want it there. I didn't want to have reminders of it anymore, and I didn't want to have my kids come across it.

Q. How long did the gun stay in the culvert as far as you know?

A. Until Agent Hein -- is that correct?

Q. Agent Hein from the DEA?

A. Yes.

Q. What about him?

CR07-3047-LRR Def Ex55_Page_167

A. Till he came, and I told him about it.

Q. And then what happened?

A. And then I took him to where it was, and we went and got it.

Q. Had you -- do you remember that happening in early February of this year? Does that sound right?

A. Yes, I do.

Q. Had you been interviewed by law enforcement prior to then?

A. Yes, I had.

Q. And you were questioned then about whether you had any gun for Mr. Honken; right?

A. Right.

Q. And you didn't tell them about this particular gun at that time.

A. That's right.

Q. But eventually you did tell Mr. Hein and gave it to him; right?

A. Uh-huh.

Q. You have to answer yes or no.

A. Yes.

Q. Let me show you what's marked Government Exhibit 7. Do you recognize Government Exhibit 7?

A. Yes, I do.

Q. What is that?

A.   That's the .380.

Q.   And what is the other material in the bag that's Exhibit 7?

A.   Box of shells.

Q.   And what's the gray material here at the top on the right side?

A.   This here?

Q.   Inside the bag.

A.   It's a plastic bag.

Q.   And do you see some gray material inside there?

A.   No, I don't.  I don't understand what you're looking at.

Q.   Do you see some gray material on the back of the bag?

A.   Gray tape?

Q.   Yeah.  Do you see the gray tape?

A.   Right.

Q.   What's the gray tape?

A.   It's duct tape.

Q.   Is that what you had the gun wrapped in?

A.   Yes.

Q.   Have you ever had any conversations with Mr. Honken about drugs?

A.   Yes, I had.

Q.   Have you ever talked to him about methamphetamine?

A.   Yes, I did.

Q.   What have you talked to him about concerning

methamphetamine?

A.    I guess just the conversation of what the drugs are, what they're used for.

Q.    Have you ever obtained any methamphetamine from Mr. Honken?

A.    Twice.

Q.    Approximately when did that happen as best you recall?

A.    June of '95.

Q.    How much did you obtain?

A.    I never paid for it.

Q.    No.  I'm asking you how much in terms of quantity.

A.    What they call a line.

Q.    Have you ever talked to Mr. Honken about glassware?

A.    Yes.

Q.    What was the nature of that conversation?

A.    Dustin had told me that he was going to be writing a book and that he was going to have some glass and plastic, and he asked me if -- sometime if I would keep it for him.

Q.    Store it for him?

A.    Store it for him.

Q.    Did you do that?

A.    No.

Q.    Do you remember when that conversation took place?

A.    Must have been before June '95.

Q.    Why do you say it must have been before then?

A.    Because he was arrested, wasn't he?

Q.    You're talking about after you talked to him about the gun?

A.    Uh-huh.

Q.    Do you mean June '96?

A.    It was before he was arrested.

Q.    Before he was arrested and detained in jail you mean.

A.    Right.

Q.    Well, if I told you that was June '96, would that refresh your memory as to when this happened?

A.    Yes.

Q.    When do you think the conversation was about the glassware in relation to that date?

A.    It was in the first -- it was months before that.

Q.    Do you think it was in the same year?

A.    Yes.

Q.    In your capacity as a farmer which is your other job than Kraft, do you have occasion to purchase feed?

A.    Yes, I do.

Q.    Why do you purchase feed?

A.    To feed pigs.

Q.    For the pigs?  Was there an occasion in the summer of 1996 when you had accumulated a feed bill of some size?

A.    Yes, I did.

Q.    About how much did you owe?

A.   I think it was eleven or twelve thousand.

Q.   Had you ever discussed that with Mr. Honken?

A.   Yeah, we talked a lot about everything.

Q.   Including your feed bills?

A.   Including -- yes, including feed bills.

Q.   Now, let me show you what's been received as Government Exhibit 11H.   Do you see -- have you seen that document before?

A.   Yes, I have.

Q.   You've been shown that by agents?

A.   Uh-huh.

Q.   Do you see a reference in there to how, quote, this guy can help solve your feed bill situation, unquote?

A.   Uh-huh.

Q.   You have to answer yes or no.

A.   Yes.

Q.   Did you ever see this letter before the government showed it to you?

A.   No, I didn't.

Q.   It was never delivered to you?

A.   No.

Q.   But you did have a large feed bill in the summer of '96?

A.   Yes, I did.

            MR. COLLOTON:  All right.  That's all I have, Judge.

            THE COURT:  Mr. Colloton, I have a question for you.

What in the government's view is the relevance of this witness's testimony regarding the guns? Which contested issues does it go to?

MR. COLLOTON: It goes, we believe, to the obstruction issue and to the firearm issue because we think our position will be that the evidence will show that the gun is related to obstruction which is relevant conduct.

THE COURT: We'll take that up later.

Mr. Parrish?

MR. PARRISH: Thank you, Your Honor. What was the date of the note?

MR. COLLOTON: It's undated. It doesn't have a date written on it.

MR. PARRISH: Thank you. Thanks.

CROSS-EXAMINATION

BY MR. PARRISH:

Q. If someone had shown up at your farm, at your work with a note and said it was from Dustin Honken and this person would take care of a feed bill, what would your response have been?

A. I don't know if I would have believed it or not. Why would anybody want to do that?

Q. And that would have been your response; is that right?

A. Correct.

Q. And what if it was a person you never heard of and never

seen before?

A. I really wouldn't believe it then.

Q. As I understand it -- and correct me if I'm wrong because I'm a little confused by the government's evidence on this point --

THE COURT: Mr. Parrish, can I interrupt you for a second?

MR. PARRISH: Yeah.

THE COURT: Mr. Fletcher, we're going to take a break probably as soon as Mr. Parrish is done -- I imagine 10 or 15 minutes -- and then I'll try and track you down because we need to discuss that speedy trial problem. Are you going to be in the building for a while?

MR. FLETCHER: Yes, sir. Want me to check with you here or in your chambers?

THE COURT: I'll just try and track you down.

MR. FLETCHER: I'll probably be in probation with Mr. Niles.

THE COURT: Thank you. Excuse me, Mr. Parrish.

MR. PARRISH: That's all right, Your Honor.

BY MR. PARRISH:

Q. As I was saying, I was a little confused on the government's evidence on this point, and I want it to be clear. As I understand it, you had an interview with law enforcement officials where you had indicated to them that

CV-03074, CR07-3043-LRR Def Ex55_Page_174

you had not obtained a gun for Mr. Honken; is that correct?

A.   Yes.

Q.   Because he had told you all along it was for a girlfriend.

A.   Correct.

Q.   And as a matter of fact, you related to them even after you were reinterviewed both by the agents and Mr. Colloton who came in February of '97 that you believed that it was for the girlfriend.

A.   Yes, I do.

Q.   And you'd also related to them that you had the weapon. You told Mr. Honken he could get it at any point. He had an opportunity to get it, and he never got it from your vehicle.

A.   Yes.

Q.   And this was a few days even before he was arrested.

A.   Correct.

Q.   And it was his girlfriend who had the conversation with you who indicated that she didn't need it anymore, didn't want it anymore; is that correct?

A.   Yes.

Q.   Now, when you purchased the weapon from Mr. Riepma, did you have to sign any paperwork or documents?

A.   No, I didn't.

Q.   So if Mr. Riepma had indicated that if anyone had to purchase any weapon from him they had to fill out documents,

you for one would be one person who would say you purchased a weapon from him and did not have to fill out any purchase order or purchase form or anything like that; is that correct?

A. Right.

Q. So if he were to have made representations like that at least with regard to you, that representation would have been untrue. If he had made a representation that he would only sell the weapon if a purchase order or purchase form was filled out, at least as it pertained to you, that would have been untrue?

A. Yes.

Q. Okay. And you never once told him, did you, that the weapon was being purchased for Mr. Honken? You never told Mr. Riepma that?

A. No, I never told Mr. Riepma that.

Q. And it was not for -- when you went up to purchase it, as you understood the whole scenario, it was not for Mr. Honken; is that correct?

A. Dustin never asked me to buy a weapon for him. At the time he asked me to buy the weapon for his girlfriend.

Q. Now, did you know of your own knowledge if his girlfriend was, in fact, moving to Des Moines?

A. No, I didn't.

Q. Okay. Did you ever find that out at any point?

CR01-3047-LRR PoEx55_Page_3176

A. No, I didn't.

Q. Did you know why his girlfriend wanted the weapon?

A. Only from what Dustin had told me.

Q. And what did Dustin tell you?

A. Because she was moving to a big city of Des Moines and being down there by herself and she was scared and wanted some protection.

Q. Did you at all discuss that conversation that you just had here with us with Mr. Riepma in any way?

A. No, sir.

Q. Not even as you sit here today --

A. No, sir.

Q. -- you haven't had that discussion with him.

A. No, sir.

Q. Sir, you live on a farm and have, in fact, as you indicated, dealt in the hog business for a while. In 1997 did you have a hog bill then?

A. Yes.

Q. I mean -- I should say 1997. Was it the same hog bill from 1996?

A. Yes, it was.

Q. And when was the last conversation you had with Mr. Honken if you can recall?

A. It was before he was arrested.

Q. Which would --

Cr01-3047-MWB Def Ex 55_Page_177

A.   The last time when he was locked up.

Q.   And you're referring to '96; is that correct?

A.   Correct.

Q.   Okay.  Now, you were asked several questions with regard to Mr. Honken inquiring to you with regard to other weapons; is that correct?

A.   Yes.

Q.   Other than the weapon for his girlfriend who was moving to Des Moines, did he ever indicate to you that he wanted to purchase a weapon for himself for any purpose?

A.   No, he didn't.

Q.   Other than the weapon for his girlfriend, did he ever indicate that he wanted to purchase a weapon for any other purpose?

A.   No, he didn't.

Q.   The last questions I have for you center around your knowledge and observations of the relationship between Mr. Cutkomp and Mr. Honken.  Were you familiar with both of those gentlemen?

A.   Yes, I am.

Q.   Did you have occasions to see them at work?

A.   Yes.

Q.   What about outside of work?

A.   No, I never seen them outside of work except one time.

Q.   If you had to describe to someone what you observed

about the nature of their relationship, how would you describe that relationship?

A. They were close friends. They did things together. They were pals.

Q. Did it appear to be a mutual friendship?

A. Yes, it was.

Q. Did it appear that one dominated the friendship more than the other from what you observed?

A. No. I think when they teased each other it was teasing back and forth. It was not one person teasing the other one.

Q. And in the time that you had to meet with and see and visit and discuss with Mr. Honken, did you ever in any way hear him threaten anyone in any fashion, shape, or form?

