IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

vs.

DUSTIN LEE HONKEN,

      Defendant.

_____/

# ORIGINAL

No. CR 96-3004

TRANSCRIPT OF SENTENCING

VOLUME 2

The Sentencing held before the Honorable Mark W. Bennett, Judge of the United States District Court for the Northern District of Iowa, at the Federal Courthouse, 320 Sixth Street, Sioux City, Iowa, December 16, 1997, commencing at 8:04 a.m.

APPEARANCES

| | |
|---|---|
| For the Plaintiff: | PATRICK J. REINERT, ESQ.<br>STEVEN M. COLLOTON, ESQ.<br>Assistant United States Attorneys<br>Suite 400<br>401 First Street Southeast<br>Cedar Rapids, IA  52407-4950 |
| For the Defendant: | ALFREDO PARRISH, ESQ.<br>Parrish, Kruidenier, Moss,<br>  Dunn & Montgomery<br>2910 Grand Avenue<br>Des Moines, IA 50312 |
| Also present: | Jay Jackson, Probation Officer |
| Reported by: | Shelly Semmler, CSR, RMR<br>320 Sixth Street<br>Sioux City, IA  51101<br>(712) 233-3846 |

THE COURT: Please be seated. Mr. Cutkomp, you're still under oath, and I think you're still on direct examination as I recall.

MR. COLLOTON: Your Honor, Mr. Reinert had to attend to another matter if that's all right.

THE COURT: So you're going to continue?

MR. COLLOTON: Yes.

THE COURT: I forgot. Thank you, Mr. Colloton.

TIMOTHY CUTKOMP, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

CONTINUED DIRECT EXAMINATION

BY MR. COLLOTON:

Q. Mr. Cutkomp, you have in front of you Government Exhibits 1B through 5B which we talked a little bit about yesterday.

A. Yes.

Q. Let me ask you some questions about those exhibits. In Exhibit 1B, would you please turn to page 2 and look at the second Dustin block from the bottom? Do you see where it says, But it doesn't sound like they got a whole lot. I think that shit's in Oklahoma?

A. Yes.

Q. What did you understand Mr. Honken to mean by that shit's in Oklahoma?

A. The chemicals or glassware.

Q. Which chemicals or glassware?

A.    From the lab that we had in Mason City.

Q.    Let me ask you to turn to page 3 at the top of the page, the first Dustin block, second line.  Do you see where it says Mr. Honken --

MR. PARRISH:  What date are you reading from?

MR. COLLOTON:  This is Exhibit 1B.

MR. PARRISH:  Thanks.

BY MR. COLLOTON:

Q.    Do you see where it says, He's gonna ask Reinert exactly where it's at?

A.    Yes.

Q.    What did you understand Mr. Honken to mean by that?

A.    The chemicals and glassware again.

Q.    What about them?

A.    He's going to have his lawyer find out where the chemicals and glassware are at.

Q.    Let me ask you to go down to the second Dustin block from the bottom of that page.  Do you see in the middle of the paragraph it says, He cooperated me since October 5, man, everything, I get my hands on him October 5.  Every time he talked to me or you he'd go right to Graham?

A.    I don't see that.

Q.    Do you see that in the middle of the --

A.    Yes, yes.

Q.    What did you understand Mr. Honken to mean by every time

he talked to me?

A. It was Dan Cobeen.

Q. Let me ask you to turn to page 6. Do you see the third Dustin block from the bottom where it says, I don't even need to get him. Why do I need to get him?

A. Dan Cobeen again.

Q. And what did you understand Mr. Honken to mean by get him?

A. To make him disappear, to kill him.

Q. Do you see the next Dustin block where it says, Remember I said every link in the chain has to be there?

A. Where was that at?

Q. The next Dustin block after the one you were just looking at.

A. Okay.

Q. What did you understand Mr. Honken to mean by every link in the chain has to be there?

A. That everyone that was at the house during the raid that had handled the chemicals or glassware would have to be -- have to be accounted for.

Q. Let me ask you to turn to page 10. Look at the last block on the page. Do you see where in the fourth line from the bottom it says, So now I found this company that'll build you anything they want, you want?

A. Yes.

Q. Do you see that?

A. Yes.

Q. What did you understand Mr. Honken to be talking about there?

A. Getting some kind of an electronic device that would -- so he would be able to fool the ankle bracelet so he'd be able to leave if he wanted to.

Q. Let me ask you to turn to page 11 and look at the fifth Dustin block from the bottom beginning with, I know. Do you see that?

A. Yes.

Q. Do you see the last sentence there says, Um, if I don't get it off, I'm going to be very short timeline?

A. Yes.

Q. What did you understand Mr. Honken to mean by that?

A. He would only have a short time to be out of the house.

Q. If what?

A. If he wasn't able to get the ankle bracelet taken off or figure out how to fool it somehow.

Q. Now, do you see two Dustin blocks down from there you've just said, Who's the people that and Dustin says, I already found one of 'em?

A. Yes.

Q. And do you see then two more blocks down from there Dustin says, I found one. Basically there's two others to

find?

A. Yes, yes.

Q. What was your understanding of Mr. Honken's statements there?

A. Those would have been the people at the house during the raid.

Q. What about them?

A. He found where one person lived, but he still needed to find where the other two people lived.

Q. Then do you see at the bottom --

THE COURT: Mr. Colloton?

MR. COLLOTON: Yes.

THE COURT: I don't want to interfere with your relentless pursuit of the obvious, but so far, you know, I've understood everything you've gone through. There hasn't been any question in my mind what any of these matters meant. It was very clear to me. But like I said, it's an important matter, and if you want to pursue the obvious, far be it from me to stop you.

BY MR. COLLOTON:

Q. Let me ask you to look at Exhibit 2B. I'll ask you to turn to page 8. Do you see the fourth Dustin block down from there?

A. Yes.

Q. Do you see where Mr. Honken says, I've climbed far

bigger hills than that little hill?

A.   Yes.

Q.   What did you understand him to be referring to there?

A.   The case that we had in '93.

Q.   What about it?

A.   The people that had disappeared.

Q.   Let me ask you to turn to page 18 of that exhibit.  Do you see the fifth Dustin block down --

A.   Yes.

Q.   -- where Mr. Honken says, At least not for no ten fucking years and then at the end he says, That lowers you down to two to four at the most?  Do you see that?

A.   Yes.

Q.   Do you see the next block, Mr. Honken says, That one over there is a hundred percent?

A.   Yes.

Q.   And you say, That one would be easy?

A.   Yes.

Q.   What are you referring to when you say that one?

A.   Dan Cobeen.

Q.   Let me ask you to turn to page 21.  Do you see the second Dustin block down where he says, As long as this person don't vanish before then?

A.   Yes.

Q.   What did you understand this person to mean?

A.    Dan Cobeen.

Q.    And do you see two more blocks down Mr. Honken says, One and one only.  You don't want two, three, or four?

A.    Yes.

Q.    What did you understand him to be talking about there?

A.    I didn't want anyone -- I was telling him I didn't want anyone else other than the one person he was talking about to get killed.

Q.    Let me ask you to turn to page 26.  Do you see halfway down the page there's a block where you say, I'm worried about the other stuff still?

A.    Yes.

Q.    What did you mean by the other stuff?

A.    The people that disappeared in '93.

Q.    Do you see the last block on the page?  You say, I'm worried that you took a little thing threw in there or something.

A.    Yes.

Q.    What did you mean by that?

A.    Piece of clothing or a shoe or something that I had had.

Q.    What about it?

A.    That if he had buried the people he would have left something of mine there.

Q.    On the next page, the second Dustin block, the third line, do you see where he says, So there's no possibility of

you having anything to worry about me. I have stuff to worry about from you?

A. Yes.

Q. What did you understand him to mean by that?

A. I was telling him that I was worried about him having done something to get me in trouble, and he said that he hadn't done anything and had nothing to worry -- I didn't have to worry about him but he was worried about me cooperating.

Q. Please turn to page 29. Do you see the second Dustin block from the bottom where he says, Probably, but it's so hard to get that person to do anything?

A. Yes.

Q. Then you said, So she'd just go up and -- do you see that?

A. Yes.

Q. Who were you referring to there?

A. Angie Johnson.

Q. Please turn to page 33. Do you see the second Tim block from the bottom where you say, Brian Beach?

A. Yes.

Q. Who's Brian Beach?

A. Dan Cobeen's friend.

Q. And what was the relevance of Brian Beach to your discussion here?

A.    That Dan was staying with Brian.

Q.    Please turn to page 37 -- actually, I'm sorry, page 38. Do you see the second Dustin block from the bottom where he says, This is a step back from last time?

A.    Yes.

Q.    What did you understand that to refer to?

A.    '93 case again.

Q.    Then on the next page, the second Dustin block from the top, do you see where it says, You gotta remember both those guys were skeptical?

A.    Yes.

Q.    What did you understand that to refer to?

A.    Terry DeGeus and Greg Nicholson.

Q.    Then do you see three more Dustin blocks down where he says, I mean the one fucking moved, vanished?

A.    Yes.

Q.    Then do you see further down from there, two more Dustin blocks down, it says, Mister one of his friends that has a very big mouth?

A.    Yes.

Q.    Then the next block says, The big guy, and you say, Oh, yeah.

A.    Yes.

Q.    What do you understand that -- what was that discussion about?

A. It was about Scott Gahn had told Dustin where Greg Nicholson was living because he had moved out of his house.

Q. Please turn to Exhibit 3B. On page 12 -- well, that's probably too obvious. Let me go to page 13, the first Dustin block at the top. Do you see that, where it says, You need -- you pick the most important thing first because, ah, there are other things that might be important after the first one?

A. Yes.

Q. And then you said, Have you decided what the most important thing is first?

A. Yes.

Q. What was that discussion about?

MR. PARRISH: Well, I'm going to object -- you can allow a whole lot in sentencing hearings, but I'm going to object to what it's all about. The conversation speaks for itself. And if he's changing the conversation, he shouldn't use that as a foundation to change the nature and meaning of the conversation. The conversation was taped by agents. They knew what they meant. It would be irrelevant as to anything dealing with this conversation because it changes the nature of this conversation.

THE COURT: Well, I think the question what's it all about is a shorthand for what this witness's understanding of the conversation was, and I think that's permissible, so the objection's overruled.

A. Talking about the people that were in the house and who would be the most important person in those people that would -- if one of them would disappear, that it would make the whole case fall apart.

Q. All right. Please turn to page -- bottom of page 18. Do you see your last block there? You say, That gun.

A. Yes.

Q. Then on the top of the next page, the third block down, you say, Well, that's something I helped with. Draws me into it.

A. Yes.

Q. What were you referring to there?

A. The gun that we had melted down.

Q. Do you see about four Tim blocks down from there you said, What is the possibility of one of them showing up?

A. Yes.

Q. What did you mean by that?

A. One of the people that disappeared in '93.

Q. And then do you see your next block? You say, I know that, laugh, I mean, and then you said, Coming up?

A. Yes.

Q. What did you mean by that?

A. Being unburied.

Q. Please turn to page 25. Do you see the sixth Dustin block down where Mr. Honken says, I could always just wait

until they're at a friend's house and go around and clean house if I had to?

A. Yes.

Q. You have a discussion about rules, rules of war?

A. Yes.

Q. What did you understand Mr. Honken to mean by go around and clean house if I had to?

A. If Dan was in a house with a bunch of other people, he could just go over to the house and shoot them all.

Q. Please turn to page 28. Do you see the fifth Dustin block from the bottom where he says in the second line, That's why if I can fool this right here probably be -- I'll probably be better?

A. Yes.

Q. Then do you see on the top of the next page there's discussion of a frequency meter?

A. Yes.

Q. What was your understanding of that discussion?

A. There was a frequency meter at Radio Shack that he wanted me to go look at.

Q. Now, did you actually do anything in response to this discussion after the conversation was over?

A. Yes.

Q. What did you do?

A. I went to Radio Shack and looked at one and got

information on it.

Q. What'd you do with the information?

A. I brought it back to Dustin.

Q. Please turn to page 34. Do you see the second block from the top you say, You're not using my torch again?

A. Yes.

Q. What did you mean there?

A. There was another gun that he wanted to get rid of. He couldn't use a torch at my parents' house again.

Q. Like you had done in '93?

A. Yes.

Q. Do you see on the next page, the very bottom, Dustin says, Even if I'm in prison for fucking 15 years, whatever. When I get out, he's still dead?

A. Yes.

Q. Who did you understand him to mean by he?

A. Dan Cobeen.

Q. Pardon me?

A. Dan Cobeen.

Q. Please turn to page 44 and look at the fifth Dustin block from the bottom. Do you see where he says, That's another thing I want you to do. You remem -- can you describe me the -- the -- the station wagon?

A. Yes.

Q. And then you say, It was dark?

A.   Yes.

Q.   What was your understanding of that conversation?

A.   A station wagon had come into my -- the driveway one night, and I thought it was Mr. Graham, and he wanted me to check and see if the station wagon that I had seen was a -- was the one that Graham was driving.  On 17th Street he wanted me to drive by the house and see if it was the same car.

Q.   On page 46 do you see the Dustin block in the middle of the page right after you've said, 'Cause I have a conscience?

A.   Yes.

Q.   Then he says in the middle there, They put themselves in that position.  They made me choose between my family and them?

A.   Yes.

Q.   Who did you understand him to mean by they?

A.   Any of the witnesses.

Q.   Then do you see on the next page on the top of the page, the first Dustin block says, As long as he doesn't pull a Houdini, you know.  I'm confident that you'll walk?

A.   Yes.

Q.   And then you said, He hasn't yet?

A.   Yes.

Q.   Who are you referring to when you said he?

A.   Dan Cobeen.

Q.   Then on the next exhibit, 4B, do you see at the bottom of the page, you talked about I went by Radio Shack?

A.   First page?

Q.   No, page 3.  I'm sorry.  Bottom of the page.

A.   Yes.

Q.   Is that what you were referring to before when you went by to get the information?

MR. PARRISH:  Objection.  Asked and answered.  He stated that.  It's in the record.  It's cumulative.

THE COURT:  Overruled.

A.   Would you ask the question again?

Q.   I'll skip that one.

A.   Okay.

Q.   Please turn to bottom of 16.  Do you see the last Dustin block where he says, I'm not that worried about it.  I've seen worse things that I care never to speak of?

A.   Yes.

Q.   And at the top of the page following you said, Does it bother you?

A.   Yes.

Q.   What were you referring to when you said it?

A.   The people that disappeared in '93.

Q.   What about the people?

A.   Having killed them.

Q.   Please turn to the last one, Exhibit 5B.  Do you see --

please turn to page 11 and look at the third Dustin block from the bottom. Do you see where he says, You don't ask shit like that. What happened to your left -- pardon me, your right-hand, left-hand shit?

A.   Yeah.

Q.   Then you said, I wasn't planning on being involved in anything.

A.   Yes.

Q.   What was your understanding of that discussion about right hand, left hand?

A.   When he was talking to me about the disappearances and the possibility of getting rid of more witnesses before, I told him if he was going to do something just to do it and not tell me anything about it. The right hand shouldn't know what the left hand is doing.

Q.   Then on the top of the next page do you see your first block? You said, Well, I need to know. I need to know before I go any farther.

A.   Yes.

Q.   Then Mr. Honken says, I'm not going to discuss -- I'm not going to discuss that here and now. No way. So maybe sometime.

A.   Yes.

Q.   What did you mean when you said, I need to know before I go any farther?

A. I wanted to know what happened with the people that had disappeared, where they were at.

Q. Please turn to page 22. Do you see the first Tim block on the page? You say, It's partly why I want to know about the others?

A. Yes.

Q. What were you referring to there?

A. I'm just trying to find out what happened to those disappearance -- the people that disappeared.

Q. Then do you see further down on that page Mr. Honken in the third block of Dustin down from there at the end of that block, he says, Well, I can guarantee you with one thing. There is no possible way ever. There's only one thing in my mind? Do you see that?

A. Yes.

Q. Then the next block Dustin says, There's only one?

A. Yes.

Q. And then three blocks down from there you say, I know exactly which one you're talking about too?

A. Yes.

Q. What were you referring to there when you said, I know exactly which one you're talking about too?

A. Terry DeGeus.

Q. What did you mean by that?

A. That there was a possibility that he would show up

somehow.

Q. What do you mean by show up somehow?

A. Come out of the ground.

Q. And back up in the first Dustin block that I read there where he says, Well, I can guarantee you with one thing, there is no possible way ever --

A. Yes.

Q. -- what did you understand that sentence to mean?

A. Greg and his girlfriend and the two kids.

Q. What about them?

A. That they would never be found.

Q. And then please turn to page 26 and 27, the last two pages, and I will mercifully end this part of the questioning. Do you see where at the end Dustin says, I mean as long as he don't disappear. It's the only way. Well, it doesn't matter?

A. Yes.

Q. And at the top of the next page you say, I thought that's what we wanted, and then he says, Well, I mean they hide him?

A. Yes.

Q. What did you understand him to mean by hide him?

A. That Dan might be put in protective custody.

Q. Do you see the next Dustin block where he says, But even if that happens, I'm still going to go another route anyway

so --

A.   Yes.

Q.   What did you understand him to mean by that?

A.   The people that were in the house during the raid.

Q.   What about them?

A.   That they would be the ones that he'd go after anyway.

Q.   Now, let me ask you just a couple other questions. There was some discussion in here about avoiding electronic monitoring --

A.   Yes.

Q.   -- that you mentioned.  Were you having any conversations with Mr. Honken during this period other than the ones that are recorded?

A.   Yes.

Q.   Where were you talking to him?

A.   At work.

Q.   Did you ever have any conversations with him at work about what steps he could take to avoid being monitored or being constrained in his movement?

A.   Yes, the --

Q.   What conversation did you have about that?

A.   Getting the monitor taken off.

Q.   What conversations, if any, did you have about his work schedule at Kraft?

A.   The -- one time he had not come to work and had someone

else work for him, just seeing if that would be possible, if he could do that without the probation officer finding out about it.

MR. COLLOTON: That's all I have, Judge. I appreciate the Court bearing with me on that.

THE COURT: Thank you, Mr. Colloton.

Mr. Parrish, you may cross-examine.

MR. PARRISH: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. PARRISH:

Q.    Mr. Cutkomp, why don't we get started by your telling me the approximate number of times you've met with law enforcement officials on this case.

A.    I don't know how many times it would be.

Q.    Over 20 you would think?

A.    Yes.

Q.    Over 30?

A.    Possibly, yes.

Q.    Okay. Did you meet with any law enforcement officials to get ready for your examination here in court?

A.    Yes.

Q.    And did they brief you on preparing for cross-examination at all?

A.    How do you mean brief?

Q.    Did they tell you about questions you might be asked on

cross-examination?

A. No.

Q. They did not.

A. No.

Q. They haven't told you anything about that.

A. About questions --

Q. Mr. Colloton, Mr. Reinert, any of the other people who might be involved did not tell you anything about the fact that you may be questioned in court by someone who is not representing the government?

A. Yes.

Q. What did they tell you about that?

A. That you would cross-examine me.

Q. What did they tell you?

A. Just that you would cross-examine me on the evidence.

Q. That's all?

A. Yes.

Q. They didn't go in any further detail than that?

A. Not that I recall.

Q. When did they tell you that?

A. A couple days ago I know they told me.

Q. And where did you meet when they sat to talk about that?

A. In LeMars.

Q. In LeMars?

A. Yes.

Q. And tell me who was present.

A. Myself, Lori, and the lawyer here.

Q. Mr. Colloton?

A. Mr. Colloton.

Q. And how long did that meeting last?

A. Several hours.

Q. What do you call several hours?

A. Two.

Q. And what did you go over in that meeting?

A. The information in the tapes.

Q. That's it?

A. And the grand jury. I looked over that.

Q. Okay. Explain to me how you went over that when you met with them. When they were sitting there, had you had the grand jury notes before you met with them --

A. Yes.

Q. -- to review?

A. Yes, I did.

Q. So then they sat down with you for two hours, and what did you talk about during those two hours?

A. Just what I meant by what I had said on certain parts.

Q. Much like Mr. Colloton did here in court with you today?

A. Yes.

Q. So he took about two hours, and you already had the transcript. And what he did when you were meeting with him

for those two hours is cover with you what you meant by some of the things that were in the tapes.

A. Yes.

Q. Is that right?

A. Yes.

Q. Did he tell you why he was doing that?

A. To make the time go faster here because I didn't want to have to read the whole thing here because I --

Q. Well, did he tell you it was already in evidence and we had agreed that it was going into evidence already?

A. Yes.

Q. Well, did he give you any further explanation as to why he was going over specific items and what it meant other than that?

A. No.

Q. Other than going over those items in the transcript, what else did he do during those two hours with you?

A. Went over the grand jury.

Q. Did he ask you what things in the grand jury meant too?

A. Just went over the -- went over it like what we did here like --

Q. Well, I thought he covered the grand jury. He was the person conducting the grand jury.

A. Yes.

Q. Well, if he was the person conducting the grand jury,

why did he have you go over and explain what you meant when you testified in front of the grand jury?

A. I don't know.

Q. Did he ask you if you wanted to change anything or anything?

A. No.

Q. What else did he do during that meeting other than go over and point out to you what he wanted to have you testify to in court and what it meant in the transcript?

A. That was all.

Q. Did they relate to you as to how you were to testify on cross-examination?

A. No.

Q. What about direct examination?

A. What's direct examination?

Q. When he asks you questions, did he give you an idea of what you were supposed to do during that process?

A. No.

Q. They didn't even tell you and say answer the questions yes rather than nodding your head; they didn't say look at the court, look at the lawyers who are asking you the questions? They didn't do anything like that?

A. They may have said something about looking at the judge or lawyers.

Q. I want to know what they said to you.

A. I don't remember that, no.

Q. You don't remember anything else that they said to you?

A. I don't remember being told how to answer any questions, no.

Q. And was that the only meeting you had with them?

A. No, it wasn't.

Q. Had you met with Mr. Colloton before?

A. Yes.

Q. Where was that?

A. In Cedar Rapids.

Q. And how long before this last meeting of a couple of days ago had you met with him on that?

A. Approximately a month.

Q. And what did you do at that meeting?

A. About the same thing we did.

Q. So you had your transcripts at that point?

A. I didn't have them before that. I just looked them over.

Q. While he was there?

A. Most of the time I spent listening to the tapes and making sure that the -- that these were correct and then went over it just for a few minutes.

Q. With Mr. Colloton.

A. Yes.

Q. And when you say a few minutes, what do you call a few

minutes?

A. Talked to him for probably half an hour.

Q. And you went over the transcripts at that point also?

A. Just questions that he had about certain things.

Q. What kind of questions did he have?

A. I don't remember.

Q. Had you met with him at any time prior to that?

A. Yes.

Q. With the transcripts or without them?

A. With -- I looked over the transcripts another time, and I believe it was at that time that I went into the grand jury.

Q. So before you went to the grand jury, you reviewed another set of transcripts; is that correct?

A. I reviewed my -- what I had told the officers, yes.

Q. I mean you reviewed the tape transcripts in April before you went before the grand jury.

A. I don't remember if it was before or -- I don't remember the time frame there.

Q. So how many times would you say you reviewed the transcripts in this case?

A. The transcripts being the tapes?

Q. Yes.

A. Six times.

Q. Okay. And how many times have you reviewed them with

Mr. Colloton before you came into court today?

A. The two times.

Q. Well, actually it would have been three because you also reviewed them in April; right? You said you couldn't remember whether it was before or afterwards.

A. I listened to tapes to make sure they were correct, yes.

Q. So it would have been three times.

A. Yes.

Q. Did you change any of your interpretation of the taped conversation or transcripts at any point in time since April of 1997 when you went in front of the grand jury?

A. No. I may have changed a few words the last time I listened to it because the quality of the sound was a lot better.

Q. I just noticed what you did is that you added things in them like buried. And I listened to the tapes. I also read the transcripts, and I didn't find anything in there like that. Did I miss something?

A. If it's written down, then yes.

Q. Well, it's not written down, and you said buried and unburied when you were referring to certain witnesses.

A. Oh.

Q. Now, did you just make that up, or is that in the tapes somewhere where you and Mr. Colloton discussed that?

A. It's -- it was implied by Dustin and myself.

Q. Oh, so he never said it. Is that what you're telling me?

A. He never directly said it.

Q. Okay. And where did you get the word buried? From the -- did you get that from some of the law enforcement officials or something?

A. No, just from Dustin and I talking.

Q. Well, you said Dustin never said it because it's not on the tapes. You said it was implied.

A. Yes.

Q. I guess my question is where did you specifically get the term buried and unburied from. Unburied is kind of an unusual term.

A. From discussing the disappearances of the people that had disappeared in '93. Over time in the things that Dustin had said, I understood him to mean that he had -- after he had killed the people that he had buried them.

Q. I didn't see anywhere on any of these tapes he said he had killed anyone. Did I miss something on that?

A. It was implied also.

Q. Okay. So it was implied that he had killed them. It was implied that he had buried them. And you also mentioned at some point yesterday in your testimony that he had incinerated them at some point. Was that implied also?

A. He was implying that he would try to do that. He hadn't

implied that he had done that.

Q. And also I guess it was implied that he was getting money to buy a backhoe. That was implied also.

A. No, that was direct. He wanted to --

Q. No, I mean a backhoe so he could dig up the bodies and bury them deeper. That was implied; right?

A. Yes.

Q. Let me ask you this: Why is all of the stuff that's so damaging implied?

A. Because that's the way that Dustin and I talked. We -- in high school and after that we'd gotten in some trouble together, and we just over time learned to talk in the way that if anyone else was listening that it wouldn't be understood exactly what we were talking about.

Q. Oh, so you mean you all have developed such a system of communication that you don't even speak directly to each other. You only speak by implication. Is that what your testimony is before this Court?

A. At times, yes.

Q. Well, you say at times. I thought you had indicated to the grand jury -- and correct me if I'm wrong -- that this is a young man you had known since, what, kindergarten or something and you're a year older than him; right?

A. That's correct, yes.

Q. And that he had talked you into coming out to Arizona at

least two or three separate occasions?

A. Yes.

Q. Was all this by implication too?

A. No, that was direct.

Q. Oh. So some conversations I take that he has direct and some he has by implication.

A. Yes.

Q. So not all of your conversations are by implication.

A. That's true.

Q. Well, let me give you some idea. When you were meeting with the agents, how many times did you tell them you had been arrested for exposure?

A. Twice.

Q. Are you sure you didn't tell them once?

A. I believe it was twice.

Q. Have you seen your presentence report?

A. Yes, I have.

Q. And what does your presentence report say?

A. That I was prosecuted for one indecent exposure.

Q. Well, does it say you were arrested twice?

A. Yes.

Q. It does?

A. I believe it does. I don't have it in front of me. I don't know.

Q. You reviewed it, did you not?

A. Yes, I did.

Q. So you believe you told -- and your testimony is that you told the presentence investigators and your report actually reflects that you were arrested twice for exposure.

A. Yes. I believe that I told them that.

Q. Could you be mistaken by that?

A. I could be mistaken, yes.

Q. You possibly could have told them just once?

A. Yes.

Q. And that would have been a mistake.

A. Yes.

Q. Would that have been a deliberate mistake?

A. No.

Q. What kind of mistake would that have been?

A. I was prosecuted for it once, and I may have misunderstood at the time.

Q. Oh. So you're saying that rather than telling them about it once, you thought they were only asking you questions about how many times you had been prosecuted for it?

A. I don't recall what was going on at that time exactly. If I had the investigation here, the report, I might clear my mind a little more.

Q. You think the report may help you clarify it?

A. Yes.

MR. PARRISH: Your Honor, at this time I would request a copy of the presentence report. I think I should be entitled to it to at least cross-examine him on some of the issues. What they've disclosed to me in the Jencks material was one indecent exposure count which was charged 10-10 of '95 and 11-17-95 dismissed without prejudice.

THE COURT: Mr. Colloton?

MR. COLLOTON: We've disclosed to him a computer printout of prior convictions in case there's any felonies that would be impeaching. I don't have his presentence report here. I don't know -- he's admitted that there was a second arrest for which he was not prosecuted. I guess I'm not sure what the issue is, why there's a need for the presentence report. I think he's elicited another arrest that's not even a conviction and not shown on the computer printout. It's not a conviction. It's not impeaching. I understand the rules of evidence don't apply. But if the Court wants to order that we get the presentence report or if it would be helpful, I can try to have it faxed here. I don't know that Mr. Parrish is entitled to read his whole presentence report. Those are normally sealed. I guess I just don't see where he's going.

THE COURT: Do you want it for any other purpose other than the impeachment of one conviction, one arrest for indecent exposure?

MR. PARRISH:  I may want it, Your Honor, to test his credibility on other matters as we develop.  He is a pretty critical witness.  I think the government is relying on him. They've met with him over 20 or 30 times.  They've disclosed everything else.  It's kind of strange they would leave out -- as thorough as I know Mr. Colloton is and Mr. Reinert is, it's strange for them to leave out an arrest on a case.  And I don't know what else is left out.

MR. COLLOTON:  Normally an arrest -- I'm sorry.

THE COURT:  No.  Go ahead, Mr. Colloton.

MR. COLLOTON:  An arrest is not typically impeachment material unless it's a conviction, and we typically don't provide a complete presentence report for someone to the opposing counsel.

MR. PARRISH:  Well, Your Honor, I have a copy of a citation from -- showing two arrests of Mr. Cutkomp.  It does not show any dismissal, and I didn't know -- show dismissal of both counts on indecent exposure.  So I don't know -- I didn't get this from the government, but it's kind of unusual I think for the government to miss something like that, particularly on one of their informants who they've worked so diligently with, both -- and law enforcement officials.  I want to know if they've missed something else or something else they're not telling me about.

THE COURT:  Well, I mean, the problem is that a

presentence report is not really a statement by the individual. And so, I mean, usually the lawyer prepares the offense conduct statement if a defense lawyer even does it. Most of the time they don't do anything. So it's not really this witness's statement. If -- I think they'd be required to turn over any statement, but I don't think a presentence report is a statement. I think you'd agree with that.

MR. PARRISH: They do, Your Honor, as I understand it, debrief him during the presentence or take a statement from the defendant. Whether they did that in this case or not, I don't know. I would at least at a minimum like to see that statement if it was taken because it is reviewed. I know with my clients it's reviewed with the -- if they decide to give a statement, it's reviewed with the presentence investigator for the accuracy of it. As a matter of fact, those are some of the most accurate statements I've seen, those that are taken from the defendant.

THE COURT: Mr. Jackson, who did the presentence report on Mr. Honken if you know?

MR. JACKSON: I did, Your Honor.

THE COURT: Okay. Does the government have any objection to me turning over the presentence report to Mr. Parrish just for purposes of review and for cross-examination of Mr. Honken -- Mr. Cutkomp? Do you have any objection to him seeing the presentence report? I guess if he wanted it,

he could have asked for it earlier.

MR. COLLOTON: I guess that's a little bit of my view, that it wasn't in the discovery file. We could have discussed this ahead of time. But given where we are, if he wants a statement that he made, it seems to me Mr. Jackson could look at the report, see if there's some paragraphs in there that say Mr. Cutkomp was interviewed and said the following and then copy that part of it rather than -- because as I understand the reason they're sealed is there's a lot of personal biographical stuff in there that really isn't relevant to cross-examination and is private.

THE COURT: Let me ask Mr. Jackson a couple more questions. Mr. Jackson, do you actually have a separate document in your file that you consider to be the statement of the individual for whom you're preparing the presentence report?

MR. JACKSON: At times we do. Not in every case, but at times we do and the problem --

THE COURT: Do you recall -- I'm sorry.

MR. JACKSON: The other problem with Mr. Cutkomp, at the time of his presentence interview, he was in Linn County Jail, and Bob Askelson actually did the interview in the jail. So I didn't actually interview him, but I prepared the report, the guideline computations and that. So I don't have an accurate reflection of the interview. But I can look in

the file and see if there is notes to that effect.

THE COURT: Did Mr. Askelson prepare a written memorandum or summary of his interview of Mr. Cutkomp?

MR. JACKSON: I believe he did, Your Honor.

THE COURT: Well, I think Mr. Parrish is entitled to the summary of the statement by Mr. Cutkomp, and out of an abundance of caution I'm going to give him the entire presentence report. It's a little bit unusual, but there's a lot at stake here, and I'm giving both sides some leeway. And, Mr. Jackson, I'd ask you to make a copy of Mr. Cutkomp's presentence report and make a copy of the statement that Mr. Askelson obtained if there is one from Mr. Cutkomp, and we'll give that to Mr. Parrish at our next recess -- first recess. Would you be able to do that now?

MR. JACKSON: Yes.

THE COURT: Okay. Thank you, Mr. Jackson.

MR. COLLOTON: Is that a practice, Judge, you want to follow with all witnesses here who may have been prosecuted in federal court? Should we be gathering up all presentence reports, or can we limit it to any statements that might have been made that are somehow relevant?

THE COURT: Well, who are the other witnesses that have been prosecuted -- nobody's been prosecuted in relationship to this conspiracy.

MR. COLLOTON: That's right.

THE COURT: I'm going to limit -- Mr. Cutkomp kind of stands alone in that regard.

MR. PARRISH: That would be my position. I don't think I have the request in any other cases. Just the fact that the relationship is so intricate and it goes to the issue of who was controlling whom and what the responsibility of the drug issue is, and I think that's what we're going to be getting into. The rest of the witnesses don't even come close to this issue.

THE COURT: Okay. You may continue your cross-examination.

BY MR. PARRISH:

Q. I think the next point I was getting to, Mr. Cutkomp, as a matter of fact, these incidents take place in September. One takes place in September of 1995; is that correct?

A. Yes.

Q. And where were you living when the first incident took place?

A. I was -- I don't recall for sure where I was living, either with my parents on Eighth Street or in -- with my ex-wife.

Q. And where was your ex-wife living at that time?

A. In Mason City.

Q. And your parents lived where? At Rural Route 2?

A. Yes.

Q. In Britt, Iowa?

A. Yes.

Q. And were you on probation September 1 of 1995?

A. No.

Q. Had your charges been dismissed at that point?

A. In September?

Q. Yes, sir.

A. No.

Q. They were still pending. I thought they were dismissed in March.

A. Which charges are you talking --

Q. Your original charges.

A. The drug charges?

Q. Yes. The 1993 charges.

A. My charges had been dropped right -- just a few weeks after I was arrested.

Q. For exposure?

A. No, drug charges.

Q. Oh, you mean the drug charges. So on September 1 -- I guess that's the point I'm getting at. September 1, 1995, you had no charges pending on anything; is that correct?

A. That's correct.

Q. And you and Mr. Honken September 1, 1995, weren't engaged in any type of conspiracy to do anything, were you?

A. At that time, yes.

Q.  You're saying you were.

A.  Yes.

Q.  And you were charged with exposing yourself.

A.  Yes, I was.

Q.  And you told him about it.

A.  Told --

Q.  Dustin about it.

A.  I don't recall if I told him or not.

Q.  Was he --

A.  At that time.

Q.  So you may not have mentioned that to him.

A.  The second arrest I did.

Q.  But the first arrest you may not have.

A.  Yes.

Q.  And were you prosecuted on the first arrest?

A.  The first one's the one that was dropped.

Q.  Let me ask you -- so that's the one you may not have told him about?

A.  I don't recall if I told him or --

Q.  Now, what stage were you in in 1995, September 1, when you were arrested on this first exposure charge?  What stage were you in in any drug -- illegal drug activity?

A.  We were -- either had just moved everything out of my house or was getting ready to move it into Dustin's house on 16th Street.  I don't recall exactly what was going on at

that time.

Q.   You don't recall -- are you telling me you were moving the stuff?  You don't recall what was going on?  Which one?

A.   I don't know what the time period is that we had had it set up in the house and when --

Q.   Were -- go ahead.  I'm sorry.

A.   -- and when I had left my house.

Q.   Let me ask you this question about the incident:  Were you hospitalized at any point around September of 1995?

A.   For the second arrest I was, yes.

Q.   And how long were you hospitalized?

A.   Three days I believe.

Q.   Okay.  Did Dustin know about that?

A.   Yes.

Q.   So from September 1 to October 11 when you were arrested again on the exact same charge, my question is are you telling me that you and Dustin continued to work on establishing an illegal drug operation, or was there a break in it?

A.   How do you mean?  Were we physically making the drugs at that time?

Q.   Right.

A.   I don't know if we were -- at that very time we were physically making them.  I mean, there was -- we were talking about it and stuff at that time.

Q.   Well, you were having other emotional problems at that time, weren't you?

A.   Yes.

Q.   So would you agree with me that it's possible that there was a period of time when you and Dustin did not talk and you did not tell him about the incident of your arrest, this life-long friend of yours, and you did not tell him the kind of emotional problems you were going through?

A.   Yes.

Q.   And you were not engaged in any drug activity of any sort.

A.   How do you mean?

Q.   Well, you weren't engaged because you weren't talking. You weren't even seeing him.

A.   Oh, I was -- I talked to him even between those times. I worked with him.  I would have seen him and talked to him, hung out with him, but I didn't tell him about the first arrest.

Q.   Oh.  So then here's your life-long friend who you generally share everything with, and you're saying from September 1 up until October 11 you had no conversation with him about the fact you had been arrested.

A.   I don't know if I did or not.  I may have.  I may not have.

Q.   But yet you were still working together on a drug

venture; is that right?

A. That's correct.

Q. And it was after these people had disappeared; is that correct?

A. Yes.

Q. And you were in custody for how long, or were you just given a ticket?

A. For the indecent --

Q. On the first arrest.

A. I was released right away.

Q. You were taken to jail and then released?

A. Yes.

Q. And I take it Dustin was your best friend back then.

A. Yes.

Q. You were not working for law enforcement officials.

A. No, I wasn't.

Q. And it's possible, as you indicate, that you may not have mentioned this to him all the way until October 11 when you went and was hospitalized.

A. That's correct.

Q. That would have been unusual; isn't that correct?

A. It was an embarrassing thing. I didn't even --

Q. That's not my question about whether or not it was embarrassing. It would have been unusual; would you agree?

A. I would share most of the things that happened in my

life with him, yes.

Q. So it would be unusual that you didn't tell him about this for almost a month and a half?

A. In most circumstances, yes.

Q. Well, did you have any other arrest in your life that you didn't tell Dustin about?

A. No.

Q. So it was unusual.

A. Yes.

Q. Why is it so difficult for you to admit that?

A. It's -- because of the circumstances at that time, I -- I didn't want him to know about it. It was really embarrassing for me.

Q. No, that's not the question I'm asking. Why is it so unusual for you to admit to me that -- why is it so difficult for you to admit to me that it was unusual not to tell him something like that?

A. I don't know what -- I don't know what you're getting at.

Q. You understood the question, did you not?

A. (Witness nodded head.) Can you repeat what you're wanting me to answer?

Q. Well, you have answered it at this point, but I'm wondering why it's so difficult for you to acknowledge that it was unusual.

A. I don't know.

Q. No one told you not to answer my questions directly, did they?

A. No. I'm trying to answer you directly.

Q. Did you readily tell him about your second arrest when you were hospitalized?

A. I don't remember exactly what I told him.

Q. Is it --

A. I told him about it, yes.

Q. Is it a fact that possibly Dustin asked you as to where you had been and why you hadn't been hanging out with him in the last month or so that the whole issue came up?

A. No. I would have been -- I would have been around him at that time.

Q. Okay. You had indicated you'd have been around him, and you said you were staying with your wife in Mason City; is that correct?

A. Yes.

Q. On the first arrest you were staying with your wife in Mason City?

A. At that -- I don't know where I was at. I was either on Eighth Street with my ex-wife or in Britt.

Q. One of those two addresses; is that right?

A. Three addresses.

Q. Okay. Give us those three addresses that you would have

been living.

A.   Either in Britt, Mason City on Eighth --

Q.   Okay.  What address would you have been living at in Britt?

A.   2785 Iowa Avenue.

Q.   Okay.  And whose address is that?

A.   That's my parents' house.

Q.   Okay.

A.   On Eighth Street in Mason City or -- I don't remember where my ex-wife was at.  It might have been Pennsylvania or something like that.

Q.   Let me go now to -- we're at this time of September of 1995, and you indicate you don't remember what you and Mr. Honken were doing, but you think it might have been something having to do with drugs; is that correct?

A.   I know that we were at least setting up or getting ready to set up in his house in Mason City.

Q.   But you don't know whether you were setting up, getting ready to set up, having a conversation about setting up?

A.   I don't recall what we were doing at that time.

Q.   Those were difficult times for you; right?

A.   That was a hard time for me, yes.

Q.   And were you hospitalized more than once?

A.   No.

Q.   Were you on drugs or anything?

A.  I was drinking alcohol, yes.

Q.  And did you go on binges at all?

A.  No.  One night I would drink.

Q.  Just a one-night binge?

A.  Where I would go out and party at night?  Yeah.

Q.  And how long would you say that period of time in September and October did you have those problems, the emotional problems, the drinking problems -- how long did they go on other than the -- and the arrest, the two arrests in 1995?

A.  Could I explain something about what was going on in my mind at that time?

Q.  Sure.

A.  With the disappearances and being involved in the drugs and with my ex-wife, I had -- I had -- there was a lot of things that were going on that really were stressful for me at that time.  And I really didn't want to be involved in the drug activity at that time, but in a way I was afraid not to be.  And the indecent exposure things came from I needed a -- it was a way for me to escape kind of from all the pressures that were going on.

Q.  Who told you that?

A.  I had a -- I went to a counselor for a while, and these are issues that we discussed.

Q.  So you're saying that's what your counselor told you was

going on; is that right?

A. That's the conclusions that I came to through talking to him, yes.

Q. Okay. And you admit that at that point you were pretty emotionally unstable?

A. I needed a way to escape. I think most of my activities during that time were stable, but that one activity that I embellished in was not a stable thing to do, no.

Q. Okay. Now, you're not claiming you were so unstable that you got involved in the drug business during that time.

A. How do you mean? That I got involved with it because I was unstable?

Q. Right.

A. No, I didn't.

Q. And you would agree that someone who was your best friend would have recognized probably that you were kind of going through some weird things?

A. Yes.

Q. Now, if we had to put a time limit on when you were going through that phase and we just have these two target dates here of September and October of 1995, what kind of time would you put on it?

A. I would say that I had problems with it before that.

Q. Okay. What kind of time period would you put on it?

A. Probably years.

Q.   Years?

A.   Yes.

Q.   How many years?

A.   Since our arrest in '93.

Q.   So you think you had emotional problems from 1993 straight up until including --

A.   That one problem, the indecent exposure.  It was a way of me escaping from --

Q.   So this would have been the end of it.

A.   Yes.

Q.   So for two years then you think you would have been pretty well emotionally unstable?

A.   I wasn't emotionally unstable.  I had a situation where I would feel very -- a whole lot of pressure and I would do that, yes.

Q.   Okay.  Now, let me ask you this:  Are you saying from 1993 up until 1995 when you went through this and were finally hospitalized in 1995 that you didn't know what you were doing?

A.   I knew what I was doing, yes.

Q.   And your memory may have been a little off during that time?

A.   I don't have a perfect memory anyway, so it could be off any time.

Q.   Your memory's just not that good.

A. I have an okay memory, but I don't -- I can't memorize everything.

Q. It fails you sometimes; is that right?

A. I don't remember what I'm supposed to remember sometimes.

Q. That's what I mean. Your memory fails you on occasion.

A. Yes.

Q. More so than what you think other people's memories fail them?

A. I would say average. I'm average.

Q. You've had plenty of time, have you not, though, to go back and re-read your activity which involved getting involved in drug transactions?

A. Yes.

Q. You weren't exposing yourself back in 1992, were you, when you went out to Arizona?

A. I may have been, yes.

Q. You were doing it then too?

A. Yes.

Q. You were never arrested for it, though.

A. No.

Q. Did you have any other kind of problem other than public exposure problems back in 1992?

A. Not that I recall.

Q. Okay. Now, you just indicated you thought these public

exposure problems came from your arrest in '93 and the fact of the disappearance of these people. Are you telling us now that these public exposure problems preceded that date?

A. Yes, they would have, some of them.

Q. Some of them?

A. I did have some problem with it after my divorce from my ex-wife too.

Q. And when was that?

A. In -- that would have been in '92.

Q. So then before your arrest then you were exposing yourself; is that right?

A. Yes.

Q. Did you tell Dustin about that?

A. No.

Q. This is the first time Dustin would have known anything about it is today?

A. Yes.

Q. Did you ever get arrested for it before?

A. No.

Q. And how often were you doing it?

A. Could be once a month, once every six months.

Q. And when you make the statement that a lot of your problems with public exposure came from your involvement with Dustin and drug trafficking, that's not quite accurate, is it?

A. It began before that, but it had accelerated. And before that I had pretty much stopped doing it, but after the arrest it triggered the pressure of thinking that I was going to go to prison. It was an escape for me.

Q. Let me ask you, did you tell the law enforcement officials about this before today?

A. I don't recall telling them the whole thing, no. I may have but -- I told -- I told someone about it. It might have been the psychiatrist. I talked to him about it.

Q. Are you telling me that you told law enforcement officials prior to today about the incidents that occurred prior to September 1 of 1995?

A. I don't remember if I did or not.

Q. You might have just overlooked that.

A. I -- yes.

Q. Did they ask you when they were debriefing you if you had other problems, emotional problems or psychiatric problems prior to the hospitalization in 1995?

A. Yes.

Q. You didn't admit them to them, though.

A. I don't remember if I did or not.

Q. Would that have been something deliberate on your part that you did not admit that?

A. No.

Q. It was just an oversight on your part maybe.

A.    Yes.

Q.    And is it because your memory fails you on things like that too?

A.    No.

Q.    You were too embarrassed to admit it?

A.    Some of it, yes, I was embarrassed to admit it.

Q.    So you would agree then that you're the type individual where if something is going to embarrass you or make you look bad you have a difficult time admitting it.

A.    I would say with that, yes, I had a difficult time admitting it.  I have done my best to relate everything that's happened in my life to the officers to make sure that I hadn't left anything out.

Q.    But you would agree that that was more embarrassing to you than drug dealing.

A.    It's all embarrassing to me.  It was --

Q.    Well, it was equally embarrassing to you.  You made admissions about your drug dealing and your misconduct and drugs, but you did not make any admissions about your misconduct with public exposure or violating other laws.  You would agree with that.

A.    I may have told them.  I don't remember for sure what I said.

Q.    Well, I've read all the reports they have given to me, and I have not seen it.  And so I'm asking you if you did

tell them who did you tell?

A.   I know I told the psychiatrist.

Q.   Well, I asked about law enforcement officials.

A.   I may have told one of them at one time during our interviews.  I don't recall.

Q.   Which one?

A.   I don't recall.  I don't know.

Q.   Did they tell you that if you told them things that you would eventually have to tell me or you'd have to be cross-examined on it?

A.   Yes.

Q.   Is that one reason you didn't tell them?

A.   No.

Q.   Can you come up with any other explanation other than what you've given as to why you didn't tell them about this other type of misconduct you had been involved in for several years?

A.   I may have told them.  I don't remember for sure.

Q.   And if you did tell them, you've forgotten that you've told them?

A.   Yes.

Q.   Can you think of any other misconduct that you have been involved in that you may have forgotten to tell them?

A.   No.

Q.   Now, if we could just go back then to 1992 out in

Arizona, did you, in fact, get involved with any public exposure in Arizona?

A.   Yes, I did.

Q.   On how many occasions?

A.   One time.

Q.   And what happened?

A.   I was questioned about it and released.

Q.   Where were you questioned?

A.   Near a college.

Q.   And was it by law enforcement officials?

A.   It was -- the campus police were there.

Q.   And was there a report made on it?

A.   I don't know.

Q.   Where were you taken to be questioned?

A.   Just right on the street.

Q.   Did you tell Dustin about it?

A.   I don't recall that I did.

Q.   And that happened while you were making drugs.

A.   Yes.

Q.   And that was the only time that it happened in Arizona?

A.   Yes.

Q.   And you admit that you did not tell the law enforcement officials about that incident in Arizona.

A.   I don't know if I did or not.

Q.   Did they ever ask you at any point in their debriefing

of you is there anything else that you need to tell us yourself about your background, about any law violations that you may have been involved in and we want you to be completely honest with us?

A.   Yes.

Q.   Did you know at that time when you didn't tell them about these incidents that you were being dishonest with them?

A.   I may have told them.  I really don't remember.

Q.   I understand.  But do you think if you had not told them about it you would have been dishonest with them?  Let me ask it that way.

A.   If I was thinking about it at that time that I should tell them, yes, that would have been dishonest.

Q.   So it's possible then you may have been dishonest with them about that.

A.   The possibility's there.

Q.   Okay.  And the reason that you were dishonest with them about that you believe is because it was too embarrassing to you to talk about?

        MR. COLLOTON:  Objection to the form of the question because he didn't say he had been dishonest about it.

        THE COURT:  Sustained.

BY MR. PARRISH:

Q.   If, in fact, you had not told them about it, would you

have been dishonest with them about it?

A. Yes, if I left it out on purpose, yes.

Q. And you're saying you did not leave it out on purpose?

A. If I left it out, I did not leave it out on purpose.

Q. It was accidentally?

A. Yes.

Q. And if you had to count the number of times you had exposed yourself, how many times would that be?

A. Thirty probably.

Q. And so you think leaving out 29 of those times was not dishonest.

A. If I left them out, I did it understanding that by talking to the psychiatrist that I had -- that those were things for the psychiatrist. I didn't know that everything that had ever happened in my life I should tell people about.

Q. What about -- did you think it was illegal?

A. Yes.

Q. You knew it was against the law.

A. Yes.

Q. You knew you had been questioned about it.

A. Yes.

Q. And you're telling us as you sit here today that disclosure of misconduct that you knew was illegal was not something that you thought was required in this case.

A. I know I did tell them about it. I didn't tell them

about every single incident.

Q. And so you think by not telling them about 30 times where you had been involved in a situation like that would not show that you were being dishonest?

A. I believe I told them that I was having problems with it, so that would have covered the 30 times. I didn't realize I needed to tell them about every single incident.

Q. Now, in Arizona you would agree that you were the person manufacturing the drugs.

A. Yes.

Q. You would agree that you were the person who spent probably 95 percent of the time with the drugs.

A. Yes.

Q. You would agree that you were the person who bought the equipment for the drugs.

A. After I moved down there I bought the rest of the equipment, yes. Most of the equipment was purchased before I arrived.

Q. Well, you indicated, did you not, when you arrived there that the equipment was, in fact, old, rusted out things and there had been no production before you arrived. That's what you said in your statements, did you not?

A. Not that the equipment was old. I said that it had rusted -- the chemicals had rusted a bicycle, yes.

Q. And there had been no production before you arrived.

A.   There had been no methamphetamine made.

Q.   Right.

A.   Yes.

Q.   So actually no methamphetamine was produced until you arrived in Arizona.

A.   That's correct.

Q.   As a matter of fact, you would agree that Dustin had never produced any methamphetamine to your knowledge until you worked with him.

A.   Yes.

Q.   You would also agree that you were the one who had financial problems.

A.   Yes.

Q.   You would also agree that you were the individual who had a marital problem.

A.   That's correct.

Q.   You would also agree that in Arizona you never saw Dustin deliver any drugs to anyone.

A.   That is correct.

Q.   You never saw him collect money from anyone.

A.   That's correct.

Q.   You would also agree that in Arizona the house that the drugs were being manufactured was a house listed in your name.

A.   Yes.

Q. You would also agree that the apartment was in your name.

A. That's right.

Q. I take it you had no telephone there.

A. At the house we didn't. I don't know about the -- I used a pay phone at the apartment, yes.

Q. As a matter of fact, Dustin moved out and moved in with the other young lady who testified, Miss Friesenborg or -- I can't recall her name. Yeah, Miss Friesenborg; is that correct?

A. In November, yes.

Q. And you had been there since May.

A. Yes.

Q. And from May till almost August, the most that was produced was approximately four ounces that you basically supervised; isn't that correct?

A. Could you repeat that?

Q. It was only four ounces that were produced that you basically supervised the production of.

A. No, that's not right.

Q. How many ounces were produced?

A. Where I -- I never supervised production.

Q. I thought you said just a minute ago that you were there 95 percent of the time. You said Dustin never came over except maybe stop by once a week. You also said that it was

in your name, the apartment and the house.

A.    Uh-huh.

Q.    And you were the one who went out to buy the equipment; is that correct?

A.    Yes.

Q.    And I assume you were the one who was taking care of the equipment and doing the production.

A.    What do you mean by supervise?  I was watching --

Q.    Oh, does that trigger something because of the guidelines in your mind?

A.    No, I don't know what you mean by supervised.

Q.    Well, I mean, if you're handling equipment, you're supervising the production.

A.    Like I'm doing it myself?

Q.    Yes.

A.    Okay.  Yes.  I would have done most of it, yes.

Q.    All right.  You did most of it.

A.    Yes.

Q.    And you actually packaged it up?

A.    With help, yes.

Q.    What do you mean with help?

A.    Dustin helped me when we packaged it.  Dustin would help me.

Q.    So he would just come over to package it?

A.    He was there to -- if I had any problems and I didn't

understand how to get through a process, he would show me how to get through it.

Q. So it was like a team effort.

A. Yes.

Q. What? Were you better mechanically or something like that?

A. I wouldn't think I was better at it.

Q. Well, is Dustin pretty good with mechanical things?

A. Yeah.

Q. What do you mean pretty good? Are you better than he is?

A. Better than average.

Q. But he's not as good as you, is he?

A. I would say he's probably better than I am at mechanical things.

Q. Well, who put the mechanics on the equipment to produce the meth?

A. How do you mean?

Q. Who put it together?

A. We did.

Q. When you say we, didn't you indicate in your prior statements that you did?

A. During the majority of the time I did most of the work on it, yes.

Q. That's what I mean. So you're saying that you did most

of the work mechanically, but you're saying he was as good as you.

A.    Yes.

Q.    If he was as good as you at it, why didn't he do it?

A.    That was my part of the third that I was supposed to collect. My part was to manufacture.

Q.    Let's talk about that third for a second. You said it was who -- Jeff was supposed to get a third?

A.    Yes.

Q.    Dustin was supposed to get a third?

A.    Yes.

Q.    And you were supposed to get a third?

A.    That's correct.

Q.    But actually you were getting more than a third.

A.    I only got a couple thousand dollars out of it.

Q.    I thought you said that your rent at $600 a month was being paid.

A.    Well, that was the rent for the -- that's where I was living, but it was the rent for the manufacture of the drugs.

Q.    Oh, so that didn't count as a benefit to you.

A.    I didn't look at it that way, no.

Q.    Oh, okay. But even though you were living in a house, you had entertainment money, you had food, that was -- and there was no production for 4 months, so that's $2,400 right there, and then you had food bill on top of that, and you had

entertainment money you've consistently talked about on top of that. So roughly that could have been $5,000 in benefits.

A. Yes.

Q. Isn't that true?

A. Yes.

Q. Plus you also told the agents you got another 5,000 in cash, didn't you?

A. Two to three thousand.

Q. Well, didn't you say a total of 5,000 to the grand jury?

A. I don't remember.

Q. Well, I read your grand jury statement again last night. I thought you told them another $5,000. Could I have been inaccurate on that?

A. I don't remember what it says.

Q. Well, I thought you indicated that the total was 5,000 in cash that you had received.

A. I don't know.

Q. Does that sound about right?

A. I don't know the exact number.

Q. Okay. So if you had the benefit that you received by living, by the expenses, you also got travel money, didn't you?

A. I went back to Iowa on a Greyhound bus once -- twice.

Q. Well, once, but you came back some other time, didn't you?

A.   Yes.

Q.   And you also got an apartment in 1992 in December in Des Moines that you signed a lease for six months?

A.   Yes.

Q.   How did you get out of that lease?

A.   I just quit paying for it.

Q.   And how much did that lease cost you for that apartment down in Merle Hay?

A.   I only paid for probably two months' rent.

Q.   How much was that?

A.   I don't remember.  It was a pretty cheap apartment. $200.

Q.   Near Merle Hay?

A.   It was an old -- like a hotel.

Q.   You said a refurbished hotel.

A.   Yeah.

Q.   And they charge by the day rate.

A.   No, it was a month.

Q.   How much was it?

A.   Like 220 or 250.  I don't remember.

Q.   Okay.  So that's two months.  That's another, say, $500. So that's almost eleven or twelve thousand dollars; is that right?

A.   I don't know.  I don't know exactly what all of it would add up to be.

Q.   Let's just look at that just a second then in terms of what you've testified to.  If we take the advance money with no production and we take the 5,000 in cash that you think you might have received over the period of time and we also take the rent that you paid in Des Moines, I assume the living expenses because you didn't have a job when you were living in Des Moines; right?  Is that correct?

A.   Yes.

Q.   All right.  That's roughly about eleven or twelve thousand dollars.

MR. COLLOTON:  I object again to the form of the question because he never said he got $5,000 or even that he might have.  He said two to three thousand.

THE COURT:  Sustained.

BY MR. PARRISH:

Q.   Well, are you telling us all you got then was 2,000 in cash?  Is that your testimony today?

A.   I remember on the one incident after the 20,000 was brought back that I got two to three thousand dollars, yes.

Q.   All right.  But you also got money at other times; isn't that correct?

A.   Yes, I would have.

Q.   All right.  So if you add it all up, wouldn't you agree that you came roughly close to 5,000 cash that you're willing to admit to?

A.    I would say yeah.  That would be reasonable that I received that much.

MR. PARRISH:  Do you still have an objection?

MR. COLLOTON:  If I have one, I'll pose it.

THE COURT:  Why don't we take a recess now till ten o'clock.  Mr. Jackson, were you able to obtain copies of the statement by Mr. Cutkomp and the presentence report?

MR. JACKSON:  I was, Your Honor.

THE COURT:  Why don't you give those to Mr. Parrish for purposes -- Mr. Colloton?

MR. COLLOTON:  I wonder, Judge, on some of the family information, where people live and his family, whether that's really necessary to turn that over, if we could omit that section.

MR. PARRISH:  Your Honor, I'm satisfied with just the statement, his statement that he gave.

MR. COLLOTON:  All right.  Well, then that resolves that.

MR. PARRISH:  Your Honor, I would make another request from the government.  If they have information about this gentleman that we be allowed to -- Mr. Cutkomp that we be allowed to get it at this point.  If he's made those statements to law enforcement officials, I'd like for them to at least check their records because we have no acknowledgment in that in the information they've given us

under --

THE COURT: I don't understand what you're asking for.

MR. PARRISH: I'd like any statements they've made that may relate to his law violations other than what they've given us in this material here. They've given us the grand jury. They've given us his statements, and none of them refer to that.

MR. COLLOTON: The Jencks file should contain everything that's written down. Now, if he said something to an agent and they didn't write it down, I wouldn't have any report on that. So if Mr. Parrish wants, I can look through that and make sure everything we have is in there but other than that --

THE COURT: Well, I'm not going to delay this any longer. You could have asked for this stuff earlier.

MR. PARRISH: You can't, Your Honor, under the rules. There's no way I can get it.

THE COURT: They don't have to give it to you. You've gotta ask for it.

MR. PARRISH: Well, after he testifies I'm entitled to it.

THE COURT: But generally the government gives you Jencks Act material earlier than what the statutory requirement is.

MR. PARRISH: They didn't here so --

THE COURT: You didn't get the Jencks --

MR. COLLOTON: I think he had it overnight.

MR. PARRISH: Yeah, I took it the night after he got on the stand. Yesterday I had it.

THE COURT: Okay. Well, whatever. Well, what is it that you're asking for?

MR. PARRISH: Well, if they have other statements about Mr. Cutkomp's conduct, I'd like for them to at least ask the agents if he made a disclosure of this to other agents about his misconduct. I think we're entitled to get it.

THE COURT: I think we've gone through that enough. Tell me, you know, what is it that you want.

MR. PARRISH: Just what I said.

THE COURT: Well, I don't understand what you said.

MR. PARRISH: I said if he -- if they have law enforcement statements that he's made with regard to any misconduct on his part, I'd like to get those statements.

THE COURT: Statements that Mr. Cutkomp made to law enforcement about -- what do you mean misconduct?

MR. PARRISH: Any misconduct. He's saying he thinks he might have told some agent.

THE COURT: But wait a minute. You're entitled to Mr. Cutkomp's statements.

MR. PARRISH: Right.

THE COURT: Okay. Do you have any of Mr. Cutkomp's statements --

MR. PARRISH: That's all I'm asking.

THE COURT: -- as that word is defined in the Jencks Act that you haven't already given Mr. Parrish?

MR. COLLOTON: Not that I know of. That's why I said I'll look through this and compare it to my file. But we had copied all of the statements; plus we put in there things that we don't think are even Jencks material which are reports of agents who interviewed Mr. Cutkomp, but we've turned those over so that Mr. Parrish would have those.

THE COURT: Okay.

MR. COLLOTON: I thought what he's asking for is things he may have said that weren't written down, and I just have no record of that.

THE COURT: That's not a statement for Jencks Act purposes.

MR. COLLOTON: That's my understanding.

THE COURT: And you're not asking for that. You're asking for any written statements.

MR. PARRISH: Any statements he's given with regard to any misconduct. The problem I'm having, there's nothing in there to indicate what he's talking about now, but he says, I may have told them. If he told them, it may be

important for us to know that because we have no knowledge of this.

THE COURT: And you're saying you've given every Jencks Act statement that Mr. Cutkomp made to Mr. Parrish?

MR. COLLOTON: Plus all --

THE COURT: Plus other things that don't even fall within the Jencks Act, but you're taking a liberal view.

MR. COLLOTON: I guess it's debatable whether they fall. Our view is they don't. But yes, we've given him reports by agents and said yes, we interviewed him on such and such a date, and here's what he said. What I don't know is whether Mr. Cutkomp said to one of the agents one time, By the way, I had this public exposure problem and they didn't write it down in the report because they were doing a report about --

THE COURT: Something else.

MR. COLLOTON: -- his drug activity.

THE COURT: But you've given him all Jencks Act reports.

MR. COLLOTON: Right.

THE COURT: And you're going to double-check just to make sure you've given him all Jencks Act reports.

MR. COLLOTON: Since that's an issue, I will do that.

THE COURT: And, Mr. Jackson, you've given me the

presentence report.

MR. JACKSON: That's correct, Your Honor.

THE COURT: And is there also a separate statement that the defendant -- I'm sorry, that Mr. Cutkomp gave?

MR. JACKSON: I have the notes of the presentence interview, Your Honor.

MR. PARRISH: And I'm satisfied with just his statement to the presentence interviewer without --

THE COURT: Well, it's not really a statement I guess. It depends.

MR. COLLOTON: It's Mr. Askelson's statements.

THE COURT: It's Mr. Askelson's notes which would not be a statement under the Jencks Act.

MR. COLLOTON: Right.

THE COURT: But I'm going to give it to him anyway.

MR. COLLOTON: That's fine.

THE COURT: It's better to err on the side of full disclosure here because there's no reason not to.

MR. COLLOTON: That's fine. That's of the nature of these reports of what he said.

THE COURT: Okay. I'm going to give you, Mr. Parrish -- here's a copy of the presentence report.

MR. COLLOTON: On the family stuff, Judge, do you feel that we can -- if he's comfortable with just the statements, could we just copy those pages? Usually that's

three or four pages at the most.

THE COURT: Is there something about the personal and family data section that's a problem? I'm sure Mr. Honken knows a heck of a lot more about Mr. Cutkomp's personal family situation than what's contained in the presentence report. They were best friends all of their lives from first grade. What could possibly be in here that Mr. Honken wouldn't know a thousand times fold? Have you looked at it?

MR. COLLOTON: I haven't looked at it. I'm sorry.

THE COURT: Why don't you look at it and tell me what the problem is. I mean, we're just wasting my time again. Is there something in there that's a problem?

MR. COLLOTON: No, Judge. I wasn't sure how detailed it was on whereabouts, addresses, phone numbers, and that sort of thing. It does seem to be just names and ages and general employment and things like that. I appreciate the chance to look at it.

THE COURT: Now, if you think there is something in here that raises some kind of security concern --

MR. COLLOTON: That's what I was getting at. I should have been more implicit maybe.

THE COURT: I was just assuming because of their friendship he would know where the siblings live and those kinds of things that are generally contained in the

presentence report.  If there is a security concern, let me know.  I don't want to be responsible for --

MR. COLLOTON:  Well, and that's how I felt about it. That's why I wanted to look at it.  It doesn't seem that it has anything about people having moved or new addresses or anything like that.

THE COURT:  Okay.

MR. PARRISH:  Thank you.

THE COURT:  Why don't we -- we'll be in recess until 10:15.

(Recess at 9:48 a.m.)

THE COURT:  Please be seated.  Mr. Parrish?

MR. PARRISH:  Thank you, Your Honor.

BY MR. PARRISH:

Q.   I believe I left off -- I know that's probably not right up there at the moment, but we were asking you questions about your prior arrest, and then we went back to I believe 1992 and the manufacturing process out in Arizona and the amount of funds that you were, in fact, receiving.  Now, if you concede at least that you had approximately $12,000, could you tell me at most the amount of money Mr. Honken had at any one point in time that you observed?

A.   On his person or --

Q.   From any production the two of you all made.

A.   At one time I know he had 20,000.

Q. Yes. I saw that in your notes. I heard your testimony about that yesterday. And my question is did you see $20,000, and did you along with him count out $20,000?

A. I don't recall if we counted it all out, no.

Q. As a matter of fact, would it be accurate to say that you never saw $20,000 on him?

A. I never counted it out, so I don't know for sure.

Q. You just know that he made a statement once that he had $20,000, is that right, after he had come back from Iowa?

A. He came back from Iowa with a bunch of money, pulled it out and said, This is $20,000.

Q. But you never saw it.

A. I saw the money, yes.

Q. The full 20,000.

A. I didn't count it all, no.

Q. And other than his statement, you had no other independent verification of the fact that it was $20,000; is that correct?

A. That's correct.

Q. You never spoke with Mr. DeGeus, and you never spoke with Mr. Nicholson to confirm that they had given him $20,000; is that correct?

A. That's correct.

Q. And you knew for a fact at least to your knowledge they were the only two people he had dealt with in Iowa.

A.   That's correct, yes.

Q.   And you did not observe him give $20,000 to Jeff at any point; would that be accurate?

A.   That would be correct, yes.

Q.   But he did give you money out of that; is that correct? That's when you took what you thought was approximately two to three thousand dollars at that point.

A.   I don't recall if he gave that to me or if Jeff did.

Q.   Okay.  But one of the two gave it to you.

A.   Yes.

Q.   So would it be accurate to say that if you had to look at the whole production operation when you were in Arizona and what you had done in Iowa you may have received, if you count the benefit and count the $5,000 you received -- the total amount he had was roughly $30,000 -- you would have received one-third of that.

A.   If that's the amount we came up with.

Q.   Is there any reason why you would dispute that?

A.   No.

Q.   Let's talk a little bit about the amounts that came up in Arizona.  Now, as I understand it, you worked in Arizona from May until you came back for the Britt Hobo Days or something like that, and you produced a relatively small amount, is that right, initially which was approximately four ounces?

A. Yes.

Q. And it's true that that was mixed prior to the time you came back to Iowa; is that right?

A. I don't remember if we did it before or after.

Q. Well, it was mixed at some point.

A. Yes, it was.

Q. And if my understanding is correct, you didn't come back to Iowa the first time.

A. That's correct.

Q. And you don't recall any pure meth being delivered to anyone, do you?

A. I wasn't there, no.

Q. But you don't recall that being done to your best recollection.

MR. COLLOTON: Objection. He just said he wasn't there.

THE COURT: Overruled.

A. Could you repeat what you --

Q. Yeah. Do you remember any pure meth being delivered to anyone?

A. I don't remember seeing any meth delivered to anybody, no.

Q. Pure meth.

A. I don't know if it would have been pure or not when it was delivered. I guess I don't understand what you're --

Q. Well, did you mix the meth on occasion?

A. Yes.

Q. On how many occasions would you say you mixed the meth?

A. Two or three times.

Q. And would that have been the batch that would have been a pound, a pound and a half that would have been toward the end of November?

A. No. That one --

Q. Of 1992.

A. I don't remember. It was a pound and a half, and then we -- if we mixed it ourselves with the cut, then it would have been whatever, twice that when we brought it back.

Q. Okay. On the drive back?

A. Yeah. I don't remember if we did it or if we took the cut and had -- so Greg could do it because I remember that we took cut up there to him so he could mix it himself sometimes.

Q. Well, are you saying now that you took cut to Greg? I thought you said you never delivered anything --

A. I never took it.

Q. So as far as you know, Greg could have been getting it from some other source too.

A. Yes.

Q. All right. So any pure meth found at Greg Nicholson's place may not have even belonged to you guys.

A.   That's possible, yes.

Q.   All right.  And I guess my other point is you would agree that from what you're saying right now you don't recall whether you mixed it before you left Arizona or not.

A.   That's true.

Q.   All right.  And you do know for a fact that it was mixed two or three times.

A.   Yes.

Q.   Possibly more.

A.   I wouldn't think any more than that because I --

Q.   What were you using for mix?

A.   Vitamin B.

Q.   And who bought the vitamin B?

A.   Dustin and I went to a smoke shop type place and bought it.

Q.   You both went at the same time?

A.   Yes.

Q.   And did you use the same mix for all of it?

A.   Yes.

Q.   And in your sentencing you did not contest at all the amount, did you?

A.   No, I did not.

Q.   Did you have a chance to take a look at it, the report, the presentence report?

A.   Which report would --

Q. Your final presentence report.

A. Yes, I did.

Q. All right. And in it you noted that they talked about the amount of actual meth and the amount of mixture?

A. I don't --

Q. You don't recall that?

A. I don't remember -- I don't remember what was all in the report, no.

Q. Okay. Well, let me just refresh your recollection just a second. If they talked about actual meth being somewhere in the neighborhood of 5.6 to 7.4 kilograms, from what you actually saw, that would be high?

A. That would be the pure meth?

Q. Right.

A. I would have to -- how many pounds would that be?

Q. By 2.2 pounds --

A. So it would be about ten pounds all together? It would --

Q. I'm talking about pure meth now. I'm not talking about a mixture.

A. Okay. Probably -- from what I remember, it would be about six or seven pounds.

Q. Total of pure.

A. Yes.

Q. That you made?

A.    Yes.

Q.    Are you sure about that?

A.    Yes.

Q.    So if we go back then and talk about what you said in your presentence report, you would agree that that might be inconsistent with that?

A.    If I said that many kilos, yeah.  I don't know what I said.

         MR. COLLOTON:  May I ask what paragraph you're looking at?

         MR. PARRISH:  Well, I'm not really looking at a paragraph, but if you want to look at page 8, paragraph 26.

BY MR. PARRISH:

Q.    Well, at one -- now, you also talked about a mixture, and then the mixtures, you talked about 4 ounces, 16 ounces, another 16 ounces, another 6 ounces, another 40 ounces, and that was it.

A.    That's all -- whatever's down there is what we --

Q.    Well, how did that get up in terms of what you produced to 5.6 or 6 kilograms?

A.    I don't know.

Q.    Could you have been mistaken?

A.    If I wrote down the 5.6 I could have been.

Q.    Do you think that would be high?

A.    I don't know the exact amounts.

Q. Were you confused about the amounts at one point or something or the weight?

A. I don't remember the exact weights, no.

Q. Did you weigh them out?

A. I was there when they were weighed, yes.

Q. Who actually weighed them?

A. Both of us would have weighed it as we were going along, when we were packaging it.

Q. I mean the final product. Who would weigh out the final product?

A. Both of us.

Q. And did you weigh it in the mixed form after vitamin B had been added?

A. Both.

Q. Did you make notes on it when you would weigh it out in the final pure form and then in the mixed form?

A. No.

Q. Well, which time would you weigh it?

A. Both. We weighed it both before and after.

Q. All right. But you didn't keep notes on it.

A. No.

Q. So then you would produce the pure meth and then do the mix and then weigh it out again.

A. Yes.

Q. All right. So then you did mostly mix it before then it

was delivered.

A. Two or three times. I don't remember the exact amount. I know that we delivered it pure and we delivered it mixed both.

Q. Okay. What's the most you've seen in terms of the pure form actually produced at one time?

A. Pound and a half.

Q. All right. And that's the one you said you produced about November; isn't that correct?

A. No. That was the end of --

Q. End of August?

A. February.

Q. And that was the only time?

A. Of that much, yes.

Q. Okay. And that was the largest amount you ever produced?

A. Yes.

Q. Now, was that a mixture, or was that pure?

A. That was pure at the pound and a half.

Q. And you're positive about that.

A. Yes. It was --

Q. And what did you do with that pound and a half of pure?

A. We packaged it up, and I took it to Greg.

Q. Is that the time your parents picked you up at the bus station?

A. Yes.

Q. And this was in -- I think it was March, right, of 1993 according to what you said?

A. Yes.

Q. And who took him the mixture at that point?

A. He would have had it already.

Q. You actually delivered it.

A. Yes.

Q. So you delivered the pure meth that you manufactured in Arizona that no one helped you mix that you had, in fact, manufactured on your own, and then you had the conversation directly with Nicholson once you delivered it; is that what you're telling us?

A. If we had not mixed it ahead of time. I don't remember if that was one we -- I don't remember which ones we mixed and did not mix.

Q. And you're saying Mr. Honken did not deliver it; is that correct?

A. The last batch Dustin did not deliver. That's true.

Q. Well, the March of '93 batch, he did not deliver it; is that correct?

A. That's correct.

Q. He did not manufacture it because you indicated you had done that already.

A. I did most of it, yes.

Q. He did not package it.

A. No, he helped me package.

Q. All he did was to help you package it before you left.

A. That was the majority of what he did was helping me package it, yes.

Q. All right. And he was gone during that time living with Miss Friesenborg, and he would only drop by about one day a week according to what you said.

A. Yes.

Q. So the largest batch that you made, if I understand you correctly, which was pure, you did basically 95 percent of the work including the delivery.

A. Yes.

Q. And did you negotiate with Mr. Nicholson once you arrived back in Iowa the fact that he didn't have to pay you?

A. The fact --

Q. That Mr. Nicholson didn't have to pay you.

A. At that time?

Q. Yes.

A. I didn't do any negotiating, no.

Q. Well, you dropped it off, and there had to be some discussion whether or not he had to pay you.

A. I don't remember talking about payment.

Q. Well, what was your conversation with Mr. Nicholson when you dropped it off?

A.    Talked about his band, and I don't remember the whole conversation.

Q.    You've forgotten that.

A.    Yeah.

Q.    And this is the largest delivery you ever made to him.

A.    Yes.

Q.    Did you ever make any other deliveries that you had manufactured to anyone else other than Mr. Nicholson?

A.    Not that I recall.

Q.    And did you make any other deliveries to Mr. Nicholson?

A.    Not that I recall.

Q.    And then you would agree then that everything else was a mixture because there were only three other times.

A.    I'm not sure.  It would have been two or three times that we mixed it.

Q.    Okay.  What about the four-ounce delivery then?  The four-ounce delivery, was that a mixture?

A.    Four ounces?

Q.    Yes.  That was the amount that was made when you first went out to Arizona in 1992.

A.    That would have been what we made, and then it would have got cut after that.

Q.    Okay.  So you actually had eight ounces maybe?

A.    Yeah, if we mixed it.  I don't know when we mixed it.

Q.    Okay.  Did you ever make a delivery to Mr. DeGeus of any

money -- pick up any money from him or deliver any methamphetamine to him?

A. I picked up some money from him a couple times.

Q. Two times?

A. That I remember, yes.

Q. And how much did you pick up?

A. I don't remember how much money it was.

Q. So if I understand it correctly then, in addition to manufacturing -- spending 95 percent manufacturing, you also picked up money in addition to delivery of the pure --

A. Yes.

Q. Totally how many deliveries were there to Mr. DeGeus?

A. I don't know how many times he got it.

Q. But you only manufactured about four times; is that right?

A. About six times.

Q. A total of six times.

A. Yes.

Q. Is that right? And the rest of the weights you would agree were between the four ounces which was the smallest amount you all produced right after you got there until the pound and a half that you produced right before you came back to Iowa and delivered it yourself.

A. Yes.

Q. Okay. And would the other amounts have been somewhere

around 6 to 16 ounces the other 3 times?

A.   Yes.

Q.   Never over 16 ounces; you agree?

A.   Except for the last batch.

Q.   Right.  We've talked about the last batch, but the other two to three times would have been in --

A.   Yes.

Q.   Okay.  In that range.  And when you indicate in your presentence report that the four ounces were a mixture -- and would you like to take a look at this so we won't --

          MR. COLLOTON:  What paragraph are you looking at?

          MR. PARRISH:  We're going to look at page 28.

BY MR. PARRISH:

Q.   Look at page 28 (sic) on page 9 where you say those 4 ounces of mixture -- I just want to make sure I'm not confusing you because you indicate there was 8 ounces with a mixture in your testimony, but in your presentence it says 4 ounces of mixture, and you also indicated to the officers in your initial statements it was 4 ounces that was made when you first went out there.

          MR. COLLOTON:  My presentence report only has 18 pages here.  Are you sure it's the presentence report you're --

          MR. PARRISH:  I thought it was.  Let me see.  Maybe I'm looking at the wrong one.

MR. COLLOTON: Is that Mr. Honken?

MR. PARRISH: Yeah, that's Mr. Honken's. I thought I had a copy of his. Did I give you my copy?

MR. COLLOTON: No, no, you had one.

MR. PARRISH: Thanks. Let me get this. Sorry about that. I'm trying to find one -- oh, here it is.

BY MR. PARRISH:

Q. Do you recall giving an initial statement to a Mr. Graham back May 14 of 1996?

A. Yes.

Q. And do you recall you told him in that report that once you got to Arizona that you produced four ounces. It was the first time you and Mr. Honken made it after you had numerous setbacks out in Arizona?

A. Yes.

Q. So you're telling us now that that was eight ounces.

A. If we would have -- if we would have mixed it up. I don't know if we cut it or not.

Q. So you're not sure then if I'm correct that that was, in fact, eight ounces. That could have been four ounces mixed.

A. I believe it was four ounces of pure from what I remember.

Q. But you could be mistaken.

A. That is possible, yes.

Q. Okay. Because you never told them at any point during

any interview that it was eight ounces.

A. No.

Q. Okay. And you never told them that the pound and a half was ever three pounds.

A. I don't remember that.

Q. Okay.

A. I may have.

Q. So if we would go then to the next production date -- which would have been your trip back, what, about November sometime?

A. No, that was late September, early October.

Q. Okay. Did you bring any back at that point?

A. Not that I remember.

Q. Did Dustin bring any back?

A. Yes.

Q. And how much did he bring back to your recollection?

A. Between 8 to 10 ounces.

Q. All right. And that could have been a mixture?

A. That one I'm sure was 8 to 10 ounces.

Q. Of mixture.

A. Of pure.

Q. Of pure.

A. Yes.

Q. Okay. And going then into -- was there another trip in 1993, or was that the last trip?

A.    '92 you mean?

Q.    '92.

A.    No.  There was one in December sometime.

Q.    And that's when you moved back to Iowa and got an apartment.

A.    Yes.

Q.    Did you bring any back at that point?

A.    I don't believe I brought that back, no.

Q.    Okay.  Did Dustin bring anything back at that point?

A.    Yes.

Q.    And how much did he bring back?

A.    Around 8 to 10 ounces again.

Q.    And was that a mixture or pure?

A.    That would have been pure.

Q.    Then where were the two to three times that you brought back the mixture?

A.    The other times that we would have had it would have been mixture.

Q.    In March is when you closed the lab down; right?

A.    Yes.

Q.    So that was a pound and a half of pure you brought back.

A.    That's true.

Q.    So if all of them were pure each time you manufactured, there was no time left for mixture.

A.    I don't recall which ones were mixed or not.  I know

when we got done manufacturing them before they were mixed on those others that those were the weights that they were. I don't know what they were when we brought them back.

Q. And you're not saying you're absolutely correct on them.

A. I'm sure on the ones after -- the four ounces I'm not positive about, but the others I am sure.

Q. So according to your testimony, there is only one mixture that you're definitely sure about.

A. That we mixed?

Q. Right.

A. I know that we did it at least two times that we mixed it, but I don't know what it -- I don't know which ones they were.

Q. Okay. That's what you're confused about?

A. Yes.

Q. Okay. And you don't recall ever clarifying for law enforcement officials which ones were pure and which ones were mixtures, I take it.

A. Yes.

Q. Is that accurate?

A. I went by pure on all of them is what I was meaning to do.

Q. Okay. But now that you've been questioned on it, you would have to agree that all of them were not pure.

A. Not all of them were pure when we -- when they were

delivered. That's true.

Q. But you do know for a fact that the largest batch that was delivered that you did most of the work on, that was pure.

A. No, I don't know that. That was -- we could have cut that one also.

Q. So you're saying even the one that you brought back when you closed the lab down in 1993 where you brought back the pound and a half, that may not have even been pure.

A. The pound and a half that we manufactured may have been cut before we delivered it. I don't remember.

Q. So when you testified just a few minutes ago that you delivered DeGeus a pound and a half of pure, that could have been inaccurate?

A. Did I say DeGeus?

Q. Nicholson.

A. Nicholson.

Q. That could have been inaccurate.

A. I'm meaning that it was a pound and a half of pure that we made. I don't remember if it was a pound and a half when I delivered it.

Q. Okay. You could have delivered three pounds.

A. That's correct.

Q. Okay. Can you think of any other deliveries in there other than the ones we've discussed here this morning?

A. No, I don't remember any more.

Q. So if we had to look back then at your operation in Arizona, you would agree that we have discussed every instance that you've manufactured methamphetamine while you were in Arizona for delivery back to Iowa.

A. Yes.

Q. And you can't think of any other instance in which you or Mr. Honken would have brought drugs back to Iowa that were manufactured in Arizona when the two of you all were working together out there.

A. I don't recall any other instance, no.

Q. And I think we have covered the mixture, and I realize you indicate that some you're unclear on, but we would have discussed the mixture on each time that you manufactured a batch.

A. I believe so, yes.

Q. Okay. And you would agree that up until this point the only thing about our discussion that was not discussed with law enforcement officials were the exact mixtures.

A. If I didn't discuss that with them, then yes. I may have discussed that with them. I don't recall.

Q. But you just can't recall; is that correct?

A. Yes.

Q. Now, if we could and without going through 1995, that period between September and October when you were having

those difficulties, would you agree that you and Mr. Honken had some type of falling out in 1995 other than what you related to law enforcement officials up to this point?

A.   I don't remember any falling out that we had.

Q.   Are you sure about that?

A.   Yes.

Q.   Do you recall whether or not there was some disagreement between you and he over his relationship with your spouse?

A.   Yes, that did happen.

Q.   Did you just forget about that or something when I asked the question initially?

A.   We didn't have a falling out about it.  I knew that something happened, and he denied it, and she said something happened.  I didn't -- I didn't get upset with it or anything like that.

Q.   Are you telling me you never related to law enforcement officials that you and Mr. Honken had another ax to grind against each other?

A.   I don't know if I mentioned that or not.

Q.   You mean it was just an oversight on your part?

A.   I didn't think that was important to discuss, no.

Q.   You didn't think it was important to discuss the fact that you got upset with him because he and your wife got involved in a relationship?

          MR. COLLOTON:  Objection.  He just said he didn't

get upset with them, they didn't have a falling out, so I think that question misstates the record.

THE COURT: Overruled.

A.   Could you ask me the question again?

Q.   Let me ask you, are you telling me that you didn't think it was any concern to law enforcement officials that you and Mr. Honken had had some type of disagreement over the fact that he had had a relationship with your wife in 1995 right before you began to work for the government?

A.   I started working for them in '96.

Q.   Well, isn't it true that you became upset, also had a problem with the exposure, the mental health hospital, and other problems right after you found out he had had a relationship with your wife?

A.   If that was the same time period, yes.

Q.   Okay.  You didn't disclose that to the government, did you?

A.   No, I didn't tell them about their relationship, no.

Q.   Is there some reason as to why you didn't tell them about it?

A.   I didn't think that it was important.

Q.   Well, don't you think, Mr. Cutkomp, that it would be important to tell the government if you were going in with taped conversations that there may have been an ulterior motive on your part to entrap this man in conversation that

was incriminating because you would have an ax to grind because he had a relationship with your wife?

A.   I -- it didn't even cross my mind.  It was a -- Dustin said it didn't happen, so I took it at that, that it didn't happen.

Q.   Oh.  So you believed Dustin and you disbelieved your wife?

A.   I would have believed Dustin before I would have believed her, yes.

Q.   So you were having all of these other problems with this idea of your wife having a relationship which led to basically a mental breakdown, and you're telling us that then you agreed to work for the government to get Mr. Honken on tape, and you did not think it was important to let them know that maybe you and Dustin had other problems with each other.

A.   I didn't even -- I hadn't even looked at it as a problem.

Q.   If you hadn't looked at it as a problem, then why did you have to go get mental health assistance because of it?

A.   That had nothing to do with me going for help.

Q.   Are you telling us that you didn't disclose to the psychiatrist that your wife had had a relationship with a guy you considered to be your best friend?

A.   I'm sure I mentioned it, yes.

Q.   Well, if it was important enough to mention to the

psychiatrist and now you were going to go try to get this man on tape to show that he was a bad, bad man, are you telling me that you didn't think it was important enough to mention to the law enforcement officials?

A.   No, I did not.

Q.   Okay.  And I assume that's the same thing you considered when you had exposure charges of over 30 times.  You took that same factor of analysis into consideration that that wasn't important to let them know?

MR. COLLOTON:  I object because he never said he was charged 30 times with exposure.

MR. PARRISH:  I withdraw the question.  Not charged. I withdraw the question.

BY MR. PARRISH:

Q.   So you would agree that at about the same time that Mr. Honken and you had some discussion about him having a relationship with your wife, your wife making an admission that she and Mr. Honken had a relationship, it was the same time that you decided to pull out of this drug operation with Mr. Honken?

A.   It would have been about that time, yes.

Q.   Okay.  And you're telling us that the only reason you decided to pull out is that you suddenly had a relationship with God.

A.   No, that's not why.  I had been considering it before

that all along.

Q. Isn't it true that you felt since early on that Mr. Honken was the type person who used you as an individual to attract a woman and then he would end up getting the woman because he knew how to talk to them?

A. Oh, yes, that happened.

Q. And when that ultimately happened to your wife, that was in your opinion the straw that broke the camel's back, and you were going to do whatever was necessary to destroy this man.

A. At that time in my relationship with my ex-wife, she had had -- been with -- had affairs with many other people, and at that point we were just friends. We had decided that we would just be friends, and I was okay with that.

Q. Well, Mr. Cutkomp, that's not exactly the fact, is it, because you and your wife had had a relationship that would be off and on and had been off and on for a number of years?

A. We talked about getting back together.

Q. Right.

A. We never actually did.

Q. I understand that. But it was a relationship that would be off sometimes, a relationship that would be on sometimes.

A. Yes, to a point.

Q. Okay. And you would agree that all these factors came in together at one point. You were arrested twice for

exposure. You went into a mental hospital for three days. Dustin had related to you that he and your wife had had a relationship, and she had acknowledged it, and it was at the same time that you decided to break away from the drug operation. All of those things happened at one juncture in 1995.

A. Around the same time period, yes.

Q. All right. Now, would you agree that it was the next point in time that -- in this whole relationship that you began to have conversations with Mr. Honken about -- and we're not talking about taped conversations -- about his relationship with your wife?

A. It was during that time period that it happened. I only remember one or two conversations with Dustin about it.

Q. And you would agree that then starting in January of '96 up to and including May of '96, did you work with Dustin at all in setting up a lab?

A. Of '96?

Q. Yes.

A. Or '95?

Q. '96 we're talking right now. Your last arrest and mental assistance was in October and early November of 1995.

A. Yes.

Q. Now we're going to January through May of 1996. Did you work at all with setting up a lab?

A. There was a lab set up at Dustin's house in the garage, yes.

Q. My question is, did you work at all in setting it up?

A. I assisted, yes.

Q. All right. But you told him in 1995 you wanted out.

A. Yes, I did.

Q. And you acknowledged -- well, let me strike that question.

When did you first then agree to work with law enforcement officials?

A. After my arrest.

Q. In what month?

A. Can you tell me what month I was arrested? It was a couple weeks after, the week after, right around there.

Q. That you began to do it? Would it be like April?

A. Whatever the time frame is. I don't remember the exact time. Spring after the arrest.

Q. Is your memory better if it's like in spring, fall, and things like that as opposed to dates?

A. Yes.

Q. Again, like you say, you have a tough time with memory.

A. Specifics, yes.

Q. Okay. And that's when you decided to some extent you would implicate your friend; is that right?

A. Yes.

Q. And you would agree that one of the things you wanted to try to implicate him in is in a murder.

A. Yes.

Q. And you perhaps knew him better than anyone; is that correct?

A. That is correct.

Q. And you had what? Six separate conversations with him where they were taped?

A. Yeah, around there.

Q. Okay. And you have already agreed in my cross-examination that at no point in time did he indicate to you he had killed anyone, he had buried someone, he had unburied someone. You would agree to that.

A. He indicated to me he did, yes.

Q. He told you he had killed someone.

A. He didn't say, I killed someone, but I knew what he was talking about.

Q. Well, we're not going by what you knew he was talking about, but we're just trying to go by what he said.

A. I don't know if the word kill was used or not.

Q. Well, has he ever told you even off tape that he's killed someone?

A. It was the same way as it was on tape.

Q. My question is, sir, did he ever tell you off tape that he had killed someone?

A. In the way that he did on the tape, yes, in the --

Q. Do you have a tough time understanding my question or something?

A. I don't know what you're wanting me to --

Q. Did he ever tell you, I have killed someone?

A. No, he did not say those words.

MR. COLLOTON: Objection. Asked and answered.

THE COURT: It has been now.

BY MR. PARRISH:

Q. Did he ever tell you he had buried someone, he says, I have buried someone?

A. No.

Q. Did he ever tell you, I have burned someone up?

A. No.

Q. Either on or off tape.

A. No.

Q. Did he ever tell you that I've had someone kill Mr. DeGeus or his family or Mr. Nicholson and his family or anyone like that?

A. No.

Q. As a matter of fact, what you did is that while you were working with Dustin, you would start conversations in private that were not on tape knowing later on you would be on tape; isn't that true?

A. No, that's not correct.

Q.   Are you telling me while you were working for them between May and June -- and when I say working for them, the law enforcement officials -- you never had any conversations about what about happened to Mr. DeGeus or Mr. Nicholson?

A.   Yes, we did.

Q.   Off tape?

A.   Yes.

Q.   So then you would have those conversations off tape knowing that the conversations would be picked up later on on tape.

A.   I guess I didn't -- I don't understand what you're --

Q.   Let me try to clarify a little bit.  You and Mr. Honken would be at work sometimes.

A.   Yes.

Q.   Is that true?

A.   Yes.

Q.   You would not be on tape at work.

A.   That's correct.

Q.   But later on you were on tape.

A.   Yes.

Q.   You would have conversations about these people or what he was doing or what his plans were off tape.

A.   Yes, that's correct.

Q.   But then once you were wired, you would go back and pick up that conversation on occasion.

A.   I went back and discussed what -- when I would go in, I was told not to bring up anything, to let him bring it up, and that's what I attempted to do when I was on the tape.

Q.   Well, what about when you were off the tape, you know, when you're priming the pump?  Do you know how to prime a pump?

A.   Yeah.

Q.   Are we speaking the same language?

A.   Yeah, I understand what you're saying.

Q.   All right.  So when you're trying to get a deal and you're with this man who's your best friend who you found out has had a relationship with your wife and you want to prime the pump, do you know how to do that?

A.   I don't believe that I could have done that to him, no.

Q.   Why is that?

A.   I don't think that he would have fallen for something like that.

Q.   Because you think he's -- he knew what was going on?

A.   I think he's smart enough to know if somebody was trying to prime the pump on him.

Q.   Well, let me ask you this:  Why is it that there's no reference at all to maybe someone is taping us or maybe our phones are bugged?  I mean, I've been listening to this stuff for 27 years.  There's absolutely nothing on the tape to indicate when he's talking to you that maybe you're wired.

A.    That I --

Q.    That you're wired.

A.    I didn't tell him that I was wired.

Q.    Yeah.  But if he's so smart, wouldn't he have figured it out?

A.    He did start to question it at several points, yes.

Q.    And where do you say he decided to question it?  What does he say to you?

A.    He asks me if I'm wired.

Q.    And what do you say?

A.    I told him no at least on one occasion and yes on another.

Q.    And you told him you were wired on another?

A.    And I lifted my shirt up so he could look on another occasion.

Q.    And during those times did his conversation ever change?

A.    I don't recall.  I'd have to look back at the transcripts.

Q.    And when you lifted your shirt up, did the conversation ever change?

A.    For a few minutes.

Q.    Did he ever talk any differently other than as you indicated he's always talked?

A.    Pretty much the same all the time.

Q.    There's no doubt in your mind about that?

A. No.

Q. Did he ever deny at all any involvement in any drug manufacturing?

A. To me?

Q. Yes.

A. No.

Q. Did he ever deny that he had harmed anyone?

A. Just saying are you meaning I deny that I -- I don't recall if he just said those words or not. He may have.

Q. Well, did he ever say, I don't know what happened to those folks?

A. That's possible, yes.

Q. He said that several times that you were making inquiries, didn't he?

A. I don't remember. At least one point he said that.

Q. And I know Mr. Colloton had you go through and read various portions of the transcripts, and we're not going to do that. But would you agree that as he highlighted certain portions of the transcripts he left out clearly explanations that followed or conversations that may have led up to those highlights that he wants to put into the transcript?

A. I didn't see that, no.

Q. Well, at one point when you were talking about, well, what are you going to do and he says it could be easy -- I think it's transcript 5B or something like that, the Exhibit

5B -- he said, Well, what does your lawyer say about it? What does your lawyer say you should do?  That's the other part of that conversation.

A.    I remember that part.

Q.    Yeah.  And you would agree as he highlights various points there are other things that follow up that explains what Dustin means also other than your going back now and explaining what he means.

A.    It had to do with the same thing.

Q.    Right.

A.    Just another way of asking me.

Q.    And you would agree also that there were conversations that took place off the record about some of these same things.

A.    Yes.

Q.    All right.  And even during those conversations Dustin never made any admissions that he did something himself.

A.    Not in the way that you told me.

Q.    Other than what's here on tape.

A.    In that way he told me, yes.

Q.    As a matter of fact, you probably told the officers that beforehand, didn't you?

A.    Yes, I did.

Q.    And that would -- let me just ask you something.  It's true, is it not, that with regard to Mr. Nicholson's

disappearance, that was more beneficial to your case than it was to Dustin's case, wasn't it?

A.    Not that I know of.  I didn't have a case at the time.

Q.    You eventually had one.

A.    In '93 or -- which one are you talking about?

Q.    The '93 delivery.

A.    Yeah, I got arrested with him, but my charges were dropped.

Q.    And Mr. Nicholson was the pound and a half that you delivered to and that you manufactured out in Arizona.

A.    Yes.

Q.    So as you analyzed your culpability on that pound and a half, your weight was a lot heavier than Dustin's was, wasn't it?

A.    The testimony of him on me?

Q.    Right.

A.    No, I would say he would have more testimony against Dustin than myself.

Q.    Well, you just said Dustin never delivered him a pound and a half.  You're the one that did that.

A.    Yes.

Q.    So I'm saying weight-wise Nicholson's testimony was more damaging to you than it was to Dustin.

A.    You mean for the amount.

Q.    Yeah, yeah.

A. Yes, that would be --

Q. Absolutely. It's not even a close question, is it?

A. Greg would have known that it came from Dustin also, though.

Q. How do you know? You said you never dealt -- you never saw the two of them together.

A. I knew what they were doing. He wouldn't have accepted the drugs from me if he didn't know what we were doing.

Q. Well, that's just your word.

A. Yes.

Q. So if we disbelieve your word, who else's word do we go to?

MR. COLLOTON: Objection. That's argumentative.

MR. PARRISH: If he knows.

THE COURT: Overruled.

A. Would you repeat it?

Q. Yeah. If we reject your word, who else's word do we go to?

A. Dustin's or Greg's.

Q. Do you know where Greg is?

A. No.

Q. Now, how far did DeGeus live from you?

A. About a quarter mile.

Q. Did he live closer to you, or did he live closer to Dustin?

A. He lived closer to me.

Q. Did you know him?

A. I -- yeah, I knew him.

Q. Did you ever go to his house?

A. To pick up the drugs, yes.

Q. Oh, DeGeus's house to pick up the drugs?

A. Or the money from the drugs. I'm sorry.

Q. And you never saw Dustin do that?

A. No, I never saw him go to his house.

Q. So DeGeus was someone who could've implicated you more so than he could have implicated Dustin too, couldn't he?

A. I only picked up money from him.

Q. How much?

A. A couple thousand at the most I would say from him.

Q. And was anyone there at the time you picked it up?

A. No.

Q. So DeGeus could have implicated you also?

A. He could have said I picked up money, yes.

Q. For drugs.

A. I don't remember if I discussed the drugs or not with him. I just -- he knew I was picking up the money for Dustin.

Q. As you assess this in your particular situation and as you have testified here today, who did most of the work in this manufacture in terms of amounts as opposed to you,

Dustin?

A.   The actual work?

Q.   Yes.

A.   Or the -- the actual labor on it would have been me. The brain work on it --

Q.   And who delivered the greatest weight of drugs of anyone involved in this?  You or Dustin?

A.   At one time it would have been me, the one and a half pounds.

Q.   But totally who delivered the most drugs in this transaction in terms of weight?  You or Dustin?

A.   Dustin.

Q.   Well, we added it up.  It looks like you did most.

A.   I only remember --

        MR. COLLOTON:  Objection at this point.  I'm sorry. I'll withdraw it.

A.   I only remember delivering the one time, the pound and a half.

Q.   Well, at any other point was there -- well, you said it could have been 3.2 pounds also.

A.   If we had mixed it up, yes, it would have been.

Q.   Well, who else ever delivered a weight that heavy other than you?

A.   At one time no one did.

Q.   Okay.  So you delivered the largest single amount of

drugs --

A.    Yes.

Q.    -- in this whole thing; right?

A.    Yes.

Q.    You did the most work.  You did the most drugs.  Who lived in the place where the drugs were manufactured?

A.    I did.

Q.    And whose name was the drugs in -- in the house, the apartment, the house?

A.    The house was in my name.

Q.    And Dustin never supplied you any money for any of this, did he, when you went out?

A.    What do you mean when I went out?

Q.    To Arizona.  You said Jeff supplied the money.

A.    That's where the money came from.  I don't know if Jeff handed me the money or Dustin did.

Q.    So Jeff actually supplied the money; is that correct?

A.    That's correct.

Q.    Now, you mentioned yesterday about a gun that was there. Did you ever tell the agents at all about a gun being there?

A.    I don't remember if I did or not.  I think I did, but I don't remember.

Q.    You think you might have told them about a gun?

A.    That we would have had at the house.  I don't remember.

Q.    But it's possible that you forgot that also?

A. I don't -- I don't know. If it's not in there, yes, I forgot to put that down, yes.

Q. You didn't realize that would have added possibly another charge had you admitted that.

A. No, I didn't know that.

Q. You had no idea.

A. No.

Q. Were you ever shown any statements of Mr. Nicholson or did anyone show you the amounts that Mr. Nicholson claimed that he was getting?

A. I saw the list of what people owed. That's all.

Q. Where did you get that list from?

A. Dustin showed it to me.

Q. Did you show any other -- were you shown any other list?

A. That's the only one I remember.

Q. Nothing else?

A. No.

MR. PARRISH: I don't have any further questions.

THE COURT: Mr. Colloton?

REDIRECT EXAMINATION

BY MR. COLLOTON:

Q. Mr. Cutkomp, Mr. Parrish was asking you whether -- what your role was and saying all -- I think you said you did the leg work?

A. I did most of the actual manufacture.

Q. All right. And I thought you got cut off there when you started talking about what Mr. Honken's role was.

A. He was the one that explained to me how to do it and made sure I was doing it correctly.

Q. And who's the one -- how did you know to deliver drugs to Nicholson and DeGeus?

A. Dustin told me.

Q. How did you know how much money or when to collect money from those guys?

A. Dustin told me.

Q. When you're talking to Mr. Parrish about quantity, there was a lot of talk about pure and mix everything. Let me make sure I got that understood. Were the quantities that you gave yesterday on direct examination for each batch the amounts before or after you mixed them?

A. That was before we mixed it.

Q. And you're saying then four ounces the first time is your best recollection.

A. Yes.

Q. And then you listed the others which were 8 to 10 and 8 to 10 and then a pound and a pound and a pound and a half; right?

A. Yes.

Q. And you believe those are accurate amounts of the actual methamphetamine before it was mixed.

A. Yes.

Q. And then you're saying two or three of those may have been mixed before they were brought to Iowa.

A. That's right.

Q. But you can't tell us which one was mixed before it came and which ones came pure.

A. Yes.

Q. And that's your best estimate of the total amount that you made in Arizona and brought to Iowa.

A. Yes, that's my best estimate.

Q. Now, with regard to the money, Mr. Parrish said as I recall -- I'll try to state it accurately -- that if we came up with a total of $30,000 made out of this venture, then you would have received about a third of it.

A. Yes, I remember that.

Q. Do you remember him asking that?

A. Yes.

Q. And you said yes to that because he thought after he went through it with you that you may have received 10,000 or so in --

A. Benefits.

Q. -- aggregate benefits; right?

A. Yes.

Q. Now, what was the price of the methamphetamine as it was sold in Iowa?

A. Well, to begin with it was around 1,800.

Q. Did it change over time?

A. Yes.

Q. What did it change to?

A. I was told that it was lowered to -- I think it got down to about 1,400.

Q. 1,400. And when did it change? Do you know?

A. Just over time.

Q. You don't know as to which batch it changed?

A. Each time he'd -- I don't know exactly when it was, no.

Q. All right. So if we took the total number of ounces that you've mentioned using the conservative amount, say 8, and if it's an 8 to 10 and we took that times 1,400 just to be safe and not fight about 1,800 versus 1,400, that would be the total amount of money that would have been made from selling all that meth; is that right?

A. Yes, if we would have sold it all, yes.

Q. Did you sell most of it?

A. The last batch, I know that it hadn't been all sold yet.

Q. Because Nicholson got caught?

A. Yes.

Q. Do you know how much he paid on that?

A. That would have been around 1,400.

Q. Around 1,400?

A. Yes.

Q. So if you want to figure out the actual amount as opposed to just taking 30,000, you would have to do the math as to all of the meth before the last batch, take 1,400 for the last batch, and then that would be the total amount of money owed?

A. Yes.

Q. I mean paid. I'm sorry.

A. I don't know how exactly we did it. If it was like one ounce, he'd get charged for two because of the cut if it was the pure stuff.

Q. Oh, so you might have even made more money than if you just take the pure ounces times 1,400.

A. Yes.

Q. Because you might have made 2,800 on one pure ounce.

A. Yes.

Q. So that would even be very conservative if we only counted the pure meth times 1,400.

A. Yes.

Q. So then we would have to take about 10,000 as a percentage of that total number to see what your real percentage was, wouldn't we?

A. Yes.

Q. All right. I won't -- we can do the math. We've made the record, but I don't think we need to dwell on --

        MR. PARRISH: Who made the record?

MR. COLLOTON: We can argue about it too.

MR. PARRISH: Yeah, we can.

THE COURT: And no doubt will.

MR. COLLOTON: No doubt.

BY MR. COLLOTON:

Q. Now, do you remember Mr. Parrish said something to you about how there was no -- he's done all these cases and there was never any point in here like other cases apparently where the defendant worried about having a wire on you?

MR. PARRISH: That's a misstatement of the record, but that's fine.

MR. COLLOTON: Is that a misstatement of the record? Okay then.

BY MR. COLLOTON:

Q. Do you remember questions about whether Mr. Honken was concerned about your wearing a wire?

A. Yes.

Q. And you said you thought that it had come up; is that right?

A. Yes.

Q. Do you still got those exhibits in front of you, those transcripts?

A. Yes.

Q. Look at 5B, please, and page 14, the first block. Do you see there where Dustin says, How do I know that you

didn't fucking cooperate with those mother fuckers, pin something else on me to get off this? That's what I'm worried about, Tim, to be honest with you. That's why I'm scared to talk about anything until I can get somewhere where I can sit there and check to make sure there ain't nothin'? Do you see that?

A.   Yes.

Q.   What did you understand him to be talking about there?

A.   He wanted to get somewhere where he could strip search me and make sure there was no wires and feel safe.

Q.   Back in 1993 when Mr. Nicholson disappeared, you're saying your charge was dismissed in state court; right?

A.   Yes.

MR. COLLOTON:  That's all I have, Judge.  That's all I have.

THE COURT:  Thank you, Mr. Colloton.

Any recross, Mr. Parrish?

MR. PARRISH:  Just a second, Your Honor.

RECROSS-EXAMINATION

BY MR. PARRISH:

Q.   After you had had this serious problem in 1995 with your mental health, were there any points in time where you and Dustin talked in detail about that?

A.   I don't recall discussing it in detail, no.

Q.   Did you ever tell the agents prior to the time that you

signed up that you had been in a mental institution for a while?

A. I don't know if I did or not.

Q. You might have forgotten to mention that too?

A. If I didn't mention it and I meant to, then I forgot, yeah.

Q. Okay. Now, Dustin knew about it; is that right?

A. Yeah.

Q. And you would have to admit -- you even indicate in a couple of your statements that I just read over the break -- that you were having a tough time mentally.

A. Yes.

Q. And Dustin recognized that you were on the edge, you had indicated earlier because of his relationship with you, and he knew you were on the edge.

A. Yes.

Q. And you acknowledged that; is that right?

A. Yes.

Q. Now, how did you know that he was not trying to keep you from cracking up and doing something crazy such as what you had done before?

A. That's possible that he could have been doing that at one point, yes.

Q. Because didn't you at one point tell him with regard to Cobeen, I'm watching you closely?

A.   I --

Q.   With regard to what was happening with Cobeen.

A.   I don't know.  I don't remember that statement.

Q.   Have you ever owned a gun before?

A.   Have I owned a gun?  No.

Q.   You never had a gun?

A.   I had a shotgun, yes.  It was my brother's.

Q.   When was the last time you've had a gun?

A.   I had the gun in high school.  It was my brother's gun.

Q.   And you're telling us you have not had a gun in your hand since then?

A.   I have not had one that was -- that I was keeping for myself, no.

Q.   Well, have you had a gun in your hand since then?

A.   The ones of Jeff's I had.

Q.   Oh, you did.

A.   Yes.

Q.   When did you have them?

A.   In Arizona.

Q.   And how many did you have?

A.   Two.

Q.   Where did you have them?

A.   In the house.

Q.   Did you ever take them over to Miss Friesenborg's house?

A.   I don't remember if I did or not.

Q. You might have done that?

A. I might have when I moved out of the house.

Q. Okay. That's something you would have done; is that right?

A. If I would have, I would have left them there for Jeff to come to pick up, yes.

Q. Right. And it was you who called Miss Friesenborg and told her to move that stuff out, didn't you?

A. Yes.

Q. It was not Dustin who called, was it?

A. I don't know if he called later, but that time it was me, yes.

Q. And it was also you who showed up when she went down to be debriefed by agents; is that right?

A. That's correct.

Q. It was not Dustin; is that right?

A. That's correct.

Q. Now, Dustin knew, according to what you're saying, that you were operating on the edge, so to speak, at some point. Did he try to do anything to put your mind at ease about your case?

A. I don't remember if he did or not.

Q. Well, didn't he accept responsibility for making the mistakes that got you into this trouble?

A. At one point he said that he was sorry he got me into

the trouble, yes.

Q. Because he had made the mistakes and not you, is that right, because you were -- you didn't make those kind of mistakes?

A. I had told him that we shouldn't -- that we should get out of making the drugs and not to talk to Cobeen, and that was the mistake he was referring to, those mistakes.

Q. And he was trying to put your mind at ease about Cobeen, wasn't he?

A. He was trying to put my mind at ease about that he would take care of things.

Q. Well, did he ever say, I will take care of Cobeen?

A. If the -- in a way he did, yes. I'd have to look back over to see if it was exactly worded that way or not.

Q. Okay. But don't you think he was basically trying to put your mind at ease about the mistakes he had made and to acknowledge that you had not made the mistakes, that he had made the mistakes?

A. That's not why I think he was saying that, no.

Q. But you would agree that during that point in time you were not at your mental best.

A. When I was taping him?

Q. Not only when you were taping him but back through when you had the mental breakdown.

A. I would say at that point I was not at my best.

Q. Is that the only breakdown you had was that in October of '95? Was that the last breakdown you had?

A. That's the -- yes.

Q. You never went back?

A. No.

Q. And you didn't keep seeing the psychiatrist?

A. Yes, I did.

Q. Did you tell the agents at the time you started working with them that you were under psychiatric care?

A. Yes, I believe I did.

Q. You did?

A. I know that when I was arrested I was ordered to get psychiatric care. So if I didn't mention it, I assumed that they knew.

Q. You were told to get psychiatric care?

A. Yes.

Q. By whom?

A. The judge.

Q. For what reason?

A. For the indecent exposure and also when I was charged with the drugs to get psychiatric care also for -- to see if I needed any other help.

Q. But my question is, did you tell them beforehand that you were on psychiatric care?

A. I don't recall if I did or not.

Q. But you were already prior to your arrest; is that right?

A. Yes.

Q. And Dustin knew that.

A. Yes.

Q. And so for the first time you were receiving psychiatric care at the same time that you were going through these problems with your personal life.

A. Yes.

Q. And these conversations took place under that whole umbrella of your relationship with him.

A. With the psychiatrist?

Q. Right.

A. (Witness nodded head.)

Q. And Dustin being aware of it, being aware that you were on the verge of a possible another nervous breakdown.

A. I don't know if he thought that or not.

Q. But you'd just had one.

A. I didn't think that I was on the verge of another one.

Q. Okay. You thought you had recovered okay.

A. Yes.

Q. Okay. But you're not familiar as to what Dustin thought.

A. I don't know what he thought, no.

Q. Okay. And did you have any discussions with him about

that?

A. I don't recall having discussions with him about it, no.

Q. Not even off the record.

A. No, not even off the record.

MR. PARRISH: Okay. I have nothing further.

THE COURT: Mr. Colloton?

FURTHER REDIRECT EXAMINATION

BY MR. COLLOTON:

Q. Do you think it's accurate to say you had a mental breakdown?

A. I don't know if that's what word I would use.

Q. You had a three-day period where you were in the hospital?

A. I wanted to get help for it.

Q. And then you had some ongoing consultation?

A. Yes.

Q. What did Mr. DeGeus look like?

A. Probably about 5-10, slender, muscular.

Q. DeGeus or Nicholson?

A. DeGeus. But he was muscular, but he was -- he wasn't fat or anything.

MR. COLLOTON: Nothing else.

MR. PARRISH: I don't have anything further, Your Honor. Thank you.

THE COURT: Thank you, Mr. Cutkomp. You're excused.

MR. PARRISH: He gave me some other notes. I gave those to -- Steve, do you have those notes? I think they go back to Jay.

THE COURT: Mr. Jackson, I'm going to return the Cutkomp presentence report to you. And I think we also have the notes from Bob Askelson.

MR. PARRISH: Wasn't there another -- was there another note on the back of that, or was that it? Okay.

THE COURT: Are you ready to call another witness?

MR. COLLOTON: Sure. Yeah. I'm sorry.

THE COURT: That's okay.

MR. COLLOTON: United States calls Dean Donaldson.

DEPUTY WALHOF: We have to get him from upstairs, Your Honor.

THE COURT: How long do you think his testimony will take?

MR. COLLOTON: It will take past noon. I know that. It's fairly lengthy I'm afraid.

THE COURT: We'll go till noon and then take an hour break.

MR. COLLOTON: Okay.

(A discussion was held off the record.)

THE COURT: You'll have to stand up so I can swear you in.

DEAN DONALDSON, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated. Would you state your full name, please, and spell your last name.

THE WITNESS: Dean Lester Donaldson, D-o-n-a-l-d-s-o-n.

DIRECT EXAMINATION

BY MR. COLLOTON:

Q. Mr. Donaldson, are you currently in state custody?

A. Yes, I am.

Q. You're serving a state sentence?

A. Yes.

Q. And for what are you serving a state sentence?

A. Second degree theft.

Q. Were you prosecuted in Woodbury County?

A. Yes.

Q. Were you incarcerated for a time at Woodbury County Jail?

A. Yes.

Q. When did you go into the Woodbury County Jail in connection with that theft charge?

A. January 23, 1996.

Q. And about how long were you incarcerated there in that stretch?

A. Till August 14.

Q. Were you awaiting trial?

A. Yes.

Q. And why were you in jail as opposed to out?

A. Because I couldn't post bond.

Q. Where were you housed in the Woodbury County Jail?

A. D block.

Q. Do you know the defendant in this case, Dustin Honken?

A. Yes.

Q. Do you see him here in court today?

A. Yes.

Q. How did you first meet him or where, I should say?

A. In D block in Woodbury County Jail.

Q. Did you meet him when he was detained in there on this federal case?

A. Yes.

Q. What conversations did you have with Mr. Honken about his case when he first came in?

A. Not too much at all at first.

Q. All right. What eventually did you talk about?

A. That progressed, and he told me why he was in there.

Q. What did he say about why he was in there?

A. Because he had a meth lab.

Q. What did he say, if anything, about the government's evidence against him?

A. He had some witnesses testifying that he had a lab.

Q. Who did he say were the government witnesses?

A. Cobeen.

Q. Who else did he say was a government witness?

A. Tim.

Q. How did he describe Tim?

A. He was 6-2, blond hair. That's all. And he used to be his best friend for 13 years.

Q. What did Mr. Honken tell you about -- well, strike that. Excuse me.

What, if anything, did Mr. Honken say to you about his future plans?

A. As to --

Q. As relating to drugs.

A. Well, we had talked about a deal where if he had the chemicals that he needed he could make one more deal worth ten million dollars.

Q. What did he say about how he wanted to do that?

A. Well, he needed some things that weren't confiscated the first time, and he also -- there was some other chemicals that he needed that possibly he wanted me to get if I would.

Q. What did he say about how he was going to sell the drugs in this future plan?

A. Through the Internet so no one could pick up any big quantity. It would be placed through the Internet where people would pick tubes of meth up at -- just small quantities of meth.

Q. What did he say about how that was going to work?

A.    In response to -- I don't understand.

Q.    You were going to use the Internet to have tubes of meth --

A.    That only he would know where they were at.  No one could break into the Internet to ever get where they're all placed at.

Q.    Now, you said that he told you he needed some chemicals and things like that that had not been seized?

A.    Right.  Well -- yes.

Q.    What did he tell you that he needed to do this future meth project?

A.    Well, he had a tank that was hard to get ahold of that he wanted me to go get for him, and there was some other things, some other chemicals that he wanted me to get.

Q.    Let me ask you about this tank first.  What did he say about this tank?

A.    That it wasn't seized -- it wasn't found in the -- when the feds come in and got his stuff.

Q.    What did he say about where it was?

A.    It was at a friend of his.

Q.    Did he describe who that was?

A.    Yes.

Q.    Who did he say had the tank?

A.    A guy named Jay, a friend of his that he worked with, young, 21, likable guy.

Q. From where?

A. Mason City.

Q. And what did he talk to you about with respect to that tank?

A. He wanted me to get it and hang on to it.

Q. And what kind of arrangement did he propose to you financially?

A. Well, that he was going to make one big time, one more big deal worth ten million and we'd split it.

Q. How were you supposed to get this tank if you're in the Woodbury County Jail?

A. He was going to bond me out.

Q. And then how were you supposed to get a tank from somebody named Jay in Mason City?

A. He left me a note.

Q. What do you mean by that?

A. A note to give to Jay.

Q. Let me show you what's been marked Government Exhibit 11G. Do you recognize Government Exhibit 11G?

A. Yes.

Q. What's 11G?

A. That's the note to Jay from Dustin.

Q. Is this a note that he gave to you in the jail?

A. Yes.

Q. What did you eventually do with this note?

A.    I put it with the rest of my paperwork that I had while I was in jail.

Q.    Where did you put that paperwork?

A.    At Phil Parmelee's when I got out.

Q.    Now, you mentioned Mr. Honken also wanted you to get some chemicals; is that right?

A.    Yes.

Q.    How were you supposed to know what chemicals to get?

A.    He gave me a list of things to do.

Q.    Let me show you what's marked Government Exhibit 11F. Do you recognize that?

A.    Yes, I do.

Q.    What's Government Exhibit 11F?

A.    It's a list of things he wanted me to get for him.  He wrote them down.  I copied them.

Q.    Why did you copy them?

A.    Because he didn't want his handwriting on them.

Q.    Did you discuss with him any of these specific chemicals on Exhibit 11F?

A.    Yes.

Q.    What did you talk about?

A.    The rocket fuel and the paint thinner.

Q.    Which one's the rocket fuel?

A.    The methane.  I think that's how you pronounce it.

Q.    What conversation did you have about that?

A.   Well, I told him that I thought I knew where I could get it.

Q.   What conversation did you have about paint -- what do you mean by paint thinner?

A.   It's a chemical that's in paint thinner.

Q.   Which one is that?

A.   Toluene, toluene.

Q.   And what conversation did you have about that with Mr. Honken?

A.   He just told me how much to get, how much of it to get. It would make a certain amount which I don't remember what that was.

Q.   Is sassafras oil listed on that exhibit?

A.   Yes.

Q.   What conversation, if any, did you have with Mr. Honken about that?

A.   That was another drug that he was going to make.

Q.   What was another drug?

A.   Sassafras was -- is a chemical he needed to put in some drug he was going to make I think from the sixties that college people like, and he was going to make a lot of money so in order to finance maybe the ten million dollar meth if he didn't have the money.

Q.   What is listed on the bottom of Exhibit 11F, on the bottom of the first page?

A. Professor Buzz.

Q. But I mean what is the nature of those things?

A. Oh, they're all drug-related chemicals.

Q. Professor Buzz is a chemical?

A. That's -- them are books that he wanted me to get.

Q. What did he say about the books?

A. They were books that he wanted me to get because they might be outdated by the time, you know, that -- anytime they'd be outdated.

Q. Do you see about six lines up or seven lines up from the bottom of 11F it says D, period, m-o-m-s?

A. Yes.

Q. Did you talk about that notation with Mr. Honken?

A. Yes, I did.

Q. What did he tell you about that?

A. That book could be gotten at his mother's place.

Q. And what does D, period, m-o-m-s mean?

A. That's Dustin's mom.

Q. What's on the second page or maybe the back of what you have there, of 11F?

A. Them are just some more books.

Q. What did he say about those books or --

A. He gave me a place that says Dalton's book store, where to purchase a book.

Q. What did Mr. Honken say to you about how he was going to

be able to participate in this if he was in the Woodbury County Jail?

A.   Well, he was going to bond me out.  As we talked earlier on, he was going to bond me out just to get this done.

Q.   And when did he think he would be able to participate in that with you?

A.   When we first talked, in just a few years, maybe possibly five.

Q.   How did he tell you that he had figured that?

A.   Because he had a book of federal guidelines that he checked out every day.

Q.   You say that was at first.  What discussions did you have about timing after that?

A.   This was the period of a month and a half or a month. Kept talking every day about it, and I believed after a while we weren't even getting -- I was never -- it was just talk.

Q.   But I mean how did the time when he would be available change if at all over your --

A.   Well, in his guidelines he pointed out if Tim was gone or Cobeen, especially Tim because he took him back to the '93 meth lab, would knock off so many points on the guideline and possibly knock a couple years off.

Q.   Now, you say Tim would take him back to '93.  What do you mean by that?

A.   Tim and him were involved in '93.

Q. Involved in what?

A. In a meth bust by the federal government.

Q. How do you know that?

A. He told me so.

Q. And what did Mr. Honken tell you about how that case got resolved?

A. It was resolved because all the witnesses came up missing.

Q. What description, if any, did Mr. Honken give you about the witnesses who came up missing?

A. That one was a big tough guy.

Q. What did he say about the big tough guy? How else did he describe him?

A. He used to date Angie, his girlfriend.

Q. What else did he say to describe him?

A. He owed $30,000.

Q. To whom?

A. To Dustin.

Q. And who else did he say?

A. He just mentioned a couple.

Q. Pardon me?

A. A couple is all he mentioned. He didn't say the names, just a couple.

Q. And did he mention anybody else being missing?

A. No.

Q. He mentioned nobody else being missing?

A. Well, he said a kid had been missing, but he never got into detail of any kind.

Q. And what did he say, if anything, to you about how the first person you mentioned who owed the $30,000 ended up missing?

A. Well, he just said he was supposed to go to sentencing or a plea bargain and again the witnesses never -- they came up missing so --

Q. And what did he say to you, if anything, about how the first guy you mentioned, the $30,000 debt guy, disappeared?

A. They met out in the country at an abandoned place.

Q. Who did?

A. Dustin and this man.

Q. And what did Dustin tell you happened out there?

A. He was shot out there, and he said he didn't die like they do on TV. He shot him and he kept coming. He shot him and he kept coming.

Q. Who shot who?

A. Dustin shot the big guy.

Q. What did he say happened after that?

A. He shot him again, and he said they don't die like they do on TV. He kept coming, and the guy said, Don't kill me. I'll pay you 30,000.

Q. And what happened then?

A.   He died.

Q.   What else did he tell you about that?

A.   Just that dead people are heavier when they're -- dead people are real heavy.  He told me that.

Q.   What did he tell you about how this couple disappeared, if anything?

A.   He mentioned that they pulled up in front of a house.  He said it was more Angie's idea to do it than his.  Pulled up, and they went in the house, and they strangled them.

Q.   What did he say about how these people had been strangled?

A.   With a drop cord.

Q.   What did he say happened to the bodies of these people after they were killed?

A.   They were buried.

Q.   What did he say, if anything, about how they were buried?

A.   They were buried with a backhoe.

Q.   Did he ever express any concern about that situation?

A.   Yes.

Q.   What did he say to you about that?

A.   He was worried about them surfacing.  Either they were buried shallow or he was worried about Angie telling.

Q.   Did you talk to Mr. Honken or did he talk to you about any plans he had to try to avoid liability for his current

case?

A.   Yes.

Q.   What did he say to you about that?

A.   That if he -- he had just beaten this monitoring band on his leg, if he would have had another week, he was going to take care of all the witnesses again.

Q.   Did he say specifically anything about who he was going to take care of again?

A.   Cobeen -- at that time Cobeen, Pat Reinert, the chemist from Chicago I believe he was and then come back and kill Angie because she was a witness to all -- she was the key to a lot of things.

Q.   What do you mean when he said he'd beaten the -- did you say something about beating an electronic monitor?

A.   Yes.

Q.   What did he say to you about that?

A.   He'd figured out how the monitor was going to say he was at home and he really wasn't.

Q.   And what did he say was the benefit of that?

A.   Well, he had -- he had proof he was home.

Q.   Did he say anything about any role for Angie Johnson in that plan or that prospect?

A.   No, he didn't, just that that was the last person he was going to kill because she could link him to the '93.  And they figured they would put pressure on her so he would

eliminate that.

Q. Did you discuss with Mr. Honken how since he wasn't out of jail, that he was in jail, he could try to do any of these things?

A. Well, as we progressed in talking -- again, it seemed like just talk -- he discussed in his guidelines book if -- well, if Tim was gone, I'd be down to this much. And that's when he discussed maybe having someone take him out.

Q. And what further conversation did you have with him about that?

A. He had asked me if I would do it, and I guess at that time I agreed to do it.

Q. So what discussions did you have about it?

A. We just -- he -- we discussed it for several days, and then he ended up giving me directions to his folks' place.

Q. All right. Let me first ask you how did he describe -- well, who did you talk about that you were supposed to kill?

A. Tim.

Q. And you said he described him as 6-2, blond hair, best friend for 13 years?

A. Yes.

Q. What did he say about where he worked?

A. He worked with him at the Jell-O plants.

Q. What did he say about what kind of car he drove, if anything?

A. I believe it was a 1984 to '86 two-tone brown Chevy.

Q. What did he say about where --

A. Impala, I believe.

Q. Pardon me?

A. I think it was an Impala, I believe.

Q. What did he say about where this fella lived?

A. He lived with his folks out in the country.

Q. Now, you said you were unable to get bond. How were you supposed to get out of jail to do this?

A. He was going to do that for me.

Q. What did he say about how he would do that?

A. Since I had been living in Texas, I had a Texas address, so I needed collateral, and he was going to take care of that for me. He was going to have Kathy Ricks take care of it, the collateral.

Q. Did he tell you who Kathy Rick or Ricks is?

A. One of his girlfriends.

Q. Did you eventually get bonded out?

A. Yes.

Q. Do you know how -- did you have contact with the bonding company about it?

A. Through Lederman Bonding.

Q. Do you know who put up bond for you to get out?

A. Kathy Rick.

Q. When was it that you got bonded out?

A.   August 14.

Q.   Did you discuss with Mr. Honken the timing of when you were going to get out?

A.   Yes.

Q.   What conversation did you have about that?

A.   It was important that I got out because he -- his deadline for trial was coming up soon.

Q.   Now, you said he gave you some kind of directions as to how you were supposed to find Tim?

A.   Yeah.

Q.   How did you get those directions?

A.   He gave me directions, and I copied it.

Q.   Let me show you what's marked Government Exhibit 11K. Do you recognize Exhibit 11K?

A.   Yes.

Q.   What's that?

A.   That's directions to Tim's folks.

Q.   And you're saying you copied this down?

A.   Yes.

Q.   From what?

A.   From his copy.

Q.   Now let me ask you, did you talk to Mr. Honken about this diagram?

A.   Yes.

Q.   Well, first of all, what did you do with this paper

after you got out of jail?

A. Again, all my belongings was at Phil Parmelee's.

Q. And then at some point you got taken back -- we'll get to this, but you got taken back into jail in November; is that right?

A. Right.

Q. Pardon me?

A. Yes.

Q. And your papers and stuff were still at Phil Parmelee's house?

A. Yes.

Q. And so you haven't seen this since you left -- you didn't have physical custody of it since you left Parmelee's house?

A. No.

Q. All right. Do you see on the bottom right-hand part of Exhibit 11G there's a box with an X in it that says, This one?

A. Right. That was where Tim's folks' lived.

Q. And what conversation did you have with Mr. Honken about how you were supposed to carry out this plan to kill Tim?

A. Further down the road there's a bridge, and on the left-hand side there's some bends, and he said to park there, put up a barricade, and he'll stop to move the barricade, and he said to shoot him there.

Q.   Was that the first idea he mentioned?

A.   Yes.

Q.   Did you ever talk about whether you should kill him at the house itself?

A.   Yes, he did.  He did say prior to that just to go to the house and kill them all.

Q.   What did he say about that, or what did you say about that?

A.   I asked him why would he kill his mom and dad, and he just said they had him.

Q.   How did you react to that idea?

A.   I didn't think that was real smart.

Q.   So then you discussed this other idea that you mentioned?

A.   I just --

Q.   Where is -- I'm sorry.

A.   Go ahead.

Q.   Where is that depicted on the diagram?

A.   It's back to this corner by the blacktop.  There's a bend in the house there -- or bend in buildings or something he said.

Q.   Is there anything on Exhibit 11K that marks the spot where you were talking about?

A.   Yes.

Q.   What marks the spot?

A.    An X.

Q.    Which X?

A.    It's an X with a circle around it by the -- it says two miles.  Right below it there's an X.

Q.    And that's where you discussed putting a barricade in the road?

A.    Right.

Q.    What discussion did you have with Mr. Honken about the other X that's on the right side of the diagram to the left of the word b-r-i-g-e?

A.    Well, I had told him that I didn't think that was very good, so that's why we went down to this place, and further down the road he said that Tim's dad had an abandoned place down the road farther, to just park the car in there and walk down to the corner and wait for him by the barricade.

Q.    And when you're talking about walking down to the corner away from by the barricade, you mean the X near the two-mile mark?

A.    Right.

Q.    What conversation did you have with Mr. Honken about the X up by the word bridge?

A.    Again, nothing -- that was -- that was his first plan which -- one of the first plans that we chose not to do.

Q.    Did you talk to Mr. Honken about how you were supposed to actually kill somebody, what weapon or method you would

use?

A.   A gun.

Q.   What did he say to you about how you could get a gun?

A.   He said he had a gun.

Q.   Where did he say -- did he say you could get the gun?

A.   Yes, he said I could -- well, he -- he did say I could get the gun.

Q.   What did he say about where it was?

A.   He said it was at Rick Held's.

Q.   Did you know Rick Held?

A.   No.

Q.   Did you agree to use that gun?

A.   No.

Q.   Why not?

A.   Because of what -- it probably went back to '93.  I'm assuming it went back to '93.

Q.   Therefore what?

A.   I didn't -- I figured there was killings behind it.  I'm assuming.  And I said no, I didn't want it.

Q.   Did he tell you about what kind of gun he had?

A.   Yes, he did, but I really don't remember.  It was a rifle I believe.

THE COURT:  Mr. Colloton, do you have any problem with taking our noon break now?

MR. COLLOTON:  None, Judge.

THE COURT: Okay. We'll be in recess until one o'clock. Thank you.

(Lunch recess at 12:01 p.m.)

THE COURT: Please be seated. Mr. Colloton, I interrupted you. You were in the middle of your direct examination of Mr. Donaldson.

MR. COLLOTON: Yeah. Let me try to remember.

THE COURT: Do you want me to read back what your last question was?

MR. COLLOTON: That would be helpful, Judge.

THE COURT: Question, Did he tell you about the kind of gun he had? Answer, Yes, he did, but I really don't remember. It was a rifle I believe. The Court, Mr. Colloton, do you have any problem with taking our noon break now?

MR. COLLOTON: Mr. Colloton, none.

THE COURT: None.

MR. COLLOTON: All right.

BY MR. COLLOTON:

Q. Mr. Donaldson, did you discuss with Mr. Honken when you should go out to the places indicated on the diagram to try to kill Tim?

A. Yes.

Q. What did he say to you about that?

A. He gave me the days that he would go in an hour early to

the Jell-O place.  I believe it was on a Tuesday I believe.

Q.   What do you mean he gave it to you?

A.   He gave me the days and nights that he worked.

Q.   In what form did he give it to you?

A.   He had a calendar with -- put minuses and zero.  Zero meant one or the other, and minuses meant the other.

Q.   Let me show you Government Exhibit 11J.  Do you recognize that?

A.   Yes.

Q.   Is that the document you're referring to?

A.   Yes.

Q.   And you're saying that -- where did you get that document?

A.   From Dustin.

Q.   Whose writing is on that document?

A.   Dustin's I believe.  That's the way I received it.

Q.   And what discussion did you have about Exhibit 11J with Mr. Honken?

A.   Well, again, on Tuesday -- the first Tuesday of the working -- the day shift they'd go in an hour early, so it would therefore be darker -- it'd be best to get -- that'd be the best time of the day to do it early in the morning when he was at that stop sign.

Q.   Did you discuss how you were supposed to kill Tim if it was early in the morning and still dark or dark outside?

A.   Well, he'd given me a deal on a high-powered rifle night scopes.

Q.   What do you mean he'd given you a deal on that?

A.   He'd given me an address.

Q.   Do you still have Exhibit 11K in front of you?

A.   I got 11J.

Q.   You don't still have 11K which was the diagram?  Do you still have that in front of you?

A.   Yeah.

Q.   All right.  Would you look at the back of that which I think is the second page on the photocopies?

A.   Okay.  Go ahead.

Q.   What is the information written at the bottom of the back side of 11K?

A.   These are just addresses.

Q.   What's at the bottom?

A.   Oh, there's a deal here, but it's an address for night scopes.

Q.   Are you saying you can't see it because of the sticker?

A.   I can see night and amounts, scope.

Q.   All right.  Well, let me --

        MR. COLLOTON:  Any objection to my showing a copy of that to the witness?

        MR. PARRISH:  None.

BY MR. COLLOTON:

Q.   Let me show you a copy of 11K which doesn't have the evidence tag blocking it.  Do you see the writing at the bottom of the back side of the second page of 11K?

A.   Right.

Q.   Where did you get that information?

A.   From Dustin.

Q.   What discussion did you have with him about that?

A.   That if it was dark that I could put a night scope on it.  That way I wouldn't have no trouble seeing.

Q.   You could put a night scope on what?

A.   On the rifle.

Q.   Now, what discussion did you have with him about the specific writing on there, Night Scope International and the number underneath it?

A.   He got that out of a magazine I believe.  Is that what you're saying?

Q.   What did he tell you about it?

A.   That that's where I could -- if I needed a scope that I could get one here, a night scope.

Q.   What's the writing on the right side where it appears to say 279?

A.   That's the price of it.  It says gun mount.

Q.   All right.  And did you write that?

A.   Yes.

Q.   Why did you write that?

A.   Because, again, he said possibly this would be a place to get a high -- or a night scope and gun mounting, a gun mount.

Q.   Did you talk to Mr. Honken about the plan for what you were to do after you killed Tim?

A.   Yes.

Q.   What conversation did you have with Mr. Honken about that?

A.   Again, goes back to this diagram.  He wanted me to take it back to where his -- to where my car was to be parked and leave -- throw him in his car and throw -- take it back to this abandoned place that Tim's dad owned behind them buildings and leave it.

Q.   What did he want you to do after that?

A.   Take the gun and throw it in a pond that was not far from there.  It was real muddy water.

Q.   What did he want you to do after that?

A.   He wanted me to -- we discussed on Minneapolis or Des Moines.  He wanted me to write a letter to Cobeen's mom and dad advising him it wouldn't be wise that their son shows up for court, for Dustin Honken's court.

Q.   What do you mean when you say we discussed Minneapolis and Des Moines?  What was said about those places?

A.   Well, he said take to Des Moines -- or excuse me, to Minneapolis, and I -- in the final end the point was the

letter was supposed to be sent from Des Moines.

Q. Why did he say he wanted you to go to Minneapolis?

A. To take -- so there wouldn't be no fingers pointed at Angie.

Q. Why didn't you eventually plan to go to Minneapolis?

A. I told him I didn't want to drive up to Minneapolis. That's what I told him.

Q. Now, you were supposed to send a letter then from Des Moines. Is that what you're saying?

A. Right.

Q. And how were you supposed to prepare the letter?

A. Supposed to be typed. I was supposed to have purchased an old typewriter.

Q. Whose idea was that?

A. Dustin suggested all those things, and he's very intelligent. I went along with a lot of the things he said.

Q. What was the purpose of an old typewriter?

A. Not being able to go back and find out possibly where it was purchased or what typewriter it came off of.

Q. How did you know what you were supposed to say in this letter that you're talking about?

A. He'd given me -- he showed me what to put on that letter.

Q. Let me show you what are Government Exhibits 11L and M. What's Government Exhibit 11L?

A. This is what he wanted put in the letter.

Q. Who wrote that document in front of you, 11L?

A. I did.

Q. Why did you write it?

A. He didn't want his handwriting on anything.

Q. And where were you supposed to send that letter once you typed it?

A. To Darrell Cobeen.

Q. How did you know the name and address to send it?

A. He gave it to me.

Q. Do you see Exhibit 11M in front of you?

A. Yes.

Q. What's that?

A. That's the address, Darrell Cobeen.

Q. What did Mr. Honken say about the likely effect of these actions on his case?

A. That his family would probably advise him to withdraw to testify against him, and he would be let go.

Q. When you say the family would probably advise him to withdraw --

A. Advise the son to withdraw testifying against Dustin.

Q. Meaning who to withdraw?

A. Their son. I don't know their son's name. Cobeen's son.

Q. And that would result in Dustin's case having to be

dropped?

A.   Right.

Q.   What was to be the benefit to you of doing all of this?

A.   Again, it goes back to that ten million he talked about. He'd talked about going halves when we got into this. He'd give it all to me if I did it.

Q.   Was there ever a point at which you discussed some alternate plan to kill Tim other than your doing it yourself?

A.   Yes.

Q.   How did that come up?

A.   Because again for -- this went on for weeks, and it was more like talk than being realistic, and at the very end it looked like I was going to get out. I said I didn't know if I could do it. So I told him I knew some El Forestros and I knew this other man that would possibly do it and I'd ask.

Q.   What other person are you talking about?

A.   LaDean Hummel was a man that I suggested was kind of a violent man, that he'd possibly do it, and I knew a guy at the El Forestros that would do it I said. I didn't say I knew he'd do it. I said he might do it.

Q.   Did you think it would cost anything?

A.   Yes.

Q.   What did you decide about that?

A.   We didn't know. Five or ten thousand. Weren't sure.

Q.   When you started to discuss that option, how did you and

Mr. Honken think you were going to get the money to do that?

A. We talked about what I had been in trouble for in the past, and that's livestock theft, hog rustling, and he said his friend, Rick Held, was behind on a feed bill and his wife didn't have knowledge of it. Possibly he'd be interested in helping him out and helping himself out at the same time.

Q. So specifically what were you to tell Rick Held?

A. He had a note for me to give to Rick Held. It was basically to help Dustin with his lawyer fees.

Q. What was to help Dustin with his lawyer fees?

A. The hogs, the hogs that I was going to bring -- he was going to ask to use his truck and trailer and ask him if he would sell these and get a third or -- possibly a third I believe it was and the rest Dustin would get to take care of his lawyer fees. He needed money for his attorney.

Q. So you were supposed to tell Rick Held the money was going to be for lawyer fees?

A. (Witness nodded head.)

Q. Is that right?

A. Right, plus help him with his feed bill.

Q. Let me show you Government Exhibits 11H and I. Do you recognize those?

A. Yes.

Q. What are those? What's 11H?

A. That's a note that he wrote to Rick.

Q. And what's 11I at the bottom there, bottom of the same envelope?

A. Oh, I'm sorry. That's Rick Held, Mason City. That's where he was employed. He's a farmer, and he's employed at the Jell-O place where Dustin worked.

Q. How do you know that?

A. Only that Dustin told me. I don't know that.

Q. Who wrote 11I with the name and the town?

A. I did.

Q. Why did Dustin write 11H which was the letter to Rick Held?

A. Because that was -- he would more be -- he would more believe it if Dustin wrote it than I.

Q. Did you talk to Mr. Honken about your thoughts about whether you would actually do this or not when you got out?

A. In regards to --

Q. Whether you would actually carry out what he wanted you to do.

A. I assured him I would try.

Q. And did you talk about the possibility that you wouldn't do it?

A. Yes.

Q. What did you say about that or what conversation --

A. That's where again we brought in El Forestros, and that's when El Forestros and other men were brought into the

picture.

Q.   Did Mr. Honken ever say anything to you about what would happen if you didn't carry out the plan?

A.   Only time he mentioned just don't make him mad.  I asked him what would happen.  He just said not to make him mad.

Q.   Let me show you some other exhibits here, Mr. Donaldson. On 11K which is the diagram with the names and the numbers on the back --

A.   Yes.

Q.   -- what did Mr. Honken say to you about why he wanted you to copy down those names and numbers?

A.   Kathy Rick was his -- he said if I needed anything to call Kathy.  And Marvea Smidt was his mother, and I was supposed to pick something up from her, a book.  And Angie Johnson was basically for drugs.  She was supposed to get drugs from Jimmy Rodriguez, and I was supposed to help set that up.

Q.   What do you mean by that?

A.   Well, not help set it up, but he had his number here that if I wanted I could call him and see if he did it or call her and see if she had gotten them.  And also Jimmy Rodriguez had $200 that he had given him for work release, and he was supposed to pay it back, and he said if I needed it I could call him.

Q.   Is Jimmy Rodriguez's number on here?

A.   Yes, it is.

Q.   Is that where it says Jimmy?

A.   Yes.

Q.   Did you talk to Mr. Honken about how you should communicate with him once you got out of jail?

A.   Yes.

Q.   What did he tell you about that?

A.   I had a special book with a code.  It was a book that he give me with a code that I could go by.

Q.   Let me show you Government Exhibit 11B.  Do you recognize that?

A.   Yes.

Q.   What's 11B?

A.   That's the code that he set up to communicate with him.

Q.   What did he tell you about -- in general about how that was supposed to work?

A.   Well, I honestly don't remember, to be honest, about how it works.  I don't.

Q.   Well, do you see on the piece of paper where there's a block that says page and then there's a number sign?  What was that supposed to refer to?

A.   Well, it'd be so many zeroes would be the page and the paragraph and the word and then the letters.  So I had a system so he could read -- the first word in a paragraph of the page would be an R, and it would set up words is what it

did.

Q.   And you're saying you got a book from him that you were supposed to use for that purpose?

A.   (Witness nodded head.)

Q.   You have to answer out loud.

A.   Yes.  I'm sorry.

Q.   Let me show you Government Exhibits 11C and D.  Do you recognize Government Exhibit 11C there?  Do you recognize Government Exhibit 11C?

A.   Yes.

Q.   What's that?

A.   It's Kathy Rick -- that's her number.

Q.   And what's on the back of 11C?

A.   Phil Parmelee's name and number.

Q.   Who wrote that information down?

A.   I did.

Q.   Who was Phil Parmelee again?

A.   It's a person when I bonded out of here I bonded to his address.

Q.   And then what's Exhibit 11D?  It's on the same envelope there, that small piece of paper.

A.   Oh.  Again, Kathy Rick, Mason City.  It's her telephone number.

Q.   Let me show you Exhibit 11E.  Do you recognize that?

A.   Yes.

Q. What's Exhibit 11E?

A. It's some more chemicals that are needed to make metham -- meth.

Q. Is this more of the chemicals that Mr. Honken wanted you to get when you got out?

A. Yes.

Q. Did you write this stuff down?

A. Yes.

Q. Where did you get the information to write it down?

A. From Dustin.

Q. Let me show you Government Exhibit 11N. What's that?

A. It's a map of Iowa.

Q. Where did you get that?

A. Dustin gave it to me.

Q. What did he say about why he was giving you that?

A. To better guide me in that area that I'm not knowledgeable about around the Mason City area.

Q. Where are you from?

A. I'm from Sioux City area.

Q. Let me show you Exhibit 11O.

A. That's just an envelope that he had given me, put some personal things in it.

Q. And let me show you Exhibit 11A. What's that?

A. That's just an envelope with my attorney's name on it, Peter Van Etten.

Q.   And let me show you Government Exhibit 11P.   What's that?

A.   That was just a magazine that I had inquired at the D unit, D block, and I told Dustin that it reminded me of him.

Q.   Who's pictured on the front of that cover?

A.   Just says, The odyssey of a mad genius.   I can't even think of his name.

Q.   Now, you said you were released from jail on August 14 after Mr. Honken arranged for you to be bonded out; right?

A.   (Witness nodded head.)

Q.   You have to answer out loud.

A.   Yes.

Q.   Then you went to Phil Parmelee's place?

A.   Yes.

Q.   And you stored your belongings there?

A.   Yes.

Q.   Did you store all the exhibits that I've shown you in the 11 series at Parmelee's house?

A.   Yes.

Q.   Did you ever take any action on the plan to kill a witness or witnesses -- a witness that you had discussed with Mr. Honken?

A.   No, I didn't.

Q.   Did you ever make any contact with Rick Held?

A.   No.

Q.   Did you ever make any contact with Jay, the guy who had the tank?

A.   No, I didn't.

Q.   Did you ever make any contact with Angie Johnson?

A.   No, I didn't.

Q.   Did you ever make any contact with anyone from the El Forestros?

A.   No.

Q.   Did you ever make any contact with LaDean Hummel?

A.   No, I didn't.

Q.   Did you ever have any contact from outside the jail with Mr. Honken when you were out --

A.   No, I didn't.

Q.   Did you ever contact Mr. Honken's mother?

A.   No.

Q.   Did you ever purchase any of the books that Mr. Honken had listed?

A.   No, I didn't.

Q.   Did you ever visit the area of the location of Tim's parents?

A.   No, I didn't.

Q.   Did you ever take any steps in furtherance of the plan that you had to kill Tim?

A.   No, I didn't.

Q.   Did you make contact with Kathy Rick?

A. Yes.

Q. What was the nature of your contact with her?

A. Because she wanted some money back from that bond which Phil kept saying he would pay her some money. He was trying to help me out. She kept calling, and I didn't have it. So I talked to her several times on the phone.

Q. What was your understanding with Mr. Honken as to your responsibility for that bond?

A. He wasn't concerned about the money. He was concerned about getting done what he wanted done.

Q. Did you stay at Phil Parmelee's house the whole time you were out on bond?

A. No, I didn't. I stayed there like two weeks, and then I moved to Steve White's place.

Q. What did you do with the paperwork that I've showed you when you left Parmelee's house?

A. I never seen that. Once I left jail, I never seen it again till I was in jail again, till I was --

Q. Where did you leave it?

A. I left it at Phil Parmelee's.

Q. Did you have a state case going then?

A. Yes.

Q. Criminal case? And what happened to that case while you were out on bond?

A. I pleaded guilty to five-year sentence and was supposed

to be in court on November 7, and I failed to be there.

Q. What happened when you failed to be there? Eventually what happened?

A. I was caught 13 days later by the bondsman.

Q. What happened to you after you got caught?

A. I was brought into Woodbury County Jail.

Q. Where were you put in the Woodbury County Jail?

A. C block.

Q. Did you have any contact, visual or verbal, with Mr. Honken?

A. Yes. I saw him -- I saw him walk by once, and I wrote him a letter one time, a short letter.

Q. What happened when you first saw him again when you were back in the jail?

A. He had that look in his eyes like he had when we talked about Tim.

Q. Describe that look.

A. A evil look.

Q. What did you do when you first saw him?

A. I didn't want to see him. I just went back to my room, and then I -- I don't know if it was that day or what day it was I wrote him a short note. I didn't have no paper. And I said I'd get back to him, and he never got back to me, so I knew something was wrong right there. I wrote a note through the door. He was in D block.

Q. How did you end up having contact with the federal government in connection with this whole matter?

A. Prior to that there was a guy that was in his unit that made a noose. He said I was dead, and he somehow got Dustin's name involved, and I knew what he was talking about anyway. And so I talked to my attorney about it, and he contacted you.

Q. At some point then did a federal agent come to visit you at the Wood --

A. Yes, he did.

Q. At the Woodbury jail?

A. Yes.

Q. What, if anything, happened in regard to this whole matter on December 18 of last year?

A. On December 18?

Q. Yeah.

A. I'm not positive of the date, but after talking to these people, I was sitting up on the rail talking to a little Vietnamese guy, and the guy that was two doors down from me yelled over to me several times, said, Somebody's shooting at you. And I immediately knew who it was. And I took my time going over there, and he's pointing a gun at me.

Q. Who is?

A. Dustin.

Q. Where were you?

A.    I was in C unit on the top rail.

Q.    Where was Mr. Honken?

A.    He was in the rec. room across the hall with glass windows.

Q.    What do you mean he was pointing a gun at you?

A.    Well, pointing at me like a gun.

Q.    You mean with his hand in --

A.    Right.

Q.    You have to let me finish the question.  You mean with his hand in the shape of a gun?

A.    Right.

Q.    What else did you see through the window at that time?

A.    Then he said I was a -- a snitch, and I just said no.  I went back to my room.  I stayed there.  Everybody kept looking up there.  And then Boo Dean came in, and he was taking it as a joke kind of, said that he said I was a dead man and he was supposed to come up and kick the shit out of me.

Q.    Who's Boo Dean?

A.    He's a guy that was in C unit with me.

Q.    What do you mean he was taking it as a joke?

A.    Well, I don't -- I don't think he took it as serious as it was.

Q.    How did you take it?

A.    Serious.

Q. Why did you take it seriously?

A. Because what I know of Dustin.

Q. How do you know he was calling you a snitch if you were --

A. Because I --

Q. Let me finish the question.

A. Excuse me.

Q. -- if you were separated by a window?

A. Because you could read -- it was clear. You can read lips.

Q. Have you had any further contact with Mr. Honken after that occasion before today?

A. No.

Q. Were you moved out of the Woodbury County Jail?

A. Yes.

Q. Shortly thereafter?

A. Yes.

Q. Now let me go through what happened in your case in state court. You eventually ended up having a plea and a sentencing in that; right?

A. Yes.

Q. Now, is it right that initially you were charged with two counts of theft?

A. Yes.

Q. And you were charged as an habitual offender; is that

right?

A.   Yes.

Q.   Because you had -- is it two or three --

A.   Yeah.

Q.   Pardon me?

A.   Right.

Q.   You had three prior theft convictions?

A.   Yes.

Q.   And then after you failed to appear for sentencing, you were charged with another failure to appear?

A.   Yes.

Q.   Not another but I mean you were charged with failure to appear; right?

A.   Yes.

Q.   Then did you eventually work out a plea agreement with the county attorney?

A.   Yes, I did.

Q.   Did you plead to two counts of theft and one count of failure to appear?

A.   Yes.

Q.   As part of the plea agreement, did the county attorney drop the habitual offender enhancement?

A.   Yes.

Q.   What was your understanding of the benefit of that to you?

A.   The only benefit, if any, was that he came to my sentencing.

Q.   No, no.  I'm talking about the benefit of the dropping of the habitual offender enhancement.

A.   Five years.  It saved me five years.

Q.   And -- now, you mentioned somebody coming to your sentencing.  Did you and your attorney subpoena a DEA agent to come to your sentencing?

A.   Yes, we did.

Q.   Did he testify about your assistance in this investigation?

A.   Yes.

Q.   Did he testify that you had given substantial assistance in the view of the government?

A.   Yes.

Q.   Did he make any recommendation to the judge specifically as to what you should get as a sentence?

A.   No, he didn't.

Q.   What was the potential sentence for you in that case?

A.   Fifteen years versus ten.

Q.   You mean --

A.   I got 10; I could have got 15.

Q.   You could have had three 5-year consecutive terms?

A.   Right.

Q.   And the judge decided to give you what?

A.    Two.

THE COURT:    Were they consecutive or concurrent?

THE WITNESS:    Consecutive.

BY MR. COLLOTON:

Q.    You mean the two 5 years were consecutive to each other?

A.    Right, right.

Q.    What happened to the third 5-year?  Was that run concurrent?

A.    Concurrent.

Q.    And you say that the habitual enhancement would have added another five.  Do you understand how that works?

A.    Well, the habitual wasn't -- it wasn't involved in that plea bargain.  There was no habitual.

Q.    But originally you had an habitual enhancement; right?

A.    Yeah.

Q.    What penalty did you understand that to carry?

A.    Well, if you got five years, you can get ten more added on to it with a habitual.

Q.    So -- okay.  Now, let me see.  As far as any arrangement you've had with the federal government, you had what we call a proffer letter; right?

A.    Yes.

Q.    And that proffer letter said that you would not have used against you directly anything you said in your testimony; right?

A. Right.

Q. And that's as far as you've gotten as far as any formal agreement or any agreement, isn't it, with the government?

A. Yes.

Q. Has anybody promised you anything more than that?

A. Nothing.

Q. Do you have an understanding whether you have any potential exposure in federal court?

A. Rephrase that question again.

Q. Is it your impression that you're likely to be charged with anything or not charged?

A. I assume that I won't be, but I have no guarantees.

Q. And have you received any other -- I mean, have you received -- when the DEA agent came to talk to you, he'd give you something to drink or something like that.

A. Right.

Q. But other than that, have you received any other benefits from the government?

A. No.

MR. COLLOTON: That's all I have, Judge.

THE COURT: Thank you, Mr. Colloton.

Mr. Parrish?

MR. PARRISH: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. PARRISH:

Q. You're how old, sir?

A. Forty-four.

Q. Are you married?

A. No.

Q. Ever been married?

A. No.

Q. Any children?

A. No.

Q. When's the last time you had a job?

A. December -- three weeks before I got arrested. I was working in Fort Worth, Texas.

Q. And how long did you work there?

A. I've been working for that guy for over a year.

Q. Doing what?

A. Hot tar.

Q. And what did you do before that?

A. Worked for Gleeson Construction.

Q. Where?

A. Right here in Sioux City.

Q. How long did you work for them?

A. About eight months.

Q. What'd you do before that?

A. I was in prison.

Q. Uh-huh. How long were you there?

A. Over a year.

Q. Where?

A. Minimum security.

Q. Where?

A. Newton, Iowa.

Q. And where were you before that?

A. In regards to what?

Q. Well, before you were in Newton in regards to your life where were you?

A. Well, I've basically been in Sioux City all my life except the first years of my life I farmed around Cleghorn, Iowa.

Q. What were you doing before you were in Newton in prison?

A. I worked for a guy doing sheet rocking.

Q. How long did you work for him?

A. A year.

Q. And what'd you do before that?

A. Off the top of my head, I don't know what I've been doing all those years.

Q. When's the last time you filed taxes?

A. '94.

Q. You did file in '94?

A. Yes.

Q. Where?

A. H & R Block on Pierce Street.

Q. And when is the last time you filed before that?

A.    Probably when I farmed is when I used to make a lot of money.  I worked for the federal government taking grain samples, and I farmed, made a lot of money, and I filed then.

Q.    What year was that?

A.    Probably '75 to '84 probably, '83.  I filed every year.

Q.    '75 to '83?

A.    That's when I worked for the government and farmed.  And since then there's times -- yeah, I filed since then too.

Q.    Where did you work for the government in '75?

A.    Right here in Sioux City, Iowa.

Q.    Doing what?

A.    Taking grain samples.

Q.    What government did you work for?

A.    It would be the grain division.

Q.    And who was that?

A.    Well, the grain division of the government.  I can't -- I had a license, but that was a long time ago.  I can't tell you.

Q.    So you don't recall who you worked for when you worked for the federal government for eight years?

A.    Well, I got paid through the grain exchange.

Q.    Excuse me.  Let me finish.  You're telling us you don't recall who you worked for when you worked for the government for eight years?

A.    No, I never saw the guy I worked for for several years.

Q. I thought you worked for the government?

A. I did. But I never saw the man that employed me for several years. Then the check came from the Sioux City Grain Exchange if you want to know where I got the check.

Q. You didn't get one of these green checks from the government?

A. No.

Q. Were you on salary?

A. No.

Q. So how did you get paid if you weren't on salary?

A. On the basis of what I did.

Q. Oh.

A. My --

Q. What kind of government job is that?

A. The most I ever made in a 3-month period was over 18,000. I made a lot of money. Yes, I did.

Q. You made 18,000 in 3 months working for the federal government?

A. I still got the receipts at my mom's garage if anybody doubted it.

Q. Well, how much did you make for a whole year working for the federal government then?

A. I think I made 40,000 the last year I worked.

Q. And that's what you filed taxes on? Excuse me. What'd you say the name of that agency was?

A.   The Sioux -- grain -- Sioux City Grain Exchange.

Q.   And your life just went down after that, I take it.

A.   Yes, it has.

Q.   You just turned into a thief.

A.   If -- I worked if you want to call it that I guess -- my record -- if you want to look at a piece of paper that says I am, but it goes deeper than that.

Q.   Well, that's what you are, aren't you, just a thief?

A.   I'm more than a thief.

Q.   What's more than a thief?

A.   You classify me just a thief, never worked, don't do nothing.  Well, got the wrong guy.

Q.   Well, I'm just looking at your record here.  You had built up a record to the point where you were such a thief that in Iowa you were charged with a habitual -- being a habitual criminal.

A.   Right.

Q.   So you had to have how many convictions even to get to be an habitual in Iowa?

A.   The third.

Q.   At least a third; right?

A.   Right.

Q.   But you had some others too, didn't you?

A.   I have two prior felon convictions.  I got a misdemeanor and two felony convictions.  The third felony conviction you

get are considered habitual.

Q. You mean you had no crime problems in Texas?

A. No, I didn't, Your Honor -- or sir.

Q. Excuse me?

A. No, I didn't. I worked.

Q. Are you sure about that?

A. Yes, I am.

Q. And you said you worked in Texas?

A. Yes, I did.

Q. For a year for a construction company?

A. I worked for Steve White if you want to know, subcontracted through Robinson Roofing and another construction place, roofing place down in Fort Worth, Texas.

Q. That was after you got out of prison in Iowa?

A. Yes.

Q. You were paroled down there.

A. No, I wasn't on paper.

Q. You left Newton?

A. I went -- I worked for Gleeson Construction, if you remember right, I mentioned to you earlier.

Q. But let me make sure I understand this. You left Newton and went to Texas?

A. I did not say that. I told you I went -- I worked for Gleeson Construction. Then I went to work for this guy in Texas.

Q. How long were you on parole?

A. Probably eight months.

Q. You were only on parole for eight months from a felony charge in Iowa?

A. Yes.

Q. How did you discharge from parole in eight months from a felony charge in Iowa?

A. A five-year sentence is cut in half when you get to Oakdale, Iowa. So if you do over a year -- and another thing, I went to a halfway house in Council Bluffs, but I was paroled from them in 58 days, but I stayed longer because my job was down there. When I got done, I came to LeMars, Iowa, because that's where Gleeson's next job was at.

Q. Okay. I understand. But you're saying you paroled from Iowa in eight months. Is that what your testimony is?

A. Yes, it is.

Q. And you were allowed to leave Iowa and move to Texas?

A. I was not on parole when I left Texas -- left Iowa for Texas.

Q. You're saying you were discharged.

A. Yes.

Q. And that was just from your first felony.

A. No. You -- no. You're trying to confuse me. I'm telling you -- you asked me what the last time where I worked, and I just told you Texas. Now you're trying to go

back to the first one, from the last one to the first one. You're trying to mix it up.

Q.   No, I'm just trying to understand your record.  How many felony convictions did you have before you went to Texas?

A.   The one from '90.  There's one conviction.  Conviction is different -- I had two different convictions of felonies. This is the first time I've been habitual is what I'm trying to tell you.

Q.   I just asked a simple question.  When was the last time you had a conviction before you went to Texas?

A.   '92.

Q.   What year did you go to Texas?

A.   Probably '95.

Q.   Before '92 is it your testimony you had no prior convictions?

A.   I did not say that.  I just told you '90.

Q.   How many had you had?

A.   My first felony conviction was in '90.

Q.   And your second was in '92?

A.   Yes.

Q.   When was your third one?

A.   April 28.

Q.   What year?

A.   1997.

Q.   So you went what?  Four years without a -- five years

without a felony conviction?

A.   Yes.

Q.   And one of those years was spent in prison.

A.   Yes, over a year but --

Q.   Now, how many theft aggravated misdemeanor convictions did you have?

       MR. COLLOTON:  Objection.  Irrelevant.

A.   I can't even answer that.  You have to tell me.

       MR. COLLOTON:  Well, it's normally improper impeachment.  If the Court's allowing that because the rules don't apply, then I'll withdraw it; and, therefore, I apologize for breaking in.  I'm sorry, Mr. Parrish.

BY MR. PARRISH:

Q.   How many did you have?

A.   I said you'll have to tell me because I don't know.

Q.   You forgot?

A.   It can't be that many.

Q.   Excuse me?

A.   It shouldn't be that many so whatever you tell me.

Q.   No.  I want you to tell us how many you had.

A.   I don't know.

Q.   Did you lose track?

A.   I don't try to keep track.  I didn't know there was that many of them.

Q.   Well, we know you have three felonies.  You've already

told us that.

A.   I've never been on probation if that answers any questions.

Q.   I'm not talking about probation.  I want to know how many times you were convicted --

A.   I said I don't know.

Q.   -- of theft.

A.   I don't know.

Q.   You've forgotten.  You've lost track.

A.   Yes.

Q.   It's been so many convictions that you lost track.

A.   You said that.  I didn't.

Q.   Well, I'm asking you.

A.   I don't know I said.

Q.   Why is it that you don't know?

A.   Why is it that I should know?  I mean, I'm supposed to keep track of these?

Q.   Well, some people do keep track of their felony convictions.

A.   I guess I'm not one of those guys.

Q.   Well, let's talk about it.  Since you acknowledged that you're not that big --

A.   Obviously you have it in front of you.  Why don't you tell me, and I'll agree or I'll disagree.

        THE COURT:  Mr. Donaldson, here's the rules.  He

gets to ask the questions.

THE WITNESS: I'm just trying to make it easier. He's badgering me. I said I don't know.

THE COURT: I understand that. Why don't you try to listen to the question and do your best to try to answer the question. You're doing a nice job of trying to answer the questions. Why don't you keep that up. Thanks.

BY MR. PARRISH:

Q. Now, if you are no more than a thief, let me ask you, other than stealing Dustin Honken's girlfriend's money by getting out on bond, what else did you do?

MR. COLLOTON: I object to the form of that.

A. I thought it was given to me.

THE COURT: Do you have an objection, Mr. Colloton?

MR. COLLOTON: I was, but the answer's already in, so I'll withhold.

BY MR. PARRISH:

Q. That's what you did, isn't it?

A. No.

Q. You stole --

A. How can --

Q. You talked him in to letting his girlfriend put up bond, and you didn't pay her back.

A. I didn't talk --

Q. What you've been doing for the last ten years.

A. Who talked who into what?

Q. Well, you just said you took his girlfriend's money that she put up for a bond and you hid from her so you wouldn't have to pay her back.

A. Who hid from her?

Q. You did. You said she couldn't track you down when she called.

A. Dustin told me if I got someone killed he didn't care about no money, so how can I be taking money?

Q. Let's just talk about what you did now. You've had a chance for Mr. Colloton to explain what you did. Let me just ask my questions on it. This is what you did; right? You talked to him about his girlfriend posting property to get you out so you could be free.

A. He talked to me about it.

Q. But let's accept that. Okay. He talked to you about it, and you were out on bond; is that right?

A. I really didn't want out on bond at the end. He pushed me to go out. I didn't really care. I wanted to get it over with.

Q. But you got out on bond; right?

A. Right.

Q. His girlfriend, according to you, called and said, Where's my money?

A. Right.

Q.   You stayed away from her so you didn't have to pay her back.

A.   So what do you want me to do?  Go steal so I had money?  Is that what you're saying?  I don't do that; okay?

Q.   I thought that's what you did.

A.   Did is the key word.  I did.  That don't mean I still do.

Q.   Oh, so you were a hog thief; right?

A.   Yes.

Q.   Putzier and you were hog thieves?

A.   Yes.

Q.   As a matter of fact, didn't you steal a couple of trucks and that's why you were zapped for the --

A.   I took possession of a truck knowing it was stolen is what I was charged with.

Q.   Actually it was two trucks, wasn't it?

A.   No.

Q.   It was just one?

A.   (Witness nodded head.)

Q.   Is that right?

A.   Yes.

Q.   So you didn't really steal that?

A.   I never have stole a truck, no.

Q.   Was he the only person you asked about getting out on bond?

A.   I never even asked him.  He volunteered to bond me out.

Q.   That was not my question.  Is that the only person you asked about getting out on bond?

MR. COLLOTON:  Objection.  Assumes facts not in the record.

THE COURT:  Sustained.

BY MR. PARRISH:

Q.   Did you ask anyone else about getting out on bond?

MR. COLLOTON:  Same objection.

THE COURT:  Overruled.

A.   Again, I never asked him to get bonded out.  He asked me.  He'd bond me out.  He asked me what my bond was.

Q.   My question --

A.   I don't recall anyone asking no one, no.

Q.   No.  I asked -- listen to my question a second.  Did you ask anyone else about getting out on bond?

A.   I just said I don't recall.

Q.   So you may have asked and had a discussion with someone else about getting out on bond but you don't recall?

A.   No.  I have no idea.  I'm not going to say yes or no because I don't recall nothing.

Q.   If another witness were to indicate that you discussed working out some plan to get out on bond with them, that could be true also.

A.   I'd have to hear the person.  And then if he said it,

yes, I would believe it. I don't recall it.

Q. Did you ever pay the money back?

A. No, I didn't.

Q. How much was it?

A. Five hundred. There was some money paid back, yes, but not the full five hundred.

Q. And who did you pay it back to?

A. Phil Parmelee paid Kathy Rick several times.

Q. How much did he pay her back?

A. You'd have to ask that man.

Q. And that was paying back for you?

A. Because I was working for him, yes, for several weeks, and he paid what he could.

Q. And what type work were you doing for him?

A. He owned a partnership in some business over in South Sioux City where they had all kinds of faulty toys and stuff that needed fixed and they fixed them. It's a big warehouse in South Sioux City.

Q. How long were you out?

A. Three months.

Q. And during that three months I assume you went to the agents right away to discuss with them what Mr. Honken had asked you to do.

A. No, I didn't. If you would have listened clearly, I just explained to him that it wasn't till he was telling

people he was going to have me killed that I went to them agents. I wasn't going to do nothing, just let it go. I was hoping I could get out of there without ever seeing him.

Q.   I didn't think that you had heard him say to anyone that he was going to have you killed.

A.   I just told you that someone through a window made a noose, someone in his unit, and somehow his name was brought up, and I already knew what he was talking about.

Q.   And do you think he might have been a little ticked off at the fact that you took $500 from his girlfriend and didn't pay her back after you got out?

A.   I can't answer that. You'd have to ask him.

Q.   Well, just tell me what you think.

A.   The normal person ain't going to kill somebody for 500, but maybe he would. I don't know.

Q.   My question, don't you think he'd be a little upset if you promised, Look, if I get out, I'm going to pay her the $500 back?

A.   That wasn't our agreement. That wasn't our agreement, sir.

Q.   Do you think that someone --

A.   If that was the agreement, yes, but it wasn't our agreement.

Q.   Do you think that someone would have been upset?

A.   Yes, if that was the agreement.

Q. And so if he thought that that's what you were going to do, you would not be upset with him for being upset if that was the case?

A. If that was the agreement, no, I wouldn't.

Q. Now let's talk about his paperwork. Did you have an opportunity to ever be in Dustin's cell?

A. Yes.

Q. And I take it he had a lot of legal papers.

A. Yes, he did.

Q. And it's true that on one occasion, at least one occasion, you were caught going through his legal papers.

A. I don't think that's true. Who told you that?

Q. You're saying you don't think you were caught or you never went through them?

A. No. No, I wasn't, no.

Q. Are you saying you never looked at his legal papers?

A. He might have handed me some papers, but I didn't go through his legal, no. Anything I went through he handed me.

Q. Have you ever been in his cell alone --

A. No.

Q. -- where he was out of his cell and you were in his cell?

A. If it was, it was only -- if he told me to go get a candy bar, if that was true, that'd be the only time.

Q. Do you remember an occasion when the toilet in your cell

was stopped up?

A.   I don't recall it, no.

Q.   Did that ever happen when you were there at some point prior to the time that you were --

A.   It's been so long ago, I don't recall.  I don't know.  I don't recall it.

Q.   So are you saying there has been no occasions where you've ever gone to Mr. Honken's cell without Dustin being in there?

A.   I want to say no.

Q.   Excuse me?

A.   I don't go in anybody's cell if they're not there or they direct me towards it.  Either he told me to or no, I was never in there.

Q.   Are you saying you never went in there?

A.   Without his permission if I did.  I don't even remember, but if I did, it was with his permission.

Q.   Okay.  And on that occasion if you did, in fact, go in there, do you have any recollection of going through his legal papers?

A.   I have never did that, never.

Q.   But you have seen some of his legal papers?

A.   Only what he showed me.

Q.   So you have seen them.

A.   What he showed me, yes.

Q. And you were aware of what he was charged with.

A. Yes, I was.

Q. And you were aware that he told you that his best friend and life-long friend had worn a wire.

A. Yes.

Q. And that he then made an admission to you under those circumstances in that cell having just met you that he had killed some people.

A. He didn't do that right away. No, he didn't. That was the progress that he made as time went -- weeks went by from bonding me out.

Q. And he also confided in you that he had buried some people.

A. At the very end, yes. Again, that was a month -- over a month from the start. We talked every day.

Q. Now, Mr. Honken through what you had told him knew you were, in fact, a hog thief.

A. Yes.

Q. And you are an admitted hog thief.

A. Yes.

Q. And how many hogs have you stolen?

A. A lot.

Q. Well, I have no idea what a lot are. Tell me.

A. I can't give you an exact number. Just a lot. I've done it many times.

Q.  Well, like two hogs?

A.  I don't know.  Five hundred hogs.

Q.  All at one time?

A.  No.

Q.  Over how long?

A.  Bunch of years.

Q.  Over how many years?

A.  Ten.

Q.  Okay.  That goes back to 1988, doesn't it?

A.  Probably '84.

Q.  Oh, you started stealing hogs in 1984?

A.  I believe so.

Q.  And you've stole them almost every year up until the present time?

A.  No, I haven't stole every year since then, no.

Q.  You skipped a few years?

A.  I'm just telling you I haven't stole pigs every year but from that -- that's the first time I ever stole anything in my life until as I sit here.  Through them years that's probably what I have.

Q.  Now, with these hogs that you've stolen, you became aware that Mr. Honken had a friend who had a farm where they kept hogs; isn't that true?

A.  Right.

Q.  As a matter of fact, you were going to steal some hogs

and take them up to Mr. Held, weren't you?

A.   You haven't listened closely.  We were going to use his truck and trailer with his permission to do that.  That was just what we talked about in jail.

Q.   To steal hogs.

A.   We talked about it, yes.

Q.   And that was one of the plans that you indicated that you wanted to do once you got out.

A.   To pay you, yes.

Q.   To pay me?

A.   Yes.

Q.   So you were going to steal hogs to pay me?

A.   That was part of the plan.

Q.   Now, let me ask you this:  How many hogs were you going to steal?

A.   I don't know.  Thirty or sixty.

Q.   And where were you going to steal them from?

A.   I don't know.

Q.   Well, you're the hog thief.  You tell us where you were going to get them from.

A.   He had told me some places around there that there was hogs, and that's where it was left right there.

Q.   Oh, so now a man who's been stealing hogs for ten years, you were going to go up near Mason City and start doing a little hog stealing?

A.   Only to take care of what he needed taken care of, yes.

Q.   I noticed that there was nothing in your notes that talk about the hog stealing plan.  What happened to those notes?

A.   I don't know where they're at.  Dustin had give me some -- they should have been in there.

Q.   Well, the only notes I saw were the notes on the drugs and the killing of people.  But I don't see anything on hog stealing.

A.   There wasn't much there because he was going to go to Rick Held, and he told me that there was some places around there to go.

Q.   Well, you just told Mr. Colloton that the only reason he was sending you up to Mr. Held was to get a gun.  Now you're saying that there was something about stealing some hogs.

       MR. COLLOTON:  I object to that as a misstatement of the record.  That's not what he just said.  He said he had two purposes to go to Held.

       THE COURT:  Why don't you rephrase your question, Mr. Parrish.

BY MR. PARRISH:

Q.   What were the two purposes then you were going to go to Held?

A.   To go get his truck and trailer.

Q.   I mean to Mr. Held.  I shouldn't say that.

A.   And about the gun, but I didn't want the gun, so the

only purpose I would have went for would be the truck and trailer.

Q.   And the truck and trailer was to use that for your hogs.

A.   Yes.

Q.   And then where were you going to take that?

A.   He was going to take care of it if he did it, agreed to do it.

Q.   I notice that you didn't mention anything about hogs when you were talking to Mr. Colloton.

A.   I only asked -- I only spoke on what I was asked.

Q.   Okay.  But you do acknowledge now that part of the plan included the theft of hogs; is that correct?

A.   That's correct.

Q.   And did you when you were debriefed by any of the agents tell them that was part of the plan?

A.   Yes, I did.

Q.   And did you tell the grand jury that was part of the plan?

A.   I believe I did.

Q.   You're sure about that.

A.   I'm po -- not positive, but I'm pretty sure I did.

Q.   And you're also indicating that you're pretty sure that in your debriefing statements with the agents you also told them that.  Is that correct also?

A.   Yes, I am sure.

Q.   Now, your only debriefing statements you would agree would be the statements you gave to the grand jury, the statements where you were debriefed at the Woodbury County Jail December 13, 1996, and then the statements where you were debriefed on December 9, 1996.

A.   I'm not sure of the dates, but that sounds like it's right.

Q.   Okay.  December 26, 1996.  Now, let's just talk for a second.  When you were indicating that you had revealed these plans for this hog theft operation that you were going to engage in with Mr. Held, did you go into details about that?

A.   There was no details.

Q.   As a matter of fact, you would agree the agents weren't that interested in that.

A.   There wasn't nothing to tell.

Q.   Okay.

A.   There was -- it was just a plan that never happened.  It was get a truck and trailer, and that was the end of it.  It didn't happen.  I never met the man, and that was the end of it.

Q.   Let's talk about your sentences that Mr. Colloton went over with you.  Initially what did your lawyer tell you you were facing with regard to the state court charges?

A.   I was facing five years until I missed court on my sentencing for five years and the worst possibly scenario

would be 15.

Q.   And that was for the theft of a truck?

A.   Taking possession of a truck knowing it was stolen, yes.

Q.   Was the 15 going to be added in addition to that which would have been the habitual charge?

A.   That's what that would be.

Q.   Excuse me?

A.   That would be the enhancement.

Q.   And you would have had to serve a mandatory minimum sentence on that?

A.   Probably three years.

Q.   And that would have been served after you'd served your --

A.   No.

Q.   -- sentence; is that correct?

A.   No.  It's all one sentence.

Q.   Is it required that it's all one sentence?

A.   It is.  It's just one sentence.

Q.   Are you sure about that?

A.   Yes.

Q.   So you're saying you ended up getting more time.

A.   Than I started out with for missing court, yes.  I got double the time.

Q.   How many times did they file an habitual on you?  Just once?

A.   This last time, yes.

Q.   And when did they dismiss it against you?

A.   Well, I guess in a plea bargain.  That's when it'd be dismissed.

Q.   So they dismissed the habitual which would have been a 15-year sentence; is that right?

A.   Habitual goes into effect if you take it to trial and lose.

Q.   No.  Let's just follow me a second.  The habitual would have been a 15-year sentence; is that correct?

A.   If you take it to trial, yes, and lose.

Q.   The habitual would have been a 15-year sentence; is that correct?

A.   Yes, if you take it to trial and lose.

Q.   Now, the second charge was a five-year charge that was going to be placed against you; is that correct?

A.   They don't -- it doesn't work like that.  It'd be habitual against both of them as one.  It'd still be 15.  They just -- that second five was a deuce that they enhanced to a five to make a plea bargain.  That's all that was.  That five was dropped.  That was a deuce dropped enhanced to a five on a plea bargain.  That five was not even in existence.  That was just a plea bargain they come up with.

Q.   Well, let's go back and start from the beginning.  You were charged with five years, and you would've been held in

prison for the five-year charge; is that right?

A.   Right.

Q.   That's what you were waiting trial on?

A.   No, I was waiting sentencing on five years, and I missed sentencing on the 7th of November.

Q.   Then you came back.  They had a charge for you for failure to appear; is that correct?

A.   Yes.

Q.   And that carried how many years?

A.   Five.

Q.   Have they added the habitual sentence to your charge before you were charged with a failure to appear?

A.   Even if they had --

Q.   No, I'm not -- just answer my question.

A.   That was their plea bargain power, yes.  It's called plea bargain power.  That's all it is.

Q.   Right.  So then before you even made your deal with the government, you were facing a 15-year sentence for habitual. You were awaiting a five-year sentence on a theft.  Just follow me a second.  And then after you didn't show up for your sentence, you were facing a failure to appear, another five-year sentence.

A.   That's not correct.

Q.   So you had a total -- just follow me.  You had a total of 5, 10, 25 years that you were facing in state court.  Now

we're not talking about what you ended up with. We're talking about what you were looking at.

A. Never did face that. No, I didn't. Never did.

Q. I think the record speaks for itself.

A. Yes, it does, but you're taking -- you're breaking it down all wrong. The five -- the second five was never enhanced until I -- we made a deal to bring it up. That was dropped and gone.

Q. Sir, with the two prior felonies, you're always facing habitual sentence on the third time as enhancements.

A. They only had so many days once we had a plea agreement that that plea agreement stuck.

Q. Okay. So just follow me then. That was the potential then. Let's keep it that way. That was the potential; is that correct?

A. No, it's not.

Q. All right. You're saying they missed the deadline.

A. Yeah. There was never 25 ever in any possibility of that.

Q. Now let's go over to after you made your deal with the government. After you made your -- and you seem to know these numbers pretty well.

A. Excuse me. We didn't make no deal, though. Me and the feds did not make no deal.

Q. After you talked then, let's put it that way. Is that

better?

A.    Yes.

Q.    Okay.  You ended up with a five-year sentence on the theft, is that right, that you were originally supposed to be sentenced on?

A.    Right.

Q.    And what happened to the failure to appear?

A.    They brought up a -- this was my -- I'm the one who come up with that plea agreement.

Q.    Just answer my question.

A.    They enhanced --

Q.    Just answer my question.  What happened to the failure to appear charge?

A.    That was -- it's still there.  It's on my record.

Q.    All right.  So you were convicted of that.

A.    Yes.

Q.    What happened to the habitual sentence after you talked?

A.    That was a plea bargain.  It was out.

Q.    Okay.  The 15-year went out.  What happened to the other five-year sentence that you had?

A.    It was -- there never -- the five was gone when I took the five.  It was a deuce and a five.  They dropped the deuce.  I pleaded guilty to a five.  In order to do this plea bargain, they took the deuce that was dropped, enhanced it to a 5 making it 10, and it was up to the judge on the 15, on

the 5 for failure to appear. That was a plea bargain.

Q. And then the judge decided not to do it after the DEA agent testified for you.

A. It was up to the judge, yes.

Q. Okay. So what you got then, according to your theory, is basically a five-year drop.

A. I got two tens consecutive. I got ten.

Q. But you know that the two fives consecutive once you're sent down and the parole board looks at it becomes almost like a concurrent sentence.

A. That's not true. That is not true.

Q. But under my theory you went from 25 down to basically a 10.

A. Again, it was never 25.

Q. I understand. But just follow my theory.

A. On your theory but not the right theory.

Q. Of course you know the law a lot better than me. You seem to know it.

A. I didn't say that. I just said you don't know this part of the law I guess.

Q. That's probably true. So how much time will you do on this ten-year sentence?

A. That's up to the parole board. I have no idea.

Q. Well, what do you think?

A. Two years.

Q. So I figured about 18 months to 22 months; is that right?

A. Yeah.

Q. And had you -- under my theory -- and just tell me -- out of the 15 years, the plus 5 and the failure to appear, how much time would you have done?

A. One moment. Those numbers were never in one bunch.

Q. I understand. But just tell me how much time you would have done had that been the case.

MR. COLLOTON: I object to questions about Mr. Parrish's theory because the witness is just being asked to answer questions about a hypothetical situation that he says didn't exist.

THE COURT: It's a little late to be objecting to it. I mean, we've been talking about --

THE WITNESS: Well --

THE COURT: Just a second. We've been talking about Mr. Parrish's theory for quite a while. Why don't you wrap it up in this area.

MR. PARRISH: I am. And that's what I'd like to do with this question, Your Honor, and I would state for the record Mr. Colloton just gave me this information after I had requested it because he didn't have it in his original Jencks material. And he gave it to me after I told him that's what he had been facing. And true enough, it does have an

habitual on there and a dismissal of the habitual right on his record, and that's part of the record in this case.

THE WITNESS: But you can't get two habituals on one.

THE COURT: Just a second, Mr. Donaldson. Okay. You continue with your questioning. You answer Mr. Parrish's questions to the best of your ability.

BY MR. PARRISH:

Q. So with the habitual and the five and the failure to appear, what kind of time would you have been facing?

A. I never faced that number, so you'd have to call the parole board.

MR. PARRISH: Your Honor, I would ask the Court then to look at -- and we think we have it as a document here -- his actual arrest and conviction sheet that Mr. Colloton furnished to me right before -- after he had finished testifying, and I think it does show the dismissal of the habitual on there.

THE COURT: Is that going to come in as an exhibit?

MR. PARRISH: That's all I have.

THE COURT: Are you just going to stipulate to it, Mr. Colloton, or there's no agreement?

MR. COLLOTON: I don't have any -- if I understand what he's asking, I don't have any problem stipulating to what he was charged with and what he ended up pleading to.

We can do that now, or we can do it after the Court -- after the witness is gone.

MR. PARRISH:  So you are stipulating that he did have an habitual and that was dismissed?

THE WITNESS:  On the five-year sentence.

THE COURT:  Mr. Donaldson, just a second.  Let's try to work this out among the lawyers.

MR. COLLOTON:  I thought that's what we elicited on direct examination.  I'm not sure what the debate is.

MR. PARRISH:  He's saying he never had it.

THE WITNESS:  On the third one.  I'm sorry.  I'm sorry.

THE COURT:  It's hard because we're talking about something that happened to you.  We don't have any -- we're leaving you out of it, I understand.  For a moment let's leave you out of it.  We'll get back to you on it.  Hang loose for a minute here.

MR. COLLOTON:  I agree that the records I've been provided by the county attorney show that initially there was a theft charge with an habitual enhancement and that eventually he pled guilty to offenses that did not have the habitual enhancement.  What I don't -- I'm sorry.

THE COURT:  Do you have an understanding as to what the net effect of that is in terms of the bottom line of the sentence that he received after he cooperated with the feds

versus the sentence he might have received before he cooperated?

MR. COLLOTON: No, I don't have enough knowledge to know whether what Mr. Donaldson says is accurate.

THE COURT: I'll get to you. I haven't forgot about you, Mr. Donaldson. I appreciate you raising your hand, though. That's more polite than we've had in this courtroom in a long time. So I appreciate that. And I promise you I'll get back to you and we're going to. Right now we're dealing with the lawyers.

You don't have any understanding really of kind of how it worked?

MR. COLLOTON: I can't give you a specific number, he would have had X number of years and then afterwards he gets Y.

MR. PARRISH: But under mandatory minimum, the 15 years, he wouldn't be -- even be eligible for parole until after he served the 3 years on the habitual. There's just no way in Iowa that can happen.

THE COURT: So in your view what was the benefit of his bargain here?

MR. PARRISH: They could have stacked his habitual on top of his 5 and 5 if they wanted to, and then he would have had to serve a mandatory minimum on the 15, so he received a basic overall benefit of almost 5 years in state

court had the habitual stayed there and the failure to appear stayed there.

THE COURT: Now, I'm going to let you, Mr. Donaldson -- I'm going to let you tell me what you think happened, and then I'm going to let the lawyers ask you a few questions. Then we're moving on to another area.

THE WITNESS: First of all, they never got any play. The county attorney didn't want to listen to these people, but here's the way it is. I have a five-year sentence and a two-year sentence. They dropped the two-year sentence. I got a five. He's trying to say there's a double habitual. The failure to appear wasn't even in existence, so how can he throw these two habituals together because they never existed? I had a plea bargain on one five. I missed sentencing, and we had so many days to appeal it. So instead you got one five-year sentence.

This other five, it was my idea to bring it back in order to avoid court. I brought up the five. They didn't. I did. You could ask Peter Van Etten. He was my attorney. I said, Okay, we'll go for this deal and leave the third one up to the judge, and she said -- Jill Pitsenbarger said yes. But they did not listen to -- these people didn't have any influence on them at all, none to the plea bargain. I made that. They couldn't get no influence at all. She didn't want to hear about it.

THE COURT:  Okay.

BY MR. PARRISH:

Q.   So let me ask you this:  Who brought the DEA agent to testify at your sentencing then?

A.   Peter Van Etten.

Q.   And who consented to have a DEA agent appear in state court based upon evidence you had given to a federal -- about a federal prisoner?

A.   Well, again, all's they said is I did -- giving them information.  He asked them, What do you think he should have, and he didn't say.  He said I just give --

Q.   What was the purpose of him coming in then?

A.   You'd have to get Peter Van Etten and ask him.

Q.   Okay.  It's true, is it not, that you have had a serious drug problem over the years?

A.   No, it's not true.  Who told you that?

Q.   You've never used crack cocaine or anything like that?

A.   I've been around it, yes.

Q.   I asked you have you ever used it.

A.   No.  I've used it, yes, yes.  But you're saying did I abuse it.  No.

        MR. PARRISH:  Okay.  That's fine.  Nothing further.

        THE COURT:  Mr. Colloton, anything further of Mr. Donaldson?

        MR. COLLOTON:  Yes.

REDIRECT EXAMINATION

BY MR. COLLOTON:

Q. Why did you call the -- why did you have Mr. Van Etten call the federal government originally?

A. Because I know Dustin's past, and I knew that he was going to have something done to me. I knew too much.

Q. Do you feel that -- you've had a lot of questions about what happened in your state case and the like. Do you feel this has been a good deal for you?

A. (Witness shook head.) As far as me getting time off, I didn't get -- you guys didn't save me nothing.

Q. Do you feel like you're glad to be here testifying today?

A. It's like I say. I don't like testifying for nobody. If it's my life or your life, my life counts.

Q. I meant to ask you before and I forgot. You asked the other day whether the government would write letters to the parole board; is that right?

A. Yes.

Q. And you were told that what we've done in some cases is to send a factual statement of somebody's cooperation and the total story about their involvement and any benefits they've received to the parole board; right?

A. Right.

Q. And I told you we would -- I would check with my office

and consider whether it would be done here.

A.   (Witness nodded head.)

Q.   All right.  I wanted to make that -- is that a yes?

A.   Yes.  And as I told you, that's something that would help me because nothing to this point has really helped me.

MR. COLLOTON:  I think that's all I have, Judge.

THE COURT:  Do you have any other questions, Mr. Parrish?

MR. PARRISH:  Just a couple of questions, Your Honor.

RECROSS-EXAMINATION

BY MR. PARRISH:

Q.   What's your relationship with William Dean?

A.   Just a friend I knew off the streets.

Q.   Was he in jail with you at the same time?

A.   Yes.

Q.   Did you guys do drugs together?

A.   I don't do drugs with him, no.  Been around him when he's done drugs, but I wasn't doing them.

Q.   What kind of drugs are those?

A.   He does cocaine.

Q.   What about Putzier?

A.   He does a lot of drugs too.

Q.   And what's your relationship with him?

A.   As you know, we've done business together.  I stole hogs

with him.

Q. Okay. And what kind of drugs did you do with him?

A. I probably snorted, and he shoots into his veins.

Q. Okay. And just one last question.

A. Yes.

Q. Why were you paying this money back to Dustin's girlfriend when you were going to be out stealing hogs and making money to go get a hit man and pay his lawyer?

A. It was like -- if you would listen, I said it was all talk in jail. I talked big in jail, but I wasn't -- I guess I'm not a killer.

Q. Well, just to break a rule here, it's all big talk in jail. Is that what people do there, just do a lot of big talk?

A. I would want to say no, but I'm proof that it is.

MR. PARRISH: All right. I don't have anything further.

FURTHER REDIRECT EXAMINATION

BY MR. COLLOTON:

Q. Well, now, did you feel when Mr. Honken was proposing this scheme to you that from his point of view it was all talk?

A. No.

Q. Why do you say that?

A. He -- again, he give me too many -- too many points --

too many things that he had did, like people how they die and how they're heavy and all this, too many things he said.

Q. Did you tell him before you left the jail that you weren't going to do -- you weren't going to kill the witness?

A. I told him I didn't think I could, and that's when he insisted to go try, try to get somebody to do it.

Q. And then you didn't do anything; right?

A. (Witness shook head.)

Q. You have to answer out loud.

A. No. I'm sorry.

Q. And then you --

MR. COLLOTON: All right. That's all I have, Judge.

THE COURT: Anything further, Mr. Parrish?

FURTHER RECROSS-EXAMINATION

BY MR. PARRISH:

Q. Why would he bail you out if you told him you weren't going to do it?

A. Because he didn't -- he thought I was. I told him I would try to find someone to do it.

MR. PARRISH: I don't have anything further.

THE COURT: Mr. Colloton, anything further?

MR. COLLOTON: No.

THE COURT: Why don't we take a 15-minute recess until 2:35. Why don't we make it 20 minutes, till 20 to 3.

(Recess at 2:21 p.m.)

THE COURT: Please be seated. Is the government ready to call your next witness?

MR. REINERT: Yes, Your Honor. United States calls Kathy Rick.

KATHY RICK, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated here. Would you state your full name and spell your last name, please.

THE WITNESS: Kathy Ann Rick, R-i-c-k.

DIRECT EXAMINATION

BY MR. REINERT:

Q.   Ms. Rick, do you know the defendant, Dustin Honken?

A.   Yes.

Q.   In fact, you had dated him for some time and share a child; is that correct?

A.   That's correct.

Q.   Directing your attention to the time period when Mr. Honken was in the Woodbury County Jail last year, did you receive any contact from Mr. Honken about bonding someone out of jail?

A.   Yes, I did.

Q.   How was that contact made?

A.   By phone.

Q.   And what did Mr. Honken ask you to do?

A.   He asked me to bail out Dean Donaldson.

Q.   Did he indicate why he wanted Mr. Donaldson out?

A.  Yes.

Q.  What did he say he wanted Mr. Donaldson out for?

A.  I had borrowed money to Dustin for attorney fees, and I needed that money back, and Dean had -- if someone would bond him out, he was willing to double the amount that that cost and return that to me.

Q.  Did you have any contact with Mr. Donaldson before you actually went and executed the bond when he was still in jail?

A.  I don't believe so.

Q.  So if he had your phone number -- first of all, I have Exhibit 11K here.  On the back side of 11K, that first number where it says Kathy Rick, is that your address?  I realize the paper's torn, but is that your address there?

A.  It looks like it.

Q.  And the phone numbers that are listed for your home and work, are those your phone numbers?

A.  Yes, they are.

Q.  Did Mr. Honken have your address and your phone numbers?

A.  Yes.

MR. REINERT:  Nothing further, Your Honor.

THE COURT:  Mr. Parrish?

MR. PARRISH:  Just a couple questions, Your Honor.

CROSS-EXAMINATION

BY MR. PARRISH:

Q. Did you get paid back for bonding him out?

A. Not totally.

Q. How much did he pay you back?

A. $200.

Q. What did he say about paying you back the rest?

A. It would not be a problem.

Q. But he never got back to you; is that right?

A. That's correct.

Q. Did you try to call him to see if he would pay you the balance of it?

A. Initially I called quite a few times.

Q. Took you a lot to try to track him down?

A. Yes.

Q. Did he ever say anything or engage in any conversation with you about anything else that Dustin had bonded him out for other than to make sure you were paid back double?

A. No, we didn't have conversation.

MR. PARRISH: I have no further questions, Your Honor.

THE COURT: Anything further, Mr. Reinert?

MR. REINERT: No, Your Honor.

THE COURT: Thank you.

MR. PARRISH: She may be a witness for us when we're up, and I think she may be aware of that, but we don't want to go into that at this time.

THE COURT: You don't want to put that on at this time?

MR. PARRISH: That's correct.

THE COURT: Okay. You're excused for now.

MR. REINERT: United States calls William Walter Dean, Your Honor.

WILLIAM DEAN, PLAINTIFF'S WITNESS, SWORN

THE COURT: Be seated here, please.

Let me ask you a question. Did you make any effort to try and get a stipulation on that last witness's testimony? Nothing was controverted. Drag somebody up here all the way from Des Moines for three minutes of uncontroverted testimony?

MR. REINERT: We had talked about it, and I assumed that Mr. Parrish was going to go into what he had -- I knew he wanted to call her as well, and since we had already called her, I assumed that he would go into that at this point. I also wanted -- I wasn't a hundred percent sure of the phone number that was on that note to verify it until I had a chance to talk to her about it this morning. So we probably could have if I'd have had a chance to meet her.

THE COURT: This case isn't certainly going to turn on the accuracy of that phone number. I can assure you of that.

MR. REINERT: It's one more aspect of corroboration,

Your Honor, but it is not the critical piece.

THE COURT: You know, I realize you have the power to drag people up here like that, but I question the wisdom of you doing it in this kind of situation. But I realize you have a lot of things going on. It's not always possible to figure these things out ahead of time.

MR. REINERT: And that was not the most and foremost thing in my mind of one of many witnesses. I understand the Court's concern.

THE COURT: Appreciate it. Thank you, Mr. Reinert.

You may -- why don't you state your full name and spell your last name, please.

THE WITNESS: Name is William Walter Dean, D-e-a-n.

THE COURT: Mr. Reinert.

DIRECT EXAMINATION

BY MR. REINERT:

Q. Mr. Dean, I see that you are currently incarcerated?

A. Yes.

Q. On what types of charges are you incarcerated?

A. Failure to appear and third degree burglary.

Q. Those are felony offenses?

A. Yep.

Q. And you had previously provided information regarding Mr. Honken; is that correct?

A. Yes.

Q. And, in fact, after providing that information, you had requested that the United States Attorney's Office write a letter to the parole board informing them of the fact of that cooperation; is that correct?

A. Yeah, the parole board, yes.

Q. And, in fact, when I met with you over the weekend, you wanted to verify to make sure that happened and, in fact, you asked for a copy of that letter because you had never received it; is that correct?

A. Uh-huh.

Q. And you further asked that a copy of that letter be forwarded to the assistant county attorney here in Woodbury County and the -- your attorney in South Sioux; is that right?

A. Yeah.

Q. And you have also received copies of those letters forwarding a copy of that factual statement; is that correct?

A. Yeah.

THE COURT: Mr. Dean, it would help if you speak up and if you answer yes and no. The yeahs and uh-huhs are hard to get down for the court reporter.

THE WITNESS: All right.

THE COURT: Thank you.

BY MR. REINERT:

Q. Mr. Dean, do you go by any other names?

A.   Boo is my nickname.

Q.   When were you in the Woodbury County Jail last year?

A.   I can't specifically say when.  I mean, I can't specifically say what date it was I was in jail.  I was in; then I bonded out.  Then I got re-picked up again and stuff, you know, like that.

Q.   Do you see the defendant, Dustin Honken, here in court?

A.   Yes, I know Dustin.

Q.   Were you incarcerated in the same cell block with him?

A.   At one time, yeah.

Q.   Do you know Dean Donaldson?

A.   Yes, I know Dean Donaldson.

Q.   Was there a time when you were incarcerated in the same cell block with Mr. Donaldson and the defendant, Mr. Honken?

A.   Yeah.

Q.   Were you present when Mr. Honken made statements about his case and witnesses in his case?

A.   I was president -- present when they talked about methamphetamine.

Q.   When you talk about they, who are you talking about?

A.   Dean and -- Dean and Honkens talking about methamphetamine.

Q.   What did Mr. Honken say about methamphetamine to Mr. Donaldson?

A.   But nothing about -- the quality, making it better,

quality of methamphetamine.  You know, you could make a better quality.  He knew how to do it.

Q.   When you say he knew how to do it, who are you talking about he?

A.   Hisself I guess or -- hisself.

Q.   Do you mean Mr. Honken?

A.   Yeah.

Q.   Did they have any discussions about how he had been caught or particular witnesses in his case?

A.   Yeah, one of his -- his best friends told on him.  One of his best friends told on him.  That's mostly what I hear of how he got busted.

Q.   Did you overhear any discussions between Mr. Honken and Mr. Donaldson about what he wanted Mr. Donaldson to do?

A.   Donaldson told me what he wanted him to do.

Q.   Were you present when they discussed being -- Mr. Donaldson being bonded out?

A.   Yeah, I was present when Donaldson getting bonded out, yeah.

Q.   Would you describe for the Court the conversation you heard between Mr. Honken and Mr. Donaldson about being bonded out?

A.   Mr. Honkens asked me was Donaldson -- was he a man of his word, and I told him yeah, he was a man of his word.  Then Donaldson got to talking about that Mr. Honken was

supposed to get him, you know, to bond him out of jail, and I didn't know what the reason was for at that time. That's about the extent of the conversation when -- you know, about bonding out, that he was supposed to bond Dean out of jail.

Q. Were Mr. Donaldson and the defendant, Mr. Honken, frequent visitors? Did they talk frequently?

A. Yeah.

Q. Were you present during any conversations where deaths of individuals or methods of death were discussed?

A. Yes. They -- I think Honken -- I think he was just trying to scare Dean or whatever. I don't know what it was.

Q. What did Mr. Honken specifically say?

A. He said to Dean that something -- according to something being wrapped around their throat, a wire cord and something, and the fact of a body being lighter when he's alive. That's the only part I know of.

Q. That a body's lighter when a person's alive?

A. Yeah, a body's heavier when he's dead.

Q. You said you had bonded out.

A. Yeah.

Q. Were you bonded out by Mr. Honken?

A. No.

Q. Now, when you bonded out, was that the same time period when Mr. Donaldson was also bonded out?

A. About two weeks later Donaldson bonded out.

Q. Did you have any meetings with Donaldson during the time period when you were both out on bond?

A. Yes. Donaldson came up to my house on several occasions, and he told me the reason why Honkens -- the reason why he bonded him out of jail.

Q. What did he tell you?

A. He told me that he was supposed to move some -- or get some kind of stuff to make some amphetamine and he was supposed to get in touch with some El Forestros to help Donaldson take care of some people.

Q. Ultimately you said you had some difficulty on your release and you actually got arrested for a failure to appear?

A. Uh-huh.

Q. I presume they didn't bond you out on that anyway.

A. Who bonded me out?

Q. After you got arrested for failure to appear, did you go to jail or did they bond you out again?

A. I went to jail for the charges. I bonded out. Then I got picked up again. This last time I never -- I couldn't bond out because they put my bond at 5,000 cash bond.

Q. So once you were back in jail again, did you again see -- were you in the same cell block with Mr. Donaldson or with Mr. Honken?

A. I was in the same cell block with Donaldson, Dean, yeah.

Q. Did you observe Mr. Honken through any kind of glass windows between the cell blocks?

A. Yeah.

Q. What did you observe Mr. Honken do?

A. He -- I think he was going to rec., and he -- he told -- well, he told me that he knew that Dean was snitching on him or something like that.

Q. Now, could you hear him through the glass, or how did you know?

A. No, he just said, Snitch, snitch. You can see -- I know what he was doing, snitch, you know. Then he said -- then he went like -- like -- I don't know. I guess like he was dead or something (demonstrating).

Q. Now, the motion you just made, could you describe that as a slashing motion across your throat?

A. I guess like (demonstrating), like a person -- like Dean was dead or whatever. And then when he came back, he told me to go up -- something about go up and tell Dean or somebody should go up there and kick his ass or something like that. And I went up and talked to Dean, and that was about it.

Q. Did you observe Mr. Honken on another occasion gesturing through the window regarding Mr. Donaldson?

A. I think it was twice I remember, as I can remember. I seen him, you know.

Q. What happened on that second time?

A. He motioned -- first time I think he just motioned like his neck, and the second time he went something like this, put up his finger or something like that (demonstrating).

Q. Now, when you put up your fingers and gestured for the Court, would you describe that for the record? What kind of shape was your hand in?

A. Shaped like this (demonstrating). I don't know what -- I can't say what the man was --

Q. And what does that gesture depict when you have your first two fingers out, your last two fingers, your pinky finger --

A. To me it was a gun, but I can't say what was on the man's mind at that time.

MR. REINERT: Nothing further, Your Honor.

THE COURT: Mr. Parrish?

MR. PARRISH: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. PARRISH:

Q. Do you know Mr. Donald?

A. Mr. Who?

Q. Mr. Donald. Donaldson.

A. Donaldson? Yes.

Q. How do you know him?

A. Well, I've been knowing him for years, hanging out together on the streets, whatever, bars. I've been knowing

him for years.

Q. How many years?

A. Boy. Like I say, since about '83, '84. I've been knowing him ever since then.

Q. What do you guys do together?

A. Talk, hang out, go to bars, whatever.

Q. That's it?

A. Is that it?

Q. Yes. Is that all you do? Kind of hang out, go to bars together?

A. Mostly, yeah.

Q. You don't do anything else together?

A. As far as -- that's mostly what we do, I mean.

Q. Do you have any business that you do together?

A. Business?

Q. Yes.

A. No, I ain't got no business that we do together.

Q. You've never done any business with Mr. Donaldson before?

A. Depends on what kind of business. No, not business, business. Not that I know of.

Q. Well, what kind of business do you do together then?

A. We don't do no business.

Q. Are you telling me as you sit here today that you and Mr. Donaldson have never done any business together of any

sort?

A. Not that I -- you say business. I don't know what kind of business you're saying of. I mean, we ain't never had no business together like no store business or no business. I don't know what you're --

Q. Well, could you give me some idea of what kind of business if it's not a store business -- do you do any illegal business together?

A. Legal business.

Q. Illegal business.

A. What you mean? Like use dope or something?

Q. That's one thing. You use dope together, you and Mr. Donaldson?

A. We have.

Q. You've been using dope together since 1983, 1984?

A. Yeah, mostly.

Q. What? Crack cocaine?

A. (Witness nodded head.)

Q. Is that right?

A. (Witness nodded head.)

Q. Yeah? Is that yes?

A. Yeah.

Q. Okay. What other kind of dope did you and Mr. Donaldson use together other than crack cocaine?

A. That's about it between me and Donaldson.

Q. Okay. And you've been doing that what? About 10, 12, 14 years together?

A. Off and on.

Q. All right. And he's a pretty good friend of yours, isn't he?

A. I guess he is.

Q. Okay. Have you done any other kind of illegal business with Mr. Donaldson like steal pigs?

A. Have I?

Q. Yes.

A. I mean, I -- what you want me to do? Answer that?

Q. I think so.

A. I can't answer that.

Q. Do you want to take the Fifth Amendment?

A. I can't answer that.

Q. Well, you know whether or not you and Mr. Donaldson have stolen pigs and hogs together over the years, don't you?

A. I can't answer that. I take the Fifth on that.

THE COURT: I'm going to interject here, Mr. Dean. I just want to make sure you understand that if an answer to a question from either one of the lawyers, your answer would tend to incriminate yourself, then you have a right, as all citizens have a right, to invoke the Fifth Amendment of the United States Constitution.

THE WITNESS: That's what I do then.

MR. PARRISH: Okay.

BY MR. PARRISH:

Q. So with regard to your criminal activity that you and Mr. Donaldson have done together over the last ten years or so, you want to take the Fifth Amendment; is that right?

A. Me and his criminal activity, I'm going to take the Fifth on that question.

Q. Okay. Now, you did tell the government back April 22 of 1997 that they better give you a better deal if they wanted some statements against Mr. Honken, didn't you?

A. Yeah.

Q. Because they weren't offering you nothing as you put it; right?

A. Yeah.

Q. And if they could offer you something, maybe you could tell them something; is that right?

A. That's mostly what it was.

Q. And you admit that you and Donaldson had talked before you met with the grand jury on April 22, 1997; isn't that true?

A. I mean, we was in -- we talked because we was out on the streets together.

Q. Exactly. And he told you some things that he said that Dustin Honken had said; isn't that true?

A. No. He told me what Dustin was supposed to have him do.

Q.   That's what I'm saying.  He told you some things -- Mr. Donaldson, your buddy, told you some things like that; is that right?

A.   Yeah, that's what he did.

Q.   And some of the times you all would be doing this you'd be doing drugs together?

A.   No, not when he was -- I think we was just drink -- I mean, we might have had a drink or two, but we wasn't doing no drugs together when he was telling me that.

Q.   Just sitting around drinking a little bit when he'd tell you that?

A.   Any other time I wouldn't want to hear what he had to talk about.

Q.   Okay.  So you were basically listening to what Mr. Donaldson was telling you about what Dustin had said or wanted him to do; is that right?

A.   Uh-huh.

Q.   Is that a yes?

A.   Yeah.

Q.   Okay.  And you thought that Dustin was just trying to scare him; is that right?

A.   Yeah.

Q.   Does Donaldson also kind of talk a lot and maybe not tell the truth all the time?

A.   I don't know.

Q. Okay. You don't know whether he does or not over the years, huh?

A. No, I don't know if he tells the truth of everything he says.

Q. Okay. Now, when he told you some of the things that Dustin had said to him, you reached a conclusion based upon what he told you that Dustin was just trying to frighten him is what you told us, at least of what you said earlier; isn't that true?

A. Uh-huh.

Q. Is that a yes?

A. Yeah.

Q. Okay. And he told you that Dustin told him something about doing something about making meth; is that right?

A. Uh-huh.

Q. Is that a yes?

A. Yeah.

Q. Did he also tell him something about stealing some hogs?

A. Did Dustin --

Q. Did Mr. Donaldson tell you something that Dustin said about stealing some hogs?

A. I can't remember that, if he did or didn't.

Q. Okay. And did he ever name any names of any people that he wanted him to harm at all?

A. I think he said -- he didn't name the names, but he said

a main witness and I think the mother and father or something like that, name of his mother and father.

Q.   But you didn't determine who that might have been through Mr. Donaldson's conversations?

A.   I mean, no, because I didn't -- like I said, I only had a little time when I was in there to deal with these guys.  I mean, I wasn't really concerned about what's what.

Q.   When Mr. Donaldson didn't pay Mr. Honken's girlfriend back, did he say why he didn't pay her back for bonding him out?

A.   Why he didn't pay her back?

Q.   Right.

A.   He didn't say nothing to me about it.

Q.   Okay.  Did he tell you he owed her some money?  Did he ever tell you that?

A.   No.

Q.   Did he ever tell you where he was going to make this methamphetamine?

A.   No, he didn't tell me where he was going to make it at, huh-uh.

Q.   Did he tell you what kind of deal he got out of talking about Mr. Honken with the federal agent?

A.   Yeah.

Q.   What kind of deal did he tell you he had gotten?

A.   For them to not to press charges of conspiracy to commit

murder.

Q. And what else?

A. And not give an habitual.

Q. Okay. And what else?

A. That's the only thing I know of.

Q. What about a letter to the parole board?

A. He said he was going to ask about that. I don't know. He said.

Q. And what about the failure to appear?

A. Yeah, he did say something about a failure to appear.

Q. That they were going to adjust that charge also?

A. I don't know what would become of that.

Q. But did they also drop a five-year charge against him? Did he tell you that also?

A. Yeah.

Q. So they would not file a conspiracy to commit murder. They would not file a habitual against him. They would drop or maybe do something with the failure to appear charge against him; is that right?

A. Yeah. I don't know what happened to that charge.

Q. And write a letter to the parole board; is that right?

        MR. REINERT: That's been asked and answered, Your Honor.

        THE COURT: It has been.

BY MR. PARRISH:

Q. Anything else you can think that he said the feds were going to do for him for making a statement against Mr. Honken?

A. No.

Q. Okay. When you first refused to talk on April 22, 1997, as you put it in your words until you can come up with a better deal, I'm not getting nothing out of this so why should I do it, what did they say they would do for you?

A. They told me all the things -- they said they couldn't release me or nothing like that. They said that's all they -- that's all they said they could do.

Q. What?

A. Write the parole board, recommend that -- recommend things.

Q. And what kind of time are you facing?

A. What kind of time I'm facing.

Q. Yes, sir.

A. What I'm facing now.

Q. I have no idea.

A. Ten, ten years.

Q. For what?

A. The burglary and failure to appear.

Q. Okay. And is that consecutive, or is that concurrent? Is the burglary a burglary third or --

A. Third.

Q.    A burglary third?

A.    Yeah.

Q.    It's class D; is that right?  Five years?

A.    Yeah.

Q.    Okay.  And you're facing a five-year failure to appear?

A.    Yeah.

Q.    And how many other felony convictions did you have before this?

A.    About three.

Q.    And what were those?  Do you know?

A.    (Witness nodded head.)

Q.    What were they?

A.    Robbery.

Q.    Okay.  Robbery first or second?

A.    Had to be second.

Q.    Okay.  That's a ten-year robbery?

A.    Yes.

Q.    And what else?

A.    I had two robbery seconds.

Q.    Okay.  Two -- and they were served at two separate times for you?

A.    Yeah.

Q.    Okay.  Were they with or without a firearm?

A.    No, there wasn't no firearm.

Q.    No firearm?  Okay.

A. Huh-uh.

Q. And so when is your discharge date?

A. 2001.

Q. Okay. Were you and Mr. Donaldson together prior to the time of you both being released at the same time Mr. Honken was in the Woodbury County Jail?

A. Were we together?

Q. Yes, sir.

A. We had to be together. We was in the same cell block.

Q. You were actually in the same cell block then.

A. Yeah.

Q. You weren't like in a different area.

A. No, not when I first met Dustin, no.

Q. Okay. At the time this incident happened where you said that Donaldson observed Honken making some type of gesture toward him, were you in the same cell block at that time?

A. Oh, no, not with -- no, no.

Q. Okay. So did you actually see any gesture at all with your own eyes?

A. Yeah. I --

Q. And was Donaldson in the same cell block at the time?

A. Yeah, but he was up in his room.

Q. So he didn't see anything.

A. No.

Q. So if Donaldson said he saw anything like that, that

would have been inaccurate.

A.  As I can remember he wasn't -- he was not in the --

Q.  Okay.  Was there any way Honken could have seen Donaldson from where Honken was?

A.  I think yeah, he could have seen him.  I think what happened is when Honken -- I mean when him and the group started coming down, Dean seen Honkens, and Dean ran up to his room because, you know, he knew -- you know, he ran to his room.

Q.  Because he was afraid of Honken.

A.  I guess that's what it is.  He knew what the -- yeah.

Q.  And he knew Honken had bailed him out and he didn't pay him back.

A.  That's --

Q.  And that's what Donaldson told you.

A.  He didn't tell me nothing about paying him back.  He knowed that he bailed him out, and whatever was supposed to have been done was supposed to have been done.

Q.  And you're saying Donaldson never told you even up to this point whether or not he's paid back Honken's girlfriend?

A.  I imagine he haven't.  I know he haven't.

Q.  How do you know that?

A.  Because he got -- he's been in jail ever since a month after -- I guess about a month after he got out of jail.

MR. PARRISH:  Okay.  I have nothing further.  Thank

you.

THE COURT: Mr. Reinert, anything further?

MR. REINERT: No, Your Honor.

THE COURT: Thank you, Mr. Dean.

MR. REINERT: Terry Bregar. Your Honor, Mr. Bregar is an incarcerated witness. They're bringing him down. He also has low vision, so they need to move him a little slow.

THE COURT: Thank you.

MR. PARRISH: He has what, Pat?

MR. REINERT: He's lost his sight.

MR. PARRISH: Oh, okay.

MR. REINERT: He was a diabetic and I believe has lost his sight.

(A discussion was held off the record.)

THE COURT: Would you raise your right hand, please?

TERRY BREGAR, PLAINTIFF'S WITNESS, SWORN

THE WITNESS: Yeah, but, Your Honor?

THE COURT: Yes.

THE WITNESS: Can I say something to you?

THE COURT: Yeah, you can. Go ahead.

THE WITNESS: Okay. I'm about blind as a bat, and I really don't want to be in this situation. I don't want to be -- whatever prison I'm at, this kind of stuff follows, and I'm too vulnerable to maybe get pushed down the stairs. I really have nothing to say.

THE COURT: Well, you've been subpoenaed by the government to testify, and so --

THE WITNESS: Do I have to say anything?

THE COURT: You have to unless you have a valid Fifth Amendment privilege which you can invoke. And what that means is if in good faith you believe that a question would incriminate you, then you have the right to take the Fifth Amendment, as does everybody have that right. But short of invoking your Fifth Amendment right on a question that would incriminate you personally, you have to respond to the questions from both sides as long as I determine that they're relevant issues in this case. Sorry for the inconvenience, but those are kind of the rules we have to live by. So if you'd please --

THE WITNESS: If I choose not to say anything, I mean, I have -- what happens?

THE COURT: I can hold you in contempt, and you can get that added on your sentence, and you don't want that to happen.

THE WITNESS: Hell, I won't get out till 2009 anyway.

THE COURT: Well, it will be longer than 2009 when I'm done with you, and you don't want that. That's not in your best interest. You're here. I suggest you answer your questions. You're under oath. You do the best job to answer

the questions that all the lawyers ask you; okay? It won't take that long, and it will be pretty painless; okay? Appreciate your help. Why don't you be seated. Would you state your full name and spell your last name, please.

THE WITNESS: Terry William Bregar, Bregar, B-r-e-g-a-r.

THE COURT: Okay. Now the government lawyers are going to ask you some questions. Mr. Colloton or -- Mr. Colloton?

MR. COLLOTON: I'll go ahead, Judge.

THE COURT: Okay. Thank you.

DIRECT EXAMINATION

BY MR. COLLOTON:

Q. Mr. Bregar, you're currently a federal inmate; is that right?

A. Yes, sir.

Q. What are you convicted of that led you to be in federal prison?

A. Conspiracy on methamphetamine.

Q. Were you convicted in this court?

A. Yeah, by this man.

Q. You were sentenced by this judge?

A. Yeah.

Q. And what was your sentence?

A. Fifteen years, five supervised release.

Q. Now, when you went through court, were you detained for some period of time at the Woodbury County Jail?

A. Yes, sir.

Q. Do you remember when that was?

A. The first part of November.

Q. November of last year?

A. Yeah.

Q. All right. For about two weeks?

A. Yeah.

Q. What cell were you assigned to there?

A. D unit, cell 1.

Q. Do you know -- did you meet a fellow there named Dustin Honken?

A. Yes, sir.

Q. And as I understand it, you've had serious problems with your sight recently; is that right?

A. Yeah, about six months ago.

Q. Was it -- what was your sight like when you were in the Woodbury jail last November?

A. 20/20.

Q. And you had a problem at one of the federal facilities, right, with your healthcare?

A. Yeah, diabetes.

Q. So you can't see Mr. Honken here today, but you knew him at the time; is that right?

A.   Yeah.

Q.   Where was -- how did you meet Mr. Honken?

A.   New man on the block come in the door, and, you know, he was -- lived above me.  I can't remember the cell number, but he lived straight above me.  He'd come down and we'd talk about -- you know, we both had dope crimes and so forth.

Q.   Was D-1 the cell you're in on the end of the block?

A.   Yeah, under the stairs.

Q.   And what was adjacent to you on the other side of your wall?

A.   C.

Q.   C block?

A.   Yeah.

Q.   And you're saying you discussed with Mr. Honken your cases?  Is that what you're saying?

A.   Yeah.

Q.   What did he tell you about his case?

A.   That he had a methamphetamine case approximately to distribute I think nine kilos, somewheres in that area.

Q.   What did he tell you about manufacturing of methamphetamine, if anything?

A.   We talked back and forth that, you know, I knowed how to make methamphetamine, and he was -- he told me he said he did, and he showed me some pictures of some stuff that was seized at a raid at his house.  I think they were his house.

Q. What did he tell you about the quality of methamphetamine that he could make?

A. Said 91, 92 percent which is outstanding.

Q. What did he tell you about where he first became involved with methamphetamine production?

A. Elaborate.

Q. Where -- did he tell you where or when he first got involved in --

A. You mean location?

Q. Yeah, start with that.

A. In Phoenix, Arizona.

Q. Did he tell you about any plans he had for meth production in the future?

A. Yeah.

Q. What did he tell you about that?

A. About like everybody, that, you know, if we was out we could do this or do that. He had some kind of scam that if he got out that he could make some dope and distribute it some elaborate way with computers which I don't know nothing about computers, so it's beyond my capabilities.

Q. Did he tell you anything about the evidence against him in his pending case, in the current case that he was in for?

A. Define that a little for me.

Q. Did he say anything about who the witnesses might be in his current case?

A.   Yeah, a friend of his.  I don't believe he ever said the man's name that turned him in.  I think a life-long friend or something like this.

Q.   What did he say about what kind of evidence that friend had provided?

A.   That he had turned over nine kilos to this guy to sell I guess.

Q.   And what other kind of evidence did he say this friend had provided?

A.   That his friend had come -- was with a wire.

Q.   What do you mean by a wire?

A.   A tape, had him -- the cops sent him with a tape, and they had a conversation on tape.

Q.   What did he say was the nature of the investigation or the evidence that came up on the tapes?

A.   It was something to do with maybe some witness -- disappearing witnesses back from '93, '94, something like that.

Q.   What did Mr. Honken say about his statements on the tape?

A.   That he was hoping to plead guilty and just get three- or four-point enhancement and not have to have the tapes played.

Q.   Why didn't he want the tapes played?

A.   Evidently there was some incriminating evidence on them.

Q. Did Mr. Honken ever tell you anything more about a case of his from 1993?

A. Yeah, that he had a case in '93 and it was all dismissed because nobody showed up for Court.

Q. And when he was telling you that, what else, if anything, did he do or say?

A. That the witnesses disappeared.

Q. And what else, if anything, did he do or say when he told you about the disappearances?

A. Elab -- what do you mean?

Q. Well, did he say anything else about how they disappeared? Did he make any gestures or anything like that?

A. Oh, he might have -- yeah, yeah, something like this (demonstrating), whatever, you know, that could mean. He said people disappear.

Q. And when he was saying that, he was making a gesture?

A. Yeah.

Q. All right. Why don't you describe what you're doing there with your hand.

A. I presume like a pistol. Dustin's favorite thing is he kept his hand in his pocket like that. I don't know if he thought he had a pistol with him all the time or what or just someplace to rest his hand.

Q. Did he talk to you about any strategy that he had to try to beat his '96 case?

A.    Yeah.  He said if he was out he could probably beat the whole thing.

Q.    What did he say about how he could do that?

A.    Take care of the prosecutor.

Q.    What do you mean by that?

A.    I suppose shoot him.

Q.    What else did he say he intended to do if he got out? Did he talk about anybody else besides a prosecutor?

A.    Yeah, there was somebody -- his friend, his best friend, that he could disappear.  You know, they wouldn't have no witnesses against him.

Q.    What was -- what was Mr. Honken's tone of voice when he was talking about best friend and the prosecutor would be taken care of, disappearing?

A.    Very stern.

Q.    Have you heard other people in jail talk about killing witnesses or prosecutors?

A.    Shit, everybody, me included, you know.

Q.    And how did Mr. Honken compare to other people who make those kind of statements?

A.    Not happy about getting his time.  You know, like I said, he was very stern.

Q.    How did he compare to other people who make statements like that when he said them?

A.    Maybe someone to be afraid of or something.  Just stern.

It wasn't bullshit. He was stern. You know, the jailhouse talk, I'm going to kill this guy, kill that guy and so forth.

Q. You didn't take it as that kind of jailhouse talk? Is that what you're saying?

A. No, it seemed above that.

Q. Did he ever talk to you about bonding somebody out of jail?

A. Yeah.

Q. What did he say to you about that?

A. He had bonded somebody out to take care of some business and some affairs for him.

Q. And what did he say happened with that?

A. The guy never showed up for Court and he lost his money. He was really irate and mad about the guy not showing up for court.

Q. Did he say what kind of matters this guy was supposed to take care of for him?

A. No, he didn't.

Q. Did he ever talk -- Mr. Honken ever talk to you about any of his girlfriends?

A. Yeah, I seen pictures of them, that and his children.

Q. Did he ever talk to you about Angie Johnson?

A. He talked about an Angie, but I don't recall him saying the last name.

Q. Okay. What did he say about Angie's role in his

criminal activity?

A.   That she could possibly hurt him.  He was more afraid, you know, of her, what she might be able to say to incriminate him than the drug -- it would be more serious than a drug case.

Q.   During the time you were in the D block in November of 1996, did you ever become aware of any effort to escape from the jail?

A.   Yeah.

Q.   Did you ever talk to Mr. Honken about that?

A.   Yeah.

Q.   How did you first find out about such a plan?

A.   He asked me if I'd be interested in going.

Q.   Who asked you that?  Dustin?

A.   Dustin.  I told him thanks for the offer but, you know, no.  I got enough problem right now.

Q.   So what did he tell you about this plan to escape from jail?

A.   He didn't really elaborate any more at that pacific (sic) time.  It might have been a couple days later.  He kind of told me some of the plans, that there was being a hole knocked through the wall.

Q.   Where was this hole?

A.   Right next -- he lived upstairs, and it would be the next cell if you stand looking at the door to the right.

Q. In what block was the hole?

A. C.

Q. He told you there was a hole in the C block?

A. Yeah.

Q. And what did he say about how the hole had been made, if anything, or where it was?

A. What do you mean there? There was a couple blocks up by the ceiling knocked out, knocked loose, and try to get a hole big enough to crawl out of. Is that what you mean?

Q. That's fine. I'll ask you another question. Did he tell you anything about how the plan was to go from there once there was a hole broken in the wall?

A. Yeah. They needed to get a rope, big rope, up.

Q. And what did he say was the plan with the rope?

A. Well, to make -- they made a small rope. It was on the other side. He made a small rope out of blankets and was going to lower it down and hook the larger rope and drag it up. I guess it's something like 40 feet to the ground.

Q. Now, since this hole he told you about was in the C block and he was in the D block, what, if anything, did he say to you about how he was going to get over to where the hole was?

A. Well, he was going to try to go through the wall between the two cells.

Q. And what, if anything, did you see regarding that or an

attempt to do that?

A. Well, a whole lot of noise one evening, and I went up and looked, and there's a little hole about half inch or inch deep by two inches.

Q. Well --

A. And the walls are cord or poured concrete inside the block and rebar.

Q. Did you see who was creating this hole?

A. Dustin wasn't beating on that. Dayton was, Sebastian (sic).

Q. Where was Dustin?

A. Overseeing.

Q. Overseeing what Dayton was doing?

A. Yeah, watching.

Q. What did you see this fellow Dayton banging with?

A. Door handle.

Q. Did you see where the door handle came from?

A. Yeah, come off of the downstairs on number 5.

Q. Who was in cell number 5?

A. Jim Brownlee and Daniel Frye.

Q. How do you know it came from there?

A. I was sitting down by the table when the handle got broke.

Q. Who did you see with the handle downstairs?

A. Dayton.

Q. Was anybody with him?

A. Dustin.

Q. And when you saw the banging going on in the cell upstairs, was it just the door handle involved?

A. No. It was a coat hangar off the wall, one of them break-away coat hangers made out of quarter-inch steel but it breaks away. You can hang yourself by it. And he was using that for a chisel and beating on it, using the brass handle for a hammer.

Q. You said then you saw some kind of hole or damage done to the wall, but it was cord?

A. Yeah.

Q. So you mean it wasn't possible to get through the wall?

A. Oh, no.

Q. So what did you do or what happened to that hole?

A. I went down and got some soap out of the shower because it was yellow and kind of patched it and put it in the hole.

Q. Why did you do that?

A. Because I figured the cops would be there to see what all the noise was all about, and I'd hate to lose the telephone and the TV.

Q. What other efforts, if any, did you observe by Mr. Honken to try to get to the C block from the D block?

A. He messed with the fire door between them.

Q. When you say the fire door, can you explain what you

mean by that?

A.    A fire door goes between all the units.  For him to leave, he would have to get out of D into C, so he was trying to pick the lock on the fire door.

Q.    What specifically did you see him doing with the fire door?

A.    Setting on a garbage can top with a glass boat trying to rake the tumblers and that thing -- coat hook off the wall for tension, tension bar.

Q.    What view do the guards have of that fire door?

A.    None.  It's a blind spot.

Q.    Did you ever see the results of these efforts by Mr. Honken to pick the lock at the door?

A.    I never did see him open the door.

Q.    Did he ever say anything to you about his efforts, in other words, whether it worked or not?

A.    I think he thought it did.  I think he got the thing turned, but, you know, I don't know if that would open the door or not.  They're not a knob.  They put the key and use the big key as a knob.

Q.    What, if anything, did Mr. Honken tell you about how the work was progressing in the C block with the hole that you mentioned?

A.    Well, it sounded like -- he said it was doing real well.

Q.    Did he say whether there were ever any problems

encountered or whether --

A.   They needed to get a piece of rebar.

Q.   What's rebar?

A.   Half-inch steel rod that they stick down into the block.

Q.   What did Mr. Honken tell you about this rebar?

A.   Well, they'd take a hacksaw or something abrasive to file on it, but you could bust it off so you'd have room to go out the hole.

Q.   And what, if anything, did he do or say about that problem?

A.   He took the striker plate off my door and popped a piece of nosing off the steps.

Q.   What's a striker plate?

A.   It's on the door that slams against -- that the metal bolt comes out for the lock or comes out that strengthens the door.  It's made out of eighth-inch steel.

Q.   And you say he took that and took a piece of nosing off the stairs?

A.   Yeah, broke a piece of nosing off.

Q.   What stairs?

A.   Right in front of my cell in D, five, six, seven steps up.  I'm not really sure.

Q.   And what is nosing?

A.   It's an abrasive material that's hooked to a piece of aluminum where you won't slip on the stairs.

Q. Did you see what Mr. Honken did with this piece of abrasive nosing?

A. Yeah. Dayton put it on a piece of string and flipped it over to another guy in C.

Q. Did you see what Dayton flipped -- well, first of all, how does that work? How do you flip something over?

A. Put a piece of string, put it under the door, and make an arch and swing it in a circle, called a jigger string.

Q. And you're saying he was able by doing that to swing this object under the door over into the C block?

A. Yeah.

Q. Did you see -- could you see into the C block?

A. Yeah, real well.

Q. Did you see who received it on the other side?

A. Yeah, a guy with -- that had a shaved head.

Q. What was his name?

A. Dennis. I don't know his last name.

Q. Did you ever see any evidence that Mr. Honken was actually planning to leave soon or escape soon?

A. Yeah. He packed up all of his stuff and took it out on a visit. It's legal material and pictures and stuff.

Q. When you say he took it out on a visit, what does that mean?

A. Gave it to somebody, you know, got it out of the jail.

Q. Was there ever an occasion when Mr. Honken said to you

that he was close to leaving on this escape?

A.   Yeah.

Q.   And what did he say to you about that?

A.   Come in and wanted to know if he could shut the light off and look out my window, and I said yeah. And he looked out, and he said, I think it's a go. There was an automobile sitting across the street.

Q.   What happened after that?

A.   Nobody showed up.

Q.   What do you mean by that?

A.   Well, evidently somebody was supposed to come with a rope, and that part never materialized.

Q.   When you say evidently, how do you know that?

A.   Well, that's what he said. Somebody had been paid to do this, and they didn't show.

Q.   Now, when you were interviewed by the government, you talked about what's called Rule 35; is that right?

A.   Yeah.

Q.   You understand that that's a way that your sentence possibly could be reduced if the government decides to make a motion to the judge.

A.   Right.

Q.   And would you agree that you were told that the government would consider that back at the U.S. Attorney's Office but there were no promises made to you about that?

A.    Yeah.

Q.    Is that your understanding?

A.    Yeah.

Q.    Now, you said when you came in here to the judge that you didn't want to testify.  Can you explain a little more why you feel that way?

A.    As publicized as this thing's going to be, there's people from six or seven different prisons that I know of -- and I'm blind -- in on this thing, and word's going to be out, and I don't want to have to wear a snitch jacket.  I got plenty of time.  I really don't want any more time either.  And with my eyesight the way it is -- they are, I'm extremely vulnerable.

      MR. COLLOTON:  All right.  I appreciate that.  Thank you for your answers, and that's all I have for the witness, Judge.

      THE COURT:  Mr. Parrish?

      MR. PARRISH:  Thank you, Your Honor.

                    CROSS-EXAMINATION

BY MR. PARRISH:

Q.    You were sentenced you say in federal district court in the Northern District; is that correct?

A.    Yes, sir.

Q.    And you got how many years?

A.    Fifteen plus five.

Q. And what was your weight in the methamphetamine?

A. 1,800 grams.

Q. Was it pure?

A. It's a dry case. It was conspiracy.

Q. Did you plead or go to trial?

A. Plea.

Q. And you didn't get any substantial assistance on a Rule 5K?

A. No, sir.

Q. And you've been in now since when?

A. I've been locked up since October of last year.

Q. And that's of '96; is that right?

A. Yes, sir.

Q. And did anyone get any 5K motions granted where they testified against you?

A. I really don't know. They didn't disclose all their witnesses.

Q. Who represented you?

A. Beverly Wild from Guthrie Center, Iowa.

Q. But evidently they had some witnesses against you; is that correct? That's why you entered your plea.

A. Oh, yeah. Yeah.

Q. And so they're talking about a Rule 35 motion to you now if you were to offer evidence against Dustin Honken; is that correct?

A.   Yeah.

Q.   Did you negotiate that on your own, or did someone on your behalf negotiate that agreement with them?

A.   You mean like an attorney or something?

Q.   Yes, sir.

A.   No, sir.

Q.   You basically did that yourself.

A.   They come to me.

Q.   And then they came to you with the Rule 35 or --

A.   They came to me when I was in jail and said they could help me, and I told them no, they couldn't, I already got 15 years.

Q.   Okay.  Who came to you and said they could help you?

A.   Mark O'Brien I think.  That was the first guy that come to talk to me.  Then the next gentleman was -- with Mark is one of these guys over here.  I can't tell which one.

Q.   Was it Mark Hein or Mark O'Brien?  You said Mark -- was it Mark Hein?

A.   Mark Hein.  Excuse me.  It was my error.

Q.   And who was the next person?  It was right over where?

A.   It was one of these gentlemen over on my right.

Q.   Mr. Reinert or Mr. Colloton; is that right?

A.   Mr. Colloton.

Q.   Okay.  And they made the offer to you that they could help you?

A. They said they could possibly help me, yes, sir.

Q. Did they say what the possibilities of help would be?

A. In maybe getting some time cut off my sentence.

Q. Did they tell you how much time?

A. No, they didn't.

Q. But they indicated it would be a possible Rule 35 motion?

A. Yes, sir.

Q. And that is before you gave them any information?

A. Yeah, because I didn't want -- at first I didn't even want to talk to them. Then they said, well, time cut, and I'm thinking, time cut, yeah.

Q. So after they told you they could help you and give you a Rule 35, it was only after that that you provided information to them; is that correct?

A. Yes, sir.

Q. As you sit here today, do you have any idea when they are planning to file a Rule 35 motion on your behalf?

A. I expect never.

Q. Why do you say that?

A. Because it's just the way they operate. You know, I'm looking at 2009, and that's when -- you know, I don't see nothing happening. I don't believe anything the government says if you want to know the truth.

Q. Did you make the statement on direct examination that

over at the jail you hear all the time about people killing people or people threatening to harm somebody?

A.  Sure.

Q.  Who do they threaten to harm?

A.  Prosecutor, judge, wives, friends.

Q.  And you've been in prison before?

A.  This is my third time.

Q.  All in federal prison?

A.  No, sir.

Q.  Where?

A.  First one was state -- was federal, second one state, now this one.

Q.  And how many years all total have you done in prison?

A.  Oh, probably seven so far.

Q.  Were the charges all drug charges?

A.  No, sir.

Q.  What were they?

A.  Misprison (sic) of a felony, failure of a federal crime and -- failure to turn it in, conspiracy of amphetamines and accessory after the fact on cocaine.  It was all done at one time in 1981 by Judge Stewart, Des Moines, Iowa.

Q.  Do you have any theft charges or anything?

A.  Yes, sir.  In 1990 I got convicted of first degree theft which was possession of $10,000 worth of stolen tools.

Q.  Any other theft charges?

A.    Just that one there.

Q.    So you have what?  Five felony convictions?

A.    Yes, sir.

Q.    So that's probably another reason you had such a high prison sentence, because you had a criminal history that was pretty extensive, probably put you in a category 6 or something?

A.    Five.

Q.    Five?

A.    Yeah.

Q.    And what did you get the 5 years on top of the 15 years for?

A.    That's supervised.

Q.    All right.  So it wasn't like a 924C or anything like that.

A.    No, no.  I think everybody gets supervised release, three or five years on top of your sentence.

Q.    That's what I was trying to understand when you said on top of.  So you would agree probably that except for your health situation the only way you have out or to get any type of reduction is to provide information to the government.

A.    Yeah.

Q.    There are no other alternatives for you.

A.    No.  They are for nobody in the federal system.  They don't have no parole.  You do 85 percent.

Q. Unless you talk and get a 5K or get a Rule 35.

A. Right.

Q. Now, when you indicated early on you didn't want to talk when you first came in here, in actuality, if the government would help you, you do want to say something that would help yourself get a reduced sentence, don't you?

A. Yeah, but I don't look to get nothing.

Q. I understand. And in this information you provided with regard to Mr. Honken, as I take it, other than the one time you said you saw him -- was it fiddling with a door?

A. Yeah.

Q. -- you never saw him do anything else with regard to an escape?

A. Oh, no.

Q. And you also know that about November of last year -- well, let's zero in on the date first. You said at one point while you were incarcerated with him he packed up all of his clothes, and you responded that that gave you some indication that he was about ready to leave; is that right?

A. Yeah.

Q. Now, you were not aware that also about that time -- that would have been November of last year, 1996; isn't that correct?

A. Yes, sir.

Q. Did you also know at that time there was -- he might

have been moved over to Cedar Rapids to enter a plea because his lawyer was involved in a trial over in Cedar Rapids and that was also a possibility?

A.    That was a possibility, but he would have kept his legal material and that with him.

Q.    Well, let me ask you on that.  Do you think that he could have packed his stuff because one of the possibilities was he was going to move to Cedar Rapids to do a plea because the judge was over there?

A.    That's possible.

Q.    Okay.  And you heard some talk about that also.

A.    He told me because he was expecting to go over there hoping -- - you know, he's been waiting a long time to get sentenced now.  I'm sure he's more than tired of waiting now.

Q.    And also did that happen again in May?  Were you still --

A.    No, I was only there a couple weeks.

Q.    And you were gone at that point.

A.    I was there two weeks.

Q.    Okay.  Let me ask you this:  If he had picked the lock, what would have been the result of him picking the lock had he been able to even do that?

A.    All he'd have done was got to the next unit.

Q.    And could he have escaped from there?

A.    If they had the hole in the wall.

Q.   If they had had the hole in the wall?

A.   Yeah.

Q.   And did they have a hole in the wall for someone to --

A.   I don't know.

Q.   You don't know?

A.   I don't know.

Q.   And to your knowledge he never opened the --

A.   No, he didn't open no door.

Q.   And let me ask you this:  Do people talk about escaping or breaking out of jail all the time?

A.   Hell yeah.

Q.   And you hear that from a lot of people?

A.   Yeah, about eight out of ten.

Q.   And do they have all these ideas of how to do it?

A.   Everybody's got a plan.

Q.   Did you hear any plans any better than Dustin's plan or any worse than Dustin's plan all the time you've been in jail all these seven years?

A.   Oh, I've heard them all from helicopters to, you know, somebody storming the place.  No.  His plan, you couldn't force me to crawl out of a hole 40 foot in the air on a rope.

Q.   The hole would have had to have been pretty big also; is that right?

A.   Well, hell yeah.

Q.   Okay.  Did you ever see the hole?

A. No. I couldn't see it. I was in D unit.

Q. Okay. And he didn't have any kind of rope.

A. No.

Q. Did he ask you to go with them?

A. He asked if I was interested, and I said no, no thanks. You know, I had all the problems I needed right now.

Q. And do you think under the circumstances of what you saw him do that it would have materialized?

A. Seriously?

Q. Yes.

A. No.

Q. And why?

A. I just don't think it's feasible.

Q. When you indicated in your response to Mr. Colloton's question that Dustin's responses with regard to his comments about his witnesses for his trial appeared to be on another level or a little different level than the other comments you hear, let me ask you this: Did he appear to you to be a rather serious person, a person not too often engaged in small talk?

A. He's a very intellectual and very serious person about everything. He don't talk bullshit. He's very intelligent.

Q. And would you agree that conversations with him are a little different than conversations with other people who you normally run into at a jail facility, not a prison facility,

a federal prison facility, but a jail facility where you have a lot of people charged with state crimes?

A. He's probably the smartest man I've ever talked to intelligent-wise, you know, carry on a complete -- a real good conversation without all the stupid shit.

THE COURT: Does that include the assistant U.S. attorneys that talked to you?

MR. COLLOTON: And the current questioner.

THE COURT: And the judge? So we're all in the same boat I guess.

THE WITNESS: No comment on the judge.

BY MR. PARRISH:

Q. So you would agree that because of his intelligence and ability to engage in conversations that people would be more apt to take anything he might say with a bit more seriousness?

A. Yeah, he's a very serious person.

Q. Okay. It didn't mean at all, did it, that his comments had any more truthfulness to them?

A. No.

MR. PARRISH: Okay. I have nothing further.

REDIRECT EXAMINATION

BY MR. COLLOTON:

Q. On that last point there, Mr. Bregar, that's not exactly what you said in the grand jury, is it?

A. I don't remember. What did I say? Read it. He's a serious person. You know, I would be --

Q. But you remember saying in there that other guys who talked like that in the jail didn't talk with the intent and the coldness that this man had. Do you remember saying that?

A. Right.

Q. And you remember saying that you just had an eerie feeling about him when he talked about it because you believed the man is very dangerous. Do you remember saying that?

A. Yeah.

Q. Do you still believe that to be true?

A. I don't know. If the man -- if the man done all the crimes they've said he's done, he's gotta be Jesse James.

Q. But when you made this statement, this was based on your own interaction with him; is that right?

A. Pardon me?

Q. When you made that statement to the grand jury, was that based on your own --

A. Yeah.

Q. -- dealings with him?

A. Yeah.

Q. It wasn't based on what somebody else told you about him; right?

A. Yeah.

Q. Now, Mr. Parrish asked you some questions about other stories or people you've heard talk about trying to escape. Remember that?

A. Yes, sir.

Q. Did you see anybody else in the Woodbury County Jail try to pick the lock on a fire door?

A. No.

Q. Did you see anybody else at the Woodbury County Jail break a piece of nosing off a stair and arrange for it to be sent over to the C block?

A. No.

Q. Did you see anybody else in the Woodbury County Jail oversee the banging on a wall of a cell that was adjacent to the C block?

A. No.

MR. COLLOTON: That's all I have, Judge.

THE COURT: Mr. Parrish, anything further?

MR. PARRISH: No questions, Your Honor.

THE COURT: Okay. You're excused. Is your eyesight going to get better at all?

THE WITNESS: No. Diabetes got the optic nerves.

THE COURT: Nothing they can do for you, huh?

THE WITNESS: I guess not.

MR. REINERT: United States calls Daniel Frye.

THE COURT: Why don't we take a -- do they have to

get him, or is he close by?

MR. REINERT: These are all prisoners.

DEPUTY WALHOF: I called for him a couple minutes ago on the radio.

THE COURT: Will he be a short witness?

MR. REINERT: The next three or four witnesses should be relatively brief.

THE COURT: Why don't we take a 10-minute recess and -- maybe 15. We'll start at ten after four because we're going to go past five o'clock, aren't we? Is that the plan?

MR. REINERT: If the Court desires, we certainly would like to.

THE COURT: Well, it's up to you all. We're not going to finish today anyway, so I guess there's no point in killing anybody, but I'm available till six if you want to. If the parties don't want to, that's fine.

MR. REINERT: I think it would be fine with us to go till six because we've got all the incarcerated witnesses that are already here. I'm sure it would help the marshals if we didn't have to bring them back a second time.

THE COURT: I think it would be an inconvenience. Would you rather stay till six or haul them back another time?

DEPUTY WALHOF: It's haul them back from the other side of the state another time, so tonight's fine with me.

THE COURT: Let's keep going till six.

(Recess at 3:56 p.m.)

THE COURT: Please be seated. Would you raise your right hand, please?

DANIEL FRYE, PLAINTIFF'S WITNESS, SWORN

THE COURT: Okay. Please be seated over here. Would you state your full name and spell your last name.

THE WITNESS: Daniel Lester Frye, F-r-y-e.

DIRECT EXAMINATION

BY MR. REINERT:

Q. Mr. Frye, are you currently incarcerated on an offense?

A. Yes, I am.

Q. And what offense is that?

A. Intent to deliver methamphetamines.

Q. And is that a felony offense?

A. Yes, it is.

Q. Have you been convicted of any other prior felony offenses?

A. No, I have not.

Q. As part of that drug offense, did you spend some time in the Woodbury County Jail?

A. Yes, I did.

Q. When was that?

A. October, November, and December of last year.

Q. Of 1996?

A. Yes.

Q. Do you know Dustin Honken?

A. Yes, I do.

Q. Were you incarcerated with Mr. Honken?

A. Yes, I was.

Q. What cell block were you in at that time?

A. D block.

Q. D as in dog?

A. Yeah.

Q. Did you have the opportunity to have some discussions with Mr. Honken about why he was in prison?

A. Yes, I did.

Q. What offense did he tell you he was in jail for?

A. Manufacturing methamphetamines.

Q. Did you discuss the evidence or some of his conduct that resulted in him being in jail?

A. I don't understand the question.

Q. Did you discuss some of the evidence and who are some of the witnesses against him?

A. Not the witnesses. He just said that they raided a garage or something and found some glassware and some chemicals or something.

Q. Did he indicate what his starting ingredient was to manufacture the methamphetamine?

A. No, I'm not sure what his starting ingredient was, but

he mentioned toluene.

Q. Toluene?

A. Toluene or something like that, toluene.

Q. Did he talk about any other person who was involved in the manufacture of methamphetamine with him?

A. No.

Q. Did you have a discussion with Mr. Honken regarding bonding anyone out of jail?

A. Yeah. He approached me one day and said he bonded someone out and that they jumped bond on him, and he was trying to locate that person to get him arrested.

Q. Did he indicate to you why he had bonded that individual out?

A. No, I don't believe he did.

Q. Did you ever have a door handle on your cell door come up missing?

A. Yeah.

Q. What cell were you in?

A. I'm thinking 7, but I'm not sure.

Q. Now, when we talk about door handle, is it like a small doorknob? Could you describe that for the judge?

A. It's kind of a U-shaped handle. It's like brass. It's about this big, about that big (indicating).

Q. About 12 inches long?

A. Yeah, it's a pretty good-sized door handle.

Q. About how heavy is it?

A. I know it'd have to be a couple pounds. It's supposed to be solid brass I guess or something, so it's pretty heavy.

Q. On the day that your door handle turned up missing, did you see anything when you walked back into the cell and saw the door handle was gone?

A. I saw my celly. He was in there.

Q. Your celly, is that your cell mate?

A. Cell mate, yeah, he was in there eating a candy bar. I asked him what happened to the door handle, and he just kind of smiled and didn't say anything so --

Q. Who was your cell mate at that time?

A. Jim Brownlee.

Q. Now, about the time when you heard or when you saw that the door handle was missing, did you hear anything in the cell block?

A. A little while after that I heard some pounding.

Q. Do you know where the pounding was coming from?

A. Cell 2.

Q. And whose cell was that?

A. Dustin Honken's.

Q. At any time did you get the door handle back?

A. I did not, but it was given back to my cell mate, and he turned it in before lockdown.

Q. Who gave the door handle back to your cell mate? Do you

know?

A.    I'm not sure who did.

Q.    Did you observe who was banging up in the cell?

A.    When I heard the pounding, I went up there and seen Dustin Honken pounding on the wall with the door handle.

Q.    Who else was present?

A.    Dayton Sebastian (sic).

Q.    Did you ask -- have any discussion with Mr. Honken or Mr. Sabasta about what he was doing with your door handle in his cell?

A.    Kind of was like, What the fuck you doing?  And they said, Is that pretty loud?  I said, Well, fuck yeah, it's loud.  I mean, and they were basically like, you know, come in or out, you know, because I had the door open standing in the doorway.

Q.    So in response to their in-or-out request, what did you do?

A.    I went back down into the day area.

        MR. REINERT:  No further questions.

        THE COURT:  Mr. Parrish?

        MR. PARRISH:  I don't have any other -- any questions, Your Honor.  Thank you.

        THE COURT:  Thank you.  You're excused.

        MR. REINERT:  United States calls James Brownlee.

        JAMES BROWNLEE, PLAINTIFF'S WITNESS, SWORN

THE COURT: Okay. Be seated over here, please. State your full name, please, and spell your last name.

THE WITNESS: James Jonathan Brownlee, B-r-o-w-n-l-e-e.

DIRECT EXAMINATION

BY MR. REINERT:

Q. Mr. Brownlee, I see that you're currently incarcerated; is that correct?

A. Yes, I am.

Q. And you're incarcerated on a felony offense?

A. Yes.

Q. And what offense is that?

A. Possession of methamphetamine with intent to deliver.

Q. And have you had some prior felony convictions for drugs and alcohol?

A. Yes.

Q. When were you sentenced on your last drug case?

A. I believe it was November -- about November 15, 1996.

Q. And were you housed in the Woodbury County Jail?

A. Yes.

Q. And what -- do you know Dustin Honken?

A. Yes, from jail.

Q. And were you in the same cell block with him?

A. Yes.

Q. Mr. Brownlee, who was your cell mate when you were in

Woodbury County?

A. Dan Frye.

Q. Was there a day when your door handle was removed from your cell door?

A. Yes, there was.

Q. Were you present when that occurred?

A. Yes.

Q. Do you recall who broke the door handle off?

A. I'm not real sure because it's quite a while ago, but I think it was -- now I can't remember his name again. I'd know it if I heard it but I --

Q. And we've -- we discussed this I believe Sunday night, and do you recall when we talked at that time you said it could have been Dayton?

A. Yeah.

Q. What --

A. Not real sure but --

Q. And was Dayton someone that hung around with Mr. Honken?

A. Kind of.

Q. What, if anything, did you get in return for loaning your door handle to Dayton?

A. I got a candy bar.

Q. After the door handle was removed from your door, what, if anything, did you hear?

A. I heard a couple loud thuds coming from one of the

cells.

Q. What cell did you hear that loud banging?

A. It was upstairs.

Q. In which cell upstairs?

A. I don't know what number it was.

MR. PARRISH: Do you want to tell him that too?

MR. REINERT: Pardon me?

MR. PARRISH: Do you want to tell him that also? You can go ahead and tell him. I don't care.

BY MR. REINERT:

Q. Do you know who was residing in the cell in which you heard the noise?

A. I believe it was Dustin's room.

Q. Was the -- did you get the door handle back?

A. Yeah.

Q. When did that take place?

A. Just shortly after.

Q. Do you recall who brought that back to you?

A. No, I don't.

Q. When you mean shortly after, about what time would you have gotten that back in regard to when it was lockdown or the bed check time?

A. Shortly before ten o'clock lockdown.

Q. What happens at ten o'clock lockdown?

A. We all have to lock our doors, lock ourselves in our

cell, and they come in and look in each cell.

Q. What did you do with the door handle when you got it back at lockdown?

A. I laid it out by the sink.

Q. Did you tell anybody about it?

A. Yeah, I told the guard that it got broke off.

MR. REINERT: No further questions, Your Honor.

THE COURT: Mr. Parrish, any questions for Mr. Brownlee?

MR. PARRISH: Let me think just a second, Your Honor.

CROSS-EXAMINATION

BY MR. PARRISH:

Q. Do you know whether or not you saw Dustin Honken pounding on the wall?

A. No, I didn't see him pounding on the wall.

Q. Do you know how people get attention from someone else if they want them to listen to what they have to say? They pound on the wall. Is that something -- a process they use there?

A. Uh-huh.

Q. Is that a yes?

A. Yes.

Q. And that's a normal procedure that you observed in Woodbury County Jail?

A.    Yes.

MR. PARRISH:  I have nothing further.

MR. REINERT:  Just one, Your Honor.

REDIRECT EXAMINATION

BY MR. REINERT:

Q.    Is it normal procedure to get somebody's attention to pound on the wall with a door handle?

MR. PARRISH:  Well --

A.    Well, that was -- that was the first time I had experienced that but --

MR. REINERT:  No further questions.

RECROSS-EXAMINATION

BY MR. PARRISH:

Q.    Did you see someone pound on the wall with a door handle?

A.    No.

MR. PARRISH:  Okay.  I have nothing further.

THE COURT:  Thank you, Mr. Brownlee.  You're excused.

MR. REINERT:  James Derrick.

MR. PARRISH:  You didn't have any notes on this gentleman, did you --

MR. REINERT:  Huh-uh.

MR. PARRISH:  -- who just finished, Mr. Brownlee?

MR. REINERT:  Huh-uh.  First time I interviewed him

was Sunday night.

MR. PARRISH: It shows.

THE COURT: Mr. Reinert, we'll hold your induction ceremony for just-the-one-question club later. You're now an official member.

MR. REINERT: And I presume Mr. Parrish's comments were in no manner some kind of objection to my conduct.

MR. PARRISH: Well, you told him two or three answers, Mr. Reinert. That's the only problem I had. And I didn't have any problem. I just wanted to speed up the process. He didn't know the answer, and I said just tell him. I don't mind.

MR. REINERT: Mr. Parrish, if you have an objection to my form of question, please pose the objection and we'll deal with it.

THE COURT: Would you raise your right hand, please?

JAMES DERRICK, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated over here. Would you state your full name and spell your last name, please.

THE WITNESS: James David Derrick, D-e-r-r-i-c-k.

DIRECT EXAMINATION

BY MR. REINERT:

Q.   Mr. Derrick, I see that you're currently incarcerated.

A.   Yes, I am.

Q.   On what offense?

A.   I have a contempt of court charge.

Q.   And is that a felony offense?

A.   No, it's not.

Q.   Have you had some prior felony convictions, sir?

A.   Yes, I have.

Q.   And what are those?

A.   I had one a couple years ago.  It was a serious assault charge and a child endangerment back in February '95.

Q.   Were you incarcerated last year in the Woodbury County Jail?

A.   Yes, I was, from September '96 to May '97.

Q.   And in what cell block were you?

A.   I was in D.

Q.   Do you know Dustin Honken?

A.   I know who he is.  I didn't know him very well.

Q.   Do you see him here in court?

A.   Yes, I do.

Q.   Did you know him -- where did you know him from?

A.   We were in the same section together for, oh, I guess maybe a couple months.

Q.   Do you know an individual named Dayton Sabasta?

A.   He was in there also at the same time I was.

Q.   Did you observe any interaction between Mr. Sabasta and Mr. Honken?

A.   Yeah.  I'd seen them talking together at various times.

Q. Did you observe Mr. Honken do anything regarding the door between C block and D block?

A. I might have -- well, I'll have to say a lot of inmates stand next to the fire door and talk to other inmates in the next section. You can't see them, but they'll stand and just, you know, converse.

Q. Other than just standing there and conversing, did you see Mr. Honken do any other activities regarding specifically the lock on the fire door?

A. Not the fire door, no.

Q. To any door in the cell block.

A. Well, yes, to the main entrance door I saw him stick something in there like a key one day in the locking mechanism to see if it would fit because he'd been working on filing something for a couple hours, and I just observed him to walk up to the main door and stick this thing in there and see if it fit, and he went back to his filing.

Q. Now, where was he filing?

A. He was sitting up by his room at the top of the stairs, and his cell was just right across.

Q. Did you see what he was using as an abrasive material to file?

A. No. He was just using the concrete on the stairwell.

Q. Did you ever hear any loud banging noises when you were in D block with Mr. Honken?

A.    Yeah, yes, I did.

Q.    Would you describe that for the Court?

A.    One night while we were all just -- it was a peaceful evening.  Everybody was watching TV, and next thing you know you hear this loud banging noise.  And it was behind their closed door, so we couldn't really actually see them doing it, but we sure could hear it.

Q.    You said behind their closed door.  Whose closed door?

A.    Well, it was Dustin's cell, and there was just a loud banging noise like they were pounding the wall or pounding the concrete slab.  I couldn't see.  They had the door shut.

Q.    Now, you talked a little bit earlier about meeting at the cell doors, and you talked about this other door into the hallway.  Is there a way other than passing things underneath that main fire door to get items from C block to D block?

A.    Well, a lot of notes are passed through that fire door, but the door -- it's mostly flush with the door, but through the side you can stick a paper.  I've even seen newspapers go through there.

Q.    What about through the other door that you were talking about?

A.    Well, yeah.  There's a little bit more leeway on the bottom.  Yeah.  If we have notes we need passed to the jailers or if they pass our mail to us or newspapers, yeah, they use the bottom of the door.

Q. Now, on the bottom of that particular door, is there a method you have observed prisoners use in that block to get an object to C block?

A. Have I noticed?

Q. Have you seen anyone do that?

A. Oh, sure, sure.

Q. What do they do?

A. What do they pass?

Q. No. What's the procedure they do?

A. Oh, they just knock on the door to get someone's attention next door.

Q. I think I just confused myself.

A. Or you confused me.

Q. Let's not talk about the fire door anymore.

A. Okay.

Q. We'll talk about the other door that has the larger gap underneath it.

A. Okay.

Q. Have you seen people utilize that door and the large gap underneath it to pass items to the other cell block?

A. No.

Q. You had talked about -- we had mentioned Mr. Sabasta earlier. Had you seen Mr. Sabasta do any of that type, passing items?

A. Yes. Now I know what you're trying to say. I observed

Dayton one night. He unraveled a cotton string from his sock, and he was wrapping it around a slab of concrete. He was trying to pass it to C-section. He was out there trying to fish it -- I'd say it's maybe only ten feet to the C-section door, but he kept trying to pass it from our section under our door through the hallway to the next section, and he must have tried this, oh, on and off for maybe ten minutes.

Q. Do you know if he --

A. And I don't know if he succeeded in doing it, but I did notice when he was through doing it he wrapped it up and went back up, started talking to Dustin.

MR. REINERT: No further questions, Your Honor.

THE COURT: Mr. Parrish?

MR. PARRISH: Thank you.

CROSS-EXAMINATION

BY MR. PARRISH:

Q. As I understand it, Mr. Derrick, there's a lot of pounding going on in the jail to get attention.

A. Yeah, you could say that. It's pretty noisy in there.

Q. And if you want to get someone at the next cell or something like that, you have to pound on the wall?

A. Yes, sir.

Q. What kind of things do they use to pound on the wall?

A. Oh, usually just a fist.

Q. What about shoes?

A. Yeah, yeah. They kick the door also.

Q. They kick the door?

A. Yeah, with their heel.

Q. What about -- I'm sorry. Go ahead.

A. Yeah, they'll kick it with their heel just a couple times, you know, a loud knock.

Q. What about if someone is walking down along the street or something like a woman and they want to get their attention? What do they bang with then?

A. I guess their fist.

Q. And this item -- you indicated you saw Mr. Honken at one time sharpening an item or filing an item?

A. Right.

Q. Do you know what he was making?

A. Well, the gossip around the jail was he was trying to file it into the style of a key that would fit the locking mechanism to the main door.

Q. And did you ever see him do that?

A. I saw him filing, and I just saw him walk up to the door and stick it in there to see, like, if it would fit.

Q. And did it -- did you notice whether it fit or not?

A. It didn't take him two seconds. He just stuck it in and removed it.

Q. And did you ever see the object?

A. It was a piece of slab. Yes.

Q. I'm sorry?

A. A piece of slab concrete.

Q. That's what it was?

A. Yeah.

Q. So it was not a piece of metal.

A. No.

Q. And the slab concrete, do you know whether or not it was being used for a weapon or whether or not it was being used for a key?

A. As a weapon I don't know. But from what I observed, he was trying to make it into the form of a key.

Q. From the room --

A. From the filing -- from other filing he'd been doing with it.

Q. But you don't know whether it was being made into a weapon.

A. I have no idea.

Q. And you saw it from about 50 feet away; is that right?

A. Well, no, it wasn't 50 feet. After he went down the stairs to the door, I was up on the upper tier. I'd say maybe 25 feet, 30 feet.

Q. And what did it look like to you?

A. Just a gray object is really all -- maybe this big (indicating).

Q. And you're describing an object about two inches?

A. Two or three inches.

Q. Two to three inches? And the door that you saw him go up to, what does that go into, the main door? What does it go into?

A. It goes out -- well, into our section or if you go out of it it goes out into the corridor.

Q. It does not go into C block, does it?

A. Well, C block is ten feet from us, next door to us. Yeah, it's the main hallway.

Q. It goes out into the main hallway.

A. Right, uh-huh.

Q. And that's the only door in there; is that correct?

A. Well, no. Actually there's two doors that can be used.

Q. And the other door goes into where?

A. The hallway or into our -- that D section.

MR. PARRISH: I have nothing further.

MR. REINERT: Nothing.

THE COURT: Thank you. You're excused.

MR. REINERT: David Leavitt.

MR. PARRISH: What was that last name?

MR. REINERT: Leavitt.

MR. PARRISH: How many more do you have?

MR. REINERT: Not too many.

MR. PARRISH: What's not too many?

MR. COLLOTON:  I think three including this one.

MR. PARRISH:  Including this one?

MR. COLLOTON:  Yeah.

THE COURT:  Would you raise your right hand, please?

DAVID LEAVITT, PLAINTIFF'S WITNESS, SWORN

THE COURT:  Please be seated over here, please. Would you state your full name, please, and spell your last name.

THE WITNESS:  Full name, David Leavitt; last name, L-e-a-v-i-t-t.

THE COURT:  Mr. Colloton.

MR. COLLOTON:  May I go ahead, Judge?

DIRECT EXAMINATION

BY MR. COLLOTON:

Q.   Mr. Leavitt, are you in federal custody right now?

A.   Yes, I am.  I'm currently under the Federal Bureau of Prisons in Rochester, Minnesota.

Q.   And for what offense are you in federal prison?

A.   Possession of a controlled substance.

Q.   With intent to distribute?

A.   Yes, sir.

Q.   Were you sentenced in this court?

A.   Yes, I was, by Mr. Bennett.

Q.   And what'd you get from Mr. Bennett?

A.   Mr. Bennett was real lenient on me.  He gave me the

lower end of the sentence, 46 months.

Q. And after you were sentenced, where were you incarcerated right after you got sentenced?

A. Right here in Sioux City, Woodbury County Jail.

Q. What was your sentencing date?

A. November 1, I believe.

Q. Last year?

A. Yes, sir.

Q. How long were you there at Woodbury before you moved?

A. I can't give an exactly time period, but I'd say about 20 to 30 days after I was sentenced.

Q. What cell block were you in when you were housed at the Woodbury County Jail?

A. C block.

Q. During the period you were there in November, did you observe anything unusual in cell block C-8 or cell C-8?

A. Yes, sir. Apparently there was a hole in the -- on the ceiling, on the wall, and they were trying to get through to the other side.

Q. What did you actually see in there yourself?

A. I saw them patching the hole.

Q. Where was the hole?

A. As you walk in and you face the wall, it's on the upper right-hand corner on your left-hand side.

Q. What was the condition of the hole when you saw it, when

you first saw it?

A.   About a block missing.

Q.   What kind of -- did you say you saw some work going on there?

A.   Yeah, it was getting patched.

Q.   What do you mean by that?

A.   Cardboard was being placed on there and redone with some soap.

Q.   Who did you see doing that?

A.   Mr. Putzier.

Q.   Do you know his first name?

A.   Dennis.

Q.   Did you see anybody else working with him?

A.   Another person that I don't recall which I have told you.

Q.   Do you remember where that other fellow was incarcerated?

A.   In cell block C-2.

Q.   Did you ever do anything to assist Mr. Putzier?

A.   As a favor I did.

Q.   What'd you do for him?

A.   I threaded some rope for him.

Q.   What kind of rope?

A.   Some rope.

Q.   What was it made out of?

A. Out of a bed sheet.

Q. And did he tell you why he wanted the rope?

A. At first, no, he didn't tell me. But when I got to the amount of rope he wanted, you know, it's obviously clear what his intentions were.

Q. Did he ever say anything to you what he was going to use the rope for?

A. Possibly escape, escape from the jail.

Q. Did he say specifically what he would use a rope like that for?

A. Yeah, try to escape.

Q. But I mean --

A. Oh, okay. Yeah. Apparently he wasn't going to be able to get out of the jail because there were some bars running through the cement, through the blocks, so he needed some sort of assistance like a sledge hammer or a file to cut through the --

Q. And your rope was supposed to help get that stuff. Is that what you're saying?

A. Yeah.

Q. Did you ever see Mr. Putzier communicating with anybody in the D block?

A. Yes, I did.

Q. Is the D block adjacent to the C block?

A. Yes.

Q.   Where did you see him communicating?

A.   At the fire door.

Q.   From the C block could you see into the D block to see with whom he was communicating?

A.   No, I couldn't see who he was speaking to.

Q.   And you had an agreement -- you've reached an agreement with the government whereby if you gave what the government considered to be truthful testimony then you would not be prosecuted for any involvement in this escape attempt; is that right?

A.   Yes, sir.

Q.   You received no other consideration?

A.   No, sir.

          MR. COLLOTON:  That's all I have for this fellow, this witness.

          THE COURT:  Thank you, Mr. Colloton.

          Mr. Parrish?

                    CROSS-EXAMINATION

BY MR. PARRISH:

Q.   You know, I kind of missed that last part of it.  You said you are getting some assistance or not getting any assistance from the government.

A.   I'm just not going to be prosecuted for this.  You see, my intentions of this, I had nothing to do with it.  I just did him a favor.  Know what I'm saying?  But my name came up

in this, and apparently they think that I had some involvement as to try and escape myself which I wasn't going to escape.

Q.   I see.  So by making the rope from the sheets, you had no idea what they were doing?

A.   After I have -- he told me the amount of rope, yes, I kind of -- and seen the hole on the roof, I got an idea what they were going to do, you know.  It doesn't take no genius to know exactly what was going on.

Q.   But the rope was finished before then; is that right?

A.   Excuse me?

Q.   The rope was already finished at that point.

A.   No.  The hole was done, and I did the rope.

Q.   Well, no.  That's what I'm saying.  Your work was done before you knew what they were going to do.

A.   Yes.

Q.   And then after you had finished with your rope, you figured out what they were going to do.

A.   Yep.

Q.   And while you were making the rope, you had no idea what was going on.

A.   Well, like I said, when 40 -- 40 feet of rope, you know, you kind of assume, you know, what's going on and you see a hole in the wall.

Q.   Okay.  I understand what you're saying.  But I was

trying to get your benefit here. If you're sitting there and you're watching and you're making a rope up in your jail cell, are you telling me that you were just doing them a favor and you didn't have any idea that Putzier was going to try to escape with the rope that you were making?

A. He was going to try to escape with the rope.

Q. That you were making.

A. Yeah.

Q. And you knew that at the time you were making it.

A. But he couldn't escape. The reason why he wanted that rope is to bring in some heavier rope and some other things, you know, to finish the job, you know.

Q. So the rope you were making you are saying was not going to be used to escape with.

A. No, because --

Q. It wouldn't have been strong enough, number one.

A. It wouldn't have been strong enough, no.

Q. And while you were making that, did you know that the rope was going to be used to bring in other material?

A. No, not until the end. When I found out they couldn't because there was bars running through, that's when I knew the rope was going to be used to bring in some other stuff.

Q. What did you think the rope was going to be made for the first time while you were sitting there making it?

A. Probably to escape, you know.

Q. And so you knew you were doing wrong at that time.

A. Yes, I did.

Q. And so you knew that the government had a pretty good case against you.

A. Well, yes.

Q. And so what you are trying to do is offer them some testimony to help you get out of the predicament you found yourself in.

A. Yes.

Q. And that information that you offered to them under those circumstances is that you saw Putzier do something with regard -- and a gentleman named Mike; is that right?

A. Mike who?

Q. You said it was a gentleman named Mike who you thought was assisting Putzier.

A. I don't remember no Mike.

MR. COLLOTON: I object to that. I don't think that's a correct statement of the record.

THE COURT: The record speaks for itself.

MR. COLLOTON: Oh, I'm sorry.

THE COURT: No, that's okay. He said no.

BY MR. PARRISH:

Q. So you're saying you didn't see a gentleman by the name of Mike or you thought his name was Mike working with Putzier in an escape?

A. Mike who?

Q. I don't know. You didn't know his last name.

A. No.

Q. You're saying you never made a statement like that.

A. Like I said, the only person that I saw was someone in C-2, but I don't remember his name, and I don't think I mentioned his name either.

Q. Did you ever stay at the Linn County Jail in Cedar Rapids, Iowa?

A. Yes, I did.

Q. And were you interviewed there by a person by the name of Mr. Mark Hein?

A. I guess so. I can't remember who it was.

Q. And did a Mr. Colloton also come in and interview you along with Mr. Hein while you were there?

A. Yes.

Q. And did you ever make a statement to them when you were interviewed at the Linn County Jail in Cedar Rapids, Iowa, concerning his knowledge of an attempted escape from the Woodbury County Jail in Sioux City, Iowa, where you stated that in November 1996 Dennis Putzier and an individual he thought was named Mike but he wasn't sure were making a hole in cell C-8 of C block of the Woodbury County Jail? You're saying you never made that statement?

A. I don't recall the word -- the name Mike.

Q.   So if Mr. Hein indicated that you'd made that statement, would Mr. Hein be mistaken?

A.   No.  If he said I said it, then I said it.

Q.   Okay.

A.   But I don't remember if I said the name Mike.

Q.   Okay.  You mean you might have said that and just might have forgotten about it.

A.   Possibly, yes.

Q.   Okay.  And you never saw Mr. Honken do anything.

A.   No, I don't even know who Mr. Honken is.

        MR. PARRISH:  Thank you.  I have nothing further.

        THE COURT:  Mr. Colloton?

        MR. COLLOTON:  I just want to make sure for the record here.

REDIRECT EXAMINATION

BY MR. COLLOTON:

Q.   While you were on -- you've got no other felony convictions; right?

A.   I have one, yes.

Q.   Well, while you were on pretrial release in this case, you had another case where you got a deferred judgment; right?

A.   Yes, I did, sir.

Q.   And that was in Oklahoma?

A.   Yes.

Q.   For possession of a controlled --

A.   Substance.

Q.   -- controlled substance.

      MR. COLLOTON:  That's all.

      THE COURT:  Anything further, Mr. Parrish?

      MR. PARRISH:  Yes, just one thing.

                  RECROSS-EXAMINATION

BY MR. PARRISH:

Q.   You had been sentenced already in this case --

A.   Yes, I have.

Q.   -- when you were making the rope?

A.   Yes, I have.

Q.   You had been sentenced at that point.

A.   Yes, I had been.

Q.   And you were just waiting to be transferred --

A.   Yes, to my --

Q.   -- to a federal institution?

A.   Yes, I have -- I was.

Q.   And no state charges were filed against you?

A.   No, sir.

Q.   And no federal charges were filed against you.

A.   No, sir.

Q.   And no enhancement was placed on your sentence because
of your conduct in making a rope in this instance.

A.   No, sir.

MR. PARRISH:  Okay.  Thank you.

THE COURT:  Anything further, Mr. Colloton?

MR. COLLOTON:  No.

THE COURT:  Thank you, Mr. Leavitt.

MR. REINERT:  Derek Boggs.

DEREK BOGGS, PLAINTIFF'S WITNESS, SWORN

THE COURT:  Please be seated here.  Would you state your full name, please, and spell your last name.

THE WITNESS:  Middle name too?

THE COURT:  That's fine.

THE WITNESS:  Derek Vaughn Boggs; last name, B-o-g-g-s.

THE COURT:  Thank you.

THE WITNESS:  Uh-huh.

DIRECT EXAMINATION

BY MR. REINERT:

Q.   Mr. Boggs, are you currently incarcerated for a felony offense?

A.   Yes, sir.

Q.   And what is that?

A.   Class D and class C felony.

Q.   And what offense is that?

A.   Theft, both of them.

Q.   And actually you're toward the end of your incarceration period.

A. I'm at the end.

Q. And why do you say that?

A. I got a parole last Wednesday, so I can be home in a matter of days.

Q. Were you housed in the Woodbury County Jail last year?

A. Yeah.

Q. About when?

A. First part of November, something to that effect.

Q. And specifically what was your cell?

A. 8, C-8.

Q. Was there anything unusual about C-8 when you got there?

A. Yeah.

Q. What was unusual about C-8?

A. There was a hole in the wall.

Q. Did you get any guidance when you first got into C-8 as to who was making the hole in your cell?

A. Yeah.

Q. And what -- who told you about who was making the hole?

A. Dennis Putzier told me that he was making the hole.

Q. Were you -- what instructions, if any, were you given regarding whether you were going to be involved in making the hole?

A. I could be. Otherwise I didn't have to be.

Q. And what decision did you make?

A. Not to.

Q. So what did you do when people wanted to work on the hole?

A. Went into the day room.

Q. Did you ever observe Mr. Putzier conversing with anyone in the cell block next door in D block?

A. Yeah.

Q. Who did you see him talking to?

A. Oh, I saw him talking to a couple of different people through the fire door.

Q. Did you see him -- do you see Mr. Honken here in court?

A. Yeah.

Q. Did you observe Mr. Putzier talking with Mr. Honken on any occasions?

A. Yeah.

Q. Did you observe any other conduct between Mr. Putzier and Mr. Honken at the fire door?

A. Notes being passed through. That's common.

MR. REINERT: Nothing further, Your Honor.

THE COURT: Mr. Parrish?

MR. PARRISH: I have no questions, Your Honor.

THE COURT: You're excused, Mr. Boggs. Good luck to you on your release.

THE WITNESS: Thank you.

MR. REINERT: Dennis Putzier, Your Honor.

DEPUTY WALHOF: It will be a minute, Your Honor.

They're still upstairs.

THE COURT: Why don't you all stand and take a stretch break.

MR. PARRISH: This is the last one?

MR. COLLOTON: I thought. I may have spoken out of turn. I thought we were going to stop after that, but Pat's telling me maybe we have one more. Getting tired?

MR. PARRISH: Yeah.

(A discussion was held off the record.)

DENNIS PUTZIER, PLAINTIFF'S WITNESS, SWORN

THE COURT: Okay. Why don't you be seated right over here. State your full name, please, and spell your last name.

THE WITNESS: Dennis Leroy Putzier, P-u-t-z-i-e-r.

DIRECT EXAMINATION

BY MR. COLLOTON:

Q. Mr. Putzier, are you currently in state custody?

A. Yes, sir.

Q. And for what offense are you in state custody?

A. Five years for failure to appear, five years for theft of some hogs, and five years for forgery all back to back.

Q. In connection with those charges, were you housed for a time at the Woodbury County Jail?

A. Yeah, I was.

Q. When were you in there?

A. Like from June, the end of June, till December.

Q. Of last year? '96?

A. Yeah.

Q. And what block were you in in the summer?

A. First block I was in was E block. I got in an altercation, and they moved me to C block.

Q. All right. Well, when you were in E block, did you have any contact with an inmate named Dean Donaldson?

A. Yeah.

Q. Did you know Donaldson from before you got in jail?

A. Yeah.

Q. And what -- how did you communicate with Donaldson when you were in E block?

A. I talked to him through the door.

Q. You mean the fire door?

A. Yeah, yes, sir.

Q. What did Donaldson talk to you about at that time?

A. Asked me how to get ahold of my brother.

Q. Anybody else?

A. Asked me about LaDean. He asked me --

Q. Hold on, Mr. Putzier. When you say LaDean, who do you mean by that?

A. LaDean Hummel.

Q. What did he ask you about LaDean Hummel?

A. What he was -- if he was still down in Cushing and if he

was -- if he could talk to him.

Q. Did he say anything about why he wanted to talk to LaDean Hummel?

A. Not really. I mean, not at that time.

Q. All right. Did you ever come to know the defendant in this case, Dustin Honken?

A. Yeah.

Q. How did you first meet Mr. Honken?

A. I got a letter, note slid through the door.

Q. Where were you when that happened?

A. I was in E block.

Q. What kind of notes did you get? Or you said a note. What note did you get?

A. Just like he send me a note and said, Hey, you don't know me. My name's Dustin Honken. I'm the one that bonded Dean out.

Q. Did you know what he meant at that time?

A. Yeah, I knew what he meant.

Q. How did you know about bonding out Dean?

A. Because when I was talking to Dean through the door, he said he had -- that this guy's going to bond him out. I didn't know at the time that it was Dustin, and he said he don't want me to talk to the guy, this and that, and he was in lock-up anyways.

Q. Did Dean tell you about getting bonded out at the same

time he was asking you about LaDean Hummel?

A. Yes.

Q. Now, what else did Mr. Honken say to you in his note or notes about bonding out Dean?

A. He asked me what I thought about Dean, if he could trust Dean.

Q. Why did -- what did he say about why he wanted to know that?

A. Some time during the period of time when I talked to Dustin he said he gave him some things, some important things, to take care of.

Q. Did you ever at some point have further conversations with Mr. Honken about that whole topic?

A. Yeah, throughout the period I was locked up in the jail.

Q. Well, at first you said you just got some notes; right?

A. Yes.

Q. Did you ever come to have face-to-face contact with Mr. Honken?

A. I don't know -- never face to face. One time in church is the only time I've ever been face to face with him ever.

Q. All right. Did you have occasion to actually talk to him as opposed to have notes?

A. Oh, yeah.

Q. How did that come about?

A. Just everybody goes in them jails to the fire doors and

talks, you know.

Q. So you started to talk to Mr. Honken through a fire door. Is that what you're saying?

A. Yeah, he came and asked me questions. Like I said, I didn't know the guy and then --

Q. Where were you when these conversations started?

A. I was in E block when the conversations first started.

Q. Where was Mr. Honken?

A. D block.

Q. What conversations did you have with him?

A. Several different conversations about his case and about my case and why I was in there, and he asked me about Dean, and I told him, you know, Dean had told on me for stealing the hogs with him.

Q. What did Mr. Honken say to you about this business of bonding out Dean?

A. He said that he'd given him a map -- I know that -- and some other things to do. I can't, you know, really say what it was. But some time during the time he asked if my brother LaDean was capable of killing somebody.

Q. What did he say about why he wanted to know that?

A. Because the dude, this Tim, his partner, was supposed to be telling on him. If he could get him killed, he could get out.

Q. Do you know what happened with Donaldson's bond when he

was out?

A.   Yeah.  He never came back.  The dude took off.

Q.   Did you talk to Mr. Honken about that?

A.   Yeah, several times.  That's why I started talking to him.  That's why I felt sorry for the dude, man.  I mean, I felt like I was in a bad position, and, you know, I just felt like he was getting the bad end of the deal.

Q.   What did he say to you about the fact that Donaldson had taken off?

A.   He said his wife and kids are going to lose the house.

Q.   What other concerns, if any, did he express?

A.   Just he said, you know, I sent him some paperwork and some other things.  You'd think he'd give them to the feds or you think he'd use them against me to get out of his time.

Q.   What did he say about the paperwork?

A.   Just that there was one map maybe, and he thought that was the only thing with his handwriting, and the other things -- I can't really recall what the other stuff was so -- I think it had something to do with -- I know there was supposed to be something to do with some kind of drugs.  I don't know, you know, if the dude was going to make some for him or sell some for him or what.

Q.   Was there a time when you eventually moved to the C block?

A.   Yeah.  That's -- I said that before.  I'd got into a

fight, and they moved me from E block to C block.

Q. You said that before. You mean when you got interviewed?

A. No.

Q. Or did you say it here? I'm sorry.

A. Yeah.

Q. I missed it. And you moved to C block. And did you have any more conversations with Mr. Honken while you were in C block about his case?

A. I had several conversations with him throughout the day every day, you know.

Q. So you had regular conversations with him through the door?

A. Yeah.

Q. What else did you talk to him about concerning his pending case?

A. Just he showed me his paper, his paperwork with all the charges and shit, you know, said, Don't let nobody read it. I didn't. I kind of looked at it. You know, I ain't very good at reading and shit, and I just kind of looked at it, you know, kind of curious. And, you know, he just -- we talked about lots of different things, just that he beat one in '93 because a bunch of people disappeared.

Q. What did he say to you, if anything, about how he hoped to beat the '96 case?

A. Have the witness disappear like they did in the one in '93.

Q. Is that what he said?

A. (Witness nodded head.)

Q. You have to answer out loud.

A. Yeah.

Q. What specifically did he talk to you about concerning having a witness disappear in '96?

A. The only person that's really got anything on him is this Tim, this friend of his.

Q. What did he say to you about that?

A. You know, if he'd get rid of him he could get out. They'd have to let him go.

Q. Did he ever talk to you specifically about how to do that?

A. Some time in there we talked about it.

Q. How did that come up?

A. Me and Terry Davenport busted a hole in the wall. I thought I might be getting out of the jail. I was trying to escape.

Q. And what -- where were you busting a hole in the wall?

A. In C block, C-8.

Q. Who was staying in that cell at the time?

A. A dude named Boggs and a little dude named Lon Daley or something, Little Lon. I don't know his last -- I can't

remember. It's been a long time.

Q. And you said that you and Terry Davenport were trying to break this hole out and escape; is that right?

A. Yeah.

Q. And you said that somehow you connected that to Mr. Honken; is that right?

A. Somehow after he -- everybody knew about -- you know, a lot of people knew about it, and we ended up talking about it one time. I'm not sure how it got started or why.

Q. What conversation did you have with Mr. Honken about your hole in the wall?

A. Just if I could get out there, you know, take care of that business for him as in getting rid of that friend of his, that Tim, that he'd take care of me forever and all this shit. I mean, we talked about so much stuff it's hard to remember everything, and it ain't like I sat down and took notes trying to get out of some time, you know. I never planned on ever having to be up here on this stand testifying against nobody.

Q. When he talked to you about getting out and taking care of Tim, what did he tell you about how that could be done?

A. He just said the dude lived on a farm down somewhere by Des Moines and he lived with his mom and dad, that if I could get out that hole, you know, and I couldn't get out the hole, and we kept trying to figure how we'd get out and this and

that and that his girlfriend would come take me out there to the place.

Q. Did he tell you who the girlfriend was, the name I mean?

A. Yeah.

Q. What did he say was her name?

A. Angie.

Q. What happened with your hole in the wall in cell C-8?

A. I busted a bunch of brick out.

Q. And did you ever run into any problems in the hole?

A. Several different times.

Q. What kind of problems?

A. Ran into bars. There was a bar I couldn't get -- you know, even if I got the whole bricks out, I couldn't get through with that bar.

Q. So did you ever talk to Mr. Honken about the problem with the bar?

A. Yeah.

Q. What conversation did you have with him about that?

A. Just trying to figure out ways to -- I could get that bar out of there.

Q. And what did you talk to Mr. Honken about?

A. Several different things. I mean, one was a piece of step. One was maybe getting a hacksaw blade in. One was through a book or something.

Q. Let me take you through --

A.    One was knocking just a hole in, putting a rope out and pulling up a hacksaw, a hammer, and chisel.

Q.    All right.   Let me ask you about this piece of step you mentioned.   What happened with regard to that?

A.    It didn't work.

Q.    No.   I mean what happened?   What did you do with it?

A.    I'm not sure what I did.   I mean, I got it sent over to me.

Q.    Who sent it over to you?

A.    I believe Dayton sent it to me.

Q.    Did you talk to Mr. Honken about the piece of the step?

A.    Yeah.

Q.    What conversation did you have with him about the piece of the step?

A.    He just told me that he had a piece of step he'd broke off that he was going to get sent over to me.

Q.    How did it get sent over to you?

A.    Slid under one door from B block over to the one E block -- or C block, excuse me.

Q.    I'm sorry.   I'm mixed up on the blocks.   Say that again now.

A.    He slid it from D block to C block.

Q.    And how -- what mechanism do you use to slide something?

A.    You tie a comb or something on a piece of string and slide it out under the door, hook another piece of string

that slid from the other door, and then just pull it in.

Q. How was the piece of step supposed to help with the bar?

A. Maybe it could have cut through the bar to get it out of the way.

Q. You mentioned that you also talked about a rope that would be used to pull up some other items; is that right?

A. Yeah.

Q. Did you talk about that with Mr. Honken?

A. Yeah.

Q. What conversation did you have with him about this rope?

A. Just I was trying to make a rope so I could maybe knock a hole all the way through and get something hooked on so I could pull another rope up, a good rope with a hammer, chisel, and a hacksaw. That way, you know, we could get through.

Q. What involvement, if any, was Mr. Honken going to have with that?

A. He was going to get the rope and stuff dropped off.

Q. The rope and stuff. What do you mean by stuff?

A. The rope, the hacksaw, a chisel, and a hammer.

Q. What did he say about how he was going to get that dropped off?

A. He could have Angie drop it off over there.

Q. Did you ever make any kind of rope?

A. Yeah, I made rope a couple different times, one when I

thought I was going to be able to get out. Then I ran into that bar. We had to tear it apart. Then we made one that we could slide out.

Q. Who, if anyone, helped you make the one that you could slide out?

A. David Leavitt, Leavitt. I think Terry Davenport helped make it too.

Q. Did you ever -- what involvement, if any, was Mr. Honken to have in the actual escape?

A. Have a ride set up for me, have the stuff dropped off, and have a place for me to be.

Q. Was there ever a time when Mr. Honken talked to you about whether he was going to go on the escape?

A. Towards the end.

Q. What happened towards the end?

A. He decided maybe he could go with us.

Q. And what conversation did you have with him about that?

A. Making a hole through the wall from C block to D block or from D block to C block. He wanted to see if I could get through there, and I thought about it, and Davenport said, No, tell him to come through if he wants to come through.

Q. So you told him that?

A. Yeah. I said --

Q. What, if anything, did you observe him doing after you told him that?

A. I can't say I observed him doing nothing. I can say --

Q. What, if any -- I'm sorry. Go ahead.

A. -- that he tried to come through his wall. You know, he told me. I can't say I seen anything because I didn't.

Q. Fair enough. What did he tell you?

A. That he got a door handle and tried to come through the wall.

Q. What did he tell you about how he got the door handle?

A. Like I said, it's been a long time. I know they broke it off of J. B.'s door. I mean --

Q. Who's J. B.?

A. Jim Brownlee.

Q. When you say they broke it off, who do you mean?

A. I'm not sure who broke it off for sure. It's either him or Dayton.

Q. Did you ever -- well, the idea was to do what with the door handle?

A. Knock a brick out so he could come from D block over to C block.

Q. Did you ever have any reason to believe he tried to do that?

A. Yeah.

Q. What reason did you have to believe that?

A. Because I heard him pounding on the wall. About knocked -- you know, you could hear it from one end of the jail to

the other, and there's a little oriental dude in a cell block where they was coming from D into his cell. He's in lock-up, and he's saying, Tell the cop, you know. Hey, what happened? I don't know. Don't tell nobody, I said, you know. Just be quiet.

Q. What kind of success did Mr. -- did you ever talk to Mr. Honken about whether he had any success with that?

A. Yeah, there wasn't no way they could make it through. Way too much pounding and too little progress.

Q. Did he tell you that?

A. Yeah.

Q. What other efforts, if any, did you learn about from the part of Mr. Honken to get from D block to C block?

A. Me and Dustin tried to open the fire door.

Q. What did you do to try to open the fire door?

A. Took door handles and pried in there and turned it while we pushed a bolt up in there and tried to move the mechanisms or whatever you call them, tried to just jimmy the door.

Q. Were you both working on that from either side?

A. Yeah. I'd be turning on one side, and he'd be trying that side. He'd turn it. I'd try it. Couldn't get it.

Q. What else, if anything, did Mr. Honken do to assist in this escape plan?

A. He gave me that piece of bolt that he filed down, I mean.

Q. How did he give you a piece of bolt?

A. I had that slid under the doors too.

Q. What was the purpose of the piece of bolt?

A. Try to make that -- open that door.

Q. You mean the fire door?

A. Yeah.

Q. Did you have -- well, what happened to the escape plan in the end?

A. In the end we was -- you know, we was still talking about it every day, was going to get that stuff dropped off. Well, I was shaving my head one day, and I got called into the hallway by a jailor. And they told me, you know, you can't -- this shaver ain't for shaving heads. Woo-woo this, woo-woo that. I said, Well, I'm going to finish shaving my head. They said, No, you're not. I said, Yeah, I am. I said, I'm not going to go around here looking dumb. They said, You look dumb anyway. I said, You look dumb too. That's it, something like that. Maybe a little more. Next thing I know, they're telling me I'm moving. Pack your shit.

Q. So you were moved out of C block?

A. Yeah.

Q. And therefore you couldn't pursue the plan anymore?

A. Yeah.

Q. Do you remember about when that was?

A. It would have been the end of -- like towards the end of

November.

Q. Did you have correspondence with Mr. Honken after that?

A. Yeah.

Q. And did you send some letters to him in December of '96?

A. Yep.

Q. Do you remember reading those letters previously when they were shown to you?

A. Yeah.

Q. And do you remember there's some statements in there about Dean?

A. Yeah.

Q. What was the purpose of your correspondence with Mr. Honken in December?

A. I was writing him telling him I was trying to help him get Dean back in jail so Kathy wouldn't lose her house, her and the kids, you know. I was just doing what I thought at the time was best, you know.

Q. Back when you were still in C block, did you ever have any -- well, I'm sorry. Strike that.

Let me show you what's marked Government Exhibit 32. Do you recognize that?

A. Yeah.

Q. Pardon me?

A. Yes.

Q. What's Government Exhibit 32?

A.   It's a letter from Dustin.

Q.   Did you receive it?

A.   Yeah.

Q.   You received it at the Clarinda facility?

A.   Yeah.

Q.   And do you see in there on the second page of the letter there's a paragraph beginning about the escape stuff and then there's a colon?

A.   Yeah.

Q.   And then there's another paragraph that says, I know it's crazy because you weren't even in there when that hole was there?

A.   Uh-huh.

Q.   You have to answer out loud.

A.   Yes.

Q.   Is that true, that you weren't even in cell C-8 when the hole was there?

A.   It's true that I wasn't in that cell, but I was in the cell block because I was never -- I mean, I've been in and out of that cell.  I was never living in that cell.  But the hole wasn't there until I went into the cell.

Q.   What was your understanding of this letter when you read it?

A.   The understanding to me is, you know, saying, hey, say the hole was already there, that you didn't have nothing to

do with it.  That's my understanding.

Q.  And based on your conversations with Mr. Honken, was he in a position to know whether that was true or false?

A.  Yes, he was.

Q.  And you're saying that's false because you had something to do with it?

A.  I'm saying it's false because I made the hole.

Q.  Let me show you what have been marked Government Exhibits 38 and 39.

MR. COLLOTON:  Your Honor, these were not included in our original set.

THE COURT:  Have you given copies to Mr. Parrish?

MR. COLLOTON:  We have.  I gave him some over the noon hour, and I believe Mr. Reinert just gave him a marked copy.  I apologize for not getting them to the Court sooner. We just received these when we arrived in Sioux City.

THE COURT:  Yesterday?

MR. COLLOTON:  Yes.

BY MR. COLLOTON:

Q.  Mr. Putzier, do you recognize Exhibits 38 and 39?

A.  Yes.

Q.  What are Exhibits 38 and 39?

A.  Some notes sent to me from Dustin.

MR. COLLOTON:  Have you got two copies of that, Mr. Parrish?

MR. PARRISH: I have 38 and 39.

MR. COLLOTON: Do you have the earlier copies that we gave you by chance?

MR. PARRISH: No. You needed it for something? You can use these.

MR. COLLOTON: If I may.

MR. PARRISH: There you go.

BY MR. COLLOTON:

Q. When did you receive these documents?

A. After I got here this time like on a Sunday and probably maybe a Tuesday or Wednesday. I'm not positive.

Q. How did you receive them?

A. From somebody out of a different block slid through a door to me.

Q. And is there some additional writing on there that wasn't on there when you got them?

A. Yeah.

Q. What's on there that wasn't there when you got them?

A. Looks like, Received from Honken by Putzier.

Q. Other than that, are they accurate copies of -- or accurate actual documents that you received?

A. Yes.

MR. COLLOTON: We'd offer Exhibits 38 and 39.

* * * *

(Government Exhibits 38 and 39 were offered.)

* * * *

MR. PARRISH: No objection.

THE COURT: Thirty-eight and thirty-nine are received.

* * * *

(Government Exhibits 38 and 39 were received.)

* * * *

BY MR. COLLOTON:

Q. You've entered into a plea agreement recently; is that right?

A. Yep.

Q. And that's with the United States?

A. Yes, sir.

Q. And what's the agreement as you understand?

A. I had to plead guilty to aiding and abetting a felon to escape.

Q. Aiding and abetting what?

A. A felon prisoner to escape.

Q. And do you understand that it has to be a federal prisoner?

A. Or a federal prisoner, yeah, that's -- yes.

Q. And who are you going to plead guilty to aiding and abetting to escape?

A. Dustin.

Q. Did you also agree to cooperate with the United States?

A. Yeah.

Q. And do you understand that you have the potential to get some kind of reduction from your sentence?

A. Yes.

Q. And do you understand how that works?

A. I gotta completely, you know, say everything I know and be honest about everything or get burnt up worse.

THE COURT: Takes you all about eight paragraphs in your plea agreement to explain that, and I thought Mr. Putzier did it quite well.

MR. COLLOTON: I'll take that back to Mr. Teig, Mr. Murphy.

THE COURT: You do that. You have the transcript made for them.

BY MR. COLLOTON:

Q. You got some prior felony convictions other than the one you're in for now?

A. Yes, sir.

Q. Does that include an attempted burglary back in 1990?

A. Yes, sir.

Q. And does it include a delivery of a controlled substance in 1990 as well?

A. Yeah.

Q. Or 1991?

A. Yes.

Q. Does it include another attempted burglary in 1991?

A. Yes.

Q. And a theft second in 1991?

A. Yes.

Q. You were called to testify in the grand jury about some of these matters previously; right?

A. Yes.

Q. Were you truthful in the grand jury?

A. No.

Q. Basically you lied about much of the stuff you said here today; isn't that right?

A. Yes.

Q. Why did you do that?

A. Like I said when I got here, you know, I didn't sit there. I didn't take notes. I ain't in here for telling on people. You know, I do my crimes. I do my time. I've always done that. But, I mean, the further I got -- the more I tried to stay out of it, the worse I was in it. I mean, I can't see doing, you know, no 10, 15, 20 years fed time for trying to -- for feeling sorry for somebody else and lying for somebody else. I ain't doing it.

Q. What do you mean by that, doing 10, 15, 20 years for feeling sorry for somebody?

A. I mean I lied on the -- in front of the grand jury because I felt like, you know, I ain't no rat and I ain't

going to get up there and just tell on somebody. Next thing I know, you're getting charged for escape. You're getting charged for perjury. You're getting charged for aiding and abetting or -- yeah, aiding and abetting the escape and conspiracy to commit murder. Come on. I ain't trying to kill nothing. I ain't trying to -- you know, I already got 15 years state time. You know, I couldn't see getting another 10, 20 years fed time.

Q.    Now, you were never charged with any of that stuff. You're saying you were -- you're not saying you were charged with that.

A.    No.

Q.    You were concerned about that?

A.    Yes.

Q.    And how did you end up having contact with the government about this?

A.    I talked -- after I left the grand jury, I talked to one of -- I believe Mark.

Q.    You called up the DEA; is that right?

A.    Terry Davenport called up the DEA and said -- had his sister say that we wanted to talk to them.

Q.    Then you eventually talked to the DEA?

A.    Yes.

Q.    And eventually had a plea agreement set up; right?

A.    Yeah.

Q. And with respect to your perjury, what's your understanding of how that factors into your plea agreement?

A. For perjuring myself I get some points added on. I really don't understand it. I know I don't get charged for perjury, but I still get time for perjuring myself whether I get charged for it or not.

Q. Points added on, you mean under the federal guidelines?

A. Yeah.

MR. COLLOTON: That's all I have for this witness, Judge.

THE COURT: Thank you, Mr. Colloton.

Mr. Parrish?

CROSS-EXAMINATION

BY MR. PARRISH:

Q. Mr. Putzier --

A. Yes, sir.

Q. -- are you from Iowa, or are you from Texas?

A. I'm from Iowa.

Q. Were you in Texas for a while?

A. No.

Q. So you never went to Texas with Dean.

A. No.

Q. But you reached a conclusion that Dean was a big liar.

A. He can be.

Q. And you told the grand jury that; is that correct?

A.   I told the grand jury that because of the fact that he told on me, you know.

Q.   Well --

A.   And I was mad at him.

Q.   Well, were you telling the grand jury the truth when you said that Dean was a big liar?

A.   I don't think there's no totally honest person in this world.

Q.   That's not what I asked you.  Were you telling the truth to the grand jury --

A.   No.

Q.   You were lying to the grand jury about Dean Donaldson being a liar.

A.   Yeah.

Q.   Are you saying Dean Donaldson is an honest human being?

A.   Like I said, I don't think there's no honest human being in this world.

Q.   That's not what I asked you.  You're telling us now in your testimony today that Dean Donaldson is an honest human being.

A.   On certain things.  I can't say he's completely honest in everything and every day of his life.

Q.   But you agree you have been involved in dishonest conduct with him.

A.   Yes, I have.

Q. And some of the matters which you told the grand jury about his dishonesty was, in fact, the truth.

A. I didn't understand that.

Q. Some of the matters that you spoke to the grand jury about indicating that Dean Donaldson was dishonest was, in fact, the truth.

A. I don't remember what all I said he was dishonest about.

Q. Well, when you were asked by Mr. Colloton, I'll give you one last chance if you can remember anything about what you heard about where Dean got bonded out and you says, I'm not sure. I really don't know. Then you proceed to tell him, I don't believe Donaldson being bonded out was important to anybody. He was going to do nothing but run down, smoke some crack, sit on a corner, and not have nothing. That's all he's gonna do, steal some pigs. Was that the truth, or was that a lie?

A. Well, I believe it depends on what he had in it what he was going to do for anybody.

Q. Well, I just ask you is that statement there --

A. And I'm sure he probably went out, maybe smoked some crack. I don't know if he sat on a street corner.

Q. And that he was going to steal some pigs which he'd done for about ten years before that; right?

A. He steals pigs, yeah.

Q. That's how he makes his living.

A. Yeah.

Q. That was the truth?

A. That ain't the only -- yeah, that's the truth that he steals pigs.

Q. And when you made that statement to the grand jury in relation to him being bonded out, that was the truth?

A. I'd have to say yes and no. I know he was going to go out and steal pigs, but I also knew he had something else to do, and I was just lying for him.

Q. Who were you lying for?

A. Dustin.

Q. Well, how were you lying for Dustin when you were talking about Dean?

A. Because I was in front of the grand jury for Dustin, not for Dean.

Q. So you were lying to the grand jury about Dustin but actually telling the truth about Dean.

A. Yeah.

Q. So when you were in front of the grand jury, you were telling the truth when you made that statement.

A. That he'd go out and steal hogs, yeah.

Q. Now, were you lying to the grand jury when you told the grand jury that Dean -- strike that question.

Were you telling the truth to the grand jury when you told the grand jury that you told Dustin Honken that Dean

was a snitch? Was that the truth?

A.   No, I wasn't lying to the grand jury.

Q.   That was the truth also.

A.   Yeah, Dean is a snitch.

Q.   And you did, in fact, tell Dustin that he was a snitch.

A.   Yes, I did.

Q.   And you told him he was a snitch before he was released.

A.   No.

Q.   You're saying you did not?

A.   I did not tell Dustin he was a snitch before he was released. I never talked to Dustin until after Donaldson was released.

Q.   And that's when you told him that.

A.   Yeah.

Q.   And how long after that did you tell him?

A.   I can't be for sure. You know, he started writing me letters. Probably a week or two maybe, maybe more. I'm not sure.

Q.   Did you tell him anything about Mr. Hershaw?

A.   Mr. Hershaw?

Q.   Yes.

A.   Who's Mr. Hershaw?

Q.   Well, why don't you tell me who Mr. Hershaw is. Do you know who he is?

A.   Not for sure. Can you --

Q. In relation to Dean Donaldson being bonded out, do you know anything about Mr. Hershaw?

A. Oh, he's -- Mr. Hershaw bonded me out.

Q. And how did Mr. Hershaw bond you out?

A. Richard Hershaw? Is this the one, same one?

Q. Yes.

A. Yes, he bonded -- he put two cars up for me.

Q. And what is his relationship to Mr. Dean?

A. Nothing.

Q. I mean not Mr. Dean but Mr. Donaldson.

A. Nothing. Hershaw and --

Q. Didn't Mr. Donaldson try to get Mr. Hershaw to bond him out also?

A. I'm not sure. I wasn't there. I couldn't -- you know, can't answer that.

Q. You were out.

A. Yeah.

Q. And while Mr. Donaldson was still in.

A. Yeah.

Q. And you and Mr. Donaldson were good friends.

A. No, we ain't good friends. I cannot say that.

Q. Well, he's kind of messed over you a little bit and snitched on you, so you're no longer friends; right?

A. Yeah, and that was from the whole time we was in jail, so that started a long time ago.

Q.   Well, what I mean, though, is that part of the reason you're in jail is because Dean set you up to do these hogs with him and then turned on you and confessed to everything; isn't that right?  That's part of the reason --

A.   Nobody forced me to do nothing.  If I want to do something, I'm going to do it.

Q.   Well, but he told on you after you did it.

A.   Yeah, he told on me after he got caught for doing it.

Q.   Right.  So you had a dislike at that point for Dean Donaldson.

A.   Yeah, you could say that.

Q.   All right.  But when you went in and you got into this mess that landed you at the Woodbury County Jail, you then used Hershaw to bond out, so wouldn't it be natural to think that Dean Donaldson would also have tried to contact Mr. Hershaw to get out also?

A.   No.  How could that be, you know?  I wouldn't know that.

Q.   You wouldn't know it.

A.   No.  I wasn't in the jail.

Q.   But it's possible?

A.   It could be possible because the dude was, like, kind of easy.  You know what I'm saying?  I just talked him into bonding me out.  I tricked -- I told him a lie so he could bond me out.

Q.   Well, okay.  So you lied to the bondsman.  You also lied

to the grand jury.

A.   I didn't lie to the bondsman.  I lied to Hershaw.

Q.   Well, to put up the car, your friend.

A.   He ain't my friend.  I didn't know the dude.  He molested a kid.

Q.   Okay.  But he bonded you out.

A.   Yeah.

Q.   And what did you lie to him about?

A.   About going to kidnap his daughter, going to, you know, set his other daughter up for drugs so he could get out of his case, see.

Q.   Oh.  You lied for him to benefit him.

A.   I didn't lie for nobody.  I lied to him to benefit me.

Q.   And how did you benefit yourself by lying to him?

A.   I had him bond me out.  Then I went out there and told his wife, you know, Here, this is what the dude wants you to do -- wants me to do.  I wasn't going to get that little girl hurt for nothing.  You know, he had already molested her for years, her and the other kid.

Q.   I see what you're saying.  So Hershaw then helped you bond out so you could go out and get some information -- some things done for him.

A.   Yeah.

Q.   Is that right?

A.   Uh-huh.

Q.   Okay.  So then you don't know whether or not Donaldson went to Hershaw to try to get him to bail him out too?

A.   Yeah, I don't know nothing about that because I was out. But they also contacted me, tried to offer me immunity to everything to testify against this Hershaw, and I wouldn't do it.

Q.   So why didn't you take immunity to testify against Hershaw since he had done such bad things?

A.   Because that's not me, you know.  I already felt like I, you know, got him.

Q.   How did you get him?

A.   Sold everything he had on the outside.

Q.   And you didn't take immunity; is that right?

A.   That's exactly right.

Q.   But in this case because they were going to file these additional charges against you, escape, perjury, aiding and abetting a felon -- a federal felony prisoner, conspiracy to commit murder, you decided that you would testify.

A.   Yeah, because I had nothing to -- you know, all I did was feel sorry for this dude, try to not let him lose his house and not have Dean give him a life sentence.  I ain't going to do no time.  I mean, I ain't -- I'm not doing no time for somebody, you know.  I could see getting some state charges for trying to break out of this jail, for attempted escape.  I can't see doing no 5, 10, 15 years federal time

for just trying to be somebody's friend, you know, and don't want to do nothing for you unless you're in some kind of jam, write you a letter, hey, I've been thinking about you. Yeah, my ass you been thinking about me.

Q. So tell me how Dean was going to get him a life sentence.

A. Huh?

Q. How was Dean Donaldson going to get him a life sentence?

A. I ain't talking about Dean Donaldson getting a life sentence. I'm talking about Dustin Honken getting a life sentence.

Q. Well, how was Dean Donaldson going to get Dustin Honken a life sentence?

A. Tell on him about Dustin trying to get him to hire somebody to kill some Tim for him, tell on him because he wrote him a map to this Tim's house, you know. That's why I went in front of that grand jury and did what I could at that time.

Q. Well, did you ever see a map that Dustin wrote for him?

A. No, I haven't.

Q. So how do you know he wrote a map?

A. Because Dustin told me, I gave him -- the only thing that I'm worried about is I gave him a map that I put in my handwriting.

Q. Well, have you heard what Dean Donaldson had to say

about the map?

A.   No.

Q.   So you're saying that Dean -- that Dustin told you that he wrote it out in his own handwriting?

A.   He gave him some paperworks -- like I said, it's been a year ago.  It could have been a map that he gave him in his own handwriting or another piece of paper in that papers, but there was something in there in his own handwriting.

Q.   So when you said that Dustin gave him a map in his own handwriting, that could be a mistake.

A.   Maybe the map or the piece of paper.  Something in that paper, but I believe to the best of my knowledge that it was a map, and I know when Dustin asked me about my brother, if my brother LaDean would kill the dude for him, I knew he was serious.

Q.   And tell me why you knew he was serious.

A.   Just by the way he talked.  I mean, I knew he wanted it done.  And then he said, Hey, I took care of them in '93, you know.

Q.   Is that what he said?

A.   Yeah.

Q.   And he told you, a perfect stranger, that that's what he did in '93?

A.   He sure did.  That's why this perfect stranger's sitting right here.

Q.   Why is that?

A.   Because I talked to that dude and he talked to everybody else in the whole God damn jail.

Q.   And he told them all the same thing?

A.   I'm sure he told them -- I don't know about the same thing, but he sure told them enough.

Q.   And everybody thought he was serious.

A.   What would you think?

Q.   I'm asking you.

A.   That's all I got --

Q.   Based upon what you observed, everyone thought he was serious.

A.   I'm sure they did.

Q.   Based upon what?

A.   Based upon the evidence of his last case; based upon the people that had disappeared; based upon bonded some stranger out he does not know; based upon, you know, saying, Yeah, you go out there and get rid of him, I'll give you, you know, this much money, this here.

Q.   How much money did he give someone?

A.   He didn't give nobody nothing.  He just offered me something.

Q.   How much did he offer you?

A.   Like $10,000.

Q.   And where was he supposed --

A. And some drugs.

Q. I'm sorry. Where was he supposed to get the $10,000 from?

A. He would take care of it when I got out there.

Q. And did he ever offer to bond you out?

A. I think we talked about it. But my bond was so high, there wasn't no bond to me.

Q. How much was your bond?

A. It was over 100,000.

Q. When you were in when you used the cars to get out?

A. No, that's after I got -- they rearrested me.

Q. But you never discussed getting out beforehand; is that right?

A. I never knew him beforehand.

Q. So if I understand you correctly now -- correct me if I'm wrong -- Dustin was talking with everyone around. He was telling everyone all of this information; is that correct?

A. All I can go on --

Q. Wait.

A. -- is I'm sitting up in a cell with ten people, and they're all talking about what Dustin told them what they did, you know. That's all I can base that on is at least 10 up there, and there's 20 more somewhere else.

Q. Who say the same thing.

A. That say -- I don't know about the same thing but say a

lot of different things.

Q. The point I want to make and the question I want to ask you, if you thought he was serious, other than his conversation, what else do you have to base it on?

A. Just his last case where they all disappeared and him trying to have Angie come and get me and asking me to do it.

Q. You never talked to Angie.

A. What do you mean I never talked to Angie?

Q. Did you ever talk with Angie?

A. Uh-huh.

Q. When?

A. On the phone when I went to Cedar Rapids.

Q. And what did you say to her?

A. I don't remember. It's been a while back.

Q. Did you say anything --

A. We was talking about -- she said Tim's there and the one that told on him, all this shit. She's going to send me some money down there and I'll help you get this. I'm sorry you got in all this mess, woo, woo, woo. They ain't sent me shit. Only thing they ever sent me was DEA agent and a --

Q. Well, let me ask you -- I'm kind of confused. What mess did he get you in? I thought you were the one trying to escape.

A. It went from me escaping to him wanting to go with me; okay? The mess would have been me getting state time.

That's nothing. But when it turns into federal time, that's a lot. That's a mess.

Q. You're a little upset about that, I take it; right?

A. Yeah, yeah, I'm a little upset about that.

Q. So now if I understand you correctly, Dustin indicated prior to the time that you were going to escape that there was no way he could escape?

A. He said yeah, he could. That's why he's trying to go through the wall.

Q. I thought you answered Mr. Colloton that he decided beforehand that there was no way he could do it.

A. At which time? If I said that --

Q. When he was asking you on direct --

A. Because we couldn't get through the wall, see, but then we tried to jimmy the door. But then the hacksaw, the sledge hammer, and the chisel come into play. That was going to get him through the wall.

Q. But I thought that never got up there.

A. None of that got up there because I got moved.

Q. And how do you know any plans were made to get that there?

A. Because he told me, you know, I just talked to Angie.

Q. So other than his talking to you, you're saying you have nothing else independent of that to substantiate any of the statements he's made.

A.   Yes, sir.

Q.   Is that true?

A.   Yes, sir.

Q.   All right.  And as far as you know, other than what Dustin said or what other people said to you that Dustin said, you have nothing else independent of that to support that statement?

A.   Which statement we talking about now?

Q.   All of the statements.

A.   What do you mean all these statements?  He sat there and talked to me.  I don't know what you're trying to throw all these into one for when it's not one.  It's several different statements at several different times.

Q.   All right.  Well, name anything independent other than Dustin's word that you have to support anything that he said.

A.   As in --

Q.   Other than his conversation to you.

A.   As in talking to Kathy on the phone three-way and Phil wiring her money for him bonding Dean out, you know.  What else?

Q.   Yeah.  Other than that.

     MR. COLLOTON:  I object to this as a compound question.  I think that Mr. Parrish ought to ask a specific question on a specific statement.

     THE COURT:  Overruled.

BY MR. PARRISH:

Q.   Anything else you can think of?

A.   Just about the map that he sent with Dean and all the paperwork, okay, about Angie taking me out to the dude's house that lived on a farm with his parents, you know.

Q.   That never happened, did it?

A.   No, that didn't happen.

Q.   I'm talking about other than his --

A.   But how would I know that he lived out on a farm with his parents if that didn't, you know --

Q.   Well, the question I'm asking you --

A.   The question you're asking me, you're trying to get me all tangled up in a bunch of shit that I'm already in like he got me in.

THE COURT:  Well, just a second.  Mr. Parrish is going to ask you the question.  You try and listen to his question, and you do the best job of trying to answer his question, not ask him another question; okay?

THE WITNESS:  Yes, sir.

THE COURT:  I know this is stressful for you.

BY MR. PARRISH:

Q.   Other than Mr. Honken's conversation with you, do you have anything else that indicates to you that what Mr. Honken was telling you was, in fact, the truth?

A.   Besides what I've said, no.

Q. So you would agree then that it was basically his demeanor and how he conversed with you that led you to believe that what he said was truthful.

A. Yeah.

Q. Would you agree with that? Is it the fact that he appears to be a very intelligent human being?

A. He don't appear to be intelligent to me. Maybe to you.

Q. You said he appears to be what?

A. I said he doesn't appear to be that intelligent to me. He may to you, not to me. That must be yours.

Q. Okay. Is it a fact that he does not have much time for small talk? Does that make you think that what he says is truthful?

A. I don't understand the small talk. He talked to me 24 hours a day every day about nothing.

Q. Is it the fact that -- oh, you said about nothing? So he engaged in a lot of small talk with you?

A. No. You just said that.

Q. Did he --

A. I said about nothing. You said small talk. See, at first it wasn't small talk. Now it is. Which is it?

Q. Well, did he engage in a lot of small talk with you?

A. Yeah, some, and some in some other talk. You know what I'm saying?

Q. Well, what was it about his conversation that led you to

believe that what he said was, in fact, truthful?

MR. COLLOTON: Objection. Asked and answered.

THE COURT: Overruled.

A. On which -- what are you talking about now?

Q. Well, you said you believed him, and I asked you -- I gave you the follow-up question on that. Now my question is what was it about the conversation that he had with you that led you to believe --

A. That I believed --

Q. Yes, to believe him.

A. When I read through some of his papers where he got busted the first time in '93 and that the witnesses had disappeared, that led me to believe that he did kill them, like I said; okay? And it also led me to believe that he'd go to any length, you know, to get somebody, to get rid of this person like he was talking to get him out of this charge.

Q. Well, didn't you tell the grand jury that you would not believe that Mr. Honken would harm anyone?

A. Yes, I did, but the reason I did that was like I said --

Q. No.

A. I can't answer this now?

Q. You can answer whatever you want to.

A. The reason I said that was because they had me there in front of them. I did not want to be there. I was not happy

about being there. And I told him I'd be there for him all the way through this.

Q. Well, let me ask you this question: Did you, in fact, tell the grand jury when you were under oath there that you did not believe he had harmed anyone?

A. Yes, I did, but I also perjured myself.

Q. Was that -- so you're now admitting that you committed perjury.

A. Yeah.

Q. And you committed perjury to the grand jury on several occasions.

A. Yep.

Q. So why do you think we should believe you now if you lied when you had taken an oath to tell the truth before the grand jury?

A. That's gotta be up to you. You can believe me if you want to.

Q. The only thing different is that now you're saying that you're telling the truth to avoid additional charges being placed against you; isn't that true? That's the only thing that's different.

A. Oh, I don't know if that's the only thing that's different, but it's because I talked to this dude I got the charges. You know what I'm saying? The reason I'm in here right now today is because I tried to talk to Dustin.

Q.   So you're saying the only thing that is different now about the oath you took when you said you would tell the truth before is that they filed additional charges with you and you're now blaming Dustin for putting you in that position.  Other than that, that's the only two things that are different.

A.   I'm blaming myself for getting in that position, but I wouldn't have been in that position if I wouldn't have had to listen to him every day.

Q.   Are those the only two things that are different then; is that right?

A.   Yes.

        MR. PARRISH:  All right.  I have nothing further.

        THE COURT:  Mr. Colloton?

                    REDIRECT EXAMINATION

BY MR. COLLOTON:

Q.   Let me just clear up one thing about additional charges, Mr. Putzier.  The government never came to you -- well, the government didn't come to you in the first instance and say, We're going to charge you with escape, perjury, and conspiracy to murder a witness, did it?

A.   No.

Q.   In fact, you contacted the government or through Terry Davenport?

A.   Yeah, Terry Davenport contacted them.

Q. Because you were concerned based on what you've been involved with that somebody might try to charge you with those things; is that right?

A. Yes.

Q. And that's how your series of interviews or your interview got set up.

A. Yes.

MR. COLLOTON: That's all I have.

THE COURT: Just for my information, is he represented by -- is it pre-indictment?

MR. COLLOTON: Yes, he's represented by a court-appointed counsel.

THE COURT: Has he been indicted yet?

MR. COLLOTON: No. The -- no, there's a pre-indictment agreement and a waiver of indictment and a draft information, and it's not been put on file yet.

THE COURT: Okay. Mr. Parrish, did you have any additional questions?

MR. PARRISH: No, Your Honor.

THE COURT: And you had nothing further, Mr. Colloton?

MR. COLLOTON: That's all I have.

THE COURT: Thank you. You're excused, Mr. Putzier.

MR. REINERT: Well, Your Honor, we were close to our attempted timeliness.

THE COURT: Very close. I'm going to continue the matter now until -- I believe it's February --

MR. PARRISH: 17.

THE COURT: -- 17.

MR. PARRISH: And it looks like we're going to go three days. I think we said we could start on the 16th.

THE COURT: Are we going to go three days?

MR. PARRISH: I don't think so. We're going to have my witnesses lined up.

THE COURT: We still have how many more government witnesses?

MR. COLLOTON: Some of these have dropped, Judge.

THE COURT: Oh, okay.

MR. COLLOTON: I think that -- and also as to the agents, I think I mentioned this morning we're going to see if we can't get some kind of stipulation at least as to summary matters or matters that --

MR. PARRISH: I think we can do that.

MR. COLLOTON: So --

THE COURT: I still think you have nine or ten witnesses. You have ten witnesses I think.

MR. COLLOTON: Well, we had the lab gentleman.

THE COURT: Well, without the experts. Who's your expert? What's his name?

MR. REINERT: John Meyers.

MR. COLLOTON: Number 5 on the list. We have Mr. Skadburg who should be very short.

MR. REINERT: And may even be by stipulation.

MR. COLLOTON: Right.

MR. PARRISH: What I'd like to see us do, Your Honor -- and I don't know if the next time we could call our drug people first because mine is coming from Chicago. I don't know whether your guy's coming from Chicago -- get them on. I think that may knock down a lot of the heavy stuff and then save the other people until afterwards because I think a lot of the other people we might be able to do by stipulation.

THE COURT: Is your expert going to want to sit in and hear their expert?

MR. PARRISH: Right, and I think we worked out some arrangement on that already.

THE COURT: Whatever you work out is going to be fine with me. Maybe we should start at 9 a.m. or whenever you want to start with your expert. Then we'll try and get the experts out of the way. And then you can call the non-expert witnesses.

MR. REINERT: And we anticipate at this point having our expert, Mr. Meyers, testify. Their expert would be present during court. And then when their expert testifies, we would have either Mr. Meyers or another chemist. And

whether we'd have to call that person or not, I don't know, but at least we'd have a number of experts around or people experienced in chemistry to lead us through the process.

THE COURT: Now, I hate to burden the parties, but, you know, there are a lot of issues in here. So did you envision like as soon as you're done with the evidence -- I mean, somebody was talking about filing briefs but they wanted to wait till the evidence was in. I think that was your statement, Mr. Colloton. Do you want me to then just start boom, boom, boom deciding everything? Or are we going to have arguments? Are we going to do all this in two days?

MR. COLLOTON: If the Court -- well, I guess the Court's going to have to make some decisions here. If it would be helpful for the Court to have time after that to make the decisions with briefing after the evidence, that'd be acceptable to us I'm sure. If you'd like a brief between now and the next hearing based on the evidence that's come in and on at least what we expect the evidence to be so the Court would be able to make rulings at that time, we'd be happy to do that as well.

THE COURT: What do you think?

MR. COLLOTON: I think -- I think we could probably submit a good brief before the next hearing but -- and then if there are differences in the evidence or nuances in the evidence take them up at oral argument which might alter or

move somewhat from what the briefs were. But I think we all have a pretty good idea of what the experts are going to say or at least what our position's going to be on that and as to the other issues.

THE COURT: Mr. Parrish?

MR. PARRISH: I'm not so sure because on the obstruction, I think the Court -- you know, you guys have the burden on that, and you haven't heard our evidence on the obstruction issue yet, and I think the legal issue about whether or not it's applicable to the other thing, we could perhaps work that out. But I can't see how we're going to use any factual basis to work up the obstruction issue prior to the time the Court hears all the evidence.

My thought would be perhaps we get it in, then file our briefs then because I think my expert's going to want the historical testimony on the drugs that came from Mr. Cutkomp.

MR. REINERT: Well --

MR. PARRISH: And your guys might want it also.

MR. REINERT: I think on the first issue on the brief on the obstruction, I think we could probably -- I'm not sure how much you've talked to your people. You probably anticipate Y, and we anticipate the facts our witnesses would say would be X. We've seen what the government witnesses are, do the legal argument. So I think we could probably still put a brief in on all of the issues between now and

then.

THE COURT: Let me ask you, what's the legal question on obstruction?

MR. COLLOTON: I don't know. Mr. Parrish raised one with us earlier in the day.

MR. PARRISH: Well, is it applicable in his instance, the escape charges, part of an obstruction that takes away his acceptance of responsibility under the way the -- each party has outlined it. I think probation is saying that -- and I think also the government is saying that the obstruction takes away his acceptance, his three levels on acceptance.

THE COURT: Well, yeah.

MR. PARRISH: Because of the so-called attempted escape.

THE COURT: Okay.

MR. PARRISH: I think that's what --

MR. REINERT: But, of course, we're asserting more than one obstructive ground as well.

THE COURT: Yes. I understand that.

MR. COLLOTON: I guess I thought maybe Mr. Parrish had a legal argument that if obstructive conduct is found but it's all before the guilty plea then there cannot -- then the application note that says you cannot get acceptance if you get obstruction --

THE COURT: Doesn't say that.

MR. COLLOTON: Except in extraordinary cases.

THE COURT: Right.

MR. COLLOTON: Doesn't apply. Now, if that's a legal argument, then that's something we could --

THE COURT: Some circuits have held that.

MR. COLLOTON: We'll have to study that and see if --

THE COURT: I've already studied it. But you guys --

MR. REINERT: But on the issue of -- the second issue raised by Mr. Parrish on Mr. Cutkomp's testimony, I think that would be a good thing for both experts to review. It's certainly something that we can talk about, and I'm sure we can get transcripts ordered of that. I would presume if we're ordering one witness's testimony it won't take too long to get.

THE COURT: You have two months.

MR. REINERT: So I'm sure we can get that well in time to have the experts look at it and review.

MR. PARRISH: Does the Court have a suggestion as to how we could handle this?

THE COURT: Well, right now the only evidence in the record on this obstruction and acceptance issue, I think the only evidence in the record that there's any obstruction

after the guilty plea is Government's Exhibit 32 and perhaps Government Exhibits 38 and 39 that I'm aware of in the record that I've heard. Now, maybe there's more. I don't know. But that is an important point for my determination because I'm inclined as I read the case law -- I haven't made any final decisions yet, but if I were to find that there was no obstruction after the guilty plea, my inclination would be that this would be an extraordinary case that would allow for obstruction should I find that and for acceptance of responsibility.

So that's going to be an important question, whether there was an obstruction -- whether there was evidence of obstruction of justice after the date of the guilty plea. At least that's an important question in my mind, and it's an important question as I read the case law from the circuits on the question of what's an exception case and when is it that -- the rare case that you can get both. But --

MR. REINERT: And, Your Honor, for completion of the record purposes, we do have one more witness that would provide some information about post-plea obstructive conduct. We just didn't get to him today.

THE COURT: Get to him today. Sure. And I realize all the evidence isn't in. I think what I probably want to do is hear all of the evidence and then set a briefing schedule, have the briefing and argument on it, and then I'll

decide all the issues and impose the sentence. So I guess that means there will be a third day beyond what we scheduled in February to complete the sentencing.

MR. PARRISH: Your Honor, let me suggest this. I don't know -- and a lot of this evidence we could narrow I think. Maybe the government and I should get a summary of our witnesses, exchange just a paragraph or a page summary, and see if we could stipulate to a lot of the facts that are remaining except for the chemical -- the chemists. I think we could perhaps do that. I think the chemists are going to take all day, but I think we could perhaps do that with a lot of the evidence here.

THE COURT: Well, here's what I think I'm going to do. I'm not going to -- I mean, I don't hear anybody saying really they want to file briefs, or do you?

MR. PARRISH: I think we do.

MR. COLLOTON: Yes, I think we should.

MR. REINERT: Your Honor, in my experience especially on --

MR. PARRISH: I'm not begging to file it, Your Honor.

MR. REINERT: Especially on the lab issue, that can be a cumbersome legal issue on determining --

THE COURT: You could file that before the February hearing.

MR. REINERT: Certainly. In fact, we've got a brief about three quarters of the way drafted that covers all of the issues, that we would be able to file a brief before that --

THE COURT: When can you file the brief?

MR. REINERT: Pardon me?

THE COURT: Well, when can you file this brief that covers all the issues?

MR. REINERT: We should be able to have that put together in the next couple weeks I would think.

THE COURT: If it's three quarters done, I would think so.

MR. REINERT: There's always more research to do, and it's never quite good enough.

THE COURT: You got that right. That's been my experience anyway.

MR. REINERT: So, you know, we wanted to get this so the brief will be helpful to the Court, so we do have it basically in rough form getting there toward being done. So we could certainly get that filed before the February hearing. But if the Court wants --

MR. PARRISH: Is it January or February?

MR. REINERT: February.

THE COURT: February 16 because your expert needed -- your expert needed more time.

MR. PARRISH:  Yeah, two weeks.

MR. COLLOTON:  Would it be helpful to the Court if they came in the 1st of February?  Would that be enough time to consider them before the hearing?

THE COURT:  Why don't you file your brief by January -- can you file it by Friday, January 9?  I mean, I realize there's some holidays in here, but, you know, if it's three quarters done --

MR. COLLOTON:  If that -- sure.

THE COURT:  Well, is that too burdensome?  If it's too burdensome, tell me.

MR. REINERT:  We should be able to get it in by then I would think, Your Honor.  If we run into a snag --

THE COURT:  Then I'll extend the time.

MR. REINERT:  -- we'll contact the Court.

THE COURT:  Yeah.  And I'm always liberal on extending time for filing briefs.

MR. COLLOTON:  I would think by mid January for sure, but we'll shoot for the 9th.

THE COURT:  Well, here's what we'll do.  You file your brief by the 16th.  How's that?  That's a Friday.  And Mr. Parrish can have until February 9 in which to file any reply brief and --

MR. PARRISH:  That's fine.

THE COURT:  -- any other issues that you want to

brief that the government didn't brief in their brief, and then I'll just try and decide it at the end of the evidence so we won't have a third episode of this sentencing.

MR. REINERT: Sounds great, Judge.

THE COURT: Because I'm not sure there are all that many difficult legal issues. I think it's mostly factual issues in this case.

MR. PARRISH: I agree. I think the factual issue particularly on the scientific stuff.

THE COURT: You're the legal whiz, Mr. Colloton. What are the tough legal issues in this case?

MR. COLLOTON: Well, I'm embarrassed to say I'm not up on those cases about obstruction and acceptance, but we'll study those.

THE COURT: That's okay because I feel I'm very up on it.

MR. COLLOTON: May we still submit something on that?

THE COURT: Of course you can. Sure. That's obviously a big issue, so I took a close look at it even though the parties chose not to file briefs at all which kind of surprised me. You know, it's my job to try and get it right whether I get help from the parties or not. So we'll see you all on the 16th -- or I guess the 17th.

MR. PARRISH: 17th.

THE COURT: 17th.

MR. PARRISH: Thank you, Judge.

THE COURT: We'll be in recess.

(The foregoing sentencing was adjourned at 6:16 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____
Shelly Semmler, CSR, RMR

1.12.98
Date

I N D E X

TIMOTHY CUTKOMP
CONTINUED DIRECT EXAMINATION
BY MR. COLLOTON........................................... 263:9
CROSS-EXAMINATION
BY MR. PARRISH............................................ 282:9
REDIRECT EXAMINATION
BY MR. COLLOTON.......................................... 375:20
RECROSS-EXAMINATION
BY MR. PARRISH........................................... 381:19
FURTHER REDIRECT EXAMINATION
BY MR. COLLOTON........................................... 388:7

DEAN DONALDSON
DIRECT EXAMINATION
BY MR. COLLOTON.......................................... 389:25
CROSS-EXAMINATION
BY MR. PARRISH........................................... 434:24
REDIRECT EXAMINATION
BY MR. COLLOTON........................................... 471:1
RECROSS-EXAMINATION
BY MR. PARRISH........................................... 472:11
FURTHER REDIRECT EXAMINATION
BY MR. COLLOTON.......................................... 473:18
FURTHER RECROSS-EXAMINATION
BY MR. PARRISH........................................... 474:14

KATHY RICK
DIRECT EXAMINATION
BY MR. REINERT............................................ 475:5
CROSS-EXAMINATION
BY MR. PARRISH........................................... 476:24

WILLIAM DEAN
DIRECT EXAMINATION
BY MR. REINERT............................................ 478:7
CROSS-EXAMINATION
BY MR. PARRISH........................................... 486:17

TERRY BREGAR
DIRECT EXAMINATION
BY MR. COLLOTON.......................................... 499:16
CROSS-EXAMINATION
BY MR. PARRISH........................................... 517:19
REDIRECT EXAMINATION
BY MR. COLLOTON.......................................... 527:22

DANIEL FRYE
DIRECT EXAMINATION
BY MR. REINERT............................................ 531:5

JAMES BROWNLEE

DIRECT EXAMINATION
BY MR. REINERT.................................. 535:25
CROSS-EXAMINATION
BY MR. PARRISH................................. 539:12
REDIRECT EXAMINATION
BY MR. REINERT.................................. 540:4
RECROSS-EXAMINATION
BY MR. PARRISH................................. 540:12

JAMES DERRICK

DIRECT EXAMINATION
BY MR. REINERT.................................. 541:17
CROSS-EXAMINATION
BY MR. PARRISH................................. 546:16

DAVID LEAVITT

DIRECT EXAMINATION
BY MR. COLLOTON................................ 550:5
CROSS-EXAMINATION
BY MR. PARRISH................................. 554:18
REDIRECT EXAMINATION
BY MR. COLLOTON................................ 559:15
RECROSS-EXAMINATION
BY MR. PARRISH................................. 560:7

DEREK BOGGS

DIRECT EXAMINATION
BY MR. REINERT.................................. 561:6

DENNIS PUTZIER

DIRECT EXAMINATION
BY MR. COLLOTON................................ 564:10
CROSS-EXAMINATION
BY MR. PARRISH................................. 588:13
REDIRECT EXAMINATION
BY MR. COLLOTON................................ 608:15

(Government Exhibits 38 and 39 were offered.)........ 583:25
(Government Exhibits 38 and 39 were received.) ....... 584:6