# 74

## Declaration of Leon Spies, Esq.
## Pursuant to 28 U.S.C. § 1746

1.     My name is Leon Spies.  I am an attorney admitted to practice in the State of Iowa, and I have an office in Iowa City.  In 2004, I was one of three lawyers who represented Dustin Honken in his federal capital murder trial.  I have been asked by Mr. Honken's current counsel to provide the following information with regard to specific aspects of our representation.

2.     I became involved in the case at the request of Alfredo Parrish, who was lead counsel.  He had previously represented Mr. Honken in a drug case involving the manufacture of methamphetamine.  Charlie Rogers was also appointed to represent Mr. Honken.  He was appointed as learned capital counsel.  Neither Mr. Parrish nor I had any experience defending capital cases prior to our assignment to this case, so we often deferred to Mr. Roger's expertise on capital issues and jurisprudence.

3.     Mr. Parrish was primarily responsible for the guilt phase.  I was primarily responsible for presenting the penalty phase case, and Mr. Rogers advised on all matters.  We often talked by phone and in person. Although we each had areas of primary responsibility, we made most major decisions jointly.

4.     I have reviewed the Section 2255 Motion that has been submitted by Mr. Honken's current counsel.   The first two claims are grounded in findings made by the court in Mr. Honken's prior drug case, and their use (Claim 1) or lack of use (Claim 2) at the murder trial.  I recall that we raised and lost a broad double jeopardy challenge to the successive prosecution of Dustin for drug conspiracy.  However, I do not recall considering the approach advanced in Claims 1 and 2 of the 2255 Motion.   I do not recall any discussions about these

1

approaches. I can think of no tactical or strategic reasons that we had for not asserting Mr. Honken's rights as set forth in those claims. Mr. Rogers was responsible for researching and drafting the double jeopardy motion. I read the cases most relevant to that claim, and I reviewed the motion, and likely made some minor suggestions and edits. However, I deferred to Mr. Rogers on the thrust of the motion. If Mr. Rogers had identified the legal issues raised in the first two claims of the Section 2255 motion, I can recall no reason that we would not have raised them as well. Indeed, we sought to raise and litigate every meritorious legal issue in Mr. Honken's case.

5. I likewise do not recall that we had any tactical or strategic reason for not objecting on double jeopardy grounds to Mr. Honken's multiplicitous convictions for drug conspiracy murder and continuing criminal enterprise murder. I recall that Mr. Honken's codefendant, Angela Johnson, did raise the issue and had her drug conspiracy convictions vacated by the Eighth Circuit. I believe that, if we had preserved the issue at trial, Mr. Honken's drug conspiracy convictions also would have been vacated.

6. Jeffrey Honken is Dustin Honken's brother. He was called by the government as a witness at trial. Our investigator, Delbert King, interviewed him by phone regarding guilt-phase issues. Lisa Rickert, our mitigation specialist, interviewed him regarding the penalty phase. I do not recall that we conducted any investigation regarding the question of whether Jeffrey Honken was "managed" or "supervised" by Dustin Honken in the course of the alleged continuing criminal enterprise. I spoke by telephone with and also met once with Timothy Cutkomp. I do not remember asking Mr. Cutkomp about Jeffrey's role in the operation or Jeffrey's relationship with Dustin Honken in the operation. I do not recall any tactical or strategic reason for not specifically investigating these questions.

2

7.      I have reviewed Claim 4 in the 2255 Motion.  This claim alleges that we should have conducted an investigation into whether Dustin Honken controlled Jeffrey Honken for purposes of refuting the continuing criminal enterprise counts.  I can think of no tactical or strategic reason for not having conducted that investigation.

8.      I have also reviewed Claim 9 which asserts that we failed to conduct an adequate mitigation investigation for the penalty phase.   In preparation for the penalty phase, we retained Lisa Rickert, a mitigation specialist.  Of the three lawyers, I worked most closely with her.  She was very highly qualified and easy to work with.  She did all that was asked of her.

9.      During our preparation we retained Dr. Michael Gelbort to do neuropsychological testing.  His testing was not useful to the defense and he was not called as a witness.  We also retained Dr. Mark Cunningham, who is also a psychologist.  Dr. Cunningham was retained solely to address the question of whether Mr. Honken would pose a future danger while incarcerated.  He provided us with what we considered a helpful opinion and he testified to it.  Of note, however, is that Dr. Cunningham's opinion was not based on his evaluation of Mr. Honken, or of Mr. Honken's psychological makeup.  Dr. Cunningham never met Mr. Honken and his testimony was based entirely on his assessment of the Bureau of Prison's ability to safely incarcerate Mr. Honken.

10.      Ms. Rickert generated a life history for Mr. Honken.  This history was notable because it showed that he was raised with a degree of family dysfunction and was influenced by a father with pronounced criminal and violent propensities.  She made a recommendation that we present all of his life history and retain a mental health professional to explore the psychological impact of that upbringing.  This latter recommendation would have required that Mr. Honken be evaluated by that expert.   We presented most of his life history, although we sanitized it to

3

remove aspects that we believed would be harmful. We did not follow her recommendation that we engage a mental health expert to evaluate Mr. Honken and to potentially present an opinion.

11.    Mr. Parrish, Mr. Rogers and I discussed both of Ms. Rickert's recommendations. We decided not to use an evaluating mental health expert. We were motivated in part by our concern that by using such an expert we would be opening Mr. Honken to evaluation by a government expert. The government had dropped the name of Park Dietz, M.D. and Daniel Martell (a psychologist who works with Dr. Dietz). This caused us concern because each are well-known as strong government experts, who generally find criminal defendants to have anti social personality disorder. In part because of this concern we opted not to retain an expert or have Mr. Honken evaluated.

12.    It has been pointed out to me by current counsel that such an evaluation of Mr. Honken would have been confidential, i.e., the results would not have been disclosable to the government unless and until we concluded that overall the opinion would be helpful to Mr. Honken. I have also been advised by current counsel that pursuant to the firewall provisions of Fed.R.Crim.P. 12.2, and cases interpreting that Rule, even if we decided to use the testimony of such an expert, that the results of the evaluation and the content of her opinion, would not be disclosable to the trial prosecutors unless and until a capital-eligible verdict was returned in the guilt phase. Mr. Parrish and I relied heavily upon Mr. Rogers, as learned counsel, on aspects of the litigation that were unique to the federal death penalty. We were advised by Mr. Rogers of the confidential nature of the evaluation we were considering. I do not now recall if we discussed the firewall provisions.

13.    Regarding the sanitizing of the life-history facts that we presented to the jury, I have also been advised by current counsel that had we had Mr. Honken evaluated, we may have

obtained an opinion that would have placed some of these bad facts in light that would have enhanced the penalty phase presentation. Since we did not retain the expert, however, we never acquired that understanding of these ostensibly adverse facts.

14. I have been advised by current counsel that they have had Mr. Honken evaluated and they have shared the opinions of their experts with me. Had these opinions been available to me at the time of trial, I would have strongly considered using them. Similarly, since they place some of the negative facts about Mr. Honken in a helpful light, I would have considered placing Mr. Honken's full history before the jury.

15. I recall discussions in which we were considering consulting with a toxicologist to assess the impact of Mr. Honken's drug use on his mental condition. I do not recall any specific reason why we did not ultimately do so.

16. This declaration provides a summary of my views on the issues discussed, but it is not inclusive of all information that I possess on these topics.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Leon Spies, Esq.

Date: June 6, 2011

5