IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA

DUSTIN LEE HONKEN, )
)
          Plaintiff, )   10-CV-3074-LRR
)
  VS. )  **VOLUME I**
)
UNITED STATES OF AMERICA, )
)
          Defendant. )

APPEARANCES:

ATTORNEYS SHAWN NOLAN, AREN ADJOIAN, AND AYANNA SALA WILLIAMS, Capital Habeas Unit, Federal Community Defender Office, Eastern District of Pennsylvania, Suite 545 West-Curtis Building, 601 Walnut Street, Philadelphia, Pennsylvania 19106, appeared on behalf of the Plaintiff.

ATTORNEY CHARLES J. WILLIAMS, Assistant U.S. Attorney, Suite 400, 401 First Street S.E., Cedar Rapids, Iowa 52401, appeared on behalf of the United States.

<u>EVIDENTIARY HEARING,</u>

held before the Hon. Linda R. Reade on the 31st day of

October, 2011, at 4200 C Street S.W., Cedar Rapids,

Iowa, commencing at 8:01 a.m.

Patrice A. Murray, CSR, RPR, RMR, FCRR
United States District Court
4200 C Street S.W.
Cedar Rapids, Iowa 52404
(319) 286-2324

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

INDEX

| WITNESS | D | C | RD | RC |
|---|---|---|---|---|
| Alfredo Parrish | 8 | 29 | 75 | |
| Jeffrey Honken | 98 | 129 | 158 | |
| David Honken | 166 | 191 | | |
| Dennis Putzier | 198 | 208 | 214 | |

EXHIBITS

| | O | R |
|---|---|---|
| Exhibit No. 80 | 4 | 5 |
| Exhibit No. 81 | 4 | 5 |
| Exhibit No. 82 | 4 | 5 |
| Exhibit No. 83 | 4 | 5 |
| Exhibit No. 84 | 4 | 5 |
| Exhibit No. 85 | 4 | 5 |
| Exhibit No. 86 | 4 | 5 |
| Exhibit No. 87 | 4 | 5 |
| Exhibit K | 74 | 74 |

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

(The following was held in open court.)

THE CLERK:  In Civil Matter 10-3074, United States of America versus Dustin Lee Honken [sic], on for evidentiary hearing.

Counsel, please state your appearances.

MR. WILLIAMS:  C.J. Williams appears on behalf of the United States.

MR. NOLAN:  Good morning, Your Honor.  Shawn Nolan with the Federal Defender's Office in Philadelphia on behalf of Mr. Honken.

THE COURT:  Very fine.  And we are ready, I think, to receive evidence, unless the lawyers have any record they wish to make to open.

MR. WILLIAMS:  Your Honor, I think we have a few just housekeeping matters we'd like to discuss with the Court.  I know the Court's rules are usually that, in the audience, you don't want to have people taking notes.  We have a couple of victims's family members here, and there's a lot of victims's family members.  These are taking notes and then kind of going back and sharing with other people, and we'd ask the people for exception to the rule and allow them to take some notes.

THE COURT:  Absolutely.

MR. WILLIAMS:  Thank you.  That's all I have.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

MR. NOLAN: Your Honor, there are some stipulations. As you know, counsel and I have been working together to streamline the presentation for Your Honor, and we've agreed to some stipulations, so I could put those on the record at this time.

THE COURT: Absolutely.

MR. NOLAN: Your Honor, there are -- there are several witnesses that the government has agreed that the stipulation -- they would stipulate that the declarations that we filed with our habeas petition, and as well as with our exhibits with this Court, would be accepted in lieu of live testimony. And those individuals are: Laurel Christianson, which is Plaintiff's Exhibit 80; Sandy Fiems, Plaintiff's Exhibit 81; Carol Hilgenberg, Plaintiff's Exhibit 82; Carol Honken, Plaintiff's Exhibit 83; Steven Honken, Plaintiff's Exhibit 84; Mark Johnson, Plaintiff's Exhibit 85; Ronald Nelson, Plaintiff's Exhibit 86; and Courtney Snater, Plaintiff's Exhibit 87. And the stipulation, Your Honor, is that that evidence would be received as it goes to penalty phase claims only, that it would not be relevant to any guilt phase issues that have been raised in our petition.

THE COURT: So stipulated?

MR. WILLIAMS: So stipulated, Your Honor.

Case 3:10-cv-03074-LTS-KEM Document 83 Filed 12/07/11 Page 4 of 246

(Whereupon, Exhibits 80 through 87 were received.)

THE COURT: Thank you.

MR. NOLAN: And, Your Honor, with regard to scheduling, I just did want to note for the Court, as you can imagine, witnesses are coming from various parts of the country, and we've done our best to schedule, to fill up the week, I guess, is what I'm saying. Because we've been able to cooperate and have stipulations -- we've also done, I believe, 6 depositions previously in the case -- I'm a little concerned that some days we may run out of witnesses a little early, and I wanted to let the Court know that as early as I could.

THE COURT: That's fine.

MR. NOLAN: And also, we wanted to inquire of the Court, how the Court wishes to deal with the actual transcripts of the depositions. We could simply file those by ECF when they're all in. We have, I think, 4 of the 6 transcripts that are completed at this time.

THE COURT: I think that's fine. Then the -- they'll be on the record for appellate review.

MR. WILLIAMS: Yeah, I think that's fine. The other option, I suppose we could mark them as Court Exhibits 1 through whatever, whatever the Court's

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM Document 83 Filed 12/07/11 Page 5 of 246

pleasure is on that. Any way we get it into the record is my only concern obviously.

THE COURT: I think that filing them on cm/ecf is probably the easiest way to handle them and probably the quickest, and that will be fine with me.

MR. NOLAN: Thank you, Judge. Then we will file -- the 4 that are ready, we'll file today at the conclusion of court. That way -- and the others, I'll discuss with Mr. Williams when they're going to be ready. We haven't figured that out yet.

THE COURT: All right. We still have additional briefing to do, and we've still got oral argument set in the future, so I wouldn't have a heart attack if it takes a little while to get those in. That's fine.

MR. NOLAN: Thank you, Your Honor. And I didn't know if Your Honor wanted kind of a preview of who we're going to call this week. If you don't, we can just get started.

THE COURT: I think I'll catch on.

MR. NOLAN: Yeah. I think so too. With that, we would call Alfredo Parrish.

MR. WILLIAMS: If I could, before we get started, there's 2 other housekeeping things, just so the Court knows. 1 is, we have a witness, Terry Bregar,

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM Document 83 Filed 12/07/11 Page 6 of 246

who apparently is in some dire medical condition. It's a defense witness. We've agreed either to take him by phone or maybe do a deposition after this week or at the end of this week or something like that. Defense counsel is going to discuss it and come up with a decision on that, but it's okay with the government to take that witness by phone, if ultimately it is decided to do that.

And then, again, because of scheduling issues and Leon Spies's availability, we may be taking Leon Spies and 1 other witness out of order on Friday, and the government's witnesses may appear on Thursday --

THE COURT: That's fine.

MR. WILLIAMS: -- because of scheduling issues.

THE COURT: That's fine.

MR. NOLAN: And I guess I would make a formal motion for sequestration of witnesses for the pendency of the hearing.

THE COURT: Yes.

MR. WILLIAMS: Yeah. And, Your Honor, we have a case agent here, Lori Lewis, that I'd ask to be able to sit at counsel table. Other than that, we have no witnesses in the courtroom.

THE COURT: Any objection to that,

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 7 of 246

Mr. Nolan?

MR. NOLAN:  No, Your Honor.

THE COURT:  All right.  That will be fine.

MR. NOLAN:  And we'd call Mr. Parrish to the stand.

THE COURT:  All right.  Mr. Parrish, will you please come forward.  Ms. Snider will administer the oath.

ALFREDO PARRISH,
called as a witness, being first duly sworn or affirmed, was examined and testified as follows:

THE CLERK:  You may take the stand.

DIRECT EXAMINATION

BY MR. NOLAN:

Q.    Good morning, Mr. Parrish.

A.    Good morning.

Q.    I'm sorry, I'll pull this microphone down.

Mr. Parrish, what is your occupation?

A.    A lawyer.

Q.    And how long have you been an attorney?

A.    40 years.

Q.    And what type of practice are you in?

A.    Trial practice.  I do major felony cases, some personal injury, and some medical malpractice.

Q.    Okay.  And did you represent Mr. Honken back in

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 8 of 246

2004?

A.    I did.

Q.    And in what capacity did you represent him in 2004?

A.    I was his lawyer, appointed by the Court, having represented him in a previous case, to assist him in the charge of murder in his capital case.

Q.    Okay.  And we'll come back to the previous case in just a moment.  At the time that you were appointed to represent Mr. Honken in 2004 in his capital matter, had you had prior capital experience?

A.    One case I had done before in federal court, in the Northern District, did not go to trial.

Q.    Okay.  And other than that, had you had involvement in murder cases?

A.    Quite a few.

Q.    Okay.  Now, you had previously represented, I believe you just stated, Mr. Honken in a prior case, in the '90s, in 1996.  What type of case was that?

A.    It was a methamphetamine conspiracy case.

Q.    And what was the disposition of that case?

A.    Guilty plea, and a hearing on the sentencing phase in front of Judge Bennett.

Q.    Okay.  And how long did that sentencing hearing last, if you recall?

A.    I don't recall offhand.  It's a matter of record, but I would say maybe 5 days to 7 days, something like that.

Q.    And had you previously been involved in a sentencing hearing of that -- of that length?

A.    Not that I can recall.

Q.    And what were the -- do you recall what kind of -- generally, what the issues were with respect to the sentencing in that case?  In other words, why did it take so long?

A.    Well, I think there were a couple of issues.  1 was obstruction along with acceptance of responsibility, which became kind of like the Honken rule, so to speak, from the Eighth Circuit.  It was 1 of the first times that issue was presented.  The other was the purity of the methamphetamine.  And I think also there may have been some issues about who was involved in the conspiracy.  But the details of it are pretty much laid out in the Eighth Circuit opinion, but I can't remember the -- I just remember the major issues.

Q.    Do you recall that the timing of the conspiracy was an issue in the case?

A.    Correct.

Q.    Okay.  Now, in the capital case in which you were appointed in 2004, were there other attorneys also

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 10 of 246

involved?

A.      Yes.

Q.      And who were they?

A.      Leon Spies.

Q.      And how did Mr. Spies get involved?

A.      Mr. Spies and I had worked on a number of cases over the years and -- together and when we have represented separate defendants, when I've had a conflict or he's had a conflict.  And he has a great reputation and is an excellent lawyer.  And Dustin and I had a conversation, and he wanted to know, could I speak to him about becoming involved in his defense, and I agreed to.  And I think I spoke to who was then Magistrate Jarvey at that point, and it was my understanding he agreed to have Mr. Spies assist me in the case at that point.

Q.      And then would that have meant that Mr. Spies would have been formally appointed as well?

A.      That's correct.

Q.      And did there come a point when another attorney became involved in the case as well?

A.      Correct, Mr. Charles Rogers from Kansas City.

Q.      How did it come about that he also became involved in the case?

A.      As I recall, we were attempting to find lawyers

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 11 of 246

in the Midwest or -- well, the preference was the Midwest, to assist us on the capital issues. And we, I believe, may have contacted several people, including the Federal Defender's Office and other people, to try to find out who was available. I think we went through a couple of people to see who was available, what their schedules were, because most of these people are fairly busy. And I think we narrowed it down to Mr. Rogers and maybe 1 other person to assist us in the capital issues.

Q. And why did you need someone to assist you in the capital issues?

A. Well, we had no previous experience, except the 1 I mentioned, other than murder cases that we both had handled. But in federal capital cases, we did not have experience in that area.

Q. So are you also familiar with whether Mr. Spies had ever, previously to Mr. Honken's case, ever handled a capital case?

A. It's my recollection he had not. I can't say with any -- 100 percent accuracy.

Q. Okay. And so Mr. Rogers then came in as what would be known as learned counsel?

A. Correct.

Q. And so when you -- when the 3 of you started working up the case, who was ultimately responsible for

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 12 of 246
*to purchase a complete copy of the transcript.*

decisions that involved the capital nature of the case?

A.    Mr. Rogers.  We relied on his expertise in this area.  I think both Leon and I took some classes that were available.  I know I went to a class out in California and maybe another class somewhere, and I think Mr. Spies may have done something similar, but we relied on Mr. Rogers for his work.

Q.    Okay.  Let's talk for a moment about the roles of each of the attorneys, each of the 3 attorneys, leading up to the case.  What was your responsibility leading up to the case?

A.    Well, since I knew Dustin better than anyone, had worked with him on his previous case, I was kind of the person who he basically relied on to get information out to other people.  But we ultimately decided, with his consent, that I would handle the guilt phase because of the number of prior first degree murder cases that I tried in Iowa, and Mr. Spies would handle the -- and that was subject to some question later on, but he was -- he would handle the penalty phase.  Mr. Rogers we would rely on basically to give us advice and to assist us in our motion hearings regarding issues that could impact the penalty or the ultimate disposition of the case.

Q.    Okay.  And in preparation yourself, in

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 13 of 246

preparation for the guilt phase, how much work was involved in that?

A.     Well, I honestly can't recall, but my time records pretty much reflect what I did.  I don't know whether they are in evidence or not, but I believe on a monthly basis -- I think when we started out, the fee structure was something like $95 an hour or something like that.  Then we -- at some point, it was increased, maybe to 125 an hour.  But we pretty -- we had -- I think we billed every month, so I -- every couple of months, I don't know.  But whatever we put in as time in that would reflect in the records.  I have no recollection of it as I sit here today, but the time records would speak for themselves, but I'm not -- I'm quite sure all of the time that we spent did not go into the record.

Q.     Okay.  And the majority of your time -- I guess, ultimately my question is, the majority of your time, was that focused on preparation of the guilt phase or the penalty phase?

A.     The guilt phase.

Q.     And do you recall that there were numerous cooperating witnesses in the case?

A.     Yes.

Q.     And did you spend a significant amount of time in

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 14 of 246
*to purchase a complete copy of the transcript.*

preparation for examining those witnesses?

A.      I did, and I had a couple of my younger associates who worked with me on that work to give them experience and also to help prepare cross-examination questions and delve into the background of many of these witnesses, much as you could find on, like, Google or any other source you could go through.  And I think we had an investigator also who assisted us to some extent.

Q.      Okay.  Was that Delbert King?

A.      Correct.

Q.      Now, do you recall --

A.      I think we had 1 other too.  David Stuart also helped us on the case some.

Q.      Was Mr. Stuart in your office or outside?

A.      Yes, he was in my office.

Q.      How about Mr. King?

A.      Yes, Mr. King was -- he was there for about 8 years.  There may have been a transition period.  He may not have been actually in the office when he first started, but at some point he was in the office pretty much full-time.

Q.      Okay.  Now, do you recall that 1 of the cooperating witnesses was named Dennis Putzier?

A.      Correct.

Q.      And do you recall that in the trial he testified

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 15 of 246

that he was facing a 20-year sentence?

A.      That's my recollection.  I can't say with any specificity, but I know he was facing some time, so --

Q.      Okay.  If you -- at the time that you were cross-examining him, if you had known that he had been threatened with a life sentence prior to his testimony, would you have used that information in examining him?

A.      I would have, yes.

Q.      Now, I want to ask you about a double jeopardy motion that was filed prior to trial.  Do you recall that?

A.      I do.

Q.      And do you recall what the basis of the double jeopardy motion was, generally?

A.      I don't.  But I -- you know, in the last few days, I'm getting ready for two appellate arguments, so all my issues are kind of -- actually, I have 1 tomorrow and 1 on Thursday, in a first degree murder case and another case.  So, yeah, I do recall reading it, but you may have to refresh my recollection on it, but it probably speaks for itself.

Q.      Right.  It's of record, so that's fine.

A.      Right.

Q.      But my question is, who in the team of the 3 members of the attorneys was responsible for that

motion?

A.    Mr. Rogers would have been responsible for it, but, in fairness, whenever we drafted a motion, we would circulate it in Word amongst ourselves, we'd review it, and anyone who wanted to make changes on it would do so. And then we would get it back with our comments to whoever originated the motion.  And in this case, it would have been Mr. Rogers.

Q.    Now, I want to take you back to the 1996 sentencing -- or the 1996 case, which resulted in that long sentencing proceeding that we discussed previously. During the -- during the litigation of that sentencing proceeding, were you aware that Mr. Honken was being looked at for -- by the authorities for the murders that he later was indicted for?

A.    I was, and I believe Mr. Honken was also.

Q.    And was it your understanding during those proceedings that all of the parties to those proceedings knew that as well?

A.    You know, I can't say with -- depends on who you are referring to as "the parties."  I would say that --

Q.    The government and the defense.

A.    Right.  I think we all kind of had this understanding that there was something else out there, correct.  And we pretty much, I would say, would think

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 17 of 246
*to purchase a complete copy of the transcript.*

that it would have been these missing people, correct.

Q.    And were you aware at the time that there were grand jury proceedings pending?

A.    The specificity as to grand jury proceedings, I can't say, but I'm sure, if my knowledge that something was going on, it would have included that.  But as I sit here today I can't say with 100 percent degree of accuracy that I knew from what I recall right now, but I was pretty much up-to-date with everything that was happening back then.

Q.    Okay.  Do you remember what sentence the prosecution was trying for in the sentencing proceeding?

A.    It wouldn't surprise me if it was life, but I know they wanted an upward departure from the Court, and so I would just leave it at that.

Q.    Okay.

A.    I think the penalty could have run to life, as I recall, but --

Q.    Okay.  When -- we're going to move back -- I'm sorry to be moving back and forth.

A.    That's okay.

Q.    We'll move back to 2004.  Prior to the trial on the murder cases, do you recall that Judge Bennett ruled with respect to the double jeopardy motion?

A.    I recall a ruling from the Court, and I have

reviewed it.

Q. Okay. And you recall it was a published opinion?

A. Correct.

MR. NOLAN: And for the record, Your Honor, the opinion is cited at 271 F. Supp. 2d 1097, July 21, 2003.

THE COURT: Thank you.

Q. And, Mr. Parrish, I want to read you a short quote from Judge Bennett's opinion and ask you if it refreshes your recollection as to a part of his ruling. And I'm referring to Page 1106, Footnote 2. Judge Bennett wrote: However, Honken is not asserting the protection of the double jeopardy clause in the sense of "collateral estoppel" because he is not relying on any "ultimate fact" determined against the government in his prior prosecution on the drug conspiracy charge.

Do you recall that that was part of Judge Bennett's ruling?

A. I do.

Q. Okay. And when you received that ruling from Judge Bennett, was there any discussion among the lawyers about filing a reargument or in some way during the trial perhaps raising this issue again to perhaps raise it in terms of collateral estoppel?

A. Not that I can recall.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 19 of 246

Q.      Do you recall if there was any strategic reason for not doing that?

A.      No.

Q.      Now, Mr. Parrish, have you read, to some extent, the pleadings that we have filed with Judge Reade in this case?

A.      I have.

Q.      And do you recall that Claims 1 and Claims 2 refer to the prior sentencing proceeding?  In other words, they are claims that -- to which findings of the prior sentencing proceeding are relevant to those claims?

A.      Yes, I did read that.

Q.      Do you recall ever any discussions among counsel about why you did not raise claims at the trial level similar to those Claims 1 and 2?

A.      I don't recall any discussions.  Like I said, we pretty much vetted everything.  There were numerous telephone conversations, many of which are well documented, and our exchange and review of documents and draft documents.  But, no, I don't recall anything like that.

Q.      Do you recall any strategy decisions that were made for failure to raise or object in the basis of these claims?

A.      No.

Q.      Were -- as counsel for Mr. Honken in his capital case, were you trying to raise every meritorious claim that you could think of?

A.      Well, yes, you want to bring -- raise every claim that you can think of, but I would say -- I don't think we were the type of lawyers who engaged in frivolous claims or wasting the Court's time.  I mean, I hope not.  I'm sure to some extent I might have that reputation, but we try not to do that.

Q.      Of course.  Mr. Parrish, let's move to another claim that was raised in our petition, which was Claim 5.  And this involved the multiplicitous counts of drug conspiracy/murder -- which, Your Honor, for the record are Counts 8 through 12 in the indictment, and the CCE/murder, continuing criminal enterprise/murder, which were Counts 13 through 17 in the indictment.

        Have you reviewed that claim in our petition?

A.      I have.

Q.      And are you also familiar with whether or not the lawyers for Angela Johnson raised that issue at some point?

A.      And they did, and I read the Eighth Circuit's ruling on it.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Q.    Okay.  And do you know if they were successful or unsuccessful?

A.    Successful.  But, actually, in the end result, you know, it doesn't make much difference, I don't think, but that's fair thought.  But I'm not sure it would have applied coequally here, but -- so, yes, I did read it.  I read the results.  And I read -- and I think there was some great discussion in our camp about that issue.  I'm trying to make sure it didn't flow over from, you know, reading the Johnson opinion, but I do think that we did discuss the -- both of those theories of getting to the capital offense.

Q.    Well, did the -- the Johnson opinion came out after your trial?

A.    Yes, yes.

Q.    Can you recall any strategic reason for not raising that issue about this multiplicitous claims?

A.    You know, I don't, but I can -- it's my recollection -- and I don't know about the other lawyers, but for some reason, I do remember some discussion about it, but I can't think of why we didn't raise it theoretically.  I can't go in and formulate an idea in my mind as to why we didn't raise it.

Q.    Especially because it ended up being a claim that was successful in Angela Johnson's case.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 22 of 246
*to purchase a complete copy of the transcript.*

A.    Successful in the sense that -- but did it change the outcome, I guess, is the question, right.  But it was successful.  I think the Eighth Circuit indicated that count -- that it had to come out, as I recall.

Q.    Okay.  Mr. Parrish, I want to talk to you a little bit about the preparation of the penalty phase for this -- for the case.  During the preparation of the -- or during the time leading up to the trial, I'll say, who was -- who was in charge of preparing the penalty phase or preparing --

A.    Mr. Spies was, and I'll leave it at that for the moment.  Yes, Mr. Spies was.

Q.    Okay.  And were you -- were you very involved in the -- in the preparation of the penalty phase?

A.    I was not.  I attended several of the meetings. We discussed it, as for a strategy, when Mr. Spies wanted input from myself or from Mr. Rogers.  And Mr. Spies shared all the documents, and communications I was copied on.  And I had, I would imagine, several meetings with Mr. Honken when issues were coming up as to how to deal with various matters.  I was kind of the -- before he was moved to Sioux City, I was kind of the main contact person because I got all the documents over to him at the Polk County jail and made arrangements for the sheriff to allow him to have all of

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 23 of 246

his documents to work in a room. And so I would go down to the cell at -- in Polk County to meet with him most of the time. So if there were some issues coming up, it was my responsibility to go down and go through them with him. And so in that sense, that was my responsibility. But in terms of preparing the specific strategy, the questions, etcetera, that was not my responsibility.

Q. Okay. Was there a point in time when Mr. Spies and Mr. Honken developed a particular bond?

A. Yes. Well, I think, quite frankly, he liked Mr. Spies early on and had heard of his reputation, knew we were friends, and had encouraged me to try to get him on board. And so as soon as he met him -- as you know, Mr. Spies is a wonderful individual with a great ability to communicate with clients and difficult clients, and I think that Mr. Honken attached to him pretty easily.

Q. Okay. And did Mr. Spies spend a good amount of time with Mr. Honken?

A. A great deal of time with him, correct.

Q. Okay. Did Mr. Spies at some point retain -- or did the team at some point retain a mitigation specialist?

A. Yes, I think they were looking around for several people. Again, those individuals are very hard workers,

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 24 of 246

and they're hard to find and difficult to access and also difficult to access within this area, because Iowa, you know, as you are fully aware, didn't have the death penalty for numerous years, so consequently, people in the -- access to Iowa was pretty limited, right.

Q.    And who was it that was eventually retained?

A.    Ms. Rickert, Lisa Rickert, out of Wisconsin is my recollection.

Q.    Did you have much contact with her?

A.    I met with her several times. I didn't go to meet with her in Wisconsin, but I was aware of the material that she was producing. And I don't think I met her, and I hope I'm not mistaken by this, until she was actually in Sioux City. That's my best recollection.

Q.    When you say when she was in Sioux City, would that have been around the time of the trial then?

A.    Correct.

Q.    Okay. And who was it, who in the team, who suggested that Ms. Rickert be retained, do you recall?

A.    Boy, that's a tough question. I -- you know, I know Mr. Spies eventually ended up retaining her. How many specific people he went through or if Mr. Rogers made the suggestion, I just can't recall. I'm sure I perhaps would have been in on it to some extent, but I

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 25 of 246

did not make the ultimate decision.

Q.    Okay.  Do you recall whether Ms. Rickert recommended that the team retain a mental health professional to have Mr. Honken evaluated in terms of his life history?

A.    As I look back on the notes, it appears that that was the case, correct.

Q.    And did you do that?

A.    No.

Q.    At the time that that decision was made, were you involved in that decision?

A.    Well, I'm sure I was involved.  We rarely did anything on our own.  I'm sure I perhaps had some input, but it would have been limited, and I would have deferred to Mr. Spies or Mr. Rogers.  That's how we would normally work.  For instance, in the guilt phase material, we'd talk about it, but they would defer to me to make the ultimate decision, along with Dustin, Mr. Honken, correct.

Q.    Do you recall any discussion about whether or not that type of an evaluation would be confidential, in other words, it would not need to be revealed to the government unless and until you decided to use that information?  Do you remember a discussion --

A.    I remember the discussion, yes.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 26 of 246

Q. And do you remember any discussion about Rule 12.2 of the Rules of Criminal Procedure that sets up a firewall in the prosecutor's office with regard to mental health issues? Do you remember any discussion about that?

A. In the penalty phase?

Q. Yes.

A. I don't remember any specific discussion about a firewall in the penalty phase.

Q. Okay. Now, have you had discussions with myself and other members of Mr. Honken's current team about the mental health mitigation that we've developed?

A. I have.

Q. If you had had that mitigation developed at the time of the trial -- and I'm keeping in mind that you weren't the main person doing the presentation of the penalty phase -- would you have considered using that mitigation?

A. The mitigation that you've developed or --

Q. Yes.

A. -- mitigation in general?

Q. Yes, the mitigation that we've developed.

A. Well, considering my role, let me say, it would have been discussed. Ultimately, we would have had to decide how valuable it would be and whether or not at

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 27 of 246

some point we would have to turn it over.  The question that you're asking me is, would we have used it in retrospect?

Q.    Which I know is a tough question.

A.    It's an extremely tough question.  And I'm trying to be as fair and candid as I know how to be in responding to it.  It would have been an extremely tough call.  I would have -- if we all evaluated it, I would have deferred to Mr. Honken, Mr. Rogers, and Mr. Spies, and I would have offered my opinion.  Perhaps if it was helpful, I would say, yes, we would use it.  If it would cause more damage to his case by not being strong enough and you consider in balance what could come back, then it becomes a tougher question for him.

Q.    Do you recall that there was a concern that Mr. Rogers expressed that if you had Mr. Honken evaluated, that the government would then attempt to have him branded as antisocial personality -- with antisocial personality disorder?  Do you recall that discussion?

A.    Not the specificity of it, but -- but I would say someone who the government -- there was discussion about the government being able to come back, if an eval was done and they had access to it, coming back and using an expert to damage Mr. Honken in the penalty phase.  Yes,

I do remember that.

MR. NOLAN: Okay. May I have 1 moment, Your Honor?

THE COURT: Yes.

MR. NOLAN: Thank you, Mr. Parrish.

I have no other questions, Your Honor.

THE COURT: Mr. Williams.

MR. WILLIAMS: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. WILLIAMS:

Q.    Good morning, Mr. Parrish.

A.    Good morning, Mr. Williams. How are you?

Q.    I'm doing well. Thank you. And yourself?

A.    No problems.

Q.    Good. I want to have you elaborate just a little bit more about your past experience. Could you put on the record -- you've been practicing law for 40 years. And you mentioned I think on direct examination 1 of the reasons you were paid for handling the guilt phase of the trial was because of the number of first degree murder cases you had tried. So could you elaborate a little bit more on what your experience is in trying murder cases?

A.    Well, prior to that time, I perhaps tried maybe 35 or 40 first degree murder cases, and I had perhaps

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 29 of 246
*to purchase a complete copy of the transcript.*

handled maybe -- I don't know how many more than that. I've tried them in Des Moines County -- well, I tried them probably in about 20 counties at that point around the state of Iowa, including I had had a recent acquittal up in Sioux City on a first degree murder case that I tried twice. Once in Davenport, where I lost. Appealed it to the Iowa Supreme Court, was reversed. And then we tried it in Sioux City, and we got an acquittal up in Sioux City.

Q. As I recall, that's not the only acquittal you've achieved in a murder case; is that correct?

A. That's true. I've won a few, right.

Q. This is no time to be modest, Mr. Parrish. How many do you think you've -- how many acquittals do you think you've won in murder cases over the years?

A. Oh, maybe 20, 25 maybe.

Q. Okay. You've handled forensic evidence before in many murder cases?

A. Correct, I have.

Q. Through that experience, you're able to assess in a criminal case, in a murder case, whether the forensic evidence -- whether there's any real hope of attacking the government's forensic evidence?

A. Yes, I've had enough -- I've worked quite a bit with DNA and other material, right.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 30 of 246

Q.    And fair to say, in some cases, there's holes to be punched in the government's forensic cases?

A.    Sometimes there are holes to be punched in them, correct.

Q.    Okay.  And with your experience as of 2004 when this case went to trial, you were capable of making that assessment of whether there was actually any ability to attack the government's forensic evidence?

A.    Yes.

Q.    Okay.  And give a little bit more of a background about yourself.  Are you in any leadership positions over the years with the Bar?

A.    Well, I sat on the Ethics Commission.  I have for 5 years.  I also sat on the Polk County Judicial Nomination Commission for 6 years, elected by the lawyers.  And then I've 3 times served on the Federal Magistrate Judge Appointing Commission -- well, I think 4 times now, maybe 5.  But I think 4 of the magistrates who are now sitting magistrates I sat on the commission for their appointment.  And then I worked at Drake University Law School, actually, with -- when Judge -- before Judge Reade started law school.  I shouldn't say that, because it goes back so far.

Q.    It dates you.

A.    I'm more concerned about it might date the judge,

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 31 of 246

and she doesn't want to be associated with my dating her.  But, yes, it goes back quite a few years.

Q.     Tell about your experience at the law school. What did you do at Drake University?

A.     Well, I worked with law students.  At that time, they had a minority retention program, and it was at the same time I was working on my master's in public administration.  I was -- that was actually by compensation, and I would meet with students for about, I think, 1 day a week to review what issues they had at the -- at the law school.  And that's when Judge Reade was working at the law school, back then.

Q.     And you've been --

A.     I don't know how many years ago that was.  I think I was also working at Legal Aid at that time.

Q.     You've also spoken at numerous conferences over the years on various topics.  Is that fair to say?

A.     Correct, I have given many presentations to lawyers, mostly on criminal defense, to the criminal defense bar.

Q.     What is your educational background, sir?

A.     Graduated from the University of Dubuque, and then I graduated from the University of Iowa Law School. I then went to work at the Polk County Legal Aid Society for 3 and a half years, and then I set up my own

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 32 of 246

practice in 1974, November of '74.

Q.    You indicated you were pursuing a master's in public administration at some point?

A.    Right, I got about probably 14 hours toward my master's of public administration, but I never completed the coursework.

Q.    Very good.  Let's talk a little bit about the sentencing of Dustin Honken back in 1998.  During that sentencing hearing, 1 of the key fights at that sentencing hearing was the lab capacity.  Is that fair to say?

A.    Correct, yes.  Well, we had an expert come in from Chicago to testify, correct.

Q.    Right.  And the government's primary evidence regarding drug quantity that was going to ultimately drive the sentence in that case was its own expert testimony, extrapolating what the capacity of the lab was going to be based on some of the chemicals that were seized from Dustin Honken's lab at that time?

A.    That's correct.

Q.    Okay.  And the focus of the defense attack on that was the -- whether the government's expert was properly extrapolating from what chemicals were there, whether we even knew what chemicals were present, and then attacking the drug quantity based on that

calculation?

A.     That's correct.

Q.     Okay.  And that was the focus of the drug fight at the sentencing hearing in 1998?

A.     Yes, it was.

Q.     Okay.  Now, at the trial in 2004, drug quantity didn't focus on lab capacity, did it?

A.     It did not.

Q.     Okay.  The drug capacity -- I'm sorry, the drug evidence at trial focused on the testimony from numerous witnesses, did it not?

A.     That's correct.

Q.     Defendant was charged with conspiring to distribute, manufacture methamphetamine, and with participating in a continuing criminal enterprise; is that correct?

A.     That's correct.

Q.     He wasn't charged with possession, correct?

A.     Right.

Q.     So the exact amount of drugs in his possession at any time was not at issue?

A.     It was not an issue.

Q.     Okay.  And the -- for the government to meet its burden in that case, in the trial of the murder case, we had to simply establish there was an agreement between 2

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 34 of 246
*to purchase a complete copy of the transcript.*

or more people to distribute more than a certain amount

of drugs.  Is that fair?

A.      That's my understanding.

Q.      Okay.  And there was testimony, you recall, from

1 of the victims in the case, Greg Nicholson, that he

had provided in grand jury concerning drug quantity,

correct?

A.      Correct.

Q.      There was testimony from Tim Cutkomp, 1 of the

other conspirators, concerning the shipment of pounds of

methamphetamine that were pure methamphetamine up to

Iowa?

A.      That's correct.

Q.      Okay.  Do you remember Dan Cobeen from the trial?

A.      Yes, I do.

Q.      Do you remember Dan Cobeen testified to a number

of admissions that Dustin Honken had made to him about

how pure his meth was and how much had been distributed?

Do you remember that testimony?

A.      I do recall that.

Q.      And do you remember the same thing with Aaron

Ryerson?  Do you remember Aaron Ryerson?

A.      I don't.  The name -- his name does not stand out

at all.

Q.      Let me see if I can refresh your recollection.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 35 of 246
*to purchase a complete copy of the transcript.*

He was kind of Terry DeGeus's friend and hung out with him a lot, and he and Terry would share methamphetamine, and Terry would sell methamphetamine to him once in a while?

A.     Yes, okay, all right.

Q.     He was the guy that was in the house when Terry's house was raided.  Do you remember the testimony by Aaron Ryerson that he had said that the meth he had gotten from Terry DeGeus, which had ultimately come from Dustin, was pure?

A.     I do recall that.

Q.     Okay.  You were asked questions about this double jeopardy argument.  And you recall that there was -- if I've got this down right, with regard to Judge Bennett's order, you don't recall any discussion about the Footnote 2, about the -- raising the collateral attack?

A.     Well, I think my recollection is that I do recall some vague discussion about it.  The details of it, I can't.  But the original motion was circulated, like all of the other motions were, for us to make comment on it.  But after the judge ruled, I don't recall any further detailed discussion about it.

Q.     Okay.  Even though you weren't really in charge of that part of it, is it fair to say that if you would have seen or thought of a good legal argument to have

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 36 of 246
*to purchase a complete copy of the transcript.*

raised in connection with that double jeopardy challenge, you would have brought it to Mr. Rogers's attention at that time, would you not?

A.     I would have, yes.

Q.     Okay.  And were you familiar back in 2004 with any federal case where a court had held that findings made by a judge at a sentencing hearing could be used against the government in a collateral -- as a form of collateral estoppel, if you will?

A.     I was not familiar with a case like that at that point.

Q.     You've read the defense -- I'm sorry, the petitioner's brief in this case where they make that challenge, right?

A.     I have read that.

Q.     Are you familiar even today with any reported cases where a court has found that findings by a judge at a sentencing hearing could be used against the government as a collateral estoppel?

A.     I have not seen that, a ruling to that effect.

Q.     You were asked about the cooperators at the trial in this case, and in particular, you were asked about Mr. Putzier.  When you were preparing for trial in this matter, in particular, focused on Mr. Putzier's cross-examination, you would have read his grand jury

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 37 of 246
*to purchase a complete copy of the transcript.*

testimony?

A.    I would have read everything and would have outlined every single document and item that we would have had on the individual, including our -- any additional work that we did on these folks, like tracking newspaper articles, whatever we could find.

Q.    Okay.

A.    Right.

Q.    And so if there are statements in interview reports concerning what he considered to be threats made to him by the government about what he might be facing, you would have reviewed those interview reports?

A.    I would have, yes.

Q.    You would have reviewed his prior sentencing testimony at Dustin Honken's 1998 sentencing?

A.    Correct.

Q.    You would have reviewed --

A.    I think, actually, I was there for that.

Q.    But --

A.    I would have reviewed it again, right, right, but it was pretty fresh in my mind back then.

Q.    You remember Mr. Putzier pretty well?

A.    I do.  He was 1 of the few kind of standouts.

Q.    And 1 of the reasons he stands out is you attacked him pretty well for lying repeatedly, right?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 38 of 246

A.    Correct.

Q.    And he -- I think you got him to admit that he even lied about lying?

A.    That's true.  That's why he kind of stands out. It was an unusual admission.

Q.    Now, you remember Terry Bregar?

A.    I do, vaguely.

Q.    You cross-examined him at Dustin Honken's sentencing hearing in 19 -- he actually testified on December 16, 1997.  Do you remember him testifying at that sentencing hearing?

A.    I can't remember him testifying at the hearing as I sit here, as kind of a video recollection, but his testimony kind of stands out.

Q.    Do you remember him testifying about having problems with his eyes because of diabetes --

A.    Correct --

Q.    -- at that hearing?

A.    -- I do remember that.

Q.    Okay.  Do you recall any mention at all about him allegedly having memory problems?

A.    I can't say.  I can't say I have.  I don't have any recollection of that.

Q.    Based on any of your investigation, did you ever come up with anything suggesting that he had ever

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 39 of 246
*to purchase a complete copy of the transcript.*

suffered a stroke that caused problems with his memory?

A.     No.

Q.     Are you familiar with the Claim Number 4, where the petitioner has alleged that counsel was ineffective for failing to present evidence that would show that Dustin Honken did not control his brother, Jeff Honken?

A.     I am familiar with the allegation, correct. That's in the petition?

Q.     Yes.

A.     Yes, I've read that and reviewed it.

Q.     And you're familiar, part of that allegation is that there was no investigation even by the trial counsel into his control.  Are you familiar with that's part of the allegation?

A.     I am.

Q.     Okay.  Have you had an opportunity to review the work product of Lisa Rickert concerning her interviews of various family members?

A.     I have.  I have had a chance to review that, and I also am familiar with my recollection --

Q.     Okay.

A.     -- in that area.

Q.     What is your recollection in that area, sir?

A.     Well, I was, as you know, involved in the first case, and I had to do extensive work on Mr. Honken's

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 40 of 246

preparation and his many tests that he had to do to perfect this purity of methamphetamine, how he got his financing, what he did, etcetera. And in my opinion, I'm not sure it was a question as to whether or not Dustin was the person who controlled the situation.

Q. And what do you mean, you're not sure if there was a question about that?

A. Well, it was -- my end result is that he was the person basically in charge. I didn't think that was ever a huge dispute.

Q. Yeah, he was the 1 who really even knew how to make methamphetamine in the first place, right?

A. Correct. He bought the books. He did the work. He did the testing. Went to the desert. Yes, that was kind of my thought. I never thought it was a huge issue.

Q. And, in fact, in your review of Lisa Rickert's work in here, she did, as part of her investigation, get some statements from family members that, as kind of a general relationship issue with family members, Jeff historically was more in control of his little brother, Dustin, in that aspect. Do you remember that was part of her investigation?

A. Correct.

Q. And you actually elicited some testimony, you and

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 41 of 246

other counsel, elicited some testimony to that extent during trial. Do you remember that?

A. I do.

Q. You elicited testimony at the transcript at 3092 to 3094, for example, that Jeff was considered the alpha dog. Do you remember eliciting that testimony?

A. I do.

Q. So there was a number of places where, using that investigation conducted by Lisa Rickert, you at least tried to make an issue out of Jeff's position relative to Dustin; is that correct?

A. That is correct.

Q. Okay. But you also recognized his -- in any number of cases over the years, that there was a huge amount of evidence suggesting -- showing beyond a reasonable doubt that Dustin Honken was the 1 who really organized this entire operation. Isn't that fair to say?

A. I would agree with that.

Q. Okay.

A. And that's the drug operation; is that correct?

Q. Drug operation, yes. Now, you were asked questions about Claim Number 5, the multiplicity claim. And you recall, there was discussion among counsel. You can't today -- as I recall your testimony, you can't

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 42 of 246

today recall why you decided not to raise that or not, but you remember there was a discussion with counsel about that multiplicity claim?

A.    There was a discussion about it.  Quite frankly, at some point -- and I'm sure the other lawyers's recollection might be better than mine.  I think we went through each of these, the allegations, and discussed them and discussed how to approach them.

Q.    And while you can't recall today why you decided not to raise that multiplicity claim, if you would have thought it had merit and you would have weighed the pros and cons of raising an issue like that, would there have been any reason that you would not have raised it other than strategy?

A.    Well, pretrial, I can't candidly say that there would be any downside to raising it pretrial.  Now, ultimately, if it impacted how we presented the evidence -- and, as I've explained to these other lawyers, if you go back to 2004 in Iowa with the methamphetamine scourge running through the state, obviously you don't want to get in a fight in front of the jury in a capital case about methamphetamine.  You want to put it as far away from the trial as you can. You just don't want that out there, so you basically concede any issue on that.  But pretrial though, if it

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 43 of 246
*to purchase a complete copy of the transcript.*

could be resolved favorably, it would be an issue you'd want to bring up. If it lapped over to the trial, obviously, you had to rethink how it's going to come out and be presented.

Q. And do you recall, with regard to the multiplicity claim, in fact, the case law is such that it establishes that even if the conspiracy is a lesser included, it still goes to the jury, and ultimately the resolution, if there is any, might be in the jury instructions, instructing the jury that if they find CCE, then they don't need to go to the issue of conspiracy?

A. Right, right, that's true.

Q. Okay.

A. And that kind of refreshes -- I know we had some discussions about it. And Charlie, Mr. Rogers, could perhaps articulate it a little bit better than I can, because that was more in his bailiwick than mine.

Q. At the end of the day, you mentioned it doesn't make a difference. And what's your views on that?

A. You mean the difference in filing it as the -- as it came out in the Johnson decision?

Q. Yes, sir.

A. Well, if you look at the Johnson decision, was it enough obviously to get to the jury on another theory?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM Document 83 Filed 12/07/11 Page 44 of 246

It did get presented. My ultimate thought about it -- and obviously, it's just my thought about it -- if it had been presented in Honken or had been excluded, the same different theory would have gone to the jury and we would have been in the same box, so to speak. So I'm not sure, in looking at the Johnson decision, that it would have made any difference ultimately in what was presented to the jury. That's kind of my analysis of it, but I'm not sure that carries much weight 1 way or the other.

Q. Are you familiar with Claim 7, which deals with jury selection?

A. I am. I've read that, and, you know, I was a little confused by it, but, yes, I did read it.

Q. Why were you a little confused by it? What do you mean by that?

A. Well, I didn't quite understand the claim as to the -- I mean, I understand the theory behind it, that people were excluded who possibly didn't believe in the -- in capital punishment and it kind of somehow set a different jury that -- as opposed to the jury that would have been allowed as a pool. That's kind of how I analyzed it at least.

Q. All right. Now, as part of this case, defense counsel and the government reached a compromise where we

agreed to strike the -- you know, kind of the outliers, the people that were on either extreme of the views on the death penalty; is that right?

A.      That's absolutely correct.

Q.      Why was that part of the defense strategy, to agree to that type of an agreement with the government?

A.      Well, I don't know where to start.  We're trying a case in Sioux City, so that might be a good place to start.  I think -- politically, I mean, I've tried cases all over the state of Iowa.  Once you get outside of Woodbury County, you're dealing with some pretty conservative folks.  And I think we talked about that in great detail.  And coming from the Northern District, you look at the outlying counties.  I'm sure we ran charts.  We looked at the information.  We probably looked at the political landscape.  And then you have to make some ultimate decision, particularly if you're trying a case that involves methamphetamine and death of young kids.  You have to kind of say, well, do you want these folks who are way out on the spectrum sitting in your pool.  And I know Judge Bennett did a fabulous job of getting us to the point where we could have a fair pool.  But I think you have to make some type of decision within that framework of do you want these folks sitting in there and ultimately 1 or 2 of them

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 46 of 246

ending up on your pool. I think we ultimately decided -- and the other lawyers can speak for themselves -- that that's not how we wanted to do it. So ultimately we reached an agreement after we had done, as I recall, just a lot of work on questionnaires, etcetera, to get these folks out of there. It's a tough environment to try any first degree murder case, but to try a case involving young kids's deaths and methamphetamine, you couldn't ask for a more toxic mix. So clearly, you want -- these people on the fringes, you want them out of there as quickly and as early as possible. If you can do it by agreement, that's the route you take. If you want to do it in some other fashion, sitting there and knocking heads day in and day out, my thought is that's not a wise decision.

Q. Now, in this petition, the defense has pointed out that perhaps there was 1 or 2 or 3 individuals that, even pursuant to our agreement, should have been struck. Have you read the Government's response to the plaintiff's petition?

A. I have not. I have not read that.

Q. It's excellent reading.

A. Okay. If you wrote it, I'm sure it is.

MR. NOLAN: Objection.

(Laughter.)

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 47 of 246

Q.    Mr. Parrish, let's assume that there was some mistakes made, that there were 2 or 3 people that even pursuant to the agreement should have been struck that weren't among the list submitted to the Court.  Let's go back over the process you used in getting to that.  Did all 3 lawyers work on reviewing the list?

A.    Oh, absolutely.  And we -- I had an expert.  I can't remember the total cost, but it was some enormous figure that it cost to do it, but -- she did a great job, but we all worked extremely hard on that list.  Northwest Iowa is a tough place to try a case like that.  Well, anyplace in Iowa or anyplace back in 2004 was an extremely difficult time to try a case like this.

Q.    A case like this, involving methamphetamine and the death of 2 young children?

A.    2 young kids and methamphetamine.  You -- I mean, you tell me a more difficult case to try to try.  I can't think of 1.

Q.    Now, you talked about the --

A.    And in the manner that they died --

Q.    Yeah.

A.    -- you know.  That's the thing, right.

Q.    You talked about the expert.  This is a jury consulting expert, right?

A.    Correct, it is.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 48 of 246

Q.     Whose job it is, is to do exactly this kind of thing, keep track of jurors, figure out who should be struck, who shouldn't be struck.  That's their job, correct?

A.     That's correct.

Q.     Was this 1 with some experience?

A.     Enormous experience.  I don't remember her resume per se, but I think it's part of the record.  But she had great experience.  I think she had a Ph.D. in psychology or something like that.  And she worked with us.  She met with us in our office.  She basically helped us decide how Dustin should dress.  She helped us decide to some extent how we should dress on occasion.  Talked about all kinds of factors like that.  Then she would -- we would meet every evening and go through each of the jurors in great detail, how they would interact with each other.  So we did a lot of work in trying to pick the best possible jury.

Q.     And did she, in fact, participate in this compromise between the government and the defense on trying to figure out who the outliers were and who was going to be struck by agreement?

A.     Correct.

Q.     Claim Number 8, it says that trial counsel was ineffective for failing to challenge the jury pool in

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 49 of 246
*to purchase a complete copy of the transcript.*

the Northern District of Iowa as not being racially balanced. Do you remember reviewing that claim?

A. I do.

Q. Was that discussed by trial counsel, about whether a claim like that should be made?

A. I'm sure it was perhaps discussed in passing, and, I mean, obviously, we also understand the fact that you don't have to be black or white or Hispanic or whatever to challenge it, but anyone familiar with the population in that area should be fully cognizant of the fact that it would not be a significant claim to make.

Q. And you were probably familiar with the law at that time as well in the Eighth Circuit, US v. Deering and US v. Einfeldt, both of which had already ruled that the jury pool -- denied claims attacking the jury pool selection in the Northern District of Iowa in particular?

A. Correct, and I think I did the US v. Freeman down in the Southern District with Judge Stuart at 1 point, where I had a white defendant in a marijuana case, and I challenged the make-up of the pool in that case, and that was an Eighth Circuit ruling.

Q. And were you successful there?

A. It was reversed on other grounds, but I don't think it was reversed on that ground. But somehow I got

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 50 of 246
*to purchase a complete copy of the transcript.*

it resolved after it came back down.

Q.    Let's talk about the mental health issue raised by the petitioner.  First of all, having represented Dustin Honken back in 1998, you were aware that in 1997 he was examined by a Bureau of Prisons's psychiatrist?

A.    Correct.  Is that the Chicago exam or is that the --

Q.    (Mr. Williams indicated.)

A.    Okay.

Q.    Yes.

A.    Right, correct.

Q.    So you were familiar with the findings by that psychiatrist?

A.    Yes.

Q.    Okay.  The defense team ultimately did hire Dr. Gelbort to do a neurological examination of Dustin Honken?

A.    Correct.

Q.    Okay.  And that was 1 of Ms. Rickert's recommendations?

A.    Correct.

Q.    Okay.  And you remember -- I think your testimony on direct was you remember discussing with the other attorneys Ms. Rickert's recommendation that another psychiatrist be hired, and you remember some of the

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 51 of 246

Q. discussions by defense counsel, including Charlie Rogers, having a concern about the government's ability to respond and so forth. Do you remember that testimony on direct?

A. I do.

Q. Okay. Now, in your -- in the declaration that you filed -- or that was filed in this case, I think the statement you make in there is that you remember that being 1 of the issues or 1 of the reasons why you decided not to go in that direction. Do you remember what the other reasons were?

A. I do. At least I recall from our discussions -- it was a pretty intense discussion, and we kept going back and forth on it -- and that was whether or not ultimately, if these opinions were given to the government -- we were debating who the government would bring in as a rebuttal witness to us, and I think they referred to some fellow -- Dr. Dietz maybe. Some fellow from -- I could be wrong on the name, but they call him Dr. Death, I think as a -- as it's kind of commonly referred to in the defense community. And our concern is that that's who might have been in the wing, so to speak. And I could be wrong. Parker [sic] Dietz or something like that. I could be dead wrong on that, but that's kind of my recollection.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM Document 83 Filed 12/07/11 Page 52 of 246

Q.     It's actually Park Dietz & Associates?

A.     Okay.

Q.     And do you recall in this case that the government had actually designated Park Dietz as 1 of the experts it was anticipating calling in this case if you presented a mental health defense?

A.     Now, that refreshes my recollection a little bit more, because Mr. Rogers -- and, of course, his recollection is better than mine -- was familiar with him and made calls to verify information he knew about him, and I think perhaps Mr. Rogers may have dealt with him in the past, may have had some colleagues who dealt with him in the past, and they were quite concerned about him being called.  And in a strategy session, it was my understanding that if we presented -- if Mr. Spies at least presented evidence about confinement, that Mr. Honken would be in a secure place, for the type jury that we were looking at, that might have more impact than taking the risk of bringing in a person who could allege that Mr. Honken or give an opinion that Mr. Honken had no qualities to preserve his life with. I think that was kind of a discussion and a balancing point, but again, I would defer to them and their recollection.

Q.     Now, there's some discussion on direct

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 53 of 246

examination on this issue with regard to Rule 12.2.  Do you remember Rule 12.2, and I think it's Subsection (b) as it applied to capital cases, was a relatively new rule at the time that we tried this case in 2004?  Wasn't it?

A.      Correct.

Q.      And in fact, I think that there was at the time we tried this case perhaps only 1 reported decision regarding the scope of Rule 12.2 and what the government could or could not get of defense counsel's expert opinion.  Do you remember reviewing the law in that area?

A.      I don't remember reviewing the law.  I just remember our discussion and our concern and what ultimate decision we made.  I'm sure that Mr. Spies and Mr. Rogers could give you a more refined answer than what I'm able to give at this point.  I was not that deeply involved in the nuances of it.  I was involved in the strategy decision on it.  So that's my -- that's my thought on it.  I was probably a little burned out after what I -- during the guilt phase too for a while.

Q.      Now, 1 of the things brought up during direct examination was the idea of the 12.2 allows for an, I think, a walled-off evaluation.

A.      A firewall.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 54 of 246

Q.      In other words, an examination that could be done by a defense counsel, and even if the government had an opportunity to have the defendant examined in response to that, that there would be a wall-off counsel in that regard.  Do you remember that discussion on direct examination?

A.      I do remember that discussion.

Q.      Okay.  Again, at the time, do you recall the law that -- first of all, in 12.2 there's nothing actually that says that that's the procedure, that the government must create a walled-off -- or the defendant has a right to a walled-off evaluation team on the government's side.  Do you recall anything in 12.2 that --

A.      I don't recall anything like that.  My only real knowledge -- and we're talking about the federal system.  In the state, I know -- and I have always done this, if there were some concerns, gone in and gotten my own eval on my client and decided if I'm going to use it or not.  That's the only time the government has access to it.  In the federal proceedings specifically, I can't say if I reached the conclusion that the same rule applied, but I don't think that we had to share any information with the government unless we intended to use it.  But again, Mr. Spies and Mr. Rogers can give a more refined answer as to their understanding of dealing with the government

on that issue.

Q. All right. Now, if -- let's assume for the sake of argument that another psychiatrist could examine Dustin Honken and opine as to mental health problems that arose. You're aware that if there's going to be any basis for that opinion, it would have been that he has psychological problems arising from his childhood. Fair enough?

A. Correct.

Q. Okay. We didn't have a mental retardation issue in this case, right?

A. Not that I know of, no.

Q. We didn't have head injuries or anything like that?

A. Correct.

Q. So if there was going to be another psychological claim -- and, in fact, what the petitioner now claims should have been presented was all based on alleged mental health problems that arose from Dustin Honken's alleged disadvantaged childhood. You're familiar that's the basis for their now current opinions?

A. Okay, I will accept that. They have talked -- I have talked with them about them briefly, and maybe I'm misspeaking, but I thought maybe his meth use or something like that, and maybe --

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 56 of 246

Q.     That's true, yeah.  Granted, they also have the meth use on top of that.

A.     Right.

Q.     I want to focus a little bit on this idea that Dustin Honken had mental problems as a result of his childhood.  Now, Dustin Honken is pretty private about his family, isn't he?

A.     To some extent.  And I've had numerous conversations with him.  I would say he's pretty private about his family.  I think that's a fair statement.

Q.     When you were discussing presenting a psychological defense in this case, did Dustin Honken have any input about whether he wanted any type of mental health defense presented at trial?

A.     Dustin Honken was involved in every aspect of his case.  Every single -- you just didn't make a major decision without him.  He was very actively involved.

Q.     What was his thought about putting on mental health testimony that would have suggested that he was raised by a mother that neglected him?

A.     Again, I -- I'd defer to Mr. Spies and Mr. Rogers on this, but I'll give a general response.  It's my thought that he acquiesced in the decision not to present evidence of that nature.  I think he had his own concerns about -- of what that type of defense would do.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 57 of 246
*to purchase a complete copy of the transcript.*

Q.   And did he express those concerns to you?

A.   Yes.

Q.   And what do you recall those concerns to be?

A.   It was not so much having to do with the family, as I recall, but more so to do with a strategy type of matter, a strategic matter.  He thought the strategy was better this way.  He's more of a strategic thinker, I think, in my dealing with him.  He -- he did not deal in what I would call details about his family interaction.  That's not his structure.  He was more of a person who dealt with strategy and the best presentation and balancing those factors out.

Q.   Okay.  Now, among the various factors that went into the decision not to follow-up on Ms. Rickert's recommendation and present a mental health defense, did you take into account whether any mental health defense presented at the penalty phase of trial would be consistent or inconsistent with the theory of defense during the guilt phase?  In other words, at --

A.   Oh, absolutely.

Q.   The guilt at trial -- in the guilt phase, the position was Dustin Honken had nothing to do with these murders, right?

A.   Right.  That's an excellent question.  It goes so to the base of a case.  1 of the things we talked about

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 58 of 246

was making sure that our penalty phase presentation was consistent with our guilt phase presentation. I mean, obviously, you worry about that all the time and giving a jury something to say, *Well, you know, you were inconsistent, you made a mistake, you're not being completely candid with us,* but I agree that it was 1 of our huge points that we had to deal with. You know, you say, *Well, he did it, but . . .* you know, you say, *At the trial you say he didn't do it, but you say* -- well, the jury, I think, and I would always have this position, would be extremely troubled by that, particularly the jury we were dealing with, I think would have been extremely troubled by it. So to answer your specific question, we were very concerned about that. We wanted to be consistent. And I think we -- I normally term it you don't want to insult the jury, so to speak. That's kind of my philosophy.

Q. To kind of summarize that, 1 of the concerns you had was that if you -- if your trial guilt phase defense was he didn't do it, was not even present at it, and then you went to a penalty phase and presented mental health testimony saying, *Okay, I guess he did it but he had these problems that affected his ability to make a judgment in deciding to get involved,* that there would be an inconsistency in that type of presentation that

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM Document 83 Filed 12/07/11 Page 59 of 246
*to purchase a complete copy of the transcript.*

would jeopardize the credibility you had in front of the jury?

A.    I agree with that 100 percent.  That's always a concern, but more so in a case like this.

Q.    1 of the claims by the petitioner is that defense counsel was ineffective for failing to put on more evidence of Angela Johnson's violence and her control and that kind of stuff.  Did defense counsel -- first of all, through your investigation, you're aware of her history of violence and kind of being a mean person?

A.    Correct.

Q.    Okay.  And did you talk about whether you should be putting on more evidence about that part of her personality or not?

A.    Well, to answer your question, we discussed it. To elaborate briefly, it would not have been wise trial strategy to do that.  Also, coupled with that was Mr. Honken's position of being extremely protective of Ms. Johnson.

Q.    Okay.  So let's take each of those at a turn then.  It would have been bad trial strategy why, sir?

A.    Well, if you -- again, you go back to the base theory, that you have some young kids who were murdered. If you add to that presentation a person who Mr. Honken is associated with who has a propensity for violence,

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 60 of 246
*to purchase a complete copy of the transcript.*

you want to, if anything, play that down and not present it as a huge factor. You basically want to -- I think we decided to attack the credibility, if you followed the case, which I know you did fairly well. Just attack the government's case. You don't have any great positive gains to make by presenting Ms. Johnson as a witness -- I mean, presenting her propensity for violence as something advantageous to Mr. Honken, because you're not going to be able, I don't believe, to convince the jury that she did this act alone. I mean, you could intimate that, but you're not going to do it by any presentation on our part.

Q. And you said another problem was Dustin Honken's position was that he was very protective of Angela Johnson, but did you have a discussion with Dustin Honken about not putting on evidence or not attacking Angela Johnson?

A. Numerous discussions with Mr. Honken about the position he wanted to take with Ms. Johnson. And quite frankly, 1 of our concerns early on, when this case first started, was whether or not she ultimately would be a witness against him, against him in the case. I, just based upon my experience, kept thinking that was going to happen.

Q. 1 of the allegations of ineffective assistance in

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM Document 83 Filed 12/07/11 Page 61 of 246
*to purchase a complete copy of the transcript.*

this case is that counsel was ineffective for stipulating to admission of the maps drawn by Angela Johnson in the jail. Why did counsel stipulate to admission of that maps versus having us -- having the government be in a position of having to call Mr. McNeese and presenting the evidence in that manner?

A.       There was a good bit of discussion. I don't recall it in detail. But to me, it is a very easy decision to make. Again, if you balance all the factors I talked about the first time -- with the map, the young kids, the manner in which they were killed -- if you bring in, say, a person like Mr. McNeese, the person who talked Ms. Johnson into giving the maps which ultimately led to the bodies, you basically -- there was no clear line of attack on him, I couldn't think, in front of a jury if I had to analyze it. There was just no clear line of attack to him. So basically, in those type of situations, it's my thought to stipulate, not let the jury hear that length of testimony, because you establish Mr. McNeese, you establish what he's like, you establish how they got the information. The government could have a field day, basically, in laying out all of that information, which increases the pressure on us, and there's no clear line of defense or attack to that. So basically, if that's the situation, I always advise

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 62 of 246
*to purchase a complete copy of the transcript.*

my clients to stipulate. And that's an easier pill to swallow for the jury, and you can concentrate on what I call the monumental issues to fight, not the smaller issues. You try to avoid the smaller battles, if you can, during the course of a trial.

Q. And 1 of the reasons there is really no clear line of attack on the admission of those maps is the circumstantial evidence alone was enough to establish that those maps could only have come from Angela Johnson even without the testimony of Mr. McNeese. Isn't that fair to say?

A. I would -- I would agree with that also, but the impact of it and laying the foundation of it and going through the jail and how they befriended, it's pretty powerful evidence. And if you can avoid it, you try to. You don't want to put a face on the map if you can avoid it.

Q. Sure. Did you have any concerns about McNeese, himself, on cross-examination and where he might go if --

A. You never know -- from the background we did, I mean, you just would never know where he would go. That would be my thought.

Q. Now -- and 1 of the reasons that there was a concern there is, the way the stipulation is written up,

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM Document 83 Filed 12/07/11 Page 63 of 246

basically the map comes in and nothing else?

A.    Correct.

Q.    Okay.  You knew from looking through the discovery file that Angela Johnson had made numerous statements to Mr. McNeese about Dustin Honken's involvement in the murders and how the murders occurred and other details like that that -- had Mr. McNeese been on the stand, there was always a danger that that might come out, blurted out by Mr. McNeese during cross-examination or something like that.  Was that a concern of yours?

A.    That's always a concern when you're dealing with a jailhouse snitch.  An example, I just most recently tried a case in federal court, last week or 2 weeks ago. We gave a person 3 admonitions.  The US Attorney admonished him and the judge admonished him twice, and 2 times he blurted out information that was damaging to my client.  So, you know, it's -- and, you know, compared to the fellow that was testifying 2 weeks ago, if I had to look at McNeese, he's probably 10 times more difficult to control based upon what we knew about him.

Q.    Do you remember examining -- cross-examining Scott Gahn at trial?

A.    Scott Gahn, I do not.

Q.    Okay.  This is Allegation 14, Claim 14, in the

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 64 of 246
*to purchase a complete copy of the transcript.*

petition, and it had to do with an examination of Scott Gahn. And let me see if I can refresh your recollection. Scott Gahn was kind of, oh, I guess, an acquaintance of Dustin Honken. He had previously purchased drugs from Dustin Honken on a couple of occasions prior to 1992. He had bought cocaine and marijuana, I think, if my recall is good. And then he's the 1 who -- part of the evidence was that he was the 1 who told Dustin where Greg Nicholson was living at the time.

A. Okay.

Q. Does that refresh your recollection?

A. That refreshes my recollection.

Q. Now, during direct examination by Mr. Miller, my co-counsel, he had asked some questions that had elicited answers from Mr. Gahn about those prior drug sales prior to the time of the charged conspiracy in 1992, and you had objected to that as being outside the scope of the charged conspiracy, and the Court had sustained your objection. The allegation of error here is that after your cross-examination, there was a redirect examination that I think consisted of maybe 1 question, maybe 2, and in response to that, Mr. Gahn again mentioned that he had bought cocaine from your client prior to 1992. And the assertion of ineffective

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 65 of 246

assistance of counsel is that you should have objected at that second time when it came out on a second occasion. Now, does that refresh your recollection of what the claim is that they're making here?

A. I do understand the claim. The context of it is a little vague --

Q. Okay.

A. -- but I do remember the individual now.

Q. Okay. Do you recall why you did not object the second time when that came out on redirect examination?

A. I cannot.

Q. Okay.

A. Normally, I perhaps would have and moved to strike, but I don't recall.

Q. When you make a decision like that, whether to object or not object, do you take into account whether the Court's already told the jury that they should disregard any testimony on that prohibited topic?

A. I do, and I also think about the instructions later that the Court gives about that issue. But I can't say that in every instance I -- I follow-up if it comes back again. That's normally unusual, I would think.

Q. Claim Number 15 says that trial counsel was ineffective for failing to object during trial to

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM Document 83 Filed 12/07/11 Page 66 of 246

keeping out evidence about Dustin Honken's escape from -- or attempted escape from the Woodbury County Jail. Do you remember that claim?

A. I do remember the claim, and I remember the incident and investigating it, yes.

Q. Now, pretrial, defense counsel had filed a motion to exclude that evidence. Do you recall that?

A. Correct.

Q. And that was overruled by the Court?

A. Correct.

Q. Okay. Do you remember why during trial you didn't again attempt to keep that evidence out?

A. Well, I would say I would rely on the fact, if we didn't object again, that we would rely on the pretrial motion to raise the issue.

Q. Claim 16 suggests that defense counsel was ineffective for failing to present evidence that Terry DeGeus was the murderer of the first four people. Now, you recall from the government's evidence that at some point some of the government investigators actually dug up a site where Terry DeGeus had previously worked, thinking that maybe he had something to do with the burial of the bodies and so forth. Do you remember making a decision during trial about whether you should or shouldn't present evidence attempting to allege that

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 67 of 246

Terry DeGeus was the murderer?

A.     I think we did debate that and discuss it.

Q.     And what was your thoughts for why you didn't put on more evidence that, you know, the government at least at some point thought that maybe Terry was involved?

A.     I'm trying to recall why we didn't ultimately make that decision.  If anything, it was perhaps --

MR. NOLAN:  Your Honor, I would object to speculation.

THE WITNESS:  Oh, okay.

THE COURT:  I'll let Mr. Parrish answer.

A.     I'm just sitting here thinking.  I don't want to -- because I know I was in charge of the guilt phase, and I perhaps ultimately made all the decisions along with Dustin on that.  It's my thought that -- I'm trying to think -- that ultimately we decided it did not make a lot of sense, and it would involve indicating that Dustin had more knowledge than he actually should have had about all of the deaths.  That's my recollection, as best I can remember.  And I'm not sure -- and I believe we thought it was sort of a conflicting theory to our presentation.

Q.     And --

A.     That's my best recollection as I sit here this morning.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 68 of 246
*to purchase a complete copy of the transcript.*

Q.      Very good.  And do you recall whether any thought went into whether -- if you went down that road, if you started to present some evidence that Terry DeGeus was allegedly the murderer, did you have -- do you recall having a concern at that point that if you went down that road some, you were kind of taking on, in the jury's view, a burden of proof?  You were -- even though you don't have it, if you start to present evidence of it, then, in the jury's eyes, you've made an allegation and you've presented some evidence; there's a concern that now the jury is going to think that you have an obligation to carry through with that.  Did that go into your thinking at all?

A.      Not so much as having a consistent theory that he didn't do it, put the government to the burden of proof.  That was how the case had to be tried.  When you get into underlying theories that you want to take the jury on, I always consider that a pretty dangerous path to take in the defense of a murder case.  My thought has always been to take a rifle approach as opposed to a shotgun approach to defense, and it's been pretty successful in my practice.  And that's what I tend to do.  I don't like to get caught in a whole bunch of side theories.  I like to make sure it's consistent.  And you bite the bullet, so to speak, and you go through with

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 69 of 246
*to purchase a complete copy of the transcript.*

that type of presentation. I would consider that the theory more so than being concerned about having to establish evidence otherwise.

Q. Dustin Honken was obviously secured during trial. He was chained and bolted to the floor, and he had a stun belt on, all of which you were aware of, right?

A. I was aware of it.

Q. And the reality is, despite that, Dustin Honken continued to communicate with you throughout the trial, right?

A. He did.

Q. Passed notes to you, right?

A. He did.

Q. Gave you ideas of what maybe even ought to be asked of witnesses from time to time, correct?

A. Correct.

Q. Okay. At any point did Dustin Honken's secured status interfere in any way with your ability to communicate with him during trial?

A. It did not. My only concern, which I expressed as you can tell from the record numerous times, was if the jury knew that he was bolted or confined in some way, that it would convey to them a sense of dangerousness that you couldn't rebut, create some 403 issues. I did not have any problem communicating with

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM Document 83 Filed 12/07/11 Page 70 of 246
*to purchase a complete copy of the transcript.*

him.  During breaks, we always communicated with him. In the evenings, 1 of the 3 of us would meet with him. And the marshals were pretty fabulous.  They would allow us most of the time in the mornings opportunities to go up and meet with him prior to the meeting [sic].  So in terms of communications, we had absolutely no problem communicating with him about any issue in the case.

Q.     Now, prior to the trial, you were aware that Dustin Honken had complained from time to time about having kind of a heart flutter.  Do you remember that from various records?

A.     I do.

Q.     Okay.  That was, I think, in his presentence investigation report, from 1997, Government's Exhibit I. At Paragraph 155, he talks about having a heart flutter issue?

A.     Correct.

Q.     Do you remember that also came out in the BOP report out of Chicago, the psychiatrist, when he analyzed him in 19 -- or examined him in 1997?

A.     That's correct.

Q.     And you remember also it was mentioned by Dr. Gelbort in his report?

A.     Correct.

Q.     At any point during the trial, did Dustin

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 71 of 246

Honken's prior complaints about having heart flutters or whatever it was ever affect his ability to communicate with you at all?

A.    No.

Q.    Did it arise at all in the issue of him being extra concerned about the stun belt on him, for example?

A.    No.

Q.    At trial -- I'm sorry, exhibit -- or I'm sorry, Claim 19 in this case is that defense counsel was ineffective for failing to attack the forensic evidence put on by the government.  I guess, as a general question, did you have any belief that there was going to be a valid way to attack the forensic evidence in this case?

A.    We looked at the evidence pretty thoroughly.  And I assume you meant the anthropological information.  The -- well, let me just answer your question.  We studied that very closely.  We debated it.  Obviously, I was in charge of that decision.  In my opinion, it would have created more problems to have a wholesale attack on it, like I did with some of the snitch witnesses, so to speak.  And I think, basically, it was my decision to not attack it as vociferously as I could have.  I did not see any reasonable basis to show or to attack the credibility of that evidence, because it made sense.  I

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 72 of 246

mean, if it didn't make sense then or there were gaping holes so to speak in that type of evidence, then you attack it. Otherwise you live with it and try to show a different theory to getting around it.

MR. WILLIAMS: May I approach, Your Honor?

THE COURT: Yes.

(Mr. Williams approached the witness stand.)

Q. Mr. Parrish, I've just handed you Exhibit K. Would you just take a few minutes and read Exhibit K.

A. Okay.

(The witness complied.)

A. Okay, I have had an opportunity to read it. Thank you.

Q. Do you recall the defense team hired a Dr. Rose to review the government's forensic evidence in this case?

A. Correct. And now I kind of see why I made my original statement, but I wasn't thinking about this letter at the time. But I had done numerous -- as a matter of fact, I sat through a couple of autopsies myself in preparing for cases, and so it looked pretty rock solid to me. But this -- this letter from Government Exhibit K refreshes my recollection now.

Q. And this is a letter addressed to you and Mr. Rogers dated December 19, 2002, from Leon Spies?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM Document 83 Filed 12/07/11 Page 73 of 246

A.      That's correct.

Q.      And it kind of relates in summary form the results of Dr. Rose's review and examination of the government's forensic evidence?

A.      That's correct.

        MR. WILLIAMS:  United States moves to admit Exhibit K, Your Honor.

        MR. NOLAN:  No objection.

        THE COURT:  Exhibit K is received in evidence.

        (Whereupon, Exhibit K was received.)

Q.      And if you would, in the second paragraph -- if you could just read the first three sentences of the second paragraph into the record, sir.

A.      Okay.  "I met with Dr. Rose on December 19th, and he reviewed some of the photographic evidence compiled during the investigation.  After reviewing all the forensic, medical, and dental work done in the case, it was his conclusion that he could not disagree with the conclusions reached in the Government's investigation. Significantly, he noted that the investigation and documentation was some of the most thorough work he has ever seen in his professional life."

Q.      Thank you.

A.      And that was pretty much my conclusion based upon

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 74 of 246
*to purchase a complete copy of the transcript.*

my experience with trying cases, that it was thorough.
It was -- we looked at everything, and I did not see any
holes, as I said earlier before I was shown this letter,
that we could -- you know, again, you have to maintain
your credibility with the jury -- that you could
reasonably attack.  If there were areas that you could
go into and show -- you know, I have no problem with it,
but to just do it to do it is just not my -- not the way
I believe in presenting cases.

MR. WILLIAMS:  Thank you, Mr. Parrish.  I
have no more questions.

THE COURT:  Any redirect?

MR. NOLAN:  I have a few, Your Honor, if you
don't mind.

REDIRECT EXAMINATION

BY MR. NOLAN:

Q.     Mr. Parrish, you were asked questions in relation
to the testimony of Scott Gahn?

A.     Correct.

Q.     And there was an objection at 1 point, and then
he indicated something else on redirect and you did not
object.

A.     Correct.

Q.     Is it your practice to object each time there is
something objectionable in order to preserve it for the

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 75 of 246
*to purchase a complete copy of the transcript.*

record, for the appellate record?

A.     Well, let me explain what I explain to my clients -- and my theory of doing this for now nearly 40 years -- I try not to make an objection unless I absolutely have to.  I try to take care of all of my major motions -- and it was probably the situation in 2004; I did learn a lot from that experience -- to file motions in limine to take care of any objectionable matters.  My position is that I don't object to every possible factor that comes in that does some damage to my client.  If it's substantial, I will make an objection.  I'll make a record.  I'll argue with the Court to come up and make a record outside the presence of the jury.  And if anyone knows the way I practice law, I have no hesitancy about asking for a mistrial. So that's kind of my way I present matters, but only on what I would call critical issues that could in fact impact my client's case with the jury and something that I would want an appellate court to review.

Q.     Okay.

A.     So I hope that answers your question.

Q.     It does.

A.     No, I don't object to everything.

Q.     Okay.  But in this specific instance, you did object to this information coming out in front of the

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 76 of 246
*to purchase a complete copy of the transcript.*

jury?

A.    I did.

Q.    And then it came out a second time and you didn't, but you don't recall why you didn't the second time?

A.    You're absolutely right.  I don't.

Q.    All right.  Thank you.  That's all.

I want to talk for just a moment about this Rule 12.2 that we were discussing.

A.    Okay.

Q.    Prior to Mr. Honken's case, had you ever dealt with Rule 12.2 as it refers to a capital matter?

A.    Not as it relates to a capital matter.  Well, let's not just jump ahead.  This young man I was appointed to represent in the Northern District, and honestly, I don't remember a whole lot about the case. I remember it was a plea.  He got a life sentence.  It was a young man, I think, charged with killing another young fellow, along with 2 or 3 of his friends.  I'm not sure in that case if we did some type of eval but I don't recall it off the top of my head.  I would say, as far as my memory is correct, except for that case, I couldn't -- I could say that I don't recall dealing with 12.2 in a capital case.

Q.    And so in that situation, would that have been

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 77 of 246

of those matters that you would defer to Charlie Rogers as learned counsel?

A.    It would be, if there was an issue about it. That's correct.

Q.    Mr. Williams was asking you kind of about, I guess, about maybe this general concept in capital cases in which at the guilt phase you're arguing that your client did not do the crimes?

A.    Right.

Q.    But then in the penalty phase, you would put on evidence for the jury to consider about mental health issues that might arise.  Do you recall that testimony on cross-examination?

A.    I do.

Q.    I mean, isn't that, Mr. Parrish, what happens all the time, very often in capital cases?

A.    Well, from my experience, but obviously, I read a lot about it and try to stay up-to-date with matters involving death penalty cases out of just curiosity and growing up in Alabama, but -- and also being an African-American.  It's something that greatly concerns me.  I would say, to answer your question, consistency in a presentation of a defense, particularly in a case like this and in the area we were working in, northwest Iowa, had to be pretty important.  I don't think, as a

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 78 of 246

lawyer, just my thought, that you can present something to a jury and the next day turn around and say, *Well, he did it but don't send him to his death.* And I don't want to get too philosophical with you here, but, quite frankly, I don't think it works. I think we could have risked losing -- you know, we did lose, but we could have lost on the adults also. I just don't think, from my perspective, you take that type of chance because you're basically trying to save this man's life. So I think any nuance that conflicts with what you've said all along, you run that risk. Now, ultimately there are more learned people than I am in this area, but that's just my philosophy about it.

Q. Would it be your philosophy that any time in a capital case counsel is arguing that their client did not commit the crime, that they should not present mental health mitigation in the penalty phase?

A. No, mental health that, in fact, contains within it an admission of misconduct toward these individuals who you're ultimately deciding did he kill or did she kill. That's the point I'm making.

Did I make myself clear on that?

Q. I'm not sure. Let me ask 1 more follow-up.

A. Okay, sure.

Q. Are you aware that mental health mitigating

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 79 of 246
*to purchase a complete copy of the transcript.*

evidence does not necessarily need to be connected to the crime?  In other words --

A.     Absolutely.  Absolutely.  But what I'm saying, when you run the danger is that if you do, say, for instance, in Mr. Honken's case, present it and it overlaps to facts that implicate him, you're on dangerous grounds.  That's my thought.  And it's still my thought.  It was my thought then.  It would be my thought today.

Q.     Did Mr. Rogers agree with that thought?

A.     I don't know whether he agreed with it or not, but --

Q.     Did you --

A.     Would I trump him on it?  I'm not sure I would trump him on it.

Q.     As learned counsel, did you have any discussions with him about that?

A.     We had discussions, I believe, about consistency of the defense.  We had discussions about whether or not -- what do we open the door to if someone had access or an eval of Mr. Honken.  Obviously, you would have the issue if they could eval him and come up with information or he wouldn't speak about it, then -- I don't know.  I think it creates some problems to overlapping or getting into his knowledge of the death

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 80 of 246
*to purchase a complete copy of the transcript.*

of these people, and I think you have to avoid that under the theory we presented at all costs.  That would be my position.

Now, I'm not saying you can't present some type of penalty phase evidence without getting into that.  I think you have to be extremely careful, and I believe how we decided to do it is -- now, again, rely on these other folks more than you rely on me -- is Dustin going to be secure, talk -- I think the BOP expert came in and talked about where would he be housed, would there be any chance of him escaping.  This is -- was a concerted theory that the lawyers discussed to tell the jury that give him a life penalty as opposed to death.  We were trying to cut the edges as close as we could without being inconsistent.

Now, they can articulate it much better than I can, but that's the major part of my recollection about how we decided -- and I think my recollection is Dustin was satisfied with that presentation, but it was heavily discussed and debated.  There's no doubt about that.

Q.    But it was discussed and debated with Mr. Honken and between counsel, again, without ever having a mental health evaluation done of him.  Is that fair to say?

A.    Oh, oh, absolutely.  Well, we had the 1 from

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Chicago, which was when I was representing Dustin. We had, I believe, the 1 from Lisa Rickert on the -- I think we did a -- some type of physical thing because we were concerned about did he have any organicity.

Q. Neuropsychological?

A. Yes, we had that done. And I think, based upon that, we were okay, but --

Q. Well, you would -- in the Chicago 1, that was done for the prior case?

A. Correct, correct.

Q. Okay. Was that -- was that before any -- any family history mitigation was ever developed?

A. Yes, it was before that, correct, correct.

Q. Now, in this -- in the structure of your defense, you had separated in terms of who would present the guilt phase and that a different lawyer would present the penalty phase?

A. That is absolutely correct.

Q. And are you aware that that is typically the model that is followed in death penalty cases?

A. We were aware of that.

Q. Do you know why?

A. Why? Because once you lose, you're in big trouble. I don't know. My thought is that it's a wise model. If I was doing death penalty cases, I can't

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM Document 83 Filed 12/07/11 Page 82 of 246
*to purchase a complete copy of the transcript.*

think of a better model to use.  But I think in terms of credibility, it has to remain consistent, whoever the lawyers might be.  The evidence really is the driving forces of that because we always tell them, you know, what we say is not evidence, and so the evidence is what drives it.  So you would hope that, *Look, if you believe that this guy did it, which you've always told us already, this is what we want you to do then.  He's going to be safe, he's not going to escape, he's not going to ever get out.*  And you don't go down the -- a road of it's all about his psychology.

Q.    Except that you can present psychological evidence that has nothing to do with guilt or innocence?

A.    Absolutely.  There's no doubt about that.

Q.    Okay.  Now, I believe you testified that -- that there was a concern about having him evaluated because that could -- there was worry about rebuttal evidence --

A.    Right.  Well --

Q.    -- that he could -- he could be found to be antisocial?  And if you -- if we should ask Mr. Rogers more about this than you, I could do that.

A.    I think you probably should, because I keep telling you my thought on this is that if you don't use it -- if you don't use it, the government perhaps would not have access to it.  And again, that's locked in my

mind, but it could be locked in my mind from Iowa's -- the state of Iowa's rule on this, which I am more familiar with. But I've always had the position, quite frankly, that if -- even in court-appointed cases, that we can do what we need to do to prepare our client, but as long as we don't share it -- we don't intend to use it, we're not required to share it with the opposition. That's just kind of locked in my mind --

Q. Okay.

A. -- right.

Q. Are you aware that, most recently, that the evaluations of Mr. Honken that have been done by both sides have found that he does not have antisocial personality disorder?

A. That's what I've been told, correct.

Q. Okay. I want to talk for just a moment about Claim 7. You were asked about Claim 7, which had to do with the exclusion of jurors.

A. Yes.

THE COURT: Could I interrupt here? I think we've been going about 2 hours, and I think Ms. Murray could use a break, and probably Mr. Parrish. Let's be at recess until 10:15, and then we'll take it up.

(Whereupon, a brief recess was taken.)

THE COURT: We're back on the record in the

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 84 of 246

case of Honken versus the United States.  Mr. Parrish is on the stand.  He's still under oath.  And you may proceed, Mr. Nolan.

MR. NOLAN:  Thank you, Your Honor.

Q.    I had just mentioned we were going to talk about the juror issue, but then I found this exhibit, so I want to do this first just to get that done with.

A.    Okay.

Q.    You were asked on cross-examination about Mr. Bregar, who was a government witness at the trial. Do you recall that Mr. Bregar was a government witness?

A.    Correct.

Q.    And you were asked about if you knew that he had memory problems, whether you did know that or not.  I'm showing you Plaintiff's 125.

A.    Okay.

Q.    And if you can take a look at that.

A.    I read that paragraph during the break.

Q.    Oh, you did?  Good.

A.    I did.

Q.    What's the date on that paragraph?

A.    7-1-04.

Q.    And do you know what the timing of that is in relation to his testimony at the trial?

A.    At the criminal trial?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 85 of 246

Q.    At the murder trial.

A.    I don't know.  I couldn't tell you offhand. Whatever the --

Q.    Whatever the record shows?

A.    Yes, absolutely.

Q.    It was within several weeks though before he testified.  Would that -- would that be fair to say?

A.    Okay, that would be fair to say.

Q.    And this is a record from his Bureau of Prisons's medical record?

A.    Right.

Q.    And do you see there that it indicates that he has had trouble with short-term memory?

A.    Correct.

Q.    And that there were -- there was Alzheimer's in his family which concerned him?

A.    That's correct.

Q.    If you had known about these things, would you have used that information to cross-examine him?

A.    It's possible.  Obviously, I would have used it to evaluate his testimony.  Whether or not I would use it to cross-examine him, I'm sure would depend a lot on what his testimony would be.

Q.    And I'm moving to the next page of that same exhibit.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

A.     Sure.

Q.     And do you see there where it says in this -- do you see where it says temporal arteritis, 3 lines down?

A.     Yes, I do.

Q.     Are you familiar with -- that that term means a stroke?

A.     I'm not familiar with it.

Q.     Do you see the date next to that?

A.     Correct.

Q.     What is it?

A.     9 October '97.

Q.     And again, I'll ask you that question.  If you had known that he had had a stroke prior to his testimony, would you have used that or considered using that information?

A.     Absolutely, I would --

        MR. WILLIAMS:  Objection -- I'm sorry, objection, misstates the evidence.  There's no evidence that that is a stroke, and the testimony was he doesn't recognize that term as indicating a stroke.

        THE COURT:  All right.  Objection is sustained.  You may proceed.

Q.     Well, let me ask it this way.  If you had information that he had had a stroke, would you have used that in your examination of him?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 87 of 246

A.    If I had any evidence on this particular case that this individual may have had some memory issues or a stroke, if I had been aware of it, more likely than not, I would have evaluated it to make a determination as to whether or not I would use it.  But more likely, it would have depended on what his original testimony would have been.  I wouldn't use it just to use it.  I would use it if it would have some impact on showing that his memory was impacted by his health condition.

Q.    Well, if you recall, Mr. Bregar testified about some incidents that occurred in the county prison when he and Mr. Honken were together in prison, --

A.    Okay.

Q.    -- is that right?  Do you remember that?

A.    I do.

Q.    And do you remember that in cross-examination you were challenging his credibility?

A.    Correct.

Q.    And so if you had had information that he had had issues with memory, would that have helped you challenge his credibility or his memory of incidents?

A.    I think it would have helped.

Q.    Okay.

(Defense counsel conferred.)

MR. NOLAN:  Sorry, Your Honor.

Q.      Now let's go to that Claim 7 that we were going
to talk about for a moment --

A.      Okay.

Q.      -- about the jurors.

A.      All right.

Q.      Now, as you recall, you indicated that you
reviewed the claim as we raised it in our petition?

A.      I did.

Q.      And so did you recall that we -- that in part of
that claim, we raised that 2 specific jurors were struck
that should not have been struck, Juror Number 538 and
Juror Number 813.

A.      Okay.  I do recall that claim, yes.

Q.      And are you aware that the defense raised an
objection to those jurors being dismissed?

A.      I would just rely on the record.  If we did raise
an objection, I would -- I would rely on the record.

Q.      And are you aware that in a capital matter, even
1 juror voting for life can result in a life sentence?

A.      If you tell me that's what the status of the law
was, I would accept that.

Q.      Okay.  Maybe I'll ask Mr. Rogers that.

A.      Okay.

Q.      Now, with respect to the multiplicity issue that
we were discussing on direct and on cross --

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 89 of 246

A.    Okay.

Q.    For the record, that would be Claim Number 5 of our petition. I believe you answered a question to Mr. Williams that, raising that issue pretrial, that you would feel there would be no downside to that?

A.    That was my response, correct.

Q.    What did you mean by that?

A.    Well, if there are pretrial motions to be raised that would stay within the confines of the pretrial and not leak over to trial issues that could be problematic, it's always my position to raise those if they have merit pretrial. If, in fact, the issue would create problems at trial in terms of proof that could negate the theory that we are trying to present to the jury, then it's problematic. And if an appellate court had to review both the pretrial and the trial matters to make a determination, then I would opt out of presenting it pretrial if it did not have substantial merit. That's kind of my process of analyzing issues.

Q.    In your review of the Johnson decision that granted relief on the issue of the multiplicity, did you -- are you aware that she -- she originally had 10 death sentences, I believe. And are you aware that the result of that decision made it so that she had 5 death sentences? Do you recall that? If you don't, it's of

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 90 of 246

record.

A.     Well, yeah, it's of record, but as I said, ultimately, and not -- I don't mean this lightly.  I laugh out of a reflection of the end result is the same.

So my question -- I mean, I really don't have a question, but my response would be the same as I said earlier.  I don't know what the -- how the end result would change, because in our case, as I recall, the jury only found death on the children and not the adults, so I guess I'm straining to see the impact.

Q.     Well, let me --

A.     Okay.

Q.     -- ask it this way.  And I understand that you're much more used to asking questions than answering them.

A.     Yeah, right.  So I'll try not to -- that's 1 thing I have to do.  I'm not here very often, but 1 thing, I have to restrain myself when I'm on post-conviction issues not to ask questions.

Q.     So you just accurately stated that Mr. Honken was given death sentences for the killing of the children.  And so he was given 4 counts of death.  Do you recall that?

A.     Correct.

Q.     So there would have been 2 counts that were drug-related killings and 2 counts that were CCE-related

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 91 of 246

killings?

A.    Right, right.

Q.    And so if the multiplicity issue had been raised, and he was left with, for example, just the CCE killings, wouldn't a successful challenge to those killings that we've raised eliminate death possibly for Mr. Honken?

A.    I see your theory.  In terms of trial strategy and presentation of evidence, I see no difference.

Q.    You were asked questions about the earlier sentencing case that you handled.

A.    Yes.

Q.    And on cross-examination Mr. Williams asked you about witnesses -- well, strike that.  Mr. Williams on cross asked you questions about the fact that, in the 2004 trial, that the drug quantity did not focus on lab capacity, I believe he asked you, and you said that was right.

A.    That's correct.

Q.    And then he asked you about -- he said, instead it was -- the government relied on various witnesses for that evidence?

A.    For the trial?

Q.    For the trial.

A.    Correct.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 92 of 246
*to purchase a complete copy of the transcript.*

Q.      Now, the witnesses that he named to you, including Tim Cutkomp, Dan Cobeen, Aaron Ryerson, didn't all of those witnesses also testify at that sentencing hearing, that previous sentencing hearing?

A.      I can't say for sure.  The record will speak for itself.  The way I understood his question was not whether or not they testified or not, but the theory presented to the government in terms of what they were trying to do for the sentencing and in the trial, showing that there was a conspiracy where these individuals either -- got together by buying and selling drugs at various times and Mr. Honken was the principal supplier of those.  That's how I understood his question.

Q.      Okay.

A.      Right.

Q.      He also asked you if the exact amount -- in fact, he asked -- obviously leading, as he was cross-examining you -- that the exact amount was not at issue in the 2004 trial, and I believe you said "Yes."

A.      I would tend to agree with that, and even if it were, it's not a place we would have gone, quite frankly.

Q.      Let me ask you that --

A.      Okay.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 93 of 246

Q.    -- because isn't it a fact that if the government could not prove that there was over 100 grams involved, then it wouldn't be a death case?

A.    Well, first of all -- well, let me put it this way --

Q.    Could you answer --

A.    There was never an issue.

Q.    That was never an issue?

A.    That's a phantom issue, yes.  100 grams was -- was an easy mark, easy target.  We weren't going to get into a fight over methamphetamine in the trial.

Q.    No, but I'm not talking about methamphetamine in general, but I'm talking about --

A.    You're talking about amounts.

Q.    -- specific quantities.

A.    Right.

Q.    If you could establish that there wasn't 100 grams, wouldn't that have taken death out of the case?

A.    I would say I would not dispute that, but that's a phantom issue.  It would not have gone anywhere.

Q.    Well, are you aware that -- that the way that the government established that there was more than 100 grams was through hearsay testimony?

A.    Yes, I would have stipulated to 100 grams if they had put it on the table.  It was -- it was not a fight

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 94 of 246
*to purchase a complete copy of the transcript.*

to be had.

MR. NOLAN: Could I just have a moment, Your Honor?

THE COURT: Certainly.

(Defense counsel conferred.)

Q.    Mr. Parrish, I'm just pulling up an exhibit there --

A.    Sure, yep.

Q.    -- which is Plaintiff's Exhibit 118.  We're going to scroll down to the last page.

A.    Okay.

Q.    Do you see the signature on the bottom of the that page?

A.    I do.

Q.    And who is that?  Whose signature is that?

A.    It says "Alfredo Parrish."

Q.    Did you sign that?

A.    I did.

Q.    And what's it dated?

A.    June 6th of 2011.

Q.    And before you signed that, did you review this document for accuracy?

A.    I did.

Q.    And did you determine that it was accurate?

A.    I did.

Q.    Now, I'd like to draw your attention to Paragraph 8.  Could you just read that to yourself?

A.    Okay.

Q.    Does that paragraph accurately describe your recollection of the discussions that you had with co-counsel leading up to the --

A.    It does.  It does.

Q.    And I'd ask you to refer to Paragraph 9, which you can also see.  And read that to yourself.

A.    Now, when you say "current counsel," I assume now, because you've expanded as of our last meeting, that the government also had him analyzed, so -- are you asking me to expand my answer to that?  Because I just found that out recently.

Q.    Yeah, I don't think -- was that ever provided to you?

A.    It's not been provided to me, but the question is, as I understand it from "current counsel," that they had Mr. Honken evaluated by mental health experts, you only mean you?

Q.    Yes.

A.    Okay, I understand.

Q.    In other words, that was the state of the events at the time you signed this declaration?

A.    Right.  And you say "considered the opinions of

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 96 of 246
*to purchase a complete copy of the transcript.*

their experts," you mean only 1 expert, is that right?
It says "experts."  It's plural.

Q.     Well, no, I think that we discussed Dr. Dudley,
Dr. Warren, and Dr. Piasecki with you.

A.     Okay, all right.

Q.     Does this -- Paragraph 9, does that accurately
reflect how you felt about this at the time you signed
this in June of 2011?

A.     Yes, and I -- and I still feel that way.

MR. NOLAN:  Thank you.  Your Honor, I have
no other questions of Mr. Parrish.

THE COURT:  Mr. Williams.

MR. WILLIAMS:  Nothing else, Your Honor.

THE COURT:  Thank you, Mr. Parrish.

And may he go back to work?

THE WITNESS:  Thank you, Your Honor.

MR. NOLAN:  Absolutely, Your Honor.

THE COURT:  Okay.  Thank you.

THE WITNESS:  Thank you, Your Honor.  Good
to see you.

THE COURT:  Safe travels.

THE WITNESS:  Thank you.

MR. NOLAN:  Do you want us to call our next
witness, Your Honor?

THE COURT:  Yes.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 97 of 246
*to purchase a complete copy of the transcript.*

MR. NOLAN: Your Honor, we'll call Jeffrey Honken to the stand.

May I be excused for 1 moment to say good-bye to Mr. Parrish?

THE COURT: Sure.

Mr. Honken, will you please come forward and stand before the bench and take the oath.

JEFFREY HONKEN, called as a witness, being first duly sworn or affirmed, was examined and testified as follows:

THE CLERK: You may take the stand.

MR. NOLAN: Sorry, Judge. I just need a moment to shift gears here.

THE COURT: That's fine. No problem.

MR. NOLAN: I left my computer yesterday in Mr. Parrish's office in Des Moines, so he's having it brought down for me, but -- so I'm using lots of papers.

May I proceed?

THE COURT: Please.

DIRECT EXAMINATION

BY MR. NOLAN:

Q.    Mr. Honken, state your name for the record.

A.    Jeffrey Allen Honken.

Q.    And what is your relationship to Dustin Honken?

A.    He's my brother.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 98 of 246
*to purchase a complete copy of the transcript.*

Q.    How many children are in your family?

A.    There are myself; we had a brother, Matthew, that passed away; and Dustin and Alyssa.  There's 3 siblings.

Q.    Can you pull the microphone up a little bit?

A.    Sorry.

Q.    Or sit up.  That's better.  Thank you.

        MR. NOLAN:  Can you hear okay, C.J.?

        MR. WILLIAMS:  Yeah, I'm fine.

Q.    All right.  Just back up a second.  You said you had a brother, Matthew, who passed away?

A.    Correct.

Q.    Was he -- where did he fit in the family structure?

A.    I'm the oldest.  Matthew was after me.  He passed away when he was a baby.  Then Dustin and Alyssa.

Q.    Do you remember Matthew passing away as a baby?

A.    I was very young.  All I remember is that I was expecting a sibling, and the next thing I knew, the crib and everything was packed away, and they explained to me that he had passed away.

Q.    Okay.  And how much older than Dustin are you?

A.    6 years.

Q.    Do you recall when Dustin was a child whether he had issues with his heart?

A.    He always said that, you know, he had problems

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 99 of 246

with his chest and his heart area. He would get attacks. He'd say it felt like he was having a heart attack. And then once he would lay down and would calm down, then it seemed to go away.

Q. And do you remember those types of incidents?

A. Yes, I do.

Q. When you were a child, were there times when you would spend time out of your household with other family members?

A. Yes.

Q. Who were those?

A. Both my -- all my grandparents were living, so I would spend a lot of time with my grandparents.

Q. Okay. And what was that like? What was it like to get out of the house and spend time with your grandparents?

A. It was good. My grandparents had a very good family structure. My grandfathers taught me how to fish, how to hunt, how to -- they would take me to their places of work. I mean, Grandpa Honken taught me my love for electronics. My grandmothers taught me how to cook, do dishes. And it was good.

Q. And how often would you spend time out of your family's house with your grandparents?

A. I would spend most of the summers with my

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM Document 83 Filed 12/07/11 Page 100 of 246

grandparents; and my grandparents or 1 of my parents would take me fairly frequently during the school year.

Q. Was there a reason that you wanted to get out of your family situation and do that?

A. Well, they were -- it was -- it was a good structure. It felt right.

Q. All right. We'll come back to your home structure in a moment.

Did Dustin have that opportunity as well?

A. Dustin, like I said, he was considerably younger than what I am, and my grandparents were getting older by that time. My grandmother on my father's side had a stroke, and she was in the nursing home when he was getting up older, and they just weren't able to do the things that they did with me with him.

Q. So as he got older, did he spend significant amounts of time with the grandparents as you did?

A. No.

Q. What kind of effect did that have on your upbringing, having this structured environment to spend time in?

A. Well, you know, it was that -- my grandparents, like I said, it was -- it felt like -- I mean, there was a family structure. You know, it -- when I got hungry, my grandmothers would feed me. When, you know, I needed

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM Document 83 Filed 12/07/11 Page 101 of 246

somebody to talk to, my grandparents were there.

Q.    And let's talk about that in relation to the environment in your household.  And let's start with when your mother and father were still married.  First of all, how old were you when they were divorced?

A.    Somewhere between 14 and 15.

Q.    Okay.  And prior to the time that they were divorced, what did your father do for a living?

A.    He was a boilermaker.  He was a welder with the boilermakers union.

Q.    And what would he do -- would he be at home all the time, like during the weeks?

A.    No.  During the week, he would leave.  So he would leave either late Saturday -- or Sunday night or Monday morning, depending upon how far he had to travel.

Q.    Did he work out of the home for the entire week typically?

A.    Yes.

Q.    And what would he do on weekends when he came home?

A.    Well, my dad was very much an alcoholic.  He would drink.  He would have friends come over; they would drink.  And he -- that's pretty much what it was.

Q.    We're going to come back to that in a moment.  I want to talk -- ask you to talk for a moment about your

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 102 of 246

mother, Marvea. During those times when your parents were still living together and you were living in the house, was your mother home often?

A. She would be home. A lot of times at night she would actually go into town. We lived 4 miles outside of town. She would -- she had friends in town, both male and female.

Q. And what was she doing in town as far as you know?

A. I don't know. It was late at night. You know, she would go, visit her friends or go to establishments, you know. I don't know.

Q. And how often would that happen?

A. Well, at least weekly, multiple times during the week.

Q. Multiple times during the week?

A. Yeah.

Q. And when she would do that, who took care of the kids?

A. I did.

Q. And how old were you when this started happening?

A. Oh, well, I remember taking care of Dustin when Alyssa wasn't there. So Dustin's 6 years younger than I am. Alyssa's 8 years younger than I am. So I must have been somewhere around, I don't know, maybe 9-ish, 8-ish,

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 103 of 246

somewhere in there.

Q.     Okay.  And then after Alyssa was born, did this -- did this continue?

A.     Yes, it did.

Q.     Did it get worse or more often?

A.     It got worse as time went on.  The older I got, the worse it got.

Q.     And at that point -- so Alyssa is 8 years younger than you?

A.     Correct.

Q.     And after she was born, then what would happen when your mother would go out?

A.     I would take care of the kids.  I'd put them to bed, change their diapers.

Q.     Okay.  And so you're changing diapers.  That would have been -- you would have been between 8 and 10 years old, as Alyssa was a pre-toddler?

A.     That's correct.

Q.     Okay.  And what was the house like that you lived in?

A.     It was a small 2-bedroom house.  Like I said, it was about 4 miles outside of a small town of about 2,300 people at the time.

Q.     And on these nights when you were left alone with these little children, how did you feel?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 104 of 246

A.    Well, things go bump in the night.  I was scared most of the time.

Q.    And what would you do when your mom was away?

A.    Well, after I took care of the kids and got them to bed, I would usually -- we had a window.  And I would look out the window and wait for her to come home.  I would -- I'd look for the -- it was an old highway that I could see from the window, and I would look for the headlights.  So I would stay up until I saw those headlights, and she would come around the bend, and I would jump in bed and act like I was sleeping.

Q.    And did you ever find out later that your mom -- what your mother was doing and who she was seeing when she was out?

A.    Yes, I did.  After a while, gentlemen would come out to the house.  They would -- mom would go out to the house [sic] and talk to them.

Q.    You said "gentlemen"?

A.    Yes.

Q.    Not a gentleman?

A.    No, plural.

Q.    Okay.  Let's go back to your father, James Honken, for a bit.  You had indicated earlier that he was an alcoholic.  Did you see him drink?

A.    Yes.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 105 of 246
*to purchase a complete copy of the transcript.*

Q.      How often?

A.      Weekly.  There wasn't a week that he didn't drink.

Q.      When you say "weekly," you mean that's at the times on the weekends when he was home?

A.      That's correct.

Q.      Was he drinking pretty much all of the time that you were around him?

A.      Yeah, he -- he would either -- he would be drinking either -- well, if friends came over, he would be drinking beer.  When friends weren't around, he would be drinking Vodka.

Q.      And did he ever tell you anything about Vodka?

A.      Well, yeah.  I mean, what he'd do is he had, you know, a Ford pickup, and he would take me to the grandparents.  I remember him taking me over to Grandpa and Grandma Honken's 1 time, and he made the statement, he goes -- he goes, "Jeff," he goes, "you can always tell an alcoholic.  They always drink Vodka," he says, "You can't smell the Vodka on their breath," and he said, "So the guys that go to work and that, they're always drinking Vodka."  And I questioned him about the Vodka that he was drinking that he even had in the truck.  And he didn't quite have an answer for me.

Q.      And how old were you about at that time?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 106 of 246

A.    Maybe 9, 10.  I don't know exactly.  I was young.

Q.    So at that point Dustin would have been 3 or 4?

A.    Yes.

Q.    And did your father drink in the house and out of the house?

A.    Yes.

Q.    Now, did your father have a tendency to tell stories to you, to other people?

A.    Yeah.  When my dad drank, the stories got bigger and bigger, more and more embellished when he drank.

Q.    And what would he tell you about himself?

A.    He prided himself on being able to beat the system, basically, and --

Q.    What do you mean by that?

A.    Well, my dad was always looking for the easy way out.  He prided himself when he was working, and he would go to work.  He would also -- on jobs -- he had jobs, and he would -- they would take things from the jobs.  Welders, whatever.  When the jobs were completed, basically they were -- stole materials.  He would take them and he would brag about how much money he could make off of his equipment that was being stolen.  And he would just brag about what he had, about what he did.

Q.    And did he brag also to you?

A.    Yes.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 107 of 246

Q.   And to Dustin?

A.   Oh, yes.

Q.   Did Dustin speak with him about these things often?

A.   With dad, it was never -- what he was doing was never a secret.  I mean, he would talk to anybody about it pretty much.  He would just -- was his -- that was his way of having everybody think that he was the big guy on the block.

Q.   And did there come a time when you kind of had a change of realization about what your father really was?

A.   Yeah, yeah.  When I was about 16 -- 15, 16, I came to the conclusion that he was -- he always had the saying that he was crazy like a fox, and I came to the conclusion that he was just crazy and not the fox.

Q.   Did your father talk about violence often with you and Dustin?

A.   He would talk about when -- if anybody crossed him, if anybody would basically go against him -- he had a saying.  He would always say that -- you know, capping somebody off, that was what his favorite saying was.  He would just say, "Well, I'll just cap them off," which I knew that that meant that he would take care of them.

Q.   Take care of them in what way?

A.   Well, that he would kill them.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 108 of 246

Q.      And did he talk to you and Dustin about that often?

A.      Yeah, it was 1 of his favorite sayings, yeah.

Q.      Now, you had said that your father had talked about -- or had been involved in maybe some stealing and things like that.  Was he involved in other illegal activities?

A.      His 3 favorite games were basically fencing stolen material, arson, and he always played the disability game.

Q.      What do you mean by "the disability game"?

A.      He -- he always worked on trying to go on disability so that he could collect disability checks, so he was always trying to come up with some ailment that he could go on disability.

Q.      And would he talk to you and Dustin about that?

A.      Sure.

Q.      And what about -- you said fencing stolen materials.  Where did he get -- where did he steal from?

A.      He would get them from jobs, like I said.  Every time now that I see a crane with a big welder on the top, I know why they're hoisting the welder on top of the crane.

Q.      What do you mean?  Can you explain that?

A.      Well, if you ever look at a construction site,

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 109 of 246

there will be a crane.  And usually at nights what they'll do is they'll hoist the welders up on the crane so you'll see them dangling from the crane.

Q.      What do you mean by "welders"?

A.      They're big -- it's a welder.  They're gas-powered welders that people use for industrial welding.

Q.      Okay.  And what did you mean by that?  Why would you know that that's why they now do that?  What would your father do with those things?

A.      Oh, he would basically take them from jobsites, and he'd bring them home and sell them where he could, I guess.

Q.      And did he talk to you and Dustin about that?

A.      Yes.

Q.      How often?

A.      It happened from the time that I was a little kid to the time that I quit talking to him.

Q.      All right.  Now, you talked about arson.  What types of things would your father burn?

A.      He burned his -- well, he's burned his garage --

        MR. WILLIAMS:  Objection to lack of foundation, Your Honor, lack of personal knowledge.

        THE COURT:  At this point, it's sustained.  You may ask further questions.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 110 of 246
*to purchase a complete copy of the transcript.*

Q.      Did you ever see your -- the results of your
father's burnings?

A.      Yes, he -- like I said, he would burn garages.
He would burn houses, cars, whatever he could collect
insurance from.

Q.      And did he ever burn any of your personal items
when you were a kid?

A.      Sure, twice.  Our garage burned down in Hutchins.
Once, when I was a little, little kid.  I had a lot of
things in there, from my bicycle, to my fishing poles,
to my -- every toy that I would play with outside.  Had
them all burned away.  Later on, the second time it
burned down, my motorcycle was in there, a little
motorcycle, and just personal-type stuff that a kid
would have.

Q.      And how did that -- how did that make you feel,
that your father burned your things?

A.      Well, you quickly learned that whatever
possession you had wasn't necessarily yours.

Q.      Was there a time after -- we'll talk about this
in a minute -- that you had tried to go to school for a
time?  When you came back from trying to go to school,
were you living in a house in Britt?

A.      Yes, I was.

Q.      And whose house was that?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 111 of 246
*to purchase a complete copy of the transcript.*

A.    My dad's.

Q.    Were you living with him?

A.    No.

Q.    And did there come a time that that house burned down?

A.    Yes.

Q.    What happened?

A.    I was down in Cedar Falls visiting some friends. My mom calls up, said the house I was living in burned down.

Q.    And do you know if your father put in insurance claims for that as well?

A.    Yes, he did.

Q.    Did you have all of your personal items in the house?

A.    Yes, I did.

Q.    And what about vehicles, cars?

A.    The 1 that I know of was his Mercury Marquis.  He had a Mercury Marquis.  I was 16 and a half.  I had a -- I had wrecked actually my car.  He lent me his car. He -- after so long, he needed it back so that he could -- so he could burn it and collect insurance from it.

          MR. WILLIAMS:  Objection.  It's hearsay, Your Honor.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 112 of 246

THE COURT: It appears to be at this point. You may rephrase your question.

MR. NOLAN: Well, Your Honor, I would also suggest that at the penalty phase some hearsay evidence would be admissible in terms of family life history.

THE COURT: The problem is that in a hearing on a 2255, the Rules of Evidence do apply. So whether it would be relevant at time of the penalty phase is, I think, not relevant in this hearing.

MR. NOLAN: Well, Your Honor, it would go -- just for the record, it would go to the prejudice analysis of whether or not we have established an ineffective assistance of counsel claim.

THE COURT: Well, you may be able to ask it in such a way as it would be admissible, but the problem is, this is a hearing in which hearsay is not permitted, unless it falls within 1 of the recognized exceptions.

Q. Let me rephrase the question, Mr. Honken. That Mercury Marquis that you had, did you ever see that vehicle again?

A. No.

Q. Did your father ever ask you to be involved in burning things for insurance purposes?

A. When I was younger, he was -- he would -- he burned down a store, and he had me in his pickup when I

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 113 of 246

was a young kid. And as he did it, he wanted me to honk the horn if anybody pulled up.

Q. And you said that your father's third thing was this fake disability. Could you describe that?

A. He was -- his jobs got fewer and fewer between in the boilermakers. I don't know if it was his doing or their doing or what it was, but he just was working less and less. And he was trying harder and harder to collect disability.

Q. Did you know him ever to be actually injured and -- in which he would be eligible for --

A. No.

Q. -- disability? No. Did you ever have pets when you were children?

A. I did, yes.

Q. And what happened to your pets?

A. Well, we lived out in the country. The -- any -- I always had dogs. The dogs that I had, when something would happen to them, they would -- dad would take care of them.

Q. How would he take care of them?

A. He would take them out and shoot them.

Q. What did he call that?

A. His 25 cent solution.

Q. And how often did that happen?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 114 of 246

A.    At least 3 times.

Q.    And did Dustin have pets as well or were they the same pets?

A.    Same pets, same scenario.

Q.    Do you remember ever talking to Dustin about the 25 cent solution?

A.    Not specifically.

Q.    Okay.  At some point you moved to Arizona?

A.    Correct.

Q.    Do you remember having conversations with Dustin about your father ever after you moved -- well, let me back up for a minute.  Did you still speak with your father when you moved?

A.    No.

Q.    What happened?

A.    Well, like I said, I -- he just -- I mean, he drank so much that he just -- I could tell.  2 words out of his mouth, I knew he was drinking, and I just told him I refused to talk to him when he was drinking.  And he drank all the time, so --

Q.    And was that 1 of the reasons that you moved away?

A.    No.  Mostly, I moved away for other opportunities, I guess.

Q.    Okay.  And do you remember when you first moved

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 115 of 246
*to purchase a complete copy of the transcript.*

to Arizona or not long thereafter having conversations with Dustin about your father?

A.      Yes.  Dustin was very close to dad, so anything I heard about dad came through Dustin.

Q.      And what was going on with your father at that point?

MR. WILLIAMS:  Calls for hearsay, Your Honor.

THE COURT:  Do you agree it's hearsay?  And if it is hearsay, does an exception apply?

MR. NOLAN:  May I have a moment, Your Honor?

(Brief pause.)

MR. NOLAN:  I'll rephrase the question, Your Honor.

THE COURT:  All right.  The objection is sustained.  You may proceed.

Q.      Do you know -- you have a younger sister; is that right?

A.      I do, yes.

Q.      And what's her name?

A.      Alyssa.

Q.      And how did your father treat Alyssa?

A.      He -- he pretty much left her alone, with the exception of verbally.

Q.      And how would he treat her verbally?  What do you

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 116 of 246

mean by that?

A.    He would just say things to her face, that she was fat like her mother and was going to grow up like her mother.

Q.    In what sense?  What would he say though?

A.    Can I say it?

Q.    Yeah.

A.    He said that she was going to grow up like a whore like his mom -- or her mother.

Q.    When you were living with your mother and father before the divorce, did you ever hear them in arguments?

A.    Before the divorce, the -- we lived in a small, little -- small, little house, and I would hear them arguing in their bedroom, but I don't know any specifics.

Q.    Well, did you hear?

A.    Yes, I did.

Q.    What did you hear?

A.    Them arguing.

Q.    And what did that sound like?

A.    It sounded like mom and dad arguing.

Q.    Was it loud or not loud?

A.    It was -- I mean, it was loud enough for me to hear the mumbling and the complaining back and forth, but, I mean, I was young.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 117 of 246
*to purchase a complete copy of the transcript.*

Q. All right. And would they be in the same room with you when this would happen?

A. No.

Q. And was Dustin living there at times when this would happen as well?

A. Yes.

Q. Did your father make promises to you as you were younger?

A. Oh, yeah, yes.

Q. About what types of things?

A. Gosh, when I was -- the ones that stick out in my mind was that -- when I was going to be 16, he was going to buy me a car. When I was --

Q. Did he do that?

A. No, no. He -- Dad would make a lot of promises that just never came about.

Q. Was there a time when he told you he would get you a job?

A. Yes.

Q. Can you describe that for Her Honor?

A. Yes. When I was getting out of high school, I didn't -- I didn't have any direction. The -- he said that he had high ranking people within the boilermakers that could send myself out for employment right away. He said that he contacted those people, and he told me

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM Document 83 Filed 12/07/11 Page 118 of 246

to go get special boots, go get clothes, go down to Kansas City, and that he would have it all lined up and then they would just send us out for work there.

Q.    And did you do that?

A.    I did.

Q.    Did you take somebody with you?

A.    I did.  I had a friend that went down with me.

Q.    What happened?

A.    We went down to Kansas City.  We had all of our -- all of our stuff packed to go work.  We got down there, waited in a very long line.  By the time we got to the front of the line, the person that was at the window didn't know who I was.  My dad did give me a name of a person.  I gave them that name.  That person -- that gentleman came out, said he hadn't talked to my dad for a long time.  Explained the apprenticeship program for the boilermakers, that you had to apply for it, and so he says "I don't know why your dad sent you here."

Q.    After you graduated high school, what did you do?

A.    After I graduated from high school, the -- I went -- I went -- when I was in high school, I got my EMT, which is emergency medical technician.  I went down to Iowa City.  I wanted to be a paramedic.

Q.    And did you talk to your father about that?

A.    I did.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 119 of 246

Q.    Were there plans made for you to go do that?

A.    He said he was going to pay my tuition and my room and board.

Q.    And what happened when you went there?

A.    I applied, went down.  He -- the tuition was never paid.  There was no money for room and board.  Luckily, I had a friend that was in my graduating class, and she let me sleep on her couch while I started the classes.

Q.    Were there ever times that you were around your father that he was not drinking?

A.    Very, very early in the morning.  If he would get up -- he usually got up between 5 and 6, so if you'd catch him between 5 and 6 and maybe 8 o'clock, 9 o'clock in the morning, you could catch him when he wasn't drinking.

Q.    Where did you go to school, Mr. Honken?

A.    Rudd, Iowa.

Q.    For grade school and high school?

A.    That's correct.

Q.    Was your father involved in any way with your schooling?

A.    No.

Q.    What -- did you ever ask him about -- to be involved in your schooling?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 120 of 246

A. Dad -- Dad didn't graduate from high school. He didn't believe in schooling. He thought anybody that went to school was not very intelligent, because there was easier ways to get by in life than going to school.

Q. And how about your mother? Was your mother involved in your schooling?

A. No.

Q. Did she ever ask you about how school was?

A. No.

Q. Did she ever help you with your homework, anything like that?

A. I never had any -- I never did any homework in high school or junior high, ever.

Q. So at the point where you left -- well, let me ask you this. When did you get your driver's license?

A. 16.

Q. And did anything change for you when you got your driver's license?

A. I was free.

Q. What do you mean by that?

A. I could go to my grandparents' any time I wanted, and I didn't have to depend upon them coming to pick me up. I didn't have to depend upon anybody. I could just drive over and go have dinner with them. I could stay there. I could do whatever I wanted to do.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM Document 83 Filed 12/07/11 Page 121 of 246
*to purchase a complete copy of the transcript.*

Q.    And once you turned 16 and got your driver's
license, did you spend a majority of your time out of
the household?

A.    Yes.

Q.    And how about Dustin?  At that point, he was
about 10?

A.    He was still there.

Q.    And how did you feel about that at the time?

A.    Well, I realized I shouldn't have felt that way,
but I was just tired.  Just --

Q.    Tired of what?

A.    Just taking care of Dustin and Alyssa, and just
tired of the house.  I was tired.

Q.    And as you look back on it, you kind of got out
and Dustin didn't.  How do you feel about that?

A.    Well, Dustin got -- you know, my grandparents
were older at the time, so he didn't get that benefit.
Things really changed after my mom and dad got divorced.
So, I mean, where at least he would have had some of
mom's time, a lot of that time was no longer there.  So
he just kind of got left.

Q.    "Left," did you say?

A.    Left.

Q.    All right.  Let's talk about that.  After your
mother and father got divorced, was your mother

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 122 of 246

remarried?

A.    She was, yes.

Q.    And who did she remarry?

A.    A gentleman by the name of Ron Smidt.

Q.    And had she been spending time with him prior to the divorce?

A.    Yes.

Q.    How long after the divorce did she get married?

A.    I don't think the divorce was fully finalized because they went out of state to actually get married.

Q.    So it was soon in time?

A.    Pardon me?

Q.    So it was soon in time?

A.    Yes.

Q.    Okay.  And did you say you were around 14?  I think -- is that what you said earlier?

A.    14, 15, right in that area.

Q.    And what -- how did your mom change when she got married to Ron, if at all?

A.    I just remember that -- the biggest thing I remember, I remember her literally telling us all at the dinner table when we were there that Ron was now her priority, that she was married, and Ron became -- that Ron was first.

Q.    And did your mother's behavior towards you

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 123 of 246
*to purchase a complete copy of the transcript.*

reflect those remarks?

A.    Yes.

Q.    In what way?

A.    Once they -- once they were married, we moved in -- everybody moved in a house together.  Basically, what would happen is Ron demanded that we eat at 6 o'clock, which we all did sit down and eat at 6 o'clock.  And after that, they would disappear into their room, and you wouldn't see them the rest of the night.

Q.    And after they disappeared into their room, what would the children do?

A.    We'd watch TV, do what we wanted to do.  Once it got later, I would get the -- I would get Dustin and Alyssa ready for bed and get them in bed, and Mom might pop out between 9 and 10 to see if we were in bed.

Q.    Was there any restriction on the behavior of the children during those times?

A.    No, not as long as we just didn't disturb them.

Q.    Did Ron have a daughter that came to live with you for a bit?

A.    Yes, her name was Carmen.

Q.    Carmen.  What was Carmen like?

A.    Carmen was -- she was just mean.  There's no other words for it.  She just was --

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 124 of 246
*to purchase a complete copy of the transcript.*

Q. And how long did she live in that household?

A. You know, I don't exactly know.

Q. And where was she in relation to yourself in terms of age?

A. She was between Dustin and myself.

Q. So younger than you and older than Dustin?

A. Correct.

Q. Now, your mother's new husband, Ron, what type of a father figure was he?

A. He wasn't a father figure. I mean, I worked out -- he owned a body shop and a junkyard, and I did work out there, but it was pretty much of a -- you know, he -- it was pretty much an employee/employer type situation. The -- but there was no -- I mean, Ron still today doesn't talk much.

Q. Was there any interaction between Ron and Dustin during those years, when Dustin was 8 and older?

A. Not in the house. When Dustin was younger, no, not really.

Q. So could you just describe for Her Honor what you -- what you see as the difference between the way you were raised and the way Dustin was raised?

A. I had the benefit of my grandparents. I had an escape. The -- I could -- I saw what and experienced what -- the family structure, what most of us think the

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 125 of 246

family structure should be, even though the grandparents were aging.  I got to go on vacations with the grandparents, so -- Dustin didn't get that, like I said.

Q.    Now, at some point, after you were living in Arizona, did Dustin come out to stay with you?

A.    Yes.

Q.    And at 1 point did you become aware that he was attempting to manufacture an illegal substance?

A.    Yes.

Q.    Did he ask you to loan him money?

A.    Yes.

Q.    Did you do that?

A.    Yes.

Q.    During the time that Dustin was out there, did he ever -- did he ever control you?

A.    No, no.  I was always working, so it wasn't a situation where I would consider anybody was controlling me.

Q.    Did you ever take orders from Dustin?

A.    No.

Q.    Did he manage you in any way?

A.    No.

Q.    At some point, was Dustin living -- or staying in a house south of Tucson?

A.    Yes.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 126 of 246
*to purchase a complete copy of the transcript.*

Q.    And where were you living then?

A.    Phoenix.

Q.    How far is that from where that was?

A.    140 miles.

Q.    So during that timeframe, for how long -- do you know -- remember now how long that house was rented?

A.    No, I don't know exactly.  2, 3 months probably.

Q.    During that time, did you spend much time with Dustin?

A.    No.

Q.    Now, prior to the trial in this matter -- did you testify at the trial?

A.    Yes.

Q.    And who called you as a witness?

A.    The prosecution.

Q.    Prior to your testifying in this case, did you speak with anybody from Dustin's defense team?

A.    Yes, briefly.

Q.    And who was that, do you know?

A.    I don't know the --

Q.    Was it a male or a female?

A.    I remember -- I remember a female, because I got very upset at her, and I've heard that there was also a male that I also must have got upset at because I wasn't very cooperative.

Q.    Well, let me ask you this.  When you spoke to that woman, how did that come about?

A.    She called me and said who she was.  She started asking me questions.

Q.    About what?

A.    About my family life, Dustin, a lot of the same questions that have been asked before.

Q.    And did she ask you those questions on the phone?

A.    She did.  It was -- like I said, it was a short -- I got very upset and it was a short conversation.

Q.    Why did you get upset?

A.    Because the questions you're asking me today are very -- they're some of my deepest scars, and I just can't do that over the phone.

Q.    You can't, sorry?

A.    I just can't -- I just can't talk about that over the phone.

Q.    Did you ever speak with Dustin's lawyers before the trial?

A.    Yeah -- before trial?

Q.    Uh-huh.

A.    No.

        MR. NOLAN:  May I have just a moment, Your Honor?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 128 of 246
*to purchase a complete copy of the transcript.*

THE COURT: Yes.

(Brief pause.)

MR. NOLAN: Thank you, Mr. Honken. I don't have any other questions at this time.

THE COURT: Cross-examination.

MR. WILLIAMS: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Honken, you indicated that these were tough things for you to talk about over the phone. Fair to say, it would have been equally tough to talk about it in person, right?

A. It is, but when you're talking to somebody face-to-face and you have the time, I can talk a lot better face-to-face than I can over the phone.

Q. They at least tried to talk to you about these family issues, and you just refused to talk to them, right?

A. That's correct.

Q. All right. Now, as a general matter, you didn't really have much of a relationship with Dustin growing up because you guys were always in different phases of life because of the age difference. Isn't that fair to say?

A. That's correct.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 129 of 246

Q.    And you've never been close to him, have you?

A.    No, I have not.

Q.    When you were growing up, were you in Cub Scouts?

A.    Yes, I was.

Q.    And was your mother a den mother for you?

A.    Yes, she was.

Q.    How many years were you in Cub Scouts where your mother acted as a den mother for you?

A.    Oh, 3, maybe 4.

Q.    You went to a Lutheran church?

A.    That's correct.

Q.    And you were active in the youth group in church, right?

A.    They didn't really have a youth group, but I went through confirmation at the church, yes.

Q.    Was your mother involved as a leader in that confirmation?

A.    No.

Q.    Okay.  You indicated that when you were growing up, you never did homework?

A.    That's correct.

Q.    Are you saying ever?  You just never did homework at all?

A.    I did absolutely no homework at all.

Q.    Okay.  Let's talk about timing on this.  You

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 130 of 246

graduated from high school in 1982, roughly?

A.    1980.

Q.    1980, okay.  And then from there, you went to various colleges, right?

A.    That's correct.

Q.    Okay.  And you moved out of the house when you were what age, sir?

A.    Like 17, 18, whatever it is when you graduate.

Q.    Okay.  And when you moved out of the house, then Dustin would have been probably around 12, right?

A.    That's correct.

Q.    All right.  And from the time you moved out of the house, you didn't make -- or have much contact with him from then on, did you?

A.    No, I didn't.

Q.    Now, Dustin actually moved to Arizona on a couple of occasions, isn't that right?

A.    That's correct.

Q.    Moved to Arizona in 1986 and was there for a couple of years, and then moved back to Iowa?

A.    That's correct.  Well, I don't know about the timeframe, but he did move -- yes, he was there twice.

Q.    Okay.  And the first time he was there for a couple of years, right?

A.    That sounds correct.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Q.     And if I told you that he graduated from high school in '86, you recall that he moved down shortly after graduating from high school, right?

A.     That's correct.

Q.     And then he moved back down in 1992, correct?

A.     That sounds about right.

Q.     Okay.  So let's talk about the first time he was down there.  The first time he came to Arizona, you had a company at that time, right?

A.     That's correct.

Q.     And you hired him as an employee?

A.     That's correct.

Q.     He actually ended up working as a manager in your company, didn't he?

A.     That's correct.

Q.     Managed other employees?

A.     That's correct.

Q.     Managed the entire lab down there, right?

A.     That's correct.

Q.     You had a company that was manufacturing circuit boards, correct?

A.     That's correct.

Q.     And the area that he was in charge of was dealing with the chemical process and manufacturing process with the manufacturing of those boards, right?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 132 of 246

A.     That, along with the manufacturing people, that's correct.

Q.     All right.  Now, he left in 1986 [sic] and came back to Iowa and worked for another company making circuit boards for computers, didn't he?

A.     That's correct.

Q.     And he had actually talked 1 of your most valuable employees from [sic] leaving your company and going back to Iowa and working for that company, didn't he?

A.     That's correct.

Q.     And you were pretty upset about that, weren't you?

A.     I was very upset about that.

Q.     And so there were a number of years there where you didn't even talk to Dustin, right?

A.     That's correct.

Q.     Now, the first time that Dustin came down to Arizona, did you have any involvement in drug activity with him at all?

A.     Not that I recall.

Q.     Now, when you were living at home still, would you take any vacations as a family?  And let's break this down.  Let's look at the time period up until your mother divorces.  So when your father, Jim, is still at

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 133 of 246

home, you guys take family vacations?

A.    We took 1 vacation with my grandparents that my parents were there, yes.

Q.    You also went to Clear Lake though on occasion, didn't you?

A.    My mom would rent a cabin in Clear Lake.

Q.    Okay.  And so you would do that for a week every summer?

A.    I don't know if it was every summer, but we would do it in the summer, yes.

Q.    And on those occasions, would you have other relatives there?

A.    I don't recall any.

Q.    Okay.  You talked a little bit about your father's illegal activities.  Fair to say, your father was kind of a story teller, wasn't he?

A.    That's an understatement.

Q.    Okay.  And so other than the 1 time you testified about you were sitting in the car when your father was apparently lighting something on fire, you weren't personally involved in any other criminal activity he was involved in, were you?

A.    No.

Q.    All right.  Now, there's been some allegations that you actually burned down 1 of the houses for your

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 134 of 246

father, is that true?

A.    No.

Q.    You talked about the -- the pets, and that there were 3 pets that your father killed when something happened to the pets.  Let's talk about that.  First of all, there were 3 dogs?

A.    Dogs.

Q.    Okay.  And do you remember the names of the dogs?

A.    Bingo; a German Shepard was the -- was Heidi; and I can't remember the third.

Q.    Okay.  And when did you have Bingo?

A.    I don't know.  I think Bingo was actually Dustin's dog.  Boy, I don't know.  I don't know.

Q.    Can you put years on this at all?

A.    No.

Q.    All right.  What happened to Bingo that caused your father to apparently shoot him?

A.    He -- somehow he got injured.  I think he got injured by a car.  I don't know the specifics.  But his back leg was hurt, and Dad took care of him.

Q.    Okay.  You don't know the specifics.  You didn't see him injured?

A.    No.

Q.    You don't know how badly he was injured?

A.    I was a little kid.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 135 of 246
*to purchase a complete copy of the transcript.*

Q.      Okay.  And you didn't actually see your father shoot him, but you heard that?

A.      That's correct.

Q.      Okay.  What happened to Heidi?

A.      My understanding is Dad shot him too.

Q.      Okay.  And again, you didn't see the dog get injured?

A.      No.

Q.      Don't know the extent of the injuries?

A.      No.

Q.      Didn't see your father shoot him?

A.      No.

Q.      All right.  This is all something somebody told you?

A.      That's correct.

Q.      How about the other remaining dog you can't remember the name of?

A.      Same scenario.

Q.      Okay.  Injured somehow, you don't know how bad, don't know what kind of injuries, and you only heard that your father shot him?

A.      For some reason, it sticks in my head that the third dog actually attacked some chickens of 1 of the neighbors, and Dad took care of it because it attacked some chickens.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 136 of 246

Q. All right. Now, you'd agree with me that Dustin was never an impulsive person, was he?

A. No.

Q. And let's make sure we're communicating. Was Dustin an impulsive person?

A. In what aspect?

Q. In any aspect. Was he an impulsive person?

A. If he was going to spend money, yeah, he was very impulsive. If it was something that he was going to -- if it was something that he was going to do, he was not impulsive.

Q. Okay. And you remember testifying at the Angela Johnson trial, sir?

A. I do.

Q. Okay. And do you remember you were asked this question and you were given -- you gave these answers? At Pages 322 and 323 of the transcript.

"Question: Describe for the jury, if you would, was Dustin Honken an impulsive person?

"Answer: No.

"Question: What was he like?

"Answer: Dustin was very much of a thinker. He was -- he just wasn't impulsive."

Do you remember having those questions asked of you and giving those answers?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 137 of 246

A.    No, but I would still stick by those answers.

Q.    Okay.  And, in fact, he was the kind of person who actually would think things out pretty carefully in advance of doing anything, wouldn't he?

A.    With the exception of spending money, that's correct.

Q.    Now, during the time that he worked for you, during the 1986 to 1988 time period, roughly, when he was down in Arizona the first time, the name of the company you had was Cadtek, is that right?

A.    That's correct.

Q.    C-A-D-T-E-K?

A.    That's correct.

Q.    And at that time Dustin was a pretty good worker, wasn't he?

A.    Very good.

Q.    Kind of worked his way up the company pretty quickly, didn't he?

A.    Yes, he did.  He earned what he got.

Q.    Were you about to demote him when he left for Iowa?

A.    He -- he actually got in a physical fight with 1 of the -- with 1 of his employees, and we had a regulation of no tolerance for fighting.  So he was -- the other person he got in a fight with ended up

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 138 of 246

leaving, but Dustin did not leave on that accord, but, yeah -- his record was not tarnished, let's put it that way.

Q. Do you remember ever telling anybody about him getting into a physical fight before with another employee?

A. It's common knowledge, I know.

Q. Do you remember ever telling the government when they were interviewing you that he got involved in a physical fight?

A. I don't recall that, no.

Q. Do you remember during trial I asked you multiple times if you ever knew Dustin Honken to ever have been involved in any violence with anybody other than -- until he met Angela Johnson and you repeatedly saying no?

A. No, I don't recall that.

Q. You don't remember ever bringing up at that time that he had actually been in a physical fight with --

A. All it was was a push between 2 guys. That's what created the black mark. It wasn't fist swings. It was a push. But a push in a company is a push, and --

Q. Okay. Did you ever ask Dustin Honken to -- let me back up here. In -- in prepping for today's testimony, did counsel share certain information with

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM Document 83 Filed 12/07/11 Page 139 of 246

you?

A.     Yes.

Q.     Okay.  Did you ever see the interview reports that were done by their -- the trial counsels' mitigation specialist, named Lisa Rickert?

A.     No.  All they shared with me is what I had conveyed to her while she was at my house.

Q.     Okay.  Were you aware that Dustin Honken claimed that you asked him to sell marijuana for him?

A.     No.

Q.     Is that true?  Did you ever ask Dustin Honken to sell marijuana for you?

A.     No.

Q.     He claimed in interviews to Ms. Rickert that you had a marijuana connection by the name of Jesus Alvarez in Mexico and it was your marijuana connection that he linked up to and got marijuana from pursuant to the setup you arranged.  Is that true?

A.     He knew -- Jesus worked in the same company, Jesus worked in Cadtek.  He had all the same -- he knew all the same people I did.

Q.     Well, let's go straight to the allegation though. He's saying you bought marijuana and cocaine from Jesus Alvarez and gave it to Dustin then to sell.  Is that true?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 140 of 246
*to purchase a complete copy of the transcript.*

A.     There's never -- I have never bought or sold cocaine in my entire life.

Q.     1 of your stepbrothers through the marriage with Ron Smidt is Bruce Smidt?

A.     That's correct.

Q.     Okay.  There's allegations that Bruce was involved with you in attempting to synthesize cocaine. Was Bruce ever involved in trying to synthesize cocaine with you?

A.     No, never.

Q.     Was Bruce Smidt involved in any illegal drug activity to your knowledge?

A.     No, never.

Q.     Allegations that he helped fund the meth operation, is that true?

A.     No.

Q.     Dustin claims that in 20 -- I'm sorry, in 1992, you're the 1 who asked --

             MR. NOLAN:  Could I clarify something, Your Honor?  I just want to know where that last allegation came from.  I'm just not certain if they're still talking about what Dustin told this investigator or something else?

             THE COURT:  All right.

             MR. WILLIAMS:  Exhibit -- let me see, it's

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 141 of 246

going to be the report of interview of Dustin Honken by Rickert, Bates Number 005337.

MR. NOLAN: Thank you.

MR. WILLIAMS: It's an exhibit of yours, Pages 2 through 5.

Q. Going to 1992, Dustin claims that you talked -- asked him to come down to Arizona, is that true?

A. No.

Q. Okay. That's the occasion where Dustin came down on his own, right?

A. Dustin came down on his own both times he came down.

Q. Okay. And the second time he came down, he came down with the idea of trying to synthesize drugs and manufacture drugs, right?

A. That's correct.

Q. That wasn't your idea?

A. No. He actually started doing that research when he was in -- up in NIACC.

Q. He claims that you asked him to make cocaine and methamphetamine. Did you ask Dustin to make drugs?

A. Dustin thought he could make drugs when he was up here in Iowa. That was -- he did research and said he went down to Ames, and Dustin was a research nut.

Q. Okay. So the bottom line is, no, you didn't ask

Case 3:10-cv-03074-LTS-KEM Document 83 Filed 12/07/11 Page 142 of 246

him to make cocaine or methamphetamine?

A.      No.

Q.      Okay.  He claims -- again, these are in notes of interviews by their mitigation specialist -- claims that you needed him to make methamphetamine.  Did you ever tell Dustin Honken you needed him to make methamphetamine?

A.      No.

Q.      He claims that you kept most of the profits from the manufacturing of methamphetamine and only gave them minimal living expenses.  Is that true?

A.      Well, first of all, there really wasn't very many profits, to my knowledge.  Secondarily, Dustin had what profits -- I mean, Dustin was the 1 that had the connections that he was selling to, so Dustin was the 1 that had the money.

Q.      He's the 1 who controlled the cash flow, right?

A.      That's correct, and also coming in was what he was borrowing from me.

Q.      Now, Dustin also claims in the same interview notes that you ran the operation.  Did you run the operation, the manufacturing of methamphetamine?

A.      I would never have the knowledge to do that.

Q.      Did you run any aspect of the distribution of the methamphetamine back to Iowa?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 143 of 246

A.    I did not have the connections to do that.

Q.    Dustin is the 1 who claimed that you burned down a trailer.  You didn't burn down the trailer?

A.    No.  The only trailer that I know that my dad burned down was 1 that was in Cherokee, Iowa.  I actually think he might have had my uncle burn it down, and my dad threw a guilt trip on me, and I had to go clean up the mess.

Q.    Okay.  And which uncle do you think he talked into doing that?

A.    My Uncle Tim.

Q.    Okay.  Dustin claimed that your dad had you burn a supra car.  Did you burn a supra car?  S-U-P-R-A.

A.    No, not that I remember, no.

Q.    Okay.  He also claims your dad had you crash a couple of cars in order to collect insurance.  Did you ever do that?

A.    No.

Q.    Dustin Honken says that you asked him to kill your business partner, Terri Frye, because you --

A.    What?

Q.    -- had an affair with her?

A.    Say that again.

Q.    Okay.  Dustin claims that you asked him to kill your business partner, your former business partner,

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 144 of 246

Terri Frye, because you were having an affair with her, and this was at a time when your business was failing, and she had an insurance policy for a million dollars, and that you could collect on the insurance policy. Did you ever ask Dustin to kill your business partner?

A.   No.  That is the craziest thing I've ever heard.

Q.   Did you have a plot to kill your business partner?

A.   No.

Q.   Now, the first time you got involved at all with Dustin Honken in any drugs at all was the second time he moved to Arizona, isn't that right, in 1992?

A.   That's correct.

Q.   Okay.  So we've been over the first time he came down to Arizona.  You didn't have any involvement with him with any drugs then?

A.   No.

Q.   Okay.  And then when he moved back to Iowa, you weren't even hardly speaking to him at that point, right?

A.   That's correct.

Q.   You weren't shipping marijuana up to Dustin to sell to people up there?

A.   I know he was, but I wasn't doing it.

Q.   Now, Dustin asked you for money to manufacture

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 145 of 246

methamphetamine, right?

A.     That's correct.

Q.     And you knew that's what he was doing with the money?

A.     I did.

Q.     All right.  And the way it would work, is he would continue to come back to you with requests for additional funds from time to time based on what he needed, right?

A.     For all of his needs, that's correct.

Q.     Okay.  And you knew that at least some of that money was going to be going to the manufacturing process, right?

A.     Yes, I did.

Q.     And you knew other money was going to his living expenses in connection with him manufacturing -- while he was manufacturing, right?

A.     That's correct.

Q.     Okay.  And when he would ask for money, you would give it over to him, right?

A.     That's correct.

Q.     Now, you indicated that, to your knowledge, that this operation didn't make a lot of money.  Were you aware that on an undercover tape, Dustin told Greg Nicholson that he so far had grossed $100,000 in

proceeds from the sales of meth?

A. No, I was not aware of anything like that.

Q. Did you have any idea that there was that kind of money involved in this?

A. If Dustin had that kind of money, he would have at least had a really nice car.

Q. Do you know how much he was selling the meth for?

A. I have no idea.

Q. Do you know how many pounds of meth he manufactured?

A. No.

Q. Now, when Dustin moved down to Arizona the first time, he moved in with you and your wife at that point, right?

A. Yes.

Q. He tried to make some methamphetamine in your apartment, but it wasn't successful at that point, right?

A. This is the second time he came down?

Q. Yes.

A. Yes, correct.

Q. Okay. And it was making a smell that your wife wasn't happy with?

A. Or me, yes.

Q. Okay. And your wife, by the way, didn't know

Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 147 of 246

what was going on.  Dustin had told her some story about trying to extract gold off of plating or something.

A.    Yes, I'm sure.

Q.    Okay.  And so the decision was made to -- for them to get an apartment, and this is about the time Tim Cutkomp comes down, right?

A.    Sounds about right, yes.

Q.    And Dustin was the 1 who decided to get an apartment?

A.    That's correct.

Q.    Okay.  And then manufactured at the apartment for a little bit, but because of, again, the risk of smell, Dustin made a decision we needed -- he needed to move the operation out in the country someplace, right?

A.    That's correct.

Q.    And again Dustin comes to you on each of these occasions and says, "I need money for the apartment.  I need money for this house out in the country"?

A.    "I need money for gas.  I need money for eating," yeah, yeah, yeah.

Q.    Dustin was the 1 with the connections for selling the meth in Iowa?

A.    Yes.

Q.    You knew 1 of those people was Terry DeGeus?

A.    I did.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 148 of 246
*to purchase a complete copy of the transcript.*

Q.      You didn't even know the name of the other person he was selling to, did you?

A.      Did not.

Q.      You don't know how Dustin got the meth up to Iowa, do you?

A.      He usually drove it.

Q.      Okay.  And you don't know how many trips he made, do you?

A.      I do not.

Q.      The most amount of money you ever got back from this investment that you made into this operation is maybe about 5,000 and maybe smaller amounts a couple more times after that?

A.      That sounds about right.

Q.      You never got back all the money you put into this operation, right?

A.      I did not, no.

Q.      Now, when Dustin is arrested in March of 1993, you end up going over to the apartment that he's been sharing with Missy Friesenborg, right?

A.      Yes.

Q.      And it's at that point that, you walk in, you realize that he had paid for all this nice furniture that was in Missy's place, right?

A.      From her, yes.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 149 of 246

Q.    Right.  So she tells you that he's paid for a couch and a love seat that were pretty nice, leather couch and love seat, right?

A.    That's correct.

Q.    Had a very expensive stereo, right?

A.    That's correct.

Q.    She bought -- she told you that he bought the bedroom set as well, right?

A.    Yep.

Q.    Bought her a diamond ring, right?

A.    That's correct.

Q.    Okay.  And that was the first you knew that he was spending that kind of money that you were supplying?

A.    That's very correct.

Q.    Right.  And to your knowledge, he had no other source of income, other than coming to you and getting the money from you, right?

A.    That's correct.

Q.    And what he was making from selling the methamphetamine?

A.    That's correct.

Q.    He wasn't working a job while he was down there, right?

A.    Not to my knowledge, no.

Q.    Now, when Dustin was arrested in March of 1993,

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 150 of 246
*to purchase a complete copy of the transcript.*

he called Melissa Friesenborg, Missy Friesenborg, and had her convey a message to you, right?

A.    Missy conveyed the message to me, that's correct.

Q.    Okay.

A.    Or Missy called me and said that Dustin got arrested, and I responded.

Q.    Okay.  There's more to it than that.  "Dustin got arrested and you need to destroy some equipment," right?

A.    Well, as you just pointed out, you know, he had a lot of things that he had.  He needed money for bail, so he wanted me to sell his stereo.  Again, this is coming from Missy.  Missy said that there was stuff in the freezer that she got rid of and dumped it down the toilet.  I knew he had stuff in my storage shed, so I got rid of whatever he had in the storage shed.

Q.    Well, you were told to get rid of the stuff in the storage shed, right?  Isn't that the message Missy told you?

A.    All -- what I remember is Missy calling up, saying Dustin was arrested, and, you know, Missy told me that the stuff -- we had to get rid of the stuff.

Q.    All right.  Now, Missy wasn't involved in the operation, was she?

A.    No.

Q.    All right.  And so she's telling you that "We've

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 151 of 246

got to get rid of the stuff," you knew that to mean the stuff that was stored in the storage unit, right?

A.    I took it as that, that's correct.

Q.    All right.  And, again, you remember testifying at Angela Johnson's trial?

A.    I do.

Q.    And you remember testifying about this topic?

A.    Yes.

Q.    Okay.  Do you remember you were asked these questions and gave these answers, Page 360 of the Johnson trial transcript:

"Question:  Did you have any contact with Melissa Friesenborg?

"Answer:  Yes.

"Question:  And what contact was that?

"Answer:  She gave me a call shortly after my mother called me and said that she had been in contact with Dustin, and that -- she reiterated that he got arrested.  And she had a message.  She said that he had asked me to come down to Tucson and dispose of what he had placed in 1 of my storage sheds, and he also asked me to sell a stereo that he had at their apartment, and not to be upset with what I would see."

Do you remember giving that testimony in the Angela Johnson trial?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 152 of 246

A.     I do.

Q.     And -- okay.  In fact, it was a message conveyed from Angela -- I'm sorry, from Dustin Honken to you, wasn't it?

A.     It was always my assumption that Angie [sic] talked to Dustin and Angie conveyed the message to me, that's correct.

Q.     I'm sorry, that "Angie" conveyed the message to you or that Dustin talked to Melissa and conveyed the message to you?

A.     Dustin -- I always assumed that Dustin talked to Missy and Missy conveyed the message to me.

Q.     All right.  Well, she actually told you that she's conveying a message from Dustin, didn't she?

A.     I always assumed that's where it came from, yes.  I don't remember the exact conversation word -- verbatim.

Q.     All right.  Well, your memory back 7 years ago when you testified in this trial would be better than it is today.  Isn't that fair to say?

A.     Well, as age goes on, it gets older and older and older.

Q.     All right.  Do you remember testifying in Dustin Honken's trial, almost 7 years ago now?  At Page 301, you were asked these questions:

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 153 of 246
*to purchase a complete copy of the transcript.*

"Question: Did you receive any other calls then or shortly thereafter?

"Answer: Yes, I did.

"Question: And who was that from?

"Answer: From his girlfriend in Tucson.

"Question: And what was her name again?

"Answer: Missy or Melissa.

"Question: And what did she tell you?

"Answer: She told me that she had talked to Dustin, and Dustin wanted her to convey a message to me to go down and dispose of anything that he had left in 1 of my storage sheds and that he wanted me to pick up his stereo and sell it for him, and not to get upset when I went down at what I had seen."

Do you remember giving that testimony in Dustin Honken's trial?

A.     Not specifically, but it's basically the same words I said in the other trial.

Q.     And the same words you gave in both trials is that the message was she told you that she was conveying a message directly from Dustin to you.  Isn't that what you testified to in both trials, sir?

A.     According to what you just read, yes.

Q.     And you testified before you were living in Phoenix at the time, right?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 154 of 246

A.     That's correct.

Q.     So the storage shed was down in Tucson, so you're driving, what, a couple hours south from Phoenix down to Tucson?

A.     That's correct.

Q.     And you knew those materials were meth manufacturing materials, didn't you?

A.     Yes.

Q.     Now, Dustin knew the chemistry, isn't that right, knew how to manufacture methamphetamine?

A.     Yes.

Q.     Okay.  You didn't know how to do that?

A.     No.

Q.     Okay.  He's the 1 who asked you to get involved in this, isn't he?

A.     He asked me for the money.

Q.     Yeah.  And you understood, by him asking you for the money, he was asking you to get involved in the meth manufacturing operation, right?

A.     I don't know if I would put it that way.  Dustin just always asked me for money, and he told me what he was doing, and I loaned him the money.

Q.     It wasn't your idea -- you didn't come up with the idea, *Oh, I understand, Dustin, you're making meth. Let me invest in your business*?  That wasn't your idea,

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 155 of 246

right?

A.     No.

Q.     Dustin came to you and asked you to get involved, isn't that right?

A.     He wanted me to --

          MR. NOLAN:  Objection to the characterization "involved," Your Honor.  He said what he had -- what his impression was at the time.

          THE COURT:  Overruled.  You may answer, or if your answer is complete, we can go on to the next question.

A.     I don't know how to answer any differently.

Q.     Okay.  Dustin was the 1 who organized the chemicals and manufacturing?

A.     Yes.

Q.     Okay.  Dustin was the 1 who made the decision who to sell the meth to, right?

A.     That's correct.

Q.     He's the 1 who decided to bring Tim Cutkomp into it?

A.     That's correct.

Q.     He decided where to manufacture the methamphet-amine?

A.     That's correct.

Q.     He decided what quantity of methamphetamine to

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 156 of 246

make?

A.    That's correct.

Q.    He decided how much to charge for the meth?

A.    That's correct.

Q.    Dustin's the 1 who decided who was going to get what portion of the money that came from the sale of the meth, right?

A.    That's correct.

Q.    Now, you never saw Dustin use any controlled substances, isn't that right?

A.    Not that really sticks out in my head, no.  I remember him sampling but not as a user.

Q.    Now, were you -- have you ever been treated for any type of mental health illness, sir?

A.    No.

Q.    Ever been diagnosed with any mental health issues?

A.    No.

Q.    No depression, no anxiety, anything like that?

A.    No.

            MR. WILLIAMS:  Just a moment, Your Honor.

            THE COURT:  Yes.

            (Brief pause.)

            MR. WILLIAMS:  No further questions, Your Honor.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 157 of 246
*to purchase a complete copy of the transcript.*

THE COURT: Any redirect?

MR. NOLAN: Just a couple questions, Your Honor.

REDIRECT EXAMINATION

BY MR. NOLAN:

Q.    Mr. Honken, do you remember a conversation with Dustin after the time he moved back from Arizona about the fact that he was dating 2 women and had -- was having a child from each of them?

A.    Yes.

Q.    And what did he tell you about that?

MR. WILLIAMS: Calls for hearsay, Your Honor.

THE COURT: Do you agree it's hearsay? And if it is hearsay, does an exception apply?

MR. NOLAN: Your Honor, it would be an admission by the defendant.

MR. WILLIAMS: But that can only be offered by the party-opponent, Your Honor.

THE COURT: Yeah, objection is sustained. And you may ask another question.

Q.    Did you have -- Mr. Honken, did you have anything to do with the methamphetamine operation?

A.    Besides giving Dustin money, no.

Q.    You were asked questions about your father's

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 158 of 246

illegal activities.  Did your father go to jail?

A.     Yes.

Q.     What for?

A.     I don't know the exact legal terms, but I think he attempted to rob a bank.

Q.     Was he in federal prison for some time?

A.     Yes.

Q.     Did you ever visit him in federal prison?

A.     Once.

Q.     Mr. Honken, I'd like to show you an exhibit. It's going to come up on the screen in front of you there.

A.     Okay.

Q.     It's Plaintiff's Exhibit 114.

A.     Okay.

Q.     Can you identify what that is for the record?

A.     This?

Q.     Yes.

A.     It's a statement that --

Q.     Well, what does it say at the top?

A.     Oh, Declaration of Jeffrey Honken.

Q.     Is that your signature on the last page?

A.     Yes, it is.

Q.     And what -- what was the date on this?

A.     5-18-11.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 159 of 246

Q.   And before you signed this declaration, did you read it?

A.   Yes, I did.

Q.   Did you read it to be sure that it was accurate?

A.   Yes, I tried.

Q.   And did you make several edits to it before signing it?

A.   Yes, I did.

Q.   Mr. Honken, if Lisa Rickert or anyone from the defense team had spent time with you at your home discussing the issues that you've testified to today, would you have been willing to testify to these things back at the time of Mr. Honken's trial?

A.   Yes.

MR. NOLAN:  I don't have any other questions, Your Honor.

MR. WILLIAMS:  Nothing further, Your Honor.

THE COURT:  Thank you, sir.  You may step down.

We are about 5 minutes to lunch, so let's go ahead and take our lunch break now and pick it up again at 1 o'clock.  Thank you.

MR. NOLAN:  Your Honor, our next witness is in custody.

THE COURT:  Okay.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 160 of 246

MR. NOLAN: So I guess we need to speak to someone about how to get that --

THE COURT: Yes, if you would just stop at the marshal's and let them know, they'll be happy to have the witness here.

MR. WILLIAMS: I'll work with them, Your Honor, to show them where the marshal's --

THE COURT: Oh, I appreciate that. Thank you.

(Whereupon, a luncheon recess was taken.)

THE COURT: We are on the record in Dustin Lee Honken versus the United States of America, CV 10-3074 and 01-3047. And we're ready for any additional evidence that would be offered on behalf of Mr. Honken.

MR. NOLAN: Thank you, Your Honor. Before we call our next witness, could I make a brief argument for the record regarding Your Honor's hearsay rulings?

THE COURT: Yes.

MR. NOLAN: Your Honor, as I mentioned before, hearsay, as Your Honor is well aware, is admissible at a federal capital sentencing, and Your Honor aptly pointed out that it is not admissible at a 2255 hearing because of the Rules of Evidence. And I would suggest to the Court that this ties our hands in a way that is unconstitutional, in that we are required by

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 161 of 246

Strickland to prove prejudice, and the only way we can prove prejudice is to prove what counsel could have presented at the penalty phase. And so I would suggest to the Court that precluding this evidence is a violation of due process. It's also a violation of the Sixth Amendment right to counsel, and that it is a violation of the Eighth Amendment prohibitions against cruel and unusual punishment.

The United States Supreme Court has said -- it has recognized this in Sears versus Upton in the state context, wherein it said, "We have also recognized that reliable hearsay evidence that is relevant to a capital defendant's mitigation defense should not be excluded by rote application of a state hearsay rule." And I would suggest that the same is true here, in that since we are required by Strickland to establish this prejudice, that evidence that is technically maybe hearsay should still be admitted at this hearing for us to prove that prong of Strickland.

Also, in Green versus Georgia, in 1979, the United States Supreme Court held that even if proffered testimony comes within Georgia's hearsay rule, that its exclusion could constitute a violation of due process and, in fact, did constitute a violation of due process in that matter.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 162 of 246

So for these reasons, Your Honor, we would ask the Court to reconsider its rulings regarding specific hearsay. And just to let the Court know, this is going to come up again and again, because we are calling family witnesses that would have been able to testify to these things at the original penalty phase. And what we would request, if the Court would not reconsider the ruling, is that the proffer for purposes of any reconsideration later or for purposes of an appeal would be the evidence that is submitted in our declarations, because we feel that -- and if there's something, we would point that out to the Court, but for the most part the evidence that we are trying to elicit that may, in fact, be hearsay would be contained in those declarations, so we would ask that that would technically be our proffer. It would save time rather than having us do a proffer each time.

THE COURT: Response.

MR. WILLIAMS: Thank you, Your Honor. The difficulty here is that we are in an artificial setting to some degree. The Rules of Evidence do apply to this hearing. I agree with counsel, that if what they're trying to show is what they would have put on in evidence at the penalty phase, that the Rules of Evidence don't apply to the penalty phase. The problem

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 163 of 246

is, particularly with the witnesses we've had so far today, there's been no delineation between when it's being offered for that versus when it's being offered as to, like, role in the offense, when it's being offered as to some other issue.  So I think Number 1 is, if we're going to go that direction, then it has to be clearly articulated that this witness -- what they're proffering is what this witness, they claim, would have testified to in the penalty phase.  But then it's not as easy as simply all hearsay comes in.  Although the Rules of Evidence don't apply in the penalty phase, the Court still has a gatekeeping ability to keep out unreliable evidence, even in the penalty phase, if it lacks reliability, and so the Court still can make the judgment call about whether to allow or not allow that evidence in under that more relaxed standard of the Rules of Evidence.  And so I think it's not just simply a case that the Rules of Evidence don't apply and all the hearsay can come into this hearing.  I think it's a much more nuanced analysis that has to go into each statement that's made and each question asked of the witness here.

THE COURT:  And I guess that the easiest way then to handle it is, if you -- if the purpose of the question is to elicit what you would have asked in the

penalty phase, you can so indicate in your question, and then if there's an objection to that, then I can rule. But that was not the way we were proceeding before. With regard to the objections that I did sustain on the basis of hearsay, if you want to make a proffer at some point regarding those, that may clean up the record.

MR. NOLAN:  Thank you, Your Honor.

THE COURT:  All right.

MR. NOLAN:  Your Honor, I apologize, we were just informed by the marshals that our next witness who was in custody is in route.  We're checking to see if our witness after him is here because we could start with him instead.

THE COURT:  Okay.

MR. NOLAN:  Your Honor, our next witness is going through security right now, so he'll be right in.

THE COURT:  Okay.  All right.  Had you given the marshals a time for the witness in custody?

MR. NOLAN:  We had indicated to them that we would try to call him right after lunch, just after the lunch break.

THE COURT:  Okay.  Usually they're real good about that if you give them advance notice.  I don't know where this prisoner was being housed.  But just for example, tomorrow, if you tell them today approximately

when you'll need your witnesses tomorrow, they're generally really good about getting them here.

MR. NOLAN:  Thank you.  I believe this is our only witness in custody, so hopefully we won't have the problem.

THE COURT:  All right.  Moot point.

MR. NOLAN:  Mr. Adjoian is going to examine the next 2 witnesses, Your Honor.

THE COURT:  All right.

MR. ADJOIAN:  Thank you, Your Honor.  Our next witness will be David Honken, who I think may still be going through security.

THE COURT:  All right.

(Witness entered the courtroom.)

THE COURT:  Hello, please come forward and be sworn.

DAVID HONKEN,
called as a witness, being first duly sworn or affirmed, was examined and testified as follows:

THE CLERK:  You may take the stand.

DIRECT EXAMINATION

BY MR. ADJOIAN:

Q.    Good afternoon, Mr. Honken.  Can you please state your name for the record?

A.    David Honken, H-O-N-K-E-N.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 166 of 246

Q.    And, Mr. Honken, are you related to the defendant in this case, Dustin Honken?

A.    Yes, he's my nephew.

Q.    Okay.  And are you related to him on his mother's side or his father's side?

A.    Father's side.

Q.    So are you then James Honken's brother?

A.    Yes.

Q.    Okay.  Mr. Honken, just to begin, is your brother, James, still with us?

A.    No, he passed away last year.

Q.    Okay.  How did he pass away?

A.    It was from acute alcohol poisoning.

Q.    Okay.  How old was your brother in relation to you?

A.    1 year younger.

Q.    Did you testify at Dustin Honken's trial in 2004?

A.    Yes, I did.

Q.    And was that at the penalty phase?

A.    That was at Sioux City, Iowa.

Q.    Yes, sir.  Was that at the -- had Mr. Honken already been convicted of murder at the time you testified?

A.    Yes.

Q.    So it was at the second phase of trial that you

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 167 of 246
*to purchase a complete copy of the transcript.*

testified?

A.    Yes.

Q.    Okay.  Did you also do a declaration for Mr. Honken's current counsel, current defense team?

A.    Yes, I did.

Q.    If you'll look to the screen, on there is Petitioner's Exhibit 112.  It's right in front of you on the screen as well.  And I'm just going to skip to the bottom.  Is that your signature at the bottom?

A.    Yes, it is.

Q.    Okay.  Mr. Honken, did you review this declaration before you signed it?

A.    Yes, I did.

Q.    Is it accurate to the best of your knowledge?

A.    I believe so.

Q.    Okay.  Mr. Honken, if you can just tell us a little bit about yourself.  Where do you live currently?

A.    I've retired to Stoddard, Wisconsin, just south of La Crosse.

Q.    Okay.  And when you were -- before you retired, what did you do for a living?

A.    I was in the grocery business and convenience store business, and I built and franchised some stores in Iowa.

Q.    Do you have a family, Mr. Honken?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 168 of 246
*to purchase a complete copy of the transcript.*

A.     Yes, my wife and 4 children.

Q.     I'd like to talk to you a little bit about your brother, James Honken.  If we could start with growing up.  Can you tell the Court what your relationship with Jim was like growing up?

A.     He had -- he got put back a grade in school, grade school, and then he kind of resented that, and it affected his whole -- I think everything he did in school.  Was -- other kids teased him a little bit about being put back a grade.

Q.     Were you close with your brother growing up?

A.     No.  We traveled in a little different crowd, I guess.

Q.     What do you mean by that?  What kind --

A.     Well, I was -- I played sports and went with the football players and basketball players and baseball players, and he didn't play any sports.  So he kind of went his way, and I went mine.

Q.     And what type of a crowd more so was he involved with?

A.     What's that?

Q.     What type of a crowd was he involved with more so?

A.     Just the -- a little bit of a wilder -- rowdier bunch of kids, I guess.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 169 of 246

Q.    Did Jim Honken eventually graduate from high school?

A.    No, he didn't.

Q.    After he left school, what did he do after that?

A.    He joined the Army.

Q.    And how long was he in the Army for?

A.    3 years.

Q.    What did Jim Honken do after he returned from the Army?

A.    He had an assortment of jobs.  Mechanic and -- I'm trying to think.  And then he worked for a construction company.  Eventually, he went on to work for -- a welder on the union, out of Chicago.

Q.    Did Jim Honken eventually get married at some point?

A.    Yes.

Q.    And to whom did he get married?

A.    Marvea Hamilton.

Q.    As an adult, did you spend much time around Jim, Marvea, and his family?

A.    No, I didn't.

Q.    Would you see them nevertheless?

A.    Yes, every once in a while at my folks's place for Christmas and some birthdays and when we just happened to be there, our family and his family would

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 170 of 246

come also.

Q.    So were you living in the same town?

A.    No.

Q.    Okay.  So even though you weren't living in the same town, would you nevertheless see him several times a year as an adult?

A.    Yes.

Q.    I'd like to ask you a little bit about Jim and drinking.  Did Jim have a problem with alcohol?

A.    Yes, he did.

Q.    When did he start consuming alcohol to your knowledge?

A.    During I think his first marriage -- when he first got married, he was already starting on the beer mainly, but I didn't realize that he had jumped into the Vodka until a little later on.

Q.    And what you did realize about Jim's drinking -- how often would you say Jim would drink?

            MR. WILLIAMS:  Objection, lack of foundation.

A.    I'd say he drank every day.

            THE COURT:  Just a minute.  When there's an objection, sir, you have to stop talking.

            Mr. Adjoian.

            MR. ADJOIAN:  Your Honor, I can lay a bit of

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 171 of 246

a foundation.

THE COURT: Okay, fine.

Q.    Did you observe of your knowledge Jim Honken drinking?  Of your own perception, did you observe him drinking on occasion?

A.    Yes, several times.

Q.    When you were around him, for example, at the family occasions, the several times a year that you described, would Jim drink during those times?

A.    He never drank at my parents' house.  He would drink at his house.

Q.    Okay.  And when you saw him at his house, how much would he drink?

A.    Steadily.

Q.    What percentage of the time would you say that you were around him at his house was he intoxicated?

A.    Probably, if we got there for the noon meal, he would -- in the afternoon, he was already getting with the program.

Q.    And would that be essentially every time you saw him?

A.    Yes, basically.

Q.    Would Jim Honken's family be around during these times, his children and his wife?

A.    Yes.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 172 of 246
*to purchase a complete copy of the transcript.*

Q.    Okay.  What was Jim like when he was drunk?

A.    He got real surly.  You didn't want to start an argument with him.

Q.    Was this different from how he was when he wasn't drinking?

A.    Well, he was kind of a pleasant person when he wasn't drinking.

Q.    Okay.  So you just testified that Jim's personality changed quite a bit when he was drinking. Did -- would you describe Jim as a violent person when he was drunk?

A.    He talked violence.

Q.    Okay.  Did Mr. Honken ever offer to commit violence on your behalf?

A.    Well, you didn't dare say somebody was -- you didn't like somebody or somebody had done something, didn't pay you or something, because he would say, "Well, what do you want me to do?  Do you want me to go get them for you and take care of them?"

Q.    What did you understand that to mean?

A.    Well, it was kind of a threat to do physical harm to the people.

Q.    Okay.  Would that physical harm, in your mind as you interpreted it, have involved even killing?

A.    Well, he insinuated that.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 173 of 246

Q.     And how did you take that?  Did you take those as serious comments?

A.     Well, I did.

Q.     In addition to talking about committing violence on your behalf, did he talk ever about taking care of Dustin?

A.     Well, yes and no.  When Dustin was in prison, he thought that he could help him do away with himself.

Q.     Did he talk about taking care of Angela Johnson ever at any point that you were --

MR. WILLIAMS:  Objection, calls for hearsay.

THE COURT:  Do you agree it's hearsay?  And if it is hearsay, does an exception apply?

MR. ADJOIAN:  Your Honor, first of all, I would just go back to Mr. Nolan's record that he just made.  Mr. Honken, this witness, is exclusively a penalty phase witness.  Anything that he is testifying to now would have come into the penalty phase at the original trial.  But furthermore, the -- the evidence that's being offered is being offered for the effect that Jim's comments would have had on the people who were hearing them.  I believe this is circumstantial evidence of the atmosphere in the family home, that things like this were being communicated to other members of the family.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 174 of 246

THE COURT: Mr. Williams.

MR. WILLIAMS: I take it from that, he's saying it's not being introduced for the truth of the matter asserted, so if that's the case, and given the condition that this was exclusively for the penalty phase only, then the government withdraws its objection.

THE COURT: All right. You may proceed. And the question started to come in, "Did he talk about taking care of Angela Johnson ever at any point that you were --"

Q. That you were aware of?

A. I guess I can't remember for sure. It's been 13, 14, 15 years ago, and it's -- I believe it was mentioned.

Q. All right. Mr. Honken, would it refresh your recollection to take a look at the declaration that you signed for -- as to any comments Jim may have made about Angela Johnson?

If you could take a look at Paragraph 4 up on the screen there. Bottom of Page 1, going into Page 2. Just read that to yourself.

A. I believe, yeah, that he did mention that, keep anything -- to keep Dustin out of jail, I think he would -- he had mentioned that.

Q. All right. Mr. Honken, would -- was there any

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 175 of 246

point at which Jim made threats against you personally or your family?

A.      Yes.  I had to drive by his place going to western Iowa when we had some stores out there, and his house was awful close to the road, and I think he would watch out the window.  It was like 30 feet off the road. And he would watch out the window, and he would -- because there wasn't that much traffic on the road, and he would see me drive by and didn't stop.  And 1 time I just thought, well, I better stop.  It had been a month or 2 since I talked to him.  So I just pulled in.  He said -- he said, "I see you driving by."  He says, "You son of a bitch," and he was going on at me, and it kind of bothered me at the time.  I said, well, I better -- things could happen here.  I better stop more often.

Q.      Mr. Honken, did -- was -- was Jim drunk at that time when he came by your [sic] house?

A.      I believe he was.

Q.      I'm sorry, when you came by his house.

A.      Yes.  Well, he had been drinking.  Of course, that was steady.

Q.      Yes, sir.  Was -- did Jim Honken have guns in his house?

A.      Yes.

Q.      Did there come a time that Jim Honken became a

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 176 of 246

convicted felon at some point in his life?

A.    Well, when he was convicted of bank robbery.

Q.    And I'll get to that in a moment, but did Mr. Honken -- after he was released from prison on the bank robbery, did he continue to have guns?

MR. WILLIAMS:  Relevance, Your Honor.

A.    Yes.

THE COURT:  Whenever there is an objection, you have to stop talking.  So at this point, I would strike the answer.  And the objection is relevance.  And would you like to be heard on that?

MR. ADJOIAN:  Your Honor, I think this just goes again to Mr. Honken's, you know, character for violence and disregard for the law and its impact on the Honken family and Dustin Honken specifically in terms of the effects that this would have had on his development.

THE COURT:  I'll allow it.  The objection is overruled.  And you can -- Ms. Murray, will you please read back the question and we'll let him answer.

(Whereupon, the requested portion of the record was read by the court reporter.)

A.    Yes, he did.  1 was given to him by his -- Jeff, his son.

Q.    Mr. Honken, were you afraid of Jim?

A.    Yes, I was.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 177 of 246

Q.    Were you afraid of Jim even as an adult?

A.    Well, yes, because he was capable of -- if he threatened you, things could happen.

Q.    I wanted to talk a little bit now about Jim. Aside from the violence, was he generally a law-abiding citizen in your view?

A.    The last few years I believe he was.

Q.    Okay.  But for the majority of his life, did Jim keep to the straight and narrow?

A.    No.

Q.    Was he involved in any sort of scams over the course of his life?

        MR. WILLIAMS:  Objection, lack of foundation.

        THE COURT:  Sustained.

Q.    Mr. Honken, you've testified previously that you spent time with Mr. Honken -- time with Jim Honken, both growing up and periodically over the course of the years as you were adults.  Did you have personal knowledge of any scams that Jim Honken was pulling during his adulthood?

A.    He would try to give my father things that were stolen, but my dad just wouldn't accept them at all.  He didn't want them around at all.

Q.    What types of things would Jim try to give to

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 178 of 246

your father?

MR. WILLIAMS:  Again, Your Honor, I'm going to object for foundation.  I'm not sure if this is coming from what the father said or where he's got the basis of this knowledge.

THE COURT:  All right.  Do you want to rephrase your question, please?

MR. ADJOIAN:  Yes, Your Honor.  Thank you.

Q.    Were you ever present at your father's house or with your father anywhere at a time where Jim attempted to give your father stolen goods?

A.    At the time he had just -- my dad said he didn't want it, and I -- I talked to him after that, where the 3 of us were together, after he had tried to give it to him.

Q.    Okay.

A.    And my dad had said that he wasn't accepting anything like that.

Q.    Okay.  And what had Jim tried to give your father?

A.    An outboard motor.

Q.    Did you -- did you -- was it communicated to your father that this was a stolen outboard motor?

A.    I'm trying to think.  I just can't remember how it was said that -- but my dad took it as being stolen,

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 179 of 246

and my brother didn't deny it.

Q. Okay. Did Jim Honken -- did you ever observe Jim Honken with any sort of tools from worksites that did not belong to him?

MR. WILLIAMS: Again, lack of foundation, Your Honor.

THE COURT: Sustained.

Q. Did Jim ever tell you about occasions on which he would steal things from jobsites?

A. Yes, he did.

Q. Okay. What types of things did he tell you he would steal from jobsites?

A. Oh, tools, welding -- stuff for welding, torches and things like that, wrenches.

Q. And did he describe to you how -- what the nature of his theft operation was from these jobsites?

A. Well, he just said, "There's no problem with this." He said, "It's all cost plus. I can take it and they just replace it."

Q. What does cost plus mean?

A. I guess on a government job, they have a cost plus and all -- and any equipment you need can be purchased as they need it. And so if something was missing, they just went and bought another piece of equipment and used that, so they weren't -- the company

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM Document 83 Filed 12/07/11 Page 180 of 246
*to purchase a complete copy of the transcript.*

wasn't really out the equipment.

Q.   Was -- were you aware from your knowledge that at some point Jim was convicted of bank robbery?

A.   Yes, I was, when the FBI stopped.

Q.   After -- was Mr. -- was Mr. Honken eventually convicted of this bank robbery?

A.   Yes.

Q.   Okay.  Did he go to federal prison for it?

A.   Yes.

Q.   Did you ever visit Mr. Honken in federal prison?

A.   He was sent to Rochester -- or Mayo Clinic in Rochester, Minnesota.  And it was, like, 60 or 70 miles up, and I did go twice, because my folks wanted to go up and check on him.

Q.   When you saw Jim at the federal prison, did he have anything to say about his fellow inmates there?

A.   We were in a visitor's room and with maybe 20 or 30 people, visitors in there and the prisoners.  And he would point over and say, "Oh, that's a friend of mine. He's been convicted of murder or bank robbery or something.  And there's another friend over here. They're all great guys," that type of --

Q.   So was he glorifying essentially his fellow prisoners?

A.   Yeah, uh-huh.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 181 of 246

Q.      Did you have a sense that Jim was really in his element in the prison?

A.      I'm not sure.

Q.      After Jim got out of prison, what did he do?

A.      He was in a halfway house in Waterloo, which was about 10 miles from where we lived, and he had gone to work for a construction company in Independence, Iowa.

Q.      And how long was he working for that construction company?

A.      Excuse me?

Q.      How long, do you know, was he working for that construction company?

A.      Oh, not long.  6 months.

Q.      Okay.

A.      I'm guessing now.

Q.      Did there come a point, do you know, that he stopped working?

A.      Yes, he said he fell off a crane and hurt himself.

Q.      Okay.  Did you have a chance to see him after he said he fell off this crane?

A.      Oh, yes.

Q.      And in your view, did he seem disabled to you?

A.      No.

Q.      Were you ever able at any point beyond that date

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 182 of 246

to observe an injury that he seemed to have, work-related?

A.    No.

Q.    Did you, around that timeframe, offer to Jim Honken some work?

A.    Yes.  We had -- were building some stores, and if he needed -- he needed some money to get along, so we would say, okay, go up to such and such a town and paint the store or put some equipment in or do some floor work, and he would earn a little money with it.

Q.    And what was Jim's response to that?

A.    Well, he would do that just to get some extra money until his, I believe, the -- when he didn't have any work and he -- after he fell off the crane and he wasn't getting any money, so he needed a little money, but then after a certain period of time, he kept applying for disability, and finally, he said, "Oh, shoot," he said, "they just get tired of seeing you there and so they give it to me."

Q.    The disability, you mean?

A.    Yeah.

Q.    And after he got disability, was he still willing to work for you?

A.    No, no.

Q.    Why not?  Why did he --

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 183 of 246
*to purchase a complete copy of the transcript.*

A.    He said, "I can't work anymore."  He says, "The union might see me and not give me my pension."

Q.    Mr. Honken, you have testified a bit about Jim's own criminal exploits and his attitudes towards crime. Do you know, from your own observation, whether Jim would convey to his children that these criminal behaviors -- anything about these criminal behaviors and how they should be viewed?

A.    He said he did.  I didn't hear them.

Q.    What type of things did he say he told his children?

A.    Well, I think about stealing the equipment and tools and things like that off the job.

Q.    Did he -- did he suggest that he told his children that these were bad things to do?

A.    I think he bragged about them.

Q.    Okay.  How did Jim feel, if you know, about the legal system?  Did he ever talk to you about his feelings towards attorneys, judges, police officers?

A.    He said they were all liars and crooks.

Q.    If you know, did Jim ever communicate these feelings to his children?

A.    Oh, sure.  Yes, he did.

Q.    Did you hear him communicate these --

A.    He just said he did.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 184 of 246

Q.    Okay.  You talked a little bit previously about Jim's relationship with your father.  Do you feel that Jim's life-style put stress on your parents?

A.    Yes, it was.

Q.    Did -- did your -- did either of your parents suffer any, in your father's view, any adverse health consequences as a result?

          MR. WILLIAMS:  Objection, lack of foundation, Your Honor, objection.

          THE COURT:  Sustained.

Q.    Did your father ever communicate to you a feeling he had about how Jim's life-style affected your mother?

A.    Yes, he said he blamed my brother for my mother's stroke.

Q.    After -- after your mother had the stroke, did your father ever tell you about a time when Jim came to visit your parents?

A.    Yes.  He finally would acknowledge -- my brother didn't come there for quite a while.  A year -- I think a couple of years is my recollection.  And finally he came, and I went with him to kind of break the ice with my folk -- with my dad.

Q.    And did Jim bring anything with him when he came to --

A.    At 1 time -- this came from Jim.  He said, you

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 185 of 246

know, "I brought Dad some food, some groceries, and I left it on the table," and he said, "I went home.  And I forgot something so I came back, and" he said, "Dad had thrown everything in the garbage."

Q.    Did Jim tell you why his father threw these things in the --

A.    No.  He just said, you know, "He threw everything in the garbage I bought for him."

Q.    Okay.  Later in life, did there ever come a time when Jim was arrested and sent to a mental hospital?

A.    I got a call from the sheriff, and I can't remember which county it was.  It's in -- but anyway, he called, "Hey" -- he says, "Hey, I had to go get your brother."

Q.    And why did he say he had to go get Jim?

A.    He said, "Your brother is dancing around out in the front yard with no clothes on, so" he said, "I had to haul him to jail."

Q.    And did you go to -- did he get taken to jail?

A.    Yes, and then they took him to Iowa City to the hospital.

Q.    Did you go visit him in the hospital there?

A.    I finally did about 2 or 3 weeks after he had been down there, and he was unconscious.  I tried to shake him a little bit and say, "Hey, wake up," and

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 186 of 246

nothing. So I stayed about 15 or 20 minutes, and then I just left. So about 2 or 3 weeks after that, my wife says, "You better go down and check, see what's going on down at the hospital." So I drove down, and same thing. There's tubes all over him, and shook him a little bit, and the nurse came over, and she says, "Oh, he's out of it." She says, "He'll never get out of here alive."

Q.    What was your feeling when the nurse told you that, that he would never make it out of the hospital alive?

MR. WILLIAMS:  Relevance, Your Honor.

THE COURT:  I don't see the relevance, but I'll let you answer.  Go ahead.

A.    I thought, well, this is -- this isn't too bad of a deal, if he goes right now.  It will be a good deal for everybody, all his kids and families and -- if he's just gone.

Q.    Why did you feel that way?

A.    Well, any time he called, it was usually bad news, so you just dreaded the calls coming; something else might -- probably happened.

Q.    Just to be clear, Mr. Honken, what type of a hospital was this that Jim was in?

A.    It was the Iowa City hospital.  I think it's a veterans hospital also.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 187 of 246
*to purchase a complete copy of the transcript.*

Q.     Was it a mental hospital?

A.     When I went in, he was just in a ward on a -- in a hospital bed, and I didn't know for sure where it was in the hospital.

Q.     Did Mr. Honken -- did Jim Honken eventually pass away at that hospital?

A.     No, no.  He called.  Believe or not, he called 4 days later after I went to see him and the nurse said he'll never -- he called and said, "Hey, I need a ride home."  And my wife and I couldn't believe it.  And so I went down and picked him up.  And as we were driving back, he said, "Pull over here, to this convenience store."  He said -- so he went in, and he came out and he had a carton of cigarettes.  So I said, "Gee, whiz! I said you've been off cigarettes for 5 weeks now in the hospital."  I said, "Can't you quit?"

"Nope," he says "I'll never quit smoking." He says, "I may quit drinking, but I'll never quit smoking."

Q.     Mr. Honken, did anybody from Dustin's trial team meet with you prior to Dustin's trial?

A.     Yes.

Q.     And who was that?

A.     I guess -- I think it was an investigator for the -- and I'm not sure of her name.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 188 of 246

Q.    Was it a man or a woman?

A.    Woman.

Q.    Did you ever meet with his attorneys at any point?

A.    Just at the trial.

Q.    You mean when you were on the stand or --

A.    No, beforehand.  I talked to him a little bit.  I knew him from Waterloo, and so I just passed conversation with him, on some people we knew and things like that.

Q.    Did you discuss your testimony much with --

A.    No, it was mostly a call among acquaintances -- or talk among acquaintances that I knew and he knew.

Q.    Who was this attorney that you spoke to?

A.    Alfredo Parrish.

Q.    Okay.  And was he the -- was he the attorney who questioned you when you testified, if you recall?

A.    Yes.

Q.    He was?

A.    Yes.

Q.    Did you meet with a mental health expert in conjunction with these proceedings here on behalf of Dustin's current attorneys?

A.    I can't remember of it.  I could have.

Q.    Did you meet with a psychiatrist recently, Dr.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 189 of 246

Dudley?

A. Oh, yes, yes.

Q. Did you meet with a mental health expert at the time of Dustin's trial, similar to Dr. Dudley?

A. No, I don't -- I can't remember of it.

Q. Okay. Would you have met with a mental health expert at the time of trial, much like you did during these current proceedings, had you been asked to?

A. No, I didn't.

Q. Would you have had you been asked to?

A. Oh, yeah, yes.

Q. And would you have been willing to share the information that you shared with Dr. Dudley with --

A. Oh, yes.

Q. And would you have been willing to the extent that -- would you have been willing to testify to all the information that you just testified about --

A. Yes.

Q. -- at trial?

MR. ADJOIAN: Thank you, Mr. Honken. I have no further questions.

THE COURT: Cross-examination, Mr. Williams.

MR. WILLIAMS: Thank you, Your Honor.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 190 of 246
*to purchase a complete copy of the transcript.*

CROSS-EXAMINATION

BY MR. WILLIAMS:

Q.    Mr. Honken, I want to go back over some of your testimony here.  You spoke at 1 point about having a conversation with your brother, Jim, in which he talked about taking care of Angela Johnson.  Do you remember that part of your testimony?

A.    I can kind of remember him talking about it --

Q.    Okay.

A.    -- if he had a chance.

Q.    Now, counsel pointed out your declaration in this case, and in the declaration you don't actually talk about your brother ever mentioning that.  What you say in your declaration was, "He also had told me Angela Johnson was mean, a mean and tough woman, who would rather shoot you than look at you.  After the bodies were found, I thought -- I thought if Angela Johnson got out of prison, Jim would have her killed for sure." That's what you had in your declaration, isn't that right?

A.    Yes, yes, I believe that's -- that came up.

Q.    All right.  So now your testimony today is you remembered your brother saying something about harming Angela Johnson?  Is that what your testimony is?

A.    I believe it came up.  I just -- that's been a

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 191 of 246

long time ago for me.

Q.     Okay.  Well, in any event, when this -- when you had any conversation with your brother, when this could have come up, Dustin Honken wasn't present for that, was he?

A.     No.

Q.     You -- you testified that, after your brother was convicted of bank robbery, that he continued to have guns in the house.  Do you remember that testimony?

A.     Yes.

Q.     All right.  Now, first of all, you said that 1 of the guns was given to him by his son, Jeff.  How do you know about that, sir?

A.     He showed it to me.

Q.     Who showed it to you?

A.     My brother.

Q.     Okay.  So any statement -- any knowledge you have of where your brother got that gun is something --

A.     Yeah, that would be hear -- I -- just what he told me.

Q.     Okay.  You weren't there when Jeff gave him a gun?

A.     Nope.

Q.     This is just based on what your brother told you?

A.     Yes.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 192 of 246

Q.    And the reality is, your brother made up a lot of stories, didn't he, sir?

A.    Oh, yes.

Q.    He lied all the time, didn't he?

A.    Yes.

Q.    Embellished stories all the time?

A.    Yes.

Q.    Bragged about criminal activities --

A.    Yes.

Q.    -- that he may or may not have been involved in?

A.    Yes.

Q.    And you're not aware of Dustin Honken ever knowing whether your brother had a gun after he was released from prison, do you?

A.    No, I wouldn't know for sure that --

Q.    Okay.  Now, you indicated on direct examination that you were worried, you know, that if Jim threatened you, things could happen.  Do you remember making that statement?

A.    Yes.

Q.    The reality is, Jim never did engage in any acts of violence with you, did he, sir?

A.    No, he never -- just talk.

Q.    Just talk?

A.    Yes.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 193 of 246
*to purchase a complete copy of the transcript.*

Q.   All right.  You indicated -- you told a little bit about an incident where Jim Honken tried to give your father an outboard motor, communicated something about it being stolen, and your dad refused to take that.  Do you remember that testimony on direct exam?

A.   Yes.

Q.   Again, Dustin Honken wasn't there, was he?

A.   No.

Q.   You told about a time when you visited your brother in prison after the bank robbery, and he was glorifying his conduct -- or contact with other inmates there.  Dustin Honken wasn't with you on that visit?

A.   No.

Q.   Okay.  You talked about your brother falling off a crane and ultimately applying for disability.  You never saw the medical records for that, did you, sir?

A.   No, I didn't.

Q.   You don't know whether, in fact, your brother had a disability or not, do you, sir?

A.   I just heard from the -- his employer.  His employer was a friend of mine.  And he says, "Hey, what's your brother trying to do to me, collecting -- trying to collect workmen's comp on me?"

Q.   All right.  But you don't know whether, in fact, he injured himself, do you?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 194 of 246

A.    No, I don't.

Q.    All right.  You talked about -- on direct examination you indicated that Jim Honken would convey to his children his attitude about criminal activity.  Do you remember saying that on direct examination?

A.    Yes, I think so.

Q.    Okay.  And I think you said all that is just based on what Jim told you, right?

A.    Yes, it is.

Q.    Okay.  You were never present when he talked to --

A.    No.

Q.    -- his sons?

A.    No.

Q.    Okay.  And the reality is, you didn't spend much time around Dustin Honken, did you?

A.    Probably 3 or 4 times a year we would get together.  At Christmas maybe.  She had us up for -- Jim's wife, Marvea, had us up for Thanksgiving usually every year.

Q.    Okay.

A.    And then maybe once during the summer and -- then we would see the family.

Q.    And that would be about the extent of your exposure --

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 195 of 246

A.    Yes.

Q.    -- to Dustin, right?

A.    Yes.

Q.    Now, Marvea was a pretty good mother, wasn't she?

A.    Well, we thought so, my wife and I.

Q.    I mean, she -- when you were around the family, she was attentive to the children, wasn't she?

A.    Oh, yes.

Q.    She was actively involved in their upbringing, to your knowledge, right?

A.    Oh, yes.

Q.    She was a den mother in the Cub Scouts, right?

A.    I believe so.

Q.    Okay.  And your interaction with the family, Marvea was pretty good to the kids, wasn't she?

A.    I would say so.

Q.    Yeah.  They were well provided for, right?

A.    Yes.

Q.    They had plenty of food?

A.    Yes.

Q.    They had good clothes that they could wear?

A.    Yes.

Q.    All right.  And never wanting for things like that?

A.    No.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 196 of 246

Q.    All right.  You talked on direct examination about your brother bragging about stealing things from his worksites, that it was -- something about cost plus. Do you remember that on direct?

A.    Yes.

Q.    Again, when he's telling you about this kind of stuff, Dustin Honken is not around, is he?

A.    No.

Q.    Did you ever at any time you were around ever see your brother Jim ever engage in any violent conduct with his children?

A.    No, I didn't.

Q.    Did you ever hear him threaten his children in any way with physical violence?

A.    No.

          MR. WILLIAMS:  Just a minute, Your Honor.

          THE COURT:  Yes.

          (Brief pause.)

          MR. WILLIAMS:  No further questions, Your Honor.  Thank you.

          THE COURT:  Any redirect?

          MR. ADJOIAN:  No, Your Honor.  I have no redirect.

          THE COURT:  Thank you, sir.  You may step down.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 197 of 246
*to purchase a complete copy of the transcript.*

MR. ADJOIAN: Your Honor, our next witness would be Dennis Putzier.

THE COURT: All right.

MR. ADJOIAN: Who is in custody, but I believe who is now present.

THE COURT: All right. Hello, sir. Will you please come forward and be sworn.

DENNIS PUTZIER, called as a witness, being first duly sworn or affirmed, was examined and testified as follows:

THE CLERK: You may take the stand.

DIRECT EXAMINATION

BY MR. ADJOIAN:

Q.   Good afternoon, Mr. Putzier. Could you please state your name for the record?

A.   Dennis Leroy Putzier.

Q.   And how do you spell your last name, Mr. Putzier?

A.   P-U-T-Z-I-E-R.

Q.   Mr. Putzier, have you at any point in your life come to meet Dustin Honken?

A.   Have I ever come to meet him?

Q.   Do you know who Dustin Honken is?

A.   Yeah, I know who he is.

Q.   Okay. Did you meet Dustin Honken at some point?

A.   I've seen him.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 198 of 246

Q.    Okay.  Where have you seen him?

A.    In the Woodbury County Jail.

Q.    And when was this that you saw him in the Woodbury County Jail?

A.    '96 to '98.

Q.    And were you housed together at the Woodbury County Jail in the same cellblock?

A.    No.

Q.    Can you tell me a little bit about how the jail is laid out?  Are there different cellblocks or pods?

A.    Yeah, there's different cellblocks.  I think it goes up to G or H.

Q.    And do inmates who are housed in different blocks, do -- are they able to come into contact with 1 another?  Are they able to --

A.    They can look at each other through -- in separate blocks, they could look through the windows or they can talk through, it would be, like a fire door, but you can't -- I mean, you can see each other through the window, and you can talk through, like, a fire door, but you don't come into contact at all.

Q.    So have you ever spoken with Mr. Honken face-to-face?

A.    No.

Q.    How -- how much of time did you overlap at the

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 199 of 246

Woodbury County Jail, as far as being incarcerated together?

A.     I couldn't tell you the -- you know, be specific on time.  Anywheres from 3 to -- 3 to 6 months, something like that.

Q.     All right.  And were you in communication with him throughout this period of time?

A.     I was in E block for a while, and he was in D block.  And then I got moved into C block while he was still in D block.  And then I got moved from D [sic] block to G block, to where you couldn't communicate at all.

Q.     Have you testified in Mr. Honken's case before?

A.     Yes, I have.

Q.     When was the first time that you testified in Mr. Honken's case?

A.     I believe it was '98.

Q.     And what type of proceeding was this?

A.     I don't -- I don't understand that.

Q.     Was it a trial?  Was it a grand jury proceeding?  Was it a sentencing proceeding?

A.     A sentencing, I think.

Q.     Okay.  Did you testify prior to his sentencing hearing at a grand jury proceeding?

A.     Yes.

Q. Okay. How did it come about that you got called into the grand jury to testify?

A. I'm not -- I'm not positive. The -- the marshals, I believe, brought me there, as far as I know. The federal government brought me there to testify.

Q. Was it a surprise to you that you were getting called into the grand jury?

A. Yeah, kind of, yes.

Q. I wanted to just talk briefly, Mr. Putzier, about your testimony at the grand jury. Did you testify at the grand jury that you tried to escape from the Woodbury County Jail?

A. I'm sure it was brought up. It's been so long ago, I can't -- I ain't trying to sit here and say what I did and didn't do.

Q. Would it refresh your recollection, Mr. Putzier, to see your testimony from the grand jury?

A. Yes.

Q. Okay. Do you see something on the screen in front of you, Mr. Putzier? And for the record, this is Petitioner's Exhibit 29.

A. "So if I asked you about a hole in C block in the wall" --

Q. If you could, Mr. Putzier, just look -- starting at actually the bottom of Page 34 here, the question

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 201 of 246

that begins on Line 24.

A.     Yeah.

Q.     And going up to the beginning of Page 35, do you see your answer there?  Does that refresh your recollection as to whether you testified you attempted to escape from the Woodbury County Jail at the grand jury?

A.     See, I don't know which 1 you want me -- on 23? 24?  What --

Q.     Starting at Line 2, your answer starting at Line 2 on Page 35.

A.     Line 2?

Q.     Yeah, on the right side of the screen there.

A.     Okay.  "I had a detective come and ask me about an escape.  I told him I don't know nothing.  I don't know nothing.  That's all -- that's all I've got to say."

Q.     So did you, in fact, testify at the grand jury that you tried to escape from the Woodbury County Jail?

A.     From right here, it don't look that I testified that I tried to, no.

Q.     Okay.  Did you testify at the grand jury that you had knowledge that Dustin Honken was trying to escape from the Woodbury County Jail, if you recall?

A.     Here, I don't know where you're coming from or

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 202 of 246
*to purchase a complete copy of the transcript.*

where you're trying to get to, but I know I did try to escape out of the county jail, so I ain't trying to get it all -- you putting me in some kind of a mix-up here where I end up with some kind of perjury. Yes, I did try to escape out of the county jail. I broke a brick and a half out of the wall with a door handle. Nobody could escape. I mean, there was no way out. I tried.

Q. Mr. Putzier, I'm just asking if you recall whether you testified --

A. Apparently, I don't recall that.

Q. Okay. If you could look with me -- same exhibit too -- well, basically, the same place you just looked, starting at Line 2.

A. All right.

Q. You know, did you say anything about Mr. Honken and him trying to escape from the --

A. In the grand jury?

Q. In the grand jury, yes.

A. No, I don't believe I did.

Q. Okay. Did you testify -- again, just sticking with the grand jury -- about anything having to do with Tim Cutkomp, about yourself trying to escape -- first of all, about yourself trying to escape to do anything to Tim Cutkomp?

A. No.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM Document 83 Filed 12/07/11 Page 203 of 246
*to purchase a complete copy of the transcript.*

Q.    How about Mr. Honken trying to escape to do anything to Tim Cutkomp?

A.    No.

Q.    How about Dean Donaldson doing anything to escape to try and harm Tim Cutkomp?

A.    No, I don't believe I mentioned -- testified to any of that.

Q.    Okay.  Did you testify at the grand jury that you knew anything about Angela Johnson, if you recall?

A.    I -- I don't recall.  I know I talked to her a couple times on the phone, and she was supposed to bring me some clothes over here to this jail that I'm in now, and that was -- that was all that I remember.  I don't know if I got a letter from her ever or not, but --

Q.    Just sticking with your grand jury testimony, Mr. Putzier, if you would look to Page 39 here, on the right side of the screen, starting at Line 3.  Does that refresh your recollection as to what you testified regarding Angela Johnson?

A.    Yeah.

Q.    Okay.  And did you, in fact, have much to say about Angela Johnson --

A.    Nothing.

Q.    -- at that time?

A.    No.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 204 of 246

Q.      Okay.  Did you, if you recall, testify that Mr. Honken admitted to you -- again, at the grand jury, anything having to do with his 1993 --

A.      Probably not.

Q.      Okay.  Do you recall?  Do you recall specifically if you testified --

A.      I -- I don't believe I recall anything about talking about Dustin at that grand jury.  I tried not to talk about nobody at that grand jury.

Q.      Okay.  Did you testify at the grand jury that Mr. Honken admitted to you killing anyone?

A.      No, I don't believe so.

Q.      After you testified at the grand jury, did you at any point meet with law enforcement agents outside of court?

A.      After that grand jury?

Q.      Yes, sir.

A.      Right like when I walked out of there, there was -- there was some there, and then they had to bring me back to the jail, and then I can't -- I can't say when, but sometime later they came to -- some agents and a US District Attorney came to the prison I was in, in Clarinda.

Q.      Okay.  And did they interview you at the Clarinda prison?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 205 of 246
*to purchase a complete copy of the transcript.*

A.     Yes, they -- they asked me about -- if I had gotten another letter or heard anything else from Dustin, and different questions, and --

Q.     Do you recall specifically when this was?

A.     It was in Clarinda, Iowa.

Q.     Okay.  But date-wise do you recall when this was?

A.     No, I don't.  It would have been in '98, I'm sure.  Is there any way I can get a copy of this?

Q.     Yes.  Would it refresh your recollection to look at the report of the interview?

A.     I would like to have a copy of it myself.

Q.     All right.

        MR. ADJOIAN:  May I approach, Your Honor?

        THE COURT:  Yes.  Why don't you give it to the marshal and --

        MR. ADJOIAN:  Yes, Your Honor.

        THE WITNESS:  Thank you.

Q.     And, Mr. Putzier, I'd really just like you to take a look at the date at the top.  Do you see that?

A.     The date at the top of this here?

Q.     Yes, sir.

A.     December 8th, '97.

Q.     Okay.  And if you go just into the first area of text there, does it talk about when the actual interview took place date-wise?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 206 of 246

A.    In 1996.  1996, is that it?  Or, no, I see it.
November 19, 1997.

Q.    Okay.  During the course of this interview,
Mr. Putzier, was it communicated to you at any point
that you might -- you might pick up some new charges?

A.    More or less, right after I got in there.

Q.    Okay.  And what new charges was it communicated
to you that you might be facing?

A.    Conspiracy to commit murder, perjury, and aiding
and abetting a federal prisoner to escape.

Q.    And were you told what type of a sentence you
could potentially face on these new charges?

A.    365 months to life.

Q.    Were you actually charged at that time with these
new charges?

A.    No, but to my -- what I remember of it is they
had everything with them.  They had a scale that showed
where I would be at and the whole 9 yards.  And they let
me go talk to an attorney.  And the attorney said, more
or less, that they -- they would -- that I would end up
with a life sentence.

        MR. ADJOIAN:  Your Honor, may I have just a
moment, please?

        THE COURT:  Sure.

        (Brief pause.)

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 207 of 246

MR. ADJOIAN: Thank you, Mr. Putzier. I have no further questions for you. Mr. Williams might have some questions.

THE COURT: Mr. Williams, cross-examination.

MR. WILLIAMS: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Putzier, have you had a chance to review your testimony at the Honken trial?

A. I -- it's been so long ago that, no, I haven't.

Q. Okay. Best -- best of your recollection, Mr. Putzier, when you testified at the Honken trial, did you tell the truth?

A. At the trial, yeah. It's -- you know, I don't remember everything that was asked, and I tried to be as truthful as I could be, you know, from what I could remember.

Q. Sure. And you recall the -- the focus of your testimony at trial was about this attempted escape and Dustin's role in it and all that. And did you do your best to tell the truth about his role and so forth at trial?

A. Yeah, I'm sure I did.

Q. Okay. And they've gone over your grand jury testimony, and during your grand jury you denied really

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM Document 83 Filed 12/07/11 Page 208 of 246

everything, right, at that point, right?

A.      Yeah.

Q.      Okay.  And at that point you hadn't been charged with anything yet, right?

A.      No.

Q.      And fair to say, you were worried, at least in part, that you might be get charged with something arising out of that attempted escape, weren't you?

A.      The state couldn't do nothing.  I mean, when I was in that grand jury, I wasn't worried about nothing.  I didn't know how the feds worked, you know.  I didn't have no understanding how -- that they could just do whatever they felt like doing.

Q.      Okay.  Well, now, did you reach -- wasn't the reason that Mr. Colloton, the prosecutor, and the agent came down to talk to you at Clarinda, isn't that because you kind of reached out to them through a friend of yours and said you wanted to talk to them?

A.      No, that had nothing to do with it.  My friend went down there and did it himself.

Q.      He did what himself?

A.      Who?  Terry Davenport?

Q.      Yes, sir.

A.      He went down there and tried to talk to them about -- he was going to try to get some time off or

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 209 of 246

some money.

Q.    Oh, I see.

A.    It had nothing to do with me telling them that I wanted to talk to them, nothing.

Q.    So it was after that then Mr. Colloton and the agents came down and talked to you at Clarinda?

A.    It was the same time, because he came out onto the yard and said, "I don't know what happened.  I won't say nothing about you, but," wa, wa, wa.  I don't remember.  It's been a long time.  But I know right after they talked to him, within 30 minutes they brought me into the room.

Q.    Okay.  And you recall testifying in the sentencing hearing about the fact that the agents had threatened you with -- with charging you with, as you said today, conspiracy to commit murder?  You remember escape, perjury, aiding and abetting a felon, conspiracy to commit murder.  Do you remember testifying in the sentencing hearing that they had threatened you with that at that time as well?

        MR. ADJOIAN:  Your Honor, could I just ask for the record for a clarification, which sentencing hearing we're talking about?

        MR. WILLIAMS:  Yes, the Dustin Honken sentencing hearing in 1998, Page 596 of the transcript.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 210 of 246

A.      You know, that was -- you know what year it is now?

Q.      Sure.

A.      Okay, that was a long, long time ago, and I ain't -- like, I just said an oath here, and I ain't trying to get another -- I already got 262 months of my life to do for you guys.  You know, I ain't trying to do the rest.  Hopefully I can get out, you know.

Q.      No, Mr. Putzier --

A.      It would be different -- you know, I went to court on -- on a conspiracy charge, and all they talked about was my burglaries from my past and a quarter pound of marijuana from 1986, you know.  I had no drugs.  I had no drugs on me, but they ended up giving me 262 months of my life anyway, so --

Q.      Yeah, and, Mr. Putzier, I'm not trying to trick you up at all.  In fact, what I'm trying to do is show that you already testified about this matter.

                MR. WILLIAMS:  Could I approach, Your Honor?

                THE COURT:  Yes, that would be fine.  If you'd give it to the marshal, please.

Q.      Mr. Putzier, just take a look at that page.  And just read that to yourself for a couple minutes.  And let me know when you are done, and I'll just retrieve that from you, okay.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 211 of 246
*to purchase a complete copy of the transcript.*

A.     From what I can see, yes, they were going to charge me with all that.  And I -- I was looking at 365 months to life if I did not do it.  And they said not only would I get that -- you know, could I; I would get that, you know.  And I also remember coming out of there, and they said if I testified against Terry Davenport and Dayton Sebastian, that they would drop all the charges.  And I remember telling them that I didn't go up there to testify against people, that I went up there to save my life.

Q.     All right.  In any event, sir, you read your transcript.  And in fact, during the sentencing in 1998 you had mentioned what you did today.  And that is, that when the agents came to see you, they told you that they could charge you with perjury and aiding and abetting and escape and aiding -- or, I'm sorry, conspiracy to commit murder.  You already testified about that in 1998, just like you did today, right?

A.     Yes.

Q.     Nothing new there, is there?

A.     No.

Q.     All right.  And as you testified on direct examination, the truth is, you did try to escape from the Woodbury County Jail, right?

A.     Yeah.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 212 of 246

Q.    And you had communications with Dustin Honken, right?

A.    I talked through a fire door with him, yes.

Q.    Now, there was 1 time where you guys ran into each other at church though, right?

A.    No, I was never in a church, not -- not that I can recall.

Q.    Okay.  Fair enough.  So in any event though, you guys talked through this door, right?

A.    Yeah.

Q.    Among other things, he was wanting to escape as well, right?

A.    I'm sure he was.

Q.    Okay.  You remember both you guys trying to jimmy the door on either side of the door, that fire door?

A.    There's -- there's no way you can jimmy that door.  I mean, I'm sure we messed with a little bit of everything, yes.

Q.    Okay.

A.    But that door was not --

Q.    You sent a letter to Judge Bennett in January of this year.  Do you remember that, sir?

A.    Yeah, I remember it.  I don't remember what I wrote in that letter.

Q.    Okay.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 213 of 246

A.      But, I mean, kind of, but not everything.

Q.      Sure.  1 of the things you wrote in here is that the agents knew that you did not know Dustin Honken.  Do you remember writing that?

A.      Yeah, I remember writing that.

Q.      Okay.

A.      Okay.  They knew that I never ever knew that person on the outside, ever, in my life.  I've never spoke to him.  I've never -- nothing, you know.  So all this, you know, going to give me life in prison for talking to somebody through a fire door seems like a pretty hateful event, I mean, but I guess the feds do what they want.

Q.      All right.  The reality is, you did know Dustin Honken though.  You just didn't know him from the outside?

A.      I've talked to him through a fire door, yes.

            MR. WILLIAMS:  No further questions, Your Honor.

            THE COURT:  Any redirect?

            MR. ADJOIAN:  Yes, Your Honor.  Thank you.

                    REDIRECT EXAMINATION

BY MR. ADJOIAN:

Q.      Mr. Putzier, do you still have the transcript in front of you that --

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 214 of 246

A.      Yeah.

Q.      You do?  That Mr. Williams just showed to you?

A.      What now?

Q.      The transcript that Mr. Williams just showed you, do you still have that in front of you?

A.      No, I don't.

                MR. ADJOIAN:  May I approach, Your Honor?

                THE COURT:  Yes.  You can give it to the marshal.

                MR. ADJOIAN:  Thank you.

Q.      And the bottom of Page 596 there, the portion that Mr. Williams pointed out to you, do you see anything there about a life sentence?

A.      Bottom of --

                (Document was reviewed by the witness.)

A.      Yeah, I can -- you know, that says, *But this case, because they were going to file these additional charges against you, escape, perjury, commit a murder, you decided that you would testify?*

                *Yeah, because I had nothing to -- you know, or I did feel like I was --*

Q.      My question, Mr. Putzier, is if there's anything on there about a life sentence.

A.      Yeah.

Q.      Do you -- can you point that out?  Where does it

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 215 of 246

say that you might get a life sentence?

A.      Not -- not have Dean give him a life sentence?

Q.      Okay.  Was there anything about you and possibly getting a life sentence?

A.      No.

Q.      Okay.  What type of time at the sentencing hearing did you express that you might be facing on these new charges?

A.      5, 10, or 15 years.

Q.      Okay.  So Mr. --

A.      That was in a letter, I believe, that he gave me -- I think that Dustin sent after the grand jury.

Q.      All right.  Mr. Putzier, you were asked on cross-examination about a letter that you sent recently, and I'm going to pull it up on the screen here so you can take a look.  This is Petitioner's Exhibit 26.  And just going down to Page 4, first of all, is that -- on the screen there, Mr. Putzier, is that your signature?

A.      Yes.

Q.      Okay.  And just for the record, the 5th page of this -- who is that addressed to?

A.      Judge O'Brien.

Q.      Okay.  I'm now going up to Page 3.  And Mr. Williams asked you some questions about helping Mr. Honken escape.  What did you say in this letter

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 216 of 246

about whether you tried to help Mr. Honken escape, the first full sentence there?

A.     "To him through a keyhole in a fire door, and wrote him some letters.  They knew I could not escape, help him escape, and that I was not going to -- going to and would not kill anyone."

Q.     And what's the next sentence?

A.     "And told me that."

Q.     And the sentence after that?

A.     Said "If I did not do what they want, I would do life in prison."

          MR. ADJOIAN:  I have no further questions, Mr. Putzier.

          THE COURT:  Mr. Williams?

          MR. WILLIAMS:  No further questions, Your Honor.

          THE COURT:  All right.  Thank you.

          I think they're done with this witness.

          Are you done?

          MR. NOLAN:  Yes, Your Honor.

          MR. WILLIAMS:  Yes, Your Honor.

          THE COURT:  All right.  Thank you.

          All right.  Additional evidence?

          MR. NOLAN:  Your Honor, we had 2 additional witnesses we were originally going to present today that

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 217 of 246

were on our schedule that we've decided not to present. And the government did not wish to call either of those witnesses either. So, I'm sorry, we don't have any other witnesses to present today --

THE COURT: Okay.

MR. NOLAN: -- because the other folks are coming from out of town tonight.

THE COURT: All right.

MR. NOLAN: So we would ask if the Court would adjourn until tomorrow.

THE COURT: And who will we hear from tomorrow?

MR. NOLAN: Your Honor, we'll hear from Mr. Rogers, who was learned counsel for Mr. Honken.

THE COURT: Right.

MR. NOLAN: We'll hear from Timothy Cutkomp. We'll hear from Anthony Johnson. And we'll hear from Dan Cobeen. We were originally supposed to hear from Mr. Bregar. Terry Bregar is the man who Mr. Williams talked about earlier with the health conditions. We think we're going to be able to do him by telephone on Wednesday.

THE COURT: All right. That will require a little IT involvement, so I'd ask that when you get that set up, you get in touch with our IT person to make sure

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM Document 83 Filed 12/07/11 Page 218 of 246

it all goes together. It will just be telephone, not conference?

MR. WILLIAMS: Video conference? No, Your Honor.

THE COURT: Video conference. It wouldn't be video conference, right?

MR. NOLAN: No, Your Honor. He's in a nursing home, and we've agreed we can just do it by telephone.

THE COURT: All right. And what city is he in?

MR. NOLAN: He's in Des Moines.

THE COURT: Okay. All right.

MR. NOLAN: Your Honor, the only other question we have, typically in my experience when we do exhibits in this type of situation, we would wait until the end to move everything in and have discussions at that point. But I don't know if the Your Honor cares if we do it that way or if you prefer us to do it as we go along.

THE COURT: Is there any objection to the proposed exhibits on behalf of Mr. Honken?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Okay. Why don't we -- why don't you get those together, and we will at some point make a

record on that.  Are you going to be showing any of the -- well, it doesn't matter since it's judge-only. We can argue that at the end.

MR. WILLIAMS:  Certainly.  And to be clear, some of them I don't have any objection to.  Some of them I do.

THE COURT:  Okay.

MR. WILLIAMS:  And so --

MR. NOLAN:  It may make sense to wait until the end and go through all of that.

THE COURT:  All right.  That will be fine.

Have a good rest.  And I'll see you -- do you want to start at 8:00 tomorrow or 9:00?

MR. NOLAN:  Looking at the number of witnesses, I think we could get through these folks probably in about the same order as we did today, so whatever you'd prefer.  It doesn't matter to us.

MR. WILLIAMS:  I'm open to whatever, Your Honor.

THE COURT:  All right.  Let's start at 9:00, and you can get an extra hour's sleep.

MR. NOLAN:  That's great.  Since we're on a different time zone, I'm a little confused about --

THE COURT:  Uh-huh, uh-huh.  Well, see, you should be up and ready to go.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 220 of 246

MR. NOLAN:  Earlier.

THE COURT:  Yeah, so you just argued against your own position.

MR. NOLAN:  You would think that, but --

THE COURT:  Yeah.  Let's start tomorrow at 9:00, and that will give you time to kind of refocus and be ready for tomorrow.

MR. NOLAN:  Thank you, Your Honor.

(Proceedings concluded at 2:21 p.m.)

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 221 of 246
*to purchase a complete copy of the transcript.*

C E R T I F I C A T E

I, Patrice A. Murray, a Certified Shorthand Reporter of the State of Iowa, do hereby certify that at the time and place heretofore indicated, a hearing was held before the Honorable Linda R. Reade; that I reported in shorthand the proceedings of said hearing, reduced the same to print to the best of my ability by means of computer-assisted transcription under my direction and supervision, and that the foregoing transcript is a true record of all proceedings had on the taking of said hearing at the above time and place.

I further certify that I am not related to or employed by any of the parties to this action, and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto or financially interested in the action.

IN WITNESS WHEREOF, I have set my hand this 6th day of December, 2011.

/s/ Patrice A. Murray
Patrice A. Murray, CSR, RPR, RMR, FCRR
United States District Court, NDIA
4200 C Street S.W.
Cedar Rapids, Iowa 52404

**$**

**$100,000** [1] - 146:25
**$95** [1] - 14:7

**'**

**'74** [1] - 33:1
**'86** [1] - 132:2
**'90s** [1] - 9:19
**'96** [1] - 199:5
**'97** [2] - 87:11, 206:22
**'98** [3] - 199:5, 200:17, 206:7

**0**

**005337** [1] - 142:2
**01-3047** [1] - 161:13

**1**

**1** [102] - 5:25, 6:25, 7:11, 10:11, 10:14, 12:9, 12:12, 15:12, 15:22, 16:17, 16:18, 20:8, 20:16, 29:2, 29:18, 32:10, 33:9, 35:5, 35:9, 38:23, 38:24, 41:11, 42:16, 45:9, 46:25, 47:17, 48:18, 49:6, 50:19, 51:19, 52:9, 53:4, 54:8, 54:22, 58:25, 59:6, 59:18, 60:5, 61:20, 61:25, 63:6, 63:24, 65:8, 65:22, 71:2, 75:20, 77:25, 79:23, 81:25, 82:2, 82:8, 89:19, 91:15, 91:16, 97:1, 98:3, 101:1, 106:17, 109:3, 112:18, 113:17, 115:21, 126:7, 133:7, 134:2, 134:18, 134:25, 136:23, 138:22, 138:23, 141:3, 141:18, 143:14, 143:15, 143:17, 144:2, 144:5, 148:8, 148:21, 148:24, 152:21, 154:11, 155:14, 156:13, 156:16, 156:19, 157:5, 160:22, 164:5, 167:16, 175:20, 176:9, 177:22, 185:25, 191:4, 192:11, 199:14, 202:8, 213:4, 214:2
**10** [8] - 64:20, 90:22, 104:17, 107:1, 122:6, 124:16, 182:6, 216:9
**10-3074** [2] - 3:2, 161:13
**100** [8] - 12:20, 18:7, 60:3, 94:2, 94:9, 94:17, 94:22, 94:24
**1097** [1] - 19:5
**10:15** [1] - 84:23
**1106** [1] - 19:11

**112** [1] - 168:7
**114** [1] - 159:14
**118** [1] - 95:9
**12** [2] - 21:15, 131:10
**12.2** [10] - 27:2, 54:1, 54:2, 54:9, 54:23, 55:9, 55:13, 77:9, 77:12, 77:24
**125** [2] - 14:9, 85:15
**13** [2] - 21:17, 175:12
**14** [7] - 33:4, 64:25, 102:6, 123:15, 123:17, 175:13
**140** [1] - 127:4
**15** [7] - 66:24, 102:6, 108:12, 123:17, 175:13, 187:1, 216:9
**155** [1] - 71:15
**16** [8] - 39:10, 67:16, 108:12, 112:19, 118:12, 121:16, 122:1
**17** [2] - 21:17, 131:8
**18** [1] - 131:8
**19** [5] - 39:9, 71:20, 72:9, 73:25, 207:2
**1974** [1] - 33:1
**1979** [1] - 162:20
**1980** [2] - 131:2, 131:3
**1982** [1] - 131:1
**1986** [4] - 131:19, 133:3, 138:8, 211:13
**1988** [1] - 138:8
**1992** [7] - 65:6, 65:18, 65:25, 132:5, 141:17, 142:6, 145:12
**1993** [3] - 149:18, 150:25, 205:3
**1996** [5] - 9:19, 17:9, 17:10, 207:1
**1997** [5] - 39:10, 51:4, 71:14, 71:20, 207:2
**1998** [7] - 33:8, 34:4, 38:15, 51:4, 210:25, 212:12, 212:18
**19th** [1] - 74:15

**2**

**2** [35] - 6:24, 19:11, 20:8, 20:16, 34:25, 36:16, 46:25, 47:17, 48:2, 48:15, 48:16, 64:14, 64:16, 64:19, 65:23, 77:19, 84:21, 89:10, 91:24, 91:25, 115:17, 127:7, 139:20, 142:5, 158:8, 166:8, 175:21, 176:11, 186:23, 187:2, 202:10, 202:11, 202:12, 203:13, 217:24
**2,300** [1] - 104:22
**2-bedroom** [1] - 104:21
**20** [5] - 30:3, 30:16, 141:17, 181:17, 187:1
**20-year** [1] - 16:1
**2002** [1] - 73:25

**2003** [1] - 19:6
**2004** [15] - 9:1, 9:4, 9:10, 10:25, 18:22, 31:5, 34:6, 37:5, 43:19, 48:12, 54:4, 76:7, 92:16, 93:20, 167:17
**2011** [2] - 95:20, 97:8
**21** [1] - 19:5
**2255** [2] - 113:7, 161:23
**23** [1] - 202:8
**24** [2] - 202:1, 202:9
**25** [3] - 30:16, 114:24, 115:6
**26** [1] - 216:16
**262** [2] - 211:6, 211:15
**271** [1] - 19:5
**29** [1] - 201:21
**2:21** [1] - 221:9
**2d** [1] - 19:5

**3**

**3** [29] - 12:24, 13:9, 16:24, 31:16, 32:25, 47:17, 48:2, 48:6, 64:15, 71:2, 77:19, 87:3, 99:3, 107:2, 109:8, 115:1, 127:7, 130:9, 135:4, 135:6, 170:7, 179:14, 186:23, 187:2, 195:17, 200:4, 204:17, 216:23
**30** [3] - 176:6, 181:18, 210:11
**301** [1] - 153:24
**3092** [1] - 42:4
**3094** [1] - 42:5
**322** [1] - 137:17
**323** [1] - 137:17
**34** [1] - 201:25
**35** [3] - 29:25, 202:3, 202:11
**360** [1] - 152:10
**365** [2] - 207:13, 212:3
**39** [1] - 204:16

**4**

**4** [15] - 5:19, 6:7, 31:18, 40:3, 91:21, 103:5, 104:22, 107:2, 130:9, 169:1, 175:19, 188:8, 195:17, 216:17
**40** [4] - 8:21, 29:17, 29:25, 76:4
**403** [1] - 70:24

**5**

**5** [13] - 10:2, 21:13, 31:14, 31:18, 42:23, 90:2, 90:24, 120:13, 120:14, 142:5, 160:20, 188:15, 216:9
**5,000** [1] - 149:12
**5-18-11** [1] - 159:25

**538** [1] - 89:11
**596** [2] - 210:25, 215:11
**5th** [1] - 216:20

**6**

**6** [11] - 5:10, 5:19, 31:15, 99:22, 103:23, 120:13, 120:14, 124:7, 124:8, 182:13, 200:4
**60** [1] - 181:12
**6th** [1] - 95:20

**7**

**7** [7] - 10:2, 45:11, 84:17, 89:1, 153:18, 153:24
**7-1-04** [1] - 85:22
**70** [1] - 181:12

**8**

**8** [9] - 15:18, 21:15, 49:24, 96:2, 103:24, 104:8, 104:16, 120:14, 125:17
**8-ish** [1] - 103:25
**80** [2] - 4:14, 5:1
**81** [1] - 4:15
**813** [1] - 89:12
**82** [1] - 4:15
**83** [1] - 4:16
**84** [1] - 4:17
**85** [1] - 4:18
**86** [1] - 4:18
**87** [2] - 4:19, 5:1
**8:00** [1] - 220:13
**8th** [1] - 206:22

**9**

**9** [7] - 87:11, 96:8, 97:6, 107:1, 120:14, 124:16, 207:18
**9-ish** [1] - 103:25
**9:00** [3] - 220:13, 220:20, 221:6

**A**

**Aaron** [4] - 35:21, 35:22, 36:8, 93:2
**abetting** [3] - 207:10, 210:17, 212:15
**abiding** [1] - 178:5
**ability** [7] - 24:15, 31:7, 52:2, 59:23, 70:18, 72:2, 164:12
**able** [14] - 5:9, 7:23, 28:23, 30:20, 54:17, 61:9, 101:14, 107:12, 113:14, 163:5, 182:25, 199:14, 199:15,

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 223 of 246

218:21
**absolutely** [17] - 3:23, 4:6, 46:4, 48:7, 58:20, 71:6, 76:5, 77:6, 80:3, 81:25, 82:18, 83:14, 86:5, 87:16, 97:17, 130:24
**accept** [3] - 56:22, 89:21, 178:23
**acceptance** [1] - 10:12
**accepted** [1] - 4:12
**accepting** [1] - 179:17
**access** [7] - 25:1, 25:2, 25:5, 28:24, 55:19, 80:20, 83:25
**accord** [1] - 139:1
**according** [1] - 154:23
**account** [2] - 58:16, 66:16
**accuracy** [3] - 12:20, 18:8, 95:22
**accurate** [3] - 95:24, 160:4, 168:14
**accurately** [3] - 91:19, 96:4, 97:6
**achieved** [1] - 30:11
**acknowledge** [1] - 185:18
**acquaintance** [1] - 65:4
**acquaintances** [2] - 189:12, 189:13
**acquiesced** [1] - 57:23
**acquittal** [3] - 30:5, 30:9, 30:10
**acquittals** [1] - 30:14
**act** [2] - 61:10, 105:11
**acted** [1] - 130:8
**active** [1] - 130:12
**actively** [2] - 57:17, 196:9
**activities** [4] - 109:7, 134:15, 159:1, 193:8
**activity** [4] - 133:19, 134:21, 141:12, 195:4
**acts** [1] - 193:21
**actual** [2] - 5:17, 206:24
**acute** [1] - 167:13
**add** [1] - 60:24
**addition** [1] - 174:4
**additional** [7] - 6:12, 38:5, 146:8, 161:13, 215:17, 217:23, 217:24
**addressed** [2] - 73:24, 216:21
**Adjoian** [2] - 166:7, 171:24
**ADJOIAN** [21] - 166:10, 166:22, 171:25, 174:14, 177:12, 179:8, 190:20, 197:22, 198:1, 198:4, 198:13, 206:13, 206:16, 207:22, 208:1, 210:21, 214:21, 214:23, 215:7, 215:10, 217:12
**adjourn** [1] - 218:10
**administer** [1] - 8:7
**administration** [3] - 32:8, 33:3, 33:5

**admissible** [4] - 113:5, 113:15, 161:21, 161:22
**admission** [6] - 39:5, 62:2, 62:4, 63:7, 79:19, 158:17
**admissions** [1] - 35:17
**admit** [2] - 39:2, 74:6
**admitted** [3] - 162:18, 205:2, 205:11
**admonished** [2] - 64:16
**admonitions** [1] - 64:15
**adult** [3] - 170:19, 171:6, 178:1
**adulthood** [1] - 178:21
**adults** [3] - 79:7, 91:10, 178:19
**advance** [2] - 138:4, 165:23
**advantageous** [1] - 61:8
**adverse** [1] - 185:6
**advice** [1] - 13:21
**advise** [1] - 62:25
**affair** [2] - 144:22, 145:1
**affect** [1] - 72:2
**affected** [3] - 59:23, 169:8, 185:12
**affirmed** [4] - 8:10, 98:9, 166:18, 198:9
**afraid** [2] - 177:24, 178:1
**African** [1] - 78:21
**African-American** [1] - 78:21
**afternoon** [3] - 166:23, 172:18, 198:14
**age** [4] - 125:4, 129:23, 131:7, 153:21
**agent** [2] - 7:22, 209:15
**agents** [6] - 205:14, 205:21, 210:6, 210:14, 212:14, 214:3
**aging** [1] - 126:2
**ago** [10] - 32:14, 64:14, 64:19, 153:18, 153:24, 175:13, 192:1, 201:14, 208:10, 211:4
**agree** [12] - 42:19, 46:6, 59:6, 60:3, 63:12, 80:10, 93:21, 116:9, 137:1, 158:14, 163:22, 174:12
**agreed** [8] - 4:4, 4:8, 7:2, 11:13, 11:15, 46:1, 80:11, 219:8
**agreement** [7] - 34:25, 46:6, 47:4, 47:12, 47:18, 48:3, 49:22
**ahead** [3] - 77:14, 160:21, 187:13
**Aid** [2] - 32:15, 32:24
**aiding** [4] - 207:9, 210:17, 212:15, 212:16
**ailment** [1] - 109:14
**ain't** [5] - 201:14, 203:2, 211:5, 211:7
**Alabama** [1] - 78:20

**alcohol** [3] - 167:13, 171:9, 171:11
**alcoholic** [3] - 102:21, 105:24, 106:19
**Alfredo** [3] - 6:22, 95:16, 189:15
**ALFREDO** [1] - 8:9
**alive** [2] - 187:7, 187:10
**allegation** [7] - 40:7, 40:11, 40:14, 65:20, 69:9, 140:22, 141:20
**Allegation** [1] - 64:25
**allegations** [5] - 43:7, 61:25, 134:24, 141:6, 141:14
**allege** [2] - 53:20, 67:25
**alleged** [3] - 40:4, 56:18, 56:20
**allegedly** [2] - 39:21, 69:4
**Allen** [1] - 98:23
**allow** [6] - 3:22, 23:25, 71:3, 164:15, 177:17
**allowed** [1] - 45:22
**allows** [1] - 54:23
**almost** [1] - 153:24
**alone** [4] - 61:10, 63:8, 104:24, 116:23
**alpha** [1] - 42:5
**Alvarez** [2] - 140:15, 140:24
**Alyssa** [10] - 99:3, 99:15, 103:23, 104:2, 104:8, 104:17, 116:21, 116:22, 122:12, 124:15
**Alyssa's** [1] - 103:24
**Alzheimer's** [1] - 86:15
**Amendment** [2] - 162:6, 162:7
**America** [2] - 3:3, 161:12
**American** [1] - 78:21
**Ames** [1] - 142:24
**amine** [1] - 156:23
**amount** [8] - 14:25, 24:18, 34:20, 35:1, 42:15, 93:17, 93:19, 149:10
**amounts** [3] - 94:14, 101:17, 149:12
**analysis** [3] - 45:8, 113:12, 164:20
**analyze** [1] - 62:16
**analyzed** [3] - 45:23, 71:20, 96:12
**analyzing** [1] - 90:19
**Angela** [23] - 21:22, 22:25, 60:7, 61:14, 61:17, 62:2, 63:9, 64:4, 137:12, 139:15, 152:5, 152:25, 153:3, 174:9, 175:9, 175:18, 191:6, 191:14, 191:17, 191:24, 204:9, 204:19, 204:22
**Angie** [3] - 153:5, 153:6, 153:8
**answer** [26] - 54:16,

55:24, 59:13, 60:15, 68:11, 72:17, 78:22, 94:6, 96:13, 106:24, 137:20, 137:22, 152:14, 152:16, 154:3, 154:5, 154:7, 154:9, 156:9, 156:10, 156:12, 177:10, 177:19, 187:13, 202:4, 202:10
**answered** [1] - 90:3
**answering** [1] - 91:14
**answers** [6] - 65:16, 76:21, 137:16, 137:25, 138:1, 152:10
**Anthony** [1] - 218:17
**anthropological** [1] - 72:16
**anticipating** [1] - 53:5
**antisocial** [4] - 28:18, 28:19, 83:20, 84:13
**anxiety** [1] - 157:19
**anyplace** [2] - 48:12
**anyway** [2] - 186:12, 211:15
**anywheres** [1] - 200:4
**apartment** [7] - 147:17, 148:5, 148:9, 148:11, 148:17, 149:19, 152:23
**apologize** [1] - 165:9
**appeal** [1] - 163:10
**appealed** [1] - 30:7
**appear** [1] - 7:12
**appearances** [1] - 3:5
**appellate** [5] - 5:22, 16:16, 76:1, 76:19, 90:15
**application** [1] - 162:14
**applied** [4] - 22:6, 54:3, 55:21, 120:5
**apply** [9] - 113:7, 116:10, 119:17, 158:15, 163:21, 163:25, 164:11, 164:18, 174:13
**applying** [2] - 183:17, 194:15
**appointed** [6] - 9:5, 9:9, 10:25, 11:18, 77:15, 84:4
**Appointing** [1] - 31:17
**appointment** [1] - 31:20
**appreciate** [1] - 161:8
**apprenticeship** [1] - 119:16
**approach** [7] - 43:8, 69:20, 69:21, 73:5, 206:13, 211:19, 215:7
**approached** [1] - 73:7
**aptly** [1] - 161:22
**area** [13] - 12:15, 13:3, 25:2, 40:22, 40:23, 50:10, 54:12, 78:24, 79:12, 100:1, 123:17, 132:23, 206:23
**areas** [1] - 75:6
**argue** [2] - 76:12, 220:3
**argued** [1] - 221:2
**arguing** [5] - 78:7, 79:15, 117:14, 117:19, 117:21

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 224 of 246

**argument** [6] - 6:13, 36:13, 36:25, 56:3, 161:16, 173:3

**arguments** [2] - 16:16, 117:11

**arise** [2] - 72:5, 78:12

**arising** [2] - 56:7, 209:8

**Arizona** [13] - 115:8, 116:1, 126:5, 131:16, 131:19, 132:8, 133:19, 138:9, 142:7, 145:12, 145:15, 147:12, 158:7

**Army** [3] - 170:5, 170:6, 170:9

**arose** [2] - 56:5, 56:19

**arranged** [1] - 140:18

**arrangements** [1] - 23:25

**arrested** [7] - 149:18, 150:25, 151:6, 151:8, 151:20, 152:19, 186:10

**arson** [2] - 109:9, 110:19

**arteritis** [1] - 87:3

**articles** [1] - 38:6

**articulate** [2] - 44:17, 81:16

**articulated** [1] - 164:7

**artificial** [1] - 163:20

**aside** [1] - 178:5

**aspect** [5] - 41:22, 57:15, 137:6, 137:7, 143:24

**asserted** [1] - 175:4

**asserting** [1] - 19:12

**assertion** [1] - 65:25

**assess** [1] - 30:20

**assessment** [1] - 31:7

**assist** [6] - 9:6, 11:15, 12:2, 12:9, 12:10, 13:21

**assistance** [3] - 61:25, 66:1, 113:13

**assisted** [1] - 15:8

**associated** [2] - 32:1, 60:25

**associates** [1] - 15:3

**Associates** [1] - 53:1

**assortment** [1] - 170:10

**assume** [4] - 48:1, 56:2, 72:16, 96:10

**assumed** [2] - 153:11, 153:15

**assumption** [1] - 153:5

**atmosphere** [1] - 174:23

**attached** [1] - 24:17

**attack** [18] - 6:14, 31:8, 33:21, 36:16, 61:3, 61:4, 62:15, 62:17, 62:24, 63:7, 72:10, 72:13, 72:20, 72:23, 72:24, 73:3, 75:6, 100:3

**attacked** [3] - 38:25, 136:23, 136:24

**attacking** [4] - 30:22, 33:25, 50:15, 61:16

**attacks** [1] - 100:2

**attempt** [2] - 28:17, 67:12

**attempted** [6] - 67:2, 159:5, 179:10, 202:5, 208:19, 209:8

**attempting** [4] - 11:25, 67:25, 126:8, 141:7

**attended** [1] - 23:15

**attention** [2] - 37:3, 96:1

**attentive** [1] - 196:7

**attitude** [1] - 195:4

**attitudes** [1] - 184:4

**Attorney** [2] - 64:15, 205:22

**attorney** [6] - 8:20, 11:20, 189:14, 189:16, 207:19

**attorneys** [8] - 10:25, 13:9, 16:25, 51:24, 184:19, 189:3, 189:23

**audience** [1] - 3:17

**authorities** [1] - 17:14

**autopsies** [1] - 73:20

**availability** [1] - 7:10

**available** [3] - 12:5, 12:6, 13:4

**avoid** [4] - 63:4, 63:15, 63:16, 81:1

**aware** [28] - 17:13, 18:2, 25:3, 25:11, 51:4, 56:5, 60:9, 70:6, 70:7, 71:8, 79:25, 82:19, 82:21, 84:11, 88:3, 89:14, 89:18, 90:22, 90:23, 94:21, 126:7, 140:8, 146:24, 147:2, 161:20, 175:11, 181:2, 193:12

**awful** [1] - 176:5

**B**

**baby** [2] - 99:15, 99:16

**background** [4] - 15:5, 31:10, 32:21, 63:21

**bad** [5] - 60:21, 136:19, 184:15, 187:14, 187:19

**badly** [1] - 135:24

**bail** [1] - 151:10

**bailiwick** [1] - 44:18

**balance** [2] - 28:13, 62:9

**balanced** [1] - 50:2

**balancing** [2] - 53:22, 58:12

**bank** [8] - 159:5, 177:2, 177:5, 181:3, 181:6, 181:20, 192:8, 194:10

**bar** [1] - 32:20

**Bar** [1] - 31:12

**base** [2] - 58:25, 60:22

**baseball** [1] - 169:16

**based** [11] - 33:18, 33:25, 39:24, 56:18, 61:23, 64:21, 74:25, 82:6, 146:8, 192:24, 195:8

**basis** [8] - 14:6, 16:13, 20:24, 56:6, 56:21, 72:24, 165:5, 179:5

**basketball** [1] - 169:16

**Bates** [1] - 142:2

**battles** [1] - 63:4

**beat** [1] - 107:12

**became** [5] - 10:13, 11:21, 11:23, 123:23, 176:25

**become** [1] - 126:7

**becomes** [1] - 28:14

**becoming** [1] - 11:12

**bed** [7] - 104:14, 105:5, 105:11, 124:15, 124:16, 188:3

**bedroom** [2] - 117:14, 150:8

**beer** [2] - 106:11, 171:14

**beforehand** [1] - 189:7

**befriended** [1] - 63:14

**begin** [1] - 167:9

**beginning** [1] - 202:3

**begins** [1] - 202:1

**behalf** [7] - 3:7, 3:10, 161:14, 173:14, 174:5, 189:22, 219:22

**behavior** [2] - 123:25, 124:17

**behaviors** [2] - 184:7

**behind** [1] - 45:18

**belief** [1] - 72:12

**belong** [1] - 180:4

**belt** [2] - 70:6, 72:6

**bench** [1] - 98:7

**bend** [1] - 105:10

**benefit** [2] - 122:17, 125:23

**Bennett** [6] - 9:23, 18:23, 19:12, 19:21, 46:21, 213:21

**Bennett's** [3] - 19:9, 19:18, 36:14

**best** [10] - 5:7, 25:14, 49:18, 58:11, 68:20, 68:24, 168:14, 208:11, 208:21

**better** [14] - 13:12, 43:6, 44:17, 53:9, 58:7, 81:16, 83:1, 99:6, 129:15, 153:19, 176:10, 176:14, 176:15, 187:3

**between** [14] - 34:25, 49:20, 81:23, 102:6, 104:16, 114:5, 120:13, 120:14, 124:16, 125:5, 125:16, 125:21, 139:20, 164:2

**beyond** [2] - 42:15, 182:25

**bicycle** [1] - 111:10

**big** [4] - 82:23, 108:8, 109:21, 110:5

**bigger** [2] - 107:9, 107:10

**biggest** [1] - 123:20

**billed** [1] - 14:10

**Bingo** [4] - 135:9, 135:11, 135:12, 135:16

**birthdays** [1] - 170:24

**bit** [31] - 23:6, 29:16, 29:22, 30:24, 31:10, 33:7, 44:17, 53:7, 57:4, 62:7, 99:4, 105:23, 124:21, 134:14, 148:12, 168:17, 169:2, 169:9, 169:24, 171:8, 171:25, 173:9, 178:4, 184:3, 185:1, 186:25, 187:5, 189:7, 194:2, 199:9, 213:17

**bitch** [1] - 176:13

**bite** [1] - 69:25

**black** [2] - 50:8, 139:21

**blamed** [1] - 185:13

**block** [8] - 108:9, 200:8, 200:9, 200:10, 200:11, 201:22

**blocks** [2] - 199:14, 199:17

**blurted** [2] - 64:9, 64:17

**board** [3] - 24:14, 120:3, 120:6

**boards** [3] - 132:21, 132:25, 133:5

**bodies** [3] - 62:14, 67:23, 191:16

**body** [1] - 125:11

**boilermaker** [1] - 102:9

**boilermakers** [4] - 102:10, 114:6, 118:23, 119:17

**bolted** [2] - 70:5, 70:22

**bond** [1] - 24:10

**books** [1] - 41:13

**boots** [1] - 119:1

**BOP** [2] - 71:18, 81:9

**born** [2] - 104:2, 104:11

**borrowing** [1] - 143:19

**bothered** [1] - 176:14

**bottom** [8] - 95:12, 142:25, 168:9, 175:20, 201:25, 215:11, 215:14

**bought** [10] - 41:13, 65:6, 65:24, 140:23, 141:1, 150:7, 150:10, 180:24, 186:8

**box** [1] - 45:5

**boy** [2] - 25:21, 135:13

**brag** [3] - 107:21, 107:23, 107:24

**bragged** [2] - 184:16, 193:8

**bragging** [1] - 197:2

**branded** [1] - 28:18

**break** [6] - 84:22, 85:18, 133:23, 160:21, 165:21, 185:21

**breaks** [1] - 71:1

**breath** [1] - 106:20

**Bregar** [7] - 6:25, 39:6, 85:10, 85:11, 88:10, 218:19

**brick** [1] - 203:5

**brief** [5] - 37:13, 84:24, 157:23, 161:16, 207:25

**Brief** [3] - 116:12, 129:2, 197:18

**briefing** [1] - 6:12

**briefly** [4] - 56:23, 60:16,

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 225 of 246

127:18, 201:9

**bring** [9] - 21:5, 44:2, 52:17, 62:12, 110:12, 156:19, 185:23, 204:11, 205:19

**bringing** [2] - 53:19, 139:18

**Britt** [1] - 111:23

**broke** [1] - 203:5

**brother** [31] - 40:6, 41:21, 98:25, 99:2, 99:10, 167:7, 167:10, 167:14, 169:3, 169:11, 180:1, 185:13, 185:18, 186:14, 186:16, 191:5, 191:13, 191:23, 192:3, 192:7, 192:16, 192:18, 192:24, 193:1, 193:13, 194:10, 194:14, 194:18, 194:22, 197:2, 197:10

**brought** [8] - 37:2, 54:22, 98:17, 186:1, 201:4, 201:5, 201:13, 210:11

**Bruce** [4] - 141:4, 141:6, 141:8, 141:11

**building** [1] - 183:6

**built** [1] - 168:23

**bullet** [1] - 69:25

**bump** [1] - 105:1

**bunch** [2] - 69:23, 169:25

**burden** [3] - 34:24, 69:7, 69:15

**Bureau** [2] - 51:5, 86:9

**burglaries** [1] - 211:12

**burial** [1] - 67:23

**burn** [9] - 110:20, 111:3, 111:4, 111:6, 112:22, 144:3, 144:6, 144:12, 144:13

**burned** [13] - 54:20, 110:21, 111:8, 111:12, 111:13, 111:17, 112:4, 112:9, 113:25, 134:25, 144:2, 144:5

**burning** [1] - 113:23

**burnings** [1] - 111:2

**business** [9] - 144:20, 144:25, 145:2, 145:5, 145:7, 155:25, 168:22, 168:23

**busy** [1] - 12:8

**buy** [1] - 118:13

**buying** [1] - 93:11

**BY** [11] - 8:14, 29:10, 75:16, 98:21, 129:8, 158:5, 166:22, 191:2, 198:13, 208:7, 214:23

**bye** [1] - 98:4

## C

**C.J** [2] - 3:6, 99:7

**cabin** [1] - 134:6

**CADTEK** [1] - 138:12

**Cadtek** [2] - 138:10, 140:20

**calculation** [1] - 34:1

**California** [1] - 13:5

**calm** [1] - 100:3

**camp** [1] - 22:8

**candid** [2] - 28:6, 59:6

**candidly** [1] - 43:15

**cannot** [1] - 66:11

**cap** [1] - 108:22

**capable** [2] - 31:6, 178:2

**capacity** [6] - 9:3, 33:10, 33:17, 34:7, 34:9, 92:17

**capital** [24] - 9:7, 9:10, 9:11, 10:24, 12:2, 12:9, 12:11, 12:14, 12:18, 13:1, 21:2, 22:12, 43:22, 45:20, 54:3, 77:12, 77:13, 77:24, 78:6, 78:16, 79:15, 89:18, 161:21, 162:13

**capping** [1] - 108:20

**car** [8] - 112:20, 118:13, 134:19, 135:19, 144:13, 147:6

**care** [18] - 76:5, 76:8, 103:18, 103:22, 104:13, 105:4, 108:23, 108:24, 114:19, 114:21, 122:12, 135:20, 136:24, 173:19, 174:5, 174:9, 175:9, 191:6

**careful** [1] - 81:6

**carefully** [1] - 138:3

**cares** [1] - 219:18

**Carmen** [4] - 124:22, 124:23, 124:24

**Carol** [2] - 4:15, 4:16

**carries** [1] - 45:9

**carry** [1] - 69:12

**cars** [3] - 111:4, 112:17, 144:16

**carton** [1] - 188:14

**case** [110] - 5:11, 7:22, 9:6, 9:7, 9:8, 9:12, 9:18, 9:19, 9:20, 9:21, 10:9, 10:22, 10:24, 11:16, 11:21, 11:24, 12:17, 12:18, 12:25, 13:1, 13:10, 13:11, 13:13, 13:24, 14:23, 15:13, 16:18, 16:19, 17:7, 17:10, 20:6, 21:3, 22:25, 23:7, 26:7, 28:12, 30:5, 30:11, 30:21, 31:6, 33:16, 34:24, 35:5, 37:6, 37:10, 37:13, 37:22, 40:25, 43:22, 44:6, 45:24, 46:8, 46:18, 47:7, 47:8, 48:11, 48:13, 48:14, 48:17, 50:20, 50:21, 52:7, 53:3, 53:5, 54:4, 54:8, 56:11, 57:12, 57:16, 58:25, 60:4, 61:4, 61:5, 61:20, 61:22, 62:1, 64:14, 69:16, 69:19, 71:7, 72:9, 72:14, 73:16, 74:18, 76:18, 77:11, 77:16,

77:20, 77:22, 77:24, 78:23, 79:15, 80:5, 82:9, 85:1, 88:1, 91:8, 92:11, 94:3, 94:18, 127:16, 164:18, 167:2, 175:4, 191:12, 200:13, 200:16, 215:17

**cases** [27] - 8:23, 9:15, 11:6, 12:13, 12:14, 13:17, 18:23, 29:21, 29:23, 29:25, 30:15, 30:18, 31:1, 31:2, 37:17, 42:14, 46:9, 54:3, 73:21, 75:1, 75:9, 78:6, 78:16, 78:19, 82:20, 82:25, 84:4

**cash** [1] - 143:17

**catch** [3] - 6:20, 120:14, 120:15

**caught** [1] - 69:23

**caused** [2] - 40:1, 135:16

**CCE** [3] - 44:11, 91:25, 92:4

**CCE-related** [1] - 91:25

**CCE/murder** [1] - 21:16

**Cedar** [1] - 112:8

**cell** [1] - 24:2

**cellblock** [1] - 199:7

**cellblocks** [2] - 199:10, 199:11

**cent** [2] - 114:24, 115:6

**certain** [4] - 35:1, 139:25, 141:21, 183:16

**certainly** [2] - 95:4, 220:4

**chained** [1] - 70:5

**challenge** [6] - 37:2, 37:14, 49:25, 50:9, 88:20, 92:5

**challenged** [1] - 50:21

**challenging** [1] - 88:17

**chance** [6] - 40:19, 79:8, 81:11, 182:20, 191:10, 208:8

**change** [6] - 23:1, 91:8, 104:14, 108:11, 121:17, 123:18

**changed** [2] - 122:18, 173:9

**changes** [1] - 17:5

**changing** [1] - 104:15

**character** [1] - 177:13

**characterization** [1] - 156:7

**charge** [12] - 9:7, 19:16, 23:9, 36:23, 41:9, 68:13, 72:19, 132:23, 157:3, 211:11, 212:2, 212:15

**charged** [8] - 34:13, 34:18, 65:17, 65:19, 77:18, 207:14, 209:3, 209:7

**charges** [7] - 207:5, 207:7, 207:12, 207:15, 212:8, 215:18, 216:8

**charging** [1] - 210:15

**Charles** [1] - 11:22

**Charlie** [3] - 44:16, 52:1,

78:1

**charts** [1] - 46:15

**check** [2] - 181:14, 187:3

**checking** [1] - 165:11

**checks** [1] - 109:13

**chemical** [1] - 132:24

**chemicals** [4] - 33:18, 33:23, 33:24, 156:14

**chemistry** [1] - 155:9

**Cherokee** [1] - 144:5

**chest** [1] - 100:1

**Chicago** [6] - 33:13, 51:6, 71:19, 82:1, 82:8, 170:13

**chickens** [2] - 136:23, 136:25

**child** [3] - 99:23, 100:7, 158:9

**childhood** [3] - 56:7, 56:20, 57:6

**children** [18] - 48:15, 91:9, 91:20, 99:1, 104:25, 114:14, 124:12, 124:18, 169:1, 172:24, 184:6, 184:11, 184:15, 184:22, 195:4, 196:7, 197:11, 197:13

**Christianson** [1] - 4:13

**Christmas** [2] - 170:24, 195:18

**church** [5] - 130:10, 130:12, 130:15, 213:5, 213:6

**cigarettes** [2] - 188:14, 188:15

**Circuit** [5] - 10:14, 10:19, 23:3, 50:13, 50:22

**circuit** [2] - 132:20, 133:5

**Circuit's** [1] - 21:24

**circulate** [1] - 17:4

**circulated** [1] - 36:19

**circumstantial** [2] - 63:8, 174:22

**cited** [1] - 19:5

**citizen** [1] - 178:6

**City** [14] - 11:22, 23:22, 25:14, 25:16, 30:5, 30:8, 30:9, 46:8, 119:2, 119:9, 119:23, 167:20, 186:20, 187:24

**city** [1] - 219:10

**Civil** [1] - 3:2

**claim** [26] - 21:3, 21:5, 21:12, 21:18, 22:24, 42:23, 43:3, 43:10, 44:6, 45:17, 49:24, 50:2, 50:5, 50:11, 56:17, 66:4, 66:5, 66:24, 67:3, 67:4, 67:16, 89:7, 89:10, 89:13, 113:13, 164:8

**Claim** [10] - 21:12, 40:3, 42:23, 45:11, 64:25, 72:9, 84:17, 89:1, 90:2

**claimed** [4] - 140:8, 140:14, 144:2, 144:12

**claims** [20] - 4:21, 20:10,

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM     Document 83     Filed 12/07/11     Page 226 of 246

20:12, 20:15, 20:25, 21:8, 22:17, 50:15, 56:17, 60:5, 112:12, 141:17, 142:6, 142:20, 143:3, 143:4, 143:9, 143:20, 144:15, 144:24

**Claims** [3] - 20:8, 20:16
**clarification** [1] - 210:22
**clarify** [1] - 141:19
**Clarinda** [5] - 205:23, 205:24, 206:5, 209:16, 210:6
**class** [3] - 13:4, 13:5, 120:7
**classes** [2] - 13:3, 120:9
**clause** [1] - 19:13
**clean** [2] - 144:8, 165:6
**clear** [7] - 62:14, 62:16, 62:24, 63:6, 79:22, 187:22, 220:4
**Clear** [2] - 134:4, 134:6
**clearly** [2] - 47:10, 164:7
**CLERK** [5] - 3:2, 8:12, 98:11, 166:20, 198:11
**client** [7] - 55:18, 64:18, 65:25, 76:11, 78:8, 79:15, 84:5
**client's** [1] - 76:18
**clients** [4] - 24:16, 63:1, 76:3
**Clinic** [1] - 181:11
**close** [5] - 81:14, 116:3, 130:1, 169:11, 176:5
**closely** [1] - 72:18
**clothes** [4] - 119:1, 186:17, 196:21, 204:12
**cm/ecf** [1] - 6:4
**co** [2] - 65:15, 96:6
**co-counsel** [2] - 65:15, 96:6
**Cobeen** [4] - 35:14, 35:16, 93:2, 218:18
**cocaine** [8] - 65:6, 65:24, 140:23, 141:2, 141:7, 141:8, 142:20, 143:1
**coequally** [1] - 22:6
**cognizant** [1] - 50:10
**collateral** [6] - 19:14, 19:24, 36:16, 37:8, 37:9, 37:19
**colleagues** [1] - 53:12
**collect** [7] - 109:13, 111:4, 112:22, 114:9, 144:16, 145:4, 194:23
**collecting** [1] - 194:22
**colleges** [1] - 131:4
**Colloton** [2] - 209:15, 210:5
**coming** [15] - 5:6, 23:20, 24:3, 28:24, 46:13, 76:25, 121:22, 143:18, 150:16, 151:11, 179:4, 187:20, 202:25, 212:5, 218:7
**comment** [1] - 36:20

**comments** [4] - 17:6, 174:2, 174:21, 175:17
**Commission** [3] - 31:13, 31:15, 31:17
**commission** [1] - 31:19
**commit** [7] - 79:16, 173:13, 207:9, 210:16, 210:18, 212:17, 215:18
**committing** [1] - 174:4
**common** [1] - 139:7
**commonly** [1] - 52:20
**communicate** [8] - 24:16, 70:9, 70:19, 72:2, 184:21, 184:24, 185:11, 200:11
**communicated** [6] - 71:1, 174:24, 179:22, 194:3, 207:4, 207:7
**communicating** [3] - 70:25, 71:7, 137:4
**communication** [1] - 200:6
**communications** [3] - 23:18, 71:6, 213:1
**community** [1] - 52:21
**comp** [1] - 194:23
**company** [15] - 132:9, 132:14, 132:20, 133:4, 133:8, 133:9, 138:10, 138:17, 139:22, 140:19, 170:12, 180:25, 182:7, 182:9, 182:12
**compared** [1] - 64:18
**compensation** [1] - 32:9
**compiled** [1] - 74:16
**complained** [1] - 71:9
**complaining** [1] - 117:24
**complaints** [1] - 72:1
**complete** [1] - 156:10
**completed** [3] - 5:19, 33:5, 107:19
**completely** [1] - 59:6
**complied** [1] - 73:11
**compromise** [2] - 45:25, 49:20
**computer** [1] - 98:15
**computers** [1] - 133:5
**concede** [1] - 43:25
**concentrate** [1] - 63:2
**concept** [1] - 78:6
**concern** [13] - 6:2, 28:15, 52:2, 52:21, 54:14, 60:4, 63:25, 64:11, 64:12, 69:5, 69:10, 70:20, 83:16
**concerned** [8] - 5:11, 31:25, 53:13, 59:14, 70:2, 72:6, 82:4, 86:16
**concerning** [4] - 35:6, 35:10, 38:10, 40:17
**concerns** [8] - 55:17, 57:25, 58:1, 58:3, 59:18, 61:20, 63:18, 78:21
**concerted** [1] - 81:12
**concluded** [1] - 221:9
**conclusion** [6] - 6:8,

55:21, 74:19, 74:25, 108:13, 108:15
**conclusions** [1] - 74:20
**condition** [3] - 7:1, 88:9, 175:5
**conditions** [1] - 218:20
**conduct** [2] - 194:11, 197:10
**conducted** [1] - 42:9
**conference** [4] - 219:2, 219:3, 219:5, 219:6
**conferences** [1] - 32:16
**conferred** [2] - 88:24, 95:5
**confidential** [1] - 26:21
**confined** [1] - 70:22
**confinement** [1] - 53:16
**confines** [1] - 90:9
**confirmation** [2] - 130:15, 130:17
**conflict** [2] - 11:9
**conflicting** [1] - 68:21
**conflicts** [1] - 79:10
**confused** [3] - 45:14, 45:15, 220:23
**conjunction** [1] - 189:22
**connected** [1] - 80:1
**connection** [4] - 37:1, 140:15, 140:16, 146:16
**connections** [3] - 143:15, 144:1, 148:21
**cons** [1] - 43:12
**consent** [1] - 13:16
**consequences** [1] - 185:7
**consequently** [1] - 25:4
**conservative** [1] - 46:12
**consider** [5] - 28:13, 69:18, 70:1, 78:11, 126:17
**considerably** [1] - 101:10
**considered** [5] - 27:17, 38:10, 42:5, 87:14, 96:25
**considering** [1] - 27:23
**consisted** [1] - 65:22
**consistency** [2] - 78:22, 80:18
**consistent** [6] - 58:18, 59:2, 59:15, 69:14, 69:24, 83:2
**conspiracy** [14] - 9:20, 10:18, 10:21, 19:16, 44:7, 44:12, 65:17, 65:19, 93:10, 207:9, 210:16, 210:17, 211:11, 212:16
**conspiracy/murder** [1] - 21:14
**conspirators** [1] - 35:10
**conspiring** [1] - 34:13
**constitute** [2] - 162:23, 162:24
**construction** [5] - 109:25, 170:12, 182:7, 182:8, 182:12
**consulting** [1] - 48:24
**consuming** [1] - 171:11
**contact** [9] - 23:23, 25:9,

131:13, 152:12, 152:15, 152:18, 194:11, 199:14, 199:21
**contacted** [2] - 12:3, 118:25
**contained** [1] - 163:14
**contains** [1] - 79:18
**context** [2] - 66:5, 162:11
**continue** [3] - 104:3, 146:7, 177:5
**continued** [2] - 70:9, 192:8
**continuing** [2] - 21:16, 34:15
**control** [6] - 40:6, 40:13, 41:21, 60:7, 64:21, 126:15
**controlled** [3] - 41:5, 143:17, 157:9
**controlling** [1] - 126:17
**convenience** [2] - 168:22, 188:12
**conversation** [7] - 11:11, 128:11, 153:16, 158:6, 189:9, 191:5, 192:3
**conversations** [4] - 20:19, 57:9, 115:10, 116:1
**convey** [5] - 70:23, 151:2, 154:10, 184:6, 195:3
**conveyed** [7] - 140:7, 151:3, 153:2, 153:6, 153:8, 153:9, 153:12
**conveying** [2] - 153:14, 154:20
**convicted** [7] - 167:22, 177:1, 177:2, 181:3, 181:6, 181:20, 192:8
**conviction** [1] - 91:18
**convince** [1] - 61:10
**cook** [1] - 100:22
**cooperate** [1] - 5:9
**cooperating** [2] - 14:23, 15:23
**cooperative** [1] - 127:25
**cooperators** [1] - 37:21
**copied** [1] - 23:19
**copy** [2] - 206:8, 206:11
**correct** [144] - 10:23, 11:19, 11:22, 12:23, 15:10, 15:24, 17:25, 18:1, 19:3, 24:20, 25:18, 26:7, 26:19, 30:11, 30:19, 31:4, 32:18, 33:12, 33:13, 33:20, 34:2, 34:12, 34:16, 34:17, 34:18, 35:7, 35:8, 35:13, 38:16, 39:1, 39:17, 40:7, 41:13, 41:24, 42:11, 42:12, 42:21, 46:4, 48:25, 49:4, 49:5, 49:23, 50:18, 51:6, 51:11, 51:18, 51:21, 54:6, 56:9, 56:15, 60:11, 64:2, 67:8, 67:10, 70:15, 70:16, 71:17, 71:21, 71:24, 73:17, 74:1, 74:5, 75:19, 75:23, 77:22, 78:4, 82:10, 82:13, 82:18,

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM Document 83 Filed 12/07/11 Page 227 of 246

84:15, 85:12, 86:14, 86:17, 87:9, 88:18, 90:6, 91:23, 92:19, 92:25, 99:11, 104:10, 104:18, 106:6, 115:9, 120:20, 125:7, 129:19, 129:25, 130:11, 130:21, 131:5, 131:11, 131:18, 131:21, 131:25, 132:4, 132:5, 132:10, 132:12, 132:15, 132:17, 132:19, 132:21, 132:22, 133:2, 133:6, 133:11, 133:17, 136:3, 136:15, 138:6, 138:11, 138:13, 141:5, 142:16, 143:18, 145:13, 145:21, 146:2, 146:10, 146:18, 146:21, 147:21, 148:10, 148:15, 150:4, 150:6, 150:11, 150:14, 150:18, 150:21, 151:3, 152:3, 153:7, 155:1, 155:5, 156:18, 156:21, 156:24, 157:2, 157:4, 157:8

**cost** [6] - 48:8, 48:9, 180:18, 180:20, 180:21, 197:3

**costs** [1] - 81:2

**couch** [3] - 120:8, 150:2, 150:3

**counsel** [45] - 3:5, 4:2, 7:5, 7:23, 12:22, 20:14, 21:2, 40:4, 40:13, 42:1, 42:24, 43:2, 45:25, 49:24, 50:4, 52:1, 55:2, 55:4, 60:6, 60:8, 62:1, 62:3, 65:15, 66:1, 66:24, 67:6, 67:16, 72:9, 78:2, 79:15, 80:16, 81:23, 88:24, 95:5, 96:6, 96:10, 96:18, 113:13, 139:25, 162:2, 162:6, 163:22, 168:4, 191:11, 218:14

**counsel's** [1] - 54:10

**counsels'** [1] - 140:4

**count** [1] - 23:4

**counties** [2] - 30:3, 46:14

**country** [4] - 5:7, 114:17, 148:14, 148:18

**counts** [4] - 21:13, 91:21, 91:24, 91:25

**Counts** [2] - 21:15, 21:17

**County** [16] - 23:24, 24:2, 30:2, 31:14, 32:24, 46:11, 67:2, 199:2, 199:4, 199:7, 200:1, 201:12, 202:6, 202:19, 202:24, 212:24

**county** [4] - 88:11, 186:12, 203:2, 203:5

**couple** [17] - 3:18, 10:11, 12:6, 14:10, 15:2, 65:5, 73:20, 131:16, 131:20, 131:24, 144:16, 149:12, 155:3, 158:2, 185:20, 204:11, 211:23

**coupled** [1] - 60:17

**course** [7] - 21:11, 53:8, 63:5, 176:20, 178:12, 178:18, 207:3

**coursework** [1] - 33:6

**court** [12] - 3:1, 6:8, 9:12, 37:6, 37:17, 64:14, 76:19, 84:4, 90:15, 177:21, 205:15, 211:11

**COURT** [108] - 3:11, 3:23, 4:6, 4:24, 5:3, 5:14, 5:21, 6:3, 6:11, 6:20, 7:13, 7:16, 7:20, 7:25, 8:3, 8:6, 19:7, 29:4, 29:7, 68:11, 73:6, 74:9, 75:12, 84:20, 84:25, 87:21, 95:4, 97:12, 97:14, 97:18, 97:21, 97:25, 98:5, 98:14, 98:19, 110:24, 113:1, 113:6, 113:14, 116:9, 116:15, 129:1, 129:5, 141:24, 156:9, 157:22, 158:1, 158:14, 158:20, 160:18, 160:25, 161:3, 161:8, 161:11, 161:18, 163:18, 164:23, 165:8, 165:14, 165:17, 165:22, 166:6, 166:9, 166:13, 166:15, 171:22, 172:2, 174:12, 175:1, 175:7, 177:8, 177:17, 178:15, 179:6, 180:7, 185:10, 187:12, 190:22, 197:17, 197:21, 197:24, 198:3, 198:6, 206:14, 207:24, 208:4, 211:20, 214:20, 215:8, 217:14, 217:17, 217:22, 218:5, 218:8, 218:11, 218:15, 218:23, 219:5, 219:10, 219:13, 219:21, 219:24, 220:7, 220:11, 220:20, 220:24, 221:2, 221:5

**Court** [29] - 3:16, 4:11, 5:5, 5:13, 5:16, 5:24, 6:25, 9:5, 18:14, 18:25, 30:7, 48:4, 65:19, 66:20, 67:9, 76:13, 161:24, 162:4, 162:9, 162:21, 163:2, 163:3, 163:7, 163:12, 164:11, 164:14, 169:4, 218:9

**Court's** [4] - 3:16, 5:25, 21:8, 66:17

**court-appointed** [1] - 84:4

**Courtney** [1] - 4:19

**courtroom** [2] - 7:24, 166:14

**crane** [9] - 109:21, 109:23, 110:1, 110:2, 110:3, 182:18, 182:21, 183:14, 194:15

**crash** [1] - 144:15

**craziest** [1] - 145:6

**crazy** [2] - 108:14, 108:15

**create** [3] - 55:11, 70:24, 90:12

**created** [2] - 72:20, 139:21

**creates** [1] - 80:24

**credibility** [7] - 60:1, 61:3, 72:25, 75:5, 83:2, 88:17, 88:21

**crib** [1] - 99:18

**crime** [3] - 79:16, 80:2, 184:4

**crimes** [1] - 78:8

**Criminal** [1] - 27:2

**criminal** [12] - 21:16, 30:21, 32:19, 34:15, 85:25, 134:21, 184:4, 184:6, 184:7, 193:8, 195:4

**critical** [1] - 76:17

**crooks** [1] - 184:20

**cross** [21] - 15:4, 16:5, 37:25, 39:8, 63:19, 64:10, 64:22, 65:21, 78:13, 85:9, 86:19, 86:22, 88:16, 89:25, 92:13, 92:15, 93:18, 129:5, 190:22, 208:4, 216:14

**CROSS** [4] - 29:9, 129:7, 191:1, 208:6

**cross-examination** [13] - 15:4, 37:25, 63:19, 64:10, 65:21, 78:13, 85:9, 88:16, 92:13, 129:5, 190:22, 208:4, 216:14

**CROSS-EXAMINATION** [4] - 29:9, 129:7, 191:1, 208:6

**cross-examine** [2] - 86:19, 86:22

**cross-examined** [1] - 39:8

**cross-examining** [3] - 16:5, 64:22, 93:18

**Crosse** [1] - 168:19

**crossed** [1] - 108:18

**crowd** [3] - 169:12, 169:19, 169:22

**cruel** [1] - 162:8

**Cub** [3] - 130:3, 130:7, 196:12

**curiosity** [1] - 78:19

**current** [8] - 27:11, 56:21, 96:10, 96:18, 168:4, 189:23, 190:8

**custody** [5] - 160:24, 165:11, 165:18, 166:4, 198:4

**cut** [1] - 81:14

**Cutkomp** [9] - 35:9, 93:2, 148:6, 156:19, 203:22, 203:24, 204:2, 204:5, 218:16

**CV** [1] - 161:12

## D

**dad** [23] - 102:21, 107:9, 107:15, 108:5, 114:19, 116:3, 116:4, 117:21, 119:13, 119:15, 119:18, 121:1, 122:18, 144:4, 144:7, 144:12, 144:15, 178:23, 179:12, 179:17, 179:25, 185:22, 194:4

**Dad** [7] - 118:15, 121:1, 135:20, 136:5, 136:24, 186:1, 186:3

**dad's** [1] - 112:1

**damage** [3] - 28:12, 28:25, 76:10

**damaging** [1] - 64:17

**Dan** [4] - 35:14, 35:16, 93:2, 218:18

**dancing** [1] - 186:16

**danger** [2] - 64:8, 80:4

**dangerous** [2] - 69:18, 80:7

**dangerousness** [1] - 70:24

**dangling** [1] - 110:3

**dare** [1] - 173:15

**date** [11] - 18:9, 31:25, 78:18, 85:21, 87:8, 159:24, 182:25, 206:6, 206:19, 206:20, 206:25

**date-wise** [2] - 206:6, 206:25

**dated** [2] - 73:25, 95:19

**dates** [1] - 31:24

**dating** [2] - 32:1, 158:8

**daughter** [1] - 124:20

**Davenport** [3] - 30:6, 209:22, 212:7

**David** [3] - 15:12, 166:11, 166:25

**DAVID** [1] - 166:17

**days** [5] - 5:11, 10:2, 16:16, 188:8

**Dayton** [1] - 212:7

**dead** [1] - 52:24

**deal** [7] - 5:16, 23:21, 24:20, 58:8, 59:7, 187:15

**dealing** [7] - 46:11, 55:25, 58:8, 59:12, 64:12, 77:23, 132:23

**deals** [1] - 45:11

**dealt** [4] - 53:11, 53:12, 58:11, 77:11

**Dean** [2] - 204:4, 216:2

**death** [19] - 25:3, 46:3, 46:18, 48:15, 52:20, 78:19, 79:3, 80:25, 81:14, 82:20, 82:25, 90:23, 90:24, 91:9, 91:20, 91:21, 92:6, 94:3, 94:18

**deaths** [2] - 47:8, 68:19

**debate** [1] - 68:2

**debated** [3] - 72:18, 81:20, 81:22

**debating** [1] - 52:16

**December** [4] - 39:10,

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 228 of 246

73:25, 74:15, 206:22

**decide** [3] - 27:25, 49:12, 49:13

**decided** [20] - 7:7, 13:15, 26:23, 43:1, 43:9, 47:1, 52:10, 55:18, 61:3, 68:16, 81:7, 81:18, 148:8, 156:19, 156:22, 156:25, 157:3, 157:5, 215:19, 218:1

**deciding** [2] - 59:24, 79:20

**decision** [28] - 7:6, 26:1, 26:10, 26:11, 26:18, 44:22, 44:24, 45:6, 46:17, 46:24, 47:15, 54:8, 54:15, 54:19, 57:17, 57:23, 58:14, 62:9, 66:15, 67:24, 68:7, 72:19, 72:22, 90:20, 90:24, 148:4, 148:13, 156:16

**decisions** [3] - 13:1, 20:23, 68:14

**Declaration** [1] - 159:21

**declaration** [10] - 52:6, 96:24, 160:1, 168:3, 168:12, 175:16, 191:11, 191:12, 191:14, 191:19

**declarations** [3] - 4:10, 163:11, 163:15

**deepest** [1] - 128:14

**deeply** [1] - 54:18

**Deering** [1] - 50:13

**defendant** [6] - 34:13, 50:20, 55:3, 55:11, 158:17, 167:1

**defendant's** [1] - 162:13

**defendants** [1] - 11:8

**Defender's** [2] - 3:9, 12:4

**Defense** [2] - 88:24, 95:5

**defense** [42] - 7:2, 7:4, 11:12, 17:22, 32:19, 32:20, 33:21, 37:12, 45:24, 46:5, 47:16, 49:20, 51:15, 52:1, 52:21, 53:6, 54:10, 55:2, 57:12, 57:14, 57:25, 58:15, 58:16, 58:18, 59:19, 60:5, 60:8, 62:24, 67:6, 67:16, 69:19, 69:21, 72:9, 73:14, 78:23, 80:19, 82:14, 89:14, 127:17, 160:10, 162:13, 168:4

**defer** [4] - 26:17, 53:23, 57:21, 78:1

**deferred** [2] - 26:15, 28:9

**DeGeus** [6] - 36:9, 67:18, 67:21, 68:1, 69:3, 148:24

**DeGeus's** [1] - 36:1

**degree** [8] - 13:17, 16:18, 18:7, 29:20, 29:25, 30:5, 47:7, 163:21

**Delbert** [1] - 15:9

**delineation** [1] - 164:2

**delve** [1] - 15:5

**demanded** [1] - 124:6

**demote** [1] - 138:20

**den** [3] - 130:5, 130:8, 196:12

**denied** [2] - 50:15, 208:25

**DENNIS** [1] - 198:8

**Dennis** [3] - 15:23, 198:2, 198:16

**dental** [1] - 74:18

**deny** [1] - 180:1

**departure** [1] - 18:14

**depended** [1] - 88:6

**deposition** [1] - 7:3

**depositions** [2] - 5:10, 5:17

**depression** [1] - 157:19

**Des** [3] - 30:2, 98:16, 219:12

**describe** [7] - 96:4, 114:4, 118:20, 125:20, 137:18, 173:10, 180:15

**described** [1] - 172:9

**desert** [1] - 41:14

**designated** [1] - 53:4

**despite** [1] - 70:8

**destroy** [1] - 151:8

**detail** [3] - 46:13, 49:16, 62:8

**detailed** [1] - 36:22

**details** [4] - 10:18, 36:18, 58:9, 64:7

**detective** [1] - 202:14

**determination** [2] - 88:4, 90:17

**determine** [1] - 95:24

**determined** [1] - 19:15

**developed** [6] - 24:10, 27:12, 27:14, 27:19, 27:22, 82:12

**development** [1] - 177:16

**diabetes** [1] - 39:16

**diagnosed** [1] - 157:16

**diamond** [1] - 150:10

**diapers** [2] - 104:14, 104:15

**died** [1] - 48:20

**Dietz** [4] - 52:18, 52:23, 53:1, 53:4

**difference** [7] - 22:4, 44:20, 44:21, 45:7, 92:9, 125:21, 129:23

**different** [13] - 45:4, 45:21, 73:4, 82:16, 129:22, 169:12, 173:4, 199:10, 199:11, 199:13, 206:3, 211:10, 220:23

**differently** [1] - 156:12

**difficult** [6] - 24:16, 25:1, 25:2, 48:13, 48:17, 64:21

**difficulty** [1] - 163:20

**dinner** [2] - 121:24, 123:22

**dire** [1] - 7:1

**DIRECT** [4] - 8:13, 98:20, 166:21, 198:12

**direct** [15] - 29:18, 51:23,

52:4, 53:25, 54:22, 55:5, 65:14, 89:25, 193:16, 194:5, 195:2, 195:5, 197:1, 197:4, 212:22

**direction** [3] - 52:10, 118:22, 164:6

**directly** [1] - 154:21

**disability** [13] - 109:10, 109:11, 109:13, 109:15, 114:4, 114:9, 114:13, 183:17, 183:20, 183:22, 194:15, 194:19

**disabled** [1] - 182:23

**disadvantaged** [1] - 56:20

**disagree** [1] - 74:19

**disappear** [1] - 124:8

**disappeared** [1] - 124:11

**discovery** [1] - 64:4

**discuss** [6] - 3:15, 6:9, 7:5, 22:11, 68:2, 189:11

**discussed** [12] - 17:11, 23:16, 27:24, 43:7, 43:8, 50:4, 50:6, 60:15, 81:12, 81:20, 81:22, 97:3

**discussing** [5] - 51:23, 57:11, 77:9, 89:25, 160:11

**discussion** [25] - 19:21, 22:8, 22:21, 26:20, 26:24, 26:25, 27:1, 27:4, 27:8, 28:20, 28:22, 36:15, 36:18, 36:22, 42:24, 43:2, 43:4, 52:13, 53:22, 53:25, 54:14, 55:5, 55:7, 61:15, 62:7

**discussions** [12] - 20:14, 20:17, 27:10, 44:16, 52:1, 52:12, 61:18, 80:16, 80:18, 80:19, 96:5, 219:17

**dishes** [1] - 100:22

**dismissed** [1] - 89:15

**disorder** [2] - 28:19, 84:14

**dispose** [2] - 152:20, 154:11

**disposition** [2] - 9:21, 13:23

**dispute** [2] - 41:10, 94:19

**disregard** [2] - 66:18, 177:14

**distribute** [2] - 34:14, 35:1

**distributed** [1] - 35:18

**distribution** [1] - 143:24

**District** [7] - 9:13, 46:13, 50:1, 50:16, 50:19, 77:15, 205:22

**disturb** [1] - 124:19

**divorce** [5] - 117:11, 117:12, 123:6, 123:8, 123:9

**divorced** [4] - 102:5, 102:8, 122:18, 122:25

**divorces** [1] - 133:25

**DNA** [1] - 30:25

**document** [3] - 38:3, 95:22, 215:15

**documentation** [1] - 74:22

**documented** [1] - 20:20

**documents** [5] - 20:20, 20:21, 23:18, 23:23, 24:1

**dog** [5] - 42:6, 135:13, 136:6, 136:16, 136:23

**dogs** [5] - 114:18, 135:6, 135:7, 135:8

**dollars** [1] - 145:3

**Donaldson** [1] - 204:4

**done** [20] - 5:7, 5:10, 9:12, 13:6, 28:24, 47:4, 55:1, 55:16, 73:19, 74:18, 81:24, 82:6, 82:9, 84:12, 85:7, 140:4, 173:16, 211:24, 217:18, 217:19

**door** [14] - 80:20, 199:18, 199:20, 203:6, 213:3, 213:9, 213:15, 213:17, 213:20, 214:11, 214:17, 217:3

**double** [6] - 16:9, 16:13, 18:24, 19:13, 36:12, 37:1

**doubt** [3] - 42:16, 81:20, 83:14

**down** [71] - 8:17, 12:8, 24:1, 24:4, 36:14, 50:18, 51:1, 61:1, 69:2, 69:5, 83:10, 87:3, 95:10, 98:17, 100:3, 100:4, 111:8, 111:13, 112:5, 112:8, 112:10, 113:25, 119:1, 119:7, 119:9, 119:10, 119:22, 120:5, 124:7, 132:2, 132:5, 132:8, 132:18, 133:18, 133:24, 134:25, 138:9, 142:7, 142:9, 142:11, 142:12, 142:13, 142:14, 142:24, 144:2, 144:3, 144:5, 144:6, 145:15, 147:12, 147:19, 148:6, 150:22, 151:13, 152:20, 154:11, 154:14, 155:2, 155:3, 160:19, 186:24, 187:3, 187:4, 188:11, 197:25, 209:16, 209:20, 209:24, 210:6, 216:17

**downside** [2] - 43:16, 90:5

**Dr** [13] - 51:15, 52:18, 52:20, 71:22, 73:14, 74:3, 74:15, 97:3, 97:4, 189:25, 190:4, 190:13

**draft** [1] - 20:21

**drafted** [1] - 17:3

**Drake** [2] - 31:20, 32:4

**drank** [6] - 107:9, 107:10, 115:17, 115:20, 171:21, 172:10

**draw** [1] - 96:1

**drawn** [1] - 62:2

**dreaded** [1] - 187:20

**dress** [2] - 49:12, 49:13

**drink** [10] - 102:22, 102:23, 105:24, 106:3, 106:19, 107:4, 171:18,

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM Document 83 Filed 12/07/11 Page 229 of 246

172:9, 172:11, 172:13

**drinking** [19] - 106:7, 106:10, 106:11, 106:12, 106:22, 106:23, 115:18, 115:19, 120:11, 120:16, 171:9, 171:17, 172:4, 172:5, 173:5, 173:7, 173:9, 176:20, 188:18

**drive** [4] - 33:16, 121:24, 176:3, 176:9

**driver's** [3] - 121:15, 121:18, 122:1

**drives** [1] - 83:6

**driving** [4] - 83:3, 155:3, 176:12, 188:11

**drop** [1] - 212:7

**drove** [2] - 149:6, 187:4

**drug** [16] - 19:16, 21:13, 33:15, 33:25, 34:3, 34:6, 34:9, 35:6, 42:21, 42:22, 65:16, 91:25, 92:16, 133:19, 141:11

**drug-related** [1] - 91:25

**drugs** [12] - 34:20, 35:2, 65:5, 93:12, 142:14, 142:15, 142:21, 142:22, 145:11, 145:16, 211:13, 211:14

**drunk** [3] - 173:1, 173:11, 176:16

**Dubuque** [1] - 32:22

**Dudley** [4] - 97:3, 190:1, 190:4, 190:13

**due** [3] - 162:5, 162:23, 162:24

**dug** [1] - 67:20

**duly** [4] - 8:10, 98:9, 166:18, 198:9

**dumped** [1] - 151:13

**during** [46] - 17:12, 17:17, 19:22, 23:7, 23:8, 33:8, 42:2, 54:21, 54:22, 58:19, 63:5, 64:9, 65:14, 66:25, 67:11, 67:24, 70:4, 70:19, 71:1, 71:25, 74:17, 85:18, 101:2, 102:12, 102:13, 103:1, 103:14, 103:16, 124:18, 125:17, 126:14, 127:5, 127:8, 138:7, 138:8, 139:12, 171:13, 172:9, 172:23, 178:20, 190:7, 195:22, 207:3, 208:25, 212:12

**Dustin** [180] - 3:3, 11:10, 13:12, 26:18, 33:8, 33:19, 35:17, 36:10, 38:15, 39:8, 40:6, 41:5, 41:22, 42:11, 42:16, 49:12, 51:4, 51:16, 56:4, 56:19, 57:5, 57:6, 57:12, 57:15, 58:22, 61:13, 61:15, 64:5, 65:4, 65:5, 65:9, 67:1, 68:15, 68:18, 70:4, 70:8, 70:17, 71:9, 71:25, 81:9, 81:19, 82:1,

98:24, 99:3, 99:15, 99:21, 99:23, 101:9, 101:10, 103:22, 107:2, 108:1, 108:3, 108:17, 109:1, 109:16, 110:14, 115:2, 115:5, 115:10, 116:2, 116:3, 116:4, 118:4, 122:5, 122:12, 122:15, 122:16, 124:14, 125:5, 125:6, 125:16, 125:17, 125:18, 125:22, 126:3, 126:5, 126:14, 126:19, 126:23, 127:9, 128:6, 129:21, 131:10, 131:16, 133:16, 133:18, 137:1, 137:5, 137:19, 137:22, 138:14, 139:1, 139:13, 139:23, 140:8, 140:11, 140:24, 141:17, 141:22, 142:1, 142:6, 142:9, 142:11, 142:21, 142:22, 142:24, 143:6, 143:13, 143:14, 143:15, 143:20, 144:2, 144:12, 144:19, 144:24, 145:5, 145:11, 145:22, 145:25, 146:24, 147:5, 147:12, 148:1, 148:8, 148:13, 148:16, 148:21, 149:4, 149:18, 150:25, 151:5, 151:7, 151:20, 152:18, 153:3, 153:6, 153:9, 153:11, 153:14, 153:23, 154:10, 154:16, 154:21, 155:9, 155:20, 155:24, 156:3, 156:13, 156:16, 157:9, 158:7, 158:24, 161:11, 167:2, 167:17, 174:6, 174:7, 175:23, 177:15, 192:4, 193:12, 194:7, 194:12, 195:16, 196:2, 197:7, 198:20, 198:22, 198:24, 202:23, 205:8, 206:3, 210:24, 213:1, 214:3, 214:14, 216:12

**Dustin's** [10] - 103:23, 127:17, 128:19, 135:13, 157:5, 188:20, 188:21, 189:23, 190:4, 208:20

## E

**early** [6] - 5:12, 5:13, 24:12, 47:11, 61:20, 120:12

**earn** [1] - 183:10

**earned** [1] - 138:19

**easier** [2] - 63:1, 121:4

**easiest** [2] - 6:4, 164:23

**easily** [1] - 24:17

**easy** [5] - 62:8, 94:10, 107:15, 164:10

**eat** [2] - 124:6, 124:7

**eating** [1] - 148:19

**ECF** [1] - 5:18

**edges** [1] - 81:14

**edits** [1] - 160:6

**educational** [1] - 32:21

**effect** [3] - 37:20, 101:19, 174:20

**effects** [1] - 177:16

**Eighth** [7] - 10:14, 10:19, 21:24, 23:3, 50:13, 50:22, 162:7

**Einfeldt** [1] - 50:14

**either** [10] - 7:2, 46:2, 93:11, 102:14, 106:9, 106:10, 185:5, 213:15, 218:2, 218:3

**elaborate** [3] - 29:15, 29:21, 60:16

**elected** [1] - 31:15

**electronics** [1] - 100:21

**element** [1] - 182:2

**elicit** [2] - 163:13, 164:25

**elicited** [4] - 41:25, 42:1, 42:4, 65:16

**eliciting** [1] - 42:6

**eligible** [1] - 114:11

**eliminate** [1] - 92:6

**embellished** [2] - 107:10, 193:6

**emergency** [1] - 119:22

**employee** [2] - 132:11, 139:6

**employee/employer** [1] - 125:13

**employees** [3] - 132:16, 133:8, 138:23

**employer** [2] - 194:20, 194:21

**employment** [1] - 118:24

**EMT** [1] - 119:22

**encouraged** [1] - 24:13

**end** [12] - 7:4, 22:3, 41:8, 44:19, 91:4, 91:7, 149:19, 203:4, 207:20, 219:17, 220:3, 220:10

**ended** [5] - 22:24, 25:22, 132:13, 138:25, 211:14

**ending** [1] - 47:1

**enforcement** [1] - 205:14

**engage** [2] - 193:21, 197:10

**engaged** [1] - 21:7

**enormous** [2] - 48:8, 49:7

**entered** [1] - 166:14

**enterprise** [1] - 34:15

**enterprise/murder** [1] - 21:16

**entire** [4] - 42:17, 102:16, 132:18, 141:2

**environment** [3] - 47:7, 101:20, 102:3

**equally** [1] - 129:11

**equipment** [7] - 107:22, 151:8, 180:22, 180:25, 181:1, 183:9, 184:12

**error** [1] - 65:20

**escape** [29] - 67:1, 67:2, 83:9, 125:24, 201:11, 202:6, 202:15, 202:19, 202:23, 203:2, 203:5, 203:7, 203:16, 203:22, 203:23, 204:1, 204:4, 207:10, 208:19, 209:8, 210:17, 212:16, 212:23, 213:11, 215:18, 216:25, 217:1, 217:4, 217:5

**escaping** [1] - 81:11

**especially** [1] - 22:24

**essentially** [2] - 172:20, 181:23

**establish** [8] - 34:25, 62:20, 62:21, 63:8, 70:3, 94:17, 162:16

**established** [2] - 94:22, 113:12

**establishes** [1] - 44:7

**establishments** [1] - 103:11

**estoppel** [4] - 19:14, 19:24, 37:9, 37:19

**etcetera** [3] - 24:7, 41:3, 47:6

**Ethics** [1] - 31:13

**eval** [5] - 28:23, 55:17, 77:20, 80:21, 80:22

**evaluate** [1] - 86:21

**evaluated** [6] - 26:4, 28:8, 28:17, 83:16, 88:4, 96:19

**evaluation** [4] - 26:21, 54:24, 55:12, 81:24

**evaluations** [1] - 84:12

**evening** [1] - 49:15

**evenings** [1] - 71:2

**event** [4] - 192:2, 212:11, 213:8, 214:12

**events** [1] - 96:23

**eventually** [7] - 25:6, 25:22, 170:1, 170:12, 170:14, 181:5, 188:5

**evidence** [67] - 3:12, 4:20, 14:5, 30:17, 30:22, 30:23, 31:8, 33:14, 34:10, 40:5, 42:15, 43:18, 53:16, 57:24, 60:7, 60:13, 61:16, 62:6, 63:8, 63:15, 65:8, 67:1, 67:7, 67:12, 67:17, 67:19, 67:25, 68:4, 69:3, 69:8, 69:10, 70:3, 72:10, 72:13, 72:15, 72:25, 73:2, 73:15, 74:4, 74:10, 74:16, 78:11, 80:1, 81:5, 83:3, 83:5, 83:13, 83:17, 87:18, 88:1, 92:9, 92:22, 113:4, 161:14, 162:4, 162:12, 162:17, 163:10, 163:13, 163:24, 164:13, 164:16, 174:19, 174:23, 217:23

**Evidence** [7] - 113:7, 161:23, 163:21, 163:25, 164:11, 164:17, 164:18

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 230 of 246

**evidentiary** [1] - 3:4
**exact** [5] - 34:20, 93:17, 93:19, 153:16, 159:4
**exactly** [4] - 49:1, 107:1, 125:2, 127:7
**exam** [2] - 51:6, 194:5
**EXAMINATION** [11] - 8:13, 29:9, 75:15, 98:20, 129:7, 158:4, 166:21, 191:1, 198:12, 208:6, 214:22
**examination** [30] - 15:4, 29:18, 37:25, 51:16, 54:1, 54:23, 55:1, 55:6, 63:19, 64:10, 65:1, 65:14, 65:21, 65:22, 66:10, 74:3, 78:13, 85:9, 87:25, 88:16, 92:13, 129:5, 190:22, 193:16, 195:3, 195:5, 197:1, 208:4, 212:23, 216:14
**examine** [4] - 56:3, 86:19, 86:22, 166:7
**examined** [8] - 8:11, 39:8, 51:5, 55:3, 71:20, 98:10, 166:19, 198:10
**examining** [6] - 15:1, 16:5, 16:7, 64:22, 93:18
**example** [6] - 42:5, 64:13, 72:6, 92:4, 165:25, 172:7
**excellent** [3] - 11:10, 47:22, 58:24
**except** [3] - 12:12, 77:22, 83:12
**exception** [6] - 3:22, 116:10, 116:24, 138:5, 158:15, 174:13
**exceptions** [1] - 113:17
**exchange** [1] - 20:20
**exclude** [1] - 67:7
**excluded** [3] - 45:3, 45:19, 162:14
**exclusion** [2] - 84:18, 162:23
**exclusively** [2] - 174:16, 175:5
**excuse** [1] - 182:10
**excused** [1] - 98:3
**Exhibit** [20] - 4:14, 4:15, 4:16, 4:17, 4:18, 4:19, 71:14, 73:8, 73:9, 73:23, 74:7, 74:9, 74:11, 95:9, 159:14, 168:7, 201:21, 216:16
**exhibit** [8] - 72:8, 85:6, 86:25, 95:6, 141:25, 142:4, 159:10, 203:11
**exhibits** [3] - 4:11, 219:16, 219:22
**Exhibits** [2] - 5:1, 5:25
**expand** [1] - 96:13
**expanded** [1] - 96:11
**expecting** [1] - 99:18
**expenses** [2] - 143:11, 146:16
**expensive** [1] - 150:5

**experience** [17] - 9:11, 12:12, 12:15, 15:4, 29:16, 29:22, 30:20, 31:5, 32:3, 49:6, 49:7, 49:9, 61:23, 75:1, 76:7, 78:17, 219:15
**experienced** [1] - 125:24
**expert** [13] - 28:25, 33:12, 33:16, 33:22, 48:7, 48:23, 48:24, 54:10, 81:10, 97:1, 189:21, 190:3, 190:7
**expertise** [1] - 13:2
**experts** [4] - 53:5, 96:19, 97:1, 97:2
**explain** [3] - 76:2, 109:24
**explained** [3] - 43:18, 99:19, 119:16
**exploits** [1] - 184:4
**exposure** [1] - 195:25
**express** [2] - 58:1, 216:7
**expressed** [2] - 28:16, 70:20
**extensive** [1] - 40:25
**extent** [10] - 15:8, 20:4, 21:9, 25:25, 42:1, 49:13, 57:8, 136:9, 190:15, 195:24
**extra** [3] - 72:6, 183:12, 220:21
**extract** [1] - 148:2
**extrapolating** [2] - 33:17, 33:23
**extreme** [1] - 46:2
**extremely** [8] - 28:5, 28:7, 48:10, 48:13, 59:11, 59:13, 60:18, 81:6
**eyes** [2] - 39:16, 69:9

## F

**fabulous** [2] - 46:21, 71:3
**face** [9] - 63:16, 117:2, 129:14, 129:15, 199:23, 207:12
**face-to-face** [3] - 129:14, 129:15, 199:23
**facing** [5] - 16:1, 16:3, 38:11, 207:8, 216:7
**fact** [28] - 19:15, 41:17, 44:6, 49:19, 50:7, 50:11, 54:7, 56:17, 67:13, 73:20, 76:17, 79:18, 90:12, 92:15, 93:17, 94:1, 138:2, 153:2, 158:8, 162:24, 163:14, 194:18, 194:24, 202:18, 204:21, 210:14, 211:17, 212:12
**factor** [2] - 61:2, 76:10
**factors** [4] - 49:14, 58:12, 58:13, 62:9
**facts** [1] - 80:6
**failing** [7] - 40:5, 49:25, 60:6, 66:25, 67:17, 72:10, 145:2
**failure** [1] - 20:24

**fair** [21] - 22:5, 28:6, 31:1, 32:17, 33:10, 35:2, 36:24, 42:17, 46:22, 56:8, 57:10, 63:11, 81:24, 86:7, 86:8, 129:10, 129:23, 134:15, 153:20, 209:6, 213:8
**fairly** [3] - 12:7, 61:4, 101:2
**fairness** [1] - 17:3
**fake** [1] - 114:4
**falling** [1] - 194:14
**Falls** [1] - 112:8
**falls** [1] - 113:17
**familiar** [19] - 12:16, 21:21, 37:5, 37:10, 37:16, 40:3, 40:7, 40:11, 40:13, 40:20, 45:11, 50:9, 50:12, 51:12, 53:9, 56:20, 84:3, 87:5, 87:7
**families** [1] - 187:16
**family** [38] - 3:18, 3:19, 40:18, 41:19, 41:20, 57:7, 57:10, 58:4, 58:9, 82:12, 86:16, 99:1, 99:12, 100:8, 100:18, 101:4, 101:24, 113:5, 125:25, 126:1, 128:6, 129:17, 133:23, 134:1, 163:5, 168:25, 170:20, 170:25, 172:8, 172:23, 174:23, 174:25, 176:2, 177:15, 195:23, 196:6, 196:14
**family's** [1] - 100:24
**far** [10] - 31:23, 43:23, 77:22, 102:15, 103:8, 127:3, 146:25, 164:1, 200:1, 201:4
**fashion** [1] - 47:14
**fat** [1] - 117:3
**father** [48] - 102:4, 102:8, 105:22, 107:4, 107:7, 108:11, 108:16, 109:4, 110:10, 110:20, 111:17, 112:11, 113:22, 115:11, 115:13, 116:2, 116:5, 116:22, 117:10, 118:7, 119:24, 120:11, 120:21, 122:25, 125:9, 125:10, 133:25, 134:15, 134:19, 135:1, 135:4, 135:17, 136:1, 136:11, 136:21, 159:1, 178:22, 179:1, 179:4, 179:10, 179:11, 179:20, 179:23, 185:2, 185:11, 185:16, 186:5, 194:3
**father's** [9] - 101:12, 111:2, 114:3, 134:15, 158:25, 167:5, 167:6, 179:9, 185:6
**favorably** [1] - 44:1
**favorite** [3] - 108:21, 109:3, 109:8
**FBI** [1] - 181:4

**federal** [14] - 9:12, 12:14, 37:6, 55:15, 55:20, 64:14, 159:6, 159:8, 161:21, 181:8, 181:10, 181:15, 201:5, 207:10
**Federal** [3] - 3:9, 12:4, 31:16
**feds** [2] - 209:11, 214:12
**fee** [1] - 14:6
**feed** [1] - 101:25
**feelings** [2] - 184:19, 184:22
**feet** [1] - 176:6
**fell** [3] - 182:18, 182:21, 183:14
**fellow** [6] - 52:18, 64:19, 77:19, 181:16, 181:23
**felon** [2] - 177:1, 210:17
**felony** [1] - 8:23
**felt** [6] - 97:7, 100:2, 101:6, 101:23, 122:9, 209:13
**female** [3] - 103:7, 127:21, 127:22
**fencing** [2] - 109:8, 109:18
**few** [9] - 3:15, 9:16, 16:15, 30:12, 32:2, 38:23, 73:9, 75:13, 178:7
**fewer** [2] - 114:5
**field** [1] - 62:22
**Fiems** [1] - 4:14
**fight** [10] - 34:3, 43:21, 63:3, 94:11, 94:25, 138:22, 138:25, 139:5, 139:10, 139:19
**fighting** [1] - 138:24
**fights** [1] - 33:9
**figure** [5] - 48:9, 49:2, 49:21, 125:9, 125:10
**figured** [1] - 6:10
**file** [6] - 5:18, 6:7, 64:4, 76:7, 215:17
**filed** [6] - 4:10, 16:10, 20:5, 52:7, 67:6
**filing** [3] - 6:3, 19:22, 44:21
**fill** [1] - 5:8
**finalized** [1] - 123:9
**finally** [4] - 183:17, 185:18, 185:20, 186:23
**financing** [1] - 41:3
**findings** [4] - 20:10, 37:6, 37:17, 51:12
**fine** [15] - 3:11, 5:14, 5:21, 5:23, 6:5, 6:15, 7:13, 7:16, 8:3, 16:22, 98:14, 99:8, 172:2, 211:20, 220:11
**fire** [8] - 134:20, 199:18, 199:20, 213:3, 213:15, 214:11, 214:17, 217:3
**firewall** [3] - 27:3, 27:9, 54:25
**first** [46] - 8:10, 10:14, 13:17, 15:19, 16:18, 29:20,

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM Document 83 Filed 12/07/11 Page 231 of 246

29:25, 30:5, 40:24, 41:12, 47:7, 51:3, 55:9, 60:8, 61:21, 62:10, 67:18, 74:13, 85:7, 94:4, 98:9, 102:4, 115:25, 123:24, 131:23, 132:7, 132:8, 133:18, 135:5, 138:9, 143:12, 145:10, 145:14, 147:12, 150:12, 166:18, 171:13, 171:14, 174:14, 192:11, 198:9, 200:15, 203:22, 206:23, 216:17, 217:2

**fish** [1] - 100:19
**fishing** [1] - 111:10
**fist** [1] - 139:21
**fit** [1] - 99:12
**floor** [2] - 70:5, 183:9
**flow** [2] - 22:9, 143:17
**flutter** [2] - 71:10, 71:15
**flutters** [1] - 72:1
**focus** [6] - 33:21, 34:3, 34:7, 57:4, 92:16, 208:18
**focused** [3] - 14:19, 34:10, 37:24
**folk** [1] - 185:22
**folks** [9] - 38:5, 46:12, 46:20, 46:25, 47:6, 81:8, 181:13, 218:6, 220:15
**folks's** [1] - 170:23
**follow** [3] - 58:14, 66:21, 79:23
**follow-up** [3] - 58:14, 66:21, 79:23
**followed** [2] - 61:3, 82:20
**following** [1] - 3:1
**follows** [4] - 8:11, 98:10, 166:19, 198:10
**food** [2] - 186:1, 196:19
**football** [1] - 169:16
**Footnote** [2] - 19:11, 36:16
**forces** [1] - 83:4
**Ford** [1] - 106:15
**forensic** [10] - 30:17, 30:21, 30:23, 31:2, 31:8, 72:10, 72:13, 73:15, 74:4, 74:18
**forgot** [1] - 186:3
**form** [2] - 37:8, 74:2
**formal** [1] - 7:18
**formally** [1] - 11:18
**former** [1] - 144:25
**formulate** [1] - 22:22
**forth** [6] - 18:20, 52:3, 52:14, 67:23, 117:24, 208:21
**forward** [4] - 8:7, 98:6, 166:15, 198:7
**foundation** [8] - 63:13, 110:23, 171:20, 172:1, 178:14, 179:3, 180:5, 185:9
**four** [1] - 67:18
**fox** [2] - 108:14, 108:15
**framework** [1] - 46:24

**franchised** [1] - 168:23
**frankly** [6] - 24:11, 43:4, 61:20, 79:5, 84:4, 93:23
**free** [1] - 121:19
**Freeman** [1] - 50:18
**freezer** [1] - 151:13
**frequently** [1] - 101:2
**fresh** [1] - 38:21
**Friday** [1] - 7:11
**friend** [8] - 36:1, 119:7, 120:7, 181:19, 181:21, 194:21, 209:17, 209:19
**friends** [8] - 24:13, 77:19, 102:22, 103:6, 103:11, 106:10, 106:11, 112:8
**Friesenborg** [4] - 149:20, 151:1, 152:13
**fringes** [1] - 47:10
**frivolous** [1] - 21:7
**front** [12] - 9:23, 43:21, 60:1, 62:15, 76:25, 119:12, 159:11, 168:7, 186:17, 201:20, 214:25, 215:5
**Frye** [2] - 144:20, 145:1
**full** [2] - 15:21, 217:2
**full-time** [1] - 15:21
**fully** [3] - 25:3, 50:10, 123:9
**fund** [1] - 141:14
**funds** [1] - 146:8
**furniture** [1] - 149:23
**furthermore** [1] - 174:19
**future** [1] - 6:13

## G

**Gahn** [7] - 64:23, 64:24, 65:2, 65:3, 65:16, 65:23, 75:18
**gains** [1] - 61:6
**game** [2] - 109:10, 109:11
**games** [1] - 109:8
**gaping** [1] - 73:1
**garage** [2] - 110:21, 111:8
**garages** [1] - 111:3
**garbage** [2] - 186:4, 186:8
**gas** [2] - 110:6, 148:19
**gas-powered** [1] - 110:6
**gatekeeping** [1] - 164:12
**gears** [1] - 98:13
**Gee** [1] - 188:14
**Gelbort** [2] - 51:16, 71:23
**general** [7] - 27:21, 41:20, 57:22, 72:11, 78:6, 94:13, 129:20
**generally** [4] - 10:8, 16:14, 166:2, 178:5
**gentleman** [3] - 105:20, 119:15, 123:4
**gentlemen** [2] - 105:15, 105:18
**Georgia** [1] - 162:20
**Georgia's** [1] - 162:22

**German** [1] - 135:9
**girlfriend** [1] - 154:5
**given** [9] - 32:18, 52:15, 91:20, 91:21, 137:16, 165:17, 175:4, 177:22, 192:12
**glorifying** [2] - 181:23, 194:11
**gold** [1] - 148:2
**good-bye** [1] - 98:4
**goods** [1] - 179:11
**Google** [1] - 15:6
**gosh** [1] - 118:11
**government** [43] - 4:8, 7:6, 17:22, 19:15, 26:23, 28:17, 28:22, 28:23, 34:23, 37:8, 37:19, 38:11, 45:25, 46:6, 49:20, 52:16, 53:4, 54:9, 55:2, 55:10, 55:19, 55:23, 55:25, 62:5, 62:21, 67:20, 68:4, 69:15, 72:11, 83:24, 85:10, 85:11, 92:21, 93:8, 94:1, 94:22, 96:12, 139:8, 175:6, 180:21, 201:5, 218:2
**Government** [1] - 73:23
**Government's** [3] - 47:19, 71:14, 74:20
**government's** [12] - 7:12, 30:23, 31:2, 31:8, 33:14, 33:22, 52:2, 55:12, 61:5, 67:19, 73:15, 74:4
**grade** [4] - 120:19, 169:6, 169:7, 169:10
**graduate** [3] - 121:1, 131:8, 170:1
**graduated** [6] - 32:22, 32:23, 119:19, 119:20, 131:1, 132:1
**graduating** [2] - 120:7, 132:3
**grams** [5] - 94:2, 94:9, 94:18, 94:23, 94:24
**grand** [29] - 18:3, 18:4, 35:6, 37:25, 200:20, 200:24, 201:2, 201:7, 201:10, 201:11, 201:17, 202:6, 202:18, 202:22, 203:17, 203:18, 203:21, 204:8, 204:15, 205:2, 205:8, 205:9, 205:10, 205:13, 205:16, 208:24, 208:25, 209:10, 216:12
**grandfathers** [1] - 100:18
**Grandma** [1] - 106:17
**grandmother** [1] - 101:12
**grandmothers** [2] - 100:21, 101:25
**Grandpa** [2] - 100:20, 106:16
**grandparents** [17] - 100:12, 100:13, 100:16, 100:17, 100:24, 101:1, 101:11, 101:17, 101:22,

102:1, 106:16, 122:16, 125:23, 126:1, 126:3, 134:2
**grandparents'** [1] - 121:21
**granted** [2] - 57:1, 90:21
**great** [11] - 11:9, 22:8, 24:15, 24:20, 46:13, 48:9, 49:9, 49:16, 61:5, 181:22, 220:22
**greatly** [1] - 78:21
**Green** [1] - 162:20
**Greg** [3] - 35:5, 65:9, 146:24
**groceries** [1] - 186:1
**grocery** [1] - 168:22
**grossed** [1] - 146:25
**ground** [1] - 50:25
**grounds** [2] - 50:24, 80:7
**group** [2] - 130:12, 130:14
**grow** [2] - 117:3, 117:8
**growing** [8] - 78:20, 129:21, 130:3, 130:19, 169:3, 169:5, 169:11, 178:18
**guess** [19] - 5:8, 7:17, 14:17, 23:2, 59:22, 65:3, 72:11, 78:6, 91:10, 110:13, 115:24, 161:1, 164:23, 169:13, 169:25, 175:12, 180:21, 188:24, 214:12
**guessing** [1] - 182:15
**guilt** [18] - 4:22, 13:16, 14:1, 14:19, 14:21, 26:16, 29:19, 54:21, 58:19, 58:21, 59:2, 59:19, 68:13, 78:7, 82:16, 83:13, 144:7
**guilty** [1] - 9:22
**gun** [3] - 192:18, 192:22, 193:13
**guns** [4] - 176:22, 177:5, 192:9, 192:12
**guy** [3] - 36:6, 83:7, 108:9
**guys** [9] - 106:21, 129:22, 134:1, 139:20, 181:22, 211:7, 213:4, 213:9, 213:14

## H

**H-O-N-K-E-N** [1] - 166:25
**habeas** [1] - 4:10
**half** [3] - 32:25, 112:19, 203:6
**halfway** [1] - 182:5
**Hamilton** [1] - 170:18
**handed** [1] - 73:8
**handle** [6] - 6:4, 13:16, 13:18, 13:20, 164:24, 203:6
**handled** [5] - 12:14, 12:17, 30:1, 30:17, 92:11
**handling** [1] - 29:19
**hands** [1] - 161:24
**happy** [2] - 147:23, 161:4
**hard** [3] - 24:25, 25:1, 48:10

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM     Document 83     Filed 12/07/11     Page 232 of 246

harder [2] - 114:8
hardly [1] - 145:19
harm [3] - 173:21, 173:23, 204:5
harming [1] - 191:23
hateful [1] - 214:12
haul [1] - 186:18
head [4] - 56:13, 77:21, 136:22, 157:11
headlights [2] - 105:9, 105:10
heads [1] - 47:14
health [26] - 26:3, 27:4, 27:12, 51:2, 53:6, 56:4, 56:19, 57:14, 57:19, 58:15, 58:16, 59:22, 78:11, 79:17, 79:18, 79:25, 81:24, 88:9, 96:19, 157:14, 157:16, 185:6, 189:21, 190:3, 190:6, 218:20
hear [17] - 62:19, 99:7, 117:11, 117:13, 117:16, 117:18, 117:24, 184:9, 184:24, 192:19, 197:13, 218:11, 218:13, 218:16, 218:17, 218:18
heard [9] - 24:12, 116:4, 127:23, 136:2, 136:20, 145:6, 177:11, 194:20, 206:2
hearing [30] - 3:4, 7:19, 9:22, 9:24, 10:5, 33:9, 33:10, 34:4, 37:7, 37:18, 39:9, 39:11, 39:12, 39:18, 93:4, 113:6, 113:9, 113:16, 161:23, 162:18, 163:22, 164:19, 174:22, 200:24, 210:14, 210:19, 210:23, 210:25, 216:7
hearings [1] - 13:22
hearsay [24] - 94:23, 112:24, 113:4, 113:16, 116:7, 116:9, 116:10, 158:12, 158:14, 158:15, 161:17, 161:20, 162:12, 162:14, 162:18, 162:22, 163:3, 163:14, 164:10, 164:19, 165:5, 174:11, 174:12, 174:13
heart [7] - 6:13, 71:10, 71:15, 72:1, 99:24, 100:1, 100:2
heavily [1] - 81:20
Heidi [2] - 135:9, 136:4
held [3] - 3:1, 37:6, 162:21
hello [2] - 166:15, 198:6
help [5] - 15:4, 121:10, 174:8, 217:1, 217:5
helped [6] - 15:13, 49:12, 88:20, 88:22, 141:14
helpful [1] - 28:11
helping [1] - 216:24
hesitancy [1] - 76:15
high [13] - 118:21, 118:23,

119:19, 119:20, 119:21, 120:19, 121:1, 121:13, 131:1, 132:1, 132:3, 170:1
highway [1] - 105:7
Hilgenberg [1] - 4:15
himself [9] - 63:19, 107:11, 107:12, 107:16, 174:8, 182:19, 194:25, 209:20, 209:21
hire [1] - 51:15
hired [3] - 51:25, 73:14, 132:11
Hispanic [1] - 50:8
historically [1] - 41:21
history [4] - 26:5, 60:10, 82:12, 113:5
hoist [1] - 110:2
hoisting [1] - 109:22
hole [1] - 201:22
holes [4] - 31:1, 31:3, 73:2, 75:3
home [17] - 101:7, 101:13, 102:11, 102:16, 102:20, 103:3, 103:4, 105:6, 106:5, 110:12, 133:22, 134:1, 160:10, 174:23, 186:2, 188:10, 219:8
homework [5] - 121:10, 121:12, 130:20, 130:22, 130:24
honestly [2] - 14:3, 77:16
honk [1] - 114:1
HONKEN [2] - 98:8, 166:17
Honken [153] - 3:3, 3:10, 4:16, 8:25, 9:10, 9:18, 10:13, 17:13, 17:16, 19:12, 21:2, 23:20, 24:10, 24:17, 24:19, 26:4, 26:19, 28:9, 28:16, 28:25, 33:8, 35:17, 40:6, 42:16, 45:3, 51:4, 51:17, 53:17, 53:20, 53:21, 56:4, 57:5, 57:6, 57:12, 57:15, 58:22, 60:24, 61:8, 61:16, 61:18, 65:4, 65:5, 70:4, 70:8, 71:9, 80:21, 81:22, 84:12, 85:1, 88:12, 91:19, 92:7, 93:12, 96:19, 98:2, 98:6, 98:22, 98:23, 98:24, 100:20, 105:23, 113:18, 120:17, 129:3, 129:9, 137:19, 139:13, 139:23, 140:8, 140:11, 142:1, 143:6, 144:19, 145:11, 153:3, 158:6, 158:22, 159:10, 159:21, 160:9, 161:12, 161:14, 166:11, 166:23, 166:25, 167:1, 167:2, 167:9, 167:21, 168:11, 168:16, 168:25, 169:3, 170:1, 170:8, 170:14, 172:3, 173:13, 174:16, 175:15, 175:25, 176:16, 176:22,

176:25, 177:4, 177:15, 177:24, 178:16, 178:17, 178:20, 180:2, 180:3, 181:5, 181:10, 183:5, 184:3, 187:22, 188:5, 188:20, 190:20, 191:3, 192:4, 193:12, 194:2, 194:7, 194:12, 195:3, 195:16, 197:7, 198:20, 198:22, 198:24, 199:22, 202:23, 203:15, 204:1, 205:2, 205:11, 208:9, 208:12, 210:24, 213:1, 214:3, 214:15, 216:25, 217:1, 218:14, 219:22
Honken's [26] - 12:17, 27:11, 33:19, 38:15, 39:8, 40:25, 56:19, 60:18, 61:13, 64:5, 67:1, 70:17, 72:1, 77:11, 80:5, 106:17, 153:24, 154:16, 160:13, 167:7, 167:17, 168:4, 172:23, 177:13, 200:13, 200:16
Honor [100] - 3:8, 3:14, 4:1, 4:4, 4:7, 4:20, 4:25, 5:4, 6:16, 6:17, 7:21, 8:2, 19:4, 21:14, 29:3, 29:6, 29:8, 68:8, 73:5, 74:7, 75:13, 85:4, 88:25, 95:3, 97:10, 97:13, 97:16, 97:17, 97:19, 97:24, 98:1, 110:23, 112:25, 113:3, 113:10, 116:8, 116:11, 116:14, 118:20, 125:20, 128:25, 129:6, 141:20, 156:7, 157:21, 157:25, 158:3, 158:13, 158:16, 158:19, 160:16, 160:17, 160:23, 161:7, 161:15, 161:19, 161:20, 161:22, 163:1, 163:19, 165:7, 165:9, 165:15, 166:8, 166:10, 171:25, 174:14, 177:6, 177:12, 179:2, 179:8, 180:6, 185:9, 187:11, 190:23, 197:16, 197:20, 197:22, 198:1, 206:13, 206:16, 207:22, 208:5, 210:21, 211:19, 214:19, 214:21, 215:7, 217:16, 217:20, 217:21, 217:24, 218:13, 219:4, 219:7, 219:14, 219:18, 219:23, 220:19, 221:8
Honor's [1] - 161:17
hope [5] - 21:8, 25:13, 30:22, 76:21, 83:6
hopefully [2] - 166:4, 211:8
horn [1] - 114:2
hospital [13] - 186:10, 186:21, 186:22, 187:4, 187:9, 187:23, 187:24, 187:25, 188:1, 188:3,

188:4, 188:6, 188:16
hour [2] - 14:7, 14:9
hour's [1] - 220:21
hours [3] - 33:4, 84:21, 155:3
house [38] - 36:6, 36:7, 100:15, 100:24, 103:3, 104:19, 104:21, 105:16, 105:17, 107:4, 107:5, 111:23, 111:25, 112:4, 112:9, 112:15, 117:13, 122:13, 124:5, 125:18, 126:24, 127:6, 131:6, 131:9, 131:13, 140:7, 148:18, 172:10, 172:11, 172:12, 172:16, 176:5, 176:17, 176:19, 176:23, 179:9, 182:5, 192:9
housed [4] - 81:11, 165:24, 199:6, 199:13
household [4] - 100:8, 102:3, 122:3, 125:1
housekeeping [2] - 3:15, 6:24
houses [2] - 111:4, 134:25
huge [5] - 41:10, 41:15, 42:14, 59:7, 61:2
hung [1] - 36:1
hungry [1] - 101:24
hunt [1] - 100:19
hurt [2] - 135:20, 182:18
husband [1] - 125:8
Hutchins [1] - 111:8

## I

ice [1] - 185:21
idea [10] - 22:23, 54:23, 57:4, 142:14, 142:17, 147:3, 147:8, 155:23, 155:24, 155:25
ideas [1] - 70:14
identify [1] - 159:16
illegal [5] - 109:6, 126:8, 134:15, 141:11, 159:1
illness [1] - 157:14
imagine [2] - 5:6, 23:19
impact [7] - 13:23, 53:19, 63:13, 76:18, 88:8, 91:10, 177:14
impacted [2] - 43:17, 88:9
implicate [1] - 80:6
important [1] - 78:25
impression [1] - 156:8
impulsive [7] - 137:2, 137:5, 137:7, 137:9, 137:11, 137:19, 137:23
incarcerated [1] - 200:1
incident [2] - 67:5, 194:2
incidents [3] - 88:11, 88:21, 100:5
included [2] - 18:6, 44:8
including [5] - 12:3, 30:4,

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 233 of 246

38:4, 52:1, 93:2
income [1] - 150:16
inconsistency [1] - 59:25
inconsistent [3] - 58:18, 59:5, 81:15
increased [1] - 14:8
increases [1] - 62:23
Independence [1] - 182:7
indicate [1] - 165:1
indicated [13] - 23:3, 33:2, 51:8, 75:21, 89:6, 105:23, 129:9, 130:19, 146:22, 165:19, 193:16, 194:1, 195:3
indicates [1] - 86:12
indicating [2] - 68:17, 87:20
indicted [1] - 17:15
indictment [2] - 21:15, 21:17
individual [4] - 24:15, 38:4, 66:8, 88:2
individuals [5] - 4:13, 24:25, 47:17, 79:19, 93:11
industrial [1] - 110:6
ineffective [10] - 40:4, 49:25, 60:6, 61:25, 62:1, 65:25, 66:25, 67:17, 72:10, 113:13
information [19] - 13:14, 16:7, 26:24, 46:15, 53:10, 55:22, 62:21, 62:23, 64:17, 72:16, 76:25, 80:23, 86:19, 87:15, 87:24, 88:19, 139:25, 190:13, 190:17
informed [1] - 165:10
injured [8] - 114:10, 135:18, 135:19, 135:22, 135:24, 136:7, 136:19, 194:25
injuries [3] - 56:13, 136:9, 136:20
injury [2] - 8:24, 183:1
inmates [3] - 181:16, 194:11, 199:13
innocence [1] - 83:13
input [3] - 23:17, 26:13, 57:13
inquire [1] - 5:15
insinuated [1] - 173:25
instance [4] - 26:16, 66:21, 76:24, 80:5
instead [2] - 92:20, 165:13
instructing [1] - 44:10
instructions [2] - 44:10, 66:19
insult [1] - 59:16
insurance [7] - 111:5, 112:11, 112:22, 113:23, 144:16, 145:3, 145:4
intelligent [1] - 121:3
intend [1] - 84:6
intended [1] - 55:23
intense [1] - 52:13

interact [1] - 49:16
interaction [3] - 58:9, 125:16, 196:14
interfere [1] - 70:18
interpreted [1] - 173:24
interrupt [1] - 84:20
interview [9] - 38:9, 38:12, 140:3, 142:1, 143:20, 205:24, 206:10, 206:24, 207:3
interviewing [1] - 139:9
interviews [3] - 40:17, 140:14, 143:4
intimate [1] - 61:11
intoxicated [1] - 172:16
introduced [1] - 175:3
invest [1] - 155:25
investigating [1] - 67:5
investigation [10] - 39:24, 40:12, 41:18, 41:23, 42:9, 60:9, 71:14, 74:17, 74:20, 74:21
investigator [3] - 15:8, 141:22, 188:24
investigators [1] - 67:20
investment [1] - 149:11
involve [1] - 68:17
involved [48] - 10:4, 10:17, 11:1, 11:5, 11:12, 11:21, 11:24, 13:1, 14:2, 21:13, 23:13, 26:11, 26:12, 40:24, 54:18, 57:15, 57:17, 59:24, 68:5, 94:2, 109:5, 109:6, 113:22, 120:21, 120:25, 121:6, 130:16, 134:21, 134:22, 139:9, 139:14, 141:7, 141:8, 141:11, 145:10, 147:4, 151:22, 155:14, 155:18, 156:3, 156:7, 169:19, 169:22, 173:24, 178:11, 193:10, 196:9
involvement [5] - 9:15, 64:6, 133:19, 145:15, 218:24
involves [1] - 46:18
involving [3] - 47:8, 48:14, 78:19
Iowa [33] - 13:18, 25:2, 25:5, 30:4, 30:7, 32:23, 35:12, 43:19, 46:10, 48:11, 48:12, 50:1, 50:16, 78:25, 119:23, 120:18, 131:20, 133:4, 133:9, 138:21, 142:23, 143:25, 144:5, 145:18, 148:22, 149:5, 167:20, 168:24, 176:4, 182:7, 186:20, 187:24, 206:5
Iowa's [2] - 84:1, 84:2
issue [38] - 10:15, 10:22, 19:23, 21:22, 22:9, 22:17, 34:21, 34:22, 41:16, 41:20, 42:10, 43:12, 43:25, 44:1,

44:11, 51:2, 54:1, 56:1, 56:10, 66:20, 67:15, 71:7, 71:16, 72:5, 78:3, 80:22, 85:6, 89:24, 90:4, 90:12, 90:21, 92:3, 93:19, 94:7, 94:8, 94:9, 94:20, 164:5
issues [31] - 4:22, 7:10, 7:15, 10:8, 10:11, 10:17, 10:20, 12:2, 12:9, 12:11, 13:22, 16:17, 23:20, 24:3, 27:4, 32:10, 52:9, 63:3, 63:4, 70:25, 76:17, 78:12, 88:2, 88:20, 90:10, 90:19, 91:18, 99:24, 129:17, 157:17, 160:11
IT [2] - 218:24, 218:25
item [1] - 38:3
items [2] - 111:6, 112:14
itself [2] - 16:21, 93:6

## J

jail [12] - 23:24, 62:3, 63:14, 159:1, 175:23, 186:18, 186:19, 199:9, 203:2, 203:5, 204:12, 205:20
Jail [10] - 67:3, 199:2, 199:4, 199:7, 200:1, 201:12, 202:6, 202:19, 202:24, 212:24
jailhouse [1] - 64:13
James [4] - 105:22, 167:7, 167:10, 169:3
January [1] - 213:21
Jarvey [1] - 11:14
Jeff [7] - 40:6, 41:20, 42:5, 106:18, 177:22, 192:12, 192:21
Jeff's [1] - 42:10
Jeffrey [3] - 98:1, 98:23, 159:21
JEFFREY [1] - 98:8
jeopardize [1] - 60:1
jeopardy [6] - 16:9, 16:14, 18:24, 19:13, 36:13, 37:1
Jesus [4] - 140:15, 140:19, 140:20, 140:23
Jim [55] - 133:25, 169:5, 170:1, 170:8, 170:14, 170:19, 171:8, 171:9, 171:18, 172:3, 172:9, 172:23, 173:1, 173:10, 175:17, 176:1, 176:16, 176:22, 176:25, 177:24, 178:1, 178:4, 178:8, 178:17, 178:20, 178:25, 179:10, 179:19, 180:2, 180:8, 181:3, 181:15, 182:1, 182:4, 183:4, 184:5, 184:17, 184:21, 185:16, 185:23, 185:25, 186:5, 186:10, 186:15, 187:23, 188:5, 191:5, 191:18,

193:17, 193:21, 194:2, 195:3, 195:8, 197:10
Jim's [9] - 171:17, 173:8, 174:21, 183:11, 184:3, 185:2, 185:3, 185:12, 195:19
jimmy [2] - 213:14, 213:16
job [8] - 46:21, 48:10, 49:1, 49:3, 118:18, 150:22, 180:21, 184:13
jobs [7] - 107:17, 107:18, 107:19, 109:20, 114:5, 170:10
jobsites [4] - 110:11, 180:9, 180:12, 180:16
Johnson [32] - 4:17, 21:22, 22:10, 22:13, 44:22, 44:24, 45:6, 60:19, 61:6, 61:15, 61:17, 61:19, 62:3, 62:13, 63:9, 64:4, 90:20, 137:13, 139:15, 152:11, 152:25, 174:9, 175:9, 175:18, 191:6, 191:15, 191:17, 191:24, 204:9, 204:19, 204:22, 218:17
Johnson's [3] - 22:25, 60:7, 152:5
joined [1] - 170:5
Judge [17] - 6:6, 9:23, 18:23, 19:9, 19:11, 19:17, 19:21, 20:5, 31:17, 31:21, 31:22, 32:11, 36:14, 46:21, 50:19, 98:12, 213:21
judge [7] - 31:25, 36:21, 37:7, 37:17, 64:16, 216:22, 220:2
judge-only [1] - 220:2
judges [1] - 184:19
judgment [2] - 59:24, 164:15
Judicial [1] - 31:14
July [1] - 19:5
jump [2] - 77:14, 105:11
jumped [1] - 171:15
June [2] - 95:20, 97:8
junior [1] - 121:13
junkyard [1] - 125:11
juror [2] - 85:6, 89:19
Juror [2] - 89:11, 89:12
jurors [6] - 49:2, 49:16, 84:18, 89:4, 89:10, 89:15
jury [68] - 18:3, 18:4, 35:6, 37:25, 43:22, 44:8, 44:9, 44:10, 44:25, 45:4, 45:8, 45:12, 45:21, 48:23, 49:18, 49:25, 50:15, 53:18, 59:4, 59:10, 59:12, 59:16, 60:2, 61:10, 62:16, 62:19, 63:2, 66:17, 69:11, 69:17, 70:22, 75:5, 76:14, 76:18, 77:1, 78:11, 79:2, 81:13, 90:14, 91:9, 137:18, 200:20, 200:24, 201:2, 201:7, 201:10, 201:11, 201:17,

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM Document 83 Filed 12/07/11 Page 234 of 246

202:7, 202:18, 202:22, 203:17, 203:18, 203:21, 204:8, 204:15, 205:2, 205:8, 205:9, 205:10, 205:13, 205:16, 208:24, 208:25, 209:10, 216:12
**jury's** [2] - 69:7, 69:9

## K

**Kansas** [3] - 11:22, 119:2, 119:9
**keep** [7] - 49:2, 67:12, 83:22, 164:12, 175:22, 175:23, 178:9
**keeping** [2] - 27:15, 67:1
**kept** [4] - 52:13, 61:23, 143:9, 183:16
**key** [1] - 33:9
**keyhole** [1] - 217:3
**kid** [6] - 110:17, 111:7, 111:9, 111:14, 114:1, 135:25
**kids** [11] - 46:19, 48:16, 60:23, 62:11, 103:19, 104:13, 105:4, 169:9, 169:25, 187:16, 196:15
**kids's** [1] - 47:8
**kill** [8] - 79:20, 79:21, 108:25, 144:19, 144:24, 145:5, 145:7, 217:6
**killed** [3] - 62:11, 135:4, 191:18
**killing** [4] - 77:18, 91:20, 173:24, 205:11
**killings** [4] - 91:25, 92:1, 92:5, 92:6
**kind** [65] - 3:20, 6:17, 10:7, 10:13, 13:13, 16:17, 17:23, 23:21, 23:22, 36:1, 38:23, 39:4, 39:13, 39:14, 41:15, 41:19, 44:15, 45:8, 45:20, 45:22, 46:1, 46:19, 49:1, 52:20, 52:25, 53:22, 59:17, 59:18, 60:8, 60:10, 65:3, 69:6, 71:10, 73:17, 74:2, 76:16, 78:5, 84:8, 90:19, 101:19, 108:10, 122:14, 122:21, 134:16, 136:20, 138:2, 138:17, 147:3, 147:5, 150:13, 169:7, 169:14, 169:17, 173:6, 173:21, 176:13, 185:21, 191:8, 197:6, 201:8, 203:3, 203:4, 209:17, 214:1, 221:6
**kinds** [1] - 49:14
**King** [3] - 15:9, 15:16, 15:17
**knocking** [1] - 47:14
**knowing** [1] - 193:13
**knowledge** [21] - 18:5, 55:15, 68:18, 80:25,

110:23, 139:7, 141:12, 143:13, 143:23, 146:22, 150:15, 150:24, 168:14, 171:12, 172:3, 178:19, 179:5, 181:2, 192:17, 196:10, 202:23
**known** [4] - 12:22, 16:5, 86:18, 87:13
**knows** [2] - 6:25, 76:14

## L

**lab** [6] - 33:10, 33:17, 33:19, 34:7, 92:16, 132:18
**lack** [6] - 110:22, 110:23, 171:19, 178:13, 180:5, 185:8
**lacks** [1] - 164:13
**laid** [2] - 10:18, 199:10
**Lake** [2] - 134:4, 134:6
**landscape** [1] - 46:16
**lapped** [1] - 44:2
**last** [10] - 9:25, 16:15, 64:14, 95:10, 96:11, 141:20, 159:22, 167:11, 178:7, 198:17
**late** [2] - 102:14, 103:10
**laugh** [1] - 91:4
**Laughter** [1] - 47:25
**Laurel** [1] - 4:13
**Law** [2] - 31:21, 32:23
**law** [16] - 29:17, 31:22, 32:3, 32:5, 32:11, 32:12, 44:6, 50:12, 54:11, 54:13, 55:8, 76:15, 89:20, 177:14, 178:5, 205:14
**law-abiding** [1] - 178:5
**lawyer** [5] - 8:19, 9:5, 11:10, 79:1, 82:16
**lawyers** [14] - 3:12, 11:25, 19:22, 21:7, 21:22, 22:20, 31:16, 32:19, 43:19, 47:2, 48:6, 81:12, 83:3, 128:19
**lawyers's** [1] - 43:5
**lay** [2] - 100:3, 171:25
**laying** [2] - 62:22, 63:13
**leader** [1] - 130:16
**leadership** [1] - 31:11
**leading** [5] - 13:9, 13:10, 23:8, 93:18, 96:6
**leak** [1] - 90:10
**learn** [1] - 76:7
**learned** [6] - 12:22, 78:2, 79:12, 80:16, 111:18, 218:14
**least** [12] - 42:9, 45:23, 52:12, 53:16, 68:4, 103:14, 115:1, 122:19, 129:16, 146:11, 147:6, 209:6
**leather** [1] - 150:2
**leave** [5] - 18:15, 23:11, 102:13, 102:14, 139:1
**leaving** [2] - 133:8, 139:1

**led** [1] - 62:14
**Lee** [2] - 3:3, 161:12
**left** [14] - 92:4, 98:15, 104:24, 116:23, 121:14, 122:21, 122:22, 122:23, 133:3, 138:20, 154:11, 170:4, 186:2, 187:2
**leg** [1] - 135:20
**legal** [3] - 36:25, 159:4, 184:18
**Legal** [2] - 32:15, 32:24
**length** [2] - 10:5, 62:19
**lent** [1] - 112:20
**Leon** [5] - 7:10, 7:11, 11:4, 13:3, 73:25
**Leroy** [1] - 198:16
**less** [4] - 114:7, 114:8, 207:6, 207:20
**lesser** [1] - 44:7
**letter** [11] - 73:19, 73:22, 73:24, 75:3, 204:14, 206:2, 213:21, 213:24, 216:11, 216:14, 216:25
**letters** [1] - 217:4
**level** [1] - 20:15
**Lewis** [1] - 7:22
**liars** [1] - 184:20
**license** [3] - 121:15, 121:18, 122:2
**lied** [2] - 39:3, 193:4
**lieu** [1] - 4:12
**life** [37] - 16:6, 18:13, 18:17, 26:5, 53:21, 74:23, 77:17, 79:9, 81:13, 89:19, 113:5, 121:4, 128:6, 129:23, 141:2, 177:1, 178:8, 178:12, 185:3, 185:12, 186:9, 198:19, 207:13, 207:21, 211:7, 211:15, 212:3, 212:10, 214:8, 214:10, 215:13, 215:23, 216:1, 216:2, 216:4, 217:11
**life-style** [2] - 185:3, 185:12
**lighting** [1] - 134:20
**lightly** [1] - 91:3
**likely** [2] - 88:3, 88:5
**limine** [1] - 76:8
**limited** [2] - 25:5, 26:14
**line** [7] - 62:15, 62:17, 62:24, 63:7, 119:11, 119:12, 142:25
**Line** [6] - 202:1, 202:10, 202:12, 203:13, 204:17
**lined** [1] - 119:2
**lines** [1] - 87:3
**linked** [1] - 140:17
**Lisa** [7] - 25:7, 40:17, 41:17, 42:9, 82:2, 140:5, 160:9
**list** [3] - 48:4, 48:6, 48:10
**literally** [1] - 123:21
**litigation** [1] - 17:12

**live** [5] - 4:12, 73:3, 124:20, 125:1, 168:17
**lived** [5] - 103:5, 104:19, 114:17, 117:12, 182:6
**living** [20] - 65:9, 100:12, 102:8, 103:2, 111:23, 112:2, 112:9, 117:10, 118:4, 126:4, 126:23, 127:1, 133:22, 143:11, 146:15, 154:24, 168:21, 171:2, 171:4
**loan** [1] - 126:10
**loaned** [1] - 155:22
**locked** [3] - 83:25, 84:1, 84:8
**look** [25] - 26:6, 44:24, 46:14, 64:20, 85:17, 105:6, 105:7, 105:8, 109:25, 122:14, 133:24, 168:6, 175:16, 175:19, 191:16, 199:16, 199:17, 201:24, 202:20, 203:11, 204:16, 206:9, 206:19, 211:22, 216:16
**Look** [1] - 83:6
**looked** [7] - 17:14, 46:15, 46:16, 72:15, 73:21, 75:2, 203:12
**looking** [7] - 24:24, 45:6, 53:18, 64:3, 107:15, 212:2, 220:14
**Lori** [1] - 7:22
**lose** [2] - 79:6, 82:23
**losing** [1] - 79:6
**lost** [2] - 30:6, 79:7
**loud** [3] - 117:22, 117:23
**love** [3] - 100:21, 150:2, 150:3
**luckily** [1] - 120:7
**lunch** [4] - 160:20, 160:21, 165:20, 165:21
**luncheon** [1] - 161:10
**Lutheran** [1] - 130:10
**lying** [2] - 38:25, 39:3

## M

**Magistrate** [2] - 11:14, 31:17
**magistrates** [2] - 31:18, 31:19
**main** [2] - 23:23, 27:16
**maintain** [1] - 75:4
**major** [5] - 8:23, 10:20, 57:16, 76:6, 81:17
**majority** [4] - 14:17, 14:18, 122:2, 178:8
**make-up** [1] - 50:21
**male** [3] - 103:7, 127:21, 127:24
**malpractice** [1] - 8:24
**man** [4] - 77:14, 77:18, 189:1, 218:19

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

man's [1] - 79:9
manage [1] - 126:21
managed [2] - 132:16, 132:18
manager [1] - 132:13
manner [3] - 48:20, 62:6, 62:11
manufacture [6] - 34:14, 126:8, 142:15, 145:25, 155:10, 156:22
manufactured [2] - 147:10, 148:11
manufacturing [12] - 132:20, 132:24, 132:25, 133:1, 143:10, 143:22, 146:12, 146:16, 146:17, 155:7, 155:19, 156:14
map [3] - 62:10, 63:16, 64:1
maps [5] - 62:2, 62:4, 62:13, 63:7, 63:9
March [2] - 149:18, 150:25
marijuana [10] - 50:20, 65:7, 140:9, 140:12, 140:15, 140:16, 140:17, 140:23, 145:22, 211:13
mark [3] - 5:24, 94:10, 139:21
Mark [1] - 4:17
Marquis [3] - 112:18, 112:19, 113:19
marriage [2] - 141:3, 171:13
married [9] - 102:4, 123:8, 123:10, 123:19, 123:23, 124:4, 170:14, 170:17, 171:14
marshal [3] - 206:15, 211:21, 215:9
marshal's [2] - 161:4, 161:7
marshals [4] - 71:3, 165:10, 165:18, 201:4
Marvea [6] - 103:1, 170:18, 170:20, 195:19, 196:4, 196:15
master's [3] - 32:7, 33:2, 33:5
material [4] - 25:12, 26:17, 30:25, 109:9
materials [4] - 107:20, 109:19, 155:6, 155:7
matter [16] - 9:10, 10:1, 37:24, 58:6, 73:20, 77:12, 77:13, 89:18, 127:11, 129:20, 162:25, 175:4, 211:18, 220:2, 220:17
Matter [1] - 3:2
matters [7] - 3:15, 23:21, 76:9, 76:16, 78:1, 78:18, 90:16
Matthew [4] - 99:2, 99:10, 99:14, 99:16
Mayo [1] - 181:11

McNeese [9] - 62:6, 62:12, 62:20, 63:10, 63:18, 64:5, 64:7, 64:9, 64:20
meal [1] - 172:17
mean [55] - 21:8, 41:6, 44:21, 45:16, 45:18, 46:9, 48:16, 50:7, 59:2, 60:10, 61:7, 61:10, 63:22, 73:1, 78:15, 90:7, 91:3, 91:5, 96:20, 97:1, 100:20, 101:23, 106:4, 106:14, 107:14, 108:6, 109:11, 109:24, 110:4, 110:8, 115:16, 117:1, 117:23, 117:25, 121:20, 122:19, 124:24, 125:10, 125:14, 143:14, 152:1, 169:14, 173:20, 180:20, 183:20, 189:6, 191:15, 196:6, 199:19, 203:7, 209:9, 213:17, 214:1, 214:12
means [1] - 87:5
meant [3] - 11:17, 72:16, 108:23
mechanic [1] - 170:10
medical [6] - 7:1, 8:24, 74:18, 86:10, 119:22, 194:16
meet [16] - 24:2, 25:11, 32:9, 34:23, 49:15, 71:2, 71:5, 188:21, 189:3, 189:21, 189:25, 190:3, 198:20, 198:21, 198:24, 205:14
meeting [2] - 71:5, 96:11
meetings [2] - 23:15, 23:20
Melissa [4] - 151:1, 152:13, 153:9, 154:7
members [9] - 3:18, 3:19, 16:25, 27:11, 40:18, 41:19, 41:20, 100:9, 174:25
memory [10] - 39:21, 40:1, 77:22, 85:14, 86:13, 88:2, 88:9, 88:20, 88:21, 153:18
mental [27] - 26:3, 27:4, 27:12, 51:2, 53:6, 56:4, 56:10, 56:19, 57:5, 57:14, 57:18, 58:15, 58:16, 59:21, 78:11, 79:17, 79:18, 79:25, 81:23, 96:19, 157:14, 157:16, 186:10, 188:1, 189:21, 190:3, 190:6
mention [2] - 39:20, 175:22
mentioned [11] - 12:13, 29:18, 44:19, 65:24, 71:22, 85:5, 161:19, 175:14, 175:24, 204:6, 212:13
mentioning [1] - 191:13
Mercury [3] - 112:18, 112:19, 113:19
merit [3] - 43:11, 90:12, 90:18

meritorious [1] - 21:3
mess [1] - 144:8
message [13] - 151:2, 151:3, 151:17, 152:19, 153:2, 153:6, 153:8, 153:10, 153:12, 153:14, 154:10, 154:20, 154:21
messed [1] - 213:17
met [7] - 24:14, 25:10, 25:13, 49:11, 74:15, 139:15, 190:6
meth [16] - 35:18, 36:8, 56:24, 57:2, 141:14, 147:1, 147:7, 147:9, 148:22, 149:4, 155:6, 155:18, 155:24, 156:17, 157:3, 157:7
methamphet [1] - 156:22
methamphetamine [30] - 9:20, 10:16, 34:14, 35:11, 36:2, 36:3, 41:2, 41:12, 43:20, 43:22, 46:18, 47:9, 48:14, 48:16, 94:11, 94:12, 142:21, 143:1, 143:5, 143:7, 143:10, 143:22, 143:25, 146:1, 147:16, 150:20, 155:10, 156:25, 158:23
Mexico [1] - 140:16
microphone [2] - 8:17, 99:4
Midwest [2] - 12:1, 12:2
might [23] - 21:9, 31:25, 38:11, 43:6, 44:9, 46:8, 52:22, 53:18, 63:19, 64:8, 78:12, 83:3, 124:15, 144:6, 184:2, 187:21, 207:5, 207:8, 208:2, 209:7, 216:1, 216:7
miles [5] - 103:5, 104:22, 127:4, 181:12, 182:6
Miller [1] - 65:14
million [1] - 145:3
mind [9] - 22:23, 27:15, 38:21, 75:14, 84:1, 84:8, 118:12, 173:23
mine [6] - 43:6, 44:18, 53:9, 169:18, 181:19, 194:21
minimal [1] - 143:11
Minnesota [1] - 181:12
minority [1] - 32:6
minute [4] - 111:21, 115:12, 171:22, 197:16
minutes [5] - 73:9, 160:20, 187:1, 210:11, 211:23
misconduct [1] - 79:19
missing [2] - 18:1, 180:24
misspeaking [1] - 56:24
misstates [1] - 87:18
Missy [13] - 149:20, 151:1, 151:3, 151:5, 151:12, 151:17, 151:19, 151:20, 151:22, 153:12, 154:7

Missy's [1] - 149:24
mistake [1] - 59:5
mistaken [1] - 25:13
mistakes [1] - 48:2
mistrial [1] - 76:15
mitigating [1] - 79:25
mitigation [12] - 24:22, 27:12, 27:14, 27:18, 27:19, 27:21, 27:22, 79:17, 82:12, 140:5, 143:4, 162:13
mix [2] - 47:9, 203:3
mix-up [1] - 203:3
model [3] - 82:20, 82:25, 83:1
modest [1] - 30:13
Moines [3] - 30:2, 98:16, 219:12
mom [9] - 105:3, 105:12, 105:16, 112:9, 117:9, 117:21, 122:18, 123:18, 134:6
Mom [1] - 124:15
mom's [1] - 122:20
moment [18] - 9:9, 13:8, 23:12, 29:2, 77:8, 84:16, 89:2, 95:2, 98:3, 98:13, 101:8, 102:24, 102:25, 116:11, 128:24, 157:21, 177:3, 207:23
Monday [1] - 102:15
money [35] - 107:21, 120:6, 126:10, 137:8, 138:5, 143:16, 145:25, 146:4, 146:12, 146:15, 146:19, 146:23, 147:4, 147:5, 148:17, 148:18, 148:19, 149:10, 149:15, 150:13, 150:17, 151:10, 155:16, 155:18, 155:21, 155:22, 157:6, 158:24, 183:7, 183:10, 183:13, 183:15, 210:1
month [2] - 14:10, 176:10
monthly [1] - 14:6
months [8] - 14:11, 127:7, 182:13, 200:4, 207:13, 211:6, 211:15, 212:3
monumental [1] - 63:3
moot [1] - 166:6
morning [9] - 3:8, 8:15, 8:16, 29:11, 29:12, 68:25, 102:15, 120:12, 120:15
mornings [1] - 71:4
most [13] - 12:7, 24:2, 64:13, 71:4, 74:22, 84:11, 100:25, 105:2, 125:25, 133:7, 143:9, 149:10, 163:13
mostly [3] - 32:19, 115:23, 189:12
mother [25] - 57:20, 102:4, 103:1, 103:3, 104:12, 105:13, 117:3, 117:4, 117:9, 117:10, 121:5,

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 236 of 246

122:25, 130:5, 130:8, 130:16, 133:25, 152:17, 185:12, 185:15, 196:4, 196:12

**mother's** [4] - 123:25, 125:8, 167:4, 185:13

**motion** [11] - 7:18, 13:22, 16:10, 16:14, 17:1, 17:3, 17:7, 18:24, 36:19, 67:6, 67:15

**motions** [4] - 36:20, 76:6, 76:8, 90:8

**motor** [3] - 179:21, 179:23, 194:3

**motorcycle** [2] - 111:13, 111:14

**mouth** [1] - 115:18

**move** [6] - 18:19, 18:22, 21:11, 131:22, 148:13, 219:17

**moved** [25] - 23:22, 66:13, 115:8, 115:11, 115:13, 115:21, 115:23, 115:25, 124:4, 124:5, 131:6, 131:9, 131:12, 131:16, 131:19, 131:20, 132:2, 132:5, 145:12, 145:18, 147:12, 147:13, 158:7, 200:9, 200:10

**moves** [1] - 74:6

**moving** [2] - 18:20, 86:24

**MR** [144] - 3:6, 3:8, 3:14, 3:24, 4:1, 4:7, 4:25, 5:4, 5:15, 5:23, 6:6, 6:16, 6:21, 6:23, 7:14, 7:17, 7:21, 8:2, 8:4, 8:14, 19:4, 29:2, 29:5, 29:8, 29:10, 47:24, 68:8, 73:5, 74:6, 74:8, 75:10, 75:13, 75:16, 85:4, 87:17, 88:25, 95:2, 97:10, 97:13, 97:17, 97:23, 98:1, 98:12, 98:15, 98:21, 99:7, 99:8, 110:22, 112:24, 113:3, 113:10, 116:7, 116:11, 116:13, 128:24, 129:3, 129:6, 129:8, 141:19, 141:25, 142:3, 142:4, 156:6, 157:21, 158:2, 158:5, 158:12, 158:16, 158:18, 160:15, 160:17, 160:23, 161:1, 161:6, 161:15, 161:19, 163:19, 165:7, 165:9, 165:15, 165:19, 166:3, 166:7, 166:10, 166:22, 171:19, 171:25, 174:11, 174:14, 175:2, 177:6, 177:12, 178:13, 179:2, 179:8, 180:5, 185:8, 187:11, 190:20, 190:23, 191:2, 197:16, 197:19, 197:22, 198:1, 198:4, 198:13, 206:13, 206:16, 207:22, 208:1, 208:5, 208:7,

210:21, 210:24, 211:19, 214:18, 214:21, 214:23, 215:7, 215:10, 217:12, 217:15, 217:20, 217:21, 217:24, 218:6, 218:9, 218:13, 218:16, 219:3, 219:7, 219:12, 219:14, 219:23, 220:4, 220:8, 220:9, 220:14, 220:18, 220:22, 221:1, 221:4, 221:8

**multiple** [3] - 103:14, 103:16, 139:12

**multiplicitous** [2] - 21:13, 22:17

**multiplicity** [7] - 42:23, 43:3, 43:10, 44:6, 89:24, 90:21, 92:3

**mumbling** [1] - 117:24

**murder** [25] - 9:7, 9:15, 12:13, 13:17, 16:18, 18:23, 29:21, 29:23, 29:25, 30:5, 30:11, 30:15, 30:18, 30:21, 34:24, 47:7, 69:19, 86:1, 167:22, 181:20, 207:9, 210:16, 210:18, 212:17, 215:18

**murdered** [1] - 60:23

**murderer** [3] - 67:18, 68:1, 69:4

**murders** [4] - 17:14, 58:23, 64:6

**Murray** [2] - 84:21, 177:18

**must** [3] - 55:11, 103:24, 127:24

## N

**name** [18] - 35:23, 52:19, 98:22, 116:20, 119:13, 119:14, 123:4, 124:22, 136:17, 138:9, 140:15, 149:1, 154:6, 166:24, 188:25, 198:15, 198:17

**named** [3] - 15:23, 93:1, 140:5

**names** [1] - 135:8

**narrow** [1] - 178:9

**narrowed** [1] - 12:8

**nature** [3] - 13:1, 57:24, 180:15

**nearly** [1] - 76:3

**necessarily** [2] - 80:1, 111:19

**need** [16] - 12:10, 26:22, 44:11, 80:1, 84:5, 98:12, 148:17, 148:18, 148:19, 151:8, 161:1, 166:1, 180:22, 180:23, 188:9

**needed** [11] - 101:25, 112:21, 143:5, 143:6, 146:9, 148:13, 151:10, 183:7, 183:15

**needs** [1] - 146:10

**negate** [1] - 90:13

**neglected** [1] - 57:20

**neighbors** [1] - 136:24

**Nelson** [1] - 4:18

**nephew** [1] - 167:3

**neurological** [1] - 51:16

**neuropsychological** [1] - 82:5

**never** [38] - 33:5, 41:15, 63:21, 63:22, 94:7, 94:8, 108:5, 108:6, 118:16, 120:6, 121:12, 130:1, 130:20, 130:22, 137:2, 141:1, 141:10, 141:13, 143:23, 149:15, 157:9, 172:10, 187:7, 187:9, 188:9, 188:17, 188:18, 193:21, 193:23, 194:16, 195:10, 196:23, 213:6, 214:7, 214:8, 214:9

**nevertheless** [2] - 170:22, 171:5

**new** [8] - 54:3, 125:8, 207:5, 207:7, 207:12, 207:15, 212:20, 216:8

**news** [1] - 187:20

**newspaper** [1] - 38:6

**next** [14] - 79:2, 86:24, 87:8, 97:23, 99:18, 156:10, 160:23, 161:16, 165:10, 165:15, 166:8, 166:11, 198:1, 217:7

**NIACC** [1] - 142:19

**nice** [3] - 147:6, 149:23, 150:2

**Nicholson** [3] - 35:5, 65:9, 146:25

**night** [5] - 102:14, 103:4, 103:10, 105:1, 124:10

**nights** [2] - 104:24, 110:1

**nobody** [2] - 203:6, 205:9

**NOLAN** [69] - 3:8, 4:1, 4:7, 5:4, 5:15, 6:6, 6:16, 6:21, 7:17, 8:2, 8:4, 8:14, 19:4, 29:2, 29:5, 47:24, 68:8, 74:8, 75:13, 75:16, 85:4, 88:25, 95:2, 97:10, 97:17, 97:23, 98:1, 98:12, 98:15, 98:21, 99:7, 113:3, 113:10, 116:11, 116:13, 128:24, 129:3, 141:19, 142:3, 156:6, 158:2, 158:5, 158:16, 160:15, 160:23, 161:1, 161:15, 161:19, 165:7, 165:9, 165:15, 165:19, 166:3, 166:7, 217:20, 217:24, 218:6, 218:9, 218:13, 218:16, 219:7, 219:12, 219:14, 220:9, 220:14, 220:22, 221:1, 221:4, 221:8

**Nolan** [3] - 3:9, 8:1, 85:3

**Nolan's** [1] - 174:15

**Nomination** [1] - 31:15

**noon** [1] - 172:17

**normally** [4] - 26:16, 59:16, 66:13, 66:22

**Northern** [5] - 9:13, 46:13, 50:1, 50:16, 77:15

**northwest** [2] - 48:11, 78:24

**note** [1] - 5:5

**noted** [1] - 74:21

**notes** [7] - 3:18, 3:20, 3:22, 26:6, 70:12, 143:3, 143:21

**nothing** [19] - 55:9, 58:22, 64:1, 83:13, 97:13, 160:17, 187:1, 202:15, 202:16, 204:23, 209:9, 209:10, 209:19, 210:3, 210:4, 210:9, 212:20, 214:9, 215:20

**notice** [1] - 165:23

**November** [2] - 33:1, 207:2

**nuance** [1] - 79:10

**nuanced** [1] - 164:20

**nuances** [1] - 54:18

**number** [8] - 11:6, 13:17, 29:20, 35:16, 42:8, 42:14, 133:15, 220:14

**Number** [9] - 40:3, 42:23, 49:24, 66:24, 89:11, 89:12, 90:2, 142:2, 164:5

**numerous** [10] - 14:22, 20:18, 25:4, 32:16, 34:10, 57:8, 61:18, 64:4, 70:21, 73:19

**nurse** [3] - 187:6, 187:8, 188:8

**nursing** [2] - 101:13, 219:8

**nut** [1] - 142:24

## O

**O'Brien** [1] - 216:22

**o'clock** [5] - 120:14, 124:7, 124:8, 160:22

**oath** [4] - 8:8, 85:2, 98:7, 211:5

**object** [13] - 20:24, 66:9, 66:16, 66:25, 67:14, 68:8, 75:22, 75:24, 76:9, 76:23, 76:25, 179:3

**objected** [2] - 65:18, 66:1

**objection** [30] - 7:25, 47:24, 65:20, 74:8, 75:20, 76:4, 76:12, 87:17, 87:18, 87:21, 89:15, 89:17, 110:22, 112:24, 116:15, 156:6, 158:20, 165:2, 171:19, 171:23, 174:11, 175:6, 177:8, 177:10, 177:17, 178:13, 185:8, 185:9, 219:21, 220:5

Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 237 of 246

**objectionable** [2] - 75:25, 76:8
**objections** [1] - 165:4
**obligation** [1] - 69:12
**observation** [1] - 184:5
**observe** [4] - 172:3, 172:4, 180:2, 183:1
**obstruction** [1] - 10:12
**obviously** [13] - 6:2, 43:21, 44:3, 44:25, 45:2, 50:7, 59:3, 70:4, 72:18, 78:17, 80:21, 86:20, 93:18
**occasion** [5] - 49:13, 66:3, 134:4, 142:9, 172:5
**occasions** [6] - 65:6, 131:17, 134:11, 148:17, 172:8, 180:8
**occupation** [1] - 8:18
**occurred** [2] - 64:6, 88:11
**October** [1] - 87:11
**offense** [2] - 22:12, 164:4
**offer** [2] - 173:13, 183:4
**offered** [8] - 28:10, 158:18, 161:14, 164:3, 164:4, 174:20
**offhand** [2] - 10:1, 86:2
**office** [7] - 15:14, 15:15, 15:19, 15:20, 27:3, 49:11, 98:16
**Office** [2] - 3:9, 12:4
**officers** [1] - 184:19
**often** [14] - 78:16, 91:16, 100:23, 103:3, 103:13, 104:5, 106:1, 108:4, 108:16, 109:2, 110:16, 114:25, 171:18, 176:15
**old** [6] - 102:5, 103:21, 104:17, 105:7, 106:25, 167:14
**older** [11] - 99:21, 101:11, 101:14, 101:16, 104:6, 122:17, 125:6, 125:17, 153:21, 153:22
**oldest** [1] - 99:14
**once** [13] - 30:6, 36:3, 46:10, 82:23, 100:3, 111:9, 122:1, 124:4, 124:13, 159:9, 170:23, 195:22
**one** [1] - 9:12
**ones** [1] - 118:11
**open** [4] - 3:1, 3:13, 80:20, 220:18
**operation** [14] - 42:17, 42:21, 42:22, 141:15, 143:21, 143:22, 146:23, 148:14, 149:11, 149:16, 151:23, 155:19, 158:23, 180:16
**opine** [1] - 56:4
**opinion** [12] - 10:19, 19:2, 19:5, 19:9, 22:10, 22:13, 28:10, 41:3, 53:20, 54:11, 56:6, 72:19
**opinions** [3] - 52:15,

56:21, 96:25
**opponent** [1] - 158:19
**opportunities** [2] - 71:4, 115:24
**opportunity** [4] - 40:16, 55:3, 73:12, 101:9
**opposed** [3] - 45:21, 69:20, 81:13
**opposition** [1] - 84:7
**opt** [1] - 90:17
**option** [1] - 5:24
**oral** [1] - 6:12
**order** [5] - 7:11, 36:15, 75:25, 144:16, 220:16
**orders** [1] - 126:19
**organicity** [1] - 82:4
**organized** [2] - 42:17, 156:13
**original** [5] - 36:19, 73:18, 88:6, 163:6, 174:19
**originally** [3] - 90:22, 217:25, 218:18
**originated** [1] - 17:7
**otherwise** [2] - 70:3, 73:3
**ought** [1] - 70:14
**ourselves** [1] - 17:4
**outboard** [3] - 179:21, 179:23, 194:3
**outcome** [1] - 23:2
**outliers** [2] - 46:1, 49:21
**outlined** [1] - 38:3
**outlying** [1] - 46:14
**outside** [10] - 15:14, 46:10, 65:18, 76:13, 103:5, 104:22, 111:11, 205:14, 214:8, 214:16
**overlap** [1] - 199:25
**overlapping** [1] - 80:25
**overlaps** [1] - 80:6
**overruled** [3] - 67:9, 156:9, 177:18
**own** [11] - 26:13, 32:25, 33:16, 55:17, 57:24, 142:10, 142:11, 172:4, 184:4, 184:5, 221:3
**owned** [1] - 125:11

**P**

**P-U-T-Z-I-E-R** [1] - 198:18
**p.m** [1] - 221:9
**packed** [2] - 99:19, 119:10
**page** [6] - 86:24, 95:10, 95:13, 159:22, 211:22, 216:20
**Page** [13] - 19:11, 152:10, 153:24, 175:20, 201:25, 202:3, 202:11, 204:16, 210:25, 215:11, 216:17, 216:23
**Pages** [2] - 137:17, 142:5
**paid** [4] - 29:19, 120:6, 149:23, 150:1

**paint** [1] - 183:8
**papers** [1] - 98:17
**Paragraph** [5] - 71:15, 96:1, 96:8, 97:6, 175:19
**paragraph** [5] - 74:12, 74:14, 85:18, 85:21, 96:4
**paramedic** [1] - 119:23
**pardon** [1] - 123:12
**parents** [6] - 101:1, 103:1, 134:3, 185:3, 185:5, 185:17
**parents'** [1] - 172:10
**Park** [2] - 53:1, 53:4
**parker** [1] - 52:23
**Parrish** [26] - 6:22, 8:4, 8:6, 8:15, 8:18, 19:8, 20:4, 21:11, 23:5, 29:5, 29:11, 30:13, 48:1, 68:11, 73:8, 75:10, 75:17, 78:15, 84:22, 85:1, 95:6, 95:16, 97:11, 97:14, 98:4, 189:15
**PARRISH** [1] - 8:9
**Parrish's** [1] - 98:16
**part** [18] - 19:10, 19:17, 36:24, 40:11, 40:14, 41:18, 41:22, 45:24, 46:5, 49:8, 60:13, 61:12, 65:8, 81:17, 89:9, 163:13, 191:7, 209:7
**participate** [1] - 49:19
**participating** [1] - 34:15
**particular** [5] - 24:10, 37:22, 37:24, 50:17, 88:1
**particularly** [4] - 46:17, 59:12, 78:23, 164:1
**parties** [2] - 17:18, 17:21
**partner** [5] - 144:20, 144:25, 145:5, 145:8
**parts** [1] - 5:6
**party** [1] - 158:19
**party-opponent** [1] - 158:19
**pass** [2] - 167:12, 188:5
**passed** [7] - 70:12, 99:3, 99:10, 99:14, 99:20, 167:11, 189:8
**passing** [2] - 50:6, 99:16
**past** [4] - 29:16, 53:12, 53:13, 211:12
**path** [1] - 69:18
**pause** [5] - 116:12, 129:2, 157:23, 197:18, 207:25
**pay** [2] - 120:2, 173:17
**penalty** [39] - 4:21, 13:20, 13:23, 14:20, 18:17, 23:6, 23:10, 23:14, 25:4, 27:6, 27:9, 27:17, 28:25, 46:3, 58:17, 59:1, 59:21, 78:10, 78:19, 79:17, 81:5, 81:13, 82:17, 82:20, 82:25, 113:4, 113:8, 162:3, 163:6, 163:24, 163:25, 164:9, 164:11, 164:13, 165:1, 167:19, 174:17, 174:18, 175:5
**pendency** [1] - 7:19

**pending** [1] - 18:3
**pension** [1] - 184:2
**people** [34] - 3:17, 3:21, 12:3, 12:4, 12:6, 12:7, 13:15, 18:1, 24:25, 25:4, 25:23, 35:1, 45:19, 46:2, 47:10, 48:2, 67:18, 79:12, 81:1, 104:23, 107:8, 110:6, 118:23, 118:25, 133:1, 140:21, 145:23, 148:24, 173:22, 174:21, 181:18, 189:9, 212:9
**per** [1] - 49:8
**percent** [3] - 12:20, 18:7, 60:3
**percentage** [1] - 172:15
**perception** [1] - 172:4
**perfect** [1] - 41:2
**perhaps** [16] - 19:23, 25:25, 26:13, 28:10, 29:24, 29:25, 44:17, 47:17, 50:6, 53:11, 54:8, 66:13, 68:7, 68:14, 83:24
**period** [5] - 15:18, 133:24, 138:8, 183:16, 200:7
**periodically** [1] - 178:18
**perjury** [5] - 203:4, 207:9, 210:17, 212:15, 215:18
**permitted** [1] - 113:16
**person** [28] - 12:9, 13:14, 23:23, 27:16, 41:5, 41:9, 53:19, 58:10, 60:10, 60:24, 62:12, 64:15, 119:12, 119:14, 129:12, 137:2, 137:5, 137:7, 137:19, 138:2, 138:25, 149:1, 173:6, 173:10, 214:8, 218:25
**personal** [6] - 8:24, 110:23, 111:6, 111:14, 112:14, 178:19
**personal-type** [1] - 111:14
**personality** [5] - 28:18, 28:19, 60:14, 84:14, 173:9
**personally** [2] - 134:21, 176:1
**perspective** [1] - 79:8
**petition** [10] - 4:10, 4:23, 21:12, 21:19, 40:8, 47:16, 47:20, 65:1, 89:7, 90:3
**petitioner** [4] - 40:4, 51:3, 56:17, 60:5
**Petitioner's** [3] - 168:7, 201:21, 216:16
**petitioner's** [1] - 37:13
**pets** [8] - 114:13, 114:16, 115:2, 115:3, 115:4, 135:3, 135:4, 135:5
**Ph.D** [1] - 49:9
**phantom** [2] - 94:9, 94:20
**phase** [48] - 4:21, 4:22, 9:23, 13:16, 13:20, 14:1, 14:19, 14:20, 14:21, 23:6, 23:10, 23:14, 26:16, 27:6,

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM   Document 83   Filed 12/07/11   Page 238 of 246

27:9, 27:17, 28:25, 29:19, 54:21, 58:17, 58:19, 58:21, 59:1, 59:2, 59:19, 59:21, 68:13, 78:7, 78:10, 79:17, 81:5, 82:16, 82:17, 113:4, 113:8, 162:3, 163:6, 163:24, 163:25, 164:9, 164:11, 164:13, 165:1, 167:19, 167:25, 174:17, 174:18, 175:6

**phases** [1] - 129:22
**Philadelphia** [1] - 3:9
**philosophical** [1] - 79:4
**philosophy** [3] - 59:17, 79:13, 79:14
**Phoenix** [3] - 127:2, 154:25, 155:3
**phone** [8] - 7:3, 7:7, 128:8, 128:15, 128:18, 129:10, 129:15, 204:11
**photographic** [1] - 74:16
**physical** [8] - 82:3, 138:22, 139:5, 139:10, 139:19, 173:21, 173:23, 197:14
**Piasecki** [1] - 97:4
**pick** [5] - 49:18, 121:22, 154:12, 160:21, 207:5
**picked** [1] - 188:11
**pickup** [2] - 106:15, 113:25
**piece** [1] - 180:24
**pill** [1] - 63:1
**place** [10] - 41:12, 46:8, 48:11, 53:17, 93:22, 149:24, 170:23, 176:3, 203:12, 206:25
**placed** [1] - 152:21
**places** [2] - 42:8, 100:20
**plaintiff's** [1] - 47:20
**Plaintiff's** [11] - 4:14, 4:15, 4:16, 4:17, 4:18, 4:19, 85:15, 95:9, 159:14
**plans** [1] - 120:1
**plating** [1] - 148:2
**play** [3] - 61:1, 111:11, 169:17
**played** [2] - 109:9, 169:15
**players** [3] - 169:16, 169:17
**plea** [2] - 9:22, 77:17
**pleadings** [1] - 20:5
**pleasant** [1] - 173:6
**pleasure** [1] - 6:1
**plenty** [1] - 196:19
**plot** [1] - 145:7
**plural** [2] - 97:2, 105:21
**plus** [4] - 180:18, 180:20, 180:22, 197:3
**pods** [1] - 199:10
**point** [64] - 11:14, 11:16, 11:20, 14:8, 15:20, 21:23, 24:9, 24:21, 24:22, 28:1, 30:3, 33:3, 37:11, 43:5,

46:22, 50:19, 53:23, 54:17, 67:20, 68:5, 69:5, 70:17, 71:25, 75:20, 79:21, 104:8, 107:2, 110:24, 113:1, 115:8, 116:6, 121:14, 122:5, 126:4, 126:7, 126:23, 145:19, 147:13, 147:17, 149:22, 163:12, 165:6, 166:6, 170:15, 174:10, 175:9, 176:1, 177:1, 177:9, 181:3, 181:19, 182:16, 182:25, 189:4, 191:4, 198:19, 198:24, 205:14, 207:4, 209:1, 209:3, 215:25, 219:18, 219:25
**pointed** [5] - 47:16, 151:9, 161:22, 191:11, 215:12
**points** [1] - 59:7
**poisoning** [1] - 167:13
**poles** [1] - 111:10
**police** [1] - 184:19
**policy** [2] - 145:3, 145:4
**political** [1] - 46:16
**politically** [1] - 46:9
**Polk** [4] - 23:24, 24:2, 31:14, 32:24
**pool** [8] - 45:22, 46:21, 46:23, 47:1, 49:25, 50:15, 50:21
**pop** [1] - 124:16
**population** [1] - 50:10
**portion** [3] - 157:6, 177:20, 215:11
**position** [12] - 42:10, 58:22, 59:11, 60:18, 61:14, 61:19, 62:5, 76:9, 81:3, 84:3, 90:11, 221:3
**positions** [1] - 31:11
**positive** [2] - 61:6, 201:3
**possession** [3] - 34:18, 34:20, 111:19
**possible** [4] - 47:12, 49:18, 76:10, 86:20
**possibly** [3] - 45:19, 92:6, 216:3
**post** [1] - 91:18
**post-conviction** [1] - 91:18
**potentially** [1] - 207:12
**pound** [1] - 211:12
**pounds** [2] - 35:10, 147:9
**powered** [1] - 110:6
**powerful** [1] - 63:15
**practice** [6] - 8:22, 8:23, 33:1, 69:22, 75:24, 76:14
**practicing** [1] - 29:17
**pre** [1] - 104:17
**pre-toddler** [1] - 104:17
**precluding** [1] - 162:4
**prefer** [2] - 219:19, 220:17
**preference** [1] - 12:1
**prejudice** [4] - 113:11, 162:1, 162:2, 162:17

**preparation** [8] - 13:25, 14:1, 14:19, 15:1, 23:6, 23:7, 23:14, 41:1
**prepare** [2] - 15:4, 84:5
**preparing** [5] - 23:9, 23:10, 24:6, 37:23, 73:21
**prepping** [1] - 139:24
**presence** [1] - 76:13
**present** [26] - 33:24, 40:5, 57:24, 58:15, 59:20, 61:1, 67:17, 67:25, 69:3, 69:8, 76:16, 79:1, 79:16, 80:5, 81:4, 82:15, 82:16, 83:12, 90:14, 179:9, 192:4, 195:10, 198:5, 217:25, 218:1, 218:4
**presentation** [13] - 4:3, 27:16, 58:11, 59:1, 59:2, 59:25, 60:24, 61:12, 68:22, 70:1, 78:23, 81:19, 92:9
**presentations** [1] - 32:18
**presented** [17] - 10:15, 43:17, 44:4, 45:1, 45:3, 45:8, 53:6, 53:15, 53:16, 56:18, 57:14, 58:17, 59:21, 69:10, 81:2, 93:8, 162:3
**presentence** [1] - 71:13
**presenting** [6] - 57:11, 61:6, 61:7, 62:6, 75:9, 90:17
**preserve** [2] - 53:21, 75:25
**pressure** [1] - 62:23
**pretrial** [11] - 43:15, 43:16, 43:25, 67:6, 67:14, 90:4, 90:8, 90:9, 90:12, 90:16, 90:18
**pretty** [38] - 10:18, 14:4, 14:9, 15:20, 17:25, 18:9, 20:18, 24:17, 25:5, 38:21, 38:22, 38:25, 46:11, 52:13, 57:6, 57:9, 63:14, 69:18, 69:21, 71:3, 72:15, 73:21, 74:25, 78:25, 102:23, 106:7, 108:7, 116:23, 125:12, 125:13, 133:12, 138:3, 138:14, 138:17, 150:2, 196:4, 196:15, 214:12
**preview** [1] - 6:17
**previous** [5] - 9:6, 9:8, 12:12, 13:13, 93:4
**previously** [9] - 5:10, 9:17, 10:4, 12:17, 17:11, 65:4, 67:21, 178:16, 185:1
**prided** [2] - 107:12, 107:16
**primary** [1] - 33:14
**principal** [1] - 93:12
**priority** [1] - 123:23
**prison** [18] - 88:11, 88:12, 159:6, 159:8, 174:7, 177:4, 181:8, 181:10, 181:15, 182:2, 182:4, 191:18,

193:14, 194:10, 205:22, 205:25, 214:10, 217:11
**prisoner** [2] - 165:24, 207:10
**prisoners** [2] - 181:18, 181:24
**Prisons's** [2] - 51:5, 86:9
**private** [2] - 57:6, 57:9
**problem** [11] - 61:13, 70:25, 71:6, 75:7, 98:14, 113:6, 113:15, 163:25, 166:5, 171:9, 180:17
**problematic** [2] - 90:10, 90:15
**problems** [14] - 29:14, 39:16, 39:21, 40:1, 56:4, 56:7, 56:19, 57:5, 59:23, 72:20, 80:24, 85:14, 90:13, 99:25
**Procedure** [1] - 27:2
**procedure** [1] - 55:10
**proceed** [5] - 85:3, 87:22, 98:18, 116:16, 175:7
**proceeding** [10] - 17:11, 17:13, 18:12, 20:9, 20:11, 165:3, 200:18, 200:20, 200:21, 200:24
**Proceedings** [1] - 221:9
**proceedings** [7] - 17:18, 18:3, 18:4, 55:20, 189:22, 190:8
**proceeds** [1] - 147:1
**process** [8] - 48:5, 90:19, 132:24, 146:13, 162:5, 162:23, 162:24
**producing** [1] - 25:12
**product** [1] - 40:17
**professional** [2] - 26:4, 74:23
**proffer** [4] - 163:8, 163:16, 163:17, 165:5
**proffered** [1] - 162:21
**proffering** [1] - 164:8
**profits** [3] - 143:9, 143:13, 143:14
**program** [3] - 32:6, 119:16, 172:19
**prohibited** [1] - 66:18
**prohibitions** [1] - 162:7
**promises** [2] - 118:7, 118:15
**prong** [1] - 162:19
**proof** [3] - 69:7, 69:15, 90:13
**propensity** [2] - 60:25, 61:7
**properly** [1] - 33:23
**proposed** [1] - 219:22
**pros** [1] - 43:11
**prosecution** [3] - 18:12, 19:16, 127:15
**prosecutor** [1] - 209:15
**prosecutor's** [1] - 27:3
**protection** [1] - 19:13

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 239 of 246

protective [2] - 60:18, 61:14
prove [5] - 94:2, 162:1, 162:2, 162:19
provided [4] - 35:6, 96:15, 96:17, 196:17
psychiatrist [6] - 51:5, 51:13, 51:25, 56:3, 71:19, 189:25
psychological [4] - 56:7, 56:16, 57:12, 83:12
psychology [2] - 49:10, 83:11
public [3] - 32:7, 33:3, 33:5
published [1] - 19:2
Pull [1] - 188:12
pull [3] - 8:17, 99:4, 216:15
pulled [2] - 114:2, 176:11
pulling [2] - 95:6, 178:20
punched [2] - 31:2, 31:3
punishment [2] - 45:20, 162:8
purchased [2] - 65:5, 180:23
pure [3] - 35:11, 35:18, 36:10
purity [2] - 10:15, 41:2
purpose [1] - 164:24
purposes [3] - 113:23, 163:8, 163:9
pursuant [3] - 47:18, 48:3, 140:17
pursuing [1] - 33:2
push [4] - 139:20, 139:22
put [23] - 4:5, 14:11, 29:16, 43:23, 60:6, 63:16, 68:3, 69:15, 72:11, 78:10, 94:4, 94:25, 104:13, 112:11, 135:14, 139:2, 149:15, 155:20, 163:23, 169:6, 169:10, 183:9, 185:3
putting [4] - 57:18, 60:13, 61:16, 203:3
PUTZIER [1] - 198:8
Putzier [27] - 15:23, 37:23, 38:22, 198:2, 198:14, 198:16, 198:17, 198:19, 201:9, 201:16, 201:20, 201:24, 203:8, 204:16, 206:18, 207:4, 208:1, 208:8, 208:12, 211:9, 211:16, 211:22, 214:24, 215:22, 216:13, 216:18, 217:13
Putzier's [1] - 37:24

## Q

qualities [1] - 53:21
quantities [1] - 94:15
quantity [6] - 33:15,

33:25, 34:6, 35:6, 92:16, 156:25
quarter [1] - 211:12
questioned [2] - 106:22, 189:17
questionnaires [1] - 47:5
questions [35] - 15:5, 24:7, 29:6, 36:12, 42:23, 65:15, 75:11, 75:17, 91:14, 91:18, 92:10, 92:15, 97:11, 110:25, 128:4, 128:7, 128:8, 128:13, 129:4, 137:24, 152:10, 153:25, 157:24, 158:2, 158:25, 160:16, 190:21, 197:19, 206:3, 208:2, 208:3, 214:18, 216:24, 217:12, 217:15
quickest [1] - 6:5
quickly [3] - 47:11, 111:18, 138:18
quit [5] - 110:18, 188:16, 188:17, 188:18
quite [15] - 9:16, 14:15, 24:11, 30:24, 32:2, 43:4, 45:17, 53:13, 61:19, 79:4, 84:3, 93:22, 106:24, 173:9, 185:19
quote [1] - 19:9

## R

racially [1] - 50:1
raided [1] - 36:7
raise [12] - 19:24, 20:15, 20:24, 21:3, 21:5, 22:22, 22:23, 43:1, 43:10, 67:15, 89:16, 90:11
raised [15] - 4:23, 21:12, 21:22, 37:1, 43:13, 51:2, 57:20, 89:7, 89:10, 89:14, 90:8, 92:3, 92:6, 125:22
raising [6] - 19:23, 22:17, 36:16, 43:12, 43:16, 90:4
ran [3] - 46:14, 143:21, 213:4
ranking [1] - 118:23
rarely [1] - 26:12
rather [2] - 163:16, 191:16
reach [1] - 209:14
reached [5] - 45:25, 47:4, 55:21, 74:20, 209:17
read [31] - 19:8, 20:4, 20:13, 21:24, 22:7, 37:12, 37:15, 37:25, 38:2, 40:10, 45:13, 45:14, 47:19, 47:21, 73:9, 73:12, 74:13, 78:17, 85:18, 96:2, 96:9, 154:23, 160:2, 160:4, 175:21, 177:19, 177:21, 211:23, 212:11
Reade [3] - 20:5, 31:22, 32:11

reading [3] - 16:19, 22:10, 47:22
ready [8] - 3:11, 6:7, 6:10, 16:16, 124:15, 161:13, 220:25, 221:7
real [4] - 30:22, 55:14, 165:22, 173:2
reality [5] - 70:8, 193:1, 193:21, 195:15, 214:14
realization [1] - 108:11
realize [3] - 149:23, 171:15, 171:17
realized [1] - 122:9
really [19] - 36:23, 41:11, 42:16, 63:6, 83:3, 91:5, 108:11, 122:18, 125:19, 129:21, 130:14, 143:12, 147:6, 157:11, 166:2, 181:1, 182:1, 206:18, 208:25
reargument [1] - 19:22
reason [7] - 20:1, 22:16, 22:20, 43:13, 101:3, 136:22, 209:15
reasonable [2] - 42:16, 72:24
reasonably [1] - 75:6
reasons [8] - 29:19, 38:24, 52:9, 52:11, 63:6, 63:24, 115:21, 163:1
rebut [1] - 70:24
rebuttal [2] - 52:17, 83:17
receive [2] - 3:12, 154:1
received [5] - 4:21, 5:2, 19:20, 74:9, 74:11
recent [1] - 30:4
recently [5] - 64:13, 84:11, 96:14, 189:25, 216:14
recess [3] - 84:23, 84:24, 161:10
recognize [1] - 87:20
recognized [4] - 42:13, 113:17, 162:10, 162:11
recollection [36] - 12:19, 14:13, 16:2, 16:20, 19:10, 22:19, 25:8, 25:15, 35:25, 36:17, 39:13, 39:23, 40:20, 40:23, 43:6, 52:25, 53:7, 53:9, 53:24, 65:3, 65:12, 65:13, 66:3, 68:19, 68:24, 73:23, 81:17, 81:18, 96:5, 175:16, 185:20, 201:16, 202:5, 204:18, 206:9, 208:11
recommendation [2] - 51:24, 58:15
recommendations [1] - 51:20
recommended [1] - 26:3
reconsider [2] - 163:2, 163:8
reconsideration [1] - 163:9
record [42] - 3:13, 4:5,

5:22, 6:1, 10:1, 14:16, 16:22, 19:4, 21:14, 29:17, 49:8, 70:21, 74:14, 76:1, 76:12, 76:13, 84:25, 86:4, 86:9, 86:10, 89:16, 89:17, 90:2, 91:1, 91:2, 93:5, 98:22, 113:11, 139:2, 159:16, 161:11, 161:17, 165:6, 166:24, 174:15, 177:21, 198:15, 201:20, 210:22, 216:20, 220:1
records [5] - 14:4, 14:12, 14:14, 71:11, 194:16
redirect [8] - 65:22, 66:10, 75:12, 75:21, 158:1, 197:21, 197:23, 214:20
REDIRECT [3] - 75:15, 158:4, 214:22
refer [2] - 20:9, 96:8
referred [2] - 52:18, 52:21
referring [2] - 17:21, 19:11
refers [1] - 77:12
refined [2] - 54:16, 55:24
reflect [4] - 14:4, 14:12, 97:7, 124:1
reflection [1] - 91:4
refocus [1] - 221:6
refresh [10] - 16:20, 35:25, 65:2, 65:12, 66:3, 175:15, 201:16, 202:4, 204:18, 206:9
refreshes [5] - 19:10, 44:15, 53:7, 65:13, 73:23
refused [3] - 115:19, 129:17, 194:4
regard [7] - 5:4, 27:3, 36:14, 44:5, 54:1, 55:5, 165:4
regarding [7] - 13:22, 33:15, 54:9, 161:17, 163:2, 165:6, 204:19
regulation [1] - 138:24
reiterated [1] - 152:18
related [5] - 91:25, 167:1, 167:4, 183:2
relates [2] - 74:2, 77:13
relation [5] - 75:17, 85:24, 102:2, 125:3, 167:14
relationship [5] - 41:20, 98:24, 129:21, 169:4, 185:2
relative [1] - 42:10
relatively [1] - 54:3
relatives [1] - 134:12
relaxed [1] - 164:16
released [2] - 177:4, 193:14
relevance [4] - 177:6, 177:10, 187:11, 187:12
relevant [5] - 4:22, 20:11, 113:8, 113:9, 162:12
reliability [1] - 164:14
reliable [1] - 162:12
relied [4] - 13:2, 13:7, 13:14, 92:21

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 240 of 246

relief [1] - 90:21
rely [7] - 13:21, 67:13, 67:14, 81:7, 81:8, 89:16, 89:17
relying [1] - 19:14
remain [1] - 83:2
remaining [1] - 136:16
remarks [1] - 124:1
remarried [1] - 123:1
remarry [1] - 123:3
remember [118] - 10:19, 10:20, 18:11, 22:20, 26:24, 26:25, 27:1, 27:4, 27:8, 29:1, 35:14, 35:16, 35:19, 35:21, 35:22, 36:7, 38:22, 39:6, 39:10, 39:12, 39:15, 39:19, 41:22, 42:2, 42:6, 43:2, 48:8, 49:7, 50:2, 51:22, 51:23, 51:25, 52:3, 52:8, 52:10, 54:2, 54:11, 54:13, 54:14, 55:5, 55:7, 64:22, 66:8, 67:3, 67:4, 67:11, 67:23, 68:20, 71:10, 71:18, 71:22, 77:16, 77:17, 88:14, 88:16, 99:16, 99:17, 100:5, 103:22, 106:16, 115:5, 115:10, 115:25, 123:20, 123:21, 127:6, 127:22, 135:8, 135:10, 136:17, 137:12, 137:15, 137:24, 139:4, 139:8, 139:12, 139:18, 144:14, 151:19, 152:4, 152:7, 152:9, 152:24, 153:16, 153:23, 154:15, 157:12, 158:6, 175:12, 179:24, 186:12, 189:24, 190:5, 191:6, 191:8, 192:9, 193:18, 194:5, 195:5, 197:4, 204:13, 207:16, 208:15, 208:17, 210:10, 210:16, 210:18, 212:5, 212:8, 213:14, 213:22, 213:23, 214:4, 214:5
remembered [1] - 191:23
rent [1] - 134:6
rented [1] - 127:6
repeatedly [2] - 38:25, 139:15
rephrase [4] - 113:2, 113:18, 116:13, 179:7
replace [1] - 180:19
report [5] - 71:14, 71:19, 71:23, 142:1, 206:10
reported [2] - 37:16, 54:8
reporter [1] - 177:21
reports [3] - 38:10, 38:12, 140:3
represent [4] - 8:25, 9:3, 9:10, 77:15
represented [4] - 9:6, 9:17, 11:8, 51:3
representing [1] - 82:1
reputation [3] - 11:10,

21:9, 24:12
request [1] - 163:7
requested [1] - 177:20
requests [1] - 146:7
require [1] - 218:23
required [3] - 84:7, 161:25, 162:16
research [3] - 142:18, 142:23, 142:24
resented [1] - 169:7
resolution [1] - 44:9
resolved [2] - 44:1, 51:1
respect [3] - 10:8, 18:24, 89:24
respond [1] - 52:3
responded [1] - 151:6
responding [1] - 28:7
response [8] - 47:19, 55:3, 57:22, 65:23, 90:6, 91:6, 163:18, 183:11
responsibility [5] - 10:12, 13:10, 24:4, 24:6, 24:8
responsible [3] - 12:25, 16:25, 17:2
rest [3] - 124:9, 211:8, 220:12
restrain [1] - 91:17
restriction [1] - 124:17
result [8] - 22:3, 41:8, 57:5, 89:19, 90:24, 91:4, 91:8, 185:7
resulted [1] - 17:10
results [3] - 22:7, 74:3, 111:1
resume [1] - 49:7
retain [3] - 24:21, 24:22, 26:3
retained [2] - 25:6, 25:20
retaining [1] - 25:22
retardation [1] - 56:10
retention [1] - 32:6
rethink [1] - 44:3
retired [2] - 168:18, 168:20
retrieve [1] - 211:24
retrospect [1] - 28:3
returned [1] - 170:8
revealed [1] - 26:22
reversed [3] - 30:7, 50:24, 50:25
review [15] - 5:22, 17:4, 20:20, 32:10, 40:16, 40:19, 41:17, 73:15, 74:3, 76:19, 90:16, 90:20, 95:21, 168:11, 208:8
reviewed [10] - 19:1, 21:18, 38:12, 38:14, 38:17, 38:20, 40:10, 74:16, 89:7, 215:15
reviewing [5] - 48:6, 50:2, 54:11, 54:13, 74:17
Rickert [11] - 25:7, 25:20, 26:2, 40:17, 42:9, 82:2, 140:5, 140:14, 142:2, 160:9

Rickert's [4] - 41:17, 51:19, 51:24, 58:14
rid [5] - 151:13, 151:15, 151:16, 151:21, 152:1
ride [1] - 188:9
rifle [1] - 69:20
ring [1] - 150:10
risk [3] - 53:19, 79:11, 148:12
risked [1] - 79:6
road [6] - 69:2, 69:6, 83:11, 176:5, 176:6, 176:8
rob [1] - 159:5
robbery [7] - 177:2, 177:5, 181:3, 181:6, 181:20, 192:8, 194:10
Rochester [2] - 181:11, 181:12
rock [1] - 73:22
Rogers [26] - 11:22, 12:8, 12:21, 13:2, 13:7, 13:20, 17:2, 17:8, 23:17, 25:23, 26:15, 28:9, 28:16, 44:16, 52:2, 53:8, 53:11, 54:16, 55:24, 57:21, 73:25, 78:1, 80:10, 83:20, 89:22, 218:14
Rogers's [1] - 37:2
role [4] - 27:23, 164:4, 208:20, 208:21
roles [1] - 13:8
Ron [11] - 123:4, 123:19, 123:22, 123:23, 123:24, 124:6, 124:20, 125:8, 125:14, 125:16, 141:4
Ronald [1] - 4:18
room [8] - 24:1, 118:1, 120:3, 120:6, 124:9, 124:11, 181:17, 210:12
Rose [2] - 73:14, 74:15
Rose's [1] - 74:3
rote [1] - 162:14
roughly [2] - 131:1, 138:8
route [2] - 47:13, 165:11
rowdier [1] - 169:24
Rudd [1] - 120:18
Rule [6] - 27:1, 54:1, 54:2, 54:9, 77:9, 77:12
rule [8] - 3:22, 10:13, 54:4, 55:21, 84:2, 162:14, 162:22, 165:2
ruled [3] - 18:23, 36:21, 50:14
Rules [8] - 27:2, 113:7, 161:23, 163:21, 163:24, 164:10, 164:17, 164:18
rules [1] - 3:16
ruling [8] - 18:25, 19:10, 19:18, 19:20, 21:25, 37:20, 50:22, 163:8
rulings [2] - 161:17, 163:2
run [6] - 5:12, 18:17, 79:11, 80:4, 143:21, 143:24
running [1] - 43:20
Ryerson [4] - 35:22, 36:8,

93:2

## S

S-U-P-R-A [1] - 144:13
safe [2] - 83:9, 97:21
sake [1] - 56:2
sale [1] - 157:6
sales [2] - 65:17, 147:1
sampling [1] - 157:12
Sandy [1] - 4:14
sat [4] - 31:13, 31:14, 31:19, 73:20
satisfied [1] - 81:19
Saturday [1] - 102:14
save [3] - 79:9, 163:16, 212:10
saw [8] - 105:9, 125:24, 157:9, 172:12, 172:20, 181:15, 194:16, 199:3
sayings [1] - 109:3
scale [1] - 207:17
scams [2] - 178:11, 178:20
scared [1] - 105:1
scars [1] - 128:14
scenario [2] - 115:4, 136:18
schedule [2] - 5:7, 218:1
schedules [1] - 12:7
scheduling [3] - 5:5, 7:9, 7:14
School [2] - 31:21, 32:23
school [27] - 31:22, 32:3, 32:11, 32:12, 101:2, 111:21, 111:22, 118:21, 119:19, 119:20, 119:21, 120:17, 120:19, 121:1, 121:3, 121:4, 121:8, 121:13, 131:1, 132:2, 132:3, 169:6, 169:7, 169:9, 170:2, 170:4
schooling [4] - 120:22, 120:25, 121:2, 121:6
scope [2] - 54:9, 65:19
Scott [5] - 64:23, 64:24, 65:1, 65:3, 75:18
Scouts [3] - 130:3, 130:7, 196:12
screen [9] - 159:11, 168:6, 168:8, 175:20, 201:19, 202:13, 204:17, 216:15, 216:18
scroll [1] - 95:10
se [1] - 49:8
Sears [1] - 162:10
seat [2] - 150:2, 150:3
Sebastian [1] - 212:7
second [13] - 66:2, 66:10, 74:12, 74:14, 77:3, 77:4, 99:9, 111:12, 142:13, 145:11, 147:19, 167:25
secondarily [1] - 143:13

**secret** [1] - 108:6
**secure** [2] - 53:17, 81:9
**secured** [2] - 70:4, 70:17
**security** [2] - 165:16, 166:12
**see** [57] - 12:6, 35:25, 65:2, 72:24, 73:17, 75:2, 86:12, 87:2, 87:3, 87:8, 91:10, 92:8, 92:9, 95:12, 96:9, 97:20, 105:8, 105:24, 109:21, 110:3, 111:1, 113:19, 124:9, 124:16, 125:21, 135:22, 136:1, 136:6, 136:11, 140:3, 141:25, 152:23, 165:11, 170:22, 171:5, 176:9, 176:12, 182:20, 184:2, 187:3, 187:12, 188:8, 195:23, 197:9, 199:19, 201:17, 201:19, 202:4, 202:8, 206:19, 207:1, 210:2, 212:1, 212:14, 215:12, 220:12, 220:24
**seeing** [2] - 105:13, 183:18
**seem** [1] - 182:23
**seized** [1] - 33:19
**selection** [2] - 45:12, 50:16
**sell** [10] - 36:3, 110:12, 140:9, 140:12, 140:24, 145:23, 151:11, 152:22, 154:13, 156:17
**selling** [6] - 93:11, 143:15, 147:7, 148:21, 149:2, 150:19
**send** [3] - 79:3, 118:24, 119:3
**sense** [10] - 19:13, 23:1, 24:5, 68:17, 70:23, 72:25, 73:1, 117:5, 182:1, 220:9
**sent** [6] - 119:18, 181:11, 186:10, 213:21, 216:12, 216:14
**sentence** [16] - 16:1, 16:6, 18:11, 33:16, 77:17, 89:19, 207:11, 207:21, 215:13, 215:23, 216:1, 216:2, 216:4, 217:2, 217:7, 217:9
**sentences** [4] - 74:13, 90:23, 90:25, 91:20
**sentencing** [34] - 9:22, 9:24, 10:5, 10:9, 17:10, 17:11, 17:12, 18:12, 20:9, 20:11, 33:8, 33:9, 33:10, 34:4, 37:7, 37:18, 38:14, 38:15, 39:9, 39:11, 92:11, 93:3, 93:4, 93:9, 161:21, 200:21, 200:22, 200:23, 210:14, 210:19, 210:22, 210:25, 212:12, 216:6
**separate** [2] - 11:8, 199:17
**separated** [1] - 82:15
**sequestration** [1] - 7:18

**serious** [1] - 174:2
**served** [1] - 31:16
**session** [1] - 53:14
**set** [5] - 6:13, 32:25, 45:20, 150:8, 218:25
**sets** [1] - 27:2
**setting** [1] - 163:20
**setup** [1] - 140:18
**several** [11] - 4:8, 12:3, 23:15, 23:19, 24:24, 25:10, 86:6, 160:6, 171:5, 172:6, 172:8
**shake** [1] - 186:25
**share** [6] - 36:2, 55:22, 84:6, 84:7, 139:25, 190:12
**shared** [3] - 23:18, 140:6, 190:13
**sharing** [2] - 3:21, 149:20
**Shawn** [1] - 3:8
**shed** [4] - 151:14, 151:15, 151:17, 155:2
**sheds** [2] - 152:21, 154:12
**Shepard** [1] - 135:9
**sheriff** [2] - 23:25, 186:11
**shift** [1] - 98:13
**shipment** [1] - 35:10
**shipping** [1] - 145:22
**shook** [1] - 187:5
**shoot** [6] - 114:22, 135:17, 136:2, 136:11, 183:18, 191:16
**shop** [1] - 125:11
**short** [4] - 19:8, 86:13, 128:10
**short-term** [1] - 86:13
**shortly** [3] - 132:2, 152:16, 154:2
**shot** [2] - 136:5, 136:21
**shotgun** [1] - 69:21
**show** [8] - 40:5, 72:24, 73:3, 75:7, 159:10, 161:7, 163:23, 211:17
**showed** [5] - 192:14, 192:15, 207:17, 215:2, 215:4
**showing** [5] - 42:15, 85:15, 88:8, 93:10, 220:1
**shown** [1] - 75:3
**shows** [1] - 86:4
**sibling** [1] - 99:18
**siblings** [1] - 99:3
**sic** [8] - 3:3, 52:23, 105:17, 133:3, 133:8, 153:5, 176:17, 200:10
**sic]** [1] - 71:5
**side** [9] - 55:13, 69:23, 101:12, 167:5, 167:6, 202:13, 204:17, 213:15
**sides** [1] - 84:13
**sign** [1] - 95:17
**signature** [5] - 95:12, 95:15, 159:22, 168:9, 216:18
**signed** [6] - 95:21, 96:24,

97:7, 160:1, 168:12, 175:17
**significant** [3] - 14:25, 50:11, 101:16
**significantly** [1] - 74:21
**signing** [1] - 160:7
**similar** [3] - 13:6, 20:16, 190:4
**simply** [4] - 5:17, 34:25, 164:10, 164:17
**single** [2] - 38:3, 57:16
**Sioux** [8] - 23:22, 25:14, 25:16, 30:5, 30:8, 30:9, 46:8, 167:20
**sister** [1] - 116:17
**sit** [8] - 7:23, 14:13, 18:6, 39:13, 68:24, 99:6, 124:7, 201:14
**site** [2] - 67:21, 109:25
**sitting** [6] - 31:19, 46:20, 46:25, 47:14, 68:12, 134:19
**situation** [8] - 41:5, 62:25, 76:6, 77:25, 101:4, 125:14, 126:17, 219:16
**situations** [1] - 62:18
**Sixth** [1] - 162:6
**skip** [1] - 168:8
**sleep** [2] - 120:8, 220:21
**sleeping** [1] - 105:11
**small** [4] - 104:21, 104:22, 117:12, 117:13
**smaller** [3] - 63:3, 63:4, 149:12
**smell** [3] - 106:20, 147:22, 148:12
**Smidt** [4] - 123:4, 141:4, 141:11
**smoking** [2] - 188:17, 188:19
**Snater** [1] - 4:19
**Snider** [1] - 8:7
**snitch** [2] - 64:13, 72:21
**Society** [1] - 32:24
**sold** [1] - 141:1
**solid** [1] - 73:22
**solution** [2] - 114:24, 115:6
**someone** [4] - 12:10, 28:22, 80:20, 161:2
**someplace** [1] - 148:14
**sometime** [1] - 205:21
**sometimes** [1] - 31:3
**somewhere** [4] - 13:5, 102:6, 103:25, 104:1
**son** [3] - 176:13, 177:23, 192:12
**sons** [1] - 195:13
**soon** [3] - 24:14, 123:11, 123:13
**sorry** [17] - 8:17, 18:20, 34:9, 37:12, 72:8, 87:17, 88:25, 98:12, 99:5, 128:16, 141:17, 153:3, 153:8, 176:19, 212:16, 218:3
**sort** [3] - 68:21, 178:11,

180:3
**sound** [1] - 117:20
**sounded** [1] - 117:21
**sounds** [4] - 131:25, 132:6, 148:7, 149:14
**source** [2] - 15:7, 150:16
**south** [3] - 126:24, 155:3, 168:18
**Southern** [1] - 50:19
**speaking** [1] - 145:19
**speaks** [1] - 16:21
**special** [1] - 119:1
**specialist** [3] - 24:23, 140:5, 143:4
**specific** [9] - 24:6, 25:23, 27:8, 59:14, 76:24, 89:10, 94:15, 163:3, 200:3
**specifically** [6] - 55:20, 115:7, 154:17, 177:15, 205:5, 206:4
**specificity** [3] - 16:3, 18:4, 28:21
**specifics** [3] - 117:15, 135:19, 135:21
**spectrum** [1] - 46:20
**speculation** [1] - 68:9
**spell** [1] - 198:17
**spend** [14] - 14:25, 24:18, 100:8, 100:13, 100:15, 100:23, 100:25, 101:16, 101:20, 122:2, 127:8, 137:8, 170:19, 195:15
**spending** [3] - 123:5, 138:5, 150:13
**spent** [3] - 14:15, 160:10, 178:17
**Spies** [26] - 7:11, 11:4, 11:5, 11:6, 11:15, 11:17, 12:16, 13:6, 13:18, 23:11, 23:12, 23:16, 23:18, 24:9, 24:12, 24:15, 24:18, 24:21, 25:22, 26:15, 28:9, 53:16, 54:15, 55:24, 57:21, 73:25
**Spies's** [1] - 7:10
**spoken** [2] - 32:16, 199:22
**sports** [2] - 169:15, 169:17
**stand** [12] - 8:5, 8:12, 35:23, 64:8, 73:7, 85:2, 98:2, 98:7, 98:11, 166:20, 189:6, 198:11
**standard** [1] - 164:16
**standouts** [1] - 38:23
**stands** [3] - 38:24, 39:4, 39:14
**start** [11] - 46:7, 46:9, 69:8, 102:3, 165:12, 169:3, 171:11, 173:2, 220:13, 220:20, 221:5
**started** [13] - 6:19, 6:24, 12:24, 14:6, 15:20, 31:22, 61:21, 69:3, 103:21, 120:8, 128:3, 142:18, 175:8
**starting** [6] - 171:14,

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 242 of 246

201:24, 202:10, 203:13, 204:17

**state** [14] - 3:5, 30:4, 43:20, 46:10, 55:16, 84:2, 96:23, 98:22, 123:10, 162:11, 162:14, 166:23, 198:15, 209:9

**statement** [8] - 52:8, 57:10, 73:18, 106:17, 159:19, 164:21, 192:17, 193:19

**statements** [3] - 38:9, 41:19, 64:5

**States** [7] - 3:3, 3:7, 74:6, 85:1, 161:12, 162:9, 162:21

**status** [2] - 70:18, 89:20

**stay** [5] - 78:18, 90:9, 105:9, 121:24, 126:5

**stayed** [1] - 187:1

**staying** [1] - 126:23

**steadily** [1] - 172:14

**steady** [1] - 176:21

**steal** [3] - 109:19, 180:9, 180:12

**stealing** [3] - 109:5, 184:12, 197:2

**step** [2] - 160:18, 197:24

**stepbrothers** [1] - 141:3

**stereo** [4] - 150:5, 151:11, 152:22, 154:13

**Steven** [1] - 4:16

**stick** [2] - 118:11, 138:1

**sticking** [2] - 203:20, 204:15

**sticks** [2] - 136:22, 157:11

**still** [24] - 6:11, 6:12, 44:8, 80:7, 85:2, 97:9, 102:4, 103:2, 115:12, 122:7, 125:14, 133:22, 133:25, 138:1, 141:21, 162:18, 164:12, 164:14, 166:11, 167:10, 183:22, 200:10, 214:24, 215:5

**stipulate** [4] - 4:9, 62:3, 62:18, 63:1

**stipulated** [3] - 4:24, 4:25, 94:24

**stipulating** [1] - 62:2

**stipulation** [3] - 4:9, 4:20, 63:25

**stipulations** [3] - 4:2, 4:4, 5:9

**Stoddard** [1] - 168:18

**stole** [1] - 107:20

**stolen** [8] - 107:22, 109:9, 109:18, 178:23, 179:11, 179:23, 179:25, 194:4

**stop** [6] - 161:3, 171:23, 176:9, 176:10, 176:15, 177:9

**stopped** [2] - 181:4, 182:17

**storage** [7] - 151:14, 151:15, 151:17, 152:2,

152:21, 154:12, 155:2

**store** [4] - 113:25, 168:23, 183:9, 188:13

**stored** [1] - 152:2

**stores** [3] - 168:23, 176:4, 183:6

**stories** [4] - 107:8, 107:9, 193:2, 193:6

**story** [2] - 134:16, 148:1

**straight** [2] - 140:22, 178:9

**straining** [1] - 91:10

**strategic** [4] - 20:1, 22:16, 58:6, 58:7

**strategy** [13] - 20:23, 23:16, 24:7, 43:14, 46:5, 53:14, 54:19, 58:5, 58:6, 58:11, 60:17, 60:21, 92:8

**streamline** [1] - 4:3

**stress** [1] - 185:3

**Strickland** [3] - 162:1, 162:16, 162:19

**strike** [4] - 46:1, 66:14, 92:14, 177:10

**stroke** [10] - 40:1, 87:6, 87:13, 87:19, 87:20, 87:24, 88:3, 101:13, 185:14, 185:15

**strong** [1] - 28:12

**struck** [7] - 47:18, 48:3, 49:3, 49:22, 89:10, 89:11

**structure** [10] - 14:7, 58:10, 82:14, 99:13, 100:18, 101:6, 101:8, 101:24, 125:25, 126:1

**structured** [1] - 101:20

**Stuart** [3] - 15:12, 15:14, 50:19

**students** [2] - 32:5, 32:9

**studied** [1] - 72:18

**stuff** [12] - 60:8, 111:14, 119:10, 151:12, 151:14, 151:16, 151:21, 152:1, 152:2, 180:13, 197:7

**stun** [2] - 70:6, 72:6

**style** [2] - 185:3, 185:12

**subject** [1] - 13:19

**submitted** [2] - 48:4, 163:10

**Subsection** [1] - 54:2

**substance** [1] - 126:8

**substances** [1] - 157:10

**substantial** [2] - 76:11, 90:18

**successful** [9] - 22:1, 22:3, 22:25, 23:1, 23:3, 50:23, 69:22, 92:5, 147:17

**suffer** [1] - 185:6

**suffered** [1] - 40:1

**suggest** [5] - 113:4, 161:24, 162:3, 162:15, 184:14

**suggested** [2] - 25:20, 57:19

**suggesting** [2] - 39:25, 42:15

**suggestion** [1] - 25:24

**suggests** [1] - 67:16

**summarize** [1] - 59:18

**summary** [1] - 74:2

**summer** [4] - 134:8, 134:9, 134:10, 195:22

**summers** [1] - 100:25

**Sunday** [1] - 102:14

**Supp** [1] - 19:5

**supplier** [1] - 93:13

**supplying** [1] - 150:13

**suppose** [1] - 5:24

**supposed** [2] - 204:11, 218:18

**supra** [2] - 144:13

**Supreme** [3] - 30:7, 162:9, 162:21

**surly** [1] - 173:2

**surprise** [2] - 18:13, 201:6

**sustain** [1] - 165:4

**sustained** [8] - 65:20, 87:22, 110:24, 116:16, 158:20, 178:15, 180:7, 185:10

**swallow** [1] - 63:2

**swings** [1] - 139:21

**sworn** [6] - 8:10, 98:9, 166:16, 166:18, 198:7, 198:9

**synthesize** [3] - 141:7, 141:8, 142:14

**system** [3] - 55:15, 107:13, 184:18

## T

**table** [4] - 7:23, 94:25, 123:22, 186:2

**talks** [1] - 71:15

**tape** [1] - 146:24

**target** [1] - 94:10

**tarnished** [1] - 139:2

**taught** [3] - 100:18, 100:20, 100:21

**team** [12] - 16:24, 24:22, 25:19, 26:3, 27:11, 51:15, 55:12, 73:14, 127:17, 160:10, 168:4, 188:20

**teased** [1] - 169:9

**technically** [2] - 162:17, 163:16

**technician** [1] - 119:22

**telephone** [4] - 20:19, 218:21, 219:1, 219:9

**teller** [1] - 134:16

**temporal** [1] - 87:3

**tend** [2] - 69:22, 93:21

**tendency** [1] - 107:7

**term** [4] - 59:16, 86:13, 87:5, 87:20

**terms** [13] - 19:24, 24:6,

26:4, 71:6, 82:15, 83:1, 90:13, 92:8, 93:8, 113:5, 125:4, 159:4, 177:15

**Terri** [2] - 144:20, 145:1

**Terry** [15] - 6:25, 36:1, 36:2, 36:3, 36:9, 39:6, 67:17, 67:21, 68:1, 68:5, 69:3, 148:24, 209:22, 212:6, 218:19

**Terry's** [1] - 36:6

**testified** [39] - 8:11, 15:25, 35:16, 39:9, 83:15, 86:7, 88:10, 93:7, 98:10, 134:18, 153:19, 154:22, 154:24, 160:11, 164:9, 166:19, 167:23, 168:1, 173:8, 178:16, 184:3, 189:17, 190:17, 192:7, 198:10, 200:13, 200:15, 202:5, 202:20, 203:9, 204:6, 204:18, 205:6, 205:13, 208:12, 211:18, 212:6, 212:17, 212:22

**testify** [19] - 33:13, 93:3, 127:12, 160:12, 163:6, 167:17, 190:16, 200:23, 201:2, 201:5, 201:10, 202:18, 202:22, 203:20, 204:8, 205:1, 205:10, 212:9, 215:19

**testifying** [12] - 39:10, 39:12, 39:15, 64:19, 127:16, 137:12, 152:4, 152:7, 153:23, 174:17, 210:13, 210:18

**testimony** [49] - 4:12, 16:6, 33:17, 34:10, 35:4, 35:9, 35:19, 36:7, 38:1, 38:15, 39:14, 41:25, 42:1, 42:4, 42:6, 42:25, 51:22, 52:3, 57:19, 59:22, 62:19, 63:10, 66:18, 75:18, 78:12, 85:24, 86:21, 86:23, 87:14, 87:19, 88:6, 94:23, 139:25, 152:24, 154:15, 162:22, 189:11, 191:4, 191:7, 191:22, 191:24, 192:9, 194:5, 201:10, 201:17, 204:15, 208:9, 208:19, 208:25

**testing** [1] - 41:14

**tests** [1] - 41:1

**text** [1] - 206:24

**Thanksgiving** [1] - 195:19

**THE** [118] - 3:2, 3:11, 3:23, 4:6, 4:24, 5:3, 5:14, 5:21, 6:3, 6:11, 6:20, 7:13, 7:16, 7:20, 7:25, 8:3, 8:6, 8:12, 19:7, 29:4, 29:7, 68:10, 68:11, 73:6, 74:9, 75:12, 84:20, 84:25, 87:21, 95:4, 97:12, 97:14, 97:16, 97:18, 97:19, 97:21, 97:22, 97:25, 98:5, 98:11, 98:14, 98:19,

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 243 of 246

110:24, 113:1, 113:6, 113:14, 116:9, 116:15, 129:1, 129:5, 141:24, 156:9, 157:22, 158:1, 158:14, 158:20, 160:18, 160:25, 161:3, 161:8, 161:11, 161:18, 163:18, 164:23, 165:8, 165:14, 165:17, 165:22, 166:6, 166:9, 166:13, 166:15, 166:20, 171:22, 172:2, 174:12, 175:1, 175:7, 177:8, 177:17, 178:15, 179:6, 180:7, 185:10, 187:12, 190:22, 197:17, 197:21, 197:24, 198:3, 198:6, 198:11, 206:14, 206:17, 207:24, 208:4, 211:20, 214:20, 215:8, 217:14, 217:17, 217:22, 218:5, 218:8, 218:11, 218:15, 218:23, 219:5, 219:10, 219:13, 219:21, 219:24, 220:7, 220:11, 220:20, 220:24, 221:2, 221:5

**theft** [1] - 180:16

**themselves** [2] - 14:14, 47:3

**theoretically** [1] - 22:22

**theories** [3] - 22:11, 69:17, 69:24

**theory** [15] - 44:25, 45:4, 45:18, 58:18, 60:23, 68:21, 69:14, 70:2, 73:4, 76:3, 81:2, 81:12, 90:14, 92:8, 93:7

**thereafter** [2] - 116:1, 154:2

**they've** [1] - 208:24

**thinker** [2] - 58:7, 137:22

**thinking** [5] - 61:23, 67:22, 68:12, 69:13, 73:18

**third** [3] - 114:3, 135:10, 136:23

**thorough** [2] - 74:22, 75:1

**thoroughly** [1] - 72:15

**thoughts** [1] - 68:3

**threat** [1] - 173:21

**threaten** [1] - 197:13

**threatened** [5] - 16:6, 178:3, 193:17, 210:15, 210:19

**threats** [2] - 38:10, 176:1

**three** [1] - 74:13

**threw** [3] - 144:7, 186:5, 186:7

**throughout** [2] - 70:9, 200:7

**thrown** [1] - 186:4

**Thursday** [2] - 7:12, 16:18

**ties** [1] - 161:24

**Tim** [9] - 35:9, 93:2, 144:11, 148:5, 156:19,

203:22, 203:24, 204:2, 204:5

**timeframe** [3] - 127:5, 131:22, 183:4

**timing** [3] - 10:21, 85:23, 130:25

**Timothy** [1] - 218:16

**tired** [5] - 122:10, 122:11, 122:13, 183:18

**today** [21] - 6:7, 14:13, 18:7, 37:16, 42:25, 43:1, 43:9, 80:9, 125:15, 128:13, 153:20, 160:11, 164:2, 165:25, 191:22, 210:16, 212:13, 212:18, 217:25, 218:4, 220:16

**today's** [1] - 139:24

**toddler** [1] - 104:17

**together** [12] - 4:3, 11:7, 88:12, 93:11, 103:2, 124:5, 179:14, 195:18, 199:6, 200:2, 219:1, 219:25

**toilet** [1] - 151:14

**tolerance** [1] - 138:24

**tomorrow** [8] - 16:17, 165:25, 166:1, 218:10, 218:12, 220:13, 221:5, 221:7

**tonight** [1] - 218:7

**took** [10] - 13:3, 103:18, 105:4, 134:2, 135:20, 136:24, 152:3, 179:25, 186:20, 206:25

**tools** [3] - 180:3, 180:13, 184:13

**top** [7] - 57:2, 77:21, 109:22, 159:20, 206:19, 206:20

**topic** [2] - 66:18, 152:7

**topics** [1] - 32:17

**torches** [1] - 180:13

**total** [1] - 48:8

**touch** [1] - 218:25

**tough** [9] - 25:21, 28:4, 28:5, 28:7, 47:6, 48:11, 129:9, 129:11, 191:15

**tougher** [1] - 28:14

**toward** [2] - 33:4, 79:19

**towards** [3] - 123:25, 184:4, 184:19

**town** [9] - 103:5, 103:6, 103:8, 104:22, 171:2, 171:5, 183:8, 218:7

**toxic** [1] - 47:9

**toy** [1] - 111:11

**track** [1] - 49:2

**tracking** [1] - 38:6

**traffic** [1] - 176:8

**trailer** [3] - 144:3, 144:4

**transcript** [7] - 42:4, 137:17, 152:11, 210:25, 212:12, 214:24, 215:4

**transcripts** [2] - 5:17, 5:19

**transition** [1] - 15:18

**travel** [1] - 102:15

**traveled** [1] - 169:12

**travels** [1] - 97:21

**treat** [2] - 116:22, 116:25

**treated** [1] - 157:13

**trial** [88] - 8:23, 9:13, 15:25, 16:10, 18:22, 19:23, 20:15, 22:14, 23:8, 25:17, 27:15, 29:20, 31:6, 34:6, 34:10, 34:24, 35:14, 37:21, 37:23, 40:12, 42:2, 43:23, 44:2, 49:24, 50:4, 57:14, 58:17, 58:21, 59:9, 59:19, 60:16, 60:21, 63:5, 64:23, 66:24, 66:25, 67:11, 67:24, 70:4, 70:9, 70:19, 71:8, 71:25, 72:8, 85:10, 85:24, 85:25, 86:1, 90:10, 90:13, 90:16, 92:8, 92:16, 92:23, 92:24, 93:9, 93:20, 94:11, 127:11, 127:12, 128:20, 128:21, 137:13, 139:12, 140:4, 152:5, 152:11, 152:25, 153:19, 153:24, 154:16, 154:18, 160:13, 167:17, 167:25, 174:19, 188:20, 188:21, 189:5, 190:4, 190:7, 190:19, 200:20, 208:9, 208:12, 208:14, 208:19, 208:22

**trials** [2] - 154:19, 154:22

**trick** [1] - 211:16

**tried** [29] - 13:18, 29:21, 29:24, 30:2, 30:6, 30:8, 42:10, 46:9, 54:4, 54:8, 64:14, 69:16, 111:21, 129:16, 147:16, 160:5, 179:14, 179:19, 186:24, 194:2, 201:11, 202:19, 202:21, 203:7, 205:8, 208:15, 209:24, 217:1

**trip** [1] - 144:7

**trips** [1] - 149:7

**trouble** [2] - 82:24, 86:13

**troubled** [2] - 59:11, 59:13

**truck** [1] - 106:24

**true** [12] - 30:12, 39:4, 44:13, 57:1, 135:1, 140:11, 140:18, 140:25, 141:15, 142:7, 143:11, 162:15

**trump** [2] - 80:14, 80:15

**truth** [4] - 175:3, 208:13, 208:21, 212:23

**truthful** [1] - 208:16

**try** [24] - 12:4, 21:10, 24:13, 47:7, 47:8, 48:11, 48:13, 48:17, 63:4, 63:15, 73:3, 76:4, 76:5, 78:18, 91:15, 165:20, 178:22, 178:25, 203:1, 203:5, 204:5, 209:25, 212:23

**trying** [42] - 18:12, 21:3, 22:9, 28:5, 29:22, 46:7, 46:18, 49:17, 49:21, 68:6,

68:15, 75:1, 79:9, 81:14, 90:14, 93:9, 109:12, 109:14, 111:22, 114:8, 141:8, 142:14, 148:2, 163:13, 163:23, 170:11, 179:24, 194:22, 194:23, 201:14, 202:23, 203:1, 203:2, 203:16, 203:22, 203:23, 204:1, 211:6, 211:7, 211:16, 211:17, 213:14

**tubes** [1] - 187:5

**Tucson** [5] - 126:24, 152:20, 154:5, 155:2, 155:4

**tuition** [2] - 120:2, 120:5

**turn** [3] - 28:1, 60:20, 79:2

**turned** [1] - 122:1

**TV** [1] - 124:13

**twice** [5] - 30:6, 64:16, 111:8, 131:22, 181:13

**two** [1] - 16:16

**type** [31] - 8:22, 9:19, 21:7, 26:21, 46:6, 46:23, 53:17, 57:13, 57:25, 58:5, 59:25, 62:17, 70:1, 73:2, 77:20, 79:8, 81:5, 82:3, 111:14, 125:8, 125:13, 157:14, 169:19, 169:22, 181:22, 184:10, 187:22, 200:18, 207:11, 216:6, 219:16

**types** [5] - 100:5, 110:20, 118:10, 178:25, 180:11

**typically** [3] - 82:19, 102:17, 219:15

**U**

**ultimate** [7] - 13:23, 19:15, 26:1, 26:18, 45:1, 46:17, 54:15

**ultimately** [24] - 7:7, 12:25, 13:15, 14:18, 27:24, 33:15, 36:9, 43:17, 44:8, 45:7, 46:25, 47:1, 47:4, 51:15, 52:15, 61:21, 62:13, 68:6, 68:14, 68:16, 79:11, 79:20, 91:3, 194:15

**uncle** [2] - 144:6, 144:9

**Uncle** [1] - 144:11

**unconscious** [1] - 186:24

**unconstitutional** [1] - 161:25

**under** [3] - 81:2, 85:2, 164:16

**undercover** [1] - 146:24

**underlying** [1] - 69:17

**understatement** [1] - 134:17

**understood** [3] - 93:6, 93:13, 155:17

**union** [3] - 102:10, 170:13, 184:2

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 83    Filed 12/07/11    Page 244 of 246

unit [1] - 152:2
United [7] - 3:2, 3:7, 74:6, 85:1, 161:12, 162:9, 162:21
University [4] - 31:21, 32:4, 32:22, 32:23
unless [5] - 3:12, 26:23, 55:23, 76:4, 113:17
unreliable [1] - 164:12
unsuccessful [1] - 22:2
unusual [3] - 39:5, 66:22, 162:8
up [105] - 5:8, 7:5, 12:25, 13:10, 18:9, 22:24, 23:8, 23:20, 24:3, 25:22, 27:2, 30:5, 30:9, 32:25, 35:11, 39:25, 44:2, 47:1, 50:21, 54:22, 58:14, 63:25, 66:21, 67:21, 71:5, 76:13, 78:18, 78:20, 79:23, 80:22, 84:23, 95:6, 96:6, 99:4, 99:6, 99:9, 101:14, 105:9, 109:14, 110:2, 112:9, 114:2, 115:12, 117:3, 117:8, 119:2, 120:13, 121:23, 129:22, 130:3, 130:20, 132:13, 133:24, 138:17, 138:25, 139:18, 139:24, 140:17, 142:19, 142:22, 144:8, 145:22, 145:23, 149:4, 149:19, 151:19, 154:12, 155:23, 159:11, 160:21, 163:4, 165:6, 169:4, 169:5, 169:11, 175:19, 178:18, 181:13, 183:8, 186:25, 188:11, 191:21, 191:25, 192:4, 193:1, 195:18, 195:19, 199:12, 201:13, 202:3, 203:3, 203:4, 207:5, 207:20, 211:14, 211:17, 212:9, 216:15, 216:23, 218:25, 220:25
up-to-date [2] - 18:9, 78:18
upbringing [2] - 101:20, 196:9
upset [8] - 127:23, 127:24, 128:10, 128:12, 133:12, 133:14, 152:23, 154:13
Upton [1] - 162:10
upward [1] - 18:14
US [5] - 50:13, 50:14, 50:18, 64:15, 205:22
user [1] - 157:12

**V**

vacation [1] - 134:2
vacations [3] - 126:2, 133:23, 134:1
vague [2] - 36:18, 66:6
vaguely [1] - 39:7
valid [1] - 72:13

valuable [2] - 27:25, 133:8
various [9] - 5:6, 23:21, 32:17, 40:18, 58:13, 71:11, 92:21, 93:12, 131:4
vehicle [1] - 113:20
vehicles [1] - 112:17
verbally [2] - 116:24, 116:25
verbatim [1] - 153:17
verify [1] - 53:10
versus [7] - 3:3, 62:4, 85:1, 161:12, 162:10, 162:20, 164:3
veterans [1] - 187:25
vetted [1] - 20:18
victims [1] - 35:5
victims's [2] - 3:18, 3:19
video [4] - 39:13, 219:3, 219:5, 219:6
view [4] - 69:7, 178:6, 182:23, 185:6
viewed [1] - 184:8
views [2] - 44:20, 46:2
violation [5] - 162:5, 162:7, 162:23, 162:24
violence [13] - 60:7, 60:10, 60:25, 61:8, 108:16, 139:14, 173:12, 173:14, 174:4, 177:14, 178:5, 193:22, 197:14
violent [2] - 173:10, 197:10
visit [6] - 103:11, 159:8, 181:10, 185:17, 186:22, 194:12
visited [1] - 194:9
visiting [1] - 112:8
visitor's [1] - 181:17
visitors [1] - 181:18
vociferously [1] - 72:23
Vodka [7] - 106:12, 106:13, 106:19, 106:20, 106:22, 106:23, 171:16
voting [1] - 89:19

**W**

wa [3] - 210:9
wait [3] - 105:6, 219:16, 220:9
waited [1] - 119:11
wake [1] - 186:25
walk [1] - 149:22
walked [1] - 205:18
wall [3] - 55:4, 201:23, 203:6
wall-off [1] - 55:4
walled [3] - 54:24, 55:11, 55:12
walled-off [3] - 54:24, 55:11, 55:12
ward [1] - 188:2
Warren [1] - 97:4

wasting [1] - 21:8
watch [3] - 124:13, 176:6, 176:7
Waterloo [2] - 182:5, 189:8
ways [1] - 121:4
wear [1] - 196:21
Wednesday [1] - 218:22
week [12] - 5:8, 6:18, 7:3, 7:4, 32:10, 64:14, 102:13, 102:16, 103:15, 103:16, 106:2, 134:7
weekends [2] - 102:19, 106:5
weekly [3] - 103:14, 106:2, 106:4
weeks [7] - 64:14, 64:19, 86:6, 102:12, 186:23, 187:2, 188:15
weighed [1] - 43:11
weight [1] - 45:9
welder [5] - 102:9, 109:21, 109:22, 110:5, 170:13
welders [4] - 107:19, 110:2, 110:4, 110:6
welding [3] - 110:7, 180:13
western [1] - 176:4
wherein [1] - 162:11
white [2] - 50:8, 50:20
whiz [1] - 188:14
whole [4] - 69:23, 77:16, 169:8, 207:18
wholesale [1] - 72:20
whore [1] - 117:9
wife [9] - 147:13, 147:22, 147:25, 169:1, 172:24, 187:2, 188:10, 195:19, 196:5
wilder [1] - 169:24
WILLIAMS [55] - 3:6, 3:14, 3:24, 4:25, 5:23, 6:23, 7:14, 7:21, 29:8, 29:10, 73:5, 74:6, 75:10, 87:17, 97:13, 99:8, 110:22, 112:24, 116:7, 129:6, 129:8, 141:25, 142:4, 157:21, 157:24, 158:12, 158:18, 160:17, 161:6, 163:19, 171:19, 174:11, 175:2, 177:6, 178:13, 179:2, 180:5, 185:8, 187:11, 190:23, 191:2, 197:16, 197:19, 208:5, 208:7, 210:24, 211:19, 214:18, 217:15, 217:21, 219:3, 219:23, 220:4, 220:8, 220:18
williams [1] - 51:8
Williams [20] - 3:6, 6:9, 29:7, 29:12, 73:7, 78:5, 90:4, 92:13, 92:14, 97:12, 175:1, 190:22, 208:2, 208:4, 215:2, 215:4,

215:12, 216:24, 217:14, 218:19
willing [5] - 160:12, 183:22, 190:12, 190:15, 190:16
window [7] - 105:5, 105:6, 105:8, 119:13, 176:6, 176:7, 199:20
windows [1] - 199:17
wing [1] - 52:22
Wisconsin [3] - 25:7, 25:11, 168:18
wise [5] - 47:15, 60:16, 82:24, 206:6, 206:25
wish [2] - 3:13, 218:2
wishes [1] - 5:16
withdraws [1] - 175:6
WITNESS [5] - 68:10, 97:16, 97:19, 97:22, 206:17
witness [35] - 6:25, 7:2, 7:7, 7:11, 8:10, 52:17, 61:7, 61:22, 73:7, 73:11, 85:10, 85:11, 97:24, 98:9, 127:14, 160:23, 161:5, 161:16, 164:7, 164:8, 164:22, 165:10, 165:12, 165:15, 165:18, 166:4, 166:11, 166:14, 166:18, 174:16, 174:17, 198:1, 198:9, 215:15, 217:18
witnesses [25] - 4:8, 5:6, 5:12, 7:12, 7:18, 7:24, 14:23, 15:1, 15:6, 15:23, 34:11, 70:15, 72:21, 92:14, 92:21, 93:1, 93:3, 163:5, 164:1, 166:1, 166:8, 217:25, 218:3, 218:4, 220:15
woman [4] - 128:2, 189:1, 189:2, 191:15
women [1] - 158:8
won [2] - 30:12, 30:15
wonderful [1] - 24:15
Woodbury [11] - 46:11, 67:2, 199:2, 199:4, 199:6, 200:1, 201:12, 202:6, 202:19, 202:24, 212:24
Word [1] - 17:4
word [1] - 153:16
words [11] - 10:9, 20:10, 26:22, 55:1, 58:19, 80:2, 96:23, 115:17, 124:25, 154:18, 154:19
work-related [1] - 183:2
worker [1] - 138:14
workers [1] - 24:25
workmen's [1] - 194:23
works [1] - 79:5
worksites [2] - 180:3, 197:3
worried [3] - 193:17, 209:6, 209:10
worry [2] - 59:3, 83:17
worse [3] - 104:5, 104:6,

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

104:7
  **wrecked** [1] - 112:20
  **wrenches** [1] - 180:14
  **writing** [2] - 214:4, 214:5
  **written** [1] - 63:25
  **wrote** [5] - 19:12, 47:23, 213:24, 214:2, 217:4

## Y

  **yard** [2] - 186:17, 210:8
  **yards** [1] - 207:18
  **year** [10] - 101:2, 167:11, 167:16, 171:6, 172:8, 185:19, 195:17, 195:20, 211:1, 213:22
  **years** [34] - 8:21, 11:7, 15:18, 25:4, 29:17, 30:15, 31:12, 31:14, 31:15, 32:2, 32:14, 32:17, 32:25, 42:14, 76:4, 99:22, 103:23, 103:24, 104:8, 104:17, 125:17, 130:7, 131:20, 131:24, 133:15, 135:14, 153:18, 153:24, 170:7, 175:13, 178:7, 178:18, 185:20, 216:9
  **yesterday** [1] - 98:15
  **young** [13] - 46:19, 47:8, 48:15, 48:16, 60:23, 62:10, 77:14, 77:18, 77:19, 99:17, 107:1, 114:1, 117:25
  **younger** [11] - 15:2, 101:10, 103:23, 103:24, 104:8, 113:24, 116:17, 118:8, 125:6, 125:18, 167:16
  **yourself** [11] - 13:25, 29:13, 31:11, 96:2, 96:9, 125:3, 168:17, 175:21, 203:22, 203:23, 211:23
  **youth** [2] - 130:12, 130:14

## Z

  **zone** [1] - 220:23

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*