IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA

DUSTIN LEE HONKEN,           )
                              )
         Plaintiff,    )   10-CV-3074-LRR
                              )
   VS.                  )   **VOLUME II**
                              )
UNITED STATES OF AMERICA,  )
                              )
         Defendant.    )

APPEARANCES:

ATTORNEYS SHAWN NOLAN, AREN ADJOIAN, AND AYANNA SALA WILLIAMS, Capital Habeas Unit, Federal Community Defender Office, Eastern District of Pennsylvania, Suite 545 West-Curtis Building, 601 Walnut Street, Philadelphia, Pennsylvania 19106, appeared on behalf of the Plaintiff.

ATTORNEY CHARLES J. WILLIAMS, Assistant U.S. Attorney, Suite 400, 401 First Street S.E., Cedar Rapids, Iowa 52401, appeared on behalf of the United States.

<u>EVIDENTIARY HEARING,</u>

held before the Hon. Linda R. Reade on the 1st day of

November, 2011, at 4200 C Street S.W., Cedar Rapids,

Iowa, commencing at 8:57 a.m.

Patrice A. Murray, CSR, RPR, RMR, FCRR
United States District Court
4200 C Street S.W.
Cedar Rapids, Iowa 52404
(319) 286-2324

Case 3:10-cv-03074-LTS-KEM   Document 84   Filed 12/07/11   Page 1 of 152

INDEX

| WITNESS | D | C | RD | RC |
|---|---|---|---|---|
| Charles Rogers | 226 | 248 | 273 | |
| Anthony Johnson | 279 | 288 | 293 | |
| Daniel Cobeen | 296 | | | |
| Timothy Cutkomp | 306 | 324 | 349 | |

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

(The following was held in open court.)

THE COURT: We are back on the record in United States -- or in Dustin Lee Honken versus the United States, Case Numbers CV 10-3074 and CR 01-3047. Counsel is here.

You know, yesterday I should have made a brief record with counsel about the fact that Mr. Honken is not personally present in the courtroom, nor participating by telephone conference call. I don't think there is a right to be personally present, but it was my understanding, Mr. Nolan, that Mr. Honken did not wish to be transported to this hearing. Is that correct?

MR. NOLAN: That's correct, Your Honor.

THE COURT: All right. And that he did not wish to be present for the entire hearing by telephone conference call?

MR. NOLAN: That is correct, Your Honor.

THE COURT: All right. Thank you.

MR. NOLAN: That does bring up 1 request though. We are doing some legal calls with him, and in prison, we need to do them in the morning because of the prison. So I was going to request that we could start again tomorrow at 9:00. That makes it easier for us.

THE COURT: Absolutely.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

MR. NOLAN: With our schedule, I think that would work okay.

THE COURT: That will be just fine.

MR. NOLAN: Thank you.

THE COURT: We are ready now for any additional evidence.

MR. NOLAN: Your Honor, we would call Charles Rogers to the stand.

THE COURT: Good morning, Mr. Rogers.

THE WITNESS: Good morning, Your Honor.

THE COURT: Will you please come forward.

CHARLES ROGERS,

called as a witness, being first duly sworn or affirmed, was examined and testified as follows:

THE CLERK: You may take the stand.

MR. NOLAN: Your Honor, we may need the screen on.

THE COURT: Okay.

MR. NOLAN: There we go. Perfect.

THE COURT: All right.

DIRECT EXAMINATION

BY MR. NOLAN:

Q. Good morning, Mr. Rogers.

A. Good morning.

Q. Could you state your full name for the record?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM Document 84 Filed 12/07/11 Page 4 of 152

A. Charles M. Rogers.

Q. And, Mr. Rogers, what do you do for a living?

A. I'm an attorney.

Q. And how long have you been an attorney?

A. Since 1976, 35 years.

Q. And what kind of practice are you currently in?

A. I am in a small firm. We do -- or I do almost exclusively criminal defense. I have a focus on federal capital cases.

Q. Okay. And in the past, have you done other kinds of legal work as well?

A. I have done -- I've been mainly criminal defense my entire career. For over 17 years, I was -- worked for the Missouri State Public Defender system, in various capacities, doing trial work mainly. I worked for a year at the Missouri Capital Punishment Resource Center doing capital habeas work and state post-conviction, and --

Q. Could I ask you what the timeframe was on that?

A. That would have been 1994 to 1995, when they -- Congress pulled the plug on resource centers. And then since then I've been with my current firm, and I've done a mix of trial work and habeas work and appellate work, almost all criminal defense, and a great deal of it capital.

Q.     And when did you first start getting involved in doing capital work, do you recall?

A.     Maybe 1980.  Missouri passed a death penalty statute, I believe, in 1979.  And I was, at that time, having been there 4 years, 1 of the -- by 1980, having been there 4 years, I was 1 of the senior lawyers in the Public Defender's Office in Kansas City, so I handled some capital cases.  I tried my first capital case, I think, in 1984.

Q.     Okay.  Now, at some point in 2004, did you become involved in the Dustin Honken matter?

A.     I had been involved before that, but, yes.  But the trial was in 2004.

Q.     Right.  So when did you get involved?  Like how long before the trial, I guess is the easiest way to --

A.     At least a couple of years.  In the meantime, I was involved in a marathon trial in the Southern District of Illinois that lasted from September of 2003 until March of 2004.  So even though I was involved in the Honken matter, I didn't do a whole lot on it for those several months.

Q.     Okay.  And who else -- when you got brought into the case or asked -- how did it come about that you got brought into the case?

A.     I had previously worked with Mr. Parrish in a

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 84   Filed 12/07/11   Page 6 of 152

capital case in the Northern District of Iowa. The defendant's name was Luis Lua, L-U-A. And at that time, that was a multiple defendant case that happened in the very northern part of Iowa by the Minnesota border. Actually, the killing happened in Minnesota. It was a kidnapping, resulting in death, and crossed the state line, which is what made it a federal case.

There were several defendants. Iowa did not/does not have the death penalty. Minnesota did not/does not have the death penalty, and they had exhausted the very small pool of death qualified lawyers, I guess I'd call them -- learned counsel is what the statute says -- in the Omaha area, so I was asked to take part in that case. And then after that, when this case was filed, Mr. Parrish contacted me.

Q. And what did he ask you to do?

A. He asked me to be the learned counsel, the capital counsel on the case.

Q. And in the case that you had previously with Mr. Parrish, which was capital, did that case go to trial?

A. No, it did not. In fact, that was back during the Clinton administration, and the local US Attorney offered us an opportunity to plead guilty for a life sentence before the DOJ authorization conference, which

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 84   Filed 12/07/11   Page 7 of 152
*to purchase a complete copy of the transcript.*

they could do in those days.

Q.    Okay.  So it wasn't ever actually authorized as capital?

A.    It was never authorized as capital, but if we had not taken the deal, it probably would have been.

Q.    Okay.  And other than you and Mr. Parrish being involved in Mr. Honken's case at that point, who was the third attorney?

A.    Leon Spies.

Q.    And did you know -- did you know Mr. Spies?

A.    I did not.

Q.    Okay.  Did you know whether he had any capital experience?

A.    I knew that he didn't.  We talked about that. Nobody in Iowa had capital experience, with the exception of the lawyers who were involved in the earlier Lua case and then there was another, what I think of as the Disneyland case, where the people robbed and killed a person and took the money and went to Disneyland.

Q.    And so other than the 1 case that you had with Mr. Parrish, were you aware of whether he had any previous capital experience?

A.    I knew that he had no other capital experience.

Q.    Okay.  And so were you -- you were brought in

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 84   Filed 12/07/11   Page 8 of 152

then as -- what did you call it?

A.    Learned counsel.

Q.    Learned counsel.

A.    Because -- counsel learned in the law applicable to capital cases, I believe is what the statute says.

Q.    Okay.  And so when the 3 of you first started kind of figuring out who was going to do what, did the other 2 defer to you in matters of capital litigation?

A.    Yeah, that was sort of my role.

Q.    Okay.  And did that continue throughout the litigation?

A.    It continued through most of it.  When I was involved in my Illinois trial, Mr. Spies basically assumed the primary role in the mitigation investigation, working with the mitigation specialist.  I had worked with Ms. Rickert before, and I'm the 1 who basically got her onboard, but while I was in trial in Illinois, she and Mr. Spies did a lot of the mitigation work at that time.

Q.    Well, let's talk about the roles of each of the attorneys on the team.  What was Mr. Parrish's role?

A.    He was, I think, the lead counsel in terms of the administrative duties, as well as the main litigator for what Judge Bennett called the merits phase, the guilt or innocence phase of the trial.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 84   Filed 12/07/11   Page 9 of 152
*to purchase a complete copy of the transcript.*

Q.    Okay.  And what was -- was there a decision made as to who early on -- as to who was going to present the penalty phase, if it got to that?

A.    Early on -- I don't know that there was an explicit statement, but I think the assumption was that I would be primarily responsible for presenting the penalty phase; however, as the trial approached and got very close or maybe even during the jury selection part of the trial, Mr. Honken requested that Mr. Spies be primarily responsible for the penalty phase.

Q.    For presenting it to the jury, you mean?

A.    Yes.

Q.    But still, you were -- you were consulted on all matters specifically relating to capital litigation?

           MR. WILLIAMS:  Objection, leading, Your Honor.

Q.    I'm sorry, were you -- were you consulted at that time about various matters?

A.    Yes, I was, and not only -- I mean, we talked about the whole case, but, certainly, my emphasis was on the penalty aspects.

Q.    And let's go back to Ms. Rickert, who you just mentioned.  What's her name?

A.    Lisa Rickert.

Q.    And how did you know her?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 84   Filed 12/07/11   Page 10 of 152
*to purchase a complete copy of the transcript.*

A.        I had worked with her before on a case in Missouri.  She had -- I'm trying to -- I got her name from -- she's in Madison, Wisconsin.  And there's a well-known, nationally recognized mitigation person in Madison named Jill Miller, who I had worked with long ago or -- I don't know if I worked directly with her or somebody in my office worked with her on a case in Missouri.  And so I had, I think, called Jill, and she says, "I'm not available, but there's this woman who used to work with me who now has her own mitigation practice who is really good.  Give her a call," so I did.

Q.        All right.  Mr. Rogers, I'd like you to look on the screen in front of you.  For the record, this is P-119.

          Can you identify what that document is?

A.        That's my declaration.

Q.        And I'm going to show you the last page of that declaration.  Is that your signature?

A.        Yes, it is.

Q.        And before you signed this, did you verify its accuracy?

A.        I did.  In fact, I made some changes to it, I think.

Q.        All right.  Had you and I met several times prior

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 11 of 152
*to purchase a complete copy of the transcript.*

to you signing this declaration?

A.      At least a couple, yeah.  I'm not sure how many is "several," but I'm not sure how many times we met. We also talked on the phone.

Q.      All right.  Now, Mr. Rogers, did we at some point provide you with an opportunity -- with a copy of our habeas petition and our memorandum of law?

A.      Yes, you did.

Q.      And have you had an opportunity to review that?

A.      I have, although I'm not ready to be tested on it.

Q.      Understood.  All right.  I'd like to talk to you a little bit about a motion that you filed pretrial, which was a double jeopardy motion.  Do you recall that?

A.      Yes.

Q.      And who was mainly responsible for the double jeopardy motion that was filed?

A.      I was.

Q.      And so how did that work?  Did you -- how did it work in terms of working with the other team members in terms of drafting or --

A.      I would -- I got documents -- I had documents from this case.  I got documents from the earlier drug case of Mr. Honken's from Mr. Parrish.  And I did a draft of the motion.  I circulated it to Mr. Parrish and

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 84   Filed 12/07/11   Page 12 of 152

Mr. Spies by e-mail, got some feedback from them I'm sure, and then made some changes and finalized it and filed it.

Q.     Okay.  Can you just -- not in much detail but just generally, what was the gist of that motion?

A.     The gist of the motion was that the -- both the drug conspiracy, which was the basis for the murder in furtherance of a drug conspiracy, murders in furtherance of a drug conspiracy, and the criminal -- continuing criminal enterprise, which was the basis for the other counts of murder in furtherance of a CCE, arose from the same course of conduct as the drug charges to which Mr. Honken had pled guilty.  And we -- we viewed them -- I viewed them as lesser included offenses of the drug -- the drug conspiracy, the CCE, where -- first of all, the drug conspiracy is a lesser included offense of the CCE. The CCEs and the drug conspiracies are lesser included offenses of the murders.  And so since they had already been subjected to jeopardy for the included offenses, it would be a double jeopardy violation to charge him now with the inclusive offenses.

Q.     Okay.  In that motion, did you include the concept of collateral estoppel based on specific findings that were made by Judge Bennett during the previous sentencing proceedings?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 84   Filed 12/07/11   Page 13 of 152

A.      No, I did not.

Q.      Was there a reason that you did not include that?

A.      Not a conscious 1.  I would say that I was either not aware of the specific findings -- and you're talking about the findings related to the continuing criminal enterprise and where he found that there was not a continuing criminal enterprise in connection with the sentencing for the drug conspiracy.  And I -- either I was not aware of the specific findings or I did not realize the significance of that finding in the context of our case in terms of the number of individuals who were alleged to be supervised by Mr. Honken as part of the CCE counts.

Q.      Okay.  And when you reviewed the prior findings of Judge Bennett or the prior proceedings of Judge Bennett, were you aware that he had found that Mr. Honken was not involved in a CCE during the time that he was on pre-release, which would have been March 1993 until sometime in 1995?

            MR. WILLIAMS:  Objection, misstates the record.  Judge Bennett made no finding regarding continuing criminal enterprise.  He made findings with regard to the timing of the conspiracy.

            THE COURT:  The Court will take the testimony subject to the objection made by Mr. Williams.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 14 of 152

A.     And since I wasn't aware of it, I don't know whether -- whether Judge Bennett made such a finding or not.

Q.     Okay.  After -- well, let me ask you this, did you have any strategic reason for not including the type of claim that we included in Claim 2 that you've reviewed in the double jeopardy motion?

A.     No, if I had -- if it had occurred to me and I had been aware of the factual basis for such a claim, I certainly would have included it.

Q.     And are -- after -- when Judge Bennett decided the double jeopardy motion, did he issue an opinion?

A.     I'm sure he did, yes.  Yes, he did.  I've seen it.

Q.     And I'd like to show you a quote from the opinion.  For the record, this is United States versus Honken, 271 F. Supp. 2d 1097.  Mr. Rogers, the quote should be on the screen there in front of you.  Could you just read that into the record?

A.     "However, Honken is not asserting the protection of the double jeopardy clause in the sense of collateral estoppel because he is not relying on any ultimate fact determined against the government in his prior prosecution on the drug conspiracy charge."

Q.     Do you remember reviewing his opinion and seeing

this footnote after -- when the opinion came out?

A.      I do not independently remember it.  I have, however, seen it recently, know it's there.

Q.      Was there any discussion or any consideration by you and co-counsel about perhaps renewing the motion and including the collateral estoppel concept?

A.      I don't remember any discussion, and it did not occur to me, I can tell you that.  And that sort of reinforces my belief that I was not aware of the specific findings made by Judge Bennett in the sentencing part of the earlier proceeding.

Q.      Mr. Rogers, did you also review Claim 1 of our petition?

A.      I did, and I'm not -- yeah, I did.

Q.      Okay.  And do you recall what type of argument -- or what type of -- what type of issue we raised there?

A.      It's an ineffective assistance of counsel for failure to adequately investigate and present what I'll call the psychological aspects of Mr. Honken's --

Q.      I'm sorry, that's Claim 9.  Do you have the petition before you?

A.      No, I don't.  I'm sorry, I missed -- the wrong 1.

        MR. NOLAN:  Excuse me, Your Honor, for a moment.

        THE COURT:  Sure.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 16 of 152
*to purchase a complete copy of the transcript.*

THE WITNESS: What's Claim 1?

MR. NOLAN: Your Honor, could I approach the witness?

THE COURT: Certainly.

THE WITNESS: Thank you.

Q. Mr. Rogers, showing you the Memorandum of Law that was filed in this case, can you just review maybe the claim heading of Claim 1 to see if that refreshes your recollection?

A. It does, and it also proves that I'm not ready to be tested on this.

Q. I understand. Quite a lengthy document, I'm sorry to say.

A. Yes. It's a claim of ineffective assistance of counsel for failure to object to the admission of the prior sentencing findings on behalf of the government.

Q. Okay. And -- and do you recall any discussion or any consideration by you or between counsel whether you should have raised this issue pretrial or during the trial?

A. I don't recall a discussion about it. It seems to me that it is certainly worthy of discussion. I mean, I knew -- I know that we talked about the findings and some bad -- bad facts, as we call them, that would have -- that were there.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 17 of 152

Q.     Was there any strategic reason that you had at the time for not raising that issue?

A.     Not that I'm aware of, no.

Q.     All right.  Let's move to the claim of what we've been referring to as the multiplicity claim.

A.     Okay.

Q.     And in our petition, that was Claim Number 5. Are you familiar with what the multiplicity claim is?

A.     Yes.

Q.     And do you know whether it was raised in Angela Johnson's case?

A.     I know now that it was raised on -- in her case, and that it succeeded on appeal in her case.

Q.     Did you have any strategic reason for not raising that issue?

A.     No.

Q.     All right.  Mr. Rogers, let's move on to another thing, another area.  Mr. Rogers, you had explained earlier that -- that you had suggested Lisa Rickert be involved for the penalty/mitigation workup?

A.     Yes.

Q.     And so did you meet with her?

A.     Initially, I think I talked with her by telephone and that she met with Mr. Spies, is my vague recollection of that.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM     Document 84     Filed 12/07/11     Page 18 of 152

Q. Okay. Well, during the time that -- the many months leading up to trial, did you ever have a meeting with her with other counsel, or was it just Mr. Spies?

A. I think -- I think we did meet at least once with all of us, but that was in the summer immediately preceding the trial.

Q. Okay. And during the time leading up to the trial, were you and Mr. Spies in communication often?

A. Yes, we would communicate by e-mail and talk on the phone, and then there were at least 3 pretrial hearings during which we would also -- we'd meet for, like, half a day and then we'd have the hearing the next day, and then meet after the hearing sometimes.

Q. Okay. At some point -- well, let me ask you this: Who was making the decisions with regard to the penalty phase as to basically what to do to prepare for it?

A. They were, in a sense, group decisions, but in terms of who was sort of leading them, probably Mr. Spies.

Q. Was there a decision made at some point to have Mr. Honken evaluated by a neuropsychologist?

A. Yes.

Q. Do you know how that decision came about?

A. That was at a meeting where all 3 of us were

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

there, and I think also that may be the meeting where Ms. Rickert was there as well. I think it was -- I think it was Mr. Parrish who suggested Dr. Gelbort, but I'm not sure about that. That could have been Ms. Rickert as well.

Q. Okay. Did there come a time when Ms. Rickert recommended that you have a mental health professional, psychiatrist or psychologist, evaluate Mr. Honken in terms of his life history?

A. Yes, she did. We had a fairly extensive discussion about it.

Q. Okay. And ultimately, did you make a decision not to do that?

A. Yes.

Q. And why was that decision made?

A. We were afraid that, first of all, it would become discoverable if we found anything that we wanted to use, and that the government would then have the right to do an evaluation, and we were afraid that that evaluation would find Mr. Honken to be antisocial or even a sociopath, is the kind of words that the government evaluators like to use.

Q. Which -- just to be clear for the record, which evaluation were you concerned would find him to be antisocial?

A.     The government's evaluation.  We were afraid that they would use Dr. Park Dietz or his associate, Dr. Daniel Martell.

Q.     Looking back on it, would there have been any reason to not have Mr. Honken evaluated yourself and then decide later what to do with it depending on the results?

A.     That would have been a better move.  No doubt about it.

Q.     Do you remember a discussion between counsel about Federal Rule of Criminal Procedure 12.2?

A.     I do not.

Q.     Are you familiar with that rule now?

A.     Yes.

Q.     Okay.  Mr. Rogers, was there a discussion about whether or not to hire an expert toxicologist or an expert in the use of methamphetamine?

A.     There may have been such a discussion before the evaluation by Dr. Gelbort but not after, so -- because at least my impression from Dr. Gelbort's report was that there was nothing there which a toxicologist, or who I would probably use would be a psychopharma-cologist -- no physical findings that would give rise to such an explanation of how they came about.

Q.     Mr. Rogers, you said that you have reviewed the

pleadings that we filed. And did you also have an opportunity to review some of the declarations or reports from the experts in the case?

A. Yes, I have.

Q. And are you aware of whether or not the government's expert, Dr. Grody, diagnosed Mr. Honken with antisocial personality disorder?

A. He did not.

Q. If you had developed the mental health mitigation that you've had the opportunity to review at this time, would you have considered presenting it to the jury in mitigation?

A. Yes. In fact, I would have almost certainly done so.

Q. All right. Let's move to another area briefly. I believe you've also reviewed Claim 7 of our petition, which -- are you aware of -- as learned counsel, are you aware of what a Witherspoon claim is?

A. Yes.

Q. Could you just briefly explain that for the record?

A. That's where somebody is stricken for cause because they cannot consider imposing a sentence of death.

Q. And in reviewing the claim, do you know whether

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 84   Filed 12/07/11   Page 22 of 152
*to purchase a complete copy of the transcript.*

or not there was argument and objections made by yourself and co-counsel regarding the cause strikes of 2 jurors?

A.     Yes, there was.

Q.     And why were those -- why would those objections have been made?

A.     Oh, I don't think that there was -- did not think and do not think that there was an adequate basis to strike those particular jurors for cause.  I thought they were what we called scrupled jurors, but I thought that they were, in fact, qualified and could meaningfully consider the full range of punishment if on the jury.

Q.     So did you attempt to make a record to preserve that issue -- those issues for appeal?

A.     Yes.

Q.     Mr. Rogers, Mr. Spies in presenting the penalty phase to the jury called 1 expert witness.  Do you recall Dr. Cunningham?

A.     Yes.

Q.     And what was the purpose of calling Dr. Cunningham?

A.     Dr. Cunningham was, well, we thought of as a teaching witness, to let the jury know that if Mr. Honken were sentenced to life imprisonment, the

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM   Document 84   Filed 12/07/11   Page 23 of 152

Federal Bureau of Prisons could house him in a manner which would make him not a danger to BOP staff or even to other inmates. Dr. Cunningham testified from kind of an actuarial approach about the fact that persons who have been convicted of homicides are less prone to violence than other inmates of prisons.

Q.    All right. And during the presentation of his testimony or at some point during the penalty phase, do you know if the jury was told that Mr. Honken at various times had been in a high custody classification?

A.    There was testimony about his assignment to USP Florence, Colorado, which is a high custody, not a maximum custody but a high custody, high security, institution. I don't know whether there was testimony about his subsequent assignment to USP Marion, Illinois, which at that time was a -- was the second most secure facility in the Bureau of Prisons.

Q.    Okay. In any event, if you could look at the memo of law that's in front of you, on Page 106, the memo quotes a jury instruction given by Judge Bennett at the top of the page. Do you see that?

A.    Yes.

Q.    Could you just read that for the record?

A.    "Aggravating factors. Evidence that the defendant would be a danger in the future to the lives

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 24 of 152

and safety of other persons may include 1 or more of the following:

> A) Specific threats of violence,
>
> B) A continuing pattern of violence,
>
> C) Low rehabilitative potential,
>
> D) Lack of remorse, and
>
> E) High custody classification."

Q.     And for the record, that's at Docket Number 524 at Page 23.

Mr. Rogers, do you see how in that instruction the jury was -- was told, if it found 1 or more of these 5 things, that it could find future dangerousness?

A.     Right.

Q.     Was there a reason that -- that you did not object to that instruction?

A.     No.  I must admit, it looks objectionable.  For 1 thing, I don't know that high custody classification is a -- indicia of future dangerousness.  It ought to make you less dangerous, certainly according to Dr. Cunningham's testimony and I think statistically speaking.  You may get the high custody classification because you're viewed as a danger, but once you have it, you're less dangerous than you would be in a lower custody classification.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 84   Filed 12/07/11   Page 25 of 152
*to purchase a complete copy of the transcript.*

Q.    Well, particularly in light of the fact that you're the -- the main thrust of your mitigation case was that he was in high custody classification, do you -- should you have objected to this instruction?

A.    Yes.

MR. WILLIAMS:  Objection, argumentative.

THE COURT:  It is argumentative, but I will take it subject to the objection.  You may proceed.

A.    Yes.

Q.    Was there any strategic reason for not objecting?

A.    No.

MR. NOLAN:  May I have a moment, Your Honor?

THE COURT:  Certainly.

(Brief pause.)

MR. NOLAN:  Thank you, Your Honor.

Thank you, Mr. Rogers.  I have no other questions.

THE COURT:  Cross-examination.

MR. WILLIAMS:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. WILLIAMS:

Q.    Mr. Rogers, what do you have in front of you that you took up to the witness stand with you?

A.    A copy of my declaration.

Q.    Okay.  And you testified on direct examination

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 26 of 152

that you had met with counsel for Dustin Honken in this habeas matter several times?

A.    At least 2, yes.

Q.    Okay.  And spoke with them on the phone --

A.    Yes.

Q.    -- is that correct?  Now I e-mailed you this last year and requested that you have contact with me about the case, and you said you would not do that, isn't that right?

A.    That's correct.

Q.    All right.  How many capital cases have you handled over your career, sir?

A.    I'll have to work backwards.  It's been a long time.  Between 15 and 20.

Q.    That would be trials?

A.    Probably 8 or 10 trials.

Q.    Okay.  And how many of those occurred after Dustin Honken's trial?  In both categories, both trials and just cases you handled.

A.    3 trials and 5 cases, not counting the 1 that I'm handling now.

Q.    And these are federal cases?

A.    Most of the recent ones, but probably 9 cases and 6 trials were federal.

Q.    You were asked about Rule 12.2.  In 2004 Rule

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 84   Filed 12/07/11   Page 27 of 152

12.2(b), which deals with disclosure of expert information in capital cases, was a pretty new rule that was just recently enacted, was it not, sir?

A.    I believe so.

Q.    In fact, if I recall, I think there was only 1 reported case in existence at the time we went to trial on Honken that talked about the degree to which the government could have access to the work product created by the defense in preparing for a capital case on psychiatric testing, isn't that right?

A.    I'll take your word for it.  I don't know.

Q.    Okay.  In any event, pretty unexplored area in the case law at that point, wasn't it?

A.    Right.

Q.    There's real question at that point, and given the absence of any case law out there, about whether the government would or would not have access to any evaluation you conducted of Dustin Honken, isn't that right?

A.    Yes.

Q.    Okay.  And equally so, there was really no case law and there's a big question at the time in 2004 about whether the government would be able to immediately have Dustin Honken examined by its own experts before the trial, as -- the minute you did your own examination?

There's a real question about whether we could do that right then, wasn't there?

A.     Well, my understanding at the time was that if we gave notice that we intended to present this evidence in the penalty phase, then you could probably get an evaluation.  What the circumstances would be, whether it can be revealed to you or did it have to be a taint team or whatever went on, was not clear.

Q.     That was all up in the air at the time, wasn't it?

A.     Right.

Q.     Okay.  And likewise, there was some question the Court in this case put in some early deadlines for the defense to indicate whether they were going to be presenting a mental health defense, right?

A.     Right.

Q.     And part of the reason for that is because it takes so much time to do these evaluations and so forth. The Courts are imposing early deadlines for the defense to notify precisely in order to give the government an opportunity pretrial to do its own examination of the defendant, right?

A.     I assume that's the rationale, yes, although I don't know that it takes that long, by the way.

Q.     Okay.  Sure.  But looking back at the state of

the law in 2004, it was anything but settled on what was going to happen if you went forward and had a psychiatrist examine Dustin Honken, wasn't it?

A.     It was not settled.

Q.     Okay.  You were asked about the first claim, and that is about whether you should have objected to the admission of the judgments from Dustin Honken's 1998 conviction.  Do you remember those questions?

A.     Yes.

Q.     Okay.  And part of the thought there was -- or at least the claim is that there are references in those judgments to drug quantity and role that are somehow adverse to Dustin Honken.  You understand that's kind of the nature of the claim?

A.     Yes.

Q.     And that you all should have objected to those judgments coming in because of that.  Do you understand that?

A.     Right.

Q.     Okay.  Now, first of all, you agree with me that there's no question those judgments were going to come in as admissible evidence of the prior conviction, right?

A.     The judgment itself.

Q.     All right.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 84   Filed 12/07/11   Page 30 of 152
*to purchase a complete copy of the transcript.*

A.     Right.

Q.     And so the only question would be, is whether somehow the language in the judgment that referenced drug quantity or role should have been redacted or blanked out somehow to avoid the jury finding out about that?

A.     Right.

Q.     Okay.  Now, you would agree with me that at Dustin Honken's 1998 sentencing, the focus was on the drug capacity of the lab that had been seized from his house.  Wasn't that the focus of the litigation there?

A.     I was not directly involved in that litigation. From having -- I did, however, view a part of the testimony of a chemist, I guess, when I was in Sioux City on the Lua case.  Mr. Parrish was presenting that before we had whatever we had going on there, and so I don't dispute that that was at least a focus.

Q.     Okay.  All right.  And then -- well, in preparing for Dustin Honken's trial, you reviewed the transcript of the sentencing hearing.  You may not recall all the specifics but you reviewed the transcript of the sentencing hearing?

A.     Yes, I did.

Q.     Okay.  Now, at Dustin Honken's trial, he was -- in the capital case, he was charged with the conspiracy

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 31 of 152

and a CCE, isn't that right?

A.     Right.

Q.     Okay.  Now, with regard to the CCE, the government had no obligation to prove any drug quantity at all, did it?

A.     No.

Q.     Okay.  With regard to the conspiracy, the government had an obligation to prove more than 100 grams of actual methamphetamine was involved in the conspiracy, right?

A.     I'll take your word for it again, but, yes.

Q.     Okay.  And by definition, that charge, conspiracy, only required the government to prove the defendant had an agreement with 1 or more people to manufacture or distribute more than 100 grams of methamphetamine, right?

A.     Correct.

Q.     The government never had to prove that they actually manufactured more than 100 grams, did it?

A.     No.

Q.     Just that there was an agreement to do so, right?

A.     For the conspiracy.

Q.     Right.  Now, you recall the testimony at trial, the government put on substantial evidence about pounds of methamphetamine being shipped to Iowa, right?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 84   Filed 12/07/11   Page 32 of 152
*to purchase a complete copy of the transcript.*

A.      Yes.

Q.      And testimony both from Greg Nicholson by death, even though he was dead, through his grand jury testimony, about the methamphetamine being very pure?

A.      Yes.

Q.      There was testimony by Tim Cutkomp, who actually helped manufacture the methamphetamine, that it was pure methamphetamine and pounds were shipped to Iowa.  Do you recall that testimony?

A.      Yes.

Q.      And I'm not going to go through it, but you recall that there was a number of statements that Dustin Honken had made to other people that ultimately testified in which he bragged about how pure the meth was that he had manufactured, right?

A.      Yes.

Q.      Okay.  And so you would agree with me that there was fairly overwhelming evidence presented by the government at the trial in Dustin Honken's capital case that there was more than 100 grams of pure methamphetamine involved in the conspiracy, right?

