IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA

DUSTIN LEE HONKEN,                )
                                  )
                Plaintiff,        )    10-CV-3074-LRR
                                  )
     VS.                          )    **VOLUME III**
                                  )
UNITED STATES OF AMERICA,         )
                                  )
                Defendant.        )

APPEARANCES:

ATTORNEYS SHAWN NOLAN, AREN ADJOIAN, AND AYANNA SALA WILLIAMS, Capital Habeas Unit, Federal Community Defender Office, Eastern District of Pennsylvania, Suite 545 West-Curtis Building, 601 Walnut Street, Philadelphia, Pennsylvania 19106, appeared on behalf of the Plaintiff.

ATTORNEY CHARLES J. WILLIAMS, Assistant U.S. Attorney, Suite 400, 401 First Street S.E., Cedar Rapids, Iowa 52401, appeared on behalf of the United States.

EVIDENTIARY HEARING,

held before the Hon. Linda R. Reade on the 2nd day of

November, 2011, at 4200 C Street S.W., Cedar Rapids,

Iowa, commencing at 8:54 a.m.

Patrice A. Murray, CSR, RPR, RMR, FCRR
United States District Court
4200 C Street S.W.
Cedar Rapids, Iowa 52404
(319) 286-2324

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 1 of 177

INDEX

| WITNESS | D | C | RD | RC |
|---------|-----|-----|-----|-----|
| Marvea Smidt | 363 | 392 | 408 | |
| Alyssa Nelson | 410 | 435 | 442 | |
| Kathy Scheuss | 444 | 452 | | |
| Terry Bregar | 458 | 472 | 484 | |
| John Graham | 487 | 493 | | |
| Lori Lewis | 495 | 499 | | |
| Duane Walhof | 500 | 510 | | |

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

(The following was held in open court.)

THE COURT: We're on the record in Honken versus the United States, Case Number 10-3074, 01-3047.

Mr. Nolan.

MR. NOLAN: Your Honor, we're going to present 3 witnesses this morning, and then we have Mr. Bregar, who is going to testify by phone, scheduled at 1:00.

THE COURT: Okay.

MR. NOLAN: And then the government has been able to rearrange their witnesses to put some of them on this afternoon. I spoke to Mr. Spies last night, and he's doing closing arguments today.

THE COURT: Great.

MR. NOLAN: So he will be available tomorrow.

THE COURT: Great.

MR. NOLAN: As far as the timing of when he'll be available, I will hope to be able to let the Court know that by the end of the day today when I'll speak to him this afternoon. But it may be that -- if he doesn't have a verdict by today, maybe we would want to start at 8:00 tomorrow, and we could get him done early enough that he would still be able to get down for his appearance there, or perhaps we could break for him

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 3 of 177

to go take a verdict or something. I think he's in Iowa City.

THE COURT: Okay, sure.

MR. NOLAN: And we decided not to call the other witness on our list, Melissa Friesenborg. As the Court noted yesterday, much of what we wanted to present from her is elsewhere in the record. So we believe we will wrap up the hearing tomorrow once Mr. Spies testifies.

THE COURT: Great. All right. We'll -- I have set aside all of these days, so it doesn't matter really. Whenever Mr. Spies can get here is fine.

MR. WILLIAMS: And, Your Honor, just to let you know, we plan on calling Lori Lewis, John Graham, and Duane Walhof this afternoon. There's 1 witness, who -- the availability wasn't so good, and we will probably not end up calling him, but if we do, it will be tomorrow. It's Mark Hein. And then there's a last witness, who -- Bill Basler, who is the case agent on this case. His father died yesterday afternoon.

THE COURT: Oh, my.

MR. WILLIAMS: His mother is in a nursing home. The defense has graciously agreed to try to find a way around this, and so we're going to talk about trying to do a stipulation. And if that doesn't work,

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 4 of 177
*to purchase a complete copy of the transcript.*

then we may do, like, a deposition or a VTC deposition or something next week and then submit the transcript to the Court at a later date, if that's acceptable to the Court.

THE COURT: Yes. We'll just work around that. How unfortunate.

MR. WILLIAMS: Thank you, Your Honor.

THE COURT: All right. We are ready to go.

MR. NOLAN: Your Honor, we'll call Marvea Smidt to the stand.

THE COURT: Mrs. Smidt, will you just come forward here. And we'll place you under oath, and then we'll have you take your chair.

THE WITNESS: Okay.

MARVEA SMIDT,
called as a witness, being first duly sworn or affirmed, was examined and testified as follows:

THE CLERK: You may take the stand.

MR. NOLAN: May I proceed, Your Honor?

THE COURT: You may.

DIRECT EXAMINATION

BY MR. NOLAN:

Q. Good morning, Ms. Smidt.

A. Good morning.

Q. You seem so far away. Can you just state your

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 5 of 177
*to purchase a complete copy of the transcript.*

name for the record, and spell your name, please?

A.     Marvea, M-A-R-V-E-A, Mary, M-A-R-Y, Smidt, S-M-I-D-T.

Q.     Ma'am, how are you related to Dustin Honken?

A.     I am his mother.

Q.     And how many children did you have?

A.     I had 4.

Q.     And what number child for you was Dustin?

A.     Dustin would have been the third one.

Q.     And who is your oldest child?

A.     Jeff.

Q.     And after Jeff, who was born?

A.     Matthew.

Q.     And what happened with Matthew?

A.     Matthew died shortly after he was born.

Q.     Okay.  And how much younger than Jeff was Matthew?

A.     About 3 years.

Q.     And after -- after Matthew, who was born?

A.     Then Dustin.

Q.     Okay.  And how much younger is Dustin than Jeff?

A.     Jeff is -- there's 6 years between Dustin and Jeff.

Q.     Okay.  And then who was your youngest child?

A.     Alyssa.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 6 of 177
*to purchase a complete copy of the transcript.*

Q.     And how much younger than Dustin is she?

A.     3 years.

Q.     Okay.  Did you testify at Dustin's trial?

A.     Yes, I did.

Q.     And did you testify at the merits phase or the penalty phase?  Do you know what the difference is?

A.     No.

Q.     Okay.  That's all right.  When you -- did you have any difficulties with your pregnancies?

A.     Yes, I did.

Q.     Can you describe that for Her Honor?

A.     I would say mainly I had problems with -- not so much with Jeff.

Q.     Was Jeff delivered by C section?

A.     Yes.

Q.     And then after that?

A.     Then Matthew, not -- not so much, I can't say there.  With Dustin, I was sick for a long time.

Q.     And what happened with -- you said Matthew died not long after he was born.  What happened with that?

A.     Well, I never got to see Matthew, as I had a C section.  At that time, you had spinals and they made you lay still for 24 hours flat.  And they could not bring Matthew to me because they had said his breathing was irregular.  And so every time I would ask to see

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 7 of 177
*to purchase a complete copy of the transcript.*

him, they would say, "Well, not yet.  His breathing isn't good."  And I kept asking and asking, and then finally I kind of thought *There's something really wrong here.*  And then later on, they came in and said Matthew had died.

Q.     And when you were pregnant with Dustin, did you have any difficulties throughout the pregnancy?

A.     I was anemic.  I was very anemic, and I didn't, you know, gain much weight or anything.  The doctor was a little bit worried at first because I couldn't keep anything down.

Q.     And when Dustin was born, were there any difficulties when he was born?

A.     He was C section also, and they said he was blue, is more or less what they said.  And I got real upset and nervous, because I had already lost 1 baby, you know.  And so I was real upset because I thought *Here we go again*, and they said, "No, he's going to be okay. He's going to be okay," you know, "They're going to put him in the warming oven or someplace, you know, to get him warm.  He's going to be fine," and then he was.

Q.     And how long did he stay in the hospital after he was born?

A.     We were in there about 5 days, because he had trouble with not keeping any formula down.

Q.     And did that trouble last throughout his infancy?

A.     Yes, it did.

Q.     And can you describe that a little bit?

A.     It just seemed like every time he would eat, it would just come right back up again, is what it would. He was a baby that they said had to have a pacifier, because every time you'd go down -- when I was in the hospital, every time I would go down to look at him, he would be balling.  And then 1 time his back was towards me, and he wasn't crying.  And I thought what's with this, you know, this is unusual.  And then I looked around, they had stuffed cotton in a nipple, and they had stuck in his mouth.  And then the doctor told me, "This baby has got to have a pacifier," because what had happened was the formula -- at that time, they didn't have all the things that they have nowadays.  And so they ended up putting, like, oatmeal or something like that in the formula, so they had to make the hole bigger in the nipple for him to suck it, and so he wasn't getting all that -- the sucking that he should have.  So he had a pacifier until -- in fact, I thought he was going to go to school with it.

Q.     Okay.  I would like you to talk a little bit about Dustin as a young child.  What was his -- what was his temperament like as a young child?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 9 of 177

A.     Dustin was kind of my rambunctious 1.  He learned everything early.  He walked early.  He talked early.  He -- he was just kind of -- with different things, he was just real fussy.

Q.     What do you mean by "fussy"?  Can you describe that a little bit?

A.     He was a very fussy eater.  I don't know if it came from -- you know, just certain things, like textures would bother him, I think, in his mouth, because he didn't want anything that was kind of chunky or anything like that.  So more or less, all the way for a long time, it seemed like I was always making 2 different meals.

Q.     And was he -- how about his appearance?  Did he have any particular obsessive -- obsessions about appearance or anything like that?

A.     Well, when he got older and everything, Dustin was a clean freak.  He would take several showers a day.  And his clothes, everything had to be matched.  And his hair couldn't be out of place.  And he was just obsessive with things like that.

Q.     Did he have an issue with color blindness?

A.     Yes, he did.  He got -- navy blue, brown, black, everything was all the same.  So when he would be getting ready for school, he would come down and say

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 10 of 177
*to purchase a complete copy of the transcript.*

"Now, Mom, does this match?  Does this go with this, this go with that," so a lot of times at night I would lay his clothes out for him.

Q.    When he was a child did you notice any issues with nervousness?

A.    He was always -- you know, never could sit still. His legs were always jumping up and down and things like that.  And it just -- like when he would talk, he'd talk really, really fast, and just things like that, you know.  He'd -- just twitching here and there.  He just never could sit still.

Q.    Did that remind you of anybody in your family?

A.    Oh, yes.  My brother.

Q.    Who is your brother?

A.    Tim Hamilton.

Q.    And we'll come back to talk about Tim in a few minutes.  Was there a time when you were bathing Dustin in the tub and you noticed anything?

A.    Yes, I did.  He had bruises on his arms, and I asked him.  I said, "Dustin, what happened?  Why do you have bruises on your arms?"

           "Nothing.  Nothing."

           I said, "Well, it's something.  There's bruises.  I want to know what's wrong."

           "Nope.  Nothing," and he just absolutely

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 11 of 177
*to purchase a complete copy of the transcript.*

would not tell me what was wrong.  And later I found out that this teacher was really good at grabbing the kids, you know, when she was upset and everything with them. And I never did do anything about it, because he said, "Well, Mom, don't do anything about it because it would just make matters worse for me."

Q.    Do you feel you should have done something about it?

A.    Oh, yeah, I should have.

Q.    Well, I want to talk a little bit about your family and the history of mental illness in your family. Who was your mother?

A.    Opal.

Q.    Can you just spell that?

A.    Opal, O-P-A-L, Opal, and it was Hamilton.

Q.    Okay.

A.    Maiden name Munson.

Q.    Did your mother have any issues with mental illness?

A.    Depression.

Q.    And how would you describe what you saw in her, particularly after your younger sister was born?

A.    Well, my sister, when she was born --

Q.    First, for the record, what's your sister's name?

A.    My sister's name is Laurel, L-A-U-R-E-L, and

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 12 of 177
*to purchase a complete copy of the transcript.*

she's 8 years younger than I am. Laurel was very temperamental and had this -- was prone to colic very, very much so when she was a baby. And at that time, my mother, just when she came home with Laurel and everything, just wasn't able to do a lot of things. And so that is when, more or less, my dad and I took turns walking her, because when she had colic, back then there wasn't much they did for it. And we'd walk her, you know, all the time. And I learned how to do a lot of the housework and helped mom out because she was in bed a lot.

Q.    Why was she in bed?

A.    She just couldn't function. I mean, you know, just everything -- she just absolutely could not function.

Q.    All right. Now let's go back to your sister, Laurel. What's her last name?

A.    It's right now -- it's Laurel Christianson. She goes by Laurel Hamilton now.

Q.    Okay. And when she was young -- a young child, what was she like? What was her temperament like?

A.    Laurel was very, very shy. People -- like when she grew up, they used to think she was stuck-up, but it was that she was just very, very shy and that. She was a real bookworm. She didn't participate in many

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 13 of 177

different things or anything like that.  Like I said, when she was younger, she would have terrible temper tantrums.

Q.    And as she got older, did she develop some issues with mental illness?

A.    Yes, she did.

Q.    Can you describe that for Her Honor?

A.    When she was older and left the house -- of course, like I said, I'm 8 years older than she is, but at 1 time she had lived in the Cities, and Mom called me, and she says, "I can't find Laurel.  I don't know.  She won't answer her phone.  I don't know where she's at."  And she was real upset.  And we tried different places, and we -- we basically couldn't find her.  And then -- I don't know how long it was, and she finally did get ahold of my mother, and she had been in the hospital with a complete nervous breakdown.

Q.    Okay.  And are you aware that -- of your sister being on medications over the years?

A.    Yes.

Q.    And for what?

A.    For depression, severe depression.

Q.    Has she ever attempted to commit suicide?

A.    Yes, she has.

Q.    Do you know how many times?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 14 of 177
*to purchase a complete copy of the transcript.*

A.      It's 2 or 3.

Q.      And does she also have a son?

A.      Yes, she does, Cole.

Q.      Does Cole have any issues with mental illness?

A.      Cole is a bulimic, an anorexic.  He's an alcoholic.  And he's a drug addict.

Q.      Let's talk about your -- you mentioned your brother, Tim; that Dustin's behavior as a child reminded you of your brother, Tim.

A.      Uh-huh.

Q.      Does your brother, Tim, have issues with mental illness?

A.      Tim is an alcoholic.

Q.      Does he have any other issues with mental illness?

A.      He has been on depression medication, but then after a while, he just more or less just threw it all away and said he wasn't going to take it.

Q.      And how about your daughter, Alyssa?  Has Alyssa had issues with any mental illness?

A.      Yes.  She suffers from depression also.  It started in high school.

Q.      Okay.  That's okay.  We'll ask her about that.

A.      Okay.

Q.      Ms. Smidt, how about yourself, have you had

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 15 of 177

issues with depression and anxiety over the years?

A. On and off. Many, many years ago. I can't exactly remember. That was when Dr. Camp was in Britt. He had said at the time -- he said, I was 1 of the most nervous people that he knew, but I kept it all inside. And he had prescribed some medication for me, but the side effects I absolutely hated, so I wouldn't take it.

Q. Was that after you were married?

A. Yes.

Q. And how about -- so that was many years ago --

A. Yes.

Q. -- you had some medication. How about more recently, have you had treatment for mental illness, depression?

A. Then -- I can't remember the year, because it was with Dr. Dunker. He treated me for anxiety, and I was put on the medication Buspar.

Q. Okay.

A. And then the only other time I took anything was when Dustin was at trial. I mean, I was very nervous, and I couldn't sleep and cried all the time, so they put me on something. And then afterwards and everything, I discontinued and I haven't been on anything.

Q. Okay. All right. I'd like you to talk a little bit about the -- some of the alcoholism in your family.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM Document 85 Filed 12/07/11 Page 16 of 177

Q. You mentioned your brother, Tim. How about your father?

A. My father was an alcoholic also.

Q. And how about your grandfather?

A. His father was an alcoholic also.

Q. And what was his name?

A. Thomas Hamilton.

Q. All right. Now, Ms. Smidt, I'd like to talk a little bit about your marriage to Jim Honken. How long were you married to Jim?

A. I think it was 17 years.

Q. And how old were you when you got married?

A. I had just turned 18.

Q. Did your parents want you to get married --

A. Absolutely not, because I was going to leave the church, for 1 thing, and I was raised a very strict Catholic.

Q. And so what happened at the time you got married?

A. Well, my mother took me to monsignor, and she made me -- I did go with her, and, of course, he just had told me at the time that if I was going to leave the church, I was going to go straight to hell, is what basically what he told me, and -- but then I, of course, didn't listen. My mother -- at that time, too, you had to produce a birth certificate that you were old enough to get married, and they hid my birth certificate, is

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 17 of 177

what they did, from me. But I got ahold of it, and --

Q.      They didn't want you to marry Jim?

A.      Oh, absolutely not.

Q.      And at the time that you got married, did you know whether Jim was a drinker?

A.      Yes, I knew that he drank, but, you know, I was so used to living in a home that there was alcohol and everything like that, I never really thought anything about it.

Q.      And did there -- did there come a time soon after you got married that you realized that it was more of a problem than you originally thought?

A.      Definitely, I did, yes.

Q.      Can you describe -- can you describe that a little bit?

A.      Well, for 1 thing, I can say, you know, when I did get married, it was mainly more or less to get out of the house, is what it was. All my friends had left for college and everything like that. And so -- and I was working in the telephone office half days and going to school, and then I was more or less -- I was buying my parents a car, and things just balled up for me. And so I thought it would be a lot better to get married than the situation I was in, even -- yeah, I knew Jim was a drinker, but like I said, my father was too, so I

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 18 of 177

didn't think, you know, it would be so bad.  But it steadily got worse, his drinking did.

Q.    And as it got worse, did you at some point ask your parents for help?

A.    Yes.  I went and I talked to my mother, and, of course, she went back to, like, you know, before I got married, like, you know, she didn't want us to, and she said, "Well, you made your bed.  You lie in it."  So, I mean, there was -- there was nothing there.  And I didn't know what to do.  I just stayed there.

Q.    Okay.  Can you describe for Her Honor a little bit about what Jim was like when he was drunk?  How did he treat you?

A.    Jim always would -- he was a great 1 to promise things and everything and to do things and whatever, but it never came about.  He -- a lot of times, just being more or less, you know, sarcastic and that with me, is what he would be, you know, because he -- he didn't want me to work or anything and I stayed home, and so it was more or less -- he called me -- he always called me Fatty.  And at that time, of course, I wasn't Fatty.  I was very, very thin, but he had just -- I don't know, he just said words to me that my self-esteem just kind of went 0.  I didn't have much to begin with anyway, but then it even went lower.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Q.    And was there a time previously, early in your marriage, that you had had a surgery?

A.    We -- well, shortly after we were married, I had went to the doctor for a checkup, and he thought I had a tumor.  And I went and had exploratory surgery, and at the time he said it was -- my uterus was in the shape of an hour glass, and that if I could get pregnant -- that was, if I could -- it would be the best thing for it, you know.  And at that time, they -- and they took, they told me, like a wedge out of 1 of my ovaries at that time too, and they told me the best thing would be if I could get pregnant.

Q.    And were there times when Jim would make comments about how that surgery affected you?

A.    That was later on after I had had all the kids, and we had a lot of problems and that.  And, I mean, I had an exploratory and I had 4 C sections, so my stomach looked like a road map.  I mean, not very good.  And he used to just laugh at me and say no man would ever want me because my body was so ugly.

Q.    Would he say these things when he was drinking?

A.    Oh, yes.

Q.    And during -- during your marriage while he was working, did he work away from the home for periods of time?

A.    Yes, he did.  He worked for the boilermakers.
That's when he was mainly away from home.

Q.    And how long would he be away from home?

A.    Well, sometimes it would be for a week, you know,
longer.

Q.    And then when he would come home on weekends,
what would he do?

A.    Well, mainly, he would just more or less drink,
is what he would do.

Q.    Were there times when -- when you would try to
get the children out of the house because of Jim's
drinking?

A.    There would be times and that because, like I
said, he was always so sarcastic and saying things like
that when he was drinking, so I would grab the kids and
get in the old station wagon, and we would just go and
just drive around and that and everything.  And then
when we would come back, he would be sleeping.

Q.    Where would he be sleeping?

A.    Usually on the davenport.

Q.    Now, you had just said -- you had said that you
didn't work when you were married with Jim.  And why is
that?

A.    He didn't want me to.  He just said he didn't
want a working wife.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 21 of 177
*to purchase a complete copy of the transcript.*

Q. And did you ever have discussions with Jim about family issues, or the children, or anything like that?

A. Do you mean just more or less things happening in the family and things like that?

Q. Yes, yes.

A. I really can't remember about, you know, really things that -- you know, real important family issues or anything like that, because he never -- he never took much interest in the family as a whole.

Q. Did he take much interest in the children?

A. Once in a while, but he never went to a conference at school. He never went to church. Basically -- I don't know. He just wasn't that interested in that.

(Weather disturbance.)

Q. That sounded like thunder.

A. That's what I thought too.

THE COURT: You will find, out in this old warehouse courtroom, that when it rains, you know it, just by sound.

Q. Ms. Smidt, I want to ask you a little bit about your sexual relationship with Jim. Later in your marriage, around the time that -- soon before the time of your divorce, what was your sexual relationship like?

A. Well, he was just 1 that -- he just said I was

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

his wife and he could do anything he wanted to with me.
So the kids, of course, were home and everything, and I
just wouldn't make an issue.  I would just lay there and
take it.  I mean, you know, more or less, like -- I
don't know.  It was -- it was not good.  I would -- you
know, I didn't holler, I didn't anything, because kids
were there.  I mean, you don't do things like that.

Q.    I know it's hard to talk about, but could you
describe a little bit what you mean by "not good"?

A.    Well, it would hurt because he was so terribly
rough.

Q.    Did you feel that you were being raped?

A.    I would say so, yes.

Q.    All right.  Let's talk for a moment about the
divorce.  Prior to the time you got divorced, did you
start seeing someone else?

A.    Yes, I did.

Q.    Who was that?

A.    Ron Smidt.

Q.    And was Mr. Smidt still married at that time?

A.    Yes, he was.

Q.    And then at some point, you filed divorce papers?

A.    Yes.

Q.    Okay.  I'm going to show you -- can you see that
screen that's in front of you there?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 23 of 177
*to purchase a complete copy of the transcript.*

A. Yes.

Q. Is there a document that popped up on it?

A. Yes.

Q. Okay. Is that the divorce paperwork?

A. Yes, yes, it is.

MR. NOLAN: For the record, this is P-130, Your Honor.

THE COURT: All right.

Q. Ms. Smidt, I'm going to go down to the second page. Could you read Paragraph 12 out loud, please?

A. "That this petitioner is in fear of her life and health at the hands of the respondent and is in fear for the life and health of the minor children of the parties at the hands of the respondent, unless said respondent is restrained from in any manner molesting, harassing, or otherwise interfering with the petitioner or the minor children of the parties during the pendency of this action."

Q. All right. Now I'm going to go down a little further. Is that your signature on there?

A. Yes, it is.

Q. And was that -- was that accurate? Is that the way you felt at the time?

A. Very much so.

Q. And what did you think Jim was going to do to

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 24 of 177
*to purchase a complete copy of the transcript.*

you?

A.     Well, I -- he always said that if he couldn't have me, nobody else would.  And for some reason, I kept thinking -- I don't know, it was just in my mind that he would probably kill me and end up killing himself.

Q.     When you testified at Dustin's trial, did his lawyers ask you about this divorce paperwork?

A.     No.

Q.     When you got -- when you were getting divorced, was there a time when you had a conversation about where Dustin would live after the divorce?

A.     Yes, that's 1 of the things I've always regretted.  For some reason, Jim always favored Dustin.  You know, I don't know.  I mean, it just seemed like if any attention paid, it was to him.  It wasn't to Jeff or Alyssa.  And so I told him, I said, you know, "If it comes down to it, that, you know, you're going to go, you know, go for the children or things like that," I said, "I would give Dustin up," because the reason why, I thought he would probably take better care of Dustin but not the other 2.

Q.     Okay.  And at some point did Dustin find out about that?

A.     That could be.  I mean, when Dustin was 9 years old, he had asked to live with his father.  He was --

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 25 of 177

that's when Ron and I were married. And he said, "I want to go live with dad," because dad had promised him a bunch of stuff. And I said, "No, Dustin," I said, "you can't." I said, "But when you're 12 years old, if you still want to go live with your dad, then you can." But when he was 12 years old, it never, ever came up, because he didn't want to.

Q. Okay. Did you know Jim to be involved in, I guess, illegal activities, for want of a better word?

A. I kind of knew. You know, I mean, I really -- I could never prove it or anything, but, yeah, from what he talked and said, yes.

Q. Well, that's what I'm talking about.

A. Okay.

Q. What did he talk about?

A. We were living in Algona, and he was on construction. And he had a dragline, and something happened to the dragline. He collected the insurance money. We were living in Hutchins. Our big shed with -- the car was in it, and it burned. It burned down and everything. And I remember I was so upset and everything like that, you know, and -- because I had a mommy cat and some kittens in there. And -- but the mommy cat and the kittens were in a box up under the -- on the porch, is where they were, and so they

miraculously survived.

Q.    Do you know how the kittens got out of the building before it burned?

A.    No, I don't.

Q.    Did Jim talk to Dustin about activities like that?

MR. WILLIAMS:  Your Honor, I would object on hearsay, unless there's -- as I understand it, if this is only submitted for the penalty phase of the trial, then I'm fine with it.

MR. NOLAN:  That's right.  It's presented for what the lawyers could have presented to the jury, Your Honor.

THE COURT:  All right.  Then it sounds like there's no objection.  You may proceed, sir.

A.    What was the question again, please?

Q.    I'm sorry.  Did Jim talk to Dustin about these types of activities?

A.    Jim talked to a -- yeah, he -- he talked, you know, to Dustin.  Yeah, he talked to him about different things.  He always glorified these things.  He always thought you could get away with it, you know, and, I guess, get money for nothing.  I mean, you know, you didn't have to work for it, is more or less what it was.

Q.    And do you know at some point in time that Jim

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 27 of 177

had gotten arrested and sent to prison?

A.    Yes.

Q.    Okay.  When he went to prison, did you go visit him?

A.    No.

Q.    Did Dustin?

A.    I -- I'm not real sure.

Q.    Okay.  That's fine.  So let's back up just a little bit.  When you -- after your divorce, how soon did you get remarried?

A.    Yes, real -- it was quite soon.

Q.    Quite soon.  Like how soon?

A.    Well, just as soon as the law would permit, whatever it was.  I can't really remember.

Q.    Okay.  And once you got married to Ron, where did you live?

A.    We lived in -- in Britt.

Q.    And when you got married to Ron, did your relationship with your children change in any way?

A.    I would say, yes.

Q.    Can you describe it?

A.    Well, I had a new husband, and I also ended up with a stepdaughter.  I started working.  It just seemed like -- I imagine, they were used to a mom kind of being with them, so they got kind of -- they got kind of put

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 28 of 177

on the back burner a little bit because I had a lot of other things too. And, I mean, I know I paid a lot of attention to Ron because here was somebody that really loved me, and I -- you know, and --

THE COURT: Erin, could we have some Kleenex?

MR. NOLAN: There's some up there, Your Honor. Could we have just a moment?

THE COURT: Sure.

(Brief pause.)

A. I've never been loved like that before. I'm sorry.

Q. That's okay, Marvea. Do you have some water up there?

A. Yeah.

Q. Just take your time.

A. So I'm sure that, you know, I -- the kids didn't get all the attention that they should have.

Q. Okay. I want to talk to you for a moment about the time of Dustin's trial. You had said previously that you testified?

A. Yes.

Q. Before you testified, did you speak with his lawyers?

A. The night before.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 29 of 177
*to purchase a complete copy of the transcript.*

Q. The night before you testified?

A. Uh-huh.

Q. And where was that, that you spoke with his lawyers?

A. It was a suite in their hotel room.

Q. Okay. And do you know -- do you remember how long you met with them?

A. Oh, it wasn't very long. Maybe an hour.

Q. And was anybody else with you when you met with them?

A. Alyssa was.

Q. And that's your daughter, who also testified the next day?

A. Yes.

Q. Prior to that time, had you met with a woman by the name of Lisa Rickert?

A. Yes.

Q. And what did Ms. Rickert ask you about when she met with you?

A. Mainly, contacts and things that Dustin had, you know, people that he knew and things like that.

Q. Did she ask you about any issues related to mental illness in your family?

A. No.

Q. Did she ask you any issues about yourself and

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 30 of 177
*to purchase a complete copy of the transcript.*

issues with mental illness?

A.     No.

Q.     Did you also speak to a man by the name of Delbert King?

A.     Yes, I did.

Q.     Did you speak to him in person or on the phone, do you remember?

A.     No, in person.  He came to my house.

Q.     And what did Mr. King ask you about?

A.     Well, more or less, it was just different people that Dustin knew and hung around with and things like that.

Q.     Okay.  So he was asking you for contacts, you mean, of other people?

A.     Yes, yes.

Q.     Did he ask you anything about Dustin's life history or your family?

A.     Not that I can remember, huh-uh.

Q.     If Ms. Rickert or Mr. King had asked you about these issues, about mental illness in the family and these other issues, would you have talked to them the same way you've talked to us and that you're testifying?

A.     Of course, I would have.

Q.     Did Ms. Rickert or your son's lawyers ever ask you to meet with any mental health professionals or

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 31 of 177

experts?

A.      No.

Q.      If they did, would you have done that?

A.      Yes, I would have.

Q.      Did we ask you to meet with any mental health experts?

A.      Yes, you did.

Q.      And did you?

A.      Yes, I did.

Q.      Do you remember who you met with?

A.      Mr. Dudley.

Q.      Mr. Dudley, okay.  Do you remember if he was a doctor?

A.      Yes --

Q.      Okay.

A.      -- he was.

Q.      Now, you did testify at your son's trial --

A.      Yes.

Q.      -- at 1 point?  If you had -- during that time you testified, if you had been asked the questions that I asked you today, would you have testified to the things that you testified today?

A.      Yes.

            MR. NOLAN:  May I have a moment, Your Honor, please?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 32 of 177
*to purchase a complete copy of the transcript.*

THE COURT:  Yes.

(Brief pause.)

(Weather disturbance.)

THE COURT:  Don't worry.  The roof does not leak, so far.

MR. NOLAN:  I didn't bring a rain coat.

THE COURT:  Now, you folks from the city are out in the country, so you have to get used to this.

MR. NOLAN:  Yes, it's very different.

Q.    Ms. Smidt, I'd ask you to take a look on the screen there, and this is what's been marked for identification as P-120.  Can you just identify what that is?

A.    It's the declaration, my declaration.

Q.    Okay.  And I'm going to scroll down to the last page.  Is that your signature?

A.    Yes, it is.

Q.    Okay.  And before you signed this, did you read it to make sure it was accurate?

A.    Yes, I did.

Q.    Okay.

MR. NOLAN:  Thank you, Your Honor.  I don't have any other questions at this time.

THE COURT:  Mr. Williams?

MR. WILLIAMS:  Thank you, Your Honor.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 33 of 177
*to purchase a complete copy of the transcript.*

CROSS-EXAMINATION

BY MR. WILLIAMS:

Q.     Ms. Smidt, I'm going to be talking kind of loud to talk over this.

A.     That's okay.

Q.     So don't take it as yelling, but I want to make sure that you can hear me.

A.     Okay.

Q.     You were asked questions about the investigation done by Lisa Rickert.  I don't suppose you probably had the benefit of reviewing a confidential work product of interview notes that are provided to the attorneys in this case?

A.     No.

        MR. WILLIAMS:  Counsel, at 005329.

Q.     So you probably wouldn't be aware that she had a whole section in a document she provided to the attorneys that covered the family history of alcoholism --

A.     No.

Q.     -- and in which she reported that alcoholism ran with Jim Honken, Grandma Opal Hamilton, Grandpa -- Jim Honken, Grandma Opal Hamilton, Grandpa Vernon Hamilton, Uncle Tim Hamilton, and 4 cousins on the Honken side?  You weren't aware that she provided that information to

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 34 of 177
*to purchase a complete copy of the transcript.*

the attorneys?

A.    No.

Q.    Okay.  You weren't aware that she also had a section entitled Family History of Mental Illness --

A.    No.

Q.    -- in which she provided information to the attorneys that you suffered from depression and either is or were on Prozac; that Uncle Tim suffered from depression; that Opal Hamilton suffered from depression; that Alyssa suffered from depression, was on medication; that Aunt Laurel had an emotional breakdown, was on meds and was hospitalized; and that all of Uncle Dave's children have emotional problems?

A.    No.

Q.    You weren't aware that she provided that information --

A.    No.

Q.    -- to the investigators?  All right.  Speaking of your own experience with depression, defense counsel has marked as an exhibit your medical records.  I've been through it.  Does it sound consistent with your memory that the first time there was any -- there would be any entry in your medical records that they marked as an exhibit reflecting any type of anxiety, depression, or any other mental illness was on May 8, 1991?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 35 of 177

MR. WILLIAMS:  Counsel, that's going to be at Page 347 of -- I think it's Exhibit 44.

A.    What was --

Q.    Yeah, let me go back.

A.    I'm sorry.

Q.    Yeah.

MR. NOLAN:  Will you just give me a moment to find that, please?

MR. WILLIAMS:  Sure.

MR. NOLAN:  You know what, could I just --

MR. WILLIAMS:  Just a moment, Your Honor.

THE COURT:  Yes.

(Counsel conferred.)

MR. NOLAN:  Sorry, Your Honor, if we could just have a moment.

THE COURT:  No, that's fine.  Take your time.

(Counsel conferred.)

Q.    All right.  Ms. Smidt, we'll take care of this over the break, but it looks like the -- when I pulled documents out of what was provided to me, it doesn't match up necessarily with the way the exhibits got married, so what I'm going to do is just ask you a question.

When I was going through the medical records

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 36 of 177
*to purchase a complete copy of the transcript.*

Q. provided to me concerning your mental health history, the first entry I found where there's any reference at all to anxiety or depression was in -- on May 8th of 1991, when you went in to see Norman Thede, Dr. Thede?

A. Thede.

Q. Thede?

A. Uh-huh.

Q. Okay. And Dr. Rosenfeld sent a letter to Dr. Thede indicating that he's enclosing a copy of his evaluation, he could find no abnormalities and thought it was more anxiety-type symptoms. Does that sound about right with your memory, that 1991 was maybe the first time you had any type of anxiety issues?

A. That could be the anxiety. I do remember years ago though, when I lived in Hutchins, and it was under Dr. Camp. So that had to be very, very many years ago. And that was when he gave me something, but like I said, the side effects were so bad that I did not take it. It just made me so sleepy and everything.

Q. And he gave that to you for what? What were you complaining of at the time?

A. Just nerves. It was just more or less nerves. I have no idea what it was.

Q. Okay. And then when I went forward on the rest of the Mason City clinic records for you, the only other

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 37 of 177

entries I found of any type of mental health treatment started on February 10th of 1997, and there it indicates that your ongoing source of depression was the fact that your son was in jail.  Does that ring a bell with you?

A.    I did get some medication at that time.

Q.    Okay.

A.    Yes, uh-huh, but then --

Q.    I'm sorry.

A.    There was a time before that that I was on the Buspar that Dr. Dunker had put me on.  I don't know when that was.

Q.    Okay.  Starting in 1997, and actually continuing through 1998, that was the time period that your son, Dustin, was being sentenced in Sioux City, Iowa.  Do you remember that?

A.    Uh-huh, yes.

Q.    And your medical records reflect that during that time period, you were receiving some medications for depression related to your anxiety over your son being sentenced.  Does that sound right?

