IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA

DUSTIN LEE HONKEN,                )
                                  )
              Plaintiff,          )    10-CV-3074-LRR
                                  )
     VS.                          )    **VOLUME IV**
                                  )
UNITED STATES OF AMERICA,         )
                                  )
              Defendant.          )

APPEARANCES:

ATTORNEYS SHAWN NOLAN, AREN ADJOIAN, AND AYANNA SALA WILLIAMS, Capital Habeas Unit, Federal Community Defender Office, Eastern District of Pennsylvania, Suite 545 West-Curtis Building, 601 Walnut Street, Philadelphia, Pennsylvania 19106, appeared on behalf of the Plaintiff.

ATTORNEY CHARLES J. WILLIAMS, Assistant U.S. Attorney, Suite 400, 401 First Street S.E., Cedar Rapids, Iowa 52401, appeared on behalf of the United States.

EVIDENTIARY HEARING,

held before the Hon. Linda R. Reade on the 3rd day of

November, 2011, at 4200 C Street S.W., Cedar Rapids,

Iowa, commencing at 7:54 a.m.

Patrice A. Murray, CSR, RPR, RMR, FCRR
United States District Court
4200 C Street S.W.
Cedar Rapids, Iowa 52404
(319) 286-2324

INDEX

| WITNESS | D | C | RD | RC |
|---|---|---|---|---|
| Leon Spies | 520 | 554 | 586 | 595 |
| | | | 598 | 598 |
| | | | 599 | |

EXHIBITS

| | O | R |
|---|---|---|
| Exhibit Nos. 1 through 8 | 602 | Admitted |
| Exhibit No. 9 | 602 | |
| Exhibit Nos. 10 through 22 | 602 | Admitted |
| Exhibit No. 23 | 602 | |
| Exhibit No. 24 | 602 | Admitted |
| Exhibit No. 25 (Withdrawn) | | |
| Exhibit Nos. 26 and 27 | 602 | |
| Exhibit Nos. 28 and 29 | 602 | Admitted |
| Exhibit No. 30 | 602 | |
| Exhibit Nos. 31 through 109 | 602 | Admitted |
| Exhibit Nos. 110 through 114 | 602 | |
| Exhibit Nos. 115 through 116 | 602 | Admitted |
| Exhibit Nos. 117 through 122 | 602 | |
| Exhibit Nos. 123 through 133 | 602 | Admitted |
| Exhibits A through F | 608 | Admitted |
| Exhibits G and H (Withdrawn) | | |
| Exhibit I | 608 | Admitted |
| Exhibit J (Withdrawn) | | |
| Exhibit K (Admitted in Vol. I) | | |
| Exhibits L through S | 609 | Admitted |
| Exhibits T and U (Withdrawn) | | |
| Exhibits V and W | 609 | Admitted |

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM   Document 86   Filed 12/07/11   Page 2 of 110

(The following was held in open court.)

THE CLERK: In Civil Matter 10-3074, Dustin Lee Honken versus United States of America, on for evidentiary hearing.

Counsel, please state your appearances.

MR. WILLIAMS: C.J. Williams on behalf of the United States, Your Honor.

MR. NOLAN: Good morning, Your Honor. Shawn Nolan on behalf of Mr. Honken.

THE COURT: All right. And we're ready for your next witness, Mr. Nolan.

MR. NOLAN: We are, Your Honor. We'll call Leon Spies to the stand.

LEON SPIES,

called as a witness, being first duly sworn or affirmed, was examined and testified as follows:

THE CLERK: You may take the stand.

THE COURT: Good morning, Mr. Spies.

THE WITNESS: Good morning, Your Honor.

DIRECT EXAMINATION

BY MR. NOLAN:

Q. Good morning, Mr. Spies.

A. Good morning.

Q. Please state your name and spell your last name for the record, please.

Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.

Case 3:10-cv-03074-LTS-KEM   Document 86   Filed 12/07/11   Page 3 of 110

A.      Leon Spies, S-P-I-E-S.

Q.      Mr. Spies, what's your occupation?

A.      I'm a lawyer.

Q.      And how long has -- have you been a lawyer?

A.      36 years.

Q.      And what type of practice are you in currently?

A.      Trial practice, primarily criminal defense.

Q.      And how long have you been doing criminal defense work?

A.      36 years.

Q.      At some point were you appointed to represent Mr. Honken in his murder case?

A.      Yes, I was.

Q.      And when did that occur?

A.      I don't recall the year, but it was shortly after the return of the indictment or even maybe shortly before that.

Q.      And how was it that you ended up getting involved in getting appointed in the case?

A.      I think I was invited to assist Alfredo Parrish in representing Mr. Honken.  Mr. Parrish had represented Dustin in the drug conspiracy case that had been brought against him in the Northern District of Iowa. Mr. Parrish and I worked together on several other cases, and he asked me to assist, and I said, "Yes."

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 86   Filed 12/07/11   Page 4 of 110

Q.    And then the Court thereafter appointed you?

A.    That's right.

Q.    At the time you were appointed to represent Mr. Honken, did you have any capital experience?

A.    No.

Q.    And how about since?

A.    Pardon me?

Q.    How about since then?

A.    No.

Q.    Other than his case, I meant --

A.    That's right.

Q.    -- which was a lot of experience, I know.

A.    It was substantial.

Q.    Have you had experience in the past of working with mental health professionals in your practice?

A.    Yes, both in criminal and civil cases.

Q.    Would you just describe that briefly for the Court.

A.    Sure.  I've worked with forensic psychiatrists, neuropsychologists, both in assisting clients charged with crimes where mental health defenses have been involved, I've also represented head-injured clients in civil cases, and substance abuse cases, and mental health related cases.

Q.    And at some point did a third attorney get

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 86   Filed 12/07/11   Page 5 of 110
*to purchase a complete copy of the transcript.*

appointed to get involved in the case?

A.    Yes, Charles Rogers was our learned counsel.

Q.    How did that come about, if you recall?

A.    I don't recall specifically.  I think that primarily Mr. Parrish had done some groundwork on investigating counsel to assist us.  Unfortunately, the passage of time has made the details a little bit foggy to me.

Q.    That's fine.  Do you remember who -- well, who determined that you needed learned counsel?  Was that a discussion that you had, or did that come from somewhere outside?

A.    I don't recall the details, but I just understood we needed 1, and both for purposes of assistance and I think it was required by the statute.

Q.    All right.  I want to ask you a little bit about the roles of the individual attorneys.  We'll get to, actually, trial but let's talk about at the beginning, when you first started splitting up the work and deciding who was going to do what.  What was it decided that Mr. Parrish's role would be early on?

A.    Well, I think, generally, Mr. Parrish was going to focus on prospective evidence from Mr. Honken's alleged confederates and also witnesses who were going to be brought in from the institutions to testify

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 86   Filed 12/07/11   Page 6 of 110

against Mr. Honken. So generally speaking, the guilt phase was going to be his primary area of concentration.

Q. Okay. And --

A. And a lot of this -- not to indulge, but a lot of this was pretty fluid. We were -- there was a lot of material to cover. There was a substantial amount of discovery, and we were all trying to acquaint ourselves with all of it.

Q. And at the early stages, what was it decided that Mr. Rogers's role would be in the case?

A. He was the brains of the outfit and obviously had experience with capital juris prudence and was helping us get our feet on the ground learning a little bit about that, but also focusing on some of the substantial legal aspects that would revolve around the capital aspects of the case.

Q. And was there a determination made early on who would be actually presenting the penalty phase, if it got to that point, to the jury?

A. At the penalty phase, I think originally, Mr. Rogers was going to do a substantial part of that, and then in time, it became my job.

Q. Okay. We'll come back to that in a moment. As you were preparing to get ready for the trial, in the months before jury selection, what was your role at that

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 86   Filed 12/07/11   Page 7 of 110
*to purchase a complete copy of the transcript.*

time?

A.     Well, in addition to becoming prepared for jury selection and helping to -- other counsel in becoming acquainted with all the other aspects of the case, I worked most closely with our mitigation specialist, Lisa Rickert from Madison, Wisconsin.

Q.     And how did it come about that you were doing that rather than Mr. Rogers, who was learned counsel?

A.     You know, I don't remember exactly how that transition took place.  I think it was felt at some point, either by osmosis or determination, that I might be able to work more closely with her and maybe be more appropriate in presentation of the mitigation evidence at trial.

Q.     Okay.  Do you recall that Mr. Rogers was involved in another trial, a protracted trial, at some point, as you were preparing for this case?

A.     Yes, I do recall that.

Q.     Did that have anything to do with that determination, about how much your involvement would be directly with Ms. Rickert?

A.     I think that was a factor, yes.

Q.     Okay.  And then you said at some point it was determined that, rather than Mr. Rogers, you would actually present the penalty phase to the jury.  When

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 86   Filed 12/07/11   Page 8 of 110
*to purchase a complete copy of the transcript.*

did that determination get made?

A. Again, I don't recall exactly when that took place.

Q. Do you have some water up there?

A. Yeah. And in part, I think that was a choice that Mr. Honken felt most comfortable with as well. So I don't know. The answer to your question is, I don't recall.

Q. Okay. Well, do you recall when that happened though?

A. That's what I don't recall.

Q. Okay. I see. I noticed in reviewing the transcript that during the merits phase or the guilt phase of the trial, you did cross-examine several witnesses. How did it come about that you did that?

A. Sure. I guess a colloquial way to put it was that I was supposed to stay clean during the course of the trial, meaning not get dirtied up by cross-examining snitch witnesses and trying to kind of stay above the fray, so at the time of the mitigation stage of the case, if we got to that, that I would be the good guy in the trial team.

Q. Okay.

A. I never thought we worked that crudely, but I guess we do.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 86   Filed 12/07/11   Page 9 of 110
*to purchase a complete copy of the transcript.*

Q. Now, as this was the first time you had been involved in a capital matter, did you spend time learning up on juris prudence and studying as you were preparing?

A. Yes.

Q. And were you trying to identify every meritorious issue that you could to raise in the case?

A. Yes, to the best of our ability.

Q. Now, Mr. Spies, have you at some point been provided a copy of the petition that we filed on behalf of Mr. Honken?

A. I have.

Q. And at some point, had you also been provided a copy of the memorandum of law and supplement that we filed?

A. Yes.

Q. Okay. And did you have an opportunity to review those to some extent?

A. To some degree, yes.

Q. All right. I want to ask you about a couple issues in particular. Do you recall that trial counsel for Mr. Honken, including yourself, filed a double jeopardy motion prior to the trial?

A. Yes, I recall that.

Q. And who was responsible for researching that

motion and drafting that motion?

A.     I think that primarily Mr. Rogers was responsible for that.  In looking through some of my files, I noticed that I had a file marked Double Jeopardy, and we had some drafts of the motion and memorandum in there, as well as some cases that myself and my law clerk had pulled out and read, but the drafting I think was primarily Mr. Rogers.

Q.     Okay.  And in that motion that was filed, did you include a challenge on the basis of collateral estoppel based on the prior findings of Judge Bennett in the previous sentencing proceedings?

A.     I believe not.

Q.     Do you recall whether there was a discussion about whether to include such an argument?

A.     I don't recall such a discussion.

Q.     And do you recall that the motion was at some point decided by Judge Bennett pretrial?

A.     Yes.

Q.     Okay.  And was that in a published opinion?

A.     Yes.

Q.     And when that opinion came out, did you review it -- or did you read it, I guess I'll say?

A.     Yes.

Q.     And do you remember discussing the decision with

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 86    Filed 12/07/11    Page 11 of 110
*to purchase a complete copy of the transcript.*

co-counsel?

A.   I'm sure there was a discussion, but I don't at this point recall the contents of that.

Q.   I'm going to show you a quote from Judge Bennett's decision, which, for the record, is United States versus Honken, 271 F. Supp. 2d 1097, and this is at 1106, and it's Footnote 2.  Could you just read that footnote to yourself?

A.   I have.

Q.   Do you remember after seeing this footnote whether there was any discussion about renewing the motion and including a challenge based on collateral estoppel?

A.   I don't recall that.

Q.   Do you recall if there was any strategic reason for not doing so?

A.   I can't think of 1.

Q.   Now, Mr. Spies, we also -- did you review Claim 1 of our petition?  And I'll tell you what that is, and you can tell me whether you reviewed it.  Claim 1 is a claim that objects to findings from the prior proceeding being admitted during Mr. Honken's murder trial.

          Do you recall reviewing that?

A.   Yes.

Q.   And do you remember any discussion with

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 86   Filed 12/07/11   Page 12 of 110

co-counsel about whether you should object to those findings coming in or challenge those in a pretrial motion?

A.     I only vaguely recall a conversation about that.

Q.     Do you remember if there was any strategic reason for failing to object or failing to challenge that evidence?

A.     Well, as much as I'd like to say that there was, I don't remember 1.

Q.     And do you recall reading at some point that, in the Angela Johnson matter, Mr. Honken's codefendant, that her attorneys challenged multiple counts of murder based on multiplicity?

Do you remember reading anything along those lines in her case at some point?

A.     Yes.

Q.     Do you remember whether -- whether the 3 of you challenged -- raised a similar challenge in Mr. Honken's case?

A.     I don't believe so, but that's the best of my recollection.

Q.     Do you remember any discussion about whether you should raise such a similar challenge in Mr. Honken's case?

A.     I don't recall 1.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 86   Filed 12/07/11   Page 13 of 110
*to purchase a complete copy of the transcript.*

Q.     Do you recall whether there was any strategic reason for not doing so?

A.     I don't.

Q.     Do you remember in preparation for the trial considering that Mr. Honken was charged with a continuing criminal enterprise?  Do you recall that?

A.     Yes.

Q.     And are you aware of what is required by the government to prove a continuing criminal enterprise?

A.     Generally, yes.

Q.     Okay.  And the government has to prove that there is control of 5 or more people.  Does that --

A.     That's right.

            MR. WILLIAMS:  Objection.  I don't think that accurately states what the law is.

            THE COURT:  I'll take it subject to the objection.  You may proceed.

Q.     Do you remember that in Mr. Honken's case that there were exactly 5 people that were alleged to have been controlled by him?

A.     That is my recollection today, yes.

            MR. WILLIAMS:  Again, I'd object.  I think it misstates what the record and what the charges are.

            THE COURT:  So noted.

Q.     Do you recall whether there was any investigation

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 86   Filed 12/07/11   Page 14 of 110

to show -- that was conducted by defense counsel, your team -- to show whether or not Jeff Honken, Mr. Honken's brother was, in fact, controlled by him or not?

A.    Yes, generally.

Q.    Generally, you remember that?

A.    Yes.

Q.    Maybe I -- let me rephrase the question.

A.    I do recall that we inquired and tried to determine Jeff's role in the family and his interaction with Dustin in particular.

Q.    Okay.  At some point, did you interview Tim Cutkomp?

A.    Yes.

Q.    Do you remember if that was in person or by phone?

A.    In person is the 1 I recall most specifically.

Q.    Do you remember whether you asked him any questions about Jeff's role in the conspiracy during that interview?

A.    I don't believe that was an issue in the interview that I had with him.

Q.    Do you recall interviewing any other witnesses yourself and inquiring as to Jeff's role in any conspiracy?

A.    No.  I think that my interest in Jeff was

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 86    Filed 12/07/11    Page 15 of 110

primarily in looking into the family dynamics of the
Honken family for the mitigation phase.

Q.      Okay.  Okay.  So let's talk about the mitigation
phase.  So who was primarily responsible on the team for
preparing for the penalty phase, leading up to the
trial?

A.      Me.

Q.      Okay.  And at some point you hired a mitigation
specialist?

A.      Yes.

Q.      And how did that come -- what's her name, first
of all?

A.      Lisa Rickert, from Madison, Wisconsin.

Q.      How did it come about that she was hired?

A.      To the best of my recollection, we had been
recommended to a mitigation specialist in the Chicago
area, and she was unavailable, and I think perhaps she
recommended Ms. Rickert to us.  And Ms. Rickert was
interviewed.  We became familiar with some of her work
product and past experience in capital cases and felt
comfortable with both her experience and her aptitudes,
and I think that's how she was chosen.

Q.      And again, just to be clear, were you the member
of the team who was working most closely with her
leading up to the trial?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 86    Filed 12/07/11    Page 16 of 110
*to purchase a complete copy of the transcript.*

A.      Yes, I think -- maybe Mr. Rogers may have had some experience with her and may have had some early involvement with her, but I was primarily responsible for working with her.  And I met with her a couple of times in Madison and kept abreast and received memos from her.

Q.      And how about Mr. Parrish, how involved was he with her work early on in the preparation?

A.      I don't recall that -- other than in being kept informed, he may have had some meetings with her because he had worked with Dustin for so long, and also had, obviously, a lot of work product that she may have obtained through Mr. Parrish.  But I'm sorry to be vague, but I think primarily he had known Dustin, had worked with him a long time, and knew a lot of the dynamics of that relationship, both criminal and otherwise.

Q.      And at some point, you had Mr. Honken evaluated by a neuropsychologist --

A.      Yes.

Q.      -- is that correct?  And who was that?

A.      Michael Gelbort.

Q.      How does that decision come about, to have Mr. Gelbort examine Mr. Honken, if you recall?

A.      I don't remember the specifics of that, as to who

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 86   Filed 12/07/11   Page 17 of 110
*to purchase a complete copy of the transcript.*

recommended Mr. Gelbort.  It might have been through other capital counsel who had worked with him or maybe through Ms. Rickert.  I was not personally familiar with him, so it had to have come from a recommendation from somewhere else.

MR. NOLAN:  Your Honor, could I have a moment with counsel?

THE COURT:  Sure.

(Counsel conferred.)

MR. NOLAN:  Your Honor, I'm going to see if I can use this ELMO over here.

THE COURT:  All right.

MR. NOLAN:  Thank you.

Q.    Mr. Spies, I'm going to ask you some questions about the timing and the timeline of the requirements to disclose your experts to the government pretrial.  Do you recall that there was some issue about the timing of what you had to disclose and when you had to disclose?

A.    Yes.

Q.    And what's your general recollection of that, of those issues that came up during the case?

A.    Well, the issues that we, as trial lawyers, face generally, and specifically in this case, we had a lot of material, a lot of deadlines.  Judge Bennett was both at times flexible and forgiving in our rushing to meet

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 86    Filed 12/07/11    Page 18 of 110

deadlines or exceeding them, but --

Q.    And do you recall what the original deadline was for the disclosure of your experts?

A.    I don't.

Q.    Okay.  I'm going to show you a joint proposed scheduling order.  Oh, you've got that up on the screen there too.  That's great.

Can you see the notation for October 14th?

A.    I can.

Q.    And what is that?

A.    That's the deadline for defense motions to dismiss, motions in limine, to suppress, or to challenge evidence under Rule 104.

Q.    And were you familiar at the time that Rule 12 would also require that to be the time when you would disclose expert declarations -- or expert intentions, I guess, to the other side?

A.    Yes.

Q.    And at some point that deadline was moved.  Do you remember that?

A.    That's my best recollection, yes.

Q.    And do you recall that the government at 1 point filed a motion to preclude expert testimony?

A.    Now that you mention it, yes.

Q.    And do you recall when that was filed?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 86    Filed 12/07/11    Page 19 of 110

A.     No.

Q.     I'm going to show you this and see if I can find -- the date's very hard to read on this.  For the record, this is Docket Number 165.

       Can you see what that motion is?

A.     I can.

Q.     Can you just read it into the record, what the title is?

A.     It's a Motion to Exclude Expert Evidence from the Defense on the Issue of Mental Disease, Defect, Or Condition at Trial or Penalty Phase.

Q.     And the date is on the second page.  It's very faint.  If I tell you for the record that that docket indicates that's November 21st of 2003, does that seem about right?

A.     Yes.

Q.     And do you recall at some point Judge Bennett denied that motion?

A.     That's my recollection, yes.

Q.     And I'm sure you don't remember the exact date of that, so I'm going to show you his order.  Can you see that order?

A.     Yes, I can.

Q.     And on the second page, can you see the date of that?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 86   Filed 12/07/11   Page 20 of 110
*to purchase a complete copy of the transcript.*

A.      January 21, 2004.

Q.      Okay.  And then at some point thereafter, you filed a -- kind of a general notice of intent to put on mental health evidence.  Do you remember that?

A.      I generally remember that, yes.

Q.      Okay.  And for the record, that's Docket Number 231, and I'll show you that motion now.

        Can you just read the caption of that --

A.      Yes, Notice of Intent to Offer Expert Testimony.

Q.      And just moving down, is that your name on 1 of the signature lines?

A.      It is.

Q.      And what's the date?

A.      March 19, 2004.

        MR. NOLAN:  I'm sorry, Your Honor, may I just have a moment?

        THE COURT:  No problem.

        MR. NOLAN:  Excuse me 1 second.

        (Brief pause.)

Q.      And do you recall at some point that another pretrial scheduling order was issued by the Court, a modified order?

A.      I will agree that probably did occur, yes.

Q.      All right.  And I'll show you -- can you just read for the record what the caption is here?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 86   Filed 12/07/11   Page 21 of 110

A.      Pretrial Scheduling Order.

Q.      And can you read that notation June 14, 2004?

A.      Defense Designation of Expert Witnesses (Guilt Phase and Mitigation Factor Penalty Phase).

Q.      And when you got the scheduling order, what did you take this to require of you?

A.      To, as to that deadline, designate any expert witnesses we intended to call at either the guilt phase or the penalty phase.

Q.      Do you recall that at some point you filed a motion to extend that deadline?

A.      That's my recollection.

Q.      And I'll show you that motion.  Can you see this motion?

A.      I can.  It's entitled Motion to Extend Deadline for Designation of Expert Witnesses.

Q.      And when do you ask that it be extended until? You can see I've underlined it there for you.

A.      June 16, 2004.

Q.      And then do you recall at some point the government filing an additional motion to preclude expert testimony?

A.      I don't specifically recall that, but I'm sure the record will bear that out.

Q.      Just so we can -- I'm just trying to get the

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 86    Filed 12/07/11    Page 22 of 110

timeline clear for the record, Your Honor.

Can you see this?

A.    Yes, it's entitled Government's Motion to Exclude Expert Evidence from Michael Gelbort.

Q.    I don't know if you can see -- and can you see the date that that was filed?

A.    June 22, 2004.

Q.    And can you just read for the record that paragraph that begins "The defendant's conduct"?

A.    "The defendant's conduct in providing this extremely late notice, in violation of the Federal Rules of Criminal Procedure and this Court's order, is the latest in a long pattern of dilatory conduct by the defendant in this case."

Q.    Okay.  And do you recall, Mr. Spies, that thereafter there was a -- there was a hearing in front of Judge Bennett?

A.    On this issue?

Q.    Regarding this and other issues.

A.    I'm sure there was.

Q.    And I imagine you don't remember the date, so I'll show you the front page of that transcript.  Could you just read that for the record?

A.    "The hearing held before the Honorable Mark W." -- I'm sure, Bennett.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 86    Filed 12/07/11    Page 23 of 110
*to purchase a complete copy of the transcript.*

Q. Oh, I'm sorry. It's cut off there. No, nope -- oh, there it is, yeah. This is 1 of those bad published jobs. I apologize. I just wanted you to read the date there.

A. It could have been me.

"The Honorable Mark W. Bennett, Chief Judge of the United States District Court for the Northern District of Iowa, at the Federal Courthouse, 320 6th Street, Sioux City, Iowa, July 1, 2004, commencing 1:33 p.m."

Q. Does that sound about right, when you had that argument on a lot of these issues before the Court?

A. That sounds about right, yes.

Q. When were you scheduled to start jury selection?

A. I don't remember.

Q. How -- roughly how long after that?

A. Shortly thereafter.

Q. Okay. And do you recall that at -- you know, at some point during that hearing, the -- the Court gave you some additional time with which to provide notice to the government regarding expert testimony at the penalty phase?

A. That's generally my recollection.

Q. Okay. And I'm going to show you Page 91 of this transcript. I'm sorry, it's still that -- I don't know

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 86   Filed 12/07/11   Page 24 of 110
*to purchase a complete copy of the transcript.*

how that happened.

See that -- if you can just read right here where my finger is?

A.    Yes.

Q.    What does the Court say there?

A.    The Court says, "Why don't we do this.  How about July 21st?  I'm giving you more time than you asked.  But you know what?  If you don't disclose it by July 21st and you don't have an incredibly impressive reason, that's going to be it.  Is that fair?"

