# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA

_____

| | : | |
| UNITED STATES OF AMERICA, | : | No. C10 – 3074 – LRR |
| | : | |
| Respondent, | : | **CAPITAL 2255 PROCEEDINGS** |
| | : | |
| -v- | : | HON. LINDA R. READE |
| | : | Chief U.S.D.J. |
| DUSTIN LEE HONKEN, | : | |
| | : | |
| Petitioner. | : | |
| _____ | : | |

### PETITIONER'S POST-HEARING BRIEF

Leigh Skipper
Chief Federal Defender
By: Shawn Nolan
Assistant Chief, Capital Habeas Unit
Timothy Kane
Aren Adjoian
Ayanna Williams
Assistant Federal Defenders
Federal Community Defender Office
Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520
Counsel for Petitioner, Dustin Lee Honken

Dated:     Philadelphia, PA
           January 24, 2012

# TABLE OF CONTENTS

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

CLAIMS FOR RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

**Claim One**

Petitioner's Rights to Due Process, Trial by Jury, Confrontation, Compulsory Process, and Against Cruel and Unusual Punishment Were Violated When Trial Counsel Provided Ineffective Assistance by Failing to Object to the Admission of the Court's Sentencing Findings from a Prior Case; Appellate Counsel Likewise Provided Ineffective Assistance by Failing to Raise and Litigate the Issue.. . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**Claim Two**

Petitioner's Rights to Effective Trial and Appellate Counsel, Due Process, and Against Double Jeopardy and Cruel and Unusual Punishment Were Violated When Trial Counsel Failed to Object to the Charges and Evidence Related to Issues Previously Litigated and Resolved in Petitioner's Favor in His 1998 Drug Conspiracy Sentencing Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**Claim Three**

The Government Violated Due Process When it Failed to Disclose Exculpatory Evidence Relevant to Cooperating Witnesses. Trial Counsel Ineffectively Failed to Discover this Evidence. Accordingly, Petitioner's Convictions and Sentences Violated the Fifth, Sixth and Eighth Amendments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**Claim Four**

Petitioner's Convictions and Sentences Resulting from His Convictions for Violation of 21 U.S.C. § 848(c) (Continuing Criminal Enterprise) were Obtained in Violation of the Fifth, Sixth and Eighth Amendments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**Claim Five**

Petitioner's Rights to Effective Assistance of Counsel, Due Process, and Against Double Jeopardy and Cruel and Unusual Punishment Were Violated When Trial Counsel Failed to Object to Multiplicitous Charges for Drug Conspiracy Murder and Continuing Criminal Conspiracy Murder, in Violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

**Claim Seven**

Petitioner's Rights to Due Process, to an Impartial Jury, to Effective Assistance of Counsel, and Against Cruel and Unusual Punishment Were Violated Where Trial Counsel Failed to Object to the Exclusion of Qualified Jurors from the Venire, Contrary to Witherspoon v. Illinois and its Progeny; Appellate Counsel Were Ineffective for Failing to Raise and Litigate this Issue; All in Violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution. . . . . . . . . . . . . . . . . . . . . . . 24

**Claim Nine**

Petitioner Was Denied His Sixth Amendment Right to Effective Assistance of Counsel at His Capital Sentencing. . . . . . . . . . . . . . . . . . . . . . 31

**Claim Ten**

The Court's Penalty Phase Instructions Failed to Properly Narrow the Scope of the Jury's Consideration of Future Dangerousness and Failed to Guide the Jury's Weighing of Aggravating and Mitigating Circumstances; Counsel Were Ineffective for Failing to Object in Violation of Petitioner's Fifth, Sixth, and Eighth Amendment Rights. . . . 54

**Claim Eleven**

Victim Impact Evidence Presented to the Jury Was Received in Violation of the Fifth, Sixth and Eighth Amendments. . . . . . . . . . . . . . . . . 57

**Claim Fourteen**

     The Government Violated the Fifth and Eighth Amendments When it Repeatedly Elicited Inadmissible Testimony Regarding Petitioner's Alleged Involvement with Drugs and Violence That Was Too Remote to be Relevant. Trial and Appellate Counsel Ineffectively Failed to Object to or Litigate All of the Instances of Misconduct. . . . . . . . . . . . . . . . 59

**Claim Sixteen**

     Trial Counsel Ineffectively Failed to Present Abundant, Readily Available Evidence that Would Have Supported Their Theory of Defense. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

**Conclusion**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

# INTRODUCTION

This Post-Hearing Brief addresses evidence presented by the parties during the evidentiary hearing held by this Court from October 31, 2011, to November 3, 2011, and in depositions taken by the parties before the hearing.

This Brief addresses only those claims for which meaningful evidence was presented, and does not address other claims. Petitioner has not included a significant amount of legal authority in this Memorandum as there has previously been substantial briefing. By not addressing any issue in this Brief, Petitioner does not intend to waive any argument or claim. Petitioner instead submits that those matters are ripe for decision based on the parties' prior pleadings and the record of the case. In taking this position, Petitioner maintains that his ability to collect facts supporting some of his claims was erroneously limited by the Court's rulings on his requests for discovery.

Stylistic conventions and citations in this Brief conform to those employed in Petitioner's Memorandum of Law and Supplemented § 2255 Motion, and the Reply Brief in support thereof. (*See* Dkt. No. 19 at x-xii; Dkt. No. 29 at v.) Transcripts of the evidentiary hearing are cited as "2255 Tr." followed by a page citation. Transcripts of the trial proceedings are again cited only as "Tr." followed by a page citation. Transcripts of other proceedings are cited either as "Tr." followed by the

1

date of the proceeding and a page number, or as "Johnson Tr." followed by a page citation for co-defendant Johnson's trial transcripts. Notations to the exhibits introduced at the evidentiary hearing are cited as "Pet. Ex." or "Gov. Ex." followed by the number or letter.

The deposition transcripts of six witnesses were admitted in lieu of live testimony. At the Court's direction, they were filed through ECF with the following docket numbers: 67 (Dr. John Warren taken on 10/3/11); 68 (Dr. Melissa Piasecki taken on 10/13/11); 69 (Lisa Rickert taken on 10/14/11); 70 (Dr. Michael Gelbort taken on 10/20/11); 71 (Dr. Christopher Grote taken on 10/20/11); 72 (Dr. Richard Dudley taken on 10/25/2011).

The ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES (2003) are published at 31 Hofstra L. Rev. 913 (2003) and are available on-line: www.aba.org/advocacy/other_aba_initatives/ death_penalty_representation/resources/Guidelines.html (last visited June 5, 2011). They are herein referred to simply as the "ABA Guidelines."

All emphasis is provided unless otherwise noted.

2

## CLAIMS FOR RELIEF

### CLAIM ONE

**PETITIONER'S RIGHTS TO DUE PROCESS, TRIAL BY JURY, CONFRONTATION, COMPULSORY PROCESS, AND AGAINST CRUEL AND UNUSUAL PUNISHMENT WERE VIOLATED WHEN TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE BY FAILING TO OBJECT TO THE ADMISSION OF THE COURT'S SENTENCING FINDINGS FROM A PRIOR CASE; APPELLATE COUNSEL LIKEWISE PROVIDED INEFFECTIVE ASSISTANCE BY FAILING TO RAISE AND LITIGATE THE ISSUE.**

The Habeas Petition alleged that trial counsel were ineffective in failing to object to the Government's use of exhibits containing the District Court's sentencing findings (in the Government's favor) in the prior drug conspiracy prosecution of Mr. Honken. These findings included that Petitioner had an aggravated role in the conspiracy, the extreme length of his prison sentence, that he was prohibited from possessing a firearm on supervised release, and that he was held accountable for 2.87 kilograms of methamphetamine. The findings were relevant to numerous factual issues at the guilt and penalty phase of this trial, and thus the Government's use of these sentencing findings violated Petitioner's rights to due process, to trial by jury, to compel and confront witness against him, and against cruel and unusual punishment.

The Government largely conceded the factual basis of the claim, *i.e.*, the content of the sentencing findings and that the Government introduced and presented

3

argument based on these findings at trial. *See* Opp. 24-25, 28-29. The Government nonetheless argued that (A) it presented other, additional evidence of these factual issues, Opp. at 27-28; (B) Petitioner's confrontation rights were not violated because the court's sentencing findings were "a ministerial act, more akin to the creation of a business record," and thus admissible against Petitioner, *id.* at 30-31; (C) trial counsel were not deficient because Petitioner was not entitled to "perfect or errorless representation," *id.* at 29; and (D) Petitioner was not prejudiced because, *inter alia*, "the fact that trial counsel did not notice the reference to drug quantity in the judgments is likely reflective of the degree to which any juror paid attention to it." *Id*. at 31. Petitioner addressed these arguments in his Reply Brief, and with the exception of (C), these defenses raise pure legal issues and/or can be determined based solely on the record.

With regard to issue (C), whether trial counsel's performance was deficient, Mr. Parrish, Mr. Rogers, and Mr. Spies all testified, consistent with their Declarations, that they sought to raise all meritorious objections at trial, and that they had no tactical or strategic reason for failing to do so here. *See* 2255 Tr. at 20-21, 90 (Parrish); *id*. at 240 (Rogers); *id*. at 527, 530-31 (Spies). Mr. Spies had a vague recollection that some related issue may have been discussed in the courtroom among defense counsel and counsel for the Government, but the testimony was clear that

4

trial counsel had no strategic reason for not objecting to the admission of the sentencing findings. *See id.* at 559-60.

As discussed in prior pleadings, counsel's failure to object to the sentencing findings permitted the jury to receive improper and highly prejudicial evidence that was relevant to numerous factual issues at the guilt phase, including whether Petitioner was a manager of five other persons in a continuing criminal enterprise, whether Petitioner had possessed a firearm, and whether the alleged drug conspiracy and continuing criminal enterprise involved more than 100 grams of actual methamphetamine. All of the sentencing findings were likewise relevant to the jury's decision whether to sentence Mr. Honken to life imprisonment or to death. Accordingly, relief is warranted.

## CLAIM TWO

**PETITIONER'S RIGHTS TO EFFECTIVE TRIAL AND APPELLATE COUNSEL, DUE PROCESS, AND AGAINST DOUBLE JEOPARDY AND CRUEL AND UNUSUAL PUNISHMENT WERE VIOLATED WHEN TRIAL COUNSEL FAILED TO OBJECT TO CHARGES AND EVIDENCE RELATED TO ISSUES PREVIOUSLY LITIGATED AND RESOLVED IN PETITIONER'S FAVOR IN HIS 1998 DRUG CONSPIRACY SENTENCING PROCEEDINGS.**

While failing to prevent the jury from hearing the District Court's prior sentencing findings in the Government's favor, trial counsel also failed to assert Petitioner's rights under federal law and the Double Jeopardy Clause as to the District

5

Court's findings in Petitioner's favor. The Petition thus alleged that trial counsel were ineffective in failing to object to the relitigation of these factual issues, and that effective counsel would have asserted Petitioner's rights under federal and constitutional law, thus precluding Petitioner's capital convictions. *See* Pet. 10-27.

