IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| DUSTIN LEE HONKEN, | ) | |
| | ) | No. 10-CV-03074-LRR |
| Petitioner/Defendant, | ) | No. 01-CR-3047-MWB |
| | ) | |
| vs. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

**GOVERNMENT'S POST-HEARING BRIEF IN OPPOSITION
TO PETITIONER'S MOTION UNDER 28 U.S.C. § 2255**

**Table of Contents**

I.    INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

II.   CLAIM 1 – ADMISSION OF PETITIONER'S PRIOR JUDGMENTS. . . . . . . . .  1

III.  CLAIM 2 – COLLATERAL ESTOPPEL. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

IV .  CLAIM 3 – *BRADY* CLAIM.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

      A.    Dennis Putzier.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

      B.    Anthony Johnson. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

      C.    Terry Bregar. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      D.    Dan Cobeen. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

V.    CLAIM 4 – PETITIONER'S ROLE AS ORGANIZER OF THE CCE. . . . . . . . . 16

VI.   CLAIM 5 – MULTIPLICITY.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

VII.  CLAIM 6 – DRUG QUANTITY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

i

VIII.    CLAIM 7 – JURY SELECTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

IX.    CLAIM 9 – MENTAL HEALTH EVIDENCE. . . . . . . . . . . . . . . . . . . . . . . . . . 27

    A.    Counsels' Performance Was Not Deficient. . . . . . . . . . . . . . . . . . . . . . 27

    B.    Petitioner Has Failed to Establish Prejudice. . . . . . . . . . . . . . . . . . . . 31

        1.    Trial Counsels' Investigation v. Habeas Counsels' Investigation.  32

        2.    Impeachment of Petitioner's New Experts. . . . . . . . . . . . . . . . . 33

        3.    The Mental Health Evidence is Not Mitigating. . . . . . . . . . . . . . 43

X.    CLAIM 10 – FUTURE DANGEROUSNESS.. . . . . . . . . . . . . . . . . . . . . . . . . 45

    A.    The Jury Instructions.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

    B.    Trial Counsels' Performance Was Not Deficient. . . . . . . . . . . . . . . . . 48

    C.    Petitioner Has Not Shown Prejudice. . . . . . . . . . . . . . . . . . . . . . . . . . 48

XI.    CLAIM 11 – VICTIM IMPACT EVIDENCE.. . . . . . . . . . . . . . . . . . . . . . . . . . 49

XII.    CLAIM 14 – PETITIONER'S PRIOR DISTRIBUTION OF COCAINE. . . . . . . 51

XIII.    CLAIM 16 – THEORY THAT DeGEUS WAS THE MURDERER.. . . . . . . . . . 54

    A.    Petitioner's Alleged "Evidence" that DeGeus Was the Murderer. . . . . 54

    B.    Trial Counsels' Performance Was Not Deficient. . . . . . . . . . . . . . . . . 57

    C.    Petitioner Has Not Demonstrated Prejudice. . . . . . . . . . . . . . . . . . . . 58

XIV.    CLAIM 18 – SECURITY ISSUES.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

XV.    CLAIM 19 – FORENSIC EVIDENCE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

XVI.    CONCLUSION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

## I.  INTRODUCTION

The United States filed a pre-hearing memorandum (Doc. 22), containing citations to the trial record and some exhibits ultimately admitted into evidence during the 2255 hearing, in resistance to all of the claims made by Petitioner in his motion.  To avoid needless duplication, the government has not in this post-hearing brief repeated those arguments and citations, but continues to proffer them in support of its resistance to Petitioner's 2255 Motion.

This post-hearing brief responds to the 11 issues briefed by Petitioner in his post-hearing brief.  In addition, however, this brief also addresses three additional claims Petitioner did not brief, but with respect to which evidence was submitted during the 2255 hearing.  These claims are: Claim 6 (regarding drug quantity), Claim 18 (regarding security issues), and Claim 19 (regarding forensic evidence).  The government relies on the record and its prior briefing with regard to the remaining claims (Claims 8, 12, 13, and 15).

## II.  CLAIM 1 – ADMISSION OF PETITIONER'S PRIOR JUDGMENTS

Petitioner claims his trial attorneys were ineffective for failing to object to admission of the district court's sentencing findings in relation to his prior drug conviction.  (PPHB 3-5).[1]  Specifically, Petitioner claims his trial counsel should have

---

[1]  Petitioner's pre-hearing Memorandum of Law (Doc. 19) is referenced herein as "PM," and his Post-Hearing Brief (Doc. 92) as "PPHB."  Declarations attached to Petitioner's Memorandum are referenced by their corresponding docket entry number and page.  Deposition transcripts are referenced by the first name of the deponent, followed by page references.  The trial transcript is referenced as "Tr." and the transcript from the 2255 hearing as "2255 Tr."  The transcript from Petitioner's 1998 sentencing hearing is referenced as "Sent. Tr."

objected to admission of Trial Exhibit 303 (the original judgment) and Exhibit 304 (the amended judgment) in relation to his 1998 conviction for Conspiracy to Distribute Methamphetamine and Attempted Manufacturing of Methamphetamine. Petitioner claims admission of the exhibits containing the Court's factual findings relating to drug quantity, Petitioner's role enhancement, and firearm possession, violated his constitutional rights because they were not proven beyond a reasonable doubt to the jury and "effectively" constituted testimony by the judge. (PM 4-5).

Petitioner has devoted little attention to his claim to the reference in the judgments to a role enhancement. This is understandable given that the reference to "role" in the judgments is meaningless because the jury did not need to find Petitioner occupied any role to convict him of murdering in furtherance of the drug conspiracy. It is also meaningless, even with regard to the CCE counts, because for those counts the jury had to find Petitioner occupied a particular type of role with regard to a specified number of specific participants. There was nothing in the judgment setting forth the type of role Petitioner occupied, with respect to whom he occupied any such role, or the number of people with respect to which he occupied any role. Similarly, his continued claim the judgments contained language regarding his possession of firearms is simply inaccurate. The judgments say nothing about Petitioner's possession of firearms.

Thus, Petitioner's focused on the reference in the judgments to a finding regarding drug quantity. Petitioner's post-hearing brief is limited to a reference to testimony of trial counsel and a reassertion of his conclusory declaration that the evidence was "highly prejudicial." (PPHB 5). Petitioner references only general assertions by trial counsel that they sought to raise all meritorious claims, however, and

2

conclusory testimony that trial counsel could not recall the strategic reason for not objecting to admission of the prior judgments. (Id.). Petitioner did not fully set forth the testimony of trial counsel on this issue, however, which explained trial counsels' strategic thinking on this point.

Trial attorney Alfredo Parrish testified that at the murder trial all the government had to prove was the existence of a conspiracy to distribute more than 100 grams, and that was "never an issue," that it was a "phantom issue" because "100 grams was – was an easy mark, easy target." (2255 Tr., 94). Mr. Parrish stated: "We weren't going to get into a fight over methamphetamine at the trial" because "[i]t would not have gone anywhere." (Id.). Mr. Parrish testified he "would have stipulated to 100 grams if they had put it on the table. It was – it was not a fight to be had." (2255 Tr., 94-95). Charlie Rogers, another of Petitioner's trial attorneys, conceded there was overwhelming evidence that Petitioner conspired to distribute more than 100 grams of pure methamphetamine. (2255 Tr., 225).

As the government pointed out in its pre-hearing brief (Doc. 22, pp. 27-28), the government presented overwhelming evidence of Petitioner's methamphetamine conspiracy, the drug quantity, and his role in the offense. Therefore, trial counsels' decision not to object to the exhibits did not fall below an objective standard of reasonableness. This was not an issue Petitioner was going to win at trial regardless of whether his 1998 judgment was admitted into evidence. For the same reason, there was no prejudice as a result of admission of the judgments. As previously pointed out, the judgments themselves were admissible – at most, Petitioner could have requested some of the language in the judgments be redacted. Doing so would have invited the

3

jury to speculate, however, as to what was redacted.

Nor has Petitioner demonstrated he was prejudiced. Again, the evidence of drug quantity was overwhelming. Regardless, the government did not have to prove a specific drug quantity with respect to murders in furtherance of a Continuing Criminal Enterprise (Counts 13 through 17). Therefore, any error in admission of the judgments would affect only his conviction for committing murders in furtherance of a drug conspiracy (Counts 8 through 12).

## III.    CLAIM 2 – COLLATERAL ESTOPPEL

Petitioner claims his trial attorneys were ineffective for failing to argue the government was collaterally estopped from litigating whether Petitioner was engaged in a drug conspiracy and whether he possessed a firearm at the time he committed the murders in 1993. (PM 10-27). Petitioner claims his trial counsels' performance fell below an objective standard of reasonableness because they failed to allege that a judge's findings of fact on sentencing issues bars the government from prosecuting the defendant for crimes connected to those facts. Petitioner argues that trial counsels' failure was due to oversight alone. (PPHB 7).

The initial fault with Petitioner's claim is his failure to cite any case holding that a sentencing judge's findings of fact, regarding the application of sentencing guidelines, on different charges, can collateral estop the government from prosecuting the defendant at a later date on a different crime.[2] For the reasons previously articulated in

---

[2] Petitioner's reliance on *Rice v. Marshall*, 816 F.2d 1126 (6th Cir. 1987), is unavailing. That case involved a prior jury determination, not a finding of fact on a different charge by a sentencing judge. Further, this is not binding authority, and should not serve as even persuasive authority because it is poorly reasoned. That a jury

4

its pre-hearing memorandum, the government asserts this is not the law.  Most certainly, there was no case law extant in 2004 holding this was the law of which trial counsel should have been aware.  Indeed, trial counsel testified they were unaware of any such case.  (2255 Tr., 37 (Parrish); 256 (Rogers).

Regardless, even if Petitioner is correct on this novel interpretation of collateral estoppel, trial counsel cannot be found to have performed below a reasonable standard of competence for failing to assert an argument that no court had ever credited.  It is not an oversight when there was nothing to see when they looked.  Trial counsel researched double jeopardy issues and challenged the prosecution on double jeopardy grounds.  That they failed to raise the novel, and unsupported, argument Petitioner now makes does not mean trial counsels' performance was deficient.  See *United States v. Swayze*, 2008 WL 859030, at *14 (N.D. Iowa, March 28, 2008) (holding counsel was not ineffective for failing to raise a novel argument) (citing *Anderson v. United States*, 393 F.3d 749, 754 (8th Cir. 2005) (concluding no constitutional violation occurred when defense counsel failed to recognize and raise novel argument)).

In any event, Petitioner was not prejudiced because, for the reasons set forth in the government's pre-hearing brief, the claim would not have prevailed had trial counsel

---

acquitted a defendant of possession of a gun in a prior trial should not mean the government should be barred from presenting evidence on a rape charge that the defendant possessed a gun to effectuate the rape.  The jury could have acquitted the defendant on the gun charge, for example, because it found the weapon did not fit the definition of a firearm under the code.  That the defendant possessed something that appeared to the rape victim to be a gun, regardless of whether it met the legal definition or traveled in interstate commerce, should have been admissible in a trial on rape charges.  See, e.g., *State v. Wade*, 2008 WL 366143, at *6 (Ohio App. 10 Dist., Feb. 12, 2008) (finding reasoning in *Rice* erroneous).

raised it.

**IV.   CLAIM 3 – *BRADY* CLAIM**

In his pre-hearing memorandum, Petitioner claimed one or more witnesses would testify they were "threatened, cajoled, induced and coerced" into providing "false, exaggerated, and misleading testimony implicating Petitioner." (PM 15). Petitioner argues this violated his due process rights, under *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny. Petitioner also claims his trial attorneys were ineffective for failing adequately to investigate these witnesses and impeach them with this alleged information. The evidence presented during the hearing demonstrates there was no *Brady* violation.

A.   Dennis Putzier

Petitioner claims Dennis Putzier testified at trial that he changed his testimony after falsely claiming ignorance before the grand jury because agents "came and talked to [him] and told [him] to think about what [he was] doing." (PPHB 13, citing Tr., 1308). Petitioner claims the reason Putzier changed his testimony is because the government threatened him with a life sentence, and this threat was not disclosed. (PPHB 13-14). The full record shows something different.

At Petitioner's 1997 sentencing hearing, Putzier testified he entered into a plea agreement with the United States to plead guilty to aiding and abetting an escape attempt by Petitioner. (Sent. Tr. 584-85). He further testified he was concerned about being charged with other offenses, including conspiracy to commit murder. (Sent. Tr. 587, 596). Trial counsel had a copy of this testimony and Mr. Parrish, one of Petitioner's trial attorneys, also represented Petitioner at the sentencing hearing.

