# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA

———————————————————————

UNITED STATES OF AMERICA,

               Respondent,

        -v-

DUSTIN LEE HONKEN,

               Petitioner.

———————————————————————

 :
 :      No. C10 – 3074 – LRR
 :
 :    **CAPITAL 2255 PROCEEDINGS**
 :
 :    HON. LINDA R. READE
 :       Chief U.S.D.J.
 :
 :
 :
 :

**PETITIONER'S POST-HEARING REPLY BRIEF**

Leigh Skipper
Chief Federal Defender
By: Shawn Nolan
Assistant Chief, Capital Habeas Unit
Timothy Kane
Aren Adjoian
Ayanna Williams
Assistant Federal Defenders
Federal Community Defender Office
Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520
Counsel for Petitioner, Dustin Lee Honken

Dated:      March 26, 2012

TABLE OF CONTENTS

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

CLAIMS FOR RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**Claim One**

Petitioner's Rights to Due Process, Trial by Jury, Confrontation, Compulsory Process, and Against Cruel and Unusual Punishment Were Violated When Trial Counsel Provided Ineffective Assistance by Failing to Object to the Admission of the Court's Sentencing Findings from a Prior Case; Appellate Counsel Likewise Provided Ineffective Assistance by Failing to Raise and Litigate the Issue.. . . . . . . . . . . . 2

**Claim Two**

Petitioner's Rights to Effective Trial and Appellate Counsel, Due Process, and Against Double Jeopardy and Cruel and Unusual Punishment Were Violated When Trial Counsel Failed to Object to the Charges and Evidence Related to Issues Previously Litigated and Resolved in Petitioner's Favor in His 1998 Drug Conspiracy Sentencing Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**Claim Three**

The Government Violated Due Process When it Failed to Disclose Exculpatory Evidence Relevant to Cooperating Witnesses. Trial Counsel Ineffectively Failed to Discover this Evidence. Accordingly, Petitioner's Convictions and Sentences Violated the Fifth, Sixth and Eighth Amendments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**Claim Five**

Petitioner's Rights to Effective Assistance of Counsel, Due Process, and Against Double Jeopardy and Cruel and Unusual Punishment Were Violated When Trial Counsel Failed to Object to Multiplicitous Charges for Drug Conspiracy Murder and Continuing Criminal Conspiracy Murder, in Violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**Claim Seven**

Petitioner's Rights to Due Process, to an Impartial Jury, to Effective Assistance of Counsel, and Against Cruel and Unusual Punishment Were Violated Where Trial Counsel Failed to Object to the Exclusion of Qualified Jurors from the Venire, Contrary to Witherspoon v. Illinois and its Progeny; Appellate Counsel Were Ineffective for Failing to Raise and Litigate this Issue; All in Violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution. . . . . . . . . . . . . . . . . . 15

**Claim Nine**

Petitioner Was Denied His Sixth Amendment Right to Effective Assistance of
Counsel at His Capital Sentencing.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**Claim Ten**

The Court's Penalty Phase Instructions Failed to Properly Narrow the Scope of the
Jury's Consideration of Future Dangerousness and Failed to Guide the Jury's
Weighing of Aggravating and Mitigating Circumstances; Counsel Were Ineffective
for Failing to Object in Violation of Petitioner's Fifth, Sixth, and Eighth Amendment
Rights. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

**Claim Eleven**

Victim Impact Evidence Presented to the Jury Was Received in Violation of the
Fifth, Sixth and Eighth Amendments.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

**Claim Fourteen**

The Government Violated the Fifth and Eighth Amendments When it Repeatedly
Elicited Inadmissible Testimony Regarding Petitioner's Alleged Involvement with
Drugs and Violence That Was Too Remote to be Relevant.  Trial and Appellate
Counsel Ineffectively Failed to Object to or Litigate All of the Instances of
Misconduct.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

**Claim Sixteen**

Trial Counsel Ineffectively Failed to Present Abundant, Readily Available Evidence
that Would Have Supported Their Theory of
Defense. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

**Conclusion**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

# INTRODUCTION

This Post-Hearing Reply Brief discusses only those arguments raised in the Government's Post-Hearing Brief that Petitioner did not already address in prior pleadings. By not addressing an issue in this Reply Brief, Petitioner does not intend to waive any argument or claim. Petitioner instead submits that those matters are ripe for decision based on the parties' prior pleadings and the record of the case.

Stylistic conventions and citations in this brief conform to those employed in Petitioner's Post-Hearing Brief. (*See* Doc. # 90 at 1-2.) All emphasis is provided unless otherwise noted.

*       *       *       *

On March 22, 2012, in the related § 2255 proceedings of Petitioner's co-defendant,.Angela Johnson, Judge Bennett issued a 448-page opinion granting penalty phase relief on grounds of ineffective assistance of counsel. *See Johnson v. United States*, CV-09-3064-MWB, Doc. # 377. Undersigned counsel is reviewing the opinion and may seek leave of the Court to file a supplemental brief addressing the relevance of Judge Bennett's opinion to Petitioner's case generally and, more specifically, to his claim of ineffective assistance of counsel at penalty phase.

1

## CLAIMS FOR RELIEF

### CLAIM ONE

**PETITIONER'S RIGHTS TO DUE PROCESS, TRIAL BY JURY, CONFRONTATION, COMPULSORY PROCESS, AND AGAINST CRUEL AND UNUSUAL PUNISHMENT WERE VIOLATED WHEN TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE BY FAILING TO OBJECT TO THE ADMISSION OF THE COURT'S SENTENCING FINDINGS FROM A PRIOR CASE; APPELLATE COUNSEL LIKEWISE PROVIDED INEFFECTIVE ASSISTANCE BY FAILING TO RAISE AND LITIGATE THE ISSUE.**

Trial counsel were ineffective in failing to object to the Government's use of exhibits containing the District Court's judgments and sentencing findings (in the Government's favor) in the prior drug conspiracy prosecution of Petitioner.

The Government's Post-Hearing Brief argues that (1) the reference in the judgments to Petitioner's aggravated role in the conspiracy was "meaningless"; (2) "[t]he judgments say nothing about Petitioner's possession of firearms"; and (3) trial counsel did not object to the admission of the judgments as a result of "strategic thinking." *See* Gov't Post-Hr'g Br. at 2-3.

(1) The Government argues that the District Court's finding of a sentencing "enhancement" due to Petitioner's "Aggravated Role" in his prior case (*see* Gov. Trial Ex. 303 at 7, Appendix 1; Gov. Trial Ex. 304 at 7, Appendix 2) was "meaningless" because the finding did not correspond to a specific element of the charged crimes in the instant case. *See* Gov't Post-Hr'g Br. at 2. Improper evidence need not match an element of the charged crime to be prejudicial; rather, the question is whether the nature of the evidence "raises the risk of a verdict tainted by improper considerations." *Old Chief v. United States*, 519 U.S. 172, 174 (1997). That is what happened here. Moreover, the prejudice at penalty phase is particularly clear given that the jury was tasked with weighing mitigating circumstances against "aggravating" circumstances – the same language used in the

2

District Court's improperly admitted finding regarding Petitioner's "Aggravated Role" in the earlier case. It would be difficult for a reasonable juror not to make a connection between the two findings.

