# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## CENTRAL DIVISION

| | |
|---|---|
| **DUSTIN LEE HONKEN,** | |
| **Movant,** | **No. CV10-3074-LRR**<br>**No. CR01-3047-MWB** |
| **vs.** | |
| **UNITED STATES OF AMERICA.** | **ORDER REGARDING MOTION TO VACATE, SET ASIDE OR CORRECT CONVICTIONS AND SENTENCES** |

## TABLE OF CONTENTS

**I.   INTRODUCTION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

**II.   BACKGROUND**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1
    **A.   Underlying Criminal Proceedings**. . . . . . . . . . . . . . . . . . . . . . .   1
        **1.   Drug charges against the movant in 1993 and disappearance of five witnesses**. . . . . . . . . . . . . . . . . . . . . . . . . .   1
        **2.   Drug charges against the movant in 1996 and efforts to avoid convictions**. . . . . . . . . . . . . . . . . . . . . . . . .   6
        **3.   Ongoing investigation, charges against Angela Johnson in 2000 and discovery of the victims' bodies**. . . . . . . . . . . . .   13
        **4.   Charges in 2001**. . . . . . . . . . . . . . . . . . . . . . . . . . .   15
        **5.   Pre-trial filings and rulings**. . . . . . . . . . . . . . . . . . . . . .   18
        **6.   Jury selection and trial**. . . . . . . . . . . . . . . . . . . . . . .   21
        **7.   Post-trial rulings and judgment**. . . . . . . . . . . . . . . . . . .   28
        **8.   Direct appeal**. . . . . . . . . . . . . . . . . . . . . . . . . . . .   29
    **B.   Proceedings Related to Civil Action Under 28 U.S.C. § 2255**. . . . . .   31

**III.   STANDARDS APPLICABLE TO CLAIMS UNDER 28 U.S.C. § 2255**. . . .   35
    **A.   Remedies on Motion Attacking Federal Sentence**. . . . . . . . . . . . .   35
    **B.   Heightened Scrutiny in Capital Case**. . . . . . . . . . . . . . . . . . .   38
    **C.   Ineffective Assistance of Counsel Under the United States Constitution**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   39

|  |  | 1. | Overview | 39 |
|  |  | 2. | Deficient performance | 41 |
|  |  | 3. | Prejudice | 44 |
|  |  | 4. | Appellate counsel | 46 |
|  |  | 5. | Summary | 47 |
|  | D. | Harmless Error Review of Constitutional Error | | 48 |

IV. REVIEW OF GROUNDS FOR RELIEF.......................... 49

A. Ground One — Constitutional Violations Occurred as a Result of the Admission of the Judgments of Conviction that Related to the 1996 Case. ...................................... 50
  1. Arguments of the parties. ........................ 50
     a. The movant.. ............................ 50
     b. The government.. ........................ 52
  2. Background. ............................ 54
  3. Analysis. ............................ 56

B. Ground Two — Constitutional Violations Occurred as a Result of the Findings that Were Made Pursuant to the Sentencing Hearing in the 1996 Case. ........................ 63
  1. Arguments of the parties. ........................ 63
     a. The movant.. ............................ 63
     b. The government.. ........................ 68
  2. Applicable law. ............................ 70
  3. Analysis. ............................ 74

C. Ground Three — Constitutional Violations Occurred as a Result of the Parties' Actions Concerning Jailhouse Informants and Cooperators. ...................................... 79
  1. Arguments of the parties. ........................ 79
     a. The movant.. ............................ 79
     b. The government.. ........................ 84
  2. Applicable law. ............................ 85
  3. Analysis. ............................ 89
     a. The information cited by the movant. ............. 89
        (1) Dennis Putzier. ........................ 90
        (2) Terry Bregar. ........................ 93
        (3) Anthony Johnson. ........................ 97
        (4) Daniel Cobeen. ........................ 98
        (5) Summary. ........................ 99
     b. Materiality. ............................ 101
     c. The performance of trial counsel and the prior cooperation of witnesses. ........................ 103

D. Ground Four — Constitutional Violations Occurred as a Result of the Litigation of the Continuing Criminal Enterprise Murder Counts.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

    1. Arguments of the parties. . . . . . . . . . . . . . . . . . . . . . . 105

        a. The movant.. . . . . . . . . . . . . . . . . . . . . . . . . . 105

        b. The government.. . . . . . . . . . . . . . . . . . . . . . . 108

    2. Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

E. Ground Five — Constitutional Violations Occurred as a Result of the Multiplicitous Charges. . . . . . . . . . . . . . . . . . . . . . . 120

    1. Arguments of the parties. . . . . . . . . . . . . . . . . . . . . . . 120

        a. The movant.. . . . . . . . . . . . . . . . . . . . . . . . . . 120

        b. The government.. . . . . . . . . . . . . . . . . . . . . . . 123

    2. Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

F. Ground Six — Constitutional Violations Occurred as a Result of the Admission of Hearsay Evidence to Support the Quantity of Drugs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

    1. Arguments of the parties. . . . . . . . . . . . . . . . . . . . . . . 129

        a. The movant.. . . . . . . . . . . . . . . . . . . . . . . . . . 129

        b. The government.. . . . . . . . . . . . . . . . . . . . . . . 132

    2. Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

G. Ground Seven — Constitutional Violations Occurred as a Result of the Jury Selection Process. . . . . . . . . . . . . . . . . . . . . . . 137

    1. Arguments of the parties. . . . . . . . . . . . . . . . . . . . . . . 137

        a. The movant.. . . . . . . . . . . . . . . . . . . . . . . . . . 137

        b. The government.. . . . . . . . . . . . . . . . . . . . . . . 138

    2. Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140

        a. The agreement. . . . . . . . . . . . . . . . . . . . . . . . 142

        b. The implementation of the agreement and the reliance on a jury consultant. . . . . . . . . . . . . . . . . . . . . . 145

        c. The role of the trial court. . . . . . . . . . . . . . . . . . 149

        d. The decision by appellate counsel. . . . . . . . . . . . . 150

H. Ground Eight — Constitutional Violations Occurred as a Result of the System for Summoning Venire Members. . . . . . . . . . . . . 155

    1. Arguments of the parties. . . . . . . . . . . . . . . . . . . . . . . 155

        a. The movant.. . . . . . . . . . . . . . . . . . . . . . . . . . 155

        b. The government.. . . . . . . . . . . . . . . . . . . . . . . 159

    2. Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 160

I. Ground Nine — Constitutional Violations Related to the Penalty Phase of Trial. . . . . . . . . . . . . . . . . . . . . . . . . 162

    1. Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 163

        a. The investigation. . . . . . . . . . . . . . . . . . . . . . . 163

     b.     *The mitigating circumstance evidence that trial counsel did present at the penalty phase* . . . . . . . . . . 183

2.     *Arguments of the parties*. . . . . . . . . . . . . . . . . . . . . . . 195

     a.     *The movant*. . . . . . . . . . . . . . . . . . . . . . . . . . . . 195

          (1)     *Family history*. . . . . . . . . . . . . . . . . . . . . . 196

          (2)     *Drug use*. . . . . . . . . . . . . . . . . . . . . . . . . . 199

          (3)     *Rejection of mitigation specialist's recommendation to have mental health experts conduct an evaluation, reliance on wrong experts and missed opportunities to discover additional unknown facts*. . . . . . . . . . . . . . . 201

     b.     *The government*. . . . . . . . . . . . . . . . . . . . . . . . . 203

3.     *Additional evidence that should have been presented*. . . . . . 205

     a.     *Dr. Richard G. Dudley, Jr.*. . . . . . . . . . . . . . . . . 205

     b.     *Dr. John F. Warren, III*. . . . . . . . . . . . . . . . . . 210

     c.     *Dr. Melissa P. Piasecki*. . . . . . . . . . . . . . . . . . . 212

     d.     *Dr. Michael M. Gelbort*. . . . . . . . . . . . . . . . . . 214

4.     *Analysis*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 215

     a.     *The applicable law*. . . . . . . . . . . . . . . . . . . . . . . 215

     b.     *The investigation and the presentation of the mitigation evidence*. . . . . . . . . . . . . . . . . . . . . . 220

          (1)     *Evidence known to the defense*. . . . . . . . . . 220

          (2)     *Recommendation of mitigation specialist*. . . . . 226

          (3)     *Consideration of the government's response*. . . 233

          (4)     *Timely development of mitigation case*. . . . . . 239

          (5)     *Consideration of drug use*. . . . . . . . . . . . . 240

          (6)     *Consideration of theory of defense*. . . . . . . . 243

          (7)     *Overall presentation of mitigation evidence*. . . 244

     c.     *The reasonableness of presenting a mitigation case based on mental health and drug use evidence*. . . . . . 247

          (1)     *Reliable evidence not taken into account by the movant's experts*. . . . . . . . . . . . . . . . . . . 247

          (2)     *Testimony of the movant's experts*. . . . . . . . 255

               (a)     *Mental health evidence*. . . . . . . . . . . 255

                    (i)     *Dr. Richard G. Dudley, Jr.*. . . . . . 256

                    (ii)     *Dr. John F. Warren, III*. . . . . . . 260

                    (iii)     *Summary*. . . . . . . . . . . . . . . . . 263

               (b)     *Drug use evidence*. . . . . . . . . . . . . . 267

          (3)     *Competent counsel would not offer the current mitigation case*. . . . . . . . . . . . . . . . . . . . . 273

     d.     *The lack of prejudice*. . . . . . . . . . . . . . . . . . . . 275

| | | |
|---|---|---|
| J. | *Ground Ten — Constitutional Violations Occurred as a Result of the Penalty Phase Jury Instructions*. . . . . . . . . . . . . . . . . . . . . | 279 |
| | 1. *Arguments of the parties*. . . . . . . . . . . . . . . . . . . . . . . | 279 |
| | a. *The movant*. . . . . . . . . . . . . . . . . . . . . . . . . . | 279 |
| | b. *The government*. . . . . . . . . . . . . . . . . . . . . . . | 286 |
| | 2. *Analysis*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 290 |
| K. | *Ground Eleven — Constitutional Violations Occurred as a Result of the Admission of Victim Impact Evidence*. . . . . . . . . . . . . . . . | 297 |
| | 1. *Arguments of the parties*. . . . . . . . . . . . . . . . . . . . . . . | 297 |
| | a. *The movant*. . . . . . . . . . . . . . . . . . . . . . . . . . | 297 |
| | b. *The government*. . . . . . . . . . . . . . . . . . . . . . . | 301 |
| | 2. *Analysis*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 302 |
| L. | *Ground Twelve — Constitutional Violations Occurred as a Result of the Presentation of Inconsistent Arguments During Related Trials*. . . . . . . . . . . . . . . . . . . . . . . . . . . | 312 |
| | 1. *Arguments of the parties*. . . . . . . . . . . . . . . . . . . . . . . | 312 |
| | a. *The movant*. . . . . . . . . . . . . . . . . . . . . . . . . . | 312 |
| | b. *The government*. . . . . . . . . . . . . . . . . . . . . . . | 317 |
| | 2. *Analysis*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 319 |
| M. | *Ground Thirteen — Constitutional Violations Occurred as a Result of the Admission of Evidence by the Parties' Stipulation*. . . . . . . . | 325 |
| | 1. *Arguments of the parties*. . . . . . . . . . . . . . . . . . . . . . . | 325 |
| | a. *The movant*. . . . . . . . . . . . . . . . . . . . . . . . . . | 325 |
| | b. *The government*. . . . . . . . . . . . . . . . . . . . . . . | 330 |
| | 2. *Analysis*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 332 |
| N. | *Ground Fourteen — Constitutional Violations Occurred as a Result of the Admission of Testimony About Drugs and Threats of Violence*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 334 |
| | 1. *Arguments of the parties*. . . . . . . . . . . . . . . . . . . . . . . | 334 |
| | a. *The movant*. . . . . . . . . . . . . . . . . . . . . . . . . . | 334 |
| | b. *The government*. . . . . . . . . . . . . . . . . . . . . . . | 339 |
| | 2. *Analysis*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 341 |
| O. | *Ground Fifteen — Constitutional Violations Occurred as a Result of the Admission of Testimony About Bad Acts*. . . . . . . . . . . . . | 345 |
| | 1. *Background regarding the escape evidence*. . . . . . . . . . . . | 346 |
| | 2. *Arguments of the parties*. . . . . . . . . . . . . . . . . . . . . . . | 349 |
| | a. *The movant*. . . . . . . . . . . . . . . . . . . . . . . . . . | 349 |
| | b. *The government*. . . . . . . . . . . . . . . . . . . . . . . | 353 |
| | 3. *Analysis*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 355 |
| P. | *Ground Sixteen — Constitutional Violations Occurred as a Result of the Insufficient Evidence in Support of the Theory of Defense*. . | 357 |

|  |  | 1. | *Arguments of the parties.* . . . . . . . . . . . . . . . . . . . . . . | 357 |
|  |  |  | a. *The movant.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . | 357 |
|  |  |  | b. *The government*. . . . . . . . . . . . . . . . . . . . . . . . . . | 361 |
|  |  | 2. | *Analysis.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 363 |
|  | Q. | *Ground Seventeen — Constitutional Violations Occurred as a Result of a Dismissed Juror.* . . . . . . . . . . . . . . . . . . . . . . . . . . . | 366 |
|  |  | 1. | *Background relating to Juror 523.* . . . . . . . . . . . . . . . . | 367 |
|  |  | 2. | *Arguments of the parties.* . . . . . . . . . . . . . . . . . . . . . . | 370 |
|  |  |  | a. *The movant.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . | 370 |
|  |  |  | b. *The government*. . . . . . . . . . . . . . . . . . . . . . . . . . | 372 |
|  |  | 3. | *Analysis.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 374 |
|  | R. | *Ground Eighteen — Constitutional Violations Occurred as a Result of the Security Measures*. . . . . . . . . . . . . . . . . . . . . . . . . | 378 |
|  |  | 1. | *Arguments of the parties.* . . . . . . . . . . . . . . . . . . . . . . | 378 |
|  |  |  | a. *The movant.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . | 378 |
|  |  |  | b. *The government*. . . . . . . . . . . . . . . . . . . . . . . . . . | 381 |
|  |  | 2. | *Analysis.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 383 |
|  | S. | *Ground Nineteen — Constitutional Violations Occurred as a Result of the Admission of Forensic Evidence.*. . . . . . . . . . . . . . . . . | 387 |
|  |  | 1. | *Arguments of the parties.* . . . . . . . . . . . . . . . . . . . . . . | 387 |
|  |  |  | a. *The movant.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . | 387 |
|  |  |  | b. *The government*. . . . . . . . . . . . . . . . . . . . . . . . . . | 388 |
|  |  | 2. | *Analysis.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 390 |
|  | T. | *Grounds Twenty and Twenty-One — Constitutional Violations Occurred as a Result of Cumulative Error and Manner of Execution*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 392 |
| V. | *SUMMARY OF RESOLUTION OF GROUNDS*. . . . . . . . . . . . . . . . . . | 393 |
| VI. | *CERTIFICATE OF APPEALABILITY*. . . . . . . . . . . . . . . . . . . . . | 396 |
| VII. | *CONCLUSION*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 398 |

# I. INTRODUCTION

After convicting Dustin Lee Honken ("the movant") of five capital counts of conspiracy to commit murder while engaging in the manufacture and distribution of methamphetamine ("conspiracy murder") and five capital counts of continuing criminal enterprise murder ("CCE murder"), a jury sentenced him to death for the murders of two little girls who were ten years old and six years old at the time of their deaths. The movant now seeks relief under 28 U.S.C. § 2255 and/or 28 U.S.C. § 2241. The government opposes the movant's request to vacate, correct or set aside his sentences and the movant's request to prevent his execution in a particular manner.

# II. BACKGROUND

## A. Underlying Criminal Proceedings

### 1. Drug charges against the movant in 1993 and disappearance of five witnesses

In 1992, the movant and his best friend, Timothy Cutkomp, began manufacturing methamphetamine in Tucson, Arizona. The movant's brother, Jeffrey Honken, financed their methamphetamine operation, and the name of Jeffrey Honken's company was used to purchase precursor chemicals that were needed to manufacture methamphetamine. While in Arizona, the movant and Timothy Cutkomp manufactured pounds of methamphetamine, which generated more than $100,000.00 after being distributed. The movant distributed the methamphetamine that he and Timothy Cutkomp manufactured only to Gregory Nicholson and Terry DeGeus, who distributed methamphetamine to their own customers in the Mason City, Iowa, area.

In early 1993, the movant became acquainted with Terry DeGeus's girlfriend, Angela Johnson. Terry DeGeus caused the movant and Angela Johnson to meet when he instructed Angela Johnson to give the movant some money. Shortly thereafter, Angela Johnson told the movant that she wanted to sell methamphetamine without having to purchase it from Terry DeGeus, and the movant and Angela Johnson became romantically

involved.  Within six months of the formation of their relationship, Angela Johnson became pregnant with the movant's child.  At some point, the movant confided in Jeffrey Honken that Angela Johnson had drug connections.

As a result of an investigation that originated in Minnesota, law enforcement targeted Gregory Nicholson in March of 1993.  After he unwittingly participated in a controlled buy and law enforcement discovered drugs, including a large amount of methamphetamine (143.89 grams of actual (pure) methamphetamine), cash and a gun in his home, Gregory Nicholson decided to cooperate with law enforcement.  Despite being fearful of the movant, Gregory Nicholson arranged to meet the movant on March 21, 1993.  Unbeknownst to the movant, the meeting between the movant and Gregory Nicholson was monitored and recorded by law enforcement.  During the meeting, the movant and Gregory Nicholson discussed the distribution of methamphetamine, and Gregory Nicholson paid the movant $3,000.00, which was part of the amount of money that he owed the movant for past methamphetamine deliveries.  On the same day that the meeting took place, law enforcement arrested the movant and Timothy Cutkomp.

On March 23, 1993, the government filed a federal criminal complaint against the movant.  *See United States v. Honken*, Case No. 3:93-cr-03019-MJM (N.D. Iowa 1995).[1] After being released on bond, the movant moved from Arizona to Mason City, Iowa.  His release, however, had conditions, which included, among others, being prohibited from possessing a firearm and contacting Timothy Cutkomp, Gregory Nicholson, Terry DeGeus, Dave Patrick and Russell Miller.  In April of 1993, a grand jury indicted the movant for conspiracy to distribute methamphetamine.  Before indicting the movant, the grand jury considered Gregory Nicholson's testimony.  The movant told Timothy Cutkomp that he believed Gregory Nicholson would testify against him during trial.

---

[1] David G. Thinnes represented the movant.  Assistant United States Attorney Patrick J. Reinert represented the government.

During June and July of 1993, the movant and Angela Johnson searched for Gregory Nicholson. To facilitate their search, they often asked Angela Johnson's friend, Christi Gaubatz, to babysit Angela Johnson's daughter. On June 30, 1993, Angela Johnson obtained a permit to purchase a handgun. On July 7, 1993, Angela Johnson traveled to Waterloo, Iowa, and purchased an Intratec Tec-9, nine millimeter, semi-automatic handgun at a pawn shop.

For about two weeks after his arrest, Gregory Nicholson continued to live with his wife. During such period, Gregory Nicholson acted paranoid by demanding the curtains be shut and forbidding his wife and child to go outside during the day. After his wife left him, Gregory Nicholson lived in various places. In mid-July of 1993, a mutual friend introduced Gregory Nicholson to Lori Duncan, who was a single, working mother of two girls. Shortly thereafter, Gregory Nicholson began staying at her home in Mason City, Iowa.

After being informed prior to July 23, 1993, that the movant intended to plead guilty, the trial court set a change of plea hearing.[2] On July 24, 1993, the movant and Angela Johnson again asked Christi Gaubatz to babysit Angela Johnson's daughter at Angela Johnson's home, and they borrowed Christi Gaubatz's car so that they could search for Gregory Nicholson. Rather than return around midnight as usual, the movant and Angela Johnson returned home at 5:00 a.m. When they returned, Christi Gaubatz heard them whisper and then go into the bathroom. The shower began running, and Christi Gaubatz left and went home. After July 24, 1993, the movant and Angela Johnson never

---

[2] A letter from the government to the movant states that the movant notified the government that he wanted to change his plea during a conversation that occurred on July 8, 1993. On July 22, 1993, the government filed a motion to set plea, and, on July 23, 1993, the trial court notified the parties that it set July 30, 1993, as the date for the hearing regarding the movant's change of plea.

3

asked Christi Gaubatz to babysit or to borrow her car so that they could look for Gregory Nicholson.

On July 25, 1993, Gregory Nicholson (age 34) went missing. At the same time that Gregory Nicholson disappeared, Lori Duncan (age 31) and her daughters, Kandi Duncan (age 10) and Amber Duncan (age 6) also went missing.

On July 30, 1993, the movant appeared for his change of plea hearing, but he advised his attorney that he was not going to plead guilty. To explain his decision, the movant informed his attorney that he had heard Gregory Nicholson skipped town. The movant's attorney then informed the government that the case against his client was not as strong as the government believed. The movant also provided his attorney with a VHS tape that he said had been placed in his car by an unknown person. On such tape, Gregory Nicholson exculpated the movant by stating that he had set up the movant because he needed to give the government someone. The movant's attorney did not show the tape to the government.

As a result of being unable to find Gregory Nicholson, the government focused its attention on Terry DeGeus. On October 27, 1993, the government subpoenaed several witnesses, including Angela Johnson and Aaron Ryerson, to appear before the grand jury. As an associate of Angela Johnson and Terry DeGeus, Aaron Ryerson had obtained methamphetamine from Terry DeGeus, knew that Terry DeGeus supplied Angela Johnson with methamphetamine and saw a man who matched the movant's description deliver methamphetamine to Terry DeGeus. After appearing in front of the grand jury where he invoked his right to remain silent, Aaron Ryerson told Terry DeGeus that Terry DeGeus and the movant were the subjects of the grand jury investigation. Terry DeGeus then called Angela Johnson, who had also appeared before the same grand jury while the movant waited for her, to convey what he knew about the grand jury investigation. Having reason to believe that the government had subpoenaed Terry DeGeus to appear in

4

front of the grand jury, the movant told Timothy Cutkomp that he was worried about Terry DeGeus because he thought Terry DeGeus would testify against him during trial.

On November 5, 1993, Terry DeGeus (age 32) went missing. Sometime during the day that he disappeared, Angela Johnson called Terry DeGeus's mother and told his mother to have Terry DeGeus call her. On the evening that he disappeared, Terry DeGeus told Aaron Ryerson that he was going to see Angela Johnson. Terry DeGeus also dropped off his ten-year-old daughter at his mother's home and told his mother and daughter that he was going to meet Angela Johnson. Despite telling his mother and daughter that he would return shortly to get his daughter, Terry DeGeus never did. In response to questions that Terry DeGeus's family and law enforcement asked, Angela Johnson made contradictory statements. Specifically, on the one hand, she denied that she ever saw Terry DeGeus on the evening of November 5, 1993, and, on the other hand, she admitted that she saw him on November 5, 1993, and claimed that he left after they talked.

As close friends, Angela Johnson and Christi Gaubatz had keys to each other's homes, and they came and went from each other's homes as they pleased. While cleaning a bedroom closet in her home some time during the winter of 1993 to 1994, Christi Gaubatz discovered a large, black handgun with a silencer. Such handgun resembled a Tec-9, nine millimeter, semi-automatic handgun like the one that Angela Johnson had purchased. Christi Gaubatz found the handgun inside of a cosmetics bag that belonged to Angela Johnson. Because she believed the handgun belonged to Angela Johnson, Christi Gaubatz called Angela Johnson to demand that she remove it. In response, Angela Johnson told Christi Gaubatz not to worry about the handgun because the movant would take care of it.

In the winter of 1993 to 1994, the movant planned to destroy a large, black handgun. To do so, the movant sought Timothy Cutkomp's assistance. Both of them used

5

a torch to cut and melt the handgun into unrecognizable pieces, which they discarded in ditches along a country road.

After the disappearance of Gregory Nicholson and Terry DeGeus, the government did not prosecute the movant. Consequently, on March 21, 1995, the trial court dismissed without prejudice the indictment against the movant. Years after receiving the VHS tape and shortly after the trial court entered its dismissal order, the movant's attorney returned the tape to the movant.[3]

### 2. *Drug charges against the movant in 1996 and efforts to avoid convictions*

While the 1993 charges against him were pending, the movant sought to manufacture methamphetamine by building a laboratory and by taking significant steps to facilitate the manufacture of methamphetamine. For example, the movant, Angela Johnson, Timothy Cutkomp and Christi Gaubatz made trips to Arizona to recover methamphetamine manufacturing equipment and to purchase chemicals to manufacture methamphetamine and other drugs. And, after the trial court dismissed the 1993 indictment against the movant in March of 1995, Timothy Cutkomp and the movant traveled to Arizona to obtain more chemicals to manufacture drugs.

From March of 1993 through 1995, the movant and Timothy Cutkomp experimented with the manufacture of methamphetamine and other drugs at various locations, including Timothy Cutkomp's home and Angela Johnson's home. Angela Johnson helped the movant and Timothy Cutkomp by providing funding to them. Jeffrey Honken also provided money to the movant. In late 1995, the movant rented a home in Mason City, Iowa, and the movant and Timothy Cutkomp moved their drug operation to such home.

---

[3] The Honorable Michael J. Melloy, who was then a district court judge, presided over *United States v. Honken*, Case No. 3:93-cr-03019-MJM (N.D. Iowa 1995). He is now a judge for the United States Court of Appeals for the Eighth Circuit.

6

In the fall of 1995, the movant recruited Daniel Cobeen to help him and Timothy Cutkomp manufacture methamphetamine. Daniel Cobeen, however, contacted law enforcement and began cooperating with them. Pursuant to such cooperation, law enforcement learned that the movant told Daniel Cobeen that he had made witnesses disappear and he wanted to kill law enforcement officers who had investigated his prior drug activity. Law enforcement also learned that the movant introduced Daniel Cobeen to four other individuals, not including Timothy Cutkomp or Angela Johnson, who would be involved in the methamphetamine operation and took him to meet Angela Johnson so that she could approve of his participation.

From mid-1995 to February of 1996, the movant, while receiving funding from Angela Johnson and assistance from Timothy Cutkomp and Daniel Cobeen, built a complex methamphetamine laboratory and took significant steps toward the manufacture of methamphetamine. After conducting an undercover investigation and obtaining a search warrant, law enforcement searched the movant's home on February 7, 1996. In addition to a methamphetamine laboratory, chemicals and equipment, law enforcement seized paper notes and books about using counter-surveillance measures, manufacturing drugs and gun silencers and binding and gagging prisoners.

On April 11, 1996, a grand jury again indicted the movant. This time he faced several charges, including a charge of conspiring with co-defendant Timothy Cutkomp and others to manufacture and distribute 1000 grams or more of a mixture or substance containing a detectable amount of methamphetamine and 100 grams or more of pure methamphetamine. *See United States v. Honken*, Case No. 3:96-cr-03004-MWB (N.D. Iowa 1998).[4] On April 29, 1996, law enforcement arrested the movant. The trial court

---

[4] Alfredo G. Parrish represented the movant throughout pre-plea proceedings, plea proceedings, post-plea proceedings, sentencing proceedings and direct appeal proceedings.
(continued…)

released the movant and Timothy Cutkomp pending trial.[5]  With respect to the movant's pre-trial release, the trial court confined him to his home, granted him work release, subjected him to electronic monitoring and placed restrictions on his communications.  The trial court ordered that he not be in contact with Timothy Cutkomp and Daniel Cobeen.

While the 1996 indictment was pending, the movant plotted to murder Daniel Cobeen, law enforcement officers and chemists, and he planned to destroy physical evidence that the government could use against him.  Rather than go along with the movant's plan, Timothy Cutkomp decided to cooperate with law enforcement.  As part of such cooperation, Timothy Cutkomp wore a wire when he conversed with the movant.  In more than eight hours of recorded conversations, the movant discussed his 1993 charges, referenced witnesses that had been eliminated in 1993 and described his plan to evade his current charges by killing witnesses and law enforcement officers.

In light of the recordings, the movant was arrested on June 11, 1996, and the trial court revoked his pre-trial release.  Before the trial court revoked his pre-trial release, the movant had persuaded a co-worker, Rick Held, to buy a handgun for Angela Johnson.  Rick Held purchased a handgun, but, after being detained, the movant had Angela Johnson call Rick Held to let him know that the movant no longer needed the handgun.

---

[4](…continued)
Assistant United States Attorney Patrick J. Reinert represented the government prior to the movant's direct appeal.  Steven M. Colloton, who was then an Assistant United States Attorney, also represented the government prior to the movant's direct appeal and on direct appeal.  Steven M. Colloton is now a judge for the United States Court of Appeals for the Eighth Circuit.

[5] The Honorable Mark W. Bennett presided over *United States v. Honken*, Case No. 3:96-cr-03004-MWB (N.D. Iowa 1998), *United States v. Johnson*, Case No. 3:00-cr-03034-MWB (N.D. Iowa 2004), *United States v. Johnson*, Case No. 3:01-cr-03046-MWB (N.D. Iowa 2005), and *United States v. Honken*, Case No. 3:01-cr-03047-MWB (N.D. Iowa 2005).

8

While detained at the Woodbury County Jail in Sioux City, Iowa, the movant admitted to other inmates that he had killed witnesses to avoid earlier charges. The movant described the murders in great detail. Aside from divulging details about the murders, the movant plotted additional murders. Specifically, he planned to murder Daniel Cobeen, Timothy Cutkomp, a chemist who determined a substance to be methamphetamine, an assistant federal prosecutor and Angela Johnson.

The movant instructed a fellow inmate at the Woodbury County Jail, Dean Donaldson, to kill Timothy Cutkomp and provided Dean Donaldson with very specific information, including Timothy Cutkomp's work schedule and directions to Timothy Cutkomp's home and place of work. He also directed Dean Donaldson to send threatening letters to Daniel Cobeen and to continue to manufacture methamphetamine. With respect to the latter directive, the movant gave Dean Donaldson manufacturing instructions and directed him to locations where he had stored manufacturing equipment.

Aside from just talking to Dean Donaldson, the movant took significant steps to effectuate his plans. For example, the movant wrote notes to guide and help Dean Donaldson, and the movant had his girlfriend, Kathy Rick, get Dean Donaldson out of the Woodbury County Jail by posting his bond. To secure Dean Donaldson's bond, Kathy Rick pledged her home as collateral. On August 14, 1996, Dean Donaldson got out of the Woodbury County Jail. As a result of Dean Donaldson's failure to follow through with the movant's plan before he was arrested while out on bond, the movant sought to have Angela Johnson post bond for Anthony Altimus and to have her help him find Timothy Cutkomp so that Anthony Altimus could kill him. To execute such plan, Angela Johnson obtained $1,000.00 from Colleen Birkey after the movant sold a methamphetamine recipe to Colleen Birkey's ex-husband. Angela Johnson, however, never posted Anthony Altimus's bond because she lacked sufficient funds.

9

Additionally, while at the Woodbury County Jail, the movant and other inmates, including Dennis Putzier, unsuccessfully attempted to escape by breaking a hole in the wall of a cell and arranging for Angela Johnson to deliver a hacksaw, a chisel, a hammer and a rope to them. In the event that he did escape, the movant intended to kill witnesses and other individuals. Jailers, however, thwarted the movant's escape.

On June 2, 1997, the movant changed his plea with respect to two counts of a four-count superseding indictment, which was returned by the grand jury on July 10, 1996. Specifically, he pleaded guilty to: (1) conspiring to manufacture and distribute 1000 grams or more of a mixture or substance containing a detectable amount of methamphetamine and 100 grams or more of pure methamphetamine from between about 1992 and February 7, 1996[6] and (2) attempting to manufacture 1000 grams or more of a mixture or substance containing a detectable amount of methamphetamine and 100 grams or more of pure methamphetamine on or about February 7, 1996. Before the trial court accepted his guilty pleas, the movant acknowledged and admitted the elements of each offense, including the amount of methamphetamine—at least 1000 grams of a mixture or substance containing a detectable amount of methamphetamine and at least 100 grams of pure methamphetamine—that he conspired to manufacture and distribute and attempted to manufacture, and he acknowledged the minimum and maximum sentence that he faced as a result of conspiring to manufacture and distribute 1000 grams of a mixture or substance containing a detectable amount of methamphetamine and 100 grams of pure methamphetamine and attempting to manufacture 1000 grams of a mixture or substance containing a detectable amount of methamphetamine and 100 grams of pure methamphetamine.

---

[6] The court notes that the relevant dates of the conspiracy count changed. Rather than allege "between about 1993 and February 7, 1996," count 1 of the superseding indictment alleged "between about 1992 and February 7, 1996."

10

During the movant's sentencing hearing, the government presented evidence that tied the movant to the disappearances of Gregory Nicholson, Lori Duncan, Kandi Duncan, Amber Duncan and Terry DeGeus and that showed the movant's ongoing efforts to evade criminal charges. The movant elected to testify to avoid sentencing enhancements. While testifying, the movant: (1) admitted that he manufactured methamphetamine with Timothy Cutkomp but disputed the quantities; (2) admitted that, in 1993, he told his attorney about a VHS tape in which Gregory Nicholson exculpated him but denied it ever existed; (3) admitted that he talked to Daniel Cobeen about helping him and Timothy Cutkomp manufacture methamphetamine; (4) admitted that, while on pre-trial release in 1993, he had run into Scott Gahn and he discussed Gregory Nicholson with him; (5) admitted that, after being arrested in 1996, he and Timothy Cutkomp talked about killing Daniel Cobeen and other witnesses and about the other witnesses that posed a problem for the movant in 1993; (6) admitted that he gave Timothy Cutkomp a rifle, not a Tec-9, nine millimeter, semi-automatic handgun, because his children, who were both under the age of two, expressed excessive interest in it; (7) admitted that he gave Dean Donaldson a map to Timothy Cutkomp's home, a work schedule for Timothy Cutkomp and notes that were directed to others; and (8) admitted that he had Kathy Rick post bond to get Dean Donaldson out of jail but did so to have Dean Donaldson manufacture and distribute methamphetamine in an attempt to secure an additional retainer for his attorney rather than to harm Timothy Cutkomp.

After a lengthy, multi-day sentencing hearing, the trial court made several findings. The trial court did not find support for the government's assertion that the movant conspired to manufacture and distribute methamphetamine while under supervision for the 1993 charge of conspiring to distribute methamphetamine. It reasoned that the government failed to carry its burden because Timothy Cutkomp had credibility issues and the record lacked corroborating evidence. Consequently, it did not apply an enhancement under

11

USSG §2J1.7.  Concerning an enhancement under USSG §3C1.1 and an enhancement under USSG §2D1.1(b)(1), the government argued that the movant's possession of firearms was tied to the enhancement for obstruction of justice and argued that the movant possessed firearms in furtherance of the methamphetamine conspiracy.  The trial court found that the movant obstructed justice because he arranged to have a person hide evidence after being arrested in 1996, but it declined to find that he obstructed justice on the other grounds asserted by the government or that he possessed a firearm in furtherance of drug trafficking activity.  And, finally, the trial court made specific findings as to drug quantity under USSG §2D1.1(a), role under USSG §3B1.1 and acceptance of responsibility under USSG §3E1.1.  Ultimately, the trial court sentenced the movant to a 293 month term of imprisonment on each count of conviction.  On February 25, 1998, judgment entered against the movant.

Both parties appealed.  On direct appeal, the Eighth Circuit Court of Appeals affirmed the convictions but vacated the sentences.  *See United States v. Honken*, 184 F.3d 961, 973 (8th Cir. 1999).  On January 25, 2000, the trial court resentenced the movant to a 324 month term of imprisonment on each count of conviction, and, on February 1, 2000, it entered an amended judgment against him.  The movant appealed.  On January 29, 2001, the Eighth Circuit Court of Appeals affirmed.  *See United States v. Honken*, 2 F. App'x 611, 612 (8th Cir. 2001).[7]

―――――――――――――――

[7] As set forth above, the record indicates that: law enforcement's investigation of the movant intensified shortly after the government dismissed the 1993 indictment in March of 1995; the grand jury returned an indictment against the movant on April 11, 1996, and a superseding indictment on July 10, 1996; the movant pleaded guilty on June 2, 1997; a multi-day sentencing hearing took place in 1997 and 1998; judgment entered against the movant on February 25, 1998; and amended judgment entered against the movant on February 1, 2000.  For ease of reading, relevant events that are related to this time period will be described by referencing the "1996 case".

12

### 3. Ongoing investigation, charges against Angela Johnson in 2000 and discovery of the victims' bodies

Although law enforcement began an investigation into the disappearances of Gregory Nicholson, Lori Duncan, Kandi Duncan, Amber Duncan and Terry DeGeus in 1993, the investigation was disjointed. As a result of the 1996 drug investigation surrounding the movant and Timothy Cutkomp, law enforcement started a second investigation into the disappearances and likely murders of Gregory Nicholson, Lori Duncan, Kandi Duncan, Amber Duncan and Terry DeGeus. And, in 1999, law enforcement renewed their murder investigation.

In 2000, Christi Gaubatz decided to cooperate in the ongoing murder investigation. She told law enforcement about the efforts undertaken by the movant and Angela Johnson to find Gregory Nicholson and the large, black handgun that she found in her closet.

On July 26, 2000, a grand jury indicted Angela Johnson. *See United States v. Johnson*, Case No. 3:00-cr-03034-MWB (N.D. Iowa 2004). The government charged her with aiding and abetting the murders of Gregory Nicholson, Lori Duncan, Kandi Duncan, Amber Duncan and Terry DeGeus. In addition to those five counts, it charged her with one count of aiding and abetting the solicitation of the murder of witnesses and one count of conspiracy to interfere with witnesses.

Angela Johnson was arrested on July 30, 2000. While she was detained at the Benton County Jail in Vinton, Iowa, Angela Johnson discussed her case with Robert McNeese, who was serving a life sentence on an unrelated federal charge. Robert McNeese convinced Angela Johnson that she could escape responsibility for the five murders if he arranged to have an inmate who was already serving a life sentence falsely confess to the killings of Gregory Nicholson, Lori Duncan, Kandi Duncan, Amber Duncan and Terry DeGeus. He also convinced her to give him information that would provide a credible basis for the false confession. Angela Johnson fell for the ruse and prepared and

13

provided Robert McNeese with maps and notes that described the locations where the five bodies were buried. Eventually, Robert McNeese turned the maps and the notes over to law enforcement.

Using Angela Johnson's maps and notes, law enforcement discovered two shallow graves containing the bodies of the five murder victims. Law enforcement found Gregory Nicholson, Lori Duncan, Kandi Duncan and Amber Duncan in a wooded area outside of Mason City, Iowa. They were all buried in a single hole. Amber Duncan was at the bottom of the hole. Kandi Duncan, Lori Duncan and then Gregory Nicholson were stacked on top of her. Gregory Nicholson, as well as Lori Duncan, had been bound, gagged and shot multiple times, including once in the head. Kandi Duncan had been shot once in the back of the head, and Amber Duncan had been shot once in the back of the head. Law enforcement found Terry DeGeus a few miles away from where the other murder victims were found. Terry DeGeus was buried face down in a farm field that was behind an abandoned house. He had been shot one or more times, including in the head, and his skull was severely fragmented.

While serving his 324 month term of imprisonment at the United States Penitentiary in Florence, Colorado, the movant admitted to several inmates that he murdered people in 1993. He also admitted that he plotted to kill witnesses, law enforcement officers and a federal prosecutor after he was arrested in 1996.

As a result of law enforcement's continued investigation into his involvement in the disappearances of Gregory Nicholson, Lori Duncan, Kandi Duncan, Amber Duncan and Terry DeGeus, the movant became convinced that he would be charged with murder, and, consequently, he began to plan how he would escape and what he would do to those individuals whom he held responsible for his imprisonment. Envisioning a trial, the movant planned to call his associates as character witnesses, whom he believed would be held at the same jail and would be able to help him overpower and kill guards and escape.

14

After escaping, the movant intended to murder witnesses, law enforcement officers and a federal prosecutor. To facilitate their escape, the movant and his recruited associates practiced retrieving an officer's weapon, bribed a prison guard to give them handcuffs and a black box that locks over the chain between the handcuffs, learned to remove handcuffs with minimal tools and trained in martial arts scenarios that involved overpowering an armed escort.

### 4. *Charges in 2001*[8]

Following the discovery of the bodies of the five murder victims, the government sought from a grand jury an additional indictment against Angela Johnson. *See United States v. Johnson*, Case No. 3:01-cr-03046-MWB (N.D. Iowa 2005). The grand jury returned an indictment against Angela Johnson on August 30, 2001. Pursuant to such indictment, the government charged Angela Johnson with ten capital counts for the murders of Gregory Nicholson, Lori Duncan, Kandi Duncan, Amber Duncan and Terry DeGeus.

---

[8] During pre-trial, trial and sentencing proceedings, Alfredo G. Parrish, Leon F. Spies and Charles Myers Rogers (learned counsel) represented the movant, and Assistant United States Attorney Charles J. Williams, Assistant United States Attorney Patrick J. Reinert and Thomas Henry Miller, as Assistant Iowa Attorney General and Special Assistant United States Attorney for this case, represented the government. The trial court permitted Assistant United States Attorney Patrick J. Reinert to withdraw as counsel for the government on September 5, 2003.

Despite the fact that three different attorneys represented the movant throughout the proceedings that occurred in the underlying criminal case and each attorney focused on different aspects of the movant's case, the court deems it appropriate to refer to Alfredo G. Parrish, Leon F. Spies and Charles Myers Rogers as "trial counsel" throughout this order. So, the use of "trial counsel" may relate to one or more of those attorneys. The court finds that there is no need to delineate the individual and collective actions that the movant's attorneys undertook on particular pre-trial, trial, sentencing or post-trial issues because it is clear that they collaborated on nearly every aspect of the movant's criminal case.

The government also sought and obtained on August 30, 2001, an indictment against the movant. *See United States v. Honken*, Case No. 3:01-cr-03047-MWB (N.D. Iowa 2005). Specifically, a grand jury indicted the movant on seventeen counts: five counts of tampering with witnesses or potential witnesses by murdering them; one count of soliciting a crime of violence, that is, the murder of a witness; one count of conspiracy to tamper with witnesses and to solicit the murder of witnesses; five capital counts of conspiracy murder; and five capital counts of CCE murder (criminal docket no. 1).[9] All of the charges arose from the movant's murder and solicitation of murder of witnesses to his drug-trafficking and other criminal activity.

On August 23, 2002, the government filed a superseding indictment (criminal docket no. 46) against the movant. Concerning the non-capital offenses, count 1 through count 5 charged the movant with "witness tampering." More specifically, count 1 alleged that the movant "did willfully, deliberately, maliciously, and with premeditation and malice aforethought, unlawfully kill Gregory Nicholson" with the intent to prevent Gregory Nicholson from testifying in an official proceeding, with the intent to prevent Gregory Nicholson from communicating to law enforcement, with the intent to retaliate against Gregory Nicholson for providing information to law enforcement and with the intent to retaliate against Gregory Nicholson for testifying before the grand jury. Superseding Indictment (criminal docket no. 46) at 1-2, 5-6. Such conduct is in violation of 18 U.S.C. § 1512(a)(1)(A) and (a)(1)(C), 18 U.S.C. § 1513(a)(1)(A) and (a)(1)(B) and 18 U.S.C. § 1111. And, count 2 through count 5 alleged that the movant "did willfully, deliberately, maliciously, and with premeditation and malice aforethought, unlawfully

---

[9] The seven non-capital offenses mirrored the seven non-capital offenses that are included in the July of 2000 indictment against Angela Johnson. *Compare United States v. Johnson*, Case No. 3:00-cr-03034-MWB (N.D. Iowa 2004), *with United States v. Honken*, Case No. 3:01-cr-03047-MWB (N.D. Iowa 2005).

16

kill", respectively, Lori Duncan, Kandi Duncan, Amber Duncan and Terry DeGeus, with the intent to prevent [the named individual] from communicating to law enforcement. Such conduct is in violation of 18 U.S.C. § 1512(a)(1)(C) and (a)(2)(A) and 18 U.S.C. § 1111. Superseding Indictment (criminal docket no. 46) at 2-6. As to the other non-capital offenses, count 6 charged the movant with soliciting Dean Donaldson and Anthony Altimus to murder Timothy Cutkomp and Daniel Cobeen to prevent them from testifying in the 1996 case. Such conduct is in violation of 18 U.S.C. § 373(a)(1). Count 7 charged the movant with conspiring to tamper with witnesses and to solicit the murder of witnesses. Such conduct is in violation of 18 U.S.C. § 371.

The superseding indictment amended the capital charges. Count 8 through count 12 charged conspiracy murder of Gregory Nicholson, Lori Duncan, Amber Duncan, Kandi Duncan and Terry DeGeus, respectively, as follows:

> On or about [July 25, 1993, or November 5, 1993], in the Northern District of Iowa, DUSTIN LEE HONKEN, while knowingly engaging in an offense punishable under Title 21, United States Code, Sections 846 and 841(b)(1)(A), that is, between 1992 and 1998[,] DUSTIN LEE HONKEN did knowingly and unlawfully conspire[] to: 1) manufacture 100 grams or more of pure methamphetamine and 1000 grams or more of a mixture or substance containing a detectable amount of methamphetamine and 2) distribute 100 grams or more of pure methamphetamine and 1000 grams or more of a mixture or substance containing a detectable amount of methamphetamine, intentionally killed and counseled, commanded, induced, procured, and caused and aided and abetted the intentional killing of [the named individual], and such killing resulted.

> All in violation of Title 21, United States Code, Section 848(e)(1)(A) and Title 18, United States Code, Section 2.

17

Superseding Indictment (criminal docket no. 46) at 14-17. Count 13 through count 17 charged CCE murder of Gregory Nicholson, Lori Duncan, Amber Duncan, Kandi Duncan and Terry DeGeus, respectively, as follows:

> On or about [July 25, 1993, or November 5, 1993], in the Northern District of Iowa, . . . DUSTIN LEE HONKEN, while engaging in and working in furtherance of a continuing criminal enterprise in violation of Title 21, United States Code, Section 848(c), intentionally killed and counseled, commanded, induced, procured, and caused the intentional killing of [the named individual], and such killing resulted.

> The continuing criminal enterprise DUSTIN LEE HONKEN engaged in and worked in furtherance of was undertaken by DUSTIN LEE HONKEN in concert with five or more other persons[,] including, but not limited to, Timothy Cutkomp, Gregory Nicholson, Terry DeGeus, [Angela Johnson], and [Jeffrey] Honken. In the organization, DUSTIN LEE HONKEN occupied a position of organizer, supervisor or other position of management. The criminal enterprise involved the commission of a continuing series of narcotics violations under Title 21, United States Code, Section 801[] et[] seq. occurring between 1992 and 2000, specifically:

> [listing offenses in eighteen paragraphs].

> From this continuing criminal enterprise, DUSTIN [LEE] HONKEN and others derived substantial income and resources.

> All in violation of Title 21, United States Code, Section 848(e)(1)(A) and Title 18, United States Code, Section 2.

*Id*. at 17-37.

### 5. *Pre-trial filings and rulings*

On June 6, 2003, the movant filed a motion to dismiss the capital counts (criminal docket no. 119). He sought dismissal on the basis of double jeopardy. On June 10, 2003, the government notified the movant of its intent to seek the death penalty and outlined the

18

aggravating factors that justified the imposition of the death penalty (criminal docket no. 120). On July 3, 2003, the government filed a resistance to the movant's motion to dismiss (criminal docket no. 129). On July 21, 2003, the trial court denied the movant's motion to dismiss (criminal docket no. 131). *See United States v. Honken*, 271 F. Supp. 2d 1097 (N.D. Iowa 2003).

Aside from the double jeopardy issue, the trial court addressed evidentiary and other issues that the parties raised prior to trial. Those issues include, but are not limited to, the following:

> (1) anonymous jury (criminal docket nos. 150, 153, 169, 176, 185, 186, 187, 201, 207, 214, 249); (2) presence of victims during the merits phase (criminal docket nos. 163, 164, 184, 193, 197); (3) exclusion of expert evidence from defense on issue of mental disease, defect or condition (criminal docket nos. 165, 166, 184, 189, 197, 231); (4) alibi defense (criminal docket nos. 8, 167, 168, 184, 190, 197, 211, 215, 237, 240); (5) recusal (criminal docket nos. 170, 196, 205); (6) admission of evidence, which included the maps that Angela Johnson drew (criminal docket nos. 183, 212, 224, 225, 230, 242, 252, 258, 266, 272), the audio recordings of meetings that involved the movant, Gregory Nicholson and Timothy Cutkomp (criminal docket nos. 213, 218, 236, 252, 258, 266, 272), a replica of a firearm (criminal docket nos. 238, 252, 258, 260, 261, 266, 272, 591), out of court statements made by Gregory Nicholson and Terry DeGeus (criminal docket nos. 264, 298, 323) and the judgments and admissions that were part of the 1996 case (criminal docket nos. 180, 194, 198, 252, 258, 266, 272); (7) exclusion of prior bad acts of Timothy Cutkomp (criminal docket nos. 263, 300, 302, 323); (8) use of shackles at trial and other security measures (criminal docket nos. 268, 287, 320, 328); (9) exclusion of escape evidence, literature, publications, book order forms, group membership and privileged conversations (criminal docket nos. 288, 297, 323); (10) exclusion of discussion or evidence of aspects of the death penalty (criminal docket nos. 278, 304, 323); (11) exclusion of evidence from an expert, Dr. Michael M. Gelbort, and a

19

mitigation specialist, Lisa A. Rickert (criminal docket nos. 289, 292, 305, 306, 323); (12) limits on the right of allocution (criminal docket nos. 303, 312, 520, 591); (13) disclosure of attorney fee information (criminal docket nos. 353, 361, 364, 367, 368, 369); (14) agreement as to which jurors should be stricken for cause (criminal docket nos. 342, 344); (15) voir dire (criminal docket nos. 151, 329, 408, 414, 445); and (16) jury instructions (criminal docket nos. 136, 137, 345, 355, 357, 432, 557).[10]

---

[10] Pursuant to the trial court's January 29, 2004 order, the jurors remained "anonymous" to the extent that their names, addresses and places of employment, and the names of spouses and their places of employment, were not disclosed to the parties, their counsel or the public, either before or after selection of the jury panel. *See generally United States v. Honken*, 378 F. Supp. 2d 880 (N.D. Iowa 2004). However, a juror's community of residence, the "nature" of his or her employment and the "nature" of his or her spouse's employment were disclosed to the parties, their counsel and the public. *Id.*; *see also United States v. Honken*, 378 F. Supp. 2d 925, 927 (N.D. Iowa 2004) (denying reconsideration); *United States v. Honken*, 438 F. Supp. 2d 983 (N.D. Iowa 2004) (ordering closure of hearing on anonymous jury); *United States v. Honken*, 380 F. Supp. 2d 996 (N.D. Iowa 2003) (addressing motion for anonymous jury). On June 7, 2004, the trial court granted: (1) the government's motion to admit evidence of the movant's admissions during his guilty plea, sentencing and convictions on the drug charges in the 1996 case; (2) the government's motion to admit the maps showing the locations of the graves of the murder victims that Angela Johnson had given to Robert McNeese in 2000; and (3) the government's motion to admit certain audio recordings of conversations between the movant and Gregory Nicholson and between the movant and Timothy Cutkomp. *See generally United States v. Honken*, 378 F. Supp. 2d 928 (N.D. Iowa 2004). It also reserved for trial the question of the admissibility, for demonstrative purposes, of a replica firearm. *Id.* Additionally, on July 16, 2004, the trial court granted: (1) the government's motion to exclude evidence related to Timothy Cutkomp's criminal history; (2) the government's motion to admit certain hearsay statements by murder victim Terry DeGeus and murder victim Gregory Nicholson; and (3) the government's motion to bar evidence or discussion concerning certain aspects of the death penalty. *See generally United States v. Honken*, 378 F. Supp. 2d 970 (N.D. Iowa 2004). It also granted in part and denied in part the movant's motion to exclude certain evidence, denied the government's motion to exclude evidence from Dr. Michael M. Gelbort and denied the

(continued…)

20

### *6.     Jury selection and trial*

Prior to trial, the trial court permitted the defense to hire a jury consultant.  It also authorized the use of an extensive juror questionnaire, which the jury consultant helped draft, to obtain basic biographical information about each prospective juror, as well as more detailed information about the juror's views on trial-related issues, such as the death penalty.  The questionnaire was distributed to 1000 prospective jurors.  If a questionnaire was returned as undeliverable, personnel from the clerk's office attempted to determine whether the prospective juror had moved or died and would resend the questionnaire to the prospective juror if a different address was obtained.  Based on directions from the trial court, personnel from the clerk's office excused jurors who could not be located.

After prospective jurors returned their questionnaires, the parties met on July 26, 2004, to review the questionnaires.  As a result of their meeting, the parties agreed to excuse over two hundred prospective jurors for hardship or inability to qualify to serve on the jury.  A conference between the trial court and the attorneys for both parties occurred on that same date.  On July 29, 2004, and July 30, 2004, the trial court excused potential jurors with a hardship or an extreme view on the death penalty because the circumstances fairly denoted that neither the movant nor the government had any objection to eliminating them.  The remaining prospective jurors were randomly sorted into panels of fifteen, and each juror was notified of the day on which his or her panel was to appear for preliminary jury selection.  After panel assignment notices were sent out, the trial court excused

---

[10](…continued)
government's motion to exclude evidence from Lisa A. Rickert.  *Id*.  Further, on July 21, 2004, the trial court granted the government's motion to have the movant wear shackles at trial, *see generally United States v. Honken*, 378 F. Supp. 2d 1010 (N.D. Iowa 2004), and, on September 1, 2004, it ruled that the jury could consider any "residual" or "lingering" doubts as to the movant's guilt or involvement in the charged offenses as a mitigating factor during the penalty phase, *see generally United States v. Honken*, 378 F. Supp. 2d 1040 (N.D. Iowa 2004).

21

several additional jurors for hardship based on renewed requests to be excused from service.

Jury selection began on August 17, 2004, with the first panel of approximately fifteen prospective jurors appearing for group and individual voir dire. By agreement with the parties, the trial court initiated the jury selection process. However, counsel on both sides were provided considerable latitude in questioning the panel as a whole and in questioning each individual prospective juror. Throughout jury selection, prospective jurors were excused for hardship or on challenges for cause. Prospective jurors not excused on those bases were "qualified" for the final juror pool.

After twelve daily panels were interviewed, a sufficient pool of "qualified" prospective jurors was obtained. Once seventy-five prospective jurors were "qualified," the "qualified pool" was notified to appear for final jury selection. The "qualified pool" of seventy-five prospective jurors appeared on September 8, 2004. After further voir dire, the trial court excused for hardship three prospective jurors and struck for cause one prospective juror. Following the parties' exercise of their peremptory challenges pursuant to Federal Rule of Criminal Procedure 24, the trial court empaneled twelve trial jurors and six alternate jurors.[11]

On September 9, 2004, the merits phase of the movant's jury trial commenced. During such phase, the jury heard the testimony of sixty-five witnesses, eleven of whom were called by the movant, and viewed hundreds of exhibits that were offered by both parties and nineteen demonstrative exhibits that were presented by the government. On October 7, 2004, or the fifteenth trial day, the presentation of merits phase evidence

---

[11] After reading the preliminary merits phase jury instructions, a juror notified the trial court that she had just realized that she had read various rulings in the companion case against Angela Johnson. In light of such notice, the trial court and the parties agreed to strike that juror for cause. Therefore, trial continued with a total of seventeen jurors, five of whom were alternates.

concluded, and the trial court read most of the final merits phase jury instructions.[12] On October 11, 2004, after closing arguments, the trial court read the remaining jury instructions on deliberations, dismissed the remaining alternate jurors until required for any penalty phase and submitted the merits phase to the jury.

The jury deliberated approximately two-and-one-half days. On October 14, 2004, it returned guilty verdicts on all seventeen counts (criminal docket no. 513). Before returning its verdicts, the jury made specific findings as to each count.[13]

---

[12] Prior to or in the course of trial, the government narrowed some of the charges to conform to the evidence. Specifically, as to the non-capital charge of solicitation of murder in count 6, the government withdrew its allegation that the movant solicited the murder of Daniel Cobeen. Consequently, count 6 went to the jury only on the allegation that the movant solicited the murder of Timothy Cutkomp. As to the CCE murder charges in count 13 through count 17, the government withdrew the "working in furtherance of the continuing criminal enterprise" alternative and submitted only the "engaging in the continuing criminal enterprise" alternative. Thus, the government was required to prove that the movant was actually guilty of the underlying continuing criminal enterprise offense as well as that he was the "organizer, supervisor or manager" of the continuing criminal enterprise. The government also narrowed from eighteen to thirteen the alleged violations that constituted the series of three or more related felony violations underlying the continuing criminal enterprise offense.

[13] Regarding count 1 through count 5, the jury found all of the prohibited intents for the murder of the witness under its consideration. As to count 6, the jury found that the movant solicited Dean Donaldson and Anthony Altimus to kill Timothy Cutkomp. Concerning count 7, the jury found each of the five alleged offenses were objectives of the conspiracy and each of the nineteen alleged overt acts were committed in furtherance of the conspiracy. As to the conspiracy murder charges in count 8 through count 12, the jury found that the objectives of the underlying conspiracy were the manufacture and distribution of 100 grams or more of actual (pure) methamphetamine, which was the maximum amount alleged. The jury also found that the movant intentionally killed, rather than aided and abetted the killing of, each of the five murder victims. With respect to the CCE murder charges in count 13 through count 17, the jury found that the underlying continuing criminal enterprise involved all thirteen of the offenses constituting the series of three or more violations and that the movant intentionally killed, rather than aided and
(continued…)

23

Several days later, the penalty phase of the movant's trial on the capital counts began. On October 18, 2004, the trial court read the preliminary penalty phase jury instructions, the parties gave their opening statements and the parties presented evidence. The presentation of the defense's penalty phase evidence continued through the morning of October 19, 2004, and most of the following day. During the late afternoon of October 20, 2004, the government presented rebuttal evidence. Over the course of the penalty phase, the jury heard the testimony of twenty witnesses, nine of whom were called by the movant. In addition, the jury viewed thirteen government exhibits and sixty-six defense exhibits. On October 21, 2004, the trial court read the final penalty phase jury instructions, and the parties made their closing arguments. Before noon, the trial court dismissed the remaining alternate jurors pending possible recall and submitted the penalty phase case to the jury.

Shortly after they began deliberating on October 21, 2004, the jurors chose to end their deliberations early and informed the trial court that they decided not to deliberate the next day, that is, Friday, October 22, 2004. But, before the jurors were escorted by deputy marshals to their dispersal site, Juror 523 asked a deputy clerk of the court for an excuse from work for the remainder of the day and the following day because her boss had been making inappropriate comments to her. After the deputy clerk informed the trial court of the situation, the trial court notified the parties.

The trial court investigated Juror 523's allegation by questioning her during a hearing that same day. On October 22, 2004, the trial court held another hearing, during

---

[13](…continued)
abetted the killing of, each of the five murder victims. The jurors were not required to respond to any query regarding the members of the continuing criminal enterprise because the government only alleged the minimum required for a continuing criminal enterprise violation, that is, five persons, in addition to the movant, were members of the continuing criminal enterprise. *See* 21 U.S.C. § 848(c).

24

which it asked Juror 523 whether she had said anything about her boss's comments to the other jurors.  Because the parties agreed, the trial court excused Juror 523 from further deliberations.  With respect to the remaining jurors, including the three remaining alternates,[14] the trial court gave them supplemental instructions and held a hearing on October 25, 2004.  The trial court asked all of them whether they had heard Juror 523 say anything about comments that her boss had made.  After questioning the remaining jurors, the trial court reserved ruling on the movant's motion for a mistrial.

The trial court gave the movant the choice of continuing the penalty phase deliberations with eleven jurors or seating one of the three remaining alternate jurors. Without waiving any objections, the movant chose the latter option.  After being given the opportunity to select one of the three remaining alternates, the movant chose Juror 425. After empaneling Juror 425, the trial court gave supplemental explanatory instructions and directed the reconstituted jury to begin penalty phase deliberations anew.

On October 27, 2004, the jury made a binding recommendation that the movant be sentenced to death for the murders of the two children, Kandi Duncan and Amber Duncan, and it voted to impose a sentence of life imprisonment for the murders of the three adults, Gregory Nicholson, Lori Duncan and Terry DeGeus (criminal docket no. 547).  The verdict form for the ten capital counts required the jurors to state their verdicts in five "steps."[15]  In Step 1, for each of the ten capital counts, the jury found as an "eligibility

---

[14] Prior to the situation involving Juror 523, the trial court dismissed two other alternate jurors.

[15] With respect to the jury instructions and the verdict form, the trial court followed the procedure set forth in 21 U.S.C. § 848(k).  In 2006, Congress repealed that provision and several other provisions, that is, subsections (g)-(r), of 21 U.S.C. § 848.  So, the Federal Death Penalty Act, 18 U.S.C. §§ 3591-99, is "[the only statutory scheme] applicable to all federal death-eligible offenses."  *See United States v. Honken*, 541 F.3d 1146, 1165 n.17 (8th Cir. 2008) (quoting *United States v. Barrett*, 496 F.3d 1079, 1106
(continued…)

25

aggravating factor" that the movant intentionally killed the victim identified in the count under consideration. *See* 21 U.S.C. § 848(n)(1)(A) (repealed 2006).[16] In Step 2, the jury found that the government had proved all of the "statutory aggravating factors" alleged, with the exception that the jury did not find that the movant committed the killings of the children, Kandi Duncan and Amber Duncan, after substantial planning and premeditation.[17] In Step 3, the jury found that the government had proved all of the "non-statutory aggravating factors" that it asserted.[18] In Step 4, at least one juror found each of the fifteen "mitigating factors" that the movant asserted, but not a single juror found any

---

[15](…continued)
(10th Cir. 2007)) (alteration in original) (internal quotation mark omitted).

[16] The only other "eligibility aggravating factor" submitted to the jury was whether the movant "intentionally engaged in conduct intending that the victim in question be killed or that lethal force be employed against the victim, which resulted in the death of the victim." 21 U.S.C. § 848(n)(1)(C) (repealed 2006).

[17] With respect to the three "statutory aggravating factors" asserted by the government, the jury made several findings. Specifically, as to the killings of the three adults, the jury found that the movant committed the offenses in question after substantial planning and premeditation, *see* 21 U.S.C. § 848(n)(8) (repealed 2006), but did not so find as to the killings of the two children. As to the three adult victims, the only ones as to whom this aggravating factor was asserted, the jury found that the movant committed the offenses in question in an especially heinous, cruel or depraved manner, with a specific finding that the offenses involved both torture and serious physical abuse, *see* 21 U.S.C. § 848(n)(12) (repealed 2006). And, as to the children, the only victims as to whom this aggravating factor was asserted, the jury found that the victims were particularly vulnerable due to their young age, *see* 21 U.S.C. § 848(n)(9) (repealed 2006).

[18] As to the four "non-statutory aggravating factors" asserted by the government, the jury found that the movant would be a danger in the future to the lives and safety of other persons; that the movant obstructed justice by preventing the victims from providing testimony or information to law enforcement officers or by retaliating against the victims for cooperating with authorities; that the movant intentionally killed more than one person in a single criminal episode, a factor not asserted as to the killing of Terry DeGeus; and that the effect of the crimes upon the victims' families was injurious.

26

"residual or lingering doubts as to the movant's guilt or innocence or his role in the offense, even though those doubts did not rise to the level of 'reasonable doubts' during the 'merits phase' of the trial."[19] Finally, in Step 5, the jury weighed all of the pertinent factors and determined the sentences on each of the ten capital counts.

---

[19] As to all ten capital counts, twelve jurors found that the movant does not have a history of significant criminal convictions prior to the offenses at issue here; twelve jurors found that the movant does not have a history of violent or assaultive behavior prior to the offenses at issue here; nine jurors found that the movant loves his son, Ryan Honken; seven jurors found that the movant is loved by his son, Ryan Honken, and that the execution of the movant would cause his innocent son extraordinary emotional harm; nine jurors found that the movant loves his daughter, Marvea Honken; seven jurors found that the movant is loved by his daughter, Marvea Honken, and that the execution of the movant would cause his innocent daughter extraordinary emotional harm; nine jurors found that the movant loves Kathy Rick's son, Brandon Rick, and has always treated Brandon Rick as if he were his biological son; seven jurors found that the movant is loved by Kathy Rick's son, Brandon Rick, and that the execution of the movant would cause Kathy Rick's son, Brandon Rick, extraordinary emotional harm; nine jurors found that the movant is loved by his mother and stepfather, Marvea Honken/Smidt and Ron Smidt, and that the execution of the movant would cause them extraordinary emotional harm; ten jurors found that the movant is loved by his sister, Alyssa Nelson, and that the execution of the movant would cause his sister, Alyssa Nelson, extraordinary emotional harm; one juror found that the movant's father, Jim Honken, was an alcoholic convict who was proud of his criminal lifestyle and who bragged to his sons about his crimes; one juror found that, as an infant, the movant did not experience normal parental love and nurturing because his mother, Marvea Honken/Smidt, was depressed and unhappy in her marriage to Jim Honken, Jim Honken worked out of town Monday through Friday and Jim Honken was usually intoxicated all weekend; three jurors found that the movant's father, Jim Honken, never participated in caring for the movant by holding him, feeding him or changing his diapers and never played ball with him or participated in any one-on-one father-son activities with him; twelve jurors found that the movant's natural parents, Jim Honken and Marvea Honken/Smidt, were divorced when the movant was only eight years old, and the movant had only sporadic contact with Jim Honken between the ages of eight and fifteen; and twelve jurors found that, since being incarcerated in the Federal Bureau of Prisons, the movant has generally been a well-behaved inmate, in that he has received only three citations for disciplinary infractions in over seven years (two for possession of a homemade alcoholic beverage and one for fighting without serious injury).

27

### 7. *Post-trial rulings and judgment*

Post-trial, the movant filed a motion for judgment of acquittal or, in the alternative, for a new trial pursuant to Federal Rules of Criminal Procedure 29(c) and 33 (criminal docket nos. 578, 634). The government filed a resistance (criminal docket no. 642). The movant filed a reply (criminal docket no. 664) and a supplemental reply (criminal docket no. 690). On July 29, 2005, the trial court denied the movant's motion for judgment of acquittal or, in the alternative, for a new trial (criminal docket nos. 693, 695). *See generally United States v. Honken*, 381 F. Supp. 2d 936 (N.D. Iowa 2005). Before doing so, the trial court addressed multiple claims, including, but not limited to, the following: prohibition against being put in jeopardy twice, recusal, security measures, anonymous jury, striking or failing to strike jurors for cause, admissibility of certain evidence, limitation on cross-examination, testimony that related to drug activity that occurred prior to the first year the government charged for the instant offenses, correctness of jury instructions, jury's findings as to conspiracy murder and CCE murder, jury taint and inquiries put to jurors.

On September 20, 2005, a United States probation officer amended and finalized a pre-sentence investigation report regarding the movant (criminal docket no. 710), which the trial court adopted without change. On October 11, 2005, the trial court imposed sentences of death for the murders of Kandi Duncan and Amber Duncan, life imprisonment for the murders of Gregory Nicholson, Lori Duncan and Terry DeGeus and terms of imprisonment for the remaining counts (criminal docket no. 702).

28

## 8. *Direct appeal*[20]

The movant appealed his convictions and sentences (criminal docket nos. 704, 706). During appellate proceedings, the movant desired a complete record of all proceedings (criminal docket nos. 748, 749, 754, 755, 756, 759). *See United States v. Honken*, 477 F. Supp. 2d 1004 (N.D. Iowa 2007) (addressing request regarding the record for appellate purposes). In response to the movant's requests to clarify the record, the government filed a response (criminal docket no. 757). Pursuant to Federal Rule of Appellate Procedure 10(c), the trial court settled and approved the record for appellate purposes (criminal docket nos. 758, 760, 764).

On September 12, 2008, the Eighth Circuit Court of Appeals affirmed the convictions and sentences, including the four sentences of death for the children on the conspiracy murder counts and CCE murder counts. *See Honken*, 541 F.3d at 1175. Before affirming the trial court's judgment in all respects, the Eighth Circuit Court of Appeals addressed eleven claims of error: (1) the trial court erroneously permitted the movant to be put in jeopardy twice because (a) the government indicted the movant on multiplicitous counts and (b) the government charged the movant with conspiracy murder and CCE murder after it had obtained a conviction for conspiring to manufacture and distribute methamphetamine and a conviction for attempting to manufacture and distribute methamphetamine in the 1996 case; (2) the trial court erred by admitting the maps drawn by Angela Johnson because they violated the movant's constitutional right to confront the witness against him, constituted inadmissible hearsay and had no probative value; (3) the

---

[20] On direct appeal, Jean deSalcs Barrett, Gary Eugene Brotherton and Monica Foster represented the movant. Assistant United States Attorney Charles J. Williams and Iowa Attorney General Thomas J. Miller represented the government. Like the use of "trial counsel" to describe one or more of the attorneys who represented the movant at the trial level, the use of "appellate counsel" may refer to the representation of one or more of the attorneys who represented the movant in appellate proceedings.

29

trial court erred when it restrained the movant during trial; (4) the trial court erred when it replaced Juror 523 with an alternate juror during the penalty phase; (5) the trial court erroneously let stand the guilty verdicts because the comments made by Juror 523's boss occurred prior to the merits phase deliberations; (6) the trial court erred by failing to instruct the jury that it had to find unanimously the identity of the five persons that the movant directed as part of the continuing criminal enterprise; (7) the trial court erred when it instructed the jury to weigh the movant's intent as an aggravating factor because such intent was properly considered only as a threshold or gateway factor; (8) the trial court erroneously denied the movant's motion to allocute before or give a statement to the jury during the penalty phase without being subject to cross-examination; (9) the government's penalty phase closing argument misled the jurors and violated the movant's Eighth Amendment rights; (10) the death penalty is unconstitutional based on the possibility that innocent people may be executed; and (11) the penalty provisions of the Anti-Drug Abuse Act (ADAA), 21 U.S.C. § 848(e)–(r) (repealed, in part, 2006), are unconstitutional because they do not explicitly authorize the government to submit aggravating factors to the grand jury.[21]  The movant sought rehearing en banc and rehearing by the panel, but the Eighth Circuit Court of Appeals denied the movant's petition for rehearing (criminal docket no. 779) on January 7, 2009.  The movant filed a petition for a writ of certiorari (criminal docket no. 782), which the Supreme Court denied on December 14, 2009.  *See Honken v. United States*, 558 U.S. 1091 (2009).

---

[21] With regard to the last error, the movant argued that, rather than comport with the Sixth Amendment's requirement that aggravating factors be presented to the grand jury and charged in the indictment, the ADAA impermissibly grants the authority to allege aggravating factors exclusively to the government.  The movant also argued that, because the ADAA contemplates the government will file a separate notice of statutory aggravating factors, the government is prohibited from submitting aggravating factors to the grand jury and including them in an indictment.

30

### B. Proceedings Related to Civil Action Under 28 U.S.C. § 2255

Prior to receiving a decision from the Supreme Court with respect to the movant's petition for a writ of certiorari, appellate counsel filed a motion for appointment of new counsel to pursue any and all available post-conviction remedies (criminal docket no. 783). Pursuant to 18 U.S.C. § 3599(a)(2), appellate counsel asked the trial court to appoint Jon M. Sands, the Federal Public Defender for the District of Arizona, to represent the movant. On September 16, 2009, the trial court appointed Jon M. Sands as counsel to pursue relief under 28 U.S.C. § 2255 (criminal docket no. 784). Consistent with the trial court's order regarding appointment of counsel, several attorneys from the Capital Habeas Corpus Unit of the Federal Public Defender for the District of Arizona, that is, Jon M. Sands, Jaleh Najafi, Robin C. Konrad and Timothy M. Gabrielsen, appeared on behalf of the movant. On December 30, 2009, the trial court directed the parties to consult and to file a joint proposed scheduling order for the disposition of an anticipated civil action under 28 U.S.C. § 2255 (criminal docket no. 786).

On May 20, 2010, counsel filed a motion to withdraw due to a conflict of interest (criminal docket no. 788). On the same date, the trial court granted counsel's motion to withdraw (criminal docket no. 789). On May 25, 2010, Michael Wiseman, the Chief of the Capital Habeas Corpus Unit of the Federal Public Defender for the Eastern District of Pennsylvania, filed a motion to be appointed as replacement counsel for the movant (criminal docket no. 790). On the same date, the trial court granted such motion and appointed Michael Wiseman to represent the movant (criminal docket no. 791). Consistent with the trial court's order regarding appointment of counsel, several attorneys from the Capital Habeas Corpus Unit of the Federal Public Defender for the Eastern District of Pennsylvania, that is, Shawn Nolan, Timothy Patrick Kane, Aren Adjoian, Ayanna Sala

31

Williams and Michael Wiseman,[22] appeared on behalf of the movant. The movant is still represented by several attorneys from the Capital Habeas Corpus Unit of the Federal Public Defender for the Eastern District of Pennsylvania.

On November 29, 2010, the movant filed a motion to extend the time that he had to investigate his grounds for relief and to add grounds and to extend the time for the parties to submit their joint proposed scheduling order (criminal docket no. 796). The government did not oppose such motion. On November 30, 2010, the trial court set December 14, 2010, as the date that the movant must file a motion under 28 U.S.C. § 2255, set a deadline for the parties to establish a briefing schedule and set October 31, 2011, as the date for the movant's evidentiary hearing (criminal docket no. 797). The trial court also permitted the movant to file any amendments and supporting documents, exhibits or other evidence on or before June 1, 2011.

On December 14, 2010, the movant filed his motion for relief pursuant to 28 U.S.C. § 2255 or, in the alternative, 28 U.S.C. § 2241 (civil docket no. 1).[23] In it, the movant contends that his convictions and sentences violate his rights under the Fifth Amendment, Sixth Amendment and Eighth Amendment of the United States Constitution. In support of his contention that his convictions and sentences deprived him of his right to effective assistance of counsel, right to due process of law and right to be free from cruel and unusual punishment, the movant specified twenty-one grounds for relief and set forth facts supporting each ground. Consistent with Rule 2 of the Rules Governing Section 2255 Proceedings, the movant did not include legal arguments or citations in his motion for

---

[22] On September 9, 2011, Michael Wiseman notified the court that he no longer represented the movant.

[23] Originally, the movant filed his motion for relief (criminal docket no. 798), which is dated December 13, 2010, and related filings (criminal docket nos. 783, 785, 788, 790, 792, 793, 796, 799) in his underlying criminal case. The movant, however, subsequently filed them in the civil case.

32

relief. On December 14, 2010, the trial court informed the parties that it had reviewed the movant's motion for relief, and it directed the government to file an answer pursuant to Rule 5 of the Rules Governing Section 2255 Proceedings (civil docket no. 2).

On December 15, 2010, the trial court reassigned the civil case to the undersigned (civil docket no. 3). On December 27, 2010, the movant filed a motion for reconsideration of the trial court's reassignment order and for a statement of reasons (civil docket no. 6). On January 3, 2011, the trial court concluded that no grounds to withdraw the reassignment of the civil case to the undersigned existed, and, therefore, the trial court denied such motion (civil docket no. 7). Although the movant sought a writ of mandamus with respect to who should preside over this matter, the Eighth Circuit Court of Appeals and the Supreme Court declined to vacate the reassignment order and to direct the trial court to preside over the civil proceedings.

On January 5, 2011, the government filed its answer (civil docket no. 8). In such answer, the government generally asserted that no constitutional error occurred, none of the grounds for relief establish a fundamental defect that inherently results in a complete miscarriage of justice and the court lacks jurisdiction to consider the manner in which the sentence of death should be carried out. On the same date, the parties submitted their joint scheduling order (civil docket no. 9). Such order established deadlines for, among other things, discovery, the movant's amendments to the motion for relief, the government's amended answer, the movant's reply to the government's amended answer, disclosure of expert witnesses, the movant's pre-hearing brief, exchange of witness lists and exhibits, the government's pre-hearing brief, evidentiary hearing and post-hearing briefs. Thereafter, upon the parties' joint motions, the court amended the deadlines to accommodate their needs and desires (civil docket nos. 13, 14, 15, 16, 17, 18).

The movant elected not to amend the motion for relief. Consequently, the government never filed an amended answer, and the movant never filed a reply to the

33

government's amended answer. Rather than file an amended motion, the movant elected to brief the twenty-one grounds that he included in his original motion for relief. On June 6, 2011, the movant filed his brief and eighty-six exhibits (civil docket no. 19) in support of his motion for relief. On July 14, 2011, the government filed a resistance and eleven exhibits (civil docket no. 22). On August 5, 2011, the movant filed a reply (civil docket no. 29) to the government's resistance to his motion for relief.

On July 18, 2011, the government sought to have the movant examined by its own mental health experts without certain conditions that the movant deemed necessary (civil docket no. 27). On July 19, 2011, the movant filed a resistance and several exhibits (civil docket no. 28) in response to the government's request. The court granted the government's motion for a court order regarding its requested mental health evaluation of the movant (civil docket no. 35).

On its own and pursuant to the parties' requests, the court addressed additional scheduling, briefing and hearing matters (civil docket nos. 30, 31, 33, 38, 39, 40). It also dismissed the movant's cumulative error ground and the manner of execution ground (civil docket no. 39).

On August 15, 2011, the movant filed a motion for discovery (civil docket no. 32). On August 24, 2011, the government filed a resistance to the request for discovery (civil docket no. 34). On August 30, 2011, the movant filed a reply (civil docket no. 36). On September 28, 2011, the court denied the movant's motion for discovery (civil docket no. 41). On October 6, 2011, the movant availed himself of the additional opportunity to request appropriate discovery that the court afforded him by filing a renewed motion for discovery (civil docket no. 46). On October 13, 2011, the government filed a resistance (civil docket no. 49). On October 27, 2011, the court denied the movant's renewed motion for discovery (civil docket no. 63).

34

The court held an evidentiary hearing from October 31, 2011, to November 3, 2011, during which it heard the testimony of sixteen witnesses, thirteen of whom were called by the movant. In addition, the parties introduced 151 exhibits, eighteen of which were offered by the government, the depositions of six witnesses (civil docket nos. 67, 68, 69, 70, 71, 72) and a stipulation (civil docket no. 75). The movant made clear that he did not desire to appear at the evidentiary hearing or participate through other means. He also opted not to testify on his own behalf.

After the evidentiary hearing, the court permitted the parties to submit additional briefs and extended the deadlines for doing so (civil docket nos. 76, 88, 89, 90, 91, 94, 95, 96, 97). On January 24, 2012, the movant filed a post-hearing brief (civil docket no. 92). On February 21, 2012, the government filed a post-hearing brief opposing any grant of relief (civil docket no. 93). And, on March 26, 2012, the movant filed a reply brief (civil docket no. 98).

Oral argument on the post-hearing briefs and evidentiary hearing was contemplated by the scheduling order. Nevertheless, the parties elected to rely on their briefing. In light of the record, the court agrees with the parties that oral argument is not necessary.

## III. STANDARDS APPLICABLE TO CLAIMS UNDER 28 U.S.C. § 2255

### A. Remedies on Motion Attacking Federal Sentence

A prisoner in custody under sentence of a federal court is able to move the sentencing court to vacate, set aside or correct a sentence. *See* 28 U.S.C. § 2255(a). To obtain relief pursuant to 28 U.S.C. § 2255, a federal prisoner must establish: (1) "that the sentence was imposed in violation of the Constitution or laws of the United States"; (2) "that the court was without jurisdiction to impose such sentence"; (3) "that the sentence was in excess of the maximum authorized by law"; or (4) "[that the judgment or sentence] is otherwise subject to collateral attack." *Id.*; *see also Hill v. United States*, 368 U.S. 424, 426-27 (1962) (listing four grounds upon which relief under 28 U.S.C. § 2255 may be

35

claimed); *Watson v. United States*, 493 F.3d 960, 963 (8th Cir. 2007) (same); *Lee v. United States*, 501 F.2d 494, 499-500 (8th Cir. 1974) (clarifying that subject matter jurisdiction exists over enumerated grounds within the statute); Rule 1 of the Rules Governing Section 2255 Proceedings (specifying scope of 28 U.S.C. § 2255). If any one of the four grounds is established, the court is required "to vacate and set aside the judgment and [it is required to] discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate." 28 U.S.C. § 2255(b).

When enacting 28 U.S.C. § 2255, Congress "intended to afford federal prisoners a remedy identical in scope to federal habeas corpus." *Sun Bear v. United States*, 644 F.3d 700, 704 (8th Cir. 2011) (en banc) (quoting *Davis v. United States*, 417 U.S. 333, 343 (1974)) (internal quotation mark omitted). Although it appears to be broad, 28 U.S.C. § 2255 does not provide a remedy for "all claimed errors in conviction and sentencing." *Id*. (quoting *United States v. Addonizio*, 442 U.S. 178, 185 (1979)). Rather, 28 U.S.C. § 2255 is intended to redress constitutional and jurisdictional errors and, apart from those errors, only "fundamental defect[s] which inherently [result] in a complete miscarriage of justice" and "omission[s] inconsistent with the rudimentary demands of fair procedure." *Hill*, 368 U.S. at 428; *see also Sun Bear*, 644 F.3d at 704 (clarifying that the scope of 28 U.S.C. § 2255 is severely limited and quoting *Hill*, 368 U.S. at 428); *United States v. Apfel*, 97 F.3d 1074, 1076 (8th Cir. 1996) ("Relief under 28 U.S.C. § 2255 is reserved for transgressions of constitutional rights and for a narrow range of injuries that could not have been raised for the first time on direct appeal and, if uncorrected, would result in a complete miscarriage of justice." (citing *Poor Thunder v. United States*, 810 F.2d 817, 821 (8th Cir. 1987))). A collateral challenge under 28 U.S.C. § 2255 is not interchangeable or substitutable for a direct appeal. *See United States v. Frady*, 456 U.S. 152, 165 (1982) (making clear that a motion pursuant to 28 U.S.C. § 2255 will not be allowed to do service for an appeal). Consequently, "an error that may justify reversal on

36

direct appeal will not necessarily support a collateral attack on a final judgment." *Id.* (quoting *Addonizio*, 442 U.S. at 184).

In addition, it is well-settled that "[i]ssues raised and decided on direct appeal cannot ordinarily be relitigated in a collateral proceeding based on 28 U.S.C. § 2255." *United States v. Wiley*, 245 F.3d 750, 751 (8th Cir. 2001) (citing *United States v. McGee*, 201 F.3d 1022, 1023 (8th Cir. 2000)); *see also Lefkowitz v. United States*, 446 F.3d 788, 790-91 (8th Cir. 2006) (concluding that the same issues that have been raised in a new trial motion and decided by the district court cannot be reconsidered in a subsequent collateral attack); *Bear Stops v. United States*, 339 F.3d 777, 780 (8th Cir. 2003) ("'It is well-settled that claims which were raised and decided on direct appeal cannot be relitigated on a motion to vacate pursuant to 28 U.S.C. § 2255.'" (quoting *United States v. Shabazz*, 657 F.2d 189, 190 (8th Cir. 1981))); *Dall v. United States*, 957 F.2d 571, 572-73 (8th Cir. 1992) (per curiam) (concluding that claims already addressed on direct appeal could not be raised); *United States v. Kraemer*, 810 F.2d 173, 177 (8th Cir. 1987) (concluding that a movant could not "raise the same issues . . . that have been decided on direct appeal or in a new trial motion"); *Butler v. United States*, 340 F.2d 63, 64 (8th Cir. 1965) (concluding that a movant was not entitled to another review of his question). With respect to a claim that has already been conclusively resolved on direct appeal, the court may only consider the same claim in a collateral action if "convincing new evidence of actual innocence" exists. *Wiley*, 245 F.3d at 752 (citing cases and emphasizing the narrowness of the exception).

Further, movants ordinarily are precluded from asserting claims that they failed to raise on direct appeal. *See McNeal v. United States*, 249 F.3d 747, 749 (8th Cir. 2001); *see also Ramey v. United States*, 8 F.3d 1313, 1314 (8th Cir. 1993) (per curiam) (citing *Frady*, 456 U.S. at 167-68, for the proposition that a movant is not able to rely on 28 U.S.C. § 2255 to correct errors that could have been raised at trial or on direct appeal);

37

*United States v. Samuelson*, 722 F.2d 425, 427 (8th Cir. 1983) (concluding that a collateral proceeding is not a substitute for a direct appeal and refusing to consider matters that could have been raised on direct appeal). "A [movant] who has procedurally defaulted a claim by failing to raise it on direct review may raise the claim in a [28 U.S.C. §] 2255 proceeding only by demonstrating cause for the default and prejudice or actual innocence." *McNeal*, 249 F.3d at 749 (citing *Bousley v. United States*, 523 U.S. 614, 622 (1998)); *see also Massaro v. United States*, 538 U.S. 500, 504 (2003) ("[T]he general rule [is] that claims not raised on direct appeal may not be raised on collateral review unless the [movant] shows cause and prejudice."). "'[C]ause' under the cause and prejudice test must be something *external* to the [movant], something that cannot be fairly attributed to him." *Coleman v. Thompson*, 501 U.S. 722, 753 (1991). If a movant fails to show cause, a court need not consider whether actual prejudice exists. *McCleskey v. Zant*, 499 U.S. 467, 501 (1991). Actual innocence under the actual innocence test "means factual innocence, not mere legal insufficiency." *Bousley*, 523 U.S. at 623-24; *see also McNeal*, 249 F.3d at 749 ("[A movant] must show factual innocence, not simply legal insufficiency of evidence to support a conviction."). To establish actual innocence, a movant "must demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." *Bousley*, 523 U.S. at 623 (citation omitted) (internal quotation marks omitted).[24]

### B.  Heightened Scrutiny in Capital Case

It is axiomatic that the death penalty is profoundly different from all other penalties and such difference is largely owed to its severity and total irrevocability. *See Monge v.*

---

[24] The procedural default rule applies to a conviction obtained through trial or through the entry of a guilty plea. *See, e.g.*, *Matthews v. United States*, 114 F.3d 112, 113 (8th Cir. 1997); *Thomas v. United States*, 112 F.3d 365, 366 (8th Cir. 1997); *Reid v. United States*, 976 F.2d 446, 448 (8th Cir. 1992).

38

*California*, 524 U.S. 721, 732 (1998). Consequently, there is a "heightened 'need for reliability in the determination that death is the appropriate punishment in a specific case.'" *Caldwell v. Mississippi*, 472 U.S. 320, 323 (1985) (quoting *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (plurality opinion)); *see also Monge*, 524 U.S. at 732 (recognizing that there is "an acute need for reliability in capital sentencing proceedings"). To achieve reliability in a capital case, the court must "search for constitutional error with painstaking care." *Burger v. Kemp*, 483 U.S. 776, 785 (1987); *see also Kyles v. Whitley*, 514 U.S. 419, 422 (1995) (quoting *Burger*, 483 U.S. at 785); *Strickland v. Washington*, 466 U.S. 668, 704 (1984) (Brennan, J., concurring in part and dissenting in part) (requiring that "capital proceedings be policed at all stages by an especially vigilant concern for procedural fairness and for the accuracy of factfinding"); *Smith v. Mullin*, 379 F.3d 919, 939 (10th Cir. 2004) (observing that, although the same constitutional principles guide a court's examination of counsel's performance during the guilt phase and sentencing phase, particular vigilance or heightened attention is necessary when scrutinizing the effective assistance of counsel during a proceeding where the defendant faces a sentence of death).

### C. Ineffective Assistance of Counsel Under the United States Constitution

#### 1. Overview

The Sixth Amendment of the United States Constitution provides, in pertinent part, that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his [or her] defen[s]e." U.S. Const. amend. VI. Under the United States Constitution, an accused person is afforded counsel at trial and on direct appeal. *Evitts v. Lucey*, 469 U.S. 387, 393-96 (1985); *Douglas v. California*, 372 U.S. 353, 356-57 (1963); *Steele v. United States*, 518 F.3d 986, 988 (8th Cir. 2008); *Bear Stops*, 339 F.3d at 780. The constitutional right to effective assistance of counsel is clearly established. *See Strickland*, 466 U.S. at 687-94 (setting forth applicable standards); *see*

39

*also Williams v. Taylor*, 529 U.S. 362, 391 (2000) (observing that the right to effective counsel had not just been recognized and reasserting that the *Strickland* standard must be applied when determining whether a defendant received effective assistance); *King v. United States*, 595 F.3d 844, 852 (8th Cir. 2010) (making clear that, if a defendant is not afforded effective assistance of counsel as is guaranteed by the Sixth Amendment, the sentence violates the United States Constitution and relief is available).

"'[T]he purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation . . . [but] simply to ensure that criminal defendants receive a fair trial.'" *Cullen v. Pinholster*, ___ U.S. ___, ___, 131 S. Ct. 1388, 1403 (2011) (quoting *Strickland*, 466 U.S. at 689). So, "'[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so *undermined* the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.'" *Id.* (quoting *Strickland*, 466 U.S. at 686). A constitutional violation of the right to counsel has two components:

> First, [a movant] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [movant] by the Sixth Amendment. Second, [a movant] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [movant] of a fair trial, a trial whose result is reliable.

*Strickland*, 466 U.S. at 687; *see also Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) (reaffirming that "a defendant must show both deficient performance and prejudice in order to prove that he has received ineffective assistance of counsel"); *Kimmelman v. Morrison*, 477 U.S. 365, 381-82 (1986) (emphasizing that *Strickland*'s standard is rigorous and highly demanding).

40

"'Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.'" *Gianakos v. United States*, 560 F.3d 817, 821 (8th Cir. 2009) (quoting *Strickland*, 466 U.S. at 687). Because both components must be met to obtain relief, it necessarily follows that "a court deciding an ineffective assistance claim [need not] address both components of the inquiry if the [movant] makes an insufficient showing on one." *Strickland*, 466 U.S. at 697. "If it is easier to dispose of an ineffectiveness claim on grounds of lack of sufficient prejudice, . . . that course should be followed." *Id.*; *see also United States v. Walker*, 324 F.3d 1032, 1040 (8th Cir. 2003) (addressing only alleged deficiencies by counsel and declining to consider the issue of prejudice) (citing *Brown v. United States*, 311 F.3d 875, 878 (8th Cir. 2002)); *Hoon v. Iowa*, 313 F.3d 1058, 1061 (8th Cir. 2002) ("We need not inquire into the effectiveness of counsel, however, if we determine that no prejudice resulted from counsel's alleged deficiencies."); *Apfel*, 97 F.3d at 1076 ("[A court] need not address the reasonableness of the attorney's behavior if the movant cannot prove prejudice.").

### 2. *Deficient performance*

To establish that counsel's performance was deficient, a movant "must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. Although representation of an accused person includes basic duties such as advocating the accused's cause, consulting with the accused on important decisions, keeping the accused informed of important developments in the course of the prosecution and bringing to bear such skill and knowledge as will render the trial a reliable adversarial testing process, such duties do not "exhaustively define the obligations of counsel." *Id*. When assessing an attorney's performance, several well-established principles guide the court's analysis:

41

(1) All of the circumstances must be considered. *Id.* at 688-91; *see also Pinholster*, ___ U.S. at ___, 131 S. Ct. at 1403 (requiring the defendant to show that counsel failed to act "reasonabl[y] considering all the circumstances" (quoting *Strickland*, 466 U.S. at 688)); *Bell v. Cone*, 535 U.S. 685, 698 (2002) (reiterating that "'every effort [must] be made . . . to reconstruct the circumstances of counsel's challenged conduct'" (quoting *Strickland*, 466 U.S. at 689)).

(2) Professional norms prevailing when the representation took place serve as useful guides. *Strickland*, 466 U.S. at 688-89; *see also Bobby v. Van Hook*, 558 U.S. 4, 8 (2009) (reiterating that the ABA standards are only guides as to what reasonableness means, not its definition, and observing that the United States Constitution requires only that counsel make objectively reasonable choices); *accord Missouri v. Frye*, 566 U.S. ___, ___, 132 S. Ct. 1399, 1408 (2012) (stating that the codified standards of professional practice serve as important guides when determining whether counsel made objectively reasonable choices).

(3) "[S]crutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689; *see also Bell*, 535 U.S. at 698 (reiterating that "'[j]udicial scrutiny of a counsel's performance must be highly deferential'" (quoting *Strickland*, 466 U.S. at 689)).

(4) "[E]very effort [should] be made to eliminate the distorting effects of hindsight . . . ." *Strickland*, 466 U.S. at 689; *see also Bell*, 535 U.S. at 698 (reiterating that "'every effort [must] be made to eliminate the distorting effects of hindsight'" (quoting *Strickland*, 466 U.S. at 689)).

(5) "[T]he reasonableness of counsel's challenged conduct [must be judged] on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690; *see also Rompilla v. Beard*, 545 U.S. 374, 381 (2005) (emphasizing that

42

"hindsight is discounted by pegging adequacy to 'counsel's perspective at the time' investigative decisions are made" (quoting *Strickland*, 466 U.S. at 689)); *Bell*, 535 U.S. at 698 (reiterating that "'every effort [must] be made . . . to evaluate the conduct from counsel's perspective at the time'" (quoting *Strickland*, 466 U.S. at 689)); *King*, 595 F.3d at 852-53 (quoting *Ruff v. Armontrout*, 77 F.3d 265, 268 (8th Cir. 1996).

(6)    "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690; *see also Pinholster*, ___ U.S. at ___, 131 S. Ct. at 1403 (quoting *Strickland*, 466 U.S. at 689)); *United States v. Rice*, 449 F.3d 887, 897 (8th Cir. 2006) (operating on the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" (quoting *Strickland*, 466 U.S. at 689)); *Johnson v. United States*, 278 F.3d 839, 842 (8th Cir. 2002) (same); *United States v. Taylor*, 258 F.3d 815, 818 (8th Cir. 2001) (same).

(7)    "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[] and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91; *see also United States v. Orr*, 636 F.3d 944, 952 (8th Cir. 2011) (quoting *Strickland*, 466 U.S. at 690-91); *Rice*, 449 F.3d at 897 (same).   But, "a cursory investigation [does not] automatically [justify] a tactical decision . . . .   Rather, a reviewing court must consider the reasonableness of the investigation said to support that strategy." *Wiggins v. Smith*, 539 U.S. 510, 527 (2003); *see also Francis v. Miller*, 557 F.3d 894, 901 (8th Cir. 2009) ("[T]he strength of the general presumption that counsel engaged in sound trial strategy 'turns on the adequacy

43

of counsel's investigation.'" (quoting *White v. Roper*, 416 F.3d 728, 732 (8th Cir. 2005))); *Armstrong v. Kemna*, 534 F.3d 857, 864-65 (8th Cir. 2008) (clarifying that "strategic choices 'resulting from lack of diligence in preparation and investigation [are] not protected by the presumption in favor of counsel.'" (quoting *Kenley v. Armontrout*, 937 F.2d 1298, 1304 (8th Cir. 1991))).

(8)     "[A] heavy measure of deference to counsel's judgments [concerning what to investigate and what not to investigate must be applied]." *Strickland*, 466 U.S. at 691; *see also Rompilla*, 545 U.S. at 381 (reiterating that "'heavy measure of deference to counsel's judgment'" is required (quoting *Strickland*, 466 U.S. at 691)); *Sanders v. Trickey*, 875 F.2d 205, 209-10 (8th Cir. 1989) (making clear that broad latitude to make strategic and tactical choices regarding the appropriate action to take or refrain from taking is afforded when acting in a representative capacity).

(9)     The reasonableness of counsel's actions should be assessed in light of the defendant's own statements or actions and the informed strategic choices made by the defendant and the information supplied by the defendant. *Strickland*, 466 U.S. at 691.

### 3.     *Prejudice*

As previously noted, a convicted defendant making a claim of ineffective assistance must prove that he suffered prejudice as a result of counsel's deficient performance.  *See Pinholster*, ___ U.S. at ___, 131 S. Ct. at 1403 (citing *Strickland*, 466 U.S. at 691-92); *cf. King*, 595 F.3d at 852-53 (stating that, even if it can be shown that counsel's error prejudiced the movant's defense, relief is not available unless counsel's error was professionally unreasonable at the time).  To establish prejudice, "[i]t is not enough for [a movant] to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693.  Rather, a movant "must show that there is a

44

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Pinholster*, ___ U.S. at ___, 131 S. Ct. at 1403 (emphasizing that there must be "a 'substantial,' not just 'conceivable,' likelihood of a different result" (quoting *Harrington v. Richter*, ___ U.S. ___, ___, 131 S. Ct. 770, 791 (2011))); *Gianakos*, 560 F.3d at 821 ("'An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.'" (quoting *Strickland*, 466 U.S. at 691)); *United States v. Millard*, 235 F.3d 1119, 1121 (8th Cir. 2000) (noting that the burden to show prejudice for purposes of an ineffective assistance of counsel claim is slightly lower than the burden to show plain error, that is, an error affected the outcome of the proceedings).

Further, the court's prejudice inquiry differs to some extent if the court is examining errors that pertain to the defendant's conviction for a capital offense or errors that pertain to the imposition of a death sentence. *Strickland*, 466 U.S. at 695.

> When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt. When a defendant challenges a death sentence . . ., the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent [that] it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.

*Id.*; *see also Wiggins*, 539 U.S. at 537 (articulating that, if "there is a reasonable probability that at least one juror would have struck a different balance [when considering whether the mitigating evidence outweighs the aggravating evidence], the death penalty

45

cannot be imposed"). And, when deciding whether there is sufficient prejudice, the court must be mindful of the following:

> [A] court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

*Strickland*, 466 U.S. at 695-96.

### 4. *Appellate counsel*

Due process as guaranteed by the Fifth Amendment of the United States Constitution requires that an individual receive effective assistance of counsel during his or her first appeal. *Steele*, 518 F.3d at 988. A claim that asserts ineffective assistance of appellate counsel also requires proof of deficient performance and prejudice. *United States v. Brown*, 528 F.3d 1030, 1032-33 (8th Cir. 2008). And, the Eighth Circuit Court of Appeals emphasizes that demanding standards are applied when the ineffectiveness of appellate counsel is being challenged:

> The deficient performance standard is rigorous. "Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal." *Jones v. Barnes*, 463 U.S. 745, 751, 103 S. Ct. 3308, 77 L. Ed. 2d 987 (1983). Therefore, absent contrary evidence, "we assume that appellate counsel's failure to raise a claim was an exercise of sound appellate strategy." *Roe v. Delo*,

46

160 F.3d 416, 418 (8th Cir. 1998) (quotation omitted).  The
prejudice standard is equally rigorous.  [The movant] must
show that "the result of the proceeding would have been
different" had he raised the [specified] issue on direct appeal.
*Becht v. United States*, 403 F.3d 541, 546 (8th Cir. 2005),
*cert. denied*, 546 U.S. 1177, 126 S. Ct. 1346, 164 L. Ed. 2d
59 (2006).

*Id*. at 1033.

### 5.    *Summary*

In *Strickland*, the Supreme Court pointed out that "[t]here are countless ways to
provide effective assistance in any given case [and that] [e]ven the best criminal defense
attorneys would not defend a particular client in the same way."  466 U.S. at 689.  And,
just recently, the Supreme Court reiterated the deficient performance standard and
prejudice standard as set forth in *Strickland*, and it then observed the following:

"Surmounting *Strickland*'s high bar is never an easy
task."  *Padilla v. Kentucky*, 559 U.S. ___, ___, 130 S. Ct.
1473, 1485 . . . (2010).  . . . [T]he *Strickland* standard must
be applied with scrupulous care, lest 'intrusive post-trial
inquiry' threaten the integrity of the very adversary process the
right to counsel is meant to serve.  *Strickland*, [466 U.S. at
689-90].    .  .  .  [T]he  standard  for  judging  counsel's
representation is a most deferential one.  Unlike a later
reviewing  court,  the  attorney  observed  the  relevant
proceedings,  knew of materials outside the record, and
interacted with the client, with opposing counsel, and with the
judge.  It is "all too tempting" to "second-guess counsel's
assistance after conviction or adverse sentence."  [*Id*. at 689];
*see also Bell*[, 535 U.S. at 702]; *Lockhart v. Fretwell*, [506
U.S. 364, 372 (1993)].  The question is whether an attorney's
representation amounted to incompetence under "prevailing
professional norms," not whether it deviated from best
practices or most common custom.  *Strickland*, [466 U.S. at
690].

47

*Richter*, ___ U.S. at ___, 131 S. Ct. at 788. Thus, the court must "determine whether, in light of all the circumstances, the identified acts or omissions were outside the range of professionally competent assistance." *Strickland*, 466 U.S. at 690; *see also Richter*, ___ U.S. at ___, 131 S. Ct. at 787 (reiterating that it must be shown "'that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment'" (quoting *Strickland*, 466 U.S. at 687)).

### D. Harmless Error Review of Constitutional Error

"[N]ot all constitutional violations amount to reversible error." *Satterwhite v. Texas*, 486 U.S. 249, 256 (1988). Reversal is required where a "structural defect affect[s] the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991). So far, an error has been found to be structural only in cases where there is a complete denial of counsel, a biased trial judge, an unlawful exclusion of grand jurors based on race, a denial of self-representation at trial, a denial of a public trial or a defective reasonable doubt jury instruction. *Johnson v. United States*, 520 U.S. 461, 468-69 (1997) (collecting cases); *see also United States v. Marcus*, 560 U.S. 258, ___, 130 S. Ct. 2159, 2164-65 (2010) (reaffirming that structural error has been found only in a very limited class of cases). On the other hand, if no structural constitutional error occurred and "the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other [constitutional] errors that may have occurred are subject to harmless-error analysis." *Rose v. Clark*, 478 U.S. 570, 579 (1986); *accord Fulminante*, 499 U.S. at 306-07 (reiterating that constitutional errors that are not structural defects are subject to a harmless error review). In that situation, the test is whether it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman v. California*, 386 U.S. 18, 24 (1967); *see also Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986) (stating that errors determined to be "'harmless' in terms of their effect on the

48

factfinding process at trial" are excused under *Chapman*); *United States v. Barnhart*, 979 F.2d 647, 652 (8th Cir. 1992) (observing that a conviction will not be overturned if an error is deemed to be harmless beyond a reasonable doubt).[25]

## IV. REVIEW OF GROUNDS FOR RELIEF

The twenty-one grounds that the movant asserts for relief relate to pre-trial issues, jury issues, merits phase issues, penalty phase issues, post-trial issues and/or appellate issues. Because each of the movant's grounds consist of multiple arguments and sometimes relate to arguments that are included in separate grounds, the court deems it

[25] It is unclear what harmless error review standard applies in proceedings under 28 U.S.C. § 2255. The court must either be able to declare a belief that the error was harmless beyond a reasonable doubt, *see Chapman*, 386 U.S. at 24, or be able to decide that the error "had substantial and injurious effect or influence in determining the jury's verdict," *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). In the 28 U.S.C. § 2254 context, it is clear that the less onerous standard applies. *See Fry v. Pliler*, 551 U.S. 112, 121-22 (2007) (holding that the "substantial and injurious effect" standard set forth in *Brecht* applies in proceedings under 28 U.S.C. § 2254). But, the Supreme Court has not directly decided whether that same standard applies in proceedings under 28 U.S.C. § 2255. *Cf. id.*; *Frady*, 456 U.S. at 164-66 (holding that the "plain error" standard is out of place when a prisoner collaterally attacks a criminal conviction under 28 U.S.C. § 2255). Several circuit courts of appeals, however, have held that the *Brecht* harmless error standard applies when a conviction is collaterally attacked under 28 U.S.C. § 2255. *See United States v. Dago*, 441 F.3d 1238, 1245-46 (10th Cir. 2006) (citing *United States v. Montalvo*, 331 F.3d 1052, 1057-58 (9th Cir. 2003), *Ross v. United States*, 289 F.3d 67, 682 (11th Cir. 2002) and *Murr v. United States*, 200 F.3d 895, 906 (6th Cir. 2000)); *see also Peck v. United States*, 106 F.3d 450, 454 (2d Cir. 1997) (observing that a court must determine whether the constitutional error substantially influenced the jury's decision). Other circuit courts of appeals just assume that the more demanding standard applies. *See, e.g.*, *Herrin v. United States*, 349 F.3d 544, 548-49 (8th Cir. 2003) (Riley, J., concurring) (concluding that a prosecutor's improper remarks were harmless beyond a reasonable doubt); *Monsanto v. United States*, 348 F.3d 345, 349 (2d Cir. 2003) (finding no reversible error in the district court's application of *Chapman*); *Santana-Madera v. United States*, 260 F.3d 133, 140 (2d Cir. 2001) (finding error to be harmless under either standard).

49

appropriate to address the movant's grounds in the manner and order that he advanced them.

### A. Ground One — Constitutional Violations Occurred as a Result of the Admission of the Judgments of Conviction that Related to the 1996 Case

#### 1. Arguments of the parties

##### a. The movant

The movant contends that the jury impermissibly considered findings that the trial court made during his sentencing hearing in *United States v. Honken*, Case No. 3:96-cr-03004-MWB (N.D. Iowa 1998). Specifically, he takes issue with the introduction of findings that were part of his judgment, Trial Exhibit 303 (civil docket no. 19-1), and amended judgment, Trial Exhibit 304 (civil docket no. 19-2). Those findings include that: (1) he should be held accountable for 2.87 kilograms of actual methamphetamine; (2) he had an aggravated role in the drug conspiracy; (3) he should receive a 293 month term of imprisonment or approximately twenty-four years, but, as a result of losing acceptance of responsibility, he should receive a 324 month term of imprisonment or twenty-seven years; (4) upon his release, he should be under supervision for five years and subject to certain terms, including that he could not possess a firearm; and (5) he should serve a 324 month term of imprisonment to promote respect for the law, to provide just punishment for the offense and to afford adequate deterrence to criminal conduct. The movant asserts such inadmissible evidence impacted the merits phase and penalty phase of his trial.

The movant maintains that the government's presentation of these findings to the jury violated his constitutional rights for several reasons. First, the movant asserts that a constitutional violation occurred because: (1) the jury must assess all of the facts that either constitute an element of a charged crime or increase the punishment for a crime and (2) the jury's assessment of the facts required the government to prove them beyond a reasonable doubt. He maintains that the government's presentation of the trial court's findings as

50

incontrovertible facts and the jury's inability to weigh the facts that supported the trial court's prior findings do not satisfy constitutional imperatives. He argues that his convictions and sentences are premised on an unconstitutionally low burden of proof. Second, the movant asserts that the government's reliance on and presentation of the trial court's prior findings caused the trial court to become a witness against him and he never had the opportunity to compel and confront such witness. Third, the movant contends that the jury's consideration of the enumerated findings undermines the heightened reliability that due process and the Eighth Amendment require in capital cases.

As to his constitutional right to counsel, the movant claims that, despite well-established constitutional principles, trial counsel ineffectively failed to object to the admission of the trial court's prior findings that were recorded on the judgment, Trial Exhibit 303 (civil docket no. 19-1), and the amended judgment, Trial Exhibit 304 (civil docket no. 19-2). He alleges that trial counsel had no tactical reason for failing to object because absolutely nothing could be gained by admitting such evidence. And, regarding appellate counsel, the movant contends that they should have raised the admission of the trial court's findings as plain error because the Eighth Circuit Court of Appeals would have vacated the convictions or, at a minimum, vacated the sentences of death. He remarks that, because they failed to raise an arguably meritorious claim on direct appeal, appellate counsel provided ineffective assistance.

In support of his assertion that he received ineffective assistance of counsel, the movant makes several observations. Regarding the merits phase, the movant maintains that the improperly admitted evidence influenced the jury's determinations as to whether he organized, supervised or managed five or more persons in a continuing criminal enterprise (what role he played in the offense), whether he had possessed and/or used a firearm and whether the drug conspiracy involved more than 100 grams of pure methamphetamine. He emphasizes that the government presented the improperly admitted

51

sentencing findings and the improperly admitted laboratory report to establish the statutory amount of methamphetamine as charged in count 8 through count 12 of the superseding indictment. With respect to the penalty phase, the movant claims that the trial court's prior findings caused the jury to improperly consider what additional sentence should be imposed and allowed it to impose a sentence of death that the trial court tacitly approved. He emphasizes that the reference to "aggravated role" in the judgments from the 1996 case is particularly harmful in light of the jury's duty to weigh "mitigating circumstances" against "aggravating circumstances." He argues that the improperly admitted evidence, which received the trial court's imprimatur, encouraged the jury to reach harsh verdicts.

### b. The government

The government disputes the movant's assertion that trial counsel did not properly object to the admission of evidence included in the judgments from the 1996 case. It points out that trial counsel did object to evidence relating to the movant's convictions in the 1996 case and that, based on their review of the government's discovery file and the charges, they knew the government would be presenting substantial evidence of drug quantity and role in the offense. In light of the record, the government asserts that trial counsel's performance did not fall below an objective level of reasonableness merely because they failed to ask for the redaction of some information or overlooked how the jury might interpret some information that was included in the judgments from the 1996 case. It maintains that the movant is not entitled to perfect or errorless representation.

The government makes several observations about the evidence that it presented in support of count 8 through count 17. The government observes that it did not offer the judgment, Trial Exhibit 303 (civil docket no. 19-1), and the amended judgment, Trial Exhibit 304 (civil docket no. 19-2), to prove a particular drug quantity that could be attributed to the movant or the role that the movant played in the offenses. The government also observes that it relied upon the judgments from the 1996 case only as

52

further evidence that the movant conspired to manufacture and distribute methamphetamine. And, the government observes that it presented overwhelming additional evidence that proved the movant participated in a conspiracy that produced large quantities of methamphetamine and acted as an organizer, supervisor or manager of the methamphetamine conspiracy.

In addition, the government claims that no constitutional confrontation violation occurred as a result of the jury's consideration of the judgments from the 1996 case. It maintains that the admission of the judgments from the 1996 case did not cause the trial court to become a witness against him because they are not testimonial in nature. It states that a court merely performs a ministerial duty when entering a judgment of conviction against a defendant, and, like the creation of a business record, an entry of judgment by a court does not serve the purpose of providing evidence against a defendant at trial.

Regardless of whether trial counsel performed deficiently, the government argues that the movant suffered no prejudice. It calls attention to the following facts: (1) the judgments from the 1996 case reference drug quantity in the context of base offense level on the last page; (2) no witness testified as to what being held "accountable for 2.87 kilograms of methamphetamine actual" meant; (3) the judgments reference "aggravated role" but do not define it; (4) no argument addressed the trial court's specific findings; and (5) it is doubtful that any juror saw the references, understood them and relied upon them when making a decision as to drug quantity or the movant's role in the offenses. Moreover, the government emphasizes that the movant's role does not impact the conspiracy murder counts and drug quantity is not an element of the CCE murder counts. With respect to the conspiracy murder counts, the government points out that, because abundant evidence supports the jury's finding as to drug quantity and the jury only needed to find the object of the conspiracy was to manufacture 100 grams or more of pure methamphetamine and to distribute 100 grams or more of pure methamphetamine, the

53

reference to a specific amount of methamphetamine in the judgments had a negligible impact. Similarly, the government argues that a vague reference to "aggravated role" had no effect on the outcome. The government stresses that the jury needed to find that the movant had a particular role with regard to five specific participants to find him guilty of the CCE murder counts, but the reference to "aggravated role" in the judgments does not bear upon a particular role that the movant had or the number of individuals involved.

### 2. *Background*

When prosecuting the movant, the government elected to present evidence of the movant's convictions from the 1996 case to prove that the movant engaged in a continuing series of federal narcotics violations and to show that he intended to kill individuals who impeded his methamphetamine operation or jeopardized his freedom. It then relied on Federal Rule of Evidence 104 to seek a pre-trial ruling regarding the admissibility of the movant's testimony during the change of plea hearing in the 1996 case, the movant's testimony during the sentencing hearing in the 1996 case, the judgment in the 1996 case and the amended judgment in the 1996 case. *See* criminal docket nos. 180, 194, 198, 252, 258, 266, 272. When resisting, the movant argued that the trial court should rely on Federal Rule of Evidence 402 and Federal Rule of Evidence 403 to preclude the admission of such evidence. Alternatively, he argued that, if admitted, it should be limited to avoid unfair prejudice and the needless presentation of cumulative evidence. The movant proposed that it would be sufficient if he stipulated to his prior convictions in the 1996 case and the government introduced just the certified copies of his judgments from the 1996 case. Trial counsel, however, did not argue that certain language included in the judgments from the 1996 case should be redacted. The trial court found in favor of the government and allowed the government to present evidence of the movant's illegal acts and intents.

54

Consistent with the trial court's pre-trial rulings, the government introduced evidence that related to topics the parties addressed during the sentencing hearing in the 1996 case. Specifically, an agent testified about what generally happens after a defendant pleads guilty in a federal case. He informed the jury that: (1) a probation officer conducts a pre-sentence investigation and prepares a pre-sentence investigation report that applies sentencing guidelines and identifies additional information pertaining to the defendant; (2) after a pre-sentence investigation report is prepared, the parties are afforded an opportunity to object to it if they think a factor that affects a sentence is not justified; and (3) when factors are disputed, a court conducts a hearing where it considers evidence. And, concerning the sentencing hearing in the 1996 case, he explained that the parties disputed several sentencing factors: (1) the extent of the drug operation, which included the total quantity and purity of the methamphetamine manufactured; (2) the role that the movant played in the drug conspiracy; (3) the obstructive efforts of the movant; and (4) the existence of firearms. After acknowledging that a court enters a judgment of conviction against a defendant after it imposes a sentence, the agent clarified that there are two judgments against the movant because the first judgment was replaced with the second judgment as a result of a disputed issue being resolved on appeal.

During its merits phase closing argument, the government set forth the elements of conspiracy murder and summarized how the evidence established each element beyond a reasonable doubt. With respect to the first element—whether the movant engaged in a conspiracy to commit a drug crime—the government referred to Trial Exhibit 303 (civil docket no. 19-1). When doing so, it observed that the judgment pertained to two drug crimes, that is, the conspiracy to manufacture and distribute at least 100 grams of pure methamphetamine and the attempted manufacture of methamphetamine. With regard to the second element—whether the conspiracy involved at least 100 grams of pure methamphetamine—the government referred to a laboratory report, testimony from an

55

agent and Final Instruction No. 9—Counts 8 Through 12: Conspiracy Murder, *see* criminal docket no. 512 at 71-74. And, after deciding not to reiterate the evidence pertaining to the intentional murders or the third element, the government went over the verdict form, emphasizing to the jury that, if it found the movant guilty and the amount of actual methamphetamine to be as specified in the laboratory report, then it should complete the verdict form by indicating the intentional murders involved the distribution of 100 grams or more of actual (pure) methamphetamine and the manufacture of 100 grams or more of actual (pure) methamphetamine. As to the CCE murder counts, the government referred to Trial Exhibit 303 (civil docket no. 19-1) in support of its assertion that at least three or more related felony violations were part of the continuing criminal enterprise. Rather than refer to the 2.87 kilograms of actual methamphetamine finding or the aggravated role finding that the trial court included in its statement of reasons, the government stated that the movant had already been convicted of conspiracy to manufacture and distribute at least 100 grams of pure methamphetamine.

### 3.    *Analysis*

In light of the record, the court disagrees with the movant's description or characterization of the government's use of the evidence related to the convictions in the 1996 case. Contrary to the movant's assertion, the government never presented the findings that the trial court made on the basis of a preponderance of the evidence standard as incontrovertible facts. When it had the agent identify the judgments during its presentation of evidence, the government only displayed the first page to the jury. Aside from pointing out the fact that the judgments confirmed the movant's convictions from the 1996 case, the government did not emphasize any other aspect of them. It never elicited any specific information regarding drug quantity, aggravated role or possession of a firearm from the agent. And, the government did not rely on either the specific findings included in the statement of reasons or the prohibition against possessing a firearm on

56

supervised release when arguing the amount of methamphetamine involved in the charged offenses, the role of the movant in the charged offenses and the use of firearms during the charged offenses. Rather than point to the drug quantity finding or the aggravated role finding, the government only referenced the movant's prior convictions in the 1996 case to help establish the existence of the first element of conspiracy murder and some of the continuing series of drug offenses in furtherance of the continuing criminal enterprise. In addition, the court finds that the government's presentation of evidence and argument as to the convictions in the 1996 case were merely moments in an extended trial, which included testimony of numerous witnesses, thorough arguments of the parties, receipt of hundreds of exhibits and instruction of the jury by the judge. The extensive testimony from numerous witnesses, a laboratory report and/or the recorded conversations that the government introduced at trial established the large amount of methamphetamine involved in the methamphetamine operation and the organizational role that the movant played in that operation.

Further, the court finds that the allegedly offending evidence did not deprive the movant of any constitutional right. Regarding the movant's assertion that the use of the findings in the judgments from the 1996 case constituted the impermissible use of hearsay, it is clear that only testimonial out-of-court statements raise constitutional confrontation concerns. *See Whorton v. Bockting*, 549 U.S. 406, 420 (2007) (making clear that the challenged statement must be testimonial); *Davis v. Washington*, 547 U.S. 813, 823-25 (2006) (same). When setting forth the plea, the adjudication and the sentence in the movant's judgments of conviction, the trial court complied with Federal Rule of Criminal Procedure 32. It did not enter its findings for the purpose of establishing or proving some facts in anticipation of future litigation. Because the judgments from the 1996 case are not testimonial in nature, no violation of the movant's right to confront a witness occurred. *See United States v. Causevic*, 636 F.3d 998, 1002-04 (8th Cir. 2011) (finding that

57

"testimonial evidence" for purposes of *Crawford v. Washington*, 541 U.S. 36 (2004), does not encompass a criminal judgment admitted to show that a defendant has a prior conviction but does encompass a criminal judgment admitted to show that the defendant committed the underlying charged crime if the defendant never had a prior opportunity for cross-examination); *United States v. Weiland*, 420 F.3d 1062, 1076-77 (9th Cir. 2005) (concluding that records of conviction and the information contained therein do not violate the Confrontation Clause of the Sixth Amendment); *see also United States v. Watson*, 650 F.3d 1084, 1090 n.3 (8th Cir. 2011) (observing that no confrontation right is implicated because the hearsay exception for public records is firmly rooted); *United States v. Sine*, 493 F.3d 1021, 1035 n.11 (9th Cir. 2007) (rejecting a claim that the use of statements in a court order violates the Confrontation Clause).

And, it is clear from the record that the government did not introduce the judgments to prove the truth of the findings that the trial court made during the sentencing hearing in the 1996 case. *Cf. Sine*, 493 F.3d at 1036 (treating prior judgment as hearsay because the government introduced discrete judicial findings and analysis underlying the judgment to prove the truth of those findings and that analysis). Rather, the government only offered the judgments to demonstrate the effect of them, that is, that the movant had been legally convicted and sentenced in the 1996 case as a result of pleading guilty. Further, a hearsay exception exists. *See United States v. Jeanpierre*, 636 F.3d 416, 423-24 (8th Cir. 2011) (observing that other federal courts have found judicial findings of fact are hearsay and only admissible if a specific hearsay exception exists). The judgments are admissible under Federal Rule of Evidence 803(8), which excludes "public records" from the hearsay rule unless the source of information or other circumstances indicate a lack of trustworthiness. *See Weiland*, 420 F.3d at 1074 (public records, including records of conviction, must be admitted, if at all, under Federal Rule of Evidence 803(8) or, in some cases, Federal Rule of Evidence 803(22), and such admission is appropriate if the records

58

are properly authenticated).  *But see Herrick v. Garvey*, 298 F.3d 1184, 1191-92 (10th Cir. 2002) (concluding that Federal Rule of Evidence 803(8) does not apply to judicial findings of fact); *United States v. Jones*, 29 F.3d 1549, 1554 (11th Cir. 1994) (same); *Nipper v. Snipes*, 7 F.3d 415, 417 (4th Cir. 1993) (same).

Moreover, if any evidentiary error occurred in this case, such error did not contribute at all to the outcome.  *See Bear Stops*, 339 F.3d at 782 (finding that, even if an error occurred as a result of the evidence being admitted, such error was harmless beyond a reasonable doubt).  *But see United States v. DeSantis*, 134 F.3d 760, 769-70 (6th Cir. 1998) (concluding that the erroneous admission of evidence, which included in part the reading of an appellate court's detailed factual findings and conclusions during closing argument, was likely prejudicial).  Given the government's proper introduction of irrefutable proof of the movant's guilt, the court finds beyond a reasonable doubt that the jury would have convicted the movant on all of the counts, would have found the aggravating factors outweighed the mitigating factors and would have recommended a sentence of death for the murders of the Duncan girls regardless of the information that was included in the judgments.  The failure to redact portions of the judgments from the 1996 case had absolutely no impact on any of the jury's verdicts.

Concerning the movant's additional right to due process and right to jury trial allegations, it cannot reasonably be argued that the government failed to charge the facts giving rise to the death penalty or failed to prove those facts to the jury beyond a reasonable doubt.  *See Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000) (holding that any fact, other than the fact of a prior conviction, that increases the penalty for a crime beyond the prescribed statutory maximum must be included in the indictment and proven to the jury beyond a reasonable doubt); *In re Winship*, 397 U.S. 358, 364 (1970) (holding that proof beyond a reasonable doubt of every fact necessary to constitute the charged crime is constitutionally required).  Also, because the government relied on the judgments

59

from the 1996 case for a limited purpose and never directed the jury's attention to any information that was included in page two through page seven, the court finds that it is extremely implausible the admitted evidence encouraged the jury to reach a harsh verdict because the trial court previously imposed a lengthy sentence. *See Sumner v. Shuman*, 483 U.S. 66, 72 (1987) (stating that the Eighth Amendment requires heightened reliability when determining whether the death penalty is appropriate in a particular case); *Quercia v. United States*, 289 U.S. 466, 469 (1933) ("The influence of a trial judge on a jury is necessarily and properly of great weight and his lightest word or intimation is received with deference, and may prove controlling."). And, as previously determined, any error was harmless beyond a reasonable doubt, especially considering the overwhelming evidence introduced by the government.

As to the movant's allegation of ineffective assistance of trial counsel, the failure to object to the admission of the statements included in the judgments from the 1996 case did not fall below an objective standard of reasonableness. When trial counsel challenged the admissibility of evidence prior to trial, they raised appropriate arguments. Although they may have neglected to request the redaction of certain language that was included in the judgments or failed to object when the government introduced Trial Exhibit 303 (civil docket no. 19-1) and Trial Exhibit 304 (civil docket no. 19-2), their actions are no doubt a result of: (1) a well-founded belief that drug quantity was never an issue, especially considering that the movant pleaded guilty to conspiring to manufacture and distribute at least 1000 grams of a mixture or substance containing a detectable amount of methamphetamine and at least 100 grams of pure methamphetamine and attempting to manufacture at least 1000 grams of a mixture or substance containing a detectable amount of methamphetamine and at least 100 grams of pure methamphetamine, and (2) the government's limited use of and reference to the judgments from the 1996 case. Because the government did not analyze or emphasize the specific findings included in the statement

60

of reasons or the prohibition against possessing a firearm on supervised release, the court is unable to find that trial counsel's representation fell below acceptable professional standards. *See Strickland*, 466 U.S. at 688 (concluding that a person must show that "counsel's representation fell below an objective standard of reasonableness" to establish deficient performance); *Richter*, ___ U.S. at ___, 131 S. Ct. at 791 ("[The Sixth Amendment] does not guarantee perfect representation, only a 'reasonably competent attorney.'" (quoting *Strickland*, 466 U.S. at 687)).

Additionally, the court cannot find that the admission of this evidence prejudiced the defense because this case was not a close one. The movant speculates that the jury relied on the judgments from the 1996 case to find him guilty during the merits phase, but he does not explain in much detail exactly why such evidence, which the government did not emphasize at trial, outweighs the mountain of other evidence proving his guilt. And, although the movant argues that the jury could have relied on the evidence to impose a harsher sentence, he does not point to any impermissible argument offered by the government during the penalty phase or take into account the jury instructions that sought to minimize or nullify the influence that the trial court had on the jury's deliberations. Given the overwhelming evidence presented by the government, the court finds that the movant failed to show that, but for counsel's failure to litigate the language included in the judgments, there is a reasonable probability that the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 694; *see also Bear Stops*, 339 F.3d at 782 (finding that the inclusion of any hearsay evidence was not so prejudicial that it would have changed the outcome). It cannot be said that some of the language that was included in the judgments from the 1996 case swayed the jury to reach verdicts it would otherwise not have reached; it is a near certainty that this evidence did not contribute at all to the jury's verdicts during either the merits phase or penalty phase.

61

Turning to appellate counsel's performance, relief is not available for the same reasons as set forth above. Appellate counsel reasonably decided not to raise as a claim the erroneous admission of statements that were included in the judgments from the 1996 case on direct appeal because it was unlikely to succeed, especially considering it would have been subject to plain error review. *See Roe*, 160 F.3d at 418 ("The decision to forgo a plain error claim is usually the result of a reasonable winnowing of weaker appellate claims."). It is apparent from the record that appellate counsel's performance was reasonable and that there was no reasonable probability of either the convictions or the sentences being reversed. Because the evidence was overwhelming, appellate counsel's failure to raise the admission of the trial court's prior findings did not result in any prejudice to the movant. *Cf. Bear Stops*, 339 F.3d at 782 (concluding that any evidentiary error was harmless beyond a reasonable doubt and, consequently, any deficiency in appellate counsel's failure to raise a hearsay claim on direct appeal did not prejudice the defense).

Therefore, the court concludes that relief is not available on this ground. The admission of some language included in the judgment, Trial Exhibit 303 (civil docket no. 19-1), and the amended judgment, Trial Exhibit 304 (civil docket no. 19-2), did not violate the movant's right to due process under the Fifth Amendment, right to a jury trial under the Sixth Amendment, right to confront a witness under the Sixth Amendment, right to a heightened degree of reliability in the determination that death is the appropriate punishment under the Eighth Amendment or right to counsel under either the Fifth Amendment or the Sixth Amendment.

62

### B. Ground Two — Constitutional Violations Occurred as a Result of the Findings that Were Made Pursuant to the Sentencing Hearing in the 1996 Case

#### 1. Arguments of the parties

##### a. The movant

The movant claims that, apart from the fact that they did not object when the government introduced prejudicial judicial sentencing findings from the 1996 case, trial counsel failed to litigate issues or present to the jury the trial court's prior sentencing findings that were helpful to him. He states that, during the sentencing hearing in the 1996 case, the government sought and obtained final factual findings even though the trial court warned the government of possible collateral consequences of litigating particular issues. The movant stresses that the trial court ruled in his favor on several issues and the relitigation of those issues is barred by the doctrine of collateral estoppel, his constitutional right to due process and his constitutional right to not be put in jeopardy twice.

Specifically, the movant offers that, because he faced a possible life sentence, the parties vigorously litigated several issues during the sentencing hearing in the 1996 case. Aside from disputing drug quantity, they contested whether an enhancement under USSG §2J1.7 applied because the movant continued the conspiracy to manufacture and distribute methamphetamine while under supervision for the 1993 charge of conspiring to distribute methamphetamine. The movant also opposed an enhancement under USSG §3B1.1 for role in the offense, an enhancement under USSG §3C1.1 for obstruction of justice and an enhancement under USSG §2D1.1(b)(1) for possessing a dangerous weapon in furtherance of the methamphetamine conspiracy. Concerning those sentencing enhancements, the movant disputed that he possessed firearms in furtherance of the methamphetamine operation and that he planned and organized the manufacturing and distribution of methamphetamine or recruited and supervised participants.

63

Ultimately, regarding those issues, the movant states that the trial court found: (1) the movant ceased participating in the conspiracy to manufacture and distribute methamphetamine while on pre-trial release, which lasted from March 26, 1993, through March 21, 1995; (2) the movant did not possess a Tec-9, nine millimeter, semi-automatic handgun in the course of the drug conspiracy and such handgun had not been present in the course of the drug conspiracy; and (3) the movant had not attempted to obstruct justice or influence the testimony of Dennis Putzier when he wrote and sent letters to Dennis Putzier. He emphasizes that, before the trial court made the second finding, the government had alleged specific facts that had occurred in the course of the conspiracy, specifically: (1) the movant possessed a Tec-9, nine millimeter, semi-automatic handgun that Angela Johnson had purchased; (2) the Tec-9, nine millimeter, semi-automatic handgun had been melted down and destroyed by the movant and Timothy Cutkomp in 1993 to hide evidence of crimes that the movant had committed with the handgun; (3) the movant had purchased a different handgun from Rick Held while on pre-trial release in 1996; and (4) the movant had sought a high-powered automatic firearm to threaten Timothy Cutkomp if he cooperated with the government. The movant asserts that the trial court's determinations regarding those three issues obviously impacted the outcome of the sentencing hearing in the 1996 case. Namely, he contends that he received a term of months rather than a sentence of life imprisonment.

The movant contends that the issues alleged, presented and disputed at his trial are indistinguishable from the issues that the trial court decided in his favor after the parties had a full and fair opportunity to litigate during the sentencing hearing in the 1996 case. Specifically, with respect to his trial, the movant points to: (1) the allegations contained in count 8 through count 12 of the superseding indictment and the allegations contained in count 13 through count 17 of the superseding indictment; (2) the specific factual allegations underlying the CCE murder charges that are set forth in count 13 through count 17 of the

64

superseding indictment; (3) the government's allegations, evidence and argument that he possessed a Tec-9, nine millimeter, semi-automatic handgun in the course of the drug conspiracy and the continuing criminal enterprise, he used the handgun to kill Terry DeGeus and he and Timothy Cutkomp melted down and destroyed the handgun to conceal and destroy evidence of his crimes; (4) the government's allegations, evidence and argument that he purchased a handgun from Rick Held while on pre-trial release in 1996; (5) the government's allegations, evidence and argument that he had discussed and sought a high-powered automatic firearm to eliminate witnesses in 1996; and (6) the government's evidence that he had attempted to obstruct justice and influence the testimony of Dennis Putzier when he wrote and sent letters to Dennis Putzier.

Because the judge made definitive findings during the sentencing hearing in the 1996 case, the movant contends that none of those findings should have been relitigated during his trial on the ten capital counts. The movant emphasizes that it is constitutionally impermissible that the judge and the jury reached opposite conclusions. More specifically, he points to the trial court's reliance on findings of fact to impose a sentence of twenty-seven years rather than a life sentence and the jury's subsequent reliance on contrary findings of fact to impose sentences of death rather than life sentences. The movant also finds fault with the government's attempt to establish the statutory nexus in count 8 through count 17. Namely, he states that the trial court's sentencing finding that the movant ceased participating in the drug conspiracy from March of 1993 through March of 1995 precluded the government from establishing that the murders occurred "while" he was engaged in the drug conspiracy or "while" he was engaged in or working in furtherance of the continuing criminal enterprise. Similarly, he contends that the trial court's prior sentencing finding as to the Tec-9, nine millimeter, semi-automatic handgun precluded the government from litigating that issue during his trial.

65

The movant underscores his claim that a violation of the Fifth Amendment occurred by relying on *Ashe v. Swenson*, 397 U.S. 436 (1970). In *Ashe*, the Supreme Court reiterated that, "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Id.* at 443; *see also Garrett v. United States*, 471 U.S. 773, 798 (1985) (O'Connor, J., concurring) ("Any acquittal on a predicate offense would of course bar the Government from later attempting to relitigate issues in a prosecution under § 848." (citing *Ashe*, 397 U.S. at 436)); *Nesbitt v. Hopkins*, 86 F.3d 118, 120 (8th Cir. 1996) ("In a criminal case, a fact previously determined 'is not an "ultimate fact" unless it was necessarily determined by the [factfinder] against the government and, in the second prosecution, that same fact is required to be proved beyond a reasonable doubt in order to convict.'" (quoting *Prince v. Lockhart*, 971 F.2d 118, 123 (8th Cir. 1992))). He maintains that the rule that prevents the same parties from litigating the same issue of fact in a subsequent lawsuit applies regardless of whether a judge or jury determined the issue of fact. *See United States v. Oppenheimer*, 242 U.S. 85, 87-88 (1916) (declaring that, when a criminal matter is adjudicated upon by a court having jurisdiction to hear and determine it, that adjudication is final as to the matter so adjudicated upon).

Although he acknowledges that trial counsel vehemently opposed the government's subsequent charges on the basis of double jeopardy, the movant takes issue with trial counsel's decision to forgo a collateral estoppel objection because the trial court previously ruled in his favor during the sentencing hearing in the 1996 case and it explicitly warned the parties that collateral consequences could arise in subsequent proceedings. *See Honken*, 271 F. Supp. 2d at 1097 (addressing a double jeopardy claim); *id.* at 1106 n.2 (explaining that collateral estoppel is not being pursued "because he is not relying on any 'ultimate fact' determined against the government in his prior prosecution on the drug conspiracy charge"); *cf. Murphy v. Puckett*, 893 F.2d 94, 95-96 (5th Cir. 1990)

66

(addressing a lawyer's failure to raise double jeopardy as a defense at or before trial or on appeal). He charges that trial counsel completely overlooked the prior findings that the trial court made during the sentencing proceedings in the 1996 case and states that such oversight apparently occurred because Charles Myers Rogers, rather than counsel who represented him during the sentencing hearing in the 1996 case, drafted the double jeopardy challenge.

The movant declares that, if trial counsel had prevented the relitigation of findings that the trial court made during the sentencing hearing in the 1996 case, there is a reasonable likelihood that the jury would not have reached guilty verdicts on any of the charged counts and, by definition, could not have reached guilty verdicts on count 8 through count 17. And, he offers that, even if the jury reached guilty verdicts on one or more of the capital charges, there is a reasonable likelihood that the jury would have returned sentences of life imprisonment during the penalty phase.

Further, the movant picks apart trial counsel's basis for seeking judgments of acquittal. Although he recognizes that trial counsel moved for acquittal on count 8 through count 17, he contends that they only sought acquittal on the theory that the government did not present evidence that the drug conspiracy continued after March of 1993 and, consequently, failed to establish that the murders were committed "while" the drug conspiracy and the continuing criminal enterprise were ongoing. He states that the government argued against acquittal by pointing to evidence, testimony and exhibits that the trial court rejected during the sentencing hearing in the 1996 case. And, he points out that, although the prior case involved a dispute about the duration of the conspiracy and the trial court made explicit findings as to duration, trial counsel never alerted the trial court to its prior findings. He argues that, if trial counsel had argued the impact of the trial court's prior findings, the trial court would have rejected the government's argument that sufficient evidence existed and it would have granted the movant's request for

67

acquittal.  Alternatively, the movant presses that trial counsel should have invoked the trial court's prior findings in his case or sought a new trial that excluded the trial court's prior findings.

The movant also contends that appellate counsel should have raised this claim on direct appeal.  He states that, if they had raised the trial court's prior findings as plain error, the Eighth Circuit Court of Appeals would have vacated the convictions and/or vacated the sentences of death.  Because they failed to raise an arguably meritorious claim on direct appeal, the movant argues that appellate counsel provided ineffective assistance.

### b.      The government

The government argues that no viable claim based on due process, collateral estoppel or double jeopardy principles exists.  It acknowledges that the parties litigated several issues during the movant's sentencing hearing for his prior drug convictions, but it points out that such sentencing took place in 1997 and 1998, which is well before investigators discovered the bodies of the five victims and the government charged the movant with conspiracy murder and continuing criminal enterprise murder.  The government observes that the prior case charged the movant with conspiring to manufacture and distribute methamphetamine and attempting to manufacture methamphetamine, not murder.  In light of the record, the government maintains that neither its presentation of evidence nor the findings made by the trial court during the movant's sentencing hearing in the 1996 case barred it from presenting evidence to support the subsequent conspiracy murder charges and CCE murder charges.

The government states that trial counsel and appellate counsel consistently took the position that the movant's convictions in the 1996 case barred the government from prosecuting him for the murders of the five witnesses.  It also contends that no violation of the movant's constitutional right to counsel occurred as a result of trial counsel's failure to assert collateral estoppel as an aspect of the movant's double jeopardy claim.  It points

68

out that none of the cases cited by the movant involved the application of collateral estoppel based on sentencing findings. Consequently, the government contends that the failure to raise an argument for which there is no reported precedent does not establish deficient performance on the part of trial counsel. *See Anderson v. United States*, 393 F.3d 749, 754 (8th Cir. 2005) (concluding that the failure to recognize and raise a novel argument does not give rise to a constitutional violation).

With respect to prejudice, the government asserts that the movant suffered none because his collateral estoppel argument lacks merit. It proposes that precluding relitigation on the basis of sentencing findings should be presumed improper. To support such proposal, the government cites *United States v. U.S. Currency in the Amount of $119,984.00*, 304 F.3d 165 (2d Cir. 2002). In that case, the Second Circuit Court of Appeals reiterated that application of collateral estoppel to sentencing findings is presumptively improper, *id*. at 172-73 (quoting *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 306 (2d Cir. 1999)), and reversed the dismissal of the government's civil forfeiture action because the district court erred when concluding that earlier findings made during a sentencing hearing precluded the government from arguing the currency was either derived from an unlawful source or intended for an unlawful use, *id*. at 172-79.

The government also argues that collateral estoppel is not applicable because: (1) the issues that the jury addressed during the movant's trial were not the same as the issues that the trial court addressed at the movant's sentencing hearing in the 1996 case; (2) the same issues were not actually litigated and decided in the prior action; and (3) the sentencing hearing did not offer the government, as the party sought to be estopped, a full and fair opportunity to litigate the issues that the movant seeks to preclude. The government emphasizes that, rather than determine whether the movant killed five individuals in furtherance of his methamphetamine operation, the trial court only determined: (1) whether the movant conspired to manufacture and distribute methamphetamine while on pre-trial

69

release and (2) whether he possessed firearms after his arrest in 1996 and possessed a Tec-9, nine millimeter, semi-automatic handgun to protect himself from Terry DeGeus.

### 2. *Applicable law*

The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution serves to protect a defendant against a second prosecution for the same offense after acquittal, a second prosecution for the same offense after conviction and multiple punishments for the same offense. *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969), *overruled on other grounds by Alabama v. Smith*, 490 U.S. 794 (1989). Double jeopardy protections, however, are not usually applicable to sentencing proceedings. *Monge*, 524 U.S. at 728 (citing *Bullington v. Missouri*, 451 U.S. 430, 438 (1981)). This is so because "[t]he imposition of a particular sentence usually is not regarded as an 'acquittal' of any more severe sentence that could have been imposed." *Bullington*, 451 U.S. at 438; *see also Monge*, 524 U.S. at 728 (observing that determinations made during a sentencing do not place a defendant in jeopardy for an "offense"); *Caspari v. Bohlen*, 510 U.S. 383, 391-92 (1994) (recognizing the historical refusal to extend double jeopardy protections to non-capital sentencing proceedings because they do not have the qualities of constitutional finality that attend an acquittal); *United States v. DiFrancesco*, 449 U.S. 117, 133-34 (1980) (stating that the pronouncement of sentence is qualitatively different from an acquittal).

Nevertheless, in the realm of capital sentencing, double jeopardy protections may be available. In *Bullington*, the Supreme Court addressed whether the State of Missouri was barred from attempting to impose the death penalty at retrial because the State of Missouri had failed to obtain the death penalty in the penalty phase of the first trial. It held that, because Missouri's "presentence hearing resembled and, indeed, in all relevant respects was like the immediately preceding trial on the issue of guilt or innocence," the first jury's refusal to impose the death penalty amounted to an "acquittal" of that

70

punishment. *Bullington*, 451 U.S. at 438. Unlike an ordinary sentencing that may involve informal proceedings and standardless discretion in the sentencer, a capital sentencing under the State of Missouri's procedures is like a trial, and, therefore, double jeopardy protections attach to it. *Id*. at 446; *see also Arizona v. Rumsey*, 467 U.S. 203, 209-12 (1984) (reiterating that principles of double jeopardy preclude second attempt to obtain death penalty because the first sentencing where the trial court "acquitted" the defendant of the death penalty had the hallmarks of a trial on guilt or innocence); *Nelson v. Lockhart*, 828 F.2d 446, 449 (8th Cir. 1987) ("Under *Bullington*, then, double jeopardy attaches to [capital] sentencing proceedings if the process of determining the defendant's punishment was similar to the process of determining guilt."), *rev'd on other grounds*, 488 U.S. 33 (1988).

The characteristics that make a capital sentencing comparable to a trial include the following: (1) discretion of the sentencer is substantially restricted; (2) factual determinations are guided by substantive standards and are made after hearing evidence during a separate hearing that formally resembles a trial; and (3) findings of fact that justify a sentence of death must be proven beyond a reasonable doubt. *See Rumsey*, 467 U.S. at 209-10; *Bullington*, 451 U.S. at 438-41. In contrast, double jeopardy protections are not available if the sentencing bears little resemblance to a trial on guilt or innocence. *Bullington*, 451 U.S. at 439; *see also Schiro v. Farley*, 510 U.S. 222, 231 (1994) (observing that the exception to the general principle that double jeopardy is not applicable to sentencing proceedings is narrow). For those cases where double jeopardy does not apply, the sentencer has broad discretion in choosing an appropriate punishment from a wide range of potential penalties and the burden of proof is less than proof beyond a reasonable doubt. *Bullington*, 451 U.S. at 439-41.

Although it is clear that double jeopardy may apply in the capital sentencing context, the Supreme Court refused to extend the reasoning of *Bullington* to non-capital

71

sentencing proceedings. *Monge*, 524 U.S. at 733-34. Before making clear that double jeopardy protections have no place in non-capital sentencing proceedings, the Supreme Court emphasized the following:

> Sentencing decisions favorable to the defendant, moreover, cannot generally be analogized to an acquittal. We have held that where an appeals court overturns a conviction on the ground that the prosecution proffered insufficient evidence of guilt, that finding is comparable to an acquittal, and the Double Jeopardy Clause precludes a second trial. Where a similar failure of proof occurs in a sentencing proceeding, however, the analogy is inapt. The pronouncement of sentence simply does not have the qualities of constitutional finality that attend an acquittal.

*Id*. at 729 (citations omitted) (internal quotation marks omitted).

In addition, the doctrine of collateral estoppel, which is embodied in the Double Jeopardy Clause, provides that, "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Ashe*, 397 U.S. at 443; *see also id*. at 445-46 (parting ways with the conclusion in *Oppenheimer*, 242 U.S. at 87-88, that collateral estoppel is grounded in the right to due process by constitutionalizing collateral estoppel as part of the Fifth Amendment's guarantee against double jeopardy). As previously pointed out, double jeopardy usually relates to subsequent prosecutions involving the same offense. *See United States v. Martin Linen Supply Co.*, 430 U.S. 564, 571 (1977). In comparison, collateral estoppel simply prohibits the government from relitigating any ultimate facts that were resolved in the defendant's favor by the prior acquittal. *Ashe*, 397 U.S. at 445-47. So, apart from being protected against retrial for the "same offense" after an acquittal, a defendant is protected from being prosecuted for an offense that requires proof of a fact found in his favor by the prior acquittal.

72

Under *Ashe*, two inquires are made: (1) what facts were necessarily established in the first trial and (2) is a party trying to litigate during a subsequent trial facts that were necessarily established against it in the first trial. *Dowling v. United States*, 493 U.S. 342, 350 (1990).  Further, if a previous judgment of acquittal was based on a general verdict, a court must "'examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.'" *Ashe*, 397 U.S. at 444 (citation omitted).  The party that seeks to preclude relitigation of an issue must demonstrate that the issue was necessarily decided in the first trial.  *Schiro*, 510 U.S. at 232-36; *Dowling*, 493 U.S. at 350.

Additionally, in the federal legal system, it is clear that different rights and interests are adjudicated in criminal cases and civil cases.  Namely, parties litigate private rights in civil cases.  *See Standefer v. United States*, 447 U.S. 10, 24 (1980).[26]  In contrast, the public interest in the enforcement of criminal law and the rights of the individual defendant are at issue in criminal cases.  *Id.* at 25.  Given the importance of what is being decided

---

[26] The government correctly points out that courts are reluctant to give preclusive effect to the findings of a sentencing court during subsequent civil litigation.  *See, e.g.*, *Kosinski v. Comm'r*, 541 F.3d 671, 679 (6th Cir. 2008) (refusing to ascribe preclusive effect to a sentencing court's findings of fact); *Maciel v. Comm'r*, 489 F.3d 1018, 1023 (9th Cir. 2007) (holding preclusion is presumptively inapplicable to sentencing findings); *Morse v. Comm'r*, 419 F.3d 829, 834 (8th Cir. 2005) (concluding that collateral estoppel is inapplicable because criminal restitution is not an element of the crime of conviction and the judge is afforded considerable discretion as to whether he should order restitution); *U.S. Currency in the Amount of $119,984.00*, 304 F.3d at 173 (reiterating that the application of collateral estoppel to sentencing findings is presumptively improper); *see also SEC v. Ridenour*, 913 F.2d 515, 518 (8th Cir. 1990) ("The doctrine of collateral estoppel applies only when the issue sought to be precluded is the same as that involved in the prior litigation, the issue was actually litigated and the party sought to be estopped was given a full and fair opportunity to be heard on the issue, and determination of the issue was essential to a valid and final judgment.").

73

during a criminal case, the public interest in reaching an accurate and just result outweighs the efficiency concern that might otherwise favor application of the doctrine of collateral estoppel. *Id*. Consequently, the application of the doctrine of collateral estoppel in criminal cases is disfavored. *See Pinkney v. Keane*, 920 F.2d 1090, 1096-97 (2d Cir. 1990) (observing that the doctrine of collateral estoppel is less likely to be applied in criminal cases where the primary concern is to reach a correct result and where other considerations peculiar to the criminal process may outweigh the need to avoid repetitive litigation).

### 3.    *Analysis*

Here, the movant previously pleaded guilty to two charges: (1) conspiring to manufacture and distribute 1000 grams or more of a mixture or substance containing a detectable amount of methamphetamine and 100 grams or more of pure methamphetamine from between about 1992 and February 7, 1996 and (2) attempting to manufacture 1000 grams or more of a mixture or substance containing a detectable amount of methamphetamine and 100 grams or more of pure methamphetamine on or about February 7, 1996. More specifically, with respect to the former charge, the movant admitted that he and Timothy Cutkomp had an agreement to manufacture 1000 grams or more of a mixture or substance containing a detectable amount of methamphetamine and 100 grams or more of pure methamphetamine between 1992 and February 7, 1996, and that he knew they would be manufacturing methamphetamine. Concerning the latter charge, the movant admitted that he attempted to manufacture methamphetamine on February 7, 1996, and knew that he was manufacturing methamphetamine. In light of those admissions and the statements included in the government's letter under Federal Rule of Criminal Procedure 11, the trial court accepted the movant's pleas. So, unlike in *Ashe* where a jury acquitted a defendant after trial, this case differs because the movant pleaded guilty. *See Ohio v. Johnson*, 467 U.S. 493, 500 n.9 (1984) (rejecting the argument that prosecution on the

74

murder and aggravated robbery charges after the court accepted pleas of guilt as to the involuntary manslaughter and grand theft charges is barred by the principles of collateral estoppel because the taking of a guilty plea is not the same as an adjudication on the merits after a full trial, like the one that took place in *Ashe*, 397 U.S. 436).

Aside from the fact that a plea of guilty may not be sufficient to authorize application of collateral estoppel, it is clear that the dimensions of the issues addressed during a criminal trial and during a sentencing hearing are fundamentally different. Indeed, a sentencing hearing is not undertaken to convict a defendant for the alleged violation, and, therefore, it does not give rise to the full panoply of rights that are due a defendant at trial. The only "evidence" that is typically considered at a hearing to determine a defendant's particular sentence is information that is included in a pre-sentence investigation report, which is based in part on the input of the parties. *See* Fed. R. Crim. P. 32 (addressing sentencing and judgment). And, even if sentencing factors are in dispute, sentencing hearings are usually less formal than and not as long as a trial that adjudicates guilt or innocence.[27] The firm differences between the trial stage and the

--------

[27] The relative "informality" of the sentencing forum is due at least in part to the sentencing procedures that guide federal courts. For example, in deciding disputed sentencing factors, "the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." USSG §6A1.3(a); *see also United States v. Watts*, 519 U.S. 148, 157 (1997) (explaining that information may be considered if it has sufficient indicia of reliability to support its probable accuracy); *Witte v. United States*, 515 U.S. 389, 399-401 (1995) (noting that sentencing courts have traditionally considered a wide range of information without the procedural protections of a criminal trial, including information concerning criminal conduct that may be the subject of a subsequent prosecution). Additionally, the court "must determine the appropriate procedure in light of the nature of the dispute, its relevance to the sentencing determination, and applicable case law." USSG §6A1.3, comment. Finally, the court decides factual disputes based on a preponderance of the evidence standard of proof rather
(continued…)

75

sentencing stage provide a sufficient basis to make double jeopardy inapplicable to non-capital sentencing proceedings. *See Monge*, 524 U.S. at 733-34. For the same reasons, the court finds that the application of collateral estoppel has no place outside of capital proceedings.

Moreover, with respect to the specific issues disputed and decided at the sentencing hearing in the 1996 case, the court is unable to conclude that they are the same as those issues that the parties addressed during trial.[28] The issues are not the same for purposes of preclusion for several reasons. First, there is not a substantial overlap between the evidence and the argument that the parties advanced in the sentencing hearing and the trial. At the sentencing hearing in the 1996 case, the parties addressed the application of USSG §2J1.7 because the movant participated in the conspiracy to manufacture and distribute methamphetamine while on pre-trial release and the application of USSG §2D1.1(b)(1) because the movant possessed a firearm in furtherance of the methamphetamine conspiracy.[29] During trial, however, the government introduced evidence and offered argument in an effort to convict the movant for killing five individuals in furtherance of his methamphetamine operation. Second, the evidence and argument that the government presented during trial does not involve the same rule of law as that involved in the sentencing hearing. Unlike the sentencing hearing where the trial court considered

---

[27](…continued)
than beyond a reasonable doubt. *Id*.

[28] The court notes that the sentencing hearing in the 1996 case occurred prior to the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005). So, the sentencing guidelines were mandatory, not advisory, when the trial court determined what sentences to impose.

[29] Despite the fact that the trial court relied on USSG §3B1.1(b) when increasing by three levels the movant's offense level, the movant does not assert that the government should have been precluded from asserting that the movant organized five or more participants.

76

evidence and found facts based on a preponderance of the evidence standard, the jury considered relevant and probative evidence and decided the merits phase and penalty phase based on a beyond a reasonable doubt standard. *Cf. Dowling*, 493 U.S. at 349-50 (finding that the doctrine of collateral estoppel does not bar in all circumstances the later use of evidence relating to prior conduct that the government failed to prove beyond a reasonable doubt). Third, the government's preparation and discovery relating to the movant's possession of firearms and unlawful conduct while on pre-trial release could not reasonably be expected to have embraced the matters that the government presented during trial. Prior to and after the government obtained convictions against the movant in the 1996 case, law enforcement continued to investigate the disappearances and possible murders of witnesses. As a result of such investigation, the known facts changed. The relevance of the determinations that the trial court made during the sentencing hearing in the 1996 case is significantly negated as a result of the movant's own actions. Stated differently, the opportunity to litigate in a sentencing hearing cannot be characterized as fair if one party conceals information that materially affects the outcome of the case. Finally, the claims involved in the two proceedings are not closely related, especially considering the nature of the allegations and the possible penalties.

Aside from the fact that the movant pleaded guilty, trials and sentencing hearings are notably different and the issues are not the same, the movant points to no legal authority that indicates a finding during an ordinary sentencing hearing provides a basis to assert collateral estoppel if a defendant is subsequently charged with capital offenses that may be premised on facts that are inconsistent with the prior sentencing finding. All of the cases cited by the movant pertain to findings made prior to trial or findings made as a result of a jury trial or bench trial. And, the court is unable to find any cases that support the movant's position. It, however, is apparent to the court that compelling policy

77

considerations support the refusal to give preclusive effect to findings made during an ordinary sentencing hearing.

The practical realities of litigating sentencing factors are significant. At a sentencing hearing, it may not be convenient or necessary to produce evidence or litigate at all. For example, where a sentencing factor guides a court to impose a lengthy sentence there may be less incentive to argue other factors. And, given the current law, it is also significant that a party may not foresee at the time of the sentencing hearing the relevance of the issue for purposes of a subsequent action. At least in the criminal context, it appears that precluding the reexamination of an issue is unfair, especially if the lack of foreseeability contributed to the losing party's failure to litigate the issue fully. Further, if preclusive effect were given to sentencing issues, the dynamic of litigating during sentencing hearings might change. It may be that a party, who would otherwise present evidence and argument in support of a particular result, may be deterred from doing so if sentencing determinations effectively preclude relitigation of particular issues. Or, in an attempt to avoid the issue of preclusion in a subsequent action, a party might seek to present all available evidence and argument, and, consequently, the burdens of litigation on the parties and the courts would necessarily increase, rather than decrease.

In addition, it bears repeating that the government is responsible for enforcing law that affects members of the public generally. The government may bring a criminal action against an individual for the protection or relief of particular persons or of a broad segment of the public, and, as a result, a criminal judgment may have a direct impact on those who are not themselves parties. In such cases, due consideration of the interests of persons not themselves before the court in the prior action may justify relitigation of an issue actually litigated and determined in that action. Further, in the sentencing context, the reexamination of an issue appears prudent if the effect of applying preclusion is to give one party a favored position in the current administration of law. Undoubtedly, the application

78

of collateral estoppel to bar the government from pursuing capital charges confers a tremendous benefit on the accused and results in the manifestly inequitable administration of the law.

In sum, the court finds that the movant is unable to rely on the doctrine of collateral estoppel, his constitutional right to due process and his constitutional right to not be put in jeopardy twice. The determination that the movant did not participate in the methamphetamine conspiracy from March 26, 1993, through March 21, 1995, or while on pre-trial release, the determination that he did not posses a firearm and other determinations made at the sentencing hearing in the 1996 case did not bar the government from presenting evidence to show the movant possessed a firearm or participated in a methamphetamine conspiracy as part of a conspiracy or enterprise to commit murder. In light of the record, the interests supporting a new determination of an already determined issue outweighed the interests of conserving judicial resources, of maintaining consistency and of avoiding the burdens of relitigation. Although there may be proceedings, such as capital sentencing proceedings, where the balance tips in favor of preclusion because it is clear that the issue was fully and fairly litigated, that is not the case here. And, it necessarily follows, then, that trial counsel and appellate counsel did not provide ineffective assistance by failing to prevent the relitigation of findings that were made during the sentencing hearing in the 1996 case. *See Strickland*, 466 U.S. at 688-94.

### C. Ground Three — Constitutional Violations Occurred as a Result of the Parties' Actions Concerning Jailhouse Informants and Cooperators

#### 1. Arguments of the parties

##### a. The movant

The movant asserts that a due process violation occurred because the government failed to disclose exculpatory or favorable information pertaining to jailhouse informants and cooperators. He points to fifteen witnesses who testified against the movant as

79

jailhouse informants or as cooperators: Daniel Cobeen, Timothy Cutkomp, Dean Donaldson, William Dean, Dennis Putzier, Terry Bregar, Daniel Frye, Frederick Tokars, Ronald McIntosh, Steve Vest, Steven Ferguson, Anthony Altimus, Anthony Johnson, Joseph McGee and Michael Kluver. The movant asserts that the government shirked its obligation to turn over evidence that pertains to the credibility of those witnesses. Specifically, he claims that, even though the government professed that it had turned over all exculpatory or favorable information, a recent investigation reveals that the government did not provide impeachment evidence that pertains to the witnesses' veracity, bias and/or motive to lie, failed to let on that witnesses cooperated in the past, did not disclose some inducements that it had made in exchange for testimony, forced witnesses to provide certain testimony and failed to reveal that the witnesses discussed their testimony and their expectations of receiving favorable treatment with each other when they were transported together or were otherwise together. The movant contends that several jailhouse informants and cooperating witnesses have come forward and they have established a significant pattern of unconstitutional non-disclosure by the government. The movant charges that the new evidence establishes that the witnesses provided false, exaggerated and misleading testimony that implicated him only after the government threatened, cajoled, induced and coaxed them, the witnesses had been cooperating for years and the witnesses colluded to conform their testimony.

To establish that the government used impermissible tactics, the movant relies on: (1) the trial court's observation during the sentencing hearing in the 1996 case that something caused Timothy Cutkomp to testify to larger drug quantities; (2) the indication by Terry Bregar that the government pressured him to testify falsely; (3) the statement by Dennis Putzier that the government threatened him with a life sentence for conspiring to commit murder if he did not testify as the government directed him to testify and he only testified as a result of the government's threats; (4) the acknowledgment by Dennis Putzier

80

that the government showed him a sentencing guidelines chart and indicated to him that he could be facing a sentence of 360 months to life; (5) the assertion by Dennis Putzier that, while in the Woodbury County Jail, he never spoke face-to-face with the movant; (6) the statement by Dennis Putzier that he told the government that there was no way the movant could have made it to his cell block to effectuate an escape; (7) the admission by Dennis Putzier that he lied to the grand jury; (8) the acknowledgment by Terry Bregar that the government knew his memory had been significantly affected by a stroke; (9) the revelation that, when he testified, Terry Bregar took medication for major depression; (10) the acknowledgment by Dennis Putzier and Terry Bregar that jailhouse informants discussed the movant's case and their testimony, compared notes and made up stories when they were transported or held together prior to testifying during the sentencing hearing in the 1996 case, the grand jury proceedings and/or the capital trial; (11) the indication by Anthony Johnson that the government threatened him with criminal charges if he did not cooperate; and (12) the statement by Anthony Johnson that, after the government informed him that it knew about his involvement with illegal drug sales, he obtained an attorney and negotiated a written agreement with the government. The movant offers that the government never revealed to the defense any of its coercive efforts and the witnesses falsely denied relevant and material information when they testified and/or provided misleading and exaggerated testimony that implicated him.

Aside from asserting that a due process violation occurred as a result of the government's misconduct, the movant claims that a violation of his right to effective assistance of counsel occurred. To the extent that trial counsel knew, or reasonably should have known, the government improperly procured testimony, the movant asserts that they provided ineffective assistance. He asserts that trial counsel did not exercise reasonable professional judgment when they failed to act on the presumption that the government engaged in improper conduct. And, the movant asserts that trial counsel performed

81

deficiently when they failed to fully investigate the backgrounds of the witnesses and when they failed to impeach the witnesses with information that was actually available or information that could have been discovered. He declares that, if they had conducted a proper or more thorough investigation, trial counsel could have learned that the government improperly procured testimony from witnesses, some witnesses had long histories of cooperating with the government and the witnesses colluded with each other when they were transported or held together.

He also faults trial counsel for failing to call into question the veracity of the jailhouse informants or cooperators. The movant criticizes trial counsel for calling only David Loparo and Neal Huffman to refute the testimony of Joseph McGee, Frederick Tokars and Steve Vest. He claims that, to rebut the testimony of all of the jailhouse informants and cooperators, trial counsel should have presented available evidence or called numerous witnesses who would have readily testified that the jailhouse informants or cooperators fabricated their stories, that they had access to the movant's legal papers or that they had been pressured by the government to testify falsely. *See* Movant Hearing Ex. 104, civil docket no. 74-132; Movant Hearing Ex. 105, civil docket no. 74-133; Movant Hearing Ex. 106, civil docket no. 74-134; Movant Hearing Ex. 107, civil docket no. 74-135; Movant Hearing Ex. 108, civil docket no. 74-136; Movant Hearing Ex. 109, civil docket no. 74-137. Apart from disapproving of the decision to call two witnesses to challenge the credibility of only three of the government's witnesses, the movant also contends that trial counsel impermissibly failed to rely on evidence showing that certain witnesses had cooperated in the past to undermine their credibility.

The movant claims that the government's impermissible conduct and trial counsel's deficiencies impacted his convictions and sentences. With respect to materiality, the movant maintains that the government's failure to disclose evidence significantly calls into question the outcome of the proceedings. He states that he did not receive a fair trial

82

because there is a reasonable likelihood that the government's non-disclosure of information pertaining to the credibility of the jailhouse informants and cooperators affected the judgment of the jury. The movant advances that the veracity of the witnesses is significantly impugned when one considers that they were able to discuss their testimony when they were transported together or otherwise held together and they were threatened by the government. Concerning the prejudice he suffered, the movant asserts that trial counsel's failure to uncover the government's misconduct undermines confidence in the outcome of the merits phase and penalty phase.

In support of his materiality and prejudice assertions, the movant emphasizes that the government relied on jailhouse informants and cooperating witnesses who said that he confessed to establish its case against him and that their testimony provided the only "direct" evidence that showed he committed the murders. He states that the case against him was completely circumstantial because there was no eyewitness testimony, no confession to a law enforcement officer and no forensic evidence to connect him to the murders. The movant declares that the testimony of the witnesses would have been decimated and the jury probably would have reached different verdicts if the government revealed exculpatory information, trial counsel discovered such information on their own or trial counsel had undertaken efforts to challenge their testimony. The movant alleges that, at a minimum, the inducements should have been disclosed to the jury so that it could review the government's improper tactics and evidence with a more discerning eye.

Additionally, the movant contends that, because many of the witnesses cooperated with the government in unrelated criminal matters and prior to the time the movant made incriminating statements to them, the introduction of their statements violated his right to remain silent (Fifth Amendment) and right to counsel (Sixth Amendment); he asserts that a violation of his rights under the Fifth Amendment and Sixth Amendment occurred because he made statements while he was in custody and while he was being questioned

83

by an agent of the government. Apart from alleging that such cooperation violated his constitutional rights, the movant avows that the past cooperation by witnesses shows their bias and motive.

### b. The government

The government denies that it engaged in misconduct when prosecuting the movant. The government maintains that the record establishes that: (1) it neither used coercive tactics nor failed to disclose such tactics to the defense; (2) it did not fail to disclose inducements or benefits that witnesses received in exchange for their testimony; (3) it did not fail to disclose impeachment evidence pertaining to a witness's memory problems, a witness's inability to communicate with the movant while in the Woodbury County Jail or the past cooperation of witnesses; and (4) it neither failed to disclose how witnesses were transported together or otherwise held together nor concealed that witnesses (a) discussed their testimony and expectations of receiving favorable treatment with each other and/or (b) attempted to collude to conform their testimony. It details the known pre-trial information and trial evidence, which includes the witnesses' testimony during grand jury proceedings, sentencing proceedings that related to the convictions in the 1996 case and trial proceedings, and asserts that the movant's reliance on recent statements from witnesses does not establish a constitutional violation. And, with respect to witnesses colluding with each other, the government asserts that, to the extent that witnesses spoke about their testimony when being transported or held together, it did not fail to disclose anything because it was never aware of witnesses conversing with each other. It also contends that no violation of the movant's constitutional right to remain silent or constitutional right to counsel occurred as a result of some cooperation by witnesses in the past.

Additionally, the government maintains that no violation of the movant's right to counsel occurred. With respect to their performance, the government contends that trial

84

counsel adequately investigated, cross-examined and attempted to impeach the government's witnesses. Apart from pointing out that trial counsel had no reason to conduct a more thorough investigation regarding the government's procurement of testimony and the witnesses' contact with each other because the recent statements are inconsistent with the information that trial counsel had prior to 2004, the government points out that none of the information relied on by the movant shows further investigation of witnesses was necessary because it is merely impeaching and does not reveal that they ever colluded with each other. The government also contends that the decision not to call additional witnesses who could have impeached the jailhouse informants and cooperators comports with the Sixth Amendment because trial counsel vigorously attacked their credibility and further impeachment of them would have been fruitless in light of the overwhelming evidence proving the movant's guilt. It states that, because the uncalled witnesses had criminal records and there is no basis to conclude their testimony would have aided the defense in any way, trial counsel's performance did not fall below acceptable professional standards. With respect to prejudice, the government disagrees with the movant's assertion that the proffered additional information was highly material and certainly would have resulted in an acquittal because the proffered additional information only pertains to witnesses who testified primarily about an escape attempt at the Woodbury County Jail, the proffered additional information supported the non-murder charges and an enormous amount of evidence showing the movant committed the murders was presented.

### 2. *Applicable law*

To meet constitutional due process requirements, it is clear that the government is obligated to protect the integrity of proceedings that are commenced against accused persons. *See generally Giglio v. United States*, 405 U.S. 150, 153-54 (1972) (describing conduct by the government that is incompatible with the rudimentary demands of justice).

85

Indeed, the law prohibits conduct and imposes affirmative duties: (1) the government may not knowingly present false evidence, *see United States v. West*, 612 F.3d 993, 996 (8th Cir. 2010) (laying out factors that the court must consider when a due process violation is based on the prosecution's use of false evidence, which includes false testimony), *United States v. Bass*, 478 F.3d 948, 951 (8th Cir. 2007) (same), *United States v. Funchess*, 422 F.3d 698, 701 (8th Cir. 2005) (same) and *United States v. Martin*, 59 F.3d 767, 770 (8th Cir. 1995) (same); (2) the government must correct false evidence that it did not solicit, *see United States v. Foster*, 874 F.2d 491, 494-95 (8th Cir. 1988) (emphasizing that due process requires the prosecutor to correct false testimony) (citing *Napue v. Illinois*, 360 U.S. 264, 269 (1959)) and *United States v. Johnson*, 649 F.2d 617, 618 (8th Cir. 1981) (same); and (3) the government must not suppress material evidence, *see United States v. Whitehill*, 532 F.3d 746, 753 (8th Cir. 2008) (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963)) and *United States v. Heppner*, 519 F.3d 744, 750 (8th Cir. 2008) (discussing the government's affirmative duty to disclose evidence that is both favorable to the accused and material to either guilt or punishment).

There is no doubt that, if the government knows that false evidence is being used to obtain a conviction or is being presented, the trial cannot in any real sense be termed fair. *See Napue*, 360 U.S. at 269; *see also Banks v. Dretke*, 540 U.S. 668, 694 (2004) (reiterating that the presentation of known false evidence is incompatible with the rudimentary demands of justice). With respect to the government's affirmative duty to correct false evidence when it appears, it does not matter that the false evidence pertains only to a witness's credibility. *Napue*, 360 U.S. at 269. It is impermissible for the government to rely on false credibility testimony to obtain a conviction because "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend."

86

*Id.* Consequently, it is the government's responsibility to elicit the truth when a falsehood is in any way relevant to the case. *Id.* at 269-70 (observing that the government's affirmative duty to correct what it knows to be false applies to evidence that goes to the witness's credibility as well as evidence that goes to the defendant's guilt). "[I]f 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury,'" relief is warranted. *Giglio*, 405 U.S. at 154 (quoting *Napue*, 360 U.S. at 271).

Just as the prosecution's knowing use of false evidence affronts the fundamental notion that justice be done, the prosecution's failure to disclose material evidence sometimes impermissibly undermines the search for truth. *Brady*, 373 U.S. at 87 (holding "that the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution"). The essential components of a *Brady* violation have developed over time. *See Strickler v. Greene*, 527 U.S. 263, 280-81 (1999) (discussing cases). Since *Brady*, it is clear that the government's duty to disclose does not depend on a specific request from the accused. *See United States v. Agurs*, 427 U.S. 97, 107 (1976) ("[I]f the evidence is so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce, that duty should equally arise even if no request is made."). Further, the duty to disclose encompasses impeachment evidence as well as exculpatory evidence. *See United States v. Bagley*, 473 U.S. 667, 676 (1985) (citing *Giglio*, 405 U.S. at 154); *United States v. O'Conner*, 64 F.3d 355, 358 (8th Cir. 1995) (same). And, undisclosed evidence "is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682.

With respect to materiality, the Supreme Court emphasized:

> [The] touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than

87

> not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Kyles*, 514 U.S. at 434 (quoting *Bagley*, 473 U.S. at 678); *see also Strickler*, 527 U.S. at 281 (stating that prejudice cannot be shown "unless the [non-disclosure] was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict"). Apart from emphasizing that "[a] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal" and that a showing of materiality only requires a reasonable probability that the result would have been different, the Supreme Court clarified that: (1) there is no need to demonstrate that, "after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict"; (2) a harmless error inquiry is not appropriate; and (3) the materiality of suppressed evidence must be considered collectively, not item-by-item. *Kyles*, 514 U.S. at 434-38; *see also Liggins v. Burger*, 422 F.3d 642, 651-52 (8th Cir. 2005) (clarifying that a determination as to whether the government's evidentiary suppression undermines confidence in the verdict requires the court to consider the items of suppressed evidence collectively, rather than individually).

So, when determining whether a *Brady* violation occurred, the court considers the following: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the [government], either willfully or inadvertently; and prejudice must have ensued." *Strickler*, 527 U.S. at 281-82. The court must also be mindful of the fact that the duty to enforce *Brady* "with painstaking care is never more exacting than it is in a capital case." *Kyles*, 514 U.S. at 422.

88

The materiality analysis under *Brady* is co-extensive with the prejudice analysis under *Strickland*. *Strickler*, 527 U.S. at 282-88. In assessing materiality, the court must consider the ways in which effective defense counsel could have used the suppressed evidence during their pre-trial investigation and development of other evidence and during trial. *Bagley*, 473 U.S. at 683 (directing a court to analyze what effect suppressed evidence had on the preparation or presentation of defense); *accord Kyles*, 514 U.S. at 441 (addressing whether disclosure of suppressed evidence to competent counsel would have made a different result reasonably probable).

### 3. Analysis

#### a. The information cited by the movant

The movant continues to complain that the court unfairly limited his access to some jailhouse informants and cooperators. Such complaint is unjustified. Prior to the evidentiary hearing, the movant stated that significant information obtained from Dennis Putzier, Terry Bregar and Anthony Johnson established that: (1) witnesses colluded to conform their testimony; (2) government agents pressured witnesses to reveal information; (3) government agents threatened to charge witnesses if they did not cooperate; and (4) government agents offered witnesses leniency if they cooperated. The court, however, declined to allow the movant to interview the witnesses who are in the United States Federal Witness Protection Program[30] to advance his claims because the movant did not establish a significant pattern of unconstitutional non-disclosure by the government. The testimony that the movant offered during the evidentiary hearing bolsters the court's previous conclusion that he did not establish "good cause." Rather than show the

---

[30] Such program is also known as the Witness Security Program or WITSEC. It is administered by the United States Department of Justice, and it is operated by the United States Marshal Service.

89

government acted in an unconstitutional manner, all of the movant's witnesses undermined his perfunctory and sweeping allegations.

### *(1)    Dennis Putzier*

Prior to testifying at the sentencing hearing in the 1996 case and at trial, Dennis Putzier lied to a grand jury. He minimized his interactions with the movant, claimed ignorance about the movant's relationship with Dean Donaldson and declined to offer any details about an attempted escape. Dennis Putzier, however, contacted the government through another individual shortly after appearing before the grand jury because he believed that he might be facing twenty more years in prison as a result of his own actions and the actions of the movant and others. The government never approached Dennis Putzier and never told him that it was going to charge him with conspiracy to commit murder, escape or perjury. As a result of contacting the government, Dennis Putzier participated in a series of interviews. During an interview on November 19, 1997, the government informed Dennis Putzier that he might be facing charges of conspiracy to commit murder, aiding and abetting a federal prisoner's escape and perjury. It also referenced a federal sentencing table and explained different scenarios to Dennis Putzier. After discussing with an attorney the possible sentences that he might face if charged with conspiracy to commit murder, aiding and abetting a federal prisoner's escape and perjury, Dennis Putzier decided to enter into an agreement to plead guilty to instigating or assisting the movant's attempted escape and to cooperate with the government.

At trial, Dennis Putzier testified that: (1) he faced new charges of assault and driving while under the influence of alcohol and the government did not promise him that it would provide him any help on those charges in exchange for his testimony; (2) he pleaded guilty to a federal charge as a result of trying to escape with the movant and received a reduction in his sentence for cooperating; (3) he did not receive any benefit concerning any of his numerous other convictions in exchange for his cooperation; and

90

(4) he expected nothing in return for testifying against the movant. Dennis Putzier provided testimony that did not substantially differ from his testimony at the sentencing hearing in the 1996 case. He again stated that the movant confessed to murdering people, wanted him to escape from the Woodbury County Jail so that he could kill Timothy Cutkomp, posted bond to get Dean Donaldson out of the Woodbury County Jail so that Dean Donaldson could kill Timothy Cutkomp and attempted to escape from the Woodbury County Jail. Dennis Putzier also acknowledged that he lied to the grand jury to protect the movant.

In light of the record, the court does not find that the government failed to disclose any information pertaining to Dennis Putzier. Contrary to the movant's assertion, the record does not establish that Dennis Putzier consistently and repeatedly maintained that he was threatened with a life sentence. Prior to writing to the trial court in January of 2011, preparing an unsigned statement[31] and testifying at the evidentiary hearing, Dennis Putzier testified that he did not believe he should be charged federally for conspiring to murder a witness, assisting an escape or lying while testifying, and he clarified that he changed his testimony because he wanted to avoid a sentence that ranged from five to twenty years. He, however, never mentioned the possibility of a life sentence, and no testimony during the sentencing hearing in the 1996 case or during trial suggests that he really believed that he faced a life sentence. Dennis Putzier's recent allegations concerning his interactions with the government are undoubtedly due to the fact that he faced an

---

[31] The movant withdrew this document. The court, however, notes that Dennis Putzier's opinion about the likelihood of escape is not relevant and some of his statements do not address new information. He already admitted that he lied to the grand jury. Also, his suggestion that he was unable to communicate face-to-face with the movant is consistent with his prior testimony during the sentencing hearing in the 1996 case and during trial. Similarly, his suggestion that it was unlikely that the movant could escape with him is corroborated by trial testimony that indicates they needed help from the outside and the movant had great difficulty getting through a wall and a door.

91

additional federal charge in December of 2010 and received a lengthy sentence. It is apparent that he resents the government. And, the mere discussion of possible sentencing outcomes if particular charges are pursued is not the same as actually being told that the government's directives must be followed or a life sentence will be sought. Dennis Putzier's testimony indicates that he considered different sentences in light of his situation but never considered a conspiracy to murder a witness charge to be a realistic possibility. It also indicates that he never cooperated because the government forced him to do so. Therefore, the court finds that the government did not actually threaten to charge Dennis Putzier with conspiring to murder a witness and to pursue a life sentence against him.

Moreover, it is apparent from the sentencing hearing in the 1996 case that the movant knew Dennis Putzier was aware of the possibility of being charged with conspiracy to murder a witness and other charges as a result of their interactions with each other. The movant also knew that Dennis Putzier had an extensive criminal history and that he did not want to face five, ten, fifteen or twenty years in prison for committing federal crimes after serving fifteen years in prison for committing state crimes. Further, the movant knew that Dennis Putzier pleaded guilty to instigating or assisting the movant's attempted escape rather than conspiring to murder a witness. Dennis Putzier's recent acknowledgment that the government told him that he might face a lengthy sentence if charged with certain offenses is not significantly different than the testimony he provided during the sentencing hearing in the 1996 case. The fact that Dennis Putzier had discussions with the government and his attorney about the possibility of receiving a sentence between five years and life is consistent with his extensive criminal background and status as a career offender. So, it cannot be said that the government deprived the movant of information that allowed him to claim Dennis Putzier changed his testimony because he faced a lengthy sentence.

92

In addition, during the evidentiary hearing in this action, Dennis Putzier confirmed that he testified truthfully at the sentencing hearing in the 1996 case and during trial. He stated that his testimony about the movant's attempted escape from the Woodbury County Jail, the movant's murder confession and the movant's attempt to have Dean Donaldson kill Timothy Cutkomp is correct. But, more importantly, it is clear that Dennis Putzier still stands by his prior assertion that he did not receive any benefit from testifying at the movant's trial and his prior assertion that he decided to divulge information to the government after being asked to consider what he was doing and after being told that others had already given information. Contrary to the movant's assertion, Dennis Putzier never expressed that he only changed his testimony and agreed to cooperate because the government threatened him with a life sentence for conspiring to kill Timothy Cutkomp.

### (2)    Terry Bregar

On March 14, 1997, Terry Bregar testified before a grand jury pursuant to a proffer agreement that he entered into with the government, and, on December 16, 1997, he reluctantly testified during the movant's sentencing hearing in the 1996 case. At the latter proceeding, Terry Bregar indicated that his eyesight started failing about six months earlier. He said his diabetes, not a stroke, damaged his optic nerve and caused his blindness. He did not state that he had memory problems or had ever suffered a stroke. He also stated that the government approached him and told him that he might be able to get a reduction in his sentence for cooperating. He, however, stated that he did not believe the government would ever seek a sentence reduction on his behalf.

At trial, Terry Bregar provided consistent testimony. Terry Bregar testified that he lost his sight as a complication of diabetes. He did not state that he had trouble remembering or had suffered any complication as a result of a stroke. Terry Bregar again testified that the government approached him in 1997 and that he initially did not want to help but he ultimately decided to talk to the government because it might be possible for

93

him to get a reduced sentence if he cooperated. Terry Bregar stated that the government never made any promises or guarantees to him and that he did not make anything up to get a reduction in his sentence. In addition, Terry Bregar also testified that: (1) the movant was involved in an escape plan; (2) the movant talked about killing people; (3) the movant had bailed an individual out of the Woodbury County Jail to take care of some things for him; and (4) the movant had motioned as if shooting a gun when disclosing that witnesses had not shown up in an earlier case. Further, the government solicited from Terry Bregar that, after he testified at the sentencing hearing in the 1996 case, the trial court reduced his sentence by fifty-four months in exchange for his cooperation. Terry Bregar also acknowledged that he only had to serve thirteen months and two weeks in relation to his federal sentence and that he did not expect to receive any benefit for testifying again.

The court finds that the government never pressured Terry Bregar. The interactions between Terry Bregar and the government do not indicate that the government sought to have him provide testimony during trial that differed from his earlier statements. Terry Bregar did not convey during the sentencing hearing in the 1996 case or the trial that the government ever coerced or threatened him. During trial, he made clear that, although the government explained to him that some mothers and fathers really wanted to know where their children were, he told the government that he did not know anything or hear anything about missing bodies. Terry Bregar subsequently reiterated that he provided truthful testimony to the grand jury, the court and the jury. He testified that, when preparing for trial, he felt like the government wanted him to say that the movant admitted to killing people, but he also acknowledged that the movant had admitted people disappeared, had said they were all in one spot, had motioned as if shooting somebody and had stated that he just needed one week out of jail and it would be the same as in 1993. He also acknowledged that he had participated in an interview on March 5, 1997, where he stated that the movant told him that people do not die like they do on television.

94

Although the government admits that, when preparing for trial, it asked Terry Bregar whether the movant confessed to him, nothing prevented the government from doing so, especially considering the government was relying on information provided at an interview, testimony provided at a grand jury proceeding and testimony offered at the sentencing hearing in the 1996 case.

The court also finds that Terry Bregar did not have a stroke or any other health issues that affected his ability to provide truthful testimony during trial. The testimony that he provided from 1997 to 2011 is remarkably consistent and does not indicate any abnormal memory issues. His only reference to memory relates to his concern in 2004 about the heritability of Alzheimer's. And, none of Terry Bregar's medical records include a definite diagnosis of a stroke, a course of treatment for memory problems or an unusual problem with depression. They indicate that Terry Bregar went to Springfield, Missouri, from October 7, 1997, to December 8, 1997, to be treated for his diabetes and deteriorating eye sight.

Terry Bregar's medical records include a notation about a "vascular accident in left eye in past, possibly temporal arteritis." Movant Ex. 14; Movant Hearing Ex. 125. It, however, is an early observation that is followed by a notation about a return to clinic for photos and a macular exam. Like later notations, the preliminary notations appear to relate to optic nerve atrophy or degeneration that is due to some type of disturbance, not a stroke. When considered as a whole, the medical records reveal that medical personnel examined Terry Bregar, ordered tests and made observations in order to reach a final diagnosis. Indeed, they indicate: (1) a presumption of optic neuropathy of inflammatory or ischemic origin based on history; (2) an impression that a temporal artery biopsy should be performed by general surgery to rule out temporal arteritis, which is extremely unlikely, and that bilateral optic nerve atrophy is probably due to non-arteritic ischemic optic neuropathy; and (3) a final diagnosis of bilateral optic nerve atrophy with functionally

95

exaggerated visual deficit.  There is absolutely nothing in Terry Bregar's medical records that indicates he had a stroke.

Also, it is clear that the government did not have any information regarding a stroke or memory loss that it failed to disclose prior to trial.  *See* civil docket no. 75, ¶ 6 (Bill Basler stipulation).  At no time during the March 5, 1998 sentence reduction hearing did Terry Bregar either state that he suffered a stroke or that it affected his memory, and Terry Bregar never said anything about a stroke or his memory problems prior to having a declaration prepared for him.  This includes when a separate team of lawyers interviewed him in August of 2009.

Further, the court finds that no *Brady* violation occurred as a result of transporting or housing jailhouse informants and cooperators together.  Nothing in the record indicates jailhouse informants and cooperators fabricated their testimony as a result of being transported together or otherwise held together.[32]  By the time of trial, numerous witnesses, including Daniel Cobeen, Timothy Cutkomp, Dean Donaldson, William Dean, Dennis Putzier, Terry Bregar and Daniel Frye had already testified during the movant's sentencing hearing in the 1996 case.  In addition, at the evidentiary hearing, Terry Bregar did testify that he and four or five other individuals rode in the same van on the way to testify during trial, but he described more specifically what was said.  Contrary to his declaration, Terry Bregar clarified that he did not talk at all while he was in the van.  He also did not lend any support to the movant's original contention that jailhouse informants and cooperators colluded to provide false testimony.  Terry Bregar stated that none of the people talking in the van attempted to match up their stories and that he did not believe jailhouse informants and cooperators were talking with the purpose of changing their

---

[32] The movant withdrew Dennis Putzier's statement and did not solicit from Dennis Putzier any testimony that establishes jailhouse informants and cooperators coordinated their testimony.

96

testimony.  He identified Dean Donaldson as one of the passengers who spoke and observed that he recognized others as having been confined in the same pod at the Woodbury County Jail.  Apart from stating that the other jailhouse informants and cooperators generally talked about their experiences with the movant and their desires to receive a reduction in their sentences, Terry Bregar did not remember any significant details that were discussed or convey that anyone attempted to learn more facts because a larger sentence reduction might be obtained.  Further, Terry Bregar merely speculated or imagined that deputy marshals overheard and paid attention to the jailhouse informants and cooperators.

### *(3)     Anthony Johnson*

The court does not find that the government failed to disclose to the movant information regarding Anthony Johnson.  It is undisputed that the government provided Anthony Johnson's interview report dated January 26, 1998, to the movant and that such report refers to a proffer letter and indicates he wanted "full immunity" for information disclosed during the interview.  The report revealed that a variety of topics came up at the interview.  Apart from disclosing that he had purchased a methamphetamine recipe from the movant for $1,000.00, Anthony Johnson disclosed the delivery of firearms and past drug debts in relation to his camper and trailer.  At the time of trial, Anthony Johnson had been released and was employed.  Anthony Johnson testified that he had served his federal sentence without receiving a reduction in his sentence for cooperating, that nobody promised him anything and that he was not receiving any benefit for testifying against the movant.  But, on cross-examination, Anthony Johnson clarified that he only provided information to the government because it had promised not to use any disclosed information against him.  He stated that the government approached him and that he answered its questions after his lawyer negotiated an agreement with the government.  At no point during trial did Anthony Johnson indicate that the government threatened to

97

charge him if he did not agree to provide information. Further, after providing information to the government pursuant to the terms of the proffer letter, Anthony Johnson did not enter into an additional agreement with the government. Although the government did not prosecute him, nothing prevented the government from doing so. As is indicated in the proffer letter, the government never granted Anthony Johnson immunity regarding any of his illegal conduct and only agreed that his statements could not be used as direct evidence against him. In light of the record, which includes, but is not limited to, the trial testimony indicating Anthony Johnson did not receive any assurances from the government, the misstatements that Anthony Johnson included in his March 8, 2011 declaration and the information contradicting Anthony Johnson's understanding of his arrangement with the government, it is clear that the government acted appropriately.

### *(4)* *Daniel Cobeen*

Like the government's conduct with respect to Dennis Putzier, Terry Bregar and Anthony Johnson, the government's conduct with regard to Daniel Cobeen did not violate any constitutional right. The court finds that the government fully disclosed to the movant the nature and extent of the "benefits" provided to Daniel Cobeen and that the information pertaining to Daniel Cobeen is not different from the information the movant had at the time of trial. In May of 1997, Daniel Cobeen acknowledged during grand jury proceedings that he was on probation and living in a half-way house when the movant first approached him. During the sentencing hearing in the 1996 case and at trial, the parties focused on Daniel Cobeen's extensive cooperation with the government. Daniel Cobeen's testimony indicated that he was worried about getting into more trouble while on probation and scared when he entered a room that included an "army" of federal agents. It is apparent from his testimony that he just wanted to avoid trouble, complete his probation and help out his family. When asked at trial about receiving approximately $7,000.00, Daniel Cobeen admitted that the government gave it to him to relocate to Florida and that

98

he had used some of it to pay fines that related to his state charges. Daniel Cobeen also stated that he did not know whether he received a reduction in the amount of time that he had to serve on probation as a result of his cooperation. Although unclear as to whether he in fact received a benefit, he clarified that his state probation officer did not want him to cooperate with the government until he left the half-way house and completed his term of probation and that he did not report to his state probation officer after he left the half-way house. He also emphasized that, once he left the half-way house, he started to report his interactions with the movant to a federal agent and ultimately moved away because, after arresting the movant, the government feared for his safety. Daniel Cobeen provided consistent testimony during the evidentiary hearing in the instant case. Indeed, Daniel Cobeen testified that he thought his probation had ended early. But, nothing in the record definitively establishes the original period of probation that Daniel Cobeen received, the total amount of time that he served on probation or the terms that he faced throughout his probation. Because the movant did not offer official documentation from the state or present the state probation officer's explanation, it is unclear whether his probation ended in the normal course or terminated at an earlier date. It is also unclear what part, if any, Daniel Cobeen, his attorney, the state and/or the government played in changing or terminating his probation. Therefore, Daniel Cobeen's uncertainty as to what occurred is not a sufficient basis to establish that the government acted improperly. Moreover, if Daniel Cobeen's probation ended early as a result of a federal agent's intervention, it is doubtful whether that can actually be considered a real benefit, especially considering that Daniel Cobeen's cooperation caused upheaval in his life and put his family's safety in jeopardy.

### (5)    Summary

The court concludes that the government complied with its constitutional obligation to protect the integrity of the movant's trial. The government fully disclosed to the movant

99

all evidence relating to jailhouse informants and cooperators. The movant's contention that the government threatened, cajoled, induced or coaxed the jailhouse informants or other cooperating witnesses into providing false, exaggerated or misleading testimony and that it did not disclose such tactics to him is belied by the record. The court finds that the credible testimony indicates the government conducted itself in a manner that exceeded constitutional requirements. It is clear that the government disclosed to the movant its interactions with jailhouse informants and cooperators and nothing it did impacted the truthfulness of their testimony. The movant's characterization of what occurred is not correct. The record also reveals that either the government or trial counsel explored the witnesses' reasons for testifying and they truthfully testified about their motives. Contrary to the movant's assertion, the record does not show that the government's witnesses testified because they had received a benefit or had been promised a future benefit or that the government failed to disclose such inducement for testifying.

Additionally, the record indicates that, even when tested on cross-examination by trial counsel, all of the government's witnesses provided extraordinarily consistent testimony. Although more than six years passed between earlier proceedings and trial, none of the witnesses changed their testimony. All of them recounted the events that had occurred years earlier. Despite making brazen assertions in his original pleading, the movant fails to identify any trial testimony that is false. Further, it is clear that the movant had access to impeachment evidence because the government zealously provided it to him and the government never willfully or inadvertently suppressed any impeachment evidence. When it obtained information, the government promptly provided it to the defense. And, there is absolutely nothing in the record that indicates that the government presented false testimony or failed to correct testimony that it knew was false.

100

### b. Materiality

Even if the government suppressed or failed to disclose favorable information relating to jailhouse informants and cooperators, no *Brady* violation occurs unless the information is material. *Strickler*, 527 U.S. at 281-82. Evidence is "material" when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id*. at 280. A reasonable probability is one that is sufficient to undermine confidence in the outcome of the trial. *Kyles*, 514 U.S. at 434. A court must determine whether the movant received a fair trial in the absence of excluded evidence, not whether it is more likely than not that the jury would have returned a different verdict. *See Strickler*, 527 U.S. at 289-90 (quoting *Kyles*, 514 U.S. at 434).

It is clear that the movant received a fair trial because the impeachment evidence, which includes, but is not limited to, all of the movant's assertions as to Dennis Putzier, Terry Bregar, Anthony Johnson and Daniel Cobeen, is not material. The movant wholly ignores the other evidence admitted during trial and mischaracterizes the record. It is preposterous for the movant to assert that the only direct evidence came from jailhouse informants or cooperators who testified that he had confessed to them. An overwhelming amount of direct evidence, which includes recorded statements, inculpates the movant. Assuming that the movant could impugn the testimony of the jailhouse informants and cooperators, the court is confident beyond all doubt that the jury would have returned the same merits phase verdicts and penalty phase verdicts because a tremendous amount of evidence establishes that the movant heinously murdered Gregory Nicholson, Lori Duncan, Kandi Duncan, Amber Duncan and Terry DeGeus.

Although impeachment evidence may be material if it is disclosed and effectively used by the defense when conducting a pre-trial investigation, developing other evidence and examining a witness, there is not much that trial counsel would have been able to do

101

with the evidence in this case.  *Cf. Kyles*, 514 U.S. at 445 (analyzing damage to the prosecution's case if counsel had been afforded the opportunity to attack, among other things, the circumstances in which the physical evidence was found and the government's thoroughness and good faith investigation).  The movant points to the government's failure to obtain and reveal information regarding the pre-trial transportation of some witnesses who testified during the sentencing hearing in the 1996 case.  It, however, turns out that he unduly emphasizes what actually occurred on the trip to the courthouse.  The movant also emphatically asserts that he would have been able to present to the jury a question about the credibility of the government's witnesses.  But, he had already attempted to undermine their credibility with information that the government provided to him.  And, the record indicates that very little, if any, of the evidence calls into question the credibility of the jailhouse informants and cooperators.

Moreover, the evidence that the government introduced through those witnesses only played a small part in its case against the movant.  Their testimony makes up just a small portion of the testimony for which no innocent explanation was plausible. Considering the entire case, the court finds that there is no reasonable probability that the verdicts would have been different had the government known of the complained of evidence and disclosed it.  It cannot be said that the evidence relied upon by the movant puts the whole case in such a different light that it undermines confidence in the verdicts. *Cf. United States v. Goodson*, 165 F.3d 610, 615 (8th Cir. 1999) (concluding that a claim based on a *Brady* violation failed because the unavailable evidence would have been minimally, if at all, useful (materiality) and a claim based on the use of false evidence failed because a reasonable likelihood that the false testimony could have affected the jury's judgment did not exist).

102

### c. The performance of trial counsel and the prior cooperation of witnesses

As to the movant's assertions regarding trial counsel's inadequate investigation, cross-examination and impeachment of the government's witnesses, the record clearly establishes that trial counsel did all that was necessary to attack the credibility of the government's witnesses. *See Strickland*, 466 U.S. at 688 (addressing deficient performance prong). The movant appears to generally assert that trial counsel should have better tested the witnesses' accounts of what he confessed to them so as to establish his innocence or they should have tried harder to establish that the witnesses could not be relied on because they harbored ulterior motives. Nothing, however, suggests that trial counsel failed to fully investigate the backgrounds of the government's witnesses or that they could have and should have further challenged their veracity. There is no doubt that trial counsel's representation exceeded professional standards. *Cf. Rompilla*, 545 U.S. at 385-86 (observing that trial counsel must conduct an adequate investigation, examine files and consider viable theories that weaken the government's case). Moreover, because the court already concluded that the information regarding the jailhouse informants and cooperators had no material effect on the movant's defense, the assertion that trial counsel could have and should have done more necessarily fails. *See Strickler*, 527 U.S. at 282-88 (observing that the materiality analysis under *Brady* is co-extensive with the prejudice analysis under *Strickland*); *see also Strickland*, 466 U.S. at 694 (addressing prejudice prong).

With respect to trial counsel's decision not to call additional witnesses who could have impeached the government's witnesses, no constitutional violation occurred. *See Strickland*, 466 U.S. at 688-94. The record establishes that trial counsel did call witnesses to support the movant's version of events that occurred while imprisoned. Those witnesses, however, did not offer convincing testimony. If they provided the best available

103

testimony, it is not surprising that trial counsel elected not to call other witnesses. Because it is highly doubtful that testimony from inmates who spent time with the movant would have aided his defense in any way, the court concludes that trial counsel's performance did not fall below acceptable professional standards. The court is unable to fault trial counsel for failing to find and call more than two witnesses who could testify that they knew the movant and he never admitted to them that he killed anyone. *See United States v. Staples*, 410 F.3d 484, 488 (8th Cir. 2005) ("The decision not to call a witness is a virtually unchallengeable decision of trial strategy . . . ." (internal quotation marks omitted)). In addition, the court concludes that further attempts to impeach the jailhouse informants and cooperators who provided consistent testimony in exchange for limited benefits would have been futile, especially considering the tremendous amount of evidence showing the movant's guilt.

Lastly, the court finds that the movant's other claim concerning the prior cooperation of witnesses on other matters and before he made incriminating statements to them is baseless. In light of *Texas v. Cobb*, 532 U.S. 162, 172-73 (2001) (addressing right to counsel), and *Illinois v. Perkins*, 496 U.S. 292, 297-99 (1990) (addressing right to remain silent and right to counsel), it is clear that no violation of the movant's constitutional right to remain silent or constitutional right to counsel occurred as a result of some cooperation by witnesses in the past. The record reflects that the movant freely spoke to many inmates he encountered and the government charged him on August 30, 2001, which is well after he made incriminating statements to them. There is absolutely no evidence that any jailhouse informant or cooperator was instructed or directed to gather information from the movant. *Cf. Massiah v. United States*, 377 U.S. 201, 206-07 (1964) (holding that, even though it is entirely proper to continue an investigation of suspected criminal activities after the government obtains an indictment, a defendant's incriminating statements, surreptitiously and indirectly obtained by federal agents in the absence of

104

counsel, cannot be used against him at trial).  To the extent that he blames trial counsel for not raising these claims, the United States Constitution does not require counsel to advance claims that are unsupported by the facts or the law.

In sum, the court concludes that the record refutes the movant's claims that the government engaged in misconduct and trial counsel provided representation that was deficient and prejudicial.  As such, relief is not justified on this ground.

### D.  Ground Four — Constitutional Violations Occurred as a Result of the Litigation of the Continuing Criminal Enterprise Murder Counts

#### 1.  Arguments of the parties

##### a.  The movant

The movant generally asserts that trial counsel failed to properly investigate and litigate the CCE murder counts (count 13 through count 17) of the superseding indictment. He specifies two deficient aspects of their assistance.  Namely, he states that trial counsel did not properly challenge whether a continuing criminal enterprise existed under 21 U.S.C. § 848 and did not object to the jury instructions.  Aside from asserting ineffective assistance of counsel, the movant again asserts a *Brady* violation.  The movant contends that the government failed to disclose evidence that establishes he did not organize, supervise or manage Jeffrey Honken in the drug operation.

As to the first ground of ineffective assistance of counsel, the movant contends that trial counsel should have discovered and presented evidence that he acted as a subordinate in the drug enterprise and Jeffrey Honken acted as the organizer, supervisor or manager of the drug enterprise.  In support of such contention, the movant relies on the statements and/or testimony of several individuals: Melissa Friesenborg, Timothy Cutkomp, David Honken, Kathy Schuess, Jeffrey Honken, Marvea Honken/Smidt and Alyssa Nelson. According to the movant, the additional evidence provided by those individuals demonstrates the following: (1) as the older and dominant brother, Jeffrey Honken held

105

considerable sway and influence over the movant and such influence manifested itself in the formulation and operation of the drug enterprise and earlier schemes; (2) Jeffrey Honken acted as the organizer, supervisor and manager of the charged drug enterprise and earlier schemes and drug operations; (3) when questioned about his role in the drug enterprise, Jeffrey Honken minimized and misstated his financial profits, his own use and distribution of methamphetamine, his knowledge of the drug enterprise and his decision-making authority; (4) as the older and dominant brother, Jeffrey Honken never took any orders, directions or instructions from the movant about anything; and (5) the movant never organized, supervised or managed Jeffrey Honken in the drug enterprise.

Given such evidence, the movant asserts that trial counsel unreasonably failed to focus on Jeffrey Honken's role in the enterprise. He states that trial counsel never articulated a tactical or strategic reason for failing to develop and present evidence that showed he did not organize, supervise or otherwise manage Jeffrey Honken. He also states that trial counsel failed to appreciate that there is a difference between organizing the drug enterprise and exercising a leadership role over all of the participants. And, the movant states that, rather than collect and present available evidence, trial counsel presented only two witnesses—Marvea Honken/Smidt and Alyssa Nelson—during the merits phase and limited their closing argument to whether he exercised control over Jeffrey Honken.

Regarding the second ground of ineffective assistance of counsel, the movant claims that the trial court improperly instructed the jury when it addressed the requirements for proof of the existence of a continuing criminal enterprise and stated in its preliminary merits phase instructions: "You are *not* required to agree unanimously as to the identities of the five persons." Criminal docket no. 512 at 29-30 (setting forth Preliminary Instruction No. 11—Requirements for Proof: "Continuing Criminal Enterprise (CCE)" Defined). He maintains that such instruction is erroneous because the government alleged

106

the statutory minimum number of persons (one organizer plus five others acting in concert) to constitute a continuing criminal enterprise. *See* 21 U.S.C. § 848(c). Given the statutory minimum number of individuals involved, the movant states that the trial court should have instructed the jury that it needed to unanimously agree beyond a reasonable doubt that the movant organized, supervised or managed Timothy Cutkomp, Gregory Nicholson, Terry DeGeus, Angela Johnson and Jeffrey Honken. He stresses that, because the trial court erroneously instructed the jury, trial counsel should have objected but inexplicably failed to do so.

With respect to the failure to present more evidence and the failure to object to the jury instructions, the movant advances that the facts show trial counsel performed in a deficient manner. He also emphasizes that prejudice ensued from trial counsel's performance. The movant argues that, if the jury had been properly instructed as to all of the indispensable elements and had considered evidence showing he did not manage Jeffrey Honken, there is a reasonable likelihood that it would not have reached guilty verdicts on the CCE murder counts and a sentence of death on any of the capital counts. He cites multiple cases as being analogous to his situation. *See White*, 416 F.3d at 732 (concluding that a constitutional violation occurred because counsel's superficial investigation did not reveal the comparative strength of two witnesses and counsel failed to call two witnesses who supported the defense's theory); *Reagan v. Norris*, 365 F.3d 616, 621-22 (8th Cir. 2004) (concluding that counsel performed deficiently in failing to object to an instruction that lacked an essential element of the crime and prejudice resulted); *Parkus v. Delo*, 33 F.3d 933, 938-39 (8th Cir. 1994) (remanding for an evidentiary hearing where counsel failed to pursue institutional records even though the sole defense rested on showing the existence of a serious mental condition that affected the capacity to deliberate); *Starr v. Lockhart*, 23 F.3d 1280, 1285 (8th Cir. 1994) (concluding that counsel performed deficiently in failing to object to an unconstitutionally vague

107

aggravating circumstance sentencing factor and prejudice resulted); *Foster v. Lockhart*, 9 F.3d 722, 726 (8th Cir. 1993) (deciding that an attorney's performance was deficient because the decision to pursue an alibi defense does not excuse the failure to investigate and present an impotency defense that would bolster rather than detract from the primary alibi defense).

### b. The government

The government denies that the convictions and sentences as to the CCE murder counts are invalid as a result of insufficient evidence and instructional error. With respect to the first assertion of invalidity, the government states that the evidence clearly satisfies all of the elements of a continuing criminal enterprise violation because the movant always functioned as the leader of the entire methamphetamine enterprise. It maintains that, when exercising his authority as the leader, the movant arranged the positions or roles that Jeffrey Honken, Timothy Cutkomp, Angela Johnson, Gregory Nicholson and Terry DeGeus occupied in the continuing criminal enterprise and made nearly every decision regarding the continuing criminal enterprise. The government maintains that it proved beyond a reasonable doubt that the movant held a leadership role as to five other individuals in the continuing criminal enterprise and the movant's general relationship with his older brother is not relevant. Concerning the second assertion of invalidity, the government states that the trial court did not err when providing instruction as to the identity of the five people that the movant organized, supervised or managed. It contends that the law does not support the movant's contention that a jury must unanimously find the identity of the five people that the movant organized, supervised or managed.

Further, the government maintains that, because no instructional error occurred and the evidence demonstrates that the movant operated as the organizer, supervisor and manager of the continuing criminal enterprise, trial counsel did not provide ineffective assistance. It contends that the record indicates trial counsel investigated issues related to

108

Jeffrey Honken and litigated them during trial. As to prejudice, it asserts that there is absolutely no basis to conclude that additional testimony regarding the relationship between brothers would have altered the jury's verdicts. Lastly, the government denies that it impermissibly failed to disclose evidence that the movant did not act as an organizer, supervisor or manager.

### 2. Analysis

To establish a continuing criminal enterprise under 21 U.S.C. § 848, the government needed to prove: (1) a felony violation of the federal narcotics laws; (2) as part of a continuing series of three or more related felony violations of federal narcotics laws; (3) in concert with five or more other persons; (4) for whom the movant was an organizer, manager or supervisor; and (5) from which the movant derived substantial income or resources. *See* 21 U.S.C. § 848(c); *see also Honken*, 541 F.3d at 1158 (citing *United States v. Maull*, 806 F.2d 1340, 1342 (8th Cir. 1986)); *United States v. Jackson*, 345 F.3d 638, 645 (8th Cir. 2003) (citing *United States v. Jelinek*, 57 F.3d 655, 657 (8th Cir. 1995)). "The terms 'organizer,' 'manager,' and 'supervisor' are interpreted according to their plain meaning." *Jackson*, 345 F.3d at 646 (citing *United States v. Possick*, 849 F.2d 332, 335 (8th Cir. 1988)). "The government need not establish that the defendant managed five people at once, that the five acted in concert with each other, that the defendant exercised the same kind of control over each of the five, or even that the defendant had personal contact with each of the five." *Possick*, 849 F.2d at 335-36. If the "defendant exert[s] some type of influence over another individual as exemplified by that individual's compliance with the defendant's directions, instructions, or terms," the element of acting as an organizer, manager or supervisor is satisfied. *Jackson*, 345 F.3d at 646 (quoting *Possick*, 849 F.2d at 336); *see also United States v. Mathison*, 518 F.3d 935, 939 (8th Cir. 2008) (discussing the fourth element).

109

In the CCE murder counts, the government alleged that: (1) "the continuing criminal enterprise [the movant] engaged in and worked in furtherance of was undertaken by [him] in concert with five or more other persons[,] including, but not limited to, Timothy Cutkomp, Gregory Nicholson, Terry DeGeus, [Angela Johnson], and [Jeffrey] Honken"; (2) the movant "occupied a position of organizer, supervisor or other position of management" in the organization; (3) the "criminal enterprise involved the commission of a continuing series of narcotics violations"; and (4) "[the movant] and others derived substantial income and resources" from the continuing criminal enterprise. Consistent with the allegations included in count 13 through count 17 of the superseding indictment, the trial court informed the jury that five requirements must be met to establish the existence of a continuing criminal enterprise. Specifically, in its preliminary instructions, the trial court stated:

> To prove the existence of a CCE, the prosecution must prove *all* of the following requirements beyond a reasonable doubt:
>
> *One*, there was a felony violation of the federal controlled substances laws.
>
> *Two*, that offense was part of a continuing series of three or more related felony violations of the federal controlled substances laws.
>
> "A continuing series of violations" means at least three violations of the federal controlled substance laws that were connected together as a series of related or on-going activities, as distinguished from isolated and disconnected acts. The violations are "related" if they are driven by a single impulse and operated by continuous force. You must unanimously agree on which three violations constituted the series of three or more violations in order to find that this element has been proved.
>
> *Three*, such offenses involved the concerted action of five or more persons.

110

To act "in concert" means to act pursuant to a common design or plan. You are *not* required to agree unanimously on the identities of the five persons.

*Four*, at least one person acted as organizer, supervisor, or manager of those five or more persons.

The person must have organized, supervised or managed, either personally or through others, five or more persons with whom the person was acting in concert while the person committed the series of offenses. An "organizer" is a person who puts together a number of people engaged in separate activities and arranges them in these activities in one operation or enterprise. A "supervisor" is a person who manages, directs, or oversees the activities of others.

However, it is not necessary that the person managed all five at once or that the five other persons acted together at any time or in the same place. It also is not necessary that the person have been the only person who organized, managed or supervised the five or more other persons, or that the person exercised the same amount of control over each of the five, or that the person had the highest rank of authority in the enterprise.

*Five*, that person or those persons acting as organizers, supervisors, or managers obtained a substantial income, money, or other property from the series of violations.

You may consider all money or property that passed through the participants' hands as a result of illegal drug dealings, not just profit, to determine whether the amount was "substantial." "Substantial" means of real worth and importance, of considerable value, or valuable.

Whenever an element of an offense requires the prosecution to prove the existence of a "continuing criminal enterprise" or CCE, the prosecution must prove *all* of these

111

> requirements beyond a reasonable doubt for you to find that
> the CCE existed.

Criminal docket no. 512 at 29-30 (Preliminary Instruction No. 11—Requirements for Proof: "Continuing Criminal Enterprise (CCE)" Defined).  It also asked the jury to remember "that the preliminary instructions on the charged offenses provide only a preliminary outline of the requirements for proof of each offense . . . [and, because] the final written instructions are more detailed, . . . [the] final instructions, rather than [the] preliminary instructions, [should be relied upon] where there is a difference."  Criminal docket no. 512 at 10 (Preliminary Instruction No. 4—Requirements for Proof: Preliminary Matters).

During trial, the government introduced overwhelming evidence that established the movant acted as the leader of the criminal enterprise.  The evidence showed that the movant controlled the continuing criminal enterprise by determining: what illegal substance would be manufactured, how many people would be involved, who would provide financing, how funds would be expended, what method would be used to manufacture the methamphetamine, who would manufacture the methamphetamine, where the methamphetamine would be manufactured, where to get chemicals and equipment to manufacture the methamphetamine, how to set up the equipment, when the methamphetamine would be manufactured, how much methamphetamine would be manufactured, where the methamphetamine would be distributed, how the methamphetamine would be transported, who would transport it, how much to charge for the methamphetamine, who would distribute the methamphetamine and how to distribute and spend the proceeds.  The evidence also clearly showed that the movant arranged for at least five other individuals—Jeffrey Honken, Timothy Cutkomp, Gregory Nicholson, Terry DeGeus and Angela Johnson—to participate in the criminal enterprise.

112

After both sides finished presenting evidence, the trial court gave the jury final instructions.  In its final instructions, the trial court reiterated that the government needed to prove beyond a reasonable doubt that the movant engaged in a continuing criminal enterprise.  It again listed the five requirements to establish the existence of a continuing criminal enterprise and then explained them in detail.

> The requirements for proof of the existence of a CCE are the following: (a) an organizer, supervisor, or manager of the CCE committed a felony violation of the federal controlled substances laws; (b) that violation was part of a continuing series of three or more related felony violations of the federal controlled substances laws; (c) the series of related violations were undertaken by the organizer, supervisor, or manager in concert with five or more other persons; (d) the organizer, supervisor, or manager organized, supervised, or managed those five or more persons; and (e) the organizer, supervisor, or manager obtained substantial income, money, or other property from the series of violations.

> I must now explain these requirements for proof of the existence of a CCE in more detail.  Requirements (a) and (b) require the commission of a violation of the federal controlled substances laws as part of a series of three or more such related felony violations.  The violations are "related" if they are driven by a single impulse and operated by continuous force.  You must unanimously agree on which violations constituted the series of three or more "related" violations.  The [superseding indictment] charges that the following offenses were part of the series of three or more related felony violations:

> [listing offenses in thirteen paragraphs].

> . . . You must unanimously agree on which violations constitute the series of three or more violations in order to find that the CCE existed.

> Next, requirements (c) and (d) for proof of the existence of a CCE require proof that the series of related violations

were undertaken by an organizer, supervisor, or manager in concert with five or more other persons and that the organizer, supervisor, or manager organized, supervised, or managed those five or more other persons. To act "in concert" means to act pursuant to a common design or plan. There may be more than one organizer, supervisor, or manager of the CCE. You must unanimously agree that there was an organizer, supervisor, or manager and at least five *other* people, or a total of at least six people, involved in the CCE. The prosecution alleges that [the movant] was the organizer, supervisor, or manager of [Jeffrey] Honken, [Timothy] Cutkomp, Angela Johnson, [Gregory] Nicholson, and Terry DeGeus.

Requirement (e) for proof of the existence of a CCE requires the prosecution to prove beyond a reasonable doubt that the organizer, supervisor, or manager obtained a substantial income, money, or other property from the series of violations. To decide whether this requirement has been proved, you may consider all money or property that passed through the participants' hands as a result of illegal drug dealings, not just profit, to determine whether the amount was "substantial." "Substantial" means of real worth and importance, of considerable value, or valuable.

In addition to the existence of the CCE, [this element] requires the prosecution to prove beyond a reasonable doubt that [the movant] was "engaging in" the CCE. ["]Engaging in" a CCE means actually guilty of the CCE offense; in other words, [the movant] must have been the person who committed one or more violations in the series of violations, acted as an organizer, supervisor, or manager of five or more other participants in the CCE, and obtained a substantial income, money, or other property from the series of violations.

Criminal docket no. 512 at 77-81 (Final Instruction No. 11—Counts 13 through 17: CCE Murder).

Given the record, the court finds that the movant's contentions regarding trial counsel's investigation and litigation of the CCE murder counts are without merit. The

114

movant offers absolutely no credible support for any of his allegations, including his allegation that Jeffrey Honken held a higher position in the enterprise and acted as the organizer, supervisor and manager of it. All of the evidence that the movant points to only addresses whether he controlled Jeffrey Honken, but it does not rebut the strong evidence that shows the movant acted as the principal leader of the enterprise. The statements and/or testimony of Melissa Friesenborg, Timothy Cutkomp, David Honken, Kathy Schuess, Jeffrey Honken, Marvea Honken/Smidt and Alyssa Nelson do not undermine the fact that the movant organized all of the participants and their roles in the enterprise. A fair characterization of the evidence reveals that any attempt to shift more blame onto Jeffrey Honken is misguided, especially considering that the movant does not dispute that he organized the drug operation.

The movant's role in organizing the enterprise necessarily entails the members of it and their roles. The evidence shows that at all times material: Jeffrey Honken lived in Arizona; the movant moved there and stayed at Jeffrey Honken's home; the movant and Jeffrey Honken attempted to manufacture methamphetamine in Jeffrey Honken's home; the movant asked Jeffrey Honken to finance his operation and he agreed to do so; the movant and Timothy Cutkomp rented a place with Jeffrey Honken's money; the movant obtained chemicals and equipment by using the name of Jeffrey Honken's company; Jeffrey Honken provided the movant with vehicles; Jeffrey Honken had minimal or no contact with the other participants, including those who had spent time in Arizona; the movant made decisions regarding the manufacture, transportation and distribution of the methamphetamine and other decisions that ensured the success of the enterprise; the movant kept the majority of the proceeds from the enterprise; the movant relied on Jeffrey Honken as a point of contact in Arizona; and, at the behest or prompting of the movant, Jeffrey Honken destroyed evidence that the movant kept in a storage shed owned by

115

Jeffrey Honken. The evidence also shows that the movant set up the enterprise so Jeffrey Honken had limited knowledge of and participation in it.

Although the movant did not direct and control Jeffrey Honken in the same way as the four other participants, it is clear that the movant coordinated Jeffrey Honken's participation in the enterprise. The movant managed to get Jeffrey Honken to provide start-up funds for the enterprise and additional support to further the enterprise. Indeed, Jeffrey Honken appears to have unwittingly provided additional support even though the enterprise produced substantial proceeds. Apart from showing that the movant manipulated Jeffrey Honken into helping him, the evidence shows that Jeffrey Honken took steps to conceal evidence of the enterprise in response to the movant's directives.

Because the movant's assertions regarding Jeffrey Honken's role are not supported by any credible facts, the court is unable to conclude that trial counsel performed in a deficient manner. *See Strickland*, 466 U.S. at 688. The record shows that trial counsel performed admirably when faced with very few helpful facts. The movant argues that trial counsel should have pursued every possible theory, including implausible and untenable ones, but the United States Constitution does not require this. It also does not require trial counsel to offer every available witness with an opinion about the relationship that existed between the movant and Jeffrey Honken.

Moreover, the record indicates that trial counsel made strategic or tactical decisions. Pre-trial, trial counsel pursued reasonable theories about Jeffrey Honken's role, but he refused to cooperate with them. And, when they questioned Jeffrey Honken, Marvea Honken/Smidt and Alyssa Nelson, trial counsel fully explored the nature of the movant's relationship with his brother. In addition, trial counsel attempted to establish through argument that the movant did not control Jeffrey Honken's participation in the enterprise in the hope that the jury would not find all of the elements of a continuing criminal enterprise. Further, in light of the evidence presented during trial, trial counsel sought

116

acquittal as to all of the CCE murder counts. *See, e.g.*, *Honken*, 381 F. Supp. 2d at 1012-14 (rejecting the argument that the evidence did not establish the requisite five other members of the continuing criminal enterprise, the argument that the defendant never organized, supervised or managed one of the five other members of the continuing criminal enterprise and the argument that none of the six members of the enterprise can be classified as the organizer, supervisor or manager of the continuing criminal enterprise). Given trial counsel's choices, the court finds that they did not unreasonably fail to advance the theory that Jeffrey Honken occupied a much larger role in the enterprise by either introducing evidence or arguing particular points. The court does not hesitate to make such finding because the theory now advanced by the movant is contrary to the reasonable strategy that trial counsel adopted. It is evident that trial counsel appropriately focused on Jeffrey Honken because the government presented overwhelming evidence as to the roles that Timothy Cutkomp, Angela Johnson, Gregory Nicholson and Terry DeGeus occupied in the enterprise. It is also evident that, if they had elected to introduce evidence to attempt to show that Jeffrey Honken had a more significant role in the enterprise and to argue specific facts to attempt to establish that Jeffrey Honken actually supervised the movant and others, trial counsel would have essentially eliminated the slight chance that they had of successfully arguing to the jury that the movant did not organize, supervise or manage the statutory minimum number of persons. This is especially so because the movant did not have to: (1) be the only person who organized, managed or supervised five other members of the enterprise; (2) exercise the same amount of control over each of the five; or (3) have the highest rank of authority in the enterprise.

As to the jury instructions, the court finds that the trial court properly instructed the jury. The trial court's preliminary instructions accurately reflected the charges that the movant faced. Because the government alleged that the movant acted in concert with five or more other persons, including, but not limited to, Jeffrey Honken, Timothy Cutkomp,

117

Angela Johnson, Gregory Nicholson and Terry DeGeus, the trial court informed the jury that it need not agree unanimously as to the identities of the five persons. In light of the evidence that it presented during trial, the government decided to narrow some of the charges. Consequently, the trial court made appropriate changes to the final instructions. The trial court's final instructions informed the jury that the government alleged the movant was the organizer, supervisor or manager of Jeffrey Honken, Timothy Cutkomp, Angela Johnson, Gregory Nicholson and Terry DeGeus and informed the jury that it had to unanimously agree that an organizer, supervisor or manager and at least five other people, or a total of six people, were involved in the continuing criminal enterprise. The final instructions also informed the jury that it had to find beyond a reasonable doubt that the movant committed one or more violations in the series of violations, acted as an organizer, supervisor or manager of five or more other participants in the continuing criminal enterprise and obtained a substantial income, money or other property from the series of violations.

The preliminary instructions and the final instructions conform to the law. Nothing required the trial court to instruct the jury that it had to agree unanimously to the identity of the five other people the movant organized, supervised or managed. *See United States v. Cuervo*, 354 F.3d 969, 994 (8th Cir. 2004) (reaffirming that 21 U.S.C. § 848(c)(2)(A) does not require jury unanimity as to the identities of the five supervised or managed individuals); *see also Jelinek*, 57 F.3d at 658-59 (holding that the district court did not clearly err when it declined to give proffered unanimity instruction and special interrogatory). Because trial counsel is not required to advance a position that is not supported by the law, the court concludes that trial counsel's representation as to the jury instructions did not fall below acceptable professional standards.

Further, appellate counsel did raise the legal sufficiency of the jury instructions regarding the continuing criminal enterprise. The Eighth Circuit Court of Appeals held

118

that the lack of a specific instruction requiring unanimity as to the identities of the "five or more other persons" did not constitute plain error.  *Honken*, 541 F.3d at 1170.  The court is not able to disturb that finding based on the movant's assertion of ineffective assistance of trial counsel.  Had trial counsel objected, the same instructions would have been given.  And, the Eighth Circuit Court of Appeals would have reached the same conclusion.  *See Jelinek*, 57 F.3d at 658-59 (affirming the district court's refusal to give the defendant's proffered unanimity instruction and special interrogatory).

Regarding unconstitutional prejudice, the movant suffered none as a result of trial counsel's investigation and litigation of the CCE murder counts.  *See Strickland*, 466 U.S. at 694.  The court disagrees with the movant's contention that the limited amount of evidence pertaining to the movant's relationship with Jeffrey Honken and the roles of the movant and Jeffrey Honken in the enterprise does not satisfy due process requirements. The evidence clearly demonstrates that the movant occupied a position of leadership as to the five other individuals in the continuing criminal enterprise.  Further, no additional investigation, no additional presentation of evidence and no unanimity instruction as to the identities of the five persons the movant directed as part of the continuing criminal enterprise would have altered the outcome of either the merits phase or penalty phase. Having considered the "additional" evidence the movant presented and all of the jury instructions, the court disagrees with the movant's assertion that there is a reasonable likelihood that the jury would have returned different verdicts.  The evidence that the movant relies on is not significantly different than what he presented during trial, and the jury instructions appropriately clarified for the jury that: (1) it had to find beyond a reasonable doubt that the movant acted as an organizer, supervisor or manager of five or more other participants in the continuing criminal enterprise and (2) the government

119

maintained Jeffrey Honken, Timothy Cutkomp, Angela Johnson, Gregory Nicholson and Terry DeGeus made up the requisite group.[33]

Lastly, the court finds that there is absolutely no support for the movant's contention that the government committed a *Brady* violation. Although the movant indicated in his motion for relief that he would file a motion for discovery with respect to the government's non-disclosure of information related to Jeffrey Honken, he did not do so. And, he never briefed how the government violated his constitutional rights. Consequently, the court finds that the movant abandoned this particular *Brady* claim.

Thus, the court concludes that none of the movant's contentions as to trial counsel or the government under this particular ground give rise to relief. Because a constitutional violation did not occur, this ground must be dismissed.

### E. Ground Five — Constitutional Violations Occurred as a Result of the Multiplicitous Charges

#### 1. Arguments of the parties

##### a. The movant

The movant claims that the conspiracy murder charges set forth in count 8 through count 12 of the superseding indictment are lesser included offenses and, consequently, they are multiplicitous of the CCE murder charges set forth in count 13 through count 17 of the superseding indictment. He contends that, despite controlling case law from the Supreme Court and the Eighth Circuit Court of Appeals, trial counsel inexplicably failed to move to dismiss or object to the multiplicitous charges. With respect to the Supreme Court, the movant relies on *Rutledge v. United States*, 517 U.S. 292, 307 (1996), which held:

---

[33] The court notes that, although the parties focus on Jeffrey Honken, Timothy Cutkomp, Angela Johnson, Gregory Nicholson and Terry DeGeus as the five other individuals in the continuing criminal enterprise, a reasonable argument can be made from the evidence in the record that other individuals also participated in the continuing criminal enterprise.

> A guilty verdict on a [continuing criminal enterprise charge under 21 U.S.C. § 848] necessarily includes a finding that the defendant also participated in a conspiracy violative of [21 U.S.C. § 846]; conspiracy is therefore a lesser included offense of [a continuing criminal enterprise].

Regarding the controlling law in the Eighth Circuit Court of Appeals, the movant emphasizes that, prior to and after the Supreme Court's decision in *Rutledge*, the Eighth Circuit Court of Appeals held that conspiracy is a lesser included offense in a continuing criminal enterprise. *See United States v. Jefferson*, 215 F.3d 820, 823 (8th Cir. 2000); *United States v. Fairchild*, 189 F.3d 769, 781 (8th Cir. 1999); *Jelinek*, 57 F.3d at 660; *United States v. Holt*, 969 F.2d 685, 687 (8th Cir. 1992); *Possick*, 849 F.2d at 341; *Maull*, 806 F.2d at 1347; *United States v. Samuelson*, 697 F.2d 255, 260 (8th Cir. 1983).

The movant criticizes trial counsel's decision to challenge his prosecution only on the basis that the right to not be put in jeopardy twice does not permit a successive prosecution. *See generally Honken*, 271 F. Supp. 2d 1097. He charges that trial counsel should have protected his right to not be put in jeopardy twice by challenging the conspiracy murder counts as being multiplicitous of the CCE murder counts. In support of his claim that trial counsel should have raised the meritorious double jeopardy objection based on multiplicity, the movant relies on *Honken*, 541 F.3d at 1153-54, in which the Eighth Circuit Court of Appeals declined to address the multiplicity argument because the movant waived it. He contends that, had trial counsel properly objected, the Eighth Circuit Court of Appeals would have afforded him relief with respect to the conspiracy murder counts. He points out that appellate counsel in the companion case of Angela Johnson successfully litigated on direct appeal the multiplicity of the conspiracy murder counts. *See United States v. Johnson*, 495 F.3d 951, 980-81 (8th Cir. 2007).

He also takes issue with the position that trial counsel took in the motion to dismiss count 8 through count 17 on the grounds of former jeopardy. Specifically, he disapproves

121

of: (1) trial counsel's discussion of federal cases that establish a defendant may not be convicted of conspiracy and continuing criminal enterprise because it is impermissible for a defendant to be punished twice for the same conduct, *see* criminal docket no. 119 at 6-7 (discussing and/or citing *Jeffers v. United States*, 432 U.S. 137, 149-50 (1977) (plurality opinion), *Jefferson*, 215 F.3d at 823, *Fairchild*, 189 F.3d at 781, and *Jelinek*, 57 F.3d at 660), and (2) trial counsel's assertion that the procedure whereby an appellate court vacates a conviction on the lesser included charge if it affirms a conviction on the greater charge is not applicable because his position is that the right to not be put in jeopardy twice prevents any prosecution for both the lesser included charges set forth in count 8 through count 12 of the superseding indictment and the greater charges set forth in count 13 through count 17 of the superseding indictment, *see id.* at 7 n.4.

Additionally, the movant condemns trial counsel's failure to ask the trial court to instruct the jurors that they need not return a verdict on a lesser included offense if they found the defendant guilty of the greater offense.[34] *See Rutledge*, 517 U.S. at 307 n.16.; *see also Honken*, 541 F.3d at 1154 (citing *United States v. Moore*, 149 F.3d 773, 779 (8th Cir. 1998), for the proposition that, although a defendant could not be convicted of both conspiracy murder and continuing criminal enterprise murder, the district court could submit the two counts together and instruct the jury that it need not consider the charge of murder while engaged in a drug conspiracy if it found the defendant guilty of murder in furtherance of a continuing criminal enterprise). He states that there is no valid reason for failing to ask the trial court to direct the jury not to consider the conspiracy murder counts in the event that it found him guilty of the CCE murder counts. And, he notes that trial

---

[34] The movant generally asserts in his motion for relief that trial counsel failed to object to the multiplicitous counts. He, however, does not specifically assert that trial counsel failed to properly object to the jury instructions.

122

counsel offers no explanation as to why they did not ask the trial court to limit the jury's consideration.

Aside from asserting that the Eighth Circuit Court of Appeals would have vacated his convictions and sentences with respect to count 8 through count 12 if the issue of multiplicity had been properly raised by trial counsel and that trial counsel should have requested an instruction that eliminated the need for the jury to consider lesser included offenses, the movant asserts that, during the penalty phase, trial counsel failed to protect his rights and, as a result of such failure, the trial court incorrectly directed the jury to consider twice whether he should be sentenced to death. He contends that the jury should only have been required to consider the prospect of a sentence of death for the CCE murder counts and that there was no reason for the jury to consider the possibility of a sentence of death for the conspiracy murder counts. The movant maintains that the jury instructions twice put his life in jeopardy and impermissibly allowed the jury to double-count as aggravating factors the multiplicitous counts. He stresses that, apart from violating his constitutional right to not be put in jeopardy twice, a violation of his constitutional right to due process and his constitutional right to be free from cruel and unusual punishment occurred when the trial court required the jury to place undue emphasis on the option of a sentence of death. With respect to the Eighth Amendment, the movant maintains that, by permitting the jury to double-count the multiplicitous counts, the sentences of death were arbitrary and capricious.

### b. The government

The government disputes that trial counsel provided ineffective assistance as to the multiplicitous counts included in the superseding indictment. The government contends that trial counsel's failure to specifically raise the multiplicity of count 8 through count 12 did not fall below an objective standard of reasonableness. Although it agrees that a defendant cannot be convicted of conspiracy murder and continuing criminal enterprise

123

murder, the government states that the jury may consider all of the capital counts and argues that any oversight by trial counsel regarding the trial court's jury instructions did not deprive the movant of his right to have a reasonably competent attorney assist him. The government acknowledges that trial counsel could have asked the trial court to direct the jurors to consider the conspiracy murder charges only in the event they found him not guilty of the CCE murder counts, but it maintains that trial counsel's representation cannot be characterized as deficient. Further, the government argues that prejudice is lacking. It emphasizes that the alleged deficiency of trial counsel's representation does nothing to undermine confidence in the outcome because the remedy only pertains to the conspiracy murder counts. The government also emphasizes that the movant's speculation about what might have occurred if the trial court told the jury that it need not consider the lesser included counts is not enough to justify relief. In light of the aggravating factors found by the jury, the government states that it is preposterous to assert that the jury would have imposed life imprisonment for the murders of Kandi Duncan and Amber Duncan if it had one box to check rather than two.

### 2. *Analysis*

Pre-trial and post-trial, trial counsel argued that a double jeopardy violation occurred. They, however, did not assert that a violation of the movant's right to not be put in jeopardy twice occurred because the conspiracy murder counts are multiplicitous of the CCE murder counts. On direct appeal, appellate counsel raised the issue of the multiplicitous capital counts. The Eighth Circuit Court of Appeals denied relief as to the multiplicitous counts because the movant did not specifically assert at the trial level that the conspiracy murder convictions are lesser included offenses of the CCE murder convictions. *Honken*, 541 F.3d at 1153-54.

In the companion case of Angela Johnson, the defense filed a motion to dismiss on December 26, 2001. In response to such motion, the trial court observed that: (1) a

124

defendant cannot be convicted and punished for conspiracy murder and continuing criminal enterprise murder and (2) counts charging both kinds of murder of the same person are "potentially multiplicitous." *United States v. Johnson*, 225 F. Supp. 2d 1009, 1016 (N.D. Iowa 2002) (citing *Moore*, 149 F.3d at 779). Relying in part on the cases that the trial court cited in its June 24, 2002 order, the defense sought to have the government elect counts to remedy multiplicity issues on October 21, 2002. When addressing the defense's request on February 13, 2003, the trial court expressed considerable doubt that she could show circumstances requiring the government to elect among the counts against her. Although the trial court allowed her to reassert the election of counts by the government, she never did so. And, she did not ask the trial court to instruct the jury that, if it found her guilty of continuing criminal enterprise murder, it need not consider the charge of conspiracy murder. Because the defense did not waive her right to challenge the multiplicity of the conspiracy murder counts, the defense successfully litigated the issue on direct appeal. *See Johnson*, 495 F.3d at 980-81. After mandate issued, the trial court vacated her five convictions and sentences for conspiracy murder as multiplicitous of her convictions and sentences for continuing criminal enterprise murder.

Given the record in this case and the record in the companion case of Angela Johnson, the court finds that the majority of the allegations of error do not involve deficient performance. It is true that a defendant cannot be convicted of both conspiracy murder and continuing criminal enterprise murder because conspiracy murder is a lesser included offense of continuing criminal enterprise murder. *Honken*, 541 F.3d at 1153-54. It, however, is also true that conspiracy counts and continuing criminal enterprise counts can be tried at the same time. *Jelinek*, 57 F.3d at 660 (explaining that the proper procedure entails a review of the lesser included conspiracy conviction and the continuing criminal enterprise conviction and a remand to vacate the conviction that subjects the defendant to double jeopardy). Although it is permissible to submit either conspiracy

125

counts or continuing criminal enterprise counts to the jury, doing so does not increase judicial economy. *Id.*; *see also Moore*, 149 F.3d at 779 (deciding that the district court did not err when it did not dismiss one of the counts or require the government to elect between them). So, if the movant had requested to sever the CCE murder counts from the conspiracy murder counts, the trial court could have and most likely would have denied such request. Similarly, the trial court could have and most likely would have rejected any request by the movant to: (1) submit all of the counts together and to instruct the jury that it need not consider the conspiracy murder counts if it found him guilty of the CCE murder counts or (2) withdraw from the jury's consideration the penalties on the conspiracy murder counts after it convicted him on all of the CCE murder counts. *Cf. Moore*, 149 F.3d at 779 (concluding that the district court eliminated the risk of multiplicitous convictions or punishment by instructing the jurors that they need not consider the conspiracy murder charge if they found the defendant guilty of continuing criminal enterprise murder). By allowing the jury to determine guilt and punishment on the conspiracy murder charges and the CCE murder charges, the trial court avoided duplicative trials. *See Jelinek*, 57 F.3d at 660 (approving the procedure under which the merits of both convictions are reviewed on direct appeal).

As to prejudice, the movant merely speculates that the multiplicitous capital counts had an effect on the jury's sentencing determinations. During the penalty phase, the trial court informed the jurors that two counts related to each murder but instructed them to weigh each aggravating factor only for the count in question. And, it emphasized in the preliminary instructions and the final instructions that the jurors had a duty to consider the capital counts separately. Specifically, it stated:

> You must give separate consideration to the sentence to impose on each count for which the death penalty is at issue. Therefore, you must return a separate sentencing verdict on each such count. *Your determination to impose a death*

126

> *sentence must be unanimous.* On the other hand, if any one of you finds that a sentence of death is not called for on a particular count, then the death sentence *cannot* be imposed on that count, and you must then enter a verdict imposing life imprisonment without possibility of release for that count.

Criminal docket no. 524 at 18 (Final "Penalty Phase" Instruction No. 1— Introduction); *see also* criminal docket no. 524 at 5 (Preliminary "Penalty Phase" Instruction No. 2—Nature of Proceedings) (directing the jury to give separate consideration to the sentence to impose on each count and to return a separate sentencing verdict on each such count). The court finds that the jury's determinations as to the multiplicitous conspiracy murder counts and the CCE murder counts neither skewed the weighing process nor created any risk of an arbitrary sentence being imposed. *Cf. United States v. McCullah*, 76 F.3d 1087, 1111-12 (10th Cir. 1996) (holding that consideration of duplicative aggravating factors for the same capital offense unconstitutionally skews the weighing process). In light of the nature and extent of the evidence presented during the merits phase and penalty phase and the manner in which the trial court instructed the jury, the separate consideration of each of ten capital counts rather than each of five capital counts had little, if any, chance of generating an adverse psychological effect on the jury. *See United States v. Sue*, 586 F.2d 70, 72 (8th Cir. 1978) (concluding that the defendant suffered no prejudice because the evidence indicated that the multiplicitous indictment could only have had a negligible effect on the jury).

As to the movant's assertion that trial counsel improperly waived the multiplicitous convictions issue, it is clear that the Eighth Circuit Court of Appeals would have afforded him relief with respect to the conspiracy murder convictions had they raised such issue prior to trial or after trial. *See Johnson*, 495 F.3d at 980-81 (remanding to vacate multiplicitous conspiracy murder convictions). It is also clear that trial counsel must challenge a multiplicitous indictment. *See United States v. Jones*, 403 F.3d 604, 606-07

(8th Cir. 2005) (concluding that a reasonably competent attorney is expected to recognize a multiplicitous indictment and to move at the end of the government's case to strike a multiplicitous count). Further, it is clear that prejudice results from the additional convictions themselves. *Id*. at 607. Because the constitutional right to counsel is violated where trial counsel does not properly preserve for appellate review multiplicitous convictions, the movant is entitled to relief on the conspiracy murder convictions. The court shall direct that they be vacated without prejudice. *See Johnson*, 495 F.3d at 982 (remanding so that the district court may vacate multiplicitous convictions and sentences); *see also United States v. Davenport*, 519 F.3d 940, 948 (9th Cir. 2008) (vacating the judgment and directing the district court to vacate without prejudice one of the multiplicitous counts). The conspiracy murder convictions are subject to being reinstated if the CCE murder convictions are overturned by the Eighth Circuit Court of Appeals or the Supreme Court in any subsequent appeal. *See Davenport*, 519 F.3d at 948 (allowing for a vacated conviction to be reinstated if the defendant's other conviction is overturned on direct or collateral review).

Therefore, relief is not available on any claim except for the claim that trial counsel failed to properly preserve the multiplicitous convictions issue prior to entry of judgment. The movant's other assertions that a violation of his constitutional right to counsel occurred and assertion that an unconstitutional skewing effect occurred as a result of the multiplicitous capital counts are without merit. The court finds that the conduct of trial counsel fell within a wide range of reasonable professional assistance, *see Strickland*, 466 U.S. at 689, and trial counsel's performance did not prejudice the movant's defense, *see id*. at 692-94. Because the evidence proved beyond all doubt that the movant intentionally slaughtered two little girls who were particularly vulnerable due to their young age, presented a danger in the future to the lives and safety of other persons, obstructed justice by preventing the victims from providing testimony or information to law enforcement,

128

killed more than one person in a single criminal episode and devastated the families of the victims, there is no reasonable probability that, absent the multiplicitous capital counts, the jury would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.  *See id*. at 695.

### F.  Ground Six — Constitutional Violations Occurred as a Result of the Admission of Hearsay Evidence to Support the Quantity of Drugs

#### 1.  Arguments of the parties

##### a.  The movant

The movant asserts that trial counsel were ineffective because they unreasonably failed to object to the admission of hearsay evidence regarding the quantity of drugs that the government alleged in the conspiracy murder charges and the CCE murder charges.[35] He argues that, to establish the movant was accountable for a particular number of grams of pure methamphetamine or a mixture or substance containing a detectable amount of methamphetamine as set forth in count 8 through count 17 of the superseding indictment, the government only relied on the laboratory report of Debra Davis, a criminalist, and such report was presented through the hearsay testimony of Frank Stearns, a police officer. So, in essence, the movant takes issue with trial counsel's response to the government's reliance on the laboratory report to establish an element of the murder offenses and the lack of any direct testimony from Debra Davis.

---

[35] Apart from the inadmissible hearsay evidence, the movant again reiterates his assertion in Ground One that the jury should not have been permitted to rely on the findings made by the trial court during the movant's sentencing hearing in *United States v. Honken*, Case No. 3:96-cr-03004-MWB (N.D. Iowa 1998) and set forth in the judgment, Trial Exhibit 303 (civil docket no. 19-1), and the amended judgment, Trial Exhibit 304 (civil docket no. 19-2), that entered against him in *United States v. Honken*, Case No. 3:96-cr-03004-MWB (N.D. Iowa 1998).  He asserts that, to the extent that the jury relied on the trial court's prior findings to support its finding as to the quantity of drugs, a constitutional violation occurred.

129

The movant claims that, despite clear law that precluded the use of testimonial hearsay, trial counsel did not challenge the inadmissible evidence. He underscores such point by relying on authority that establishes the use of a laboratory report without proper foundation is not permitted under the Confrontation Clause or the Federal Rules of Evidence because it includes testimonial hearsay. *See Crawford*, 541 U.S. at 53-54 (holding that the Confrontation Clause bars testimonial hearsay absent witness unavailability and a prior opportunity to cross-examine); *United States v. Riley*, 236 F.3d 982, 984-85 (8th Cir. 2001) (holding that the Federal Rules of Evidence barred the presentation of crime laboratory reports because the police officer lacked the personal knowledge to lay the foundation for them); *see also Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 309-12 (2009) (explaining that a rather straightforward application of the holding in *Crawford* bars the hearsay presentation of laboratory reports); *United States v. Le*, 272 F.3d 530, 531-32 (8th Cir. 2001) (concluding that the trial court abused its discretion when it admitted over defense counsel's proper objection a laboratory report without proper foundation). Given the law, the movant complains that he never had the opportunity to confront Debra Davis about her credentials, assumptions and conclusions or explore how she collected, tested or analyzed the evidence upon which she based her conclusions. Because trial counsel did not protect the movant's right to cross-examine Debra Davis and, thereby, call into question the findings or establish that the quantity included in the report was false or fraudulent, the movant contends that trial counsel provided ineffective assistance. *See Manning v. Bowersox*, 310 F.3d 571, 576-77 (8th Cir. 2002) (deeming performance deficient where counsel filed a motion in limine but failed to object to the admission of constitutionally inadmissible evidence at trial). He maintains that, because no sound strategy can include failing to assert a constitutional objection, it is clear that trial counsel's performance was deficient. *See Burns v. Gammon*, 260 F.3d

130

892, 897 (8th Cir. 2001) ("No sound trial strategy could include failing to make a constitutional objection . . . .").

The movant also finds fault with trial counsel's decision not to take every opportunity to challenge an essential aspect of the government's case against him. In light of the lack of other drug quantity evidence that supported the murder offenses, the movant finds it inexplicable that trial counsel did not do more. Specifically, the movant faults trial counsel for failing to attack the reliability of the laboratory report because the trial court found a similar report that depended on evidence collected by the same law enforcement agencies was false, fraudulent or misleading during the sentencing hearing in the 1996 case.

As to the prejudice that he suffered as a result of trial counsel's actions, the movant states that, absent a determination regarding drug quantity, he could not have been found guilty of count 8 through count 17 and he could not have been sentenced to death. He offers that the jury would have returned not guilty verdicts if trial counsel objected and the trial court excluded the hearsay presentation of the laboratory report. *See Le*, 272 F.3d at 532 ("We explicitly reject the government's suggestion that the error was harmless. It is difficult to imagine, and should be even more difficult to argue, that a defect in proving the chemical was methamphetamine is harmless, when the defendants are on trial for distribution of that drug."); *see also Manning*, 310 F.3d at 576-77 (concluding that counsel's conduct prejudiced the defendant because the jury heard damaging, inadmissible and suppressible testimony from a government informant). Alternatively, the movant argues that subjecting Debra Davis to cross-examination would have undermined her conclusions.

The movant also contends that appellate counsel should have raised a claim based on the erroneous admission of the laboratory report on direct appeal. Because the admission of the laboratory report constitutes plain error, the movant maintains that it

131

should have been raised as such. He states that standard practice and the law required appellate counsel to assert the arguably meritorious confrontation issue and, had appellate counsel done so, the Eighth Circuit Court of Appeals would have vacated his convictions on count 8 through count 17. In the absence of any valid tactic or strategy, the movant maintains that appellate counsel provided ineffective assistance.

### b. The government

The government responds that the movant fails to assert a meritorious ineffective assistance of trial counsel claim as to the introduction of the laboratory report. The government disputes that: (1) the laboratory report served as the only evidence of drug quantity; (2) the credentials, assumptions and conclusions of Debra Davis could have been called into question if she had been subject to cross-examination; and (3) the laboratory report is subject to attack in the same manner as the laboratory report at issue in the sentencing hearing in the 1996 case. It states that the movant misstates the evidence of drug quantity and argues that trial counsel cannot be faulted for failing to raise challenges that have no basis in fact. And, it argues that, by not belaboring the issue of drug quantity, trial counsel made a strategic decision. Further, the government contends that the movant suffered no prejudice because it would have just called Debra Davis as the author of the laboratory report had trial counsel objected, it presented substantial evidence of drug quantity and it charged and obtained convictions on the CCE murder charges, which did not require proof of drug quantity. For similar reasons, the government maintains that failing to challenge the laboratory report on hearsay and confrontation premises does not constitute ineffective assistance of appellate counsel. It states that substantial evidence that is independent of the laboratory report established drug quantity and appellate counsel is not required to recognize and raise every conceivable constitutional claim.

132

### 2. Analysis

The facts are insufficient to justify relief as to the litigation of drug quantity at the trial level or appellate level. The court concludes that neither trial counsel nor appellate counsel provided representation that fell below acceptable professional standards. *See Strickland*, 466 U.S. at 688. Moreover, it is apparent that no prejudice ensued from the strategic decisions that trial counsel and appellate counsel made. *See id*. at 694. The movant's ineffective assistance of counsel claims lack merit because he fails to offer a plausible argument regarding the effect of the laboratory report on the jury.

At trial, Frank Sterns testified that law enforcement seized finished methamphetamine from Gregory Nicholson after conducting a search of his home in 1993. He also testified that the Iowa Division of Criminal Investigation provided him with a laboratory report that specified the total amount and purity of the methamphetamine. As a criminalist for the Iowa Division of Criminal Investigation, Debra Davis analyzed the seized methamphetamine. When doing so, she conducted standard scientific tests that did not require her to assume anything. Debra Davis provided her conclusions in the laboratory report that the government presented to the jury through Frank Sterns.

In contrast to the laboratory report admitted during trial, a criminalist for the Drug Enforcement Administration prepared the laboratory report at issue in the sentencing hearing in the 1996 case. Such criminalist calculated drug quantity based on the capacity of the methamphetamine laboratory that law enforcement discovered in 1996, but he never analyzed the finished methamphetamine that law enforcement seized in 1993. Unlike the laboratory report at issue during the sentencing hearing in the 1996 case, the laboratory report admitted during trial did not calculate drug quantity based on the capacity of the methamphetamine laboratory that law enforcement discovered in 1996.

Moreover, apart from Debra Davis's laboratory report, substantial evidence showed that the movant manufactured 100 grams or more of pure methamphetamine and

133

distributed 100 grams or more of pure methamphetamine. As to the actual amount of methamphetamine, statements from the movant, Gregory Nicholson and Timothy Cutkomp establish that the conspiracy involved well over 100 grams of pure methamphetamine. Indeed, in a recorded conversation, the movant acknowledged that he distributed a quarter of a pound of methamphetamine (113.4 grams). In addition, Gregory Nicholson's testimony indicated that the movant delivered to him more than 100 grams of pure methamphetamine, *see, e.g.*, Gov. Trial Ex. 27 at 8-16, and Timothy Cutkomp's testimony indicated that he and the movant produced multiple batches of methamphetamine and delivered pounds of uncut methamphetamine to their distributors in Iowa. Moreover, many other witnesses testified that the conspiracy involved methamphetamine. Regarding the high purity of the methamphetamine, the movant repeatedly bragged about it. And, Aaron Ryerson, Terry Bregar and Daniel Cobeen corroborated the movant's assertions about the exceptional purity of the methamphetamine that he produced.

Therefore, the court finds that the movant's assertion that the government relied exclusively on the laboratory report to establish an element of the murder charges is belied by the record. Likewise, his assertion that grounds existed to challenge the reliability of the laboratory report is wholly unsupported by any facts. There is absolutely no basis to conclude that Debra Davis improperly collected, tested or analyzed the finished methamphetamine that law enforcement seized in 1993 and provided to her. The movant's conjecture about her credentials or her methodology does not undermine the weight and purity findings that she included in her laboratory report.

Further, the government offered the laboratory reports to address completely different issues. During the sentencing hearing in the 1996 case, the parties disputed the amount of methamphetamine that could be produced from the remaining chemicals found in the movant's home, and it was the criminalist's calculation of drug quantity based on the capacity of the methamphetamine laboratory that the trial court found unpersuasive.

134

In contrast to that proceeding, the only issue at trial was the amount of methamphetamine that was the object of the conspiracy. For purposes of the conspiracy murder charges, it did not matter whether the movant actually produced methamphetamine or was capable of producing it.

In addition, the record establishes that trial counsel fully appreciated the significance of the laboratory report at trial. It was readily apparent that other evidence would establish the amount of methamphetamine that was the object of the conspiracy. So, rather than frivolously contest drug quantity based on the criminalist's analysis of the finished methamphetamine, trial counsel properly kept their focus on the main issue by attempting to contest evidence that addressed whether the movant murdered five individuals while engaged in a conspiracy or a continuing criminal enterprise. The record also establishes that a strategic reason justifies the decision not to challenge the admissibility of the laboratory report. Namely, trial counsel sought to limit as much as possible evidence that related to the movant's manufacturing and distribution of methamphetamine because such evidence is viewed negatively by the public. In light of the charges that the movant faced, the introduction of the convictions from the 1996 case and the significant evidence proving the movant supervised an operation that produced pounds of methamphetamine, such tactic is entirely reasonable. As such, it is unchallengeable.

Aside from failing to prove that trial counsel's decision is inconsistent with professional standards, the court concludes that the failure to object to the manner by which the government introduced the laboratory report had no prejudicial effect on the movant's defense. The jury returned verdicts on ten capital counts, but drug quantity is an element of only five of the ten capital counts. The introduction of the laboratory report does not undermine the validity of the verdicts that the jury returned with respect to the CCE murder counts. Further, substantial evidence established that the object of the conspiracy was to manufacture and distribute methamphetamine and that the movant and

135

Timothy Cutkomp produced and distributed large quantities of very pure methamphetamine. In light of the strong evidence of drug quantity, the court finds that a reasonable probability that the results of the proceedings would have been different absent trial counsel's decision does not exist. *See United States v. Watkins*, 486 F.3d 458, 466-67 (8th Cir. 2007) (concluding that there was no prejudice where other evidence clearly established the identity of the illegal substance), *vacated on other grounds*, 552 U.S. 1091 (2008).

And, contrary to the movant's assertions, no evidence suggests appellate counsel overlooked any issue. *See Link v. Luebbers*, 469 F.3d 1197, 1205 (8th Cir. 2006) (reiterating that it is permissible to winnow out the weaker arguments). Rather, it reveals that appellate counsel was made aware of possible confrontation issues. *See* Movant Hearing Ex. 52, civil docket no. 74-80 (e-mail). Moreover, because nothing in the record indicates effective cross-examination of Debra Davis would have yielded a different result, the court is convinced that appellate counsel did not unreasonably fail to raise the confrontation issue. *See Brown*, 528 F.3d at 1033 (concluding that the failure to raise a confrontation issue on appeal did not prejudice the defense); *Carter v. Bowersox*, 265 F.3d 705, 716-17 (8th Cir. 2001) (recognizing that appellate counsel can limit the appeal to those issues that he determines to have the highest likelihood of success but concluding that appellate counsel's performance was constitutionally deficient because appellate counsel's affidavit stated that he overlooked the instructional error). There is no need to raise an appellate argument that has no chance of altering the outcome of the appeal.

In sum, no violation of the movant's constitutional right to counsel occurred as a result of the admission of the laboratory report. Because the record does not demonstrate that either trial counsel or appellate counsel performed unreasonably or that the movant was prejudiced by their performances, there is no basis to grant relief under this ground.

136

### G. *Ground Seven — Constitutional Violations Occurred as a Result of the Jury Selection Process*

#### 1. *Arguments of the parties*

##### a. *The movant*

The movant criticizes the jury selection process on five separate but related bases. First, the movant maintains that, during jury selection, trial counsel unreasonably consented to the removal of nearly thirty venire members for cause without: (1) any voir dire regarding their ability to be impartial and to follow the law or (2) any indication that they would be unable to serve. He states that trial counsel's decision to enter into an agreement to exclude potential jurors with constitutionally permissible viewpoints constitutes ineffective assistance in light of *Witherspoon v. Illinois*, 391 U.S. 510 (1968). He argues that, at a minimum, some of the venire members should have been subjected to live questioning after they completed their questionnaires. Second, assuming that trial counsel wisely chose to enter into an agreement to eliminate all potential jurors with extreme beliefs as to the death penalty, the movant faults trial counsel for failing to make sure that he fully benefitted from his bargain. He states that comparable pro-death candidates remained in the qualified pool even though they should have been eliminated pursuant to the agreement. Aside from mishandling the bad deal when they overlooked some pro-death candidates who should have been excluded, the movant maintains that trial counsel failed to recognize that other anti-death candidates should have remained in the qualified pool. Third, the movant maintains that trial counsel should not have delegated the review and analysis of the questionnaires to a jury consultant who had limited experience in capital cases. Fourth, the movant contends that the trial court unconstitutionally abdicated its responsibility to supervise the voir dire process. And, fifth, the movant argues that appellate counsel should have challenged the wrongful exclusion of venire members based upon the parties' agreement and they should have

137

asserted that the trial court unconstitutionally excluded for cause venire members 538 and 813.

### b. The government

In response, the government argues that the parties negotiated and entered into a reasonable agreement whereby they eliminated potential jurors who held the most extreme views on the death penalty. The government maintains that the parties believed individuals who appeared to be very favorable to the death penalty and individuals who appeared to be strongly opposed to the death penalty would not make good jurors so they entered into a mutually beneficial arrangement to exclude them. It states that, rather than attempt to rehabilitate prospective jurors through an unnecessarily prolonged process, the parties elected to focus on the venire members that expressed views that appeared more neutral. It also emphasizes that hundreds of potential jurors completed questionnaires, the parties selected a death qualified jury from this large group of potential jurors and the parties did not question all of the venire members because the parties settled on a death qualified jury after extensive questioning of approximately 180 potential jurors.

In light of the facts surrounding the parties' agreement and the manner in which the jury was selected, the government contends that trial counsel did not provide ineffective assistance. It argues that the movant's current reservations about not being able to question some venire members after they completed their questionnaires is an insufficient basis to grant relief. The government stresses that trial counsel made a strategic decision that benefitted the movant because the essentially equal elimination of potential jurors prevented the rehabilitation of candidates with extreme pro-death views. As to the execution of the parties' agreement, the government maintains that the mistaken inclusion or exclusion of a handful of potential jurors out of the large jury pool does not run afoul of the Sixth Amendment.

138

The government also disputes the movant's assertions as to prejudice. It points out that, prior to randomly assigning jurors to different panels, the trial court did not strike any potential juror over any party's objection. It states that the trial court only eliminated potential jurors because the parties agreed that sufficient hardship or cause existed to excuse them from service. In addition, the government observes that the facts do not demonstrate that any of the potential jurors who were eliminated as a result of how they answered a question in the questionnaire actually qualified to serve on a jury in a capital case. It states that the movant should not be permitted to rely on answers in the questionnaires to presume that potential jurors qualified to serve on the jury. And, the government claims that any mistakes when generating the list of potential jurors had no impact whatsoever on the selection of the jury. It emphasizes that none of the correctly identified potential jurors with pro-death views ever appeared on a panel that was interviewed and the parties' oversights as to anti-death venire members do not undermine confidence in the outcome of the jury selection process.

Regarding appellate counsel, the government asserts that their representation did not fall below an objective standard of reasonableness. It states that the trial court properly excluded venire members 538 and 813 because their views on capital punishment would prevent or substantially impair the performance of their duties as jurors in accordance with the instructions that they would be required to follow and the oath that they would be required to take. It also states that the movant challenged the exclusion of venire members 538 and 813 for cause after trial and the trial court fully developed the record and denied relief on the merits. In light of the record, the government argues that appellate counsel cannot be blamed for failing to raise an additional issue on direct appeal because they appropriately winnowed out the weaker arguments. It maintains that appellate counsel's failure to raise an improper exclusion of venire members claim was an exercise of sound appellate strategy. Additionally, the government contends that the movant cannot

139

demonstrate that he suffered any prejudice. It states that merely proclaiming "I was prejudiced" is not enough to establish ineffective assistance of counsel.

### 2. *Analysis*

A capital defendant must be tried by an impartial jury. *Morgan v. Illinois*, 504 U.S. 719, 729-30 (1992). The right to an impartial jury prohibits the government from "[entrusting] the determination of whether a man should live or die to a tribunal organized to return a verdict of death." *Witherspoon*, 391 U.S. at 521. "[A] sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Id*. at 522. It must be determined "whether the juror's views would 'prevent or substantially impair the performance of his [or her] duties as a juror in accordance with his [or her] instructions and his [or her] oath.'" *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)). If even one venire member is improperly excluded for cause, a death sentence cannot stand. *Gray v. Mississippi*, 481 U.S. 648, 667-68 (1987); *accord Kinder v. Bowersox*, 272 F.3d 532, 543 (8th Cir. 2001).

Keeping those well-founded principles in mind, the trial court caused a thirty-page questionnaire to be mailed to 1000 potential jurors in advance of the movant's trial. With respect to potential jurors who could be located and who returned questionnaires, the parties entered into an agreement that excluded 250 of the venire members. Of that quarter, the parties agreed to eliminate 165 potential venire members based on the answer that they provided to Question 72, which identified individuals who would be excluded under *Witherspoon* and *Morgan*.[36] The parties, however, did not just agree to eliminate

---

[36] Question 72 provided:

> Regarding the death penalty, which of the following ten statements most
> (continued…)

140

accurately represents your beliefs? Please read all ten statements, take some time to reflect, and then circle the appropriate statement(s):

a. I am personally, morally, religiously or otherwise opposed to the death penalty, and will never vote to impose it under any circumstances.

b. I am strongly opposed to the death penalty, and I will have a difficult time voting to impose it.

c. I am philosophically, morally or religiously opposed to the death penalty. Nonetheless, I believe that I can vote to impose the death penalty if it is called for by the facts and the law in the case.

d. I am generally opposed to the death penalty. Nonetheless, I believe that I can vote to impose the death penalty if it is called for by the facts and the law in the case.

e. In a case in which the defendant is convicted and in which the death penalty is requested, I can vote to impose the death penalty, or a sentence other than death, [whichever] is appropriate based on the facts and the law in the case.

f. I am generally in favor of the death penalty. Nonetheless, I believe that I can vote to impose a sentence other than death if it is called for by the facts and the law in the case.

g. I am philosophically, morally or religiously in favor of the death penalty. Nonetheless, I believe that I can vote to impose a sentence other than death if it is called for by the facts and the law in the case.

h. I am strongly in favor of the death penalty and I will have a difficult time voting against it.

i. In a case in which the defendant is convicted and in which the death penalty is requested, I will always vote to impose the death penalty.

j. None of the above.

(continued…)

141

those potential jurors (102) who selected "a" or "i". They also agreed to eliminate potential jurors (63) who selected "b" or "h" without subjecting them to follow-up questioning. Rather than ask them whether their beliefs would substantially impair their ability to follow the trial court's instructions, trial counsel and the government chose to eliminate all potential jurors from the ends of the spectrum. Consistent with the parties' agreement, the trial court excused for cause from service the potential jurors that the parties included in their list. *See* criminal docket no. 342 (order); Gov. Ex. D, civil docket no. 22-3, Gov. Hearing Ex. D, civil docket no. 74-5.

Given the trial court's role, trial counsel's conduct as to the selection of the jury and appellate counsel's pursuit of claims unrelated to the qualifications of potential jurors, the movant proclaims that he is entitled to a new penalty phase. The court finds that such proclamation is not supported by the facts or the law for the following reasons: (1) the parties did not enter into an unsound agreement; (2) the parties did not execute the agreement in a deficient manner; (3) trial counsel appropriately relied on the jury consultant to assist them in selecting a jury; (4) voir dire was conducted in a fair and evenhanded manner in order to comport with constitutional requirements; and (5) appellate counsel appropriately asserted potential errors that they believed were most likely to provide for reversal.

### a.    *The agreement*

The movant claims that trial counsel's acquiescence to the elimination of venire members with extreme views on the death penalty negatively impacted him. The movant observes that, because selecting "b" on Question 72 reflects a general objection to the death penalty, not one venire member should have been excluded solely on the basis that

---

[36](…continued)
*See, e.g.*, Questionnaire for venire member 12, Movant Ex. 29, civil docket no. 19-29 or Movant Hearing Ex. 90, civil docket no. 74-118.

142

he or she made such selection. *See Witherspoon*, 391 U.S. at 522 (holding that no defendant can constitutionally be put to death if any venire member was excluded for cause because he or she "voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction"). He contends that venire members who selected "b" should have been subjected to additional questioning. *See Nicklasson v. Roper*, 491 F.3d 830, 836 (8th Cir. 2007) (observing that the highest state court may have misapplied clearly established federal law when it failed to recognize the need for additional death qualification voir dire questioning in the face of contradictory responses by sixteen potential jurors); *United States v. Chanthadara*, 230 F.3d 1237, 1269-73 (10th Cir. 2000) (reserving for another day the question of whether a trial court has an obligation to voir dire prospective jurors before removing them for cause based on responses that they provided in a capital case questionnaire and deciding that a potential juror's equivocal questionnaire responses did not support her dismissal for cause). And, as a consequence of eliminating potential jurors who indicated that they strongly opposed the death penalty and would have a difficult time voting to impose it, the movant asserts that there is a substantial probability that the selected jurors were more prone to imposing a sentence of death.

The movant also asserts that trial counsel's ill-conceived agreement to exclude venire members who selected "b" and "h" when answering Question 72 favors the government, not the defense. The movant advances that trial counsel unwittingly permitted the removal of venire members who would be most likely to vote for life imprisonment. The movant stresses that trial counsel did not enter into a sensible deal because the government needed a unanimous jury whereas he only needed a single juror to vote for a life sentence. *See Wiggins*, 539 U.S. at 537 (concluding that a sentence of death should be vacated because the record established "a reasonable probability that at least one juror would have struck a different balance").

143

The court disagrees that trial counsel made a lopsided or unreasonable trade when they agreed to exclude a small percentage of venire members based on the answers that they provided in their questionnaires. No legal authority disallows parties to broker an agreement as to potential jurors who should be excused for cause or for hardship, and no legal authority requires all potential jurors to be questioned. The movant, at least in part, acknowledges this because he does not fault trial counsel for agreeing to eliminate potential jurors who expressed hardship or selected "a" before they were questioned. Concerning the latter individuals, it is entirely possible that some of them were mistakenly placed on the list as a result of their own actions or the parties' actions. Some of them might have been qualified to serve in light of other answers in their questionnaires or after being rehabilitated during questioning. It is evident from the record that the movant acquiesced in the decision that trial counsel made but now has misgivings as to whether some of the venire members should have remained in the venire pool. In light of the law and the movant's current position as to just a subset of the parties' arrangement to exclude venire members, the court finds that trial counsel did not provide ineffective assistance when they entered into an agreement on the movant's behalf.

In addition, there is no reason to conclude that the decision to eliminate potential jurors based on their answer to Question 72 unfairly narrowed the juror pool. It is true that the movant needed just one juror to vote for life and the government needed twelve to secure a sentence of death. It, however, is not true that trial counsel unwittingly decided to eliminate qualified jurors who were most likely to vote for a sentence of life or that trial counsel unknowingly acted in a manner that increased the likelihood that the movant would be sentenced to death. Contrary to the movant's assertion, the record indicates that trial counsel realized the importance of getting a juror to find the facts merited a life sentence. It also indicates that, despite issues surrounding the agreement, trial counsel opted to eliminate as many extremely pro-death candidates as they could.

144

Rather than choose potential jurors from a jury pool that included all of the potential jurors except those excused for hardship or under *Witherspoon* and *Morgan*, trial counsel thought it important to get rid of the "conservative folks" as quickly and as early as possible. The court concludes that eliminating some candidates that appeared to have extreme pro-death views in exchange for eliminating some candidates that appeared to have extreme anti-death views is a reasonable trial strategy, especially considering the case involved the slaughter of three adults and two little girls. Because the decision to enter into the agreement is not so patently unreasonable that no competent attorney would have chosen to make the same decision, trial counsel did not provide ineffective assistance. Further, the court finds that theorizing about what might have happened if a different agreement or no agreement had been entered into is an insufficient basis to establish prejudice. Even if the parties did not enter into an agreement, it is entirely possible that none of the twenty-eight potential jurors who selected "b" would be interviewed because they made up only a small percentage of the non-hardship juror pool and because potential jurors were randomly sorted into panels of fifteen.

### b. The implementation of the agreement and the reliance on a jury consultant

With respect to the execution of the agreement, the movant challenges the exclusion of a potential juror who did not answer "b" in the first place, the exclusion of eight potential jurors who selected "b" but made clear elsewhere in their questionnaires that their views were more moderate and the inclusion of three potential jurors who held strong pro-death views. Specifically, he points to venire member 12 as being improperly identified as having selected "b" when answering Question 72. *See* Questionnaire for venire member 12, Movant Ex. 29, civil docket no. 19-29 or Movant Hearing Ex. 90, civil docket no. 74-118. As to venire members 338, 635, 668, 701, 809, 916, 935 and 945, the movant disapproves of their exclusion because they indicated in their questionnaires that

145

they could be impartial and impose the death penalty.  *See* Questionnaires for venire members 338, 635, 668, 701, 809, 916, 935 and 945, Movant Ex. 31, 35, 36, 37, 38, 40, 41, 42 (civil docket nos. 19-31, 19-35, 19-36, 19-37, 19-38, 19-40, 19-41, 19-42) or Movant Hearing Ex. 92, 96, 97, 98, 99, 101, 102, 103 (civil docket nos. 74-120, 74-124, 74-125, 74-126, 74-127, 74-129, 74-130, 74-131), respectively.  He reiterates that selecting "b" is not enough to establish exclusion under *Witherspoon* and argues that trial counsel wrongly classified venire members 338, 635, 668, 701, 809, 916, 935 and 945 as individuals who selected "b" even though they did so.  Further, the movant finds fault with trial counsel's failure to remove venire members 24, 556 and 574 because they had selected "h" or "i" when answering Question 72.  *See* Questionnaires for venire members 24, 556 and 574, Movant Ex. 30, 33, 34 (civil docket nos. 19-30, 19-33, 19-34) or Movant Hearing Ex. 91, 94, 95 (civil docket nos. 74-119, 74-122, 74-123), respectively.

To show that trial counsel did not secure an even trade pursuant to the parties' agreement, the movant points to venire member 556.  *See* Questionnaire for venire member 556, Movant Ex. 33 (civil docket no. 19-33) or Movant Hearing Ex. 94 (civil docket no. 74-122).  He states that, even though venire member 556 selected "i" when answering Question 72,[37] she remained in the qualified pool.  The movant states that, despite venire member 556's pro-death views, trial counsel found it necessary to challenge for cause venire member 556 during voir dire.  *See* criminal docket no. 449 (strike worksheet).  He claims that no reasonable strategy can be predicated on including more venire members who are strongly in favor of the death penalty and including less venire members who are strongly opposed to the death penalty.

The movant also contends that trial counsel's mishandling of the juror selection process is due to their reliance on an inexperienced jury consultant.  He objects to trial

---

[37] In addition to selecting "i", venire member 556 selected "e" and "f".

146

counsel's decision to rely on a jury consultant who allowed a potential juror to be struck as a result of being misidentified. In support of such objection, he again points to venire member 12, who was struck for cause for selecting "b" when answering Question 72 even though she had selected "d" when answering Question 72. Additionally, the movant objects to trial counsel's decision to rely on a jury consultant who allowed venire member 809 to be struck. He states that, even though the parties agreed that venire members who selected multiple answers would remain in the qualified pool, venire member 809 was struck for selecting "b", "c" and "e" when answering Question 72. He avers that many of those types of errors occurred because an inexperienced jury consultant advised trial counsel.

In light of the record, the court is unable to find that either trial counsel's preparation of the list of venire members that should be excluded or trial counsel's reliance on the jury consultant fell below an objective standard of reasonableness. Regarding the latter assertion of ineffective assistance, nothing indicates that the jury consultant was incapable of tracking questionnaires and providing sound advice in a capital case. The movant's bare assertions as to the jury consultant's qualifications do not establish that trial counsel provided ineffective assistance. Moreover, the court finds that trial counsel reasonably relied on a highly experienced jury consultant to keep track of a very large number of potential jurors and to figure out who should be struck and who should not be struck. There is absolutely no basis to conclude that trial counsel's consultation of an expert is professionally unreasonable.

As to the alleged oversights, it is not clear to the court that these really are oversights. The parties obviously agreed to remove venire members based predominantly on how venire members answered Question 72. But, it appears likely that they also relied on other aspects of the questionnaires when they met to decide which venire members to include on the list. For example, venire member 12 underlined portions of "b" but

147

ultimately circled "d" when responding to Question 72. In addition, venire member 12 disclosed that she had heard specific details about the offenses, she had concerns about threats being made against jurors because an innocent person would not make such a threat and her husband's uncle may have been involved in the investigation. Similarly, venire members 809 and 635 selected more than just "b" when answering Question 72, and they clarified their views. Venire member 809 stated that, as a Catholic, she did not agree anyone should be put to death even in a case such as the Oklahoma City bomber. And, venire member 635 indicated that he could not decide whether to take another person's life and his opposition to the death penalty would make it difficult for him to fairly and impartially perform his duty as a juror in the merits phase. In light of the answers provided in the questionnaires and the fact that the parties discussed whether sufficient cause existed as to 165 venire members, it is doubtful that any mistakes occurred.

To the extent that the parties inadvertently included or excluded venire members from the list, the court finds that trial counsel's conduct cannot be characterized as so inept that it permeates the entire jury selection process with obvious unfairness. At least five lawyers and one jury consultant reviewed hundreds of questionnaires. Out of that number, the movant essentially identifies one venire member, that is, venire member 12, whom he thinks trial counsel should have subjected to questioning. Further, although the parties included venire member 12 on the list, they also excluded from the list venire member 53 even though "b" was chosen for Question 72 and venire member 918 even though "a" was chosen for Question 72.[38] With respect to the other venire members, the record indicates that each one of them selected "b". Because venire members 338, 635, 668, 701, 809, 916, 935 and 945 responded in a manner that is consistent with the parties' understandings,

_____

[38] The trial court ultimately excused for cause venire member 53 after being informed of the parties' oversight.

148

there is no reason to conclude that trial counsel and/or the jury consultant missed something when they did not include them in the jury pool.

As to the pro-death candidates left in the jury pool, none of them were seated on the jury. Venire member 24 selected "c", "e", "h" and "i" when answering Question 72. He, however, was never called to appear in court to be interviewed. Venire member 574 was excused for hardship, and venire member 556 should never have been included on the list because she was qualified to serve as a juror. Because the trial court denied his motion to strike venire member 556 for cause, the movant exercised one of his twenty peremptory challenges to remove venire member 556. *See* criminal docket no. 449. Consequently, he eliminated any potential error arising from either the parties' failure to include venire member 556 on the list or the trial court's failure to strike venire member 556 for cause. *See Johnson*, 495 F.3d at 963 (concluding that no violation of the defendant's right to an impartial jury occurred because she used peremptory strikes to prevent challenged venire members from sitting on the jury).

### c. The role of the trial court

The movant contends that the trial court erroneously permitted trial counsel to eliminate potential jurors without making an independent determination that such jurors did not qualify to serve on the jury. Because no judicial review or evaluation of the grounds for excluding potential jurors took place, the movant declares that trial counsel's errors were exacerbated. He argues that the trial court should have exercised its discretion and required further inquiry before deciding whether potential jurors could be rehabilitated.

The jury selection process in this case does not indicate that the trial court abdicated its responsibility. The trial court properly assumed that trial counsel adapted their juror selection strategy to what in their professional opinion served the movant's best interests and that the movant approved of trial counsel's decisions because he never expressed any disagreement with them. Nothing requires a court to make an independent determination

149

as to the qualifications of potential jurors if the parties do not dispute that their exclusion is appropriate. Further, nothing requires a court to intervene and force the parties to include additional venire members. Had the trial court done so here, it is possible that rehabilitated pro-death candidates could have been seated on the jury. The movant dismisses this possibility and blindly assumes that only anti-death candidates would have ended up on the jury.

If all of the facts are taken into consideration, it is not difficult to conclude that the parties entered into a reasonable agreement in an effort to eliminate a small portion of potential jurors that had extreme opinions about the death penalty. Given the record, the court concludes that there is absolutely no basis to second-guess the strategic decisions made by the parties. Their attempt to be efficient and to only question and seat fair and impartial jurors with more neutral views is entitled to deference, especially when the alternative includes the possibility of seating a juror with immoderate opinions as to the appropriateness of the death penalty. Although the movant needed just a single juror to vote for a life sentence, the parties were selecting a jury from hundreds of candidates, and the slight chance of seating jurors from the small percentage of anti-death candidates does not outweigh the risk of seating jurors from the small percentage of pro-death candidates.

### d. The decision by appellate counsel

The movant also contends that appellate counsel should have raised the impermissible exclusion of potential jurors on direct appeal. The movant alleges that, by waiving valid claims, appellate counsel provided ineffective assistance. He states that nearly thirty opportunities to prove a violation of *Witherspoon* existed and appellate counsel unreasonably elected not to try to establish the wrongful exclusion of at least one venire member. Additionally, he argues that appellate counsel should have argued on direct appeal that the trial court unconstitutionally excluded for cause venire members 538 and 813 after both of them maintained during voir dire that they could be impartial.

150

The movant asserts that venire member 538 never expressed that she would refuse to consider the death penalty. Given her statements, the movant rejects the trial court's conclusion that venire member 538 could not serve as a juror because her views would substantially impair her performance as a juror. Further, the movant objects to how the government and the trial court characterized venire member 538's articulation of the appropriate standard of proof. He maintains that, when she stated that the government should prove guilt beyond all doubt rather than beyond a reasonable doubt, venire member 538 only made such statement in the context of whether an individual should receive a sentence of death, not in the context of whether the individual should be found guilty. And, the movant offers that, because residual doubt is a legitimate mitigating circumstance, her expressions are perfectly consistent with an individual who finds a defendant guilty but votes for life imprisonment because of some lingering doubts as to guilt.

Similarly, the movant stresses that a constitutional error occurred when the trial court struck another qualified juror. He states that venire member 813 selected "c", "d" and "e" when answering Question 72 and never expressed that she would be unable to vote to impose a sentence of death. The movant maintains that, despite the fact that venire member 813 made clear that she could vote to impose a sentence of death, the government repeatedly attempted to convince her that she would require more than just proof beyond a reasonable doubt. He condemns the government for forcing venire member 813 to acquiesce that she would have to be convinced beyond all doubt before voting to impose a sentence of death after she conveyed that she would have to be "very sure" or "very, very sure" before deciding that a defendant should receive the death penalty. And, he advances that trial counsel's subsequent rehabilitation of venire member 813 established that she would find it very hard to vote to impose the death penalty but could do so after considering and weighing everything and the government's follow-up questioning

151

unambiguously revealed venire member 813's views would not substantially impair her duty to consider both sentencing options.

Given the voir dire conducted with respect to venire member 813, the movant argues that the trial court erred when it found that she would require more than just proof beyond a reasonable doubt if she were evaluating whether the government had established an aggravating factor. He contends that, although the trial court acknowledged neither the government nor the defense asked venire member 813 about aggravating factors, it misevaluated her testimony and impermissibly stood by its decision to exclude her for cause.

Based on the parties' dispute concerning venire members 538 and 813, the movant refuses to endorse appellate counsel's decision not to raise their wrongful exclusion on direct appeal, especially considering the extent the parties argued venire member 538's qualifications to serve as a juror and the trial court's hesitation when making the decision to exclude her. He states that the Eighth Circuit Court of Appeals would have vacated the sentences of death after deciding that the trial court excluded venire members in violation of *Witherspoon* and *Witt*. Because they failed to raise an arguably meritorious claim on direct appeal, the movant argues that appellate counsel provided ineffective assistance.

The court disagrees that appellate counsel provided ineffective assistance when they failed to raise either a claim based on the twenty-eight potential jurors who selected "b" when answering Question 72 or a claim based on the trial court's decision to grant the government's challenges for cause. The facts do not indicate that those claims had any chance of succeeding at the appellate level. As to whether appellate counsel should have claimed that trial counsel unreasonably entered into and executed an agreement to exclude potential jurors, it is rare for ineffective assistance of counsel claims to be addressed on direct appeal. *See United States v. McAdory*, 501 F.3d 868, 872-73 (8th Cir. 2007) (noting that ineffective assistance of counsel claims are ordinarily deferred to collateral

152

review under 28 U.S.C. § 2255).  To the extent that the movant argues that appellate counsel should have challenged the role that the trial court played in the selection of the jury, relief is not warranted because, as the court previously explained, the underlying issues are meritless.  The court is confident that the result of the movant's appellate proceeding would have been the same had he raised the issues on direct appeal.

Furthermore, appellate counsel acted reasonably when they decided not to challenge the trial court's removal of venire members 538 and 813.  Despite saying that he would present evidence regarding appellate counsel's decisions, the movant never did so.  So, the court is left with the movant's broad conclusory allegations regarding appellate counsel and a record that establishes good reason for appellate counsel to assert other issues.

When addressing the movant's motion for judgment of acquittal or, in the alternative, for a new trial, the trial court thoroughly addressed the movant's current contentions regarding venire members 538 and 813.  *See Honken*, 381 F. Supp. 2d at 984-94.  The trial court detailed the questions asked by the parties, the answers provided during voir dire, the parties' arguments and its findings.  *Id*. at 986-89.  It also laid out the parties' post-trial arguments and conducted an exhaustive analysis.  *Id*. at 989-95.  Ultimately, the trial court concluded that it properly granted the government's requests to strike for cause both venire members.  *Id*. at 994-95.  Before doing so, the trial court reaffirmed its prior findings.  *Id*.  Specifically, the trial court found that venire member 538 could not apply the proper standards and could not be impartial and venire member 813 could not follow the trial court's instructions because she insisted that a higher standard than reasonable doubt should apply for the imposition of the death penalty.  *Id*.

In addition to the record in his own case, the movant also had the benefit of the Eighth Circuit Court of Appeals's opinion in the companion case of Angela Johnson.  *See Johnson*, 495 F.3d at 963-64.  With respect to her direct appeal, the Eighth Circuit Court

153

of Appeals succinctly disposed of the defendant's claim regarding a juror that the trial court sat over the defendant's objection. It stated:

> The district court did not abuse its discretion in denying [the defendant's] motion to strike juror 600. A venireperson may be properly excluded from sitting in a capital case if the venireperson's views on capital punishment would "prevent or substantially impair the performance of his [or her] duties as a juror in accordance with his [or her] instructions and his [or her] oath." [*Witt*, 469 U.S. at 424]. "Because the trial judge is in the best position to analyze the demeanor and credibility of a venireman, we will not reverse a court's rulings absent an abuse of discretion." *United States v. Ortiz*, 315 F.3d 873, 888 (8th Cir. 2002); *see also* [*Uttecht v. Brown*, 551 U.S. 1, 9 (2007)] (concluding that a trial judge's determinations regarding substantial impairment should be accorded deference). [The defendant] contends that juror 600 should have been struck because he stated that his empathy for the victim's family and the fact that the crime involved children could affect his judgments about the case. She also asserts that juror 600 would not consider any deals that a prisoner may have received or might hope for in weighing the prisoner's testimony. Although the juror gave some equivocal answers and acknowledged the possibility that his judgment could be affected by some aspects of the case, the district court concluded that juror 600 could be fair and impartial and that his statements reflected the "reasonable self doubts" of a conscientious and reflective person. Moreover, although he initially indicated little interest in whether witnesses hoped for sentencing reductions in exchange for their testimony, juror 600 stated that he would consider the motivations of witnesses in testifying and acknowledged the "real possibility" that some witnesses might lie to obtain some sort of benefit. We therefore cannot say that the district court abused its discretion in denying [the defendant's] for-cause challenge to this juror.

154

*Id*.  Although the issues here are not identical to the issues that were raised in Angela Johnson's case, there is absolutely no reason to conclude that the Eighth Circuit Court of Appeals would not have accorded the trial court deference as to its decisions regarding venire members 538 and 813.

Moreover, it is clear that appellate counsel consulted with trial counsel about possible appellate issues in January of 2006.  *See* Movant Hearing Ex. 52, civil docket no. 74-80 (e-mail).  Those issues included: (1) confrontation in violation of *Crawford*; (2) the presiding judge's emotions; (3) juror misconduct; (4) the erroneous grant of the government's challenges for cause; (5) the use of hearsay testimony at the hearing regarding shackling; (6) the unanticipated recusal of a judge for the United States Court of Appeals for the Eighth Circuit; and (7) double jeopardy on the CCE murder charges. *Id*.  In light of the record, the court concludes that appellate counsel's failure to raise an improper exclusion of venire members claim was an exercise of sound appellate strategy. Appellate counsel may winnow out weaker claims and it is evident that they did so.  As to prejudice, the movant established none.  The result of the movant's appellate proceeding would have been the same had appellate counsel raised the trial court's exclusion of venire members 538 and 813.

In sum, the movant failed to establish any constitutional violation.  The claimed errors of trial counsel, appellate counsel and the trial court are insufficient, and, consequently, this ground provides no basis to grant relief.

### H.  Ground Eight — Constitutional Violations Occurred as a Result of the System for Summoning Venire Members

#### 1.  Arguments of the parties

##### a.  The movant

Aside from criticizing the parties' selection of the jury, the movant complains that a violation of the requirement that a petit jury be selected from a fair cross-section of the

155

community occurred as a result of the system that is in place in the Northern District of Iowa. He states that the jury selection process deprived him of a venire that represents a fair cross-section of the community because it only included one African American and two Latinos. The movant contends that the dramatic under-representation of African Americans and Latinos in the original 600 member venire establishes systematic exclusion. And, the movant claims that, as a consequence of adhering to an improper jury selection process, the seventy-five qualified venire members from which the parties ultimately selected eighteen jurors did not include any minorities.

The movant asserts that the right of a defendant to a jury that is chosen from a representative cross-section of the community is an essential component of the right to a jury trial under the Sixth Amendment, *see Taylor v. Louisiana*, 419 U.S. 522, 530 (1975), and acknowledges that three elements must be met to establish a violation of the fair cross-section requirement, *see Duren v. Missouri*, 439 U.S. 357, 364 (1979). In support of his assertion that a violation of the constitutional fair cross-section requirement occurred, he states that: (1) the relevant community contains two distinctive groups—African Americans and Latinos; (2) the representation of those distinctive groups in the venire is not fair and reasonable in relation to the population of each group in the community; and (3) the under-representation of African Americans and Latinos is the result of systematic exclusion from the jury selection process.

As to the relevant community, the movant offers that it is undisputable that African Americans and Latinos are distinctive groups in Iowa. *See United States v. Garcia*, 991 F.2d 489, 491 (8th Cir. 1993). He states that, as of the 2000 census, African Americans represented 1.65% of the population in the Northern District of Iowa and 0.86% of the population in the fourteen counties from which venire members were selected but they only made up 0.17% of the 600 member venire pool and 0.00% of the qualified seventy-five member pool. Similarly, he contends that, although Latinos represented 2.39% of the

156

population in the Northern District of Iowa and 5.11% of the population in the fourteen counties from which venire members were selected, they only made up 0.33% of the 600 member venire pool and 0.00% of the qualified seventy-five member pool.

With respect to whether those disparities are reasonable, the movant asserts that analyses of absolute disparity and comparative disparity reveal significant statistical differences. *See United States v. Rogers*, 73 F.3d 774, 776-77 (8th Cir. 1996). Specifically, he calculates that there is an absolute disparity of either 1.48% or 0.69% for African Americans and an absolute disparity of either 2.06% or 4.78% for Latinos.[39] And, he calculates that the comparative disparity for African Americans is either 90% or 80% and the comparative disparity for Latinos is either 86% or 93%.[40] He also emphasizes that the comparative disparity for both distinctive groups is 100% if the qualified seventy-five member pool rather than the 600 member venire pool is examined.

---

[39] Absolute disparity is calculated by subtracting the percentage of a distinctive group in the jury pool from the percentage of that group in the jury division. *See Rogers*, 73 F.3d at 776. For African Americans, the movant arrives at an absolute disparity of 1.48% after subtracting 0.17% (the percentage of African Americans in the 600 member venire pool) from 1.65% (the percentage of African Americans in the Northern District of Iowa). Or, he arrives at an absolute disparity of 0.69% after subtracting 0.17% (the percentage of African Americans in the 600 member venire pool) from 0.86% (the percentage of African Americans in the fourteen counties). For Latinos, the movant calculates an absolute disparity of 2.06% after subtracting 0.33% (the percentage of Latinos in the 600 member venire pool) from 2.39% (the percentage of Latinos in the Northern District of Iowa). Or, he arrives at an absolute disparity of 4.78% after subtracting 0.33% (the percentage of Latinos in the 600 member venire pool) from 5.11% (the percentage of Latinos in the fourteen counties).

[40] Comparative disparity is calculated by dividing the absolute disparity by the percentage of the distinctive group in the community and then multiplying that number by 100. *Id*. Such analysis determines how less likely it is that members of a distinctive group will be selected because of systemic under-representation or because the composition of a source list such as a voter registration list does not perfectly mirror the community. *Id*. at 777.

157

Given such staggering numbers, the movant claims that the jury selection system in the Northern District of Iowa excludes nearly all African Americans and Latinos from jury service. *Cf. id.* at 776-77 (affirming the decision to uphold the Iowa jury selection plan after calculating an absolute disparity of 0.579% and a comparative disparity of 30.96%); *see also Ambrose v. Booker*, 684 F.3d 638, 642 n.1 (6th Cir. 2012) (explaining differences between absolute disparity and comparative disparity).

As to the requirement that the under-representation of African Americans and Latinos be due to systematic exclusion, the movant remonstrates against the Eighth Circuit Court of Appeals's application of *Duren* and continued willingness to abide by *Garcia*. *See, e.g.*, *United States v. Rodriguez*, 581 F.3d 775, 789-90 (8th Cir. 2009) (finding that the allegation of systematic exclusion of the distinct group failed because the record was devoid of evidence showing that the voters faced obstacles to voting). He states that the jury selection process in the Northern District of Iowa does not comport with constitutional requirements because it does not ensure minority representation. *See Rogers*, 73 F.3d at 775-77 (expressing that jury lists should be supplemented with persons who have a driver's license or a state identification card to increase minority representation).

Because he thinks that it is at least debatable whether the system in Iowa unconstitutionally summons venire members, the movant contends that no valid strategy or tactic supports trial counsel's actions. He claims that they did not do enough after the trial court permitted them to expend funds for jury selection experts. The movant maintains that trial counsel should have examined the information available to them at the time of trial and they unreasonably relied on the experts who provided them with a list of potential jurors based on various demographics that did not include any race information. He suggests that the lack of information as to race is due to trial counsel's failure to request it or their unreasonable reliance on the experts' determinations as to what was germane to the movant's capital jury selection. The movant also charges that trial counsel

158

either did not realize what to do with the information that the jury selection experts provided them or unreasonably relied on experts who did not know that systemic under-representation violates the Sixth Amendment.

The movant also contends that appellate counsel should have raised this claim on direct appeal. He states that, because the unconstitutional jury selection system constitutes plain error, the Eighth Circuit Court of Appeals would have vacated his convictions and sentences of death. Because they failed to raise an arguably meritorious claim on direct appeal, the movant argues that appellate counsel provided ineffective assistance. With respect to relief, the movant argues that it is appropriate to vacate his convictions and sentences of death because a jury comprised of a non-representative cross-section of the community violates his constitutional right to jury trial.

### b. The government

The government responds that neither trial counsel nor appellate counsel provided ineffective assistance because no basis exists to challenge the summoning of venire members in the Northern District of Iowa. It concedes that African Americans and Latinos are distinctive groups in the community but contends that the record neither demonstrates that the representation of African Americans and Latinos in venires from which juries are drawn is unfair and unreasonable in relation to the number of such persons in the community nor shows that the jury selection process in the Northern District of Iowa systematically excludes African Americans and Latinos. As to whether the representation of African Americans and Latinos in the venire is fair and reasonable, the government criticizes the movant's analysis by pointing out, among other things, his failure to establish the percentage of African Americans and Latinos who were included in other venires or served on other juries. Regarding the exclusion of venire members as a result of the jury selection process that is in place in the Northern District of Iowa, the government asserts that: (1) there is nothing inherently exclusionary or discriminatory about procedures that

159

rely on lists of registered voters and motor vehicle operators to select venire members and (2) African Americans and Latinos did not face obstacles that prevented their inclusion in the venire.

Additionally, the government emphasizes that the law in the Eighth Circuit Court of Appeals is not unsettled and an attorney need not advocate a position that is contrary to existing law. It maintains that, prior to the movant's trial in 2004, the Eighth Circuit Court of Appeals rejected attacks on the manner in which venire members are selected in Iowa. *See, e.g.*, *United States v. Einfeldt*, 138 F.3d 373, 379 (8th Cir. 1998); *Rogers*, 73 F.3d at 775-77; *Garcia*, 991 F.2d at 492. In light of the law establishing the validity of the method of selecting venire members in the Northern District of Iowa, the government asserts that the representation of trial counsel and appellate counsel did not fall below professional standards. It also asserts that their failure to challenge the improper exclusion of African Americans and Latinos had no impact on the movant's case.

### 2. *Analysis*

The court finds that the movant's assertions do not establish that the jury selection process improperly excluded African Americans and Latinos in violation of his constitutional right to a jury comprised of a fair cross-section of the community. The movant merely asserts that a constitutional violation occurred. And, despite asserting that he would offer evidence to prove that the under-representation of African Americans and Latinos is the result of systematic exclusion from the jury selection process, he did not do so. Consequently, the movant essentially abandoned this ground.

Aside from finding that the movant's conclusory allegations do not warrant relief under 28 U.S.C. § 2255, the court concludes that the law precludes granting relief on this ground. "'[E]thnic and racial disparities between the general population and jury pools do not by themselves invalidate the use of voter registration lists and cannot establish the "systematic exclusion" of allegedly under-represented groups.'" *United States v. Morin*,

160

338 F.3d 838, 844 (8th Cir. 2003) (quoting *United States v. Sanchez*, 156 F.3d 875, 879 (8th Cir. 1998)). Absent proof that a distinct group faces obstacles to registering to vote, the use of voter registration lists in the selection of venire members is constitutional. *Id*. at 843-44; *see also Rodriquez*, 581 F.3d at 789-90 (determining that it is permissible to rely on lists of actual voters from the most recent presidential election because nothing showed that minorities faced obstacles); *United States v. Greatwalker*, 356 F.3d 908, 910-11 (8th Cir. 2004) (concluding that no constitutional violation occurred because the evidence did not establish that Native Americans faced obstacles to registering to vote in presidential elections); *Smith v. Copeland*, 87 F.3d 265, 269 (8th Cir. 1996) (reaffirming that "a jury selection plan based on registered voter lists withstands constitutional scrutiny unless there is a showing of systematic exclusion of blacks in the jury selection process"). Because the movant fails to allege that African Americans and Latinos faced obstacles that prevented their inclusion in venires or that the jury selection procedure was administered in a discriminatory manner, the movant is entitled to no relief. *Cf. Sanchez*, 156 F.3d at 879 (holding that statistics alone cannot prove a Sixth Amendment violation when jury pools are selected from voter registration lists); *United States v. Ireland*, 62 F.3d 227, 231-32 (8th Cir. 1995) (finding that the systematic exclusion of a distinct group was not demonstrated because neither suspect voter registration qualifications nor discriminatory administration of the jury selection procedure was alleged).

Moreover, the court is not permitted to disregard the law as determined by the Eighth Circuit Court of Appeals. Between 1993 and 1998, the Eighth Circuit Court of Appeals upheld the jury selection process utilized in Iowa. *See Einfeldt*, 138 F.3d at 379 (affirming use of voter registration lists in the Northern District of Iowa); *Rogers*, 73 F.3d at 775-77 (reviewing challenge to the random selection of jurors in the Southern District of Iowa); *Garcia*, 991 F.2d at 491-92 (considering whether a constitutional violation occurred if the challenger fails to show that the jury selection process in the Southern

161

District of Iowa systematically excluded African Americans). It matters not that the jury selection process in Iowa is now more inclusive than other districts that do not also draw venire members from lists of registered voters and motor vehicle operators. *See Einfeldt*, 138 F.3d at 379 (observing that the Northern District of Iowa adopted a more inclusive jury selection process); *Rogers*, 73 F.3d at 778 (recommending that jury selection procedures be reformed to increase minority participation).

Because the system for summoning venire members in the Northern District of Iowa complies with federal law, it necessarily follows that neither trial counsel nor appellate counsel provided ineffective assistance. The court finds that trial counsel reasonably relied on expert advice when selecting the jury and appellate counsel cannot be faulted for failing to raise a challenge that is without merit. In light of the state of the law, there is absolutely no basis to conclude that the outcome would have been different had trial counsel or appellate counsel raised concerns about the jury selection procedure. Therefore, relief under this ground is not warranted.

### I. Ground Nine — Constitutional Violations Related to the Penalty Phase of Trial

The movant advances several interrelated allegations pertaining to the penalty phase. He generally claims that trial counsel failed to follow the mitigation specialist's recommendation to consult experts who could explore the significance of the movant's upbringing and background, provide a proper mental health perspective on information about the movant that had been uncovered and assist in the discovery of additional unknown information. He alleges that trial counsel did not conduct an adequate investigation based in part on their misunderstanding of the law and, consequently, failed to present mitigating evidence on a number of issues that would have been helpful to his defense. The government disputes that trial counsel provided ineffective assistance.

162

### 1.    Background

#### a.    The investigation

In relation to *United States v. Honken*, Case No. 3:96-cr-03004-MWB (N.D. Iowa 1998), the trial court relied on 18 U.S.C. § 3552(c) and granted the movant's request for a pre-sentence examination and report by a psychiatric or psychological examiner. Pursuant to the trial court's August 22, 1997 order, Dr. Daniel S. Greenstein conducted a forensic psychological evaluation, which included but was not limited to a multi-session clinical interview, and generated a report thereon to assist the trial court in determining the movant's mental condition. Gov. Ex. G, civil docket no. 22-10; Movant Hearing Ex. 132, civil docket no. 74-161. Dr. Daniel S. Greenstein's final forensic report dated October 21, 1997, included a detailed discussion of the reason for the movant's referral, the data reviewed, the movant's background information, the evaluation results and case formulation, the movant's course of incarceration, the movant's diagnosis and the movant's prognosis. *Id*. The background information portion of the report indicated:

> [The movant] was raised in Britt, Iowa, by his mother, Marvea [Honken/Smidt], and his biological father, [Jim] Honken. His parents divorced when [he] was eight years old. His mother remarried. After the divorce, [he] resided with his mother and stepfather. [He] is a middle child, having one brother and one sister. He also has one maternal stepsister. He reportedly maintains "close contact" with his biological sister. He has been "feuding" with his brother. Regarding his childhood, [he] indicated his father was "never around." His father worked in construction, and typically was only at home on weekends. He stated, "I don't really remember my childhood." Despite this statement, he described that his father was an alcoholic. The home environment was typified by emotional turmoil, mainly related to his father's alcoholism. [He] reported several instances in which his father physically struck him, though the extent of physical abuse is not known. His father served federal prison time for bank

163

robbery. [He] denied a history of physical abuse during his [pre-sentence] investigation. He reported a "good childhood."

. . . .

[He] denied a history of psychiatric treatment.

. . . .

He denied having consumed alcohol until he was 24 or 25-years-old. In 1992 or 1993, he began "experimenting" with psychoactive substances. He stated "I started with hard drugs." He began using methamphetamine in 1992, while in Tucson, Arizona. He also used marijuana and LSD. He added "I didn't use needles." He denied using psychoactive substances between 1993 and 1995, "because I had to take [urines]." He was referring to the fact that he had urine analysis for drugs due to his legal involvement. In 1995, after legal charges were dismissed, he used "small amounts" of drugs[,] including marijuana, crank[] and LSD. He also occasionally used cocaine in 1995.

Regarding alcohol use, [he] stated "My father was an alcoholic and I didn't want to become like that." He added, "My dad would get drunk and brag. I hate that so much." Regarding his psychoactive substance use, he stated that the first time his best friend used methamphetamine, his friend stated "If you don't try it, I'll break your arm." He described trying the methamphetamine and liking "the feeling it gave me. I decided that drugs must not be so bad. It's just propaganda about drugs." He described that he started to consume alcohol when he used methamphetamine. He used psychoactive substances until his arrest on the current case. His [pre-sentence investigation report] indicates that his mother believed that [he] did not use psychoactive substances.

*Id*. at 3-4. The evaluation and case formulation portion revealed the following:

[He] was administered various instruments which objectively measured his clinical/emotional status. The obtained results are considered to be valid as suggested by validity indicators and his perceived level of cooperation. [He] was cooperative

164

throughout the evaluation. The obtained results reflect an individual with a history of various psychoactive substance abuse. His abuse was primarily of methamphetamine. He used crank, LSD, cocaine and alcohol to a lesser extent.

Between 1992 and his arrest in 1996, he used psychoactive substances "on and off." He did not use psychoactive substances during his incarceration, and at times when he was subject to a urinalysis.

Amidst the picture of psychoactive substance abuse, [he] is currently experiencing clinically significant levels of anxiety. His anxiety is related to his perception of the allegations against him. Specifically, he has difficulty containing his "worrying" about the "false allegations" made against him (i.e., murders).

[He] is an individual who typically keeps tight reign over his emotions. He values maintaining control over a display of emotions. Despite his attempts to "control" his emotions, signs that he is experiencing anxiety were received from several sources. [He] experienced somatic complaints such as diarrhea, nausea, restlessness, difficulty with concentration, and reduced energy. [He] also experienced emotional disruption over news that his girlfriend was involved in a relationship with another man. This news, added to other stressors, made it difficult for him to control his emotions. He was observed to be teary-eyed during the week following the news that his girlfriend was involved with another person. Staff observed, for a period of two days, that [he] did not consume meals. After this situation was addressed by psychology staff, [he] was referred for treatment for his anxiety to the contract psychiatrist.

In addition to the anxiety he experiences, which is mainly related to his legal difficulties, [his] personality style may be characterized by interpersonal instability. He likely experiences volatile interpersonal relationships, anger, and impulsivity. This is consistent with a tendency to experience intense and short-lived relationships. His personality is also characterized by antisocial features. This is consistent with his

165

> adult antisocial behavior, his distribution of methamphetamine without regard to its impact upon others.

> Projective data, which is less objective, suggests that [he] is struggling with various issues, such as guilt, forsaking responsibility, and issues of death. He is not considered to be imminently suicidal, though he is struggling over issues of existential meaning in his life. This is appropriate to his situation, given the possibility of him receiving a life sentence.

*Id*. at 6-7. As to the course of incarceration section, it indicated:

> [He] did not engage in behavior which resulted in disciplinary action while at MCC Chicago. He spent much of his time in his room. He also periodically played cards or chess with other inmates. These activities helped focus his thoughts on specific matters, other than his legal and personal predicaments. Due to signs and symptoms of anxiety at MCC Chicago, [he] was referred to the contract psychiatrist. He was prescribed Buspar 10 mg noon, 15 mg at night. [His] anxiety symptoms improved throughout the course of the evaluation. He experienced reduced feelings of anxiety, decreased gastrointestinal symptoms, and decreased sweating, diarrhea, and nausea related to anxiety.

*Id*. at 7. Dr. Daniel S. Greenstein's diagnosis referenced the following: 309.24 Adjustment Disorder With Anxiety, 305.70 Methamphetamine Abuse and V71.01 Adult Antisocial Behavior regarding Axis I and 301.9 Personality Disorder, Not Otherwise Specified, With Antisocial And Borderline Features regarding Axis II. *Id*. at 7-8. And, his prognosis revealed the following:

> [He] is not considered to suffer from a severe mental disease or defect. The anxiety which disrupted his mood remitted through medication intervention and adjustment throughout the course of the evaluation. He will continue to have periodic disruptions of mood, related to his ongoing case, loss of a relationship, and likelihood of substantial prison sentence. Refraining from substance abuse can only improve his functioning.

166

*Id*. at 8.  The pre-sentence investigation report, which was prepared by a probation officer on August 13, 1997, relied on by Dr. Daniel S. Greenstein and revised by a probation officer on December 4, 1997, included consistent information.  Gov. Ex. I, civil docket no. 22-6; Gov. Hearing Ex. I, civil docket no. 74-8.  It indicated:

> The [movant's] parents divorced when he was age 8 and following the divorce the [movant] remained with his mother in Britt, Iowa.  His mother married Ron Smidt approximately 18 months later.  The [movant], his mother and stepfather remained in Britt where his mother has been employed at a local bank for 17 years and his stepfather owns a used car lot. . . .  According to the [movant] and his mother, [Jim Honken] is a chronic alcoholic and rarely works.  Despite his father's alcohol abuse, the [movant] maintains he has a good relationship with him when his father is sober. . . .  Although the [movant's] parents separated when he was at a young age, he describes his childhood upbringing as good.  He reported he was never abused or neglected and advised he had a good relationship with his mother and stepfather.  The [movant] described his mother as "perfect." . . .  The [movant's] mother verified the family history as provided by the [movant].  [Marvea Honken/Smidt] advised that the family loves [the movant] and remains very supportive.  [She] described her son as friendly, outgoing, caring, and an overall good person.  According to [her,] neither drugs nor alcohol have been a problem for her son and he has never shown any signs of violence. . . .  [The movant] has two children.  [His son,] Ryan Honken . . . resides with his mother, Kathy Rick, in Mason City, Iowa.  The [movant] had an on and off romantic relationship with [Kathy] Rick from 1989 through 1993. . . .  [Kathy] Rick . . . described the [movant] as a good father and [a] caring person. . . .  [His daughter,] Marvea Honken . . . resides with her mother, Angela Johnson, in Urbandale, Iowa.  The [movant] cohabited with [Angela] Johnson from late 1993 until his arrest in April 1996.  [Angela] Johnson advised she has a good relationship with the [movant] and has maintained contact with him while he has

167

been in jail. [Angela] Johnson described the [movant] as a reasonable, sensible and down to earth person. She stated that he has always supported his daughter[, and she] considers him [to be] a good father. . . . The [movant] described his mental and emotional health as stable. Prior to his arrest for the instant offense, he has never had or sought any professional help in this area. . . . The [movant] reported that he drinks alcohol two or three times per month and does not feel he has any alcohol related problems. The [movant] stated that he was introduced to marijuana in approximately 1993 and after that began using the drug roughly once a week. The [movant] also admitted to experimenting with cocaine and LSD or acid but reported no extended use. The [movant] reported that in early [1992] he was introduced to methamphetamine. He advised that shortly thereafter he was using the drug on nearly a daily basis for approximately four months before his arrest in March 1993. The [movant] advised that while he was on [pre-trial] release for the 1993 arrest, he did not use any drugs and after his release (May 1995) he used methamphetamine on an occasional basis. He advised he smoked and snorted the drug. The [movant] related that in retrospect he believes he had a drug problem during the early part of 1993.

*Id*. at 31-33 (paragraph structure omitted).

On December 4, 1997, and December 19, 1997, the movant responded to an inquiry about his drug use because his attorney, who also served as the movant's trial counsel, believed such information had the potential to help him during his sentencing hearing in the 1996 case. Movant Hearing Ex. 1, civil docket no. 74-21. The movant informed his attorney that he used drugs all of the time, including when he was incarcerated. *Id*. And, he expressed concern about relying on his drug use as a reason for imposing a lower sentence because he had previously reported to a probation officer that he had not been using drugs. *Id*.

In December of 2002 and while the criminal case against the movant was pending, Dr. Earl F. Rose reported to trial counsel that he reviewed the records (19) that were

168

provided to him and found no shortcomings that would alter the diagnoses and conclusions that related to the government's forensic pathology investigation into the time and cause of death of two young girls, their mother and two other witnesses. Movant Hearing Ex. 5, civil docket no. 74-25. He also stated the following:

> My personal experience, observations and studies, however, suggest that there might be events in the antecedent history of [the movant] that could prove very important, and explain his tragic, violent and seemingly irrational behavior. It is my opinion that antisocial behavior, and even violent crimes, may be caused by neurological and psychiatric factors that have been present for years. . . . I urge that this be explored.

*Id*. In a letter to co-counsel, trial counsel noted that he met with Dr. Earl F. Rose on December 19, 2002, and that they had a discussion about possible efforts to explain the movant's deadly behavior. Gov. Ex. K, civil docket no. 22-8; Gov. Hearing Ex. K, civil docket no. 74-9.

Lisa A. Rickert, the mitigation specialist, interviewed the movant on January 28, 2003, January 29, 2003, and January 30, 2003, and prepared extensive notes. Gov. Hearing Ex. V, civil docket no. 74-19. Excerpts of Lisa A. Rickert's notes indicated the following:

> He sacrificed his children's future. He thought that he was a smart guy, but the hurdles in his life were too overwhelming and too disastrous for him. His parents did not teach character values. He was mad at his sister, Alyssa Nelson, because she implied that he killed Gregory Nicholson, Lori Duncan, Kandi Duncan, Amber Duncan and Terry DeGeus, and he thought his brother, Jeffrey Honken, was a piece of work. He relied on his mother for emotional support and his father for financial support. He and his mother were very close, she was very caring and affectionate and she never raised her voice. He would be devastated if she expressed her disappointment in him. He never yelled because he was not brought up that way.

169

He was in Cub Scouts from second grade through fifth grade, and his mother was a scout leader. He participated in wrestling, baseball, football, track and basketball. He never had behavior problems, showed aggression or received detention while he was in school. His teachers like him. He was not super popular in school.

He never experienced family violence, and he did not get physically disciplined. There were no threats of violence and there was only one time when his father got frustrated and pushed him and his sister into a chair. His father was not affectionate, and he did not spend quality time with him. He was not verbally abused but would be called a snotnosed kid when his father was drunk. He thought his father was a bad influence on him. He was his father's favorite child because he was smart. He caught on to his father's criminal activity when he was around twelve years old and was embarrassed when his father was drunk and bragged. He understood that his father was not respected by others and broke promises.

His brother was not physically abusive to him, babysat him and got along well with his mother and stepfather. He got along better with his sister because she was closer in age to him. He does not have a lot of memories of his parents being together and he does not recall arguments or fights between them.

He moved from Hutchins, Iowa, to Britt, Iowa, after his parents divorced and did not see his father for awhile. Sara Matoon lived next door to them in Hutchins, Iowa, and she was like a grandmother to him. His best friend from age eight to thirteen was Brian DeGeus, who is Terry DeGeus's brother, and Timothy Cutkomp was his best friend since age thirteen. When he was age fourteen, he and Timothy Cutkomp attended Sonny Onoo's Karate Sports and Health. From when he was in fourth grade to eighth grade, he also had a friend who was a bully and belittled others to make himself feel good. He views himself as being a loyal friend but having weak moral courage.

170

His mother married Ron Smidt after getting divorced. Ron Smidt was a good man and was always supportive of him. Ron Smidt was not violent, mean or affectionate. He adjusted to Ron Smidt as his stepfather just fine. His father married Carol Honken after getting divorced and he went over to his father's home only to get money. He had a close relationship with his maternal grandmother, who is funny and affectionate. He used to stay overnight at the home of his maternal grandparents on the weekends and during the summer and helped his maternal grandmother cook. He stayed overnight at the home of his paternal grandparents on occasion and always for a week during the summer, and he visited his paternal grandmother after he began driving.

From when he was age twelve to age fourteen, he worked for Ron Smidt at Smidt Motors. When he was fifteen, he worked at an A&W restaurant. The owners of that restaurant really like him. From when he was age sixteen to age eighteen, he again worked for Ron Smidt at Smidt Motors. He dated the same girl on and off from age fifteen to age eighteen.

His father solicited him to steal boat motors when he was fifteen and a truck when he was sixteen. His father took no responsibility for influencing him. Sometime in 1986, he stole a car with some of his friends. His father was in Texas at that time but, when he returned home and found out, he was really mad. Nevertheless, his father helped him get rid of the car. After Carol Honken kicked Jim Honken out of their home, Jim Honken did not have a place to stay and no money. Jim Honken was starving and living in abandoned buildings. He refused to help his father in an insurance scheme but provided his father with a copy of a key that allowed his mother to enter the bank in Britt, Iowa, which is where she worked, and his father used such key to rob the bank. His father robbed another bank in Missouri and ended up serving time in a federal prison from 1987 to 1991. He lived in Arizona from the summer of 1986 to 1989 and, while he was there, he worked for his brother and worked on a counterfeit money scheme. He dated a woman in 1988. He did not like that Jeffrey Honken had an affair with his business partner and

171

talked about killing her to collect a million dollar life insurance policy.

From 1989 to 1991, he lived in Iowa. While back in Iowa, he worked for a brief period of time and attended college. He dated Kathy Rick. Another person was supposed to ship marijuana for him, and Gregory Nicholson threatened him because he owed $1,400.00 for it. He first met Angela Johnson in 1989 in Cedar Rapids, Iowa. She dated Terry DeGeus. She would be around when he dropped off drugs, and she weighed the cocaine that he brought to Terry DeGeus.

In 1991, Jeffrey Honken talked to him about running marijuana and making synthetic cocaine. Jeffrey Honken and Bruce Smidt looked into making the synthetic cocaine. He was told by dealers in Iowa that they all wanted methamphetamine.

He moved back to Arizona in part to get away from Kathy Rick and, in January of 1992, started to manufacture methamphetamine. While in Arizona, he used a lot of methamphetamine over a five month period and after that period tried LSD three times, methamphetamine a couple of times and marijuana a couple of times. He loved Melissa Friesenborg. She moved out to Arizona with him in 1992, and she was aware of his methamphetamine laboratory. He and Melissa Friesenborg got engaged. He would call Kathy Rick from pay phones.

After seeing Angela Johnson in 1989, he did not see her until she dropped off some money for Terry DeGeus in 1992. When he saw Angela Johnson on that occasion, he did not want to speak with her. In early 1992, he met with Angela Johnson and she told him that Terry DeGeus was doing all of the drugs and failing to pay bills. He shut down the methamphetamine laboratory in Arizona in March of 1993. His brother discarded the laboratory equipment that had been placed in storage. He learned that Terry DeGeus was a dope addict, was physically abusive to Angela Johnson and was planning to kill Gregory Nicholson after stealing drugs from him. He warned Gregory Nicholson about Terry DeGeus's plan.

172

After he got arrested, he worked for Ron Smidt at Smidt Motors for eight months to a year. From March of 1993 to 1995, he stayed at the home of his mother and Ron Smidt, but, for sometime in 1994, he mostly slept at Angela Johnson's home.

He worked at Kraft Foods from 1994 to June of 1996. He and Timothy Cutkomp made methamphetamine in Jim Honken's home. He told his father not to go into the upstairs bedroom and his father never asked what he was doing. Kathy Rick and Angela Johnson financially supported his drug activity. Even though Kathy Rick really did not want to use drugs, sell them and help in his laboratory, she did so because she would do anything for him. Ron Smidt was very mad at him after he was arrested again in 1996, and his mother was disappointed and kept asking him why he did it. His father lied to protect him when he told a detective that he saw Angela Johnson and two Aryan brothers snorting cocaine, heard them talking about murdering people, followed them and saw them with shovels.

There is a family history of alcoholism and mental illness. His use of alcohol was quite minimal. He had no medical problems, and he never had been to counseling and never had symptoms of mental illness. He desperately wanted to get out of jail in 1997 so he requested a psychological evaluation and was transferred to MCC Chicago. He thought that the psychological report diagnosed him as being antisocial but rehabilitative. He thought that the evaluators were stupid and did not spend a lot of time with him. He expressed that he answered questions accurately and without having to lie because many of the questions pertained to violence and he is not a violent person. He very rarely experienced depression, and, although he took Buspar prior to his sentencing, he did not need it. He never experienced anxiety, major losses or trauma. He considered himself to be nervous, mistrustful and paranoid because people turned on him.

He thought it would be a good idea to accept a deal if it saved Angela Johnson and gave the impression to his children that he was a good person. Immediate and extended family members

173

wrote to him and visited him while he has been in prison. He could count on his father to send him money because he reminded his father that he was the only one who had stuck by him throughout the years.

*See id.*

On February 5, 2003, trial counsel wrote to co-counsel. Gov. Hearing Ex. Q, civil docket no. 74-16. Trial counsel stated:

> I again spoke with our mitigation specialist, [Lisa A. Rickert]. [She] confirmed for me that during her three days of meetings with [the movant] she really obtained nothing that would be worth submitting to the [Department of Justice] in its consideration of whether or not to seek the death penalty. She is going to continue to explore information about [the movant's] family, and will provide me written reports of her interviews as she prepares them. I will send them on to you for your review.

*Id.*

On March 1, 2003, Lisa A. Rickert, the mitigation specialist, interviewed Alyssa Nelson, the movant's sister. Movant Hearing Ex. 2, civil docket no. 74-25. Excerpts of Lisa A Rickert's notes of that interview indicated the following:

> She and the movant attended bible camps as children. Her mother is generous, loving and a good cook. Her mother sacrifices herself for her children. Her mother is affectionate and expresses her love. She feels very pampered by her mother when she returns home to visit. Her father is manipulative, a braggert, antisocial and greedy. He was like a disease. If you come into contact with him, you will suffer. She felt sorry for her father and, as the responsible child, she kept track of him. She did not care about her parents' divorce but her brothers took it hard. Her father let her down her entire life, but Ron Smidt has always filled in for her father. Jeffrey Honken is only out for himself and, aside from being more polished and not abusing alcohol, is similar to her father. She has always been very close to the movant. The movant

174

has an antisocial personality which he either inherited or learned from his father. Her mother fails to recognize the antisocial characteristics in her sons. Her mother stopped all contact with Jim Honken after the divorce. The movant is racist. Prior to getting divorced, her father was only home on the weekends and had his friends over to drink with him. Her mother often left the kids and her father threatened on one occasion to hit her with a two-by-four when she left the house to go find her mother. She feared her father. The movant wanted Ron Smidt to be his father but was confused because Jim Honken demanded loyalty. Ron Smidt was quiet and shy but became jealous if her mother spent too must time with her children. When she was growing up, the movant frequently beat her up. Because the movant left her so bruised, her teachers questioned her. He repeatedly hit her in the back of the head. The movant demeaned her by calling her fat, stupid and ugly. The movant has a quick temper. The movant held a pillow to her face after she told one of his girlfriends that he had other girlfriends. She was unable to breathe and afraid he was going to kill her, but then he realized what he was doing. He was scared, apologetic and cried after trying to suffocate her. The movant tried to drown her in a hotel pool. She could not breathe and swallowed a bunch of water. After realizing what he had done, the movant helped her to the side of the pool. Because the movant physically abused her, she feared him and was always trying to please him. The movant did not pick on her when Jeffrey Honken was around. Jeffrey Honken controlled the movant by bossing him around, not by hitting him. There was only one incident when her father was physical with her brothers. Her father threw them across the room because her father was supposed to watch her, he got drunk, he told her brothers to watch her, they left her alone and she went to find her mother, her mother got angry and her father blamed her brothers. The movant is a hard worker. The movant loved karate, went all the time and was good at it. In 1986, the movant told her that Jim Honken had been kicked out by Carol Honken and had asked him to make a copy of the bank key. She was aware of the movant's car theft. Jeffrey Honken and Bruce Smidt financed the movant's drug

175

operation. The movant does anything that Jeffrey Honken tells him to do. Jeffrey Honken has some kind of hold over the movant. The movant dropped out of college because Jeffrey Honken asked him to come to Arizona. She was mad and it almost killed her mother when they heard the movant had gotten Kathy Rick pregnant and Angela Johnson pregnant. The movant has a big heart and is a great father. After Ryan Honken and Marvea Honken were born, the movant took care of them and provided financial support to them. The movant looked terrible at that time. He was thin, his complexion was gray, he did not eat and his hair was falling out. Nevertheless, he played with his kids. Kathy Rick is very nice. Despite the fact that Angela Johnson is a worn out whore, tough, abrasive, vain and always bitching at the movant, he will be loyal to her and protect her. Angela Johnson sang a threatening song about the prosecutors during the movant's sentencing hearing in the 1996 case and took pictures of people when they were outside on break. Timothy Cutkomp is a big, old, dopey dog. He is stupid, loyal and naive. He and the movant were inseparable. The movant would never put a hit on him. The movant lied to her after he was arrested the first time because he did not want her to think badly of him. The idea of drugs and the movant is hard to fathom, but the movant did need the money because he had two kids. Even though more people are involved, the movant will take the blame for everything because he wants to protect his children from possible danger.

*See id*.

After she interviewed the movant and at least twenty-five other individuals, Lisa A. Rickert provided trial counsel with a social history investigation and preliminary mitigation summary on May 15, 2003. Movant Hearing Ex. 7, civil docket no. 74-27. Her summary followed Dr. James Frederick Gilligan's theory of violence to explain the movant's situation. *Id*.[41] More specifically, she focused on the possible conditions and factors that

---

[41] Dr. James Frederick Gilligan is a psychiatrist and author. Over his career, he has

(continued…)

176

influenced the movant's involvement in the manufacture and delivery of methamphetamine and the conditions and factors—beyond the obvious motive of self-interest—that influenced his use of violence. *Id*. In her summary, she emphasized the conditions in the movant's family system that could have had an influence on his emotional development, the conceivable responses he had to those conditions and his resort to violence as a result of those conditions. *Id*. And, it included a detailed chronological history. *Id*. Excerpts of Lisa A. Rickert's summary indicated the following:

> The movant experienced an absence of love and nurturing or attachment issues. It is unlikely he bonded securely with his caregivers. His father was not warm, predictable or present. His mother suffered from depression, was unhappy in her marriage and was unable to consistently care and nurture an irritable infant. His mother had a miscarriage in 1964 and lost Matthew Honken two days after giving birth to him on September 10, 1966. He was irritable due to problems with his formula. Jeffrey Honken was not a warm, loving or caring brother and babysat him when he was young. His father never participated in childcare duties, such as feeding, changing diapers or holding him. His father was not affectionate and only expressed love by buying things. He recalled that, when he was six, his father was drinking with some of his friends at his home and forced his cat to drink beer. He also stated that he witnessed his dog get hit by a car and later heard his father shoot it. He felt bad about killing a robin and a squirrel by shooting them and killing his fish by forgetting to turn the fish tank light off.
>
> The movant was not physically abused, but his memories and responses are similar to that of an abused child. He has very few memories that he can recall from his childhood. He was numb and could not convey whether he was happy or unhappy.

---

[41](…continued)
focused on violent criminals and violence generally. Lisa A. Rickert relied on his book entitled *Violence: Reflections on a National Epidemic* (1997).

177

He felt shame and embarrassment due to his father's drinking and bragging. He never had a sense of control in his life and developed low self-esteem and tried hard to become the opposite of his father. He established rigid standards for himself and expected others to adhere to his rules. He had bizarre habits associated with eating, hygiene and appearance. His ability to form loving relationships with others was impaired. He never dated one woman at a time and preferred to have one best friend who he could easily control.

He was devastated by his parents' divorce, but such devastation had to do with his incorrect perception that his father did not get anything. Soon after getting a divorce, his mother married the man that had an affair with her. He did not receive his mother's love and attention because she focused on his stepfather. He had a difficult time establishing a meaningful and loving relationship with Ron Smidt. Within a year of getting a divorce, his father married again and had a daughter. He only saw his father occasionally from ages eight to fifteen. His father did not have visitation set up and never initiated contact with him.

His father normalized crime by bragging about it to his sons and expressed his pride in not being caught. His father considered him to be less worthless than Jeffrey Honken and considered Jeffrey Honken to be a crook. His father and brother participated in lots of criminal schemes, including committing insurance fraud and counterfeiting money. Between the ages of fifteen and sixteen and after his brother moved to Arizona, his father asked him to commit crimes, such as stealing boat motors and a truck. When he was eighteen, he stole a vehicle and his father told him that he would shoot him to prevent him from getting arrested and others from having their way with him. His father glamorized his lifestyle while in prison after being convicted of bank robbery. He felt a sense of connection to his father and brother while assisting them in illegal activity. He wanted to be like his father and brother. He felt a sense of power and importance when he was making money from legal and illegal

178

> means. His brother introduced him to selling marijuana and financed the methamphetamine laboratory.
>
> The movant's children are his complete source of pride and self-worth. He was present for Ryan Honken's birth on August 11, 1993, and Marvea Honken's birth on February 14, 1994. His self-esteem is tied to his role as a father. The loss or separation from his children or the loss of his children's respect and love would be the death of his "self." He experienced shame, lacked the emotional capacity of feeling love and guilt toward others and perceived that killing was the only way to defend his "self" and what is most important to him, namely his role as a father, his pride and his self-respect. Some of his family and friends could conceive of him killing the adults under the circumstances that he faced but not the children. There is no doubt that the movant liked and got along well with children, but he would sacrifice everything to keep his children because they gave him pride.

*See id*. In light of her investigation, she recommended that trial counsel consult an expert on attachment issues or disorders, obtain a psychiatric evaluation and hire a victim liaison. *See id*. She specifically suggested that Dr. James Frederick Gilligan conduct a psychiatric evaluation. *See id*.

In June of 1993, trial counsel wrote to co-counsel. Movant Hearing Ex. 3, civil docket no. 74-23; Movant Hearing Ex. 13, civil docket no. 74-33. Trial counsel inquired about whether the juror questionnaire should include questions about a potential juror's feelings about mental health issues and mental health experts if they decided to pursue Lisa A. Rickert's theory that, if guilty, the movant's depravity was due to some psychiatric or psychological condition. Movant Hearing Ex. 3, civil docket no. 74-23; Movant Hearing Ex. 13, civil docket no. 74-33. And, in relation to the movant's mental heath, trial counsel also inquired about whether the questionnaire should devote some attention to a potential juror's experiences during childhood, including divorce or criminal experiences by parents.

179

On December 16, 2003, Lisa A. Rickert sent trial counsel a memorandum regarding the movant. Movant Hearing Ex. 53, civil docket no. 74-81. In it, she inquired about whether they obtained approval to consult Dr. Mark D. Cunningham, a clinical and forensic psychologist, recommended that Dr. Michael M. Gelbort, a clinical psychologist, conduct a neuropsychological evaluation and followed up on whether the defense would be able to obtain a victim liaison. *Id*. She did not mention Dr. James Frederick Gilligan.

On April 27, 2004, Lisa A. Rickert updated her preliminary summary of relevant mitigation issues that explained the movant and the conditions and factors that influenced his behavior and judgment. Movant Hearing Ex. 8, civil docket no. 74-28. She reiterated that the movant: (1) probably did not bond securely with his caregivers; (2) did not respond well to the absence of love and developed insecure attachment; (3) experienced his parents' divorce when he was eight years of age and, at approximately fifteen years of age, became involved in criminal activity due to the influence of his father and brother and the lack of intervention by his mother; (4) has family members who suffer from alcoholism; (5) was exposed to toxic chemicals when he made circuit boards in Tucson, Arizona, and Mason City, Iowa, from 1987 to 1989 and when he failed to use a respirator while manufacturing methamphetamine during part of 1992 and 1993 and during a five month period in 1995 and 1996; and (6) loves his children, who provide his complete sense of pride and self-worth. *See id*. She also stated that it was necessary to consult an expert on attachment issues or disorders, to obtain a neuropsychological evaluation to determine if the movant suffered any brain damage and to hire a victim liaison. *See id*. She did not include a recommendation that Dr. James Frederick Gilligan do an evaluation.

On April 28, 2004, trial counsel met with Lisa A. Rickert to discuss her progress in the mitigation aspects of the movant's case. Gov. Hearing Ex. P, civil docket no. 74-14. After doing so, trial counsel wrote to co-counsel. *Id*. In his letter, trial counsel stated:

180

In speaking frankly about the mitigation potentials in this case, [Lisa A. Rickert] has concluded that she has been unable to identify very much that is sympathetic about [the movant]. As you will see from her summary, [the movant] grew up in a family environment deprived of much affection and with a father whose own criminality and eagerness to recruit his sons in his criminal acts led to [the movant's] life deviating from that of others. [Lisa A. Rickert] has also uncovered a substantial amount of information that tends to cast [the movant] in a very bad light. Some of this information has not been uncovered by government investigators, including [the movant's] scheme to kill one of his accomplices after the car theft in 1986. [A friend of the movant's sister dated the movant in 1990 at North Iowa Area Community College, which is where he studied chemistry,] and was raped by him while they were dating. He also made a veiled threat about locking her in the basement and how long it would take someone to find her. [That same friend] was also told by Alyssa [Nelson] that [the movant] was wondering how deep one would have to bury someone to keep them from getting plowed up by farm implements. The government investigators are unaware of this information.

[Lisa A. Rickert] will be conveying this information to [Dr. Mark D. Cunningham] who has agreed to assist us in any mitigation phase. [Dr. Mark D. Cunningham] suggests that [the movant] undergo a neuropsychological evaluation, and he has made some specific suggestions about appropriate psychologists to test [the movant]. To avoid the prospect of the government discovering some of the "bad" information about [the movant], [Lisa A. Rickert] has cleansed the chronology of most of the potentially destructive material she and I discussed.

*Id*.

On May 10, 2004, Lisa A. Rickert e-mailed trial counsel. Movant Hearing Ex. 53, civil docket no. 74-81. In her e-mail, she conveyed that there was nothing helpful in the records from the Linn County Correctional Center and that the incoming and outgoing mail

181

information was disturbing and certainly not helpful to the movant. *Id*. She also expressed that she was weighing how to contact particular family members of Terry DeGeus and that she had everything ready to send to Dr. Mark D. Cunningham and Dr. Michael M. Gelbort. *Id*. She also e-mailed trial counsel on June 11, 2004, and July 5, 2004. *Id*. In those e-mails, she conveyed that she had sent Dr. Mark D. Cunningham and Dr. Michael M. Gelbort a packet of information and had been assisting them. *Id*. The packet she sent them included the movant's Federal Bureau of Prisons records, the movant's chronological history, her preliminary summary of mitigation issues, the movant's medical records, the movant's school records, the movant's employment records and Jim Honken's medical records.

On July 19, 2004, Dr. Michael M. Gelbort evaluated the movant neuropsychologically, and, on July 21, 2004, he provided trial counsel with a preliminary report. Movant Hearing Ex. 11, civil docket no. 74-31. Excerpts of Dr. Michael M. Gelbort's report revealed the following:

> The movant provided historical information and such information has not been reconciled with the social history that was provided by Lisa A. Rickert. The movant had been exposed to numerous toxins and chemicals as a result of making circuit boards. He had been seen psychologically in 1997 for purposes of a court ordered evaluation. He had also seen a psychiatrist in Florence for anti-depressant treatment. He denied any neurological disease. His drug history was significant for methyl amphetamine usage as well as marijuana usage. He otherwise described his use of LSD as being 10-20 times and use of cocaine as being a few times. He completed almost two years of college at North Iowa Area Community College and then quit as he became involved in the drug trade. He earned straight A's when he applied himself. He was reared by his mother. Other family members, including his stepfather, who he got along with reasonably well, brother, sister, step-siblings and half-sister, were also in the picture.

182

> The movant was administered a comprehensive battery of tests. He showed indication based on current data and his history of likely having been able to perform or function at a higher level in the past and now, while still generating testing out in the average or slightly above average range, and of having a pattern indicative of an acquired dysfunction leading to relative if not absolute suppressions in his ability to perform.

*See id*.

### b. *The mitigating circumstance evidence that trial counsel did present at the penalty phase*

During the penalty phase, the government outlined the aggravating factors, pointed out that it would be relying upon the evidence that had been presented during the merits phase and indicated that its evidence during the penalty phase would only address: (1) the character of the victims and the impact of each victim's murder on survivors and (2) the serious physical abuse of Lori Duncan. The government called eleven witnesses to support its position that the death penalty was warranted (Trial Tr. at 3472-3533; 3853-82). The government's entire presentation took approximately half of a day.

In response, the movant called numerous mitigation witnesses. Those witnesses included Barb Formanek (Trial Tr. at 3534-40), Carol Honken (Trial Tr. at 3540-51), David Honken (Trial Tr. at 3551-60), Sonny Onoo (Trial Tr. at 3561-72), Dennis Brumm (Trial Tr. at 3602-08), Sandra Fiems (Trial Tr. at 3608-17), Alyssa Nelson (Trial Tr. at 3618-46), Dr. Mark D. Cunningham (Trial Tr. at 3717-81) and Marvea Honken/Smidt (Trial Tr. at 3782-3852). His presentation lasted approximately two days. The non-expert witnesses provided largely consistent testimony to the effect that the movant had come from a difficult upbringing but was friendly, kind and considerate.

Barb Formanek testified about employing the movant before he graduated from high school and moved to Arizona. She testified that she knew the movant because she was acquainted with Marvea Honken/Smidt and Ron Smidt and he came into her A&W

183

restaurant to eat fries with his friends. She testified that the movant worked as a cook for her for approximately a season and a half. She described him as an excellent worker, a fast learner, neat, always punctual, clean-cut and a good kid. She also indicated that she and her husband thoroughly enjoyed him, that he did whatever they asked him to do, that he abided by their instructions, that they had no problems with him and that he was always willing to pitch in and help. She stated that he had aspirations and continued to stop by to say hello after he went to work for his stepfather.

Carol Honken, the movant's stepmother, testified about being married to the movant's father for about eight years. She informed the jury that Jeffrey Honken, the movant and Alyssa Nelson did not live with them but, rather, lived with their mother in Britt, Iowa, and they would only come to see their father once in a while in Garner, Iowa, and sometimes would see him at their paternal grandparents' home. She described the movant as a great, well-mannered kid. She stated that he was great to his younger half-sister, he went to church and Sunday school all of the time, he never got into any kind of trouble, he was a loving little boy and probably a mother's dream child. She admitted that Jim Honken suffered from alcoholism during her marriage to him and Jim Honken primarily took care of the movant's half-sister because he could not hold a job. She also stated: (1) although Jim Honken married her, he never really quit loving Marvea Honken/Smidt; (2) Jim Honken loved his children dearly; (3) Jim Honken's drinking and bank robbery had a negative impact on the movant's half-sister; (4) Jim Honken's conviction for bank robbery in 1986, or after the movant finished high school, was his only conviction and it probably had an impact on the movant; and (5) Jim Honken took care of his grandchildren after getting into trouble.

David Honken, the movant's uncle, testified that his family would get together with the movant's family during holidays and that the movant's father drank alcohol all of the time. He stated that Jim Honken's drinking was hard on the movant's family because he

184

would become surly and would boast. He indicated that Jim Honken did not have any money because he would just throw it away, that some things that Jim Honken owned inexplicably caught on fire, that Jim Honken's parents would not allow him to keep stolen things at their home and that Jim Honken was an embarrassment to him and his parents. He testified that his children and his brother's children got along really well and that he and his family liked Marvea Honken/Smidt better than Jim Honken. He revealed that he had heard that the movant did well in school and all of his children liked him. He also indicated that the movant's father was at his lowest point in 1986 because that was the year Carol Honken left him and he was without a job as a result of getting injured in 1982.

Sonny Onoo testified that he ran a martial arts school in Mason City, Iowa, and taught self-defense skills to the movant in the early to mid-1980s. He explained that the movant's mother registered him for classes and, although he was quiet at first, the movant developed self-discipline and self-confidence. He described him as average, non-aggressive and neat in appearance. He also indicated that, when he reached higher levels, the movant helped him by teaching the younger students.

Dennis Brumm testified as someone who taught the movant while he was in high school. He stated that the movant was an average student, was neat and, like other students, could have worked a little harder. He indicated that he enjoyed having the movant in class, got along with him and had a good relationship with him. He recalled that the movant and Timothy Cutkomp interacted well with each other and that he got along fine with the movant's father when they worked together at an automotive service station.

Sandra Fiems testified about being in a relationship with Jim Honken in 1991 and getting to know the movant and Alyssa Nelson. She conveyed that she found it easy to get along with Jim Honken, that he was never abusive, that he was inebriated 98% of the time and that he bragged and told stories when he was drinking. She stated that, in the early

185

1990s, the movant visited his father while he was living in Steamboat Rock at least once every two weeks and he would almost always bring Brandon Rick and Ryan Honken, usually bring Timothy Cutkomp and sometimes bring Kathy Rick. She recalled that the movant would give the children rides on the lawnmower. She stated that, despite being disappointed about his father's drinking, the movant got along very well with his father. She expressed that she really admired the movant as a father because he took care of his children and never hit them or yelled at them.

The movant called his sister to testify about their family and upbringing. Alyssa Nelson conveyed that she and the movant had a good time while living in the huge old house in Britt, Iowa, but that "everything was not all peaches and cream" because they were a normal brother and sister. She stated that they visited their grandparents and attended church. She described Marvea Honken/Smidt as the mother that all of the movant's friends and her friends wanted. She said that their friends always wanted to come to their house after school, eat supper there and stay overnight there. Alyssa Nelson emphasized that everybody was accepted in their home and she grew up in a good family environment. She described Ron Smidt as always being quiet but always being there for them.

As for her father, she recalled that he was not around much because he worked on construction projects that would require him to be gone during the week, he would be passed out on the couch, he was not the caretaker because her mother solely fulfilled that role and he caused them to be disappointed. She stated that her mother provided for them despite their father's shortcomings. She expressed that her father never participated in any school activities, got the movant to help him rob the bank in Britt, Iowa, by telling the movant that he was going to kill himself, got into trouble after robbing a bank in Missouri and always bragged. She clarified that her father considered the movant and Jeffrey Honken to be his "lackeys and buddies."

186

She explained that, as a result of her parents' divorce, she was saddened because she did not understand what was happening, Jeffrey Honken was mad because he was forced into being a caretaker and then Ron Smidt took that role away from him and the movant was left wondering how he fit into the equation. She expressed that the movant and her were affected by Marvea Honken/Smidt's marriage to Ron Smidt because they were used to having their mother all to themselves because Jim Honken was not around and she did everything. She stated that, early on, they were jealous of Ron Smidt because he had their mother's attention and that it was not always easy for her mother to balance the interests of her children and the interests of Ron Smidt and his children.

Alyssa Nelson explained that Jim Honken married Carol Honken and really talked her up but it turned out that her father never really changed. She stated that he still drank and she decided not to visit him very much because he drank and disparaged her mother. She clarified that the movant could handle their father's situation better than she could but the movant did not visit his father as much as she did. She testified that she went over to her father's home more often because she thought that she needed to protect her half-sister when her half-sister was alone with her father.

She stated that, when the movant was in seventh grade, he got into trouble for taking something in a store and Marvea Honken/Smidt marched him out of the store and to the car and was really mad at him. She testified that the movant was very well-liked in high school and hung out with Timothy Cutkomp and Todd Olson. She also stated that he babysat quite a bit from when he was thirteen years old up until he turned sixteen years old, including for a child who had low self-esteem, and worked at the A&W restaurant and Smidt Motors. She indicated that the movant had aspirations of being an attorney and a chemist because he was smart.

Alyssa Nelson conveyed that the movant formed a relationship with Kathy Rick and he is very good with Brandon Rick, Kathy Rick's son, and Ryan Honken. She stated that

187

he dispensed advice to Brandon Rick about dealing with difficult interpersonal situations and took care of Ryan Honken by changing his diapers and feeding him. She expressed that the movant's daughter is named after their mother and that Marvea Honken was happy but missed her father. Alyssa Nelson stated that she loved her brother and that he loved her.

Dr. Mark D. Cunningham was called as an expert. He explained future dangerousness issues to the jury by testifying about the classification system used by the Federal Bureau of Prisons and prison homicide rates and by testifying that an inmate such as the movant—that is, an inmate facing a term of life imprisonment if not sentenced to death—would be housed in a high security level institution. Although he expressed familiarity with the government's allegations about the movant's future dangerousness, Dr. Mark D. Cunningham clarified that he did not assess whether the movant was dangerous and that he was only providing context that could be helpful when assessing the risk of an inmate causing serious injury to somebody either by personally engaging in violence or by ordering others to commit violence.

Marvea Honken/Smidt testified at great length on various subjects. Excerpts of her direct testimony revealed the following:

> She married Jim Honken because she came from a really stable family where alcohol was a feature and did not think anything of Jim Honken's use of alcohol. Jim Honken wanted her to be a stay-at-home wife. Jim Honken was present for the birth of Jeffrey Honken and rushed her and Jeffrey Honken out the back door of the hospital. It was very difficult for her and Jim Honken to lose Matthew Honken shortly after he was born. There was a funeral service for Matthew Honken at the hospital, Jim Honken arranged for rites to be given at a graveside ceremony, she did not get to see Matthew Honken before he was buried and she returned home to find that the items she put in place for Matthew Honken's arrival were removed. She gave birth to the movant and, after doing so,

188

primarily cared for her boys. Jim Honken did not change diapers or do anything. He really wanted children but did not do anything with them once they were born. He continued to drink alcohol and did not fulfill promises that he made. She and her mother would take the kids to celebrations and things like celebrations. Her parents did not want her to marry Jim Honken but they loved their grandchildren and helped care for them. Her mother helped bring Alyssa Nelson home from the hospital after she was born. Jim Honken's absence from the home and presence in the home caused a strain on her. She should have left him earlier. Jim Honken was never involved with his children's school activities or conferences. The family would go to the homes of the movant's grandparents. She experienced emotional difficulties, including low self-esteem, as a result of Jim Honken's drinking, absence from the home and attitude toward family life. Jim Honken told her that no man would want her after she had four cesarean sections. She saw a counselor when her relationship with Jim Honken was really breaking up but Jim Honken refused to see a counselor with her. She was sure she was depressed but did not take any medication on account of how she felt.

The movant was easy to raise. Jeffrey Honken was more dominant merely because he was six years older and put in the position of having to be so. The movant enjoyed usual childhood activities while growing up, such as coloring, playing outside and being with his friends. She made Christmas stockings, which she still used after the birth of the movant's own children, for all of her children when they were little. She arranged for a photographer to come to the house to take a photo of her children and the movant helped out. The movant was anxious to go to school because his brother was already attending school. The movant participated in Cub Scouts because she was a den mother, and he participated in church activities. The movant's troop met at their house for Cub Scouts. She and her children attended church in Britt, Iowa, because she taught Sunday school. The movant enjoyed interacting with other kids in the neighborhood and grew up in a small town. He attended bible camps and loved doing so.

189

He had many friends, including Timothy Cutkomp, Todd Olson and Brian DeGeus.

Jim Honken's drinking and the fact that she did not love him anymore caused her to get a divorce. Jim Honken's role as a father was not meaningful to her or her children because he was not there that much and did not exemplify her idea of what a father should be. She started a relationship with Ron Smidt before she or Ron Smidt were divorced. She and Jim Honken shared a lawyer and the divorce was peaceful. They split their assets and, even though she offered to let the movant live with Jim Honken because he liked him more and paid more attention to him, they agreed that the kids would remain with her.

Her boys were upset when she and Jim Honken got divorced. Jeffrey Honken was hurt the most. The movant just went along with what Jeffrey Honken said. Jeffrey Honken, the movant, Alyssa Nelson and Carmen Smidt interacted and got along with each other pretty well. They always ate meals together. Although they had their ups and downs, everybody got along. Because Jim Honken had influence over her boys, they did not refer to Ron Smidt as their dad. Ron Smidt was very quiet and private and they listened to Jim Honken. She did not allow the movant to live with Jim Honken when the movant asked to do so around ten years of age but told him that he could do so when he turned twelve years of age. The movant decided not to live with his father after he reached the age of twelve because he understood how things were and did not want to live with him. The movant occasionally visited his father and sometimes stayed at his house.

The movant had a fairly normal childhood in Britt, Iowa. She was concerned with the movant's relationship with his father for various reasons, including Jim Honken's suspected participation in criminal activity that she could not prove. The movant worked for Ron Smidt at his salvage yard and he was a better worker than Jeffrey Honken or Ron Smidt's son. Her children continued to have a relationship with Jim Honken's parents. The movant participated in ordinary social events,

190

had girlfriends and friendly relationships with boys and girls. The movant continued to have contact with his father in his teen years.

He had an interest in girls and cars, and the latter got him into legal trouble. He got arrested for stealing a car after he graduated from high school. The movant moved to Arizona shortly after finishing high school. He returned to Iowa and went to college where he did really well and, consequently, was put in charge at his dorm. He worked at Wellborn Industries and met Kathy Rick who was pregnant with Brandon Rick. The movant helped name Brandon Rick and considered him to be his son. The movant sought to maintain a relationship with his father after his father was released from prison and moved to Steamboat Rock, Iowa. The movant returned to Arizona in 1992 with Timothy Cutkomp. She learned that Kathy Rick was pregnant with the movant's child. She also learned that Angela Johnson was pregnant and carrying the movant's child. The movant was arrested in 1993 and began to work for his stepfather again. The movant was excited and proud to have a son of his own, very happy to have a little girl and enjoyed his role as a father. The movant continued to build his relationships with his children and others before and after he got arrested again in 1996 and sent to prison. He loves Brandon Rick and his children, and they love him. She loves her son, and he is very important to her. Ron Smidt also loves the movant and completely supports him. She and others really value their contact with the movant. She did not see any reason to take away the movant from Brandon Rick, Ryan Honken and Marvea Honken, who really have very little to hold on to in their lives.

On cross-examination, Marvea Honken/Smidt acknowledged that she told a probation officer in 1987 that Jim Honken was a good father and a good provider, that the movant and many of those who were closest to him gathered together to enjoy Christmas in December of 1993 and that Alyssa Nelson and Jim Honken visited the movant while he has been imprisoned.

191

After the close of all of the penalty phase evidence, the parties made their closing arguments. The government briefly summarized the evidence as to each aggravating factor and asked the jury to impose the death penalty (Trial Tr. at 3901-18). In response, trial counsel discussed the instructions, reviewed aspects of the movant's life and strongly urged the jury to spare him (Trial Tr. at 3919-29). When arguing the mitigating features of the movant's case, trial counsel emphasized the following:

> The movant's dreams were tempered and greatly influenced by his father, who was a drunk, a braggart, a thief and a convict. Jim Honken's alcoholism fractured the family and caused members of the movant's family to experience belittlement, despair, isolation and loneliness. The movant's father played a great role in helping the movant decide how to behave, how to treat other people, how to influence others and how to take care of himself. The movant and his siblings tried in various ways to repel the influence that their father had in their lives. Despite the fact that the movant was exposed to a poisonous environment, the movant had many good qualities, including that he supported, encouraged and took care of his younger sister, he befriended a little boy in a trailer park, he was a good employee, he formed good friendships and he befriended Kathy Rick and loved Brandon Rick as his own son.

Trial counsel clarified that the movant was not asserting that something in his background or upbringing justified or excused the crimes that he had been found guilty of committing but that features of his background and upbringing provided an important basis to understand who he is and how he should now be treated. Trial counsel highlighted that the movant's decision to love Brandon Rick and become his father was an exceptional gesture, especially considering that he was a young man who came from a family where doing such things was uncommon. In addition, trial counsel noted that it was remarkable that, despite facing huge burdens as a youngster and the substantial influence of his father, the movant resurrected some good in his heart to become a devoted father, a caring brother and a loving son. Trial counsel implored each juror to let the movant die in prison as a

192

lonely outcast in a world of outcasts, to be driven by the preciousness of life rather than vengeance or retribution, to make sure no mistake was being made, to consider that the movant's life was very meaningful to his children and his family, to think about the possibility of reconciliation and redemption because love still existed within the movant and to find that there was hope for him and a reason for him now or in the future to live.

Before making a binding recommendation that the movant be sentenced to death for the murders of Kandi Duncan and Amber Duncan, the jury found beyond a reasonable doubt that: (1) the movant intentionally killed the victim identified in each of the ten capital counts; (2) the movant killed the three adults after substantial planning and premeditation, the movant killed the three adults in an especially heinous, cruel or depraved manner in that the offense in question involved both torture and serious physical abuse and the children were particularly vulnerable due to their young age; and (3) the movant would be a danger in the future to the lives and safety of other persons, the movant obstructed justice by preventing the victims from providing testimony or information to law enforcement officers or by retaliating against the victims for cooperating with authorities, the movant intentionally killed more than one person in a single criminal episode and the effect of the crimes upon the victims' families was injurious. Further, at least one juror found by the greater weight of the evidence each of fifteen "mitigating factors" that the movant asserted, but not a single juror found any "residual or lingering doubts as to the movant's guilt or innocence or his role in the offense, even though those doubts did not rise to the level of 'reasonable doubts' during the 'merits phase' of the trial."[42] None of the jurors,

_____

[42] As to all ten capital counts, the jurors indicated the number of them that agreed a mitigating factor applied. The penalty phase verdict form indicates: twelve jurors found that the movant does not have a history of significant criminal convictions prior to the offenses at issue here; twelve jurors found that the movant does not have a history of violent or assaultive behavior prior to the offenses at issue here; nine jurors found that the

(continued…)

193

however, identified any further mitigating factor. In accordance with the jury's recommendation, the trial court sentenced the movant to death for the murders of Kandi Duncan and Amber Duncan.

---

[42](…continued)
movant loves his son, Ryan Honken; seven jurors found that the movant is loved by his son, Ryan Honken, and that the execution of the movant would cause his innocent son extraordinary emotional harm; nine jurors found that the movant loves his daughter, Marvea Honken; seven jurors found that the movant is loved by his daughter, Marvea Honken, and that the execution of the movant would cause his innocent daughter extraordinary emotional harm; nine jurors found that the movant loves Kathy Rick's son, Brandon Rick, and has always treated Brandon Rick as if he were the movant's biological son; seven jurors found that the movant is loved by Kathy Rick's son, Brandon Rick, and that the execution of the movant would cause Kathy Rick's son, Brandon Rick, extraordinary emotional harm; nine jurors found that the movant is loved by his mother, Marvea Honken/Smidt, and stepfather, Ron Smidt, and that the execution of the movant would cause them extraordinary emotional harm; ten jurors found that the movant is loved by his sister, Alyssa Nelson, and that the execution of the movant would cause his sister, Alyssa Nelson, extraordinary emotional harm; one juror found that the movant's father, Jim Honken, was an alcoholic convict who was proud of his criminal lifestyle and who bragged to his sons about his crimes; one juror found that, as an infant, the movant did not experience normal parental love and nurturing because his mother, Marvea Honken/Smidt, was depressed and unhappy in her marriage to Jim Honken, Jim Honken worked out of town Monday through Friday and Jim Honken was usually intoxicated all weekend; three jurors found that the movant's father, Jim Honken, never participated in caring for the movant by holding him, feeding him or changing his diapers and never played ball with him or participated in any one-on-one father-son activities with him; twelve jurors found that the movant's natural parents, Jim Honken and Marvea Honken/Smidt, were divorced when the movant was only eight years old, and the movant had only sporadic contact with Jim Honken between the ages of eight and fifteen; and twelve jurors found that, since being incarcerated in the Federal Bureau of Prisons, the movant has generally been a well-behaved inmate, in that he has received only three citations for disciplinary infractions in over seven years (two for possession of a homemade alcoholic beverage and one for fighting without serious injury).

194

### 2. Arguments of the parties

#### a. The movant

The movant contends that trial counsel were ineffective at the penalty phase because they cut off their investigation too early and, as a result, failed to present adequate mitigating circumstance evidence. He argues that a different approach should have been taken on two fronts. First, the movant contends that not enough evidence of his family history was presented and no expert mental health explanation was provided to the jury. The movant alleges that trial counsel only presented some evidence of dysfunction and utterly failed to present any evidence of emotional disturbance. Second, the movant maintains that no evidence of his drug use was introduced and, consequently, the jury never considered that his use of drugs impacted the decisions he made and the behavior he exhibited.

To support his assertions as to what mitigating circumstance evidence should have been investigated and presented, the movant relies on three mental health experts—two that evaluated him and one that provided an opinion as to what impact his drug use and exposure to the methamphetamine manufacturing process had on him. He offers that the mental health experts present a far more mitigating profile than what trial counsel presented and claims that the mental health experts would have provided an explanation for the aggravating evidence that the government introduced. He contends that the results of the post-conviction mental health evaluations provide true insight into the mental health deficits that significantly influenced his conduct. He indicates that the information provided by the mental health experts would have allowed the jury to impose a penalty that reflected their reasoned moral response to his background, character and crimes. *See Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) ("[It is clear] that punishment should be directly related to the personal culpability of the criminal defendant. If the sentencer is to make an individualized assessment of the appropriateness of the death penalty, evidence

195

about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse."), *abrogated on other grounds*, *Atkins v. Virginia*, 536 U.S. 304 (2002). Further, the movant stresses that, if trial counsel had presented expert testimony regarding his mental health, there is a reasonable probability that the jury would have voted for a life sentence. He argues that the mitigating expert evidence pertaining to his family history and drug abuse would have lessened the aggravating evidence so as to cause at least one juror to strike a different balance.

### *(1) Family history*

The movant claims that trial counsel performed deficiently at the penalty phase of his trial because they failed to effectively present mitigating evidence pertaining to his mother and father. The movant claims that a review of his childhood reveals severe abuse and dysfunction within his family. He argues that a violation of his rights under the Sixth Amendment and Eighth Amendment occurred and, consequently, the court should grant him relief.

With respect to his mother, the movant generally claims that she did little that could be described as motherly. He explains that his mother met and married his father when she was a teenager, mental illness and dysfunction permeated both of their families and his mother married his father as a means to escape the alcoholism and mental illness that wracked her family. The movant points out that, after giving birth to his older brother in 1962 and having a miscarriage, his mother gave birth to Matthew Honken, who died shortly after he was born. He offers that his mother never saw or held Matthew Honken because his father buried him before she arrived home from the hospital. He suggests that his mother became melancholy and eventually suffered from chronic depression because she lost her child and his father removed everything from the home that indicated they

196

expected a new child. The movant contends that his mother did not provide the stability and nurturing that was required for him to develop into a productive, mentally healthy and law abiding person because she suffered from depression. He also states that she withdrew from performing basic maternal duties while having extra-marital affairs and pursuing a relationship with a person who was not his father. The movant asserts that his mother left many of the child-rearing duties to his older brother. The movant presses that his mother failed to protect him from his father and blindly ignored his father's enlistment of him in criminal activities.

In light of what trial counsel knew about his mother, the movant claims that trial counsel failed to investigate whether his mother suffered from depression, whether she had been diagnosed with depression and whether she had been treated for depression. He also charges that they failed to investigate the mental illnesses that affected his mother's mother, sister, brother, daughter and nephew. With respect to his maternal uncle, the movant contends that he suffered from severe depression and alcoholism and his children experienced similar problems.

As to his father, the movant generally describes him as a violent criminal. Apart from his father being an arsonist, an insurance cheat, a thief, a counterfeiter, a bank robber and a chronic perpetrator of fraud, the movant indicates that his father was suicidal, a non-functioning alcoholic and abusive to everyone. The movant declares that his father engaged in criminal, deceitful and atrocious activity when his children were young. For example, his father destroyed a construction crane for insurance proceeds, stole boat motors, burned his own property to collect insurance proceeds and killed family pets by shooting them. He contends that his father acted inappropriately in front of him and openly bragged about his illegal actions. Additionally, regarding his rearing, the movant states that, when he lived with his parents, his father would drink alcohol each hour that he remained awake. According to the movant, his father's drinking had a profound impact

197

on his family's mental health.  He maintains that, because his father drank, his mother became depressed, had an affair and remained unable to nullify the negative impact that his father had on the family.  Aside from the fact that his father bragged about his illegal conduct, the movant declares that his father recruited him to assist in criminal activities and menaced him by talking about eliminating witnesses as a means of escaping responsibility, threatening to kill him if the authorities ever closed in or came around and threatening to shoot it out with police officers.[43]

Although trial counsel were aware of facts about the role the movant's mother and father played in his childhood and they presented some of them during the penalty phase, the movant maintains that they were woefully unaware of the part that they played in his mental health.  He argues that an expert should have explained to the jury what psychological impact his social history had on him and why such history is mitigating.  He states that the facts pertaining to his mother and father explain his violent actions and trial counsel should have presented such facts to the jury because the Eighth Amendment requires it.

He maintains that experts were necessary to explain how his childhood plagued his ability to function as an adult.  He states that experts could have offered that he suffers from a lifelong anxiety disorder that is on the continuum of symptoms that are experienced by children who experience abuse, trauma and family dysfunction and experts could have explained that he experiences symptoms associated with Attention Deficit Disorder and Obsessive Compulsive Disorder and that such symptoms are also experienced by children who had childhoods like his.  He emphasizes that children who experience trauma and

---

[43] The movant attributes to his father statements such as: (1) "I would shoot you in the head before I would let the authorities have their way with you"; (2) "If the authorities came around, I'd shoot it out with them"; and (3) "I will kill all the people who ratted on me and will need a backhoe big enough to bury everybody."

198

dysfunction similar to what he experienced during his early childhood can have difficulty focusing and, as a result of trying to compensate, they seek a high level of order in their lives. He also suggests that experts could have explained that: (1) the chances of children committing crimes rise dramatically if they have parents who model criminal behavior; (2) children are greatly impacted by a parent who is especially open about committing notorious crimes; (3) a child's reaction to such a parent is in many ways similar to the reaction of a child who experiences or witnesses physical abuse; (4) the effect of being exposed to an adult criminal lifestyle is greatly exacerbated if the adult role model also engages in violence or conveys violence or violent imagery to the child; and (5) a child's exposure to an adult criminal lifestyle can be equated to a child who actually experiences violence. The movant expresses that it is undeniable that prison populations are grossly over-represented with individuals who have social histories like his because these types of histories prompt the use of illegal drugs to self-medicate, cause mood disorders and emotional lability and affect a person's ability to trust, control impulses and judge the future consequences of his or her short-term actions.

### *(2) Drug use*

The movant claims that he did not receive effective assistance during the penalty phase because trial counsel failed to present mitigating evidence pertaining to his extensive drug use. The movant explains that, although he initially forswore the use of drugs and alcohol in response to his father's alcoholism, a dramatic change occurred after he began to manufacture methamphetamine in Arizona. He alleges that, apart from manufacturing methamphetamine, he sampled his methamphetamine and such sampling resulted in him using methamphetamine in large doses and with great consistency. The movant states that his multi-daily use of unusually potent (97% pure) methamphetamine over many months in conjunction with his use of LSD, marijuana, cocaine and pure grain alcohol impaired his judgment. He declares that his ability to reason, to trust, to judge and to control his

199

impulses and emotions became severely impaired as a result of using drugs from the date he began manufacturing drugs in Arizona through the date of the capital offenses.

He claims that trial counsel failed to investigate or employ an expert to explain the impact that his drug abuse had on him. The movant argues that trial counsel unreasonably relied on the fact that he looked fine at the time the government prosecuted him for the capital offenses. Rather than rely on their observations, the movant contends that they should have consulted with an expert who could have opined that the negative effects of heavily using methamphetamine do abate with the passage of time. And, he offers that trial counsel should have interviewed witnesses who could have attested to his use of drugs.

The movant contends that an expert was necessary to show that the use of methamphetamine can cause neurotoxicity. He states that it was important to explain to the jury that the use of methamphetamine can cause structural changes to the brain and associated changes in brain function and that such changes begin within days of using methamphetamine and can continue for years after an individual stops using methamphetamine. He offers that serotonin and dopamine coordinate and affect normal brain function and methamphetamine usage can cause dopamine production and regulation damage that persists for years. He also suggests that methamphetamine can cause long-lasting serotonin depletion. The movant explains that the use of methamphetamine can cause damage to the frontal lobes of the brain because methamphetamine decreases metabolism and, if damage to the frontal lobes occurs as a result of methamphetamine usage, it is possible for a person to have impaired judgment, to make poor choices, to exhibit paranoia, aggression, impulsivity, repetitive and maladaptive decision-making and to lose verbal memory and abstract learning capacity. He maintains that findings that indicate he suffered from compromised frontal lobes at the time of the capital offenses should have been presented to the jury. In addition, the movant maintains that the jury

200

should have considered evidence that establishes his emotions ran rampant, he lacked the capacity to make proper judgments and he experienced virtually no control of his impulses.

He also presses that it is not necessary to use methamphetamine to experience persistent neurotoxic problems. The movant states that damage to brain structure and functioning may result when a person absorbs through the lungs and skin particles that are released during the production of methamphetamine. He offers that greater brain damage may occur as a result of both cooking methamphetamine and using methamphetamine.

Further, the movant maintains that an expert could have been relied upon to establish that statistical evidence shows that the link between the use of methamphetamine and violent behavior is greater than any other illegally abused substance. He points out that the majority of male methamphetamine abusers engage in violent behavior and a methamphetamine abuser is 900% more likely to commit a homicide. The movant contends that methamphetamine abuse by itself increases violent behavior but the likelihood of violence increases if the methamphetamine abuser uses more frequently or in higher doses, has been arrested and/or has experienced family dysfunction. The movant also adds that methamphetamine abuse can cause bizarre behavior, psychotic thought processes and significant sleep deprivation.

> ### *(3) Rejection of mitigation specialist's recommendation to have mental health experts conduct an evaluation, reliance on wrong experts and missed opportunities to discover additional unknown facts*

Given the existence of significant mitigating evidence as a result of Lisa A. Rickert's work, the movant asserts that trial counsel: (1) unreasonably ignored her recommendation to retain a mental health expert to explain to the jury how his childhood impacted him; (2) unwisely chose not to retain an expert in light of the disclosure by the government that, in the event he elected to make a presentation regarding his mental health, it would rebut such presentation by having Dr. Park E. Dietz, who did not evaluate

201

him, testify during the penalty phase; and (3) blindly relied on a neuropsychologist who did not find noteworthy impairments. Concerning his childhood in particular, the movant finds fault with trial counsel's decision not to seek out a professional who could explain how a role model like his father weighed heavily on him after Lisa A. Rickert advised them to do so. He disputes that deciding not to investigate mental health issues can be described as a sound strategy because trial counsel did not have all of the relevant facts. The movant also observes that, because Federal Rule of Criminal Procedure 12.2(c)(2) required the government's trial team to have no involvement in any penalty phase mental health investigation, trial counsel had no reason to fear Dr. Park E. Dietz or any other professional whom the government would retain to evaluate him. Regarding his drug abuse in particular, he rejects the path chosen by trial counsel because it is clear that the decisions he made and the behavior he exhibited are indicative of changes in brain chemistry and functioning that resulted from his use of methamphetamine. He rejects trial counsel's reliance on a neuropsychologist who determined that neuropsychological testing did not reveal impairments. The movant maintains that such reliance was unwarranted because such testing did not account for his drug use and related impairments at the time of the capital offenses and the passage of time since his drug abuse abated. Aside from contending that trial counsel's performance fell below acceptable professional standards because it is clear that his social history and drug abuse significantly impaired his ability to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law, the movant contends that there is a reasonable likelihood that presenting mitigation evidence that focused on the impact his family history and drug abuse had on him could have led one juror to vote for life, rather than death.

Lastly, the movant challenges trial counsel's conduct on the basis that they lost the opportunity to have mental health professionals elicit additional mitigating facts from lay witnesses that the defense contacted. He maintains that, despite the fact that the well-

202

qualified mitigation specialist admirably performed her role, trial counsel missed out on: (1) the opportunity to have mental health experts advise them and their mitigation specialist about identifying red flags that should be further investigated; (2) the opportunity to have mental health experts provide them guidance about soliciting painful and embarrassing information from witnesses; and (3) the opportunity to have mental health experts, who are able to elicit information in a professional manner, interview select lay witnesses.

In support of his assertion that more could have been discovered and presented, the movant cites the following additional facts: Marvea Honken/Smidt's deeply dysfunctional and abusive relationship with the movant's father negatively affected her ability to emotionally connect with and accept him and her children (Decl. Richard G. Dudley, Jr., M.D., Movant Ex. 47, civil docket no. 19-47, ¶ 6; Decl. Marvea Honken/Smidt, Movant Ex. 75, civil docket no. 19-75, ¶ 19); after she remarried, Marvea Honken/Smidt addressed the needs of Ron Smidt before the needs of her children (Decl. Alyssa Nelson, Movant Ex. 26, civil docket no. 19-26, ¶¶ 11, 13); Marvea Honken/Smidt told Jim Honken that he could have custody of the movant when they were divorcing (Decl. Marvea Honken/Smidt, Movant Ex. 75, civil docket no. 19-75, ¶ 22); and there is a family history of mental health problems (Decl. Marvea Honken/Smidt, Movant Ex. 75, civil docket no. 19-75, ¶¶ 12-15; Decl. Alyssa Nelson, Movant Ex. 26, civil docket no. 19-26, ¶¶ 24-25).

### b.      *The government*

The government maintains that there is no basis to conclude that trial counsel were deficient because they failed to present mitigating circumstance evidence through mental health experts and none of the evidence now relied upon by the movant would have changed the outcome of the penalty phase in light of the crimes he committed and the nature of the aggravating circumstances. It disputes that trial counsel should have relied on mental health experts because they were necessary to show that: (1) the emotional trauma and anxiety the movant experienced as a result of his poor upbringing contributed

203

to his decision to manufacture and use methamphetamine and (2) the movant's lifelong anxiety disorder, exposure to the methamphetamine manufacturing process and use of methamphetamine and other substances explains the aggravating evidence. The government emphasizes that the movant's mental health was thoroughly investigated and considered by trial counsel after they appropriately consulted experts and trial counsel were not required to shop around until they found a more favorable opinion from a mental health expert. The government points out that the mental health experts' opinions that were presented in the instant proceedings are primarily based on information that was uncovered prior to trial and that the allegedly unknown facts pertaining to the corrupting influence of the movant's father and the inattention of his mother are merely cumulative of the type of facts trial counsel presented during the penalty phase. It emphasizes that deciding to present lay testimony to demonstrate what the movant's childhood was like and to forgo expert mental health testimony cannot be characterized as deficient in light of what trial counsel knew about the movant, the likely presentation of harmful evidence in anticipation of or response to the psychological evidence he would have introduced and the theory of defense that was pursued. Moreover, the government argues that: (1) it is not reasonably probable that, if trial counsel had retained the type of experts that the movant claims they should have, such experts would have reached the same diagnosis and (2) there is no reasonable probability that mental health evidence would have altered the outcome of the penalty phase, especially considering that (a) it is debatable whether the experts' testimony would have been introduced, (b) it is possible that the jury would have been incensed by the presentation of mental health evidence that was inconsistent with evidence and argument that was presented during the merits phase and (c) it is unlikely that a case based on expert mental health testimony would have nullified any of the overwhelming aggravating evidence.

204

### 3. *Additional evidence that should have been presented*

As previously pointed out, the movant generally identifies two categories of additional mitigating circumstance evidence that he thinks should have been presented. The first category relates to the movant's family history and the need to have experts explain the resulting mental health issues. The second category concerns the movant's drug use and the need to have an expert explain its effect on him. The movant relies on the statements of Dr. Richard G. Dudley, Jr., Dr. John F. Warren, III, Dr. Melissa P. Piasecki and Dr. Michael M. Gelbort as exemplifying the type of testimony that could have and should have been presented by trial counsel.

### a. *Dr. Richard G. Dudley, Jr.*

The movant relies on the June 2, 2011 declaration of Dr. Richard G. Dudley, Jr., who is a psychiatrist. His declaration reveals the following:

> The movant's extremely difficult childhood and adolescence caused him to develop and suffer from psychiatric difficulties, which include a profound sense of abandonment. The absence of a stable, nurturing and loving family environment and the experience of parental abandonment and dysfunction caused the movant to develop paranoia and impaired his ability to control his impulses, to make sound judgments, to predict the consequences of his behavior and to develop or maintain adult relationships. The movant's emotional difficulties first presented themselves during his childhood years and became increasingly complex and pronounced during his adolescent and young adult years. In addition, the movant displayed the hallmarks of an adult survivor of childhood trauma. Namely, as a result of experiencing his father's constant threats of violence, actual violence and family and peer bullying, the movant developed trauma-related symptoms of anxiety, that is, overwhelming and chronic fear that something horrible was going to happen, hypervigilance and over-reactivity to perceived threats. The movant developed a physiological component, that is, hyper-arousal that is extremely difficult to manage and control because nobody offered him support or

205

> protection from traumatic threats of violence and actual violence. The movant has anxiety disorder, not otherwise specified, with many of the symptoms of anxiety and avoidant behavior associated with traumatized children. Additionally, it is not at all surprising that the movant wanted more methamphetamine after he discovered how well it medicated away his anxiety, fears and sense of powerlessness and that his heavy drug abuse ultimately made him more fearful, paranoid, grandiose, impulsive and frantic in his efforts to maintain some sense of security and stability in his life. His drug abuse further caused him to have more difficulty maintaining a stable mood and impaired his decision-making capabilities and judgment. Further, trial counsel's presentation of a narrow and superficial factual snapshot of the movant's upbringing and failure to offer an explanation for how his background shaped his mental health deficits was lacking. Trial counsel will typically present opinions such as the opinions he expressed in the penalty phase.

*See* Decl. Richard G. Dudley, Jr., M.D., Movant Ex. 47, civil docket no. 19-47; *see also* Decl. Alfredo G. Parrish, Movant Ex. 73, civil docket no. 19-73, ¶ 9 (expressing that the defense would have strongly considered presenting medical expert's opinions); Decl. Leon F. Spies, Movant Ex. 74, civil docket no. 19-74, ¶ 13 (same).

During his deposition, Dr. Richard G. Dudley, Jr. admitted that he reviewed the report of Dr. Christopher L. Grote and the deposition testimony of Dr. Melissa P. Piasecki, Dr. John F. Warren, III and Lisa A. Rickert. *See* civil docket no. 67. Additionally, he stated that he relied on information that Marvea Honken/Smidt, Alyssa Nelson, David Honken, Carol Hilgenborg and Timothy Cutkomp provided to him. *See id.* He testified to the following:

> The movant had the type of troubled upbringing and resulting psychological and psychiatric deficits that are typically mitigating in capital cases. The movant has an anxiety disorder, not otherwise specified, a personality disorder,

206

mixed type, with narcissistic and borderline features, and a methamphetamine dependence.

The movant had an extremely difficult childhood that could be characterized by an abusive and a kind of threatening sort of environment that was made worse by the absence of any sort of safe space or comfort that would have mitigated against the impact of that environment. Prior to the movant's parents being divorced, the movant's father could be described as being away a lot but, when at home, as a severe alcoholic, a threatening presence, a verbally abusive person, a psychologically abusive person because he denigrated and put down others and a frightening individual because he communicated that at any moment it was possible for him to explode into some sort of violence. And, during the same period, the movant's mother was overwhelmed as a result of trying to function in an environment that included the movant's father, she began to suffer from pretty severe depression and, consequently, she was unable to calm her children down or provide a safe space for them and she would just leave them. In addition, in his early childhood years, the movant had an ongoing relationship with another boy who was bigger, stronger and more aggressive than he was and who threatened and bullied him. After his father married again and the movant began to visit him, the movant learned that his mother offered to let his father have custody of him and this information upset him. His father stopped working, drank more, made his criminal activity more explicit to the movant, degraded the movant's mother and humiliated the movant's sister. His father bragged about escapades when the movant was a child, became more explicit about his unlawful activities as the movant aged, involved his brother in his criminal schemes and ultimately instructed the movant to commit crimes.

The psychological effect of growing up in an environment where ongoing threats are faced outside the home and inside the home is that the individual experiences an enormous amount of anxiety, uncertainty and fear about what is going to happen next and, consequently, overreacts in the sense that he

207

or she is always looking to protect himself or herself from the possibility of something worse happening. The movant's situation was particularly problematic because of the absence of any safe space to go; the movant had a physiologic response as a result of his mother's neglect or failure to calm him or tell him that things were going to be okay. Because the movant's mother failed to help him calm down by telling him that he was safe when he had a physiological response to a threatening or frightening situation, the movant never learned how to calm or soothe himself and ended up in a state where he was constantly physiologically aroused and experienced psychological anxiety. The criminal lifestyle that the movant's father introduced over the course of the movant's childhood and adolescence had an impact on the movant. The movant's diagnosis is consistent with a significant family history of mental illness, such as mood disorders, depressive disorders and bipolar disorders, and substance abuse, primarily alcohol. When traumatic experiences occur, there are a cluster of anxiety symptoms that are seen in children and then adolescents and adults and these symptoms are exacerbated by stress and real or perceived threats.

The movant's personality disorder stems from his parents' failures. As to the narcissistic features of his personality disorder, he did not learn how to feel good about himself because his parents were not loving caretakers who emphasized that he was a great kid, their little boy, their little angel or something along those lines and he did not have childhood experiences to incorporate into a positive sense of himself. Because he did not receive appropriate information from his parents and experienced trauma, tragic losses and abandonment issues while growing up, the movant never had a good feeling about himself that he could internalize into his own sense of self-worth and self-esteem and ended up only being able to function in a very immature and childish sort of way. Namely, his self-esteem comes from external factors and is modeled after how his father handled problems. He feels that he is special or superior because he is smarter than everyone else and able to attract women and that people should

208

recognize his specialness. He dismisses or devalues others and feels anger when they do not acknowledge him.

In addition, regarding the borderline features of his personality disorder, the movant did not have the kind of parenting that fosters attachment so he fears abandonment, has problems connecting to and trusting others and has broad-based instability in his relationships, his sense of self, his mood and his decision-making, which is evidenced by impulsivity. Attachment to some significant parenting person is required for healthy development, but neither of the movant's parents were available to him.

The movant's disorders have an effect on judgment and decision-making. The movant's anxiety disorder and underlying borderline personality disorder were exacerbated by the movant's use of drugs. Namely, having psychiatric problems and being high on large quantities of methamphetamine had the effect of elevating his anxiety and fear to the point of being paranoid. The movant had difficulties before using drugs and they became exacerbated and more severe during the time he was actively using drugs. The combination of the movant's psychiatric problems and drug use over time left the movant in a deteriorated state at the time the murders were committed. Even if he stopped using methamphetamine, he would still be working toward restabilization from a deteriorated state. The movant lacked the capacity to really come up with a reasonable range of hypothetical alternative solutions to problems that he confronted and was unable to tolerate holding alternatives in his head while he weighed the pros and cons of them in a reasonable and reality-based way. The movant's ability to function and make important decisions, particularly affect-laden ones, was at an all time low when he returned from Arizona due to the interaction between his substance abuse and his underlying psychiatric problems.

*See id*.

209

### b.    Dr. John F. Warren, III

The movant also relies on the June 3, 2011 declaration of Dr. John F. Warren, III, who is a psychologist.  The movant states that, after reviewing voluminous materials about his life and upbringing, conducting two clinical interviews and administering psychological tests, Dr. John F. Warren, III expressed opinions that are largely consistent with Dr. Richard G. Dudley, Jr.'s opinions.  Decl. John F. Warren, III, Ph.D., Movant Ex. 45, civil docket no. 19-45, ¶¶ 4-5.  The movant also points out that Dr. John F. Warren, III rejected trial counsel's concerns that the movant could have been diagnosed with antisocial personality disorder.  *Id.*, ¶ 13.  He emphasizes that Dr. John F. Warren, III determined that neither the movant's background, which lacked the requisite child conduct disorder, nor administered psychological tests led him to diagnose the movant with such disorder.  *Id.*  The movant also emphasizes the following observations that Dr. John F. Warren, III made:

> [T]here was a great deal of mitigating evidence that could have been presented to the jury.  At the time of the offenses, [the movant] was a severely debilitated individual.  Despite these significant mental health impairments, the trial record of the penalty phase reveals that no mental health mitigation was presented at all.  The psychological difficulties and resultant dysfunction described herein and in [Dr. Richard G. Dudley, Jr.'s] declaration were not part of the penalty phase presentation.  In my experience, the combined mental health effects of the family history of mental illness, [the movant's] upbringing, which was marked by abuse, neglect and abandonment, and his severe drug use, would have been substantially mitigating.

*Id.*, ¶ 14.  And, the movant points out that, like Dr. Richard G. Dudley, Jr., Dr. John F. Warren, III expressed that the movant's methamphetamine abuse coincided with and profoundly exacerbated the psychological and emotional crisis that the movant experienced at the time of the crimes.  *Id.*, ¶¶ 10-11.

210

Dr. John F. Warren, III testified during a deposition. *See* civil docket no. 67. Dr. John F. Warren, III's testimony indicated that he diagnosed the movant as having an anxiety disorder, which caused him to worry, to be overwhelmed by stress and to be fearful of losing control or keeping it together since he was a child. *See id*. His testimony also indicated that he agreed with Dr. Richard G. Dudley, Jr.'s views, including that the movant experienced a dysfunctional upbringing, the movant's childhood had an impact on his psychological development and it was significant that there was a family history of mental illness. *See id*. During his deposition, he stated that, as a child, the movant experienced emotional volatility, aggressive language, threats of aggression, trauma and vicarious violence; the movant suffered abuse, neglect and abandonment; the movant was careful, stoic, defensive and non-confrontational with his father; and the movant did not depend on his mother to meet any of his needs or expect any warmth or nurturance from her. *See id*. After observing that people with family histories of substance abuse, depression and anxiety are more likely to have problems with substance abuse, depression and anxiety than someone who does not have a genetic or biological predisposition, he emphasized that the movant had a genetic propensity to anxiety. *See id*. Further, he opined that the movant developed an extreme substance abuse problem to cope with his anxiety, the movant faced numerous stressors after being arrested in 1993 and the movant's extreme methamphetamine abuse coincided with and profoundly exacerbated the psychological and emotional crisis that he was experiencing at the time of the murders. *See id*. He described the movant as becoming more erratic, more impulsive, more volatile, more prone to crazy ideas, more likely to go for days and then crash, more hypersexual and more agitated around the time that he used methamphetamine. *See id*. In addition, although he acknowledged that the movant engaged in adult antisocial behavior, he determined that the movant did not meet the criteria for antisocial personality disorder because there was no evidence of a conduct disorder before he reached the age

211

of fifteen, he was not superficial, glib or predatory, he was able to control his behavior and appreciate rules and he had friendships, peer relationships and significant lasting relationships with others. *See id*. Lastly, he opined that the movant's ability to appreciate and conform his conduct to the requirements of the law was impaired as a result of his mental and substance abuse disorders. *See id*.

### c.     Dr. Melissa P. Piasecki

The movant also contends that trial counsel should have relied on a forensic practitioner such as Dr. Melissa P. Piasecki, who provided a report that addressed the effects of using and manufacturing methamphetamine. Report Melissa P. Piasecki, M.D., Movant Ex. 48, civil docket no. 19-48. In her report, Dr. Melissa P. Piasecki noted that amphetamine's association with violence in chronic users has been recognized since the 1970s and methamphetamine's association with violence has also been confirmed. *Id*. at 2. She stated that the use of methamphetamine is associated with behavior changes that include irrational and violent behavior. *Id*. She highlighted the following:

> A survey of 1,000 users entering treatment found that interpersonal violence was frequently reported . . . . A review of fatalities involving methamphetamine found a significant elevation of death by homicide and suicide in users relative to users of other substances. . . . A 2009 case control study of inmates convicted of homicide found that a history of recent methamphetamine use increased the odds of being involved with a homicide nearly nine-fold . . . .

*Id*. at 3. And, she explained that methamphetamine users can experience paranoia and psychotic symptoms. *Id*. Lastly, Dr. Melissa P. Piasecki observed that a person who is merely exposed to the manufacturing process can experience many of the same side effects that are experienced by an individual who actually ingests methamphetamine. *Id*. at 4.

When being deposed, Dr. Melissa P. Piasecki provided testimony that generally addressed the harmful effects of using methamphetamine. *See* civil docket no. 68. She

212

acknowledged that she did not meet with the movant and, aside from reviewing the 1997 forensic report of Dr. Daniel S. Greenstein and the appellate opinion in this case, she did not review other parts of the record. *See id*. She clarified that her opinion was solely based on a hypothetical that was sent to her. *See id*. She observed the following: (1) methamphetamine may become addictive within weeks or months of using it or over time if occasional use results in loss of control; (2) various psychosocial factors, such as parental mental illness, paternal substance abuse, paternal criminal history, parental neglect, verbal abuse within a family, psychological abuse within a family and physical abuse directed toward a parent, increase the risk of methamphetamine abuse; (3) damage to brain structure that is related to the management of memory and emotions may result when significant amounts of methamphetamine are used; (4) damage to brain functioning that is related to memory and executive skills, such as organizing information, problem solving, judgment and impulse control, may result when there is chronic exposure to methamphetamine; (5) brain functioning impairments may be exacerbated if marijuana is used; (6) brain damage may occur within a few months of using methamphetamine; (7) brain damage remains and can get worse after methamphetamine is no longer used; (8) a normalization in brain structure occurs after eighteen months and in brain functioning after approximately two-and-a-half years of abstinence; (9) the use of methamphetamine does not necessarily cause a user to have deficits in all aspects of his or her life; (10) the abuse of methamphetamine is correlated with and increases the risk of violent behavior, including when the abuser is not actually intoxicated with methamphetamine; (11) the abuse of methamphetamine is associated with causing anxiety problems; (12) the exposure to the methamphetamine manufacturing process can cause adverse effects; and (13) the harmful neuropsychological effects of chronic methamphetamine use was known in the medical and scientific communities prior to the trial in this case. *See id*.

213

### d. Dr. Michael M. Gelbort

The movant contends that, pursuant to his neuropsychological evaluation of the movant in 2004, Dr. Michael M. Gelbort found that the movant had some notable variations in his abilities and some other soft signs of possible organic brain dysfunction, such as minor issues with attention but, on the whole, he did not have significant neuropsychological deficits. Movant Hearing Ex. 14, civil docket no. 74-34. He also explained that he agreed with the general observations that Dr. Melissa P. Piasecki included in her report and clarified that, although his testing showed the movant to be largely neurologically intact, he did not address whether the movant was similarly intact at the time of the offenses. *Id*. Further, during his deposition, he testified that he liked to rely on other people's reporting and medical histories rather than an individual's own reports because the former stand a better chance of being objective, that he did not believe it was incumbent on him to inform trial counsel that soft signs of possible organic brain dysfunction might be due to the movant's use of methamphetamine and that he concurred with Dr. Melissa P. Piasecki's findings regarding the effects of drug use. *See* civil docket no. 70. He stated:

> My thoughts about [the movant] are that when I [evaluated him neuropsychologically], he had some relative strengths and some relative weaknesses; that there's any number of etiologies which could lead to those strengths and weaknesses; and that after reading [Dr. Melissa P. Piasecki's] report, there's certainly a possibility that drug use/abuse would be one of the reasons why he [demonstrated some weaknesses]. . . .

*Id*. at 53. Nevertheless, he did not opine that the weaknesses he saw in the movant were, in fact, caused by the movant's use of drugs.

214

### 4. Analysis

#### a. The applicable law

"Evidence of a difficult family history and of emotional disturbance is typically introduced by defendants in mitigation." *Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982). Before deciding what mitigating evidence, if any, should be presented to the jury during a capital penalty phase, counsel has a duty to conduct a thorough investigation into a defendant's background. *See Porter v. McCullom*, 558 U.S. 30, 39 (2009) (noting that "counsel had an 'obligation to conduct a thorough investigation of the defendant's background'" (quoting *Williams*, 529 U.S. at 396)); *Sinisterra v. United States*, 600 F.3d 900, 907 (8th Cir. 2010) (observing that "counsel had an obligation to conduct a thorough background investigation and to exercise reasonable, professional judgment in determining the mitigation evidence to present during the penalty phase" (citing *Williams*, 529 U.S. at 396)); *Link*, 469 F.3d at 1203 (stating that "counsel has a duty to conduct a reasonable investigation or to make a reasonable determination that an investigation is unnecessary" (citing *Sidebottom v. Delo*, 46 F.3d 744, 752 (8th Cir. 1995))).

As a general matter, there is a strong presumption that counsel made all significant decisions while exercising reasonable professional judgment. *See Strickland*, 466 U.S. at 689. The deference owed to strategic judgments is defined in terms of the adequacy of the investigation supporting such judgments:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.

*Id.* at 690-91. "On the other hand, strategic choices 'resulting from lack of diligence in preparation and investigation [are] not protected by the presumption in favor of counsel.'" *Armstrong*, 534 F.3d at 864 (alteration in original) (quoting *Kenley*, 937 F.2d at 1304).

215

The principle concern in deciding whether counsel exercised reasonable professional judgment as to a defendant's mitigation case is whether the investigation was reasonable. *See Wiggins*, 539 U.S. at 522-23 (citing *Strickland*, 466 U.S. at 691); *see also Francis*, 557 F.3d at 901 ("[T]he strength of the general presumption that counsel engaged in sound trial strategy 'turns on the adequacy of counsel's investigation.'" (quoting *White*, 416 F.3d at 732)). When evaluating whether counsel was ineffective for failing to investigate adequately a defendant's background, an objective review is conducted. *Wiggins*, 539 U.S. at 523 (citing *Strickland*, 466 U.S. at 688-89). The performance of counsel is "measured for 'reasonableness under prevailing professional norms,' which includes a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.'" *Id*. (citations omitted) (quoting *Strickland*, 466 U.S. at 688-89); *see also Rompilla*, 545 U.S. at 380-81 (reiterating that the "norms of adequate investigation in preparing for the sentencing phase of a capital trial" are considered). "[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691; *accord Nooner v. Norris*, 402 F.3d 801, 808 (8th Cir. 2005).

It is clear that counsel is required to conduct an investigation that "should comprise efforts to discover *all reasonably available* mitigating evidence." *Wiggins*, 539 U.S. at 524 (citation omitted) (internal quotation marks omitted); *see also Cagle v. Norris*, 474 F.3d 1090, 1097 (8th Cir. 2007) ("'Reasonable performance of counsel includes an adequate investigation of facts, consideration of viable theories, and development of evidence to support those theories.'" (quoting *Lyons v. Luebbers*, 403 F.3d 585, 594 (8th Cir. 2005))); *Henderson v. Sargent*, 926 F.2d 706, 711 (8th Cir. 1991) (same). The failure to uncover and present voluminous mitigating evidence cannot be justified as a tactical decision to focus on different mitigation evidence if counsel does not fulfill their obligation to conduct a thorough investigation of the defendant's background. *Wiggins*,

216

539 U.S. at 522.  Stated differently, "a cursory investigation [does not] automatically [justify] a tactical decision."  *Id*. at 527.  But, "the duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste."  *Rompilla*, 545 U.S. at 383.

In the context of a claim that relates to the failure to pursue a mitigation strategy based on expert psychological testimony, the focus is on whether counsel conducted an adequate investigation and whether counsel's decision to refrain from further investigation and presentation of mental health mitigation was reasonable.  *See Worthington v. Roper*, 631 F.3d 487, 500 (8th Cir. 2011) (explaining that an appropriate analysis entails two inquiries); *see also Antwine v. Delo*, 54 F.3d 1357, 1367-68 (8th Cir. 1995) ("The issue is whether it was reasonable not to investigate [the petitioner's] mental state more fully. If it was, then counsel's subsequent decision to reject strategies based on [the petitioner's] mental condition was also reasonable.  But if limiting the investigation was not reasonable, then neither was the subsequent strategic choice.").  It must be determined whether there was any reasonable justification for counsel's conduct and whether the course of action taken by counsel would not have been taken by any reasonably competent attorney.  *See, e.g.*, *Wiggins*, 539 U.S. at 534-35 (concluding that the evidence would have led a reasonably competent attorney to investigate further and to introduce the considerable mitigating evidence at the sentencing).

When deciding if the presumption that counsel performed reasonably has been overcome, it is important to keep in mind that counsel's preparation for the mitigation phase does not have to be "ideal" and the course of action taken by counsel cannot be disregarded.  *Worthington*, 631 F.3d at 501.  Although "'it is probably true that defense counsel in a capital case should routinely have their client evaluated by a mental health professional,'" no per se rule has been laid down.  *Ortiz v. United States*, 664 F.3d 1151,

217

1169 (8th Cir. 2011) (quoting *Jones v. Delo*, 258 F.3d 893, 902 (8th Cir. 2001)). Deficient performance is established only "'where the record is clear that no reasonable attorney . . . would have failed to pursue further evidence'" in support of a psychological mitigation strategy and no reasonable attorney would have refrained from "presenting expert psychological evidence at the penalty phase." *Worthington*, 631 F.3d at 501-02 (alteration in original) (quoting *Link*, 469 F.3d at 1203). The latter inquiry encompasses the consideration of whether any consultation about the beneficial and negative aspects of expert testimony occurred and whether a meaningful mitigation case was presented. *Id*. at 503; *see also Newland v. Hall*, 527 F.3d 1162, 1216-17 (11th Cir. 2008) (acknowledging that it is appropriate to consider whether there is a danger of sentence aggravating facts being introduced on cross-examination).

Regarding prejudice in the mitigation context, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. Instead, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id*. at 695. The mitigating circumstance evidence that was not presented, along with that which was, must be reviewed, and the totality of it against the aggravating circumstances that were found must be considered. *See Wong v. Belmontes*, 558 U.S. 15, 20 (2009) (requiring a court to reweigh all of the mitigating evidence that was and that could have been presented, but for trial counsel's unreasonable performance, against the aggravating evidence presented); *Wiggins*, 539 U.S. at 536 (stating that the totality of the evidence adduced at trial and during collateral proceedings is evaluated); *Williams*, 529 U.S. at 397-98 (emphasizing that a court must reweigh the totality of the available evidence in mitigation against the evidence in aggravation); *Worthington*, 631 F.3d at 506 n.12 (observing that a determination as to the prejudice prong requires a court to consider all of the relevant

218

mitigation that was presented at trial and that should have been presented at trial but for the deficient performance of trial counsel).  So, if there is "a reasonable probability that a competent attorney, aware of [the available mitigating evidence], would have introduced it at sentencing," the inquiry shifts to whether there is a reasonable probability that the jury would have returned a different sentence had it been confronted with the mitigating evidence.  *Wiggins*, 539 U.S. at 535-36; *see also Williams*, 529 U.S. at 398-99 (deciding that there was a reasonable probability of a different sentence being imposed "if competent counsel had presented and explained the significance of all the available evidence").  This inquiry "will necessarily require a court to 'speculate' as to the effect of the new evidence—regardless of how much or how little mitigation evidence was presented during the initial penalty phase."  *Sears v. Upton*, ___ U.S. ___, ___, 130 S. Ct. 3259, 3266-67 (2010); *see also Williams v. Roper*, 695 F.3d 825, 837 (8th Cir. 2012) (stating that the prejudice determination is not an exact science and requires a predictive judgment about how jurors would consider a different record of mitigating evidence).

"A claim of ineffective assistance based on the failure to consult and call an expert requires 'evidence of what [an] . . . expert would have stated' at trial in order to establish *Strickland* prejudice."  *Rodela-Aguilar v. United States*, 596 F.3d 457, 462 (8th Cir. 2010) (quoting *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009)) (citing *Delgado v. United States*, 162 F.3d 981, 983 (8th Cir. 1998)).  Even if counsel performed deficiently in failing to present particular expert testimony, unconstitutional prejudice may not exist if the prosecution already had in its hands strong contrary expert testimony.  *See Cole v. Roper*, 623 F.3d 1183, 1190 (8th Cir. 2010).  On the other hand, prejudice may exist if counsel failed to present credible evidence that would have supported "'the kind of troubled history [that is unquestionably regarded as] relevant to assessing a defendant's moral culpability.'"  *Sinisterra*, 600 F.3d at 907 (quoting *Wiggins*, 539 U.S. at 535).

219

### b. The investigation and the presentation of the mitigation evidence

### (1) Evidence known to the defense

On this record, the court is unwilling to find that trial counsel's investigation was outside the bounds of competency. It cannot be said that trial counsel conducted an investigation that was so inadequate that it fell below an objective standard of reasonableness. Contrary to the movant's assertion, trial counsel did not abandon their investigation after acquiring only rudimentary or superficial knowledge of the movant's history from a narrow set of sources. It is undisputed that trial counsel were aware of Dr. Daniel S. Greenstein's 1997 report and the pre-sentence investigation report that was finalized in 1997. From the former report, it was apparent that Dr. Daniel S. Greenstein viewed the movant as having experienced anxiety as a result of his legal troubles, having abused methamphetamine and having engaged in adult antisocial behavior. It appeared to Dr. Daniel S. Greenstein that those psychological disorders were experienced over a shorter period of time and were mild to moderate, not severe. It was also clear that Dr. Daniel S. Greenstein viewed the movant as having a personality disorder with antisocial and borderline features and that such disorder lasted for a longer term and could be associated with deeply rooted personality traits. Dr. Daniel S. Greenstein found that, in addition to experiencing situational anxiety, the movant's personality style could be characterized by interpersonal instability and antisocial features, which was consistent with his adult antisocial behavior. As to the pre-sentence investigation report, it was evident that the movant had a good upbringing, did not suffer abuse or neglect, had a good relationship with his mother and stepfather and considered his mother to be perfect. In addition, the movant denied psychiatric issues and described his mental and emotional health as stable.

In the latter part of 2002 and the early part of 2003, trial counsel and Lisa A. Rickert, the mitigation specialist, were actively looking into penalty phase mitigation. Lisa

220

A. Rickert's notes from her interviews with the movant in January of 2003 indicated the following: he relied on his mother for emotional support; he and his mother were very close; his mother was very caring and affectionate and she never raised her voice; he would be devastated if his mother expressed her disappointment in him; he never yelled because he was not brought up that way; he was in Cub Scouts from second grade through fifth grade and his mother was a scout leader; he participated in sports; he never had behavior problems, showed aggression or received detention while he was in school; he did fairly well in school; he never experienced family violence; he did not get physically disciplined; he never experienced threats of violence; he and his sister were pushed into a chair on one occasion when his father got frustrated; he did not get verbally abused; he did not get physically abused by his brother; he could not recall arguments or fights between his parents; he had lasting friendships; he thought his stepfather was a good man and someone who was always supportive of him; he had family members with a history of alcoholism and mental illness; he had no medical problems; he never had been to counseling and never had symptoms of mental illness; and he never experienced anxiety, major losses or trauma.

In March of 2003, one of the people who was closest to the movant, Alyssa Nelson, the movant's sister, provided additional background information: she and the movant attended bible camps as children; her mother is generous, loving and a good cook; her mother sacrifices herself for her children; her mother is affectionate and expresses her love; Ron Smidt has always filled in for Jim Honken; the movant has an antisocial personality; the movant wanted Ron Smidt to be his father; the movant verbally and physically abused her and caused her to fear for her life on two occasions; she feared the movant and was always trying to please him; there was only one incident when her father was physical with her brothers; the movant is a hard worker; and the movant will take the blame for the offenses because he is loyal.

221

It is true that, in May of 2003, Lisa A. Rickert summarized possible trauma and attachment, abandonment and negative parental modeling issues that influenced the movant's emotional development, but support for her assertions is thin and oftentimes actually belied by the facts. Nothing suggested that the movant experienced any significant trauma during his childhood, and the account that the movant and Alyssa Nelson gave of Marvea Honken/Smidt's role in the family system contradicts Lisa A. Rickert's assertions that relate to attachment and abandonment. If the facts were considered in context rather than embellished in the hope of making a point, it is exceedingly difficult to find that: there was a total absence of love in the movant's home; the movant failed to bond securely with his mother; other family members failed to offer him any love and support; the movant experienced significant trauma, threats or violence; the movant's memories and responses are similar to those of a child who suffered abuse; the movant never had a sense of control in his life and developed low self-esteem; the movant's ability to form loving relationships with others was impaired; the movant did not receive love and attention from his mother after his parents divorced; the movant did not establish a meaningful and loving relationship with his stepfather; the movant's father had a significant influence on him from ages eight to fifteen; the movant felt a sense of connection to his father and brother while assisting them in illegal activity; the movant tried hard to become the opposite of his father but then wanted to be like his father and brother; or the movant lacked the emotional capacity of feeling love and guilt toward others. In order to come up with something helpful for the mitigation case, isolated events were relied on to make sweeping generalizations. Lisa A. Rickert seized on snippets of the movant's life in an effort to come up with some sort of mitigation theme that could be presented during the penalty phase. Nevertheless, if the big picture is considered, it is clear that very little supported a mental health mitigation defense.

222

It cannot be said that trial counsel's investigation was substandard or that they made an unreasonable decision after conducting an inadequate investigation. There was a vast amount of information known to trial counsel in May of 2003 and very little additional information provided more insight into the movant's mental makeup and background by April of 2004. The record demonstrates that trial counsel considered an alternative that included the presentation of mental health evidence. Trial counsel were not novices when it came to criminal cases. Trial counsel who primarily handled the merits phase practiced law for decades and had tried between thirty-five and forty murder cases prior to the movant's trial. Trial counsel who primarily handled the penalty phase had also practiced law for decades, had worked with forensic psychiatrists and neuropsychologists and had tried nine to ten murder cases prior to the movant's trial. In light of their experience, trial counsel clearly knew what evidence is and is not persuasive when jurors from Iowa are asked to decide a murder case. Trial counsel consulted with each other and learned counsel on nearly all matters, and they relied on Lisa A. Rickert, who played a significant role in preparing for the mitigation case. Further, trial counsel interacted with the movant over the course of many years, and, consequently, they knew the movant's strengths and weaknesses. Indeed, a member of the movant's trial team first appeared on the movant's behalf in May of 1996. The rapport that trial counsel had with the movant is not easily discounted. It is evident that the movant trusted trial counsel and was actively involved with his defense.

Experienced lawyers such as trial counsel could have properly decided not to pursue mental health evidence. *See Link*, 469 F.3d at 1204 (observing that a strategic decision to not put on psychological evidence after a thorough investigation is virtually unchallengeable). The substantial evidence known to trial counsel in April of 2004 would not lead a reasonable attorney to conclude that a mental health defense was a realistic option. Trial counsel could have reasonably relied on Dr. Daniel S. Greenstein's final

223

forensic report to conclude that, despite having a home environment typified by emotional turmoil that was mainly related to his father's alcoholism, the movant did not suffer from any diagnosable mental disease or defect, and they could have reasonably relied on Lisa A. Rickert's notes and summaries to conclude that, although some aspects of the movant's childhood were unfortunate, the movant could accurately be described as happy, well-mannered, cared for and loved by his mother and others, even-tempered, good-natured, dependable, able to spend a significant amount of his childhood and adolescence in a stable and nurturing environment and able to maintain meaningful relationships, including with his own children. They could have also reasonably relied on Dr. Michael M. Gelbort's report in July of 2004 and his discussion of the implications of his findings to confirm their conclusion that the movant did not have any significant brain impairment. Rather than help their case, Dr. Michael M. Gelbort's report confirmed for trial counsel that there were many characteristics, including his intelligence, that could be used against him. Apart from considering the information that was obtained from Dr. Daniel S. Greenstein, Lisa A. Rickert and Dr. Michael M. Gelbort, it is clear that trial counsel had discussions with other attorneys and Dr. Mark D. Cunningham. Based on all of the information that trial counsel gathered and considered, the court finds that trial counsel could have reasonably concluded that there were not substantial circumstances about the movant's mental makeup and background that were mitigating in a capital sentencing setting.

Trial counsel's omissions did not fall below acceptable professional standards. It is clear that trial counsel reasonably investigated whether a defense based on the movant's mental health was viable and reasonably concluded to cut off further investigation after deciding that the facts would not allow a psychologist or psychiatrist to come up with a credible and helpful diagnosis. *Cf. Winfield v. Roper*, 460 F.3d 1026, 1034 (8th Cir. 2006) (deciding that the failure to interview additional witnesses did not constitute ineffective assistance because experienced penalty counsel had already made reasonable

224

decisions as to the witnesses that should and should not be called to testify). This is not a case where trial counsel did nothing or based their decision on unreasonable assumptions. Trial counsel had amassed and considered an enormous amount of information about the movant, observed the movant's behavior and interacted with him over an extended period of time, consulted with other attorneys and experts, opted not to focus on the movant's mental state and hired a clinical psychologist to make sure they were not overlooking some aspect that might explain the movant's actions.

Moreover, showing that another attorney might have elected to pursue a different course or might have done a better job is not the same as showing trial counsel's investigation amounted to errors so serious that they violated the movant's right to counsel. Given the recommendations that trial counsel had received, it is possible that some attorneys would have opted to have the movant reevaluated by a psychologist or psychiatrist after April of 2004. But, trial counsel need not follow every recommendation that they receive, especially if there is good reason to believe a mental health evaluation would prove fruitless or harmful. *See Ringo v. Roper*, 472 F.3d 1001, 1003-06 (8th Cir. 2007) (deciding that a constitutional violation did not occur even though trial counsel decided not to follow an expert's suggestion that a different expert might be consulted to look into a different aspect of the petitioner's mental health). Trial counsel already had a forensic report from 1997 and mitigation summaries from May of 2003 and April of 2004 that they could reasonably rely on to predict what mental health mitigation case could be presented, and, in light of the 1997 forensic report, there was no need for them to consult experts until a favorable opinion was provided, especially considering that nothing happened that should have alerted them to any reason why the expert's advice was inadequate. *See Worthington*, 631 F.3d at 501; *Cole*, 623 F.3d at 1189-90; *Forsyth v. Ault*, 537 F.3d 887, 892 (8th Cir. 2008); *Winfield*, 460 F.3d at 1041; *Sidebottom*, 46 F.3d at 753. In light of the facts that trial counsel knew as a result of their investigation, the

225

court is unable to find that their performance was professionally incompetent. *Richter*, ___ U.S. at ___, 131 S. Ct. at 791 ("[The Sixth Amendment] does not guarantee perfect representation, only a 'reasonably competent attorney.'" (quoting *Strickland*, 466 U.S. at 687)).

### (2)    *Recommendation of mitigation specialist*

For purposes of establishing deficient performance, the movant relies heavily on Lisa A. Rickert.[44]  Pursuant to her investigation, Lisa A. Rickert states that she discovered several prominent mitigation themes, which included notable family dysfunction, violence and threats of violence.  Decl. Lisa A. Rickert, Movant Ex. 44, civil docket no. 19-44, ¶ 7.  Lisa A. Rickert indicated that the evidence she uncovered during her investigation revealed the following: the movant's father drank alcohol, committed crimes and recruited his sons to commit crimes, *id*., ¶ 8; the movant's father caused his children to experience significant trauma when he violently killed family pets and threatened to kill his children, *id*., ¶¶ 9-10; the movant actually believed that his father could make people disappear, *id*., ¶¶ 9-10, 12; the movant's mother did not counterbalance the horrendous dysfunction that the movant's father caused because she also suffered as a result of his actions and became chronically depressed, *id*., ¶¶ 7, 13; and, although the movant's mother eventually divorced the movant's father and married another man, she did not provide her children with any emotional support or the type of love and nurturing that children require because she focused entirely on her new husband, *id*., ¶ 13.

---

[44] The movant acknowledges that she is a highly qualified mitigation specialist who worked on a significant number of capital cases and that she had previously worked with a member of the trial team.  Additionally, he admits that, as a result of her qualifications and experience, she could screen individuals for the presence of mental or psychological disorders or impairments.  *See* ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 4.1(A) (rev. ed. 2003); ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 10.4(C)(2) (rev. ed. 2003).

226

Lisa A. Rickert explained the significance of the facts that she discovered:

> The facts that I have summarized above are highly significant to a mitigation specialist in a number of ways. First, it is indisputably accepted in the mental health field that parental modeling can shape the mental health of children, and how generally they grow into adults. In the case of the [family of the movant], [Jim Honken] modeled an asocial lifestyle. As a thief, liar and bully, he, in effect, normalized this behavior for his children. They learned that it is not only acceptable, but admirable to "get by" by stealing and breaking the law, instead of working; that breaking the law was a badge of honor, and most regrettably that violence is a legitimate tool to obtain one's way in life. Second, [Jim Honken's] conduct toward his children, his wife, other people and even animals was highly traumatic for those around him. There was much about [the movant] that struck me as similar to the profile one often sees in physically abused and traumatized children, even as they grow to adulthood. To be sure, I encountered significant reports of childhood physical abuse. However, the physical abuse in this case was overshadowed by the trauma visited by [Jim Honken] upon his family. Third, the family dynamic combined with [the movant's] presentation evidenced that early childhood abandonment and attachment issues were present. Such issues can lead to a host of mental health pathology, which can be highly mitigating in the context of a capital case. In sum, the mitigation themes that emerged related to [the movant's] parental abandonment and attachment issues; trauma-related pathology and the toll taken by the horrendously poor parental modeling.

*Id.*, ¶ 14. The movant praises Lisa A. Rickert for generating the social history that she did and lauds her screening of mental impairments that are relevant to his social history. He proclaims that, in light of her investigation, it is not at all surprising that she strongly recommended to trial counsel that they have him evaluated by a mental health professional. He points out that she stated:

227

> In both my written and oral communications with [trial counsel] through the course of my preparations and investigation, I advised them of the need to have [the movant] evaluated by a mental health expert with a specialty in the areas of trauma, abandonment and related subjects.

*Id.*, ¶ 15. He also points out that she observed that, although they consulted Dr. Michael M. Gelbort and Dr. Mark D. Cunningham, trial counsel never followed her recommendation to have a mental health expert explore the trauma, attachment, abandonment and negative parental modeling issues that she identified, and she expressed no understanding as to why trial counsel chose not to have a confidential evaluation undertaken or a comprehensive mitigation workup performed because obtaining either an evaluation or a workup presented no downside. *Id.*, ¶¶ 16-17.

The movant criticizes trial counsel for failing to understand that the "bad facts" about him that Lisa A. Rickert discovered during her investigation are actually mitigating facts when considered in context. He contends that trial counsel's failure to obtain a mental health evaluation limited their ability to see and understand that the "bad facts" they decided would be best to keep from the jury actually are mitigating facts when considered from a mental health perspective. *Cf. Thomas v. Horn*, 570 F.3d 105, 129 (3d Cir. 2009) (citing *Penry*, 492 U.S. at 319). The movant complains that, by making the uninformed choice to have no mental health professional conduct an evaluation, trial counsel necessarily guaranteed that the jury would not be able to appreciate how a complete picture of him mitigated against imposing the penalty of death. To support his criticism, the movant again relies on Lisa A. Rickert, who averred:

> I also expressed my belief that it was critically important to set forth the full picture of [the movant's] life, even though some aspects of it were negative and even involved [the movant's] own criminal conduct. For instance, I learned that[,] in some instances well before the capital offense[s,] [the movant] engaged in conduct eerily similar to that displayed by his

228

father. As with much capital mitigation, some of what I learned had a "two edged sword" quality to it, that is, it had the potential to mitigate or aggravate. [Trial counsel] made the determination not to present some of the potentially mitigating evidence out of fear of its potential aggravation without having obtained the opinion of a mental health professional.

Decl. Lisa A. Rickert, Movant Ex. 44, civil docket no. 19-44, ¶ 15.

During her deposition, Lisa A. Rickert reiterated points that she had made in her declaration. *See* civil docket no. 69. Excerpts of Lisa A. Rickert's testimony indicated the following:

The movant experienced minimal love and nurturing. The movant had very little attachment to his caregivers. The movant's father caused him to experience threats of violence. Those threats of violence related to times when the movant's father mistreated a cat and a dog, made the movant believe that he did away with Rodney Cutkomp and told the movant that he would shoot him before letting anyone arrest him. The movant's father groomed his children to engage in criminal activity. The movant's mother did nothing to protect her children from their father.

It was clear to her that the movant did not bond with his caregivers, the movant did not have good social relationships in his adult life, the movant suffered trauma as a result of being threatened by his father and being exposed to his father's lifestyle, the movant feared his father, the movant's lack of memory of his early childhood indicates trauma, the movant's mother was unavailable to her children during both of her marriages, the movant's mother just focused on Ron Smidt, who was very demanding and needy, the movant's mother and Ron Smidt would often retreat to their bedroom after dinner and the movant had signs of mental heath issues, including that he worked hard not to be like his father, had rigid rules for himself and had obsessive behaviors.

229

*See id*.  Excerpts of Lisa A. Rickert's testimony on cross-examination indicated the following:

> As of April 27, 2004, she no longer recommended that Dr. James Frederick Gilligan do an evaluation in an attempt to explain why the movant engaged in violence.  She no longer made such recommendation because either her investigation and analysis caused her to take a different course or trial counsel were not in agreement with having the movant evaluated by Dr. James Frederick Gilligan.  She sent materials to Dr. Mark D. Cunningham and Dr. Michael M. Gelbort.  Although she thought the fact that the movant truly believed that his father made Rodney Cutkomp disappear was really crucial to explain his mental health, she did not know that the movant had previously explained that Timothy Cutkomp had killed Rodney Cutkomp.  The movant's father only threatened to kill the movant once or twice and did so after the movant got caught stealing a car.  The movant never admitted that he feared his father and used an amusing tone when he described his father's crazy antics.  The movant's father shot the family dog after it had been hit by a car and probably did so to prevent the dog from suffering.  The movant's father shot small animals but that might have been customarily done in rural Iowa.  There is nothing in her notes or summary that indicates the movant's father made Rodney Cutkomp disappear.[45]  She acknowledged that she had stated in her declaration that she had encountered significant reports of childhood physical abuse, but she could only point to Alyssa Nelson's report of one instance where her father threw the movant and Jeffrey Honken against a wall because they did not watch her and Dr. Daniel S. Greenstein's 1997 report where he noted that the movant provided conflicting statements about

---

[45] The court notes that, although she did not dispute that her records might not reference how the movant's father mistreated his cat, her notes and summary indicate the movant's father poured beer down a cat's throat when the movant was six.  In her notes, she described that event, the shooting of his dog after it got hit by a car and his parents' divorce as being traumatic.

230

experiencing physical abuse. She admitted that she had stated in her May 15, 2003 summary and April 27, 2004 summary that the movant had not been physically abused. Her notes indicate Ron Smidt was a good man and was always supportive of the movant. She did not recall that, in response to Alyssa Nelson's assertion during the penalty phase that her father pressured the movant to get a key to the bank so he could rob it, the government called several witnesses who testified that the movant had talked about robbing the bank two years before Jim Honken robbed the bank, or that the plot that the movant came up with during high school included killing the guy that the movant was going to talk into committing the bank robbery and disposing of his body in a nearby pond. She was also unaware that, after she had visited the movant on March 11, 2004, the movant had written to trial counsel and, in his letter, conveyed that she made him feel bad, that everything he does is for a reason rather than some impulsive, irrational or momentary lapse of judgment and that he was still pushing a version of events where Angela Johnson and Terry DeGeus committed the murders. She maintained that further investigation was necessary even though she discovered that he played with friends, watched television, read, enjoyed cooking with his mother, was not poor, did well in school, was an excellent worker, was respectful of authority and was described as always being happy. She acknowledged that the defense team had meetings where the hiring of experts was discussed and she had many conversations with trial counsel that covered all aspects of the penalty phase. She clarified that the trauma experienced by the movant relates to the movant's life with his father and his obsessive behaviors and that the movant's abandonment and attachment issues relate to his mother. She recommended that more of the movant's life story should have been presented to show what shaped him but clarified that a full picture surely did not include evidence of rape or schemes to kill people.

*See id.*

231

In light of the record, the court finds that Lisa A. Rickert maintained a position prior to trial that is remarkably different than the one she advances for purposes of this collateral action. It is undoubtedly true that, in January of 2003, Lisa A. Rickert and trial counsel recognized that the movant's own account of his life would not be substantially mitigating. And, after obtaining additional information about the movant's background from numerous individuals, she attempted in May of 2003 to provide an explanation that might explain why the movant resorted to violence. At that point, she screened the information that she collected and presented the "best" case from which a psychologist or psychiatrist might be able to provide a beneficial diagnosis. From December 16, 2003, to April 27, 2004, Lisa A. Rickert focused on Dr. Mark D. Cunningham and Dr. Michael M. Gelbort, rather than Dr. James Frederick Gilligan. Even though she emphasized on April 27, 2004, that she thought it was necessary to consult an expert on attachment issues and a nueropsychologist to determine whether the movant suffered any brain damage, she never deemed it appropriate to write to trial counsel and inform them that she believed the course they were pursuing was terribly flawed. After April 28, 2004, or the date that she and trial counsel concluded that there was not very much that was sympathetic about the movant, she willingly assisted in the mitigation preparation by providing Dr. Mark D. Cunningham and Dr. Michael M. Gelbort with relevant information. Her correspondence from the early part of May of 2004 through the early part of June of 2004 indicates that she had no issues with the decisions that trial counsel made.

Although Lisa A. Rickert now maintains that she adamantly insisted that trial counsel have a mental health expert explore the trauma, attachment, abandonment and negative parental modeling issues that she identified, it is much more likely that Lisa A. Rickert agreed with trial counsel's decision after meeting with them. Rather than condemn trial counsel's decision, it is evident that she went along with it. The record reveals that she and trial counsel considered strategic factors and determined that the facts uncovered

232

during her investigation did not justify a psychiatric or psychological evaluation. Indeed, a member of the movant's trial team explained that, after "[Lisa A. Rickert] recommended that [the movant be] evaluated by a psychologist or psychiatrist to assess the psychological impact of his difficult upbringing, [the movant's other attorneys] and I consulted with [Lisa A. Rickert] about this, and discussed this among ourselves and decided not to have the evaluation conducted." *See* Decl. Charles Myers Rogers, Movant Ex. 72, civil docket no. 19-72, ¶ 8. Rather than blindly ignore Lisa A. Rickert's recommendation, it is clear that trial counsel considered it and reasonably relied on her when she said that there was not much there. When the mitigation themes that Lisa A. Rickert identified are considered in light of all of the facts, it is clear that they are weak, not prominent. Consequently, trial counsel acted reasonably in not retaining an independent psychologist or psychiatrist to conduct an examination that might have led them to discover mental health impairments.

### *(3)     Consideration of the government's response*

As to strategic factors that were considered, the likely response of the government was one reason that led trial counsel to conclude that it would not be worthwhile to consult a mental health expert who could potentially present an opinion after evaluating the movant. *See* Decl. Charles Myers Rogers, Movant Ex. 72, civil docket no. 19-72, ¶ 8; Decl. Alfredo G. Parrish, Movant Ex. 73, civil docket no. 19-73, ¶ 7; Decl. Leon F. Spies, Movant Ex. 74, civil docket no. 19-74, ¶¶ 10-11; 2255 Evidentiary Hearing Tr. at 28, 575-80. Trial counsel appropriately considered whether presenting evidence that suggested the movant's mental health impacted his state of mind at the time of the murders would open the door to the government's presentation of psychological evidence. *See* ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 10.11(G) (rev. ed. 2003) ("In determining what presentation to make concerning penalty, counsel should consider whether any portion of the defense will open the door to the prosecution's presentation of otherwise inadmissible aggravating evidence."). Even with

233

the benefit of hindsight, the court concludes that a competent attorney could have and most likely would have chosen the path taken by trial counsel, especially considering that trial counsel legitimately feared what evidence might be revealed from a mental health evaluation. *See Link*, 469 F.3d at 1204 (observing that anticipation of the government's response is a proper basis for choosing not to present mental health evidence).

The movant dismisses as unreasonable trial counsel's concern that a defense evaluation would reveal that he had an antisocial personality disorder, concern that the government would rely on either Dr. Park E. Dietz or Dr. Daniel A. Martell to conduct an evaluation in response to providing notice of their intent to present mental health evidence and concern that a government evaluation would reveal he had an antisocial personality disorder. *See* Decl. Charles Myers Rogers, Movant Ex. 72, civil docket no. 19-72, ¶ 8; Decl. Alfredo G. Parrish, Movant Ex. 73, civil docket no. 19-73, ¶ 7; Decl. Leon F. Spies, Movant Ex. 74, civil docket no. 19-74, ¶ 11; Decl. Lisa A. Rickert, Movant Ex. 44, civil docket no. 19-44, ¶ 17. He maintains that trial counsel's concerns cannot be labeled as reasonable because any evaluation would have remained confidential until trial counsel provided notice of their intent to present mental health evidence in the penalty phase. He argues that trial counsel had nothing to lose if they followed Lisa A. Rickert's recommendation to obtain an evaluation. He stresses that no results or reports would have been available unless trial counsel decided to present mental health evidence in the penalty phase and, consequently, neither their evaluation nor the government's evaluation could have caused him any harm until trial counsel decided to review the parties' reports. The movant states that trial counsel failed to have further evaluations performed because they incorrectly understood that the law prevented him from suffering any harm until the defense decided to place his mental health in issue. The movant emphasizes that any assessment of whether trial counsel made a strategic decision not to follow Lisa A. Rickert's recommendation to have an expert conduct a mental health

234

evaluation must take into consideration trial counsel's failure to understand Federal Rule of Criminal Procedure 12.2(c)(2), which provides that the results and reports of mental health evaluations must be sealed and must not be disclosed to any attorney for the government or the defendant unless the defendant is found guilty of a capital crime. He argues that it would have been a better strategy to at least have access to the experts' reports and results so a fully informed decision could be made in the event that he was found guilty of a capital offense.

The court disagrees with each of the movant's assertions. Nothing suggests that trial counsel labored under a mistaken understanding of the law. At least one member of the movant's trial team had a firm grasp of the rules governing capital cases, including the firewall provisions of Federal Rule of Criminal Procedure 12.2(c)(2). *See generally* Decl. Charles Myers Rogers, Movant Ex. 72, civil docket no. 19-72. And, the member of the movant's trial team that primarily addressed the penalty phase was fully aware of the confidential nature of the evaluation that they were considering. *See* Decl. Leon F. Spies, Movant Ex. 74, civil docket no. 19-74, ¶ 11; 2255 Evidentiary Hearing Tr. at 594. Further, it is apparent from the record that trial counsel were familiar with the companion case of Angela Johnson, that they interacted with her attorneys and that the issue of how to handle mental health evaluations was fully explored in her case. Moreover, the emphasis that the movant places on the operation of a firewall as provided under Federal Rule of Criminal Procedure 12.2(c)(2) is misplaced, especially considering that it is evident that trial counsel were attempting to come up with a comprehensive theory of defense prior to trial and to limit the discovery of bad facts that would minimize the movant's chances of getting a life sentence. Although it is true that trial counsel could have sought an evaluation and the content of such evaluation would not have been disclosed to either party until the jury found the movant guilty of a capital crime, nothing

235

would have prevented the government from searching for evidence that might counter mitigating mental health evidence.

Trial counsel clearly considered whether it was appropriate to include as part of the movant's penalty phase expert and lay witnesses for the purpose of providing insights that might explain or lessen the movant's culpability. *See* ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 10.11(F)(2) (rev. ed. 2003). When doing so, they became concerned about several issues that additional investigation might reveal. Pursuant to their investigation, trial counsel had discovered that at least one doctor diagnosed the movant as having a personality disorder with antisocial and borderline features. They also discovered that the movant was racist; had physically and verbally abused his sister when she was growing up; had begun to suffocate his sister after learning that she told on him; had begun to drown his sister on an occasion; made his sister fear him; schemed to kill one of his accomplices after stealing a car in 1986; was involved in a conversation where the possibility of killing a business partner to collect a million dollar life insurance policy was discussed; raped a woman he was dating; threatened the same woman by discussing the possibility of locking her in the basement and the time it would take someone to find her; and wondered how deep one would have to bury someone to keep them from getting plowed up by farm implements. Given the information about the movant that they knew, trial counsel could have reasonably feared that other damning evidence might be discovered by the government and that their own expert would diagnose the movant as a sociopath. The record, which includes Alyssa Nelson's strongly held belief that the movant had an antisocial personality, clearly validates the reasonableness of their fears.

As to trial counsel's concern about who the government might rely on to counter their mental health evidence, the court finds that trial counsel's fears were well-grounded. According to trial counsel, it was apparent that the government would rely on Dr. Park E.

236

Dietz or Dr. Daniel A. Martell. *See generally* Decl. Charles Myers Rogers, Movant Ex. 72, civil docket no. 19-72, ¶ 8; Decl. Leon F. Spies, Movant Ex. 74, civil docket no. 19-74, ¶ 11; Decl. Lisa A. Rickert, Movant Ex. 44, civil docket no. 19-44, ¶ 17. Trial counsel regarded both doctors as strong experts who routinely worked for the government at that time and generally found capital defendants to have an antisocial personality disorder. *See generally* Decl. Charles Myers Rogers, Movant Ex. 72, civil docket no. 19-72, ¶ 8; Decl. Leon F. Spies, Movant Ex. 74, civil docket no. 19-74, ¶ 11; Decl. Lisa A. Rickert, Movant Ex. 44, civil docket no. 19-44, ¶ 17. At least one member of the movant's trial team was convinced that Dr. Park E. Dietz would find that the movant had an antisocial personality disorder. Decl. Charles Myers Rogers, Movant Ex. 72, civil docket no. 19-72, ¶ 8. If Dr. Park E. Dietz consistently testified that capital defendants had an antisocial personality disorder, trial counsel could only hope to impeach his testimony on the basis that he always arrived at the same diagnosis or did not consider all of the factors, including whether there was evidence of a conduct disorder prior to reaching the age of fifteen, whether he was superficial, glib or predatory, whether he was able to control his behavior and appreciate rules and whether he had friendships, peer relationships and significant lasting relationships with others.

In light of who the government intended to call, the court concludes that it was perfectly reasonable for trial counsel to decide that it would be better to avoid a battle of the experts over the movant's psychological makeup. *See Link*, 469 F.3d at 1203. Even if experts had just diagnosed the movant as having a personality disorder with antisocial and borderline features or something similar, the jury could have been exposed to harmful information. The government definitely would have inquired about the movant's personality disorder. In the event that the movant did not meet the criteria for having an antisocial personality disorder, the government might have been able to stress that: when Alyssa Nelson was growing up, the movant physically and verbally abused her and

237

prevented her from breathing on at least two occasions; in approximately 1984, the movant plotted a bank robbery where the person who he would convince to commit the robbery would be killed and thrown into a pond; in 1986, the movant plotted to kill someone that had helped him steal a vehicle; sometime between 1986 and 1989, the movant was involved in a conversation where the possibility of killing his brother's business partner to collect a million dollar life insurance policy was discussed; in 1990, the movant raped and threatened his girlfriend; in 1993, the movant actually hunted and killed five individuals; and in 1996, the movant schemed and took significant steps to kill others.

In addition, trial counsel ran the risk of having their mitigation witnesses testify on cross-examination about whether they knew of the movant's past crimes, thought the movant knew the difference between right and wrong or knew the movant had a high IQ. The government most likely would have subjected the movant's experts to broad cross-examination, including whether the movant's narcissistic personality just meant that he was self-centered and fell in love with his own ego. Or, the government could have reasonably asked questions such as:

> (1) Is it true that over 90% of criminals would test as sociopathic or antisocial?;
>
> (2) What particular characteristics of the movant distinguished him from sociopaths, which can be defined as individuals without the usual type of companions or loyalties, who are frequently selfish, very impulsive, showing little in the line of responsibility or concern for the needs or wants of others and having little in the line of guilt or remorse?; and
>
> (3) Is it common for a sociopath to have a compelling need to tell someone about what is was like to commit murder, like the movant had done, because he or she might get some type of pleasure by doing so?

*Cf. Eddings*, 455 U.S. at 126 n.8 (Burger, C.J., dissenting).

238

Given the record, it is evident that trial counsel reasonably feared matters of historical fact that would have harmed the movant's chances for a life sentence. Trial counsel clearly desired to avoid portraying the movant as having violent tendencies and tried very hard to get the jury to find the movant's offenses were inconsistent with his prior behavior. Because trial counsel thoughtfully considered the pros and cons of relying on expert testimony, the court finds that they were not deficient.

### (4) Timely development of mitigation case

As to the movant's assertion that trial counsel waited until the last minute to develop a mitigation case, the court concludes that such assertion is belied by the record. A member of the movant's trial team first appeared on behalf of the movant in 1996. Shortly after being indicted in 2001, two members of the movant's trial team began to represent the movant, and, in early 2002, learned counsel made an appearance on behalf of the movant. From the early part of 2002, trial counsel had clearly developed a case plan, which continued to evolve throughout the proceedings. *See, e.g.*, criminal docket nos. 23, 35, 38, 62, 72, 79, 159, 165, 197, 202, 203, 208, 231, 250, 277, 282, 295, 296, 325, 334, 374, 479, 506, 587, 615, 616, 619, 645. Before the July 21, 2004 deadline passed for the movant to disclose the nature of the testimony that would be offered through his experts, trial counsel knew that the movant did not have a mental disease or defect that would relieve the movant from criminal responsibility. They also knew that the movant had been diagnosed as having particular psychological disorders. It makes little difference that Dr. Daniel S. Greenstein evaluated the movant to determine his mental condition rather than for mitigation purposes because experienced attorneys such as trial counsel would have been able to discern the nature of the mitigation case that might be feasible. In addition, in June of 2004, trial counsel were aware that the government intended to call Dr. Park E. Dietz and Dr. Daniel A. Martell as possible rebuttal witnesses because trial

239

counsel had provided notice of their intent to call as witnesses Dr. Mark D. Cunningham, Lisa A. Rickert and Dr. Michael M. Gelbort.

Similarly, it is clear that trial counsel neither failed to provide Dr. Michael M. Gelbort with background materials or adequate time nor limited his evaluation in an unreasonable manner. *See, e.g.*, civil docket no. 70 at 25-42 (Dr. Michael M. Gelbort explaining that he could have spent more time with the movant but did not think it was necessary). Prior to July 5, 2004, Lisa A. Rickert sent Dr. Mark D. Cunningham and Dr. Michael M. Gelbort the movant's complete history, and Dr. Michael M. Gelbort expressed that he had adequate time to complete the comprehensive evaluation that trial counsel asked him to conduct. Rather than show that Dr. Michael M. Gelbort hastily conducted his evaluation, the record shows that Dr. Michael M. Gelbort had ample time to diagnose the movant as not having any significant brain impairment. Because trial counsel had already preliminarily decided not to have experts explore whether the movant had lifelong neuropsychological impairments that affected his functioning and caused him to act in the manner that he did, the court finds that trial counsel's decision to consult Dr. Michael M. Gelbort on limited matters did not fall below an objective standard of reasonableness. This is especially so because it is highly doubtful that, even if every possible avenue had been explored, any credible expert would have diagnosed the movant with notable impairments prior to trial.

### (5) Consideration of drug use

As to the movant's related criticism of trial counsel for failing to seek an evaluation as to whether his use of methamphetamine in combination with his exposure to methamphetamine when manufacturing it influenced his offense behavior and assertion that no oversight would have occurred if trial counsel had sought a comprehensive mental health evaluation, *see* Decl. Richard G. Dudley, Jr., M.D., Movant Ex. 47, civil docket no. 19-47, ¶¶ 16-17; Decl. John F. Warren, III, Ph.D., Movant Ex. 45, civil docket

240

no. 19-45, ¶¶ 10-11; Report Melissa P. Piasecki, M.D., Movant Ex. 48, civil docket no. 19-48, the record establishes that the decision to refrain from further investigating the impact of the movant's use of drugs resulted from reasoned strategic judgment, not inattention. When looking into the evidence that might be mitigating, trial counsel considered whether it was appropriate to consult a toxicologist to assess the impact of the movant's drug use on his mental condition. *See* Decl. Charles Myers Rogers, Movant Ex. 72, civil docket no. 19-72, ¶ 9; Decl. Leon F. Spies, Movant Ex. 74, civil docket no. 19-74, ¶ 15. Although trial counsel could not recall a specific reason as to why they did not consult a toxicologist, the record indicates that they had good reason to doubt that they would find any helpful mitigating evidence on this point. *See Foster*, 9 F.3d at 726 (observing that, although great deference is given to an attorney's informed strategic choices, close scrutiny is given to an attorney's preparatory activities).

As of 1997, the movant denied using psychoactive substances between 1993 and 1995 because he was subject to urinalysis and acknowledged using drugs in 1995 until his arrest in April of 1996. Around that same time, the movant's mother reported that the movant did not use psychoactive substances. Although she was unaware of the movant's use of drugs, it was evident that, between 1992 and 1996, the movant used psychoactive substances "on" and "off." The movant reported that, shortly after manufacturing methamphetamine in early 1992, he began to use methamphetamine on nearly a daily basis for a period that lasted approximately four months. Having reflected on his past, the movant believed that he had a drug problem just during that period. In addition, the movant advised that, while he was on pre-trial release as a result of his arrest in 1993, he did not use any drugs and, after his pre-trial release conditions ended in 1995, he used methamphetamine on an occasional basis until he was arrested in 1996. As of 2003, the movant reported that, after he moved back to Arizona in January of 1992, he used a lot of methamphetamine over a five month period and then used various drugs occasionally.

241

And, in July of 2004, Dr. Michael M. Gelbort clearly considered the movant's history, including his drug use and exposure to chemicals, and concluded that he showed signs of

> having been able to [perform] or function at a higher level in the past and now, while still generating testing out in the average or slightly above average range, and of having a pattern indicative of an acquired dysfunction leading to relative if not absolute suppressions in his ability to perform.

Movant Hearing Ex. 11, civil docket no. 74-31 at 3-4.

That information combined with the other evidence of the movant's mental health would not lead a reasonable attorney to conclude that pursuing the movant's use of methamphetamine had a substantial likelihood of generating anything that would be helpful to the movant's defense. Trial counsel knew that, before he ever used drugs, the movant physically and verbally abused his sister and prevented her from breathing on at least two occasions, schemed to kill a person, discussed killing another person to collect life insurance proceeds and raped and threatened his girlfriend. They also knew that the evidence indicated: (1) during June and July of 1993, the movant actually hunted Gregory Nicholson and, at the end of July, killed him, a mother and her two little girls; (2) in November of 1993, the movant killed Terry DeGeus; and (3) after murdering Gregory Nicholson, Lori Duncan, Kandi Duncan, Amber Duncan and Terry DeGeus, the movant manufactured methamphetamine to varying degrees of success, used drugs and schemed to kill others. So, even if trial counsel's decision to cut off further investigation into the movant's use of drugs can somehow be characterized as less than optimal, their representation cannot be deemed constitutionally inadequate because they exercised reasonable professional judgment. *Burger*, 483 U.S. at 788-95 (finding that counsel's decision to not fully investigate the petitioner's background and decision to not offer mitigating evidence at two capital sentencing hearings were supported by reasonable professional judgment, in that counsel's interviews and studies of psychological reports

242

indicated that an explanation of the petitioner's background would not have minimized the risk of the death penalty). When all of the circumstances are considered, it is clear that trial counsel knew of the movant's history of drug use, considered how it could be used to explain the movant's actions and wisely opted not to pursue as a mitigating factor the movant's use of methamphetamine.

### *(6)* *Consideration of theory of defense*

Further, it is apparent that, as a result of their entire investigation, trial counsel appropriately focused on the theory of defense that they would present during the merits phase and penalty phase. Trial counsel's decision on whether, how and when to present evidence of the movant's upbringing and background has not been shown to be objectively unreasonable. Because the movant insisted on denying guilt, trial counsel argued someone else committed the murders. After deciding to assert that the movant had not been involved in the murders of Gregory Nicholson, Lori Duncan, Kandi Duncan, Amber Duncan and Terry DeGeus, trial counsel wisely chose to maintain the theory of defense that they had presented during the merits phase and to refrain from presenting evidence of the movant's mental health and use of methamphetamine at the time of the murders. Rather than acknowledge that he was guilty all along, trial counsel reasonably decided to focus on the movant's less-than-perfect upbringing and the possibility of redemption during the penalty phase.

Because he stuck to a reasonable doubt strategy during the merits phase and a residual doubt theory during the penalty phase, the movant risked no flip-flop effect. Had the movant claimed innocence and made the government prove its case against him during the entire first phase of the trial and then put on evidence that his mental health and drug use explained why he committed the murders during the second phase, it is highly likely that the defense would have lost any credibility that they had garnered and it is at least possible that the jury would have been incensed or felt that the movant wasted its time for

243

weeks.  Contrary to the movant's assertion otherwise, a mental health mitigation case that highlighted the movant's state of mind at the time he committed the murders would have been completely inconsistent with his assertion during the merits phase that he was not involved in the murders.  *See* ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 10.11, comment. (rev. ed. 2003) ("Consistency is crucial because, as discussed in the Commentary to Guideline 10.10.1, counsel risks losing credibility by making an unconvincing argument in the first place that the defendant did not commit the crime, then attempting to show in the penalty phase why the client committed the crime."); *see also id.* (a guilt phase defense denying involvement is more likely to be inconsistent with mitigation evidence of mental illness, domination by a co-defendant, substance abuse or trauma).  Given the fact that the movant has consistently maintained his innocence despite overwhelming evidence that establishes his culpability, the court finds that trial counsel did not slip below the professional norm when they opted not to present a conflicting mental health defense.  *See Middleton v. Roper*, 455 F.3d 838, 848-49 (8th Cir. 2006) (deciding that counsel did not provide ineffective assistance by failing to present a duress defense when the petitioner claimed he was not present at the time of the murder).  It was reasonable for trial counsel to make the strategic choice not to present a mental health defense in conflict with the movant's claim of innocence.

### (7)    *Overall presentation of mitigation evidence*

Based on the foregoing, the court concludes that a reasonable attorney would not have pursued further evidence for mitigation purposes.  *See Worthington*, 631 F.3d at 500.  The decision not to develop mental health mitigation evidence was based in part on a consultation with defense mental health experts.  *See id.* at 502 (concluding that counsel reasonably investigated the facts and reasonably decided not to proceed further with a psychological mitigation strategy after they had consulted with mental health experts).  There is no doubt that trial counsel consulted each other, their mitigation specialist,

244

Dr. Mark D. Cunningham, Dr. Michael M. Gelbort and other lawyers before deciding not to have mental health experts testify. *See, e.g.*, 2255 Evidentiary Hearing Tr. at 569-70. Further, because the movant never conceded guilt, his only real hope for a successful mitigation case hinged on pursuing a mitigating factor of residual doubt and showing that features of his background and upbringing provided an important basis to understand who he is and how he should be treated. A reasonable attorney could have concluded that it was likely the movant would be convicted and that, instead of trying to show how the movant's mental impairments and mental state affected and explained why he committed murder, it was worth trying to emphasize that the movant had many good qualities and was loved by his family. Trial counsel surely recognized that it would be nearly impossible to persuasively show that the movant was substantially impaired when he killed Gregory Nicholson, Lori Duncan and her two little girls and then, after months passed, Terry DeGeus, and they reasonably decided not to attempt to show that something in his background or upbringing justified or excused the crimes that he had been found guilty of committing. *See Worthington*, 631 F.3d at 506 n.12 (rejecting a claim that trial counsel unreasonably failed to pursue expert psychological testimony and unreasonably failed to present additional lay testimony).

It is not apparent from the record that it was necessary to rely on experts to explain to the jury who the movant was. The presentation of lay testimony on the movant's social history was not deficient. Trial counsel appropriately focused on the quality and quantity of the witnesses that would be called. In light of the witnesses that they called, trial counsel persuasively argued that the movant was a pleasant and obedient child despite having experienced an unfortunate childhood, lacked a significant criminal history, lacked a history of violent or assaultive behavior, had good character and was a good and loving father. They also asked for mercy in light of lingering doubt and those who loved the movant. Trial counsel emphasized that the movant had been exposed to an alcoholic parent

245

who made the movant feel bad and idealized a criminal lifestyle and that the movant's negative experiences with his father throughout his upbringing significantly shaped the movant and impacted how he treated other people. The decision to slip into the closing argument the tremendous impact that a horrendous parent had on the movant can be viewed as just the right amount of subtlety to maneuver jurors toward a life sentence. The court concludes that trial counsel's choices concerning what evidence to present during the penalty phase were reasonable strategies that are not subject to being second-guessed. *See Rice*, 449 F.3d at 897-98 (emphasizing that strategic choices are virtually unchallengeable).

Considering the record as a whole, the court finds that trial counsel presented a meaningful mitigation case. Any additional, credible information that the movant points to is merely cumulative. *See Paul v. United States*, 534 F.3d 832, 842-43 (8th Cir. 2008) (determining that the decision to not present cumulative evidence did not satisfy the deficient performance prong of *Strickland*); *Winfield*, 460 F.3d at 1033 (same); *Fretwell v. Norris*, 133 F.3d 621, 627-28 (8th Cir. 1998) (deciding that the introduction of only some of the available evidence on a point did not constitute deficient performance). Moreover, it is extremely difficult to conclude that trial counsel could have and should have presented a better mitigation case by introducing more evidence of the movant's childhood. Trial counsel presented sufficient evidence about the difficult experiences that the movant faced during his upbringing, and it is reasonably debatable whether any additional evidence, which includes but is not limited to the alleged evidence of the trauma, abuse and abandonment that he suffered, the alleged evidence of the dysfunctional relationship that he had with his father and the alleged evidence of the bad influence that his father had on him, should have been introduced. Although different counsel may have elected to present more or less mitigation evidence, trial counsel's actions did not fall below an objective standard of reasonableness.

246

    **c.**   *The reasonableness of presenting a mitigation case based on mental health and drug use evidence*

    **(1)**  *Reliable evidence not taken into account by the movant's experts*

At first glance, the recently obtained expert mental health evidence looks helpful. But, a thorough examination of the basis for the opinions of the mental health experts leads the court to conclude that no reasonable attorney would have called them to testify during the penalty phase. The court finds that the experts' diagnoses of mental conditions are dubious because they are based on assumptions and generalizations that conflict with contemporaneous evidence, pre-trial and post-trial statements made by the movant and pre-trial and post-trial statements made by close family members, friends and others who had observed the movant over significant periods of time.

The consistent statements made by the movant refute the foundation for the experts' conclusions. Up to and through his trial, the movant always maintained that: his alcoholic father was never around and was not affectionate; he did not spend quality time with his father; his mother was perfect; he and his mother were very close; his mother was very caring and affectionate and she never raised her voice; he did not ever remember his parents arguing or fighting; his upbringing included family members and others who were caring and affectionate; he was never physically or verbally abused; he never experienced family violence; he did not get physically disciplined; he never experienced threats of violence; he was never neglected; he experienced a good childhood; he had good friends; his relationship with his father was good; his relationship with his mother and stepfather was good; his mental and emotional state was stable; he did not have medical problems; he never had been to counseling; he never had symptoms of mental illness; he very rarely experienced depression; he never experienced anxiety, major losses or trauma; and he was nervous, mistrustful and paranoid because people turned on him.

In addition, the movant never asserted that he was under the influence of any substance at the time of the murders and adamantly professed his innocence. The movant repeatedly indicated that he started to use methamphetamine in early 1992 and, shortly thereafter, used it on nearly a daily basis for a four to five month period. He never stated that he was addicted to any substance or experienced any negative effects after he stopped using methamphetamine. All of the evidence suggests that he used methamphetamine when he wanted to get high.

Very few of those who were closest to the movant indicated that he had a serious substance abuse problem or that he acted as though he did. Indeed, the movant visited Kathy Rick in 1992 approximately every two months and, although some of the movant's behavior changed, she was unaware that he used drugs. Movant Hearing Ex. 30, civil docket no. 74-50; *see also* 2255 Evidentiary Hearing Tr. at 454-55. Likewise, even though the movant worked for Ron Smidt and lived with his mother and Ron Smidt while he was on pre-trial release in 1993, the movant's mother conveyed in 1997 that she did not believe the movant ever used drugs. And, even though Alyssa Nelson spent considerable time with the movant after he returned from Arizona in 1993, she was under the impression that he did not use drugs. Movant Hearing Ex. 113, civil docket no. 74-141; *see also* 2255 Evidentiary Hearing Tr. at 430. But, she readily acknowledged that Angela Johnson used drugs. Movant Hearing Ex. 113, civil docket no. 74-141.

Melissa Friesenborg, Timothy Cutkomp and Jeffrey Honken primarily described the movant's use of drugs while he was in Arizona in 1992 and shortly after he returned to Iowa. Movant Hearing Ex. 110, civil docket no. 74-138; Movant Hearing Ex. 111, civil docket no. 74-139; Movant Hearing Ex. 114, civil docket no. 74-142. Even though she spent considerable time with the movant, Melissa Friesenborg stated that she was unaware the movant was manufacturing methamphetamine when he was doing so and that she did not realize the movant was using methamphetamine when he was doing so. Movant

248

Hearing Ex. 110, civil docket no. 74-138. In hindsight, she associated many of the movant's odd behaviors with the use of methamphetamine and thought that the movant could be diagnosed as having an addiction to methamphetamine. *Id*. Timothy Cutkomp stated that the movant pretty much used methamphetamine all the time, including after they returned from Arizona, while working at Kraft Foods and while around his parents. Movant Hearing Ex. 111, civil docket no. 74-139; 2255 Evidentiary Hearing Tr. at 315-19, 321-24. Timothy Cutkomp also testified to the following: the first time they were successful in manufacturing methamphetamine was in August of 1992 and they stopped making it in February of 1993; in July or August of 1992, he and the movant both tried part of a batch of methamphetamine that they manufactured; they decided to move their manufacturing operation to a remote ranch; in September or October of 1992, they again successfully manufactured methamphetamine and started to use it; it was possible that Melissa Friesenborg came down to Arizona in October of 1992; the movant spent most of his time with Melissa Friesenborg and lived with her in an apartment that was far from the ranch; the movant would use methamphetamine for a couple of days in a row when he came to visit during the week; the movant never injected methamphetamine; he previously stated during related proceedings that the movant used either a line of methamphetamine every other day when they had it or just a line a day and that they used methamphetamine about fifteen times a month, over about a four month period and for a total of about sixty times; after Melissa Friesenborg came down to Arizona, the movant did not come out to the ranch very often; he had no knowledge of the movant's drug use from March of 1993 through the fall of 1993 and never saw him use during that period; and the movant began to work at Kraft Foods in January of 1994 and he never saw the movant obtain drugs from anyone while at work. 2255 Evidentiary Hearing Tr. at 332-47. Jeffrey Honken made clear that he saw the movant sample methamphetamine but he never saw the movant use methamphetamine. 2255 Evidentiary Hearing Tr. at 157. *But see* Movant Hearing

249

Ex. 114, civil docket no. 74-142, ¶ 33 (stating that he knew the movant was using the methamphetamine he was making, saw him snort it and it was a really big change for the movant to use methamphetamine).

Others corroborated the social history that the movant described, including the parts of his childhood that were less than ideal. Prior to trial, Alyssa Nelson stated that her mother was generous, loving, affectionate and expressive. Aside from emphasizing those qualities, Alyssa Nelson emphasized that her mother sacrificed herself for her children. She stated that her father was not physically abusive, Ron Smidt always filled in for her father, she was close to the movant and loved him even though they fought a lot. At trial, Alyssa Nelson expressed that she and the movant had a great time living in the huge old house in Britt, Iowa, they were a normal brother and sister, they visited their grandparents and they attended church. She also maintained that her mother was the mother that all of their friends wanted, everybody was accepted in their home, she grew up in a good family environment and Ron Smidt was always there for them. She emphasized that her father was not the caretaker because her mother solely fulfilled that role, her mother provided for them despite their father's shortcomings and they were initially jealous of Ron Smidt because their mother did everything for them and they were used to having her all to themselves. And, various family members indicated that the movant's family vacationed for approximately a week each summer at a cabin.

In addition, the movant's close family members and friends and others provided a detailed description of the movant's personality and behavior. Prior to the sentencing hearing in the 1996 case, those individuals who knew the movant best described the movant as: caring, friendly, outgoing, reasonable, sensible, down to earth and an overall good person. And, prior to trial, he was consistently described as having a big heart and being a good father because he supported his children and was a wonderful influence on them. During trial, witnesses described the movant as:

250

> an excellent worker, a fast learner, neat, always punctual, clean-cut, a good kid, enjoyable, an ideal employee, a great kid, a well-mannered kid, great to his younger half-sister, never getting into trouble, a loving little boy, probably a mother's dream child, able to get along with his cousins really well, likeable, self-disciplined, self-confident, non-aggressive, helpful to others, able to interact well with others, good at maintaining relationships, able to get along with his father despite being disappointed with his drinking, admirable, very well-liked in school, compassionate to an individual who he saw as having low self-esteem, smart, aspirational, loving and a good father.

Witnesses also elaborated on aspects of the movant's family life during trial. Carol Honken stated that, even though he was an alcoholic, Jim Honken took care of their daughter and grandchildren, never really quit loving Marvea Honken/Smidt and loved his children dearly. Dennis Brumm indicated that he got along fine with the movant's father when they had worked together. Sandra Fiems indicated that, even though he was inebriated 98% of the time, Jim Honken was easy to get along with and was never abusive. Marvea Honken/Smidt indicated that: she primarily cared for her boys; Jim Honken did not do anything; her parents loved her children and helped care for them; the movant was easy to raise; the movant enjoyed usual childhood activities; she and the movant participated in Cub Scouts; they attended church and participated in church activities; Jim Honken's role as a father was not meaningful to her or her children because he was not around; her children and Carmen Smidt interacted and got along with each other pretty well after she married Ron Smidt; they always ate meals together; the movant decided that he did not want to live with his father when he reached the age of twelve because he preferred to live with his mother; the movant had a fairly normal childhood; the movant worked for Ron Smidt; the movant participated in ordinary social events; the movant had girlfriends and friendly relationships with girls and boys; the movant was a really good student when he applied himself; the movant is a good father; the movant worked on his

251

relationships, including the relationships that he has with his children; and she and Ron Smidt love and completely support him. She also admitted that, in 1987, she told a probation officer that Jim Honken was a good father and a good provider.

Then, in 2011, Marvea Honken/Smidt provided consistent testimony during the evidentiary hearing. 2255 Evidentiary Hearing Tr. at 364-408; *see also* Movant Hearing Ex. 120, civil docket no. 74-148. Marvea Honken/Smidt's testimony indicates the following: Jim Honken's drinking steadily got worse; when Jim Honken got drunk, he would be sarcastic and call her names, like "fatty," and, later on after she had all of her children, he would tell her that no man would want her because of all of her surgeries; Jim Honken was not interested in his family; she felt bad at different points in her life, including after she lost a baby (Matthew Honken) and Jim Honken and her mother cleared baby items from her home; she protected her children by preventing them from learning about unpleasant aspects of her relationship with Jim Honken; she protected her children by making them get in the station wagon and driving them around until Jim Honken fell asleep on the couch; even though she attempted to appease Jim Honken by offering to let him have custody of the movant, she sought to protect herself and her children from Jim Honken when she filed for divorce; she recognized that, as a consequence of marrying Ron Smidt, she ended up with a larger family, started working, felt really loved for the first time and did not give her children as much attention as they should have received; after marrying Ron Smidt, she refused to let the movant, who was nine years old, live with his father, who had promised him "a bunch of stuff"; the movant was very much a wanted baby; the movant was generally an affectionate and happy child; she made the movant the meal that he preferred because he was a picky eater; the movant consulted her about whether his clothes matched and oftentimes she would lay them out for him because he was color blind; she was worried that the movant had gotten black and blue marks from a teacher who grabbed students when she became upset; her mother loved the movant dearly

252

and described him as bright and happy; the movant played with other children; the movant had friends; the movant was active in church activities, which included youth groups, camps and confirmation; she never raised her voice; she was close with all of her children; none of her children were physically disciplined or verbally abused; she was not aware of any threats of violence; Jeffrey Honken babysat the movant and Alyssa Nelson when he was twelve; a babysitter came to watch her children when Jeffrey Honken was not old enough to babysit; Ron Smidt treated her children just like his own children and did not show favoritism; the movant did well in school because things came easily for him; she helped all of her children with homework when she could; she went to school conferences and school activities; Ron Smidt attended some conferences and attended church and school events with them; she and Ron Smidt thought it was important to always eat dinner together so the family could talk; she did not abandon her children after dinner; her children often did their own things after dinner; and she and Ron Smidt often visited with each other about their day after dinner. Consistent with Marvea Honken/Smidt's testimony, Lisa A. Rickert verified that her pre-trial investigation revealed many positive aspects of the movant's background and personality. *See* civil docket no. 69 at 36-43.

Many of the individuals who the movant relies on in support his request for a new penalty phase have been willing to completely vilify the movant's father, who is now deceased. Undoubtedly, there is evidence in the record that demonstrates the movant's father was at certain points in his life a non-functioning alcoholic and a criminal. And, there is evidence that shows the movant's father sometimes behaved in a manner that could be described as distressing, abusive, manipulative and threatening. A proper profile of Jim Honken, however, also includes evidence that he was not entirely bad. Such evidence includes the following: he found it very difficult to lose a child (Matthew Honken) shortly after he was born; he was not around very much because he was working in construction all of the time; he was a good father and a good provider; although he would drink on the

253

weekends, he had friends who would come over to drink with him; he did not physically or verbally abuse his children or neglect them; he, his family and extended family gathered together; he recognized that the movant was smart; he provided financial support to the movant; he tried to express love by buying things; he did not threaten the use of violence; he put a dog down after it had been hit by a car and removed cats from a garage before lighting it on fire; he only became physical with his children on two occasions, that is, pushed the movant and Alyssa Nelson on one occasion and threw the movant and Jeffrey Honken on one occasion; he did not disclose to Marvea Honken/Smidt information that proved he committed crimes; he amicably divorced Marvea Honken/Smidt and agreed that their children should remain with her; he married after getting divorced and remained married for approximately ten years; he had another child with Carol Honken and he took care of his daughter; he never really quit loving Marvea Honken/Smidt; he loved his children dearly; he and his children continued to have a relationship with his parents; when working at a service station, he got along fine with a co-worker, who was also one of the movant's teachers; after losing his job in 1982 as a result of getting injured, letting his second marriage fail, being forced out of his home and finding it difficult to feed himself, he robbed a bank; after getting out of prison, he formed another relationship in 1991 with an individual who found him easy to get along with and non-abusive; he took care of his grandchildren; he was angry when he found out that the movant stole a car; he tried to protect and help the movant when he got into trouble; he was sufficiently regarded by the movant, Alyssa Nelson and others for them to maintain their relationships with him, to visit him and/or to be compelled to watch out for him; he visited the movant while the movant was in prison; he stopped drinking; and he sought to make amends with the movant.

By comparison, very few of those same individuals have deemed it appropriate to malign the movant's mother. It is perfectly understandable why those that refrained from

254

speaking ill of the movant's mother did so. It is because she is a good person and absolutely fulfilled her role as a mother. There is absolutely no basis to conclude that she did anything but love, support and care for her children, including the movant. It is also apparent why one might decide to disparage the movant's mother, but any attempt at obtaining relief must not sacrifice the truth. Consequently, the court finds that many of the recent assertions, including those that were made by Alyssa Nelson and Jeffrey Honken about their mother, are unreliable. The record does not support that she neglected and abandoned her children or that she failed to nurture, guide or parent any of her children. Rather, it indicates that she was an attentive parent to her own children and other children. *See, e.g.*, 2255 Evidentiary Hearing Tr. at 348 (indicating that Timothy Cutkomp considered Marvea Honken/Smidt to be like a second mother to him).

### (2) Testimony of the movant's experts

Against that backdrop, the court turns to consider the testimony of the movant's experts. In general, the evidence that could have been introduced through Dr. Richard G. Dudley, Jr., Dr. John F. Warren, III, Dr. Melissa P. Piasecki and Dr. Michael M. Gelbort is not in any respect persuasive. This is so because: (1) there is little evidence that the movant experienced the type of troubled upbringing that the movant's experts described or that he ever suffered any mental impairment as a result of anything that occurred during his childhood or adolescence and (2) it is apparent that the movant's use of methamphetamine did not have a significant effect on him.

### (a) Mental health evidence

As to the evaluations undertaken by Dr. Richard G. Dudley, Jr. and Dr. John F. Warren, III, they do not prove that the movant has significant impairments or deficits that would cause a jury to reject a sentence of death. If just the credible testimony from the movant's experts is considered, the information that trial counsel knew about the movant is not dramatically different from the information that is now known about the movant.

255

Dr. John F. Warren, III's post-conviction mental health findings are based on evaluations that were done in 2010, and Dr. Richard G. Dudley, Jr.'s post-conviction mental health findings are based on evaluations that were done in 2011. Their opinions were rendered more than six years after trial and more than seventeen years after the movant committed the murders. Given the entire record, it is apparent that the results of the evaluations conducted by Dr. Richard G. Dudley, Jr. and Dr. John F. Warren, III and the statements that they made during their depositions were affected by biased collateral information, Lisa A. Rickert's summaries, each other's opinions, the jury's prior finding of guilt and appropriate punishment and/or the theory that the movant now believes best fits into his mitigation case.

### *(i)     Dr. Richard G. Dudley, Jr.*

Even though the movant heralds Dr. Richard G. Dudley, Jr. as a highly credentialed expert, the court finds that he is unquestionably biased. At a minimum, there is support in the record for the government's position that Dr. Richard G. Dudley, Jr.'s strong feelings as to the appropriateness of the death penalty clouded his medical opinion.

The court finds that the testimony offered by Dr. Richard G. Dudley, Jr. is not credible because he essentially relied on the themes (trauma, abuse, abandonment) that Lisa A. Rickert suggested in her summaries. He did so even though there is virtually no evidence that demonstrates the movant experienced any trauma, abuse or abandonment during his childhood or adolescence. The majority of the themes that Lisa A. Rickert identified prior to trial are not supported by the record. Dr. Richard G. Dudley, Jr. willingly ignored the movant's own statements and overall history, which indicated he was happy and upbeat and had only minor issues most of his life, and unreasonably relied on biased collateral information. Rather than remain objective, Dr. Richard G. Dudley, Jr. admittedly reviewed collateral material in an effort to anticipate what the movant's difficulties might be.

256

Aside from basing his opinion on what others said and ignoring what the movant expressed, Dr. Richard G. Dudley, Jr. deemed it appropriate to focus on little snippets of the movant's life and embellished and generalized them to support his sweeping diagnoses. To support his finding that the movant was under constant threats of violence and his finding that the movant experienced actual violence, Dr. Richard G. Dudley, Jr. pointed to one instance where the movant's father used threatening language after the movant was arrested for stealing a car and suggested there were repeated occasions where the movant's father shot family pets. Despite being unable to point to specifics, he summarily concluded that the movant's father was generally just aggressive, frightening, threatening, denigrating and verbally abusive all of the time. He, however, admitted that there was absolutely nothing that indicated the movant's father ever acted violently toward anyone. He also suggested that the movant's terrible experiences with his father were compounded by his experiences with a childhood bully. To support his finding that the movant acted impulsively or did not think things through, Dr. Richard G. Dudley, Jr. relied on the movant's involvement with more than one woman. In support of his opinion that the movant was abandoned, Dr. Richard G. Dudley, Jr. thought it was significant that Marvea Honken/Smidt was overwhelmed and unable to function as a result of Jim Honken's alcoholism and just left her children; Marvea Honken/Smidt left her children alone when Jeffrey Honken was too young to babysit; the movant was very upset when he learned that his mother had discussed letting Jim Honken have custody of him; Jim Honken did not want custody of the movant; and Marvea Honken/Smidt focused entirely on her new husband and never was attentive to her children. In addition, he highlighted that the movant's father thought of the movant as the smart child but then asked him to commit crimes as an adolescent. To bolster his opinion about the movant's lifelong anxiety, Dr. Richard G. Dudley, Jr. stated that the movant had trouble sitting still, had an obsession with food and his appearance, had panic and nervousness issues and was always worrying,

257

needing to please and needing to know everything was going to be alright. He also emphasized that the movant's mother and sister suffered from long-term mental health issues. Much of what Dr. Richard G. Dudley, Jr. points to is not particularly meaningful if the movant's entire background is considered and, more importantly, it is belied by more credible assertions of the movant and those individuals who have known him for his entire life.

Further, it is doubtful whether Dr. Richard G. Dudley, Jr. balanced any of the good aspects of the movant's upbringing, including those that Lisa A. Rickert identified, when he made his findings. And, even though Dr. Richard G. Dudley, Jr. indicated that he reviewed the trial transcripts, it is evident that he never considered any testimony that indicated the movant's mother was wonderful or, if he did, gave it virtually no weight. It is difficult to understand why Dr. Richard G. Dudley, Jr. deemed it appropriate to disregard the consistent picture that was presented pre-trial and during trial by the movant, Alyssa Nelson, Marvea Honken/Smidt and others about the positive aspects of his childhood. He made no attempt to distinguish the prior statements at all, and he decided to rely exclusively on statements made by individuals who had a strong motive to embellish the few negative and relatively minor aspects of the movant's upbringing. Dr. Richard G. Dudley, Jr. appears to have given no consideration whatsoever to the fact that the individuals who he relied on the most, including Alyssa Nelson, Jeffrey Honken and Timothy Cutkomp, have strong motivation to lie at this point because they do not want the movant to be executed or the fact that many of their statements are contradicted by statements they made earlier and the big picture.

It is troubling that Dr. Richard G. Dudley, Jr. clung to his opinion that the movant experienced an extremely difficult childhood and adolescence even though it was clear that at least half of the basis for such opinion is absolutely wrong. Despite the fact that it is absolutely certain the movant's mother provided a stable, nurturing and loving

258

environment, never abandoned him, did not fail to provide any sort of safe space or comfort to him, never neglected him, never failed to calm him or tell him that things were going to be okay, acted as a loving caretaker and facilitated the movant's attachment to her by making herself available to him, Dr. Richard G. Dudley, Jr. adamantly refused to back off from his assertion that the movant's mother failed to act as a parent. Based on the substantial record that pertains to Marvea Honken/Smidt and the court's observations of her, the court finds that Dr. Richard G. Dudley, Jr.'s conclusion that she just had the title of "mother" and was not emotionally present to be preposterous. There is absolutely no reasonable basis to conclude that she neglected her children.

As further evidence of his bias, Dr. Richard G. Dudley, Jr. stood by his assertion that the movant experienced significant stress around the time of the murders as a result of meeting the demands of his children even though it was evident that the movant did not have children of his own when he murdered Gregory Nicholson, Lori Duncan, Kandi Duncan and Amber Duncan. Further, in spite of the lack of evidence of any drug use by the movant around the time of the murders, he also would not concede that drugs might not have played any part in the murders. Additionally, he gave little, if any, consideration to the fact that Ron Smidt played a role in the movant's life, and he maintained that the movant did not lack empathy in light of the fact that he cared for his father or remorse in light of the fact that he regretted getting involved with drugs and into certain relationships. Because it is clear that Dr. Richard G. Dudley, Jr. totally disregarded all of the contrary evidence that suggested the movant had a relatively normal upbringing and magnified unreliable evidence of family dysfunction into some inherently unbelievable mental condition, there is no real possibility that a juror would have been swayed toward a life sentence by anything he said. It is a near certainty that the jury would have totally rejected his testimony or given it very little weight.

259

### (ii)     Dr. John F. Warren, III

Likewise, the court finds that the final opinion of Dr. John F. Warren, III is unreliable. He too points to very little information that establishes the movant experienced trauma, abuse, neglect, threats, violence and abandonment during his childhood or adolescence. Rather than point to specific examples, Dr. John F. Warren, III merely relied on generalities. For example, as to the extreme abuse and violence that he states the movant experienced, Dr. John F. Warren, III pointed to: (1) lack of proper parenting and (2) Jim Honken's general demeanor, which included his occasional use of threatening or aggressive language, his treatment of the movant's mother, Carol Honken and the family's pets and his mention of schemes when the movant was sixteen, seventeen or eighteen years of age. Dr. John F. Warren, III also concluded that the movant experienced a terribly dysfunctional upbringing on account of his parents even though no credible statements by anyone who had knowledge of the circumstances that the movant faced really supported that conclusion. Despite the fact that the movant never acknowledged that his mother neglected him or failed to offer him any warmth or nurturance, the fact that the movant was protective and defensive of his parents when negative things were said about them and the fact that nobody credibly stated anything negative about the movant's mother, Dr. John F. Warren, III maintained that he was able to recognize the dysfunction in the movant's family. Given his admissions, it is apparent that Dr. John F. Warren, III blindly relied on statements that Alyssa Nelson and Jeffrey Honken made after the movant was sentenced to death. He reached his opinions without regard to the accuracy of their statements and made no attempt whatsoever to reconcile his inconsistent conclusions with the trial record and earlier reports that indicated the movant's mother never failed to care for her children, give them guidance, provide for them or spend time with them. Similarly, although he did not hesitate to conclude that Jim Honken was not an adequate parent based on Carol Honken's declaration, he never accounted for any of the earlier information that indicates

260

Jim Honken had positive attributes. Because his opinion is predicated upon very few facts and is inconsistent with the credible account given by the movant, the movant's immediate family members and others, his conclusions do not provide an enlightening view of the movant's mental condition.

Moreover, it is evident that Dr. John F. Warren, III diagnosed the movant in a manner that was consistent with Dr. Daniel S. Greenstein's diagnosis of adult antisocial behavior but then attempted to expand upon his findings and adapt or tailor his findings to Dr. Richard G. Dudley, Jr.'s findings, Lisa A. Rickert's preliminary observations and/or Dr. Melissa P. Piasecki's assumptions. After interviewing the movant for in excess of three hours on October 29, 2010, and on December 7, 2010, reviewing the documents that had been sent to him and starting his memorandum on November 11, 2010, Dr. John F. Warren, III finalized his memorandum on May 20, 2011. In his final memorandum, Dr. John F. Warren, III diagnosed the movant as having Axis I adult antisocial behavior and did not diagnose the movant as having Axis II disorders. Gov. Hearing Ex. L, civil docket no. 74-10. Nevertheless, between the date that Dr. John F. Warren, III completed his memorandum, that is, May 20, 2011, and the date that he completed his declaration, that is, June 3, 2011, he found that the movant also had an anxiety disorder with obsessive compulsive features. He explained that more information that was provided to him prior to the date he completed his declaration added to his understanding of the movant and allowed him to definitively offer the additional diagnoses of methamphetamine abuse and generalized anxiety. However, it is clear that, after Dr. John F. Warren, III spoke with counsel for half of an hour on May 20, 2011, he spent a total of three hours on the movant's case. Gov. Hearing Ex. M, civil docket no. 74-11. During those three hours, he reviewed the movant's records, finalized his declaration and sent an e-mail to counsel. *Id*. Because it is apparent that he dramatically changed his diagnoses by relying on others,

261

including counsel, it cannot be said that Dr. John F. Warren, III's opinion is fair and objective.

It is also clear that many of his statements are unsupported and based on incredible assumptions. Despite the fact that the movant consistently maintained that he never suffered from anxiety and the fact that there is very little that supported Dr. John F. Warren, III's impression that the movant worried all the time, tried to constantly recognize what was going on around him, always feared losing control, had a strong desire to take care of things and tried to cope with his overwhelming anxiety by presenting himself as a normal teenager and young adult, Dr. John F. Warren, III said that the movant suffered from chronic anxiety for at least five years prior to the offenses and five years after the offenses. But, no one, including prison staff, ever observed that the movant suffered from chronic anxiety in the five year period after he murdered Gregory Nicholson, Lori Duncan, Kandi Duncan, Amber Duncan and Terry DeGeus.

Rather than rely on credible information that the movant had conveyed to him or reliable information that was obtained from family members who observed the movant, Dr. John F. Warren, III thought that his diagnosis of anxiety disorder with obsessive compulsive features was significantly supported by the fact that the movant did not do as well in school around the time he lived with his mother and Ron Smidt and did not attract a lot of attention, was compliant and avoided difficult situations when he was in high school. As further support for his diagnoses, Dr. John F. Warren, III stated that the movant had erratic and impulsive behavior, like when he moved from place to place and dated different women. But, those individuals who were closest to the movant, including his sister and brother, rejected the notion that the movant was ever impulsive. And, Dr. John F. Warren, III totally dismissed that it might be important to know whether the movant acted impulsively around the time of the murders. Indeed, he concluded that it was not necessary to know anything about the murders to understand the movant. He also

262

relied on immediate family members who reported that they suffered from mental health problems to support his diagnoses of the movant. But, very little corroborates that they had any significant issues prior to the movant's legal problems. So, essentially very few of Dr. John F. Warren, III's statements are reliable.

### (iii) Summary

In light of the record, the court does not find that Dr. Richard G. Dudley, Jr. and Dr. John F. Warren, III present a clinically significant picture of the psychological conditions that confronted the movant in his developmental years because the credible facts do not demonstrate that the movant suffered abuse, neglect or abandonment. There is no basis to conclude that the movant was unable to depend on his mother to meet any of his needs or expect any warmth or nurturance from her or anyone else. All of the credible evidence indicates the movant had a loving and caring upbringing on account of his mother and others. It is far from the nightmarish childhood that Dr. Richard G. Dudley, Jr. and Dr. John F. Warren, III assert the movant experienced. They were clearly blinded by what they thought their conclusions needed to reveal.

It is significant that the movant's experts offer opinions that are inconsistent with evidence of the movant's behavior prior to the murders and after the murders. Prior to and after his arrest in 1993, the movant has always been able to function at a high level and has never suggested that he has ever been unable to do so as a result of stress or anything else. Even when facing capital charges, trial counsel found the movant to be likeable and, at no point, did they ever express their concern that he was experiencing severe anxiety or any other issues. And, despite being in prison for nearly two decades, the movant has had virtually no mental health issues. So, up until 2010 and 2011, that is, when the movant's experts diagnosed the movant as having lifelong mental health issues, everything indicates that the movant had relatively minor issues.

263

It is also significant that the movant's experts refused to explore the movant's state of mind just prior to committing the murders, while committing the murders and after committing the murders. Despite what the movant's experts might believe, the court finds that the movant's input regarding his state of mind when he planned and murdered five individuals over the course of nine months is highly relevant to any mental health evidence that trial counsel could have presented. Because the movant's experts failed to ask or were not permitted to ask appropriate questions, it necessarily follows that the experts' conjecture as to the movant's state of mind at the time of the offenses is not convincing. The court is unwilling to rely on their pure speculation to conclude that the movant suffered a serious lack of judgment and impulse control at the time of the murders.

Even if aspects of the experts' opinions were to be credited, the explanation that is now advanced by the movant to justify his conduct ran a high risk of being used against him if presented to the jury during the penalty phase. The jury could have rationally construed the diagnoses offered by the movant's experts as indicating that the movant did not have a mental condition that would render him unable to appreciate the nature and quality or wrongfulness of his acts. This is especially so because: (1) Dr. Richard G. Dudley, Jr. admitted that the movant's impairments did not prevent him from knowing what he was doing or understanding that he had a choice to kill or not to kill and (2) Dr. John F. Warren, III admitted that nothing prevented the movant from knowing what he was doing was wrong. Given their admissions, the jury could have reasonably concluded that the movant's minor impairments do not adequately explain why he and Angela Johnson, who was presumably not using methamphetamine because she was pregnant with the movant's child, decided to hunt for Gregory Nicholson and execute him, a mother, and her two little girls and, then, after months passed, lure Terry DeGeus to a location so that they could execute him. It is also not difficult to conclude that, after reaching such reasonable determination, the jury could have reasonably concluded that the

264

movant's unjustifiable acts warrant society's ultimate punishment. Because of the exceedingly high risk that the movant's mental health experts would be used against him, it is hardly debatable whether competent counsel would have called these mental health experts to testify.

Moreover, the mitigating effect of the mental health evidence that trial counsel could have presented definitely would have been offset by additional aggravating evidence to which the mitigating evidence would have opened the door. The government's expert, Dr. Christopher L. Grote, is absolutely credible. *See generally* Gov. Hearing Ex. O, civil docket no. 74-13; civil docket no. 71 (deposition of Christopher L. Grote, Ph.D.). Dr. Christopher L. Grote's conclusions, which are based in part on his evaluation of the movant on August 29, 2011 and August 30, 2011, are refreshingly objective and, consequently, convincing. Highlights of his findings included the following:

> The movant did not recall meeting either Dr. John F. Warren, III or Dr. Richard G. Dudley, Jr.; the movant described his mother as a little too permissive; the movant denied ever experiencing any physical or sexual abuse; the movant thought that his mother believed the best situation for him and his father might be that they live together because of their relationship but not because she did not want him to live with her; the movant never felt rejected by his mother at the time of his parents' divorce; the movant described Ron Smidt as good, quiet, never abusive and not negative; the movant discussed at length the same negative aspects of his father; the movant reported that he moved to Arizona after he graduated from high school because he wanted to get away from his father, who at that time was in prison; the movant and Jeffrey Honken distributed marijuana and cocaine after the movant moved back to Iowa; the movant returned to Arizona in 1992 in part to get away from Kathy Rick and stayed there because he was loyal to his brother and did not want to admit to his mother that moving to Arizona a second time was a mistake; he and Timothy Cutkomp, who had moved down to Arizona in May of 1992, first successfully manufactured methamphetamine in

265

the summer of 1992, which is when he first tried it; the movant denied ever having a physical dependence on methamphetamine; the movant used methamphetamine until he was arrested and used little to no drugs or alcohol after April of 1993; the movant directed his brother to get rid of evidence as soon as he was arrested in 1993; the movant stayed with his mother and Ron Smidt after he was released on bond in March of 1993; the movant would spend time at his father's home and work on a methamphetamine laboratory in the attic after his children were born; the movant again sought to manufacture methamphetamine after he no longer faced charges and again relied on his brother to get his laboratory set up; the movant's health records from the Federal Bureau of Prisons indicated that the movant denied mental health issues and observations of him did not disclose any mental health issues; the movant denied a history of substance abuse in December of 1998; the movant denied excessive worry in May of 2003; the movant described one time in his life in 1997 when he was very anxious; the movant suffered no cognitive deficits and was an exceptionally bright guy; the movant's encyclopedic recall of the manufacturing process and very detailed recall of events from before, during and after the murders do not indicate that his cognitive functioning was ever significantly compromised by his use of drugs; the movant projected blame onto others, including his brother who he believes should also be on death row; the movant showed an enormous amount of planning and foresight when manufacturing and distributing methamphetamine; the movant did not demonstrate that he acted in random or non-purposeful ways in his life; the movant demonstrated that his mental health has been intact across time; the movant only had brief episodes of anxiety and depression after he was imprisoned and those episodes resolved quickly; the movant was never disabled by cognitive or mental health issues at any point in his life; the movant has always had the ability to make informed decisions on his own; the movant acted independently and with determination, including when he excelled in college and when building a high quality methamphetamine laboratory; and no past or

266

<blockquote>current cognitive, mental health or psychosocial factors explain or account for any of his criminal activities.</blockquote>

Gov. Hearing Ex. O, civil docket no. 74-13. Even after assuming that the scenario of abuse and neglect as reported by Lisa A. Rickert, Dr. John F. Warren, III and Dr. Richard G. Dudley, Jr. were correct, Dr. Christopher L. Grote determined that nothing indicates it caused the movant to suffer any mental impairments. *See* civil docket no. 71 at 31. And, Dr. Christopher L. Grote's conclusions are at least in part bolstered by the movant's experts because both of them admitted that there was nothing about the movant's disorders that suggested he did not know it was wrong to kill five people and neither of them could point to any evidence of any kind of any methamphetamine related psychosis that would prevent the movant from knowing it was wrong to kill. In light of all of the expert testimony, there is no doubt that the government would have repeatedly reminded the jury that the movant did not labor under a low IQ or mental defect and, consequently, there was less to excuse what he did. Consequently, no reasonable attorney would have presented the mental health evidence now advanced by the movant.

### *(b)     Drug use evidence*

The 2004 preliminary results of the initial neuropsychological testing by Dr. Michael M. Gelbort indicated that he discovered very little helpful information. In light of what was known about the movant, further unbiased testing and consultation with witnesses, who were willing to cooperate, most likely would have produced results that were relatively normal. This is so because, during trial, Melissa Friesenborg, Jeffrey Honken and Timothy Cutkomp all testified on behalf of the government, not the movant. Until recently, Jeffrey Honken adamantly refused to assist the movant at all. But, more importantly, the post-sentencing testimony of Kathy Rick, Melissa Friesenborg, Jeffrey Honken and Timothy Cutkomp predominantly indicates that the movant used methamphetamine when he wanted to use it. And, even if favorable information was

267

obtained and presented to the jury, it would have been susceptible to impeachment by the government either on cross-examination or through its expert witness.

Although the movant's experts suggest that the movant might have suffered some type of brain impairment as a result of using methamphetamine, none of them account for his drug use after the murders. At a minimum, the movant acknowledged that he manufactured methamphetamine and used methamphetamine in 1995 and 1996. So, it would have been difficult for any expert to reasonably opine as to the extent of his brain impairments as a result of using methamphetamine in 1992 and 1993. In addition, not one of the movant's experts asked the movant whether he was using drugs around the time of the murders or whether he was under the influence of drugs when he committed the murders. And, none of the movant's experts deemed it appropriate to use brain scans, which are a better method for detecting brain damage as a result of methamphetamine use.

Among the experts that the movant relies on, Dr. Melissa P. Piasecki is by far the most credible because she offered testimony about methamphetamine use in general. Her testimony, however, would have carried little, if any, weight. The fact that Dr. Melissa P. Piasecki did not evaluate the movant because he opted not to have her do so would have effectively neutralized her testimony or turned her into a witness for the government. Rather than instruct her to obtain specific information that would allow her to give a detailed assessment of the effect that the movant's use of methamphetamine and involvement in the manufacturing of it may have had on him, she was instructed not to interview the movant and to rely on a hypothetical that did not fairly reflect the movant's use of drugs and participation in the manufacturing of methamphetamine.

Dr. Melissa P. Piasecki was asked to assume that the movant was a chronic methamphetamine abuser, but she admitted that the hypothetical that was provided to her did not allow her to determine: whether the movant ever suffered from memory loss as a result of using methamphetamine; how the movant used methamphetamine; whether the

268

method by which he used methamphetamine changed; whether the methamphetamine he used was of good quality, that is, pure; what quantity of methamphetamine he used on any occasion; how often the movant used methamphetamine and other substances; whether he used methamphetamine a couple of times a week, daily or multiple times a day; what the movant's use of methamphetamine was like during the entire period of time he used such substance; whether he ever increased his use of methamphetamine over time; whether he was unable to get high from the same amount of methamphetamine; whether he suffered any physical problems as a result of using methamphetamine; whether he suffered any withdrawal symptoms when he ceased using methamphetamine; whether he used more methamphetamine than he intended; whether he used methamphetamine over a longer period than he intended; or whether he had unsuccessfully tried to cut down on the amount of methamphetamine he was using. As to his use around the time of the murders, Dr. Melissa P. Piasecki acknowledged that she did not know whether months or weeks passed after he used methamphetamine in Arizona and returned to Iowa. And, although she was led to believe that the movant continued to use methamphetamine after his arrest in 1993, she was not told that the movant had previously stated that he did not use drugs after being arrested and that he was subject to random urinalysis testing while on pre-trial release.

In addition, she assumed that the movant manufactured the methamphetamine and, consequently, was exposed to harmful substances. She was not told who was primarily responsible for manufacturing the methamphetamine, where the movant and Timothy Cutkomp manufactured methamphetamine, whether they were ever exposed to volatile chemicals, how they manufactured it or how long they manufactured it. She did not know that the movant tasked Timothy Cutkomp with manufacturing the methamphetamine in a shed out on a ranch or that the movant was rarely around.

269

Further, she generally opined about what might be possible if a methamphetamine abuser had been neglected and physically abused as a child but acknowledged that the hypothetical she relied upon did not indicate the movant had ever suffered any physical abuse. She also admitted that she did not know the movant maintained that he never experienced any abuse or neglect. And, although Dr. Melissa P. Piasecki implied that the movant's decision to commit multiple murders could have been tied to his use of methamphetamine, the studies that she cited were completed after the movant's trial in 2004, the subjects in the studies used methamphetamine more often, in larger amounts and for longer periods than the movant used methamphetamine and only one study linked violence and methamphetamine users who were high.

In light of Dr. Melissa P. Piasecki's testimony, it would have been highly likely that jurors would have viewed the movant's drug history as aggravating because it is apparent that he used drugs on a recreational basis. The evidence that he suffered from drug dependency is thin. Rather than show that the movant's use of methamphetamine had a devastating effect on him, the record indicates his use of methamphetamine had a trivial effect on him. It does not suggest he was addicted. On the other hand, if jurors believed that the movant's use of methamphetamine had an effect on him, they could have easily concluded that the movant's use of methamphetamine was an explosion waiting to happen. And, the introduction of drug evidence would have opened the door to the introduction of evidence that he continued to manufacture and use methamphetamine years after the murders. Jurors could have easily decided that, even though he knew that he was unable to control himself and ended up killing Gregory Nicholson, Lori Duncan, Kandi Duncan, Amber Duncan and Terry DeGeus as a result of using methamphetamine, he continued to use it.

Similarly, the court finds that Dr. Richard G. Dudley, Jr. and Dr. John F. Warren, III unreasonably relied on Dr. Melissa P. Piasecki. Their assertions about how the

270

movant's methamphetamine use affected him at the time of the murders are unreliable and of little use as mitigating circumstances evidence, especially considering that other evidence pertaining to the movant's own behavior and conduct is inconsistent with their opinions. Dr. John F. Warren, III's suggestions that the movant managed his stress by using his pretty good cognitive skills and pretty good interpersonal skills but then turned to methamphetamine to manage his anxiety, went from a teetotaler or a limited experimenter to someone who was using too much methamphetamine, was exposed to dangerous chemicals while holed up in the desert and lacked impulse control as a result of his drug use are far fetched, especially considering that Dr. John F. Warren, III had very little knowledge about the movant's actual manufacturing of methamphetamine and use of methamphetamine, including whether he used heavy quantities or whether he used around the time of the murders. Dr. John F. Warren, III admitted that he did not see the point in asking the movant about his drug use around the time of the murders and that no one ever described the movant as having suffered from severe effects of drug use at the time of the murders. Consequently, Dr. John F. Warren, III's opinion about the effect that the movant's use of methamphetamine had on him at the time of the murders is founded on baseless speculation. It is highly improbable that the jury would have given any weight to Dr. John F. Warren, III's conclusion that, because methamphetamine use was something that may have been going on, likely was going on or could have been going on and the movant has mental health issues, the movant's methamphetamine use would have contributed to him not being cool, calm, collected, rational, thoughtful, insightful, non-aggressive or whatever his more normal state was.

As to Dr. Richard G. Dudley, Jr.'s opinion, it is predominantly premised on the movant's use of more and more methamphetamine, failure to stop using methamphetamine and overdose while staying at the home of his mother and Ron Smidt in 1993. As a result of failing to have a firm grasp of the movant's actual use of drugs, Dr. Richard G.

271

Dudley, Jr. offered highly implausible possibilities about the effect that the movant's use of methamphetamine had on him. Dr. Richard G. Dudley, Jr. had absolutely no knowledge about the quality of the methamphetamine that the movant used, the amount he used or the negative effects that it had on him, including whether he used more than he intended, whether he tried to stop using but was unable to do so, whether he suffered withdrawal symptoms after he stopped using or whether he gave up or lost any important social, occupational or recreational activities as a result of his use of methamphetamine. Rather than have the movant respond to questions that would allow him to make a decision about the movant's mental state as a result of his drug use around the time of the murders, Dr. Richard G. Dudley, Jr. opted to rely on facts that are belied by the record. As a result, the court is unable to conclude that his decision is based on a reasonable degree of certainty.

It is absolutely clear that the opinions offered by Dr. Michael M. Gelbort, Dr. Melissa P. Piasecki, Dr. John F. Warren, III and Dr. Richard G. Dudley, Jr. are only trustworthy to the extent that the information they rely on is accurate. Because the overall picture of the movant's drug use that the movant's experts relied on conflicts with nearly every credible account, none of their opinions provide meaningful insight into the effect that the movant's drug use had on him at the time of the murders. Their conclusions that the movant was unable to conform his conduct to the law because of a severe emotional disturbance that was exacerbated by his use of methamphetamine is contrary to the facts of the murders and amounts to rather fantastic speculation. The guesswork done by all of the movant's experts would not lead any juror to place significant weight on any of their testimony. Because a defense strategy based on opinions that are inconsistent with the movant's own behavior and conduct is unlikely to succeed, a competent attorney would not pursue the course now charted by counsel in this action.

272

### (3)     *Competent counsel would not offer the current mitigation case*

In sum, there is very little in the movant's upbringing or background that explains why the movant killed five individuals. The movant has always recounted details from his life with great specificity and consistency. Nearly everyone, including the movant, described his childhood as good and, regardless of whether he was using drugs or not using drugs, the movant engaged in violence or plotted violence from 1984 through 1996. Over significant periods and without regard to whether his actions impacted others, the movant pursued opportunities that suited him. Indeed, after killing five individuals and waiting for a strategic amount of time, the movant again built a complex drug laboratory because he could and wanted the money, and, after getting caught, he again sought to kill others.

The movant merely desires another opportunity to convince a jury that he is not deserving of the death penalty based on a different strategy. The movant rejects the theory of defense that was actually pursued through his trial and ignores the evidence that was presented during both phases. The jury was told that, despite being raised in a poisonous environment, the movant had a loving side to him. The jury could have rationally concluded that he had a good and bad side to him. That there might have been a speculative explanation for why the movant resorted to violence is hardly mitigating. Although he has shown the type of mental health mitigation case that could have been presented, the movant has failed to show that a reasonable attorney would have presented it or that any reasonable juror would have believed it.

The fact that another strategy could have been pursued is not the test of whether trial counsel acted unreasonably. *See Pinholster*, ___ U.S. at ___, 131 S. Ct. at 1403 ("'There are countless ways to provide effective assistance in any given case,' and '[e]ven the best criminal defense attorneys would not defend a particular client in the same way.'"

273

(quoting *Strickland*, 466 U.S. at 689)).  In light of what they knew, it is clear that trial counsel's position was much more reasonable than the one offered by counsel.  Indeed, a reasonably competent attorney who was faced with the facts of this case, namely, murdering children and others over a significant period of time, would not have considered it prudent to flip-flop, especially if it is apparent that mental health mitigation evidence is, at best, weak and, at worst, disingenuous.

Moreover, aside from the fact that the current mental health and drug use theory of defense would have contradicted the merits phase innocence defense, the movant still is unwilling to admit that he had any part in the murders.  Rather than change his position because the evidence showing he is guilty is insurmountable, the movant has steadfastly maintained the same position throughout all of his proceedings.  *See, e.g.*, criminal docket no. 713 (sentencing transcript allocution); Gov. Hearing Ex. O, civil docket no. 74-13 (discussing the movant's account of his trial).  It is apparent that the movant and counsel have not really decided what theory of defense should have been pursued.  According to Dr. Christopher L. Grote's credible account, the movant was unaware of the grounds that were being advanced by counsel and he refused to answer any questions about the murders because the statute of limitations on the murders had not run in Iowa and he had been advised not to speak about the murders.  Gov. Hearing Ex. O, civil docket no. 74-13. Counsel's failure to consult with the movant is troubling, especially considering that the record strongly suggests the movant would never have agreed to present the theory of defense now advanced by counsel.  *See* ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 10.15.1 (rev. ed. 2003) (addressing duties of post-conviction counsel); *see also* ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (rev. ed. 2003) (addressing relationship with counsel); ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 10.11 (rev. ed. 2003) (addressing the defense case concerning penalty).

274

Because the movant has, for the most part admirably and accurately maintained that his mother is ideal in every way, it is unlikely that he would have allowed any defense premised on her failure to be a mother. And, it surely does not appear wise to eliminate strong aspects of a mitigation case. There is no doubt that evidence regarding the movant's loving relationship with his mother was some of the most powerful mitigating evidence offered during the penalty phase.

### d.     The lack of prejudice

Aside from concluding that trial counsel conducted a thorough background investigation and exercised reasonable, professional judgment in determining the best possible mitigation case to present during the penalty phase, the court concludes that there is insufficient prejudice to warrant setting aside the movant's sentences of death. Assuming that there is a reasonable probability that a competent attorney would have introduced the proposed expert evidence during the penalty phase, the movant has failed to prove that there is a reasonable probability that the outcome of the penalty phase would have been different. *Pinholster*, ___ U.S. at ___, 131 S. Ct. at 1403 (holding that, to prevail on an ineffective assistance of counsel claim, there must be "a 'substantial,' not just 'conceivable,' likelihood of a different result"). The court cannot say that there is a reasonable probability that the outcome of the penalty phase would have been different had trial counsel presented expert testimony on mental health and/or drug use because such evidence would not have changed the evidence of the movant's involvement in the murders and it would have been, at best, marginally helpful as to his culpability at the time of the killings. *See Penry*, 492 U.S. at 319.

That there are strong aggravating circumstances in this case is not subject to reasonable dispute. The movant's upbringing could accurately be described as good. The overall picture of the movant indicates that he was a happy, well-adjusted child and had the potential to be a successful, well-adjusted adult. Indeed, as an adolescent and a young

275

man, he was compassionate, studious, likeable and a hard worker. There is no debating that the movant is a smart individual who understands chemistry. But, rather than use his talents wisely, he decided to build a laboratory to manufacture methamphetamine and to distribute methamphetamine in a carefully thought out way. And, after getting caught, he devised a murderous scheme to avoid the inevitable term of imprisonment that he would have to serve.

As to the circumstances surrounding the murders, there is overwhelming evidence of the movant's deliberation and premeditation. The record indicates, among other things, that the movant purchased a handgun, hunted for Gregory Nicholson, developed a plan to gain entry into the Duncans' home, borrowed another person's car to avoid being caught, learned how to effectively gag an individual, forced Gregory Nicholson to exculpate him while being videotaped, determined a remote site to bury the bodies, killed Gregory Nicholson, Lori Duncan, Kandi Duncan and Amber Duncan in a single episode and used Lori Duncan's ring as a means to divert the police because it had her name on it. After engaging in violent retribution against Gregory Nicholson for cooperating and after killing Lori Duncan and her girls to prevent them from inculpating him, the movant decided that his other distributor, Terry DeGeus, stood in the way of his continued freedom, and, consequently, the movant lured Terry DeGeus out to a site, killed him by shooting and beating him and then destroyed the handgun.

Aside from the evidence of the movant's deliberation and premeditation, it is obvious that the offenses were committed in an especially heinous, cruel or depraved manner. The movant murdered Gregory Nicholson, Lori Duncan, Kandi Duncan and Amber Duncan on July 25, 1993, experienced his own son being born on August 11, 1993, murdered Terry DeGeus on November 5, 1993, and enjoyed a happy Christmas with his family in December of 1993. There is absolutely no doubt that Gregory Nicholson, Lori Duncan and Terry DeGeus recognized well in advance that they were going to die.

276

Furthermore, the circumstances that the children, who were exceptionally vulnerable due to their young age, faced before they were executed are unimaginable.

At the time of trial, the movant was unable to persuasively refute the government's assertion that he had a relatively privileged upbringing and still is unable to do so. It was nearly impossible for the movant to distance himself from the fact that he killed five individuals, including two young girls, merely for greedy and selfish reasons. He also was unable to distance himself from the fact that, following the dismissal of the 1993 charges, he again sought to manufacture methamphetamine and continued to elaborately plot to kill people even though he did not use drugs and sometimes was confined in prison. Aside from the evidence of the movant's actual crimes and his future dangerousness, the effect of the crime upon each victim's family was devastating. Although the movant argues otherwise, there was very little that could be done to nullify the overwhelming aggravating evidence.

The movant contends that expert evidence of an abusive and traumatic childhood and his severe drug addiction should have been introduced. But, the movant was twenty-four years old when he started manufacturing and using methamphetamine, and he was twenty-five years old when he committed the murders. Because the jury found significant aggravating circumstances and the movant was not young at the time of the murders, the court finds that expert evidence concerning the impact that the movant's upbringing and use of drugs as an adult had on him is entitled to little, if any, mitigating weight. *Williams*, 695 F.3d at 837.

Moreover, as previously pointed out, the cited expert evidence would have done little to aid the movant's defense. *See Pinholster*, ___ U.S. at ___, 131 S. Ct. at 1410 (concluding that mitigating evidence gathered years after the conviction was of questionable mitigating value where it would have opened the door to rebuttal testimony from an expert); *Paul*, 534 F.3d at 843 (observing that consideration must be given to the

incremental benefit of the proffered evidence in the context of the entire record).  The credible evidence that the movant says trial counsel should have offered at the penalty phase would have barely altered the favorable picture of the movant that was presented to the jury.  *See Porter*, 558 U.S. at 41.  It is clear that trial counsel's decision as to the presentation of expert testimony was not prejudicial because each of the movant's experts would have been subjected to sweeping and damning cross-examination.  The aggravating evidence, the testimony of the movant's experts on cross-examination and the testimony of the government's expert definitely would have undermined the movant's defense.  This is especially so because the movant's current theory of defense still encompasses his assertion of innocence and his refusal to express any remorse.  So, it cannot be said that the verdicts were harsher as a result of trial counsel's failure to present expert testimony.

Having considered the mitigating circumstance evidence that the movant says could and should have been presented, along with that which was actually presented, the court concludes that it does not outweigh the overwhelming aggravating circumstances.  The record demonstrates that it was the balance of aggravating factors and mitigating factors other than Jim Honken's alcoholism and the absence of parental love and nurturing that tipped the balance in favor of sentences of death for Kandi Duncan and Amber Duncan.  Very few jurors found those mitigating factors to be supported by the evidence.  The other mitigating factors—that is, the movant's lack of a significant prior criminal history, the movant's lack of a prior history of violence, the movant's relationship with Ryan Honken, Marvea Honken, Brandon Rick, Marvea Honken/Smidt, Ron Smidt and Alyssa Nelson, the movant's experience of having his parents get divorced when he was young and having only sporadic contact with his father after the divorce and the movant's behavior since being incarcerated—were much more compelling.  Despite those compelling mitigating factors, the aggravating factors tipped the balance in favor of death for the murders of the girls.  It is apparent that jurors were not unanimous regarding the appropriate sentence for

278

the adults but had little difficulty reaching a sentence of death for the girls. So, even if jurors had found that mental health evidence and drug use evidence was in some respect mitigating, there is no reasonable probability that at least one juror would have found the balance of aggravating and mitigating factors tipped in favor of a life sentence for all of the counts.

In light of all of the evidence, there is, at best, only a minute possibility, not a reasonable probability, that the outcome of the penalty phase would have been different had trial counsel performed as the movant now believes they should have performed. Because there is no reasonable probability that the presentation of the movant's expert testimony would have changed the conclusion that the aggravating circumstances outweighed the mitigating circumstances, there is no basis to conclude that the movant's right to counsel or right to be free from cruel and unusual punishment was violated. *Strickland*, 466 U.S. at 700; *see also Schneider v. Delo*, 85 F.3d 335, 339-41 (8th Cir. 1996) (deciding that the decision not to arrange a second psychiatric examination and decision not to present additional evidence did not undermine confidence in the outcome of the penalty phase).

### J.  Ground Ten — Constitutional Violations Occurred as a Result of the Penalty Phase Jury Instructions

#### 1.  Arguments of the parties

##### a.  The movant

The movant contends that, during the penalty phase, the trial court improperly instructed the jury regarding the future dangerousness aggravating factor and the weighing process. Specifically, as to future dangerousness, the movant challenges Final "Penalty Phase" Instruction No. 4—Step Three: "Non-Statutory" Aggravating Factors. Such instruction provides:

> In **Step Three**, you must consider whether the prosecution has proved beyond a reasonable doubt *one or more*

of the "Step Three Aggravating Factors." These aggravating factors are sometimes called "non-statutory" aggravating factors, because they are not identified by the statute authorizing the death penalty for "conspiracy murder" and "CCE murder," although they are identified by other applicable law. The "Step Three Aggravating Factors" are the following:

(1) For **Counts 8 through 17**, the defendant would be a danger in the future to the lives and safety of other persons.

Evidence that the defendant would be a danger in the future to the lives and safety of other persons may include one or more of the following: (a) specific threats of violence; (b) a continuing pattern of violence; (c) low rehabilitative potential; (d) lack of remorse; and (e) a high custody classification. In addition, the prosecution must prove that the defendant's dangerousness tends to support imposition of the death penalty.

(2) For **Counts 8 through 17**, the defendant obstructed justice by preventing the victim from providing testimony or information to law enforcement officers or by retaliating against the victim for cooperating with authorities.

The prosecution must prove that the victim was murdered to obstruct a criminal investigation or to tamper with or retaliate against a witness or potential witness in a federal criminal trial or a federal investigation conducted by the grand jury, and that such obstruction or retaliation tends to support imposition of the death penalty.

(3) For **Counts 8 through 11 and 13 through 16**, the defendant intentionally killed more than one person in a single criminal episode.

This factor is only applicable, if at all, to the murders of Gregory Nicholson in **Counts 8 and 13**, Lori Duncan in **Counts 9 and 14**, Amber Duncan in **Counts 10 and 15**, and Kandi Duncan in **Counts 11**

280

**and 16**.  As to those murders, the prosecution must prove that the defendant killed more than one person in a criminal episode and that his participation in those acts tends to support imposition of the death penalty.  This factor is not applicable to the murder of Terry DeGeus in **Counts 12 and 17**.

(4) For **Counts 8 through 17**, the effect of the crime upon the victim's family was injurious.

The prosecution must prove that the murder of the victim deprived the surviving members of the victim's family of the benefit of having the victim in their lives and as a result, their lives have changed and they have experienced significant emotional trauma, and that such injurious effect tends to support imposition of the death penalty.

You must unanimously agree that a particular "Step Three Aggravating Factor" has been proved beyond a reasonable doubt, or you cannot consider that aggravating factor further.  You may consider in **Step Five** any "Step Three Aggravating Factor" that you unanimously find that the prosecution has proved beyond a reasonable doubt.

Criminal docket no. 524 at 25-26 (Final "Penalty Phase" Instruction No. 4—Step Three: "Non-Statutory" Aggravating Factors).  The movant claims that the future dangerousness aspect of this instruction is problematic for several reasons.

First, he maintains that it is overly broad because it permitted the jury to find that he would be a danger in the future to the lives and safety of other persons from the mere fact that he had a high custody classification.  The movant argues that a broadly worded aggravating circumstance is unconstitutional because "the channeling and limiting of the sentencer's discretion in imposing the death penalty is a fundamental constitutional requirement for sufficiently minimizing the risk of wholly arbitrary and capricious action." *Maynard v. Cartwright*, 486 U.S. 356, 362 (1988) (listing cases); *see also Furman v. Georgia*, 408 U.S. 238, 239-40 (1972) (concluding that the application of the death penalty

281

by the states of Texas and Georgia was unconstitutionally cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments). He contends that the trial court's instruction did not adequately guide the discretion of the jury because the use of the words "one or more of the following" permitted the jury to find the future dangerousness aggravating factor based solely on his high custody classification, which he had presented as mitigating, not aggravating.

Second, he maintains that the trial court's inclusion of "high custody classification" endorsed the government's view and implicitly rejected his view that a high custody classification mitigated against imposing the death penalty. With respect to his view, he states that Dr. Mark D. Cunningham explained future dangerousness issues to the jury by testifying about the classification system used by the Federal Bureau of Prisons and prison homicide rates and by testifying that an inmate such as the movant—that is, an inmate facing a term of life imprisonment if not sentenced to death—would be housed in a high security level institution. The movant argues that the trial court's implicit rejection of his reliance on Dr. Mark D. Cunningham's findings to establish that a high custody classification mitigated against imposing the death penalty violated his right to due process, right to a jury trial and the narrowing requirements of the Eighth Amendment.

Aside from finding fault with Final "Penalty Phase" Instruction No. 4—Step Three: "Non-Statutory" Aggravating Factors, the movant states that, with respect to the appropriate standard of proof, the trial court improperly instructed the jury how to weigh the aggravating circumstances against the mitigating circumstances. He claims that a constitutional violation occurred because the jury must be convinced beyond a reasonable doubt of the relative weight of the aggravating and mitigating circumstances before it may return a verdict of death.

The movant underscores his standard of proof assertion by relying on *Ring v. Arizona*, 536 U.S. 584, 589 (2002), which held that, if an increase in a capital defendant's

282

authorized punishment is contingent on the finding of a fact such as a sentencing aggravating factor, that fact must be found by a jury. The movant maintains that, in the wake of the Supreme Court's decision in *Ring*, the trial court failed to properly instruct the jury. Specifically, he argues that it is unconstitutional to merely instruct jurors that they must unanimously find that the prosecution has proved beyond a reasonable doubt an aggravating factor that is being considered by them. He claims that the trial court stopped short when it did not instruct the jury that they could only impose a penalty of death if they unanimously found beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances.

More specifically, the movant dislikes the fact that the trial court only directed the jury to engage in a weighing process when it gave Final "Penalty Phase" Instruction No. 6—Step Five: Weighing the Factors. Such instruction provides:

> At **Step Five**, you must consider whether the "aggravating factors" you found to exist in **Steps One** and **Two**, and any additional "aggravating factor" or "aggravating factors" that you found in **Step Three**, taken together, sufficiently outweigh any "mitigating factors" that you found in **Step Four**, so that the count in question calls for a sentence of death. In the absence of any "mitigating factors," you must consider whether the "aggravating factors" are themselves sufficient to call for a sentence of death. Based on your weighing of *all* of the factors, you will decide whether to impose a sentence of death rather than a sentence of life imprisonment without possibility of release for the count in question.
>
> In determining the appropriate sentence, all of you must weigh the aggravating factors that you unanimously found to exist, and each of you must weigh any mitigating factor or factors that you individually found to exist. Each of you may also weigh any mitigating factor or factors that another or others of your fellow jurors found to exist. In engaging in the weighing process, you must avoid any influence of passion,

283

prejudice, or undue sympathy. Your deliberations should be based on the evidence you have seen and heard and the law on which I have instructed you.

The process of weighing aggravating and mitigating factors against each other—or weighing aggravating factors alone, if you find no mitigating factors—in order to determine the proper punishment is not a mechanical process. You must not simply count the number of "aggravating factors" and "mitigating factors" to reach your decision; rather, you must consider the weight and value of each factor.

The law contemplates that different factors may be given different weights or values by different jurors. Thus, you may find that one mitigating factor outweighs all aggravating factors combined, or that the aggravating factor(s) proved do not, standing alone, call for imposition of a sentence of death on a particular count. If one or more of you so find, you must return a sentence of life in prison without possibility of release on that count. On the other hand, you may unanimously find that a particular aggravating factor sufficiently outweighs all mitigating factors combined to call for a sentence of death. Each of you must decide what weight or value is to be given to a particular aggravating or mitigating factor in your decision-making process.

*Your determination to impose a death sentence must be unanimous*. On the other hand, if, after weighing the "aggravating factors" proved in the case and all of the "mitigating factors" found by any juror, any one of you finds that a sentence of death is not called for on a particular count, then the death sentence *cannot* be imposed on that count, and you must then enter a verdict imposing life imprisonment without possibility of release for that count.

Regardless of your findings with respect to "aggravating factors" and "mitigating factors," you are *never* required to impose a death sentence.

284

> Again, whether or not the circumstances of a particular count call for a sentence of death is a decision that the law leaves entirely to you.

Criminal docket no. 524 at 30 (Final "Penalty Phase" Instruction No. 6—Step Five: Weighing the Factors). Because the jury failed to find beyond a reasonable doubt that the aggravating factors outweighed the mitigating factors, the movant insists that his sentences of death must be vacated. *See Ring*, 536 U.S. at 599-600 (emphasizing that any fact that would determine a defendant's eligibility for capital punishment must be charged in an indictment, submitted to the jury and proven beyond a reasonable doubt); *see also United States v. Gabrion*, 648 F.3d 307, 325 (6th Cir. 2011) (holding that "a jury's finding that the aggravating factors outweigh the mitigating factors is an element of the death penalty and must be found beyond a reasonable doubt, the same standard constitutionally required for all other findings of fact and mixed questions of law and fact"), *vacated*, 719 F.3d 511 (6th Cir. 2013) (en banc) (rejecting as meritless the argument that the jury needed to find beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors); *Harrison v. Gillespie*, 596 F.3d 551, 563-65 (9th Cir. 2010) (applying law of Nevada, which holds that the jury's determination as to whether mitigation outweighed aggravation is a factual finding rather than merely discretionary weighing), *vacated on other grounds*, 640 F.3d 888 (9th Cir. 2011).

Because both instructions are fundamental, the movant claims that trial counsel provided ineffective assistance when they failed to object to the inclusion of: (1) a high custody classification as something that could be considered as evidence of the future dangerousness aggravating factor and (2) a weighing instruction that did not properly guide the weighing of aggravating factors and mitigating factors. Regarding the former failure, he maintains that trial counsel's failure to ask the trial court to omit his high custody classification from the list of things that could be considered as evidence of future dangerousness is inexplicable in light of their argument during closing that his high custody

285

classification should be considered as support for his assertion that he would be less dangerous in prison. With respect to prejudice, he likens the trial court's use of a high custody classification in the list of evidence that could be considered by the jury to directing a verdict against him with respect to the future dangerousness aggravating factor. He claims that, by including a high custody classification in the list, the trial court did not properly guide the jury's consideration of aggravating and mitigating evidence. The movant presses that the trial court's erroneous instruction impermissibly caused the jury to find beyond a reasonable doubt the future dangerousness aggravating factor and there is a reasonable probability that the outcome of the penalty phase would have been different had trial counsel objected. As to the latter failure, the movant contends that a new penalty phase is necessary because a jury's finding that the aggravating factors outweigh the mitigating factors is an element of the death penalty and, as such, had to be found beyond a reasonable doubt.

The movant also contends that appellate counsel should have raised these claims on direct appeal. He states that both instructional errors constitute plain error and appellate counsel should have raised them as such. Because appellate counsel failed to raise arguably meritorious plain errors on direct appeal, the movant contends that they provided ineffective assistance.

### b. The government

The government disputes that trial counsel provided ineffective assistance in connection with the jury instructions. Concerning the contention that trial counsel failed to object to the inclusion of "high custody classification" as something the jury could consider when determining the future dangerousness aggravating factor, the government asserts that the trial court neither erroneously failed to narrow the sentencer's discretion nor impermissibly took sides and discredited the movant's expert witness because the trial court only set forth allegations of what might constitute evidence showing that the movant

286

would be a danger in the future to the lives and safety of other persons. The government states that the future dangerousness language in Final "Penalty Phase" Instruction No. 4—Step Three: "Non-Statutory" Aggravating Factors tracks the language included in its notice of intention to seek a sentence of death on the capital counts. Such notice, in relevant part, provides:

> Future Dangerousness of the Defendant. The defendant is likely to commit criminal acts of violence in the future which would be a continuing and serious threat to the lives and safety of others. Simmons v. South Carolina, 114 S. Ct. 2187, 2193 (1994). In addition to committing the murders charged in this case, the defendant has 1) engaged in a continuing pattern of violent conduct, 2) threatened others with violence, 3) demonstrated low rehabilitative potential, 4) a high custody classification and 5) demonstrated lack of remorse, and committed one or more of the following: On various occasions, the defendant has threatened to kill Daniel Cobeen, Timothy Cutkomp, agents, investigators, chemists, and prosecutors involved in the prosecution of this case. The defendant has made plans and threatened to kill guards and escape from custody. The defendant has threatened to harm other individuals who cooperate. After the search of his residence in 1996, the defendant developed a plan to obstruct justice and destroy evidence by locating cooperating individuals, purchasing a gun, destroying evidence, locating officers and other public officials in his case and harming them, while using the electronic monitoring device as an alibi. While incarcerated in the Woodbury County Jail, pending trial and sentencing, the defendant attempted to escape and assisted in the planned escape of Dennis Putzier. While incarcerated in Woodbury County Jail, pending trial and sentencing, the defendant solicited others to bond out of county jail with the purpose of those individuals killing Timothy Cutkomp and Daniel Cobeen, who were cooperating individuals. On February 25, 1998, the defendant was sentenced [on two drug counts]. While incarcerated in the United States Penitentiary in Florence, Colorado, . . . the defendant identified

287

cooperating individuals and disseminated information in the form of "snitch packets" in an effort to assist others in identifying and harming cooperating individuals. While incarcerated in the United States Penitentiary [in Florence, Colorado], the defendant developed a plan and solicited individuals to join in his plan to escape from custody by overpowering and killing guards, stealing weapons, and amassing cash by committing crimes for the purpose of killing cooperating individuals and law enforcement officials involved in the investigation and prosecution of the defendant and Angela Johnson. The defendant has demonstrated a lack of remorse by boasting about killing his "rats" (cooperating individuals), encouraging others to kill cooperating individuals, and, in one or more conversations, indicating that the killings of the victims did not bother him. The defendant has had a number of disciplinary reports and has been placed in segregation as punishment for misconduct while incarcerated. The defendant's custody classification within the Bureau of Prisons is high and the defendant is incarcerated in a high-level institution, that is[,] a United States Penitentiary.

*See* criminal docket no. 120 at 2-4 (Notice of Intent to Seek Death Penalty). The government argues that, because it alleged a myriad of options in support of the future dangerousness aggravating factor, the trial court appropriately focused the jury's attention on whether sufficient evidence proved beyond a reasonable doubt that the movant would be a danger in the future to the lives and safety of other persons. In addition, the government states that the language in Final "Penalty Phase" Instruction No. 4—Step Three: "Non-Statutory" Aggravating Factors cannot be fairly characterized as an endorsement of its arguments relating to the movant's future dangerousness or as a declaration that a high custody classification establishes future dangerousness. In light of what was alleged to be proof of future dangerousness and what the trial court stated, the government maintains that trial counsel's actions are not so lacking that they fell below an

288

objective standard of reasonableness.  Moreover, the government asserts that trial counsel skillfully negated some of the evidence it relied on to show future dangerousness.

As to the contention that trial counsel failed to object to the inclusion of an erroneous instruction on the burden of proof, the government points out that the weighing instruction given by the trial court followed almost word-for-word the Eighth Circuit Court of Appeals Model Instruction and maintains that the law does not require a jury to be convinced beyond a reasonable doubt of the relative weight of the aggravating and mitigating circumstances before returning a verdict of death.  *See United States v. Purkey*, 428 F.3d 738, 749-50 (8th Cir. 2005) (finding that the requisite weighing process is not a fact to be found but a "lens through which the jury must focus the facts that it has found" to reach its individualized determination regarding what sentence is appropriate).  The government states that, although the jury must find the existence of aggravating factors beyond a reasonable doubt, no constitutional provision requires the jury to find beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors.

Aside from arguing that the instructions are not erroneous, the government argues that the evidence of future dangerousness was overwhelming.  The government emphasizes that its future dangerousness evidence addressed specific threats of violence that were made while the movant was confined, a pattern of violence that began in 1993 and continued while the movant was confined and the lack of any remorse that the movant had for the horrendous murders he committed.  It states that, while in prison, the movant posted bond for a prisoner and attempted to post bond for other prisoners so they could kill witnesses, attempted to escape, plotted to escape and unreasonably justified his murderous actions. Because it relied on abundant evidence not related to the movant's high custody classification, the government claims that it is not possible to show that there is a reasonable probability that the jury would have found the movant did not pose a future danger had trial counsel been able to get the high custody classification option omitted

289

from the instruction. Additionally, the government claims that, even without a finding by the jury that the movant would be a danger in the future to the lives and safety of other persons, it is not possible to show that there is a reasonable probability of an outcome that included only sentences of life imprisonment for the murders of Kandi Duncan and Amber Duncan. It states that the jurors' findings as to the other aggravating factors unequivocally evinces their unanimous conclusion that the crimes involved the infliction of unnecessary and senseless violence on helpless victims and, consequently, the fifteen mitigating factors found by one or more of the jurors never would have neutralized the aggravating circumstances of the movant's crimes.

Similarly, the government contends that, even if trial counsel had objected and the jurors had been instructed that they needed to find beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors, there is no reasonable probability that the result of the penalty phase would have been different because the evidence establishing the aggravating factors was overwhelming. It contends that the jury unanimously found beyond a reasonable doubt every aggravating factor and the mitigation evidence does little, if anything, to negate all of the aggravating evidence.

### 2.  *Analysis*

The court finds that the future dangerousness aspect of Final "Penalty Phase" Instruction No. 4—Step Three: "Non-Statutory" Aggravating Factors is not erroneous. Neither the argument that the language is too broad nor the argument that the trial court impermissibly sided with the government has any merit. So, the actions of trial counsel and appellate counsel survive constitutional scrutiny.

In fixing appropriate punishment, it is undisputed that a jury may consider future dangerousness. Because it is a permissible aggravating factor, the trial court instructed the jury that it needed to find beyond a reasonable doubt that the movant would be a danger in the future to the lives and safety of other persons and that the movant's dangerousness

290

tends to support imposition of the death penalty. As to the former requirement, the trial court instructed the jury that it may be shown by specific threats of violence, a continuing pattern of violence, low rehabilitative potential, lack of remorse or a high custody classification. So, if evidence indicated that the movant had received a high custody classification because he had been identified as a dangerous or high risk offender, the jury could consider it when determining future dangerousness. On the other hand, if no evidence established that he required higher supervision or separation, the jury would not be able to rely on a high custody classification to support its future dangerousness finding. Stated differently, nothing required the jury to consider a high custody classification as evidence of future dangerousness and it could have declined to consider such evidence. The same can be said for each of the options, including low rehabilitative potential. Despite the fact that neither party squarely addressed low rehabilitative potential, the movant does not complain about that option. Of course, a fair description of the evidence reveals that the likelihood of the movant committing further offenses is high, especially considering the movant repeatedly vowed revenge.

Further, contrary to the movant's allegation, the trial court did not take sides. The trial court correctly channeled the discretion of the jury when setting forth the evidence, if any, it could consider. The jury was free to decide whether the possibility of receiving a classification in the future based on being convicted of capital murder but sentenced to life imprisonment mitigated against imposing the death penalty. But, it was also free to decide that the exhaustive discussion of custody classification made the movant more dangerous. In fact, the jury could have easily concluded from the detailed information, which the movant heard, that the movant would merely behave for a period of time so he could get a lower classification. Additionally, the trial court directed the jury to consider any other circumstance that might mitigate against imposing the penalty of death and repeatedly instructed the jury that nothing that it did or said was to be taken as a suggestion

291

as to what the proper outcome should be.  Nothing indicates that the jury did not follow the trial court's instructions.  *See Gianakos v. United States*, 560 F.3d 817, 823 (8th Cir. 2009) (presuming that jurors follow instructions unless evidence shows otherwise); *accord United States v. Bolden*, 545 F.3d 609, 619 (8th Cir. 2008).

Aside from finding the language in the instruction to be unoffensive, the court finds that the record belies the movant's position.  During the penalty phase, the government laid out the aggravating factors but predominantly presented evidence to show the serious physical abuse of Lori Duncan and to describe the character of each victim and the emotional, financial and/or physical impact of each victim's murder on the survivors.  It relied heavily on the evidence that it presented during the merits phase to establish future dangerousness and the other aggravating factors.  Unlike the government, trial counsel decided to present evidence as to future dangerousness during the penalty phase.  They decided to call Dr. Mark D. Cunningham.  Trial counsel informed the jury that the purpose of calling Dr. Mark D. Cunningham was to help it understand some issues dealing with the government's allegations as to the movant's future dangerousness.

Dr. Mark D. Cunningham testified that he was familiar with the government's allegations about future dangerousness in this case and that he was not assessing whether the movant was dangerous.  He stated that he was only providing context that might be helpful when assessing the risk of an inmate causing serious injury to somebody either by personally engaging in violence or by ordering others to commit violence.  After trial counsel asked Dr. Mark D. Cunningham to assume that the movant had been identified as someone who posed a significant risk of communicating an intent to do violence in the community, he expressed that the Federal Bureau of Prisons is equipped to limit communications to and from such inmates.  In addition, the jury learned through Dr. Mark D. Cunningham's testimony that:

292

(1) the Federal Bureau of Prisons has specialized facilities that are devoted solely to the prevention of violence in prison and the quarantining of people who are a danger to people in prison and, of course, to people who are in the community; (2) the Federal Bureau of Prisons decides where an inmate is placed and its decision is, in part, guided by information that is provided by the Department of Justice; (3) aside from considering the nature of the offense(s) for which a person was committed, incidents involving threats to the life or well-being of another person, substance abuse issues, family connections, financial means, etc., the Federal Bureau of Prisons considers regulations when designating inmates to correctional facilities; (4) a person who is convicted of capital murder but is not sentenced to death is likely to be placed in a United States Penitentiary such as the United States Penitentiary in Marion, Illinois, or the United States Penitentiary in Florence, Colorado; (5) it is possible for a person who is convicted of capital murder but is not sentenced to death to be assigned to administrative maximum at the United States Penitentiary in Florence, Colorado ("ADX Florence"), which is the most secure facility in the Federal Bureau of Prisons; (6) the Federal Bureau of Prisons does not intend to place inmates at ADX Florence permanently; (7) it takes at least three years to transition out of ADX Florence; (8) it is possible for a person who is convicted of capital murder but is not sentenced to death to be placed at some point in a Federal Correctional Institution, which is less secure than a United States Penitentiary; (9) although a United States Penitentiary is a high security institution, it is possible for a person who is convicted of capital murder but is not sentenced to death to be housed at some point in a less secure facility as a result of some event, such as having to appear in court; (10) if retaliation is the motive, there is a continuous risk of ordering violence in the community; (11) the best predictor of future behavior is past behavior; and (12) the only way to be absolutely sure that somebody is not going to commit future violence is to impose the death penalty.

293

When seeking to convict the movant, the government introduced evidence that proved beyond all doubt that he presented a future danger. The evidence established that the movant engaged in a pattern of violence that began in 1993 and continued after he realized additional charges would keep him away from his family, repeatedly threatened violence and expressed no remorse for committing horrifying violence. Despite being confined, the movant posted bond for a prisoner and attempted to post bond for other prisoners so they could kill witnesses, attempted to escape and plotted to escape. Indeed, the record reflects that, while confined at the United States Penitentiary in Florence, Colorado, the movant plotted and schemed to kill more individuals while escaping and after escaping. And, right after calling Dr. Mark D. Cunningham, trial counsel solicited testimony from Marvea Honken/Smidt that the movant served part of his 324 month term of imprisonment at the United States Penitentiary in Florence, Colorado, and the United States Penitentiary in Marion, Illinois. Those are both high security facilities, and neither one of them deterred the movant from attempting to murder those he held responsible for putting him in prison. But, more importantly, rather than express remorse, the evidence established that the movant conveyed to others that murdering five individuals did not bother him at all. In light of the movant's nearly constant calculating, which included how to commit additional acts of violence, and total absence of regard for human life, there is absolutely no possibility that the jury would have found the evidence of future dangerousness insufficient.

Because the record establishes that the movant had a high custody classification and such classification was entirely warranted, the court finds that the jury could have relied exclusively on his high custody classification to establish future dangerousness. It could have relied exclusively on any of the other options as well. Alternatively, the overwhelming evidence of the movant's guilt coupled with the negligible, if any, effect of including a high custody classification in Final "Penalty Phase" Instruction No. 4—Step

294

Three: "Non-Statutory" Aggravating Factors does not lead the court to conclude that a constitutional violation occurred. *See Boyde v. California*, 494 U.S. 370, 380 (1990) ("[A] capital sentencing proceeding is not inconsistent with the Eighth Amendment if there is only a possibility [that the jury applied a challenged instruction in a way that prevented the consideration of mitigating evidence].").  In light of the substantial evidence presented by the government, the court is not convinced that there is a reasonable probability that, but for being represented by trial counsel who did not object to the trial court instructing the jury that it could consider evidence of a high custody classification when determining future dangerousness, the jury would have concluded that the movant did not pose a future danger.

Similarly, the court finds that Final "Penalty Phase" Instruction No. 6—Step Five: Weighing the Factors appropriately instructed the jury as to what it must do in order to impose a sentence of death.  *Cf. Kansas v. Marsh*, 548 U.S. 163, 175 (2006) ("In aggregate, our precedents confer upon defendants the right to present sentencers with information relevant to the sentencing decision and oblige sentencers to consider that information in determining the appropriate sentence.  The thrust of our mitigation jurisprudence ends here.  'We have never held that a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required.'" (quoting *Franklin v. Lynaugh*, 487 U.S. 164, 179 (1988))).  Although it is true that the trial court did not give a reasonable doubt weighing instruction, binding precedent makes clear that the trial court did not err when instructing the jury.  *See Purkey*, 428 F.3d at 749-50 (finding that the requisite weighing process is not a fact to be found but a "lens through which the jury must focus the facts that it has found" to reach its individualized determination regarding what sentence is appropriate); *see also United States v. Fields*, 516 F.3d 923, 950 (10th Cir. 2008) (deciding that it is not necessary for a jury to determine beyond a reasonable doubt that the aggravating factors outweigh the mitigating

295

factors); *United States v. Mitchell*, 502 F.3d 931, 993-94 (9th Cir. 2007) (finding that weighing instructions that did not instruct the jury to find beyond a reasonable doubt that the aggravating factors sufficiently outweigh the mitigating factors are not plainly erroneous); *United States v. Barrett*, 496 F.3d 1079, 1107-08 (10th Cir. 2007) (concluding that *Ring* does not extend to the ultimate decision of whether to impose the death penalty); *United States v. Sampson*, 486 F.3d 13, 32 (1st Cir. 2007) (holding that "the requisite weighing constitutes a process, not a fact to be found" and that "[t]he outcome of the weighing process is not an objective truth that is susceptible to (further) proof by either party"); *United States v. Fields*, 483 F.3d 313, 346 (5th Cir. 2007) (holding that "the jury's decision that the aggravating factors outweigh the mitigating factors is not a finding of fact" but "a 'highly subjective,' 'largely moral judgment'" (quoting *Caldwell*, 472 U.S. at 340 n.7)).  Because nearly every circuit court of appeals, including the Eighth Circuit Court of Appeals, has determined that the jury need not determine beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors, the movant's constitutional claims are not viable.

In light of the foregoing, the court concludes that the actions of trial counsel and appellate counsel survive constitutional scrutiny.  *See Strickland*, 466 U.S. at 688-94. Trial counsel did not unreasonably fail to object to the jury instructions and their actions did not prejudice the defense.  Similarly, appellate counsel reasonably decided not to raise these instructional errors on direct appeal because they were unlikely to succeed, especially considering they would have been subject to plain error review.  *See Roe*, 160 F.3d at 418 ("The decision to forgo a plain error claim is usually the result of a reasonable winnowing of weaker appellate claims.").  It is apparent from the record that appellate counsel made informed decisions and that there was no reasonable probability of the sentences being reversed if they challenged the jury instructions.  Therefore, relief is not available on this ground.

296

### K. Ground Eleven — Constitutional Violations Occurred as a Result of the Admission of Victim Impact Evidence

#### 1. Arguments of the parties

##### a. The movant

The movant complains about several aspects of the victim impact presentation. First, he contends that, although the Eighth Amendment generally does not preclude victim impact evidence, the government presented victim impact evidence that falls outside constitutional parameters because it was far too emotional and highly charged. *See Payne v. Tennessee*, 501 U.S. 808, 817-25 (1991) (deciding that, although it is proper for a jury to consider victim impact evidence when it is assessing the penalty, a capital defendant is constitutionally entitled to a reliable sentencing determination that is based on the jurors' reasoned response to evidence that is not "so unduly prejudicial that it renders the trial fundamentally unfair"). In support of his contention that the extraordinarily moving victim impact portion of the penalty phase violated his right to due process and right to be free from cruel and unusual punishment, the movant points to the presiding judge's emotional reaction and the trial court's prior observations. With respect to the latter, he observes that, when addressing whether the trial involving Angela Johnson should be held in a "merits phase" on the elements of the capital offenses, a "gateway phase" on the "gateway factors" for imposition of the death penalty and a "weighing phase" involving any other aggravating and mitigating factors, the trial court stated the following:

> I have already presided over the "penalty phase" in the companion case against Dustin Honken. This case will likely involve "victim impact" evidence that is substantially similar to the "victim impact" evidence in Honken's case, because this case involves the same alleged murders of the same victims. I can say, without hesitation, that the "victim impact" testimony presented in Honken's trial was the most forceful, emotionally powerful, and emotionally draining evidence that I have heard in any kind of proceeding in any case, civil or

297

criminal, in my entire career as a practicing trial attorney and federal judge spanning nearly [thirty] years. Indeed, I cannot help but wonder if [*Payne*], which held that victim impact evidence is legitimate information for a jury to hear to determine the proper punishment for capital murder, would have been decided the same way if the Supreme Court Justices in the majority had ever sat as trial court judges in a federal death penalty case and had observed first hand, rather than through review of a cold record, the unsurpassed emotional power of victim impact testimony on a jury. It has now been four months since I heard this testimony in the [Honken] trial and the juror[s'] sobbing during the victim impact testimony still rings in my ears. This is true even though the federal prosecutors in [Honken] used admirable restraint in terms of the scope, amount, and length of victim impact testimony. To pretend that such evidence is not potentially unfairly prejudicial on issues to which it has little or no probative value is simply not realistic, even if the court were to give a careful limiting instruction. Rather, such potent, emotional evidence is a quintessential example of information likely to cause a jury to make a determination on an unrelated issue on the improper basis of inflamed emotion and bias—sympathetic or antipathetic, depending on whether one is considering the defendant or the victims' families.

*United States v. Johnson*, 362 F. Supp. 2d 1043, 1106-07 (N.D. Iowa 2005).

Apart from pointing to the presiding judge's remarks to establish that the scope, amount and length of the victim impact evidence had a prejudicial impact on his defense, the movant contends that the presiding judge's emotional display in front of the jury during the presentation of the victim impact evidence had a prejudicial extraneous influence on the jury. He contends that the record indisputably establishes that the presiding judge became emotional and it is possible that the jury sensed his emotions because trial counsel did. He professes that a violation of his right to due process occurred because it is likely the jury would have reached different verdicts absent an emotional response from the presiding judge.

298

Second, the movant criticizes the testimony of several witnesses that the government called to establish that the effect of the crime upon each victim's family was injurious. The movant contends that the government's presentation during the victim impact portion of the penalty phase violated the Eighth Amendment because it impermissibly introduced false and/or speculative testimony. He presses that the government presented an untrue picture or false impression of the impact that Terry DeGeus's death had on his surviving family members. Specifically, he takes issue with Rhonda Francis's testimony concerning: the emotional impact that Terry DeGeus's death had on her; the character and emotional makeup of her brother and how it compared to her father's character and emotional makeup; the development of her father's diabetes as a result of Terry DeGeus's death; and the long journey and high blood pressure that she and others have experienced after Terry DeGeus's death. The movant suggests that Rhonda Francis falsely testified that Terry DeGeus was "always kind and always loving" and the government impermissibly presented such testimony even though it knew Terry DeGeus had habitually committed violent crimes, dealt drugs and engaged in violence as an enforcer in various criminal enterprises.

Similarly, he finds fault with Kathy Nicholson's testimony. The movant states that, as the ex-wife of Gregory Nicholson, Kathy Nicholson described how Gregory Nicholson's death impacted his father. He dislikes that she testified about Gregory Nicholson's father experiencing stress and health problems, having to retire early from his job and ultimately dying as a result of his son's death. Also, he emphasizes that Robert Milbrath, who is Lori Duncan's brother, offered testimony that is belied by the facts. Specifically, he calls attention to Robert Milbrath's assertion that Lori Duncan opposed drugs and did not want to associate with people who were involved with drugs or to have her girls around drugs. He argues that such assertion obviously conflicts with the evidence that reveals she dated men such as Gregory Nicholson.

299

With respect to Rhonda Francis, Kathy Nicholson and Robert Milbrath, the movant maintains that trial counsel should have objected to their victim impact testimony on the basis that it was not relevant, beyond the scope of a layperson's expertise and/or too prejudicial. Apart from arguing that trial counsel did not uphold their duty to raise timely objections, he asserts that, at a minimum, they should have challenged those witnesses' testimony on cross-examination, through extrinsic evidence, in argument or by moving in limine to preclude improper victim impact testimony. He argues that, had trial counsel properly litigated the issues surrounding the victim impact evidence, the trial court would have curtailed or precluded its admission. And, he argues that, if not exposed to prejudicial evidence, at least one juror would have voted to impose life sentences for the murders of Kandi Duncan and Amber Duncan.

The movant also criticizes trial counsel for failing to properly move to sanitize the emotionally wrenching information that pertained to Lori Duncan and her two children. In particular, the movant draws attention to the photographs of Kandi Duncan and Amber Duncan in their Halloween costumes and to the testimony concerning the devastation that the family experienced as a consequence of their deaths. He suggests that, because it obviously caused undue prejudice, trial counsel should have acted in a manner that brought such testimony within the parameters of the Fifth Amendment and Eighth Amendment.

Third, the movant again alleges that the trial court's Final "Penalty Phase" Instruction No. 4—Step Three: "Non-Statutory" Aggravating Factors is erroneous. *See* criminal docket no. 524 at 25-26 (Final "Penalty Phase" Instruction No. 4—Step Three: "Non-Statutory" Aggravating Factors). He challenges such instruction on the basis that it does not permit the jury to use the victim impact aggravating factor to narrow who truly is deserving of the death penalty. He states that it is not sufficiently narrowing because any death deprives the surviving family members of the benefits of having the victim in their lives. He argues that the victim impact aggravating factor is unconstitutional because

300

it does not meaningfully distinguish those individuals who are sentenced to death from those individuals who are not sentenced to death. *See Maynard*, 486 U.S. at 361-62 (emphasizing that, after *Furman*, it is clear that open-ended discretion in a capital sentencing scheme violates the narrowing requirements of the Eighth Amendment). He also argues that, when Final "Penalty Phase" Instruction No. 4—Step Three: "Non-Statutory" Aggravating Factors is considered with the other instructions, it is clear that the jurors had no guidance as to how the factors should be applied. *See Tuilaepa v. California*, 512 U.S. 967, 971-72 (1994) (discussing eligibility decision and the selection decision).

Apart from faulting trial counsel for their handling of issues that were related to the victim impact evidence, the movant contends that appellate counsel should have raised these claims on direct appeal. He states that, had they raised the admission of the victim impact evidence as plain error, the Eighth Circuit Court of Appeals would have vacated the sentences of death. Because they failed to raise arguably meritorious claims on direct appeal, the movant argues that appellate counsel provided ineffective assistance.

### b. The government

The government denies that any constitutional violation occurred as a result of the evidence and argument that it presented during the penalty phase. The government acknowledges that emotions were stirred when witnesses testified about the effect of the crime upon them and other family members but points out that the stirring of emotions is only attributable to the movant's abhorrent behavior. It maintains that the movant does not adequately take into account the fact that he murdered five people, including an innocent mother and her two little girls. Regarding the movant's specific assertions, the government contends that: (1) no due process violation occurred because it used admirable restraint in terms of the scope, the amount and the length of the victim impact evidence; (2) the presentation of emotional evidence is permitted as long as it does not render the

301

trial fundamentally unfair; (3) the nature and scope of the testimony elicited from Rhonda Francis, Kathy Nicholson and Robert Milbrath did not exceed constitutional parameters; (4) the presiding judge's emotional response to the victim impact evidence had no impact on the overall fairness of the movant's trial; and (5) the instruction as to the effect of the crime upon the victim's family is proper because, rather than narrow the class of defendants who are eligible for the death penalty, it individualizes the case for a defendant who is eligible for the death penalty and because it does not equate victim impact evidence with the loss of a family member.

In addition, the government contends that neither the performance of trial counsel nor the performance of appellate counsel fell outside the range of competence demanded of attorneys in capital cases. The government states that: (1) trial counsel did not unreasonably fail to sanitize the victim impact evidence; (2) trial counsel wisely chose not to object when the family members of the murder victims testified; (3) trial counsel did not unreasonably fail to challenge an instruction that comports with the law and the notice of intention to seek a sentence of death on the capital counts; and (4) appellate counsel reasonably decided to raise other issues on direct appeal. As for the alleged prejudice suffered by the movant, the government contends that conclusory allegations provide an insufficient basis to analyze whether a constitutional violation occurred and, even if trial counsel had prevented the introduction of some evidence during the penalty phase, the jury would have returned the same verdicts, especially considering the other properly admitted victim impact testimony and the revolting nature of the movant's crimes.

### 2. *Analysis*

All of the movant's assertions are without merit. The court finds that no due process violation occurred in this case. Neither the government's presentation of the victim impact evidence nor its closing argument fell outside constitutional boundaries, and the presiding judge's limited emotional reaction to the victim impact evidence did not

302

deprive the movant of a fair proceeding. Additionally, the trial court did not improperly instruct the jury. Because it is clear that no error occurred during the penalty phase of the movant's trial, the court finds that no violation of the movant's constitutional right to counsel occurred.

Victim impact evidence may be presented to the jury as "a legitimate way 'of informing the sentencing authority about the specific harm caused by the crime in question.'" *Williams v. Norris*, 612 F.3d 941, 951 (8th Cir. 2010) (quoting *Payne*, 501 U.S. at 825). The prosecution's ability to introduce such evidence, however, is limited by the defendant's right to due process. *See Storey v. Roper*, 603 F.3d 507, 517-18 (8th Cir. 2010) (observing that, although the prosecution is not afforded unbridled discretion to offer victim impact evidence, specific guidance about the permissible extent and content of victim impact evidence does not exist). Indeed, a defendant may be entitled to relief "[i]f a witness or remark in a particular case so infects the sentencing proceeding so as to render it fundamentally unfair." *Id*. at 517 (citing *Payne*, 501 U.S. at 825). The pertinent inquiry is whether the victim impact evidence provided "'a quick glimpse of the life' which a defendant 'chose to extinguish.'" *Payne*, 501 U.S. at 822 (quoting *Mills v. Maryland*, 486 U.S. 367, 397 (1988)); *see also Storey*, 603 F.3d at 518 (observing that victim impact evidence "should show the victim's uniqueness as an individual and the resulting loss to society"). If the victim impact evidence is not relevant and does not show the victim's uniqueness as an individual and the resulting loss to society, relief is only available where there is a reasonable probability that the jury's verdict likely would have been different in the absence of the impropriety. *See Skillicorn v. Luebbers*, 475 F.3d 965, 972 (8th Cir. 2007) (discussing the burden that must be met to establish a due process violation).

In its opening statement, the government outlined the aggravating factors and indicated that its evidence during the penalty phase would only address: (1) the character of each victim and the impact of each victim's murder on survivors and (2) the serious

303

physical abuse of Lori Duncan. The government's brief opening statement (Trial Tr. at 3461-66) was followed by the movant's equally brief opening statement (Trial Tr. at 3467-72). After the parties' opening statements, the government called eight witnesses (Trial Tr. at 3472-3533). Five of those witnesses testified about the victim's uniqueness as an individual and the loss suffered by the victim's family. With respect to Terry DeGeus, Rhonda Francis (Trial Tr. at 3472-82), as Terry DeGeus's sister, Wendy Jensen (Trial Tr. at 3483-90), as Terry DeGeus's ex-wife, and Ashley DeGeus (Trial Tr. at 3490-93), as Terry DeGeus's daughter, testified. Concerning Gregory Nicholson, Kathy Nicholson (Trial Tr. at 3495-3504), as Gregory Nicholson's ex-wife, testified. And, on behalf of Lori Duncan, Kandi Duncan and Amber Duncan, Robert Milbrath (Trial Tr. at 3505-20) provided testimony as a brother and uncle. Brittany Asbe (Trial Tr. at 3529-33) also testified about Amber Duncan, who was her best friend. The other witnesses, Bill Basler (Trial Tr. at 3520-24) and Joshua Miller (Trial Tr. at 3524-27), provided testimony related to a ring that Lori Duncan wore on her hand. The government called Bill Basler and Joshua Miller to show the serious physical abuse of Lori Duncan. The government's presentation took less than half of a day and consisted of approximately sixty-one pages of transcript.

Following the presentation of the government's evidence, the movant called nine mitigation witnesses (Trial Tr. at 3534-3852). His presentation lasted about two days and consisted of approximately 217 pages of transcript. After the movant decided not to call any more witnesses, the government called Kenneth Hansen (Trial Tr. at 3853-58), Alan Johnson (Trial Tr. at 3858-65), Mark Johnson (Trial Tr. at 3865-72) and Bill Basler (Trial Tr. at 3872-82) as rebuttal witnesses. All of them testified about a bank robbery that occurred in 1986. None of them provided evidence as to the character of any victim or evidence as to the emotional impact of the loss of any victim. The government's rebuttal consisted of approximately thirty pages of transcript.

After the trial court gave nine out of the ten final penalty phase instructions, the parties made their closing arguments. The government briefly summarized the evidence as to each aggravating factor and asked the jury to impose the death penalty (Trial Tr. at 3901-18). In response, the movant reviewed aspects of his life and asked the jury to confine him for the rest of his life (Trial Tr. at 3919-29). The movant's closing consisted of approximately ten pages of transcript. The government gave a short rebuttal (Trial Tr. at 3929-33). The government's closing argument and rebuttal consisted of approximately twenty-one pages of transcript. Following the government's short rebuttal, the trial court gave the jury the tenth instruction, that is, Final "Penalty Phase" Instruction No. 10—Concluding Instruction. *See* criminal docket no. 524 at 35 (Final "Penalty Phase" Instruction No. 10—Concluding Instruction).

Having considered the qualitative and quantitative aspects of the victim impact evidence presented by the government, the court finds that the movant received a fair trial. *See United States v. Nelson*, 347 F.3d 701, 713-14 (8th Cir. 2003) (stating that quantitative and qualitative aspects of the victim impact evidence are considered when deciding whether such evidence renders the trial fundamentally unfair). The six witnesses clearly provided emotional testimony about the five victims and the impact that their murders had on the lives of those who were closest to them. Their testimony coupled with the photographs of Kandi Duncan and Amber Duncan in their Halloween costumes, however, does not infringe on the movant's constitutional right to due process. The evidence presented by the government fell squarely within a permissible category of victim impact evidence because it addressed the emotional loss suffered by those who were closest to the victims.

Contrary to the movant's assertions, the victim impact evidence was neither false nor unduly prejudicial, and, consequently, it was admissible. *See United States v. Montgomery*, 635 F.3d 1074, 1091-92 (8th Cir. 2011) (observing that information is admissible during the penalty phase of a capital trial unless its probative value is

305

outweighed by the danger of creating unfair prejudice, confusion of the issues or misleading the jury). The movant's assertions as to Rhonda Francis, Kathy Nicholson and Robert Milbrath are not persuasive. All three of them testified about the relationship they had with one or more of the victims and the impact the murders had on the loved ones who were left behind. They offered their personal observations and opinions, not baseless speculation. Consequently, the jury properly considered their testimony. Further, when testifying, none of them disputed that Terry DeGeus and Gregory Nicholson had negative traits or made bad decisions. Rather than address the faults of the victims, their testimony addressed the love and kindness that the victims had expressed to them and others. This is exactly the type of evidence that the movant presented when trying to mitigate the aggravating circumstances of his crimes. Indeed, he tried to establish that, even though he behaved in a terribly violent manner when dealing with the five victims, he still loved his children and his children loved him. Because the nature and scope of the victim impact evidence was not meaningfully different from the victim impact evidence that other courts have found permissible in capital cases, the quality of the government's evidence does not give the court pause as to whether a constitutional violation occurred. *See Nelson*, 347 F.3d at 714 (discussing the qualitative nature of the victim impact evidence).

Similarly, the quantity of the government's evidence does not lead the court to conclude that the movant's trial was fundamentally unfair. Given the record, it cannot be said that the evidence was excessive or cumulative. By electing to call six witnesses as representatives of the family members and friends who had been impacted by the killings, the government took a reasonable and measured approach. Only three witnesses testified about Terry DeGeus, only two witnesses testified about Lori Duncan, Kandi Duncan and/or Amber Duncan and only one witness testified about Gregory Nicholson. The testimony related to the impact of the killings lasted less than half of a day whereas the entire trial lasted weeks. Moreover, the movant presented numerous witnesses, including

306

his mother, to offset the government's victim impact presentation. Therefore, no constitutional error occurred. *Id*. at 713 (discussing the quantitative nature of the victim impact evidence); *see also United States v. Johnson*, 403 F. Supp. 2d 721, 854-57 (N.D. Iowa 2005) (rejecting a due process claim).

As to the movant's contention that a constitutional violation occurred as a result of the presiding judge's emotional response to the victim impact evidence, the court finds that there is no chance that the jury's sentencing decision came under undue or improper influence. The movant merely speculates that, because a judge has considerable influence over a jury, it is likely that the presiding judge's limited emotional reaction intimated to the jury what sentencing decision to make. *See United States v. Dellinger*, 472 F.2d 340, 386 (7th Cir. 1972) (explaining that a trial judge cannot say or do anything that is likely to remain firmly lodged in the memory of the jury and to excite a prejudice that would preclude a fair and dispassionate consideration of the evidence); *see also United States v. Wisecarver*, 598 F.3d 982, 989 (8th Cir. 2010) (explaining that the influence of the trial judge on the jury is necessarily and properly of great weight). Such speculation is not enough to establish a constitutional violation.

Although the presiding judge admitted that there was some emotion in his voice during a brief moment in the penalty phase, the law does not require judges to refrain from expressing any emotion. *See, e.g.*, *Jones v. Luebbers*, 359 F.3d 1005, 1013 (8th Cir. 2004) (explaining that judges are not held to a "superhuman standard that would allow no expressions of emotion"); *United States v. Weiss*, 491 F.2d 460, 468 (2d Cir. 1974) ("[Although] expected to possess more than the average amount of self-restraint, [judges] are still only human."). Further, it is abundantly evident that the movant "received a trial in a courtroom where the proper 'atmosphere of austerity' was present." *United States v. Roell*, 487 F.2d 395, 403 (8th Cir. 1973) (quoting *Offutt v. United States*, 348 U.S. 11, 17 (1954)); *see also United States v. Bordeaux*, 570 F.3d 1041, 1046 (8th Cir. 2009)

307

(reviewing the record as a whole and concluding that the trial's overall fairness was not impacted by the court's passing comment). Apart from alleging that the presiding judge expressed some emotion during the presentation of the victim impact evidence, the movant does not suggest that the presiding judge said or did anything else that compromised the "atmosphere of austerity" that is "consonant with a fair trial." *Offutt*, 348 U.S. at 17. And, he points to no evidence that any juror saw the presiding judge react to the victim impact evidence or recognized the emotion in his voice.

Moreover, before, during and at the end of trial, the trial court gave the jurors written and oral instructions. When doing so, the trial court emphasized that all instructions must be followed, *see* criminal docket no. 512 at 45 (setting forth Final Instruction No. 1—Introduction); criminal docket no. 524 at 17 (setting forth Final "Penalty Phase" Instruction No. 1—Introduction), informed jurors that each verdict must be based solely on the evidence that was presented during trial, *see* criminal docket no. 512 at 7 (setting forth Preliminary Instruction No. 3—Duty of Jurors); criminal docket no. 512 at 99 (setting forth Final Instruction No. 18—Duty During Deliberations); criminal docket no. 534-2 at 5 (setting forth Supplemental Instruction F—Deliberations), and directed the jurors that they should not take anything the trial court said or did as an indication of what the verdicts should be, *see* criminal docket no. 512 at 7 (setting forth Preliminary Instruction No. 3—Duty of Jurors); criminal docket no. 512 at 99 (setting forth Final Instruction No. 18—Duty During Deliberations); criminal docket no. 524 at 16 (setting forth Preliminary "Penalty Phase" Instruction No. 5—Duty of Jurors); criminal docket no. 524 at 35 (setting forth Final "Penalty Phase" Instruction No. 10—Concluding Instruction); criminal docket no. 534-2 at 5 (setting forth Supplemental Instruction F—Deliberations). After the parties made their closing arguments but before the jury began deliberating, the trial court gave Final "Penalty Phase" Instruction No. 10—Concluding Instruction, which provides:

308

> You have heard emotional testimony presented by both sides in the "penalty phase." Such testimony may have caused emotional responses from persons present in the courtroom, including spectators, participants in the trial, or other court personnel. However, you must not be swayed by the emotional responses of others to the evidence. Let me remind you again that nothing that I have said in these instructions—and nothing that I have said or done during either the "merits phase" or the "penalty phase" of the trial—has been said or done to suggest to you what I think your decision should be. I have no opinion about what your decision should be. That decision is your exclusive responsibility.
>
> . . . .

Criminal docket no. 524 at 35 (Final "Penalty Phase" Instruction No. 10—Concluding Instruction). Jurors are presumed to have followed all of the trial court's instructions. *See United States v. Paul*, 217 F.3d 989, 997 (8th Cir. 2000) (citing *Jones v. United States*, 527 U.S. 373, 394 (1999)). And, nothing in the record gives credence to the movant's allegation that the jurors disregarded the trial court's directives by taking into account the emotional responses of others and, consequently, failed to fairly and dispassionately consider the evidence when deciding what sentence to impose. *Cf. Bordeaux*, 570 F.3d at 1046-47 (finding that the district court's directive to the jurors that "they were the sole judges of the evidence and that they should not take anything the court said or did as indicating its beliefs regarding the evidence or what the verdict should be" was sufficient to cure any potential prejudice from its statement). Therefore, this contention fails.

Regarding Final "Penalty Phase" Instruction No. 4—Step Three: "Non-Statutory" Aggravating Factors, the court finds that it properly directed the jury. The statutory aggravating factors narrow who truly is deserving of the death penalty but non-statutory aggravating factors, including the victim impact non-statutory aggravating factor, allow the jury to individualize the case for a defendant that the jury has already found to be eligible for the death penalty. As part of the process whereby the jury must select an

309

appropriate penalty, the non-statutory aggravating factors do not serve a narrowing function. Consequently, the movant's reading of the victim impact aggravating factor is not correct. Rather than merely require the government to prove beyond a reasonable doubt that the murder of a victim deprived the surviving family members of the benefits of having the victim in their lives, the victim impact aggravating factor also required the government to prove that, as a result of such deprivation, the surviving family members' lives have changed and the surviving family members have experienced significant emotional trauma. In addition, it required the government to prove beyond a reasonable doubt that the injurious effect of a victim's murder on the surviving family members tends to support imposition of the death penalty. Those requirements establish a valid aggravating factor that could be weighed by the jury. With regard to the instructions as a whole, it cannot be reasonably argued that they do not properly guide how the aggravating factors and mitigating factors should be applied. Thus, the movant's contentions as to the instructions that the trial court gave to the jury are without merit.

Having concluded that the victim impact evidence falls within constitutional parameters, it cannot be said that trial counsel's failure to object to such evidence fell below an objective standard of reasonableness. *See Jenner v. Class*, 79 F.3d 736, 739 (8th Cir. 1996) (concluding that no Sixth Amendment violation occurred because the failure to object to questioning and statements was well within the range of professionally reasonable judgment). The record indicates that trial counsel made strategic decisions while listening to the testimony of the six witnesses. Because trial counsel's actions are a result of tactical choices, considerable deference must be accorded to them. If trial counsel had objected, they ran a very high risk of appearing incredibly insensitive. Further, there is no valid basis to conclude that the movant's constitutional right to counsel was infringed when trial counsel failed to: (1) preclude evidence by filing a motion in limine; (2) subject the six witnesses to cross-examination; (3) sanitize the evidence; (4) admit extrinsic evidence;

310

(5) make additional arguments; and/or (6) propose a limiting instruction. Because the movant relies on mere generalities, it is not possible to find that trial counsel performed deficiently. Similarly, the record indicates that trial counsel did not unreasonably fail to challenge the presiding judge's limited emotional response or the instructions given to the jury. *See* Trial Tr. at 3655-76. As to appellate counsel, the record makes clear that, although aware of possible issues surrounding the presiding judge, *see* Movant Hearing Ex. 52, civil docket no. 74-80 (e-mail), they opted to pursue claims that they believed had a greater chance of yielding relief. Further, the movant suffered absolutely no prejudice as a result of anything either trial counsel or appellate counsel did, or failed to do. Had they done what the movant asserts, there is no reasonable probability that the result of the penalty phase would have changed.

In sum, the court concludes that no constitutional violation occurred. It is apparent from the record that the movant received a fair trial and trial counsel reasonably prepared for and responded to the victim impact evidence. Because the litigation tactics referenced by the movant would not have been successful, it cannot be said that trial counsel performed in a deficient manner. *See Strickland*, 466 U.S. at 688. And, like the trial court, trial counsel did not do or fail to do anything that prejudiced the movant. Any claim of prejudice directed at trial counsel's actions during the penalty phase is nullified by the voluminous aggravating evidence presented. *Id.* at 694. Similarly, appellate counsel's failure to raise these claims on direct appeal did not result in any prejudice to the movant. *See Roe*, 160 F.3d at 418 ("The decision to forgo a plain error claim is usually the result of a reasonable winnowing of weaker appellate claims."). Therefore, relief is not available on this ground.

311

### L. Ground Twelve — Constitutional Violations Occurred as a Result of the Presentation of Inconsistent Arguments During Related Trials

#### 1. Arguments of the parties

##### a. The movant

The movant maintains that his sentences cannot stand because the government violated his constitutional right to be free from cruel and unusual punishment and his constitutional right to due process when it presented conflicting evidence and theories during his trial and the trial of Angela Johnson in her related case. He explains that, in his trial, the government described him as the manipulator and strenuously argued that a sentence of death was warranted. He contrasts that description with the description that the government offered during Angela Johnson's trial. Namely, the movant faults the government for arguing during her trial that he was non-violent and incapable of murder absent Angela Johnson's manipulation and negative influence. The movant claims that the government's contrary views, which are supported by evidence that the government introduced during Angela Johnson's trial, are relevant to many issues, such as culpability and future dangerousness, that the parties disputed during the penalty phase of his trial.

To support his assertions that the government acted improperly when it presented him as wholly deserving of the death penalty during his penalty phase proceedings, the movant primarily points to the significant amount of time that the government devoted to arguing that he substantially planned and premeditated the killings and poses a future danger. He then relies on several excerpts from Angela Johnson's companion case. He states that the record establishes the government consistently argued that none of the murders would have occurred but for Angela Johnson's extreme manipulation of him and propensity to act. For example, he points to the following:

> Ask yourself absent both of them coming together, Dustin Honken being the planner in this case and obviously with the

312

> motivation to kill and Angela Johnson who was somebody who acts, whether without her intentional conduct and prodding along Dustin Honken, whether this murder would have happened. But for her, Dustin Honken couldn't have made entry into that house. [Gregory] Nicholson would have seen him at that point and resisted.

> But for her, there was no way to get Terry DeGeus out to a point where he could be killed. But for her, Dustin Honken, he could have come up with a gun maybe someplace, but would he have? Could he have? It's that conduct by the defendant in this case that led to these murders.

*United States v. Johnson*, Trial Tr. at 2465. He also asserts that a question the government asked Alyssa Nelson is illuminating: "Knowing what you know about his personality absent some outside influence, can you see Dustin Honken murdering five people?" *Id*. at 2679. The movant points out such question because he thinks that it tends to show that the government thought that he was incapable of murder or relatively harmless unless he interacted with a person with a domineering personality. The movant argues that the government's good faith belief that he was incapable of committing murder absent some sort of outside influence is relevant because it reveals a characteristic that could have served as a basis to impose a sentence less than death, *see Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (holding that the sentencer may "not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death"), and it could have had an impact on the jury's sentencing determination, *see Bradshaw v. Stumpf*, 545 U.S. 175, 187 (2005) (concluding that it was at least arguable that the sentencing panel's conclusion about who played a principal role in the offense was material to its sentencing determination).

Additionally, the movant emphasizes that the record in Angela Johnson's case establishes the government clearly believed that she manipulated him rather than the other

313

way around. He states that, in an attempt to advance the future dangerousness aggravating factor and to rebut mitigation evidence that suggested Angela Johnson had a minimal role or only participated in the murders as a result of his strong influence, the government asked the trial court to admit threatening, profanity-laden telephone messages. *United States v. Johnson*, Trial Tr. at 2512-13. He also points out that, in addition to seeking permission to introduce evidence to establish that Angela Johnson did not participate in the murders as a result of being under duress, the government argued against allowing the jury to consider as a mitigating factor the substantial influence that the movant exerted over her because she did not produce any evidence to support such mitigating factor. *Id*. at 3979-80.

Further, the movant maintains that, during Angela Johnson's trial, the government repeatedly took the position that Angela Johnson deserved the penalty of death more than he did because she had a higher level of moral culpability. He criticizes the government's closing argument during Angela Johnson's penalty phase in two respects. First, he disapproves of the government's characterization of Angela Johnson because it is unlike the image that the government asked the jury to consider in his case. In Angela Johnson's case, the government stated:

> What I was trying to describe to you is the Angela Johnson who manipulated her way to the top of the [Dustin] Honken organization, who constantly pushed and pressured [Dustin] Honken to get with it and make that methamphetamine so she could get her money back, who has kept pushing Dustin Honken after he was caught again in 1996 to kill again, and that's the image that I asked you to accept.

*Id*. at 4079-80. Second, he dislikes the guidance that the government offered when addressing the jury:

> When you're back thinking about the role in the offense, do not, do not, just jump to the conclusion that the person who pulls the trigger is the person who's the most morally culpable

314

> for the crime. Think about what you know about the defendant and her violence, her impulsivity, her ability to manipulate [Dustin] Honken, Terry DeGeus. And ask yourself this question: Is it more morally culpable to pull the trigger, or is it more culpable for someone to egg on, to push?

*Id*. at 4026. As further support for his position, the movant points to the government's response to Angela Johnson's motion for judgment of acquittal or new trial. During oral argument, the government stated:

> [P]rior to Dustin Honken meeting Angela Johnson, he did not engage in any violence. He wasn't a violent person. He shot nobody. He beat nobody. In contrast, Angela Johnson was a violent person. She was angry, she was volatile, and, when you mix those two people together, death results, and it is not irrational for the jury to have looked at this and said, you know, [Dustin] Honken was a planner, he was a schemer, he was a dreamer, he clearly had this great plan to be a big drug dealer in the world and he thought about a lot of different things, but you know, when it came down to it, it was Angela Johnson who pushed him, who was saying "do it."

*United States v. Johnson*, November 16, 2005 Hearing Tr. at 88.

The movant emphasizes that a jury must be able to give a "reasoned moral response" to evidence that tends to diminish a defendant's culpability when deciding whether to sentence him to death and evidence that shows he was not capable of murder absent some outside influence qualifies as such evidence. *See Brewer v. Quarterman*, 550 U.S. 286, 289 (2007) (quoting *Penry*, 492 U.S. at 323). The movant argues that, if the jury had learned Angela Johnson was more culpable because he was incapable of murder absent her influence, there is more than a reasonable probability that the jury would have sentenced him to life imprisonment for the murders of the girls.

He also proclaims that the government highlighted his non-violent history during Angela Johnson's case. For example, the movant relies on the testimony of Timothy Cutkomp and other witnesses who would have favored Angela Johnson over him. *United*

315

*States v. Johnson*, Trial Tr. at 323-24, 856-58, 977-78, 1056-57, 1521, 2668-69, 2672, 3203-04, 3271.  He claims that other witnesses, such as Angela Johnson's siblings and ex-husband, substantiate his contention that he had a non-violent history.  He also states that Timothy Cutkomp testified that, without Angela Johnson's influence, the movant might not have been capable of murder, *id*. at 914-15, and that he feared Angela Johnson more than the movant, *id*. at 2621, 4026-27.  In comparison to the government's minimization of Angela Johnson's role during his trial, the movant maintains that the government sought to establish during her trial that she had a lifelong history of violence and a history of threatening others.  He emphasizes that the evidence showed Angela Johnson expressed her jealousy of Kathy Rick by repeatedly threatening to kill her, attempting to break into her house and vandalizing her car.  *Id*. at 779-881, 2637-39.  It also showed that Angela Johnson threatened to kill Daniel Cobeen, *id*. at 709, threatened to kill a corrections officer at the Benton County Jail, *id*. at 2777, and indirectly threatened to kill Jeffrey Honken and his children, *id*. at 368-70.  He asserts that the government solicited testimony that shows Angela Johnson took steps that are consistent with the threats that she made.  For example, she photographed people who were present during court proceedings, *id*. at 2679-81, tried to obtain information about a corrections officer, *id*. at 2777, and held a gun to the movant's head, *id*. at 2678-79.

Lastly, the movant argues that Angela Johnson's separate actions lend weight to his assertion that the government improperly and repeatedly pressed that he deserved the penalty of death as a result of being a callous, calculating and violent manipulator.  Namely, he points to: (1) her involvement with the methamphetamine business prior to meeting him and after he began serving his 293 month term of imprisonment for his earlier convictions and (2) her attempts to be more involved with the methamphetamine business, which includes enthusiastically discussing with an undercover law enforcement officer the prospect of being a hit woman.  *Id*. at 2740.

316

Aside from asserting that his constitutional right to be free from cruel and unusual punishment and his constitutional right to due process were violated, the movant declares that, to the extent that favorable evidence existed, trial counsel should have presented it because there is no valid reason why it should not have been presented. He maintains that, because the evidence was consistent with and supportive of the defense that he presented during his merits phase and penalty phase, trial counsel's failure to present it cannot be described as strategic. He criticizes trial counsel for failing to investigate and for failing to present evidence that tended to show he was less culpable, less dangerous and less deserving of a sentence of death. He also asserts that there is a reasonable probability that at least one juror would have voted for a life sentence absent trial counsel's omissions.

### b. The government

In response, the government asserts that no constitutional violation occurred as a result of the argument that it made in the movant's case and the subsequent argument that it made in the companion case against Angela Johnson. The government states that it appropriately emphasized the movant's conduct as opposed to Angela Johnson's conduct during his trial and then Angela Johnson's conduct rather than the movant's conduct during her trial. The government disagrees with the movant's characterization of its arguments regarding the movant's role in the murders, history of violence and culpability.

It states that a fair summation of the evidence against the movant reveals the following: (1) the movant, as a person with tremendous motive, planned, schemed and organized the murders; (2) although he planned, threatened and prepared to engage in violence and had others engage in physical violence on his behalf, the movant did not personally commit any significant act of physical violence prior to meeting Angela Johnson; (3) Angela Johnson had a tendency to impulsive violence; and (4) the killings of all five individuals occurred because the movant, as the planner, and Angela Johnson, as the facilitator, made a lethal combination when acting in concert with each other. As to

317

Angela Johnson's trial, the government states that much of the evidence showed that she had a violent and impulsive personality and knowingly facilitated the murders by cajoling the movant and manipulating others.

In light of the evidence presented during the movant's trial, the government advances that it argued that the movant: "was an evil [mastermind] who personally killed five people, including two little, innocent girls, and for that, he deserved to be executed"; "anyone capable of killing four people, including the little girls, then after months to deliberate on the horror of his crimes, murders yet another person, deserves to be executed"; and "a person who commits crimes in cold blood, then plots and takes steps to escape and kill again when arrested a second time, poses a future danger to society and deserves to be executed." It maintains that those arguments are not inconsistent with its argument that Angela Johnson deserved to be executed because, as an emotional, manipulative, hotheaded and violent woman, she pushed the movant to carry out his murderous plans. The government disputes that it ever argued that the movant engaged in violence prior to 1993, Angela Johnson was not violent or impulsive or the movant manipulated Angela Johnson into participating in the murders during his trial. It also disputes that it ever argued Angela Johnson planned the murders during her trial. Based on the record, the government contends that it neither presented factually inconsistent evidence nor presented factually contradictory theories or arguments based on the evidence.

The government also argues that the movant cannot demonstrate deficient performance as a result of trial counsel's actions or prejudice from any of the claims of error. Regarding deficient performance, the government asserts that nothing supports the movant's assertion that trial counsel failed to investigate his culpability or present evidence showing he was less culpable. It also asserts that there are legitimate reasons that explain why trial counsel did not present evidence or argue that Angela Johnson was more

318

blameworthy than he was. First, the government contends that vilifying Angela Johnson does little to diminish the fact that the movant shot two little girls to death. Second, it points out that, on the eve of trial, the movant debriefed in an attempt to not only evade the death penalty but to exonerate Angela Johnson and minimize her involvement and responsibility. The government argues that, to the extent that the movant directed trial counsel not to blame Angela Johnson, their deference to the movant is objectively reasonable. Lastly, the government emphasizes that, because the movant took the position at trial that he was innocent, it would not be wise for him to contend that he killed all five individuals because Angela Johnson manipulated him. As to prejudice, the government asserts that the movant's speculation about what might have been material to the jury's sentencing determination is not enough.

### 2. Analysis

"[T]he very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free." *Herring v. New York*, 422 U.S. 853, 862 (1975). Therefore, the adversary system is primarily relied upon to "guarantee a defendant's due process rights." *Holbrook v. Flynn*, 475 U.S. 560, 567 (1986). Only in extraordinary circumstances will partisan advocacy not be able to ensure the "fairness of the factfinding process." *Id*. at 568 (quoting *Estelle v. Williams*, 425 U.S. 501, 503-04 (1976)). For example, a defendant's due process rights may be infringed if the accuracy of the outcome is undermined by the presentation of false evidence, *West*, 612 F.3d at 996, the failure to correct false evidence, *Foster*, 874 F.2d at 494-95, or the failure to disclose material evidence, *Whitehill*, 532 F.3d at 753. Similarly, although a prosecutor need not present precisely the same evidence and theories in trials for different defendants, the prosecution's "use of inherently factually contradictory theories violates the principles of due process" if the contradiction or inconsistency relates to the core of the prosecutor's cases. *Smith v.*

319

*Groose*, 205 F.3d 1045, 1052 (8th Cir. 2000); *see also Bradshaw*, 545 U.S. at 187 (remanding the case to the Sixth Circuit Court of Appeals so that it could address whether the prosecutor's allegedly inconsistent theories about who played a principal role in the offense had an impact on the sentencing determination)[46].

As to the movant's assertions, the movant does not adequately explain how it is that the evidence or the government's arguments based on the evidence in Angela Johnson's trial affected the fundamental fairness of his trial. When the proceedings in Angela Johnson's trial are considered as a whole, it is clear that they do not undermine confidence in the movant's convictions or sentences. Nothing in her trial amounts to a "truly persuasive demonstration of [the movant's] 'actual innocence,'" *Herrera v. Collins*, 506 U.S. 390, 417 (1993), or demonstrates that there is evidence showing the movant is "innocent of the death penalty," *Sawyer v. Whitley*, 505 U.S. 333, 335-36, 345 (1992). In addition, it cannot be said that the jury was precluded from considering any mitigating aspect of the movant's character or record or any of the circumstances of the murder that he proffered as a basis for a sentence less than death. The court is not persuaded by the movant's contention that the government's arguments at Angela Johnson's trial denied him the ability to present all relevant mitigating evidence at his trial because the movant maintained his innocence during trial and, to some extent, still does. And, even if the arguments that were based on the evidence at Angela Johnson's trial can be considered mitigating, the movant is not entitled "to sentencing anew whenever additional mitigating evidence is found." *Noel v. Norris*, 322 F.3d 500, 504 (8th Cir. 2003); *see also United States v. Rusan*, 460 F.3d 989, 993 (8th Cir. 2006) (observing that statements made during closing arguments are not evidence).

---

[46] Further proceedings have occurred. *See, e.g.*, *Stumpf v. Houk*, 653 F.3d 426 (6th Cir. 2011), *vacated*, 722 F.3d 739 (6th Cir. 2013) (en banc) (deciding that the prosecutor's various arguments did not violate the defendant's due process rights).

320

Further, an examination of the records in both cases indicates that the movant's due process claim lacks merit. The government did not manipulate the evidence. *Cf. Smith*, 205 F.3d at 1051 (concluding that a defendant is deprived of due process if the prosecution manipulates evidence to pursue as many convictions as possible). Rather, it presented the same evidence in both trials. The movant points to argument and testimony from Angela Johnson's trial, but none of the excerpts indicate that the government presented improper or inconsistent evidence that was essential to the successful prosecution of Angela Johnson. In other words, it is clear that the government did not rely on a different factual premise to obtain convictions in Angela Johnson's case because it was unable to rely on the facts that it presented in the movant's case. Therefore, the movant cannot credibly claim that relief is justified on the basis that the government presented irreconcilable evidence. *See United States v. Higgs*, 353 F.3d 281, 326 (4th Cir. 2003) (rejecting a claim that a due process violation occurred because the government merely responded to the defense's tactic, argued the same factual predicate and maintained a relatively consistent position); *United States v. Dickerson*, 248 F.3d 1036, 1043-44 (11th Cir. 2001) (finding that the search for truth was not impacted because the government did not "attempt to prosecute and convict multiple defendants for the same crime in the hopes that one of them is the true perpetrator of the crime"); *Nguyen v. Lindsey*, 232 F.3d 1236, 1240-41 (9th Cir. 2000) (concluding that no due process violation occurred because the nature of the crime made it possible for both defendants to be guilty); *Paul*, 217 F.3d at 998 (holding that the defendant's case was unlike a situation where a deprivation of due process occurs as a result of the prosecution's reliance upon factually inconsistent and irreconcilable evidence at the separate trials of different defendants for the same offense).

Similarly, the movant cannot plausibly contend that the government presented irreconcilably inconsistent arguments based on the evidence. *Cf. Jacobs v. Scott*, 513 U.S. 1067, 1069-70 (1995) (Stevens, J., dissenting) (arguing that certiorari should be granted

321

because the prosecutor formerly disavowed the petitioner's prior confession at the accomplice's trial); *Drake v. Kemp*, 762 F.2d 1449, 1470-79 (11th Cir. 1985) (Clark, J., concurring) (opining that inconsistent theories advanced at separate trials rendered the defendant's trial fundamentally unfair). When the government's specific arguments are considered, it is clear that the government maintained the same core theory about why the movant and Angela Johnson deserved the death penalty. The "government's theory in [the movant's] case was that [he] and [Angela] Johnson *acted in concert*, perhaps with varying degrees of direct involvement, in the killings of all five individuals," *United States v. Johnson*, 377 F. Supp. 2d 689, 693 (N.D. Iowa 2005), and, after the jury found that the movant was the principal offender, the government sought the death penalty for Angela Johnson on the theory that she aided and abetted the movant. So, the theories that the government advanced in the separate trials of the movant and Angela Johnson do not even slightly conflict with each other.

Although the government is unable to present mutually inconsistent core theories of the same case against different defendants, *see Smith*, 205 F.3d at 1051, the law permits the government to focus on the particular role of the defendant on trial, *see Higgs*, 353 F.3d at 326-27. When it focused on the conduct and motives of the movant during his trial and then focused on the conduct and motives of Angela Johnson during her trial, the government made arguments that are reconcilable and consistent with the same version of the facts that it presented in both cases. *Cf. Johnson v. United States*, 860 F. Supp. 2d 663, 836 (N.D. Iowa 2012) (concluding that "the prosecution did not paint different pictures of the same defendant in different trials, but emphasized the conduct of the defendant on trial in each case in a way that was entirely reconcilable with the description of the conduct of the other defendant in that defendant's trial"). Because the government legitimately emphasized inferences and factual conclusions that were possible in the

322

particular case that it was trying, it cannot be said that the government subverted in any way the truth seeking purpose of the movant's trial.

The evidence in both records establishes that the movant and Angela Johnson are extremely manipulative individuals. However, the evidence did not establish that one of them was more culpable or manipulative than the other or that Angela Johnson's propensities nullified the movant's propensities. Rather, the evidence reveals that their combined characteristics and propensities caused five individuals to be murdered. Because both criminal proceedings shared a common view of how the crimes occurred and do not differ in any fundamental way, the movant's due process claim fails. *See United States v. Fulks*, 683 F.3d 512, 523-25 (4th Cir. 2012) (deciding that the defendant's receipt of the death penalty comported with due process because the government, at best, presented an inconsistent argument and did not rely upon factual theories that were inconsistent at the core of its case); *Paul*, 217 F.3d at 998 (emphasizing that a deprivation of due process occurs only when the prosecution presents inconsistent theories and relies upon factually inconsistent and irreconcilable evidence at the separate trials of different defendants for the same offense); *Beathard v. Johnson*, 177 F.3d 340, 348 (5th Cir. 1999) (finding no due process violation where the prosecutor "presented essentially the same two versions of the facts" but offered inconsistent arguments); *Nichols v. Scott*, 69 F.3d 1255, 1268 (5th Cir. 1995) (deciding that no due process violation occurred where the prosecutor presented the same evidence in two different trials but argued each defendant was the primary shooter because the arguments amounted to "different interpretations of the same evidence"); *see also Bradshaw*, 545 U.S. at 190 (Thomas, J., concurring) ("This court has never hinted, must less held, that the Due Process Clause prevents a State from prosecuting defendants based on inconsistent theories.").

Further, if an error occurred as a result of the government's arguments based on the evidence, it is harmless beyond a reasonable doubt. Viewing the government's arguments

323

in light of the record as a whole, it cannot be said that they contributed to the sentencing verdicts, especially considering the murders of the children.  The evidence against the movant is damning, and a reasonable juror could find that the movant's conduct is death-worthy.

Regarding trial counsel's actions, the movant's bald assertions do not lead the court to conclude that a constitutional violation occurred.  *See Strickland*, 466 U.S. at 688-94. It is clear from the record that trial counsel fully investigated the movant's role and Angela Johnson's role in the murders and, if favorable evidence existed, they would have presented it.  However, none existed.  Further, the evidence that he points to is not consistent with and supportive of the defense that he presented during the merits phase and penalty phase of his trial.  Throughout all of his proceedings, the movant conveyed that he did not commit the murders.  Further, after blaming Timothy Cutkomp during his sentencing hearing in the 1996 case and then Angela Johnson and Terry DeGeus during the merits phase, the movant decided to blame his father during the penalty phase.  Trial counsel wisely attempted to shift the jury's focus off of the roles of the movant and Angela Johnson in the murders and onto the movant's upbringing and the possibility of redemption during the penalty phase.  Contrary to the movant's assertion, trial counsel is not required to make arguments during the penalty phase that are inconsistent with what they argued during the merits phase.  *See* ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 10.11, comment. (rev. ed. 2003) ("Consistency [between the merits phase and penalty phase presentations] is crucial because, as discussed in the Commentary to Guideline 10.10.1, counsel risks losing credibility by making an unconvincing argument in the first place that the defendant did not commit the crime, then attempting to show in the penalty phase why the client committed the crime.").  For purposes of the penalty phase, it would not have made sense to again shift his theory as to Angela Johnson's role, especially considering the jury squarely rejected his arguments

324

during the merits phase.  In addition, the court concludes beyond all doubt that not one juror would have voted for a life sentence absent trial counsel's actions.  Because he fails to establish either deficient performance or prejudice, the movant's contentions regarding trial counsel are without merit.

In light of the foregoing, it is evident that the alleged errors do not undermine confidence in the outcome.  Because the record does not demonstrate that a constitutional violation resulted from the government's presentation during the movant's trial and subsequent presentation during Angela Johnson's trial, no relief is justified.  Likewise, because the movant cannot demonstrate deficient performance by trial counsel or a reasonable probability of a different result if trial counsel had advanced the theories that he now deems more suitable, no relief on the basis of the Sixth Amendment is available.

### M.  Ground Thirteen — Constitutional Violations Occurred as a Result of the Admission of Evidence by the Parties' Stipulation

#### 1.  Arguments of the parties

##### a.  The movant

The movant claims that trial counsel rendered ineffective assistance because certain background facts admitted into evidence prior to the government's introduction of maps that described the location of the victims' bodies should have been presented in a different manner.  He disapproves of trial counsel's decision not to challenge the circumstances regarding the acquisition of the maps and the conclusions that Angela Johnson generated the maps.  More specifically, he faults trial counsel for allowing the government to present to the jury that the parties stipulated and agreed to the following:

> During August and September of 2000, Angela Johnson was in the Benton County Jail awaiting trial on federal criminal charges relating to the deaths of [Gregory] Nicholson, Lori Duncan, Kandi Duncan, Amber Duncan and Terry DeGeus.
>
> While in the Benton County Jail, Johnson became acquainted with a fellow inmate named Robert McNeese.  McNeese was

325

> and currently still is serving a federal sentence of life in prison on matters unrelated to the case.
>
> Johnson and McNeese discussed Johnson's case. As a ruse, McNeese told Johnson that she could escape responsibility for these deaths if McNeese could arrange to have some other inmate who was already serving a life sentence falsely claim responsibility for murdering the five victims.
>
> McNeese told Johnson that, in order to make the confession believable, the other inmate would need to be able to furnish proof of his involvement by leading authorities to the victims' bodies.
>
> Johnson prepared and provided to McNeese certain maps and notes describing the location where the bodies of the five victims were buried. McNeese then turned over these maps and notes, Government's Exhibits 310, 311, and 312, to Iowa law enforcement authorities.
>
> Exhibits 310, 311, and 312 have been analyzed at the Iowa DCI criminalistics laboratory. Both the fingerprint and handwriting analysts conclude that Angela Johnson authored, or could not be eliminated as authoring, Exhibits 310, 311, and 312.

Criminal docket no. 471 (stipulation); Trial Tr. at 2320. The movant asserts that such stipulation denied him the opportunity to assert lack of foundation for the maps to be admitted into evidence and precluded him from disputing the source and the authenticity of the maps.

The movant objects to trial counsel's decision because no evidence connected him to the maps and the parties' stipulation permitted the government to repeatedly rely on Angela Johnson's knowledge of the location of the bodies to infer that he also knew where the victims had been buried. In support of his objection, he points to a portion of the government's closing argument where it relied on a "guilt by association" tactic:

> In July of the year 2000, Dustin Honken's girlfriend, the mother of his daughter and the associate in his continuing

326

drug enterprise, Angela Johnson, was indicted and arrested for the murders of [Gregory] Nicholson, Terry DeGeus, Lori Duncan, Kandi Duncan, and Amber Duncan, and, within weeks after that arrest, while sitting in the Benton County Jail, was duped by a fellow inmate into drawing two maps, maps that located two graves in the country near Mason City, Iowa, two hidden, shallow graves, one of which held the body of Terry DeGeus, the other, a shallow grave holding the bodies of [Gregory] Nicholson, Lori Duncan, Kandi Duncan, and Amber Duncan.

Ladies and gentleman, that is an outline of the government's case, the circumstantial evidence, the series of occurrences, the chain of circumstances from which there is one logical, one reasonable conclusion: That Dustin Honken and Angela Johnson together murdered these five people.

Trial Tr. at 3216-17. He also points to the government's summation where it called upon the jury to find him guilty based on the maps and argued that his guilt could be established as a result of Angela Johnson's guilt. *Id*. at 3256-57, 3273, 3287, 3391.

Further, the movant states that trial counsel should have sought the testimony of Robert McNeese to explain how the government obtained the maps that described the locations of the five bodies. He argues that trial counsel's decision cause him to forfeit the opportunity to confront Robert McNeese, cross-examine him and bring to the jury's attention a number of important issues. Specifically, he emphasizes that trial counsel unreasonably elected not to explore whether Angela Johnson actually generated the maps, whether Robert McNeese previously cooperated with the government and presented false evidence, whether Robert McNeese benefitted from his extensive cooperation with the government[47] and whether Angela Johnson responded to Robert McNeese's advances

---

[47] Although he was serving a life sentence at the time of the movant's trial, Robert McNeese received a reduction of his sentence for his cooperation in earlier unrelated cases. *See generally United States v. Johnson*, 196 F. Supp. 2d 795, 802-06 (N.D. Iowa (continued…)

during their relationship. He explains that, unlike a situation where a witness's testimony would have highlighted damning evidence, *see United States v. Toms*, 396 F.3d 427, 433 (D.C. Cir. 2005), rigorous cross-examination of Robert McNeese would have called into question his credibility.

As to the handwriting and fingerprint analysts, the movant contends that, by entering into the stipulation, he lost the opportunity to challenge their unreliable opinions as to who authored the maps. The movant contends that the analyst's handwriting opinion is based on "junk" science and that it, as well as the analyst's fingerprint opinion, is subject to being challenged based on a 2009 report from the National Academy of Sciences, that is, *Strengthening Forensic Science in the United States: A Path Forward* (2009). With respect to such report, the movant highlights two conclusions: (1) the scientific basis for handwriting comparisons needs to be strengthened and (2) claims of absolute confidence in fingerprint identification are unjustified in light of the many ways in which fingerprint testimony is subject to being challenged.

In addition, the movant states that trial counsel unreasonably gave up hearsay objections when entering into the stipulation. Namely, the movant points out that trial counsel would have been able to object to Robert McNeese's potential testimony that Angela Johnson told him what the maps represented and there would have been a basis to object to the potential testimonial hearsay of the handwriting and fingerprint witnesses. The movant asserts that case law provided a basis for objecting to the testimonial hearsay of the handwriting and fingerprint witnesses. He cites *Crawford*, 541 U.S. at 51-52, in support of his proposition that the use of testimonial hearsay without the opportunity for cross-examination violates the Constitution.

---

[47](…continued)
2002), *rev'd*, 338 F.3d 918 (8th Cir. 2003).

328

The movant maintains that, although trial counsel fully recognized the damaging impact of the maps and their significance to the government's case and vigorously challenged their admissibility, *see* Trial Tr. at 2342-61, they unreasonably elected not to challenge the admissibility and the credibility of the potential testimony that provided the context, background, meaning and authenticity of the maps. He observes that "[t]here are few subjects . . . upon which [the courts] have been more nearly unanimous than in the expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." *Lee v. Illinois*, 476 U.S. 530, 540 (1986). And, he observes that a defendant may waive confrontation rights by stipulating to the admission of evidence only if "it can be said that the attorney's decision was a legitimate trial tactic or part of a prudent trial strategy." *United States v. Stephens*, 609 F.2d 230, 232-33 (5th Cir. 1980); *see also Phillips v. Wyrick*, 558 F.2d 489, 496-97 (8th Cir. 1977) (suggesting that "[a] waiver of the confrontation right must be effected personally by an accused who is acting intentionally and knowledgeably"). Given the record, the movant argues that no sound strategic or tactical reason supports trial counsel's decision to enter into the stipulation and their decision prejudiced his defense.

The movant also contends that appellate counsel should have raised a claim based on trial counsel's decision to stipulate to the admission of evidence concerning who authored the maps and how they were acquired. He presses that admitting evidence through the parties' stipulation constitutes plain error, and, consequently, it should have been raised as such. The movant acknowledges that appellate counsel argued that the trial court violated the Sixth Amendment and the Federal Rules of Evidence when it admitted the maps, but he protests appellate counsel's failure to challenge the admissibility of the hearsay statements that are contained in the stipulation. He states that no strategic or tactical reason explains appellate counsel's decision and the Eighth Circuit Court of

329

Appeals certainly would have granted relief if appellate counsel had raised a confrontation error.

### b.     The government

When countering the movant's claim that there was much to be gained from having the jury consider certain facts through testimony rather than stipulation, the government calls attention to the fact that the movant personally signed the stipulation and contends that relying on hindsight is not enough to establish a constitutional violation. In addition, the government points out that the movant's allegations illuminate a fundamental misunderstanding of the case. It states that the circumstantial evidence surrounding Angela Johnson's arrest, the production of the maps and the discovery of the bodies of the five victims overwhelmingly demonstrates that Angela Johnson knew the location of the bodies and drew the maps. It also states that the movant fails to show other evidence establishes that someone other than Angela Johnson could have known where the bodies were buried or someone other than Angela Johnson authored the maps while in the Benton County Jail.

As to the movant's specific criticism of Robert McNeese, the government claims that attacking his credibility would serve no purpose because absolutely no evidence indicates he or someone else at the Benton County Jail knew the location of the victims' bodies as a result of first-hand information or second-hand information obtained from a source other than Angela Johnson. And, it claims that, even if the parties had not stipulated to the circumstances regarding the acquisition of the maps, the evidence establishes that Angela Johnson was the source of the maps. The government maintains that it did not need to rely on Robert McNeese to admit the maps because all it had to do was introduce evidence showing: (1) Angela Johnson was the movant's girlfriend; (2) Angela Johnson purchased a firearm weeks before the murders; (3) Angela Johnson was arrested for the murders on July 30, 2000; (4) Angela Johnson was placed in the Benton County Jail; (5) no other inmates from Mason City, Iowa, were housed in the

330

Benton County Jail; (6) another inmate, Robert McNeese, was placed in the Benton County Jail while Angela Johnson was there; (7) the maps were seized from such inmate, who cooperated with the government, approximately two months after Angela Johnson was placed in the Benton County Jail; and (8) law enforcement relied upon the maps to discover the victims' bodies. The government emphasizes that, in light of the facts, it was a foregone conclusion that Angela Johnson was the source of the maps.

Further, the government argues that, even if Robert McNeese was necessary to lay the foundation for the admission of the maps, there are legitimate reasons that justify the jury's consideration of certain facts by stipulation of the parties. The government contends that trial counsel strategically chose to stipulate to the admission of certain facts because any attempt to challenge the admissibility and credibility of the potential testimony would have jeopardized their credibility with the jury. Aside from the risk of trial counsel losing credibility with the jury, the government alleges that it is likely that Angela Johnson's damaging statements about the movant could have been presented to the jury if Robert McNeese had been called to testify. The government argues that, because Robert McNeese could have been difficult to control, trial counsel reasonably avoided the risk of him disclosing more damaging evidence. Moreover, it asserts that the relationship between Angela Johnson and Robert McNeese and the relationship between Robert McNeese and the government is not central to the case against the movant. So, the government advances that it is not appropriate to fault trial counsel for failing to focus on tangential issues that did not directly involve the movant or that had less potential to benefit the movant.

As to the movant's assertion that trial counsel failed to cast doubt on the conclusions of the fingerprint analyst and handwriting analyst, the government contends that bare assertions are insufficient to show a deprivation of the right to counsel. It asserts that the movant does not identify anything that demonstrates the forensic evidence was inadmissible

331

or subject to being successfully challenged. It states that merely alleging that trial counsel might have been able to raise doubt about who generated the maps does not demonstrate that they performed deficiently.

For similar reasons, the government contends that the movant suffered no prejudice as a result of anything trial counsel did or failed to do. It maintains that, even if trial counsel could somehow impugn the credibility of Robert McNeese or the conclusions of the analysts, they were still incapable of presenting any evidence that demonstrates someone other than Angela Johnson drew the maps that showed the location of the victims' bodies, and, consequently, the stipulation had no impact on the outcome of the movant's trial.

### 2. *Analysis*

It is clear "that '[j]udicial scrutiny of a counsel's performance must be highly deferential' and that 'every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Bell*, 535 U.S. at 698 (quoting *Strickland*, 466 U.S. at 689); *see also King*, 595 F.3d at 852-53 (emphasizing that the reasonableness of counsel's conduct must be judged at the time it occurred). Because the movant merely relies on hindsight to criticize trial counsel for stipulating to certain facts and ignores the evidence that establishes beyond all doubt that Angela Johnson was the source of the maps, this claim is without merit.

In light of the record, trial counsel's failure to proceed without stipulating cannot be described as a serious mistake or as falling outside the bounds of normal competency. This is especially so because there were discernible strategic bases for trial counsel's decision to stipulate to certain facts. Indeed, it is not difficult to conclude that the movant benefitted by entering into the stipulation because it prevented the government from presenting damaging evidence through witnesses. On the other hand, very little could be

332

gained by drawing more attention to Angela Johnson's nefarious conduct, including her ill-conceived scheme to let another individual falsely accept responsibility for the murders.

Contrary to the movant's assertions, there do not appear to be any valid reasons that support the movant's current position. Considering all of the evidence, the only reasonable conclusion was that Angela Johnson knew the location of the victims' bodies because she and the movant murdered the victims and disposed of their bodies. The government was so confident of such conclusion that it opted to prosecute Angela Johnson for each of the murders even though it did not have the maps and had not discovered the victims' bodies. Considering that the movant could not credibly dispute that he did not know where the victims' bodies were buried or that he did not kill the victims, it would have made no difference if trial counsel attacked the credibility of Robert McNeese or the conclusions of the analysts.

Further, objecting would have been fruitless. The evidence was admissible as statements of a co-conspirator under Federal Rule of Evidence 801(d)(2)(E). *See United States v. Shyres*, 898 F.2d 647, 657 (8th Cir. 1990). And, because the movant knowingly and voluntarily signed the stipulation, it cannot be argued that a constitutional violation occurred. *See United States v. Moore*, 651 F.3d 30, 71 n.13 (D.C. Cir. 2011) (concluding that a report admitted into evidence pursuant to a stipulation raises no Confrontation Clause issue); *United States v. Robinson*, 617 F.3d 984, 989-90 (8th Cir. 2010) (holding that a defendant's acquiescence in his counsel's stipulation can be presumed if such defendant does not make his objection known); *Loggins v. Frey*, 786 F.2d 364, 367-68 (8th Cir. 1986) (concluding that no constitutional violation occurred when the petitioner acquiesced in counsel's strategic decision to stipulate to certain facts).

Based on the foregoing, the court concludes that relief is not justified on any of the movant's allegations. The informed tactical choices of trial counsel demonstrate much more than the reasonable competence which is "expected of the 'ordinary fallible lawyer.'"

333

*White v. Helling*, 194 F.3d 937, 941 (8th Cir. 1999) (quoting *Nolan v. Armontrout*, 973 F.2d 615, 618 (8th Cir. 1992)).  Given the circumstances that trial counsel confronted, it makes absolutely no sense to second-guess their decisions.  This is true in spite of the lost opportunity to object to or to inquire about particular issues.  Because none of the movant's allegations regarding trial counsel demonstrate either deficient performance or prejudice, the court concludes that no constitutional violation occurred.  *See Strickland*, 466 U.S. at 688-94.  Similarly, appellate counsel's performance exceeded constitutional requirements.  Appellate counsel is not required to raise frivolous arguments, and any challenge regarding the admissibility of the hearsay statements that are contained in the stipulation assuredly would have detracted from the other claims raised on direct appeal. *See Roe*, 160 F.3d at 418 ("The decision to forgo a plain error claim is usually the result of a reasonable winnowing of weaker appellate claims.").

### N.  Ground Fourteen — Constitutional Violations Occurred as a Result of the Admission of Testimony About Drugs and Threats of Violence

### 1.  Arguments of the parties

#### a.  The movant

The movant asserts that his constitutional rights were violated when the government elicited inadmissible testimony from Scott Gahn.  The movant points to three instances where the government asked questions that indicated he distributed drugs prior to the period of time surrounding the original case that the government dismissed (1991 to 1993) and the period of time surrounding the seventeen charges he faced in this case (1992 to 2000).  With regard to the government's direct examination of Scott Gahn, the movant asserts that the trial court sustained two of his objections on the basis that the testimony was too remote to be relevant because it related to events that occurred at some point in 1988, 1989, 1990 or 1991, but probably before 1991.  *See* Trial Tr. at 188-90, 192-94. He also points out that, after sustaining his objections, the trial court instructed the jury

334

to disregard any testimony of drug activity that pertained to a time frame earlier than 1991. *See* Trial Tr. at 190, 193-94, 204-05. As to the third instance, the movant complains that, despite the fact that the trial court excluded some of Scott Gahn's testimony, including that the movant asked him if he knew anyone who could sell some cocaine and that he owed the movant for some cocaine he did and it would be dangerous to shortchange the movant, trial counsel did not object to Scott Gahn's testimony on redirect examination. Specifically, he dislikes that the government asked Scott Gahn how he knew it to be true that the movant was emphatic, insistent and almost desperate when he was looking for Gregory Nicholson and Scott Gahn responded:

> There were two times that [the movant] ever made me real nervous, and you get that gut feeling where you know something's a little bit off. One was when he told me to pay up for the money—pay him the money for the coke that I did. I had a little feeling that if I didn't pay this guy his money, it could be bad news. I had that same feeling the afternoon he was in my club looking for [Gregory] Nicholson, and I know that's all opinion or whatever, but that's how I know.

Trial Tr. at 225-26. The movant contends that, as a result of the government's question on redirect examination and trial counsel's failure to object, the jury heard improper evidence about his prior distribution of cocaine and threat of violence.

Concerning his first assertion of constitutional error, the movant claims that the government's misconduct deprived him of a fair trial. The movant maintains that principles of due process prevent a prosecutor from soliciting statements that he knows, or should know, are inadmissible and require a prosecutor to warn a witness not to make statements pertaining to a prohibited subject. The movant claims that, although a prosecutor's duties are well-established, it is apparent from the record that the government deliberately asked a question on redirect examination that it knew, or should have known, would evoke the same answer the trial court previously ruled inadmissible. Therefore, the

335

movant claims that a violation of his right to due process occurred. He stresses that the government's decision to elicit prohibited testimony on a third occasion establishes that it deliberately flouted the trial court's prior rulings. *See United States v. Whimpy*, 531 F.2d 768, 771 (5th Cir. 1976) ("We refuse to countenance the conduct of the prosecutor in . . . conducting the rebuttal examination in a way which was in direct conflict with the ruling of the court."); *see also United States v. Robinson*, 774 F.2d 261, 277-78 (8th Cir. 1985) (finding that the district court did not abuse its discretion in denying a mistrial where the prosecutor's improper questions were inadvertent and stemmed from the prosecutor's confusion of the dates involved and the district court gave a thorough cautionary instruction); *United States v. Haley*, 452 F.2d 391, 396 (8th Cir. 1971) ("[W]hen the government deliberately engages in prejudicial proof it may be estopped to deny the prejudicial effect on the jury regardless of the strength of its case.").

Aside from the government's improper conduct, the movant declares that a constitutional violation occurred when he was deprived of competent counsel. He states that, at a minimum, trial counsel unreasonably failed to object and should have asked the trial court to give a curative instruction. *See United States v. Wadlington*, 233 F.3d 1067, 1077-78 (8th Cir. 2000) (concluding that the prosecutor's question was improper but the defendant suffered no prejudice where counsel objected and the court sustained the objection and provided instruction to the jury); *Robinson*, 774 F.2d at 277 (finding no prejudice where the government merely asked an improper question and defense counsel objected). The movant maintains that, in light of trial counsel's opposition to having the jury hear any evidence of his distribution of drugs prior to 1991, there is no strategic reason that explains trial counsel's failure to object to the third instance where Scott Gahn alluded to a prohibited subject.

Further, the movant asserts that trial counsel failed to properly raise this claim in his motion for judgment of acquittal or, in the alternative, for a new trial. The movant

336

acknowledges that trial counsel claimed post-trial that Scott Gahn evaded the trial court's evidentiary rulings when testifying about who used drugs but argues that they should have pointed the trial court to the occasion on redirect examination where the government asked a question that evaded the trial court's evidentiary ruling and the answer suggested that he distributed drugs prior to 1991. *See Honken*, 381 F. Supp. 2d at 1002-05. He argues that, had trial counsel done so, the trial court would not have concluded that he failed to cite to anything in the record in support of his claim regarding Scott Gahn. *Id*.

The movant proclaims that he suffered prejudice as a result of trial counsel's failures. Namely, he argues that the improper testimony offered by Scott Gahn prejudiced him because it was irrelevant to the crimes charged, it constituted improper propensity testimony and it impermissibly bolstered Scott Gahn's assertions about his behavior on the day that Gregory Nicholson disappeared. *See Manning*, 310 F.3d at 576-77 (finding counsel's failure to object to admission of evidence constitutionally deficient). Stated differently, the movant disapproves of the jury's consideration of testimony that implied he distributed drugs during the charged conspiracy because he distributed drugs prior to 1991 (propensity) and the jury's consideration of testimony that compared how Scott Gahn felt on two separate occasions—the day when the movant asked Scott Gahn to pay a drug debt and the day when the movant was in Scott Gahn's club looking for Gregory Nicholson (bolstering). He states that the propensity evidence offered by the government via Scott Gahn's testimony cannot support his convictions because it has nothing to do with the story or narrative of his case. *See Old Chief v. United States*, 519 U.S. 172, 180-92 (1997) (holding that, if the point to be proved is abstract or has nothing to do with the story of the case and does not address issues such as knowledge or intent, it is an abuse of discretion under Federal Rule of Evidence 403 to refuse a defendant's offer to stipulate to his status as a felon). *But see United States v. Dorsey*, 523 F.3d 878, 880 (8th Cir. 2008) (observing that the holding in *Old Chief* is narrow in that it is limited to cases involving proof of felon

337

status).  With respect to bolstering, the movant states that the government emphasized during its closing argument that he desperately wanted to find Gregory Nicholson.  *See* Trial Tr. at 3231.  He advances that Scott Gahn's testimony is significantly less credible if the prohibited subject is omitted and, consequently, it is reasonably likely that the jury would have discounted Scott Gahn's testimony about meeting with him during the charged conspiracy.

The movant's third assertion of error pertains to his constitutional right to be free from cruel and unusual punishment.  The movant states that the jury was improperly allowed to consider additional bad acts when balancing the competing factors during the penalty phase.  He contends that the government's question undermined his right under the Eighth Amendment to heightened reliability in the capital sentencing determination.  *See Caldwell*, 472 U.S. at 323 (emphasizing that there is a heightened "need for reliability in the determination that death is the appropriate punishment in a specific case"); *see also Woodson*, 428 U.S. at 304 (observing that particularized consideration of relevant aspects of the character and record of each convicted defendant and the circumstances of the particular crime is a constitutionally indispensable part of the process of inflicting the penalty of death).

Finally, the movant contends that appellate counsel should have raised on direct appeal the government's misdeed because his due process claim arguably had merit.  He proclaims that appellate counsel should have presented the due process violation as a plain error and, if they had, the Eighth Circuit Court of Appeals would have vacated the convictions and/or vacated the sentences of death.  *See Johnson*, 495 F.3d at 979-80 (concluding that, although the prosecution's remarks strayed beyond the bounds of permissible argument, they did not constitute plain error).  Because they failed to raise an arguably meritorious claim on direct appeal, the movant argues that appellate counsel provided ineffective assistance.

338

### b.      *The government*

The government resists the grant of relief based on due process, ineffective assistance of counsel and sentencing grounds.  Regarding the assertion that the movant did not receive a fair trial, the government contends that it did not engage in misconduct when questioning Scott Gahn on redirect examination.  The government argues that, if the full context of the questioning and the form of the question are considered, it cannot be said that it knew or should have known that Scott Gahn would answer in the manner that he did.  The government asserts that, by asking Scott Gahn how he knew it was true that, on the night Gregory Nicholson disappeared, the movant was emphatic, insistent and almost desperate when he was looking for Gregory Nicholson, it could not have anticipated that Scott Gahn would testify about feeling apprehensive or nervous on an occasion when he owed the movant for "coke" and thought about the consequences of not paying the movant. Further, the government states that, in the context of evidence that established the movant distributed pounds of pure methamphetamine and murdered three adults and two little girls, the passing comment about a past drug debt is inconsequential.

As to trial counsel, the government maintains that their performance did not fall below an objective standard of reasonableness and no prejudice ensued from Scott Gahn's passing comment.  It states that trial counsel did object to the admission of evidence of drug activity outside the charged conduct and, as a result of objecting, the trial court gave curative instructions.  *See United States v. Johnston*, 353 F.3d 617, 623 (8th Cir. 2003) (assuming that a jury will follow a curative instruction because the record did not show otherwise and finding that admonishment to the jury adequately protected the defendant from having the jury consider improper testimony); *United States v. Encee*, 256 F.3d 852, 854 (8th Cir. 2001) (deciding that a curative instruction was sufficient because substantial evidence supported the defendant's conviction).  In addition, the government argues that the failure to object to one remark cannot be viewed as unreasonable because the case

339

predominantly concerned whether the movant murdered five individuals, an objection had the potential of drawing more attention to the evidence or antagonizing the jury and trial counsel may have reasonably decided to trust the jury to remember and follow the trial court's instructions to disregard testimony of drug activity that occurred earlier than 1991. *See United States v. Caver*, 470 F.3d 220, 244 (6th Cir. 2006) (concluding that the lack of a limiting instruction is not a valid basis for relief because it was apparent that counsel did not want to draw attention to the improper statement); *United States v. Allison*, 59 F.3d 625, 629 (7th Cir. 1995) (finding that the "failure to object to a single improper statement does not establish objective deficiency, particularly where it may have been sound trial strategy to let the comment pass rather than draw additional attention to it"). Further, the government asserts that trial counsel properly raised the issue in a post-trial motion, which the trial court addressed on the merits. *See Honken*, 381 F. Supp. 2d at 1002-05.

As to prejudice, the government contends that it is absurd to claim that Scott Gahn's passing comment would have changed the outcome of the movant's trial. It states that the movant's conjecture about the result that the jury might have reached at either the merits phase or penalty phase belies common sense, especially considering that Scott Gahn was one of fifty-four witnesses who testified during a lengthy case and the jury indicated it had no residual doubt about the movant's guilt. And, aside from arguing that the evidence unquestionably showed he brutally killed five individuals, including two little girls, while engaging in a continuing criminal enterprise, the government argues that the movant suffered no prejudice because the evidence was admissible, even though the trial court ruled otherwise. It states that, when evidence is an integral part of the immediate context of the charged conduct, it is admissible. *See United States v. O'Dell*, 204 F.3d 829, 833 (8th Cir. 2000) (observing that "crimes or acts which are 'inextricably intertwined' with the charged crime are not extrinsic and Rule 404(b) does not apply"); *United States v. Rolett*, 151 F.3d 787, 790-91 (8th Cir. 1998) (concluding that the government is not

340

precluded from introducing evidence concerning the nature and extent of an enterprise engaged in racketeering even though such evidence is not similar to evidence concerning conspiracy to commit murder); *United States v. Moore*, 735 F.2d 289, 292 (8th Cir. 1984) ("A jury is entitled to know the circumstances and background of a criminal charge."). And, it offers that, even if it does not qualify as admissible intrinsic evidence, the jury properly considered the evidence as proof of the relationship between the movant, Scott Gahn and Gregory Nicholson and as proof of the movant's intent to enter into a conspiracy to distribute and manufacture methamphetamine. *See Rolett*, 151 F.3d at 791 (deciding that the district court did not abuse its discretion in admitting bad acts evidence under Federal Rule of Evidence 404(b)); *United States v. Shoffner*, 71 F.3d 1429, 1432-33 (8th Cir. 1995) (concluding that the admission of evidence pursuant to Federal Rule of Evidence 404(b) was proper because it was relevant to a material issue, higher in probative value than prejudicial effect and similar in kind and close in time to the crime charged).

### 2. *Analysis*

It is true that the prosecution's duty "is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935); *accord Agurs*, 427 U.S. at 111 (stating that it is the "prosecutor's obligation to serve the cause of justice"). It is also true that, in light of such duty, a prosecutor must proceed carefully when considering what questions to ask and when asking questions. *See Whimpy*, 531 F.2d at 771-72 & n.6 ("It is clearly improper for the prosecuting attorney to ask questions eliciting facts and evidence which are inadmissible and prejudicial."); *see also Wadlington*, 233 F.3d at 1078 (finding that the prosecutor not only sought inadmissible information but actually conveyed that information to the jury through the form of the question); *United States v. Johnston*, 127 F.3d 380, 394-96 (5th Cir. 1997) (finding that the prosecutor's questions constituted misconduct because the questions were designed to elicit otherwise inadmissible hearsay testimony of informants and law enforcement officials). However, contrary to the

341

movant's assertions, absolutely nothing in the record indicates the government engaged in misconduct. Because the government asked a question that did not directly refer to a prohibited subject and because the trial court instructed the jury to disregard testimony of drug activity that pertained to a time frame earlier than 1991, the movant's substantial rights were not affected and he was not denied a fair trial. *See Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor."); *United States v. LaFuente*, 54 F.3d 457, 462 (8th Cir. 1995) (concluding "that any prosecutorial overreaching, in the context of the whole trial, did not affect the verdict"). Considering not only the alleged misconduct but also the totality of the evidence and the overall conduct of the government during trial, the court does not find that the alleged error "fatally infected," *LaFuente*, 54 F.3d at 462, the movant's trial or resulted in a miscarriage of justice. It is clear from the record that any error was harmless beyond a reasonable doubt.

Furthermore, the movant's contentions are foreclosed by the trial court's previous findings. When addressing the movant's motion for judgment of acquittal or, in the alternative, for a new trial, the trial court considered all of Scott Gahn's testimony. The order denying post-trial relief, in relevant part, states:

> The court also finds no "miscarriage of justice" in the admission of any of Mr. Gahn's actual testimony. *See* Fed. R. Crim. P. 33(a) (providing for a new trial "if the interest of justice so requires"); [*United States v. Campos*, 306 F.3d 577, 579 (8th Cir. 2002)] (interpreting the "interest of justice" requirement of Rule 33(a) to require a showing of a "miscarriage of justice"). There is absolutely no evidence that the government ever misused testimony from Mr. Gahn to appeal to the passions and prejudices of the jury, in defiance of any ruling by the court. To the extent that the court admitted evidence of Honken's drug dealing prior to 1993 to put in context the relationship between and among Honken,

342

Gahn, and Nicholson, that evidence was plainly admissible. *See, e.g.*, *United States v. Holliman*, 291 F.3d 498, 502 (8th Cir. 2002) (evidence of a prior bad act may be admissible as intrinsic evidence to show the full context of the crime charged), *cert. denied*, [537 U.S. 1137] (2003); *United States v. Carroll*, 207 F.3d 465, 468 (8th Cir. 2000) (same). Moreover, the court sustained Honken's objections to some of Gahn's testimony about Honken's drug activity prior to 1991, which the court found was not probative to show the context of the relationship between Honken and Nicholson. Although Honken's counsel expressed concern during the trial that there was a problem with the "cumulative effect" of Mr. Gahn's testimony about Honken's drug activities prior to 1993, even where the court had sustained objections to some of that testimony, the court cannot find that Honken suffered any unfair prejudice from Mr. Gahn's testimony, where there was voluminous evidence of Honken's drug activities before and after 1993.

Finally, there was overwhelming evidence from multiple witnesses and exhibits concerning Honken's methamphetamine manufacturing and distribution. Thus, admitting testimony that Honken used or distributed cocaine would clearly be harmless error. *See* [*United States v. Mack*, 343 F.3d 929, 935 (8th Cir. 2003)] (evidentiary rulings that are an abuse of discretion will not require reversal of the conviction if the error was harmless); [*United States v. Crenshaw*, 359 F.3d 977, 1003-04 (8th Cir. 2004)] ("An evidentiary error is harmless 'if, after reviewing the entire record, we determine that the substantial rights of the defendant were unaffected, and that the error did not influence or had only a slight influence on the verdict.'" (quoting *Carroll*, 207 F.3d at 470)).

*Honken*, 381 F. Supp. 2d at 1004-05. Nothing now offered by the movant alters those findings.

So, just as the trial court did before, the court finds that the movant received a fair trial. The government properly asked a follow-up question after: the trial court agreed that

343

it could show the context in which the relationship between and among Scott Gahn, the movant and Gregory Nicholson developed, *see* Trial Tr. at 199-203; trial counsel inquired as to whether Scott Gahn bought cocaine from Gregory Nicholson as well, *id*. at 213-14; trial counsel asked if Scott Gahn collected money for people who were dealing drugs, *id*. at 216-17; and trial counsel solicited from Scott Gahn that, although he had told the grand jury in 1993 that the movant conveyed to him that he wanted to talk to Gregory Nicholson, he now maintained that the movant was emphatic, insistent and almost desperate when he came around looking for Gregory Nicholson, *id*. at 225. *See United States v. Thomas*, 593 F.3d 752, 758-59 (8th Cir. 2010) (observing that the admission of evidence of other crimes requires reversal only when such evidence had no bearing on the case and was introduced solely to prove the defendant's propensity to commit criminal acts); *United States v. Trogdon*, 575 F.3d 762, 766 (8th Cir. 2009) (same); *Wadlington*, 233 F.3d at 1078 (recognizing that the government "may use evidence on 'redirect examination to clarify an issue that was opened up by the defense on cross-examination—even when this evidence would otherwise be inadmissible'" (quoting *United States v. Braidlow*, 806 F.2d 781, 783 (8th Cir. 1986))). The actual question—"How do you know that to be true?"—did not convey any information to the jury, and Scott Gahn's fleeting response did not deprive the movant of his constitutional right to due process, especially considering that there was very little exculpatory evidence presented in a lengthy trial.

For similar reasons, the court finds that the movant's assertions regarding trial counsel and appellate counsel and assertions regarding the jury's sentencing determination are meritless. Trial counsel acted reasonably and nothing they did or failed to do prejudiced the movant's defense. The court is unable to conclude that they unreasonably responded to the single comment made by Scott Gahn, especially considering that: (1) the lack of emphasis on such comment lessened the likelihood of drawing the jury's attention to it; (2) substantial evidence established the movant distributed large quantities of

344

marijuana prior to distributing methamphetamine, *see, e.g.*, Gov. Trial Ex. 27 at 6-8; and (3) other factors led Scott Gahn to think his encounter with the movant at Scott Gahn's club was strange. In addition, on this record, the court is unable to conclude that the jury ignored the trial court's verbal instructions. And, even if they did consider Scott Gahn's comment, it is clear that any error had no impact on the outcome because overwhelming evidence supported all of the jury's findings. *See Sinisterra*, 600 F.3d at 909-12 (concluding that, despite counsel's failure to object to the prosecution's improper arguments, no prejudice existed because substantial evidence supported the jury's findings and it could not be shown that the movant would have received something less than a sentence of death in light of the evidence). Likewise, appellate counsel did not violate the movant's constitutional right to counsel when they failed to appeal the government's "misdeed." *Id.* at 912 (concluding that no Fifth Amendment violation occurred as a result of counsel's failure to appeal prosecutorial misconduct because there was not a reasonable probability that the jury would have returned with a different sentence).

In sum, the record demonstrates that the movant received a fair trial and competent counsel at the trial level and appellate level. The court's confidence in the movant's convictions and sentences is not diminished in the least by anything that the government did; the court remains firmly convinced of the integrity of the proceedings. And, the record refutes the movant's allegation that trial counsel's representation was lacking or appellate counsel's decision to argue issues unrelated to Scott Gahn's testimony was unconstitutional. Therefore, relief on this ground is not warranted.

### O. Ground Fifteen — Constitutional Violations Occurred as a Result of the Admission of Testimony About Bad Acts

The movant alleges that the jury improperly considered evidence pertaining to his attempted escape from the Woodbury County Jail. He takes issue with the government's introduction of detailed, extensive, unnecessary and marginally relevant evidence of his

345

attempted escape to obtain a conviction on count 6 (soliciting Dean Donaldson and Anthony Altimus to murder Timothy Cutkomp) and count 7 (conspiracy to tamper with witnesses and to solicit the murder of witnesses). He states that the attempted escape evidence served the improper purpose of showing his propensity to commit crimes and it should have been excluded as improper character evidence under Federal Rule of Evidence 404(b). In addition, he states that any probative value of the attempted escape evidence was substantially outweighed by the prejudicial effect of such evidence, and, therefore, it should have been excluded under Federal Rule of Evidence 403. The government disputes that relief is warranted.

### 1. *Background regarding the escape evidence*

Before trial, the trial court addressed trial counsel's request to exclude evidence of the movant's attempted escape from the Woodbury County Jail. *See* criminal docket nos. 288, 297, 323). The trial court summarized the parties' arguments as follows:

> Honken contends that evidence that he attempted to escape from the Woodbury County Jail does not make it more or less likely that he committed the offenses charged in this case and, therefore, is not relevant. Moreover, he contends that such evidence is not admissible under Rule 404(b), because it is irrelevant, does not involve any conduct similar to the crimes charged, and is not "intrinsic" evidence of the crimes charged. He also contends that there is insufficient evidence of escape to warrant misdirecting the jury into a "minitrial" on his alleged escape attempt, because, for example, he was never charged with the crime of escape nor was he even charged with violating a jail rule on the basis of the alleged attempted escape. Honken also suggests that the potential prejudice of such irrelevant or marginally probative evidence is so substantial as to warrant exclusion of the evidence, because it suggests that he is "dangerous," when no tribunal found that he had attempted to escape. Honken contended at oral arguments that the government is not putting the purported escape attempt in the proper factual context and

346

> is not pointing to substantial evidence of a real escape attempt *by Honken*.
>
> > The government contends that the evidence of Honken's attempted escape is relevant and admissible, because Honken told several inmates that one of his goals in escaping was to kill witnesses, a prosecutor, and certain law enforcement officers, and to continue his drug-trafficking activities. Thus, the government argues that evidence of the escape attempt is "intrinsic" evidence on Counts 6 and 7. The government also contends that the evidence is admissible under Rule 404(b) to show Honken's motive, intent, preparation, and plan on those charges, and should be admissible in the penalty phase as proof of his future dangerousness. At oral arguments, the government opined that the focus of its evidence about the escape wold not be minute details of the manner in which it was attempted, but the statements that Honken made to other inmates about the goal of such an escape.

*United States v. Honken*, 378 F. Supp. 2d 970, 1001 (N.D. Iowa 2004).

As to the merits of those arguments, the trial court agreed with the government that the evidence of the movant's attempted escape was inextricably intertwined with the charge of soliciting Dean Donaldson and Anthony Altimus to murder witnesses and the charge of conspiring to tamper with witnesses and to solicit the murder of witnesses, and it observed that such evidence had probative value as evidence of consciousness of guilt. *Id*. at 1002. In addition, the trial court determined that evidence of the attempted escape was admissible because it demonstrated the movant's intent, plan and motive to kill witnesses and pursue drug-trafficking activities. *Id*. (relying on Fed. R. Evid. 404(b)). When ultimately deciding whether to admit or exclude the attempted escape evidence, the trial court found that the substantial probative value of the evidence was not outweighed by any unfair prejudice, confusion of the issues, undue delay or waste of time. *Id*. at 1003 (relying on Fed. R. Evid. 403). It found that, because the evidence was neither weak nor uncertain and fairly suggested he was dangerous, the potential for unfair prejudice arising from any

347

inference of dangerousness that the jury could draw from the evidence was much less than the movant asserted. *Id*. The trial court also reasoned that the dangers of confusion of the issues, undue delay or waste of time did not outweigh the substantial probative value of the attempted escape evidence where the government represented that it only intended to introduce evidence that addressed the movant's objectives after escaping and the movant suggested that he intended to broaden the inquiry into the attempted escape in an effort to undermine the government's allegations. *Id*.

Consistent with the trial court's pre-trial evidentiary ruling, the government introduced evidence in support of its theory that the movant attempted to escape because he believed that he would not have to serve any time in prison if he killed certain witnesses. Specifically, the government introduced exhibits, including twenty-five photographs, and called three witnesses: Dennis Putzier, Terry Bregar and Dennis Frye. Dennis Putzier testified that he managed to break a hole in an outside wall that was next to the movant's cell block. Trial Tr. at 287-88, 1297-1306. Dennis Putzier communicated with the movant through a door that provided access between their cell blocks. *Id*. at 1288-89. After learning that Dennis Putzier had broken through the bricks in his cell, the movant asked Dennis Putzier whether he could participate in the escape. *Id*. at 1292, 1303-06, 1315-1320. Dennis Putzier and the movant agreed that, if the movant could get into Dennis Putzier's cell block, Dennis Putzier would help the movant escape in exchange for money and drugs. *Id*. at 1288. Dennis Putzier understood that the movant wanted to get out of the Woodbury County Jail to harm witnesses, including Timothy Cutkomp. *Id*. at 1287-88, 1298-99. Terry Bregar testified that the movant planned to escape with Dennis Putzier, that Angela Johnson was going to help them from the outside and that he saw the movant chiseling bricks in his cell, *id*. at 1399-1405, and Dennis Frye testified that he noticed the movant using a broken door handle to chip the bricks in his cell, *id*. at 1431-33. After determining that it would not be possible to break through the wall that

348

separated the two cell blocks, the movant tried to gain access to the adjoining cell block by manipulating the locking mechanism on the door. *Id*. at 1317-18, 1402-04, 1431-33. The plan to escape did not materialize for several reasons, and Dennis Putzier eventually pleaded guilty to a federal charge as a result of trying to escape with the movant. *Id*. at 1319-20.

In response to the government's presentation of evidence regarding the movant's attempted escape, trial counsel tried to establish that the movant did not really attempt to escape and never faced a new charge for attempting to escape. The movant did so by calling three witnesses: Lynette Redden, David Harley Amick and Thomas Steven Mullin. *Id*. at 2902-45, 3027-44. Lynette Redden and David Harley Amick worked at the Woodbury County Jail, and Thomas Steven Mullin served as the county attorney.

### 2. *Arguments of the parties*

#### a. *The movant*

The movant generally blames trial counsel for failing to do more pre-trial and for failing to raise issues during trial, and he faults appellate counsel for failing to raise errors on direct appeal. He contends that trial counsel did not do enough to ensure the proper functioning of the adversarial process when litigating the admissibility of the attempted escape evidence. The movant acknowledges that trial counsel sought to exclude the evidence of his attempted escape from the Woodbury County Jail, but he maintains that trial counsel failed to argue in the motion in limine the proper basis for excluding such evidence, failed to ask the trial court to strike such evidence and failed to ask the trial court to give the jury a cautionary instruction concerning such evidence. As to appellate counsel, the movant asserts that they should have raised any colorable claim, which includes a claim based on the erroneous admission of the attempted escape evidence.

In light of the testimony of the jailhouse informants, the movant maintains that the government presented extensive evidence despite its assurance that it would not do so. He

349

also asserts that none of the testimony offered by the three witnesses is inextricably intertwined with the conduct that is charged in count 6 or count 7 and it is, at best, only marginally relevant to his intent and plan to murder or tamper with witnesses. He argues that it is clear from the testimony that he did not attempt to escape so that he could solicit others to commit murder or to conspire to tamper with or solicit the murder of witnesses. *See United States v. Heidebur*, 122 F.3d 577, 579-80 (8th Cir. 1997) (rejecting the government's position that a defendant's sexual contact with his stepdaughter was inextricably intertwined with the charged crime of possessing child pornography). The movant emphasizes that, rather than offer evidence of his attempted escape to support an integral part of the immediate context of the conduct charged in count 6 and count 7, the government only offered such evidence to show that the movant attempted to escape so that he could kill Dean Donaldson for failing to kill Timothy Cutkomp, which is a separate and distinct crime. *Cf. United States v. Williams*, 95 F.3d 723, 731 (8th Cir. 1996) (concluding that the presentation of evidence regarding the separate act of killing did not violate Rule 404(b) because the slaying was an integral part of the kidnapping charge).

The movant acknowledges that, when a defendant is charged with participating in a conspiracy, the government may introduce "intrinsic" evidence, which includes evidence that a defendant committed another crime if it is inextricably intertwined with the conspiracy. *See O'Dell*, 204 F.3d at 833-34 ("[C]rimes or acts which are 'inextricably intertwined' with the charged crime are not extrinsic and [Rule 404(b)'s prohibition against using character evidence] does not apply."); *United States v. Molina*, 172 F.3d 1048, 1055 (8th Cir. 1999) (explaining that evidence of another crime is not extrinsic if it "is so intertwined with the offense of conviction that proof of one incidentally involves the other or explains the circumstances of the other"). He also acknowledges that Rule 404(b) allows evidence of other crimes to be admitted if it addresses other purposes, such as proof of intent or plan. *See Heidebur*, 122 F.3d at 580 (observing that, even if Rule 404(b) is

350

implicated, testimony is admissible if it is probative of the crime charged or offered for a purpose other than to show propensity).  But, he stresses that evidence of bad acts tends "to weigh too much with the jury," *Michelson v. United States*, 335 U.S. 469, 476 (1948), and much care should be taken to prevent a jury from "generalizing a defendant's earlier bad act into bad character and taking that as raising the odds that he did the later bad act now charged," *Old Chief*, 519 U.S. at 180.

And, as to Federal Rule of Evidence 403, the movant contends that the undue prejudice caused by the admission of evidence related to his attempted escape from the Woodbury County Jail vastly outweighed any conceivable probative value that it had, especially considering that witnesses such as Dennis Putzier and Terry Bregar also testified as to his solicitation of Dean Donaldson and Anthony Altimus to murder Timothy Cutkomp.  He faults the trial court for failing to consider the attempted escape in light of the other admissible evidence.  *See Old Chief*, 519 U.S. at 184-85 (indicating that Rule 403 requires a court to determine the marginal probative value of extrinsic evidence relative to other available evidence).  He argues that the attempted escape evidence should not have been admitted because it only indirectly supported his participation in the charged crimes.  He maintains that the government only offered his unrelated attempted escape as evidence of his bad character and propensity to commit the charged crimes.

With respect to the jury's consideration of the attempted escape evidence, the movant criticizes the trial court for failing to instruct the jury that such evidence could only be considered for the limited purpose of deciding whether the movant committed the conduct that the government charged in count 6 and count 7.  He argues that a proper instruction would have lessened the danger of any unfair prejudice that arose from the erroneous admission of evidence that had minimal probative value.  *See Spencer v. Texas*, 385 U.S. 554, 561-62 (1967) (approving the use of limiting instructions to protect a defendant's interests); *Rolett*, 151 F.3d at 789-91 (concluding that a proper Rule 404(b)

351

instruction was given at the time the evidence was elicited and there was ample independent evidence to support the verdict).

The movant contends that trial counsel knew the attempted escape evidence presented a danger because such evidence allowed the jury to conclude that he had a propensity to commit crimes, but, after hearing the government's three witnesses, they never forcefully renewed their objection or asked that the testimony be stricken. He also faults trial counsel for failing to request a limiting instruction that the evidence could only be considered as to count 6 (soliciting Dean Donaldson and Anthony Altimus to murder Timothy Cutkomp) and count 7 (conspiracy to tamper with witnesses and to solicit the murder of witnesses) of the superseding indictment. *See Dawson v. Cowan*, 531 F.2d 1374, 1377 (6th Cir. 1976) (finding that the district court's failure to give a limiting instruction even though counsel did not request such instruction caused the conviction to be obtained in violation of due process). Given the case law on "intrinsic" evidence, he suggests that the trial court would have instructed the jury as to the narrow purpose for which the evidence of his attempted escape could be considered. The movant asserts that, because it is important to properly instruct a jury, there can be no strategic or tactical reason that justifies the failure to request a limiting instruction. He emphasizes that, without proper guidance, there is a reasonable likelihood that the jury impermissibly considered his attempted escape to establish his criminal disposition and that the verdicts in both phases would have been different. *See Manning*, 310 F.3d at 576-77 (concluding that the failure to object to the admission of evidence constituted ineffective assistance of counsel).

Further, the movant claims that the erroneous admission of evidence of his attempted escape cannot be considered harmless because such evidence likely exerted a substantial influence on the jury's verdicts, especially those that pertained to the capital charges. Concerning the merits phase, he presses that overwhelming, untainted evidence

352

did not exist and the admissible evidence had unexplained gaps and credibility issues. With respect to the prejudice that he suffered during the penalty phase, the movant alleges that the jury could have considered evidence of his attempted escape as evidence that he posed a continuing threat even while incarcerated. He argues that the jury should not have been permitted to rely on such evidence when balancing the applicable sentencing factors. And, he argues that there is a reasonable likelihood that the jury would have reached different verdicts during the merits phase and penalty phase if trial counsel had successfully precluded the jury from considering the attempted escape evidence or obtained an appropriate limiting instruction.

Finally, the movant contends that appellate counsel should have raised as plain error the erroneous admission of the attempted escape evidence. He explains that this claim is colorable, and, consequently, it should have been raised on direct appeal. *See* ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 10.15.1 (rev. ed. 2003); *Carter*, 265 F.3d at 716-17 (recognizing that appellate counsel can limit the appeal to those issues that he determines to have the highest likelihood of success but concluding that appellate counsel's performance was constitutionally deficient because appellate counsel's affidavit stated that he overlooked the instructional error). The movant offers that, if afforded the opportunity to address issues related to the attempted escape evidence, the Eighth Circuit Court of Appeals would have vacated his convictions and/or his sentences.

### b. The government

The government argues that the movant's allegation that the trial court improperly admitted evidence of his attempted escape as "intrinsic" evidence and his allegation that trial counsel failed to make the correct argument or otherwise act to prevent the admission of prejudicial evidence are not supported by the record. It states that the movant is precluded from arguing that the attempted escape evidence should have been excluded as

353

unnecessary or marginally relevant to the charged conduct because the trial court already addressed such arguments. The government reiterates that it still remains true that: (1) the movant sought to kill witnesses so he could avoid spending time in prison and solicited others to kill witnesses for him because he could not do it himself while confined in the Woodbury County Jail and (2) evidence of his attempted escape from the Woodbury County Jail is relevant to his intent, plan and motive. *See United States v. Bass*, 794 F.2d 1305, 1311-12 (8th Cir. 1986) (finding that the jury properly considered evidence of escape because such evidence was admissible as an integral part of an extended criminal transaction). It also emphasizes that evidence of the movant's attempted escape was admissible to show his consciousness of guilt for the charged offenses. *See United States v. Honken*, 378 F. Supp. 2d 970, 1002 (N.D. Iowa 2004) (citing *United States v. Williams*, 295 F.3d 817, 819 (8th Cir. 2002), and *United States v. Barnes*, 140 F.3d 737, 738 (8th Cir. 1998)).

In addition, the government points out that the movant's arguments are no different than the ones trial counsel made prior to trial and, consequently, the movant is unable to establish that trial counsel provided ineffective assistance. The government states that the record indicates trial counsel raised appropriate arguments and no additional argument would have caused the trial court to find that the attempted escape evidence was not inextricably intertwined with the charged conduct and did not show his intent, plan and motive to kill witnesses and pursue drug-trafficking activities. Further, the government maintains that requesting an instruction that limited the jury's use of the admitted evidence for the purpose of considering count 6 and count 7 of the superseding indictment would have been proper had the trial court only admitted the evidence under Federal Rule of Evidence 404(b) but it also admitted the evidence on the basis that it was inextricably intertwined with the charged conduct. Consequently, it argues that trial counsel did not unreasonably fail to request a limiting instruction. *See United States v. Dungy*,

354

51 F. App'x 194, 196 (8th Cir. 2002) (concluding that it would have been inappropriate to request a 404(b) instruction because acts were inextricably intertwined with the charged crime); *United States v. Held*, 11 F. App'x 664, 665 (8th Cir. 2001) (determining that any request for a limiting instruction on Rule 404(b) grounds would have been meritless in light of the evidence and the charges). And, the government asserts that appellate counsel acted reasonably when deciding not to pursue a meritless claim. *Held*, 11 F. App'x at 665 (deciding that no constitutional violation occurred as a result of appellate counsel's actions because raising a 404(b) issue on appeal would have been fruitless).

As to prejudice, the government asserts that the testimony of Dean Donaldson, Trial Tr. at 1085-1226, Daniel Lederman, *id*. at 1226-40, William Dean, *id*. at 1241-74, Dennis Putzier, *id*. at 1275-1382, Anthony Altimus, *id*. at 2016-86, and Anthony Johnson, *id*. at 2086-2105, overwhelmingly demonstrates the movant's guilt on count 6 and count 7. In addition, it states that the movant's argument that the attempted escape evidence unfairly affected the outcome of the penalty phase is baseless. The government maintains that, because there is a relaxed standard for the admission of evidence and the evidence of his attempted escape addresses future dangerousness, the jury properly considered such evidence.

### 3. *Analysis*

The movant is not entitled to retry his case. The trial court already accepted the government's position that the evidence was inextricably intertwined with the conduct charged in count 6 and count 7 of the superseding indictment and the evidence was admissible under Federal Rule of Evidence 404(b) because it established the movant's intent and plan to murder or tamper with witnesses. The trial court also determined that Federal Rule of Evidence 403 did not require it to exclude the attempted escape evidence because the probative value of the evidence outweighed any undue prejudice. Nothing the movant states in his motion for relief or briefing indicates that the trial court erred when

355

admitting the evidence because it was inextricably intertwined with the charged conduct or it served as proof of his intent, plan and motive to kill witnesses and to continue his drug-trafficking activities. Similarly, none of his statements reveal that the trial court erroneously determined that the attempted escape evidence was not subject to exclusion because any potential danger that might arise from the admission of such evidence did not outweigh its substantial probative value. In addition, the trial court was not obligated to give a limiting instruction. *See United States v. Joos*, 638 F.3d 581, 588 (8th Cir. 2011) (concluding that the absence of a limiting instruction did not affect the defendant's substantial rights where government presented significant evidence at trial supporting his convictions).

As to trial counsel and appellate counsel, the movant's assertions are devoid of merit. *See Strickland*, 466 U.S. at 688-94. It cannot be said that trial counsel failed to raise appropriate arguments pre-trial or failed to exercise professional judgment during trial. They made appropriate evidentiary objections regarding the attempted escape evidence. Contrary to the movant's assertions, the government did not conduct a "mini-trial" on the nature of the escape attempt, so there was no need for trial counsel to revisit the trial court's evidentiary ruling. Likewise, in light of the trial court's ruling and all of the circumstances, it is clear that trial counsel's assistance, which includes not asking for a limiting instruction, was reasonable. There is absolutely no basis to conclude that they failed to apply ordinary legal skill and knowledge to render the movant's trial a reliable adversarial process. Moreover, aside from the fact that trial counsel's conduct surpassed any standard of professional reasonableness, their conduct had no effect on the judgment. Because the government only offered scant evidence concerning the movant's attempted escape from the Woodbury County Jail and substantial other evidence established the movant committed the crimes charged and deserved the death penalty, the movant was not prejudiced by trial counsel's actions. Concerning appellate counsel, it is clear that they

356

exercised reasonable professional judgment when they raised claims unrelated to the attempted escape evidence. Given the voluminous record, it cannot be said that the Eighth Circuit Court of Appeals would have concluded that the trial court abused its discretion by permitting the government to introduce evidence of the movant's attempted escape.

So, the court reaffirms the prior determinations regarding the admissibility of the attempted escape evidence. The movant's allegations do not undermine confidence in the outcome. Further, the court concludes that the movant was not deprived of his Sixth Amendment right to counsel or Fifth Amendment right to counsel. Because it is evident from the record that none of the movant's constitutional rights were violated, there is no basis to grant relief under 28 U.S.C. § 2255 on this ground.

### P. Ground Sixteen — Constitutional Violations Occurred as a Result of the Insufficient Evidence in Support of the Theory of Defense

### 1. Arguments of the parties

#### a. The movant

The movant asserts that trial counsel were ineffective when they failed to present abundant, readily available evidence that supported their theory of defense, that is, Terry DeGeus, rather than the movant, was primarily responsible for the deaths of Gregory Nicholson, Lori Duncan, Kandi Duncan and Amber Duncan, and, then, he was later killed as a result of his involvement in their deaths. He agrees that trial counsel reasonably attempted to shift the jury's focus onto Terry DeGeus by pointing out particular facts but states that trial counsel neither conducted a minimal investigation nor relied on substantial evidence that the government provided in its discovery file. The movant argues that, rather than marshal and present available evidence to establish reasonable doubt or residual doubt in the minds of the jurors, trial counsel only presented a small amount of evidence to cast doubt on the government's case during the merits phase and penalty phase.

357

The movant contends that trial counsel should have introduced evidence pertaining to the following subjects: (1) Terry DeGeus engaged in violence, had become paranoid, exhibited hyper-aggression and dealt and used methamphetamine; (2) Terry DeGeus had motive to kill Gregory Nicholson; and (3) law enforcement primarily suspected Terry DeGeus for years. With respect to the law enforcement evidence, the movant maintains that law enforcement officers knew Terry DeGeus worked for his father's excavation business around the time Gregory Nicholson, Lori Duncan, Kandi Duncan and Amber Duncan disappeared and, in light of their suspicions, they thoroughly examined an excavation site in 1997 and 1999 in an attempt to find the victims' bodies. *See* Division of Criminal Investigation Report, Movant Ex. 50, civil docket no. 19-50; Interview of Joann DeGeus, Movant Ex. 51, civil docket no. 19-51; Division of Criminal Investigation Report, Movant Ex. 52, civil docket no. 19-52; Mason City Police Report, Movant Ex. 53, civil docket no. 19-53.

As to motive, the movant points to two known reasons that Terry DeGeus wanted to kill Gregory Nicholson: he viewed Gregory Nicholson as a competitor in the Mason City, Iowa, methamphetamine market, *see* Interview of Mike Billick, Movant Ex. 54, civil docket no. 19-54, and he viewed Gregory Nicholson's cooperation with the government as having a significant impact on any sentence he might have to serve, *see* Interview of Brandy Wilson, Movant Ex. 55, civil docket no. 19-55 (indicating that Terry DeGeus inquired about whether he had been subpoenaed); Interview of Christi Gaubatz on 2/13/97, Movant Ex. 56, civil docket no. 19-56 (same). He states that law enforcement reasonably suspected that Terry DeGeus had motive to kill Gregory Nicholson and it is likely that Terry DeGeus knew Gregory Nicholson testified before the grand jury and named him when doing so.

Regarding Terry DeGeus's tendencies and personal traits, the movant contends that nearly every witness described Terry DeGeus as violent and aggressive. *See, e.g.*,

358

Interview of Kristin Thompson, Movant Ex. 57, civil docket no. 19-57. He claims that trial counsel could have shown that Terry DeGeus physically and verbally abused Angela Johnson by pointing to specific instances where he threatened to kill her, stalked her and broke into her home. *See* Interview of Christi Gaubatz on 2/13/97, Movant Ex. 56, civil docket no. 19-56; Interview of Cherryl Bachman, Movant Ex. 58, civil docket no. 19-58; Interview of Sherri Kunkel on 2/15/94, Movant Ex. 59, civil docket no. 19-59; Interview of Sherri Kunkel on 4/10/97, Movant Ex. 60, civil docket no. 19-60; Interview of Holly Johnson, Movant Ex. 61, civil docket no. 19-61; Interview of Arlyn Johnson, Movant Ex. 62, civil docket no. 19-62; Interview of Mikell Olson, Movant Ex. 63, civil docket no. 19-63; Interview of Richard Summers, Movant Ex. 64, civil docket no. 19-64. In addition, Wendy Jensen, who is Terry DeGeus's ex-wife, could have testified that Terry DeGeus threatened to kill her and himself with a shotgun on Christmas, that Terry DeGeus took on five police officers and won, that she feared Terry DeGeus, that she sent Angela Johnson a card to thank her for breaking up her marriage and causing her and Terry DeGeus to get a divorce, that she got as far away from Terry DeGeus as possible after they divorced and that she felt as though Angela Johnson was manipulating Terry DeGeus. Also, the movant asserts that trial counsel could have presented other evidence that demonstrated Terry DeGeus: (1) harassed others, *see* Interview of Christi Gaubatz on 2/13/97, Movant Ex. 56, civil docket no. 19-56; (2) engaged in a two-hour standoff with law enforcement when they sought to arrest him in 1993, *see* DEA Report of Investigation, Movant Ex. 66, civil docket no. 19-66; (3) incessantly inquired as to whether he had been subpoenaed by a grand jury, *see* Interview of Brandy Wilson, Movant Ex. 55, civil docket no. 19-55; Interview of Christi Gaubatz on 2/13/97, Movant Ex. 56, civil docket no. 19-56; (4) threatened to kill Rich Gerdes for stealing his daughter's piggy bank, *see* Interview of Terry Kunkel, Movant Ex. 68, civil docket no. 19-68; (5) threatened to kill Christi Gaubatz's ex-husband, *see* Interview of Christi Gaubatz on 2/13/97, Movant Ex. 56, civil

359

docket no. 19-56; (6) abused methamphetamine, alcohol and other substances, *see* Interview of Christi Gaubatz on 2/13/97, Movant Ex. 56, civil docket no. 19-56; and (7) appeared manic, paranoid and disheveled when Gregory Nicholson, Lori Duncan, Kandi Duncan and Amber Duncan disappeared, *see* Interview of Christi Gaubatz on 2/13/97, Movant Ex. 56, civil docket no. 19-56. The movant argues that such evidence tends to cast greater suspicion on Terry DeGeus, especially if Terry DeGeus's history of violence is compared to the lack of violence in his background.

The movant asserts that, if trial counsel had presented more evidence about Terry DeGeus, there is a reasonable probability that the jury would have had reasonable doubt as to his guilt. The movant states that trial counsel offered no valid explanation for failing to present evidence that would cast suspicion on Terry DeGeus and, thereby, cause the jury to find more believable the assertions that were made during his closing argument. *See* 2255 Evidentiary Hearing Tr. at 67-70; *see also* Trial Tr. at 3330-31 (arguing that Terry DeGeus could have played a part in the murders of Gregory Nicholson, Lori Duncan, Kandi Duncan and Amber Duncan); Trial Tr. at 3365-67 (same). And, he states that trial counsel's concern about the possibility that the jury could believe he was taking on the burden to prove certain facts if he presented evidence should not be credited. In addition, he maintains that absolutely no physical evidence links him to the Duncans' home or the crime scenes, the government did not believe it had enough evidence until seven years after Gregory Nicholson, Lori Duncan, Kandi Duncan, Amber Duncan and Terry DeGeus disappeared or until their bodies were discovered and the government's entirely circumstantial case relied too heavily on untrustworthy jailhouse informants and cooperators. Concerning his sentence, the movant also asserts that, if more evidence had been presented by trial counsel, it is likely that a juror would have acknowledged during the penalty phase that residual doubt existed and it mitigated against imposing the death

360

penalty. He contends that the additional and available evidence casting suspicion on Terry DeGeus would have caused a juror to have some residual doubt.

### b. The government

The government contends that a review of the evidence indicates that the notion that Terry DeGeus murdered anyone is baseless. In addition, it disputes that trial counsel should have done more to show that Terry DeGeus killed Gregory Nicholson, Lori Duncan, Kandi Duncan and Amber Duncan and that he was later killed as a result of his role in killing them. The government argues that the movant's completely untenable theory cannot establish deficient performance and prejudice is lacking because the movant does nothing to explain Terry DeGeus's brutal murder and fails to negate the enormous amount of circumstantial evidence that demonstrated he murdered all five victims according to his own well-orchestrated plan.

As to the evidence of Terry DeGeus's involvement in the murders of Gregory Nicholson, Lori Duncan, Kandi Duncan and Amber Duncan, the government points out that: (1) law enforcement conducted a proper investigation after considering the possibility that Terry DeGeus had some part in the crimes and that the movant murdered Terry DeGeus because he wanted to eliminate a potential witness who could testify against him, *see* civil docket no. 75, ¶¶ 2-5 (Bill Basler stipulation); 2255 Evidentiary Hearing Tr. at 490-91; (2) law enforcement examined an excavation site in an attempt to verify whether Terry DeGeus acted as the movant's accomplice when murdering Gregory Nicholson, Lori Duncan, Kandi Duncan and Amber Duncan or burying them, *see* civil docket no. 75, ¶¶ 2-5 (Bill Basler stipulation); 2255 Evidentiary Hearing Tr. at 490-91; (3) Terry DeGeus lacked the motive to kill Gregory Nicholson, especially considering that nothing indicates animosity existed between them and the movant intentionally limited the knowledge that Gregory Nicholson and Terry DeGeus had about the other's role in the continuing criminal enterprise, *see* Gov. Trial Ex. 27 at 13; 2255 Evidentiary Hearing Tr. at 331; and

361

(4) Terry DeGeus worried about being subpoenaed to testify after Gregory Nicholson disappeared, *see* Trial Tr. at 519-20, and frantically tried to find Gregory Nicholson after his disappearance, *see* Trial Tr. at 447-48. The government also emphasizes that the movant was the primary suspect because: (1) Gregory Nicholson wore a wire that caused the movant's arrest, not Terry DeGeus's arrest; (2) Gregory Nicholson testified against the movant, not Terry DeGeus; (3) the movant decided not to plead guilty to drug charges immediately after Gregory Nicholson disappeared; (4) Terry DeGeus never faced federal drug charges; (5) Terry DeGeus disappeared shortly after Angela Johnson and Aaron Ryerson appeared before the grand jury and were questioned about their knowledge of drug activity that involved the movant and Terry DeGeus; (6) the movant worried about Terry DeGeus testifying against him after the movant learned that the government began to focus on Terry DeGeus; (7) Angela Johnson was in a romantic relationship with the movant; and (8) Angela Johnson was the last person to see Terry DeGeus alive. In addition, the government contends that evidence of Terry DeGeus's violent interactions with women and law enforcement does not provide a motive for him to kill Gregory Nicholson, Lori Duncan and her two little girls.

With respect to trial counsel, the government maintains that the facts do not demonstrate that they performed below an objective level of reasonableness or that they prejudiced the movant's defense as a result of their investigation prior to trial and presentation during trial. The government observes that the theory that Terry DeGeus may have played a part in the disappearances of Gregory Nicholson, Lori Duncan, Kandi Duncan and Amber Duncan was not unknown to trial counsel and trial counsel cannot be blamed for failing to do more because there was no credible evidence that linked Terry DeGeus to the disappearances of Gregory Nicholson, Lori Duncan, Kandi Duncan and Amber Duncan. It also states that, during trial counsel's cross-examination of the government's witnesses, trial counsel fully explored Terry DeGeus's negative personal

362

traits and behavior, including that he was involved in a standoff with law enforcement and resisted arrest, *see* Trial Tr. at 259-61, and that he threatened a man who was seeing Angela Johnson and did things that made Angela Johnson fear him, *see* Trial Tr. at 417-25. The government argues that trial counsel made strategic and tactical choices regarding the appropriate action to take or refrain from taking and, when viewed at the time such choices were made, trial counsel's decisions not to pursue an unrealistic theory or to call witnesses to show Terry DeGeus was violent and aggressive are professionally reasonable. The government also notes that, if trial counsel opted to present evidence in an effort to demonstrate that Terry DeGeus killed Gregory Nicholson, Lori Duncan, Kandi Duncan and Amber Duncan, it would have rebutted such evidence by presenting evidence that showed law enforcement investigated Terry DeGeus only because he was connected to the movant. It points out that trial counsel wisely decided not to jeopardize their credibility by directly alleging that Terry DeGeus was the killer and sensibly chose to hint during closing argument that Terry DeGeus might have been involved. Further, concerning prejudice, the government highlights that the movant suffered none because the evidence proved beyond all doubt that he murdered Gregory Nicholson, Lori Duncan, Kandi Duncan and Amber Duncan and, then, Terry DeGeus even after having some time to contemplate the abhorrent nature of his earlier crimes.

### 2. *Analysis*

On this record, the court is unable to find that trial counsel failed to exercise the customary skill and diligence that a reasonably competent attorney would display under similar circumstances. With the benefit of hindsight, it is probable that an attorney would try a case differently. Nevertheless, when reviewing an ineffective assistance of counsel claim, it is appropriate to consider trial counsel's decisions at the time they were made. Because trial counsel were confronted with insurmountable evidence that established the movant murdered Gregory Nicholson, Lori Duncan, Kandi Duncan, Amber Duncan and

363

Terry DeGeus, no constitutional provision required them to belabor points or present trivial, inconsequential and damaging facts. The movant totally ignores all of the evidence that indicates he murdered Gregory Nicholson, Lori Duncan, Kandi Duncan, Amber Duncan and Terry DeGeus, including his own statements to his best friend that, at a minimum, implied that he committed each murder. Contrary to the movant's assertions, this is not a case where trial counsel failed to investigate, consider plausible theories or present a defense that actually had a factual basis. *Cf. White*, 416 F.3d at 732 (concluding that counsel's investigation was too superficial and counsel should have called two additional witnesses who would have provided stronger testimony in support of the defense's theory); *Foster*, 9 F.3d at 726 (deciding that counsel failed to properly investigate the issue of guilt because additional investigation would have revealed objective medical evidence that cast substantial doubt on the victim's story); *United States v. Easter*, 539 F.2d 663, 666 (8th Cir. 1976) (finding that counsel unreasonably failed to present only defense available).

Had trial counsel presented evidence in support of a theory of defense based on the implausible notion that Terry DeGeus murdered Gregory Nicholson, Lori Duncan, Kandi Duncan and Amber Duncan and, then, some unknown person decided to kill him, it is highly probable that trial counsel would have lost nearly all of their credibility with the jury. And, because it was virtually certain that the movant would be convicted of capital murder, trial counsel reasonably decided to avoid strategies that increased the risk of being sentenced to death by the jury. *See Hanes v. Dormire*, 240 F.3d 694, 698 (8th Cir. 2001) (finding that the proffered testimony was not so important as to put counsel's failure to call witnesses outside the wide bounds of sound trial strategy). Very little, if anything, could be gained by presenting evidence pertaining to Terry DeGeus, especially considering that focusing too much on a victim or blaming a victim most likely would have bolstered the government's case for imposing the death penalty. The alternative strategy now advanced

364

by the movant—that is, present any evidence that suggested Terry DeGeus might have been involved and hope that the government would opt not to rebut such evidence by highlighting evidence or presenting more evidence that showed Terry DeGeus had absolutely nothing to do with the murders of Gregory Nicholson, Lori Duncan, Kandi Duncan and Amber Duncan—surely was no more likely to succeed than the strategy that trial counsel pursued.

Moreover, apart from failing to demonstrate that the challenged actions of trial counsel "were outside the wide range of professionally competent assistance," *Strickland*, 466 U.S. at 690, the movant fails to demonstrate that he was prejudiced by anything trial counsel did or failed to do, *see id.* at 692-94. None of the evidence identified by the movant would have caused a juror to harbor either reasonable doubt or residual doubt about the movant's guilt. Trial counsel faced a situation where they could have reasonably considered whether it was in the movant's best interest to tender a guilty plea or offer to stipulate away the merits phase because it was literally a foregone conclusion that the jury would convict him of capital murder. So, it cannot be said that trial counsel's conduct had any conceivable effect on the outcome of either the merits phase proceeding or penalty phase proceeding; the evidence relating to Terry DeGeus neither diminishes the crushing evidence showing the movant's culpability nor mitigates against imposing the death penalty. *See Schneider*, 85 F.3d at 339-41 (considering whether counsel's failure to conduct further investigation and to present evidence establishes prejudice and determining that no constitutional violation occurred).

Therefore, the court concludes that trial counsel did not provide ineffective assistance. *See Strickland*, 466 U.S. at 688-94. The deficiencies alleged by the movant do not demonstrate the necessity for relief on this ground.

365

### *Q. Ground Seventeen — Constitutional Violations Occurred as a Result of a Dismissed Juror*

The movant asserts that his constitutional rights were violated as a result of Juror 523's involvement in his case. More specifically, the movant argues that a violation of his right to due process and right to a trial by an impartial jury occurred when the trial court ultimately dismissed Juror 523 but upheld the verdicts that she and the other jurors returned during the merits phase. He maintains that the post-trial inquiry into whether any outside influence had a prejudicial extraneous influence on the jury did not comply with Federal Rule of Evidence 606(b), and, consequently, the trial court's findings might have been improperly influenced. Similarly, he maintains that the Eighth Circuit Court of Appeals's decision might be erroneous because it relied on those same findings. In addition, the movant argues that trial counsel and appellate counsel ineffectively litigated the issues that related to Juror 523. He contends that, although they were on notice and zealously litigated some issues that arose from Juror 523's participation in his case, trial counsel should have argued that Juror 523's willingness to mislead the trial court suggested she was a biased juror and called into question the validity of the verdicts that the jury reached during the merits phase. And, he contends that appellate counsel should have pointed out that the trial court relied on inadmissible evidence when making all of its factual findings and Juror 523's dishonesty indicates that an impartial jury did not find him guilty. In response, the government maintains that the movant's attempt to relitigate issues that have already been conclusively resolved at the trial level and appellate level by arguing trial counsel and appellate counsel could have and should have asserted additional arguments is futile.

366

### 1. *Background relating to Juror 523*[48]

On October 21, 2004, the jury began penalty phase deliberations, but the jurors decided to end their deliberations early and elected not to deliberate the following day. Juror 523 approached court staff sometime in the afternoon and asked if she could get an excuse from work for the remainder of the day and the following day because she alleged that her boss had been making inappropriate comments to her about the trial. When requesting the trial court's permission not to return to work, she became teary-eyed. After Juror 523 was questioned on October 21, 2004, and October 22, 2004, the trial court told her that she would not be deliberating further in the case. On October 25, 2004, the remaining jurors and the alternate jurors were questioned. Ultimately, the trial court replaced Juror 523 with Alternate Juror 425 and instructed the reconstituted jury to begin its penalty phase deliberations anew.

Based on the circumstances surrounding Juror 523, the movant sought a mistrial, and, after the jury returned verdicts that sentenced him to death for the murders of Kandi Duncan and Amber Duncan, the movant sought a new trial. On December 16, 2004, the trial court conducted an evidentiary hearing to determine whether relief should be granted.

---

[48] The record regarding Juror 523 is extensive. It includes: transcripts, *see* criminal docket nos. 529-1, 530-1, 532-1, 533-1, 593-1, 603, 624-9, 624-10, 624-11, 732-4; supplemental instructions, *see* criminal docket no. 534-1; the parties' writings, *see* criminal docket nos. 578, 634, 642, 664, 690; the trial court's findings and conclusions, *see* criminal docket no. 695; and the Eighth Circuit Court of Appeals's determinations, *see* criminal docket no. 773. In its order on the movant's motion for judgment of acquittal or, in the alternative, for a new trial, the trial court undertook a sweeping discussion and analysis of the issues that related to Juror 523. *See Honken*, 381 F. Supp. 2d at 1017-56. Likewise, the Eighth Circuit Court of Appeals thoroughly addressed whether a violation of the Sixth Amendment occurred as a result of jury taint. *See Honken*, 541 F.3d at 1166-69. For purposes of this claim, an exhaustive recitation of what occurred at the trial level and appellate level is not necessary. The court deems it appropriate to focus on the portions of the record that most bear on the movant's assertions.

During such hearing, the government offered the testimony of six officers or managers of the company at which Juror 523 worked, and the movant offered the testimony of Juror 523. Another officer or manager of the company was subsequently deposed by the parties. On July 12, 2005, the trial court held a hearing where the parties argued their respective positions.

On July 29, 2005, the trial court denied the movant's request for post-trial relief. Before denying relief on the basis of alleged jury taint, the trial court found that: (1) Juror 523's boss did not make comments to the effect of "guilty, guilty, guilty," "fry him" or "when are you gonna burn him?"; (2) Juror 523's testimony was inconsistent, and the only comment supported by credible testimony was that "Juror 523 should have said something 'outrageous' to get out of jury duty"; (3) neither Juror 523's boss nor any other employee made any other comment to Juror 523; (4) Juror 523's boss credibly testified that "he did not know what trial Juror 523 was hearing; [that he] did not follow the Honken trial; [that he] did not know what the trial was about, apart from 'drugs'; [that he] did not know that the case was a death penalty case, until after the trial was in progress; and that he did not pay attention to the process"; (5) Juror 523 "was not troubled and upset by the comments that her boss was purportedly making, but by the stress of the duties of a juror in a capital case, coupled with the stress of changing 'gears' to return to work when she was not in trial, and the fact that she had to go to work while other jurors did not, all of which manifested in a desire to finish deliberations as quickly as possible and to 'get her life back'"; and (6) "it was the stress of involvement in the trial that caused Juror 523 to magnify (and indeed, multiply) the single incident of an innocuous comment from her boss into the reason for seeking an excuse from work on October 21, 2004." *Honken*, 381 F. Supp. 2d at 1032-34. Given those findings, the trial court determined that the unsolicited, passing remark, which was made and taken in jest, was completely insignificant and had no affect on the jury's deliberations or its verdicts. *Id*. at 1049-52.

368

On direct appeal, the Eighth Circuit Court of Appeals found that the trial court's factual determinations were supported by the record and were well within its discretion. *Honken*, 541 F.3d at 1166. It then observed that the single remark—say "guilty, guilty, guilty" to avoid jury duty, say "hang him" to avoid jury duty or say "I'm an expert in the law, enjoy the law, he's guilty or something of that nature" to avoid jury duty—was relatively unimportant. *Id*. at 1153, 1166-67. After recognizing that Juror 523's boss offered a "humorous" suggestion of a comment that she could make to get out of jury service, the Eighth Circuit Court of Appeals determined that the movant suffered no prejudice as a result of Juror 523's participation in the merits phase deliberations. *Id*.

In addition, after concluding that the trial court violated Federal Rule of Evidence 606(b) when it allowed, over the defense's objection, the government to ask Juror 523 what effect her boss's comment had on her and whether her exposure to such comment affected her ability to be impartial, the Eighth Circuit Court of Appeals decided to make an independent determination as to whether the comment made by Juror 523's boss could have been improperly used in deliberations. *Id*. at 1167-69; *see also* December 16, 2004 Hearing Tr. at 62-67 (objecting on the basis of Federal Rule of Evidence 606(b)). That determination is as follows:

> Because Rule 606(b) precludes questioning the jurors as to the subjective effects of an outside influence, "the court must apply an objective test, assessing for itself the likelihood that the influence would affect a typical juror." [*United States v. Simpson*, 950 F.2d 1519, 1522 (10th Cir. 1991)] (citing [*United States v. Bassler*, 651 F.2d 600, 603 (8th Cir. 1981)]). "The inquiry is whether there exists a reasonable possibility that the external influence or information affected the verdict." *Id*. (citation omitted). In Honken's case, no evidence suggests Juror 523's boss's remark, that Juror 523 should have said something "outrageous" to get out of jury service, presented even a remote possibility of influencing any typical or reasonable juror's verdict either in favor or against Honken.

369

> The record does suggest the comment amounted to nothing more than an unsolicited, passing remark which was made, and taken, in jest. Honken is not entitled to a new trial.

*Honken*, 541 F.3d at 1169.

### 2. *Arguments of the parties*

#### a. *The movant*

The movant takes issue with the trial court's previous determinations. He states that little evidence supports them. For example, he states that Juror 523 never testified that she experienced stress as a result of her jury service. Further, to undermine the trial court's observations concerning Juror 523's stress, the movant points to her earlier responses. Specifically, he states that, during voir dire, Juror 523 expressed no reservations about deciding his guilt or innocence and, if guilty, his penalty. *See* criminal docket nos. 532-1, 593-1. The movant also takes issue with the trial court's conclusion that Juror 523 provided inconsistent testimony. He states that Juror 523 consistently maintained that her boss stated "guilty, guilty, guilty" and, rather than change her testimony, Juror 523 only minimized the effect of her boss's statements on her ability to be impartial. *See* criminal docket nos. 529-1, 530-1, 533-1, 624-9, 603.

The movant also disagrees with the Eighth Circuit Court of Appeals's analysis regarding Juror 523. Specifically, he disapproves of the conclusion that the comment made by Juror 523's boss would not have an effect on a typical juror because the Eighth Circuit Court of Appeals relied on the trial court's erroneous findings as to Juror 523's credibility and the nature of the comment her boss made. He labels the trial court's findings as erroneous because the trial court heard and considered Juror 523's statements that her boss's comment did not influence her.

Alternatively, the movant argues that, if the trial court's findings are correct, Juror 523 violated his right to an impartial jury. In light of the non-credible and telling answers that Juror 523 provided when she was asked about the comments that her boss made, the

370

movant faults the trial court for upholding the verdicts that the jury reached during the merits phase. The movant contends that Juror 523's claims about her boss's comments show that she lied during deliberations and held a strong bias against him. He points out that Juror 523 falsely alleged that her boss commented that he was "guilty, guilty, guilty" because she had a desire to finish deliberations as quickly as possible and to "get her life back." And, he argues that the trial court's findings as to her motivations for attributing certain comments to her boss suggest that she rushed to judgment and determined his guilt based on reasons other than the evidence presented.

In light of the trial court's findings, the movant avers that trial counsel ineffectively litigated the issues that relate to Juror 523. He acknowledges that trial counsel argued that an outside influence deprived him of an impartial jury and the trial court could not consider testimony that addressed whether the remark impacted Juror 523's ability to remain impartial. But, he maintains that, because they had notice and earnestly litigated related issues, trial counsel should have argued in the alternative that Juror 523's willingness to mislead the trial court called into question the validity of the jury's verdicts during the merits phase. The movant argues that the trial court's post-trial findings as to Juror 523's credibility impacted whether she was properly seated as a juror. He contends that trial counsel should have done more because Juror 523's dishonesty during trial reveals a strong bias against him and Juror 523's desire to finish deliberations as quickly as possible reveals she considered inappropriate reasons, rather than the evidence, before finding him guilty. In addition, the movant blames trial counsel for failing to assert that the scope of the trial court's inquiry did not comport with Federal Rule of Evidence 606(b). He states that, as a consequence of such failure, Juror 523's impermissible testimony, which minimized the effect of her boss's comments on her ability to be impartial, influenced the trial court's factual findings. He claims that, but for trial counsel's failures, there is a reasonable probability that the result of the proceedings would have been different. *See United States*

371

*v. Dean*, 647 F.2d 779, 785 (8th Cir. 1981) (concluding that a new trial was warranted because the trial judge had found that the juror was so biased that it could not be said that the juror decided the case on the basis of an impartial consideration of the evidence).

The movant also contends that appellate counsel should have raised as plain error the improper scope of the evidentiary hearing and Juror 523's dishonesty. He admits that appellate counsel argued the trial court erroneously concluded that he suffered no prejudice after it relied on inadmissible evidence, but he states that appellate counsel did not fault the trial court for relying on inadmissible evidence when it made its factual findings. Because the errors pertaining to the scope of the evidentiary hearing and the impact that Juror 523's dishonesty had on the guilty verdicts are plain, he argues that the Eighth Circuit Court of Appeals would have vacated his convictions or, at least, his sentences if appellate counsel had raised appropriate arguments. ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 10.15.1 (rev. ed. 2003); *Carter*, 265 F.3d at 716-17 (recognizing that appellate counsel can limit the appeal to those issues that he determines to have the highest likelihood of success but concluding that appellate counsel's performance was constitutionally deficient because appellate counsel's affidavit stated that he overlooked the instructional error).

### b. The government

The government maintains that the movant is unable to challenge the trial court's jury taint findings because he already fully litigated whether the trial court erred when making determinations as to the credibility of witnesses. Further, the government disagrees with the movant's assertions that trial counsel and appellate counsel provided deficient assistance and their deficient assistance prejudiced his defense. It asserts that there is no basis to grant relief to the movant as a result of anything the trial court, trial counsel, appellate counsel or the Eighth Circuit Court of Appeals did in response to the situation involving Juror 523.

372

As to trial counsel, the government asserts that they vigorously litigated the issues related to Juror 523. It points out that trial counsel: moved for a mistrial based on jury taint; fully participated in the inquiries that occurred on October 21, 2004, October 22, 2004 and October 25, 2004; moved for a new trial based on jury taint; questioned Juror 523 and other employees of the company where she worked, including Juror 523's boss, on December 16, 2004; and objected to testimony that they believed violated Federal Rule of Evidence 606(b).

The government disputes that trial counsel failed to properly challenge the scope of the questioning and the impact of what the trial court considered when making its factual findings. It states that trial counsel clearly relied on Federal Rule of Evidence 606(b) when objecting to the admission of testimony, *see, e.g.*, December 16, 2004 Hearing Tr. at 62-67, and they were particularly effective because "no Eighth Circuit [Court of Appeals] case specifically [addressed] whether a district court [could], at a post-verdict hearing, ask a juror whether an outside influence affected that juror's ability to be impartial." *Honken*, 541 F.3d at 1168. The government also disputes that trial counsel could have and should have challenged the guilty verdicts on the basis of Juror 523's representations when seeking an excuse from work. It states that trial counsel did as much as they possibly could have done with the information that they had and they cannot be faulted for failing to predict how the trial court would determine the facts based on the credibility of witnesses. It contends that the movant's conclusory allegation that Juror 523's statements reveal a strong bias and a likelihood that she considered reasons other than the evidence when determining his guilt is an insufficient basis to establish deficient performance.

Regarding appellate counsel, the government argues that they appropriately raised the circumstances surrounding Juror 523 as a ground for relief on direct appeal. The government disputes that appellate counsel should have argued that the trial court's

373

conclusion that Juror 523's boss made "nothing more than an unsolicited, passing remark which was made, and taken, in jest," *see id*. at 1169, was influenced by its consideration of inadmissible testimony. It points out that the inquiry into what was said to Juror 523 and the finding that the comment was innocuous is different than the inquiry into whether the comment affected Juror 523's ability to be fair and impartial and the finding that there was no reasonable possibility that the comment affected Juror 523's freedom of action as a juror. And, the government emphasizes that, after finding the trial court erred when it considered testimony that was barred by Federal Rule of Evidence 606(b), the Eighth Circuit Court of Appeals made an independent determination that the evidence uniformly pointed to the conclusion that the remark was completely insignificant and did not present even a remote possibility of influencing any typical or reasonable juror's verdict. *Id*. Further, the government disputes that appellate counsel should have asserted that Juror 523 was biased and rushed to judgment because the record demonstrates she never improperly formed an opinion as to any issue that needed to be decided.

Aside from arguing that the actions of trial counsel or appellate counsel cannot be characterized as deficient, the government argues that prejudice is lacking. It emphasizes that the movant does not assert sufficient facts in support of his contention that he suffered prejudice as a result of the performances of either trial counsel or appellate counsel and he is unable to do so in light of the findings and conclusions of the trial court and the Eighth Circuit Court of Appeals.

### 3. *Analysis*

"[T]he criminally accused [have a constitutional right to] a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961).

> [Due process, however,] does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable. The safeguards of juror

374

> impartiality, such as voir dire and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.

*Phillips*, 455 U.S. at 217. Having reviewed the record, the court concludes that it is nothing less than outlandish to suggest that the movant's right to a trial by an impartial jury and right to due process were violated as a result of judicial determinations that were made at either the trial level or appellate level.

Moreover, the court is constrained by the trial court's previous findings and the Eighth Circuit Court of Appeals's determinations; the movant is unable to relitigate issues that were conclusively decided pursuant to post-trial review or appellate review. *See Lefkowitz*, 446 F.3d at 790-91 (concluding that the same issues that have been decided in a new trial motion cannot be reconsidered in a subsequent collateral attack); *Bear Stops*, 339 F.3d at 780 (deciding that it need not address an alleged spillover issue that had already been explicitly rejected on direct appeal); *Kraemer*, 810 F.2d at 177 (concluding that it is impermissible to "raise the same issues . . . that have been decided on direct appeal or in a new trial motion"). But, even if the court were not so constrained, the movant states nothing that leads the court to conclude that the trial court erred. The record indicates that the trial court properly inquired into whether a communication was made and what it contained and, after doing so, correctly determined the content of the single remark that was made and the reason for seeking an excuse from work. Contrary to the movant's assertions, those determinations are independent of the determination that the comment did not affect Juror 523's ability to be fair and impartial during the merits phase.

375

Further, there is no basis to conclude that Juror 523 failed to either remain objective or properly weigh the evidence for and against the movant during the merits phase. The trial court already decided that Juror 523 sought an excuse from work because she experienced a heightened state of stress that was caused by her involvement as a juror in a capital case. *Honken*, 381 F. Supp. 2d at 1032-34. The statements that Juror 523 made shortly after the jury began penalty phase deliberations do not indicate that she was compromised by bias. *Cf. Sanders v. Norris*, 529 F.3d 787, 792 (8th Cir. 2008) (considering examples of bias); *United States v. Evans*, 272 F.3d 1069, 1079 (8th Cir. 2001) (discussing whether a juror has improperly formed an opinion as to the issue to be tried); *United States v. Wade*, 467 F.2d 1226, 1229 (8th Cir. 1972) (affirming the denial of a mistrial because unsolicited remark was innocently made). The trial court's assessment of the situation that Juror 523 confronted after the jury began to deliberate during the penalty phase does not suggest that she failed to remain impartial when participating in deliberations. Rather than show that she lied or held a strong bias against him, her statements show that she wanted to continue deliberating and was frustrated as a result of having to return to work while other jurors did not have to change gears. The movant's eagerness to assume from the circumstances surrounding Juror 523 that she rushed to judgment and determined his guilt based on factors other than the evidence does not outweigh her unequivocal answers that demonstrated she would serve fairly and impartially throughout the proceedings. *See United States v. Wilson*, 565 F.3d 1059, 1069 (8th Cir. 2009) (concluding that a generalized claim of jury bias is insufficient). In light of the record, there is no reason to doubt that the jury based its decision solely on the evidence presented at trial, and there is no reason to believe that the jury ignored the trial court's instructions. *See Gianakos*, 560 F.3d at 822-23 (concluding that no violation of the right to a fair trial by an impartial jury occurred).

376

Similarly, the movant's claims relating to trial counsel lack merit. *See Strickland*, 466 U.S. at 688-94. The record clearly demonstrates that trial counsel performed admirably. They were put in a difficult position and the ultimate resolution of the matter did not hinge on anything they did or failed to do. Trial counsel provided representation that exceeded the reasonable competence that is demanded of an ordinary professional attorney. With respect to what testimony the trial court could consider, trial counsel appropriately objected pursuant to Federal Rule of Evidence 606(b). And, in light of the information that trial counsel had and the arguments that trial counsel elected to assert post-trial, it cannot be said that trial counsel performed deficiently when they failed to assert alternative arguments based on Juror 523's willingness to magnify her boss's suggestion into a reason for seeking an excuse from work. Regarding prejudice, it is not possible to find that the movant suffered any as a result of trial counsel's actions. The record proves beyond a reasonable doubt that Juror 523's participation in the merits phase did not harm the movant because the outside influence was totally insignificant and, when considered in context, Juror 523's statements do not demonstrate an inability to remain impartial or consider just the evidence.

As to appellate counsel, no constitutional violation occurred. *See id*. It is clear that they heeded trial counsel's advice about asserting jury taint as an appellate issue. *See* Movant Hearing Ex. 52, civil docket no. 74-80 (e-mail). Indeed, they raised appropriate arguments relating to Juror 523, and, consequently, the Eighth Circuit Court of Appeals made an independent determination as to whether the intrusion affected the jury's deliberations and thereby its verdicts. Given the record, the court is unpersuaded by the movant's insistence that the Eighth Circuit Court of Appeals would have arrived at a different outcome had appellate counsel asserted that none of the findings pertaining to the remark that was made to Juror 523 could be relied upon because they were tainted by the consideration of impermissible testimony. Likewise, the court is unconvinced by the

377

movant's assertion that the Eighth Circuit Court of Appeals overlooked relevant issues that were related to Juror 523 when making an independent determination because appellate counsel failed to call attention to them. Nothing suggests that the Eighth Circuit Court of Appeals failed to fully and fairly consider whether the situation involving Juror 523 undermined the verdicts that the jury reached during the merits phase.

In sum, the court agrees with the government. Because the trial court, trial counsel, appellate counsel and the Eighth Circuit Court of Appeals did not violate any of the movant's constitutional rights, the movant cannot obtain relief on the basis of Juror 523's involvement in his case.

### R. Ground Eighteen — Constitutional Violations Occurred as a Result of the Security Measures

#### 1. Arguments of the parties

##### a. The movant

The movant protests the enhanced security measures that the trial court put in place during his trial. He maintains that they deprived him of his right to a jury trial, right to the presumption of innocence, right to due process, right to be free from cruel and unusual punishment and right to effective assistance of counsel. He argues that, if all of the facts had come out, it would have been apparent to the trial court that it was not necessary to bolt him to the floor or make him wear a stun belt.

With respect to the decisions that were made prior to trial, the movant asserts that he did not receive a full and fair hearing. The movant states that the trial court was unable to properly evaluate the true nature of his alleged attempted escapes and threats because the government presented unreliable and incomplete information. Specifically, he takes issue with the government's presentation of information that had been obtained from jailhouse informants. He maintains that, when arguing for greater restrictions, the government failed to disclose to him and the trial court facts that undermined the veracity

378

of those jailhouse informants.  And, as a result of the government's failure to reveal some impeachment information, the movant states that the trial court's decisions regarding the security measures that would be put in place during his trial were not based on a complete picture.[49]

In addition, the movant maintains that the trial court violated his right to due process when it failed to properly find a particularized reason that justified the enhanced security measures.  The movant emphasizes that the testimony that the government introduced to support its request for increased security measures came almost exclusively from Marshal Roger Arechiga, who had obtained information from compromised jailhouse informants. The movant claims that he did not have an opportunity to challenge through cross-examination the information that jailhouse informants provided to Marshal Roger Arechiga because none of them testified during the sealed hearing.  He argues that any of the particular concerns found by the trial court are unreliable because the trial court conducted a superficial and materially incomplete inquiry and considered hearsay.

The movant acknowledges that the trial court concluded that some of the information provided by the government had been subject to adversarial testing during the sentencing hearing that took place in the 1996 case and the anonymous jury hearing.  *See United States v. Honken*, 378 F. Supp. 2d 1010, 1025-26 (N.D. Iowa 2004).  But, he proclaims that he did not have a full opportunity to present his position because the government suppressed information.

Further, the movant contends that he did not receive a full and fair trial because the extremely strict security measures prejudiced the jury; he alleges that the security measures

_____

[49] The movant's assertion as to the government's failure to disclose information for purposes of deciding what security measures should be in place during his trial is related to and contingent upon his previous claim that the government violated his right to due process when it suppressed favorable evidence, that is, the government failed to disclose information that could impeach jailhouse informants and cooperating witnesses.

379

ordered by the trial court and effectuated by the United States Marshals Service had the potential to represent to the jury that the trial court and/or law enforcement personnel found him to be very dangerous. He primarily disapproves of jurors being able to see him shackled to the floor, but, aside from the fact that he was bolted to the floor, he complains that jurors were required to meet in a secret location each day, were transported under very tight security and were ushered into the courthouse under very tight security, which included snipers and other uniformed and armed officials. Because his dangerousness was a key issue during trial, the movant asserts that the merits phase verdicts and penalty phase verdicts were tainted by those extraneous influences.

Also, the movant states that the security measures interfered with his right to counsel, especially considering that he suffers from a severe heart impairment and the activation of the stun belt would have been fatal if it had been activated. Movant Ex. 69, civil docket no. 19-69; Movant Ex. 70, civil docket no. 19-70. He emphasizes that his medical records indicate that he has had a heart condition since he was fourteen. Movant Ex. 71, civil docket no. 19-71. The movant asserts that he could not freely consult with trial counsel and participate during trial because he feared being stunned.

With respect to his right to counsel under the Sixth Amendment, the movant asserts that, to the extent that they could have discovered helpful information pertaining to jailhouse informants, trial counsel failed to properly litigate the security measures that were put in place during trial. He also asserts that trial counsel should have done a better job of challenging whether he had a fair chance to test the testimony that Marshal Roger Arechiga provided and, because they never secured his medical records, trial counsel did not raise as an issue the likelihood that the security measures hindered his defense.

Lastly, the movant contends that appellate counsel should have raised additional issues related to the security measures on direct appeal. He acknowledges that appellate counsel raised his restraints as an issue on direct appeal and the Eighth Circuit Court of

380

Appeals rejected it. *See Honken*, 541 F.3d at 1163. He, however, argues that it is appropriate to raise the validity of the security measures again because new facts exist and appellate counsel did not raise these particular constitutional violations. Namely, he maintains that the trial court violated his constitutional rights when it based its decision upon information that: (1) was not subject to adversarial testing and (2) was compromised as a result of due process violations.

### b.    The government

In response, the government contends that, because the movant fully and fairly litigated the appropriateness of the security measures at the trial level and the appellate level, the movant's claims are procedurally barred. It states that none of the facts relied on by the movant warrant additional review under 28 U.S.C. § 2255. But, aside from contending that the movant is unable to reassert issues that have already been conclusively resolved against him, the government contends that the movant's allegations are without merit. And, it advances that the alleged facts do not establish that the representation provided by either trial counsel or appellate counsel amounted to incompetence under prevailing professional norms.

Regarding the movant's assertion that he did not receive a full and fair hearing prior to trial, the government maintains that: (1) the trial court's evaluation of the seriousness of the risk was not compromised by any failure to disclose evidence; (2) there is no requirement that information from jailhouse informants be subject to adversarial testing; and (3) nothing indicates the trial court violated his right to due process when it considered opinion testimony that was based on information obtained from jailhouse informants. The government states that the trial court conducted a proper evidentiary hearing, made significant factual findings, considered alternatives and set forth sufficient reasons for the security measures.

381

Further, the government disputes that the movant did not receive a full and fair trial because the security measures prejudiced the jury and interfered with his right to counsel. As to whether any juror observed tightened security measures, the government maintains that the movant only offers conjecture. It states that he fails to present either a new fact or a sworn statement that demonstrates the jury was exposed to prejudicial extraneous influences. It points out that: (1) even though there were many individuals who participated in his trial and observed it, the movant is still unable to establish that a member of the jury or anyone else viewed any security measures in the courthouse, *see* criminal docket no. 578 at 50, and (2) contrary to the movant's speculation, the record indicates prejudicial security measures were not in place when jurors were transported into and out of the courthouse and those that were in place were not visible to them, *see, e.g.*, Gov. Ex. J, civil docket no. 22-7.

Similarly, the government contends that the movant's suggestion that the security measures, coupled with his severe heart condition, violated his constitutional rights is far fetched. It states that, apart from the movant's conclusory assertion that the stun belt greatly exacerbated his anxiety and limited his ability to communicate with his attorneys, there is nothing in the record, such as a declaration by an attorney, the jury consultant, the mitigation specialist or anyone else, that indicates that having a heart condition and being subjected to a stun belt interfered with his right to counsel. Additionally, the government emphasizes that no new fact demonstrates that the movant's medical condition, which was referenced in the 1997 pre-sentence investigation report, *see* Gov. Ex. I, civil docket no. 22-6, ¶ 155; Gov. Hearing Ex. I, civil docket no. 74-8, ¶ 155, the 1997 evaluation from the Federal Bureau of Prisons, *see* Gov. Ex. G, civil docket no. 22-10 at 4; Movant Hearing Ex. 132, civil docket no. 74-161 at 36, and the July of 2004 evaluation by Dr. Michael M. Gelbort, *see* Gov. Ex. H, civil docket no. 22-11 at 1-2, had any significant relevance to the trial court's determination.

382

Moreover, the government asserts that the movant failed to adequately show that the assistance of either trial counsel or appellate counsel was unconstitutional. It states that the movant points to no newly discovered evidence in support of his contention that the security measures were only partially litigated at the trial level and the appellate level. It maintains that neither trial counsel nor appellate counsel can be faulted for litigating the security measures in the manner that they did.

With respect to trial counsel in particular, the government emphasizes that they thoroughly litigated the appropriateness of the security measures that were put in place during the movant's trial and the facts do not demonstrate that their investigation or representation was deficient. It states that trial counsel fully recognized potential issues that the security measures presented and they opposed them in a professional manner. Because the movant was charged with murdering federal witnesses, a mother and two little girls, plotted an escape and the additional murders of witnesses and law enforcement officers after being arrested in 1996 and plotted an escape and the murders of individuals connected with his capital charges, the government argues that the security measures were fully justified and, consequently, trial counsel's efforts did not fall below an objective standard of reasonableness. Further, the government asserts that the movant is unable to show that trial counsel's actions prejudiced his defense. It states that, even if the security measures were assessed in light of his heart condition, the use of the stun belt was still justified. And, the government stresses that trial counsel could not do more when it was clear that prejudicial extraneous influences did not affect the jury's determinations and nothing suggested to them that the movant was unable to assist in his own defense.

### 2. *Analysis*

In light of the extensive record, the parties' arguments and the court's previous determination that the government did not suppress evidence or utilize false evidence in violation of the movant's right to due process, there is absolutely no basis to conclude that

383

any security measure violated the movant's constitutional rights. All of the facts demonstrate that: (1) the movant received a full and fair hearing prior to trial; (2) the security measures neither had a significant effect on the jury nor impeded the movant's ability to communicate with his attorneys or participate in his own defense; and (3) trial counsel and appellate counsel devoted great effort to ensure that the movant received a fair trial.

Prior to trial, the parties vehemently disputed whether shackles and a stun belt were necessary to address special safety and escape concerns. *See* criminal docket nos. 268, 287. On July 15, 2004, the trial court held a closed hearing. *See* criminal docket nos. 320, 321, 733-2. And, on July 21, 2004, the trial court granted the government's motion to have the movant wear shackles and a stun belt at trial. *See generally United States v. Honken*, 378 F. Supp. 2d 1010 (N.D. Iowa 2004). Before doing so, the trial court narrowed what it would consider, *see id*. at 1023-26, and provided a particularized justification for heightened security measures, *id*. at 1026-40. In addition, the trial court made clear on August 12, 2004, that security measures could be explored during voir dire. Further, after trial, the parties litigated whether relief should be granted on the basis of the security measures. *See* criminal docket nos. 578, 634, 642, 664, 690. On July 29, 2005, the trial court denied the movant's motion for judgment of acquittal or, in the alternative, for a new trial. *See generally Honken*, 381 F. Supp. 2d 936. Before doing so, the trial court discussed at great length the impact of the security measures on the movant's trial. *Id*. at 977-81. Then, on direct appeal, the parties argued the appropriateness of the security measures. *See Honken*, 541 F.3d at 1162-64. Like the trial court, the Eighth Circuit Court of Appeals took account of compelling evidence that demonstrated the movant presented a threat to courtroom security and a serious escape risk and concluded that shackling the movant, bolting the shackles to the floor and forcing him to wear a stun belt during trial was justified under the circumstances. *Id*.

384

It is clear from the extensive record that the movant is attempting to reargue points that were previously raised and rejected. The movant, however, is unable to relitigate issues that were conclusively decided pursuant to post-trial review or appellate review. *See Lefkowitz*, 446 F.3d at 790-91 (concluding that the same issues that have been decided in a new trial motion cannot be reconsidered in a subsequent collateral attack); *Bear Stops*, 339 F.3d at 780 (deciding that it need not address an alleged spillover issue that had already been explicitly rejected on direct appeal); *Kraemer*, 810 F.2d at 177 (concluding that it is impermissible to "raise the same issues . . . that have been decided on direct appeal or in a new trial motion"). Because it is clear that the movant is just repeating arguments that he advanced in earlier proceedings, another review is not warranted.

Insofar as the movant asserts that he is entitled to relief on the basis of new evidence, a close examination of the record reveals that the movant's allegations are frivolous. There is absolutely no support for the movant's allegation that the fullness and fairness of the hearing was undermined by the government's failure to disclose evidence and the trial court's consideration of testimony that the government presented. Similarly, in light of the precautions that were undertaken to minimize the prejudicial effect of the security measures, the trial court's instructions and the lack of evidence that indicates any member of the jury was ever aware of the security measures inside or outside the courthouse, it cannot be said that impermissible factors came into play and had a negative impact on the jury. Furthermore, the movant's current assertion as to his heart condition is inconsistent with the position that he advanced prior to trial. Indeed, he previously expressed a preference for a stun belt in lieu of shackles bolted to the floor. Consequently, highlighting relatively insignificant medical information that had been disclosed to the trial court years earlier would not have altered the trial court's determinations, including that a mild warning shock might deter a situation in which a full shock or physical force might otherwise be required. And, aside from the record being devoid of any evidence that

385

shows the stun belt exacerbated his anxiety and limited his ability to assist in his own defense, the movant's willingness to wear a stun belt belies his contention that he faced a serious heart condition and it interfered with his right to counsel.

The record also clearly establishes that trial counsel's representation exceeded professional standards. *See Strickland*, 466 U.S. at 688. When litigating pre-trial and post-trial whether there was a need for additional security measures, trial counsel raised appropriate arguments. Indeed, they raised essentially the same arguments that the movant reasserts here. In addition, had trial counsel feared that any of the restraints interfered with the movant's ability to consult with them and participate during trial or caused him any prejudice, they undoubtedly would have alerted the trial court to their particular concern, especially considering that the trial court reminded them to do so. Likewise, appellate counsel adequately raised whether the security measures that the trial court adopted in the courtroom prejudiced the movant's defense. *Id*. And, aside from failing to demonstrate deficient performance, the movant fails to demonstrate that the actions of trial counsel and appellate counsel had a prejudicial effect on the outcome of either the merits phase or penalty phase. *Id*. at 694.

In sum, the record refutes the movant's contentions. The government, the trial court and trial counsel ensured that the movant received a fair trial. And, nothing trial counsel or appellate counsel did or failed to do deprived the movant of any constitutional right. Because the errors asserted by the movant are without merit, they do not justify relief.

386

### S. Ground Nineteen — Constitutional Violations Occurred as a Result of the Admission of Forensic Evidence

#### 1.    Arguments of the parties

##### a.    The movant

The movant argues that trial counsel failed to properly contest the significant forensic evidence that the government presented.  He states that the government's forensic evidence included: handwriting evidence, fingerprint evidence, questioned document evidence, DNA evidence, firearms and ballistics evidence, pathology evidence, dental evidence and anthropology evidence.  The movant argues that the use of such evidence violated his constitutional rights because forensic practitioners employ methodologies that do not have perfect accuracy.  He maintains that the government's experts offered inaccurate,  unreliable and pseudo-scientific testimony and, therefore, trial counsel should have attempted to exclude it by asking for a *Daubert*[50] hearing, to rebut it by calling defense experts who could present contrary scientific evidence and to call it into question by properly cross-examining witnesses.  The movant contends that, if trial counsel had taken steps to show sound scientific bases did not support the forensic evidence, the outcome of the merits phase and the outcome of the penalty phase would have been different.

Alternatively, the movant asserts that the 2009 report from the National Academy of Sciences constitutes new evidence that entitles him to a new trial.  *See* Nat'l Acad. of Sci., *Strengthening Forensic Science in the United States: A Path Forward* (2009).  Specifically, he argues that such report undermines the reliability of the forensic evidence that was presented by the government.  The movant claims that he is entitled to relief

---

[50] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

because the admission of flawed forensic evidence violated his right to due process under the Fifth Amendment and his right to be free from cruel and unusual punishment under the Eighth Amendment.

With respect to the merits phase verdicts that the jury returned, the movant maintains that his convictions must be supported by sufficient evidence and the evidence against him is significantly undermined if the government's use of exaggerated, inaccurate or misleading testimony is taken into account. He states that there is a reasonable likelihood that the false testimony presented by the government affected the judgment of the jury. *See Napue*, 360 U.S. at 269-70 (holding that due process requires the prosecutor to correct false testimony). Further, as to the penalty phase, the movant argues that the acute need for reliability in capital sentencing proceedings has not been satisfied because the jury considered materially inaccurate evidence before reaching its verdicts. *See Tuggle v. Netherland*, 516 U.S. 10, 14 (1995) (stating that a jury's consideration of materially inaccurate information in support of an aggravating factor cannot support a death sentence); *see also Gregg v. Georgia*, 428 U.S. 153, 190 (1976) (plurality opinion) (stating that "accurate sentencing information is an indispensable prerequisite to a reasoned determination of whether a defendant shall live or die by a jury of people who may never before have made a sentencing decision").

### b. The government

The government takes issue with the movant's blanket assertion that all of the scientific evidence is flawed. It contends that the movant fails to point to anything that shows the forensic evidence is inadmissible or questionable and, consequently, he is unable to demonstrate the performance of trial counsel was deficient and prejudiced his defense. The government asserts that all of the forensic evidence is admissible as it is based on sound scientific bases and methodologies and the movant cannot fault trial counsel's

388

conduct in 2004 based on findings that are included in the 2009 report from the National Academy of Sciences.

According to the government, the grounds for challenging the admissibility of the forensic evidence are not supported by any facts. The government argues that: (1) the movant's broad assertions fail to demonstrate the unreliability of the scientific basis for each type of forensic evidence that it introduced during trial; (2) the movant's sweeping generalizations do not establish the invalidity of the experts' forensic analyses that relate to this case; and (3) the movant's across-the-board assertions as to the impact of the 2009 report from the National Academy of Sciences, which is similar to other literature that is critical of forensic science, fail to show any forensic expert lacked the capacity to accurately analyze evidence and report findings.

Regarding trial counsel, the government disputes that they failed to provide professionally competent assistance. It argues that trial counsel cannot be faulted for failing to ask the trial court to exclude the forensic evidence because there is no valid basis for seeking its exclusion. Similarly, it argues that they cannot be blamed for failing to present contrary scientific evidence because none exists. The government maintains that, aside from the movant's own speculative opinion, no other opinion demonstrates that trial counsel could have presented contrary testimony that was reliable. The government points out that trial counsel had an expert review its pathological and anthropological evidence but such expert determined that it was not possible to disagree with the scientific results because the investigation and documentation demonstrated some of the most thorough work he had ever seen in his professional life. *See* Gov. Ex. K, civil docket no. 22-8; Gov. Hearing Ex. K, civil docket no. 74-9; Movant Hearing Ex. 5, civil docket no. 74-25. And, with respect to the other allegation against trial counsel, the government maintains that the movant alleges no facts that show additional cross-examination of witnesses who provided testimony related to the forensic evidence was warranted.

389

Moreover, the government disputes the movant's assertion that he suffered prejudice. It contends that simply declaring that there is a reasonable probability that the outcome of the merits phase and penalty phase would have been different if trial counsel had chosen another course does not make it so. The government emphasizes that its primary objective during trial was to establish who killed Gregory Nicholson, Lori Duncan, Kandi Duncan, Amber Duncan and Terry DeGeus and the forensic evidence did not identify the murderer. It claims that the forensic evidence merely corroborated the non-forensic evidence that proved beyond all doubt that the movant murdered Gregory Nicholson, Lori Duncan, Kandi Duncan, Amber Duncan and Terry DeGeus and deserved to be executed. It maintains that there is simply no basis to conclude that a challenge by trial counsel would have altered the outcome.

### 2. *Analysis*

The court agrees with the government. Because the movant relies only on indefinite allegations, the court is unable to find that a constitutional violation occurred. The movant's generalizations do not demonstrate that the jury improperly considered any forensic evidence that was presented by the government. Given the lack of any supporting facts, there is no basis to conclude that any expert failed to obtain reliable results that were within a reasonable degree of scientific certainty. And, contrary to the movant's preposterous allegation, there is no basis to conclude that the government presented false testimony and, thereby, violated his right to due process. Having scoured the record, the court concludes that the testimony of the government's forensic experts was properly admitted. *See Daubert*, 509 U.S. at 593-94 (specifying what factors should be considered when deciding if expert testimony is admissible); Fed. R. Evid. 702 (addressing testimony by expert witnesses).

The 2009 report from the National Academy of Sciences does not alter such conclusion. Despite the movant's assertions otherwise, such report fails to demonstrate

390

that a new trial is warranted because new information undermines the reliability of the forensic evidence that was admitted during trial. But, even if some of the forensic evidence is now subject to closer scrutiny, the record establishes that the movant received a fair trial. Because the movant essentially confessed to being involved in the murders of Gregory Nicholson, Lori Duncan, Kandi Duncan, Amber Duncan and Terry DeGeus and other compelling evidence showed his involvement in their murders, there was sufficient evidence to support all of the jury's verdicts.

Likewise, none of the movant's general allegations about trial counsel demonstrate deficient performance. *See Strickland*, 466 U.S. at 688. The movant does not point to any valid basis for excluding the forensic evidence pre-trial and does not show contrary scientific evidence could have and should have been presented by a rebuttal witness or additional cross-examination could have and should have been undertaken during trial. Rather than demonstrate trial counsel failed to function in the manner that is guaranteed by the Sixth Amendment, the record demonstrates that they obtained an independent review of some of the damaging scientific results and subjected the government's witnesses to appropriate cross-examination. All of the facts and circumstances surrounding trial counsel's conduct indicate that they proceeded in a prudent and professional manner, especially considering the role that the forensic evidence had in the movant's trial. Moreover, disturbing the jury's determination that the movant committed the charged crimes or the jury's determination that death is the appropriate punishment for the murders of Kandi Duncan and Amber Duncan is not warranted. Given the movant's inculpating statements and the other overwhelming and uncontroverted evidence of his culpability, it is clear that the movant suffered no prejudice as a result of the jury's consideration of the forensic evidence. *Id*. at 694.

In light of the foregoing, it is clear that the movant's claims do not establish a constitutional violation. Nothing offered by the movant undermines confidence in the

outcome.  And, the record belies any notion that trial counsel failed to ably fulfill their role as advocates.  Consequently, the movant is not entitled to relief on this ground.

### T.  Grounds Twenty and Twenty-One — Constitutional Violations Occurred as a Result of Cumulative Error and Manner of Execution

The movant asks the court to consider in the aggregate all of the constitutional errors, including those that relate to ineffective assistance of counsel, prosecutorial misconduct and the trial court's rulings.  On September 12, 2011, the court dismissed the movant's cumulative error ground for relief.  Before doing so, it observed that, in the Eighth Circuit Court of Appeals, an error must establish on its own that relief is warranted, and, therefore, a cumulative error theory cannot be relied upon in order to obtain relief under 28 U.S.C. § 2255.  *See Cole*, 623 F.3d at 1196 (rejecting the cumulative effect of errors as a basis for relief); *see also Brown*, 528 F.3d at 1034 (citing *Middleton*, 455 F.3d at 851); *United States v. Robinson*, 301 F.3d 923, 925 n.3 (8th Cir. 2002) (citing *Wainwright v. Lockhart*, 80 F.3d 1226, 1233 (8th Cir. 1996)); *Hall v. Luebbers*, 296 F.3d 685, 692 (8th Cir. 2002) (same).  In light of all of the facts and circumstances surrounding the movant's claims, the court now reaffirms its prior conclusion.  Neither the decisions made by the trial court nor the performance of trial counsel and appellate counsel demonstrate that the continuing criminal enterprise murder convictions and resulting sentences are unconstitutional.  But, even if a cumulative error review is undertaken, relief is not justified because the sum of no prejudice at all from any of the alleged errors is still no prejudice at all in the aggregate.

Similarly, although any prejudice arising from the government's actions must be considered collectively, there is absolutely no basis to conclude that the government breached any of its affirmative duties or utilized improper methods to obtain wrongful convictions.  *See Kyles*, 514 U.S. at 436-37 (emphasizing that prejudice as a result of the government's failure or choice not to disclose evidence is considered collectively, not item-

392

by-item); *United States v. New*, 491 F.3d 369, 377 (8th Cir. 2007) (stating that, when determining whether a due process violation occurred as a result of government misconduct, a court considers "the cumulative effect of the misconduct, the strength of the properly admitted evidence of the defendant's guilt, and any curative actions taken by the trial judge"). The record clearly demonstrates that the government never engaged in any misconduct whatsoever and relied on legitimate means to produce just results. Because the sum of no prejudice at all from the alleged misconduct by the government is still no prejudice at all in the aggregate, no relief is justified on due process grounds.

As to the other ground that the court previously dismissed, there is no basis to revisit it. The parties have not changed their position that the manner of execution claim is not ripe, and it is clear that the court lacks the ability to consider an attack on the manner of execution. *See Gravink v. United States*, 549 F.2d 1152, 1153-54 (8th Cir. 1977) (concluding that a manner of execution claim is not cognizable under 28 U.S.C. § 2255 and such claim is properly asserted under 28 U.S.C. § 2241 in the district where the movant is in custody). So, the court stands by its earlier determination to dismiss such ground.

## V.  SUMMARY OF RESOLUTION OF GROUNDS

Before addressing the movant's motion for judgment of acquittal or, in the alternative, for a new trial, the trial court commented on the quality of counsel's representation. It observed the following:

> As Justice Sutherland explained so eloquently some seventy years ago,
>
>> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As

393

> such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

[*Berger*, 295 U.S. at 88]. The prosecutors in this case . . . precisely fulfilled Justice Sutherland's conception of the role of a federal prosecutor. These two experienced and highly skilled prosecutors were exceptionally well-prepared and demonstrated unsurpassed skill in presenting the "merits" and "penalty" phases to the jury. Their zealousness in presenting the "merits" and "penalty" phases of the . . . trial was exceeded only by their professionalism and commitment to fairness.

[The movant] likewise enjoyed legal representation meeting or exceeding the standards for defense counsel, as conceived by Justice Stevens:

> [T]he adversarial process protected by the Sixth Amendment requires that the accused have "counsel acting in the role of an advocate." *Anders v. California*, 386 U.S. 738, 743, 87 S. Ct. 1396, 1399, 18 L. Ed. 2d 493 (1967). . . . As Judge Wyzanski has written: "While a criminal trial is not a game in which the participants are expected to enter the ring with a near match in skills, neither is it a sacrifice of unarmed prisoners to gladiators." *United States ex rel. Williams v. Twomey*, 510 F.2d 634, 640 (CA7), *cert. denied sub nom. Sielaff v. Williams*, 423 U.S. 876, 96 S. Ct. 148, 46 L. Ed. 2d 109 (1975).

*United States v. Cronic*, 466 U.S. 648, 656-57 (1984). By no means was [the movant] sacrificed unarmed to gladiators. Rather, his defense team consisted of two exceptionally experienced and highly regarded criminal defense lawyers

394

> from Iowa . . . . As required by statute, these two Iowa attorneys were joined by "learned" counsel in death penalty cases . . . . Like the prosecutors, the three defense lawyers were exceptionally well-prepared, incredibly zealous and skillful, and highly professional, ably fulfilling "the role of advocate[s]." *Id.* [The movant], thus, not only had "the guiding hand of counsel at every step in the proceedings against him," *Powell v. Alabama*, 287 U.S. 45, 69 (1932), but "the 'ample opportunity to meet the case of the prosecution' to which [he was] entitled." [*Strickland*, 466 U.S. at 685] (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 275 (1942)).

*Honken*, 381 F. Supp. 2d at 948-49. Based on its thorough review of the record, the court agrees with the trial court. Absolutely none of the movant's grounds for relief alter the court's view of the government's conduct or trial counsel's representation.

Further, appellate counsel performed admirably. It is apparent that they exercised sound appellate strategy when asserting claims of error on direct appeal and the result of appellate proceedings would not have been altered even if they had raised the issues that the movant now asserts should have been raised. Likewise, counsel in these proceedings ably fulfilled their role as advocates. It cannot be said that they failed to raise and fully litigate all issues that were arguably meritorious. The record clearly establishes that counsel's representation exceeded professional standards because they reinvestigated the case by zealously examining the facts underlying the convictions and sentences, as well as such items as trial counsel's performance, prosecutorial misconduct and the trial court's role, and reinvestigated the movant by competently seeking to develop a better biography of him than what was known at the time of trial.

As to the trial court's role, there is no doubt that every precaution was taken to safeguard the movant's constitutional rights. The trial court skillfully, faithfully and impartially followed the law when overseeing the movant's case. None of the errors that

395

the movant attributes to the trial court provide a basis to disturb the jury's determination that death is the appropriate punishment in this case.

In sum, the movant's convictions and sentences of death withstand scrutiny even in light of the heightened standards that are applied in capital cases. Aside from the limited relief that is available with respect to Ground Five, there is no basis to grant relief to the movant under 28 U.S.C. § 2255. Because they are multiplicitous of the CCE murder charges set forth in count 13 through count 17 of the superseding indictment, the conspiracy murder charges set forth in count 8 through count 12 of the superseding indictment shall be vacated. *See Jones*, 403 F.3d at 607. An amended judgment shall reflect such change. In the event that the movant paid any special assessment fees in association with count 8 through count 12, the clerk's office shall be directed to refund them. *Id*.

## VI. CERTIFICATE OF APPEALABILITY

In a 28 U.S.C. § 2255 proceeding before a district judge, the final order is subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held. *See* 28 U.S.C. § 2253(a). Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals. *See* 28 U.S.C. § 2253(c)(1)(B). A district court possesses the authority to issue certificates of appealability under 28 U.S.C. § 2253(c) and Federal Rule of Appellate Procedure 22(b). *See Tiedeman v. Benson*, 122 F.3d 518, 522 (8th Cir. 1997). Under 28 U.S.C. § 2253(c)(2), a certificate of appealability may issue only if a movant has made a substantial showing of the denial of a constitutional right. *See Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003); *Garrett v. United States*, 211 F.3d 1075, 1076-77 (8th Cir. 2000); *Carter v. Hopkins*, 151 F.3d 872, 873-74 (8th Cir. 1998); *Cox v. Norris*, 133 F.3d 565, 569 (8th Cir. 1997); *Tiedeman*, 122 F.3d at 523. To make such a showing, the issues must be debatable among reasonable jurists, a court could resolve the issues differently,

396

or the issues deserve further proceedings.  *Cox*, 133 F.3d at 569 (citing *Flieger v. Delo*, 16 F.3d 878, 882-83 (8th Cir. 1994)); *see also Miller-El*, 537 U.S. at 335-36 (reiterating standard).

Courts reject constitutional claims either on the merits or on procedural grounds. "'[W]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy [28 U.S.C.] § 2253(c) is straightforward: [t]he [movant] must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.'" *Miller-El*, 537 U.S. at 338 (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).  When a federal habeas petition is dismissed on procedural grounds without reaching the underlying constitutional claim, "the [movant must show], at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  *Slack*, 529 U.S. at 484.

Having thoroughly reviewed the record in this case, the court finds that the movant failed to make the requisite "substantial showing" with respect to the grounds that he raised in his motion for relief under 28 U.S.C. § 2255.  *See* 28 U.S.C. § 2253(c)(2); Fed. R. App. P. 22(b).  The court's resolution of the movant's grounds is not debatable or wrong.  Because he does not present a question of substance for appellate review, there is no reason to grant a certificate of appealability.  Accordingly, a certificate of appealability shall be denied.  If he desires further review of his motion for relief under 28 U.S.C. § 2255, the movant may request issuance of the certificate of appealability by a circuit judge of the Eighth Circuit Court of Appeals in accordance with *Tiedeman*, 122 F.3d at 520-22.

## VII. CONCLUSION

**IT IS THEREFORE ORDERED:**

1) The movant's motion for relief under 28 U.S.C. § 2255 and/or 28 U.S.C. § 2241 (civil docket no. 1) is granted in part and denied in part.

2) The conspiracy murder charges set forth in count 8 through count 12 of the superseding indictment are vacated.

3) An amended judgment reflecting such change will issue forthwith.

4) In the event that the movant paid any special assessment fees in association with count 8 through count 12 of the superseding indictment, the clerk's office is directed to refund them.

5) A certificate of appealability with respect to the movant's motion for relief under 28 U.S.C. § 2255 is denied.

**DATED** this 4th day of October, 2013.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA

398