A. No, I've never really heard Dustin threaten anybody.

Q. Have you ever seen him make any -- heard him make any admissions with regard to any --

A. No.

Q. -- conduct where he's harmed anyone?

A. No.

MR. PARRISH: I have nothing further. Thank you so much.

THE COURT: Thank you, Mr. Parrish.

Anything further, Mr. Colloton?

MR. COLLOTON: Yes, Judge, if I may.

REDIRECT EXAMINATION

CR01-3047-LRR Def Ex55_Page_8379

BY MR. COLLOTON:

Q. Prior to the time the federal drug case was brought against Mr. Honken, did you know that he was in a manufacturing conspiracy with Mr. Cutkomp?

A. No.

Q. Did you ever talk to either one of them about conspiracy to make methamphetamine?

A. The only thing I knew was Dustin was interested in writing a book.

Q. He told you he was writing a book.

A. About methamphetamine.

Q. He never told you he was in a conspiracy with Mr. Cutkomp to make it.

A. No.

Q. So you never had any occasion to observe their relationship in the context of a methamphetamine conspiracy.

A. No.

Q. Do you remember when Mr. Parrish asked you about the phone call from the girlfriend about the gun?

A. Yes.

Q. Now, I thought Mr. Parrish asked -- correct me if I'm wrong, but did you tell Mr. Parrish that the girlfriend said that she didn't want the gun anymore?

A. She said, Dustin doesn't want the pup anymore.

Q. Okay. Now, let me ask you a few questions about your

CR01-3047-LRR DoEx55_Page_180

prior statements to the DEA that Mr. Parrish asked you about. Do you remember those questions?

A.    (Witness nodded head.)

Q.    You have to answer yes or no.

A.    Yes.

Q.    The DEA came out to your residence in December of last year; correct?

A.    Correct.

Q.    They had a search warrant; right?

A.    Correct.

Q.    And they told you they were searching for a gun; right?

A.    Correct.

Q.    And at that time you had the .380 pistol wrapped up in duct tape and hidden in a culvert; correct?

A.    Correct.

Q.    And they asked you a lot of questions about whether you had a gun for Mr. Honken; correct?

A.    Correct.

Q.    And you decided that you would tell them no because you felt that the gun was for a girlfriend.

A.    Yes.

Q.    Why didn't you just tell the DEA that, well, I have this gun that Mr. Honken asked me to buy and he said it was for his girlfriend?

A.    Because it really took me by surprise.  I was confused.

And I just didn't bring it up at that time. They never asked me if I had bought a gun -- if I bought a gun for Dustin. They were interested at that time about -- not about a pistol like this. They were -- asked the question on some automatic that shoots 1,400 rounds per minute.

Q. But they asked you in general whether you had any gun, didn't they?

A. No. They asked me if I had a high -- a high-powered gun.

Q. You don't recall them asking you did you have a gun for Mr. Honken in general?

A. No, not really, no. Sorry.

Q. All right. But anyway --

MR. COLLOTON: That's all I have, Judge.

THE COURT: Mr. Parrish, anything further?

MR. PARRISH: No, Your Honor.

THE COURT: You're excused. Thank you.

THE WITNESS: Thank you.

THE COURT: We'll take a recess until five minutes to three. Thank you.

(Recess at 2:34 p.m.)

THE COURT: Please be seated. Next witness, please.

MR. REINERT: United States calls Belen Butterfield Kappelmann.

BELEN BUTTERFIELD KAPPELMANN, PLAINTIFF'S WITNESS, SWORN

CV03074, CR01-3047-LRR Pet.Ex55_Page_182

THE COURT: Please be seated here. Would you state your full name, please, and spell your full name for the court reporter.

THE WITNESS: Belen Kappelmann, B-e-l-e-n K-a-p-p-e-l-m-a-n-n.

THE COURT: Mr. Reinert?

DIRECT EXAMINATION

BY MR. REINERT:

Q. Miss Kappelmann, do you know the defendant, Dustin Honken?

A. Yes.

Q. And where did you meet Mr. Honken?

A. At work.

Q. And at Kraft Foods?

A. Kraft Foods, yes.

Q. Would you -- were you a close friend of Mr. Honken's or a casual acquaintance?

A. Just casual.

Q. Did you ever have any discussions with Mr. Honken about methamphetamine?

A. No.

Q. Did you ever have any discussions with him regarding obtaining books or using your name?

A. He did purchase a book, and he had it sent to my house. I did not know what it was in regards to, didn't know the

CR01-3047-MWB DocEx55_Page_183

title, where it was coming from. And so it arrived at my place, and I just took it over there.

Q. Did he explain to you why he wanted to have a book ordered in your name sent to your house?

A. No.

Q. And you never asked him any questions as to why he would be doing that?

A. No.

Q. And your -- Kappelmann is your married name; is that correct?

A. Correct.

Q. And your name prior to being married is Belen Butterfield?

A. Correct.

MR. REINERT: Thank you, ma'am. No further questions.

CROSS-EXAMINATION

BY MR. PARRISH:

Q. Miss Kappelmann, let me ask you, did you know Mr. Cutkomp?

A. Yes.

Q. And did you work with him?

A. Yes.

Q. And on an average of let's say during the course of a week, how many hours did you work with Mr. Cutkomp?

MR. REINERT: Objection, Your Honor. Goes beyond the scope.

THE COURT: It does, but I'm going to allow it. Thank you.

A. Hours? I'd say probably half of a work week.

Q. Okay. And you knew Mr. Honken and Mr. Cutkomp had a friendship; is that correct?

A. Yes.

Q. You made observations of that friendship; isn't that correct?

A. Yes.

Q. To the extent that you would on occasion see them off talking on their own?

A. Yes.

Q. And with Mr. Cutkomp did you see him talking with numerous other individuals more than you would see him talk to Mr. Honken, or would Mr. Honken be the main person who he would spend his time with when he would be in conversation?

A. I don't think I could fully assess that question. Tim talked to a lot of people, and I never kept track of exactly who and how much time with each person.

Q. But you did make note of the fact that he spent some time talking with Mr. Honken?

A. Yeah.

Q. And did you make any assessment of the observations you

made about the two men as to what their relationship was?

A. Well, I just knew that they grew up together and they've known each other from way back when, and it didn't seem unusual that they would talk by themselves.

Q. And when you say talk by themselves, it is a fact, is it not, that when they would have these conversations it would be just the two of them off to themselves?

A. They wouldn't go out hiding. It would be in the work place, you know.

Q. But it would be just the two of them.

A. Yeah.

Q. And you did not in any way and would you not have had any reason to to see whether or not any of those conversations correlated at all as to when Mr. Cutkomp would be wired later on in the afternoon for an additional conversation with Mr. Honken?

A. (Witness shook head.)

Q. You're not aware of any of those dates correlating, are you?

A. No.

Q. Did Mr. Honken just ask you basically about one book that he wanted you to order in your name for him?

A. Correct.

Q. And how did that come about?

A. I believe I was working in materials that day, and I was

CR01-3047 Ex 55_Page_3186

supplying the lines, and, you know, he worked on either a sleeve or case packer that day. And I was bringing glue, and, you know, I would on occasion just stop and say hi to whoever was operating the machines that day and just have general conversation. And he just asked if I would do him a favor, and it didn't seem like any big deal, so I did.

Q. Did anyone ask in an interview what kind of book it was, in any of your interviewing?

A. I believe so.

Q. And what did you tell them it was?

A. I didn't know what it was.

Q. Okay. Did anyone ever tell you there was anything illegal about the book?

A. I don't think so at the time.

Q. And he told you in advance that it would contain books; is that correct? Mr. Honken had told you it would be books?

A. Yes.

Q. And you haven't found out any different other than that, that they were, in fact, books; is that correct?

A. Right.

MR. PARRISH: I don't think I have any further questions.

THE COURT: Mr. Reinert, anything further?

MR. REINERT: Just one, Your Honor.

REDIRECT EXAMINATION

CV03074 CR07 3047 LRR DoEx65_Page_187

BY MR. REINERT:

Q. When was the time that he had ordered the books in relation to when his house was searched?

A. I believe the book incident was in like February of '95 -- 6, this last year.

Q. And that was before the search?

A. I believe so.

MR. REINERT: Nothing further.

THE COURT: Thank you.

Anything further, Mr. Parrish?

RECROSS-EXAMINATION

BY MR. PARRISH:

Q. And to your knowledge he took the books to his house, I assume. He took the books.

A. Right. I took it over there, gave it to him.

Q. Took it over to his house?

A. Yeah.

MR. PARRISH: Thank you. I have nothing further.

THE COURT: Mr. Reinert, anything further?

MR. REINERT: No, Your Honor.

THE COURT: Okay. Thank you.

THE WITNESS: Thanks.

THE COURT: You missed your gold star opportunity, but I'm sure there will be many others.

MR. REINERT: Well, Your Honor, I tried, but I had

CV03074, CR07-3047-LRR DOEx55_Page_188

to clarify that one point.

THE COURT: That's right. Duty called.

MR. REINERT: Had to give up the star for --

THE COURT: Duty over recognition; right?

MR. REINERT: Exactly, Your Honor. United States calls Jay Lien. And I'm still below average on that.

THE COURT: Very much so. Well, you're very above average. Let's phrase it that way.

Please come forward, and I'll swear you in.

JAY LIEN, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated here. When you're comfortable, would you state your full name and spell your last name, please.

THE WITNESS: First name Jay, J-a-y, Lien, L-i-e-n.

DIRECT EXAMINATION

BY MR. REINERT:

Q. Mr. Lien, do you know the defendant, Dustin Honken?

A. Yes.

Q. How do you know him?

A. Through Kraft Foods.

Q. Were you a close friend of Mr. Honken's or just an acquaintance from work?

A. A little bit in the middle.

Q. Was there a time when you've had discussions with Mr. Honken about using your name or credit card to order items?

A. Yes.
Q. Could you describe that conversation for the Court?
A. It was just at work, and he asked if he could use my credit card to order some books.
Q. And do you recall when that conversation was?
A. Not for sure on the dates.
Q. Do you recall the time period when Mr. Honken was charged or when his house was searched and it was in the paper?
A. Not right off the top of my head.
Q. Did the event with the ordering of the books happen before that or after that?
A. Before that.

MR. PARRISH: Your Honor, may I make an objection? I guess my objection's going to go to relevancy on the issue of the sentencing issues here. I don't know -- that's just my objection. It doesn't relate to any sentencing issues that are being contested. That's my objection.

THE COURT: That hasn't stopped them. Objection's overruled. I'm struggling with the relevancy of some of this, but I guess they'll point it out to me at some point.

BY MR. REINERT:
Q. Mr. Lien, was there an occasion after the book ordering -- did you actually get something ordered and sent to your house?