A.      Right.

Q.      All right.  You were asked about this double jeopardy argument that you -- that counsel now claims that you were ineffective for failing to raise, that

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 33 of 152
*to purchase a complete copy of the transcript.*

there was a -- the government was collaterally estopped somehow from -- because of purported adverse findings by Judge Bennett in the sentencing hearing in 1998. Do you remember that argument?

A. Yes.

Q. Okay. Now, were you aware back in 1998 of any case reported anywhere that held that a judge's findings at a sentencing hearing could be held against the government under a collateral estoppel theory?

A. I've never looked. And I was not aware of anything having to do with this case in 1998.

Q. Okay. Are you aware of any case, at the time that this case went to trial in 2004, any case that held that?

A. Not specifically. I do think that -- I mean, I do know the elements of collateral estoppel. Let me put it that way.

Q. Were you aware in 2004 of any case at all that held that?

A. No.

Q. Are you aware today of any case that holds that a finding by a judge in a sentencing hearing can collaterally estop the government from bringing charges in a later prosecution or that it can be collaterally estopped from arguing a position in a later prosecution?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM Document 84 Filed 12/07/11 Page 34 of 152
*to purchase a complete copy of the transcript.*

Are you aware of any case that would support the proposition proposed by the defense in Claim 2?

MR. NOLAN: Objection -- objection, Your Honor, to what is the relevance to what he is aware of now.

THE COURT: I will take it subject to the objection. The witness may answer.

A.     To me, I don't know that the fact that it happens at a sentencing as opposed to some other stage of the proceedings has anything to do with whether or not it's a collateral estoppel. I think for collateral estoppel, you need a factual determination with either the same or a lesser burden of proof, you need identity of parties, you need identity of issues, and then that's what I think the elements of collateral estoppel are. I'm not specifically aware of any case holding 1 way or the other whether findings at a sentencing by a preponderance of the evidence collaterally estop later proceedings requiring proof beyond a reasonable doubt.

Q.     All right. When Judge Bennett issued that order that you previously read the footnote from, you read the order in its entirety, I trust, at the time?

A.     I'm sure I did.

Q.     And you had discussions with the other trial counsel who also, from your discussions with them, it

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM   Document 84   Filed 12/07/11   Page 35 of 152

was clear to you they had read the opinion as well?

A.     We all talked about the order, yeah.

Q.     All right.  You were asked about Claim 7, which is the jury selection claim, and there was questions asked of you about whether there was a couple of jurors that, in your view, were Witherspoon excludables, meaning that they should not have been struck, in your opinion, and you objected to it at the time of trial and made a record.  Do you recall that claim?

A.     Yes.

Q.     Okay.  You had conversations with appellate counsel, didn't you, as they were preparing to appeal the case?

A.     Yes, although we didn't get into the specifics of that.  In fact, I don't know that we even talked about jury selection.

Q.     Okay.  And, in fact, they interviewed you on March 8, 2007, right?  Does that sound right?

A.     It sounds like it's within the realm of possibility at least.  I don't have a specific memory of when they did it.  They basically came to Kansas City, came to our office, gathered up boxes of documents and things, and we did spend quite a bit of time talking about the case.

Q.     Okay.  And they -- during that "quite a bit of

time" you ended up discussing the case, you raised with them various things you thought ought to be appealed, right?

A.     Talked about a couple of things that I thought were the really significant things.

Q.     Okay.  You didn't mention the -- those jurors, did you?

A.     I don't recall mentioning those jurors, no.

Q.     Now, do you recall that part of Claim 7 is also that trial counsel were ineffective for failing to strike a couple of jurors that should have been struck pursuant to the agreement the government and the defense had to exclude the people on the extreme ends of the view on the death penalty?

A.     That had not leaped out at me when I looked at this, no, but I'll -- I do remember that agreement.

Q.     Okay.  You remember that it was all focused on Question 72.  Do you remember that?  That was the -- Question 72 had the various subparts, A through H, I think.  And if you were A, you were -- you would always impose the death penalty.  If you were H, you never would, or vice versa.  Do you remember that?

A.     I do remember that.

Q.     And do you remember the agreement was by the parties that we were going to strike A -- all people

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 84   Filed 12/07/11   Page 37 of 152

under A and B and all people under I think it's H and --

A.      G and H?

Q.      H and I, I'm sorry.  It's actually H and I.  Do you remember that?  So the 2 categories on the extremes.

A.      I do remember the 2 categories on the extremes.

Q.      Okay.  And the defense -- Dustin Honken in this proceeding has alleged that you all missed 2 or 3 jurors that should have been struck under that agreement, and you and your jury consultant just missed those.  Do you recall that?

A.      I'll accept that statement.

Q.      Okay.  All right.

        MR. WILLIAMS:  May I approach, Your Honor?

        THE COURT:  Yes.

A.      I've got it in front of me.

Q.      No, that's all right.  I'll show you something different.  In fact, I think I'll do it this way.

        Mr. Rogers, I'm going to show you Questionnaire 608.

        I'm having trouble getting this focused here.  There we go.

A.      That's good, yeah.

Q.      This is a questionnaire for Juror 918.  Do you recognize that?

A.      I can see that, yes.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 84   Filed 12/07/11   Page 38 of 152
*to purchase a complete copy of the transcript.*

Q.    Okay.  And if we go to Question 72, Question 72A, it says, "I am personally, morally, religiously, or otherwise opposed to the death penalty and will never vote to impose it under any circumstances."  Do you see that?

A.    Yes.

Q.    You'd agree with me that under our agreement Juror 918 is 1 of those that should have been included on the list to be struck, right?

A.    Yes.

Q.    Okay.  And this was bad for the government.  If 918 was not in that list of people to be struck, that was bad for the government, wasn't it?

A.    Yeah, although I don't know that the government has the right to effective assistance of counsel, not that they don't get it all the time, but --

Q.    In looking at Questionnaire Number 53, do you see that's a questionnaire for Juror Number 53?

A.    Yes.

Q.    And if we go to Question Number 72 again, the juror circled B under Question 72.  And you agree with me that under our agreement, 72 [sic] should have been struck, right?

A.    Under our agreement, yes.

Q.    Okay.  And again this was something that

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM   Document 84   Filed 12/07/11   Page 39 of 152

benefited the defendant, that Number 53 -- if Number 53 wasn't on that list, that benefited the defendant, didn't it?

A.    Yes.  Now, I have a question.  We also struck -- or excused people for hardships, and we had an agreement about that too.

Q.    Yes.

A.    Were these people who actually showed up for jury duty or were these people who weren't on the cause list because they were already on the hardship list?

Q.    I don't know if I know the answer to that, although I'm pretty sure 53 -- neither 53 nor 918 were excluded for cause either because of the death penalty or other reasons.

A.    Okay.

Q.    You were asked about the mental health presentation that was made in this case, and so let's talk about that.  We talked a little bit about Rule 12.2, but I want to go back and talk about this in a little bit more detail.

First of all, you were aware that Dustin Honken had been evaluated by a psychiatrist in 1997 by the Bureau of Prisons, do you recall that?

A.    I don't recall that, but I don't dispute that.

Q.    Okay.  And so there was already in the possession

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 40 of 152

of the defense a psychological evaluation of Dustin Honken, wasn't there?

A.    I don't recall seeing such a thing, but was this before -- '98 would have been before the sentencing, so --

Q.    Right.

A.    Mr. Parrish would have had it, I'm sure.

Q.    Okay.  You said that you considered and you had, I think your quote was, "extensive discussions" about whether you should hire another psychiatrist in 2004 to evaluate Dustin Honken.  Do you remember that testimony?

A.    Right.

Q.    Okay.  And you expressed you had some concerns about the disclosure and whether the government could do their own exam and so forth.  Were there other reasons though for -- that were also discussed, pros and cons about whether you should or shouldn't have a psychiatrist, other than simply worried about what the government may do in response?

A.    Well, I did not at the time think that there was -- I was, probably incorrectly, pretty convinced that Mr. -- Mr. Honken would be found to be a -- to have antisocial personality disorder, which, as I said, I think the government witness would characterize as being a sociopath and -- or a psychopath, and I had been aware

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 84   Filed 12/07/11   Page 41 of 152

of testimony about that, which had been used to fairly devastating effect in the penalty phase in some other cases. So that's what I was afraid of.

Q. And in particular, you were afraid of Park Dietz & Associates, right?

A. Or the guy in Virginia, Dr. Reddy, 1 or the other.

Q. Right. And Park Dietz & Associates, and in particular Park Dietz, and as you said, Dan Martell, another doctor that works with Park Dietz & Associates, were kind of known in the defense community for kind of regularly finding defendants, capital defendants, to be sociopaths or antisocial personality disorder, isn't that fair to say?

A. Yes. Quite frankly, almost all -- in fact, I don't have the Bureau of Prisons's psychiatrists' workups from 1997, but I would be quite surprised if it doesn't find antisocial personality disorder. Almost all government reports say that.

Q. Okay. And you were aware that the government had actually designated Park Dietz as its expert in this case?

A. I think that was done -- or I was aware of that in the context of Judge Bennett's scheduling order saying *If you're going to do this, do it now, so they*

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 42 of 152

*have a chance to do their evaluation*, yes.

Q.      Right.  Now, in addition to your concern about the government's response though, you agree with me there was other tactical reasons that you were concerned about calling -- or mounting some type of mental health defense in the penalty phase, wasn't there?

A.      I think they're all part and parcel of the same big reason.

Q.      And what do you mean by that?

A.      I mean, I think that -- first of all, I was not personally aware of the nature and significance of Mr. Honken's traumatic childhood.  I mean, I knew some of the basic facts, but I did not know how extensive and pervasive it was, and I did not know how damaging it was.  Secondly, Mr. Honken has a very -- what do I want to say -- a very well-established defense mechanism in terms of his tough-guy persona.  He is very intelligent, and I think a jury who heard an expert say, *Well, he's a sociopath and here are the characteristics*, would look at Mr. Honken and say, *Yeah, that's right.  That fits him*, although I think that if, in fact, there's -- I think, having reviewed the later evaluations, that that could be penetrated successfully, so, you know -- but other than the fear of the jury viewing him as a sociopath, I mean, that's all part of the same big

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM   Document 84   Filed 12/07/11   Page 43 of 152

concern.

Q.     Okay.  Well, let's talk about that for a minute, and then I'm going to come back to "other reason."  You say that you did not know how damaging his childhood was.  Lisa Rickert had extensively investigated his childhood and background and talked about the drunken father and all those problems, right?

A.     Yes, she had.  I had not spent the kind of time with her that I should have to understand in depth the true nature of it.

Q.     All right.  Leon Spies spent more time with her, isn't that right?

A.     Yes.

Q.     All right.  And then you say that now, with these later evaluations, you think it could have -- you could have dealt with the appearance, I guess, of antisocial personality disorder that you feared here.  Again, that's with the benefit of hindsight looking at these evaluations that trial -- that habeas counsel put together, right?

A.     Right.

Q.     Okay.  Now, you don't know what they based those opinions on, do you, sir?

A.     I've read their declarations, so I know what they say they based it on.

Q.      Okay. All right. Now, Mr. Rogers, isn't it also a case that there was a concern about whether there was going to be a presentation of inconsistency if the defense at the guilt phase was that Dustin Honken had nothing to do with the murders whatsoever? There was a discussion between you and Al Parrish and Leon Spies that if you went down the road of presenting some type of psychological defense at the penalty phase, that would be inconsistent with the position that was taken by the defense during the trial. Wasn't there that discussion, about a concern about inconsistency?

A.      I think there is always a concern about -- there probably was such a discussion, and I'm probably the 1 who couched it in terms of you want your entire case to be -- your penalty phase to be congruent with the themes of your -- they don't necessarily have to be consistent, but they have to be congruent with the themes of your guilt phase. But there's -- I mean, it is not at all unusual to have a penalty phase after a contested guilt phase, and you can present mitigating evidence and life history evidence without conceding guilt. This was not a case where there is a spur-of-the-moment rage kind of thing. And so you wouldn't have to show, "Oh, yeah, here's the frontal lobe damage which makes them incapable of perceiving that," the formulating,

whatever, but you still -- I mean, we were hoping that there would be some residual doubt about Mr. Honken's role in the homicides or whether he was actually involved, but that would not have been inconsistent with presenting the type of background that showed how he got to the situation where he was manufacturing and importing into Iowa bunches of drugs.

Q.    Let's talk about that for a little bit.  First of all, you'd agree with me it would have been inconsistent to have gone to trial and said, Honken had absolutely nothing to do with this crime.  And, jury, we're asking you to find residual doubt as a mitigator, and presenting evidence during the penalty phase from a psychiatrist who purported to say that at the time of the offense when Dustin Honken was involved with the murders, he had an inability to make judgment calls and had mental health problems that affected his ability to weigh decisions and that kind of thing.  That would be inconsistent, right?

A.    To present like an NGRI kind of defense in the min -- in the penalty phase, yes.

Q.    All right.  Now, what you're talking about is going ahead and presenting *He wasn't present, he didn't commit the murders, and we're asking you to find residual doubt,* with a jury, *He suffers from some type*

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 46 of 152

*of mental health defect, and we're asking you not to take that into account with regard to what he did but with regard to just have mercy on him and understand that he has -- you know, he's damaged goods, and maybe when you're deciding between death and life, you ought to weight toward life*, and you're saying that can be presented in a way that's not inconsistent?

A.      Yeah.

Q.      Okay, all right.  So if in this case the habeas counsel's experts are purporting to opine that Dustin Honken at the time he committed the offense suffered from mental health defects that affected his ability to make judgment calls and make decisions and weigh the factors, that's the type that you've already identified would be inconsistent with the defense that was presented at trial, isn't it?

A.      Well, first of all, the defense presented at trial didn't work very well.  But not necessarily.  I mean, it would not be, I don't think -- as I read it, they're not saying he is not guilty by reason of mental disease or that he did not have the capacity to form the necessary intent.  What they're saying is that his judgment was impaired, which explains how he got in the situation he was in, whether he did the homicides or not.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 47 of 152
*to purchase a complete copy of the transcript.*

Q.    All right.  You were asked on direct examination about whether you should have called a psychopharmacologist or somebody.  Do you remember that testimony?

A.    Yeah, I'm the 1 who suggested psychopharmacologist as opposed to toxicologist.

Q.    And your testimony was that, after Gelbort's opinion came back, it was pretty clear to you that wasn't going to fly?

A.    Well, I did not see in Gelbort's report the basis that said to me, oh, we need to get somebody to explain these neuropsychological findings in terms of his exposure to methamphetamine and the manufacturing of methamphetamine over a period of several months.

Q.    Who is the 1 who had the contact with Dr. Gelbort when he was doing his evaluation and ultimately rendered his opinion?

A.    I think it was Mr. Parrish.  It was not me.

Q.    Okay.  Let me ask it this way then.  When you hire a neuropsychologist in any of your cases, you, as a lawyer, are you -- are you trusting that the neuropsychologist is going to come back and alert you if they see any problems?

A.    Yes, but you also need to think about and talk about your referral questions and what you are asking

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 48 of 152

them to do.

Q.    Okay.  And you'd agree with me that a neuropsychologist, just any neuropsychologist worth their salt, is going to be aware that drug use can affect a person's mental health, right?

A.    I would assume so.

Q.    All right.  You were asked about the security classification and the testimony of Dr. Cunningham, and you said that you recall that there was testimony that Dustin Honken was placed in Florence, a high security classification setting.  Do you remember that testimony on direct examination?

A.    USP Florence.

Q.    USP Florence, okay.  Now, I know you haven't read -- memorized the transcript in this case, but the reality is, Mr. Rogers, that while there was reference to him being at Florence, there wasn't any testimony presented during the trial anywhere about what classification setting or classification rating Florence had, was there?

A.    I don't know 1 way or the other.

Q.    Okay.

A.    I mean, I know what it is.

Q.    Right, you know what it is.  And you know what Marion is, right?  But there wasn't any evidence

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 84   Filed 12/07/11   Page 49 of 152
*to purchase a complete copy of the transcript.*

presented to the jury at all by the government and certainly not by the defense about what the various classification settings were of those institutions, at least until Dr. Cunningham testified, right?

A.     I don't know 1 way or the other.  That's probably right.  I don't see what would be relevant about it.

Q.     Okay.  And then you pointed out that, frankly, you don't think that the security classification should be a factor to determine future dangerousness.  You said just the opposite, that according to Dr. Cunningham, a higher classification setting is something to tell the jury should make them feel he is not going to be a future danger, right?

A.     Right.

Q.     Okay.  And that's, in fact, what Dr. Cunningham did do in his testimony, didn't he?

A.     I think so, yes.

MR. WILLIAMS:  Just a moment, Your Honor.

THE COURT:  Yes.

(Brief pause.)

MR. WILLIAMS:  No further questions.

THE COURT:  Any redirect?

MR. NOLAN:  A few, Your Honor, please.

Thank you.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 50 of 152
*to purchase a complete copy of the transcript.*

REDIRECT EXAMINATION

BY MR. NOLAN:

Q.      Mr. Rogers, are you familiar with an ABA guideline that discusses whether or not counsel should meet with the prosecutors in habeas proceedings?

A.      Yes.

Q.      When Mr. Williams contacted you and asked you to meet, why did you not meet with him?

A.      I did not think that would be consistent to -- with my ethical obligations to a former client.

Q.      Now, do you remember the timing in terms of the decision about whether or not to follow Ms. Rickert's recommendation about hiring a mental health professional?  Do you know if that ultimate decision that was made not to do that was done before or after Dr. Gelbort's evaluation or report?

A.      I've been assuming it was after, but I'm not for sure now that you ask me that.

Q.      Yeah.  Now, do you remember that Dr. Gelbort -- do you remember when Dr. Gelbort saw Mr. Honken?

A.      Not really.

Q.      Okay.

        MR. NOLAN:  Excuse me, Your Honor, if I could just turn on the --

        THE COURT:  Sure.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 84   Filed 12/07/11   Page 51 of 152
*to purchase a complete copy of the transcript.*

MR. NOLAN: Sorry.

Q. There we go. Can you see what's been previously marked as P-11?

A. Yes.

Q. And what is that for the record?

A. That is Dr. Gelbort's report.

Q. And what's the date of evaluation noted?

A. July 19, 2004, so that would have been the month before jury selection.

Q. The month before. And are you aware that you were required to report to the Court a month before jury selection whether you were going to present any mental health mitigation?

A. I'll accept that statement. I know we had a deadline. I don't know what it was.

Q. Okay. And can you see on the top of this report that there are 2 dates that look like fax dates?

A. Yes.

Q. And what are those 2 dates?

A. The earlier 1 is July 21, 2004. The second one is July 22, 2004.

Q. Well, it's a matter of record, but are you -- do you recall that you were required to report to the Court whether or not you were going to present mental health testimony within a day or 2 days of those dates? Do you

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 52 of 152

remember that?

A. I don't remember that, but I accept that representation.

Q. Do you remember Mr. Williams asked you questions about whether at the time of this trial it was unclear whether or not the government would have access to your reports? Do you remember he asked that question?

A. Yes.

Q. Was it your understanding that if you decided not to use the report that the law was clear, that you did not have to turn it over?

A. That's my understanding, yes. And I think that's what Judge Bennett had told us too.

Q. Mr. Williams had asked you questions about the quantities of drugs involved in the case, and he asked you a question that it was fairly overwhelming that the evidence was more than 100 grams, which you agreed to. Would that give you more or less of a reason to argue collateral estoppel if there was a previous determination that it was less than that?

A. If I were aware of a previous determination that it was less than 100 grams and if 100 grams or more was their burden of proof, I would think the collateral estoppel would preclude them from proceeding on that allegation.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 84   Filed 12/07/11   Page 53 of 152
*to purchase a complete copy of the transcript.*

Q.   Okay.

A.   So it would be more of a reason, because it -- you know, if they couldn't prove it anyway, why worry about it?  But if they could have a slam dunk like Mr. Williams has portrayed, then -- and you can keep it out, why would you not want to do that?

Q.   All right.  Now, Mr. Williams asked you a question about conversation that you had with appellate counsel.  As trial counsel, is it your responsibility to tell appellate counsel what issues to raise?

A.   No.

Q.   Mr. Williams also asked you about 2 specific jurors where he showed you the questionnaire, Juror 918 and Juror 53.

A.   Right.

Q.   Were those the 2 jurors that were raised as Witherspoon jurors in our claim?

A.   No.  Those are jurors that under our agreement should have been Xed out by the government if they'd asked to.

Q.   Okay.  Mr. Williams also asked you about a psychological evaluation that had been done on Mr. Honken back in 1977.  As -- as learned capital counsel, are you familiar with the importance of providing collateral data to mental health experts?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 84   Filed 12/07/11   Page 54 of 152
*to purchase a complete copy of the transcript.*

A.      Sure.

Q.      What is the importance of that?

A.      It gives them a context beyond the current capital case to -- to use in formulating their evaluations, formulating their opinions.  It is before there's any motive to feign any type of illness or symptoms.  Depending on what it is, you know, it could be an essential part of diagnosing mental disabilities or something like that.

Q.      And are you aware of whether or not the -- the mental health professional who evaluated Mr. Honken back in 1997 had any collateral data?

A.      I don't know anything about that evaluation.

Q.      And regarding the questioning that Mr. Williams asked you about, the psychopharmacologist or something along those lines, you indicated that once Dr. Gelbort's report came back, that there was no -- that -- that there was -- I don't know if you said there was a decision made not to do that or -- do you remember whether there was a decision?

A.      I -- what I said was that there was nothing that I was aware of that would indicate that that would be helpful.  Let me put it that way.

Q.      Okay.

A.      And it may have been not the actual report but

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 84   Filed 12/07/11   Page 55 of 152
*to purchase a complete copy of the transcript.*

some phone conversation about what Dr. Gelbort had said he had found or hadn't found --

Q.    Okay.  Well --

A.    -- now that I'm looking at the date of the report.

Q.    Right, right.  Well, the evaluation was -- the date that he met with Mr. Honken was July 19th, I believe, according to that.

A.    So I could be confused.  I may be talking about the earlier BOP evaluation.

Q.    Okay.

A.    I don't know.

Q.    That's fine.

        MR. NOLAN:  Thank you, Your Honor.  I have no other questions for Mr. Rogers.

        THE COURT:  Anything else, Mr. Williams?

        MR. WILLIAMS:  No, Your Honor.

        THE COURT:  Thank you.  You may step down.

        THE WITNESS:  Thank you, Your Honor.

        THE COURT:  May he be excused?

        MR. NOLAN:  Yes.

        MR. WILLIAMS:  Yes.

        MR. NOLAN:  Thank you, Mr. Rogers, for coming out.

        THE COURT:  All right.  Let's take our

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 84   Filed 12/07/11   Page 56 of 152
*to purchase a complete copy of the transcript.*

recess. We'll be at recess until 20 to 11:00.

MR. NOLAN: Thank you, Your Honor.

(Whereupon, a brief recess was taken.)

THE COURT: All right. We're ready to continue in Dustin Lee Honken versus the United States of America, Case Numbers CV 10-3074, CR 01-3047. And we're ready for any additional evidence.

MR. ADJOIAN: Your Honor, the defense would call Anthony Johnson at this time.

THE COURT: Mr. Johnson, will you please come forward and be sworn.

ANTHONY JOHNSON, called as a witness, being first duly sworn or affirmed, was examined and testified as follows:

THE CLERK: You may take the stand.

DIRECT EXAMINATION

BY MR. ADJOIAN:

Q. Mr. Johnson, could you please state your name for the record?

A. Anthony C. Johnson.

Q. And, Mr. Johnson, where do you live currently?

A. Fort Dodge, Iowa.

Q. Are you currently working, Mr. Johnson?

A. Yes, I am.

Q. What do you do for a living?

A.    Union pipefitter and plumber.

Q.    Mr. Johnson, at any point in your life did you come to meet Dustin Honken?

A.    Yes, I did.

Q.    And when was that, that you met Mr. Honken?

A.    When I was incarcerated in Sioux City County Jail [sic].

Q.    And when was that?

A.    '97.

Q.    Okay.  How -- well, back up for a second.  What brought you to the Woodbury County Jail?

A.    Drug charges.

Q.    Were those state charges or federal charges?

A.    Federal.

Q.    And what type of sentence did you receive on those drug charges?

A.    5 years, 2 months.

Q.    And did you serve that sentence?

A.    Yes.

Q.    Did you serve that sentence in full?

A.    No -- yeah, in full.  I finished it, yeah.

Q.    Okay.  How long were you and Mr. Honken incarcerated together in the Woodbury County Jail?

A.    Oh, 1 to 2 months, I would say.

Q.    Okay.  Did you testify at Mr. Honken's trial in

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 58 of 152

2004?

A.    Yes, I did.

Q.    And have you more recently signed a declaration on behalf of Mr. Honken's current defense team?

A.    I don't understand that.

Q.    Have you signed a declaration recently that Mr. Honken's current defense team did with you?

A.    Yeah.

Q.    Okay.  Can I ask you to look at the screen in front of you.  And for the record, on the screen now is Petitioner's Exhibit 122.

Do you recognize that document?

A.    Yes, I do.

Q.    What is that?

A.    Yes, I recognize it.

Q.    What is the document?

A.    It's 1 that when you came over to my house we wrote down and I signed.

Q.    Okay.  And I'm going to show you the last page right now.  That's Page 6.  Is that your signature at the bottom?

A.    Yes, it is.

Q.    Okay.  Did you review this?  Did we go over this document before you -- before you signed it?

A.    Yes.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 59 of 152

Q.    Did you initial each page at the bottom?

A.    Yes, I did.

Q.    And is it accurate to the best of your --

A.    Yes.

Q.    -- knowledge?  Okay.  How did you first get involved as a witness at Mr. Honken's trial?

A.    I suppose because I was incarcerated with him.

Q.    Okay.  Did you reach out to the government to try to become a witness, or did they approach you about --

A.    They approached me.

Q.    Okay.  Where were you located when you were first contacted by the government?

A.    Yankton Federal Prison.

Q.    And what happened?  Did agents come to see you there in Yankton?

A.    They just came and picked me up and took me to Sioux City.

Q.    Okay.  And did you know why you were being brought down to Sioux City?

A.    No, no.

Q.    When was this exactly, to the best of your --

A.    When I was in the county jail there, I asked around what was going on, because I had seen people that I had served with when me and Dustin were together, and they told me that they were here because of Dustin.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 60 of 152
*to purchase a complete copy of the transcript.*

Q.     And when was this exactly that you were brought down to Sioux City, if you recall?

A.     It would have been the end of '97, right before Christmas I would say.

Q.     Do you -- if you recall, do you know who was speaking to you on behalf of the government at that time?

A.     I think -- I just know it was -- I think they said FBI and DCI.  I don't remember for sure who it was.  I just know it was government agents.

Q.     Was it 1 person or more than 1 person?

A.     You know, I read that on that paper last night, and, you know, I don't remember.  I remember -- I only remember one time.  And how many there was, it was, like, 4 or 5 one time, and I think that was the second time.  I couldn't tell you for sure how many people was there the first time.

Q.     That's fine.  Did they ask you about your contacts with Mr. Honken during that first meeting that you spoke about?

A.     They just asked me a few questions, wanted answers about Dustin, and that led to other, you know -- I guess you better repeat that question.

Q.     Sure.  Did they -- what did they ask you when you first got there?  Did they ask you about Mr. Honken and

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 84   Filed 12/07/11   Page 61 of 152
*to purchase a complete copy of the transcript.*

what you knew about him?

A.     Well, they just said it was a meeting to find out about Dustin, and somewhere along in the meeting, they said, "Well, we know about you buying a camper for" --

Q.     Let's stop there for a second.  When they asked you about Mr. Honken, what was your response to them?

A.     I don't recall.

Q.     You don't recall?

A.     No.

Q.     If I can direct you to Page 2 of your declaration, at the bottom there, do you mind just reading the sentence that starts with "I" to yourself.

A.     (Witness complied.)

Q.     Does that refresh your recollection as to what your response was to --

A.     I guess, if -- you know, as time goes on, it keeps getting more vague and more vague, you know, so that could be true.

Q.     Sure, that's fine.  How -- you were beginning to say something else before I asked you that question.  What did the agents respond to you after you --

A.     I don't remember how it was all said.  I just remember that they said that they knew how I bought my camper, and that I had some guns delivered, and stuff like that.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM     Document 84     Filed 12/07/11     Page 62 of 152
*to purchase a complete copy of the transcript.*

Q.      Okay.  And what was your -- how did you take that comment, about the camper and the guns?

A.      Well, how did I take it?

Q.      Yeah.

A.      Well, I -- like here comes more charges.

Q.      All right.  And what did you -- what did you do at that time after you heard that comment?

A.      I asked for a lawyer.

Q.      Do you recall the name of the lawyer you eventually -- first of all, did you get a lawyer?

A.      Yeah, 2 or 3 months later.

Q.      Okay.  And do you recall the lawyer's name, who you eventually --

A.      No, no.

Q.      -- got assigned?

THE COURT:  This is getting -- the record is getting a little difficult for the reporter because the attorney drops his voice, the witness starts answering before the question is completed.  So I will ask the attorney to keep his voice up so we can hear the end of the question.  I'll ask the witness to pause and make sure the question is complete before you start to answer.

MR. ADJOIAN:  Yes, Your Honor.  I apologize.

Q.      Mr. Johnson, I'm putting what has been previously

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 63 of 152
*to purchase a complete copy of the transcript.*

marked as Petitioner's Exhibit 124 on the screen.  Do you recognize this document, first of all?

A.     No, I'm sure -- I don't remember.  Let's put it that way.

Q.     Okay.  I'm going to scroll down to the last page of the document right now.  The first signature there, whose signature is that?

A.     Mine.

Q.     Okay.  So did you sign this document?

A.     Evidently.  I don't even know what the document is yet.  Is this my --

Q.     Okay.  We'll go up to the top.

THE COURT:  You know, with all due respect, these witnesses are not accustomed to this IT.  Do you have a hard copy so that this witness can see the entire document so he's not confused?

MR. ADJOIAN:  Yes, Your Honor, I do.  Your Honor, may I approach?

THE COURT:  Yes.

Would that be helpful to you, sir?

A.     Well, I'm just -- is this my agreement?

Q.     Mr. Johnson, I've just handed you Petitioner's Exhibit 124.  Do you recognize that as the agreement you ultimately signed regarding what would happen to the charges you --

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM   Document 84   Filed 12/07/11   Page 64 of 152

A.      Yeah, right.

Q.      Okay.  I'm going to direct you to the second paragraph now of that letter, starting with the word "Based."  Do you mind reading that to yourself.

A.      Okay, I read it.  I've read it twice now.

Q.      Okay.  Did you understand -- what did you understand about what would happen to your potential charges coming from the camper and the guns as a result of you providing information to the government?

A.      Would you repeat that?

Q.      Sure thing.  What did you understand -- you previously testified that the government mentioned stuff about the camper and how you obtained that and some guns that you may have had and that you thought you might get new charges as a result.  What did you understand this agreement to do with respect to those charges --

A.      Well, if I --

Q.      -- potential charges?

A.      -- said what I knew about Dustin, that there would not be no charges that could be brought against me that was previous -- anything that was previous could not be charged, you know, brought up against me.

Q.      And did you -- did you eventually meet with the government and provide them information regarding --

A.      Yes.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 65 of 152
*to purchase a complete copy of the transcript.*

Q.      -- Mr. Honken?

A.      Yes, I did.

Q.      Were you, in fact, ever charged with anything having to do with drugs, illegal drug sales, or -- well, let's start with drugs.  Subsequent to getting out of prison, were you ever charged with anything having to do with drugs?