A.    Yes.

Q.    Okay.  And then there's no other entries in your medical records, that I could find, on any type of mental health issues until we get to the year of 2000.  And then in September, on September 14th of 2000,

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 38 of 177

there's an entry that you were in getting treated for depression again. Does that sound about right to you?

A.    I really can't remember.

Q.    Okay. You recall then in August of 2000, shortly before this September 14, 2000, entry, was when Angela Johnson was arrested for murdering the 5 people in this case. Does that sound familiar, for timeline?

A.    No, I really can't remember that. I'm sorry.

Q.    Okay. And then the entries that occur in the progress notes from Hancock Community -- or County Memorial Hospital for you, there's a number of entries here, starting in 2000 and then going through 2004.

(Counsel conferred.)

Q.    And do you -- does it fit with your recollection that in these entries there's a number of references to you receiving medication for depression, and in these entries they explain that the source of your depression is your son being charged with and being tried ultimately for murder? Does that sound right, that that was kind of the source of your depression?

A.    I'm sure, yes.

Q.    Now, you'd agree with me that Dustin was very much a wanted baby?

A.    Very much so.

Q.    Okay. And he was generally an affectionate,

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 39 of 177

happy child, wasn't he?

A.    Most generally, yes.

Q.    And it wouldn't surprise you that other people described him as happy either, would it?

A.    No.

Q.    Okay.  And Opal described him as being bright and happy to Lisa Rickert?

A.    My mother just loved him dearly, yes.

Q.    And high school teacher, Dennis Brumm, said he was always happy?

A.    Yes.

Q.    And is that kind of an accurate description of Dustin growing up?

A.    Yes.

Q.    He played with other children, right?

A.    Yes, he did.

Q.    And he had friends?

A.    Yes.

Q.    Participated in school activities?

A.    Somewhat, uh-huh.

Q.    Participated in Cub Scouts, right?

A.    Yes.

Q.    And you were actually the den mother for his Cub Scout group, weren't you?

A.    Yes, I was.

Q.    And for how many years did you do that, ma'am?

A.    I really can't remember.  I can't remember.

Q.    More than 1?

A.    I'm sure.  It probably was, uh-huh.

Q.    Okay.  Now, Dustin also was active in the church youth group, wasn't he?

A.    Yes, he was into the Luther League.

Q.    Okay.

A.    All the kids were.

Q.    Right.  And part of that was, they go to Bible camp in the summer, right?

A.    Yes.

Q.    And Dustin always did that?

A.    Yes, he did.

Q.    Okay.  And he went through confirmation class, right?

A.    Yes.

Q.    And were you involved in his confirmation class? I can't remember.

A.    No, I was not.

Q.    Okay.  Did you -- did you have some kind of leadership position though in the -- in the church with his youth group, or did you participate in that?

A.    No.  I taught Sunday school.

Q.    Taught Sunday school, okay.  I remembered

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 41 of 177
*to purchase a complete copy of the transcript.*

something. I couldn't remember what it was.

Now, Dustin described you as being a very caring and affectionate mother growing up. Does that sound like that fits the description of how you treated Dustin?

A. Well, I hope so. I imagine I could have been better, but I hope so.

Q. He said he was very close with you. And were you close with Dustin?

A. I was close with all 3 of my kids.

Q. You never raised your voice at Dustin, did you?

A. I never raised my voice at any of my children very much.

Q. Okay. It's true that Dustin was never physically disciplined as a child, was he?

A. All 3 of them weren't.

Q. Okay. And there were no threats of violence, right?

A. Not from me.

Q. Well, are you aware of threats of violence to Dustin growing up from anybody?

A. No.

Q. Okay. He wasn't verbally abused growing up either, was he?

A. No.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 42 of 177
*to purchase a complete copy of the transcript.*

Q.    Now, during the time period that you were married to Jim Honken, did you spend evenings out away from the kids and leave them at home alone?

A.    Not until Jeff was so old -- you know, much older, that he could baby-sit.

Q.    Okay.

A.    Otherwise they had a baby-sitter.

Q.    Okay.  And how old was that, then, when Jeff was old enough to baby-sit?

A.    I imagine Jeff was around 12 years old.

Q.    Okay.  And before that time, if you were out, you would have had a baby-sitter for them?

A.    Yes.

Q.    Okay.  You at some point started a relationship with Ron Smidt while you were still married with Jim?

A.    That's true.

Q.    Did you have relationships with other men?

A.    I had.

Q.    Okay.  And did some of those men come over to the house or not?

A.    I think 1 did.

Q.    Okay.  Now, Ron -- Ron's kind of a quiet guy, isn't he?

A.    He's very quiet.

Q.    How did he treat your kids though, once you got

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 43 of 177
*to purchase a complete copy of the transcript.*

married and combined households?

A.      Ron treated them just like they were his kids.

Q.      What do you mean by that?

A.      I mean, Ron never showed any favoritism with his kids or mine or anything like that.

Q.      Okay.  Was he interested in what they were doing in school?

A.      To some -- to some extent.  Ron worked an awful lot.

Q.      Okay.  You said that while you were married to Jim, Jim never went to school conferences and didn't participate in church and things like that?

A.      Uh-huh.

Q.      Now, you went to all the school conferences, right?

A.      Yes, I did.

Q.      And participated in church, right?

A.      Yes, I did.

Q.      You went to the school activities the kids had?

A.      Yes.

Q.      And then once you got married to Ron, how was it at that point?  Did you continue to go to conferences?

A.      Yes, I did.

Q.      Did Ron attend conferences?

A.      He attended some of them.  He did.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 44 of 177
*to purchase a complete copy of the transcript.*

Q.      Okay.  And then did Ron go to church and participate in church?

A.      Yes, he did.

Q.      Okay.  And then did Ron attend school events and stuff the kids were in?

A.      Yes.

Q.      Now, it's my understanding that it was important to maybe Ron to have dinner at 6 o'clock every night. Is that accurate?

A.      Ron didn't get off work until then, so that's why we set it at that time.

Q.      Okay.  And was it viewed by you and Ron that it was important that the family sit down and have dinner together every night?

A.      Yes.

Q.      Okay.  And the reason for that is, it's important to have family time to talk and be a family, isn't it?

A.      Yes.

Q.      Okay.  And then after you'd have dinner, what would you -- how would you spend most nights at that point?

A.      Well, a lot of times -- I don't know.  Ron and I would probably go and talk about what day he had because, like I said, he put in many hours at work and everything, and I was working at that time too --

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM     Document 85     Filed 12/07/11     Page 45 of 177

Q.    All right.

A.    -- and trying to juggle a lot of different things.  So Ron and I would get together and, you know, talk about how the day went and everything.

Q.    Okay.  Now, would you just abandon the children after dinner and leave them on their own, or would you still have interaction with the kids then at night?

A.    Well, I wouldn't say I abandoned them, but I can't say that I spent the whole evening with them either.  I mean, just Ron and I would, you know, visit and things like that, and the kids would do their own thing.

Q.    Okay.  Now, when the kids had homework, would you guys help with homework?

A.    If I could.

Q.    Sure.  Some of it's -- I went through that myself this summer.  Some of it's over my head too.  But when you could, you helped them with the homework?

A.    Yes.

Q.    Would Ron do that?

A.    No.

Q.    Okay.  That was more what you would do, right?

A.    Yes.

Q.    Okay.  Now, Jeff was, what, about 14 years old when you separated from Jim?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 46 of 177

A.    Yes.

Q.    Okay.  And before that, when -- well, Jeff would have homework from time to time?

A.    I'm sure he did, uh-huh.

Q.    Okay.  And when Jeff would have homework, would you help him with that homework when you were married to Jim?

A.    I probably did, because I was in charge of the kids, because Jim wasn't around.

Q.    And so Jim wasn't 1 to help with homework?

A.    No.

Q.    Okay.  And once you got married to Ron, you continued to help with homework if anybody did?

A.    Yes.

Q.    Okay.  And do you remember specifically with Dustin, would you help Dustin with homework from time to time?

A.    Probably not, because, I mean, school wasn't that hard for him.

Q.    He was actually a pretty decent student?

A.    Well, he could have been lots better.

Q.    When he tried, right?

A.    Yes, that's right.

Q.    Okay.  Now, Ron gave a job to both Jeff and Dustin in his shop, right?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 47 of 177

A.      Yeah, and his son, Bruce.

Q.      Okay.  And that happened even -- Dustin was arrested in March of 1993 the first time, and even after that, while he was on pretrial release, Ron gave him a job in the shop at that point too, right?

A.      Yes, he did.

Q.      You were asked on direct examination about Jim ultimately getting arrested and going to prison.  Do you remember that question?

A.      Yes, I do.

Q.      He was arrested for bank robbery, right?

A.      Yes.

Q.      And 1 of the banks he robbed was the bank you worked at?

A.      That's correct.

Q.      And you know that he gained entry into that bank using a key matched off of your key, right?

A.      Well, I did not know it until, you know, whatever, the paper or whatever.  Otherwise I did not know it, no.

Q.      You know now that Dustin is the 1 who took your key and made a match out of it, don't you?

A.      That's what they said.

Q.      Okay.  And were you aware that Dustin had planned that bank robbery when he was in high school still?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 48 of 177
*to purchase a complete copy of the transcript.*

A.      No.

Q.      You were asked on direct examination about your preparation for testifying in Dustin's trial.  You said you met with the attorneys for about an hour the night before you testified?

A.      Yes, I did.

Q.      Do you remember that testimony?

A.      Yes, I did.

Q.      Had you met the attorneys before that?

A.      You know, I really can't even remember.

Q.      Okay.  You remember meeting with Lisa Rickert?

A.      Yes.

Q.      And you remember meeting with the investigator, Mr. King?

A.      Yes, I do.

Q.      Okay.  1 moment, Your Honor.

        (Brief pause.)

Q.      You recall, Ms. Smidt, that your son was sentenced in 1998 in a fairly long hearing out in Sioux City, Iowa.  Do you remember that hearing?

A.      That wasn't the trial, was it?

Q.      No.  This is in 1998.  Do you remember that?

A.      No, I don't.

Q.      Okay.

A.      I really don't.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 49 of 177
*to purchase a complete copy of the transcript.*

Q.      All right.  Fair enough.

            MR. WILLIAMS:  Thank you.  No further questions, Your Honor.

            THE COURT:  Redirect.

            MR. NOLAN:  Thank you, Your Honor.  I'm sorry, can I just turn the projector on?

            THE COURT:  Sure.

                    REDIRECT EXAMINATION

BY MR. NOLAN:

Q.      Ms. Smidt, I'd ask you to look at that projector there.

A.      Uh-huh.

Q.      For the record, this is P-41.  Do you see the notation at the bottom?  What's the date on that, on the left-hand side?

A.      March 3, 1970.

Q.      And do you see what -- what the bottom line says?  It says Plexonal?

A.      Okay.

Q.      Do you know what Plexonal is for?

A.      No, I don't.

Q.      Okay.

            MR.  NOLAN:  I'm sorry, for the record, Your Honor, that was Page 108 of that exhibit.

Q.      I'm sorry, there's too many pages to this.  I'm

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 50 of 177
*to purchase a complete copy of the transcript.*

trying to get to, for the record, 306 of the same exhibit.

Ms. Smidt, I'm showing you what is also in P-41, Page 306. Do you see the notation on the right-hand side that indicates Buspar?

A. Yes.

Q. Okay. And do you see the date that's above that on the left, 7-1-92?

A. Yes, I do.

Q. Okay. Does that refresh your recollection as to when you were given Buspar?

A. It says so. I mean, I can't --

Q. That's fine. That's fine.

A. I can't remember way back then.

MR. NOLAN: Thank you, Your Honor. I have no other questions.

THE COURT: Anything else, Mr. Williams?

MR. WILLIAMS: No, Your Honor. Thank you.

THE COURT: Thank you. You may step down.

We're ready for any additional evidence.

MR. NOLAN: Your Honor, we would call Alyssa Nelson to the stand.

THE COURT: All right.

THE CLERK: Please raise your right hand.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 51 of 177
*to purchase a complete copy of the transcript.*

ALYSSA NELSON,

called as a witness, being first duly sworn or affirmed,

was examined and testified as follows:

THE CLERK: You may take the stand.

MR. NOLAN: May I proceed, Your Honor?

THE COURT: Yes.

MR. NOLAN: Thank you.

DIRECT EXAMINATION

BY MR. NOLAN:

Q. Good morning, ma'am.

A. Good morning.

Q. Could you just state your name and spell your name for the record, please?

A. My name is Alyssa Nelson. A-L-Y-S-S-A N-E-L-S-O-N.

Q. Ms. Nelson, are you related to Dustin Honken?

A. Yes, I am.

Q. In what way?

A. I am his sister.

Q. And are you younger or older than him?

A. I'm younger.

Q. By how many years?

A. 3 years.

Q. And do you also have another older brother?

A. Yes, I do.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 52 of 177
*to purchase a complete copy of the transcript.*

Q.    And who is that?

A.    Jeff Honken.

Q.    When you were growing up, did you live in the same household with Dustin?

A.    Yes, I did.

Q.    Okay.  Ms. Nelson, what's your occupation?

A.    I am a probation officer for the State of Nebraska.

Q.    And how long have you had that --

A.    13 years.

Q.    Now, I'd like to have you talk about some of your early memories as a child.  Do you remember how old you were when your parents were divorced?

A.    I was approximately 5 or 6 years old.

Q.    Do you remember living in the household with your mother and father before the divorce?

A.    I have some vague recollections of some of the things.  It's kind of fuzzy just because of my age at that time.

Q.    But do you have some memories?

A.    Yes, I do.

Q.    Do you remember an incident with your father, when you were left for him to watch you?

A.    Yes, I do.

Q.    And could you describe that for the Court?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 53 of 177

A.     My mother had left to -- we were living in Hutchins at the time, and my mother had left me in the care of my father.  She had to go and help a lady do her hair or something down the road.  And my father had some of his drinking companions over, and they were drinking at the kitchen table.  And I just had wanted to be with my mother, because I was never -- I didn't really know my father as well, and --

Q.     Why was that?  Why didn't you know your father well?

A.     He was oftentimes on the road with construction, or he was just kind of a stranger to me.  And if he was home, he was usually in his recliner sleeping or intoxicated, if he was home.

Q.     Okay.  And so what happened this day when you were home with him?

A.     Well, I decided I wanted to go with my mother, and I asked my father if I could, and he had said no.  And so he just told me just to go away and find something to do.  So I had went outside on my swing set, which was in front of the house.  And I was on a swing, and I kept looking at the window to see if he was watching me.  He looked out at me once, and I kept swinging, looking at him.  And then he went back, and that's when I took off running down the highway or

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM     Document 85     Filed 12/07/11     Page 54 of 177
*to purchase a complete copy of the transcript.*

street, whichever 1 it was at that time, and toward to where I knew my mom was at. And I could hear then the truck coming.

Q. Whose truck?

A. My father's truck. And it was his old red Ford pickup truck, and he had yelled to stop, and I stopped. He got out. And he had a piece of board. It was like a piece of board that you would build a house with, like a 2 by 4. And he swung it at me and he told me, you know, "Get your ass in the truck now," and I was very scared. And so I got in, and I sat as close to the passenger's side of the door as possible to get away from him. And he brought me home, and he still had his buddies there. He went back to sit down at the table, drinking. And I found 1 of my mom's coats. It was like leather with, like, the sheepskin lining inside or the -- it's kind of fluffy or something. And I crawled underneath of it because it smelled like her perfume and that kind of made me feel a little better. And I hid under it, thinking that he couldn't see me or find me. And that's where I stayed until mom came.

Q. Okay. Was there another incident at 1 point when you were -- your older brothers were supposed to watch you?

A. Yes.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 55 of 177
*to purchase a complete copy of the transcript.*

Q.      When your mother -- could you describe that for
Her Honor?

A.      I was -- again, it was in Hutchins, and I was
taking a nap with my mother upstairs.  She -- according
to them, she had told them -- she had woke up from her
nap, and she had told my brothers that she was going to
leave, and they were to tell my dad when he came home
that they were not to forget about me.  I was upstairs
sleeping, and my dad had taken my brothers somewhere and
they had forgotten about me upstairs.  I had woken up.
And the house was completely dark, and it was late,
later on at night, and so it was dark outside.  I had
remembered I got up and walked around the house,
yelling, you know, "Mom."  And I was -- I was very
scared.  I was young.

        And so I walked outside, and I went across
the street to our neighbor's, Sarah Mattoon's house.
And luckily, she was there, and she took me in and
waited for my mom to come home.  And she did.  We then
went back over to our house, my mother and I did.  We
waited until my dad and my brothers came home.  And my
mom told my dad what had happened, and he became very
angry at my brothers for forgetting me.  And I remember
him becoming verbally very angry.  And then he had
thrown both my brothers and pushed them and threw them

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 56 of 177

across, you know, the room at the wall; and them crying. And I was upset too because I had never seen anything like that before.

Q.     All right.  And so how did you feel about your father around those years?

A.     My father scared me.  I -- he was, like I said, a stranger to me.

Q.     And were there times when he would -- was verbally abusive to you?

A.     Yes.

Q.     Can you describe that for Her Honor?

A.     After my parents divorced, there were times when I had to go over and visit my father, and he would -- he would become -- he would become very intoxicated.  And many times I think that he did it because I look like my mother.  It happened in front of Dustin a lot too, but --

Q.     What would he do?

A.     He would -- he would say I was fat, I was ugly, I was stupid, and I would be a whore just like my mother. And he would follow me around the house.  I tried to get rid of him, you know, just thinking he would go away, until he would back me into a corner.  And he'd just keep saying it, how stupid and fat and ugly, no man is ever going to want me.  And then I would just crouch in

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 57 of 177
*to purchase a complete copy of the transcript.*

a corner, and I would -- just to protect myself. I just put my hands over my head, thinking he would go away. And then he finally would go away, and those words just really stuck with me.

Q. And how old were you when these events happened?

A. I had to have been about 7, on up until about 7, 8, 9.

Q. Did it happen more than once?

A. Yes.

Q. Okay. And was Dustin present during some of these incidents?

A. Yes, he was.

Q. And what would he be doing?

A. He sat there silently, just listening.

Q. Do you remember how -- how your father -- there's some water up there, if you need.

A. Thank you.

Q. Just help yourself.

Do you remember how your father treated your mother?

A. I just remember that he would say bad things, like after the divorce. He would just say that, you know, he didn't understand why he was paying child support, just for the fact that she's just using it to pay bills, it's not going towards us kids anyway. And

he'd always put her down and say bad things about her.

Q.   Do you remember when -- prior to the time your parents were divorced, you had said previously that your father was out of the house a lot of times working. Were there times when your mother would leave you with your older brother, Jeff?

A.   Yes.

Q.   And do you remember how often that would happen?

A.   I don't remember exactly how many times that was, because I was so young at the time.

Q.   All right.  Let's talk about the timing -- the time that your parents got divorced.  Do you remember them getting divorced?  You would have been about 6, I think you said.

A.   I remember my mom telling us that the divorce was going to happen and how she went about doing that.  Like I said, I had to have been around 5 or 6 when she told us.  She had brought Jeff, Dustin, and myself into my room, and it was upstairs in Hutchins.  And we had sat down, and she said, "I need to tell you kids something. Your dad and I are getting a divorce."  And, of course, I didn't understand what divorce meant.  And I says, you know, "Mom, what's divorce?"  And Dustin said, "It means, Stupid," or stupid or dummy, "that mom and dad aren't going to be together anymore."  And that's, you

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 59 of 177
*to purchase a complete copy of the transcript.*

know, all I remember from that conversation.

Q. And after the divorce, did you move somewhere different?

A. It's like a gray area in between Hutchins and then going to the big house, but I remember all of a sudden walking into this huge house in Britt, carrying my doll, and then there's some strange man there with my mom that I had never met before.

Q. And who was that?

A. It was my stepfather, Ron.

Q. And when your mother and Ron got married, did you notice any difference in the way your mother reacted towards you or treated you and your brothers?

A. Yes, I did.

Q. Could you describe that?

A. Well, it seemed like, you know, before the divorce, you know, it's -- we were first. After -- after the divorce and she had married Ron, Ron always came first before anybody. She catered to Ron, and we were always last.

Q. And so what was the household like after you -- or, well, let me ask you this first. Did -- did Dustin and Jeff also live with you and Ron and your mom?

A. Yes.

Q. Okay. Did somebody else also live there?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM Document 85 Filed 12/07/11 Page 60 of 177
*to purchase a complete copy of the transcript.*

A.    Yes, my stepsister, Carmen.

Q.    Okay.  And so whose daughter was she?

A.    That was Ron's daughter.

Q.    And did she move in at the same time or later?

A.    Later on.

Q.    And what happened when she moved in?

A.    Chaos, pure chaos.

Q.    Okay.  Just explain what you mean a little bit, okay.

A.    She moved in when she was approximately 13.  I had met her maybe once before.

Q.    How old were you then?

A.    Well, she's 7 years older than me.  I was younger.  And she just -- I don't know.  It was like you didn't know what you were going to get from day-to-day.  She would be nice 1 day.  She would be mean the next day.  You're walking on eggshells around her.  She's still like that to this day.

Q.    And so did the household change in some way when she moved in?

A.    Yes, it was -- it was very stressful to live there.  And she -- you know, I was scared to come home some days, because -- I'd walk around the block a couple times afraid to go in the house, because she wasn't always very nice, and so I would wait, and then I'd go

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 61 of 177

in. And then I remember I would -- and I saw Dustin first. I would say, "How's Carmen? What's she like?" And he would say, "She's okay," meaning she's in a better mood, it's okay to come in, or "No, don't come in. She's in a bad mood," because I was usually her target.

Q. Okay. Did you ever know Dustin to be her target?

A. Yes, some occasions, yes.

Q. Now, in the household, after your mom got remarried, would you all have dinner together each night?

A. 6 o'clock on the dot.

Q. And why was that?

A. Because that's the time when -- after Ron was finished working at the shop, and that's when he wanted supper, so we all had to be there, with our hands washed, sitting at the table.

Q. And what would happen after dinner?

A. After dinner, all of us kids had to clear the table, we all had our chores, while Ron usually sat in his recliner and watched TV. And he just kind of disappeared, and then mom usually went with him wherever he went.

Q. And where would they go?

A. Usually, they would go behind doors.

Q. What do you mean by "behind doors"?

A. Usually in their bedroom.

Q. Okay. Did you have much interaction with Ron when you were a child?

A. I did.

Q. Can you describe that?

A. A lot of times, you know, if you wanted interaction with him, still to this day, you would have to almost force yourself on him to even get a couple words out of him. And I'm -- I'm that type of person, and I would have to go in and sit directly right beside him to make him talk to me. If I didn't do that, you're not going to get anything out of him at all.

Q. And what was his relationship like with the boys?

A. Well, he was more standoffish with the boys than he was with me. If they needed to borrow, like, a couple dollars or something, like teenagers do, he would just tell them, you know, "Go earn it" or "Go do" -- you know, "Go get a job" or something. He'd be real gruff with them. So they would usually send me in to go ask for money because he would be more likely to give it to me than to give it to the boys.

Q. All right. Let's talk about your father after the divorce, your father, Jim Honken. Did he get remarried at some point?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 63 of 177

A.    Yes, he did.

Q.    Who did he marry?

A.    He married Carol.

Q.    And would you -- you told us about 1 -- or the way your father treated you at times when you would be over there.  Did you spend time over at the house then?

A.    Yes, I did.

Q.    Like how often?

A.    I spent more time over there after they had my half sister, Ann.

Q.    And how -- what's the age difference between you and she?  How old --

A.    7 years.

Q.    You were 7 when she was born?

A.    Yes.

Q.    And why did you end up spending more time after she was born?

A.    Because I was -- I was afraid for Ann.

Q.    Why?

A.    Because both Carol and my dad, they would drink quite a bit.  And then Carol would go to work, and my dad was, like, on disability at the time from, like, being a boilermaker.  And he would stay at home, and he would drink and pass out on the couch.  And Ann was just real little, and I was scared, you know, something would

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 64 of 177
*to purchase a complete copy of the transcript.*

happen to her. And she was often, you know, just kind of left alone.

Q. And so what would happen when you would go over there?

A. Oh, you know, sometimes, you know, he was awake, but, you know, he had always been drinking. And I would take her for walks a lot. I would take over and take care of her. I would feed her because, you know, he hadn't done that or change her diaper. I'd stay for quite a bit just to take care of her.

Q. And would you -- when you would take her for walks, where would you take her to? Somewhere else?

A. I would usually take her down to my Grandma Hamilton's.

Q. Was that in walking distance?

A. Yes, about 2 blocks.

Q. Now, did there come a time when your father and Carol separated?

A. Yes.

Q. And why did that come about?

A. Because of my dad's alcoholism.

Q. And what happened?

A. Well, she kicked him out and left him without anything at all. He had no place to stay or anything, so -- they did own a shed in Garner, so he went to live

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 65 of 177
*to purchase a complete copy of the transcript.*

in a shed.

Q. And was he still drinking at the time?

A. Yes.

THE COURT: I wonder if this isn't a good time to take our morning break. Let's be at recess until 20 minutes of 11:00.

MR. NOLAN: Thank you, Your Honor.

(Whereupon, a brief recess was taken.)

THE COURT: We are back on the record in Honken versus the United States, 10-3074, and 01-3047. The witness is still under oath.

And you may proceed.

MR. NOLAN: Thank you, Your Honor.

Q. Ms. Nelson, I think where we were was when Carol put your father out. That was, I think, the last thing you had mentioned. And what happened when Carol put your father out?

A. My father, he was living, like, in a, I don't know, like a shack or like a storage facility. I can't quite describe it. It was like a wooden kind of -- like a garage, I guess you would say.

Q. And was he still drinking at that point?

A. Yes, he was.

Q. Did you know that your father eventually ended up in federal prison?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 66 of 177
*to purchase a complete copy of the transcript.*

A.      Yes, I do.

Q.      And did you visit him there?

A.      No, I did not.

Q.      And how long was he in prison, if you know?

A.      I am going to say approximately -- and I may be wrong -- 6 years.

Q.      Okay.  When -- before your father went to prison, did he discuss with you and with your brothers certain criminal-type activities that he was involved in?

            MR. WILLIAMS:  Objection, Your Honor, to hearsay, unless it's offered only in the penalty phase of the trial.

            MR. NOLAN:  Your Honor, it would go to what counsel could have submitted to the jury during the penalty phase.

            THE COURT:  All right.  That's fine.  And it sounds like the government does not oppose it under those circumstances.

            MR. WILLIAMS:  That's correct.

            MR. NOLAN:  Okay.

Q.      Do you want me to repeat my question?

A.      Yes, please.

Q.      Okay.  Before your father went to prison, did he have discussions with you and with your brothers about other criminal -- criminal-type activities he was

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 67 of 177

involved in?

A.    He would -- he was always bragging about -- you know, he was always like a big wig.  He'd know different people that were involved in criminal activities.  It wasn't so much, you know, around me, you know, before he went to prison as after he went to prison.

Q.    Okay.  Why don't you describe that then.

A.    After he went to prison and when he got out, you know, he was talking about how he knew some man by the last name of Gotti or something and also people that were in the mob, and how if, you know, I ever needed somebody that needed to be taken out, that he could have it arranged, and if somebody ever hurt me, that he'd have them taken care of.  And he was always talking like that.  And I always tried to, you know, get rid of the conversation by changing the subject, because I didn't like him talking like that.  It made me uncomfortable.

Q.    And this was after he got out of prison.  Roughly how old were you then, when you would have these conversations?

A.    I was probably 21.  20, 21.

Q.    And going backwards, did he have those kinds of conversations with Dustin as well?

A.    Yes, he did.

Q.    All right.  I want to take you back to your

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 68 of 177

brother Dustin as a child.  You said you were 3 years younger than him, roughly --

A.     Yes.

Q.     -- is that right?  So you remember him as a child?

A.     Yes, I do.

Q.     What was he like as a child?

A.     Dustin was -- he's often kind of -- he's, like, a nervous person, and, like, he could never -- like, if we were sitting at home, you know, like, on a Sunday, and we were watching, you know -- they always had the Sunday Disney show, you know, we'd sit down and watch that or something, he could never sit still.  He'd get up and he'd pace.  He paces.  Or if he does sit down, his feet or his knees -- he's got to sit there and constantly jiggle them.  He gets too frustrated.  He bites his nails.  He just -- he's a very nervous person.

Q.     And you had told me something about him chewing gum.  Could you describe that for the Court?

A.     Oh, yeah.  And he always carries gum on him usually.  He's always got to have a piece of gum in his mouth, because it's -- I don't know if it's like a tension thing for him.  And he's chewing gum, and -- because he'll talk really fast too.  And he chews gum just to kind of, you know, either reduce stress or,

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 69 of 177

like, his anxiety or something.

Q. And these things that you're describing, are these when he was a child?

A. Well, as a child, on going up, like, into adulthood. He always had these kind of quirks to him. We were used to it as a family, because that was just Dustin.

Q. Is Dustin the type -- was he the type of person who could get close to other people, like yourself? Not yourself. Like other people, and then we'll talk about you.

A. Not really. It was -- you know, it was difficult for him to ever open up and share his feelings about anything. You'd ask him, you know, "How are you doing" or "What's wrong," or anything like that. He would just kind of either change the subject or kind of, you know, push/pull away, like, you know, whatever. It's always like he had a box surrounding him, like, you know, nobody can get close.

Q. And I want to take you to 1993. Where were you living then?

A. 1993, well, I was a senior at Morningside College in Sioux City, Iowa.

Q. When did you graduate?

A. May of 1993.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 70 of 177

Q.    Okay.  And after you -- well, while you were there, did you spend time at home periodically?

A.    I would go home.  I'd at least try to go home every other weekend, and, you know, if he was -- if he was there, then, yes, I would get -- I would get to see him.

Q.    Around that time, do you remember spending some time with Dustin?

A.    Yes, I do.

Q.    And what was going on then, or could you describe what -- what he was like then?

A.    Well, he was --

Q.    Well, first of all, at that point were you aware that he had been arrested?

A.    Yeah, I know he had charges pending, and he was -- well, I know when -- we went to, like, a movie or out to eat or something, because I wanted to spend some time with him, and he had, like, a little brown car he was driving at that time.  And he was just -- I don't know.  It was like he was not eating right.  He was so skinny.  And he just didn't feel well.  And he couldn't eat hardly anything.

Q.    How did he look to you?

A.    He looked -- well, he looked very stressed out, and he was kind of all -- like, a gray pallor to him.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 71 of 177

And I don't know. He just looked like somebody that hadn't slept a while because he was just, like, sick to his stomach.

Q. And did you ask him then if he was using drugs?

A. No, because it never crossed my mind.

Q. Why not?

A. Because my brother, he was always against any drinking or drugs or smoking a cigarette as long as I ever knew him, so when this came out, it absolutely threw me for a loop, and I was so disgusted with it.

Q. Okay. I want to talk about your brother Jeff for just a minute. Did you spend time with Jeff and Dustin and see how their interactions were over the years?

A. Yes.

Q. Was Jeff someone who would ever listen to Dustin or do what Dustin told him to do?

A. No.

Q. All right. You smiled when I asked -- when you answered that question. Why? What -- can you just explain what -- what you mean by that?

A. Jeff is the type of person that does not take orders from anybody.

Q. Okay. Now, I want to talk a little bit about the family history of some mental illness in your family. Are you aware of any mental illness in your extended

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 72 of 177

family?

A.    Yes.

Q.    And have you had -- have you been diagnosed with any depression or any issues like that?

A.    Yes.

Q.    And when did that happen?

A.    When I was 18 years old, I was diagnosed with depression.

Q.    And have you been treated for depression over the years?

A.    Since I was 18 up until the present time.

Q.    Okay.  And were there -- have there been times when you were on medication?

A.    I've been on medication since I've been 18.

Q.    And are you aware of -- what is your mother's sister's name?

A.    Laurel.

Q.    Okay.  And do you know her?

A.    Yes, very well.

Q.    Okay.  And are you aware of any issues of mental illness in Laurel?

A.    Yes.

Q.    And what are those?

A.    I know that she suffers from depression because we've talked about it before.  I don't know her other

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 73 of 177

Q. diagnoses really, other than depression and anxiety.

Q. All right. And how about your Uncle Tim?

A. My Uncle Tim, he has anxiety and depression and alcoholism.

Q. And how about his children? Do you know his children?

A. Yes. Let me see, it would be Jason, is depression, and he -- he has had problems with using alcohol and drugs. And Jacob is the same way. I don't know much about Jesse. I think that he's had a little bit of a problem with the depression also.

Q. Okay. Now, Ms. Nelson, can you -- can you just describe as you grew up how your childhood -- if it was different than your brother Dustin's childhood?

A. Mine was different from Dustin's because I did not spend as much time with my father as what Dustin did. I was more -- I was more sheltered from my father than what Dustin was, so to speak.

Q. Okay. Now, did you testify at Dustin's trial back in 2004?

A. Yes.

Q. Yeah. And did you meet with any of Dustin's lawyers prior to testifying?

A. Yes.

Q. When was that in relation to your testimony?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 74 of 177

A.    I think it was right before I -- right before I testified.

Q.    Do you remember?

A.    Not really.

Q.    How many times did you meet with the lawyers before you testified?

A.    Once.

Q.    Do you remember for how long?

A.    Approximately 15, 20 minutes.

Q.    And before that, had you talked to a woman by the name of Lisa Rickert?

A.    Yes.

Q.    Okay.  Did your brother's lawyers ever ask you at that time to talk to any mental health professionals?

A.    No.

Q.    I mean in relation to his case.

A.    No.

Q.    If they had, would you have done that?

A.    Yes.

Q.    Does Dustin's current legal team, which includes me, did we ask you to meet with any mental health professionals?

A.    Yes.

Q.    And to talk about Dustin's life with the mental health professional?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 75 of 177
*to purchase a complete copy of the transcript.*

A.      Yes.

Q.      And did you do that?

A.      Yes.

Q.      Who was it that you met with?

A.      I'm not very good with names.

Q.      That's fine.  Could you just describe him?

A.      Yes.  He was an older gentleman that was -- it was a black man.

Q.      Okay.  And was he a doctor?  Did he tell you he was a doctor?

A.      Yes.

Q.      Now, when you testified at Dustin's trial, if you had been asked -- you were asked a lot of questions, I understand, and you testified to some of the things that you testified to today, but if you had been asked all of the questions that I asked, would you have testified to all the things that you testified to today?

A.      Yes.

Q.      Okay.  I'm showing you what's been marked P-113.

            Uh-oh.  What did I hit?

            Do you see that on the screen there?  It's right in front of you too.

A.      Yes.

Q.      And can you just identify what that is for the record?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 76 of 177
*to purchase a complete copy of the transcript.*

A.     It says Declaration of Alyssa Nelson.

Q.     And let me go to the last page.  Is that your signature?

A.     Yes, it is.

Q.     And before you signed this, did you read it?

A.     Yes, I did.

Q.     And was it accurate?

A.     Yes.

MR. NOLAN:  Thank you, Your Honor.  I have no further questions for Ms. Nelson.

THE COURT:  Cross-examination.

MR. WILLIAMS:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. WILLIAMS:

Q.     Ms. Nelson, you have no criminal history; is that correct?

A.     That's correct.

Q.     You testified a little bit about your history of depression.  You're aware that, in preparation for this hearing, counsel obtained medical records of your past medical history?