Q.    Does that refresh your recollection as to the -- the series of events and how they went down?

A.    I can recall the sighs of relief.

Q.    I'm sorry, "sighs of relief"?

A.    Yes.

MR. NOLAN:  Excuse me, Your Honor.  I'm going to go back.

(Counsel returned to counsel table.)

Q.    Mr. Spies, do you recall -- excuse me 1 second.

(Brief pause.)

MR. NOLAN:  Could I have the computer version put up on the screen?

(Law clerk complied.)

MR. NOLAN:  Thank you.

Q.    So, Mr. Spies, you recall at some point that Dr.

Case 3:10-cv-03074-LTS-KEM    Document 86    Filed 12/07/11    Page 25 of 110

Gelbort saw Mr. Honken?

A.    Yes.

Q.    And I'm showing you what's been marked P-11.  Can you identify what that is for the record?

A.    This is a report authored by Dr. Gelbort following his neuropsychological evaluation of Mr. Honken on July 19, 2004.

Q.    Okay.  So what day did Dr. Gelbort see Mr. Honken?

A.    According to the exhibit you have in front of us, it was July 19, 2004.

Q.    And does that sound about right, from your memory of the series of events?

A.    As nearly as I can recall, that sounds about right.

Q.    And do you see on the top of that document there are 2 dates, which are fax dates?  What are those?

A.    The first is July 21, 2004, at 4:53 p.m., and the second appears to have come from Mr. Parrish's office, July 22, 2004, at 3:39 p.m.

Q.    And just so we're clear, July 21st is the day your reports -- your -- your reports to the other side -- your disclosure to the other side were due?

A.    Yes.

Q.    If I could show you the last page of this report,

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 86    Filed 12/07/11    Page 26 of 110

does Dr. Gelbort indicate next to his signature -- what does he indicate?

A.    It says, "Dictated but not read."

Q.    Now, at some point, did Lisa Rickert recommend that you retain a mental health professional to evaluate Mr. Honken in terms of his life history, to evaluate him or to -- in terms of the life history that she developed?

A.    The reason I'm hesitating is that I know that that topic came up, but to be fair, I can't recall that there was a specific recommendation of a life history expert.

Q.    Okay.  Let me ask the question a different way. I didn't mean to ask a compound question like that.  Did Ms. Rickert at some point recommend that you hire a mental health professional other than Dr. Gelbort?

A.    That may be so.  I'm sorry, this morning I can't specifically recall that recommendation.

Q.    Do you recall whether Dr. Gelbort -- you had said he was hired as a neuropsychologist.  What was he asked to do, if you recall?

A.    Well, I think, as with any neuropsychologist, his inquiry would have been into any cognitive or developmental or organic problems in Dustin's mental health history.

Q. And what was your understanding about how he would test or -- test for that or make that determination?

A. Well, based on my experience, he would probably have had administered a series of neuropsychological assessments gauging Dustin's intelligence, signs of any mental disorder that would arise from brain injury or disease, as in a standard neuropsychological assessment. I don't believe that a personality assessment was administered by Dr. Gelbort, an MMPI.

Q. Did you ask him to do anything other than a neuropsychological assessment?

A. Today, I don't recall that I did or that we did. I know that there were some conversations, generally, about that and with some other people involved in the mitigation aspects, but I don't recall today.

Q. Can you see the first line of Dr. Gelbort's report?

A. I can.

Q. And what does he say in that first line?

A. "Mr. Dustin Lee Honken is a 36-year-old, right-handed, single, white male, who was referred for neuropsychological evaluation by his defense attorney, Mr. Leon Spies."

Q. Does that refresh your recollection about whether

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 86    Filed 12/07/11    Page 28 of 110
*to purchase a complete copy of the transcript.*

he was asked to do anything other than neuropsychological testing?

A.    Not according to that first line, no.

Q.    Okay.

A.    The answer is, it does refresh my recollection.

Q.    I'm sorry, I asked that question poorly.

A.    I answered it poorly too.

Q.    So other than Dr. Gelbort, did you retain any other mental health experts?

A.    Not in that sense, no.

Q.    When you say "not in that sense," could you just explain that answer for me?

A.    Well, sure.  I didn't mean to be oblique, but we conferred with other experts about the importance of mental health and the role it might play in Dustin's defense, but we didn't retain any other defense mental health experts.

Q.    And do you remember why that decision was made.

A.    To the best of my recollection, yes.

Q.    Okay.  If you could tell us why?

A.    The -- well, we were -- we were conflicted about how mental health evidence might play in Dustin's trial, and specifically, whether he might come out looking too good and not significantly impaired enough to persuade the fact finders that there was something sympathetic

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

about him. And so strategically, we were, as I said, conflicted about how the results, good or bad, might pan out.

Q. Okay. And that decision that you made, was that made after you received this report back from Dr. Gelbort?

A. Yes.

Q. So that would have been made on the same day that you were to report back to the Court, that decision?

A. Yeah, there was a flurry of activity, but we had a whole 7 hours left.

Q. Was there a discussion about whether or not you could have had Mr. Honken evaluated and that that evaluation -- the results of that evaluation would have been confidential? In other words, you would not have had to have turned those over unless you decided to use the results of those.

A. There was some conversation about that, yes.

Q. And do you remember whether or not it was considered that you should at least have him evaluated and then see what the results were and then make a determination? Do you remember considering that yourself or with counsel?

A. Well, the answer is, yes.

Q. And did you determine not to do that for some

reason?

A. As I looked back through my notes, my memory was refreshed about that. And we were concerned about turning information over to the government and triggering a counter-evaluation by government experts.

Q. Okay. I guess my question is, did you consider that you could have had him evaluated and seen what the results were and you wouldn't have had to get to that point?

A. I don't recall that specific conversation.

Q. Do you recall whether there was any discussion of the provision of Criminal Procedure Rule 12.2 that basically sets up, for want of a better word, a firewall, and that you could have -- if you decided to turn evidence over, it would have been turned over to not Mr. Williams but maybe another team of attorneys?

MR. WILLIAMS: And I'd object just to the form of the question. I don't think that 12.2 actually sets up a firewall procedure by itself.

MR. NOLAN: Well, there's case law that would say that. But in any case, why don't I rephrase the question, Your Honor.

THE COURT: Very fine.

Q. Do you recall a discussion of Rule 12.2?

A. I do not.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 86    Filed 12/07/11    Page 31 of 110
*to purchase a complete copy of the transcript.*

Q.      Did you hire -- strike that.  Mr. Spies, you said that you have been provided with the memorandum and the habeas petition that was filed by my office and reviewed that?

A.      Yes.

Q.      Have you also had an opportunity to review mental health mitigation that we have raised with this court?

A.      Yes.

Q.      Have you also had an opportunity to look at the government's expert that they hired pursuant to this current litigation?

A.      If it was in the material that you provided me, the answer's yes.

Q.      Just to go back to that decision that was made -- you may have said this but I might have missed it -- what was it precisely that you were afraid that could happen if you had ended up turning over mental health evidence to the government?

A.      Well, as I recall it today, the concern was that, as I said, it would trigger the government retaining 1 or more renowned mental health professionals that would evaluate and/or testify that Dustin was -- had personality disorders that would make him dangerous. That's kind of the general drift of it, as I recall it today.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 86   Filed 12/07/11   Page 32 of 110

Q.    And of the 3 members of the team, who was -- who was most vocal about that concern?

A.    Well, I think Mr. Rogers by virtue of his experience and familiarity with similar capital cases and the use of those experts in those capital cases.

Q.    And, Mr. Spies, in looking back and considering -- or strike that.  Are you also aware that the government's current expert has not found that Mr. Honken has antisocial personality disorder?

A.    That's what I understand from the evaluation that you provided me.

Q.    And in looking back and considering the current mental health mitigation that you've reviewed, do you feel that you should have had Mr. Honken evaluated to at least see what the results would have been before making this determination?

A.    Yes.

Q.    If you had developed the type of mental health mitigation that we showed you, that we have submitted to this Court, would you have presented that to the Court -- or to the jury rather?

A.    The answer is probably so.

Q.    All right.  I want to move to just a couple other areas very briefly.  During jury selection, who was -- which member of the team was, I guess, primarily

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 86    Filed 12/07/11    Page 33 of 110
*to purchase a complete copy of the transcript.*

responsible for raising objections or arguments related to the capital nature of the case?

A.    Again, probably, Mr. Rogers, because of his experience and familiarity with capital cases.

Q.    Do you recall that there were some arguments regarding life or death qualifications of jurors during jury selection?

A.    Generally, yes.

Q.    Were you involved in those arguments in any way, or did Mr. Rogers handle that portion?

A.    I think I was primarily spectating at that point.

Q.    And in regard to the jury instructions for the penalty phase, which member of the team was responsible for dealing with that aspect of the case?

A.    I believe that we all were, but, again, to the extent that there were issues that dealt with the capital aspects of the case, then Mr. Rogers would have been lead on that.  But we share responsibility, of course.

MR. NOLAN:  Excuse me 1 second, Your Honor, I have to find something.

(Brief pause.)

Q.    Do you recall a -- an instruction by the Court regarding a future dangerousness aggravating circumstance?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 86    Filed 12/07/11    Page 34 of 110

A.      Yes.

Q.      I know you don't recall the details of it, so maybe I'll put it up on the ELMO.

A.      Thank you.

Q.      And for the record, this is Docket Number 524 at Page 23.  You can just read that to yourself, it's previously been read into the record.

A.      Yes, I've read it.

Q.      Do you know if an objection was posed by the defense to this instruction?

A.      I don't recall if there was.

Q.      Okay.  If there wasn't, do you recall if there was any discussion about a strategic reason to not object to it?

A.      No, I don't recall that.

Q.      And the consideration of the jury instructions was all -- was done in writing to some extent and there were conferences.  How did that work, do you remember?

A.      On the issue of jury instructions?

Q.      Yes.

A.      To the best of my recollection, both the government and the defense were required to submit either joint proposed instructions or individual sets of instructions, and, of course, the Court was providing us with proposed instructions as well.  So there was a

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 86    Filed 12/07/11    Page 35 of 110
*to purchase a complete copy of the transcript.*

substantial amount of work done on jury instructions.

Q.   Would you say that there was ample time to consider and pose objections if you had an objection?

A.   The answer is, yes.  And even if there wasn't, we should.

Q.   Okay.  Just 1 other short area, Mr. Spies.  I'm almost finished.

Do you recall -- you said at the beginning that you did examine a couple witnesses during the merits phase of the trial.  Do you remember cross-examining a man by the name of Terry Bregar?

A.   I think so.  If he was the blind inmate, yes.

Q.   If -- at the time that you cross-examined him, if you knew that 2 months before his testimony that he had told the Bureau of Prisons that he had issues with his memory, would you have used that to cross-examine him?

A.   Absolutely.

Q.   If you knew that 1 week before his testimony his prison records indicated that he was on 12 different medications, including antidepressants, would you have considered cross-examining him with that evidence?

A.   Yes.

MR. NOLAN:  Thank you, Mr. Spies.  I have no other questions.

THE COURT:  Mr. Williams.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 86   Filed 12/07/11   Page 36 of 110

MR. WILLIAMS: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Spies, with regard to those last questions, there was any number of inmate witnesses who testified for the government, right?

A. Yes, there were.

Q. Defense counsel has the authority under Rule 17(c) to subpoena records from third-parties, does it not?

A. Yes.

Q. Defense counsel could have subpoenaed records, including medical records, from the Bureau of Prisons for any 1 of the inmate witnesses presented by the government, could it not have?

A. Yes, it could.

Q. Did you do that in this case?

A. Well, as I was preparing to testify last night, I recalled that there were substantial requests made, I think between us and the United States Attorney's Office, for access, but I don't recall that there was -- today, I don't recall that there was subpoenas issued to the Bureau of Prisons.

Q. And in a typical case, have you done that in other cases, where you've subpoenaed medical records on

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 86    Filed 12/07/11    Page 37 of 110

inmate witnesses?

A.     I don't recall that I have.

Q.     Okay.  I want to go back to kind of the beginning here, Mr. Spies, and just have you give a little bit more detail on your experience.  How many murder cases had you tried prior to the Dustin Honken trial in -- starting in July of 2004?

A.     I was trying to recall that as I was walking the dog this morning.  I think -- I think 9 or 10.

Q.     And how many murder cases had you handled -- not tried, but handled, been defense counsel on -- prior to the Dustin Honken trial?

A.     Probably 7 or 8, as trial counsel.

Q.     And you spoke about the fact that you had experience in handling and dealing with mental health issues in your representation of both criminal defendants and other litigants over the years, and that all predated the Dustin Honken trial?

A.     Yes.

Q.     When you were appointed ultimately to represent Dustin Honken, did you receive any training in capital litigation?

A.     I don't recall if we received any formal training.  We were given access to a wide variety of capital counsel throughout the United States to assist

Case 3:10-cv-03074-LTS-KEM    Document 86    Filed 12/07/11    Page 38 of 110

us, and we were put on -- or given access to a website that furnished us with access to capital defense strategies and legal materials, and I know in looking through my file that we exchanged e-mails and telephone conferences with other capital counsel throughout the country.

Q.     Do you remember attending any classes, continuing legal education classes or anything like that, in the area of capital litigation prior to the trial?

A.     You know, it rings a bell, but I don't recall.

Q.     Okay.  Going to these communications you had with these other people, were you assigned somebody by the Capital Resource Center?

A.     That sounds familiar.

Q.     Okay.  And that's somebody who is an expert in defending capital cases and is available to defense teams?

A.     Yes.

Q.     And you consulted with that expert throughout your litigation and representation of Dustin Honken?

A.     Yes.

Q.     Did you consult with those experts on things like the mental health defense here?

A.     Yes.

Q.     And you indicated that prior to coming here

today, you reviewed some files and e-mails and so forth. Do you know, were those files and e-mails turned over to the habeas counsel?

A.    You know, I don't recall.  I know that there was an exchange of a lot of material, and -- I don't know. I'm sorry.

Q.    All right.  You indicated on direct examination that there was, regarding the roles that each of you were going to play in the representation of Dustin Honken, that there was a time when it was decided that you would be handling primarily the penalty phase, and you indicated that that was a call made, at least in part, by Dustin Honken.  Do you remember that testimony?

A.    Yes.

Q.    And what was -- what was Dustin Honken's decision in that regard, if you recall -- as you recall it?

A.    To the best of my recollection, Dustin, I think, felt -- Mr. Honken felt more comfortable with me handling that aspect of the case.  He thought that I might be somewhat more persuasive with the jury on issues relating to his family and being able to, I guess, convey some of the more convincing aspects of the mitigation to the jury.

Q.    And you had a pretty close relationship ultimately with Dustin Honken during the trial, did you

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 86    Filed 12/07/11    Page 40 of 110
*to purchase a complete copy of the transcript.*

not, sir?

A.    I did.

Q.    And he was pretty actively involved in talking with you about how to present the mental health -- I'm sorry, how to present the mitigation case, wasn't he?

A.    The answer is, yes, he was actively involved in all aspects of the litigation, but he had some strong preferences about mitigation, yes.

Q.    What was his preference with regard to the mental health presentation?

A.    To the best of my recollection, he was concerned about how he would appear.  I mean, I'm sorry to be vague about that, but I don't want to say something that I can't specifically recall.  But he was concerned about his image.

Q.    Sure.  I mean, generally speaking, he did not want to have anything come off making him look like he was mentally ill, did he?

A.    I don't recall that he specifically did or did not.  I'm sorry.

Q.    All right.  Did he make decisions on who to call or not call as witnesses during the mitigation phase?

A.    He was involved in those decisions.

Q.    All right.

A.    I don't think he exercised any vetoes, to the

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 86    Filed 12/07/11    Page 41 of 110

best of my recollection.

Q.    Okay.  How about, for example, with his -- the mother of 1 of his children, Kathy Rick?  Did he have a preference not to call her as a witness?

A.    That rings a bell.  I'm sorry, I don't specifically recall.

Q.    And there was other witnesses like that, other family members, perhaps, that he would -- had a strong preference that you not call in the mitigation?

A.    That's my recollection.

Q.    Okay.  Counsel talked with you about their first claim, and that is the objecting to the findings from the judgment, from the 1998 conviction, and your response was you recalled a discussion about that vaguely.  And then the question was, did you have any strategic reasons not to object to it.  And you said, no.  We didn't really get an answer from you though on what was your -- what was the discussions you and other counsel had about whether you should or shouldn't be objecting to that judgment coming in?

A.    You know, Mr. Williams, I can't recall the specifics of it, and it's -- I can recall the discussion.  I can't recall the contents.  I'm sorry.

Q.    That's all right.  Do you recall, was there a lengthy discussion?  Was it -- I mean, do you -- give us

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

what you can, Mr. Spies.

A.      Sure.

Q.      Do you remember anything at all about the discussion?

A.      Yeah, you know, I hate to be accused of being evasive, but I really -- I can't give you the specifics. I almost can recall it happening in the courtroom, and maybe having you involved in the conversation. But to the best of my abilities, I -- I'm just baffled about the specifics. I'm sorry.

Q.      Fair enough. Fair enough. By the way, going back to the presentation of the mitigation case, do you remember you presented Marvea Smidt as a witness?

A.      Yes.

Q.      Okay. And prior to presenting her as a witness, did you prepare her for her testimony?

A.      Yes.

Q.      And what do you recall about when and how long you spent preparing her for her testimony?

A.      To the best of my recollections, we had, of course, spoken by phone. We were housed at a hotel in Sioux City, and we had a conference room where we met with witnesses, and, to the best of my recollection, we would have met with her there. That's the best of my remembrance on that.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 86   Filed 12/07/11   Page 43 of 110

Q.      Okay.  And let's explore that just a little bit, Mr. Spies.  You had met Ms. Smidt, I take it, kind of from the beginning of the case -- or at least from the beginning of the trial you had had contact with her.

A.      Yes.

Q.      Had you met her before the trial?

A.      So much as I can recall, yes.

Q.      And just give the Court an idea.  How many times do you think prior to the trial you would have had either phone contact with her or in-person contact with her?

A.      I don't know specifically how often, but I know that she was actively involved in our efforts to negotiate a resolution of the case, because I think that her input on that was important to us and it was important to Mr. Honken.  So there was -- there were times we were having a lot of contact with her, especially during that flurry of activity.  Of course, Ms. Rickert was in contact with her pretty frequently, and so through Lisa, I was -- through Ms. Rickert, I was getting information about Ms. Smidt.

Q.      And do you recall, prior to trial, had you had a discussion either over the phone or in person with Ms. Smidt that it was possible or even likely that you were going to call her as a witness during the penalty

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 86   Filed 12/07/11   Page 44 of 110
*to purchase a complete copy of the transcript.*

phase?

A.      Yes.

Q.      And as the trial progressed, did you have continuing conversations with her from time to time in which you talked about the fact that she was going to be a witness at the penalty phase?

A.      That is my recollection.

Q.      And the same questions, I guess, with Alyssa Nelson, Dustin Honken's sister.  Had you talked to her well in advance of trial about her testifying during the penalty phase?

A.      I believe so.

Q.      And had you had contact with her, both before trial and during trial, on numerous occasions?

A.      Yes.  And, again, not only about trial testimony but her input with Mr. Honken about negotiations.

Q.      You were asked some questions about 1 witness, Terry Bregar.  And you recall in preparation for his testimony you had reviewed in depth, I'm sure, his report of interview, his grand jury testimony, his testimony during the 1978 [sic] sentencing.  You had reviewed all those materials in preparation for your cross-examination of him, correct?

A.      Yes.

Q.      All right.  And fair to say that his rendition of

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 86   Filed 12/07/11   Page 45 of 110

events was consistent from the interview, through grand jury, and through the 1970 -- yeah, 1998 sentencing hearing. His testimony was pretty consistent throughout that time period?

A. I don't remember the specifics of it, other than just, yeah, generally, yes, I don't think there were any surprises in his testimony.

Q. You were asked some questions about the investigation into the relationship between Jeff Honken and Dustin Honken. Do you recall those questions?

A. Yes.

Q. Okay. And your answer was, yeah, that had been investigated. You and Lisa Rickert had looked into the family relationship and dynamic and the relationship between Dustin Honken and Jeff Honken, correct?

A. Yes.

Q. Okay. And during the penalty phase, you actually presented some evidence of that. Do you recall that?

A. Yes.

Q. For example, you had some testimony from Marvea Smidt about Jeff always being the alpha dog. Do you remember that phrase being used?

A. Yes.

Q. Okay. And that was the product, if you will, of the investigation that was conducted in advance about

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 86    Filed 12/07/11    Page 46 of 110

that relationship, wasn't it?

A.    Yes, it was.

Q.    Now, do you recall, you said earlier in your testimony Lisa Rickert would provide you with memorandums of interviews and other summary memoranda?

A.    Yes.

Q.    And I understand that, to a certain degree, you relied upon the accuracy of that information from Lisa Rickert in order to prepare for trial, right?

A.    Yes.

Q.    Okay.  And are you aware whether those same materials are the materials upon which the current experts hired by habeas counsel are relying, at least in part, in rendering their opinion?

A.    I don't know that.

Q.    All right.  Let's talk a little bit about the mental health mitigation evidence here.  First of all, you were aware, of course, that Dustin Honken was evaluated in 1997 at the Bureau of Prisons by a psychiatrist?

A.    Yes.

Q.    And you had that in your file back when you were, you and the other counsel, were struggling with this decision whether to present a mental health defense, were you not?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 86    Filed 12/07/11    Page 47 of 110
*to purchase a complete copy of the transcript.*

A.    I'm sure we were, yes.

Q.    And you're aware that that diagnosis had him as adult antisocial behavior?

A.    Yes.

Q.    Now, are you familiar with the DSM-IV-TR designation for what it takes to be an antisocial personality disorder diagnosis?

A.    I'm sure I was back then, --

Q.    Okay.

A.    -- yes.

Q.    Do you generally recall that in order for that -- for any psychiatrist or psychologist to give that diagnosis, 1 of the requirements is it has to have some indication of an onset prior to a certain age.  It's like 13 or 14 years old.

A.    I'll have to take your word for that.

Q.    All right.  You would agree with me that there was significant evidence in this case of Dustin Honken engaging in antisocial behavior, right?

A.    Yes.

Q.    All right.  And, in fact, if we looked at the DSM designation for antisocial personality disorder, do you recall it well enough to agree with me that he fits almost everything except for the onset of that -- of this disorder prior to the age of 13?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 86    Filed 12/07/11    Page 48 of 110
*to purchase a complete copy of the transcript.*

MR. NOLAN: Objection, Your Honor. He's not an expert in that area.

THE COURT: I'll let you testify as to a lawyer's interpretation of that.

Q. And let me rephrase, because I didn't mean to put you in a spot of being an expert. I'm asking if you recall from the various factors for the DSM that there was evidence that would support those except for the timing of the onset of these indicators.

A. I'm sorry, I'm not familiar enough with the factors as we sit here today to tell you that he does or does not conform to those diagnostic criteria.

Q. Okay. And let's put the diagnostic criteria aside. You recognize that there's a significant risk at trial that, whether he fit the designation under the DSM or not, any psychiatrist or psychologist that was going to testify about Dustin Honken was going to be probed significantly about his antisocial behavior as an adult?

A. Yes.

Q. And that was a significant risk that you were going to run if you presented any mental health defense in this case, right?

A. Yes.

Q. And 1 of the other things you mentioned, Mr. Spies, is you were concerned that there was going to

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 86   Filed 12/07/11   Page 49 of 110

be some good things that were going to come out about Dustin Honken's mental health that may outweigh any bad things that would be mitigating?  Do you remember saying something to that effect?

A.    Yes, and that was a considerable point of discussion.

Q.    Yeah, and, for example, he came off very intelligent, right?

A.    Yes.

Q.    And you're aware that he tests well above the average intelligence rating, right?

A.    Yes.

Q.    You got some of that both from dealing with him personally but you also got it from the neuropsychological report by Dr. Gelbort, right?

A.    We did.

Q.    And, in fact, that neurological evaluation by Dr. Gelbort, what was your assessment of the -- his findings?

A.    My recollection, as nearly as I can recall, is that Dustin -- that Mr. Honken tested well on intelligence measures.  There was some indication that he may have been a lot smarter before than he was then at the time of his evaluation; and that there weren't any areas of significant impairment, as nearly as I can

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 86    Filed 12/07/11    Page 50 of 110

recall.

Q.     And when you -- when you retain a neuropsychologist for testing, you indicated earlier in your testimony that you're expecting them to test for cognitive disabilities and things like that, right?