At the hearing, the evidence showed as follows. Mr. Rogers was responsible for drafting the double jeopardy motion well in advance of trial. 2255 Tr. at 16-17 (Parrish); *id.* at 234-35 (Rogers); *id.* at 528 (Spies). Although Mr. Spies and Mr. Parrish reviewed the motion and discussed it with Mr. Rogers, they largely deferred to Mr. Rogers on the matter. *E.g., id.* at 528 (Spies). Mr. Rogers was generally aware of the standard governing collateral estoppel, and was not aware of any exception to this standard for sentencing findings. *Id.* at 257 (Rogers). While Mr. Rogers reviewed the prior drug sentencing proceedings, he believes that he was not aware of the specific findings made by Judge Bennett in Petitioner's favor, or, at least, he overlooked the significance of those findings in preparing the double jeopardy motion. *Id.* at 236-38 (Rogers). As a result, an objection based on collateral estoppel grounds was not raised or even discussed, even after Judge Bennett's opinion denying the motion noted that Petitioner had not asserted collateral estoppel. *Id*.

Thus, contrary to the Government's suggestion that counsel did not raise the issue because they were not aware of case law addressing the exact same scenario,

6

trial counsel failed to assert and litigate Petitioner's collateral estoppel rights simply as a result of an oversight. Counsel did not have a tactical or strategic reason for this failure. *Id.* at 19-21 (Parrish); *id.* at 236-38 (Rogers); *id.* at 528-29 (Spies).

The Government's primary argument that trial counsel's performance was not deficient – because counsel was not aware of a case addressing this exact scenario – is thus unavailing. *See* Opp. 36-39. Indeed, as discussed in Petitioner's Reply Brief, at least one Court of Appeals has found counsel deficient under a comparable scenario. In *Rice v. Marshall*, 816 F.2d 1126 (6th Cir. 1987), the Sixth Circuit found counsel ineffective for failing to object on the grounds of constitutional collateral estoppel. There, the defendant was first tried on charges of rape, kidnaping, and possessing a weapon, all arising from the same incident. 816 F.2d at 1127-28. The jury found him not guilty of the weapon charge, but hung on the other two counts. *Id*. At a retrial on the remaining two charges, the evidence of the rape included the victim's testimony, in which she discussed the gun with which the defendant allegedly threatened her. *Id.* Defense counsel did not object, and likewise did not object to the prosecutor's references to the gun during opening statement and closing argument. *Id.* The court granted relief and explained:

> The present case differs factually from *Ashe v. Swenson*. . . . No doubt this is what threw counsel off. . . . Nevertheless, he failed to appreciate the fact that Rice's acquittal of the weapon charge constituted a finding

7

> that he did not have a gun and precluded the introduction of contrary evidence at the subsequent trial. . . .
>
> Rice's appointed attorney forthrightly stated at the evidentiary hearing that it did not occur to him that acquittal of the weapon charge would foreclose the admission of testimony about a gun at the second trial. This being the case, his failure to seek exclusion of that evidence cannot be attributed to trial tactics. His strategy of seeking to question the complaining witness's credibility would not have ruled out an effort to exclude the evidence of a gun. The two objectives would not have been inconsistent.
>
> Having concluded that counsel's representation was deficient, the further conclusion that Rice was prejudiced is inescapable.

*Id*. at 1131-32. The exact same concerns are present here, both as to the District Court's prior finding that Petitioner did not possess a gun, and as to the court's other findings, including that the Petitioner was not engaged in the drug conspiracy at the time of the murders. Indeed, the Government expressly acknowledged at the hearing that "[Judge Bennett] made findings with regard to the timing of the conspiracy." 2255 Tr. at 236. Those findings were in direct conflict with the allegation underlying the Government's ten capital counts in this case.

Further, regardless of then-existing case law, counsel had a professional duty "to consider all legal claims potentially available." ABA Guideline 10.8A.1. Even under the deferential review required by 28 U.S.C. § 2254, the Supreme Court has recognized that it can be unreasonable for courts to "*refuse[] to extend [a legal]*

8

*principle to a new context where it should apply*." *Williams v. Taylor*, 529 U.S. 362, 407 (2000); *accord Wiggins v. Smith*, 539 U.S. 510, 520 (2003). The same principle governs counsel's representation.

Indeed, there are numerous examples where courts have applied *Ashe* in unique factual circumstances. *E.g.*, *United States v. Carbullido*, 307 F.3d 957 (9th Cir. 2002) (applying *Ashe* and ruling that District Court's finding in prior prosecution that defendant was legally insane at the time of the charged offense precluded a second prosecution for another charged offense occurring in the same time period); *United States v. Gonzalez-Sanchez*, 825 F.2d 527 (1st Cir. 1987) (applying *Ashe* to find that prior acquittal on conspiracy charge precluded the Government from presenting other evidence, in subsequent prosecution, of defendant's involvement in same scheme); *Humphries v. Wainwright*, 584 F.2d 702 (5th Cir. 1978) (applying *Ashe* and according preclusive effect *to the Government's decision*, in an earlier related prosecution, to *nolle prosse* the case after the Government had rested); *Delap v. Dugger*, 890 F.2d 285 (11th Cir. 1989) (applying *Ashe* and according preclusive effect to jury's prior acquittal where Government sought to prove overlapping facts to establish an aggravating factor in later capital trial); *United States v. Brown*, 547 F.2d 438 (8th Cir. 1977) (vacating conviction where prior acquittal necessarily implied factual finding which contradicted factual finding on which the subsequent

9

conviction depended).

The purportedly "novel" circumstance nonetheless relied on by the Government here is that the prior factual findings resulted from a sentencing hearing. Opp. 38-39. But, under double jeopardy law, "what constitutes an 'acquittal' is not to be controlled *by the form* of the judge's action." *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 571 (1977) (citations omitted). Instead, the Court "must determine whether the ruling of the judge, *whatever its label*, actually represents a resolution, correct or not, of some or all of the factual elements of the offense charged." *Id.* The record here establishes that the District Court's factual findings were indeed such a "resolution," and the Government's formalistic argument finds no support in principle or precedent. As the Supreme Court recognized in *Ashe*, "the rule of collateral estoppel in criminal cases is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality." *Ashe*, 397 U.S. at 444. The Government's hypertechnical defense of counsel's failure is misplaced.

Finally, as the Sixth Circuit recognized in *Rice*, "having concluded that counsel's representation was deficient, the further conclusion that Rice was prejudiced is inescapable." *Rice*, 816 F.2d at 1131-32. The same is true here. Allegations made in the Superseding Indictment, and the evidence presented by the

10

Government in support of those allegations at trial, covered the same ground and relitigated the same issues that Judge Bennett had already resolved in Petitioner's favor. *See* Pet. 11-22. An appropriate objection by trial counsel would have precluded relitigation of these issues and thus would have precluded Petitioner's convictions on Counts 8 to 17.

**CLAIM THREE**

**THE GOVERNMENT VIOLATED DUE PROCESS WHEN IT FAILED TO DISCLOSE EXCULPATORY EVIDENCE RELEVANT TO COOPERATING WITNESSES. TRIAL COUNSEL INEFFECTIVELY FAILED TO DISCOVER THIS EVIDENCE. ACCORDINGLY, PETITIONER'S CONVICTIONS AND SENTENCES VIOLATED THE FIFTH, SIXTH AND EIGHTH AMENDMENTS.**

Petitioner has alleged that the Government withheld information from the defense that it was obligated to turn over under *Brady v. Maryland*, 373 U.S. 83 (1963). *See* Pet. Mem. at 27 - 46. At trial, the Government used a significant number of jailhouse informant witnesses to testify that Petitioner confessed to certain things. In these §2255 proceedings, while Petitioner's counsel was not permitted to speak to all of these witnesses, counsel had uncovered new information about promises and benefits received, as well as pressure by Government agents, that was not reported to defense counsel at trial.

Specifically, Petitioner presented testimony from four Government informant

11

witnesses at the §2255 hearing: Dennis Putzier, Anthony Johnson, Terry Bregar, and Dan Cobeen. Each of these four witnesses offered testimony that they received benefits, promises, and threats that were not disclosed to trial counsel.

### A. The Undisclosed Information

#### 1. Dennis Putzier

Dennis Putzier was incarcerated with Petitioner at the Woodbury County Jail in 1996. He testified at trial to a number of damaging facts against Petitioner. He testified that 1) Petitioner confessed to the killings in this case; 2) Petitioner wanted Putzier to escape from the jail so that Putzier could kill Timothy Cutkomp, who was a witness against Petitioner; 3) Petitioner also bonded Dean Donaldson out in order to kill Cutkomp; and 4) Petitioner attempted to escape from the jail himself. Tr. 1286-1320. Petitioner supposedly confided all of this information to Putzier and trusted Putzier enough to enlist his help despite the fact that the two did not know each other prior to being incarcerated, were only incarcerated together a short time, were housed in different cell blocks, and thus never actually met face-to-face. Tr. at 1291-92. Putzier was asked on direct examination at trial whether he received any benefit for his testimony, other than a sentence reduction on his charge for aiding and abetting Petitioner's attempted escape from the Woodbury County Jail. Tr. at 1279-80. He testified that he had not. Tr. at 1280.

12

Putzier's initial involvement in the case came when he testified at the grand jury in April, 1997. Putzier's grand jury testimony was decidedly different from his trial testimony. At the grand jury, Putzier did not testify that Petitioner confessed to him, nor did he testify about anyone's attempt to escape or to do harm to Cutkomp. Pet. Ex. 29; 2255 Tr. at 200-05.

Following his testimony at the grand jury, Putzier was visited by federal law enforcement agents in November, 1997. Tr. at 1308-09; 2255 Tr. at 205. Putzier received this visit shortly before he testified at Petitioner's 1998 sentencing proceeding on Petitioner's drug charges. Putzier's testimony at Petitioner's sentencing proceeding was in large part consistent with his trial testimony, and markedly inconsistent with his grand jury testimony. At Petitioner's trial, the Government asked Putzier why he made a sudden about face in his testimony. Tr. at 1308. Putzier stated that the reason he became willing to talk was because federal agents "came and talked to [him] and told [him] to think about what [he was] doing." Tr. at 1308. Putzier also testified that they suggested to him that others had already given information, so he may as well give information, too. Tr. at 1309-10.

Putzier's testimony at the §2255 hearing paints a much different picture. He did not, in fact, change his testimony because law enforcement officers told him "to think about what [he was] doing," but rather because they threatened him with a life

13

sentence in federal prison for conspiring to kill Cutkomp if he did not cooperate. 2255 Tr. at 207. Putzier further described his interaction with federal agents during that 1997 meeting in a letter to Judge O'Brien in conjunction with some recent charges he was facing [text reproduced as it appears in original]:

> Ya know I do not trust the fed's. Tim Calliton Mark Hinze, and one outher D.E.A. officer came to the prison in Clarinda, IA, in 98 and told me that if I did not testify on Dustin Honken that they would give me 365 months to life! And they knew I did not know Dustin Honken. I talked to him through a key hole in a fire door and wrote him some letter's. They knew I could not excape, help him excape, and that I was not going to and would not kill any one! And told me that! But said if I did not do what they want I would do life in prison! They even told me how to say everything in court! And when that was over they told me to tell on two outher people and they would drop all the charges. I told them I did not come to tell I came to save my life for doing nothing. I'm afraid of the fed's. they can do what ever they want. And told me so! And I beleave Dustin Honken got what he had coming to him. If I would of knowen he killed them people and them children I would of told because it is right! I don't think the fed's have a right to take peoples lives for no reason eather!