6

At trial, Putzier testified he was awaiting trial on an assault charge and driving under the influence charge, and that no one on behalf of the government promised him that anything would be done regarding those charges in exchange for his testimony. (Tr. 1276). He testified that he had numerous past convictions, but never received any benefit from the government in relation to those convictions in exchange for his cooperation. (Tr. 1277-78). Putzier testified he pled guilty to attempting to escape from prison and helping Petitioner escape, and that his sentence on that charge was reduced for his cooperation against Petitioner. (Tr. 1278-79). He testified that he had no expectation of getting any benefits for testifying at Petitioner's trial. (Tr. 1280).

At the 2255 hearing, Putzier testified that when he was visited by Assistant United States Attorney Steve Colloton and an agent, they told him he could be facing 365 months to life for these charges. (2255 Tr. 207). He later expanded on this, claiming he was told he "would get" that sentence. (2255 Tr. 212). On the other hand, he also testified that "they had a scale that showed where I would be at and the whole nine yards. And they let me go talk to an attorney. And the attorney said, more or less, that they – they would – that I would end up with a life sentence." (2255 Tr. 207).

Putzier's testimony is, at best, inconclusive and inconsistent. Never before has Putzier claimed he was threatened with a life sentenced. Moreover, it appears the talk of a life sentence came not from the government, but from Putzier's attorney. Rather, it appears the government told Putzier what he might face were he charged with certain offenses.

In any event, the government disclosed that it had threatened Putzier with serious charges, including conspiracy to commit murder, and that he ultimately pled

7

guilty to aiding and abetting an escape.  Even assuming the government threatened Putzier with a life sentence, Petitioner could impeach Putzier based on the threatened prosecution and the potential for a prison sentence that would naturally follow.  That conspiracy to commit murder might carry a life sentence would be obvious, especially given that Petitioner was on trial for his life for committing murders.

Regardless, Petitioner cannot demonstrate he was prejudiced.  Putzier confirmed that his trial testimony was truthful.  (2255 Tr. 208-210).  Putzier was thoroughly impeached with other evidence, including an admission that he has lied about lying.  (2255 Tr. 38-39).  This would be merely cumulative impeachment evidence that would not be material.  See, e.g., *English v. United States*, 998 F.2d 609, 611-12 (8th Cir. 1993) (denying 2255 motion on claim of newly discovered evidence when it was, at most, impeaching); *United States v. Johnson*, 450 F.3d 366, 373 (8th Cir. 2006) (finding testimony from others that material witness recanted is merely impeachment evidence, not meriting a new trial); *United States v. Yerkes*, 345 F.3d 558, 563 (8th Cir. 2003) (denying motion for new trial when alleged new evidence would only go toward impeaching a government witness).

B.    Anthony Johnson

Petitioner originally argued Anthony Johnson recently claimed he was threatened with criminal charges if he did not cooperate, after which Johnson got a lawyer who "negotiated a deal with the government where [Mr. Johnson] would not get new charges if [he] told them what [he] knew about Petitioner," and that there was a written agreement to this effect that was never turned over to Petitioner.  (PM 34-35).  Petitioner never produced a copy of the alleged written agreement.  The evidence did

8

not support this claim.

Anthony Johnson pled guilty to federal drug charges without a plea agreement. (Tr. 2088-89). Johnson served his five and a half-year sentence without receiving any reduction for cooperation. (Tr. 2089-90). Johnson was approached on January 22, 1998, by law enforcement agents about Petitioner while he was serving his sentence. (Exhibit C). Johnson was provided with a proffer letter, pursuant to which he provided the information about Petitioner. (Exhibit B). Johnson's interview report, which was included in the government's discovery file provided to trial counsel, references the proffer letter in the second sentence. (Exhibit C). There was no other written agreement with Johnson.

At Petitioner's trial, Johnson testified he got no benefit "whatsoever" for testifying against Petitioner. (Tr. 2090). At the time of trial, Johnson was not in custody and was employed. (Tr. 2087). He testified he was not getting anything for testifying at the trial. (Tr. 2090). Johnson testified he did have an agreement that his involvement in purchasing a methamphetamine recipe from Petitioner for $1,000 while they were incarcerated in the Woodbury County Jail would not be used against him. (Tr. 2000-2001).

Petitioner's claim morphed at the 2255 hearing to a claim that Johnson "received assurances that he would not be charged with unrelated criminal conduct, specifically, obtaining a camper from drug sales or with illegally delivering firearms. (PPHB 16). The record does not support this claim either. At the 2255 Hearing, Johnson testified that, though "it keeps getting more vague and more vague," he "remember[ed] that they said that they knew how I bought my camper, and that I had some guns delivered, and

9

stuff like that." (2255 Tr. 284). When asked how he took that comment, Johnson replied: "Well, I – like here comes more charges." When pressed, Johnson could not recall the name of the agent who made the comment, whether he was tall, short, fat, or skinny, or whether there was one person or four people. (2255 Tr. 289). The government repeatedly asked Johnson to relate everything said to him about the camper and guns. The most Johnson recalled was that the unidentified agents claimed to know he bought his camper for meth and $200. (2255 Tr. 289-90). At no point did Johnson testify the agents threatened to prosecute him for the conduct. At no point did Johnson testify he was given any assurances he would not be prosecuted for any conduct related to the camper or guns. Indeed, there is nothing in his testimony to establish there was anything illegal about his transportation of guns.

Johnson's testimony is unreliable because of his lack of memory and the fact that his version of events changed between his declaration and his testimony. Regardless, there is nothing in the record to support Petitioner's claim the government made any threats of criminal prosecution in relation to whatever Johnson did with his camper or guns. Nor is there anything in the record to support Petitioner's claim the government made Johnson any assurances that he would not be prosecuted.

In any event, Petitioner cannot show any prejudice. Johnson testified everything he said at trial was true. (2255 Tr. 289). Johnson was impeached with his criminal history and the proffer letter, and any further cross examination regarding an alleged, vague reference to a camper and guns would be, at most, cumulative impeachment not sufficient to constitute material information under *Brady*.

10

C.      Terry Bregar

Petitioner claims the government unsuccessfully attempted to coerce testimony from Terry Bregar, the government knew and failed to disclose Bregar had a stroke that impaired his memory, and the government knew and failed to disclose that Bregar and other unidentified witnesses conspired to change their testimony to curry favor with the government.  Not one of these claims has merit.

Bregar testified at trial that he was approached by law enforcement officers in 1997.  (Tr. 1417).  He said he heard out the agents, who said he might be able to get a reduction in his sentence for cooperating.  (Tr. 1417-18).  Bregar said the agents made no promises or guarantees.  (Tr. 1418).  Bregar said nothing about being pressured or threatened.  Bregar said nothing about having suffered a stroke or having memory problems.

Bregar testified before the grand jury (Exhibit S) and at Petitioner's sentencing hearing.   Bregar testified he began having problems with his sight about six months prior to his testimony.  (Honken 1998 Sent. Tr. 502).  He said it was caused by diabetes.  (Id.).  At neither time did Bregar claim he was threatened or pressured, that he suffered a stroke, or had memory loss.  In exchange for this cooperation, Bregar received a reduction in his sentence.  (Tr. 1385, 1418-19).
He said nothing about memory problems.  He said nothing about an alleged stroke.

At trial, Terry Bregar testified his blindness was a complication from his diabetes.  (Tr. 1383).  By the time of Petitioner's trial, Bregar had only 13 months and two weeks remaining of his federal sentence for conspiracy to distribute methamphetamine.  (Tr. 1384-85).  Bregar testified he did not think he was going to get any further benefit for

11

testifying at trial.  (Tr. 1387).  Bregar said nothing about threats or pressure, a stroke, or memory problems.  His testimony reflects that he did not have memory problems.

Exhibit A is a collection of portions of Bregar medical records from the Bureau of Prisons, covering the period March 27, 1997 to July 1, 2004.  To begin with, Bregar is, and since at least 1997 has been, an insulin-dependent diabetic.  It is also clear from his medical records that his blindness is attributed to his diabetes (though it's also apparent that at periods Bregar was exaggerating the extent of his visual impairments).  Bregar was admitted to the medical center in Springfield, Missouri, from October 7, 1997 to December 8, 1997, to be seen about his deteriorating vision.

There is an entry in Bregar's medical records referencing a temporal arteritis, which Petitioner claims means Bregar suffered a stroke.  (PM 36).  The October 9, 1997, entry which reflects he had a "vascular accident" in his "left eye in past, possibly temporal arteritis," is in connection with an eye examination.  (Exhibit A, at 9-10).  First, this is not a conclusive diagnosis – indeed, specifically indicates it is "possible." Second, Petitioner produced no medical evidence or testimony establishing that a "vascular incident" or "temporal arteritis" in an eye constitutes a stroke.  The medical records themselves do not make reference to a stroke.  There is no other reference in his medical records post-dating the October 9, 1997, entry, indicating Bregar ever suffered a stroke.  Though Petitioner claims Bregar suffered a "stroke," the medical records do not support his assertion.

Similarly, there is nothing in Bregar's medical records to support the assertion the alleged "stroke" in 1997 affected his memory.  There is nothing in Bregar's medical records from his stay in Springfield that references memory problems.  The only

12

mention of alleged memory difficulties the undersigned could find in Bregar's medical records is a single complaint, seven years later, made on July 1, 2004, about noticing increasing trouble with short term memory over the past several months. There is nothing in the medical records to support Petitioner's assertion that "it is now clear that some combination of seizures and the stroke contributed to his blindness and also affected his memory." (PM 36).

At the 2255 hearing, Bregar testified his blindness was caused by "[a] stroke from the diabetes." (2255 Tr. 459). As related above, the medical records do not show Bregar ever suffered a stroke. Bregar claimed he indicated to medical staff that his "stroke" affected his memory. (2255 Tr. 463). The medical records do not support this. Again, the only reference to his memory occurs seven years after his alleged stroke, and relates to his concern about hereditary Alzheimer's disease. (Exhibit A, p. 40).

At the 2255 hearing, Bregar testified he told the agents that his "medical condition" "was caused from diabetes" and could not recall mentioning a stroke. (2255 Tr. 466). This is consistent with the agents' memory that Bregar made no mention of a stroke or memory loss. (2255 Tr. 489, 497). To the extent Petitioner claimed the government knew about the stroke because it was raised during Bregar's hearing on a Rule 35 motion, and that the government failed to disclose that it allegedly agreed to a further reduction in Bregar's sentence because of his stroke, the transcript from the Rule 35 hearing (Exhibit W) shows none of that is true.

Petitioner claims the government "exerted significant pressure on him to tell them that Petitioner confessed to him." (PPHB 17). Petitioner did confess to Bregar. (2255 Tr. 478-79). As for the alleged "pressure," Bregar indicated the government asked him

13

if Petitioner "ever told you that he had killed anybody," and Bregar said it made him "feel" like they wanted him to say he did. (2255 Tr. 465-66). First, this does not constitute pressure – it constitutes questions. Second, Petitioner did indicate to Bregar that he killed people and questions designed to elicit the type of testimony he gave regarding those statements (2255 Tr. 478-79), was proper.

Petitioner continues to claim that cooperating witnesses fabricated their testimony as a result of being transported together, and claims the government knew this and failed to disclose it. Nothing in Bregar's testimony supports this contention. First, Bregar can recall the name of only one other inmate. (2255 Tr. 482-83). He can only recall a single statement that inmate made. (Id.). He testified the inmates were not "trying to match up stories to make sure that everybody's stories were the same." (2255 Tr. 483). Finally, Bregar only speculated the deputy marshals transporting the inmates could overhear their conversation. (Id.).

D.      Dan Cobeen

In his Post Hearing brief, Petitioner for the first time alleges the government failed to disclose benefits allegedly given to Dan Cobeen. Petitioner claims Cobeen testified "unequivocally" that an agent arranged to have a year dropped from Cobeen's probation. (PPHB 19). Petitioner claims Cobeen did not testify to this during his trial. (PPHB 18-19). Petitioner therefore claims this was an undisclosed benefit provided to a cooperator.

First, the evidence falls far short of establishing that Cobeen received any reduction in his probation. Contrary to Petitioner's suggestion that Cobeen "previously testified" he received a two-year term of probation (2255 Tr. 297), Cobeen actually

14

testified at trial when asked if he received a two-year term that he could not recall how long he got.  (Tr. 607).  Second, at trial Cobeen testified that he only knew he reported to a probation officer until he got out of a halfway house, then he did not have to report to one, and if arrangements were made to get his probation reduced he did not know about it.  (Tr. 608).  Third, Petitioner has failed to produce evidence establishing the length of Cobeen's original probation, whether it was one or two years, and whether it was, in fact, reduced at any point.  Fourth, Cobeen's testimony at the 2255 hearing was anything but unequivocal about whether he received any reduction in his probation.  In relation to his probation, this exchange took place:

> Q.     So you didn't go to your probation officer to try to get off of probation at an earlier time?
>
> A.     No.
>
> Q.     Didn't Mr. Graham get you off probation at an earlier time so that you could cooperate?
>
> A.     I think I got a year dropped.