(2) The Government's assertion that "[t]he judgments say nothing about Petitioner's possession of firearms" is belied by the judgments themselves. Both judgments plainly order that "[t]he defendant shall not possess a firearm." Gov. Trial Ex. 303 at 3, Appendix 1; Gov. Trial Ex. 304 at 3, Appendix 2.

(3) The Government argues that trial counsel's failure to object to the improper evidence was somehow the result of "strategic thinking." Gov't Post-Hr'g Br. at 3. Mr. Parrish testified that he did not recall "any strategy decisions" that explain the failure to raise this claim. *See* 2255 Tr. at 20-21. Mr. Rogers and Mr. Spies testified along the same lines. *See id.* at 239-40 (Rogers); *id*. at 559-60 (Spies). As counsel for the Government stated to Mr. Spies at the hearing:

> Counsel talked with you about their first claim, and that is the objecting to the findings from the judgment, from the 1998 conviction, and your response was you recalled a discussion about that vaguely. And then the question was, did you have any strategic reasons not to object to it. And you said, no.

*Id.* at 559. The record plainly does not support the notion that counsel decided not to object as a result of strategic thinking.

### CLAIM TWO

**PETITIONER'S RIGHTS TO EFFECTIVE TRIAL AND APPELLATE COUNSEL, DUE PROCESS, AND AGAINST DOUBLE JEOPARDY AND CRUEL AND UNUSUAL PUNISHMENT WERE VIOLATED WHEN TRIAL COUNSEL FAILED TO OBJECT TO CHARGES AND EVIDENCE RELATED TO ISSUES PREVIOUSLY LITIGATED AND RESOLVED IN PETITIONER'S FAVOR IN HIS 1998 DRUG CONSPIRACY SENTENCING PROCEEDINGS.**

Trial counsel were ineffective in failing to raise a collateral estoppel objection to the Government's re-litigation at trial of issues determined in Petitioner's favor in the prior drug

3

conspiracy proceedings. A proper objection would have precluded Petitioner's prosecution on the capital counts at issue here. Despite the trial court's pre-trial comment on counsel's omission, counsel failed to raise such an objection, because Mr. Rogers, the lawyer who researched the double jeopardy issues, was not familiar with or failed to appreciate the import of Judge Bennett's prior findings, while Mr. Parrish, the lawyer involved in the prior proceedings, was not directly involved in preparing the double jeopardy motion. Counsel had no strategic or tactical reason for failing to raise such an objection, nor is such a reason conceivable. *See generally* Petitioner's Post-Hr'g Br. at 6-11.

In response, the Government argues that trial counsel was not aware of any case applying *Ashe v. Swenson*, 397 U.S. 436 (1970)*, under these precise circumstances. *See* Gov't Post-Hr'g Br. at 4-5. Counsel's testimony on this point, however, is illuminating:

> Q. Are you aware today of any case that holds that a finding by a judge in a sentencing hearing can collaterally estop the government from bringing charges in a later prosecution or that it can be collaterally estopped from arguing a position in a later prosecution? Are you aware of any case that would support the proposition proposed by the defense in Claim 2?
>
> A. To me, I don't know that the fact that it happens at a sentencing as opposed to some other stage of the proceedings has anything to do with whether or not it's a collateral estoppel. I think for collateral estoppel, you need a factual determination with either the same or a lesser burden of proof, you need identity of parties, you need identity of issues, and then that's what I think the elements of collateral estoppel are. I'm not specifically aware of any case holding 1 way or the other whether findings at a sentencing by a preponderance of the evidence collaterally estop later proceedings requiring proof beyond a reasonable doubt.

*See* 2255 Tr. at 256-57 (Rogers). A capital defense lawyer – like every lawyer – must necessarily raise objections based on principles of law as applied to specific factual scenarios. Counsel's failure to do so here was deficient.

4

While asserting that "there was no case law extant in 2004" presenting an identical scenario as here, the Government relegates *Rice v. Marshall*, 816 F.2d 1126 (6th Cir. 1987), to a footnote. As discussed in Petitioner's prior pleadings, *Rice* involved a similar situation as here, and the Sixth Circuit found counsel ineffective for failing to raise a collateral estoppel objection. Obviously, *Rice* was "extant in 2004." The Government nonetheless argues that this Court should disregard *Rice*, in part because a state court found the "reasoning in *Rice* erroneous." Gov't Post-Hr'g Br. at 4-5 n.2 (citing *State v. Wade*, 2008 WL 366143 (Ohio App. 10 Dist. 2008)). *Wade* made no such finding but instead found the appellant's reliance on *Rice* to be "misplaced," because *Wade* did not involve an ineffectiveness claim. *Id*. at *6 n.4. The *Wade* court likewise recognized that, to the extent *Rice* was inconsistent with *Dowling v. United States*, 493 U.S. 342 (1990), *Dowling* controlled, a point with which Petitioner has no quarrel. *See id*. *Wade*'s discussion of the law of collateral estoppel, in fact, strongly supports the claim for relief here:

> Simply put, collateral estoppel means that when an issue of ultimate fact has been determined by a valid and final judgment, that issue cannot be litigated again between the same parties in any future lawsuit. [*Ashe*, 397 U.S.] at 443; *State v. Lovejoy* (1997), 79 Ohio St. 3d 440, 442.

> Collateral estoppel may affect successive prosecutions in one of two ways. *United States v. Brackett* (C.A .5, 1997), 113 F.3d 1396, 1398. First, it will completely bar a subsequent prosecution if one of the facts necessarily determined in the former trial is an essential element of the subsequent prosecution.... Secondly, collateral estoppel can also bar certain evidence in a subsequent trial. The doctrine prohibits the government from relitigating an issue of ultimate fact that was determined by a valid and final judgment. *Dowling v. United States* (1990), 493 U.S. 342, 347.

*Id.* at *3-*4. It is these well-recognized principles of law upon which Petitioner's claim for relief relies.

The Government appears to recognize that some exception to the *Ashe* rule must be carved

5

out here in order to deny relief, and the Government thus attempts to limit *Ashe* only to "prior jury determination[s]." Gov't Post-Hr'g Br. at 4-5 & n.2. *Ashe* and *Dowling*, however, do not limit their holdings to a jury determinations but instead apply to any issue of fact "determined by a valid and final judgment."[1] *Dowling*, 493 U.S. at 347; *Ashe*, 397 U.S. at 443. It is this law that the Court must apply.

The Government also cites *United States v. Swayze*, 2008 WL 859030, at *14 (N.D. Iowa 2008), and *Anderson v. United States*, 393 F.3d 749, 754 (8th Cir. 2005), for the proposition that counsel is not ineffective for failing to raise a novel argument. *Swayze* and *Anderson* both involved counsel's failure to anticipate claims based on *later* Supreme Court case law. Here, on the other hand, Petitioner relies on Supreme Court law that was decades-old at the time of trial, including *Ashe* (1970) and *United States v. Oppenheimer*, 242 U.S. 85 (1916). His claim is therefore not "novel."

### CLAIM THREE

**THE GOVERNMENT VIOLATED DUE PROCESS WHEN IT FAILED TO DISCLOSE EXCULPATORY EVIDENCE RELEVANT TO COOPERATING WITNESSES. TRIAL COUNSEL INEFFECTIVELY FAILED TO DISCOVER THIS EVIDENCE. ACCORDINGLY, PETITIONER'S CONVICTIONS AND SENTENCES VIOLATED THE FIFTH, SIXTH AND EIGHTH AMENDMENTS.**

The Government offers no legitimate response to Petitioner's *Brady*[2] claim as to any of the four jailhouse informant witnesses about whom the Government withheld impeachment information. To the contrary, the Government's response confirms that material exculpatory information was

---

[1] *Dowling* did recognize an exception – quite familiar in collateral estoppel law – where the prior factual determination was made to a higher standard of proof, and the subsequent action is governed by a lower standard of proof. *Dowling*, 493 U.S. at 349. That exception is obviously irrelevant here as the Government's standard of proof was *higher* in the subsequent action, i.e., at trial.