CR01-3047-LRR D-Ex55_Page_190

A.   Yes, I did.

Q.   And what did you do with that?

A.   I brought it to Dustin at work.

Q.   And did you open that?

A.   No, I didn't.

Q.   Was there an occasion after that when Mr. Honken asked to store something else at your residence?

A.   Yes, there was.

Q.   What did he ask to store there?

A.   He just said he just had some boxes that he wanted to store.

Q.   Did you ultimately determine what he had stored there?

A.   No, I didn't.

Q.   Did you go in your garage and observe what's been admitted as Exhibit 10, that big blue cylinder?

A.   Not at the time, no.

Q.   Did you at some time later after Mr. Honken told you he was going to put something in the garage?

A.   Yes.

Q.   When in relation to the search of Mr. Honken's residence did you have the hydrogen tank in your house?

A.   That was after the search of his house I had that.

Q.   Did he put it in your residence after the house was searched?

A.   Before his house was searched?  No, that -- that one I

don't know for sure on the time as to when his house was searched.

Q. Did you have any discussion with Mr. Honken about what you should do with the blue hydrogen tank that was stored in your garage?

A. Yes, he told me to remove it and take it elsewhere.

Q. What did he tell you to do with the hydrogen tank?

A. Take it to a friend's house or to get rid of it away from my house.

Q. And what did you do with it?

A. Took it over to a friend of mine, Jerry Flaherty's.

Q. Did -- other than the hydrogen tank, did Mr. Honken have anything else stored at your residence?

A. No.

MR. REINERT: Nothing further.

THE COURT: Mr. Parrish?

MR. PARRISH: I just have a couple of questions.

CROSS-EXAMINATION

BY MR. PARRISH:

Q. Mr. Lien, Mr. Honken has never indicated to you or in your presence ever threatened anyone or harmed anyone physically; is that correct?

A. No.

Q. He's never admitted to you that he harmed anyone in any fashion.

CR01-3047-LRR Def Ex 55_Page_192

A. No.

MR. PARRISH: I have nothing further.

BY MR. PARRISH:

Q. Have you ever seen him with weapons or anything like that?

A. No, I haven't.

MR. PARRISH: I have nothing further.

THE COURT: Mr. Reinert, anything further?

MR. REINERT: No, Your Honor.

THE COURT: Thank you. You're excused.

MR. REINERT: United States calls Tim Cutkomp. Your Honor, while the marshals are bringing Mr. Cutkomp, I have taken -- had the agent take a Polaroid photograph of Exhibit 10, the blue hydrogen tank, and we'd ask that that be inserted into the record as Exhibit 10 in lieu of the original tank since the tank contains hydrogen, compressed hydrogen, which is explosive.

THE COURT: Mr. Parrish, any objection?

MR. PARRISH: No, Your Honor.

THE COURT: Government's Exhibit 10 is received, and I guess the actual item is withdrawn as evidence?

MR. REINERT: Yes, Your Honor. And we'll have the DEA take care of that, get it out of the building.

THE COURT: Thank you. Hi. Would you raise your right hand, please?

CR07-3047-LRR Ex55_Page_193

TIMOTHY CUTKOMP, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated here. Would you state your full name, please, and spell your last name.

THE WITNESS: Timothy Ken Cutkomp, C-u-t-k-o-m-p.

MR. COLLOTON: I'll go ahead if I may, Judge.

THE COURT: Thank you, Mr. Colloton.

DIRECT EXAMINATION

BY MR. COLLOTON:

Q. Mr. Cutkomp, are you currently in federal custody?

A. Yes, I am.

Q. Why are you in federal custody?

A. I was sentenced to federal custody for attempt to manufacture methamphetamine.

Q. And did you also plead guilty to being in a conspiracy?

A. Yes.

Q. And what was your sentence?

A. Four and a half years.

Q. Was that a downward departure from what would normally have been your sentence under the federal guidelines?

A. Yes, it was.

Q. And that was after the government made a motion based on substantial assistance?

A. Yes.

Q. And then the judge decided what your sentence should be?

A. That's right.

CV-03074, CR07-3047-LRR PoEx55_Page_194

Q. And what was the amount of the departure?

A. Sixty some percent, several years.

Q. Do you know the defendant in this case, Dustin Honken?

A. Yes, I do.

Q. Do you see him here today?

A. Yes.

Q. How long have you known Mr. Honken?

A. Since first grade.

Q. Were you in school with him?

A. Yes.

Q. How far through school did you go with Mr. Honken?

A. From first grade till we graduated high school.

Q. In what town was that?

A. Britt, Iowa.

Q. Were you charged as a codefendant with Mr. Honken in your criminal case?

A. Yes, I was.

Q. What kind of relationship did you have with Mr. Honken as you went through school?

A. We were best friends.

Q. What did you do after you went to high school in Britt?

A. Directly afterwards?

Q. Did you have any further schooling?

A. Yes, I went to two more years of school.

Q. Where?

A. At NIACC in Mason City.
Q. What years did you attend NIACC?
A. '90 to '92.
Q. Where was Mr. Honken at that time?
A. He was going to school also.
Q. Pardon me?
A. He was in school also at NIACC.
Q. When did you first talk about methamphetamine with Mr. Honken?
A. While we were going to NIACC. He mentioned the possibility of manufacturing drugs while we were attending NIACC.
Q. So that would have been in '90 or '91? Do you recall when?
A. Would have been in '91.
Q. What did he say to you at that time about manufacturing methamphetamine?
A. Began with he just wondered if I'd be interested in helping, if he were to do it if I'd be interested in helping him.
Q. How did you respond at that time?
A. I said I didn't want anything to do with it at that time.
Q. What further conversation did you have with him about that topic while you were at NIACC?

CV-03074, CR01-3047-LRR P-Ex55_Page_3196

A. Just -- there wasn't really much after that. Every once in a while we'd talked about the possibility of it but --

Q. Was there a later date when the topic came up again?

A. After he had moved to Arizona.

Q. Where had he moved?

A. To Tucson.

Q. Where were you at the time?

A. I was still at NIACC, Mason City.

Q. So -- and where was he living in Tucson? Do you know?

A. With his brother Jeff.

Q. What conversation did you have with him about methamphetamine then?

A. He informed me that he and Jeff were attempting to manufacture it and wanted to know if I would like to come down and help him out.

Q. What did you do?

A. At first I said no, but then in May I said I would go down and help him out.

Q. When was this first discussion about your going to Arizona?

A. Early '92.

Q. So then you moved to Arizona in May you're saying?

A. Yes.

Q. What kind of discussion, if any, did you have about the financial aspect of that project?

A. I would -- he said if I would come down and assist him on at least one batch I could get between ten and twenty thousand dollars and if I wanted to continue helping I could get even more than that.

Q. So where did you go when you moved to Arizona?

A. I moved in with Jeff and Dustin at Jeff's house.

Q. What discussions did you have with Dustin Honken at that time about manufacturing methamphetamine?

A. That we could no longer do it at Jeff's house because Jeff's wife Patty didn't want them working on it anymore because it was making the house stink.

Q. What, if anything, did Mr. Honken tell you about the wife's role in the drug business?

A. She thought that they were making or taking chemicals from gold plating and extracting the gold out of it or trying to.

Q. So what happened after he told you about the problem with Jeff's wife?

A. We moved the chemicals and glassware that were still at Jeff's apartment to a storage shed in Tucson.

Q. How long did that stuff remain in the storage shed?

A. Couple weeks.

Q. What happened after that?

A. I got an apartment at Tamarac apartment complex, and we moved the chemicals and glassware to the bedroom at the

CV03074, CR01-3047-MWB DOEx55_Page_198

apartment.

Q. When you say we, who do you mean?

A. Dustin and I.

Q. Was the Tamarac apartment complex in Tucson?

A. Yes, it was.

Q. Who lived in the apartment?

A. I did and Dustin did.

Q. Who paid the rent?

A. Jeff Honken.

Q. Why did he pay the rent?

A. We -- he was the one that was providing us with money to manufacture the methamphetamine.

Q. And what conversation did you have when you first -- in the early time you were in Tucson about a financial arrangement with the Honken brothers?

A. That if I continued to help manufacture that I would receive a third of what was ever made.

Q. What was the understanding as to what the others would receive?

A. Each would get a third.

Q. What happened after you moved all this equipment to the apartment that was rented in the Tamarac apartments?

A. We began to manufacture the methamphetamine.

Q. Who actually was involved physically in manufacturing the methamphetamine?

A.    Dustin and I.

Q.    Did you at that point know how to make methamphetamine?

A.    No, I did not.

Q.    How did you then go about to make the methamphetamine?

A.    We started out with toluene.

Q.    Actually what I meant is how did you do it if you didn't know how?

A.    Dustin explained to me how to do it and showed me the process.

Q.    And you were starting to explain the process. Is that what you were doing?

A.    Yeah.

Q.    All right. What was the process that Mr. Honken showed you?

A.    We converted meth -- toluene to benzyl cyanide by bubbling chlorine through it, and after that we took that -- the benzyl chloride and made it into benzyl cyanide. And after that step we used a sodium metal reaction to make P-2-P. And then we used the hydrogen bomb to make the methamphetamine.

Q.    What do you mean by a hydrogen bomb?

A.    We made a shaker that would put hydrogen into a solution that we'd made with P-2-P and some other chemicals that reacted to make the methamphetamine.

Q.    What kind of success did you have with that process when

you tried to make it there in the Tamarac apartments?

A. We -- it took a few months, but we made about four ounces on the first load.

Q. Why did it take a few months?

A. Well, we had never done it before, and we were -- the chlorine from the benzyl chloride made a pretty good smell, so we were running the chlorine really slow.

Q. Why were you running it slow?

A. So that the neighbors wouldn't smell the chlorine.

Q. And so that took longer than it would if you'd have done it --

A. Yes.

Q. -- more efficiently? What kind of equipment was involved in that process?

A. Flasks and condensers, things like that.

Q. Where did you obtain the equipment?

A. From Adchemco.

Q. What's Adchemco?

A. A chemical company in Tucson.

Q. Who actually purchased the equipment?

A. Dustin did, had the equipment when I got down there. And when -- if we needed more things after that, I went and purchased it.

Q. Why did you go and purchase it?

A. That was the role that I was playing.

Q. Who paid for any additional equipment that you needed?

A. Jeff did.

Q. What happened to the four ounces of methamphetamine that you made in that first batch?

A. Dustin took it up to Mason City, gave it to Greg Nicholson.

Q. How do you know that?

A. Dustin told me.

Q. Did you know who Greg Nicholson was?

A. Yes, I had met him before.

Q. How did you know Mr. Nicholson?

A. At least on one occasion I had been to his house when Dustin was selling him some marijuana when we were in college.

Q. Do you remember when Mr. Honken went to Mason City with the methamphetamine?

A. Late July and early August.

Q. Why do you remember it being then?

A. Hobo Days -- it's a festival that's held in Britt -- was going on at that time.

Q. How is it that you remember that it was about four ounces?

A. That's just because it was the first time we'd made it, and it sticks -- stuck in my mind.

Q. What happened next then in the drug manufacturing

business after Mr. Honken went to Iowa in August?