A.      No.

Q.      Were you ever charged with anything having to do with guns?

A.      No.

Q.      And were you ever charged with anything having to do with the camper or possessing any proceeds from drug sales?

A.      No.

Q.      Have you had, in fact, any charges whatsoever since you were released from federal prison?

A.      No, I haven't.

Q.      State or federal?

A.      Nope.

        MR. ADJOIAN:  I have no further questions for you, Mr. Johnson.

                    CROSS-EXAMINATION

BY MR. WILLIAMS:

Q.      Mr. Johnson, my name is C.J. Williams.  I think

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 66 of 152

we met before. Mr. Johnson, everything you testified about at trial, that was all true, wasn't it, sir?

A.    Yes.

Q.    Okay. Now, with regard to this first meeting you had, you said that there was some agents and somebody made some comments about a trailer and some guns, okay. And from what I understand from your testimony, you don't recall the name of that person?

A.    No.

Q.    Was it a male or a female?

A.    It was a male.

Q.    Okay. And can you tell me about -- anything about the male? Was he tall, short, fat, skinny?

A.    No. And like I said, I don't remember if it was 1 person or 2, 3, 4 people. I don't remember anymore.

Q.    Okay. And what exactly did they say about your camper?

A.    They know that I bought my camper for an ounce of meth and $200.

Q.    All right. And what else did they say about the camper then?

A.    Well, they just said, "Well, we know this is what you did, that you bought this camper for the meth and the $200. And we know that you had some guns delivered," and that was all I recall.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 67 of 152

Q.    Okay.  Now, was that part of the charges that you were in prison for?

A.    No.

Q.    This is something else?

A.    Yes.

Q.    Okay.  And what did they say about the guns?

A.    They just said they knew that I had some guns delivered.

Q.    Okay.  Did they say anything else about the guns or the camper, other than what you've related today?

A.    Not that I -- I don't remember.

Q.    Okay.  In any event, you asked for an attorney, right?

A.    Correct.

Q.    Okay.  And you had a conversation with your attorney.  And did your attorney explain this whole letter to you, this agreement that you talked about?

A.    Yes, at the time he did, yeah.

Q.    Okay.  Now, you remember during trial you were questioned about this agreement?

A.    Not really.

Q.    Okay.  Let me -- I'm going to read a portion of your testimony from trial and see if this refreshes your recollection, okay?

A.    Okay.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 68 of 152

Q. You were asked a question by Leon Spies.

MR. ADJOIAN: If I may just ask what page.

MR. WILLIAMS: I'm sorry, yes. Page 2099.

MR. ADJOIAN: Thank you.

Q. "My name is Leon Spies. I'm 1 of the lawyers representing Mr. Honken here this morning, and I have just a few questions for you. You told Mr. Williams that you didn't get anything in exchange for providing information to the government about what you knew about Mr. Honken and the time that you spent with him in the Woodbury County Jail, but in order for you to provide this information, you reached an agreement with the government that anything that you told them about your activities in the jail wouldn't be used against you, right?"

And you answered, "That's correct."

And -- "Question: And you had your lawyer negotiate that with the investigators and the United States Attorney's Office?"

And you answered, "That's correct."

Does that refresh your recollection that that was covered during your trial?

A. Yes.

Q. And that's the agreement we're talking about here, right?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM Document 84 Filed 12/07/11 Page 69 of 152

A.    Yeah.

Q.    Okay.  And you had testified at trial that you hadn't gotten any other benefit from your cooperation with the government, right?

A.    No other benefits besides this, I guess.

Q.    Okay.  And you also were asked a question -- you know, you were actually shown the report, the report of interview, before you testified.  Do you remember that?

A.    Say that again.

Q.    Yeah, it's a poor question.  Let me start back up.  You remember when you were interviewed, when you finally sat down with your attorney and you sat down with the agents and they interviewed you.  Do you remember that?

A.    Vaguely.

Q.    Okay.  Now, let's go, first of all, to that interview.  Were they the same agents at that interview who had talked to you the first time, or were they different agents?

A.    I don't remember.

Q.    Okay.  You don't know --

A.    Nope, I do not know if it was the same agents or not, not anymore, because I didn't think it was really relevant --

Q.    Sure.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 70 of 152
*to purchase a complete copy of the transcript.*

A.     -- for further on in life, you know.

Q.     I understand.  I'm just trying to probe your memory a little bit.  Okay.  And do you remember that before you testified in Honken's trial you had actually reviewed that report of your interview?  Does that ring a bell?

A.     I imagine, yeah.

MR. WILLIAMS:  Okay.  No further questions, Your Honor.

THE COURT:  Anything else for this witness?

MR. ADJOIAN:  Yes, briefly, Your Honor.

REDIRECT EXAMINATION

BY MR. ADJOIAN:

Q.     Mr. Johnson, you were asked a question on cross-examination regarding a question and answer that you were -- that you gave at trial, and that question and answer was read to you.  Can I -- I'm just going to read to you briefly a portion that Mr. Williams just read from the question that you were asked at trial.  And this is Mr. Spies, the defense lawyer, asking you: "You told Mr. Williams that you didn't get anything in exchange for providing information to the government about what you knew about Mr. Honken and the time that you spent with him in the Woodbury County Jail.  But in order for you to provide this information, you reached

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 84   Filed 12/07/11   Page 71 of 152
*to purchase a complete copy of the transcript.*

an agreement with the government that anything you told them about your activities in the jail wouldn't be used against you, right?"

A.     Correct.

Q.     Did you -- the stuff that was brought up about delivering guns and the camper, were those activities of yours in the jail, or did that happen before you were incarcerated?

A.     The camper had happened before I was in jail. The guns happened after I was in jail.

Q.     What was, generally speaking, the -- strike that. Did you testify at Mr. Honken's trial regarding a purchase of a meth recipe from Mr. Honken?

A.     I don't remember if I talked about it at the trial or not.  I remember we -- me and Dustin having a deal about a meth recipe though, a discussion.

Q.     All right.  If you -- if I were to show you your trial testimony, might that refresh your recollection as to what you testified about regarding a meth recipe?

A.     I don't know.

Q.     You don't know whether it would refresh --

A.     Well, I don't remember what all was done at the trial.  I mean, you can show it to me.  I might and I might not.

MR. ADJOIAN:  May I approach, Your Honor?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 72 of 152

THE COURT: Yes.

Q. I'm actually going to put this up on the screen here, Mr. Johnson. All right. Do you see at the bottom of Page 2095, starting at Line 24, a question that begins with the word "Okay"?

A. Yeah.

Q. And going on into the next page, an answer on Line 2?

A. Yes.

Q. Does that refresh your recollection as to whether or not you were testifying about a purchase of a methamphetamine recipe?

A. Well, I don't actually remember it, but I see that I did.

MR. ADJOIAN: Okay. Thank you, Mr. Johnson.

THE COURT: Anything else, Mr. Williams?

MR. WILLIAMS: No, thank you, Your Honor.

THE COURT: Thank you, Mr. Johnson. You may step down. You are excused.

MR. NOLAN: Can we call our next witness, Your Honor?

THE COURT: Yes.

MR. NOLAN: Daniel Cobeen.

THE COURT: Hello, sir. Will you please come forward and be sworn. Right here is fine. Thank

you.

DANIEL COBEEN,

called as a witness, being first duly sworn or affirmed,

was examined and testified as follows:

THE CLERK: You may take the stand.

DIRECT EXAMINATION

BY MR. NOLAN:

Q. Good morning, Mr. Cobeen.

A. Good morning.

Q. Could you state your name for the record, please?

A. Daniel Ross Cobeen.

Q. Okay. Have you ever met me, Mr. Cobeen?

A. You don't look familiar, no.

Q. Okay. How about this gentleman next to me,
Mr. Adjoian, does he look familiar?

A. Neither of you 3 look familiar to me.

Q. Do you remember Mr. Adjoian and another gentleman
coming to your house at some point, maybe last summer --

A. I --

Q. -- asking to speak to you about Mr. Honken?

A. Maybe, and I think I said I didn't want to talk
to him.

Q. Okay. How did you know Mr. Honken?

A. I met him at Kraft Foods where he was working and
where I got a job at.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 84   Filed 12/07/11   Page 74 of 152

Q. And when was that that you were working there, roughly? I'm not asking for specific dates. I know it's a long time ago.

A. In the mid '90s.

Q. Okay. Okay. When you were working there, were you -- where were you living?

A. I was in a halfway house in -- Beje Clark, it's called, in Mason City.

Q. Why were you in a halfway house?

A. Because I got accused and charged with stealing 32 sheets of plywood with my Ford Escort.

Q. Okay. And what was your sentence, do you recall?

A. 120 days in Beje Clark for an evaluation and a year's probation, I think.

Q. Did you -- would it -- did you previously testify that it was 2 years probation?

A. I might -- I can't remember exactly how long, but it was like a year or 2 of probation, yeah.

Q. All right. When you were working with Mr. Honken at Kraft, did there -- were there times when Mr. Honken asked you to get him methamphetamine?

A. I think he might have asked me that once or twice.

Q. And you did get him methamphetamine; is that correct?

Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 75 of 152

A.      Yes, I did get him it once.

Q.      Only once?

A.      Only once that I can recall.

Q.      And how about marijuana, did you also get him marijuana?

A.      I think I might have got him that once too, yeah.

Q.      And do you recall how much methamphetamine?

A.      If I'm right, it was under a gram.

Q.      When you testified at 1 point at the trial, you said 3 quarters of a gram.  Does that sound about right?

A.      That sounds about exactly right.

Q.      Were you aware that Mr. Honken was a user of methamphetamine at that time?

A.      Yes.

Q.      Okay.  And why was it your understanding that he wanted to buy that amount of methamphetamine from you?

A.      Well, he was trying to trust me.

Q.      Okay.  Well, what was he going to do with it, in your understanding?

A.      Well, at that what I would call a meeting of what he called the minds, it was a bunch of people that he had got all together to be involved in this little process of him manufacturing, and 1 person was going to distribute, 1 person was -- I was supposed to hook him up with a few people, like Steve Gomez, some big people

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 76 of 152

that dealt in Mason City. And, basically, we all -- there was like 4, 5 people there. A couple bikers showed up, but I didn't know them and then they disappeared right away. And the rest of the people I knew at the table, and we all sat there and did a little bit and smoked a little bit and played cards.

Q. When you say "we did a little bit," you're talking about methamphetamine?

A. Methamphetamine and marijuana.

Q. So did you use methamphetamine with Dustin Honken at that time?

A. I'm pretty sure I did a line in front of him so he could trust me, yes.

Q. And did he also use it?

A. I don't really remember or recall, to be honest with you.

Q. Did you tell -- do you know who John Graham is?

A. Yes, I do.

Q. Okay. Did you tell John Graham that you used drugs with Mr. Honken?

A. I think I might have, and he told me "Never do it again."

Q. And that was because you were cooperating with him at the time?

A. I was cooperating with the US Marshals or the

task force, whatever you want to call them.

Q.    Do you remember a meeting on -- or do you remember being at a house on New Year's Day of 1996, and Mr. Honken was there, and Angie, and a woman named Darla were there?

A.    And a guy by the name of Brian, if I remember right.

Q.    Okay.  And do you remember testifying previously that there was a plate of methamphetamine that was going around?

A.    I don't recall, but I know that's what -- when we did it that 1 time, it was on a plate.

MR. NOLAN:  Your Honor, could I approach the witness?

THE COURT:  Sure.

MR. NOLAN:  I'm going to use a hard copy.  I think it would be easier.

THE COURT:  Yeah, I think it works better.

MR. NOLAN:  Your Honor, also for the record, this is an exhibit that we did not previously submit to the Court.  It's grand jury testimony that Mr. Cobeen -- by Mr. Cobeen, so we have -- we have marked it Exhibit No. 133, and I have copies for the Court, and I believe counsel already has a copy.

THE COURT:  All right.  Any -- are you using

it for a refreshing, or what are you using it for?

MR. NOLAN: I'm using it for refreshing at this point, Your Honor.

THE COURT: Okay. Proceed.

Q. Mr. Cobeen, I'd ask you to look at Page 5 of what's been marked as P-133. And can you just read that to yourself.

THE COURT: I think there might be some confusion. Do you mean the actual Page 5 or -- there are 4 pages on each page, so what do you want him to look at?

Q. I'm sorry, Mr. Cobeen. I want you to look at the small Page 5.

A. Yes, I see it.

Q. Do you see what I mean? So it's the top left-hand corner?

A. "I think it was exactly New Year's Day," yeah.

Q. Okay. Yes, starting with that.

A. Do you want me to read it out loud?

Q. No, I just want you to read it to yourself. Just let me know when you are finished, please.

A. Yeah, I'm done.

Q. So, Mr. Cobeen, do you remember now during that meeting whether you saw Mr. Honken using methamphetamine?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM Document 84 Filed 12/07/11 Page 79 of 152

A.    Yes.

Q.    And did you?

A.    I remember everybody was using.

Q.    Okay.  And did you also -- do you also recall whether Mr. Honken was using marijuana at -- during that meeting?

A.    After quite a few people left -- exactly about like this states.  After quite a bit of people left, it was just me, him, and Angie, and, yeah, we sat there and smoked 1.

Q.    Now, Mr. Cobeen, when you were living in the halfway house, you -- you also had to report to a probation officer, is that right?

A.    After the halfway house, I did.

Q.    After, okay.  Now, at some point, Mr. Honken approached you and asked you about being involved in a methamphetamine manufacture, is that right?

A.    While I was at Kraft Foods, he asked everybody there about me and my reputation, and then he found out I was what you'd call -- I could be used probably, and then he had come up -- well, every day he would show me gun magazines and this and that, and we talked about it, and, yeah.

Q.    Yeah, I'm not asking about all the details of that.  I was just trying to set the timeframe.  So after

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 84   Filed 12/07/11   Page 80 of 152

that happened, then, did you go and tell your probation officer about that?

A.    To be honest with you, when I first saw him at Kraft Foods and all the questions he asked me, I thought he was an FBI agent because I had just got set up for 32 sheets of plywood I stole in my Ford Escort, so I thought I was just played, you know.  So I went and told my public pretender, is what I called her, that I was -- I think I was being set up again, and I've got 1 strike that I didn't do.  So I told her who he was, what was going on.  And she goes, "Don't worry about it.  I'll get back ahold of you later, like tomorrow."  Well, within 30 minutes I get a phone call from her saying meet her at the District Attorney's Office in the basement floor of the Mason City Courthouse.  I walked in there, and there was DCI, FBI, marshals, cam-corders, you name it.  And I walked in through the door saying, "Holy F!  What did I just get myself into?"

            "Come on in, Mr. Cobeen."

            That's how it happened.

Q.    Okay.  So you said that you said this to your public defender.  You didn't go tell your probation officer about this, not your public defender?

A.    I didn't have to report to Probation until after I was out of Beje Clark, and then John Graham would not

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 81 of 152

let me do any of this until I was off of probation.

Q. All right. I'd ask you to turn to the small Page 13 in that volume that you have in front of you, which has been identified as P-133. And can you see, Mr. Cobeen, the second line down, there's a question that says, "I didn't want to cut you off when you were in the middle of a," and then the answer was, "No, I was just going to say, as soon as he confronted me, I went to my probation officer and I told her what was going on. And she told me she wanted to let somebody else know, and I assumed that was John Graham."

A. That was --

Q. And then you were put in touch with her?

A. Yeah, that was actually wrong. It wasn't my probation officer. It was my public defender or pretender, whatever you want to call her.

Q. It wasn't your probation officer?

A. No, it was not.

Q. So you didn't go to your probation officer to try to get off of probation at an earlier time?

A. No.

Q. Didn't Mr. Graham get you off probation at an earlier time so that you could do this cooperation?

A. I think I got a year dropped.

Q. But you didn't testify to that in front of the

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 82 of 152

jury in Mr. Honken's murder trial, did you?

A.    I don't recall if they asked me that or not.

MR. NOLAN:  I have no other questions. Thank you.

THE COURT:  Mr. Williams?

MR. WILLIAMS:  A moment, Your Honor.

(Brief pause.)

MR. WILLIAMS:  No questions, Your Honor.

THE COURT:  Thank you.  You may step down, sir.

Is he excused?

MR. NOLAN:  He is excused, Your Honor.

THE COURT:  All right.  Thank you, sir.

THE WITNESS:  Thank you, ma'am.

Does somebody want this?

THE COURT:  You can just leave it there. Thank you, sir.

MR. NOLAN:  Might I have just 1 moment with the witness, Your Honor?

THE COURT:  Sure.

MR. NOLAN:  Thank you, Your Honor.  May we call our next witness?

THE COURT:  Fine.

MR. NOLAN:  We'll call Timothy Cutkomp to the stand.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 83 of 152

THE COURT: Hello, sir. Will you please come forward and be sworn.

TIMOTHY CUTKOMP, called as a witness, being first duly sworn or affirmed, was examined and testified as follows:

THE CLERK: You may take the stand.

THE COURT: Right here.

MR. NOLAN: May I proceed, Your Honor?

THE COURT: Yes.

MR. NOLAN: Thank you.

DIRECT EXAMINATION

BY MR. NOLAN:

Q. Mr. Cutkomp, can you just state your name for the record, please?

A. Timothy Cutkomp.

Q. When Mr. Honken was tried for murder back in 2004, did you testify?

A. I did.

Q. And who called you as a witness?

A. Prosecution.

Q. How did you know Mr. Honken?

A. I went to school with him; grade school, high school.

Q. And when did you first meet him?

A. When we were in grade school; probably first

grade.

Q.      And did there come a time later in grade school that you and he became better friends?

A.      Yes.

Q.      When was that?

A.      It would have been around seventh or eighth grade.

Q.      And what did you and he do together as young boys at that time?

A.      Hung out, watched TV, ate.

Q.      Ate, did you say?

A.      Yes.

Q.      And did you also spend time around Mr. Honken's family?

A.      Yes.

Q.      Who did you know in his family?

A.      I knew his -- I knew his brother, and sister, stepdad --

Q.      What's his --

A.      -- mom.

Q.      What was his stepdad's name?

A.      Ron.

Q.      Okay.  Ron Smidt, is that --

A.      Yes.

Q.      And his mother, what's her name?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM     Document 84     Filed 12/07/11     Page 85 of 152

A.    Marvea.

Q.    Anybody else?

A.    His sister.

Q.    That's Alyssa?

A.    Alyssa.  Brother, Jeff.

Q.    And how about his real father?

A.    Jim, yes, I knew him.

Q.    Did you spend a good deal of time with Jim Honken when you were a young boy?

A.    Some time.  Not a lot.  I'd visit every now and then.

Q.    And when you would spend time with Jim, was Dustin with you?

A.    Yes.

Q.    Okay.  And where was Jim living then?

A.    In Garner, Garner, Iowa.

Q.    So by the time that you and Dustin became closer friends and you spent time with the family, were his birth parents still living together?

A.    No.

Q.    Okay.  So they were already divorced and Marvea was remarried by then, is that --

A.    Yes.

Q.    Okay.  Now, did you know Dustin's father, Jim, to be involved in illegal activities?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 86 of 152

A.    Yes.

Q.    And how did you know that?

A.    He talked about it some, and Dustin talked about it.  And 1 time we drove with Jim to -- Jim took a truck from -- from someplace in Minnesota.

Q.    When you say he "took a truck," what do you mean?

A.    Stole the truck.

Q.    Okay.  When you say "we drove" with him, who is "we"?

A.    Dustin and I.

Q.    And how did that come about?

A.    I don't remember exactly.  Jim wanted to go get it.

Q.    And who drove up to Minnesota?

A.    I believe I did.

Q.    Were you older than Dustin or younger?

A.    I'm older.

Q.    And did Jim tell you what he was going to do?

A.    Yes.

Q.    What did he tell you he was going to do?

A.    Going to steal the truck.

Q.    Do you know how old you were at that point?

A.    I must have been 16.  I don't remember exactly.

Q.    Okay.  Did you know of Jim Honken to be involved in arson?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 87 of 152

A.    I believe he was, yes.

Q.    Did he talk about that?

A.    I don't know if it was him or Dustin that talked about it.

Q.    To you, you mean?

A.    Yes.

Q.    Was there a time that you and Dustin had gotten arrested for stealing a car as teenagers?

A.    Yes.

Q.    Do you remember how old you were about then?

A.    I was 18 or 19.

Q.    Okay.  And was Jim Honken involved in that in some way?

A.    Not in the theft, no.

Q.    Was he involved after the theft?

A.    Yes.

Q.    In what way?  What happened?

A.    We stored it at his shed, and he helped us to get -- get rid of it.

Q.    And did he say anything to you about -- about what he would do if the police were coming after you?

A.    He would -- we'd take the truck and he would drive behind us and crash into the police, if they were after us.

Q.    And did you believe that to be true when he told

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 88 of 152

you that?

A. Yes.

Q. And was Dustin with you then?

A. Yes.

Q. Do you know about -- whether Jim Honken drank alcohol?

A. Yes, he did.

Q. How much, if you know?

A. He was drunk quite a bit, so drank a lot.

Q. And what would he drink? Did you know what he drank?

A. I think he drank beer most of the time.

Q. Did you ever see him drinking Vodka?

A. I don't recall him drinking Vodka.

Q. Do you remember seeing him in a condition from drinking? In other words, you said that he was a drinker. Did you ever see him acting drunk?

A. Yes.

Q. And how often would that be at the times you saw him?

A. The majority of the time.

Q. Did Dustin ever talk to you about how that affected him?

A. He -- he did not like it, that his dad drank that much.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM Document 84 Filed 12/07/11 Page 89 of 152

Q.    And you said that you would sometimes spend time at Marvea's house?

A.    Yes.

Q.    And so did you -- would you see Ron there, the stepfather?

A.    On occasion, yes.

Q.    Did you ever see Ron and Dustin interact in any way?

A.    A little.

Q.    And how was that, in what way?

A.    It just -- it wasn't a whole lot of interaction when I saw.

Q.    Would Ron ever speak to you or in front of you?

A.    A little, yeah.

Q.    Now, when you -- when you and Dustin were teenagers, did -- did you go to high school together?

A.    Yes.

Q.    And were there people in the high school that drank alcohol or beer?

A.    Yes.

Q.    Did Dustin?

A.    No.

Q.    Do you know why?

A.    I assume because he didn't like it, but probably had something to do with his dad.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 90 of 152
*to purchase a complete copy of the transcript.*

Q. And how about using drugs, did Dustin ever use drugs to your knowledge?

A. No.

Q. Did there come a time later when you saw Dustin using drugs?

A. Yes.

Q. Now, after -- when did you graduate from high school?

A. '86.

Q. And do you remember what year -- at some point, did you move to Arizona for a period?

A. Yes.

Q. Do you remember when that was?

A. Must have been in '91, '92.

Q. So from the time period of '86 to '91, '92, did you continue to spend time with Dustin?

A. Yes.

Q. Was there a time when he had moved away, during that time period, to Arizona?

A. Yes.

Q. So with the exception of that time period, did you spend time together in Britt?

A. Yes.

Q. Is that where you lived then, or where did you live?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 91 of 152
*to purchase a complete copy of the transcript.*

A.     Part of the time I lived in Britt or around Des Moines.

Q.     And during that time prior to you going to Arizona, '91, '92, did you ever see Dustin drinking or using drugs?

A.     No.

Q.     And why did you end up moving to Arizona?

A.     To assist Dustin in the making of the methamphetamine.

Q.     Okay.  And when you first got there, where were you living?

A.     At Jeff's house.

Q.     And who is Jeff again, just for the record?

A.     Dustin's brother.

Q.     Okay.  And then at some point did you move out of Jeff's house?

A.     Yes.

Q.     And where did you move to?

A.     Tamarack Apartments.

Q.     Where was that?

A.     In Tucson.

Q.     And when you lived in the Tamarack Apartments, did you start the process of making methamphetamine?

A.     Yes.

Q.     And where was the -- where in the apartment was

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 84   Filed 12/07/11   Page 92 of 152

that process going on?

A.    In 1 of the bedrooms.

Q.    And who was living there then?

A.    Dustin and I.

Q.    Do you remember how long you lived there?

A.    2 to 3 months.

Q.    And during the time that you lived there and were making methamphetamine, did Dustin -- did there come a time when Dustin started to use it?

A.    Yes.

Q.    And how did that -- how did that come about, do you remember?

A.    After we made our first batch, we tried it to see what it did.

Q.    And then did there come a time when Dustin's use increased?

A.    Yes.

Q.    And how did that go about -- or how much?

A.    I'm not sure when it started, but he started using more as time went on.

Q.    And was there a point at some point when he was using it every day?

A.    Yes.

Q.    And were the 2 of you living together at that point still?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 93 of 152
*to purchase a complete copy of the transcript.*

A.    Well, I was at the house south of Tucson, and he was there part of the time but he wasn't always there.

Q.    Okay.  But how about -- I'm still back in the apartment.  When you were in the apartment, was there a time when Dustin was using every day?

A.    No.

Q.    That came about later?

A.    Yes.

Q.    And you talked about this house.  What is this house?

A.    It was a house we rented to make the methamphetamine.

Q.    And who paid to rent the house?

A.    Jeff.

Q.    So were there times that you would actually see Dustin using methamphetamine?

A.    Yes.

Q.    And in what form, like, would he take it?

A.    He would snort it or smoke it.

Q.    How do -- how would you smoke methamphetamine?

A.    He would sprinkle it on with -- some marijuana and smoke it.

Q.    And snort it, what form would that be in that it would be snorted?

A.    In powder form.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 94 of 152
*to purchase a complete copy of the transcript.*

Q.    And how about -- any other way that he ingested it other than snorting it or smoking it?

A.    There was -- put it in some gel caps and we had some liquid stuff too.

Q.    And what would you do with that -- or what would he do with that?

A.    Put it on a toothpick and ingest it.

Q.    Like swallow it, you mean?

A.    Yes.

Q.    And during the time that you were making the methamphetamine, how pure was it?

A.    I don't know what the purity was.

Q.    Okay.

A.    It was pretty pure.

Q.    And the form that Dustin was using, was he cutting it with anything?

A.    No.

Q.    And how about you, at some point were you using some too?

A.    Yes.

Q.    And were you cutting it with anything?

A.    No.

Q.    Were there times that you witnessed Dustin using methamphetamine for days at a time?

A.    Yes.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 95 of 152
*to purchase a complete copy of the transcript.*

Q.     And how -- could you describe that?

A.     He just -- I don't remember.

Q.     Well, describe what, you know, what -- you were living together and what you would witness.

A.     He would use it, and I guess it would be over days that he'd just keep using it, not -- not quit.

Q.     And would he sleep during those times?

A.     No.

Q.     Were there times that you would hear him awake when you were trying to sleep?

A.     Yes.

Q.     What would you hear?

A.     I'd hear the bubbling of the bong that he was using.

Q.     That he was using to do what?

A.     Smoke the marijuana and methamphetamine.

Q.     Was there a time when you were living in the apartment that you and Dustin thought that you were being poisoned from the manufacturing process?

A.     Yes.

Q.     Can you describe that?

A.     We'd made -- there was a process that made some gas, and Dustin had thought that 1 of the filters that we were using for our mask filtered the gas out, and it -- we found out later that it did not.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 84   Filed 12/07/11   Page 96 of 152

Q. And what did you do when you found that out?

A. We called the Poison Control to see what they had to say, and just waited to see what would happen.

Q. During the time you were in Arizona, you said that Jeff had paid the rent on the house. Did Jeff provide money for anything else?

A. Food and for -- for the equipment for making the drugs.

Q. Did you ever see Dustin bossing Jeff around or telling Jeff what to do?

A. No.

Q. Do you know whether -- were you familiar with Dustin and Jeff's relationship over the years?

A. Somewhat.

Q. Do you know whether Jeff would have allowed Dustin to boss him around?

MR. WILLIAMS: Calls for speculation, Your Honor.

THE COURT: Sustained.

Q. Well, in -- you said that you were familiar with their relationship somewhat. In the manner that you were familiar with their relationship, to that extent, would you -- would you ever see whether Jeff would allow Dustin to boss him around?

MR. WILLIAMS: Objection. And I'm not sure

Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 97 of 152

if it's framed in a factual -- objection to the form of the question.  I'm not sure if it's actually asking factually did he ever see it or whether he's asking an opinion.

THE COURT:  Well, he's already asked if he saw it, and the answer was no, and it seems like the rest of it is speculation, so the objection is sustained.

Q.    Other than providing the money, did Jeff do anything else in relation to the production or distribution?

A.    No.

Q.    Now, at some point did you move back from Arizona to Iowa?

A.    Yes.

Q.    Do you remember when that was?

A.    Around November of '92, I think, and then I moved back to Arizona, and then I moved back in the spring of '93, I think.

Q.    Well, do you remember that you were arrested in March of '03 [sic]?

A.    Yes.

MR. WILLIAMS:  '03 or '93?

(Whereupon, counsel conferred.)

Q.    1993, I apologize.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 98 of 152
*to purchase a complete copy of the transcript.*

Thank you, Mr. Williams.

A.    Yes.

Q.    And had you been -- had you already moved back to Iowa then, or were you just here visiting when you got arrested?

A.    I was in the process of moving back.

Q.    And after -- and was Dustin also arrested around the same time?

A.    Yes.

Q.    After the 2 of you were back in Iowa, did you start working somewhere?

A.    Yes.

Q.    Where?

A.    I had -- I started at Dahl's (phonetic) Heating and Cooling when we first moved back.

Q.    And how about after that?

A.    Later I got a job at Kraft.

Q.    And was Dustin also working there?

A.    Yes.

Q.    Was -- at the time both of you had moved back to Iowa, was Dustin still using methamphetamine?

A.    Yes.

Q.    And do you know where he was getting it from?

A.    I know he got it from Angie sometimes.

Q.    Anybody else?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 99 of 152
*to purchase a complete copy of the transcript.*

A. Probably some people from work had it.

Q. Did you ever see Dustin use LSD or acid?

A. Yes.

Q. And when was that?

A. Twice I saw him do it.

Q. And where?

A. At Angie's house.

Q. Was that in that timeframe after you had moved back from Iowa?

A. Yes.

Q. Were there times when you were on pre-release [sic] and were subject to drug testing?

A. Yes.

Q. And were there times during that time period that you were still using meth -- methamphetamine?

A. Yes.

Q. And how would you deal with the drug testing during those times?

A. I didn't very often at that time. I just -- if I did it, I just let it clear out of my system.

Q. Okay. When you and Dustin were working at Kraft, did you know whether he was still using methamphetamine?

A. Yes.

Q. And how did the shifts work at Kraft?

A. They were 12-hour shifts, 4 days a week.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 84   Filed 12/07/11   Page 100 of 152

Q.      And after you worked 4 days on, how long would you have off?

A.      4 days.

Q.      And did you ever see Dustin during those 4 days off using methamphetamine?

A.      Yes.

Q.      And how much or how often?

A.      It wasn't as much as when we were in Arizona. Just didn't have it at that time.

Q.      Okay.  Now, you knew Dustin fairly well by this time, had known him for many years.  Did you notice any changes in his personality from using methamphetamine?

        MR. WILLIAMS:  Objection, calls for speculation.