A.     Yes.

Q.     You probably signed a release or something for that, right?

A.     Yes.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 77 of 177

Q.    Okay.  Have you had a chance to review those medical records?

A.    No.

Q.    Okay.  You indicated you have had a history of depression going back to when you were 18 years old, so what year was that, approximately?

A.    1989, 1988.

Q.    Okay.  Are you aware of the existence of any medical records that would support that, that you have received prescriptions for medication going back to that time period?

A.    Can you repeat that again?

Q.    Yeah.  Are you aware of any medical records that would show that?

A.    From the Women's Health in Mason City, yes.

Q.    Okay.  And anyplace else?

A.    Not that I can recall.

Q.    All right.  You were asked about some family history a little bit, and 1 of the people you talked about was your stepsister, Ann, who was born to your biological father and your stepmother.  Do you remember that testimony?

A.    Yes.

Q.    Okay.  And how old is she today?

A.    She's 7 years younger than me, and I am 40.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 78 of 177

Q.      Okay.  And what does she do these days?

A.      I do not know exactly what she does for a living.

Q.      Okay.  What has she done in the past, that you know of?

A.      I really honestly don't know what she has done. I have hearsay of what she's done.

Q.      Okay.  What's your hearsay of what she's done?

A.      My hearsay is that she was a stripper in a club.

Q.      Okay.  You talked about your Grandmother Hamilton, and you would sometimes take Ann over to your Grandmother Hamilton's house.  Do you remember that testimony?

A.      Yes.

Q.      Okay.  And where did your Grandmother Hamilton live in relation to your house in Britt?

A.      My Grandmother Hamilton lived in Garner --

Q.      Okay.

A.      -- so I would stay at Grandma Hamilton's.

Q.      You would stay there when you went to visit your father?

A.      I would go and just go for a quick visit to my Grandma Hamilton's, and then I would walk over, and, you know, visit for, like, a day to take care of Ann.

Q.      Was your grandfather still alive at that time as well?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 79 of 177

A.    Yes, he was.

Q.    Okay.  Did you spend much time with your grandparents then?

A.    On and off I did.

Q.    Over the years growing up?

A.    Yes.

Q.    Okay.  Jeff did too, right?

A.    Yes.

Q.    And the same with Dustin?

A.    Yes.

Q.    You talked about how in 1993, after Dustin was arrested, you spent some time with him and he looked -- I think you said, his pallor was white.  Maybe I made -- or gray.  He hadn't slept for a while.  He looked stressed out.  He looked like he hadn't been eating, that kind of stuff.  Do you remember that testimony?

A.    Yes.

Q.    And this would have been when after his arrest?  Do you remember how long after his arrest?

A.    No, I don't.

Q.    Do you remember, was it summer?  Was it spring?

A.    It probably was.  Like I said, I'm not really exact on it because it's been a long time ago.

Q.    Okay.

A.    I believe it may have been after -- it was after

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 80 of 177
*to purchase a complete copy of the transcript.*

May. I'm not quite sure. I really am not.

Q. You had graduated from college by then?

A. Yes.

Q. Okay. So you graduated in May --

A. Yes.

Q. -- right? So it would have had to have been after May then?

A. I believe so.

Q. Okay. And then did you spend a lot of time with him at that point, or was this just like 1 occasion where you were back for a little while and spent some time with him?

A. No, this was just, like, a weekend.

Q. Okay.

A. I didn't get home very often at that point in time.

Q. All right. And so when you're talking about your observations of him, that's your observations over a weekend sometime in 1993?

A. Yes.

Q. Okay. And do you remember -- again, just trying to place this in time -- was this before or after Ryan was born, if you recall?

A. I -- I can't answer "yes" or "no" because, like, again, it's been so long ago. I can't pinpoint it.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 81 of 177
*to purchase a complete copy of the transcript.*

Q.      That's fine.  And I was just trying to see if that refreshed your recollection at all, and it doesn't help, it doesn't sound like.

A.      No, I'm sorry.

Q.      That's all right.  Now, you talked about -- a little bit about your observations of the interaction between your brother Jeff and your brother Dustin.  Do you remember that testimony?

A.      Yes.

Q.      Okay.  Now, you weren't even aware that Jeff and Dustin were involved in any type of meth manufacturing operation in 1992 to 1993, were you?

A.      No.

Q.      All right.  You don't -- you never went down to Arizona during that time period?

A.      No.

Q.      Never talked to them during that time period about their meth operation?

A.      No.

Q.      You don't have any knowledge at all about who did what in the meth operation, do you, ma'am?

A.      No.

Q.      You'd agree with me that Dustin is not an impulsive person, is he?

A.      I -- you're saying I would agree with you?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 82 of 177
*to purchase a complete copy of the transcript.*

Q.      Yeah, Dustin's not impulsive, is he?

A.      I think on certain things, he can be, but on other things, he's not.  It depends upon the situation.

Q.      Okay.  Well, you remember you testified in Angela Johnson's trial.  Do you remember that?

A.      Yes, I do.

Q.      Okay.  And that was in 2005?  Do you remember that testimony?

A.      Parts of it, yes.

Q.      Okay.  You were asked this question, and you gave these answers, on Page 2690 of the transcript from the Johnson trial:

        "Question:  Would it be fair to characterize your brother as much more of a deliberate planning-type of person as opposed to a hothead, somebody who didn't -- somebody who acted impulsively?

        "Answer:  No, Dustin is not impulsive, no.

        "Question:  He's not impulsive?

        "Answer:  No."

        Do you recall giving that testimony --

A.      Yes.

Q.      -- in Angela Johnson's trial?

A.      Yes.

Q.      And you'd agree with me that it's typical for your brother Dustin to blame others for his own problems

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 83 of 177
*to purchase a complete copy of the transcript.*

rather than himself, isn't that true?

A.    Again, it depends upon the situation.

Q.    You remember testifying before a federal grand jury on July 20, 2001?

A.    I don't remember everything, but I remember being there.

Q.    Okay.  And do you remember -- at Page 16 of that transcript, counsel -- you were asked this question, you gave this answer:

"Question:  In other words, typical for him to blame others for his own problems rather than himself?

"Answer:  Yes."

Do you remember giving that testimony before the grand jury in 2001?

A.    No, I don't recall.

MR. WILLIAMS:  Nothing else, Your Honor.

THE COURT:  Anything on redirect?

REDIRECT EXAMINATION

BY MR. NOLAN:

Q.    1 question.  You -- you were asked a question about your half sister, Ann?

A.    Yes.

Q.    Do you know if she has a history of mental illness?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 84 of 177
*to purchase a complete copy of the transcript.*

A.      Yes.

Q.      Can you describe that?

A.      I do not know her diagnosis.

Q.      Uh-huh.

A.      But she's had some -- a lot of issues with her family and with her life.

Q.      Like what?

A.      Well, she has -- she has made some scam issues and used -- forged my father's name on documents and -- where my dad has had to pay them off and he refused to turn her in.

Q.      Okay.

A.      And she's also -- her -- 1 of her children, the second eldest, has Shaken Baby Syndrome, and she had the child taken away from her for a while.

Q.      Okay.  All right.

        MR. NOLAN:  Thank you.  I don't have any other questions.

        THE COURT:  I have 1 question.  Are you on medication as you sit here today?

        THE WITNESS:  Yes, I am.

        THE COURT:  And under the rules in Nebraska, are you armed as a probation officer?

        THE WITNESS:  No, we're not armed.

        THE COURT:  Okay.  Thank you.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 85 of 177
*to purchase a complete copy of the transcript.*

Anything else?

MR. NOLAN: No, Your Honor. Thank you.

THE COURT: Mr. Williams?

MR. WILLIAMS: No, thank you, Your Honor.

THE COURT: You may step down.

Any other evidence?

MR. NOLAN: Your Honor, my colleague, Ms. Williams, is going to call our next witness.

THE COURT: All right.

MS. WILLIAMS: We would like to call Kathy Rick Scheuss to the stand.

THE CLERK: Please raise your right hand.

KATHY SCHEUSS,

called as a witness, being first duly sworn or affirmed, was examined and testified as follows:

THE CLERK: You may take the stand.

MS. WILLIAMS: May I proceed, Your Honor?

THE COURT: Yes.

DIRECT EXAMINATION

BY MS. WILLIAMS:

Q.    Mrs. Scheuss, can you state your name and spell it for the record, please?

A.    Kathy Scheuss, S-C-H-E-U-S-S.

Q.    And where do you currently live?

A.    Crosslake, Minnesota.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 86 of 177
*to purchase a complete copy of the transcript.*

Q.      How long have you lived there?

A.      Since 1998.

Q.      Are you married?

A.      Yes.

Q.      And do you have any children?

A.      Yes, I have 4.

Q.      Okay.  And prior to moving to Crosslake,
Minnesota, where did you live?

A.      In Mason City, Iowa.

Q.      When you were living in Mason City, were you
employed?

A.      Yes.

Q.      Where were you working?

A.      At Wellborn Industries.

Q.      What type of work did you do there?

A.      I was in the engineering/planning department in
management.

Q.      And about how long did you work at Wellborn
Industries?

A.      16 to 17 years.

Q.      And was it while you were working there that you
met someone named Dustin Honken?

A.      Yes.

Q.      Had you known him before that?

A.      No.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 87 of 177
*to purchase a complete copy of the transcript.*

Q. And about when did you first meet him, what year?

A. 1989, I believe.

Q. And do you know where he was working at the time, if he was working?

A. I met him when he was employed at Wellborn Industries.

Q. And can you describe what your relationship was like with Mr. Honken at first?

A. We worked -- we worked in departments that were close together, so eventually we became friends. And then later on down the road, we began dating.

Q. Okay. And about how long were you friends before you started dating?

A. Probably 8 months.

Q. Okay. So would this be -- you started dating sometime in 1990?

A. Yeah, sometime in 1990.

Q. And how long did you and Mr. Honken date?

A. A few years.

Q. Okay. Why did you stop dating?

A. Well, he moved to Arizona, and we were still somewhat dating.

Q. Uh-huh.

A. And then when his legal troubles started, we weren't actually dating then.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 88 of 177

Q.      Okay.  And do you know when he moved to Arizona?

A.      In the winter of 1992, I believe.

Q.      Did he tell you why he was moving to Arizona?

A.      His brother Jeff needed him to come there and help him.

Q.      Okay.  And you said you dated somewhat after he moved to Arizona.  Would you see him in Arizona, or would he come to visit you in Iowa?

A.      He came to Iowa.

Q.      About how often would he come back to Iowa?

A.      Probably every couple months.

Q.      Okay.  And when he would come back, would he stay with you?

A.      Some of the times.

Q.      You mentioned earlier that you have 4 children. Could you tell me their names and their ages?

A.      Their ages today?

Q.      Yes.

A.      I have Robby, who is 27; Brandon, who is 21; Ryan is 18; and Samuel is 12.

Q.      I'd like to, I guess, talk with you a bit about Brandon.  When was Brandon born?

A.      Brandon was born in March of 1990.

Q.      And so when you started dating Mr. Honken, were you pregnant with Brandon or --

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 89 of 177
*to purchase a complete copy of the transcript.*

A.    I wasn't dating him when I was pregnant with Brandon.  I started dating him when Brandon was an infant.

Q.    Okay.  And could you describe what Mr. Honken was like when -- or what his relationship with Brandon was like when he was born and was an infant?

A.    He was very involved and enjoyed Brandon a lot. He would get involved with the infant care, feeding, changing, playing with.  He would take him out for stroller rides.  Later, when he was a tot, he would play with him in the sandbox and on the swing set and in the backyard.

Q.    And did you and Mr. Honken have a child together?

A.    Yes.

Q.    And would that be your son Ryan?

A.    Yes.

Q.    And when was he born?

A.    He was born in August of 1993.

Q.    And did Mr. Honken do the same sorts of things with Ryan that he did with Brandon when he was born?

A.    Yes.

Q.    Okay.  And can you talk a little bit more about, I guess, what Mr. Honken would do with both Brandon and Ryan around the time when Ryan was born?

A.    He would pick him up.  And then Dustin's job was

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 90 of 177

so many days on and so many days off.  So he would pick them up at day-care or preschool when he could, and then on days off he would take them to where he was living and care for them and play with them.  He would take them down to his dad's in Steamboat Rock, because Brandon was obsessed with tractors and trucks, and they would go down there to ride on the lawnmower.  And he would take them over to his mom's in Britt.  And he would do all the regular things that fathers do with toddlers and preschoolers.

Q.    And during the time that you were -- you were friends and you were dating Mr. Honken, did he ever talk to you about his family and his childhood?

MR. WILLIAMS:  Objection, Your Honor.  Calls for hearsay, unless this is being proffered only as penalty phase evidence.

MS. WILLIAMS:  It goes to what Mr. Honken's trial lawyers could have presented at penalty phase.

THE COURT:  All right.  You may proceed.

A.    What was the question?

Q.    I'll repeat it.  During the time that you were -- you were friends and you were dating, did Mr. Honken ever talk to you about his family and his childhood?

A.    Yes.

Q.    And what sorts of things did he tell you?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 91 of 177

A.    He was -- his parents were divorced when he was about 8, and in Dustin's mind, that was -- that was a huge change in his life, and he remembered his -- standing at the screen door and waving and watching his dad leave.

Q.    And when he told you that, did he seem upset about his parents' divorce and his father leaving?

A.    Yeah.  Yes, he did.

Q.    Okay.  Can you describe that for me?

A.    He was very close to his dad, and his dad's -- he was his dad's little buddy.  And his mother then remarried, like, immediately, and that was really difficult on Dustin.  She married someone that was very quiet and didn't get involved with any of the parenting and child rearing and didn't play with the kids or interact with them the way that most fathers interact with their children, so he sought to compete with his brother on getting his dad's attention.  They both competed to be the favorite son.

Q.    Earlier you mentioned that, I'm sorry, Mr. Honken moved to Arizona in 1992 and that he came back to visit you occasionally.  Did you notice any changes in his behavior when he -- when he came -- the times he came back to visit you?

A.    He was -- seemed stressed out a lot and very

anxious, antsy, and edgy.

Q.   Did your sexual relationship with Mr. Honken -- were there any changes in that aspect of your relationship?

A.   Well, during the times when he came back, he seemed to be a lot more interested in having sex and the frequency of sex.

Q.   Now, you -- did you testify at Angela Johnson's trial?

A.   In the penalty phase.

Q.   And did you testify at Mr. Honken's trial in 2004?

A.   No.

Q.   If you had testified at his trial, would you have provided the same testimony that you've given here today?

A.   Yes.

Q.   On the screen, for the record, is Plaintiff's Exhibit 30.  I'm going to scroll up to the top.

A.   Okay.

Q.   Can you identify that?

A.   Yes.

Q.   Okay.  What is it?

A.   It's the declaration that I signed last spring.

Q.   Okay.  And I'm going to scroll down to the last

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 93 of 177
*to purchase a complete copy of the transcript.*

page. Is that your signature?

A.      Yes, it is.

Q.      And did you read it before you signed it?

A.      Yes.

Q.      And was it accurate at the time you -- when you signed it?

A.      Yes.

              MS. WILLIAMS:  I don't have any further questions.

              THE COURT:  Cross-examination.

              MR. WILLIAMS:  Thank you, Your Honor.

                    CROSS-EXAMINATION

BY MR. WILLIAMS:

Q.      Ms. Scheuss, you testified that after Dustin Honken moved to Arizona, he came back up to Iowa, I think you said, once every other month or every couple months, something like that.  Do you remember that testimony, ma'am?

A.      Yes.

Q.      Okay.  And those are the occasions you knew of him coming back to Iowa, right?

A.      Correct.

Q.      Okay.  For all you know, there were other occasions when he came back to Iowa and didn't -- did not visit you, right?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 94 of 177
*to purchase a complete copy of the transcript.*

A.    At least 1.

Q.    Okay.  And when you say "at least 1," you had a little bit of a smile.  The 1 you're talking about is when he was arrested in March of 1993?

A.    Yes.

Q.    He was back in Iowa and you didn't even know it, did you?

A.    No, I didn't.

Q.    Okay.  And it's fair to say, Ms. Scheuss, you had no idea of -- or knowledge at all of Dustin Honken's involvement with methamphetamine manufacturing or distribution, did you?

A.    No, I didn't.

Q.    You were asked questions about Dustin's childhood and you related some information about him growing up and the divorce upsetting him and so forth.  All that information is information you obtained from Dustin, right?

A.    That's correct.

Q.    You indicated that when he came back during those visits from Arizona, that his personality had -- or his behavior, I guess was the term, had changed.  He was stressed out, anxious, edgy, antsy, that kind of stuff.  Do you remember giving that testimony?

A.    Yes.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 95 of 177
*to purchase a complete copy of the transcript.*

Q.    And that was a change from his normal behavior, right?

A.    It was.

Q.    Okay.  When you were working with Dustin at Wellborn, he was also in a management position there, wasn't he?

A.    Yes, he was, at 1 time.

Q.    Okay.  And he was a pretty good worker there, wasn't he?

A.    He was.

Q.    He supervised some employees there?

A.    Yes.

Q.    And got along well with the other workers at Wellborn?

A.    As far as I know.

Q.    There was a period in 1995, 1996, when he went to work at Kraft.  Do you remember that time period?

A.    Yes.

Q.    And he had a number of friends at Kraft as well, didn't he?

A.    I believe so.

Q.    You never personally saw Dustin Honken with any controlled substances, did you, ma'am?

A.    No, I didn't.

Q.    Never saw him use any drugs?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 96 of 177

A.     No.

MR. WILLIAMS:  Just a moment, Your Honor.

THE COURT:  Yes.

(Brief pause.)

MR. WILLIAMS:  Just a couple more questions, Your Honor.

Q.     In preparation for your testimony in today's hearing, did you have an opportunity to review an interview that was conducted of Dustin Honken back in 2003 by the mitigation specialist that was hired by the defense team back then?

A.     No, I've not seen the document.

Q.     Okay.  In this document -- this document is a multipage document.

Starts at 005321, for defense counsel.

And in this, at 005339, Dustin Honken told Miss Rick [sic] that you were -- you participated in drug use with him.  Is that true?

A.     Miss -- I was Miss Rick?

Q.     No, I'm sorry.  Let me rephrase that.  In this document, which is a report of an interview that Miss Rick [sic] did of Dustin Honken --

(Mr. Williams conferred with Agent Lewis.)

Q.     I'm misspeaking.  Let me start over, okay.  I'm looking at a tab here.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 97 of 177

In 19 -- I'm sorry, in 2003, Ms. Rickert had done an interview, Lisa Rickert, had an done interview of Dustin Honken, okay. In this interview report of Dustin Honken, he claims that you participated in drug use with him, is that true?

A.      That is not true.

Q.      Okay. He also says that you participated in selling methamphetamine for him?

A.      That is not true.

Q.      He also claimed that you participated in lab work, which I take to mean the manufacturing process of the methamphetamine, is that true?

A.      That is not true.

Q.      All right. He claims that you didn't want to do any of this, but you would do anything for him?

A.      That is not true.

MR. WILLIAMS: All right. I have no further questions.

THE COURT: Anything else for this witness?

MS. WILLIAMS: No further questions, Your Honor.

THE COURT: Thank you, ma'am. You may step down.

Is she excused?

MS. WILLIAMS: She is.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 98 of 177
*to purchase a complete copy of the transcript.*

THE COURT:  All right.  Thank you.

Any other witnesses for the petitioner?

MR. NOLAN:  Your Honor, there's -- our next witness is Mr. Bregar, who is by telephone at 1:00 p.m.

THE COURT:  Okay.

MR. NOLAN:  And he would be our last witness for the day, and then I think the government is going to call a few.

THE COURT:  Very fine.  Then we will be in recess -- why don't you be in here at least by 5 to 1:00 so we can get everything set up.

MR. NOLAN:  Absolutely.

THE COURT:  Thank you.

MR. NOLAN:  Thank you, Your Honor.

(Whereupon, a luncheon recess was taken.)

(The telephone connection was made to Mr. Bregar.)

THE COURT:  Mr. Bregar, this is Judge Reade. We are going to place you under oath.  Will you please raise your right hand.

THE WITNESS:  Yes.

TERRY BREGAR,

called as a witness, being first duly sworn or affirmed, was examined and testified as follows:

THE COURT:  We are back on the record in

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 99 of 177
*to purchase a complete copy of the transcript.*

Dustin Lee Honken versus the United States. This is Case Number 10-3074. Mr. Bregar, Mr. Terry Bregar, is on the telephone. He has been sworn.

Mr. Bregar, the first attorney that will ask you questions is Mr. Nolan, who is representing Mr. Honken in this post-conviction proceeding. If you cannot hear at any time or if you don't understand the question, obviously, stop us and we'll go back and try to make things more clear.

Is that agreeable?

THE WITNESS: Yes.

THE COURT: All right. Then I'm going to turn this over to Mr. Nolan.

THE WITNESS: Okay.

MR. NOLAN: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. NOLAN:

Q. Good afternoon, Mr. Bregar.

A. Hello.

Q. Do you remember meeting with me?

A. Yes, I do.

Q. Okay. I'm the person who saw you on Sunday?

A. Yeah.

Q. Okay. How old are you, Mr. Bregar?

A. I am 66.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 100 of 177
*to purchase a complete copy of the transcript.*

Q.     And where do you live?

A.     I live in a care facility in Des Moines, Iowa.

Q.     And how long have you lived in that care facility?

A.     It will be 4 years in March.

Q.     And what is your -- what is your health condition at this point?  Do you have a certain condition you suffer from?

A.     I have severe diabetes.  And at this present time, I have kidney problems.  And at this present time, I have foot problems.

Q.     Okay.

A.     I have an open sore on my left foot, and then a spur on my right, where I can't walk very well.

Q.     Mr. Bregar, can you see?

A.     No.  I can see shadows with the left eye.  The right eye is completely blacked out.

Q.     And how long have you been blind?

A.     April of '97.

Q.     And what caused your blindness?

A.     A stroke from the diabetes.

Q.     Okay.  Mr. Bregar, do you remember testifying at Dustin Honken's trial back in 2004?

A.     Yes, I do.

Q.     Okay.  Now, you also testified previously to

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 101 of 177

that, maybe in a grand jury or 2, and also at a sentencing?

A.    Yes.

Q.    Do you remember that?

A.    Yes.

Q.    Okay.  When you testified at the trial, did you testify about events that happened at the prison in Sioux City back in 1996?

A.    Yes.

Q.    Did you meet Dustin Honken at some point in prison?

A.    I met him in the county jail in Sioux City.

Q.    Do you remember when that was?

A.    I believe 1st or 2nd of November of '96.

Q.    And did you spend a good deal amount of time with Mr. Honken?

A.    Yeah, we talked a lot, and we played cards.

Q.    And did he tell you anything about -- did you have any conversations with him about methamphetamine?

A.    Oh, yeah, yeah, yeah.

Q.    And what did he tell you about -- did he tell you about whether he used methamphetamine?

        MR. WILLIAMS:  Objection to hearsay, unless this is being offered solely during the penalty phase of the trial.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 102 of 177
*to purchase a complete copy of the transcript.*

MR. NOLAN: This portion, Your Honor, is -- would be for what Mr. Honken's lawyers could have presented at the penalty phase.

THE COURT: You may proceed.

MR. NOLAN: Thank you.

Q. Mr. Bregar, I'll ask that question again. Did Mr. Honken talk to you about whether he used methamphetamine?

A. Yes, he did.

Q. And what was -- how did that discussion go? What did he say? What did you say?

A. He used methamphetamine, and he -- he knew how to make it.

Q. Did he tell you whether he liked using methamphetamine?

A. Yeah, he liked it.

Q. In 2002 when you testified, first of all, sir, what type of a sentence were you serving?

A. 15 years, plus 5 years special.

Q. And when you testified in 1997, I think at some point in your testimony, did you receive some -- some benefit in terms of your sentencing in return for your cooperation with the government?

A. Yes.

Q. And what was that?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 103 of 177

A.    4 and a half years off of my 15.

Q.    All right.  And when you testified, did you testify that it was agreed that 3 years would be knocked off your sentence?

A.    Yeah.

Q.    And how did it come about that it actually ended up being 4 and a half years?

A.    The judge changed it, and he gave me 4 and a half years, partially because of my eyesight and being in prison.

Q.    And who was that judge?

A.    That was Judge Bennett.

Q.    Okay.  And when did that happen in relation to your testimony, do you remember?

A.    No, I can't.  I thought about that, and I can't remember.

Q.    Okay.  When the -- when the judge changed that, to knock off an extra year and a half, did the government indicate whether they agreed to that or opposed that?

A.    They agreed to it.

Q.    Mr. Bregar, you indicated that you had a stroke because of the diabetes that left you blind.  Do you remember testifying to that just a couple minutes ago?

A.    Yes.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 104 of 177

Q.    Did the stroke affect your memory?

A.    Yeah, yes.

Q.    In what way?

A.    Well, just caused me not to remember real well, and I wasn't able to talk very good for a while.

Q.    Did you -- did you ever indicate to the Bureau of Prisons's officials that the stroke affected your memory?

A.    I think they realized that fact.

Q.    And did you ever indicate to prison officials -- I guess what I'm asking -- let me rephrase that.  Did you ever indicate to medical staff in the prison that it affected your memory?

A.    Yes.

Q.    And did you ever indicate to medical staff or prison staff that you were concerned about these memory issues?

A.    No.  It's just something that goes along with a stroke.

            MR. NOLAN:  May I just have a moment, Your Honor.

            THE COURT:  Yes.

            (Brief pause.)

Q.    Mr. Bregar, I'm going to read you a portion from your Bureau of Prisons's medical records to see if this

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 105 of 177
*to purchase a complete copy of the transcript.*

refreshes your recollection, okay?

A.     Okay.

          MR. NOLAN:  And for the record, Your Honor, this is P-125.

Q.     So this is a -- this is a notation in your Bureau of Prisons's records, dated July 1st of 2004.  And it says, "The patient states that he has noticed increasing trouble with short-term memory over the last several months.  He states both of his parents had Alzheimer's and that he is very concerned about his symptoms," I believe is what the word is, "He also" -- "he C/O" -- "he complains of short-term memory problems, along with the feeling that" --

          MR. WILLIAMS:  "My mind is racing," I think is what it says.

          MR. NOLAN:  Thank you.

Q.     "Along with the feeling that my mind is racing." Do you remember that you had those complaints at 1 point and told prison officials that?

A.     I'm not sure.

Q.     Okay.  And do you know when it was that you testified in this matter -- in the trial, I should say, in front of -- in front of a jury?

A.     That was in 2004, I believe.

Q.     Okay.  If I told you it was September 23, 2004,

does that seem about accurate?

A.    I guess so.  I'm not sure.

Q.    That's fine.  Prior to preparing -- or prior to testifying in the trial, did you meet with agents from the government at various times?

A.    Yeah.

Q.    And do you remember where you met with them?

A.    I believe they come to Waseca, Minnesota.

Q.    And where were you then?

A.    At Waseca, Minnesota, in prison.

Q.    In prison, okay.  And when the -- when these government officials were speaking to you, what were they -- what were they asking you?

A.    They was wanting to know if Dustin had told me that he had killed anybody.

Q.    And had Dustin ever told you that he had killed anybody?

A.    No, he did not.

Q.    And did you tell that to these officials?

A.    Yes.

Q.    How many times did they ask you about whether or not Dustin had --

A.    Numerous times.

Q.    And how did you feel when they were asking you those questions?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 107 of 177
*to purchase a complete copy of the transcript.*

A.     I felt that they wanted me to say that he did, you know, but he didn't, and I wasn't going to say it.

Q.     At the time you were speaking to these officials, were you blind then, Mr. Bregar?

A.     Yes.

Q.     Did you tell them how that came about?

A.     Yeah, I think so.

Q.     Did you tell them that, that you had had a stroke that had some impact on your memory?

MR. WILLIAMS:  Leading, Your Honor.

THE COURT:  Sustained.

Q.     Did they ask you whether you had a stroke?

A.     I can't remember.

Q.     Okay.  What did you tell them, if anything, about what caused your medical condition?

A.     Well, it was -- it was caused from diabetes.

Q.     Mr. Bregar, were you also treated at some point for depression when you were in prison?

A.     Yeah, I'm sure I was.  Being in prison is bad enough, then not having any eyesight.

Q.     Right.  And, Mr. Bregar, were you on various medications in 2004 when you testified?

A.     Yeah.

Q.     Do you remember when you were moved from FCI Waseca before testifying?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 108 of 177
*to purchase a complete copy of the transcript.*

A.    I don't understand that.

Q.    I'm sorry, at some point before you testified in September of 2004, were you moved from Waseca where you were housed?

A.    I was moved to a medical -- to Rochester, Minnesota, for a while.

Q.    No, I'm talking about right before you testified in Mr. Honken's trial.

A.    Well, yeah, we was -- we was taken to Sioux City.

Q.    Okay.  And how did you get to Sioux City?

A.    By Marshal's Service.

Q.    And did you drive there or fly there?  How did you get there?

A.    We drove there.

Q.    And what kind of vehicle?

A.    I believe I was in a van.

Q.    And were there other prisoners in the van with you?

A.    Yes.

Q.    And who were those -- who were those prisoners?

A.    Dean Donaldson was 1 of them.

Q.    How many other prisoners were in the van with you, if you remember?

A.    I think there must have been about 6 of us.

Q.    And where were the other prisoners going?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 109 of 177
*to purchase a complete copy of the transcript.*

A.    Everybody was headed for Sioux City.

Q.    And why were they going to Sioux City?

A.    To testify in court.

Q.    At whose trial?

A.    Dustin's.

Q.    And during the van ride, were there discussions among the prisoners?

A.    Yeah.

Q.    And what kind of discussions?

A.    About Dustin.

Q.    And what were those discussions about?  And more particular than just about Dustin.

A.    I don't understand what you mean.  What are you saying?

Q.    Well, you said that there was discussion among the prisoners.  First of all, were you all in 1 part of the van together?

A.    Yeah.

Q.    And could you hear each other and talk to each other?

A.    Yeah.

Q.    And you said people were talking about Dustin. Were they talking about the trial or about past events, or what were they talking about in particular?

A.    Past events.  Dean Donaldson said that Dustin

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 110 of 177

wanted him to do -- to get -- get out of jail to do certain things for him, help him get money for his lawyer.

Q. And how long were you in this van with all these other prisoners having these discussions?

A. Oh, God, hours. We went from -- I was picked up at Cedar Rapids, and I believe we went -- we went to Fort Madison, went and picked up people.

Q. Did you talk during that van ride about any expectations that you had in return for your testimony?

A. No.

Q. Did anyone else?

A. I suppose there was some conversation.

Q. About what?

A. About what some of the guys was expecting for their testimony.

Q. And what kinds of things were some of the guys expecting for their testimony?

A. Years off their sentence.

Q. Now, when you -- where did you -- where were you taken once you got to Sioux City?

A. I was taken to the Woodbury County Jail.

Q. And when you got to the Woodbury County Jail, did you go through intake there?

A. Yeah.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 111 of 177
*to purchase a complete copy of the transcript.*

Q.    And did they ask you about medications and your health conditions and things like that?

A.    I think they had paperwork.

Q.    They had paperwork.  And so at the time you got to that prison, did they give you the medications that you were supposed to be on?

A.    Well, I got the insulin, but I don't know about the other stuff.

Q.    Okay.

A.    I think they did.  I'm sure they gave me something.

Q.    Okay.  I'm going to read a list to you of medications that the prison records show that is dated September 17, '04.  Does that sound roughly about right, when you would have arrived there prior to the trial?

A.    I think so.

Q.    All right.  I'm just going to read this list to you and ask you if you remember that you were on these medications at the time:  Trazodone, T-R-A-Z-A-D-O-N-E [sic]; Omeprazole, O-M-E-P-R-A-Z-O-L-E; Prazosin, P-R-A-Z-O-S-I-N; Lisinopril, L-I-S-I-N-O-P-R-I-L; TNG; that's what -- excuse me, Amitriptyline, A-M-I-T-R-I-P-T-Y-L-I-N-E; glucose gel; Glyburide, G-L-Y-B-U-R-I-D-E; Metformin, M-E-T-F-O-R-M-I-N; NPH insulin; Hydrochlorothiazide,

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 112 of 177

H-Y-D-R-O-C-H-L-O-R-O-T-H-I-A-Z-I-D-E; and Naprosyn, N-A-P-R-O-S-Y-N.

Mr. Bregar, does that sound about right, about the drugs that you were on, prescribed at the time?

A.    Yeah.

Q.    Mr. Bregar, at some point, did you meet with me? I'm not talking about this past Sunday, but on a prior occasion or 2.

A.    You and another gentleman?

Q.    Yes.

A.    Yeah.

Q.    And do you remember that in December of last year that we met with you and I read a declaration to you?

A.    Yes.

Q.    And that you signed it?

A.    Yes.

Q.    And when I read it to you, was it based on the previous discussion that we had had?

A.    Yes.

Q.    And when I read it to you and you signed it, did you confirm that it was accurate based on what I read to you before you signed it?

A.    It sounded right.

Q.    Okay.  Thank you, Mr. Bregar.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 113 of 177

MR. NOLAN:  I don't have any other questions.

THE COURT:  Cross-examination, Mr. Williams.

MR. WILLIAMS:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. WILLIAMS:

Q.    Mr. Bregar, when you were interviewed by these gentlemen back in December of last year, were you on either all or most of the same medications you were on when you testified in trial in 2004?

A.    Yes.

Q.    Okay.  And you understood what they were asking you at the time?

A.    Yeah.

Q.    You could remember events enough to be able to answer their questions when they spoke with you in December of last year?

A.    Yeah, I believe so.

Q.    You fully understood what they were having you do at the time?

A.    Yeah.

Q.    Okay.  You indicate in your testimony that you had suffered a stroke in 1997.  Who told you you had suffered a stroke?

A.    Medical.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 114 of 177

Q. And how did the stroke affect you, other than you indicate today that it affected your speech for a little bit and affected your memory?

A. Yeah.

Q. And so did you complain to medical staff back in 1997 about memory problems and the fact that it was affecting your speech?

A. Yes, they knowed this.

Q. And so if we went back to your medical records from the Bureau of Prisons, we should be able to find in there some references back in 1997 that you were having some memory problems?

A. I believe so.

Q. Okay. Now, you were first interviewed about Dustin Honken on March 5, 1997. Does that sound about right, sir?

Mr. Bregar?

A. Yeah, I'm thinking. I'm just trying to --

Q. Okay. I just wanted to make sure we hadn't lost you.

A. I'm not sure. Somewheres -- somewheres in that time, I think.

Q. Okay. And I'm looking at a Report of Interview of yours dated March 4, 1997. It said you were interviewed in the Plymouth County Jail in Le Mars,

Iowa, by Special Agents Mark Hein and Lori Lewis, and Assistant United States Attorney Steven Colloton. Does that ring a bell with you?

A.    Yeah.

Q.    Okay. And when you were interviewed by those people, you told them the truth, didn't you, sir?

A.    Yeah, I believe so.

Q.    Okay. And you testified before the grand jury on March 14, 1997. Do you recall doing that, sir?

A.    Yeah.

Q.    And you were placed under oath at that time?

A.    Yeah.

Q.    And you told the grand jury the truth too, didn't you?

A.    Yes.

Q.    Okay. And then you -- you testified at Dustin Honken's sentencing hearing in 1998. You were pretty reluctant to do that, but you did testify at that hearing, do you remember that?