A.     Yes.

Q.     And you know from your experience, Mr. Spies, that the use of controlled substances can affect cognitive functioning, right?

A.     Yes.

Q.     And when you hire a neuropsychologist, you're assuming that that neuropsychologist is also aware that the use of controlled substances can affect cognitive abilities, right?

A.     Of course, yes.

Q.     And you would expect a neuropsychologist to take that into account in assessing the neural abilities or the cognitive abilities of a patient, right?

A.     Yes.

Q.     And, in fact, you recall in Dr. Gelbort's report, he has a small section where he actually talks about drug use by Dustin Honken?

A.     Yes.

Q.     Would you have expected Dr. Gelbort, as an expert, as a neuropsychologist, to consider and take

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM     Document 86     Filed 12/07/11     Page 51 of 110

into account whether the drug use by Dustin Honken might have affected his cognitive abilities?

A.     Yes.

Q.     You indicate in your direct examination that you did not retain any other mental health experts but you conferred with other experts, and then I couldn't write down the rest of what you talked about fast enough, so I want to go back to that.

Do you recall mentioning that you conferred with other mental health experts?

A.     Yes.

Q.     Why don't you explain to the Court, what did you and other counsel do with regard to conferring with other mental health experts?

A.     Well, I didn't mean to say that we spoke with other mental health experts, but we talked -- I know I talked with Mark Cunningham, who we were going to have testify about the conditions of confinement and, by inference, the issue of future dangerousness. And I know that I talked with Mr. -- or Dr. Cunningham about Mr. -- about Dr. Gelbort's report and some of the strategies. We also conferred with other capital counsel about the mental health issues.

Q.     Let's take these kind of 1 at a time. What do you recall Dr. Cunningham's advice or response was when

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM     Document 86     Filed 12/07/11     Page 52 of 110

you talked to him about Dr. Gelbort's report and whether you should be presenting more of a mental health presentation during the mitigation phase?

A.     You know, I -- I don't mean to dodge your question.  I don't recall too much of the specifics of the conversations, other than having gone over some notes last night.  And my recollection from those notes is that we talked about the pros and the cons of putting on mental health evidence, specifically, Dr. Gelbort's findings.  And I think that -- again, from the recollection of my notes -- that there was a decision that it would either not be helpful or, again, could backfire on us strategically.  That's just my general recollection from some old notes.

Q.     Okay.  And then I say that you conferred with capital counsel as well.  Do you recall who the capital counsel were that you conferred with?

A.     You know, I remember looking at the e-mail last night, and, I'm sorry, I don't remember.

Q.     Okay.  What do you recall about what the advice was that you got from capital counsel about this issue?

A.     Again, that there would be some downsides to putting on mental health evidence if Dustin looked too good.

Q.     Do you remember what -- the bottom line advice

you got from them?  Did they get to the point of saying, *Yes, you should do it*, or, *No, you shouldn't do it*?

A.     No, I don't think they were that forthright about making those sorts of judgments, but I think that the consensus was that there was -- that the risks would outweigh the benefits --

Q.     Okay.  And --

A.     -- based on what we knew then.

Q.     Right.  And you used the word "judgments."

MR. NOLAN:  I'm sorry, could I just object to "the consensus"?  By whom, I guess is my question.  I think that's a vague -- a vague answer for the record.

THE COURT:  You could bring that out if you have further questions.

Please proceed.

MR. WILLIAMS:  Thank you.

Q.     And, Mr. Spies, I'll save Mr. Nolan the time. Could you elaborate on that?  When you say it was a consensus, who was it a consensus with, if you recall?

A.     Well, again, to the best of my recollection from my notes, is that I shared these conversations and e-mails with Mr. Parrish and Mr. Rogers, and I think Mr. Honken as well.

Q.     And was it -- was the consensus you were talking about also a consensus with regard to whoever it was

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 86   Filed 12/07/11   Page 54 of 110

that you can't remember the name of, capital counsel that you were consulting with? Was that part of the consensus there?

A. I don't know that he was in on the conversation. My recollection was that it was an exchange of e-mails between him and me or him and me and Mr. Rogers, but he wasn't involved in the conversation between Mr. Parrish and Mr. Rogers and Mr. Honken and me, among us.

Q. And you indicated you specifically consulted with Dustin Honken in this decision whether to or not to present mental health evidence during the mitigation phase?

A. That's my recollection, but I'm trying to fix, you know, the date and where Mr. Honken was at that time, if he was in Des Moines at that time or if he was up in Sioux City. I don't recall specifically.

Q. You indicated that there was some discussion about having Dustin Honken evaluated but not disclosing the results. Do you recall what that discussion was?

A. You know, other than what I told Mr. Nolan, that there was concern that evidence we obtained in the evaluation of Mr. Honken would be disclosed to the government and thereby triggering an evaluation by government experts.

Q. Now, you indicated on direct examination that, in

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 86    Filed 12/07/11    Page 55 of 110

hindsight, you now believe you should have had him evaluated without disclosing the information to the government and then made an assessment about what to do about his mental health.  Do you remember that testimony?

A.     Yes.

Q.     All right.  Now, at the time you were making this decision back in 2004, you'd agree with me that Rule 12.2(b), which deals with the disclosure of expert evidence in a capital case, was very new?

A.     Yes, it was, certainly new to me.

Q.     And you would agree with me that there is virtually no case law on what was going to have to be disclosed and what would not have to be disclosed in a capital case with regard to expert information obtained by the defense?

A.     I can't say that, because I don't recall that I inquired into the case law or delved into it at that point.

Q.     Do you recall, Mr. Spies, at the time that you and the other counsel are talking about this, that there was a concern, even if you can't recall the case law, that there was a concern back then that you didn't know the answer, you didn't know what was going to happen if you went and had him evaluated, what the government

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 86   Filed 12/07/11   Page 56 of 110

would or would not have access to?

A.    The answer is, I don't know.  I just know that there was concern about, as I said, this information getting to the prosecution and then it, again, triggering an evaluation by government's experts.

Q.    You were asked, I guess, the ultimate question here, and that is, you know, do you feel that you should have presented the evidence that habeas counsel has now developed in this case.  And in response, there was a hesitation, and then you answered, "Probably."  Do you recall that testimony on direct?

A.    Yes.

Q.    Okay.  First of all, why did you hesitate in answering that?  And why is the answer "probably" versus "yes" versus "no"?

A.    Well, I don't mean to come across as a bad witness, but, you know, as I -- as I try to construct, you know, what I would have done then and putting it in the context of what I know now, every time you consider what witnesses you are going to present in a trial, you consider not only the evidence itself but, significantly, its impact on the finders of fact.  And we knew that we were in a conservative part of the state, where the jury panel and jurors had been chosen from what we consider to be a very conservative part of

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 86    Filed 12/07/11    Page 57 of 110
*to purchase a complete copy of the transcript.*

the state's population. And what would sell to those finders of fact and would not seem -- would not undercut other potential evidence was an important consideration. And I know from my experience in trial that jurors are often skeptical of experts and mental health defenses in general. So that all would have gone into the mix. On the other hand, I know that capital cases are a different breed of animal, and this was my first capital case, my only capital case. So maybe it was -- maybe the balance should be shifted more toward presenting mental health evidence regardless of how compelling or persuasive it might have been to a conservative jury.

Q. And you said "maybe," right?

A. Right.

Q. Yeah.

A. So that, I guess, distilled down, means "probably."

Q. Yeah, it's kind of -- it remains even today a tough judgment call, right?

A. Yes.

Q. And a judgment call that counsel has to make in the heat of battle, in the -- knowing everything you know about the -- how the trial's been tried, what the evidence is, what the jury's like, how they're reading the evidence, right?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 86    Filed 12/07/11    Page 58 of 110

A.    Yes.

Q.    Okay.  Do you recall that 1 of the -- 1 of the factors that went into the decision of whether to present mental health testimony or not at trial was whether it was going to be consistent or inconsistent with the guilt phase presentation?

A.    Yes.

Q.    Okay.  Now, you can present mental health mitigation evidence that generally says the person suffers from some type of mental problem, have some sympathy and don't impose the death penalty, and divorce it from their state of mind at the time of the offense, right?

A.    Generally, yes.

Q.    Okay.  And there's also mental health defense [sic] that you can -- or evidence you can present in the mitigation phase that purports to opine about the ability of the person to make judgment calls and make decisions at the time of the offense, right?

A.    Yes.

Q.    And if you present that type of evidence, you run a risk of inconsistency if your defense at the guilt phase was he didn't do it, right?

A.    There would be a, yeah, I guess, a naturally occurring inconsistency, but on the other hand, 1 of our

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 86    Filed 12/07/11    Page 59 of 110

mitigating factors was residual doubt and -- yeah, but, I mean, the circumstances of the offense would always have a bearing, as I understood it, on the mitigation phase.

Q. Right. And let's talk about that residual doubt mitigator. For residual doubt -- for the jury to find residual doubt, basically what you're counting on then is, even if they haven't completely decided that the defendant's not guilty, there may be some hesitance, some remaining unreasonable doubt, I guess, that he may not be guilty, right?

A. Yes.

Q. Okay. So if you're counting on this -- and in this case, you did, right?

A. Yes.

Q. If you're counting on that during the mitigation phase, hoping the jury finds that, you don't want to present anything during the penalty phase that would come across as an admission by the defense that he did it but we've got an explanation for why he did it, right?

A. Yes.

Q. Now -- and part of your work in making some decisions about what to present and what not to present in evidence during the mitigation phase, you relied on

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 86    Filed 12/07/11    Page 60 of 110

Lisa Rickert to provide that kind of information to you, at least in part, right?

A.      Yes.

Q.      Okay.  And, Mr. Spies, I'm going to put up here on the screen a letter dated May 4, 2004, to Mr. Alfredo Parrish and Charlie Rogers.  And do you see that it's from you?

A.      Yes, I do.

Q.      Okay.  And in --

THE COURT:  Does that have an exhibit number?  I'm sorry.

MR. WILLIAMS:  Yes, it does.  Exhibit P. I'm sorry, Your Honor.

THE COURT:  P?

MR. WILLIAMS:  P, as in "Peter."

THE COURT:  Okay.  Thank you.

MR. WILLIAMS:  Thank you.

Q.      And you agree with me that you wrote to -- you wrote to Mr. Parrish and Mr. Rogers.  In the second paragraph, you said, "In speaking frankly about the mitigation potentials in this case, Lisa has concluded that she has been unable to identify very much that is sympathetic about Dustin."

A.      Yes.

Q.      And then you go on in this letter to indicate not

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM   Document 86   Filed 12/07/11   Page 61 of 110

only is there not much sympathetic, but there's actually things she's found that's even worse that the government doesn't know about, right?

A.     Yes.

Q.     Including a scheme to kill 1 of his accomplices after the car theft in 1986?

A.     Yes.

Q.     Including his rape of a woman he was dating in college?

A.     Yes.

Q.     I'm going to show you what's been marked as Government's Exhibit Q as well.  And this is another letter going back to February 3rd -- I'm sorry, February 5, 2003; again, from you to Mr. Parrish and Mr. Rogers.  Do you recognize that letter, sir?

A.     I do.

Q.     Okay.  And this is 1 that is being sent at a time when the defense team is trying to make a decision whether to make a presentation to the Department of Justice Capital Case Review Committee about whether to approve or not approve this case for capital litigation, correct?

A.     That's right.

Q.     Okay.  And part of what you were conveying here is that Ms. Rickert confirmed for me that during her

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM     Document 86     Filed 12/07/11     Page 62 of 110

3 days of meetings with Dustin, she really obtained nothing that would be worth submitting to the Department in its consideration of whether or not to seek the death penalty. Is that correct?

A.    Yes, it is.

Q.    Going back to your testimony that you probably would present the mental health testimony that habeas counsel has developed in this case, you haven't actually spoken with any of these experts yourself, have you, sir?

A.    No, other than Dr. Gelbort.

Q.    Okay. You didn't sit in on their depositions that we've taken in this case, right?

A.    Of course not, no.

Q.    You don't know how they came across as witnesses, correct?

A.    I do not.

Q.    You didn't see the cross-examination of these witnesses, right?

A.    I can only imagine it. No.

Q.    And did you realize that Dr. Piasecki based her entire opinion upon a hypothetical that was provided by defense counsel?

A.    No.

Q.    Did you look at that hypothetical?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 86    Filed 12/07/11    Page 63 of 110
*to purchase a complete copy of the transcript.*

A.    Did I?  No.

Q.    In deciding what type of mental -- or what kind of mitigation case to present in this case, Mr. Spies, did you and the other counsel consider having a psychopharmacologist testify?

A.    I don't recall that we did.

Q.    Okay.  1 of the claims raised in the petition here, Claim 11, is that trial counsel was ineffective for failing to object to victim impact evidence that came in, and I want to talk to you for a few minutes about that claim.  1 of the claims is that Ronda Francis testified that the death of her brother caused her father to develop diabetes and most of the family to have high blood pressure.  And the allegation is that counsel was ineffective for failing to object to that as speculation.  Do you recall that testimony coming in?

A.    I don't specifically recall it.

Q.    Okay.  You recall though that the Federal Rules of Evidence do not apply during a penalty phase of a capital case, right?

A.    Yes.

Q.    Okay.  There was an assertion that trial counsel was ineffective for failing to object when Ms. Francis testified that Terry was always kind and loving.  Do you remember that testimony by Ronda Francis?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 86   Filed 12/07/11   Page 64 of 110
*to purchase a complete copy of the transcript.*

A.    Generally, yes.

Q.    Okay.  Why didn't you object to that testimony on the theory that it was inconsistent with evidence showing that he was mean to Angela Johnson and law enforcement officers and generally violent to other people and so forth?

A.    As I sit here today, Mr. Williams, I can't specifically recall why I didn't object to that.  I can postulate why I wouldn't have objected to it, but I don't remember specifically.

Q.    You'd agree with me that somebody can be kind and loving to family members, right?

A.    I'll concede that, yes.

Q.    And yet at the same time be mean maybe to other people, to girlfriends, to law enforcement officers?

A.    Yes.

Q.    All right.  It is alleged that you were ineffective for failing to object when Kathy Nicholson testified that the stress of Greg Nicholson's death made his father's sickness worse.  Do you remember her testifying to that?

A.    Generally, yes.

Q.    Okay.  And do you remember why you didn't object to that testimony?

A.    I don't recall.  Again, I can only speculate as

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 86    Filed 12/07/11    Page 65 of 110

to why I didn't.

Q.     You remember there was testimony at trial about Lori Duncan and how she ended up meeting Greg Nicholson. Do you remember that testimony generally?

A.     Could you repeat the question, please?

Q.     Sure.  Do you remember that there was testimony at trial about how Lori Duncan ended up meeting Greg Nicholson?

A.     Yes.

Q.     And you recall that at trial there was no evidence at all that Lori Duncan had any involvement in drug activity, was there?

A.     That's correct.

Q.     Okay.  And you recall that she ended up being introduced to Greg Nicholson through a mutual friend?

A.     That's my recollection, yes.

Q.     Okay.  And do you recall the testimony that Greg Nicholson, after he had been arrested in March of 1993, had made some strides to get away from drugs?  Do you remember that came through his wife, Kathy Nicholson -- his ex-wife?

A.     I generally recall that, yes.

Q.     Okay.  Now, you're faulted, Mr. Spies, at trial with failing to object when Robert Milbrath, Lori's brother, testified that Lori was against drugs.  And the

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 86    Filed 12/07/11    Page 66 of 110

theory is that you should have objected to that because clearly she wasn't against drugs if she was hanging out with Greg Nicholson.

Do you recall that testimony by Mr. Milbrath to begin with?

A.    No.

Q.    Do you recall making any decision whether you should or shouldn't object to that kind of testimony?

A.    You know, I can only testify about why I probably would not have objected, but I don't recall specifically in that instance.

Q.    And probably why would you not object?

A.    Well --

MR. NOLAN:  Objection -- objection, calls for speculation.

THE COURT:  I'll receive it.  You may answer.

A.    Well, generally speaking, when, you know, people are speaking about -- or testifying about their bereavement, strategically, you may not gain any points with the finders of fact by objecting, especially when people are testifying about matters that are common to the jurors, you know, why you would feel upset, why you would -- I mean, people make judgments in their lives all the time and express the emotions that they

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 86   Filed 12/07/11   Page 67 of 110
*to purchase a complete copy of the transcript.*

encounter in crisis, in times of catastrophe or sadness, that -- you know, you could object, but what would be the point of it?  Because the jurors are going to understand exactly what the witness is saying.  And furthermore, to have your objection overruled makes you look like either a bad lawyer or an insensitive 1, or both, and why do that to yourself, let alone to your client?

Q.     And let's do it this way, Mr. Spies, since -- and understandably, you don't have a specific recollection of specific testimony or what your decision was on a particular statement made by a witness during the penalty phase.  Let's do it this way.  Were you paying careful attention to the testimony by each of the witnesses the government put up during their testimony in the penalty phase?

A.     Of course.

Q.     And did you consider throughout their testimony whether to object or not to object to statements they made during their testimony?

A.     Yes.

Q.     If you failed to object to any testimony by any of those witnesses, would it have been a strategic reason that you chose not to object?

A.     Yes.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 86    Filed 12/07/11    Page 68 of 110
*to purchase a complete copy of the transcript.*

MR. WILLIAMS: Just a moment, Your Honor.

THE COURT: Would you like to take a little break and then -- I think Mr. Spies has been on for an hour and a half. We ought to give him a little break.

MR. WILLIAMS: That would be great, Your Honor.

THE COURT: All right. Let's break until 10 to 10:00.

(Whereupon, a brief recess was taken.)

THE COURT: We're continuing in Honken versus the United States. Mr. Spies is testifying. He's still under oath.

And you may proceed.

MR. WILLIAMS: I'm sorry, Your Honor, I told defense counsel -- and that's why I was pausing -- I have no further questions for Mr. Spies at this time. Thank you.

THE COURT: All right. Very fine.

Mr. Nolan, further questions for Mr. Spies?

MR. NOLAN: Yes, Your Honor. Thank you.

REDIRECT EXAMINATION

BY MR. NOLAN:

Q.    Mr. Spies, you were asked on cross-examination about Terry Bregar and his Bureau of Prisons records. Did you have any strategic reason for not subpoenaing

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 86    Filed 12/07/11    Page 69 of 110

those records?

A.     None that occur to me, no.

Q.     You indicated that there was someone from the Capital Resource Center who you consulted with from time to time.

A.     Yes.

Q.     Okay.  Do you recall whether you consulted with that person on July 21st, the day that you had to make to decision?

A.     I don't recall that, no.

Q.     Can you take a look at --

            MR. NOLAN:  I'm sorry, could we have the screen up.

            (Law clerk complied.)

            MR. NOLAN:  Thank you.

Q.     Again, this is what's been marked P-11 for identification.  Could you take a look again at that document?  Do you see the fax that's July 21, '04?  And what time was that received?

A.     4:54 p.m.

Q.     And that was the day that you had to report to the Court and to the government if you were going to present mental health evidence?

A.     Yes.

Q.     Do you recall that evening whether you had a

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 86   Filed 12/07/11   Page 70 of 110

conversation with counsel from the Capital Resource Center?

A.    I don't recall that, no.

Q.    Let me ask the question a different way to get a clear answer.  Did you have a conversation that evening with Capital Resource counsel?

A.    Not that I can remember, no.

Q.    You had indicated during cross-examination you were asked about Mr. Honken and whether he had a preference that there would be people that were not called as witnesses at the penalty phase.  Do you remember who he did not want -- want -- who he wanted you to not call specifically?

A.    No, other than from Mr. Williams's questions of me about Kathy Rick, but -- and I don't know that he did not want her called.  And again, as I sit here today, I can only remember, in general, conversations with Mr. Honken about how he wanted to be portrayed or, alternatively, who he did not want to subject to testifying at trial.

Q.    So you don't -- so you don't remember that he told you not to call Kathy Rick.  Is that your testimony?

A.    I think the answer to that question is, yes, I don't recall that.  But again, I'm not trying to dodge

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 86    Filed 12/07/11    Page 71 of 110
*to purchase a complete copy of the transcript.*

your questions.

Q. I know.

A. So to be more specific, I don't remember specifically that he said, *Don't call Kathy Rick,* and my best -- my best memory at this point is that there were misgivings about his relationship with intimates in his life, so I don't remember that he said, you know, *Don't call Kathy Rick.*

Q. Is there anybody that you wanted to call that you did not call because Mr. Honken told you not to?

A. I can't say that there was.

Q. With respect to Mr. Honken's mother, Marvea Smidt, you indicated that you had had contact with her. Do you remember meeting her in person before the trial began?

A. That is my memory, but, again, obscured by the passage of time.

Q. All right. Do you know where she lives?

A. Well, she lived in the Britt area. I think there's a car dealership that was run by her then-husband in Britt.

Q. Do you remember ever going up there and meeting with her at her home?

A. Not at her home, no.

Q. Do you remember ever meeting with her in your

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 86    Filed 12/07/11    Page 72 of 110

office?

A.    I don't remember meeting her in my office.  What stands out in my mind is maybe meeting her in Des Moines or in, of course, in Sioux City during the preparation for trial, but, you know, again, it's foggy.  I apologize.

Q.    That's fine.  And when you say "the preparation for trial," that would have been when the penalty phase started or before that, or can you remember?

A.    It would have been before that.  And again, my best recollection is that we had kind of a war room in Sioux City, where Ms. Rickert was working and meeting with people, and people coming in and out.  That's -- but, again, I apologize for the vagueness of my memory.

Q.    That's fine.  And the times that -- I know you said that Ms. Rickert had had some contact with Mr. Honken's mother regarding her possibly assisting in getting -- in getting -- helping to convince Mr. Honken to accept a guilty plea.  Is that --

A.    Yes.

Q.    Would you just explain that a little bit?

A.    To the best of my recollection, Ms. Rickert had spoken with me and with Mr. Honken's mother about, at that time, what he should consider in deciding whether to authorize us to negotiate a plea agreement or

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 86   Filed 12/07/11   Page 73 of 110

strategies to approach a plea agreement. And, again, the best of my recollection is that he was concerned about how his family would see him if we negotiated something or attempted to negotiate something. And, Ms. Rickert conferred with Dustin's mother to be in a position to assure him that whatever decisions he made were okay and, you know, not to try to influence him, other than to reassure him that she was on board with any choices he made. That's the best of my recollection.

Q. And do you remember if you had those discussions with her as well or just Ms. Rickert?

A. I believe so. And I think that I also spoke with Dustin's sister, who I think was a probation or parole officer in the Quad Cities. And again, that's my recollection, not having reviewed my notes before this morning.

Q. And is it possible that those are the only discussions you had with Mr. Honken's mother prior to the -- being in Sioux City when the trial started?

A. Prior to when?

Q. Prior to being in Sioux City when the trial started.

A. That could be.

(Brief pause.)

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM    Document 86    Filed 12/07/11    Page 74 of 110
*to purchase a complete copy of the transcript.*

A.      May I make sure that I gave you the right answer to that question?

Q.      Sure.

A.      If you're asking if I had conversations with Dustin's mother, I think that's correct.  And the reason I say that is -- I wasn't sure if you meant by "you," meaning you, "me," or you, "the defense team," because I know Ms. Rickert was having a lot of contact with her.

Q.      Okay.  So just to clarify, when I asked the question the last time, "you," I meant you, Mr. Spies.

A.      I appreciate that.  Thank you.

Q.      Mr. Williams was talking about that the team was making this judgment call regarding whether to have Mr. Honken evaluated by a mental health expert other than Dr. Gelbort.  And do you recall that that -- I believe you testified on direct examination that that was a decision that was made on July 21st?

A.      About having him evaluated?

Q.      Yes, about whether to have him evaluated by someone other than Dr. Gelbort.

A.      Oh.

Q.      When I say July 21st, I mean the day that your disclosure was due.

A.      If that's the answer I gave, then maybe I misunderstood the question.  My -- what I -- I think the

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 86   Filed 12/07/11   Page 75 of 110

decision of July 21st was -- was whether to disclose or to designate Dr. Gelbort as an expert. I don't know that the decision about whether to have any other evaluations done was a decision we made on July 21st.

Q. Do you remember when it was made?

A. I can't specifically say that, no, or whether there was a decision to have him evaluated by anyone else.

Q. Just to clarify that last part of your answer, so you said "or whether there was a decision to have him evaluated by somebody else." What did you mean by that?