Pet. Ex. 26 at 2-3. Putzier's letter to Judge O'Brien regarding the threat of a life sentence is not only consistent with his §2255 hearing testimony, but also with numerous statements he has recently given to law enforcement agents. *See* Pet. Ex. 27, 28.

Trial counsel was never informed that Putzier was threatened with a life sentence if he refused to provide information. Although Putzier did state during his

14

testimony at Petitioner's 1998 sentencing hearing that he was facing new potential charges of perjury, aiding and abetting escape, and conspiracy to commit murder, he provided a drastically different picture of the potential sentence he might receive: 5, 10, or 15 years. 2255 Tr. at 210-12, 215-16. Petitioner's jury never learned that Putzier only started to supply his dubious testimony about Petitioner's alleged confession s to him – while he was housed in a different jail block – after Putzier was threatened with a life sentence. Trial counsel, Mr. Parrish testified at the §2255 hearing that he would have used this information to impeach Putzier had he been aware of it. 2255 Tr. at 15-16. To whatever unlikely extent he could have learned of it in the face of the Government's non-disclosure, he was ineffective for failing to do so.

### 2. Anthony Johnson

Anthony Johnson offered testimony at trial that he purchased a methamphetamine recipe from Petitioner while the two were incarcerated together at the Woodbury County Jail. When asked by the Government whether he received any benefit for testifying against Petitioner, he replied "[n]one whatsoever." Tr. at 2090. On cross-examination at trial, defense counsel elicited the fact that Mr. Johnson "reached an agreement with the Government that anything that [he] told them about [his] activities in the jail wouldn't be used against [him]." Tr. at 2099.

15

At the §2255 hearing, however, Mr. Johnson made clear that the benefits he received for offering information against Mr. Honken were not limited to insulating himself from new charges relating to the meth recipe. In addition to this benefit, Mr. Johnson also received assurances that he would not be charged with unrelated criminal conduct, specifically, obtaining a camper from drug sales or with illegally delivering firearms. 2255 Tr. at 284-85. Mr. Johnson had been threatened with these new charges by federal agents after initially refusing to provide them information pertaining to Petitioner. *Id.*; *see also* Pet. Ex. 122 (Johnson Declaration). Thus, here again, the full extent of the threats levied and the benefits received by a cooperating witness was not disclosed to Petitioner's trial counsel.

### 3. Terry Bregar

Terry Bregar testified that Petitioner was involved in an escape plan and that Petitioner had told him that he had bailed Dean Donaldson out of prison to take care of some things for him. He also testified that Petitioner had made a motion as if shooting a gun when he told Bregar that witnesses had not shown up in his earlier case. The Government elicited testimony from Bregar at trial that his sentence was reduced by four and a half years in return for his cooperation. Tr. at 1385.

At the §2255 hearing, Petitioner presented significant additional impeachment material that was not disclosed to defense counsel at trial. Most significantly, it was

16

documented in his Bureau of Prisons medical records in 1997 that he had previously had a "vascular accident" with possible "temporal arterisis." In other words, he had a stroke. Pet. Ex. 125 at 4. Further, he complained to prison medical staff of memory loss and concern about Alzheimer's symptoms in light of the fact that both of his parents suffered from this disease. *Id.* at 3.

Bregar also testified, consistent with the Declaration he provided, that the Government exerted significant pressure on him to tell them that Petitioner confessed to him. 2255 Tr. at 465-66. While Bregar did not succumb to these tactics, they certainly shed light on the investigation into these crimes and into the Government's dealings with all of the jailhouse informant witnesses, and would have provided significant and compelling avenues for cross-examination.

Finally, Bregar testified that 5 or 6 of the jailhouse informant witnesses who testified at Petitioner's trial were all transported in a single van together in advance of their testimony. 2255 Tr. at 467. One of these witnesses was Dean Donaldson. *Id.* The van ride lasted for "hours," and the inmate passengers in the van were all discussing Petitioner. *Id.* at 468-69. Some inmates were discussing how they would be able to shave "[y]ears off their sentence" in exchange for their testimony. *Id.* at 469. Bregar testified that the two United States Marshals in the front of the van were able to hear this entire conversation. *Id.* at 483-84.

17

Counsel Spies, who cross-examined Bregar, was not aware of his stroke or memory problems. 2255 Tr. at 553. He was not in possession of Bregar's BOP medical records. 2255 Tr. at 554. Had he been aware of Bregar's memory problems, he "[a]bsolutely" would have used them in cross-examination. 2255 Tr. at 553.

### 4. Dan Cobeen

Dan Cobeen offered testimony against Petitioner at trial regarding Petitioner's attempts to manufacture methamphetamine in 1995. He was asked on direct examination whether he received any benefits for his testimony. Tr. at 585-86. Cobeen testified that he was given $7,000 in relocation money, but otherwise received no benefit. *Id.* He was specifically asked if he was given any benefit regarding the state charges he had at the time, to which he responded that he was not, other than the ability to pay off about $200 in fines with some of the relocation money he received. *Id.*

On cross-examination at trial, defense counsel attempted to elicit whether or not Cobeen had, in fact, received a benefit on his state charge, contrary to his testimony elicited on direct; namely, Cobeen was asked whether he received a reduction in his probation time as a result of his cooperation. Tr. at 606-10. Over this extended exchange with counsel, Cobeen gave conflicting, vague, and non-responsive answers as to whether he received a reduction in his probation. At one juncture,

18

defense counsel asked Cobeen whether he was aware what arrangements were made so that he no longer had to report to his probation officer, and the Government objected, stating: "[t]here's no evidence saying arrangements were made. Misstates the evidence." Tr. at 608-09.

At the §2255 hearing, however, Cobeen testified unequivocally on direct examination that John Graham arranged for him to get a year dropped from his probation as a result of his cooperation against Petitioner:

> Q: Didn't Mr. Graham get you off probation at an earlier time so that you could do this cooperation?
>
> A: I think I got a year dropped.
>
> Q: But you didn't testify to that in front of the jury in Mr. Honken's murder trial, did you?
>
> A: I don't recall if they asked me that or not.

2255 Tr. at 304-05. The Government did not cross-examine Cobeen at the hearing. 2255 Tr. at 305.

**B.    The Undisclosed Information Was Material Under *Brady***

Petitioner has set forth the law of *Brady* materiality in his Memorandum of Law and does not repeat it here. *See* Pet. Mem. 29 - 32. Petitioner submits that the evidence outlined above establishes that the undisclosed information is highly material. Without the informant testimony, the case against Petitioner was completely

19

circumstantial. There was no eyewitness testimony. There was no confession to law enforcement. There is no forensic evidence whatsoever to connect Petitioner to the crimes. The only direct evidence that Petitioner committed these crimes came from the jailhouse informants who testified that Petitioner had confessed to them. Had the Government turned over the suppressed evidence, or if counsel discovered it on their own, the testimony of these cooperating witnesses would have been viewed in a significantly different light. The wholesale challenge to the credibility of these witnesses that could have been mounted would certainly have resulted in the probability of a different verdict and/or sentence. At a minimum, however, Petitioner requests, that in light of the above evidence, this Court revisit its decision not to allow Petitioner access to discovery and to interview the remaining Government informant witnesses whom he has not yet been able to interview.

Finally, for the same reasons that the evidence is material, counsel's failure to uncover it, to the extent that they could have in the face of suppression, resulted in prejudice. *See Strickler v. Greene*, 527 U.S. 263, 297 (1999) (Souter, J., concurring) ("the Court treats the prejudice enquiry as synonymous with the materiality determination under *Brady*"). In either event, confidence in the outcome of the trial and sentencing is undermined, and Petitioner should be granted a new trial.

20

## CLAIM FOUR

**PETITIONER'S CONVICTIONS AND SENTENCES RESULTING FROM HIS CONVICTIONS FOR VIOLATION OF 21 U.S.C. § 848(C) (CONTINUING CRIMINAL ENTERPRISE) WERE OBTAINED IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS.**

The Petition alleged that trial counsel were ineffective in failing to collect and present available evidence that would have shown that Petitioner did not act as an organizer, supervisor, or manager of his older brother, Jeffrey Honken, in the alleged continuing criminal enterprise. Because the Government alleged that Petitioner managed only the statutory minimum of five other persons, *see* 21 U.S.C. § 848(c), trial counsel's failure thus permitted the Government to obtain convictions and death sentences on Counts 13 to 17. *See* Pet. 46-49.

The evidence presented at the hearing confirmed several aspects of the Petition's allegations. Two witnesses testified that Petitioner never managed, controlled, or gave orders to Jeffrey Honken. 2255 Tr. at 126 (Jeffrey Honken); *id.* at 319-20 (Cutkomp). Mr. Spies testified that, despite interviewing Jeffrey Honken before trial, he did not inquire about his role in the conspiracy. *Id.* at 532-33.

The government, meanwhile, presented evidence that Petitioner had a leadership role in the drug operation. *E.g., id.* at 40-42. Petitioner, however, has never alleged otherwise and instead contends simply that Petitioner did not have a

21

leadership role *with respect to Jeffrey Honken*. *See* Pet. 46-49. The evidence about Petitioner's general leadership role in the operation is thus irrelevant to the factual issue that was ripe to be contested at trial. Mr. Parrish's testimony on this topic suggests a failure to appreciate this distinction. *See* 2255 Tr. at 40-42.

The Government also presented evidence that, after Petitioner's and Cutkomp's arrest in 1993, Petitioner told Cutkomp to tell Melissa Friesenborg to tell Jeffrey Honken to get rid of various items that were being kept at a storage facility, and that Jeffrey Honken then did so. *See id.* at 151-54, 333-34. Even assuming that this evidence of Petitioner's attenuated influence over Jeffrey Honken is credited, Petitioner submits that it does not meet the statutory threshold intended by Congress in 21 U.S.C. § 848(c) and that a statutory interpretation finding that evidence sufficient under § 848(c) would be inconsistent with Petitioner's right to due process.

**CLAIM FIVE**

**PETITIONER'S RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL, DUE PROCESS, AND AGAINST DOUBLE JEOPARDY AND CRUEL AND UNUSUAL PUNISHMENT WERE VIOLATED WHEN TRIAL COUNSEL FAILED TO OBJECT TO MULTIPLICITOUS CHARGES FOR DRUG CONSPIRACY MURDER AND CONTINUING CRIMINAL CONSPIRACY MURDER, IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

The Petition alleged that trial counsel were ineffective in failing to object to the multiplicitous counts for the drug conspiracy charges in Counts 8 through 12 and the

22

continuing criminal enterprise charges in Counts 13 through 17.  Pet. 50-53.  As the Government has previously conceded:

> Had trial counsel objected to multiplicity, like trial counsel did in Johnson's case, the remedy would have been the same on appeal – remand to vacate the murder in furtherance of drug conspiracy convictions.