(2255 Tr. 304) (emphasis added).

Fifth, assuming for the sake of argument that 1) Cobeen began with a two-year term of probation, and 2) that the agent did something to get it reduced in order to allow Cobeen to cooperate, Petitioner has failed to show that this information was not disclosed to trial counsel.  What Cobeen testified to at trial does not reflect what information was provided to trial counsel.  From the nature of the questions trial counsel asked Cobeen about his probation, however, it would appear they had some reason to believe Cobeen's probation may have been reduced.  Petitioner has failed to establish a record of what was disclosed in discovery to trial counsel about Cobeen's criminal

15

history, the term of probation he received, and whether that term was reduced. Petitioner did not elicit testimony from any of the trial attorneys about this matter. For all anyone knows on the record before this Court, the government fully disclosed that it caused Cobeen's probation to be cut short a year. Because Petitioner raised this issue for the first time in his post-hearing brief, there was no opportunity for the government to develop a factual record regarding this claim.

Finally, even assuming, again, that the agents arranged to reduce Cobeen's term of probation so he could cooperate, Petitioner has failed to demonstrate that it was in the least bit material to his testimony. Cobeen's testimony was corroborated by recordings, receipts, documents, and evidence seized during the search of Petitioner's house. Trial counsel impeached Cobeen's testimony through his criminal history, drug use, receipt of payments from the government, prior inconsistent statements, and poor memory. (Tr. 604-625). Evidence that his probation was reduced by law enforcement officers so as to allow him to work undercover would have constituted marginal, and cumulative, impeachment evidence.

Accordingly, Petitioner's claim that the government failed to produce alleged *Brady* material is without factual or legal support. Evidence that his attorney's performance investigating this issue constituted ineffective assistance of counsel is nonexistent.

## V.     CLAIM 4 – PETITIONER'S ROLE AS ORGANIZER OF THE CCE

Petitioner continues to assert he was wrongly convicted of being an organizer, supervisor, or manager of five or more other people in a Continuing Criminal Enterprise because he did not act as an organizer, supervisor, or manager of his brother Jeff

16

Honken.  (PM 46; PPHB 21-22).  In Petitioner's post-hearing brief, he fails to acknowledge that this claim is procedurally barred unless he can establish his counsel were ineffective in failing to investigate and present evidence on this issue.  Petitioner's post-hearing brief reads as if he is raising this claim on the merits, divorced from any evidence showing his trial attorneys were ineffective.

Assuming for the sake of argument there was evidence Petitioner did not organize, supervise, or manage his brother Jeff Honken, the record provides no support to the claim that trial counsel failed to investigate or present evidence on this issue.  To the contrary, the record shows trial counsel investigated this issue, and presented evidence at trial on this issue.  Trial counsel attempted to interview Jeff Honken about his involvement, but he refused to talk to them.  (2255 Tr. 129).  Trial counsel did "inquire[ ] and tried to determine Jeff's role in the family and his interaction with Dustin in particular."  (2255 Tr. 532, 563).  Their mitigation specialist, Lisa Rickert, also investigated the relationship between Jeff Honken and Petitioner.  (2255 Tr. 40-41).  Petitioner concedes that trial counsel elicited testimony from his sister that "Jeff was the more dominant brother," was out for himself, and that Petitioner was "loyal."  (PM 48; Tr. 3085-86).  Similarly, Petitioner concedes his trial counsel elicited testimony from his mother regarding his relationship with Jeff Honken.  She testified that, between them Jeff Honken was "the alpha dog" and "the boss."  (Tr. 3092-94).  Petitioner failed to mention that his trial attorneys elicited similar testimony from Jeff Honken, focusing on his superior experience supervising 75 employees, that he supervised Petitioner when Petitioner worked at Jeff Honken's company, and that he controlled Petitioner's salary.  (Tr. 311, 314).  Thus, trial counsels' performance investigating this issue and presenting

17

evidence regarding this issue did not fall below an objective standard of reasonableness.  As trial counsel testified, there was never "a question as to whether or not Dustin was the person who controlled the situation."  (2255 Tr. 41).

Moreover, Petitioner has not demonstrated that there exists other material evidence trial counsel failed to discover or present that would have made a difference on this issue at trial.  Petitioner points to testimony during the 2255 hearing that Jeff Honken and Tim Cutkomp testified that Petitioner never managed, controlled, or gave orders to Jeff Honken.  (PPHB 21).  This is not materially different from the similar testimony elicited from the same witnesses by trial counsel at trial.  Trial counsel elicited testimony from Tim Cutkomp that it was a "three-way partnership" between Petitioner, Jeff Honken, and himself.  (Tr. 825).  From Jeff Honken, trial counsel elicited testimony that Jeff was six years older than Petitioner, owned his own company, supervised 75 employees, and owned his own home.  (Tr. 311-12).  Trial counsel elicited from Jeff Honken that he was the one who, in part, trained Petitioner when Petitioner came to work for Jeff Honken in his business, and that Jeff Honken supervised Petitioner in that business.  (Tr. 313-14).  Trial counsel elicited testimony from Jeff Honken that he controlled Petitioner's salary and finances during that period.  (Tr. 314).

Petitioner has also failed to show prejudice.  The evidence elicited at the 2255 hearing continued to firmly establish that Petitioner organized the CCE operation, including Jeff Honken's role in it.  Jeff Honken testified at the 2255 hearing that Petitioner moved to Arizona in 1992 with the idea of manufacturing drugs, Petitioner "was the one that had the connections that he was selling to, so Dustin was the one that had the money," and that Petitioner controlled the cash flow.  (2255 Tr. 142-44).

18

Jeff Honken testified that Petitioner would come to him to get money for the methamphetamine manufacturing operation, yet Jeff Honken was "not aware" that the operation grossed more than $100,000 in proceeds. (2255 Tr. 146-47). Jeff Honken testified that he did not even get reimbursed the amount of money he invested in the operation, let alone realize any profit from the operation. (2255 Tr. 149-50). Jeff Honken had no idea how much Petitioner was selling the methamphetamine for or how many pounds of methamphetamine was manufactured. (2255 Tr. 147). Jeff Honken testified it was Petitioner who decided to get an apartment in order to establish a location to manufacture the methamphetamine, and made the decision to move the operation to a house in the country when the smell of the operation became noticeable in the apartment. (2255 Tr. 148). Jeff Honken testified it was Petitioner who had the connections for selling the methamphetamine and Jeff Honken did not even know to whom he was selling the meth. (2255 Tr. 148-49). Jeff Honken testified it was Petitioner who organized the chemicals and manufacturing, who determined the buyers, who brought Cutkomp into the operation, who decided where and how much to manufacture, the price to be charged, and the distribution of the proceeds. (2255 Tr. 156-57). Finally, Jeff Honken confirmed the testimony he provided in both Petitioner's trial and Angela Johnson's trial that, after Petitioner's arrest in March 1993, Petitioner instructed Jeff Honken to destroy evidence of the methamphetamine operation. (2255 Tr. 151-154).

Therefore, Petitioner's motion on this issue must be denied because he has failed to demonstrate ineffective assistance of counsel.

19

## VI.    CLAIM 5 – MULTIPLICITY

Petitioner claims his trial attorneys were ineffective for failing to object to multiplicitous counts. (PM 50).  Petitioner claims his trial counsel should have objected to the counts or moved to dismiss them, and the failure to do so prejudiced Petitioner. (Id.).

In Petitioner's case, his trial counsel did not object specifically on the ground that the charges were multiplicitous.  Therefore, the Court of Appeals found he waived that claim.  *United States v. Honken*, 541 F.3d 1146, 1154 (8th Cir. 2008).  It does not follow, however, that Petitioner's trial attorneys were ineffective.  They challenged the government's indictment on double jeopardy grounds.  While a defendant cannot be convicted of multiplicitous counts, it is proper for the court to submit all the counts to the jury.  *United States v. Moore*, 149 F.3d 773, 779 (8th Cir. 1998).  Thus, while Mr. Parrish testified that they could have raised the issue pretrial (2255 Tr. 43-44), Mr. Parrish recognized it would have made no difference in the admissibility of the evidence or the presentation of the case.  See 2255 Tr. 92 ("In terms of trial strategy and presentation of evidence, I see no difference.").[3]  At most, the court would have instructed the jury that if they found Petitioner guilty of the murder in furtherance of the CCE, they need

_____

[3]  Petitioner claims all three trial attorneys testified they "had no strategic reason for not raising this claim."  (PPHB 23).  That is not accurate.  Petitioner cites page 21 of the transcript regarding Mr. Parrish's testimony on this issue, but there is nothing on that page regarding a strategic decision.  Rather, on page 22 Mr. Parrish remembered discussing the issue, but could not recall why they did not raise it.  Mr. Rogers testified only that he is not aware of a strategic reason for not raising the issue.  (2255 Tr. 240).  Petitioner cites page 527 for the proposition that Mr. Spies allegedly testified there was no strategic reason for failing to raise the multiplicity claim, but that topic is not even discussed with Mr. Spies on that page.  Rather, Mr. Spies testified he could not recall if they had a strategic reason for not raising the claim.  (2255 Tr. 530).

20

not consider the charge of murder in furtherance of the drug conspiracy. (Id.). Thus, trial counsels' performance did not fall below an objective standard of reasonableness.

In any event, Petitioner cannot demonstrate he was prejudiced. The jury found Petitioner guilty of committing murders in furtherance of the CCE, and sentenced him to death for those counts. There is no factual basis to conclude that the jury's decision would have been different regarding the death penalty had they been instructed that they did not have to consider the murder in furtherance of the drug conspiracy counts.

Petitioner engages in pure speculation in asserting that he would not have been sentenced to death on any counts had trial counsel raised a multiplicity claim. This argument ignores the overwhelming aggravating factors justifying Petitioner's execution in this case. Petitioner substantially planned and premeditated all of the murders, killed four people in one episode, brutally killed another victim several months later after he had time to contemplate the horror of his prior murders, bound and gagged two adult victims and brutally beat a third to death after shooting him multiple times, obstructed a criminal investigation, slaughtered two innocent little girls, and devastated several families, not to mention that he poses a future danger to others. (Penalty Phase Verdict Form, Doc. 547, pp. 2-4). The idea that the jury would not have sentenced him to death if they had only one box to check for each victim instead of two is preposterous.

Finally, Petitioner faults appellate counsel as well for failing to raise the issue on appeal. Had appellate counsel raised this issue on appeal, like appellate counsel did in Johnson's case, the remedy would have been the same – remand to vacate the murder in furtherance of drug conspiracy convictions. The outcome – that Petitioner was sentenced to death – would have been the same as well.

21

## VII.  CLAIM 6 – DRUG QUANTITY

Petitioner claims his trial attorneys were ineffective for failing to object to admission of the laboratory report regarding the quantity of drugs found in Greg Nicholson's house through an agent instead of requiring the government to introduce it through the criminalist.  (PM 54).  Petitioner claims the laboratory report was the "primary" evidence the government relied on to establish drug quantity.  (Id.).  Petitioner claims trial counsel was successful in attacking "a similar drug quantity report" in the 1998 sentencing hearing, and should have similarly attacked the drug report here.  (PM 56).  Petitioner asserts that "[c]ross-examination of Ms. Davis would have been a fertile ground for challenging her assumptions, credentials, methods, and conclusions." (Id.).

In its pretrial memorandum, the government set forth at length the evidence it relied on to establish drug quantity aside from the judgments and the laboratory report.  (Doc. 22, pp. 69-71).  As summarized in response to Claim 1, trial counsel was well aware that the evidence of drug quantity was overwhelming and challenging it would jeopardize credibility with the jury.  (See infra pp. 1-4).  Moreover, Petitioner's attempt to compare trial counsels' successful litigation of drug quantity during Petitioner's 1998 sentencing with their failure to challenge drug quantity at trial is misplaced.  As Mr. Parrish testified, the drug quantity issues at sentencing were completely different from the drug quantity issues at the trial.  The first turned on the capacity of a methamphetamine laboratory determined by extrapolation from the remains of the laboratory, while at trial the drug quantity at issue was the amount of methamphetamine that was the object of the conspiracy, regardless of what was produced or capable of being produced.  (2255 Tr. 33-36).

22

Moreover, Petitioner has failed to demonstrate there was not a tactical or strategic reason behind the decision not to challenge the admissibility of the laboratory report. As Mr. Parrish testified, his strategy was to keep methamphetamine out of the trial as much as possible, given the negative views of methamphetamine in the community. (2255 Tr. 43-44). The reality is that Petitioner was already convicted of conspiring to distribute methamphetamine, and the jury would know that. Abundant evidence was admitted about the size of Petitioner's methamphetamine manufacturing operation. Petitioner was on trial for murdering five people in furtherance of a drug enterprise. The evidence Petitioner was involved in a drug lab producing pounds of very pure methamphetamine was overwhelming and there is no basis to conclude that objecting to admission of the laboratory report would have led to a different result at trial. It was not unreasonable for trial counsel to conclude that attempting to dispute drug quantity based on a laboratory analysis of finished product was not going to be fruitful.