[2] *Brady v. Maryland*, 373 U.S. 83 (1963).

6

withheld, in violation of Petitioner's constitutional rights. Petitioner should be afforded a new trial, or at a minimum granted access to those informants with whom he has not yet had an opportunity to speak.

### A.    The Undisclosed Information

#### 1.    Dennis Putzier

As the Government acknowledges in their response, Dennis Putzier testified at Petitioner's trial that he got no benefit for his testimony, other than a reduction in sentence for his escape charges. Gov't Post-Hr'g Br. at 7. As the Government also apparently acknowledges, this testimony was false. *Id.* (noting that Putzier had in fact been threatened with a conspiracy to commit murder charge). The Government nonetheless responds in much the same fashion as it did in its pre-hearing response brief, by arguing that it is perfectly permissible to allow false testimony to go uncorrected so long as the defense has the ability to impeach it. *Id.* at 6-8. This is, of course, not correct. *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (due process is violated "when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.").

Furthermore, the Government did not disclose that it had threatened Putzier with a potential life sentence if he did not testify against Petitioner. Indeed, Putzier testified at Petitioner's 1998 drug sentencing hearing that he thought he might face as little as five years for this conspiracy charge. Tr. 12/16/97 at 596. The Government has not, at any point throughout this litigation, claimed that it did supply this information. Instead, it offers a series of weak defenses, none of which withstand scrutiny.

The Government first describes Putzier's testimony as "inconclusive and inconsistent" and claims that "[n]ever before has Putzier claimed he was threatened with a life sentenced [sic]." Gov't

Post-Hr'g Br. at 7. This is simply incorrect.  As Petitioner has previously noted, Putzier has consistently and repeatedly maintained that he was threatened with a life sentence by federal authorities, having said the same thing to law enforcement agents when he was recently arrested in Sioux City (Pet. Ex. 27, beginning at 56:12), in a letter to a federal judge (Pet. Ex. 26), and to federal agents who re-interviewed Putzier in preparation for this 2255 hearing (Pet. Ex. 28).

In stating that Putzier's testimony was "inconsistent," the Government points only to the fact that at one point he said that Government agents told him he "could" receive a life sentence, and at another that they told him he "would" receive a life sentence.  Gov't Post-Hr'g Br. at 7.  This is an entirely meaningless distinction – the fact remains that Government agents informed Putzier that he faced a potential life sentence if he failed to cooperate.[3]

The Government cannot refute that Putzier's testimony changed dramatically from his initial appearance in front of the grand jury (before this meeting with Government authorities) to his later appearances at Petitioner's 1998 sentencing and eventual trial (both after the meeting with Government authorities).  It is crystal clear why there was such a dramatic change – because Putzier did not want to spend the rest of his life in prison.  Putzier was thus willing to offer questionable testimony that a man whom he had never met face-to-face had for some reason confessed to him to killing multiple people.  Petitioner was denied this substantial impeachment material.

### 2. Anthony Johnson

The Government has conceded that Johnson testified that he received no benefit

---

[3]The Government further suggests in its response that it was not, in fact, Government agents who told Putzier about the life sentence, but his attorney, subsequent to his meeting with the Government.  Gov't Post-Hr'g Br. at 7.  This is simply not the case, and is refuted by the Government's own pleading, which acknowledges that Putzier testified at the 2255 hearing that the threat originally came from the Government.  *Id.*

8

"whatsoever" for testifying against Petitioner. Gov't Post-Hr'g Br. at 9; Tr. 2090. The Government now apparently concedes that, much like Putzier's testimony, Johnson's testimony elicited on direct examination was also false, as Johnson signed a written proffer agreement prior to offering information. Gov't Post-Hr'g Br. at 9. This proffer agreement was never turned over by the Government until these 2255 proceedings.

While the Government is correct in noting that Johnson's interview report references the proffer letter, it is clear that trial counsel was unaware of the full range of benefits received by Johnson in exchange for his testimony. Nowhere in either the proffer letter or the interview report does it mention that Johnson was promised *immunity* from gun delivery charges or drug sales charges. Johnson testified at the 2255 hearing, however, that these benefits were a part of his deal. 2255 Tr. at 284-88. The fact that the defense was not privy to this information is corroborated by counsel's questioning at trial. Defense counsel only cross-examined Johnson on the fact that Johnson's involvement in purchasing a methamphetamine recipe from Petitioner for $1,000 would not be used against him in exchange for his testimony. Tr. 2000-01. Had counsel known about the additional, more serious, threatened charges that were never brought as a result of his proffer agreement, surely he would have impeached Johnson's credibility on those grounds.

The Government offers only two unpersuasive responses to Johnson's 2255 testimony, which actually give further credence to Petitioner's allegations. The Government's first response is simply to fault Johnson for not being able to remember every precise detail of this meeting with Government agents more than a decade ago. Gov't Post-Hr'g Br. 9-10. Johnson, however, never wavered in his testimony about the threatened charges that were communicated to him, and in any event, the Government should not be able to profit from Johnson's difficulty remembering such details where

9

the Government failed to disclose the information for so long. The Government's second response – that law enforcement's communication to Johnson about their knowledge of gun and drug delivery may not have constituted threats of prosecution – is even less meritorious. Law enforcement did not bring these topics up just to make small talk. As the Government itself concedes, Johnson testified that he understood these comments to mean that he might face new charges. Gov't Post-Hr'g Br. at 10; 2255 Tr. at 285.[4]

### 3. Terry Bregar

The Government's response to Petitioner's allegations of withheld information regarding Bregar also misses the mark. The Government spends a good deal of time quibbling over the full extent of Bregar's medical and memory problems. *See* Gov't Post-Hr'g Br. at 12-13. What is relevant for the purposes of this claim is that it is unquestionably documented in BOP medical records that Bregar may have had a stroke and complained of memory problems prior to the time of his trial testimony. Trial counsel was denied the benefit of using this information to challenge the veracity of Bregar's testimony. Trial counsel testified that he "[a]bsolutely" would have used this information in cross-examination had he been privy to it. 2255 Tr. at 553.

Bregar's allegations about the fact that 5 or 6 jailhouse informant witnesses were transported together pre-trial and discussed their testimony together went unrebutted by the Government at the hearing and should have been disclosed at trial. It is improper for witnesses to be exposed to other witnesses' testimony prior to testifying themselves. It is for this reason that courts impose sequestration orders on witnesses during the course of trials. *See Perry v. Leeke*, 488 U.S. 272, 281-

---

[4]The Government's last contention, that "[a]t no point did Johnson testify he was given any assurances he would not be prosecuted for any conduct related to the camper or guns," Gov't Post-Hr'g Br. at 10, is simply mistaken. *See* 2255 Tr. at 287.