A.   When he returned we continued to manufacture at the apartment for a little while and --

Q.   Before you get into that, did Mr. Honken get any money as far as you know for the four ounces of methamphetamine?

A.   Yes, he did.

Q.   How do you know that?

A.   I saw it.

Q.   What happened to that money?

A.   Jeff got it.

Q.   Why did he get all of it?

A.   Because he's the one that had provided us with the money to start, so he was being paid back first.

Q.   So you said then you started to try to make more methamphetamine in your apartment?

A.   Yes.

Q.   What happened there?

A.   We -- well, we decided to try to find a place where the smell wouldn't be noticed as much.

Q.   So what did you do in that regard?

A.   I went and found a house in Arivaca, down by Green Valley south of Tucson.

Q.   What did you do at the house?

A.   Set up the lab.

Q.   Did you buy it, rent it?

A. Rented it.

Q. Who rented the house?

A. I did.

Q. Who paid for the home rental?

A. Jeff did.

Q. Where did you set up the methamphetamine business there?

A. There was a shed underneath the carport right outside the house.

Q. Did you then begin the production process in the shed?

A. Yes.

Q. Did you use the same production process you described before?

A. Yes, we did.

Q. How did that -- what did you do then?

A. We finished another batch.

Q. Who actually physically produced that?

A. I did most of that.

Q. Why did you do most of it?

A. Dustin was -- would stay in Tucson a lot of the time. That was my role in the 30 percent. I was to manufacture the methamphetamine.

Q. How did you get that role?

A. Because Jeff provided the money for it and Dustin was selling it, and he did the research on how to make it.

Q. So do you remember how much you produced in that next

batch?

A.   Eight to ten ounces.

Q.   Do you remember that it was more than the first time?

A.   Yes.

Q.   What happened to that quantity of methamphetamine?

A.   Dustin took it back to Mason City and gave it to Greg and Terry.

Q.   When you say Terry, who do you mean?

A.   Terry DeGeus.

Q.   When you say Greg, who do you mean?

A.   Greg Nicholson.

Q.   How do you know that he took it to those two?

A.   Well, he told me.  And when I came back in October, I collected money from both of them.

Q.   So the drugs went out before October of '92?

A.   Yes.

Q.   To Iowa?

A.   Yes.

Q.   What did Mr. Honken tell you about his arrangements with Mr. Nicholson and Mr. DeGeus?

A.   He would take the drugs to Terry or to Greg Nicholson.  And when Terry would call and needed -- had somebody who would buy it or wanted some to sell, he would go back and get some from Greg and take to Terry.

Q.   You mean Dustin Honken would go back and get some from

Greg --

A. Yes.

Q. -- if Terry contacted Mr. Honken?

A. Yes.

Q. What did he say about why he wanted Mr. DeGeus to go back through him?

A. He didn't want Greg and Terry to meet and corroborate in the sale of the drugs.

Q. And you're saying you came back to Iowa in October of '92?

A. Yes.

Q. Why did you come back?

A. I was thinking of moving back.

Q. And you collected some money from both Mr. Nicholson and Mr. DeGeus?

A. Yes.

Q. How did you know to do that?

A. Dustin had asked me to.

Q. How much did you collect?

A. A couple thousand.

Q. What did you do with the money?

A. I sent it back to Jeff and Dustin in Arizona.

Q. So had Dustin Honken returned to Arizona by that time?

A. Yes, he had.

Q. How much money, if any, did you get out of that 2,000 or

CV-03074, CR01-3047-MWB P-Ex55_Page_206

so?

A. I don't recall getting any of it, but I had -- I mean, they'd provided me with some entertainment money and stuff and a place to live while I was in Tucson so --

Q. Would that $2,000 have covered the whole 8 to 10 ounces?

A. No.

Q. Do you know how much Dustin Honken was selling it for to DeGeus and Nicholson?

A. When we started out it was about 1,800 an ounce.

Q. So how did the rest of the money come back to Arizona for that eight to ten ounces?

A. Dustin would have gone and gotten it.

Q. Did you end up staying in Iowa when you came back?

A. No, I didn't.

Q. When did you leave?

A. In early November.

Q. Did you return to Tucson?

A. Yes, I did.

Q. Did you go back to the house --

A. Yes.

Q. -- where you lived before? Where was Mr. Honken at that point?

A. He was in Tucson.

Q. Why was he living or staying regularly?

A. Well, in November, sometime in November, Missy moved

CR01-3047-MWB Def_Ex55_Page_207

down there, down to Tucson.

Q. When you say Missy, who do you mean?

A. Missy Friesenborg, and he moved in with her.

Q. So at that point you were the only one living in the house?

A. Yes.

Q. What happened with the methamphetamine production in November?

A. I continued to manufacture.

Q. What did you manufacture?

A. Another eight to -- eight ounces to a pound of methamphetamine.

Q. And what was Mr. Honken's role in the physical production of that batch?

A. He would come check on me at the house, and if I had any trouble or -- with the process that I was doing, then he'd show me how to get through it.

Q. What happened to that batch of methamphetamine? Was that finished in November?

A. Early December.

Q. Early December? And what happened to that?

A. Dustin took it back to Iowa.

Q. Did he tell you that?

A. Yes, and I knew he left. I knew he had gone.

Q. Do you know what happened to the methamphetamine in

Iowa?

A. He gave it to Terry and -- Terry DeGeus and Greg Nicholson.

Q. Did you talk to him about that?

A. Yes.

Q. How did money get paid for that batch?

A. He would have collected some of it, and I was back for Christmas, and at least on one occasion I had collected from both of them.

Q. Did you have any contact with Mr. Honken when you were back in Iowa over Christmas?

A. Yes, I did.

Q. What was the nature of that as it related to the drug business?

A. It didn't really. At that time it didn't really.

Q. How long did you stay in Iowa?

A. About a month.

Q. What happened after that?

A. I moved back to Tucson, continued manufacture.

Q. For how long did you continue to manufacture?

A. Till the end of February.

Q. How much did you manufacture between January and the end of February?

A. About three and a half pounds.

Q. How many different times --

A. About three batches.
Q. Do you remember specifically how the batches broke down in terms of quantity?
A. The first two during the year were about a pound each, and our last batch was a pound and a half.
Q. Why do you remember that?
A. It was the best yields that we had gotten up to that point.
Q. So how long was it taking you at that point to make a batch of methamphetamine?
A. Three, four weeks.
Q. What happened to those three batches of methamphetamine?
A. Dustin took the first two back to Iowa, and the last batch I took back when I moved back in early March.
Q. How often was Mr. Honken traveling to Iowa?
A. About every two weeks.
Q. What were the purposes of his trips?
A. Either to collect money or to deliver methamphetamine.
Q. Did he talk to you about who was getting the methamphetamine at that time?
A. Yes. It was Terry and Greg.
Q. Did you ever see any money that was collected by Mr. Honken on these trips?
A. I would see it when he come back.
Q. What was the largest amount of money you ever saw Mr.

CR01-3047-MWB DefEx55_Page_210

Honken with?

A.   He brought $20,000 back one time.

Q.   How much of a cut, shall we say, were you getting from the proceeds at that time?

A.   I only received about two to three thousand dollars out of that twenty thousand dollar -- twenty thousand dollars he brought back.  Other than that, it was some money for entertainment and living.

Q.   What kind of records, if any, did you keep or Mr. Honken keep about the drug sales?

A.   He had a piece of paper that told how much Terry and Greg owed.

Q.   How do you know that?

A.   I saw it on several occasions.

Q.   How did Mr. Honken keep the records on this paper?

A.   They were in a column, one on the left-hand side, one on the right, with T-man and G-man on it on the top telling how much they owed.

Q.   And what was your understanding of the meaning of T-man and G-man?

A.   T-man was for Terry DeGeus, and G-man was for Greg Nicholson.

Q.   Do you ever remember any specific data from the records that you saw about who owed what?

A.   T-man owed $30,000.

Q. At what point do you remember that?
A. Later on, the end of February.
Q. Did you ever discuss with Mr. Honken why Mr. DeGeus ran up such a big debt?
A. Yes.
Q. What did he tell you about that?
A. That he was using most of the methamphetamine for his own use or for his friends instead of selling it.
Q. Do you know somebody named Angela Johnson?
A. Yes, I do.
Q. Who is Angela Johnson?
A. She's Dustin's girlfriend.
Q. How did you come to know her?
A. Dustin introduced me to her.
Q. About when?
A. It would have been in December or early part of '93.
Q. December of '92, early '93?
A. Yes.
Q. And what, if anything, did he tell you about her at that time?
A. That she had -- she was Terry DeGeus's girlfriend at that time, and she had contacted him to tell him that Terry wasn't selling the drugs, that any money that he was getting was coming from her, from the drugs she was selling, and that he should just cut Terry out and deal with her directly.

CR01-3047 DeEx55_Page_212

Q. What did you do at the end of February '93?

A. I moved back to Iowa.

Q. Why did you move back to Iowa?

A. To get away from the drugs and to move back -- see if I could work things out with my ex-wife, be near my kids.

Q. What did you do with your house in Arizona?

A. Cleaned it up and gave the keys back to the real estate agent.

Q. What did you do with your property?

A. I took a suitcase full of my clothes and property back with me to Iowa, left a suitcase and a box of personal things at Missy's house or apartment.

Q. What else did you bring back to Iowa with you?

A. I brought back our last batch of methamphetamine.

Q. This would have been the pound and a half that you described?

A. Yes.

Q. What did you do with that?

A. I delivered it to Greg Nicholson.

Q. Where did you deliver it to him?

A. At his house.

Q. What did you observe, if anything, that he did with it?

A. He put it under a bar in his basement.

Q. How did you get back to Iowa from Arizona?

A. I rode a Greyhound bus.

Q. Who paid for that?

A. Jeff would have.

Q. How did you carry the methamphetamine back to Iowa?

A. In a, like, backpack book bag.

Q. And how was the methamphetamine itself packaged?

A. It was in a couple of glass jars with -- that were wrapped with, like, towels so that they wouldn't break.

Q. Was that the typical packaging you and Mr. Honken used when the meth was sent to Iowa?

A. We would use jars usually, yes.

Q. Can you describe the jars that you would use?

A. We used different kinds of jars.

Q. What were the different kinds?

A. They're -- I believe on that occasion they were clear bottles about this tall (indicating) with white lids on.

Q. What other kinds did you ever use?

A. Brown bottles with -- tapered at the top with black lids on them.

Q. Let me show you what's been received as Government Exhibit 18 and ask you to go to the last page of the photographs. Do you see pictured there some people holding jars?