        MR. NOLAN:  Well, I would say that it doesn't, Your Honor.  He knew him very well.  I've established the foundation.

        THE COURT:  Well, I'll take it subject to the objection.

        You may answer, if you remember.

A.      Could you repeat it?

Q.      Do you remember my question?  Did you note any changes in Dustin's personality from -- when using methamphetamine?

A.      I'd say some, yes.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 101 of 152

Q. Could you describe them?

A. I don't remember exactly. I know that he wanted the methamphetamine pretty bad.

Q. Are you familiar about a time when Dustin overdosed on methamphetamine?

A. Yes.

Q. Can you describe that for Her Honor?

A. He told me that he was at his mother's house and had used quite a bit, and he for several days couldn't get out of bed. Even going to the restroom was difficult.

MR. NOLAN: May I have a moment, Your Honor?

THE COURT: Yes.

(Brief pause.)

MR. NOLAN: Your Honor, I have no other questions. Thank you.

THE COURT: Cross.

MR. WILLIAMS: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Cutkomp, it's fair to say that you're very anti-death penalty, are you not, sir?

A. I am, yes.

Q. And, in fact, I think you've indicated that you've regretted that you didn't make it a condition

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM Document 84 Filed 12/07/11 Page 102 of 152

somehow of your agreement to cooperate with the government, that we not seek the death penalty?

A.    Correct.

Q.    Now, you talked about there was this car theft that Jim Honken was involved in and you drove up to Minnesota for.  How do you know he was stealing the car, other than he told you that?

A.    That's all.  Other than that -- I mean, I know he took it from a car lot.

Q.    Okay.  And did you do it in the middle of the night or something?

A.    Yes.

Q.    Okay.  All right.  Now, in -- you also testified about the stealing of the car that you and Dustin Honken were involved in.  Do you remember giving that testimony?

A.    Yes.

Q.    And was Kenny Hansen involved somehow in that as well?

A.    Yes, he was.

Q.    Didn't Dustin have a plan that -- at some point he was afraid that Kenny was going to cooperate with the government and he had a plan or talked about killing Kenny Hansen?

A.    Yes, he did.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 103 of 152
*to purchase a complete copy of the transcript.*

Q.    Now, I want to go back over a little bit the timeframe here.  Do you remember Dustin Honken worked at Wellborn Industries during about 1990 and '92?  Does that sound familiar?

A.    Yes.

Q.    And you worked there for a period of time, right?

A.    I did.

Q.    When you both worked there together, Dustin was in management, right?

A.    Yes.

Q.    And you were working the line?

A.    Yes.

Q.    Okay.  And as a general matter, you would say Dustin was kind of a controlling person, wasn't he?

A.    Yes, he was.

Q.    Very much a planner?

A.    Yes.

Q.    Really didn't like to fly by the seat of his pants on anything, did he?

A.    No.

Q.    You would say that Dustin was calm and thinks things through before he does them, doesn't he?

A.    Yes.

Q.    When you first got involved in the meth making operation down in Arizona, it was Dustin who called you

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 104 of 152

up to recruit you for that, right?

A.     Yes, he did, yes.

Q.     And, in fact, he had called you numerous times to talk you into it, and you resisted for a while?

A.     Yes.

Q.     Okay.  And then ultimately, you were having some money problems, going through a divorce, and you ultimately agreed to do it?

A.     Yes.

Q.     Okay.  You understood that your job was going to be to do the labor, actually making the methamphetamine, right?

A.     Yes.

Q.     Part of what Dustin had also set up as part of this division of duties is the apartment's going to be in your name, right?

A.     Yes.

Q.     Any ordering of chemicals and things like that, if anybody had to have their name down on anything, it was going to be your name down on paper, right?

A.     Yes.

Q.     Okay.  And you understood that Jeff's role in this was he was going to be financing the operation?

A.     Correct.

Q.     And part of that financing of the operation

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM     Document 84     Filed 12/07/11     Page 105 of 152

included paying for your food and daily living, right?

A.    Correct.

Q.    Paying for chemicals?

A.    Yes.

Q.    Paying for equipment?

A.    Yes.

Q.    Paying the rent?

A.    Yes.

Q.    Okay.  Was -- was Bruce Smidt involved at all in the methamphetamine operation?

A.    I'm not sure who -- is that his brother?

Q.    Stepbrother.

A.    Stepbrother.

Q.    An attorney up in Phoenix.

A.    As far as I know, he was not.

Q.    Okay.  It was Dustin who was the 1 who decided to make the meth down there?

A.    Yes.

Q.    And, in fact, he was the only 1 who really knew how to make meth, wasn't he?

A.    Yes.

Q.    Dustin was the 1 who decided how to set up the meth lab?

A.    Yes.

Q.    He designed the meth lab?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM   Document 84   Filed 12/07/11   Page 106 of 152

A.    Yes.

Q.    He decided what chemicals to buy?

A.    Yes.

Q.    He decided what equipment was needed?

A.    Yes.

Q.    He would sometimes have you add cut to the final product down in Arizona.  Sometimes the cut would just be sent up to Greg Nicholson to have Greg add the cut up there.  Right?

A.    Yes.

Q.    And it was Dustin who made the decision, you know, whether to add the cut down in Arizona or whether to ship it up to Iowa and have Greg add the cut later, right?

A.    Yes.

Q.    Okay.  And ultimately it was Dustin who had the connections to sell the meth back in Iowa in the first place?

A.    Yes.

Q.    He was the 1 who made the decision who was going to get the meth, right?

A.    Yes.

Q.    He decided how much they were going to get?

A.    Yes.

Q.    He decided how much was going to be charged for

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 107 of 152
*to purchase a complete copy of the transcript.*

it?

A. Yes.

Q. He was the 1 who decided whether you were going to allow these guys to owe money, right, because for a while, Terry DeGeus, for example, owed up to $30,000 at 1 point, right?

A. I don't remember the amount, but, yes.

Q. Okay. I don't want to pin you down, Tim, but he owed some large amount of money at some point, right?

A. Yes.

Q. And Dustin decided to allow them to carry a little bit of a debt, right?

A. Yes.

Q. And that was Dustin's call?

A. Yes.

Q. Okay. And then when the money would come back in to Dustin, he was the 1 who decided what to do with the money, right?

A. Yes.

Q. Now, he made some pretty big promises to you about how much money you were going to get out of this operation, right?

A. Yes.

Q. Didn't carry through with that though, did he?

A. No.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 84   Filed 12/07/11   Page 108 of 152
*to purchase a complete copy of the transcript.*

Q.     Part of this operation was that Dustin had Greg Nicholson store methamphetamine at his house, right?  At Greg's house --

A.     Yes.

Q.     -- right?  Now, he really -- he, Dustin, only really distributed to 2 people up there primarily, and that's going to be Greg Nicholson and Terry DeGeus, right?

A.     Yes.

Q.     But he didn't have Terry DeGeus come over to Greg Nicholson's house to get the meth when he needed it, did he?

A.     I don't believe so.

Q.     And the way he worked that, if Terry DeGeus needed some additional methamphetamine, Dustin would travel himself back to Iowa so he could go to Greg's house to get the methamphetamine to get it to Terry DeGeus, right?

A.     Yes.

Q.     That was a conscious decision by Dustin, that he wanted to make sure that those 2 couldn't end up working together, right?

A.     Yes.

Q.     During this meth operation from about -- well, let me back up here.  The first time you guys actually

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM   Document 84   Filed 12/07/11   Page 109 of 152

succeeded in making methamphetamine was in August of 1992, right?

A.    Yes.

Q.    Okay.  And then you continued to make meth up through, I think, February of 1993, was the last batch, before you boxed up everything.  Does that sound about right?

A.    Yes.

Q.    And during that time period, Dustin Honken made over $100,000 in drug proceeds, didn't he?

A.    Yes.

Q.    And how much of that $100,000 did you get?

A.    I don't recall the amount exactly.  A few thousand.

Q.    Okay.  And you knew that Dustin was using part of his money, the drug proceeds, to buy things for Missy Friesenborg, right?

A.    Yes.

Q.    Bought her a couch and love seat --

A.    Yes.

Q.    -- right?  Bought a very expensive stereo system?

A.    Yes.

Q.    Bought a bedroom set, really nice bedroom set?

A.    Yes.

Q.    Bought her a diamond ring?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 84   Filed 12/07/11   Page 110 of 152
*to purchase a complete copy of the transcript.*

A.    Yes.

Q.    Okay.  Now, after the arrest occurred in 1993, Dustin told you to get ahold of Missy, didn't he?

A.    Yes.

Q.    And he gave you some instructions to pass to Missy and to -- also for Missy to pass on to Jeff, right?

A.    Yes.

Q.    And those instructions were to Missy that there was some stuff hidden in her freezer, that she should get rid of it, and some boxes maybe in a den that she should destroy, right?

A.    Yes.

Q.    Okay.  And then she was supposed to pass on to Jeff that he should go down to the storage units down in Tucson and destroy all the equipment that was hidden in the -- or stored in the storage units down there, right?

            MR. NOLAN:  Objection.  That's based on hearsay, Your Honor.

            MR. WILLIAMS:  Co-conspirator hearsay exception to the --

            THE COURT:  Objection is overruled.

            MR. NOLAN:  Missy was not a co-conspirator, Your Honor.

            MR. WILLIAMS:  If I could respond, Your

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 111 of 152

Honor. The statement is made by Dustin Honken. Dustin Honken was a member of the conspiracy, made during the time of the conspiracy, in furtherance of the conspiracy.

MR. NOLAN: But the statement was made by Dustin Honken through Missy, so it's double hearsay. Her part --

THE COURT: Well, I'll take it subject to the objection. Proceed.

MR. NOLAN: Thank you.

Q. So Mr. Cutkomp, those were the instructions, right?

A. Yes.

Q. Now, you were asked some questions about the exposure to chemicals. And apparently 1 time you and Mr. Honken thought that you had been exposed to some chemicals, right? And you talked about calling the Poison Control Center and you waited around to see what would happen?

A. Yes.

Q. Okay. Anything happen?

A. No.

Q. Okay. And this was at the Tamarack Apartments where this incident occurred, right?

A. Yes.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM Document 84 Filed 12/07/11 Page 112 of 152
*to purchase a complete copy of the transcript.*

Q.     And at that location, you guys only produced 1 batch of methamphetamine, right?

A.     Yes.

Q.     And that was the smallest batch.  It was around 2 to 4 ounces of meth?

A.     Yes.

Q.     After that, you moved to the house out in the desert?

A.     Yes.

Q.     And it's out there that you were producing pounds of methamphetamine, right?

A.     Yes.

Q.     Okay.  And what happened is, once you moved out there -- that was in about September, October of 1992, right?

A.     Yes.

Q.     Okay.  And in about late October is when Missy came down from Iowa?

A.     I don't remember the -- around that time, yes.

Q.     Okay, around that timeframe.  And she -- she got set up in an apartment by Dustin, right?  It was Dustin's girlfriend.

A.     Yes.

Q.     He set her up in an apartment in Tucson?

A.     Yes.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 84   Filed 12/07/11   Page 113 of 152

Q.      That's where he ended up spending most of his time after that, right?

A.      Yes.

Q.      And, in fact, you lived out in the house by yourself from about September all the way through the time you left in March of -- or February -- I guess early March of 1993, right?

A.      I had moved back for a month or so, but, yes, other than that.

Q.      Right.  I'm sorry, Mr. Cutkomp, you did move for about a month in, like, November of 1992?

A.      Yes.

Q.      Okay.  And the rest of that time Dustin's actually living in town in Tucson with his girlfriend, Missy?

A.      Yes.

Q.      And what would happen is he would come out maybe once about a week to kind of see where the process was that you were manufacturing meth, right?

A.      About that.

Q.      Okay.  And so he would -- when he would come out the once a week, sometimes he would come out and stay just that day and turn around and go back, right?

A.      Yes.

Q.      And sometimes he'd come out and maybe stay a day

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM   Document 84   Filed 12/07/11   Page 114 of 152

or 2, right?

A.    Yes.

Q.    The rest of the time he's in Tucson, living in Tucson with Missy?

A.    Yes.

Q.    You're out in the desert making the methamphetamine?

A.    Yes.

Q.    Okay.  Now, the methamphetamine was manufactured out in the desert, actually in a shed outside the house, right?

A.    Correct.

Q.    It wasn't inside the house where you guys were living?

A.    No.

Q.    Okay.  It wasn't -- and outside this shed, the fumes could dissipate outside, in the outside air, right?

A.    Yes.

Q.    Didn't get into the house?

A.    Not much.

Q.    Okay.  Never had any instances out at the house where Dustin Honken got exposed to chemicals, right?

A.     I don't recall if he ever -- it wasn't like that other time.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 84   Filed 12/07/11   Page 115 of 152

Q.    Okay.  You don't recall any other instances where you had any concern or Dustin Honken had any concern that he had been overcome by any type of chemical exposure or anything like that, right?

A.    I don't recall that happening.

Q.    Okay.  Okay.  Now, I want to talk to you a little bit about Dustin's drug usage.  You indicated that when you were in the Tamarack Apartments and you had that first batch of methamphetamine, you used a little bit of meth at that point, right?

A.    Yes.

Q.    And how much meth do you recall on that occasion, Mr. Cutkomp, using with Dustin Honken?

A.    Whatever -- just a small amount.

Q.    Okay.  And then once you used it and found out it was good, then the rest of that was packaged up and sent up north?

A.    I don't know how much -- most of it was.

Q.    Okay.  Did you -- did you, yourself, retain any of that product for your own personal use?

A.    No.

Q.    Are you -- do you know from your own personal knowledge, personal observation, that Dustin Honken kept any of it for his own personal use?

A.    I don't recall that he did.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 84   Filed 12/07/11   Page 116 of 152
*to purchase a complete copy of the transcript.*

Q.     Okay.  So then you moved to the house in Arizona, and -- I'm sorry, out in the desert, south of Tucson, and you set up the meth lab out there.  And that takes about a month or 2 for you to actually get any product out of the first batch there, right?

A.     Yes.

Q.     And so during that time period, there's no meth use, right?

A.     I don't recall if we had any at that time, no.

Q.     Okay.  And so then sometime in September, October, somewhere in there, maybe you get your first batch of methamphetamine at the house out in Arizona, correct?

A.     Yes.

Q.     And then it's from that point up until you go back to Iowa that you're using some of the methamphetamine you actually are producing there, right?

A.     Yes.

Q.     And it's during that time period that Dustin will come out maybe once a week or so to check on you, and when he's there, sometimes he used methamphetamine with you?

A.     Yes.

Q.     Okay.  And it's during that time period that you're saying that for a day or 2 he would stay up and

use meth out at the house?

A.    Yes.

Q.    Okay.  And how many times did that happen, Mr. Cutkomp, that he would use for multiple days at a time down in Arizona?

A.    I don't recall how many times.

Q.    Okay.

A.    A few times.

Q.    A few times, okay.

A.    I don't know the amount.

Q.    All right.  And when he was using methamphet-amine, did you ever kind of keep track of how much methamphetamine he was using?

A.    Well, when he was there, I'd -- at night when I'd hear him bubbling it through the bong, I would give him a hard time that he was overusing it.

Q.    Okay.  And my question was a little different. It was poorly worded, Mr. Cutkomp.  But you never saw the actual quantity of what he was using, in the sense of how much he would put in the marijuana cigarette, for example, or how much he would put in the bong?  I mean, you never measured that out?

A.    No, I didn't.

Q.    Dustin never injected it?

A.    Not that I know of.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 84   Filed 12/07/11   Page 118 of 152
*to purchase a complete copy of the transcript.*

Q.     Now, you testified at both Dustin's trial and at Angela Johnson's trial; is that correct?

A.     I did.

Q.     Do you remember testifying there that the meth use was a line every other day when you had it?

A.     Yes.

Q.     Okay.  And you testified at Angela Johnson's trial that it was just 1 line a day.  Do you remember that?

A.     Yes.

Q.     Okay.

A.     I don't remember exactly.

          MR. NOLAN:  Can we have a reference, please?

          MR. WILLIAMS:  940, Page 940 to 941.

Q.     And this is during a cross-examination by Al Willett, counsel for Angela Johnson.  And he was going through it with you pretty carefully here, and he said, "You used it, 1 line a day, used it about 15 times a month, over about a 4-month period, for a total of about 60 times."  Do you remember giving that testimony in Angela Johnson's trial?

A.     I don't recall it, no.

Q.     Now, during the time period that -- you were down in Arizona with Dustin Honken manufacturing this methamphetamine, so let's concentrate on the time period

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 84   Filed 12/07/11   Page 119 of 152

between August of 1992 up through March of 1993, when you -- when you moved back to Iowa. We've already established most of that time Dustin is actually living in Tucson with Missy, right?

A. Yes.

Q. Okay. Now, on top of that, he's also flying back to Iowa or driving back to Iowa about every week or every other week, right?

A. Yes.

Q. Okay. And he's flying back or driving back to either deliver methamphetamine or pick up cash during that time period?

A. Yes.

Q. And when he starts on these kind of biweekly -- or bimonthly trips, I'm sorry, every other week, back to Iowa, his visits out to the house become less and less frequent, don't they?

A. Yes.

Q. All right. And so is it fair to say, Mr. Cutkomp, that there was a period kind of early on when you succeeded in manufacturing the methamphetamine out at the house in Arizona, in the desert, where there was kind of a burst of meth use by Dustin Honken, when you first started manufacturing it, but then Missy comes down and he's making the trips back to Iowa, and that

time period of him using meth heavily kind of ends after that, doesn't it?

A.    I don't know what he did when he was with Missy, but --

Q.    Okay.  But as far as your observations, he doesn't come out to the house nearly as often after that, does he?

A.    No, he does not.

Q.    Okay.  And he doesn't come out and use it for days at a time after that, does he?

A.    I don't recall it.

Q.    Now, let's go to this arrest that occurred in 1993.  Do you recall, Mr. Cutkomp, that the arrest occurred on March 21, 1993?

A.    Yes.

Q.    Okay.  And it happened while Dustin was delivering -- I'm sorry, it was at Greg Nicholson's house picking up drug proceeds, right?

A.    Yes.

Q.    And the police stopped the car, and you and Dustin were both arrested?

A.    Yes.

Q.    You're taken to the jail.  You stay a night or maybe 2 nights; you can't recall.  And then released, right?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 121 of 152

A.    Yes.

Q.    Okay.  Now, the charges stay on Dustin after that, don't they?

A.    Yes, they do.

Q.    And eventually he gets federal charges?

A.    Yes.

Q.    The charges are dropped on you pretty quickly, aren't they?

A.    Yes.

Q.    Okay.  In fact, they're -- you're only under charges for about 19 days at that point, aren't you?

A.    Yes.

Q.    And during that time period, you weren't monitored, right?

A.    No.

Q.    You didn't have to drop any urinalysis tests at that point, right?

A.    No.

Q.    You weren't ultimately charged federally on the 1993 activity at that point, right?

A.    Correct.

Q.    Okay.  You're not charged federally until 1996?

A.    Correct.

Q.    And it's at that point in 1996 that you are for the first time put on the requirement of providing urine

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 122 of 152

samples, right?

A.    Yes.

Q.    Okay.  Now, after the arrest in March of 1993,
you were living in Maxwell with your sister, right?

A.    Yes.

Q.    And you had a job?

A.    Yes.

Q.    Okay.  And between March of 1993 and the fall of
1993 you went to Mason City to see Dustin maybe once or
twice per month, right?

A.    Yes.

Q.    And he came down to Maxwell maybe once or twice
during that time period?

A.    Yes.

Q.    Otherwise you didn't have much contact during
that time period, right?

A.    Correct.

Q.    You were trying to keep some distance from him at
that point, right?

A.    Yes.

Q.    And so during that time period, between March of
1993 and the fall of 1993, you don't really know what
his drug use was during that time period, do you?

A.    No, I don't.

Q.    You never saw him use drugs during that time

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 123 of 152
*to purchase a complete copy of the transcript.*

period?

A.      I don't recall seeing him use it.

Q.      Now, you talked on direct examination about Dustin getting methamphetamine while at Kraft.  Dustin didn't start working at Kraft until January of 1994.  Does that sound right?

A.      Yes.

Q.      Okay.  And so to the extent that Dustin is getting meth there and using meth from his sources at Kraft, this is all going to postdate whatever time period that is, postdate January of 1994, right?

A.      Yes.

Q.      Okay.

THE COURT:  I think it's about time for us to break for lunch, unless you just have a few questions and we can finish with the witness.  Or do you still have a ways to go?

MR. NOLAN:  Your Honor, I did want to let the Court know, unfortunately, this was our last witness for the day.  We expected Mr. Rogers to take all morning, so perhaps we could finish with him, or we could come back.  It's totally up to Your Honor.  And I apologize for that.  We tried to schedule things the best we could.

THE COURT:  Okay.  We're going to have to go

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 84   Filed 12/07/11   Page 124 of 152
*to purchase a complete copy of the transcript.*

through your witness list. I'm getting a little concerned about getting all this in by Friday. So let's go ahead then and try to finish with Mr. Cutkomp so he can get back to whatever he was doing, and then we'll take up scheduling.

MR. WILLIAMS: Very good. And I am almost done, Your Honor. I just have a few questions.

THE COURT: All right. Thank you.

Q. Mr. Cutkomp, when -- when you were working at -- at Kraft with Dustin Honken, did you actually see him getting methamphetamine from anybody?

A. Not that I recall.

Q. Okay. And you talked about the use of acid 2 times by Dustin. This again is going to be after he's at Kraft, right?

A. Yes.

Q. Okay. Never used any acid down in Arizona?

A. No.

Q. Okay. Never used cocaine down in Arizona?

A. No.

Q. Okay. Did you ever see Dustin Honken using cocaine, by the way?

A. No.

MR. WILLIAMS: Just a moment, Your Honor. I think that's my last question.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM Document 84 Filed 12/07/11 Page 125 of 152

THE COURT:  Okay.

(Brief pause.)

Q.     Oh, just a couple things.  You were testifying about the time you spent around the Honken family. Marvea was kind of like a second mother to you, wasn't she?

A.     Yes.

Q.     And she was a pretty good mother at that, wasn't she?

A.     I thought she was, yes.

Q.     Yeah.  She was pretty attentive to the children, wasn't she?

A.     I thought so.

Q.     Attentive to you, even as a kind of a special son, in a way, right?

A.     Yes.

Q.     Was involved with her children?

A.     Yes.

Q.     Went to the school activities, that you know of?

A.     As far as I know.

Q.     Okay.  This Ron, the stepfather, kind of a quiet guy, right?

A.     Yes.

Q.     But he was pretty nice, wasn't he?

A.     I never saw him be cruel to anybody.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 84   Filed 12/07/11   Page 126 of 152

Q.     Okay.  And beyond that, Mr. Cutkomp, though -- I mean, he was a friendly guy, right?

A.     He was quiet.  I don't know.  I didn't have a whole lot to do with him, so --

MR. WILLIAMS:  Okay.  I have no further questions, Your Honor.

THE COURT:  Any redirect?

MR. NOLAN:  Just a couple, Your Honor.

REDIRECT EXAMINATION

BY MR. NOLAN:

Q.     Mr. Williams at 1 point asked you a question, which was, between September of '92 and the spring, that you were in that home south of Tucson alone.  Was it actually later than that?  Because didn't you say that Missy didn't come out until October?  Do you remember when Missy --

A.     I don't recall when she came out.

Q.     Okay.  But before the time that she came out, was Dustin living with you in the house?

A.     Yes, he must have been, yes.

Q.     During the time that you and Dustin were staying together, was he using more methamphetamine than you were?

A.     Yes.

Q.     And in what relation, like how much more than you

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 84   Filed 12/07/11   Page 127 of 152
*to purchase a complete copy of the transcript.*

were?

A.    At least twice as much.

MR. NOLAN:  Thank you.  I have nothing else, Your Honor.

THE COURT:  Anything else?

MR. WILLIAMS:  No, Your Honor.

THE COURT:  Thank you, Mr. Cutkomp.

And can he be excused?

MR. NOLAN:  Yes, Your Honor.  Thank you.

THE COURT:  Thank you, sir.

All right.  Let's get the petitioner's witness list and tell me who we have yet to cover.  This is the end of 2 days, and we only have 3 left, so I'm getting a little nervous.

MR. NOLAN:  Well, Your Honor, I'm quite sure we will finish everything.

THE COURT:  Okay.

MR. NOLAN:  In fact, we could have finished everything in a shorter timeframe, it turns out, and I apologize that we didn't anticipate this.  I expected many of these witnesses to take much longer on cross than they did.  But we certainly have plenty of time to finish everything.

THE COURT:  Okay.  And let's just go through your list.  Tell me who you are not going to call.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 84   Filed 12/07/11   Page 128 of 152

MR. NOLAN:  All right.  We are not going to call Bruce Smidt, who I believe was --

THE COURT:  Can you start on the first page so that I don't have to flip back and forth?

MR. NOLAN:  I'm sorry, Your Honor.  Let me get it.

THE COURT:  Anthony Altimus, you're not calling him.

MR. NOLAN:  No, Your Honor.  Oh, you're talking about our original witness list.  I apologize. Can I just have a moment to find that?

THE COURT:  Yeah.

I can just read them off.  Terry Bregar, he's the man in the nursing home.

MR. NOLAN:  I found it, Your Honor.  Yes, and we're going to take him tomorrow by telephone. That's been set up.

THE COURT:  Laurel Christianson.

MR. NOLAN:  That was a stipulation.

THE COURT:  Okay.  Dean Donaldson, no?

MR. NOLAN:  No.  The ones with asterisks were the ones that were subject to our previous discovery motion.

THE COURT:  All right.  Dudley is by depo?

MR. NOLAN:  Correct.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM   Document 84   Filed 12/07/11   Page 129 of 152

THE COURT: Steve Ferguson, no. Sandy Fiems?

MR. NOLAN: That was a stipulation, Your Honor.

THE COURT: All right. Missy Friesenborg?

MR. NOLAN: Yes, we had requested -- Mr. Williams agreed that we could take her out of order on Friday.

THE COURT: Okay. Dr. Gelbort?

MR. NOLAN: That's by -- that's by deposition.

THE COURT: Carol Hilgenberg?

MR. NOLAN: By stipulation.

THE COURT: Carol Honken?

MR. NOLAN: By stipulation.

THE COURT: Steve Honken?

MR. NOLAN: By stipulation.

THE COURT: Alan Johnson?

MR. NOLAN: Your Honor, we're not calling him.

THE COURT: Okay. Mark Johnson?

MR. NOLAN: That's by stipulation.

THE COURT: McGee, McNeese, and McIntosh, no. Pastor Melby?

MR. NOLAN: Your Honor, we are not

presenting him.

THE COURT: Alyssa Nelson?

MR. NOLAN: She's scheduled to be here for tomorrow, Your Honor.

THE COURT: All right. Ron Nelson?

MR. NOLAN: That's by stipulation.

THE COURT: Melissa Piasecki?

MR. NOLAN: Piasecki. She was by deposition.

THE COURT: Piasecki. Okay. Lisa Rickert?

MR. NOLAN: That was by deposition, that's completed.

THE COURT: Kathy Scheuss.

MR. NOLAN: We are presenting her tomorrow, Your Honor.

THE COURT: Okay. Marvea --

MR. NOLAN: Smidt. That's Mr. Honken's mother. She'll be here tomorrow.

THE COURT: Okay. Bruce Smidt?

MR. NOLAN: We are not presenting him. There's a possibility the government may wish to present some evidence from him.

THE COURT: Courtney Snater?

MR. NOLAN: That was a stipulation.

THE COURT: Leon's coming Friday, did you

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 131 of 152

tell me?

MR. NOLAN: Yes, although I'm still thinking we may be able to get him here earlier. I'm waiting to hear back on the status of his trial.

THE COURT: Tokars and Vest, no. John Warren?

MR. NOLAN: That was by deposition.

THE COURT: I assume you're not calling your co-counsel.

MR. NOLAN: No, Your Honor.

THE COURT: Jean Barrett?

MR. NOLAN: No.

THE COURT: Agent Basler?

MR. NOLAN: The government is considering calling Agent Basler. We are not.

THE COURT: Gary Brotherton?

MR. NOLAN: No.

THE COURT: Monica Foster?

MR. NOLAN: No.

THE COURT: John Graham and Mark Hein I think are on the government's list. Are you going to call them?

MR. NOLAN: We will not, no.

THE COURT: Jessica Johnson.

MR. NOLAN: We will not present her at this

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 132 of 152

point.  Unless something comes up tomorrow, no.

THE COURT:  Delbert King?

MR. NOLAN:  No.

THE COURT:  Lori Lewis, Sanders, and Wagner?

MR. NOLAN:  We will not present any of them.
The government may.  I think they're also on their list.

THE COURT:  All right.  That helps.

Just a reminder, I see from our scheduling
order, Honken's post-hearing brief is due December 5th,
the government's response, January 5th, and then
Honken's post-hearing reply, the 19th of January, with
oral argument on February the 17th.  I think the
post-hearing briefs are limited to 80 pages.  And if
Mr. Honken's counsel wants to file a reply, it would be
limited to 40 pages.  All those dates are of record in
Document 40 from the September 15th revision.

Any problems?

MR. WILLIAMS:  No, Your Honor.

MR. NOLAN:  No, Your Honor.

THE COURT:  Okay.  All right.  Anything else
we can tend to today?

Let's see, we don't have long witnesses
tomorrow, it doesn't look like.

MR. WILLIAMS:  Your Honor, I'm not sure how
you want to proceed, but what I could do -- I'm not sure

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 84   Filed 12/07/11   Page 133 of 152

that I can get this done, but I'll give it a shot. My guess is, we're going to take the morning tomorrow with defense witnesses and probably be in about the same position; we'll be done about noon. I'm going to see if I can't get my witnesses to get here so that I can put them on tomorrow afternoon.

THE COURT: That would be great.

MR. WILLIAMS: And then we can maybe take Thursday off at that point, because the other 2 witnesses we have left are not going to be available, I don't think, until Friday.

MR. NOLAN: Unless Mr. Spies's trial is over. Then we could get him here Thursday and maybe make attempts to get our other witness here Thursday.

THE COURT: Why don't you try to -- there's nothing you can do about Leon, but why don't you try to get Missy Friesenborg here earlier. Again, so much of what I'm hearing is what I read in the trial transcript, that -- I don't know what else she has to say, but she was a witness at trial, and I've read her testimony, so you might look at that. If there's nothing new, you could just cite me to page and verse, and I'll go back over it. But I have read the trial transcript.

MR. NOLAN: Understood, Your Honor.

THE COURT: All right. See what you can do

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 84   Filed 12/07/11   Page 134 of 152

on moving people up, except don't put any pressure on Leon. I don't know what kind of case he is trying, but I'm sure he doesn't need any more pressure.

MR. WILLIAMS: Very good.

THE COURT: All right. We'll start tomorrow at 9:00.

(Proceedings concluded at 12:11 p.m.)

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 84   Filed 12/07/11   Page 135 of 152

C E R T I F I C A T E

   I, Patrice A. Murray, a Certified Shorthand Reporter of the State of Iowa, do hereby certify that at the time and place heretofore indicated, a hearing was held before the Honorable Linda R. Reade; that I reported in shorthand the proceedings of said hearing, reduced the same to print to the best of my ability by means of computer-assisted transcription under my direction and supervision, and that the foregoing transcript is a true record of all proceedings had on the taking of said hearing at the above time and place.