A.    Yes.

Q.    Mr. Bregar, you said "yes"?

A.    Yes.

Q.    Okay. Thank you. And you were placed under oath again at that hearing too, right?

A.    Yes.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 116 of 177
*to purchase a complete copy of the transcript.*

Q.    And you told the truth there as well, didn't you?

A.    Yes.

Q.    Okay.  And then you testified at Dustin Honken's trial in 2004.  You remember that?

A.    Yes.

Q.    Is that a "yes," sir?

A.    Yes.

Q.    Okay.  And you were again placed under oath during that trial, right?

A.    Yes.

Q.    And you told the truth during that trial as well, didn't you?

A.    Yes.

Q.    Now, you were asked about this declaration that Mr. Nolan read to you and that you agreed was true, and you signed off on it.  Do you remember that -- those questions Mr. Nolan just asked you about?

A.    Yeah.

Q.    Okay.  And so 1 of the things in there is that, on Paragraph 4 of your declaration -- I'm going to read you the whole paragraph, okay?

A.    Uh-huh.

Q.    It says, "I remember when I was in prison in Minneapolis the prosecutors came and talked to me. There was a bunch of them, agents and lawyers.  They

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 117 of 177
*to purchase a complete copy of the transcript.*

were there to prepare me for my testimony at trial. The prosecutor kept trying to get me to say that Dustin had told me that he had killed some people. He kept pushing me to say that. It wasn't true, and I kept telling him that. Despite his talk, Dustin never struck me as a violent person."

Do you remember agreeing that that was your statement?

A. Yes.

Q. Okay. And to this day, you believe that to be true?

A. Yes.

Q. Okay. And at Paragraph 7, it has down on your declaration that "At some point, after I had testified in front of Judge Bennett but before I testified in front of the jury, I had a phone conference with Judge Bennett about my own case. As I said, the government had agreed to knock 3 years off the 15-year sentence I was serving in return for my cooperation against Dustin Honken. At the hearing, my lawyer, Beverly Wild, told the judge about my stroke and how it affected me. The judge agreed to take another year and a half off my sentence. The prosecutor said that the government did not object."

Do you remember that portion of your

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 118 of 177

declaration being read to you?

A.     Yes.

Q.     And you're saying that's all true?

A.     Yes.

Q.     Okay.  I want to talk about that hearing then a little bit more.  Do you remember who the prosecutor was?

A.     No.

Q.     Okay.  What do you remember your lawyer telling the judge about your stroke?

A.     No, I don't.

Q.     And, I'm sorry, I may have asked a poor question. My question was, what do you remember your lawyer saying about your stroke?

A.     Well, she told the judge that -- about my stroke.

Q.     Did she tell the judge that it affected your memory?

A.     I think so.  You know, it's been a long time ago.

Q.     Okay.  So you're not so certain that she told the judge about your memory, but you're certain that she told the judge about your stroke?

A.     Yes.

Q.     And you're certain the government agreed to another year and a half off your sentence?

A.     Yes.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 119 of 177
*to purchase a complete copy of the transcript.*

Q.     And you're certain of that?

A.     I think so.  I don't remember him objecting to it.

Q.     Okay.  Are you certain that you told the judge about your -- or that your lawyer told the judge about your stroke?

A.     I think she did.  It's been a long time ago, you know, to remember everything.

Q.     Okay.  Let's go back to your statement that the prosecutor -- I think you're saying today that the prosecutor was asking you in trial prep whether Dustin Honken had admitted to you that he killed some people. Do you remember that line of questioning?

A.     Yes.

Q.     Now, Dustin had told you quite a few things about -- about his involvement with some people disappearing, didn't he?

A.     Yeah.

Q.     He told you some people disappeared and he made the motion with his hand of somebody shooting somebody with a thumb and forefinger, didn't he?

A.     Yes.

Q.     He told you that they are all in 1 spot, referring to the people that were missing, didn't he?

A.     Let me think a second.  Yeah, I think so.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 120 of 177
*to purchase a complete copy of the transcript.*

Q.     And he told you that if he had a week out of jail, it would be the same as it was in 1993, meaning that there wouldn't be any witnesses?

A.     Yeah.

Q.     Okay.  Now, remember, I read you that statement before that you said that -- in response to the prosecutor talking to you about whether Dustin had made admissions about killing people, you said, "It wasn't true, and I kept telling him that.  Despite his talk, Dustin never struck me as a violent person."  You remember I read you that part of your declaration that you gave for Mr. Nolan?

A.     Yes.

Q.     Okay.  Do you remember in that interview you gave to law enforcement back on March 5, 1997, you said that you believed Dustin -- that Honken could kill somebody and that he had killed someone.  Do you remember saying that to law enforcement officers back on March 5, 1997?

A.     No.  The only statement he made to something like that is he said people don't die the way it is on television.

Q.     And you believed him, didn't you, sir?

A.     Yeah.

Q.     And you believed he could kill somebody, didn't you?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 121 of 177
*to purchase a complete copy of the transcript.*

A.     I can't say that's true.  He didn't strike me as that type of person, but he --

Q.     Now, do you remember you were visited by lawyers on behalf of Angela Johnson in connection with her litigation?  They visited you on August 17, 2009.  Do you remember that?

A.     No.

Q.     They came and visited you and had you -- they also had a declaration for you to sign, a 2-page declaration.  Do you remember that happening?

A.     No, I don't.

Q.     They asked you all about Dustin Honken and what he did in jail and what was said and all that stuff.  You don't remember that interview in August of 2009?

A.     August of 2009?  I'm not sure.  If you say they did, I guess they did.  They was for Dustin or for the woman?

Q.     For the woman.

A.     Yeah, I think so.

Q.     Okay.  You never said 1 thing during that interview with them about having suffered a stroke that affected your memory, did you, sir?

A.     I don't know.  You're asking me something I don't know.  I can't remember.

Q.     I want to talk about your testimony.  You said

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 122 of 177

that you rode in the van with a number of other inmates and there was talk about Dustin Honken.  Do you remember that part of your testimony here today --

A.     Yeah.

Q.     -- Mr. Bregar?

A.     Yes.

Q.     Okay.  I'm sorry.  And you identified 1 person.  You said Dean Donaldson was in the van with you?

A.     Yes.

Q.     And where was he picked up at?

A.     He was picked up at Fort Madison.

Q.     Okay.  And who else was in that van that testified at Dustin Honken's trial?

A.     I can't remember the names.

Q.     Can you remember any name of any other individual other than Dean Donaldson?

A.     No, I can't.

Q.     Okay.  Did you change your testimony in light of what Dean Donaldson said or in light of what anybody else in that van said?

A.     No.

Q.     Okay.  And you don't know whether anybody else in that van changed their testimony in light of what you said or what anybody else said, do you?

A.     No, I don't.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 123 of 177

Q.    Okay.  Did you tell anybody in the van what you were going to testify about?

A.    No.

Q.    Can you in any way describe any of the other people in this van?

A.    I think 1 guy was a black guy.  I don't remember his name.  They was just -- they was people from the pod we was in at Sioux City.

Q.    Okay.  And how many total people did you hear talking about Dustin Honken in the van?

A.    Probably everybody in the van.

Q.    Okay.  And what do you -- well, how many were in the van though?

A.    I believe, with me, there was 5 or 6.

Q.    And what precisely do you remember them saying about Dustin Honken?

A.    Dean Donaldson was talking that Dustin wanted him to get out of jail to help him raise money to pay an attorney.

Q.    Okay.  What else?

A.    I'm not sure.  Something -- I -- I can't remember exactly what he did say.  He was talking -- was talking all against Dustin.

Q.    And this was Dean Donaldson?

A.    Yes.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 124 of 177

Q.    Okay.  Can you remember anything else he said?

A.    No, I can't.

Q.    Can you remember anything that anybody else in that van said about Dustin Honken?

A.    Nobody had anything good to say.

Q.    Can you remember anything else that anybody else said in that van?

A.    No.

Q.    Now, Mr. Bregar, what I take from this is you're all riding in the van, you're talking about Dustin Honken and what everybody knew about him.  Were people trying to match up their stories to make sure that everybody's stories were the same?

A.    No, I don't believe so.

Q.    Now, there was obviously a marshal driving the van?

A.    Yeah, there was a marshal driving, and there was a marshal beside him, you know, in the front seat.

Q.    All right.  And then what's between you and the marshals?

A.    A wire cage.

Q.    Okay.  And are you guys talking loud enough that the marshals are listening to you?

A.    Oh, I would imagine, yeah.  I would say so.

Q.    Okay.  Did they ever engage in the conversation

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 125 of 177

with you?

A.      No.

Q.      Do you know whether, in fact, they heard what you were saying?

A.      I'm sure they heard.

Q.      Do you know that they heard because of anything they said or did that indicated to you that they heard?

A.      No, they -- I think they was paying attention though.

Q.      Just a moment, Mr. Bregar.

        (Brief pause.)

        MR. WILLIAMS:  Nothing further, Your Honor.

        Thank you, Mr. Bregar.

        THE COURT:  Mr. Nolan, do you have any other questions for Mr. Bregar?

        MR. NOLAN:  1 or 2, Your Honor, that's all.

        THE COURT:  All right.  Mr. Bregar, Mr. Nolan is now going to ask you some additional questions.

        THE WITNESS:  Okay.

                REDIRECT EXAMINATION

BY MR. NOLAN:

Q.      Mr. Bregar, when you would speak to Mr. Honken about methamphetamine, did he tell you how pure the methamphetamine was that he could make?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 126 of 177

MR. WILLIAMS: Again, objection, Your Honor. If this is being offered in the penalty phase only or what the defense counsel should have brought out in the penalty phase, I don't object. Otherwise it's calling for hearsay and I would object.

MR. NOLAN: That's correct, Your Honor, it is only offered for penalty phase.

THE COURT: All right. You may proceed.

And, Mr. Bregar, do you remember the question?

THE WITNESS: Yes.

THE COURT: Okay. You can answer it then, please.

A.    He said he could make 100 percent pure meth, which I don't know -- I'm not sure if there are such a thing, but --

Q.    Mr. Bregar, you remember that you testified at a grand jury at some point; is that right?

A.    Yes.

Q.    And I'm going to read you a question and answer from that grand jury from your testimony.

MR. NOLAN: And I'm referring to -- this is, for the record, Your Honor, Government's Exhibit S, as in "Sam." March 14, 1997, on Page 8.

Q.    Here's the question, Mr. Bregar:

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 127 of 177

"What did he tell you about the quality of methamphetamine that he could make in this operation?

"Answer: He could make 91, 92 percent testable crank, methamphetamine."

Do you remember testifying to that, sir?

A. I think so.

Q. And is that -- is that consistent with what Dustin Honken told you about the methamphetamine?

A. Yeah.

Q. And also on that same page you were asked:

"You mean he liked to use it?"

And you answered, "Yeah."

Do you remember that testimony?

A. Yeah.

Q. Okay.

MR. NOLAN: That's all I have. Thank you, Judge.

THE COURT: Anything else, Mr. Williams?

MR. WILLIAMS: No, Your Honor. Thank you.

THE COURT: Mr. Bregar, this concludes your testimony. We very much appreciate receiving it by telephone, and we're going to hang up now.

THE WITNESS: Okay. Thank you.

THE COURT: Bye-bye.

All right. And as I understand it, the next

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 128 of 177

couple of witnesses are going to be government witnesses; is that correct?

MR. WILLIAMS: That's correct, Your Honor.

THE COURT: You may proceed.

MR. WILLIAMS: United States calls John Graham.

THE COURT: Good afternoon, Agent Graham.

THE WITNESS: Good afternoon.

JOHN GRAHAM,

called as a witness, being first duly sworn or affirmed, was examined and testified as follows:

THE CLERK: You may take the stand.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q.    When you're comfortable there, sir, please state your name.

A.    John Phillip Graham, G-R-A-H-A-M.

Q.    How are you employed, sir?

A.    I'm employed by the State of Iowa and assigned to the Division of Narcotics Enforcement within the Department of Public Safety.

Q.    What is your position there, sir?

A.    I'm currently an agent in charge.

Q.    How long have you been a special agent or an agent in charge with the Iowa Division of Narcotics

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 129 of 177

Enforcement, including the time before that when it was part of the DCI?

A.    I've been a narcotics agent for 29 years, and the last 3 years is when I've been serving as an agent in charge.

Q.    Were you involved in the investigation of Dustin Honken and Angela Johnson in connection with both the narcotics and the murder -- murders related to the narcotics trafficking?

A.    Yes.

Q.    And what was your role, in just general terms, in the investigation?

A.    I first became involved in November 1993 when I assisted Agent Bill Basler with a search of the Terry DeGeus residence after he was reported missing by his parents.

Q.    And then did you continue in the investigation into the drug activity by Dustin Honken in the 1996 timeframe?

A.    Yes, I did.

Q.    Now, as part of the investigation in this matter, did you participate in preparing Terry Bregar for his testimony in the Dustin Honken trial in 2004?

A.    Yes.

Q.    And where did that take place at?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 130 of 177

A.    It took place in a federal prison in the Minneapolis, Minnesota, area.

Q.    Who do you recall being present at that trial prep session?

A.    Yourself, Mr. Tom Miller with the AG's office in the State of Iowa, and Agent Bill Basler, and myself.

Q.    During that prep session, what, if anything, did Terry Bregar state about having suffered a stroke that affected his memory?

A.    He didn't say anything about it.

Q.    Do you remember him mentioning anything about ever having suffered a stroke?

A.    No.

Q.    Do you remember him saying anything about having memory problems?

A.    No.

Q.    Did he mention anything about colluding about his testimony with anybody else?

A.    No, he did not.

Q.    And as a general matter, at any point during the investigation up through the trial, were you ever made aware by anybody that any of the government's cooperators had in any way colluded on their testimony?

A.    No.

Q.    At some point in this investigation, was -- did

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 131 of 177

law enforcement look at Terry DeGeus as a possible suspect in relation to the murders of Greg Nicholson, Lori Duncan, Kandi Duncan, and Amber Duncan?

A.    Yes.

Q.    And could you explain to the judge, why was Terry DeGeus looked at in that way?

A.    There was a theory that we floated around, that Mr. Terry DeGeus was employed by his father, Mr. Ed DeGeus, and they did an excavating business.  And part of that was burying old farmsteads, so we theorized perhaps Mr. Terry DeGeus could have assisted Mr. Honken in the burying of the bodies.

Q.    Did law enforcement ever contemplate Terry DeGeus committing this murder by himself?

A.    No.

Q.    When he was considered as a possible suspect in the burying of the bodies, was it in connection with Dustin Honken?

A.    Yes, it was.

Q.    Was it ever considered that he would have had involvement other than with Dustin Honken?

A.    No.  We theorized again that anything that Mr. DeGeus may have participated in would have been under the direction and control of Mr. Honken.

Q.    Pursuant to that theory by law enforcement, did

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 132 of 177

law enforcement agents follow-up on that theory?

A.     Yes, we did.

Q.     And did you participate in that follow-up investigation?

A.     Yes.

Q.     And what did you do?

A.     During the summer of 1997, we contacted the DeGeus family to see where they may have been working at during the summer, and specifically, July 25th, 26th of 1993.  They researched their records.  We identified a farmstead that they had buried some old buildings at on July 26, 1993.  And then in September 1997, we basically dug up the excavation site.

Q.     And was any evidence found at that site?

A.     No.

Q.     Now, eventually, in the year 2000, the murder victims's bodies were discovered?

A.     Yes.

Q.     Were they discovered at that site?

A.     No, they were not.

Q.     Once law enforcement dug up that site and did not find any evidence of the murders, what happened with the theory that Terry DeGeus was involved in the murders or the burials of the victims?

A.     Based on not finding anything, as well as other

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 133 of 177
*to purchase a complete copy of the transcript.*

information that we uncovered -- not uncovered, but developed during the investigation, we basically removed Terry DeGeus from being a suspect.

Q.     Without getting into any of it, could you -- without getting into all of it, could you give the Court an indication of some of the other evidence that led you to conclude that Terry DeGeus was not involved in the murders?

A.     Yes.  Once Tim Cutkomp decided to cooperate in -- after his arrest in 1996, Mr. Cutkomp provided a debriefing.  And during that, he identified:  That there was a gun purchased, which we were able to document that Angie Johnson purchased the gun; Mr. Cutkomp was aware that Mr. Honken had provided a tape that was done by Mr. Nicholson exonerating him, and that was confirmed by Mr. Honken's attorney at that time, Mr. Thinnes; Mr. Cutkomp advised us that he assisted in the cutting up of a gun during January 1994; a piece of metal that Mr. Cutkomp later identified was recovered in a ditch where he said that the parts were thrown into; the fact that we didn't come up with anything in the excavation of the farm site; and Angela Johnson drawing the maps to the body locations, not indicating Mr. DeGeus's involvement in that; as well as the several inmates that we interviewed throughout the investigation who never

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 134 of 177

said that Honken admitted to them that Mr. DeGeus was involved.

MR. WILLIAMS: No further questions, Your Honor.

THE COURT: Cross-examination, Mr. Nolan.

MR. NOLAN: May I have just 1 moment, Judge, please.

(Brief pause.)

CROSS-EXAMINATION

BY MR. NOLAN:

Q. Good afternoon, Agent.

A. Good afternoon.

Q. You were asked a question about the prep session with Terry Bregar and whether or not he indicated anything about having had a stroke. Did you try to obtain Mr. Bregar's Bureau of Prisons's records?

A. I did not.

Q. Could you have if you wanted to?

A. Yes.

Q. Are you aware that the Bureau of Prisons's indicate that he had memory problems?

A. I have not reviewed his medical records while he's been incarcerated.

Q. Thank you. You just discussed this first excavation. When did that take place?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 135 of 177

A.     September of 1997.

MR. NOLAN:  Your Honor, could I just get the screen?

THE COURT:  Absolutely.

Q.     Agent, I'm showing you a document that has been marked P-61.  It's a Division of Criminal Investigation Report, Excavation Activity Preface.  Do you see that document?

A.     Yes, I do.

Q.     Now, you indicated on direct examination that any theory involving Mr. DeGeus prior to this excavation also included that Mr. Honken would have been involved; is that right?

A.     Yes.

Q.     Now, do you see that in this document there is no mention of Mr. Honken?

Just let me know if you need to scroll down.

A.     Yeah, so far from what you've shown me, there is no mention of Mr. Honken.

Q.     I think that's the end there.

MR. NOLAN:  That's all I have.  Thank you, Judge.

THE COURT:  Mr. Williams?

MR. WILLIAMS:  That's all.  Thank you, Your Honor.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 136 of 177

THE COURT: Is he excused so he can go back to work?

MR. WILLIAMS: Yes, he is, Your Honor.

THE COURT: All right. Thank you.

THE WITNESS: Thank you, Judge.

MR. WILLIAMS: United States calls Lori Lewis.

THE COURT: Agent Lewis, please come forward and be sworn.

LORI LEWIS, called as a witness, being first duly sworn or affirmed, was examined and testified as follows:

THE CLERK: You may take the stand.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. When you are comfortable, ma'am, please state your name?

A. Lori A. Lewis, L-E-W-I-S.

Q. How are you employed?

A. I'm a special agent with the Iowa Division of Narcotics Enforcement.

Q. And how long have you been in that position?

A. Since 1985.

Q. Were you also involved in the investigation of narcotics trafficking activity by Dustin Honken, Angela

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 137 of 177

Johnson, and the related murders?

A.    Yes.

Q.    And what was your role in that investigation?

A.    I became involved in 1996 following the indictment of Honken and Cutkomp after allegations were made that Honken was attempting to kill witnesses involved in the case.

Q.    And as a result of those allegations and the information obtained, was some kind of walls created in law enforcement at that point?

A.    Yes.

Q.    And explain that to the Court, please.

A.    As I understand it, how it worked, anyone that was involved in the '93 drug case or the '95, '96 drug case were walled off and not allowed to be part of the obstruction investigation concerning the threats, and that -- I'm sorry, that was for the prosecutors as well.

Q.    I was about to ask that.  And so as a result of that, did -- who did you end up working with as part of your investigation then?

A.    Special Agent Mark Hein with the DEA, Mark Terra with the FBI, Dick Kemming with the Division of Criminal Investigation, and we worked with Steve Colloton of the US Attorney's Office.

Q.    And was the focus of your -- what was the focus

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 138 of 177

of your investigation?

A.    The threats that had been made towards witnesses involved in the '95, '96 drug case.

Q.    Now, I would like to direct your attention to March 4, 1997.  Did you participate in an interview of Terry Bregar on that date?

A.    Yes, I did.

Q.    And was Special -- I'm sorry, Special Agent Mark Hein also present?

A.    Yes.

Q.    And Assistant United States Attorney Steve Colloton?

A.    Yes.

Q.    At any point during that interview of Terry Bregar did he ever mention having suffered a stroke?

A.    No.

Q.    Did he ever mention having any memory problems?

A.    No.

Q.    Were you part of the -- did you continue to be part of the investigation team into the murders of the victims in this case?

A.    Only on an as-needed basis.

Q.    Okay.  And in that regard, were you brought in as well to help investigate leads or possibilities that perhaps Terry DeGeus was somehow involved in the

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 139 of 177

murders?

A.     Yes.

Q.     And explain to the Court, what was the law enforcement theory of Terry, how he could possibly have been involved in the murders.

A.     Well, as Agent Graham indicated, our working theory was that we knew that Terry DeGeus was 1 of the people that Dustin Honken was laying methamphetamine off to.  And when Nicholson went missing, it was logical to me that we would attempt to investigate his whereabouts at that particular timeframe, and we felt that it was logical that he could have been involved in the disappearance of the initial 4 people.

Q.     And in what way would he have been involved?

A.     We knew that he had the experience to operate heavy equipment, backhoes and excavating equipment, so we felt that his involvement would have been more to the disposal of the bodies or the hiding of the bodies.

Q.     Did law enforcement have a theory that -- that Terry DeGeus, acting alone, killed Greg Nicholson and the Duncan family?

A.     Not that I'm aware of.

Q.     What was the theory of who else Terry DeGeus would have been involved with if he wasn't acting alone?

A.     Dustin Honken.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 140 of 177

Q.    Was it ever contemplated he would have been involved in these murders other than in connection with Dustin Honken?

A.    Again, not that I'm aware of.

MR. WILLIAMS:  No further questions, Your Honor.

THE COURT:  Cross-examination, Mr. Nolan.

CROSS-EXAMINATION

BY MR. NOLAN:

Q.    Agent, how are you?

A.    Fine.

Q.    Were you aware at the time of this investigation that Angela Johnson and Terry DeGeus had been dating?

A.    Yes.

MR. NOLAN:  Thank you.  Nothing else.

MR. WILLIAMS:  Nothing further, Your Honor.

THE COURT:  Thank you.

MR. WILLIAMS:  United States calls Duane Walhof.

DUANE WALHOF,
called as a witness, being first duly sworn or affirmed, was examined and testified as follows:

THE CLERK:  You may take the stand.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 141 of 177

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q.    When you're comfortable there, sir, please state your name.

A.    Duane Walhof.  Last name is spelled W-A-L-H-O-F.

Q.    How are you employed, sir?

A.    Deputy US Marshal, currently the supervisor in Sioux City, for the past -- I've been a deputy for 23 years.

Q.    How long have you been in a supervisory position in Sioux City?

A.    Since 2003.

Q.    I want to direct your attention to the spring and summer of 2004.  Were you provided any responsibility -- or given any responsibility for the security that was going to be adopted for the trial of Dustin Honken?

A.    Yes.

Q.    Can you explain to the Court what your responsibilities were?

A.    Being the supervisor in Sioux City, I was responsible for all -- overseeing all aspects of that trial, from the courthouse security, to judicial security, to jury security, witness security, and the security of the defendant himself while he was being housed at the Woodbury County Jail.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 142 of 177

Q.      Now, did this trial also involve witnesses that were in the Witness Security Protection Program, also known as the WITSEC program?

A.      Correct.

Q.      Could you explain to the Court, what, if any, responsibility did you have with regard to WITSEC prisoners?

A.      My responsibility for WITSEC prisoner witnesses was coordinating with the WITSEC inspector that was in charge of moving them in and out from wherever they were housed, in whatever facility, to Sioux City and then back.  So the coordination entailed making sure that the witnesses -- well, I made the arrangements at local facilities for those witnesses to be housed and held because the WITSEC inspector didn't know anything about our local jails.  So I coordinated where they were going to be held, and then I was informed by the WITSEC inspector what days they were coming in, when they were supposed to testify, that type of things.  And then coordinated with him also their transport and arrival times from that local facility to the Federal Building, and a secure room at the Federal Building, making sure they got produced appropriately, and then returned out of the Federal Building and on the way back to the facility where they were being housed long-term.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 143 of 177

Q. And so in that regard, did you become familiar with the -- how they were transported and where they were housed in connection with their testimony in the Dustin Honken trial in 2004?

A. Yes, I made those arrangements.

Q. Were any of the WITSEC prisoners ever transported with other WITSEC prisoners?

A. No.

Q. Were any of the WITSEC prisoners ever transported with any non-WITSEC prisoner witnesses?

A. No.

Q. Were they housed -- let me be precise in my questioning. Were any of the WITSEC prisoner witnesses housed even temporarily with any other WITSEC prisoner witnesses or any other non-WITSEC prisoner witnesses?

A. I believe there was an overlap. 2 of the WITSEC witnesses were in the same facility at the same time, but they were in different parts of the facility. And when they were housed in a facility, they were kept away from all other prisoners. They were in isolation. So not only couldn't they see each other, but they couldn't see any other prisoners in the facility at all while they were housed there.

Q. And then when they were brought to the courthouse, were they kept separate from each other and

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 144 of 177

from all other witnesses?

A.      Yes.

Q.      Now, did you have, among your responsibilities --
I think you indicated you had responsibility for the
transportation and protection of the jurors in this
case?

A.      That's correct.

Q.      Can you explain to the Court, what was the
procedure for how the jurors were -- how they arrived at
the courthouse each day?

A.      If I can, I'll back up a little bit and go on how
Mr. Honken was brought to the courthouse each day to
give a clear picture.

Q.      That would be great.

A.      Our shift started at 6:00 a.m., and deputies
would show up on-site at the courthouse and would
contact the local jail to make sure Mr. Honken was up,
showered, ready to go.  The transport of him from the
county jail, Woodbury County Jail, to the Federal
Building would take place.  He would be brought to the
Federal Building, secured in the cellblock.

              And then some of the same deputies that did
that transport would then take the 2 juror vans, which
were rented by the Clerk of Court, and go to an offsite
location about, oh, roughly an hour later after his

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 145 of 177
*to purchase a complete copy of the transcript.*

transport. Go to an offsite location, where we would meet the jury pool all in 1 spot. And then the jurors would load up into the 2 vans, and then come back to the Federal Building.

Now, in each of those vans was a deputy US Marshal and a guard that we assisted for -- that we hired to assist for security and things. So there was 2 persons in each van that would accompany the jurors. And that was done also so that if there was any comments made or anything said by jurors, then we'd have 2 witnesses to hear it or understand what was going on.

Q. So let's talk and kind of break this down 1 thing at a time here. When the marshals and the security guard meet with the jurors at this offsite location, was the security visible to the jurors at that point at that offsite location?

A. No. They were dressed much like I am today, or when the weather got cold, with a winter jacket instead of a suit coat.

Q. Did any of those -- I mean, any of the deputy marshals or security personnel carry long guns, machine guns, rifles, shotguns, anything like that?

A. For picking up jurors, no.

Q. Okay. Were they armed?

A. Probably, yes. I mean, we almost always are, so,

yes, I would say they were armed.

Q.     And in what manner were they armed?

A.     With a sidearm, which was covered with either a jacket or a winter coat or their suit coat, whatever.

Q.     These vans, were they armored vans?

A.     No.  They were just 15-passenger or 12-passenger vans like the schools rent or use for transporting some school club.

Q.     At these offsite locations where you picked up the jurors, did you have perimeter security, other marshals, anybody else around?

A.     No.  We would just meet in a parking lot, either of a vacant business or of a current business, like Target or Wal-Mart or something like that.  They'd park in a corner and jurors would get in, and we would make sure we had the right numbers -- the right number and the right numbered jurors since we didn't know names. And as soon as we had them all, they'd head for the Federal Building.

Q.     When you transported them to the Federal Building, did you have any type of escort vehicles, other than the 2 vans?

A.     Nope.

Q.     Once you got to the courthouse, what happened with the jurors?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 147 of 177

A.     Vans would pull up behind the courthouse in the rear alley, where it's our -- where we do everything, load and unload everybody at the Federal Building.  And they'd just pull up; a CSO would come to the back door of the Federal Building, open the door, and then they would be escorted by 1 of the 2 people driving the vans into the building and up to the jury room to make sure they didn't run into any witnesses, any attorneys, any family members, any of that stuff, so there was no problem with juror tampering or any issues with them having contact that we didn't want them to have.

Q.     Now, you said a CSO.  What is a CSO?

A.     Court security officer, the guys in the blue jackets and ties that are sitting at the front door.

Q.     And those officers are typically armed as well?

A.     Correct.

Q.     Again, with a sidearm.  It's usually covered up with a jacket or something?

A.     Always.

Q.     Okay.  Was there any perimeter security in place at the courthouse when the jurors were brought to the courthouse?

A.     No, none -- none visible.  I mean, we had cameras on the -- on the inside where we could see the outside, but, no, there was no people stationed out there, no.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 148 of 177

Q. Didn't have anybody, any marshals, with shotguns or machine guns or rifles or anything?

A. Not needed and none there, no.

Q. Okay. Didn't have counter-snipers on the rooftops or anything like that?

A. We never employed any of those for the whole trial.

Q. Did you have anybody dressed in, like, SWAT fatigues or anything like that?

A. At that time of the day, no.

Q. Okay. When the jurors were transported?

A. When the jurors were transported, no, nothing like that.

Q. Now, any security that would have been in place when Dustin Honken was transported, that would have ended about an hour before the jurors were transported?

A. Correct. And all the personnel that provided that security detailed into other jobs. Like I said, they'd either transport the jury or they would change clothes and they would be courtroom deputies, courtroom security, wearing suits and ties by the time trial started.

Q. And when the jurors were brought to the courthouse and then transported up to a location within the courthouse, was there any security visible to the

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 149 of 177

jurors from the back door of the courthouse up to the jury room?

A.     No.   Just the normal CSOs that are in the building, and they were, like I said, escorted by a deputy or CSO up to the jury room, so we made sure they were there without running into anybody.  But, no, there was no security, other than our normal day-to-day security that goes on every day in the Federal Building.

Q.     Now, the procedure that you've just described of the transportation of the jurors from the remote location to the courthouse and into the courthouse, was that same type of procedure then adopted for taking them out of the courthouse at the end of the day?

A.     It was done exactly in reverse.  Jurors at the end of the day were released by the Court, the vans were pulled up in back by deputies, assisted by a guard. Jurors were escorted down, out the back, into a van, brought back to the rally point where we picked them up in the morning.  They left.

        Deputies would then come back to the courthouse, and then we would prepare for the transport of Mr. Honken back to the local jail.  So jurors were not only out of the building, they were offsite and gone by a half an hour or more before we even got ready to move Mr. Honken.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM     Document 85     Filed 12/07/11     Page 150 of 177

Q.    And so in that regard, was there any security visible to the jurors when they were leaving the courthouse any different from what they saw or would have been able to see coming to the courthouse?

A.    Nope, it was the same.  Same security coming in and leaving.

Q.    And the security procedures you just described for the Court, both the transporting of the jurors to the courthouse and from the courthouse, was that the same procedure adopted every single day of trial?

A.    Yes.

Q.    At any point during your -- during the Honken trial, were you made aware by any of your employees of any instances where jurors had been exposed to any type of security precautions that were taken at the courthouse, other than what you've described?

A.    None.  And I made a point of at least twice a week, it wasn't -- might have been 3 times a week.  I won't say every day.  But asking the deputies and the guard when they came in, *Any issues with the jurors, anybody say anything, any discussions/communications about trial, anything that's going on that we need to know about.*  And all those questions were answered with a *No, nobody said anything.*  Nobody -- there was no comments made.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 151 of 177

Q.     Now, at any point did any of your deputies or anybody working under your direction ever alert you that any of the inmate witnesses were colluding in fabricating testimony, that they overheard them while transporting the witnesses or overheard them in the holding cells or anything like that?

A.     No, not -- never reported.

MR. WILLIAMS:  Nothing else, Your Honor.

THE COURT:  Cross-examination, Mr. Nolan.

MR. NOLAN:  Thank you.

CROSS-EXAMINATION

BY MR. NOLAN:

Q.     Good afternoon, sir.

A.     Good afternoon.

Q.     Typically, in trials where you work, the jurors just come to the courthouse and meet there every day?

A.     Correct.

Q.     Okay.  But this was different, right?

A.     This was different, yes.

Q.     And each day was there a different location?

A.     No.

Q.     So how did that work?  Like how many -- would there be something for several days, or how did that work?

A.     Over the course of -- from when the jury pool was

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 152 of 177

selected to when the trial was over, I think we probably used 3 locations.

Q.    And would you stagger those locations?

A.    We'd use 1 for a couple of weeks and another 1 for a couple of weeks, and then move on to a third one.

Q.    Were the jurors told why they couldn't just come to the courthouse, if you know?

A.    I don't know what the judge told them.  Those were arrangements made between the judge and the attorneys.

Q.    Did the marshals, as far as you know, have any conversation with the jurors about why they couldn't just come to the courthouse?

A.    No, we did not, and they were instructed not to talk to jurors about anything.

Q.    Okay.

A.    Our job was to drive.

Q.    All right.  Now, you indicated that the witnesses who were in WITSEC were -- would each be transported separately, and do you remember that testimony?

A.    Yes.

Q.    You indicated that 2 -- there was an overlap of 2 of these witnesses who were at the same facility?

A.    I think for a day.

Q.    Do you know who those 2 witnesses were?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 153 of 177

A.      I do not.

Q.      Did you know at some point who those 2 witnesses --

A.      I knew who they were back then, but I don't have a clue.  I don't even remember who the WITSEC witnesses were at this point.

Q.      Would that have been -- at the time you found out that there were 2 WITSEC witnesses in the same place, would you generate some paperwork to reflect that?

A.      No.

Q.      Well, would that be something that would typically concern you, that 2 WITSEC witnesses would be in the same facility?

A.      It wouldn't -- it wouldn't concern me.  That's up to the WITSEC inspector.  And as long as he was comfortable that they were going to be separated, not only from each other but all other persons in there, then he was -- that was okay with him.

Q.      And did you find that information out from the WITSEC inspector or from someone else?

A.      I made the arrangements for where they were staying, so when the WITSEC inspector told me he had another witness coming in, I said, "Well, they're going to be at the same facility, and these are the arrangements," and he was okay with that.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 154 of 177
*to purchase a complete copy of the transcript.*

Q.     Okay.  You just said that you don't know who the WITSEC witnesses were at this point going back in time.

A.     I don't remember, no.

Q.     Okay.  You do know that Mr. Bregar was not in the WITSEC though; is that correct?

A.     Correct.  I'm familiar with Mr. Bregar from years before this case.

Q.     And are you also familiar that Dean Donaldson was not in the WITSEC program?

A.     I don't believe he was.  That's not a name I recognize from that.

Q.     Do you know how many witnesses were in the WITSEC program during this trial?

A.     If I remember right, it was 3.  And I remember 1 name is Vest.  The other 1 I don't -- the other 2 I can't tell you who they were today.  I don't know.