A. I don't recall that there was any decision or consideration to have him evaluated by anyone else.

Q. So is it your memory that there was only consideration of using Dr. Gelbort or no 1 else?

A. I don't remember. And again, as I believe I testified earlier and had hoped to convey, that I had no personal experience with Dr. Gelbort in the past, and I can't recall today how the recommendation was made to confer with him or to consult with him about Mr. Honken. So as I sit here today, I don't know if there were other names that were under consideration or whether we had specifically discussed other potential doctors. I just don't know.

Q. And Mr. Williams was asking you a little bit

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 86    Filed 12/07/11    Page 76 of 110

about this Rule 12.2 and whether, you know, it was a new rule and there was some -- it was a little bit unclear. Do you remember that -- those questions?

A.    I do, yes.

Q.    But is it your understanding that the law was very clear, that you would not have had to turn over an expert report if you had decided not to use that evidence?  Was that your understanding of the law at the time?

A.    And now?

Q.    Yes.

A.    Yes.

Q.    And, in fact, that's what happened with Dr. Gelbort, is that right?  You didn't have to turn over his report, right?

A.    That's my understanding.

Q.    You were also asked some questions about this notion of whether presenting a mental health defense at a penalty phase may be inconsistent with a guilt phase. Do you remember those questions?

A.    Yes.

Q.    And as you said, you've reviewed documents that we've provided to you more recently, including evidence that Mr. Honken has been diagnosed with anxiety disorder, not otherwise specified, personality disorders

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
Case 3:10-cv-03074-LTS-KEM   Document 86   Filed 12/07/11   Page 77 of 110
*to purchase a complete copy of the transcript.*

with narcicisstic and borderline tendencies.  You could have presented that to the jury in a way that would not have been inconsistent with arguing that he was not guilty of the crimes at the guilt phase, could you have?

A.    Yes, could have, uh-huh.

MR. NOLAN:  That's all I have.  Thank you, Judge.

THE WITNESS:  Thank you.

THE COURT:  Mr. Williams?

MR. WILLIAMS:  Briefly, Your Honor.  I'm going to see if I can refresh Mr. Spies's recollection here a little bit.

RECROSS-EXAMINATION

BY MR. WILLIAMS:

Q.    You were asked some questions about considering other expert witnesses, other than Mr. -- or Dr. Gelbort.  You recall among the various memos that you received from Lisa Rickert was this 1 dated April 27, 2004?

MR. NOLAN:  Which exhibit is that, Mr. Williams?

MR. WILLIAMS:  It's not an exhibit.  It's 00093.

A.    I recognize that, yes.

Q.    Okay.  And on Page 6 of this, there is a

Case 3:10-cv-03074-LTS-KEM   Document 86   Filed 12/07/11   Page 78 of 110

reference at the bottom where she says "Need a neuropsychological evaluation to determine any brain damage."

A.    Yes, I see that.

Q.    Okay.  And then, actually, back on the second page, this is where she has a recommendation, "Need an expert on attachment issues/disorder."  Do you see that?

A.    I do.

Q.    Okay.  And this was, again, dated April 27, 2004. There's documents going back -- for example, I'm going to show you a document, June 9, 2003.  It's a letter, again, from you to Mr. Parrish and Mr. Spies [sic].

            MR. WILLIAMS:  It's 011270 and -271, counsel.

Q.    Do you remember this letter?

A.    Yes.

Q.    Okay.  And at the bottom here, there's a reference again, "If we decide to pursue Lisa Rickert's theory that, if guilty, Dustin's depravity was due to some psychiatric or psychological condition," and then you go on to talk about whether you should have questions in the questionnaire.

A.    Yes.

Q.    Now, does that refresh your recollection, that as far back as 2003, the idea of hiring a neuropsychologist

Case 3:10-cv-03074-LTS-KEM   Document 86   Filed 12/07/11   Page 79 of 110

and another psychiatrist was under debate among the defense team?

A.    Yes.

Q.    Okay.  And so there was consideration about hiring somebody other than Dr. Gelbort, and that's part of what you talked with capital counsel about, right?

A.    It was under consideration.  I don't recall whether we -- by "capital counsel," you mean Mr. Rogers?

Q.    Let me break that down.  I had asked you a compound question.  I apologize.

The idea of whether to hire an additional psychiatrist or psychologist, other than the neuropsychologist, was part of the discussion among the defense team, right?

A.    Yes.

Q.    Okay.  And was it also part of the discussion you had with Resource Capital [sic] counsel?

A.    At some point it was, and I don't know if it was back in 2003.

Q.    Okay.  And ultimately, at the end of the day, you decided not to hire another psychiatrist to do an evaluation?

A.    Yes.

MR. WILLIAMS:  All right.  Thank you.  No further questions.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 86   Filed 12/07/11   Page 80 of 110

THE COURT:  Anything else?

MR. NOLAN:  Yes, Your Honor.  Thank you.

REDIRECT EXAMINATION

BY MR. NOLAN:

Q.    And, Mr. Spies, is it your recollection that you made that decision, again, because you were worried about the government's experts coming back and finding that Mr. Honken had antisocial personality disorder?

A.    That's my best recollection of the decision as I sit here today.

MR. NOLAN:  Thank you.  That's all.

MR. WILLIAMS:  One last follow-up, Your Honor.

RECROSS-EXAMINATION

BY MR. WILLIAMS:

Q.    Mr. Spies, to be fair, during direct examination and I think even cross-examination you talked that there was more than just that in the decision whether to get a psychiatrist, another psychiatrist.  You said that there were a lot of factors that went in, including whether more good things will come out of that than bad things in any evaluation of Dustin Honken, how the jury would read it and so forth, right?  So there was more than just simply worrying about what the government would do?

A.    Right, and I mis -- if I misunderstood, I

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 86    Filed 12/07/11    Page 81 of 110

apologize. But I -- as far as getting anybody other than Dr. Gelbort at that point, that was our prime consideration in July of 2004. But, yeah, I mean, throughout the case, in conferring with Ms. Rickert, we talked about all sorts of possibilities of -- and experts on all sorts of issues where expert testimony might be helpful. But as far as making a specific choice about a specific doctor or a specific issue, the Gelbort matter is the only 1 that I have a specific recollection about. I'm sorry.

MR. WILLIAMS: Fair enough. No further questions.

THE COURT: Mr. Nolan?

MR. NOLAN: One more if I may, Your Honor. I apologize.

THE COURT: You always say that.

REDIRECT EXAMINATION

BY MR. NOLAN:

Q. And the decision that was made not to use Dr. Gelbort that was made on the 21st, was that decision mostly directed by this concern about the government's experts?

A. Yes.

Q. Okay. All right.

MR. NOLAN: That's all. Thanks.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 86   Filed 12/07/11   Page 82 of 110

MR. WILLIAMS:  None, Your Honor.

THE COURT:  All right.

MR. WILLIAMS:  Thank you.

THE COURT:  Thank you, Mr. Spies.

May he go back to work?

MR. WILLIAMS:  He may.

THE COURT:  All right.  All right.

MR. NOLAN:  Your Honor, that concludes the presentation of evidence on behalf of Mr. Honken.

THE COURT:  All right.  And, Mr. Williams, have you presented everything you wanted to?

MR. WILLIAMS:  We have, with the exception of Mr. Basler's testimony.  I provided last night, or I guess late yesterday afternoon, a draft stipulation regarding his testimony.  Mr. Nolan has advised me that it's acceptable, and so my plan is to go back to the office, put on a caption, and then run it by Mr. Nolan 1 more time.  And then I'll file it by ECF and we'll submit Mr. Basler's testimony by stipulation of the parties.

THE COURT:  All right.

MR. NOLAN:  And, Your Honor, obviously the stipulation would be not to its accuracy but that that's what he would testify to.

THE COURT:  I understand.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM   Document 86   Filed 12/07/11   Page 83 of 110

MR. NOLAN:  Thank you.

THE COURT:  All right.  And with that, then, I guess we are at the point where we offer exhibits and make objections to them.  I think that the easiest way to handle this is to have you make your record, and then in my written decision I will talk about what I considered and what I did not consider.  That would probably speed things up a little bit.

MR. WILLIAMS:  Very good.

THE COURT:  So can I ask -- anything else before I have Mr. Nolan start that process?

MR. WILLIAMS:  No, Your Honor.

MR. NOLAN:  The only other thing in doing this is there's going to be requests that many of these documents be sealed for various reasons.

THE COURT:  All right.  Can you make that record at the same time?

MR. NOLAN:  Sure.

THE COURT:  Very fine.

MR. WILLIAMS:  And perhaps, Your Honor -- Mr. Nolan and I and his team spent some time on this.  I think I can probably go down the list of the defense exhibits and tell you which ones I object to and what the grounds are for my objections.  There aren't that many.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 86    Filed 12/07/11    Page 84 of 110

THE COURT: All right.

MR. WILLIAMS: So if I don't mention them, we have no objection to them being admitted and considered in full by the Court.

THE COURT: All right. Then I'll just have Mr. Nolan make his general offer, and then you can make your record on which of those you object to.

MR. NOLAN: And just to -- 1 other thing that may make it easier, Your Honor, I'll do that and then he could go down the list, and then I would have some sort of general argument, because there's categories, --

THE COURT: Okay.

MR. NOLAN: -- that I could make, and it may be easier to do it -- quicker to do it that way.

THE COURT: All right. So will you make your general offer, please.

MR. NOLAN: Yes, Your Honor. So at this point we would move to have Exhibits 1 through 33 [sic] admitted.

MR. WILLIAMS: 1 to 133.

MR. NOLAN: That's what I said. Didn't I say that? 1 to 133?

THE COURT: Okay. I thought I was getting off a little easy there. 1 to 133.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

And, Mr. Williams, what objections do you have, if any?

MR. WILLIAMS:  Your Honor, we object to:

Exhibit 9 on the grounds of hearsay.

Object to 23, on the grounds of hearsay.

25, on the grounds of both hearsay and foundation, and it's an unsigned declaration by Dennis Putzier.

Object to 26 and 27 on hearsay grounds.

30, we object to on hearsay grounds.

110 through 114, we would object to on hearsay grounds.

117 through 122, we object to on hearsay grounds.

And if the Court likes, we can go through at this point and tell you which ones the parties have agreed should be sealed for various privacy reasons or otherwise.

THE COURT:  That's fine.

MR. WILLIAMS:  Okay.  And, Shawn, tell me if I get this wrong.  1, 3, 4 --

MR. NOLAN:  2.

MR. WILLIAMS:  2 as well?

(Counsel conferred.)

MR. WILLIAMS:  I guess 1 through 5 then, 7

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 86   Filed 12/07/11   Page 86 of 110

and 8, 11 through 14, 16, 18, 20 through 22, 31 through 52.

(Counsel conferred.)

MR. WILLIAMS: 53 as well, Your Honor.

(Counsel conferred.)

MR. WILLIAMS: 115 and 116, 125, and then 130 through 133.

THE COURT: So stipulated?

MR. NOLAN: Yes, Your Honor. That's by agreement.

THE COURT: All right. Thank you.

Mr. Nolan, first of all, with regard to this Number 25, which purports to be a declaration, is it just a scrivener's error that we don't have a signed 1 or --

MR. NOLAN: No, Your Honor. We have no argument with respect to that exhibit.

THE COURT: All right. So we'll just strike that 1, 25. All right. And then the rest of them, I think, are all hearsay objections.

MR. WILLIAMS: That's correct, Your Honor. And to be clear -- because, again, this is kind of an artificial setting we're in -- I'm objecting on the grounds that it's hearsay in this hearing. I understand that there are statements in there that -- that the

defense would argue that is evidence of what they should have said or what should have been presented at trial, but the fact is that these statements are hearsay about what they would have said. And so, for example, we have a declaration by some of the witnesses that testified here today. Declaration of Lisa Rickert, for example, Number 9, she testified by deposition by the agreement of the parties. She testified in deposition, was subject to cross-examination. The fact that she also then had a declaration about what she would have said during this hearing is hearsay. And so I don't think it comes in under those grounds, so I just wanted to clarify what my objection was.

THE COURT: All right. Mr. Nolan?

MR. NOLAN: Your Honor, I'll just make some general argument, if I may, and then --

THE COURT: That's fine.

MR. NOLAN: -- maybe on just a couple things I might have a specific argument. So we would argue that under Rule 7 of the rules governing 2255, Rule 7 states that affidavits also may be submitted and considered as part of the record. And in this type of a situation, obviously the Court can give the proper weight to the evidence that is presented in that fashion as opposed to evidence that is presented through live

testimony.

Secondly, we would suggest, Your Honor, that 28 United States Code Section 1746, which covers unsworn declarations, discusses some of those same issues and the reliability of unsworn declarations. Our declarations all conform with that statute, and so for those reasons as well, we would suggest that they're reliable and should be admitted.

Thirdly, just the reliability question in general, which is always what hearsay is determined on, basically, the -- many of the witnesses testified before Your Honor. They verified the accuracy of their declarations. They were cross-examined with respect to their declarations and adopted those declarations. There were even times when witnesses read a portion of their own declaration and said, yes, that portion is absolutely true. And obviously, in those situations, we would ask the Court to accept that as if it's testimony, because that's really what it is. The government had an opportunity to cross-examine them on those specifics at that time in open court.

Additionally, Your Honor, the declarations should be admitted for the purposes that they were considered by the experts. And so there are experts on both sides that considered portions of declarations, and

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 86   Filed 12/07/11   Page 89 of 110

so at least for that purpose, I guess I'm kind of going down the list of admissibility of how much weight to give it, right. So that in that aspect, the Court should accept them into the record, because the experts considered those and formed their opinions based on those. The experts obviously, in this setting or in any trial setting, can't always form their expert opinion based on the testimony in live court, because of the timing and it doesn't always work that way obviously. So that's another reason that they should be accepted in the case.

There are even portions of the declarations that maybe should be admitted as prior consistent statements or even prior inconsistent statements. Mr. Williams cross-examined at times with prior inconsistent statements. As Your Honor well knows, those are admitted for those purposes. So as you're going through them and considering them, we would ask you to keep that in mind as well.

With respect to Mr. Putzier's I guess Exhibits 26, 27, and 28, we would suggest to the Court that those are prior consistent statements, and we would ask the Court to take that into consideration when reviewing those.

Also, with respect to what Mr. Putzier had

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM   Document 86   Filed 12/07/11   Page 90 of 110

said in those documents and on the stand is that there were statements made to him by government agents. You'll recall his testimony. And we would suggest that those statements are admissible as a statement of a party-opponent as well.

And finally, we would suggest to the Court that -- this overarching notion that hearsay is admissible at a penalty phase and so that -- many of these documents should be taken in that light. And so, in other words, the Court should consider them in terms of what counsel could have presented to the jury in weighing whether or not we've proven prejudice under the 2-prong Strickland test.

And that is it. Thank you.

THE COURT: All right. And the Court will take those into consideration.

Mr. Williams, do you want to make the offer of the government exhibits?

MR. WILLIAMS: Yes. Thank you, Your Honor. The government moves to admit Exhibits A through F.

We're withdrawing G and H because they are duplicates of plaintiff exhibits.

We move to admit Exhibit I.

We're withdrawing J and K, again, because they're duplicates. Actually, to make the record clear,

we admitted already in this hearing Exhibit K.  Exhibit K is a duplicate of Plaintiff's Exhibit 5.  So I guess we don't care which 1 the Court takes.

We move to admit Exhibits L through S.

We withdraw T and U because they are duplicates of plaintiff exhibits.

And we move to admit Exhibits V and W.

Of those, we'd ask the Court seal the following exhibits:  A, I, K, L, M, O, P, Q, S, and V, as in "Victor."

(Counsel conferred.)

MR. NOLAN:  Your Honor, we have no objection to the admission of those exhibits, and we agree with the request for sealing.

THE COURT:  Very fine.

All right.  The next thing that's on our scheduling order is the Honken post-hearing brief.  And as I look at these dates -- and I don't mean to undermine my own dates, but it's December 5th. Ms. Murray and I are going to be in Sioux City trying a case all of next week, so Ms. Murray is not going to be sitting in her office eating bonbons.  She's going to be very busy with the Court.  Then we have the holiday.

So I'm just asking you, is that a realistic date, Mr. Nolan?

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 86    Filed 12/07/11    Page 92 of 110

MR. NOLAN:  You read my mind, Your Honor.  I mentioned to Mr. Williams earlier this morning that I was going to ask the Court for additional time.  I also have a capital evidentiary hearing in Delaware on December 12th, so the next month for me is going to be difficult.  My co-counsel, Mr. Kane, is actually back in Philadelphia having a baby today.  He's in the hospital right now, actually.

THE COURT:  That must be some kind of scientific miracle.

(Laughter.)

MR. NOLAN:  Well, you haven't met him, so --

(Laughter.)

THE COURT:  Yes, but Mr. Nolan, I have a biology undergraduate degree from Drake University.  I think I know a little about this.

(Laughter.)

THE COURT:  Well, in all seriousness, I -- I know there is concern about getting to this promptly, but I do not want anyone to have a heart attack trying to get this done.  So --

MR. WILLIAMS:  Your Honor, Mr. Nolan and I are also talking about this, the deadlines in this case.  And 1 thing we were talking about is, we have -- the Court has as part of its scheduling order oral arguments

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 86    Filed 12/07/11    Page 93 of 110

on this case.

THE COURT: Right.

MR. WILLIAMS: Mr. Nolan and I -- neither 1 of us are necessarily convinced that's necessary. We're willing, obviously, to do whatever is helpful to the Court. And if the Court would find oral arguments helpful, we're more than willing to come and have oral arguments. At the same time, I don't think either 1 of us are petitioning for oral arguments if the Court would not find that to be helpful. And if that's the case, I think that frees up some time and still allows us to get this case kind of submitted on the same time schedule. If we put off again all the deadlines by 30 days, I think that kind of frees up everybody. If we're going to eliminate oral argument, it doesn't really impact I think the ultimate timing of the decision in this case.

THE COURT: I think that, as I recall my schedule, I'm in a long trial during that February time period. I really, in most cases, don't gain much understanding during oral argument. I've -- by the time I get there, I've studied everything. I will in this case have read every single piece of paper and looked at all of your exhibits. And I think the record will be what the record will be, and the law is what the law is. So I have no concerns about not having oral argument. I

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM Document 86 Filed 12/07/11 Page 94 of 110

would like your briefs.

And let's do this. Will the 2 of you put your calendars together and send me a proposal as to when it's realistic for you to get your briefs in. And again, I don't want to prolong this. I'm sure that Mr. Honken is concerned about the outcome, as are the family members of those who died. But I think that we can, within reason, work around your schedules, and, of course, Patrice's schedule, because she's going to be with me.

MR. WILLIAMS: Very good, Your Honor.

THE COURT: So just submit something. I'm sure it will be fine with the Court.

MR. NOLAN: Thank you, Your Honor. I appreciate that.

THE COURT: Mr. Nolan, anything else, sir?

MR. NOLAN: No, Your Honor. Thank you very much.

THE COURT: Mr. Williams?

MR. WILLIAMS: No, thank you, Your Honor.

THE COURT: I really appreciate all the excellent work that has gone into the preparation for this hearing, all of your briefing thus far. You both -- both teams have done an excellent job and have presented things that are very helpful to the Court.

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 3:10-cv-03074-LTS-KEM    Document 86    Filed 12/07/11    Page 95 of 110

I've enjoyed having the Philadelphia team here, and I'm glad you're getting out before the snow. I hope I don't have to have you back in the middle of January or February for anything.

And, Mr. Williams, fine job, as usual.

MR. WILLIAMS: Thank you, Your Honor.

THE COURT: Thank you.

MR. NOLAN: Thank you.

(Proceedings concluded at 10:22 a.m.)

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 86    Filed 12/07/11    Page 96 of 110

C E R T I F I C A T E

I, Patrice A. Murray, a Certified Shorthand Reporter of the State of Iowa, do hereby certify that at the time and place heretofore indicated, a hearing was held before the Honorable Linda R. Reade; that I reported in shorthand the proceedings of said hearing, reduced the same to print to the best of my ability by means of computer-assisted transcription under my direction and supervision, and that the foregoing transcript is a true record of all proceedings had on the taking of said hearing at the above time and place.

I further certify that I am not related to or employed by any of the parties to this action, and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto or financially interested in the action.

IN WITNESS WHEREOF, I have set my hand this 6th day of December, 2011.


/s/ Patrice A. Murray
Patrice A. Murray, CSR, RPR, RMR, FCRR
United States District Court, NDIA
4200 C Street S.W.
Cedar Rapids, Iowa 52404

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 86    Filed 12/07/11    Page 97 of 110

**'**

**'04** [1] - 587:18

**0**

**00093** [1] - 595:23
**011270** [1] - 596:13

**1**

**1** [48] - 523:14, 529:17, 529:18, 529:20, 530:9, 530:25, 532:16, 536:22, 538:10, 538:18, 541:2, 541:9, 542:19, 549:20, 551:20, 553:6, 553:18, 554:14, 559:3, 562:17, 565:13, 566:24, 569:24, 576:2, 576:25, 579:5, 579:17, 581:7, 581:11, 585:6, 593:15, 595:18, 599:9, 600:17, 602:8, 602:19, 602:21, 602:23, 602:25, 603:21, 603:25, 604:14, 604:19, 609:3, 610:24, 611:3, 611:8
**10** [2] - 555:9, 586:7
**10-3074** [1] - 520:2
**104** [1] - 536:13
**1097** [1] - 529:6
**10:00** [1] - 586:8
**10:22** [1] - 613:9
**11** [2] - 581:8, 604:1
**110** [1] - 603:11
**1106** [1] - 529:7
**114** [1] - 603:11
**115** [1] - 604:6
**116** [1] - 604:6
**117** [1] - 603:13
**12** [2] - 536:14, 553:19
**12.2** [4] - 548:12, 548:18, 548:24, 594:1
**12.2(b** [1] - 573:9
**122** [1] - 603:13
**125** [1] - 604:6
**12th** [1] - 610:5
**13** [2] - 565:15, 565:25
**130** [1] - 604:7
**133** [4] - 602:21, 602:23, 602:25, 604:7
**14** [3] - 539:2, 565:15, 604:1
**14th** [1] - 536:8
**16** [2] - 539:19, 604:1
**165** [1] - 537:4
**17(c** [1] - 554:9
**1746** [1] - 606:3
**18** [1] - 604:1
**19** [3] - 538:14, 543:7, 543:11
**1970** [1] - 563:2

**1978** [1] - 562:21
**1986** [1] - 579:6
**1993** [1] - 583:18
**1997** [1] - 564:19
**1998** [2] - 559:13, 563:2
**1:33** [1] - 541:10

**2**

**2** [6] - 529:7, 543:17, 553:14, 603:22, 603:23, 612:2
**2-prong** [1] - 608:13
**20** [1] - 604:1
**2003** [5] - 537:14, 579:14, 596:11, 596:25, 597:19
**2004** [16] - 538:1, 538:14, 539:2, 539:19, 540:7, 541:9, 543:7, 543:11, 543:18, 543:20, 555:7, 573:8, 578:5, 595:19, 596:9, 599:3
**21** [3] - 538:1, 543:18, 587:18
**21st** [10] - 537:14, 542:7, 542:9, 543:21, 587:8, 592:17, 592:22, 593:1, 593:4, 599:20
**22** [3] - 540:7, 543:20, 604:1
**2255** [1] - 605:20
**23** [2] - 552:6, 603:5
**231** [1] - 538:7
**25** [3] - 603:6, 604:13, 604:19
**26** [2] - 603:9, 607:21
**27** [4] - 595:18, 596:9, 603:9, 607:21
**271** [2] - 529:6, 596:13
**28** [2] - 606:3, 607:21
**2d** [1] - 529:6

**3**

**3** [4] - 530:17, 550:1, 580:1, 603:21
**30** [2] - 603:10, 611:13
**31** [1] - 604:1
**320** [1] - 541:8
**33** [1] - 602:19
**36** [2] - 521:5, 521:10
**36-year-old** [1] - 545:21
**3:39** [1] - 543:20
**3rd** [1] - 579:13

**4**

**4** [2] - 578:5, 603:21
**4:53** [1] - 543:18
**4:54** [1] - 587:20

**5**

**5** [5] - 531:12, 531:19, 579:14, 603:25, 609:2
**52** [1] - 604:2
**524** [1] - 552:5
**53** [1] - 604:4
**5th** [1] - 609:19