Opp. 67-68.

The evidence adduced at the evidentiary hearing confirmed that trial counsel had no strategic reason for not raising this claim.  *See* 2255 Tr. at 21 (Parrish); *id.* at 240 (Rogers); *id.* at 527 (Spies).  As Mr. Parrish pointed out, there is simply no downside to raising such an objection before trial.  *See id.* at 43-44.

In light of the evidence, the proper remedy is "to vacate the murder in furtherance of drug conspiracy convictions." Opp. 68.  In addition, the Court should consider whether, as set forth in the Petition, the improper doubling of Petitioner's capital counts impermissibly tipped the scales in favor of death at the penalty phase of trial.  There is a reasonable likelihood that, absent counsel's failure, Petitioner would not have been sentenced to death on any counts if trial counsel had properly objected.  *See* Pet. 53.

23

**PETITIONER'S RIGHTS TO DUE PROCESS, TO AN IMPARTIAL JURY, TO EFFECTIVE ASSISTANCE OF COUNSEL, AND AGAINST CRUEL AND UNUSUAL PUNISHMENT WERE VIOLATED WHERE TRIAL COUNSEL FAILED TO OBJECT TO THE EXCLUSION OF QUALIFIED JURORS FROM THE VENIRE, CONTRARY TO *WITHERSPOON V. ILLINOIS* AND ITS PROGENY; APPELLATE COUNSEL WERE INEFFECTIVE FOR FAILING TO RAISE AND LITIGATE THIS ISSUE; ALL IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

## A.    Introduction

The Constitution requires that a capital defendant be tried by an impartial jury. *Morgan v. Illinois*, 504 U.S. 719, 729-30 (1992). It is well-settled that the justice system "may not entrust the determination of whether a man should live or die to a tribunal organized to return a verdict of death." *Witherspoon v. Illinois*, 391 U.S. 510, 521 (1968). "A sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Id.* at 522. The test for determining whether a juror can be impartial in a capital case "is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (*quoting Adams v. Texas*, 448 U.S. 38, 45 (1980)). If even one venire member is improperly

24

excluded for cause, a death sentence cannot stand. *Kinder v. Bowersox*, 272 F.3d 532, 543 (8th Cir. 2001) (citing *Gray v. Mississippi*, 481 U.S. 648, 667-68 (1987)).

Petitioner has raised two ineffective assistance of counsel claims with regard to the way in which jury selection was conducted at his trial. First, Petitioner has claimed that trial counsel were ineffective in brokering and executing a deal in which otherwise-qualified jurors at the opposite ends of the spectrum of death penalty views were excused by agreement of the parties. Second, Petitioner has claimed that appellate counsel were ineffective for failing to raise preserved *Witherspoon* challenges to two specific jurors (numbers 538 and 813).

In this brief, Petitioner discusses only the claim of trial ineffectiveness, as the merits of the underlying *Witherspoon* challenges to jurors 538 and 813 are based in the trial record and were fully briefed in Petitioner's Memorandum of Law. *See* Pet. Mem. at 66 - 74. Appellate counsel were necessarily ineffective in failing to raise these clearly meritorious issues, which would have resulted in the granting of a new penalty phase. There was not, and could not be, any tactical or strategic reason for counsel not to raise these well-preserved, meritorious claims of constitutional error, which are per se prejudicial. *See Kinder*, 272 F.3d at 543. Due to the underlying merit of the claim, there is again necessarily a reasonable probability that raising this claim would have resulted in the reversal of Petitioner's sentences.

### B.     The Voir Dire Process in this Case

One thousand potential jurors were each mailed a thirty-page questionnaire in advance of Petitioner's trial.  After eliminating persons who could not be located or who did not return their questionnaires, counsel for both parties entered an agreement to exclude nearly 250 potential jurors for cause, based solely on answers given in the questionnaires.  *See* Dkt.  342, Order (July 29, 2004).  Approximately 163 of the 250 were excused based on their answers to Question 72 of the questionnaire, regarding *Witherspoon* eligibility.  Question 72 offered a series of positions on the death penalty, listed as "a" through "i" and asked potential jurors to circle the statement that most accurately reflected their beliefs.[1]  Statements "a" and "i," expressed views stating that the potential juror would either never vote for the death penalty or always vote for the death penalty, respectively.  Statements "b" and "h," the next choice in from either end of the spectrum, expressed points of view stating that the juror would simply "have a difficult time" voting for or against the death penalty, respectively.

The Questionnaire obviously was designed to ferret out those jurors who would be excludable under *Witherspoon* (those who answered "yes" to "a"), and those who would be excludable under *Morgan* (those who answered "yes" to "i").  In live voir dire, those who provided answers on the next grade in from either end of the

---

[1]There was also a "none of the above" option listed as "j."

26

spectrum, *i.e.*, those who answered "yes" to either question "b" or "h" should have been subject to further probing as to whether those answers would substantially impair their ability to perform their duty as jurors. *See Witt*, 469 U.S. at 428; *Uttecht v. Brown*, 551 U.S. 1 (2007). Depending on follow up questioning, some of those jurors may have been qualified, while others may not have been.

Rather than subjecting these jurors to further probing, counsel engaged in a trade with the Government to eliminate all potential jurors who answered yes to "a," "b," "h," or "i" on their questionnaires. Upon the completion of the questionnaires in this case, 29 potential jurors were struck for answering "b."

### C.  Counsel's Performance was Deficient

Petitioner has claimed that this trade was on its face a bad deal, thus it constituted deficient performance under *Strickland*. This is so because while the Government must obtain a unanimous decision in order to secure a death sentence, the defense requires but a single holdout in order to obtain a life sentence. *See, e.g.*, *Wiggins v. Smith*, 539 U.S. 510, 537 (2003) (reversing death sentence due to counsel's ineffectiveness where Court held that there was "a reasonable probability that at least one juror would have struck a different balance."). By consenting to the removal of jurors from the ends of the spectrum without even bothering to question them about their views, counsel improperly consented to the removal of the precise

27

individuals who would be most likely to vote for life. Because the Government needs unanimity, while the defense needs a single vote, the removal of (otherwise qualified) jurors from the ends of the spectrum favors the Government, not the defense.

Mr. Parrish was questioned about this deal at the §2255 hearing, and his answers confirm that he lacked a reasonable strategy for making this deal. First, Mr. Parrish was not aware that a single juror voting for life can result in a life sentence. 2255 Tr. at 89 ("Q: And are you aware that in a capital matter, even 1 juror voting for life can result in a life sentence? A: If you tell me that's what the status of the law was, I would accept that."). Second, Mr. Parrish's decision to attempt to eliminate outlier jurors was not a reasonable strategy. In Mr. Parrish's words, in the portion of Iowa from which Petitioner's jury was selected, "you're dealing with some pretty conservative folks," 2255 Tr. at 46, and as a result, "these people on the fringes, you want them out of there as quickly and as early as possible." *Id.* at 47. Counsel's justification does not flow from his premise. If the pool from which jurors are to be drawn was on the whole conservative (and therefore presumably more inclined to vote for death, under counsel's reasoning), then that is all the more reason to want to keep any of the life-leaning jurors on the panel. Counsel's desire to remove fringe jurors simply fails to take into consideration the fact that this also resulted in the removal of those jurors most likely to vote for life.

28

The second problem with this deal, as Petitioner has set forth in his Memorandum of Law, is that Petitioner did not even receive the full benefit of its terms. This is because multiple jurors who answered yes to question 72 "h" or "i" (those who would have a difficult time not imposing death) were left in the qualified pool (venire persons 24, 556 and 574). Pet. Ex. 91, 94, 95. Moreover, some of the struck "b" venire persons were struck even though they answered follow-up questions indicating that they could be impartial and follow the court's instructions. At least 8 venire persons who answered "b" nonetheless indicated in response to subsequent questions that they could be impartial and impose the death penalty in accordance with the law (venire persons 338, 635, 668, 701, 809, 916, 935 and 945). Pet. Ex. 92, 96, 97, 98, 99, 101, 102, 103. For example, venire person 945 stated that "I am unsure how I feel about the death penalty [] I believe that it is religiously wrong, but I am not 100% against it," suggesting her ability to follow the law as instructed. *Id.* Nothing in the questionnaires indicates that these venire persons were properly excludable under *Witherspoon*.

Further, multiple jurors' responses were misidentified as a matter of simple oversight, further increasing the detriment of the deal to Petitioner. For example, Juror 12 was struck for cause for answering "b," despite the fact that on her questionnaire she answered "d." Pet. Ex. 90. Juror 809 circled answers "b," "c" and

29

"e," yet also was struck for answering "b." Pet. Ex. 99.

The Government questioned Mr. Rogers at the hearing regarding two questionnaires in which errors enured to Petitioner's benefit, rather than the Government's. 2255 Tr. at 260-61. However, even if it is true that errors were made in both directions, it is clear that the number of errors on the whole enured much more to the benefit of the Government than to Petitioner. As Petitioner has previously noted, even at the time of the agreement one member of the defense team had substantial concerns. *See* Pet. Ex. 12 ("The juror agreement was ok *but there were issues*").

### 2. Petitioner Suffered Prejudice

Petitioner was prejudiced by counsel's ineffectiveness. None of the jurors who answered "b" on the questionnaire were excludable for cause simply based upon that answer. *See United States v. Chanthadara*, 230 F.3d 1237, 1269 (10th Cir. 2000) (Federal Death Penalty Act case where juror found to have been improperly excused based solely on questionnaire answer, which was equivocal); *Nicklasson v. Roper*, 491 F.3d 830, 836 (8th Cir. 2007) (finding that "[b]y failing to recognize the need for additional death qualification voir dire questioning in the face of contradictory responses by sixteen potential jurors, the Missouri Supreme Court may have overlooked essential demands of fairness"). The "b" answer reflects precisely the

30

kind of "general objection[]" to or expression of "conscientious or religious scruples" against the death penalty that *Witherspoon* dictates is not a proper criterion for exclusion. *Witherspoon*, 391 U.S. at 522.

Any violation of *Witherspoon* is prejudicial; the wrongful exclusion of even a single venire person for cause is grounds for vacating the death penalty. *Kinder*, 272 F.3d at 543 (citing *Gray*, 481 U.S. at 667-68). Because of counsel's ill-conceived and ill-executed deal, there is clearly a substantial probability that the jury empaneled to decide Petitioner's fate was drawn from an unrepresentative pool that was unconstitutionally skewed towards death. The combination of the bad deal with the errors in execution of the deal resulted in a sea change in the composition of the qualified pool. Petitioner was prejudiced, and is entitled to a new sentencing hearing with a jury drawn from a pool that is not unconstitutionally predisposed to return a death verdict.