Nor did Petitioner present any evidence at the hearing that would show he was prejudiced by trial counsels' strategy. Had trial counsel objected to admission of the laboratory report through Detective Stearns, the government would have simply called Criminalist Davis to testify about her analysis. This would have only served to emphasize the drug quantity evidence more than it was by allowing it to come in through the detective. At the 2255 hearing, Petitioner completely failed to present any evidence supporting his allegation that there was "fertile ground for challenging her assumptions, credentials, methods, and conclusions." (PM 56). Petitioner offered no evidence at the hearing showing, for example, that the methodology or assumptions

23

applied were erroneous, or that the conclusions reached were in error. Petitioner offered no evidence that would call into question Ms. Davis's credentials. Rather, Petitioner tried to defame her by claiming she worked for the same agency who employed the criminalist who analyzed the capacity of Petitioner's 1998 methamphetamine laboratory, which analysis Petitioner claims was false. The problem with this attack is that Davis was an employee of the State of Iowa, and the criminalist who analyzed Petitioner's laboratory capacity in 1998 was an employee of the Drug Enforcement Administration. Finally, it would have made no difference in the end because Petitioner was convicted of Counts 13 through 17, which charged him with committing murders in furtherance of a Continuing Criminal Enterprise, and those counts did not require proof of a specific drug quantity.

## VIII. CLAIM 7 – JURY SELECTION

Petitioner alleges his attorneys were ineffective for failing to object to the elimination of 29 allegedly qualified jurors as part of an agreement with the government. (PM 58-59). Petitioner further alleges trial counsel missed, through oversight, several jurors they claim should have been struck as part of the agreement. (PM 59). In his pre-hearing memorandum, Petitioner did not clearly argue that his attorneys erred by reaching an agreement with the government to strike jurors with extreme views about the death penalty. Rather, he faulted trial counsel for their execution of the agreement. In his post-hearing brief, however, Petitioner starts with the argument that the very agreement itself constituted deficient performance. (PPHB 25).

The agreement was to strike all jurors with extreme views about the death penalty as reflected by those who circled (a), (b), (h), or (i) on Question 72. It was not

24

an unreasonable agreement to reach with the government. Such a quid-pro-quo agreement to strike jurors is a strategic decision that should not be second-guessed by those with the benefit of hind-sight. Trial counsel reasonably believed, as a matter of trial strategy, that "you want – these people on the fringes, you want them out of there as quickly and as early as possible. If you can do it by agreement, that's the route you take. If you want to do it in some other fashion, sitting there and knocking heads day in and day out, my thought is that's not a wise decision." (2255 Tr. 47).

Petitioner believes those who circled (b) might have been qualified and should not have been struck as part of a deal. Had that been the deal, however, then the government would not have agreed to strike those who circled (h) in response to Question 72. While Petitioner theorizes that some of the prospective jurors who circled (b) might have been qualified, so might some of those who circled (h). Who might have qualified, and how the ultimate jury would have shook out had the deal been different, is pure conjecture. Regardless, Petitioner failed to present evidence at the 2255 hearing demonstrating each of the 29 who answered "yes" to question 72(b) were, in fact, qualified.

As to Petitioner's claim that trial counsel made errors in the execution of the deal, he has failed to demonstrate their performance fell below an objective degree of reasonableness, or that it caused him any prejudice. There is a difference between counsel making human error when dealing with a thousand questionnaires, and counsel performing so poorly that their performance fell below an objective standard of reasonableness. Further, trial counsel relied on the advice of a professional jury consultant with "[e]normous experience," "[w]hose job it is, is to do exactly this kind of

25

thing, keep track of jurors, figure out who should be struck, who shouldn't be struck." (2255 Tr. 48-49). Trial counsels' performance was not deficient in relying on such expertise.

Moreover, to the extent the parties missed a few of jurors who should have been on the list and were not, or were on the list but did not belong there, the oversight included jurors with views on both extremes. Trial attorney Rogers acknowledged the parties missed two jurors who held extreme anti-death penalty views who should have been struck pursuant to the agreement. (2255 Tr., 260-62). Apparently counsel for both sides missed one or two jurors who should have been excluded by reason of the agreement between the parties. Missing these jurors did not render trial counsels' performance deficient, particularly when it is considered that counsel was dealing with 1,000 questionnaires.

Petitioner claims trial counsel were ineffective because "multiple venire persons who answered 'yes' to 'h' (those who would have a difficult time not imposing death) were left in the qualified pool." (Id.). Petitioner identifies these persons as Jurors 24, 556, and 574. (Id.). There was no possible prejudice, however, as to Jurors 24 and 574. Because of the random order in which jurors appeared before the court for jury selection, Juror 24 never appeared in court before a jury was selected. Thus, whether Juror 24 should or should not have been struck because of the agreement of the parties is irrelevant. Similarly, Juror 574 was excused for hardship, so Petitioner did not have to exercise a peremptory strike to eliminate that juror. (Doc. 398). Only Juror 556 was struck by Petitioner's exercise of a peremptory strike. (Exhibit E). With regard to Juror 556, the juror circled not only 72(i), but also 72(e) and 72(f). Moreover, Juror 556's

26

answers to questions 73 and 74 reflect that Juror 556 did not hold extreme views on the death penalty. The court denied Petitioner's motion to strike Juror 556 for cause, showing that regardless of the juror's answers in the questionnaire, they were qualified to serve as a juror in this case. Regardless, Petitioner's exercise of a peremptory strike to remove Juror 556 removed any claim he could have for error in failing to strike the juror for cause. See *United States v. Johnson*, 495 F.3d 951, 963 (8th Cir. 2007) (finding no Sixth Amendment claim where defendant exercised peremptory strikes to remove juror defendant claimed the court should have removed for cause).

## IX.   CLAIM 9 – MENTAL HEALTH EVIDENCE

In his original motion, Petitioner alleged his trial counsel were ineffective during the penalty phase in the presentation of mitigation evidence. By the time Petitioner submitted his pre-hearing memorandum on this issue, it morphed into a claim focused entirely on the alleged failure of his trial counsel to investigate and present mental health expert testimony to establish mitigation evidence. (PM 81-104). That remained the focus of Petitioner's claim at the 2255 hearing.

### A.    Counsels' Performance Was Not Deficient

Petitioner was evaluated by the Bureau of Prisons in 1997 at a time he was represented by trial counsel Alfredo Parrish. That evaluation resulted in an Axis I diagnosis of: "309.24 Adjustment Disorder With Anxiety[;] 305.7 Methamphetamine Abuse[;] and V71.01 Adult Antisocial Behavior." (Exhibit G). Petitioner stated then that he did not use controlled substances between his arrest in March 1993 and 1995 because he was on pretrial release and subject to urinalysis tests. (Exhibit F, p.4). Trial counsel were, of course, aware of this evaluation and the diagnosis. (2255 Tr., 51,

27

564).

Petitioner's mitigation specialist, Lisa Rickert, researched Petitioner's childhood. Rickert's investigation revealed that Petitioner got along well with his stepfather, whom he called a "good man" and of whom Petitioner said he was "supportive." (Rickert Depo., 36). Her investigation revealed that Petitioner did well in school, that his teachers said he was not a behavioral problem, was polite, popular, was a good student, and was "always happy." (Id., 41-42). Her investigation further revealed that Petitioner was a compliant child who generally obeyed the house rules and the rules of the community, and did the normal things kids do, such as playing with friends, watching television, reading, participating in Cub Scouts, engaging in a variety of organized sports, and cooking with his mother. (Id., 42-43). One of his employers said he was "an excellent worker, very conscientious, respectful of authority, and fun to work with." (Id., 42). Ms. Rickert's investigation determined Petitioner grew up in a middle class family and that he did not smoke or drink alcohol or do drugs until he was in his 20s. (Id., 43). In the affidavit Petitioner submitted in support of his 2255 motion, Rickert stated under oath "to be sure, I encountered significant reports of childhood physical abuse," but that is not what she told the trial attorneys. Rickert told trial counsel at the time there was no evidence of physical abuse. (Id., 31-32). Ultimately, Rickert reported to trial counsel that she had been unable to identify very much that was sympathetic about Petitioner. (Id., 60; Exhibit P).

Nevertheless, Rickert recommended to trial counsel that a mental health professional might be able to further develop the mitigation case. (Rickert Depo., 17). In a memorandum dated April 27, 2004, she recommended they hire an expert on

28

"attachment issues/disorder." (Id., 22). She also recommended they hire a neuropsychologist. (2255 Tr., 51).

In response to Ms. Rickert's suggestion, trial counsel hired neuropsychologist Dr. Michael Gelbort, who conducted a neuropsychological evaluation of Petitioner in July 2004. (Exhibit H). In his evaluation, Dr. Gelbort explored Petitioner's history of drug abuse, including his use of methamphetamine. (Exhibit H). Dr. Gelbort determined Petitioner had a higher-than average IQ, and was unable to identify any mental health deficiencies. (Id.). Dr. Gelbort testified at the 2255 hearing that he could have spent more time talking to Petitioner about his drug use "if I so chose," but he chose not to. (Gelbort Depo., 25). Dr. Gelbort also recognized, as a result of his training and education, that Petitioner's history of drug use "could be a potential contributing factor to any cognitive impairments he might display." (Id., 26). Nevertheless, he did not think it was his responsibility to alert trial counsel that they may want to look further at this issue. (Id., 28-29). Gelbort never told trial counsel that he was unable to do a complete evaluation due to time constraints. (Id., 40-41). Gelbort never told trial counsel that he believed he needed more time to do a more thorough evaluation of Petitioner. (Id., 42).

Petitioner's trial attorneys were no novices to criminal cases or psychological issues. Mr. Parrish has practiced law for 40 years, and by the time of Petitioner's trial had handled 35 to 40 first degree murder cases, resulting in 20 to 25 acquittals. (2255 Tr., 30). Mr. Spies has practiced law for 36 years, had worked with forensic psychiatrists and neuropsychologists, and prior to Petitioner's trial had tried 9 or 10 murder cases. (2255 Tr., 522, 555). Trial counsel were aware there was significant evidence of Petitioner engaging in antisocial behavior. (2255 Tr., 565). They knew that

29

any mental health expert called to testify at trial would be probed significantly about Petitioner's antisocial behavior. (2255 Tr., 566). They deemed this to be a significant risk. (Id.). They were also concerned that any mental health presentation would reveal good things about Petitioner's mental health that would not help his case, such as his superior intelligence. (2255 Tr., 567). Counsel were also concerned that presenting mental health evidence would run the risk of presenting an inconsistent case – that it could be interpreted by the jury as a tacit admission that Petitioner committed the murders but was now attempting to suggest mental health problems impaired his ability to make decisions. (2255 Tr., 59). Trial counsel consulted with psychologist Dr. Mark Cunningham about Dr. Gelbort's report and the pros and cons of presenting mental health evidence, and conferred with other capital counsel about the mental health issues in the case. (2255 Tr., 569-70). Ultimately, counsel concluded that presenting mental health evidence would not be helpful and could, in fact, backfire on them. (2255 Tr., 570).

The record belies Petitioner's claim that "counsel's [sic] failures here resulted from decisions made after no investigation of the mental health impacts of Petitioner's 'difficult family history.'" (PM, 91). Trial counsel thoroughly investigated Petitioner's family history. Trial counsel was aware of his 1997 evaluation, and hired a neuropsychologist to evaluate Petitioner again in 2004 and consulted with a third psychologist about the results of the first two examinations. This was not a case of "no investigation" or even an investigation so inadequate that it fell below an objective standard of reasonableness.

Trial counsels' decision to forego presenting alleged mental health mitigation

evidence was not deficient.  A conscious decision not to pursue or introduce psychological evidence as a matter of trial strategy is virtually unchallengable in a collateral attack.  In this case, trial counsel had the benefit of two psychological evaluations of Petitioner.  Trial counsel concluded the findings were not sufficiently mitigating to warrant presentation.  The jury would have learned Petitioner was of superior intelligence and had engaged in significant antisocial behavior as an adult, which would hardly be mitigating evidence.  Petitioner criticizes one of trial counsels' explanation for not seeking further mental evaluations – that if they did so, the government would have the opportunity to rebut it – on the ground they could have conducted the evaluations without disclosure to the government under Rule 12.2.  (PM, 91-93).  This criticism is empty, for Petitioner's entire claim here is premised on the assumption that he has new mental health evidence that should have been presented, which necessarily would have opened up the door to a government rebuttal.  Conducting a secret examination would not have helped Petitioner's mitigation case if it were kept secret.