10

82 (1989) ("It is a common practice for a judge to instruct a witness not to discuss his or her testimony with third parties until the trial is completed. Such nondiscussion orders are a corollary of the broader rule that witnesses may be sequestered to lessen the danger that their testimony will be influenced by hearing what other witnesses have to say, and to increase the likelihood that they will confine themselves to truthful statements based on their own recollections.") (citing cases). The Government's contention that Bregar could merely "speculate" that the U.S. Marshals who were transporting the inmates could hear them discussing their testimony, Gov't Post-Hr'g Br. at 14, is without merit. First, it is uncontested that the Government was at the very least aware that inmate witnesses were being transported together. Second, Bregar's claim that he was "sure" law enforcement agents were able to hear conversations occurring in the back of a van while they were sitting in the front, 2255 Tr. at 484, is not mere speculation. It is a reasonable conclusion drawn from the fact that several individuals were sitting in an enclosed vehicle in close enough proximity to hear what each other were saying.

### 4. Dan Cobeen

The Government does not challenge the fact that Cobeen testified at trial that the sole benefit for his testimony against Petitioner was relocation money and the subsequent ability to pay off a portion of a fine with that money. Tr. at 585-86. At the 2255 hearing, Cobeen testified that, contrary to his trial testimony, he also received a reduction in his probation time as a result of his cooperation. 2255 Tr. at 304. The Government does not offer any legitimate defense to this lack of disclosure.

The Government begins by chastising Petitioner for raising this claim for the first time in his post-hearing brief, thus allegedly denying the Government a meaningful chance to respond. Gov't Post-Hr'g Br. at 14, 16. The reason Petitioner did not (and could not) raise this argument earlier,

11

however, is because Cobeen was unwilling to speak with Petitioner's defense team without a subpoena. 2255 Tr. at 296. Furthermore, the Government should be aware of what benefits it provided to which witnesses, so the substance of Cobeen's testimony should not have come as a surprise. The Government cannot withhold information about benefits offered to witnesses and then chide a habeas petitioner for not discovering the withheld information sooner. The Government's complaint about a lack of ability to challenge this claim rings particularly hollow given that it elected not to cross-examine Cobeen at the 2255 hearing.

The Government next suggests that Cobeen may not have actually received any benefit. Cobeen, however, testified at the 2255 hearing: "I think I got a year dropped." 2255 Tr. at 304. The Government quotes this same language in its response, and underlines the word "think." Gov't Post-Hr'g Br. at 15. Cobeen's phrasing, if it has any significance at all, merely suggests that he was unsure of the precise extent of the benefit he received, not whether he received a benefit at all.

The Government's next suggestion, that Petitioner has not proven that the Government did not turn over this information at trial, is also without merit. As Petitioner noted in his initial Post-Hearing Brief, counsel for the Government objected when trial counsel asked Cobeen whether he was aware what arrangements were made so that he no longer had to report to his probation officer, stating: "[t]here's no evidence saying arrangements were made. Misstates the evidence." Tr. at 608-09. It would be odd indeed if counsel for the Government had turned over information that Cobeen received a reduction in his probation in exchange for his testimony, then objected when counsel attempted to ask him about this reduction.

### B. The Undisclosed Information Was Material Under *Brady*

Petitioner has repeatedly explained in his prior pleadings all the reasons why the withheld

12

information about informant benefits was material to Petitioner's trial within the meaning of *Brady*. Petitioner simply emphasizes again here that had the Government fulfilled its obligations to turn over exculpatory and impeaching information, Petitioner would have been able not only to further challenge the veracity of the informant witnesses listed above, but of all the informant witnesses and of the character of the Government investigation as a whole in this entirely circumstantial case.

Evidence that Government agents threatened and induced the testimony of certain witnesses would have cast doubt on the testimony of all of the informants. *See Kyles v. Whitley*, 514 U.S. 419, 445 (1995) ("Damage to the prosecution's case would not have been confined to evidence of the eyewitnesses, for [the suppressed evidence] would have raised opportunities to attack not only the probative value of crucial physical evidence and the circumstances in which it was found, but the thoroughness and even the good faith of the investigation"); *id*. at 446, *quoting Bowen v. Maryland*, 799 F.2d 593, 613 (10th Cir. 1986) ("A common trial tactic of defense lawyers is to discredit the caliber of the investigation or the decision to charge the defendant, and we may consider such use in assessing a possible *Brady* violation"); *Lindsey v. King*, 769 F.2d 1034, 1042 (5th Cir. 1985) (noting that *Brady* evidence "carried within it the potential . . . for the . . . discrediting . . . of the police methods employed in assembling the case.").

The *Brady* violations in this case, assessed cumulatively, are material. For the same reason they are material, Petitioner has met the co-extensive *Strickland* prejudice standard should this Court determine that defense counsel was ineffective for discovering some or all of the withheld information. At the very least, Petitioner should be afforded the opportunity to interview the remaining inmate witnesses he has not yet had the opportunity to interview.

13

**PETITIONER'S RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL, DUE PROCESS, AND AGAINST DOUBLE JEOPARDY AND CRUEL AND UNUSUAL PUNISHMENT WERE VIOLATED WHEN TRIAL COUNSEL FAILED TO OBJECT TO MULTIPLICITOUS CHARGES FOR DRUG CONSPIRACY MURDER AND CONTINUING CRIMINAL CONSPIRACY MURDER, IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

Trial counsel were ineffective in failing to object to the multiplicitous counts for the drug conspiracy charges in Counts 8 through 12 and the continuing criminal enterprise charges in Counts 13 through 17.

At the 2255 hearing, trial counsel did not testify as to any strategic reason for failing to raise this objection, nor is any such reason conceivable. *See* 2255 Tr. at 21, 43-44 (Parrish); *id.* at 240 (Rogers); *id.* at 527 (Spies). In its post-hearing brief, the Government disputes the import of this testimony, but neither contends that counsel testified to having a strategic reason for their failure, nor proposes what such a strategic reason could be. *See* Gov't Post-Hr'g Br. at 20 n.3.

If trial counsel had objected, or if appellate counsel had litigated the issue on appeal, the remedy would have been, at a minimum, to "vacate the murder in furtherance of drug conspiracy convictions." *Id*. at 21. In addition, the Court must consider whether, as set forth in the Petition, the improper doubling of Petitioner's capital counts impermissibly tipped the scales in favor of death at the penalty phase of trial. On this issue, the Government contends that there are "overwhelming aggravating factors" in this case. *Id*. This assertion, however, ignores that: (1) juries frequently reach life sentences in highly aggravated cases; (2) a life sentence in a capital case requires the vote of only one juror, *e.g.*, *Wiggins v. Smith*, 539 U.S. 510, 536 (2003); and (3) the jury in this case found that the aggravating factors – far from being "overwhelming" – were actually outweighed by the

14

mitigating factors in six of the ten capital counts. Thus, there is a reasonable likelihood that Petitioner would not have been sentenced to death on any counts if trial counsel had properly objected to the multiplicitous capital counts.