A. Yes.

Q. How do those jars pictured in Exhibit 18 compare to what you've just described that you used?

A. Those look like some that we had used.
Q. What did you do then when you moved back to Iowa? Where did you go?
A. I moved in with my parents.
Q. Where did they live?
A. Britt, Iowa.
Q. And what, if anything, happened on March 21 of 1993?
A. It was, I think, the day before that we -- or that day we got arrested.
Q. When you say we, who do you mean?
A. Dustin and I.
Q. Was there something that happened the day before that?
A. Dustin picked me up from my sister's house, and we went to Mason City.
Q. What led to this arrest on March 21?
A. Greg Nicholson had been arrested and cooperated with the --
Q. What actually happened on March 21 before the arrest?
A. Well, we had slept in late that day because we'd been out the night before partying, and we -- Dustin came into the hotel room and said that he had talked to Greg and it was time to go pick up some money from him.
Q. So what did you do then?
A. I went out in the car with him and drove to Greg's house.

CV 03-3074, CR 07-3043-MWB DoEx66_Page_215

Q. What happened at Greg's house?

A. Dustin went in to collect some money from him, and I waited in the car. And he came back out about a half an hour, and we started driving away, and we were arrested.

Q. Where were you taken when you were arrested?

A. Cerro Gordo County Jail.

Q. What, if anything, did you do relating to the drug business while you were at the Cerro Gordo County Jail?

A. I called Missy and told her to get rid of a box.

Q. This is Missy Friesenborg?

A. Missy Friesenborg, yes.

Q. Where did you call her?

A. From the jail.

Q. Where was she?

A. At her apartment.

Q. In Tucson?

A. In Tucson, yes.

Q. Why did you call her?

A. Dustin had told me that there was a box that had some drug paraphernalia in it and possibly some drugs in it, that one of us should call to get -- to have Missy get rid of it.

Q. Did you ever keep any vials of methamphetamine in the refrigerator or freezer at her house?

A. At one time or another we had little bottles of liquid methamphetamine, two bottles, I believe. Dustin and I each

CV-03074, CR07-3047-LRR DoEx55_Page_216

had one.

Q. And you said you also stored some of your stuff at Missy's house when you went back to Iowa; right?

A. Yes.

Q. Did you ever see a gun --

A. No, I never --

Q. -- at her house?

A. No, I didn't.

Q. Did you ever stay at her house?

A. Yes.

Q. Did you stay in the den?

A. Yes.

Q. Did you ever see a gun in there when you were staying there?

A. I don't remember if -- we had a gun that was Jeff's, but I don't know if it was at Missy's house.

Q. What kind of gun was that?

A. It was a .22 handheld gun, and I think it was a .45 caliber.

Q. Are you talking about two separate guns or one gun?

A. There was two guns, but I don't remember them being at Missy's house.

Q. When you say we had them, who do you mean?

A. They were Jeff's guns, and we had them at the house while we were manufacturing the drugs.

Q. When you say we had had them at the house, who?
A. Dustin and I.
Q. Why did you have them at the house?
A. It was out in the middle of nowhere in Arizona. Just for protection.
Q. Do you remember whether you ever told any of the agents about that before?
A. No, I don't remember.
Q. Did anybody ever ask you about that before?
A. I don't believe so.
Q. How long did you stay in the Cerro Gordo jail?
A. Probably a day.
Q. And what happened after that? You got released?
A. Yes, I did.
Q. Were you charged with anything?
A. I was charged while I was there, and the charges were dropped a few weeks later.
Q. Were you charged in state court or federal court?
A. I was charged in state court.
Q. Did you keep track of what happened with Mr. Honken and his charges?
A. Yes, I did.
Q. What did you learn about that?
A. That he was -- had been charged federally in Cedar Rapids.

CV-03-3074, CR07-3047-LRR Def Ex55_Page_218

Q. Did you have any contact with Angela Johnson around that time?

A. She had called me after I was released from jail just to make sure that I wasn't going to say anything.

Q. Say anything about what?

A. The drug manufacturing.

Q. Where did you live after you got released?

A. I stayed with my parents for a little while, and then I moved down to Maxwell, Iowa.

Q. Did you have any contact with Mr. Honken in the period after the arrest and the charges?

A. Yes, I did.

Q. Did you discuss the federal case at all with Mr. Honken?

A. Yes, I did.

Q. What discussions did you have at first about the case?

A. Who was a witness and what evidence that they had against us.

Q. What do you remember -- well, were you charged in that?

A. Well, at that time I wasn't. I was under the assumption that I would be charged later on.

Q. You felt that you were under investigation?

A. Yes.

Q. What did Mr. Honken say to you about the evidence as he understood it?

A. That there wasn't really that much evidence against him.

Greg Nicholson would have been the key witness against him.

Q. Did Mr. Honken ever discuss with you at any time any other prospective witnesses?

A. Terry DeGeus and Greg Nicholson's -- I don't know if she was his wife at that time or not, who he was living with at the time that we were arrested.

Q. Do you know who that was by name?

A. No, I can't remember her name.

Q. When did that conversation come up about other prospective witnesses?

A. At one time when we had gotten together and were talking. It was in the summer of '93 after we had been arrested.

Q. What did Mr. Honken say to you at that time about Mr. DeGeus as a prospective witness?

A. At that time he wasn't real concerned about him.

Q. No. I mean at the later time when he brought him up.

A. That he had been subpoenaed to a grand jury and he thought that Terry was being investigated and that if there were charges brought against him that he would probably roll over and turn Dustin in.

Q. What happened to the drug business after this arrest?

A. At first we just stopped it all together. And a little while after that Dustin contacted me and wanted me to go down to Arizona and pick up some more chemicals so that we could

continue manufacturing.

Q. What did he say about why he wanted to do that?

A. To have enough money so that he could either flee the country or offer Greg money to take his testimony back or so he could leave the country also.

Q. So what did you do when Mr. Honken came to you with this proposition?

A. I told him at first that I didn't want to have anything to do with the drugs anymore.

Q. You say at first. Does that mean you changed then?

A. Later on after he continued talking to me about it, I told him I would drive down to Tucson and pick up some more chemicals.

Q. How did you go about doing that?

A. He gave me a couple thousand dollars, and I purchased a car and started off towards Arizona.

Q. Do you remember about when this was?

A. In the spring or early summer of '93.

Q. So you purchased a car, and what'd you do with the car?

A. I drove down to -- I started on my way down to Tucson, Arizona.

Q. And how far did you go?

A. I got to New Mexico and stopped and decided not to go, so I stayed overnight and turned around and came back.

Q. Why did you do that?

A. I just didn't want to be involved in it anymore.

Q. So what happened when you came back to Iowa?

A. I told Dustin that the money had been stolen that he'd given me.

Q. Why did you tell him that?

A. So that he wouldn't be bothering me about going down to get any more chemicals because I thought there wouldn't be enough money after that to worry about it.

Q. So what then happened after that with regard to this drug business?

A. Later on he told me that Christy, Christy Cole, wanted to go down to Arizona to exchange custody of her daughter with her ex-husband and thought it would be a good time for me to go down and pick up some chemicals.

Q. Who was Christy Cole?

A. It was a friend of Angie's and a girl that I had gone out with a couple times.

Q. So did you do that?

A. Yes, I did.

Q. And where did you go? Did you go to Arizona?

A. Yes, I did.

Q. What happened when you got to Arizona?

A. We went to Flagstaff and exchanged custody with her ex-husband, stayed overnight there, and the next day we drove down to Tucson, and I set up an answering service there for

CV-03074, CR07-3043-LRR Def Ex 55 Page 222

later use. If we were going to buy any glassware or chemicals, we'd be able to use the answering service as a place for Adchemco to call.

Q. What, if anything, did you bring back to Iowa?

A. Some chemicals that we picked up at Adchemco.

Q. What did you do with the chemicals when you got back to Iowa?

A. We put them at Dustin's dad's house.

Q. When you say we, who do you mean?

A. Dustin and I.

Q. About when was this?

A. It was in July sometime, early July.

Q. Did you learn that in late July of '93 Greg Nicholson disappeared?

A. Yes.

Q. How did you learn about that?

A. Dustin contacted me and asked to get together. And when we got together, he told me that Greg had not shown up for his court, his sentencing in court, and that he was missing.

Q. What did he say about who else, if anyone, was missing?

A. His girlfriend and two little girls.

Q. Did you ever have any further conversation with Mr. Honken about that disappearance?

A. Yes.

Q. When do you remember that happening?

A.   It would have been not too long after that.  We talked about it several times over the course of time.  But --

Q.   All right.  What other conversations do you remember having about that disappearance?

A.   Not too long after the disappearance, he asked me a scenario.  He wanted to know if I was in a certain position as a hostage if I would do something, if I would make a tape.

Q.   Why don't you explain what scenario he put to you.

A.   He started out about how to abduct someone from their house, to have someone that the person in the house didn't know come up to the house dressed as a pizza delivery person and knock on the door to get the person to answer and he -- the person with the pizza delivery would help another person that would be hiding abduct the person in the house along with a family member or close friend or something and either hold them in the house or take them somewhere else and put them in separate rooms and tell the person that you wanted to make the videotape to -- that they had to make a tape exonerating someone for a crime or something would happen to the family member or friend in the other room and if they would make that tape that that person would be released.

Q.   And what scenario or what did he actually pose to you after he described that scenario?

A.   He wanted to know if I would -- if I would do that, if I would make the tape.

Q. And what did you tell him?

A. I said that I wouldn't.

Q. What did he tell you more about that scenario?

A. That no matter what had happened that the people in that situation would be killed.

Q. Why did he say that?

A. They would be a witness to having been kidnapped, and they could take back what they had said on the tape.

Q. Now, did you ever have any further conversation with Mr. Honken about Mr. Nicholson and a videotape?

A. He at least on one occasion showed me a videotape that he had in his car.

Q. When did he do that?

A. In the wintertime of -- would have been in --

Q. You mean late '93?

A. Late '93, early '94 sometime.

Q. Okay. And what happened in that situation?

A. Well, he just showed me the tape.

Q. What statements did he make to you about the videotape?

A. He showed me -- This is the tape that Greg made, told me that Greg was on there saying that Dustin wasn't involved in the drug business and that he was sorry for turning him in.

Q. What else did Mr. Honken say to you about the tape?

A. He wanted me to say that I -- that Greg had come to me with the tape.

Q.   What did he say about why he wanted you to do that?

A.   So that it would be admissible in court.

Q.   What did he say about where he got that idea or why he felt --

A.   He needed a way of getting the tape into court so he could use it as evidence to say that he wasn't guilty of the charges.

Q.   And what did he tell you about that tape after that occasion?

A.   He had given it to his lawyer, and his lawyer didn't want to give it back.

Q.   He told you you mean at some later time that he had given it to his lawyer?

A.   Yes.

Q.   Did you ever view the videotape?

A.   No, I didn't.

Q.   Did he ever tell you anything more about the videotape after he told you he had given it to his lawyer and the lawyer didn't want to give it back?