   I further certify that I am not related to or employed by any of the parties to this action, and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto or financially interested in the action.

   IN WITNESS WHEREOF, I have set my hand this 6th day of December, 2011.


   /s/ Patrice A. Murray
   Patrice A. Murray, CSR, RPR, RMR, FCRR
   United States District Court, NDIA
   4200 C Street S.W.
   Cedar Rapids, Iowa 52404

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 136 of 152

**1**

| | | | |
|---|---|---|---|
| **$** | **13** [1] - 304:3 | **3** | **A** |

**$100,000** [2] - 332:10, 332:12
**$200** [2] - 289:19, 289:24
**$30,000** [1] - 330:5

**'**

**'03** [2] - 320:21, 320:23
**'86** [2] - 313:9, 313:15
**'90s** [1] - 297:4
**'91** [3] - 313:14, 313:15, 314:4
**'92** [6] - 313:14, 313:15, 314:4, 320:17, 326:3, 349:12
**'93** [2] - 320:19, 320:23
**'97** [2] - 280:9, 283:3
**'98** [1] - 263:4

**0**

**01-3047** [2] - 225:4, 279:6

**1**

**1** [54] - 225:20, 228:5, 228:6, 230:21, 231:16, 236:3, 238:12, 238:22, 239:1, 239:8, 245:18, 247:1, 247:11, 247:17, 249:20, 250:5, 254:14, 257:16, 261:8, 264:6, 267:13, 270:5, 270:15, 271:21, 272:5, 274:20, 280:24, 281:17, 283:11, 289:15, 291:5, 298:9, 298:23, 298:24, 300:12, 302:10, 303:9, 305:18, 309:4, 315:2, 318:23, 328:16, 328:19, 328:22, 329:20, 330:3, 330:6, 330:17, 334:15, 335:1, 341:8, 341:18, 349:11
**10** [1] - 249:16
**10-3074** [2] - 225:4, 279:6
**100** [7] - 254:9, 254:15, 254:19, 255:20, 275:17, 275:22
**106** [1] - 246:19
**1097** [1] - 237:17
**11:00** [1] - 279:1
**12-hour** [1] - 322:25
**12.2** [3] - 243:11, 249:25, 262:19
**12.2(b** [1] - 250:1
**120** [1] - 297:13
**122** [1] - 281:11
**124** [2] - 286:1, 286:23
**12:11** [1] - 357:7

**133** [1] - 300:23
**15** [2] - 249:14, 341:18
**15th** [1] - 355:16
**16** [1] - 309:23
**17** [1] - 227:13
**17th** [1] - 355:12
**18** [1] - 310:11
**19** [3] - 274:8, 310:11, 344:11
**1976** [1] - 227:5
**1977** [1] - 276:23
**1979** [1] - 228:4
**1980** [2] - 228:3, 228:5
**1984** [1] - 228:9
**1990** [1] - 326:3
**1992** [4] - 332:2, 335:14, 336:11, 342:1
**1993** [14] - 236:19, 320:25, 332:5, 333:2, 336:7, 342:1, 343:13, 343:14, 344:20, 345:3, 345:8, 345:9, 345:22
**1994** [3] - 227:20, 346:5, 346:11
**1995** [2] - 227:20, 236:19
**1996** [3] - 300:3, 344:22, 344:24
**1997** [3] - 262:22, 264:17, 277:12
**1998** [5] - 252:7, 253:9, 256:3, 256:6, 256:11
**19th** [2] - 278:7, 355:11

**2**

**2** [34] - 231:8, 237:6, 245:2, 249:3, 257:2, 260:4, 260:5, 260:7, 274:17, 274:19, 274:25, 276:12, 276:16, 280:17, 280:24, 284:10, 285:11, 289:15, 295:8, 297:16, 297:18, 315:6, 315:24, 321:10, 331:6, 331:21, 335:4, 337:1, 339:4, 339:25, 343:24, 347:13, 350:13, 356:9
**20** [2] - 249:14, 279:1
**2003** [1] - 228:18
**2004** [14] - 228:10, 228:13, 228:19, 249:25, 250:22, 252:1, 256:13, 256:18, 263:10, 274:8, 274:20, 274:21, 281:1, 306:17
**2007** [1] - 258:18
**2095** [1] - 295:4
**2099** [1] - 291:3
**21** [2] - 274:20, 343:14
**22** [1] - 274:21
**23** [1] - 247:9
**24** [1] - 295:4
**271** [1] - 237:17
**2d** [1] - 237:17

**3** [11] - 231:6, 241:10, 241:25, 249:20, 260:7, 285:11, 289:15, 296:16, 298:10, 315:6, 350:13
**30** [1] - 303:13
**32** [2] - 297:11, 303:6
**35** [1] - 227:5

**4**

**4** [11] - 228:5, 228:6, 283:15, 289:15, 299:2, 301:10, 322:25, 323:1, 323:3, 323:4, 335:5
**4-month** [1] - 341:19
**40** [2] - 355:15, 355:16

**5**

**5** [9] - 240:7, 247:12, 249:20, 280:17, 283:15, 299:2, 301:5, 301:9, 301:13
**524** [1] - 247:8
**53** [7] - 261:17, 261:18, 262:1, 262:12, 276:14
**5th** [2] - 355:9, 355:10

**6**

**6** [2] - 249:24, 281:20
**60** [1] - 341:20
**608** [1] - 260:19

**7**

**7** [3] - 244:16, 258:3, 259:9
**72** [6] - 259:18, 259:19, 261:1, 261:20, 261:21, 261:22
**72A** [1] - 261:1

**8**

**8** [2] - 249:16, 258:18
**80** [1] - 355:13

**9**

**9** [2] - 238:20, 249:23
**918** [5] - 260:23, 261:8, 261:12, 262:12, 276:13
**940** [2] - 341:14
**941** [1] - 341:14
**9:00** [2] - 225:24, 357:6

**ABA** [1] - 273:3
**ability** [2] - 268:17, 269:12
**able** [2] - 250:23, 354:3
**absence** [1] - 250:16
**absolutely** [2] - 225:25, 268:10
**accept** [3] - 260:11, 274:14, 275:2
**access** [3] - 250:8, 250:17, 275:6
**according** [3] - 247:20, 272:10, 278:8
**account** [1] - 269:2
**accuracy** [1] - 233:22
**accurate** [1] - 282:3
**accused** [1] - 297:10
**accustomed** [1] - 286:14
**acid** [3] - 322:2, 347:13, 347:17
**acting** [1] - 311:17
**activities** [5] - 291:14, 294:2, 294:6, 308:25, 348:19
**activity** [1] - 344:20
**actual** [4] - 254:9, 277:25, 301:9, 340:19
**actuarial** [1] - 246:4
**add** [4] - 329:6, 329:8, 329:12, 329:13
**addition** [1] - 265:2
**additional** [3] - 226:6, 279:7, 331:15
**adequate** [1] - 245:8
**adequately** [1] - 238:18
**Adjoian** [2] - 296:15, 296:17
**ADJOIAN** [11] - 279:8, 279:17, 285:24, 286:17, 288:21, 291:2, 291:4, 293:11, 293:13, 294:25, 295:15
**administration** [1] - 229:23
**administrative** [1] - 231:23
**admissible** [1] - 252:22
**admission** [2] - 239:15, 252:7
**admit** [1] - 247:17
**adverse** [2] - 252:13, 256:2
**affect** [1] - 271:5
**affected** [3] - 268:17, 269:12, 311:23
**affirmed** [4] - 226:13, 279:13, 296:3, 306:4
**afraid** [6] - 242:16, 242:19, 243:1, 264:3, 264:4, 325:22
**afternoon** [1] - 356:6
**agent** [2] - 303:5, 354:13
**Agent** [1] - 354:15

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 137 of 152

**agents** [8] - 282:14, 283:10, 284:21, 289:5, 292:13, 292:17, 292:19, 292:22

**aggravating** [1] - 246:24

**ago** [2] - 233:6, 297:3

**agree** [8] - 252:20, 253:8, 255:17, 261:7, 261:21, 265:3, 268:9, 271:2

**agreed** [3] - 275:17, 327:8, 352:7

**agreement** [20] - 254:14, 254:21, 259:12, 259:16, 259:24, 260:8, 261:7, 261:22, 261:24, 262:5, 276:18, 286:21, 286:23, 287:16, 290:17, 290:20, 291:12, 291:24, 294:1, 325:1

**ahead** [2] - 268:23, 347:3

**ahold** [2] - 303:12, 333:3

**air** [2] - 251:9, 337:17

**Al** [2] - 267:6, 341:15

**Alan** [1] - 352:18

**alcohol** [2] - 311:6, 312:19

**alert** [1] - 270:22

**allegation** [1] - 275:25

**alleged** [2] - 236:12, 260:7

**allow** [3] - 319:23, 330:4, 330:11

**allowed** [1] - 319:15

**almost** [6] - 227:7, 227:24, 244:13, 264:15, 264:18, 347:6

**alone** [1] - 349:13

**Altimus** [1] - 351:7

**Alyssa** [3] - 308:4, 308:5, 353:2

**America** [1] - 279:6

**amine** [2] - 337:7, 340:12

**amount** [6] - 298:16, 330:7, 330:9, 332:13, 338:14, 340:10

**Angela** [5] - 240:10, 341:2, 341:7, 341:16, 341:21

**Angie** [3] - 300:4, 302:9, 321:24

**Angie's** [1] - 322:7

**answer** [9] - 257:7, 262:11, 285:23, 293:15, 293:17, 295:7, 304:7, 320:6, 323:20

**answered** [2] - 291:16, 291:20

**answering** [1] - 285:18

**answers** [1] - 283:22

**Anthony** [3] - 279:9, 279:20, 351:7

**ANTHONY** [1] - 279:12

**anti** [1] - 324:22

**anti-death** [1] - 324:22

**anticipate** [1] - 350:20

**antisocial** [7] - 242:20,

242:25, 244:7, 263:23, 264:13, 264:18, 266:16

**anyway** [1] - 276:3

**apartment** [6] - 314:25, 316:4, 318:18, 335:21, 335:24

**apartment's** [1] - 327:15

**Apartments** [4] - 314:19, 314:22, 334:23, 338:8

**apologize** [5] - 285:24, 320:25, 346:23, 350:20, 351:10

**appeal** [3] - 240:13, 245:15, 258:12

**appealed** [1] - 259:2

**appearance** [1] - 266:16

**appellate** [4] - 227:23, 258:11, 276:8, 276:10

**applicable** [1] - 231:4

**approach** [7] - 239:2, 246:4, 260:13, 282:9, 286:18, 294:25, 300:13

**approached** [3] - 232:7, 282:10, 302:16

**area** [4] - 229:13, 240:18, 244:15, 250:12

**argue** [1] - 275:18

**arguing** [1] - 256:25

**argument** [5] - 238:15, 245:1, 255:24, 256:4, 355:12

**argumentative** [2] - 248:6, 248:7

**Arizona** [18] - 313:11, 313:19, 314:4, 314:7, 319:4, 320:13, 320:18, 323:8, 326:25, 329:7, 329:12, 339:1, 339:12, 340:5, 341:24, 342:22, 347:17, 347:19

**arose** [1] - 235:11

**arrest** [4] - 333:2, 343:12, 343:13, 345:3

**arrested** [5] - 310:8, 320:20, 321:5, 321:7, 343:21

**arson** [1] - 309:25

**aspects** [2] - 232:21, 238:19

**asserting** [1] - 237:20

**assigned** [1] - 285:15

**assignment** [2] - 246:11, 246:15

**assist** [1] - 314:8

**assistance** [3] - 238:17, 239:14, 261:15

**associate** [1] - 243:2

**Associates** [3] - 264:5, 264:8, 264:10

**assume** [4] - 251:23, 271:6, 312:24, 354:8

**assumed** [2] - 231:14, 304:11

**assuming** [1] - 273:17

**assumption** [1] - 232:5

**asterisks** [1] - 351:21

**ate** [2] - 307:10, 307:11

**attempt** [1] - 245:14

**attempts** [1] - 356:14

**attentive** [2] - 348:11, 348:14

**Attorney** [1] - 229:23

**attorney** [10] - 227:3, 227:4, 230:8, 285:18, 285:20, 290:12, 290:16, 292:12, 328:14

**Attorney's** [2] - 291:19, 303:14

**attorneys** [1] - 231:21

**August** [2] - 332:1, 342:1

**authorization** [1] - 229:25

**authorized** [2] - 230:2, 230:4

**available** [2] - 233:9, 356:10

**avoid** [1] - 253:5

**awake** [1] - 318:9

**aware** [30] - 230:22, 236:4, 236:9, 236:16, 237:1, 237:9, 238:9, 240:3, 244:5, 244:17, 244:18, 256:6, 256:10, 256:12, 256:18, 256:21, 257:1, 257:4, 257:16, 262:21, 263:25, 264:20, 264:23, 265:11, 271:4, 274:10, 275:21, 277:10, 277:22, 298:12

## B

**background** [2] - 266:6, 268:5

**backwards** [1] - 249:13

**bad** [5] - 239:24, 261:11, 261:13, 324:3

**Barrett** [1] - 354:11

**Based** [1] - 287:4

**based** [4] - 235:23, 266:22, 266:25, 333:18

**basement** [1] - 303:15

**basic** [1] - 265:13

**basis** [5] - 235:7, 235:10, 237:9, 245:8, 270:10

**Basler** [2] - 354:13, 354:15

**batch** [7] - 315:13, 332:5, 335:2, 335:4, 338:9, 339:5, 339:12

**became** [2] - 307:3, 308:17

**become** [4] - 228:10, 242:17, 282:9, 342:16

**bed** [1] - 324:10

**bedroom** [2] - 332:23

**bedrooms** [1] - 315:2

**beer** [2] - 311:12, 312:19

**beginning** [1] - 284:19

**begins** [1] - 295:5

**behalf** [3] - 239:16, 281:4, 283:6

**behind** [1] - 310:23

**Beje** [3] - 297:7, 297:13, 303:25

**belief** [1] - 238:9

**bell** [1] - 293:6

**benefit** [2] - 266:18, 292:3

**benefited** [2] - 262:1, 262:2

**benefits** [1] - 292:5

**Bennett** [12] - 231:24, 235:24, 236:15, 236:16, 236:21, 237:2, 237:11, 238:10, 246:20, 256:3, 257:20, 275:13

**Bennett's** [1] - 264:24

**best** [3] - 282:3, 282:21, 346:24

**better** [4] - 243:8, 283:23, 300:18, 307:3

**between** [9] - 239:18, 243:10, 249:14, 267:6, 269:5, 342:1, 345:8, 345:21, 349:12

**beyond** [3] - 257:19, 277:3, 349:1

**big** [5] - 250:22, 265:8, 265:25, 298:25, 330:20

**bikers** [1] - 299:2

**bimonthly** [1] - 342:15

**birth** [1] - 308:19

**bit** [17] - 234:13, 258:23, 258:25, 262:18, 262:20, 268:8, 293:3, 299:6, 299:7, 302:8, 311:9, 324:9, 326:1, 330:12, 338:7, 338:9

**biweekly** [1] - 342:14

**blanked** [1] - 253:5

**bong** [3] - 318:13, 340:15, 340:21

**BOP** [2] - 246:2, 278:10

**border** [1] - 229:4

**boss** [2] - 319:16, 319:24

**bossing** [1] - 319:9

**bottom** [4] - 281:21, 282:1, 284:11, 295:3

**bought** [7] - 284:23, 289:18, 289:23, 332:19, 332:21, 332:23, 332:25

**boxed** [1] - 332:6

**boxes** [2] - 258:22, 333:11

**boy** [1] - 308:9

**boys** [1] - 307:8

**bragged** [1] - 255:14

**break** [1] - 346:15

**Bregar** [1] - 351:13

**Brian** [1] - 300:6

**brief** [4] - 225:7, 272:20, 279:3, 355:9

**Brief** [4] - 248:14, 305:7, 324:14, 348:2

**briefly** [4] - 244:15,

Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 138 of 152

244:20, 293:11, 293:18
**briefs** [1] - 355:13
**bring** [1] - 225:20
**bringing** [1] - 256:23
**Britt** [2] - 313:22, 314:1
**brother** [4] - 307:17, 308:5, 314:14, 328:11
**Brotherton** [1] - 354:16
**brought** [9] - 228:22, 228:24, 230:25, 280:11, 282:19, 283:1, 287:20, 287:22, 294:5
**Bruce** [3] - 328:9, 351:2, 353:19
**bubbling** [2] - 318:13, 340:15
**bunch** [1] - 298:21
**bunches** [1] - 268:7
**burden** [2] - 257:13, 275:23
**Bureau** [4] - 246:1, 246:17, 262:23, 264:16
**burst** [1] - 342:23
**buy** [3] - 298:16, 329:2, 332:16
**buying** [1] - 284:4
**BY** [10] - 226:22, 248:21, 273:2, 279:17, 288:24, 293:13, 296:7, 306:12, 324:20, 349:10

**C**

**C.J** [1] - 288:25
**calm** [1] - 326:21
**cam** [1] - 303:16
**cam-corders** [1] - 303:16
**camper** [13] - 284:4, 284:24, 285:2, 287:8, 287:13, 288:13, 289:17, 289:18, 289:21, 289:23, 290:10, 294:6, 294:9
**cannot** [1] - 244:23
**capacities** [1] - 227:15
**capacity** [2] - 253:10, 269:21
**capital** [26] - 227:9, 227:17, 227:25, 228:2, 228:8, 229:1, 229:18, 229:20, 230:3, 230:4, 230:12, 230:15, 230:23, 230:24, 231:5, 231:8, 232:14, 249:11, 250:2, 250:9, 253:25, 255:19, 264:12, 276:23, 277:4
**Capital** [1] - 227:16
**caps** [1] - 317:3
**car** [6] - 310:8, 325:4, 325:6, 325:9, 325:14, 343:20
**cards** [1] - 299:6
**career** [2] - 227:13, 249:12
**carefully** [1] - 341:17

**Carol** [2] - 352:12, 352:14
**carry** [2] - 330:11, 330:24
**Case** [2] - 225:4, 279:6
**case** [59] - 228:8, 228:23, 228:24, 229:1, 229:3, 229:7, 229:14, 229:15, 229:18, 229:19, 229:20, 230:7, 230:17, 230:18, 230:21, 232:20, 233:1, 233:7, 234:23, 234:24, 236:11, 239:7, 240:11, 240:12, 240:13, 244:3, 248:2, 249:8, 250:6, 250:9, 250:13, 250:16, 250:21, 251:13, 253:15, 253:25, 255:19, 256:7, 256:11, 256:12, 256:13, 256:18, 256:21, 257:1, 257:16, 258:13, 258:24, 259:1, 262:17, 264:22, 267:2, 267:14, 267:22, 269:9, 271:15, 275:15, 277:4, 357:2
**cases** [11] - 227:9, 228:8, 231:5, 249:11, 249:19, 249:20, 249:22, 249:23, 250:2, 264:3, 270:20
**cash** [1] - 342:11
**categories** [3] - 249:18, 260:4, 260:5
**CCE** [7] - 235:11, 235:15, 235:16, 236:13, 236:17, 254:1, 254:3
**CCEs** [1] - 235:17
**Center** [2] - 227:17, 334:18
**centers** [1] - 227:21
**certainly** [9] - 232:20, 237:10, 239:4, 239:22, 244:13, 247:20, 248:13, 272:2, 350:22
**chance** [1] - 265:1
**changes** [4] - 233:23, 235:2, 323:12, 323:23
**characteristics** [1] - 265:19
**characterize** [1] - 263:24
**charge** [3] - 235:20, 237:24, 254:12
**charged** [10] - 253:25, 287:22, 288:3, 288:6, 288:9, 288:12, 297:10, 329:25, 344:19, 344:22
**charges** [19] - 235:12, 256:23, 280:12, 280:13, 280:16, 285:5, 286:25, 287:8, 287:15, 287:16, 287:18, 287:20, 288:16, 290:1, 344:2, 344:5, 344:7, 344:11
**Charles** [2] - 226:8, 227:1
**CHARLES** [1] - 226:12
**check** [1] - 339:20
**chemical** [1] - 338:3

**chemicals** [6] - 327:18, 328:3, 329:2, 334:15, 334:17, 337:23
**chemist** [1] - 253:14
**childhood** [3] - 265:12, 266:4, 266:6
**children** [2] - 348:11, 348:17
**Christianson** [1] - 351:18
**Christmas** [1] - 283:4
**cigarette** [1] - 340:20
**circled** [1] - 261:21
**circulated** [1] - 234:25
**circumstances** [2] - 251:6, 261:4
**cite** [1] - 356:22
**City** [11] - 228:7, 253:15, 258:21, 280:6, 282:17, 282:19, 283:2, 297:8, 299:1, 303:15, 345:9
**claim** [15] - 237:6, 237:9, 239:8, 239:14, 240:4, 240:5, 240:8, 244:18, 244:25, 252:5, 252:11, 252:14, 258:4, 258:9, 276:17
**Claim** [10] - 237:6, 238:12, 238:20, 239:1, 239:8, 240:7, 244:16, 257:2, 258:3, 259:9
**claims** [1] - 255:24
**Clark** [3] - 297:7, 297:13, 303:25
**classification** [13] - 246:10, 247:7, 247:18, 247:22, 247:25, 248:3, 271:8, 271:11, 271:19, 272:3, 272:8, 272:11
**clause** [1] - 237:21
**clear** [6] - 242:23, 251:8, 258:1, 270:8, 275:10, 322:20
**CLERK** [4] - 226:15, 279:15, 296:5, 306:6
**client** [1] - 273:10
**Clinton** [1] - 229:23
**close** [1] - 232:8
**closer** [1] - 308:17
**co** [5] - 238:5, 245:2, 333:20, 333:23, 354:9
**co-conspirator** [2] - 333:20, 333:23
**co-counsel** [3] - 238:5, 245:2, 354:9
**Cobeen** [12] - 295:23, 296:8, 296:11, 296:12, 300:21, 300:22, 301:5, 301:12, 301:23, 302:11, 303:19, 304:5
**COBEEN** [1] - 296:2
**cocaine** [2] - 347:19, 347:22
**collateral** [12] - 235:23, 237:21, 238:6, 256:9,

256:16, 257:11, 257:15, 275:19, 275:23, 276:25, 277:12
**collaterally** [4] - 256:1, 256:23, 256:24, 257:18
**cologist** [1] - 243:23
**Colorado** [1] - 246:12
**coming** [6] - 252:17, 278:24, 287:8, 296:18, 310:21, 353:25
**comment** [2] - 285:2, 285:7
**comments** [1] - 289:6
**commit** [1] - 268:24
**committed** [1] - 269:11
**communicate** [1] - 241:9
**communication** [1] - 241:8
**community** [1] - 264:11
**complete** [1] - 285:22
**completed** [2] - 285:19, 353:12
**complied** [1] - 284:13
**conceding** [1] - 267:21
**concentrate** [1] - 341:25
**concept** [2] - 235:23, 238:6
**concern** [7] - 265:2, 266:1, 267:2, 267:11, 267:12, 338:2
**concerned** [3] - 242:24, 265:4, 347:2
**concerns** [1] - 263:13
**concluded** [1] - 357:7
**condition** [2] - 311:15, 324:25
**conduct** [1] - 235:12
**conducted** [1] - 250:18
**conference** [3] - 225:9, 225:17, 229:25
**conferred** [1] - 320:24
**confronted** [1] - 304:8
**confused** [2] - 278:9, 286:16
**confusion** [1] - 301:9
**Congress** [1] - 227:21
**congruent** [2] - 267:15, 267:17
**connection** [1] - 236:7
**connections** [1] - 329:17
**cons** [1] - 263:16
**conscious** [2] - 236:3, 331:20
**consider** [2] - 244:23, 245:12
**consideration** [2] - 238:4, 239:18
**considered** [2] - 244:11, 263:8
**considering** [1] - 354:14
**consistent** [2] - 267:16, 273:9
**conspiracies** [1] - 235:17
**conspiracy** [17] - 235:7,

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 139 of 152

235:8, 235:9, 235:15, 235:16, 236:8, 236:23, 237:24, 253:25, 254:7, 254:10, 254:13, 254:22, 255:21, 334:2, 334:3, 334:4

**conspirator** [2] - 333:20, 333:23

**consultant** [1] - 260:9

**consulted** [2] - 232:13, 232:17

**contact** [3] - 249:7, 270:15, 345:15

**contacted** [3] - 229:15, 273:7, 282:12

**contacts** [1] - 283:19

**contested** [1] - 267:19

**context** [3] - 236:10, 264:24, 277:3

**continue** [3] - 231:10, 279:5, 313:16

**continued** [2] - 231:12, 332:4

**continuing** [5] - 235:9, 236:5, 236:7, 236:22, 247:4

**Control** [2] - 319:2, 334:18

**controlling** [1] - 326:14

**conversation** [3] - 276:8, 278:1, 290:15

**conversations** [1] - 258:11

**convicted** [1] - 246:5

**conviction** [3] - 227:18, 252:8, 252:22

**convinced** [1] - 263:21

**Cooling** [1] - 321:15

**cooperate** [2] - 325:1, 325:22

**cooperating** [2] - 299:23, 299:25

**cooperation** [2] - 292:3, 304:23

**copies** [1] - 300:23

**copy** [5] - 234:6, 248:24, 286:15, 300:16, 300:24

**corders** [1] - 303:16

**corner** [1] - 301:16

**correct** [21] - 225:13, 225:14, 225:18, 249:6, 249:10, 254:17, 290:14, 291:16, 291:20, 294:4, 297:25, 325:3, 327:24, 328:2, 337:12, 339:13, 341:2, 344:21, 344:23, 345:17, 351:25

**couch** [1] - 332:19

**couched** [1] - 267:14

**counsel** [34] - 225:5, 225:7, 229:12, 229:17, 229:18, 231:2, 231:3, 231:4, 231:22, 238:5, 238:17, 239:15, 239:18, 241:3, 243:10, 244:17, 245:2, 249:1, 255:24, 257:25, 258:12, 259:10, 261:15, 266:19, 273:4, 276:9, 276:10, 276:24, 300:24, 320:24, 341:16, 354:9, 355:14

**counsel's** [1] - 269:10

**counting** [1] - 249:20

**counts** [2] - 235:11, 236:13

**County** [5] - 280:6, 280:11, 280:23, 291:11, 293:24

**county** [1] - 282:22

**couple** [8] - 228:16, 234:2, 258:5, 259:4, 259:11, 299:2, 348:3, 349:8

**course** [1] - 235:12

**court** [1] - 225:1

**Court** [7] - 236:24, 251:13, 274:11, 274:23, 300:21, 300:23, 346:19

**COURT** [107] - 225:2, 225:15, 225:19, 225:25, 226:3, 226:5, 226:9, 226:11, 226:18, 226:20, 236:24, 238:25, 239:4, 248:7, 248:13, 248:18, 257:6, 260:14, 272:19, 272:22, 273:25, 278:16, 278:18, 278:20, 278:25, 279:4, 279:10, 285:16, 286:13, 286:19, 293:10, 295:1, 295:16, 295:18, 295:22, 295:24, 300:15, 300:18, 300:25, 301:4, 301:8, 305:5, 305:9, 305:13, 305:16, 305:20, 305:23, 306:1, 306:7, 306:9, 319:19, 320:5, 323:18, 324:13, 324:17, 333:22, 334:8, 346:14, 346:25, 347:8, 348:1, 349:7, 350:5, 350:7, 350:10, 350:17, 350:24, 351:3, 351:7, 351:12, 351:18, 351:20, 351:24, 352:1, 352:5, 352:9, 352:12, 352:14, 352:16, 352:18, 352:21, 352:23, 353:2, 353:5, 353:7, 353:10, 353:13, 353:16, 353:19, 353:23, 353:25, 354:5, 354:8, 354:11, 354:13, 354:16, 354:18, 354:20, 354:24, 355:2, 355:4, 355:7, 355:20, 356:7, 356:15, 356:25, 357:5

**Courthouse** [1] - 303:15

**Courtney** [1] - 353:23

**courtroom** [1] - 225:8

**Courts** [1] - 251:19

**cover** [1] - 350:12

**covered** [1] - 291:22

**CR** [2] - 225:4, 279:6

**crash** [1] - 310:23

**created** [1] - 250:8

**crime** [1] - 268:11

**criminal** [8] - 227:8, 227:12, 227:24, 235:9, 235:10, 236:5, 236:7, 236:22

**Criminal** [1] - 243:11

**cross** [5] - 248:18, 293:15, 324:17, 341:15, 350:21

**CROSS** [3] - 248:20, 288:23, 324:19

**cross-examination** [3] - 248:18, 293:15, 341:15

**CROSS-EXAMINATION** [3] - 248:20, 288:23, 324:19

**crossed** [1] - 229:6

**cruel** [1] - 348:25

**Cunningham** [8] - 245:19, 245:22, 245:23, 246:3, 271:8, 272:4, 272:10, 272:15

**Cunningham's** [1] - 247:21

**current** [4] - 227:22, 277:3, 281:4, 281:7

**custody** [9] - 246:10, 246:12, 246:13, 247:7, 247:18, 247:22, 247:25, 248:3

**cut** [6] - 304:6, 329:6, 329:7, 329:8, 329:12, 329:13

**Cutkomp** [16] - 255:6, 305:24, 306:13, 306:15, 324:21, 334:11, 336:10, 338:13, 340:4, 340:18, 342:20, 343:13, 347:3, 347:9, 349:1, 350:7