MR. NOLAN:  Excuse me, Your Honor, may I just have a moment?

THE COURT:  Yes.

(Brief pause.)

MR. NOLAN:  Thank you.  Thank you, sir.  No other questions.

THE COURT:  Mr. Williams.

MR. WILLIAMS:  No follow-up, Your Honor.  Thank you.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 155 of 177

THE COURT: Thank you. Thank you very much.

MR. WILLIAMS: Your Honor, that would conclude all the witnesses the government has at this point, with the exception of Bill Basler, who we indicated earlier we're going to try to work out a stipulation to. And if that doesn't work, we'll find out some other means of presenting his testimony.

THE COURT: All right. And under the circumstances, if necessary, we could move that to another day. I don't want to put -- make his life any more miserable than it already is because of the family.

MR. WILLIAMS: I appreciate that. And I have to say, defense counsel has been very gracious in this matter as well.

THE COURT: All right. So let's recap what we're going to do tomorrow. We're going to start at 8 o'clock with Leon Spies; is that correct?

MR. NOLAN: Well, the -- I believe that's correct, Your Honor; however --

THE COURT: Okay.

MR. NOLAN: -- I've been having trouble getting Mr. Spies on the phone. He did his closing argument this morning. I spoke with his secretary over the luncheon break, and she expected him back before 1:00. He was supposed to call me if he came back and he

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM Document 85 Filed 12/07/11 Page 156 of 177

hasn't.  I asked her if he would e-mail me after 1:00 if we were in session, so I could check that.  But if -- is there a way that I could inform the Court after hours perhaps?

THE COURT:  Sure.  Just drop me an e-mail, if you would, and let me know if you want to start at 8:00 or 9:00.  And besides Mr. Spies, then, who do we have left to do?  Anyone, with the exception of Agent Basler?

MR. WILLIAMS:  No, I think that's it, Your Honor.

THE COURT:  Okay.

MR. NOLAN:  So we'll have to have a discussion about the exhibits at some point.  And Mr. Williams and I will discuss that now and see if we can resolve any issues.

THE COURT:  Okay.  That would be good.

MR. WILLIAMS:  Our thought was that perhaps we could set aside 5 or 10 minutes tomorrow morning and we could go through the exhibits with you and let you know which ones we've agreed to admission and which ones we have objections to, and lay that out for the Court in the morning.

THE COURT:  That would be good.  What I'll probably do is take them subject to the objections.  As

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM   Document 85   Filed 12/07/11   Page 157 of 177

you know, although the Rules of Evidence do apply, then you have Rule 7, and you've got a lot of other considerations, and so we'll go through those and see where we end up.

MR. WILLIAMS: Very good.

THE COURT: All right. Appreciate it. See you either at 8:00 or 9:00. And also, Mr. Nolan, I know that you'll send an e-mail to Mr. Williams to let him know when to be in court.

MR. NOLAN: Absolutely. Absolutely.

THE COURT: All right. Thanks.

(Proceedings concluded at 2:14 p.m.)

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM Document 85 Filed 12/07/11 Page 158 of 177

C E R T I F I C A T E

I, Patrice A. Murray, a Certified Shorthand Reporter of the State of Iowa, do hereby certify that at the time and place heretofore indicated, a hearing was held before the Honorable Linda R. Reade; that I reported in shorthand the proceedings of said hearing, reduced the same to print to the best of my ability by means of computer-assisted transcription under my direction and supervision, and that the foregoing transcript is a true record of all proceedings had on the taking of said hearing at the above time and place.

I further certify that I am not related to or employed by any of the parties to this action, and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto or financially interested in the action.

IN WITNESS WHEREOF, I have set my hand this 6th day of December, 2011.

/s/ Patrice A. Murray
Patrice A. Murray, CSR, RPR, RMR, FCRR
United States District Court, NDIA
4200 C Street S.W.
Cedar Rapids, Iowa 52404

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 159 of 177

**'**

'04 [1] - 470:14
'93 [1] - 496:14
'95 [2] - 496:14, 497:3
'96 [3] - 460:14, 496:14, 497:3
'97 [1] - 459:19

**0**

0 [1] - 377:24
005321 [1] - 455:15
005329 [1] - 392:15
005339 [1] - 455:16
01-3047 [2] - 361:3, 424:10

**1**

1 [51] - 362:15, 366:16, 367:9, 368:1, 372:10, 374:4, 375:15, 376:16, 377:14, 378:10, 380:25, 383:12, 390:19, 399:3, 401:21, 405:10, 406:13, 406:21, 407:16, 413:1, 413:15, 413:22, 419:16, 422:4, 436:19, 439:10, 442:21, 443:13, 443:19, 453:1, 453:2, 453:3, 454:7, 464:18, 467:21, 468:16, 475:19, 478:23, 480:20, 481:7, 482:6, 484:16, 493:6, 498:7, 504:2, 504:12, 506:6, 511:4, 513:14, 513:15
10 [1] - 515:19
10-3074 [3] - 361:3, 424:10, 458:2
100 [1] - 485:14
108 [1] - 408:24
10th [1] - 396:2
11:00 [1] - 424:6
12 [5] - 382:10, 384:4, 384:6, 401:10, 447:20
12-passenger [1] - 505:6
13 [2] - 411:10, 419:10
14 [4] - 397:5, 404:24, 474:9, 485:24
14th [1] - 396:25
15 [3] - 433:9, 461:19, 462:1
15-passenger [1] - 505:6
15-year [1] - 476:18
16 [2] - 442:7, 445:20
17 [4] - 375:10, 445:20, 470:14, 480:5
18 [6] - 375:12, 431:7, 431:11, 431:14, 436:5, 447:20
19 [1] - 456:1

**2**

1970 [1] - 408:16
1985 [1] - 495:23
1988 [1] - 436:7
1989 [2] - 436:7, 446:2
1990 [3] - 446:16, 446:17, 447:23
1991 [3] - 393:25, 395:4, 395:12
1992 [3] - 440:12, 447:2, 450:21
1993 [13] - 406:3, 428:20, 428:22, 428:25, 438:11, 439:19, 440:12, 448:18, 453:4, 479:2, 488:13, 491:10, 491:12
1994 [1] - 492:18
1995 [1] - 454:16
1996 [5] - 454:16, 460:8, 488:18, 492:10, 496:4
1997 [16] - 396:2, 396:12, 461:20, 472:23, 473:6, 473:11, 473:15, 473:24, 474:9, 479:15, 479:18, 485:24, 491:7, 491:12, 494:1, 497:5
1998 [5] - 396:13, 407:19, 407:22, 445:2, 474:17
1:00 [5] - 361:8, 457:4, 457:10, 514:25, 515:1
1st [2] - 460:14, 464:6

2 [22] - 368:12, 373:1, 383:21, 413:9, 423:16, 460:1, 471:9, 484:16, 502:16, 503:23, 504:3, 504:7, 504:10, 505:22, 506:6, 511:22, 511:25, 512:2, 512:8, 512:12, 513:15
2-page [1] - 480:9
20 [4] - 424:6, 426:21, 433:9, 442:4
2000 [6] - 396:24, 396:25, 397:4, 397:5, 397:12, 491:16
2001 [2] - 442:4, 442:15
2002 [1] - 461:17
2003 [3] - 455:10, 456:1, 500:12
2004 [14] - 397:12, 432:20, 451:12, 459:23, 464:6, 464:24, 464:25, 466:22, 467:3, 472:10, 475:4, 488:23, 500:14, 502:4
2005 [1] - 441:7
2009 [3] - 480:5, 480:14, 480:15
21 [3] - 426:21, 447:19
23 [2] - 464:25, 500:9
24 [1] - 365:23
25th [1] - 491:9

26 [1] - 491:12
2690 [1] - 441:11
26th [1] - 491:9
27 [1] - 447:19
29 [1] - 488:3
2:14 [1] - 516:12
2nd [1] - 460:14

**3**

3 [15] - 361:6, 364:18, 365:2, 373:1, 400:10, 400:16, 408:16, 410:23, 427:1, 462:3, 476:18, 488:4, 509:18, 511:2, 513:14
30 [1] - 451:19
306 [2] - 409:1, 409:4
347 [1] - 394:2

**4**

4 [14] - 364:7, 378:17, 392:24, 413:9, 445:6, 447:15, 459:5, 462:1, 462:7, 462:8, 473:24, 475:20, 497:5, 498:13
40 [1] - 436:25
44 [1] - 394:2

**5**

5 [11] - 366:24, 397:6, 411:14, 417:17, 457:10, 461:19, 473:15, 479:15, 479:18, 482:14, 515:19

**6**

6 [9] - 364:22, 403:8, 411:14, 417:13, 417:17, 420:12, 425:6, 467:24, 482:14
66 [1] - 458:25
6:00 [1] - 503:15

**7**

7 [8] - 416:6, 419:13, 422:13, 422:14, 436:25, 476:13, 516:2
7-1-92 [1] - 409:8

**8**

8 [8] - 371:1, 372:9, 393:25, 416:7, 446:14, 450:2, 485:24, 514:17
8:00 [3] - 361:23, 515:7, 516:7
8th [1] - 395:3

**9**

9 [2] - 383:24, 416:7
91 [1] - 486:3
92 [1] - 486:3
9:00 [2] - 515:7, 516:7

**A**

a.m [1] - 503:15
abandon [1] - 404:5
abandoned [1] - 404:8
able [9] - 361:11, 361:19, 361:24, 371:5, 463:5, 472:15, 473:10, 492:12, 509:4
abnormalities [1] - 395:10
absolutely [10] - 369:25, 371:14, 374:7, 375:14, 376:3, 430:9, 457:12, 494:4, 516:10
abused [1] - 400:23
abusive [1] - 415:9
acceptable [1] - 363:3
accompany [1] - 504:8
according [1] - 414:4
accurate [8] - 382:22, 391:19, 398:12, 403:9, 435:7, 452:5, 465:1, 471:22
acted [1] - 441:16
acting [2] - 498:20, 498:24
action [1] - 382:18
active [1] - 399:5
activities [8] - 384:9, 385:5, 385:18, 398:19, 402:19, 425:9, 425:25, 426:4
Activity [1] - 494:7
activity [2] - 488:18, 495:25
addict [1] - 373:6
additional [2] - 409:20, 484:18
admission [1] - 515:21
admissions [1] - 479:8
admitted [2] - 478:12, 493:1
adopted [3] - 500:16, 508:12, 509:10
adulthood [1] - 428:5
advised [1] - 492:17
affect [2] - 463:1, 473:1
affected [9] - 378:14, 463:7, 463:13, 473:2, 473:3, 476:21, 477:16, 480:22, 489:9
affecting [1] - 473:7
affectionate [2] - 397:25, 400:3
affirmed [7] - 363:16,

410:2, 444:14, 457:23, 487:10, 495:11, 499:21
**afraid** [2] - 419:24, 422:18
**afternoon** [11] - 361:12, 361:21, 362:15, 362:20, 458:18, 487:7, 487:8, 493:11, 493:12, 510:13, 510:14
**afterwards** [1] - 374:22
**AG's** [1] - 489:5
**age** [2] - 411:18, 422:11
**Agent** [9] - 455:23, 487:7, 488:14, 489:6, 493:11, 496:21, 497:8, 498:6, 515:8
**agent** [10] - 362:19, 487:23, 487:24, 487:25, 488:3, 488:4, 494:5, 495:8, 495:20, 499:10
**agents** [3] - 465:4, 475:25, 491:1
**Agents** [1] - 474:1
**ages** [2] - 447:16, 447:17
**ago** [9] - 374:2, 374:10, 395:15, 395:16, 438:23, 439:25, 462:24, 477:18, 478:7
**agree** [4] - 397:22, 440:23, 440:25, 441:24
**agreeable** [1] - 458:10
**agreed** [9] - 362:23, 462:3, 462:19, 462:21, 475:15, 476:18, 476:22, 477:23, 515:21
**agreeing** [1] - 476:7
**ahold** [2] - 372:16, 376:1
**alcohol** [2] - 376:7, 432:9
**alcoholic** [4] - 373:6, 373:13, 375:2, 375:4
**alcoholism** [5] - 374:25, 392:19, 392:21, 423:21, 432:4
**alert** [1] - 510:2
**Algona** [1] - 384:16
**alive** [1] - 437:24
**allegations** [2] - 496:5, 496:8
**alley** [1] - 506:2
**allowed** [1] - 496:15
**almost** [2] - 421:9, 504:25
**alone** [4] - 401:3, 423:2, 498:20, 498:24
**Alyssa** [9] - 364:25, 373:19, 383:16, 388:11, 393:10, 409:21, 410:14, 435:1
**ALYSSA** [2] - 410:1, 410:14
**Alzheimer's** [1] - 464:9
**Amber** [1] - 490:3
**Amitriptyline** [1] - 470:22
**AMITRIPTYLINE** [1] - 470:23
**amount** [1] - 460:15
**anemic** [2] - 366:8

**Angela** [9] - 397:5, 441:4, 441:22, 451:8, 480:4, 488:7, 492:22, 495:25, 499:13
**Angie** [1] - 492:13
**angry** [2] - 414:23, 414:24
**Ann** [7] - 422:10, 422:18, 422:24, 436:20, 437:10, 437:23, 442:22
**anorexic** [1] - 373:5
**answer** [10] - 372:12, 439:24, 441:17, 441:19, 442:9, 442:13, 472:16, 485:12, 485:20, 486:3
**answered** [3] - 430:19, 486:12, 509:23
**answers** [1] - 441:11
**antsy** [2] - 451:1, 453:23
**anxiety** [11] - 374:1, 374:16, 393:24, 395:3, 395:11, 395:13, 395:14, 396:19, 428:1, 432:1, 432:3
**anxiety-type** [1] - 395:11
**anxious** [2] - 451:1, 453:23
**anyplace** [1] - 436:16
**anyway** [2] - 377:24, 416:25
**appearance** [3] - 361:25, 368:14, 368:16
**apply** [1] - 516:1
**appreciate** [3] - 486:21, 514:12, 516:6
**appropriately** [1] - 501:23
**April** [1] - 459:19
**area** [2] - 418:4, 489:2
**argument** [1] - 514:23
**arguments** [1] - 361:13
**Arizona** [9] - 440:15, 446:21, 447:1, 447:3, 447:7, 450:21, 452:15, 453:21
**armed** [6] - 443:23, 443:24, 504:24, 505:1, 505:2, 506:15
**armored** [1] - 505:5
**arms** [2] - 369:19, 369:21
**arranged** [1] - 426:13
**arrangements** [5] - 501:13, 502:5, 511:9, 512:21, 512:25
**arrest** [3] - 438:18, 438:19, 492:10
**arrested** [8] - 386:1, 397:6, 406:3, 406:8, 406:11, 429:14, 438:12, 453:4
**arrival** [1] - 501:20
**arrived** [2] - 470:15, 503:9
**as-needed** [1] - 497:22
**aside** [2] - 362:11, 515:19
**aspect** [1] - 451:3
**aspects** [1] - 500:21
**ass** [1] - 413:10

**assigned** [1] - 487:19
**assist** [1] - 504:7
**Assistant** [2] - 474:2, 497:11
**assisted** [5] - 488:14, 490:11, 492:17, 504:6, 508:16
**attempt** [1] - 498:10
**attempted** [1] - 372:23
**attempting** [1] - 496:6
**attend** [2] - 402:24, 403:4
**attended** [1] - 402:25
**attention** [7] - 383:15, 387:3, 387:18, 450:18, 484:8, 497:4, 500:13
**Attorney** [2] - 474:2, 497:11
**attorney** [3] - 458:4, 482:19, 492:16
**Attorney's** [1] - 496:24
**attorneys** [8] - 392:12, 392:18, 393:1, 393:7, 407:4, 407:9, 506:8, 511:10
**August** [5] - 397:4, 448:18, 480:5, 480:14, 480:15
**Aunt** [1] - 393:11
**availability** [1] - 362:16
**available** [2] - 361:15, 361:19
**awake** [1] - 423:5
**aware** [22] - 372:18, 392:16, 392:25, 393:3, 393:15, 400:20, 406:24, 429:13, 430:25, 431:15, 431:20, 435:19, 436:8, 436:13, 440:10, 489:22, 492:13, 493:20, 498:22, 499:4, 499:12, 509:13
**awful** [1] - 402:8

## B

**baby** [9] - 366:16, 367:6, 367:14, 371:3, 397:23, 401:5, 401:7, 401:9, 401:12
**Baby** [1] - 443:14
**baby-sit** [2] - 401:5, 401:9
**baby-sitter** [2] - 401:7, 401:12
**backhoes** [1] - 498:16
**backwards** [1] - 426:22
**backyard** [1] - 448:12
**bad** [6] - 377:1, 395:18, 416:21, 417:1, 420:5, 466:19
**balled** [1] - 376:22
**balling** [1] - 367:9
**bank** [4] - 406:11, 406:13, 406:16, 406:25
**banks** [1] - 406:13
**based** [3] - 471:18, 471:22, 491:25

**basis** [1] - 497:22
**Basler** [5] - 362:19, 488:14, 489:6, 514:4, 515:9
**bathing** [1] - 369:17
**became** [4] - 414:22, 446:10, 488:13, 496:4
**become** [3] - 415:14, 502:1
**becoming** [1] - 414:24
**bed** [3] - 371:10, 371:12, 377:8
**bedroom** [1] - 421:2
**began** [1] - 446:11
**begin** [1] - 377:24
**behalf** [1] - 480:4
**behavior** [4] - 373:8, 450:23, 453:22, 454:1
**behind** [3] - 420:25, 421:1, 506:1
**bell** [2] - 396:4, 474:3
**benefit** [2] - 392:11, 461:22
**Bennett** [3] - 462:12, 476:15, 476:17
**beside** [2] - 421:11, 483:18
**best** [2] - 378:8, 378:11
**better** [7] - 376:23, 383:20, 384:9, 400:7, 405:21, 413:19, 420:4
**between** [6] - 364:22, 418:4, 422:11, 440:7, 483:19, 511:9
**Beverly** [1] - 476:20
**Bible** [1] - 399:10
**big** [3] - 384:19, 418:5, 426:3
**bigger** [1] - 367:18
**Bill** [4] - 362:19, 488:14, 489:6, 514:4
**bills** [1] - 416:25
**biological** [1] - 436:21
**birth** [2] - 375:24, 375:25
**bit** [27] - 366:10, 367:3, 367:23, 368:6, 370:10, 374:25, 375:8, 376:15, 377:12, 380:21, 381:9, 386:9, 387:1, 419:8, 422:21, 423:10, 430:23, 432:11, 435:18, 436:19, 440:6, 447:21, 448:22, 453:3, 473:3, 477:6, 503:11
**bites** [1] - 427:16
**black** [3] - 368:23, 434:8, 482:6
**blacked** [1] - 459:17
**blame** [2] - 441:25, 442:11
**blind** [3] - 459:18, 462:23, 466:4
**blindness** [2] - 368:22, 459:20
**block** [1] - 419:23
**blocks** [1] - 423:16
**blue** [3] - 366:14, 368:23,

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 161 of 177

506:13
board [2] - 413:7, 413:8
bodies [5] - 490:12, 490:17, 491:17, 498:18
body [2] - 378:20, 492:23
boilermaker [1] - 422:23
boilermakers [1] - 379:1
bookworm [1] - 371:25
born [20] - 364:12, 364:15, 364:19, 365:20, 366:12, 366:13, 366:23, 370:22, 370:23, 422:14, 422:17, 436:20, 439:23, 447:22, 447:23, 448:6, 448:17, 448:18, 448:20, 448:24
borrow [1] - 421:16
bother [1] - 368:9
bottom [2] - 408:14, 408:17
box [2] - 384:24, 428:18
boys [3] - 421:14, 421:15, 421:22
bragging [1] - 426:2
Brandon [12] - 447:19, 447:22, 447:23, 447:25, 448:2, 448:5, 448:7, 448:20, 448:23, 449:6
break [5] - 361:25, 394:20, 424:5, 504:12, 514:24
breakdown [2] - 372:17, 393:11
breathing [2] - 365:24, 366:1
BREGAR [1] - 457:22
Bregar [41] - 361:7, 457:4, 457:17, 457:18, 458:2, 458:4, 458:18, 458:24, 459:15, 459:22, 461:6, 462:22, 463:24, 466:4, 466:17, 466:21, 471:3, 471:7, 471:25, 472:7, 473:17, 474:21, 481:5, 483:9, 484:10, 484:13, 484:15, 484:17, 484:23, 485:9, 485:17, 485:25, 486:20, 488:22, 489:8, 493:14, 497:6, 497:15, 513:4, 513:6
Bregar's [1] - 493:16
brief [2] - 391:2, 424:8
Brief [7] - 387:10, 407:17, 455:4, 463:23, 484:11, 493:8, 513:20
bright [1] - 398:6
bring [2] - 365:24, 391:6
Britt [5] - 374:3, 386:17, 418:6, 437:15, 449:8
brother [18] - 369:13, 369:14, 373:8, 373:9, 373:11, 375:1, 410:24, 417:6, 427:1, 430:7, 430:11, 432:14, 440:7, 441:14, 441:25, 447:4, 450:18

brother's [1] - 433:13
brothers [9] - 413:23, 414:6, 414:9, 414:21, 414:23, 414:25, 418:13, 425:8, 425:24
brought [10] - 413:13, 417:18, 485:3, 497:23, 502:24, 503:12, 503:20, 506:21, 507:23, 508:18
brown [2] - 368:23, 429:18
Bruce [1] - 406:1
bruises [3] - 369:19, 369:21, 369:24
Brumm [1] - 398:9
buddies [1] - 413:13
buddy [1] - 450:11
build [1] - 413:8
Building [11] - 501:21, 501:22, 501:24, 503:20, 503:21, 504:4, 505:19, 505:21, 506:3, 506:5, 508:8
building [4] - 385:3, 506:7, 508:4, 508:23
buildings [1] - 491:11
bulimic [1] - 373:5
bunch [2] - 384:3, 475:25
Bureau [6] - 463:6, 463:25, 464:5, 473:10, 493:16, 493:20
burials [1] - 491:24
buried [1] - 491:11
burned [3] - 384:20, 385:3
burner [1] - 387:1
burying [3] - 490:10, 490:12, 490:17
business [3] - 490:9, 505:13
Buspar [4] - 374:17, 396:10, 409:5, 409:11
buying [1] - 376:21
BY [17] - 363:22, 392:2, 408:9, 410:9, 435:14, 442:20, 444:20, 452:13, 458:17, 472:6, 484:22, 487:14, 493:10, 495:15, 499:9, 500:2, 510:12
bye [2] - 486:24
bye-bye [1] - 486:24

## C

C/O [1] - 464:11
cage [1] - 483:21
cameras [1] - 506:23
camp [3] - 374:3, 395:16, 399:11
cannot [1] - 458:7
car [3] - 376:22, 384:20, 429:18
cards [1] - 460:17
care [12] - 383:20, 394:19, 412:3, 423:8, 423:10, 426:14, 437:23, 448:8,

449:2, 449:4, 459:2, 459:3
caring [1] - 400:3
Carmen [2] - 419:1, 420:2
Carol [6] - 422:3, 422:20, 422:21, 423:18, 424:14, 424:16
carries [1] - 427:20
carry [1] - 504:21
carrying [1] - 418:6
Case [2] - 361:3, 458:2
case [13] - 362:19, 362:20, 392:13, 397:7, 433:16, 476:17, 496:7, 496:14, 496:15, 497:3, 497:21, 503:6, 513:7
cat [2] - 384:23, 384:24
catered [1] - 418:19
Catholic [1] - 375:16
caused [4] - 459:20, 463:4, 466:15, 466:16
Cedar [1] - 469:7
cellblock [1] - 503:21
cells [1] - 510:6
certain [10] - 368:8, 425:8, 441:2, 459:7, 469:2, 477:19, 477:20, 477:23, 478:1, 478:4
certificate [2] - 375:24, 375:25
chair [1] - 363:13
chance [1] - 436:1
change [8] - 386:19, 419:19, 423:9, 428:16, 450:3, 454:1, 481:18, 507:19
changed [4] - 453:22, 462:8, 462:17, 481:23
changes [2] - 450:22, 451:3
changing [2] - 426:16, 448:9
chaos [2] - 419:7
characterize [1] - 441:13
charge [5] - 405:8, 487:23, 487:25, 488:5, 501:10
charged [1] - 397:18
charges [1] - 429:15
check [1] - 515:2
checkup [1] - 378:4
chewing [2] - 427:18, 427:23
chews [1] - 427:24
child [21] - 364:8, 364:10, 364:24, 367:24, 367:25, 369:4, 371:20, 373:8, 398:1, 400:15, 411:12, 416:23, 421:4, 427:1, 427:5, 427:7, 428:3, 428:4, 443:15, 448:13, 450:15
childhood [5] - 432:13, 432:14, 449:13, 449:23, 453:14
children [18] - 364:6, 379:11, 380:2, 380:10,

382:13, 382:17, 383:18, 386:19, 393:13, 398:15, 400:12, 404:5, 432:5, 432:6, 443:13, 445:5, 447:15, 450:17
chores [1] - 420:20
Christianson [1] - 371:18
chunky [1] - 368:10
church [9] - 375:15, 375:21, 380:12, 399:5, 399:22, 402:12, 402:17, 403:1, 403:2
cigarette [1] - 430:8
circumstances [2] - 425:18, 514:9
Cities [1] - 372:10
city [1] - 391:7
City [20] - 362:2, 395:25, 396:14, 407:20, 428:23, 436:15, 445:9, 445:10, 460:8, 460:12, 467:9, 467:10, 468:1, 468:2, 469:21, 482:8, 500:8, 500:11, 500:20, 501:11
claimed [1] - 456:10
claims [2] - 456:4, 456:14
class [2] - 399:15, 399:18
clean [1] - 368:18
clear [3] - 420:19, 458:9, 503:13
Clerk [1] - 503:24
CLERK [8] - 363:18, 409:24, 410:4, 444:12, 444:16, 487:12, 495:13, 499:23
clinic [1] - 395:25
close [8] - 400:8, 400:9, 400:10, 413:11, 428:9, 428:19, 446:10, 450:10
closing [2] - 361:13, 514:22
clothes [3] - 368:19, 369:3, 507:20
club [2] - 437:8, 505:8
clue [1] - 512:5
coat [4] - 391:6, 504:19, 505:4
coats [1] - 413:15
cold [1] - 504:18
Cole [3] - 373:3, 373:4, 373:5
colic [2] - 371:2, 371:7
colleague [1] - 444:7
collected [1] - 384:18
College [1] - 428:22
college [2] - 376:19, 439:2
Colloton [3] - 474:2, 496:23, 497:12
colluded [1] - 489:23
colluding [2] - 489:17, 510:3
color [1] - 368:22
combined [1] - 402:1
comfortable [4] - 487:15,

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM     Document 85     Filed 12/07/11     Page 162 of 177

495:16, 500:3, 512:16

coming [6] - 413:3, 452:21, 501:18, 509:4, 509:5, 512:23

comments [3] - 378:13, 504:9, 509:25

commit [1] - 372:23

committing [1] - 490:14

Community [1] - 397:10

companions [1] - 412:5

compete [1] - 450:17

competed [1] - 450:19

complain [1] - 473:5

complaining [1] - 395:21

complains [1] - 464:12

complaints [1] - 464:18

complete [1] - 372:17

completely [2] - 414:11, 459:17

concern [2] - 512:12, 512:14

concerned [2] - 463:16, 464:10

concerning [2] - 395:1, 496:16

conclude [2] - 492:7, 514:3

concluded [1] - 516:12

concludes [1] - 486:20

condition [3] - 459:6, 459:7, 466:15

conditions [1] - 470:2

conducted [1] - 455:9

conference [2] - 380:12, 476:16

conferences [4] - 402:11, 402:14, 402:22, 402:24

conferred [4] - 394:13, 394:18, 397:13, 455:23

confidential [1] - 392:11

confirm [1] - 471:22

confirmation [2] - 399:15, 399:18

confirmed [1] - 492:15

connection [6] - 457:16, 480:4, 488:7, 490:17, 499:2, 502:3

considerations [1] - 516:3

considered [2] - 490:16, 490:20

consistent [2] - 393:21, 486:7

constantly [1] - 427:15

construction [2] - 384:17, 412:11

contact [2] - 503:17, 506:11

contacted [1] - 491:7

contacts [2] - 388:20, 389:13

contemplate [1] - 490:13

contemplated [1] - 499:1

continue [3] - 402:22, 488:17, 497:19

continued [1] - 405:13

continuing [1] - 396:12

control [1] - 490:24

controlled [1] - 454:23

conversation [6] - 383:10, 418:1, 426:16, 469:13, 483:25, 511:12

conversations [3] - 426:20, 426:23, 460:19

conviction [1] - 458:6

cooperate [1] - 492:9

cooperation [2] - 461:23, 476:19

cooperators [1] - 489:23

coordinated [2] - 501:16, 501:20

coordinating [1] - 501:9

coordination [1] - 501:12

copy [1] - 395:9

corner [3] - 415:23, 416:1, 505:15

correct [18] - 406:15, 425:19, 435:16, 435:17, 452:22, 453:19, 485:6, 487:2, 487:3, 501:4, 503:7, 506:16, 507:17, 510:17, 513:5, 513:6, 514:17, 514:19

cotton [1] - 367:12

couch [1] - 422:24

Counsel [2] - 394:13, 394:18

counsel [10] - 392:15, 393:19, 394:1, 397:13, 425:14, 435:20, 442:8, 455:15, 485:3, 514:13

counter [1] - 507:4

counter-snipers [1] - 507:4

country [1] - 391:8

county [2] - 460:12, 503:19

County [6] - 397:10, 469:22, 469:23, 473:25, 500:25, 503:19

couple [10] - 419:23, 421:9, 421:17, 447:11, 452:16, 455:5, 462:24, 487:1, 511:4, 511:5

course [9] - 372:9, 375:19, 375:22, 377:6, 377:21, 381:2, 389:23, 417:21, 510:25

court [4] - 361:1, 468:3, 506:13, 516:9

COURT [86] - 361:2, 361:9, 361:14, 361:17, 362:3, 362:10, 362:21, 363:5, 363:8, 363:11, 363:20, 380:18, 382:8, 385:14, 387:5, 387:9, 391:1, 391:4, 391:7, 391:24, 394:12, 394:16, 408:4, 408:7, 409:17, 409:19, 409:23, 410:6, 424:4, 424:9, 425:16, 435:11, 442:18, 443:19, 443:22, 443:25, 444:3, 444:5, 444:9, 444:18, 449:19, 452:10, 455:3, 456:19, 456:22, 457:1, 457:5, 457:9, 457:13, 457:18, 457:25, 458:12, 461:4, 463:22, 466:11, 472:3, 484:14, 484:17, 485:8, 485:12, 486:18, 486:20, 486:24, 487:4, 487:7, 493:5, 494:4, 494:23, 495:1, 495:4, 495:8, 499:7, 499:17, 510:9, 513:19, 513:23, 514:1, 514:8, 514:15, 514:20, 515:5, 515:12, 515:17, 515:24, 516:6, 516:11

Court [17] - 361:20, 362:6, 363:3, 363:4, 411:25, 427:19, 492:5, 496:12, 498:3, 500:18, 501:5, 503:8, 503:24, 508:15, 509:8, 515:3, 515:22

courthouse [24] - 500:22, 502:25, 503:10, 503:12, 503:16, 505:24, 506:1, 506:21, 506:22, 507:24, 507:25, 508:1, 508:11, 508:13, 508:21, 509:3, 509:4, 509:9, 509:16, 510:16, 511:7, 511:13

courtroom [3] - 380:19, 507:20

cousins [1] - 392:24

covered [3] - 392:18, 505:3, 506:17

crank [1] - 486:4

crawled [1] - 413:17

created [1] - 496:9

cried [1] - 374:21

criminal [5] - 425:9, 425:25, 426:4, 435:15

Criminal [2] - 494:6, 496:22

criminal-type [2] - 425:9, 425:25

CROSS [7] - 392:1, 435:13, 452:12, 472:5, 493:9, 499:8, 510:11

cross [6] - 435:11, 452:10, 472:3, 493:5, 499:7, 510:9

CROSS-EXAMINATION [7] - 392:1, 435:13, 452:12, 472:5, 493:9, 499:8, 510:11

cross-examination [6] - 435:11, 452:10, 472:3, 493:5, 499:7, 510:9

crossed [1] - 430:5

Crosslake [2] - 444:25, 445:7

crouch [1] - 415:25

crying [2] - 367:10, 415:1

CSO [4] - 506:4, 506:12, 508:5

CSOs [1] - 508:3

Cub [2] - 398:21, 398:23

current [2] - 433:20, 505:13

Cutkomp [6] - 492:9, 492:10, 492:13, 492:17, 492:19, 496:5

cutting [1] - 492:17

## D

dad [15] - 371:6, 384:2, 384:5, 414:7, 414:9, 414:21, 414:22, 417:21, 417:24, 422:20, 422:22, 443:10, 450:5, 450:10

dad's [5] - 423:21, 449:5, 450:10, 450:11, 450:18

dark [2] - 414:11, 414:12

date [5] - 363:3, 408:14, 409:7, 446:18, 497:6

dated [4] - 447:6, 464:6, 470:13, 473:24

dating [12] - 446:11, 446:13, 446:15, 446:20, 446:22, 446:25, 447:24, 448:1, 448:2, 449:12, 449:22, 499:13

daughter [4] - 373:19, 388:12, 419:2, 419:3

Dave's [1] - 393:12

davenport [1] - 379:20

day-care [1] - 449:2

day-to-day [2] - 419:15, 508:7

days [10] - 362:11, 366:24, 376:20, 419:23, 437:1, 449:1, 449:3, 501:18, 510:23

DCI [1] - 488:2

DEA [1] - 496:21

deal [1] - 460:15

Dean [8] - 467:21, 468:25, 481:8, 481:16, 481:19, 482:17, 482:24, 513:8

dearly [1] - 398:8

debriefing [1] - 492:11

December [3] - 471:13, 472:8, 472:17

decent [1] - 405:20

decided [3] - 362:4, 412:17, 492:9

declaration [11] - 391:14, 451:24, 471:14, 475:14, 475:20, 476:14, 477:1, 479:11, 480:9, 480:10

Declaration [1] - 435:1

defendant [1] - 500:24

defense [6] - 362:23,

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 163 of 177

5

393:19, 455:11, 455:15, 485:3, 514:13
**definitely** [1] - 376:13
**DeGeus** [19] - 488:15, 490:1, 490:6, 490:8, 490:9, 490:11, 490:13, 490:23, 491:8, 491:23, 492:3, 492:7, 493:1, 494:11, 497:25, 498:7, 498:20, 498:23, 499:13
**DeGeus's** [1] - 492:23
**Delbert** [1] - 389:4
**deliberate** [1] - 441:14
**delivered** [1] - 365:14
**den** [1] - 398:23
**Dennis** [1] - 398:9
**department** [1] - 445:16
**Department** [1] - 487:21
**departments** [1] - 446:9
**deposition** [2] - 363:1
**depression** [31] - 370:20, 372:22, 373:16, 373:21, 374:1, 374:14, 393:7, 393:9, 393:10, 393:19, 393:24, 395:3, 396:3, 396:19, 397:2, 397:16, 397:17, 397:20, 431:4, 431:8, 431:9, 431:24, 432:1, 432:3, 432:8, 432:11, 435:19, 436:5, 466:18
**deputies** [7] - 503:15, 503:22, 507:20, 508:16, 508:20, 509:19, 510:1
**deputy** [5] - 500:7, 500:8, 504:5, 504:20, 508:5
**Des** [1] - 459:2
**describe** [26] - 365:11, 367:3, 368:5, 370:21, 372:7, 376:14, 377:11, 381:9, 386:21, 411:25, 414:1, 415:11, 418:15, 421:6, 424:20, 426:7, 427:19, 429:10, 432:13, 434:6, 443:2, 446:7, 448:4, 450:9, 482:4
**described** [6] - 398:4, 398:6, 400:2, 508:9, 509:7, 509:16
**describing** [1] - 428:2
**description** [2] - 398:12, 400:4
**despite** [2] - 476:5, 479:9
**detailed** [1] - 507:18
**develop** [1] - 372:4
**developed** [1] - 492:2
**diabetes** [4] - 459:9, 459:21, 462:23, 466:16
**diagnosed** [2] - 431:3, 431:7
**diagnoses** [1] - 432:1
**diagnosis** [1] - 443:3
**diaper** [1] - 423:9
**Dick** [1] - 496:22