**6**

**6** [1] - 595:25
**6th** [1] - 541:8

**7**

**7** [5] - 547:11, 555:13, 603:25, 605:20

**8**

**8** [2] - 555:13, 604:1

**9**

**9** [4] - 555:9, 596:11, 603:4, 605:7
**91** [1] - 541:24

**A**

**a.m** [1] - 613:9
**abilities** [5] - 560:9, 568:14, 568:17, 568:18, 569:2
**ability** [2] - 527:8, 576:18
**able** [2] - 525:12, 557:21
**abreast** [1] - 534:5
**absolutely** [2] - 553:17, 606:17
**abuse** [1] - 522:23
**accept** [3] - 590:19, 606:18, 607:4
**acceptable** [1] - 600:16
**accepted** [1] - 607:10
**access** [5] - 554:21, 555:24, 556:1, 556:2, 574:1
**accomplices** [1] - 579:5
**according** [2] - 543:10, 546:3
**account** [2] - 568:17, 569:1
**accuracy** [3] - 564:8, 600:23, 606:12
**accurately** [1] - 531:15
**accused** [1] - 560:5
**acquaint** [1] - 524:7
**acquainted** [1] - 525:4
**actively** [3] - 558:3, 558:6, 561:13

**activity** [3] - 547:10, 561:18, 583:12
**addition** [1] - 525:2
**additional** [4] - 539:21, 541:20, 597:11, 610:3
**additionally** [1] - 606:22
**administered** [2] - 545:5, 545:10
**admissibility** [1] - 607:2
**admissible** [2] - 608:4, 608:8
**admission** [2] - 577:19, 609:13
**admit** [4] - 608:20, 608:23, 609:4, 609:7
**admitted** [8] - 529:22, 602:3, 602:20, 606:8, 606:23, 607:13, 607:17, 609:1
**adopted** [1] - 606:14
**adult** [2] - 565:3, 566:18
**advance** [2] - 562:10, 563:25
**advice** [3] - 569:25, 570:20, 570:25
**advised** [1] - 600:15
**affect** [2] - 568:8, 568:13
**affected** [1] - 569:2
**affidavits** [1] - 605:21
**affirmed** [1] - 520:15
**afraid** [1] - 549:16
**afternoon** [1] - 600:14
**age** [2] - 565:14, 565:25
**agents** [1] - 608:2
**aggravating** [1] - 551:24
**agree** [8] - 538:23, 565:17, 565:23, 573:8, 573:12, 578:18, 582:11, 609:13
**agreed** [1] - 603:17
**agreement** [4] - 590:25, 591:1, 604:10, 605:7
**Alfredo** [2] - 521:20, 578:5
**allegation** [1] - 581:14
**alleged** [3] - 523:24, 531:19, 582:17
**allows** [1] - 611:11
**almost** [3] - 553:7, 560:7, 565:24
**alone** [1] - 585:7
**alpha** [1] - 563:21
**alternatively** [1] - 588:19
**Alyssa** [1] - 562:8
**America** [1] - 520:3
**amount** [2] - 524:6, 553:1
**ample** [1] - 553:2
**Angela** [2] - 530:11, 582:4
**animal** [1] - 575:8
**answer** [19] - 526:7, 546:5, 546:12, 547:24, 550:22, 553:4, 558:6, 559:17, 563:12, 571:12, 573:24, 574:2, 574:14, 584:17, 588:5, 588:24, 592:1, 592:24, 593:9

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 86    Filed 12/07/11    Page 98 of 110

**answer's** [1] - 549:13
**answered** [2] - 546:7, 574:10
**answering** [1] - 574:14
**antidepressants** [1] - 553:20
**antisocial** [7] - 550:9, 565:3, 565:6, 565:19, 565:22, 566:18, 598:8
**anxiety** [1] - 594:24
**apologize** [6] - 541:3, 590:6, 590:14, 597:10, 599:1, 599:15
**appear** [1] - 558:12
**appearances** [1] - 520:5
**apply** [1] - 581:19
**appointed** [6] - 521:11, 521:19, 522:1, 522:3, 523:1, 555:20
**appreciate** [3] - 592:11, 612:15, 612:21
**approach** [1] - 591:1
**appropriate** [1] - 525:13
**approve** [2] - 579:21
**April** [2] - 595:18, 596:9
**aptitudes** [1] - 533:21
**area** [6] - 524:2, 533:17, 553:6, 556:9, 566:2, 589:19
**areas** [2] - 550:24, 567:25
**argue** [2] - 605:1, 605:19
**arguing** [1] - 595:3
**argument** [9] - 528:15, 541:12, 602:11, 604:17, 605:16, 605:19, 611:15, 611:20, 611:25
**arguments** [7] - 551:1, 551:5, 551:9, 610:25, 611:6, 611:8, 611:9
**arise** [1] - 545:7
**arrested** [1] - 583:18
**artificial** [1] - 604:23
**aside** [1] - 566:14
**aspect** [3] - 551:14, 557:19, 607:3
**aspects** [7] - 524:15, 524:16, 525:4, 545:16, 551:17, 557:22, 558:7
**assertion** [1] - 581:22
**assessing** [1] - 568:17
**assessment** [5] - 545:8, 545:9, 545:12, 567:18, 573:3
**assessments** [1] - 545:6
**assigned** [1] - 556:12
**assist** [4] - 521:20, 521:25, 523:6, 555:25
**assistance** [1] - 523:14
**assisting** [2] - 522:20, 590:17
**assuming** [1] - 568:12
**assure** [1] - 591:6
**attachment** [1] - 596:7
**attack** [1] - 610:20
**attempted** [1] - 591:4

**attending** [1] - 556:7
**attention** [1] - 585:14
**attorney** [2] - 522:25, 545:23
**Attorney's** [1] - 554:20
**attorneys** [3] - 523:17, 530:12, 548:16
**authored** [1] - 543:5
**authority** [1] - 554:8
**authorize** [1] - 590:25
**available** [1] - 556:16
**average** [1] - 567:11
**aware** [7] - 531:8, 550:7, 564:11, 564:18, 565:2, 567:10, 568:12

## B

**baby** [1] - 610:7
**backfire** [1] - 570:13
**bad** [6] - 541:2, 547:2, 567:2, 574:16, 585:6, 598:21
**baffled** [1] - 560:9
**balance** [1] - 575:10
**based** [8] - 528:11, 529:12, 530:13, 545:4, 571:8, 580:21, 607:5, 607:8
**basis** [1] - 528:10
**Basler's** [2] - 600:13, 600:19
**battle** [1] - 575:22
**bear** [1] - 539:24
**bearing** [1] - 577:3
**became** [2] - 524:22, 533:19
**becoming** [2] - 525:2, 525:3
**began** [1] - 589:15
**begin** [1] - 584:5
**beginning** [5] - 523:18, 553:8, 555:3, 561:3, 561:4
**begins** [1] - 540:9
**behalf** [4] - 520:6, 520:9, 527:10, 600:9
**behavior** [3] - 565:3, 565:19, 566:18
**bell** [2] - 556:10, 559:5
**benefits** [1] - 571:6
**Bennett** [7] - 528:11, 528:18, 535:24, 537:17, 540:17, 540:25, 541:6
**Bennett's** [1] - 529:5
**bereavement** [1] - 584:20
**best** [21] - 527:8, 530:20, 533:15, 536:21, 546:19, 552:21, 557:17, 558:11, 559:1, 560:9, 560:20, 560:23, 560:24, 571:20, 589:5, 590:11, 590:22, 591:2, 591:9, 598:9
**better** [1] - 548:13
**between** [5] - 554:20,

563:9, 563:15, 572:6, 572:7
**biology** [1] - 610:15
**bit** [11] - 523:7, 523:16, 524:13, 555:4, 561:1, 564:16, 590:21, 593:25, 594:2, 595:12, 601:8
**blind** [1] - 553:12
**blood** [1] - 581:14
**board** [1] - 591:8
**bonbons** [1] - 609:22
**borderline** [1] - 595:1
**bottom** [3] - 570:25, 596:1, 596:17
**brain** [2] - 545:7, 596:2
**brains** [1] - 524:11
**break** [4] - 586:3, 586:4, 586:7, 597:9
**breed** [1] - 575:8
**Bregar** [3] - 553:11, 562:18, 586:24
**Brief** [4] - 538:19, 542:20, 551:22, 591:25
**brief** [2] - 586:9, 609:17
**briefing** [1] - 612:23
**briefly** [3] - 522:17, 550:24, 595:10
**briefs** [2] - 612:1, 612:4
**bring** [1] - 571:13
**Britt** [2] - 589:19, 589:21
**brother** [3] - 532:3, 581:12, 583:25
**brought** [2] - 521:22, 523:25
**Bureau** [5] - 553:15, 554:13, 554:23, 564:19, 586:24
**busy** [1] - 609:23
**BY** [7] - 520:21, 554:3, 586:22, 595:14, 598:4, 598:15, 599:18

## C

**C.J** [1] - 520:6
**calendars** [1] - 612:3
**Capital** [6] - 556:13, 579:20, 587:4, 588:1, 588:6, 597:17
**capital** [32] - 522:4, 524:12, 524:15, 527:2, 533:20, 535:2, 550:4, 550:5, 551:2, 551:4, 551:17, 555:21, 555:25, 556:2, 556:5, 556:9, 556:16, 569:22, 570:16, 570:21, 572:1, 573:10, 573:15, 575:7, 575:8, 575:9, 579:21, 581:20, 597:6, 597:8, 610:4
**caption** [3] - 538:8, 538:25, 600:17
**car** [2] - 579:6, 589:20
**care** [1] - 609:3

**careful** [1] - 585:14
**case** [57] - 521:12, 521:19, 521:22, 522:10, 523:1, 524:10, 524:16, 525:4, 525:17, 526:21, 527:7, 530:15, 530:19, 530:24, 531:18, 535:21, 535:23, 540:14, 548:20, 548:21, 551:2, 551:14, 551:17, 554:17, 554:24, 557:19, 558:5, 560:12, 561:3, 561:14, 565:18, 566:22, 573:10, 573:13, 573:15, 573:18, 573:22, 574:9, 575:9, 577:14, 578:21, 579:21, 580:8, 580:13, 581:3, 581:20, 599:4, 607:11, 609:21, 610:23, 611:1, 611:10, 611:12, 611:16, 611:22
**Case** [1] - 579:20
**cases** [16] - 521:25, 522:16, 522:23, 522:24, 528:6, 533:20, 550:4, 550:5, 551:4, 554:25, 555:5, 555:10, 556:16, 575:7, 611:19
**catastrophe** [1] - 585:1
**categories** [1] - 602:12
**caused** [1] - 581:12
**Center** [3] - 556:13, 587:4, 588:2
**certain** [2] - 564:7, 565:14
**certainly** [1] - 573:11
**challenge** [7] - 528:10, 529:12, 530:2, 530:6, 530:18, 530:23, 536:12
**challenged** [2] - 530:12, 530:18
**charged** [2] - 522:20, 531:5
**charges** [1] - 531:23
**Charles** [1] - 523:2
**Charlie** [1] - 578:6
**Chicago** [1] - 533:16
**Chief** [1] - 541:6
**children** [1] - 559:3
**choice** [2] - 526:5, 599:8
**choices** [1] - 591:9
**chose** [1] - 585:24
**chosen** [2] - 533:22, 574:24
**circumstance** [1] - 551:25
**circumstances** [1] - 577:2
**Cities** [1] - 591:15
**City** [8] - 541:9, 560:22, 572:16, 590:4, 590:12, 591:20, 591:22, 609:20
**civil** [2] - 522:16, 522:23
**Civil** [1] - 520:2
**Claim** [3] - 529:18, 529:20, 581:8
**claim** [3] - 529:21, 559:12, 581:11

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 86    Filed 12/07/11    Page 99 of 110

**claims** [2] - 581:7, 581:11
**clarify** [3] - 592:9, 593:9, 605:13
**classes** [2] - 556:7, 556:8
**clean** [1] - 526:17
**clear** [7] - 533:23, 540:1, 543:21, 588:5, 594:6, 604:22, 608:25
**clearly** [1] - 584:2
**CLERK** [2] - 520:2, 520:17
**clerk** [3] - 528:6, 542:23, 587:14
**client** [1] - 585:8
**clients** [2] - 522:20, 522:22
**close** [1] - 557:24
**closely** [3] - 525:5, 525:12, 533:24
**co** [3] - 529:1, 530:1, 610:6
**co-counsel** [3] - 529:1, 530:1, 610:6
**Code** [1] - 606:3
**codefendant** [1] - 530:11
**cognitive** [6] - 544:23, 568:5, 568:9, 568:13, 568:18, 569:2
**collateral** [2] - 528:10, 529:12
**college** [1] - 579:9
**colloquial** [1] - 526:16
**comfortable** [3] - 526:6, 533:21, 557:18
**coming** [6] - 530:2, 556:25, 559:20, 581:16, 590:13, 598:7
**commencing** [1] - 541:9
**Committee** [1] - 579:20
**common** [1] - 584:22
**communications** [1] - 556:11
**compelling** [1] - 575:11
**completely** [1] - 577:8
**complied** [2] - 542:23, 587:14
**compound** [2] - 544:14, 597:10
**computer** [1] - 542:21
**concede** [1] - 582:13
**concentration** [1] - 524:2
**concern** [8] - 549:19, 550:2, 572:21, 573:22, 573:23, 574:3, 599:21, 610:19
**concerned** [6] - 548:3, 558:11, 558:14, 566:25, 591:2, 612:6
**concerns** [1] - 611:25
**concluded** [2] - 578:21, 613:9
**concludes** [1] - 600:8
**Condition** [1] - 537:11
**condition** [1] - 596:20
**conditions** [1] - 569:18

**conduct** [3] - 540:9, 540:10, 540:13
**conducted** [2] - 532:1, 563:25
**confederates** [1] - 523:24
**confer** [1] - 593:20
**conference** [1] - 560:22
**conferences** [2] - 552:18, 556:5
**conferred** [12] - 535:9, 546:14, 569:6, 569:9, 569:22, 570:15, 570:17, 591:5, 603:24, 604:3, 604:5, 609:11
**conferring** [2] - 569:13, 599:4
**confidential** [1] - 547:15
**confinement** [1] - 569:18
**confirmed** [1] - 579:25
**conflicted** [2] - 546:21, 547:2
**conform** [2] - 566:12, 606:6
**cons** [1] - 570:8
**consensus** [7] - 571:5, 571:11, 571:19, 571:24, 571:25, 572:3
**conservative** [3] - 574:23, 574:25, 575:12
**consider** [11] - 548:6, 553:3, 568:25, 574:19, 574:21, 574:25, 581:4, 585:18, 590:24, 601:7, 608:10
**considerable** [1] - 567:5
**consideration** [11] - 552:16, 575:3, 580:3, 593:13, 593:15, 593:22, 597:4, 597:7, 599:3, 607:23, 608:16
**considered** [8] - 547:20, 553:21, 601:7, 602:4, 605:22, 606:24, 606:25, 607:5
**considering** [6] - 531:5, 547:22, 550:6, 550:12, 595:15, 607:18
**consistent** [5] - 563:1, 563:3, 576:5, 607:13, 607:22
**conspiracy** [3] - 521:22, 532:18, 532:24
**construct** [1] - 574:17
**consult** [2] - 556:22, 593:20
**consulted** [4] - 556:19, 572:9, 587:4, 587:7
**consulting** [1] - 572:2
**contact** [9] - 561:4, 561:10, 561:17, 561:19, 562:13, 589:13, 590:16, 592:8
**contents** [2] - 529:3, 559:23

**context** [1] - 574:19
**continuing** [5] - 531:6, 531:9, 556:7, 562:4, 586:10
**control** [1] - 531:12
**controlled** [4] - 531:20, 532:3, 568:8, 568:13
**conversation** [8] - 530:4, 547:18, 548:10, 560:8, 572:4, 572:7, 588:1, 588:5
**conversations** [6] - 545:14, 562:4, 570:6, 571:21, 588:17, 592:4
**convey** [2] - 557:22, 593:17
**conveying** [1] - 579:24
**conviction** [1] - 559:13
**convince** [1] - 590:18
**convinced** [1] - 611:4
**convincing** [1] - 557:22
**copy** [2] - 527:10, 527:14
**correct** [9] - 534:21, 562:23, 563:15, 579:22, 580:4, 580:16, 583:13, 592:5, 604:21
**Counsel** [4] - 535:9, 604:3, 604:5, 609:11
**counsel** [51] - 520:5, 523:2, 523:6, 523:10, 525:3, 525:8, 527:21, 529:1, 530:1, 532:1, 535:2, 535:7, 542:18, 547:23, 554:8, 554:12, 555:11, 555:13, 555:25, 556:5, 557:3, 559:11, 559:19, 564:13, 564:23, 569:13, 569:23, 570:16, 570:17, 570:21, 572:1, 573:21, 574:8, 575:21, 580:8, 580:23, 581:4, 581:8, 581:15, 581:22, 586:15, 588:1, 588:6, 596:14, 597:6, 597:8, 597:17, 603:24, 608:11, 610:6
**counter** [1] - 548:5
**counter-evaluation** [1] - 548:5
**counting** [3] - 577:7, 577:13, 577:16
**country** [1] - 556:6
**counts** [1] - 530:12
**couple** [5] - 527:20, 534:4, 550:23, 553:9, 605:18
**course** [11] - 526:17, 551:19, 552:24, 560:21, 561:18, 564:18, 568:15, 580:14, 585:17, 590:4, 612:9
**Court** [36] - 522:1, 522:18, 538:21, 541:7, 541:12, 541:19, 542:5, 542:6, 547:9, 550:20, 550:21, 551:23, 552:24, 561:8, 569:12, 587:22, 602:4, 603:15, 605:23, 606:18,

607:3, 607:21, 607:23, 608:6, 608:10, 608:15, 609:3, 609:8, 609:23, 610:3, 610:25, 611:6, 611:9, 612:13, 612:25
**court** [4] - 520:1, 549:7, 606:21, 607:8
**COURT** [56] - 520:10, 520:18, 531:16, 531:24, 535:8, 535:12, 538:17, 548:23, 553:25, 566:3, 571:13, 578:10, 578:14, 578:16, 584:16, 586:2, 586:7, 586:10, 586:18, 595:9, 598:1, 599:13, 599:16, 600:2, 600:4, 600:7, 600:10, 600:21, 600:25, 601:2, 601:10, 601:16, 601:19, 602:1, 602:5, 602:13, 602:16, 602:24, 603:19, 604:8, 604:11, 604:18, 605:14, 605:17, 608:15, 609:15, 610:9, 610:14, 610:18, 611:2, 611:17, 612:12, 612:16, 612:19, 612:21, 613:7
**Court's** [1] - 540:12
**Courthouse** [1] - 541:8
**courtroom** [1] - 560:7
**cover** [1] - 524:6
**covers** [1] - 606:3
**crimes** [2] - 522:21, 595:4
**Criminal** [2] - 540:12, 548:12
**criminal** [7] - 521:7, 521:8, 522:16, 531:6, 531:9, 534:16, 555:16
**crisis** [1] - 585:1
**criteria** [2] - 566:12, 566:13
**cross** [15] - 526:14, 526:18, 553:11, 553:13, 553:16, 553:21, 562:23, 580:18, 586:23, 588:8, 598:17, 605:9, 606:13, 606:20, 607:15
**CROSS** [1] - 554:2
**cross-examination** [6] - 562:23, 580:18, 586:23, 588:8, 598:17, 605:9
**CROSS-EXAMINATION** [1] - 554:2
**cross-examine** [3] - 526:14, 553:16, 606:20
**cross-examined** [3] - 553:13, 606:13, 607:15
**cross-examining** [3] - 526:18, 553:11, 553:21
**crudely** [1] - 526:24
**Cunningham** [2] - 569:17, 569:20
**Cunningham's** [1] - 569:25

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM   Document 86   Filed 12/07/11   Page 100 of 110

**current** [4] - 549:11, 550:8, 550:12, 564:12
**cut** [1] - 541:1
**Cutkomp** [1] - 532:12

## D

**damage** [1] - 596:3
**dangerous** [1] - 549:23
**dangerousness** [2] - 551:24, 569:19
**date** [9] - 537:12, 537:20, 537:24, 538:13, 540:6, 540:21, 541:3, 572:14, 609:25
**date's** [1] - 537:3
**dated** [3] - 578:5, 595:18, 596:9
**dates** [4] - 543:17, 609:18, 609:19
**dating** [1] - 579:8
**days** [2] - 580:1, 611:13
**Deadline** [1] - 539:15
**deadline** [5] - 536:2, 536:11, 536:19, 539:7, 539:11
**deadlines** [4] - 535:24, 536:1, 610:23, 611:13
**dealership** [1] - 589:20
**dealing** [3] - 551:14, 555:15, 567:13
**deals** [1] - 573:9
**dealt** [1] - 551:16
**death** [5] - 551:6, 576:11, 580:3, 581:12, 582:19
**debate** [1] - 597:1
**December** [2] - 609:19, 610:5
**decide** [1] - 596:18
**decided** [9] - 523:20, 524:9, 528:18, 547:16, 548:14, 557:10, 577:8, 594:7, 597:21
**deciding** [3] - 523:20, 581:2, 590:24
**decision** [31] - 528:25, 529:5, 534:23, 546:18, 547:4, 547:9, 549:14, 557:15, 564:24, 570:11, 572:10, 573:8, 576:3, 579:18, 584:7, 585:11, 587:9, 592:17, 593:1, 593:3, 593:4, 593:7, 593:10, 593:12, 598:6, 598:9, 598:18, 599:19, 599:20, 601:6, 611:16
**decisions** [5] - 558:21, 558:23, 576:19, 577:24, 591:6
**declaration** [6] - 603:7, 604:13, 605:5, 605:6, 605:10, 606:16
**declarations** [10] - 536:16,

606:4, 606:5, 606:6, 606:13, 606:14, 606:22, 606:25, 607:12
**Defect** [1] - 537:10
**defendant** [1] - 540:14
**defendant's** [3] - 540:9, 540:10, 577:9
**defendants** [1] - 555:17
**defending** [1] - 556:16
**defense** [31] - 521:7, 521:8, 532:1, 536:11, 539:3, 545:23, 546:16, 552:10, 552:22, 554:8, 554:12, 555:11, 556:2, 556:16, 556:23, 564:24, 566:21, 573:16, 576:15, 576:22, 577:19, 579:18, 580:23, 586:15, 592:7, 594:18, 597:2, 597:14, 601:22, 605:1
**Defense** [1] - 537:10
**defenses** [2] - 522:21, 575:5
**degree** [3] - 527:19, 564:7, 610:15
**Delaware** [1] - 610:4
**delved** [1] - 573:18
**denied** [1] - 537:18
**Dennis** [1] - 603:7
**Department** [2] - 579:19, 580:2
**deposition** [2] - 605:7, 605:8
**depositions** [1] - 580:12
**depravity** [1] - 596:19
**depth** [1] - 562:19
**Des** [2] - 572:15, 590:3
**describe** [1] - 522:17
**designate** [2] - 539:7, 593:2
**designation** [3] - 565:6, 565:22, 566:15
**Designation** [2] - 539:3, 539:16
**detail** [1] - 555:5
**details** [3] - 523:7, 523:13, 552:2
**determination** [7] - 524:17, 525:11, 525:20, 526:1, 545:3, 547:22, 550:16
**determine** [3] - 532:9, 547:25, 596:2
**determined** [3] - 523:10, 525:24, 606:10
**develop** [1] - 581:13
**developed** [4] - 544:8, 550:18, 574:9, 580:8
**developmental** [1] - 544:24
**diabetes** [1] - 581:13
**diagnosed** [1] - 594:24
**diagnosis** [3] - 565:2, 565:7, 565:13