### CLAIM NINE

**PETITIONER WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AT HIS CAPITAL SENTENCING.**

Trial counsel were ineffective for failing to follow the recommendation of their mitigation specialist to engage mental health experts to explore the significance of Petitioner's upbringing and background, to place the information uncovered by the

31

mitigation specialist into a mental health perspective, and to assist in the discovery of additional facts relevant to understanding Petitioner's character and background. Counsel failed to thoroughly investigate the available mitigating evidence, a failure based in part on their misunderstanding of the federal rules applicable to mental health evaluations. Counsel's failure prejudiced Petitioner. Had the available evidence been collected and presented at trial, there is a reasonable probability of a difference outcome. *See* Pet. 81-104.

### A. Deficient Performance.

Counsel did not present any mental health mitigation evidence. This was because counsel failed to reasonably obtain psychiatric or general psychological evaluations. Instead, counsel obtained a single, limited neuropsychological evaluation that addressed only the question of whether Petitioner had brain damage. Counsel was deficient.

Counsel hired Lisa Rickert as the mitigation specialist. However, in spite of numerous red flags of Petitioner's dysfunctional upbringing and the resultant negative psychiatric and psychological effects of that childhood identified by Ms. Rickert, counsel failed to obtain a psychiatric or general psychological evaluation. Ms. Rickert's investigation revealed numerous red flags indicative of the need for a mental health evaluation, including obsessive behaviors, repressed early childhood

32

memories, bizarre eating habits, and attachment problems. *See* Rickert Dep. at 10, 12, 16.

Under these circumstances, capital counsel have a Sixth Amendment duty to obtain appropriate evaluations and to reasonably consult with the proper experts. *E.g., Rompilla v. Beard*, 545 U.S. 374, 391 n.8 (2005) (counsel "could not reasonably have ignored mitigation evidence or red flags" indicating the need for more testing or evaluation); *see also Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982) (mitigating evidence "of emotional disturbance is typically introduced by defendants in mitigation").

Indeed, counsel were specifically advised by Ms. Rickert to obtain such evaluations. Ms. Rickert's investigation led her to believe that it was important and necessary to have a mental health evaluation of Petitioner completed, and she repeatedly recommended that trial counsel pursue that course. Rickert Dep. at 10-12.

Ms. Rickert's recommendations included oral discussions, as well as written memoranda advising that the defense team "need[ed] an expert on attachment issues/disorder" and also needed a psychiatric evaluation of Petitioner. *Id.* at 11-12, 44, 49.

Counsel failed to follow the recommendations of Ms. Rickert, because they were afraid that an additional evaluation would automatically trigger a government

33

evaluation that may result in bad findings.  However, as described below, counsel failed to realize that they were under no obligation to turn over the evaluation unless and until they decided to use it.  The decision to forgo a mental health evaluation was not a reasonable strategic or tactical decisions.

Learned counsel for Mr. Honken, Charles Rogers, was the only member of the team with any significant capital experience.  For this reason, the other two attorneys deferred to him in "matters of capital litigation."  2255 Tr. at 231.  He testified that the team should have followed the recommendation of Ms. Rickert to have Petitioner evaluated by mental health experts (other than neuropsychologist Dr. Gelbort):

> Q.     ... would there have been any reason to not have Mr. Honken evaluated yourself and then decide later what to do with it depending on the results?
>
> A.     That would have been a better move.  No doubt about it.

*Id.* at 243.

Mr. Rogers also testified that the decision to not have further evaluations was based on concern that a government expert would have found Mr. Honken to be a sociopath, *i.e.*, to have anti-social personality disorder.  *Id.* at 263.  As described below, this was an unreasonable decision since counsel would not have been required to disclose any expert report until they decided to call the expert, and, in any event, not until after the merits phase of the trial.

34

Leon Spies was the member of the team who worked most closely with Ms. Rickert and who presented the mitigation to the jury. Originally, Mr. Rogers, who was learned capital counsel, was supposed to handle that role, but that changed. *Id.* at 232 (Mr. Rogers testified that "the assumption was that I would be primarily responsible for presenting the penalty phase; however, as the trial approached and got very close or maybe even during the jury selection part of the trial, Mr. Honken requested that Mr. Spies be primarily responsible for the penalty phase.").[14] Mr. Spies concurred with Mr. Rogers' testimony that the team should have had Mr. Honken evaluated by other mental health experts prior to making the decision to forgo this mitigation. *Id.* at 550 (counsel agreeing that they "should have had Mr. Honken evaluated to at least see what the results would have been before making this determination").

Again, this decision to not have Mr. Honken evaluated in accordance with the recommendation by the mitigation specialist was based upon the fear that the government would then be able to present evidence of "personality disorders that would make him dangerous." *Id.* at 549. However, Mr. Spies acknowledged that "he

---

[14]Alfredo Parrish, who also represented Mr. Honken at the capital trial, testified that he was primarily responsible for the merits phase of the trial. He was therefore not very involved with the preparation of the penalty phase evidence, 2255 Tr. at 23, and testified that "in terms of preparing the specific strategy, the questions, etcetera [for the penalty phase], that was not my responsibility." *Id.* at 24.

35

would not have had to turn over an expert report if [he] had decided not to use that evidence." *Id.* at 594. Counsel's determination was unreasonable.[15]

Thus, counsel based their decision to cut short their investigation into the impact of Petitioner's mental health on an unreasonable fear that any evaluation would have automatically resulted in any harmful diagnoses or results being disclosed to the Government. Counsel failed to appreciate that the results of any such evaluation would have remained confidential until such time – if ever – that the defendant is convicted of capital murder. *See* Fed. R. Crim. Pro. 12.2.

Rule 12.2 was amended in 2002 – two years before Petitioner's trial – to allow for the sealing of the results of the type of examinations that should have been conducted here. In spite of the government's intimations to the contrary during questioning of trial counsel, there was nothing confusing or unsettled about this rule. It states clearly: "The results and reports of any examination conducted solely under Rule 12.2(c)(1) after notice under Rule 12.2(b)(2) must be sealed and must not be disclosed to any attorney for the government or the defendant unless the defendant

---

[15]Petitioner notes Mr. Spies' testimony in this area was unclear. At one point he testified that he did not "recall that there was any decision or consideration to have [Mr. Honken] evaluated by anyone [other than Dr. Gelbort]." *Id.* at 593. *See also id.* ("I don't know if there were other names that were under consideration or whether we had specifically discussed other potential doctors."). Thus, Mr. Spies seems to recall that the only decision was whether or not to call Dr. Gelbort. In any event, the failure to engage proper mental health experts was deficient.

36

is found guilty of one or more capital crimes and the defendant confirms an intent to offer during sentencing proceedings expert evidence on mental condition." Fed. R. Crim. Pro. 12.2(c)(2).

Additionally, the Advisory Committee notes at the time of Mr. Honken's trial clearly lay out the procedure that would have been followed here:

> The proposed change in Rule 12.2(c)(2) adopts the procedure used by some courts to seal or otherwise insulate the results of the examination until it is clear that the defendant will introduce expert evidence about his or her mental condition at a capital sentencing hearing; i.e., after a verdict of guilty on one or more capital crimes, and a reaffirmation by the defendant of an intent to introduce expert mental-condition evidence in the sentencing phase. See, e.g., *United States v. Beckford,* 962 F. Supp. 748 (E.D. Va. 1997).

Rule 12.2, Advisory Committee Notes. In *Beckford*, the case cited by the committee, the district court set up a procedure of deferring the release to the government of the reports of both the defense experts and government experts until after finding of guilt and confirmation by the defendant to offer mental health evidence. The amendment to the rule, two years prior to Petitioner's trial, codified this procedure.

At the evidentiary hearing, the government repeatedly attempted to elicit from counsel that Rule 12.2 was relatively new and that its application was unclear at the time of Petitioner's trial. *See e.g.*, 2255 Tr. at 250 (questioning Charles Rogers regarding the lack of settled law regarding this rule). This position is misleading. There was no "real question at that point, and given the absence of any case law out

37

there, about whether the government would or would not have access to any evaluation" conducted. 2255 Tr. at 250 (government question to Mr. Rogers). The rule could not be any more clear in stating that the government does not get access to the examination until after a conviction of capital murder and the defense confirms the intent to use the mental health evidence in mitigation.

Moreover, if there was any question about the procedure, reasonable counsel would have filed a motion in limine to clarify the issue prior to making this determination. Indeed, in the co-defendant, Angela Johnson's case, Judge Bennett had already noted the applicability of Rule 12.2. *See United States v. Angela Johnson*, CR 01-3046-MWB, Dkt. 180 (8/12/03).[16] Petitioner's trial counsel should have been aware of Judge Bennett's order in the Johnson case and the applicability of this rule.

Additionally, the record establishes that the decision to not engage additional mental health experts was based on a hasty determination made on the day that the defense team was required to disclose to the Court and the government the nature of any expert testimony that would be presented. Indeed, Dr. Gelbort evaluated Mr.

---

[16]Judge Bennett, who was also Petitioner's trial judge, ultimately ruled that a "taint team" be set up in the U.S. Attorney's Office to deal with these issues, so that the defendant would not be prejudiced at trial by any premature disclosure of expert opinions. *United States v. Johnson*, 383 F.Supp.2d 1145, 1149 (N.D. Iowa 2005).

38

Honken on July 19, 2004. *See* Pet. Ex. 11 (Report of Dr. Gelbort). He faxed his

report to counsel on July 21, 2004. *Id.*; *see also* 2255 Tr. at 274 (testimony of Charles

Rogers identifying the fax and noting the dates of July 21 and 22, 2004). This is the

*same date* by which the defense was required to make its expert disclosures. *Id.* at

542 (testimony of Mr. Spies acknowledging that Judge Bennett set the date for expert

disclosures to July 21, 2004). Counsel waited until the last minute to attempt to

develop its mitigation case.

Indeed, in its motion to preclude mental health expert testimony, the

government described counsel's deficiency: "[t]he defendant's conduct in providing

extremely late notice, in violation of the Federal Rules of Criminal Procedure and this

Court's order, is the latest in a long pattern of dilatory conduct by the defendant in

this case." Memorandum in Support of Government's motion to Exclude Expert

Evidence from Michael Gelbort, Docket Number 289 at 5 (June 22, 2004). At the

time the government filed this motion, years after counsel had first been appointed

to the case, there had still been no mental health evaluation of Mr. Honken. It was

not until two days before the Court would likely decide to preclude anything not

disclosed by July 21, 2004, that Mr. Honken was finally seen by Dr. Gelbort for an

evaluation that addressed only the question of brain damage. *See* Gelbort Dep. at 40

("The attorneys needed some sort of report within a couple of days."). By then,

39

counsel had painted themselves into a corner and there was not time to adequately pursue Ms. Rickert's recommendations. *See* Rickert Dep. at 13 (trial counsel did not follow her recommendations, and the neuropsychological evaluation did not address the psychiatric and emotional issues that she had identified).