When, as here, trial counsel conducted an investigation into a Petitioner's mental health and hired an expert for that purpose, counsels' performance cannot be deemed so deficient that it amounts to ineffective assistance of counsel.

B.    Petitioner Has Failed to Establish Prejudice

Petitioner has failed to show that it would have made a difference in the outcome had his trial counsel presented the evidence habeas counsel presented in this matter.  First, the evidence obtained by habeas counsel is not materially different from that obtained by trial counsel.  Second, the government could easily impeach Petitioner's

31

new expert testimony.  Finally, the evidence falls far short of proving Petitioner suffers from any type of mental health disease or defect that would constitute mitigating evidence when taken as a whole.

        1.     <u>Trial Counsels' Investigation v. Habeas Counsels' Investigation</u>

As set forth above, trial counsel knew from their investigation that Petitioner had problems with anxiety, drug use, and anti-social behavior.  Trial counsel had a psychiatric report from 1998 that diagnosed defendant with Adjustment Disorder With Anxiety, Methamphetamine Abuse, and Adult Antisocial Behavior.  Dr. Gelbort did not provide a diagnosis, but his testing purportedly showed that while Petitioner performed very well on the tests, he might have performed better in the past, and that he had a history of drug abuse.

Petitioner's new experts' opinions are not materially different.  Dr. Warren claims Petitioner "has traits of Generalized Anxiety Disorder, and Anxiety Disorder, NOS, including features of Obsessive-Compulsive Disorder."  (Warren Declaration, Doc. 19-45, p.3).  Dr. Warren did not diagnosis Petitioner with Personality Disorder with narcissistic and borderline features (2255 Tr., 119), but claimed to concur in that diagnosis when made by Dr. Dudley (<u>Id.</u>).  Dr. Dudley also diagnosed Petitioner with Anxiety Disorder, NOS.  (Doc. 19-47, p.6).  Dr. Dudley identified defendant as having a methamphetamine dependence (Doc. 19-47, p.8), while Dr. Warren claimed that "by the time of the crimes in question, Mr. Honken was suffering severe effects of the drug use in combination with other mental health problems (Doc. 19-45, p.4).

Accordingly, further investigation of Petitioner's purported mental health issues would not have garnered materially different information from that which trial counsel

32

already had through their own investigation.  This is not a case, for example, where trial counsel failed to uncover some significant mental health disease or defect.

Thus, Petitioner has failed to show he was prejudiced by trial counsels' alleged failure to investigate his mental health.

### 2.    Impeachment of Petitioner's New Experts

Nor has Petitioner failed to show how he was prejudiced by trial counsels' decision not to present mental health evidence.  Moreover, to the extent Petitioner's new experts claim Petitioner suffers from mental health diseases or defects that in any way impaired his state of mind at the time of the murders, or in any way affected his judgment in a mitigating sense, their testimony would have been easily impeached.

### Dr. Warren

Dr. Dudley signed his declaration on June 2, 2011.  (Doc. 19-47, p.9).  Dr. Warren saw Dr. Dudley's declaration prior to signing his own, as Dr. Warren references it in his own declaration.  (Doc. 19-45, pp.4, 6).  Dr. Warren signed his declaration on June 3, 2011.  (Doc. 19-45, p.6).  On May 20, 2011, however, Dr. Warren had written a memo to the file which included his diagnosis.  (Exhibit L).  His only mental health diagnosis at that time was Adult antisocial behavior.  (Exhibit L, p.3).  There was nothing in this internal memo mentioning Anxiety Disorder or methamphetamine addiction.  When confronted with this inconsistency between his internal memo dated May 20, 2011, and his declaration, dated June 3, 2011, Dr. Warren claimed:

> Prior to doing the declaration, there were documents that came in that added to my understanding of Mr. Honken and probably immediately prior to the May 20th date, there'd been some documents that came in.  And at some point along the way, I ended up determining about his methamphetamine abuse, as well as coming to the understanding of this

33

> anxiety problem as I looked back on my meetings with him and compared that to the biographical information that had become available to and about him.

(Warren Depo., 92). Dr. Warren's billing records only show three additional hours of work on May 22, 2011, during which he "reviewed legal, medical and/or mental health records" and a declaration and sent an email to counsel. (Exhibit M). Dr. Warren was unable to explain what information he received that caused this dramatic shift in his diagnosis in two days. (Warren Depo., 92-93). Petitioner failed to provide a copy of any medical and/or mental health records he reviewed that would have justified such a dramatic change in his diagnosis. While Petitioner failed to identify the "declaration" Dr. Warren reviewed, it almost certainly was Dr. Dudley's draft declaration. The most apparent explanation for the sudden transformation of Dr. Warren's diagnosis, therefore, is that he received and reviewed Dr. Dudley's declaration and decided to change his diagnosis to fit Dr. Dudley's diagnosis.

Dr. Warren's testimony was impeached on other grounds as well. Dr. Warren based his opinion on results of a version of the MMPI test that did not exist in 2004. (Warren Depo., 86-87). Dr. Warren concluded Petitioner was abused and neglected as a child (Doc. 19-45, p.3), but felt no need to reconcile this with Petitioner's report to probation officers that he was never abused or neglected (Warren Depo., 104). Dr. Warren based his opinion in part on a reported history of other family members suffering mental health problems, but he did not receive any documentation that corroborated those claims. (Id., 113).[4] In supporting his adoptive diagnosis that

---

[4] In fact, the documents do not support the claims. The only medical records produced by Petitioner for his mother show her mental health problems consist of

34

Petitioner suffers a personality disorder, Dr. Warren claimed Petitioner's behavior was impulsive. (Id., 119). Pressed to identify one thing Petitioner ever did in his life that was impulsive, Dr. Warren mentioned Petitioner moving to Arizona and "impulsive decisions about interpersonal relationships." (Id., 119-20).[5] Dr. Warren opined that Petitioner has been suffering from anxiety since he was a child, but when pressed to identify anything in Petitioner's past that would show anxiety, Dr. Warren claimed the fact that Petitioner was a compliant child and did not draw attention to himself showed anxiety. (Id., 170-173).

In his declaration Dr. Warren claimed "Honken began to use heavy quantities of extremely pure methamphetamine" and that over time "the quantities and frequency increased" such that "[b]y the time of the crimes in question, Mr. Honken was suffering sever effects of the drug use in combination with his other mental health problems." (Doc. 19-45, p.4). When pressed regarding the "increased quantities," Dr. Warren backed down saying, "[w]ell, I guess I should say frequent, increased frequency . . .." (Warren Depo., 126). Dr. Warren admitted he did not know the actual quantities of methamphetamine Petitioner used, the time period he used methamphetamine, the purity level, or the dosage. (Id., 127, 130, 132, 133). Dr. Warren admitted there is no one who has described Petitioner as suffering from sever effects of drug use at the time of the murders. (Id., 136). Dr. Warren was unaware that Petitioner had told his

---

depression which arose as a result of Petitioner's legal problems. (Exhibits 41-44; 2255 Tr., 395-397). The earliest medical records Petitioner produced for his sister start in 2006, again at a time after Petitioner's legal problems began. (Exhibits 49-50).

[5] In contrast, Petitioner's own brother and sister testified that Petitioner was not impulsive. (2255 Tr. 137-38; 440-41).

35

probation officer that he had not been using methamphetamine for months prior to the murders.  (Id., 128).  Moreover, while Dr. Warren relied largely on alleged reports by Tim Cutkomp about Petitioner's drug use, Cutkomp testified that Petitioner's use of methamphetamine was limited to a brief period after they were first successful in making methamphetamine, and Cutkomp had no knowledge of Petitioner's drug use between Petitioner's arrest in March 1993 and the murders.  (2255 Tr. 338-47).

In his declaration, Dr. Warren also claimed "Mr. Honken was also exposed to significant neurotoxins in a closed environment for substantial periods of time during the manufacture of methamphetamine."  (Doc. 19-45, p. 4).  Dr. Warren, however, did not know the physical layout of the location where the methamphetamine was manufactured in Arizona, whether it was made in the house, whether the windows were open, whether there was venting, or even the identity of the chemicals to which Petitioner was allegedly exposed.  (Warren Depo., 140-41).  Dr. Warren had no idea what method Petitioner was using to make methamphetamine.  (Id., 142-43).  The truth is that Petitioner spent little time manufacturing the methamphetamine (having tasked Tim Cutkomp with that job), spent most of his time living in Tucson with his girlfriend, and the methamphetamine manufacturing took place in a shed outside the house.  (2255 Tr. 334-37).  In the end, Dr. Warren's opinion was reduced to mere possibilities – that Petitioner's prior drug use "may have" impaired his ability to appreciate and conform his behavior to the law.  (Id., 155).

Dr. Dudley

Dr. Dudley's testimony was similarly subject to impeachment.  While Dr. Dudley used to be a practicing psychiatrist, for the last three years he has shifted to almost 100

36

percent forensic work as an expert witness. (Dudley Depo., 67). When asked if he would agree that "one of the risks of doing all forensic work is that you lose some of the clinical sharpness," Dr. Dudley said "no." (Id., 68). But, in fact, in 2008 Dr. Dudley published a law review article in which he wrote: "Experts who work solely in a forensic setting may keep their composure during testimony, but they may risk losing clinical sharpness in their field." (Id.). Moreover, it was shown that Dr. Dudley is hardly an unbiased professional. He has always testified for the defense in capital cases and the articles he has authored have been defense-oriented. (Dudley Depo., 69).

Like Dr. Warren, Dr. Dudley based his opinion, in part, on his conclusion that Petitioner's mother and sister also suffered from long-term mental health illnesses, but he admitted there are no records corroborating the reports. (Id., 71-72). As previously noted, to the extent Petitioner's mother and sister have any mental health issues, the extant medical records only show mental health issues arising after Petitioner got in trouble with the law. Of course, Dr. Dudley admitted there is no record of Jeff Honken suffering any mental health issues. (Id., 73).

Despite Dr. Dudley's claim that Petitioner grew up with constant threats of violence and actual violence, he could identify only a single occasion, reported by Petitioner, when Petitioner's father allegedly made a statement that Petitioner took as threatening. (Id., 79-81). Dr. Dudley admitted he had never read a report by Lisa Rickert in which Petitioner told her that he and his mother were very close and there were never any threats of violence or verbal abuse as a child. (Id., 83-84). Petitioner's mother, Marvea Smidt, testified she was not aware of any threats of violence to Petitioner while he was growing up. (2255 Tr., 400). She also testified that Petitioner

37

was not physically disciplined or verbally abused.  (Id.).

Dr. Dudley claimed his mother neglected him.  (Doc. 19-47, p.6).  The evidence does not support this conclusion.  Petitioner's mother, Marvea Smidt, testified she was close with Petitioner, attended school conferences, the kids' school activities, taught Sunday school, and would help them with homework.  (2255 Tr. 399-400, 402-404).  Ms. Smidt, testified that Petitioner was a wanted baby, was an affectionate and happy child, who had friends and played with other children and participated in Cub Scouts.  (2255 Tr., 397-98).  Tim Cutkomp testified that he was treated like another child by Marvea Smidt, whom he said was involved with her children, attended their school activities, and was a "good" and "attentive" mother.  (2255 Tr. 348).  When asked if he was aware that Petitioner's mother served as a den mother of Petitioner's Cub Scout troop, however, Dr. Dudley flippantly replied "Technically."  (Dudley Depo., 85).  Dr. Dudley claimed Petitioner's mother only "had that title" but was not present for Petitioner "emotionally."  (Id., 86).

In his testimony on direct examination, Dr. Dudley claimed that when Petitioner came back to Iowa in April 1993, he had a number of things he was dealing with that were stressors, including having two children with two different women.  (Dudley Depo., 88).  Dr. Dudley identified those two children as Ryan and Marvea.  (Id.).  Dr. Dudley was wrong, however, as neither child was born until after the murders.  (Id., 88-89).

Like Dr. Warren, Dr. Dudley claimed Petitioner acted impulsively, allegedly making it difficult for Petitioner to make decisions.  (Id., 89).  Dr. Dudley was repeatedly pressed to come up with a single example of impulsive conduct by Petitioner, and finally claimed his involvement with more than one woman at a time was "an indication of his

38

impulsivity." (Id., 89-92).

Like Dr. Warren, Dr. Dudley based his opinion on his Petitioner's alleged drug use and methamphetamine dependence. (Doc. 19-47, p.8). Dr. Dudley admitted, however, that he did not know how much methamphetamine Petitioner used during his life. (Dudley Depo., 93-94). He admitted he did not know the purity of the methamphetamine Petitioner used. (Id., 94). The government then questioned Dr. Dudley about the indication of methamphetamine dependence under the DSM. Dr. Dudley admitted it was unclear whether Petitioner ever used more methamphetamine than he intended. (Id., 95). Another symptom of methamphetamine dependence under the DSM is that a person tries to stop using methamphetamine, but is unable to do so. Dr. Dudley admitted there was no evidence to find Petitioner had this symptom. (Id., 96-97). He admitted that when Petitioner stopped using methamphetamine, there was no evidence of withdrawal symptoms. (Id., 100-101). He admitted Petitioner never gave up or lost any important social, occupational, or recreational activity as a result of methamphetamine use. (Id., 105).