**CLAIM SEVEN**

**PETITIONER'S RIGHTS TO DUE PROCESS, TO AN IMPARTIAL JURY, TO EFFECTIVE ASSISTANCE OF COUNSEL, AND AGAINST CRUEL AND UNUSUAL PUNISHMENT WERE VIOLATED WHERE TRIAL COUNSEL FAILED TO OBJECT TO THE EXCLUSION OF QUALIFIED JURORS FROM THE VENIRE, CONTRARY TO *WITHERSPOON V. ILLINOIS* AND ITS PROGENY; APPELLATE COUNSEL WERE INEFFECTIVE FOR FAILING TO RAISE AND LITIGATE THIS ISSUE; ALL IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

Trial counsel were ineffective in conducting voir dire in two respects: 1) by brokering a deal with the Government in which jurors on the edges of the spectrum of death penalty views were excluded by agreement, to the detriment of Petitioner; and 2) by improperly executing this already unfair agreement to the further detriment of Petitioner. The Government begins its post-hearing response to this claim by arguing that Petitioner "did not clearly argue" previously that the agreement itself was problematic, merely that it was poorly executed. Gov't Post-Hr'g Br. 24. The Government is mistaken in making this argument. In Petitioner's Memorandum of Law, he argued the following:

> Counsel were ineffective under *Strickland* for unwittingly stacking the deck against their client in terms of the death penalty viewpoints of the qualified pool. First, even had counsel carefully read the questionnaires and correctly tallied all of the potential jurors who actually chose answer "b" and all of the potential jurors who actually chose answer "h," this would not have been a sensible trade. The reason it was not sensible is because, while the Government must obtain a unanimous decision in order to secure a death sentence, the defense requires but a single holdout in order to obtain a life sentence. *See, e.g.*, *Wiggins v. Smith*, 539 U.S. 510, 537 (2003) (reversing death sentence due to counsel's ineffectiveness where Court held that there was "a reasonable probability that at least one juror would have struck a different

15

balance."). By consenting to the removal of jurors from the ends of the spectrum without even bothering to question them about their views, counsel improperly consented to the removal of the precise individuals who would be most likely to vote for life. Because the Government needs unanimity, while the defense needs a single vote, the removal of (otherwise qualified) jurors from the ends of the spectrum favors the Government, not the defense.

Pet. at 63-64.

As to the merits of the first portion of the claim (the brokering of the agreement itself), the Government offers no compelling response to Petitioner's argument that he satisfies both prongs of *Strickland* ineffectiveness. First, with respect to deficient performance, the Government does not put forth any reasonable strategic decision that counsel made in support of this agreement. The Government simply notes Mr. Parrish's testimony that he wanted "people on the fringes out of there as quickly and as early as possible." 2255 Tr. at 47. This is the same language that Petitioner quoted in his Post-Hearing Brief. *See* Pet. Post-Hearing Br. at 28. There is no question that Mr. Parrish testified that this was his strategy; the question is whether or not that currently proffered[5] strategy was reasonable. Petitioner has already set forth in his Post-Hearing Brief the reasons why this alleged strategy was not reasonable, *see id.*, and the Government offers nothing more than a conclusory statement to counter Petitioner's argument.

As to prejudice, the Government asserts that Petitioner has offered nothing more than conjecture as to "how the ultimate jury would have shook out had the deal been different." Gov't Post-Hr'g Br. 24. Here again, the Government's argument does not withstand scrutiny. Claims of error in the selection of a death qualified jury are by their nature "speculative." It is impossible to

---

[5]Petitioner refers to Mr. Parrish's testimony as a "currently proffered" strategy because it appears from a contemporaneous e-mail to co-counsel at the time of trial that Mr. Parrish was in fact somewhat critical of the juror agreement. Pet. Ex. 12 (Mr. Parrish stating, in e-mail to Mr. Spies, that "[t]he juror agreement was ok but there were issues.").

16

ever know with certainty how any particular improperly excluded juror would have voted in any particular case. But the Constitution forbids the life or death decision from being returned by "a tribunal organized to return a verdict of death," *Witherspoon v. Illinois*, 391 U.S. 510, 521 (1968). As such, where a court ruling is responsible for stacking the deck against a capital defendant, "the relevant inquiry is 'whether the composition of the *jury panel as a whole* could possibly have been affected by the trial court's error.'" *Gray v. Mississippi*, 481 U.S. 648, 665 (quoting *Moore v. Estelle*, 670 F.2d 56, 58 (5th Cir. 1982)) (emphasis in original). Where the error comes as a result of defense counsel's actions, the inquiry must be the same, and it does not require that a defendant prove with certitude that improperly excluded jurors would have voted in any particular way.

As to the second portion of the claim – that counsel were ineffective in their execution of the agreement – the Government again fails to offer a compelling response. The Government first argues that Petitioner cannot establish deficient performance because counsel were bound to make mistakes given the large number of questionnaires with which they were dealing. But Petitioner has pointed in his Memorandum of Law and his Post-Hearing Brief to more than a dozen errors that trial counsel made in conducting jury selection. This is a significant number of errors, which far outstripped any errors made by the Government.

The Government's second contention, that counsel's performance is immune from challenge because they relied on a professional jury consultant, fares no better, as "capital trial counsel cannot outsource their fundamental responsibilities." *Winston v. Kelly*, 600 F. Supp. 2d 717, 732 n.14 (W.D. Va. 2009).

As to prejudice, the Government again simply picks out a few jurors of the more than a dozen specified by Petitioner, and argues that their exclusion was not prejudicial. *See* Pet. Post-Hearing

17

Br. at 29-30; Gov't Post-Hr'g Br. at 26-27. But as Petitioner has previously stated, the wrongful exclusion of even a single venire person based upon their death penalty views is prejudicial. *Gray*, 481 U.S. at 667-68; *Kinder v. Bowersox*, 272 F.3d 532, 543 (8th Cir. 2001). The Government does not and cannot rebut the fact that Petitioner's counsel made many errors in agreeing to exclude qualified jurors based solely on their questionnaires. These errors certainly affected the "composition of the jury panel as a whole," *Gray*, 481 U.S. at 665, to Petitioner's detriment.

## CLAIM NINE

### PETITIONER WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AT HIS CAPITAL SENTENCING.

Trial counsel were ineffective for failing to follow the recommendation of their mitigation specialist to engage mental health experts to explore the significance of Petitioner's upbringing and background, to place the information uncovered by the mitigation specialist into a mental health perspective, and to assist in the discovery of additional facts relevant to understanding Petitioner's character and background.

The Government uses the heading "Mental Health Evidence" in its response to this claim and states that Petitioner's claim has "morphed into a claim focused entirely on the alleged failure" to present mental health evidence. *See* Gov't Post-Hr'g Br. at 27. That is not the case. While the main thrust of Petitioner's ineffectiveness claim focuses on counsel's unreasonable decision, not to consult with mental health experts in a capital case, Petitioner has also presented compelling evidence of life history mitigation and the effect of that history on Petitioner's mental state that was not uncovered previously, because of counsel's deficient performance.

18

### A. Deficient Performance

With respect to deficient performance, the Government's argument is twofold. First, the Government cites to trial counsel's concern that "any mental health presentation would reveal good things about [his] mental health," and that counsel were concerned about "presenting an inconsistent case." However, the Government ignores the fact that counsel cannot make such a strategic decision in a vacuum. Counsel has the obligation to conduct the investigation, and have the proper evaluations conducted before making such a decision. *Wiggins v. Smith*, 539 U.S. 510, 527 (2003) ("*Strickland [v. Washington*, 466 U.S. 668 (1984)] does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy. Rather, a reviewing court must consider the reasonableness of the investigation said to support that strategy.").