A.   After the charges were dropped he had -- he got it back.

Q.   He told you that he got it back?

A.   Yes.

Q.   And the charges were dropped in 1995; is that your recollection?

A.   I don't remember exactly when.

Q. All right. What, if anything, did Mr. Honken tell you about how he -- what contact he had with Mr. Nicholson, how he'd come into contact with Mr. Nicholson?

A. He had told me that he was looking for Greg and he couldn't find him because he had moved out of his house, and right -- he had finally found him just a little while before he'd gone -- was supposed to go to court because Scott Gahn had told him where he was living, where Greg was living.

Q. Are you aware that Mr. DeGeus disappeared sometime in the fall of 1993?

A. Yes.

Q. Did you ever talk to Mr. Honken about the disappearance of Mr. DeGeus?

A. Yes, we did.

Q. When did you talk about that?

A. He -- on several occasions again he had discussed it with me.

Q. What kind of -- what statements did he make, or what conversations did you have about Mr. DeGeus?

A. At first it was that Terry -- he thought that -- he told me that possibly Terry had had something to do with Greg's disappearance. And he had purchased a gun to protect himself from Terry.

Q. And how did you react to that?

A. I don't remember what my reaction was.

Q. What other conversations did you have about Mr. DeGeus's disappearance?

A. Just later on he was talking about the -- we were driving around in the spring of '94, and we were by a field, and he was talking about Terry having disappeared and asked me how far down farm equipment went when they were plowing or disking and stuff.

Q. And what was your interpretation of that comment?

A. That he was worried about Terry not being buried deep enough.

Q. What did you say to Mr. Honken after he told you the information you gave us before about the hypothetical?

A. I told him that I didn't want to know any more and that if I ever knew for sure that he had something to do with killing the kids that I didn't know if I could keep that to myself, that I might go to the police with that information so not to talk about it anymore.

Q. And it was after that when he told you about the statements you made about Mr. DeGeus having something to do with Mr. Nicholson's disappearance?

A. Yes.

Q. Did he ever make -- did Mr. Honken ever make any other statements to you about -- that you took to mean something about bodies being buried?

A. On several occasions he would -- we were talking about

CV03-3074, CR01-3047-MWB PCEx55_Page_228

continuing the drug manufacture so we could either purchase a backhoe or rent one, and he would say he needed to get rid of loose ends and --

Q. In the context of getting a backhoe you mean?

A. Yes.

Q. Was there an occasion when you talked to Mr. Honken about an incinerator?

A. Yes.

Q. How did that come up?

A. He was wondering how to build an incinerator and how hot you needed to get it to burn up a body, completely burn it up.

Q. How did that come up in conversation?

A. It was just another one of those times where we'd been driving around and we were just talking, and I don't remember how -- it just came up.

Q. Did you have a conversation with Mr. Honken about the effect of frost on the ground?

A. Yes. He wanted to know how far he needed to bury something to make sure the frost doesn't pull it back up.

Q. How did that come up in conversation?

A. It was again in the context where we'd been talking in a -- not a direct way but talking about Terry or Greg, and then later on in the conversation he brought up the frost bringing things up out of the body -- or out of the ground.

Q. And in what time frame again were these conversations about backhoes and frost and farm equipment?

A. It was in the winter -- fall -- between fall and -- of '93 and spring of '94 mostly.

Q. Did you ever have any conversations with Mr. Honken about the likelihood that Mr. DeGeus or Mr. Nicholson would return?

A. Yes.

Q. What conversation -- first of all, when did you have that conversation?

A. Would have been in '94 sometime.

Q. And what conversation did you have about that?

A. I asked him what the likelihood of them showing up again would be.

Q. What did you mean by that?

A. Either coming up out of the ground or walking in a door. It was just a general statement.

Q. And what did Mr. Honken say to you about that?

A. He said he was 99 percent sure that Greg would never show back up again, but he was lesser percent sure of Terry.

Q. And in the context of all your conversations with Mr. Honken on this matter, how did you interpret that?

A. I interpreted it that he had buried the bodies of Terry and his -- or not Terry but Greg and his girlfriend and the two kids deep enough that they wouldn't come back up, and he

CR01-3047-LRR DefEx55_Page_230

was worried that he hadn't buried Terry deep enough.

Q. Did you ever have a conversation with Mr. Honken about a firearm?

A. Yes.

Q. When was that?

A. It was after Terry had disappeared. He called me up and wanted to come over and get rid of something, and it was the gun. And he --

Q. When you say the gun, is it a gun you had known about?

A. I knew he had a gun, yes, that he had got to protect himself from Terry.

Q. You mean he had previously told you that he got the gun for that purpose?

A. Yes.

Q. Okay. And then what happened after this phone call?

A. He came out to my parents' farm, and we destroyed the gun with a torch. We melted it down.

Q. What did Mr. Honken say to you about why he wanted to do that?

A. Because -- well, he didn't need the gun anymore because Terry had disappeared, and he wasn't worried about him anymore, so he thought -- he told me that if they were to find the gun that it would look bad to have a gun.

Q. So you melted it down with a torch?

A. Yes.

CV-03074, CR01-3047-MWB DoEx55_Page_231

Q. What did you do with the -- whatever was left?

A. We took it and threw it in a ditch along a road while we were driving down the road along with a piece of metal.

Q. Along with a piece of metal?

A. Yes.

Q. What piece of metal?

A. It was a piece of metal that we used to put the hot pieces of the gun on.

Q. Why did you throw that piece of metal out?

A. In case there was residue on it from the gun. We didn't want any evidence of the gun there.

Q. What kind of gun was it?

A. I don't know what kind it was.

Q. Was it a handgun?

A. It was a handgun, about that big (indicating), black with a -- like a silencer looking thing on it or muffler or something.

Q. Let me show you what's been received as Government Exhibit 37. Do you recognize that?

A. Yes.

Q. Is that something you drew for some law enforcement agents?

A. Yes, it is.

Q. What were you attempting to draw?

A. The gun that we had melted.

Q. What did Mr. Honken tell you about how he obtained that gun, if anything?
A. He told me that Angie had purchased it in Waverly or Waterloo area.
Q. When you say Angie, you mean Angie Johnson?
A. Angie Johnson, yes.
Q. What happened with the drug business then in 1994 after the disappearances of Mr. Nicholson and Mr. DeGeus?
A. After the restrictions -- travel restrictions were lifted on Dustin, he and Angie went down to Arizona again and picked up some more glassware and chemicals.
Q. How do you know that?
A. He told me that he did, and they went down and picked up a couch and a love seat from Melissa Friesenborg.
Q. What did Mr. Honken tell you about how they paid for these chemicals and glassware?
A. That Angie had cash advanced money on a credit card.
Q. Did he say how much they spent?
A. He didn't say how much he spent on the chemicals and stuff, but he -- I know she had a cash advance of 5,000.
Q. Do you know --
A. I don't know how much of that was spent on the drugs, though.
Q. You know that because Mr. Honken told you that?
A. Yes.

CR01-3047-LRR D-Ex55_Page_233

Q. Did you see any of this glassware or these chemicals when they came back to Iowa?

A. Yes, I did.

Q. Where did you see them?

A. They were at Christy's house.

Q. When you say Christy, who do you mean?

A. Christy Cole.

Q. How did you come to see the chemicals or the glassware at her house?

A. We -- Dustin and I would go over there to get some chemicals or glassware to take over to Angie's house because we were experimenting on making some methcathinone.

Q. Where was Angie's house at that time?

A. Clear Lake.

Q. Where were you experimenting with methcathinone?

A. In Angie's basement.

Q. What is methcathinone?

A. It's a drug similar to methamphetamine.

Q. Did you ever see any other drugs at that house?

A. Yes.

Q. What did you see there?

A. I saw methamphetamine several times and marijuana.

Q. What happened with your experimenting in the basement?

A. We weren't really successful in making any. We made a little bit of sodium metal, experimented on that too. Other

than that, we weren't really successful in making anything.

Q. And what again is the use or purpose of sodium metal?

A. It was a -- part of a process that we were using to make methamphetamine.

Q. So how long did this experimentation in the basement go on?

A. Several weeks.

Q. And we're in 1994 now. Do you remember what time of year?

A. It would have been fall probably.

Q. What happened after that period of experimentation?

A. We took the chemicals and glassware to Dustin's dad's house.

Q. And what, if anything, did you do with the -- that stuff at his dad's house?

A. We did some experimenting on trying to make some MDA.

Q. What's MDA?

A. It's a hallucinogen.

Q. Did you make any?

A. No, not -- no.

Q. When you say we, who do you mean?

A. Dustin and I.

Q. How long did the material or equipment stay in his dad's house?

A. A month or two.

Q. What happened to it after that?
A. We took it up to -- we packaged it all up and took it up to my apartment in Mason City.
Q. And where was the stuff before you moved? Was it all at Mr. Honken's dad's house?
A. I believe it was all there. There might have been some at Angie's house yet in -- she had a shed out back.
Q. Was Angie Johnson involved in storing things, glassware and chemicals?
A. She knew about it.
Q. How do you know that?
A. When I would go there at a later time, I know she would give me the key to go out there, and I'd tell her I was there to pick things up, pick something up for what we were doing.
Q. So what happened when you moved the lab equipment to your apartment?
A. We stored it there for eight, nine months.
Q. Without trying to make anything you mean?
A. Yes.
Q. And what happened after that?
A. In spring of '95 I got a house on Eighth Street in Mason City.
Q. During the time you were at your apartment, was there any glassware or chemicals left in Arizona?
A. Yeah, we had -- we went down on another occasion in '95,

CR01-3047 Ex55_Page_236

early '95.

Q. When you say we, who do you mean?

A. Dustin and I went down.

Q. Where did you go?

A. To Tucson and to Phoenix, Arizona.

Q. What did you do? What did you pick up there?

A. We picked up more glassware and more chemicals, what was -- the rest of what was needed to make the methamphetamine.

Q. And then you're saying you moved into a house in the spring of '95?

A. Yes.

Q. And where was that?

A. It was in Mason City on Eighth Street.

Q. And what did you do there with the equipment?

A. We built a room in the basement and set up the laboratory down there to start making methamphetamine again.

Q. And again, when you say we, you mean you and Mr. Honken?

A. Dustin and I.

Q. Did you have any conversations with Angela Johnson at that point about your drug business?

A. Just that she wanted her money back and wanted us to hurry up and get done so she could get her money back.

Q. Did you try to produce methamphetamine in your house on Eighth Street?

A. Yes.

Q. And what happened there?
A. We were not successful. We worked on it for a while, and we had a lot of problems with it.
Q. So then what did you do with the lab after that?
A. Took it all down and cleaned it up and packaged it up and took it back -- part of it back down to Dustin's dad's house and part to Angie's house.

THE COURT: Mr. Colloton, I'd like to take a short break and give our court reporter a little bit of a rest, and I have some phone calls to make. And so we'll be in recess until 4:30.

(Recess at 4:17 p.m.)