**CUTKOMP** [1] - 306:3

**cutting** [2] - 317:16, 317:21

**CV** [2] - 225:4, 279:6

## D

**dad** [2] - 311:24, 312:25

**Dahl's** [1] - 321:14

**daily** [1] - 328:1

**damage** [1] - 267:24

**damaged** [1] - 269:4

**damaging** [2] - 265:14, 266:4

**Dan** [1] - 264:9

**danger** [4] - 246:2, 246:25, 247:23, 272:13

**dangerous** [2] - 247:20, 247:24

**dangerousness** [3] - 247:13, 247:19, 272:9

**DANIEL** [1] - 296:2

**Daniel** [3] - 243:3, 295:23, 296:11

**Darla** [1] - 300:4

**data** [2] - 276:25, 277:12

**date** [3] - 274:7, 278:4, 278:7

**dates** [6] - 274:17, 274:19, 274:25, 297:2, 355:15

**days** [14] - 230:1, 274:25, 297:13, 317:24, 318:6, 322:25, 323:1, 323:3, 323:4, 324:9, 340:4, 343:10, 344:11, 350:13

**DCI** [2] - 283:9, 303:16

**dead** [1] - 255:3

**deadline** [1] - 274:15

**deadlines** [2] - 251:13, 251:19

**deal** [5] - 227:24, 230:5, 294:16, 308:8, 322:17

**deals** [1] - 250:1

**dealt** [2] - 266:16, 299:1

**Dean** [1] - 351:20

**death** [14] - 228:3, 229:6, 229:9, 229:10, 229:11, 244:24, 255:2, 259:14, 259:21, 261:3, 262:13, 269:5, 324:22, 325:2

**debt** [1] - 330:12

**December** [1] - 355:9

**decide** [1] - 243:6

**decided** [11] - 237:11, 275:9, 328:16, 328:22, 329:2, 329:4, 329:23, 329:25, 330:3, 330:11, 330:17

**deciding** [1] - 269:5

**decision** [12] - 232:1, 241:21, 241:24, 242:12, 242:15, 273:12, 273:14, 277:19, 277:20, 329:11, 329:20, 331:20

**decisions** [4] - 241:15, 241:18, 268:18, 269:13

**declaration** [7] - 233:17, 233:19, 234:1, 248:24, 281:3, 281:6, 284:11

**declarations** [2] - 244:2, 266:24

**defect** [1] - 269:1

**defects** [1] - 269:12

**defendant** [6] - 229:3, 246:25, 251:22, 254:14, 262:1, 262:2

**defendant's** [1] - 229:2

**defendants** [3] - 229:8, 264:12

**defender** [3] - 303:22, 303:23, 304:15

**Defender** [1] - 227:14

**Defender's** [1] - 228:7

**defense** [26] - 227:8, 227:12, 227:24, 250:9, 251:14, 251:15, 251:19, 257:2, 259:12, 260:6, 263:1, 264:11, 265:6,

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

265:16, 267:4, 267:8, 267:10, 268:20, 269:15, 269:17, 272:2, 279:8, 281:4, 281:7, 293:20, 356:3
**defer** [1] - 231:8
**definition** [1] - 254:12
**DeGeus** [5] - 330:5, 331:7, 331:10, 331:14, 331:18
**degree** [1] - 250:7
**Delbert** [1] - 355:2
**deliver** [1] - 342:11
**delivered** [3] - 284:24, 289:25, 290:8
**delivering** [2] - 294:6, 343:17
**den** [1] - 333:11
**depo** [1] - 351:24
**deposition** [4] - 352:11, 353:9, 353:11, 354:7
**depth** [1] - 266:9
**Des** [1] - 314:2
**describe** [5] - 318:1, 318:3, 318:21, 324:1, 324:7
**desert** [5] - 335:8, 337:6, 337:10, 339:2, 342:22
**designated** [1] - 264:21
**designed** [1] - 328:25
**destroy** [2] - 333:12, 333:16
**detail** [2] - 235:4, 262:20
**details** [1] - 302:24
**determination** [3] - 257:12, 275:20, 275:21
**determine** [1] - 272:9
**determined** [1] - 237:23
**devastating** [1] - 264:2
**developed** [1] - 244:9
**diagnosed** [1] - 244:6
**diagnosing** [1] - 277:8
**diamond** [1] - 332:25
**Dietz** [6] - 243:2, 264:4, 264:8, 264:9, 264:10, 264:21
**different** [3] - 260:17, 292:19, 340:17
**difficult** [2] - 285:17, 324:11
**direct** [6] - 248:25, 270:1, 271:12, 284:10, 287:2, 346:3
**DIRECT** [4] - 226:21, 279:16, 296:6, 306:11
**directly** [2] - 233:6, 253:12
**disabilities** [1] - 277:8
**disappeared** [1] - 299:4
**disclosure** [2] - 250:1, 263:14
**discoverable** [1] - 242:17
**discovery** [1] - 351:23
**discussed** [1] - 263:16
**discusses** [1] - 273:4
**discussing** [1] - 259:1
**discussion** [13] - 238:4, 238:7, 239:17, 239:21, 239:22, 242:11, 243:10, 243:15, 243:18, 267:6, 267:11, 267:13, 294:16
**discussions** [3] - 257:24, 257:25, 263:9
**disease** [1] - 269:21
**Disneyland** [2] - 230:18, 230:20
**disorder** [5] - 244:7, 263:23, 264:13, 264:18, 266:17
**dispute** [2] - 253:17, 262:24
**dissipate** [1] - 337:17
**distance** [1] - 345:18
**distribute** [2] - 254:15, 298:24
**distributed** [1] - 331:6
**distribution** [1] - 320:11
**District** [3] - 228:18, 229:1, 303:14
**division** [1] - 327:15
**divorce** [1] - 327:7
**divorced** [1] - 308:21
**Docket** [1] - 247:8
**doctor** [1] - 264:10
**Document** [1] - 355:16
**document** [10] - 233:16, 239:12, 281:12, 281:16, 281:24, 286:2, 286:6, 286:9, 286:10, 286:16
**documents** [4] - 234:22, 234:23, 258:22
**Dodge** [1] - 279:22
**DOJ** [1] - 229:25
**Donaldson** [1] - 351:20
**done** [12] - 227:10, 227:12, 227:22, 244:13, 264:23, 273:15, 276:22, 294:22, 301:22, 347:7, 356:1, 356:4
**door** [1] - 303:17
**double** [8] - 234:14, 234:16, 235:20, 237:7, 237:12, 237:21, 255:23, 334:6
**doubt** [5] - 243:8, 257:19, 268:2, 268:12, 268:25
**down** [28] - 267:7, 278:18, 281:18, 282:19, 283:2, 286:5, 292:12, 295:19, 304:5, 305:9, 326:25, 327:19, 327:20, 328:17, 329:7, 329:12, 330:8, 333:15, 333:17, 335:18, 340:5, 341:23, 342:25, 345:12, 347:17, 347:19
**Dr** [24] - 242:3, 243:2, 243:19, 243:20, 244:6, 245:19, 245:21, 245:23, 246:3, 247:20, 264:6, 270:15, 271:8, 272:4, 272:10, 272:15, 273:16, 273:19, 273:20, 274:6, 277:16, 278:1, 352:9
**draft** [1] - 234:25
**drafting** [1] - 234:21
**drank** [6] - 311:5, 311:9, 311:11, 311:12, 311:24, 312:19
**drink** [1] - 311:10
**drinker** [1] - 311:17
**drinking** [4] - 311:13, 311:14, 311:16, 314:4
**drive** [1] - 310:23
**driving** [2] - 342:7, 342:10
**drop** [1] - 344:16
**dropped** [2] - 304:24, 344:7
**drops** [1] - 285:18
**drove** [4] - 309:4, 309:8, 309:14, 325:5
**drug** [27] - 234:23, 235:7, 235:8, 235:9, 235:12, 235:14, 235:15, 235:16, 235:17, 236:8, 237:24, 252:12, 253:4, 253:10, 254:4, 271:4, 280:12, 280:16, 288:4, 288:13, 322:12, 322:17, 332:10, 332:16, 338:7, 343:18, 345:23
**drugs** [12] - 268:7, 275:15, 288:4, 288:5, 288:7, 299:20, 313:1, 313:2, 313:5, 314:5, 319:8, 345:25
**drunk** [2] - 311:9, 311:17
**drunken** [1] - 266:6
**Dudley** [1] - 351:24
**due** [2] - 286:13, 355:9
**duly** [4] - 226:13, 279:13, 296:3, 306:4
**dunk** [1] - 276:4
**during** [45] - 229:22, 232:8, 235:24, 236:17, 239:19, 241:1, 241:7, 241:11, 246:7, 246:8, 258:25, 267:10, 268:13, 271:18, 283:19, 290:19, 291:22, 301:23, 302:5, 313:18, 314:3, 315:7, 317:10, 318:7, 319:4, 322:14, 322:18, 323:4, 326:3, 331:24, 332:9, 334:2, 339:7, 339:19, 339:24, 341:15, 341:23, 342:11, 344:13, 345:13, 345:15, 345:21, 345:23, 345:25, 349:21
**Dustin** [115] - 225:3, 228:11, 249:1, 249:18, 250:18, 250:24, 252:3, 252:7, 252:13, 253:9, 253:19, 253:24, 255:12, 255:19, 260:6, 262:21, 263:1, 263:11, 267:4, 268:15, 269:10, 271:10, 273:19, 273:20, 274:6, 277:16, 278:1, 352:9
279:5, 280:3, 282:24, 282:25, 283:22, 284:3, 287:19, 294:15, 299:10, 308:13, 308:17, 309:3, 309:10, 309:16, 310:3, 310:7, 311:3, 311:22, 312:7, 312:15, 312:21, 313:1, 313:4, 313:16, 314:4, 314:8, 315:4, 315:8, 315:9, 316:5, 316:16, 317:15, 317:23, 318:18, 318:23, 319:9, 319:13, 319:16, 319:24, 321:7, 321:18, 321:21, 322:2, 322:21, 323:4, 323:10, 324:4, 325:14, 325:21, 326:2, 326:8, 326:14, 326:21, 326:25, 327:14, 328:16, 328:22, 329:11, 329:16, 330:11, 330:17, 331:1, 331:5, 331:15, 331:20, 332:9, 332:15, 333:3, 334:1, 334:6, 335:21, 337:23, 338:2, 338:13, 338:23, 339:19, 340:24, 341:24, 342:3, 342:23, 343:16, 343:21, 344:2, 345:9, 346:4, 346:8, 347:10, 347:14, 347:21, 349:19, 349:21
**Dustin's** [9] - 308:24, 314:14, 315:15, 323:23, 330:14, 335:22, 336:13, 338:7, 341:1
**duties** [2] - 231:23, 327:15
**duty** [1] - 262:9

**E**

**e-mail** [2] - 235:1, 241:9
**e-mailed** [1] - 249:6
**early** [6] - 232:2, 232:4, 251:13, 251:19, 336:7, 342:20
**easier** [2] - 225:24, 300:17
**easiest** [1] - 228:15
**effect** [1] - 264:2
**effective** [1] - 261:15
**eighth** [1] - 307:6
**either** [5] - 236:3, 236:8, 257:12, 262:13, 342:11
**elements** [2] - 256:16, 257:15
**emphasis** [1] - 232:20
**enacted** [1] - 250:3
**end** [5] - 283:3, 285:20, 314:7, 331:21, 350:13
**ended** [2] - 259:1, 336:1
**ends** [2] - 259:13, 343:1
**enterprise** [4] - 235:10, 236:6, 236:7, 236:22
**entire** [4] - 225:16, 227:13, 267:14, 286:15

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM   Document 84   Filed 12/07/11   Page 141 of 152

entirety [1] - 257:22
equally [1] - 250:21
equipment [4] - 319:7, 328:5, 329:4, 333:16
Escort [2] - 297:11, 303:6
essential [1] - 277:8
established [3] - 265:16, 323:17, 342:3
estop [2] - 256:23, 257:18
estopped [2] - 256:1, 256:25
estoppel [10] - 235:23, 237:22, 238:6, 256:9, 256:16, 257:11, 257:15, 275:19, 275:24
ethical [1] - 273:10
evaluate [2] - 242:8, 263:11
evaluated [4] - 241:22, 243:5, 262:22, 277:11
evaluation [17] - 242:19, 242:20, 242:24, 243:1, 243:19, 250:18, 251:6, 263:1, 265:1, 270:16, 273:16, 274:7, 276:22, 277:13, 278:6, 278:10, 297:13
evaluations [5] - 251:18, 265:22, 266:15, 266:19, 277:5
evaluators [1] - 242:22
event [3] - 246:18, 250:12, 290:12
eventually [4] - 285:10, 285:13, 287:23, 344:5
evidence [14] - 226:6, 246:24, 251:4, 252:22, 254:24, 255:18, 257:18, 267:20, 267:21, 268:13, 271:25, 275:17, 279:7, 353:22
evidently [1] - 286:10
exactly [12] - 282:21, 283:1, 289:16, 297:17, 298:11, 301:17, 302:7, 309:12, 309:23, 324:2, 332:13, 341:12
exam [1] - 263:15
examination [9] - 248:18, 248:25, 250:25, 251:21, 270:1, 271:12, 293:15, 341:15, 346:3
EXAMINATION [10] - 226:21, 248:20, 273:1, 279:16, 288:23, 293:12, 296:6, 306:11, 324:19, 349:9
examine [1] - 252:3
examined [5] - 226:14, 250:24, 279:14, 296:4, 306:5
example [2] - 330:5, 340:21
except [1] - 357:1

exception [3] - 230:16, 313:21, 333:21
exchange [2] - 291:8, 293:22
excludables [1] - 258:6
exclude [1] - 259:13
excluded [1] - 262:13
exclusively [1] - 227:8
excuse [2] - 238:23, 273:23
excused [6] - 262:5, 278:20, 295:19, 305:11, 305:12, 350:8
exhausted [1] - 229:11
exhibit [1] - 300:20
Exhibit [4] - 281:11, 286:1, 286:23, 300:22
existence [1] - 250:6
expected [2] - 346:20, 350:20
expensive [1] - 332:21
experience [4] - 230:13, 230:15, 230:23, 230:24
expert [7] - 243:16, 243:17, 244:6, 245:18, 250:1, 264:21, 265:18
experts [4] - 244:3, 250:24, 269:10, 276:25
explain [3] - 244:20, 270:11, 290:16
explained [1] - 240:18
explains [1] - 269:23
explanation [1] - 243:24
explicit [1] - 232:5
exposed [2] - 334:16, 337:23
exposure [3] - 270:13, 334:15, 338:4
expressed [1] - 263:13
extensive [3] - 242:10, 263:9, 265:13
extensively [1] - 266:5
extent [2] - 319:22, 346:8
extreme [1] - 259:13
extremes [2] - 260:4, 260:5

## F

facility [1] - 246:17
fact [24] - 225:7, 229:22, 233:23, 237:22, 244:13, 245:11, 246:4, 248:1, 250:5, 257:8, 258:15, 258:17, 260:17, 264:15, 265:21, 272:15, 288:3, 288:16, 324:24, 327:3, 328:19, 336:4, 344:10, 350:18
factor [1] - 272:9
factors [2] - 246:24, 269:14
facts [2] - 239:24, 265:13

factual [3] - 237:9, 257:12, 320:1
factually [1] - 320:3
failing [2] - 255:25, 259:10
failure [2] - 238:18, 239:15
fair [3] - 264:14, 324:21, 342:19
fairly [5] - 242:10, 255:18, 264:1, 275:16, 323:10
fall [2] - 345:8, 345:22
familiar [12] - 240:8, 243:13, 273:3, 276:24, 296:13, 296:15, 296:16, 319:12, 319:20, 319:22, 324:4, 326:4
family [4] - 307:14, 307:16, 308:18, 348:4
far [3] - 328:15, 343:5, 348:20
fat [1] - 289:13
father [3] - 266:7, 308:6, 308:24
fax [1] - 274:17
FBI [3] - 283:9, 303:5, 303:16
fear [1] - 265:24
feared [1] - 266:17
February [3] - 332:5, 336:6, 355:12
Federal [3] - 243:11, 246:1, 282:13
federal [9] - 227:8, 229:7, 249:22, 249:24, 280:13, 280:14, 288:17, 288:19, 344:5
federally [2] - 344:19, 344:22
feedback [1] - 235:1
feign [1] - 277:6
female [1] - 289:10
Ferguson [1] - 352:1
few [10] - 272:23, 283:21, 291:7, 298:25, 302:7, 332:13, 340:8, 340:9, 346:15, 347:7
Fiems [1] - 352:2
figuring [1] - 231:7
file [1] - 355:14
filed [6] - 229:15, 234:13, 234:17, 235:3, 239:7, 244:1
filtered [1] - 318:24
filters [1] - 318:23
final [1] - 329:6
finalized [1] - 235:2
finally [1] - 292:12
financing [2] - 327:23, 327:25
findings [14] - 235:24, 236:4, 236:5, 236:9, 236:14, 236:22, 238:10, 239:16, 239:23, 243:23, 256:2, 256:7, 257:17, 270:12
fine [6] - 226:3, 278:13,

283:18, 284:19, 295:25, 305:23
finish [5] - 346:16, 346:21, 347:3, 350:16, 350:23
finished [3] - 280:21, 301:21, 350:18
firm [2] - 227:7, 227:22
first [41] - 226:13, 228:1, 228:8, 231:6, 235:15, 242:16, 252:5, 252:20, 262:21, 265:10, 268:8, 269:17, 279:13, 282:5, 282:11, 283:17, 283:19, 283:25, 285:10, 286:2, 286:6, 289:4, 292:16, 292:18, 296:3, 303:3, 306:4, 306:24, 306:25, 314:10, 315:13, 321:15, 326:24, 329:17, 331:25, 342:24, 344:25, 351:3
fits [1] - 265:20
flip [1] - 351:4
floor [1] - 303:15
Florence [6] - 246:12, 271:10, 271:13, 271:14, 271:17, 271:19
fly [2] - 270:9, 326:18
flying [2] - 342:6, 342:10
focus [4] - 227:8, 253:9, 253:11, 253:17
focused [2] - 259:17, 260:20
follow [1] - 273:12
following [2] - 225:1, 247:2
follows [4] - 226:14, 279:14, 296:4, 306:5
food [2] - 319:7, 328:1
Foods [3] - 296:24, 302:18, 303:4
footnote [2] - 238:1, 257:21
force [1] - 300:1
Ford [2] - 297:11, 303:6
form [6] - 269:21, 316:18, 316:23, 316:25, 317:15, 320:1
former [1] - 273:10
formulating [3] - 267:25, 277:4, 277:5
Fort [1] - 279:22
forth [3] - 251:18, 263:15, 351:4
forward [5] - 226:11, 252:2, 279:11, 295:25, 306:2
Foster [1] - 354:18
foundation [1] - 323:17
framed [1] - 320:1
frankly [2] - 264:15, 272:7
freezer [1] - 333:10
frequent [1] - 342:17
Friday [4] - 347:2, 352:8,

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM   Document 84   Filed 12/07/11   Page 142 of 152

353:25, 356:11

**friendly** [1] - 349:2
**friends** [2] - 307:3, 308:18
**Friesenborg** [3] - 332:17, 352:5, 356:17
**front** [10] - 233:14, 237:18, 246:19, 248:22, 260:15, 281:10, 299:12, 304:3, 304:25, 312:13
**frontal** [1] - 267:24
**full** [4] - 226:25, 245:12, 280:20, 280:21
**fumes** [1] - 337:17
**furtherance** [4] - 235:8, 235:11, 334:3
**future** [5] - 246:25, 247:12, 247:19, 272:9, 272:13

## G

**Garner** [2] - 308:16
**Gary** [1] - 354:16
**gas** [2] - 318:23, 318:24
**gathered** [1] - 258:22
**gel** [1] - 317:3
**Gelbort** [7] - 242:3, 243:19, 270:15, 273:19, 273:20, 278:1, 352:9
**Gelbort's** [6] - 243:20, 270:7, 270:10, 273:16, 274:6, 277:16
**general** [1] - 326:13
**generally** [2] - 235:5, 294:11
**gentleman** [2] - 296:14, 296:17
**girlfriend** [2] - 335:22, 336:14
**gist** [2] - 235:5, 235:6
**given** [2] - 246:20, 250:15
**Gomez** [1] - 298:25
**goods** [1] - 269:4
**government** [46] - 237:23, 239:16, 242:18, 242:22, 250:8, 250:17, 250:23, 251:20, 254:4, 254:8, 254:13, 254:18, 254:24, 255:19, 256:1, 256:9, 256:23, 259:12, 261:11, 261:13, 261:14, 263:14, 263:19, 263:24, 264:19, 264:20, 272:1, 275:6, 276:19, 282:8, 282:12, 283:6, 283:10, 287:9, 287:12, 287:24, 291:9, 291:13, 292:4, 293:22, 294:1, 325:2, 325:23, 353:21, 354:14, 355:6
**government's** [5] - 243:1, 244:6, 265:3, 354:21, 355:10
**grade** [5] - 306:22, 306:25,

307:1, 307:2, 307:7
**graduate** [1] - 313:7
**Graham** [6] - 299:17, 299:19, 303:25, 304:11, 304:22, 354:20
**gram** [2] - 298:8, 298:10
**grams** [7] - 254:9, 254:15, 254:19, 255:20, 275:17, 275:22
**grand** [2] - 255:3, 300:21
**great** [2] - 227:24, 356:7
**Greg** [8] - 255:2, 329:8, 329:13, 331:1, 331:7, 331:10, 343:17
**Greg's** [2] - 331:3, 331:16
**Grody** [1] - 244:6
**group** [1] - 241:18
**guess** [10] - 228:15, 229:12, 253:14, 266:16, 283:23, 284:16, 292:5, 318:5, 336:6, 356:2
**guideline** [1] - 273:4
**guilt** [5] - 231:24, 267:4, 267:18, 267:19, 267:21
**guilty** [3] - 229:24, 235:13, 269:20
**gun** [1] - 302:22
**guns** [12] - 284:24, 285:2, 287:8, 287:13, 288:10, 289:6, 289:24, 290:6, 290:7, 290:9, 294:6, 294:10
**guy** [5] - 264:6, 265:17, 300:6, 348:22, 349:2
**guys** [4] - 330:4, 331:25, 335:1, 337:13

## H

**habeas** [7] - 227:17, 227:23, 234:7, 249:2, 266:19, 269:9, 273:5
**half** [1] - 241:12
**halfway** [4] - 297:7, 297:9, 302:12, 302:14
**hand** [1] - 301:16
**handed** [1] - 286:22
**handled** [3] - 228:7, 249:12, 249:19
**handling** [1] - 249:21
**Hansen** [2] - 325:18, 325:24
**hard** [3] - 286:15, 300:16, 340:16
**hardship** [1] - 262:10
**hardships** [1] - 262:5
**heading** [1] - 239:8
**health** [14] - 242:7, 244:9, 251:15, 262:16, 265:5, 268:17, 269:1, 269:12, 271:5, 273:13, 274:13, 274:24, 276:25, 277:11
**hear** [6] - 285:20, 318:9, 318:12, 318:13, 340:15,

354:4
**heard** [2] - 265:18, 285:7
**hearing** [13] - 225:12, 225:16, 241:12, 241:13, 253:20, 253:22, 256:3, 256:8, 256:22, 355:9, 355:11, 355:13, 356:18
**hearings** [1] - 241:11
**hearsay** [3] - 333:19, 333:20, 334:6
**Heating** [1] - 321:14
**heavily** [1] - 343:1
**Hein** [1] - 354:20
**held** [5] - 225:1, 256:7, 256:8, 256:13, 256:19
**hello** [2] - 295:24, 306:1
**helped** [2] - 255:7, 310:18
**helpful** [2] - 277:23, 286:20
**helps** [1] - 355:7
**hidden** [2] - 333:10, 333:16
**high** [12] - 246:10, 246:12, 246:13, 247:18, 247:22, 248:3, 271:10, 306:22, 312:16, 312:18, 313:7
**High** [1] - 247:7
**higher** [1] - 272:11
**Hilgenberg** [1] - 352:12
**himself** [1] - 331:16
**hindsight** [1] - 266:18
**hire** [3] - 243:16, 263:10, 270:20
**hiring** [1] - 273:13
**history** [2] - 242:9, 267:21
**holding** [1] - 257:16
**holds** [1] - 256:21
**Holy** [1] - 303:18
**home** [2] - 349:13, 351:14
**homicides** [3] - 246:5, 268:3, 269:24
**honest** [2] - 299:15, 303:3
**Honken** [89] - 225:3, 225:7, 225:11, 228:11, 228:20, 232:9, 235:13, 236:12, 236:17, 237:17, 237:20, 241:22, 242:8, 242:20, 243:5, 244:6, 245:25, 246:9, 249:1, 250:7, 250:18, 250:24, 252:3, 252:13, 255:13, 260:6, 262:22, 263:2, 263:11, 263:22, 265:15, 265:20, 267:4, 268:10, 268:15, 269:11, 271:10, 273:20, 276:23, 277:11, 278:7, 279:5, 280:3, 280:5, 280:22, 283:19, 283:25, 284:6, 288:1, 291:6, 291:10, 293:23, 294:13, 296:20, 296:23, 297:19, 297:20, 298:12, 299:10, 299:20, 300:4, 301:24, 302:5, 302:15, 306:16,

306:21, 308:8, 309:24, 310:12, 311:5, 325:5, 325:14, 326:2, 332:9, 334:1, 334:2, 334:6, 334:16, 337:23, 338:2, 338:13, 338:23, 341:24, 342:23, 347:10, 347:21, 348:4, 352:14, 352:16
**Honken's** [23] - 230:7, 234:24, 238:19, 249:18, 252:7, 253:9, 253:19, 253:24, 255:19, 265:12, 268:2, 280:25, 281:4, 281:7, 282:6, 293:4, 294:12, 305:1, 307:13, 353:17, 355:9, 355:11, 355:14
**Honor** [70] - 225:14, 225:18, 226:7, 226:10, 226:16, 232:16, 238:23, 239:2, 248:12, 248:15, 248:19, 257:4, 260:13, 272:18, 272:23, 273:23, 278:14, 278:17, 278:19, 279:2, 279:8, 285:24, 286:17, 286:18, 293:9, 293:11, 294:25, 295:17, 295:21, 300:13, 300:19, 301:3, 305:6, 305:8, 305:12, 305:19, 305:21, 306:8, 319:18, 323:16, 324:7, 324:12, 324:15, 324:18, 333:19, 333:24, 334:1, 346:18, 346:22, 347:7, 347:24, 349:6, 349:8, 350:4, 350:6, 350:9, 350:15, 351:5, 351:9, 351:15, 352:4, 352:19, 352:25, 353:4, 353:15, 354:10, 355:18, 355:19, 355:24, 356:24
**hook** [1] - 298:24
**hoping** [1] - 268:1
**house** [38] - 246:1, 253:11, 281:17, 296:18, 297:7, 297:9, 300:3, 302:12, 302:14, 312:2, 314:12, 314:16, 316:1, 316:9, 316:10, 316:11, 316:13, 319:5, 322:7, 324:8, 331:2, 331:3, 331:11, 331:17, 335:7, 336:4, 337:10, 337:13, 337:20, 337:22, 339:1, 339:12, 340:1, 342:16, 342:22, 343:6, 343:18, 349:19
**hung** [1] - 307:10

## I

**identified** [2] - 269:14, 304:4
**identify** [1] - 233:16

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 143 of 152

**identity** [2] - 257:13, 257:14
**illegal** [2] - 288:4, 308:25
**Illinois** [4] - 228:18, 231:13, 231:18, 246:15
**illness** [1] - 277:6
**imagine** [1] - 293:7
**immediately** [2] - 241:5, 250:23
**impaired** [1] - 269:23
**importance** [2] - 276:24, 277:2
**importing** [1] - 268:7
**impose** [2] - 259:21, 261:4
**imposing** [2] - 244:23, 251:19
**impression** [1] - 243:20
**imprisonment** [1] - 245:25
**inability** [1] - 268:16
**incapable** [1] - 267:25
**incarcerated** [4] - 280:6, 280:23, 282:7, 294:8
**incident** [1] - 334:24
**include** [3] - 235:22, 236:2, 247:1
**included** [8] - 235:14, 235:16, 235:17, 235:19, 237:6, 237:10, 261:8, 328:1
**including** [2] - 237:5, 238:6
**inclusive** [1] - 235:21
**inconsistency** [2] - 267:3, 267:11
**inconsistent** [6] - 267:9, 268:4, 268:9, 268:19, 269:7, 269:15
**incorrectly** [1] - 263:21
**increased** [1] - 315:16
**independently** [1] - 238:2
**indicate** [2] - 251:14, 277:22
**indicated** [3] - 277:16, 324:24, 338:7
**indicia** [1] - 247:19
**individuals** [1] - 236:11
**Industries** [1] - 326:3
**ineffective** [4] - 238:17, 239:14, 255:25, 259:10
**information** [7] - 250:2, 287:9, 287:24, 291:9, 291:12, 293:22, 293:25
**ingest** [1] - 317:7
**ingested** [1] - 317:1
**initial** [1] - 282:1
**injected** [1] - 340:24
**inmates** [2] - 246:3, 246:6
**innocence** [1] - 231:25
**inside** [1] - 337:13
**instances** [2] - 337:22, 338:1
**institution** [1] - 246:14
**institutions** [1] - 272:3
**instruction** [4] - 246:20,

247:11, 247:16, 248:4
**instructions** [3] - 333:5, 333:9, 334:11
**intelligent** [1] - 265:17
**intended** [1] - 251:4
**intent** [1] - 269:22
**interact** [1] - 312:7
**interaction** [1] - 312:11
**interview** [4] - 292:8, 292:17, 293:5
**interviewed** [3] - 258:17, 292:11, 292:13
**investigate** [1] - 238:18
**investigated** [1] - 266:5
**investigation** [1] - 231:15
**investigators** [1] - 291:18
**involved** [30] - 228:1, 228:11, 228:12, 228:14, 228:17, 228:19, 230:7, 230:16, 231:13, 236:17, 240:20, 253:12, 254:9, 255:21, 268:4, 268:15, 275:15, 282:6, 298:22, 302:16, 308:25, 309:24, 310:12, 310:15, 325:5, 325:15, 325:18, 326:24, 328:9, 348:17
**Iowa** [24] - 229:1, 229:4, 229:8, 230:15, 254:25, 255:8, 268:7, 279:22, 308:16, 320:14, 321:4, 321:10, 321:21, 322:9, 329:13, 329:17, 331:16, 335:18, 339:16, 342:2, 342:7, 342:16, 342:25
**issue** [6] - 237:12, 238:16, 239:19, 240:2, 240:15, 245:15
**issued** [1] - 257:20
**issues** [3] - 245:15, 257:14, 276:10
**IT** [1] - 286:14
**itself** [1] - 252:24

**J**

**Jail** [5] - 280:7, 280:11, 280:23, 291:11, 293:24
**jail** [7] - 282:22, 291:14, 294:2, 294:7, 294:9, 294:10, 343:23
**January** [4] - 346:5, 346:11, 355:10, 355:11
**jean** [1] - 354:11
**Jeff** [12] - 308:5, 314:13, 316:14, 319:5, 319:9, 319:10, 319:15, 319:23, 320:9, 333:6, 333:15
**Jeff's** [4] - 314:12, 314:16, 319:13, 327:22
**jeopardy** [8] - 234:14, 234:17, 235:19, 235:20, 237:7, 237:12, 237:21,

255:24
**Jessica** [1] - 354:24
**Jill** [2] - 233:5, 233:8
**Jim** [13] - 308:7, 308:8, 308:12, 308:15, 308:24, 309:4, 309:12, 309:18, 309:24, 310:12, 311:5, 325:5
**job** [4] - 296:25, 321:17, 327:10, 345:6
**John** [6] - 299:17, 299:19, 303:25, 304:11, 354:5, 354:20
**Johnson** [20] - 279:9, 279:10, 279:18, 279:20, 279:21, 279:23, 280:2, 285:25, 286:22, 288:22, 288:25, 289:1, 293:14, 295:3, 295:15, 295:18, 341:16, 352:18, 352:21, 354:24
**JOHNSON** [1] - 279:12
**Johnson's** [4] - 240:11, 341:2, 341:7, 341:21
**Judge** [13] - 231:24, 235:24, 236:15, 236:21, 237:2, 237:11, 238:10, 246:20, 256:3, 257:20, 264:24, 275:13
**judge** [1] - 256:22
**judge's** [1] - 256:7
**judgment** [5] - 252:24, 253:3, 268:16, 269:13, 269:23
**judgments** [4] - 252:7, 252:12, 252:17, 252:21
**July** [4] - 274:8, 274:20, 274:21, 278:7
**juror** [1] - 261:21
**Juror** [5] - 260:23, 261:8, 261:18, 276:13, 276:14
**jurors** [12] - 245:3, 245:9, 245:10, 258:5, 259:6, 259:8, 259:11, 260:7, 276:13, 276:16, 276:17, 276:18
**jury** [25] - 232:8, 232:11, 244:11, 245:13, 245:18, 245:24, 246:9, 246:20, 247:11, 253:5, 255:3, 258:4, 258:16, 260:9, 262:8, 265:18, 265:24, 268:11, 268:25, 272:1, 272:12, 274:9, 274:11, 300:21, 305:1