**die** [1] - 479:20
**died** [4] - 362:20, 364:15, 365:19, 366:5
**difference** [3] - 365:6, 418:12, 422:11
**different** [17] - 368:3, 368:13, 372:1, 372:13, 385:20, 389:10, 391:9, 404:2, 418:3, 426:3, 432:14, 432:15, 502:18, 509:3, 510:18, 510:19, 510:20
**difficult** [2] - 428:12, 450:13
**difficulties** [3] - 365:9, 366:7, 366:13
**dinner** [7] - 403:8, 403:13, 403:19, 404:6, 420:10, 420:18, 420:19
**DIRECT** [7] - 363:21, 410:8, 444:19, 458:16, 487:13, 495:14, 500:1
**direct** [5] - 406:7, 407:2, 494:10, 497:4, 500:13
**direction** [2] - 490:24, 510:2
**directly** [1] - 421:11
**disability** [1] - 422:22
**disappearance** [1] - 498:13
**disappeared** [2] - 420:22, 478:19
**disappearing** [1] - 478:17
**disciplined** [1] - 400:15
**discontinued** [1] - 374:23
**discovered** [2] - 491:17, 491:19
**discuss** [2] - 425:8, 515:15
**discussed** [1] - 493:24
**discussion** [4] - 461:10, 468:15, 471:19, 515:14
**discussions** [6] - 380:1, 425:24, 468:6, 468:9, 468:11, 469:5
**discussions/ communications** [1] - 509:21
**disgusted** [1] - 430:10
**Disney** [1] - 427:12
**disposal** [1] - 498:18
**distance** [1] - 423:15
**distribution** [1] - 453:12
**disturbance** [2] - 380:15, 391:3
**ditch** [1] - 492:19
**Division** [5] - 487:20, 487:25, 494:6, 495:20, 496:22
**divorce** [19] - 380:24, 381:15, 381:22, 382:4, 383:7, 383:11, 386:9, 411:16, 416:22, 417:15, 417:21, 417:22, 417:23,

418:2, 418:17, 418:18, 421:24, 450:7, 453:16
**divorced** [8] - 381:15, 383:9, 411:13, 415:12, 417:3, 417:12, 417:13, 450:1
**doctor** [6] - 366:9, 367:13, 378:4, 390:13, 434:9, 434:10
**document** [11] - 382:2, 392:17, 455:12, 455:13, 455:14, 455:21, 492:12, 494:5, 494:8, 494:15
**documents** [2] - 394:21, 443:9
**doll** [1] - 418:7
**dollars** [1] - 421:17
**Donaldson** [8] - 467:21, 468:25, 481:8, 481:16, 481:19, 482:17, 482:24, 513:8
**done** [15] - 361:23, 370:7, 390:3, 392:10, 423:9, 433:18, 437:3, 437:5, 437:6, 437:7, 456:2, 492:14, 504:9, 508:14
**door** [6] - 413:12, 450:4, 506:4, 506:5, 506:14, 508:1
**doors** [2] - 420:25, 421:1
**dot** [1] - 420:12
**down** [33] - 361:24, 366:11, 366:25, 367:7, 367:8, 368:25, 369:7, 382:9, 382:19, 383:17, 384:21, 391:15, 403:13, 409:19, 412:4, 412:25, 413:14, 417:1, 417:20, 423:13, 427:12, 427:14, 440:14, 444:5, 446:11, 449:5, 449:7, 451:25, 456:23, 476:13, 494:17, 504:12, 508:17
**Dr** [7] - 374:3, 374:16, 395:4, 395:8, 395:16, 396:10
**dragline** [2] - 384:17, 384:18
**drank** [1] - 376:6
**drawing** [1] - 492:22
**dressed** [2] - 504:17, 507:8
**drink** [3] - 379:8, 422:20, 422:24
**drinker** [2] - 376:5, 376:25
**drinking** [11] - 377:2, 378:21, 379:12, 379:15, 412:5, 413:14, 423:6, 424:2, 424:22, 430:8
**drive** [3] - 379:17, 467:12, 511:17
**driving** [4] - 429:19, 483:15, 483:17, 506:6
**drop** [1] - 515:5
**drove** [1] - 467:14

**drug** [7] - 373:6, 455:18, 456:4, 488:18, 496:14, 497:3
**drugs** [5] - 430:4, 430:8, 432:9, 454:25, 471:4
**drunk** [1] - 377:12
**Duane** [3] - 362:15, 499:18, 500:5
**DUANE** [1] - 499:20
**Dudley** [2] - 390:11, 390:12
**dug** [2] - 491:13, 491:21
**duly** [7] - 363:16, 410:2, 444:14, 457:23, 487:10, 495:11, 499:21
**dummy** [1] - 417:24
**Duncan** [4] - 490:3, 498:21
**dunker** [2] - 374:16, 396:10
**during** [31] - 378:23, 382:17, 390:19, 396:17, 401:1, 416:10, 425:14, 440:15, 440:17, 449:11, 449:21, 451:5, 453:20, 460:24, 468:6, 469:9, 475:9, 475:11, 480:20, 489:7, 489:20, 491:7, 491:9, 492:2, 492:11, 492:18, 497:14, 509:12, 513:13
**Dustin** [129] - 364:4, 364:8, 364:9, 364:20, 364:21, 364:22, 365:1, 365:18, 366:6, 366:12, 367:24, 368:1, 368:17, 369:17, 369:20, 374:20, 383:11, 383:13, 383:19, 383:20, 383:22, 383:24, 384:3, 385:5, 385:17, 385:20, 386:6, 388:20, 389:11, 396:14, 397:22, 398:13, 399:5, 399:13, 400:2, 400:5, 400:9, 400:11, 400:14, 400:21, 405:16, 405:25, 406:2, 406:21, 406:24, 410:16, 411:4, 415:16, 416:10, 417:18, 417:23, 418:22, 420:1, 420:7, 426:23, 427:1, 427:8, 428:7, 428:8, 429:8, 430:12, 430:15, 430:16, 432:16, 432:18, 438:9, 438:11, 440:7, 440:11, 440:23, 441:17, 441:25, 445:22, 450:13, 452:14, 453:10, 453:17, 454:4, 454:22, 455:9, 455:16, 455:22, 456:3, 456:4, 458:1, 459:23, 460:10, 465:14, 465:16, 465:22, 468:10, 468:12, 468:22, 468:25, 473:15, 474:16, 475:3, 476:2,

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

476:5, 476:19, 478:11, 478:15, 479:7, 479:10, 479:16, 480:12, 480:16, 481:2, 481:13, 482:10, 482:16, 482:17, 482:23, 483:4, 483:10, 486:8, 488:6, 488:18, 488:23, 490:18, 490:21, 495:25, 498:8, 498:25, 499:3, 500:16, 502:4, 507:15

**Dustin's** [18] - 365:3, 373:8, 383:6, 387:20, 389:16, 407:3, 432:14, 432:15, 432:19, 432:22, 433:20, 433:24, 434:12, 441:1, 448:25, 450:2, 453:14, 468:5

## E

**e-mail** [3] - 515:1, 515:5, 516:8
**early** [6] - 361:24, 368:2, 378:1, 411:12
**earn** [1] - 421:18
**eat** [3] - 367:4, 429:17, 429:22
**eater** [1] - 368:7
**eating** [2] - 429:20, 438:15
**Ed** [1] - 490:8
**edgy** [2] - 451:1, 453:23
**effects** [2] - 374:7, 395:18
**eggshells** [1] - 419:17
**either** [11] - 393:7, 398:4, 400:24, 404:10, 427:25, 428:16, 472:9, 505:3, 505:12, 507:19, 516:7
**eldest** [1] - 443:14
**elsewhere** [1] - 362:7
**emotional** [2] - 393:11, 393:13
**employed** [8] - 445:11, 446:5, 487:18, 487:19, 490:8, 495:19, 500:6, 507:6
**employees** [2] - 454:11, 509:13
**enclosing** [1] - 395:9
**end** [9] - 361:20, 362:17, 383:5, 422:16, 494:20, 496:19, 508:13, 508:15, 516:4
**ended** [5] - 367:17, 386:22, 424:24, 462:6, 507:16
**Enforcement** [3] - 487:20, 488:1, 495:21
**enforcement** [10] - 479:15, 479:18, 490:1, 490:13, 490:25, 491:1, 491:21, 496:10, 498:4, 498:19
**engage** [1] - 483:25
**engineering/planning** [1]

- 445:16
**enjoyed** [1] - 448:7
**entailed** [1] - 501:12
**entitled** [1] - 393:4
**entries** [6] - 396:1, 396:22, 397:9, 397:11, 397:15, 397:17
**entry** [5] - 393:23, 395:2, 397:1, 397:5, 406:16
**equipment** [2] - 498:16
**Erin** [1] - 387:5
**escort** [1] - 505:21
**escorted** [3] - 506:6, 508:4, 508:17
**esteem** [1] - 377:23
**evaluation** [1] - 395:10
**evening** [1] - 404:9
**evenings** [1] - 401:2
**events** [6] - 403:4, 416:5, 460:7, 468:23, 468:25, 472:15
**eventually** [3] - 424:24, 446:10, 491:16
**evidence** [6] - 409:20, 444:6, 449:16, 491:14, 491:22, 492:6
**Evidence** [1] - 516:1
**exact** [1] - 438:23
**exactly** [5] - 374:3, 417:9, 437:2, 482:22, 508:14
**examination** [9] - 406:7, 407:2, 435:11, 452:10, 472:3, 493:5, 494:10, 499:7, 510:9
**EXAMINATION** [17] - 363:21, 392:1, 408:8, 410:8, 435:13, 442:19, 444:19, 452:12, 458:16, 472:5, 484:21, 487:13, 493:9, 495:14, 499:8, 500:1, 510:11
**examined** [7] - 363:17, 410:3, 444:15, 457:24, 487:11, 495:12, 499:22
**excavating** [2] - 490:9, 498:16
**excavation** [4] - 491:13, 492:21, 493:25, 494:11
**Excavation** [1] - 494:7
**exception** [2] - 514:4, 515:8
**excuse** [2] - 470:22, 513:17
**excused** [2] - 456:24, 495:1
**exhibit** [4] - 393:20, 393:24, 408:24, 409:2
**Exhibit** [3] - 394:2, 451:19, 485:23
**exhibits** [3] - 394:22, 515:14, 515:20
**existence** [1] - 436:8
**exonerating** [1] - 492:15
**expectations** [1] - 469:10

**expected** [1] - 514:24
**expecting** [2] - 469:15, 469:18
**experience** [2] - 393:19, 498:15
**experts** [2] - 390:1, 390:6
**explain** [9] - 397:17, 419:8, 430:20, 490:5, 496:12, 498:3, 500:18, 501:5, 503:8
**exploratory** [2] - 378:5, 378:17
**exposed** [1] - 509:14
**extended** [1] - 430:25
**extent** [1] - 402:8
**extra** [1] - 462:18
**eye** [2] - 459:16, 459:17
**eyesight** [2] - 462:9, 466:20

## F

**fabricating** [1] - 510:4
**facilities** [1] - 501:14
**facility** [13] - 424:19, 459:2, 459:4, 501:11, 501:21, 501:25, 502:17, 502:18, 502:19, 502:22, 511:23, 512:13, 512:24
**fact** [7] - 367:21, 396:3, 416:24, 463:9, 473:6, 484:3, 492:20
**fair** [3] - 408:1, 441:13, 453:9
**fairly** [1] - 407:19
**familiar** [4] - 397:7, 502:1, 513:6, 513:8
**Family** [1] - 393:4
**family** [27] - 369:12, 370:11, 374:25, 380:2, 380:4, 380:7, 380:9, 388:23, 389:17, 389:20, 392:18, 403:13, 403:17, 428:6, 430:24, 431:1, 436:18, 443:6, 449:13, 449:23, 491:8, 498:21, 506:9, 514:11
**far** [6] - 361:18, 363:25, 391:5, 454:15, 494:18, 511:11
**farm** [1] - 492:22
**farmstead** [1] - 491:11
**farmsteads** [1] - 490:10
**fast** [2] - 369:9, 427:24
**fat** [2] - 415:19, 415:24
**father** [35] - 362:20, 375:1, 375:2, 375:4, 376:25, 383:25, 411:16, 411:22, 412:3, 412:4, 412:8, 412:9, 412:18, 415:5, 415:6, 415:13, 416:15, 416:19, 417:4, 421:23, 421:24, 422:5, 423:17, 424:15,

424:17, 424:18, 424:24, 425:7, 425:23, 432:16, 432:17, 436:21, 437:20, 450:7, 490:8
**father's** [2] - 413:5, 443:9
**fathers** [2] - 449:9, 450:16
**fatigues** [1] - 507:9
**Fatty** [2] - 377:21
**favored** [1] - 383:13
**favorite** [1] - 450:19
**favoritism** [1] - 402:4
**FBI** [1] - 496:22
**FCI** [1] - 466:24
**fear** [2] - 382:11, 382:12
**February** [1] - 396:2
**federal** [3] - 424:25, 442:3, 489:1
**Federal** [11] - 501:21, 501:22, 501:24, 503:19, 503:21, 504:4, 505:19, 505:20, 506:3, 506:5, 508:8
**feed** [1] - 423:8
**feeding** [1] - 448:8
**feelings** [1] - 428:13
**feet** [1] - 427:14
**felt** [4] - 382:23, 466:1, 498:11, 498:17
**few** [4] - 369:16, 446:19, 457:8, 478:15
**filed** [1] - 381:22
**finally** [3] - 366:3, 372:15, 416:3
**fine** [13] - 362:12, 366:21, 385:10, 386:8, 394:16, 409:13, 425:16, 434:6, 440:1, 457:9, 465:3, 499:11
**finished** [1] - 420:15
**first** [26] - 363:16, 366:10, 370:24, 393:22, 395:2, 395:13, 406:3, 410:2, 418:17, 418:19, 418:22, 420:2, 429:13, 444:14, 446:1, 446:8, 457:23, 458:4, 461:17, 468:16, 473:14, 487:10, 488:13, 493:24, 495:11, 499:21
**fit** [1] - 397:14
**fits** [1] - 400:4
**flat** [1] - 365:23
**floated** [1] - 490:7
**fluffy** [1] - 413:17
**fly** [1] - 467:12
**focus** [2] - 496:25
**folks** [1] - 391:7
**follow** [4] - 415:21, 491:1, 491:3, 513:24
**follow-up** [3] - 491:1, 491:3, 513:24
**following** [2] - 361:1, 496:4
**follows** [7] - 363:17, 410:3, 444:15, 457:24, 487:11, 495:12, 499:22
**foot** [2] - 459:11, 459:13

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 165 of 177

force [1] - 421:9
Ford [1] - 413:5
forefinger [1] - 478:21
forged [1] - 443:9
forget [1] - 414:8
forgetting [1] - 414:23
forgotten [1] - 414:10
formula [3] - 366:25, 367:15, 367:18
Fort [2] - 469:8, 481:11
forth [1] - 453:16
forward [3] - 363:12, 395:24, 495:8
freak [1] - 368:18
frequency [1] - 451:7
friends [7] - 376:18, 398:17, 446:10, 446:12, 449:12, 449:22, 454:19
Friesenborg [1] - 362:5
front [10] - 381:25, 412:21, 415:16, 434:22, 464:23, 476:15, 476:16, 483:18, 506:14
frustrated [1] - 427:16
fully [1] - 472:19
function [2] - 371:13, 371:15
fussy [3] - 368:4, 368:5, 368:7
fuzzy [1] - 411:18

## G

G-R-A-H-A-M [1] - 487:17
gain [1] - 366:9
gained [1] - 406:16
garage [1] - 424:21
Garner [2] - 423:25, 437:16
gel [1] - 470:23
general [2] - 488:11, 489:20
generally [2] - 397:25, 398:2
generate [1] - 512:9
gentleman [2] - 434:7, 471:10
gentlemen [1] - 472:8
given [3] - 409:11, 451:15, 500:15
glass [1] - 378:7
glorified [1] - 385:21
glucose [1] - 470:23
Glyburide [1] - 470:23
GLYBURIDE [1] - 470:24
God [1] - 469:6
Gotti [1] - 426:10
government [12] - 361:10, 425:17, 457:7, 461:23, 462:19, 465:5, 465:12, 476:17, 476:23, 477:23, 487:1, 514:3
Government's [1] -

485:23
government's [1] - 489:22
grab [1] - 379:15
grabbing [1] - 370:2
gracious [1] - 514:13
graciously [1] - 362:23
graduate [1] - 428:24
graduated [2] - 439:2, 439:4
GRAHAM [1] - 487:9
Graham [5] - 362:14, 487:6, 487:7, 487:17, 498:6
grand [7] - 442:3, 442:15, 460:1, 474:8, 474:13, 485:18, 485:21
grandfather [2] - 375:3, 437:24
Grandma [5] - 392:22, 392:23, 423:13, 437:18, 437:22
Grandmother [4] - 437:9, 437:11, 437:14, 437:16
Grandpa [2] - 392:22, 392:23
grandparents [1] - 438:3
gray [3] - 418:4, 429:25, 438:14
great [5] - 361:14, 361:17, 362:10, 377:14, 503:14
Greg [2] - 490:2, 498:20
grew [2] - 371:23, 432:13
group [3] - 398:24, 399:6, 399:23
growing [7] - 398:13, 400:3, 400:21, 400:23, 411:3, 438:5, 453:15
gruff [1] - 421:19
guard [4] - 504:6, 504:14, 508:16, 509:20
guess [9] - 384:9, 385:23, 424:21, 447:21, 448:23, 453:22, 463:11, 465:2, 480:16
gum [5] - 427:19, 427:20, 427:21, 427:23, 427:24
gun [3] - 492:12, 492:13, 492:18
guns [3] - 504:21, 504:22, 507:2
guy [3] - 401:22, 482:6
guys [5] - 404:14, 469:15, 469:17, 483:22, 506:13

## H

hair [2] - 368:20, 412:4
half [10] - 376:20, 422:10, 442:22, 462:1, 462:7, 462:8, 462:18, 476:22, 477:24, 508:24
Hamilton [12] - 369:15, 370:15, 371:19, 375:6, 392:22, 392:23, 392:24,

393:9, 437:10, 437:14, 437:16
Hamilton's [4] - 423:14, 437:11, 437:18, 437:22
Hancock [1] - 397:10
hand [6] - 408:15, 409:5, 409:24, 444:12, 457:20, 478:20
hands [4] - 382:12, 382:14, 416:2, 420:16
hang [1] - 486:22
happy [4] - 398:1, 398:4, 398:7, 398:10
harassing [1] - 382:15
hard [2] - 381:8, 405:19
hardly [1] - 429:22
hated [1] - 374:7
head [3] - 404:17, 416:2, 505:18
headed [1] - 468:1
Health [1] - 436:15
health [12] - 382:12, 382:13, 389:25, 390:5, 395:1, 396:1, 396:24, 433:14, 433:21, 433:25, 459:6, 470:2
hear [6] - 392:7, 413:2, 458:7, 468:19, 482:9, 504:11
heard [4] - 484:3, 484:5, 484:6, 484:7
hearing [10] - 362:8, 407:19, 407:20, 435:20, 455:8, 474:17, 474:19, 474:24, 476:20, 477:5
hearsay [8] - 385:8, 425:11, 437:6, 437:7, 437:8, 449:15, 460:23, 485:5
heavy [1] - 498:16
Hein [4] - 362:18, 474:1, 496:21, 497:9
held [3] - 361:1, 501:14, 501:17
hell [1] - 375:21
hello [1] - 458:19
help [13] - 377:4, 404:14, 405:6, 405:10, 405:13, 405:16, 412:3, 416:18, 440:3, 447:5, 469:2, 482:18, 497:24
helped [2] - 371:10, 404:18
hid [2] - 375:25, 413:19
hiding [1] - 498:18
high [3] - 373:22, 398:9, 406:25
highway [1] - 412:25
himself [5] - 383:5, 442:1, 442:12, 490:14, 500:24
hired [2] - 455:10, 504:7
history [11] - 370:11, 389:17, 392:18, 395:1, 430:24, 435:15, 435:18,

435:21, 436:4, 436:19, 442:24
History [1] - 393:4
hit [1] - 434:20
holding [1] - 510:6
hole [1] - 367:18
holler [1] - 381:6
home [24] - 362:23, 371:4, 376:7, 377:19, 378:24, 379:2, 379:3, 379:6, 381:2, 401:3, 412:13, 412:14, 412:16, 413:13, 414:7, 414:19, 414:21, 419:22, 422:23, 427:10, 429:2, 429:3, 439:15
homework [9] - 404:13, 404:14, 404:18, 405:3, 405:5, 405:6, 405:10, 405:13, 405:16
honestly [1] - 437:5
Honken [73] - 361:2, 364:4, 375:8, 392:22, 392:23, 392:24, 401:2, 410:16, 411:2, 421:24, 424:10, 445:22, 446:8, 446:18, 447:24, 448:4, 448:13, 448:19, 448:23, 449:12, 449:22, 450:20, 451:2, 452:15, 454:22, 455:9, 455:16, 455:22, 456:3, 456:4, 458:1, 458:6, 460:10, 460:16, 461:7, 473:15, 476:20, 478:12, 479:16, 480:12, 481:2, 482:10, 482:16, 483:4, 483:11, 484:23, 486:8, 488:7, 488:18, 488:23, 490:11, 490:18, 490:21, 490:24, 492:14, 493:1, 494:12, 494:16, 494:19, 495:25, 496:5, 496:6, 498:8, 498:25, 499:3, 500:16, 502:4, 503:12, 503:17, 507:15, 508:22, 508:25, 509:12
Honken's [10] - 449:17, 451:11, 453:10, 459:23, 461:2, 467:8, 474:17, 475:3, 481:13, 492:16
Honor [70] - 361:5, 362:13, 363:7, 363:9, 363:19, 365:11, 372:7, 377:11, 382:7, 385:7, 385:13, 387:8, 390:24, 391:22, 391:25, 394:11, 394:14, 407:16, 408:3, 408:5, 408:24, 409:15, 409:18, 409:21, 410:5, 414:2, 415:11, 424:7, 424:13, 425:10, 425:13, 435:9, 435:12, 442:17, 444:2, 444:4, 444:7, 444:17, 449:14, 452:11, 455:2, 455:6, 456:21,

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 166 of 177

457:3, 457:14, 458:15, 461:1, 463:21, 464:3, 466:10, 472:4, 484:12, 484:16, 485:1, 485:6, 485:23, 486:19, 487:3, 493:4, 494:2, 494:25, 495:3, 499:6, 499:16, 510:8, 513:17, 513:24, 514:2, 514:19, 515:11

**hope** [3] - 361:19, 400:6, 400:7

**Hospital** [1] - 397:11

**hospital** [3] - 366:22, 367:8, 372:17

**hospitalized** [1] - 393:12

**hotel** [1] - 388:5

**hothead** [1] - 441:15

**hour** [6] - 378:7, 388:8, 407:4, 503:25, 507:16, 508:24

**hours** [4] - 365:23, 403:24, 469:6, 515:3

**house** [19] - 372:8, 376:18, 379:11, 389:8, 401:20, 412:21, 413:8, 414:11, 414:13, 414:17, 414:20, 415:21, 417:4, 418:5, 418:6, 419:24, 422:6, 437:11, 437:15

**housed** [10] - 467:4, 500:25, 501:11, 501:14, 501:25, 502:3, 502:12, 502:14, 502:19, 502:23

**household** [5] - 411:4, 411:15, 418:21, 419:19, 420:9

**households** [1] - 402:1

**housework** [1] - 371:10

**huge** [2] - 418:6, 450:3

**hung** [1] - 389:11

**hurt** [2] - 381:10, 426:13

**husband** [1] - 386:22

**Hutchins** [6] - 384:19, 395:15, 412:2, 414:3, 417:19, 418:4

**Hydrochlorothiazide** [1] - 470:25

**HYDROCHLOROTHIAZIDE** [1] - 471:1

---

**I**

**idea** [2] - 395:23, 453:10

**identification** [1] - 391:12

**identified** [4] - 481:7, 491:10, 492:11, 492:19

**identify** [3] - 391:12, 434:24, 451:21

**illegal** [1] - 384:9

**illness** [16] - 370:11, 370:19, 372:5, 373:4, 373:12, 373:15, 373:20, 374:13, 388:23, 389:1,

389:20, 393:25, 430:24, 430:25, 431:21, 442:25

**Illness** [1] - 393:4

**imagine** [4] - 386:24, 400:6, 401:10, 483:24

**immediately** [1] - 450:12

**impact** [1] - 466:9

**important** [4] - 380:7, 403:7, 403:13, 403:16

**impulsive** [4] - 440:24, 441:1, 441:17, 441:18

**impulsively** [1] - 441:16

**incarcerated** [1] - 493:23

**incident** [2] - 411:22, 413:22

**incidents** [1] - 416:11

**included** [1] - 494:12

**includes** [1] - 433:20

**including** [1] - 488:1

**increasing** [1] - 464:7

**indicate** [8] - 462:19, 463:6, 463:10, 463:12, 463:15, 472:22, 473:2, 493:21

**indicated** [11] - 436:4, 453:20, 462:22, 484:7, 493:14, 494:10, 498:6, 503:4, 511:18, 511:22, 514:5

**indicates** [2] - 396:2, 409:5

**indicating** [2] - 395:9, 492:23

**indication** [1] - 492:6

**indictment** [1] - 496:5

**individual** [1] - 481:15

**Industries** [3] - 445:14, 445:19, 446:6

**infancy** [1] - 367:1

**infant** [3] - 448:3, 448:6, 448:8

**inform** [1] - 515:3

**information** [9] - 392:25, 393:6, 393:16, 453:15, 453:17, 492:1, 496:9, 512:19

**informed** [1] - 501:17

**initial** [1] - 498:13

**inmate** [1] - 510:3

**inmates** [2] - 481:1, 492:24

**inside** [3] - 374:5, 413:16, 506:24

**inspector** [6] - 501:9, 501:15, 501:18, 512:15, 512:20, 512:22

**instances** [1] - 509:14

**instead** [1] - 504:18

**instructed** [1] - 511:14

**insulin** [2] - 470:7, 470:25

**insurance** [1] - 384:18

**intake** [1] - 469:24

**interact** [2] - 450:16

**interaction** [4] - 404:7,

421:3, 421:8, 440:6

**interactions** [1] - 430:13

**interest** [2] - 380:9, 380:10

**interested** [3] - 380:14, 402:6, 451:6

**interfering** [1] - 382:16

**interview** [11] - 392:12, 455:9, 455:21, 456:2, 456:3, 479:14, 480:14, 480:21, 497:5, 497:14

**Interview** [1] - 473:23

**interviewed** [5] - 472:7, 473:14, 473:25, 474:5, 492:25

**intoxicated** [2] - 412:14, 415:14

**investigate** [2] - 497:24, 498:10

**Investigation** [2] - 494:6, 496:23

**investigation** [17] - 392:9, 488:6, 488:12, 488:17, 488:21, 489:21, 489:25, 491:4, 492:2, 492:25, 495:24, 496:3, 496:16, 496:20, 497:1, 497:20, 499:12

**investigator** [1] - 407:13

**investigators** [1] - 393:18

**involve** [1] - 501:1

**involved** [26] - 384:8, 399:18, 425:9, 426:1, 426:4, 440:11, 448:7, 448:8, 450:14, 488:6, 488:13, 491:23, 492:7, 493:2, 494:12, 495:24, 496:4, 496:7, 496:14, 497:3, 497:25, 498:5, 498:12, 498:14, 498:24, 499:2

**involvement** [5] - 453:11, 478:16, 490:21, 492:24, 498:17

**involving** [1] - 494:11

**Iowa** [18] - 362:1, 396:14, 407:20, 428:23, 445:9, 447:8, 447:9, 447:10, 452:15, 452:21, 452:24, 453:6, 459:2, 474:1, 487:19, 487:25, 489:6, 495:20

**irregular** [1] - 365:25

**isolation** [1] - 502:20

**issue** [2] - 368:22, 381:3

**issues** [25] - 369:4, 370:18, 372:4, 373:4, 373:11, 373:14, 373:20, 374:1, 380:2, 380:7, 388:22, 388:25, 389:1, 389:20, 389:21, 395:13, 396:24, 431:4, 431:20, 443:5, 443:8, 463:17, 506:10, 509:20, 515:16

---

**J**

**jacket** [3] - 504:18, 505:4, 506:18

**jackets** [1] - 506:14

**Jacob** [1] - 432:9

**Jail** [5] - 469:22, 469:23, 473:25, 500:25, 503:19

**jail** [9] - 396:4, 460:12, 469:1, 479:2, 480:13, 482:18, 503:17, 503:19, 508:22

**jails** [1] - 501:16

**January** [1] - 492:18

**Jason** [1] - 432:7

**Jeff** [28] - 364:11, 364:12, 364:16, 364:21, 364:22, 364:23, 365:13, 365:14, 383:15, 401:4, 401:8, 401:10, 404:24, 405:2, 405:5, 405:24, 411:2, 417:6, 417:18, 418:23, 430:11, 430:12, 430:15, 430:21, 438:7, 440:7, 440:10, 447:4

**Jesse** [1] - 432:10

**jiggle** [1] - 427:16

**Jim** [30] - 375:8, 375:9, 376:2, 376:5, 376:24, 377:12, 377:14, 378:13, 379:22, 380:1, 380:22, 382:25, 383:13, 384:8, 385:5, 385:17, 385:19, 385:25, 392:22, 401:2, 401:15, 402:11, 404:25, 405:7, 405:9, 405:10, 406:7, 421:24

**Jim's** [1] - 379:11

**job** [5] - 405:24, 406:5, 421:19, 448:25, 511:17

**jobs** [1] - 507:18

**JOHN** [1] - 487:9

**John** [3] - 362:14, 487:5, 487:17

**Johnson** [8] - 397:6, 441:12, 480:4, 488:7, 492:13, 492:22, 496:1, 499:13

**Johnson's** [3] - 441:5, 441:22, 451:8

**Judge** [8] - 457:18, 462:12, 476:15, 476:16, 486:17, 493:6, 494:22, 495:5

**judge** [15] - 462:8, 462:11, 462:17, 476:21, 476:22, 477:10, 477:15, 477:16, 477:20, 477:21, 478:4, 478:5, 490:5, 511:8, 511:9

**judicial** [1] - 500:22

**juggle** [1] - 404:2

**July** [4] - 442:4, 464:6, 491:9, 491:12

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 167 of 177

**jumping** [1] - 369:7
**juror** [2] - 503:23, 506:10
**jurors** [30] - 503:5, 503:9, 504:2, 504:8, 504:10, 504:14, 504:15, 504:23, 505:10, 505:15, 505:17, 505:25, 506:21, 507:11, 507:12, 507:16, 507:23, 508:1, 508:10, 508:14, 508:17, 508:22, 509:2, 509:8, 509:14, 509:20, 510:15, 511:6, 511:12, 511:15
**jury** [18] - 385:12, 425:14, 442:4, 442:15, 460:1, 464:23, 474:8, 474:13, 476:16, 485:18, 485:21, 500:23, 504:2, 506:7, 507:19, 508:2, 508:5, 510:25

## K

**Kandi** [1] - 490:3
**Kathy** [2] - 444:10, 444:23
**KATHY** [1] - 444:13
**keep** [2] - 366:10, 415:24
**keeping** [1] - 366:25
**Kemming** [1] - 496:22
**kept** [11] - 366:2, 374:5, 383:3, 412:22, 412:23, 476:2, 476:3, 476:4, 479:9, 502:19, 502:25
**key** [3] - 406:17, 406:22
**kicked** [1] - 423:23
**kidney** [1] - 459:10
**kids** [22] - 370:2, 378:15, 379:15, 381:2, 381:6, 387:17, 399:9, 400:10, 401:3, 401:25, 402:2, 402:5, 402:19, 403:5, 404:7, 404:11, 404:13, 405:9, 416:25, 417:20, 420:19, 450:15
**kill** [4] - 383:5, 479:16, 479:24, 496:6
**killed** [6] - 465:15, 465:16, 476:3, 478:12, 479:17, 498:20
**killing** [2] - 383:5, 479:8
**kind** [33] - 366:3, 368:1, 368:3, 368:10, 377:23, 384:10, 386:24, 386:25, 392:3, 397:20, 398:12, 399:21, 401:22, 411:18, 412:12, 413:16, 413:18, 420:21, 423:1, 424:20, 427:8, 427:25, 428:5, 428:16, 429:25, 438:16, 453:23, 467:15, 468:9, 496:9, 504:12
**kinds** [2] - 426:22, 469:17
**King** [4] - 389:4, 389:9,

389:19, 407:14
**kitchen** [1] - 412:6
**kittens** [3] - 384:23, 384:24, 385:2
**Kleenex** [1] - 387:6
**knees** [1] - 427:15
**knock** [2] - 462:18, 476:18
**knocked** [1] - 462:3
**knowed** [1] - 473:8
**knowledge** [2] - 440:20, 453:10
**known** [2] - 445:24, 501:3
**Kraft** [2] - 454:17, 454:19

## L

**L-E-W-I-S** [1] - 495:18
**lab** [1] - 456:10
**lady** [1] - 412:3
**last** [18] - 361:12, 362:18, 367:1, 371:17, 391:15, 418:20, 424:15, 426:10, 435:2, 451:24, 451:25, 457:6, 464:8, 471:13, 472:8, 472:17, 488:4, 500:5
**late** [1] - 414:11
**laugh** [1] - 378:19
**Laurel** [11] - 370:25, 371:1, 371:4, 371:17, 371:18, 371:19, 371:22, 372:11, 393:11, 431:17, 431:21
**LAUREL** [1] - 370:25
**law** [11] - 386:13, 479:15, 479:18, 490:1, 490:13, 490:25, 491:1, 491:21, 496:10, 498:3, 498:19
**lawnmower** [1] - 449:7
**lawyer** [5] - 469:3, 476:20, 477:9, 477:13, 478:5
**lawyers** [12] - 383:7, 385:12, 387:24, 388:4, 389:24, 432:23, 433:5, 433:13, 449:18, 461:2, 475:25, 480:3
**lay** [4] - 365:23, 369:3, 381:3, 515:22
**laying** [1] - 498:8
**Le** [1] - 473:25
**leadership** [1] - 399:22
**leading** [1] - 466:10
**leads** [1] - 497:24
**League** [1] - 399:7
**leak** [1] - 391:5
**learned** [2] - 368:1, 371:9
**least** [5] - 429:3, 453:1, 453:2, 457:10, 509:17
**leather** [1] - 413:15
**leave** [7] - 375:14, 375:20, 401:3, 404:6, 414:7, 417:5, 450:5
**leaving** [3] - 450:7, 509:2, 509:6