**diagnostic** [2] - 566:12, 566:13
**Dictated** [1] - 544:3
**died** [1] - 612:7
**different** [4] - 544:13, 553:19, 575:8, 588:4
**difficult** [1] - 610:6
**dilatory** [1] - 540:13
**DIRECT** [1] - 520:20
**direct** [6] - 557:7, 569:4, 572:25, 574:11, 592:16, 598:16
**directed** [1] - 599:21
**directly** [1] - 525:21
**dirtied** [1] - 526:18
**disabilities** [1] - 568:5
**disclose** [6] - 535:16, 535:18, 536:16, 542:8, 593:1
**disclosed** [3] - 572:22, 573:14
**disclosing** [2] - 572:18, 573:2
**disclosure** [4] - 536:3, 543:23, 573:9, 592:23
**discovery** [1] - 524:7
**discussed** [1] - 593:23
**discusses** [1] - 606:4
**discussing** [1] - 528:25
**discussion** [21] - 523:11, 528:14, 528:16, 529:2, 529:11, 529:25, 530:22, 547:12, 548:11, 548:24, 552:13, 559:14, 559:23, 559:25, 560:4, 561:23, 567:6, 572:17, 572:19, 597:13, 597:16
**discussions** [3] - 559:18, 591:11, 591:19
**disease** [1] - 545:8
**Disease** [1] - 537:10
**dismiss** [1] - 536:12
**disorder** [7] - 545:7, 550:9, 565:7, 565:22, 565:25, 594:25, 598:8
**disorders** [2] - 549:23, 594:25
**distilled** [1] - 575:16
**District** [3] - 521:23, 541:7, 541:8
**divorce** [1] - 576:11
**docket** [1] - 537:13
**Docket** [3] - 537:4, 538:6, 552:5
**doctor** [1] - 599:8
**doctors** [1] - 593:23
**document** [3] - 543:16, 587:18, 596:11
**documents** [5] - 594:22, 596:10, 601:15, 608:1, 608:9
**dodge** [2] - 570:4, 588:25
**dog** [2] - 555:9, 563:21
**done** [8] - 523:5, 552:17,

553:1, 554:24, 574:18, 593:4, 610:21, 612:24
**double** [1] - 527:22
**Double** [1] - 528:4
**doubt** [5] - 577:1, 577:5, 577:6, 577:7, 577:10
**down** [8] - 538:10, 542:12, 569:7, 575:16, 597:9, 601:22, 602:10, 607:2
**downsides** [1] - 570:22
**Dr** [31] - 542:25, 543:5, 543:8, 544:1, 544:16, 544:19, 545:10, 545:17, 546:8, 547:5, 567:15, 567:17, 568:20, 568:24, 569:20, 569:21, 569:25, 570:1, 570:9, 580:11, 580:21, 592:15, 592:20, 593:2, 593:15, 593:18, 594:13, 595:16, 597:5, 599:2, 599:19
**draft** [1] - 600:14
**drafting** [2] - 528:1, 528:7
**drafts** [1] - 528:5
**Drake** [1] - 610:15
**drift** [1] - 549:24
**drug** [4] - 521:22, 568:22, 569:1, 583:12
**drugs** [3] - 583:19, 583:25, 584:2
**DSM** [4] - 565:5, 565:21, 566:7, 566:15
**DSM-IV-TR** [1] - 565:5
**due** [3] - 543:23, 592:23, 596:19
**duly** [1] - 520:15
**Duncan** [3] - 583:3, 583:7, 583:11
**duplicate** [1] - 609:2
**duplicates** [3] - 608:22, 608:25, 609:6
**during** [33] - 526:13, 526:17, 529:22, 532:18, 535:21, 541:19, 550:24, 551:6, 553:9, 557:25, 558:22, 561:18, 561:25, 562:10, 562:14, 562:21, 563:17, 570:3, 572:11, 577:16, 577:18, 577:25, 579:25, 581:19, 585:12, 585:15, 585:20, 588:8, 590:4, 598:16, 605:11, 611:18, 611:20
**Dustin** [33] - 520:2, 521:22, 532:10, 534:11, 534:14, 545:21, 549:22, 555:6, 555:12, 555:18, 555:21, 556:20, 557:9, 557:13, 557:15, 557:17, 557:25, 562:9, 563:10, 563:15, 564:18, 565:18, 566:17, 567:2, 567:21, 568:22, 569:1, 570:23, 572:10, 572:18, 578:23,

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 86    Filed 12/07/11    Page 101 of 110

580:1, 598:22

**Dustin's** [8] - 544:24, 545:6, 546:15, 546:22, 591:5, 591:14, 592:5, 596:19

**dynamic** [1] - 563:14

**dynamics** [2] - 533:1, 534:16

## E

**e-mail** [1] - 570:18

**e-mails** [5] - 556:4, 557:1, 557:2, 571:22, 572:5

**early** [5] - 523:21, 524:9, 524:17, 534:2, 534:8

**easier** [2] - 602:9, 602:15

**easiest** [1] - 601:4

**easy** [1] - 602:25

**eating** [1] - 609:22

**ECF** [1] - 600:18

**education** [1] - 556:8

**effect** [1] - 567:4

**efforts** [1] - 561:13

**either** [8] - 525:11, 539:8, 552:23, 561:10, 561:23, 570:12, 585:6, 611:8

**elaborate** [1] - 571:18

**eliminate** [1] - 611:15

**ELMO** [2] - 535:11, 552:3

**emotions** [1] - 584:25

**encounter** [1] - 585:1

**end** [1] - 597:20

**ended** [5] - 521:18, 549:17, 583:3, 583:7, 583:14

**enforcement** [2] - 582:5, 582:15

**engaging** [1] - 565:19

**enjoyed** [1] - 613:1

**enterprise** [2] - 531:6, 531:9

**entire** [1] - 580:22

**entitled** [2] - 539:15, 540:3

**error** [1] - 604:14

**especially** [2] - 561:18, 584:21

**estoppel** [2] - 528:10, 529:13

**evaluate** [3] - 544:5, 544:6, 549:22

**evaluated** [15] - 534:18, 547:13, 547:20, 548:7, 550:14, 564:19, 572:18, 573:2, 573:25, 592:14, 592:18, 592:19, 593:7, 593:11, 593:13

**evaluation** [14] - 543:6, 545:23, 547:14, 548:5, 550:10, 567:17, 567:24, 572:22, 572:23, 574:5, 596:2, 597:22, 598:22

**evaluations** [1] - 593:4

**evasive** [1] - 560:6

**evening** [2] - 587:25, 588:5

**events** [3] - 542:12, 543:13, 563:1

**Evidence** [3] - 537:9, 540:4, 581:19

**evidence** [38] - 523:23, 525:13, 530:7, 536:13, 538:4, 546:22, 548:15, 549:18, 553:21, 563:18, 564:17, 565:18, 566:8, 570:9, 570:23, 572:11, 572:21, 573:10, 574:8, 574:21, 575:3, 575:11, 575:24, 575:25, 576:9, 576:16, 576:21, 577:25, 581:9, 582:3, 583:11, 587:23, 594:8, 594:23, 600:9, 605:1, 605:24, 605:25

**evidentiary** [2] - 520:4, 610:4

**ex** [1] - 583:21

**ex-wife** [1] - 583:21

**exact** [1] - 537:20

**exactly** [4] - 525:9, 526:2, 531:19, 585:4

**EXAMINATION** [7] - 520:20, 554:2, 586:21, 595:13, 598:3, 598:14, 599:17

**examination** [11] - 557:7, 562:23, 569:4, 572:25, 580:18, 586:23, 588:8, 592:16, 598:16, 598:17, 605:9

**examine** [5] - 526:14, 534:24, 553:9, 553:16, 606:20

**examined** [4] - 520:16, 553:13, 606:13, 607:15

**examining** [3] - 526:18, 553:11, 553:21

**example** [6] - 559:2, 563:20, 567:7, 596:10, 605:4, 605:6

**exceeding** [1] - 536:1

**excellent** [2] - 612:22, 612:24

**except** [2] - 565:24, 566:8

**exception** [1] - 600:12

**exchange** [2] - 557:5, 572:5

**exchanged** [1] - 556:4

**Exclude** [2] - 537:9, 540:3

**excuse** [4] - 538:18, 542:16, 542:19, 551:20

**exercised** [1] - 558:25

**exhibit** [5] - 543:10, 578:10, 595:20, 595:22, 604:17

**Exhibit** [7] - 578:12, 579:12, 603:4, 608:23,

609:1, 609:2

**exhibits** [8] - 601:3, 601:23, 608:18, 608:22, 609:6, 609:9, 609:13, 611:23

**Exhibits** [5] - 602:19, 607:21, 608:20, 609:4, 609:7

**expect** [1] - 568:16

**expected** [1] - 568:24

**expecting** [1] - 568:4

**experience** [15] - 522:4, 522:12, 522:14, 524:12, 533:20, 533:21, 534:2, 545:4, 550:4, 551:4, 555:5, 555:15, 568:7, 575:4, 593:18

**expert** [23] - 536:16, 536:23, 539:7, 539:22, 541:21, 544:12, 549:10, 550:8, 556:15, 556:19, 566:2, 566:6, 568:25, 573:9, 573:15, 592:14, 593:2, 594:7, 595:16, 596:7, 599:6, 607:7

**Expert** [5] - 537:9, 538:9, 539:3, 539:16, 540:4

**experts** [25] - 535:16, 536:3, 546:9, 546:14, 546:17, 548:5, 550:5, 556:22, 564:13, 569:5, 569:6, 569:10, 569:14, 569:16, 572:24, 574:5, 575:5, 580:9, 598:7, 599:6, 599:22, 606:24, 607:4, 607:6

**explain** [3] - 546:12, 569:12, 590:21

**explanation** [1] - 577:20

**explore** [1] - 561:1

**express** [1] - 584:25

**extend** [1] - 539:11

**Extend** [1] - 539:15

**extended** [1] - 539:17

**extent** [3] - 527:18, 551:16, 552:17

**extremely** [1] - 540:11

## F

**face** [1] - 535:22

**fact** [13] - 532:3, 546:25, 555:14, 562:5, 565:21, 567:17, 568:20, 574:22, 575:2, 584:21, 594:13, 605:3, 605:9

**Factor** [1] - 539:4

**factor** [1] - 525:22

**factors** [5] - 566:7, 566:11, 576:3, 577:1, 598:20

**failed** [1] - 585:22

**failing** [7] - 530:6, 581:9,

581:15, 581:23, 582:18, 583:24

**faint** [1] - 537:13

**fair** [7] - 542:10, 544:10, 560:11, 562:25, 598:16, 599:11

**familiar** [6] - 533:19, 535:3, 536:14, 556:14, 565:5, 566:10

**familiarity** [2] - 550:4, 551:4

**family** [10] - 532:9, 533:1, 533:2, 557:21, 559:8, 563:14, 581:13, 582:12, 591:3, 612:7

**far** [4] - 596:25, 599:1, 599:7, 612:23

**fashion** [1] - 605:24

**fast** [1] - 569:7

**father** [1] - 581:13

**father's** [1] - 582:20

**faulted** [1] - 583:23

**fax** [2] - 543:17, 587:18

**February** [4] - 579:13, 579:14, 611:18, 613:4

**Federal** [3] - 540:11, 541:8, 581:18

**feet** [1] - 524:13

**felt** [5] - 525:10, 526:6, 533:20, 557:18

**few** [1] - 581:10

**file** [4] - 528:4, 556:4, 564:22, 600:18

**filed** [10] - 527:10, 527:15, 527:22, 528:9, 536:23, 536:25, 538:3, 539:10, 540:6, 549:3

**files** [3] - 528:3, 557:1, 557:2

**filing** [1] - 539:21

**finally** [1] - 608:6

**finders** [4] - 546:25, 574:22, 575:2, 584:21

**findings** [6] - 528:11, 529:21, 530:2, 559:12, 567:19, 570:10

**fine** [11] - 523:9, 548:23, 586:18, 590:7, 590:15, 601:19, 603:19, 605:17, 609:15, 612:13, 613:5

**finger** [1] - 542:3

**finished** [1] - 553:7

**firewall** [2] - 548:14, 548:19

**first** [13] - 520:15, 523:19, 527:1, 533:11, 543:18, 545:17, 545:20, 546:3, 559:11, 564:17, 574:13, 575:8, 604:12

**fit** [1] - 566:15

**fits** [1] - 565:23

**fix** [1] - 572:13

**flexible** [1] - 535:25

**fluid** [1] - 524:5

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 86    Filed 12/07/11    Page 102 of 110

**flurry** [2] - 547:10, 561:18
**focus** [1] - 523:23
**focusing** [1] - 524:14
**foggy** [2] - 523:7, 590:5
**follow** [1] - 598:12
**follow-up** [1] - 598:12
**following** [3] - 520:1, 543:6, 609:9
**follows** [1] - 520:16
**Footnote** [1] - 529:7
**footnote** [2] - 529:8, 529:10
**forensic** [1] - 522:19
**forgiving** [1] - 535:25
**form** [2] - 548:18, 607:7
**formal** [1] - 555:23
**formed** [1] - 607:5
**forth** [3] - 557:1, 582:6, 598:23
**forthright** [1] - 571:3
**foundation** [1] - 603:7
**Francis** [3] - 581:11, 581:23, 581:25
**frankly** [1] - 578:20
**fray** [1] - 526:20
**frees** [2] - 611:11, 611:14
**frequently** [1] - 561:19
**friend** [1] - 583:15
**front** [3] - 540:16, 540:22, 543:10
**full** [1] - 602:4
**functioning** [1] - 568:9
**furnished** [1] - 556:2
**furthermore** [1] - 585:5
**future** [2] - 551:24, 569:19

# G

**gain** [2] - 584:20, 611:19
**gauging** [1] - 545:6
**Gelbort** [28] - 534:22, 534:24, 535:1, 540:4, 543:1, 543:5, 543:8, 544:1, 544:16, 544:19, 545:10, 546:8, 547:6, 567:15, 567:18, 568:24, 580:11, 592:15, 592:20, 593:2, 593:15, 593:18, 594:14, 595:17, 597:5, 599:2, 599:9, 599:20
**Gelbort's** [5] - 545:17, 568:20, 569:21, 570:1, 570:9
**general** [11] - 535:20, 538:3, 549:24, 570:13, 575:6, 588:17, 602:6, 602:11, 602:17, 605:16, 606:10
**generally** [21] - 523:22, 524:1, 531:10, 532:4, 532:5, 535:23, 538:5, 541:23, 545:14, 551:8, 558:16, 563:6, 565:11,

576:9, 576:14, 582:1, 582:5, 582:22, 583:4, 583:22, 584:18
**girlfriends** [1] - 582:15
**given** [2] - 555:24, 556:1
**glad** [1] - 613:2
**governing** [1] - 605:20
**government** [25] - 531:9, 531:11, 535:16, 536:22, 539:21, 541:21, 548:4, 548:5, 549:18, 549:20, 552:22, 554:6, 554:15, 572:23, 572:24, 573:3, 573:25, 579:2, 585:15, 587:22, 598:24, 606:19, 608:2, 608:18, 608:20
**Government's** [2] - 540:3, 579:12
**government's** [5] - 549:10, 550:7, 574:5, 598:7, 599:21
**grand** [2] - 562:20, 563:1
**great** [2] - 536:7, 586:5
**Greg** [6] - 582:19, 583:3, 583:7, 583:15, 583:17, 584:3
**ground** [1] - 524:13
**grounds** [10] - 601:24, 603:4, 603:5, 603:6, 603:9, 603:10, 603:12, 603:14, 604:24, 605:12
**groundwork** [1] - 523:5
**guess** [19] - 526:16, 526:25, 528:23, 536:17, 548:6, 550:25, 557:22, 562:8, 571:11, 574:6, 575:16, 576:24, 577:10, 600:14, 601:3, 603:25, 607:1, 607:20, 609:2
**guilt** [7] - 524:1, 526:13, 539:8, 576:6, 576:22, 594:19, 595:4
**Guilt** [1] - 539:3
**guilty** [5] - 577:9, 577:11, 590:19, 595:4, 596:19
**guy** [1] - 526:21

# H

**habeas** [5] - 549:3, 557:3, 564:13, 574:8, 580:7
**half** [1] - 586:4
**hand** [2] - 575:7, 576:25
**handed** [1] - 545:22
**handle** [2] - 551:10, 601:5
**handled** [2] - 555:10, 555:11
**handling** [3] - 555:15, 557:11, 557:19
**hanging** [1] - 584:2
**hard** [1] - 537:3
**hate** [1] - 560:5
**head** [1] - 522:22

**head-injured** [1] - 522:22
**health** [43] - 522:15, 522:21, 522:24, 538:4, 544:5, 544:16, 544:25, 546:9, 546:15, 546:17, 546:22, 549:7, 549:17, 549:21, 550:13, 550:18, 555:15, 556:23, 558:4, 558:10, 564:17, 564:24, 566:21, 567:2, 569:5, 569:10, 569:14, 569:16, 569:23, 570:2, 570:9, 570:23, 572:11, 573:4, 575:5, 575:11, 576:4, 576:8, 576:15, 580:7, 587:23, 592:14, 594:18
**hearing** [11] - 520:4, 540:16, 540:24, 541:19, 563:3, 604:24, 605:11, 609:1, 609:17, 610:4, 612:23
**hearsay** [13] - 603:4, 603:5, 603:6, 603:9, 603:10, 603:12, 603:13, 604:20, 604:24, 605:3, 605:11, 606:10, 608:7
**heart** [1] - 610:20
**heat** [1] - 575:22
**held** [2] - 520:1, 540:24
**helpful** [6] - 570:12, 599:7, 611:5, 611:7, 611:10, 612:25
**helping** [3] - 524:12, 525:3, 590:18
**hesitance** [1] - 577:9
**hesitate** [1] - 574:13
**hesitating** [1] - 544:9
**hesitation** [1] - 574:10
**high** [1] - 581:14
**hindsight** [1] - 573:1
**hire** [5] - 544:15, 549:1, 568:11, 597:11, 597:21
**hired** [5] - 533:8, 533:14, 544:20, 549:10, 564:13
**hiring** [2] - 596:25, 597:5
**history** [4] - 544:6, 544:7, 544:11, 544:25
**holiday** [1] - 609:23
**home** [2] - 589:23, 589:24
**Honken** [63] - 520:3, 520:9, 521:12, 521:21, 522:4, 524:1, 526:6, 527:11, 527:22, 529:6, 531:5, 532:2, 533:2, 534:18, 534:24, 543:1, 543:7, 543:9, 544:6, 545:21, 547:13, 550:8, 550:14, 555:6, 555:12, 555:18, 555:21, 556:20, 557:10, 557:13, 557:18, 557:25, 561:16, 562:16, 563:9, 563:10, 563:15, 564:18, 565:18, 566:17, 567:21, 568:22, 569:1,

571:23, 572:8, 572:10, 572:14, 572:18, 572:22, 586:10, 588:9, 588:18, 589:10, 590:18, 592:14, 593:20, 594:24, 598:8, 598:22, 600:9, 609:17, 612:6
**Honken's** [14] - 523:23, 529:22, 530:11, 530:18, 530:23, 531:18, 532:2, 557:15, 562:9, 567:2, 589:12, 590:17, 590:23, 591:19
**Honor** [48] - 520:7, 520:8, 520:12, 520:19, 535:6, 535:10, 538:15, 540:1, 542:16, 548:22, 551:20, 554:1, 566:1, 578:13, 586:1, 586:6, 586:14, 586:20, 595:10, 598:2, 598:13, 599:14, 600:1, 600:8, 600:22, 601:12, 601:20, 602:9, 602:18, 603:3, 604:4, 604:9, 604:16, 604:21, 605:15, 606:2, 606:12, 606:22, 607:16, 608:19, 609:12, 610:1, 610:22, 612:11, 612:14, 612:17, 612:20, 613:6
**Honorable** [2] - 540:24, 541:6
**hope** [1] - 613:3
**hoped** [1] - 593:17
**hoping** [1] - 577:17
**hospital** [1] - 610:7
**hotel** [1] - 560:21
**hour** [1] - 586:4
**hours** [1] - 547:11
**housed** [1] - 560:21
**husband** [1] - 589:21
**hypothetical** [2] - 580:22, 580:25

# I

**idea** [3] - 561:8, 596:25, 597:11
**identification** [1] - 587:17
**identify** [3] - 527:6, 543:4, 578:22
**ill** [1] - 558:18
**image** [1] - 558:15
**imagine** [2] - 540:21, 580:20
**impact** [3] - 574:22, 581:9, 611:15
**impaired** [1] - 546:24
**impairment** [1] - 567:25
**importance** [1] - 546:14
**important** [3] - 561:15, 561:16, 575:3
**impose** [1] - 576:11

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 86    Filed 12/07/11    Page 103 of 110

impressive [1] - 542:9
in-person [1] - 561:10
include [2] - 528:10, 528:15
including [8] - 527:22, 529:12, 553:20, 554:13, 579:5, 579:8, 594:23, 598:20
inconsistency [2] - 576:22, 576:25
inconsistent [6] - 576:5, 582:3, 594:19, 595:3, 607:14, 607:16
incredibly [1] - 542:9
indicate [4] - 544:1, 544:2, 569:4, 578:25
indicated [11] - 553:19, 556:25, 557:7, 557:12, 568:3, 572:9, 572:17, 572:25, 587:3, 588:8, 589:13
indicates [1] - 537:14
indication [2] - 565:14, 567:22
indicators [1] - 566:9
indictment [1] - 521:16
individual [2] - 523:17, 552:23
indulge [1] - 524:4
ineffective [4] - 581:8, 581:15, 581:23, 582:18
inference [1] - 569:19
influence [1] - 591:7
information [7] - 548:4, 561:21, 564:8, 573:2, 573:15, 574:3, 578:1
informed [1] - 534:10
injured [1] - 522:22
injury [1] - 545:7
inmate [4] - 553:12, 554:5, 554:14, 555:1
input [2] - 561:15, 562:16
inquired [2] - 532:8, 573:18
inquiring [1] - 532:23
inquiry [1] - 544:23
insensitive [1] - 585:6
instance [1] - 584:11
institutions [1] - 523:25
instruction [2] - 551:23, 552:10
instructions [7] - 551:12, 552:16, 552:19, 552:23, 552:24, 552:25, 553:1
intelligence [3] - 545:6, 567:11, 567:22
intelligent [1] - 567:8
intended [1] - 539:8
intent [1] - 538:3
Intent [1] - 538:9
intentions [1] - 536:16
interaction [1] - 532:9
interest [1] - 532:25
interpretation [1] - 566:4

interview [5] - 532:11, 532:19, 532:21, 562:20, 563:1
interviewed [1] - 533:19
interviewing [1] - 532:22
interviews [1] - 564:5
intimates [1] - 589:6
introduced [1] - 583:15
investigated [1] - 563:13
investigating [1] - 523:6
investigation [3] - 531:25, 563:9, 563:25
invited [1] - 521:20
involved [14] - 521:18, 522:22, 523:1, 525:15, 527:2, 534:7, 545:15, 551:9, 558:3, 558:6, 558:23, 560:8, 561:13, 572:7
involvement [3] - 525:20, 534:3, 583:11
Iowa [3] - 521:23, 541:8, 541:9
issue [8] - 527:7, 532:20, 535:17, 540:18, 552:19, 569:19, 570:21, 599:8
Issue [1] - 537:10
issued [2] - 538:21, 554:22
issues [12] - 527:21, 535:21, 535:22, 540:19, 541:12, 551:16, 553:15, 555:16, 557:21, 569:23, 599:6, 606:4
issues/disorder [1] - 596:7
itself [2] - 548:19, 574:21
IV [1] - 565:5

**J**

January [2] - 538:1, 613:4
Jeff [5] - 532:2, 532:25, 563:9, 563:15, 563:21
Jeff's [3] - 532:9, 532:18, 532:23
jeopardy [1] - 527:23
Jeopardy [1] - 528:4
job [3] - 524:22, 612:24, 613:5
jobs [1] - 541:3
Johnson [2] - 530:11, 582:4
joint [2] - 536:5, 552:23
Judge [8] - 528:11, 528:18, 529:4, 535:24, 537:17, 540:17, 541:6, 595:7
judgment [6] - 559:13, 559:20, 575:19, 575:21, 576:18, 592:13
judgments [3] - 571:4, 571:9, 584:24

July [16] - 541:9, 542:7, 542:9, 543:7, 543:11, 543:18, 543:20, 543:21, 555:7, 587:8, 587:18, 592:17, 592:22, 593:1, 593:4, 599:3
June [4] - 539:2, 539:19, 540:7, 596:11
juris [2] - 524:12, 527:3
jurors [5] - 551:6, 574:24, 575:4, 584:23, 585:3
jury [23] - 524:19, 524:25, 525:2, 525:25, 541:14, 550:21, 550:24, 551:7, 551:12, 552:16, 552:19, 553:1, 557:20, 557:23, 562:20, 563:2, 574:24, 575:12, 577:6, 577:17, 595:2, 598:22, 608:11
jury's [1] - 575:24
Justice [1] - 579:20