This decision to forgo a mental health evaluation was unreasonable for another reason. Mr. Rogers testified that he "was not personally aware of the nature and significance of Mr. Honken's traumatic childhood," because he did "not spend the kind of time with [Ms. Rickert] that [he] should have to understand the depth and true nature of it." 2255 Tr. at 265 - 66. In other words, Mr. Rogers was the only member of the team with any capital experience, yet he was not sufficiently involved in the preparation of the mitigation case.[17]

Even with respect to the single expert that was engaged, counsel's performance was deficient. Counsel failed to provide sufficient background materials to Dr. Gelbort, the neuropsychologist who was hired. Gelbort Dep. at 65 (Dr. Gelbort's testimony that he would have requested collateral data had his involvement continued after July 22, 2004). Nor did counsel ask Dr. Gelbort to conduct a general

---

[17] Mr. Rogers also acknowledged that his assumption that Mr. Honken may be diagnosed with antisocial personality disorder was likely incorrect, as he has since had the opportunity to review the current opinions of the experts who have recently evaluated Mr. Honken, including Dr. Grote, the government's expert. None of these experts diagnosed Petitioner with antisocial personality disorder. 2255 Tr. at 244.

40

psychological examination or a mitigation evaluation. Nor was he asked to consider the impact of Petitioner's methamphetamine addiction on his functioning at the time of the crimes. *Id.* at 15 (Dr. Gelbort's testimony that he was only asked to do a battery of neuropsychological testing). Had trial counsel done so, they would have uncovered the same mitigating evidence that has now been presented to this Court. As described above, counsel waited until the very last minute to properly consider the presentation of the available mental health mitigation. Counsel was deficient.

Counsel did not make a reasonable strategic decision. Rather, "[t]heir decision to end their investigation when they did was neither consistent with the professional standards . . . nor reasonable in light of the evidence counsel uncovered . . . that would have lead a reasonably competent attorney to investigate further." *Wiggins*, 539 U.S. at 534; *id*. at 527 ("*Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy. Rather, a reviewing court must consider the reasonableness of the investigation said to support that strategy.").

### B.     Prejudice.

Petitioner has presented substantial mitigating evidence to this Court that the sentencing jury did not hear, establishing prejudice. Prejudice is established if there is "a reasonable probability that, but for counsel's unprofessional errors, the result of

41

the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). This "undermines confidence" – "reasonable probability" standard is less demanding than proof by a preponderance of the evidence. *Id.*; *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000); *Kenley v. Armontrout*, 937 F.2d 1298, 1304 n.5 (8th Cir. 1991).

At the penalty phase, trial counsel presented a narrow and superficial snapshot of Mr. Honken's upbringing, which the Government derided in its closing argument. The Government successfully argued, for example, that the defense's presentation of Petitioner's "unfortunate childhood," was not "that different from the vast majority of people." Tr. at 3915. It described Petitioner as "a relatively privileged person" and declared that "[h]e wasn't forced" to commit murder but "knew that he was choosing that." *Id*. Without a mental health-based explanation for how Mr. Honken's dysfunctional and traumatic upbringing and methamphetamine addiction affected his behavior and mind set at the time of the crimes, the defense was unable to effectively refute the Government's argument, and the jury never heard why Petitioner's background and upbringing were compelling mitigating factors. *See* Rickert Dep. at 47-48.

Because counsel failed to consult with the proper experts, the jury never heard

42

the significance of Petitioner's family history or the significance of his life history. The expert testimony submitted to this Court provides insight into the mental health deficits that significantly influenced Petitioner's conduct. This evidence would have provided the jury with the opportunity to make a "reasoned moral response" to Mr. Honken's life history and psychiatric deficits, as required by the Supreme Court:

> If the sentencer is to make an individualized assessment of the appropriateness of the death penalty, evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are *attributable to a disadvantaged background, or to emotional and mental problems*, may be less culpable than defendants who have no such excuse... Thus, the sentence imposed at the penalty stage should reflect a reasoned moral response to the defendant's background, character, and crime.

*Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (internal quotation marks and citations omitted).

Petitioner has been evaluated by Dr. Richard Dudley, a psychiatrist.[18] Dr. Dudley reviewed a great deal of background materials regarding Mr. Honken and his extended family. He also interviewed several family members and Timothy Cutkomp, all of whom testified before this Court. Dr. Dudley has concluded that Mr. Honken had the type of troubled upbringing and resulting psychological and

---

[18]Dr. Dudley is a highly credential forensic mental health evaluator, whose credentials have been recognized by the Supreme Court. *Sears v. Upton*, 130 S.Ct. 3259, 3264 (2010) (referring to Dr. Dudley as a "well-credentialed expert").

43

psychiatric deficits that are typically mitigating in capital cases. He has diagnosed Mr. Honken with Anxiety Disorder, NOS (not otherwise specified), Personality Disorder, Mixed Type, with Narcissistic and Borderline Features, and Methamphetamine Dependence. Dudley Deposition at 22.

Dr. Dudley testified that Petitioner had "an extremely difficult childhood ... characterized by an abusive and kind of threatening sort of environment ... that was made worse by the absence of any sort of safe space or comfort that would have mitigated against the impact of that environment." *Id.* at 23. He described Petitioner's father as a "threatening presence." *Id.* He also identified and explained abandonment issues that resulted from Mr. Honken's family situation. *Id.* at 25 - 27.[19]

Dr. Dudley described the psychological effect of growing up in such "a threatening and frightening environment." *Id.* at 29.

> And so the effect of that, particularly when it's kind of – when it's ongoing is that it creates an enormous amount of anxiety and uncertainty and fear about what's going to happen next, and what we call kind of an

---

[19]Petitioner presented evidence at the hearing establishing the details of his life history, which supports the findings of Dr. Dudley and the other experts presented. Several of these witnesses were submitted through stipulations. *See* Pet. Ex. 80 (Laurel Christianson); Pet. Ex. 82 (Carol Hilgenberg); Pet. Ex. 83 (Carol Honken); Pet. Ex. 84 (Steve Honken); Pet. Ex. 85 (Mark Johnson); Pet. Ex. 86 (Ronald Nelson); and Pet. Ex. 97 (Courtney Snater). Other life history witnesses testified before the Court. *See* 2255 Tr. at 98 - 160 (Jeffrey Honken); *id.* at 166 - 97 (David Honken); *id.* at 306 - 50 (Timothy Cutkomp); *id.* at 363 - 409 (Marvea Smidt); *id.* at 410 - 443 (Alyssa Nelson); 444 - 457 (Kathy Scheuss).

44

over-reactivity in the sense of that, you know, because you're not quite sure what's going to happen next, you're always looking to protect yourself and you're always kind of overreacting to things that might happen, thinking that it could be worse.

*Id.*

Dr. Dudley also described and considered the significant family history of mental illness that was not developed by trial counsel:

Well, clearly mood disorders run in the family. There's a clear history on the mother's side of various types of mood disorders and depressive disorders, but even some instances of bipolar disorder. So mood disorders clearly run on the mother's side of the family. It's important to recognize that, you know, have a pretty clear understanding of genetics as an etiological factor in the development of mood disorders, that they run on a continuum and they kind of run together. So it's going to be the whole range that would run together through a family.

*Id.* at 34. This family history is consistent with Dr. Dudley's diagnoses of Mr. Honken. *Id.* at 37. As such, it corroborates Dr. Dudley's findings.[20]

Dr. Dudley also described the effect of Mr. Honken's childhood in terms of the anxiety disorder diagnosis: "[there] are a cluster of anxiety symptoms that are seen in children, and then adolescents and adults, who have had traumatic experiences,

---

[20]Petitioner presented independent evidence of this family history of mental illness at the hearing. *See* 2255 Tr. at 370 - 75 (Marvea Smidt describing history of mental illness in the family and her own struggles with depression and anxiety); *Id.* at 431 - 32 (Alyssa Nelson describing history of mental illness in family and her own diagnosis of depression). *See also* Pet. Ex. 41 - 44 (medical records of Marvea Smidt); Pet. Ex. 49 - 50 (medical records of Alyssa Nelson); Pet. Ex. 51 (medical records of Laurel Christianson).

45

where they're always concerned about what's going to happen to them." *Id.* at 40.

These symptoms are "exacerbated" by stress and by "real or perceived threats." *Id.*

at 41.

Additionally, Mr. Honken's personality disorders affect judgment: "Both of

them have an effect on judgment, in and of itself. But they also have an effect on the

decision-making process. So they impair judgment in two different sorts of ways."

*Id.* at 47.

Moreover, these impairments were exacerbated by Mr. Honken's drug use:

[W]hen you use enough methamphetamines, you also become more anxious, more fearful. The interaction of that with the anxiety disorder and the underlying borderline disorder can elevate that anxiety and fear to the point of being paranoid. And he talks about at times becoming quite paranoid on methamphetamines. People, I mean, if you use enough methamphetamines, you're going to become paranoid. People who have underlying borderline personality disorders are at more risk of becoming paranoid with the use of methamphetamines. And when you have the kind of anxiety disorder that he has, you know, you add those things together, it's not at all surprising that it has that effect on him.

And so it's the combination of the direct effects of being high on large quantities of methamphetamine, and the interaction of those effects with his other psychiatric problems.

*Id.* at 48-49. Dr. Dudley based these conclusions, in part, on his interview of Timothy

Cutkomp and his review of Mr. Cutkomp's declaration. "I mean, [Tim] was quite

aware of Dustin's difficulties before they ever used drugs. And so that he was able

46

to talk about how all of those difficulties became more exaggerated and became more severe during the use of – during the time that he was actively using methamphetamines." *Id.* at 51.[21]

Dr. Dudley concluded that during the time that the murders were committed, Mr. Honken's psychiatric conditions, in combination with the drug use over time, left him in a "deteriorated state." *Id.* at 42.

> It'd be my opinion that his judgment was impaired. That, as I indicated, you have, you know, clearly by the time he comes back from Arizona he's in a very bad state with regard to the interaction between the substance abuse and his underlying psychiatric problems. He continues – and now he's in a different sort of stressful and more stressful situation because of the combination of the things that are going on back in Iowa, in addition to the charges against him. And it's my understanding that he continues to use at least for some period of time after that while he's now facing that stress.
>
> So it'd be my opinion that his ability to function and make important decisions, particularly affect-laden ones, is going to be at an all-time low.

*Id.* at 55-56.

Counsel also could have presented compelling evidence describing the harmful effects that methamphetamine abuse had on Petitioner. Petitioner, who used nearly pure methamphetamine on an almost daily basis in late 1992 and early 1993, e.g.,

---

[21]Timothy Cutkomp's testimony before this Court is consistent with Dr. Dudley's findings. 2255 Tr. at 323 - 24.

47

2255 Tr. at 315-18, would have suffered many of these harmful effects. As Melissa Piasecki, M.D., testified, methamphetamine becomes addictive within weeks or months of use. Piasecki Dep. at 14. The risk of methamphetamine abuse is increased by various psychosocial factors, many of which are also found in Petitioner's upbringing. *See id.* at 30.