In an effort to appear as if he had objectively considered evidence contrary to his views, he claimed he had taken into account that Petitioner told Lisa Rickert that he had never felt anxious. (Id., 106). That was not true. That statement came in a report of interview that Dr. Dudley admitted earlier he had never seen. (Id., 107).

While Dr. Dudley claimed Petitioner's judgment in murdering the victims was impaired by his alleged mental illnesses, Dr. Dudley never asked Petitioner about his state of mind at the time of the offense. (Id., 98). He admitted that Petitioner was not so impaired as to not understand what he was doing. (Id., 113). He admitted that

39

Petitioner fully understood he had the choice to kill or not to kill.  (Id.., 113).

Dr. Piasecki

Dr. Warren relied on the report of Dr. Melissa Piasecki in reaching his opinion. (Warren Depo., 145-57).  Further, Petitioner relies on her opinion to claim trial counsel should have offered similar expert testimony to demonstrate he suffered from methamphetamine dependence.  Dr. Piasecki's opinion, however, was flawed both because it was premised on an inaccurate hypothetical and because she based her opinion on studies that were either not available in 2004 or studies of subjects that are not comparable to Petitioner.  Dr. Piasecki testified there was nothing keeping her from interviewing Petitioner, but that she was instructed not to do so and, rather, to base her opinion on a hypothetical written by defense counsel.  (Piasecki Depo., 39).  Nor was Dr. Piasecki provided the results of interviews conducted by Doctors Warren and Dudley.  (Id., 40).

Dr. Piasecki agreed that her opinion was only as good as the hypothetical provided to her by counsel.  (Id., 34).  Her opinion was based on a description of Petitioner's methamphetamine use that she concluded showed he was a chronic methamphetamine user.  Dr. Piasecki agreed, however, that there was nothing in the hypothetical that suggested Petitioner suffered from memory loss as a result of his methamphetamine use, which is one indicator of chronic use.  (Id., 36).  Dr. Piasecki testified the effects of methamphetamine use depends on the manner of use, the quantity and quality of methamphetamine, and other factors.  (Id., 42).  She agreed, however, from the hypothetical provided to her she could not establish how much methamphetamine Petitioner used on any occasion, or how often he used

40

methamphetamine, or how pure the methamphetamine was that he used.  (Id., 42-44).

She was unable to determine from the hypothetical whether he increased his use over

time, whether he was unable to get high from the same amount of methamphetamine,

how many times a day he used methamphetamine, whether he suffered any physical

problems from its use, or whether he suffered any withdrawal symptoms when he

ceased using the methamphetamine.  (Id., 44-45).  Dr. Piasecki agreed there was

nothing in the hypothetical that told her whether Petitioner ever took methamphetamine

in a larger dose than intended, or over a longer period of time than he intended, or that

he made unsuccessful efforts to cut down on the amount of methamphetamine he was

taking.  (Id., 46).

During the crucial time after his arrest in March 1993 through the murders in July

and November 1993, Dr. Piaseki was led to believe from the hypothetical that Petitioner

continued to use methamphetamine on a sporadic or intermittent basis.  (Id., 47).  The

hypothetical did not say how often, how much, how pure, or the form of the

methamphetamine that Petitioner allegedly used during this period.  (Id.).  She was not

told, in the hypothetical, that during this time period Petitioner was subject to random

urinalysis testing.  (Id., 47-48).  She was not told in the hypothetical that Petitioner had

reported to the probation office that he had not used methamphetamine during the

period of March 1993 until his arrest in 1996.  (Id., 48).  She did know, however, that he

reported the same abstention of use to a psychiatrist in 1997, but only because she

reviewed that report; it was not mentioned in the hypothetical.  (Id.).  She admitted from

the hypothetical it is impossible to tell how many months or weeks passed between his

use of methamphetamine in Arizona and his return to Iowa.  (Id., 48-49).  She admitted

41

there was nothing in the hypothetical that indicated Petitioner was under the influence of any drugs at the time of the murders. (Id., 49).

Among Dr. Piasecki's opinions was that Petitioner was "exposed to volatile organic compounds and methamphetamine throughout the building where the drug was manufactured" which caused him to suffer impairments. (Doc. 19-48, p.3). From the hypothetical, however, she was unable to say where in the house the methamphetamine was manufactured, but was "led to believe it was manufactured in the house." (Piasecki Depo., 50). In fact, it was manufactured in a shed outside of the house. (2255 Tr. 337). She admitted the hypothetical did not indicate how many hours Petitioner was himself involved in the manufacturing process or if he was even involved during steps using volatile chemicals. (Piasecki Depo., 51-52). The fact is, Petitioner had limited involvement in the actual manufacturing process. (2255 Tr. 334-37).

Dr. Piasecki strayed beyond her area of expertise to opine as to the combined effect of Petitioner allegedly suffering from neglect and physical abuse as a child with his methamphetamine use. (Doc. 19-48, p.5). She agreed, however, there was nothing in the hypothetical indicating Petitioner himself suffered any physical abuse. (Piasecki Depo., 56). She confessed that counsel did not disclose to her in the hypothetical that Petitioner told his probation officer that he grew up without neglect or abuse, and that he described his mother as "perfect." (Id., 58).

Dr. Piasecki opined there was an association between chronic methamphetamine users and the use of violence, implying that Petitioner's involvement in committing the murders in this case was tied to his methamphetamine use. (Doc. 19-48, pp.2-3). In her written declaration, Dr. Piasecki cited studies from 2006 and 2009 to

42

support this conclusion (Doc. 19-48, p.2), though these studies would not have been available when Petitioner was tried in 2004.  In an effort to claim similar studies existed at the time of the trial, she attached an appendix citing eight articles published before 2004 she claimed supported her opinion.  (Doc. 19-48, p.6; Piasecki Depo., 61).  Dr. Piasecki was questioned then about each article, and admitted that: 1) to the extent any of them involved studies of so-called chronic methamphetamine users, the subjects of those studies used methamphetamine more often, in larger amounts, and for far longer than Petitioner; 2) and none of the studies established a tie between the use of methamphetamine and the use of violence, except for one study that involved violence while the users were high on methamphetamine.  (Piasecki Depo., 61-76).

### 3. The Mental Health Evidence is Not Mitigating

Taken as a whole, the alleged mental health evidence proffered by Petitioner is not mitigating to a degree that it would have changed the outcome of the trial had it been offered.  In addition, the government had its own expert examine Petitioner.  In determining whether Petitioner has shown prejudice, the Court should consider the nature of the government's rebuttal to the purported evidence.  That rebuttal evidence further demonstrates any presentation of mental health evidence would not have had a mitigating impact.

The government had Dr. Christopher Grote examine Petitioner.  Dr. Grote is a practicing psychologist employed by Rush University Medical Center, who is Board Certified in Neuropsychology.  (See Curriculum Vitae, Exhibit N).  Dr. Grote concluded Petitioner's IQ was in the 90th percentile, and that he suffered no cognitive deficits, in fact scoring in the average to superior range on all tests.  (Exhibit O, p.16).  In simple

43

terms, Dr. Grote found Petitioner was "an exceptionally bright guy." (Grote Depo., 23). Dr. Grote found the personality testing of Petitioner was consistent with him projecting blame on family members. (Exhibit O, p.16). Petitioner told Dr. Grote that he did not feel like he was rejected when his parents divorced, which was completely inconsistent with what Dr. Dudley claimed Petitioner told him. (Grote Depo., 26). Dr. Grote found there was "no evidence of any significant cognitive or behavior problems" and "Dr. Gelbort's contention there were 'soft signs of possible organic dysfunction' . . . is absolutely not supported by the test results . . .." (Exhibit O, p.16, emphasis original). Dr. Grote noted that Petitioner's description of the crimes he admitted to "shows an enormous amount of planning and foresight." (Exhibit O, p.17). Petitioner reported to Dr. Grote only a brief, seven-month period of methamphetamine use. (Id.). Dr. Grote concluded "there is no evidence of any past or current cognitive, mental health or psychosocial factors to explain or account for any of Mr. Honken's criminal activities." (Id.). Dr. Grote testified that, even assuming all the alleged abuse and neglect summarized in the mitigation specialist's report, and the reports by Doctors Warren and Dudley, were true, there is nothing to indicate it would have caused any mental impairment to Petitioner. (Grote Depo., 31).

Taking Petitioner's evidence in its most favorable light, it suggests Petitioner suffers from some type of anxiety, has personality problems, and for a brief period of time used methamphetamine. At best, Petitioner's experts could only speculate that these alleged problems might have somehow impaired his thinking to some degree, but not so much that he did not fully understand, and freely chose, to kill five people, including two little girls. In contrast, had trial counsel proffered any mental health

44

evidence, the government would have countered with someone like Dr. Grote, and would have shown Petitioner was of superior intelligence and mental functioning, who tended to blame family members for his problems, and suffered no mental health problems that would have impaired him in any way.

Attorney Parrish, who was only made aware of Petitioner's new experts' reports, testified that he still cannot say that he would have submitted the evidence at trial. He testified it would still be "an extremely tough call" whether he would have used it at trial because of the danger "it would cause more damage to his case by not being strong enough and you consider in balance what could come back, then it becomes a tougher question for him." (2255 Tr., 28). Mr. Spies echoed this, agreeing that even with the evidence presented by habeas counsel, without seeing how the experts came across as witnesses or performed when cross-examined, it remains "a tough judgment call" whether he would present the mental health evidence. (2255 Tr., 575, 580).

Accordingly, Petitioner has failed to demonstrate trial counsels' performance in investigating and making the call not to present alleged mental health evidence fell below an objective standard of reasonable conduct. Moreover, Petitioner has failed to demonstrate that, had trial counsel offered the mental health evidence his habeas counsel has developed, that it would have had any impact on the outcome of the trial.

## X.    CLAIM 10 – FUTURE DANGEROUSNESS

Petitioner claims the district court erroneously instructed the jury regarding future dangerousness. (PPHB 54-57). He asserts the court erred when it included a "high custody classification" in a list of factors the jury may consider in determining future dangerousness. Petitioner claims the inclusion of this factor showed the court "took

sides" with the government's view regarding custody classifications. (PM 57). Of course, this claim is procedurally barred, so Petitioner must first establish that his counsel was ineffective for failing to raise this alleged error.

A. The Jury Instructions

The trial court instructed the jury that the government alleged Petitioner posed a future danger. The instruction set forth the government's allegation (which followed the language of its Notice of Intent to Seek the Death Penalty), stating:

> Evidence that the defendant would be a danger in the future to the lives and safety of other persons may include one or more of the following: (a) specific threats of violence; (b) a continuing pattern of violence; (c) low rehabilitative potential; (d) lack of remorse; and (e) a high custody classification. In addition, the prosecution must prove that the defendant's dangerousness tends to support imposition of the death penalty.

(Penalty Phase Instruction No. 4, Doc. 524, p. 23).

The government presented no evidence regarding Petitioner's custody classification. In contrast, the government presented significant evidence that Petitioner made specific threats of violence while incarcerated,[6] participated in a continuing pattern of violence beginning in 1993 and afterwards, including at times when Petitioner was incarcerated,[7] and that Petitioner showed no remorse for the horrendous crimes he committed.[8] It was this evidence, not Petitioner's security

---

[6] See Testimony of William Dean (Tr. 1255-56); Dean Donaldson (Tr. 1102); Terry Bregar (Tr. 1395-1397).

[7] See Testimony of Anthony Altimus (Tr. 2030-2036); Dean Donaldson (Tr. 1112-1128).

[8] Petitioner was captured on tape making the following statements regarding the murders he committed:

46

classification, that was the focus of the government's closing argument on future dangerousness. (Tr. 3911-14).

In his mitigation case, Petitioner presented testimony by Dr. Mark Cunningham to argue Petitioner would not pose a future danger, in part because the Bureau of Prisons would house him in an <u>institution</u> that had a high security level. (Tr. 3740). Dr. Cunningham said nothing about <u>Petitioner's</u> security <u>classification</u>. When, during closing arguments, the government argued Petitioner posed a future danger, it focused on his lack of remorse (playing the portion of the tape recording where Petitioner stated the murders did not bother him), and on Petitioner's threats of and plots to commit violence while incarcerated. (Tr. 3911-3914). The only reference to custody classification was in an attempt to counter Dr. Cunningham's testimony by noting that, while Petitioner's higher custody classification may keep society safe for a while, Petitioner would eventually get moved to a lower security classification institution. (Tr. 3913-14).