Additionally, counsel in a capital case cannot simply decide to not present a case in mitigation because they argued that their client was not guilty. In *Antwine v. Delo*, 54 F.3d 1357 (8th Cir. 1995), on post-conviction, trial counsel sought to insulate himself by saying that he did not want to argue that his client suffered from mental illness at the penalty phase because that would have been inconsistent with the self-defense that was presented at the trial, and that he would have "lost credibility." *Id.* at 1367. The Court rejected this rationale because counsel did not conduct a constitutionally adequate investigation prior to making such a decision. "'[S]trategic choices made after less than complete investigation are reasonable [only] to the extent that reasonable professional judgements support the limitations on investigation.'" *Id.* (quoting *Strickland*, 466 U.S. at 690-91) (brackets in original). As in *Antwine*, it was unreasonable for counsel here to fail to conduct a complete investigation and consult with a mental health expert. It is routine for capital litigants to argue innocence at trial and then present a full mitigation case at the sentencing phase. It is for this

19

very reason that there are two phases of a capital trial and often the sentencing phase, as here, is presented by a different attorney.[14]

The Government also argues that counsel was not deficient because "[i]n response to [mitigation specialist] Rickert's suggestion, trial counsel hired" a neuropsychologist. Gov't Post-Hr'g Br. at 29. However, as the Government acknowledges, the mitigation specialist also recommended that counsel hire an expert on "attachment issues/disorder." *Id.* at 28-29. An expert investigating those types of disorders would have nothing to do with an evaluation for brain damage. Indeed, Petitioner is not arguing to this Court that he is brain damaged. Rather, he has argued that the jury should have heard the life history mitigation, some of which was developed by the trial mitigation specialist. But more importantly, the jury should have heard the mental health impairments that developed, in part, as a result of this history. Had counsel followed the recommendation of their mitigation specialist, Petitioner could have presented the compelling mental health evidence that was presented to this Court.

Counsel's failure to consult with a psychiatrist or psychologist other than neuropsychologist Gelbort was unreasonable. As Petitioner has established previously, this decision was based upon a fear of what the Government would submit in rebuttal. The decision was exposed as unreasonable

---

[14]It is interesting that the Government only cites to the testimony of Mr. Parrish in regard to this "inconsistent themes" argument. Mr. Parish was not very involved with the preparation of the penalty phase evidence, 2255 Tr. at 23, and testified that "in terms of preparing the specific strategy, the questions, etcetera [for the penalty phase], that was not my responsibility." *Id.* at 24. Learned counsel Charles Rogers testified that the other two lawyers deferred to him in matters of capital litigation. *Id.* at 231. He did not agree with the Government's "inconsistent themes" argument. He testified that "it is not at all unusual to have a penalty after a contested guilt phase, and you can present mitigating evidence and life history evidence without conceding guilt." *Id.* at 267. He also stated that the hope of the jury finding "some residual doubt" was not "inconsistent with presenting the type of background that showed how he got to the situation where he was manufacturing and importing into Iowa bunches of drugs." *Id.* at 266.

20

as the Government's expert here did not make the finding of anti-social personality disorder that counsel were so afraid of. If counsel had adequately investigated mental health mitigation before trial, they would have learned both parties' experts squarely rejected the diagnosis that counsel feared. In requiring counsel to make strategic decision only after reasonable investigation, *Strickland* condemns decisions based on such un-investigated fears.

Throughout its brief, the Government ignores the testimony of learned counsel, Charles Rogers, to whom other counsel deferred on questions regarding the capital nature of the case. Mr. Rogers admitted that it "would have been a better move" to have Petitioner evaluated and then decide what to do with the results. Mr. Rogers also admitted to not being "personally aware of the nature and significance of Mr. Honken's traumatic childhood," because he "had not spent the kind of time with [the mitigation specialist] that [he] should have to understand in depth the true nature of it." 2255 Tr. at 265-66. Leon Spies, who actually argued the sentencing phase, agreed with respect to the lack of a reasonable mental health evaluation:

> Q. And in looking back and considering the current mental health mitigation that you've reviewed, do you feel that you should have had Mr. Honken evaluated to at least see what the results would have been before making this determination?
> A. Yes.

*Id.* at 550. If trial counsel had performed the same investigation that post-conviction performed, they would have uncovered the same compelling mental health mitigation. This establishes deficient performance.

**B.    Prejudice**

Petitioner was prejudiced by counsel's deficient performance. Prejudice is established if there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the

21

proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 at 694. Petitioner will not belabor the arguments regarding prejudice that he has previously submitted to this Court.

The Government's response is three-fold. First, the Government suggests that the evidence presented by habeas counsel is not very different than the evidence uncovered by trial counsel; second, that the experts presented in post-conviction could have been impeached at trial; and third, that, in any event, the mental health evidence is not mitigating. The Government is wrong for the following reasons.

First, there are significant differences between the evidence presented in the 2255 proceedings and the mitigation case presented to the jury. Trial counsel presented no mental health evidence whatsoever to Petitioner's sentencing jury. Thus, the jury never heard why Petitioner's background and upbringing were mitigating. As Petitioner noted in his initial post-hearing brief, because of the failures of counsel, the Government was able to argue to the sentencing jury that Petitioner's "unfortunate childhood," was not "that different from the vast majority of people." Tr. at 3925. Had counsel had the appropriate experts to contextualize the truly mitigating nature of Petitioner's background, this argument by the Government would not have been persuasive.

The Government also suggests that the mental health evidence presented in this 2255 litigation is "not materially different from that which trial counsel already had uncovered through their own investigation." Gov't Post-Hr'g Br. at 32-33. This argument is based on that fact that counsel had a psychiatric report from 1998 diagnosing Petitioner with "Adjustment Disorder with Anxiety, Methamphatamine Abuse, and Adult Antisocial Behavior." Gov't Post-Hr'g Br. at 32. However, since counsel failed to consult with any experts about the importance and mitigating value

22

of these findings, and failed to have Petitioner examined by the proper mental health professionals, counsel did not know what to do with this evidence. Indeed, neither this report nor any similar evidence was presented to the jury.

The Government's argument that the mental health professionals presented to this Court could have been impeached is likewise not persuasive. The question is what the jury should have heard. Petitioner is not required to prove that the jury would have accepted all of the mental health evidence as true. Petitioner must merely show that the failure of counsel to present this evidence undermines confidence in the verdict. As outlined in detail in the prior submissions, Petitioner has done so. Additionally, all of the experts presented, including the Government's expert, support Petitioner's theory of mitigation that should have been presented at sentencing.

The Government argues that the mental health evidence presented is not mitigating. For the most part, the Government bases this argument on the rebuttal testimony of Dr. Grote, who examined Petitioner at the request of the Government. However, even Dr. Grote, who had never before been involved in a capital case, agreed that there was substantial mitigation, though he would not use that word, due to his lack of familiarity with capital proceedings.

The testimony of Dr. Grote does not negate the evidence presented by Petitioner. He testified that he did not find Petitioner's "family environment ... to be a significant or mitigating factor in this case." Deposition of Dr. Grote at 31. However, Dr. Grote had no idea what is, in fact, mitigating in a capital case. He had never before been involved in a capital case and did not even appear to know what a "capital case" was in this exchange during his deposition:

Q. Right. The criminal cases that you mentioned, you only mentioned that one murder case. I assume that was not a capital case?

A. When you say capital case, that means that someone is facing death row?

23

Q. Correct. Yes.

A. Not that I recall, no.

Q. Are there any other cases that you've worked on where someone was either facing death row or already on death row other than Mr. Honken's case?