THE COURT: Please be seated. Do you remember where you were, Mr. Colloton? Your last question was, So then what did you do with the lab after that? Answer, took it all down, cleaned it up, packaged it up and took it back -- part of it back down to Dustin's dad's house and part to Angie's house.

MR. COLLOTON: Thank you, Judge.

BY MR. COLLOTON:
Q. How long did the lab equipment stay stored as you just described in your last answer?
A. Until Dustin started renting a place over in Mason City.
Q. Where was that place?
A. On 16th Street.

CR07-3047-LRR PoEx55_Page_238

Q. What happened with the drug business then?
A. We set the lab back up in the garage of the house that he rented and continued manufacturing.
Q. About when did that happen?
A. In the fall of '95.
Q. When you say we set it up, again meaning you and Mr. Honken?
A. Dustin and I, yes.
Q. All right. Who else, if anyone, was involved in the methamphetamine production at that point?
A. Just he and I, Dustin and I.
Q. Did anyone else become involved?
A. Yes.
Q. Who else became involved?
A. Dan Cobeen.
Q. When do you remember Mr. Cobeen becoming involved?
A. He became involved in it through work. He worked with Dustin and I, and he discussed with Dustin selling it for us at first.
Q. How do you know that?
A. Dustin told me that.
Q. When you say he worked with you and Dustin, did you work with Dustin at Kraft --
A. Yes.
Q. -- Foods?

CR01-3047-LRR P-Ex55_Page_239

A. Yes.

Q. In Mason City?

MR. PARRISH: Your Honor, just for a point of clarification, could we have a year that he's saying that Mr. Cobeen worked with them?

MR. COLLOTON: I'll be happy to ask that.

MR. PARRISH: I would appreciate it. Thank you.

BY MR. COLLOTON:

Q. When is it as best you recall that Mr. Honken told you about Mr. Cobeen being a possible person to sell methamphetamine?

A. It was in late summer of '95, early fall.

Q. Was it before or after you set up the lab on 16th Street?

A. It was right around that time. I'm not sure if it was before or after.

Q. And at that time you and Mr. Honken both worked at Kraft?

A. Yes.

Q. Did you discuss with Mr. Honken any other outlets or means by which you could sell the methamphetamine?

A. He said -- told me that Angie would be able to sell some.

Q. What kind of financial arrangement did you discuss with Mr. Honken at that time as you were starting up this lab on

CR01-3047-MWB PCEx55_Page_240

16th Street?

A. He and I would split it, split the -- split the profits between us, and Angie would be paid back her money, and we'd split it 50/50.

Q. So did you then go ahead and manufacture methamphetamine?

A. We attempted to, yes.

Q. What happened?

A. We had -- we continued to have problems with making it.

Q. What kind of problem did you have?

A. Well, we were making our own chlorine gas, and it gave us some problems for a while. And after we got that taken care of, we got to the sodium metal reaction, and we messed that reaction up.

Q. How did the method of production that you were using in the 16th Street garage compare to the method that you used in Arizona?

A. It was the same.

Q. Did you have to purchase any chemicals at this time, or did you already have everything you needed?

A. We had pretty much everything we needed at that point with the sodium metal. After that the sodium metal reaction got screwed up. We needed a chemical to -- we were going to do a different reaction instead of sodium metal reaction, and we needed a chemical for that.

CV 03-3074, CR07-3043-LRR Def Ex 55_Page_241

Q. What chemical did you need for that?
A. I can't remember the name of it.
Q. What did you do to get that chemical?
A. Dan Cobeen and I drove up to Minnesota, and Dan went into the chemical supply company and purchased it.
Q. So then did you start again to try to make the methamphetamine on 16th Street?
A. Yes.
Q. And did the lab stay in the garage there all the way through the search warrant by --
A. Yes.
Q. Was there --
A. There was a time where the door had been left open to the garage, and Dustin and I moved the lab equipment out to the house for a time.
Q. Why did you do that?
A. We were worried that the -- that someone had gone into the house and seen the lab.
Q. When did that happen?
A. I believe it was in December sometime.
Q. What did you do with all the equipment?
A. We took some to Angie's shed, and we took some to his dad's house, to Dustin's dad's house, and we took some to Kathy Rick's garage where I was storing my furniture and stuff.

C4-03074; CR07-3043-MWB DefEx55_Page_242

Q. And did you then at some point try to start the production process again?
A. Yes. We --
Q. When did that happen?
A. Few weeks to a month after we had moved it all out we started manufacturing again.
Q. Did you move everything back to the garage?
A. No, we didn't. We left some -- we just -- what we were doing, the chemicals that we needed for what we were doing we left at the garage.
Q. And how far did you get in the production process in your next attempt?
A. We had just completed the tube furnace when the lab was raided.
Q. And the lab was raided in February of '96?
A. Yes.
Q. When you say you just completed the tube furnace, what do you mean by that?
A. The reaction that we were doing instead of the sodium metal reaction.
Q. So you substituted a tube furnace for the sodium metal step that you described earlier?
A. Yes.
Q. Otherwise did you have the same process that you described earlier?

Cv-03074, CR07-3047-LRR P-Ex55_Page_243

A. Yes.

Q. And so what was left to make the methamphetamine at the time of the raid on the garage?

A. We needed to use the hydrogen bomb procedure.

Q. What equipment was needed to do that?

A. A paint shaker, stainless steel container that would be able to hold pressure, hydrogen, and the P-2-P.

Q. Did you have the hydrogen that you needed?

A. It wasn't at the house.

Q. Where was it?

A. I didn't know at the time.

Q. How did you know you had it?

A. I had seen a receipt that Dan had purchased it.

Q. How did you come to see it?

A. Dustin showed it to me.

Q. And what statements did he make to you about -- did Dustin make to you about where the tank was?

A. He told me it was in a safe place so we didn't need to worry about it.

Q. And you're saying then the search happened before you could do that last step; right?

A. Yes.

Q. How did you find out about the search at the house -- or the garage on 16th Street?

A. Dustin called me at home.

CR07-3013-LRR Def. Ex 55_Page_244

Q. What did he say to you?

A. That Kathy Rick had called him and said that there was a search going on, a police search, on the street that he lived on.

Q. Who is Kathy Rick?

A. It was Dustin's girlfriend at the time.

Q. So he had two girlfriends: Kathy Rick and Angie Johnson?

A. Yes.

Q. Did he have any children?

A. Yes.

Q. Who were his children?

A. Ryan and Marvea.

Q. And who were their mothers?

A. Kathy was Ryan's mother, and Angie Johnson was Marvea's mother.

Q. After you got this call from Mr. Honken about the search, what did you do?

A. He asked me to go over to Kathy's and get the stuff that was in the garage and destroy it, get rid of it.

Q. What did you do?

A. I went over to the house and took the chemicals into her house and dumped the chemicals down the sink, and then I took the glassware and broke it up, and I took it to a dumpster and dumped it in.

Q. Did you have any other -- you and Mr. Honken have any other glassware or chemicals stored elsewhere?
A. Yes, at Angie Johnson's house.
Q. Did you ever talk to Mr. Honken about what happened to those?
A. Yes. He told me that he and Angie had gone out and broken all the glassware and dumped out all the chemicals in back of the shed.
Q. Now, as you said before, you were charged in the same indictment with Mr. Honken; right?
A. Yes.
Q. And you were both released on pretrial release?
A. Yes.
Q. What restrictions, if any, do you know were put on Mr. Honken?
A. He had an ankle bracelet, and he wasn't to leave the house except to go to work.
Q. Now, at some point you signed a plea agreement and agreed to cooperate with the government; is that right?
A. Yes.
Q. Before you did that, did you have conversations with Mr. Honken about your pending case?
A. Yes.
Q. What conversations did you have with Mr. Honken about your pending case before you signed your plea agreement?

Cr. 01-3047-MWB Def Ex 55_Page_246

A.    We talked about who the key witnesses might be, where the chemicals and glassware might be held.

Q.    And what discussion did you have about who the key witnesses would be?

A.    We felt that Dan Cobeen was a key witness and Detective Graham was a witness also.

Q.    Why was Detective Graham important?

A.    He was a -- he was the one that was in charge of keeping track of what Dan was doing while he was cooperating with the government.

Q.    And what conversation did you have with Mr. Honken about how to -- about what you were going to do about the charges?

A.    We were -- talked about going -- we had found a chemical supply -- or not chemical supply but chemical storage place in Bondurant where they had hazardous waste, and he thought that there was a possibility that our chemicals were at that location.

Q.    When you say he thought there was a possibility your chemicals were at that location, who do you mean by he?

A.    Dustin.

Q.    And when you say your chemicals, what do you mean?

A.    The chemicals that we used -- that we had in the house when it was raided.

Q.    So what did Mr. Honken say about that?

A.    He suggested that we break into the Bondurant location

and destroy the chemicals that were there.

Q. So what did you do, if anything, along those lines before you signed your plea agreement?

A. Dustin and I went down and surveillanced the building, went and looked inside of it to see if we could find a way to get in it, and we found a -- what we thought was the main phone lines to possibly cut them so if there was an alarm on the building that it wouldn't send in a signal to the headquarters when we broke into the building.

Q. How many times did you go down to this facility?

A. At least three or four.

Q. And what precautions, if any, did you take before you went down there?

A. We wore black clothes and a stock -- women's stockings, dark stockings, on our head so that we wouldn't be recognized because the building had cameras on it.

Q. Did you discuss any sort of plan to actually try to destroy the evidence?

A. Yes.

Q. And who made the plan?

A. Dustin did.

Q. And did you discuss it with him?

A. Yes.

Q. What plan did you discuss with him or did he discuss with you?

A. By -- breaking into the building by cutting through the duct and going through the fire trap and cutting our way back into the building through the inside duct.

Q. How did you plan to cut through that duct?

A. We purchased a battery powered Sawsall to cut through the fire trap.

Q. And in this plan how were you going to get to and from the place where you thought the evidence was?

A. If we were going to break in, we were going to have Angie drop us off and come pick us up when we would call her.

Q. Did you ever discuss the plan with her?

A. I didn't, no.

Q. Did Dustin ever tell you whether she had discussed the plan with him?

A. I don't remember if he had.

Q. How were you going to avoid getting caught with an alarm system?

A. By cutting the phone lines.

Q. Did Mr. Honken make any statements to you about prospective witnesses before you signed your plea agreement other than identifying them?

A. Just Dan and Graham.

Q. And what, if any, plan with regard to witnesses did he discuss with you?

A. That Dan was a key witness in my case, that without Dan

C-03-3074, CR01-3047-MWB DoEx55_Page_249

they really didn't have anything, and that if he would not be able to testify that I wouldn't have anything to worry about.

Q. And did you have any further conversation about Mr. Cobeen's not being able to testify?

A. He said that Angie wanted -- had told him to take care of business.

Q. Why do you say that was about Mr. Cobeen?

A. To -- I took -- I took it to mean that he -- that she had wanted him to get rid of Dan somehow, either kill him or offer him money or something so that he wouldn't be able to testify.