**K**

**Kansas** [2] - 228:7, 258:21
**Kathy** [1] - 353:13
**keep** [5] - 276:5, 285:20, 318:6, 340:12, 345:18
**keeps** [1] - 284:17

**Kenny** [3] - 325:18, 325:22, 325:24
**kept** [1] - 338:23
**kidnapping** [1] - 229:6
**killed** [1] - 230:19
**killing** [2] - 229:5, 325:23
**kind** [22] - 227:6, 231:7, 242:21, 246:3, 252:13, 264:11, 266:8, 267:22, 268:18, 268:20, 326:14, 336:18, 340:12, 342:14, 342:20, 342:23, 343:1, 348:5, 348:14, 348:21, 357:2
**kinds** [1] - 227:10
**King** [1] - 355:2
**knowledge** [3] - 282:5, 313:2, 338:23
**known** [3] - 233:4, 264:11, 323:11
**Kraft** [12] - 296:24, 297:20, 302:18, 303:4, 321:17, 322:21, 322:24, 346:4, 346:5, 346:10, 347:10, 347:15

**L**

**L-U-A** [1] - 229:2
**lab** [4] - 253:10, 328:23, 328:25, 339:3
**labor** [1] - 327:11
**Lack** [1] - 247:6
**language** [1] - 253:3
**large** [1] - 330:9
**last** [9] - 233:18, 249:6, 281:19, 283:12, 286:5, 296:18, 332:5, 346:19, 347:25
**lasted** [1] - 228:18
**late** [1] - 335:17
**Laurel** [1] - 351:18
**Law** [1] - 239:6
**law** [8] - 231:4, 234:7, 246:19, 250:13, 250:16, 250:22, 252:1, 275:10
**lawyer** [6] - 270:21, 285:8, 285:9, 285:10, 291:17, 293:20
**lawyer's** [1] - 285:12
**lawyers** [4] - 228:6, 229:12, 230:16, 291:5
**lead** [1] - 231:22
**leading** [4] - 232:15, 241:2, 241:7, 241:19
**leaped** [1] - 259:15
**learned** [7] - 229:12, 229:17, 231:2, 231:3, 231:4, 244:17, 276:23
**least** [11] - 228:16, 234:2, 241:4, 241:10, 243:20, 249:3, 252:11, 253:17, 258:20, 272:4, 350:2

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 144 of 152

**leave** [1] - 305:16
**led** [1] - 283:22
**Lee** [2] - 225:3, 279:5
**left** [6] - 301:16, 302:7, 302:8, 336:6, 350:13, 356:10
**left-hand** [1] - 301:16
**legal** [2] - 225:21, 227:11
**lengthy** [1] - 239:12
**Leon** [7] - 230:9, 266:11, 267:6, 291:1, 291:5, 356:16, 357:2
**Leon's** [1] - 353:25
**less** [8] - 246:5, 247:20, 247:24, 275:18, 275:20, 275:22, 342:16
**lesser** [4] - 235:14, 235:16, 235:17, 257:13
**letter** [2] - 287:3, 290:17
**Lewis** [1] - 355:4
**life** [8] - 229:24, 242:9, 245:25, 267:20, 269:5, 269:6, 280:2, 293:1
**light** [1] - 248:1
**likewise** [1] - 251:12
**limited** [2] - 355:13, 355:15
**Line** [2] - 295:4, 295:8
**line** [7] - 229:7, 299:12, 304:5, 326:11, 341:5, 341:8, 341:18
**lines** [1] - 277:16
**liquid** [1] - 317:4
**Lisa** [4] - 232:24, 240:19, 266:5, 353:10
**list** [11] - 261:9, 261:12, 262:2, 262:9, 262:10, 347:1, 350:12, 350:25, 351:10, 354:21, 355:6
**litigation** [5] - 231:8, 231:11, 232:14, 253:11, 253:12
**litigator** [1] - 231:23
**live** [2] - 279:21, 313:25
**lived** [6] - 313:24, 314:1, 314:22, 315:5, 315:7, 336:4
**lives** [1] - 246:25
**living** [18] - 227:2, 279:25, 297:6, 302:11, 308:15, 308:19, 314:11, 315:3, 315:24, 318:4, 318:17, 328:1, 336:14, 337:3, 337:14, 342:3, 345:4, 349:19
**lobe** [1] - 267:24
**local** [1] - 229:23
**located** [1] - 282:11
**location** [1] - 335:1
**look** [13] - 233:13, 246:18, 265:19, 274:17, 281:9, 296:13, 296:15, 296:16, 301:5, 301:11, 301:12, 355:23, 356:21
**looked** [2] - 256:10, 259:15
**looking** [5] - 243:4, 251:25, 261:17, 266:18, 278:4
**looks** [1] - 247:17
**Lori** [1] - 355:4
**loud** [1] - 301:19
**love** [1] - 332:19
**Low** [1] - 247:5
**lower** [1] - 247:24
**LSD** [1] - 322:2
**Lua** [3] - 229:2, 230:17, 253:15
**Luis** [1] - 229:2
**lunch** [1] - 346:15

## M

**ma'am** [1] - 305:14
**Madison** [2] - 233:3, 233:5
**magazines** [1] - 302:22
**mail** [2] - 235:1, 241:9
**mailed** [1] - 249:6
**main** [2] - 231:23, 248:2
**majority** [1] - 311:21
**male** [3] - 289:10, 289:11, 289:13
**man** [1] - 351:14
**management** [1] - 326:9
**manner** [2] - 246:1, 319:21
**manufacture** [3] - 254:15, 255:7, 302:17
**manufactured** [3] - 254:19, 255:15, 337:9
**manufacturing** [8] - 268:6, 270:13, 298:23, 318:19, 336:19, 341:24, 342:21, 342:24
**marathon** [1] - 228:17
**March** [11] - 228:19, 236:19, 258:18, 320:21, 336:6, 336:7, 342:1, 343:14, 345:3, 345:8, 345:21
**marijuana** [7] - 298:4, 298:5, 299:9, 302:5, 316:21, 318:16, 340:20
**Marion** [2] - 246:15, 271:25
**Mark** [2] - 352:21, 354:20
**marked** [4] - 274:3, 286:1, 300:22, 301:6
**Marshals** [1] - 299:25
**marshals** [1] - 303:16
**Martell** [2] - 243:3, 264:9
**Marvea** [4] - 308:1, 308:21, 348:5, 353:16
**Marvea's** [1] - 312:2
**mask** [1] - 318:24
**Mason** [4] - 297:8, 299:1, 303:15, 345:9
**matter** [5] - 228:11, 228:20, 249:2, 274:22, 326:13
**matters** [3] - 231:8, 232:14, 232:18
**maximum** [1] - 246:13
**Maxwell** [2] - 345:4, 345:12
**McGee** [1] - 352:23
**McIntosh** [1] - 352:23
**McNeese** [1] - 352:23
**mean** [21] - 232:11, 232:19, 239:23, 256:15, 265:9, 265:10, 265:12, 265:25, 267:18, 268:1, 269:19, 271:23, 294:23, 301:9, 301:15, 309:6, 310:5, 317:8, 325:8, 340:21, 349:2
**meaning** [1] - 258:7
**meaningfully** [1] - 245:12
**meantime** [1] - 228:16
**measured** [1] - 340:22
**mechanism** [1] - 265:16
**meet** [11] - 240:22, 241:4, 241:11, 241:13, 273:5, 273:8, 280:3, 287:23, 303:14, 306:24
**meeting** [11] - 241:2, 241:25, 242:1, 283:19, 284:2, 284:3, 289:4, 298:20, 300:2, 301:24, 302:6
**Melby** [1] - 352:24
**Melissa** [1] - 353:7
**member** [1] - 334:2
**members** [1] - 234:20
**memo** [2] - 246:19, 246:20
**Memorandum** [1] - 239:6
**memorandum** [1] - 234:7
**memorized** [1] - 271:15
**memory** [2] - 258:20, 293:3
**mental** [16] - 242:7, 244:9, 251:15, 262:16, 265:5, 268:17, 269:1, 269:12, 269:20, 271:5, 273:13, 274:12, 274:24, 276:25, 277:8, 277:11
**mention** [1] - 259:6
**mentioned** [2] - 232:23, 287:12
**mentioning** [1] - 259:8
**mercy** [1] - 269:3
**merits** [1] - 231:24
**met** [9] - 233:25, 234:3, 240:24, 249:1, 278:7, 280:5, 289:1, 296:12, 296:24
**meth** [29] - 255:14, 289:19, 289:23, 294:13, 294:16, 294:19, 322:15, 326:24, 328:17, 328:20, 328:23, 328:25, 329:17, 329:21, 331:11, 331:24, 332:4, 335:5, 336:19, 338:10, 338:12, 339:3, 339:7, 340:1, 341:4, 342:23, 343:1, 346:9
**metham** [1] - 316:11
**methamphet** [2] - 337:6, 340:11
**methamphetamine** [58] - 243:17, 254:9, 254:16, 254:25, 255:4, 255:7, 255:8, 255:21, 270:13, 270:14, 295:12, 297:21, 297:24, 298:7, 298:13, 298:16, 299:8, 299:9, 299:10, 300:9, 301:25, 302:17, 314:9, 314:23, 315:8, 316:16, 316:20, 317:11, 317:24, 318:16, 321:21, 322:15, 322:22, 323:5, 323:12, 323:24, 324:3, 324:5, 327:11, 328:10, 331:2, 331:15, 331:17, 332:1, 335:2, 335:11, 337:9, 338:9, 339:12, 339:17, 339:21, 340:13, 341:25, 342:11, 342:21, 346:4, 347:11, 349:22
**mid** [1] - 297:4
**middle** [2] - 304:7, 325:10
**might** [11] - 287:14, 294:18, 294:23, 294:24, 297:17, 297:22, 298:6, 299:21, 301:8, 305:18, 356:21
**Miller** [1] - 233:5
**min** [1] - 268:21
**mind** [2] - 284:11, 287:4
**minds** [1] - 298:21
**mine** [1] - 286:8
**Minnesota** [6] - 229:4, 229:5, 229:9, 309:5, 309:14, 325:6
**minute** [2] - 250:25, 266:2
**minutes** [1] - 303:13
**missed** [3] - 238:22, 260:7, 260:9
**Missouri** [5] - 227:14, 227:16, 228:3, 233:2, 233:8
**misstates** [1] - 236:20
**Missy** [17] - 332:16, 333:3, 333:6, 333:9, 333:23, 334:6, 335:17, 336:15, 337:4, 342:4, 342:24, 343:3, 349:15, 349:16, 352:5, 356:17
**mitigating** [1] - 267:20
**mitigation** [9] - 231:14, 231:15, 231:18, 233:4, 233:10, 244:9, 244:12, 248:2, 274:13
**mitigator** [1] - 268:12
**mix** [1] - 227:23
**Moines** [1] - 314:2

Case 3:10-cv-03074-LTS-KEM   Document 84   Filed 12/07/11   Page 145 of 152

mom [1] - 307:20
moment [9] - 238:24, 248:12, 267:22, 272:18, 305:6, 305:18, 324:12, 347:24, 351:11
money [10] - 230:19, 319:6, 320:9, 327:7, 330:4, 330:9, 330:16, 330:18, 330:21, 332:16
Monica [1] - 354:18
monitored [1] - 344:14
month [8] - 274:8, 274:10, 274:11, 336:8, 336:11, 339:4, 341:19, 345:10
months [7] - 228:21, 241:2, 270:14, 280:17, 280:24, 285:11, 315:6
morally [1] - 261:2
morning [10] - 225:22, 226:9, 226:10, 226:23, 226:24, 291:6, 296:8, 296:9, 346:21, 356:2
most [7] - 231:12, 246:16, 249:23, 311:12, 336:1, 338:18, 342:3
mother [4] - 307:25, 348:5, 348:8, 353:18
mother's [1] - 324:8
motion [11] - 234:13, 234:14, 234:17, 234:25, 235:5, 235:6, 235:22, 237:7, 237:12, 238:5, 351:23
motive [1] - 277:6
mounting [1] - 265:5
move [9] - 240:4, 240:17, 243:8, 244:15, 313:11, 314:15, 314:18, 320:13, 336:10
moved [12] - 313:18, 320:17, 320:18, 321:3, 321:15, 321:20, 322:8, 335:7, 335:13, 336:8, 339:1, 342:2
moving [3] - 314:7, 321:6, 357:1
MR [134] - 225:14, 225:18, 225:20, 226:1, 226:4, 226:7, 226:16, 226:19, 226:22, 232:15, 236:20, 238:23, 239:2, 248:6, 248:12, 248:15, 248:19, 248:21, 257:3, 260:13, 272:18, 272:21, 272:23, 273:2, 273:23, 274:1, 278:14, 278:17, 278:21, 278:22, 278:23, 279:2, 279:8, 279:17, 285:24, 286:17, 288:21, 288:24, 291:2, 291:3, 291:4, 293:8, 293:11, 293:13, 294:25, 295:15, 295:17, 295:20, 295:23, 296:7, 300:13, 300:16, 300:19, 301:2,

305:3, 305:6, 305:8, 305:12, 305:18, 305:21, 305:24, 306:8, 306:10, 306:12, 319:17, 319:25, 320:23, 323:13, 323:15, 324:12, 324:15, 324:18, 324:20, 333:18, 333:20, 333:23, 333:25, 334:5, 334:10, 341:13, 341:14, 346:18, 347:6, 347:24, 349:5, 349:8, 349:10, 350:3, 350:6, 350:9, 350:15, 350:18, 351:1, 351:5, 351:9, 351:15, 351:19, 351:21, 351:25, 352:3, 352:6, 352:10, 352:13, 352:15, 352:17, 352:19, 352:22, 352:25, 353:3, 353:6, 353:8, 353:11, 353:14, 353:17, 353:20, 353:24, 354:2, 354:7, 354:10, 354:12, 354:14, 354:17, 354:19, 354:23, 354:25, 355:3, 355:5, 355:18, 355:19, 355:24, 356:8, 356:12, 356:24, 357:4
multiple [2] - 229:3, 340:4
multiplicity [2] - 240:5, 240:8
murder [4] - 235:7, 235:11, 305:1, 306:16
murders [5] - 235:8, 235:18, 267:5, 268:16, 268:24
must [4] - 247:17, 309:23, 313:14, 349:20

**N**

name [19] - 226:25, 229:2, 232:23, 233:2, 279:18, 285:9, 285:12, 288:25, 289:8, 291:5, 296:10, 300:6, 303:17, 306:13, 307:21, 307:25, 327:16, 327:19, 327:20
named [2] - 233:5, 300:4
nationally [1] - 233:4
nature [3] - 252:14, 265:11, 266:10
nearly [1] - 343:6
necessarily [2] - 267:16, 269:18
necessary [1] - 269:22
need [8] - 225:22, 226:16, 257:12, 257:13, 257:14, 270:11, 270:24, 357:3
needed [3] - 329:4, 331:11, 331:15
negotiate [1] - 291:18
Nelson [2] - 353:2, 353:5
nervous [1] - 350:14
neuropsychological [1] -

270:12
neuropsychologist [5] - 241:22, 270:20, 270:22, 271:3
never [13] - 230:4, 254:18, 256:10, 259:21, 261:3, 337:22, 340:18, 340:22, 340:24, 345:25, 347:17, 347:19, 348:25
Never [1] - 299:21
new [3] - 250:2, 287:15, 356:21
New [2] - 300:3, 301:17
next [5] - 241:12, 295:7, 295:20, 296:14, 305:22
NGRI [1] - 268:20
nice [2] - 332:23, 348:24
Nicholson [4] - 255:2, 329:8, 331:2, 331:7
Nicholson's [2] - 331:11, 343:17
night [4] - 283:12, 325:11, 340:14, 343:23
nights [1] - 343:24
nobody [1] - 230:15
Nolan [1] - 225:11
NOLAN [90] - 225:14, 225:18, 225:20, 226:1, 226:4, 226:7, 226:16, 226:19, 226:22, 238:23, 239:2, 248:12, 248:15, 257:3, 272:23, 273:2, 273:23, 274:1, 278:14, 278:21, 278:23, 279:2, 295:20, 295:23, 296:7, 300:13, 300:16, 300:19, 301:2, 305:3, 305:12, 305:18, 305:21, 305:24, 306:8, 306:10, 306:12, 323:15, 324:12, 324:15, 333:18, 333:23, 334:5, 334:10, 341:13, 346:18, 349:8, 349:10, 350:3, 350:9, 350:15, 350:18, 351:1, 351:5, 351:9, 351:15, 351:19, 351:21, 351:25, 352:3, 352:6, 352:10, 352:13, 352:15, 352:17, 352:19, 352:22, 352:25, 353:3, 353:6, 353:8, 353:11, 353:14, 353:17, 353:20, 353:24, 354:2, 354:7, 354:10, 354:12, 354:14, 354:17, 354:19, 354:23, 354:25, 355:3, 355:5, 355:19, 356:12, 356:24
noon [1] - 356:4
north [1] - 338:17
Northern [1] - 229:1
northern [1] - 229:4
not/does [2] - 229:9, 229:10
note [1] - 323:22

noted [1] - 274:7
nothing [7] - 243:21, 267:5, 268:11, 277:21, 350:3, 356:16, 356:21
notice [2] - 251:4, 323:11
notify [1] - 251:20
November [2] - 320:17, 336:11
Number [7] - 240:7, 247:8, 261:17, 261:18, 261:20, 262:1
number [2] - 236:11, 255:12
Numbers [2] - 225:4, 279:6
numerous [1] - 327:3
nursing [1] - 351:14

**O**

object [2] - 239:15, 247:16
objected [4] - 248:4, 252:6, 252:16, 258:8
objecting [1] - 248:10
objection [16] - 232:15, 236:20, 236:25, 248:6, 248:8, 257:3, 257:7, 319:25, 320:1, 320:7, 323:13, 323:19, 333:18, 333:22, 334:9
objectionable [1] - 247:17
objections [2] - 245:1, 245:5
obligation [2] - 254:4, 254:8
obligations [1] - 273:10
observation [1] - 338:23
observations [1] - 343:5
obtained [1] - 287:13
occasion [2] - 312:6, 338:12
occur [1] - 238:8
occurred [6] - 237:8, 249:17, 333:2, 334:24, 343:12, 343:14
October [4] - 335:14, 335:17, 339:11, 349:15
offense [3] - 235:16, 268:15, 269:11
offenses [4] - 235:14, 235:18, 235:19, 235:21
offered [1] - 229:24
Office [3] - 228:7, 291:19, 303:14
office [2] - 233:7, 258:22
officer [7] - 302:13, 303:2, 303:23, 304:9, 304:15, 304:17, 304:19
often [5] - 241:8, 311:19, 322:19, 323:7, 343:6
old [2] - 309:22, 310:10
older [2] - 309:16, 309:17
Omaha [1] - 229:13

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 146 of 152

onboard [1] - 231:17
once [15] - 241:4, 247:23, 277:16, 297:22, 298:1, 298:2, 298:3, 298:6, 335:13, 336:18, 336:22, 338:15, 339:20, 345:9, 345:12
one [3] - 274:20, 283:14, 283:15
ones [3] - 249:23, 351:21, 351:22
open [1] - 225:1
operation [7] - 326:25, 327:23, 327:25, 328:10, 330:22, 331:1, 331:24
opine [1] - 269:10
opinion [9] - 237:12, 237:16, 237:25, 238:1, 258:1, 258:8, 270:8, 270:17, 320:4
opinions [2] - 266:23, 277:5
opportunity [6] - 229:24, 234:6, 234:9, 244:2, 244:10, 251:21
opposed [3] - 257:9, 261:3, 270:6
opposite [1] - 272:10
oral [1] - 355:12
order [9] - 251:20, 257:20, 257:22, 258:2, 264:24, 291:11, 293:25, 352:7, 355:9
ordering [1] - 327:18
original [1] - 351:10
otherwise [2] - 261:3, 345:15
ought [3] - 247:19, 259:2, 269:5
ounce [1] - 289:18
ounces [1] - 335:5
outside [4] - 337:10, 337:16, 337:17
overcome [1] - 338:3
overdosed [1] - 324:5
overruled [1] - 333:22
overusing [1] - 340:16
overwhelming [2] - 255:18, 275:16
owe [1] - 330:4
owed [2] - 330:5, 330:9
own [8] - 233:10, 250:24, 250:25, 251:21, 263:15, 338:20, 338:22, 338:24

**P**

P-11 [1] - 274:3
P-119 [1] - 233:15
P-133 [2] - 301:6, 304:4
p.m [1] - 357:7
packaged [1] - 338:16
Page [11] - 246:19, 247:9,

281:20, 284:10, 291:3, 295:4, 301:5, 301:9, 301:13, 304:2, 341:14
page [10] - 233:18, 246:21, 281:19, 282:1, 286:5, 291:2, 295:7, 301:10, 351:3, 356:22
pages [3] - 301:10, 355:13, 355:15
paid [2] - 316:13, 319:5
pants [1] - 326:19
paper [2] - 283:12, 327:20
paragraph [1] - 287:3
parcel [1] - 265:7
parents [1] - 308:19
Park [6] - 243:2, 264:4, 264:8, 264:9, 264:10, 264:21
Parrish [12] - 228:25, 229:15, 229:20, 230:6, 230:22, 234:24, 234:25, 242:3, 253:15, 263:7, 267:6, 270:18
Parrish's [1] - 231:21
part [21] - 229:4, 229:14, 232:8, 236:12, 238:11, 251:17, 252:10, 253:13, 259:9, 265:7, 265:25, 277:8, 290:1, 314:1, 316:2, 327:14, 327:25, 331:1, 332:15, 334:7
participating [1] - 225:9
particular [3] - 245:9, 264:4, 264:9
particularly [1] - 248:1
parties [2] - 257:13, 259:25
pass [3] - 333:5, 333:6, 333:14
passed [1] - 228:3
past [1] - 227:10
pastor [1] - 352:24
pattern [1] - 247:4
pause [6] - 248:14, 272:20, 285:21, 305:7, 324:14, 348:2
paying [4] - 328:1, 328:3, 328:5, 328:7
penalty [24] - 228:3, 229:9, 229:10, 232:3, 232:7, 232:10, 232:21, 241:16, 245:17, 246:8, 251:5, 259:14, 259:21, 261:3, 262:13, 264:2, 265:6, 267:8, 267:15, 267:19, 268:13, 268:21, 324:22, 325:2
penalty/mitigation [1] - 240:20
penetrated [1] - 265:23
people [24] - 230:18, 254:14, 255:13, 259:13, 259:25, 260:1, 261:12, 262:5, 262:8, 262:9,

282:23, 283:16, 289:15, 298:21, 298:25, 299:2, 299:4, 302:7, 302:8, 312:18, 322:1, 331:6, 357:1
per [1] - 345:10
perceiving [1] - 267:25
perfect [1] - 226:19
perhaps [2] - 238:5, 346:21
period [24] - 270:14, 313:11, 313:15, 313:19, 313:21, 322:14, 326:6, 332:9, 339:7, 339:19, 339:24, 341:19, 341:23, 341:25, 342:12, 342:20, 343:1, 344:13, 345:13, 345:16, 345:21, 345:23, 346:1, 346:11
person [9] - 230:19, 233:4, 283:11, 289:8, 289:15, 298:23, 298:24, 326:14
person's [1] - 271:5
persona [1] - 265:17
personal [4] - 338:20, 338:22, 338:23, 338:24
personality [7] - 244:7, 263:23, 264:13, 264:18, 266:17, 323:12, 323:23
personally [4] - 225:8, 225:10, 261:2, 265:11
persons [2] - 246:4, 247:1
pervasive [1] - 265:14
petition [5] - 234:7, 238:13, 238:21, 240:7, 244:16
Petitioner's [3] - 281:11, 286:1, 286:22
petitioner's [1] - 350:11
phase [19] - 231:24, 231:25, 232:3, 232:7, 232:10, 241:16, 245:18, 246:8, 251:5, 264:2, 265:6, 267:4, 267:8, 267:15, 267:18, 267:19, 267:20, 268:13, 268:21
phetamine [1] - 316:12
Phoenix [1] - 328:14
phone [5] - 234:4, 241:10, 249:4, 278:1, 303:13
phonetic [1] - 321:14
physical [1] - 243:23
Piasecki [3] - 353:7, 353:8, 353:10
pick [1] - 342:11
picked [1] - 282:16
picking [1] - 343:18
pin [1] - 330:8
pipefitter [1] - 280:1
place [1] - 329:18
placed [1] - 271:10
plan [2] - 325:21, 325:23
planner [1] - 326:16
plate [2] - 300:9, 300:12

played [2] - 299:6, 303:7
plead [1] - 229:24
pleadings [1] - 244:1
pled [1] - 235:13
plenty [1] - 350:22
plug [1] - 227:21
plumber [1] - 280:1
plywood [2] - 297:11, 303:6
point [34] - 228:10, 230:7, 234:5, 241:14, 241:21, 246:8, 250:13, 250:15, 280:2, 296:18, 298:9, 301:3, 302:15, 309:22, 313:10, 314:15, 315:21, 315:25, 317:18, 320:13, 325:21, 330:6, 330:9, 338:10, 339:15, 344:11, 344:17, 344:20, 344:24, 345:19, 349:11, 355:1, 356:9
pointed [1] - 272:7
Poison [2] - 319:2, 334:18
poisoned [1] - 318:19
police [3] - 310:21, 310:23, 343:20
pool [1] - 229:11
poor [1] - 292:10
poorly [1] - 340:18
portion [2] - 290:22, 293:18
portrayed [1] - 276:5
position [3] - 256:25, 267:9, 356:4
possessing [1] - 288:13
possession [1] - 262:25
possibility [2] - 258:20, 353:21
post [4] - 227:18, 355:9, 355:11, 355:13
post-conviction [1] - 227:18
post-hearing [3] - 355:9, 355:11, 355:13
postdate [2] - 346:10, 346:11
potential [3] - 247:5, 287:7, 287:18
pounds [3] - 254:24, 255:8, 335:10
powder [1] - 316:25
practice [2] - 227:6, 233:11
pre [2] - 236:18, 322:11
pre-release [2] - 236:18, 322:11
preceding [1] - 241:6
precisely [1] - 251:20
preclude [1] - 275:24
prepare [1] - 241:16
preparing [3] - 250:9, 253:18, 258:12
preponderance [1] - 257:18

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 147 of 152

**present** [14] - 225:8, 225:10, 225:16, 232:2, 238:18, 251:4, 267:20, 268:20, 268:23, 274:12, 274:24, 353:21, 354:25, 355:5

**presentation** [3] - 246:7, 262:17, 267:3

**presented** [6] - 255:18, 269:7, 269:16, 269:17, 271:18, 272:1

**presenting** [13] - 232:6, 232:11, 244:11, 245:17, 251:15, 253:15, 267:7, 268:5, 268:13, 268:23, 353:1, 353:14, 353:20

**preserve** [1] - 245:14

**pressure** [2] - 357:1, 357:3

**pretender** [2] - 303:8, 304:16

**pretrial** [4] - 234:13, 239:19, 241:10, 251:21

**pretty** [14] - 250:2, 250:12, 262:12, 263:21, 270:8, 299:12, 317:14, 324:3, 330:20, 341:17, 344:7, 348:8, 348:11, 348:24

**previous** [7] - 230:23, 235:25, 275:19, 275:21, 287:21, 351:22

**previously** [9] - 228:25, 229:19, 257:21, 274:2, 285:25, 287:12, 297:15, 300:8, 300:20

**primarily** [3] - 232:6, 232:10, 331:6

**primary** [1] - 231:14

**Prison** [1] - 282:13

**prison** [5] - 225:22, 225:23, 288:6, 288:17, 290:2

**Prisons** [3] - 246:1, 246:17, 262:23

**prisons** [1] - 246:6

**Prisons's** [1] - 264:16

**Probation** [1] - 303:24

**probation** [13] - 297:14, 297:16, 297:18, 302:13, 303:1, 303:22, 304:1, 304:9, 304:15, 304:17, 304:19, 304:20, 304:22

**probe** [1] - 293:2

**problems** [5] - 266:7, 268:17, 270:23, 327:7, 355:17

**Procedure** [1] - 243:11

**proceed** [5] - 248:8, 301:4, 306:8, 334:9, 355:25

**proceeding** [3] - 238:11, 260:7, 275:24

**proceedings** [5] - 235:25, 236:15, 257:10, 257:19, 273:5

**Proceedings** [1] - 357:7

**proceeds** [4] - 288:13, 332:10, 332:16, 343:18

**process** [7] - 298:23, 314:23, 315:1, 318:19, 318:22, 321:6, 336:18

**produced** [1] - 335:1

**producing** [2] - 335:10, 339:17

**product** [4] - 250:8, 329:7, 338:20, 339:4

**production** [1] - 320:10

**professional** [3] - 242:7, 273:14, 277:11

**promises** [1] - 330:20

**prone** [1] - 246:5

**proof** [3] - 257:13, 257:19, 275:23

**proposed** [1] - 257:2

**proposition** [1] - 257:2

**pros** [1] - 263:16

**prosecution** [4] - 237:24, 256:24, 256:25, 306:20

**prosecutors** [1] - 273:5

**protection** [1] - 237:20

**prove** [5] - 254:4, 254:8, 254:13, 254:18, 276:3

**proves** [1] - 239:10

**provide** [5] - 234:6, 287:24, 291:11, 293:25, 319:6

**providing** [6] - 276:25, 287:9, 291:8, 293:22, 320:9, 344:25

**psychiatric** [1] - 250:10

**psychiatrist** [6] - 242:8, 252:3, 262:22, 263:10, 263:18, 268:14

**psychiatrists'** [1] - 264:16

**psychological** [4] - 238:19, 263:1, 267:8, 276:22

**psychologist** [1] - 242:8

**psychopath** [1] - 263:25

**psychopharma** [1] - 243:22

**psychopharmacologist** [3] - 270:3, 270:6, 277:15

**Public** [2] - 227:14, 228:7

**public** [4] - 303:8, 303:22, 303:23, 304:15

**pulled** [1] - 227:21

**punishment** [1] - 245:12

**Punishment** [1] - 227:16

**purchase** [2] - 294:13, 295:11

**pure** [6] - 255:4, 255:7, 255:14, 255:20, 317:11, 317:14

**purity** [1] - 317:12

**purported** [2] - 256:2, 268:14

**purporting** [1] - 269:10

**purpose** [1] - 245:21

**pursuant** [1] - 259:12

**put** [15] - 251:13, 254:24, 256:16, 266:19, 277:23, 286:3, 295:2, 304:13, 317:3, 317:7, 340:20, 340:21, 344:25, 356:5, 357:1

**putting** [1] - 285:25

**Q**

**qualified** [2] - 229:11, 245:11

**quantities** [1] - 275:15

**quantity** [4] - 252:12, 253:4, 254:4, 340:19

**quarters** [1] - 298:10

**questioned** [1] - 290:20

**questioning** [1] - 277:14

**Questionnaire** [2] - 260:19, 261:17

**questionnaire** [3] - 260:23, 261:18, 276:13

**questions** [20] - 248:17, 252:8, 258:4, 270:25, 272:21, 275:4, 275:14, 278:15, 283:21, 288:21, 291:7, 293:8, 303:4, 305:3, 305:8, 324:16, 334:14, 346:15, 347:7, 349:6