**led** [1] - 492:6
**Lee** [1] - 458:1
**left** [14] - 372:8, 376:18, 408:15, 409:8, 411:23, 412:1, 412:2, 423:2, 423:23, 459:13, 459:16, 462:23, 508:19, 515:8
**left-hand** [1] - 408:15
**legal** [2] - 433:20, 446:24
**legs** [1] - 369:7
**Leon** [1] - 514:17
**less** [14] - 366:15, 368:11, 371:6, 373:17, 376:17, 376:21, 377:17, 377:20, 379:8, 380:3, 381:4, 385:24, 389:10, 395:22
**letter** [1] - 395:8
**LEWIS** [1] - 495:10
**Lewis** [6] - 362:14, 455:23, 474:1, 495:7, 495:8, 495:18
**lie** [1] - 377:8
**life** [7] - 382:11, 382:13, 389:16, 433:24, 443:6, 450:3, 514:10
**light** [3] - 481:18, 481:19, 481:23
**likely** [1] - 421:21
**line** [2] - 408:17, 478:13
**lining** [1] - 413:16
**Lisa** [6] - 388:16, 392:10, 398:7, 407:11, 433:11, 456:2
**Lisinopril** [1] - 470:21
**LISINOPRIL** [1] - 470:21
**list** [3] - 362:5, 470:12, 470:17
**listen** [2] - 375:23, 430:15
**listening** [2] - 416:14, 483:23
**litigation** [1] - 480:5
**live** [15] - 383:11, 383:25, 384:2, 384:5, 386:16, 411:3, 418:23, 418:25, 419:21, 423:25, 437:15, 444:24, 445:8, 459:1, 459:2
**lived** [6] - 372:10, 386:17, 395:15, 437:16, 445:1, 459:3
**living** [10] - 376:7, 384:16, 384:19, 411:15, 412:1, 424:18, 428:21, 437:2, 445:10, 449:3
**load** [2] - 504:3, 506:3
**local** [5] - 501:13, 501:16, 501:21, 503:17, 508:22
**location** [7] - 503:25, 504:1, 504:14, 504:16, 507:24, 508:11, 510:20
**locations** [4] - 492:23, 505:9, 511:2, 511:3
**logical** [2] - 498:9, 498:12
**long-term** [1] - 501:25
**look** [6] - 367:8, 391:10,

408:10, 415:15, 429:23, 490:1
**looked** [10] - 367:11, 378:18, 412:23, 429:24, 430:1, 438:12, 438:14, 438:15, 490:6
**looking** [4] - 412:22, 412:24, 455:25, 473:23
**looks** [1] - 394:20
**loop** [1] - 430:10
**LORI** [1] - 495:10
**Lori** [5] - 362:14, 474:1, 490:3, 495:6, 495:18
**lost** [2] - 366:16, 473:19
**loud** [3] - 382:10, 392:3, 483:22
**loved** [3] - 387:4, 387:11, 398:8
**lower** [1] - 377:25
**luckily** [1] - 414:18
**luncheon** [2] - 457:15, 514:24
**Luther** [1] - 399:7

## M

**ma'am** [8] - 364:4, 399:1, 410:10, 440:21, 452:18, 454:23, 456:22, 495:16
**machine** [2] - 504:21, 507:2
**Madison** [2] - 469:8, 481:11
**maiden** [1] - 370:17
**mail** [3] - 515:1, 515:5, 516:8
**man** [6] - 378:19, 389:3, 415:24, 418:7, 426:9, 434:8
**management** [2] - 445:17, 454:5
**manner** [2] - 382:15, 505:2
**manufacturing** [3] - 440:11, 453:11, 456:11
**map** [1] - 378:18
**maps** [1] - 492:22
**March** [12] - 406:3, 408:16, 447:23, 453:4, 459:5, 473:15, 473:24, 474:9, 479:15, 479:18, 485:24, 497:5
**Mark** [5] - 362:18, 474:1, 496:21, 497:8
**marked** [5] - 391:11, 393:20, 393:23, 434:19, 494:6
**marriage** [4] - 375:8, 378:2, 378:23, 380:23
**married** [30] - 374:8, 375:9, 375:11, 375:13, 375:17, 375:25, 376:4, 376:11, 376:17, 376:23, 377:7, 378:3, 379:22,

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 168 of 177

381:20, 384:1, 386:15, 386:18, 394:23, 401:1, 401:15, 402:1, 402:10, 402:21, 405:6, 405:12, 418:11, 418:18, 422:3, 445:3, 450:13

marry [2] - 376:2, 422:2
Mars [1] - 473:25
marshal [3] - 483:15, 483:17, 483:18
Marshal [2] - 500:7, 504:6
Marshal's [1] - 467:11
marshals [7] - 483:20, 483:23, 504:13, 504:21, 505:11, 507:1, 511:11
Mart [1] - 505:14
Marvea [3] - 363:9, 364:2, 387:13
MARVEA [2] - 363:15, 364:2
Mary [1] - 364:2
MARY [1] - 364:2
Mason [4] - 395:25, 436:15, 445:9, 445:10
match [4] - 369:1, 394:22, 406:22, 483:12
matched [2] - 368:19, 406:17
matter [5] - 362:11, 464:22, 488:21, 489:20, 514:14
matters [1] - 370:6
Matthew [10] - 364:13, 364:14, 364:15, 364:17, 364:19, 365:17, 365:19, 365:21, 365:24, 366:4
Mattoon's [1] - 414:17
meals [1] - 368:13
mean [32] - 368:5, 371:13, 374:20, 377:9, 378:16, 378:18, 380:3, 381:4, 381:7, 381:9, 383:14, 383:24, 384:10, 385:23, 387:2, 389:14, 402:3, 402:4, 404:10, 405:18, 409:12, 419:8, 419:16, 421:1, 430:20, 433:16, 456:11, 468:13, 486:11, 504:20, 504:25, 506:23
meaning [2] - 420:3, 479:2
means [2] - 417:24, 514:7
meant [1] - 417:22
medical [19] - 393:20, 393:23, 394:25, 396:17, 396:23, 435:20, 435:21, 436:2, 436:9, 436:13, 463:12, 463:15, 463:25, 466:15, 467:5, 472:25, 473:5, 473:9, 493:22
medication [11] - 373:16, 374:6, 374:12, 374:17, 393:10, 396:5, 397:16, 431:13, 431:14, 436:10, 443:20

medications [8] - 372:19, 396:18, 466:22, 470:1, 470:5, 470:13, 470:19, 472:9
meds [1] - 393:11
meet [13] - 389:25, 390:5, 432:22, 433:5, 433:21, 446:1, 460:10, 465:4, 471:7, 504:2, 504:14, 505:12, 510:16
meeting [3] - 407:11, 407:13, 458:20
Melissa [1] - 362:5
members [1] - 506:9
Memorial [1] - 397:11
memories [2] - 411:12, 411:20
memory [19] - 393:21, 395:12, 463:1, 463:8, 463:13, 463:16, 464:8, 464:12, 466:9, 473:3, 473:6, 473:12, 477:17, 477:20, 480:22, 489:9, 489:15, 493:21, 497:17
men [2] - 401:17, 401:19
mental [24] - 370:11, 370:18, 372:5, 373:4, 373:11, 373:14, 373:20, 374:13, 388:23, 389:1, 389:20, 389:25, 390:5, 393:25, 395:1, 396:1, 396:24, 430:24, 430:25, 431:20, 433:14, 433:21, 433:24, 442:24
Mental [1] - 393:4
mention [5] - 489:17, 494:16, 494:19, 497:15, 497:17
mentioned [5] - 373:7, 375:1, 424:16, 447:15, 450:20
mentioning [1] - 489:11
merits [1] - 365:5
met [15] - 388:7, 388:9, 388:15, 388:19, 390:10, 407:4, 407:9, 418:8, 419:11, 434:4, 445:22, 446:5, 460:12, 465:7, 471:14
metal [1] - 492:18
Metformin [1] - 470:24
METFORMIN [1] - 470:24
meth [4] - 440:11, 440:18, 440:21, 485:14
methamphetamine [14] - 453:11, 456:8, 456:12, 460:19, 460:22, 461:8, 461:12, 461:15, 484:24, 484:25, 486:2, 486:4, 486:8, 498:8
might [1] - 509:18
Miller [1] - 489:5
mind [5] - 383:4, 430:5, 450:2, 464:14, 464:17

mine [2] - 402:5, 432:15
Minneapolis [2] - 475:24, 489:2
Minnesota [6] - 444:25, 445:8, 465:8, 465:10, 467:6, 489:2
minor [2] - 382:13, 382:17
minute [1] - 430:12
minutes [5] - 369:17, 424:6, 433:9, 462:24, 515:19
miraculously [1] - 385:1
miserable [1] - 514:11
Miss [4] - 455:17, 455:19, 455:22
missing [3] - 478:24, 488:15, 498:9
misspeaking [1] - 455:24
mitigation [1] - 455:10
mob [1] - 426:11
Moines [1] - 459:2
molesting [1] - 382:15
mom [12] - 371:10, 386:24, 413:2, 413:21, 414:19, 414:22, 417:15, 417:24, 418:8, 418:23, 420:9, 420:22
Mom [5] - 369:1, 370:5, 372:10, 414:14, 417:23
mom's [2] - 413:15, 449:8
moment [13] - 381:14, 387:8, 387:19, 390:24, 394:7, 394:11, 394:15, 407:16, 455:2, 463:20, 484:10, 493:6, 513:18
mommy [2] - 384:23, 384:24
money [5] - 384:19, 385:23, 421:21, 469:2, 482:18
monsignor [1] - 375:18
month [1] - 452:16
months [4] - 446:14, 447:11, 452:17, 464:9
mood [2] - 420:4, 420:5
morning [10] - 361:6, 363:23, 363:24, 410:10, 410:11, 424:5, 508:19, 514:23, 515:19, 515:23
Morningside [1] - 428:22
most [5] - 374:4, 398:2, 403:20, 450:16, 472:9
mother [27] - 362:22, 364:5, 370:12, 370:18, 371:4, 372:16, 375:18, 375:23, 377:5, 398:8, 398:23, 400:3, 411:16, 412:1, 412:2, 412:7, 412:17, 414:1, 414:4, 414:20, 415:16, 415:20, 416:20, 417:5, 418:11, 418:12, 450:11
mother's [1] - 431:15
motion [1] - 478:20

mouth [3] - 367:13, 368:9, 427:22
move [5] - 418:2, 419:4, 508:25, 511:5, 514:9
moved [11] - 419:6, 419:10, 419:20, 446:21, 447:1, 447:7, 450:21, 452:15, 466:24, 467:3, 467:5
movie [1] - 429:16
moving [3] - 445:7, 447:3, 501:10
MR [116] - 361:5, 361:10, 361:15, 361:18, 362:4, 362:13, 362:22, 363:7, 363:9, 363:19, 363:22, 382:6, 385:7, 385:11, 387:7, 390:24, 391:6, 391:9, 391:22, 391:25, 392:2, 392:15, 394:1, 394:7, 394:9, 394:10, 394:11, 394:14, 408:2, 408:5, 408:9, 408:23, 409:15, 409:18, 409:21, 410:5, 410:7, 410:9, 424:7, 424:13, 425:10, 425:13, 425:19, 425:20, 435:9, 435:12, 435:14, 442:17, 442:20, 443:17, 444:2, 444:4, 444:7, 449:14, 452:11, 452:13, 455:2, 455:5, 456:17, 457:3, 457:6, 457:12, 457:14, 458:15, 458:17, 460:23, 461:1, 461:5, 463:20, 464:3, 464:14, 464:16, 466:10, 472:1, 472:4, 472:6, 484:12, 484:16, 484:22, 485:1, 485:6, 485:22, 486:16, 486:19, 487:3, 487:5, 487:14, 493:3, 493:6, 493:10, 494:2, 494:24, 495:3, 495:6, 495:15, 499:5, 499:9, 499:15, 499:16, 499:18, 500:2, 510:8, 510:10, 510:12, 513:17, 513:21, 513:24, 514:2, 514:12, 514:18, 514:21, 515:10, 515:13, 515:18, 516:5, 516:10
MS [7] - 444:10, 444:17, 444:20, 449:17, 452:8, 456:20, 456:25
multipage [1] - 455:14
Munson [1] - 370:17
murder [4] - 397:19, 488:8, 490:14, 491:16
murdering [1] - 397:6
murders [10] - 488:8, 490:2, 491:22, 491:23, 492:8, 496:1, 497:20, 498:1, 498:5, 499:2
must [1] - 467:24

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 169 of 177

**N**

N-A-P-R-O-S-Y-N [1] - 471:2
N-E-L-S-O-N [1] - 410:15
nails [1] - 427:17
name [25] - 364:1, 370:17, 370:24, 370:25, 371:17, 375:5, 388:16, 389:3, 410:12, 410:13, 410:14, 426:10, 431:16, 433:11, 443:9, 444:21, 481:15, 482:7, 487:16, 495:17, 500:4, 500:5, 513:10, 513:15
named [1] - 445:22
names [4] - 434:5, 447:16, 481:14, 505:17
nap [2] - 414:4, 414:6
Naprosyn [1] - 471:1
Narcotics [3] - 487:20, 487:25, 495:21
narcotics [4] - 488:3, 488:8, 488:9, 495:25
navy [1] - 368:23
Nebraska [2] - 411:8, 443:22
necessarily [1] - 394:22
necessary [1] - 514:9
need [4] - 416:16, 417:20, 494:17, 509:22
needed [6] - 421:16, 426:11, 426:12, 447:4, 497:22, 507:3
neighbor's [1] - 414:17
Nelson [9] - 409:22, 410:14, 410:16, 411:6, 424:14, 432:12, 435:1, 435:10, 435:15
NELSON [1] - 410:1
nerves [2] - 395:22
nervous [6] - 366:16, 372:17, 374:5, 374:20, 427:9, 427:17
nervousness [1] - 369:5
never [34] - 365:21, 369:6, 369:11, 370:4, 376:8, 377:16, 380:8, 380:11, 380:12, 384:6, 384:11, 387:11, 400:11, 400:12, 400:14, 402:4, 402:11, 412:7, 415:2, 418:8, 427:9, 427:13, 430:5, 440:14, 440:17, 454:22, 454:25, 476:5, 479:10, 480:20, 492:25, 507:6, 510:7
new [1] - 386:22
next [6] - 363:2, 388:13, 419:16, 444:8, 457:3, 486:25
nice [2] - 419:16, 419:25
Nicholson [4] - 490:2, 492:15, 498:9, 498:20

night [10] - 361:12, 369:2, 387:25, 388:1, 403:8, 403:14, 404:7, 407:4, 414:12, 420:11
nights [1] - 403:20
nipple [2] - 367:12, 367:19
nobody [5] - 383:3, 428:19, 483:5, 509:24
Nolan [12] - 361:4, 458:5, 458:13, 475:15, 475:17, 479:12, 484:14, 484:18, 493:5, 499:7, 510:9, 516:7
NOLAN [66] - 361:5, 361:10, 361:15, 361:18, 362:4, 363:9, 363:19, 363:22, 382:6, 385:11, 387:7, 390:24, 391:6, 391:9, 391:22, 394:7, 394:10, 394:14, 408:5, 408:9, 408:23, 409:15, 409:21, 410:5, 410:7, 410:9, 424:7, 424:13, 425:13, 425:20, 435:9, 442:20, 443:17, 444:2, 444:7, 457:3, 457:6, 457:12, 457:14, 458:15, 458:17, 461:1, 461:5, 463:20, 464:3, 464:16, 472:1, 484:16, 484:22, 485:6, 485:22, 486:16, 493:6, 493:10, 494:2, 494:21, 499:9, 499:15, 510:10, 510:12, 513:17, 513:21, 514:18, 514:21, 515:13, 516:10
non [2] - 502:10, 502:15
non-WITSEC [2] - 502:10, 502:15
none [4] - 506:23, 507:3, 509:17
normal [3] - 454:1, 508:3, 508:7
Norman [1] - 395:4
notation [3] - 408:14, 409:4, 464:5
noted [1] - 362:6
notes [2] - 392:12, 397:10
nothing [11] - 369:22, 369:25, 377:9, 385:23, 442:17, 484:12, 499:15, 499:16, 507:12, 510:8
notice [3] - 369:4, 418:12, 450:22
noticed [2] - 369:18, 464:7
November [2] - 460:14, 488:13
nowadays [1] - 367:16
NPH [1] - 470:24
Number [2] - 361:3, 458:2
number [6] - 364:8, 397:11, 397:15, 454:19, 481:1, 505:16
numbered [1] - 505:17
numbers [1] - 505:16

numerous [1] - 465:23
nursing [1] - 362:22

**O**

o'clock [3] - 403:8, 420:12, 514:17
oath [6] - 363:12, 424:11, 457:19, 474:11, 474:23, 475:8
oatmeal [1] - 367:17
object [4] - 385:7, 476:24, 485:4, 485:5
objecting [1] - 478:2
objection [5] - 385:15, 425:10, 449:14, 460:23, 485:1
objections [2] - 515:22, 515:25
observations [3] - 439:18, 440:6
obsessed [1] - 449:6
obsessions [1] - 368:15
obsessive [2] - 368:15, 368:21
obstruction [1] - 496:16
obtain [1] - 493:16
obtained [3] - 435:20, 453:17, 496:9
obviously [2] - 458:8, 483:15
occasion [2] - 439:10, 471:9
occasionally [1] - 450:22
occasions [3] - 420:8, 452:20, 452:24
occupation [1] - 411:6
occur [1] - 397:9
offered [4] - 425:11, 460:24, 485:2, 485:7
Office [1] - 496:24
office [2] - 376:20, 489:5
officer [3] - 411:7, 443:23, 506:13
officers [2] - 479:18, 506:15
officials [6] - 463:7, 463:10, 464:19, 465:12, 465:19, 466:3
offsite [6] - 503:24, 504:1, 504:14, 504:16, 505:9, 508:23
often [6] - 417:8, 422:8, 423:1, 427:8, 439:15, 447:10
oftentimes [1] - 412:11
old [25] - 375:11, 375:24, 379:16, 380:18, 383:25, 384:4, 384:6, 401:4, 401:8, 401:9, 401:10, 404:24, 411:12, 411:14, 413:5, 416:5, 419:12, 422:12, 426:19, 431:7, 436:5,

436:24, 458:24, 490:10, 491:11
older [11] - 368:17, 372:4, 372:8, 372:9, 401:5, 410:20, 410:24, 413:23, 417:6, 419:13, 434:7
oldest [1] - 364:10
Omeprazole [1] - 470:20
OMEPRAZOLE [1] - 470:20
on-site [1] - 503:16
once [15] - 362:8, 380:11, 386:15, 401:25, 402:21, 405:12, 412:23, 416:8, 419:11, 433:7, 452:16, 469:21, 491:21, 492:9, 505:24
one [2] - 364:9, 511:5
ones [2] - 515:21
ongoing [1] - 396:3
Opal [7] - 370:13, 370:15, 392:22, 392:23, 393:9, 398:6
OPAL [1] - 370:15
open [4] - 361:1, 428:13, 459:13, 506:5
operate [1] - 498:15
operation [4] - 440:12, 440:18, 440:21, 486:2
opportunity [1] - 455:8
oppose [1] - 425:17
opposed [2] - 441:15, 462:20
orders [1] - 430:22
originally [1] - 376:12
otherwise [4] - 382:16, 401:7, 406:19, 485:4
outside [4] - 412:20, 414:12, 414:16, 506:24
ovaries [1] - 378:10
oven [1] - 366:20
overheard [2] - 510:4, 510:5
overlap [2] - 502:16, 511:22
overseeing [1] - 500:21
own [7] - 393:19, 404:6, 404:11, 423:25, 441:25, 442:11, 476:17

**P**

P-113 [1] - 434:19
P-120 [1] - 391:12
P-125 [1] - 464:4
P-130 [1] - 382:6
P-41 [2] - 408:13, 409:4
P-61 [1] - 494:6
p.m [2] - 457:4, 516:12
pace [1] - 427:14
paces [1] - 427:14
pacifier [3] - 367:6, 367:14, 367:21

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM     Document 85     Filed 12/07/11     Page 170 of 177

**Page** [6] - 394:2, 408:24, 409:4, 441:11, 442:7, 485:24
**page** [5] - 382:10, 391:16, 435:2, 452:1, 486:10
**pages** [1] - 408:25
**paid** [2] - 383:15, 387:2
**pallor** [2] - 429:25, 438:13
**paper** [1] - 406:19
**papers** [1] - 381:22
**paperwork** [5] - 382:4, 383:7, 470:3, 470:4, 512:9
**paragraph** [1] - 475:21
**Paragraph** [3] - 382:10, 475:20, 476:13
**parenting** [1] - 450:14
**parents** [10] - 375:13, 376:22, 377:4, 411:13, 415:12, 417:3, 417:12, 450:1, 464:9, 488:16
**parents'** [1] - 450:7
**park** [1] - 505:14
**parking** [1] - 505:12
**part** [11] - 399:10, 468:16, 479:11, 481:3, 488:2, 488:21, 490:9, 496:15, 496:19, 497:19, 497:20
**partially** [1] - 462:9
**participate** [7] - 371:25, 399:23, 402:12, 403:2, 488:22, 491:3, 497:5
**participated** [8] - 398:19, 398:21, 402:17, 455:17, 456:4, 456:7, 456:10, 490:23
**particular** [4] - 368:15, 468:12, 468:24, 498:11
**particularly** [1] - 370:22
**parties** [2] - 382:13, 382:17
**parts** [3] - 441:9, 492:20, 502:18
**pass** [1] - 422:24
**passenger's** [1] - 413:11
**past** [6] - 435:20, 437:3, 468:23, 468:25, 471:8, 500:8
**patient** [1] - 464:7
**pause** [8] - 387:10, 391:2, 407:17, 455:4, 463:23, 484:11, 493:8, 513:20
**pay** [3] - 416:25, 443:10, 482:18
**paying** [2] - 416:23, 484:8
**penalty** [12] - 365:6, 385:9, 425:11, 425:15, 449:16, 449:18, 451:10, 460:24, 461:3, 485:2, 485:4, 485:7
**pendency** [1] - 382:17
**pending** [1] - 429:15
**people** [30] - 371:22, 374:5, 388:21, 389:10, 389:14, 397:6, 398:3, 426:4, 426:10, 428:9, 428:10, 436:19, 468:22, 469:8, 474:6, 476:3, 478:12, 478:16, 478:19, 478:24, 479:8, 479:20, 482:5, 482:7, 482:9, 483:11, 498:8, 498:13, 506:6, 506:25
**percent** [2] - 485:14, 486:3
**perfume** [1] - 413:18
**perhaps** [5] - 361:25, 490:11, 497:25, 515:4, 515:18
**perimeter** [2] - 505:10, 506:20
**period** [8] - 396:13, 396:18, 401:1, 436:11, 440:15, 440:17, 454:16, 454:17
**periodically** [1] - 429:2
**periods** [1] - 378:24
**permit** [1] - 386:13
**person** [14] - 389:6, 389:8, 421:10, 427:9, 427:17, 428:8, 430:21, 440:24, 441:15, 458:22, 476:6, 479:10, 480:2, 481:7
**personality** [1] - 453:21
**personally** [1] - 454:22
**personnel** [2] - 504:21, 507:17
**persons** [2] - 504:8, 512:17
**petitioner** [3] - 382:11, 382:16, 457:2
**phase** [13] - 365:5, 365:6, 385:9, 425:11, 425:15, 449:16, 449:18, 451:10, 460:24, 461:3, 485:2, 485:4, 485:7
**Phillip** [1] - 487:17
**phone** [5] - 361:7, 372:12, 389:6, 476:16, 514:22
**physically** [1] - 400:14
**pick** [2] - 448:25, 449:1
**picked** [6] - 469:6, 469:8, 481:10, 481:11, 505:9, 508:18
**picking** [1] - 504:23
**pickup** [1] - 413:6
**picture** [1] - 503:13
**piece** [4] - 413:7, 413:8, 427:21, 492:18
**pinpoint** [1] - 439:25
**place** [12] - 363:12, 368:20, 423:24, 439:22, 457:19, 488:25, 489:1, 493:25, 503:20, 506:20, 507:14, 512:8
**placed** [3] - 474:11, 474:23, 475:8
**places** [1] - 372:14
**Plaintiff's** [1] - 451:18
**plan** [1] - 362:14
**planned** [1] - 406:24
**planning** [1] - 441:14
**planning-type** [1] - 441:14
**play** [3] - 448:10, 449:4, 450:15
**played** [2] - 398:15, 460:17
**playing** [1] - 448:9
**Plexonal** [2] - 408:18, 408:20
**plus** [1] - 461:19
**Plymouth** [1] - 473:25
**pod** [1] - 482:7
**point** [38] - 377:3, 381:22, 383:22, 385:25, 390:19, 401:14, 402:22, 403:21, 406:5, 413:22, 421:25, 424:22, 429:13, 439:10, 439:15, 459:7, 460:10, 461:21, 464:18, 466:17, 467:2, 471:7, 476:14, 485:18, 489:20, 489:25, 496:10, 497:14, 504:15, 508:18, 509:12, 509:17, 510:1, 512:2, 512:6, 513:2, 514:4, 515:14
**pool** [2] - 504:2, 510:25
**poor** [1] - 477:12
**popped** [1] - 382:2
**porch** [1] - 384:25
**portion** [3] - 461:1, 463:24, 476:25
**position** [5] - 399:22, 454:5, 487:22, 495:22, 500:10
**possibilities** [1] - 497:24
**possible** [3] - 413:12, 490:1, 490:16
**possibly** [1] - 498:4
**post** [1] - 458:6
**post-conviction** [1] - 458:6
**Prazosin** [1] - 470:20
**PRAZOSIN** [1] - 470:21
**precautions** [1] - 509:15
**precise** [1] - 502:12
**precisely** [1] - 482:15
**Preface** [1] - 494:7
**pregnancies** [1] - 365:9
**pregnancy** [1] - 366:7
**pregnant** [5] - 366:6, 378:7, 378:12, 447:25, 448:1
**prep** [4] - 478:11, 489:4, 489:7, 493:13
**preparation** [3] - 407:3, 435:19, 455:7
**prepare** [2] - 476:1, 508:21
**preparing** [2] - 465:3, 488:22
**preschool** [1] - 449:2
**preschoolers** [1] - 449:10
**prescribed** [2] - 374:6, 471:4
**prescriptions** [1] - 436:10
**present** [8] - 361:6, 362:6, 416:10, 431:11, 459:9, 459:10, 489:3, 497:9
**presented** [4] - 385:11, 385:12, 449:18, 461:3
**presenting** [1] - 514:7
**pretrial** [1] - 406:4
**pretty** [3] - 405:20, 454:8, 474:17
**previous** [1] - 471:19
**previously** [4] - 378:1, 387:20, 417:3, 459:25
**prison** [26] - 386:1, 386:3, 406:8, 424:25, 425:4, 425:7, 425:23, 426:6, 426:8, 426:18, 460:7, 460:11, 462:10, 463:10, 463:12, 463:16, 464:19, 465:10, 465:11, 466:18, 466:19, 470:5, 470:13, 475:23, 489:1
**prisoner** [5] - 501:8, 502:10, 502:13, 502:14, 502:15
**prisoners** [13] - 467:17, 467:20, 467:22, 467:25, 468:7, 468:16, 469:5, 501:7, 502:6, 502:7, 502:9, 502:20, 502:22
**Prisons** [1] - 473:10
**Prisons's** [5] - 463:7, 463:25, 464:6, 493:16, 493:20
**probation** [2] - 411:7, 443:23
**problem** [3] - 376:12, 432:11, 506:10
**problems** [14] - 365:12, 378:16, 393:13, 432:8, 441:25, 442:11, 459:10, 459:11, 464:12, 473:6, 473:12, 489:15, 493:21, 497:17
**procedure** [4] - 503:9, 508:9, 508:12, 509:10
**procedures** [1] - 509:7
**proceed** [9] - 363:19, 385:15, 410:5, 424:12, 444:17, 449:19, 461:4, 485:8, 487:4
**proceeding** [1] - 458:6
**Proceedings** [1] - 516:12
**process** [1] - 456:11
**produce** [1] - 375:24
**produced** [1] - 501:23
**product** [1] - 392:11
**professional** [1] - 433:25
**professionals** [3] - 389:25, 433:14, 433:22
**proffered** [1] - 449:15
**Program** [1] - 501:2

**program** [3] - 501:3, 513:9, 513:13
**progress** [1] - 397:10
**projector** [2] - 408:6, 408:10
**promise** [1] - 377:14
**promised** [1] - 384:2
**prone** [1] - 371:2
**prosecutor** [6] - 476:2, 476:23, 477:6, 478:10, 478:11, 479:7
**prosecutors** [2] - 475:24, 496:17
**protect** [1] - 416:1
**Protection** [1] - 501:2
**protection** [1] - 503:5
**prove** [1] - 384:11
**provided** [12] - 392:12, 392:17, 392:25, 393:6, 393:15, 394:21, 395:1, 451:15, 492:10, 492:14, 500:14, 507:17
**Prozac** [1] - 393:8
**Public** [1] - 487:21
**pull** [2] - 506:1, 506:4
**pulled** [2] - 394:20, 508:16
**purchased** [2] - 492:12, 492:13
**pure** [3] - 419:7, 484:24, 485:14
**pursuant** [1] - 490:25
**push/pull** [1] - 428:17
**pushed** [1] - 414:25
**pushing** [1] - 476:3
**put** [12] - 361:11, 366:19, 374:17, 374:21, 386:25, 396:10, 403:24, 416:2, 417:1, 424:15, 424:16, 514:10
**putting** [1] - 367:17

## Q

**quality** [1] - 486:1
**questioning** [2] - 478:13, 502:13
**questions** [25] - 390:20, 391:23, 392:9, 408:3, 409:16, 434:13, 434:16, 435:10, 443:18, 452:9, 453:14, 455:5, 456:18, 456:20, 458:5, 465:25, 472:2, 472:16, 475:17, 484:15, 484:19, 493:3, 499:5, 509:23, 513:22
**quick** [1] - 437:21
**quiet** [3] - 401:22, 401:24, 450:14
**quirks** [1] - 428:5
**quite** [7] - 386:11, 386:12, 422:21, 423:10, 424:20, 439:1, 478:15

## R

**racing** [2] - 464:14, 464:17
**rain** [1] - 391:6
**rains** [1] - 380:19
**raise** [4] - 409:24, 444:12, 457:20, 482:18
**raised** [3] - 375:15, 400:11, 400:12
**rally** [1] - 508:18
**rambunctious** [1] - 368:1
**ran** [1] - 392:21
**raped** [1] - 381:12
**Rapids** [1] - 469:7
**rather** [2] - 442:1, 442:11
**reacted** [1] - 418:12
**read** [17] - 382:10, 391:18, 435:5, 452:3, 463:24, 470:12, 470:17, 471:14, 471:18, 471:21, 471:22, 475:15, 475:20, 477:1, 479:5, 479:11, 485:20
**Reade** [1] - 457:18
**ready** [5] - 363:8, 368:25, 409:20, 503:18, 508:24
**real** [11] - 366:15, 366:17, 368:4, 371:25, 372:13, 380:7, 386:7, 386:11, 421:19, 422:25, 463:4
**realized** [2] - 376:11, 463:9
**really** [26] - 362:12, 366:3, 369:9, 370:2, 376:8, 380:6, 384:10, 386:14, 387:3, 397:3, 397:8, 399:2, 407:10, 407:25, 412:7, 416:4, 427:24, 428:12, 432:1, 433:4, 437:5, 438:22, 439:1, 450:12
**rear** [1] - 506:2
**rearing** [1] - 450:15
**rearrange** [1] - 361:11
**reason** [4] - 383:3, 383:13, 383:19, 403:16
**recap** [1] - 514:15
**receive** [1] - 461:21
**received** [1] - 436:10
**receiving** [3] - 396:18, 397:16, 486:21
**recently** [1] - 374:13
**recess** [4] - 424:5, 424:8, 457:10, 457:15
**recliner** [2] - 412:13, 420:21
**recognize** [1] - 513:11
**recollection** [4] - 397:14, 409:10, 440:2, 464:1
**recollections** [1] - 411:17
**record** [16] - 361:2, 362:7, 364:1, 370:24, 382:6, 408:13, 408:23, 409:1, 410:13, 424:9, 434:25, 444:22, 451:18, 457:25,

464:3, 485:23
**records** [17] - 393:20, 393:23, 394:25, 395:25, 396:17, 396:23, 435:20, 436:2, 436:9, 436:13, 463:25, 464:6, 470:13, 473:9, 491:10, 493:16, 493:22
**recovered** [1] - 492:19
**red** [1] - 413:5
**redirect** [2] - 408:4, 442:18
**REDIRECT** [3] - 408:8, 442:19, 484:21
**reduce** [1] - 427:25
**reference** [1] - 395:2
**references** [2] - 397:15, 473:11
**referring** [2] - 478:24, 485:22
**reflect** [2] - 396:17, 512:9
**reflecting** [1] - 393:24
**refresh** [1] - 409:10
**refreshed** [1] - 440:2
**refreshes** [1] - 464:1
**refused** [1] - 443:10
**regard** [4] - 497:23, 501:6, 502:1, 509:1
**regretted** [1] - 383:13
**regular** [1] - 449:9
**related** [7] - 364:4, 388:22, 396:19, 410:16, 453:15, 488:8, 496:1
**relation** [5] - 432:25, 433:16, 437:15, 462:13, 490:2
**relationship** [9] - 380:22, 380:24, 386:19, 401:14, 421:14, 446:7, 448:5, 451:2, 451:4
**relationships** [1] - 401:17
**release** [2] - 406:4, 435:23
**released** [1] - 508:15
**reluctant** [1] - 474:18
**remarried** [4] - 386:10, 420:10, 421:25, 450:12
**remember** [121] - 374:3, 374:15, 380:6, 384:21, 386:14, 388:6, 389:7, 389:18, 390:10, 390:12, 395:14, 396:15, 397:3, 397:8, 399:2, 399:19, 400:1, 405:15, 406:9, 407:7, 407:10, 407:11, 407:13, 407:20, 407:22, 409:14, 411:12, 411:15, 411:22, 414:23, 416:15, 416:19, 416:21, 417:2, 417:8, 417:9, 417:12, 417:15, 418:1, 418:5, 420:1, 427:4, 429:7, 433:3, 433:8, 436:21, 437:11, 438:16, 438:19, 438:21, 439:21, 440:8, 441:4,