**K**

Kane [1] - 610:6
Kathy [7] - 559:3, 582:18, 583:20, 588:15, 588:22, 589:4, 589:8
keep [1] - 607:19
kept [2] - 534:5, 534:9
kill [1] - 579:5
kind [18] - 526:19, 538:3, 549:24, 555:3, 561:2, 569:24, 575:18, 578:1, 581:2, 581:24, 582:11, 584:8, 590:11, 604:22, 607:1, 610:9, 611:12, 611:14
knowing [1] - 575:22
known [1] - 534:14
knows [1] - 607:16

**L**

last [10] - 520:24, 543:25, 554:4, 554:18, 570:7, 570:18, 592:10, 593:9, 598:12, 600:13
late [2] - 540:11, 600:14
latest [1] - 540:13
laughter [1] - 610:11
Laughter [2] - 610:13, 610:17
law [14] - 527:14, 528:6, 531:15, 542:23, 548:20, 573:13, 573:18, 573:22, 582:4, 582:15, 594:5, 594:8, 611:24
Law [1] - 587:14
lawyer [3] - 521:3, 521:4, 585:6
lawyer's [1] - 566:4
lawyers [1] - 535:22

lead [1] - 551:18
leading [2] - 533:5, 533:25
learned [3] - 523:2, 523:10, 525:8
learning [2] - 524:13, 527:3
least [7] - 547:20, 550:15, 557:12, 561:3, 564:13, 578:2, 607:1
Lee [2] - 520:3, 545:21
left [1] - 547:11
legal [3] - 524:15, 556:3, 556:8
lengthy [1] - 559:25
Leon [3] - 520:13, 521:1, 545:24
LEON [1] - 520:14
letter [6] - 578:5, 578:25, 579:13, 579:15, 596:11, 596:15
life [5] - 544:6, 544:7, 544:11, 551:6, 589:7
light [1] - 608:9
likely [1] - 561:24
limine [1] - 536:12
line [4] - 545:17, 545:20, 546:3, 570:25
lines [2] - 530:15, 538:11
Lisa [12] - 525:5, 533:13, 544:4, 561:20, 563:13, 564:4, 564:8, 578:1, 578:21, 595:18, 596:18, 605:6
list [3] - 601:22, 602:10, 607:2
litigants [1] - 555:17
litigation [6] - 549:11, 555:22, 556:9, 556:20, 558:7, 579:21
live [2] - 605:25, 607:8
lived [1] - 589:19
lives [2] - 584:24, 589:18
look [7] - 549:9, 558:17, 580:25, 585:6, 587:11, 587:17, 609:18
looked [5] - 548:2, 563:13, 565:21, 570:23, 611:22
looking [7] - 528:3, 533:1, 546:23, 550:6, 550:12, 556:3, 570:18
Lori [4] - 583:3, 583:7, 583:11, 583:25
Lori's [1] - 583:24
loving [2] - 581:24, 582:12

**M**

Madison [3] - 525:6, 533:13, 534:5
mail [1] - 570:18
mails [5] - 556:4, 557:1, 557:2, 571:22, 572:5
male [1] - 545:22

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM   Document 86   Filed 12/07/11   Page 104 of 110

man [1] - 553:11
March [2] - 538:14, 583:18
Mark [3] - 540:24, 541:6, 569:17
marked [4] - 528:4, 543:3, 579:11, 587:16
Marvea [3] - 560:13, 563:20, 589:12
material [4] - 524:6, 535:24, 549:12, 557:5
materials [4] - 556:3, 562:22, 564:12
Matter [1] - 520:2
matter [3] - 527:2, 530:11, 599:9
matters [1] - 584:22
mean [18] - 544:14, 546:13, 558:12, 558:16, 559:25, 566:5, 569:15, 570:4, 574:16, 577:2, 582:4, 582:14, 584:24, 592:22, 593:11, 597:8, 599:3, 609:18
meaning [2] - 526:18, 592:7
means [1] - 575:16
meant [3] - 522:10, 592:6, 592:10
measures [1] - 567:22
medical [2] - 554:13, 554:25
medications [1] - 553:20
meet [1] - 535:25
meeting [8] - 583:3, 583:7, 589:14, 589:22, 589:25, 590:2, 590:3, 590:12
meetings [2] - 534:10, 580:1
member [3] - 533:23, 550:25, 551:13
members [4] - 550:1, 559:8, 582:12, 612:7
memoranda [1] - 564:5
memorandum [3] - 527:14, 528:5, 549:2
memorandums [1] - 564:5
memory [7] - 543:12, 548:2, 553:16, 589:5, 589:16, 590:14, 593:14
memos [2] - 534:5, 595:17
Mental [1] - 537:10
mental [46] - 522:15, 522:21, 522:23, 538:4, 544:5, 544:16, 544:24, 545:7, 546:9, 546:15, 546:16, 546:22, 549:6, 549:17, 549:21, 550:13, 550:18, 555:15, 556:23, 558:4, 558:9, 564:17, 564:24, 566:21, 567:2, 569:5, 569:10, 569:14, 569:16, 569:23, 570:2, 570:9, 570:23, 572:11, 573:4, 575:5, 575:11,

576:4, 576:8, 576:10, 576:15, 580:7, 581:2, 587:23, 592:14, 594:18
mentally [1] - 558:18
mention [2] - 536:24, 602:2
mentioned [2] - 566:24, 610:2
mentioning [1] - 569:9
meritorious [1] - 527:6
merits [2] - 526:13, 553:10
met [6] - 534:4, 560:22, 560:24, 561:2, 561:6, 610:12
Michael [2] - 534:22, 540:4
middle [1] - 613:3
might [12] - 525:11, 535:1, 546:15, 546:22, 546:23, 547:2, 549:15, 557:20, 569:1, 575:12, 599:7, 605:19
Milbrath [2] - 583:24, 584:4
mind [4] - 576:12, 590:3, 607:19, 610:1
minutes [1] - 581:10
miracle [1] - 610:10
mis [1] - 598:25
misgivings [1] - 589:6
missed [1] - 549:15
misstates [1] - 531:23
misunderstood [2] - 592:25, 598:25
mitigating [2] - 567:3, 577:1
mitigation [27] - 525:5, 525:13, 526:20, 533:2, 533:3, 533:8, 533:16, 545:16, 549:7, 550:13, 550:19, 557:23, 558:5, 558:8, 558:22, 559:9, 560:12, 564:17, 570:3, 572:11, 576:9, 576:17, 577:3, 577:16, 577:25, 578:21, 581:3
Mitigation [1] - 539:4
mitigator [1] - 577:6
mix [1] - 575:6
MMPI [1] - 545:10
modified [1] - 538:22
Moines [2] - 572:15, 590:3
moment [4] - 524:23, 535:7, 538:16, 586:1
month [1] - 610:5
months [2] - 524:25, 553:14
morning [9] - 520:8, 520:18, 520:19, 520:22, 520:23, 544:17, 555:9, 591:17, 610:2
most [7] - 525:5, 526:6, 532:16, 533:24, 550:2, 581:13, 611:19

mostly [1] - 599:21
mother [7] - 559:3, 589:12, 590:17, 590:23, 591:5, 591:19, 592:5
Motion [3] - 537:9, 539:15, 540:3
motion [16] - 527:23, 528:1, 528:5, 528:9, 528:17, 529:12, 530:3, 536:23, 537:5, 537:18, 538:7, 539:11, 539:13, 539:14, 539:21
motions [2] - 536:11, 536:12
move [5] - 550:23, 602:19, 608:23, 609:4, 609:7
moved [1] - 536:19
moves [1] - 608:20
moving [1] - 538:10
MR [91] - 520:6, 520:8, 520:12, 520:21, 531:14, 531:22, 535:6, 535:10, 535:13, 538:15, 538:18, 542:16, 542:21, 542:24, 548:17, 548:20, 551:20, 553:23, 554:1, 554:3, 566:1, 571:10, 571:16, 578:12, 578:15, 578:17, 584:14, 586:1, 586:5, 586:14, 586:20, 586:22, 587:12, 595:6, 595:10, 595:14, 595:20, 595:22, 596:13, 597:24, 598:2, 598:4, 598:11, 598:12, 598:15, 599:11, 599:14, 599:18, 599:25, 600:1, 600:3, 600:6, 600:8, 600:12, 600:22, 601:1, 601:9, 601:12, 601:13, 601:18, 601:20, 602:2, 602:8, 602:14, 602:18, 602:21, 602:22, 603:3, 603:20, 603:22, 603:23, 603:25, 604:4, 604:6, 604:9, 604:16, 604:21, 605:15, 605:18, 608:19, 609:12, 610:1, 610:12, 610:22, 611:3, 612:11, 612:14, 612:17, 612:20, 613:6, 613:8
multiple [1] - 530:12
multiplicity [1] - 530:13
murder [5] - 521:12, 529:22, 530:12, 555:5, 555:10
Murray [2] - 609:20, 609:21
must [1] - 610:9
mutual [1] - 583:15

N

name [6] - 520:24, 533:11, 538:10, 553:11, 572:1

names [1] - 593:22
narcicisstic [1] - 595:1
naturally [1] - 576:24
nature [1] - 551:2
nearly [3] - 543:14, 567:20, 567:25
necessarily [1] - 611:4
necessary [1] - 611:4
Need [2] - 596:1, 596:6
needed [2] - 523:10, 523:14
negotiate [3] - 561:14, 590:25, 591:4
negotiated [1] - 591:3
negotiations [1] - 562:16
Nelson [1] - 562:9
neural [1] - 568:17
neurological [1] - 567:17
neuropsychological [8] - 543:6, 545:5, 545:8, 545:12, 545:23, 546:2, 567:15, 596:2
neuropsychologist [10] - 534:19, 544:20, 544:22, 568:3, 568:11, 568:12, 568:16, 568:25, 596:25, 597:13
neuropsychologists [1] - 522:20
never [1] - 526:24
new [3] - 573:10, 573:11, 594:1
next [5] - 520:11, 544:1, 609:16, 609:21, 610:5
Nicholson [7] - 582:18, 583:3, 583:8, 583:15, 583:18, 583:20, 584:3
Nicholson's [1] - 582:19
night [4] - 554:18, 570:7, 570:19, 600:13
NOLAN [49] - 520:8, 520:12, 520:21, 535:6, 535:10, 535:13, 538:15, 538:18, 542:16, 542:21, 542:24, 548:20, 551:20, 553:23, 566:1, 571:10, 584:14, 586:20, 586:22, 587:12, 587:15, 595:6, 595:20, 598:2, 598:4, 598:11, 599:14, 599:18, 599:25, 600:8, 600:22, 601:1, 601:13, 601:18, 602:8, 602:14, 602:18, 602:22, 603:22, 604:9, 604:16, 605:15, 605:18, 609:12, 610:1, 610:12, 612:14, 612:17, 613:8
Nolan [18] - 520:9, 520:11, 571:17, 572:20, 586:19, 599:13, 600:15, 600:17, 601:11, 601:21, 602:6, 604:12, 605:14, 609:25, 610:14, 610:22, 611:3, 612:16

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

none [2] - 587:2, 600:1
Northern [2] - 521:23, 541:7
notation [2] - 536:8, 539:2
noted [1] - 531:24
notes [7] - 548:2, 570:7, 570:11, 570:14, 571:21, 591:16
nothing [1] - 580:2
notice [3] - 538:3, 540:11, 541:20
Notice [1] - 538:9
noticed [2] - 526:12, 528:4
notion [2] - 594:18, 608:7
November [1] - 537:14
number [2] - 554:5, 578:11
Number [5] - 537:4, 538:6, 552:5, 604:13, 605:7
numerous [1] - 562:14

# O

oath [1] - 586:12
object [30] - 530:1, 530:6, 531:22, 548:17, 552:14, 559:16, 571:10, 581:9, 581:15, 581:23, 582:2, 582:8, 582:18, 582:23, 583:24, 584:8, 584:12, 585:2, 585:19, 585:22, 585:24, 601:23, 602:7, 603:3, 603:5, 603:9, 603:10, 603:11, 603:13
objected [3] - 582:9, 584:1, 584:10
objecting [4] - 559:12, 559:20, 584:21, 604:23
objection [11] - 531:14, 531:17, 552:9, 553:3, 566:1, 584:14, 585:5, 602:3, 605:13, 609:12
objections [6] - 551:1, 553:3, 601:4, 601:24, 603:1, 604:20
objects [1] - 529:21
oblique [1] - 546:13
obscured [1] - 589:16
obtained [4] - 534:13, 572:21, 573:15, 580:1
obviously [8] - 524:11, 534:12, 600:22, 605:23, 606:17, 607:6, 607:9, 611:5
occasions [1] - 562:14
occupation [1] - 521:2
occur [3] - 521:14, 538:23, 587:2
occurring [1] - 576:25
October [1] - 536:8
offense [3] - 576:12, 576:19, 577:2
Offer [1] - 538:9
offer [4] - 601:3, 602:6,

602:17, 608:17
office [6] - 543:19, 549:3, 590:1, 590:2, 600:17, 609:22
Office [1] - 554:21
officer [1] - 591:15
officers [2] - 582:5, 582:15
often [2] - 561:12, 575:5
old [2] - 565:15, 570:14
one [2] - 598:12, 599:14
ones [2] - 601:23, 603:16
onset [3] - 565:14, 565:24, 566:9
open [2] - 520:1, 606:21
opine [1] - 576:17
opinion [5] - 528:20, 528:22, 564:14, 580:22, 607:7
opinions [1] - 607:5
opponent [1] - 608:5
opportunity [4] - 527:17, 549:6, 549:9, 606:20
opposed [1] - 605:25
oral [7] - 610:25, 611:6, 611:7, 611:9, 611:15, 611:20, 611:25
order [11] - 536:6, 537:21, 537:22, 538:21, 538:22, 539:5, 540:12, 564:9, 565:11, 609:17, 610:25
Order [1] - 539:1
organic [1] - 544:24
original [1] - 536:2
originally [1] - 524:20
osmosis [1] - 525:11
otherwise [3] - 534:17, 594:25, 603:18
ought [1] - 586:4
ourselves [1] - 524:7
outcome [1] - 612:6
outfit [1] - 524:11
outside [1] - 523:12
outweigh [2] - 567:2, 571:6
overarching [1] - 608:7
overruled [1] - 585:5
own [2] - 606:16, 609:19

# P

P-11 [2] - 543:3, 587:16
p.m [4] - 541:10, 543:18, 543:20, 587:20
page [5] - 537:12, 537:24, 540:22, 543:25, 596:6
Page [3] - 541:24, 552:6, 595:25
pan [1] - 547:2
panel [1] - 574:24
paper [1] - 611:22
paragraph [2] - 540:9, 578:20

pardon [1] - 522:7
parole [1] - 591:14
Parrish [13] - 521:20, 521:21, 521:24, 523:5, 523:22, 534:7, 534:13, 571:22, 572:7, 578:6, 578:19, 579:14, 596:12
Parrish's [2] - 523:21, 543:19
part [16] - 524:21, 526:5, 557:13, 564:14, 572:2, 574:23, 574:25, 577:23, 578:2, 579:24, 593:9, 597:5, 597:13, 597:16, 605:22, 610:25
particular [3] - 527:21, 532:10, 585:12
parties [4] - 554:9, 600:20, 603:16, 605:8
party [1] - 608:5
party-opponent [1] - 608:5
passage [2] - 523:7, 589:17
past [3] - 522:14, 533:20, 593:18
patient [1] - 568:18
Patrice's [1] - 612:9
pattern [1] - 540:13
pause [4] - 538:19, 542:20, 551:22, 591:25
pausing [1] - 586:15
paying [1] - 585:13
Penalty [2] - 537:11, 539:4
penalty [22] - 524:18, 524:20, 525:25, 533:5, 539:9, 541:21, 551:13, 557:11, 561:25, 562:6, 562:11, 563:17, 576:11, 577:18, 580:4, 581:19, 585:13, 585:16, 588:11, 590:8, 594:19, 608:8
people [12] - 531:12, 531:19, 545:15, 556:12, 582:6, 582:15, 584:18, 584:22, 584:24, 588:10, 590:13
perhaps [3] - 533:17, 559:8, 601:20
period [2] - 563:4, 611:19
person [8] - 532:14, 532:16, 561:10, 561:23, 576:9, 576:18, 587:8, 589:14
personal [1] - 593:18
personality [7] - 545:9, 549:23, 550:9, 565:7, 565:22, 594:25, 598:8
personally [2] - 535:3, 567:14
persuade [1] - 546:24
persuasive [2] - 557:20, 575:12
Peter [1] - 578:15

petition [4] - 527:10, 529:19, 549:3, 581:7
petitioning [1] - 611:9
phase [38] - 524:2, 524:18, 524:20, 525:25, 526:13, 526:14, 533:2, 533:4, 533:5, 539:8, 539:9, 541:22, 551:13, 553:10, 557:11, 558:22, 562:1, 562:6, 562:11, 563:17, 570:3, 572:12, 576:6, 576:17, 576:23, 577:4, 577:17, 577:18, 577:25, 581:19, 585:13, 585:16, 588:11, 590:8, 594:19, 595:4, 608:8
Phase [2] - 537:11, 539:4
Phase) [1] - 539:4
Philadelphia [2] - 610:7, 613:1
phone [4] - 532:15, 560:21, 561:10, 561:23
phrase [1] - 563:22
Piasecki [1] - 580:21
piece [1] - 611:22
place [2] - 525:10, 526:3
plaintiff [2] - 608:22, 609:6
Plaintiff's [1] - 609:2
plan [1] - 600:16
play [3] - 546:15, 546:22, 557:9
plea [3] - 590:19, 590:25, 591:1
point [38] - 521:11, 522:25, 524:19, 525:11, 525:16, 525:23, 527:9, 527:13, 528:18, 529:3, 530:10, 530:15, 532:11, 533:8, 534:18, 536:19, 536:22, 537:17, 538:2, 538:20, 539:10, 539:20, 541:19, 542:25, 544:4, 544:15, 548:9, 551:11, 567:5, 571:1, 573:19, 585:3, 589:5, 597:18, 599:2, 601:3, 602:19, 603:16
points [1] - 584:20
poorly [2] - 546:6, 546:7
population [1] - 575:1
portion [3] - 551:10, 606:15, 606:16
portions [2] - 606:25, 607:12
portrayed [1] - 588:18
pose [1] - 553:3
posed [1] - 552:9
position [1] - 591:6
possibilities [1] - 599:5
possible [2] - 561:24, 591:18
possibly [1] - 590:17
post [1] - 609:17

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

**post-hearing** [1] - 609:17
**postulate** [1] - 582:9
**potential** [2] - 575:3, 593:23
**potentials** [1] - 578:21
**practice** [3] - 521:6, 521:7, 522:15
**precisely** [1] - 549:16
**preclude** [2] - 536:23, 539:21
**predated** [1] - 555:18
**preference** [4] - 558:9, 559:4, 559:9, 588:10
**preferences** [1] - 558:8
**prejudice** [1] - 608:12
**preparation** [7] - 531:4, 534:8, 562:18, 562:22, 590:4, 590:7, 612:22
**prepare** [2] - 560:16, 564:9
**prepared** [1] - 525:2
**preparing** [6] - 524:24, 525:17, 527:4, 533:5, 554:18, 560:19
**present** [16] - 525:25, 558:4, 558:5, 564:24, 572:11, 574:20, 576:4, 576:8, 576:16, 576:21, 577:18, 577:24, 580:7, 581:3, 587:23
**presentation** [7] - 525:13, 558:10, 560:12, 570:3, 576:6, 579:19, 600:9
**presented** [13] - 550:20, 554:14, 560:13, 563:18, 566:21, 574:8, 595:2, 600:11, 605:2, 605:24, 605:25, 608:11, 612:25
**presenting** [5] - 524:18, 560:15, 570:2, 575:10, 594:18
**pressure** [1] - 581:14
**pretrial** [5] - 528:18, 530:2, 535:16, 538:21, 539:1
**pretty** [5] - 524:5, 557:24, 558:3, 561:19, 563:3
**previous** [1] - 528:12
**previously** [1] - 552:7
**primarily** [11] - 521:7, 523:5, 528:2, 528:8, 533:1, 533:4, 534:3, 534:14, 550:25, 551:11, 557:11
**primary** [1] - 524:2
**prime** [1] - 599:2
**prison** [1] - 553:19
**Prisons** [5] - 553:15, 554:13, 554:23, 564:19, 586:24
**privacy** [1] - 603:17
**probation** [1] - 591:14
**probed** [1] - 566:17
**problem** [2] - 538:17, 576:10

**problems** [1] - 544:24
**procedure** [1] - 548:19
**Procedure** [2] - 540:12, 548:12
**proceed** [3] - 531:17, 571:15, 586:13
**proceeding** [1] - 529:21
**Proceedings** [1] - 613:9
**proceedings** [1] - 528:12
**process** [1] - 601:11
**product** [3] - 533:20, 534:12, 563:24
**professional** [2] - 544:5, 544:16
**professionals** [2] - 522:15, 549:21
**progressed** [1] - 562:3
**prolong** [1] - 612:5
**promptly** [1] - 610:19
**proper** [1] - 605:23
**proposal** [1] - 612:3
**proposed** [3] - 536:5, 552:23, 552:25
**pros** [1] - 570:8
**prosecution** [1] - 574:4
**prospective** [1] - 523:23
**protracted** [1] - 525:16
**prove** [2] - 531:9, 531:11
**proven** [1] - 608:12
**provide** [3] - 541:20, 564:4, 578:1
**provided** [8] - 527:10, 527:13, 549:2, 549:12, 550:11, 580:22, 594:23, 600:13
**providing** [2] - 540:10, 552:24
**provision** [1] - 548:12
**prudence** [2] - 524:12, 527:3
**psychiatric** [1] - 596:20
**psychiatrist** [8] - 564:20, 565:12, 566:16, 597:1, 597:12, 597:21, 598:19
**psychiatrists** [1] - 522:19
**psychological** [1] - 596:20
**psychologist** [3] - 565:12, 566:16, 597:12
**psychopharmacologist** [1] - 581:5
**published** [2] - 528:20, 541:2
**pulled** [1] - 528:7
**purports** [2] - 576:17, 604:13
**purpose** [1] - 607:1
**purposes** [3] - 523:14, 606:23, 607:17
**pursuant** [1] - 549:10
**pursue** [1] - 596:18
**put** [12] - 526:16, 538:3, 542:22, 552:3, 556:1, 566:5, 566:13, 578:4,

585:15, 600:17, 611:13, 612:2
**putting** [3] - 570:8, 570:23, 574:18
**Putzier** [2] - 603:8, 607:25
**Putzier's** [1] - 607:20

**Q**

**Quad** [1] - 591:15
**qualifications** [1] - 551:6
**questionnaire** [1] - 596:22
**questions** [20] - 532:18, 535:14, 553:24, 554:4, 562:8, 562:17, 563:8, 563:10, 571:14, 586:16, 586:19, 588:14, 589:1, 594:3, 594:17, 594:20, 595:15, 596:22, 597:25, 599:12
**quicker** [1] - 602:15
**quote** [1] - 529:4

**R**

**raise** [2] - 527:7, 530:23
**raised** [3] - 530:18, 549:7, 581:7
**raising** [1] - 551:1
**rape** [1] - 579:8
**rather** [3] - 525:8, 525:24, 550:21
**rating** [1] - 567:11
**read** [20] - 528:7, 528:23, 529:7, 537:3, 537:7, 538:8, 538:25, 539:2, 540:8, 540:23, 541:3, 542:2, 544:3, 552:6, 552:7, 552:8, 598:23, 606:15, 610:1, 611:22
**reading** [3] - 530:10, 530:14, 575:24
**ready** [2] - 520:10, 524:24
**realistic** [2] - 609:24, 612:4
**realize** [1] - 580:21
**really** [7] - 559:17, 560:6, 580:1, 606:19, 611:15, 611:19, 612:21
**reason** [12] - 529:15, 530:5, 531:2, 542:10, 544:9, 548:1, 552:13, 585:24, 586:25, 592:5, 607:10, 612:8
**reasons** [4] - 559:16, 601:15, 603:17, 606:7
**reassure** [1] - 591:8
**recalled** [2] - 554:19, 559:14
**receive** [2] - 555:21, 584:16
**received** [5] - 534:5, 547:5, 555:23, 587:19,