Methamphetamine is neurotoxic, which means that its use causes brain damage. *Id.* at 15-16. Structural brain damage occurs to nerve cells and even shrinks parts of the brain, including the hippocampus, which is responsible for managing memory and emotions. *Id.* at 17. Damage to brain functioning includes impaired memory, executive functioning, and impulse control. *Id.* at 19-20. These functioning impairments are exacerbated by marijuana use, *id.* at 24, which Petitioner also abused, 2255 Tr. at 315-18.

The brain damage caused by meth starts within a few months of use. Piasecki Dep. at 25. After cessation of use, there is a lag time during which brain damage remains, and can actually get worse. *Id.* at 25-27, 83. Then, a normalization process occurs, reaching a maximum point of normalization in brain structure after 18 months of abstinence, and in brain functioning after two-and-a-half to three years. *Id.* at 26-27.

Methamphetamine abuse is highly correlated with violent behavior, a fact that

48

has long been documented. *Id.* at 21-23. This correlation includes violence that occurs even when the meth abuser is not actually intoxicated with meth. *Id.* at 54-55. Meth abuse is also associated with causing anxiety problems. *Id.* at 21-22.

All of this information about the harmful effects of methamphetamine abuse was known in the medical and scientific communities since before the trial in this case. *See, e.g., id.* at 13, 18, 20, 28-29. For example, one article published in 2003 itself referenced 88 other, earlier research articles concerning the neuropsychological effects of chronic meth use. *Id.* at 68-70. Counsel, however, neither consulted a mental health expert about the harmful effects of Petitioner's methamphetamine abuse, nor did they otherwise investigate the issue.

Dr. Gelbort testified that he concurred with the findings of Dr. Piasecki regarding the effects of drug use:

> My thoughts about Dustin Honken are that when I administered him neuropsychological evaluation, he had some relative strengths and some relative weaknesses; that there's any number of etiologies which could lead to those strengths and weaknesses; and that after reading [Dr. Piasecki's] report, there's certainly a possibility that drug use/abuse would be one of the reasons why he was demonstrating some weaknesses on the neuropsych evaluation.

Gelbort Dep. at 53. Thus, had Dr. Gelbort been provided with background materials, and had he not simply been asked to do a neuropsychological evaluation at the last minute, this mitigation could have been presented to the jury. Further, as noted

49

above, many of the harmful effects of methamphetamine abuse would have been presented.

In addition, the opinions and mitigating testimony offered by Drs. Dudley, Piasecki, and Gelbort were echoed by psychologist John F. Warren, III, Ph.D., whose Deposition was also submitted to the Court. *See* Dkt. 67. Dr. Warren reviewed background materials about Mr. Honken's life and upbringing, conducted clinical interviews with Mr. Honken, and administered psychological tests. He agrees with the views expressed by Dr. Dudley about the dysfunctional upbringing experienced by Mr. Honken, the impact of that childhood on his psychological development, and the significance of the family history of mental illness. *See, e.g.,* Warren Dep. at 24 (describing the "emotional volatility" experienced by Mr. Honken as a child); *id.* at 33 - 34 (describing Petitioner as a child as being "careful and stoic and not confrontational with Dad, and to not depend on anything, not to expect any warmth or nurturance from Mom"); *id.* at 42 ("People with family histories of substance abuse and depression and anxiety are, again, more prone than average to have problems with depression, substance abuse and anxiety."). Dr. Warren also opined that Petitioner's methamphetamine abuse coincided with and profoundly exacerbated the psychological and emotional crisis that Petitioner was experiencing at the time of the crimes. *Id.* at 52 - 53.

Even the government's expert here endorsed many aspects of Petitioner's current mental health mitigation. Dr. Grote concurred with Dr. Piasecki's report regarding the objective effects of methamphetamine abuse. Grote Dep. at 69. Dr. Grote also endorsed the principles that a child's family of origin often has an important impact on the child's emotional and psychological development and that children from more dysfunctional families often have more problems. *Id.* at 59. And Dr. Grote agreed that most children are not confronted with the type of dysfunction Petitioner faced – a parent who stays drunk for weeks at a time, or a parent who actively recruits them into criminal behavior. *See id.* at 59-60.

Dr. Grote likewise recognized that children of alcoholics and substance abusers are at greater risk of becoming alcoholic and substance abusers themselves, and are at greater risk for other psychological problems, including anxiety problems, *id.* at 61; that a child's subjective fear of violence from a parent can affect the child's psychological and emotional makeup, *id.;* that attachment and bonding problems between parent and child can effect a child's emotional development, *id.* at 62-63; that, conversely, children have an emotional and psychological need for nurturing, *id.* at 63-64; and that a number of mental illnesses, including Depression, Bipolar Disorder, and substance abuse disorders, run in families and can place a child at greater risk of developing those disorders. *Id.*

51

Dr. Grote thus acknowledged that Petitioner's upbringing affected his emotional development. Petitioner "reportedly underwent a number of negative experiences with his dad in particular, and that could potentially lead to him not being as happy or as well-adjusted person as he might have been." *Id.* at 65-66. All of this testimony from Dr. Grote, if it had been presented at trial by the Government in "rebuttal" to a defense mental health presentation, itself would have been mitigating.

To be sure, Dr. Grote conclusorily opined that there was no evidence of mental health or psychosocial factors to account for Petitioner's criminal activities, and instead opined that Petitioner's family upbringing and his father's influence were not mitigating factors. *Id.* at 30-32. Dr. Grote, however, has no experience in capital cases and was not even certain what a "capital" case was. *Id.* at 33-34. Dr. Grote therefore did not know the standard for what constitutes mitigating evidence in a capital trial. *Id.* at 70. Thus, to the extent Dr. Grote claims that evidence about a starkly dysfunctional upbringing like Petitioner's is not mitigating, this opinion is simply not creditable.

Moreover, with the exception of Petitioner's expert reports and certain case documents, Dr. Grote did not review witness declarations or collateral background documents about Petitioner's upbringing. *Id.* at 36-38, 64. Although he conceded that such collateral information can be important in the forensic setting, Dr. Grote did

52

not know that such information existed in this case. *Id.* at 64-65. He instead relied primarily on Petitioner's self-reporting, and even there tried "to kind of move on the interview to other topics" when Petitioner sought to discuss his upbringing. *Id.* at 50-53. Thus, in his handwritten notes, Dr. Grote recorded some of the scarring and depraved aspects of Petitioner's upbringing, including the fact that Petitioner's father and older brother treated him as if he was a member of a prison gang, that his brother related to him like an emotionless robot, and that his father would sometimes stay drunk for weeks at a time. These compelling aspects of Petitioner's life were not mentioned in Dr. Grote's report. *Id.* at 50-53. All of this mitigating evidence, however, could have been elicited on cross-examination at the penalty phase of trial, and thus would have contributed to painting a mitigating profile of Petitioner's upbringing and character.

The overall picture, presented to this Court, of the significant psychiatric and psychological mitigation available as a result of Petitioner's family history, upbringing, and impairments, and as exacerbated by his drug addiction, should have been also presented to the jury. There is a reasonable probability that at least one juror would have voted for life on all counts in light of this evidence, thereby establishing prejudice.

53

**THE COURT'S PENALTY PHASE INSTRUCTIONS FAILED TO PROPERLY NARROW THE SCOPE OF THE JURY'S CONSIDERATION OF FUTURE DANGEROUSNESS AND FAILED TO GUIDE THE JURY'S WEIGHING OF AGGRAVATING AND MITIGATING CIRCUMSTANCES; COUNSEL WERE INEFFECTIVE FOR FAILING TO OBJECT IN VIOLATION OF PETITIONER'S FIFTH, SIXTH, AND EIGHTH AMENDMENT RIGHTS.**

Petitioner has alleged that trial counsel was ineffective for failing to object to the court's future dangerousness instruction, which was overly broad, and to the weighing instruction, which failed to properly guide the weighing of aggravating and mitigating instructions. *See* Pet. 105-11. Petitioner addresses only the instruction regarding future dangerousness herein, and relies on the previous briefing in support of the other part of this claim.

Because counsel failed to have Mr. Honken reasonably evaluated by proper mental health experts, as established above, counsel's penalty phase strategy consisted of showing the jury that Mr. Honken would not be dangerous in the prison if they were to sentence him to life. In support of that strategy, counsel presented the testimony of Dr. Mark Cunningham. As counsel acknowledged, Dr. Cunningham testified about Mr. Honken's "assignment to USP Florence, Colorado, which is a high custody, not a maximum custody but a high custody, high security institution." 2255 Tr. at 246 (testimony of learned counsel Charles Rogers). *See also* Tr. at 3734 (Dr. Cunningham describing USP Florence as "the most secure facility within the Bureau

54

of Prisons").

The court's instructions to the jury on future dangerousness stated:

Final 'Penalty Phase' Instruction No. 4 - Step Three: 'Non-Statutory' Aggravating Factors. . . Evidence that the defendant would be a danger in the future to the lives and safety of other persons may include *one or more* of the following: (a) specific threats of violence; (b) a continuing pattern of violence: (c) low rehabilitative potential; (d) lack of remorse; and (e) *high custody classification.*

Dkt. 524, at 23. Thus, the jury was free to find future dangerousness from the mere fact that Petitioner had a high custody classification. In fact, the jury did find the existence of this aggravating circumstance.

Additionally, defense counsel presented evidence that established this aggravating factor and then failed to object to the erroneous instruction. Counsel acknowledged this deficiency at the evidentiary hearing:

Q. Mr. Rogers, do you see how in that instruction the jury was – was told, if it found one or more of these five things, that it could find future dangerousness?

A. Right.

Q. Was there a reason that – that you did not object to that instruction?

A. No. I must admit, it looks objectionable. For one thing, I don't know that high custody classification is a – indicia of future dangerousness. It ought to make you less dangerous, certainly according to Dr. Cunningham's testimony and I think statistically speaking. You may get the high custody classification because you're viewed as a danger, but once you have it, you're less

55

> dangerous than you would be in a lower custody classification.
>
> Q.   Well, particularly in light of the fact that you're the – the main thrust of your mitigation case was that he was in high custody classification, do you – should you have objected to this instruction?
>
> A.   Yes.[22]
>
> Q.   Was there any strategic reason for not objecting?
>
> A.   No.

2255 Tr. at 247 - 248.  Petitioner has established deficient performance.

Petitioner was prejudiced by counsel's deficient performance as such a broadly worded aggravating circumstance violates the Eighth Amendment.  *Furman v. Georgia*, 408 U.S. 238 (1972) (failure of capital sentencing scheme to guide the discretion of the jury violates Eighth Amendment).  Since *Furman*, the Supreme Court has "insisted that the channeling and limiting of the sentencer's discretion in imposing the death penalty is a fundamental constitutional requirement for sufficiently minimizing the risk of wholly arbitrary and capricious action." *Maynard v. Cartwright*, 486 U.S. 356, 362 (1988).  The sentencer's discretion was not guided here, where the court's instruction basically amounted to a directed verdict on this circumstance, because of the use of the words "one or more of the following."

---

[22]The Court accepted this answer subject to the government's objection that the question was argumentative.