---

Cutkomp:    Does it bother you?

Honken:     Nope. Never think about it. Never. Never bothers me. Honestly. Thought it would for a long time. Never has. Maybe someday it will. I don't know. Never dream about it. Never nothing. Always, always worried about that. Thought I'd have nightmares all kinds of nasty shit. Never thought about it. I just went (whif sound) over. Part of my life over. Go on. Don't even worry about it. (Unintelligible) no conscience (unintelligible).

(Trial Exhibit 207, page 17). <u>See also</u> Tr. 1099-1100 (Petitioner told Dean Donaldson it did not bother him to kill the kids "because they were trying to take him away from his kids.").

47

B.    Trial Counsels' Performance Was Not Deficient

Petitioner's claim that his trial counsel were ineffective for failing to object to the jury instructions is flawed.

First, Petitioner has failed to provide any law to support his assertion that a defendant's security classification is irrelevant to a determination of future dangerousness.  The instruction set forth what the government alleged constituted proof of future dangerousness.  The instruction was not an endorsement of that allegation, or a factual conclusion that a high custody classification equaled future dangerousness.  Accordingly, trial counsel were not ineffective for failing to object to that instruction.

Second, even assuming the instruction was erroneous in this regard, Petitioner has failed to demonstrate that trial counsels' performance fell below an objective standard of reasonableness.  Trial counsel did not present any evidence regarding Petitioner's security classification.  Rather, trial counsel presented testimony regarding the custody or security rating of the institution where Petitioner would be housed should he receive a life sentence.

Third, even if a juror would confuse the institution's security rating with Petitioner's personal security classification, the nature of the testimony presented by Dr. Cunningham was intended to demonstrate that Petitioner would not pose a future danger if he were placed in a high security institution.

C.    Petitioner Has Not Shown Prejudice

Again, Petitioner resorts to conclusory assertions to establish the prejudice prong of the *Strickland* test.  Petitioner simply proclaims there was prejudice.  The evidence of

48

Petitioner's future dangerousness was overwhelming. Petitioner threatened others while incarcerated, bonded and attempted to bond out other prisoners with instructions to kill witnesses, attempted to escape, plotted to escape from custody during his capital trial and kill witnesses and government officials, and showed not a shred of remorse for the brutal murders of five people, including two innocent little girls. There is no reasonable probability the jury would not have found Petitioner posed a future danger had the custody classification portion of the instruction been omitted. Or, stated another way, there is no reasonable probability that the inclusion of a high custody classification as a factor the jury could consider in determining whether Petitioner posed a future danger was the deciding factor in their conclusion he did pose a future danger. Moreover, given the other overwhelming aggravating factors, there is no reasonable probability that the jury would not have sentenced Petitioner to death, even if it had not found the future dangerousness aggravating factor.

## XI. CLAIM 11 – VICTIM IMPACT EVIDENCE

Petitioner claims the presentation of victim impact evidence in this case was "far too emotional, highly charged, and speculative, and therefore was unduly prejudicial and failed to comport with the Eighth Amendment." (PM 58; PPHB 57). In his pre-hearing memorandum, Petitioner alleged the government's victim impact evidence painted an "untrue picture" of DeGeus. (PM 58). In his post-hearing brief, Petitioner goes further, claiming "the highly charged testimony created a false impression of the impact of the deaths of Terry DeGeus and Greg Nicholson." (PPHB 57). Finally, Petitioner claims the Court's instruction regarding victim impact evidence failed to allow the jury to "narrow those deserving of the death penalty." (PM 58; PPHB 58). Of

49

course, this claim of error is procedurally barred unless Petitioner can first establish ineffective assistance of counsel.

Petitioner simply claims the victim impact evidence was improper, and faults trial counsel for failing to object to it before or during trial. Petitioner has wholly failed, however, to provide any legal authority establishing anything improper about the victim impact evidence. Similarly, Petitioner claims the government's victim impact evidence was "untrue" and "false," but has failed to provide any factual basis whatsoever to support those spurious claims. While trial counsel could not specifically recall why he chose not to object to the victim impact evidence, he opined:

> [W]hen, you know, people are speaking about – or testifying about their bereavement, strategically, you may not gain any points with the finders of fact by objecting, especially when people are testifying about matters that are common to the jurors, you know, why you would feel upset, why you would – I mean, people make judgments in their lives all the time and express the emotions that they encounter in crisis, in times of catastrophe or sadness, that – you know, you could object, but what would be the point of it? Because the jurors are going to understand exactly what the witness is saying. And furthermore, to have your objection overruled makes you look like either a bad lawyer or an insensitive one, or both, and why do that to yourself, let alone to your client.

(2255 Tr. 584-85). Mr. Spies further testified that he paid careful attention to the victim impact testimony, considered throughout the testimony whether to object or not to object, and if he failed to object to any testimony by those witnesses, it would have been a strategic reason that he chose not to object. (2255 Tr. 585). See, e.g., *Jenner v. Class*, 79 F.3d 736, 739 (8th Cir. 1996) (trial counsel's failure to object to questioning was well within the range of professionally reasonable judgement and does not constitute ineffective assistance of counsel); *Bruner v. Dunning*, 731 F.2s 527, 528 (8th Cir. 1984) (affirming district court's finding that trial counsel's decision not to object to

50

evidence was a tactical choice rather than dereliction of duty); *Wiley v. Puckett*, 969 F.2d 86, 102 (5th Cir. 1992) (finding trial attorney "could reasonably have decided not to risk antagonizing the jury by objecting").

For the reasons set forth above, Petitioner's claims have no merit and with the inapplicability of the rules of evidence during the penalty phase of trial, the Court would not have sustained any objection even if trial counsel had made one. Their decision not to object was a wise one, not an example of deficient conduct. Similarly, the jury instruction on victim impact evidence was not erroneous, and therefore trial counsels' decision not to object to the instruction was not deficient.

Petitioner has failed to present evidence establishing prejudice. Petitioner again only makes the conclusory assertion that "[t]hese failures caused Petitioner prejudice at trial and on appeal" and "surely had a significant impact on the jury." (PM 119). That is not enough. Even assuming the evidence was objectionable, it was a small portion of the penalty phase, and the nature of Petitioner's horrendous crimes makes it unlikely barring the objected-to evidence would have changed the outcome of the trial. Petitioner has simply failed to prove that presentation of the victim impact evidence was so unduly prejudicial that it rendered the trial fundamentally unfair.

## XII. CLAIM 14 – PETITIONER'S PRIOR DISTRIBUTION OF COCAINE

Petitioner continues to fault his attorneys for failing adequately to object to statements by Scott Gahn about Petitioner's prior drug activity. Petitioner alleges the government engaged in misconduct when the "Government deliberately elicited from Scott Gahn on redirect examination" testimony about Petitioner's drug activity prior to the charged conspiracy. (PPHB 59).

51

The government did not engage in misconduct. Petitioner merely alleges the conduct was "deliberate" without a shred of evidence to support that specious allegation. Petitioner could have called the prosecutor, Tom Miller, to testify about this matter at the 2255 hearing. Petitioner chose not to do so. Petitioner offered no evidence to support the allegation that the prosecutor deliberately elicited this testimony, and a fair reading of the entire transcript of Gahn's direct examination, cross examination, and redirect examination demonstrates the prosecutor's question was not designed to elicit information about prior drug activity.

Further, trial counsels' performance in not objecting to the question, or asking that the answer be stricken or the jury given a limiting instruction, was not deficient. Trial counsel previously objected to references to Petitioner's historic involvement in distributing drugs prior to 1992. The court instructed the jury to disregard the evidence. It is well-settled that the admission of allegedly prejudicial testimony is ordinarily cured by an instruction to the jury to disregard the evidence. *United States v. Encee*, 256 F.3d 852, 854 (8th Cir. 2001) (officer's prejudicial statement cured by instruction to jury to disregard). Unless there is evidence to the contrary, a court must assume the jury will follow a curative instruction. *United States v. Johnston*, 353 F.3d 617, 623 (8th Cir. 2004) (any prejudice to defendant from witness's testimony of drug dealing in 1995, when the charged conspiracy began in 2001, was cured by court's striking of the testimony and instructing jury to disregard the evidence).

When the witness blurted out another reference to drug activity prior to 1992 in response to a question that could not have anticipated such an answer, it was a tactical decision by trial counsel whether to object to this testimony. While trial counsel could

52

not specifically recall why he did not object to the testimony on redirect examination, he did take into account that the Court had already instructed the jury to disregard any evidence about Petitioner's alleged drug activity prior to the time of the charged conspiracy. (2255 Tr. 66). Furthermore, trial counsel testified that he tries "not to make an objection unless [he] absolutely ha[s] to." (2255 Tr. 76). Objecting always raises the possibility that it will draw the jury attention to the evidence. See, e.g., *United States v. Caver*, 470 F.3d 220, 244 (6th Cir. 2006) ("[N]ot drawing attention to [a] statement may be perfectly sound from a tactical standpoint."); *United States v. Vaughn*, 228 F.3d 178, 205 (3rd Cir. 2000) (holding trial counsel was not ineffective because "[c]ounsel's decision not to draw attention to remarks cannot be deemed unreasonable trial strategy in light of the facts of this case."); *United States v. Allison*, 59 F.3d 625, 629 (7th Cir. 1995) ("Counsel's failure to object to a single improper statement does not establish objective deficiency, particularly where it may have been sound trial strategy to let the comment pass rather than draw attention to it . . ..").

Finally, Petitioner has made no showing that he was prejudiced by any alleged error by counsel in failing to object. It is almost absurd to suggest that, in a case where the government presented a "tsunami" of evidence showing Petitioner guilty of committing five brutal murders in furtherance of a Continuing Criminal Enterprise Petitioner, including the murder of two innocent little girls, that he was prejudiced by a passing reference to his involvement in selling cocaine a year before the beginning of the charged conspiracy. Petitioner offers nothing but base conjecture to support such an argument. It flies in the face of common sense and the overwhelming weight of the evidence.

53

## XIII. CLAIM 16 – THEORY THAT DeGEUS WAS THE MURDERER

The last argument Petitioner chose to brief in his post-hearing submission is, perhaps, his weakest one. Petitioner claims his trial attorneys were ineffective for failing to present additional evidence to suggest Terry DeGeus killed Nicholson and the Duncan family. (PPHB 61-64). Petitioner claims there was "abundant evidence" that would have shown DeGeus was the murderer. (PPHB 61). The "evidence" Petitioner claims was contained in his pre-hearing memorandum. (PPHB 61, referencing PM 150-153). Petitioner presented no new evidence at the 2255 hearing.

There was no credible evidence supporting the theory that DeGeus killed anyone. Moreover, trial counsel were not ineffective for failing to present this "evidence."

### A. Petitioner's Alleged "Evidence" that DeGeus Was the Murderer

The evidence Petitioner claims trial counsel failed to present was that DeGeus was allegedly the "primary suspect" for the murders. (PM 150). The truth is, while law enforcement officers kept an open mind about the possibility Terry DeGeus was involved in the murders, it was only to the extent that he might have been Petitioner's accomplice. (Basler Stipulation, Doc. 75, ¶ 4).

Petitioner further claims DeGeus had a motive to kill Nicholson. (PM 150). Other than a statement by Mike Billick that Nicholson and DeGeus were competitors in selling methamphetamine, there is nothing to suggest animosity between them. Moreover, Petitioner intentionally kept Nicholson in the dark about DeGeus. Nicholson had no personal dealings with DeGeus and Nicholson testified in the grand jury that the only thing he knew was that Petitioner once told him that he was supplying

54

methamphetamine to Terry DeGeus.  (Trial exhibit 27, p 13).  Cutkomp testified that Petitioner intentionally set it up so there would not be contact between DeGeus and Nicholson.  (2255 Tr. 331).  Accordingly, DeGeus would have had no reason to know of Nicholson or be concerned that Nicholson would incriminate him.

Moreover, the idea that DeGeus was motivated to kill Nicholson never made any sense unless it was tied to Petitioner's involvement in the murders.  Nicholson wore a wire on Petitioner, causing Petitioner's arrest; he did not wear a wire on DeGeus causing DeGeus's arrest.  Nicholson testified in the grand jury against Petitioner, not against DeGeus.  DeGeus was not charged with any criminal offense at the time of Nicholson's murder; Petitioner was.  Petitioner withdrew his intent to plead guilty to drug charges immediately after Nicholson's disappearance; DeGeus had no pending federal drug charges.  DeGeus himself later disappeared shortly after Angela Johnson and Aaron Ryerson were questioned by the grand jury about drug activity between Petitioner and DeGeus.  The last person known to talk with DeGeus was Angela Johnson, Petitioner's girlfriend.