A. I don't think so. You know when I was in grad school back in Kentucky, I spent a year at KCPC, Kentucky Correction Psychiatric Center in La Grange. I think some of those guys were on death row, but it's been awhile.

Q. So you've never testified in a capital case before?

A. That's correct.

*Id.* at 33-34. He also agreed that he did not "know what the legal standard is for what's considered admissible mitigating evidence in a capital case." *Id.* at 70. All of the other experts in this case and in all capital cases for that matter, agree that the type of childhood experienced by Petitioner is mitigating. The Court should not accept Dr. Grote's obviously erroneous opinion in this regard.

Although he would not call it "mitigation," even Dr. Grote agreed that this type of childhood environment impairs development. *See id.* at 59 ("the worse your family environment is as a kid, the more likely it is to give you some problems"); *id.* at 59-60 (agreeing that most children are not confronted with dysfunction in the form of having a parent who stays drunk for weeks at a time or a parent who actively recruits them into criminal behavior); *id.* at 60-61 (agreeing that to understand a patient "as a psychologist, it is important to understand their particular experience of dysfunction"); *id.* at 61 (agreeing that children of alcoholics are at greater risk of becoming substance abusers and are at greater risk for mood problems or anxiety problems); *id.* (agreeing that a child's subjective fear of violence from a parent can effect the child's psychological and emotional makeup "at that time and perhaps over the long term"); *id.* at 63 (agreeing that when mental illness runs in the family, individuals are at a greater risk of developing those illnesses). In fact, Dr. Grote agreed that,

24

assuming Petitioner experienced a dysfunctional childhood, he would "accept that it had an impact on Mr. Honken's psychological development." *Id.* at 66-67.

Dr. Grote's failure to describe these findings as "mitigation" was based, first, on his unfamiliarity with what mitigation is in the context of capital litigation. Second, Dr. Grote did not review much of the background evidence that described Petitioner's upbringing. He testified that, with the exception of the expert reports, he did not review witness declarations or collateral background documents about Petitioner's upbringing. As such, the Government's "rebuttal" evidence would likely have been rejected by the jury. In any event, had the jury heard all of the evidence in mitigation that could have been presented by both parties, there is a reasonable probability that at least one juror would have voted for life.

The Government also notes that both Parrish and Spies testified that it would have been a tough call as to whether to present the type of mental health evidence that has been developed by habeas counsel. Gov't Post-Hr'g Br. at 45. However, as stated above, Parrish had almost nothing to do with the development and presentation at the penalty phase. While Mr. Spies stated on cross-examination that it would have been "a tough judgment call," 2255 Tr. at 575, he still maintained that he would "probably" have presented the evidence. *Id. See also id.* at 550 ("The answer is probably so."). More importantly, learned counsel, who the Government again ignores in this portion of the reply, testified that he would have "almost certainly" presented this mental health mitigation had he known about it. *Id.* at 244.

Petitioner has established that he was prejudiced as a result of counsel's deficient performance. This was a close case. Indeed, the jury returned life verdicts on the majority of the capital counts against Petitioner. Had the jury heard the compelling case for life that has now been

25

developed, there is a reasonable probability that at least one juror would have voted for life on the remaining capital counts.

**CLAIM TEN**

**THE COURT'S PENALTY PHASE INSTRUCTIONS FAILED TO PROPERLY NARROW THE SCOPE OF THE JURY'S CONSIDERATION OF FUTURE DANGEROUSNESS AND FAILED TO GUIDE THE JURY'S WEIGHING OF AGGRAVATING AND MITIGATING CIRCUMSTANCES; COUNSEL WERE INEFFECTIVE FOR FAILING TO OBJECT IN VIOLATION OF PETITIONER'S FIFTH, SIXTH, AND EIGHTH AMENDMENT RIGHTS.**

Petitioner has alleged that trial counsel was ineffective for failing to object to the court's future dangerousness instruction, which was overly broad, and to the weighing instruction, which failed to properly guide the weighing of aggravating and mitigating instructions. *See* Pet. 105-11. In his Post Hearing Brief, Petitioner addressed only the instruction regarding future dangerousness, and relied on the previous briefing in support of the other part of this claim. The Government has only responded to the future dangerousness argument.

The Government responds that it presented no evidence of Petitioner's custody classification. *See* Gov't Post-Hr'g Br. at 46. The Government, however, specifically highlighted during cross examination of Dr. Cunningham, that a person (like Petitioner) convicted of capital murder and sentenced to life, would be classified "at least at a USP level, United States penitentiary level." Tr. at 3778. Dr. Cunningham had previously described a USP as "a high-security-level institution." Tr. at 3740. Moreover, the Government admits that the prosecution argued Petitioner's classification to the jury. "The only reference [in the prosecution closing argument] to custody classification was in an attempt to counter Dr. Cunningham's testimony by noting that, while Petitioner's higher custody classification may keep society safe for a while, Petitioner would eventually get moved to a lower security classification institution." Gov't Post-Hr'g Br. at 47.

26

The Government also argues that Dr. Cunningham did not testify about Petitioner's high custody "classification" but merely testified that he would be housed in an "institution that had a high security level." *Id.* This is a distinction without a difference, particularly in light of the Government's argument to the jury noted above.

The fact that the Government did not itself present this evidence is of no moment. Petitioner argues that the defense was ineffective for couching practically its entire mitigation case in terms of Petitioner's high custody status and then failing to object to an instruction that told the jury it could find this future dangerousness on that basis alone. Learned counsel admitted to deficient performance in failing to object. 2255 Tr. at 247-48.

The Government also states that Petitioner "failed to provide any law to support his assertion that a defendant's security classification is irrelevant to a determination of future dangerousness." Gov't Post-Hr'g Br. at 48. Petitioner has not argued that classification level is irrelevant. Rather, he has argued that the erroneous wording of the instruction allowed the jury to find the circumstance based *solely* on the classification level, because of the use of the words "one or more of the following" in the instruction. *See* Trial Dkt. # 524 at 23.

The Government admits that the defense strategy resulted in proof of high custody classification: "the nature of the testimony presented by Dr. Cunningham was intended to demonstrate that Petitioner would not pose a future danger if he were placed in a high security institution." Gov't Post-Hr'g Br. at 48. That is exactly why it was deficient to fail to object to an instruction that told the jury to find the aggravator based on what the defense attempted to present as mitigating.

This failure to object further shows the unreasonableness of trial counsel's limited mitigation

27

strategy as outlined in Claim 9, since the entire strategy was based upon refuting future dangerousness. Counsel simply missed the fact that the Court's instruction undermined their penalty phase theory.

With respect to prejudice, the Government argues that there is no reasonable probability that the jury would not have found future dangerousness anyway. *See* Gov't Post-Hr'g Br. at 49. That is simply not the case. The jury struggled with the sentencing decision in this case. In fact, the jury sentenced Petitioner to life on the majority of the counts of murder. There is a reasonable probability that at least one juror would have voted for life on the remaining capital counts if not for counsel's deficiencies.

Petitioner was prejudiced by counsel's deficient performance and the over-inclusive and unconstitutional instruction, particularly when viewed in the light of counsel's failure to have Mr. Honken reasonably evaluated by proper mental health experts, as established above. This Court should grant a new sentencing phase.