Q. Did you have any other conversation about physical evidence other than this business about the place in Bondurant?

A. Yes. He said that he thought the glassware might be in a place in Chicago where they did tests on it.

Q. And what discussion did you have about that evidence?

A. Possibility of getting to that if it was there by blowing up the building.

Q. And who said what about that?

A. Dustin told me that we could make a bomb similar to the one that they used in the Oklahoma bombing using chemicals and dynamite.

Q. What was his demeanor when he told you that?

A. Calm.

Q. Did you take that as a serious suggestion?
A. Yes.
Q. Why did you -- well, eventually you signed a plea agreement with the government, and you agreed to cooperate; correct?
A. Yes.
Q. And as part of that cooperation, did you agree to make some undercover conversations with Mr. Honken?
A. Yes, I did.
Q. Did you do that under the supervision of some federal and state law enforcement agents?
A. Yes, I did.
Q. Before I ask you about those, were you still working at Kraft during this time when you were cooperating?
A. Yes.
Q. And what kind of car were you driving at that time?
A. A brown Caprice Classic.
Q. Would that be a Chevy?
A. Yes.
Q. Where were you living at that time?
A. With my parents in Britt.
Q. Were you still -- did I ask you were you still working at Kraft?
A. Yes, I was.
Q. Before you started to make the undercover tapes, did you

CR01-3047-MWB DOEx55_Page_251

discuss the possibility of trying to kill or make unavailable any witnesses other than Mr. Cobeen?

A. Mr. Graham and the possibility of the chemists and Mr. Mizell, the people who were at the house during the raid.

Q. And who was -- who said what about that?

A. Dustin suggested it.

Q. Now, have you had a chance to review the tapes that you made in your conversations with Mr. Honken?

A. Yes, I have.

Q. And did you also review some transcripts that were prepared of those conversations?

A. Yes.

Q. Let me show you what have been marked Government Exhibits 1B, 2B, 3B, 4B, and 5B. Have you seen those before?

A. Yes.

Q. And did you, in fact, initial each of those on the front page?

A. Yes, I did.

Q. Did you listen to what the DEA agent told you were the original tapes when you reviewed those transcripts?

A. Yes.

Q. And to the best of your ability, did you try to make the transcripts accurate reflections of the words spoken on the tapes?

A. Yes, I did.

CV-03074, CR01-3047-MWB DoEx66_Page_252

Q. I'd like to ask you about a few -- some portions of these conversations.

MR. PARRISH: Your Honor, I guess my objection is this: I think it's repetitive. I assume that part of the agreement and what the government indicated to me is that the Court would get them in advance. I've cooperated with them throughout each of the process of clarifying the tapes. Now they want to go through and offer into evidence additional specific portions of the tape, I assume their specific conversation. The tapes are in without objection. The documents -- the transcripts are in without objections. The Court has had an opportunity to read them without objection by agreement of counsel. I don't know what the fourth purpose of these tapes serve since we had all these prior agreements.

MR. COLLOTON: I don't want to waste Your Honor's time if the Court feels it would be a waste.

THE COURT: What is it that you intend to do? Do you want to ask him about specific portions and --

MR. COLLOTON: Yeah. As to some of these portions it seemed to me -- and maybe it's clear to the Court, but there are places where there are words used that are either pronouns like he or she or other words that may not be clear on their face but that a participant in the conversation would be able to explain given his knowledge and the context.

CR07-3047-LRR DoEx55_Page_253

THE COURT: I'm going to allow it. Here's kind of my philosophy about this sentencing hearing. It's a very important matter. The stakes are very high for both sides. And so I'm going to let both sides make the record they want, and ultimately I've got to sort it out and rule on all of the contested issues, and I'll do that. But I'm not going to really constrain either side because really the stakes are so high. I think that's the fairest way to go. And if it turns out to be redundant and superfluous and no help to me, it won't be the first time a federal judge has wasted some time on a matter nor the last.

MR. COLLOTON: Since we're almost to five o'clock, Judge, I will take this evening and try the best I can to really focus the parts --

THE COURT: Do you want to call it quits for today?

MR. COLLOTON: It seems like a logical place to break if we're going to stop at five anyway. And I'll try then to go through quickly by page number and paragraph and get through that as quickly as I can first thing in the morning.

THE COURT: That's fine.

MR. PARRISH: My only concern -- and I guess I want a clarification here, and I don't have a problem with the Court's ruling on it. But I assume the tapes speak for themselves at this point unless they're saying the tapes are

inaccurate now.

THE COURT: Well, here's the way I'm looking at it. The tapes are in evidence, but I don't think that precludes the witness from explaining their understanding of what was said or putting it in context or embellishing it if you will, and I don't know of any rule of evidence that prohibits the witness from testifying to those kinds of things simply because the tape's already in evidence.

MR. PARRISH: If that's what he's saying they were going to do. I was assuming they were going to go back through the tapes again after we worked out this agreement as to how the tapes were going to be submitted and have him restate what the tapes said. That's what I thought he was --

MR. COLLOTON: I'm proposing to do what the judge is saying.

THE COURT: To explain certain portions of the tape that you think may be confusing to me or that I'm not getting --

MR. COLLOTON: Not clear on their face.

THE COURT: Not clear on their face because of the context which it appears.

MR. COLLOTON: Yes. For example, I would envision saying, Let me ask you to look at page 2, the fourth block where Tim or Dustin speaks and you say -- it says he was going to the store; who did you understand to mean by he or

what did you mean by the store if it's unclear? That's what I'm talking about. I'm not asking him to re-read the transcripts and --

THE COURT: Or to fill in the inaudibles or anything like that.

MR. COLLOTON: No, because that was the purpose of having him review them.

MR. PARRISH: That was my concern as to what they were going to do. We've been through this two or three times by agreement now, and I thought that was the whole purpose of the earlier agreement, and that was my concern, not to have us go through this whole thing again.

THE COURT: Well, I don't think we're going to go through the whole thing. I think we're going to go through very specific portions for clarification whether I need it or not.

MR. COLLOTON: And if the Court feels that I'm dwelling on things that are unhelpful, I'd be happy to try to move on.

THE COURT: I'll give you a chance. You think it's important, and until you do it, I'm not going to. So I'm going to allow you to proceed. And, you know, it's an important matter, and we're going to take -- I don't want to rush anybody. We're going to take the time it takes so that both sides are fully heard on the matter. It's particularly

CR07-3013-LRR DefEx55_Page_256

true because unfortunately from my perspective the federal rules of evidence don't apply to these proceedings. They ought to, but they don't. So we'll take it all.

MR. COLLOTON: Yeah. I guess I would say I think this sort of questioning would be allowed even under the rules as to this matter. Maybe some other things that have been done wouldn't.

THE COURT: See you all at eight o'clock tomorrow morning. Thank you.

(The foregoing sentencing hearing was

adjourned at 4:53 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Shelly Semmler, CSR, RMR

1.12.98
Date

# I N D E X

FRANK STEARNS

DIRECT EXAMINATION
BY MR. REINERT.......................................... 12:14
CROSS-EXAMINATION
BY MR. PARRISH.......................................... 20:19
REDIRECT EXAMINATION
BY MR. REINERT.......................................... 25:17
RECROSS-EXAMINATION
BY MR. PARRISH.......................................... 26:16

SCOTT GAHN

DIRECT EXAMINATION
BY MR. REINERT.......................................... 29:25
CROSS-EXAMINATION
BY MR. PARRISH.......................................... 35:14

DANIEL COBEEN

DIRECT EXAMINATION
BY MR. REINERT.......................................... 36:12
CROSS-EXAMINATION
BY MR. PARRISH.......................................... 47:19
REDIRECT EXAMINATION
BY MR. REINERT.......................................... 65:17
RECROSS-EXAMINATION
BY MR. PARRISH........................................... 69:3
FURTHER REDIRECT EXAMINATION
BY MR. REINERT.......................................... 70:21
FURTHER RECROSS-EXAMINATION
BY MR. PARRISH........................................... 71:8

MELISSA FRIESENBORG

DIRECT EXAMINATION
BY MR. REINERT...........................................71:24
CROSS-EXAMINATION
BY MR. PARRISH........................................... 79:1
REDIRECT EXAMINATION
BY MR. REINERT........................................... 97:3
RECROSS-EXAMINATION
BY MR. PARRISH......................................... 101:12

MARCY HYDE

DIRECT EXAMINATION
BY MR. COLLOTON........................................ 105:21
CROSS-EXAMINATION
BY MR. PARRISH......................................... 114:22
REDIRECT EXAMINATION
BY MR. COLLOTON........................................ 121:20
RECROSS-EXAMINATION
BY MR. PARRISH......................................... 122:22

ARTHUR KETCHUM

DIRECT EXAMINATION
BY MR. COLLOTON........................................ 123:13
CROSS-EXAMINATION
BY MR. PARRISH......................................... 127:1
REDIRECT EXAMINATION
BY MR. COLLOTON........................................ 131:8

KURT ZIRBEL

DIRECT EXAMINATION
BY MR. COLLOTON........................................ 132:2
CROSS-EXAMINATION
BY MR. PARRISH......................................... 136:19
REDIRECT EXAMINATION
BY MR. COLLOTON........................................ 144:15
RECROSS-EXAMINATION
BY MR. PARRISH......................................... 145:25
FURTHER REDIRECT EXAMINATION
BY MR. COLLOTON........................................ 148:7

ROBERT RIEPMA

DIRECT EXAMINATION
BY MR. COLLOTON........................................ 150:7
CROSS-EXAMINATION
BY MR. PARRISH......................................... 155:14
REDIRECT EXAMINATION
BY MR. COLLOTON........................................ 159:18
RECROSS-EXAMINATION
BY MR. PARRISH......................................... 160:13

RICK HELD

DIRECT EXAMINATION
BY MR. COLLOTON........................................ 160:25
CROSS-EXAMINATION
BY MR. PARRISH......................................... 173:15
REDIRECT EXAMINATION
BY MR. COLLOTON........................................ 179:25

BELEN BUTTERFIELD KAPPELMANN

DIRECT EXAMINATION
BY MR. REINERT......................................... 182:25
CROSS-EXAMINATION
BY MR. PARRISH......................................... 184:17
REDIRECT EXAMINATION
BY MR. REINERT......................................... 187:25
RECROSS-EXAMINATION
BY MR. PARRISH......................................... 188:11

CV-03074, CR07-3047-LRR D-Ex55_Page_260

JAY LIEN

DIRECT EXAMINATION
BY MR. REINERT...................................... 189:10
CROSS-EXAMINATION
BY MR. PARRISH...................................... 192:18

TIMOTHY CUTKOMP

DIRECT EXAMINATION
BY MR. COLLOTON...................................... 194:1

(Government Exhibits 1 through 37 were offered.)........ 8:6
(Government Exhibits 1 through 37 were received.) ..... 9:19