**quickly** [1] - 344:7

**quiet** [2] - 348:21, 349:3

**quit** [1] - 318:6

**quite** [10] - 239:12, 258:23, 258:25, 264:15, 264:17, 302:7, 302:8, 311:9, 324:9, 350:15

**quote** [3] - 237:15, 237:17, 263:9

**quotes** [1] - 246:20

**R**

**rage** [1] - 267:22

**raise** [2] - 255:25, 276:10

**raised** [6] - 238:16, 239:19, 240:10, 240:12, 259:1, 276:16

**raising** [2] - 240:2, 240:14

**range** [1] - 245:12

**rating** [1] - 271:19

**rationale** [1] - 251:23

**reach** [1] - 282:8

**reached** [2] - 291:12, 293:25

**read** [22] - 237:19, 246:23, 257:21, 258:1, 266:24, 269:19, 271:15, 283:12, 287:5, 290:22, 293:17, 293:18, 293:19, 301:6, 301:19, 301:20, 351:13, 356:18, 356:20, 356:23

**reading** [2] - 284:12,

287:4

**ready** [5] - 226:5, 234:10, 239:10, 279:4, 279:7

**real** [3] - 250:15, 251:1, 308:6

**reality** [1] - 271:16

**realize** [1] - 236:10

**really** [13] - 233:11, 250:21, 259:5, 273:21, 290:21, 292:23, 299:15, 326:18, 328:19, 331:5, 331:6, 332:23, 345:22

**realm** [1] - 258:19

**reason** [13] - 236:2, 237:5, 240:1, 240:14, 243:5, 247:15, 248:10, 251:17, 265:8, 266:3, 269:20, 275:18, 276:2

**reasonable** [1] - 257:19

**reasons** [3] - 262:14, 263:15, 265:4

**receive** [1] - 280:15

**recent** [1] - 249:23

**recently** [4] - 238:3, 250:3, 281:3, 281:6

**recess** [3] - 279:1, 279:3

**recipe** [4] - 294:13, 294:16, 294:19, 295:12

**recognize** [5] - 260:24, 281:12, 281:15, 286:2, 286:23

**recognized** [1] - 233:4

**recollection** [7] - 239:9, 240:25, 284:14, 290:24, 291:21, 294:18, 295:10

**recommendation** [1] - 273:13

**recommended** [1] - 242:7

**record** [23] - 225:2, 225:7, 226:25, 233:14, 236:21, 237:16, 237:19, 242:23, 244:21, 245:14, 246:23, 247:8, 258:9, 274:5, 274:22, 279:19, 281:10, 285:16, 296:10, 300:19, 306:14, 314:13, 355:15

**recruit** [1] - 327:1

**redacted** [1] - 253:4

**Reddy** [1] - 264:6

**redirect** [2] - 272:22, 349:7

**REDIRECT** [3] - 273:1, 293:12, 349:9

**reference** [2] - 271:16, 341:13

**referenced** [1] - 253:3

**references** [1] - 252:11

**referral** [1] - 270:25

**referring** [1] - 240:5

**refresh** [5] - 284:14, 291:21, 294:18, 294:21, 295:10

**refreshes** [2] - 239:8, 290:23

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 148 of 152

**refreshing** [2] - 301:1, 301:2
**regard** [7] - 236:23, 241:15, 254:3, 254:7, 269:2, 269:3, 289:4
**regarding** [8] - 236:21, 245:2, 277:14, 286:24, 287:24, 293:15, 294:12, 294:19
**regretted** [1] - 324:25
**regularly** [1] - 264:12
**rehabilitative** [1] - 247:5
**reinforces** [1] - 238:9
**related** [2] - 236:5, 290:10
**relating** [1] - 232:14
**relation** [2] - 320:10, 349:25
**relationship** [3] - 319:13, 319:21, 319:22
**release** [2] - 236:18, 322:11
**released** [2] - 288:17, 343:24
**relevance** [1] - 257:4
**relevant** [2] - 272:6, 292:24
**religiously** [1] - 261:2
**relying** [1] - 237:22
**remarried** [1] - 308:22
**remember** [77] - 237:25, 238:2, 238:7, 243:10, 252:8, 256:4, 259:16, 259:17, 259:18, 259:22, 259:23, 259:24, 260:4, 260:5, 263:11, 270:3, 271:11, 273:11, 273:19, 273:20, 275:1, 275:2, 275:4, 275:7, 277:19, 283:9, 283:13, 283:14, 284:22, 284:23, 286:3, 289:14, 289:15, 290:11, 290:19, 292:8, 292:11, 292:14, 292:20, 293:3, 294:14, 294:15, 294:22, 295:13, 296:17, 297:17, 299:15, 300:2, 300:3, 300:6, 300:8, 301:23, 302:3, 309:12, 309:23, 310:10, 311:15, 313:10, 313:13, 315:5, 315:12, 318:2, 320:16, 320:20, 323:20, 323:22, 324:2, 325:15, 326:2, 330:7, 335:19, 341:4, 341:8, 341:12, 341:20, 349:15
**reminder** [1] - 355:8
**remorse** [1] - 247:6
**rendered** [1] - 270:16
**renewing** [1] - 238:5
**rent** [3] - 316:13, 319:5, 328:7
**rented** [1] - 316:11
**repeat** [3] - 283:23, 287:10, 323:21

**reply** [2] - 355:11, 355:14
**report** [16] - 243:20, 270:10, 273:16, 274:6, 274:11, 274:16, 274:23, 275:10, 277:17, 277:25, 278:5, 292:7, 293:5, 302:12, 303:24
**reported** [2] - 250:6, 256:7
**reporter** [1] - 285:17
**reports** [3] - 244:3, 264:19, 275:7
**representation** [1] - 275:3
**representing** [1] - 291:6
**reputation** [1] - 302:19
**request** [2] - 225:20, 225:23
**requested** [3] - 232:9, 249:7, 352:6
**required** [3] - 254:13, 274:11, 274:23
**requirement** [1] - 344:25
**requiring** [1] - 257:19
**residual** [3] - 268:2, 268:12, 268:25
**resisted** [1] - 327:4
**Resource** [1] - 227:16
**resource** [1] - 227:21
**respect** [2] - 286:13, 287:16
**respond** [2] - 284:21, 333:25
**response** [5] - 263:19, 265:3, 284:6, 284:15, 355:10
**responsibility** [1] - 276:9
**responsible** [3] - 232:6, 232:10, 234:16
**rest** [5] - 299:4, 320:7, 336:13, 337:3, 338:16
**restroom** [1] - 324:10
**result** [2] - 287:8, 287:15
**resulting** [1] - 229:6
**results** [1] - 243:7
**retain** [1] - 338:19
**revealed** [1] - 251:7
**review** [6] - 234:9, 238:12, 239:7, 244:2, 244:10, 281:23
**reviewed** [8] - 236:14, 237:7, 243:25, 244:16, 253:19, 253:21, 265:22, 293:5
**reviewing** [2] - 237:25, 244:25
**revision** [1] - 355:16
**Rickert** [9] - 231:16, 232:22, 232:24, 240:19, 242:2, 242:5, 242:6, 266:5, 353:10
**Rickert's** [1] - 273:12
**rid** [2] - 310:19, 333:11
**ring** [2] - 293:5, 332:25
**rise** [1] - 243:23
**road** [1] - 267:7

**robbed** [1] - 230:18
**Rogers** [25] - 226:8, 226:9, 226:23, 227:1, 227:2, 233:13, 234:5, 237:17, 238:12, 239:6, 240:17, 240:18, 243:15, 243:25, 245:17, 247:10, 248:16, 248:22, 260:18, 267:1, 271:16, 273:3, 278:15, 278:23, 346:20
**ROGERS** [1] - 226:12
**role** [7] - 231:9, 231:14, 231:21, 252:12, 253:4, 268:3, 327:22
**roles** [1] - 231:20
**Ron** [7] - 307:22, 307:23, 312:4, 312:7, 312:13, 348:21, 353:5
**Ross** [1] - 296:11
**roughly** [1] - 297:2
**Rule** [4] - 243:11, 249:25, 262:18
**rule** [2] - 243:13, 250:2

## S

**safety** [1] - 247:1
**sales** [2] - 288:4, 288:14
**salt** [1] - 271:4
**samples** [1] - 345:1
**Sanders** [1] - 355:4
**Sandy** [1] - 352:1
**sat** [4] - 292:12, 299:5, 302:9
**saw** [11] - 273:20, 301:24, 303:3, 311:19, 312:12, 313:4, 320:6, 322:5, 340:18, 345:25, 348:25
**schedule** [2] - 226:1, 346:23
**scheduled** [1] - 353:3
**scheduling** [3] - 264:24, 347:5, 355:8
**Scheuss** [1] - 353:13
**school** [9] - 306:22, 306:23, 306:25, 307:2, 312:16, 312:18, 313:8, 348:19
**screen** [7] - 226:17, 233:14, 237:18, 281:9, 281:10, 286:1, 295:2
**scroll** [1] - 286:5
**scrupled** [1] - 245:10
**seat** [2] - 326:18, 332:19
**second** [8] - 246:16, 274:20, 280:10, 283:15, 284:5, 287:2, 304:5, 348:5
**secondly** [1] - 265:15
**secure** [1] - 246:16
**security** [4] - 246:13, 271:7, 271:10, 272:8
**see** [42] - 239:8, 246:21, 247:10, 260:25, 261:4,

261:17, 270:10, 270:23, 272:6, 274:2, 274:16, 282:14, 286:15, 290:23, 295:3, 295:13, 301:14, 301:15, 304:4, 311:13, 311:17, 312:4, 312:7, 314:4, 315:13, 316:15, 319:2, 319:3, 319:9, 319:23, 320:3, 322:2, 323:4, 334:18, 336:18, 345:9, 347:10, 347:21, 355:8, 355:22, 356:4, 356:25
**seeing** [4] - 237:25, 263:3, 311:15, 346:2
**seek** [1] - 325:2
**seized** [1] - 253:10
**selection** [5] - 232:8, 258:4, 258:16, 274:9, 274:12
**sell** [1] - 329:17
**senior** [1] - 228:6
**sense** [3] - 237:21, 241:18, 340:19
**sent** [2] - 329:8, 338:16
**sentence** [7] - 229:25, 244:23, 280:15, 280:18, 280:20, 284:12, 297:12
**sentenced** [1] - 245:25
**sentencing** [13] - 235:25, 236:8, 238:11, 239:16, 253:9, 253:20, 253:22, 256:3, 256:8, 256:22, 257:9, 257:17, 263:4
**September** [6] - 228:18, 335:14, 336:5, 339:10, 349:12, 355:16
**serve** [2] - 280:18, 280:20
**served** [1] - 282:24
**set** [11] - 302:25, 303:5, 303:9, 327:14, 328:22, 332:23, 335:21, 335:24, 339:3, 351:17
**setting** [3] - 271:11, 271:19, 272:11
**settings** [1] - 272:3
**settled** [2] - 252:1, 252:4
**seventh** [1] - 307:6
**several** [7] - 228:21, 229:8, 233:25, 234:3, 249:2, 270:14, 324:9
**shed** [3] - 310:18, 337:10, 337:16
**sheets** [2] - 297:11, 303:6
**shifts** [2] - 322:24, 322:25
**ship** [1] - 329:13
**shipped** [2] - 254:25, 255:8
**short** [1] - 289:13
**shorter** [1] - 350:19
**shot** [1] - 356:1
**show** [9] - 233:18, 237:15, 260:16, 260:18, 267:23, 281:19, 294:17, 294:23,

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM   Document 84   Filed 12/07/11   Page 149 of 152

302:21
**showed** [4] - 262:8, 268:5, 276:13, 299:3
**showing** [1] - 239:6
**shown** [1] - 292:7
**sic** [3] - 261:22, 320:21, 322:12
**sic]** [1] - 280:7
**sign** [1] - 286:9
**signature** [4] - 233:19, 281:20, 286:6, 286:7
**signed** [6] - 233:21, 281:3, 281:6, 281:18, 281:24, 286:24
**significance** [2] - 236:10, 265:11
**significant** [1] - 259:5
**signing** [1] - 234:1
**simply** [1] - 263:18
**Sioux** [5] - 253:15, 280:6, 282:17, 282:19, 283:2
**sister** [3] - 307:17, 308:3, 345:4
**situation** [2] - 268:6, 269:24
**skinny** [1] - 289:13
**slam** [1] - 276:4
**sleep** [2] - 318:7, 318:10
**small** [5] - 227:7, 229:11, 301:13, 304:2, 338:14
**smallest** [1] - 335:4
**Smidt** [5] - 307:23, 328:9, 351:2, 353:17, 353:19
**smoke** [4] - 316:19, 316:20, 316:22, 318:16
**smoked** [2] - 299:6, 302:10
**smoking** [1] - 317:2
**Snater** [1] - 353:23
**snort** [2] - 316:19, 316:23
**snorted** [1] - 316:24
**snorting** [1] - 317:2
**sociopath** [4] - 242:21, 263:25, 265:19, 265:25
**sociopaths** [1] - 264:13
**someplace** [1] - 309:5
**sometime** [2] - 236:19, 339:10
**sometimes** [8] - 241:13, 312:1, 321:24, 329:6, 329:7, 336:22, 336:25, 339:21
**somewhat** [2] - 319:14, 319:21
**somewhere** [3] - 284:3, 321:11, 339:11
**son** [1] - 348:15
**soon** [1] - 304:8
**sorry** [13] - 232:17, 238:20, 238:22, 239:13, 260:3, 274:1, 291:3, 301:12, 336:10, 339:2, 342:15, 343:17, 351:5
**sort** [3] - 231:9, 238:8,

241:19
**sound** [5] - 258:18, 298:10, 326:4, 332:6, 346:6
**sounds** [2] - 258:19, 298:11
**sources** [1] - 346:9
**south** [3] - 316:1, 339:2, 349:13
**Southern** [1] - 228:17
**speaking** [3] - 247:22, 283:6, 294:11
**special** [1] - 348:14
**specialist** [1] - 231:15
**specific** [7] - 235:23, 236:4, 236:9, 238:10, 258:20, 276:12, 297:2
**Specific** [1] - 247:3
**specifically** [3] - 232:14, 256:15, 257:16
**specifics** [2] - 253:21, 258:14
**speculation** [3] - 319:17, 320:7, 323:14
**spend** [7] - 258:23, 307:13, 308:8, 308:12, 312:1, 313:16, 313:22
**spending** [1] - 336:1
**spent** [6] - 266:8, 266:11, 291:10, 293:24, 308:18, 348:4
**Spies** [16] - 230:9, 230:10, 231:13, 231:18, 232:9, 235:1, 240:24, 241:3, 241:8, 241:20, 245:17, 266:11, 267:6, 291:1, 291:5, 293:20
**Spies's** [1] - 356:12
**spring** [2] - 320:18, 349:12
**sprinkle** [1] - 316:21
**spur** [1] - 267:22
**spur-of-the-moment** [1] - 267:22
**staff** [1] - 246:2
**stage** [1] - 257:9
**stand** [7] - 226:8, 226:15, 248:23, 279:15, 296:5, 305:25, 306:6
**start** [10] - 225:23, 228:1, 285:22, 288:5, 292:10, 314:23, 321:11, 346:5, 351:3, 357:5
**started** [6] - 231:6, 315:9, 315:19, 321:14, 342:24
**starting** [3] - 287:3, 295:4, 301:18
**starts** [3] - 284:12, 285:18, 342:14
**state** [9] - 226:25, 227:17, 229:6, 251:25, 279:18, 280:13, 288:19, 296:10, 306:13
**State** [1] - 227:14
**statement** [5] - 232:5,

260:11, 274:14, 334:1, 334:5
**statements** [1] - 255:12
**states** [1] - 302:8
**States** [5] - 225:3, 225:4, 237:16, 279:5, 291:19
**statistically** [1] - 247:21
**status** [1] - 354:4
**statute** [3] - 228:4, 229:13, 231:5
**stay** [5] - 336:22, 336:25, 339:25, 343:23, 344:2
**staying** [1] - 349:21
**steal** [1] - 309:21
**stealing** [4] - 297:10, 310:8, 325:6, 325:14
**step** [3] - 278:18, 295:19, 305:9
**stepbrother** [2] - 328:12, 328:13
**stepdad** [1] - 307:18
**stepdad's** [1] - 307:21
**stepfather** [2] - 312:5, 348:21
**stereo** [1] - 332:21
**Steve** [3] - 298:25, 352:1, 352:16
**still** [10] - 232:13, 268:1, 308:19, 315:25, 316:3, 321:21, 322:15, 322:22, 346:16, 354:2
**stipulation** [8] - 351:19, 352:3, 352:13, 352:15, 352:17, 352:22, 353:6, 353:24
**stole** [2] - 303:6, 309:7
**stop** [1] - 284:5
**stopped** [1] - 343:20
**storage** [2] - 333:15, 333:17
**store** [1] - 331:2
**stored** [2] - 310:18, 333:17
**strategic** [4] - 237:5, 240:1, 240:14, 248:10
**stricken** [1] - 244:22
**strike** [5] - 245:9, 259:11, 259:25, 294:11, 303:9
**strikes** [1] - 245:2
**struck** [7] - 258:7, 259:11, 260:8, 261:9, 261:12, 261:23, 262:4
**stuff** [5] - 284:24, 287:12, 294:5, 317:4, 333:10
**subject** [7] - 236:25, 248:8, 257:6, 322:12, 323:18, 334:8, 351:22
**subjected** [1] - 235:19
**submit** [1] - 300:20
**subparts** [1] - 259:19
**subsequent** [2] - 246:15, 288:5
**substantial** [1] - 254:24
**succeeded** [3] - 240:13,

332:1, 342:21
**successfully** [1] - 265:23
**suffered** [1] - 269:11
**suffers** [1] - 268:25
**suggested** [3] - 240:19, 242:3, 270:5
**summer** [2] - 241:5, 296:18
**supervised** [1] - 236:12
**Supp** [1] - 237:17
**support** [1] - 257:1
**suppose** [1] - 282:7
**supposed** [2] - 298:24, 333:14
**surprised** [1] - 264:17
**sustained** [2] - 319:19, 320:8
**swallow** [1] - 317:8
**sworn** [7] - 226:13, 279:11, 279:13, 295:25, 296:3, 306:2, 306:4
**symptoms** [1] - 277:7
**system** [3] - 227:14, 322:20, 332:21

**T**

**table** [1] - 299:5
**tactical** [1] - 265:4
**taint** [1] - 251:7
**tall** [1] - 289:13
**Tamarack** [4] - 314:19, 314:22, 334:23, 338:8
**task** [1] - 300:1
**teaching** [1] - 245:24
**team** [5] - 231:21, 234:20, 251:7, 281:4, 281:7
**teenagers** [2] - 310:8, 312:16
**telephone** [4] - 225:9, 225:16, 240:23, 351:16
**tend** [1] - 355:21
**terms** [10] - 231:22, 234:20, 234:21, 236:11, 241:19, 242:9, 265:17, 267:14, 270:12, 273:11
**Terry** [6] - 330:5, 331:7, 331:10, 331:14, 331:17, 351:13
**tested** [2] - 234:10, 239:11
**testified** [18] - 226:14, 246:3, 248:25, 255:14, 272:4, 279:14, 287:12, 289:1, 292:2, 292:8, 293:4, 294:19, 296:4, 298:9, 306:5, 325:13, 341:1, 341:7
**testify** [5] - 280:25, 294:12, 297:15, 304:25, 306:17
**testifying** [4] - 295:11, 300:8, 341:4, 348:3
**testimony** [28] - 236:25, 246:8, 246:11, 246:14,

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 84    Filed 12/07/11    Page 150 of 152

247:21, 253:14, 254:23, 255:2, 255:4, 255:6, 255:9, 263:11, 264:1, 270:4, 270:7, 271:8, 271:9, 271:11, 271:17, 272:16, 274:25, 289:7, 290:23, 294:18, 300:21, 325:16, 341:20, 356:20

**testing** [3] - 250:10, 322:12, 322:17

**tests** [1] - 344:16

**THE** [115] - 225:2, 225:15, 225:19, 225:25, 226:3, 226:5, 226:9, 226:10, 226:11, 226:15, 226:18, 226:20, 236:24, 238:25, 239:4, 239:5, 248:7, 248:13, 248:18, 257:6, 260:14, 272:19, 272:22, 273:25, 278:16, 278:18, 278:19, 278:20, 278:25, 279:4, 279:10, 279:15, 285:16, 286:13, 286:19, 293:10, 295:1, 295:16, 295:18, 295:22, 295:24, 296:5, 300:15, 300:18, 300:25, 301:4, 301:8, 305:5, 305:9, 305:13, 305:14, 305:16, 305:20, 305:23, 306:1, 306:6, 306:7, 306:9, 319:19, 320:5, 323:18, 324:13, 324:17, 333:22, 334:8, 346:14, 346:25, 347:8, 348:1, 349:7, 350:5, 350:7, 350:10, 350:17, 350:24, 351:3, 351:7, 351:12, 351:18, 351:20, 351:24, 352:1, 352:5, 352:9, 352:12, 352:14, 352:16, 352:18, 352:21, 352:23, 353:2, 353:5, 353:7, 353:10, 353:13, 353:16, 353:19, 353:23, 353:25, 354:5, 354:8, 354:11, 354:13, 354:16, 354:18, 354:20, 354:24, 355:2, 355:4, 355:7, 355:20, 356:7, 356:15, 356:25, 357:5

**theft** [3] - 310:14, 310:15, 325:4

**themes** [2] - 267:15, 267:17

**theory** [1] - 256:9

**thinking** [1] - 354:2

**thinks** [1] - 326:21

**third** [1] - 230:8

**thousand** [1] - 332:14

**threats** [1] - 247:3

**throughout** [1] - 231:10

**thrust** [1] - 248:2

**Thursday** [3] - 356:9, 356:13, 356:14

**Tim** [2] - 255:6, 330:8

**timeframe** [6] - 227:19, 302:25, 322:8, 326:2, 335:20, 350:19

**timing** [2] - 236:23, 273:11

**Timothy** [2] - 305:24, 306:15

**TIMOTHY** [1] - 306:3

**today** [3] - 256:21, 290:10, 355:21

**together** [13] - 266:20, 280:23, 282:24, 298:22, 307:8, 308:19, 312:16, 313:22, 315:24, 318:4, 326:8, 331:22, 349:22

**Tokars** [1] - 354:5

**tomorrow** [11] - 225:24, 303:12, 351:16, 353:4, 353:14, 353:18, 355:1, 355:23, 356:2, 356:6, 357:5

**took** [6] - 230:19, 248:23, 282:16, 309:4, 309:6, 325:9

**toothpick** [1] - 317:7

**top** [5] - 246:21, 274:16, 286:12, 301:15, 342:6

**total** [1] - 341:19

**totally** [1] - 346:22

**touch** [1] - 304:13

**tough** [1] - 265:17

**tough-guy** [1] - 265:17

**toward** [1] - 269:6

**town** [1] - 336:14

**toxicologist** [3] - 243:16, 243:21, 270:6

**track** [1] - 340:12

**trailer** [1] - 289:6

**transcript** [5] - 253:19, 253:21, 271:15, 356:18, 356:23

**transported** [1] - 225:12

**traumatic** [1] - 265:12

**travel** [1] - 331:16

**trial** [59] - 227:15, 227:23, 228:13, 228:15, 228:17, 229:21, 231:13, 231:17, 231:25, 232:7, 232:9, 239:20, 241:2, 241:6, 241:8, 249:18, 250:6, 250:25, 253:19, 253:24, 254:23, 255:19, 256:13, 257:24, 258:8, 259:10, 266:19, 267:10, 268:10, 269:16, 269:18, 271:18, 275:5, 276:9, 280:25, 282:6, 289:2, 290:19, 290:23, 291:22, 292:2, 293:4, 293:16, 293:19, 294:12, 294:15, 294:18, 294:23, 298:9, 305:1, 341:1, 341:2, 341:8, 341:21, 354:4, 356:12, 356:18, 356:20, 356:23

**trials** [5] - 249:15, 249:16, 249:18, 249:20, 249:24

**tried** [4] - 228:8, 306:16, 315:13, 346:23

**trips** [2] - 342:15, 342:25

**trouble** [1] - 260:20

**truck** [5] - 309:4, 309:6, 309:7, 309:21, 310:22

**true** [4] - 266:10, 284:18, 289:2, 310:25

**trust** [3] - 257:22, 298:17, 299:13

**trusting** [1] - 270:21

**try** [5] - 282:8, 304:19, 347:3, 356:15, 356:16

**trying** [7] - 233:2, 293:2, 298:17, 302:25, 318:10, 345:18, 357:2

**Tucson** [10] - 314:21, 316:1, 333:16, 335:24, 336:14, 337:3, 337:4, 339:2, 342:4, 349:13

**turn** [4] - 273:24, 275:11, 304:2, 336:23

**turns** [1] - 350:19

**TV** [1] - 307:10

**twice** [6] - 287:5, 297:23, 322:5, 345:10, 345:12, 350:2

**type** [12] - 237:5, 238:15, 238:16, 265:5, 267:7, 268:5, 268:25, 269:14, 277:6, 280:15, 338:3

## U

**ultimate** [2] - 237:22, 273:14

**ultimately** [8] - 242:12, 255:13, 270:16, 286:24, 327:6, 327:8, 329:16, 344:19

**unclear** [1] - 275:5

**under** [12] - 256:9, 260:1, 260:8, 261:4, 261:7, 261:21, 261:22, 261:24, 276:18, 298:8, 344:10

**understood** [4] - 234:12, 327:10, 327:22, 356:24

**unexplored** [1] - 250:12

**unfortunately** [1] - 346:19

**union** [1] - 280:1

**United** [5] - 225:3, 225:4, 237:16, 279:5, 291:18

**units** [2] - 333:15, 333:17

**unless** [3] - 346:15, 355:1, 356:12

**unusual** [1] - 267:19

**up** [53] - 225:20, 241:2, 241:7, 248:23, 251:9, 258:22, 259:1, 262:8, 280:10, 282:16, 285:20, 286:12, 287:22, 292:11, 294:5, 295:2, 298:25, 299:3, 302:21, 303:5,

303:9, 309:14, 314:7, 325:5, 327:1, 327:14, 328:14, 328:22, 329:8, 329:13, 330:5, 331:6, 331:21, 331:25, 332:4, 332:6, 335:21, 335:24, 336:1, 338:16, 338:17, 339:3, 339:15, 339:25, 342:1, 342:11, 343:18, 346:22, 347:5, 351:17, 355:1, 357:1

**urinalysis** [1] - 344:16

**urine** [1] - 344:25

**US** [2] - 229:23, 299:25

**usage** [1] - 338:7

**user** [1] - 298:12

**USP** [4] - 246:11, 246:15, 271:13, 271:14

## V

**vague** [3] - 240:24, 284:17

**vaguely** [1] - 292:15

**various** [6] - 227:15, 232:18, 246:9, 259:2, 259:19, 272:2

**verify** [1] - 233:21

**versa** [1] - 259:22

**verse** [1] - 356:22

**versus** [3] - 225:3, 237:16, 279:5

**Vest** [1] - 354:5

**vice** [1] - 259:22

**view** [3] - 253:13, 258:6, 259:14

**viewed** [3] - 235:13, 235:14, 247:23

**viewing** [1] - 265:24

**violation** [1] - 235:20

**violence** [3] - 246:6, 247:3, 247:4

**Virginia** [1] - 264:6

**visit** [1] - 308:10

**visiting** [1] - 321:4

**visits** [1] - 342:16

**Vodka** [2] - 311:13, 311:14

**voice** [2] - 285:18, 285:20

**volume** [1] - 304:3

**vote** [1] - 261:4

## W

**Wagner** [1] - 355:4

**waited** [2] - 319:3, 334:18

**waiting** [1] - 354:3

**walked** [2] - 303:15, 303:17

**wants** [1] - 355:14

**Warren** [1] - 354:6

**watched** [1] - 307:10

**ways** [1] - 346:17

**week** [7] - 322:25, 336:18,

336:22, 339:20, 342:7, 342:8, 342:15

**weigh** [2] - 268:18, 269:13
**weight** [1] - 269:6
**well-established** [1] - 265:16
**well-known** [1] - 233:4
**Wellborn** [1] - 326:3
**whatsoever** [2] - 267:5, 288:16
**whole** [5] - 228:20, 232:20, 290:16, 312:11, 349:4
**Willett** [1] - 341:16
**Williams** [19] - 236:25, 273:7, 275:4, 275:14, 276:5, 276:7, 276:12, 276:21, 277:14, 278:16, 288:25, 291:7, 293:18, 293:21, 295:16, 305:5, 321:1, 349:11, 352:7
**WILLIAMS** [33] - 232:15, 236:20, 248:6, 248:19, 248:21, 260:13, 272:18, 272:21, 278:17, 278:22, 288:24, 291:3, 293:8, 295:17, 305:6, 305:8, 319:17, 319:25, 320:23, 323:13, 324:18, 324:20, 333:20, 333:25, 341:14, 347:6, 347:24, 349:5, 350:6, 355:18, 355:24, 356:8, 357:4
**Wisconsin** [1] - 233:3
**wish** [3] - 225:12, 225:16, 353:21
**Witherspoon** [3] - 244:18, 258:6, 276:17
**Witness** [1] - 284:13
**WITNESS** [5] - 226:10, 239:1, 239:5, 278:19, 305:14
**witness** [29] - 226:13, 239:3, 245:18, 245:24, 248:23, 257:7, 263:24, 279:13, 282:6, 282:9, 285:18, 285:21, 286:15, 293:10, 295:20, 296:3, 300:14, 305:19, 305:22, 306:4, 306:19, 318:4, 346:16, 346:19, 347:1, 350:12, 351:10, 356:14, 356:20
**witnessed** [1] - 317:23
**witnesses** [6] - 286:14, 350:21, 355:22, 356:3, 356:5, 356:10
**woman** [2] - 233:9, 300:4
**Woodbury** [4] - 280:11, 280:23, 291:11, 293:24
**word** [4] - 250:11, 254:11, 287:3, 295:5
**worded** [1] - 340:18
**words** [2] - 242:21, 311:16

**works** [2] - 264:10, 300:18
**workup** [1] - 240:20
**workups** [1] - 264:17
**worried** [1] - 263:18
**worry** [2] - 276:3, 303:11
**worth** [1] - 271:3
**worthy** [1] - 239:22
**wrote** [1] - 281:18

# X



**Xed** [1] - 276:19

# Y



**Yankton** [2] - 282:13, 282:15
**year** [5] - 227:16, 249:7, 297:18, 304:24, 313:10
**year's** [1] - 297:14
**Year's** [2] - 300:3, 301:17
**years** [9] - 227:5, 227:13, 228:5, 228:6, 228:16, 280:17, 297:16, 319:13, 323:11
**yesterday** [1] - 225:6
**young** [2] - 307:8, 308:9
**younger** [1] - 309:16
**yourself** [8] - 243:5, 245:2, 284:12, 287:4, 301:7, 301:20, 336:5, 338:19

Case 3:10-cv-03074-LTS-KEM   Document 84   Filed 12/07/11   Page 152 of 152