441:5, 441:7, 442:3, 442:5, 442:7, 442:14, 452:17, 453:24, 454:17, 458:20, 459:22, 460:4, 460:13, 462:14, 462:16, 462:24, 463:4, 464:18, 465:7, 466:13, 466:24, 467:23, 470:18, 471:13, 472:15, 474:19, 475:4, 475:16, 475:23, 476:7, 476:25, 477:6, 477:9, 477:13, 478:2, 478:8, 478:13, 479:5, 479:11, 479:14, 479:17, 480:3, 480:6, 480:10, 480:14, 480:24, 481:2, 481:14, 481:15, 482:6, 482:15, 482:21, 483:1, 483:3, 483:6, 485:9, 485:17, 486:5, 486:13, 489:11, 489:14, 511:20, 512:5, 513:3, 513:14
**remembered** [3] - 399:25, 414:13, 450:3
**remind** [1] - 369:12
**reminded** [1] - 373:8
**remote** [1] - 508:10
**removed** [1] - 492:2
**rent** [1] - 505:7
**rented** [1] - 503:24
**repeat** [3] - 425:21, 436:12, 449:21
**rephrase** [2] - 455:20, 463:11
**Report** [2] - 473:23, 494:7
**report** [2] - 455:21, 456:3
**reported** [3] - 392:21, 488:15, 510:7
**representing** [1] - 458:5
**researched** [1] - 491:10
**residence** [1] - 488:15
**resolve** [1] - 515:16
**respondent** [3] - 382:12, 382:14
**response** [1] - 479:6
**responsibilities** [2] - 500:19, 503:3
**responsibility** [5] - 500:14, 500:15, 501:6, 501:8, 503:4
**responsible** [1] - 500:21
**rest** [1] - 395:24
**restrained** [1] - 382:15
**result** [2] - 496:8, 496:18
**return** [3] - 461:22, 469:10, 476:19
**returned** [1] - 501:23
**reverse** [1] - 508:14
**review** [2] - 436:1, 455:8
**reviewed** [1] - 493:22
**reviewing** [1] - 392:11
**Rick** [4] - 444:11, 455:17, 455:19, 455:22
**Rickert** [10] - 388:16, 388:18, 389:19, 389:24,

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM Document 85 Filed 12/07/11 Page 172 of 177

392:10, 398:7, 407:11, 433:11, 456:1, 456:2
**rid** [2] - 415:22, 426:15
**ride** [3] - 449:7, 468:6, 469:9
**rides** [1] - 448:10
**riding** [1] - 483:10
**rifles** [2] - 504:22, 507:2
**right-hand** [1] - 409:5
**ring** [2] - 396:4, 474:3
**road** [4] - 378:18, 412:4, 412:11, 446:11
**robbed** [1] - 406:13
**robbery** [2] - 406:11, 406:25
**Robby** [1] - 447:19
**Rochester** [1] - 467:5
**Rock** [1] - 449:5
**rode** [1] - 481:1
**role** [2] - 488:11, 496:3
**Ron** [33] - 381:19, 384:1, 386:15, 386:18, 387:3, 401:15, 401:22, 402:2, 402:4, 402:8, 402:21, 402:24, 403:1, 403:4, 403:8, 403:10, 403:12, 403:22, 404:3, 404:10, 404:20, 405:12, 405:24, 406:4, 418:10, 418:11, 418:18, 418:19, 418:23, 420:14, 420:20, 421:3
**Ron's** [2] - 401:22, 419:3
**roof** [1] - 391:4
**rooftops** [1] - 507:5
**room** [7] - 388:5, 415:1, 417:19, 501:22, 506:7, 508:2, 508:5
**Rosenfeld** [1] - 395:8
**rough** [1] - 381:11
**roughly** [4] - 426:18, 427:2, 470:14, 503:25
**Rule** [1] - 516:2
**rules** [1] - 443:22
**Rules** [1] - 516:1
**run** [1] - 506:8
**running** [2] - 412:25, 508:6
**Ryan** [6] - 439:22, 447:19, 448:15, 448:20, 448:24

**S**

**S-C-H-E-U-S-S** [1] - 444:23
**S-M-I-D-T** [1] - 364:3
**Safety** [1] - 487:21
**Sam** [1] - 485:24
**Samuel** [1] - 447:20
**sandbox** [1] - 448:11
**Sarah** [1] - 414:17
**sarcastic** [2] - 377:17, 379:14
**sat** [4] - 413:11, 416:14,

417:19, 420:20
**saw** [6] - 370:21, 420:1, 454:22, 454:25, 458:22, 509:3
**scam** [1] - 443:8
**scared** [5] - 413:10, 414:15, 415:6, 419:22, 422:25
**scheduled** [1] - 361:7
**Scheuss** [5] - 444:11, 444:21, 444:23, 452:14, 453:9
**SCHEUSS** [1] - 444:13
**school** [17] - 367:22, 368:25, 373:22, 376:21, 380:12, 398:9, 398:19, 399:24, 399:25, 402:7, 402:11, 402:14, 402:19, 403:4, 405:18, 406:25, 505:8
**schools** [1] - 505:7
**Scout** [1] - 398:24
**Scouts** [1] - 398:21
**screen** [6] - 381:25, 391:11, 434:21, 450:4, 451:18, 494:3
**scroll** [4] - 391:15, 451:19, 451:25, 494:17
**search** [1] - 488:14
**seat** [1] - 483:18
**second** [3] - 382:9, 443:14, 478:25
**secretary** [1] - 514:23
**section** [5] - 365:14, 365:22, 366:14, 392:17, 393:4
**sections** [1] - 378:17
**secure** [1] - 501:22
**secured** [1] - 503:21
**security** [23] - 500:15, 500:22, 500:23, 500:24, 504:7, 504:13, 504:15, 504:21, 505:10, 506:13, 506:20, 507:14, 507:18, 507:21, 507:25, 508:7, 508:8, 509:1, 509:5, 509:7, 509:15
**Security** [1] - 501:2
**see** [29] - 365:21, 365:25, 381:24, 395:4, 408:13, 408:17, 409:4, 409:7, 412:22, 413:20, 429:5, 430:13, 432:7, 434:21, 440:1, 447:7, 459:15, 459:16, 463:25, 491:8, 494:7, 494:15, 502:21, 502:22, 506:24, 509:4, 515:15, 516:3, 516:6
**seeing** [1] - 381:16
**seem** [3] - 363:25, 450:6, 465:1
**selected** [1] - 511:1
**self** [1] - 377:23
**self-esteem** [1] - 377:23

**selling** [1] - 456:8
**send** [2] - 421:20, 516:8
**senior** [1] - 428:22
**sent** [2] - 386:1, 395:8
**sentence** [6] - 461:18, 462:4, 469:19, 476:18, 476:23, 477:24
**sentenced** [3] - 396:14, 396:20, 407:19
**sentencing** [3] - 460:2, 461:22, 474:17
**separate** [1] - 502:25
**separated** [3] - 404:25, 423:18, 512:16
**separately** [1] - 511:20
**September** [8] - 396:25, 397:5, 464:25, 467:3, 470:14, 491:12, 494:1
**Service** [1] - 467:11
**serving** [3] - 461:18, 476:19, 488:4
**session** [4] - 489:4, 489:7, 493:13, 515:2
**set** [6] - 362:11, 403:11, 412:20, 448:11, 457:11, 515:19
**several** [4] - 368:18, 464:8, 492:24, 510:23
**severe** [2] - 372:22, 459:9
**sex** [2] - 451:6, 451:7
**sexual** [3] - 380:22, 380:24, 451:2
**shack** [1] - 424:19
**shadows** [1] - 459:16
**Shaken** [1] - 443:14
**shape** [1] - 378:6
**share** [1] - 428:13
**shed** [3] - 384:19, 423:25, 424:1
**sheepskin** [1] - 413:16
**sheltered** [1] - 432:17
**shift** [1] - 503:15
**shooting** [1] - 478:20
**shop** [3] - 405:25, 406:5, 420:15
**short** [2] - 464:8, 464:12
**short-term** [2] - 464:8, 464:12
**shortly** [3] - 364:15, 378:3, 397:4
**shotguns** [2] - 504:22, 507:1
**show** [5] - 381:24, 427:12, 436:14, 470:13, 503:16
**showed** [1] - 402:4
**showered** [1] - 503:18
**showers** [1] - 368:18
**showing** [3] - 409:3, 434:19, 494:5
**shown** [1] - 494:18
**shy** [2] - 371:22, 371:24
**sic** [3] - 455:17, 455:22, 470:20

**sick** [2] - 365:18, 430:2
**side** [6] - 374:7, 392:24, 395:18, 408:15, 409:5, 413:12
**sidearm** [2] - 505:3, 506:17
**sign** [1] - 480:9
**signature** [4] - 382:20, 391:16, 435:3, 452:1
**signed** [10] - 391:18, 435:5, 435:23, 451:24, 452:3, 452:6, 471:16, 471:21, 471:23, 475:16
**silently** [1] - 416:14
**single** [1] - 509:10
**Sioux** [15] - 396:14, 407:19, 428:23, 460:8, 460:12, 467:9, 467:10, 468:1, 468:2, 469:21, 482:8, 500:8, 500:11, 500:20, 501:11
**sister** [7] - 370:22, 370:23, 371:16, 372:18, 410:19, 422:10, 442:22
**sister's** [3] - 370:24, 370:25, 431:16
**sit** [12] - 369:6, 369:11, 401:5, 401:9, 403:13, 413:14, 421:11, 427:12, 427:13, 427:14, 427:15, 443:20
**site** [6] - 491:13, 491:14, 491:19, 491:21, 492:22, 503:16
**sitter** [2] - 401:7, 401:12
**sitting** [3] - 420:17, 427:10, 506:14
**situation** [3] - 376:24, 441:3, 442:2
**skinny** [1] - 429:21
**sleep** [1] - 374:21
**sleeping** [4] - 379:18, 379:19, 412:13, 414:9
**sleepy** [1] - 395:19
**slept** [2] - 430:2, 438:14
**smelled** [1] - 413:18
**Smidt** [17] - 363:10, 363:11, 363:23, 364:2, 373:25, 375:7, 380:21, 381:19, 381:20, 382:9, 391:10, 392:3, 394:19, 401:15, 407:18, 408:10, 409:3
**SMIDT** [1] - 363:15
**smile** [1] - 453:3
**smiled** [1] - 430:18
**smoking** [1] - 430:8
**snipers** [1] - 507:4
**solely** [1] - 460:24
**someone** [6] - 381:16, 430:15, 445:22, 450:13, 479:17, 512:20
**someplace** [1] - 366:20
**sometime** [3] - 439:19,

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 85    Filed 12/07/11    Page 173 of 177

446:16, 446:17
**sometimes** [3] - 379:4, 423:5, 437:10
**somewhat** [3] - 398:20, 446:22, 447:6
**somewhere** [3] - 414:9, 418:2, 423:12
**somewheres** [2] - 473:21
**son** [9] - 373:2, 396:4, 396:13, 396:19, 397:18, 406:1, 407:18, 448:15, 450:19
**son's** [2] - 389:24, 390:17
**soon** [8] - 376:10, 380:23, 386:9, 386:11, 386:12, 386:13, 505:18
**sore** [1] - 459:13
**sorry** [18] - 385:17, 387:12, 394:5, 394:14, 396:8, 397:8, 408:6, 408:23, 408:25, 440:4, 450:20, 455:20, 456:1, 467:2, 477:12, 481:7, 496:17, 497:8
**sorts** [2] - 448:19, 449:25
**sought** [1] - 450:17
**sound** [12] - 380:20, 393:21, 395:11, 396:20, 397:2, 397:7, 397:19, 400:4, 440:3, 470:14, 471:3, 473:15
**sounded** [2] - 380:16, 471:24
**sounds** [2] - 385:14, 425:17
**source** [3] - 396:3, 397:17, 397:20
**speaking** [3] - 393:18, 465:12, 466:3
**special** [4] - 461:19, 487:24, 495:20, 496:21
**Special** [3] - 474:1, 497:8
**specialist** [1] - 455:10
**specifically** [2] - 405:15, 491:9
**speech** [2] - 473:2, 473:7
**spell** [4] - 364:1, 370:14, 410:12, 444:21
**spelled** [1] - 500:5
**spend** [10] - 401:2, 403:20, 422:6, 429:2, 429:17, 430:12, 432:16, 438:2, 439:9, 460:15
**spending** [2] - 422:16, 429:7
**spent** [4] - 404:9, 422:9, 438:12, 439:11
**Spies** [6] - 361:12, 362:8, 362:12, 514:17, 514:22, 515:7
**spinals** [1] - 365:22
**spot** [2] - 478:23, 504:2
**spring** [3] - 438:21, 451:24, 500:13

**spur** [1] - 459:14
**staff** [4] - 463:12, 463:15, 463:16, 473:5
**stagger** [1] - 511:3
**stand** [9] - 363:10, 363:18, 409:22, 410:4, 444:11, 444:16, 487:12, 495:13, 499:23
**standing** [1] - 450:4
**standoffish** [1] - 421:15
**start** [5] - 361:23, 381:16, 455:24, 514:16, 515:6
**started** [11] - 373:22, 386:23, 396:2, 401:14, 446:13, 446:15, 446:24, 447:24, 448:2, 503:15, 507:22
**starting** [2] - 396:12, 397:12
**starts** [1] - 455:15
**State** [3] - 411:7, 487:19, 489:6
**state** [7] - 363:25, 410:12, 444:21, 487:15, 489:8, 495:16, 500:3
**statement** [4] - 476:8, 478:9, 479:5, 479:19
**states** [2] - 464:7, 464:9
**States** [8] - 361:3, 424:10, 458:1, 474:2, 487:5, 495:6, 497:11, 499:18
**station** [1] - 379:16
**stationed** [1] - 506:25
**stay** [7] - 366:22, 422:23, 423:9, 423:24, 437:18, 437:19, 447:12
**stayed** [3] - 377:10, 377:19, 413:21
**staying** [1] - 512:22
**steadily** [1] - 377:2
**Steamboat** [1] - 449:5
**step** [3] - 409:19, 444:5, 456:22
**stepdaughter** [1] - 386:23
**stepfather** [1] - 418:10
**stepmother** [1] - 436:21
**stepsister** [2] - 419:1, 436:20
**Steve** [2] - 496:23, 497:11
**Steven** [1] - 474:2
**still** [18] - 361:24, 365:23, 369:6, 369:11, 381:20, 384:5, 401:15, 404:7, 406:25, 413:13, 419:18, 421:8, 424:2, 424:11, 424:22, 427:13, 437:24, 446:21
**stipulation** [2] - 362:25, 514:6
**stomach** [2] - 378:17, 430:3
**stop** [3] - 413:6, 446:20, 458:8
**stopped** [1] - 413:6

**storage** [1] - 424:19
**stories** [2] - 483:12, 483:13
**straight** [1] - 375:21
**strange** [1] - 418:7
**stranger** [2] - 412:12, 415:7
**street** [2] - 413:1, 414:17
**stress** [1] - 427:25
**stressed** [4] - 429:24, 438:15, 450:25, 453:23
**stressful** [1] - 419:21
**strict** [1] - 375:15
**strike** [1] - 480:1
**stripper** [1] - 437:8
**stroke** [21] - 459:21, 462:22, 463:1, 463:7, 463:19, 466:8, 466:12, 472:23, 472:24, 473:1, 476:21, 477:10, 477:14, 477:15, 477:21, 478:6, 480:21, 489:8, 489:12, 493:15, 497:15
**stroller** [1] - 448:10
**struck** [2] - 476:5, 479:10
**stuck** [3] - 367:13, 371:23, 416:4
**stuck-up** [1] - 371:23
**student** [1] - 405:20
**stuff** [7] - 384:3, 403:5, 438:16, 453:23, 470:8, 480:13, 506:9
**stuffed** [1] - 367:12
**stupid** [3] - 415:20, 415:24, 417:24
**Stupid** [1] - 417:24
**subject** [3] - 426:16, 428:16, 515:25
**submit** [1] - 363:2
**submitted** [2] - 385:9, 425:14
**substances** [1] - 454:23
**suck** [1] - 367:19
**sucking** [1] - 367:20
**sudden** [1] - 418:6
**suffer** [1] - 459:8
**suffered** [10] - 393:7, 393:8, 393:9, 393:10, 472:23, 472:24, 480:21, 489:8, 489:12, 497:15
**suffers** [2] - 373:21, 431:24
**suicide** [1] - 372:23
**suit** [2] - 504:19, 505:4
**suite** [1] - 388:5
**suits** [1] - 507:21
**summer** [6] - 399:11, 404:17, 438:21, 491:7, 491:9, 500:14
**Sunday** [6] - 399:24, 399:25, 427:10, 427:11, 458:22, 471:8
**supervised** [1] - 454:11
**supervisor** [2] - 500:7,

500:20
**supervisory** [1] - 500:10
**supper** [1] - 420:16
**support** [2] - 416:24, 436:9
**suppose** [2] - 392:10, 469:13
**supposed** [4] - 413:23, 470:6, 501:19, 514:25
**surgery** [3] - 378:2, 378:5, 378:14
**surprise** [1] - 398:3
**surrounding** [1] - 428:18
**survived** [1] - 385:1
**suspect** [3] - 490:2, 490:16, 492:3
**sustained** [1] - 466:11
**SWAT** [1] - 507:8
**swing** [3] - 412:20, 412:21, 448:11
**swinging** [1] - 412:24
**sworn** [9] - 363:16, 410:2, 444:14, 457:23, 458:3, 487:10, 495:9, 495:11, 499:21
**swung** [1] - 413:9
**symptoms** [2] - 395:11, 464:10
**Syndrome** [1] - 443:14

## T

**tab** [1] - 455:25
**table** [4] - 412:6, 413:14, 420:17, 420:20
**tampering** [1] - 506:10
**tantrums** [1] - 372:3
**tape** [1] - 492:14
**target** [2] - 420:6, 420:7
**Target** [1] - 505:14
**taught** [2] - 399:24, 399:25
**teacher** [2] - 370:2, 398:9
**team** [3] - 433:20, 455:11, 497:20
**teenagers** [1] - 421:17
**telephone** [5] - 376:20, 457:4, 457:16, 458:3, 486:22
**television** [1] - 479:21
**temper** [1] - 372:2
**temperament** [2] - 367:25, 371:21
**temperamental** [1] - 371:2
**temporarily** [1] - 502:14
**tension** [1] - 427:23
**term** [4] - 453:22, 464:8, 464:12, 501:25
**terms** [2] - 461:22, 488:11
**Terra** [1] - 496:21
**terrible** [1] - 372:2
**terribly** [1] - 381:10
**TERRY** [1] - 457:22

Case 3:10-cv-03074-LTS-KEM Document 85 Filed 12/07/11 Page 174 of 177

**Terry** [21] - 458:2, 488:14, 488:22, 489:8, 490:1, 490:5, 490:8, 490:11, 490:13, 491:23, 492:3, 492:7, 493:14, 497:6, 497:14, 497:25, 498:4, 498:7, 498:20, 498:23, 499:13

**testable** [1] - 486:4
**testified** [44] - 363:17, 383:6, 387:21, 387:23, 388:1, 388:12, 390:20, 390:21, 390:22, 407:5, 410:3, 433:2, 433:6, 434:12, 434:14, 434:15, 434:16, 434:17, 435:18, 441:4, 444:15, 451:14, 452:14, 457:24, 459:25, 460:6, 461:17, 461:20, 462:2, 464:22, 466:22, 467:2, 467:7, 472:10, 474:8, 474:16, 475:3, 476:14, 476:15, 481:13, 485:17, 487:11, 495:12, 499:22

**testifies** [1] - 362:9
**testify** [13] - 361:7, 365:3, 365:5, 390:17, 432:19, 451:8, 451:11, 460:7, 462:3, 468:3, 474:18, 482:2, 501:19

**testifying** [9] - 389:22, 407:3, 432:23, 442:3, 459:22, 462:24, 465:4, 466:25, 486:5

**testimony** [34] - 407:7, 432:25, 436:22, 437:12, 438:16, 440:8, 441:8, 441:20, 442:14, 451:15, 452:18, 453:24, 455:7, 461:21, 462:14, 469:10, 469:16, 469:18, 472:22, 476:1, 480:25, 481:3, 481:18, 481:23, 485:21, 486:13, 486:21, 488:23, 489:18, 489:23, 502:3, 510:4, 511:20, 514:7

**textures** [1] - 368:9
**THE** [105] - 361:2, 361:9, 361:14, 361:17, 362:3, 362:10, 362:21, 363:5, 363:8, 363:11, 363:14, 363:18, 363:20, 380:18, 382:8, 385:14, 387:5, 387:9, 391:1, 391:4, 391:7, 391:24, 394:12, 394:16, 408:4, 408:7, 409:17, 409:19, 409:23, 409:24, 410:4, 410:6, 424:4, 424:9, 425:16, 435:11, 442:18, 443:19, 443:21, 443:22, 443:24, 443:25, 444:3, 444:5, 444:9, 444:12, 444:16, 444:18, 449:19,

452:10, 455:3, 456:19, 456:22, 457:1, 457:5, 457:9, 457:13, 457:18, 457:21, 457:25, 458:11, 458:12, 458:14, 461:4, 463:22, 466:11, 472:3, 484:14, 484:17, 484:20, 485:8, 485:11, 485:12, 486:18, 486:20, 486:23, 486:24, 487:4, 487:7, 487:8, 487:12, 493:5, 494:4, 494:23, 495:1, 495:4, 495:5, 495:8, 495:13, 499:7, 499:17, 499:23, 510:9, 513:19, 513:23, 514:1, 514:8, 514:15, 514:20, 515:5, 515:12, 515:17, 515:24, 516:6, 516:11

**Thede** [5] - 395:4, 395:5, 395:6, 395:9
**theorized** [2] - 490:10, 490:22
**theory** [9] - 490:7, 490:25, 491:1, 491:23, 494:11, 498:4, 498:7, 498:19, 498:23
**thin** [1] - 377:22
**thinking** [5] - 383:4, 413:20, 415:22, 416:2, 473:18
**Thinnes** [1] - 492:16
**third** [2] - 364:9, 511:5
**Thomas** [1] - 375:6
**threats** [4] - 400:17, 400:20, 496:16, 497:2
**threw** [3] - 373:17, 414:25, 430:10
**throughout** [3] - 366:7, 367:1, 492:25
**thrown** [2] - 414:25, 492:20
**thumb** [1] - 478:21
**thunder** [1] - 380:16
**ties** [2] - 506:14, 507:21
**Tim** [12] - 369:15, 369:16, 373:8, 373:9, 373:11, 373:13, 375:1, 392:24, 393:8, 432:2, 432:3, 492:9
**timeframe** [2] - 488:19, 498:11
**timeline** [1] - 397:7
**timing** [2] - 361:18, 417:11
**TNG** [1] - 470:21
**today** [16] - 361:13, 361:20, 361:22, 390:21, 390:22, 434:15, 434:17, 436:24, 443:20, 447:17, 451:16, 473:2, 478:10, 481:3, 504:17, 513:16
**today's** [1] - 455:7
**toddlers** [1] - 449:10
**together** [7] - 403:14, 404:3, 417:25, 420:10,

446:10, 448:13, 468:17
**Tom** [1] - 489:5
**tomorrow** [6] - 361:16, 361:23, 362:8, 362:18, 514:16, 515:19
**took** [9] - 371:6, 374:19, 375:18, 378:9, 380:8, 406:21, 412:25, 414:18, 489:1
**top** [1] - 451:19
**tot** [1] - 448:10
**total** [1] - 482:9
**toward** [1] - 413:1
**towards** [4] - 367:9, 416:25, 418:13, 497:2
**tractors** [1] - 449:6
**trafficking** [2] - 488:9, 495:25
**transcript** [3] - 363:2, 441:11, 442:8
**transport** [6] - 501:20, 503:18, 503:23, 504:1, 507:19, 508:21
**transportation** [2] - 503:5, 508:10
**transported** [10] - 502:2, 502:6, 502:9, 505:20, 507:11, 507:12, 507:15, 507:16, 507:24, 511:19
**transporting** [3] - 505:7, 509:8, 510:5
**TRAZADONE** [1] - 470:19
**Trazodone** [1] - 470:19
**treat** [2] - 377:13, 401:25
**treated** [9] - 374:16, 397:1, 400:4, 402:2, 416:19, 418:13, 422:5, 431:9, 466:17
**treatment** [2] - 374:13, 396:1
**trial** [48] - 365:3, 374:20, 383:6, 385:9, 387:20, 390:17, 407:3, 407:21, 425:12, 432:19, 434:12, 441:5, 441:12, 441:22, 449:18, 451:9, 451:11, 451:14, 459:23, 460:6, 460:25, 464:22, 465:4, 467:8, 468:4, 468:23, 470:15, 472:10, 475:4, 475:9, 475:11, 476:1, 478:11, 481:13, 488:23, 489:3, 489:21, 500:16, 500:22, 501:1, 502:4, 507:7, 507:21, 509:10, 509:13, 509:22, 511:1, 513:13
**trials** [1] - 510:15
**tried** [5] - 372:13, 397:18, 405:22, 415:21, 426:15
**trouble** [4] - 366:25, 367:1, 464:8, 514:21
**troubles** [1] - 446:24
**truck** [5] - 413:3, 413:4,

413:5, 413:6, 413:10
**trucks** [1] - 449:6
**true** [16] - 400:14, 401:16, 442:1, 455:18, 456:5, 456:6, 456:9, 456:12, 456:13, 456:16, 475:15, 476:4, 476:11, 477:3, 479:9, 480:1
**truth** [4] - 474:6, 474:13, 475:1, 475:11
**try** [6] - 362:23, 379:10, 429:3, 458:8, 493:15, 514:5
**trying** [8] - 362:25, 404:2, 409:1, 439:21, 440:1, 473:18, 476:2, 483:12
**tub** [1] - 369:18
**tumor** [1] - 378:5
**turn** [3] - 408:6, 443:11, 458:13
**turned** [1] - 375:12
**turns** [1] - 371:6
**TV** [1] - 420:21
**twice** [1] - 509:17
**twitching** [1] - 369:10
**type** [20] - 393:24, 395:11, 395:13, 396:1, 396:23, 421:10, 425:9, 425:25, 428:8, 430:21, 440:11, 441:14, 445:15, 461:18, 480:2, 501:19, 505:21, 508:12, 509:14
**types** [1] - 385:18
**typical** [2] - 441:24, 442:10
**typically** [3] - 506:15, 510:15, 512:12

## U

**ugly** [3] - 378:20, 415:19, 415:24
**uh-oh** [1] - 434:20
**ultimately** [2] - 397:19, 406:8
**Uncle** [5] - 392:24, 393:8, 393:12, 432:2, 432:3
**uncomfortable** [1] - 426:17
**uncovered** [2] - 492:1
**under** [14] - 363:12, 384:24, 395:15, 413:19, 424:11, 425:17, 443:22, 457:19, 474:11, 474:23, 475:8, 490:24, 510:2, 514:8
**underneath** [1] - 413:17
**understood** [2] - 472:12, 472:19
**unfortunate** [1] - 363:6
**United** [8] - 361:3, 424:10, 458:1, 474:2, 487:5, 495:6, 497:11, 499:18
**unless** [5] - 382:14, 385:8, 425:11, 449:15, 460:23

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM     Document 85     Filed 12/07/11     Page 175 of 177

**unload** [1] - 506:3
**unusual** [1] - 367:11
**up** [75] - 362:8, 362:17, 367:5, 367:17, 369:7, 371:23, 376:22, 382:2, 383:5, 383:19, 384:6, 384:24, 386:8, 386:22, 387:7, 387:13, 394:22, 398:13, 400:3, 400:21, 400:23, 411:3, 414:5, 414:10, 414:13, 416:6, 416:16, 422:16, 424:24, 427:13, 428:4, 428:13, 431:11, 432:13, 438:5, 448:25, 449:2, 451:19, 452:15, 453:15, 457:11, 462:7, 469:6, 469:8, 481:10, 481:11, 483:12, 486:22, 489:21, 491:1, 491:3, 491:13, 491:21, 492:18, 492:21, 496:19, 503:11, 503:16, 503:17, 504:3, 504:23, 505:9, 506:1, 506:4, 506:7, 506:17, 507:24, 508:1, 508:5, 508:16, 508:18, 512:14, 513:24, 516:4
**upset** [7] - 366:15, 366:17, 370:3, 372:13, 384:21, 415:2, 450:6
**upsetting** [1] - 453:16
**upstairs** [4] - 414:4, 414:8, 414:10, 417:19
**US** [3] - 496:24, 500:7, 504:5
**uterus** [1] - 378:6

**V**

**vacant** [1] - 505:13
**vague** [1] - 411:17
**van** [23] - 467:16, 467:17, 467:22, 468:6, 468:17, 469:4, 469:9, 481:1, 481:8, 481:12, 481:20, 481:23, 482:1, 482:5, 482:10, 482:11, 482:13, 483:4, 483:7, 483:10, 483:16, 504:8, 508:17
**vans** [10] - 503:23, 504:3, 504:5, 505:5, 505:7, 505:22, 506:1, 506:6, 508:15
**various** [2] - 465:5, 466:21
**vehicle** [1] - 467:15
**vehicles** [1] - 505:21
**verbally** [3] - 400:23, 414:24, 415:9
**verdict** [2] - 361:22, 362:1
**Vernon** [1] - 392:23
**versus** [3] - 361:3, 424:10, 458:1
**Vest** [1] - 513:15

**victims** [2] - 491:24, 497:21
**victims's** [1] - 491:17
**viewed** [1] - 403:12
**violence** [2] - 400:17, 400:20
**violent** [2] - 476:6, 479:10
**visible** [4] - 504:15, 506:23, 507:25, 509:2
**visit** [11] - 386:3, 404:10, 415:13, 425:2, 437:19, 437:21, 437:23, 447:8, 450:21, 450:24, 452:25
**visited** [3] - 480:3, 480:5, 480:8
**visits** [1] - 453:21
**voice** [2] - 400:11, 400:12
**VTC** [1] - 363:1

**W**

**W-A-L-H-O-F** [1] - 500:5
**wagon** [1] - 379:16
**wait** [1] - 419:25
**waited** [2] - 414:19, 414:21
**Wal** [1] - 505:14
**Wal-Mart** [1] - 505:14
**Walhof** [3] - 362:15, 499:19, 500:5
**WALHOF** [1] - 499:20
**walk** [4] - 371:8, 419:23, 437:22, 459:14
**walked** [3] - 368:2, 414:13, 414:16
**walking** [4] - 371:7, 418:6, 419:17, 423:15
**walks** [2] - 423:7, 423:12
**wall** [1] - 415:1
**walled** [1] - 496:15
**walls** [1] - 496:9
**warehouse** [1] - 380:19
**warm** [1] - 366:21
**warming** [1] - 366:20
**Waseca** [4] - 465:8, 465:10, 466:25, 467:3
**washed** [1] - 420:17
**watch** [3] - 411:23, 413:23, 427:12
**watched** [1] - 420:21
**watching** [3] - 412:23, 427:11, 450:4
**water** [2] - 387:13, 416:16
**waving** [1] - 450:4
**wearing** [1] - 507:21
**Weather** [2] - 380:15, 391:3
**weather** [1] - 504:18
**wedge** [1] - 378:10
**week** [5] - 363:2, 379:4, 479:1, 509:18
**weekend** [3] - 429:4, 439:13, 439:19

**weekends** [1] - 379:6
**weeks** [2] - 511:4, 511:5
**weight** [1] - 366:9
**Wellborn** [5] - 445:14, 445:18, 446:5, 454:5, 454:14
**whereabouts** [1] - 498:10
**whichever** [1] - 413:1
**white** [1] - 438:13
**whole** [5] - 380:9, 392:17, 404:9, 475:21, 507:6
**whore** [1] - 415:20
**wife** [2] - 379:25, 381:1
**wig** [1] - 426:3
**Wild** [1] - 476:20
**Williams** [11] - 391:24, 409:17, 444:3, 444:8, 455:23, 472:3, 486:18, 494:23, 513:23, 515:15, 516:8
**WILLIAMS** [58] - 362:13, 362:22, 363:7, 385:7, 391:25, 392:2, 392:15, 394:1, 394:9, 394:11, 408:2, 409:18, 425:10, 425:19, 435:12, 435:14, 442:17, 444:4, 444:10, 444:17, 444:20, 449:14, 449:17, 452:8, 452:11, 452:13, 455:2, 455:5, 456:17, 456:20, 456:25, 460:23, 464:14, 466:10, 472:4, 472:6, 484:12, 485:1, 486:19, 487:3, 487:5, 487:14, 493:3, 494:24, 495:3, 495:6, 495:15, 499:5, 499:16, 499:18, 500:2, 510:8, 513:24, 514:2, 514:12, 515:10, 515:18, 516:5
**window** [1] - 412:22
**winter** [3] - 447:2, 504:18, 505:4
**wire** [1] - 483:21
**witness** [17] - 362:5, 362:15, 362:19, 363:16, 410:2, 424:11, 444:8, 444:14, 456:19, 457:4, 457:6, 457:23, 487:10, 495:11, 499:21, 500:23, 512:23
**WITNESS** [11] - 363:14, 443:21, 443:24, 457:21, 458:11, 458:14, 484:20, 485:11, 486:23, 487:8, 495:5
**Witness** [1] - 501:2
**witnesses** [32] - 361:6, 361:11, 457:2, 479:3, 487:1, 487:2, 496:6, 497:2, 501:1, 501:8, 501:13, 501:14, 502:10, 502:13, 502:15, 502:17, 503:1, 504:11, 506:8, 510:3,

510:5, 511:18, 511:23, 511:25, 512:3, 512:5, 512:8, 512:12, 513:2, 513:12, 514:3
**WITSEC** [25] - 501:3, 501:6, 501:8, 501:9, 501:15, 501:17, 502:6, 502:7, 502:9, 502:10, 502:13, 502:14, 502:15, 502:16, 511:19, 512:5, 512:8, 512:12, 512:15, 512:20, 512:22, 513:2, 513:5, 513:9, 513:12
**woke** [1] - 414:5
**woken** [1] - 414:10
**woman** [4] - 388:15, 433:10, 480:17, 480:18
**Women's** [1] - 436:15
**wonder** [1] - 424:4
**Woodbury** [4] - 469:22, 469:23, 500:25, 503:19
**wooden** [1] - 424:20
**word** [2] - 384:9, 464:11
**words** [4] - 377:23, 416:3, 421:10, 442:10
**worker** [1] - 454:8
**workers** [1] - 454:13
**worried** [1] - 366:10
**worry** [1] - 391:4
**worse** [3] - 370:6, 377:2, 377:3
**wrap** [1] - 362:8

**Y**

**year** [11] - 374:15, 396:24, 436:6, 446:1, 462:18, 471:13, 472:8, 472:17, 476:22, 477:24, 491:16
**years** [48] - 364:18, 364:22, 365:2, 371:1, 372:9, 372:19, 374:1, 374:2, 374:10, 375:10, 383:24, 384:4, 384:6, 395:14, 395:16, 399:1, 401:10, 404:24, 410:22, 410:23, 411:10, 411:14, 415:5, 419:13, 422:13, 425:6, 427:1, 430:13, 431:7, 431:10, 436:5, 436:25, 438:5, 445:20, 446:19, 459:5, 461:19, 462:1, 462:3, 462:7, 462:9, 469:19, 476:18, 488:3, 488:4, 500:9, 513:6
**yelled** [1] - 413:6
**yelling** [2] - 392:6, 414:14
**yesterday** [2] - 362:6, 362:20
**young** [6] - 367:24, 367:25, 371:20, 414:15, 417:10
**younger** [11] - 364:16,

364:21, 365:1, 370:22, 371:1, 372:2, 410:20, 410:21, 419:14, 427:2, 436:25

**youngest** [1] - 364:24

**yourself** [7] - 373:25, 388:25, 416:18, 421:9, 428:9, 428:10, 489:5

**youth** [2] - 399:6, 399:23

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*