595:18
**recently** [1] - 594:23
**recess** [1] - 586:9
**recognize** [3] - 566:14, 579:15, 595:24
**recollection** [38] - 530:21, 531:21, 533:15, 535:20, 536:21, 537:19, 539:12, 541:23, 542:11, 545:25, 546:5, 546:19, 552:21, 557:17, 558:11, 559:1, 559:10, 560:23, 562:7, 567:20, 570:7, 570:11, 570:14, 571:20, 572:5, 572:13, 583:16, 585:10, 590:11, 590:22, 591:2, 591:10, 591:16, 595:11, 596:24, 598:5, 598:9, 599:10
**recollections** [1] - 560:20
**recommend** [2] - 544:4, 544:15
**recommendation** [5] - 535:4, 544:11, 544:18, 593:19, 596:6
**recommended** [3] - 533:16, 533:18, 535:1
**record** [24] - 520:25, 529:5, 531:23, 537:4, 537:7, 537:13, 538:6, 538:25, 539:24, 540:1, 540:8, 540:23, 543:4, 552:5, 552:7, 571:12, 601:5, 601:17, 602:7, 605:22, 607:4, 608:25, 611:23, 611:24
**records** [7] - 553:19, 554:9, 554:12, 554:13, 554:25, 586:24, 587:1
**RECROSS** [2] - 595:13, 598:14
**RECROSS-EXAMINATION** [2] - 595:13, 598:14
**REDIRECT** [3] - 586:21, 598:3, 599:17
**reference** [2] - 596:1, 596:18
**referred** [1] - 545:22
**refresh** [5] - 542:11, 545:25, 546:5, 595:11, 596:24
**refreshed** [1] - 548:3
**regard** [8] - 551:12, 554:4, 557:16, 558:9, 569:13, 571:25, 573:15, 604:12
**regarding** [8] - 540:19, 541:21, 551:6, 551:24, 557:8, 590:17, 592:13, 600:15
**regardless** [1] - 575:11
**related** [2] - 522:24, 551:1
**relating** [1] - 557:21
**relationship** [7] - 534:16,

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 86    Filed 12/07/11    Page 107 of 110

557:24, 563:9, 563:14, 564:1, 589:6
**reliability** [2] - 606:5, 606:9
**reliable** [1] - 606:8
**relied** [2] - 564:8, 577:25
**relief** [2] - 542:13, 542:14
**relying** [1] - 564:13
**remaining** [1] - 577:10
**remains** [1] - 575:18
**remember** [64] - 523:9, 525:9, 528:25, 529:10, 529:25, 530:5, 530:9, 530:14, 530:17, 530:22, 531:4, 531:18, 532:5, 532:14, 532:17, 534:25, 536:20, 537:20, 538:4, 538:5, 540:21, 541:15, 546:18, 547:19, 547:22, 552:18, 553:10, 556:7, 557:13, 560:3, 560:13, 563:5, 563:22, 567:3, 570:18, 570:19, 570:25, 572:1, 573:4, 581:25, 582:10, 582:20, 582:23, 583:2, 583:4, 583:6, 583:20, 588:7, 588:12, 588:17, 588:21, 589:3, 589:7, 589:14, 589:22, 589:25, 590:2, 590:9, 591:11, 593:5, 593:16, 594:3, 594:20, 596:15
**remembrance** [1] - 560:25
**rendering** [1] - 564:14
**rendition** [1] - 562:25
**renewing** [1] - 529:11
**renowned** [1] - 549:21
**repeat** [1] - 583:5
**rephrase** [3] - 532:7, 548:21, 566:5
**report** [13] - 543:5, 543:25, 545:18, 547:5, 547:9, 562:20, 567:15, 568:20, 569:21, 570:1, 587:21, 594:7, 594:15
**reports** [2] - 543:22
**represent** [3] - 521:11, 522:3, 555:20
**representation** [3] - 555:16, 556:20, 557:9
**represented** [2] - 521:21, 522:22
**representing** [1] - 521:21
**request** [1] - 609:14
**requests** [2] - 554:19, 601:14
**require** [2] - 536:15, 539:6
**required** [3] - 523:15, 531:8, 552:22
**requirements** [2] - 535:15, 565:13
**researching** [1] - 527:25
**residual** [4] - 577:1, 577:5, 577:6, 577:7

**resolution** [1] - 561:14
**Resource** [5] - 556:13, 587:4, 588:1, 588:6, 597:17
**respect** [5] - 589:12, 604:17, 606:13, 607:20, 607:25
**response** [3] - 559:14, 569:25, 574:9
**responsibility** [1] - 551:18
**responsible** [6] - 527:25, 528:2, 533:4, 534:3, 551:1, 551:13
**rest** [2] - 569:7, 604:19
**results** [7] - 547:2, 547:14, 547:17, 547:21, 548:8, 550:15, 572:19
**retain** [5] - 544:5, 546:8, 546:16, 568:2, 569:5
**retaining** [1] - 549:20
**return** [1] - 521:16
**returned** [1] - 542:18
**Review** [1] - 579:20
**review** [4] - 527:17, 528:22, 529:18, 549:6
**reviewed** [8] - 529:20, 549:3, 550:13, 557:1, 562:19, 562:22, 591:16, 594:22
**reviewing** [3] - 526:12, 529:23, 607:24
**revolve** [1] - 524:15
**Rick** [5] - 559:3, 588:15, 588:22, 589:4, 589:8
**Rickert** [24] - 525:6, 525:21, 533:13, 533:18, 535:3, 544:4, 544:15, 561:19, 561:20, 563:13, 564:4, 564:9, 578:1, 579:25, 590:12, 590:16, 590:22, 591:5, 591:12, 592:8, 595:18, 599:4, 605:6
**Rickert's** [1] - 596:18
**right-handed** [1] - 545:22
**rings** [2] - 556:10, 559:5
**risk** [3] - 566:14, 566:20, 576:22
**risks** [1] - 571:5
**Robert** [1] - 583:24
**Rogers** [19] - 523:2, 524:21, 525:8, 525:15, 525:24, 528:2, 528:8, 534:1, 550:3, 551:3, 551:10, 551:17, 571:22, 572:6, 572:8, 578:6, 578:19, 579:15, 597:8
**Rogers's** [1] - 524:10
**role** [7] - 523:21, 524:10, 524:25, 532:9, 532:18, 532:23, 546:15
**roles** [2] - 523:17, 557:8
**Ronda** [2] - 581:11, 581:25
**room** [2] - 560:22, 590:11
**roughly** [1] - 541:16

**Rule** [9] - 536:13, 536:14, 548:12, 548:24, 554:8, 573:8, 594:1, 605:20
**rule** [1] - 594:2
**rules** [1] - 605:20
**Rules** [2] - 540:11, 581:18
**run** [4] - 566:21, 576:21, 589:20, 600:17
**rushing** [1] - 535:25

## S

**S-P-I-E-S** [1] - 521:1
**sadness** [1] - 585:1
**save** [1] - 571:17
**saw** [1] - 543:1
**schedule** [3] - 611:12, 611:18, 612:9
**scheduled** [1] - 541:14
**schedules** [1] - 612:8
**scheduling** [5] - 536:6, 538:21, 539:5, 609:17, 610:25
**Scheduling** [1] - 539:1
**scheme** [1] - 579:5
**scientific** [1] - 610:10
**screen** [4] - 536:6, 542:22, 578:5, 587:13
**scrivener's** [1] - 604:14
**seal** [1] - 609:8
**sealed** [2] - 601:15, 603:17
**sealing** [1] - 609:14
**second** [8] - 537:12, 537:24, 538:18, 542:19, 543:19, 551:20, 578:19, 596:5
**secondly** [1] - 606:2
**section** [1] - 568:21
**Section** [1] - 606:3
**see** [25] - 526:12, 535:10, 536:8, 537:2, 537:5, 537:21, 537:24, 539:13, 539:18, 540:2, 540:5, 542:2, 543:8, 543:16, 545:17, 547:21, 550:15, 578:6, 580:18, 587:18, 591:3, 595:11, 596:4, 596:7
**seeing** [1] - 529:10
**seek** [1] - 580:3
**seem** [2] - 537:14, 575:2
**selection** [5] - 524:25, 525:3, 541:14, 550:24, 551:7
**sell** [1] - 575:1
**send** [1] - 612:3
**sense** [2] - 546:10, 546:11
**sent** [1] - 579:17
**sentencing** [3] - 528:12, 562:21, 563:2
**series** [3] - 542:12, 543:13, 545:5
**seriousness** [1] - 610:18

**sets** [3] - 548:13, 548:19, 552:23
**setting** [3] - 604:23, 607:6, 607:7
**several** [2] - 521:24, 526:14
**share** [1] - 551:18
**shared** [1] - 571:21
**Shawn** [2] - 520:8, 603:20
**shifted** [1] - 575:10
**short** [1] - 553:6
**shortly** [3] - 521:15, 521:16, 541:17
**show** [14] - 529:4, 532:1, 532:2, 536:5, 537:2, 537:21, 538:7, 538:24, 539:13, 540:22, 541:24, 543:25, 579:11, 596:11
**showed** [1] - 550:19
**showing** [2] - 543:3, 582:4
**sic** [4] - 562:21, 576:16, 597:17, 602:19
**sic]** [1] - 596:12
**sickness** [1] - 582:20
**side** [3] - 536:17, 543:23
**sides** [1] - 606:25
**sighs** [2] - 542:13, 542:14
**signature** [2] - 538:11, 544:1
**signed** [1] - 604:14
**significant** [4] - 565:18, 566:14, 566:20, 567:25
**significantly** [3] - 546:24, 566:18, 574:22
**signs** [1] - 545:6
**similar** [3] - 530:18, 530:23, 550:4
**simply** [1] - 598:24
**single** [2] - 545:22, 611:22
**Sioux** [8] - 541:9, 560:22, 572:16, 590:4, 590:12, 591:20, 591:22, 609:20
**sister** [2] - 562:9, 591:14
**sit** [6] - 566:11, 580:12, 582:7, 588:16, 593:21, 598:10
**sitting** [1] - 609:22
**situation** [1] - 605:23
**situations** [1] - 606:17
**skeptical** [1] - 575:5
**small** [1] - 568:21
**smarter** [1] - 567:23
**Smidt** [6] - 560:13, 561:2, 561:21, 561:24, 563:21, 589:13
**snitch** [1] - 526:19
**snow** [1] - 613:2
**someone** [2] - 587:3, 592:20
**somewhat** [1] - 557:20
**somewhere** [2] - 523:11, 535:5
**sorry** [23] - 534:13, 538:15, 541:1, 541:25,

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 3:10-cv-03074-LTS-KEM    Document 86    Filed 12/07/11    Page 108 of 110

542:14, 544:17, 546:6, 557:6, 558:5, 558:12, 558:20, 559:5, 559:23, 560:10, 566:10, 570:19, 571:10, 578:11, 578:13, 579:13, 586:14, 587:12, 599:10

**sort** [1] - 602:11

**sorts** [3] - 571:4, 599:5, 599:6

**sound** [2] - 541:11, 543:12

**sounds** [3] - 541:13, 543:14, 556:14

**speaking** [5] - 524:1, 558:16, 578:20, 584:18, 584:19

**specialist** [3] - 525:5, 533:9, 533:16

**specific** [10] - 544:11, 548:10, 585:10, 585:11, 589:3, 599:7, 599:8, 599:9, 605:19

**specifically** [21] - 523:4, 532:16, 535:23, 539:23, 544:18, 546:23, 558:14, 558:19, 559:6, 561:12, 570:9, 572:9, 572:16, 581:17, 582:8, 582:10, 584:10, 588:13, 589:4, 593:6, 593:23

**specifics** [7] - 534:25, 559:22, 560:6, 560:10, 563:5, 570:5, 606:20

**specified** [1] - 594:25

**spectating** [1] - 551:11

**speculate** [1] - 582:25

**speculation** [2] - 581:16, 584:15

**speed** [1] - 601:8

**spell** [1] - 520:24

**spend** [1] - 527:2

**spent** [2] - 560:19, 601:21

**Spies** [38] - 520:13, 520:18, 520:22, 521:1, 521:2, 527:9, 529:18, 535:14, 540:15, 542:19, 542:25, 545:24, 549:1, 550:6, 553:6, 553:23, 554:4, 555:4, 560:1, 561:2, 566:25, 568:7, 571:17, 573:20, 578:4, 581:3, 583:23, 585:9, 586:3, 586:11, 586:16, 586:19, 586:23, 592:10, 596:12, 598:5, 598:16, 600:4

**SPIES** [1] - 520:14

**Spies's** [1] - 595:11

**splitting** [1] - 523:19

**spoken** [3] - 560:21, 580:9, 590:23

**spot** [1] - 566:6

**stage** [1] - 526:20

**stages** [1] - 524:9

**stand** [3] - 520:13, 520:17,

608:1

**standard** [1] - 545:8

**stands** [1] - 590:3

**start** [2] - 541:14, 601:11

**started** [4] - 523:19, 590:9, 591:20, 591:23

**starting** [1] - 555:7

**state** [4] - 520:5, 520:24, 574:24, 576:12

**state's** [1] - 575:1

**statement** [2] - 585:12, 608:4

**statements** [9] - 585:19, 604:25, 605:3, 607:14, 607:16, 607:22, 608:2, 608:4

**states** [2] - 531:15, 605:21

**States** [8] - 520:3, 520:7, 529:6, 541:7, 554:20, 555:25, 586:11, 606:3

**statute** [2] - 523:15, 606:6

**stay** [2] - 526:17, 526:19

**still** [3] - 541:25, 586:12, 611:11

**stipulated** [1] - 604:8

**stipulation** [3] - 600:14, 600:19, 600:23

**strategic** [7] - 529:15, 530:5, 531:1, 552:13, 559:16, 585:23, 586:25

**strategically** [3] - 547:1, 570:13, 584:20

**strategies** [3] - 556:3, 569:22, 591:1

**Street** [1] - 541:9

**stress** [1] - 582:19

**Strickland** [1] - 608:13

**strides** [1] - 583:19

**strike** [3] - 549:1, 550:7, 604:18

**strong** [2] - 558:7, 559:8

**struggling** [1] - 564:23

**studied** [1] - 611:21

**studying** [1] - 527:3

**subject** [3] - 531:16, 588:19, 605:9

**submit** [3] - 552:22, 600:19, 612:12

**submitted** [3] - 550:19, 605:21, 611:12

**submitting** [1] - 580:2

**subpoena** [1] - 554:9

**subpoenaed** [2] - 554:12, 554:25

**subpoenaing** [1] - 586:25

**subpoenas** [1] - 554:22

**substance** [1] - 522:23

**substances** [2] - 568:8, 568:13

**substantial** [6] - 522:13, 524:6, 524:14, 524:21, 553:1, 554:19

**suffers** [1] - 576:10

**suggest** [5] - 606:2, 606:7,

607:21, 608:3, 608:6

**summary** [1] - 564:5

**Supp** [1] - 529:6

**supplement** [1] - 527:14

**support** [1] - 566:8

**supposed** [1] - 526:17

**suppress** [1] - 536:12

**surprises** [1] - 563:7

**sworn** [1] - 520:15

**sympathetic** [3] - 546:25, 578:23, 579:1

**sympathy** [1] - 576:11

**T**

**table** [1] - 542:18

**talks** [1] - 568:21

**team** [15] - 526:22, 532:2, 533:4, 533:24, 548:16, 550:1, 550:25, 551:13, 579:18, 592:7, 592:12, 597:2, 597:14, 601:21, 613:1

**teams** [2] - 556:17, 612:24

**telephone** [1] - 556:4

**tendencies** [1] - 595:1

**terms** [3] - 544:6, 544:7, 608:10

**Terry** [4] - 553:11, 562:18, 581:24, 586:24

**test** [4] - 545:2, 568:4, 608:13

**tested** [1] - 567:21

**testified** [12] - 520:16, 554:5, 581:12, 581:24, 582:19, 583:25, 592:16, 593:17, 605:5, 605:7, 605:8, 606:11

**testify** [9] - 523:25, 549:22, 554:18, 566:3, 566:17, 569:18, 581:5, 584:9, 600:24

**testifying** [6] - 562:10, 582:21, 584:19, 584:22, 586:11, 588:20

**testimony** [47] - 536:23, 539:22, 541:21, 553:14, 553:18, 557:13, 560:16, 560:19, 562:15, 562:19, 562:20, 562:21, 563:3, 563:7, 563:20, 564:4, 568:4, 573:5, 574:11, 576:4, 580:6, 580:7, 581:16, 581:25, 582:2, 582:24, 583:2, 583:4, 583:6, 583:17, 584:4, 584:8, 585:11, 585:14, 585:15, 585:18, 585:20, 585:22, 588:23, 599:6, 600:13, 600:15, 600:19, 606:1, 606:18, 607:8, 608:3

**Testimony** [1] - 538:9

**testing** [2] - 546:2, 568:3

**tests** [1] - 567:10

**THE** [60] - 520:2, 520:10, 520:17, 520:18, 520:19, 531:16, 531:24, 535:8, 535:12, 538:17, 548:23, 553:25, 566:3, 571:13, 578:10, 578:14, 578:16, 584:16, 586:2, 586:7, 586:10, 586:18, 595:8, 595:9, 598:1, 599:13, 599:16, 600:2, 600:4, 600:7, 600:10, 600:21, 600:25, 601:2, 601:10, 601:16, 601:19, 602:1, 602:5, 602:13, 602:16, 602:24, 603:19, 604:8, 604:11, 604:18, 605:14, 605:17, 608:15, 609:15, 610:9, 610:14, 610:18, 611:2, 611:17, 612:12, 612:16, 612:19, 612:21, 613:7

**theft** [1] - 579:6

**then-husband** [1] - 589:21

**theory** [3] - 582:3, 584:1, 596:19

**thereafter** [4] - 522:1, 538:2, 540:16, 541:17

**thereby** [1] - 572:23

**third** [2] - 522:25, 554:9

**third-parties** [1] - 554:9

**thirdly** [1] - 606:9

**throughout** [6] - 555:25, 556:5, 556:19, 563:3, 585:18, 599:4

**Tim** [1] - 532:11

**timeline** [2] - 535:15, 540:1

**timing** [5] - 535:15, 535:17, 566:9, 607:9, 611:16

**title** [1] - 537:8

**today** [16] - 531:21, 545:13, 545:16, 549:19, 549:25, 554:22, 557:1, 566:11, 575:18, 582:7, 588:16, 593:19, 593:21, 598:10, 605:6, 610:7

**together** [2] - 521:24, 612:3

**took** [2] - 525:10, 526:2

**top** [1] - 543:16

**topic** [1] - 544:10

**tough** [1] - 575:19

**toward** [1] - 575:10

**TR** [1] - 565:5

**training** [2] - 555:21, 555:24

**transcript** [3] - 526:13, 540:22, 541:25

**transition** [1] - 525:10

**trial** [53] - 521:7, 523:18, 524:24, 525:14, 525:16, 526:14, 526:18, 526:22,

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

527:21, 527:23, 529:22, 531:4, 533:6, 533:25, 535:22, 546:22, 553:10, 555:6, 555:12, 555:13, 555:18, 556:9, 557:25, 561:4, 561:6, 561:9, 561:22, 562:3, 562:10, 562:14, 562:15, 564:9, 566:15, 574:20, 575:4, 576:4, 581:8, 581:22, 583:2, 583:7, 583:10, 583:23, 588:20, 589:14, 590:5, 590:8, 591:20, 591:22, 605:2, 607:7, 611:18

**Trial** [1] - 537:11

**trial's** [1] - 575:23

**tried** [4] - 532:8, 555:6, 555:11, 575:23

**trigger** [1] - 549:20

**triggering** [3] - 548:5, 572:23, 574:5

**true** [1] - 606:17

**try** [2] - 574:17, 591:7

**trying** [10] - 524:7, 526:19, 527:6, 539:25, 555:8, 572:13, 579:18, 588:25, 609:20, 610:20

**turn** [3] - 548:15, 594:6, 594:14

**turned** [3] - 547:16, 548:15, 557:2

**turning** [2] - 548:4, 549:17

**type** [6] - 521:6, 550:18, 576:10, 576:21, 581:2, 605:22

**typical** [1] - 554:24

## U

**ultimate** [2] - 574:6, 611:16

**ultimately** [3] - 555:20, 557:25, 597:20

**unable** [1] - 578:22

**unavailable** [1] - 533:17

**unclear** [1] - 594:2

**under** [10] - 536:13, 554:8, 566:15, 586:12, 593:22, 597:1, 597:7, 605:12, 605:20, 608:12

**undercut** [1] - 575:2

**undergraduate** [1] - 610:15

**underlined** [1] - 539:18

**undermine** [1] - 609:19

**understandably** [1] - 585:10

**understood** [2] - 523:13, 577:3

**unfortunately** [1] - 523:6

**United** [8] - 520:3, 520:7, 529:5, 541:7, 554:20,

555:25, 586:11, 606:3

**University** [1] - 610:15

**unless** [1] - 547:16

**unreasonable** [1] - 577:10

**unsigned** [1] - 603:7

**unsworn** [2] - 606:3, 606:5

**up** [27] - 521:18, 523:19, 526:4, 526:18, 527:3, 533:5, 533:25, 535:21, 536:6, 542:22, 544:10, 548:13, 548:19, 549:17, 552:3, 572:16, 578:4, 583:3, 583:7, 583:14, 585:15, 587:13, 589:22, 598:12, 601:8, 611:11, 611:14

**upset** [1] - 584:23

**usual** [1] - 613:5

## V

**vague** [4] - 534:14, 558:13, 571:12

**vaguely** [2] - 530:4, 559:15

**vagueness** [1] - 590:14

**variety** [1] - 555:24

**various** [4] - 566:7, 595:17, 601:15, 603:17

**verified** [1] - 606:12

**version** [1] - 542:22

**versus** [5] - 520:3, 529:6, 574:14, 574:15, 586:11

**vetoes** [1] - 558:25

**victim** [1] - 581:9

**Victor** [1] - 609:10

**violation** [1] - 540:11

**violent** [1] - 582:5

**virtually** [1] - 573:13

**virtue** [1] - 550:3

**vocal** [1] - 550:2

## W

**walking** [1] - 555:8

**war** [1] - 590:11

**water** [1] - 526:4

**website** [1] - 556:1

**week** [2] - 553:18, 609:21

**weighing** [1] - 608:12

**weight** [2] - 605:24, 607:2

**white** [1] - 545:22

**whole** [1] - 547:11

**wide** [1] - 555:24

**wife** [2] - 583:20, 583:21

**WILLIAMS** [43] - 520:6, 531:14, 531:22, 548:17, 554:1, 554:3, 571:16, 578:12, 578:15, 578:17, 586:1, 586:5, 586:14, 595:10, 595:14, 595:22,

596:13, 597:24, 598:12, 598:15, 599:11, 600:1, 600:3, 600:6, 600:12, 601:9, 601:12, 601:20, 602:2, 602:21, 603:3, 603:20, 603:23, 603:25, 604:4, 604:6, 604:21, 608:19, 610:22, 611:3, 612:11, 612:20, 613:6

**Williams** [16] - 520:6, 548:16, 553:25, 559:21, 582:7, 592:12, 593:25, 595:9, 595:21, 600:10, 603:1, 607:15, 608:17, 610:2, 612:19, 613:5

**Williams's** [1] - 588:14

**willing** [2] - 611:5, 611:7

**Wisconsin** [2] - 525:6, 533:13

**withdraw** [1] - 609:5

**withdrawing** [2] - 608:21, 608:24

**witness** [11] - 520:11, 520:15, 559:4, 560:13, 560:15, 561:25, 562:6, 562:17, 574:17, 585:4, 585:12

**WITNESS** [2] - 520:19, 595:8

**witnesses** [22] - 523:24, 526:15, 526:19, 532:22, 539:8, 553:9, 554:5, 554:14, 555:1, 558:22, 559:7, 560:23, 574:20, 580:15, 580:19, 585:15, 585:23, 588:11, 595:16, 605:5, 606:11, 606:15

**Witnesses** [2] - 539:3, 539:16

**woman** [1] - 579:8

**word** [3] - 548:13, 565:16, 571:9

**words** [2] - 547:15, 608:10

**worried** [1] - 598:6

**worrying** [1] - 598:24

**worse** [2] - 579:2, 582:20

**worth** [1] - 580:2

**write** [1] - 569:6

**writing** [1] - 552:17

**written** [1] - 601:6

**wrote** [2] - 578:18, 578:19

## Y

**year** [1] - 521:15

**years** [4] - 521:5, 521:10, 555:17, 565:15

**yesterday** [1] - 600:14

**yourself** [7] - 527:22, 529:8, 532:23, 547:23, 552:6, 580:9, 585:7

*Contact Patrice Murray at 319-286-2324 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*