As learned counsel acknowledged at the hearing, the instruction was particularly problematic in view of the testimony presented by Dr. Mark Cunningham. He was presented "to help [the jury] understand some issues dealing with the Government's allegation about future dangerousness in this case." Tr. at 3725 (question to Dr. Cunningham by trial counsel). Dr. Cunningham testified that the Security Designation and Custody Classification Manual of the U.S. Bureau of Prisons requires that inmates serving a life sentence, like Petitioner would be if not sentenced to death, "shall be housed in a high-security-level institution." Tr. at 3740. Thus, the court's instruction endorsed the Government's view that a high custody status equated to future dangerousness, and thereby implicitly rejected trial counsel's argument that it was mitigating. Since the jury found this aggravating circumstance, Petitioner was prejudiced.

## CLAIM ELEVEN

### VICTIM IMPACT EVIDENCE PRESENTED TO THE JURY WAS RECEIVED IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS.

The Petition alleged that the victim impact presentation in this case exceeded the bounds of *Payne v. Tennessee*, 501 U.S. 808 (1991), because it was too emotional, highly charged and speculative, and thus failed to comport with the Eighth Amendment. In some respects, the highly charged testimony created a false impression of the impact of the deaths of Terry DeGeus and Greg Nicholson.

57

Moreover, both the victim impact aggravating factor itself and the instructions provided by the trial court gave the jury no guidance as to how to apply the factor, and thus failed to provide Petitioner with the "individualized determination" of his sentence required by the Eighth Amendment. *See Tuilaepa v. California*, 512 U.S. 967, 971-72 (1994). The Petitioner further alleged that trial counsel ineffectively failed to object or to otherwise litigate the issues arising from the victim impact evidence. *See* Pet. 112-19.

Mr. Spies testified at the evidentiary hearing that he was responsible for the penalty phase presentation and did not recall why he did not object to the Government's victim impact presentation. 2225 Tr. at 524, 582-85. Mr. Spies could only speculate that he did not object because he did not want to appear insensitive in front of the jury, if his objection was overruled. *Id*. at 585. Even if counsel's speculation could be credited, counsel was on notice as early as June 10, 2003, that the Government intended to put on victim impact evidence. *See* Dkt. 120, p.4-5. To the extent that Mr. Spies did not want to raise the issue in front of the jury, he could have objected at a side bar or moved pretrial to preclude the highly charged and speculative evidence. *E.g.*, *Roberts v. Bowersox*, 641 F. Supp. 2d 896, 935-36 (E.D. Mo. 1999) (filing pretrial motion in limine).

Counsel could have no tactical or strategic reason for not doing so, and this

failure caused Petitioner prejudice. Proper litigation of these issues would have curtailed, or precluded, the Government's presentation of victim impact evidence. Without these errors, there is a reasonable likelihood that at least one juror would have voted for life. *See Wiggins v. Smith*, 539 U.S. 510, 537 (2003).[23]

### CLAIM FOURTEEN

**THE GOVERNMENT VIOLATED THE FIFTH AND EIGHTH AMENDMENTS WHEN IT REPEATEDLY ELICITED INADMISSIBLE TESTIMONY REGARDING PETITIONER'S ALLEGED INVOLVEMENT WITH DRUGS AND VIOLENCE THAT WAS TOO REMOTE TO BE RELEVANT. TRIAL AND APPELLATE COUNSEL INEFFECTIVELY FAILED TO OBJECT TO OR LITIGATE ALL OF THE INSTANCES OF MISCONDUCT.**

The Petition alleged that trial counsel were ineffective for failing to object and seek a curative instruction when the Government deliberately elicited testimony from Scott Gahn on redirect examination that was in direct conflict with the trial court's prior ruling that evidence of Petitioner's alleged drug distribution prior to the time of the charged conspiracy in this case (1993-2000) and the original case (1991-1993) was inadmissible. *See* Pet. 133-39.

The Government suggested that trial counsel did not object because an

---

[23] Petitioner renews his request for permission to interview jurors about the emotional response of the trial court to the victim impact presentation (Tr. at 3669), and the emotional responses of any jurors. *See United States v. Johnson*, 362 F. Supp. 2d 1043, 1106-07 (N.D. Iowa 2005) (Judge Bennett stating, "It has now been over four months since I heard this testimony in the Honken trial and the juror's sobbing during the victim impact testimony still rings in my ears.").

59

objection would have drawn the jury's attention to the inadmissible evidence. Opp. 145. At the evidentiary hearing, Mr. Parrish could not recall if his failure to object on redirect examination was the product of any reasonable strategic or tactical decision. 2255 Tr. at 66, 77. He also stated, "[n]ormally, I perhaps would have moved to strike[,]" but could not recall why he did not. *Id*. at 66.

During Mr. Gahn's direct examination, Mr. Parrish repeatedly objected to testimony about Petitioner's alleged drug activity prior to the time of the charged conspiracy and requested a mistrial and curative instructions. *See* Opp. 141-44. Counsel clearly wanted to prevent the jury from hearing this prejudicial information and could have no reason not to object to this improper evidence the third time it was elicited, especially given the trial court's rulings in his favor.

An appropriate objective by trial counsel would have precluded the admission of this evidence, which was irrelevant to the crimes charged, constituted improper propensity evidence and impermissibly bolstered Mr. Gahn's testimony. Without this bolstering, Mr. Gahn's testimony would have been significantly less credible, and it is reasonably likely that the jury would have discredited it.

**TRIAL COUNSEL INEFFECTIVELY FAILED TO PRESENT ABUNDANT, READILY AVAILABLE EVIDENCE THAT WOULD HAVE SUPPORTED THEIR THEORY OF DEFENSE.**

Petitioner has claimed that trial counsel was ineffective for failing to investigate and present available evidence that would have supported their trial theory that Terry DeGeus was responsible for the deaths of Greg Nicholson and the Duncans. In Petitioner's Memorandum of Law, he set forth abundant evidence that was already available to or discoverable by defense counsel that they could have used to forward this theory. *See* Pet. Mem. at 150-53. Counsel, however, failed to use nearly all of this information to support this theory and to establish a reasonable doubt, or a residual doubt, in the minds of the jury. Had counsel presented this additional available evidence, there is a reasonable probability that the jury would have found Petitioner not guilty and/or would have harbored a residual doubt and would not have sentenced Petitioner to death.

Counsel lacked a reasonable strategic basis for failing to marshal and present the evidence set forth in Petitioner's Memorandum of Law. When questioned about his tactics at the §2255 hearing by the Government, Mr. Parrish, who was responsible for the guilt phase, gave conflicting answers. Initially, he seemed to have some trouble recalling why the team did not present more evidence of DeGeus's possible

61

involvement. 2255 Tr. at 67-68. Next, he suggested that "it did not make a lot of sense, and it would involve indicating that Dustin had more knowledge than he actually should have had about all of the deaths." *Id.* at 68. Mr. Parrish then stated that he believed the defense team "thought it was sort of a conflicting theory to our presentation." *Id.* Mr. Parrish's final answer, after counsel for the Government suggested that Mr. Parrish might have had a concern about "taking on, in the jury's view, a burden of proof," *Id.* at 69, was to agree that this was indeed his concern in not putting up more evidence of DeGeus's guilt. *Id.* at 69-70.

Mr. Parrish's comments that placing suspicion to DeGeus "did not make a lot of sense," was "a conflicting theory to our presentation," and could have resulted in unwanted burden-shifting are belied by the trial record. It would be odd indeed if Mr. Parrish believed that casting suspicion on DeGeus was a conflicting theory to his presentation, since he spent considerable time during his closing argument advancing this precise theory. *See* Tr. at 3330-31; 3365-67. As an example, Mr. Parrish argued the following:

> The other thing I wanted to mention about that which I did not mention and I believe Mr. Basler talked about it, that Mr. DeGeus had a Buick that was sold, was a large car. He also drove a truck with a topper on it during the same time in July of 2003 (sic).
> And I ask you when you go back into the jury room you look at

> the Toyota Tercel[24] driving through that mud and muck, et cetera, with the low – and you have a look at photographs of that car going down through a floodplain in 1993 as opposed to a truck with a topper. When you get to the physical evidence and you start evaluating and trying to connect up what the state has been – the government has been telling you about this case, you'll see that as a jury which one is more logical and reasonable. The government is asking you to do that. We're asking you to do that also.

Tr. at 3367.

In light of counsel's testimony and his closing argument, two conclusions are possible. Either his guilt phase defense strategy was by his own admission unreasonable, or it was perfectly reasonable and he was mistaken in his §2255 hearing testimony. Petitioner submits that the latter is the case, as he has alleged in his §2255 Petition. Counsel's strategy in attempting to cast suspicion on DeGeus was a reasonable one, but they were ineffective in failing to present evidence to support that theory.

Counsel's failure to introduce this evidence prejudiced Petitioner. Had counsel presented the facts that led law enforcement agencies to suspect DeGeus, there is a reasonable probability that the jury would have had a reasonable doubt as to Petitioner's guilt. There was absolutely no physical evidence linking Petitioner with the Duncan home or the crime scenes. The Government's case was entirely

---

[24]According to the Government's theory, Petitioner was driving in a Toyota Tercel.

63

circumstantial and relied heavily on the testimony of jailhouse informants and other individuals (such as Cristi Gaubatz and Timothy Cutkomp) who were similarly seeking to curry favor with the Government to escape their own criminal liability. Many of the Government's key witnesses admitted to having previously committed perjury and/or lied to investigators. Had the defense followed through on their attempt to cast suspicion on DeGeus, there is a reasonable probability that the jury would have reached a different verdict.

Counsel's failures also detrimentally affected Petitioner's sentence, in violation of the Sixth and Eighth Amendments. While the prospect of residual doubt was submitted to the jury as a proposed mitigating circumstance, no juror found the existence of this mitigator. Yet even the Government did not feel it had enough evidence to prosecute Petitioner until seven years after the victims' disappearances, and most of the evidence ultimately presented at Petitioner's trial was already known to law enforcement prior to the bodies being discovered.[25] Had counsel put up the evidence outlined above, there is at least a reasonable probability that one juror would have found residual doubt at the penalty phase and thus spared Petitioner's life.

_____

[25]The primary exception, of course, being the numerous Government informant witnesses who sought benefits to testify against Petitioner after he was incarcerated facing capital charges.

64

For all of the above reasons, those contained in the Petition and supporting pleadings, and based upon the entire record herein, Petitioner requests that the Court grant the relief sought in the § 2255 Motion.

Respectfully Submitted,

/s/ Shawn Nolan
Shawn Nolan
Timothy Kane
Aren Adjoian
Ayanna Williams
Federal Community Defender
Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520

Counsel for Petitioner
Dustin Lee Honken

Dated:      January 24, 2012
            Philadelphia, Pennsylvania

**CERTIFICATE OF SERVICE**

I, Shawn Nolan, hereby certify that on this 24th day of January, 2012, I served the foregoing on the following person via the Court's electronic delivery system:

C.J. Williams, Esq.
Assistant United States Attorney
United States Attorney's Office
Northern District of Iowa
401 First Street, S.E.
Hach Building, Suite 400
Cedar Rapids, IA 52401-1825

/s/ Shawn Nolan
Shawn Nolan