Petitioner points to DeGeus's involvement in excavation work as evidence he was involved in the murders.  (PM 150-51).  Again, law enforcement officers considered the possibility that he helped Petitioner murder Nicholson and the Duncan family or helped bury the bodies, but only because of his connection to Petitioner.  (Basler Stipulation, Doc. 75, ¶ 4).  To the extent law enforcement ever suspected DeGeus of having any involvement in the murders, it was only under the theory that he "would have been under the direction and control of Mr. Honken."  (2255 Tr. 490).  When agents followed up on the theory by excavating the last locations where DeGeus had

55

Case 3:10-cv-03074-LTS-KEM    Document 93    Filed 02/21/12    Page 57 of 65

performed earth moving work before he was murdered, the agents did not recover any evidence showing he was involved in the murders. (2255 Tr. 491). Of course, the victims' remains were not found where DeGeus had worked.

Petitioner claims DeGeus was concerned about receiving a grand jury subpoena before the murders. (PM 151). In fact, his concern about being subpoenaed occurred after the murders, not before. Joanne DeGeus, Terry DeGeus's mother, testified that it was after Greg Nicholson testified that Terry DeGeus was worried about whether anyone had delivered a subpoena for him to testify. (Tr. 519-520). She testified that DeGeus was very worried and upset at this time. (Tr. 520). This comports with the observation made by Christy Gaubatz who testified that after Nicholson disappeared, she ran into Terry DeGeus. (Tr. 447).

> We had seen each other or he saw me on the – on a road that connects Clear Lake to Mason City, and I could see in my rear view mirror that he was turning around to follow me, so I pulled over and he got in my car, and that was the incident in which I noticed he – there was an odor, and he said he had not slept in a long time and he was very upset, very nervous, and he pulled out a – I don't know if it was a note. It was just a piece of paper, and it had Greg's name on it, and he asked me did I know who he was, and I said no. And he said, Well, I can't find him. He's been missing, and I said, I don't know what you're talking about, and he was just ranting."

(Tr. 448).

Petitioner points to evidence that DeGeus was violent as showing his likely involvement in the murders. (PM 151-53). While there was evidence DeGeus was violent and aggressive, his violence was limited to beating or threatening girlfriends and scuffling with law enforcement officers. Evidence DeGeus stalked and beat Johnson does nothing to establish a motive for him to kill Greg Nicholson, Lori Duncan, and her

56

two little girls.

Finally, Petitioner's claim that DeGeus murdered Nicholson and the Duncan family does nothing to explain DeGeus's own brutal murder.

B.    Trial Counsels' Performance Was Not Deficient

To the extent Petitioner claims his attorneys could have done more to point the finger at DeGeus, he cannot demonstrate the presentation they did make was so deficient that it fell below an objective standard of reasonableness.  Petitioner does not claim trial counsel failed to investigate the theory DeGeus was involved in the murders; rather, his criticism is limited to how they presented the evidence.  (PM 154).  Trial counsel elicited testimony of DeGeus's involvement in violent conduct through cross examination of government witnesses.  Trial counsel elicited testimony from Aaron Ryerson that Terry DeGeus was involved in a stand-off with police officers and resisted arrest.  (Tr. 259-61).  Trial counsel also elicited testimony from Christy Gaubatz that DeGeus threatened a man who was seeing Angela Johnson, that Johnson was fearful of DeGeus, and that DeGeus was involved in a high-speed chase of Johnson that ended at a police station.  (Tr. 417-425). To the extent Petitioner claims trial counsel should have called additional witnesses on this issue, that decision "must be viewed as of the time it was made."  *Winfield v. Roper*, 460 F.3d 1026, 1033 (8th Cir. 2006).  There was no credible evidence linking DeGeus to the murders of Nicholson and the Duncan family.  Petitioner simply claims trial counsel could have presented additional evidence, but whether and which witnesses to call are fundamentally a strategy decision to be made by trial counsel.  *Winfield*, 460 F.3d at 1033 (decision whether to call witnesses is presumed to be one of strategy).  See also *Hanes v. Dormire*, 240 F.3d 694, 698 (8th

57

Cir. 2001) (witness selections are left to counsel's judgment).

Trial counsel was wise not to have attempted to present evidence directly alleging that DeGeus murdered Nicholson and the Duncan family. Had counsel done so, the government would have countered with evidence similar to that summarized above showing any suspicion of DeGeus was, first, only because of his connection to Petitioner, and, second, was firmly discarded as a result of all the other evidence showing Petitioner committed the murders. Trial counsel was wise, instead, to hint in the evidence that DeGeus could have been the murderer without jeopardizing their credibility by directly alleging it. Trial counsel was wise, instead, to suggest in closing argument DeGeus's possible involvement as a means of attempting to implant the seed of reasonable doubt, without assuming the burden of proposing it as the truth.[9]

### C. Petitioner Has Not Demonstrated Prejudice

Any attempt to blame DeGeus for the murders of Nicholson and the Duncan family was, and is, completely untenable. The evidence overwhelmingly demonstrated that Petitioner and his girlfriend, Angela Johnson, murdered the first four victims. Moreover, it also showed they then murdered Terry DeGeus. Petitioner's claim that DeGeus murdered Nicholson and the Duncan family does nothing to explain DeGeus's own brutal murder.

The reality is the evidence overwhelmingly proved Petitioner guilty to the point that not only did the jury find him guilty beyond a reasonable doubt – not a single juror

---

[9] The government must take issue with Petitioner's assertion that Mr. Parrish spent "considerable time" in closing argument devoted to this theme. Petitioner points to a total of 4 pages of transcript. Mr. Parrish's closing argument consumed 87 pages of transcript (Tr. 3299 to 3386).

58

harbored even a fictitious "residual doubt" about his guilt. (Penalty Phase Verdict Form, Doc. 547, p 7).

## XIV.   CLAIM 18 – SECURITY ISSUES

Petitioner claimed the security measures used by the Marshals during trial violated his Fifth, Sixth, and Eighth Amendment rights. He claimed the security measures "interfered with Petitioner's right to counsel" and "impacted the jury, who [sic] were led to believe that Petitioner was an extraordinary dangerous person." (PM164). At the 2255 hearing, Petitioner produced no evidence demonstrating the security measures interfered with his right to counsel. Nor did Petitioner produce any evidence showing the security measures impacted the jury.

Petitioner asserted he was prejudiced by "[a]dditional onerous and unnecessary security measures" "also put in place with respect to the jury that could have only had an objective and profound impact on the individual jurors." (PM 170). Petitioner claimed that when jurors arrived at the courthouse, "they were ushered inside also under very tight security and were able to see snipers and other uniformed and armed law enforcement personnel in many areas in and around the courthouse," speculating that "[s]uch drastic security measure were surely to have effects on the jurors' view of Petitioner and their analysis of the evidence . . .." (Id.).

The evidence produce by the government at the 2255 hearing showed these allegations to be untrue. Deputy United States Marshal Duane Walhof testified that he was responsible for overseeing all aspects of security for the trial. (2255 Tr. 500). Deputy Walhof described in detail the manner in which Petitioner and the jurors were transported to and from the Courthouse, and established through his testimony that

there was no way any jurors saw the security measures adopted for transporting Petitioner. (2255 Tr. 503-510). He testified there were no security measures visible to the jurors when they were brought to or from the courthouse. (2255 Tr. 507-509).

Finally, Petitioner asserted he had "additional facts" to support his claim that the adoption of security measures was inappropriate. (PM, 97 n. 10). Specifically, Petitioner asserted the security measures were implemented based on "information from jail house informants that was not subject to adversarial testing and was compromised by due process violations." (Id.). Petitioner further claimed "the Government suppressed exculpatory information of which the court was unaware." (PM 166 n. 25). To that degree, this claim is dependant on his claimed *Brady* violations, which are themselves viable only to the extent Petitioner can demonstrate trial counsel were ineffective for failing to properly investigate the cooperators. (See Petitioner's Claim 3).

As shown in response to Claim 3, none of the evidence supported Petitioner's *Brady* violations claims. Furthermore, Petitioner did not tie anything allegedly said by the witnesses to the basis for adoption of the security measures. It is not, for example, as if Petitioner established that in making its decisions regarding security the district court relied on information from Terry Bregar which Petitioner, then proved was unreliable. There simply is no evidence linking up the alleged *Brady* claims with this claim.

Regardless of the merits of this claim, it is barred absent evidence showing ineffective assistance of counsel for failing to investigate or raise this issues. As with Claim 3, Petitioner produced no evidence linking this claim to ineffective assistance of

counsel.

## XV.    CLAIM 19 – FORENSIC EVIDENCE

Petitioner is critical of the government's expert testimony, claiming it suffered from serious flaws in methodology and accuracy, and generally lacked a sound scientific basis.  (PM 172-73).  To evade procedural default, Petitioner couches this claim in terms of ineffective assistance of counsel, asserting his attorneys "were ineffective for failing either to attempt to exclude this evidence pre-trial via a *Daubert* hearing, present contrary scientific evidence of their own, or, at a minimum, effectively challenge the Government's evidence through cross-examination."  (Id.).  Petitioner cites a 2009 report by the National Academy of Sciences which he asserts calls into question the forensic evidence presented by the government.  Petitioner claims this is "new evidence" such that it is not procedurally defaulted.  (PM 173-74).

Petitioner's claim is wholly lacking in specificity.  Petitioner claimed the government's scientific evidence was defective, but failed to identify specifically what evidence was deficient and how it was allegedly deficient.  At best, he broadly asserted all the government's handwriting, ballistics, pathology, dental, and anthropology forensic evidence "suffered from serious flaws in methodology and accuracy, and generally lacked a sound scientific basis."  (PM 172-73).

At the 2255 hearing, Petitioner offered no evidence to narrow this claim. Petitioner failed to present any evidence establishing the methodology or accuracy or scientific basis of the government's forensic evidence was lacking.  The same lack of specificity and factual allegations apply to Petitioner's claim that his trial attorneys were ineffective with regard to the forensic evidence.  Petitioner broadly alleged his trial

61

attorneys were ineffective for 1) failing to attempt to exclude this evidence, 2) present contrary scientific evidence of their own, or 3) effectively challenge the Government's evidence through cross examination. (PM 173). Petitioner presented no evidence at the 2255 hearing, however, to support this claim either.

In contrast, the government presented evidence demonstrating trial counsels' performance was not deficient. Mr. Parrish was a very experienced trial attorney who had significant experience dealing with forensic evidence. (2255 Tr. 30-31). Mr. Parrish testified that trial counsel "looked at the evidence pretty thoroughly" and, in his opinion, "it would have created more problems to have a wholesale attack" on the forensic evidence. (2255 Tr. 72). Mr. Parrish testified he "did not see any reasonable basis to show or to attack the credibility of that evidence, because it made sense." (Id.). Trial counsel had, in fact, hired a forensic expert, Dr. Earl F. Rose, to review the government's pathological and anthropological forensic evidence. Dr. Rose found "he could not disagree with the conclusions reached in the government's investigation," and that "the investigation and documentation was some of the most thorough work he has ever seen in his professional life." (Exhibit K, letter from Leon Spies to Alfredo Parrish and Charles Rogers, dated 12/19/2002). Mr. Parrish indicated "that was pretty much my conclusion based upon my experience with trying cases, that it was thorough. It was – we looked at everything, and I did not see any holes, as I said earlier before I was shown this letter, that we could – you know, again, you have to maintain your credibility with the jury – that you could reasonably attack." (2255 Tr. 74-75).

Finally, Petitioner failed to present any evidence demonstrating he was prejudiced by trial counsels' performance. As stated above, Petitioner presented no

evidence calling into question in any way the government's forensic evidence at trial. Regardless, this case was never about whether or how the victims were killed, the identity of the victims, or even who drew the maps leading to discovery of the bodies. The forensic evidence was corroborative, but hardly determinative, of the outcome of the case. To the extent there was any real issue during the guilt phase, it was about who murdered the victims. None of the forensic evidence identified the killer, and was therefore not important to that central issue. The evidence at trial proving Petitioner's guilt and justifying his execution was overwhelming. There is simply no factual basis to conclude that a successful challenge to the government's forensic evidence would have had any impact on the outcome oft he case.

## XVI. CONCLUSION

WHEREFORE, for the reasons set forth above, the United States respectfully requests that the Court deny Petitioner's motion.

Respectfully submitted,

STEPHANIE M. ROSE
United States Attorney

By: s/ C.J. WILLIAMS

C.J. WILLIAMS
Assistant United States Attorney
401 First Street SE, Suite 400
Cedar Rapids, Iowa 52401
319-363-6333
(Fax 319-363-1990)
cj.williams@usdoj.gov

CERTIFICATE OF SERVICE

I certify that I electronically served a copy of the foregoing document to which this certificate is attached to the parties or attorneys of record, shown below, on February 21, 2012.

UNITED STATES ATTORNEY

BY: s/ S. Van Weelden

COPIES TO: Counsel of Record