### CLAIM ELEVEN

**VICTIM IMPACT EVIDENCE PRESENTED TO THE JURY WAS RECEIVED IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS.**

Trial counsel ineffectively failed to object or to otherwise litigate the issues arising from the victim impact evidence. Mr. Spies testified at the evidentiary hearing that he was responsible for the penalty phase presentation and did not recall why he did not object to the Government's victim impact presentation. 2225 Tr. at 524, 582-85. Mr. Spies could only speculate that he did not object because he did not want to appear insensitive in front of the jury, or look foolish if his objection was overruled. *Id*. at 585. These concerns, however, were not relevant to counsel's decision not to raise an objection at sidebar or in limine.

28

The Government's Post-Hearing Brief nonetheless urges this Court to accept counsel's speculation as to why he did not object as dispositive fact. Gov't Post-Hr'g Br. at 50. Counsel clearly testified, however, that he could not recall why he did not object to the victim impact evidence. Moreover, to the extent that Mr. Spies did not want to raise the issue in front of the jury, he could have objected at a side bar or moved pretrial to preclude the evidence. Petitioner was prejudiced by counsel's failure to object to the highly emotional victim impact evidence presented in this case.

### CLAIM FOURTEEN

**THE GOVERNMENT VIOLATED THE FIFTH AND EIGHTH AMENDMENTS WHEN IT REPEATEDLY ELICITED INADMISSIBLE TESTIMONY REGARDING PETITIONER'S ALLEGED INVOLVEMENT WITH DRUGS AND VIOLENCE THAT WAS TOO REMOTE TO BE RELEVANT. TRIAL AND APPELLATE COUNSEL INEFFECTIVELY FAILED TO OBJECT TO OR LITIGATE ALL OF THE INSTANCES OF MISCONDUCT.**

Trial counsel ineffectively failed to object and seek a curative instruction when the Government elicited testimony from Scott Gahn on redirect examination that was in direct conflict with the trial court's prior ruling that evidence of Petitioner's alleged drug distribution prior to the time of the charged conspiracy in this case (1993-2000) and the original case (1991-1993) was inadmissible.

The Government says that trial counsel's performance was not deficient because "[t]he court instructed the jury to disregard the evidence." Gov't Post-Hr'g Br. at 52. The Government's response misses the point. As evidenced by the cases cited by the Government, *id*., the normal course of action is for counsel to object and the court to rule and issue a cautionary instruction, if appropriate. Here, counsel never objected and the lower court did not instruct the jury that Gahn's testimony was outside the scope of the conspiracy and should not be considered as evidence.

29

Although the court had previously ruled that such evidence was not admissible, because counsel failed to object on redirect examination, there is a reasonable probability that the jury considered the inadmissible evidence.

The Government suggests that Mr. Parrish's decision not to object to Gahn's testimony on redirect examination was motivated by the knowledge that "[o]bjecting always raises the possibility that it will draw the jury [sic] attention to the evidence." Gov't Post-Hr'g Br. at 53. The Government's claim is contrary to the record. Mr. Parrish did not testify that he did not object because he did not wish to draw attention to the evidence. Instead, Mr. Parrish testified that he could not recall if his failure to object on redirect examination was the product of any reasonable strategic or tactical decision. 2255 Tr. at 66, 77. He also stated, "Normally, I perhaps would have moved to strike[,]" but could not recall why he did not. *Id*. at 66.

Petitioner was prejudiced by counsel's deficient performance. As a result of counsel's failure to object and/or request a curative instruction, the jury was free to consider evidence of alleged drug activity that was irrelevant to the charged crimes and in direct conflict with the ruling of the court. *See Manning v. Bowersox*, 310 F.3d 571, 576-77 (8th Cir. 2002) (finding trial counsel's failure to object to admission of evidence constitutionally deficient).

### CLAIM SIXTEEN

**TRIAL COUNSEL INEFFECTIVELY FAILED TO PRESENT ABUNDANT, READILY AVAILABLE EVIDENCE THAT WOULD HAVE SUPPORTED THEIR THEORY OF DEFENSE.**

Defense counsel argued in his guilt phase closing argument that the jury should consider whether Terry DeGeus murdered Greg Nicholson and the Duncans. Tr. at 3330-31; 3365-67. Counsel did so without having presented evidence of this theory. Petitioner has alleged that this was

30

ineffective.

The Government responds by stating that this theory of defense "never made any sense unless it was tied to Petitioner's involvement in the murders." Gov't Post-Hr'g Br. at 55. As such, "[t]rial counsel was wise not to have attempted to present evidence directly alleging that DeGeus murdered Nicholson and the Duncan family," and was "wise, instead, to hint in the evidence that DeGeus could have been the murderer without jeopardizing their credibility by directly alleging it." *Id.* at 58. In other words, the Government is arguing that it was reasonable for counsel to advance a nonsensical theory of defense, so long as they did not put up any evidence to support it. The Government's argument is illogical. Either counsel argued a nonsensical theory, or they argued a legitimate theory, but should have presented evidence to support it.

Further, the Government's disparagement of the theory that DeGeus was involved in the Nicholson/Duncan murders is misplaced. The Government states that the defense should not have presented evidence that DeGeus may have been involved because in the eyes of the investigating officers, DeGeus was only potentially involved as an accomplice to Petitioner. The subjective views of law enforcement officers, however, are irrelevant. What is important is that the defense could have used the information that cast suspicion on DeGeus – much of it contained in the discovery turned over by the Government – to raise a reasonable doubt as to Petitioner's guilt.

The Government's arguments that DeGeus would not have had motive for murdering Nicholson are similarly without merit. First, the Government is incorrect in suggesting that DeGeus was not worried about the possibility of receiving a subpoena until after Nicholson disappeared. *See* Pet. Ex. 66 (Interview of Brandy Jo Wilson, who notes that she and DeGeus dated, but had broken up by the time of Nicholson's disappearance, and that DeGeus mentioned being worried about

31

receiving a subpoena while the two of them were still dating). The Government's second contention, that DeGeus would have had no reason to want to harm Nicholson, is also incorrect. Although Nicholson provided information to law enforcement about Petitioner, this information obviously had the potential to get DeGeus in trouble as well, as he was closely connected to the methamphetamine dealing. DeGeus was clearly aware that his name could come up to law enforcement agents at any moment, if it had not already.

Counsel were ineffective for failing to use evidence to support their chosen theory of defense. Petitioner suffered prejudice. At the very least, there is a reasonable probability that at least one juror faced with an entirely circumstantial case against Petitioner and a compelling potential alternate theory would have had enough doubt about what actually happened to sentence Petitioner to life in prison.

**CONCLUSION**

For all of the above reasons, those contained in the Petition and supporting pleadings, and based upon the entire record herein, Petitioner requests that the Court grant the relief sought in the § 2255 Motion.


Respectfully Submitted,

/s/ Shawn Nolan
Shawn Nolan
Timothy Kane
Aren Adjoian
Ayanna Williams
Federal Community Defender
Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520

Counsel for Petitioner
Dustin Lee Honken


Dated:          March 26, 2012
               Philadelphia, Pennsylvania

33

## CERTIFICATE OF SERVICE

I, Shawn Nolan, hereby certify that on this 26th day of March, 2012, I served the foregoing on the following person via the Court's electronic delivery system:

C.J. Williams, Esq.
Assistant United States Attorney
United States Attorney's Office
Northern District of Iowa
401 First Street, S.E.
Hach Building, Suite 400
Cedar Rapids, IA 52401-1825


/s/ Shawn Nolan
Shawn Nolan